Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal)

representative of the Estate)

of David Kleiman, and W&K   ) Case No:

Info Defense Research, LLC, ) 9:18-cv-80176-BB/BR

       Plaintiffs,          )

         v.                   )

CRAIG WRIGHT,                 )

       Defendant.           )

         - - - - - - - - - - -

CONFIDENTIAL

VIDEOTAPED DEPOSITION

JAMIE R. WILSON

Friday, November 8, 2019

Plaintiffs' Designations

Reported by:  Lori J. Goodin, RPR, CLR, CRR, RSA

California CSR #13959

Assignment No. 528739



Page 2

1

2

3          The deposition of JAMIE WILSON was

4   convened on Friday, November 8, 2019, commencing

5   at 8:36 a.m., at the offices of

6

7          BOIES SCHILLER FLEXNER LLP

8          1410 New York Avenue, Northwest

9          Washington, D.C.  20005

10

11  before Lori J. Goodin, Registered Professional

12  Reporter, Certified LiveNote Reporter, Certified

13  Realtime Reporter, Realtime Systems Administrator,

14  California CSR #13959, and Notary Public in and

15  for the District of Columbia.

16

17

18

19

20

21

22



Page 3

```
 1                  APPEARANCES
 2   For Plaintiffs:
         VELVEL FREEDMAN, Esquire
 3       ROCHE FREEDMAN
         200 South Biscayne Boulevard
 4       Suite 5500
         Miami, Florida  33131
 5       305-357-3861
         vel@rochefreedman.com
 6
     And Co-counsel:
 7       KYLE ROCHE, Esquire (via telephone)
         ROCHE FREEDMAN
 8       185 Wythe Avenue, F2
         Brooklyn, New York  11249
 9       929-457-0050
         kyle@rochefreedman.com
10
     And Co-counsel:
11       ANDREW S. BRENNER, Esquire
         BOIES SCHILLER FLEXNER LLP
12       11401 New York Avenue, Northwest
         Washington, D.C.  20005
13       202-237-2727
         abrenner@bsfllp.com
14
15   For Defendant:
         ZALMAN KASS, Esquire
16       BRYAN L. PASCHAL, Esquire
         JULIO PEREZ, Esquire (via video link)
17       RIVERO MESTRE
         565 Fifth Avenue
18       7th Floor
         New York, New York  10017
19       zkass@riveromestre.com
         bpaschal@riveromestre.com
20       jperez@riveromestre.com
21   ALSO PRESENT:
22       David Campbell, videographer
```



```
                                                Page 4
 1                      CONTENTS
     EXAMINATION BY                               PAGE
 2   Mr. Freedman                              8, 168
     Mr. Paschal                                    84
 3
 4                      EXHIBITS
     WILSON
 5   EXHIBIT NO. DESCRIPTION                      PAGE
 6   Exhibit 1   Mr. Wilson's resignation letters  18
 7               10/23/2013
 8               Defense Australia 108905-108908
 9   Exhibit 2   E-mail from Wilson to Wright    24
10               9/20/2013, Defense 45496
11   Exhibit 3   Exhibit to Plaintiffs' complaint  32
12               Document 83-5
13   Exhibit 4   E-mail, Wright to Wilson        41
14               6/26/2013, Defense 28015
15   Exhibit 5   E-mail, Wright, cc Wilson       42
16               7/2/2013, Defense 266797
17   Exhibit 6   E-mail, Wright to Hardy,        44
18               cc Wilson, 10/9/2013
19               Defense 25094
20   Exhibit 7   E-mail, Wright, cc: Wilson      52
21               10/2/2013
22               Defense Australia 553926
```



Page 5

1                    EXHIBITS CONTINUED

2    WILSON

3    EXHIBIT NO. DESCRIPTION                    PAGE

4    Exhibit 8    E-mail, Wright, cc: Wilson       54

5                 10/12/2013, Defense 45457

6    Exhibit 9    E-mail, Wright to Italia         57

7                 cc: Wilson, 10/6/2013

8                 Defense 46093

9    Exhibit 10   E-mail, Wright to Manu, Wilson   59

10                9/23/2013

11                Defense Australia 113043

12   Exhibit 11   E-mail, Wright to Dempster,      62

13                cc: Wilson, 7/18/2013

14                Defense 30127

15   Exhibit 12   E-mail, Wright to Italia         64

16                cc: Wilson, 10/6/2013

17                Defense 46098

18   Exhibit 13   E-mail, Lipke to Wright, Wilson  65

19                9/27/2013, Defense 467687

20   Exhibit 14   Affidavit submitted by Wright to 68

21                Supreme Court of New South Wales

22                Document 83-4



Page 6

1                    EXHIBITS CONTINUED

2    WILSON

3    EXHIBIT NO. DESCRIPTION                      PAGE

4    Exhibit 15  E-mail, Wilson to Wright and      74

5                Watts, 8/11/2013, Defense 43726

6    Exhibit 16  E-mail, Wright to Wilson, Watts   75

7                7/2/2013, Defense 31588

8    Exhibit 17  E-mail, Wright to Alastair        80

9                cc: Wilson, 8/8/2013

10               Defense 267325

11   Exhibit 18  MYOB Program                      82

12               Defense 262775

13   Exhibit 19  Jamie Wilson's business card      92

14   Exhibit 20  Employee Remuneration Schedule   100

15               10/29/2013

16   Exhibit 21  Jamie Wilson's LinkedIn profile  111

17   Exhibit 22  U.S. Patent 14354359 by Wilson   156

18

19           (Original Exhibits attached to the

20   original transcript.)

21

22



Page 7

1                    PROCEEDINGS

2                   *    *    *

3

4           THE VIDEOGRAPHER:  We are now on the

5    record.  This begins Media Unit Number 1 in

6    the deposition of Jamie Wilson.

7           This is in the matter of Ira Kleiman

8    as the personal representative of the estate

9    of David Kleiman and W&K Info Defense

10   Research LLC, versus Craig Wright.

11          This is in the United States

12   District Court, Southern District of Florida.

13   Case Number 918 CV 80176 B/BR.

14          Today is November 8, 2019, and the

15   time is 8:36 a.m.

16          This deposition is being taken at

17   the Washington, D.C. offices of Boies

18   Schiller.

19          The videographer today is David

20   Campbell of Magna Legal Services and the

21   court reporter is Lori Goodin of Magna Legal

22   Services.



Page 8

```
 1              Counsel will you please identify

 2       yourselves for the record and then the

 3       witness will be sworn in and we can proceed.

 4              MR. FREEDMAN:  Vel Freedman of Roche

 5       Freedman for the plaintiff.

 6              MR. BRENNER:  Andrew Brenner from

 7       Boies Schiller for the plaintiff.

 8              MR. PASCHAL:  Bryan Paschal for

 9       Dr. Craig Wright.

10              MR. KASS:  Zalman Kass for Dr. Craig

11       Wright.  And from our team we also have Julio

12       Perez who is on video link.

13                   *   *   *

14                   JAMIE R. WILSON,

15       a witness called for examination, having been

16       first duly sworn, testified as follows:

17                   *   *   *

18                   EXAMINATION

19       BY MR. FREEDMAN:

20          Q.    Good morning, Mr. Wilson.

21          A.    Good morning.

22          Q.    My name is Vel Freedman, we have met
```



Page 9

1    and spoken a few times before.

2              This is your deposition.  You have

3    just told us earlier that you have never taken a

4    deposition before.  Is that correct?

5         A.    That's correct.

6         Q.    I will go through a little bit of

7    the ground rules here for you and then we can get

8    started.  But before that, lets just take care of

9    a little housekeeping.

10             Can you please state your full name

11   and date of birth for the record?

12        A.    Jamie Robert Wilson, 15th of June,

13   1980.

14        Q.    And your home address?

15        A.    361 Westlake Drive, Queensland,

16   Australia.

17        Q.    And your work address?

18        A.    11420 George Street, Queensland,

19   Brisbane.

20        Q.    All in Australia?

21        A.    All in Australia.

22        Q.    So you understand that you are under



1    oath today and you are sworn to tell the truth?

2        A.    Yes.

3        Q.    And your examination is now being

4    recorded and may be shown to a jury at some

5    point.

6            Along those lines of the ground

7    rules, the court reporter is taking down

8    everything you say.  And so it might be

9    counterintuitive, but you need to try to audibly

10   respond.  So yes or no.  If you shake your head

11   yes or if you shake your head no, she won't get

12   it.

13       A.    Okay.

14       Q.    I will try to remind you to speak

15   audibly, but try to do your best also.

16       A.    I understand.

17       Q.    Are you taking any medication today

18   that might affect your ability to tell the truth?

19       A.    No, I'm not.

20       Q.    Or to recollect anything?

21       A.    No.

22       Q.    Is there anything that would impair



Page 11

1   your ability to tell the truth at this deposition

2   today?

3       A.   No.

4       Q.   Okay.  If I ask you a question and

5   you don't understand it, please ask me to explain

6   or repeat it.

7       A.   Will do.

8       Q.   If you don't, I will assume that you

9   understood the question, and I will rely on your

10  answer, okay?

11      A.   Okay.

12          MR. PASCHAL:  Just one second, but

13     mine is working, but --

14          MR. FREEDMAN:  Go off the record.

15          THE VIDEOGRAPHER:  Off the record at

16     8:38.

17          (Whereupon, a discussion off the

18  record took place.)

19          THE VIDEOGRAPHER:  We are back on

20     the record at 8:39.

21  BY MR. FREEDMAN:

22      Q.   And finally, if you need a bathroom



Page 12

1    break or you just need a break, stretch your

2    legs, take a second.  Let me know.  This is not a

3    marathon.

4          A.    Will do, okay.

5          Q.    Okay.  So, Mr. Wilson, you were born

6    in Australia?

7          A.    Yes.

8          Q.    Did you go to college or university?

9          A.    Yes.

10         Q.    Where did you go?

11         A.    Queensland University of Technology.

12         Q.    Did you attain any degrees there?

13         A.    Bachelor of Commerce.

14         Q.    And what year did you get the

15   Bachelor of Commerce?

16         A.    2006.

17         Q.    Did you ever become a CPA or go to

18   graduate school?

19         A.    No.

20         Q.    Okay.  Have you been an accountant?

21         A.    Yes, but not a tax accountant.

22         Q.    And did you take any training to



Page 13

1    become an accountant?

2         A.    Yes.

3         Q.    Where?

4         A.    At JW Schubert & Co, located in

5    Springwood in Logan, in Queensland.

6         Q.    When did that program start?

7         A.    It would have -- 2004 to 2008.

8         Q.    Okay.  Was that your undergraduate

9    in commerce also?

10        A.    It was.

11        Q.    And then after, and you graduated in

12   2008?

13        A.    Yes.

14        Q.    And then did you begin working as an

15   accountant?

16        A.    Yes, I did.

17        Q.    In 2008?

18        A.    I started from 2004.

19        Q.    2004 you were working as an

20   accountant?

21        A.    That's right.

22        Q.    And how long did you continue



Page 14

1  working as an accountant?

2          A.    Up to 2010.

3          Q.    Okay.  Did you ever work as an

4  accountant after 2010?

5          A.    I, well only on the projects that I

6  was looking after full-time.

7          Q.    Got it.  So you weren't --

8          A.    So, not outside, where my interests

9  weren't involved.

10          Q.    Got it.  When did you first learn

11  about Bitcoin?

12          A.    Bitcoin, 2011.

13          Q.    Okay.  And how did you learn about

14  Bitcoin?

15          A.    It was part of my travels around the

16  world where I was cross-examining a whole lot of

17  cybersecurity experts looking for a solution that

18  I have built today in the market.

19          Q.    Okay.  So, can you tell me when you

20  first met -- well, do you know Craig Wright?

21          A.    Yes, I do.

22          Q.    Can you tell me when you first met



Page 15

1   Craig Wright?

2          A.    Craig Wright I would have met in

3   2012.

4          Q.    And how did you come to meet him?

5          A.    Through working and cross examining

6   a whole lot of cybersecurity experts to build a

7   stronger solution.

8          Q.    And tell me about the solution that

9   you have now built.

10              Is that your digital file?

11         A.    That's correct.  So, our technology

12  is called Cryptoloc which is a cryptographic

13  solution and we've got global patents which have

14  an escrow in a point of difference on a global

15  stage.

16         Q.    And you first spoke with Dr. Wright

17  to help you build this technology?

18         A.    That's correct, yes.

19         Q.    Along with a bunch of other --

20         A.    So, I already had started in 2012.

21         Q.    Okay.

22         A.    So, it would have been like '12,



1  early '13 that I actually physically met Craig.

2       Q.    Okay.

3       A.    And from there we did bring Craig in

4  as a, the expert cybersecurity to be able to

5  oversee the development of the product.

6       Q.    Got it.  And did, similarly did

7  Craig involve you in his companies at that point?

8       A.    No, no.  It was after that period of

9  time.

10      Q.    Approximately when did Craig involve

11  you in his companies?

12      A.    It would be 2014.  Around about June

13  or July of 2014.

14      Q.    Okay.  Do you recall what capacity

15  he, Dr. Wright involved you in his companies?

16      A.    Because we were working on the

17  Cryptoloc Solution for Your Digital File, he

18  liked the way I was building the culture of the

19  team.  And, he said to me Jamie, I want to start

20  a new project would you come on as a director.

21           And also with my background you

22  would become the CFO.



 1        Q.    Got it.  So, he, Dr. Wright listed

 2   you as a director of various companies.

 3        A.    That's correct.

 4        Q.    Were you a director of Coin

 5   Exchange?

 6        A.    Yes.

 7        Q.    Were you a director of Integers?

 8        A.    Yes.

 9             MR. PASCHAL:  Objection, form.

10   BY MR. FREEDMAN:

11        Q.    Were you a director of -- do you

12   remember all of the companies you were director

13   of?

14        A.    No, I don't.

15        Q.    Were you a director of

16   Interconnected Research Pty?

17        A.    I would have to have a look at the

18   ASX Register.

19        Q.    Were you a director of Hotwire

20   Preemptive Intelligence Pty?

21        A.    Yes.

22        Q.    Were you also a shareholder in some



Page 18

1    of these companies?

2           A.     Craig did gift me shares.

3           Q.     Okay.

4           A.     But when I resigned, it was removed.

5           Q.     Okay.  Were you, do you recall if

6    you became a shareholder of Coin Exchange Pty?

7           A.     I'm positive I did, yes.

8           Q.     Okay.  And were you also the CFO for

9    Coin Exchange?

10          A.     I was.  So, for all companies I

11   would have been the CFO.

12          Q.     Okay.  And bear with me here.

13   Since, we had some printing trouble earlier so

14   I'm trying to pull these up electronically.

15                 Let me e-mail these to you guys.

16                 I'm going to hand you what has been

17   produced in this litigation as Defense Australia

18   108905 through 108908.

19                 And we will mark it as Plaintiffs

20   Exhibit 1.

21                        (Wilson Exhibit Number 1

22                         marked for identification.)



 1    BY MR. FREEDMAN:

 2         Q.    If you could start at the top and go

 3    forward.  You guys should have it in your e-mail.

 4         A.    The resignation letters.

 5         Q.    Correct.  So, if you take a look at

 6    the date at the top for me, Mr. Wilson.

 7         A.    23rd of October, 2013.

 8         Q.    So, does that help you potentially

 9    remember when you started working and when you

10    ended working for Dr. Wright?

11         A.    It would have been, so, Craig would

12    have come in, I would have to have a look at my

13    records.  It would have been the end of 2011 and

14    2012.

15         Q.    Okay.  And then you would have

16    resigned in October of 2013?

17         A.    Yes, I did, yes.  After I returned

18    from New York.

19         Q.    Okay.  And if you take a look for me

20    at the page that is marked at the bottom 108907,

21    it is the third down.

22         A.    Yep.



Page 20

1          Q.    Do you see where it says--

2          A.    907, Interconnected Research Pty.

3          Q.    Does that help you remember if you

4    were the director of Interconnected Research Pty?

5          A.    Yes, this one here was a company

6    that I was set up when I was in New York which

7    would have been September or October, which Craig

8    signed me up as a director without my consent.

9          Q.    Okay.  Did you -- thank you,

10   Mr. Wilson.

11               Did you ever help -- well, you know

12   what, before I take these back from you, do you

13   recall writing these resignation letters?

14         A.    Absolutely.  And I physically handed

15   it to Craig as well.

16         Q.    And these are the resignation

17   letters that you handed to Craig?

18         A.    That's right.  And e-mailed.

19         Q.    Okay.  Did you ever help Craig set

20   up a trust?

21         A.    No.  One of our lawyers, who was

22   also on the board of Your Digital File, called



Page 21

1    Diane Pinder, was the one who looked after the

2    trust.

3         Q.    Okay.  And then as we have just seen

4    you have resigned in October of 2013.

5         A.    Yes.

6         Q.    Can you tell me why you resigned?

7         A.    The reason for it is that I wasn't

8    feeling comfortable with the position of what was

9    happening and not understanding everything behind

10   the documentation and the accounts.  That was the

11   purpose of it.

12              And also at the same time my ex-wife

13   had medical issues as well.

14        Q.    Okay.  Can you explain to me a

15   little bit more what you meant, what you mean by

16   you weren't comfortable with what was going on in

17   the documentation.

18        A.    Well, in, the lead up to my

19   resignation, and it would have been over a

20   12-month period, Craig did set up these

21   companies.  And I was working with Craig, prior

22   being on the board of White Ear and as an advisor



Page 22

1    to us in regards to development.

2              But, my trouble was, and it was

3    exciting moving in with him to start working on

4    the new projects.

5              But, where I didn't feel comfortable

6    is Craig's change of attitude from a developer

7    that would be in hoodies and, you know, very low

8    key and working with, to one that, that is it,

9    I've got to be the man, I've got to be the CEO,

10   new flash suits, ties, and it was just a massive

11   change from where he was conservative to right

12   out there.

13             Also I didn't agree on the

14   employment of the staff and the buildup of these

15   companies without understanding, the full

16   understanding, of where the funding was coming

17   from.

18             So, I know there was a lot of

19   Bitcoin there.  However, when I started to have a

20   look at the R&D and the claiming of the R&D,

21   research and development, for the Australia

22   federal government I didn't feel comfortable when



Page 23

1    I noticed that these amounts were from a U.S.,

2    and at that time and I am still not aware if the

3    money actually was funded by the U.S. government.

4              And I thought, well hang on, the

5    Supreme Court of Australia has turned around and

6    brought this IP into Australia, and now Craig is

7    turning around and claiming the R&D on this

8    money, that was paid by the U.S. government.

9              And I thought, this to me looks

10   fraud.  And, I want nothing to do with it.

11        Q.    So, you resigned?

12        A.    I resigned.  And since then I have

13   had many times with the Australia taxation

14   office, coming and investigate where I had to

15   give evidence and the breakdown of it, purely

16   because of, they put me under a microscope, the

17   ATO.

18        Q.    And has the ATO found that you did

19   anything wrong?

20        A.    No, no.

21        Q.    Okay.  I am, and ATO is the

22   Australia Tax Office?



Page 24

1          A.      Taxation Office.

2          Q.      Okay.

3                  (Wilson Exhibit Number 2

4                  marked for identification.)

5                  MR. FREEDMAN:  I have just sent

6      e-mails to you, counsel.

7  BY MR. FREEDMAN:

8          Q.      But Mr. Wilson, I'm going to hand

9  you what has been produced in this litigation as

10 Defense 45496.  And if you can take a look at it

11 for a second, specifically under the line is, it

12 appears to be an e-mail from you to Craig.  Do

13 you see that?

14         A.      Yep.

15         Q.      Do you remember sending this e-mail?

16 You can take a second to familiarize yourself

17 with the document.

18                 MR. PASCHAL:  You going to be

19     e-mailing us documents or do you have

20     physicals.

21                 MR. FREEDMAN:  We are waiting for

22     them to print.  But I will e-mail them to you



Page 25

1      in the meantime.

2                MR. PASCHAL:  If you are e-mailing,

3        it takes a second to get to us, so let us

4        look at it before you show it to him.

5                THE WITNESS:  That's correct.

6   BY MR. FREEDMAN:

7        Q.    So, you recognize this document?

8        A.    Yes.  And I did send it.

9        Q.    Okay.  And, can you tell me a little

10   bit about what happened in this e-mail?

11       A.    Okay.  So, the reason for it was

12   that Craig wanted to increase his holdings within

13   YDF, with --

14       Q.    This is your company?

15       A.    That's correct.  It was called the

16   Digital Filing Company Pty Ltd which no longer

17   holds, in operation.

18                The reason, I wasn't aware that the

19   transfer in these amounts had been done and, nor

20   the capitalization of these accounts with the

21   listed on ASIC, hence why I did do the e-mail

22   just so that it was down on paper.



1        Q.      Let me break this down for you.  The

2    capitalization of the accounts.  Can you explain

3    that a little bit to the jury?

4        A.      This is what the issue was.  I

5    didn't see the physical cash in the bank; it was

6    done by Bitcoin.

7        Q.      There was a capitalization of, I'm

8    looking at your e-mail, looking at a

9    capitalization of eight and a half million

10   dollars?

11       A.      Correct.

12       Q.      $40 million?

13       A.      That's right.

14       Q.      $30 million.

15       A.      That's right.

16       Q.      Suffice to say 10s and 10s of

17   millions of Bitcoin?

18       A.      Oh, absolutely.  And "Craig I see

19   you have issued shares to me personally and I'm

20   not aware this was done already.  This needs to

21   be fully accounted for as we are dealing with a

22   publically listed company."  And that was Rubik



Page 27

1   over in Australia.

2             They also were investigated by the

3   Australia Taxation Office in regards to the

4   matter with Craig.

5        Q.    Got it.  And did you ever sit down

6   with Craig and discuss this e-mail with him?

7        A.    I can't recall.

8        Q.    Okay.

9        A.    But the response is there from

10  Craig, too, it doesn't allow this right now, but

11  we have the following, oh, capitalization, that,

12  why didn't Xero do it?  Because it didn't have

13  Bitcoin at that stage of the currency.

14       Q.    Got it.  What happened to all of

15  your shares in these businesses after you

16  resigned, Jamie?

17       A.    Oh, they were just removed.

18       Q.    Okay.  During the time that you

19  worked for, or with Dr. Wright, so that would be

20  from about 2011 to 2000 -- October of 2013.

21       A.    '13.

22       Q.    Did you ever --



```
 1              MR. PASCHAL:  Objection, form.

 2   BY MR. FREEDMAN:

 3        Q.    Did you ever talk or e-mail with

 4   Dave Kleiman?

 5        A.    No.  Not me personally, no.

 6        Q.    Had you heard of Dave Kleiman?

 7        A.    Yes, I had.

 8        Q.    Okay.  How did you hear of Dave

 9   Kleiman?

10        A.    Through Craig, saying it was his

11   best mate and that they had been working on

12   projects together.

13        Q.    Okay.  Did he describe him as his

14   partner?

15        A.    He, no, a good mate.

16        Q.    I don't mean a romantic partner, I

17   mean like a business partner?

18        A.    No, no, no.  A business partner.

19        Q.    Did he describe him as a business

20   partner?

21        A.    Yes.

22        Q.    And somebody he was working with on
```



Page 29

1    projects with?

2         A.    That's right.

3         Q.    Did you understand that to be

4    intellectual property projects?

5         A.    No.

6         Q.    What type of projects did you

7    understand it to be?

8         A.    I only understood later on, when I

9    was going through the paperwork to do the R&D,

10   that all of the material of the break up of the

11   money that Dave Kleiman was actually on all of

12   these applications, all of the grants for the

13   federal, the U.S. government.

14             So, that is how I started to become

15   aware of it.

16             Craig is not forthcoming with

17   information.  It is a very slow feed.  But, the

18   longer I was there, the more I started to realize

19   that this is not correct way of doing business.

20        Q.    I see.  So you don't have much

21   details about what they worked on.

22             You just know that they worked on it



Page 30

1   together.  Is that fair?

2          A.    That's correct.

3                MR. PASCHAL:  Objection, form.

4   BY MR. FREEDMAN:

5          Q.    Okay.  Do you have a lot of details

6   about what they worked on together?

7          A.    No.

8          Q.    There may be times when opposing

9   counsel lodges an objection to the way I'm asking

10  you a question.

11               So you may hear me ask a question

12  more than once.

13               If you could just answer it again.

14         A.    Okay.

15         Q.    Did Craig ever talk to you about

16  Dave Kleiman's intent about anything?

17         A.    No.

18         Q.    Okay.  Bear with me one second.

19               So, Mr. Wilson, I think you told me

20  before that you were Director of Coin Exchange;

21  is that correct?

22         A.    Correct.



1            MR. PASCHAL: Objection, form.

2    BY MR. FREEDMAN:

3        Q.    You also were a shareholder of Coin

4    Exchange or were you, were you or were you not a

5    shareholder of Coin Exchange?

6            MR. PASCHAL: Objection, form.

7            THE WITNESS: I was given shares.

8    BY MR. FREEDMAN:

9        Q.    Sorry, go ahead.

10       A.    I was given shares by, gifted shares

11   by Craig.

12       Q.    Did you serve as its CFO?

13       A.    Yes.

14           MR. PASCHAL: Objection, form.

15   BY MR. FREEDMAN:

16       Q.    Were you, did you handle the

17   accounts for Coin Exchange?

18       A.    No.  And what is strange is I didn't

19   actually handle the accounts for any of it.

20   There was a bookkeeper that was involved.

21           So, although I had the title of the

22   CFO, Chief Financial Officer, my capacity as an



Page 32

1    accountant, I was not given full control, nor did

2    I even have access to zero.

3         Q.   Okay.  So, during the time you were

4    director and shareholder and the CFO of Coin

5    Exchange, did Craig ever tell you that Dave

6    Kleiman was also a shareholder of Coin Exchange?

7         A.   No.

8                   (Wilson Exhibit Number 3

9                   marked for identification.)

10   BY MR. FREEDMAN:

11        Q.   Mr. Wilson, I'm handing you what we

12   are going to mark as Plaintiffs Exhibit 3?  And

13   it is a Document 83-5.  It is an exhibit to the

14   plaintiff's complaint.

15             Can you take a look at this document

16   and let me know if you have ever seen it before?

17        A.   No, I haven't.

18        Q.   Okay.  Do you see -- if you go to

19   Page 1 of 9 for me.  Or 3 of 11 at the top.

20        A.   3 of 11.

21        Q.   Do you see that?

22        A.   Yes.



1      Q.    It says The agreement is between

2   Dave Kleiman of W&K Info Defense Florida.   Are

3   you familiar with this Florida company W&K Info

4   Defense LLC?

5      A.    I became aware of it when I was done

6   the R&D and realized that the W&K Info Defense

7   LLC was a part of it.   That is why I started

8   questioning a lot.

9      Q.    Were you ever a director of W&K Info

10  Defense LLC?

11     A.    No.

12     Q.    Were you ever a shareholder of W&K

13  Info Defense LLC?

14     A.    No.

15     Q.    Were you ever an officer of W&K LLC?

16     A.    No. I wasn't even aware of it.

17     Q.    Did you ever have anything to do

18  with -- strike that.

19            If you turn to Page 5 of 11 at the

20  top.  You will see Paragraph 4B.

21     A.    Yes.

22     Q.    And it says, "Except the vendor's"



1  and the vendor is on Page 3, the vendor is Dave

2  Kleiman of W&K Defense Info Research, "So accept

3  Dave Kleiman's 323,000 remaining mined Bitcoin as

4  a 49.5 percent stake in a new venture to be

5  formed in Australia to be called Coin Exchange

6  Pty Ltd."

7            Do you see that?

8        A.    I do.  But if you have a look at the

9  ASX registers it will turn around and advise you

10  of the history of the directors of the company.

11        Q.    So you were never aware of this

12  agreement or --

13        A.    No, this is the first time I have

14  seen it.

15            MR. PASCHAL:  Objection to form.

16  BY MR. FREEDMAN:

17        Q.    Were you ever aware of this

18  agreement?

19        A.    No.

20            MR. PASCHAL:  Objection to form.

21  BY MR. FREEDMAN:

22        Q.    Were you ever aware that Dave had



Page 35

```
 1  reportedly bought an interest in Coin Exchange?

 2               MR. PASCHAL:  Objection to form.

 3               THE WITNESS:  No.  This is

 4      April 2013.

 5  BY MR. FREEDMAN:

 6        Q.    So, you were the CFO, in April of

 7  2013 -- strike that.

 8               What positions did you hold in Coin

 9  Exchange in April of 2013?

10        A.    I'm not too sure when I, when it was

11  kicked off and when I was added as a director.  I

12  would have to go through the ASX Register.

13        Q.    Okay.  Thank you.

14        A.    That previous -- oh, not to worry.

15        Q.    Okay.  Mr. Wilson, were you aware

16  that Dave Kleiman died in April of 2013?

17        A.    Yes.

18        Q.    How did you know that Dave died?

19        A.    Craig said to me a good mate of his

20  just passed away, and I believe he came over to

21  Florida.

22        Q.    Okay.
```



Page 36

1          A.      Or he did fly to the States.

2          Q.      Did you notice a change in Craig

3     from before and after Dave died?

