# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No.  18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** is before the Court upon Plaintiffs' Omnibus Sanctions Motion, ECF No. [507] ("Motion"),[1] and Plaintiffs' Notice of Supplemental Evidence Supporting Plaintiffs' Omnibus Motion for Sanctions, ECF No. [541] ("Supplement"). Defendant filed a Response, ECF No. [551] ("Response"), to which Plaintiffs filed a Reply, ECF No. [572] ("Reply"). The Court has reviewed the Motion, the Supplement, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

## I.      BACKGROUND

The Court assumes the parties' familiarity with the general factual allegations and nature of this case. *See, e.g.*, ECF Nos. [68]; [83]; [265]; [373]. This Motion arises from Defendant's alleged failure to curb his litigation misconduct throughout the proceedings, even after having been

---

[1] The Motion was filed under seal. On May 18, 2020, the Court denied Plaintiffs' motion to seal the Motion, ECF No. [506], and directed Plaintiffs to re-file the Motion with redactions following a good faith conference with Defendant regarding what portions of the Motion, if any, should be exempt from the public's right of access. *See* ECF No. [508]. On May 21, 2020, the Motion was refiled with redactions. *See* ECF No. [512]. For ease of reference, the Court cites to ECF No. [507].

sanctioned previously by the Court. According to Plaintiffs, throughout the litigation Defendant "has engaged in a sustained pattern of perjury, forged evidence, misleading filings, and obstruction," including submission of false evidence, and Defendant's "well documented history of lies, forgeries and overall disdain for the legal system continues unabated." ECF No. [507] at 3. Indeed, since being sanctioned, Defendant allegedly has "submitted a false notice of compliance, a forged list of his bitcoin, and relied on forged documents in his summary judgment motion[.]" *Id.* Plaintiffs assert that they have been prejudiced by Defendant's alleged misconduct, and they contend that his actions demonstrate sanctionable bad faith. In their view, the severe sanction of striking Defendant's Amended Answer and entering a default judgment is warranted.

### A.    ALLEGED MISCONDUCT

Plaintiffs represent that Defendant's actions fit the following behavioral framework: (1) Defendant "has repeatedly lied under oath and submitted forged evidence in a failed effort to avoid trial and win this case through dispositive motions;" (2) Defendant "provides perjurious testimony and forged evidence in an effort to avoid compliance with Court orders;" (3) Defendant "submitted new lies and forgeries directly to this Court to avoid sanctions and to prevent Plaintiffs from proving their case;" (4) Defendant "has the ability to open the encrypted file, but won't because it will contain evidence of the partnership and its bitcoin holdings;" (5) Defendant has "flagrantly obstructed the discovery process and Plaintiffs' attempts to prove the scope and extent of the Satoshi Nakamoto partnership;" and (6) Defendant's "conduct has made and will continue to make a mockery of the judicial system." *See generally* ECF No. [507]. The Court details the allegations in each category below.

### i.    Lying under oath and submission of forged evidence related to jurisdictional issues

Plaintiffs contend that Defendant committed the following misconduct:

First, on April 16, 2018, Defendant submitted a sworn declaration claiming no relationship with W&K in support of his original motion to dismiss for lack of personal jurisdiction, *see* ECF No. [12-2][2] at 2, but this declaration was "directly contrary to a sworn declaration he submitted in Australia." ECF No. [507] at 3 (citing ECF No. [83] at ¶¶ 160-70). Specifically, the declaration submitted in support of the motion to dismiss stated that Defendant has "never been a member of W&K or any Florida business," he has "never shared in the profits, or had a duty to share in the losses, of W&K or any Florida business," he has "never been an agent of W&K or any Florida business," he has "never been a director, member, shareholder, officer, employee, or representative of W&K or of any Florida business," he has "never exercised authority or control over W&K or any Florida business, and [has] not had any right to exercise authority or control over W&K or any Florida business." *See* ECF No. [12-2] at 2.

However, as noted in the Motion, Plaintiffs attached as an exhibit to the operative Second Amended Complaint, ECF No. [83] ("SAC"), a sworn affidavit submitted by Defendant to the Supreme Court of New South Wales in Australia in which he lists himself as a "50.0%" shareholder in W&K Info Defense LLC. *See* ECF No. [83-4] at 5. That affidavit further stated that W&K was an "incorporated partnership" in which "[a]ll shares are held jointly," a "shareholders meeting" occurred on August 16, 2013 in which he was present, and that he voted "yes" on a motion to appoint Jamie Wilson to "act as director for the purposes of consenting to orders and the company to be wound down." *Id.* at 5-6. That Australian affidavit also included records in which Defendant signed documents as W&K's "authorized representative," *see id.* at 56, 63, 70, 76, 83,

---

[2] Upon review of the record, Plaintiffs' citation to ECF No. [12-1] at 2 does not support Plaintiffs' contention. That document references an affidavit from attorney Gordon Grieve, and page two does not discuss W&K. However, Plaintiffs' representation is more appropriately examined by reference to ECF No. [12-2] at 2, which is a declaration from Defendant and which discusses Defendant's alleged relationship to W&K.

90, identified himself as W&K's "lead researcher," *see id.* at 45-46, and its "technical contact," *see id.* at 50, 57, 64, 71, 77, 84, affiliated his "mailing address" with W&K's Florida address, *see id.* at 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90, and four emails confirming Defendant's uploads of various proposals on behalf of W&K. *See id.* at 40-43. Additionally, Plaintiffs attached as an exhibit to the SAC two "Acknowledgement of Liquidated Claim" filings in Australia in which Defendant signed as the "legal agent and representative" of W&K and as its "Director / Australian Agent." *See* ECF No. [83-30].

Second, on June 15, 2018, Defendant submitted a declaration swearing that he has "no documents in [his] possession from any ATO [Australian Tax Office] investigation" and that if he did, they would be in Australia. *See* ECF No. [33-3] at ¶ 18. However, according to Plaintiffs, discovery revealed that Defendant "has thousands of documents from the ATO" and that he later opposed discovery of ATO documents. ECF No. [507] at 1-2 (citing ECF No. [127] at 7).

Third, on April 15, 2019, Defendant submitted two allegedly forged exhibits in support of his motion for judgment on the pleadings. *See id.* at 2 (citing ECF Nos. [144-1] and [144-6]). Specifically, these exhibits purported to demonstrate that W&K had foreign members. Defendant later withdrew these exhibits, *see* ECF Nos. [154] and [265] at 6.

Fourth, on May 8, 2020, Defendant submitted his Motion for Summary Judgment, ECF No. [487], in which he argues that the Court lacks subject matter jurisdiction over this action, in part, based on a "divorce decree" from Australia in which Defendant's ex-wife, Lynn Wright, was allegedly given an ownership interest in W&K. ECF No. [507] at 2 (citing ECF No. [487] at 13). According to Plaintiffs, the "divorce decree" refers to an "appendix" purporting to be a "family law settlement" from June 2011 between Defendant and Lynn Wright in which she is given "50% of shares from Craig Wright[.]" *See* ECF No. [488-17] at 147. Plaintiffs represent that this

document is a forgery because they "obtained the Wrights' divorce records directly from the Federal Magistrates Court in Australia, which include no such copy of the agreement," and the court file "revealed that their <u>2013</u> divorce application states, unequivocally, that there were not <u>any 'binding agreements . . . about family law . . . involving any of the parties</u>[.]'" *See* ECF No. [507] at 2 (emphasis in original; citing ECF No. [507-1] at 7).

Fifth, on March 3, 2020, Defendant produced a document allegedly executed in February 2011 by Dave Kleiman purporting to be an operating agreement for W&K that identified Lynn Wright as a member of W&K. *See id.* at 3 (citing ECF No. [507-2] at 3). Under section III.H of the document, ECF No. [507-2] at 5, it notes that the members' duties are governed by the Florida Revised Limited Liability Company Act, but according to Plaintiffs, that statute, Fla. Stat. § 605.0101 *et seq.*, was not enacted until June 2013[3] after Dave Kleiman had passed away. ECF No. [507] at 3. Thus, Plaintiffs posit that this document is a forgery.

### ii.    Defendant's perjurious testimony and submission of forged evidence previously resulted in sanctions being imposed against him

Plaintiffs argue that since January 10, 2020, when the Court entered its Order, ECF No. [373] ("Objections Order"), affirming in part and reversing in part Judge Reinhart's sanctions order, ECF No. [277] ("Underlying Sanctions Order"), Defendant has continued to submit forgeries and lies in an effort to avoid compliance with Court orders related to producing a list of his bitcoin holdings. ECF No. [507] at 3. For context to evaluate Plaintiffs' assertions, the Court summarizes the Underlying Sanctions Order and the Objections Order.

