CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

NO. 9:18-cv-80176-BB/BR

- - - - - - - - - - - - - - - - - - - - - - - - - x

Ira Kleiman, as the personal

representative of the Estate

of David Kleiman, and W&K Info

Defense Research, LLC,

       Plaintiffs,

    v.

Craig Wright,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - x

*** CONFIDENTIAL ***

DEPOSITION OF GAVIN A. ANDRESEN

Wednesday, February 26, 2020 at 9:11 a.m.

COURTYARD MARRIOTT HADLEY AMHERST

423 Russell Street

Hadley, Massachusetts 01035

Reporter:  Lori-Ann London, RPR

_____

MAGNA LEGAL SERVICES

866-624-6221

www.MagnaLS.com

Defendant's Designations
Plaintiffs' Objections
Plaintiffs' Counters



CONFIDENTIAL

Page 2

```
 1              APPEARANCES OF COUNSEL

 2    On Behalf of the Plaintiffs:

 3             By:  Velvel Freedman, Esquire

 4             Kyle Roche, Esquire (on telephone)

 5             ROCHE CYRULNIK FREEDMAN LLP

 6             Southeast Financial Center

 7             200 S. Biscayne Boulevard

 8             Miami, Florida 33131

 9             305.753.3675

10             vel@rcfllp.com

11

12    On Behalf of the Defendant:

13             By:  Zalman Kass, Esquire

14             RIVERO MESTRE

15             2525 Ponce de Leon Boulevard, Suite 1000

16             Miami, Florida 33134

17             305.445.2500

18             zkass@riveromestre.com

19

20    ALSO PRESENT:

21             Mati Kiin, Vidgeographer

22             Ira Kleiman (on telephone)

23

24

25
```



CONFIDENTIAL

Page 3

```
 1                          I N D E X

 2   DEPOSITION OF:                              PAGE

 3   GAVIN A. ANDRESEN

 4   EXAMINATION BY MR. FREEDMAN                    9

 5   _____X

 6                        E X H I B I T S

 7   NO.                                          PAGE

 8   Exhibit 1   Email from Satoshi Nakamoto      22

 9   Exhibit 2   Document, Bates-labeled Gavin    33

10               1296

11   Exhibit 3   Email, Bates-labeled Gavin 796   35

12   Exhibit 4   Email correspondence,            38

13               Bates-labeled Gavin 1433

14   Exhibit 5   Email, Bates-labeled Gavin 1286  43

15   Exhibit 6   Email, Bates-labeled Gavin 307   44

16   Exhibit 7   Email, Bates-labeled Gavin 1120  45

17   Exhibit 8   Email, Bates-labeled Gavin 1720  47

18   Exhibit 9   Email chain, Bates-labeled Gavin 48

19               1077

20   Exhibit 9   (Remarked) Email                 49

21   Exhibit 10  Email, Bates-labeled Gavin 810   65

22   Exhibit 11  Document, Bates-labeled Gavin    77

23               2007

24   Exhibit 12  Email with attachment,           95

25               Bates-labeled Gavin 683 and 684
```



Page 4

|    | NO.         |                                     | PAGE |
|----|-------------|-------------------------------------|------|
| 1  |             |                                     |      |
| 2  | Exhibit 13  | "The Satoshi Affair" article        | 101  |
| 3  | Exhibit 14  | Email, Bates-labeled Gavin 1007     | 107  |
| 4  | Exhibit 15  | Email, Bates-labeled Gavin 357      | 110  |
| 5  | Exhibit 16  | Email, Bates-labeled 622            | 112  |
| 6  | Exhibit 17  | Email, Bates-labeled Gavin 33       | 115  |
| 7  | Exhibit 18  | Email, Bates-labeled Gavin 1762     | 120  |
| 8  | Exhibit 19  | Email, Bates-labeled Gavin 15       | 122  |
| 9  | Exhibit 20  | Email, Bates-labeled 1521           | 125  |
| 10 | Exhibit 21  | Email, Bates-labeled Gavin 1179     | 128  |
| 11 | Exhibit 22  | Email, Bates-labeled Gavin 5        | 132  |
| 12 | Exhibit 23  | Email, Bates-labeled Gavin 47       | 135  |
| 13 | Exhibit 24  | Email, Bates-labeled Gavin 161      | 138  |
| 14 | Exhibit 25  | Email, Bates-labeled Gavin 371      | 139  |
| 15 | Exhibit 26  | Email, Bates-labeled Gavin 4        | 141  |
| 16 | Exhibit 27  | Email, Bates-labeled Gavin 18       | 142  |
| 17 | Exhibit 28  | Email, Bates-labeled Gavin 1708     | 144  |
| 18 | Exhibit 29  | Emails, Bates-labeled Gavin 1206    | 147  |
| 19 | Exhibit 30  | Email chain, Bates-labeled Gavin    | 151  |
| 20 |             | 769                                 |      |
| 21 | Exhibit 31  | Email, Bates-labeled Gavin 41       | 152  |
| 22 | Exhibit 32  | Email, Bates-labeled 1512           | 160  |
| 23 | Exhibit 33  | Email, Bates-labeled Gavin 344      | 160  |
| 24 | Exhibit 34  | Email chain, Bates-labeled Gavin    | 162  |
| 25 |             | 732                                 |      |



CONFIDENTIAL

Page 5

1    NO.                                        PAGE

2    Exhibit 35  Email, Bates-labeled    Gavin    166

3                1274

4    Exhibit 36  Email, Bates-labeled Gavin 1439  168

5    Exhibit 37  Email, Bates-labeled Gavin 869   169

6    Exhibit 38  Email, Bates-labeled  Gavin 1974 172

7    Exhibit 39  Email, Bates-labeled Gavin 1075  175

8    Exhibit 40  Email chain, which is            177

9                Bates-labeled  Gavin 1334

10   Exhibit 41  Email chain                      178

11   Exhibit 42  Email                            180

12   Exhibit 43  Email, Bates-labeled 1482        182

13   Exhibit 44  Subpoena                         188

14   Exhibit 48  Email chain, Bates-labeled Gavin 201

15               265-266

16   Exhibit 49  Email, Bates-labeled Gavin 275   201

17   Exhibit 45  Document, Bates-labeled Gavin    202

18               276 through 293

19   Exhibit 46  Email, Bates-labeled Gavin 359   203

20   Exhibit 47  Email, Bates-labeled Gavin 251   204

21   Exhibit 50  Email, Bates-labeled 380         204

22   Exhibit 51  Document, Bates-labeled Gavin    205

23               381 through 383

24   Exhibit 52  Email, Bates-labeled Gavin 415   206

25   Exhibit 53  Email, Bates-labeled Gavin 641   206



CONFIDENTIAL

Page 6

```
 1   NO.                                           PAGE

 2   Exhibit 54   Email, Bates-labeled Gavin 253   207

 3   Exhibit 55   Email, Bates-labeled 645         207

 4   Exhibit 56   Email, Bates-labeled Gavin 370   207

 5   Exhibit 57   Email, Bates-labeled 297         208

 6   Exhibit 58   Document, Bates-labeled 298-299  209

 7   Exhibit 59   Article: "Bitcoin Foundation's   210

 8                Andresen on Working with Satoshi

 9                Nakamoto"

10   Exhibit 60   Email, Bates-labeled Gavin 1467  220

11   Exhibit 61   Email, Bates-labeled 307-309     222

12   Exhibit 62   Email, Bates-labeled Gavin       222

13                1260-1262

14   Exhibit 63   Document, Bates-labeled Gavin    226

15                311

16   Exhibit 64   Email, Bates-labeled Gavin 1004  227

17   Exhibit 65   Email, Bates-labeled Gavin       228

18                348-349

19   Exhibit 66   Email, Bates-labeled Gavin 257   228

20   Exhibit 68   Email, Bates-labeled Gavin 893   245

21   Exhibit 69   Blog post                        246

22   Exhibit 70   Email, Bates-labeled Gavin       253

23                375-376

24   Exhibit 71   Blog post                        260

25   *Original exhibits attached to original transcript
```



CONFIDENTIAL

```
 1                 P R O C E E D I N G S
 2                 THE VIDEOGRAPHER:  Good morning.
 3     We're now going on the record.  This begins
 4     media -- videotape No. 1 in the deposition of Gavin
 5     Andresen in the matter of -- in the -- in the
 6     matter of the Estate of David Kleiman, et al,
 7     versus Craig Wright.  This matter is held in the
 8     United States District Court, Southern District of
 9     Florida.
10                 Today is February 26, and the time is
11     approximately 9:11 a.m.  Our deposition is being
12     taken at the Courtyard Marriott Hadley Amherst at
13     the request of Roche Cyrulnik Freedman LLP.
14                 I am the videographer, and, again, my
15     name is Mati Kiin, on behalf of Magna Legal
16     Services.  And our court reporter is Lori London,
17     here also for Magna Legal Services.
18                 I will now ask counsel and all
19     parties present to state their appearances and whom
20     they represent.
21                 MR. FREEDMAN:  Vel Freedman, for the
22     Plaintiffs.
23                 MR. KASS:  Zalman Kass, for Dr. Craig
24     Wright.
25                 THE WITNESS:  I'm Gavin Andresen, I'm
```



CONFIDENTIAL

Page 8

 1    being deposed.

 2              THE VIDEOGRAPHER:  Thank you.

 3              Is there anyone remotely?

 4              No.  Okay.

 5              MR. FREEDMAN:  There is a conference

 6    line open, and people may be joining and dropping.

 7              Do you want a record of who's on?

 8              MR. KASS:  If somebody's on now, I

 9    think they should just state that they are.

10              MR. FREEDMAN:  If anyone's on the

11    record -- if anyone's on the conference line, can

12    you please announce yourself?

13              (Discussion off the record.)

14              MR. ROCHE:  We're having trouble

15    hearing on the line.  Is there any chance you can

16    move the phone or the microphone closer to the

17    witness?  That would be helpful.

18              MR. FREEDMAN:  The witness hasn't

19    spoken really yet.  You're hearing the videographer

20    from across the room.  But we'll -- we'll push it a

21    little closer to the witness.

22              In the interim, you guys were not on

23    speaker, so we couldn't hear you.  Can you

24    re-announce who's on the line telephonically?

25              MR. ROCHE:  Kyle Roche, Roche



CONFIDENTIAL

Page 9

1  Cyrulnik Freedman, counsel for Plaintiff.

2             MR. KLEIMAN:  Ira Kleiman, Plaintiff.

3             THE STENOGRAPHER:  I can't hear the

4  name.

5             MR. FREEDMAN:  Ira Kleiman.

6             Anyone else?

7             (No response.)

8             MR. FREEDMAN:  All right, with that,

9  I'm gonna take you off speaker and put you back

10  next to Mr. Andresen.

11             (Pause.)

12             THE VIDEOGRAPHER:  At this point, I

13  would like the court reporter to please swear in

14  the witness, and we can get started.

15             GAVIN A. ANDRESEN,

16  a witness called for examination by the Plaintiff,

17  having been satisfactorily identified by the

18  production of his Massachusetts driver's license,

19  and duly sworn by the Notary Public, was examined

20  and testified as follows:

21             EXAMINATION

22  BY MR. FREEDMAN:

23      Q   Good morning, Mr. Andresen.  My name is

24  Vel Freedman, I represent the Plaintiff in this

25  action.



CONFIDENTIAL

Page 10

1              Have you ever been deposed before?

2        A    I have never been deposed before, no.

3        Q    So I'm gonna go over some of the ground

4    rules so we can get through this easier and

5    quicker.

6              It's sometimes more natural for

7    people to respond with -- non-verbally with shaking

8    your head yes or no, but in order for the court

9    reporter to take down your answers, I need you to

10   try to remember to give a verbal "yes" or a verbal

11   "no" so we have a record of -- of the way you

12   responded.

13       A    Okay.

14       Q    This is not a marathon.  If you need a

15   break, let me know, we'll stop; you can go to the

16   bathroom, take a drink, stretch your legs.

17             You understand that you're under oath

18   today, and the testimony that you're going to give

19   may be shown to a judge or jury, and they may rely

20   on that testimony?

21       A    Yes, I do.

22       Q    And if you don't understand a question, I

23   need you to ask [verbatim] me that you didn't

24   understand the question.  If you don't ask me and

25   you answer the question, I'm gonna assume you



CONFIDENTIAL

Page 11

1  understood it, and I'm gonna rely on that answer;

2  is that fair?

3      A    Yes.

4      Q    Okay.  With that, are there any

5  medications that you're taking today that would

6  affect your ability to testify or recall events?

7      A    No.

8      Q    Okay.  Thank you.

9          Mr. Andresen, can you state your name

10 and date of birth for the record.

11     A    Gavin Alexander Andresen, ███████████

12 1966.

13     Q    And is that your birth name?

14     A    That is the name on my birth certificate.

15     Q    That was an interesting response.

16     A    It's complicated.  I could get into it if

17 you really want.

18     Q    Why don't you give me the 30-second

19 version.  We'll see if it has any relevance.

20     A    The 30-second version is, actually I was

21 born Gavin Alexander Andresen.  My birth

22 certificate was changed to Gavin Alexander Bell,

23 when my mom married my dad way back in 1970 -- '70.

24 And then it was changed back, again -- I actually

25 changed my name back to Gavin Alexander Andresen.



CONFIDENTIAL

Page 12

1    So it's complicated.

2         Q    Got it.  And it sounds like it has no

3    relevance, so thank you for that.

4               Can you tell us your residential

5    address, please.

6         A    ███████████████████████████████.

7         Q    Okay.  And do you have a business

8    address?

9         A    I have an office at AmherstWorks,

10   11 Amity Street in Amherst, Massachusetts.

11        Q    Okay.  And you were born where?

12        A    Melbourne, Australia.

13        Q    And what -- sorry.  You told me your date

14   of birth, but I've forgotten it.  What -- what was

15   the year?

16        A    1966.

17        Q    '66.

18               And when did you leave Australia?

19        A    1972.

20        Q    And where did you go from there?

21        A    Seattle, Washington.

22        Q    And how long were you in Washington for?

23        A    Let's see.  Moved from Seattle to Alaska

24   when I was in third grade, which would be '74,

25   maybe '75.



CONFIDENTIAL

Page 13

1       Q    And then...

2       A    And then from Alaska, we moved to

3    southern California; that was in '76, I believe.

4       Q    Okay.  And were you in southern

5    California for a while, or did you --

6       A    I was in southern California, yeah,

7    through most of high -- excuse me -- through most

8    of school, although we did spend a couple months

9    living in Arkansas --

10      Q    Okay.

11      A    -- when I was a freshman in high school.

12   But most of that time was southern California.

13      Q    All right.  And so when did you come to

14   leave southern California?

15      A    I went to college at Princeton University

16   in Princeton, New Jersey, in 1984.

17      Q    Okay.  And graduated...

18      A    1988.

19      Q    Okay.  And where did you go after you

20   left Princeton?

21      A    To -- let's see -- Mountain View,

22   California.

23      Q    Okay.

24      A    Silicon Valley.

25      Q    And were there until...



CONFIDENTIAL

Page 14

```
1       A    Well, I moved around different places in
2   the Bay area from '88 until '96.
3       Q    Okay.  And in '96, where did you -- did
4   you -- were you still in California?
5       A    I was still in California, yeah.
6       Q    Did there come a time you left
7   California?
8       A    Yes.  In '96 we moved from Palo Alto,
9   California, to Madison, Wisconsin.
10      Q    Okay.  And when you left Wisconsin -- did
11  there come a time you left Wisconsin?
12      A    I left -- left Wisconsin --
13      Q    You're here in Massachusetts.  Certainly
14  there came a time you left Wisconsin.
15      A    Yeah.  We moved from Madison, Wisconsin,
16  to Amherst, Massachusetts --
17      Q    There we go.
18      A    -- in 1999.
19      Q    Okay.  And have you been in Amherst
20  since 1999?
21      A    I have.
22      Q    Okay.  Thank you for that.
23           And so let me take you back a second
24  to your Princeton education.  Where -- what did you
25  major in in Princeton?
```



CONFIDENTIAL

Page 15

1        A     I majored in computer science.

2        Q     And then when you graduated in '88 and

3   you moved to California, did you do that for job

4   purposes or --

5        A     Yes, I was hired by Silicon Graphics

6   Computer Systems.

7        Q     Okay.  And did you work for Silicon

8   Graphics Computer Systems for a long time or --

9        A     Eight years.

10       Q     Eight years.

11              And what did you do for them?

12       A     I wrote software.

13       Q     Got it.

14              And so that would bring us to '96,

15   when you moved to Wisconsin, also for job-related

16   purposes?

17       A     My wife got her PhD from Stanford.

18       Q     Okay.

19       A     And we moved to Wisconsin because she got

20   a job at the University of Wisconsin.  So that's

21   why we moved to Wisconsin.

22       Q     And what about your job with Silicon

23   Graphics?

24       A     I left Silicon Graphics and started a

25   startup with a -- a former coworker from Silicon



CONFIDENTIAL

Page 16

1   Graphics that failed.

2        Q     Okay.  When -- when did it fail, what

3   year?

4        A     It was clear that it failed probably a

5   year and a half, two years later.

6        Q     Like around '98?

7        A     Around '98.

8        Q     And what did you do in '98?

9        A     Let's see.  At that time, we moved here

10  to Amherst, and I joined a startup up in North

11  Adams.

12       Q     What was the name of that startup?

13       A     Resounding Technology.

14       Q     How long were you with Resounding

15  Technology?

16       A     Oh, gosh.  They were -- two years.  They

17  were purchased by another Silicon Valley company,

18  Empath Entertainment.

19       Q     Okay.  And what did you do for them?

20       A     I wrote software again.  I was the chief

21  technical officer.

22       Q     And so when they sold, in about

23  2000-ish --

24       A     It was 2000-ish, yeah.

25       Q     -- what did you -- did you leave at that



CONFIDENTIAL

Page 17

1   point?

2       A    At that point, actually, I worked

3   remotely for Empath for about a year.

4       Q    Okay.

5       A    And then -- let's see.  Our daughter was

6   born around that time, and I stopped working for a

7   while.

8       Q    Got it.

9            And are you currently employed?

10      A    No.

11      Q    Okay.  Have you been employed since

12  Empath?

13      A    Yes.

14      Q    Okay.  For who or in what capacity?

15      A    Let's see.  After Empath -- I may get the

16  order of -- of -- of this wrong, because I've done

17  a fair number of things.

18           I believe after Empath I joined two

19  University of Massachusetts graduates, and we

20  formed a company called "Zform," which made games

21  for blind people and their sighted friends and

22  family.  I was the -- again, the chief technical

23  officer and wrote a lot of the code.  That company

24  eventually failed.  I -- I -- I stayed there for I

25  think it was three or four years.



CONFIDENTIAL

Page 18

```
 1              I worked halftime for a web
 2   development company in Northampton, Massachusetts,
 3   called Gravity Switch --
 4        Q    Um-hm.
 5        A    -- doing kind of back-end web development
 6   stuff, three years -- two years, three years,
 7   something on that order.
 8              Let's see.  After that, I joined a
 9   research group at UMass run by Andrew McCallum, who
10   was a friend, doing machine learning stuff.  And,
11   again, I was -- I was a programmer in that group
12   doing various programming tasks that their -- their
13   research group needed.
14              That takes me up to, I believe, 2009.
15   And I quit that job in 2009 to go on a sabbatical
16   in Australia.
17        Q    Okay.  And since 2009, have you worked
18   for anyone else, besides yourself?
19        A    Yes.  I was hired by the Bitcoin
20   Foundation as the chief scientist of the Bitcoin
21   Foundation in -- I forget which year -- 2012,
22   maybe.  I would have to go back and -- and check
23   the years.  I'm very good at forgetting dates.  And
24   was the chief scientist at the Bitcoin Foundation
25   for several years.
```



CONFIDENTIAL

Page 19

```
 1        Q    Okay.  Thank you.  That's very helpful.
 2                  Why don't we start with, can you tell
 3    me when you first heard about Bitcoin?
 4        A    I first heard about Bitcoin in May of
 5    2010, after I had gotten back from sabbatical in
 6    Australia.  I was looking for something interesting
 7    to do, and I ran across a magazine article about
 8    interesting open-source software projects, and I
 9    think Bitcoin was one of seven or eight interesting
10    open-source software projects, and it struck my
11    interest, and that's how I became interested in it.
12        Q    Can we take one step back before we
13    continue down this line, which is, would it be a
14    fair -- would it be fair to say that the vast
15    majority of your professional career has been in
16    writing and developing code?
17        A    Yes.
18        Q    So you find out about Bitcoin in a
19    magazine article in May of 2010.  What do you do
20    after that?
21        A    I remember reading the magazine article,
22    and then finding the Bitcoin forum, which is where
23    all of the technical and other discussion about
24    Bitcoin was happening at that time.  Through that,
25    I found the source code, so I could actually
```



CONFIDENTIAL

Page 20

```
 1   download and read the source code.

 2               Because, at first, I was skeptical

 3   that it would work.  It seemed like a crazy idea.

 4   But I could see that there was real source code

 5   there; there was actually a program I could run.

 6   So I downloaded it.  I ran it.  I tried it out.  I

 7   think I mined some Bitcoins.

 8               And then shortly after that I decided

 9   I would do a little project involving Bitcoin, and

10   so I created what's called the "Bitcoin faucet,"

11   which is -- was a website that gave away Bitcoin to

12   anybody who wanted some.  I think the faucet

13   launched in June of 2010.

14        Q    And how did the faucet get supplied with

15   Bitcoin?

16        A    I bought $50 worth of Bitcoin with my

17   very own money.

18        Q    And when is the first time you had

19   contact with Satoshi Nakamoto?

20        A    I think it was fairly early in -- again,

21   in -- in May of 2010, and I contacted him via the

22   Bitcointalk forums.

23        Q    Did you -- so you mined Bitcoin in May of

24   2010, approximately; is that -- is that right?

25        A    I think so.  I'd have to go back and
```



CONFIDENTIAL

Page 21

```
 1    check when I actually flipped the switch to mine

 2    some Bitcoin.

 3         Q    And then did you ever mine Bitcoin again

 4    after that?

 5         A    Very briefly in, maybe, 2011.  I got an

 6    early hardware miner and turned that on and ran it

 7    for a little bit and measured its power consumption

 8    and realized I was spending more in electricity

 9    than I was getting in Bitcoin, so then turned

10    around and resold it.

11         Q    So from -- from -- you mined some in May

12    of 2000 -- or about circa May of 2010, and then not

13    again until sometime in 2011?

14         A    I think that's right.  Again, I'd have to

15    go back and check when I actually got that

16    hardware.  It might have been 2012.

17         Q    Okay.  But at no point after that initial

18    mining -- strike that.

19              After that initial mining, you did

20    not mine again until you purchased the hardware, be

21    that in 2011 or 2010 --

22         A    Correct.

23         Q    -- '12?  I'm sorry.

24              That's correct.  Okay.

25              So how did you come to be the --
```



CONFIDENTIAL

Page 22

1    well, let me strike that.

2              Did there come a time when you became

3    the lead core developer of Bitcoin?

4         A    At the end of 2010, Satoshi -- the --

5    the -- the pseudonym I was communicating with,

6    Satoshi, told me he was going to step back from

7    day-to-day Bitcoin stuff, and he left me with the

8    root privileges, with the -- with the

9    administrative privileges for the source code

10   repository.  So at that time only he and I had

11   access to the source forge -- source code

12   repository.

13             And I had -- through 2010, I had

14   become more and more involved with developing code

15   for the core Bitcoin system.  And then by the end

16   of 2010, Satoshi stepped away, and I was left as

17   the -- the lead developer.

18        Q    By default, because you were the only one

19   with access?

20        A    Yes.

21        Q    And I'm handing you, Mr. Andresen, what

22   we're gonna mark as Plaintiffs' Exhibit 1.  Just

23   take a look at that for me.

24             (Exhibit 1 marked for

25             identification.)



CONFIDENTIAL

Page 23

1     Q    Do you recognize this email?

2     A    Yes, I do.

3     Q    And this is an email from Satoshi

4  Nakamoto to you?

5     A    Yes.

6     Q    Did you always communicate with Satoshi

7  through the satoshin@gmx.com address?

8     A    Either -- yes, either through that email

9  address or via private messages in the Bitcointalk

10 forums.

11    Q    Did you ever use the Vistomail account?

12    A    I don't think so.

13    Q    And is this the email that you've just

14 described where Satoshi is leaving you the -- the

15 access to the Bitcoin repository?

16    A    No.  So before this, there's a -- there's

17 a -- there's a -- a website called "SourceForge"

18 that a lot of open-source software projects use,

19 and people can have administrative rights to be

20 able to write to a source-code repository.  And so

21 that was a separate privilege that I got sometime

22 in 2010.

23              This was the final -- this is about

24 an -- an alert key that would allow anybody to send

25 a message -- excuse me -- send a message over the



CONFIDENTIAL

Page 24

1  network that would appear on everybody's Bitcoin

2  software warning them that they need to upgrade or

3  that there's some security bug, those kinds of

4  things.

5       Q    Got it.  So the adding to privileges of

6  SourceForge didn't necessarily come through an

7  email; it was just an action Satoshi took to give

8  you those privileges?

9       A    Yeah, I don't remember exactly how that

10  happened.  There was probably an email or a forum

11  message where he told me that he had done that,

12  but...

13       Q    After this email from Satoshi, where I

14  think he -- he requests that you stop talking to

15  him as a myster -- about him as a mysterious

16  shadowy figure, and he says, "I've moved on to

17  other things and will probably be unavailable," did

18  you ever hear from Satoshi again through this email

19  account?

20       A    I'd have to go back and look.  I don't

21  know.

22       Q    Okay.  Do you recall, sitting here today,

23  ever hearing from him again?

24            Let me -- let me -- let me rephrase

25  the question.



CONFIDENTIAL

Page 25

1            I want you to exclude for a moment

2   the conversations you've had with Craig Wright, and

3   I want to ask, subsequent to this email, have you

4   had, in your mind, conversations with Satoshi

5   Nakamoto subsequent to this email?

6        A    I don't know.  The reason I --

7        Q    Because people have reached out to you

8   claiming to be Satoshi --

9        A    Yes.

10       Q    -- and you don't know if it's real?

11       A    Yes.  Many people have -- have contacted

12   me claiming to be Satoshi Nakamoto, and I just

13   don't know if any of them are.

14       Q    Okay.  Is it fair to say that no one

15   has -- and, again, I want to exclude the

16   conversations with Craig Wright in 2016 for

17   purposes of this question.

18            Is it -- is it fair to say that no

19   one has convinced you that they are Satoshi

20   Nakamoto -- you know what, strike that question.

21            Sitting here today, do you believe

22   you had communications with Satoshi Nakamoto after

23   this email?

24       A    No.

25       Q    Okay.  So you're, at this point in time,



CONFIDENTIAL

Page 26

1    the lead core developer of Bitcoin; is that

2    correct?

3         A    At --

4         Q    At --

5         A    Currently?

6         Q    So about April of 2011.

7         A    Oh, April of 2011, yes.

8         Q    And when did -- when did you step back

9    from being the lead core -- or stop being the lead

10   core developer in Bitcoin?

11        A    Again, I'm very good at forgetting dates,

12   but it's been a few years.

13        Q    Approximately.

14        A    2017.

15        Q    Okay.  Why did you stop being the lead

16   core developer at Bitcoin?

17        A    Several reasons.  The most immediate

18   reason was I believed that, for Bitcoin to grow,

19   there needed to be more than one implementation;

20   there needed -- needed to be more than one software

21   that people were using.

22               And so I had taken on the role of

23   chief scientist of the Bitcoin Foundation, and I

24   wanted that role to be not working on one

25   particular implementation of Bitcoin, not one



CONFIDENTIAL

Page 27

1   particular open-source software project, but to be

2   kind of bigger picture and try to encourage other

3   implementations of the Bitcoin protocol and to

4   think about kind of bigger issues facing Bitcoin.

5            And the other reason I stepped away

6   is just because we had a -- a -- there was a team

7   of people who were able to do the job of working on

8   the open-source software.  So I felt comfortable

9   stepping back and letting them take over the

10  day-to-day software engineering of the project.  So

11  I think those are the two major reasons I -- I

12  stepped back as lead developer.

13      Q    But you stayed on as the chief scientist

14  of the Bitcoin Foundation?

15      A    Yes, I stayed on as chief scientist of

16  the Bitcoin Foundation.

17      Q    Are you still the chief scientist of the

18  Bitcoin Foundation?

19      A    No.  I resigned that position a year or

20  two ago.

21      Q    Why did you resign that position?

22      A    The Bitcoin Foundation is a troubled

23  organization.  We had two members of our board of

24  directors go to jail, and I -- I believe the

25  Bitcoin Foundation lost the respect of the Bitcoin



CONFIDENTIAL

Page 28

```
1   community, partly for that reason.  Probably mostly
2   for -- for that reason, just the fact that the, you
3   know, members of the board of director turned out
4   not to be trustworthy.
5        Q    Did you take part in forming the Bitcoin
6   Foundation when it -- in its -- when it was
7   originally formed?
8        A    I did, yes.
9        Q    And who did you do that with?
10       A    Peter Vessenes, Roger Ver, Charlie Shrem.
11   I think those were the main people involved in the
12   formation.  I could go back and check my notes, see
13   who else was on the -- the emails.
14       Q    And -- and who were the members of the
15   board of directors that went to jail?
16       A    Charlie Shrem and Mark Karpeles.
17       Q    Do you -- I want to segue back -- well,
18   actually, strike that.
19            Do you -- what is your current
20   involvement with the Bitcoin community?
21       A    I have very little involvement with the
22   Bitcoin community, so I have shed all of my
23   responsibilities.
24       Q    And are you doing anything
25   employment-wise now or...
```



CONFIDENTIAL

Page 29

1       A    My only title is

2   Entrepreneur-in-Residence, UMass, Data Sciences.

3   That's an unpaid, volunteer position.  So I -- I'm

4   not getting a paycheck from anybody.

5       Q    Did you -- the -- approximately how much

6   Bitcoin did you mine in May of 2010?

7       A    I think I mined 11 blocks, each --

8   which -- 50 Bitcoins per block, so that would be

9   550 Bitcoin.

10      Q    And have you moved those -- have you

11  spent those coin bases?

12      A    Probably.

13      Q    All of them?

14      A    Probably.

15      Q    Can you check, if I were to ask you to?

16      A    Yes, I could check if you asked me to.  I

17  could see what happened to them.

18      Q    Can you do that, like, on a break, or

19  would you need to go home and have access to your

20  computers?

21      A    I need to go home and have access to my

22  computers.  I don't have those -- I -- you know,

23  I'd have to go back in it and dig out an old

24  wallet, find out what the Bitcoin addresses were,

25  find out where they moved, see if I'm still holding



CONFIDENTIAL

Page 30

1    them in some cold wallet somewhere.  I just don't

2    know.

3        Q    Do you know the identity of any other

4    miners who mined Bitcoin prior to August 20th of

5    2010?

6        A    No.

7        Q    Are you aware of any blocks that

8    Satoshi Nakamoto mined?

9        A    Yes.  Block No. 10, I believe, is a

10   famous Bitcoin block.  Because Satoshi Nakamoto

11   sent some Bitcoin to Hal Finney as, I believe, the

12   first person-to-person Bitcoin transaction that we

13   know about.

14       Q    Block 9 or block 10?

15       A    Depends on if you start counting at zero

16   or not.

17       Q    Interesting.  So the genesis block is

18   zero?

19       A    The genesis block, I believe, is usually

20   counted as zero.

21       Q    And then block 9, it could be 9 or 10,

22   depending if you count the first -- zero block

23   as -- as a -- as a block?

24       A    Correct.

25       Q    Got it.



CONFIDENTIAL

Page 31

1              Are you aware of any others that

2    Satoshi mined?

3         A    Not directly.

4         Q    And did you ever send Bitcoin to Satoshi

5    or receive Bitcoin from Satoshi?

6         A    Not to my knowledge.

7         Q    Are you aware of any patterns within the

8    blockchain that would reveal which blocks were

9    mined by Satoshi?

10        A    There is a very interesting blog post by

11   Sergio, Sergio Demian Lerner, where he found some

12   patterns that are plausible that might be

13   associated with Satoshi's mined Bitcoins.

14        Q    This is the Patoshi research?  I think he

15   calls it the Patoshi research?

16        A    Maybe.  I'm not familiar with that.

17        Q    They call it the Patoshi --

18        A    I'm not familiar with that term.

19        Q    Is it -- is it based on the Nonce value?

20        A    Yes, it's based on the Nonce values.  And

21   I have --

22              THE STENOGRAPHER:  The what value?

23   Sorry.

24              THE WITNESS:  Nonce, N-O-N-C-E.  It

25   means number used once.



CONFIDENTIAL

Page 32

1      A    I have no direct knowledge of that, but

2    his research seems plausible to me.

3      Q    Okay.  Is there any reason you can think

4    of that a miner would try to create a coin-based

5    transaction that did not hash to within a specific

6    range of values?

7                MR. KASS:  Object to form.

8      Q    Do you understand the question?

9      A    I'm not sure I understand the question.

10     Q    Okay.  Strike the question.

11                When did you first learn of Craig

12   Wright?

13     A    Again, I'm very bad with dates, but Jon

14   Matonis sent me an email saying that I should pay

15   attention to this person, Craig Wright, back in

16   whatever year that was -- sorry.  2020, '19 -- '17?

17   '18?

18     Q    Did there come a time before that where

19   Craig Wright applied for a job at the Bitcoin

20   Foundation?

21     A    Yes.  When I was responding to the

22   subpoena for this lawsuit, I went back through

23   my old emails, and I did get an email from a

24   Craig Wright asking for a job at the Bitcoin

25   Foundation that I never responded to and,



CONFIDENTIAL

Page 33

1    frankly, I had not recalled until I went through

2    my old emails.

3            MR. FREEDMAN:  So I'm gonna hand you

4    what's been marked as Plaintiffs' Exhibit 2.  And

5    it's -- for the record, it's Bates Gavin 1296.

6            (Exhibit 2 marked for

7            identification.)

8    Q    Do you recognize this email?

9    A    Yes.

10   Q    And is it fair to say this is Jodie

11   Brady, at the Bitcoin Foundation, forwarding you a

12   job application that she had received?

13   A    Yes.

14   Q    And the job application is from

15   Craig S. Wright with the email address

16   craig@panopticrypt.com?

17   A    That's --

18           MR. KASS:  Object to form.

19           THE STENOGRAPHER:  Wait.  What's the

20   address?

21           MR. FREEDMAN:  Craig@panopticrypt.

22   P-A-N-O-P-T-I-C-R-Y-P-T.

23           MR. KASS:  And object to form.

24   Q    So, from time to time, either myself or

25   Mr. Kass, depending on who's asking questions, may



CONFIDENTIAL

Page 34

1    object to form.  You can just pause, let them

2    object, and then you can answer the question.

3         A    Okay.

4              Yes.

5         Q    Okay.  Do you -- did you review this job

6    application back in November 2014 when you got it?

7         A    No.

8         Q    You didn't even see it?

9         A    I don't recall.

10        Q    Okay.  It's fair to say he did not get a

11   job with the Bitcoin Foundation?

12        A    He did not.

13        Q    Looking back at it now, would he have fit

14   the criteria you were looking for?

15             MR. KASS:  Object to form.

16        A    We were not actively looking for people,

17   there was no job opening, so there was no criteria.

18        Q    Fair enough.

19             So I want to jump back to the 2016

20   contact that you received from Jon Matonis, and

21   that was...

22             (Pause.)

23        Q    Let me hand you what's been marked as

24   Plaintiffs' Exhibit 3.  And for the record, it's

25   Gavin 796.



CONFIDENTIAL

Page 35

1                    (Exhibit 3 marked for

2                    identification.)

3      Q    Is this the email you received from

4  Jon Matonis in March -- on March 14, 2016?

5      A    Yes.

6      Q    And in this email, Jon invites you to a

7  proof session in London?

8      A    Yes.

9      Q    And he ends the third paragraph saying, I

10  per -- "I've never asked you for anything before,

11  so you are just going to have to trust me on this

12  and what I personally witnessed with the block

13  No. 1 sign and verify"?

14     A    What was the question?

15     Q    Is that -- I'm just taking you through

16  the document, highlighting the portions of the

17  document that I -- that -- that I'd like you to

18  take a look at.

19     A    Okay.

20     Q    And what did you take Jon as asking you

21  to do here?

22              MR. KASS:  Object to form.

23     A    I believe Jon was asking me to physically

24  go to London, and then witness the -- a

25  cryptographic proof of possession of a private key



CONFIDENTIAL

Page 36

1   that corresponds to the public key of one of the

2   early Bitcoin blocks.

3        Q    He says, "As we discussed" in the emails,

4   implying that there had been a previous telephonic

5   communication.

6        A    I believe we did have a telephone call.

7        Q    Do you know what he said on the telephone

8   call?

9        A    I don't recall.

10             MR. KASS:  Now, I'm just going to put

11   a standing objection out there to -- oh, well, if

12   you're gonna give it to me, so I don't have to

13   repeat it all the time.  In this email it mentions

14   there's a non-disclosure agreement.  That

15   non-disclosure agreement was executed.  So to the

16   extent you're asking information that is protected

17   by the non-disclosure agreement, I'm just putting a

18   standing objection that there is a non-disclosure

19   out there, agreement out there, and that

20   information needs to be protected.

21             MR. FREEDMAN:  What's the objection?

22   I don't understand the basis of the objection.

23             MR. KASS:  I'm just putting on the

24   record that --

25             MR. FREEDMAN:  Are you maintaining



CONFIDENTIAL

Page 37

1    Mr. Andresen --

2              THE STENOGRAPHER:  One at a time.

3              MR. FREEDMAN:  Are you maintaining

4    Mr. Andresen cannot respond to deposition

5    questions?

6              MR. KASS:  I am not instructing him

7    not to answer.  I'm just putting on the record that

8    there's a non-disclosure agreement, and that this

9    testimony that you're asking may not be permitted

10   under the non-disclosure.

11             MR. FREEDMAN:  So you are entitled to

12   seal this deposition and designate it confidential,

13   and you can exercise your right to do so, but

14   I'm -- I'm not sure what you -- I'm not sure what

15   your objection is, so...

16             MR. KASS:  All right.  It's on the

17   record, it is what it is.

18   BY MR. FREEDMAN:

19       Q    Okay.  We were talking about the

20   telephonic communication between you and -- and

21   Jon.  You said you don't recall what he said?

22       A    I don't recall.

23       Q    Did he mention Craig Wright during that

24   phone call?

25       A    I don't recall.



CONFIDENTIAL

Page 38

1      Q    Did he -- when you received this email,

2   were you aware that Craig Wright was the person

3   they wanted you to come meet?

4      A    I don't know.

5      Q    Okay.

6      A    I don't recall when the name "Craig

7   Wright" entered the conversation.

8      Q    So what was your initial reaction to --

9   when you finally did find out that there was

10   -- strike that.

11          What was your initial reaction to

12   somebody claiming to be able to prove that they

13   were Satoshi Nakamoto?

14          MR. KASS:  Object to form.

15      A    I was skeptical.

16      Q    Fair to say you were extremely skeptical?

17      A    I think that's fair to say.

18      Q    I'm handing you what's been marked as

19   Plaintiffs' Exhibit 4, I believe.

20          (Exhibit 4 marked for

21          identification.)

22      Q    Do you recognize this email

23   correspondence?  This is -- sorry -- for the

24   record, Bates Gavin 1433.

25      A    Yes.



CONFIDENTIAL

Page 39

1       Q    And if you look at the email from you --
2    this is an email from you to Jon Matonis and then
3    Jon Matonis responding back?
4       A    Yes.
5       Q    And in it you write to Jon Matonis that
6    you're seeing whispers that Craig Wright is the
7    real deal?
8       A    Yes.
9       Q    So fair to say at this point you were
10   aware it was Craig Wright they were asking you to
11   come meet?
12      A    Yes.  I'm trying to remember my state of
13   mind at that time.
14            I don't know if Jon had mentioned the
15   name "Craig Wright," and I was just seeing Craig
16   Wright in others -- other venues and putting the
17   pieces together.  But, yes, certainly the name
18   "Craig Wright" was -- was in the air at that time.
19      Q    Got it.
20            And right there in the email you
21   said, "I'm extremely skeptical"?
22      A    Yes.
23      Q    Why were you extremely skeptical?
24      A    I have been contacted by many people
25   claiming to be Satoshi Nakamoto in the past.  So



CONFIDENTIAL

Page 40

1    yet another claimed Satoshi made me extremely

2    skeptical.

3        Q    And in it you -- you lay out four

4    different things that you'd like to see any real

5    Satoshi candidate do?

6        A    Yes.

7        Q    And those were that you'd want to see a

8    message signed with the same PGP key that Satoshi

9    used in 2010; is that correct?

10       A    Yes.

11       Q    And a message signed with the keys from

12   early Bitcoin blocks?

13       A    Yes.

14       Q    And a copy of an email or private forum

15   post between you and Satoshi?

16       A    Yes.

17       Q    And you wanted to have a conversation

18   about technical things via email?

19       A    Yes.

20            MR. KASS:  Object to form.

21       Q    Did you get all four of those things

22   during your interactions with Craig Wright in 2016

23   and 2017?

24       A    No.

25       Q    Which did you get and which did you not



CONFIDENTIAL

Page 41

1    get?

2         A    I believed I got a message signed with

3    keys from early Bitcoin blocks.

4         Q    Okay.

5         A    And I did get a conversation about

6    technical stuff.  I don't believe I got any email

7    or private forum posts.  And I did not get any

8    messages signed with the PGP key that he was using

9    in 2010.

10        Q    Okay.  Did you ask for the PGP signature?

11        A    I vaguely recall a conversation about PGP

12   signatures, and I believe Craig gave me some reason

13   why he either did not have the key, or it would not

14   be good proof, but I don't recall the details.

15        Q    And...

16        A    And the private posts, again, I think I

17   recall him giving me -- I believe there was a claim

18   that all of those were deleted.  Yeah, if I recall

19   correctly, he claimed that he had deleted those,

20   and they were unavailable.

21        Q    Did you find that credible at the time?

22        A    Yes.

23        Q    Do you still find that credible?

24        A    I have my doubts.

25        Q    Okay.  Jon Matonis responds, asking you



CONFIDENTIAL

Page 42

1    to -- or -- or suggesting that you forward your

2    four expectations to Stefan in advance.

3              Do you see that?

4    A    Yes.

5    Q    Who is he talking about?

6              MR. KASS:  Object to form.

7    A    Craig Wright was working with a couple of

8    venture capital-type people.  I've forgotten the

9    name of their company.  Excuse me, I've forgotten

10   who is who.  But he was one of those venture

11   capital-type people who, I believe, were interested

12   in helping Craig through this whole process of

13   claiming to be Satoshi Nakamoto.

14   Q    And did you -- had you had interactions

15   with Stefan before this date?

16   A    I -- there might have been emails before

17   this date.

18   Q    Okay.

19   A    I'd have to go back and check.  I had not

20   met him.

21   Q    And at this point, were you aware that

22   they wanted you to participate in a public

23   endorsement of Craig Wright as Satoshi?

24             MR. KASS:  Object to form.

25   A    I think so, yes.



CONFIDENTIAL

Page 43

1      Q    Okay.  I'm gonna hand you what's been

2   marked as -- sorry -- been marked as Plaintiffs'

3   Exhibit 5.  And for the record, it's Gavin 1286.

4              (Exhibit 5 marked for

5              identification.)

6      Q    Take a moment to review that.

7              Do you recognize this email?

8      A    Yes.

9      Q    And is it an email from you to

10   craig@ncrypt.com?

11      A    Yes.

12      Q    This was Craig Wright?

13      A    Yes.

14      Q    And in it is it fair to say that you're

15   asking Craig to give you some of his backstory and

16   thoughts on the state of Bitcoin?

17      A    Yes.

18      Q    Okay.  Did he give you his backstory and

19   his thoughts on the state of Bitcoin?

20      A    I don't recall.

21      Q    Do you --

22      A    I'd have to go back and look at the email

23   thread.

24      Q    Okay.  Did -- did you have a telephonic

25   communication with Craig Wright as of this date?



CONFIDENTIAL

Page 44

```
 1      A    I don't believe so, no.
 2      Q    Okay.  And just -- this is about five
 3  days or so before the proof session in London that
 4  took place on April 7th?
 5              MR. KASS:  Object to form.
 6      A    Correct.
 7      Q    Is -- so you don't believe you had spoken
 8  to him telephonically yet?
 9      A    I don't believe so, but my recollection
10  could be faulty.
11      Q    Fair enough.
12              I'm gonna hand you what's been marked
13  as Plaintiffs' Exhibit --
14              THE STENOGRAPHER:  6.
15      Q    -- 6 -- thank you -- and for the record
16  is Gavin 307.
17              (Exhibit 6 marked for
18              identification.)
19      Q    Do you recognize this email?
20      A    Yes.
21      Q    It's an email from Craig to you?
22      A    Yes.
23              MR. KASS:  Object to form.
24      Q    In response to your last email on the
25  state of affairs of Bitcoin?
```



CONFIDENTIAL

Page 45

1        A      Yes.

2        Q      So he did respond to you.  Does this help

3    refresh your recollection that he did respond to

4    you about the state of affairs of Bitcoin as of

5    2016?

6        A      Yes.

7        Q      Okay.  And did you read this email at the

8    time?

9        A      Yes, I did.

10       Q      Did you find it convincing?

11       A      I found it convincing enough for me to

12   get on an airplane to London.

13       Q      Fair enough.

14              I'm handing you what's been marked as

15   Plaintiffs' Exhibit 7.  And for the record, it's

16   Gavin 1120.

17              (Exhibit 7 marked for

18              identification.)

19       Q      Do you recognize this email?

20       A      Yes.

21       Q      And it's one from Craig to you?

22       A      Yes.

23       Q      And it -- it includes, underneath that,

24   the thread of a -- of a message from you to Gav --

25   from you to Craig and then, initially, from Craig



CONFIDENTIAL

Page 46

1   to you?

2        A    Yes.

3        Q    And, actually, it includes that email way

4   at the bottom where you're actually asking, that we

5   looked at previously --

6        A    Yes.

7        Q    -- Plaintiffs' Exhibit 5?

8             MR. KASS:  Objection to form.

9             THE STENOGRAPHER:  Wait, wait, wait.

10       Q    So if you take a look at the email from

11  Craig to you, can you look at the -- the last line

12  of that email?  He tells you, "The backstory is

13  long.  You will have it in installments for this

14  reason, but you will have it."

15            Do you see that?

16       A    Yes.

17       Q    Did you end up having it?

18       A    I -- some of it --

19       Q    Okay.

20       A    -- maybe.  I have my doubts on -- I have

21  many, many doubts in my head about what parts of --

22  what things Craig told me are true and what are not

23  true.

24       Q    Okay.  Did he give you a long backstory?

25       A    He gave me a fairly long backstory.



CONFIDENTIAL

Page 47

 1      Q     Okay.  And when did he give you that

 2   fairly long backstory?

 3      A     In London, in the -- the hotel room.

 4      Q     Okay.

 5      A     Or the hotel basement.

 6      Q     I'm gonna come back to that.

 7            In the interim, let me hand you

 8   what's been marked as Plaintiffs' Exhibit --

 9            MR. KASS:  8?

10      Q     -- 8.  And for the record, it's Gavin

11   1720.

12            (Exhibit 8 marked for

13            identification.)

14      Q     Do you recognize this email -- or these

15   emails, I should say?

16      A     Yes.

17      Q     And it's a -- it's a series of emails

18   between you and Craig?

19      A     Yes.

20      Q     On or about April 6, 2016?

21      A     Yes.

22      Q     And it looks like -- if you look on the

23   midway point of page that's marked 1720 at the

24   bottom, it looks like what you did is you responded

25   to Craig's email by inserting your own comments in



CONFIDENTIAL

Page 48

1    line with his email below?

2              MR. KASS:  Object to form.

3        Q    Is that what happened?

4        A    Yes.

5        Q    And if you look at the second paragraph

6    up from the bottom of that page, you state to

7    Craig, "I know nothing about your business.  One

8    question on my list of things to ask you: Why lots

9    of businesses if you have lots of coin already?"

10             Do you see that?

11       A    Yes.

12       Q    That was from you?

13       A    Yes, that was from me.

14       Q    Okay.  Did he ever explain that to you?

15       A    No.

16       Q    I am handing you what's been marked as

17   Plaintiffs' Exhibit 9 --

18             THE STENOGRAPHER:  Yeah.

19       Q    -- 9, and I didn't -- accidentally did

20   not print with the Bates label, but for the record,

21   it should match to Bates Gavin 1077 -- 77.

22             (Exhibit 9 marked for

23             identification.)

24       Q    Do you recognize this email -- these

25   emails?



CONFIDENTIAL

Page 49

1     A     Yes.

2     Q     And this, similarly, is a email chain

3  between you and Craig on or about April 6 of 2016?

4     A     No --

5          MR. KASS:  Object to form.

6     A     -- this is between me and Andrew O'Hagan.

7     Q     Maybe I handed you the wrong email.  Can

8  I grab that back?

9          MR. KASS:  Is this still Exhibit 9,

10  though?

11          MR. FREEDMAN:  No, that's not.  We're

12  gonna redo Exhibit 9.  I gave you all the wrong

13  email.  Sorry.

14          (Pause.)

15          THE WITNESS:  So many email.

16          MR. FREEDMAN:  Yeah.  I apologize.  I

17  just used my printer this morning at the hotel.

18          THE STENOGRAPHER:  Do you want this

19  on?

20          MR. FREEDMAN:  Oh, actually, why

21  don't we go off the record for two minutes.

22          THE VIDEOGRAPHER:  Sure.  The time

23  now is 10:04 a.m.  We're going off the record.

24          (Exhibit 9 marked for

25          identification.)



CONFIDENTIAL

Page 50

1          (Off record.)

2          THE VIDEOGRAPHER:  The time now is

3    10:13 a.m.  We're coming back on the record.

4    BY MR. FREEDMAN:

5          Q    Okay.  I've now handed you the remarked

6    Plaintiffs' Exhibit 9.  Do you recognize this

7    email?

8          A    Yes.

9          Q    And is this email an email exchange

10    between you and Craig Wright?

11          A    Yes.

12          Q    On or about April 6, 2016?

13          A    Yes.

14          Q    I've handed you the correct exhibit this

15    time.

16          So I want to -- I want to ask you

17    some questions about some of the statements in

18    this -- in this email.

19          In the first paragraph, Craig opens

20    up, he says, "Only time will tell, but I" -- "I

21    made some incredible mistakes."

22          Do you see that?

23          A    Yes.

24          Q    The email doesn't say what those

25    incredible mistakes are, as far as I'm aware, but



CONFIDENTIAL

Page 51

1      do you know what those incredible mistakes are?

2          A      No.

3                  MR. KASS:  Object to form.

4          Q      Did you ever come to learn what those

5      incredible mistakes were?

6          A      No.

7          Q      Okay.  Did you ask him what he meant by

8      "incredible mistakes"?

9          A      I don't think so, no.

10         Q      Okay.  He then -- about halfway down the

11     page, he quotes your email that says, "I know

12     nothing about your businesses."

13                 MR. KASS:  Object to form.

14         Q      Do you see that?

15         A      Yes, I do.

16         Q      And then he responds, That was part of

17     the idea.  It was a front in some ways.  I have

18     made some really stupid mistakes.

19                 Do you know what he meant by saying

20     his businesses were a "front" in some ways?

21                 MR. KASS:  Object.  Object to form.

22         A      No.

23         Q      Did you ever come to learn what he meant

24     by that?

25         A      No.



CONFIDENTIAL

Page 52

```
 1        Q    Did you ever ask him what he meant by the

 2   fact that his businesses were a "front"?

 3        A    No.

 4        Q    Did you come to learn that he's claimed

 5   millions of dollars in tax rebates from the

 6   Australian Tax Office based on these businesses?

 7                  MR. KASS:  Object to form.

 8        A    I saw that in media reports.

 9        Q    Did it strike you as odd that he would be

10   using a front to claim millions of dollars in tax

11   rebates?

12                  MR. KASS:  Object to form.

13        A    I don't think I ever thought about it.

14        Q    So you didn't learn what the incredible

15   mistakes were.  Did you learn what the really

16   stupid mistakes were?

17        A    No.

18        Q    Did you ask him what really stupid

19   mistakes he made?

20        A    No.

21        Q    Then the next paragraph, he says, "The

22   ones that matter remain hidden."

23                  Did you take this to mean the really

24   stupid mistakes that matter remain hidden?

25                  MR. KASS:  Object to form.
```



CONFIDENTIAL

Page 53

1        A    Yes.

2        Q    And then he says, "The media has grabbed

3    all of the shit and low-hanging fruit, and they

4    have done no real investigation.  Thank God for the

5    laziness of human nature."

6              Do you know what he was concerned the

7    media would find out?

8              MR. KASS:  I'm gonna object to form.

9        A    No.

10       Q    Did you ever ask him what he was

11   concerned the media would find out about?

12       A    No.

13       Q    In the bottom paragraph on the page, he

14   says, "Now I am this guy who does what the hell he

15   likes, cannot be fired, and who has finally learnt

16   to delegate all he hates."

17             Did you ever ask him what it is he

18   likes to do?

19       A    Did I ever ask him?  He told me what he

20   likes to do.

21       Q    What did he say he likes to do?

22       A    He likes to get PhDs.  He likes to do

23   research.  He likes to write papers.

24       Q    Okay.  And then, if you turn to the next

25   page for me, marked Gavin 1078, on the top of the



CONFIDENTIAL

Page 54

1   page, Craig quotes your email again that says, "One

2   question on my list of things to ask you: Why lots

3   of businesses if you have lots of coin already?"

4              Do you see that on the top?

5      A   Yes.

6              MR. KASS:  Object to form.

7      Q   And then he responds, "Bad decisions,"

8   full stop.

9              Do you know what he meant by "bad

10  decisions"?

11     A   No.

12     Q   Did you ever ask him what he meant by

13  "bad decisions"?

14     A   No.

15     Q   You didn't ask him if stealing Bitcoin

16  had anything to do with bad decisions?

17             MR. KASS:  Object to form.

18     A   No.

19     Q   Then he says, "I was advised about risk

20  diversification in the early days."

21             Did you ask him -- do -- do you know

22  what he means there?

23     A   No.

24             MR. KASS:  Object to form.

25     Q   Did you ask him what he meant?



CONFIDENTIAL

Page 55

1                    THE STENOGRAPHER:  Wait.

2        A    No.

3                    MR. KASS:  Vel, if you could pause.

4    There's gonna be a lot of objections --

5                    THE STENOGRAPHER:  Yeah.

6                    MR. KASS:  -- throughout the email.

7                    MR. FREEDMAN:  No problem.

8                    THE WITNESS:  Sorry.

9        Q    Then, in the -- in the third paragraph

10   down from the top, he says, "Then, none of this is

11   about money."

12                   Do you see that?

13       A    Yes.

14       Q    Did you ask him what he meant by none of

15   it being about money?

16       A    No.

17       Q    Did it strike you as odd that it was not

18   at all about money?

19                   MR. KASS:  Object to form.

20       A    No.

21       Q    So he has a venture capital firm reach

22   out to you; is that -- that's right?

23       A    Yes.

24       Q    And paying for you to come to London,

25   right?



CONFIDENTIAL

Page 56

1            MR. KASS:  Object to form.

2        A     Yes.

3        Q     And funding your trip there?

4        A     Yes.

5        Q     And coordinating an entire media blitz;

6    is that an accurate statement?

7            MR. KASS:  Object to form.

8        A     Yes.

9        Q     And it didn't strike you as odd that none

10   of this was about money?

11           MR. KASS:  Object to form.

12       Q     Or, I mean, maybe it just didn't occur to

13   you.  I mean, like, tell me how -- what -- give me

14   your reaction to the statement that none of this --

15   this is -- "none of this is about money," and, yet,

16   it apparently appears, at least to me, that a ton

17   of it's about money.

18           MR. KASS:  Object to form.

19       A     I -- yeah, I was not thinking about money

20   when I received this email.  I was thinking about,

21   is this person Satoshi Nakamoto or not.  And...

22       Q     That's fair.

23       A     Yeah, that -- that's -- so, yeah, I was

24   not thinking about the money.

25       Q     In retrospect, does it strike you as odd



CONFIDENTIAL

Page 57

1    that he said "none of this is about money"?

2                MR. KASS:  Object to form.

3        A    No.

4        Q    Why?

5        A    Being Satoshi Nakamoto is about much more

6    than money.  He's almost a God-like figure in the

7    Bitcoin community.  He's the holy founder of this

8    world-changing technology.  So saying "this is not

9    about money" did not strike me as strange because

10   of that.

11               Because, you know, having been the

12   chief scientist of the Bitcoin Foundation and the

13   lead developer for the project, I had felt the kind

14   of weight of that responsibility, and to take on

15   the mantle of being Satoshi Nakamoto struck me as,

16   you know, much more important than -- than the

17   money.  So that's where my head space was through

18   this conversation.

19       Q    So consistent with something Satoshi

20   might actually say?

21       A    Yes.

22       Q    Sitting here today, do you believe this

23   was stated honestly, that it really wasn't about

24   money?

25               MR. KASS:  Object to form.



CONFIDENTIAL

Page 58

```
 1       A     I don't know.

 2       Q     At the end of that paragraph, the

 3  second-to-bottom line, he says, "I have access to

 4  systems that transfer more value and transactions a

 5  day than the existing BTC network does in a year."

 6               Do you understand what he meant by

 7  that?

 8       A     No.

 9       Q     Did you ever come to understand what he

10  meant by that?

11       A     No.

12       Q     Is this a statement that you think is --

13  is -- is possible?

14               MR. KASS:  Object to form.

15       A     I don't know.  I've never thought about

16  it.

17       Q     And then if we go down, from there, two

18  paragraphs, Craig tells you, "I want to stay as

19  close to the edge as I can without going over."

20               Do you know what he meant by that?

21               MR. KASS:  Object to form.

22       A     No.  And I think that might be a quote

23  from somebody.  It sounds familiar.

24       Q     But you can't recall who?

25       A     No.
```



CONFIDENTIAL

Page 59

1      Q    And then if you go down, you'll see

2    there's a line that begins with the word

3    "frustration"?

4      A    Yes.

5      Q    He says, "Frustration should be my middle

6    name."

7           Do you know why he said frustration

8    should be his middle name?

9           MR. KASS:  Object to form.

10     A    No.

11     Q    What did you take that statement to mean?

12     A    I can't put myself back when this email

13   was received, so I am projecting backwards.  I

14   don't know what I would have thought when I first

15   read this email.  Knowing what I know now, my

16   assumption would be he was frustrated that he

17   didn't have complete control over kind of the

18   process.

19           Because, to me, he claimed that he

20   had been extorted, and, basically, he was forced to

21   step forward and reveal himself as Satoshi

22   Nakamoto.  I don't think I knew that when I first

23   read this email, but if I project backwards, I'm --

24   that -- that is what I would assume he meant.

25     Q    And then he says, "Here... well, I have a



CONFIDENTIAL

Page 60

1   plan that is likely to leave me more hated."

2                Do you know what he meant by that?

3                MR. KASS:  Object to form.

4        A    No.

5        Q    And then if you -- if you look down

6   toward the -- the end of the -- I guess it's one,

7   two, three, four up from the bottom, he says, "Your

8   mistake may have been the BTC Foundation, mine was

9   that bloody response to a DoS."

10               Do you know what a "DoS" is?

11       A    DoS is a denial-of-service attack.

12       Q    Do you know what he meant by responding

13  to denial-of-service attack?

14               MR. KASS:  Object to form.

15       A    No.  Wait.  Yes, I think he was assuming

16  in 2010 there were denial-of-service attacks

17  against the Bitcoin network and what are called

18  "transaction spamming attacks," where somebody

19  floods the network with lots of tiny transactions.

20               And as part of that, that was --

21  there was a technical change made by Satoshi to

22  limit the Bitcoin block size to 1 megabyte, and

23  that had been, and is still, actually, hugely

24  controversial on whether to increase the block size

25  to allow more transactions.  So I believe that's



CONFIDENTIAL

Page 61

1    what he was referring to.

2         Q    Okay.  If you turn to the next page,

3    Gavin 1079, and you look two down from the top, he

4    starts the paragraph with, "Some of all this is

5    stranger than fiction."

6              Do you agree with that statement?

7         A    "Some of all of this is stranger than

8    fiction."  It's hard to agree with a statement

9    that's so vague.

10        Q    Fair enough.  And then if you -- if you

11   go down to the -- I guess two paragraphs down from

12   that, he says, "Why?  That is the question.  Why

13   not have a life of leisure?  Why not a yacht?  Yada

14   Yada Yada."

15             And then if you read the next

16   paragraph he says, "My wife and I spend time in

17   Antigua from time to time.  We have friends who

18   live there.  It becomes a life draining of vampiric

19   exercise fast.  I do not relax well.  As for the

20   boat, tried that, a hole in the water that you have

21   to maintain and my wife gets seasick."

22             What did you take these statements to

23   mean?

24        A    What did I take them to mean?  I just

25   took them to be his way of telling me that he has



CONFIDENTIAL

Page 62

1   resources and -- and, again, trying to tell me that

2   it's not about money; that he has money already.  I

3   think that's probably the way I took it when I read

4   that email.

5        Q    And then if you drop down, he quotes you

6   again, "Why lots of businesses if you have lots of

7   coin already."

8                Do you see that?

9        A    Yes.

10               MR. KASS:  Object to form.

11       Q    And then he responds, "Lots is not the

12  issue.  Lots has allowed the media to focus in the

13  wrong places.  They have no idea what the main

14  business is."

15               Did you ever get additional detail on

16  what the main business is?

17       A    No.

18       Q    Did you ask?

19       A    No.

20       Q    Do you find that inconsistent with his

21  statement that it's not about money?

22               MR. KASS:  Object to form.

23       A    Did I find it inconsistent -- I'm not

24  sure I understand the -- the question.

25       Q    Aren't businesses usually about money?



CONFIDENTIAL

Page 63

```
 1              MR. KASS:  Object to form.
 2       A    I think at the time I did not find it
 3  inconsistent.  I mean, if I think back on it now,
 4  yeah, it might be inconsistent.
 5       Q    He said that -- that the -- the lots of
 6  coin or the -- the large amount of coin has allowed
 7  the media to focus in the wrong places.
 8              Do you know what the right places
 9  they should have focused on was?
10       A    No.
11              MR. KASS:  Object to form.
12       Q    And then he says, "They even missed that
13  we paid out Hotwire and that none really failed,"
14  smiley face.
15              Do you know what that meant -- means?
16       A    No, I don't know.
17       Q    Did you ever get additional detail?
18       A    No.
19       Q    All right.  If you turn to page 1080 for
20  me.
21              You see in the bottom of the page,
22  this is -- I think now we're in an email that you
23  sent that began on the previous page, and you,
24  again, inserted your comments in line with his
25  email; is that right?
```



CONFIDENTIAL

Page 64

1          MR. KASS:  Object to form.

2     A     Let me see.  Yes.

3     Q     And then way at the bottom, you've told

4  him -- and this is a paraphrase, but let me know if

5  it's fair -- that you've given some thought to the

6  meeting with him tomorrow; you'll be bringing your

7  laptop and a new USB stick, and you'd like a couple

8  of things to verify, one being a PGP signed

9  message, like you had said earlier, and you even

10 gave the phrase "so it goes" as what you wanted him

11 to sign, right?

12    A     Yes.

13         MR. KASS:  Object.

14    Q     And then one or more messages signed

15 using keys from the early Bitcoin blocks, right?

16    A     Yes.

17    Q     And then copies of never-before published

18 private emails or forum posts between you and

19 Satoshi?

20    A     Yes.

21         MR. KASS:  Object to form.

22    Q     And consistent with your -- would it be

23 consistent with your testimony earlier that you may

24 have gotten No. 2, but you did not get No. 1 and

25 No. 3?



CONFIDENTIAL

Page 65

1      A    Yes.

2      Q    Okay.  Thank you.

3           And this was the day before you met

4   Craig in London for the proof session, right?

5           MR. KASS:  Object to form.

6      A    Yes.

7      Q    If -- if you look before -- no.  Sorry.

8   Strike that.

9           So the next day is April 7th, and you

10  arrive in London for this proof session; is that

11  right?

12     A    Yes.

13     Q    Can you walk -- you know what, why don't

14  we -- it's not really a memory test, so let me give

15  you back what we're now gonna call Plaintiffs'

16  Exhibit 10.  And this is missing the -- the Bates,

17  but it is 10 -- no.  I'm sorry.  It's Gavin 810.

18           (Exhibit 10 marked for

19           identification.)

20     Q    Do you recognize this email?

21     A    Yes.

22     Q    And is this correspondence between you

23  and Andrew O'Hagan?

24     A    Yes.

25     Q    And in it are you describing a meeting



CONFIDENTIAL

Page 66

1    you had this day, the April 7th day?

2              MR. KASS:  Object to form.

3       A    Yes.

4       Q    Okay.  Do you want to take a minute to

5    review it?

6              (Witness perusing document.)

7              MR. KASS:  Vel, I'm just gonna raise

8    my same objection about the non-disclosure.  Do you

9    just agree I don't have to raise it again and

10   whatever validity it has, it has?

11             MR. FREEDMAN:  I don't understand.  I

12   mean, you've -- you've made your statement before,

13   and the witness --

14             MR. KASS:  Fine.

15             MR. FREEDMAN:  -- is under a subpoena

16   to testify.  There's no protective order granted

17   for a nondisclosure.  You didn't raise it in front

18   of the Court.  So I'm not sure what you're saying,

19   but whatever you're saying, it's certainly there,

20   you don't have to keep saying it.

21             MR. KASS:  Okay.  That's all I wanted

22   to know.  I just wanted to avoid having to resay it

23   if you agree it's kind of said in that still.

24             MR. FREEDMAN:  Standing -- whatever

25   you said is standing.



CONFIDENTIAL

Page 67

1          MR. KASS:  Perfect.  That's all I
2    wanted.
3    BY MR. FREEDMAN:
4        Q    Have you completed your review?
5        A    Yes.
6        Q    So is it an accurate high-level summary
7    of what happened that day?
8        A    Yes.
9        Q    I want to go into it in a little bit more
10   detail with you, if that's all right.
11       A    Okay.
12       Q    You got off the plane at around 11:00 or
13   so; is that right?
14          MR. KASS:  Object to form.
15       Q    Arrived at the hotel, I should say,
16   around 11:00?
17       A    That's probably correct.
18       Q    The email, "It was a red-eye flight, so I
19   arrived at the hotel at 11:00 a.m."
20          We were not following you that day.
21       A    It was a red-eye flight, so I was very
22   tired.
23       Q    Yes.  And who -- who were the first folks
24   that you met with that day?
25       A    The venture capital people, who,



CONFIDENTIAL

Page 68

1   according to this email, are named Andrew and Rob.

2       Q    Yeah, or -- right.  And -- and what did

3   they -- where did that meeting take place?

4       A    That meeting took place in the -- in a

5   conference room in the basement of the hotel I was

6   staying at.

7       Q    Okay.  And what did they -- what did they

8   tell you?

9       A    They -- let's see.  One of them said he

10  had known Craig for a long time, and that Craig had

11  been talking to him about Bitcoin for a long time,

12  and that over time he had become convinced that

13  Craig was Satoshi and had invented Bitcoin.

14              And the other one, I believe -- I'm

15  trying to remember the conversation.  It's been a

16  very long time.  I don't recall the details of that

17  conversation, but it was also -- let's see, he

18  talked about how he was working with Craig

19  business-wise and, you know, was helping facilitate

20  everything that was happening.  And, again, I -- I

21  have very little recollection of what exactly we

22  talked about.

23      Q    Did they explain why they were involved?

24              MR. KASS:  Object to form.

25      A    Yes.  Again, one of them, I don't recall



CONFIDENTIAL

Page 69

1    which, said he had been in -- a business partner or

2    a business associate or somehow involved in Craig's

3    businesses in the past.

4              And then the -- the other one, the

5    money person, I don't recall if he -- he mentioned

6    how he had gotten involved, if it was Craig or if

7    it was this other person who brought him in.

8    Frankly, I just don't recall.

9        Q    Did there come a time when you learned

10   that this venture capital group intended to sell or

11   license many of Craig's purported intellectual

12   properties and patents under the Satoshi name to

13   monetize those inventions?

14             MR. KASS:  Object to form.

15       A    At some point, I learned that, I don't

16   recall when.

17       Q    Could it have been in this conversation?

18             MR. KASS:  Object to form.

19       A    It's possible it was in that

20   conversation, yes.

21       Q    In the email to Andrew O'Hagan you say,

22   "They gave me a lot of background and explained

23   their involvement before meeting with Craig."

24             Was that part of the background that

25   they gave you?



CONFIDENTIAL

Page 70

1          MR. KASS:  Object to form.

2     A    Was what part of the background?

3     Q    That -- this investment and what they

4 were hoping to do with it.

5          MR. KASS:  Object to form.

6     A    Possibly.  Again, I don't -- I don't

7 recall details of that conversation.

8     Q    And then, from that meeting, did you go

9 to meet Craig?

10          MR. KASS:  Object to form.

11     A    That meeting I think -- I'm trying to

12 recall physically where what happened.  I believe I

13 met them in the same room, and then Craig came into

14 the room, and I met with Craig for the first time.

15     Q    And what did he tell you there?

16          MR. KASS:  Object to form.

17     A    What did he tell me?  Again, I don't

18 recall details.  If you want to ask something

19 specific, I might be able to --

20     Q    Did he say, "Hi, I'm Satoshi Nakamoto"?

21 Like, do you remember, did he claim to be Satoshi

22 in that -- in that conversation?

23          MR. KASS:  Object to form.

24     A    I don't think he ever directly claimed to

25 be Satoshi, although, I might be mistaken.



CONFIDENTIAL

Page 71

```
 1        Q    Did you talk at all about Satoshi
 2    Nakamoto during that initial conversation?
 3        A    I don't recall.
 4        Q    Did he -- did you ask him about where all
 5    his coins were?
 6        A    No.
 7        Q    Did you discuss any of the trusts that
 8    had been set up?
 9        A    No.
10        Q    Did you discuss the creation of Bitcoin
11    at all during that initial conversation?
12        A    I don't think so.
13        Q    Did he mention Dave Kleiman in that
14    initial conversation?
15             MR. KASS:  Object to form.
16        A    I -- I think he did, but I'm not certain.
17    I remember him getting emotional.  I believe -- I
18    believe at one point there was some mention of Dave
19    Kleiman, and I remember Craig being emotional.
20        Q    Emotional in what way?
21        A    Sad about Dave's death.  I did not press
22    or ask.
23        Q    And do you know in what context Dave
24    Kleiman was raised in this initial conversation?
25        A    I think we had a conversation about the
```



CONFIDENTIAL

Page 72

1   person of Satoshi actually being three people --

2        Q     Okay.

3        A     -- being Dave Kleiman, Craig Wright, and

4   some other mysterious person, who I never asked

5   about.

6        Q    And you say you think you had this

7   conversation.  Are you sure you had this

8   conversation, or do you think you had this

9   conversation?

10       A    I think I had this conversation.  Again,

11  I was jet lagged, and this was four years ago,

12  so --

13       Q    And is the doubt --

14       A    -- my recollection is -- my recollection

15  is very fuzzy.

16       Q    And this -- this conversation -- let me

17  strike that.

18            Is the doubt that you don't know if

19  it was during this conversation or a later

20  conversation, or are you concerned you might be

21  imagining the whole thing?

22       A    Yeah, I'm -- I'm certain that, you know,

23  it could have been this conversation or the

24  following breakfast.  It's also possible...

25       Q    So is it fair to say Craig told you this,



CONFIDENTIAL

Page 73

1    you just don't remember when?

2             MR. KASS:  Object to form.

3        A    Yes.

4        Q    Okay.  So after you -- you met with Craig

5    in this initial conversation, did you go right to

6    the proof section -- proof session?

7             MR. KASS:  Object to form.

8        A    Yes.  The proof session was -- it was one

9    continuous meeting in that room at the hotel.

10       Q    Can you -- can you walk me through that

11   proof session?

12       A    Sure.  I -- I do recall producing a

13   brand-new USB stick.  So I had my laptop with me

14   and a -- put a brand-new, sealed-in-the-package USB

15   stick on the table, which I expected Craig to take

16   and produce some digital signatures that I could

17   then verify on my laptop.  That did not happen.

18   Instead, a laptop was procured, a brand-new laptop

19   was procured by an assistant.  I think it was an

20   assistant for one of the -- I don't know whose

21   assistant it was.

22             Craig and I waited in the room while

23   the laptop was purchased.  It was then unpacked and

24   booted up for the first time in front of me.  And

25   the proof then was Craig downloaded and installed



CONFIDENTIAL

Page 74

1    software.

2              And then, after some -- many hours, I

3    don't recall how many hours, but it took much

4    longer than -- than expected, at the end of that, I

5    was convinced that he had taken one of the early

6    blocks and signed a message using its private key.

7        Q    Which block did he use?

8        A    It was the block that -- I believe it was

9    block 10, the block that -- that had the

10   transaction from Satoshi to Hal Finney.

11       Q    So the assistant that went to get the

12   computer -- sorry.  Strike that.

13             Did you accompany the assistant to go

14   purchase the new computer?

15       A    No.

16       Q    When the computer came back, how -- did

17   you verify that it was factory sealed?

18       A    No.

19       Q    When the -- when the computer started up,

20   did it boot up with the typical initial startup

21   that's required on a new computer?

22       A    Yes.

23       Q    Which Bitcoin wallet did -- did

24   Dr. Wright use for the demonstration?

25             MR. KASS:  Object to form.



CONFIDENTIAL

Page 75

1       A    Which -- I be -- I'm not sure -- do

2    you -- do you mean which software did he use?

3       Q    Meaning, yes, which software did Craig

4    use to -- to initiate the transaction, the signed

5    transaction?

6       A    I went back and checked my notes this

7    morning, and it was Electrum.

8       Q    Do you have notes of that actual meeting

9    somewhere?

10      A    I don't have contemporaneous notes.  The

11   best I have is a -- a Reddit private message thread

12   that I had with a person on Reddit that -- that I

13   gave up as part of discovery.  Those are the

14   best -- that's the best notes that I have.

15      Q    And whose -- did you suggest that he use

16   Electrum?

17              MR. KASS:  Object to form.

18      A    No.

19      Q    He chose Electrum?

20              MR. KASS:  Object to form.

21      A    He chose Electrum, yes.

22      Q    How was -- how was -- how was it -- how

23   was it downloaded?  How was it -- how did Electrum

24   end up on the computer?

25      A    It was downloaded via the hotel Wi-Fi



CONFIDENTIAL

Page 76

1    from the -- and I don't recall if it was from the

2    Electrum website or from GitHub.

3        Q    And did you verify -- did you watch the

4    laptop connect to the hotel's Wi-Fi?

5        A    I don't recall.

6        Q    Did you see him input, like, the log-in

7    codes that are typically associated with a hotel

8    Wi-Fi?

9        A    I don't recall.

10       Q    Is it possible it was not the hotel's

11   Wi-Fi?

12       A    Yes, it --

13            MR. KASS:  Object to form.

14       A    Yes, it is possible.

15       Q    When Electrum was downloaded either from

16   GitHub or from Electrum's website, did you verify

17   that it had the HTTPS security certificate on the

18   website?

19       A    I don't recall.

20       Q    Did you verify the hash digest of the

21   download against something you had brought with you

22   independently?

23            MR. KASS:  Object to form.

24       A    The hash digest of the Electrum software?

25   No, I did not.



CONFIDENTIAL

Page 77

1      Q    And I understand you were jet lagged

2    during this.  Is it fair to say you were exhausted

3    at this point?

4      A    Yes, I was.

5      Q    So how did -- as I understand it, Craig

6    signed the message on his own computer, and then

7    you verified that signature on the new computer.

8    Is that -- is that right?

9               MR. KASS:  Object to form.

10     A    No.  Everything happened on that new

11   computer.  That's not true.  There had to be a

12   private key involved.

13              I don't recall -- I don't recall if

14   he signed a message on his computer and then

15   transferred it to the new computer, or if he

16   transferred the private key to that new computer.

17   I don't recall which method was used.

18              (Pause.)

19              (Exhibit 11 marked for

20              identification.)

21     Q    So I'm handing you what's been marked as

22   Plaintiffs' Exhibit 11, and it's been produced by

23   you as -- we've marked it as Gavin 2007.

24              Take a moment to familiarize yourself

25   with it, and then, if you would, turn to 2009 at



CONFIDENTIAL

Page 78

1    the bottom.

2              Is this that Reddit private message

3    you discussed earlier?

4         A    Yes, it is.

5         Q    And if you go to the bottom of page 2009,

6    do you see it says, CSW signed on his laptop using

7    Electrum.  GA -- which I assume is Gavin Andresen

8    -- did not witness the procedure on CSW's screen.

9    CSW put the signature in a text file and put the

10   text file on GA's USB stick.

11             Does this help refresh your

12   recollection of --

13        A    2009.

14        Q    -- what happened?  Sorry?  Do you want to

15   keep reading?

16        A    Let me --

17        Q    Yeah.  Go ahead.

18        A    -- find the...

19             MR. KASS:  I'm just objecting to the

20   use of this document.

21             MR. FREEDMAN:  Okay.  On what basis?

22             MR. KASS:  It's not clear if this is

23   a Reddit post.  It looks like something that was

24   copied and pasted into a Word document.  Nothing

25   has been established as to the providence of this



CONFIDENTIAL

Page 79

1    document.  So until that's established...

2              (Pause.)

3    BY MR. FREEDMAN:

4        Q    All right.  Let me take a step back,

5    actually, before you do that and address Mr. Kass's

6    concern.

7              Do you recognize this particular

8    document?

9        A    Yes.

10       Q    Can you explain to me how I obtained

11   possession of this document?

12       A    I went into my Reddit account and went

13   back through my Reddit private messages, and then I

14   copied and pasted into a text document that I sent

15   to you as part of my response to the subpoena I

16   received.

17       Q    And is this an accurate copy and paste of

18   the Reddit messages?

19       A    Some of the formatting is a little weird,

20   but, yes, all of the text is.

21       Q    The substance is accurate?

22       A    The substance is accurate, I believe.

23            MR. FREEDMAN:  Okay.  Still have an

24   objection?

25            MR. KASS:  We'll get to it on cross.



CONFIDENTIAL

Page 80

1    I mean --

2              MR. FREEDMAN:  Okay.

3              MR. KASS:  -- a little better.

4         Q    So, Mr. Andresen, does this help -- is

5    this a completely accurate description of exactly

6    what occurred in that demonstration?

7         A    The -- the text that we were talking

8    about, the -- let's see.

9              (Pause.)

10        A    Yes.  I believe at least everything on

11   page 2009 and 2010, this person I was corresponding

12   with put together from things I had said publicly

13   around the time that this was being discussed.

14        Q    And there's a message here, it says you

15   got -- are you Etmet -- Etmetm?

16        A    No, I am not Etmetm.  That was the person

17   I was discussing with that.  Etmetm is one of

18   the -- I believe he says he's an Electrum

19   developer.

20        Q    Got it.  And there's a message on the --

21   on page 2011, it says, "You got several details

22   wrong.  I'll correct when on my computer next."

23              Is that -- is that from you?

24        A    That is from me, yes.

25        Q    Did you ever correct?



CONFIDENTIAL

Page 81

1      A     No.

2      Q     Okay.  What was wrong?

3      A     Oh, boy.  Yeah, I don't recall what was

4  wrong.

5      Q     Regardless, does this -- does this

6  exchange -- does this document help refresh your

7  recollection as to whether the signature was -- the

8  sig -- the proof process was done completely on the

9  new computer or whether it involved two computers?

10     A     I have no memory of it.  So this document

11  is the best record of what probably happened.

12     Q     Okay.  So you would defer to this

13  document?

14     A     Yes.

15            MR. KASS:  Object to form.

16     Q     Is one of the mistakes -- do you believe

17  one of the mistakes in the document is that it was

18  signed on Craig's laptop and transferred to yours

19  with a USB stick?

20            MR. KASS:  Object to form.

21     A     It's possible that that is one of the

22  mistakes, because I don't remember the USB stick

23  ever being removed from its bubble shell factory --

24  but it might have been.

25     Q     So how did Craig get -- assuming that it



CONFIDENTIAL

Page 82

1   was all done on the new computer, how did Craig get

2   the private key to block 9 onto the new computer?

3                 MR. KASS:  Object to form.

4        A    I don't know.

5        Q    And then what -- what would have been the

6   -- did you go ahead and verify it after he had

7   signed it?

8                 MR. KASS:  Object to form.

9        A    Did I?  If I recall correctly, Craig

10  signed a message, and I saw him do the command to

11  -- to sign the message.  I think it must have been

12  on his personal computer.  And we probably did use

13  a USB stick to move it to the -- the fresh

14  computer.  And then Craig typed on the fresh

15  computer the verify command, which failed

16  initially.  We did it a second time, and -- and

17  that verification succeeded.

18       Q    What was different?  Why did it fail and

19  then why did it succeed?

20       A    We were verifying a slightly different

21  message.  I think that it was, you know, Gavin's

22  favorite number is 11, maybe, if I recall

23  correctly, dash, CSW versus Gavin's favorite number

24  is 11.  And we had just -- again, it had been a

25  long day.  I was jet lagged.  I think Craig was



CONFIDENTIAL

Page 83

1    tired after wrestling with new computers and

2    software, and -- and, hence, the -- the failed

3    first attempt and the -- the successful second

4    attempt.

5        Q    Wasn't the message copied from the

6    original signed message and then pasted and then

7    again copied and pasted to verify?

8             MR. KASS:  Object to form.

9        A    I'm not sure I understand the question.

10       Q    Was the message, Gavin's favorite -- so

11   we had the signed -- we had the signed message,

12   right?

13       A    You have a message that you then sign and

14   create a digital signature --

15       Q    Right.

16       A    -- yes.

17       Q    Then how did you go about verifying that

18   signature?

19       A    You take the digital signature, you

20   transfer it to -- well, you don't have to transfer

21   it to another computer, but you can then -- given

22   the -- the public key, which -- which I knew from

23   the early Bitcoin block, public key, the signature,

24   and the message that you signed, together, form a

25   verification, so you need those three things.



CONFIDENTIAL

Page 84

1      Q    And so my question is:  You didn't --

2   there -- there wasn't a copy and paste of the

3   message you were signing, you didn't create a Word

4   file or a text file of "Gavin's favorite number is

5   11-CSW," save that, put it on the USB, reopen that,

6   and use that as one of the three factors?

7      A    No, the --

8           MR. KASS:  Object to form.

9      Q    Sorry.  Go ahead.

10     A    No.  The message was --

11     Q    Retyped.

12     A    -- entered, retyped.

13          THE VIDEOGRAPHER:  Counsel, I'm sorry

14  to interrupt.  I have a bit of a technical issue.

15  Could we go off the record --

16          MR. FREEDMAN:  Sure.

17          THE VIDEOGRAPHER:  -- for a moment?

18          MR. FREEDMAN:  Time is 11:01.  We're

19  going off the record.  This will mark the end of

20  Media Unit No. 1.  We're off the record.

21          (Off record.)

22          THE VIDEOGRAPHER:  The time now is

23  11:10 a.m.  We're coming back on the record.  Now

24  beginning Media Unit No. 2 in our deposition with

25  Gavin Andresen.  We're on the record.



CONFIDENTIAL

Page 85

1    BY MR. FREEDMAN:

2         Q     Has this discussion at all refreshed your

3    recollection of whether there was, in fact, a

4    transfer of the signature from one computer to

5    another?

6                MR. KASS:  Object to form.

7         A     No.  Again, my -- I don't recollect that

8    level of detail.

9         Q     Is it fair to say that if -- if there was

10   a transfer, you did not verify that there was no

11   other software installed on the USB stick?

12               MR. KASS:  Object to form.

13        A     Yes.

14        Q     Can you guarantee there was an authentic

15   version of Electrum used for this signing event?

16               MR. KASS:  Object to form.

17        A     Can I guarantee?  No.  It's possible that

18   a rogue version was downloaded.

19        Q     Can you guarantee that no code under

20   Craig's control was installed on the computers used

21   to verify the message?

22               MR. KASS:  Object to form.

23        A     No.

24        Q     Did you verify the public address of

25   block 9 or 10 with the public address that had been



CONFIDENTIAL

Page 86

1    used to sign the block?  Did you go through every

2    letter and verify it matched?

3        A    I brought a list of all the early block

4    public addresses, and I did verify -- I don't

5    recall if I went through every single letter, but I

6    probably did at least the first four to six and the

7    last four to six, which is typically how I verify a

8    public address is -- is what I think it is.

9        Q    During the public proof demonstration,

10   was there any mention of a -- of needing a trust's

11   permission to use the private key?

12       A    I don't recall.

13       Q    Do you recall how the private key to

14   block 9 was stored on Craig's laptop in order for

15   him to sign?

16            MR. KASS:  Object to form.

17       Q    Let me strike that.

18            Do you recall how the pub -- the

19   private key to block 9 was stored by Craig Wright?

20       A    No.

21       Q    But if it was a valid signing, he had to

22   have had access to the private key of -- of

23   block 10?

24            MR. KASS:  Object to form.

25       A    Yes.



CONFIDENTIAL

Page 87

```
1       Q    Okay.  I think I said 9 before, but if
2   I'm saying block 9 or 10, I'm referring to the same
3   block, it's that one that Satoshi sent to Hal and
4   Hal sent back.  10 versus 9 being where you're
5   starting from counting, right?
6       A    Yes.
7       Q    Okay.
8       A    And, again, my recollection of the block
9   number could very well be incorrect.
10      Q    Did you choose the message you wanted
11  signed?
12      A    Yes.
13      Q    Including the CSW at the end of the
14  message?
15           MR. KASS:  Object to form.
16      A    No, I did not choose the including CSW at
17  the end of the message.
18      Q    So he added that on his own?
19           MR. KASS:  Object to form.
20      A    Yes.
21      Q    I think you've publicly stated that it's
22  certainly possible you were bamboozled by Craig.
23  Do you recall saying that?
24           MR. KASS:  Object to form.
25      A    Yes.
```



CONFIDENTIAL

Page 88

1      Q    What led to you thinking that it was
2  certainly possible you were -- well, let me take a
3  step back.
4            Sitting here today, do you believe
5  that you saw a proper signature with the private
6  key to block 9?
7      A    Sitting here today, I think it's more
8  likely than not that I saw a proper signature, but
9  I -- but I do have some doubt.
10     Q    And what made you acknowledge that it's
11 certainly possible you were bamboozled?
12     A    As I think I state in this kind of Reddit
13 private message, I did not expect the private
14 proving session to have as much weight as it did.
15 So there were certainly, you know, pos -- there are
16 places in the private proving session where I could
17 have been fooled, where somebody could have
18 switched out the software that was being used or,
19 perhaps, the laptop that was delivered was not a
20 brand-new laptop, and it had been tampered with in
21 some way.  I was also jet lagged.
22            And, again, I was not in the head
23 space of this is going to prove to the world that
24 Craig Wright is Satoshi Nakamoto.  I was in the
25 head space of, you know, this will prove to me



CONFIDENTIAL

Page 89

1    beyond a reasonable doubt that Craig Wright is

2    Satoshi Nakamoto.

3              And my doubts arise because the proof

4    that was presented to me is very different from the

5    pseudo proof that was later presented to the world.

6    Q    So after the -- after the proof session

7    was over, what happened next?

8    A    I went and got fish and chips, I had a

9    lovely fish-and-chips dinner, and then went to

10   sleep.

11             The next morning, met with Craig and

12   what's his name and who's his face, the money guys,

13   for a traditional English -- English breakfast at

14   the hotel, the hotel restaurant.

15   Q    Okay.  And during the proof session, did

16   Dave Kleiman get brought up at all?

17             MR. KASS:  Object to form.

18   A    Again, I believe he was mentioned as one

19   of the three people.

20   Q    Let's take that -- let's take that out of

21   it, 'cause I understand you're not sure whether

22   that was said in the first meeting at the proof

23   session or at the breakfast in the morning, so

24   let's take that out.

25             Aside for this conversation --



CONFIDENTIAL

Page 90

 1      A     Okay.

 2      Q     -- with Dave Kleiman being one of the

 3   three people behind the Satoshi Nakamoto moniker,

 4   was there any other mention of Dave Kleiman during

 5   the proof session?

 6             MR. KASS:  Object to form.

 7      A     I don't recall.

 8      Q     So then you -- the next morning you had a

 9   proper English breakfast with the money men.  Did

10   Craig attend that meeting?

11      A     Yes.

12      Q     So it was four people?

13      A     Four people, yes.

14      Q     Was it four people the entire time?

15      A     Yes, I believe so.

16      Q     Okay.  And aside for, again, the

17   conversation, we don't know when it took place,

18   about Dave Kleiman's involvement with Satoshi being

19   one of the three people, was Dave Kleiman raised at

20   that breakfast?

21             MR. KASS:  Object to form.

22      A     I don't recall.

23      Q     Were the trusts raised at that breakfast?

24             MR. KASS:  Object to form.

25      A     I don't recall.



CONFIDENTIAL

Page 91

1      Q    Were any trusts raised at that breakfast?

2           MR. KASS:  Same objection.

3      A    I don't recall.

4      Q    During any of these three conversations

5  with Craig, did you ever talk to Craig about where

6  all of his Bitcoin were?

7      A    No.

8           MR. KASS:  I'm gonna object to form.

9      Q    Can you tell me a bit more about the

10  conversation, whenever it occurred, with Craig

11  about the three people behind Satoshi Nakamoto?

12          MR. KASS:  Object to form.

13     A    Can I tell you more about that

14  conversation?  I don't think so.  My memory is very

15  fuzzy.  I believe we had a conversation, a short

16  two sentences, about that, but I don't recall

17  details.

18     Q    How did it come up?

19     A    I don't recall.

20     Q    And -- and how did he reference the

21  mysterious third character; what -- what did he --

22  how did he refer to that character?

23          MR. KASS:  Object to form.

24     A    I think he just said, "And there was

25  somebody else."



CONFIDENTIAL

Page 92

```
 1        Q    And -- sorry.
 2        A    And that's it.  I -- I did not -- it
 3   didn't seem to be any of my business to ask who the
 4   other mysterious third person was.
 5        Q    And -- and what was the -- the statement,
 6   that these three people what?
 7        A    That these three people were involved in
 8   creating Bitcoin in 2009.
 9        Q    Did he --
10             MR. KASS:  Object to form, prior
11   question.
12        Q    Did he describe what the duties of each
13   of the three were?
14             MR. KASS:  Object to form.
15        A    Not that I recall, no.
16        Q    Did he claim one was more Satoshi than
17   the rest?
18             MR. KASS:  Object to form.
19        A    I believe he claimed that he was the
20   primary inventor.
21        Q    And what did you -- what did he mean by,
22   or did he explain what he meant by, being the
23   "primary inventor"?
24             MR. KASS:  Object to form.
25        A    I got the impression, or at least I
```



CONFIDENTIAL

Page 93

1    believe he -- again, I don't recall details, but he

2    might have said something like, "It was my idea."

3         Q    So did he claim credit for anything more

4    than just saying it was his idea or --

5                   MR. KASS:  Object.

6         Q    -- did he leave it at, "It was my idea"?

7                   MR. KASS:  Object to form.

8         A    I believe he left it at, "It was my

9    idea."

10        Q    During any of these conversations, did

11   you ask him why he had disappeared in 2011?

12        A    No.

13        Q    Did he explain why he disappeared in

14   2011?

15        A    I believe he said that he was, at that

16   time, going through a divorce.

17        Q    Um-hm.  And, therefore...

18                  MR. KASS:  Object to form.

19        A    That he was going through a divorce and

20   just the personal stress of that contributed to him

21   stepping back, away from the project.

22        Q    I think it was Plaintiffs' Exhibit 1 was

23   Satoshi's message to you that he was moving on to

24   other things.  Do you recall that?

25        A    Yes.



CONFIDENTIAL

Page 94

1      Q    Did you ask him what those other things

2   were?

3      A    I don't recall.  I don't think I did.

4      Q    Did the topic of the other two members of

5   the Satoshi team ever come up in front of the money

6   men?

7              MR. KASS:  Object to form.

8      A    They were there during all of my

9   conversations with Craig, at least one of them --

10  one or the other of them were there, so, yes, it

11  would have been in front of them.

12     Q    Do you remember which?

13     A    No, I don't recall.

14     Q    Did they ever express concern about who

15  might have the rights to Satoshi's work product?

16             MR. KASS:  Object to form.

17     A    No.

18     Q    Did that issue ever get discussed?

19             MR. KASS:  Object to form.

20     A    No.

21     Q    During the conversations with Craig, did

22  his wealth ever come up?

23             MR. KASS:  Object to form.

24     A    Did his wealth ever come up?  No.

25     Q    Did you ever ask him what he intended to



CONFIDENTIAL

Page 95

1    do with the fortune of Bitcoin he was sitting on?

2              MR. KASS:  Object to form.

3         A    No.

4         Q    Did he say what he intended to do with

5    the fortune of Bitcoin?

6              MR. KASS:  Object to form.

7         A    Not that I recall.

8         Q    It seems you exercised extreme restraint

9    in not asking.

10        A    Yes, I did.

11             MR. KASS:  Object to form.

12             (Exhibit 12 marked for

13             identification.)

14        Q    I want to pull you out of the timeline

15   for a second, just so you see where I'm going with

16   things.

17             I'm handing you what's been marked as

18   Plaintiffs' Exhibit 12, and it is comprised of

19   Gavin 683 and 684.

20             Do you recognize this email?

21        A    Yes.

22        Q    To put this email -- and this is an email

23   from Robert MacGregor to you and Jon Matonis?

24        A    Yes.

25        Q    CC'ing Stefan Matthews from nCrypt?



CONFIDENTIAL

Page 96

 1      A     Yes.

 2      Q     And these are the money men?

 3            MR. KASS:  Object to form.

 4      A     Rob.  Yes, I believe they are.

 5      Q     Okay.  And 683 is the email, 684 is its

 6    attachment?

 7            MR. KASS:  Object to form.

 8      Q     It's the next page.

 9      A     Yes.

10      Q     Do you recall receiving this email and

11    its attachment?

12      A     I recall -- do I recall receiving it?  I

13    recall giving it to you as part of the discovery

14    process for the subpoena.

15      Q     So at some point you received it?

16            MR. KASS:  Object.

17      A     At some point I did receive it, yes.

18      Q     Okay.  And to put this in context, and

19    we'll get back to the timeline in a minute, Craig

20    attempts to prove to the world publicly that he is

21    Satoshi, and provides less than perfect proof.  Is

22    that an accurate statement?

23            MR. KASS:  Object to form.

24      A     Yes.

25      Q     And when that proof fails to demonstrate



CONFIDENTIAL

Page 97

1    who he says he is, the money men go into crisis

2    mode to save the day.  Is that an accurate

3    paraphrase of what's going on?

4              MR. KASS:  Object to form.

5         A    Yes.

6         Q    And as part of that saving of the day to

7    recover Craig's reputation, they propose that there

8    will be -- that Craig will actually send Bitcoin

9    from block 9 or block 10, that -- I think they're

10   referring to it as block 9, but it's the same

11   block, to you and Jon Matonis as unequivocal,

12   uncontrovertible proof that he has the private key

13   to block 9 --

14             MR. KASS:  Object to form.

15        Q    -- is that fair?

16        A    Yes.

17        Q    And in the attachment, it lays out kind

18   of the process of what they're going to release --

19   or, rather, it is, in fact, a blog post that they

20   were going to post; is that right?

21             MR. KASS:  Object to form.

22        A    Yes.

23        Q    And it was -- it was a draft blog post

24   for Craig to post?

25             MR. KASS:  Object to form.



CONFIDENTIAL

Page 98

1      A    Yes.

2      Q    And in it, it starts off saying, "While

3  Hal Finney was not the second person to actually

4  run Bitcoin as he had speculated, that distinction

5  goes to Dave Kleiman."

6              You see that?

7      A    Yes, I see that.

8      Q    Is this consistent with your

9  conversations with Craig that Dave Kleiman was the

10  second person to run Bitcoin?

11             MR. KASS:  Object to form.

12     A    I don't know that we ever discussed

13  running Bitcoin.

14     Q    Okay.

15     A    So, no, I don't think I ever had any

16  discussion about who was running Bitcoin when with

17  Craig.

18     Q    After you received this message, did you

19  communicate with Craig at all about Dave Kleiman

20  being the second person to run Bitcoin?

21     A    Not that I recall.

22     Q    Did you understand that Craig had signed

23  off on this blog post?

24             MR. KASS:  Object to form.

25     A    I don't think I had any knowledge about



CONFIDENTIAL

Page 99

1    whether Craig had seen this blog post prior to me

2    seeing this blog post.

3        Q    And then if you look down at the fourth

4    paragraph, it says, "Obviously, I'm well aware of

5    the furore that has been created because I did not

6    immediately sign a message with the private key

7    from this block.  I will make the reasons for this

8    clear and provide further context in an upcoming

9    post."

10               Do you see that?

11       A    Yes.

12       Q    Did he ever make the reasons for his

13   failure clear?

14       A    I don't think so, no.

15       Q    And did he ever provide further context?

16       A    He wrote a lot -- he wrote a lot

17   afterwards, and -- and a lot I didn't read, so I

18   don't know.

19               MR. FREEDMAN:  Do we want to maybe

20   take a minute and see if we can get them to quiet

21   down?

22               THE VIDEOGRAPHER:  Great idea.

23               The time is 11:31.  We're going off

24   the record.

25               (Off record.)



CONFIDENTIAL

Page 100

```
 1              THE VIDEOGRAPHER:  The time is

 2    11:33 a.m.  We're back on the record.

 3    BY MR. FREEDMAN:

 4        Q    Are you aware that -- did Craig ever

 5    mention Patrick Paige to you?

 6        A    Not that I recall.

 7        Q    Are you aware that Patrick Paige is --

 8    was one of Dave's best friends, Dave Kleiman's best

 9    friends?

10        A    No.

11        Q    Are you aware that he testified that in

12    2014 Craig told him Craig was a part of a group of

13    people that had created Bitcoin?

14              MR. KASS:  Object to form.

15        A    No.

16        Q    Is that consistent with what Craig told

17    you?

18              MR. KASS:  Object to form.

19        A    Yes.

20        Q    Did you ever read Andrew -- did you ever

21    come to meet Andrew O'Hagan -- or, sorry.  Strike

22    that.

23              Did you ever come to be introduced to

24    Andrew O'Hagan?

25        A    I don't think I've met him in person.
```



CONFIDENTIAL

Page 101

```
 1      Q    But you spoke with him?

 2      A    I don't know if we ever had a phone

 3   conversation.  I've definitely emailed with him.

 4      Q    You've communicated with Andrew O'Hagan?

 5      A    I have communicated with Andrew O'Hagan,

 6   yes.

 7      Q    Did you ever come to read the story he

 8   put together called "The Satoshi Affair"?

 9      A    Yes, I did.

10      Q    I'm gonna hand you what we're marking as

11   Plaintiffs' Exhibit 13.

12               (Exhibit 13 marked for

13               identification.)

14               MR. FREEDMAN:  I might have a second

15   copy for you, but it's 83-1.

16               MR. KASS:  Well, if you have one for

17   me, that will be helpful.

18               (Pause.)

19               (Document exhibited to counsel.)

20      Q    Do you recognize -- do you recognize what

21   I've just handed you as Plaintiffs' Exhibit 13?

22      A    Yes.

23      Q    Okay.  And can you turn -- and is this

24   "The Satoshi Affair" article that Andrew O'Hagan

25   drafted or wrote -- authored?
```



CONFIDENTIAL

Page 102

1    A    I believe so, yes.

2    Q    And is the characterization of the

3    signing session, the proof session, is that

4    accurate?

5              MR. KASS:  Object to form.

6    A    I would have to go back and reread it.

7    Q    All right.  Well, let's come back to

8    that.

9              Can you page -- turn to page -- see

10   on the top there's blue page numbers?  Sorry.

11   They're not blue in your copy.

12             Do you see in the top that there's a

13   header, it says page X --

14   A    Yes.

15   Q    -- of Y?

16   A    Yes.

17   Q    Can you -- can you turn to page 26.

18   A    Yep.

19   Q    If you go to the middle paragraph, do you

20   want to read that first sentence for the record?

21   A    "Dave Kleiman was to become the most

22   important person in Wright's professional life, the

23   man he says helped him do Satoshi's work."

24   Q    Is this consistent with statements you

25   heard from Craig?



CONFIDENTIAL

Page 103

1          MR. KASS:  Object to form.

2     A    Yes.

3     Q    And can you turn to page 76.

4          And way at the bottom, this is Andrew

5   O'Hagan recounting a conversation he had with

6   Craig.  Can you go ahead and read that back and

7   forth?

8     A    In a conversation I had, right?

9     Q    No.  Andrew O'Hagan with Craig Wright.

10  Starting from "but you can say," can you read that

11  for the record, please?

12         MR. KASS:  Object to form.

13    A    "But you can say, hand on heart, I am

14  Satoshi Nakamoto."

15    Q    And then Craig's response on the next

16  page, 77.

17         MR. KASS:  Same objection.

18    A    "I was the main part of it.  Other people

19  helped.  At the end of the day, none of this would

20  have happened with Dave Kleiman, without Hal

21  Finney, and without those who took over, like Gavin

22  and Mike."

23    Q    Are these statements about Dave Kleiman

24  consistent with other statements Craig has made to

25  you?



CONFIDENTIAL

Page 104

     1              MR. KASS:  Object to form.

     2        A    Yes.

     3        Q    Can you turn back to page 27.

     4              And on page 27 -- sorry.

     5              (Pause.)

     6        Q    Do you see the paragraph that starts off,

     7   "We needed people to respond to us"?

     8        A    Yes.

     9        Q    Halfway through that paragraph there is a

    10   sentence that begins with "If"?

    11        A    Yes.

    12        Q    It's a -- it's a quote from Craig.  Can

    13   you read that for the record?

    14        A    "If I" -- "if I had come out originally

    15   as Satoshi, without Dave, I don't think it would

    16   have gone anywhere.  I've had too many

    17   conversations with people who get annoyed because

    18   it's me."

    19        Q    Is that also consistent with your

    20   conversations with Craig?

    21              MR. KASS:  Object to form.

    22        A    Yes.

    23        Q    And consistent with statements Craig has

    24   told you?

    25              MR. KASS:  Object to form.



CONFIDENTIAL

Page 105

1       A    Yes.

2       Q    Can you go to page 31 for me?

3       A    (Witness complied.)

4       Q    And in the second paragraph of page 31,

5    Andrew O'Hagan quotes an email dated 12th

6    March 2008.  Do you see that?

7       A    Yes.

8       Q    And can you read the -- can you read the

9    quote that he's quoting from that article -- I'm

10   sorry -- can you read the quote of the email that

11   he's quoting?

12      A    That begins, "I need your help"?

13      Q    Yes.

14      A    "I need your help editing a paper I am

15   going to release later this year.  I have been

16   working on a new form of electronic money, Bit

17   cash, Bitcoin.  You are always there for me, Dave.

18   I want you to be part of it all.  I cannot release

19   it as me.  GMX, Vistomail, and Tor, I need your

20   help and I need a version of me to make this work

21   that is better than me."

22      Q    Is this email consistent with the story

23   Craig told you about his and Dave's collaboration?

24           MR. KASS:  Object to form.

25      A    Yes.



CONFIDENTIAL

Page 106

1                    (Discussion off the record.)

2                    THE VIDEOGRAPHER:  There's a signal

3        going through the audio that is disruptive, but it

4        doesn't prevent you from hearing everything.  It's

5        just annoying.  I don't know -- it just popped up.

6        I don't know where it's coming from.  We could go

7        off the record, we could try to track it down, but

8        I don't know.

9                    MR. FREEDMAN:  How bad is it?

10                   Maybe we should go off the record

11       while we're doing this.

12                   THE VIDEOGRAPHER:  Let's go off,

13       yeah.  The time is 11:41.  We're going off the

14       record.

15                   (Off record.)

16                   THE VIDEOGRAPHER:  The time is

17       11:45 a.m.  We're coming back on the record.  Now

18       beginning -- no, continuing with Media Unit No. 2.

19       Sorry.  We're on the record.

20       BY MR. FREEDMAN:

21           Q    If you turn to page 36, and you go to the

22       bottom of the page, you'll see a sentence that

23       says, "I asked Wright about this, and he told me it

24       was true, that his and Kleiman's mining activity

25       had led to a complicated trust."



CONFIDENTIAL

Page 107

```
 1              Did you discuss trusts at all with

 2    Craig?

 3              MR. KASS:  Object to form.

 4       A   I don't recall.

 5       Q   Did you discuss his and Dave Kleiman's

 6    mining activity?

 7              MR. KASS:  Object to form.

 8       A   No.

 9              (Exhibit 14 marked for

10              identification.)

11       Q   I'm gonna hand you what has been marked

12    as Plaintiffs' Exhibit 14.  And for the record,

13    it's Gavin 1007.

14              Do you recognize this email?

15       A   Yes.

16       Q   And it's an email from Craig to you and

17    Jon Matonis?

18       A   Yes.

19       Q   On April 27, 2016?

20       A   Yes.

21       Q   If you look three paragraphs down from

22    the top, do you see where Craig writes to you, "In

23    the past I would joke with Dave before he died

24    about being Bond villains"?

25       A    No, I'm not seeing that.  Third paragraph
```



CONFIDENTIAL

Page 108

1   from the --

2           (Counsel indicating.)

3       A    Oh, there.  Sorry.  I was going from the

4   bottom.  Yes, I see that.

5       Q    So you understood this to be a reference

6   to Dave Kleiman?

7           MR. KASS:  Object to form.

8       A    Yes.

9       Q    So, clearly, you had discussed Dave

10  Kleiman before this date?

11          MR. KASS:  Object to form.

12      A    Yes.

13      Q    Beyond the statements that he, Dave

14  Kleiman, and a mysterious third person had created

15  Bitcoin together, did the other -- did he make any

16  other statements about Dave Kleiman?

17          MR. KASS:  Object to form.

18      A    I don't recall.

19      Q    "Starting a Bitcoin company has meant

20  dealing" --

21          THE STENOGRAPHER:  I'm sorry.  Can

22  you start again?

23      Q    "Starting a Bitcoin company has meant

24  dealing with so many people in the past that it

25  made me feel that way."



CONFIDENTIAL

Page 109

1              Did you ever understand why he felt

2    like a Bond villain starting a Bitcoin company?

3         A    No.

4         Q    Do you see the paragraph that starts,

5    "This time"?

6         A    Yes.

7         Q    The last sentence of it, can you read it

8    for the record?

9         A    "I wonder how long I can keep my other

10   wallets secret.  Soon it won't matter."

11        Q    Do you know what he meant here by "other

12   wallets"?

13             MR. KASS:  Object to form.

14        A    No.

15        Q    Did you ever come to learn what he meant

16   by "other wallets"?

17             MR. KASS:  Object to form.

18        A    No.

19        Q    Do you see the second-to-last sentence of

20   the paragraph after that?  It starts, "But most

21   importantly," and then the whole sentence says,

22   But, most importantly, I have capital?

23        A    Yes.

24        Q    Did you understood -- did you ever come

25   to understand where that capital came from?



CONFIDENTIAL

Page 110

1              MR. KASS:  Object to form.

2      A    No.

3      Q    Do you understand how much capital he

4  had?

5      A    No.

6              MR. KASS:  Object to form.

7              (Exhibit 15 marked for

8              identification.)

9      Q    I'm going to hand you what's been marked

10  as Plaintiffs' Exhibit 15 and is Bates labeled

11  Gavin 357.

12              Do you recognize this email?

13      A    Yes.

14      Q    Can you explain what these emails were?

15              (Witness perusing document.)

16      A    Let me -- let me parse out the thread.

17  So I was contacted by Uyen Nguyen -- I don't know

18  how you pronounce the name.

19      Q    I think that's right.

20      A    -- Uyen Nguyen back in 2016.  They were

21  -- they claimed that they were trustee for some

22  trust that Craig Wright had set up.  And, if I

23  recall correctly, they were -- they were asking if

24  I could help put them in touch with Craig, because

25  they were running into some issues with the IRS or



CONFIDENTIAL

Page 111

1    something.  I think that's what the -- and I may be

2    misremembering, 'cause I may have had several

3    communications with them.

4                Third -- and then this particular

5    document is from Ian Grigg, who was asking me not

6    to make all of the information public about trusts

7    and -- and various other -- I guess about -- about

8    trusts.

9        Q    Do you know Ian Grigg from before this

10   email?

11       A    No.

12       Q    But did you know him by reputation?

13       A    I don't know if I knew him by reputation

14   before this email.

15       Q    Do you know him now?

16       A    I do know him now, yes.  He's a technical

17   guy, cryptographer-type person.

18       Q    Have you discussed this email with him?

19       A    I have not, no.

20       Q    If you look on the page Bates-labeled

21   358, second page, maybe it's the third paragraph up

22   from the bottom, it says, "Craig Wright is

23   one-third of Satoshi Nakamoto.  He is the only

24   survivor now."

25       A    I see that, yes.



CONFIDENTIAL

Page 112

1       Q    Is that consistent with statements Craig

2    has made to you?

3                MR. KASS:  Object to form.

4       A    I don't know that Craig ever talked about

5    the mysterious third person dying, but I suppose it

6    would be consistent.

7       Q    Do you see in the first paragraph Uyen

8    writes, "I was the one chosen, since I knew who and

9    what they were back in 2010"?

10      A    Where is that?

11      Q    It's in the first paragraph of her email.

12      A    I see it, yes.

13      Q    Did you ever have a conversation with

14   Uyen?

15      A    No.  I think the email conversations that

16   I produced as part of discovery was the only

17   communications I've had with Uyen.

18      Q    Did you ever talk to Craig about these

19   emails from Uyen?

20      A    No.

21      Q    Did you keep the emails confidential?

22      A    Until I was subpoenaed, yes.

23               (Exhibit 16 marked for

24               identification.)

25      Q    I'm handing you what's been marked as



CONFIDENTIAL

Page 113

1   Plaintiffs' Exhibit 16, Bates 622.

2              Do you recognize this email?

3              (Witness perusing document.)

4       A    Yes.

5       Q    And do you see your email -- this is

6   the -- the email we just looked at a moment ago

7   from Uyen that was at the bottom of the chain of

8   Plaintiffs' Exhibit 15, right?

9       A    Yes.

10      Q    And then above that, you respond back to

11  Uyen, right?

12      A    Yes.

13      Q    And you say, "Is it possible there are no

14  Bitcoins in the trust, and David and Craig were

15  making up a story all along?"

16             Which trust are you referring to?

17      A    The trust that Uyen Nguyen claimed they

18  were a trustee for.

19      Q    But Craig had never mentioned a trustee

20  before this?

21             MR. KASS:  Object to form.

22      A    I don't recall.

23      Q    And then you say -- well, why don't you

24  read the second paragraph for me, of your email.

25      A    "Given his extreme efforts to avoid



CONFIDENTIAL

Page 114

1    releasing a public signature, I'm starting to doubt

2    that Craig actually possesses the key he claims he

3    has, and he did somehow manage to trick me and,

4    perhaps, has been deceiving people for many years."

5         Q    What do you think now?  Was -- let me

6    take a step back.

7              Was that an accurate statement

8    when -- when you made it?

9         A    Yes.

10        Q    And what do you think now?

11             MR. KASS:  Object to form.

12        A    I'm not sure what to think.  I am -- I

13   might have been bamboozled.

14        Q    In the email that Uyen responds back to

15   your last email, she says, "The troublemaker is

16   Craig himself, not Dave."

17             Do you see that?  Top -- top -- or

18   second sentence of the email.

19        A    Yes, I see that.

20        Q    Do you know what she's referring to?

21             MR. KASS:  Object to form.

22        A    No.

23        Q    Did you ever ask Craig what she was

24   referring to?

25        A    No.



CONFIDENTIAL

Page 115

1      Q    And she finishes the email with,

2    "nLockTime is what controls the trust."

3              Do you see that?

4      A    Yes.

5      Q    Do you know what she means?

6              MR. KASS:  Object to form.

7      A    Yes.  NLockTime is a feature of Bitcoin

8    transactions that allows you to create a

9    transaction that cannot be published to the network

10   to transfer Bitcoins from one person to another

11   until sometime in the future.

12     Q    Okay.  Did you ever get any more detail

13   on what she means by "nLockTime is what controls

14   the trust"?

15     A    No.

16              (Exhibit 17 marked for

17              identification.)

18     Q    Okay.  I'm gonna hand you what's been

19   marked Plaintiffs' Exhibit 17, and it's been

20   Bates-labeled Gavin 33.

21              Do you recognize this email?

22     A    Yes.

23     Q    What is this email?

24     A    This is an email from me to Stefan

25   Matthews about a blog post that I wrote saying that



MAGNA
LEGAL SERVICES

CONFIDENTIAL

Page 116

1  I believe Craig Wright is Satoshi Nakamoto.

2      Q    Did you end up publishing this blog post?

3      A    Yes, I did.

4      Q    In this form?

5      A    Very close to this form.  You can check

6  my blog, it's actually still there.

7      Q    Okay.  And that final form is obviously

8  what you, yourself, posted?

9      A    Yes.

10     Q    In the draft, you write, on the second

11 paragraph, last sentence, "After spending an

12 afternoon with him" -- him meaning Craig, right?

13     A    Yes.

14          MR. KASS:  Object to form.

15     Q    -- "I am convinced beyond a reasonable

16 doubt he is Satoshi."

17          What convinced you beyond a

18 reasonable doubt at the time?

19     A    It was the combination of speaking with

20 him, communicating with him via email.  It -- he

21 seemed to have the same prickly personality of the

22 person I was communicating with in 2010, combined

23 with a plausible backstory about why he would have

24 stepped away, and then combined with -- I was

25 convinced that he actually did sign and verify a



CONFIDENTIAL

Page 117

1    message using a key from one of the early Bitcoin

2    blocks.  So those three things convinced me at the

3    time.

4         Q    And did the convincing -- the convincing

5    reason for why he stepped away was that he was

6    going through a divorce in 2011?

7         A    Yes.

8         Q    Any -- anything else?

9         A    No.

10        Q    Can you look at the third -- or maybe

11   it's fourth paragraph down, and the second sentence

12   starts with "and."  Can you read that for me?

13        A    "And he cleared up a lot of mysteries,

14   including why he disappeared when he did and what

15   he's been busy with since 2011."

16        Q    So what are the mysteries he cleared up?

17        A    I don't recall what exactly I was

18   referring to then.  Yeah, I don't recall.

19        Q    Is it fair to say that the -- the fact

20   that Satoshi Nakamoto was a team of three

21   individuals is one of those mysteries?

22             MR. KASS:  Object to form.

23        A    I guess that's fair to say, sure.

24        Q    We covered why he disappeared, right, it

25   was the divorce?



CONFIDENTIAL

Page 118

1      A      Yes.

2      Q      And then what he's been busy with since

3   2011?

4      A      Yes.  I believe the academic study.  From

5   previous emails, the -- the -- you know, busy

6   getting further degrees I assumed is what he had

7   been busy with.

8      Q      So we've covered three things:  Why he

9   disappeared, what he's been busy with, and the

10  identity -- the tri-party identity of Satoshi

11  Nakamoto.

12             He wrote, "A lot of mysteries."  Is

13  there more you just don't recall?

14     A      There's more --

15             MR. KASS:  Object to form.

16     Q      I'm just -- was it just an inaccurate

17  statement?  Why did you write, "A lot of

18  mysteries"?  Because three strikes me as a few, not

19  a lot.

20             MR. KASS:  Same objection.

21     A      I don't recall details.  I mean, we

22  discussed some design decisions in Bitcoin

23  software.  And, again, I don't recall the details

24  of exactly which of those -- like, you know, why

25  did he choose C++?  Why did he use Windows?  Why --



CONFIDENTIAL

Page 119

1    why 21 million Bitcoin?  Why -- why the name

2    Satoshi Nakamoto?

3                 I believe we discussed some of those

4    things either in London or later in emails, and so

5    those were some of the types of mysteries that I

6    felt like had been cleared up.

7        Q    Why did he choose Satoshi Nakamoto?

8                 MR. KASS:  Object to form.

9        A    He actually -- oh, he gave me a -- he

10   gave me a -- a book, which I actually haven't read

11   yet, it's a Japanese -- story about a Japanese

12   merchant, I believe.  Again, I haven't read the

13   book.  But the merchant is named Satoshi.  And so

14   that was his explanation for why he chose the name

15   "Satoshi."

16       Q    Got it.

17                 So -- okay.  I want to jump back into

18   the timeline now.  So we left it that you had just

19   exited the proof session on April 7th, and you

20   walked away from the meeting, beyond reasonable

21   doubt, thinking Craig is Satoshi?

22       A    Yes.

23       Q    And that was April 7th?

24       A    Yes.

25       Q    Craig's press conference was May 2nd.



CONFIDENTIAL

Page 120

1          MR. KASS:  Object to form.

2     Q    So I want to cover the period between

3  your meeting Craig -- your meeting Craig for the

4  proof session, and then the ultimate failure of his

5  public proof session.  Is that okay?

6     A    Okay.

7          MR. KASS:  Object to form.

8     Q    So on April 12th, I believe, you get an

9  email from Andrew O'Hagan asking whether or not --

10  did I run out -- there I am, thank you -- asking

11  whether or not you could talk.

12          This is Plaintiffs' Exhibit 18, and

13  it's Bates labeled Gavin 1762.

14          (Exhibit 18 marked for

15          identification.)

16     Q    And in response -- so is that right, you

17  get an email from Andrew O'Hagan asking if you can

18  talk?

19     A    Yes.

20     Q    In response, you forward this to the --

21  the money men and Craig, right?

22          MR. KASS:  Object to form.

23     A    Yes.

24     Q    And you say, I'm not planning on talking

25  to anyone, but let me know if you would like me to



CONFIDENTIAL

Page 121

1   talk to him; is that fair?

2        A    That's correct.

3        Q    Did they end up asking you to talk to

4   him?

5        A    I don't recall.

6        Q    And did they explain to you what Andrew

7   O'Hagan was there to do?

8        A    I don't think so.

9        Q    Did you ever come --

10       A    I don't recall them mentioning Andrew

11  O'Hagan's name at all.

12       Q    Did Andrew O'Hagan ever explain to you

13  what he was there to do?

14       A    I don't think so.  I think the -- the --

15  the next time I -- I don't know.  I wouldn't be

16  surprised if the next time I heard of Andrew

17  O'Hagan was when the big article was published.

18       Q    Okay.  Well, you had that email exchange

19  with him?

20            MR. KASS:  Object to form.

21       Q    We -- we looked at it earlier.  It was --

22  do you mind passing me your exhibits so I can find

23  it for you?

24       A    Sure.

25       Q    That's the downside of using electronic



CONFIDENTIAL

                                                   Page 122

 1    exhibits.

 2                    Here we are, Plaintiffs' Exhibit 10.

 3                    (Document exhibited to witness.)

 4         A    April 29th.  I sit corrected.

 5         Q    So do you recall ever getting explained

 6    who Andrew O'Hagan was or what he was doing there?

 7         A    No.

 8         Q    Somebody must have authorized you to give

 9    this detailed account because you were otherwise

10    under a embargo; isn't that right?

11                    MR. KASS:  Object to form.

12         A    I don't recall.

13         Q    And, in fact, an -- an NDA of some kind?

14         A    I don't recall.

15                    (Exhibit 19 marked for

16                    identification.)

17         Q    Okay.  Hand you what's been marked as

18    Plaintiffs' Exhibit 19, and what is Bates-labeled

19    Gavin 15.

20                    Do you recognize this email?

21                    (Witness perusing document.)

22         A    Yes.

23         Q    And this is you writing to Stefan

24    Matthews, I believe; is that right?

25                    MR. KASS:  Object to form.



CONFIDENTIAL

Page 123

```
1        A     Probably.  I -- I ma -- I don't know who

2    srmatt@hushmail.com is.

3        Q     He was one of the money men?

4              MR. KASS:  Object to form.

5        A     Yes.

6        Q     Okay.  And in the third paragraph down,

7    you tell him, "Convincing Andreas Antonopoulos that

8    Craig has possession of early-in-the-blockchain

9    keys, convincing him that Craig deeply understands

10   Bitcoin would, I think, be very helpful."

11             Do you see that?

12       A     Yes.

13       Q     Why did you believe it would be helpful

14   to convince Andreas Antonopoulos?

15       A     An -- Andreas Antonopoulos is well-known

16   in the Bitcoin community and is considered to be

17   very trustworthy.  He's also very knowledgeable

18   about technical stuff.

19       Q     Do you consider him to be trustworthy?

20             MR. KASS:  Object to form.

21       A     Yes.

22       Q     Do you consider him to be very

23   knowledgeable about Bitcoin?

24             MR. KASS:  Object to form.

25       A     Yes.
```



CONFIDENTIAL

Page 124

1        Q    Would you rank him in the top 10 people

2    in the world in terms of Bitcoin knowledge?

3              MR. KASS:  Object to form.

4        A    Top 10?

5        Q    Make it top 20.

6              MR. KASS:  Object to form.

7        A    Top 20?  He wrote -- he wrote a whole

8    book about Bitcoin, so he's definitely an expert.

9    If it came to actually working on the code, like

10   doing the software engineering, then he's probably

11   not in the top 20, but, I mean, he definitely

12   understands the Bitcoin system very well.

13       Q    Okay.  So there are better coders than

14   him, you're saying?

15       A    There are better coders than him, yes.

16       Q    Would you consider him to be an expert in

17   Bitcoin technologies?

18             MR. KASS:  Object to form.

19       A    Yes.

20       Q    Did Craig convince Andreas Antonopoulos

21   -- Andreas Antonopoulos that he had the keys to the

22   early Bitcoin --

23             MR. KASS:  Object to form.

24       Q    -- public addresses?

25             MR. KASS:  Object to form.



CONFIDENTIAL

Page 125

```
 1      A     No.

 2      Q     Why not?

 3      A     I believe Andreas refused to meet with

 4   Craig.

 5      Q     Do you know why?

 6      A     I don't know why.

 7      Q     Okay.  And in this email you're

 8   referencing the blog post that we -- we took a look

 9   at earlier, right?

10      A     Yes.

11            MR. KASS:  Object to form.

12            Vel, do you have an idea as to how

13   much you have left?  Because we have a cross-

14   noticed deposition, and you're probably about three

15   hours.

16            MR. FREEDMAN:  I don't know, but we

17   can take stock of that the next break.

18            MR. KASS:  All right.

19            MR. FREEDMAN:  I'm not sure how it

20   helps, though.  I've got to finish, and then we can

21   see how we proceed.

22            MR. KASS:  Well --

23            (Exhibit 20 marked for

24            identification.)

25      Q     I'm handing you Plaintiffs' Exhibit 20,
```



CONFIDENTIAL

Page 126

1    and it's Bates marked 1521.

2                  MR. FREEDMAN:  Let's discuss it

3    later.

4                  MR. KASS:  Okay.  I just want to make

5    clear, though, that we don't consent to you just

6    finishing and not leaving us sufficient time.  We

7    can talk about it at the break, but I just wanted

8    to make sure that I wasn't implicitly conceding to

9    your statement.

10                 MR. FREEDMAN:  Okay.  Your objection

11   is noted.

12                 MR. KASS:  All right.

13   BY MR. FREEDMAN:

14        Q    All right.  So I've just handed you

15   Plaintiffs' Exhibit 20 that is Bates-marked

16   Gavin 1521.

17                 Do you see that email?

18        A    Yes.

19        Q    Okay.  Do you recognize it?

20        A    Yes.

21        Q    And is it an email from Stefan Matthews

22   to you?

23        A    Yes, it is.

24        Q    Does it help you remember who

25   srmatt@hushmail.com is?



CONFIDENTIAL

Page 127

1      A      No.

2      Q      Well, do you see the "from" email?

3      A      Oh, Stefan -- Stefan Matthews.  Yes.

4  Okay.

5      Q      So "srmatt" is Stefan Matthews?

6              MR. KASS:  Object to form.

7      A      I think so.

8      Q      And one of the money men?

9              MR. KASS:  Object to form.

10     A      Yes.

11     Q      And what is this email?

12     A      This is Stefan giving me -- encouraging

13  me to communicate with Andrew about the whole

14  Satoshi affair.

15     Q      So I guess it's fair to say this is the

16  introductory explanation of who Andrew O'Hagan is

17  vis-a-vis Craig Wright's coming out as Satoshi?

18             MR. KASS:  Object to form.

19     A      Yes.

20     Q      And then you went ahead and engaged

21  Andrew O'Hagan as we saw in that email?

22     A      Yes.

23     Q      But do you recall if you spoke to him on

24  the phone yet?

25     A      I don't recall.



CONFIDENTIAL

Page 128

1              (Exhibit 21 marked for

2              identification.)

3      Q     I'm handing you -- thank you.

4              I'm handing you what we're marking as

5    Plaintiffs' Exhibit 21, and it's Bates-labeled

6    Gavin 1179.

7              Do you recognize this email?

8      A     Yes.

9      Q     What is this email?

10     A     This is an email from Craig Wright to me,

11   supposedly showing a screenshot that is some early

12   Bitcoin debug logs from the Bitcoin software.

13     Q     And he says they have his name in it?

14              THE STENOGRAPHER:  I'm sorry?

15     Q     They say -- it says that -- sorry.  He

16   says that these debug logs have his name in them;

17   is that right?

18     A     Yes, that's what he says.

19     Q     Do you see Craig.Wright in the debug --

20   debug log?

21              MR. KASS:  Object to form.  Vel, it's

22   not legible besides.

23     A     Yeah, kind of.  I think I do, actually,

24   see it kind of at the beginning.

25   C:\Users\craig.wright --



CONFIDENTIAL

Page 129

1          MR. FREEDMAN:  I can zoom in on it

2     for you.

3      A    -- AppData.

4          MR. KASS:  Well, you don't -- well,

5     if the witness has better eyes than me, he can

6     testify.

7      Q    See the --

8      A    Yes.

9      Q    All right.  There we go.  This is an

10    electronically zoomed-in version.

11              What is -- what is this debug log?

12     A    The Bitcoin software can be run with a

13    command line switch to write debugging information

14    to a file, just to help developers to figure out if

15    it makes a mistake.

16     Q    And does this show in any way that Craig

17    is Satoshi?

18     A    No.

19     Q    I mean, I could have run this debug log,

20    right?

21          MR. KASS:  Object to form.

22     A    Yeah.  Well, certainly anybody could

23    produce a screenshot that claims anything, so...

24     Q    Well, that's certainly true, right?  It

25    could be a doctored screenshot, right?



CONFIDENTIAL

Page 130

1      A    Could be a doctored screenshot.  I mean,

2    it's possible -- I don't -- I can't read the dates

3    on here.  Looks like block height.  There's block

4    index, 12,000 -- I don't know.  I mean, anybody

5    could have been running Bitcoin very early, so it

6    doesn't really prove anything.

7      Q    I mean, if -- if it is not doctored, is

8    it correct to say that it shows Craig was running

9    Bitcoin somewhere around the 12,000 block?

10             MR. KASS:  Object to form.

11     Q    I think that's 12,914.  I can -- the

12   block index says 12,914.  I can kind of zoom in on

13   it on my...

14     A    Yeah, and I think 12 -- I -- block index,

15   12,914.  I think that refers to which block is --

16   is the latest block that it knows about.  I'd have

17   to go back and -- and check to double -- make sure

18   it's not referring to some other index.

19     Q    Okay.  So when you received this, what

20   were your -- what were your mental impressions?

21     A    My only impression was that, I mean, he's

22   trying to add more evidence that he is Satoshi to

23   try to reassure me.  But, I mean, frankly, again,

24   screenshots can be doctored, so it didn't have much

25   effect on me.



CONFIDENTIAL

Page 131

1     Q    So on -- on May 1st you -- you set your
2  blog post for release on May 2nd when the press
3  conference was gonna take place.  You recall that?
4     A    Yes.
5          MR. KASS:  Object to form.
6     A    The idea was that the -- yeah, my blog
7  post and Craig's blog post would go out at the same
8  time.
9     Q    I think you were at a ConsenSys event at
10 that time, right?
11    A    I was.  I was at a ConsenSys New York
12 City conference.
13    Q    What happened?
14    A    Bad things.  So the blog post that Craig
15 released was not at all what I expected him to
16 release.  I expected him to release a very simple,
17 you know, I am Satoshi, here is some -- here is a
18 simple message signed with an early key from an
19 early block.
20          Instead, he released a very wacky
21 supposed proof that actually wasn't a proof of
22 anything but was incredibly technical and hard to
23 follow, and I was as surprised as anybody to see
24 that.  And it -- it took, I don't know, a few
25 hours, a day, for somebody to -- to figure out what



CONFIDENTIAL

Page 132

1    all that technical gobbledygook actually meant and

2    to show that it wasn't actually a proof of

3    anything.

4         Q    So he didn't even almost prove he was

5    Satoshi?

6              MR. KASS:  Object to form.

7         A    Correct.  Anybody could have produced

8    that gobbledygook proof.

9         Q    Why didn't he release a simple signed

10   message?

11             MR. KASS:  Object to form.

12        A    I don't know.

13        Q    Did you ask him?

14        A    I did not.  At least I don't think I did.

15   You're probably about to pull out an email where I

16   ask him.

17        Q    Not yet.  Maybe soon.

18             (Exhibit 22 marked for

19             identification.)

20        Q    I'm gonna hand you what's been marked as

21   Plaintiffs' Exhibit 22, and it's Bates-labeled

22   Gavin 5.

23             This is an email from the money man,

24   Stefan Matthews; is that right?

25        A    Yes.



CONFIDENTIAL

Page 133

1      Q      To you?

2      A      Yes.

3      Q      On May 2nd, 2016?

4      A      Yes.

5      Q      So this is after the press release went

6  south?

7      A      Yes.

8      Q      The demonstration went south.

9             MR. KASS:   Object to form.

10     Q      And -- and he opens by telling you that

11  Craig is working on several corrections to his blog

12  post.  Do you see that?

13     A      Yes.

14     Q      And he delivered some incorrect

15  screenshots?

16     A      Yes.

17     Q      Would there have been correct screenshots

18  that could have fixed this proof?

19             MR. KASS:   Object to form.

20     A      Yeah, there could have been.  I don't --

21  let me say I don't recall exactly what was a

22  screenshot in his blog post and what was not.  So

23  it's also possible that no -- just new screenshots

24  would not have done anything because he described

25  what he did in text.



CONFIDENTIAL

Page 134

1      Q    Right.  Did he ever produce the

2   screenshots to you?

3      A    No.

4      Q    Publicly?

5      A    Not that I know of.

6      Q    And then in the fourth paragraph,

7   Matthews asks you, "If we were to be" -- "If we

8   were able to sign a transaction, say you sent BTC

9   to an address associated with block 9, and this was

10   then sent back to you, would that" -- "that be

11   something you would entertain?"

12               Do you see that?

13      A    Yes.

14      Q    Was that something you'd entertain?

15      A    Yes, I believe I actually did send a

16   transaction to block 9.

17      Q    Did he ever send it back?

18      A    No.

19      Q    He owes you money?

20      A    Well, the money's still sitting there in

21   block 9.  So I think it was half -- .11 Bitcoin,

22   because my favorite number's 11, I think.

23      Q    Okay.

24      A    But, again, I -- I could go back and

25   check the blockchain.



CONFIDENTIAL

Page 135

```
 1      Q    It's not an insignificant amount of
 2   money.
 3      A    Yeah.
 4      Q    Have you asked for it back?
 5      A    I have not asked for it back.
 6                (Exhibit 23 marked for
 7                identification.)
 8      Q    So then --
 9                MR. FREEDMAN:  Can I get another...
10      Q    I'm handing you what we've marked as
11   Plaintiffs' Exhibit 23, and it's been Bates-labeled
12   Gavin 47.
13                Do you recognize this email?
14      A    Yes.
15      Q    And this is, again, from Stefan Matthews
16   to -- one of the money men, to you?
17                MR. KASS:  Object to form.
18      A    Yes.
19      Q    On May 2nd, 2016?
20      A    Yes.
21      Q    And this is, again, after the fiasco of
22   the public proof failed?
23                MR. KASS:  Object to form.
24      A    Yes.
25      Q    And Matthews, the money man, says to you,
```



Page 136

1    "Hi Gavin, I've just spoken to CSW" -- that's Craig

2    Steven Wright?

3         A    I believe so, yes.

4         Q    "He has agreed to sign a new message

5    twice, once with block 9 and once with block 9" --

6    sorry -- "once with block 1 and once with block 9

7    keys.  It will include proof of date.  Both signed

8    messages will be provided to each of you to give

9    additional evidence should you need it."

10            And it's sent to you and Jon Matonis,

11   right?

12        A    Yes.

13        Q    With Craig in CC?

14        A    Yes.

15        Q    Did Craig ever respond back and say, "I'm

16   not gonna do this"?

17        A    Not that I recall.

18        Q    Did he say, "I can't do it"?

19        A    Not that I recall.

20        Q    Did he ever do it?

21        A    No.

22        Q    Why not?

23            MR. KASS:  Object to form.

24        A    I don't know.

25        Q    I mean, he has -- if -- if the proof



CONFIDENTIAL

Page 137

1    session you saw was real, he has the key to

2    block 9 --

3              MR. KASS:  Object to form.

4         Q    -- is that a fair statement?

5         A    Yes.

6              MR. KASS:  Same objection.

7         Q    Would it have involved significant effort

8    for him to use that key he clearly has access to,

9    to send you a message from at least block 9?

10             MR. KASS:  Object to form.

11             Vel, you're mixing up dates.

12        A    No.  It would be easy.

13        Q    It would be easy for him to have done

14   that?

15        A    Yes.

16             MR. KASS:  Object to form.

17        Q    But he didn't?

18        A    No.

19        Q    Why do you think he didn't?

20             MR. KASS:  Object to form.

21        A    I don't really know.  If you want me to

22   speculate --

23        Q    Sure.

24        A    Do you want me to speculate?

25        Q    Speculate for this question only.



CONFIDENTIAL

Page 138

```
 1              MR. KASS:  And I'm gonna object to
 2      the speculation.
 3              MR. FREEDMAN:  Noted.
 4         A    If the -- the Bitcoins were supposed to
 5      be locked in a trust, but Craig kept the private
 6      keys when he was not supposed to, then that would
 7      be a good reason for him not to sign something with
 8      a key that he is not supposed to have access to.
 9      So that is the -- that is my speculation on why he
10      might have been very resistant to signing any
11      messages with those early keys.
12         Q    To show he has access to private keys he
13      really shouldn't have access to?
14              MR. KASS:  Object to form.
15         A    Correct.  Perhaps there is some legal
16      reason he was not supposed to have kept the keys.
17         Q    Is that pure speculation, or can you base
18      it on anything you've heard or seen from Craig or
19      the money men?
20         A    I would say that's mostly speculation.  I
21      mean, the discussion of this mysterious trust, or
22      trusts, kind of fed into that theory.
23              (Exhibit 24 marked for
24              identification.)
25         Q    So I am handing you what's been marked as
```



CONFIDENTIAL

Page 139

1    Plaintiffs' Exhibit 24, and it's Bates-labeled

2    Gavin 161.

3                And Craig says -- this is an

4    email from you -- do you recognize this email?

5        A    Yes.

6        Q    It's an email from Craig to you?

7        A    Yes, and Jon Matonis.

8        Q    And Stefan Matthews?

9        A    And Stefan Matthews.

10       Q    And he says, "Please hold that thought.

11   I'm going to re-sign the message and post a new,

12   never-used signature from 9."

13               So he has clearly committed to sign

14   using the block key -- using the private key of

15   block 9; is that right?

16               MR. KASS:  Object to form.

17       A    Yes.

18       Q    Did he?

19       A    No.

20       Q    Even though it would have been simple for

21   him to do so?

22               MR. KASS:  Object to form.

23       A    Yes.

24       Q    Okay.

25               (Exhibit 25 marked for



CONFIDENTIAL

Page 140

1          identification.)

2     Q    So I'm now handing you what's been marked

3     as Plaintiffs' Exhibit No. 25, and it is Gavin 371.

4          Do you recognize this email?

5     A    Yes.

6     Q    It is a -- it's an email, on the bottom,

7     from you -- it's an email chain that reflects,

8     first, an email from you to Craig on bottom and

9     then a response from Craig to you; do you see that?

10    A    Yes.

11    Q    And you might have predicted this

12    earlier, but do you see the opening sentence of

13    your email?

14    A    Yes.

15         MR. KASS:  Object to form.

16    Q    What does it say?

17    A    "Why the OpenSSL hoop-jumping exercise

18    and not just a simple Electrum-signed message?"

19    Q    Which, is it fair, in layman's speak to

20    say, Why didn't you just do the easy signature

21    instead of some complex gobbledygook that turned

22    out to be nothing?

23         MR. KASS:  Object to form.

24    A    Yes.

25    Q    Okay.  What is his response to that?



CONFIDENTIAL

Page 141

1     A    He claimed that he -- that the wrong blog

2   post was posted, and at the time that seemed

3   unlikely to me.

4     Q    I mean, like, your question's very

5   understandable, right, why not just do the simple,

6   unequivocal proof?

7              MR. KASS:  Object to form.

8     A    Yes.

9     Q    And did you find his response

10  unsatisfactory?

11             MR. KASS:  Object to form.

12    A    I did.  I mean, I -- I -- yes, I found it

13  unsatisfactory.

14             (Exhibit 26 marked for

15             identification.)

16    Q    So I'm gonna hand you what we're marking

17  as Plaintiffs' Exhibit 26, and it is Bates Gavin 4.

18             And this is an email that reflects a

19  chain between you and Stefan Matthews; is that

20  right?

21    A    Yes.

22    Q    The money man?

23             MR. KASS:  Object to form.

24    A    Yes.

25    Q    And Stefan Matthews says, "CSW" -- it's



CONFIDENTIAL

Page 142

1    Craig Steven Wright -- "has committed to moving a

2    coin associated with block 9 address.  The intent

3    is for you to send a coin to that address, and then

4    for CSW to return that coin to you."

5                    Do you see that?

6        A    Yes.

7        Q    And you provided the address?

8        A    Yes.

9        Q    Did you send the coin?

10       A    I did.

11       Q    And you never got 'em back.  We covered

12   that already, right?

13       A    Correct.

14               MR. KASS:  Object to form.

15               (Exhibit 27 marked for

16               identification.)

17       Q    I'm handing you what's been marked as

18   Plaintiffs' Exhibit 27; it's Bates-labeled Gavin

19   18.  And this is a -- does this -- do you recognize

20   this email?

21       A    Yes.

22       Q    And does it reflect an email chain

23   between you and Stefan Matthews and Craig Wright?

24       A    Yes.

25       Q    And you initially reach out to the two of



CONFIDENTIAL

Page 143

1    them saying that you have sent, at the time, $50

2    worth of Bitcoin to the block 9 address?

3              MR. KASS:  Object to form.

4         A    Yes.

5         Q    And Stefan Matthews, the money man,

6    writes back that he sees the transaction, and then

7    he says, "Will let you know when we do the

8    transfer.  It could be several days before we get

9    the necessary authorization fully documented,"

10   et cetera.

11             Do you see that?

12        A    Yes.

13        Q    Is this what you were basing your

14   speculation on earlier?

15             MR. KASS:  Object to form.

16        A    Yes.

17        Q    What did you understand them to mean when

18   they said "necessary authorization"?

19             I mean, let me take a step back.

20   Strike that question for a second.

21             If I have a private key to a Bitcoin

22   block -- public address, do I need anyone's

23   authorization to use that private key?

24             MR. KASS:  Object to form.

25        A    No.



CONFIDENTIAL

Page 144

```
1        Q    Okay.  So what did you take this to mean,
2   that he needed necessary authorization?
3        A    I'm trying to -- I don't remember what I
4   knew or thought I knew at that time.  So I think
5   the best answer would be I don't recall if -- it
6   might have been -- I might have imagined that there
7   was some trustee that would have to sign off on any
8   use of those private keys.  But, again, I don't
9   recall at what point I learned about the trust.
10            MR. KASS:  So, Vel, we have to
11   resolve the timing issue.  I'm happy to go off the
12   record if you want to.
13            MR. FREEDMAN:  Let's take a break.
14            THE VIDEOGRAPHER:  The time is
15   12:34 p.m.  We're now off the record.
16            (Off record.)
17            THE VIDEOGRAPHER:  The time is
18   12:44 p.m.  We're coming back on the record,
19   continuing Media No. 2.
20            (Exhibit 28 marked for
21            identification.)
22   BY MR. FREEDMAN:
23        Q    I'm now handing you what's been marked as
24   Plaintiffs' Exhibit 28, which is Bates-marked
25   Gavin 1708, but I've printed out the wrong version,
```



CONFIDENTIAL

Page 145

1    it doesn't have the Bates marking.

2              Do you recognize this email?

3       A    Yes.

4       Q    Is this an email from Craig to you?

5       A    Yes.

6       Q    And you start off by saying to him, "I'm

7    starting to doubt myself and imagining clever ways

8    you could have tricked me."

9              Well, let me take that back.  He

10   wrote you an email on May 2nd saying, We F'd up and

11   I loaded the wrong post.  I'll be loading the

12   correct one shortly.

13             And then you respond the next day, on

14   May 3rd, saying, "Today, pretty please.  I'm

15   starting to doubt myself and imagining clever ways

16   you could have tricked me."

17             Is that accurate?

18      A    Yes.

19      Q    And what does Craig say in response?

20      A    Do you want me to read that?

21      Q    Sure.

22      A    He says, "There will be a post soon.  It

23   is in review to ensure it is all okay.  We are

24   going to move coin as well, but we need to get the

25   trust permissions in place.  Lawyers..."



CONFIDENTIAL

Page 146

1     Q    So was it really speculation?

2     A    About permissions from trusts?  No,

3  apparently not.  Apparently Craig told me that that

4  was the reason permission was needed.

5     Q    So it's your understanding that Craig is

6  refusing to publicly prove that he holds the

7  private keys to block 9 because it would show he

8  inappropriately kept private keys from the trust?

9     A    Or used them in a way that was outside of

10  some legal agreement in the trust, yes.

11     Q    So that he has them, as he signed with

12  them, but isn't allowed to move coin with them?

13          MR. KASS:  Object to form.

14     A    Yes.

15     Q    Okay.

16          (Pause.)

17          MR. FREEDMAN:  I seem to be missing a

18  document.  No, it's just out of order.

19          (Pause.)

20     Q    So as things currently stand, Craig has

21  provided a public proof that failed; the money men

22  are attempting to arrange for Craig to send you

23  Bitcoin from block 9, and they are saying they need

24  authorization from a trust to do this, even though

25  he has the private key.  Is that all correct?



CONFIDENTIAL

Page 147

1          MR. KASS:  Object to form.

2     A    I believe Craig said he needs trust

3     permission.

4     Q    That's right.

5     A    I'm not sure the money men --

6     Q    Craig said he needs --

7     A    -- ever said --

8     Q    Right.  So modify my -- my question to

9     say Craig said he needed authorization from the

10    trust; is that correct?

11         MR. KASS:  Same -- same objection.

12    A    Yes.

13         (Exhibit 29 marked for

14         identification.)

15    Q    Okay.  And I'm handing you what's been

16    marked as Plaintiffs' Exhibit 29, which is

17    Bates-labeled Gavin 1206.

18         Do you recognize these emails?

19    A    Yes.

20    Q    So if -- if you go to the back of the

21    email, so the beginning of the email chain, and the

22    one sent on May 4th, 2016, and it's Robert

23    MacGregor.  He's one of the money men, correct?

24    A    Okay.

25         MR. KASS:  Object to form.



CONFIDENTIAL

Page 148

1      Q    Do you not recall who --

2      A    I don't recall what Rob -- Robert and

3    Stefan's exact roles were.  I don't -- and I don't

4    recall who had known Craig for years and who was

5    owner of the -- the VC, but if you want to call all

6    of them --

7      Q    Part of --

8      A    -- money men, sure.

9      Q    Yeah.  Sure.  Okay.  He -- he writes and

10   says that Rory from the BBC has asked if he could

11   have a one-liner from interviews, that he is

12   comfortable that you are participating, and this

13   isn't yet -- isn't a yet more fantastical hoax.

14           So the BBC wanted to know that this

15   coin was really gonna get sent, right?

16           MR. KASS:  Object to form.

17   A    Yes.

18   Q    And Jon Matonis says, "I will call Rory"?

19   A    Yes, I see that.

20   Q    And then Stefan says, "Gavin, can you

21   please call Rory"?

22   A    Yes.

23   Q    And then Jon -- and then Robert MacGregor

24   says, "Gavin replied via email, Stefan."

25           So do you remember reaching out to



CONFIDENTIAL

Page 149

1    Rory at the BBC?

2         A    I don't recall.

3         Q    Do you have any reason to doubt that you

4    didn't?

5         A    No.

6         Q    Jon Matonis said, "I just got off the

7    phone with Rory at the BBC," right?

8         A    Yes.

9         Q    And then Robert MacGregor sends a message

10   on May 4th, 2016, you're all waiting for Craig to

11   send this transaction, and can you read what he

12   says to you?

13        A    "All Stop.  Craig has just tried to

14   injure himself and is bleeding badly in the

15   washroom.  Stefan is there with him and Ramona and

16   I am en route.  Ambulance is on its way."

17        Q    So Craig tried to hurt himself?

18             MR. KASS:  Object to form.

19        A    That was my understanding, yes.

20        Q    Did you get any more details then beyond

21   this email?

22        A    I believe there was a phone call, I don't

23   recall with who, who said that -- were they at

24   Craig's house?  I don't recall the location, but

25   they were somewhere.  Craig disappeared upstairs



CONFIDENTIAL

Page 150

1   and then was found bleeding with cuts to his neck,

2   and then was taken to the hospital in -- in an

3   ambulance with an apparent suicide attempt.  I

4   think the word "suicide" was -- was used.

5        Q     And this was by someone who was at the

6   locale?

7                MR. KASS:  Object to form.

8        A     If I recall correctly, yes.

9        Q     And they were describing what was going

10  on at the time?

11       A     I believe this happened -- several days

12  or maybe a week or more later, the phone call

13  happened recounting events.

14       Q     That had -- that had happened --

15       A     That had happened in the past, on

16  May 4th.

17       Q     But you don't recall who that was?

18       A     No, I don't recall.

19       Q     Did you ever talk to Craig about this?

20       A     No.

21              Things get dark.

22       Q     This stopped the public proof -- this

23  stopped the transfer of Bitcoin?

24       A     Yes.

25                MR. KASS:  Object to form.



CONFIDENTIAL

Page 151

```
 1                  (Exhibit 30 marked for
 2                  identification.)
 3        Q    I'm handing you what's been marked as
 4   Plaintiffs' Exhibit 30, and it's been Bates-labeled
 5   Gavin 769.
 6                  Do you recognize this email chain?
 7        A    Yes.
 8        Q    This is an email between you and Robert
 9   MacGregor?
10        A    Yes.
11        Q    One of the money men group?
12                  MR. KASS:  Object to form.
13        A    Yes.
14        Q    Okay.  And in it you say to Robert
15   MacGregor that you see two possibilities about
16   what's going on, either Craig is Satoshi and is
17   under incredible pressure not to provide proof --
18   or, rather, the pressure of providing proof is too
19   much?
20        A    Yes.
21        Q    Or he's lying to everyone for many years,
22   perhaps from evidence -- perhaps with evidence that
23   he obtained from the real deal?
24        A    Yes.
25        Q    So maybe Dave Kleiman was Satoshi, he got
```



CONFIDENTIAL

Page 152

1  the keys, and he used one of the keys but doesn't

2  have more?

3           MR. KASS:  Object to form.

4     A    Sure.  Possibly.

5     Q    Possibly.  And in response, one of --

6  Robert MacGregor, who has been working with Craig

7  for at least a few months now on this coming out as

8  Satoshi -- is that accurate?

9     A    Yes.

10    Q    -- says, "I agree completely"?

11    A    Yes.

12    Q    Okay.  Do you remember receiving an email

13  from Stefan Matthews telling you that there was no

14  indication Craig would default until a minute

15  before, and that they are checking their public

16  position and so should you?

17           MR. KASS:  Object to form.

18    A    No, I don't recall.

19    Q    Did you ever have any conversations with

20  any of the money men or Craig about why this

21  default happened?

22           MR. KASS:  Object to form.

23    A    No.

24           (Exhibit 31 marked for

25           identification.)



CONFIDENTIAL

Page 153

1    Q    I'm handing you what's been marked as

2   Plaintiffs' Exhibit 31.  It's Gavin 41.

3              Do you recognize this email?

4    A    Yes.

5    Q    It's an apology email from Craig Wright

6   to you?

7    A    Yes.

8    Q    Sent May 7, 2016?

9    A    Yes.

10    Q    And in the third paragraph down, it

11   says -- Craig tells you, "At no point did I lie to

12   you nor deceive you, but it is better that I am a

13   hoaxer"?

14    A    Yes, I see that he said that.

15    Q    Do you believe that?

16    A    No.

17    Q    What do you really believe?

18    A    He certainly deceived me about what kind

19   of blog post he was going to publish, and that

20   gobbledygook proof that he published was certainly

21   deception, if not an outright lie.  So at the very

22   least, that, I consider, you know, that -- he

23   bamboozled me there.

24    Q    And had you known -- strike that.

25              As I understand your testimony, you



CONFIDENTIAL

Page 154

1  went into the proof session as kind of one element

2  of due diligence, but expecting there to be a real

3  public proof posted afterwards; is that fair?

4          MR. KASS:  Object to form.

5      A    Yes.

6      Q    And so you were maybe less than careful

7  -- strike that.

8          In reliance on what you knew would be

9  coming out, or what you assumed would be coming out

10  based on his word, you weren't as diligent as you

11  might have been otherwise in checking that the

12  proof was truly proof --

13          MR. KASS:  Object to form.

14      Q    -- is that fair?

15          MR. KASS:  Object to form.

16      A    Yes.

17      Q    And if you were to do it again today, you

18  might require much more stringent circumstances for

19  that proof?

20          MR. KASS:  Object to form.

21      A    Yes.

22      Q    So he almost socially engineered you in a

23  way?

24          MR. KASS:  Object to form.

25      Q    Social hacking?



CONFIDENTIAL

Page 155

1           MR. KASS:  Object to form.

2      A    I don't think I would use that term.

3      Q    How would you describe it?

4      A    Maybe -- maybe that's accurate.  I mean,

5  he certainly misled me.  He -- he -- he wanted

6  something from me, and he wasn't clear about what

7  he actually wanted from me.  He -- he led me to

8  believe he wanted one thing when I -- I suspect he

9  wanted something else.  I'm not sure what that

10  other thing...

11      Q    Well, I mean, you carried a lot of

12  credibility, you still do, within the Bitcoin

13  community; is that fair?

14           MR. KASS:  Object to form.

15      A    That's -- yes, that's fair.

16      Q    And your endorsement of him as Satoshi

17  would -- would carry a significant amount of

18  weight?

19      A    Yes.  I definitely --

20           MR. KASS:  Object to the form, but,

21  yeah.

22           THE WITNESS:  Sorry.

23           MR. KASS:  That's okay.

24      A    I definitely knew he wanted that from me.

25  But I guess, you know, now, looking back on it, I



CONFIDENTIAL

Page 156

1    wonder, you know, was he also trying to impress the

2    money men, was that part of what he was trying to

3    get out of it?  And I don't know.

4        Q    That he could bring -- bring down --

5    bring over Gavin Andresen onto his side?

6              MR. KASS:  Object to form.

7        A    Right.  That that would, you know, maybe

8    help him with his relationship with -- with the

9    money men.

10       Q    At the time, and you tell me if this is a

11   fair characterization, you were probably -- if not

12   the -- one of the most prominent members of the

13   Bitcoin community?

14             MR. KASS:  Object to form.

15       A    Yes.

16       Q    You were lead core developer?

17       A    Was I still at that time?  I think I had

18   stepped away from that role, and I was just chief

19   scientist at the Bitcoin Foundation.

20       Q    I think you stepped down after, but I

21   could be misremembering the time frame.

22             MR. KASS:  Object to form.

23       Q    You were certainly chief scientist of the

24   Bitcoin Foundation?

25       A    Yes.



CONFIDENTIAL

Page 157

1     Q    And you had been -- you were, and are,

2   the person Craig -- Satoshi Nakamoto had handed

3   over control of Bitcoin to?

4     A    Yes.

5     Q    You were the best replacement to Satoshi

6   the world had at the moment?

7               MR. KASS:  Object to form.

8     Q    You don't have to agree with that

9   statement.  I mean, strike that.

10    A    I sure was the best.

11    Q    So you certainly brought objective value

12  -- your endorsement certainly brought objective

13  value; is that fair?

14    A    Yes.

15    Q    And do you think that's what he wanted

16  from you?

17              MR. KASS:  Object to form.

18    A    Yes.

19    Q    And what did he lead you to believe that

20  he really wanted from you?

21              MR. KASS:  Object to form.

22    Q    You said that he -- he led you to believe

23  he wanted one thing from you, and really you

24  thought he really wanted something else.

25    A    I suspect -- yeah, I mean, I guess, you



CONFIDENTIAL

Page 158

1    know, I -- I thought that my piece would be part of

2    a larger whole of him proving beyond a reasonable

3    doubt to the world that he was Satoshi Nakamoto.

4    And I thought that that's what he wanted from me.

5                    And then he did not complete the rest

6    of the puzzle, and so that makes me wonder, is that

7    really what he wanted from me, or did he have some

8    other ulterior motive for flying me to London and

9    -- and doing this -- the proof session?  And I

10   don't know what that other motive would be.

11        Q    Did you ever -- did you ever talk to

12   Ira Kleiman?

13        A    I believe I've received email from

14   Ira Kleiman, but I don't believe I've ever spoken

15   to him.

16        Q    Did you ever -- beyond the emails that

17   we've reviewed from Uyen Nguyen to you with

18   Ian Grigg on them, have you heard from Uyen Nguyen

19   since?

20        A    I don't believe so.  There might have

21   been another -- she might have reached --

22   she/he/them?  Them.  I'll use them.  They might

23   have reached out to me again.  I seem to recall two

24   sets of emails separated in time, but I have no

25   idea when.



CONFIDENTIAL

Page 159

1       Q    Have you spoken with Craig Wright or

2    emailed with Craig Wright in the past year?

3       A    I'd have to go back and check my email.

4    I'm not sure when my last -- when he last contacted

5    me via email was.

6       Q    Have you --

7       A    It might have been more than a year.

8       Q    Have you responded to him within the past

9    year?

10      A    I don't believe I've responded to him in

11   the past year, no.

12      Q    Have you spoken with any of his

13   attorneys?

14      A    No.

15              THE WITNESS:  Oh, wait.  Are you...

16              MR. KASS:  Well, yes.

17      A    Okay.

18      Q    Before today.

19      A    Before today.

20              MR. KASS:  I don't think you got a

21   good answer to your question.

22      Q    Have you spoken with any of Craig

23   Wright's attorneys before today?

24      A    No.

25      Q    Thank you.



CONFIDENTIAL

Page 160

1                    (Exhibit 32 marked for

2                    identification.)

3        Q    I am handing you what's been marked as

4    Plaintiffs' Exhibit 32, and it's Bates-labeled

5    1512.

6                    Do you recognize this email?

7        A    Yes.

8        Q    And is it a email from Craig to you?

9        A    Yes.

10                   (Exhibit 33 marked for

11                   identification.)

12       Q    I am handing you an e -- a document

13   labeled Plaintiffs' Exhibit 33.  It is

14   Bates-labeled Gavin 344.

15                   Do you recognize this email?

16       A    Yes.

17       Q    And is it a email from Craig to you?

18       A    Yes.  I think so.  It's a different email

19   address, craig@rcjbr.org, but I believe it's from

20   Craig to me.

21                   MR. KASS:  And, also, object to form.

22   There's two emails in here.

23       Q    Okay.  Is this an email chain between you

24   and Craig where Craig is forwarding you an email?

25       A    Yes.



CONFIDENTIAL

Page 161

```
 1        Q    And it appears Craig has forwarded you an
 2    email that he received from the Australian Tax
 3    Office; is that accurate?
 4        A    Yes.
 5        Q    And in it he says to you, "They left the
 6    audit open"?
 7        A    Yes.
 8        Q    And he says, "High-wealth individuals are
 9    taxed differently.  As I have over 100 million,
10    they can assess Bitcoin as a ForEx bank holding."
11             Do you see that?
12        A    Yes.
13        Q    So Craig did, at some point, tell you
14    about his net worth --
15             MR. KASS:  Object to form.
16        Q    -- is that an accurate statement?
17        A    Sure.  I mean, this email claims to have
18    over a hundred million somethings.
19        Q    He says he has over a hundred million.
20    Well, it can't be Bitcoin.
21             MR. KASS:  Object to form.
22        A    Correct, it could not be Bitcoin.  There
23    are only -- there are fewer than 21 million
24    Bitcoin.
25        Q    Okay.
```



CONFIDENTIAL

Page 162

```
 1                 (Exhibit 34 marked for

 2                 identification.)

 3      Q     Did you ever ask him how he got a

 4   hundred -- over a hundred million dollars in net

 5   worth?

 6                 MR. KASS:  Object to form.

 7      A     No.

 8      Q     I'm handing you what's been marked as

 9   Plaintiffs' Exhibit 34, it's Gavin 732.

10                 Do you recognize this email?

11      A     Yes.

12      Q     Also from Craig Wright to you?

13      A     Yes.

14      Q     And this has below it -- it's a chain,

15   actually, between you and Craig, right?

16                 MR. KASS:  Object to form.

17      A     Yes.

18      Q     And he says in the original email to you,

19   "I am sorry for last year, but I cannot sign."

20                 You see that?

21      A     Yes.

22      Q     And then you insert in line in response,

23   Okay.  Don't worry about me.  I'm enjoying

24   semi-retirement.  All the people I care about still

25   love and respect me and don't care that you
```



CONFIDENTIAL

Page 163

1   bamboozled me, and you did, just not in the way

2   most people think.

3                MR. KASS:  Object to form.

4        Q    What did you mean by that?

5        A    I meant that he bamboozled me about the

6   gobbledygook proof, but I still think it's most

7   likely that he did not bamboozle me during the

8   signing ceremony.

9        Q    And he really does have possession of the

10  private key to block 9?

11       A    I still think it's more likely than not

12  that he does.

13               MR. KASS:  Object to form.

14       Q    And then he says, "I have sufficient

15  funds that they can force me to sell."

16               Do you see that?

17       A    Yes.

18       Q    And you say, "I am not" -- "I am not sure

19  I want to know, but who is "they"?  You can be

20  vague: former business partner?  Australian

21  government?  Somebody else?  And sell to pay what?"

22               Right?

23       A    Yes.

24       Q    And he tells you, "They is part a few

25  people, not all, in the tax office"?



CONFIDENTIAL

Page 164

```
 1              MR. KASS:  Object to the form.
 2       Q    You see that?  If you jump back up to the
 3  top of the email.
 4       A    "They is part a few people, not all."
 5  Yes, I see that.
 6       Q    And did you take this to mean that there
 7  were people not in the tax office that was trying
 8  to force him to sell?
 9              MR. KASS:  Object to the form.
10       A    Yes.
11              MR. KASS:  Vel, with regards to the
12  time, I have a proposal.
13              MR. FREEDMAN:  Let's deal with it at
14  lunch.
15              MR. KASS:  No, no, but I just want to
16  see if we get this on the record.
17              Why don't we ask the witness how long
18  he can stay today, and then we just divide it?
19              MR. FREEDMAN:  No.
20              MR. KASS:  What do you mean "No"?
21              MR. FREEDMAN:  I mean no.  I'm gonna
22  finish.  I'm almost finished, but I'm gonna finish,
23  and then you can have the rest of the time and --
24              MR. KASS:  Right.  So then I'll have
25  seven hours after that.  But I want to make sure
```



CONFIDENTIAL

Page 165

1    the witness is able to stay, because, if not, I may

2    have to get relief.  So --

3                    MR. FREEDMAN:  You can ask for

4    relief.

5                    MR. KASS:  Well, I'm gonna ask the

6    witness right now how long he can stay today.

7                    Mr. Andresen, how long are you able

8    to stay today?

9                    THE WITNESS:  Let me check my

10   calendar.

11                   MR. KASS:  Okay.

12                   (Pause.)

13                   THE WITNESS:  I can stay till 6:00.

14                   MR. KASS:  Until 6:00.  Okay.

15                   And then just one other question.

16                   MR. FREEDMAN:  Zalman?

17                   MR. KASS:  What?  One other quick

18   question.  I just want to -- I just want to

19   under --

20                   MR. FREEDMAN:  One last question.

21                   MR. KASS:  That's all I'm asking.

22                   MR. FREEDMAN:  All right.

23                   MR. KASS:  Okay.  Would you be -- if

24   necessary, would you be able to come back tomorrow

25   to continue the deposition?



CONFIDENTIAL

Page 166

1              THE WITNESS:  I have -- I'm giving a

2    lecture in the afternoon, but I believe I'm free

3    tomorrow morning.

4              MR. KASS:  Okay.

5              THE WITNESS:  Let me double check.

6              MR. KASS:  Yeah, could you just check

7    what your schedule is like tomorrow morning?

8              MR. FREEDMAN:  Check by lunch.

9              THE WITNESS:  I'm supposed to have a

10   workout from 9:00 to 10:00 a.m., and then my

11   lecture is at 2:30 in the afternoon.

12             MR. KASS:  Okay.  So 2:30.  And you

13   would be willing to come back?

14             THE WITNESS:  Yes.

15             MR. KASS:  Okay.  Back to you, Vel.

16   I just wanted to make sure the witness was...

17             (Exhibit 35 marked for

18             identification.)

19   BY MR. FREEDMAN:

20        Q    Okay.  I am handing you what's been

21   marked as Plaintiffs' Exhibit 35 and Bates-labeled

22   Gavin 1274.

23             Do you recognize that email?

24        A    Yes.

25        Q    That's an email from Craig to you?



CONFIDENTIAL

Page 167

1       A    Yes.

2       Q    And in it Craig says he has -- "I have

3    sufficient funds that they can force me to sell.

4    Signing proves control."

5                See that?

6       A    Yes.

7       Q    Did you ever find out how much sufficient

8    funds would be?

9       A    No.

10      Q    But then he says, "Right now it would

11   mean dumping 400 million in coin to pay.  I will

12   not do that."

13               Do you see that?

14      A    Yes.

15      Q    Did you take this to mean that Craig was

16   telling you he had over $400 million in Bitcoin?

17               MR. KASS:  Object to form.

18      A    Yes.

19      Q    Does that strike you as odd?

20      A    No.  If he's Satoshi, that would not be

21   an unreasonable amount.

22      Q    Okay.  Then he says, "I will not do

23   that."

24      A    Yep.

25      Q    Did you ask him why he didn't say "I



CONFIDENTIAL

Page 168

1    cannot do that" if he was having a problem with the

2    trust allowing him to move coins?

3          A    I don't recall pressing him on that.

4          Q    Do you know what he meant by "signing

5    proves control"?

6          A    Sure.  If you create a message signed

7    with a private key, it -- it -- it proves that you

8    have control of that key, that you own that key,

9    that you have access to that key.

10         Q    Unless there's a mysterious trust that

11   prevents you from using it.

12                   MR. KASS:  Object to the form.

13                   (Exhibit 36 marked for

14                   identification.)

15         Q    I'm handing you what's marked as

16   Plaintiffs' Exhibit 36, Bates-labeled Gavin 1439.

17                   Do you recognize this email?

18         A    Yes.

19         Q    And it reflects an exchange between you

20   and Craig.  I believe this is, again, another --

21   another instance where you've inserted your

22   comments into his below, right?

23         A    Yes.

24         Q    And he's saying, "I would need to pay tax

25   in fiat on the gains at a rate of 51 percent."



CONFIDENTIAL

Page 169

1          You say that's nasty.  It's a lot --

2    lot of tax.  But then you say, My advice would be

3    to pay it and move on.  What is the use of being

4    wealthy if you have to spend your time talking to

5    lawyers or worrying about what your family will do

6    if you die and leave them with a gazillion BTC and

7    a big financial mess to clean up?

8          What -- what was his response to the

9    suggestion that he just pay the tax and move on?

10     A    I don't recall.  I'm not sure I received

11   any response.

12          THE VIDEOGRAPHER:  We're at the

13   half-hour point.  I don't know if it matters

14   anymore, but --

15          MR. KASS:  So, Vel, I just want -- do

16   I have an agreement with you to stay until 6:00

17   today or tomorrow morning, if necessary, to

18   complete my deposition?

19          MR. FREEDMAN:  We'll talk about it on

20   the break.

21          (Exhibit 37 marked for

22          identification.)

23   BY MR. FREEDMAN:

24     Q    I'm handing you what's marked as

25   Exhibit 37, which is Gavin 869.



CONFIDENTIAL

Page 170

1              MR. KASS:  I suggest we should take a

2      break after this 'cause it's the half point.  So

3      ask your questions, but then I'm gonna go off.

4      BY MR. FREEDMAN:

5          Q     Do you recognize this email?

6          A     Yes.

7          Q     This is an email from Craig Wright to

8      you?

9          A     Yes.

10          Q     And here he's sig -- he's sig -- he's

11      telling you that he is an individual with over a

12      hundred million dollars in net worth -- wealth?

13              MR. KASS:  Object to form.

14          A     Over a hundred million net wealth.  I'm

15      not sure -- yes.

16          Q     He says --

17          A     Yes.

18          Q     -- "That was the point of the trust, but

19      it means that I cannot have control"?

20          A     Yes.

21          Q     And then if you look at the second to

22      last and last lines of the typed email, do you see

23      where he says, "A forced sale of 400 million in BTC

24      would be a mess, especially mine"?

25          A     Yes.



CONFIDENTIAL

Page 171

```
 1      Q    Do you take this to say Craig is telling
 2   you that he has at least 400 million BTC to sell?
 3              MR. KASS:  Object to form.
 4      A    Yes.
 5      Q    And at a rate of 51 percent, that means
 6   he has over 800 million?
 7              MR. KASS:  Object to form.
 8      A    I'm not sure where you're getting
 9   51 percent.
10      Q    On the previous email, we saw the -- the
11   tax amount would be 51 percent, right?
12      A    Yeah, but he would need to pay 51 percent
13   of the $400 million sale is what I would understand
14   the tax.
15      Q    So the total amount being 400 million?
16      A    I think, yeah.
17      Q    And he says, "400 million is too much"?
18      A    Yes.
19      Q    "I am Antiguan now...  So in a few years
20   I will pay a lot less"?
21      A    Yes.
22      Q    Did you ever follow up on this, where the
23   money was, where the Bitcoin was?
24      A    No.
25      Q    Did he ever tell you more about this?
```



Page 172

```
 1        A     No.

 2               MR. KASS:  Okay, Vel, let's go off

 3    the record.

 4               (Exhibit 38 marked for

 5               identification.)

 6        Q     I'm handing you what's been marked --

 7               MR. KASS:  Vel --

 8        Q     -- as Plaintiffs' --

 9               MR. FREEDMAN:  We're not going off

10    the record, Zalman.

11               MR. KASS:  You're running out of

12    tape.

13               THE VIDEOGRAPHER:  I need to switch

14    disks in about 4 minutes.

15               MR. FREEDMAN:  Perfect.

16    BY MR. FREEDMAN:

17        Q     I'm handing you what's been marked as

18    Plaintiffs' Exhibit 38, which is Bates-labeled

19    Gavin 1974.

20               Do you recognize this email?

21        A     Yes.

22        Q     And is this an email from Craig to you?

23        A     Yes.

24        Q     And do you see at the bottom he says, "I

25    am a fraud, but I am a fraud that is free to work
```



CONFIDENTIAL

Page 173

1    on what I need to do"?

2         A    Yes.

3         Q    How -- what did you take that to mean?

4         A    I don't think I know.

5         Q    Did you ever follow up on it with him?

6         A    Not that I recall, no.

7              MR. FREEDMAN:  Why don't we stop now.

8              THE VIDEOGRAPHER:  Okay.  The time

9    now is 1:19 p.m.  We've come to the end of Media

10   Unit No. 2.  We're now off the record.

11             (Off record.)

12             (Lunch recess taken from 1:19 p.m. to

13             2:23 p.m.)

14             THE VIDEOGRAPHER:  The time now is

15   2:23 p.m.  We're coming back on the record.  Now

16   beginning Media Unit No. 3 at deposition with Gavin

17   Andresen.  We're on the record.

18             MR. KASS:  Vel, I just wanted to

19   really quickly get on the record where we are with

20   the cross-noticing and the continuation of

21   Mr. Andresen's deposition.

22             We've agreed that we can go until

23   6:00 p.m. tonight.  It's my position that we should

24   continue tomorrow as the witness is available.

25             My understanding is I don't have a



CONFIDENTIAL

Page 174

1  firm commitment from you, but that you're open to

2  the idea, maybe if you want to just put your --

3  your position on the record.

4        MR. FREEDMAN:  Position is you don't

5  have a valid subpoena, since you didn't notice the

6  deposition in time under the local rules; but that

7  we're trying to accommodate you, nonetheless, and

8  Mr. Andresen, so he doesn't have to come back.  And

9  I will let you know who and if we can cover the

10  deposition tomorrow morning once I can finish this

11  and get into my calendar and make some calls.

12        MR. KASS:  Okay.  My position is

13  that -- I'll make this really quick -- that it

14  wasn't invalid; you were here anyways; that you

15  didn't need any additional notice under; it.  You

16  didn't object until now; so if there was any

17  objection, you've waived it by now.

18        Now let's get on with the depo.

19        MR. FREEDMAN:  Okay.

20  BY MR. FREEDMAN:

21    Q   Mr. Andresen, before we get back into the

22  documents, I want to just talk a little bit more

23  broadly about Bitcoin for a second.  Is that okay?

24    A   Sure.

25    Q   So can Bitcoin function without miners?



CONFIDENTIAL

Page 175

1        A     No.

2        Q     So it -- it needs someone to actively

3    mine in order to function?

4        A     Yes.

5        Q     And in the beginning of Bitcoin's life,

6    is it fair to say that Satoshi was one of the only

7    active miners?

8               MR. KASS:  Object to form.

9        A     We assumed that -- yes, we assumed that

10   he was the first miner.  Well, we know that he

11   created the -- the very first genesis block, and

12   it's fair to assume that he might have been the

13   only miner for a while.

14       Q     And thereby -- and, therefore, through

15   launching the system -- strike that.

16               And -- and mining Bitcoin was,

17   therefore, integral to the creation and sustaining

18   of this new creation; is that a fair statement?

19               MR. KASS:  Object to form.

20       A     Yes.

21               (Exhibit 39 marked for

22               identification.)

23       Q     I am going to hand you what's been marked

24   as Plaintiffs' Exhibit 39, and it is Bates-labeled

25   Gavin 1075.



CONFIDENTIAL

Page 176

1              Do you recognize this email?

2      A    Yes.

3      Q    And it's an email from you to Craig?

4      A    Yes.

5      Q    And on the -- in it you say that you are

6  not angry at him?

7      A    Yes.

8      Q    Is that true?

9      A    Yeah, I don't think I was angry.  I was

10 disappointed, but I wasn't angry.

11     Q    Are you angry at him now?

12     A    I tend not to get angry, so I wouldn't

13 say I'm angry.

14     Q    Still just disappointed?

15     A    Still just disappointed, yeah.

16     Q    And then you say, "If you ever need or

17 want to talk, I'll be happy to listen"?

18     A    Yes.

19     Q    Did he ever take you up on that?

20     A    No, not really.  I mean, he did send me

21 some emails after this, but it was -- and I think

22 they're all in the -- in the record.  But we

23 certainly never had a phone conversation or

24 anything.

25     Q    Is it -- is it fair to say that every



CONFIDENTIAL

Page 177

1   email that you've produced to us is an accurate

2   representation of the email you received?

3                 MR. KASS:  Object to form.

4        A    Yes.

5                 (Exhibit 71 marked for

6                 identification.)

7        Q    I'm gonna hand you what's been marked as

8   Plaintiffs' Exhibit 40, which is Bates-labeled

9   Gavin 1334.

10                Do you recognize this email chain?

11  Just to help you out, I think it's a continuation

12  of that original chain you received from Uyen about

13  the trusts.

14       A    Yes.

15       Q    But I have a particular question -- so do

16  you recognize this chain now?

17       A    Yes.

18       Q    I have a particular question about the

19  May 4th email from Uyen to you.  She says, "You

20  deserve the truth.  Do not share."

21                And then you say, "I will not share,

22  I will destroy."

23                What did she -- did she attach

24  something to that email?

25       A    She did.



CONFIDENTIAL

Page 178

1      Q    What did she attach?

2      A    I think it was a document related to the

3   Tulip Trust.

4      Q    Okay.

5      A    But I did destroy it.  So I read it once

6   and then destroyed it, and I have little

7   recollection of what it -- what the details of it

8   were.

9      Q    Was it an actual trust document?

10               MR. KASS:  Object to form.

11     A    I don't know.

12     Q    Do you think you would recognize it if

13   you saw it?

14     A    No.

15     Q    Do you remember anything about its

16   contents?

17     A    No.

18     Q    Do you remember if it talked about who

19   owned or controlled Bitcoin at all?

20     A    No.

21               (Exhibit 41 marked for

22               identification.)

23     Q    I am handing you Plaintiffs' Exhibit 41.

24   And I have neglected to print out the version with

25   the Bates label, and I can't tell you which it is,



CONFIDENTIAL

Page 179

1    unfortunately.  Exhibit -- Plaintiffs' Exhibit 41.

2              Mr. Andresen, do you recognize this

3    email chain?

4         A    Yes.

5         Q    And it's a -- an email from Stefan

6    Matthews, a/k/a the money man, to you; is that

7    correct --

8              MR. KASS:  Object to form.

9         Q    -- with a chain back and forth below

10   that?

11        A    Yes.

12        Q    And in it Stefan Matthews says to you --

13   and I asked you about this email earlier, but you

14   said you didn't recall it -- "The situation that

15   unfolded this week was horrific.  I will say no

16   more other than to say till one minute prior to

17   Craig's actions there was no indication that he

18   would default.  You have a public position on this

19   that you will need to correct for sure.  And we are

20   looking at our business position today."

21             And then at the end it says, "CSW

22   defaulted for reasons unknown to us at this stage,

23   other than the conversation we had yesterday."

24             Do you see that?

25        A    Yes.



CONFIDENTIAL

Page 180

1        Q    Do you recall that conversation?

2        A    No.

3             MR. KASS:  Object to form.

4        A    I believe he's referring to, perhaps, an

5   email that -- exchange we had the previous day, but

6   I'm not positive about that.

7        Q    And what -- do you remember what that

8   email exchange was about?

9        A    I think that was the email exchange where

10  I put forward the two possibilities of maybe Craig

11  had been conning people for years, or maybe he just

12  couldn't handle the pressure.

13       Q    Got it.

14             (Exhibit 42 marked for

15             identification.)

16       Q    All right.  I'm handing you what's been

17  marked as Plaintiffs' Exhibit 42.  Again, I did not

18  print out the Bates labels.

19             Do you recognize this email?

20       A    Yes.

21       Q    This is an email from Craig Wright to you

22  and Roger Ver; is that right?

23       A    Yes.

24       Q    In mid 2018?

25       A    Yes.



CONFIDENTIAL

Page 181

1       Q    It starts, "I have solved Blacknet"?

2       A    Yes.

3       Q    Do you know what that means?

4       A    No clue.

5       Q    He then says, "Atlas has alread" -- I'm

6    assuming that's "already" -- "shrugged."

7            Do you see that?

8       A    Yes.

9       Q    Do you know what he means there?

10      A    I'm assuming he's referring to the

11   Ayn Rand novel "Atlas Shrugged."  But, yeah, no, I

12   don't know what he's referring to.

13      Q    Okay.  Did you respond to this?

14      A    No, I did not.

15      Q    Did you talk to Roger about it?

16      A    No, I didn't.

17      Q    You just ignore it?

18      A    I believe I ignored it.  I know you

19   maybe -- you have an email where I responded.

20      Q    Whatever you recall.

21      A    But I don't recall --

22      Q    I'm not --

23      A    -- responding to it.

24      Q    -- setting you up for any traps.  I'm

25   just --



CONFIDENTIAL

Page 182

1        A     Okay.

2        Q     -- asking your recollection.

3        A     No, I -- I -- and it is a very cryptic

4    email, and I don't recall thinking anything other

5    than maybe Craig Wright is crazy.

6                     (Exhibit 43 marked for

7                     identification.)

8        Q     I am handing you what's been marked as

9    Plaintiffs' Exhibit 43 Bates-labeled 1482.

10                    Do you recognize this email?

11       A     Yes.

12       Q     It's an email from Craig to you?

13       A     Yes.

14       Q     In May of 2017?

15       A     Yes.

16       Q     He says, "The trust is all cleaned up

17   now."

18                    You see that?

19       A     I see that.

20       Q     What was unclean about the trust before?

21             MR. KASS:  Object to form.

22       A     I don't know.

23       Q     Did you ever ask him?

24       A     No.

25       Q     Did you ever get information -- any



CONFIDENTIAL

Page 183

1   information from Craig about the trust after this

2   email that you can recall?

3       A    Not that I recall, no.

4       Q    Has anyone else, beyond Craig, told you

5   about his relationship with Dave Kleiman?

6       A    Possibly Ian Grigg, but I'm not sure

7   about that -- oh, and perhaps one of the money men.

8   Yeah, and, again, I'm not sure about that.  I'm not

9   sure who told me what.

10      Q    So you said you thought that maybe Craig

11  Wright is a crazy person.  Have you given any more

12  thought to that since that email, and where do you

13  come out?

14              MR. KASS:  Object to form.

15      A    Yeah, I've wondered if maybe Craig is

16  paranoid; that he might have, you know, the -- the

17  psychological condition of paranoia.  I'm not a

18  psychologist, but it -- it seems like it would fit

19  some of the -- the behavior I've -- I've seen from

20  Craig.

21      Q    Are you aware that in this lawsuit the

22  Court has found that Craig committed perjury under

23  oath?

24              MR. KASS:  Object to form.

25      A    No, I am not aware of that.



CONFIDENTIAL

Page 184

1     Q   And are you aware that the Court has also

2  found he submitted forged documents to the Court?

3           MR. KASS:  Object to form.

4     A   I think I did see media reports about

5  that.

6     Q   That change your opinion of him at all?

7     A   No, I don't think it does.

8     Q   Why?

9     A   Because I think even before that, you

10  know, once he bamboozled me about what he was going

11  to come out with when we were supposed to have

12  these simultaneous blog posts where he announced

13  himself to the world, you know, I realized he -- he

14  was lying at least about that, and so -- and -- and

15  I think in some of our conversations he had said he

16  had lied about things in the past.  He had maybe

17  done things to muddy up the record.  He didn't go

18  into any specifics.  So, you know, I think even

19  before then I got the impression, you know, he's a

20  person who's not a hundred percent honest all the

21  time.  So it -- it didn't really change.

22     Q   Were there times that he struck you as

23  honest and others that he struck you as dishonest,

24  or you were unable to tell when you were speaking

25  with him?



CONFIDENTIAL

Page 185

1        A    I don't --

2              MR. KASS:  Object to form.

3        A    I don't think I am able to tell.

4        Q    Okay.

5              MR. FREEDMAN:  Let's take a

6    two-minute break, and I think I'm done, but I just

7    want to circle back with my notes, and we'll finish

8    up our -- our deposition.  Thank you.

9              THE VIDEOGRAPHER:  The time is

10   2:37 p.m.  We are off the record.

11             (Off record.)

12             THE VIDEOGRAPHER:  The time now is

13   2:50 p.m.  We're coming back on the record.

14             MR. FREEDMAN:  Oh, wait.  Hold on.

15   Sorry.  Go back off.

16             (Off record.)

17             MR. FREEDMAN:  All right.  We've got

18   an official conference line, so I hope that's

19   better for anyone who's on the line.

20             Are we still on the record?

21             THE VIDEOGRAPHER:  Yes.

22             MR. FREEDMAN:  Still on the record.

23   Okay.

24   BY MR. FREEDMAN:

25        Q    I just want to go back to the



CONFIDENTIAL

Page 186

1    conversations you had with Craig and request

2    whether or not you had -- recall -- strike that.

3                    Do you recall in any of your

4    conversations with Craig Wright him referring to

5    Dave Kleiman as his partner?

6                    MR. KASS:  Object to form.

7         A    I don't recall.

8         Q    It's possible he did?

9                    MR. KASS:  Object to form.

10        A    It's possible.

11        Q    Beyond the time that he got emotional

12   about Dave Kleiman, do you remember any other

13   reference to Dave Kleiman?

14                   MR. KASS:  Object.

15        A    I don't recall.

16        Q    When he told you about the three people

17   behind Satoshi, was that the same time he got

18   emotional about Dave?

19                   MR. KASS:  Object to form.

20        A    I think so, but I'm not certain.

21        Q    And do you recall -- can you do your best

22   to tell me the words you recall him using when he

23   -- when he told you that?

24                   MR. KASS:  Object to form.

25        A    No, I'm sorry, I don't think I can.



CONFIDENTIAL

Page 187

1      Q    The -- did he -- do you recall Craig ever

2    mentioning the Tulip Trust to you?

3      A    I think he did say the words "Tulip

4    Trust," although it might have been one of the

5    money men who mentioned a Tulip Trust.  Again, my

6    recollection is very fuzzy, so...

7              MR. FREEDMAN:  All right.  No further

8    questions.

9              EXAMINATION

10   BY MR. KASS:

11     Q    Well, Mr. Andresen, my name is Zalman

12   Kass, I represent Dr. Craig Wright.

13              The previous instructions that you

14   received from Mr. Freedman, ask if you don't

15   understand any questions or if you need a

16   clarification, if you need a break, just let me

17   know, those will still apply.

18              Do you recall opposing counsel asking

19   whether sometimes Dr. Wright lied?

20     A    Yes.

21     Q    And your response was you believe he --

22   he did lie in the past, correct?

23     A    Yes.

24     Q    Now, to the extent Dr. Wright told you

25   anything about Dave Kleiman, could he have been



CONFIDENTIAL

Page 188

 1   lying?

 2        A    Yes.

 3             (Pause.)

 4             MR. FREEDMAN:  Objection to form.

 5        Q    Mr. Andresen, did you do anything to

 6   prepare for today's deposition?

 7        A    The only thing I did to prepare was this

 8   morning I did go back and look at that Reddit

 9   private message thread, just to refresh my memory a

10   little bit about what might have -- what happened

11   during the so-called proving ceremony in London.

12        Q    Okay.  And do you recall anything else

13   that you did to prepare?

14        A    No, nothing else.

15        Q    All right.  Did you speak to anybody in

16   advance of this deposition related to the

17   deposition?

18        A    I certainly told my wife that I was gonna

19   be at a deposition today --

20        Q    Okay.

21        A    -- but, no.  Other than that, no.

22        Q    All right.  I'm gonna introduce as

23   Exhibit 44 a document.

24             (Exhibit 44 marked for

25             identification.)



CONFIDENTIAL

Page 189

```
1       Q    Can you let me know if you recognize this

2   document?  And take your time to look through it.

3                 (Witness perusing document.)

4       A    Yes, this is the subpoena I received last

5   year.

6       Q    Okay.

7       A    Last year?  I think it was last year.

8   Yeah, last year.

9       Q    And did you produce documents in response

10  to the subpoena?

11      A    Yes, I did.

12      Q    Did you produce all the documents that

13  you had responsive to these requests?

14      A    Yes, I did.

15      Q    And, for example, in Request No. 4, that

16  includes documents related to Craig Wright, Satoshi

17  Nakamoto, or Dave Kleiman?

18      A    Yes.

19      Q    Okay.  So would it be accurate to state

20  that all those documents have already been produced

21  in this case by you --

22      A    Yes.

23      Q    -- that you have in your possession?

24      A    Yes.  As far as I know, yes.

25      Q    And how did you go about ensuring that
```



CONFIDENTIAL

Page 190

1    you found those documents?

2         A    Most of the documents -- well, I mean,

3    there are -- there are -- let me back up.

4              So Craig Wright, Satoshi Nakamoto,

5    and David Kleiman -- Satoshi I only ever

6    communicated via either email or BitcoinTalk

7    private forum messages.

8         Q    Um-hm.

9         A    And so all of those documents -- and the

10   same thing for -- well, besides the in-person

11   meeting with Craig Wright, all of our

12   communications were via email.  And so I -- I

13   performed search over all of my Gmail inbox, like

14   all -- you know, all mail sent, all mail received

15   for Craig Wright, Satoshi Nakamoto, and David

16   Kleiman.  And then I also did some manual searches

17   in BitcoinTalk private messages, and the Reddit

18   private messages I -- I -- I had related to -- to

19   this matter.

20        Q    Okay.  Could we just actually switch

21   exhibits out.  I should have given you the marked

22   one.

23        A    Sure.

24        Q    When did you first learn of Dave

25   Kleiman's existence?



CONFIDENTIAL

Page 191

1      A    I'm not sure.

2      Q    Okay.  Do you know if you learned of Dave

3  Kleiman's existence before you learned of Craig

4  Wright's existence?

5      A    Again, I'm not sure.

6      Q    Okay.  Have you ever communicated with

7  Dave Kleiman?

8      A    Not that I know of.

9      Q    Okay.  Other than conversations that you

10  may have had with Craig Wright or other people on

11  Craig's -- you know, related to Craig's -- Craig

12  Wright, has anybody ever -- else spoken to you

13  about Dave Kleiman?

14      A    I believe Ira Kleiman contacted me.  I'm

15  not sure anybody else has ever spoken to me about

16  Dave Kleiman.

17      Q    Okay.  So would it be fair to say that

18  any information that you have related to Dave

19  Kleiman would either come from Ira, Craig, or

20  somebody close to Craig?

21      A    I mean, there's certain -- there have

22  been reports in -- in media that I've read that --

23  that talk about Dave Kleiman.  So it's, again,

24  possible I've -- I heard about him through some

25  Reddit post or something that appeared in public



CONFIDENTIAL

Page 192

1    media.

2         Q    Other -- if we were to exclude online

3    media or some sort of posting, as far as like

4    one-on-one conversations with somebody, any

5    information would have come from either Craig --

6    Dr. Craig Wright, Ira Kleiman, or someone close to

7    Craig Wright; is that correct?

8         A    Yes.

9         Q    Are you familiar with the term "firsthand

10   knowledge"?

11        A    Vaguely.

12        Q    Okay.  What does it mean to you?

13        A    Firsthand knowledge, it means you

14   actually witnessed something happening; you didn't

15   hear about it from somebody who witnessed a thing

16   happening.

17        Q    Okay.  So we're gonna use that definition

18   going forward.

19        A    Okay.

20        Q    Do you have any firsthand knowledge about

21   a partnership between Dr. Wright and Craig -- I'm

22   sorry -- Dr. Wright and Dave?

23        A    No.

24        Q    Okay.  Do you have any firsthand

25   knowledge about any intellectual property that Dave



CONFIDENTIAL

Page 193

1    Kleiman developed?

2        A    No.

3        Q    Do you have any firsthand knowledge as to

4    any Bitcoin that Dave Kleiman may have mined?

5        A    No.

6        Q    Do you have any firsthand knowledge about

7    a purported theft of Dave Kleiman's Bitcoin?

8        A    No.

9        Q    Do you have any firsthand knowledge about

10   Bitcoin that Dr. Wright may have mined?

11       A    No.

12       Q    Do you have any firsthand knowledge about

13   Dr. Wright's wealth?

14       A    I'm not sure how to -- I certainly have

15   emails, from an email address that I assumed was

16   Craig Wright, talking about his wealth.  Given the

17   definition of firsthand knowledge, I -- that we

18   were discussing --

19       Q    Correct.

20       A    -- I don't know how an email fits into

21   that definition, but that's the only knowledge I

22   have.

23       Q    Okay.  Well, let me ask you, those emails

24   mention large sums, correct?

25       A    Yes.



CONFIDENTIAL

Page 194

```
 1      Q    All right.  I believe there was one about
 2   millions -- million something, correct?
 3      A    Hundreds of millions of somethings, yes.
 4      Q    Somethings, yes.  Okay.  Right.
 5           Now, you haven't -- have you seen any
 6   bank account statements where you could see
 7   hundreds of millions of something?
 8      A    No.
 9      Q    Okay.  So any information -- is it fair
10   to say that any information that you would have
11   about Dave Kleiman's wealth is based on an email
12   that seems to come from Dave Kleiman's email inbox?
13      A    You mean Craig Wright's email?
14      Q    Craig -- yes.  I'm sorry.
15           That seems to come from Craig
16   Wright's email account, correct?
17      A    Yes, correct.
18      Q    All right.  But you haven't verified
19   whether or not -- whether that's accurate?
20      A    Correct, I have not.
21      Q    Okay.  So would it be fair to say that
22   you don't have firsthand knowledge as to whether
23   that wealth, in fact, exists?
24      A    I think that's fair to say, yes.
25      Q    And do you have any firsthand knowledge
```



CONFIDENTIAL

Page 195

1    about whether Dave Kleiman -- Ira Kleiman -- Craig

2    Wright has any trusts?

3         A    No, I don't think I do.

4         Q    Have you seen any trust documents?

5         A    I'm not sure.

6         Q    Okay.  Do you recall having seen any

7    trust documents?

8         A    The only trust document I would have seen

9    might have been that attachment that I said that I

10   destroyed in an email exchange with Uyen Nguyen.

11        Q    But is it accurate to state you don't

12   really recall what -- it could have been a trust

13   document, but you're just not -- you don't recall?

14        A    That's correct, it could have been a

15   trust document, but I don't recall.

16        Q    Okay.  And you weren't a party to setting

17   up of any trusts?

18        A    No, I was not.

19        Q    And do you have any firsthand knowledge

20   of any trusts that Dave Kleiman may have been part

21   of?

22        A    No.

23        Q    Now, I just asked you a whole bunch of

24   questions, whether you had firsthand knowledge

25   about many different subjects, correct?



CONFIDENTIAL

Page 196

1      A    Yes.

2      Q    To the extent you have any knowledge

3  about those -- those subjects that is not firsthand

4  knowledge, what would the source of that knowledge

5  be?  And we can go one by one if that's easier for

6  you.

7      A    I mean, the -- the -- the sources of any

8  of those would be emails from Craig Wright, emails

9  from Uyen Nguyen, emails from the so-called money

10 guys who are part of the -- the London proving

11 session I was part of, and then any court documents

12 or other things that I've seen reported in -- in

13 public media.

14     Q    Okay.  And do you know whether those

15 emails were, in fact, sent by Craig Wright or any

16 of those other parties?

17     A    Do I know for a hundred percent sure?

18 No.  Emails can be forged.

19     Q    Sure.  And they -- they could also be

20 sent from an email address, but the person sending

21 it is not actually the one who typed up the

22 message, right?

23     A    That is possible, yes.

24     Q    At most we know it's from -- would it be

25 fair to say that the most we know, it's from an



CONFIDENTIAL

Page 197

1    email address that is consistent with an email

2    address that we believe those people use?

3         A    Yes.

4         Q    Okay.  Now, you previously testified

5    about a cryptographic proof session in London.  Do

6    you recall that?

7         A    Yes.

8         Q    And that cryptographic proof was related

9    to either block 9 or 10, depending on how you

10   count, correct?

11        A    Yes.

12        Q    Did -- did Dr. Wright show you any

13   cryptographic proofs for any other blocks?

14        A    No.

15        Q    Do you have any knowledge as to whether

16   he has the ability to control any other Bitcoin

17   blocks?

18        A    No.

19        Q    Now, if somebody had access to a Bitcoin

20   private key in the past, does it mean they still

21   have access to a Bitcoin private key?

22        A    No.

23        Q    Is it possible to have access one day and

24   access not the other day?

25        A    Yes, keys can be lost or stolen.



CONFIDENTIAL

Page 198

1       Q    Okay.  Do you recall the date that you

2   had the proof session with Dr. Wright in London?

3       A    That was one of the things I looked at --

4            (Brief interruption.)

5            (Phone connection disconnected.)

6       A    That was one of the things I looked at

7   this morning, and I believe it was April 7th.

8       Q    Okay.  All right.  And do you recall what

9   time of day it was that the actual proof was shown

10  to you?

11      A    I think it was late afternoon.

12      Q    Okay.  So would it be fair to say that,

13  at most, you can know that in the late afternoon of

14  April 7th, Dr. Wright could have had the private

15  key to block 9 or block 10, correct?

16      A    Yeah.  Yes.

17      Q    You don't know if he had the private key

18  prior to that, correct?

19      A    Correct.

20      Q    And you don't know if he had the private

21  key after that?

22      A    Correct.

23      Q    And you don't know if -- when there were

24  those email conversations going back and forth

25  where people made representations on behalf of



CONFIDENTIAL

Page 199

1    Dr. Wright, that he would transfer money from a

2    certain Bitcoin address, you don't know if he still

3    had the key at that point in time?

4         A    Correct.

5         Q    And if he didn't have the key, it

6    wouldn't be a very easy matter to make a transfer,

7    correct?

8         A    It -- it would be impossible.

9         Q    Okay.

10                   (Calling conference line.)

11        Q    And it's -- and it's also possible that

12   Dr. Wright did not, in fact, have the key in the

13   evening of April 7th, 2016, right?

14        A    Correct.

15                   (Reconnecting into conference line.)

16        Q    You testified before that you

17   corresponded with Satoshi in 2010, correct?

18        A    Correct.

19        Q    And what was the nature of your

20   relationship with Satoshi?

21        A    It was very businesslike, very -- you

22   know, one programming geek talking to another

23   programming geek.

24        Q    Okay.  So would it be fair to say that

25   large parts of your conversations were about



CONFIDENTIAL

Page 200

1    programming stuff?

2        A    Yeah, basically all of our conversations

3    were about programming stuff.  My conversations in

4    2010 never really delved into anything personal.

5    Yeah, it was all the bus -- about the business of

6    making the Bitcoin software successful.

7        Q    Okay.  And did Satoshi ever share code

8    with you?

9        A    Did he share -- yes, he did share code

10   with me.

11       Q    And did you ever share code with Satoshi?

12       A    Yes.

13       Q    And did you have conversations with

14   Satoshi about the code?

15       A    Yes.  We had back and forth about how

16   things should be implemented.

17       Q    And would it be accurate to state that

18   you're familiar with Satoshi's programming

19   abilities?

20       A    Yes.

21       Q    And that would be based on the email

22   conversations that you had with Satoshi, correct?

23       A    Yes, and also the -- the -- the code

24   in -- that is in the Bitcoin repository, that

25   open-source software code, that we know was written



CONFIDENTIAL

Page 201

1    by Satoshi.

2         Q    Okay.  I'm going to introduce Exhibit 48.

3              (Exhibit 48 marked for

4              identification.)

5         Q    And, Mr. Andresen, do you recognize this

6    document?

7         A    2010.  Yeah.

8         Q    What -- what -- what do you believe it

9    is?

10        A    Let's see, what were we doing here?

11        Q    Well, I'm fine with the higher level

12   understanding; like, for example, are you talking

13   code with Satoshi?  Let's start, is this an email

14   with Satoshi?

15        A    Yes, this is an email with Satoshi.

16        Q    And are you talking about coding things?

17        A    Yes, we're talking about coding things.

18   I believe this is the new -- yes, this is the new

19   RPC methods for talking to the -- the Bitcoin

20   software and controlling the Bitcoin software.

21        Q    Okay.  Now, I'm going to introduce

22   Exhibit 49.

23              (Exhibit 49 marked for

24              identification.)

25        Q    And do you recognize this document?



CONFIDENTIAL

Page 202

1      A    Yes.

2      Q    And is it an email between you and

3   Satoshi Nakamoto?

4      A    Yes, it is.

5      Q    And are you talking about coding things

6   and programming?

7      A    Yes, we are.

8      Q    Okay.  And I'm going to introduce as

9   Exhibit 45 this document.

10              (Exhibit 45 marked for

11              identification.)

12     Q    And if you look at the prior exhibit that

13  I showed you, which was 49, there is an attachment

14  to it.  Do you have any knowledge as to whether

15  this attachment is what's referred to in that

16  email?

17              (Witness perusing document.)

18     Q    If it does help, the -- the Bates numbers

19  are sequential.

20     A    Yes, I think this is the attachment that

21  would go with that email.

22     Q    Okay.  Thank you.

23              And, again, so not only are you

24  talking about coding stuff in the -- the body of

25  the email, you're actually exchanging code with



CONFIDENTIAL

Page 203

1   Satoshi?

2        A    Yes.

3               (Exhibit 46 marked for

4               identification.)

5        Q    I'm going to introduce Exhibit 46.  And

6   do you recognize this document?

7        A    Yes.

8        Q    And are -- it's a Satoshi email --

9               MR. FREEDMAN:  Zalman, you said 46.

10  It's 51, I think.

11              MR. KASS:  What -- what was I saying,

12  please?

13              THE WITNESS:  This says Exhibit 46.

14              MR. KASS:  46.  I had jumped five by

15  mistake, so I just kind of went back to -- to fill

16  in the numbers I didn't have.  There were two rows

17  of stickies.

18              MR. FREEDMAN:  This is going to

19  become your new trademark, Mr. Kass.

20              MR. KASS:  Are you confused yet?

21  BY MR. KASS:

22       Q    Okay.  Exhibit 46, is this an email

23  between you and Satoshi?

24       A    Yes.

25       Q    And what's -- is this email about coding



CONFIDENTIAL

Page 204

1    and programming things?

2        A    Yes.

3        Q    Okay.

4            (Exhibit 47 marked for

5            identification.)

6        Q    I am introducing Exhibit 47.  And do you

7    recognize this document?

8        A    Yes.

9        Q    Is it an email conversation between you

10   and Satoshi Nakamoto?

11       A    Yes.

12       Q    Are you talking about programming and

13   coding things?

14       A    Yes.

15       Q    All right.

16            (Exhibit 50 marked for

17            identification.)

18       Q    Okay.  I'm going to introduce Exhibit 50.

19   Do you recognize this email?

20       A    Yes.

21       Q    Is this a conversation between you and

22   Satoshi Nakamoto?

23       A    Yes.

24       Q    Is it about coding and programming?

25       A    Yeah.  A particularly annoying one, yes.



CONFIDENTIAL

Page 205

1      Q    I'm just curious, what was particularly

2  annoying about this one?

3      A    Just the -- cleanly shutting down the

4  application took many revisions.  It seems like it

5  should be a very simple thing to do, but it was

6  much more complicated.

7      Q    And did you work with Satoshi on that?

8      A    Yes.

9           (Exhibit 51 marked for

10           identification.)

11     Q    Now, I'm going to introduce Exhibit 51,

12  which is a sequential Bates number from the prior

13  email that I sent to you.  If you could take a peek

14  at it, and let me know if that is an attachment in

15  Exhibit 50.

16     A    Yes, it is.

17     Q    So would it be fair to say that, in

18  addition to speaking about coding in the body of

19  Exhibit 50, you are also sharing code, actual code,

20  with Satoshi?

21     A    Yes.

22     Q    And Satoshi was sharing code with you as

23  kind of back --

24     A    Yes --

25     Q    -- you know, a two-way street?



CONFIDENTIAL

Page 206

1        A     -- we would trade what are called

2     "patches" back and forth.

3                    (Exhibit 52 marked for

4                    identification.)

5        Q     Okay.  I'm going to introduce Exhibit 52.

6     Do you recognize this document?

7        A     Satoshi to me.  Yes.

8        Q     Is it an email between you and Satoshi

9     Nakamoto?

10       A     Yes.

11       Q     Are you talking about programming and

12    coding?

13       A     Yes.

14       Q     Okay.  And -- okay.

15                    (Exhibit 53 marked for

16                    identification.)

17       Q     I'm going to introduce Exhibit 53.  Do

18    you recognize this document?

19       A     Yes.

20       Q     Is it a conversation between you and

21    Satoshi Nakamoto?

22       A     Yes.

23       Q     Is it related to programming and coding?

24       A     Yes.

25       Q     I'm going to introduce Exhibit No. 54.



CONFIDENTIAL

Page 207

```
 1                    (Exhibit 54 marked for

 2                    identification.)

 3        Q    Do you recognize this email?

 4        A    Yes.

 5        Q    Is it an email between you and

 6   Satoshi Nakamoto?

 7        A    Yes.

 8        Q    Is it related to programming and coding?

 9        A    Yes.

10        Q    Okay.

11                    (Exhibit 55 marked for

12                    identification.)

13        Q    I'm going to introduce Exhibit 55.  Do

14   you recognize this document?

15        A    Yes.

16        Q    Is it an email between you and Satoshi

17   Nakamoto?

18        A    Yes.

19        Q    Is it related to programming and coding?

20        A    Yes.  I'm detecting a pattern.

21        Q    Yes.  We're getting to the end of it.

22                    (Exhibit 56 marked for

23                    identification.)

24        Q    I'm introducing Exhibit No. 56.  Do you

25   recognize this document?
```



CONFIDENTIAL

Page 208

1       A     Yes.

2       Q     Is it an email between you and Satoshi

3  Nakamoto?

4       A     Yes.

5       Q     Does it relate to coding -- coding and

6  programming?

7       A     Yes.

8       Q     All right.  Is it -- is it fair to say we

9  just looked at a large number of documents that are

10  communications between you and Satoshi Nakamoto

11  related to programming and coding?

12       A     Yes.

13       Q     As it related to the Bitcoin software?

14       A     Yes.

15       Q     Okay.  And based on all those emails, did

16  you form an opinion as to Satoshi's coding or

17  programming abilities?

18       A     Yes.

19       Q     And how would you describe his

20  programming and coding abilities?

21       A     I would say he's a very good coder,

22  although a little bit old-fashioned.

23       Q     Okay.  I actually have two more exhibits

24  we've got to do.

25                 (Exhibit 57 marked for



CONFIDENTIAL

Page 209

1            identification.)

2     Q    I'm going to introduce Exhibit 57.  Do

3  you recognize this document?

4     A    Yes.

5     Q    Is it an email between you and Satoshi

6  Nakamoto?

7     A    Yes.

8     Q    Does it relate to programming and coding?

9     A    Yes.

10     Q    And, again, I am going to introduce now

11  as Exhibit 58, which is sequentially marked.

12            (Exhibit 58 marked for

13            identification.)

14     Q    And do you recognize this to be the -- do

15  you recognize 58 to be the attachment from

16  Exhibit 57?

17     A    Yes.

18     Q    And what is attached, would you -- would

19  it be fair to say, is coding and programming

20  related?

21     A    Yes.

22     Q    Is it actual code?

23     A    It's actual code.

24     Q    And this is actual code from Satoshi

25  Nakamoto?



CONFIDENTIAL

Page 210

```
 1      A    Yes.
 2      Q    Okay.  Would you consider Satoshi a
 3  brilliant programmer?
 4      A    Definitely a top 10 percent programmer.
 5      Q    All right.  And when you say "top" --
 6  "top 10 percent," is that in the world?  In the US?
 7  I just want to understand a little bit more what
 8  you mean.
 9      A    Among all the programmers that I've
10  interacted with, he's definitely in the top
11  10 percent.  I've known better programmers.  I've
12  known a lot of worse programmers.
13      Q    Sure.  Okay.  And how would you rank
14  yourself in the -- in the hierarchy of programmers?
15      A    I'd say I'm in the top 10 percent also.
16      Q    All right.  So --
17      A    I'm a little slower than most
18  programmers, but I'm -- I think I have fewer bugs.
19      Q    Okay.  So would you consider yourself on
20  equal footing with Satoshi?
21      A    It depends on what we were programming,
22  but, yeah, roughly equal.
23      Q    Okay.
24                  (Exhibit 59 marked for
25                  identification.)
```



CONFIDENTIAL

Page 211

1        Q    I am going to introduce Exhibit 59.

2              Now, I'm gonna ask you to turn to the

3    second page of the exhibit.  And then I'm going to

4    ask you to look at the fifth paragraph from the

5    bottom, and the paragraph starts with "Over."

6        A    Sure.

7        Q    Okay.  And then do you see on the second

8    line it says, "I mean, Satoshi is a brilliant

9    programmer, but he also acts like a lone wolf."

10              And then if you go on a little

11   further, this statement is attributed to you.

12              Do you recall making that statement?

13       A    Yes, I believe I did.

14       Q    Okay.

15       A    I've said similar statements in the past.

16       Q    All right.  So -- and is that an accurate

17   statement?

18       A    Yes.

19       Q    Okay.  So based on your interactions with

20   Satoshi, it's your belief that he was a brilliant

21   programmer?

22       A    Yes.

23       Q    So would it be fair to say that Satoshi

24   would know how to create a simple programmer --

25   program?



CONFIDENTIAL

Page 212

1      A    Yes.

2      Q    And if someone told you that Satoshi

3    needed help creating a simple program, what would

4    your reaction be?

5      A    I would need to know a little bit more.

6    I mean, certainly if it was an unfamiliar

7    programming language or unfamiliar programming

8    environment, then I could imagine needing help.

9    Even I would need help writing Ruby code, for

10   example; I don't know the programming language

11   Ruby.

12     Q    Um-hm.  But if it wasn't an issue of --

13   of languaging, if you -- if -- if Satoshi was able

14   to use whatever code -- programming language he

15   wanted, would you be surprised that he had

16   difficulty creating a simple program?

17     A    Yes, I would be surprised.

18     Q    All right.  And would you be surprised if

19   he would have to reach out to his best friend, who

20   was a programmer, and ask him to create simple

21   programs?

22     A    Yes.

23     Q    What's a -- are you familiar with the

24   term "simple script"?

25     A    "Simple script"?



CONFIDENTIAL

Page 213

1      Q    Yeah.

2      A    No, I don't think so, at least not as

3   a -- not as a term.

4      Q    Okay.  Well, if I were to define a simple

5   script as a series of moderately simple commands,

6   sort of like a macro in Excel --

7      A    Sure.

8      Q    -- would you understand what that is?

9      A    Absolutely, yes.

10      Q    Yeah.  Would you consider that

11   programming?

12      A    It's a kind of programming.

13      Q    Do you believe Satoshi's skills were in

14   excess of writing simple scripts?

15      A    Again, it depends.  I mean, for example,

16   the first version of Bitcoin ran on Windows, and if

17   Satoshi was a Windows programmer that needed to

18   write some UNIX scripts on a server, then I could

19   imagine him reaching out to somebody to help out

20   with -- with that kind of task.  Again, it would be

21   like -- it's -- it's basically a different

22   programming language.

23      Q    Okay.  Well, if somebody were to state

24   that Satoshi only knew how to write simple scripts,

25   as a blanket statement, would that be consistent



CONFIDENTIAL

Page 214

1    with your interactions with Satoshi?

2         A    No.  The Satoshi I was interacting with

3    had a demonstrated ability to produce code.  Or at

4    least, you know, I received code in emails.  I have

5    no firsthand knowledge that the person I was

6    communicating via email actually wrote the code.

7         Q    Okay.

8         A    But I assume that it -- that it was the

9    same person.

10        Q    Well, let me ask you.  In the emails that

11   we've looked at, in the body of the emails, are

12   there discussions about code?

13        A    Yes.

14        Q    Okay.  So based on those -- the messages

15   in the body of the email, would it be accurate to

16   state that this Satoshi, or the person who held

17   himself out as Satoshi that you were speaking with,

18   was a programmer?

19        A    Yes.

20        Q    And a coder?

21        A    Yes.

22        Q    And able to do things more advanced than

23   simple scripts?

24        A    Yes.

25        Q    Okay.  Do you recall testifying earlier



CONFIDENTIAL

Page 215

1    on that somebody reached out to you regarding

2    Craig Wright showing himself as Satoshi, correct?

3         A    Yes.

4         Q    And your initial reaction was skepticism?

5         A    Yes.

6         Q    I believe you said highly skeptical?

7         A    Yes.

8         Q    Okay.  And that was because other people

9    in the past had claimed they were Satoshi?

10        A    Quite a few, yes.

11        Q    Okay.  And, in fact, you said I'm not

12   getting on that plane until I'm -- a plane to

13   London until I'm reasonably certain that Craig

14   Wright is Satoshi?

15        A    Yes.

16        Q    Okay.  And there was an email with four

17   different ways that you could be reasonably certain

18   that you were speaking with Satoshi, correct?

19        A    Yes.

20        Q    All right.  And if you could take a look

21   at Exhibit 4, previously marked.

22        A    (Witness complied.)

23        Q    Now -- all right, if you look at the

24   bottom, it says, "I want to see" and then you have

25   one, two, three, four.  Do you recall if it was



CONFIDENTIAL

Page 216

1    that you wanted to see all four or if one of them

2    was sufficient?

3         A    The more, the better.  The more, the more

4    certain I felt I would be.

5         Q    Okay.  Now, if you look at all of those

6    four options, or at least the first three of them,

7    there's some language in parentheticals.  Do you

8    see that?

9         A    Yes.

10        Q    Okay.  And the first one, where you ask

11   for a PGP key that Satoshi used, what do you --

12   what do you state in parentheticals?

13        A    "But his computer could have been

14   hacked."

15        Q    And what's the import of that?

16        A    The import is that a PGP key can be

17   stolen, and somebody else can use it to impersonate

18   somebody if they have access to that piece of data.

19        Q    All right.  And, therefore, it's not a

20   perfect proof; is that fair?

21        A    That's fair, yeah, it's not a perfect

22   proof.

23        Q    All right.  And then we go down to the

24   second one, which is a message signed with the keys

25   from the early Bitcoin blocks.  And, again, there's



CONFIDENTIAL

Page 217

1   something in parentheticals.  Could you read that?

2        A    "But his wallet could have been stolen."

3        Q    And what's the import of that?

4        A    Again, I mean, the keys are pieces of

5   data.

6        Q    Um-hm.

7        A    The fact that you have a key, it doesn't

8   tell you anything about how you obtained that key,

9   so keys can be stolen.  And so, again, somebody

10  could have stolen those keys and used them to

11  pretend to be the person who actually mined the

12  blocks way back in 2009.

13       Q    Okay.  Now, the third one on that list is

14  an email or private forum post he sent to me in

15  2010.  And, again, you have a parenthetical.

16  What's that parenthetical?

17       A    "But email could have been hacked."

18       Q    And, again, what's the import of that?

19       A    Again, email is just data.  So if you

20  hack into a computer, you could steal somebody's

21  emails and then present them as if they were your

22  own.

23       Q    Okay.  And then there's the fourth one,

24  which is a conversation about technical stuff,

25  ideally via email, so I can see if it feels like



CONFIDENTIAL

Page 218

1   the same person I communicated with in 2010?

2       A    Yes.

3       Q    Is there any parenthetical after that?

4       A    No.

5       Q    All right.  So would it be fair to say,

6   out of those four options, the fourth option would

7   be the most convincing?

8       A    I mean, I -- I'm not sure I would say the

9   most convincing.  I mean, certainly if -- if you

10  could produce the other three, I think they would

11  have more weight.  I think any individual one --

12  yeah, no, I don't think I -- I don't think it's --

13  it's the one that would be most convincing to me.

14              I think the other three, if you could

15  produce them, would be more convincing, just

16  because I don't trust myself to -- to judge

17  whether, you know, two documents are produced by

18  the same person.  That's just not a skill that I

19  feel like, you know, I'm -- I'm super great at.

20      Q    All right.  Well, let me ask you.  For

21  the fourth one, which was this email conversation,

22  you didn't identify any downsides over there?

23      A    That's correct.

24      Q    All right.  And so would it be fair to

25  say that at that point in time, which, based on the



CONFIDENTIAL

Page 219

1    email, is March 29, 2016, you didn't identify that

2    as a downside?

3         A    I didn't identify what as a downside?

4         Q    Your inability to adequately --

5         A    -- judge whether I'm communicating with

6    the same --

7         Q    Yes.

8         A    -- person I was in the past?  Correct.

9    Yes.

10        Q    Okay.  Now, which of the four did

11   Dr. Wright eventually end up using?

12        A    I believe a message signed with a key

13   from the early Bitcoin block is the only one.

14        Q    That was a poor question.  Sorry.  Can I

15   take that back?

16        A    Sure.

17        Q    You can -- I don't want to interrupt.

18   You can answer, but I'm gonna change the question

19   anyways.

20             Before you got on the plane to go to

21   London, which one of those four did Dr. Wright use?

22        A    The conversation about technical stuff.

23   So we did have a back-and-forth conversation about

24   the state of Bitcoin --

25        Q    All right.



CONFIDENTIAL

Page 220

1       A     -- and what his thoughts were.

2       Q     And was that conversation through email?

3       A     Yes.

4       Q     Was there a phone conversation?

5       A     I don't think so, no.

6       Q     Okay.

7       A     I -- I might be -- I might be

8   misremembering, but I don't think there was.

9       Q     I'm going to introduce Exhibit 60.

10                  (Exhibit 60 marked for

11                  identification.)

12      Q     Do you recognize that document?

13      A     Yes.

14      Q     Is it an email that appears to be from

15  Stefan Matthews to you?

16      A     Yes.

17      Q     Okay.  And what does it say about --

18  like, do you -- do you know what the purpose of

19  this email was?

20      A     It was part of the logistics of me

21  traveling to London --

22      Q     Um-hm.

23      A     -- to witness signing of an early Bitcoin

24  block.

25      Q     Okay.  And if you look at the third



CONFIDENTIAL

Page 221

1    paragraph, the one that starts with, I am looping

2    Craig into this email so that the two of you have

3    the necessary email contact information for the

4    exchange of information prior to the substantial

5    discussion information exchange in London.

6              Reading that, do you have any

7    additional recollection as to what the purpose of

8    this email was?

9              (Pause.)

10   Q    I can re-ask it.

11             Was one of the reasons of this email

12   so that Craig could be in contact with you to then

13   give you the fourth -- the fourth option of the

14   list of proofs?

15   A    Yes, probably.

16   Q    And that would just be based on reading

17   that paragraph, what I just read to you?

18   A    Exactly, yes.

19   Q    Okay.

20   A    I mean, I have -- I have very little

21   recollection of exactly what happened when.

22   Q    All right.  But this is consistent with

23   what you recall?

24   A    Yes.

25   Q    Okay.  I'm going to introduce Exhibit 67.



CONFIDENTIAL

Page 222

1      A    This says --

2      Q    I'm sorry --

3      A    -- 61.

4      Q    -- 61.  I misread.  Thank you.

5                 (Exhibit 61 marked for

6                 identification.)

7      Q    Do you recognize this document?

8      A    Yes.

9      Q    Okay.  And is it an email between

10  Dr. Craig Wright and yourself?

11     A    Yes.

12     Q    Okay.  Now, I'm gonna introduce another

13  exhibit, and this exhibit is going to be Exhibit

14  No. 62.

15                (Exhibit 62 marked for

16                identification.)

17     Q    All right.  Do you recognize this

18  document?

19     A    Yes.

20     Q    Is it an email between you and Craig

21  Wright?

22     A    Yes.

23     Q    What is the time -- what -- when was the

24  email sent, what time?

25     A    It says April 3rd, 2016, 11:06 a.m.



CONFIDENTIAL

Page 223

```
1        Q    All right.  And then if you look at the

2   other email, which is Exhibit 61, what's the time

3   on that email?

4        A    It says April 3rd, 2016, 11:53 a.m.

5        Q    All right.  So would it be fair to say

6   that these emails are about 50 minutes apart,

7   slightly less?

8              MR. KASS:  50.

9        A    Yes.

10       Q    Now, could you just take a minute to

11  quickly look over the two emails, because I'm going

12  to be asking you questions.  I just want to make

13  sure you're familiar with it.

14             (Witness perusing documents.)

15       Q    And that's fine if you just read the

16  first page of both emails.

17       A    I'll skim.

18       Q    That's fine.

19             (Witness perusing document.)

20       A    Okay.

21       Q    And would it be fair to say that there

22  are similarities between these two emails?

23       A    Yeah.

24       Q    Okay.  And would it be fair to say that,

25  for the most part, it's the same substance, but
```



CONFIDENTIAL

Page 224

1    they're in different writing styles?

2                MR. FREEDMAN:  Objection, form.

3        A    Yes.

4        Q    All right.  Now, let's go to Exhibit 61.

5    If you look at the first paragraph, does Dr. Wright

6    give any explanation as to why he sent you two

7    emails less than 50 minutes apart with similar

8    substance?

9                (Witness perusing document.)

10       A    Well, the first paragraph says, Using

11   this style, I've written many blog posts.  Has a

12   few minor alterations to my standard prose.  The

13   following is more in line to how I naturally write.

14       Q    Okay.  Now, when he says, "Using this" --

15   so he says, "The first email I send to you a few

16   moments back."  Do you understand that to mean

17   Exhibit 62?

18       A    I'm not sure.

19       Q    Okay.  Well, was that email sent a few

20   moments back?

21       A    According to the dates in the sent, then,

22   yes, it was sent 50 minutes before the --

23       Q    Okay.

24       A    -- before Exhibit 61.

25       Q    And it has similar content?



CONFIDENTIAL

Page 225

1        A     It does have similar content, yes.

2        Q     But a different writing style?

3        A     Different words, certainly, yes.

4        Q     All right.  So would you be comfortable

5   stating that it's probable that is the

6   communication Dr. Wright was referring to?

7        A     Yes.

8        Q     Okay.  And if -- if there were no other

9   emails between -- in that 50-minute span, would you

10  be very convinced that that is the actual -- that

11  Dr. Wright is referring to Exhibit 62 when he says,

12  "The email I send to you a few moments back"?

13       A     Yes.

14             MR. FREEDMAN:  Objection to form.

15       Q     Okay.  Now, was part of this, these two

16  emails, did you understand it that Dr. Wright was

17  trying to show you that he could write like Satoshi

18  Nakamoto?

19       A     I hadn't thought about it until now,

20  frankly.

21       Q     All right.  And now that you've thought

22  about it...

23       A     Now that I've thought about it, yeah,

24  that seems to be what he's doing here.

25       Q     And you, in fact, were familiar with



CONFIDENTIAL

Page 226

1    Satoshi's writing style, correct?

2        A    Yes.  I think I probably read everything

3    that he wrote publicly.

4        Q    Sure.  And, in addition to what Satoshi

5    had -- had written publicly, you had also had a

6    series of email conversations with Satoshi,

7    correct?

8        A    Yes.

9        Q    Now, we've seen a lot of them related to

10   coding-type things and programming, correct?

11       A    Yes.

12       Q    But would it be accurate to state that

13   some of those conversations were more expansive

14   than that?

15       A    Yes, we'd talk about things related to

16   making the Bitcoin project succes -- successful.

17              (Pause.)

18              MR. KASS:  We're gonna take a

19   five-minute break.  Off the record.

20              THE VIDEOGRAPHER:  The time is

21   3:46 p.m.  We're going off the record.

22              (Off record.)

23              THE VIDEOGRAPHER:  The time now is

24   3:51 p.m.  We're back on the record.

25              (Exhibit 63 marked for



CONFIDENTIAL

Page 227

1              identification.)

2    BY MR. KASS:

3         Q    I'm introducing Exhibit 63.  Do you

4    recognize that document?

5         A    Yes.

6         Q    It is an email conversation between you

7    and Satoshi Nakamoto?

8         A    Yes.

9         Q    And in this email, it's -- are you

10   talking about more than just coding?

11        A    Well --

12        Q    Let me rephrase that question.

13             More than just code?

14        A    More than just code.  Yeah, we're talking

15   about user interface for the Bitcoin software and

16   how it should work.

17             (Exhibit 64 marked for

18             identification.)

19        Q    And I'm going to introduce Exhibit 64.

20   Do you recognize this document?

21        A    Yes.

22        Q    And is it an email between you and

23   Satoshi Nakamoto?

24        A    Yes.

25        Q    And are you talking about more -- or is



CONFIDENTIAL

Page 228

1    Satoshi talking to you more than just about code?

2         A    Yeah, he's talking about -- well, he's

3    talking about the design of the -- of the software

4    and how it should work.

5                   (Exhibit 65 marked for

6                   identification.)

7         Q    And I'm going to introduce Exhibit 65.

8    Do you recognize this document?

9         A    Yes.

10        Q    Is it an email between you and Satoshi

11   Nakamoto?

12        A    Yes.

13        Q    And are you talking about more than just

14   code?

15        A    Yes.

16        Q    Okay.  And would it be fair to -- and

17   would it be fair to say it's a fairly lengthy email

18   from Satoshi Nakamoto to yourself?

19        A    Yeah, it's mostly about code, but there

20   are -- I mean, we do talk about team members and --

21   and kind of higher level software development

22   stuff.

23        Q    Okay.  And I'm going to introduce

24   Exhibit 66.

25                   (Exhibit 66 marked for



CONFIDENTIAL

Page 229

1          identification.)

2     Q     Do you recognize this document?

3     A     Yes.

4     Q     Is it an email between you and Satoshi

5     Nakamoto?

6     A     Yes.

7     Q     Are you talking about anything in

8     addition to code?  And by "you," I also mean

9     Satoshi.  The conversation, does it involve things

10    in addition to code?

11    A     Yeah, we're talking about potential

12    attacks on the Bitcoin software.

13    Q     All right.  So I just showed you four

14    exhibits, and would it be accurate to state that in

15    the last four exhibits that I just showed you,

16    those are examples of conversations you had with

17    Satoshi Nakamoto that encompassed things in

18    addition to coding and programming language?

19    A     Yes.

20          MR. FREEDMAN:  Object to form.

21    Q     So based on that, would -- would it be

22    fair to state that you had an understanding as to

23    Satoshi's writing style?

24    A     I think I had a --

25          MR. FREEDMAN:  Objection to form.



CONFIDENTIAL

Page 230

1      A    I would say I had a feeling for Satoshi's

2   writing style.  I'm not sure I would say

3   understanding.

4      Q    And do you recall if, after receiving

5   the -- the two emails from Dr. Wright that were

6   about 50 minutes apart, if that was sufficient to

7   convince you to go on a plane to London to meet

8   him?

9      A    Yes, I believe that was sufficient to

10  convince me to get on an airplane.

11     Q    Okay.  So would it be fair to state that

12  you believed that that writing style was consistent

13  with the previous writing style of Satoshi?

14     A    Yes.  I felt like it could be the same

15  person.

16     Q    Okay.  And when Dr. Wright sent you those

17  emails, what year was it in?

18     A    When Dr. Wright sent me those emails, I

19  would have to go back and look at the -- the -- the

20  email headers.  2016, was it?  Again, I have a

21  terrible memory for dates.

22     Q    You can look at the email.  It's just a

23  few back.

24     A    2016.

25     Q    Okay.  Could -- do you know if Dave



CONFIDENTIAL

Page 231

1    Wright -- Dave Kleiman wrote those emails for

2    Dr. Wright?

3         A    I'm sorry.  Ask that again.

4         Q    Do you know if -- if Dave Kleiman wrote

5    those emails for Dr. Wright, those two emails that

6    were -- that were 50 minutes apart?

7         A    I -- I don't know.

8         Q    Do you know if he could have written

9    those emails?

10        A    I don't know.

11        Q    Do you know if he was alive at that point

12   in time?

13        A    I don't know.

14        Q    If I were to tell you he passed away in

15   2013, would that affect your answer?

16        A    If you tell me he died in 2013, then I

17   don't believe in ghosts.

18        Q    So you don't believe it was Dave Kleiman

19   who was communicating with you in 2016?

20        A    Correct.  I believe it was Craig Wright.

21        Q    Okay.

22        A    Maybe there are ghosts.

23        Q    How would you describe your relationship

24   -- your current -- your current relationship with

25   Craig Wright?



CONFIDENTIAL

Page 232

```
 1      A    I don't think I have a relationship with

 2 Craig Wright at the moment.

 3      Q    Okay.  How would you describe your

 4 relationship with Craig Wright after you flew to

 5 London?

 6      A    I would say we had a cordial

 7 relationship.

 8      Q    Okay.  And were you shown emails earlier

 9 on today where you continued communicating with

10 Dr. Craig Wright after that public session, correct

11 -- or after the -- after the -- Dr. Wright released

12 that -- what appeared -- what he stated was the --

13 the transaction, correct --

14                MR. FREEDMAN:  Objection to form.

15      Q    -- publicly?

16      A    Yes, we continued to have some email

17 conversations sporadically after that whole proving

18 session and then blog post and then mess.

19      Q    Sure.  And were there some sort of

20 apologies going back and forth?

21      A    Yes.

22      Q    Okay.  And did you tell him that you

23 understood, and you didn't really hold hard

24 feelings?

25      A    I -- well, it's what I said in the email,
```



CONFIDENTIAL

Page 233

1    which I -- I don't recall exactly what I said, but

2    it is in the email.

3         Q    Okay.

4         A    I believe I said I was not angry, but I

5    was disappointed, and I certainly, personally, took

6    a lot of heat and abuse.

7         Q    But -- but you weren't angry with him?

8         A    No, I don't think I was angry.

9         Q    Okay.  Now, you've testified previously

10   this morning that you've been doing coding for

11   quite a while?

12        A    Yes.

13        Q    And how many years have you been doing

14   coding?

15        A    Well, let's see.  I graduated from high

16   school in 1984.  I got my first -- I saved up when

17   I was a freshman in high school for my

18   Commodore 64, which would have been 1980 -- about

19   1980.

20        Q    Um-hm.

21        A    So since 1980, probably, I've been

22   programming.

23        Q    Okay.  And was a portion of that

24   programming professionally?

25        A    Yes.



CONFIDENTIAL

Page 234

1    Q    Would it be fair to say that you have

2    sufficient skills to look at code that was written

3    and have an understanding as to the coder's coding

4    style?

5    A    Yes.

6    Q    And have you looked at the original

7    Bitcoin software code?

8    A    Yes.

9    Q    Have you read the entire code of the

10   original release?

11   A    I don't think I've read every single

12   line, but I've read large portions of it.

13   Q    Okay.  And have you reached any opinion

    Improper expert opinion

14   as to how many people wrote the code?

15   A    My impression is that a small number of

16   people, possibly one, wrote the code, just because,

17   in a large programming project, you have to do a --

18   a good job of documenting what you're doing and

19   kind of coordinating among multiple people, and the

20   original Bitcoin code didn't have kind of any of

21   that.  It was dense and -- and not a lot of

22   comments, not a lot of explanation of, you know,

23   what different pieces of the code were doing.  So

24   that -- that gave me the impression that it was a

25   small number of people, maybe one person.



CONFIDENTIAL

Page 235

```
 1      Q    Okay.  Would you state that it was likely
 2  by one person?
 3              MR. FREEDMAN:  Objection, form.
 4      A    It could be.  I mean, any piece of code,
 5  you know, there are -- it wouldn't surprise me at
 6  all if -- if different parts were written by
 7  different people.  I mean, it's -- it's a large --
 8  well, it's a moderate size code base --
 9      Q    Um-hm.
10      A    -- but a lot of different parts.  And so
11  it wouldn't surprise me at all if, you know, some
12  of the networking code was written by a different
13  person, for example.
14      Q    Right.  So a discrete portion of it could
15  have been written by someone else?
16      A    Yes.
17      Q    Okay.  But as far as the general body of
18  it, would it be fair to say, based on actually
19  looking at the code, that it appears that it likely
20  was one person who did the bulk of the work?
21      A    Probably.
22              MR. FREEDMAN:  Objection to form.
23      A    It's possible it was multiple people who
24  just had the same coding style.
25      Q    Um-hm.
```



CONFIDENTIAL

Page 236

1    A    You know, certainly like if people work

2    together at a company, there's usually a company

3    coding style, and, you know, it is possible to

4    create, you know, a body of code that has a very

5    consistent coding style that's written by more than

6    one person.

7    Q    And if you were to do that, would the

8    coders have to have similar skill sets as far as

9    coding goes?

10    A    No.

11    Q    Okay.  So could you have a coder who only

12    knows how to write BASIC script drafting code

13    together with someone who's a brilliant coder?

14    A    Yeah, I'd say that's possible.

15    Q    And -- and how would that work?

16    A    Well --

17         MR. FREEDMAN:  Objection, form.

18    A    -- in any piece of software, there will

19    be parts of the software that are critical --

20    Q    Um-hm.

21    A    -- that have to be absolutely right, and

22    that there will be other parts of the software that

23    just aren't critical.  For example, you know, like

24    you might write code that prints out a help message

25    if you get something wrong.  You know, a junior



CONFIDENTIAL

Page 237

1   programmer could very easily be in charge of doing

2   all the help messages or something.

3        Q    Right.  But would that junior programmer

4   at least need to know how to code and program; that

5   be fair?

6        A    Sure, yes.

7        Q    Okay.

8        A    It's not that hard.

9        Q    Hey, to me this is...

10       A    I'm sure I could teach you.

11       Q    All right.  Okay.  Now, if we could go

12   back to -- I need to find an exhibit.  Sorry.

13            (Pause.)

14       Q    All right.  If you could go back to

15   Exhibit 59.

16       A    (Witness complied.)

17       Q    And if you could go to the last page, so

18   it's 3 of 3.

19       A    Yeah.

20       Q    And do you see where it says, "If you ask

21   a geek to look at some of the code I've written in

22   the past, and look at Satoshi's early code, they

23   can tell it's written by two different people, a

24   different writing style," right?  You could tell.

25   "I mean, you could tell the difference between a



CONFIDENTIAL

Page 238

 1   Kurt" --

 2                  THE STENOGRAPHER:  Excuse me?

 3                  MR. KASS:  I'm sorry.

 4       Q    "You could tell the difference between a

 5   Kurt Vonnegut novel and a Jackie Collins novel, or

 6   whatever."

 7                  Do you recall stating that?

 8       A    I don't recall it, but I believe that I

 9   did.

10       Q    Okay.  So would it be fair to state, at

11   least based on that comment, that you believe there

12   was one person who wrote the Bitcoin code?

13       A    No.

14       Q    Okay.  And why, why not?

15       A    Again, you can have multiple people who

16   have the same coding style.

17       Q    Okay.  So other than -- okay.  Let me

18   rephrase that question.

19                  So would it be fair to state that you

20   believed that the Bitcoin software was written in

21   one style -- coding style?

22       A    Yes.

23       Q    Okay.  And that could either mean that

24   one person wrote it, or that more than one person

25   wrote it but that they all had the same coding



CONFIDENTIAL

Page 239

1    style?

2         A    Yes.

3         Q    Okay.  Got it.

4              Now, I want to go to when you flew to

5    London to attend the private proof session with

6    Dr. Wright.

7              You stated that you met Dr. Wright I

8    believe it was maybe two hours after you got off

9    the flight.  Do you recall something along those

10   lines?

11        A    If I recall correctly, I got a little bit

12   of sleep at the hotel room.

13        Q    Um-hm.

14        A    And then I met with the, quote-unquote,

15   money guys; and then, yeah, an hour or two after

16   meeting with them, Craig Wright came into the room.

17        Q    Okay.  And do you recall how much sleep

18   you got?

19        A    Just a couple of hours, one or two hours.

20        Q    Okay.  So -- and you had previously

21   testified that you were jet lagged?

22        A    Yes.  Yes, I -- I -- I can't sleep on

23   airplanes very well, so...

24        Q    Okay.  And you had also testified that

25   you don't remember a lot of specific details of



CONFIDENTIAL

Page 240

1    that day?

2        A    Correct.  I remember a few details, but

3    not many at all.

4        Q    All right.  And, for example, you

5    couldn't remember exactly how the signing took

6    place?

7        A    Correct.

8        Q    And you couldn't remember how the hotel

9    Wi-Fi was accessed?

10       A    Correct.

11       Q    And I'm not gonna go through every single

12   one, but you would agree that today you -- you

13   acknowledge that there are multiple things you

14   could not remember about that, right?

15       A    Yes.  Like I wouldn't be able to tell you

16   what brand of laptop was purchased.  I just -- I

17   don't remember.  I don't know.

18       Q    Okay.  And is one reason for that because

19   you were jet lagged?

20       A    Yes, probably.  I mean, the other reason

21   would be I -- I tend to have a bad memory for

22   details.  Good memory for numbers --

23       Q    Okay.

24       A    -- but bad memory for dates, proper

25   names, details of what happened last week, last



CONFIDENTIAL

Page 241

 1   month, last year.

 2        Q    And could another reason also be the

 3   passage of time?

 4        A    Absolutely.

 5        Q    Because all this took place in 2016,

 6   correct?

 7        A    Correct.

 8        Q    So almost five years ago?

 9        A    2020.  Four years.

10        Q    Four years.  Yeah, almost four years ago?

11        A    Yes.

12        Q    Now, you initially stated that you

13   recalled some sort of conversation about Dave

14   Kleiman?

15        A    Yes.

16        Q    But initially you weren't very convinced

17   -- or very -- weren't very -- would it -- would it

18   be fair to say that -- that you weren't very sure

19   in your memories?

20        A    Yes.  I certainly -- I don't remember

21   what I heard when or what I have read in public

22   accounts.

23        Q    Okay.  And is it possible that what you

24   know about Satosh -- Craig's involvement or Dave's

25   purported involvement in -- at Satoshi came from a



CONFIDENTIAL

Page 242

```
 1       source other than Dr. Craig Wright?
 2            A    I think that's unlikely, because I do
 3       have that memory of -- of Craig being emotional
 4       around the subject of Dave.
 5            Q    Okay.  So you have in your mind that
 6       Dr. Wright was emotional about Craig, and that
 7       happened in London, correct?
 8            A    Dr. Wright was emotional about --
 9            Q    -- Dave.
10            A    -- Dave.
11            Q    And it happened --
12            A    That happened in London, yes.
13            Q    Okay.  Around the proof session time?
14            A    Yes.
15            Q    Okay.  But -- and that's -- is that
16       because -- and why -- why, in particular, does that
17       stick out in your mind?
18            A    I think it just sticks out because when
19       you see somebody acting obviously emotional, sad,
20       choked up, that's the kind of thing that just
21       sticks in your memory.
22            Q    Okay.
23            A    You know, it's -- it's unusual; you don't
24       generally see a grown man almost crying.
25            Q    So would it be fair to state that
```



CONFIDENTIAL

Page 243

1    Dr. Wright was upset about the passing of Dave

2    Kleiman?

3         A    Yes, that -- he appeared to be, yes.

4         Q    And he was emotional about that?

5         A    Yes.

6         Q    Now -- but as far as the actual -- actual

7    substance of the conversation that Dr. Wright said

8    about Dave Kleiman, do you recall much about that?

9         A    No, I don't.

10        Q    Okay.  So what you really remember most

11   is his emotions?

12        A    Yes.

13        Q    And that there was a conversation about

14   Dave Kleiman?

15        A    A conversation.  Yeah, some discuss --

16   some mention.

17        Q    A mentioning?

18        A    Yes.

19        Q    Okay.  All right.  But -- but you can't

20   state for certain that at that point in time he --

21   Dr. Wright said Dave Kleiman was the third Satoshi?

22             MR. FREEDMAN:  Objection, form.

23        A    I do seem to recall him saying that there

24   were three people involved, and that Dave was one

25   of the three people involved.



CONFIDENTIAL

Page 244

1    Q    Okay.  So now you do recall that that

2    happened at that conversation?

3              MR. FREEDMAN:  Objection.

4    A    I believe that did -- that did happen

5    around -- yes.

6    Q    All right.  Could it have been that

7    somebody else had said it --

8              MR. FREEDMAN:  Objection.

9    Q    -- other than Dr. Wright?

10             MR. FREEDMAN:  Objection.

11   A    It's possible.

12   Q    And is it possible -- do you recall that

13   there was a chain of emails from somebody called

14   "Uyen Nguyen"?

15   A    Yes.

16   Q    And do you recall if she talked about

17   Dave Kleiman in those emails?

18   A    I don't recall.  I'd have to go back and

19   read those emails.

20   Q    Okay.  So if I were to show you an email

21   where she's talking about Dave's involvement in

22   Satoshi, could -- could that be the source of your

23   memory as to Dave's involvement?

24   A    It's possible, but I think unlikely.

25   Q    Okay.  Well, how about we look at the



CONFIDENTIAL

Page 245

1    emails.

2         A    Okay.

3         Q    It's not a memory test.

4         A    Good, because I would fail, miserably.

5              (Exhibit 68 marked for

6              identification.)

7         Q    Okay.  I'm going to introduce for the

8    record -- I'm jumping one 'cause I mislabeled --

9    we'll get back to it maybe -- but I'm introducing

10   68.

11             Do you recognize this email?

12        A    Yes.

13        Q    Is it an email between Uyen Nguyen and

14   yourself?

15        A    Yes.

16        Q    Okay.  Now, do you see in the first

17   paragraph how she is mentioning Dave Kleiman?

18        A    Yes.

19        Q    And -- and Craig Wright?

20        A    Yes.

21        Q    And then if you go down to the paragraph

22   that "I write this letter"; you see that?

23        A    Yes.

24        Q    And there it says, "Craig is one-third

25   Satoshi"?



CONFIDENTIAL

Page 246

1      A    Yes.

2      Q    And, "He is the only survivor now"?

3      A    Yes.

4      Q    All right.  And do you understand if --

5  if Dave Kleiman was alive in 2016?

6      A    You have told me he was not.

7      Q    Okay.  Now, would it be fair to state

8  that, based on this email at least, Uyen Nguyen is

9  stating that Craig Wright was only one-third of

10 Satoshi?

11     A    Yes.

12     Q    And that there were other people, I

13 presume, with the other two-thirds?

14     A    Yes.

15     Q    Could this have been the source of your

16 memory that Craig was only a third of Satoshi?

17          MR. FREEDMAN:  Objection, form.

18     A    May 3rd, 2016.  I suppose it's possible.

19     Q    Now, I think this actually might help us

20 a lot.  Okay.

21          (Exhibit 69 marked for

22          identification.)

23     Q    I am going to introduce Exhibit 69.

24          Do you recognize this document?

25     A    Yes.



CONFIDENTIAL

Page 247

1        Q    What is it?

2        A    This is the blog post I wrote in 2016

3    saying that I believe Craig Wright is Satoshi

4    Nakamoto.

5        Q    And what month did you write it in?

6        A    May -- I posted it on May of 2016.

7        Q    That's fair.

8             And that was after you met with

9    Dr. Wright in London, correct?

10       A    Yes, that's correct.

11       Q    And that -- that was a few weeks after?

12            MR. FREEDMAN:  Objection.

13       A    Yes.

14            MR. FREEDMAN:  A month.

15       Q    And did you do your best to make sure

16   that what you posted on the blog was as accurate

17   that you believed could be?

18            MR. FREEDMAN:  Objection, form.

19       A    Yes.

20       Q    Let me ask -- let me ask it another way.

21            Would you write something on your

22   blog that you had doubts as to the veracity?

23       A    No.

24       Q    Now, could you read the first sentence of

25   the blog?



CONFIDENTIAL

Page 248

```
 1        A     "I believe Craig Steven Wright is the
 2   person who invented Bitcoin."
 3        Q     Now, I want you to focus on the word
 4   "the," okay?  If you had been told that Craig -- by
 5   Craig Wright that he was only one -- a third of
 6   Bitcoin, would you have written, "I believe
 7   Dr. Craig Wright is 'the' person who invented
 8   Bitcoin"?
 9        A     Maybe.
10        Q     Okay.  Do you care to explain?
11        A     Yeah.  Because, if I recall correctly,
12   and it's very possible that I don't, Craig had said
13   that he was the primary creator, the inventor of
14   Bitcoin, the system, but he had help from other
15   people in the beginning to actually make it happen.
16        Q     So when did that -- if that -- if that
17   conversation took place, which we're not sure,
18   wouldn't it have been more accurate to state that I
19   believe Craig Steven Wright is one of the people
20   who invented Bitcoin?
21        A     Inventing means you came up with the
22   idea.
23        Q     Okay.
24        A     So if I had said, you know, I think it --
25   I could say I believe Craig Wright is one of the
```



CONFIDENTIAL

Page 249

1   people who developed the first version of the

2   Bitcoin software, you know, I think that's what I

3   would have said.

4              But, I mean, the word "invented"

5   means came up with the idea, sprang out of your

6   head, and so that's what I mean there.

7      Q    Okay.  So would it be fair to say that

8   regardless of what conversation you had with Craig

9   Wright in -- in London, which, you know, we

10  understand there's some clouds surrounding it, but

11  whatever had happened, at a minimum, you still

12  believe that Craig Wright was the brain child, the

13  one who came up with the idea?

14     A    I have my doubts at this point.

15     Q    Correct.  But at this point, I just want

16  to know --

17     A    When I wrote the blog post, yes, I

18  believed that he was the primary --

19     Q    Sure.

20     A    -- inventor of the idea of Bitcoin.

21     Q    Right.  And just to clarify, I'm just

22  trying to work backwards, just to figure out what

23  that conversation could have been.  Because we know

24  for sure what you wrote, and we know that you were

25  trying to do your best to make sure it was



CONFIDENTIAL

Page 250

1    accurate.  So I'm trying to figure out what the

2    parameters of your conversation could have been.

3         A    Okay.

4         Q    Okay.  So would it be fair to state that

5    Dr. Wright didn't tell you that Dave Kleiman was an

6    inventor of Bitcoin?

7         A    Correct.

8         Q    Okay.  And that, at most, he had an

9    assisting role, if that conversation happened?

10             MR. FREEDMAN:  Objection.

11        A    Yes.  And I think, for example, he said

12   the third mysterious person -- if I recall

13   correctly --

14        Q    Um-hm.

15        A    -- this third mysterious person helped

16   out with the cryptography.

17        Q    Okay.  Do you recall, if this

18   conversation happened, what Dave's role would have

19   been?

20        A    No.

21        Q    We know it could have been something, but

22   not the invention portion of it?

23        A    Sure.

24        Q    Okay.  You've been involved in Bitcoin

25   since around 2010; is that accurate?



CONFIDENTIAL

Page 251

1      A    Yes.

2      Q    Would it be fair to state that certain

3  people may have very strong opinions as to how

4  Bitcoin should look or function?

5      A    Yes.  Yes.  Many people have many

6  opinions on how Bitcoin should function.

7      Q    And that some people have done pretty

8  drastic things to try and get their way?

9      A    That's fair to say.

10     Q    Okay.  Do you know if people have ever

11  been hacked in the controversy -- in the Bitcoin

12  controversies?

13          MR. FREEDMAN:  Objection, form.

14     A    I don't know if people have been hacked.

15  I don't have any firsthand knowledge that people

16  have been hacked.

17     Q    Sure.  Did there come a point in time

18  where -- are you familiar with -- I believe it's

19  called "Bitcoin XT"?    Relevance

20     A    Yes.

21     Q    Are you familiar with it?   Relevance

22     A    Yes.  I was one of the creators of

23  Bitcoin XT.

24     Q    Sure.  And does Bitcoin XT currently

25  exist?   Relevance



CONFIDENTIAL

Page 252

1      A      No.

2      Q      What happened to Bitcoin XT?      Relevance

3      A      Bitcoin XT was a project that, if I

4  recall correctly, Mike Hearn and I launched to try

5  to increase the Bitcoin block size to allow more

6  transactions on the Bitcoin network.  And it failed

7  to get enough miner support.  The Bitcoin miners

8  did not go along with it, and it was extremely

9  controversial when we launched it.

10            There also -- it was attacked by

11  denial-of-service attacks; and, certainly, Mike and

12  I took a lot of heat for trying to make that change

13  to the Bitcoin software.

14      Q      And do you consider a denial-of-service

15  attack a kind of hack?      Relevance

16      A      It's -- it's a kind of hack.

17      Q      So would it be fair to say that a hacker

18  worked hard to take down Bitcoin XT?      Relevance

19      A      Yes.

20            MR. FREEDMAN:  Objection, form.

21      Q      All right.  And do you recall if

22  Satoshi's email accounts were ever hacked?

23      A      There was an incident, which I don't have

24  firsthand knowledge of, but I believe the GMX --

25  the reports I saw said that the satoshin@gmx.com



CONFIDENTIAL

Page 253

1    email expired and then was taken over by somebody.

2         Q    All right.  I want to show you

3    Exhibit 70, and we'll see if that could refresh

4    your recollection.

5                   (Exhibit 70 marked for

6                   identification.)

7         A    Oh, I forgot about this.

8         Q    Does it -- let's start off with, what is
     Relevance

9    this exhibit, do you recognize it?

10        A    Yes.  This is an email from me to the

11   rest of the -- the key Bitcoin developers in 2014.

12        Q    Sure.  And does this refresh your   Relevance

13   recollection as to whether the Satoshi account was

14   hacked?

15        A    Yes.  Somebody did get ahold of Satoshi's

16   email address and took over control of the old

17   Bitcoin source repository, which, happily, we had

18   moved away from.  So it had no practical --

19   practical effect, but it was not a good thing to

20   happen.

21        Q    Okay.  So we just discussed two instances

22   of hacking in the Bitcoin community; is that fair

23   to say?   Relevance

24        A    Ye -- hacking?

25        Q    The denial of service and then the email.



CONFIDENTIAL

Page 254

1      A    Yeah, hacking doesn't have a clear

2  definition; but, yes, those were attacks.

3      Q    Okay.                          Relevance

4      A    Sorry.  As a security-conscious person,

5  like, the word "hacking" is very fuzzy, and I much

6  prefer the term "attack."

7      Q    Fine.  Attack.  Okay.  So there were two

8  attacks, computer cyber attacks?       Relevance

9      A    Yes.

10     Q    And at least in one of those attacks,

11 somebody got access to Satoshi's email account?

12     A    Yes.                          Relevance

13     Q    Are you aware of any other cyber attacks

14 or hacking, however you want to define it, related

15 to Bitcoin?

16     A    Yes.  There have been several over the

17 years.

18     Q    Do you care to list -- or please list the

19 ones that you recall.

20     A    Gosh.  Somebody in 2010 created a Bitcoin

21 transaction that created 4 billion Bitcoins --

22     Q    Um-hm.

23     A    -- leveraged a bug in the Bitcoin

24 software.  Satoshi responded to that by rolling

25 back the chain, as they say, invalidating that



CONFIDENTIAL

Page 255

1    transaction and putting -- putting things back to

2    rights and patching the code.

3        Q    Um-hm.

4        A    We had transaction-spamming attacks in

5    2010, where people would send millions upon

6    millions of tiny transactions to try to flood the

7    Bitcoin network --

8        Q    Um-hm.

9        A    -- and cause everybody to do a lot of

10   extra work validating those transactions.  We had

11   to respond to those.

12              I don't know.  I'd have to go down --

13   there's a -- there's a list on the Bitcoin wiki of

14   all the ways, you know, the -- the core Bitcoin has

15   either had bugs or been hacked.  And I'd have to go

16   back and look at that if you want more, but there

17   are -- there are a few more.

18       Q    That's fine.  So would it be fair to say

19   that hacking is kind of part of the Bitcoin story?

20              MR. FREEDMAN:  Objection, form.

21       A    Certainly, yes, attacks and security

22   incidents are definitely part of the -- of the

23   Bitcoin story.

24       Q    Now, you testified earlier on today that

25   you had, some -- I believe it was sometime in 2010,



CONFIDENTIAL

Page 256

1   but correct me, created something called the

2   "Bitcoin faucet"?

3        A     Yes, I created the Bitcoin faucet as my

4   first Bitcoin programming project.

5        Q     Okay.  And what was the Bitcoin faucet?

6        A     The Bitcoin faucet was a website, anybody

7   could go and ask for some Bitcoins, and it would

8   give you some Bitcoin.

9        Q     Was there a limit to how many Bitcoin you

10  could ask for?

11       A     Yes.  You were limited to -- when I

12  started, it was limited to five Bitcoins per person

13  per day.

14       Q     Okay.  And how long did the Bitcoin

15  faucet run for?

16       A     I'd have to go back and check when I

17  eventually had to shut it down.  About two years

18  maybe, a year and a half.

19       Q     Okay.  So if you started it sometime in

20  2010, so maybe sometime 2012 you shut it down; is

21  that fair?

22       A     Yeah.  And, again, I'd have to go back

23  and check.  My memory is terrible for dates.

24       Q     That's fine.  And when you got involved

25  in -- in Bitcoin in 2010, did you believe -- what



CONFIDENTIAL

Page 257

1    did you believe as to its potential?

2        A    I actually gave an Ignite talk in Amherst

3    in, I think -- it was either late 2010 or maybe

4    2011, where I talked about that.

5                I thought it had the potential to be

6    a major world currency to compete with the dollar

7    or the Euro or the Yen.  I thought it had a small

8    chance of becoming the world's reserve currency,

9    replacing the U.S. dollar, as kind of the currency

10   used for international payments.

11               I didn't think that that would happen

12   quickly, but I thought that there was a fair chance

13   that that could happen.

14       Q    Considering that, wouldn't it have made

15   more sense to just hold onto your Bitcoin for when

16   they're valuable, and then you could be immensely

17   wealthy?

18       A    Money is not useful unless -- money is

19   not valuable unless people use it.

20       Q    Um-hm.

21       A    And it seemed to me the best way to make

22   Bitcoin valuable was to get people using it.  So

23   that was the purpose of the faucet, was to give

24   people some Bitcoin so they could have some

25   experience using it.  And I didn't give away all of



CONFIDENTIAL

Page 258

1    my Bitcoin through the Bitcoin faucet, I did hold

2    some for myself.

3         Q    All right.  And if I were to ask what

4    percentage of your Bitcoin you gave away through

5    the Bitcoin faucet, do you know that answer?

6         A    I have -- I'm not sure I understand the

7    question.

8              MR. FREEDMAN:  Object.

9         Q    You stated you gave away Bitcoin through

10   the Bitcoin faucet?

11        A    Yes.

12        Q    You also stated that you held onto some

13   Bitcoin?

14        A    Yes.

15        Q    All right.  Do you know the -- the

16   relationship between the percentages of Bitcoin

17   that you held onto versus the amount of Bitcoin

18   that you gave away?

19        A    Yes.

20        Q    And what would it be?

21        A    I've given away more Bitcoin than I held.

22        Q    Okay.  Do you recall ever stating that

23   not all the people who were involved in early

24   Bitcoin are necessarily wealthy?

25        A    Yes, I wrote a blog post about that not



CONFIDENTIAL

Page 259

1   too long ago.

2       Q    Okay.  Let me actually see if I can pull

3   that up.

4               THE STENOGRAPHER:  Can we take a

5   quick break?

6               MR. KASS:  Sure.

7               THE VIDEOGRAPHER:  The time is -- the

8   time is 4:34 p.m.  We've now reached the end of

9   Media Unit No. 3, and we're off the record.

10              (Off record.)

11              THE VIDEOGRAPHER:  The time now is

12  4:44 p.m.  We're coming back on the record.  Now

13  beginning Media Unit 4 in a deposition with Gavin

14  Andresen.  We're on the record.

15              MR. KASS:  All right.  I'm just going

16  to put on the record the agreement that I have with

17  Mr. Freedman, and if it's inaccurate in any way,

18  Mr. Freedman, please chime in, is that we will be

19  stopping the deposition at 5:00 so Mr. Freedman can

20  catch his flight.  We will resume the deposition

21  tomorrow morning at 11:00, and I will have two and

22  a half hours to continue the deposition, which will

23  take us to 1:30, after which Mr. Freedman will have

24  a half hour for cross or redirect.

25              Do you agree, Mr. Freedman?



CONFIDENTIAL

Page 260

1                MR. FREEDMAN:  Yes, as long as you

2     help me with the exhibits like you promised.

3                MR. KASS:  Yes, I did, and the

4     witness has indicated that he is -- will show up

5     tomorrow, and he is accommodating us and we

6     appreciate that.

7                MR. FREEDMAN:  Accommodating you.

8                MR. KASS:  We have enough things to

9     argue about.

10               All right.  Let's go.

11               (Exhibit 71 marked for

12               identification.)

13    BY MR. KASS:

14        Q    I'm introducing Exhibit -- sorry.  What

15    exhibit was that, 71?

16        A    71.

17        Q    71.  All right.  Do you recognize this

18    document?

19        A    Yes.  This is a blog post I wrote,

20    apparently a while ago, in 2018.

21        Q    But it's fresh in your mind?

22        A    It is somewhat fresh in my mind, yeah.

23    Actually, I wrote another blog post recently and

24    went back and read a couple other of my older blog

25    posts.

Hearsay (as to the document and all questions related to it), and relevance (objections through 263:16)



CONFIDENTIAL

Hearsay, relevance

Page 261

```
 1        Q    Okay.  Got it.  And what's the substance
 2   of this blog post?
 3        A    A lot of people assume that if you were
 4   working on Bitcoin early in 2010, 2011 that you
 5   must be fantastically wealthy and have hundreds of
 6   millions of dollars.
 7        Q    Um-hm.
 8        A    And this just goes through reasons why
 9   that's a bad assumption and why probably a lot of
10   people who -- who were working on Bitcoin that
11   early do not have as much money as people think.
12        Q    And what are the reasons that you lay out
13   in your blog post?
14        A    The reasons are, you know, back then,
15   people were very free with their Bitcoin, so they
16   weren't worth very much.  When I funded the
17   Bitcoins that I gave away in the Bitcoin faucet, I
18   purchased them -- I purchased 10,000 Bitcoins for
19   $50.
20        Q    Okay.
21        A    So they were worth half a penny apiece,
22   one-half of one cent per Bitcoin, which is why I
23   could give away five of them, because they were
24   only worth two and a half cents.
25        Q    Um-hm.
```



CONFIDENTIAL

Hearsay, relevance

Page 262

1    A    And which is why when the Bitcoin faucet

2  got hacked and I lost, I think, 10 Bitcoins that

3  were sitting in the Bitcoin faucet, I didn't cry,

4  because at that time they were worth $20 or

5  something.  Now those Bitcoins would be worth a

6  hundred thousand dollars, so it would be something

7  to cry -- cry about now.

8              But people confound the value of

9  Bitcoin today with the value of Bitcoin back then.

10 So people were doing things like buying alpaca

11 socks from the alpaca farmer that is across the

12 river here --

13    Q    Um-hm.

14    A    -- for 50 Bitcoin.  So people would spend

15 50 Bitcoin on a pair of socks.  Which, again, at a

16 price of $10,000 for Bitcoin, you don't want to do

17 that math.  That's a very expensive pair of socks.

18 But that's what people did.

19              I know Jeff Garzik, one of the other

20 core developers who I worked with early on, I think

21 he's pretty public about using -- like spending

22 10,000 Bitcoin on -- I forget exactly what it was,

23 but some -- he paid 10,000 Bitcoin to somebody to

24 open source some piece of software.  Because,

25 again, 10,000 Bitcoins back then wasn't worth that



CONFIDENTIAL

Hearsay, relevance

Page 263

1    much.

2            And the other big reason why people

3    don't have as much as you think is because if you

4    did buy 10,000 Bitcoins for $50, and then Bitcoin

5    goes up to $10 a piece, suddenly you're sitting on

6    a hundred thousand dollars worth of capital gains,

7    and it -- you -- probably crosses your mind that,

8    well, maybe I'd like to spend $50,000 and pay down

9    my mortgage or -- or spend them some other way.  So

10   as Bitcoin rises in price, there's more and more an

11   incentive to -- to sell those Bitcoins that you --

12   you purchased earlier.

13            And so I think most people did not

14   hold on to every Bitcoin that they had.  They

15   either spent them or exchanged them and, you know,

16   bought something nice for themselves.

17        Q    Sure.  And, you know, based on your --

18   your understanding and everything that you just

19   stated, would -- would you believe it would be

20   inconsistent for someone to be sitting on a large

21   stash of -- stash of Bitcoin worth a couple of

22   hundred million dollars but be in foreclosure and

23   unable to pay a cell phone bill?

24        A    Yes.

25        Q    Okay.



CONFIDENTIAL

Page 264

1          MR. FREEDMAN:  Objection, form.

2     Q    Now, I -- I just want to -- one other

3     thing that you just mentioned, I believe you

4     mentioned that Bitcoin faucet was hacked?

5     A    Yes, the Bitcoin faucet was hacked.

6     Q    So is that another instance of hacking?

7     A    Sure.  Yes.

8     Q    And that happened to you personally?

9     A    That happened to me personally, yes.

10    The -- well, and, technically, it was the web

11    hosting company that hosted the Bitcoin faucet was

12    hacked, and so the Bitcoin faucet, plus a couple

13    other Bitcoin businesses, were hacked.  And,

14    happily, the Bitcoin faucet didn't have many

15    Bitcoins, so I didn't lose much, but one of the

16    others did, and it did lose a significant amount of

17    Bitcoins out of their wallet.

18    Q    All right.  So that's another instance of

19    hacking.  So, actually, we know at least of -- of

20    two people that were attacked in that hack?

21    A    Yes.

22    Q    Okay.  Now, I believe you testified

23    earlier that early on Bitcoin mining was necessary

24    to maintain the -- the blockchain network, the

25    Bitcoin network?



CONFIDENTIAL

Page 265

1       A    Yes, it still is.

2       Q    Okay.  And if somebody was participating

3   in mining because they wanted to keep the network

4   alive, would kind of a by-product of it be that

5   they would -- would receive Bitcoin?

6       A    Yes, that's correct.

7       Q    And not necessarily were they actually

8   mining to hold those Bitcoin?

9       A    Correct.  If there's --

10      Q    Or -- or -- or for the value, whatever

11  value it was in those Bitcoins, correct?

12      A    Sure.  Yes.

13      Q    Okay.  So if -- and do you have an

14  understanding as to what the value of Bitcoin was

15  in 2010?

16      A    At the beginning of 2010, Bitcoin had no

17  value because there was no way to sell it.

18      Q    How about around August of 2010?

19      A    I'd have to go back and look.  And,

20  again, I know May of 2010 I purchased Bitcoins for

21  Bitcoin faucet at about a half a penny apiece.  By

22  August, I don't think it had yet reached a dollar,

23  but I don't know.  I'd have to go back and -- and

24  look.  I don't -- I don't remember.

25      Q    Okay.  So if somebody were -- were mining



CONFIDENTIAL

Page 266

1    primarily to keep the network alive, and Bitcoin

2    weren't valued very much, would you be surprised if

3    that person would put the Bitcoin in an encrypted

4    drive and just kind of forget about it for the time

5    being?

6         A    No, that would not surprise me, and I

7    think I've heard stories of people who mined

8    Bitcoin for a little while and then just turned off

9    their machines and reformatted their hard drive and

10   the Bitcoins are lost forever.

11        Q    Okay.  Are you familiar with what is

12   called the "genesis" block?

13        A    Yes.

14        Q    What's the genesis block?

15        A    The genesis block is basically a piece of

16   data that's hard-coded, so it's in the software

17   code, that is kind of the beginning of this chain

18   of what are called "blocks."  So chains of -- of

19   Bitcoin containing transaction -- Bitcoin block

20   contains transactions, and the genesis block is --

21   is the very first block that everything chains

22   from.

23        Q    So if somebody were to say that the

24   genesis block was mined, would that be an accurate

25   description?



CONFIDENTIAL

Page 267

1       A    No.  No, the genesis block was created.

2   It didn't have to be mined in the same way --

3       Q    Okay.

4       A    -- as the rest of the blocks.

5       Q    And if somebody made that statement,

6   would you believe that person has a thorough

7   understanding of how the Bitcoin network works?

8       A    Yeah, I mean, the -- you do have to do

9   some work to create a -- a genesis block.  So, you

10  know, I would -- I would -- yes, I think you could

11  say it was mined when it wasn't actually mined in

12  the traditional way, and it -- you know, it would

13  be okay.  It's a fuzzy enough idea of, you know,

14  what mining is.

15      Q    Well, what if somebody were to say that

16  it was mined in the traditional way; would you

17  consider that person knowledgeable as to the

18  Bitcoin network?

19      A    Well, it's tricky.  I mean, I -- I mined

20  the genesis block -- or I created the genesis block

21  for the test network, and it is a very similar

22  process to traditional, you know, Bitcoin mining.

23  So, I mean, there's enough similarity there that I

24  -- you know, I think it is possible to -- to -- to

25  say that.  And you're being a little bit fuzzy,




CONFIDENTIAL

Page 268

1    but, yeah, I think it's -- it's -- you could say

2    that and still be an expert in -- in Bitcoin.

3         Q    And how are the two -- how -- how was the

4    creation of the genesis block different than the

5    mining of a non-genesis block?

6         A    It's just the -- the -- the -- I mean,

7    the process for creating it requires some technical

8    ability.  So, you know, to be -- to mine a regular

9    Bitcoin block, all you needed to do was download

10   the software and there was a menu item that said

11   "start mining," and that's all you had to do.

12        Q    Okay.

13        A    To actually create a new genesis block,

14   you know, when I created the test network, I

15   actually had to write some code that would arrange

16   things in the right way and then do some

17   proof-of-work calculations to create appropriate

18   proof of work for a new genesis block.

19             And so, you know, it's just -- it

20   takes more -- at that time it took more technical

21   skill to create a genesis block, and it was kind of

22   not built into the software as it -- as it was.

23        Q    All right.  When you say "hard-coded,"

24   was it just kind of -- you did your stuff on your

25   computer and then you kind of, like, inserted it,



CONFIDENTIAL

Page 269

1    is that --

2         A    Yes.

3         Q    Okay.  And -- but it didn't involve,

4    like, a network or other computers and mining?

5         A    No, it's all on a single computer.

6         Q    And it's not passing around --

7         A    No.  No, everything's done kind of

8    privately on your own computer.

9         Q    Okay.  In -- in comparison with -- well,

10   in contrast to regular mining, where it's generally

11   a collaborative effort?

12        A    Yes, you have to build on other people's

13   blocks or your block will be rejected.

14        Q    Okay.  So there are, you know, some

15   distinctions between the genesis block being

16   hard-coded versus a regular?

17        A    Yes.

18        Q    Now, are you familiar with the term

19   "Bitcoin private key"?

20        A    Yes.

21             THE STENOGRAPHER:  Private key?

22             MR. KASS:  Bitcoin private key, yes.

23        Q    And the term "Bitcoin public key"?

24        A    Yes.

25        Q    What is a "Bitcoin private key"?



CONFIDENTIAL

Page 270

1       A      A Bitcoin private key is a -- is a very

2    long number that -- that you keep private as --

3    as it -- as it says.  And, basically, private keys

4    correspond to Bitcoins.  So if you own a private

5    key, you have the ability to transfer the Bitcoins.

6    It's -- it's -- is that good enough?

7       Q      That's good enough.  I know it's a very

8    touchy subject, but for my purposes, it's enough.

9              Now, if I have a private key -- what

10   you define as a private key, which is a -- assume

11   -- let's assume the definition of a private key --

12   well, no, I don't -- I don't want to give

13   you anything -- as you understand a private key to

14   be, okay?

15             Now, if I have a private key and I

16   share it with you -- correct?

17      A      Yes.

18      Q      -- what is that called now?

19             MR. FREEDMAN:  Objection, form.

20      A      Well, I mean, it's still a private key.

21      Q      Um-hm.

22      A      But multiple people now can sign messages

23   with it or can -- if there are Bitcoin associated

24   with that private key, could spend the Bitcoin.

25      Q      So would it be fair to say that whether



CONFIDENTIAL

Page 271

1   something is a private key does not depend on

2   whether I actually keep it private?

3       A    Yes.

4       Q    Okay.

5       A    Best practice is you should keep it

6   private if you want control.

7       Q    Okay.  And if somebody were to state that

8   once a private key is shared, it no longer is a

9   private key, would you consider that an accurate

10  statement?

11      A    No.  I think it still qualifies as a --

12  as a private key.

13      Q    Okay.  Would you consider that person

14  very knowledgeable in Bitcoin terminology?

15              MR. FREEDMAN:  Objection, form.

16      A    I -- I think possibly.  I mean, you know,

17  your definition of private key may vary from the

18  commonly held idea of what a private key is.

19      Q    All right.  So you would at least agree

20  that person's definition is not consistent with

21  what the general Bitcoin community believes?

22      A    I think that would be true, although I

23  haven't polled the Bitcoin community on exactly,

24  you know, Do you call a private key something else

25  if it's been revealed to multiple people?



CONFIDENTIAL

Page 272

```
 1                MR. FREEDMAN:  Objection.
 2      Q    Based on your --
 3                MR. FREEDMAN:  Objection.
 4      Q    Based on your understanding of your
 5   involvement of the Bitcoin -- in the Bitcoin
 6   community, it's a basic general understanding?
 7      A    Yes, I mean -- yes.
 8                MR. FREEDMAN:  It's almost 5:00.  So
 9   do you want to stop now?
10                MR. KASS:  Want to stop now?
11                MR. FREEDMAN:  Yeah.
12                MR. KASS:  Okay.  So we're going to
13   go off the record now.  We will resume tomorrow at
14   11:00 a.m. here.
15                THE WITNESS:  Oh, 11's my favorite
16   number.
17                MR. KASS:  Oh, yes, there we go.
18                THE WITNESS:  Perfect.
19                THE VIDEOGRAPHER:  I'm going to read
20   off the record and close out for today.
21                MR. KASS:  Okay.
22                THE VIDEOGRAPHER:  The time now is
23   5:00 p.m., and we have reached the end of today's
24   deposition and Media Unit No. 4.  We are off the
25   record, and this deposition will continue tomorrow.
```



CONFIDENTIAL

Page 273

1    We're off the record.

2                (Off record.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



CONFIDENTIAL

Page 274

```
1               C E R T I F I C A T E

2   COMMONWEALTH OF MASSACHUSETTS

3   BRISTOL, SS

4           I, Lori-Ann London, Registered

5   Professional Reporter and Notary Public in and for

6   the Commonwealth of Massachusetts, do hereby

7   certify:

8           That, GAVIN A. ANDRESEN, the witness whose

9   deposition is hereinbefore set forth, was duly

10  sworn by me and that such deposition is a true

11  record of the testimony given by the witness to the

12  best of my knowledge, skill, and ability.

13          I further certify that I am neither

14  related to, nor employed by, any of the parties in

15  or counsel to this action, nor am I financially

16  interested in the outcome of this action.

17          IN WITNESS WHEREOF, I have hereunto set my

18  hand and seal of office this 3rd day of March 2020.

19

20

21

22                              _____

23                              Lori-Ann London, RPR

24                              Notary Public

25  My commission expires: 5/29/2026
```



Page 278

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 9:18-cv-80176-BB/BR

-------------------------------x

IRA KLEIMAN, as the Personal

Representative of the Estate

of DAVID KLEIMAN, and W&K

Info Defense Research, LLC,

Plaintiffs,

V.

CRAIG WRIGHT,

Defendant.

-------------------------------x

C O N F I D E N T I A L

CONTINUED VIDEOTAPED DEPOSITION of

GAVIN ANDRESEN

Hadley, Massachusetts

Defendant's Designations
Plaintiffs' Objections
Plaintiffs' Counters

Reporter: MaryJo O'Connor, RDR, RMR

Job No: 559472



Page 279

1

2

3

4

5              Thursday, February 27, 2020

6                     11:13 a.m.

7

8

9           CONTINUED VIDEOTAPED DEPOSITION OF

10    GAVIN ANDRESEN, held at Courtyard Hadley

11    Amherst, 423 Russell Street, Hadley,

12    Massachusetts, pursuant to notice, before

13    MaryJo O'Connor, Registered Diplomat

14    Reporter, Registered Merit Reporter, and

15    Notary Public in and for the Commonwealth of

16    Massachusetts.

17

18

19

20

21

22

23

24

25



Page 280

1   A P P E A R A N C E S

2

3   ON BEHALF OF THE PLAINTIFFS:

4   ROCHE CYRULNIK FREEDMAN

5      (Via Teleconference)

6      Southeast Financial Center

7      200 S. Biscayne Boulevard

8      Suite 5500

9      Miami, Florida 33131

10      VELVEL FREEDMAN, ESQ.

11      vel@rcfllp.com

12

13

14   ON BEHALF OF THE DEFENDANT:

15      RIVERO MESTRE LLP

16      2525 Ponce de Leon Boulevard, Suite 1000

17      Miami, Florida 33134

18      (305) 445-2500

19      BY:    ZALMAN KASS, ESQ.

20              zkass@riveromestre.com

21

22

23   ALSO PRESENT:

24      Ira Kleiman

25      Mati Kiin - Video Technician



```
1    ------------------I N D E X------------------

2


     EXAMINATION of GAVIN ANDRESEN            PAGE

3

         By Mr. Kass                          283

4        By Mr. Freedman                      355

         By Mr. Kass                          375

5        By Mr. Freedman                      384

         By Mr. Kass                          386

6

7

8

9    ----------------EXHIBITS------------------

10   ANDRESEN EXHIBIT                         PAGE

11   Exhibit 72  E-mail, Bates               293

12               GAVIN_00001821

13   Exhibit 73  E-mail, Bates               294

14               GAVIN_00001759 to

15               GAVIN_00001760

16   Exhibit 74  E-mail, Bates               351

17               GAVIN_00000023

18   Exhibit 75  Document entitled           351

19               "Non-Disclosure Agreement,"

20               Bates GAVIN_00000024 to

21               GAVIN_00000026

22

23

24

25
```



Page 282

1                    P R O C E E D I N G S

2            VIDEO TECHNICIAN:  Good morning.

3        We are now on the record.  This begins

4        media unit number one in the continuing

5        deposition of Gavin Andresen in the

6        matter of the Estate of David Kleiman,

7        et al., versus Craig Wright.

8                This matter is held in the

9        United States District Court in the

10       State of Florida.  Today is February 27,

11       2020, and the time is 11:13 a.m.

12               Our deposition is being taken at

13       the Courtyard by Marriott Hadley-Amherst

14       located at 423 Russell Street, Hadley,

15       Massachusetts 01035, and at the request

16       of the firm Rivero Mestre & Castro.

17               My name is Mati Kiin.  I'm the

18       videographer representing Magna Legal

19       Services, and our court reporter today

20       is MaryJo O'Connor, also representing

21       Magna Legal Services.

22               I will now ask counsel to

23       introduce themselves and their

24       affiliations, and we will get started.

25           MR. KASS:  Zalman Kass for



Page 283

```
 1            Dr. Craig Wright.
 2                 MR. FREEDMAN:  Velvel Freedman for
 3            the Plaintiffs.
 4                 MR. KASS:  Is there anybody else
 5            on the phone?
 6                 MR. KLEIMAN:  Ira Kleiman,
 7            Plaintiffs.
 8                 VIDEO TECHNICIAN:  I'll ask the
 9            court reporter to please swear in our
10            witness, and we can proceed.
11                 *       *       *
12
13                 GAVIN ANDRESEN, Continued
14       having been satisfactorily identified by a
15       Massachusetts drivers license and duly sworn
16       by the Notary Public, was examined and
17       testified as follows:
18       EXAMINATION
19       BY MR. KASS:
20            Q.   Good morning, Mr. Andresen.  Thank
21       you for coming back.  We appreciate that.
22                 Just some preliminary matters --
23                 MR. FREEDMAN:  Zalman, I'm sorry,
24            I can't -- I can't really hear you.  Can
25            you either project a little or get a
```



Page 284

```
 1              little closer to the phone?
 2                   MR. KASS:  One second.  Hang on.
 3              We're going to do our best.
 4         BY MR. KASS:
 5              Q.    All right.  Mr. Andresen, since
 6         you left the deposition yesterday and came to
 7         the deposition today, did you speak to anybody
 8         about either yesterday's deposition or today's
 9         deposition?
10              A.    No.
11              Q.    Okay.  Now, yesterday you
12         testified that a lot of people have claimed to
13         you that they are Satoshi, correct?
14              A.    Correct.
15              Q.    Did you ever attend proof sessions
16         with any of those other Satoshis?
17              A.    No.
18              Q.    Did you ever fly anywhere to meet
19         any of those other Satoshis?
20              A.    No.
21              Q.    So is it fair to say that when you
22         did fly to London to meet Dr. Craig Wright, you
23         were pretty convinced that he could be Satoshi?
24                   MR. FREEDMAN:  Objection.
25              A.    Yes.
```



Page 285

```
 1          Q.      And that was based on the e-mail
 2     conversations that you had with him?
 3          A.      Yes.
 4          Q.      Which involved both his technical
 5     knowledge, his discussions as to Bitcoin, and
 6     his writing style?
 7          A.      Yes.
 8                  MR. FREEDMAN:  Object to the form.
 9          Q.      Do you recall being asked
10     yesterday whether -- if you are aware if the
11     Court found that Craig committed perjury under
12     oath?
13          A.      Am I aware?
14          Q.      Do you recall being asked that
15     question?
16          A.      I do recall being asked that
17     question, yes.
18          Q.      All right.  And do you recall
19     being asked a question whether Dr. Wright
20     submitted forged documents to the Court?
21          A.      Yes, I do.
22          Q.      Are you aware that those findings,
23     or that order, was later overturned by a higher
24     court?
25          A.      No.
```



Page 286

```
1                    MR. FREEDMAN:  Objection.
2          Mischaracterizes the order.
3                    MR. KASS:  No, keep it to form,
4          please.
5                    MR. FREEDMAN:  No, no.  You're
6          totally mischaracterizing.
7                    MR. KASS:  Doesn't matter.  Come
8          on, Vel, you were doing a lot of that
9          yesterday.
10                   MR. FREEDMAN:  No, not once.
11         Zalman, you know very well --
12                   MR. KASS:  Vel.
13                   MR. FREEDMAN:  -- that it doesn't
14         (inaudible) --
15                   MR. KASS:  Vel.  Vel.  Vel.
16         That's not how this works.  I get to ask
17         the questions.  You get to object to
18         form.  Please keep it to that.
19   BY MR. KASS:
20         Q.    How would you characterize
21   Dr. Craig -- how would you characterize the
22   Bitcoin community's view of Dr. Craig Wright?
23         A.    I think, in general, most of the
24   Bitcoin community --
25                   MR. FREEDMAN:  Objection to form.
```



Page 287

```
1        A.      -- dislikes him.  They think he's

2   a liar.  They don't trust him.  They don't

3   think he is Satoshi.

4        Q.      Would you say that Dr. Craig

5   Wright is a controversial figure in the Bitcoin

6   community?

7        A.      Yes.  Definitely.

8                MR. FREEDMAN:  Object to the form.

9        Q.      And would it be fair to say that

10  there are many people who don't like Dr. Craig

11  Wright --

12       A.      Yes.

13       Q.      -- in the Bitcoin community?

14       A.      Yes.

15       Q.      And we previously talked about how

16  hacking is part of the Bitcoin community.  It's

17  something that's not uncommon.           Leading

18       A.      Yes.

19                MR. FREEDMAN:  Objection.

20       Q.      Would you be surprised if

21  Dr. Wright was hacked?                    Relevance,
                                              foundation
22                MR. FREEDMAN:  Objection.

23       A.      No.

24       Q.      Now, yesterday you spoke about

25  somebody being a Bitcoin expert?
```



MAGNA
LEGAL SERVICES

Page 288

```
 1                   MR. FREEDMAN:  Objection.

 2          A.      I believe you.

 3          Q.      Do you recall that?

 4          A.      I don't recall talking about a

 5    specific person being a Bitcoin expert.

 6          Q.      Do you recall talking about

 7    Andreas Antonopoulos?

 8          A.      Yes.

 9          Q.      Do you recall referring to him as

10    a Bitcoin expert?

11          A.      I probably did.

12          Q.      What are your criteria for someone

13    to classify somebody a Bitcoin expert?

14          A.      I think a Bitcoin expert has a

15    very good understanding of the technical

16    details of how Bitcoin works.  I don't think

17    you need to know all of the details.

18          Q.      Okay.

19          A.      But to have a good understanding

20    of kind of the Bitcoin system and how its

21    pieces fit together.

22          Q.      Would it also include how the

23    system is used?

24          A.      I think you can be a Bitcoin

25    expert without being an expert in all of the
```



Page 289

1     different ways people use Bitcoin.  I mean,

2     there are lots of different pieces of Bitcoin.

3     There is legal.  You could be an expert on, you

4     know, how Bitcoin interacts with the legal

5     system.  That doesn't necessarily make you the

6     kind of Bitcoin expert that I think of when I

7     think of a Bitcoin expert.  And same thing for

8     if you think of, you know, how are people using

9     Bitcoin for cross-border transactions.  You

10    might be that kind of expert.

11              But when I say Bitcoin expert, I'm

12    talking mostly about geeks like me and having a

13    technical understanding of Bitcoin.

14         Q.    How would you describe

15    Dr. Wright's technical understanding of

16    Bitcoin?

17         A.    Dr. Wright seems to have a very

18    good understanding of Bitcoin.

19         Q.    Would you consider him a Bitcoin

20    expert?

21         A.    Yes.  I think I would.

22         Q.    What coding language was original

23    Bitcoin software coded in?

24         A.    C++.

25         Q.    So whoever Satoshi is, what coding



Page 290

1    language would they necessarily have to know
2    how to code in?          Improper expert opinion
3         A.    C++.

4         Q.    Do you recall yesterday the term
5    money men being thrown around?
6         A.    I do, yes.
7              MR. FREEDMAN:  Objection.
8         Q.    Do you recall who those money men
9    are?
10             MR. FREEDMAN:  You just missed an
11             objection, Madam Court Reporter.  Sorry.
12        Q.    I believe I have a standing
13   question, which is:  Do you recall who they
14   are?
15        A.    I think their names were Stefan
16   and Rob.  And I think there was one other
17   person, and I don't recall who had what role.
18        Q.    Okay.  And how did they get that
19   moniker, money men?
20        A.    One or more of them were presented
21   to me as owning an investment firm or a venture
22   capital firm.
23        Q.    And do you know specifically what
24   their relationship was with Dr. Craig Wright?
25        A.    I'm trying to remember what I was



Page 291

1      told.  I believe I was told that they were --

2      they had some sort of business arrangement, and

3      I don't know the details of that business

4      arrangement.

5          Q.     Okay.  So would it be more

6      accurate to call them businessmen?

7          A.     Sure.

8          Q.     All right.  Do you have any

9      independent knowledge as to how much money they

10     have?

11         A.     I don't have any independent

12     knowledge as to how much money they have.

13         Q.     So it would be fair to say that

14     you just know there was some sort of business

15     relationship with at least one or more of them

16     and Dr. Wright?

17         A.     Yes.  That's what I was told.

18         Q.     Okay.  Do you know anything about

19     Dave Kleiman's coding abilities?

20         A.     No.

21         Q.     Do you know anything about his

22     programing abilities?

23         A.     No.

24         Q.     Do you have any personal knowledge

25     as to whether Dave was Satoshi?



Page 292

```
 1          A.    No.
 2          Q.    Do you have any personal knowledge
 3    as to whether Dave worked on the Bitcoin
 4    software?
 5          A.    No.
 6                MR. FREEDMAN:  Objection to form.
 7          Q.    Now, we discussed yesterday that
 8    some things could impact the ability to recall
 9    certain events, correct?
10          A.    Yes.
11          Q.    And one thing was the passage of
12    time?
13          A.    Yes.
14          Q.    And to being jet lagged?
15          A.    Yes.
16          Q.    Would you agree to me -- agree
17    with me, though, that if something's
18    memorialized close to the actual event that
19    it's more likely that is accurate than possibly
20    a later memory?
21                And I can rephrase that if that's
22    a confusing question.
23                MR. FREEDMAN:  Objection.
24          A.    No, I agree with that.
25                MR. KASS:  I'm going to introduce
```



Page 293

```
 1            as Exhibit 72.  And, Vel, this is the

 2            one that ends -- it's a GAVIN, and it

 3            ends in 1821.

 4                    MR. FREEDMAN:  That's a new

 5            exhibit?

 6                    MR. KASS:  Yes.

 7                    MR. FREEDMAN:  It's one of the

 8            ones you sent me?

 9                    MR. KASS:  Correct.

10                    (Document marked for

11            identification as Andresen Exhibit 72)

12            Q.    Mr. Andresen, do you recognize

13       this document?

14            A.    Yes.

15            Q.    What is it?

16            A.    It's an e-mail I received May 8,

17       2016, from somebody saying that they are Ira

18       Kleiman.

19            Q.    Okay.  And what's the e-mail

20       address?  Or let me rephrase that.

21                    So you see under the From, it says

22       something?

23            A.    From says "Ira Private,

24       iradavid2009@gmail.com.

25            Q.    Now, that "private" part, do you
```



Page 294

1      know how that got there?

2           A.    Well, you can you choose any user

3      name you like.

4           Q.    So is that something you chose or

5      he chose?

6           A.    That's something that he would

7      have chosen.

8           Q.    Okay.  All right.  And in this

9      e-mail he's reaching out to you, and he says

10     he's David's brother, and he has some

11     questions, right?

12          A.    Yes.

13                MR. FREEDMAN:  Objection.

14          Q.    We're going to move on to another

15     document, which I am going to mark as

16     Exhibit 73.

17                (Document marked for

18          identification as Andresen Exhibit 73)

19          Q.    Do you recognize this document?

20                MR. FREEDMAN:  Sorry, Zalman, this

21          is Bates 1759.

22          A.    Yes.  I recognize this document.

23          Q.    And what is it?

24          A.    This is another e-mail from Ira to

25     me.



Page 295

```
 1          Q.     Okay.  And embedded halfway

 2     through this document, do you see an e-mail

 3     from yourself to Ira?

 4          A.     Yes, I do.

 5          Q.     Okay.  And let's go to the bottom

 6     of the page, and under the e-mail that's from

 7     Ira to you and is dated May 10th and the time

 8     is 8:18, do you see the last paragraph in that

 9     e-mail starts with the "If"?

10          A.     Yes.

11          Q.     Are you able to read that

12     paragraph.

13          A.     Sure.  "If you are unable to speak

14     about Craig specifically, I understand.  I just

15     wanted to know if you knew my brother or have

16     any knowledge about him being part of a team

17     that created Bitcoin."

18          Q.     Okay.  And this -- again, this

19     e-mail is in May 10.  And approximately how

20     long after that meeting in London with

21     Dr. Craig Wright?

22          A.     Let's see.  The meeting was April

23     7th?  6th?  So approximately a month.

24          Q.     So this is about a month after,

25     okay.
```



Page 296

1              And to the extent you had any

2     conversations with Craig Wright about Dave's

3     role as part of Satoshi, it happened in London.

4     As far as your recollection.

5          A.    As far as my recollection, yes.

6          Q.    Now, let's look at your response,

7     which is at 8:42.  So shortly after.

8              Could you read your response?

9          A.    "Craig said that he worked with

10    David, and I don't have any reason to think

11    he's lying about that.  Beyond that" -- do you

12    want me to go on?

13         Q.    Yes, please.

14         A.    "Beyond that, I don't know much -

15    and, frankly, I'm happy to let the

16    investigative reporters or amateur detectives

17    try to piece together the truth."

18         Q.    So is it fair to say that Ira

19    specifically asked you whether you knew if

20    David had anything to do with Bitcoin and your

21    response is, I don't know?

22         A.    That's correct.

23         Q.    So based on that, is it also fair

24    to say that it's not very likely that you were

25    informed him being part of Satoshi when you met



Page 297

1      with Dr. Wright?

2                  MR. FREEDMAN:  Objection.

3         Q.      Well, it doesn't make it less

4      likely.

5         A.      Yes, it does make it less likely.

6         Q.      Okay.  Other than these two

7      e-mails, and for that it's going to be Exhibit

8      72 and 73 with Ira Kleiman, did you have any

9      other contact with Ira Kleiman?

10        A.      I don't recall.

11        Q.      Did you ever speak to him over the

12     phone?

13        A.      No.

14        Q.      Now, I believe you testified

15     yesterday that you spent a portion of 2010

16     working with Satoshi on the Bitcoin code.

17        A.      Yes.

18        Q.      And do you consider your work that

19     you did on that code -- strike that question.

20                How important was the work that

21     you did on the Bitcoin code?

22        A.      How important was the work I did

23     on the Bitcoin code.  On a scale of 1 to 10?

24        Q.      Well, let me ask you like this.

25     Had you not done that work with the Bitcoin, do



Page 298

1    you believe that the Bitcoin code would have

2    functioned and taken off?

3         A.    Ah -- ah -- it's hard to know.  I

4    like to think that I helped it take off faster.

5    I think it probably would have taken off even

6    without my contribution, because I think

7    somebody else would have stepped up and

8    nurtured the code.

9         Q.    So is it fair to say that another

10   person was necessary, it may just not have been

11   you.

12        A.    Yes, I think that would be fair to

13   say.

14        Q.    Now, after the fact, would you

15   consider the work that you did instrumental in

16   helping the Bitcoin code take off?

17        A.    Yes.  I think actually some things

18   that I did that weren't working on the Bitcoin

19   code were probably more instrumental.  Things

20   like, you know, talking to reporters and being

21   the public face of Bitcoin.  I think that might

22   have actually had a bigger impact than the code

23   that I contributed.

24        Q.    So would it be fair to say that

25   you did two things:  There is the coding, and



Page 299

```
 1      then the sort of the Bitcoin promoting?

 2           A.     Yes.

 3           Q.     Do you feel that Satoshi owes you

 4      anything for those two things that you did?

 5           A.     No.

 6                  MR. FREEDMAN:  Objection.

 7           Q.     Why?

 8           A.     I did those things voluntarily.  I

 9      didn't do them in expectation that any

10      particular person would give me something.  And

11      I have certainly been, since Bitcoin has become

12      a success, I've been well-compensated just by

13      the fact that I obtained some Bitcoin in 2010

14      and now they're worth a lot of money.

15                  So, you know, working on -- that's

16      part of the beauty of the Bitcoin system is the

17      incentives are there for people to want to make

18      it a success.  Once you have some Bitcoin, you

19      want to do what you can to make it more

20      valuable.  So you want the system to succeed.

21           Q.     Is it common -- and is -- is it

22      common or -- yeah.  Is it common on certain

23      types of software where people contribute and

24      do work but not necessarily are they expecting

25      to be financially compensated?
```

Relevance



Page 300

1        A.     That has become more common as
2    open-source software has become a popular means
3    of doing software around the world.
4        Q.     And was Bitcoin released as
5    open-source software?
6        A.     Yes.  Bitcoin was open-source
7    software from the start.
8        Q.     Okay.  Do you recall testifying
9    yesterday that you didn't send any money to
10    Satoshi?
11        A.     Yes, I do.
12        Q.     Okay.  I just wanted to know if
13    you could help clear up something for me,
14    because later on we looked at an e-mail where
15    it shows that you sent some Bitcoin to Block 9
16    or Block 10.
17        A.     Yes.
18        Q.     And I believe you also testified
19    that that block was known to be Satoshi's
20    block?
21        A.     Yes.
22        Q.     How do you reconcile those
23    statements?
24        A.     The -- in my mind, the pseudonym
25    Satoshi is the person I was communicating with



Page 301

1      in 2010 and 2011.

2           Q.    Okay.

3           A.    So when I was asked the question

4      had I sent Bitcoin to Satoshi, my mind was

5      saying the Satoshi of 2010 and 2011.  And so

6      the transaction that I made later, I think of

7      as a transaction to Craig Wright, not the

8      pseudonym Satoshi.

9                 So I was thinking of during my

10     work with Satoshi, did we ever exchange

11     Bitcoin.

12          Q.    Okay.  So is it fair to say you

13     were focusing more on the person or the

14     pseudonym, not necessarily the account?

15          A.    Yes.

16          Q.    And I appreciate that.  Thank you

17     for clarifying that.

18                Do you recall testifying yesterday

19     that you read an article I believe by someone,

20     his last name is Lerner, about some Patoshi

21     Pattern?

22          A.    Yes.

23          Q.    Okay.  And that article has

24     something to do with nonce values.

25          A.    Yes.



Page 302

```
 1          Q.    Other than reading that article,

 2     do you have any personal knowledge about the

 3     analysis done in that article?

 4          A.    No.

 5          Q.    Now, I'm going to turn to what is

 6     previously marked as number 2.  So going all

 7     the way down to the bottom of the pile.

 8               MR. KASS:  And, Vel, just to make

 9          it easier, it's GAVIN_1296.

10               MR. FREEDMAN:  Is that a new

11          document?

12               MR. KASS:  No.  This was

13          introduced yesterday by you as

14          Exhibit 2.

15               MR. FREEDMAN:  Wait, hold on.

16          GAVIN_1296?

17               MR. KASS:  Yes.

18               MR. FREEDMAN:  One second please.

19               MR. KASS:  I could describe it for

20          you, but I just don't want to coach.

21               MR. FREEDMAN:  I got it.

22               MR. KASS:  Okay.

23     BY MR. KASS:

24          Q.    Do you recall this document?

25          A.    Yes.
```



MAGNA
LEGAL SERVICES

```
 1          Q.      Do you recall testifying about it
 2    yesterday?
 3          A.      Yes.
 4          Q.      And do you recall being asked
 5    whether Dr. Wright had applied for a job at the
 6    foundation where you were working?
 7          A.      Yes.
 8          Q.      Now, I would like you to actually
 9    look at the e-mail from Dr. Wright, and could
10    you point to the portion where he says he's
11    applying for a job?
12          A.      He does not say that he's applying
13    for a job.
14          Q.      And, in fact, does he say, "I do
15    not want to be paid"?
16          A.      He does say "I do not want to be
17    paid," yes.
18          Q.      Does it appear more that he's just
19    asking to collaborate with you?
20          A.      Uh --
21          Q.      When you received this, what did
22    you interpret it as?
23          A.      When I received --
24          MR. FREEDMAN:  Objection.
25          A.      I received this from the secretary
```



Page 304

```
 1    of the Bitcoin Foundation --

 2          Q.     Mm-hmm.

 3          A.     -- and she presented it as a

 4    resume.  She used the term "resume."  And so,

 5    therefore, I assumed that it was somebody

 6    looking for a job.

 7                 I -- at the time, we weren't

 8    looking for anybody.  And so until discovery

 9    from the subpoena --

10          Q.     Sure.

11          A.     -- I hadn't thought about this

12    document at all.

13          Q.     Okay.  And now that you've taken a

14    second to look at this document today, do you

15    still believe it would be accurate to state

16    that Dr. Wright was looking for a job with the

17    foundation?

18          A.     No.  Now that I read it closely, I

19    think it would be more accurate to say he was

20    looking for some sort of collaboration.

21          Q.     And one other thing.  Do you

22    actually know if it was Dr. Wright who sent

23    this e-mail?

24          A.     No.  I don't know.

25          Q.     And it would be fair to say
```



1    because you just see an e-mail address, you

2    don't know who actually typed it or sent it?

3         A.    Correct.  I have no idea if

4    craig@panopticrypt.com is actually the

5    Dr. Craig Wright I met in London.

6         Q.    And even if it was, you still

7    don't know who actually typed it and sent it,

8    correct?

9         A.    Correct.

10        Q.    Now, I'm going to go to Exhibit 9

11   and previously marked yesterday.

12             MR. KASS:  And, Vel it's

13        GAVIN_1077.

14             MR. FREEDMAN:  Got it.

15        Q.    Now, yesterday do you recall being

16   asked a number of questions about this

17   document?

18        A.    Do I recall being asked a number

19   of -- I was probably asked a number of

20   questions about this document.

21        Q.    Okay.  And I'll just go through

22   one or two of them, maybe that will jog your

23   memory.

24        A.    Sure.

25        Q.    Do you recall being asked what



1    some of the incredible mistakes were?  First

2    paragraph.

3          A.     Yes.

4          Q.     And then going to the

5    fourth-from-the-last paragraph where it says,

6    "It was a front in some ways"?

7          A.     Yes.

8          Q.     And then drop one paragraph down,

9    "The ones that matter remain hidden."  Do you

10   recall being asked about that phrase?

11              "The ones that matter remain

12   hidden," that's the third-from-the-bottom

13   paragraph.

14         A.     Do I remember being asked that?

15         Q.     Yes.

16         A.     Not really, no.

17         Q.     All right.  Then how about going

18   down to the second page where the -- closer to

19   the top of the page, the paragraph starts,

20   "Then, none of this is about money."

21              Do you recall being asked about

22   that?

23         A.     I think I do recall a question

24   about that.

25         Q.     Okay.  And then at the end of the



1    paragraph, do you recall a question that was

2    about the phrase "I have access to systems that

3    transfer more value and transactions a day than

4    the existing BTC network does in a year"?

5         A.    Yes, I do remember a question

6    about that.

7         Q.    And do you recall being asked

8    about "I want to stay as close to the edge as I

9    can without going over."

10        A.    I definitely remember a question

11   about that.

12        Q.    And how about the next line,

13   "Frustration (should) be my middle name"?

14        A.    Yes, I remember that.

15        Q.    Okay.  And now I'm going to stop

16   now, because I don't think we have to go

17   through every single one.  But my question for

18   you is:  To the extent you were asked any

19   question about the portion of the e-mail

20   drafted by Craig, right?

21             MR. FREEDMAN:  Objection.  Form.

22        Q.    Do you have -- is there any way

23   that you could know what Craig actually meant?

24             MR. FREEDMAN:  Objection.

25        A.    You certainly can't read people's



Page 308

1    minds.  So, no.

2         Q.    So would it be fair to say that,

3    at best, it is your interpretation of what you

4    think Craig may have meant?

5         A.    Yes.

6         Q.    Okay.  And would that go for all

7    e-mails that were authored by Dr. Wright?

8         A.    Sure.  It's always possible --

9              MR. FREEDMAN:  Objection.

10        A.    -- to misinterpret what somebody

11   writes.

12        Q.    Okay.  Now, let's go to

13   Exhibit 10, which was previously marked

14   yesterday, and I will have the Bates number in

15   a second.  It is GAVIN_2007.

16             MR. FREEDMAN:  Got it.  Thanks.

17             MR. KASS:  Sorry?

18             MR. FREEDMAN:  I've got it.  Thank

19        you.

20             MR. KASS:  Okay.

21        Q.    I'm not sure that's the correct

22   document.  Exhibit 11.

23        A.    Oh, 11.

24        Q.    That was my error, but I did mean

25   11, so yes.  That was on me.



1           Okay.  Do you recall being asked

2    questions about this document yesterday?

3           A.     Vaguely, yes.

4           Q.     And do you recall testifying that

5    this was a conversation that you copied from

6    Reddit and then pasted it into a Word document?

7           A.     Yes.

8           Q.     And then produced it in the

9    litigation?

10          A.     Yes.

11          Q.     Do you know when you produced it,

12   if it was a Word document or -- do you know

13   what type of document it was, what format it

14   was, when you produced it?

15          A.     I believe it's a plain text file.

16          Q.     Okay.  Now, could plain text get

17   modified?

18          A.     Sure.

19          Q.     Is it easy to modify plain text?

20          A.     Yes, it's very easy.

21          Q.     Okay.  So is it possible that

22   between when you copied into plain text and it

23   was produced to you as Exhibit 11, that a

24   change was made to it?

25          A.     It's possible.



Page 310

```
 1          Q.      Now, my other question -- and you

 2     cannot state definitively that this is exactly

 3     how it appears on the Reddit page for that

 4     reason?

 5          A.      Correct.  I still have a copy of

 6     this on my laptop, so I could go back and check

 7     line by line.

 8          Q.      Sure.  But as you sit here right

 9     now.

10          A.      But as I sit here right now, no.

11          Q.      Now my other question is:  Is

12     there a reason why this was produced as text as

13     opposed to just a printout of your Reddit page?

14          A.      It was easiest for me to select

15     all of the -- it's a fairly long thread.  So to

16     produce screenshots would involve more work

17     than just selecting all of the text, copying

18     and pasting.

19          Q.      Understood.  Thank you for

20     clarifying that.

21               MR. KASS:  Now, I'm going to

22          Exhibit 11.  Vel, that's "The Satoshi

23          Affair" and docket exhibit.

24               THE WITNESS:  13.

25               MR. KASS:  Yes, number 13.
```



1                    MR. FREEDMAN:  Got it.  Thank you.

2       BY MR. KASS:

3            Q.     All right.  Do you recall being

4       asked questions about this document?

5            A.     Yes.

6            Q.     And do you recall being shown a

7       series of quotations made by people?

8            A.     Yes.

9            Q.     Now, I'm going to go over some of

10      them.  I just have a few questions.

11                  Oh, and do you recall testifying

12      that some of those statements were consistent

13      with what doctor -- what you believe Dr. Wright

14      had told you?

15           A.     I think I was told that.

16           Q.     So my question for you is when you

17      say something is consistent, what does that

18      mean?  I just want to make sure we're using the

19      same terminology.

20           A.     Consistent means there's no

21      conflict.  It's a synonym for consistent.  It

22      means --

23           Q.     Let me ask you a question like

24      this.  If I told you I came here in a car and

25      someone else told you the car was green, is



Page 312

1     that a consistent statement --

2          A.     Yes.

3          Q.     -- in your mind?

4          A.     Yes, that's consistent.  It's just

5     more detail in one statement than the other.

6          Q.     Okay.  So by "consistent," you

7     mean is it's not directly conflicting with

8     something else?

9          A.     Correct.

10          Q.     Okay.  So it doesn't mean I was

11     told something of a similar substance.

12          A.     Uh.  Yes.  I mean, something is

13     inconsistent if two things disagree with each

14     other.

15          Q.     Okay.

16          A.     Otherwise, they are consistent.

17          Q.     So as long as it's not a direct

18     disagreement, it's consistent?

19          A.     Yes.

20          Q.     Okay.  So let's turn to Page 27.

21     That's going to be on the top, the 27 of 96.

22               And if you go to the

23     second-to-the-last paragraph, it starts -- the

24     line -- the sentence starts with "If I'd come?"

25          A.     I see, yes.



Page 313

```
 1            Q.      So it says, "'If I'd come out

 2      originally as Satoshi without Dave, I don't

 3      think it would have gone anywhere.  I've had

 4      too many conversations with people who get

 5      annoyed because it's me.'"

 6                    Now, do you believe stating that

 7      that was consistent with something that

 8      Dr. Wright had told you?

 9            A.      I don't recall.

10            Q.      You could have?

11            A.      I could have, sure.

12            Q.      Now, if you did -- and that's just

13      in the transcript.  I mean, what I had said is

14      what it says.

15            A.      I believe you.

16            Q.      I'm not trying to trick you.

17                    So all of your -- so, essentially,

18      would it be fair to say all we really know from

19      that is that Craig Wright didn't say Dave isn't

20      Satoshi?

21                    MR. FREEDMAN:  Objection to form.

22            Q.      Meaning -- well, what would

23      something that Craig would have to state to be

24      that was inconsistent with this statement?

25                    MR. FREEDMAN:  Objection to form.
```



Page 314

1        A.      I'm not sure I'm understanding the

2    question.

3        Q.      Okay.  So I'm trying -- okay, so

4    let's see if we can work this through.

5        A.      Okay.

6        Q.      When you state "It's consistent

7    with what he told you," what does that mean?

8                MR. FREEDMAN:  Objection to form.

9        A.      I mean, I know that Craig -- or I

10   was told that Craig and Dave worked together.

11       Q.      All right.  And we saw that in the

12   e-mail from you to Ira, correct?

13       A.      Yes.  I mean, when I say that if

14   this statement, "'If I'd come out originally as

15   Satoshi without Dave, I don't think it would

16   have gone anywhere," um -- I mean, the fact

17   that they worked together and he's talking

18   about Dave and Satoshi together, that's

19   consistent, right?  They had some relationship

20   around that time.

21       Q.      So they had some relationship.  It

22   could have happened.  He didn't tell me

23   anything that would say it would be impossible

24   to happen; is that fair?

25       A.      That what would be impossible to



Page 315

1    happen?

2         Q.    That Craig didn't say anything

3    saying I never worked with Dave, because then

4    it would be inconsistent.

5         A.    Correct.

6         Q.    All right.

7               MR. FREEDMAN:  Objection.

8         Q.    So all you're stating is that

9    because -- so it would be fair to say Dave told

10   you he had a working relationship with Craig,

11   right?  And we know that --

12              MR. FREEDMAN:  Objection.

13        Q.    -- Craig said he was Satoshi.

14   Craig said he himself was Satoshi, correct?

15        A.    Correct.  Yes.

16        Q.    So you're saying --

17              MR. FREEDMAN:  Objection.

18        Q.    -- it's possible that he worked

19   with Dave as Satoshi.

20        A.    Yes.

21              MR. FREEDMAN:  Objection.

22        Q.    Now, let's turn to Page 31 of 96.

23   And now we're going to go to the line that

24   starts -- the paragraph that starts with "The

25   subject."



Page 316

1        A.      Okay.

2        Q.      Now, I'm going to read a portion

3    of that paragraph, and then I'm going to ask

4    you if you recall testifying about it.

5                "In an e-mail from Wright dated

6    12 March 2008.  'I need your help editing a

7    paper I am going to release later this year.  I

8    have been working on a new form of electronic

9    currency.  Bit cash, Bitcoin ... you are always

10   there for me Dave.  I want you to be part of it

11   all.  I cannot release it as me.  GMX,

12   vistomail and Tor.  I need your help and I need

13   a version of me to make this work that is

14   better than me.'"

15               Do you recall testifying --

16               MR. FREEDMAN:  Objection.

17       Q.      -- about that paragraph yesterday?

18       A.      Yes.  Vaguely.

19       Q.      Do you recall what your testimony

20   was?

21       A.      No, I don't recall what I was

22   asked, and I don't recall what I answered.

23       Q.      Okay.  Well, it's a good thing

24   that I have the transcript from yesterday, so

25   I'm going to ask you and see if what I have


MAGNA
LEGAL SERVICES

Page 317

1     written if you recall that being your response.

2     Is that --

3                    MR. FREEDMAN:  Objection.  Zalman,

4            the transcript from yesterday is a

5            rough.  That specifically says it's not

6            to be relied on.

7                    MR. KASS:  I know.  I'm not

8            relying it.  I'm just asking him if it

9            refreshes his recollection.

10                   MR. FREEDMAN:  You can't ask if

11           the transcript that is not a proper

12           transcript refreshes the witness's

13           recollection.

14                   MR. KASS:  I could.  And --

15                   MR. FREEDMAN:  You can ask him

16           what he testified.

17                   MR. KASS:  No, you can --

18                   MR. FREEDMAN:  You can do whatever

19           you want.

20                   MR. KASS:  Exactly.  And you can

21           make an objection to form.

22                   MR. FREEDMAN:  No, no.  This is

23           not a form objection.  You're presenting

24           improper documents.

25                   MR. KASS:  Vel.



Page 318

```
 1                    MR. FREEDMAN:  The document
 2          specifically says --
 3                    MR. KASS:  Vel, please stop --
 4          stop your speaking objections.
 5                    MR. FREEDMAN:  Zalman, this is not
 6          a speaking objection.
 7                    MR. KASS:  What is it?
 8                    MR. FREEDMAN:  It's not an
 9          objection to the question, how you
10          raised it.  It's an objection that
11          relates to your presenting the witness
12          with a transcript that specifically says
13          it's rough, it cannot be relied on.
14                    MR. KASS:  Vel.
15                    MR. FREEDMAN:  You're trying to
16          use that to refresh -- Zalman, let me
17          finish making the record.
18                    MR. KASS:  It's an improper --
19                    MR. FREEDMAN:  And you're trying
20          to --
21                    MR. KASS:  -- record.
22                    MR. FREEDMAN:  Zalman, you're
23          specifically trying to use that as a way
24          to refresh.  That document says it
25          shouldn't be relied on to refresh a
```



Page 319

```
 1         witness's recollection of what was
 2         stated therein.  That's not a form
 3         objection.  The objection is conduct in
 4         the deposition.  I made the record.  Now
 5         do what you like.
 6              MR. KASS:  Vel, please do not do
 7         that again.  You know that's
 8         inappropriate.  You know the only thing
 9         you're allowed to say is objection to
10         form.  If you think a question is
11         improper, object to form and make that
12         argument in front of the Judge.  Okay?
13         That's not proper conduct, and you know
14         it.
15              MR. FREEDMAN:  I disagree with
16         your statement.  I think it's a
17         perfectly appropriate objection of
18         conduct, but go ahead.
19              MR. KASS:  All right.  The record
20         is what it is, Vel.
21              MR. FREEDMAN:  If you don't think
22         it's appropriate, Mr. Kass, you can
23         raise it with the Court.
24              MR. KASS:  I don't have to raise
25         anything.  This is my depo, Vel.
```



Page 320

1                  MR. FREEDMAN:  Okay.  I'm making a

2         record.

3                  MR. KASS:  Improper record.

4    BY MR. KASS:

5         Q.    Do you recall being asked:  Is

6    this -- referring to that phrase -- consistent

7    with the story told you about Craig's and

8    Dave's collaboration?

9         A.    No, I don't recall being asked

10   that.  But I believe that I was if it's in the

11   transcript.

12        Q.    Okay.  And do you recall answering

13   yes to that?

14        A.    Again, no, I don't recall.  But I

15   believe you.

16        Q.    Okay.  Now --

17                MR. FREEDMAN:  Objection.

18        Q.    -- if you did answer yes -- let me

19   rephrase this.

20                Right now, do you believe that

21   this paragraph is in fact consistent with what

22   Dr. Wright told you?

23        A.    Yes.

24        Q.    And is it consistent, again, based

25   on the fact that Craig said him and Dave worked



Page 321

1    together?

2         A.    Yes.

3         Q.    And consistent because --

4               MR. FREEDMAN:  Objection.

5         Q.    -- Dr. Wright says that Dr. Wright

6    is Satoshi?

7         A.    Yes.

8               MR. FREEDMAN:  Objection.

9         Q.    Is there any reason that you -- is

10   there any other reason that you believe this is

11   consistent with what he previously told you?

12   He, being Dr. Wright.

13              MR. FREEDMAN:  Objection.

14        A.    Can you ask the question again?

15   Is there any --

16        Q.    That's fine.  I'm going to strike

17   that question.  Don't worry.  We can move on.

18        A.    Okay.

19        Q.    Let's go on to Page 36.  Let's go

20   to -- yup.  Let's go to the last paragraph.

21              Now, I'm going to read a sentence.

22   It's "I asked Wright about this and he told me

23   it was true that his and Kleiman's mining

24   activity had led to a complicated trust."

25              Is this consistent with what you



Page 322

1     believe Dr. Wright told you in the past?

2          A.     Sure.  Yes.

3          Q.     And in what way is it consistent?

4          A.     Well, I don't think I had ever

5     heard about any mining activity, but it's

6     certainly consistent that he and Dave had some

7     sort of relationship.

8          Q.     And, therefore, this could have

9     happened?

10         A.     Therefore this could have

11    happened, sure.  It's consistent.

12         Q.     Right.  But he never actually told

13    you that it did happen, right?

14         A.     No, not to my recollection.

15         Q.     Let's go to Page 76.  "'But you

16    can'" -- I am going to read.  "'But you can

17    say, hand on my heart, I am Satoshi Nakamoto?'"

18              And then you have a response.  "'I

19    was the main part of it.  Other people helped.

20    At the end of the day, none of this would have

21    happened without Dave Kleiman, without Hal

22    Finney, and without those who took over - like

23    Gavin and Mike.'"

24              So, first of all, just assuming

25    that this is -- do you know whether this is an



Page 323

1    accurate statement by Dr. Wright?

2         A.    No.

3         Q.    Assuming it is an accurate

4    statement, does it appear that Dr. Wright

5    believes that you were instrumental in

6    Bitcoin's success?

7         A.    Yes.

8               MR. FREEDMAN:  Objection.

9         Q.    Now, do you believe that this

10   paragraph is consistent with what Dr. Wright

11   had told you in the past?

12        A.    Yes.

13        Q.    Now, with regards to that it

14   couldn't have happened without Dave Kleiman,

15   how is that consistent with what he had told

16   you?

17        A.    Again, it's consistent because I

18   was told they worked together.  Beyond that, I

19   don't think I have any direct knowledge of, you

20   know, how Dave Kleiman might have been

21   instrumental.

22        Q.    So, essentially, it's consistent

23   because it could have happened?

24        A.    Yes.

25        Q.    Okay.  I think that's it with this



Page 324

1    exhibit.

2                      THE WITNESS:  Can we take a break?

3                      MR. KASS:  Of course, yes.  Any

4           time you want to take a break, gladly.

5                      Okay.  Let's take a five- to

6           ten-minute break.

7                      VIDEO TECHNICIAN:  The time is

8           12:02 p.m.  We are now off the record.

9                      (Proceedings recessed at

10          12:02 p.m., and reconvened at 12:08

11          p.m.)

12                     VIDEO TECHNICIAN:  The time is

13          12:08 p.m.  We're back on the record.

14                     MR. FREEDMAN:  This is Vel

15          Freedman.  I just want to state for the

16          record that during the break, the court

17          reporter and the videographer mentioned

18          that there are some issues hearing the

19          objections that are being made, an issue

20          with the speakerphone going on mute when

21          multiple people are talking.  We are

22          going to try to monitor the realtime

23          transcript and make sure they are there,

24          but it's not always possible.  And so

25          we're not exactly sure how to deal with



Page 325

```
 1            the situation, but we just want to make

 2            a record to reflect that not all

 3            objections are coming through.

 4                 MR. KASS:  All right.  And, Vel, I

 5            understand what you just raised, and I

 6            just ask if you could do your best that

 7            if there is an objection and you don't

 8            note it on the realtime, if you could

 9            just try to make it known that it's not

10            there, and then we'll just deal with it

11            as necessary.

12                 MR. FREEDMAN:  Absolutely.  I'm

13            just looking at documents and taking

14            notes.  I can't always look at the

15            realtime, but I'm going to try that.

16                 MR. KASS:  Okay.

17       BY MR. KASS:

18            Q.    You had previously testified that

19       a bunch of statements were consistent because

20       Dr. Wright had told you he had worked with

21       Dave.  Is that accurate?

22                 MR. FREEDMAN:  Objection.

23            A.    Yes.

24            Q.    Do you know the nature of their

25       relationship?
```



Page 326

```
 1          A.      No.

 2          Q.      Do you know if one was an employee

 3   of the other?

 4          A.      No.

 5          Q.      Do you know if one was an

 6   independent contractor of the other?

 7          A.      No.

 8          Q.      Do you know if one was

 9   volunteering?

10          A.      No.

11          Q.      Do you know if there was a

12   partnership?

13          A.      No.

14          Q.      Now, I'm going to ask you to turn

15   to Exhibit 16.

16                  MR. KASS:  And, Vel, that's

17          GAVIN_0622.  And it was introduced by

18          you yesterday.

19                  MR. FREEDMAN:  Got it.

20          Q.      Do you recall being shown this

21   e-mail yesterday?

22          A.      Yes.

23          Q.      Okay.  And do you recall who you

24   were communicating with in this e-mail?

25          A.      This is Uyen Nguyen [win-win].  I
```



Page 327

1     believe they -- well, they said they were

2     somebody named Uyen Nguyen.

3          Q.     Do you know who Uyen Nguyen is?

4          A.     No.

5          Q.     Do you know if Uyen Nguyen has any

6     relationship to Dr. Craig Wright?

7          A.     No.

8          Q.     So is it fair to say this is just

9     an e-mail that you received from a person who

10    was unknown to you?

11         A.     Yes.

12         Q.     Do you know whether any of the

13    information that is contained in this e-mail

14    exchange is true?

15         A.     No.

16         Q.     Do you have any personal knowledge

17    about the information that is contained in this

18    e-mail exchange?

19         A.     No.

20         Q.     And so, for example, when it says

21    on the second paragraph from the top, first

22    word says, "nLocktime is what controls a

23    trust," do you know if that's true?

24         A.     No.

25         Q.     Do you know anything about this



Page 328

1    trust?

2         A.    No.

3         Q.    Do you know what controls the

4    trust?

5         A.    No.

6         Q.    So is it fair to say that when you

7    were being asked questions yesterday about this

8    document, you were just reading off an e-mail?

9         A.    Uh, yes.

10             MR. FREEDMAN:  Objection.

11        A.    And, well -- and assuming that the

12   information in the document was true, I was

13   answering questions about what that would mean.

14        Q.    All right.  And when you say

15   "answering questions about what that would

16   mean," does that mean what your interpretation

17   of what you think this e-mail means?

18        A.    Yes.

19        Q.    Now, I want to turn to what has

20   previously been marked as Exhibit 23, and that

21   ends in -- it's a GAVIN, and it ends with 0047.

22             Do you recall being shown this

23   e-mail yesterday?

24        A.    Yes.

25        Q.    And do you recall being asked some



Page 329

1    questions about this e-mail?

2         A.    Vaguely, yes.

3         Q.    Okay.  And do you see where the

4    e-mail -- and who is this e-mail from?

5         A.    Stefan Matthews.

6         Q.    Now, do you see on the first line

7    it says, "He has agreed to sign a new message

8    twice, once with block 1 and once with block 9

9    keys"?

10        A.    Yes.

11        Q.    Do you recall being asked whether

12   that should have been relatively simple to do?

13        A.    I think it was a conditional, if

14   he has the private keys, would that be a simple

15   thing to do.

16        Q.    Okay.

17        A.    And I believe I answered yes.

18        Q.    Now, I'm going to ask the reverse

19   conditional.  If he doesn't have the private

20   keys, would that have been something hard to

21   do?

22        A.    It would be impossible.

23        Q.    So right now, you do not -- and do

24   you know whether he in fact -- he, being

25   Dr. Wright -- in fact had the keys on May 2,



Page 330

1    2016?

2         A.    I don't know.

3         Q.    So are you able to testify as to

4    whether this would have been an easy thing for

5    him to do -- to have done?

6              MR. FREEDMAN:  Objection.

7         A.    Again --

8         Q.    I can rephrase it if that's...

9              I'll rephrase it.  So I'm removing

10   a conditional.  I'm not saying you did.  I'm

11   saying --

12        A.    You're removing a conditional.

13        Q.    Right now based on the knowledge

14   you had on that date, could you state with any

15   certainty whether it would have been easy for

16   Dr. Wright to do?

17        A.    No.

18             MR. FREEDMAN:  Objection.

19             MR. KASS:  Vel, what's the basis

20        for that objection?

21             MR. FREEDMAN:  I just don't

22        understand the question.

23             MR. KASS:  Okay.

24             MR. FREEDMAN:  I'm not sure the

25        witness does, either.



Page 331

```
 1                    MR. KASS:  Well, he answered, so I
 2          think he did.
 3                    MR. FREEDMAN:  Oh.  He answered
 4          what he thinks you said.  I'm not sure
 5          what he answered is what you asked.
 6                    MR. KASS:  That's fine.  I just
 7          wanted to know what your basis was.
 8                    MR. FREEDMAN:  I've seen the
 9          transcript, and I don't know if I
10          misspoke or the transcript is
11          mistranscribed, but what I said before
12          is, what I meant to say is, he answered
13          what he thinks you asked, but I'm not
14          sure what he answered is what you asked.
15                    MR. KASS:  Okay.
16     BY MR. KASS:
17          Q.    Okay.  Now, I'm going to ask you
18     to turn to Exhibit 33, and that's GAVIN_0344.
19     And I'm also going to ask you to pull up a
20     second e-mail, and I will tell you which one
21     that is in a second.  And that's going to be
22     Exhibit 37, and that ends -- it's a GAVIN one,
23     and it ends in 0869.
24                    MR. FREEDMAN:  You cut out.  Zero
25          what?
```



Page 332

1               MR. KASS:  869.

2               MR. FREEDMAN:  All right.  Thank

3      you.

4      Q.     Do you recall being shown these

5      e-mails yesterday?

6      A.     Yes.

7      Q.     Do you recall being asked a series

8      of questions about these e-mails?

9      A.     Vaguely, yes.

10     Q.     Do you recall a question on

11     Exhibit 37 about over 100 million?

12             So that's Exhibit 37, first line

13     from the top.

14     A.     I don't recall what the question

15     was.

16     Q.     But do you remember a discussion

17     about 100 million and you weren't really sure

18     what that was?

19     A.     Yes, 100 million --

20             MR. FREEDMAN:  Objection.

21     A.     -- somethings.

22     Q.     Exactly.

23     A.     Yes, I do recall.

24     Q.     Do you recall being asked a series

25     of questions about Dr. Wright's net worth based


MAGNA
LEGAL SERVICES

Page 333

1    on Exhibit 33 and 37?

2         A.    Vaguely, yes.

3         Q.    Now, do you have any personal

4    knowledge as to Dr. Craig Wright's wealth?

5              MR. FREEDMAN:  Objection.

6         A.    No.  The only personal knowledge I

7    have is how he dresses, how he presents

8    himself, the fact that, you know -- well,

9    actually, I have no personal knowledge about

10   his travels, but he said that he travels and

11   lives a nice life-style.

12        Q.    Thank you.  Let's break that down.

13   So let's first talk about things that you've

14   observed with your senses with regards to Craig

15   Wright's wealth, and then we'll deal with the

16   other half afterwards.

17             So what have you observed with

18   regards to Craig Wright's wealth with your own

19   senses?

20        A.    When I met him in London, he

21   seemed well-dressed.  He seemed well-spoken.

22   He seemed like a person who was not poor, was

23   not lower class.

24        Q.    Okay.  Now, is the way someone

25   dressed always an indicator -- or is it a



Page 334

1    good -- do you believe it's a good indicator of

2    someone's net worth?

3            A.    No.

4            Q.    Is it possible to be --

5                  MR. FREEDMAN:  Objection.

6            Q.    -- well-dressed but heavily in

7    debt?

8            A.    Yes.  Absolutely.

9            Q.    And does one have to be --

10                 MR. FREEDMAN:  Objection.

11           Q.    Does one have to have a fortune in

12   Bitcoin to be well-dressed?

13           A.    No.

14           Q.    And the fact that somebody is

15   well-dressed, does that mean they have a

16   fortune in Bitcoin?

17           A.    No, certainly not.

18           Q.    Does that mean they have a lot of

19   money?

20           A.    No, not necessarily.

21           Q.    All right.  So that's how -- have

22   we covered everything that you've observed with

23   your own senses?

24           A.    Yes.

25           Q.    Now --



Page 335

```
 1                    MR. FREEDMAN:  Objection.

 2          Q.     So is it fair to say that

 3     everything else that you know about

 4     Dr. Wright's net worth is you heard from

 5     somebody else or somebody?

 6                    MR. FREEDMAN:  Objection.

 7          A.     Yes.  That's fair to say.

 8          Q.     So now going back to these two

 9     e-mails which are Exhibit 33 and 37, Exhibit 37

10     says "That is individuals with over 100 million

11     net wealth," correct?

12                    Do you see that?

13          A.     Yes.

14          Q.     All right.  Do you know if

15     that's -- do you know if Dr. Wright has over

16     100 million net wealth?

17          A.     My assumption, reading this

18     e-mail, is that he has more than 100 million

19     Australian dollars, because this was in the

20     context of a discussion about Australian tax

21     office stuff.

22          Q.     Do you have any personal knowledge

23     as to whether that's actually true?

24                    MR. FREEDMAN:  Objection.

25          A.     No.
```



1          Q.     So is this just based on an e-mail

2     that a person had sent by Dr. Wright?

3               MR. FREEDMAN:  Sorry.  There was

4          an objection between the "Do you have

5          any personal knowledge as to whether

6          that's actually true" and "No."

7          Q.     So is this just based on an e-mail

8     that appears to have come from Dr. Craig

9     Wright's e-mail?

10         A.     Yes.

11         Q.     Now, assuming that this is

12    accurate, because we don't know if it is,

13    correct?

14               So, again, assuming that this is

15    accurate, do you know the source of those

16    funds?  Of the net worth.

17         A.     No.

18         Q.     Could Dr. Wright have won the

19    lottery and got fabulously wealthy?

20         A.     It's possible, yes.

21         Q.     Could he have inherited a lot of

22    wealth?

23         A.     It's possible, yes.  I have no

24    knowledge.

25               MR. FREEDMAN:  Objection.



1          Q.     Could he have purchased a lot of

2     Bitcoins when they were really cheap in the

3     early days?

4               MR. FREEDMAN:  Objection.

5          A.     Yes, that's possible, too.

6          Q.     And do you have any knowledge

7     whether Dave Kleiman was involved in generating

8     any of this wealth?

9          A.     No.

10              MR. FREEDMAN:  Objection.

11         Q.     If this wealth exists, do you know

12    if it's held in Dr. Wright's name?

13         A.     No.

14              MR. FREEDMAN:  Objection.

15         Q.     Do you know if this wealth is

16    locked up in a trust somewhere?

17         A.     No.

18         Q.     Do you know if Dr. Wright has

19    access to this wealth?

20         A.     No.

21              MR. KASS:  Let's take a

22         five-minute break.  I'm actually getting

23         close to -- I'm not entirely done, but

24         I'm getting close.  I just want to go

25         over my notes and see if I have anything



Page 338

```
 1        else.

 2                     VIDEO TECHNICIAN:  The time is

 3        12:24 p.m.  We are off the record.

 4                     (Proceedings recessed at

 5        12:24 p.m.  and reconvened at 12:33

 6        p.m.)

 7                     VIDEO TECHNICIAN:  The time is

 8        12:33 p.m.  We are back on the record.

 9   BY MR. KASS:

10        Q.    All right.  I'm going to ask you

11   to turn now to what has previously been marked

12   as Exhibit 35, and that's GAVIN_0274.

13                     And then I'm going to also ask you

14   to turn to exhibit that has been previously

15   marked as 34, and that ends in -- it's GAVIN

16   and it's 0732.

17                     Do you recall being asked

18   questions about these --

19                     MR. FREEDMAN:  Sorry, Zalman.  I

20        can't seem to find the first one.  I

21        have GAVIN_0372.  What was the other

22        one?

23                     MR. KASS:  It's 1274.

24                     MR. FREEDMAN:  Got it.  Thank you.

25        Q.    Do you recall being shown these
```



Page 339

1      two exhibits yesterday?

2            A.      Yes.

3            Q.      And do you recall being asked

4      questions about these exhibits?

5            A.      Vaguely, yes.

6            Q.      Okay.  Now, on the exhibit that's

7      labeled 35, do you see the second line.  It

8      says, "I have sufficient funds that they can

9      force me to sell"?

10           A.      Yes.

11           Q.      And then do you see in the

12     paragraph under, it says, "It would mean

13     dumping 400 million in coin to pay"?

14           A.      Yes.

15           Q.      Again, do you have any personal

16     knowledge as to whether this is true?

17           A.      No.

18           Q.      Do you know --

19                   MR. FREEDMAN:  Objection.

20           Q.      -- what "coin" refers to in this

21     e-mail?

22           A.      I assumed it meant Bitcoin.

23           Q.      Right.  Could it have meant

24     another type of coin?

25                   MR. FREEDMAN:  Objection.



Page 340

```
1          A.     It could be a colloquial phase for

2     money in general.

3          Q.     Could it be that Dr. Wright is a

4     coin collector?

5                 MR. FREEDMAN:  Objection.

6          A.     It seems unlikely anybody --

7                 MR. FREEDMAN:  I'm sorry.  I'm

8                 just seeing objection.  There was an

9                 objection, or at least there was

10                 supposed to be an objection, between

11                 "Could it have meant to be another

12                 coin?"  And you have the last objection.

13          Q.     Mr. Andresen, I'm sorry, you got

14     cut off in the middle of your answer.  What was

15     your answer?

16          A.     My answer was 400 million in

17     collectable coins seems unlikely.  That would

18     be a large pile of collectable coins.  So I

19     assume he's not referring to some physical

20     coin.  But I suppose it could be possible.

21     Although, in the context of this e-mail where

22     he talks about signing, it seems unlikely to

23     me.

24          Q.     Unlikely.  But you don't know with

25     any certainty what he's really referring to?
```



Page 341

1           A.      I don't know with absolute --

2                   MR. FREEDMAN:  Objection.

3           A.      I don't know with absolute

4    certainty what he's referring to.

5           Q.      And you don't know what he's

6    saying is in fact accurate?

7           A.      Correct.  I don't even know --

8                   MR. FREEDMAN:  Objection.

9           A.      -- if craig@rcjbr.org is the Craig

10   Wright that I met in London.

11          Q.      Okay.  And let's go to Exhibit 35,

12   which -- 34.  I apologize.  34.

13                  Is it your answers apply to this

14   e-mail also, that again you have no personal

15   knowledge as to the contents of this e-mail?

16                  MR. FREEDMAN:  Sorry, Zalman.

17          This is Bates 372?

18                  MR. KASS:  Yes.  No, no.  This is

19          732.

20                  MR. FREEDMAN:  Oh.  Hold on.  Can

21          you give me one second to get the

22          document?  I apologize.

23                  MR. KASS:  Yes.  And I'm going to

24          actually rephrase that question.

25                  MR. FREEDMAN:  I got it.



Page 342

1    BY MR. KASS:

2         Q.    Okay.  So let's look at the one

3    line that says -- second from the bottom

4    paragraph, "I have sufficient funds that they

5    can force me to sell" at the bottom.

6         A.    I see that.

7         Q.    Do you know if that's true?

8         A.    No.  I have no independent

9    knowledge that that's true.

10        Q.    Sure.  And do you see a reference

11   on the third paragraph from the top relating to

12   "They is part" -- stating, "They is part a few

13   people (not all) in the tax office - years of

14   hate."

15              Do you know anything about that?

16        A.    I don't have any --

17              MR. FREEDMAN:  Objection.

18        A.    No.  I have no independent

19   knowledge about what happened between Craig

20   Wright and a tax office.

21        Q.    So would it be fair to say that,

22   at most, you're reading an e-mail that appears

23   to have been sent, or may have been sent, from

24   Dr. Wright's e-mail address and just

25   interpreting what it says based on your -- on



Page 343

1      your belief?

2            A.      Sure.  Yes.

3            Q.      Okay.  Do you recall testifying

4      yesterday that you believe Dr. Wright lied to

5      you?

6            A.      Yes.

7            Q.      What do you believe the lie was?

8            A.      I believe he deceived me, which

9      deception I believe is a form of lying.

10           Q.      Okay.

11           A.      He deceived me about the proof

12     that he would provide to the world that he had

13     a private key to one of the early Bitcoin

14     blocks.

15           Q.      Now, did he say one thing to you

16     and then do something different?  That he was

17     going to do this, and then he didn't do it?

18           A.      I don't think he ever explicitly

19     said what he was going to do.

20           Q.      Okay.  So is it fair to say that

21     you maybe feel misled about what he did?

22           A.      I definitely feel misled about

23     what he did.

24           Q.      Disappointed?

25           A.      Disappointed, yes.



1          Q.      But he didn't say a direct

2     untruth?

3          A.      Yes.

4                  MR. FREEDMAN:  Objection.

5          Q.      Are you familiar with SegWit?

6          A.      Yes.

7          Q.      What is SegWit?

8          A.      SegWit is a technical change to

9     Bitcoin that I could go into detail about, but

10    I'm not sure you want me to.

11         Q.      High -- hmm.  Let me ask -- okay,

12    let's keep it like that, high level, and we'll

13    see how deep I want to dig.

14         A.      Okay.

15         Q.      Did SegWit change the way

16    transactions are stored on the blockchain?

17         A.      SegWit introduced a new way of

18    storing transactions on the blockchain.  The

19    old way of storing transactions on the

20    blockchain are still valid with the SegWit

21    change.

22         Q.      And if somebody has an old version

23    of the Bitcoin software pre-SegWit, is it able

24    to interact with the newer transactions after

25    SegWit?



1          A.     No.  If you have an old version of
2     the software, it won't understand the new form
3     of transactions.

4          Q.     And is that a widely-accepted
5     belief in the Bitcoin community?

6          A.     Yes, I believe so.

7                 I should amend my previous
8     statement --

9          Q.     Okay.

10         A.     -- because the way SegWit is
11    implemented, I believe old versions of the
12    software will falsely accept SegWit
13    transactions.  It will not properly validate
14    them.

15         Q.     Okay.  So -- what do you mean by
16    that?  I don't want to speak for you.

17         A.     So the job of the Bitcoin software
18    is to make sure that only valid transactions
19    are accepted --

20         Q.     Mm-hmm.

21         A.     -- and what's called confirmed.

22         Q.     Mm-hmm.

23         A.     And so SegWit introduced a new
24    kind of transaction to maintain compatibility.

25                Old versions of the software



Page 346

1    accept all SegWit transactions as valid.

2    Whereas, new versions of the software do you

3    can think of it as deeper checks to make sure

4    that they actually are valid.  And the

5    assumption is the miners who do the ultimate

6    validation all run the fully-validating

7    SegWit-compatible latest version of the Bitcoin

8    software.

9         Q.    So is it fair to say that an older

10   version of the Bitcoin software can't validate

11   the newer SegWit transactions?

12        A.    Yes.

13        Q.    So would it also be fair to say

14   that the actual miner who is going to validate

15   this transaction, right, who by chance happened

16   to get the correct hashing and non- -- do the

17   correct --

18        A.    A miner who solves the block?

19        Q.    Thank you.  The miner who solves

20   the block cannot be a miner running the old

21   software?

22        A.    They could get lucky.

23        Q.    Okay.

24        A.    So, I mean, they might have some

25   SegWit transactions that they accept that turn



Page 347

```
 1    out to be valid.  But if they were to accept --
 2    if they were to create a block containing an
 3    invalid SegWit transaction, according to the
 4    new rules, then the other miners would reject
 5    their block.  And so it would not be accepted.
 6    They would lose money.
 7         Q.    Is it fair to say that it's not
 8    fully compatible --
 9         A.    Yes.
10         Q.    -- the two versions?
11         A.    Definitely fair to say they're not
12    fully compatible.
13         Q.    And what's your basis for this
14    knowledge?
15         A.    I reviewed the SegWit code
16    changes, or many of the SegWit code changes.
17         Q.    And is one reason that the older
18    software can't recognize the newer transactions
19    is because the way the transaction is
20    structured is kind of mixed about?
21         A.    Yes.
22         Q.    Okay.  Got it.
23               Prior to yesterday's deposition,
24    did you speak with counsel representing Ira
25    Kleiman or Dave Kleiman?  Let's do Dave
```



Page 348

1    Kleiman, or the Estate of Dave Kleiman.

2         A.    Yes.  They gave me a phone call

3    informing me that this deposition would happen.

4         Q.    And do you recall when that phone

5    call was?

6         A.    I don't recall.

7         Q.    Prior to that phone call, did you

8    have any communication with them?

9         A.    Yes.  We had a phone call

10   discussing the subpoena, and going through the

11   subpoena.

12        Q.    Okay.  Now, did you have any phone

13   calls, other than the two phone calls that you

14   just mentioned?

15        A.    I don't believe so, no.

16        Q.    Did you have any e-mail

17   communications with counsel for doctor -- I

18   mean, for the Plaintiffs?

19        A.    Probably.  Yes.

20              MR. KASS:  Vel, I'm going to

21         request those.

22        Q.    Let's start with the first phone

23   call regarding the subpoena.  What was

24   discussed during that phone call?

25        A.    The scope of the subpoena and



Page 349

1    mechanics of how I would respond to the

2    subpoena.

3         Q.    Did you discuss anything

4    substantively about the Plaintiffs' claims in

5    this case?

6         A.    No, I don't believe so.

7         Q.    And do you recall which attorneys

8    were on that phone call, their names?

9         A.    No, I don't.

10         Q.    Now, in the second phone call, was

11    that more recent?

12         A.    Yes, that was more recent.

13         Q.    Was it within the past few months?

14         A.    Yes.

15         Q.    And what was the substance of the

16    second phone call?

17         A.    It was logistics of this

18    deposition.

19         Q.    Did they ask you any substantive

20    questions?

21         A.    No, not that I recall.

22         Q.    Did they ask you anything about

23    your relationship with Dr. Craig Wright?

24         A.    I don't believe so, no.

25         Q.    Did they ask you anything about



Page 350

```
 1      the proof session that happened in London?

 2           A.      I don't think they asked me

 3      anything about it.  I think that they did say

 4      that they would be asking questions about it.

 5           Q.      Okay.  Did they say that they were

 6      going to be asking questions about anything

 7      else?

 8           A.      Not that I recall, no.

 9           Q.      And how long did that phone call

10      last for?  Approximately.

11           A.      Maybe ten minutes.

12           Q.      And do you know the attorneys that

13      were on that phone call, their names?

14           A.      No, I don't.

15           Q.      Could one have been Velvel

16      Freedman?

17           A.      Very possibly, yes.

18                   MR. KASS:  I'm going to mark the

19              next exhibit, although this is a little

20              risky, because starting a new sheet I

21              don't know if there is another sheet

22              around there.  So I may be jumping.

23                   COURT REPORTER:  Let me tell you

24              that.

25                   (Discussion off the record.)
```



Page 351

```
 1                     (Document marked for

 2            identification as Andresen Exhibit 74)

 3                     MR. KASS:  I'm going to introduce

 4            Exhibit 74, and this is GAVIN_0023.

 5                     MR. FREEDMAN:  Is this one of the

 6            ones you sent me?

 7                     MR. KASS:  Yes, it is.  I sent it

 8            in an e-mail.

 9                     MR. FREEDMAN:  Got it.  Thank you.

10    BY MR. KASS:

11            Q.    Do you recognize this document?

12            A.    Yes.

13            Q.    What is it?

14            A.    It's an e-mail from Stefan

15    Matthews to me.

16            Q.    And what do you say in the

17    substance of that e-mail?

18            A.    I say that I signed an NDA

19    agreement and gave him a Hushmail address to

20    communicate with me.

21                     MR. KASS:  Now, I'm going to

22            introduce as Exhibit 75, and it's Bates

23            number 0024.

24                     (Document marked for

25            identification as Andresen Exhibit 75)
```



Page 352

```
 1          Q.     And do you recognize this
 2     document?  If it helps, it's sequentially
 3     numbered.
 4          A.     Sure.  Yes.  It's probably the
 5     signed NDA agreement that was the attachment
 6     from the e-mail.
 7          Q.     Correct.  And if you go to Page 3,
 8     do you see where it says "Signed by Gavin
 9     Andresen."
10          A.     Yes.
11          Q.     Is that in fact your signature?
12          A.     That is my signature.
13          Q.     And do you believe that you signed
14     it?
15          A.     I do believe I signed it, yes.
16          Q.     Now, do you know if this
17     non-disclosure agreement was ever revoked?
18          A.     I don't know.
19          Q.     And prior to sitting -- now, let's
20     just look -- I just want to go to the first
21     page.  Under 1.1, it says, "We EITC."
22                 And then also if you go to the
23     last page, Page 3, and then it says -- it's
24     blank over here, but it seems like it should be
25     signed by "(a director) for and on behalf of
```



Page 353

1    EITC Holding Limited"?

2         A.    Yes.

3         Q.    So is it fair to say that this

4    agreement is entered into between you and EITC

5    Holding Limited?

6         A.    Assuming that they signed --

7         Q.    Signed it, yeah.

8         A.    -- their copy, sure.

9         Q.    That's who it was intended to be

10   entered into with?

11        A.    Yes.

12        Q.    Prior to being deposed, did you

13   reach out to EITC to see if they had any

14   objections to you providing testimony?

15        A.    No, I did not.

16        Q.    And let's just look at Paragraph

17   1.2.  And it seemed like it defines

18   "Confidential Information."

19             Do you see that?

20        A.    Yes.

21        Q.    And it says [As Read]:

22   Confidential Information means all confidential

23   or proprietary information (however recorded or

24   preserved) that is associated or made available

25   before or after the date of this agreement (in



Page 354

```
 1    any form or medium), directly or indirectly, by

 2    the Provider to the recipient.  For the

 3    avoidance of doubt, the fact of any

 4    confirmation or admission concerning the

 5    identity of the creator of blockchain and

 6    Bitcoin is Confidential information.

 7               Do you see where it says that

 8    there?

 9         A.    I see where it says that, yes.

10               MR. KASS:  Okay.  I think I'm

11          done, Vel.  It's all yours.

12               MR. FREEDMAN:  Okay.  Can we take

13          a five-minute break and then we'll get

14          back on the record?

15               MR. KASS:  Yes.

16               VIDEO TECHNICIAN:  The time is

17          12:54 p.m.  And I'm going to close out

18          media unit number one of today's

19          deposition.  We are off the record.

20               (Proceedings recessed at

21          12:54 p.m., and reconvened at 1:03 p.m.)

22               VIDEO TECHNICIAN:  The time now is

23          1:03 p.m.  We're coming back on the

24          record.  Now beginning media unit number

25          two in today's deposition with Gavin
```



Page 355

1             Andresen.  We're on the record.

2                  MR. KASS:  And just before we

3             start, I'm going to designate the entire

4             deposition transcript confidential,

5             especially in light of the nondisclosure

6             agreement.  And I believe the witness

7             also may have some additional portions

8             that the witness wants to designate as

9             confidential.  I'm not sure if the

10             witness wants to do it now or just send

11             an e-mail to counsel.  How would you

12             like to proceed?

13                  THE WITNESS:  I will send an

14             e-mail to counsel.  But I would request

15             that the majority of this remain

16             confidential.

17                  MR. KASS:  Okay.

18        EXAMINATION

19        BY MR. FREEDMAN:

20             Q.    All right.  Mr. Andresen, we met

21        yesterday, so I'm not able to be there in

22        person today, but thank you for coming back.

23             A.    You're welcome.

24             Q.    You mentioned yesterday that you

25        might have Bitcoin from your short mining



1     activity back in 2010.  Do you recall that?

2          A.     Yes, I do.

3          Q.     Did you check last night whether

4     or not you had any?

5          A.     No, I did not.

6          Q.     To the best of your recollection

7     right now, do any of the coinbases address --

8     the coinbase addresses of those blocks have all

9     50 coins remaining in them, or have you

10    certainly spent at least some out of all of the

11    coinbase addresses?

12         A.     I've certainly moved them to other

13    wallets.

14         Q.     So would it be fair to say at the

15    current moment, you do not have any -- you do

16    not have any Bitcoin that reside in the

17    coinbase address they were originally mined in

18    back in 2010?

19         A.     Correct.

20         Q.     Okay.  Thank you.

21                Where does Jon Matonis live?

22         A.     I don't know where Jon Matonis

23    lives.

24         Q.     Do you know his e-mail address?

25         A.     Not off the top of my head, but



Page 357

1    it's in my contact list.

2         Q.    Could you look that up for me if

3    we sent you an e-mail after the deposition?

4         A.    Yes.

5         Q.    Do you know his phone number?

6         A.    I may have a phone number in my

7    contacts for him.

8         Q.    Would you mind looking that up for

9    me also after the deposition?

10        A.    Sure.  I could do that.

11        Q.    What about his business address?

12   Do you happen to have that?  Or a home address?

13        A.    I don't think I have any physical

14   addresses for him, no.

15        Q.    Would you expect that Mr. Matonis

16   has knowledge akin to yours about the proof

17   session and interactions directly with Craig

18   Wright?

19             MR. KASS:  Objection to form.

20        A.    I believe Jon told me that he also

21   witnessed some sort of proof, but I have no

22   details of whether it was the same sort of

23   proof session that I had with Dr. Wright or

24   something completely different.

25             I haven't asked him, and he hasn't



1    told me.

2         Q.    Mr. Andresen, have you ever heard

3    the name Calvin Ayre [Ire], A-y-r-e?

4         A.    Yes, I've heard --

5         Q.    Or Ayre [Air].

6         A.    Yes, I've heard the name Calvin

7    Ayre.

8         Q.    In what context?

9         A.    He's a personality in the Bitcoin

10   world.

11        Q.    Was there any connection -- strike

12   that.

13              To your knowledge, was there any

14   connection between Calvin Ayre and Craig

15   Wright?

16        A.    Not to my knowledge.

17        Q.    Have you ever heard the name

18   nChain?

19        A.    nChain.  Maybe.  There are many

20   whatever chains in the Bitcoin blockchain

21   world.

22        Q.    Would it surprise you -- strike

23   that.

24              Do you recall the name EITC

25   Holdings Limited?



Page 359

     1          A.      EITC Holdings Limited.  Yes, I
     2     remember that because I was told EITC stands
     3     for East Indian Trading Company.
     4          Q.      And in what context did you hear
     5     that name?
     6          A.      When I flew to London, one of the
     7     people I met with was one of the EITC people,
     8     and the non-disclosure agreement that I signed
     9     was with EITC Holdings.
    10          Q.      So this is the company we
    11     discussed yesterday being the money men?
    12              MR. KASS:  Object to form.
    13          A.      Yes.  One of the -- one of the --
    14     yes.  EITC Holdings was -- yes, the business
    15     that I was told was getting involved with Craig
    16     Wright in some form.
    17          Q.      I believe you said yesterday they
    18     were a type of venture capital firm; is that
    19     correct?
    20          A.      That was my understanding, yes.  I
    21     might have done some online research --
    22              MR. KASS:  And object to form.
    23          A.      -- looking at what they did.  But,
    24     yes, some sort of investment, venture
    25     capital --


MAGNA
LEGAL SERVICES

Page 360

```
 1        Q.     And the reason that you -- sorry,
 2   go ahead.
 3        A.     Some sort of investment or venture
 4   capital firm.
 5        Q.     And the reason we use the term
 6   money men is because it was your understanding
 7   that they were providing the funding associated
 8   with Craig's coming-out as Satoshi Nakamoto?
 9             MR. KASS:  Object to form.
10        A.     Yes.  That was my understanding.
11        Q.     Mr. Andresen, would it surprise
12   you to hear that Calvin Ayre is behind the
13   entire coming-out as Satoshi Nakamoto is Craig
14   Wright?
15             MR. KASS:  Object to form.
16        A.     Uh, would it surprise me.  Um.
17   Uh.  I mean, this whole affair has been very
18   weird.  So, no, I don't think it would surprise
19   me.
20        Q.     Was there -- thinking back to your
21   time in London, was there any reference to a
22   mysterious backer or a business mogul, or some
23   other shadowy figure, that might be consistent
24   with a reference to Calvin Ayre?
25             MR. KASS:  Object to form.
```



Page 361

1          A.      No, not that I recall.

2          Q.      Mr. Andresen, you never spoke

3     directly -- strike that.

4                  Did you ever speak to Satoshi

5     Nakamoto via telephone?

6          A.      No.

7          Q.      Did you ever speak to him in any

8     other way besides written correspondence via

9     your e-mails and private Bitcoin forum

10    messages?

11         A.      No.

12         Q.      So is it possible that the person

13    you were conversing with in 2010 and 2011 was

14    actually more than one person?

15         A.      Yes, that's possible.

16         Q.      You reviewed many of the e-mails

17    that appear to have come from Craig Wright's

18    addresses during this deposition; would that be

19    a fair characterization?

20         A.      Yes.

21         Q.      And you've spoken to Craig --

22    strike that.

23                 Do you have any indication that it

24    wasn't Craig sending you those e-mails?

25         A.      No, I have no indication that it



1    was not Craig -- the Craig Wright I met in

2    London sending me those e-mails.

3         Q.     Did Craig ever tell you that you

4    should not trust e-mails that appear to come

5    from him?

6              MR. KASS:  Object to form.

7         A.     I don't think so.

8         Q.     Do you have any reason to think it

9    was not Craig that was the sender of those

10   e-mails?

11        A.     No, I have no reason to think

12   that.

13        Q.     Mr. Andresen, I'm going to read

14   you an e-mail, the first sentence of an e-mail,

15   that Craig Wright sent to Louis Kleiman, which

16   was Dave Kleiman's father.  Is that all right?

17             MR. KASS:  I'll object.  But, yes

18        to the extent you're -- well, I'm just

19        going to leave it to object to the

20        document.  I'm not going to do a speech.

21        If you want, I can flesh out my

22        argument.

23        A.     I'm listening.

24        Q.     It's dated February 11, 2014, and

25   it begins, "Hello Louis, Your son Dave and I



Page 363

1     are two of the three key people behind

2     Bitcoin..."

3               Is that very similar to what you

4     recall as Craig's statement to you that the

5     person of Satoshi was actually being three

6     people, Dave Kleiman, Craig Wright, and a

7     mysterious person you never asked about?

8               MR. KASS:  Object to form.

9          A.    Yes.

10         Q.    And you testified yesterday that

11    you recall Craig Wright getting emotional and

12    telling you about Dave being one of the three

13    people behind the Satoshi persona.

14               Do you recall that?

15         A.    I think I recall testifying to

16    that, yes.

17               MR. KASS:  Object to form.

18         Q.    And do you recall testifying that

19    it was particularly prominent in your mind

20    because it's unusual; you don't generally see a

21    grown man almost crying?

22               MR. KASS:  Object to form.

23         A.    Yes, I recall that.

24         Q.    So if your recollection is

25    accurate and Craig and Dave -- and Craig told



1    you that he and Dave were each one-third of

2    Satoshi Nakamoto, then wouldn't it be true that

3    Craig Wright worked with Dave Kleiman?

4            MR. KASS:  Object to form.

5            A.    Yes, if that -- if my recollection

6    is correct and if Craig Wright was telling the

7    truth, then yes.

8            Q.    It would be accurate to describe

9    that relationship as working with each other?

10            MR. KASS:  Object to form.

11            A.    Sure.

12            Q.    And can you turn to Exhibit 69 for

13    me, which is your blog log post from May 2,

14    2016?

15            A.    Okay.  Yes.

16            Q.    And if you look at the

17    second-to-last paragraph from the bottom of the

18    first page, and that last sentence there, can

19    you read that last sentence that says "But"?

20            A.    "But I'm going to respect

21    Dr. Wright's privacy, and let him decide how

22    much of that story he shares with the world."

23            Q.    You were expressing intent not to

24    reveal much of what Dr. Wright told you during

25    that meeting; is that accurate?

MAGNA ▶
LEGAL SERVICES

Page 365

1               MR. KASS:  Object to form.

2       A.      Yes.

3       Q.      It was on Dr. Wright to reveal the

4    intimate details of his being Satoshi; is that

5    a fair characterization of your attitude?

6               MR. KASS:  Object to form.

7       A.      Can you ask that again?

8       Q.      Is it a fair characterization of

9    your attitude toward disclosing what you were

10   told -- strike that.

11              Would it be fair to say that you

12   were approaching -- no, strike that, too.

13              Would it be fair to say that you

14   were not going to give many details out about

15   what Craig told you because you believe that

16   was for Craig to share?

17              MR. KASS:  Objection.

18      A.      Yes.

19      Q.      And can you turn back with me to

20   exhibit I believe it's 73.  It's Bates

21   GAVIN_1759.

22      A.      Okay.

23      Q.      And this is the e-mail

24   correspondence between you and Ira Kleiman; is

25   that accurate?



Page 366

```
 1          A.     Yes.

 2          Q.     Were you sure this was Ira Kleiman

 3     that you were e-mailing with?

 4          A.     No.  Well --

 5          Q.     Is it fair to say that you would

 6     have approached any conversation with the

 7     recipient of this e-mail with any caution?

 8                 MR. KASS:  Object to form.

 9          Q.     Let me rephrase that for you.

10                 Is it fair to say that you would

11     be cautious in what you would tell the other

12     person at the end of this e-mail because you

13     weren't really sure this was Dave Kleiman's

14     brother?

15                 MR. KASS:  Object to form.

16          A.     Yes, that's fair.  Well, and I'm

17     not sure --

18          Q.     If you go down --

19          A.     I'm not sure the fact that it was

20     Dave Kleiman's brother has any -- I'm generally

21     cautious about not -- not taking at face value

22     if I receive an e-mail from somebody I haven't

23     met personally and don't have a relationship

24     with, you know, I'm going to be cautious,

25     because e-mails can easily be faked.
```



1          Q.     Right.  So you didn't know who was

2     on the other end of this e-mail chain.

3          A.     Correct.  Everything --

4          Q.     And in -- go ahead.

5          A.     I was just going to say everything

6     I know is in this e-mail.

7          Q.     Right.  And the sender of this

8     e-mail asks you for information about Craig and

9     Dave Kleiman; is that accurate?

10         A.     Yes.

11         Q.     And you respond that Craig said

12    that he worked with David.

13         A.     Yes.

14         Q.     Beyond that, I don't know much.

15    Is that fair?

16         A.     Yes, that's fair.

17         Q.     Now, isn't it true that if Craig

18    told you he and Dave were one-third each of

19    Satoshi, that they worked -- that Craig worked

20    with David?

21              MR. KASS:  Object to form.

22         A.     Yes.

23         Q.     So your e-mail would be a true

24    characterization of your conversation with

25    Craig Wright even if -- strike that.



```
 1                  Your e-mail would be a true

 2      characterization of your conversation with

 3      Craig Wright, as you recall it, as he said he

 4      and Dave Kleiman were each -- as he said it,

 5      collectively two-thirds of the Satoshi persona;

 6      is that right?

 7                  MR. KASS:  Object to form.

 8           A.     Can you repeat the question?

 9           Q.     Sure.  Isn't it true that this

10      e-mail is an accurate way to cautiously give

11      someone information that would reflect the

12      conversation you had with Craig Wright that he

13      and Dave Kleiman were two of the three people

14      behind Satoshi Nakamoto?

15                  MR. KASS:  Object to form.

16           A.     I think the only thing I was --

17      again, I have to say my recollection of who

18      told me what when is fuzzy.  So --

19           Q.     But you recall --

20           A.     I do recall Craig saying that he

21      and David worked together, and I do recall him

22      getting emotional when recalling Dave.

23           Q.     In the context --

24                  MR. KASS:  I think he's still --

25                  Vel, the witness is in the middle of
```



```
 1            answering still.
 2            A.    So I'm not -- at this point, I'm
 3      not sure my memory is any more clear than being
 4      able to say I'm reasonably certain that they
 5      worked together.  Beyond that -- for example,
 6      the one-third of Satoshi Nakamoto phrase, I
 7      can't say for certain that Craig Wright ever
 8      said that to me.
 9            Q.    But you have a reasonably --
10      you're reasonably -- sorry, let me strike that.
11                  Is it more likely than not that he
12      told you that?
13                  MR. KASS:  Object to form.
14            A.    I don't know.
15            Q.    Is it less likely than not?
16                  MR. KASS:  Object to form.
17            A.    Again, I don't know.  You're
18      asking me to judge my own memory, and I'm --
19      I'm a skeptic.  I've seen the research on how
20      fallible our memories are.  So I'm not a --
21            Q.    Let's do this --
22            A.    -- good judge.
23            Q.    Sorry, go ahead finish.
24            A.    I'm just not a good judge of my
25      own certainty of my own memory.
```



```
 1          Q.    I understand that you can't swear
 2     to that this happened exactly as you recall it.
 3               Let me ask you the question this
 4     way:  Do you have a memory of Craig Wright
 5     telling you that he and Dave Kleiman were each
 6     one-third Satoshi Nakamoto?
 7               MR. KASS:  Object to form.
 8          A.    No, I don't --
 9          Q.    I understand you can't -- I
10     understand you can't swear that that's exactly
11     what happened.  But do you recall that
12     happening?
13               MR. KASS:  Same objection.
14          A.    No, I don't have a clear memory of
15     that happening.
16          Q.    So yesterday you testified that
17     you recall this occurring.  Where did that come
18     from?
19               MR. KASS:  Object to form.
20          A.    Uh, uh, uh...
21          Q.    In fact, yesterday you said it was
22     particularly prominent in your mind because you
23     remember him getting emotional about it.  It's
24     not every day that you see a grown man crying.
25               Did you make up the testimony
```



Page 371

 1    yesterday that you recall Craig telling you
 2    that?
 3                MR. KASS:  Wait.  Vel, if you're
 4          purporting to read from the
 5          transcript --
 6                MR. FREEDMAN:  Zalman --
 7                MR. KASS: -- we're going to have
 8          the same issue.
 9                MR. FREEDMAN:  Zalman, I'm going
10          to -- Zalman, you have to keep your
11          objection to form just like you asked me
12          to.
13                MR. KASS:  Yes, and like you
14          didn't do it.
15    BY MR. FREEDMAN:
16          Q.    Mr. Andresen, did you make up that
17    memory in your mind, or did you have a memory
18    you were thinking about when you testified
19    about that yesterday?
20                MR. KASS:  Object to form.
21          A.    It's very possible that that
22    memory is spurious, made up.  It's an
23    amalgamation of things that I've heard.  That's
24    very possible.  I don't have a --
25          Q.    Did you have --



Page 372

1          A.      I have --

2          Q.      But you do have a memory?

3          A.      I have --

4          MR. KASS:  Object to form.

5          A.      I have two memories that are

6   fuzzy.  Well, I have one memory that is clear,

7   and that's of Craig Wright getting emotional

8   when talking about Dave Kleiman.  That's a

9   fairly clear memory.

10          I have a less clear memory about

11   Craig saying that there were three main people

12   involved.  I don't have any clear memory of the

13   phrase one-third coming up.  But three

14   people -- I do have a vague memory of him

15   talking about three people, and that the third

16   mysterious person helped out with the

17   cryptography.  That's a clear-ish memory.

18          Beyond that, everything is fuzz.

19          Q.      Let's break that down a bit.  You

20   have a clear memory of Craig telling you there

21   was a third person who helped out with

22   cryptography behind the Satoshi Nakamoto

23   persona; is that fair?

24          MR. KASS:  Object to form.

25          A.      A fairly clear memory.  Again,



Page 373

1      it's four years ago, and my memory is

2      infamously bad.

3           Q.     I understand.  I just want to get

4      to where -- I just want to get to what you

5      remember.  I understand you're disclaiming

6      necessarily the accuracy of your memory.  But

7      let's just talk about what is in your memory.

8                  In your memory it's fair to say

9      there is a particularly clear or fairly clear

10     memory of Craig Wright telling you that there

11     was a third person behind the Satoshi Nakamoto

12     persona that was mysterious or a mystery person

13     who helped out with the cryptography.

14                 Is that a fair characterization --

15                 MR. KASS:  Object to form.

16          Q.     -- of your memory?

17          A.     I think that's what I just said,

18     yes.

19          Q.     Okay.  Now, necessarily that means

20     there were two other people; is that fair?

21                 MR. KASS:  Object to form.

22          A.     Yes.

23          Q.     And you have a fairly clear memory

24     that one of those three people was Craig Wright

25     and the other was Dave Kleiman?



Page 374

 1                    MR. KASS:  Object to form.

 2          Q.     Is that fair?

 3                    MR. KASS:  Object to form.

 4          A.     Yes, I think that's fair.

 5          Q.     Okay.  When you met with

 6    Dr. Wright and in your correspondence with

 7    Dr. Wright via e-mail -- let me strike that.

 8                    In all of your correspondence and

 9    interactions with Dr. Wright, do you think it's

10    fair to say that he led you to believe that he

11    was wealthy?

12                    MR. KASS:  Object to form.

13          A.     Yes, I'd say that's fair to say.

14          Q.     And is it fair to say that during

15    those interactions he led you to believe that

16    he owned Satoshi's Bitcoin?

17                    MR. KASS:  Object to form.

18          A.     Yes.

19          Q.     And do you think it's fair to say

20    that during those interactions he led you to

21    believe that he had significant resources?

22                    MR. KASS:  Object to form.

23          A.     Maybe.  And the only reason I say

24    maybe is because he was working with EITC, or

25    appeared to be working with EITC.  And so if he



Page 375

```
 1    had infinite -- near infinite resources or, you

 2    know, lots and lots of resources, then it's not

 3    clear why he was working with the so-called

 4    money men.

 5          Q.    Right.

 6                MR. FREEDMAN:  No further

 7          questions.

 8                MR. KASS:  All right.  So, Vel, I

 9          have probably five, maybe ten, minutes

10          of questioning.

11                MR. FREEDMAN:  All right.  I just

12          want to point out that I was under the

13          half-hour that I said I reserved.

14                MR. KASS:  Yeah.  That is

15          impressive.  Well, what if we deduct the

16          time you needed to get your things set

17          up.  Anyways...

18    EXAMINATION

19    BY MR. KASS:

20          Q.    Do you recall being asked

21    questions about Calvin Ayre?

22          A.    Just now?

23          Q.    Yes.

24          A.    Yes.

25          Q.    And do you recall being asked
```



Page 376

1    whether you would be surprised if he was

2    involved in this reveal story in some manner?

3          A.    Yes.

4          Q.    And do you recall testifying that

5    you wouldn't be surprised?

6          A.    Not particularly.  It would be

7    interesting.

8          Q.    Mm-hmm.

9          A.    Unexpected.

10         Q.    Mm-hmm.

11         A.    I'm not sure I would go as far as

12   to say surprising.

13         Q.    Okay.  And do you recall stating

14   something that this whole thing is weird, to

15   that extent?

16         A.    This whole thing is definitely

17   weird, yes.

18         Q.    So would you be surprised if, I

19   don't know, maybe the government is somehow

20   involved in all of this?

21         A.    That would surprise me.

22         Q.    Okay.  Well, let me ask you this:

23   Do you have any reason to believe that Calvin

24   Ayre actually was behind this whole reveal?

25         A.    No.



1          Q.     All right.  So it's just like it

2     could be, and it takes a lot to surprise you.

3          A.     Yes.

4          Q.     And do you recall whether

5     throughout all of the exhibits you were shown

6     today any of them were from Calvin Ayre?

7          A.     I don't believe any of them were.

8          Q.     And also all the exhibits you were

9     shown yesterday; is that accurate?

10         A.     Correct.  None of them I don't

11    think mentioned Calvin Ayre.

12         Q.     Did you ever meet Calvin Ayre?

13         A.     I never heard of Calvin Ayre until

14    a couple years ago, as far as I know.

15         Q.     And by "a couple of years ago," is

16    that after you had a proof session in London

17    with Dr. Wright?

18         A.     I believe so.  Yeah, I don't think

19    I had ever run across Calvin Ayre.  And I've

20    never -- as far as I know, I have never met him

21    personally.

22         Q.     Now -- this is where it gets

23    tough -- counsel for Plaintiffs read to you

24    what they stated was an e-mail between

25    Dr. Wright and Dave Kleiman's father.



Page 378

```
 1                    Do you recall that?
 2         A.    Yes.
 3         Q.    Have you ever seen that e-mail?
 4         A.    No.
 5         Q.    And they asked if the contents of
 6    that e-mail were similar to things Dave Wright
 7    had told you -- that Craig Wright had told you?
 8         A.    Yes.
 9         Q.    In what way are they similar?
10         A.    Just the fact that Craig told me
11    that he and Dave had worked together in the
12    past.
13         Q.    Okay.  So that's -- is that the
14    only connection between that e-mail and what
15    Craig had told you in the past?
16         A.    Yes.
17         Q.    And that's the similarity that you
18    were referring to?
19         A.    Yes.
20         Q.    Okay.  Now, you mentioned
21    something about a memory amalgamation.
22                    What do you believe that to be
23    when you state that?
24         A.    Memories are fluid.  We think we
25    remember things that we don't, and we're very
```



1    good at putting together multiple memories into

2    what we think is one memory.  So that's what I

3    mean by that.

4              It's very easy to hear things from

5    four different places and then think it's all

6    one memory that you personally experienced when

7    you didn't actually personally experience it.

8         Q.    And are you aware of any factors

9    that can make a memory amalgamation more likely

10   to occur?

11        A.    Sure.  If you're tired.  If you're

12   stressed.  If you're not paying attention,

13   because it's, you know, not something that you

14   think you might need to pay attention to.  All

15   of those things I think contribute to having a

16   worse memory of an event.

17        Q.    And could the frequency of talking

18   about a certain event or getting information

19   about it also impact a likelihood of a memory

20   amalgamation?

21        A.    Sure.  I think there are very good

22   studies about the events of our childhood that

23   are retold in stories.  And if you look at how

24   accurate they actually turn out to be, they're

25   usually not very accurate at all because each



Page 380

 1      retelling changes the memory of it.

 2           Q.     And have you talked a few times

 3      about this proof session to different people?

 4           A.     Yes, I have talked a few times

 5      about the proof session.

 6           Q.     And you've received information

 7      from different people also, correct?

 8           A.     Yes.  There has been a lot of kind

 9      of public articles and Reddit posts and

10      discussion and debate about it, yes.

11           Q.     And have you been reading those

12      articles and posts?

13           A.     I have read many of them, yes.

14           Q.     And could it be that through all

15      of that, all that you read, sort of filtered

16      into your memory and made an amalgamation?

17           A.     That's very possible.  Yes.

18           Q.     And you certainly can't state with

19      certainty that that did not happen?

20           A.     I cannot.

21           Q.     And one thing I want to clear up

22      is my understanding is you have two memories

23      with regards to when you were in London with

24      Dr. Wright.  Two primary memories -- yeah, with

25      Dr. Wright, "I have two primary memories."  Is



Page 381

```
 1     that accurate?
 2          A.    Well, I have --
 3          Q.    Let me -- I'll narrow it a little
 4     bit because I'm sure you remember a lot of
 5     stuff.
 6          A.    Yes.
 7          Q.    With regards to Dave Kleiman,
 8     okay, or the identity of Satoshi, do you have
 9     two primary memories?
10          A.    That's probably accurate, yes.
11          Q.    Okay.  And what are those two
12     primary memories?
13          A.    The two primary memories are I do
14     remember that Dr. Wright expressed emotion; he
15     expressed sadness when the subject of Dave
16     Kleiman came up.
17          Q.    Okay.
18          A.    I don't recall how the subject
19     came up.
20          Q.    Okay.
21          A.    And then I do -- I think I recall
22     Dr. Wright saying that there was a third person
23     involved somehow in the beginning that helped
24     him with some of the cryptography, because he
25     was not himself a cryptographer.
```



Page 382

```
 1            Q.      Okay.

 2            A.      And I remember that discussion

 3      because I had said in an interview previously

 4      that Satoshi was not a cryptographer, and I

 5      believe that came up with Craig and him saying

 6      you're right about that.  I was not a

 7      cryptographer.  There was somebody else that

 8      helped me with the cryptography.

 9            Q.      And are those the two memories

10      that you remember?

11            A.      Yes.

12            Q.      Now, let me ask you, if throughout

13      the deposition -- you've testified numerous

14      hours yesterday, correct?

15            A.      Yes.

16            Q.      And a few hours today?

17            A.      Yes.

18            Q.      If throughout those tellings -- if

19      throughout that time period those memories have

20      changed over time, what would you chalk that up

21      to?

22                    MR. FREEDMAN:  Objection.

23            A.      I would --

24            Q.      What would that mean to you?

25            A.      That would just reinforce my
```



Page 383

1    belief --

2              MR. FREEDMAN:  Objection.

3         A.     -- that our memories are fallible,

4    and I am no more infallible than any other

5    human being.  And that, in my opinion, the

6    written documents of the time are more accurate

7    than what I remember.

8              So anything that I wrote down at

9    the time, or near the time, is almost certainly

10   more accurate than what I remember.

11        Q.    Okay.  So, for example, if we go

12   to Exhibit 73 and there it says, is written, in

13   less than a month after you had that reveal

14   with Dr. Wright and you said, beyond that,

15   Dr. Wright works with David, I don't know much,

16   that would be more accurate than your current

17   memory?

18        A.    Most likely, yes.

19        Q.    And if you were to put a blog post

20   up a few weeks after the reveal where you said

21   Craig Wright is the person behind Satoshi, that

22   would also be more accurate?

23        A.    Well --

24        Q.    Other than you may have learned

25   things after.



Page 384

```
 1          A.      Yeah, I've learned things after
 2     that give me doubts.
 3          Q.      Right.  But as far as the --
 4          A.      What I believed at the time --
 5          Q.      Exactly, yes.  What you believed
 6     back then.
 7          A.      -- that -- yes, that more
 8     accurately reflects what I believed at the
 9     time.
10          Q.      Okay.  And would you feel
11     comfortable telling the jury in this case that
12     Dr. Wright told you Dave was one-third Satoshi?
13          A.      No.
14                  MR. FREEDMAN:  Objection to form.
15                  MR. KASS:  I'm done.
16                  MR. FREEDMAN:  I just have one
17          question.
18                  MR. KASS:  Okay.
19     EXAMINATION
20     BY MR. FREEDMAN:
21          Q.      Mr. Andresen, would you feel
22     comfortable telling -- well, let me strike
23     that.  Actually, I have one -- a couple more
24     than one question.
25                  Do you believe that everything you
```



Page 385

```
 1    said today is your best attempt to tell the
 2    truth?
 3         A.    Yes.
 4         Q.    And so your testimony to me
 5    earlier that you have a reasonably clear memory
 6    was your attempt to tell the truth?
 7         A.    Yes.
 8         Q.    And you just can't be sure of the
 9    accuracy of that memory; is that right?
10         A.    That's correct.
11         Q.    So you would be comfortable, then,
12    would you not, with the jury hearing the entire
13    presentation of the story; that you have this
14    memory that you can't be sure is correct.  Is
15    that fair?
16         A.    Sure.
17         Q.    And, Mr. Andresen, is there
18    anything inconsistent between the statement
19    Craig said that he worked with Dave, and Craig
20    and Dave each being one-third of the Satoshi
21    Nakamoto team?
22         A.    No.  Those would be consistent
23    statements.
24              MR. FREEDMAN:  I have no further
25         questions.
```



Page 386

1          MR. KASS:  I have one, maybe two

2     follow-ups.

3     EXAMINATION

4     BY MR. KASS:

5          Q.    So, Mr. Andresen, when you say

6     those statements aren't inconsistent, is that

7     consistent as we've been talking about it

8     earlier on today?

9          A.    Yes, that's consistent in that

10    they don't contradict each other.

11         Q.    Right.  But it doesn't mean that

12    it was actually said.

13         A.    Correct.

14         Q.    Now, you were asked about this

15    memory which was stated reasonably clear --

16    that was that you had a reasonably clear

17    memory.  Do you recall earlier stating it was a

18    fuzzy memory?

19         A.    I don't recall, but it's very

20    possible that I contradicted myself.

21         Q.    Is that because memory is --

22         A.    That's because memory is fuzzy.

23         Q.    Okay.  Now, if you were the jury,

24    would you feel comfortable relying on that

25    fuzzy memory in determining the outcome of this



Page 387

1    type of case?

2              MR. FREEDMAN:  Objection.

3         A.    If I was on a jury, no.

4         Q.    Okay.

5         A.    I would be skeptical of any memory

6    longer than events that happened a week ago,

7    frankly.

8         Q.    And is this also in particular

9    knowing your own memory?

10             MR. FREEDMAN:  Objection.

11        A.    Yes.  My wife can tell you all

12   about how poor my memory tends to be.

13        Q.    Do you believe your memory is also

14   suggestible?

15        A.    Yes, I believe everybody's memory

16   is suggestible.

17             MR. KASS:  That's all I have.

18             MR. FREEDMAN:  Just objection to

19        that last question.  And I have no

20        further questions.

21             MR. KASS:  All right.  I think we

22        are done.

23             VIDEO TECHNICIAN:  The time now is

24        1:41 p.m., and we're coming to the end

25        of media unit number two, and we have



Page 388

1          reached the end of today's deposition

2          with Gavin Andresen.  We are off the

3          record.

4                (Discussion off the record)

5                MR. FREEDMAN:  Mr. Andresen, you

6          have a right to read your deposition

7          transcript and correct any errors you

8          think, if, you know, the court reporter

9          took down yes and you said no, that sort

10         of thing, you can correct those errors.

11         Or you can rely on the fact that she got

12         her job right and there is a video and

13         waive the right to review that

14         deposition transcript.

15               Which would you like to do?

16               THE WITNESS:  I'd like to waive

17         that right.

18               MR. KASS:  Now, I just have one

19         other question.  But, Mr. Andresen, you

20         did state that you wanted to designate

21         certain portions as confidential, that

22         would require you to read the

23         deposition, unless you want to state you

24         want the whole thing confidential.

25               THE WITNESS:  I would like the



Page 389

1          whole thing to be confidential.

2               MR. KASS:  All right.  I think

3          that's it, Vel.  Unless you have

4          anything.

5               MR. FREEDMAN:  Nope.

6               MR. KASS:  Okay.

7               MR. FREEDMAN:  Thank you.

8               (Time Noted: 1:42 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                 C E R T I F I C A T E

 2

 3     COMMONWEALTH OF MASSACHUSETTS

 4     SUFFOLK, SS.

 5                 I, MaryJo O'Connor, a Notary Public

 6     in and for the Commonwealth of

 7     Massachusetts, do hereby certify:

 8                 That GAVIN ANDRESEN, the witness

 9     whose testimony is hereinbefore set forth,

10     was duly sworn by me and that such testimony

11     is a true and accurate record of my

12     stenotype notes taken in the foregoing

13     matter to the best of my knowledge, skill

14     and ability.

15                 IN WITNESS WHEREOF, I have hereunto

16     set my hand and Notarial Seal this 29th day

17     of February 2020.

18

19

20

21                 MARYJO O'CONNOR, RDR/RMR

22                       Notary Public

23

24     My Commission expires:

25     September 12, 2025
```