4               MR. PASCHAL:  Objection, form.

5               THE WITNESS:  Yes.

6     BY MR. FREEDMAN:

7          Q.      Okay.  Can you expand on what that

8     change was?

9          A.      The change was from Craig, as I

10    stated before, being a developer, security,

11    hoodie, you know, very much --

12               MR. FREEDMAN:  Sorry.

13               THE WITNESS:  You know, wearing

14        hoodies and things like that, when I would

15        have meetings down in Sydney, he would turn

16        up and we'd go to a little cafe shop and

17        things like that where the train station was.

18               Once Dave had passed away and things

19        started to get kicked off with these new

20        companies, there was a matter of all of a

21        sudden he had to dress in flash suits, you

22        know, wear the best watches, shoes,



Page 37

1      fascination with socks.

2              Even down to vehicles.  He moved

3      from his normal Subaru which was beaten up

4      and went and got a brand new car.  It was

5      just a massive change in lifestyle.  It

6      wasn't the Craig I originally met.

7   BY MR. FREEDMAN:

8          Q.   So, I want to drill down on that a

9   little bit more.

10              Before Dave died you said Craig

11  dressed in hoodies?

12         A.   Yes.

13         Q.   Can you expand a little bit more?

14         A.   Yes, tee shirts, normal sort of

15  developer sort of clothes.  You could tell -- I

16  mean Craig is a very bright, very smart man.

17         Q.   Right.

18         A.   As I have said before, one of the

19  greater futurists I have actually come across.

20              But it was just disappointing to see

21  the way the business was handled moving forward.

22  And his arrogance, believing that he has got to



Page 38

1    change himself, I think just caused him a lot of

2    problems.

3         Q.    Beyond the physical change of going

4    from hoodies to suits and expensive watches, did

5    you see a change in his attitude at all?

6              MR. PASCHAL:  Objection, form.

7              THE WITNESS:  Yes.

8    BY MR. FREEDMAN:

9         Q.    Did he suddenly have confidence?

10   What was the change?

11        A.    Oh, the confidence went through the

12   roof.  It was a matter of I'm the man, I'm going

13   to do this, this is the way I'm going to go about

14   it.

15             Whereas a lot more humble prior to

16   Dave's passing.

17        Q.    And, how quickly after Dave's

18   passing did this happen?

19        A.    I would have said June/July.

20        Q.    Did you understand, did you ever

21   come to have an understanding of why there was

22   this sudden shift in his personality?



1          Did it have to do with money or any,

2     I mean, tell me, did you see any -- strike that.

3          Did you ever come to have an

4     understanding of why there was a sudden, a

5     massive shift in Craig's outward appearance?

6               MR. PASCHAL:  Objection, form.

7               THE WITNESS:  No.

8     BY MR. FREEDMAN:

9          Q.    Okay.

10         A.    It was only when time has gone by.

11         Q.    Beyond flashy watches, suits, new

12    cars, did you see any other sudden displays of

13    wealth?

14              MR. PASCHAL:  Objection, form.

15              THE WITNESS:  Yes.

16    BY MR. FREEDMAN:

17         Q.    Can you expand on that?

18         A.    I did have a Christmas party and

19    Craig and Ramona joined us at the event that

20    night.

21              I mean, Craig was very much, you

22    know, the best of the Champagne, top shelf, and



Page 40

1   out of a team of around about ten, there was

2   about $15,000 spent on the evening, all paid by

3   Craig.

4          Q.    Was that something Craig would have

5   done prior?  Is that something you had seen Craig

6   do prior to Dave's death?

7          A.    No, absolutely not.  I mean, prior

8   to Dave's passing, I was the one buying the

9   coffees and spending the money travelling back

10  and forward.

11         Q.    And then thereafter?

12         A.    It was a matter of he would even fly

13  his team up to Brisbane.  We would all go out

14  together.  Craig would actually pay for everyone

15  who came along.

16         Q.    Did it appear to you that after Dave

17  died, Craig had access to massive amounts of

18  assets that he did not previously have before?

19              MR. PASCHAL:  Objection to form.

20              THE WITNESS:  The money came from

21     somewhere.

22  BY MR. FREEDMAN:



Page 41

1          Q.     Sorry, go ahead?

2          A.     I believe that there was a change,

3    and overnight he had a lot of wealth.

4          Q.     Okay.

5          A.     But, at the same time I know that he

6    was in the very early stages of Bitcoin as well.

7                 MR. FREEDMAN:  Can we take a, let's

8       go off the record for a minute.

9                 THE VIDEOGRAPHER:  Off the record at

10      9:07.

11                (Recess taken -- 9:07 a.m.)

12                (After recess -- 9:12 a.m.)

13                THE VIDEOGRAPHER:  We are back on

14      the record at 9:12.

15   BY MR. FREEDMAN:

16         Q.     Mr. Wilson, I'm handing you what has

17   been marked as Wilson 4, and it is, it was

18   produced in this litigation as Defense 28015.

19                (Wilson Exhibit Number 4

20                 marked for identification.)

21   BY MR. FREEDMAN:

22         Q.     Mr. Wilson, do you recognize this



Page 42

1     e-mail as an e-mail from Craig to you?

2          A.    Yes.

3          Q.    Do you recall this e-mail?

4          A.    Yes, I do.

5          Q.    And in it it says, "This is where

6     this started.  All of this started to move much

7     faster now.  Dave passed a couple of months ago

8     so I'm no longer waiting for him to get better."

9          A.    Correct.

10         Q.    Did you ever talk to Craig about

11    what he meant by this e-mail?

12         A.    No.

13         Q.    Do you know why he sent it to you?

14              MR. PASCHAL:  Objection, form.

15              THE WITNESS:  I think it was all

16         mainly to deal with the attachments and all

17         of the files.

18    BY MR. FREEDMAN:

19         Q.    Okay.

20         A.    And it was more about let's get

21    going.

22              (Wilson Exhibit Number 5



Page 43

1                         marked for identification.)

2    BY MR. FREEDMAN:

3         Q.    Okay.  Mr. Wilson, I'm handing you

4    an exhibit marked as Wilson 5.  It was marked in

5    this litigation, it has been produced in this

6    litigation as Defense 266797.

7               If you can take a look at this

8    e-mail.  Do you recognize it as an e-mail from

9    Craig with a cc: to you?

10        A.    Yes.

11        Q.    And in it, Craig says, "Hello Love."

12   I'm assuming that is addressed to Ramona.

13        A.    Correct.

14        Q.    "Well I said I would be doing

15   something with that money.  And there is a link,

16   Jamie is on board."

17               Do you know what money he is

18   referring to?

19               MR. PASCHAL:  Objection, form.

20               THE WITNESS:  Well, yes.

21   BY MR. FREEDMAN:

22        Q.    Which money?



Page 44

```
1         A.    It would be the money that he had

2   from Bitcoin.

3         Q.    Okay.

4               MR. PASCHAL:  What was that marked

5        as?

6               THE REPORTER:  Five.

7               MR. ROCHE:  This is Kyle Roche, is

8        there any way we can move the mic closer to

9        Mr. Wilson?

10              MR. FREEDMAN:  Kyle, we are not sure

11       how to work the system here, so ...

12              MR. ROCHE:  Okay.

13                  (Wilson Exhibit Number 6

14                    marked for identification.)

15   BY MR. FREEDMAN:

16        Q.    Mr. Wilson, I am handing you what

17   has been marked as Wilson 6.  It has been

18   produced in this litigation as Defense 25094.

19              Can you take a moment to review this

20   e-mail, Mr. Wilson, and let me know if you

21   recognize it as an e-mail from Craig Wright to

22   you?
```



Page 45

1          A.     Yes, I do.

2          Q.     Okay.   This e-mail is also addressed

3     to Michael Hardy at the Australia Tax Office; is

4     that correct?

5               MR. PASCHAL:   Objection, form.

6     BY MR. FREEDMAN:

7          Q.     Mr. Wilson?

8          A.     I'm not sure if Michael was the one

9     from the ATO.

10         Q.     Okay.   Do you remember getting this

11    e-mail from Craig?

12         A.     Yes, I do.

13         Q.     In this e-mail, Mr. Wilson, Craig

14    says that "The main addresses we control as a

15    group include the following ones listed below."

16    Do you see that?

17         A.     It is in the middle.

18         Q.     Yes, right at the top the first

19    sentence, the main address that we control as a

20    group?

21              MR. PASCHAL:   Where are you reading

22       from?



```
 1   BY MR. FREEDMAN:

 2        Q.    It says, "Hello Michael, as we noted

 3   there are a couple of recent transactions."

 4            At the end of that sentence, it

 5   says, "The main addresses we control as a group

 6   include the following ones listed below."

 7            Do you see that?

 8        A.    Yes.

 9        Q.    And then do you see, if you go to

10   the paragraph that starts, "The addresses are in

11   my control."

12        A.    Yes.

13        Q.    It says, "The addresses are in my

14   control now."

15            Did, and then, sorry, "The addresses

16   are in my control now as a matter of fate and

17   other circumstances."

18            Do you see that?

19        A.    Yes.

20        Q.    "David Reese and David Kleiman have

21   both been a central part of this project."

22        A.    Yes.
```



Page 47

1        Q.    And then, right above the little

2   graphic he says, "The addresses are," and there

3   is a list of addresses.  Do you see that?

4        A.    Yes, correct.

5        Q.    Do you see where it says balance

6   XBT?

7        A.    Yes.

8        Q.    That is the Bitcoin balance?

9              MR. PASCHAL:  Objection, form.

10  BY MR. FREEDMAN:

11       Q.    Do you recognize that as a Bitcoin

12  balance?

13       A.    Yes.

14       Q.    And it says Australia dollars and

15  there is figures underneath that?

16       A.    Correct.

17       Q.    And then there is some additional

18  wallets, addresses listed below that under the

19  title Coin and Other?

20       A.    That's right.

21       Q.    Did Craig lead you to believe that

22  he had the ability to access this Bitcoin?



Page 48

1                    MR. PASCHAL:  Objection, form.

2                    THE WITNESS:  Yes.  100 percent.

3    BY MR. FREEDMAN:

4         Q.    Did Craig ever tell you that these

5    Bitcoin were locked in a file that he could not

6    access?

7         A.    No, he could access them.

8         Q.    Okay.  This was in -- so, let's go

9    back here where it says, "These addresses are in

10   my control through fate and other circumstances.

11                  "David Reese and David Kleiman have

12   both been central parts of this project.

13                  "Both of these gentlemen, who I had

14   the good fortune to call friends, passed away

15   this year.  David Reese was a friend of my

16   grandfather before he died of Parkinson's.  Dave

17   Kleiman was my best friend."

18                  Do you know what he means by fate

19   and other circumstances?

20                  MR. PASCHAL:  Objection, form.

21                  THE WITNESS:  No.

22   BY MR. FREEDMAN:



MAGNA
LEGAL SERVICES

Page 49

1        Q.    Let me rephrase that.  Did you ever

2   come to understand what he meant by fate and

3   other circumstances?

4        A.    No.

5              MR. PASCHAL:  Objection, form.

6   BY MR. FREEDMAN:

7        Q.    Did he ever tell you what fate and

8   other circumstances meant?

9        A.    No.  And I didn't ask the question

10  either.

11       Q.    Did he ever give you any more -- did

12  Craig -- strike that.

13             Did Craig ever give you any more

14  color or explanation on what he meant by Dave was

15  a "an essential part of this project"?

16             MR. PASCHAL:  Objection, form.

17             THE WITNESS:  Yes.  In that they

18        worked together.

19             Now, I believed that Dave was the

20        original start.  He started looking on the

21        Blockchain.  And then later on Craig joined

22        it; it was a joint thing together, though.


MAGNA
LEGAL SERVICES

Page 50

1  BY MR. FREEDMAN:

2       Q.    And did you form that belief through

3  statements Craig made to you?

4       A.    Yes.

5       Q.    Okay.  When he refers to "this

6  project," did you take that to mean the mining of

7  all of this Bitcoin?

8       A.    Yes.

9            MR. PASCHAL:  Objection, form.

10 BY MR. FREEDMAN:

11      Q.    How did you take the project to mean

12 when he said Dave was an essential part of this,

13 of the, of this project?  How did you take "this

14 project" to mean?

15           MR. PASCHAL:  Objection, form.

16           THE WITNESS:  It was the mining.

17 BY MR. FREEDMAN:

18      Q.    The mining of?

19      A.    Bitcoin.

20      Q.    Okay.  Thank you.

21           Do you see if you turn the page over

22 to Defense 25095, do you see there is a graphic



Page 51

1    down there?

2         A.    Yes.

3         Q.    And if you look 1, 2, 3, 4, 5, about

4    six up from the top, from the bottom, do you see

5    where it says CSW-Dave K-DV?

6         A.    That's correct.

7         Q.    Do you know what this wallet was?

8         A.    No.

9              MR. PASCHAL:   Objection, form.

10   BY MR. FREEDMAN:

11        Q.    Do you know why there is a redaction

12   of the address?

13        A.    No.

14        Q.    Do you see at the top of the graphic

15   it says Bitcoin Wallet?

16        A.    Yes.

17        Q.    Did you take, when you received this

18   e-mail, did you understand it to be a snapshot of

19   wallets that Craig, Bitcoin wallets that --

20             MR. FREEDMAN:   It is tough.   I know

21        you know where I'm going, but for purposes of

22        the court reporter --



Page 52

```
 1              THE WITNESS:  Right.

 2              MR. FREEDMAN:  -- try to let me

 3      finish.

 4              MR. PASCHAL:  And I object, form, to

 5      all of that.

 6  BY MR. FREEDMAN:

 7       Q.    So, when you received this e-mail,

 8  were you under the impression that this was a

 9  snapshot of Bitcoin wallets that Craig had access

10  to?

11              MR. PASCHAL:  Objection, form.

12              THE WITNESS:  Yes.

13  BY MR. FREEDMAN:

14       Q.    Thank you.

15              (Wilson Exhibit Number 7

16               marked for identification.)

17  BY MR. FREEDMAN:

18       Q.    Okay.  Mr. Wilson, I'm handing you

19  what has been marked as Wilson 7.  It has been

20  produced in this litigation as Defense Australia

21  553926.

22              Mr. Wilson, do you recognize this
```



Page 53

1    e-mail as an e-mail Craig sent to you, with a cc:

2    to you, rather?

3          A.    Yes.

4          Q.    And it was sent on October 2nd,

5    2013?

6          A.    Yes.

7          Q.    And it is also sent to Jenna Spears

8    at the Australia Tax Office and Michael Hardy at

9    the Australia Tax Office?

10         A.    Yes.

11         Q.    Do you recall receiving this e-mail?

12         A.    Yes.

13         Q.    In this e-mail do you see where

14   Craig says in the second paragraph, "The group I

15   head has a holding of over 100 million Australian

16   dollars in XBT Bitcoin"?

17         A.    Yes.

18         Q.    Did you ever talk to Craig about

19   this e-mail?

20         A.    No.  This was in regards to -- so,

21   Michael Hardy, now it does -- I do remember.

22   This was in regards to the tax returns and also



Page 54

1    the R&D, research and development.

2          Q.    Did Craig lead you to believe

3    through this e-mail that he had the control over

4    $100 million in Bitcoin?

5          A.    Yes.

6                MR. PASCHAL:  Objection, form.

7    BY MR. FREEDMAN:

8          Q.    Did he ever tell you that this

9    $100 million in Bitcoin was locked in a file that

10   he could not access?

11               MR. PASCHAL:  Objection, form.

12               THE WITNESS:  No.

13   BY MR. FREEDMAN:

14         Q.    Did he ever tell you it was locked

15   in a -- strike that.

16                     (Wilson Exhibit Number 8

17                      marked for identification.)

18   BY MR. FREEDMAN:

19         Q.    Mr. Wilson, I am handing you what

20   has been marked as Wilson 8.  It has been

21   produced in this litigation as Defense 45457.

22         A.    Thank you.



1      Q.    Take a look at this e-mail for me,

2  Mr. Wilson, and tell me do you recognize this as

3  an e-mail that Craig sent with a cc: to you?

4      A.    Yes.

5      Q.    This e-mail was also sent to Michael

6  Hardy of the ATO; is that correct?

7      A.    Correct.

8      Q.    And Mark Italia of the ATO?

9      A.    Yes.

10      Q.    Do you see where he says, "I have

11  also attached a stat dec."  Is that a statutory

12  declaration?  "From our solicitors validating the

13  control of a number of Bitcoin-based addresses."

14      A.    Yes.

15      Q.    "You can validate the amount held in

16  these publicly.  For instance," and there is a

17  link with the block Explorer with the Bitcoin

18  address that begins 1933?

19      A.    Yes.

20      Q.    Do you see that?

21      A.    Yes.

22      Q.    And then the next paragraph.  "With



Page 56

1    a holding in excess of 111,114 Bitcoin.  The

2    above address we have confirmed control of is

3    valued at market, on market at Australian

4    $16.4 million."

5          A.    Yes.

6          Q.    Did you take this e-mail, did you

7    understand from this e-mail that Craig had

8    control over a Bitcoin address with over 111,000

9    Bitcoin in it?

10         A.    Yes.

11               MR. PASCHAL:  Objection, form.

12   BY MR. FREEDMAN:

13         Q.    Did you ask Craig what he meant by

14   we have confirmed control over it?

15         A.    No.  I was aware that he did have

16   control of it.

17         Q.    Okay.  Did he ever tell you that

18   this Bitcoin was locked in a file that he could

19   not access?

20               MR. PASCHAL:  Objection, form.

21               THE WITNESS:  When we talk about is

22      it locked, all of them are locked and Craig,



Page 57

1          my understanding, did have access to them.

2     BY MR. FREEDMAN:

3          Q.     So, let me rephrase that.

4                 Did he ever tell you that it was

5     locked in a file that Craig could not access

6     himself?

7          A.     No.

8                      (Wilson Exhibit Number 9

9                      marked for identification.)

10    BY MR. FREEDMAN:

11         Q.     Okay.  Mr. Wilson, I am handing you

12    what has been marked as Wilson 9, it was produced

13    in this litigation as Defense Force 46093.

14                Mr. Wilson, do you recognize this

15    e-mail as an e-mail that Craig sent with a cc: to

16    you?

17         A.     Yes.

18         Q.     It was also sent to Mark Italia of

19    the ATO?

20         A.     Yes.

21         Q.     And Michael Hardy of the ATO?

22         A.     Yes.



Page 58

1          Q.     With a cc: to Ramona Watts?

2          A.     Yes.

3          Q.     Do you see where it says about

4    midway through that e-mail, "Our funding comes as

5    we are the group that controls 5 percent of the

6    global Bitcoin market"?

7          A.     Yes.

8          Q.     Do you remember receiving this

9    e-mail?

10         A.     Yes.

11         Q.     Did you ever ask Craig about how he

12   came to control 5 percent of the global Bitcoin

13   market?

14         A.     My understanding is that he was the

15   founder.

16         Q.     Okay.  Did he ever tell you, did he

17   lead you to believe that he had control over the

18   5 percent of the Bitcoin?

19         A.     Yes.

20              MR. PASCHAL:  Objection, form.

21       Mischaracterizes the document.

22   BY MR. FREEDMAN:



Page 59

1          Q.    Did he ever tell you that this

2    5 percent of Bitcoin that he had control of was

3    locked in a file that he could not access?

4          A.    No.

5                MR. PASCHAL:  Objection,

6          mischaracterizes the document and his

7          testimony.

8                MR. FREEDMAN:  Mr. Paschal, I have

9          an e-mail from Mr. Kass specifically asking

10         me to limit my objections to form in depos.

11               I would request that you do the

12         same.

13               MR. KASS:  I would like to see that

14         e-mail if you've got it.  We've had

15         discussions.

16               MR. FREEDMAN:  Please keep your

17         objection to form.

18                    (Wilson Exhibit Number 10

19                     marked for identification.)

20   BY MR. FREEDMAN:

21         Q.    Mr. Wilson, I am handing you what

22   has been marked as defense, sorry, as Wilson



Page 60

1    Exhibit 10.  It was produced in this litigation

2    as Defense Australia 113043.

3              If you take a look, do you see the

4    e-mail at the top of the page, this is a -- do

5    you recognize this as an e-mail that Craig sent

6    to you?

7         A.    Yes.

8         Q.    It also went to Roger Manu of Rubik?

9         A.    Correct.

10        Q.    In it Craig says, "XBT Bitcoin has a

11   currency.  There are 11 million Bitcoin.  Look at

12   the exchange rate in XE.com."  And then, "We

13   control what is, all up, a little over 1 million

14   Bitcoin."

15             Do you see that?

16        A.    Correct.

17        Q.    Do you recall receiving this e-mail?

18        A.    Yes.

19        Q.    Did you believe by receiving this

20   e-mail that Craig controlled over 1 million

21   Bitcoin?

22        A.    Yes.



Page 61

```
 1            MR. PASCHAL:  Objection to form.

 2  BY MR. FREEDMAN:

 3       Q.   Was this statement that he

 4  controlled, all up, a little over 1 million

 5  Bitcoin consistent with other statements that

 6  Craig had told you?

 7            MR. PASCHAL:  Objection, form.

 8            THE WITNESS:  Yes.

 9  BY MR. FREEDMAN:

10       Q.   Did Craig ever tell you that this

11  over 1 million Bitcoin was locked in a file that

12  he could not access?

13            MR. PASCHAL:  Objection, form.

14            THE WITNESS:  No.

15            MR. FREEDMAN:  As a mechanics issue,

16       if I ask the question, take a beat before you

17       answer and give Mr. Paschal a chance to

18       object.

19            THE WITNESS:  Okay.

20            MR. PASCHAL:  Otherwise we are

21       talking over each other.

22            THE WITNESS:  Done.
```



Page 62

1   BY MR. FREEDMAN:

2       Q.    Mr. Wilson, I'm handing you what has

3   been marked as Wilson 11.

4                       (Wilson Exhibit Number 11

5                        marked for identification.)

6   BY MR. FREEDMAN:

7       Q.    It was produced in this litigation

8   as Defense 30127.

9             Do you recognize this e-mail as an

10  e-mail Craig sent to -- with a cc: to you?

11      A.    Yes.

12      Q.    It is also sent to Mr. Dempster at

13  the ATO?

14      A.    Yes.

15      Q.    And the subject is Evidence?

16      A.    Yes.

17      Q.    And in it there is a listing of

18  companies, a Coin Exchange and CSW Personal?

19      A.    Yes.

20      Q.    With the Bitcoin holdings of 438,000

21  and 57,000?

22      A.    Yes.



Page 63

1        Q.    The value of those Bitcoin on

2   Mt. Gox which totals to 53.8 million.

3        A.    Correct.

4              MR. PASCHAL:  Objection, form.

5   BY MR. FREEDMAN:

6        Q.    Okay.  And then, "My wallet is

7   listed below."

8              Do you see that?

9        A.    Yes.

10       Q.    Did you take this e-mail to -- did

11   you take this e-mail to tell you that -- sorry,

12   strike that.

13             Did you understand from this e-mail

14   that Craig owned, controlled and owned and

15   controlled over $53 million worth of Bitcoin?

16             MR. PASCHAL:  Objection, form.

17             THE WITNESS:  Yes.

18   BY MR. FREEDMAN:

19       Q.    In fact, close to 500,000 Bitcoin?

20       A.    Yes.

21       Q.    Do you remember receiving this

22   e-mail?



Page 64

1          A.     Yes.

2          Q.     Did you ever talk to Craig about

3  this e-mail?

4          A.     It was ongoing conversations.

5          Q.     Okay.  All consistent with the story

6  that, what?

7          A.     All of these Bitcoin holdings.

8          Q.     Okay.  Did he ever tell you that

9  this Bitcoin was locked in an inaccessible file

10  to him?

11          A.     No.

12          Q.     Thank you, Mr. Wilson.

13                 So I can stop asking the question a

14  million times, Mr. Wilson, did Craig ever tell

15  you that Bitcoin he owned or controlled was

16  locked in a file that he could not access?

17                 MR. PASCHAL:  Objection, form.

18                 THE WITNESS:  No.

19                     (Wilson Exhibit Number 12

20                      marked for identification.)

21  BY MR. FREEDMAN:

22          Q.     Mr. Wilson, I'm handing you what has



Page 65

1   been marked as Wilson 12.  It was produced in

2   this litigation as Defense 46098.

3           Do you recognize this as an e-mail

4   Craig sent with a cc: to you?

5       A.    Yes.

6       Q.    Do you remember receiving it?

7       A.    Yes.

8       Q.    Do you see about halfway down the

9   sentence says, "We control 165 million in XBT

10  Bitcoin"?

11      A.    Yes.

12      Q.    Did you understand this e-mail to

13  tell you that Craig controlled over 165 -- sorry,

14  strike that.

15          Did you take this e-mail -- strike

16  that.

17          Did you understand this e-mail to

18  say that Craig controlled $165 million worth of

19  Bitcoin?

20          MR. PASCHAL:  Objection, form.

21          THE WITNESS:  Yes.

22          (Wilson Exhibit Number 13



Page 66

 1                    marked for identification.)

 2    BY MR. FREEDMAN:

 3         Q.    Mr. Wilson, I'm handing you what has

 4    been marked as Wilson 13.

 5              It was produced in this litigation

 6    as Defense 467687.

 7              Do you recognize, and if you look at

 8    the second e-mail on the page, do you recognize

 9    this as an e-mail from Craig addressed to you and

10    other individuals at Hotwire?

11         A.    Yes.

12         Q.    Do you remember receiving it?

13         A.    Yes.

14         Q.    If you look at the last sentence of

15    the first paragraph it says, "A $5 million

16    Bitcoin fund was world news and TV globally.  We

17    make this look like a mom and pop operation from

18    the Winkly Bros."

19              Do you see that?

20         A.    Yes.

21         Q.    What did you understand that

22    sentence to say?



Page 67

```
 1                MR. PASCHAL:  Objection, form.

 2                THE WITNESS:  That Craig's holding

 3        is a lot greater than the small amount that

 4        the Winkler Brothers was trying to set up the

 5        fund.

 6   BY MR. FREEDMAN:

 7        Q.    Mr. Wilson, when you finally did

 8   have access to some of the books in the company,

 9   did you see specific and identifiable wallet

10   addresses?

11        A.    Yes.  Craig showed me, like on

12   screen.

13        Q.    Okay.  Outside of the e-mails we

14   have just looked at, did Craig lead you to

15   believe that he had a massive amount of Bitcoin?

16        A.    Yes.

17                MR. PASCHAL:  Objection, form.

18   BY MR. FREEDMAN:

19        Q.    Did Craig lead you to believe that

20   he was incredibly wealthy?

21                MR. PASCHAL:  Objection, form.

22                THE WITNESS:  Yes.  And that I was
```



1          extremely wealthy myself from the holdings

2          and the gifting of the Bitcoin to myself.

3                    (Wilson Exhibit Number 14

4                     marked for identification.)

5     BY MR. FREEDMAN:

6          Q.    Mr. Wilson, I'm handing you what has

7     been marked as Wilson 14.  It is Document 83-4.

8                If you open that up Mr. Wilson and

9     take a look, do you recognize this as an

10    affidavit Craig Wright submitted to the Supreme

11    Court of New South Wales?

12         A.    Yes.

13         Q.    Can you turn to Paragraph 23?

14         A.    Yes.

15         Q.    In it Craig writes, "On first of

16    August 2013 a shareholder's meeting was called

17    for W&K Info Defense LLC to be held on the 16th

18    of August 2013.

19                "The meeting was e-mailed to the

20    company address as well as sent to the address of

21    the shareholders and company.

22                "The shareholding of W&K Info



Page 69

1    Defense LLC was Craig S. Wright 50 percent; David

2    A. Kleiman 50 percent. "

3               And in Paragraph 24, "The meeting

4    from Point 23, the meeting was held on the 16th

5    of August 2013.

6               "The following people were present.

7    Jamie Wilson, Craig S. Wright."  Do you see that?

8         A.    Yes.

9         Q.    Did this meeting ever occur?

10        A.    Yes.

11        Q.    What happened at that meeting?

12        A.    Craig said to me that with David's

13   passing that we needed to do the paperwork for

14   him to turn around and take full control and

15   resolve the issue of David being on the, as a

16   shareholder.

17               To be honest, at that stage I had

18   no, I didn't have the knowledge or understanding

19   of what it all meant, because the motions were

20   already happening with the Supreme Court of New

21   South Wales.

22        Q.    So, if you look at the next page,



Page 70

1    "The following points were moved at the meeting:

2              "One, Jamie Wilson will act as a

3    director for purposes of consenting to orders and

4    the company to be wound down.  The vote was Craig

5    Wright yes; no other parties.  It was agreed that

6    filing the motion to accept the debt owned by

7    company W&K Info Defense LLC would be closed."