---

[3] Florida Senate Bill No. 1300 of the 2013 Florida Senate reflects that the Florida Revised Limited Liability Company Act commenced as part of a bill filed in February 2013 and was approved by the Governor and enacted in June 2013. *See* https://www.flsenate.gov/Session/Bill/2013/1300 (last visited May 28, 2020).

On March 14, 2019, Judge Reinhart ruled that Plaintiffs were entitled to a list of Defendant's bitcoin holdings held by Defendant as of December 31, 2013, but granted Defendant leave to file a motion for protective order based on undue burden. *See* ECF No. [277] at 4-5 (citing ECF No. [124] at 18-23). In April 2019, Defendant filed his motion for protective order related to producing a list of his bitcoin holdings, representing to the Court that in 2011, he transferred ownership of all of his bitcoin into a blind trust, he is not a trustee or a beneficiary of the blind trust, and he does not know any of the public addresses that hold any of the bitcoin in the blind trust. *See id.* at 6 (citing ECF No. [155] at 2).[4]

Judge Reinhart denied Defendant's motion and ordered him to (1) provide a sworn declaration identifying the name and location of the blind trust, the name and contact information for the current trustee and any past trustees, and the names and contact information of any current or past beneficiaries; (2) produce all documents relating to the formation, administration, and operation of the blind trust; (3) produce all transactional records of the blind trust, including records reflecting the transfer of bitcoin into blind trust in or about 2011, and to swear to the authenticity of the documents; and (4) to execute all documents or other legal process necessary to effectuate the release of the documents in the trustee's control. *Id.* at 7-8 (citing ECF No. [166] at 4).

Defendant then submitted a sworn declaration in which he affirmed that he put bitcoin into the trusts and that he was both a trustee and a beneficiary of the supposedly blind trusts. *Id.* at 8 (citing ECF No. [222]). Specifically, in 2012, the Tulip Trust I was created and in 2014, the Tulip Trust II was created. *See* ECF No. [222]. Defendant also affirmed that he mined bitcoin during the

---

[4] These representations are contrary to his deposition testimony in which he denied putting bitcoin into a trust and denied putting any private keys into the Tulip Trust. *See* ECF No. [221] at 8-9.

years 2009 and 2010 directly into a trust located in Panama, and he transferred the encrypted files that control access to that bitcoin. *Id.* Additionally, he stated that "[a]ccess to the encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined, requires myself and a combination of trustees referenced in Tulip Trust 1 to unlock based on a Shamir scheme." *Id.* at ¶ 23. In his May 13, 2019 declaration, Defendant stated that the "electronic files that would be used to create the private keys to the Bitcoin that I mined . . . were transferred into Tulip Trust 1. The Bitcoin itself, however, has never been transacted." ECF No. [332-2].

Plaintiffs later filed a motion to compel Defendant to produce a list of his bitcoin holdings. Defendant conceded that he had not complied with Judge Reinhart's orders, but argued that compliance with impossible because the information necessary to comply with the orders was in Tulip Trust I in an encrypted file protected by a "Shamir's Secret Sharing Algorithm." ECF No. [204] at 5. In this configuration, a private encryption key is divided into multiple parts with the key shares then distributed to multiple individuals through the trusts. Defendant asserted that he could not decrypt the outer level of encryption because he did not have all of the necessary decryption keys. *Id.* Following a hearing on Plaintiffs' motion to compel, Judge Reinhart again ordered Defendant to "produce a complete list of all bitcoin he mined prior to December 31, 2013." ECF No. [277] at 10 (citing ECF No. [217]). Judge Reinhart also ordered Defendant to appear in person to show cause why he should not certify a contempt of court order to this Court. *Id.* An evidentiary hearing was later scheduled.

During the evidentiary hearing, Defendant testified it was impossible to comply with the Court's orders regarding his bitcoin holdings due to the Shamir Scheme implemented related to the encrypted file. ECF No. [373] at 9. Defendant testified that to decrypt the outer most layer of the encryption, he needed eight "key slices," but that he only had seven in his possession; thus, he

could not produce a list of his Bitcoin holdings even if he wanted to do so. *Id.* Steven Coughlan a/k/a Steve Shadders ("Shadders") also testified as to his efforts to apply the filter criteria to identify Defendant's bitcoin holdings. He provided a list of Defendant's supposed bitcoin holdings, ECF No. [266-1] ("Shadders List").[5] Dr. Edman also testified about alleged alterations to documents.

In the Underlying Sanctions Order, Judge Reinhart found that Defendant had not met his burden of proving that he was unable to comply with the Court's orders. ECF No. [277] at 16. Although he found that Shadder's testimony was "credible," *Id.* at 18, he did not find Defendant to be "someone who was telling the truth." *Id.* at 19. He added that Defendant's "conduct has prevented Plaintiffs from obtaining evidence that the Court found relevant to Plaintiffs' claim that Dr. Wright and David Kleiman formed a partnership to develop Bitcoin technology and to mine Bitcoin. Plaintiffs have also been prejudiced by not being able to try to trace the Bitcoin that was mined." *Id.* at 27-28. Further, he "found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony." *Id.* at 28. Judge Reinhart then imposed sanctions, including authorizing an award of attorneys' fees, striking certain affirmative defenses, and deeming the following facts as established: (1) Defendant and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine Bitcoin; (2) any Bitcoin-related intellectual property developed by Defendant prior to David Kleiman's death (the "partnership's Bitcoin") was the property of the partnership; (3) all bitcoin mined by Defendant prior to David Kleiman's death was property of the partnership when

---

[5] Shadders testified that he made a "mistake" or "error" when applying filter criteria, and the error "was in a quirk of the particular programming language that [he] used," which resulted in "2700" bitcoin addresses being included from a "range that would have otherwise been excluded." ECF No. [264] at 23-24.

mined; and (4) Plaintiffs presently retain an ownership interest in the partnership's Bitcoin, and any assets traceable to them. *Id.* at 28-29 ("Deemed Facts").

After the Underlying Sanctions Order was entered, Defendant filed an Objection, ECF No. [311], in which he argued that the "algorithm necessary to generate a complete list of his Bitcoin public addresses is in an encrypted file that is protected by a Shamir encryption scheme. To unlock the encrypted file, Dr. Wright would need at least 8 of the 15 key slices, but he has only 7. His best friend, Dave Kleiman, set up a system whereby Dr. Wright would, at the earliest, start to receive the remaining key slices in January of 2020 by bonded courier, at which point, Dr. Wright would be able to comply with the Court's order. Dr. Wright is unable to circumvent this system to obtain the eighth key slice at an earlier date because he was not involved in setting up the courier system and because Dave Kleiman is no longer alive." ECF No. [311-] at 3-4 (internal citations omitted).

On January 10, 2020, the Court entered the Objections Order, ECF No. [373]. In that Order, the Court agreed that Defendant's conduct warranted sanctions. *See id.* at 14-18. The Court noted that it is "undisputed that the Defendant has failed to produce a list of his Bitcoin holdings and has failed to comply with the Magistrate Judge's discovery order." *Id.* at 15. It also "agree[d] with [Judge Reinhart's] credibility findings relating to Defendant." *Id.* The Court, similarly, observed that Defendant "readily admits that he knew it was 'impossible' to comply with the Court's discovery order but chose not to notify the Court or the parties of this fact." *Id.* at 18. Thus, the Court affirmed the Underlying Sanctions Order's award of attorneys' fees. *Id.* However, the Court vacated the order as to the sanctions regarding Deemed Facts and the stricken affirmative defenses because the Deemed Facts "do not specifically relate to the discovery issue that was pending before the Magistrate Judge," which caused that sanction to be improper. *See id.* at 20.