8              Do you recall this happening?

9         A.    This is my first knowledge that I

10   was acting as a director of the U.S. company.

11        Q.    So, this is the first time -- so,

12   let me break that down a little bit.

13             You do recall the meeting happening;

14   is that correct?

15        A.    It was part of our meeting that day

16   and it was around Hotwire PE.

17        Q.    Okay.

18        A.    Not so much WK.

19        Q.    So, you remember the meeting

20   happening.

21             Is it accurate to say that you

22   remember the meeting happening, but you don't



Page 71

1    remember being made a director of W&K?

2         A.    Absolutely.

3         Q.    Okay.  So then you would agree with

4    the characterization in 24, Paragraph 24 that

5    there was a meeting.  Present, Jamie Wilson and

6    Craig S. Wright were there?

7         A.    Yes.

8         Q.    But is it accurate to say you would

9    disagree with what happened in Paragraph 26?

10        A.    Yes.  This is my first that I am

11   being made aware that I was a director of the LLC

12   company.

13        Q.    LLC is a Limited Liability Company.

14   The LLC meaning W&K Info Defense Research?

15        A.    Yes.

16        Q.    Mr. Wilson, can you talk to me about

17   the type of intellectual property that Craig was

18   developing in 2013?

19             MR. PASCHAL:  Objection, form.

20             MR. FREEDMAN:  What is the basis?

21             MR. PASCHAL:  Well, you can't do it

22        both ways.  I'm going to give you every



Page 72

1      single basis or do you want it just form.

2                  MR. FREEDMAN:  I can ask you the

3      basis when I want.

4                  MR. PASCHAL:  You said keep it to

5      form.

6                  MR. FREEDMAN:  Yes, keep it to form

7      unless I ask you.  How am I supposed to know

8      what your objection is?  Normally I

9      understand what your objection is.  If I

10     don't understand what it is, I will ask you.

11                 So what is the basis of your

12     objection?

13                 MR. PASCHAL:  So, you have limited

14     time in this deposition.  Get through what

15     you need to.  Because I have questions.

16                 MR. FREEDMAN:  I have seven hours,

17     I'm good.

18                 MR. PASCHAL:  No you have three and

19     a half.

20                 MR. FREEDMAN:  Are you not going to

21     state the basis of your objection?

22                 MR. PASCHAL:  I said form.



Page 73

1              MR. BRENNER:  Mr. Paschal, you know

2       better.  Counsel is allowed to ask you --

3              MR. PASCHAL:  I'm not doing this.

4              MR. BRENNER:  You are not going to

5       answer the form, okay.  Good, then it is

6       waived.

7              MR. PASCHAL:  It is not waived.

8              MR. BRENNER:  Okay, go ahead.

9   BY MR. FREEDMAN:

10      Q.   Can you talk to me about the type of

11   intellectual property Craig was developing in

12   2013?

13             MR. PASCHAL:  Objection, form.

14  BY MR. FREEDMAN:

15      Q.   Please go ahead.

16      A.   So, we set up Hotwire PE and it was

17   all about setting up a banking platform, working

18   with Rubik out of Sydney.

19             The challenges were that it went to

20   a decimal six spaces instead of what we have

21   today being four.  So unfortunately it couldn't

22   go ahead.



Page 74

1            At the time of October, so we

2    started that around about June/July of 2013.  And

3    by October I actually had finished and resigned.

4            All projects were related to Bitcoin

5    also setting up exchanges.

6        Q.    Okay.  So, was Craig involved in

7    Bitcoin related intellectual property development

8    in 2013?

9        A.    Yes.

10                (Wilson Exhibit Number 15

11                 marked for identification.)

12   BY MR. FREEDMAN:

13       Q.    Mr. Wilson, I'm handing you what has

14   been marked as Wilson 15.

15            It was produced in this litigation

16   as Defense 43726.

17            Take a moment.  Do you recognize

18   this as an e-mail you sent to Craig and Ramona

19   Watts?

20       A.    Yes.

21       Q.    Can you explain to me what this

22   e-mail is?



Page 75

1          A.     These were all of the projects that

2    Craig wanted to work on.  5/5, Hotwire and the

3    increase in staff in a short period of time.

4          Q.     So, these were all intellectual

5    property projects?

6          A.     Yes.

7          Q.     And they all related to Bitcoin?

8                 MR. PASCHAL:  Objection, form.

9    BY MR. FREEDMAN:

10         Q.     What did they relate to?  What did

11   all of the projects relate to -- strike that.

12                Was there a common theme between all

13   of these projects?

14         A.     Yes.

15         Q.     What was the common theme between

16   all of the intellectual property projects that

17   Hotwire was working on?

18         A.     It was Bitcoin.

19                       (Wilson Exhibit Number 16

20                        marked for identification.)

21   BY MR. FREEDMAN:

22         Q.     Mr. Wilson, I'm handing you what has



Page 76

1   been marked as Wilson 16.

2              It was produced in this litigation

3   as Defense 31588.

4              Do you recognize this as an e-mail

5   Craig sent to you and Ramona Watts?

6        A.    Yes.

7        Q.    Can you take a moment to familiarize

8   yourself with it.

9        A.    Yes.

10       Q.    Can you tell me what was happening

11  in this e-mail?  What is Craig telling you?

12       A.    It was a purchase, a license

13  agreement between the two companies.

14       Q.    Which two companies?

15       A.    And -- there was an agreement

16  between, well it would have been the W&K Defense,

17  the U.S. company, and the sale for the license to

18  the Australian company.  And this here was a cost

19  that they were picking up to be able to claim for

20  the R&D.

21       Q.    And do you see the last sentence in

22  the e-mail, "We just need to ensure that the



Page 77

1    court judgment is completed by August 30th."

2         A.    And it was.

3         Q.    Do you know why it needed to be

4    completed by August 30th?

5              MR. PASCHAL:  Objection, form.

6              THE WITNESS:  To be age to launch

7        the R&D and have the tax returns completed.

8    BY MR. FREEDMAN:

9         Q.    If the court judgment wasn't

10   completed by August 30th, what would have

11   happened?

12             MR. PASCHAL:  Objection, form.

13             THE WITNESS:  It would have had to

14       fall through to the following financial year.

15   BY MR. FREEDMAN:

16        Q.    So, is it accurate to say Craig was

17   under a lot of time pressure to make sure the

18   judgment finished by August 30th?

19             MR. PASCHAL:  Objection, form.

20             THE WITNESS:  Yes.

21   BY MR. FREEDMAN:

22        Q.    Okay.  When Craig told you that he



Page 78

```
 1   worked with Dave Kleiman, did you understand that

 2   to mean that he worked -- in projects that were

 3   based in Florida?

 4        A.    Yes.

 5        Q.    Did you understand that he worked --

 6   strike that.

 7              Why don't we take ten minutes.  Can

 8   we go off the record?

 9              THE VIDEOGRAPHER:  Off the record at

10      9:49.

11              (Recess taken --  9:49 a.m.)

12              (After recess -- 10:01 a.m.)

13              THE VIDEOGRAPHER:  We are back on

14      the record at 10:01.

15   BY MR. FREEDMAN:

16        Q.    Mr. Wilson, earlier I asked you if

17   the you were a shareholder of W&K and you said

18   no.

19              But, I recall that W&K is an LLC, a

20   limited liability company.  It doesn't have

21   shareholders, it has members.

22              So, I'm going to rephrase --
```



Page 79

1              MR. PASCHAL:  Objection, form.

2              MR. FREEDMAN:  I'm going to rephrase

3        my question.  Would you like to object?

4              MR. PASCHAL:  Yes, objection, form.

5        There was no question.

6    BY MR. FREEDMAN:

7         Q.    Mr. Wilson, did you have any

8    membership interest in W&K?

9         A.    No.

10        Q.    Mr. Wilson, earlier you told me that

11   the common theme of the intellectual property

12   that Dr. Wright was working on in Hotwire was

13   Bitcoin.  Do you recall that?

14        A.    Yes.

15        Q.    Dr. Wright had other companies that

16   you were also the director and shareholder of.

17              Was there a common theme to those

18   company's intellectual property development as

19   well?

20        A.    Yes.

21        Q.    What was that common theme?

22        A.    All related to Bitcoin.



Page 80

1        Q.    Okay.  Mr. Wilson, did Craig ever

2   tell you that his e-mails were hacked?

3        A.    No.

4        Q.    Did he ever tell you his company

5   documents were hacked?

6        A.    No.

7                    (Wilson Exhibit Number 17

8                     marked for identification.)

9   BY MR. FREEDMAN:

10       Q.    Mr. Wilson, I am handing you what

11  has been marked as Wilson 17.  It was produced in

12  this litigation as Defense 267325.

13              Do you recognize the top e-mail as

14  an e-mail Craig sent with a cc: to you?

15       A.    Yes.

16       Q.    In it Craig says, "I own both

17  companies."

18              Do you see that?

19       A.    Yes.

20       Q.    And did you take that as a reference

21  to PanOptiCrypt and Hotwire in the e-mail below

22  that?



Page 81

1          A.    Yes.

2               MR. FREEDMAN:  Counsel, up until

3     this point every document Mr. Wilson has been

4     handed he was a recipient of.

5               MR. PASCHAL:  Actually, no.  Your

6     computer screen is still on that TV.

7               MR. FREEDMAN:  This document he is

8     not technically a recipient of it.

9               If you can get him to execute the

10    confidentiality order, but I really don't

11    think this is a confidential e-mail.

12               So, if you are willing to waive the

13    confidentiality designation on it we can

14    avoid that process.

15               MR. PASCHAL:  We can discuss it

16    after the depo.

17               MR. FREEDMAN:  Okay.  So, can you --

18               MR. PASCHAL:  Send me an e-mail with

19    the document.

20               MR. FREEDMAN:  I've got to hand it

21    to the witness now.

22               MR. PASCHAL:  That is fine.  If we



Page 82

1        keep it, we will mark this part confidential.

2                    MR. FREEDMAN:  If you hand it to

3        him.  I'll give you the unmarked copy.

4                    MR. PASCHAL:  Okay.

5                    (Wilson Exhibit Number 18

6                     marked for identification.)

7    BY MR. FREEDMAN:

8        Q.    I have just handed you what has been

9    marked as Wilson 18, it has been produced as

10   Defense 262775.

11                   I'm not sure if you have ever seen

12   this before Mr. Wilson, but if you could take a

13   minute to familiarize yourself with it.

14                   Are you familiar with what this is,

15   Mr. Wilson?

16       A.    It is a MYOB program.  M-Y-O-B.  It

17   is an accounting package.  I am positive it was

18   only Xero we were using as an accounting package.

19       Q.    So you don't ever recall using MYOB?

20       A.    No, not for Craig's work, no.  Not

21   at all.

22       Q.    Okay.  It references a company



Page 83

1    Information Defense.  Do you see that?

2          A.    Yes.

3          Q.    Do you recall, do you recall what

4    that company was?

5          A.    It was part of the group of

6    companies that Craig had set up for R&D.

7          Q.    And did you, were you involved with

8    that company at all?

9                MR. PASCHAL:  Objection, form.

10   BY MR. FREEDMAN:

11         Q.    Were you involved with that company?

12         A.    I can't remember it.

13         Q.    Okay.

14               MR. FREEDMAN:  We have no further

15     questions.

16               MR. PASCHAL:  Let's take a break and

17     we will have some questions.

18               THE VIDEOGRAPHER:  Off the record

19     at 10:07.

20               (Recess taken -- 10:07 a.m.)

21               (After recess -- 10:14 a.m.)

22               THE VIDEOGRAPHER:  We are back on



Page 84

```
 1        the record at 10:14.
 2                     EXAMINATION
 3   BY MR. PASCHAL:
 4        Q.    Good morning, Mr. Wilson.  I am
 5   Bryan Paschal.  I represent Dr. Craig Wright in
 6   the matter that you have just testified with
 7   Mr. Freedman.
 8        A.    Good morning.
 9        Q.    Do you recall when you came in this
10   room today?
11        A.    Yes.
12        Q.    Did you speak with that lawyer?
13        A.    No.  Well, when I came into this
14   room and you were here and present as well, at
15   the same time.
16        Q.    And that is Vel Freedman, right?
17        A.    That's correct.
18        Q.    And what did you say to
19   Mr. Freedman?
20        A.    Good morning.  Good morning to all.
21        Q.    Did you say anything else to
22   Mr. Freedman?
```



Page 85

```
 1          A.    No. That was it.  You were present

 2     when I walked in.

 3          Q.    Did you say, "Mr. Freedman, it is

 4     finally good to meet you in person"?

 5          A.    Yes.

 6          Q.    How many times have you spoken to

 7     Mr. Freedman?

 8          A.    Three, four times.

 9          Q.    When was the first time you spoke to

10     Mr. Freedman?

11          A.    Oh, maybe July.

12          Q.    July of this year?

13          A.    Or August of this year, maybe.

14          Q.    How -- this year, right?

15          A.    That's correct.  It might have been

16     August.

17          Q.    Okay.  And how did you speak with

18     Mr. Freedman?

19          A.    By phone.  By phone call.

20          Q.    You have never e-mailed

21     Mr. Freedman?

22          A.    Originally I did an e-mail.  And he
```



Page 86

1    said Jamie, we have been looking for you, can you

2    give me a call.

3            Q.    You said you sent an e-mail?

4            A.    I physically sent an e-mail.

5            Q.    To say?

6            A.    To say congratulations or something

7    like that on the case of Craig Wright.

8            Q.    So, in July or August of this year,

9    you sent an e-mail to Mr. Freedman congratulating

10   him on this case?

11           A.    That's correct.

12           Q.    And when did Mr. Freedman respond to

13   you?

14           A.    Within a 24-hour period.

15           Q.    Okay.  Let me go back to your first

16   e-mail.

17                 Was there anything else other than

18   you congratulating him for this case, was there

19   anything else that you said to Mr. Freedman in

20   that e-mail?

21           A.    No.  I mean I could give you a copy

22   of the e-mail.



Page 87

```
 1        Q.    Yes, I would like a copy of the

 2   e-mail.

 3        A.    Sure.

 4        Q.    And what did Mr. Freedman respond to

 5   you and say?

 6        A.    Can we talk?  It was a phone call

 7   after that.

 8        Q.    Was that all that Mr. Freedman said

 9   to you in that e-mail?

10        A.    Yes there wasn't much in it at all.

11        Q.    So, I just want to be clear.  You

12   congratulate him and he says I want to talk to

13   you.  That is it?

14        A.    Yes, it was very simple with a

15   reply.

16        Q.    Okay.  Are those the only e-mails

17   that you had with Mr. Freedman?

18        A.    Yes, I'm more than happy to supply

19   the e-mails to you.

20        Q.    Do you have any text messages with

21   Mr. Freedman?

22        A.    No, only that can you write or can
```



Page 88

1    you give me a call.  I want to book my flights.

2    I want to make sure that I don't stand him up and

3    to make sure that I'm here present.

4         Q.    Okay.  Let me get into that.  So you

5    booked your flight to come here for what purpose?

6         A.    No.  So, I do have an office in New

7    York, a physical office on Madison Avenue.

8         Q.    Yes.

9         A.    I travel back and forward out of the

10   U.S. on a regular basis.

11              This, while I am here in Washington,

12   was for the CINet Conference, which is a whole

13   lot of leading CISOs nationally in the U.S. that

14   we all to get together.

15        Q.    So, if I were to say that you don't

16   travel to the US that frequently, would that be a

17   false statement?

18        A.    That's correct.  And you can tell by

19   my passport and the amount of time that I enter

20   America.

21        Q.    When did Mr. Freedman arrange for

22   you to meet or have this deposition?



Page 89

1         A.    When he found out that I was coming

2    to the States.

3         Q.    When did he find out that you were

4    coming to the States?

5         A.    About two weeks ago.  Or a week ago.

6         Q.    Okay.  And how did you, how did you

7    communicate that?

8         A.    E-mail.

9         Q.    By e-mail?

10        A.    Yep.

11        Q.    Okay.  So there is a third e-mail

12   then?

13        A.    Yes, there would be a couple of

14   e-mails back and forth.

15        Q.    There is a chain of e-mails.

16        A.    That's right.

17        Q.    Okay.  Did Mr. Freedman ask you to

18   come or did you tell him that you were coming?

19        A.    No, no.  I was coming.  I mean I

20   have had my conference here for the last couple

21   of days.  Physically here.

22        Q.    And when -- I'm sorry, when did you



Page 90

1    tell him that you were coming?

2         A.    About two weeks ago.

3         Q.    About two weeks ago.  Okay.  Did

4    Mr. Freedman, when you reached out to him in July

5    or August of this year, did he ever ask you to

6    come here for any other reason?

7         A.    No, not at all.

8         Q.    Okay.  Did you ever get any filings

9    in this case?  Did Mr. Freedman ever send you any

10   filings in this case?

11        A.    No, not at all.

12        Q.    Did he ever send you any documents

13   in this case?

14        A.    Absolutely zero.

15        Q.    Did he ever ask you for any

16   documents?

17        A.    Yes.

18        Q.    You sent him documents.

19        A.    Yes.

20        Q.    How many documents did you send him?

21        A.    Oh, my resignation letters.

22              Oh, there was an e-mail or a social



1   media from Craig Wright making out that I was a

2   liar and deceitful and things like that, which

3   was posted.

4           And I thought well, you know what,

5   if that is the case, then I will give the

6   evidence that I actually did physically resign.

7   And these were the sequence of events.

8           I am more than happy to share what I

9   did share.

10      Q.    Okay.  And, are you represented by

11  counsel?

12      A.    No.

13      Q.    Okay.  And if I needed to get in

14  contact with you, how would I get in contact with

15  you?

16      A.    I'm more than happy to give you my

17  details.

18      Q.    What is your e-mail address?

19      A.    Jamie.wilson@cryptoloc,

20  C-R-Y-P-T-O-L-O-C.com.

21      Q.    And what is your phone number?

22      A.    Plus 61-416-176-816.



Page 92

1          Q.     Is that a cell phone or a land line?

2          A.     No, my mobile number.  And I will

3    give you my card as well.

4                 MR. PASCHAL:  I guess we have to

5       mark this, can you mark this?

6                      (Wilson Exhibit Number 19

7                       marked for identification.)

8    BY MR. PASCHAL:

9          Q.     And just, my colleague reminded me,

10   what is your addresses for the offices in U.S.?

11         A.     So the one in New York is 261

12   Madison Avenue, Level 9.

13         Q.     Okay.  And then you said, do you

14   have another one?  I can't remember?

15         A.     No, just the one.

16         Q.     Okay.  So I just, I don't want to

17   mischaracterize anything you have said.

18                So, you reached out to Mr. Freedman

19   to congratulate him, correct?

20         A.     Yes.

21         Q.     And then you also reached out to him

22   two weeks ago to let him know you were coming



Page 93

1    here, right?

2           A.    Yes.

3           Q.    He did not reach out to you,

4    correct?

5           A.    No.  He did.

6           Q.    He being Mr. Freedman?

7           A.    Mr. Freedman asked me when was the

8    next time I'm coming to the U.S.

9           Q.    I'm sorry, did you ever receive a

10   subpoena to show up at this deposition today?

11          A.    No.

12          Q.    Did you ever ask for a subpoena to

13   be at this deposition today?

14          A.    No.

15          Q.    Are you here voluntarily?

16          A.    Yes.

17          Q.    Okay.  Now you also testified a

18   moment ago with Mr. Freedman that -- you said

19   things changed with Dr. Wright some time between,

20   or after Dave's death, right?

21          A.    Correct.

22          Q.    Okay.  And Dave died in April



Page 94

1    of 2013, correct?

2         A.    Yes.

3         Q.    And you also testified that after

4    Dave's death Craig showed some wealth, right?

5         A.    Yes.

6         Q.    In fact you were able to tell me the

7    exact amount that Craig spent for champagne with

8    his wife, correct?

9         A.    Yes, for a Christmas party.

10        Q.    For a Christmas party.  And that

11   Christmas party was in 2013?

12        A.    Yes.

13        Q.    I'm going to break that down.

14              So --

15        A.    I don't even know if it was a

16   Christmas party.  But it was a get together,

17   anyway, a celebration.

18        Q.    Was it around Christmastime?

19        A.    I would have to go back and have a

20   look.  But it --

21        Q.    So you remember the amount he spent

22   for champagne, but you don't know --



1          A.      No, it wasn't champagne; it was

2     dinner.  It was a 15,000; it was top end, not

3     champagne, had a big top range wine as well.

4          Q.      Were you responsible for the check

5     for dinner?

6               MR. FREEDMAN:  Let the witness

7          finish his answer, Mr. Paschal, before you

8          continue.

9               THE WITNESS:  No.

10    BY MR. PASCHAL:

11         Q.      But you remember the exact amount

12    for the bill?

13         A.      Yes.

14         Q.      Now I'm just going to address this

15    in parts, so ...

16         A.      Sure.

17         Q.      You knew of Dave, right?

18         A.      Yes.  Of him.

19         Q.      Dave Kleiman, I should clarify?

20         A.      Yes.

21         Q.      And you have heard people talk about

22    Dave Kleiman, right?



Page 96

1          A.     Yes.

2          Q.     Did you know that Dave Kleiman lived

3    in the VA Hospital for the last two years of his

4    life?

5          A.     No.

6          Q.     Did you know that Mr. Dave Kleiman

7    could not afford to pay his cell phone bill

8    during that time, so his phone was disconnected?

9          A.     No.

10         Q.     Did you ever that his friends had to

11   lend him money to pay his cell phone bill so that

12   he could use his cell phone?

13         A.     No.

14         Q.     Did you know that Mr. Kleiman could

15   not afford his internet or cable and XFINITY

16   actually had to disconnect his account?

17         A.     No.

18         Q.     Did you know that the day that

19   Mr. Kleiman passed, or about the day that he

20   passed or the day before he passed, his credit

21   report showed that he had applied for a Payday

22   loan and was denied?



Page 97

1          A.     No.

2          Q.     Did you ever know Dave Kleiman to

3     have a considerable amount of wealth?

4          A.     No.

5          Q.     Did you ever see Dave Kleiman

6     develop any intellectual property?

7          A.     I never met Dave Kleiman.

8          Q.     But just answer my question:  You

9     never knew of him developing any intellectual

10    property?

11         A.     Only with Craig being Blockchain or

12    Bitcoin.

13         Q.     I'm going to get into that in a

14    second.  So that is the only way that you know

15    that?

16         A.     Absolutely yes.

17         Q.     And did Craig tell you that?

18         A.     Yes.

19         Q.     And on how many occasions did Craig

20    tell you that?

21         A.     Well that is how he started

22    Blockchain or Bitcoin.  And it was a matter of I



Page 98

1    did it with Dave Kleiman.

2              So, that is how I knew of Dave

3    Kleiman was purely because of the relationship

4    between the two.

5         Q.    Just to clarify, you said I did it

6    with Dave Kleiman?  You did it with --

7         A.    No.  No.  Craig.

8         Q.    So Craig told you that.

9         A.    Yes.

10        Q.    And that is how you formed your

11   belief that Dave created intellectual property?

12        A.    Together with Craig.

13        Q.    Together with Craig?

14        A.    That's right.  But I had no

15   understanding that --

16        Q.    So, based on that statement -- --

17   I'm sorry, go ahead.

18        A.    That he was in financial ruin.

19        Q.    Who was in financial ruin?

20        A.    David Kleiman.

21        Q.    Okay.  Now, you said that there was

22   a change in Craig.  He started wearing suits,



1    right?

2          A.    Yes.

3          Q.    You just have to answer for the

4    record.

5          A.    Yes.

6          Q.    You mentioned fancy watches.

7          A.    Yes.

8          Q.    You said that he was showing that he

9    had money.

10         A.    Yes.

11         Q.    That he had bought a new car?

12         A.    Yes.

13         Q.    And to you that made you

14   uncomfortable?

15         A.    No.  What made me uncomfortable was

16   the change in habits and also the way that he was

17   going about his business.

18                So, that was only a small effect

19   versus how he would actually run the business and

20   on-board staff and new projects.

21         Q.    Okay.

22         A.    So there is a bigger picture here.



 1    They are the smaller elements of the bigger

 2    picture.

 3        Q.    But this started in Dave's, after

 4    Dave died?

 5        A.    Yes.

 6        Q.    So, he didn't exhibit this before

 7    Dave died?

 8        A.    No.

 9        Q.    Okay.  And Dave died in April of

10    2013?

11        A.    Yes.

12        Q.    I'm going to show you --

13            MR. KASS:  It will be Exhibit 20.

14               (Wilson Exhibit Number 20

15                marked for identification.)

16    BY MR. PASCHAL:

17        Q.    So, I'm showing you an employee

18    remuneration.

19        A.    Yes.

20        Q.    But you are familiar with this

21    document, correct?

22        A.    Yes, I am.



Page 101

1          Q.     Have you done this -- how are you

2     familiar with this document?

3          A.     The reason for it is that I never

4     got paid, never received a cent.  And as I have

5     stated to the Australia Taxation Office, I never

6     received any money whatsoever from Craig Wright

7     and why should I have to pay tax.

8          Q.     Okay.

9          A.     So, I got a tax bill for money I

10    never received.

11         Q.     So, going to my question, that is

12    how you remember a document like this?

13         A.     Yes.

14         Q.     Okay.  So, I want to just go through

15    this with you.

16                Your name is on here under Employee,

17    right?

18         A.     Yes.

19         Q.     And it does say Start Date:

20    August 1, 2013, correct?

21         A.     Yes.

22         Q.     Then it says October 11, 2013,



Page 102

1    Termination, right?

2         A.    Correct.

3         Q.    That is when you resigned?

4         A.    Yes.

5         Q.    You could take a second.  But can

6    you look at Annual Salary?

7         A.    Yes.

8         Q.    And you could look at them all.

9               Are you the second highest paid

10   person for this company?

11              MR. FREEDMAN:  Objection, form.

12              THE WITNESS:  Yes.

13   BY MR. PASCHAL:

14        Q.    And how many employees are there on

15   that list?  More than 12?

16        A.    Yes.

17        Q.    More than 14?

18        A.    Yes.

19        Q.    So it is a significant amount of

20   employees for this company?  Correct.

21        A.    Yes.

22        Q.    And you are the second highest paid



Page 103

1   person?

2          A.     Yes.

3                 MR. FREEDMAN:   Objection to form.

4   BY MR. PASCHAL:

5          Q.     And you started in August of 2013,

6   right?

7          A.     No, no.  I didn't.  If you have a

8   look it was January, 8 of January, 2013.

9                 So that Christmas party that we

10  asked before --

11         Q.     Hold on, go ahead.

12         A.     That would have been in December.

13  So that does work out.

14         Q.     So, the date on this, this goes, the

15  date then the month then the year?

16         A.     Yes.

17         Q.     So, why is your resignation say here

18  then November 10, 2013, if you resigned in

19  October?

20         A.     That would have been Craig or who,

21  or his bookkeeper who looked after the accounts.

22  I would not have processed my own termination pay



Page 104

1  because I never received the payment.

2      Q.    Okay.  But you were scheduled to be

3  one of the highest employees, paid employees of

4  this company, correct?

5      A.    Yes.

6      Q.    So, it is January, you are saying

7  that you were employed January 8th of 2013.

8      A.    Yes.

9      Q.    And how many people started the

10 company, well I guess with you?

11     A.    Well Ramona Watts.  His wife.

12 Myself and Craig.

13     Q.    Okay.

14     A.    And then I would live in Brisbane;

15 Craig lives in Sydney.  All of the business was

16 done out of Sydney.  I was flying back and

17 forward.  Craig was then on-boarding other people

18 around him to start up Hotwire PE.

19     Q.    Okay.  So, for nine months -- strike

20 that.

21          So in April Dave dies?

22     A.    Yes.



Page 105

1           Q.     You stay on with Hotwire in May,

2    right?

3           A.     Yes.

4           Q.     You stay on in June, right?  You

5    stay on in July.  You stay on all of the way

6    until October or November?

7           A.     23rd of October my resignation.

8           Q.     Okay.  And at no time -- well are

9    there any documents where you express concern to

10   Craig that his demeanor has suddenly changed?

11          A.     No.

12          Q.     Are there any documents that any of

13   their employees where you say Craig suddenly

14   changed, something is wrong?

15          A.     But you -- the difference is I

16   actually knew Craig prior to him on-boarding

17   staff.

18                 I worked with Craig for quite some

19   period of time with the technology of YDF.

20                 So, the advisory board that I had

21   around me, and to one of them being our lawyer,

22   Diane Pinder, would be one that would be able to



1    say, who is an attorney herself, that his

2    demeanor did change over that period of time as

3    well as Dr. Allen, I can't remember his surname.