Notably, the Objections Order "question[ed] whether it is remotely plausible that the mysterious 'bonded courier' is going to arrive," but it agreed to "indulge" Defendant's request that he be afforded the opportunity to receive the remaining key slice to unlock the encrypted file and generate a list of his Bitcoin holdings. *See id.* at 21-22. Specifically, the Court ruled that "[i]n light of the Defendant's representations that the bonded courier is scheduled to arrive in January 2020, the Court will permit the Defendant through and including February 3, 2020, to file a notice with the Court indicating whether or not this mysterious figure has appeared from the shadows and whether the Defendant now has access to the last key slice needed to unlock the encrypted file. In the event this occurs, and further if the Defendant produces his list of Bitcoin holdings as ordered by the Magistrate Judge, then this Court will not impose any additional sanctions other than the ones discussed above. In the event the bonded courier does not arrive, and the Plaintiffs are not given access to this information, which the Court has already founded directly relevant to their claims, the Court finds additional sanctions would be warranted." *Id.*

### iii.    Post-Sanctions, Defendant submitted new lies and forgeries to the Court

Four days after the Objections Order was issued, Defendant filed a Notice of Compliance with Court's January 10, 2020 Order, ECF No. [376], in which he notified the Court that "a third party has provided the necessary information and key slice to unlock the encrypted file, and Dr. Wright has produced a list of his bitcoin holdings, as ordered by the Magistrate Judge[.]" *Id.* Plaintiffs state that Defendant also provided them with a list of 16,404 public addresses Defendant claimed were his list of Bitcoin holdings, *see* ECF Nos. [507-6] and [507-7] ("CSW Filed List"). According to Plaintiffs, Defendant's Notice of Compliance was an "egregious misrepresentation" because "no 'key slice' had been turned over as claimed, the encrypted file was never unlocked as claimed, and no bonded courier had ever arrived. Instead, Wright's wife requested a copy of

Wright's Bitcoin holdings from an alleged Kenyan lawyer who provided her with a *new* encrypted file that contained a list of Wright's Bitcoin holdings," thus making the notice a "clear attempt to deceive the Court." ECF No. [507] at 8 (citing ECF No. [507-8]). Additionally, Plaintiffs argue that the CSW Filed List is a forgery created after the Objections Order and that it does not constitute an accurate list of Defendant's Bitcoin holdings. *Id.*

First, according to Plaintiffs, four addresses on the CSW Filed List have been spent since July 2019 (one as recently as May 13, 2020), which could not occur under the set-up envisioned in Defendant's testimony in June 2019 that his bitcoin are locked away in a multi-level encrypted file, which he could not access. *Id.* at 9 (citing ECF No. [507-9]). "To be clear, it would be *impossible* to spend these bitcoin without access to the private keys Wright has testified unequivocally he still does not have access to." *Id.* Plaintiffs state that this is "incontrovertible evidence" that Defendant either "(i) submitted a fraudulent/incomplete list of his bitcoin as the CSW Filed List and/or (ii) he *does* have access to a list of his bitcoin and the private keys associated with them and is lying about and *hiding* that information to prevent Plaintiffs from using the list to prove a partnership, the amount of bitcoin at issue, and to eventually trace those assets." *Id.* They add that two of the bitcoin "transactions" that spent the bitcoin from the CSW Filed List also "simultaneously spent bitcoin that are not included on the CSW Filed List and sent them all to one recipient address." *Id.* In their view, "this strongly suggests that [] whomever has the private key to the bitcoin on the CSW Filed List (Wright) also controls bitcoin that are not on the CSW Filed List (Wright)." *Id.* (citing ECF No. [507-9]).

Second, Plaintiffs assert that the CSW Filed List is not an independent accounting record that "predates the sanctions order" but instead is a "recent fabrication derived from the Shadders list." *Id.* In support, they reference testimony Shadders previously provided about a "filter" used

to identify Defendant's bitcoin as having a "Nonce marker byte" between 0 and 58 and how an "error" or "mistake" in the Shadders List erroneously added in approximately 2,700 addresses where the Nonce marker byte was between 128 and 255 (the "Shadders Bug"). *Id.* (citing ECF No. [264] at 19-25). Plaintiffs state that the CSW Filed List "[i]nexplicably . . . contains 1749 entries where the Nonce marker byte falls between 128-255 – an exact replica of the Shadders Bug." *Id.* at 10. "In other words, it now includes bitcoin Shadders testified was *not* held by Wright." *Id.* According to Plaintiffs, the "unique method for how the Shadders Bug was introduced (a 'quirk' of the software Shadders used in 2019 that tells the computer how to interpret certain numbers) leads to the inescapable conclusion that the CSW Filed List is not a genuine record independently created in circa 2010 that coincidentally replicates the exact 'quirky' bug Shadders introduced nine years later in 2019, but is a list Wright created from the Shadders List in 2020 and submitted to Plaintiffs." *Id.*

Third, Plaintiffs maintain that the CSW Filed List's transaction IDs "provide irrefutable statistical evidence that it is not the result of someone having mined 16404 blocks on the bitcoin blockchain." *Id.* According to Plaintiffs, when data is plotted, the statistical distribution of the transaction IDs reflects "two large unnatural 'gaps'" with three Transaction IDs in each gap, which is statistically "less likely than the odds of winning the jackpot in the Powerball lottery 31 times in a row." *Id.* (citations omitted). Thus, Plaintiffs argue that the CSW Filed List is "clearly a fabrication" and likely created by "taking the Shadder's List, sorting it by Transaction ID, deleting two large swaths of addresses, and then resorting the list by block height to obfuscate the fraud." *Id.* at 11. They contend that contrary to Defendant's representations in his Notice of Compliance, ECF No. [376], "he has not heard from the 'bonded courier,'" he has "not opened the encrypted

file, and [he] has still *not produced a complete and accurate list of his bitcoin holdings*." ECF No. [507] at 11 (emphasis in original).

Fourth, in the Supplement, Plaintiffs represent that "someone anonymously posted a message" to a link in which the author signed it "with the private keys to 145 of the bitcoin addresses appearing on the CSW Filed List." ECF No. [541] at 1.[6] According to Plaintiffs, "whomever authored the message unequivocally possesses the private keys to the 145 bitcoin addresses" contained in the CSW Filed List because you "cannot sign a message in this way unless you have the private keys to those addresses." *Id.* at 2. Thus, they contend that while Defendant testified that each of these addresses were his own and part of his bitcoin holdings, and that the private keys for each are locked in a trust and inaccessible to him, in reality, the "person that *actually* controls the private keys to those addresses" posted a message thus "proving the addresses do not belong to" Defendant.  *Id.* (emphasis in original). In their view, this anonymous message "further proves that the [CSW Filed List] is not an accurate listing of Wright's bitcoin, and that he is still hiding the true list from Plaintiffs and the Court." *Id.*

### *iv.*   **Defendant can open the encrypted file, but will not do so**

Plaintiffs assert that Defendant "knew" that they cannot access the encrypted files without his key slices, which slices Defendant "clearly already has as demonstrated by the (i) spending of over $1,600,000 worth of the allegedly lock up bitcoin and (ii) his comments to [a journalist] that he could 'have tanked the market anytime in the last 10 years and ran away laughing.'" ECF No. [507] at 13 (citation omitted). They claim that Defendant's "refusal to open the encrypted file strongly suggests he knows that its contents will include partnership records, support the existence

---

[6] The anonymous post stated that "Craig Steven Wright is a liar and a fraud. He doesn't have the keys used to sign this message . . . We are all Satoshi[.]" *See* ECF No. [541] at 1.

of a partnership between Wright and Dave Kleiman, and that the 820,200 bitcoin on the CSW Filed List (or other comparable amounts) belong to the partnership, as well as the blockchain related intellectual property created before Dave died." *Id.*

>    ***v.*** **Defendant has obstructed discovery and Plaintiffs' efforts to prove their case**

Plaintiffs state that Defendant's alleged lies and forgeries have obstructed discovery "targeted at the core of the Satoshi Nakamoto partnership." *Id.* Specifically, they argue that Defendant "has not even attempted to access and collect the three email accounts that belonged to Satoshi Nakamoto" and "he has even not tried to access or collect the well-known Satoshi Nakamoto Bitcointalk forum account, thereby preventing Plaintiffs from obtaining known partnership records." *Id.* They add that Defendant has claimed that almost all communications between him and David Kleiman were through mediums that, conveniently, did not preserve a record, but that Defendant "has turned over numerous self-serving records of communications between himself and David Kleiman that are provable forgeries." *Id.* at 12.

For example, Plaintiffs assert that Defendant produced messages from a "Bitmessage" application purporting to be exchanges between himself and David Kleiman, but Bitmessage's creator testified that some of the messages predated the application's release and, therefore, he was "as certain as you could possibly be that they are forgeries." *Id.* (citing ECF No. [507-12]). Additionally, Defendant produced a file containing the private key that was necessary to send the messages from the Bitmessage account that was supposedly associated with David Kleiman. *Id.* Thus, Plaintiffs argue that Defendant "undeniably" had the ability to "send these messages" supposedly exchanged between him and David Kleiman. *Id.* Plaintiffs also point out inconsistent statements Defendant made regarding his May 2019 testimony that during 2009 and 2010, he mined bitcoin directly into a trust located in Panama. *Id.* Specifically, in August 2014, Defendant

reportedly told the ATO that he had mined bitcoin with David Kleiman into a Panama trust, *see* ECF No. [507-13] at 4), but when asked at his deposition in March 2020 if he ever mined bitcoin into a Panama trust, Defendant testified that he "did not mine Bitcoin into a Panama trust." *See* ECF No. [507-3] at 4.