4         Q.    I just want to go back to my

5    question.

6              Are there any e-mails or

7    communications where you expressed to anyone

8    during this 9 month or 10 month or 11 month

9    period that Craig's demeanor suddenly changed

10   when Dave died?

11        A.    No.

12        Q.    Did you ever express any concern

13   when you served as CFO of Hotwire?

14        A.    No.

15        Q.    As a CFO, and I guess there is a

16   difference between CFO -- well does CFO involve

17   tax duties?

18        A.    It does.  It can be, but we had a

19   external party, BDO, who would look after the

20   taxation part of it.

21        Q.    What is BDO?

22        A.    It is one of the larger, well middle



Page 107

```
 1   tier accounting firms in Australia, equivalent to

 2   like an Ernst & Young here.

 3         Q.    So it is a prestigious company?

 4         A.    Yes.

 5         Q.    And as CFO -- and your being an

 6   accounting CFO role for the company of Hotwire,

 7   right?

 8         A.    That's right.

 9         Q.    Not Craig Wright?

10         A.    No.

11         Q.    So, you owed some duties to the

12   company, correct?

13         A.    Absolutely.

14         Q.    And in this entire period there is

15   not a single e-mail or communication where you

16   said I am concerned because Craig Wright's

17   demeanor has suddenly changed.

18         A.    No, because he had the money to turn

19   around and back it, as per his Bitcoin wallets.

20               So I knew, it was all a very new

21   thing for me and to understand Bitcoin as well.

22               And so I thought well, I can see why
```



Page 108

1    he has got the money to be on board and he has

2    got the confidence to be able to bring these

3    people on.

4              This was very new for me.  I had

5    never had a background in technology.  So, this

6    is the first start.  It was, I was leading Craig

7    and following to understand how do you turn

8    around and make something.  For what he was

9    doing, wanting to achieve.

10             I mean some of the plans with the

11   company were out of my depth with what he was

12   wanting to achieve.

13             So, it was interesting for me.  I

14   mean, he's a great futurist, so I could

15   understand where he was going and what he wanted

16   to do.

17             But doing it the right way, and

18   trying to put the right people around is where

19   the challenge was for Craig.

20        Q.    Okay.  You mentioned that you were

21   CFO but there was a bookkeeper?

22        A.    Yes.



Page 109

1          Q.     Who was the bookkeeper?

2          A.     I can't remember her name.

3          Q.     Okay.  You can't remember her name.

4     But what were her duties?

5          A.     She looked after the accounts on a

6     daily basis and reported directly to Craig.

7          Q.     You testified earlier that that was

8     unusual for you?

9          A.     To not do --

10         Q.     To not do that as the CFO?

11         A.     Normally I would have full access to

12    the accounts and have a Xero access.  Xero being

13    the accounting package, that is.

14         Q.     Okay.

15         A.     In this case, no.  But then we are

16    at the early days before we were on-boarding a

17    whole lot of staff.

18                So I knew that over a period of

19    time, that the duties would increase.  But, I

20    didn't need to work in a full-time capacity.  It

21    was the early stages.  It was a startup.

22         Q.     So, for the nine months that you



Page 110

1   were CFO, 9, 10, 11 months you were CFO, did you

2   ever express any concerns that there was a

3   bookkeeper?

4          A.    No, I wouldn't express concerns of a

5   bookkeeper.  That makes total sense for the

6   everyday expenditure to be taken up by someone to

7   look after it.

8          Q.    So, that is completely okay then for

9   you?

10          A.    I have no problems with that.  It

11   makes total sense.

12          Q.    Okay.  And what were your duties as

13   CFO?

14          A.    Ours was working through the cash

15   flow.  For me, it was, and why Craig brought me

16   on, was the way that I had the discipline to be

17   able to build YDF, and the culture around it.

18                What Craig wanted was exactly

19   similar to what we had.  But the difference is on

20   a greater scale, and he had a huge amount of

21   money behind him to be able to back it, to be

22   able to do it.



Page 111

1        Q.    Okay.  I'm showing you -- what am I

2   on?

3              MR. KASS:  You are on 21.

4              (Wilson Exhibit Number 21

5               marked for identification.)

6   BY MR. PASCHAL:

7        Q.    I am showing you what we are going

8   to mark as 21?

9              What am I showing you?

10       A.    My LinkedIn profile.

11       Q.    Okay.  When was the last time you

12  updated this profile?

13       A.    Recently.

14       Q.    Did you draft this profile?

15       A.    No, my marketing, but I approved it.

16  My marketing staff would have drafted it and then

17  I signed off on it.

18       Q.    Who is your marketing staff?

19       A.    Nadine.

20       Q.    Could you spell her name, please?

21       A.    N-A-D-I-N-E.

22       Q.    What is her last name?



Page 112

1          A.      Scott.

2          Q.      And can you spell that, too?

3          A.      S-C-O-T-T.

4          Q.      Is she here in your office in New

5    York or Australia?

6          A.      Australia.

7          Q.      Okay.  And if I wanted to get in

8    contact with her, how would I do that?

9          A.      I could pass you her contact

10   details.

11         Q.      What is her e-mail address?

12         A.      If you let me know by e-mail, send

13   me an e-mail, and then I would be able to put the

14   two of you connected together.

15         Q.      Okay.  Now, if you turn to Page 3,

16   can you look at the bottom where it says

17   Education?

18         A.      Education.

19         Q.      Well let me ask you first --

20         A.      Here, Queensland University of

21   Technology.

22         Q.      So, let me ask you.  You have a



Page 113

1   marketing person looking at your LinkedIn, you

2   take this seriously, right?

3          A.    Yes, the LinkedIn.

4          Q.    And you hold this out because people

5   might use your company and want to look over

6   information about you.  Correct?

7          A.    That's correct.

8          Q.    So you would want to make sure this

9   is accurate.  Right?

10         A.    Yes.

11         Q.    You wouldn't put anything false in

12  here, right?

13         A.    No.

14         Q.    And you wouldn't leave out any

15  important information, would you?

16         A.    No.

17         Q.    Okay.  Education, where it says

18  Queensland University of Technology.

19         A.    Yes, QUT.

20         Q.    Accounting and finance was your

21  degree?

22         A.    Correct.



Page 114

1        Q.    Did you take any classes in

2    cybersecurity?

3        A.    No.

4        Q.    Did you take any classes related to

5    the Blockchain?

6        A.    No.

7        Q.    Did you take any classes related to

8    Bitcoin?

9        A.    No.

10        Q.    Did you take any classes related to

11    cryptocurrency?

12        A.    No.

13        Q.    Did you take any classes related to

14    cryptography?

15        A.    No.  And I never make out that I

16    have an IT background.

17        Q.    Okay.  And then you go in from, I

18    guess right after education you go into

19    laboratory assisted patient accounts, correct?

20        A.    Correct.

21        Q.    You didn't have any background

22    with --



Page 115

1           A.     I have had no background whatsoever.

2      It was only after my dad passing that I started

3      to take an increase and understanding in cyber

4      security.

5                  But even today, I do not read code.

6      I have experts there in my office, and I do have

7      a CISO, with a great background in cyber

8      security.

9                  (Reporter requests clarification.)

10                 THE WITNESS:  Ah.  CISO, chief

11        information security officer.

12          Q.     What is the name of your chief

13     information security officer?

14          A.     Mark McPherson.

15          Q.     Is that the only person that you

16     have in that capacity?

17          A.     Yes.

18          Q.     Do you have any computer scientists

19     working for you?

20          A.     Yes, I have a data scientist as

21     well.

22          Q.     What is that person's name?



Page 116

1          A.     Melissa Crossman.

2          Q.     And do you know their e-mail

3   addresses?

4          A.     Yes, I do.

5          Q.     What is their e-mail address?

6          A.     Melissa.crossman@cryptoloc.com and

7   mark.mcpherson@cryptoloc.com.

8          Q.     Okay.  Can you go to the first page.

9   So you say, "I took a fierce interest in cyber

10  security solutions after two devastating events

11  in my life."  Right?

12         A.     Correct.

13         Q.     Would that be when you first had a

14  passion for cyber security?

15         A.     After the loss of my father, yes.

16         Q.     And your father passed in 2011?

17         A.     Ten, so in October 2010, my father

18  passed away.  And it was through this process

19  when I was trying to find a solution in the event

20  that one dies, that you can find the will, the

21  life insurance superannuation.

22         Q.     I'm sorry, I need to ask you



Page 117

1     questions.  So that was an important -- strike

2     that.

3               When your father passed, it was

4     important that you were able to find documents

5     about him?

6          A.    Well it was.  We were fortunate to

7     have dad for a 12-month period when he was

8     terminal with cancer.

9               And through that stage it was a

10    challenge to find all of those important

11    documents.  And it was through that, that I had

12    seen, I even said to dad it was lucky that he was

13    alive, otherwise we never would have been able to

14    find the information.

15         Q.    Okay.  And I just want to ask you

16    then, so, when he, and I know it is difficult to

17    talk about some of this stuff, but I just want to

18    know.

19         A.    Uh-huh.

20         Q.    You were able to get documents from

21    him before he died because you had a window,

22    right?



Page 118

1      A.    Yes, he was alive and we could use

2    him to find the information.

3      Q.    But you, were you able to find

4    documents?

5      A.    Yes, because he was alive.

6      Q.    Would it strike you as odd if

7    somebody were to destroy documents after a family

8    member passed away?

9      A.    Well, I suppose if they don't know

10    the importance of it or a filing cabinet.

11         I mean, hence why I created YDF was

12    purely in event that I drop dead that my family

13    and my two children would know where the

14    information was.

15         Being an accountant at that stage, I

16    had a filing cabinet with a whole lot of

17    strategies of clientele.

18      Q.    Yes.

19      A.    And I thought what a mess it would

20    be that they would never receive their paperwork.

21         So I wanted to make sure that in the

22    event that I passed away, that everyone receives



Page 119

1    the information, and that it would stand up in

2    court.

3              So hence why I created the

4    technology and went on this road and journey to

5    build it.

6         Q.    That is a noble process.  I mean,

7    that is important for people that you are doing

8    that for, right?

9         A.    It is.

10         Q.    Because it is important that if

11    somebody passes they could get access to

12    important documents.  Right?

13         A.    Yes.

14         Q.    So, would it be odd to you if

15    somebody were to throw away in the trash every

16    piece of paper that their family member had?

17    Without looking at them?

18         A.    Probably not.  It depends on who the

19    individual is.

20         Q.    Let's say it was your, I mean --

21         A.    For me it is different.  Like I

22    would actually go through it.



Page 120

1              It depends on the capability of the

2    individual as well and the circumstances that

3    they grew up in.

4         Q.    So, if they erased hard drives and

5    threw out papers, that would be --

6         A.    That would be strange.

7         Q.    Okay.  Just to clarify, I'm going to

8    show you a place on your -- actually, you said

9    you became engaged in cyber security after your

10   father passed in 2011, right?

11        A.    Yes.

12        Q.    Okay.

13        A.    '10.

14        Q.    On your LinkedIn, I don't know if it

15   was just -- but it says 2010 is when you got

16   involved with cyber security.

17        A.    Correct.  So dad passed away in

18   October of 2010.

19        Q.    Okay.

20        A.    And I even spoke to dad prior to him

21   passing about it.

22        Q.    Okay.  I got it.  I'm sorry, if you



Page 121

1    wanted to keep --

2         A.    No, go ahead.  I understand.

3         Q.    Can you take a look at what was

4    Plaintiffs 15?

5         A.    Yes, with the projects.

6         Q.    Mr. Freedman asked you if there was

7    a common theme between all of these things in

8    this e-mail, right?

9         A.    Yes.

10        Q.    The live feed here says you took

11   about 20 seconds to read this e-mail, right?

12        A.    Yes.

13        Q.    Was that, and this is a two-page

14   single space e-mail, right?  Or one page?  It is

15   two pages, right?

16        A.    Yes.

17        Q.    -- let me go through here.

18             Do you see the -- let's go to the

19   fourth category.

20             MR. FREEDMAN:  Excuse me, counsel.

21        Could you tell me the Bates label on the

22        bottom of the page?



Page 122

1            MR. PASCHAL:  Yes.  It is 0043726.

2            MR. FREEDMAN:  Thank you.

3            MR. PASCHAL:  Let me know when you

4      have it.

5            MR. FREEDMAN:  Go ahead.

6    BY MR. PASCHAL:

7         Q.    So, if you go down to the fourth

8    where it says Video System.

9         A.    Yes.

10        Q.    Replacement for Adobe and

11   GoToMeeting.

12        A.    Yes.

13        Q.    What does that have to do with

14   Bitcoin?

15        A.    What he was trying to set up, Craig

16   Wright, is the ability for, where you could go

17   into an environment, be able to negotiate and

18   then you would be able to use Blockchain, pay in

19   Bitcoin for the end of an agreement.  So, of a

20   party.

21            Mainly if there was a legal problem.

22   And that as long as everyone was happy with the



Page 123

1    outcome of it, then the money would be

2    transferred.

3              If not it would stay as an escrow

4    and then other legal professions would be able to

5    come in and voice their opinion and the money

6    would be dispersed at a certain percentage.

7         Q.    Okay.  But going back to my

8    question, though.

9              How is that related to Adobe or

10   GoToMeeting?

11        A.    It was an improvement of what Adobe

12   and GoToMeeting is.

13             It is the ability to be able to use

14   Blockchain to be able to escrow or escrow the

15   money with the Bitcoin and to be able to have a

16   background so you could actually track it all

17   back from those meetings.

18        Q.    So, the process of Adobe and

19   GoToMeeting could be similar or, or Bitcoin, let

20   me say.

21        A.    Yes.

22        Q.    Could be similar or the same as



Page 124

1    GoToMeeting or Adobe?

2         A.    It would be new technology.  But,

3    you would be able to put it on the Blockchain.

4         Q.    Was that technology ever developed?

5         A.    I left in October 2013.  This is

6    August 2013.  These were projects where he was

7    scaling his staff to be able to deliver.

8         Q.    Okay.  So -- hold on.  So, the

9    Reputation Systems, think LinkedIn, do you see

10   that?

11        A.    Yes.

12        Q.    But with the tracking against

13   training?

14        A.    Yes.

15        Q.    That is related to Bitcoin?

16        A.    Blockchain.

17        Q.    Let's say Bitcoin first.

18        A.    All of these projects here are

19   Blockchain-related, which then could turn around

20   and have Bitcoin as well.

21               So when you are looking at the

22   LinkedIn, turning around and putting to



Page 125

1    qualifications, et cetera, you run it off the

2    Blockchain.

3              However you are able to send

4    information and be able to be paid in

5    remuneration with the Bitcoin.

6         Q.    So, I want to clarify this

7    Mr. Wilson, because earlier you said the common

8    point is Bitcoin?

9         A.    Secondary is Bitcoin.

10        Q.    So, the common theme is Blockchain?

11        A.    Blockchain is all of this.  All of

12   it is Blockchain as we understand.  Blockchain is

13   the underlying technology of Bitcoin.

14             So, all of this does come back into

15   receiving money and funds.

16        Q.    Okay.  But there is a lot of

17   different technologies that stemmed from

18   Blockchain, correct?

19        A.    Absolutely.

20        Q.    Is the technology used at YDF, is

21   that Blockchain?

22        A.    Absolutely not.



Page 126

1          Q.     Do you think it is better than

2     Blockchain?

3          A.     Yes, I do.

4          Q.     Is that based on your cyber security

5     experts, data scientists, and developers?

6          A.     Yes.

7          Q.     And that --

8          A.     When we, the reason for it is in

9     regards to privacy.

10              Blockchain doesn't give you the

11     privacy, and that is, it is a public ledger, and

12     that you can track all of the transactions,

13     understand what an individual is doing, be able

14     to do a 51 percent of tech.

15              There is plenty of information now

16     from the MIT which has come out and said we

17     realize that there is problems with scaling and

18     also the privacy around Blockchain.

19          Q.     Okay.

20          A.     I have done a closed ledger, you

21     know, with cryptography with an escrow being our

22     point of difference which we have patents on a



Page 127

1    global stage as well.

2              We actually could run a digital

3    currency off our Cryptoloc technology if we

4    wished and it would be a lot quicker and give the

5    privacy.  But we would work with law enforcement

6    as well.

7         Q.    Would that put you in competition

8    with Bitcoin?

9         A.    Would it put us in competition?  It

10   would if I did want to run out a digital

11   currency, but it is not on my agenda.

12        Q.    Oh, and do you have any

13   communications with Diane Pinder?

14        A.    Not recently.

15        Q.    Can you tell me the substance of

16   your communication was Diane Pinder?

17        A.    Diane Pinder was an advisory board

18   member with YDF in the early days.

19              And since then, so, many years now.

20        Q.    Uh-huh.

21        A.    Probably 2014, 2016 -- it would have

22   been 2014.



Page 128

```
 1                It is the same year after I resigned

 2    Diane finished up at Lloyd solicitors in a

 3    capacity as one of the principal lawyers.

 4                And then I haven't remained

 5    connected to Diane.

 6         Q.    Can you go back to your LinkedIn

 7    page?

 8         A.    Yes.

 9         Q.    Earlier you testified you would make

10    sure that this information was accurate.

11    Correct?

12         A.    Yes.

13         Q.    And you would make sure that

14    everything is in here that is necessary.

15    Correct?

16         A.    Yes.

17         Q.    And you wouldn't leave out anything

18    that was important?

19         A.    I could leave out something.

20         Q.    Earlier you testified that you would

21    not leave out anything important.  I am

22    clarifying your testimony.
```



Page 129

1          A.     Well, only sensitive information

2    such as the clientele that I was looking after.

3    It is not relevant to a LinkedIn profile.

4          Q.     So it wasn't relevant that you were

5    involved with Hotwire?

6          A.     No, and I didn't turn around and add

7    Hotwire PE or any of the group of companies at

8    all to my LinkedIn profile.

9               Mind you, back in those days I

10   really didn't use LinkedIn.

11         Q.     You said you were CFO and

12   shareholder of several companies with Craig

13   Wright, right?

14         A.     Yes.  The group of his companies he

15   appointed me as CFO and director.

16         Q.     And none of these are on your

17   LinkedIn.  Are they?

18         A.     No.

19         Q.     And those companies had issues with

20   the ATO, correct?

21         A.     Yes.

22         Q.     And you were copied on e-mails with



Page 130

```
 1    the ATO?

 2           A.    Yes.

 3           Q.    And you left all of them off of your

 4    experience, correct?

 5           A.    Yes, because I wasn't -- Craig ran

 6    the matters himself.

 7                 It would be different if I ran the

 8    matters.

 9                 I'm not going to turn around and put

10    myself out as the CFO when he is looking after

11    all of the matters.

12           Q.    And again you were CFO for nine

13    months, right?

14           A.    Yes.  Well --

15           Q.    And during that nine months did you

16    ever e-mail the ATO and say something is wrong?

17           A.    No, why would I?

18                 Information was only supplied as we

19    were doing the R&D and the Australia Taxation

20    Office trying to come up with the numbers.

21           Q.    And earlier you said -- I just want

22    to make sure I get it right.  You said that after
```



Page 131

1   Dave died, you were uncomfortable with the

2   documentations for the companies?

3        A.    That's correct.  And when did I

4   receive the documentation, and the accounts, it

5   all started coming through from beginning of July

6   when our end of financial period was ended on the

7   30th of June.

8             And then when I had to start putting

9   the tax returns and the R&D forms all together

10  and Craig actually even did the numbers himself

11  and then would hand them to me.

12            So, even down to legal work.  Craig

13  looked after a lot of his legal work, he would

14  look after his accounts and then it would be

15  handed over to me and then I would have to go

16  through them.  And then I would ask questions and

17  then we would try to work it out.

18            And then that is when I turned

19  around and said I don't feel comfortable.

20       Q.    Okay.

21       A.    And that is why I never lodged them.

22  And Craig actually lodged them himself.



Page 132

1          Q.    So, from January to July I guess

2    there weren't any documents that you were looking

3    at, because you didn't get them until July?

4          A.    That's right.

5          Q.    So, what were you doing from January

6    to July with Hotwire?

7          A.    Trying to have a look at okay, what

8    is the best way moving forward.  How do we turn

9    around and increase the staffing, because things

10   don't happen that quickly anyway.

11               And the staff, if you have a look,

12   they were really only started in May, June, June.

13   It was late.  It wasn't --

14         Q.    So, what were you doing to complete

15   those tasks that you have just mentioned?

16         A.    Well that was my issue.  I didn't

17   have enough information, nor a whole lot of task.

18               It was all about the projects that

19   Craig was involved in and his background with

20   Bitcoin and understanding the knowledge of

21   Blockchain.

22         Q.    Okay.  So from January to July you



Page 133

1    had an issue, because you didn't have -- could

2    you clarify what was it that you didn't have?

3          A.    There was no accounts that were

4    required to be done or completed.

5          Q.    Okay.

6          A.    All of it was to do with the

7    transfer of information and license agreements

8    and things like that.

9                So, it was more of a legal over an

10   accounting.

11         Q.    Okay.  And so, did you, are there

12   any e-mails or documents or, did you have any

13   communications where you expressed concerns that

14   you weren't doing anything for the seven-month

15   period?

16         A.    There was no work to be done.  As in

17   there was nothing from the accounting point

18   because the bookkeeper was there.  So a lot of

19   mine was strategy with Craig and sitting and

20   understanding, okay, how do we actually structure

21   this to be able to move forward.

22         Q.    So, Hotwire agreed to make you the



Page 134

1    second highest paid employee and you did nothing

2    for seven months?

3          A.    I never got a cent anyway.

4          Q.    Okay.

5          A.    But I still had to pay tax on the

6    money.  And if you go and have a look at the

7    records, I also put the down deposit down for the

8    rental property that Craig never paid me back as

9    well.  And all of the travel back and forward out

10   of Sydney and accommodation expense and

11   expenditure was never reimbursed as well.

12         Q.    Are you upset about that?

13         A.    I think it is unethical.

14         Q.    Okay.

15         A.    You would do the right thing.  If

16   you are delivering and you are working and doing

17   your duties, and your jobs and you want to be

18   part of a project, well then you should pay.

19         Q.    Were you monitoring this case?

20   Monitoring?

21         A.    No.  It actually was Steve Lipke who

22   made me aware of it.



Page 135

1          Q.     And then you reached out and

2    congratulated Mr. Freedman?

3          A.     Yes, I did.  And the same reason I

4    never got paid, that team down in Sydney did not

5    get paid.  They were loaning money off family and

6    loved ones to be able to afford to pay their rent

7    and keep afloat.

8                  They were in quite a state.  And

9    still have not recovered.

10         Q.     And you said that when you were, you

11   resigned your shares were just taken from you,

12   right?

13         A.     That's correct.

14         Q.     How did you feel about that?

15         A.     No, acceptable.  I never argued.  I

16   didn't dispute.  I, I was only wanting what I was

17   entitled to and that was the money, the physical

18   cash that I was out of pocket with.

19                But then the lawyers got involved

20   down in Sydney as part of the administration, and

21   said no, that is an individual matter for Craig.

22   We are not paying you anything.



Page 136

```
 1          Q.     And, were any other the lawyers that

 2    you spoke with other than Mr. Freedman?

 3          A.     No.

 4          Q.     You said the ATO is asking you to

 5    pay taxes on income that you would have made at

 6    Hotwire, right?

 7          A.     That's correct.

 8          Q.     But you are saying you did not make

 9    income --

10          A.     I did not receive one cent.  And you

11    can go through all the bank accounts and you will

12    notice that I never received one.  It was only me

13    sending money to Craig and never being

14    reimbursed.

15          Q.     And in January did you complain that

16    you hadn't been paid your salary?

17          A.     In January?

18          Q.     Of 2013.

19          A.     No.

20          Q.     And in February of 2013, did you

21    complain that you hadn't received your salary?

22          A.     To be honest I didn't expect to
```



Page 137

1    receive a salary.  And I didn't even, wasn't

2    aware of the Document 20, this here, that I

3    believe is what you received from the

4    administrators, of when they were looking after

5    and winding up the company.

6              That's the only way, reason I've got

7    knowledge of it as well.

8              Prior to that it was with the

9    payment summary that came in, and the ATO said I

10   received money and I said no, I didn't.

11             But, that is how this documentation

12   also was supplied to me.

13        Q.    Okay.

14        A.    So, no, I didn't expect to receive

15   any money.  Otherwise it would be strange if I

16   turned around and said no I didn't take any

17   money.

18        Q.    Okay.  So, your payment, what was

19   your payment for being CFO?  What was your

20   expected payment?  What, were you getting out of

21   being CFO.

22        A.    It was supposed to be an annual



Page 138

1   salary of what is here, 150.  But it never

2   commenced.

3            But, I wasn't worried anyway.

4            The issue is, I wasn't concerned,

5   because we were in the stages of doing a setup, a

6   startup.

7       Q.   Okay.

8       A.   During that period of time, I didn't

9   understand the whole, you know, the Bitcoin, the

10  wallets, and how much money.

11           So, I had to get all of that

12  training.  So, I was happy to turn around and

13  spend the time and learning, purely because of my

14  history with Craig, and being an advisory board

15  member of YDF and the relationship there.

16           So that's why I was more than happy

17  to turn around and wear it.  Once the companies

18  got money, then I would get paid but then my

19  duties would increase.  But we never got there.

20      Q.   So, earlier, earlier Mr. Freedman

21  asked you about whether or not you knew that

22  Dr. Wright's Bitcoin was locked up in an



Page 139

1    encrypted file.  Do you recall that line of

2    questioning?

3         A.    Yes.

4         Q.    And he asked you several times?

5         A.    And was he able to get, and was he

6    not able to get access to it.

7         Q.    Let me break that down.

8               Do you know how Craig Wright

9    obtained Bitcoin?

10        A.    Through mining.  With Dave Kleiman,

11   that was my understanding.

12        Q.    What is your understanding based on?

13        A.    From Craig saying that it was

14   working with a great mate who was in the U.S.,

15   Dave.  And they set up Bitcoin and that it was

16   Hitoshi --

17        Q.    Were those the statements to you,

18   were there any other statements that you recall

19   right now?

20        A.    No.  No.

21        Q.    So, from those statements, you --

22   well, let me back up.


MAGNA
LEGAL SERVICES

Page 140

1          Craig Wright never told you that he

2   mined with Dave?

3          A.    Yes, he did.

4               MR. FREEDMAN:  Object to form.

5   BY MR. PASCHAL:

6          Q.    Well, when did he tell you that?

7          A.    Well that is how I knew all about

8   the Bitcoin and his wallets.

9          Q.    Mr. Wilson, I asked you a second ago

10  what were all of the statements that Mr. Craig

11  Wright made to you to make you think that.

12              You did not say that Craig Wright

13  said I mined Bitcoin with Dave.

14              MR. FREEDMAN:  Object to form.  You

15      are mischaracterizing.

16              MR. PASCHAL:  He did not say that.

17      That is why the live feed is helpful.

18              THE WITNESS:  You know, Dave, not

19      Dave, Craig, had been mining it for quite

20      some time.

21  BY MR. PASCHAL:

22          Q.    Well, let me ask you -- I'm sorry,



Page 141

1    are you finished?

2         A.    Yes.

3         Q.    Okay.  If Craig purchased Bitcoin,

4    would you have known that he purchased it?

5         A.    Well you could track it back,

6    absolutely, through the ledger.  I mean there is

7    a history, there is an audit trail.

8         Q.    Do you know if -- well, do you know

9    if Craig Wright purchased Bitcoin?

10        A.    No, I don't.

11        Q.    So, if he purchases Bitcoin, you

12   wouldn't know if it came, that could be his

13   Bitcoin holding, correct?

14        A.    Correct.

15        Q.    So, you are not sure if he mined

16   that Bitcoin then, am I --

17        A.    Oh, no, he definitely mined it.  He

18   even got new servers, et cetera, that ran in his

19   garage.

20        Q.    Okay.  But let's say his garage was

21   closed down and he removed all of his equipment.

22        A.    Right.



Page 142

1          MR. FREEDMAN:  Object to form.

2   BY MR. PASCHAL:

3          Q.    Would he have been mining anywhere

4   else.

5          A.    Absolutely you can.

6          Q.    Well not anyone can, he can?

7          A.    He has the ability to be able to do

8   it on a mobile device.

9                I mean, it might blow the phone up

10  but you still have many other options of being

11  able to mine the Bitcoin.

12         Q.    Do you think he was mining on a

13  mobile device?

14         A.    No.

15         Q.    Okay.

16         A.    But if your question was do you

17  think that he had been doing -- mining Bitcoin,

18  absolutely.

19         Q.    But I'm going to go back to my

20  question.  Do you know, other than his garage,

21  was he mining Bitcoin?