Plaintiffs maintain that Defendant's alleged lies, forgeries, and deceptions have obstructed their ability to discover the scope and extent of the Satoshi Nakamoto partnership. ECF No. [507] at 12. They contend that Defendant's "refusal to open the encrypted file clearly supports an inference that it contains evidence of a partnership between Wright and Kleiman, that the 820,200 bitcoin identified belong to the partnership, as well as all blockchain based intellectual property created before Dave died." *Id.* at 13. They add that the record supports the inference that "true partnership records exist but have not been turned over," and that Defendant is "withholding authentic evidence of the partnership and attempting to supplant it with his forgeries." *Id.*

### vi. Defendant's conduct will continue to make a mockery of the judicial system

Because Defendant allegedly has engaged in so much misconduct showing "total disdain" for the judicial system that "they simply can't all be included" in the Motion, Plaintiffs set forth two "representative examples[.]" *Id.* First, despite being ordered to produce all trust documents, Defendant did not mention throughout 2019 the Tulip Trust III, a purported 2017 trust document that revoked all prior trusts and which controlled all of Defendant's assets. *Id.* Plaintiffs represent that Defendant produced this document in January 2020 "buried . . . in a production of 400 other documents[.]" *Id.* According to them, this document appears to replace all prior trust documents Defendant identified in response to Judge Reinhart's Order, which in turn means Defendant identified "obsolete documents and withheld the only operative trust document." *Id.* Yet, Plaintiffs contend that the Tulip Trust III is a recent forgery because although the document appears to show

that it was executed on July 7, 2017, it lists "JBruk Ltd (UK) (10859457)" as one of its assets, *see* ECF No. [507-14] at 17. That entity, however, was not incorporated until July 11, 2017, *see* ECF No. [507-15]. Accordingly, in their view, the Tulip Trust III could not have been executed on July 7, 2017 because "neither JBruk nor the corporate number assigned to it would have existed yet." ECF No. [507] at 13 (citing ECF No. [507-15]).

Second, days before the deposition of Defendant's wife, Ramona Watts, was to occur, she produced an email purporting to be from Watts to Defendant dated May 28, 2012. *See* ECF No. [507-16]. However, Plaintiffs represent that the "metadata demonstrates that it (i) contained a hidden timestamp from December 19, 2019 and was (ii) created/edited with a program that wasn't released until early 2013." ECF No. [207] at 14. Thus, this email too is a forgery.

Third, Plaintiffs state that "in an attempt to prevent Plaintiffs from relying on *any* of the documents he has produced, Wright has (somewhat ironically) asserted that an unspecified number of documents *he produced* are forgeries or were otherwise manipulated by hackers." *Id.* (citing ECF Nos. [507-3]; [507-17]). They also point out that Defendant provided conflicting testimony about whether he authored various emails. *See id.* (citing ECF No. [497] at 11).

## B.  SANCTIONS REQUESTED BY PLAINTIFFS

Plaintiffs now move for sanctions against Defendant based on the Court's inherent power to sanction parties that engage in litigation misconduct. "By repeatedly disregarding court orders, submitting fabricated evidence to Plaintiffs and the Court, lying under oath at deposition, at Court hearings, and through declarations, withholding relevant documents, and by repeatedly submitting misleading and false court filings," Plaintiffs contend that Defendant "has engaged in flagrant obstruction of the discovery process, caused unjustified and extreme delay, made egregious misrepresentations to Plaintiffs and the Court, and hindered Plaintiffs [sic] ability to prove its [sic]

case." ECF No. [507] at 17 (footnote omitted). Therefore, they believe Defendant's alleged misconduct "warrants the most serious sanction"—striking his Amended Answer and entering a default judgment.

According to Plaintiffs, Defendant's actions demonstrate sanctionable bad faith. First, they maintain that he supported all four of the dispositive motions he filed throughout the case "with perjured statements, forged evidence, or both." *Id.* Second, they stress that he has "repeatedly disregarded discovery orders," and that after all the hassle that resulted in sanctions against him, he only "pretended to comply with the Court's order to turn over a list of his bitcoin holdings" while withholding "the Tulip Trust III document for over six months before producing it in January 2020, without ever mentioning its existence (even though he was ordered to produce trust-related documents in May 2019)." *Id.* at 18. Third, they argue that Defendant "repeatedly submitted fabricated evidence to Plaintiffs and the Court over the course of discovery," including "mountains of forged documents (emails to/from Dave) to support his narrative in this case" and to avoid sanctions for refusing to provide his bitcoin list. *Id.*

Fourth, they contend that post-sanctions, Defendant "continued to fabricate key evidence including an email from his wife, a fake W&K LLC agreement, a fake family law settlement agreement, and the false CSW Filed List." *Id.* Additionally, he has "continued to lie directly to the Court" regarding his compliance with the Court's Order, such as by filing a "false Notice of Compliance indicating that he received the long awaited keyslice (he hadn't), he'd opened the encrypted file (he hadn't), and that he'd finally provided Plaintiffs with a true and correct list of his bitcoin (he hadn't)." *Id.* at 18-19. Fifth, he belatedly produced the Tulip Trust III document, and yet that document is inauthentic "because it either references entities that were not created (or owned by Wright) at the time of the document's purported creation, relied on software that did not

yet exist at the time of the document's purported creation, included font files that didn't exist at the time of creation, or digital forensics otherwise showed clear manipulation by" Defendant. *Id.* at 19. Further, they allege that Defendant's communications with Highsecured (whom Defendant claimed held approximately 700,000 bitcoin for him and spent at his direction) were manipulated, inauthentic, and Defendant "had the bitmessage private key to the purported Highsecured account enabling him to send messages as them (password to email account)." *Id.* (citing ECF Nos. [507-3]; [222], and [500-2]). Plaintiffs stress that it is "now apparent that—contrary to his *sworn* testimony—Wright can in fact access his Bitcoin holdings, even though the 'bonded courier' never arrived." *Id.* (emphasis in original).

Sixth, Defendant's deposition testimony has provided "irreconcilably inconsistent testimony, on essentially any matter that he was asked about twice, including key issues such as whether he and Dave mined bitcoin into a Panama trust or whether he typed certain emails." *Id.* at 19-20. Plaintiffs state that the alleged misrepresentations and discovery obstructions have "created delay after delay," and Defendant's "pervasive use of fabricated evidence" has "forced" Plaintiffs to obtain expert opinions that ordinarily would be "wholly unnecessary." *Id.* at 19. Therefore, Plaintiffs contend that default sanctions are appropriate against Defendant. Specifically, they contend that his "unrepentant pattern of lies and forgeries demonstrates his willful bad faith," and he has committed "numerous frauds upon the Court." *Id.* at 20-21. Further, his alleged misconduct has "prejudiced Plaintiffs in numerous ways," and "the evidence Wright has withheld, concealed, altered, and forged concerns *the key issues in this case*: whether Wright and David partnered to mine bitcoin and develop intellectual property, the amount of bitcoin that they collectively mined, and which intellectual property they created. As a result, Plaintiffs have been deprived of *crucial*

*information* in support of their case." *Id.* at 21-22 (emphasis in original). They add that, overall, Defendant has made a "game of discovery" and hampered the truth-finding process. *Id.* at 22.

Plaintiffs argue that no lesser sanctions suffice because Defendant has already been sanctioned once before and since then, he has "continued to engage in the exact same egregious misconduct that got him sanctioned in the first place[.]" *Id.* They add that unless the Court intervenes, "there is every reason to expect that, at every chance, Wright will provide perjured testimony, create new forgeries, and support his positions with fabricated evidence." *Id.* at 23. However, they request that should the Court decline to enter default sanctions, the Court should pursue one of two options as alternative sanctions.