22         A.    Yes.



Page 143

1          Q.    And how do you know that?

2          A.    Because he told me so.

3          Q.    Okay.  And when he told you, was he

4    saying that this is the Bitcoin that I mined in

5    my garage, do you know?

6          A.    No.  But that is not relevant, is

7    it?

8          Q.    Well, I'm asking you --

9          A.    Well, I don't think --

10         Q.    Did he say he was mining in his

11   garage and you don't know?

12         A.    No.

13         Q.    So, if he purchased Bitcoin

14   afterwards, you wouldn't know?

15         A.    No.

16         Q.    Okay.  And do you know how much he

17   mined, exactly?

18         A.    No.  Because he already had a huge

19   amount of Bitcoin as per the wallets.

20              And when Craig said to me this is

21   where my wallets are and this is the amount of

22   Bitcoin that I have mined it, well then, I mean



Page 144

1    it was all new to me.  So I would have to break

2    it down.

3              But, the wallets are there.  Craig

4    has e-mailed them through.

5         Q.    Okay.

6         A.    And I can't see Craig having that

7    sort of wealth to buy the Bitcoin when he was

8    driving around in hoodies and also, you know, in

9    a, in a very cheap car.  And a rental property.

10        Q.    Did you have access to any of

11   Dr. Craig Wright's financial records when he had

12   a hoodie?

13        A.    No.

14        Q.    Did you see his bank account

15   statements?

16        A.    No.

17        Q.    Did you see what he was spending to

18   buy computers?

19        A.    No.

20        Q.    Okay.  And let me ask you, when did

21   you stop speaking to Craig Wright?  Or did you

22   stop speaking to Craig Wright?



Page 145

1          A.     It is years ago.

2          Q.     Huh?

3          A.     Years ago.

4          Q.     Can you give me a date?  A year?

5          A.     Two, three.

6          Q.     Two, three years ago?

7          A.     Yes.

8          Q.     And what made you stop speaking with

9     Craig Wright?

10         A.     I didn't like the way he went about

11    business.  The ethics and morals.

12         Q.     Okay.

13         A.     The way he treats people.

14         Q.     Did he treat you bad?

15         A.     No.  No.  He was pretty good with

16    me.

17         Q.     Okay.  And when Craig Wright, you

18    saw these Bitcoin wallets, did you ever see Craig

19    Wright transfer Bitcoin to anyone?

20         A.     No.  See, I, I have never seen any

21    Bitcoin transfer at all.  All I have ever seen is

22    the wallets on a screen, or the ones that he has



Page 146

1    e-mailed through.  That is it.

2           Q.    So, if Craig Wright had his Bitcoin

3    encrypted, and you never saw any transfers, how

4    would you be able to say that they weren't

5    encrypted?  Is it just that he said he never told

6    you that?

7           A.    Craig would log into them.  So, I

8    know that he could access them.

9           Q.    Okay.  And when did you see Craig

10   log into Bitcoin?

11          A.    Oh, several times at his home

12   address.

13          Q.    Okay.  And what would you see?

14          A.    Oh, the accounts, his wallets, and

15   then he showed me how it works.

16          Q.    And what computer, was it a computer

17   that he was showing you it on?

18          A.    Yes.

19          Q.    Was it like a laptop?

20          A.    Oh, I can't remember.

21          Q.    Okay.

22          A.    It was at his home.



Page 147

```
1          Q.     And how many years ago was that?

2          A.     Oh, that would have been 2013.

3          Q.     And in what home was that?

4          A.     At Howard Street at North Rye, I

5     think it was.

6          Q.     But you did not see him transfer

7     Bitcoin or move Bitcoin?

8          A.     No, but there was no reason for him

9     to do that in front of me.

10         Q.     Okay.  So, if you could log into the

11    screen, right, you could see Bitcoin.

12         A.     Yes.

13         Q.     But, if it was encrypted, then he

14    couldn't move them.  You wouldn't know that,

15    right?

16         A.     Well, once you log-in and you've got

17    access to it, you would be able to send money,

18    receive money.

19         Q.     Did you see the private keys that

20    Craig Wright had?

21         A.     Only what was on the screen.  But,

22    they are not -- no, the wallets only.
```



Page 148

1          Q.     So you never saw a private key?

2          A.     No.

3                 MR. PASCHAL:  We are going to take a

4      break for a second.

5                 THE VIDEOGRAPHER:  Off the record at

6      11:04.

7                 (Recess taken -- 11:04 a.m.)

8                 (After recess -- 11:20 a.m.)

9                 THE VIDEOGRAPHER:  We are back on

10     the record at 11:20.

11   BY MR. PASCHAL:

12          Q.     Mr. Wilson, what did you discuss on

13   the phone with Mr. Freedman?

14          A.     When I was travelling back into the

15   U.S., would I be available to catch up.

16          Q.     Well, how many phone conversations

17   did you have with Mr. Freedman?

18          A.     Around about three.

19          Q.     Okay.  And they were three separate

20   e-mails, also?

21          A.     Well, yes, there were e-mails going

22   back and forward.  But some of them are very



Page 149

1    short.  I am happy to supply them.

2         Q.    Just focusing on the phone

3    conversations.

4         A.    Uh-huh.

5         Q.    What did you discuss with

6    Mr. Freedman?

7         A.    In regards to the social media posts

8    that Craig put up about myself, talking ill of

9    me, did I have any supporting documents?  And I

10   said yes I would share them with you.

11        Q.    What did you say about the posts

12   that Dr. Wright said about you?

13        A.    I wasn't aware of it.  I actually

14   had to go and search it myself.

15        Q.    Okay.

16        A.    I wasn't aware at all.

17              I actually wasn't even aware of the

18   case until Steven Lipke made me aware.

19        Q.    Who was Steven Lipke?

20        A.    He was one of the operations

21   managers for Craig Wright out of Sydney.

22        Q.    Okay.  For --



Page 150

```
 1          A.     I mean, even now, for today's

 2   meeting, somehow it has been also on, there is an

 3   article about it, that I was coming in and he

 4   made me aware of it, too.

 5          Q.     Steven Lipke did?

 6          A.     Steven Lipke did, yes.

 7          Q.     And where does Steven Lipke work

 8   now?

 9          A.     I'm not sure.

10          Q.     How does he communicate with you?

11          A.     He will send me a phone call, he

12   will send me an e-mail.

13          Q.     What is his e-mail address?

14          A.     I couldn't tell you.  I would have

15   to look it up.  It is not someone I go back and

16   forward.

17                 Now and then he would just sort of

18   pop up and, I mean, I haven't even caught up with

19   Steve in, well, for quite some time.

20          Q.     And where does he live?

21          A.     In Sydney.

22          Q.     Do you know his phone number?
```



Page 151

1          A.      I would have to look it up for you,

2    I don't.

3          Q.      Where would you look up his phone

4    number?

5          A.      Out of my cell.

6          Q.      Do you have your cell on you now?

7          A.      Yes.

8          Q.      Can you please look at his number?

9          A.      Yes.

10             MR. BRENNER:  For the record,

11        Mr. Freedman is dealing with a personal issue

12        so I just stepped in.

13             THE WITNESS:  Okay he was the

14        project manager.

15   BY MR. PASCHAL:

16         Q.      And what is his phone number?

17         A.      Plus 61-417-261-542.

18         Q.      Does your contact info also show his

19   e-mail address?

20         A.      Yes, it does.

21         Q.      Can you please provide that tome?

22         A.      Lipke_s@hotmail.com.



Page 152

1          Q.     And have you ever spoken to Ira

2     Kleiman?

3          A.     No.

4          Q.     Have you ever looked up any

5     information about Ira Kleiman?

6          A.     No.  Oh, yes.  And I had an e-mail

7     that she was originally involved right at the

8     early days of it.

9          Q.     What e-mail?

10         A.     I would have to have a look.

11         Q.     Who was the e-mail between?

12         A.     Craig Wright.

13         Q.     And who else?

14         A.     Myself.  And probably Ramona Watts.

15         Q.     And it discussed Ira Kleiman?

16         A.     Ira was involved in the e-mail.

17         Q.     He was a recipient or was he

18    discussed in the e-mail?

19         A.     No, no, no, no.  A recipient of the

20    e-mail.

21         Q.     And what did the e-mail discuss?

22         A.     It was just general information.



Page 153

1              The only reason I'm aware of it,

2    because it came up and said we have never met

3    Ira.  I actually thought it was a -- wait, is

4    that Kleiman?

5         Q.    Ira Kleiman.

6         A.    No, no, I had no correspondence

7    whatsoever.

8         Q.    Okay.

9         A.    There was another person that Craig

10   was involved with, and it was a lady.  I can't

11   remember her name, though.

12        Q.    But her name was Ira?

13        A.    No, no.  It was a Chinese name.  Or

14   an Asian name.

15        Q.    Okay.

16        A.    I have had no correspondence

17   whatsoever from the Kleiman family.

18        Q.    Could you just spell Lipke, the

19   e-mail address that you had in your phone?

20        A.    L-I-P-K-E_S@hotmail.com.

21        Q.    And when did you start working with

22   Craig Wright?



Page 154

1          A.     It would have been the end of 2011,

2     2012.

3          Q.     Okay.  And did you develop a patent

4     with Craig Wright?

5          A.     I already started the process

6     because I came up with the concept in 2010.  So,

7     the patents was already underway.

8                 And, then Craig, I got Craig

9     involved and said --

10         Q.     Let me just ask you -- so, how did

11    you start the process?

12         A.     Because I --

13                MR. BRENNER:  Object to the form.

14                THE WITNESS:  Because when I was

15         looking for the solution, and I couldn't find

16         it.  So I went to a patent attorney, from my

17         commercial lawyers.  He said go to a patent

18         attorney and see if you can find it.

19                And they said Jamie, there is

20         nothing out there on a global stage.  And I

21         said you've got to be kidding, I mean it

22         makes sense to me.



Page 155

1    BY MR. PASCHAL:

2           Q.    Just to clarify, what was the stage,

3    for what?

4           A.    In the event of losing a loved one

5    that between an escrow and a cloud provider that

6    the information would be released.

7                So I already started the process.

8           Q.    So when you say the process, do you

9    refer to the idea?

10          A.    The concept, yes.

11          Q.    But you didn't actually start the

12   whole programming and putting together and coding

13   or anything?

14          A.    Yeah, I did before Craig come along.

15          Q.    But you didn't?

16          A.    Physically, no.  As I said, I don't

17   write code.  I don't have an IT background.  I

18   make it very clear, I do not have an IT

19   background.  I do not develop.

20          Q.    Who did that for you?

21          A.    Drew Nicholas.

22          Q.    Can you spell that for me, please?



Page 156

1        A.    D-R-E-W, and Nicholas,

2   N-I-C-H-O-L-A-S.

3        Q.    Okay.  And how did you know Mr. Drew

4   Nicholas?

5        A.    I was looking for an IT company with

6   developers to be able to develop it.

7        Q.    And do you still talk to

8   Mr. Nicholas today?

9        A.    Yes, I do.

10        Q.    Did Mr. Nicholas meet Craig Wright?

11        A.    Yes.

12        Q.    Did they work together?

13        A.    Craig was only advisor.  Craig never

14   got involved in code.

15        Q.    Okay.

16        A.    Craig wasn't involved in any of the

17   coding or development of it.

18                    (Wilson Exhibit Number 22

19                     marked for identification.)

20   BY MR. PASCHAL:

21        Q.    I'm showing you what we are marking

22   as 22.



Page 157

1          So is this one of the patents that

2   you and Craig Wright put together?

3          A.    Correct.

4          Q.    Okay.  And it was registered in

5   2011?

6          A.    That's correct.

7          Q.    October 28, 2011?

8          A.    Yes.

9          Q.    Okay.  So, when did Craig come on

10  board with this patent?

11         A.    Craig was only added as a name.  I

12  had to change all of the documentation.

13             So Craig came on around about 2012.

14         Q.    So, you were just using his name for

15  the patent?

16         A.    No, no, no.  Because Craig said to

17  me, well, I needed a local and I wanted to make

18  sure that I had all of the I's dotted and the T's

19  crossed.

20         Q.    Uh-huh.

21         A.    So, Craig was even paid handsomely

22  for his time as well to oversee it, which was



Page 158

1    wrong, and I still had to get my patents

2    attorneys to go through it.

3              So, Davies Collison & Cave were the

4    ones who actually looked after the patents as

5    well.

6              And Craig, and naturally because he

7    was paid, it was my concept, the process already

8    started, he had to sign, make sure that we got a

9    signoff that he had no rights to it?

10         Q.    So, when you list Craig Wright and

11   you as the inventor, is that incorrect?

12         A.    No.  Because Craig was also an

13   advisor.  Same with my lawyers and people like

14   that.

15         Q.    Well, would your lawyers be listed

16   as an inventor?

17         A.    Well that was from the legal point.

18   Craig being IT and that this documentation was in

19   regards to the IT side, that is why it was

20   listed.

21         Q.    Why isn't Mr. Drew, why isn't Drew

22   listed on here as an inventor?



Page 159

1      A.    Drew was a developer.  It was, well

2  my concept.  Originally, it was just my name on

3  all of the documentation.

4           Then Craig wanted to get more

5  involved in it and I said well you should be

6  probably listed as an inventor as well.  And that

7  is how he got his name on it.

8      Q.    But you said he did some advising to

9  get this, right?

10     A.    He was involved, we had already done

11  all of the paperwork and all of the knowledge and

12  how it worked system-wise.

13           And then Craig came on later on down

14  the track.

15           And then I wanted Craig as a

16  director and an advisor to ensure that we were

17  moving in the right direction.

18           So, his expertise is what I was

19  using to ensure that the I's were dotted and the

20  T's were crossed.

21     Q.    Good memory.

22           Was Dave involved, Dave Kleiman



Page 160

1    involved in any way in this patent?

2         A.    No. Not at all.

3         Q.    Do you use any of this patent today?

4         A.    This is my technology.  Cryptoloc.

5         Q.    This is your technology?

6         A.    Yes.  Cryptoloc, absolutely.

7         Q.    And it involves cryptography?

8         A.    That's correct.

9         Q.    And would it be wrong to say that

10   Dave is entitled to half of this?

11        A.    How could he be entitled to half of

12   it?  How could Craig be entitled to half of it.

13        Q.    I'm just asking.  Would it be wrong

14   to say that Dave Kleiman is entitled to half of

15   this, your property right now, your intellectual

16   property.

17        A.    Absolutely not.

18             MR. FREEDMAN:  Objection to form.

19             MR. PASCHAL:  It would be correct?

20             THE WITNESS:  No, he is not entitled

21        to it at all.

22             MR. FREEDMAN:  Objection to form.



Page 161

1             THE WITNESS:  Nor is Craig Wright

2       entitled to it.

3   BY MR. PASCHAL:

4        Q.    Okay.  So, if you were to -- I just

5   want to -- have you ever amended the information

6   on this patent?

7        A.    Why would I?

8        Q.    To remove Craig Wright as inventor.

9        A.    No, Craig Wright signed off all of

10  his rights to be able to take any claim against

11  it.

12       Q.    Okay.  And --

13       A.    And that is all done under Davies

14  Collison & Cave; they are patent attorneys.

15       Q.    Okay.  And when did Craig Wright

16  sign that document?

17       A.    Oh, I'm not sure.  Davies Collison &

18  Cave would have the date.  It was at the

19  beginning stages, because Craig was paid,

20  physically paid money to it.

21       Q.    It couldn't have been early 2011,

22  right?



Page 162

1        A.    No, it wasn't.  It was '12.  I

2  already started the process with the patents

3  before Craig came along.

4        Q.    Okay.

5        A.    So, if you go and have a look at the

6  history of it, you would notice that I was the

7  only inventor.

8        Q.    But, so you are saying that Craig

9  wouldn't have interest in it because he signed

10  over any of his rights?

11        A.    That's correct.  Well he didn't have

12  the concept.  It was me who came up with the

13  concept.

14        Q.    Okay.  So I just want to clarify,

15  though --

16        A.    Craig --

17        Q.    -- would you think that it would

18  have been an accurate statement to say that Dave

19  Kleiman, the estate of Dave Kleiman is entitled

20  to half of this?

21              MR. FREEDMAN:  Objection to form.

22              THE WITNESS:  Why would you think



Page 163

```
 1      that, though?

 2   BY MR. PASCHAL:

 3         Q.    I'm just asking the question.

 4         A.    Well if you think about it, I

 5   started the process.  I had the concept.  The

 6   patent was lodged prior to them coming on board.

 7   Well, prior to Craig even being involved in the

 8   business.

 9               So, how could Dave, who I didn't

10   even know, and Craig Wright, who I didn't even

11   know at that stage, be involved or entitled to

12   the patent.

13   BY MR. PASCHAL:

14         Q.    Could Dave have been working on this

15   with -- could Craig have been working on this

16   with Dave without your knowledge?  The task that

17   you told them?

18         A.    They had no access to them.  They

19   never had access to the source code.

20         Q.    So, how was Craig making sure that

21   all of your T's were crossed and your I's were

22   dotted?
```



Page 164

1          A.    It was through the lawyers and it

2     was just paperwork.  It wasn't technology.

3                It was documentation.

4          Q.    So, you hired Craig Wright to be, to

5     look at this?

6          A.    Yes.

7          Q.    As -- well, let me -- so, Craig

8     Wright at this time he is wearing his hoodies?

9          A.    Yes.

10         Q.    He is into his IT?

11         A.    Yes.

12         Q.    He is into his developer?

13         A.    Yes.

14         Q.    So, you wouldn't hire him as a

15    lawyer?

16         A.    No, Craig Wright as an expert in, a

17    cyber security expert.

18         Q.    And that is why his name was on here

19    as an inventor?

20         A.    That's right.

21         Q.    As inventor --

22         A.    Okay then, as an inventor.



Page 165

```
 1          Q.     Okay.  And, there is a document, I

 2    haven't seen it, but he has signed, you said he

 3    waived his rights to this?

 4          A.     Absolutely.

 5          Q.     In 2012?

 6          A.     Before we even started, or I got

 7    Craig involved.

 8                 I mean naturally I'm not going to

 9    turn around and hand a concept over and have

10    people like you look at me and try to take half

11    of the technology.

12          Q.     It wouldn't be me.

13          A.     I know where you are trying to go,

14    though.

15          Q.     I don't think you do.

16                 And so, just to be clear, if you

17    look on, if you look at the document on the

18    right-hand side of application U.S. 14/354359

19    events, nowhere in here does it say that Craig

20    Wright, or did you amend this patent to remove

21    Craig Wright, correct?

22          A.     Did I -- there was movement back and
```



Page 166

1    forward with Davies Collison & Cave.  So, Davies

2    Collison & Cave would have the history and the

3    documentation, et cetera, that was needed to be

4    done in the process.

5         Q.    And let's say in his advisory role

6    Craig Wright, as the inventor, as an IT guy

7    wearing his hoodie had conversations with Dave

8    Kleiman to develop this intellectual property or

9    to do anything with it.  I mean let's say Craig

10   didn't tell you.  Well first did Craig ever tell

11   you that?

12        A.    No.  It was all done in-house.  I

13   mean, Craig may have had conversations with many

14   people about it.

15             But, it was all done in-house; it

16   wasn't --

17        Q.    Did you ever get a document from

18   Dave Kleiman saying he would waive any of his

19   interests to this patent?

20        A.    I don't see how Dave could be

21   involved in it.

22        Q.    Let's assume that a court ordered



Page 167

1    that that intellectual property belonged --

2         A.    It wouldn't be involved.

3              MR. FREEDMAN:  Objection to form.

4    BY MR. PASCHAL:

5         Q.    You didn't get a waiver from Dave

6    Kleiman, did you?

7         A.    No.  I don't need to.

8         Q.    Okay.  So, Mr. Freedman asked you

9    about hacking earlier?

10        A.    With Craig Wright, the e-mails being

11   hacked.

12        Q.    So, hacking can happen, do people

13   know exactly when a hack happens?

14        A.    Not -- no.  Not thoroughly.

15        Q.    I mean part of that, I mean the

16   hacking could be something that, in fact, I don't

17   know if I need to pull it, but on your website

18   you expressed that hacking could be something you

19   learn of much later.  Right?

20        A.    That's correct and it is public

21   knowledge.

22        Q.    And it is something even savvy



Page 168

1   people need protection, because hacking can

2   happen?

3          A.    And your e-mails are one of the

4   weakest links.

5          Q.    And so if Craig Wright were hacked,

6   and he just, is there some foolproof way that he

7   would know right away?

8          A.    No.

9          Q.    Okay.  And if he learned many years

10  later, is that something that you see as uncommon

11  in your line of work?

12         A.    No.

13         Q.    Okay.  And, I think I am pretty

14  much -- just one second.

15             MR. PASCHAL:  I think we are good.

16     That is it.

17                  FURTHER EXAMINATION

18  BY MR. FREEDMAN:

19         Q.    I have five questions for you, well

20  maybe a little more, but we will get you out of

21  here.

22             Did you ever respond to an e-mail



Page 169

1   from Craig and receive back an e-mail, I don't

2   know what you are talking about, I didn't send

3   this e-mail?

4        A.   I don't know what you mean.

5             MR. PASCHAL:  Objection to form.

6   BY MR. FREEDMAN:

7        Q.   Well we were talking about whether

8   or not the e-mails were hacked.

9             My question is, did you ever respond

10  to an e-mail from Craig, either orally or via

11  e-mail and receive a response from Craig saying I

12  didn't send that e-mail.  It is a hacked e-mail?

13       A.   No, I didn't even know he was

14  hacked.

15       Q.   Mr. Wilson, can you take a look at

16  Plaintiffs Exhibit 1 for me, or Wilson 1 for me.

17            And, those are the resignation

18  letters?

19       A.   Yes.

20       Q.   Can you read the companies you

21  resigned from?

22       A.   Coin Exchange, Hotwire Preemptive



Page 170

1    Intelligence, Interconnect Research and Integers.

2         Q.    I noticed that, and actually you

3    noticed, Mr. Wilson, during a break you mentioned

4    this to us, that there was missing W&K was

5    missing from the resignation.

6         A.    That's correct.

7         Q.    Why is that?

8         A.    Because I didn't even know I was a

9    director.

10              MR. FREEDMAN:  No further questions.

11              MR. PASCHAL:  No further questions.

12              All right, I think we are done.

13              MR. FREEDMAN:  You have a right to

14         read your deposition and you can correct

15         inaccuracies that you believe are there, or

16         you can trust the court reporter did her job.

17              Do you elect to read it or do you

18         waive your right to read it.

19              THE WITNESS:  I will waive my right.

20              THE VIDEOGRAPHER:  All right, if

21         this is everything, we are off the record at

22         November 8, 2019, at 11:39.



Page 171

1           (Whereupon, signature having been waived,

2    the deposition concluded at 11:39 a.m.)

3                        *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 172

1                CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA  )

3    DISTRICT OF COLUMBIA       )

4          I, LORI J. GOODIN, RPR, CLR, CRR, the

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the witness whose

7    testimony appears in the foregoing deposition was

8    sworn by me; that the testimony of said witness

9    was taken by me in machine shorthand and

10   thereafter transcribed by computer-aided

11   transcription; that said deposition is a true

12   record of the testimony given by said witness;

13   that I am neither counsel for, related to, nor

14   employed by any of the parties to the action in

15   which this deposition was taken; and, further,

16   that I am not a relative or employee of any

17   attorney or counsel employed by the parties

18   hereto, or financially or otherwise interested

19   in the outcome of this action.

20                  _____

                    LORI J. GOODIN, RPR, CLR, CRR, RSA

21                  Notary Public in and for the

                    District of Columbia

22   My Commission expires:  May 14, 2021



**A**

**ability** 10:18 11:1
  47:22 122:16
  123:13 142:7
**able** 16:4 76:19
  94:6 105:22 108:2
  110:17,21,22
  112:13 117:4,13
  117:20 118:3
  122:17,18 123:4
  123:13,14,15
  124:3,7 125:3,4
  126:13 133:21
  135:6 139:5,6
  142:7,11 146:4
  147:17 156:6
  161:10
**abrenner@bsfllp...**
  3:13
**absolutely** 20:14
  26:18 40:7 71:2
  90:14 97:16
  107:13 125:19,22
  141:6 142:5,18
  160:6,17 165:4
**accept** 34:2 70:6
**acceptable** 135:15
**access** 32:2 40:17
  47:22 48:6,7 52:9
  54:10 56:19 57:1
  57:5 59:3 61:12
  64:16 67:8 109:11
  109:12 119:11
  139:6 144:10
  146:8 147:17
  163:18,19
**accommodation**
  134:10
**account** 96:16
  144:14
**accountant** 12:20
  12:21 13:1,15,20
  14:1,4 32:1
  118:15
**accounted** 26:21

**accounting** 82:17
  82:18 107:1,6
  109:13 113:20
  133:10,17
**accounts** 21:10
  25:20 26:2 31:17
  31:19 103:21
  109:5,12 114:19
  131:4,14 133:3
  136:11 146:14
**accurate** 70:21
  71:8 77:16 113:9
  128:10 162:18
**achieve** 108:9,12
**act** 70:2
**acting** 70:10
**action** 172:14,19
**add** 129:6
**added** 35:11 157:11
**additional** 47:17
**address** 9:14,17
  45:19 51:12 55:18
  56:2,8 68:20,20
  91:18 95:14
  112:11 116:5
  146:12 150:13
  151:19 153:19
**addressed** 43:12
  45:2 66:9
**addresses** 45:14
  46:5,10,13,15
  47:2,3,18 48:9
  55:13 67:10 92:10
  116:3
**administration**
  135:20
**Administrator** 2:13
**administrators**
  137:4
**Adobe** 122:10
  123:9,11,18 124:1
**advise** 34:9
**advising** 159:8
**advisor** 21:22
  156:13 158:13
  159:16

**advisory** 105:20
  127:17 138:14
  166:5
**affect** 10:18
**affidavit** 5:20 68:10
**afford** 96:7,15
  135:6
**afloat** 135:7
**age** 77:6
**agenda** 127:11
**ago** 42:7 89:5,5
  90:2,3 92:22
  93:18 140:9 145:1
  145:3,6 147:1
**agree** 22:13 71:3
**agreed** 70:5 133:22
**agreement** 33:1
  34:12,18 76:13,15
  122:19
**agreements** 133:7
**Ah** 115:10
**ahead** 31:9 41:1
  73:8,15,22 98:17
  103:11 121:2
  122:5
**Alastair** 6:8
**alive** 117:13 118:1
  118:5
**Allen** 106:3
**allow** 27:10
**allowed** 73:2
**amend** 165:20
**amended** 161:5
**America** 88:20
  172:2
**amount** 55:15 67:3
  67:15 88:19 94:7
  94:21 95:11 97:3
  102:19 110:20
  143:19,21
**amounts** 23:1
  25:19 40:17
**Andrew** 3:11 8:6
**annual** 102:6
  137:22
**answer** 11:10 30:13

  61:17 73:5 95:7
  97:8 99:3
**anyway** 94:17
  132:10 134:3
  138:3
**appear** 40:16
**appearance** 39:5
**APPEARANCES**
  3:1
**appears** 24:12
  172:7
**application** 165:18
**applications** 29:12
**applied** 96:21
**appointed** 129:15
**approved** 111:15
**Approximately**
  16:10
**April** 35:4,6,9,16
  93:22 100:9
  104:21
**argued** 135:15
**arrange** 88:21
**arrogance** 37:22
**article** 150:3
**Asian** 153:14
**ASIC** 25:21
**asked** 78:16 93:7
  103:10 121:6
  138:21 139:4
  140:9 167:8
**asking** 30:9 59:9
  64:13 136:4 143:8
  160:13 163:3
**assets** 40:18
**Assignment** 1:22
**assisted** 114:19
**assume** 11:8 166:22
**assuming** 43:12
**ASX** 17:18 34:9
  35:12
**ATO** 23:17,18,21
  45:9 55:6,8 57:19
  57:21 62:13
  129:20 130:1,16
  136:4 137:9

**attached** 6:19
  55:11
**attachments** 42:16
**attain** 12:12
**attitude** 22:6 38:5
**attorney** 106:1
  154:16,18 172:17
**attorneys** 158:2
  161:14
**audibly** 10:9,15
**audit** 141:7
**August** 68:16,18
  69:5 77:1,4,10,18
  85:13,16 86:8
  90:5 101:20 103:5
  124:6
**Australia** 4:8,22
  5:11 9:16,20,21
  12:6 18:17 22:21
  23:5,6,13,22 27:1
  27:3 34:5 45:3
  47:14 52:20 53:8
  53:9 60:2 101:5
  107:1 112:5,6
  130:19
**Australian** 53:15
  56:3 76:18
**available** 148:15
**Avenue** 2:8 3:8,12
  3:17 88:7 92:12
**avoid** 81:14
**aware** 23:2 25:18
  26:20 29:15 33:5
  33:16 34:11,17,22
  35:15 56:15 71:11
  134:22 137:2
  149:13,16,17,18
  150:4 153:1
**a.m** 2:5 7:15 41:11
  41:12 78:11,12
  83:20,21 148:7,8
  171:2