First, deem the following facts established: "(1) Dr. Wright and Dave [Kleiman] entered into a 50/50 partnership to develop blockchain-related intellectual property and mine bitcoin; (2) all bitcoin (and forked assets) included in the CSW Filed List is, and remains, property of the partnership; and (3) any such intellectual property developed by Wright prior to Dave's death is, and remains, property of the partnership." *Id.* at 24. According to Plaintiffs, Defendant's alleged misconduct has made it "extremely difficult to rely on any evidence produced by Wright in this action—including his own statements—to support any fact at issue in this litigation." *Id.* Thus, this alternative sanction "cures the wrongdoing." *Id.*

Second, as an alternative, Plaintiffs request the Court permit an adverse inference instruction as follows: "(1) Wright has committed perjury, produced fabricated evidence, and withheld relevant evidence with respect to whether (a) he and David were partners, (b) the activities of their partnership, and (c) the extent of the partnership's assets; and (2) the jury may, if it so chooses, properly infer from this misconduct that (a) Wright and David entered into a 50/50 partnership to develop blockchain-related intellectual property and mine bitcoin, (b) any such

intellectual property developed by Wright prior to Dave's death was property of the partnership, and (c) all bitcoin included in the CSW Filed List is property of the partnership." *Id.* at 24-25. Plaintiffs contend that each sanction requested bears a clear "nexus" to Defendant's misconduct.

## C.    DEFENDANT'S RESPONSE TO PLAINTIFFS' ALLEGATIONS

In response, Defendant asserts that the Motion "roll[s] out a parade of horrors detailing defendant's purported misconduct," yet Plaintiffs have not met their burden of proving by clear and convincing evidence that Defendant committed a fraud on the Court. ECF No. [551] at 2. Specifically, he maintains that Plaintiffs have failed to prove that "(1) defendant fabricated any evidence for this case, that he bribed the Court or a witness, (2) any supposedly false evidence goes to any 'linchpin' or critical issue in this case, (3) his counsel in this case was involved in any of the purported wrongdoing, and (4) defendant or his counsel at any time acted in bad faith, all of which plaintiffs are required to prove before this Court can deny defendant his Constitutionally-protected day in court. At most, what plaintiffs have done is argue that certain evidence—relating to collateral issues that have little, if anything to do with the actual merits of this case—is 'suspicious.' But 'suspicion is not enough.'" *Id.* (citation omitted).

Defendant raises four overarching arguments in support of denying the Motion. First, he asserts that Plaintiffs' arguments concerning Defendant's alleged misconduct should be addressed to the jury ("Defendant's Main Argument"). *See id.* at 3-25. Second, he contends that a large portion of the Motion functions as an untimely and inappropriate motion for reconsideration. *Id.* at 25. Third, he argues that Plaintiffs have waived the "new" purported discovery violations. *Id.* at 25-28. And fourth, he maintains that the Court already has rejected Plaintiffs' request for deemed facts and should do so again here. *Id.* at 29-30.

###### i.      *Defendant's main argument – no fraud on the court*

Defendant's Main Argument, at its core, is that Plaintiffs' allegations are not undisputed facts, they are not supported by admissible evidence, and Plaintiffs have not established those facts to be true. *Id.* at 3. Therefore, Defendant contends that the jury is the proper body to resolve any factual inconsistencies, and the Motion is thus "premature and unwarranted." *Id.* at 3-4. Nonetheless, Defendant argues that even if the Court could rule on the purported misconduct and even if Plaintiffs' allegations are true, "the severe sanctions [P]laintiffs seek are inappropriate because the alleged misconduct cannot constitute a fraud on the court[.]" *Id.* at 4.

First, Defendant submits that, as a general rule, creating fraudulent documents, making false statements, or committing perjury does not constitute a fraud on the court. *See id.* at 4-7. He argues that fraud on the court necessary to invoke a court's inherent power is fraud that is "directed to the judicial machinery itself" and not "fraud between the parties or fraudulent documents, false statements or perjury." *Id.* at 4-5 (citation omitted). Thus, while perjury and fabricated evidence "are evils that can and should be exposed at trial," fraud on the court instead "is limited to the more egregious forms of subversion of the legal process," which cannot necessarily be expected to be exposed by the normal adversary process. *Id.* at 5 (citations omitted).

Second, Defendant contends that the cases Plaintiffs rely upon are inapposite. Specifically, he asserts that the "select minority of cases" Plaintiffs use for the proposition that manufactured evidence or testimony is sufficient to impose a default judgment sanction are distinguishable because in those cases, "the manufactured evidence or testimony was made up by the party for the purposes of that litigation, it was relied on by the party in the litigation, and the false evidence played a pivotal and essential role in the party's defense or prosecution of the case." *Id.* at 7. In Defendant's view, those features "did not occur over here." *Id.*

Third, Defendant argues that Plaintiffs' theory that he purposefully manufactured documents to mislead the Court "makes no sense." *Id.* at 14. According to Defendant, Plaintiffs cannot explain why the appendix to the family law settlement contains Lynn Wright's signature, why her signature field has a blank spot on the W&K operating agreement, why Defendant would produce Bitmessage keys, or why he would forge emails that support Plaintiffs' case. *Id.* Additionally, he states that of the 1.9 million pages of documents he produced in this action, Plaintiffs have "identified an extremely small subset of documents that they claim are suspect." *Id.* at 15. He adds that many of the documents did not originate from his devices, and there is "ample evidence" that his computer systems were hacked. *Id.* In his opinion, he "cannot accept responsibility for every document that he has produced, especially when many of the nearly two million pages he has produced were not his own documents." *Id.*

Fourth, Defendant maintains that although Plaintiffs challenge that the alleged manufactured evidence goes to "key issues in this case," that is not so. In his view, there is "little evidence that [D]efendant manufactured evidence for the purposes of this litigation, that [D]efendant relied on the evidence in the litigation, or that the allegedly manufactured evidence played a pivotal and essential role in the [D]efendant's defense of the case[.]" *Id.* at 10-14. The Response proceeds to address each purported instance of manufactured evidence:

### a.  Tulip trust documents

Defendant contends that none of the Tulip Trust documents "have any bearing on whether there was a purported partnership with Dave Kleiman to mine bitcoin or develop intellectual property, which is what this case is actually about." *Id.* at 10. He adds that even if the Tulip Trust documents are forgeries, "they were not forged for the purposes of this litigation," and that

Plaintiffs' expert testified that Tulip Trust I and II documents were allegedly forged in 2014 or 2015. *Id.* (citing ECF No. [551-1] at 108:4-7).

### b.      Bitmessages and emails

Defendant asserts that the allegedly forged Bitmessages "primarily relate to the trust documents set up, not whether there was a partnership between defendant and Dave Kleiman." *Id.* at 10-11. He contends that "any minimal relationship that those messages may have to the partnership issue actually tends to support [P]laintiffs' theory of the case" and it "makes no sense" that he would "manufacture those documents" if they are "not helpful to him." *Id.* at 11. Similarly, he argues that while Plaintiffs claim many emails between Defendant and Dave Kleiman are forgeries, these emails support Plaintiffs' theory of the case that there was a partnership. *Id.* Thus, he posits that there is "no basis" for Plaintiffs to argue that Defendant manufactured evidence "to support his defenses or to prejudice [P]laintiffs' case." *Id.*

### c.      Email allegedly from Ramona Watts dated May 28, 2012

Defendant maintains that this allegedly forged email that Plaintiffs admit, if genuine, "appears to support Wright's story about keyslices, Dave, and trusts," ECF No. [507] at 14 (citing ECF No. [507-16]), has nothing to do with whether Defendant and Dave Kleiman partnered to mine bitcoin and develop intellectual property, the amount of bitcoin that they collectively mined, and which intellectual property they created. ECF No. [551] at 11. Further, he adds that this email does not support Defendant's theory of the case, and there is "no evidence that defendant was involved in its creation, or that defendant intends to rely on that email at trial." *Id.* at 12.

### d.      Family law settlement

Defendant maintains that the allegedly forged appendix to Defendant's family law settlement "has nothing to do with the substantive issues in this case," and Defendant could not

have created this document "for the purposes of this litigation" because he did not have access to the document since 2015. *Id.* Further, he notes that Defendant's former wife "authenticated the document and twice testified that it was her signature on the document." *Id.* (citing ECF No. [488-17] at 22:21-24:1; 98:13-16).