**B**

**Bachelor** 12:13,15
**back** 11:19 20:12



40:9 41:13 48:9
78:13 83:22 86:15
88:9 89:14 94:19
104:16 106:4
107:19 110:21
123:7,17 125:14
128:6 129:9 134:8
134:9 139:22
141:5 142:19
148:9,14,22
150:15 165:22
169:1
**background** 16:21
108:5 114:16,21
115:1,7 123:16
132:19 155:17,19
**bad** 145:14
**balance** 47:5,8,12
**bank** 26:5 136:11
144:14
**banking** 73:17
**based** 78:3 98:16
126:4 139:12
**basis** 71:20 72:1,3
72:11,21 88:10
109:6
**Bates** 121:21
**bathroom** 11:22
**BDO** 106:19,21
**bear** 18:12 30:18
**beat** 61:16
**beaten** 37:3
**beginning** 131:5
161:19
**begins** 7:5 55:18
**belief** 50:2 98:11
**believe** 35:20 41:2
47:21 54:2 58:17
60:19 67:15,19
137:3 170:15
**believed** 49:19
**believing** 37:22
**belonged** 167:1
**best** 10:15 28:11
36:22 39:22 48:17
132:8

**better** 42:8 73:2
126:1
**Beyond** 38:3 39:11
**big** 95:3
**bigger** 99:22 100:1
**bill** 95:12 96:7,11
101:9
**birth** 9:11
**Biscayne** 3:3
**bit** 9:6 21:15 25:10
26:3 37:9,13
70:12
**Bitcoin** 14:11,12,14
22:19 26:6,17
27:13 34:3 41:6
44:2 47:8,11,22
48:5 50:7,19
51:15,19 52:9
53:16 54:4,9
55:17 56:1,8,9,18
58:6,12,18 59:2
60:10,11,14,21
61:5,11 62:20
63:1,15,19 64:7,9
64:15 65:10,19
66:16 67:15 68:2
74:4,7 75:7,18
79:13,22 97:12,22
107:19,21 114:8
122:14,19 123:15
123:19 124:15,17
124:20 125:5,8,9
125:13 127:8
132:20 138:9,22
139:9,15 140:8,13
141:3,9,11,13,16
142:11,17,21
143:4,13,19,22
144:7 145:18,19
145:21 146:2,10
147:7,7,11
**Bitcoin-based**
55:13
**block** 55:17
**Blockchain** 49:21
97:11,22 114:5

122:18 123:14
124:3,16 125:2,10
125:11,12,12,18
125:21 126:2,10
126:18 132:21
**Blockchain-related**
124:19
**blow** 142:9
**board** 20:22 21:22
43:16 105:20
108:1 127:17
138:14 157:10
163:6
**Boies** 2:7 3:11 7:17
8:7
**book** 88:1
**booked** 88:5
**bookkeeper** 31:20
103:21 108:21
109:1 110:3,5
133:18
**books** 67:8
**born** 12:5
**bottom** 19:20 51:4
112:16 121:22
**bought** 35:1 99:11
**Boulevard** 3:3
**bpaschal@rivero...**
3:19
**brand** 37:4
**break** 12:1,1 26:1
29:10 70:12 83:16
94:13 139:7 144:1
148:4 170:3
**breakdown** 23:15
**Brenner** 3:11 8:6,6
73:1,4,8 151:10
154:13
**bright** 37:16
**bring** 16:3 108:2
**Brisbane** 9:19
40:13 104:14
**Brooklyn** 3:8
**Bros** 66:18
**Brothers** 67:4
**brought** 23:6

110:15
**Bryan** 3:16 8:8
84:5
**build** 15:6,17
110:17 119:5
**building** 16:18
**buildup** 22:14
**built** 14:18 15:9
**bunch** 15:19
**business** 6:13 28:17
28:18,19 29:19
37:21 99:17,19
104:15 145:11
163:8
**businesses** 27:15
**buy** 144:7,18
**buying** 40:8
**B/BR** 7:13

## C

**cabinet** 118:10,16
**cable** 96:15
**cafe** 36:16
**California** 1:21
2:14
**call** 48:14 85:19
86:2 87:6 88:1
150:11
**called** 8:15 15:12
20:22 25:15 34:5
68:16
**Campbell** 3:22
7:20
**cancer** 117:8
**capability** 120:1
**capacity** 16:14
31:22 109:20
115:16 128:3
**capitalization**
25:20 26:2,7,9
27:11
**car** 37:4 99:11
144:9
**card** 6:13 92:3
**care** 9:8
**cars** 39:12

**case** 1:4 7:13 86:7
86:10,18 90:9,10
90:13 91:5 109:15
134:19 149:18
**cash** 26:5 110:14
135:18
**catch** 148:15
**category** 121:19
**caught** 150:18
**caused** 38:1
**Cave** 158:3 161:14
161:18 166:1,2
**cc** 4:15,18,20 5:4,7
5:13,16 6:9 43:9
53:1 55:3 57:15
58:1 62:10 65:4
80:14
**celebration** 94:17
**cell** 92:1 96:7,11,12
151:5,6
**cent** 101:4 134:3
136:10
**central** 46:21 48:12
**CEO** 22:9
**certain** 123:6
**CERTIFICATE**
172:1
**Certified** 2:12,12
**certify** 172:6
**cetera** 125:1 141:18
166:3
**CFO** 16:22 18:8,11
31:12,22 32:4
35:6 106:13,15,16
106:16 107:5,6
108:21 109:10
110:1,1,13 129:11
129:15 130:10,12
137:19,21
**chain** 89:15
**challenge** 108:19
117:10
**challenges** 73:19
**champagne** 39:22
94:7,22 95:1,3
**chance** 61:17



change 22:6,11
  36:2,8,9 37:5 38:1
  38:3,5,10 41:2
  98:22 99:16 106:2
  157:12
changed 93:19
  105:10,14 106:9
  107:17
characterization
  71:4
cheap 144:9
check 95:4
chief 31:22 115:10
  115:12
children 118:13
Chinese 153:13
Christmas 39:18
  94:9,10,11,16
  103:9
Christmastime
  94:18
CINet 88:12
circumstances
  46:17 48:10,19
  49:3,8 120:2
CISO 115:7,10
CISOs 88:13
claim 76:19 161:10
claiming 22:20
  23:7
clarification 115:9
clarify 95:19 98:5
  120:7 125:6 133:2
  155:2 162:14
clarifying 128:22
classes 114:1,4,7,10
  114:13
clear 87:11 155:18
  165:16
clientele 118:17
  129:2
close 63:19
closed 70:7 126:20
  141:21
closer 44:8
clothes 37:15

cloud 155:5
CLR 1:20 172:4,20
code 115:5 155:17
  156:14 163:19
coding 155:12
  156:17
coffees 40:9
Coin 17:4 18:6,9
  30:20 31:3,5,17
  32:4,6 34:5 35:1,8
  47:19 62:18
  169:22
colleague 92:9
college 12:8
Collison 158:3
  161:14,17 166:1,2
color 49:14
Columbia 2:15
  172:3,21
come 15:4 16:20
  19:12 37:19 38:21
  39:3 49:2 88:5
  89:18 90:6 123:5
  125:14 126:16
  130:20 155:14
  157:9
comes 58:4
comfortable 21:8
  21:16 22:5,22
  131:19
coming 22:16 23:14
  89:1,4,18,19 90:1
  92:22 93:8 131:5
  150:3 163:6
commenced 138:2
commencing 2:4
commerce 12:13,15
  13:9
commercial 154:17
Commission
  172:22
common 75:12,15
  79:11,17,21 121:7
  125:7,10
communicate 89:7
  150:10

communication
  107:15 127:16
communications
  106:7 127:13
  133:13
companies 16:7,11
  16:15 17:2,12
  18:1,10 21:21
  22:15 36:20 62:18
  76:13,14 79:15
  80:17 83:6 129:7
  129:12,14,19
  131:2 138:17
  169:20
company 20:5
  25:14,16 26:22
  33:3 34:10 67:8
  68:20,21 70:4,7
  70:10 71:12,13
  76:17,18 78:20
  80:4 82:22 83:4,8
  83:11 102:10,20
  104:4,10 107:3,6
  107:12 108:11
  113:5 137:5 156:5
company's 79:18
competition 127:7
  127:9
complain 136:15
  136:21
complaint 4:11
  32:14
complete 132:14
completed 77:1,4,7
  77:10 133:4
completely 110:8
computer 81:6
  115:18 146:16,16
computers 144:18
computer-aided
  172:10
concept 154:6
  155:10 158:7
  159:2 162:12,13
  163:5 165:9
concern 105:9

106:12
concerned 107:16
  138:4
concerns 110:2,4
  133:13
concluded 171:2
conference 88:12
  89:20
confidence 38:9,11
  108:2
confidential 1:9
  81:11 82:1
confidentiality
  81:10,13
confirmed 56:2,14
congratulate 87:12
  92:19
congratulated
  135:2
congratulating
  86:9,18
congratulations
  86:6
connected 112:14
  128:5
consent 20:8
consenting 70:3
conservative 22:11
considerable 97:3
consistent 61:5
  64:5
contact 91:14,14
  112:8,9 151:18
CONTENTS 4:1
continue 13:22
  95:8
CONTINUED 5:1
  6:1
control 32:1 45:14
  45:19 46:5,11,14
  46:16 48:10 54:3
  55:13 56:2,8,14
  56:16 58:12,17
  59:2 60:13 65:9
  69:14
controlled 60:20

61:4 63:14,15
  64:15 65:13,18
controls 58:5
convened 2:4
conversations 64:4
  148:16 149:3
  166:7,13
copied 129:22
copy 82:3 86:21
  87:1
correct 9:4,5 15:11
  15:18 17:3 19:5
  25:5,15 26:11
  29:19 30:2,21,22
  42:9 43:13 45:4
  47:4,16 51:6 55:6
  55:7 60:9,16 63:3
  70:14 84:17 85:15
  86:11 88:18 92:19
  93:4,21 94:1,8
  100:21 101:20
  102:2,20 104:4
  107:12 113:6,7,22
  114:19,20 116:12
  120:17 125:18
  128:11,15 129:20
  130:4 131:3
  135:13 136:7
  141:13,14 157:3,6
  160:8,19 162:11
  165:21 167:20
  170:6,14
correspondence
  153:6,16
cost 76:18
counsel 8:1 24:6
  30:9 73:2 81:2
  91:11 121:20
  172:13,17
counterintuitive
  10:9
couple 42:7 46:3
  89:13,20
court 1:1 5:21 7:12
  7:21 10:7 23:5
  51:22 68:11 69:20



77:1,9 119:2
166:22 170:16
172:1
**Co-counsel** 3:6,10
**CPA** 12:17
**Craig** 1:6 7:10 8:9
8:10 14:20 15:1,2
16:1,3,7,10 18:2
19:11 20:7,15,17
20:19 21:20,21
23:6 24:12 25:12
26:18 27:4,6,10
28:10 29:16 30:15
31:11 32:5 35:19
36:2,9 37:6,10,16
39:19,21 40:3,4,5
40:14,17 42:1,10
43:9,11 44:21
45:11,13 47:21
48:4 49:12,13,21
50:3 51:19 52:9
53:1,14,18 54:2
55:3 56:7,13,22
57:5,15 58:11
60:5,10,20 61:6
61:10 62:10 63:14
64:2,14 65:4,13
65:18 66:9 67:11
67:14,19 68:10,15
69:1,7,12 70:4
71:6,17 73:11
74:6,18 75:2 76:5
76:11 77:16,22
80:1,14,16 83:6
84:5 86:7 91:1
94:4,7 97:11,17
97:19 98:7,8,12
98:13,22 101:6
103:20 104:12,15
104:17 105:10,13
105:16,18 107:9
107:16 108:6,19
109:6 110:15,18
122:15 129:12
130:5 131:10,12
131:22 132:19

133:19 134:8
135:21 136:13
138:14 139:8,13
140:1,10,12,19
141:3,9 143:20
144:3,6,11,21,22
145:9,17,18 146:2
146:7,9 147:20
149:8,21 152:12
153:9,22 154:4,8
154:8 155:14
156:10,13,13,16
157:2,9,11,13,16
157:21 158:6,10
158:12,18 159:4
159:13,15 160:12
161:1,8,9,15,19
162:3,8,16 163:7
163:10,15,20
164:4,7,16 165:7
165:19,21 166:6,9
166:10,13 167:10
168:5 169:1,10,11
**Craig's** 22:6 39:5
67:2 82:20 106:9
**created** 98:11
118:11 119:3
**credit** 96:20
**cross** 15:5
**crossed** 157:19
159:20 163:21
**Crossman** 116:1
**cross-examining**
14:16
**CRR** 1:20 172:4,20
**cryptocurrency**
114:11
**cryptographic**
15:12
**cryptography**
114:14 126:21
160:7
**Cryptoloc** 15:12
16:17 127:3 160:4
160:6
**CSR** 1:21 2:14

**CSW** 62:18
**CSW-Dave** 51:5
**culture** 16:18
110:17
**currency** 27:13
60:11 127:3,11
**CV** 7:13
**cyber** 115:3,7 116:9
116:14 120:9,16
126:4 164:17
**cybersecurity**
14:17 15:6 16:4
114:2
**C-R-Y-P-T-O-L-...**
91:20

**D**

**dad** 115:2 117:7,12
120:17,20
**daily** 109:6
**data** 115:20 126:5
**date** 9:11 19:6
101:19 103:14,15
145:4 161:18
**Dave** 28:4,6,8
29:11 30:16 32:5
33:2 34:1,3,22
35:16,18 36:3,18
37:10 40:16 42:7
48:16 49:14,19
50:12 78:1 93:22
95:17,19,22 96:2
96:6 97:2,5,7 98:1
98:2,6,11 100:4,7
100:9 104:21
106:10 131:1
139:10,15 140:2
140:13,18,19
159:22,22 160:10
160:14 162:18,19
163:9,14,16 166:7
166:18,20 167:5
**Dave's** 38:16,17
40:6,8 93:20 94:4
100:3
**David** 1:4 3:22 7:9

7:19 46:20,20
48:11,11,15 69:1
69:15 98:20
**David's** 69:12
**Davies** 158:3
161:13,17 166:1,1
**day** 70:15 96:18,19
96:20
**days** 89:21 109:16
127:18 129:9
152:8
**dead** 118:12
**deal** 42:16
**dealing** 26:21
151:11
**death** 40:6 93:20
94:4
**debt** 70:6
**dec** 55:11
**deceitful** 91:2
**December** 103:12
**decimal** 73:20
**declaration** 55:12
**Defendant** 1:6 3:15
**defense** 1:4 4:8,10
4:14,16,19,22 5:5
5:8,11,14,17,19
6:5,7,10,12 7:9
18:17 24:10 33:2
33:4,6,10,13 34:2
41:18 43:6 44:18
50:22 52:20 54:21
57:13 59:22 60:2
62:8 65:2 66:6
68:17 69:1 70:7
71:14 74:16 76:3
76:16 80:12 82:10
83:1
**definitely** 141:17
**degree** 113:21
**degrees** 12:12
**deliver** 124:7
**delivering** 134:16
**demeanor** 105:10
106:2,9 107:17
**Dempster** 5:12

62:12
**denied** 96:22
**depends** 119:18
120:1
**depo** 81:16
**depos** 59:10
**deposit** 134:7
**deposition** 1:11 2:3
7:6,16 9:2,4 11:1
72:14 88:22 93:10
93:13 170:14
171:2 172:5,7,11
172:15
**depth** 108:11
**describe** 28:13,19
**DESCRIPTION**
4:5 5:3 6:3
**designation** 81:13
**destroy** 118:7
**details** 29:21 30:5
91:17 112:10
**devastating** 116:10
**develop** 97:6 154:3
155:19 156:6
166:8
**developed** 124:4
**developer** 22:6
36:10 37:15 159:1
164:12
**developers** 126:5
156:6
**developing** 71:18
73:11 97:9
**development** 16:5
22:1,21 54:1 74:7
79:18 156:17
**device** 142:8,13
**Diane** 21:1 105:22
127:13,16,17
128:2,5
**died** 35:16,18 36:3
37:10 40:17 48:16
93:22 100:4,7,9
106:10 117:21
131:1
**dies** 104:21 116:20



**difference** 15:14
105:15 106:16
110:19 126:22
**different** 119:21
125:17 130:7
**difficult** 117:16
**digital** 15:10 16:17
20:22 25:16 127:2
127:10
**dinner** 95:2,5
**direction** 159:17
**directly** 109:6
**director** 16:20 17:2
17:4,7,11,12,15
17:19 20:4,8
30:20 32:4 33:9
35:11 70:3,10
71:1,11 79:16
129:15 159:16
170:9
**directors** 34:10
**disagree** 71:9
**disappointing**
37:20
**discipline** 110:16
**disconnect** 96:16
**disconnected** 96:8
**discuss** 27:6 81:15
148:12 149:5
152:21
**discussed** 152:15
152:18
**discussion** 11:17
**discussions** 59:15
**dispersed** 123:6
**displays** 39:12
**dispute** 135:16
**District** 1:1,2 2:15
7:12,12 172:3,21
**document** 4:12
5:22 24:17 25:7
32:13,15 58:21
59:6 68:7 81:3,7
81:19 100:21
101:2,12 137:2
161:16 165:1,17

166:17
**documentation**
21:10,17 131:4
137:11 157:12
158:18 159:3
164:3 166:3
**documentations**
131:2
**documents** 24:19
80:5 90:12,16,18
90:20 105:9,12
117:4,11,20 118:4
118:7 119:12
132:2 133:12
149:9
**doing** 29:19 43:14
73:3 108:9,17
119:7 126:13
130:19 132:5,14
133:14 134:16
138:5 142:17
**dollars** 26:10 47:14
53:16
**dotted** 157:18
159:19 163:22
**Dr** 8:9,10 15:16
16:15 17:1 19:10
27:19 79:12,15
84:5 93:19 106:3
138:22 144:11
149:12
**draft** 111:14
**drafted** 111:16
**dress** 36:21
**dressed** 37:11
**Drew** 155:21 156:3
158:21,21 159:1
**drill** 37:8
**Drive** 9:15
**drives** 120:4
**driving** 144:8
**drop** 118:12
**duly** 8:16
**duties** 106:17
107:11 109:4,19
110:12 134:17

138:19
**D-R-E-W** 156:1
**D.C** 2:9 3:12 7:17

---

**E**

**Ear** 21:22
**earlier** 9:3 18:13
78:16 79:10 109:7
125:7 128:9,20
130:21 138:20,20
167:9
**early** 16:1 41:6
109:16,21 127:18
152:8 161:21
**education** 112:17
112:18 113:17
114:18
**effect** 99:18
**eight** 26:9
**either** 49:10 169:10
**elect** 170:17
**electronically**
18:14
**elements** 100:1
**employed** 104:7
172:14,17
**employee** 6:14
100:17 101:16
134:1 172:16
**employees** 102:14
102:20 104:3,3
105:13
**employment** 22:14
**encrypted** 139:1
146:3,5 147:13
**ended** 19:10 131:6
**enforcement** 127:5
**engaged** 120:9
**ensure** 76:22
159:16,19
**enter** 88:19
**entire** 107:14
**entitled** 135:17
160:10,11,12,14
160:20 161:2
162:19 163:11

**environment**
122:17
**equipment** 141:21
**equivalent** 107:1
**erased** 120:4
**Ernst** 107:2
**escrow** 15:14 123:3
123:14,14 126:21
155:5
**Esquire** 3:2,7,11,15
3:16,16
**essential** 49:15
50:12
**estate** 1:3 7:8
162:19
**et** 125:1 141:18
166:3
**ethics** 145:11
**evening** 40:2
**event** 39:19 116:19
118:12,22 155:4
**events** 91:7 116:10
165:19
**everyday** 110:6
**evidence** 23:15
62:15 91:6
**exact** 94:7 95:11
**exactly** 110:18
143:17 167:13
**examination** 4:1
8:15,18 10:3 84:2
168:17
**examining** 15:5
**excess** 56:1
**exchange** 17:5 18:6
18:9 30:20 31:4,5
31:17 32:5,6 34:5
35:1,9 60:12
62:18 169:22
**exchanges** 74:5
**exciting** 22:3
**Excuse** 121:20
**execute** 81:9
**exhibit** 4:5,6,9,11
4:11,13,15,17,20
5:3,4,6,9,12,15,18

5:20 6:3,4,6,8,11
6:13,14,16,17
18:20,21 24:3
32:8,12,13 41:19
42:22 43:4 44:13
52:15 54:16 57:8
59:18 60:1 62:4
64:19 65:22 68:3
74:10 75:19 80:7
82:5 92:6 100:6
100:13,14 111:4
156:18 169:16
**Exhibits** 4:4 5:1 6:1
6:19
**expand** 36:7 37:13
39:17
**expect** 136:22
137:14
**expected** 137:20
**expenditure** 110:6
134:11
**expense** 134:10
**expensive** 38:4
**experience** 130:4
**expert** 16:4 164:16
164:17
**expertise** 159:18
**experts** 14:17 15:6
115:6 126:5
**expires** 172:22
**explain** 11:5 21:14
26:2 74:21
**explanation** 49:14
**Explorer** 55:17
**express** 105:9
106:12 110:2,4
**expressed** 106:7
133:13 167:18
**external** 106:19
**extremely** 68:1
**ex-wife** 21:12
**e-mail** 4:9,13,15,17
4:20 5:4,6,9,12,15
5:18 6:4,6,8 18:15
19:3 24:12,15,22
25:10,21 26:8



27:6 28:3 42:1,1,3
42:11 43:8,8
44:20,21 45:2,11
45:13 51:18 52:7
53:1,1,11,13,19
54:3 55:1,3,5 56:6
56:7 57:15,15
58:4,9 59:9,14
60:4,5,17,20 62:9
62:10 63:10,11,13
63:22 64:3 65:3
65:12,15,17 66:8
66:9 74:18,22
76:4,11,22 80:13
80:14,21 81:11,18
85:22 86:3,4,9,16
86:20,22 87:2,9
89:8,9,11 90:22
91:18 107:15
112:11,12,13
116:2,5 121:8,11
121:14 130:16
150:12,13 151:19
152:6,9,11,16,18
152:20,21 153:19
168:22 169:1,3,10
169:11,12,12
**e-mailed** 20:18
68:19 85:20 144:4
146:1
**e-mailing** 24:19
25:2
**e-mails** 24:6 67:13
80:2 87:16,19
89:14,15 106:6
129:22 133:12
148:20,21 167:10
168:3 169:8

---
**F**
---
**fact** 63:19 94:6
167:16
**fair** 30:1
**fall** 77:14
**false** 88:17 113:11
**familiar** 33:3 82:14

100:20 101:2
**familiarize** 24:16
76:7 82:13
**family** 118:7,12
119:16 135:5
153:17
**fancy** 99:6
**fascination** 37:1
**faster** 42:7
**fate** 46:16 48:10,18
49:2,7
**father** 116:15,16,17
117:3 120:10
**February** 136:20
**federal** 22:22 29:13
**feed** 29:17 121:10
140:17
**feel** 22:5,22 131:19
135:14
**feeling** 21:8
**fierce** 116:9
**Fifth** 3:17
**figures** 47:15
**file** 15:10 16:17
20:22 48:5 54:9
56:18 57:5 59:3
61:11 64:9,16
139:1
**files** 42:17
**filing** 25:16 70:6
118:10,16
**filings** 90:8,10
**finally** 11:22 67:7
85:4
**finance** 113:20
**financial** 31:22
77:14 98:18,19
131:6 144:11
**financially** 172:18
**find** 89:3 116:19,20
117:4,10,14 118:2
118:3 154:15,18
**fine** 81:22
**finish** 52:3 95:7
**finished** 74:3 77:18
128:2 141:1

**firms** 107:1
**first** 8:16 14:10,20
14:22 15:16 34:13
45:18 66:15 68:15
70:9,11 71:10
85:9 86:15 108:6
112:19 116:8,13
124:17 166:10
**five** 44:6 168:19
**flash** 22:10 36:21
**flashy** 39:11
**FLEXNER** 2:7
3:11
**flight** 88:5
**flights** 88:1
**Floor** 3:18
**Florida** 1:2 3:4
7:12 33:2,3 35:21
78:3
**flow** 110:15
**fly** 36:1 40:12
**flying** 104:16
**focusing** 149:2
**following** 27:11
45:15 46:6 69:6
70:1 77:14 108:7
**follows** 8:16
**foolproof** 168:6
**Force** 57:13
**foregoing** 172:5,7
**form** 17:9 28:1 30:3
31:1,6,14 34:15
34:20 35:2 36:4
38:6 39:6,14
40:19 42:14 43:19
45:5 47:9 48:1,20
49:5,16 50:2,9,15
51:9 52:4,11 54:6
54:11 56:11,20
58:20 59:10,17
61:1,7,13 63:4,16
64:17 65:20 67:1
67:17,21 71:19
72:1,5,6,22 73:5
73:13 75:8 77:5
77:12,19 79:1,4

83:9 102:11 103:3
140:4,14 142:1
154:13 160:18,22
162:21 167:3
169:5
**formed** 34:5 98:10
**forms** 131:9
**forth** 89:14
**forthcoming** 29:16
**fortunate** 117:6
**fortune** 48:14
**forward** 19:3 37:21
40:10 88:9 104:17
132:8 133:21
134:9 148:22
150:16 166:1
**found** 23:18 89:1
**founder** 58:15
**four** 73:21 85:8
**fourth** 121:19
122:7
**fraud** 23:10
**Freedman** 3:2,3,7
4:2 8:4,4,5,19,22
11:14,21 17:10
19:1 24:5,7,21
25:6 28:2 30:4
31:2,8,15 32:10
34:16,21 35:5
36:6,12 37:7 38:8
39:8,16 40:22
41:7,15,21 42:18
43:2,21 44:10,15
45:6 46:1 47:10
48:3,22 49:6 50:1
50:10,17 51:10,20
52:2,6,13,17 54:7
54:13,18 56:12
57:2,10 58:22
59:8,16,20 61:2,9
61:15 62:1,6 63:5
63:18 64:21 66:2
67:6,18 68:5
71:20 72:2,6,16
72:20 73:9,14
74:12 75:9,21

77:8,15,21 78:15
79:2,6 80:9 81:2,7
81:17,20 82:2,7
83:10,14 84:7,16
84:19,22 85:3,7
85:10,18,21 86:9
86:12,19 87:4,8
87:17,21 88:21
89:17 90:4,9
92:18 93:6,7,18
95:6 102:11 103:3
121:6,20 122:2,5
135:2 136:2
138:20 140:4,14
142:1 148:13,17
149:6 151:11
160:18,22 162:21
167:3,8 168:18
169:6 170:10,13
**frequently** 88:16
**Friday** 1:15 2:4
**friend** 48:15,17
**friends** 48:14 96:10
**front** 147:9
**full** 9:10 22:15 32:1
69:14 109:11
**fully** 26:21
**full-time** 14:6
109:20
**fund** 66:16 67:5
**funded** 23:3
**funding** 22:16 58:4
**funds** 125:15
**further** 83:14
168:17 170:10,11
172:15
**futurist** 108:14
**futurists** 37:19
**F2** 3:8

---
**G**
---
**garage** 141:19,20
142:20 143:5,11
**general** 152:22
**gentlemen** 48:13
**George** 9:18



getting 45:10
137:20
gift 18:2
gifted 31:10
gifting 68:2
give 23:15 49:11,13
61:17 71:22 82:3
86:2,21 88:1 91:5
91:16 92:3 126:10
127:4 145:4
given 31:7,10 32:1
172:12
global 15:13,14
58:6,12 127:1
154:20
globally 66:16
go 9:6 11:14 12:8
12:10,17 19:2
31:9 32:18 35:12
36:16 38:13 40:13
41:1,8 46:9 48:8
73:8,15,22 78:8
86:15 94:19 98:17
101:14 103:11
106:4 114:17,18
116:8 119:22
121:2,17,18 122:5
122:7,16 128:6
131:15 134:6
136:11 142:19
149:14 150:15
154:17 158:2
162:5 165:13
goes 103:14
going 18:16 21:16
24:8,18 29:9
32:12 38:3,12,13
42:21 51:21 71:22
72:20 73:4 78:22
79:2 94:13 95:14
97:13 99:17
100:12 101:11
108:15 111:7
120:7 123:7 130:9
142:19 148:3,21
165:8

good 8:20,21 28:15
35:19 48:14 72:17
73:5 84:4,8,20,20
85:4 145:15
159:21 168:15
Goodin 1:20 2:11
7:21 172:4,20
GoToMeeting
122:11 123:10,12
123:19 124:1
government 22:22
23:3,8 29:13
Gox 63:2
graduate 12:18
graduated 13:11
grandfather 48:16
grants 29:12
graphic 47:2 50:22
51:14
great 108:14 115:7
139:14
greater 37:19 67:3
110:20
grew 120:3
ground 9:7 10:6
group 45:15,20
46:5 53:14 58:5
83:5 129:7,14
guess 92:4 104:10
106:15 114:18
132:1
guy 166:6
guys 18:15 19:3