### e.    W&K's operating agreement

Defendant states that the allegedly fabricated W&K operating agreement "relates to jurisdictional issues, not substantive issues," and Defendant has not relied on this document in his dispositive motions. *Id.* He also contends that there is no evidence that this document is a "recent forgery created for the purposes of this litigation[.]" *Id.*

### f.    Highsecured emails

Defendant contends that while Plaintiffs challenge that Defendant's communications with Highsecured are "inauthentic," "the actual substance of those communications has nothing to do with any purported partnership with Dave Kleiman." *Id.* (citing ECF No. [551-2]). In his view, they are "innocuous emails" that do not relate to the central issues in this case, and Defendant has not relied on them. *Id.*

### g.    Defendant's list of Bitcoin

Defendant argues that Plaintiffs have "fail[ed] to show how the list of bitcoin that [D]efendant mined has any bearing on the purported partnership with Dave Kleiman to mine bitcoin or to develop bitcoin-related intellectual property." *Id.* at 13. He notes that while Plaintiffs have argued that a list of Defendant's bitcoin holdings is "crucial to the prosecution of their case," it is not possible to use the bitcoin holdings list to show that there was a partnership because information recorded on the block chain "records non-personally identifiable control of each Bitcoin amount," and the block chain records information about control, not ownership. *Id.* (citing

ECF No. [551-3]). Further, he argues that bitcoin containing a "Satoshi fingerprint" pattern cannot be used to prove Dave Kleiman was Satoshi Nakamoto because "mining is an anonymous activity" and there is "no way of knowing who mined that bitcoin." *Id.* (citing ECF No. [551-4]). Additionally, as to the CSW Filed List, Defendant contends that none of the evidence Plaintiffs present regarding this document is "conclusive of anything, or even admissible." *Id.* at 14. Thus, in his opinion, "Plaintiffs['] assertion that the correct list of bitcoin would enable them to prove all allegations in the complaint, including what bitcoin Dave Kleinman [sic] mined or owned, is baseless." *Id.*

### ii.    *Defendant's main argument – evidentiary hurdles*

Defendant maintains that even if the alleged misconduct is the type of misconduct that could constitute a fraud on the court, Plaintiffs fail to meet the evidentiary burden needed to impose sanctions. *Id.* at 15.

First, Defendant asserts that the clear and convincing evidence standard is used to determine whether Defendant engaged in purported misconduct that would warrant sanctions under a court's inherent power. *Id.* More than inconsistencies, suspicion, and contradictory statement are required to meet this evidentiary threshold. *Id.* at 16.

Second, he contends that the expert reports from Dr. Edman, Mr. Boedeker, and Mr. Antonopoulos, and the opinions contained therein are inadmissible hearsay and cannot meet the clear and convincing evidence standard. *Id.* He adds that the opinions expressed in these reports are the subject of his *Daubert* motion, ECF No. [500], and that if "given the opportunity to fully cross-examine the experts, defendant will undoubtably expose additional flaws in their opinions." *Id.* In his view, there is "no need to rush to judgment on an incomplete and hearsay riddled

'record,'" and if the expert opinions satisfy the *Daubert* standard, the jury should be the entity to weigh the evidence. *Id.* at 16-17.

Third, Defendant argues that any purported inconsistent statements (as a predicate for perjury) need to be viewed in light of his alleged cognitive disabilities, such as being on the autism spectrum. *Id.* at 24. According to Defendant, his expert, Dr. Klin, has "provided a closely reasoned opinion explaining how someone with defendant's diagnosis could be incorrectly perceived as having provided untruthful testimony." *Id.* at 25 (citing ECF No. [509-1] at 13-18).

Fourth, Defendant challenges that Plaintiffs' evidence as to the specific forgeries and purported misconduct is neither clear nor convincing. *Id.* at 17-24. The Response proceeds to show that "[n]ot every shadow is a monster," and that the evidence Plaintiffs rely upon are not "even forgeries in the first place[.]" *Id.* at 17.

### a.    Defendant's divorce settlement

Defendant states that while Plaintiffs argue that the June 2011 appendix to Defendant's family law settlement is a forgery, Plaintiffs have failed to establish that the appendix (which was not included in the Australian court file) should have been part of the 2013 court file. *Id.* He adds that the appendix is not a "court-facilitated settlement," and it was created when he and Lynn Wright separated, not in 2013 when they applied for a formal divorce. *Id.* He further states that while the divorce application provides that there were no binding family law agreements, that answer is contained in an "Other court cases" section and needs to be analyzed in that context. *Id.* at 18. Accordingly, Defendant posits that when he "answered 'No' it does not reflect that there are no binding family law agreements, but rather that there are no binding agreements entered into in connection with a court proceeding." *Id.* at 18 (emphasis omitted). In his view, because the 2011

settlement was not issued as part of a court case, "there was no reason why [he] should have listed it in the application." *Id.*

He contends that even if the settlement agreement needed to be listed on the application, its omission "doesn't necessarily mean that [the settlement agreement is] a forgery created for this litigation. It could be that he simply failed to properly fill out the form." *Id.* Defendant adds that even though Lynn Wright testified that she did not have a copy of the family law settlement, she authenticated the document, twice asserted that her signature was on it, and "common sense dictates that people don't always keep every scrap of paper from nearly a decade ago, especially when it could bring back painful memories, such as a divorce." *Id.* at 18-19. But, most importantly, Defendant states that Plaintiffs' theory "fully collapses" because the "DEFAUS" bates stamp on the appendix "establishes that the document was created prior to 2015 and that defendant didn't have access to the document since that date. In other words, it cannot possibly be a forgery created by defendant to defeat subject matter jurisdiction . . . unless, of course, plaintiffs maintain that defendant had the foresight to know that he would be sued in 2018 and would need such a document to defeat subject matter jurisdiction." *Id.* at 19.

### b. Bitmessages

Defendant argues that though the creator of Bitmessage, Johnathon Warren, testified that he was "as certain as you could possibly be that [certain messages] are forgeries," he also testified that a version of the bitcoin software could have been circulating on the dark web before the date the messages were sent, and that he kept a copy of the software running on an unprotected server. *Id.* (citing ECF No. [261-1] at 89:24-91:7; 104:16-105:22). Defendant contends, in any event, that Mr. Warren is not a forensic examiner and, thus, he has "no basis" to conclude that the allegedly forged Bitmessages are forgeries. *Id.*

### c.        Tulip Trust III

Defendant asserts that while the Tulip Trust III document claims to have been executed on July 7, 2017, yet lists JBruck Ltd (UK) (10859457) as an asset, which entity was not incorporated until July 11, 2017, Plaintiffs have "failed to establish that a corporation cannot have a corporate number prior to being incorporated, and they also have failed to establish that one cannot choose their own corporate number (and thus know in advance what the corporate number would be)." *Id.* at 20. He also contends that it is "not uncommon for people to sign documents without updating the dates throughout the document," and that "the mere fact that the document possibly was signed a few days after the date listed in the document does not mean that the document is a forgery, nor does it mean that it was created sometime after August 2019, as plaintiffs suggest." *Id.*

### d.        W&K operating agreement

Defendant argues that although the W&K operating agreement, allegedly executed in February 2011, references the Florida Revised Limited Liability Company Act, which was not enacted until June 2013, Plaintiffs "fail to consider that the 'Florida Limited Liability Company Act,' (*i.e.*, without the 'revised') did exist when the document purports to have been drafted." *Id.* (emphasis omitted). Thus, Defendant submits that it is "entirely possible that the document contains a miscite," and as such it is not clear and convincing evidence of fraud. *Id.* at 20-21.

### e.        Defendant's Notice of Compliance and the list of bitcoin addresses

Defendant argues that his Notice of Compliance provided Plaintiffs with "precisely the information they demanded—a list of what [Defendant] believes to be bitcoin that he mined prior to December 31, 2013." *Id.* at 21. He notes that "while the Notice of Compliance could have been clearer as to the exact circumstances of how defendant received the list of bitcoin, it does not follow that defendant intentionally set out to deceive this Court, especially when one considers

defendant's autism diagnosis." *Id.* Further, he contends that he "cleared up any resulting confusion" by virtue of his interrogatory responses providing a "detailed narrative" as to how he obtained his list of bitcoin addresses. *Id.* (citing ECF Nos. [404-1] and [507-8]). He additionally maintains that the CSW Filed List's alleged deficiencies, which document Plaintiffs conclude is an inaccurate list of his bitcoin holdings, do not meet the clear and convincing evidence standard.

First, he asserts that Plaintiffs' argument - that the CSW Filed List is a forgery because somebody spent the bitcoin in four addresses and included in the transaction bitcoin that are not contained on the list - reveals only that "somebody other than [D]efendant has access to some of the private keys of the bitcoin on [D]efendant's list." *Id.* at 22. In his view, this is "not a novel concept," and it is "entirely possible that the CSW Filed List inadvertently included some bitcoin that no longer belong to [D]efendant. That, of course, does not mean that the entire list is wrong or a forgery." *Id.* According to Defendant, "the list that he provided [P]laintiffs does not come from the encrypted file that he produced on August 27, 2019" but rather from the trust records "he obtained from his Kenyan lawyer." *Id.* at 22-23. He adds that this "response" also applies to the 144 bitcoin addresses listed in the Supplement. *Id.* at 23.