—————————
H
—————————
habits 99:16
hack 167:13
hacked 80:2,5
167:11 168:5
169:8,12,14
hacking 167:9,12
167:16,18 168:1
half 26:9 72:19
160:10,11,12,14
162:20 165:10
halfway 65:8

hand 18:16 24:8
81:20 82:2 131:11
165:9
handed 20:14,17
81:4 82:8 131:15
handing 32:11
41:16 43:3 44:16
52:18 54:19 57:11
59:21 62:2 64:22
66:3 68:6 74:13
75:22 80:10
handle 31:16,19
handled 37:21
handsomely 157:21
hang 23:4
happen 38:18
132:10 167:12
168:2
happened 25:10
27:14 69:11 71:9
77:11
happening 21:9
69:20 70:8,13,20
70:22 76:10
happens 167:13
happy 87:18 91:8
91:16 122:22
138:12,16 149:1
hard 120:4
Hardy 4:17 45:3
53:8,21 55:6
57:21
head 10:10,11
53:15
hear 28:8 30:11
heard 28:6 95:21
held 55:15 68:17
69:4
Hello 43:11 46:2
help 15:17 19:8
20:3,11,19
helpful 140:17
hereto 172:18
highest 102:9,22
104:3 134:1
hire 164:14

hired 164:4
history 34:10
138:14 141:7
162:6 166:2
Hitoshi 139:16
hold 35:8 103:11
113:4 124:8
holding 53:15 56:1
67:2 141:13
holdings 25:12
62:20 64:7 68:1
holds 25:17
home 9:14 146:11
146:22 147:3
honest 69:17
136:22
hoodie 36:11
144:12 166:7
hoodies 22:7 36:14
37:11 38:4 144:8
164:8
Hospital 96:3
Hotwire 17:19
66:10 70:16 73:16
75:2,17 79:12
80:21 104:18
105:1 106:13
107:6 129:5,7
132:6 133:22
136:6 169:22
hours 72:16
housekeeping 9:9
Howard 147:4
huge 110:20 143:18
Huh 145:2
humble 38:15

—————————
I
—————————
idea 155:9
identifiable 67:9
identification 18:22
24:4 32:9 41:20
43:1 44:14 52:16
54:17 57:9 59:19
62:5 64:20 66:1
68:4 74:11 75:20

80:8 82:6 92:7
100:15 111:5
156:19
identify 8:1
ill 149:8
impair 10:22
importance 118:10
important 113:15
117:1,4,10 119:7
119:10,12 128:18
128:21
impression 52:8
improvement
123:11
inaccessible 64:9
inaccuracies
170:15
include 45:15 46:6
income 136:5,9
incorrect 158:11
increase 25:12 75:3
109:19 115:3
132:9 138:19
incredibly 67:20
individual 119:19
120:2 126:13
135:21
individuals 66:10
info 1:4 7:9 33:2,3
33:6,9,13 34:2
68:17,22 70:7
71:14 151:18
information 29:17
83:1 113:6,15
115:11,13 117:14
118:2,14 119:1
125:4 126:15
128:10 129:1
130:18 132:17
133:7 152:5,22
155:6 161:5
instance 55:16
insurance 116:21
Integers 17:7 170:1
intellectual 29:4
71:17 73:11 74:7



75:4,16 79:11,18
97:6,9 98:11
160:15 166:8
167:1
**Intelligence** 17:20
170:1
**intent** 30:16
**Interconnect** 170:1
**Interconnected**
17:16 20:2,4
**interest** 35:1 79:8
116:9 162:9
**interested** 172:18
**interesting** 108:13
**interests** 14:8
166:19
**internet** 96:15
**inventor** 158:11,16
158:22 159:6
161:8 162:7
164:19,21,22
166:6
**investigate** 23:14
**investigated** 27:2
**involve** 16:7,10
106:16
**involved** 14:9 16:15
31:20 74:6 83:7
83:11 120:16
129:5 132:19
135:19 152:7,16
153:10 154:9
156:14,16 159:5
159:10,22 160:1
163:7,11 165:7
166:21 167:2
**involves** 160:7
**in-house** 166:12,15
**IP** 23:6
**Ira** 1:3 7:7 152:1,5
152:15,16 153:3,5
153:12
**issue** 26:4 61:15
69:15 132:16
133:1 138:4
151:11

**issued** 26:19
**issues** 21:13 129:19
**Italia** 5:6,15 55:8
57:18
**I's** 157:18 159:19
163:21

___

**J**

**J** 1:20 2:11 172:4
172:20
**Jamie** 1:12 2:3 6:13
6:16 7:6 8:14 9:12
16:19 27:16 43:16
69:7 70:2 71:5
86:1 154:19
**Jamie.wilson@cr...**
91:19
**January** 103:8,8
104:6,7 132:1,5
132:22 136:15,17
**Jenna** 53:7
**job** 170:16
**jobs** 134:17
**joined** 39:19 49:21
**joint** 49:22
**journey** 119:4
**jperez@riverom...**
3:20
**judgment** 77:1,9,18
**Julio** 3:16 8:11
**July** 16:13 85:11,12
86:8 90:4 105:5
131:5 132:1,3,6
132:22
**June** 9:12 16:12
105:4 131:7
132:12,12
**June/July** 38:19
74:2
**jury** 10:4 26:3
**JW** 13:4

___

**K**

**Kass** 3:15 8:10,10
59:9,13 100:13
111:3

**keep** 59:16 72:4,6
82:1 121:1 135:7
**key** 22:8 148:1
**keys** 147:19
**kicked** 35:11 36:19
**kidding** 154:21
**Kleiman** 1:3,4 7:7
7:9 28:4,6,9 29:11
32:6 33:2 34:2
35:16 46:20 48:11
48:17 69:2 78:1
95:19,22 96:2,6
96:14,19 97:2,5,7
98:1,3,6,20
139:10 152:2,5,15
153:4,5,17 159:22
160:14 162:19,19
166:8,18 167:6
**Kleiman's** 30:16
34:3
**knew** 95:17 97:9
98:2 105:16
107:20 109:18
138:21 140:7
**know** 12:2 14:20
20:11 22:7,18
29:22 32:16 35:18
36:11,13,22 39:22
41:5 42:13 43:17
44:20 48:18 51:7
51:11,20,21 72:7
73:1 77:3 91:4
92:22 94:15,22
96:2,6,14,18 97:2
97:14 112:12
116:2 117:16,18
118:9,13 120:14
122:3 126:21
138:9 139:8
140:18 141:8,8,12
142:20 143:1,5,11
143:14,16 144:8
146:8 147:14
150:22 156:3
163:10,11 165:13
167:13,17 168:7

169:2,4,13 170:8
**knowledge** 69:18
70:9 132:20 137:7
159:11 163:16
167:21
**known** 141:4
**Kyle** 3:7 44:7,10
**kyle@rochefreed...**
3:9
**K-DV** 51:5

___

**L**

**L** 3:16
**label** 121:21
**laboratory** 114:19
**lady** 153:10
**land** 92:1
**laptop** 146:19
**larger** 106:22
**late** 132:13
**launch** 77:6
**law** 127:5
**lawyer** 84:12
105:21 164:15
**lawyers** 20:21
128:3 135:19
136:1 154:17
158:13,15 164:1
**lead** 21:18 47:21
54:2 58:17 67:14
67:19
**leading** 88:13 108:6
**learn** 14:10,13
167:19
**learned** 168:9
**learning** 138:13
**leave** 113:14
128:17,19,21
**ledger** 126:11,20
141:6
**left** 124:5 130:3
**legal** 7:20,21
122:21 123:4
131:12,13 133:9
158:17
**legs** 12:2

**lend** 96:11
**letters** 4:6 19:4
20:13,17 90:21
169:18
**let's** 41:7 42:20
48:8 83:16 119:20
121:18 124:17
141:20 166:5,9,22
**Level** 92:12
**liability** 71:13
78:20
**liar** 91:2
**license** 76:12,17
133:7
**life** 96:4 116:11,21
**lifestyle** 37:5
**liked** 16:18
**limit** 59:10
**limited** 71:13 72:13
78:20
**line** 24:11 92:1
139:1 168:11
**lines** 10:6
**link** 3:16 8:12
43:15 55:17
**LinkedIn** 6:16
111:10 113:1,3
120:14 124:9,22
128:6 129:3,8,10
129:17
**links** 168:4
**Lipke** 5:18 134:21
149:18,19 150:5,6
150:7 153:18
**Lipke_s@hotmai...**
151:22
**list** 47:3 102:15
158:10
**listed** 17:1 25:21
26:22 45:15 46:6
47:18 63:7 158:15
158:20,22 159:6
**listing** 62:17
**litigation** 18:17
24:9 41:18 43:5,6
44:18 52:20 54:21



57:13 60:1 62:7
65:2 66:5 74:15
76:2 80:12
**little** 9:6,9 21:15
25:9 26:3 36:16
37:9,13 47:1
60:13 61:4 70:12
168:20
**live** 104:14 121:10
140:17 150:20
**lived** 96:2
**LiveNote** 2:12
**lives** 104:15
**LLC** 1:4 7:10 33:4
33:7,10,13,15
68:17 69:1 70:7
71:11,13,14 78:19
**Lloyd** 128:2
**LLP** 2:7 3:11
**loan** 96:22
**loaning** 135:5
**local** 157:17
**located** 13:4
**locked** 48:5 54:9,14
56:18,22,22 57:5
59:3 61:11 64:9
64:16 138:22
**lodged** 131:21,22
163:6
**lodges** 30:9
**log** 146:7,10 147:10
**Logan** 13:5
**log-in** 147:16
**long** 13:22 122:22
**longer** 25:16 29:18
42:8
**look** 17:17 19:5,12
19:19 22:20 24:10
25:4 32:15 34:8
43:7 51:3 55:1
60:3,11 66:7,14
66:17 68:9 69:22
94:20 102:6,8
103:8 106:19
110:7 112:16
113:5 121:3

131:14 132:7,11
134:6 150:15
151:1,3,8 152:10
162:5 164:5
165:10,17,17
169:15
**looked** 21:1 67:14
103:21 109:5
131:13 152:4
158:4
**looking** 14:6,17
26:8,8 49:20 86:1
113:1 119:17
124:21 129:2
130:10 132:2
137:4 154:15
156:5
**looks** 23:9
**Lori** 1:20 2:11 7:21
172:4,20
**losing** 155:4
**loss** 116:15
**lot** 14:16 15:6 22:18
30:5 33:8 38:1,15
41:3 67:3 77:17
88:13 109:17
118:16 125:16
127:4 131:13
132:17 133:18
**Love** 43:11
**loved** 135:6 155:4
**low** 22:7
**lucky** 117:12
**L-I-P-K-E_S@h...**
153:20

___

**M**
**machine** 172:9
**Madison** 88:7
92:12
**Magna** 7:20,21
**main** 45:14,19 46:5
**making** 91:1
163:20
**man** 22:9 37:16
38:12

**manager** 151:14
**managers** 149:21
**Manu** 5:9 60:8
**marathon** 12:3
**mark** 18:19 32:12
55:8 57:18 82:1
92:5,5 111:8
115:14
**marked** 18:22
19:20 24:4 32:9
41:17,20 43:1,4,4
44:4,14,17 52:16
52:19 54:17,20
57:9,12 59:19,22
62:3,5 64:20 65:1
66:1,4 68:4,7
74:11,14 75:20
76:1 80:8,11 82:6
82:9 92:7 100:15
111:5 156:19
**market** 14:18 56:3
56:3 58:6,13
**marketing** 111:15
111:16,18 113:1
**marking** 156:21
**mark.mcpherson...**
116:7
**massive** 22:10 37:5
39:5 40:17 67:15
**mate** 28:11,15
35:19 139:14
**material** 29:10
**matter** 7:7 27:4
36:20 38:12 40:12
46:16 84:6 97:22
135:21
**matters** 130:6,8,11
**McPherson** 115:14
**mean** 21:15 28:16
28:17 37:16 39:2
39:21 40:7 50:6
50:11,14 78:2
86:21 89:19
108:10,14 118:11
119:6,20 141:6
142:9 143:22

150:1,18 154:21
165:8 166:9,13
167:15,15 169:4
**meaning** 71:14
**means** 48:18
**meant** 21:15 42:11
49:2,8,14 56:13
69:19
**mechanics** 61:15
**media** 7:5 91:1
149:7
**medical** 21:13
**medication** 10:17
**meet** 15:4 85:4
88:22 156:10
**meeting** 68:16,19
69:3,4,9,11 70:1
70:13,15,19,22
71:5 150:2
**meetings** 36:15
123:17
**Melissa** 116:1
**Melissa.crossma...**
116:6
**member** 118:8
119:16 127:18
138:15
**members** 78:21
**membership** 79:8
**memory** 159:21
**mentioned** 99:6
108:20 132:15
170:3
**mess** 118:19
**messages** 87:20
**MESTRE** 3:17
**met** 8:22 14:20,22
15:2 16:1 37:6
97:7 153:2
**Miami** 3:4
**mic** 44:8
**Michael** 45:3,8
46:2 53:8,21 55:5
57:21
**microscope** 23:16
**middle** 45:17

106:22
**midway** 58:4
**million** 26:9,12,14
53:15 54:4,9 56:4
60:11,13,20 61:4
61:11 63:2,15
64:14 65:9,18
66:15
**millions** 26:17
**Mind** 129:9
**mine** 11:13 133:19
142:11
**mined** 34:3 140:2
140:13 141:15,17
143:4,17,22
**mining** 50:6,16,18
139:10 140:19
142:3,12,17,21
143:10
**minute** 41:8 82:13
**minutes** 78:7
**mischaracterize**
92:17
**mischaracterizes**
58:21 59:6
**mischaracterizing**
140:15
**missing** 170:4,5
**MIT** 126:16
**mobile** 92:2 142:8
142:13
**mom** 66:17
**moment** 44:19
74:17 76:7 93:18
**money** 23:3,8 29:11
39:1 40:9,20
43:15,17,22 44:1
96:11 99:9 101:6
101:9 107:18
108:1 110:21
123:1,5,15 125:15
134:6 135:5,17
136:13 137:10,15
137:17 138:10,18
147:17,18 161:20
**monitoring** 134:19



134:20
**month** 103:15
  106:8,8,8
**months** 42:7
  104:19 109:22
  110:1 130:13,15
  134:2
**morals** 145:11
**morning** 8:20,21
  84:4,8,20,20
**motion** 70:6
**motions** 69:19
**move** 42:6 44:8
  133:21 147:7,14
**moved** 37:2 70:1
**movement** 165:22
**moving** 22:3 37:21
  132:8 159:17
**Mt** 63:2
**MYOB** 6:11 82:16
  82:19
**M-Y-O-B** 82:16

### N

**Nadine** 111:19
**name** 8:22 9:10
  101:16 109:2,3
  111:20,22 115:12
  115:22 153:11,12
  153:13,14 157:11
  157:14 159:2,7
  164:18
**nationally** 88:13
**naturally** 158:6
  165:8
**necessary** 128:14
**need** 10:9 11:22
  12:1 72:15 76:22
  109:20 116:22
  167:7,17 168:1
**needed** 69:13 77:3
  91:13 157:17
  166:3
**needs** 26:20
**negotiate** 122:17
**neither** 172:13

**never** 9:3 34:11
  85:20 97:7,9
  101:3,4,5,10
  104:1 108:5
  114:15 117:13
  118:20 131:21
  134:3,8,11 135:4
  135:15 136:12,13
  138:1,19 140:1
  145:20 146:3,5
  148:1 153:2
  156:13 163:19
**new** 2:8 3:8,12,18
  3:18 5:21 16:20
  19:18 20:6 22:4
  22:10 34:4 36:19
  37:4 39:11 68:11
  69:20 88:6 92:11
  99:11,20 107:20
  108:4 112:4 124:2
  141:18 144:1
**news** 66:16
**Nicholas** 155:21
  156:1,4,8,10
**night** 39:20
**nine** 104:19 109:22
  130:12,15
**noble** 119:6
**normal** 37:3,14
**Normally** 72:8
  109:11
**North** 147:4
**Northwest** 2:8 3:12
**Notary** 2:14 172:21
**noted** 46:2
**notice** 36:2 136:12
  162:6
**noticed** 23:1 170:2
  170:3
**November** 1:15 2:4
  7:14 103:18 105:6
  170:22
**number** 7:5,13
  18:21 24:3 32:8
  41:19 42:22 44:13
  52:15 54:16 55:13

57:8 59:18 62:4
64:19 65:22 68:3
74:10 75:19 80:7
82:5 91:21 92:2,6
100:14 111:4
150:22 151:4,8,16
156:18
**numbers** 130:20
131:10
**N-A-D-I-N-E**
111:21
**N-I-C-H-O-L-A-S**
156:2

### O

**oath** 10:1
**object** 52:4 61:18
79:3 140:4,14
142:1 154:13
**objection** 17:9 28:1
30:3,9 31:1,6,14
34:15,20 35:2
36:4 38:6 39:6,14
40:19 42:14 43:19
45:5 47:9 48:1,20
49:5,16 50:9,15
51:9 52:11 54:6
54:11 56:11,20
58:20 59:5,17
61:1,7,13 63:4,16
64:17 65:20 67:1
67:17,21 71:19
72:8,9,12,21
73:13 75:8 77:5
77:12,19 79:1,4
83:9 102:11 103:3
160:18,22 162:21
167:3 169:5
**objections** 59:10
**obtained** 139:9
**occasions** 97:19
**occur** 69:9
**October** 19:7,16
20:7 21:4 27:20
53:4 74:1,3
101:22 103:19

105:6,7 116:17
120:18 124:5
157:7
**odd** 118:6 119:14
**office** 23:14,22 24:1
27:3 45:3 53:8,9
88:6,7 101:5
112:4 115:6
130:20
**officer** 31:22 33:15
115:11,13
**offices** 2:5 7:17
92:10
**oh** 26:18 27:11,17
35:14 38:11 85:11
90:21,22 127:12
141:17 146:11,14
146:20 147:2
152:6 161:17
**okay** 10:13 11:4,10
11:11 12:4,5,20
13:8 14:3,13,19
15:21 16:2,14
18:3,5,8,12 19:15
19:19 20:9,19
21:3,14 23:21
24:2 25:9,11 27:8
27:18 28:8,13
30:5,14,18 32:3
32:18 35:13,15,22
36:7 39:9 41:4
42:19 43:3 44:3
44:12 45:2,10
48:8 50:5,20
52:18 56:17 57:11
58:16 61:19 63:6
64:5,8 67:13
70:17 71:3 73:5,8
74:6 77:22 80:1
81:17 82:4,22
83:13 85:17 86:15
87:16 88:4 89:6
89:11,17 90:3,8
91:10,13 92:13,16
93:17,22 98:21
99:21 100:9 101:8

101:14 104:2,13
104:19 105:8
108:20 109:3,14
110:8,12 111:1,11
112:7,15 113:17
114:17 116:8
117:15 120:7,12
120:19,22 123:7
124:8 125:16
126:19 131:20
132:7,22 133:5,11
133:20 134:4,14
137:13,18 138:7
141:3,20 142:15
143:3,16 144:5,20
145:12,17 146:9
146:13,21 147:10
148:19 149:15,22
151:13 153:8,15
154:3 156:3,15
157:4,9 161:4,12
161:15 162:4,14
164:22 165:1
167:8 168:9,13
**once** 30:12 36:18
138:17 147:16
**ones** 45:15 46:6
135:6 145:22
158:4
**ongoing** 64:4
**on-board** 99:20
**on-boarding**
104:17 105:16
109:16
**open** 68:8
**operation** 25:17
66:17
**operations** 149:20
**opinion** 123:5
**opposing** 30:8
**options** 142:10
**orally** 169:10
**order** 81:10
**ordered** 166:22
**orders** 70:3
**original** 6:19,20



49:20
originally 37:6
85:22 152:7 159:2
outcome 123:1
172:19
outside 14:8 67:13
outward 39:5
overnight 41:3
oversee 16:5
157:22
owed 107:11
owned 63:14,14
64:15 70:6

**P**

package 82:17,18
109:13
page 4:1,5 5:3 6:3
19:20 32:19 33:19
34:1 50:21 60:4
66:8 69:22 112:15
116:8 121:14,22
128:7
pages 121:15
paid 23:8 40:2
101:4 102:9,22
104:3 125:4 134:1
134:8 135:4,5
136:16 138:18
157:21 158:7
161:19,20
PanOptiCrypt
80:21
paper 25:22 119:16
papers 120:5
paperwork 29:9
69:13 118:20
159:11 164:2
paragraph 33:20
46:10 53:14 55:22
66:15 68:13 69:3
71:4,9
Parkinson's 48:16
part 14:15 33:7
46:21 49:15 50:12
70:15 82:1 83:5

106:20 134:18
135:20 167:15
parties 70:5 172:14
172:17
partner 28:14,16
28:17,18,20
parts 48:12 95:15
party 39:18 94:9,10
94:11,16 103:9
106:19 122:20
Paschal 3:16 4:2
8:8,8 11:12 17:9
24:18 25:2 28:1
30:3 31:1,6,14
34:15,20 35:2
36:4 38:6 39:6,14
40:19 42:14 43:19
44:4 45:5,21 47:9
48:1,20 49:5,16
50:9,15 51:9 52:4
52:11 54:6,11
56:11,20 58:20
59:5,8 61:1,7,13
61:17,20 63:4,16
64:17 65:20 67:1
67:17,21 71:19,21
72:4,13,18,22
73:1,3,7,13 75:8
77:5,12,19 79:1,4
81:5,15,18,22
82:4 83:9,16 84:3
84:5 92:4,8 95:7
95:10 100:16
102:13 103:4
111:6 122:1,3,6
140:5,16,21 142:2
148:3,11 151:15
155:1 156:20
160:19 161:3
163:2,13 167:4
168:15 169:5
170:11
pass 112:9
passed 35:20 36:18
42:7 48:14 96:19
96:20,20 116:16

116:18 117:3
118:8,22 120:10
120:17
passes 119:11
passing 38:16,18
40:8 69:13 115:2
120:21
passion 116:14
passport 88:19
patent 6:17 154:3
154:16,17 157:10
157:15 160:1,3
161:6,14 163:6,12
165:20 166:19
patents 15:13
126:22 154:7
157:1 158:1,4
162:2
patient 114:19
pay 40:14 96:7,11
101:7 103:22
122:18 134:5,18
135:6 136:5
Payday 96:21
paying 135:22
payment 104:1
137:9,18,19,20
PE 70:16 73:16
104:18 129:7
people 69:6 95:21
104:9,17 108:3,18
113:4 119:7
145:13 158:13
165:10 166:14
167:12 168:1
percent 34:4 48:2
58:5,12,18 59:2
69:1,2 126:14
percentage 123:6
Perez 3:16 8:12
period 16:8 21:20
75:3 86:14 105:19
106:2,9 107:14
109:18 117:7
131:6 133:15
138:8

person 85:4 102:10
103:1 113:1
115:15 153:9
personal 1:3 7:8
62:18 151:11
personality 38:22
personally 26:19
28:5
person's 115:22
phone 85:19,19
87:6 91:21 92:1
96:7,8,11,12
142:9 148:13,16
149:2 150:11,22
151:3,16 153:19
physical 26:5 38:3
88:7 135:17
physically 16:1
20:14 86:4 89:21
91:6 155:16
161:20
physicals 24:20
picking 76:19
picture 99:22 100:2
piece 119:16
Pinder 21:1 105:22
127:13,16,17
place 11:18 120:8
plaintiff 8:5,7
Plaintiffs 1:5 3:2
4:11 18:19 32:12
121:4 169:16
plaintiff's 32:14
plans 108:10
platform 73:17
please 8:1 9:10 11:5
59:16 73:15
111:20 151:8,21
155:22
plenty 126:15
Plus 91:22 151:17
pocket 135:18
point 10:5 15:14
16:7 69:4 81:3
125:8 126:22
133:17 158:17

points 70:1
pop 66:17 150:18
position 21:8
positions 35:8
positive 18:7 82:17
posted 91:3
posts 149:7,11
potentially 19:8
Preemptive 17:20
169:22
present 3:21 69:6
71:5 84:14 85:1
88:3
pressure 77:17
prestigious 107:3
pretty 145:15
168:13
previous 35:14
previously 40:18
principal 128:3
print 24:22
printing 18:13
prior 21:21 38:15
40:5,6,7 105:16
120:20 137:8
163:6,7
privacy 126:9,11
126:18 127:5
private 147:19
148:1
probably 119:18
127:21 152:14
159:6
problem 122:21
problems 38:2
110:10 126:17
proceed 8:3
PROCEEDINGS
7:1
process 81:14
116:18 119:6
123:18 154:5,11
155:7,8 158:7
162:2 163:5 166:4
processed 103:22
produced 18:17



24:9 41:18 43:5
44:18 52:20 54:21
57:12 60:1 62:7
65:1 66:5 74:15
76:2 80:11 82:9
**product** 16:5
**Professional** 2:11
**professions** 123:4
**profile** 6:16 111:10
111:12,14 129:3,8
**program** 6:11 13:6
82:16
**programming**
155:12
**project** 16:20 46:21
48:12 49:15 50:6
50:11,13,14
134:18 151:14
**projects** 14:5 22:4
28:12 29:1,4,6
74:4 75:1,5,11,13
75:16 78:2 99:20
121:5 124:6,18
132:18
**property** 29:4
71:17 73:11 74:7
75:5,16 79:11,18
97:6,10 98:11
134:8 144:9
160:15,16 166:8
167:1
**protection** 168:1
**provide** 151:21
**provider** 155:5
**Pty** 17:16,20 18:6
20:2,4 25:16 34:6
**public** 2:14 126:11
167:20 172:21
**publically** 26:22
**publicly** 55:16
**pull** 18:14 167:17
**purchase** 76:12
**purchased** 141:3,4
141:9 143:13
**purchases** 141:11
**purely** 23:15 98:3

118:12 138:13
**purpose** 21:11 88:5
**purposes** 51:21
70:3
**put** 23:16 108:18
112:13 113:11
124:3 127:7,9
130:9 134:7 149:8
157:2
**putting** 124:22
131:8 155:12

---

### Q

**qualifications**
125:1
**Queensland** 9:15
9:18 12:11 13:5
112:20 113:18
**question** 11:4,9
30:10,11 49:9
61:16 64:13 79:3
79:5 97:8 101:11
106:5 123:8
142:16,20 163:3
169:9
**questioning** 33:8
139:2
**questions** 72:15
83:15,17 117:1
131:16 168:19
170:10,11
**quicker** 127:4
**quickly** 38:17
132:10
**quite** 105:18 135:8
140:19 150:19
**QUT** 113:19

---

### R

**R** 1:12 8:14
**Ramona** 39:19
43:12 58:1 74:18
76:5 104:11
152:14
**ran** 130:5,7 141:18
**range** 95:3

**rate** 60:12
**reach** 93:3
**reached** 90:4 92:18
92:21 135:1
**read** 115:5 121:11
169:20 170:14,17
170:18
**reading** 45:21
**realize** 29:18
126:17
**realized** 33:6
**really** 81:10 129:10
132:12
**Realtime** 2:13,13
**reason** 21:7 25:11
25:18 90:6 101:3
126:8 135:3 137:6
147:8 153:1
**recall** 16:14 18:5
20:13 27:7 42:3
53:11 60:17 70:8
70:13 78:19 79:13
82:19 83:3,3 84:9
139:1,18
**receive** 93:9 118:20
131:4 136:10
137:1,14 147:18
169:1,11
**received** 51:17 52:7
101:4,6,10 104:1
136:12,21 137:3
137:10
**receives** 118:22
**receiving** 53:11
58:8 60:17,19
63:21 65:6 66:12
125:15
**recess** 41:11,12
78:11,12 83:20,21
148:7,8
**recipient** 81:4,8
152:17,19
**recognize** 25:7
41:22 43:8 44:21
47:11 52:22 55:2
57:14 60:5 62:9