Second, Defendant contends that Plaintiffs' charge that the CSW Filed List is derived from the Shadders List because they both contain the same Shadder's Bug is misplaced because the Shadder's Bug is "a relatively common form of bug." *Id.* (citing ECF No. [551-4]). Further, Plaintiffs have not established that the Shadders Bug could not have been independently reproduced when the CSW Filed List was compiled. *Id.*

Third, Defendant asserts that Plaintiffs' claim that the CSW Filed List's "statistical evidence" that the transaction IDs are "not the result of someone having mined 16404 blocks on the bitcoin" is falsely premised on the transaction IDs needing to have a uniform distribution. *Id.*

According to Defendant, uniform distribution is "only relevant if one would expect (1) SHA 256 [hashing] to be uniformly randomly distributed, and (2) if one were not able to mine bitcoin in a manner to avoid certain Transaction IDs." *Id.* Regarding the former, Defendant asserts that Plaintiffs' expert relied on a Google search, "which isn't evidence of anything." *Id.* (citing ECF No. [500] at 21). Regarding the latter, Defendant states that one of Plaintiffs' different experts conceded that "one could adjust the bitcoin address or the Coinbase input to avoid certain transaction IDs." *Id.* (citing ECF No. [551-4]). Thus, "independent of the random uniformity (or lack thereof) of the SHA 256 algorithm, [P]laintiffs cannot establish that a list of bitcoin Transaction IDs must always be uniformly randomly distributed." *Id.*

Fourth, Defendant maintains that Plaintiffs' statement that the CSW Filed List does not contain every "known" Satoshi transaction does not present clear and convincing evidence "of anything," much less that the CSW Filed List is a forgery. *Id.* at 24. He adds that Plaintiffs "fail to consider that the trust may not have maintained records of spent bitcoin, and they also fail to consider that not every bitcoin was mined directly into the trust." *Id.* Further, he contends that Plaintiffs' theory that the CSW Filed List was "most likely created by . . . taking the Shadders List, sorting it by Transaction ID, deleting two large swaths of addresses, and then resorting the list by block height" is "demonstrably false[.]" *Id.*

### iii.    *Much of the Motion is an untimely and inappropriate motion for reconsideration*

Defendant argues that the Motion "attempt[s] to rehash the same arguments" rejected by the Court in the Objections Order, and much of it is "nothing more than an untimely and inappropriate motion for reconsideration[.]" *Id.* at 25. He notes that "to the extent that [P]laintiffs are claiming that [D]efendant didn't produce a list of his bitcoin addresses, then this Court has

already determined that the sanction would be an instruction to the jury that [D]efendant has failed to provide that information." *Id.* (citing ECF No. [373] at 22; footnote omitted).

### iv.   Plaintiffs have long waived the "new" purported discovery violation

Defendant asserts that his alleged discovery violations – (1) he did not "attempt to access and collect the three email accounts that belonged to Satoshi Nakamoto;" (2) he did not open an encrypted file; and (3) he purportedly changed his testimony about a Panama trust – do not support a sanctions award because Plaintiffs "are asking the wrong judge for the wrong remedy at the wrong time." *Id.* at 26. Specifically, he asserts that Plaintiffs should have filed a motion to compel "months ago," and thus "[a]ny arguments that [P]laintiffs had as to the Satoshi emails and the encrypted file have been waived long ago." *Id.* Even were that not so, he states that the premise of Plaintiffs' allegations is flawed.

First, he states that Plaintiffs fail to mention that Defendant did not log into accounts that he opened as Satoshi "because he no longer had access to those accounts." *Id.* (citing ECF No. [507-3]). Second, he contends that as to the encrypted file, Plaintiffs "offer no evidence that [D]efendant has access to it," and the "purported fact that some of the bitcoin listed on CSW Filed [L]ist moved or were signed simply demonstrates that someone other than [D]efendant has access to the private keys to some of the bitcoin." *Id.* at 27. In his view, this "does not mean that [D]efendant moved those bitcoins." *Id.* He adds that there is "absolutely no evidence" that the encrypted file "contains information that is relevant to [P]laintiffs' claims in this case," and that Plaintiffs merely speculate that it "contains evidence of a partnership, and that certain bitcoin belonged to the partnership along with bitcoin intellectual property." *Id.* Further, Defendant posits that Plaintiffs' theory "makes no sense" that he "would produce the purportedly incriminating

documents but refuse to produce (non-existent and supposedly) relevant documents on the encrypted file (that he doesn't have access to)." *Id.* at 27-28.

Third, Defendant asserts that his alleged inconsistencies regarding his testimony about mining bitcoin into a trust located in Panama is "clarified" by his testimony that "when he said 'I am mining,' it includes people who worked for certain companies who did the mining." *Id.* at 28 (citing ECF No. [551-7]). In his view, "there is no contradiction" between his testimony that he did and did not mine bitcoin into a trust in Panama. *Id.*

> ### *v.   The Court previously rejected Plaintiffs' request for deemed facts*

Defendant asserts that the "deemed facts" Plaintiffs seek as an alternative sanction are precisely the same Deemed Facts imposed in the Underlying Sanctions Order that the Court later reversed in the Objections Order. *Id.* at 29.[7] He states that "nothing has changed" to impose this sanction because there is "no nexus" between Defendant's alleged misconduct and the "deemed facts." *Id.*

### D.   PLAINTIFFS' REPLY

In their Reply, Plaintiffs make five primary arguments. *See generally* ECF No. [572]. First, they argue that imposing default sanctions will not violate Defendant's Seventh Amendment rights. *Id.* at 1. Second, they assert that Defendant has engaged in bad faith conduct that is sufficient to warrant default sanctions. In this respect, they acknowledge that while clear and convincing evidence of bad faith must be shown for default sanctions, fraud on the court need not be

---

[7] Defendant argues that the request for the "deemed facts" sanction is "little more than a back-door attempt" at a default judgment sanction because "the facts plaintiffs ask the court to deem establish[ed] would have the same effect as a default judgment in this case." ECF No. [551] at 29 n.20. In this regard, Defendant notes that while "non-dispositive issue-related sanctions only require proof by a preponderance of the evidence," because the "deemed facts would decide the central issues of the case, plaintiffs should be held to the higher, 'clear and convincing evidence' standard required for a default judgment." *Id.*

demonstrated. *Id.* at 1-2. They further contend that Defendant's "linchpin" requirement does not exist; Defendant perpetrated a fraud on the court by repeatedly fabricating evidence, perjuring himself, and submitting a false notice of claim to avoid sanctions; Defendant's bad faith conduct is clear, pervasive, and ongoing; and Defendant fails to address his non-forgery related misconduct that merits default. *Id.* at 2-7. Third, Plaintiffs submit that they were prejudiced by Defendant's bad faith, and Defendant's argument that fabrications were immaterial or harmless "is absurd" *Id.* at 7. Specifically, they argue that Defendant fabricated evidence concerning pivotal issues and relied on that evidence to support his legal positions, and he cannot avoid default sanctions by claiming he did not fabricate evidence specifically for this litigation. *Id.* at 7-12. Fourth, they maintain that no lesser sanction will suffice because submitting Defendant's frauds to a jury is an inadequate remedy and an ineffective deterrent. *Id.* at 13-15. And finally, Plaintiffs argue that Defendant does not dispute the Court's authority to enter lesser sanctions. *Id.* at 15.

The Motion, accordingly, is ripe for consideration.

## II.    LEGAL STANDARD

The Court has an inherent power to sanction attorneys or parties to a case. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-52 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43. Such powers "must be exercised with restraint and discretion." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). A district court's decision to impose sanctions under its inherent power is reviewed for an abuse of discretion. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

The Eleventh Circuit has emphasized that "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D.

Fla. 2005) (quoting *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001)); *see also Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("To exercise its inherent power a court must find that the party acted in bad faith."). "[T]he inherent power's bad faith standard narrows the range of conduct that can satisfy this higher threshold for sanctions." *Peer v. Lewis*, 606 F.3d 1306, 1314-15 (11th Cir. 2010).

"Bad faith exists when the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, . . . or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah*, 372 F. Supp. 2d at 1373 (citing *Chambers*, 501 U.S. at 45–46); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006) ("Bad faith can be found in several instances. First, bad faith may be found where the court finds that a . . . fraud has been practiced upon it, or that the very temple of justice has been defiled. . . . Second, bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order.") (internal modifications omitted); *Porton v. SP One, Ltd*, No. 6:15–CV–566–ORL, 2015 WL 1648893, at *2 (M.D. Fla. Apr. 13, 2015) ("The most severe sanction, dismissal with prejudice, may be appropriate when a plaintiff's recalcitrance is due to [willfulness], bad faith or fault."). "In determining whether sanctions should be awarded under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Barash*, 585 F. Supp. 2d at 1362 (quoting *Rothenberg v. Sec. Mgmt. Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984)).