65:3 66:7,8 68:9
74:17 76:4 80:13
**recollect** 10:20
**record** 7:5 8:2 9:11
11:14,15,18,20
41:8,9,14 78:8,9
78:14 83:18 84:1
99:4 148:5,10
151:10 170:21
172:12
**recorded** 10:4
**records** 19:13
134:7 144:11
**recovered** 135:9
**redaction** 51:11
**Reese** 46:20 48:11
48:15
**refer** 155:9
**reference** 80:20
**references** 82:22
**referring** 43:18
**refers** 50:5
**regards** 22:1 27:3
53:20,22 126:9
149:7 158:19
**Register** 17:18
35:12
**registered** 2:11
157:4
**registers** 34:9
**regular** 88:10
**reimbursed** 134:11
136:14
**relate** 75:10,11
**related** 74:4,7 75:7
79:22 114:4,7,10
114:13 123:9
124:15 172:13
**relationship** 98:3
138:15
**relative** 172:16
**released** 155:6
**relevant** 129:3,4
143:6
**rely** 11:9
**remained** 128:4

**remaining** 34:3
**remember** 17:12
19:9 20:3 24:15
45:10 53:21 58:8
63:21 65:6 66:12
70:19,22 71:1
83:12 92:14 94:21
95:11 101:12
106:3 109:2,3
146:20 153:11
**remind** 10:14
**reminded** 92:9
**remove** 161:8
165:20
**removed** 18:4
27:17 141:21
**remuneration** 6:14
100:18 125:5
**rent** 135:6
**rental** 134:8 144:9
**repeat** 11:6
**rephrase** 49:1 57:3
78:22 79:2
**Replacement**
122:10
**reply** 87:15
**report** 96:21
**reported** 1:20
109:6
**reportedly** 35:1
**reporter** 2:12,12,13
7:21 10:7 44:6
51:22 115:9
170:16 172:1,5
**represent** 84:5
**representative** 1:3
7:8
**represented** 91:10
**Reputation** 124:9
**request** 59:11
**requests** 115:9
**required** 133:4
**research** 1:4 7:10
17:16 20:2,4
22:21 34:2 54:1
71:14 170:1



resign 91:6
resignation 4:6
19:4 20:13,16
21:19 90:21
103:17 105:7
169:17 170:5
resigned 18:4 19:16
21:4,6 23:11,12
27:16 74:3 102:3
103:18 128:1
135:11 169:21
resolve 69:15
respond 10:10
86:12 87:4 168:22
169:9
response 27:9
169:11
responsible 95:4
returned 19:17
returns 53:22 77:7
131:9
review 44:19
right 13:21 20:18
22:11 26:13,15
27:10 29:2 37:17
45:18 47:1,20
52:1 84:16 85:14
89:16 93:1,20
94:4 95:17,22
98:14 99:1 101:17
102:1 103:6 105:2
105:4 107:7,8
108:17,18 113:2,9
113:12 114:18
116:11 117:22
119:8,12 120:10
121:8,11,14,15
129:13 130:13,22
132:4 134:15
135:12 136:6
139:19 141:22
147:11,15 152:7
159:9,17 160:15
161:22 164:20
167:19 168:7
170:12,13,18,19

170:20
rights 158:9 161:10
162:10 165:3
right-hand 165:18
RIVERO 3:17
road 119:4
Robert 9:12
Roche 3:3,7,7 8:4
44:7,7,12
Roger 60:8
role 107:6 166:5
romantic 28:16
roof 38:12
room 84:10,14
RPR 1:20 172:4,20
RSA 1:20 172:20
Rubik 26:22 60:8
73:18
ruin 98:18,19
rules 9:7 10:7
run 99:19 125:1
127:2,10
Rye 147:4
R&D 22:20,20 23:7
29:9 33:6 54:1
76:20 77:7 83:6
130:19 131:9

S
S 3:11 69:1,7 71:6
salary 102:6 136:16
136:21 137:1
138:1
sale 76:17
savvy 167:22
saw 145:18 146:3
148:1
saying 28:10 104:6
136:8 139:13
143:4 162:8
166:18 169:11
says 20:1 33:1,22
42:5 43:11 45:14
46:2,5,13 47:2,5
47:14 48:9 51:5
51:15 53:14 55:10

58:3 60:10 65:9
66:15 80:16 87:12
101:22 112:16
113:17 120:15
121:10 122:8
scale 110:20
scaling 124:7
126:17
Schedule 6:14
scheduled 104:2
Schiller 2:7 3:11
7:18 8:7
school 12:18
Schubert 13:4
scientist 115:20
scientists 115:18
126:5
Scott 112:1
screen 67:12 81:6
145:22 147:11,21
search 149:14
second 11:12 12:2
24:11,16 25:3
30:18 53:14 66:8
97:14 102:5,9,22
134:1 140:9 148:4
168:14
Secondary 125:9
seconds 121:11
security 36:10
115:4,8,11,13
116:10,14 120:9
120:16 126:4
164:17
see 20:1 24:13 26:5
26:18 29:20 32:18
32:21 33:20 34:7
37:20 38:5 39:2
39:12 45:16 46:7
46:9,18 47:3,5
50:21,22 51:4,14
53:13 55:10,20
58:3 59:13 60:3
60:15 63:8 65:8
66:19 67:9 69:7
76:21 80:18 83:1

97:5 107:22
121:18 124:9
144:6,14,17
145:18,20 146:9
146:13 147:6,11
147:19 154:18
166:20 168:10
seen 21:3 32:16
34:14 40:5 82:11
117:12 145:20,21
165:2
send 25:8 81:18
90:9,12,20 112:12
125:3 147:17
150:11,12 169:2
169:12
sending 24:15
136:13
sense 110:5,11
154:22
sensitive 129:1
sent 24:5 42:13
53:1,4,7 55:3,5
57:15,18 60:5
62:10,12 65:4
68:20 74:18 76:5
80:14 86:3,4,9
90:18
sentence 45:19 46:4
65:9 66:14,22
76:21
separate 148:19
September 20:7
sequence 91:7
seriously 113:2
serve 31:12
served 106:13
servers 141:18
Services 7:20,22
set 20:6,19 21:20
67:4 73:16 83:6
122:15 139:15
setting 73:17 74:5
setup 138:5
seven 72:16 134:2
seven-month

133:14
shake 10:10,11
share 91:8,9 149:10
shareholder 17:22
18:6 31:3,5 32:4,6
33:12 69:16 78:17
79:16 129:12
shareholders 68:21
78:21
shareholder's
68:16
shareholding 68:22
shares 18:2 26:19
27:15 31:7,10,10
135:11
shelf 39:22
shift 38:22 39:5
shirts 37:14
shoes 36:22
shop 36:16
short 75:3 149:1
shorthand 172:9
show 25:4 93:10
100:12 120:8
151:18
showed 67:11 94:4
96:21 146:15
showing 99:8
100:17 111:1,7,9
146:17 156:21
shown 10:4
side 158:19 165:18
sign 158:8 161:16
signature 171:1
signed 20:8 111:17
161:9 162:9 165:2
significant 102:19
signoff 158:9
similar 110:19
123:19,22
similarly 16:6
simple 87:14
single 72:1 107:15
121:14
sit 27:5
sitting 133:19



six 51:4 73:20
slow 29:17
small 67:3 99:18
smaller 100:1
smart 37:16
snapshot 51:18
  52:9
social 90:22 149:7
socks 37:1
solicitors 55:12
  128:2
solution 14:17 15:7
  15:8,13 16:17
  116:19 154:15
solutions 116:10
somebody 28:22
  118:7 119:11,15
sorry 31:9 36:12
  41:1 46:15 59:22
  63:11 65:13 89:22
  93:9 98:17 116:22
  120:22 140:22
sort 37:14,15 144:7
  150:17
source 163:19
South 3:3 5:21
  68:11 69:21
Southern 1:2 7:12
space 121:14
spaces 73:20
speak 10:14 84:12
  85:17
speaking 144:21,22
  145:8
Spears 53:7
specific 67:9
specifically 24:11
  59:9
spell 111:20 112:2
  153:18 155:22
spend 138:13
spending 40:9
  144:17
spent 40:2 94:7,21
spoke 15:16 85:9
  120:20 136:2

spoken 9:1 85:6
  152:1
Springwood 13:5
staff 22:14 75:3
  99:20 105:17
  109:17 111:16,18
  124:7 132:11
staffing 132:9
stage 15:15 27:13
  69:17 117:9
  118:15 127:1
  154:20 155:2
  163:11
stages 41:6 109:21
  138:5 161:19
stake 34:4
stand 88:2 119:1
start 13:6 16:19
  19:2 22:3 49:20
  101:19 104:18
  108:6 131:8
  153:21 154:11
  155:11
started 9:8 13:18
  15:20 19:9 22:19
  29:14,18 33:7
  36:19 42:6,6
  49:20 74:2 97:21
  98:22 100:3 103:5
  104:9 115:2 131:5
  132:12 154:5
  155:7 158:8 162:2
  163:5 165:6
starts 46:10
startup 109:21
  138:6
stat 55:11
state 9:10 72:21
  135:8
stated 36:10 101:5
statement 61:3
  88:17 98:16
  162:18
statements 50:3
  61:5 139:17,18,21
  140:10 144:15

States 1:1 7:11 36:1
  89:2,4 172:2
station 36:17
statutory 55:11
stay 105:1,4,5,5
  123:3
stemmed 125:17
stepped 151:12
Steve 134:21
  150:19
Steven 149:18,19
  150:5,6,7
stop 64:13 144:21
  144:22 145:8
story 64:5
strange 31:18
  120:6 137:15
strategies 118:17
strategy 133:19
Street 9:18 147:4
stretch 12:1
strike 33:18 35:7
  39:2 49:12 54:15
  63:12 65:14,15
  75:11 78:6 104:19
  117:1 118:6
stronger 15:7
structure 133:20
stuff 117:17
Subaru 37:3
subject 62:15
submitted 5:20
  68:10
subpoena 93:10,12
substance 127:15
sudden 36:21 38:22
  39:4,12
suddenly 38:9
  105:10,13 106:9
  107:17
Suffice 26:16
Suite 3:4
suits 22:10 36:21
  38:4 39:11 98:22
summary 137:9
superannuation

116:21
supplied 130:18
  137:12
supply 87:18 149:1
supporting 149:9
suppose 118:9
supposed 72:7
  137:22
Supreme 5:21 23:5
  68:10 69:20
sure 35:10 44:10
  45:8 77:17 82:11
  87:3 88:2,3 95:16
  113:8 118:21
  128:10,13 130:22
  141:15 150:9
  157:18 158:8
  161:17 163:20
surname 106:3
sworn 8:3,16 10:1
  172:8
Sydney 36:15 73:18
  104:15,16 134:10
  135:4,20 149:21
  150:21
system 44:11 122:8
Systems 2:13 124:9
system-wise 159:12
S-C-O-T-T 112:3

_____

T

take 9:8 12:2,22
  19:5,19 20:12
  24:10,16 32:15
  41:7 43:7 44:19
  50:6,11,13 51:17
  55:1 56:6 60:3
  61:16 63:10,11
  65:15 68:9 69:14
  74:17 76:7 78:7
  80:20 82:12 83:16
  102:5 113:2 114:1
  114:4,7,10,13
  115:3 121:3
  137:16 148:3
  161:10 165:10

169:15
taken 7:16 9:3
  41:11 78:11 83:20
  110:6 135:11
  148:7 172:6,9,15
takes 25:3
talk 28:3 30:15
  42:10 53:18 56:21
  64:2 71:16 73:10
  87:6,12 95:21
  117:17 156:7
talking 61:21 149:8
  169:2,7
task 132:17 163:16
tasks 132:15
tax 12:21 23:22
  45:3 53:8,9,22
  77:7 101:7,9
  106:17 131:9
  134:5
taxation 23:13 24:1
  27:3 101:5 106:20
  130:19
taxes 136:5
team 8:11 16:19
  40:1,13 135:4
tech 126:14
technically 81:8
technologies
  125:17
technology 12:11
  15:11,17 105:19
  108:5 112:21
  113:18 119:4
  124:2,4 125:13,20
  127:3 160:4,5
  164:2 165:11
tee 37:14
telephone 3:7
tell 10:1,18 11:1
  14:19,22 15:8
  21:6 25:9 32:5
  37:15 39:2 48:4
  49:7 54:8,14 55:2
  56:17 57:4 58:16
  59:1 61:10 63:11



64:8,14 65:13
76:10 80:2,4
88:18 89:18 90:1
94:6 97:17,20
121:21 127:15
140:6 150:14
166:10,10
**telling** 76:11
**ten** 40:1 78:7
116:17
**terminal** 117:8
**termination** 102:1
103:22
**testified** 8:16 84:6
93:17 94:3 109:7
128:9,20
**testimony** 59:7
128:22 172:7,8,12
**text** 87:20
**thank** 20:9 35:13
50:20 52:14 54:22
64:12 122:2
**theme** 75:12,15
79:11,17,21 121:7
125:10
**thing** 49:22 107:21
134:15
**things** 36:14,17,18
91:2 93:19 121:7
132:9 133:8
**think** 30:19 38:1
42:15 81:11 124:9
126:1 134:13
140:11 142:12,17
143:9 147:5
162:17,22 163:4
165:15 168:13,15
170:12
**third** 19:21 89:11
**thoroughly** 167:14
**thought** 23:4,9 91:4
107:22 118:19
153:3
**three** 72:18 85:8
145:5,6 148:18,19
**threw** 120:5

**throw** 119:15
**tier** 107:1
**ties** 22:10
**time** 7:15 16:9
21:12 23:2 27:18
32:3 34:13 39:10
41:5 70:11 72:14
74:1 75:3 77:17
84:15 85:9 88:19
93:8,19 96:8
105:8,19 106:2
109:19 111:11
138:8,13 140:20
150:19 157:22
164:8
**times** 9:1 23:13
30:8 64:14 85:6,8
139:4 146:11
**title** 31:21 47:19
**today** 7:14,19 10:1
10:17 11:2 14:18
73:21 84:10 93:10
93:13 115:5 156:8
160:3
**today's** 150:1
**told** 9:3 30:19 61:6
77:22 79:10 98:8
140:1 143:2,3
146:5 163:17
**tome** 151:21
**top** 19:2,6 32:19
33:20 39:22 45:18
51:4,14 60:4
80:13 95:2,3
**total** 110:5,11
**totals** 63:2
**tough** 51:20
**track** 123:16
126:12 141:5
159:14
**tracking** 124:12
**trail** 141:7
**train** 36:17
**training** 12:22
124:13 138:12
**transactions** 46:3

126:12
**transcribed** 172:10
**transcript** 6:20
**transcription**
172:11
**transfer** 25:19
133:7 145:19,21
147:6
**transferred** 123:2
**transfers** 146:3
**trash** 119:15
**travel** 88:9,16
134:9
**travelling** 40:9
148:14
**travels** 14:15
**treat** 145:14
**treats** 145:13
**trouble** 18:13 22:2
**true** 172:11
**trust** 20:20 21:2
170:16
**truth** 10:1,18 11:1
**try** 10:9,14,15 52:2
131:17 165:10
**trying** 18:14 67:4
108:18 116:19
122:15 130:20
132:7 165:13
**turn** 33:19 34:9
36:15 50:21 68:13
69:14 107:18
108:7 112:15
124:19 129:6
130:9 132:8
138:12,17 165:9
**turned** 23:5 131:18
137:16
**turning** 23:7
124:22
**TV** 66:16 81:6
**two** 76:13,14 89:5
90:2,3 92:22 96:3
98:4 112:14
116:10 118:13
121:15 145:5,6

**two-page** 121:13
**type** 29:6 71:17
73:10
**T's** 157:18 159:20
163:21

_____

**U**

**Uh-huh** 117:19
127:20 149:4
157:20
**uncomfortable**
99:14,15 131:1
**uncommon** 168:10
**undergraduate**
13:8
**underlying** 125:13
**underneath** 47:15
**understand** 9:22
10:16 11:5 29:3,7
38:20 49:2 51:18
56:7 63:13 65:12
65:17 66:21 72:9
72:10 78:1,5
107:21 108:7,15
121:2 125:12
126:13 138:9
**understanding**
21:9 22:15,16
38:21 39:4 57:1
58:14 69:18 98:15
115:3 132:20
133:20 139:11,12
**understood** 11:9
29:8
**underway** 154:7
**unethical** 134:13
**unfortunately**
73:21
**Unit** 7:5
**United** 1:1 7:11
172:2
**university** 12:8,11
112:20 113:18
**unmarked** 82:3
**unusual** 109:8
**updated** 111:12

**upset** 134:12
**use** 96:12 113:5
118:1 122:18
123:13 129:10
160:3
**U.S** 6:17 23:1,3,8
29:13 70:10 76:17
88:10,13 92:10
93:8 139:14
148:15 165:18

_____

**V**

**v** 1:5
**VA** 96:3
**validate** 55:15
**validating** 55:12
**value** 63:1
**valued** 56:3
**various** 17:2
**vehicles** 37:2
**Vel** 8:4,22 84:16
**VELVEL** 3:2
**vel@rochefreed...**
3:5
**vendor** 34:1,1
**vendor's** 33:22
**venture** 34:4
**versus** 7:10 99:19
**video** 3:16 8:12
122:8
**videographer** 3:22
7:4,19 11:15,19
41:9,13 78:9,13
83:18,22 148:5,9
170:20
**VIDEOTAPED**
1:11
**voice** 123:5
**voluntarily** 93:15
**vote** 70:4

_____

**W**

**wait** 153:3
**waiting** 24:21 42:8
**waive** 81:12 166:18
170:18,19



**waived** 73:6,7
165:3 171:1
**waiver** 167:5
**Wales** 5:21 68:11
69:21
**walked** 85:2
**wallet** 51:7,15 63:6
67:9
**wallets** 47:18 51:19
51:19 52:9 107:19
138:10 140:8
143:19,21 144:3
145:18,22 146:14
147:22
**want** 16:19 23:10
37:8 72:1,3 87:11
87:12 88:1,2
92:16 101:14
106:4 113:5,8
117:15,17 125:6
127:10 130:21
134:17 161:5
162:14
**wanted** 25:12 75:2
108:15 110:18
112:7 118:21
121:1 157:17
159:4,15
**wanting** 108:9,12
135:16
**Washington** 2:9
3:12 7:17 88:11
**wasn't** 21:7 25:18
33:16 37:6 77:9
87:10 95:1 129:4
130:5 132:13
137:1 138:3,4
149:13,16,17
156:16 162:1
164:2 166:16
**watches** 36:22 38:4
39:11 99:6
**Watts** 6:5,6 58:1
74:19 76:5 104:11
152:14
**way** 16:18 29:19

30:9 37:21 38:13
44:8 97:14 99:16
105:5 108:17
110:16 132:8
137:6 145:10,13
160:1 168:6
**ways** 71:22
**weakest** 168:4
**wealth** 39:13 41:3
94:4 97:3 144:7
**wealthy** 67:20 68:1
**wear** 36:22 138:17
**wearing** 36:13
98:22 164:8 166:7
**website** 167:17
**week** 89:5
**weeks** 89:5 90:2,3
92:22
**went** 37:4 38:11
60:8 73:19 119:4
145:10 154:16
**weren't** 14:7,9
21:16 132:2
133:14 146:4
**Westlake** 9:15
**we've** 15:13 59:14
**whatsoever** 101:6
115:1 153:7,17
**White** 21:22
**wife** 94:8 104:11
**willing** 81:12
**Wilson** 1:12 2:3 4:4
4:9,13,15,18,20
5:2,4,7,9,13,16,18
6:2,4,6,9,17 7:6
8:14,20 9:12 12:5
18:21 19:6 20:10
24:3,8 30:19 32:8
32:11 35:15 41:16
41:17,19,22 42:22
43:3,4 44:9,13,16
44:17,20 45:7,13
52:15,18,19,22
54:16,19,20 55:2
57:8,11,12,14
59:18,21,22 62:2

62:3,4 64:12,14
64:19,22 65:1,22
66:3,4 67:7 68:3,6
68:7,8 69:7 70:2
71:5,16 74:10,13
74:14 75:19,22
76:1 78:16 79:7
79:10 80:1,7,10
80:11 81:3 82:5,9
82:12,15 84:4
92:6 100:14 111:4
125:7 140:9
148:12 156:18
169:15,16 170:3
**Wilson's** 4:6 6:13
6:16
**winding** 137:5
**window** 117:21
**wine** 95:3
**Winkler** 67:4
**Winkly** 66:18
**wished** 127:4
**witness** 8:3,15 25:5
31:7 35:3 36:5,13
38:7 39:7,15
40:20 42:15 43:20
48:2,21 49:17
50:16 52:1,12
54:12 56:21 61:8
61:14,19,22 63:17
64:18 65:21 67:2
67:22 77:6,13,20
81:21 95:6,9
102:12 115:10
140:18 151:13
154:14 160:20
161:1 162:22
170:19 172:6,8,12
**WK** 70:18
**work** 9:17 14:3
44:11 75:2 82:20
103:13 109:20
127:5 131:12,13
131:17 133:16
150:7 156:12
168:11

**worked** 27:19
29:21,22 30:6
49:18 78:1,2,5
105:18 159:12
**working** 11:13
13:14,19 14:1
15:5 16:16 19:9
19:10 21:21 22:3
22:8 28:11,22
73:17 75:17 79:12
110:14 115:19
134:16 139:14
153:21 163:14,15
**works** 146:15
**world** 14:16 66:16
**worried** 138:3
**worry** 35:14
**worth** 63:15 65:18
**wouldn't** 110:4
113:11,14 128:17
141:12 143:14
147:14 162:9
164:14 165:12
167:2
**wound** 70:4
**Wright** 1:6 4:9,13
4:15,17,20 5:4,6,9
5:12,15,18,20 6:4
6:6,8 7:10 8:9,11
14:20 15:1,2,16
16:15 17:1 19:10
27:19 44:21 68:10
69:1,7 70:5 71:6
79:12,15 84:5
86:7 91:1 93:19
101:6 107:9
122:16 129:13
139:8 140:1,11,12
141:9 144:21,22
145:9,17,19 146:2
147:20 149:12,21
152:12 153:22
154:4 156:10
157:2 158:10
161:1,8,9,15
163:10 164:4,8,16

165:20,21 166:6
167:10 168:5
**Wright's** 107:16
138:22 144:11
**write** 87:22 155:17
**writes** 68:15
**writing** 20:13
**wrong** 23:19
105:14 130:16
158:1 160:9,13
**Wythe** 3:8
**W&K** 1:4 7:9 33:2
33:3,6,9,12,15
34:2 68:17,22
70:7 71:1,14
76:16 78:17,19
79:8 170:4

_____
**X**
_____
**XBT** 47:6 53:16
60:10 65:9
**Xero** 27:12 82:18
109:12,12
**XE.com** 60:12
**XFINITY** 96:15

_____
**Y**
_____
**YDF** 25:13 105:19
110:17 118:11
125:20 127:18
138:15
**Yeah** 155:14
**year** 12:14 48:15
77:14 85:12,13,14
86:8 90:5 103:15
128:1 145:4
**years** 96:3 127:19
145:1,3,6 147:1
168:9
**Yep** 19:22 24:14
89:10
**York** 2:8 3:8,12,18
3:18 19:18 20:6
88:7 92:11 112:5
**Young** 107:2



**Z**

**Zalman** 3:15 8:10
**zero** 32:2 90:14
**zkass@riverome...**
 3:19

**$**

**$100** 54:4,9
**$15,000** 40:2
**$16.4** 56:4
**$165** 65:18
**$30** 26:14
**$40** 26:12
**$5** 66:15
**$53** 63:15

**#**

**#13959** 1:21 2:14

**0**

**0043726** 122:1

**1**

**1** 4:6 7:5 18:20,21
 32:19 51:3 60:13
 60:20 61:4,11
 101:20 169:16,16
**10** 5:9 59:18 60:1
 103:18 106:8
 110:1 120:13
**10s** 26:16,16
**10/12/2013** 5:5
**10/2/2013** 4:21
**10/23/2013** 4:7
**10/29/2013** 6:15
**10/6/2013** 5:7,16
**10/9/2013** 4:18
**10:01** 78:12,14
**10:07** 83:19,20
**10:14** 83:21 84:1
**100** 6:14 48:2 53:15
**10017** 3:18
**108905** 18:18
**108905-108908** 4:8
**108907** 19:20
**108908** 18:18

**11** 5:12 32:19,20
 33:19 60:11 62:3
 62:4 101:22 106:8
 110:1
**11:04** 148:6,7
**11:20** 148:8,10
**11:39** 170:22 171:2
**111** 6:16
**111,000** 56:8
**111,114** 56:1
**11249** 3:8
**113043** 5:11 60:2
**11401** 3:12
**11420** 9:18
**12** 5:15 15:22 64:19
 65:1 102:15 162:1
**12-month** 21:20
 117:7
**13** 5:18 16:1 27:21
 65:22 66:4
**14** 5:20 68:3,7
 102:17 172:22
**14/354359** 165:18
**1410** 2:8
**14354359** 6:17
**15** 6:4 74:10,14
 121:4
**15th** 9:12
**15,000** 95:2
**150** 138:1
**156** 6:17
**16** 6:6 75:19 76:1
**16th** 68:17 69:4
**165** 65:9,13
**168** 4:2
**17** 6:8 80:7,11
**18** 4:6 6:11 82:5,9
**185** 3:8
**19** 6:13 92:6
**1933** 55:18
**1980** 9:13

**2**

**2** 4:9 24:3 51:3
**2nd** 53:4
**20** 6:14 100:13,14

**121:11** 137:2
**200** 3:3
**2000** 27:20
**20005** 2:9 3:12
**2004** 13:7,18,19
**2006** 12:16
**2008** 13:7,12,17
**2010** 14:2,4 116:17
 120:15,18 154:6
**2011** 14:12 19:13
 27:20 116:16
 120:10 154:1
 157:5,7 161:21
**2012** 15:3,20 19:14
 154:2 157:13
 165:5
**2013** 19:7,16 21:4
 27:20 35:4,7,9,16
 53:5 68:16,18
 69:5 71:18 73:12
 74:2,8 94:1,11
 100:10 101:20,22
 103:5,8,18 104:7
 124:5,6 136:18,20
 147:2
**2014** 16:12,13
 127:21,22
**2016** 127:21
**2019** 1:15 2:4 7:14
 170:22
**202-237-2727** 3:13
**2021** 172:22
**21** 6:16 111:3,4,8
**22** 6:17 156:18,22
**23** 68:13 69:4
**23rd** 19:7 105:7
**24** 4:9 69:3 71:4,4
**24-hour** 86:14
**25094** 4:19 44:18
**25095** 50:22
**26** 71:9
**261** 92:11
**262775** 6:12 82:10
**266797** 4:16 43:6
**267325** 6:10 80:12
**28** 157:7

**28015** 4:14 41:18

**3**

**3** 4:11 32:8,12,19
 32:20 34:1 51:3
 112:15
**30th** 77:1,4,10,18
 131:7
**30127** 5:14 62:8
**305-357-3861** 3:5
**31588** 6:7 76:3
**32** 4:11
**323,000** 34:3
**33131** 3:4
**361** 9:15

**4**

**4** 4:13 41:17,19
 51:3
**4B** 33:20
**41** 4:13
**42** 4:15
**43726** 6:5 74:16
**438,000** 62:20
**44** 4:17
**45457** 5:5 54:21
**45496** 4:10 24:10
**46093** 5:8 57:13
**46098** 5:17 65:2
**467687** 5:19 66:6
**49.5** 34:4

**5**

**5** 4:15 33:19 42:22
 43:4 51:3 58:5,12
 58:18 59:2
**5/5** 75:2
**50** 69:1,2
**500,000** 63:19
**51** 126:14
**52** 4:20
**528739** 1:22
**53.8** 63:2
**54** 5:4
**5500** 3:4
**553926** 4:22 52:21

**565** 3:17
**57** 5:6
**57,000** 62:21
**59** 5:9

**6**

**6** 4:17 44:13,17
**6/26/2013** 4:14
**61-416-176-816**
 91:22
**61-417-261-542**
 151:17
**62** 5:12
**64** 5:15
**65** 5:18
**68** 5:20

**7**

**7** 4:20 52:15,19
**7th** 3:18
**7/18/2013** 5:13
**7/2/2013** 4:16 6:7
**74** 6:4
**75** 6:6

**8**

**8** 1:15 2:4 4:2 5:4
 7:14 54:16,20
 103:8 170:22
**8th** 104:7
**8/11/2013** 6:5
**8/8/2013** 6:9
**8:36** 2:5 7:15
**8:38** 11:16
**8:39** 11:20
**80** 6:8
**80176** 7:13
**82** 6:11
**83-4** 5:22 68:7
**83-5** 4:12 32:13
**84** 4:2

**9**

**9** 5:6 32:19 57:8,12
 92:12 106:8 110:1
**9/20/2013** 4:10



**9/23/2013** 5:10
**9/27/2013** 5:19
**9:07** 41:10,11
**9:12** 41:12,14
**9:18-cv-80176-B...**
  1:4
**9:49** 78:10,11
**907** 20:2
**918** 7:13
**92** 6:13
**929-457-0050** 3:9