"The inherent powers doctrine is most often invoked where a party commits perjury or destroys or doctors evidence." *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1268–69 (S.D. Fla. 2007) (citing *Vargas v. Peltz,* 901 F. Supp. 1572, 1581–82 (S.D. Fla.

1995); *Chemtall, Inc. v. Citi–Chem, Inc.,* 992 F. Supp. 1390, 1410 (S.D. Ga.1998)). Further, when imposing sanctions pursuant to their inherent authority, courts require that the conduct or fraud be proven by clear and convincing evidence. *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944178, at *2 (S.D. Fla. Mar. 17, 2016) (citing *Barash*, 585 F. Supp. 2d at 1365). "Clear and convincing evidence" is "evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue." *Friedman v. Schiano*, No. 16-CV-81975, 2017 WL 11487874, at *5 n.5 (S.D. Fla. Nov. 14, 2017), *aff'd*, 777 F. App'x 324 (11th Cir. 2019) (citations omitted).

Outright dismissal of a lawsuit, or entry of a default judgment, is a "particularly severe sanction, yet is within the court's discretion." *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1338 (S.D. Fla. 2007) (quoting *Chambers,* 501 U.S. at 45); *see also Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987) (noting that courts have "the inherent power to enter a default judgment as punishment for a defendant's destruction of evidence"). "Before the ultimate sanction of default judgment may be entered, this Court must make the following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff[s] [were] prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve the [goals of] punishment-and-deterrence[.]" *Telectron*, 116 F.R.D. at 131.

It is through these lenses that the Court considers the Motion and the parties' arguments.

## III.   DISCUSSION

Both parties agree that the entry of sanctions is within the Court's discretion, and that any such sanction would arise from the Court's inherent powers. Further, both parties agree that default sanctions can only be imposed upon clear and convincing evidence of bad faith.

Upon review of the record and careful consideration of the parties' briefings, the Court does not find that Plaintiffs have carried their burden to remove this case from the jury by striking Defendant's pleading and entering a default judgment as a sanction. To be sure, Plaintiffs depict unsettling issues that cast doubt regarding whether, since the Objections Order was entered in early January 2020, Defendant has committed perjury, produced forgeries, and engaged in judicial abuse. Further, the Court acknowledges  and certainly appreciates Plaintiffs' frustrations based on the events delineated in the briefings. However, these frustrations and doubts aside, significant factual disputes abound regarding the evidence presented, the role and importance of various pieces of evidence in the case, Defendant's intentions, and the credibility of witnesses. These determinations, and factual inferences and legal conclusions to be derived from them, are best suited for a jury to make as fact finder at trial, not for the Court to make.

For instance, as Plaintiffs note, Defendant's testimony has been glaringly inconsistent at numerous junctures. Defendant, however, stresses that he has been diagnosed as being on the autism spectrum, and thus his testimony needs to be evaluated in that light. ECF No. [551] at 24-25. *See Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944176, at *6 (S.D. Fla. Feb. 9, 2016), *report and recommendation adopted*, No. 14-CIV-60885, 2016 WL 3944178 (S.D. Fla. Mar. 17, 2016) ("Although Plaintiff's [cognitive] impairment does not explain every inconsistent statement, it undermines Defendants' argument that the inconsistencies were the product of a deliberate scheme to defraud the court."). Plaintiffs also assert that Defendant produced fabricated evidence during the course of this action, but Defendant counters that he has produced nearly two million pages of documents, including data from "well over 100 different media storage devices, many of which were used by former employees of [his] companies," and he contends that there is "ample evidence" that his computer systems were hacked. *Id.* at 15.

Similarly, although Plaintiffs challenge the veracity of the family law settlement, the Tulip Trust III, the W&K operating agreement, bitmessages, the CSW Filed List, and other documents, Defendant points to deficiencies in Plaintiffs' characterizations of the evidence and the claimed inconsistencies. *Id.* at 17-25.

Importantly, virtually all of the concerns raised as to the evidentiary matters at hand are fact-intensive, context-based, and require credibility determinations to resolve. They also rest on the Court making factual determinations that ultimately affect issues that go to the heart of this case. In other words, while the underlying determinations presented in the Motion ordinarily reside squarely within the provenance of a jury to decide at trial, Plaintiffs instead present them to the Court to sort out. In this regard, to warrant the "extreme" or "severe" sanction Plaintiffs request, which would remove this case from a jury trial, the clear and convincing evidence standard must be met. This is a formidable threshold, and the bad faith inquiry is not satisfied easily. Indeed, more than inconsistencies, contradictory statements, and suspicions is required to meet this standard. *See Tarasewicz*, 2016 WL 3944176. And "perjury and fabricated evidence do not constitute fraud upon the court, because they 'are evils that can and should be exposed at trial.'" *Leon v. M.I. Quality Lawn Maint., Inc.*, No. 10-20506-CIV, 2018 WL 6250529, at *12 (S.D. Fla. Nov. 29, 2018) (quoting *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985)). *See also Fahmy v. Sch. Bd. of Miami-Dade Cty.*, No. 09-23608-CIV, 2011 WL 13269611, at *3 (S.D. Fla. July 15, 2011) ("Given the extreme nature of dismissal as a sanction, the Eleventh Circuit Court of Appeals has held that fraud on the court does not generally encompass fraud between the parties, non-disclosure of material evidence, or perjury.") (citing *S.E.C. v. ESM Group, Inc.*, 835 F.2d 270 (11th Cir. 1988)).

In this setting and based on the record presented, Plaintiffs have not carried their burden to show that default sanctions are appropriate. Instead, they have laid the foundation for an overarching theme that Defendant, a "billionaire [mathematician], who stands to lose billions of dollars in this suit," "has run a risk/benefit analysis to determine that forgery and perjury is an 'affordable' in fact 'efficient,' mechanism to fight this case." ECF No. [507] at 23. The evidence and arguments Plaintiffs raise, in this regard, can be used to effectively persuade a jury, but they do not establish bad faith by clear and convincing evidence here. *See Bryant v. Troutman*, No. 3:05CV162-J-20MCR, 2006 WL 1640484, at *1-2 (M.D. Fla. June 8, 2006) (noting that the "fact that a party disputes his or her opponent's interpretation of the facts is not grounds for dismissal for fraud. . . . '[T]rials result from factual disputes. In these disputes, the facts on one side are, at best, less true and, at worse, false or fraudulent.' . . . to the extent [defendants] believe that Plaintiffs have been untruthful, Defendants will have ample opportunity to bring those untruths to light at trial") (citation omitted). Nor do they establish fraud on the court. *See Tarasewicz*, 2016 WL 3944176, at *4 ("[P]roving a fraud on the court requires 'clear and convincing evidence of an unconscionable plan designed to improperly influence the court in its decision.'") (quoting *Johnson v. Law Offices of Marshall C. Watson, PA*, 348 Fed.Appx. 447, 448 (11th Cir. 2009)). Here, Plaintiffs have aired longstanding grievances about Defendant's conduct throughout this case, but they have not shown clear and convincing evidence of an "unconscionable plan" designed to defraud the Court, most especially since the Objections Order was entered.

The Court, moreover, exercises its discretion and declines to impose Plaintiffs' suggested alternative lesser sanctions. For instance, the alternative Deemed Facts sanction is effectively dispositive of this case, and the Court agrees with Defendant that this "is little more than a back-door attempt at the same remedy" as default sanctions. ECF No. [551] at 29 n.29. Similarly,

although the Court previously left open the possibility that it would impose an adverse inference sanction under Rule 37(c)(1)(B) in the Objections Order, ECF No. [373] at 22, that was conditioned on Defendant not producing his list of bitcoin holdings. Since then, he purportedly has done so, subsequent discovery has taken place on that issue among many others, and dispositive motions and other pre-trial motions have been extensively briefed. Indeed, the parties have submitted voluminous filings encompassing hundreds of pages of briefings. As Defendant states, "Plaintiffs don't get to sit on their hands for months, wait for discovery to conclude, and then ask the Court to [sanction] [D]efendant because they believe [D]efendant failed to produce all the evidence to which they were entitled." ECF No. [551] at 26.

## IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [507]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 24, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record