IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3               CASE NO. 9:18-cv-80176-BB/BR

 4
      IRA KLEIMAN, as the personal
 5    representative of the Estate of
      David Kleiman, and W&K Info Defense
 6    Research, LLC

 7           Plaintiffs,

 8    -vs-

 9    CRAIG WRIGHT

10           Defendant.

11

12    * * * * * * * * * * * * * * * * * *

13    VIDEOTAPED DEPOSITION OF IRA KLEIMAN

14    DATE TAKEN: April 8, 2019

15    TIME: 10:10 - 2:55 p.m.

16    PLACE:100 S.E. 2nd Street

17    Miami, Florida 33131

18
      TAKEN BEFORE: RICK E. LEVY, RPR, FPR
19                 AND NOTARY PUBLIC

20

21    * * * * * * * * * * * * * * * * * *

22    Defendant's Designations
      Plaintiffs' Objections
23    Plaintiffs' Counters

24

25
```

```
 1    APPEARANCES:

 2   On behalf of the Plaintiff:

 3        KYLE ROCHE, ESQUIRE
          BOIES, SCHILLER & FLEXNER LLP
 4        333 Main Street
          Armonk, NY 10504
 5
          VEL FREEDMAN, ESQUIRE
 6        ANDREW BRENNER, ESQUIRE
          BOIES, SCHILLER & FLEXNER LLP
 7        100 S.E. 2nd Street
          Suite 2800
 8        Miami, Florida 33131

 9

10   On behalf of the Defendant:

11
          BRYAN PASCHAL, ESQUIRE
12        AMANDA MCGOVERN, ESQUIRE
          ANDRES RIVERO, ESQUIRE (VIA PHONE)
13        RIVERO MESTRE, LLP
          2525 Ponce de Leon Boulevard
14        Suite 1000
          Coral Gables, Florida 33134
15

16

17   Also Present: Rene Lavandera, The Videographer

18

19

20

21

22

23

24

25
```

```
 1                              -   -   -
                              I N D E X
 2                              -   -   -

 3   WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS
     IRA KLEIMAN
 4   BY MR. PASCHAL    5

 5                              -   -   -
                        E X H I B I T S
 6                              -   -   -

 7
     NUMBER                         PAGE
 8   DEFENDANT'S EX. 1               6
     DEFENDANT'S EX. 2              29
 9   DEFENDANT'S EX. 3              34
     DEFENDANT'S EX. 4              37
10   DEFENDANT'S EX. 5              39
     DEFENDANT'S EX. 6              45
11   DEFENDANT'S EX. 7              56
     DEFENDANT'S EX. 8              58
12   DEFENDANT'S EX. 9              59
     DEFENDANT'S EX. 10             63
13   DEFENDANT'S EX. 11             82
     DEFENDANT'S EX. 12             84
14   DEFENDANT'S EX. 13             90
     DEFENDANT'S EX. 14            108
15   DEFENDANT'S EX. 15            115
     DEFENDANT'S EX. 16            123
16   DEFENDANT'S EX. 17            122
     DEFENDANT'S EX. 18            138
17   DEFENDANT'S EX. 19            139

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2                       - - -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                       - - -

 8            THE VIDEOGRAPHER:  Good morning.  We are now

 9        on the record in the matter of Kleiman, Ira and the

10        estate of David Kleiman vs. Wright, Craig.  Today

11        is April 8th 2019.  The time is now 10:10 a.m.

12            This is the video recorded deposition of

13        Mr. Ira Kleiman being taken here at 100 Southeast

14        2nd Street, Suite 2800, Miami, Florida 33131.  My

15        name is Rene Lavandera representing First Choice

16        Reporting located in Orlando, Florida.

17            The court reporter this morning is Mr. Rick

18        Levy.  Will all counsel present please introduce

19        yourselves for the record?

20            MR. PASCHAL:  Bryan Paschal for Dr. Craig

21        Wright and Amanda McGovern for Dr. Craig Wright as

22        well.

23            MR. RIVERO:  Andres Rivero on the telephone

24        also representing Dr. Craig Wright.

25            MR. ROCHE:  Kyle Roche of Boies, Schiller &
```

```
 1        Flexner representing plaintiffs.

 2            MR. FREEDMAN:  Vel Freedman, Boies, Schiller

 3        representing plaintiff.

 4            THE VIDEOGRAPHER:  Mr. Court reporter, you may

 5        swear in the witness.

 6   Thereupon,

 7                         (Ira Kleiman)

 8            having been first duly sworn or affirmed,

 9   was examined and testified as follows:

10                      DIRECT EXAMINATION

11            THE WITNESS:  Yes.

12   BY MR. PASCHAL:

13        Q.   Could you please state your full name?

14        A.   Ira Kleiman.

15        Q.   Ira, have you ever been deposed before?

16        A.   No.

17        Q.   I'll go over a few basics how a deposition is

18   going to work today.  We need you to provide clear, oral

19   responses so the court reporter, this is the court

20   reporter, can hear you.  Please keep in mind the court

21   reporter can only take down one person at a time so only

22   one person can talk at a time.  Do you understand?

23        A.   Yes.

24        Q.   If at any time I ask you a question that you

25   do not understand please let me know right away
```

1    otherwise I'll assume that you understood the question;

2    okay?

3        A.   Yes.

4        Q.   If at any point you remember something or want

5    to clarify an answer you previously gave please do so.

6    You understand?

7        A.   Yes.

8        Q.   If you need to take a break at any point just

9    let me know, okay?

10       A.   (Indicating).

11       Q.   Is there any reason preventing you from giving

12   your best deposition testimony today?

13       A.   No.

14       Q.   Are you currently on any prescribed

15   medication?

16       A.   No.

17       Q.   Is there any medical condition or other reason

18   why it might be difficult for you understand my

19   questions today?

20       A.   No.

21           MR. PASCHAL:  This is going to be Exhibit 1.

22           (Defendant's Exhibit No. 1 was

23           marked for identification.)

24   BY MR. PASCHAL:

25       Q.   If you turn to page two of that exhibit this

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                             Page 7

```
 1    is the topics that you're to -- you're here for today in

 2    this deposition.

 3         A.   Okay.

 4         Q.   When did you first see this list?

 5         A.   When did I first receive this list?

 6         Q.   When did you review this list?

 7         A.   I believe my attorneys sent it to me maybe --

 8              MR. FREEDMAN:  One second.  Don't discuss

 9    anything that we spoke with you.  If you can answer

10    the question by just giving a date, good.  If not

11    you can't recall you can't recall.

12              THE WITNESS:  I don't remember exactly.

13    BY MR. PASCHAL:

14         Q.   Did you see this list before today?

15         A.   Yes.

16         Q.   Are you prepared to discuss these topics

17    today?

18         A.   Yes.

19         Q.   What did you do to prepare?

20              MR. FREEDMAN:  Again don't discuss anything

21    you spoke about with your attorneys but to the

22    extent you've done preparation you should answer

23    the question.

24              THE WITNESS:  I haven't done anything to

25    prepare.
```

```
 1              MS. MCGOVERN:  Can you speak up a little bit?

 2              THE WITNESS:  Yes, I haven't done anything.

 3   BY MR. PASCHAL:

 4       Q.   Did you look at any documents?

 5       A.   I reviewed some of my old e-mails, yes.

 6       Q.   About how many e-mails did you review?

 7       A.   I don't know.

 8       Q.   You met with your attorneys, right?

 9       A.   Yes.

10       Q.   What's your date of birth?

11       A.   ████████████ 1970.

12       Q.   Where were you born?

13       A.   New Jersey.

14       Q.   When did you move to Florida?

15       A.   1975.

16       Q.   Have you always lived in Palm Beach Gardens?

17       A.   No.

18       Q.   Where else did you live?

19       A.   Hollywood, Florida.

20       Q.   How long did you live in Hollywood, Florida?

21       A.   Maybe two or three years.

22       Q.   Is that right after you moved from Jersey?

23       A.   Yes -- no.  We went from New Jersey to

24   California for I think just about one year and then

25   Hollywood.
```

1     Q.    So when did you move to Palm Beach Gardens?

2     A.    Probably around 1978.

3     Q.    From 1998 -- I show that you purchased the

4     home in 1998.  Was that your first home that you

5     purchased?

6     A.    Yes.

7     Q.    Then you have that home until 2014 and it was

8     located at ███████████████        in Palm Beach Gardens; is

9     that right?

10    A.    Yes.

11    Q.    2014 through today you have a home that's

12    located at ███████████████    in Palm Beach Gardens; is

13    that correct?

14    A.    Yes.

15    Q.    How long have you been married?

16    A.    Since 2009.

17    Q.    What is your wife's name?

18    A.    Ju.

19    Q.    Ju Kleiman?

20    A.    Yes.

21    Q.    Did she go by the name of Sasithorn?

22    A.    Yes.

23    Q.    When did she change her name?

24    A.    I guess Sasithorn would be her official Thai

25    name.  Ju is what she goes by in the States.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Page 10

```
 1         Q.    That's her legal name?

 2         A.    I suppose so.  Sasithorn.

 3         Q.    Sasithorn is her legal name?

 4         A.    Yes.

 5         Q.    What is your wife's occupation?

 6         A.    She doesn't work.

 7         Q.    You have two other siblings; right?

 8         A.    Yes, I had two siblings, yes.

 9         Q.    Was that Dave and Leonard Kleiman?

10         A.    Yes.

11         Q.    How did Leonard pass away?

12         A.    I believe a drug overdose.

13         Q.    Did you speak with him often?

14         A.    Not too often, no.

15         Q.    Do you know why Dave excluded Leonard from his

16    will?

17         A.    They were --

18              MR. FREEDMAN:  Hold on, you're outside the

19         scope of your deposition unless you can tell me

20         what topic you're tied to then I'm happy to let you

21         proceed.  Otherwise I think you're outside the

22         scope.

23              MR. PASCHAL:  You're going to instruct him not

24         to answer?

25              MR. FREEDMAN:  Unless you tell me what topic,
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT

IRA KLEIMAN on 04/08/2019                                                Page 11

```
 1        yes.
 2             MR. PASCHAL:  I think this ties into location
 3        of evidence of the case.  I think that was a
 4        general order from the Court.
 5             MR. FREEDMAN:  How does the reason Dave
 6        Kleiman did or did not exclude one of his brothers
 7        tie into the --
 8             MR. PASCHAL:  This is my deposition.  I'm
 9        asking him.
10             MR. FREEDMAN:  Don't answer the question.
11   BY MR. PASCHAL:
12        Q.   Have you ever been sued?
13        A.   No.
14        Q.   Have you ever sued someone or an entity
15   excluding this lawsuit?
16        A.   Yes.
17        Q.   What lawsuit was that?
18        A.   A case against Computer Forensics, LLC.
19        Q.   What is currently happening in that case?
20        A.   It's still ongoing.
21        Q.   There's another lawsuit here it might not be
22   you it says Steve Kleiman vs. Metropolitan Health
23   Networks?
24        A.   Not me.
25        Q.   Sometimes you go by your middle name Steven?
```

```
 1        A.    Yes.

 2        Q.    Is there a reason you --

 3        A.    Certain amount of years I went by Steve and

 4   earlier people that know me from a younger age always

 5   call me Ira.

 6        Q.    So it's interchangeable?

 7        A.    Yes.

 8        Q.    Have you ever been charged or accused of a

 9   crime?

10        A.    No.

11        Q.    What schools have you attended?

12        A.    Palm Beach Gardens High School and Palm Beach

13   Community College.

14        Q.    Was the community college, that was the last

15   school attended?

16        A.    Yes.

17        Q.    What degrees and certifications do you have?

18        A.    I just have a high school diploma.

19        Q.    So you didn't graduate from the community

20   college?

21        A.    No.

22        Q.    Did you get any certifications from the

23   community college?

24        A.    No.

25        Q.    Do you have any professional licenses?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 13

```
 1          A.    No.

 2          Q.    What is your current profession?

 3          A.    Self employed, web site designer, affiliate

 4   marketing.

 5          Q.    What type of web sites do you design?

 6          A.    Basically I just design my own type of web

 7   sites that are related to affiliate marketing.

 8          Q.    What's affiliate marketing?

 9          A.    Like take Amazon as an example.  Put up a web

10   site and you advertise other people's products and if

11   someone clicks through you would -- you receive a

12   commission when someone purchases.

13          Q.    So do you typically do work for companies or

14   individuals?

15          A.    Just myself.

16          Q.    I guess the way that you get -- how do you

17   charge people, it's by the clicking?

18          A.    I receive commission.  That's it.

19          Q.    Do you work from home or an office?

20          A.    From home.

21          Q.    Is that your primary source of income?

22          A.    And trading stocks.

23          Q.    How much money more or less do you make from

24   trading stocks?

25                MR. FREEDMAN:  Wait, stop.  You're outside the
```

```
 1          scope of your deposition.  Instruct him not to

 2          answer unless you tie it to a topic.

 3               MR. PASCHAL:  These are background questions

 4          trying to find out.

 5               MR. FREEDMAN:  Don't answer the question.

 6               MR. PASCHAL:  I can't find out about his

 7          professional --

 8               MR. FREEDMAN:  Not unless you tie it to topic

 9          you disclosed.  Tie it to a topic and I'll give it

10          to you.

11               MR. PASCHAL:  Are you instructing him not to

12          answer?

13               MR. FREEDMAN:  Yes, unless you tie it to a

14          topic.

15     BY MR. PASCHAL:

16          Q.   How much -- what was your income for your

17     affiliate marketing?

18               MR. FREEDMAN:  Same instruction.

19               MR. PASCHAL:  Not to answer?

20               MR. FREEDMAN:  Don't answer unless you tie it

21          to a topic.

22     BY MR. PASCHAL:

23          Q.   From 2012 to today relatively what was your

24     income?

25               MR. FREEDMAN:  Again don't answer unless he
```

```
 1        ties it to a topic.

 2   BY MR. PASCHAL:

 3        Q.    What was your previous occupations?

 4        A.    The last time I worked for somebody I think it

 5   was for a company called Active Frame.  I was also doing

 6   web design for them.  Prior to that just like part-time

 7   jobs, florist delivery, stock person at pharmacy.  For

 8   the most part I've pretty much always worked for myself.

 9             MR. FREEDMAN:  Just one housekeeping matter.

10        I forgot to do this before we started we're going

11        the mark the whole deposition transcript

12        confidential and then we'll go through it obviously

13        with the timeframe.  For now everything is

14        confidential.

15             MS. MCGOVERN:  We disagree with that position.

16             MR. FREEDMAN:  The same for Dr. Wright just so

17        you know.

18             MS. MCGOVERN:  I think it was a different

19        situation.

20             MR. FREEDMAN:  Is it your position that you'll

21        disclose things from the deposition immediately?

22             MS. MCGOVERN:  Not taking any position with

23        respect to Dr. Wright's deposition.

24             MR. FREEDMAN:  I need to know if you intend to

25        disclose things from the deposition immediately or
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 16

```
1          if you're going to give me time to dictate a
2          report?
3                  MS. MCGOVERN:  Absolutely, no.  Would never do
4          that.  Not going to disclose anything.  I don't
5          think a blanket confidential stamp over the
6          plaintiff's deposition is appropriate in this case.
7          Just stating that for the record.
8                  MR. FREEDMAN:  Okay.  Just so it's clear --
9          the record is clear I'm saying it's temporary.
10         We're just saying don't disclose anything, we'll go
11         through it and then we'll --
12                 MR. PASCHAL:  That's fine.  I want to go back
13         to the questions you told him not to answer.  We
14         did ask for his technical experience and how much
15         money he was making off this technical experience.
16                 MR. FREEDMAN:  Disagree with that.  Take that
17         up with the judge.
18                 MR. PASCHAL:  So you did not object in your
19         e-mail but you're going to tell him not to --
20         instruct him?
21                 MR. FREEDMAN:  Don't agree this goes to the
22         technical experience.  The amount of money they
23         make doesn't go to technical experience.
24    BY MR. PASCHAL:
25         Q.   Have you ever been fired from a job?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

```
 1        A.    No.

 2        Q.    Have you ever been asked to resign from a job?

 3        A.    No.

 4        Q.    I want to ask you about a few companies you've

 5   been involved with.  What was the business purpose of

 6   The Gigabyte Connection?

 7        A.    I set that company up a long time ago.  I

 8   don't even remember what I was doing with that.  I'm not

 9   even sure I actually used it or not.

10        Q.    How long ago did you set it up?

11        A.    I think it was in the '90s.

12        Q.    Do you know how long it lasted?

13        A.    No, I don't remember.

14        Q.    Did you set it up with any business partners?

15        A.    No, it was my own company.  Probably going to

16   do some kind of computer related type of business with

17   it.

18        Q.    So Future World Shopper, Inc.  What was the

19   business purpose of that company?

20        A.    I intended on setting up like an online

21   portal.  I guess at the time I think they only had like

22   BBSs.  I don't think the internet existed and I was

23   thinking of creating a portal where people could log

24   into it and purchase products.  I guess similar to what

25   people do with Amazon today.  It never got off the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 18

```
 1   ground.
 2        Q.    What about Hackers, Inc.?
 3        A.    That wasn't my company.  That was my
 4   brother's.
 5        Q.    Which brother?
 6        A.    David.
 7        Q.    Did you work with Dave in that company?
 8        A.    No.
 9        Q.    Do you know what was the purpose of that
10   company?
11        A.    I think he was doing some kind of computer
12   consulting with a partner.
13        Q.    Do you know who that partner was?
14        A.    I think his name was Scott Howell.
15        Q.    What's the status of that company?
16        A.    That was closed many years -- that was like
17   early '90s.
18        Q.    It was closed?
19        A.    Yes.
20        Q.    What about Steve's Web Design?
21        A.    I don't think I ever did anything with it.
22        Q.    You just created it?
23        A.    Yes.
24        Q.    Did you have any partners in that?
25        A.    No.
```

```
 1          Q.    Ira, how many computers do you own?

 2          A.    Primarily one laptop.

 3          Q.    Do you own any computers from Dave?

 4          A.    Oh, yes, if you're including Dave's.

 5          Q.    In all how many computers do you own?

 6          A.    I think Dave had three laptops.

 7          Q.    What was his three laptops?

 8          A.    Two of them were Alienware.  One was a Dell

 9  laptop.

10          Q.    What's the one computer that you own?

11          A.    I believe it's an ASIS.

12          Q.    ASIS.  What year did you purchase that

13  computer?

14          A.    I don't remember.

15          Q.    Was it after 2013?

16          A.    I don't know.

17          Q.    Did you purchase it with a credit card?

18          A.    I'm not sure.  I may have got it like from one

19  of my affiliate marketing web sites where it's possible

20  I didn't need a credit card to purchase it.

21          Q.    Do you own any Bitcoin or crypto currency?

22          A.    Yes.

23          Q.    How much?

24          MR. FREEDMAN:  Don't answer the question.

25  You're outside the scope of your deposition.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                          Page 20

```
1        MR. PASCHAL:  How much Bitcoin he has is
2   outside the scope?
3        MR. FREEDMAN:  You tell me where the topics
4   that list the amount of crypto assets that are
5   being held.
6        MR. PASCHAL:  I don't know.  Let me ask this
7   then.  That was your topic we put it on here and
8   you guys asked that question so is it your position
9   that's not -- that asking how much Bitcoin somebody
10  has is outside the scope?  I'm fine if that's your
11  response.
12       MR. FREEDMAN:  Is it in yours?
13       MR. PASCHAL:  I copied yours.  I put that in
14  and you had no objection.
15       MR. FREEDMAN:  Where is the topic that says
16  the amount of Bitcoin mined or owned I think is the
17  question.
18       MR. PASCHAL:  One of them and you asked that
19  question.
20       MR. FREEDMAN:  If you show it to me I can read
21  it.  If you don't show it to me --
22       MR. PASCHAL:  Let me ask this question.  If
23  you asked that at your depo are you saying it was
24  outside the scope of your deposition topics?
25       MR. FREEDMAN:  My questions were different --
```

```
 1        my list of topics are different than your list of

 2        topics.  I had just off the top of my head I

 3        remember I had the words Satoshi Yakamoto in mine

 4        and I don't see it in yours.  This isn't an

 5        identical copy of my list.

 6             MR. PASCHAL:  So you're instructing him not to

 7        answer the question?

 8             MR. FREEDMAN:  Correct.

 9  BY MR. PASCHAL:

10        Q.   Are you familiar with how Bitcoin is stored on

11  a device?

12        A.   Not really.

13        Q.   Have you read any literature on Bitcoin and

14  crypto currency?

15        A.   I've read articles about it.

16        Q.   If you own Bitcoin how are you not familiar in

17  the manner in which it's owned?

18             MR. FREEDMAN:  Hold on a second.  Can you

19        repeat the question?

20             MR. PASCHAL:  Want me to repeat it or want the

21        reporter?

22             MR. FREEDMAN:  You can repeat it or the

23        reporter, whatever your preference.

24  BY MR. PASCHAL:

25        Q.   If you own Bitcoin how are you not familiar
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                      Page 22

1   with how it's stored?

2          MR. FREEDMAN:  Objection.  You can answer the

3       question.

4          THE WITNESS:  I don't know the technical

5       workings of how it works.  I just know you can

6       purchase it.

7   BY MR. PASCHAL:

8       Q.   Is it stored on your computer?

9          MR. FREEDMAN:  Objection, hold on.  If you

10      know what the question means you can answer.

11         THE WITNESS:  Is it --

12         MR. PASCHAL:  You can have a standing

13      objection to form but we're not going to have

14      speaking objections so let's not do that today,

15      okay?

16         MR. FREEDMAN:  Isn't that ironic?

17         MR. PASCHAL:  You can answer the question.

18         THE WITNESS:  I've heard that it can be stored

19      on a computer.

20  BY MR. PASCHAL:

21      Q.   So as you own Bitcoin do you know how it's

22  held?

23         MR. FREEDMAN:  Objection.  Go ahead and

24      answer.

25         THE WITNESS:  Not really.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT

IRA KLEIMAN on 04/08/2019                                                      Page 23

```
 1    BY MR. PASCHAL:

 2         Q.   I want to ask you a few questions about your

 3    relationship with Dave.  Before Dave passed away when

 4    was the last time you spoke with him?

 5              MR. FREEDMAN:  Hold on, Ira.  What topic does

 6         this relate to?

 7              MR. PASCHAL:  His communications with Dave.

 8              MR. FREEDMAN:  I think you're a little bit

 9         outside.  I'll give you some leeway.  Go ahead Ira,

10         answer the question.

11              THE WITNESS:  2009 November.

12    BY MR. PASCHAL:

13         Q.   That was the last time you spoke with him?

14         A.   No, that's the last time I saw him.  The last

15    time I spoke with him would probably be sometime late

16    2012.

17         Q.   Was that by phone or e-mail?

18         A.   I think I have an e-mail around that date and

19    I also think I spoke with him on the phone around then

20    too.

21         Q.   What did you talk about?

22         A.   I would have to go back and look at the

23    e-mail.  On the phone I don't remember.

24         Q.   Do you remember what his mood was like when

25    you spoke to him?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 24

```
 1        A.   I --
 2             MR. FREEDMAN:  Objection.
 3             THE WITNESS:  Not really.
 4    BY MR. PASCHAL:
 5        Q.   So in 2009 you met Dave in person -- or you
 6    saw him in person.  From then though just relatively how
 7    many times would you speak with him per year, was it
 8    monthly, weekly?
 9             MR. FREEDMAN:  Objection.
10             THE WITNESS:  It would vary.
11    BY MR. PASCHAL:
12        Q.   I just want to be clear the last time that you
13    saw your brother was 2009; right?
14        A.   I believe so.
15        Q.   Under what circumstances was that?
16        A.   We were having Thanksgiving dinner.
17        Q.   Did you have any other business ventures with
18    Dave?
19        A.   No.
20        Q.   Did you ever work together with Dave in any
21    business?
22        A.   No.
23        Q.   Dave's autopsy report showed that he had
24    cocaine in his system.  Did you know anything about
25    that?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 25

```
 1              MR. FREEDMAN:  Objection.  What topic is this
 2        relating to?
 3              MR. PASCHAL:  If he is not going to answer
 4        tell him.
 5              MR. FREEDMAN:  You can't tell me which topics
 6        this relates to?
 7              MR. PASCHAL:  This goes to background
 8        information.  Trying to find documents that was the
 9        general mandate from the Court.
10              MR. FREEDMAN:  I just don't see how Ira's
11        knowledge of cocaine in Dave's system has anything
12        to do with the --
13   BY MR. PASCHAL:
14        Q.   Do you have any documents showing that Dave
15   had cocaine in his system?
16        A.   I would have to look at the autopsy report
17   again.
18        Q.   That's the only document that you have?
19        A.   Yes, that's the only one I have.
20        Q.   Are there any communications between you and
21   Dave when you spoke about cocaine?
22        A.   No.
23        Q.   Do you know any of Dave's girlfriends?
24        A.   Not personally -- I mean I've heard of them.
25   I don't personally know them.
```

```
 1        Q.    Which ones have you heard of?

 2        A.    One named Kirsten and another named Lynada and

 3   a very old girlfriend named Angela.

 4        Q.    How did you learn about these girlfriends?

 5        A.    Angela we knew -- he was like dating her in

 6   high school.  Kirsten I believe I met once at my

 7   parent's wedding anniversary and Lynada I only found out

 8   after he passed away.

 9        Q.    Have you been in contact with any of these

10   three girlfriends?

11        A.    I think I spoke with Angela a little bit.

12        Q.    You didn't speak to Lynada?

13        A.    No.

14        Q.    Who was the last girlfriend that you know that

15   Dave had?

16        A.    That would be Lynada.

17        Q.    You haven't spoken to her?

18        A.    No.

19        Q.    When did you speak with Angela?

20        A.    Maybe like a year ago.

21        Q.    What circumstances did you speak with her,

22   what were the circumstances?

23        A.    I think I saw her -- she left like a Facebook

24   posting on my dad's web site -- I mean my dad's Facebook

25   page and then I responded to her Facebook posting.
```

```
 1        Q.    So there's a Facebook message where you

 2   responded to her?

 3        A.    Yes, I think so.  No, I just e-mailed her.

 4   She left a Facebook posting and then I e-mailed her.

 5        Q.    When did you e-mail her?

 6        A.    I think it could have been like a year, year

 7   and a half ago.

 8        Q.    What did the Facebook posting say, do you

 9   remember?

10        A.    No.

11        Q.    What did you discuss with Angela?

12        A.    We talked about David a little bit.

13        Q.    What did you talk to her about, talking about

14   David?

15        A.    At first just general things I think.

16        Q.    We'll get into that a little later.  When did

17   you learn that Dave was appointed as the representative

18   of -- or that Dave appointed you as the representative

19   of his estate, sorry?

20        A.    After he passed away.

21        Q.    So Dave never discussed that with you before

22   he passed away?

23        A.    No.

24        Q.    Were you surprised to learn --

25              MR. FREEDMAN:  Objection, don't answer the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                   Page 28

```
 1   question.
 2        MR. PASCHAL:  What's the reason for
 3   instructing him?
 4        MR. FREEDMAN:  Don't see how it has anything
 5   to do with your topics.
 6        MR. PASCHAL:  Just asking --
 7        MR. FREEDMAN:  His state of mind when he found
 8   out whether or not Dave Kleiman appointed him as
 9   the personal representative.  Where is that any of
10   your topics?
11        MR. PASCHAL:  I am going to say for the record
12   that these topics are helpful but the judge mandate
13   was really that hey, I want to have a depo so you
14   can figure out what discovery is and a number of
15   times you shut down inquiries because you just
16   don't think that these match the topic which isn't
17   helpful for us to.  It will force us to have to go
18   to the Court unnecessarily and bring Ira back here
19   for another deposition to do that.  Purpose to find
20   out where documents are and find out where evidence
21   is.  I just don't think it's helpful for the record
22   for you to instruct him not to answer background
23   questions, very basic questions.
24        MR. FREEDMAN:  Just so the record is complete
25   the parties set the tone that we had to stay
```

```
 1          strictly by the disclosed topics at Dr. Wright's

 2          deposition where we were held strictly to the

 3          topics --

 4               MR. PASCHAL:  And I don't believe you did

 5          so --

 6               MR. FREEDMAN:  If it's the defendant's

 7          position that refusing to answer background

 8          questions should necessitate a second deposition we

 9          might just able to agree to reach a second

10          deposition.  Do you want to agree to a second

11          deposition?

12               MR. PASCHAL:  I'm just moving on with you.

13          Just --

14               MR. FREEDMAN:  Okay.

15               MR. PASCHAL:  I want to ask you about what

16          you're alleging in the complaint so we know what

17          documents we're looking for.  I'm going to give you

18          a copy of the complaint.

19               (Defendant's Exhibit No. 2 was

20               marked for identification.)

21     BY MR. PASCHAL:

22          Q.   Can you turn to page 37.  Under Count I you

23     have a claim for conversion.  Do you see that?

24          A.   Yes.

25          Q.   If you go down to paragraph 171 you allege
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 30

```
 1   that Dr. Wright converted to his own use, Bitcoins,

 2   forked assets and intellectual properties that were the

 3   property of, and owned by, the estate and/or W&K.  Do

 4   you see that?

 5        A.   Yes.

 6        Q.   If you can turn to 46 and 47.

 7             MR. FREEDMAN:  Bryan, I think you just asked

 8        the witness to turn to two pages.  Which one?

 9             MR. PASCHAL:  I said page 46 and 47.

10             MR. FREEDMAN:  Which one do you want him to

11        start at?

12   BY MR. PASCHAL:

13        Q.   Start at 46.  It's Count X, 46 and 47.  You

14   have a claim for civil theft, you see that?

15        A.   Yes.

16        Q.   In that claim you allege that Dr. Wright took

17   with felonious criminal intent Bitcoins, forked assets

18   and intellectual properties that were the property of

19   and owned by the estate and/or W&K.  You see that?

20        A.   Yes.

21        Q.   Ira, is it your position that Dr. Wright stole

22   from Dave?

23             MR. FREEDMAN:  Hold on a second.  Go ahead

24        answer the question.

25             THE WITNESS:  I believe so.
```

```
 1   BY MR. PASCHAL:

 2        Q.   You believe so?

 3        A.   Yes.

 4        Q.   I want you to turn to page 16 of your

 5   complaint.  There you have a bold heading saying -- are

 6   you there?

 7        A.   Yes.

 8        Q.   You have a bold heading saying Dave and/or W&K

 9   owned a substantial amount of Bitcoin.  You see that?

10        A.   Yes.

11        Q.   Ira, do you have any e-mails from Dave where

12   he told you he had a substantial amount of Bitcoin?

13        A.   No.

14        Q.   Do you have any text messages from Dave where

15   he said that he had a substantial amount of Bitcoin?

16        A.   No.

17        Q.   Do you have any handwritten letters where Dave

18   says to you I have a substantial amount of Bitcoin?

19        A.   No.

20        Q.   Did he put that in his personal will -- let me

21   say it differently.  Did Dave put in his will that he

22   has a substantial amount of Bitcoin?

23        A.   No.

24        Q.   Are there any documents from Dave to you

25   stating that he has a substantial amount of Bitcoin?
```

```
 1        A.   No.

 2        Q.   After Dave died did you go through his

 3   possessions?

 4        A.   Yes.

 5             MR. FREEDMAN:  Objection.

 6   BY MR. PASCHAL:

 7        Q.   Did you find any mention of a substantial

 8   amount of -- any evidence to suggest there was a

 9   substantial amount of Bitcoin?

10        A.   No.

11        Q.   Do you have any documents where Dave tells you

12   about W&K and Info Defense Fund Research, LLC?

13        A.   No.

14        Q.   After Dave died did you find any documents at

15   his house regarding W&K?

16        A.   No.

17        Q.   When you became the personal representative

18   for Dave's estate did you look on SunBiz.org?  Are you

19   familiar with that web site?

20        A.   Yes.

21        Q.   Did you look on SunBiz.org to see if he owned

22   any companies?

23        A.   I was only aware of Computer Forensics

24   Company.

25        Q.   But just my question was did you go on
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 33

```
 1    SunBiz.org to search to see if he owned any companies?

 2         A.    I don't think so.

 3         Q.    Did you first learn of W&K from Dr. Wright?

 4         A.    Yes.

 5         Q.    Ira, you're aware that Dave was receiving debt

 6    collection calls in mid 2012?

 7         A.    2012, I was not aware of it.

 8         Q.    Do you have documents reflecting Dave's debt?

 9         A.    The autopsy report.

10         Q.    Sorry.  Do you have documents reflecting

11    Dave's debt?

12         A.    Oh, debt.  Sorry.

13         Q.    My mistake, sorry.

14         A.    I don't think so.

15         Q.    Do you know how much debt Dave had when he

16    died?

17         A.    I remember getting some kind of paperwork.  I

18    may have handed it over to my estate attorney so he

19    might have the actual number but I don't remember.

20         Q.    Is that attorney Joseph Karp?

21         A.    Yes.

22         Q.    Do you remember what that document was?

23         A.    No.  I didn't really look at it.

24         Q.    Do you have any bank account statements for

25    Dave?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 34

```
 1          A.    Bank account statement, I don't think so.

 2          Q.    What efforts did you take to locate any bank

 3   accounts?  Did you take any efforts?

 4          A.    I believe so.

 5          Q.    What did you do?

 6          A.    I think I contacted Joe Karp about that.

 7          Q.    Sorry, what did you say?

 8          A.    I think I contacted Joe Karp about that.  I

 9   think he looked into it to see if Dave had any -- what

10   bank accounts.

11          Q.    Was Joe Karp was he your attorney at that

12   time?

13          A.    Yes.

14          Q.    So we went over documents regarding the

15   substantial Bitcoin.  Have you spoken to any witnesses

16   that told you that Dave had a substantial amount of

17   Bitcoin?

18                MR. FREEDMAN:  Objection to form.

19                THE WITNESS:  No.

20   BY MR. PASCHAL:

21          Q.    So just to clarify then.  There are no

22   witnesses -- no testimony that says that Dave has a

23   substantial amount of Bitcoin that you have?   Relevance

24                MR. FREEDMAN:  Objection.

25                THE WITNESS:  Not that I'm aware of.
```

```
 1              MR. PASCHAL:  Ira, I'm showing you a complaint
 2         that was filed against Dave by Wells Fargo Bank.
 3              (Defendant's Exhibit No. 3 was
 4              marked for identification.)
 5              MR. FREEDMAN:  Do you have a copy for us?
 6              MR. PASCHAL:  (Indicating).
 7    BY MR. PASCHAL:
 8         Q.   Can you go to page two of that complaint.  If
 9    you look at paragraph five Wells Fargo alleges that
10    there's been a default under the note and mortgage held
11    by plaintiff and that payment due October 1, 2012 and
12    all subsequent payments have not been made?
13              MR. FREEDMAN:  Bryan, where are you?
14              MR. PASCHAL:  Page two, paragraph five.
15              MR. FREEDMAN:  Page two, paragraph five I
16         don't see that.
17              MR. PASCHAL:  Not page numbered.  Just turn to
18         the next page.
19              MR. FREEDMAN:  There is a number on the bottom
20         page.
21              THE WITNESS:  Five up top.
22              MR. PASCHAL:  Yes, paragraph five.
23    BY MR. PASCHAL:
24         Q.   Do you see that?
25         A.   Where it says there's been a default?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                        Page 36

1      Q.   Yes.   Are you aware that Dave stopped making

2  payments on his house October 1st 2012?

3      A.   I wasn't aware.

4      Q.   So Dave never told you that?

5      A.   No.

6      Q.   When was the first time that you learned this?

7      A.   I think after he passed away.

8      Q.   Ira, did you speak to Dave while he was in the

9  V.A. Hospital?

10     A.   I think couple times, yes.

11     Q.   About how many?

12     A.   Don't remember.

13     Q.   You say less than ten?

14     A.   Maybe.

15     Q.   Did you visit him while he was in the V.A.?

16     A.   No.

17     Q.   Did you exchange e-mails with him while he was

18  in the V.A.?

19     A.   Yes.

20     Q.   How many e-mails did you exchange roughly?

21     A.   I would have to go look.   Couldn't tell you

22  off the top of my head.

23     Q.   What e-mail account did you use to e-mail him,

24  do you remember?

25     A.   Mostly Dex561@ ▇▇▇▇▇▇ .

Relevance, unduly prejudicial, subject to pending motion in limine (through line 16 -- withdraw counter at 17-19 if these are disallowed).

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 37

```
 1        Q.    What e-mail did you send to Dave -- I mean not
 2   e-mail but what e-mail address was -- for Dave would you
 3   send it to?
 4        A.    Are you talking about that period of time when
 5   he was in the V.A.?
 6        Q.    When you sent those e-mails in the V.A.
 7        A.    I think at that time he was probably using
 8   Dave@███████████████.
 9        Q.    Do you remember what you talked about with
10   Dave?
11        A.    No.   I would have to go back and look.
12              MR. FREEDMAN:  Are you done with this?
13              MR. PASCHAL:  Yes.
14              MR. FREEDMAN:  Don't want to lose them.
15              MR. PASCHAL:  May want to keep them close
16        because I may go back.
17              MR. FREEDMAN:  Just keep them right here.
18   BY MR. PASCHAL:
19        Q.    Did Dave ever ask you for money in 2012?
20        A.    I don't think so.
21        Q.    Do you know if anyone made any personal loans
22   to Dave?
23        A.    I remember his friend Patrick mentioning that
24   he may have loaned Dave money like once in a while but
25   as far as like an amount I don't know.
```

```
 1        Q.   Do you have any documents related to those

 2   loans or no?

 3        A.   No.

 4        Q.   Did Dave ever tell you he needed help paying

 5   V.A. bills?

 6        A.   Paying V.A. bills, no.

 7        Q.   So you -- did you ever help him pay any V.A.

 8   bills?

 9        A.   No.

10             MR. PASCHAL:   Mark this as Exhibit 4.

11             (Defendant's Exhibit No. 4 was

12             marked for identification.)

13   BY MR. PASCHAL:

14        Q.   Showing you an e-mail from Dave to Dr. Wright

15   dated October 11, 2012.  In that e-mail Dave says to

16   Dr. Wright, "Craig, if you don't mind please do transfer

17   in USD from Liberty.  If you can handle it that way I

18   would be grateful.  I have been in the V.A. again.

19   Nothing to worry about more of a routine as we have to

20   live with.  But I am not sure when I'll be able to get

21   back home for enough time to manage all the exchanges.

22   The cost of the hospital also comes as the reason for

23   this request.  Nothing I need help on but the funds in

24   USD will make my life easier right now."  Have you seen

25   this e-mail before?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 39

```
 1              MR. FREEDMAN:  Objection.  Go ahead.
 2              THE WITNESS:  I recently saw it in one of the
 3         produced documents that Craig turned over, yes.
 4         But I have never seen it before.
 5    BY MR. PASCHAL:
 6         Q.   In this case?
 7         A.   Yes, in this case.
 8         Q.   Do you know if Dr. Wright helped Dave with his
 9    V.A. bills?
10         A.   No.
11         Q.   Ira, do you have any communications or
12    documents or anything from Dave to Dr. Wright accusing
13    him of theft?                        Relevance
14         A.   No.
15         Q.   Do you still have the October -- going back to
16    the October 11th e-mail do you have any documents -- do
17    you have any documents showing that Dave had a foreign
18    account with the bank called Liberty Reserve?
19         A.   No.
20         Q.   Did you know that Liberty Reserve was seized
21    by the United States Government?
22         A.   I remember hearing that from Craig.
23         Q.   When did you hear that from Craig?
24         A.   In one of the e-mails that he sent me.  I
25    don't remember when it was.
```

1      Q.    Have you done any research on Liberty Reserve?

2      A.    I looked it up to see what it was.

3      Q.    What did you learn?

4      A.    It was some kind of like money exchange

5  business.

6            MR. PASCHAL:  Can you mark that as the next

7      exhibit?

8            (Defendant's Exhibit No. 5 was

9            marked for identification.)

10 BY MR. PASCHAL:

11     Q.    Showing you the unsealed indictment for the

12 United States Government versus Liberty Reserve.  Can

13 you turn to page -- paragraph 20 and that's going to be

14 on page nine?  If you look at the second sentence there

15 it starts "with the merchants who accepted."  Do you see

16 that?

17     A.    Did you say the second sentence?

18     Q.    Yes, on paragraph 20 "the merchants who

19 accepted."  You can read the whole paragraph but I'm

20 starting with "the merchants who accepted."

21     A.    "To further enable to use of Liberty Reserve"

22 on 20.

23     Q.    I'll just read the whole thing.  "To further

24 enable the use of Liberty Reserve for criminal activity,

25 its website offered shopping cart interface that

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 41

```
 1   merchant web sites could use to access LR, which means
 2   Liberty Reserve, currency as a form of payment.  The
 3   merchants who accepted LR, being Liberty Reserve,
 4   currency was overwhelmingly criminal in nature.  They
 5   included, for example traffickers of stolen credit card
 6   data and personal identity information, peddlers of
 7   various types of online Ponzi and get-rich-quick
 8   schemes, computer hackers for hire, unregulated gambling
 9   enterprises and underground drug dealing web sites."
10             MR. FREEDMAN:  Objection.
11   BY MR. PASCHAL:
12        Q.   Aside from any documents we produced to you do
13   you have any documents showing that Dave was involved in
14   developing software for gambling activities?
15        A.   No.
16        Q.   Do you have any knowledge of that?
17        A.   No.  Knowledge of him creating gambling type
18   software, no.
19        Q.   Have you heard that he was doing that before
20   today?
21        A.   I heard of Craig mentioned that he was
22   involved in that type of stuff but -- and I think he
23   mentioned that Dave may have assisted him in some
24   capacity but I don't have any evidence of Dave ever
25   doing that type of stuff.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 42

```
 1        Q.   Did you learn from any third parties that --
 2   aside from Craig that Dave may have been involved in
 3   online gambling activities?
 4        A.   I don't believe so, no.
 5        Q.   Is that your testimony today?
 6        A.   Yes.
 7        Q.   One second --
 8        A.   I think the ATO may have mentioned something
 9   about Liberty Reserve but I don't know if they were
10   specifically saying that Dave was involved or not but
11   yes, I think I did get a document from ATO.
12        Q.   Let me ask you this.  Did you ever exchange an
13   e-mail with Patrick Paige where you mentioned you were
14   surprised to find out that Dave was --
15        A.   Yes.
16        Q.   Let me finish that question.  E-mail with
17   Patrick Paige where you said you were surprised to learn
18   that Dave was involved with gambling activities?
19        A.   Yes.
20             MR. FREEDMAN:  You have to wait until he
21        finishes the question and then answer so that he
22        has a clean record.
23   BY MR. PASCHAL:
24        Q.   Have you made any efforts to find the Liberty
25   Reserve account that Dave had?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                Page 43

```
 1          A.    No.

 2          Q.    Have you spoken to the Southern District of

 3     New York about Liberty Reserve?

 4          A.    No.

 5          Q.    Have you spoken to the FBI agents that were

 6     investigating Liberty Reserve?

 7          A.    No.

 8          Q.    So you mentioned the Thanksgiving dinner

 9     earlier and you allege in your complaint so let's talk

10     about that.   The 2009 Thanksgiving dinner.   Who was at

11     that dinner?

12          A.    Myself, my wife, my six month old daughter,

13     Dave and my father.

14          Q.    Now, in your complaint I don't know if you

15     want a copy but you say at paragraph 61 that Dave told

16     you that he was working on something bigger than

17     Facebook by creating his own digital money.   Do you

18     remember that?

19          A.    Yes.

20          Q.    Do you have any pictures from that day?

21          A.    Yes.

22          Q.    Do you know if they were produced in

23     discovery?

24          A.    I'm not sure.

25          Q.    After the Thanksgiving dinner did you have any
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                      Page 44

```
 1    communications with Dave in 2009 regarding the digital

 2    money that he said would be bigger than Facebook?

 3          A.   No.

 4          Q.   Do you have any communications with Dave in

 5    2010 regarding the digital money that Dave said would be

 6    bigger than Facebook?

 7          A.   No.

 8          Q.   Do you have any communications with Dave in

 9    2011 regarding the digital money that Dave said would be

10    bigger than Facebook?

11          A.   No.

12          Q.   Do you have any communications with Dave in

13    2012 regarding the digital money that Dave said would be

14    bigger than Facebook?

15          A.   No.

16          Q.   Do you have any communications with Dave up

17    until April 2013 regarding the digital money that Dave

18    said would be bigger than Facebook?

19          A.   No.

20          Q.   After Dave died I understand that you formated

21    some of Dave's hard drives and threw out a bunch of his

22    work papers; is that correct?

23                MR. FREEDMAN:  Objection.

24                THE WITNESS:  I did discard some papers and

25          hard drives I first examined to see if there was
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 45

```
 1        anything on them and once I found out that there
 2        wasn't I believe there were two hard drives that I
 3        formated.
 4   BY MR. PASCHAL:
 5        Q.   Before you formated and before you threw those
 6   papers away did you find any evidence of the digital
 7   currency that Dave said would be bigger than Facebook?
 8        A.   No.
 9             MR. PASCHAL:  I want to show you an e-mail
10        exchange that you had with Dr. Wright.
11             (Defendant's Exhibit No. 6 was
12             marked for identification.)
13   BY MR. PASCHAL:
14        Q.   So if you look at the bottom of page one and
15   you sent this e-mail -- do you remember this e-mail?  Go
16   ahead and read it.
17             MR. FREEDMAN:  What exhibit number is this?
18             MR. PASCHAL:  I think it's 6.
19             THE WITNESS:  Yes, I remember.
20   BY MR. PASCHAL:
21        Q.   You remember this e-mail?
22        A.   Yes.
23        Q.   At the bottom you'll say "hi Craig, I would
24   like to ask for your advice if I may.  After everything
25   you have shared with me I feel like I can completely
```

```
 1   trust you.  As mysterious and exciting as all this news

 2   is I also feel nervous about making mistakes.  I very

 3   well could have already made some mistakes months ago by

 4   throwing away of bunch of Dave's papers and formating

 5   drives that I could not access."  Do you remember that

 6   statement?

 7            MR. FREEDMAN:  Objection.

 8            THE WITNESS:  Yes.

 9            MR. FREEDMAN:  Wait one second let me object

10       and then go ahead and answer the question.

11   BY MR. PASCHAL:

12       Q.    Do you remember that statement?

13       A.    Yes.

14       Q.    I just want to go over this e-mail.  First you

15   say that you may have made some mistakes some months

16   ago.  When you say "some months ago" what timeframe are

17   you talking about, how many months ago?

18       A.    Sometime in 2013.

19       Q.    Was it before Thanksgiving, after

20   Thanksgiving?

21            MR. FREEDMAN:  Objection.

22            THE WITNESS:  You're talking about 2013?

23   BY MR. PASCHAL:

24       Q.    Yes, November 2013 Thanksgiving.

25       A.    It could have been before that.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                 Page 47

```
 1        Q.    Our analysis shows that two drives were

 2   formated and installed with Windows on November 10, 2013

 3   would that date be about right?

 4        A.    Possibly, yes.

 5        Q.    Did you purchase the Windows software

 6   installed on those drives?

 7        A.    I don't remember.

 8        Q.    You don't remember?

 9        A.    (Indicating).

10        Q.    Would any -- do you have any documents like

11   credit card receipts showing you purchased the Windows

12   software?

13        A.    I don't know.

14        Q.    You don't know?

15        A.    Could have been a version of Windows that my

16   brother had.

17        Q.    You also say that you threw out a bunch of

18   Dave's work papers.  How much is a bunch?

19        A.    Just when I was cleaning out his house.  I

20   don't remember exactly how many.

21        Q.    When you threw these papers out was it the

22   same day November 10th 2013 or November of 2013?

23        A.    No.  This was like shortly after he passed

24   away when I was going through his house, going through

25   his stuff.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                      Page 48

```
 1          Q.   Did you keep any of the documents that he had,
 2     any of his work papers?
 3          A.   I couldn't really find any like work papers.
 4     I only found things like related to the certificates
 5     that he earned like security related certificates.
 6          Q.   You threw away his certificates?
 7          A.   No, I'm saying I kept --
 8          Q.   You kept those?
 9          A.   Right.
10          Q.   When you say the working papers you threw away
11     what are you referring to?
12          A.   Actually I'm not even sure they were work
13     papers.  I guess they looked like things that didn't
14     look relevant to keeping.
15          Q.   Did you read all the papers before you threw
16     them away?
17          A.   Briefly.
18          Q.   So I guess none of it seemed important?
19          A.   Exactly.
20          Q.   Let me ask you.  If any of those documents had
21     a random set of numbers and letters and just random
22     gibberish you would haven't considered that important,
23     would you?
24               MR. FREEDMAN:  Objection.
25               THE WITNESS:  I don't know.  I don't know.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 49

```
 1   BY MR. PASCHAL:
 2        Q.   So what did you do to determine whether or not
 3   something was important?
 4        A.   Just whatever I looked at -- I don't know
 5   specifically.  I mean like I was just going through
 6   papers quickly and if something looked like it was
 7   connected to him I would keep it.
 8        Q.   Say the last part again, I couldn't hear you.
 9        A.   If something looked like it was connected to
10   him I would keep it.  Like certificates, things he
11   earned, anything personal.
12        Q.   So --
13        A.   Like a lot of stuff I threw out could have
14   just been like junk mail.  That was unimportant I didn't
15   need to keep it.
16        Q.   How would you consider something junk mail?
17        A.   Like advertisement type stuff.
18        Q.   Let me just -- when you were formating or when
19   you threw out the papers were you already the personal
20   representative of the estate?  Let me rephrase that.  Do
21   you know -- do you know that you were the personal
22   representative of the estate when you --
23        A.   I'm not sure if I knew at that time.
24        Q.   Okay.
25             MR. FREEDMAN:  We've been going an hour.  Can
```

```
 1         we take a break?

 2               MR. PASCHAL:  Can we --

 3               MR. FREEDMAN:  If you have more questions go

 4         ahead.

 5               MR. PASCHAL:  Few more questions and then we

 6         can take a break.

 7    BY MR. PASCHAL:

 8         Q.   So you said if it was connected to Dave you

 9    would keep it.  So if something I'm just trying to

10    figure out what the measurement that was.  If there was

11    scribbling on papers would you just throw that away?

12               MR. FREEDMAN:  Objection.

13               THE WITNESS:  I don't know.  Possibly.

14    BY MR. PASCHAL:

15         Q.   When did you become familiar with Bitcoin?

16               MR. FREEDMAN:  Do you think maybe we can take

17         a break here?  Sounds like you're going to a

18         different topic.

19               MR. PASCHAL:  Let's take a break.

20               THE VIDEOGRAPHER:  The time is 11:03 a.m. and

21         we're off the record.

22               (Thereupon, a brief recess was taken.)

23               THE VIDEOGRAPHER:  The time is now 11:17 a.m.

24         and we're back on the record.

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 51

```
1    BY MR. PASCHAL:

2         Q.   Sorry.  Just briefly before we left off and

3    earlier today.  I have some follow-up questions.  Did

4    Dave live in Palm Beach Gardens?

5         A.   It might be officially called like Riviera

6    Beach.

7         Q.   It's in the area, right?

8         A.   Yes.

9         Q.   Palm Beach County?

10        A.   Yes.

11        Q.   Last time you saw Dave was in 2009?

12        A.   Yes.

13        Q.   And you guys lived in the same county?

14        A.   Yes.

15        Q.   About how far apart did you guys live from

16   each other?

17        A.   Five to ten minutes.

18        Q.   When we left off we were talking about on the

19   e-mail where you formated and you said you formated

20   threw out some of Dave's work papers so I think we were

21   talking about the work papers.  Why were you throwing

22   the papers away?

23        A.   Like I said it just looked like it was

24   unimportant stuff.  Everyday stuff you get in the mail

25   just advertisements, news clipping type and things.
```

Relevance, unduly prejudicial, subject to pending MIL (through line 17)

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 52

```
 1        Q.   So if you go back to that e-mail in front of
 2   you you say that you were concerned that you made a
 3   mistake?
 4        A.   Yes.
 5        Q.   How were you concerned?
 6             MR. FREEDMAN:  You said how or what?
 7   BY MR. PASCHAL:
 8        Q.   Why?  Why were you concerned?
 9        A.   What's that?
10        Q.   Why were you concerned?
11        A.   Because I had just discarded some of his
12   stuff.
13        Q.   But you said the stuff you discarded was junk
14   mail?
15        A.   Right.  And I was using his drives.
16        Q.   So you were concerned because you were using
17   his drives, not because you threw out his work papers?
18        A.   No.  I was concerned about a little of
19   everything.
20        Q.   But sitting here today you can't tell us the
21   content of the papers that you threw out?
22             MR. FREEDMAN:  Objection.
23             THE WITNESS:  No.
24   BY MR. PASCHAL:
25        Q.   But you were concerned that you were throwing
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 53

```
 1    them out and formated certain drives?

 2             MR. FREEDMAN:  Objection.

 3             THE WITNESS:  Well, the drives that I formated

 4        there was nothing on them.

 5    BY MR. PASCHAL:

 6        Q.    We're going to talk about that more but you

 7    said you were concerned because you were using the

 8    drives; right?

 9        A.    Yes.  After -- after he passed away yes, I

10    started using them.

11        Q.    And you were concerned you were using them.

12    Did you continue to use them in 2014?

13        A.    Yes.

14        Q.    Did you continue to use them in 2015?

15        A.    Yes.

16        Q.    Did you continue to use them in 2016?

17        A.    Yes.

18        Q.    Did you continue to use them in 2017?

19        A.    Yes.

20        Q.    Did you continue to use them in 2018?

21        A.    I believe so.

22        Q.    After you filed the lawsuit you continued to

23    use Dave's devices; right?

24        A.    Yes.

25        Q.    When did you stop using Dave's devices?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 54

1          A.    I don't remember exactly.

2          Q.    **Was it maybe like a few months ago, few weeks**

3   **ago?**

4                MR. FREEDMAN:  Objection.

5                THE WITNESS:  In the range of like around this

6          lawsuit but --

7   BY MR. PASCHAL:

8          Q.    **Sorry, go ahead.**

9          A.    I was just putting my personal files on them.

10  I never touched Dave's stuff.

11         Q.    **Let me break that statement down.  So what**

12  **caused you to stop using the devices?**

13               MR. FREEDMAN:  If you can answer this question

14         without going into conversation you had with your

15         lawyers then answer it.

16               THE WITNESS:  Well, I just didn't want to

17         tamper with anything.

18  BY MR. PASCHAL:

19         Q.    **So you were using them in 2018 you were**

20  **tampering with it?**

21               MR. FREEDMAN:  Objection.

22               THE WITNESS:  No.  I mean I -- I was just

23         using it for my own personal use.

24  BY MR. PASCHAL:

25         Q.    **I want to go back two questions ago and you**

1    just said that you stopped using the devices because you

2    didn't want to tamper with anything.  So were you

3    concerned that you were tampering with anything in 2018?

4         A.   I was never concerned about tampering with

5    anything of Dave's.  I was concerned about tampering

6    with my own personal things like -- like through the

7    lawsuit you might view that I was somehow like deleting

8    my own stuff or something that might be a bad thing but

9    I wasn't --

10        Q.   Let me say it this way.  Because of the

11   lawsuit you were concerned that it would appear that you

12   were trying to delete things by using the devices; is

13   that fair to say?

14             MR. FREEDMAN:  Objection.

15             THE WITNESS:  Can you repeat that?

16   BY MR. PASCHAL:

17        Q.   Yes, was it because of the lawsuit that you

18   stopped using the devices because you were concerned

19   that it would appear that you were trying to delete

20   things?

21             MR. FREEDMAN:  Objection.

22             THE WITNESS:  I guess that's part of it.

23   BY MR. PASCHAL:

24        Q.   When do you remember that you first considered

25   suing or bringing this action against Dr. Wright?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                              Page 56

```
 1                MR. FREEDMAN:  Hold on.  What topic are you
 2        in?
 3                MR. PASCHAL:  That goes to the facts alleged
 4        in the amended complaint.
 5                MR. FREEDMAN:  Which number?
 6                MR. PASCHAL:  That goes to the facts alleged
 7        in the alleged complaint.  Goes to preservation of
 8        device, chain of custody.  I think it goes to
 9        several topics.  You want to go through them all?
10                MR. FREEDMAN:  Where -- can you show me the
11        number?
12                MR. PASCHAL:  Preservation of devices I think
13        that's like the first five.  That's the very
14        purpose of this deposition.
15                MR. FREEDMAN:  I don't think so.  He can
16        answer.  I'll allow the question but keeping an eye
17        on you.
18                MR. PASCHAL:  Can you read my question back?
19                (Thereupon, a portion of the record
20                was read back by the reporter.)
21                THE WITNESS:  I don't remember the exact date.
22        BY MR. PASCHAL:
23        Q.   Was it 2016?
24        A.   I don't know.
25        Q.   Could it have been after that?
```

```
 1        A.    It could have been after that.

 2        Q.    So I'm going to show you an e-mail that you

 3   had with Patrick Paige, March 31st 2016.

 4              (Defendant's Exhibit No. 7 was

 5              marked for identification.)

 6   BY MR. PASCHAL:

 7        Q.    If you turn to the second page and you can

 8   look at what you said before but you say there are a lot

 9   of details left out -- you're discussing Craig and

10   things you think about Dr. Wright.  "There are a lot of

11   details left out that I may have to reserve until

12   litigation."  You see that?

13        A.    Yes.

14        Q.    So this was March 31st 2016.  So as early at

15   least March 31st 2016 you were considering litigation?

16              MR. FREEDMAN:  Objection.

17              THE WITNESS:  I'm not sure about that.

18   BY MR. PASCHAL:

19        Q.    So what were you considering to reserve until

20   litigation when you were talking to Patrick Paige?  Who

21   were you planning on litigating against?

22              MR. FREEDMAN:  Ira, if you need to read the

23         whole e-mail read the whole e-mail and answer the

24         question.

25              MR. PASCHAL:  Take your time.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                  Page 58

```
 1              THE WITNESS:  Yes, I guess --
 2              MR. FREEDMAN:  Don't guess Ira.  Answer the
 3         question if you know it.  Not going to help them if
 4         you guess.
 5              THE WITNESS:  I may have been considering
 6         litigation against him at that time.
 7    BY MR. PASCHAL:
 8         Q.   March 31st 2016?
 9         A.   I don't believe I filed anything -- it was
10    just --
11         Q.   Just asking --
12         A.   I was thinking about it, yes.
13         Q.   Are there any documents to reflect an earlier
14    date than that?
15         A.   I don't know.
16         Q.   You don't know?  Sorry, I didn't hear you.
17         A.   I don't know.
18              MR. PASCHAL:  Showing you an article that
19         Dr. Wright and your brother wrote.
20              (Defendant's Exhibit No. 8 was
21              marked for identification.)
22    BY MR. PASCHAL:
23         Q.   It's called Overwriting Hard Drive Data: The
24    Great Wiping Controversy.  You produced this document to
25    us, do you recall that?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 59

```
 1        A.   I guess if we produced it we --

 2        Q.   Have you read this?

 3        A.   No.

 4        Q.   You have what, 20 plus years of experience

 5   with computers; right?

 6        A.   Just general use, yes.

 7        Q.   You're generally familiar with how to

 8   preserve, overwrite or delete data on a hard drive?

 9        A.   I don't have any special training in that.  I

10   just have general computer use.

11        Q.   To my question you have general experience

12   with how to overwrite, preserve or delete data from a

13   hard drive?

14        A.   Not preserve.  If you're talking about like

15   how a forensic specialist might know how to secure data

16   I don't have any training in that type of thing.  I just

17   know how to general --

18        Q.   Generally do you know how to preserve,

19   overwrite and delete data from a hard drive?

20             MR. FREEDMAN:  Objection.

21             THE WITNESS:  I just know how to generally

22        store data on a hard drive.

23   BY MR. PASCHAL:

24        Q.   You understand you're under oath today;

25   correct?
```

```
 1        A.    Yes.
 2        Q.    You understand the importance when you're
 3   under oath you have to give complete and truthful
 4   answers to the best of your ability; correct?
 5        A.    Yes.
 6             MR. PASCHAL:  I'm showing you your responses
 7        to our interrogatories.  This is going to be number
 8        eight?
 9             MR. FREEDMAN:  9.
10             (Defendant's Exhibit No. 9 was
11             marked for identification.)
12             MR. FREEDMAN:  Do you have a copy for us?
13             MR. PASCHAL:  Yes.
14   BY MR. PASCHAL:
15        Q.    If you turn to page six a response to request
16   it should be interrogatory number 20 at the second
17   sentence you say "additionally Ira has been employed in
18   web site design and affiliate marketing for the past 22
19   years and uses computers extensively as a part of his
20   work.  During this time Ira became generally familiar
21   with how to preserve, overwrite or erase data on
22   electronic devices."  Is that your statement?
23        A.    Yes.
24        Q.    And you swore this under penalty of perjury
25   just like you did here today; correct?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                 Page 61

```
 1        A.    Yes.
 2        Q.    So do you know or do you have general
 3   experience with how to preserve, overwrite or delete
 4   data from a hard drive?
 5        A.    That's just general every day use.  Just like
 6   an average computer --
 7        Q.    With that general knowledge you were in
 8   possession of overwriting paper that Dave and Dr. Wright
 9   wrote from March of 2016 you continued to use Dave's
10   electronic devices for your personal use until well
11   after -- almost a year after this litigation was filed;
12   is that correct?
13             MR. FREEDMAN:  Objection.
14             THE WITNESS:  Yes.
15   BY MR. PASCHAL:
16        Q.    So could we go back to the February 2014
17   e-mail that you had with Craig?
18             MR. FREEDMAN:  What exhibit number?
19             MR. PASCHAL:  I wasn't writing them down.  I
20        think that might be three.
21             MR. FREEDMAN:  No, three is the verified
22        complaint.
23             MR. PASCHAL:  Four?  Maybe it's five.
24             MR. FREEDMAN:  Four is the 11th October 2012
25        e-mail.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                          Page 62

```
 1            MR. PASCHAL:  Yes, that's it, four.

 2   BY MR. PASCHAL:

 3       Q.   So we talked about the work papers.  Let's

 4   talk about the formating of the drives.  You said in

 5   that e-mail that you couldn't --

 6            MR. FREEDMAN:  Give me one second to grab it

 7       myself.  Okay.  Go ahead.

 8   BY MR. PASCHAL:

 9       Q.   So you said in that e-mail that you formated

10   drives you could not access.  You see that?

11       A.   Yes.

12       Q.   What did --

13            MR. FREEDMAN:  Wait, this is the wrong e-mail.

14       This is not that e-mail.  This is from Dave Kleiman

15       to Craig Wright.  What's the date on it?

16            MR. PASCHAL:  You know what, you can borrow

17       mine and give it back to me after this question.

18            MR. FREEDMAN:  He doesn't have it in front of

19       him either.  This is Exhibit 4.

20            THE WITNESS:  I know what you're talking

21       about.

22            MR. FREEDMAN:  Hold on a second.

23       February 14th.  It's Exhibit 6.

24   BY MR. PASCHAL:

25       Q.   Ira, you said you know what I'm talking about.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 63

1    So you said that you couldn't -- you formated drives you

2    couldn't access?

3         A.   I formated drives that prompted me that they

4    could only be formated.

5         Q.   Sorry, say that again.

6         A.   When I tried to access the drive the pop up

7    screen appears and it says that the drive needs to be

8    formated.  So I take that as the drive's empty and I

9    could format it.

10        Q.   Let's break that down then.  So before you

11   formatted the drive did you ask for any professional

12   help in recovering any data from the drive?

13        A.   No.

14        Q.   When you say I take that as the drive is empty

15   what are you basing that -- your -- that statement on?

16        A.   Just my general computer use.

17        Q.   Your general -- what I discussed before your

18   general knowledge of preserving, deleting and

19   overwriting data?

20             MR. FREEDMAN:  Objection.

21             THE WITNESS:  My general use of hard drives,

22        computers.

23   BY MR. PASCHAL:

24        Q.   So Ira, I mean in 2009 Dave tells you that he

25   is working on something that's bigger than Facebook,

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 64

```
 1    this digital currency, you have two hard drives and you

 2    format them; right?

 3         A.   Yes.

 4         Q.   And then you continue to use them for several

 5    years; right?

 6         A.   Yes.

 7              MR. PASCHAL:  I'm showing you your second

 8         amended responses and objections to our first set

 9         of interrogatories.  This is going to be number

10         ten.

11              (Defendant's Exhibit No. 10 was

12              marked for identification.)

13    BY MR. PASCHAL:

14         Q.   Can you look at response number two and that

15    interrogatory two is identify all electronic devices

16    that Dave Kleiman owned or possessed at the time of his

17    death.  You see that?

18         A.   Yes.

19         Q.   Is this a complete list or is there anything

20    else that needs to be added to this list?

21         A.   I believe that's a complete list.

22         Q.   So these were all electronic devices that Dave

23    had?

24         A.   Yes.

25         Q.   Which of these drives did you format?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 65

1      A.    I believe it was two of the Seagate Momentus.

2      Q.    So there's the first one, right the Seagate

3  Momentus 500GB, that one?

4      A.    I think so.

5      Q.    Then it said the amount of data currently

6  stored is 17.6 GBs.  You see that?

7      A.    Yes.

8      Q.    Now, you said that you took the prompt as to

9  format the drive there was no information on the drives.

10  Is this entire 17.6 GBs your personal information?

11      A.    I think that's probably mostly the operating

12  system that I installed on it.

13      Q.    And then the next Seagate would be the -- I

14  think three down it's a Seagate Momentus 500 GB.  Are

15  those the same types of drive, just two of them?

16      A.    I believe so.

17      Q.    The third one that's the other one that you

18  formated?

19      A.    I think so.

20      Q.    Did you format the drives so that you could

21  use them personally?

22      A.    Yes.

23      Q.    Well, now if you've been using them for so

24  long why is it saying on the third one the amount of

25  data currently stored is zero?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Page 66

```
 1        A.   I'm not sure the amount of data on that one is

 2   accurate.  I'm not sure if that one was reported

 3   accurately.

 4        Q.   Would that be for the same one -- scratch

 5   that.  Strike that.  Would that be the same for the

 6   first one where you said 17.6 GB was for the operating

 7   system alone; is that accurate?

 8        A.   I believe so.

 9        Q.   You've been using that device for years you

10   haven't stored anything on it?

11        A.   I don't think I really used it that much.  I

12   remember installing operating systems on those two

13   drives but I never really used it much.

14        Q.   So you formated them so you could use them;

15   right?

16        A.   Yes.  I may have not used it for a very

17   limited amount of time.

18        Q.   When was that limited amount of time?

19        A.   I don't remember.

20        Q.   What are you storing on those devices?

21        A.   I think just the operating systems.  I may

22   have also put like maybe some web site design program on

23   there.

24        Q.   That's it?

25        A.   As far as I can recall.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                Page 67

```
 1        Q.    Ira, are you storing any commercial videos on
 2   those devices?
 3        A.    Commercial videos?  I don't know.
 4        Q.    Are you storing any commercial music files on
 5   those devices?
 6             MR. FREEDMAN:  Objection.
 7             THE WITNESS:  I would have to look at that, I
 8        don't know.
 9   BY MR. PASCHAL:
10        Q.    Are you storing any personal photos of your
11   family on those devices?
12             MR. FREEDMAN:  Objection.
13             THE WITNESS:  Are you talking about just the
14        Seagate?
15   BY MR. PASCHAL:
16        Q.    On these two you formated.
17        A.    I don't know.  I don't think so.  I don't
18   think I put any photos on there.
19        Q.    Were you able to access the remainder of all
20   of Dave's drives?
21        A.    No.
22             MR. FREEDMAN:  Objection.
23   BY MR. PASCHAL:
24        Q.    That's in this list.
25        A.    Yes, right.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 68

```
 1          Q.    You weren't able to access them?

 2          A.    I think there might be one or two that we

 3    weren't able to access.

 4          Q.    What were those?

 5          A.    I think the Hitachi Travelstar.

 6          Q.    What was the other one?

 7          A.    I don't remember.

 8          Q.    What did you do to access the Hitachi

 9    Travelstar 100 GB?

10          A.    I think I just plugged it in.

11          Q.    You haven't done anything else to it?

12          A.    No.

13          Q.    There's no forensic image of it?

14          A.    There was like you mean after litigation

15    started?  Not prior to litigation.

16          Q.    There was none.  There was one done after the

17    litigation?

18          A.    Yes.

19          Q.    When was that done?

20          A.    I don't remember the date.

21          Q.    Was it this year?

22          A.    Yes.

23          Q.    Are you storing any commercial videos on any

24    of these devices?

25          A.    I don't remember.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 69

```
 1        Q.   Are you storing any commercial music files on
 2   any of these devices?
 3        A.   I would have to look at them.  I don't know.
 4        Q.   You didn't look at them before today?
 5        A.   Yes, I've looked at them before today but I
 6   don't remember it exactly what was on them.
 7        Q.   Do you remember storing any pictures of your
 8   family on any of those devices?
 9        A.   I think -- yes, I think I put some photos.  I
10   mean I would imagine that some of these drives have
11   photos.
12        Q.   Which drives have photos?
13        A.   I don't know specifically.
14        Q.   Can you look at I think it's seven down where
15   you say four to five hard drives that are no longer in
16   the estate's possession.  You see that?
17        A.   Yes.
18        Q.   Then a footnote you say "Ira gave three or
19   four drives that were possessed by Dave Kleiman at the
20   time of his death to Patrick Paige (Dave's business
21   partner in Computer Forensics LLC) as Patrick informed
22   him they were Computer Forensic LLC drives with business
23   data stored on them.  There was one other drive that was
24   on Dave's bedroom counter.  This drive was broken and
25   would not power on.  Ira disposed of this drive in
```

```
 1   2013."  Do you recall that?

 2        A.   Yes.

 3        Q.   I'm going to just break that down.  Can you

 4   tell me today whether it's three or four drives that you

 5   gave to Patrick Paige and Carter Conrad?

 6        A.   I don't remember.

 7             MR. FREEDMAN:  Objection.

 8   BY MR. PASCHAL:

 9        Q.   Can you say your answer again?

10        A.   I don't remember the exact number.

11        Q.   Do you recall when you gave him those drives?

12             MR. FREEDMAN:  Objection.

13             THE WITNESS:  I believe it was maybe within

14        like a month after Dave passed away.

15   BY MR. PASCHAL:

16        Q.   Did they ever give those drives back to you?

17        A.   No.

18        Q.   I want to go into that but let me ask you

19   this.  You said you found this drive on the bedroom

20   counter.  Did Dave have an office at his house?

21        A.   Yes, he had a room in the back, yes.

22        Q.   Was this -- were the three or four drives you

23   you gave to Patrick Paige, were those in his bedroom or

24   were they in his office?

25        A.   They were in his office.
```

```
 1          Q.    Before you gave those drives to Patrick Paige

 2     did you get any professional analysis to see what was on

 3     the drives?

 4          A.    No.

 5          Q.    Did you look in the drives yourself?

 6          A.    No.

 7          Q.    Did you access the drives?

 8          A.    No.

 9          Q.    How was Patrick able to access the drives?

10          A.    Repeat that.

11          Q.    How was Patrick able to access the drives?

12          A.    I don't know.

13          Q.    So how did Patrick know that -- well, did

14     Patrick tell you how did you know that those drives

15     belonged to Computer Forensics?

16          A.    He told me that they belonged to Computer

17     Forensics.

18          Q.    Did you --

19          A.    I don't remember if they were labeled or not.

20          Q.    But so other than Patrick's word they belonged

21     to Computer Forensics did you have anything else to show

22     that they may have not been belonged to Computer

23     Forensics?

24                MR. FREEDMAN:  Objection.

25                THE WITNESS:  No.
```

```
 1   BY MR. PASCHAL:
 2        Q.   You don't know what was stored on those
 3   drives, do you?
 4        A.   Correct.
 5        Q.   So if a Bitcoin wallet was on that drive you
 6   wouldn't know?
 7        A.   Yes, I don't know -- I never looked at the
 8   drives.
 9        Q.   Have you asked for those drives back from
10   Patrick?
11        A.   No.
12        Q.   Now, you say that there was a drive on the
13   bedroom counter that you couldn't power on and you
14   disposed of it.  Do you recall that?
15        A.   Yes.
16        Q.   Dave had an office so was this the only drive
17   that was in his bedroom?
18        A.   No.  I believe there were -- he kept his
19   backpack.
20        Q.   So let me do this then.  I'm not going to show
21   you the photo but on his counter he had a backpack, a
22   blue backpack?
23        A.   Not on the counter.  In his bedroom.  You
24   asked if there were other hard drives in his bedroom.
25        Q.   Okay.  Were there any hard drives in his
```

1    bedroom?

2         A.    Yes.

3         Q.    What other drives were in his bedroom?

4         A.    I believe most of the drives that you have

5    listed here.

6         Q.    So he kept all of his drives in his bedroom?

7         A.    In a backpack, yes.

8         Q.    But the three or four drives that he didn't

9    have in the backpack they were in his office?

10        A.    Yes.

11        Q.    Now, this one drive was on the bedroom

12   counter; right?

13        A.    Yes.

14        Q.    It was the only drive that was on the bedroom

15   counter?

16        A.    Yes.

17        Q.    What was on his bedroom counter?

18              MR. FREEDMAN:  Objection.

19              THE WITNESS:  I don't remember exactly.

20   BY MR. PASCHAL:

21        Q.    What did this drive look like?

22        A.    I just remember it was an external drive.

23        Q.    Do you remember what color it was?

24        A.    No.

25        Q.    You don't know what type it was either?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Page 74

1        A.    Not offhand.

2        Q.    **Do you remember how big it was?**

3        A.    Maybe like six or seven inches high by a

4   couple inches wide.

5        Q.    **So like --**

6        A.    Yes.

7        Q.    **It was a big hard drive?**

8        A.    I don't --

9        Q.    **It wasn't like a laptop hard drive, let me ask**

10   **that?**

11        A.    No, it wasn't a laptop drive.  It was an

12   external drive.

13        Q.    **For like a tower computer?**

14        A.    For a tower computer?

15        Q.    **For like a regular computer?  For like a**

16   **desktop computer?**

17        A.    It could be used with anything.

18        Q.    **You just plug it in?**

19        A.    You can connect it to any type of computer.

20        Q.    **I'm not going to show the picture but on**

21   **Dave's countertop he had a blue backpack, he had a**

22   **yellow shirt, he had another bag, he had a bottle of**

23   **beer.  There was a wine glass that was empty and then he**

24   **had his glass mirror here.  There was a cell phone on**

25   **the top of a white box and then right below it there was**

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 75

```
 1    a very, very small black box, that doesn't fit the
 2    description of the hard drive you're talking about but
 3    could that have been the hard drive?
 4            MR. FREEDMAN:  Objection.
 5            THE WITNESS:  Where are you getting this
 6        picture?  I don't even -- I don't understand the
 7        picture that you're just painting.
 8    BY MR. PASCHAL:
 9        Q.   The pictures that the police took after when
10    they --
11        A.   You have actual photos?
12        Q.   Yes.  I can show them.
13        A.   Yes, it would help if I could see the photo
14    then I might -- I don't know.
15            MR. PASCHAL:  Can we print here?
16            MR. FREEDMAN:  Yes.
17            MR. PASCHAL:  So on our next break I'll print
18        it and show you.  I don't know -- the reason why I
19        did not show you is because it's -- it is graphic.
20        So I don't know if -- at the next break you guys
21        decide if you want to see it and I can point it out
22        to you, okay?
23            THE WITNESS:  Okay.
24    BY MR. PASCHAL:
25        Q.   So the pictures that the police took from the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT

IRA KLEIMAN on 04/08/2019                                           Page 76

1    day that they went to Dave's house you haven't seen any

2    of those pictures?

3         A.    No.

4         Q.    On the drive that you -- you threw away you

5    wouldn't be able to tell us today one way or another

6    whether or not there was Bitcoin wallets or Bitcoin

7    information on that drive?     *Improper predicate, argumentative (through line 21)*

8         A.    I was never able to access it.

9         Q.    So you wouldn't be able to tell us today

10   whether or not Bitcoin wallets or Bitcoin were on that

11   drive?

12              MR. FREEDMAN:   Objection.

13              THE WITNESS:    Again I wasn't able to access

14        it.

15   BY MR. PASCHAL:

16        Q.    Is it a yes or no?

17        A.    Anything could have been on it.

18        Q.    But you wouldn't know?

19        A.    I wouldn't know because I couldn't access it.

20        Q.    And you threw it away?

21        A.    Yes.  It was -- it didn't work.

22        Q.    Just going back.  So when you came in

23   possession of Dave's computers did you have your own

24   personal computer?

25        A.    Yes.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 77

1      Q.   So why did you format Dave's devices so that

2   you could use those computers?

3      A.   I guess I needed more storage space.  Maybe my

4   computer was full with stuff, other stuff.

5      Q.   So sitting here today you can't tell us why

6   you decided to use Dave's computers, you're speculating,

7   are you?

8      A.   Why I couldn't use --

9      Q.   Why did you use Dave's computers rather than

10  your own?

11     A.   I put the operating systems on there because

12  my computer might have had a different operating system.

13  For one reason or another I needed to use like Windows 7

14  or Windows 8 so that's why I formated those two and put

15  those operating systems on there.

16     Q.   Why didn't you just get another hard drive or

17  computer?

18          MR. FREEDMAN:  Objection.

19          THE WITNESS:  His were laying around and

20      they -- they said they could be formated.

21  BY MR. PASCHAL:

22     Q.   Who said they could be formated?

23     A.   When I plugged them in the pop up screen said

24  that the drives need to be formated.  So that to me that

25  appears that the drives were empty.

1    Q.   When you had the drive that was broken what
2    made you think it was broken?
3    A.   It wouldn't turn on.  You didn't hear like the
4    platter spinning or anything.
5    Q.   Did you ask for any professional help trying
6    to get it to start, to turn on?
7    A.   No.
8    Q.   So just -- you tried turning it on it didn't
9    turn on so you threw it away?
10   A.   Yes.
11        MR. FREEDMAN:  Objection.
12   BY MR. PASCHAL:
13   Q.   So when you became the personal representative
14   of the estate of Dave Kleiman what steps did you take to
15   preserve the assets of the estate?
16   A.   Well, I reached out to my attorney --
17        MR. FREEDMAN:  Ira, if you can answer the
18        question without revealing what you discussed with
19        your attorney then answer it.  But don't discuss
20        anything that you discussed with your attorney.
21        MR. PASCHAL:  Your objection is don't talk
22        about Karp?
23        MR. FREEDMAN:  Just discussions with your
24        lawyer.
25        MR. PASCHAL:  Don't tell me about your

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 79

```
 1        conversations with Karp.

 2   BY MR. PASCHAL:

 3        Q.   When you became the personal representative

 4   what did you do to preserve the assets of the estate?

 5        A.   My attorney assisted me with doing that.

 6        Q.   But what did you do like did you -- what did

 7   you do personally to preserve whatever was in Dave's

 8   house?

 9             MR. FREEDMAN:  Objection.

10             THE WITNESS:  I collected his personal things.

11   BY MR. PASCHAL:

12        Q.   And what did you collect?

13        A.   Well, his computer equipment, some guns in his

14   gun safe.  Some of his clothing.  Just personal items.

15   Like I said, his computer certificates, things like

16   that.

17        Q.   Can you go back to the February 2014 e-mail

18   that you had with Dr. Wright where you discussed

19   formating the drives?

20             MR. FREEDMAN:  Which exhibit number?

21             MR. PASCHAL:  I didn't write it down.  Do you

22        have it?

23             MR. FREEDMAN:  I think it's Exhibit 6.

24   BY MR. PASCHAL:

25        Q.   So if you go to the second page that's the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 80

```
 1   second paragraph where you start with Patrick.  You say
 2   "Patrick and his partner e-mailed me the other day and
 3   would like me to bring over his, I guess that means
 4   Dave's, drives.  I haven't spoken with them about what
 5   happened if they did manage to access his account.  I
 6   assume that anything in it cannot be traced when there
 7   is a withdrawal.  Being that I've only met Patrick a
 8   couple times in my life I was wondering if there are any
 9   safety measures you can recommend to me so I don't make
10   another mistake."  So let's break this down.  What did
11   you mean by another mistake?
12        A.   I guess I was thinking that if I discarded
13   anything that could have been important or related to
14   Bitcoin.
15        Q.   Then the section before you say "being that
16   I've only met Patrick a couple times in my life I was
17   wondering if there were any safety measures to
18   recommended to me again so I don't make another
19   mistake."  This is in February 2014 and you're saying
20   that you have only met Patrick a couple times in my
21   life?
22             MR. FREEDMAN:  Objection.
23   BY MR. PASCHAL:
24        Q.   Is that correct?
25             MR. FREEDMAN:  Objection.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 81

```
 1              THE WITNESS:  Yes.

 2    BY MR. PASCHAL:

 3         Q.   But one month after Dave died you gave him

 4    three or four of Dave's hard drives; right?

 5         A.   Correct.

 6         Q.   That was only based on him telling you these

 7    belong to Computer Forensics?

 8         A.   Yes.

 9         Q.   I want to be clear you take any images of the

10    drives that you gave to Patrick; right?

11         A.   No.

12         Q.   So you have no copies?

13         A.   No.

14         Q.   So if you go back to the e-mail you say you're

15    going to give certain drives to Patrick and Conrad for

16    them to analyze.  Do you see that?

17         A.   Yes.

18         Q.   Did you give them drives?

19         A.   No.

20         Q.   Why didn't you give them any drives excluding

21    the three or four that you had already given him why

22    didn't you give him drives at this point?

23         A.   I didn't -- what date are we talking about

24    again?

25         Q.   So in February of 2014 you told Craig that you
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 82

```
 1    were going to give Patrick and Conrad some of Dave's
 2    electronic devices to analyze.  Did you give Patrick and
 3    Conrad Dave's --
 4         A.   No.
 5         Q.   The answer is no?
 6         A.   No, I didn't.
 7              MS. MCGOVERN:  Just finish the question.
 8    BY MR. PASCHAL:
 9         Q.   And why didn't you give Patrick and Conrad the
10    drives?
11         A.   I thought that the best idea would be to allow
12    Craig to examine them.
13         Q.   So you didn't give any drives to Patrick
14    Paige?
15         A.   No.
16         Q.   Except for the three or four; right?
17         A.   Right.
18              MR. PASCHAL:  I'm showing you the first
19         amended complaint you filed against Patrick Paige
20         and Carter Conrad.  This is going to be what
21         exhibit?
22              THE COURT REPORTER:  11.
23              (Defendant's Exhibit No. 11 was
24              marked for identification.)
25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 83

```
 1   BY MR. PASCHAL:
 2        Q.   Can you turn to paragraph 18?  Let me know
 3   when you're there.
 4        A.   Okay.
 5        Q.   So at paragraph 18 you say "shortly after
 6   David Kleiman's passing plaintiff, and that's you, also
 7   entrusted Computer Forensics and Patrick Paige with a
 8   smart phone owned by decedent, being Dave, which was
 9   provided the defendants for the purpose of unlocking the
10   phone as it was password protected in aid of plaintiff's
11   efforts to develop information as to assets of the
12   estate.
13             The phone has never been returned to plaintiff
14   and defendant Paige has since claimed that he, a
15   computer forensic consultant, had thrown away the phone
16   after he had dropped the phone and cracked the screen."
17   Do you recall making this allegation?
18        A.   Yes.
19        Q.   So you attempted to access the device being
20   the phone by giving it to Patrick Paige; correct?
21        A.   Yes.
22        Q.   But he never gave you any information from
23   that device?
24        A.   Correct.
25        Q.   Did he ever give it back to you?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 84

```
 1        A.    No.
 2        Q.    When did you give that phone to -- that device
 3   to Patrick?
 4        A.    It was the same time that I handed him -- when
 5   he took the three drives from Dave's home.
 6        Q.    Why did you give him something?
 7        A.    Because I couldn't access it and he is a
 8   computer forensics expert I thought he would have a
 9   better chance at it than I would.
10             MR. PASCHAL:   Showing you your response and
11        objections to our first set of interrogatories.
12             (Defendant's Exhibit No. 12 was
13             marked for identification.)
14   BY MR. PASCHAL:
15        Q.    Can you turn to the last page of this
16   document?  Can you read that statement that you made?
17        A.    "I, Ira Kleiman declare under penalty of
18   perjury under the laws in the United States and the
19   State of Florida that the foregoing is true and
20   correct."
21        Q.    Can you turn to interrogatory response number
22   three?
23        A.    Okay.
24        Q.    We ask you "describe with specificity all
25   attempts you have made to access Dave Kleiman's
```

```
 1   electronic devices."  Your response was "Ira did not

 2   keep a record of every attempt he made to access Dave

 3   Kleiman's electronic devices.  That said, Ira states

 4   that he personally reviewed all drives that were

 5   accessible.  During this review Ira looked through each

 6   individual folder and each individual file contained on

 7   these drives to find anything of importance."

 8            You didn't mention in here that you gave a

 9   device the cell phone to Patrick Paige for them to

10   access; is that correct?

11        A.   Well, those drives from what I believe --

12        Q.   Not the drives I'm asking you -- go ahead.

13        A.   What are you referring to?

14        Q.   The phone, the device, the one that you allege

15   in the Computer Forensic lawsuit.

16        A.   Yes, I didn't give him the cell phone.  I just

17   asked him to access it.

18        Q.   So in your amended complaint for Computer

19   Forensics you didn't allege that you gave the phone to

20   Patrick to access the phone and that he told you that he

21   cracked the screen and threw it away?

22        A.   I handed the phone to him with an expectation

23   that it would be returned to me.

24        Q.   But you gave it to him so he could access the

25   phone; right?
```

```
 1        A.    Yes.

 2        Q.    Your testimony earlier was you gave it to him

 3   because he is a computer forensic expert so you can

 4   access the device?

 5        A.    Yes.

 6        Q.    I'm asking you you gave this answer under the

 7   penalty of perjury.  When we asked you describe with

 8   specificity all attempts you made to access Dave

 9   Kleiman's devices.  You did not say in this answer that

10   you gave an electronic device, being the phone, to

11   Patrick to access?

12        A.    I thought we listed that phone on here.

13        Q.    I'm looking just this one interrogatory right

14   here.  You can go through them but nowhere in there do

15   you say you gave the phone to Patrick Paige.

16        A.    Okay.

17        Q.    So is this an untruthful response?

18        A.    It's possible we just missed including the

19   cell phone.

20        Q.    Can you go to your amendment to this

21   interrogatory which is second amended response and

22   objection to Dr. Wright's first set of interrogatories.

23   That's Exhibit 10.

24             MR. FREEDMAN:  Are you done with 12?

25             MR. PASCHAL:  We're going to use it again.
```

```
 1   BY MR. PASCHAL:

 2        Q.   Can you turn to page 11, that's the last page.

 3   You took an oath to the court reporter today and you

 4   also signed this verification.  Can you read it out to

 5   me?

 6        A.   "I, Ira Kleiman, declare under penalty of

 7   perjury under the law of the United States and State of

 8   Florida that the foregoing is true and correct."

 9        Q.   Can you go back to that same interrogatory

10   request number three.  In the first paragraph you say

11   the same thing that you said -- just so I'm clear on

12   these you revised them you served us on March 21, 2019,

13   okay?  Your first interrogatory responses the first

14   version of this you served on March 7th 2019.  So two

15   weeks later we get this revised response.  If you look

16   in the second paragraph you add one paragraph to this

17   response.  You want to go ahead and read that?

18        A.   Where are you?

19        Q.   Interrogatory three, the same one we're

20   talking about.  It says request number three but it

21   should be -- you say describe with specificity?

22        A.   "Describe with specificity all the attempts

23   you have made to access Dave Kleiman's electronic

24   devices."

25        Q.   Now, that first paragraph it's the same
```

1   paragraph you had in your previous version to this

2   interrogatory; right?

3        A.   Yes.

4        Q.   Now, if you turn the page you added the

5   paragraph.  In this paragraph you mention that you gave

6   an electronic device to Patrick Paige to access?

7        A.   Apparently not.

8        Q.   So in the two week span that you revised you

9   did not include that additional information in this

10  interrogatory response; correct?

11       A.   I guess we missed it.

12       Q.   In the two weeks that you served the first

13  response and the second response what information did

14  you get to remember that you installed Windows operating

15  systems on two drives in an effort to gain access to the

16  drives in 2013?  What caused you to remember that that

17  information was missing?

18            MR. FREEDMAN:  Objection.

19            THE WITNESS:  Can you repeat that again?

20  BY MR. PASCHAL:

21       Q.   Yes, you give us a response on March 7th 2019;

22  right?

23       A.   Yes.

24       Q.   You supplement that response two weeks later

25  to add a new paragraph in that second paragraph here

```
 1   where you're saying you installed windows on the drives
 2   which you didn't include in your first version to these
 3   interrogatories.
 4        A.   I don't know.
 5             MR. FREEDMAN:  Objection.
 6   BY MR. PASCHAL:
 7        Q.   Are there any documents that shows why you
 8   remembered that your first answer was incomplete?
 9             MR. FREEDMAN:  Objection.
10             THE WITNESS:  I don't know.
11   BY MR. PASCHAL:
12        Q.   Is this a truthful answer?
13        A.   At the time I believe it was.
14        Q.   Is it truthful today?
15        A.   It's possible some information was missed.
16        Q.   Is it truthful?
17             MR. FREEDMAN:  Objection.
18             THE WITNESS:  If it's missing some information
19        I guess it's not completely.
20   BY MR. PASCHAL:
21        Q.   While we're on the interrogatories I'm showing
22   you an e-mail that you had with Patrick Paige and this
23   is June 27, 2015.  I think that's Exhibit 12.
24             MR. ROCHE:  13.
25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 90

```
 1                    (Defendant's Exhibit No. 13 was

 2                    marked for identification.)

 3    BY MR. PASCHAL:

 4         Q.   In this e-mail you start by saying "hi

 5    Patrick, I don't think I'm going to be able to meet up

 6    this week.  Need to finish a client's web site.  But for

 7    now I stored the drives in a safe deposit box so they'll

 8    remain safe and as Craig mentioned there's no time limit

 9    with this stuff so we have time to figure it all out."

10    Do you remember this e-mail?

11         A.   Yes.

12         Q.   Just as an initial matter is there any

13    reason -- what computer did you send this e-mail from?

14         A.   I guess my personal computer.

15         Q.   Is there a reason why the date is set for the

16    day to go first then the month and then the year?

17         A.   Can you repeat that?

18         Q.   If you look at the sent the time where it says

19    Saturday and then it says the date 27 and then it says

20    the month 6 and then the year 2015?

21         A.   Right.

22         Q.   Is there -- was is it unusual to you that it's

23    set like that?

24         A.   I never really paid attention to it.

25         Q.   Your e-mail is -- your e-mail sends out using
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 91

```
 1    that date format; right?
 2             MR. FREEDMAN:  Objection.
 3             THE WITNESS:  I don't know.  I never paid
 4        attention to it.
 5    BY MR. PASCHAL:
 6        Q.   There's no cause for concern let me ask you
 7    that that your e-mails are sending out --
 8             MR. FREEDMAN:  Objection.
 9    BY MR. PASCHAL:
10        Q.   No, right?
11        A.   No.
12        Q.   Would it be surprising to you if Dave had
13    e-mails that also had -- used that same date
14    configuration?
15             MR. FREEDMAN:  Objection.
16    BY MR. PASCHAL:
17        Q.   Date, month, year?
18        A.   I suppose not.
19        Q.   In the February 2000 -- February 15, 2014
20    e-mail you told Patrick that you put the drives in a
21    safe deposit box; correct?
22             MR. FREEDMAN:  Objection.
23             THE WITNESS:  Yes.
24    BY MR. PASCHAL:
25        Q.   Now, can you turn to your responses and
```

1    objections to the second set of interrogatories.  I

2    don't have an exhibit number on that but you guys have

3    it.

4              MR. FREEDMAN:  Second amended?

5              MR. PASCHAL:  Not the second amended, the

6         second set of interrogatories.

7              MR. FREEDMAN:  I have responses objections to

8         Wright's first set of interrogatories to plaintiff.

9         I have plaintiff's second amended responses and

10        objection to Wright's first set of interrogatories.

11             MR. PASCHAL:  Is it in that stack?

12             MR. FREEDMAN:  It should be identical.  One is

13        marked and one is not.

14             MR. ROCHE:  Plaintiff's responses and

15        objections to plaintiff's second set?

16             MR. FREEDMAN:  What number?

17             MR. ROCHE:  Nine.

18   BY MR. PASCHAL:

19        Q.   So at 14 we ask you to describe with

20   specificity all efforts you made to preserve Dave

21   Kleiman's electronic devices and data contained on them.

22   Do you see that interrogatory?

23        A.   Yes.

24        Q.   Under the penalty of perjury again you said "I

25   restored all of Dave Kleiman's electronic devices in the

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 93

```
 1    exact same place that he found them in Dave's computer

 2    backpack?"

 3         A.    Yes.

 4         Q.    Are they in a backpack or safety deposit box?

 5         A.    In a back pack.

 6         Q.    So you never put them in a safe deposit box?

 7         A.    I was thinking about them putting them in a

 8    save deposit.   Then I decided to keep them where I found

 9    them.

10         Q.    You said when Ira reviewed these devices he

11    found nothing of importance or out of ordinary but you

12    did find the true crypt file on the drive which you

13    could not access.   You made copies of these files?

14              MR. FREEDMAN:   Objection.

15    BY MR. PASCHAL:

16         Q.    You see that?

17         A.    Yes.

18         Q.    How did you determine what was of importance

19    or whether something was out of the ordinary?

20         A.    I basically kept everything of Dave's, all of

21    his files.   But are you -- are you asking me about the

22    true crypt file specifically?

23         Q.    I'm asking in that sentence.   "When I reviewed

24    Dave's devices he found nothing of importance or out of

25    the ordinary."   These are Dave's work laptops; correct,
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 94

```
 1    some of them were his personal laptops, work laptops;
 2    right?
 3              MR. FREEDMAN:  Objection.
 4              THE WITNESS:  I don't know what drives were in
 5        his laptops.
 6    BY MR. PASCHAL:
 7        Q.   But these drives had Dave's work on them;
 8    right?
 9        A.   It had forensic related software on them.  I
10    don't know.
11        Q.   How did you determine that there was nothing
12    of importance or out of the ordinary on Dave's drives?
13        A.   I kept all of his stuff.
14        Q.   That's not my question.  My question is how
15    did you determine whether something was of importance or
16    out of the ordinary?
17        A.   Being that I didn't delete any of his
18    things -- I just kept everything.
19        Q.   You made a statement here that he found or you
20    found nothing of importance out of the ordinary.  What
21    were you looking for in those drives to determine
22    whether anything was of importance or was out of the
23    ordinary?
24        A.   I don't know.
25        Q.   I'm sorry, could you say that again?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 95

```
 1        A.    I don't know.

 2        Q.    The true crypt file, what have you done to

 3   access that file?

 4        A.    I just stored it -- I just made copies of it.

 5   There's been no attempt to access it.

 6              THE VIDEOGRAPHER:   The time is 12:18 p.m. and

 7        we're off the record.

 8              (Thereupon, a brief recess was taken.)

 9              THE VIDEOGRAPHER:   The time is now 1:11 p.m.

10        and we are now back on the record.

11   BY MR. PASCHAL:

12        Q.    So Ira, when we left off we were talking about

13   where Dave's devices were located, whether they were in

14   a safety deposit box or computer bag.  You said they're

15   in the computer bag?

16        A.    Yes.

17        Q.    Where is that computer bag located?

18        A.    In my home.

19        Q.    So you have the hard drives and the bag?

20        A.    Yes.

21        Q.    What type of bag is it?

22        A.    Just a large backpack.

23        Q.    Do you know the brand?

24        A.    Not offhand.

25        Q.    Where in your house are you keeping it?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 96

```
 1          A.    I think it's in my bedroom.

 2          Q.    You think or -- are you guessing, do you know

 3    for sure?

 4          A.    Well, I sometimes move around.  Sometimes if I

 5    was like using the drives it would be in my bedroom.

 6    Other times I would store it in an extra room.

 7          Q.    You said when you use the drives, what are you

 8    using the drives for?

 9          A.    Just my personal files.

10          Q.    What personal files?

11          A.    I don't recall exactly.

12          Q.    Because earlier we spoke and on the drives

13    you -- strike that.  So I'm going back to Computer

14    Forensics, the complaint you filed against Computer

15    Forensics and Patrick Paige.  Do you have that in front

16    of you?

17                MR. FREEDMAN:  11, right?

18                MR. PASCHAL:  Yes.  Do you have it?

19                MR. FREEDMAN:  Yes.

20    BY MR. PASCHAL:

21          Q.    So if you go to paragraph 32 on page eight.

22    That's a Count III and you're seeking a permanent

23    injunction.  Do you see that?

24          A.    32?

25          Q.    The heading Count III seeking a permanent
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 97

```
 1   injunction?

 2        A.   Yes.

 3        Q.   If you go to paragraph 32 and you look at the

 4   last sentence you say "further upon information and

 5   belief David Kleiman created and maintained Bitcoin

 6   wallets which were his personal property during the time

 7   he was a member of Computer Forensics."  Do you recall

 8   making that allegation?

 9        A.   I don't remember saying those exact words

10   but --

11        Q.   But this is your complaint; right?

12        A.   Yes.

13        Q.   Now, if you go to paragraph 35 at the last

14   sentence as a part of your permanent injunction you say

15   to the extent that Computer Forensics, Paige or Conrad

16   have retained any Bitcoin wallets that were the personal

17   property of David Kleiman Computer Forensics should be

18   enjoined from monetizing, transferring or otherwise

19   converting such Bitcoin to its use and that's a typo it

20   should be or it says of or the use of its principals or

21   third parties.  Do you see that allegation that you

22   made?

23        A.   Yes.

24        Q.   So can you turn to your second amended

25   responses to our first interrogatories I think that's
```

```
 1   ten.
 2             MR. FREEDMAN:  Second amended responses?
 3             MR. PASCHAL:  Yes.
 4             MR. FREEDMAN:  It is ten.
 5             MR. PASCHAL:  10.
 6   BY MR. PASCHAL:
 7        Q.   Can you turn to page four?  You ready?  You
 8   say "describe with specificity all attempts you made to
 9   determine the identity and location of any crypto
10   currency that David Kleiman owned or possessed at the
11   time of his death."
12             In your answer under the penalty of perjury
13   you did not make any mention that you're seeking a
14   permanent injunction against Computer Forensics, Patrick
15   Paige, Carter Conrad for the return of David Kleiman's
16   personal Bitcoin wallets, do you?
17        A.   Could you repeat that?
18        Q.   Yes.  Can you read it back?
19             (Thereupon, a portion of the record
20             was read back by the reporter.)
21             THE WITNESS:  I don't know -- I suppose we
22        missed that.
23   BY MR. PASCHAL:
24        Q.   Ira, so can you go to the last page of this
25   interrogatory.  This is your signature, right?
```

```
 1        A.   Yes.
 2        Q.   And you are swearing the under penalty of
 3   perjury that the foregoing answers are true and correct;
 4   correct?
 5        A.   Yes.
 6        Q.   And the question we're asking is whether all
 7   attempts that you've made to find or locate or access
 8   David Kleiman's Bitcoin, right?
 9        A.   Yes.
10        Q.   Isn't it important to mention that you're
11   seeking a permanent injunction against three or two
12   people in a company to get those very Bitcoin?
13             MR. FREEDMAN:  Objection.
14             THE WITNESS:  We didn't know if they possessed
15        any Bitcoin.
16   BY MR. PASCHAL:
17        Q.   You made the allegation without knowing?
18        A.   I don't know.
19        Q.   You don't know if you made the allegation in
20   this complaint without knowing whether it was true or
21   not?
22             MR. FREEDMAN:  Objection.
23             THE WITNESS:  I don't remember.
24   BY MR. PASCHAL:
25        Q.   But aside from whether it's true or not you
```

```
 1    did not mention that you were seeking an injunction in

 2    the sworn interrogatory?

 3              MR. FREEDMAN:  Objection.

 4    BY MR. PASCHAL:

 5        Q.   Did you?

 6              MR. FREEDMAN:  Objection.

 7              THE WITNESS:  I don't know.

 8    BY MR. PASCHAL:

 9        Q.   Is that a yes or no?

10        A.   I don't know.

11        Q.   You don't know in this interrogatory response

12    whether you make any mention of the injunction that

13    you're seeking against Patrick Paige, Carter Conrad and

14    Computer Forensics?

15              MR. FREEDMAN:  Objection.

16              THE WITNESS:  I don't know.

17    BY MR. PASCHAL:

18        Q.   Ira, you can turn to the interrogatory and

19    read it if you would like.

20        A.   What page?

21        Q.   It's on page four.

22        A.   What is your question?

23        Q.   Nowhere in here do you mention that you're

24    seeking a permanent injunction for David Kleiman's

25    Bitcoin for Patrick Paige, Carter Conrad and Computer
```

```
 1    Forensics?

 2             MR. FREEDMAN:  Objection.

 3             THE WITNESS:  I don't know.

 4    BY MR. PASCHAL:

 5        Q.   Ira, it's really a yes or no.  In this answer

 6    do you mention that you're seeking an injunction against

 7    Patrick Paige, Carter Conrad and Computer Forensics?

 8    You're under oath today just like you were under oath

 9    under these interrogatories.

10             MR. FREEDMAN:  Objection.

11             THE WITNESS:  My attorneys drafted this and I

12        don't -- I don't completely understand what an

13        injunction is.

14    BY MR. PASCHAL:

15        Q.   Well, without understanding what an injunction

16    is you do allege here in Computer Forensics' complaint

17    that to the extent that Computer Forensics, Paige,

18    Conrad have retained any Bitcoin wallets that were the

19    personal property of David Kleiman, Computer Forensics

20    should be enjoined from monetizing, transferring or

21    otherwise converting Bitcoin to its use or its use to

22    third parties.  Do you understand the allegation you

23    made?

24             MR. FREEDMAN:  Objection.

25             THE WITNESS:  No.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                          Page 102

```
 1   BY MR. PASCHAL:
 2        Q.   So if there is a similar allegation in the
 3   Second Amended Complaint which you filed against
 4   Dr. Wright you wouldn't understand that allegation
 5   either, would you?
 6             MR. FREEDMAN:  Objection.
 7             THE WITNESS:  I didn't draft the complaints.
 8   BY MR. PASCHAL:
 9        Q.   Did you look at them?
10        A.   Yes.
11        Q.   Did you review them?
12        A.   Yes.
13        Q.   Did you say it's okay to file this?
14        A.   Yes.
15        Q.   Are did you look at these interrogatories?
16        A.   Yes.
17        Q.   Did you review them?
18        A.   Yes.
19        Q.   Did you swear under the penalty of perjury
20   that these answers are correct?
21        A.   Yes.
22             MR. FREEDMAN:  Objection.
23   BY MR. PASCHAL:
24        Q.   Are they correct?
25             MR. FREEDMAN:  Objection.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 103

```
 1              THE WITNESS:  I don't know entirely.

 2   BY MR. PASCHAL:

 3      Q.    So do you have any basis to support the

 4   allegation you're making here in the Computer Forensics

 5   complaint?

 6              MR. FREEDMAN:  Objection.

 7              THE WITNESS:  I believe so at the time.

 8   BY MR. PASCHAL:

 9      Q.    And what was that?  What evidence?  What

10   documents?

11      A.    I thought it was possible that they retain --

12   being that they were partners with Dave they may have

13   shared equipment, they may have had access to Dave's

14   property.

15      Q.    So Ira, just -- your testimony today is that

16   you made that allegation because they were partners with

17   Dave and they had access to Dave's information?

18              MR. FREEDMAN:  Objection.  There's no question

19       pending.

20              MR. PASCHAL:  There is a question.

21              MR. FREEDMAN:  What's the question?  Do you

22       want to read it back?

23              MR. PASCHAL:  Read the question back.

24              (Thereupon, a portion of the record

25              was read back by the reporter.)
```

```
 1              MR. FREEDMAN:  It's not a question.
 2   BY MR. PASCHAL:
 3        Q.   Add a question mark.  That's a question.  Is
 4   that your testimony today?
 5        A.   We're talking about Computer Forensics?
 6        Q.   Computer Forensics, this allegation.
 7        A.   Yes, because I believe that they had access to
 8   Dave's --
 9        Q.   Sorry, go ahead.
10        A.   To Dave's -- well, property that they shared
11   with Dave.
12        Q.   That was enough for you to file a complaint
13   against Computer Forensics?
14              MR. FREEDMAN:  Objection.
15              THE WITNESS:  That's not what solely the
16        complaint was about.
17   BY MR. PASCHAL:
18        Q.   I'm talking about this very sentence, these
19   two sentences I mentioned.
20              MR. FREEDMAN:  Objection.
21              THE WITNESS:  I suppose so.
22   BY MR. PASCHAL:
23        Q.   Getting back to this though are there any
24   communication aside from with your lawyers or any
25   documents showing why you decided to leave out this
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 105

```
 1    injunction or mention of the injunction in your

 2    interrogatories?

 3              MR. FREEDMAN:  Objection.

 4              THE WITNESS:  I don't know.

 5    BY MR. PASCHAL:

 6         Q.   We talked about three or four hard drives

 7    earlier that you gave to Dr. Wright after Dave died.

 8    Let me repeat the question.  That there were three to

 9    four hard drives you gave to Patrick one month after

10    Dave died?

11         A.   (Indicating).

12         Q.   Could Bitcoin address, Bitcoin wallets have

13    been on those hard drives?

14              MR. FREEDMAN:  Objection.

15              THE WITNESS:  I was told that they were just

16         work related drives.

17    BY MR. PASCHAL:

18         Q.   And who told you that?

19         A.   Patrick.

20         Q.   The person you're suing?

21         A.   Yes.

22         Q.   And that lawsuit is still active today?

23         A.   Yes.

24         Q.   Ira, did you ever notify this court in this

25    action that you have a separate action where you're
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

1    seeking the same stuff against three other people?

2          MR. FREEDMAN:  Hold on.  Where are you in your

3     topics?

4          MR. PASCHAL:  I'm just asking him.

5          MR. FREEDMAN:  Don't answer the question.

6    BY MR. PASCHAL:

> Relevance, unduly prejudicial, subject to pending MIL (through 107:4)

7          Q.   Ira, let's talk about as a personal

8    representative when you came in possession of Dave's

9    stuff.  When did you learn that Dave passed away?

10         A.   Around April -- I think it was 27, 28 of 2013.

11         Q.   So if Dave passed on the 26th you learned the

12   day after, two days after?

13         A.   I think so.

14         Q.   Where were you?

15         A.   I don't exactly recall.  Probably home.

16         Q.   Do you remember what you were doing when you

17   found out that Dave died?

18         A.   No.

19         Q.   Do you remember what time of the day it was?

20         A.   No.

21         Q.   Do you remember who told you?

22         A.   Yes, my dad.

23         Q.   Did you go to his house right away?

24         A.   Go to whose house?

25         Q.   Your brother, Dave.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Relevance, unduly prejudicial, subject to pending MIL (through 107:4)

1    A.   No.

2    Q.   When did you go to Dave's house after you

3  learned that he died?

4    A.   Probably maybe two or three weeks afterwards.

5    Q.   Did you go to your dad's house right after you

6  learned that Dave died?

7    A.   I don't remember.

8    Q.   Do you remember what you did after you learned

9  that Dave died?

10        MR. FREEDMAN:  Objection.

11        THE WITNESS:  I just remember talking to my

12   dad about it.

13  BY MR. PASCHAL:

14    Q.   But you don't remember anything else?

15    A.   No.

16    Q.   Ira, would it be fair to say that you weren't

17  really close with Dave?

18        MR. FREEDMAN:  Objection, stop.  What does

19   this go to?

20  BY MR. PASCHAL:

21    Q.   Let me rephrase.  You don't have personal

22  knowledge relating to Dave's business activities, do

23  you?

24    A.   No.

25    Q.   I'm showing you an e-mail exchange you had

```
 1   with Angie Ojea, is that how you say her last name?

 2        A.   Angie Ojea.

 3             (Defendant's Exhibit No. 14 was

 4             marked for identification.)

 5   BY MR. PASCHAL:

 6        Q.   Can you turn to -- do you remember this

 7   e-mail?  Take a look at it.

 8        A.   The one at the very top?

 9        Q.   Do you remember this e-mail in general?  Do

10   you remember having this e-mail conversation with

11   Angela?

12        A.   I remember having a few e-mail exchanges.

13        Q.   If you go to page six.

14        A.   Okay.

15             MR. FREEDMAN:  These aren't Bates stamped.

16             MR. PASCHAL:  No, these are the ones you

17        produced to us.  I guess when I printed them out

18        they didn't have the Bates stamp.

19   BY MR. PASCHAL:

20        Q.   Not important.  Somewhere in this e-mail you

21   mentioned you hired a cleaning crew?

22        A.   Yes.

23        Q.   The cleaning crew found bullet casing?

24        A.   Yes.

25        Q.   Did you take out Dave's work papers and
```

1  electronic devices before the cleaning crew cleaned the

2  house?

3       A.   No.  I definitely did not.

4       Q.   Can you tell me the name of the cleaning crew?

5       A.   I don't have it off --

6       Q.   Do you have any documents showing who the

7  cleaning crew is?

8       A.   I think I can get the name.

9            MR. PASCHAL:  Can you give us that?

10           MR. FREEDMAN:  (Indicating).

11  BY MR. PASCHAL:

12       Q.   Did the cleaning crew find anything else other

13  than the bullet casing that they mentioned to you?

14       A.   That was the only thing they mentioned.

15       Q.   So how -- when did the cleaning crew clean

16  Dave's house?

17       A.   Maybe -- I don't remember exactly.  I'm

18  thinking maybe one or two weeks after.

19       Q.   Do you know when Dave's house was foreclosed?

20       A.   No.

21       Q.   Did you go by his house and check on his

22  things or did you already remove everything from the

23  house?

24           MR. FREEDMAN:  Objection.

25           THE WITNESS:  What time are you talking about?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 110

```
 1   BY MR. PASCHAL:
 2        Q.   After he died -- before the house was
 3   foreclosed on did you already remove Dave's belongings
 4   from the house?
 5        A.   I don't know exactly.  Are you talking like
 6   after the cleaning crew?
 7        Q.   No.  So before Wells Fargo finished the
 8   foreclosure sale --
 9        A.   I don't know when that was.
10        Q.   I know but let's say it's this date.  Any time
11   before that date did you remove Dave's electronic
12   devices, his papers, his possessions?
13             MR. FREEDMAN:  Objection.
14   BY MR. PASCHAL:
15        Q.   Or were they foreclosed with his stuff still
16   in the house?
17             MR. FREEDMAN:  Objection.
18             THE WITNESS:  I don't know when they
19        foreclosed.
20   BY MR. PASCHAL:
21        Q.   Did you ever take all of Dave's stuff out of
22   the house?
23        A.   I don't think I took everything.
24        Q.   Stuff was left in the house though?
25        A.   Yes.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 111

```
 1        Q.    Who else had access to Dave's house?

 2        A.    I think his girlfriend at the time, Lyneda.

 3        Q.    What about after his death who had access to

 4   the house?

 5        A.    I'm not sure if -- I'm not sure if anyone

 6   else -- I had his key.

 7        Q.    Did you change his locks?

 8        A.    No.

 9        Q.    Did you have a security system on the house?

10        A.    I think he did.

11        Q.    Was it active after he died?

12        A.    I don't remember using a security system to

13   get in.  I just used the key.

14        Q.    Were you paying the electrical bill for the

15   house?

16        A.    I didn't.  I don't believe.

17        Q.    Was anybody paying the electric bill for the

18   house?

19        A.    Not that I'm aware of.

20        Q.    So there was no electricity in the house as

21   far as you're aware after he died?

22        A.    I'm trying to -- I don't remember.

23        Q.    So if there was no electricity in the house

24   the house was going into foreclosure -- strike that.

25   Can you definitively say whether or not there was any
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 112

```
 1   other electronic devices in the house you may have not
 2   known about?
 3              MR. FREEDMAN:  Objection.
 4              THE WITNESS:  I believe I collected all of the
 5        equipment that I visibly saw.
 6   BY MR. PASCHAL:
 7        Q.    But there was still stuff in the house; right?
 8        A.    Like furniture.
 9        Q.    Did you check all the furniture to see what
10   was in them?
11        A.    I don't remember.
12        Q.    So if something was important in some of his
13   furniture you wouldn't be able to tell us that; right?
14              MR. FREEDMAN:  Objection.
15              THE WITNESS:  I don't remember searching
16        through his furniture.
17   BY MR. PASCHAL:
18        Q.    Sorry, what did you say?
19        A.    I don't remember searching through his
20   furniture.
21        Q.    When you saw -- so Dave had two Alienware
22   computers and a laptop?
23        A.    Yes.
24        Q.    Was the Alienware -- was it -- was the
25   Alienware computer was it the color black?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 113

```
1        A.   Yes.

2        Q.   One of them was, right?

3        A.   I believe both.

4        Q.   Were the hard drives in the computer or were

5   they out of them when you got the Alienware computer?

6        A.   They were out of them.

7        Q.   Was there any evidence in the house showing

8   why the hard drives were removed from the computers?

9             MR. FREEDMAN:  Objection.

10            THE WITNESS:  No.  I don't think so.

11  BY MR. PASCHAL:

12       Q.   Did Dave typically keep his hard drives out of

13  his computer?

14       A.   I don't know what he did.

15       Q.   On the ESI disclosure you listed one phone but

16  you said that Patrick had destroyed Dave's phone so what

17  phone -- did Dave have two phones?

18       A.   Yes.

19       Q.   What phone -- do you remember the make and

20  model of the phone you gave to Patrick Paige?

21       A.   I believe it was a Samsung Galaxy.  I don't

22  remember the model.  It's probably listed in --

23       Q.   It's in the disclosures.  No, it's not

24  actually.  It's a Samsung Galaxy?

25       A.   That's all it says?
```

1      Q.   I'm asking you.

2      A.   Yes, it was a Samsung Galaxy.

3      Q.   Did you see any devices used for Bitcoin

4  mining, Bitcoin servers, anything?

5      A.   Not that I'm aware of.  I wouldn't know what a

6  Bitcoin mining server would look like.

7      Q.   Would you have known what a Bitcoin wallet

8  looks like?

9      A.   No.

10     Q.   So if you saw one you wouldn't have thought it

11 was important, would you?

12          MR. FREEDMAN:  Objection.

13          THE WITNESS:  If I saw one?  I suppose not.  I

14     wouldn't know how to detect what a Bitcoin wallet

15     was.

16 BY MR. PASCHAL:

17     Q.   If he had a wallet for example on paper and it

18 just had random letters and numbers on it you wouldn't

19 have known that was a Bitcoin wallet; right?

20          MR. FREEDMAN:  Objection.

21          THE WITNESS:  I suppose not.

22 BY MR. PASCHAL:

23     Q.   So when you threw papers away that you thought

24 weren't important you could have thrown away one of

25 those papers that had a Bitcoin wallet on it; right?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 115

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  It's possible, yes.

 3              MR. PASCHAL:  Let's go to the ESI disclosure.

 4       I haven't given that to you, I'm sorry.

 5              (Defendant's Exhibit No. 15 was

 6              marked for identification.)

 7  BY MR. PASCHAL:

 8       Q.   On this ESI disclosure under number one you

 9  list David Kleiman's e-mail accounts.  You list five.

10  You see that?

11       A.   Yes.

12       Q.   Do you have access to all five e-mail

13  accounts?

14       A.   I don't believe so.

15       Q.   Which ones do you not have access to?

16       A.   I would have to check.  I don't remember

17  offhand.

18       Q.   Do you know which e-mail account you do have

19  access to?

20       A.   I have access to Dave@███████████.

21       Q.   But you're not sure about the rest?

22       A.   I don't believe I have access to the two on

23  the bottom.  The two at the top I'm not sure about.

24       Q.   Have you tried to log into those?

25       A.   I may have.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 116

```
 1        Q.    When did --
 2        A.    I just don't remember at the present time.
 3        Q.    So you don't remember any efforts you took to
 4   access those e-mail accounts, do you?
 5              MR. FREEDMAN:  Objection.
 6              THE WITNESS:  Like I said I do recall
 7        accessing Dave@██████████.
 8   BY MR. PASCHAL:
 9        Q.    The first two and last two?
10        A.    The first two I don't remember.
11        Q.    The last two what did you do to access those
12   accounts?
13        A.    I think I recovered the domain names to those
14   but I don't think I ever like set up an active account
15   for them.  So I don't think those e-mail addresses work.
16        Q.    So when you say you have the domain name you
17   should be able to get access then to the e-mail address,
18   right?
19        A.    No, not unless you set up an account for it.
20        Q.    You haven't set up an account for these?
21        A.    I don't believe so.
22        Q.    Could you set up an account?
23        A.    Yes.
24        Q.    Why haven't you?
25        A.    Just there's no purpose.  If I set up an
```

```
 1   account it's not going to suddenly give me access to

 2   e-mails that were sent to those addresses a long time

 3   ago.

 4        Q.   Why not?

 5        A.   It's just because his e-mails were hosted

 6   elsewhere.

 7        Q.   Where were they hosted?

 8        A.   I think they were hosted with Patrick's

 9   company, Computer Forensics LLC.

10        Q.   All five of his e-mail addresses were hosted

11   by Patrick?

12        A.   I believe so.

13        Q.   Did Patrick give you access to these e-mail

14   accounts?

15        A.   It's possible after the litigation with

16   Patrick that he gave me those.  I would to check the

17   records.

18        Q.   You said through the litigation, through the

19   lawsuit?

20        A.   Yes.

21        Q.   When do you think you got access -- when do

22   you think that Patrick may have given you access to

23   those e-mail accounts?

24        A.   I would have to go back and look at the

25   records.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 118

```
 1        Q.   I just want to know the process.   For

 2   Patrick -- it would just be Patrick he can access the

 3   e-mail accounts and give you the documents in them?

 4        A.   I'm not exactly sure what access he had to

 5   those accounts after Dave passed.

 6        Q.   Did you request from Patrick access to those

 7   e-mails before you filed this lawsuit?

 8        A.   Before this lawsuit?

 9        Q.   Before this lawsuit.

10        A.   I believe so.

11        Q.   And he never gave them to you?

12        A.   I think eventually yes, he did.

13        Q.   So we haven't received any production from

14   these e-mail addresses.   Why haven't we?

15             MR. FREEDMAN:  Objection.

16             THE WITNESS:  I don't know if we've -- if

17        they're currently active.  Like I said the only one

18        that I know for certain is Dave@███████████.

19        The others I have to check.

20   BY MR. PASCHAL:

21        Q.   So Patrick obviously can help get access to

22   these two e-mail address; right?

23             MR. FREEDMAN:  Objection.

24             THE WITNESS:  I don't know.  I don't know what

25        access he had to them.  For Dave@███████, yes.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 119

```
 1   BY MR. PASCHAL:

 2        Q.   Did you access Dave Kleiman -- the one you can

 3   access before you filed this lawsuit?

 4        A.   Well, it only allowed me to set up a new

 5   account.  Like once I received the domain name from that

 6   point forward I start getting new e-mail to it.

 7   BY MR. PASCHAL:

 8        Q.   Not old e-mails?

 9        A.   Not old e-mail.

10        Q.   What about the Dave@▮▮▮▮▮▮▮▮▮▮▮▮▮?

11        A.   That's what I'm talking about.  Once I

12   received the domain at that point --

13        Q.   Do you have any old e-mails?  I'm sorry.  Do

14   you want me to repeat the question because I wasn't

15   finished?

16        A.   I may have some old that Patrick produced.  I

17   have to check.

18        Q.   So the only -- I want to break this down.  So

19   the only e-mails that you have from Dave are coming from

20   Patrick; right?

21             MR. FREEDMAN:  Objection.

22             THE WITNESS:  Yes.

23   BY MR. PASCHAL:

24        Q.   So none of them are coming from these five

25   e-mail addresses directly?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                      Page 120

```
 1            MR. FREEDMAN:  Objection.
 2            THE WITNESS:  Like I said I would have to go
 3       back and look at those accounts to see if I have
 4       access to them.  Like I said the two at the bottom
 5       I'm certain I never accessed.  The two at the top I
 6       have to check.
 7   BY MR. PASCHAL:
 8       Q.   Just back on my question.  Did you review any
 9   documents from these e-mail accounts before you filed
10   this lawsuit?
11            MR. FREEDMAN:  Obviously don't answer anything
12       to the extent it involves conversations with your
13       attorneys.
14            THE WITNESS:  I have to go back and look at
15       what records were produced.
16   BY MR. PASCHAL:
17       Q.   What e-mail account is verifymail@           ?
18       A.   Which one?
19       Q.   Verifymail@           .
20       A.   I think it was just like a temporary account
21   that I set up for my attorneys.
22       Q.   Them being them?
23       A.   Yes.
24       Q.   Do you have separate attorneys in the Computer
25   Forensics lawsuit?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 121

1      A.   I had separate, yes.

2      Q.   Do you have attorneys in the lawsuit now?

3      A.   Currently, no.

4      Q.   So I think you have about 35 e-mail addresses

5  give or take, I don't know.  Why so many?

6      A.   I don't know.

7      Q.   I want to ask you about one e-mail address in

8  particular.  It's on the second page and I don't know

9  what number it is but it's WrightKleiman@██████████.

10 What's the purpose of that e-mail account?

11     A.   It probably had something to do with the

12 litigation but I would have to look at it to see.  I

13 don't remember offhand.

14     Q.   Have you produced documents from that e-mail

15 account?

16     A.   I don't know.

17     Q.   I think we have one document which you

18 produced to us where you communicated with the ATO which

19 is this e-mail address?

20     A.   Maybe that's what it was.

21     Q.   Do you recall in this e-mail asking ATO if

22 they're continuing to investigate your brother and

23 Craig?

24     A.   Can you repeat that?

25     Q.   Do you remember if in that e-mail if you asked

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 122

```
 1    the ATO whether they're investigating your brother as in

 2    Dave Kleiman and Craig Wright?

 3         A.   I don't specifically remember what I discussed

 4    with them.

 5         Q.   Did the ATO ever tell you we're not

 6    investigating David Kleiman?

 7         A.   They never mentioned that to me.

 8              MR. PASCHAL:  I'm showing you your e-mail to

 9         Michael Hardy on June 30th 2015.

10              (Defendant's Exhibit No. 16 was

11              marked for identification.)

12    BY MR. PASCHAL:

13         Q.   At the bottom you say "dear Mr. Hardy, I

14    understand that you are investigating a case involving

15    my brother David Kleiman and his partner Craig Wright.

16    Could you tell me if you are still seeking new

17    information regarding this case or if it was closed can

18    you tell me when.  Thank you, Ira Kleiman."  Do you

19    remember that?

20         A.   Yes.

21         Q.   And at the top -- I guess he doesn't give you

22    an answer but at the top you say "what you can confirm

23    there is presently no investigation of Dr. Craig Wright

24    and my brother."  You see that?

25         A.   Yes.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                              Page 123

1      Q.    Did Mr. Hardy ever tell you one way or the

2   other or give you an answer to that question one way or

3   another?

4      A.    I guess if there's no e-mail to it probably

5   not.

6      Q.    So was WrightKleiman@███████    was it used

7   for any other reason?

8      A.    Not that I remember.

9      Q.    Let's talk about Coin Exchange briefly.  You

10  had 10.5 million shares in Coin Exchange; right?

11     A.    Yes.

12     Q.    Now, you understand that Coin Exchange is

13  under the control of an Australian liquidator; right?

14     A.    I didn't know who took control of it.

15     Q.    Is it your testimony today that you don't know

16  who took control of it?

17     A.    Yes, I wasn't sure what happened with Coin

18  Exchange.  I knew a liquidator was trying to find out

19  information about Coin Exchange but I'm not exactly sure

20  what activity they did.

21          MR. PASCHAL:  I'm showing you an e-mail with

22     Mr. Jeremy Mudford.  And these are August 31st

23     2017.

24          (Defendant's Exhibit No. 17 was

25          marked for identification.)

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 124

```
 1    BY MR. PASCHAL:

 2         Q.    Is Jeremy Mudford, is he the liquidator for

 3    Coin Exchange?

 4         A.    That's what he told me, yes.

 5         Q.    I want you to look at his e-mail to you

 6    August 29, 2017.  Do you recall discussing W&K that you

 7    believe that Dr. Wright transferred assets from W&K to

 8    Coin Exchange and then to other various entities?

 9         A.    Are you referring to an e-mail?

10         Q.    I'm just asking.  Do you remember telling

11    Jeremy Mudford that, yes or no?

12         A.    Can you repeat that?

13         Q.    Do you remember telling Jeremy Mudford that

14    Dr. Wright transferred from W&K assets to Coin Exchange

15    and then to other entities that he was involved in?

16         A.    I don't remember specifically saying that but

17    if you show me the e-mail --

18         Q.    I'll show it to you in a second.  Let's go to

19    the bottom here.  On Jeremy Mudford's e-mail to you

20    August 29, 2017?

21         A.    First page?

22         Q.    Yes.

23         A.    Of course.

24         Q.    It says "dear Ira, I referred to your e-mail

25    below in your prior e-mail correspondence regarding the
```

```
 1    company.  Besides the information provided which

 2    predominately has consisted of various blog site

 3    articles it would be appreciated if you could provide

 4    any tangible evidence that the company, being Coin

 5    Exchange, and/or its related entities" and you were

 6    talking about W&K "that we have been appointed over any

 7    IP which may include related to Bitcoin.  In the interim

 8    our preliminary investigations do not reveal any

 9    trademark registration to the company name" and then he

10    refers you to two links supporting his conclusion.  Do

11    you recall that e-mail?

12         A.   Yes.

13         Q.   This is in 2017.  In 2018 do you have any

14    communications with Jeremy Mudford?

15         A.   Do you have any e-mails that --

16         Q.   I don't.  That's why I'm asking.

17         A.   I don't know.

18         Q.   Do you have any e-mails for 2019?

19         A.   Pretty sure, no.

20         Q.   Let's talk about W&K.  You said you first

21    learned of W&K through Dr. Wright; is that correct?

22         A.   Yes.

23         Q.   At the time -- well, you reinstated W&K as a

24    company in I think it was March of 2018; correct?

25         A.   I don't remember the date.
```

```
1          Q.    But you reinstated it; correct?

2          A.    Yes.

3          Q.    When you reinstated W&K what was its business

4    purpose?

5                MR. FREEDMAN:  Hold on.  Where are you in your

6          topics?

7                MR. PASCHAL:  W&K, information regarding W&K.

8                MR. FREEDMAN:  I don't see a general

9          information regarding W&K.  Maybe I'm missing it.

10               MR. PASCHAL:  I guess this is going to go to

11         the location of W&K's proprietary documents and

12         information slips identified W&K purchases, bit

13         message account, Panama and also W&K's membership.

14               MR. FREEDMAN:  What was the question?  Can you

15         read it back?

16               (Thereupon, a portion of the record

17               was read back by the reporter.)

18               MR. FREEDMAN:  Don't answer the question.

19   BY MR. PASCHAL:

20         Q.    Can you tell me what W&K's business purpose

21   ever was?

22               THE WITNESS:  According to Craig it was for

23         research purposes and mining of Bitcoin.

24   BY MR. PASCHAL:

25         Q.    Based on your personal knowledge what was the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 127

```
 1    business purpose of W&K?

 2        A.    Like I said according to Craig --

 3        Q.    Not according to Craig.  Based on your own

 4    personal knowledge?

 5        A.    My own personal knowledge about W&K came from

 6    Craig Wright.

 7        Q.    So you have no testimony, documents or

 8    evidence other than Craig Wright?

 9        A.    Correct.

10        Q.    About W&K?

11        A.    What's that?

12        Q.    About W&K?

13        A.    Yes.

14        Q.    When you reinstated W&K you removed Coin

15    Exchange and Ms. Uyen as its publicly identified

16    members, do you recall that?

17             MR. FREEDMAN:  Can you repeat the question?

18        Sorry, I didn't hear.

19             (Thereupon, a portion of the record

20             was read back by the reporter.)

21             MR. FREEDMAN:  Don't answer the question.  I

22        don't see where it connects to your topics about

23        W&K's e-mail addresses, bit message accounts or W&K

24        Panama.

25             MR. PASCHAL:  I'm asking about proprietary
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                             Page 128

```
 1        documents about W&K.  That includes W&K's
 2        membership and its filings with Sunbiz.org.  That
 3        is the definition of proprietary documents.
 4             MR. FREEDMAN:  And the location.
 5             MR. PASCHAL:  Also very basic allegation in
 6        the second amended complaint.
 7             MR. FREEDMAN:  You'll have another chance to
 8        depose Ira when you can go to the merits.  Right
 9        now you're supposed to be asking location
10        proprietary documents.
11   BY MR. PASCHAL:
12        Q.   Do you have documents establishing W&K's
13   membership?
14        A.   From like SunBiz?
15        Q.   Do you have any documents establishing W&K's
16   membership?
17        A.   The only documents would be whatever I found
18   on the SunBiz web site.
19        Q.   Does SunBiz.org list every member of a
20   company?
21        A.   I don't know.
22             (Thereupon, a portion of the record
23             was read back by the reporter.)
24             THE WITNESS:  No, I don't know.
25
```

```
 1   BY MR. PASCHAL:

 2       Q.   Do you have any documents from the Department

 3   of Finance telling you that SunBiz.org you cannot rely

 4   on it to determine the membership of a company?

 5            MR. FREEDMAN:  Objection.

 6            THE WITNESS:  No.

 7   BY MR. PASCHAL:

 8       Q.   You do not -- is it your testimony you do not

 9   have a document stating that?

10       A.   The Department of Finance -- say that again?

11       Q.   From the Department of Finance stating that

12   you cannot rely on SunBiz.org to determine membership of

13   the company?

14       A.   I'm not aware of it.

15       Q.   Before you filed this lawsuit or before you

16   filed your amended complaint in this lawsuit are there

17   any documents with Jeremy Mudford where you discussed

18   removing Coin Exchange as a member of W&K?

19       A.   Discussing with Jeremy Mudford?

20       Q.   The liquidator for Coin Exchange.

21       A.   I don't believe so.

22       Q.   Do you have any documents that are resignation

23   letters from any members of W&K before you reinstated

24   and listed yourself as the member of W&K?

25       A.   No.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 130

```
 1          Q.    Did you take out any loans on W&K's behalf?

 2          A.    Not that I'm aware of.

 3          Q.    Are you paying -- are there any tax returns

 4    right now for W&K or any tax information for W&K?

 5          A.    No.

 6          Q.    Are you paying W&K's taxes?

 7          A.    No.

 8          Q.    Do you know who last paid W&K's taxes?

 9          A.    No.

10          Q.    Does W&K have any revenue for this year?

11          A.    Not that I'm aware of.

12          Q.    Does W&K have any revenue from last year?

13          A.    Not that I'm aware of.

14          Q.    Are you conducting any business on behalf of

15    W&K?

16          A.    Me personally?

17          Q.    Yes.

18          A.    No.

19          Q.    Is anyone conducting business on behalf of

20    W&K?

21          A.    No.

22          Q.    Has W&K assigned any of its rights in this

23    lawsuit to anyone else?

24                MR. FREEDMAN:  Hold on.  What topic are you

25          on?
```

```
 1   BY MR. PASCHAL:
 2       Q.   Are there any documents showing whether or not
 3   W&K assigned any of its interest in its lawsuit to
 4   anyone else?
 5            MR. FREEDMAN:  Don't answer the question.
 6            MR. PASCHAL:  Under what basis?
 7            MR. FREEDMAN:  If such documents exist they
 8       would be work product.
 9            MR. PASCHAL:  An assignment of a claim?  That
10       would be work product?
11            MR. FREEDMAN:  You don't like the instruction
12       bring it to the judge.
13            MR. PASCHAL:  I'm just trying to get it.  I
14       just want the record to be complete on the
15       objection.  So you're saying that an assignment of
16       claim is going to be protected by work product?
17            MR. FREEDMAN:  Either work product or
18       attorney-client privilege or the common interest
19       privilege, yes.
20   BY MR. PASCHAL:
21       Q.   We'll skip this.  Have the allegations that
22   you made in this lawsuit or this second amended
23   complaint or the amended complaint or its original
24   complaint been given to any third party other than your
25   attorneys?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Page 132

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  I believe so.

 3  BY MR. PASCHAL:

 4       Q.   Who are those third parties?

 5       A.   A company that assists in funding litigation

 6  cases.

 7       Q.   What's the name of that company?

 8       A.   Parabelum.

 9       Q.   Can you say that again?

10       A.   Parabelum.

11       Q.   When did you give that complaint to Parabelum?

12       A.   I don't remember the date.

13       Q.   When did you first meet Parabelum?

14       A.   I don't remember the date.

15       Q.   Was it 2016?

16       A.   I would have to go look at the records.

17       Q.   Did Parabelum give you any money?

18              MR. FREEDMAN:  Hold on.  What topic are you

19       on?

20              MR. PASCHAL:  This goes to -- this really goes

21       to 31 but he just answered something different so

22       I'm --

23              MR. FREEDMAN:  How does it go into 31?  I

24       don't see how it ties into 31.  If you want to ask

25       it with a tie in to 31 I'm happy to listen to it,
```

```
 1   otherwise don't answer the question.

 2        MR. PASCHAL:  Let me break that down in two

 3   things.  One, we asked questions about this

 4   regarding interrogatories, you objected.  We spoke

 5   on the phone yesterday we told you we would lay the

 6   record here so the judge could make a ruling based

 7   on the record and we wrote these topics what we

 8   knew.  I can't give exact topics on events because

 9   I just didn't know your witness would say that.  I

10   can't -- I mean --

11        MR. FREEDMAN:  I had the same problem deposing

12   Dr. Wright.

13        MR. PASCHAL:  That's the problem.  That's not

14   here right now.  I wasn't there.

15        MR. FREEDMAN:  Just saying the parties kept

16   each other to their topics.  Your team members kept

17   me to my topics so keeping you to your topics.

18   Goose gander provision.

19        MR. PASCHAL:  Did Parabelum give you any

20   money?

21        MR. FREEDMAN:  Don't answer the question.

22        MR. PASCHAL:  What's the basis?

23        MR. FREEDMAN:  First of all, I think you're

24   outside the topic.  Second of all -- I think you're

25   outside the topic.  I'm just going to rely on you
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 134

```
 1        being outside the topic.

 2   BY MR. PASCHAL:

 3        Q.    Who is BTCN1610491, LLC?

 4        A.    I think that's a company related to the entity

 5   that assists in litigation funding.

 6        Q.    Is that Parabelum?

 7        A.    Yes.

 8        Q.    So when did you first speak with Parabelum?

 9        A.    Like I said I would have to check the records.

10        Q.    Did BTCN or Parabelum give you any money?

11             MR. FREEDMAN:  Hold on.  We're going to

12        instruct Ira not to answer the question.

13             MR. PASCHAL:  On what basis?

14             MR. FREEDMAN:  A, on relevance and -- stay

15        with relevance for now.

16   BY MR. PASCHAL:

17        Q.    Under what circumstances did BTCN give you

18   money?

19             MR. FREEDMAN:  Stop.  Hold on a second.

20        Trying to figure out the position to take on your

21        question.  If you want to just stop or you want

22        take a break?

23             MS. MCGOVERN:  Let's take five minutes.

24             THE VIDEOGRAPHER:  The time is 2:08 p.m. and

25        we're off the record.
```

```
 1                (Thereupon, a brief recess was taken.)
 2                THE VIDEOGRAPHER:  The time is now 2:23 p.m.
 3           and we are now back on the record.
 4                MR. FREEDMAN:  So we just spoke with our
 5           client.  I'm going to state for the record that
 6           BTCN is owned by Parabelum Capital which is an
 7           entity that provides litigation financing
 8           assistance.  Parabelum has provided litigation
 9           financing assistance in this case.
10                I am not going to allow Ira to answer any
11           other questions about that topic because I believe
12           it will invade either work product privilege,
13           attorney-client privilege or common interest
14           privilege.  If you want more you have to go to the
15           court but I think your record is clear now what's
16           going on and what more you would want.
17                MR. PASCHAL:  There are a few things I want.
18                MR. FREEDMAN:  You can ask but I most likely
19           will instruct him not to answer.
20      BY MR. PASCHAL:
21           Q.   When did you first speak to Parabelum?
22                MR. FREEDMAN:  That you can answer.
23                THE WITNESS:  I would have to go back and
24           check the records.
25
```

```
 1   BY MS. MCGOVERN:

 2        Q.   What records would you have to check?

 3        A.   I guess e-mail exchanges with them.

 4        Q.   Did you give Parabelum documents relating to

 5   this case?  You don't have to say what documents?

 6             MR. FREEDMAN:  Go ahead.

 7             THE WITNESS:  I would have to check my

 8        records.

 9   BY MR. PASCHAL:

10        Q.   What records would you have to check?

11        A.   E-mail.

12        Q.   E-mail?  Did you sign any documents with

13   Parabelum?

14             MR. FREEDMAN:  That's fine.  Go ahead and

15        answer that question.

16             THE WITNESS:  I don't remember.  I have to

17        check that too.

18   BY MR. PASCHAL:

19        Q.   Did W&K or the estate of Dave Kleiman --

20   strike that.  Are there any documents showing that Dave

21   Kleiman or the estate of Dave Kleiman or W&K assigned

22   any portion or any right in this lawsuit to Parabelum or

23   any third party?

24             MR. FREEDMAN:  Don't answer the question.

25             MR. PASCHAL:  What's the basis?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 137

```
 1              MR. FREEDMAN:  I told you the basis.

 2   BY MR. PASCHAL:

 3        Q.   Are there any documents that give your right

 4   to recovery of any money to Parabelum or BTCN?

 5              MR. FREEDMAN:  Don't answer the question.

 6   BY MR. PASCHAL:

 7        Q.   In connection with getting funding from

 8   Parabelum did you provide any documents to support any

 9   of the allegations of the complaint?

10              MR. FREEDMAN:  Don't answer that.  Well, the

11        answer yes or no you can answer.  Just don't

12        identify what, if any, documents you provided.

13              THE WITNESS:  Yes.

14   BY MR. PASCHAL:

15        Q.   What documents did you provide?

16              MR. FREEDMAN:  Don't answer that.

17   BY MR. PASCHAL:

18        Q.   Are there any documents that you provided to

19   them that you haven't produced in this case?

20              MR. FREEDMAN:  Don't answer that.

21              MR. PASCHAL:  I'm showing you an e-mail you

22        had with Patrick Paige on March 24th 2016.

23              (Defendant's Exhibit No. 18 was

24              marked for identification.)

25
```

```
 1   BY MR. PASCHAL:

 2        Q.    In the e-mail you say "hey Patrick, I haven't

 3   heard back from you about the hosting file stuff.

 4   Anyway, there is another issue I was wondering if you

 5   can help me with.  I'm trying to locate any documents

 6   related to the W&K business Dave operated.  I remember

 7   we had a conversation at Dave's house shortly after he

 8   passed away.  You were mentioning to me how my dad was

 9   asking for the return of a file cabinet he bought for

10   Dave and you said something like what does your dad need

11   another file cabinet.  I was like I don't know I guess

12   he just wants it because he bought it.  Of course I

13   didn't think anything of it at the time but it just

14   donned on me maybe inside that cabinet is where Dave

15   stored his W&K related stuff.  You didn't possibly come

16   across any papers mentioning W&K."  Do you remember this

17   e-mail?

18        A.    Yes.

19        Q.    Did you ever recover that file cabinet?

20        A.    No.

21        Q.    Did you ever see what was in that file

22   cabinet?

23        A.    No.

24        Q.    Why did you believe that Dave may have kept

25   his W&K stuff in that file cabinet?
```

```
 1            MR. FREEDMAN:  Objection.

 2            THE WITNESS:  I didn't know what was kept in

 3        the file cabinet.

 4   BY MR. PASCHAL:

 5        Q.   Well, I'm asking -- so --

 6        A.   I wanted to determine what was --

 7            MR. FREEDMAN:  There's no question pending,

 8        Ira.

 9   BY MR. PASCHAL:

10        Q.   Are there any documents showing or any

11   documents evidencing or supporting your belief that W&K

12   documents may have been inside that cabinet?

13        A.   No.

14            MR. PASCHAL:  I'm showing you an e-mail with

15        Patrick Paige on March 17, 2017.

16            (Defendant's Exhibit No. 19 was

17            marked for identification.)

18   BY MR. PASCHAL:

19        Q.   If you go on the second page on March 28th

20   2016 Patrick Paige says "what would Appriver support do

21   for us," question mark.  "Also I found the original

22   court mailing about W&K.  Has a case number, see

23   attached."

24            You respond -- you respond by saying I don't

25   know -- only relevant part is when did you find that W&K
```

```
 1    filing question mark.  Were you ever contacted by the
 2    girl Uyen that took over David's position as director
 3    for W&K?  Patrick responds "I just found the filing
 4    today and I was looking for something else.  I was never
 5    contacted by anyone about W&K and never heard the girl."
 6              Then you respond on the first sentence in the
 7    next e-mail responding to Patrick "can you keep the
 8    letter and envelope in a safe place for me?  I would
 9    like to check it out some time."
10              Then Patrick responds "yes, I will keep it.
11    It seems weird that the address of the envelope is
12    handwritten considering it came from the Supreme Court."
13    How did Patrick get the original envelope from the
14    Australian case?
15              MR. FREEDMAN:  Objection.
16    BY MR. PASCHAL:
17         Q.   Strike that.  Do you know where Patrick found
18    the original court mailing about W&K?
19         A.   I assume it would be to the mailing address --
20    the Computer Forensics mailing address that they shared.
21         Q.   Was that the address that was listed for W&K
22    on SunBiz.org as the registered agent?
23         A.   I would have to check.  I don't remember what
24    that address is.
25         Q.   Could this envelope had been -- you sent this
```

 1   e-mail four days after you asked about the file cabinet.

 2   Could this envelope have been in the file cabinet?

 3        A.   I never asked Patrick where he found it.

 4        Q.   Did you ever recover the envelope from

 5   Patrick?

 6        A.   No, I think he just e-mailed me like a scan of

 7   it.

 8        Q.   What was the document?  What was the contents

 9   of the document?

10        A.   I would have to look at it.  I don't remember.

11        Q.   Was it the statement of claim in Australia?

12        A.   I would have to look at it.  I remember seeing

13   like an envelope but I don't remember what the contents

14   inside of it was.

15        Q.   So is it fair to say that something was mailed

16   from Australia with the W&K court case to a mailing

17   address in Palm Beach from either Computer Forensics or

18   Dave's house?

19            MR. FREEDMAN:  Objection.

20            THE WITNESS:  Again I would have to go look at

21        it to make sure what it was.

22   BY MR. PASCHAL:

23        Q.   Well, in your Second Amended Complaint you

24   allege that W&K was never served with the filings in the

25   Australian court.  Do you recall that?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                        Page 142

```
 1        A.   I believe --

 2             MR. FREEDMAN:  Objection.

 3             THE WITNESS:  I believe so.

 4   BY MR. PASCHAL:

 5        Q.   Did you make the allegation -- well,

 6   obviously -- you sent this e-mail before you made that

 7   allegation; correct?

 8        A.   I think so.

 9        Q.   And you never bothered -- sorry, you never

10   read that document before you filed the complaint?

11             MR. FREEDMAN:  Objection.

12             THE WITNESS:  I'm pretty sure I did.

13   BY MR. PASCHAL:

14        Q.   But you just don't remember what it says?

15        A.   I don't remember now.  I have to look at it.

16        Q.   Just earlier I asked you about two homes you

17   had.  I think one was on ████████ that's the one you

18   you live in now?

19        A.   Yes.

20        Q.   Then you had one on █████████?

21        A.   ██████████████████.

22        Q.   You didn't sell your first home when you

23   purchased your second home; right?

24        A.   Correct.

25        Q.   You kept it until about 2018?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 143

```
 1        A.    I would have to check.  Possibly.

 2        Q.    On your second home there's no mortgage

 3   recorded for that house?

 4             MR. FREEDMAN:  Don't answer the question.

 5             MR. PASCHAL:  On what basis?

 6             MR. FREEDMAN:  What basis are you asking?

 7        Where does this tie into your topics?

 8             MR. PASCHAL:  Several of my topics.

 9             MR. FREEDMAN:  Which one of them, name one?

10             MR. PASCHAL:  Goes to the administration of

11        the estate and goes into --

12             MR. FREEDMAN:  Whether or not Ira Kleiman has

13        a mortgage on his house goes to the administration?

14             MR. PASCHAL:  That's my question.

15             MR. FREEDMAN:  I instruct him not to answer

16        unless you can convince me it comes into a topic.

17             MS. MCGOVERN:  We're just going to make the

18        record.

19   BY MR. PASCHAL:

20        Q.    Are there any documents showing where the

21   source of funds came to purchase the second home?

22             MR. FREEDMAN:  Don't answer.

23   BY MR. PASCHAL:

24        Q.    Did you purchase that home two or three weeks

25   after Craig first reached out to you?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 144

```
 1        A.   I would have to check.  I don't remember.
 2        Q.   Would it sound about right if you purchased
 3   that home -- the finalized closing was in March of 2014?
 4             MR. FREEDMAN:  Objection.
 5             THE WITNESS:  I would have to check.  I know
 6        it was 2014.
 7   BY MR. PASCHAL:
 8        Q.   Then Craig first reached out to you in about
 9   February 2014?
10        A.   Right.
11        Q.   Telling you about Bitcoin?
12        A.   Yes.
13        Q.   You paid $450,000 cash for that house?
14             MR. FREEDMAN:  Objection, don't answer.
15   BY MR. PASCHAL:
16        Q.   Did the purchase of that house have anything
17   to do with the administration of the estate or Bitcoin?
18        A.   No.
19        Q.   Do you have documents reflecting that?
20             MR. FREEDMAN:  Objection.  You can answer.
21             THE WITNESS:  Showing that it didn't have
22        anything to do with --
23   BY MR. PASCHAL:
24        Q.   Yes.  That the source of funds for that house
25   did not come from Dave's possession, Bitcoin?
```

```
 1        A.    I probably do.

 2        Q.    What documents would that be?

 3        A.    I guess a check written by myself for the

 4   house.

 5        Q.    What about the underlying funds for that

 6   check?

 7             MR. FREEDMAN:  Objection.  I don't understand

 8        your question and it's touching on this area I've

 9        been instructing him not to answer so could you try

10        to clarify what you mean?

11   BY MR. PASCHAL:

12        Q.    Were there any documents to show that the

13   underlying funds to write a $450,000 check for that

14   house are there any documents showing it didn't come

15   from Dave's estate, from Bitcoin, from Dave's

16   possession?

17             MR. FREEDMAN:  So I don't want to instruct him

18        not to answer if I can avoid it.  The problem is

19        you're asking him about proving a negative.  Are

20        you asking whether -- obviously you don't have to

21        adopt my formulation just to see if I can get you

22        the information you want.  Are you asking whether

23        there's documents that identify where the funds

24        actually came from?

25             MR. PASCHAL:  I've asked that you've told him
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 146

```
 1        not to answer so I'm asking a different one.
 2             MR. FREEDMAN:  If you ask if there are
 3        documents that exist to show where the funds came
 4        from I'll allow him to answer.
 5             MR. PASCHAL:  Can you repeat my question,
 6        Mr. Court reporter, and then you can answer?
 7             (Thereupon, a portion of the record
 8             was read back by the reporter.)
 9             MR. FREEDMAN:  Don't answer.
10   BY MR. PASCHAL:
11        Q.   Are there any documents showing the source of
12   the funds to purchase the house came from?
13        A.   I imagine yes, there should be.
14        Q.   What documents would those be?
15             MR. FREEDMAN:  You can describe the types of
16        documents.  Don't go beyond that.
17             THE WITNESS:  Checks.
18   BY MR. PASCHAL:
19        Q.   That's it?
20        A.   Yes.  Personal checks.
21        Q.   Did the purchase of the house have anything to
22   do with the financing of this lawsuit?
23        A.   No.
24             MR. PASCHAL:  I think we're almost done so can
25        we take a break?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Page 147

```
 1              MR. FREEDMAN:  Sure.

 2              THE VIDEOGRAPHER:  The time is now 2:38 p.m.

 3         and we're off the record.

 4              (Thereupon, a brief recess was taken.)

 5              THE VIDEOGRAPHER:  The time is 2:49 p.m. and

 6         we're back on the record.

 7    BY MR. PASCHAL:

 8         Q.   Ira, could you go back to your second amended

 9    complaint and that's probably Exhibit 2 or 3?

10              MR. FREEDMAN:  2.

11    BY MR. PASCHAL:

12         Q.   Can you go to page 46.  From 46 to 47 you

13    allege that Dr. Wright stole or committed theft of

14    Dave's Bitcoin, forked assets and intellectual

15    properties.  Do you see that?

16         A.   Yes.

17         Q.   Ira, you don't have any documents showing that

18    Dr. Wright stole Dave's Bitcoin, do you?

19              MR. FREEDMAN:  Objection.

20              THE WITNESS:  Documents?  Well, I have

21         documents that lead me to believe that he stole

22         Dave's Bitcoin.

23    BY MR. PASCHAL:

24         Q.   Well, let me break that down in two parts.  Do

25    you have documents that actually show that Dr. Wright
```

```
 1    stole Dave's Bitcoin?

 2            MR. FREEDMAN:  Objection.

 3            THE WITNESS:  I don't have like a document

 4        with the kind of evidence like showing that he

 5        withdrew funds like from a bank account, no.

 6        Nothing like that, no.

 7    BY MR. PASCHAL:

 8        Q.    What documents led you to believe that

 9    Dr. Wright stole from Dave?

10        A.    Lots of e-mails from Craig Wright.

11        Q.    Are the e-mails that you produced to us?

12        A.    Should be.

13        Q.    In none of those e-mails does Dr. Wright say I

14    took Dave's Bitcoin; right?

15        A.    He may not have said that, no.  I would

16    imagine he wouldn't say that.

17        Q.    Other than communications with Craig do you

18    have any other documents evidencing that Dr. Wright

19    stole Bitcoin from Dave?

20        A.    I would have to check.  I don't know off the

21    top of my head.

22        Q.    Sitting here today do you have any knowledge

23    of any documents that evidence that Dr. Wright stole

24    Bitcoin from Dave?

25        A.    Again I would have to go back and look at all
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 149

```
 1    my documents.
 2         Q.    Right now today can you recall any of them?
 3         A.    At this moment, no.
 4         Q.    Do you have testimony from anyone or
 5    statements saying that -- or evidencing that Dr. Wright
 6    stole Bitcoin or intellectual property from Dave?
 7         A.    Testimony from other people?
 8         Q.    Or statements.
 9         A.    Not that I remember.
10         Q.    So today in this deposition you can't recall
11    any testimony or documents?
12         A.    No.
13         Q.    That last question to be clear is about
14    Bitcoin and intellectual property?
15              MR. FREEDMAN:  Objection.
16              THE WITNESS:  Okay.
17    BY MR. PASCHAL:
18         Q.    The answer is still the same; right?
19         A.    Yes.
20         Q.    The answer is no?
21         A.    No.
22              MR. PASCHAL:  I think that's about it.
23              MR. FREEDMAN:  Okay.
24              THE VIDEOGRAPHER:  Read or waive?
25              MR. FREEDMAN:  We'll read.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Page 150

```
 1        THE VIDEOGRAPHER:  The time is now 2:54 p.m

 2   and this concludes the video deposition.  We're off

 3   the record.

 4        THE COURT REPORTER:  Do you want to order?

 5        MR. PASCHAL:  Yes.

 6        MR. FREEDMAN:  Take a copy as well.

 7        MR. PASCHAL:  As soon as possible.

 8        MR. ROCHE:  Can we get a rough of that?

 9        THE COURT REPORTER:  Yes.

10        MR. ROCHE:  You guys as well?

11        MR. PASCHAL:  Yes.

12              (Witness excused.)

13          (Deposition was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

1

2                    CERTIFICATE OF REPORTER

3              THE STATE OF FLORIDA

4              COUNTY OF DADE

5

6         I, Rick Levy, Registered Professional Reporter
    and Notary Public in and for the State of Florida at
7    large, do hereby certify that I was authorized to
    and did report said deposition in stenotype of IRA
8    KLEIMAN; and that the foregoing pages, numbered from
    1 to 148, inclusive, are a true and correct
9    transcription of my shorthand notes of said
    deposition.

10

         I further certify that said deposition was
11   taken at the time and place hereinabove set forth
    and that the taking of said deposition was commenced
12   and completed as hereinabove set out.

13        I further certify that I am not attorney or
    counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
    connected with the action, nor am I financially
15   interested in the action.

16        The foregoing certification of this transcript
    does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
    direction of the certifying reporter.

18

         IN WITNESS WHEREOF, I have hereunto set my hand
19   this 10TH day of April, 2019.

20

21   _____

22        Rick Levy, RPR, FPR, Notary Public
         in and for the State of Florida
         My Commission Expires:  12/7/19
23        My Commission No.:  FF 939483.

24

25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 152

```
 1                      CERTIFICATE OF OATH

 2   THE STATE OF FLORIDA

 3             COUNTY OF DADE

 4

 5      I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

 6   Notary Public, State of Florida, certify that IRA

 7   KLEIMAN personally appeared before me on the 8th day

 8   of April, 2019 and was duly sworn.

 9

10             Signed this 11th day of April, 2019.

11

12

13

14

15   _____

16             Rick Levy, RPR, FPR
              Notary Public - State of Florida
17            My Commission Expires:  12/7/19
              My Commission No.:  FF 939483

18

19

20

21

22

23

24

25
```

```
 1              E R R A T A   S H E E T

 2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

 3    DEPOSITION OF:  IRA KLEIMAN

 4    TAKEN: 4/8/2019

 5        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 6    PAGE #  LINE #   CHANGE                    REASON

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    Please forward the original signed errata sheet to
      this office so that copies may be distributed to all
18    parties.

19    Under penalty of perjury, I declare that I have read
      my deposition and that it is true and correct
20    subject to  any changes in form or substance
      entered here.

21

22    DATE: _____

23

24    SIGNATURE OF
      DEPONENT:_____
25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Page 154

```
1   DATE:        April 11, 2019

2   TO:  VEL FREEDMAN, ESQUIRE
          BOIES, SCHILLER & FLEXNER LLP
3         100 S.E. 2nd Street
          Suite 2800
4         Miami, Florida 33131

5   IN RE: IRA KLEIMAN VS CRAIG WRIGHT

6   Dear Mr. Freedman:

7   Enclosed please find the original errata page with
    your copy of the transcript so IRA KLEIMAN may read
8   and sign their transcript.  Please have him/her make
    whatever changes are necessary on the errata page
9   and sign it.  Then place the original errata page
    back into the original transcript.  Please then
10  forward the original errata page back to our office
    @1080 Woodcock Road, Suite 100, Orlando, Florida
11  32803.

12  If the errata page is not signed by the witness
    within 30 days after this letter has been furnished,
13  we will then process the transcript without a signed
    errata page.  If your client wishes to waive their
14  right to read and sign, please have him/her sign
    their name at the bottom of this letter and send it
15  back to the office.

16       Your prompt attention to this matter is

17  appreciated.

18  Sincerely,

19  _____
    RICK E. LEVY, RPR
20
    I do hereby waive my signature:
21
    _____
22  IRA KLEIMAN

23  cc via transcript:  Bryan Paschal, Esq.
                        Vel Freedman, Esq.
24  file copy

25
```

Ira Kleiman
January 10, 2020

```
1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3               CASE NO. 9:18-cv-80176-BB/BR

4
       IRA KLEIMAN, as the personal representative
5      of the Estate of David Kleiman, and
       W&K Info Defense Research, LLC,
6
                 Plaintiffs,
7
       -vs-
8
       CRAIG WRIGHT,
9
                 Defendant.
10

11     * * * * * * * * * * * * * * * * * *

12     VIDEOTAPED DEPOSITION OF IRA KLEIMAN

13     DATE TAKEN: January 10, 2020

14     TIME: 8:49 a.m. - 2:45 p.m.

15     PLACE: 2525 Ponce de Leon Boulevard

16     Miami, Florida 33134

17
       TAKEN BEFORE: RICK E. LEVY, RPR, FPR
18                    AND NOTARY PUBLIC

19

20     * * * * * * * * * * * * * * * * * *

21     Defendant's Designations
       Plaintiffs' Objections
22     Plaintiffs' Counters

23

24

25
```

Ira Kleiman
January 10, 2020                          2

```
1    APPEARANCES:

2    On behalf of the Plaintiff:

3         VEL FREEDMAN, ESQUIRE
          ROCHE FREEDMAN, P.A.
4         200 S. Biscayne Boulevard
          Suite 5500
5         Miami, Florida 33131

6         ANDREW BRENNER, ESQUIRE
          BOIES SCHILLER & FLEXNER, P.A.
7         100 S.E 2nd Avenue
          Suite 2800
8         Miami, Florida 33131
          abrenner@bsfllp.com
9

10   On behalf of the Defendant:

11        BRYAN PASCHAL, ESQUIRE
          JULIO PAEZ, ESQUIRE
12        RIVERO MESTRE, P.A.
          2525 Ponce de Leon Boulevard
13        Suite 1000
          Coral Gables, Florida 33134
14
     Also Present: Raul Torres, The Videographer
15

16

17

18

19

20

21

22

23

24

25
```

Ira Kleiman
January 10, 2020                                    3

```
 1                          -  -  -
                         I N D E X
 2                          -  -  -

 3   WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS
     IRA KLEIMAN
 4   BY MR. PASCHAL:      4
     BY MR. FREEDMAN:             171
 5

 6                          -  -  -
                       E X H I B I T S
 7                          -  -  -

 8
     NUMBER                            PAGE
 9   DEFENDANT'S EX. 1                 13
     DEFENDANT'S EX. 2                 24
10   DEFENDANT'S EX. 3                 27
     DEFENDANT'S EX. 4                 40
11   DEFENDANT'S EX. 5                 52
     DEFENDANT'S EX. 6                 57
12   DEFENDANT'S EX. 7                 66
     DEFENDANT'S EX. 8                 69
13   DEFENDANT'S EX. 9                 76
     DEFENDANT'S EX. 10                88
14   DEFENDANT'S EX. 11               119
     DEFENDANT'S EX. 12               129
15   DEFENDANT'S EX. 13               130
     DEFENDANT'S EX. 14               134
16   DEFENDANT'S EX. 15               149

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2                      - - -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                      - - -

 8           THE VIDEOGRAPHER:  Good morning.  Today is

 9        Friday the 10th day of January.  The time is 8:49.

10        We are at 2525 Ponce De Leon Boulevard, Suite 1000.

11        Case number 9:18-cv-80176-BB/BR.  Would all counsel

12        please state their appearances for the record?

13           MR. PASCHAL:  Bryan Paschal for Dr. Craig

14        Wright.

15           MR. PAEZ:  Julio Paez for Dr. Craig Wright.

16           MR. FREEDMAN:  Vel Freedman for the plaintiff.

17           THE WITNESS:  Yes.

18                      - - -

19   Thereupon,

20                   (IRA KLEIMAN)

21                   having been first duly sworn or

22   affirmed, was examined and testified as follows:

23                   DIRECT EXAMINATION

24   BY MR. PASCHAL:

25        Q.  Good morning, Mr. Kleiman.
```

Ira Kleiman
January 10, 2020                                5

```
 1        A.   Good morning.
 2        Q.   You understand this is my second time deposing
 3   you?
 4        A.   Yes.
 5        Q.   The first time I think was back in April?
 6        A.   Right.
 7        Q.   A lot has happened since then; right?
 8        A.   Yes.
 9        Q.   We've had several depositions?
10        A.   Yes.
11        Q.   And you were able to listen in on those
12   depositions; correct?
13        A.   Yes.
14        Q.   We missed you on the W&K deposition.  You
15   didn't listen to that one, right?
16        A.   I didn't listen to that one, no.
17        Q.   Do you know who the W&K corporate rep was?
18        A.   I don't recall his name.
19        Q.   Did you ever speak with the W&K corporate rep?
20        A.   Did I -- I don't -- I don't recall.
21        Q.   Do you recall any phone conversations with the
22   corporate rep?
23        A.   I may have.
24        Q.   You may have?
25        A.   Yes.  I don't remember.
```

Ira Kleiman
January 10, 2020                                          6

```
 1        Q.   You don't remember?

 2        A.   No.

 3             MR. FREEDMAN:  For the record he may not have

 4        been identified as the corporate rep to

 5        Mr. Kleiman.

 6   BY MR. PASCHAL:

 7        Q.   Even though I deposed before and just to be

 8   clear you understand the rules for deposition; right.

 9   It's the same as before.  You need me to go over them?

10        A.   I appreciate if you do.

11        Q.   I'm going to ask you a question and I would

12   need a verbal response so our court reporter can take

13   down your response.  So you can't shake your head or say

14   no or anything, has to be a verbal response.  Counsel,

15   your counsel, will object at times but you still need to

16   answer the question unless your counsel instructs you

17   not to answer the question.

18             If you need to take a break at any time you

19   let me know and we'll take a break.  If you need to go

20   back on an answer you remembered something let me know

21   we can go back so you can revise your answer.  If you

22   don't know something I don't want you to guess.  I don't

23   want you answer the question.  Are you on any medication

24   today that may prevent you from giving testimony?

25        A.   Medication, no.
```

Ira Kleiman
January 10, 2020                                    7

```
 1        Q.   Is there any reason why you cannot give your
 2   best testimony today?
 3        A.   My state of mind isn't as clear as it probably
 4   could be.  If your client would probably stop accusing
 5   me of things online and --
 6             MR. FREEDMAN:  Ira, just answer the question.
 7             THE WITNESS:  I am.  I would be able to think
 8        a little bit clearer if he would refrain from some
 9        of those things.
10   BY MR. PASCHAL:
11        Q.   How is that affecting your testimony today?
12        A.   It just makes me more nervous than usual.
13        Q.   Are you able to testify today?
14        A.   I believe so.
15        Q.   Even though I deposed you before I'm going to
16   ask some questions that might be the same so just bear
17   with me.  So first I am going to talk about Dave
18   Kleiman.  What was your relationship with Dave Kleiman?
19        A.   He was my older brother.
20        Q.   Excuse me?
21        A.   Dave Kleiman was my older brother.
22        Q.   Was Dave Kleiman adopted in your family?
23        A.   Yes.
24        Q.   When was he adopted?
25        A.   1967.
```

Ira Kleiman
January 10, 2020                                          8

```
 1        Q.   How old were you when he was adopted?  Were
 2   you born?
 3        A.   No, he's older than me.
 4        Q.   So you weren't born when he was adopted?
 5        A.   Correct.
 6        Q.   Do you know anything about Dave's adopted --
 7   adopted parents?
 8             MR. FREEDMAN:  Objection.
 9   BY MR. PASCHAL:
10        Q.   His previous parents?
11             MR. FREEDMAN:  Biological.
12             MR. PASCHAL:  Biological, thank you.
13             THE WITNESS:  Not much, no.
14   BY MR. PASCHAL:
15        Q.   What do you know of them?
16        A.   I think his father passed away -- I think his
17   mother has also passed away.  I think he may have
18   communicated with his biological mom a couple of times.
19   But other than that I don't know much about them.
20        Q.   Do you know the circumstances of how your
21   parents chose to adopt Dave?
22        A.   No.
23        Q.   What was Dave's relationship with your
24   parents?
25        A.   It was fine.
```

```
 1        Q.   What was your relationship with Dave?

 2        A.   Fine.

 3        Q.   Were you close to Dave?

 4             MR. FREEDMAN:  Objection.

 5             THE WITNESS:  You have to define close.

 6   BY MR. PASCHAL:
```

Plaintiffs conditionally withdraw the counters on 9:7-10:5 if pending MIL on Dave & Ira Kleiman's relationship is granted.

```
 7        Q.   Did you speak every day to Dave?

 8        A.   Every day?

 9        Q.   Yes.

10        A.   As kids we probably did.

11        Q.   What about as teenagers?

12        A.   Teenagers, yes.

13        Q.   What about as adults?

14        A.   As adults, you know, he was more independent

15   and he was doing his own thing so no, we didn't talk

16   every day as adults.

17        Q.   How far apart did you live from Dave Kleiman

18   as adults?

19        A.   He moved around a bit, you know.  What's years

20   are you talking about specifically?

21        Q.   Let's say from 2008 to 2010 before he was

22   hospitalized.

23        A.   I think at that time he was living in like

24   Riviera Beach.  I was living in Palm Beach Gardens so

25   like maybe like 15 minutes away or something.
```

1      Q.   So in the last depo you testified that you

2  lived five to ten minutes away.  What period was that --

3      A.   Since then I -- I noticed that you made a big

4  deal about the five minutes so then I went online and I

5  looked it up it's further than five minutes.

6      Q.   So your testimony now is based on online

7  research?

8      A.   Yes.

Plaintiffs conditionally withdraw the counters on
10:9-10:12 if pending MIL on Dave & Ira Kleiman's
relationship is granted.

9      Q.   So he lived 15 minutes away or ten or 15

10  minutes away.  How many times did you visit his house?

11      A.   Several.  I mean I don't remember like an

12  exact amount.

13      Q.   Do you remember who lived in his house?

14      A.   For the most part it was him.  At one time his

15  girlfriend I believe moved in for a short time and I

16  think her son did as well.

17      Q.   Did he ever tell you he was engaged to his

18  girlfriend?

19      A.   He never mentioned that.  I think I heard her

20  mention that to Craig but I never heard him mention

21  that.

22      Q.   Would it surprise you if both the fiancee and

23  the son said they never saw you or Dave never spoke

24  about you?

25           MR. FREEDMAN:  Objection.

Ira Kleiman
January 10, 2020                                              11

```
 1              THE WITNESS:  I did see them.

 2    BY MR. PASCHAL:

 3        Q.   They rarely saw you?

 4        A.   I rarely saw David.

 5              MR. FREEDMAN:  Objection.

 6    BY MR. PASCHAL:

 7        Q.   When David was in the Miami V.A. you realized

 8    he was hospitalized for two years, 2011 to 2013?

 9        A.   No, I realized that he would go back and forth

10    to the hospital on a routine basis but as far as him

11    like staying for any long period of time I wasn't aware

12    of that.

13        Q.   So his medical records showed he was admitted

14    from 2011 to 2013 and I understand that they would give

15    him a day pass to go home but only under doctor's

16    approval.  Are you saying that they would let him out or

17    they actually cleared him to leave the hospital and go

18    home?

19              MR. FREEDMAN:  Objection.  Ira, just hold on a

20         second.  When Mr. Paschal asks a question just

21         pause a second so I can get a chance to object and

22         as he said before unless I instruct you not to

23         answer you can then answer.

24              MR. PASCHAL:  Go ahead.

25              THE WITNESS:  I don't know.
```

Ira Kleiman
January 10, 2020                                      12

```
 1    BY MR. PASCHAL:

 2         Q.   How many times did you visit him in the

 3    hospital?

 4         A.   I didn't visit him in the hospital.  He never

 5    asked me to.
```
Plaintiffs conditionally withdraw the counters on L.6-16 if pending MIL on Dave & Ira Kleiman's relationship is granted.
```
 6         Q.   You only visited if he asked you to visit?

 7         A.   Well, when it comes to like medical issues and

 8    financial issues we just kind of refrained from

 9    discussing that kind -- I don't think he ever felt

10    comfortable like telling me about any weaknesses and I

11    didn't discuss my weaknesses with him either.  I have

12    medical conditions that he never knew about and he

13    didn't discuss his stuff with me either.

14         Q.   He didn't discuss his finances with you

15    either?

16         A.   No.

17         Q.   Did he discuss his work with you?

18         A.   Little bit.  I knew that he was working in

19    computer forensics.

20              MR. PASCHAL:  I'm handing you what we're

21         marking as Exhibit 1.

22              MR. FREEDMAN:  Counsel, can I get a copy?

23              MR. PASCHAL:  It's right here.

24              THE WITNESS:  Thank you.

25
```

L. Kleiman
January 10, 2020                                    13

```
 1              (Defendant's Exhibit No. 1 was
 2              marked for identification.)
 3    BY MR. PASCHAL:
 4         Q.   You know what this document is; right?
 5         A.   Yes.
 6              MR. FREEDMAN:  Ira, if you need to take a
 7         minute to familiarize yourself with the document go
 8         ahead and do that.
 9    BY MR. PASCHAL:
10         Q.   Can you turn to page two?
11         A.   Yes.
12         Q.   I asked you this question before but you were
13    unable to answer.  The seventh paragraph Dave Kleiman
14    leaves out Leonard Kleiman.  Do you know why?
15         A.   He didn't speak too much with my oldest
16    brother.  They just didn't have like a close
17    relationship.  My oldest brother he had a lot of issues
18    like drug problems and yes, he -- they just didn't
19    communicate much.
20         Q.   I want to turn to the first page.  Go to the
21    second paragraph.
22         A.   Okay.
23         Q.   You see in this where Dave Kleiman he writes
24    that at the time of my death if I'm owner or co-owner of
25    any insurance settlement, bank account, government bond,
```

Ira Kleiman
January 10, 2020                                    14

```
 1   security instrument, indebtedness, blah, blah, blah that
 2   he is a joint owner with someone else it doesn't pass in
 3   his will.  Go on and read the paragraph.
 4        A.   The type is a little -- okay.
 5        Q.   Do you know why David would put that in his
 6   will?  Did he ever discuss that with you?
 7        A.   No.
 8        Q.   So you alleged in your complaint that the
 9   first time David told you about Bitcoin was during a
10   Thanksgiving dinner 2009?
11        A.   Yes.
12        Q.   Who was at that dinner?
13        A.   My wife, my dad, myself and my six
14   month-year-old daughter.
15        Q.   Was Dave sitting next to you at the
16   Thanksgiving dinner?
17        A.   Across from me.
18        Q.   Across from you?
19        A.   (Indicating).
20        Q.   Who was sitting next to Dave?
21        A.   No one.  My mom would usually sit on that
22   side.
23        Q.   So from across the table Dave tells you -- you
24   ask him what is he working on; right?
25        A.   Well, this was after dinner.  My wife and my
```

David Kleiman
January 10, 2020                                    15

1   dad were doing the dishes in the kitchen.  My daughter

2   was like in a car seat on the floor like 20 feet away

3   from the dining table we were sitting at and that's when

4   we had the conversation.

5       Q.   What was that conversation?

6       A.   I asked him -- I think there was some news on

7   Facebook at the time I said why don't you create

8   something like that Zuckerberg kid and he said I'm doing

9   something bigger.  I'm creating my own money.

10      Q.   Did he ever use the word Bitcoin?

11      A.   No.  I believe he said digital money.

12      Q.   Did he show you pictures of what the Bitcoin

13  looked like?

14      A.   At the time I didn't know what it was.  I mean

15  it just looked like a letter B with some lines through

16  it.

17      Q.   What did the Bitcoin symbol look like?

18           MR. FREEDMAN:  Objection.

19           MR. PASCHAL:  Just describe it.  You can

20      answer.

21           MR. FREEDMAN:  Go ahead.

22           THE WITNESS:  Do you mean the symbol that he

23      drew?

24  BY MR. PASCHAL:

25      Q.   Yes.

Ira Kleiman
January 10, 2020                                    16

 1        A.    He took out a business card and he flipped it
 2   over and on the back of it it just to me it just looked
 3   like the letter B with a couple lines through it.
 4        Q.    Are you familiar with cryptocurrency?
 5             MR. FREEDMAN:   Objection.
 6             THE WITNESS:   I mean I am now.
 7   BY MR. PASCHAL:
 8        Q.    When did you first become familiar with
 9   cryptocurrency?
10        A.    Once -- after Craig contacted me.
11        Q.    When was the first time you heard about
12   Bitcoin?
13        A.    When Craig contacted me in February 2014.
14        Q.    So from 2009 until Dave's death did you ever
15   ask him about the digital money that he was creating?
16        A.    No.
17        Q.    Did you ever ask him about his reference he
18   was creating his own money?
19        A.    Excuse me?
20        Q.    Did you ever ask him about any reference to
21   I'm creating my own money?
22        A.    No.  I mean it was such a brief conversation
23   that I never thought of it again because if it had
24   turned into something successful he probably would have
25   mentioned it to me but if it was a secretive project

Ira Kleiman
January 10, 2020                                    17

```
 1   that he wasn't supposed to mention when he would have
 2   kept it to himself.
 3        Q.   Do you think that his alleged involvement in
 4   Bitcoin was secretive?
 5        A.   According to what Craig told me.
 6        Q.   Do you think that?
 7             MR. FREEDMAN:  Objection.
 8             THE WITNESS:  Yes, I believe so.
 9   BY MR. PASCHAL:
10        Q.   But he told you?
11        A.   He didn't tell me specifically.  He just told
12   me in a very vague way.
13        Q.   I want to go through this really quick.  You
14   mentioned -- you know who Patrick Paige is, right?
15        A.   Yes.
16        Q.   You know he was very close to Dave?
17        A.   Yes.
18        Q.   You do realize Dave never told him about
19   Bitcoin or creating digital money or anything like that?
20             MR. FREEDMAN:  Objection.
21             THE WITNESS:  I thought his testimony was that
22        they did --
23             MR. FREEDMAN:  Ira, there's no question
24        pending.
25             MR. PASCHAL:  Actually there was but go ahead.
```

```
 1              MR. FREEDMAN:  I don't know -- maybe you can
 2        re-ask it then.  You said you do realize that Dave
 3        never told him.
 4              MR. PASCHAL:  I asked and he was answering.
 5        You stopped him from answering.
 6              MR. FREEDMAN:  There's no question pending.
 7        You can re-ask the question.
 8  BY MR. PASCHAL:
 9        Q.    The question I just asked you you do realize
10  Dave never told him meaning Patrick Paige about Bitcoin
11  or creating digital money or anything like that?
12        A.    "Uh-uh."
13              MR. FREEDMAN:  No question pending.
14  BY MR. PASCHAL:
15        Q.    Right?
16        A.    You want me to answer?
17        Q.    Yes, you have to answer.
18        A.    I thought that I heard that Patrick mentioned
19  that they did -- that Dave briefly did mention it to
20  him.
21        Q.    When did he -- Patrick tell you that?
22        A.    Either it's in e-mail or I thought he
23  testified to it.
24        Q.    His testimony was -- you heard his testimony
25  was that Dave never said a word to him.
```

Dave Kleiman
January 10, 2020                                    19

1      A.   Okay, then I believe I do have an e-mail

2  referring to he like briefly mentioned it.

3      Q.   You do realize that Dave's fiancee who lived

4  with him also mentioned that Dave never mentioned

5  anything about digital money or Bitcoin or anything like

6  that?

7           MR. FREEDMAN:  No question pending.

8  BY MR. PASCHAL:

9      Q.   Right?

10     A.   That I'm not aware of.

11     Q.   Do you realize that the son -- do you know his

12  name?

13     A.   No.  No, I don't.

14     Q.   His name is Caleb Jones.

15     A.   I heard that.

16     Q.   He considered Dave a father of his.  They

17  spoke often, they played video games, do you know that?

18     A.   I did hear about it.

19     Q.   In fact Caleb went on to be in the military

20  and study cyber security because of Dave?

21     A.   Right.

22     Q.   All their discussions they never once and Dave

23  mentioned his work to him.  Caleb -- Dave never said to

24  Caleb I'm working on Bitcoin or digital money?

25     A.   Well --

David Kleiman
January 10, 2020                                    20

```
 1              MR. FREEDMAN:  There's no question pending.

 2              MR. PASCHAL:  You can answer.

 3              MR. FREEDMAN:  There's nothing to answer.

 4         There's no question pending, Bryan.

 5              MR. PASCHAL:  You can answer.

 6              THE WITNESS:  What's the question?

 7    BY MR. PASCHAL:

 8         Q.   Do you realize -- that Dave never mentioned to

 9    Caleb that he is working on digital money or

10    cryptocurrency or Bitcoin; right?

11              MR. PASCHAL:  I've never spoken to Caleb so I

12         don't know.

13    BY MR. PASCHAL:

14         Q.   Do you find it odd that you're the only person

15    that he ever told he is working on digital money or

16    working on his own digital money?

17         A.   Like I said he told me in a very vague way

18    that he was working on Bitcoin.  He didn't specifically

19    say Bitcoin so I could never go back and attach it to

20    him.  During those next 2010, 2011 if I had heard of

21    Bitcoin I wouldn't have thought oh, that's what Dave was

22    working on.

23         Q.   None of his closest friends or fiancee or

24    anyone he had extremely close relationships with is

25    going to testify that Dave said he was working on
```

```
 1    digital money except you; is that correct?
 2           MR. FREEDMAN:  Objection.
 3           THE WITNESS:  I don't know what they'll
 4        testify to.  I hadn't spoken to them.
 5    BY MR. PASCHAL:
 6        Q.    So when Dave tells you he is working on
 7    something that's as big as what, Facebook?
 8        A.    Bigger.
 9        Q.    Bigger than Facebook?
10        A.    (Indicating).
11        Q.    That's important; right?
12        A.    Yes.
13        Q.    What is Facebook, billions of dollars?
14        A.    I suppose.
15        Q.    So if it's bigger it could be hundreds of
16    billions of dollars?
17        A.    Maybe.
18        Q.    I need an answer.
19        A.    Maybe.
20        Q.    It could be trillions?
21           MR. FREEDMAN:  Objection, calls for
22        speculation.
23           THE WITNESS:  Do you want me to speculate?
24    BY MR. PASCHAL:
25        Q.    I want you to answer my question.
```

Ira Kleiman
January 10, 2020                              22

1      A.   Whether it could be trillions?

2      Q.   Yes.

3      A.   It could be worth anything.

4      Q.   Anything bigger than Facebook; right?

5      A.   Right.

6      Q.   And you don't talk to him about it again in

7   2010?

8      A.   I don't talk to him about it?

9      Q.   Digital money he is working on in 2010?

10      A.   No.

11      Q.   You don't talk about this project that's

12   bigger than Facebook in 2011?

13      A.   No.

14      Q.   You don't talk about this project that's

15   bigger than Facebook in 2012?

16      A.   No.

17      Q.   And you don't talk about this project that's

18   bigger than Facebook in 2013 before he died?

19      A.   A secretive project he wouldn't be disclosing

20   it to me.

21           MR. FREEDMAN:  Ira, just answer the question

22      he's asking.

23           THE WITNESS:  No.

24   BY MR. PASCHAL:

25      Q.   You didn't ask him about it?

 1        A.    Right.  I had no reason to.

 2        Q.    In 2009 when he told you about this project

 3   bigger than Facebook he didn't tell you it's a secret,

 4   did he?

 5        A.    No.

 6        Q.    In fact in 2013 I guess the time -- well, in

 7   2013 did you -- before he died did you ever visit his

 8   house?

 9        A.    Before 2013?

10        Q.    In 2013 before Dave Kleiman died did you visit

11   his house?

12        A.    In 2013 within the year, no.

13        Q.    The first time you visit Dave Kleiman's house

14   is after he died; right?

15        A.    No.

16        Q.    In 2013?

17        A.    Yes, in 2013, yes.

18        Q.    When you visit his house you're there to go

19   through his things; right?

20        A.    Yes.

21             MR. FREEDMAN:  Is this a good time to take

22        bathroom break?

23             MR. PASCHAL:  Let me finish this line.

24   BY MR. PASCHAL:

25        Q.    When you're in his house you start throwing

Ira Kleiman
January 10, 2020                                24

1   away his work papers; right?

2           MR. FREEDMAN:  Objection.

3           THE WITNESS:  I go through his things and I

4       discard whatever I don't think needs to be kept.

5       Not just randomly throwing stuff away.

6   BY MR. PASCHAL:

7       Q.   Let me just ask.  Did you look for evidence of

8   this project that's bigger than Facebook?

9       A.   That stuff wasn't even on my mind, no.

10          MR. PASCHAL:  Handing you Exhibit 2.

11          (Defendant's Exhibit No. 2 was

12          marked for identification.)

13  BY MR. PASCHAL:

14      Q.   This is an e-mail you sent to Craig Wright on

15  February 17, 2014.  Do you recall this?

16      A.   Yes.

17      Q.   In it -- in the second paragraph you say "as

18  mysterious and exciting as all this news is I also feel

19  nervous about making mistakes.  I very well could have

20  already made some."  I guess some you mean mistakes "go

21  by throwing away a bunch of Dave's papers and formatting

22  drives I could not access."

23      A.   Yes.

24      Q.   So you threw away a bunch of Dave's papers?

25      A.   I threw away a bunch of things that I didn't

Ira Kleiman
January 10, 2020                           25

1    believe needed to be kept.

2        Q.   And --

3        A.   I can't possibly store everything in his house

4    in my small two bed two bath -- I don't have the garage

5    or anything.  I just don't have space to keep

6    everything.

7        Q.   So how long did it take you to throw away his

8    papers?

9        A.   I don't remember how much time I spent.

10       Q.   Did you spend a day?

11       A.   I probably spent several days going through

12   everything.

13       Q.   I think last time you testified was that you

14   didn't go through his furniture to look for any

15   documents.

16       A.   You mean like flipping up the couch seats?  I

17   would go through all his desks.

18       Q.   So now you're saying that you went through his

19   desk?

20       A.   I went through yes, everything.

21           MR. PASCHAL:  I have to get his depo

22       transcript from last time.

23           MR. FREEDMAN:  Take a break.

24           THE VIDEOGRAPHER:  Off record 9:16.

25           (Thereupon, a brief recess was taken.)

Ira Kleiman
January 10, 2020                                    26

```
 1            THE VIDEOGRAPHER:  On the record 9:22.
 2   BY MR. PASCHAL:
 3       Q.   Mr. Kleiman, you just testified that you went
 4   through Dave Kleiman's furniture and his drawers to look
 5   for stuff?
 6       A.   Yes.
 7       Q.   You do know that you're testifying under the
 8   penalty of perjury today?
 9       A.   Yes.
10       Q.   You do know how important it is to tell the
11   truth?
12       A.   Yes.
13       Q.   You do know how important it is especially
14   because you're suing for billions of dollars from
15   someone living in London?
16       A.   Yes.
17       Q.   You need to give truthful testimony?
18       A.   Yes.
19       Q.   If you don't remember something you should I
20   don't remember?
21       A.   Yes.
22       Q.   Now, the last time I deposed you you were also
23   under the penalty of perjury; correct?
24       A.   Yes.
25       Q.   You wouldn't have lied in that depo; right?
```

Ira Kleiman
January 10, 2020                                    27

```
 1        A.   Not intentionally.
 2             (Defendant's Exhibit No. 3 was
 3             marked for identification.)
 4   BY MR. PASCHAL:
 5        Q.   Here is the transcript from the deposition
 6   that you took in April; right?  Can you please turn to
 7   page 112.
 8        A.   Okay.
 9        Q.   Starting at line seven the question was "but
10   there was still stuff in the house; right" and you
11   answered "like furniture?"  Then I asked "did you check
12   all the furniture to see what was in them?"  You said --
13   your answer was "I don't remember."
14             My question then was "so if something was
15   important in some of his furniture you wouldn't be able
16   to tell us; right?  You wouldn't be able to tell us;
17   right?"  Your answer was "I don't remember searching
18   through his furniture."  I then clarified said "sorry,
19   what did you say?"  You again said under penalty of
20   perjury "I don't remember searching through his
21   furniture."  Is there a reason why your testimony
22   changed today?
23        A.   I think in my mind for some reason I was like
24   thinking of like his furniture in his living room like
25   not like in his office in his bedroom.  I thought you
```

Ira Kleiman
January 10, 2020                          28

1    meant like his sofas and stuff like that I gave away.

2        Q.   So is your testimony that that his office desk

3    isn't furniture?

4        A.   That's the stuff that I went through.

5        Q.   That's not my question.  Is his office disk

6    his furniture?

7        A.   Yes, that's also, yes.  I'm just --

8        Q.   Is his bedroom night stand furniture?

9        A.   Yes.

10       Q.   Is the --

11       A.   I'm saying at that moment in time for some

12   reason I was thinking of the stuff in his living room.

13           MR. FREEDMAN:  Ira, you have to wait until

14       there's a question pending.

15   BY MR. PASCHAL:

16       Q.   Why were you able to give a different answer

17   today?

18       A.   Because I thought you may have meant something

19   different.

20       Q.   You thought --

21       A.   Or today.  I just -- I visualized it

22   different.  I was encompassing all his furniture not

23   just things contained in his living room.

24       Q.   When I said all furniture you thought I just

25   meant his couch?

Ira Kleiman
January 10, 2020                                        29

```
1        A.   Yes.
2        Q.   So to be clear back then you just testified
3   you didn't know what Bitcoin was; right?
4        A.   Back when?
5        Q.   Back in 2013.
6        A.   Not until Craig contacted me, yes.
7        Q.   So just answer my question.  In 2013 you
8   didn't know what Bitcoin was; right?
9        A.   Are you saying prior to February of -- I'm
10  sorry, I'm getting the dates.  Yes, 2013 I did not know,
11  yes.
12       Q.   So you didn't know what a public address was,
13  did you?
14       A.   I didn't know -- no.
15       Q.   You didn't know what a private key was; right?
16       A.   No.
17       Q.   You didn't know what a hash code was?
18       A.   No.
19       Q.   I don't know if that's the right term.  If
20  there were a bunch of numbers and letters on a document
21  would you have thought that was important?
22       A.   I don't know.  If it was on a document that
23  may have looked important worth keeping then perhaps I
24  may have kept it but if it was on just a random piece of
25  paper perhaps not.
```

Ira Kleiman
January 10, 2020                                        30

1        Q.    You know what a public address looks like now;
2    right?
3        A.    Yes.
4        Q.    So -- you know that it's a bunch of numbers,
5    random letters, it doesn't spell out anything, you know
6    that?
7        A.    Yes.
8        Q.    So if there was a paper just a white piece of
9    paper with a public address on it in 2013 would you have
10   thrown it away?
11       A.    I don't know.
12             MR. PASCHAL:  Can we take a break for a
13        second?
14             MR. FREEDMAN:  Sure.
15             THE VIDEOGRAPHER:  Going off the record 9:28.
16             (Thereupon, a brief recess was taken.)
17             THE VIDEOGRAPHER:  On record 9:36.
18   BY MR. PASCHAL:
19       Q.    So we were just talking about the work papers
20   that you threw away.  So let me get into -- you said
21   that if there was a document that may have looked
22   important or worth keeping then perhaps I may have kept
23   it.  What documents did you keep?
24       A.    I don't remember all of them.
25       Q.    Where are those documents stored?

1        A.    I have some of them in my house.

2        Q.    Did you ever give those documents to your

3    attorney?

4        A.    I believe so.  At least whatever was like

5    relevant to this case I did.

6        Q.    So were those documents produced in this case?

7        A.    The relevant documents, yes.

8        Q.    You determined whether they were relevant;

9    right?

10       A.    If there were like things like just

11   certificates or like I'm supposed to hand over all his

12   books he authored, I don't know.  What are you asking?

13       Q.    Let me go back to my question.  You determined

14   whether something was relevant; right?

15            MR. FREEDMAN:  Let me just inject here for a

16       second.  If you can answer that question without

17       revealing conversations you've had with counsel

18       then go ahead.  Otherwise don't answer the

19       question.

20            THE WITNESS:  I turned over whatever documents

21       I believed was necessary.

22   BY MR. PASCHAL:

23       Q.    You mentioned certificates; right?

24       A.    Yes.

25       Q.    Did you turn those over?

Ira Kleiman
January 10, 2020                                          32

```
 1         A.   I'm not sure.
 2         Q.   You mentioned books.  Did you turn over the
 3   books?
 4         A.   Books, no.
 5         Q.   Would they be books that he authored?
 6         A.   Authored or co-authored.
 7         Q.   You didn't turn over any of those?
 8         A.   No.
 9         Q.   What else did you not turn over?
10              MR. FREEDMAN:  Objection.
11              THE WITNESS:  I don't know.
12   BY MR. PASCHAL:
13         Q.   And you've received a subpoena also in this
14   case, haven't you?
15         A.   Subpoena?  I don't remember.
16         Q.   Mr. Kleiman, I'm concerned.  I want to express
17   the concern to you but then -- so you understand where
18   I'm coming from.  This is an important case and you're
19   suing a defendant for billions of dollars.  You
20   understand you threw out papers -- I think your
21   testimony before was you just threw out the documents
22   but now you're saying you kept documents.
23              MR. FREEDMAN:  Objection, mischaracterizes.
24              MR. PASCHAL:  We can do the -- go back through
25      the depo.
```

                              L. Kleiman
                    January 10, 2020                        33

 1              MR. FREEDMAN:  We could if you want.
 2   BY MR. PASCHAL:
 3        Q.   But Mr. Kleiman, today is the first time
 4   you're telling us you kept important stuff from Dave.  I
 5   need to know what was not produced in this litigation
 6   and what was produced in this litigation.
 7              MR. FREEDMAN:  Objection and there's no
 8        question pending.
 9   BY MR. PASCHAL:
10        Q.   Where are these documents being stored in your
11   house?
12              MR. FREEDMAN:  Objection.
13              THE WITNESS:  Just in a bedroom.
14   BY MR. PASCHAL:
15        Q.   Which bedroom?
16        A.   I just -- I have a storage room where I keep
17   like most of Dave's stuff.
18        Q.   How big is the storage room?
19        A.   Just a small room like I don't know maybe
20   10 feet by 10 feet.
21        Q.   So it's basically a bedroom?
22        A.   Yes.
23        Q.   How much stuff is in that room?
24        A.   I don't know.  Define it.
25        Q.   How much -- is the room full of Dave's stuff?

Ira Kleiman
January 10, 2020                              34

1      A.   It has belongings of some of Dave's, some of

2    mine, some of my parents.  Just full of stuff from my

3    family.

4      Q.   The stuff you have not produced you're not

5    prepared to tell us today what hasn't been produced?

6      A.   I just told you I didn't turn over his books.

7      Q.   Was it just books and certificates?

8      A.   For the most part.

9      Q.   What else was there?

10     A.   You mean -- are you talking about paper

11   documents or are you talking about like all of his

12   belongings.

13     Q.   Talking about documents.  So this is a

14   physical document.

15     A.   Any piece of paper -- any single piece of

16   paper he may have been attached to?

17     Q.   Yes, every single paper.  I'm going to break

18   it down.  So papers, documents, what did you not

19   produce?

20     A.   Could be like magazines that he had, stuff

21   going back years when he worked for company -- his old

22   companies like Security Doc or something.

23     Q.   Magazines so you thought magazines were

24   important enough to keep?

25     A.   They were important to him.  So I kept them.

Mr. Kleiman
January 10, 2020                                    35

1    He liked guns and gun magazines.

2            MR. PASCHAL:  We'll get done by four I need to

3        take a break.

4            MR. FREEDMAN:  As long as you're aware of the

5        deadline.

6            THE VIDEOGRAPHER:  Off the record at 9:42.

7            (Thereupon, a brief recess was taken.)

8            THE VIDEOGRAPHER:  On record 9:46.

9    BY MR. PASCHAL:

10       Q.   Mr. Kleiman, we were just talking about the

11   documents you did not produce.  You said there were

12   documents related to his old companies, Security Doc or

13   something, you didn't produce that?

14       A.   I was just like guessing as to what -- I mean

15   I remember seeing like a Security Doc disk.  I'm not

16   sure if I had like paperwork attached to it or not.

17       Q.   But you have documents related to his old

18   companies?

19       A.   I'm not sure.  I can check.

20       Q.   Did you keep any of Dave's research papers or

21   any of that?

22       A.   Research papers?

23            MR. FREEDMAN:  Objection.

24            MR. PASCHAL:  Yes.

25            THE WITNESS:  Research papers about what?

Ira Kleiman
January 10, 2020                                    36

```
1    BY MR. PASCHAL:
2         Q.   About anything.
3         A.   I don't recall seeing research papers.
4         Q.   Did you -- what about his work papers, did you
5    keep that?
6              MR. FREEDMAN:  Objection.
7              THE WITNESS:  I never came across his work
8         papers.
9    BY MR. PASCHAL:
10        Q.   So when you say I threw out -- in your e-mail
11   when you say I may have made a mistake I threw out a
12   bunch of Dave's papers what papers are you referring to
13   that you threw out and why would you --
14             MR. FREEDMAN:  Objection, mischaracterizes the
15        document.
16             THE WITNESS:  I just threw out papers that I
17        thought were unnecessary.
18   BY MR. PASCHAL:
19        Q.   Why were you concerned that you made a
20   mistake?
21             MR. FREEDMAN:  Objection.
22             THE WITNESS:  Because once he told me Dave was
23        attached to Bitcoin at that point I thought any
24        belonging of his -- throwing out any belonging
25        could be a mistake.
```

Ira Kleiman
January 10, 2020                                      37

BY MR. PASCHAL:

Q.   Because it could have been related to Bitcoin; right?

A.   Right.

Q.   Here today you couldn't tell us if you threw something away related to Bitcoin, can you?

A.   No.

Q.   I want to talk about the hard drives.  So you testified I think there was like five hard drives that you had?

A.   Yes.

Q.   You gave two hard drives to Patrick Paige and Carter Conrad?

A.   I don't recall how many hard drives I gave them.

Q.   You testified in your last deposition that you gave two hard drives?

A.   I specifically said two?  Okay.

Q.   Is there a reason why you're not remembering that today but you remembered in April?

A.   I don't know.  I don't remember saying that -- I might have -- I remember saying that I formated two drives but I also said that I gave -- yes, I don't know --

Q.   Do you know how many drives you gave to

David Kleiman
January 10, 2020                                      38

```
 1   Patrick Paige and Carter Conrad?
 2        A.    At this moment I don't remember the exact
 3   number.
 4        Q.    Was it more than one?
 5        A.    I believe it was.
 6        Q.    More than two?
 7        A.    That I don't know.
 8        Q.    Why did you give those drives to Patrick Paige
 9   and Carter Conrad?
10        A.    Patrick said they were related to their
11   computer forensics company.
12        Q.    And you later sued Patrick Paige and Carter
13   Conrad; right?
14        A.    Yes.
15        Q.    In that lawsuit you alleged that they had
16   Bitcoin as well?
17             MR. FREEDMAN:  Objection.
18             THE WITNESS:  In the amended complaint after
19        they produced an e-mail that looked like they may
20        have been holding Dave's Bitcoin at that point we
21        asked them if they were.
22   BY MR. PASCHAL:
23        Q.    Let's talk about that.  What e-mail did they
24   produce that suggested that they were holding Dave's
25   Bitcoin?
```

Ira Kleiman
January 10, 2020                                    39

1      A.   I don't remember the specifics of it.  You

2  would have to show it to me.

3      Q.   Was Vel your lawyer for that lawsuit against

4  Patrick Paige and Carter Conrad?  Mr. Freedman was he

5  your lawyer against Patrick Paige and Carter Conrad?

6      A.   No.

7      Q.   Who was your lawyer?

8      A.   I think it was Matthew Saralson.

9      Q.   After seeing this document from Patrick Paige

10  and Carter Conrad you and your lawyer crafted a

11  complaint, an amended complaint as you said alleging

12  that Patrick Paige and Carter Conrad had Dave's Bitcoin?

13          MR. FREEDMAN:  Objection, mischaracterizes the

14      document.

15          THE WITNESS:  I don't recall the exact draft

16      of what my attorney wrote.

17  BY MR. PASCHAL:

18      Q.   Have you spoken to Patrick Paige and Carter

19  Conrad prior to this depo?

20      A.   I believe we had a meeting with them about the

21  lawsuit.

22      Q.   About which lawsuit?

23      A.   The lawsuit that I had against them.

24      Q.   When was that meeting?

25      A.   I don't remember.  Maybe a couple years ago.

Dave Kleiman
January 10, 2020                                      40

```
 1        Q.   Have you spoken to them since I last deposed
 2   you?
 3        A.   No.
 4             (Defendant's Exhibit No. 4 was
 5             marked for identification.)
 6   BY MR. PASCHAL:
 7        Q.   Is this the first amended complaint that you
 8   and your lawyer filed against Patrick Paige and Carter
 9   Conrad?  I'm handing you what's marked as Exhibit 4.  Is
10   this the First Amended Complaint that you and your
11   lawyers filed against Patrick Paige and Carter Conrad?
12        A.   It appears so.
13        Q.   Can you turn to paragraph 32.  Can you look at
14   the last sentence of that allegation, that paragraph?
15        A.   Okay.
16        Q.   Here you allege that Dave Kleiman created and
17   maintained Bitcoin wallets which were his personal
18   property during the time he was a member of Computer
19   Forensics.
20             MR. FREEDMAN:  No question pending.
21   BY MR. PASCHAL:
22        Q.   Right?
23        A.   Where is that?
24        Q.   Paragraph 32, the last sentence.
25        A.   Further upon?
```

David Kleiman
January 10, 2020                                    41

1         Q.   Is this your allegation "further upon

2    information and belief David Kleiman created and

3    maintained Bitcoin wallets which were his personal

4    property during the time he was a member of Computer

5    Forensics?"

6         A.   Okay, yes.

7         Q.   That's your allegation?

8         A.   This was drafted --

9              MR. FREEDMAN:  It's a yes or no question, Ira.

10             THE WITNESS:  Yes, if that's what it says.

11   BY MR. PASCHAL:

12        Q.   Now, paragraph 35 you ask that the Court

13   enjoin Computer Forensics or Paige and Conrad from

14   monetizing, transferring or otherwise converting such

15   Bitcoin to the use of its principals or third parties?

16             MR. FREEDMAN:  Objection, mischaracterizes the

17        document.  Can you read the entire sentence please

18        for the record?

19   BY MR. PASCHAL:

20        Q.   Do you see that in your amended complaint?

21             MR. FREEDMAN:  I'm going to read the entire

22        sentence for the record if you won't, Bryan.  "To

23        the extent that Computer Forensics, Paige or Conrad

24        --"

25             MR. PASCHAL:  Vel, this is --

```
 1           MR. FREEDMAN:  Let me make the record.
 2      "Conrad have retained any Bitcoin wallets that were
 3      the personal property of David Kleiman, Computer
 4      Forensics should be enjoined from monetizing,
 5      transferring, otherwise converting such Bitcoin to
 6      its use of the use of its principals or third
 7      parties."
 8           MR. PASCHAL:  Vel, you can do that on
 9      redirect.  I'm moving to strike what you just said
10      because it's improper.  If you continue to do that
11      sort of tactic and coaching making this depo even
12      more useless than it's already becoming I'm going
13      to make a motion on that, okay?
14           MR. FREEDMAN:  Make a motion.
15 BY MR. PASCHAL:
16      Q.   Is this your allegation in paragraph 35?
17      A.   Yes.
18      Q.   And you made this allegation against Patrick
19 Paige and Carter Conrad you had counsel; right?
20      A.   Yes.
21      Q.   You ultimately just abandoned that lawsuit;
22 right?
23      A.   My primary reason for that lawsuit was --
24           MR. FREEDMAN:  Don't say anything that has to
25      do with advice from counsel.  So if you can answer
```

Ira Kleiman
January 10, 2020                                       43

1          the question without getting into your advice from

2          counsel then answer the question.  If not don't

3          answer it.

4                  THE WITNESS:  What was the question?

5     BY MR. PASCHAL:

6          Q.   And you made this allegation together -- you

7     abandoned the lawsuit with your counsel or you and your

8     counsel abandoned this lawsuit against Patrick Paige and

9     Carter Conrad; right?

10         A.   Yes.

11         Q.   Did you ever get back the hard drives from

12    Patrick Paige and Carter Conrad?

13         A.   No.

14         Q.   And why did you abandon the lawsuit?

15                 MR. FREEDMAN:  I'm going to instruct you not

16         to answer unless you can answer in a way that does

17         not relate to advice received from counsel.  If the

18         reason you abandoned the lawsuit is on advice of

19         counsel then don't answer the question.

20                 THE WITNESS:  I obtained what I initially

21         wanted from the lawsuit.  That's why I abandoned

22         it.

23    BY MR. PASCHAL:

24         Q.   So you never had a basis to make this

25    allegation in the complaint, this first amended

Ira Kleiman
January 10, 2020                                    44

1    complaint?

2         MR. FREEDMAN:  Objection.  There's no question

3    pending, Ira.

4    BY MR. PASCHAL:

5         Q.   I said -- so you never had a basis to make

6    this allegation in the complaint; right?

7         A.   No, we did have a basis.

8         Q.   And you abandoned that basis; right?

9         MR. FREEDMAN:  Objection.  You can answer it

10        if you can.

11            THE WITNESS:  Once we were given an

12        explanation about the e-mail then we abandoned it.

13   BY MR. PASCHAL:

14        Q.   So the two hard drives you reformatted, can

15   you walk me through the steps of how you reformatted the

16   hard drives?

17        A.   It appeared to be an empty drive.  I guess

18   when you attach it it prompts you -- it says the drive

19   needs to be formated so then I click on the button and

20   it does its thing.

21        Q.   Is that what Dave's computer prompted you to

22   do is reformat the drive?

23        A.   Yes.

24        Q.   Are you aware that Dave had a password system

25   on his computer that would look like you were loading in

Dave Kleiman
January 10, 2020                                    45

1    DOS but you had to enter a password so you can get to

2    the login screen?

3            MR. FREEDMAN:  Objection.  There's no question

4        pending.  There is.  Strike it.  Strike it.  Answer

5        the question.

6            THE WITNESS:  I was only aware of one computer

7        that prompted a password to access it.  That was

8        his Dell -- his Dell laptop.

9    BY MR. PASCHAL:

10       Q.   Do you have that password?

11       A.   I think at one time I did figure it out but

12   there was no hard drive in that laptop.  It would let me

13   log in but then couldn't do anything with it.

14       Q.   How were you able to figure out the password?

15       A.   It's been a while.  I don't remember.

16       Q.   So the two hard drives that you reformatted,

17   why did you reformat them?

18       A.   I think at the time I was looking to use like

19   Windows 7 and Windows 8 for something.  So I installed

20   those operating systems on those drives.

21       Q.   Before you reformatted the hard drives did you

22   seek any professional help to recover data on those hard

23   drives?

24       A.   No.

25       Q.   Did you seek any help recovering the data

Ira Kleiman
January 10, 2020                                        46

1  relating to what Dave referred to as being bigger than

2  Facebook?

3       A.   At the time that I formated these drives Craig

4  had not contacted me.  There was no reason for me to be

5  concerned that I was deleting anything.

6            MR. FREEDMAN:  Ira, you didn't answer the

7       question.  Just answer the question he's asking,

8       please.

9            THE WITNESS:  What was the question?

10 BY MR. PASCHAL:

11      Q.   Before you reformatted these hard drives did

12 you get any help, professional or otherwise to look for

13 the data --

14      A.   No.

15      Q.   -- or information related to what Dave

16 referred to as being bigger than Facebook?

17      A.   No.

18      Q.   Are you still using Windows 7 or Windows 8 on

19 those hard drives?

20      A.   I haven't used those hard drives since.  So I

21 guess it's still on there.

22      Q.   Well, you reformatted -- what year did you

23 reformat those hard drives?

24      A.   I thought it was the end of 2013.

25      Q.   Did you use those hard drives and the Windows

Ira Kleiman
January 10, 2020                                    47

```
 1   software on them in 2014?
 2        A.   I don't remember.
 3        Q.   Did you use the hard drives in 2015?
 4        A.   I don't remember.
 5        Q.   So you don't recall using those hard drives
 6   from 2013 to 2019?
 7        A.   No.
 8        Q.   Mr. Kleiman, can you turn to your deposition
 9   transcript from April.  Before I get into that I also
10   want to remind you you are under the penalty of perjury
11   today; right?
12        A.   Yes.
13        Q.   You wouldn't intentionally give false
14   testimony, would you?
15        A.   No.
16        Q.   You're -- you were under the penalty of
17   perjury when you testified in April; right?
18        A.   Yes.
19        Q.   Can you turn to page 53 of your April
20   transcript?
21        A.   Okay.
22        Q.   So at line 11 my question was "and you were
23   concerned you were using them.  Did you continue to use
24   them in 2014?"  Your answer was "yes."  Did -- when I
25   say them it's referring to the hard drives.  "Did you
```

Ira Kleiman
January 10, 2020                                        48

1    continue to use them in 2015?  Yes.  Did you continue to
2    use them in 2016?  Yes.  Did you continue to use them in
3    2017?  Yes.  Did you continue to use them in 2018?  I
4    believe so.
5           After you filed the lawsuit you continued to
6    use Dave's devices, right?  Yes.  When did you stop
7    using Dave's devices?  I don't remember exactly.  Was it
8    maybe like a few months ago a few weeks ago?  In the
9    range of this lawsuit."
10          MR. FREEDMAN:  Ira, there's no question
11      pending.  Wait for Mr. Paschal to ask you a
12      question.
13   BY MR. PASCHAL:
14      Q.  Is there any reason why your testimony today
15   conflicts with your testimony in April?
16      A.  There's so many different devices that Dave
17   has.  Maybe I might have been thinking of you were
18   referring to his thumb drives or -- because I regularly
19   did use a lot of his drives.  So I don't know maybe I
20   just got confused.
21      Q.  What was the basis for your confusion, can you
22   say that again?
23      A.  Because he has so many different devices.
24      Q.  Which devices are you using?
25      A.  Excuse me?

Ira Kleiman
January 10, 2020                                      49

1          Q.   Which devices are you using?

2               MR. FREEDMAN:  Objection.

3               THE WITNESS:  Which devices of Dave's?

4    BY MR. PASCHAL:

5          Q.   Are you using?

6               MR. FREEDMAN:  Objection.

7               THE WITNESS:  You mean were using or currently

8          using?

9    BY MR. PASCHAL:

10         Q.   Were using, currently using, were using.

11         A.   Primarily I think it was the thumb drives.

12         Q.   So when you testify here and we're talking

13   about and we can go back now to page 52 my question was

14   "you were concerned that you were throwing work papers

15   out and formated certain drives?"

16         A.   "Uh-uh."

17         Q.   Then I just asked you a bunch of questions

18   about your using them and you said yes.

19         A.   I may have used those drives as well.  I may

20   have used the ones I installed Windows 7 and Windows 8.

21   I just don't recall exactly what I used them for.

22         Q.   It's not even using them for.  Mr. Kleiman,

23   you've now given me three sets of testimony.  You

24   testified you did not use them.  You testified in April

25   that you did use them and now you're again saying that

Ira Kleiman
January 10, 2020                              50

```
 1   maybe you did use them.
 2          MR. FREEDMAN:  Objection, mischaracterizes the
 3      testimony.
 4   BY MR. PASCHAL:
 5      Q.   I need to know which path -- which answer is
 6   true.
 7      A.   Well, I don't remember exactly what devices I
 8   used.  I know that I used his thumb drives, the hard
 9   drives I installed Windows 7 Windows 8.  I know that I
10   did that but I just don't remember exactly how often I
11   used them and what specifically I used them for.
12      Q.   Well, in your April deposition you said that
13   you did know what you were using them for.  You were
14   using them to store personal files on them.
15      A.   Okay, maybe I did.
16      Q.   Is there a reason why your testimony today
17   conflicts with your testimony in April on that point?
18          MR. FREEDMAN:  Objection.
19          THE WITNESS:  I don't know.
20   BY MR. PASCHAL:
21      Q.   Why did you stop using Dave's devices -- when
22   did you stop using Dave's devices?
23      A.   I don't remember exactly.
24      Q.   Why did you stop using Dave's devices?
25          MR. FREEDMAN:  If you can answer that question
```

Ira Kleiman
January 10, 2020                                    51

```
 1        without getting into instructions with your
 2        attorneys then you can answer the questions.  If
 3        you have to have resort to instructions from your
 4        attorneys then don't answer.  Just say I can't
 5        answer.
 6             THE WITNESS:  Can you repeat the question?
 7   BY MR. PASCHAL:
 8        Q.   Why did you stop -- why did you stop using
 9   Dave's devices?
10        A.   I guess --
11             MR. FREEDMAN:  Don't guess Ira, just answer
12        the question.
13             THE WITNESS:  As litigation was approaching I
14        didn't want to appear that I was tampering with
15        Dave's files.
16   BY MR. PASCHAL:
17        Q.   You say as litigation was approaching.  I want
18   to just clarify.  In your testimony -- in your prior
19   deposition you said that you were using them until 2019.
20        A.   Okay.
21        Q.   Is there some reason --
22        A.   Around then.  It's close.
23        Q.   Why were you able to remember that in your
24   April deposition but you can't remember that today?
25        A.   I don't know.
```

David Kleiman
January 10, 2020                                    52

```
 1        Q.    And 2019 is almost a year after you filed this
 2   case.
 3        A.    Okay.
 4              (Defendant's Exhibit No. 5 was
 5              marked for identification.)
 6   BY MR. PASCHAL:
 7        Q.    You know Dave wrote a lot of papers; right?
 8        A.    Yes.  I've seen a few.
 9        Q.    He was an expert in his field; right?
10        A.    Yes, I believe so.
11        Q.    He actually wrote this paper together with
12   Craig Wright?
13        A.    Yes.
14        Q.    And the title -- could you say the title?
15        A.    "Overwriting Hard Drive Data, The Great Wiping
16   Controversy."
17        Q.    When did you first read this article?
18        A.    I probably heard about it after Craig
19   contacted me.  He may have sent me like a link to it or
20   something.
21        Q.    Do you remember what year that was?
22        A.    Craig contacted me in 2014.
23        Q.    So he sent you this article in 2014?
24        A.    He may have sent me a link to it, yes,
25   possibly.
```

Uyen Kleiman
January 10, 2020                                    53

1      Q.    Did you read the article?

2      A.    It's too confusing for me to understand.

3      Q.    About overwriting hard drive data?

4      A.    About any very technical computer stuff like

5  this.

6      Q.    You know in the conclusion they say that

7  reformatting and placing new data on a hard drive means

8  you can't recover the data?

9      A.    (Indicating).

10     Q.    You never read this?

11     A.    No.  I remember seeing the title.  I don't

12  think I would take the time to read something I don't

13  understand.

14     Q.    What steps have you taken to recover data from

15  Dave Kleiman's hard drives?

16         MR. FREEDMAN:  Answer that to the extent it

17         doesn't get into what you've done with your

18         lawyers.

19         THE WITNESS:  I haven't done anything.

20  BY MR. PASCHAL:

21     Q.    You haven't done anything?

22     A.    To recover data?  I may have -- I'm trying to

23  remember.  I may have installed like a recovery software

24  program to see if I could -- to see he ever like deleted

25  pictures or something like that but aside from that I

Kleiman
January 10, 2020                                    54

1    don't think I did anything.  I never gave the drives to

2    like an expert to examine them.  I only offered that to

3    Craig.

4         Q.   And you're familiar with computers; right?

5         A.   Yes, I'm familiar with computers.

6         Q.   You work in an occupation that makes you deal

7    with computers all the time?

8         A.   Yes.

9         Q.   You're a web designer?

10        A.   Yes.

11        Q.   Is it Steve's Web Design, is that one of your

12   companies?

13        A.   I registered that name -- I don't think I ever

14   used it.

15        Q.   You're able to install a recovery tool on the

16   computer?

17        A.   Yes, I know how to install software.

18        Q.   Your testimony today is that it's too

19   technical for you to read an article that tells you

20   reformatting hard drive?

21        A.   I can read it.  As far as understanding it

22   probably not.

23        Q.   So if I told you reformatting a hard drive and

24   then continuing to use it would permanently delete data

25   do you understand what that means?

Dave Kleiman
January 10, 2020                                              55

```
 1        A.   Yes.
 2        Q.   What about -- are you aware Dave used to carry
 3   a USB drive very close to him at all times?
 4        A.   I heard maybe Patrick say that.
 5        Q.   You never saw Dave with that drive?
 6        A.   No.
 7        Q.   Well, I'll proffer that every witness will
 8   testify that Dave had a very unique drive on him and
 9   that's your understanding too; right?
10             MR. FREEDMAN:  Objection.
11             THE WITNESS:  I never noticed a unique drive
12        on him, no.
13   BY MR. PASCHAL:
14        Q.   But his friends at least told you?
15        A.   I only recall Patrick saying that.
16        Q.   Do any of those USB drives contain any
17   encrypted files?
18        A.   I believe there's a True Crypt file that was
19   encrypted, yes.
20        Q.   Are there any encrypted partitions on Dave
21   Kleiman's hard drives?
22        A.   That I don't know.
23        Q.   And that's because you haven't had
24   professional help to examine the drives?
25        A.   Yes.
```

Dave Kleiman
January 10, 2020                                     56

```
 1        Q.   So -- have you taken any steps to try and
 2   access the True Crypt file?
 3        A.   I tried to run the True Crypt software.  I'm
 4   not like really familiar with it.  I tried like putting
 5   in some like random passwords that I thought Dave might
 6   have used but aside from that I haven't done anything
 7   with it.
 8        Q.   Did you get any professional help to try to
 9   access the True Crypt file?
10        A.   No.
11        Q.   So sitting here today you couldn't tell the
12   jury if -- whether or not Dave Kleiman's private keys or
13   alleged private keys are on the encrypted files?
14             MR. FREEDMAN:  Objection, calls for
15   speculation.
16             THE WITNESS:  I don't know what's on the file.
17        It could be his Computer Forensic work.
18   BY MR. PASCHAL:
19        Q.   You don't know?
20        A.   I don't know.
21        Q.   It could also be Bitcoin private keys; right?
22             MR. FREEDMAN:  Objection, speculation.
23             THE WITNESS:  Yes, I don't know.
24   BY MR. PASCHAL:
25        Q.   Can you repeat that, I didn't hear?
```

Relevance, calls for speculation (through line 23)

Ira Kleiman
January 10, 2020                                   57

```
 1        A.   I don't know.
 2        Q.   If Dave had any passwords to unlock the True
 3   Crypt file that was stored on the hard drives that were
 4   reformatted and erased or -- they could have been
 5   erased; right?
 6        A.   I heard Dave only kept his passwords in his
 7   head.  He is a security expert.  He wouldn't keep
 8   passwords on a drive or a piece of paper.
 9        Q.   Going back to my question.  If there were
10   passwords on an encrypted partition on his hard drive
11   you wouldn't know; right?
12             MR. FREEDMAN:  Objection, speculation.
13             THE WITNESS:  I don't know.
14             (Defendant's Exhibit No. 6 was
15             marked for identification.)
16   BY MR. PASCHAL:
17        Q.   I'm handing you what we're marking as Exhibit
18   6.  Have you seen this document before?
19        A.   I believe so.
20        Q.   Can you please turn to -- it's not numbered
21   but can you turn to page two.
22        A.   Okay.
23        Q.   What information do you believe Patrick Paige
24   will testify to at trial?
25        A.   Can you say that again?
```

Ira Kleiman
January 10, 2020                                   58

```
 1        Q.   What information do you believe Patrick Paige
 2   will testify at trial?
 3             MR. FREEDMAN:  Objection to the extent
 4        you're -- don't answer that if it goes into
 5        discussions you've had with your attorneys.
 6             THE WITNESS:  What information do I believe
 7        Patrick --
 8   BY MR. PASCHAL:
 9        Q.   Patrick Paige will testify to at trial?
10        A.   I don't know.
11        Q.   What information do you think Carter Conrad
12   will testify to at trial?
13        A.   I don't know.
14        Q.   What information do you think GICSR will
15   testify to at trial?
16        A.   I don't know.
17        Q.   What information do you think Debra Cobser
18   will testify to at trial?
19        A.   I don't know.
20        Q.   What information do you think Nguyen Nguyen
21   will testify to at trial?
22        A.   I don't know.
23        Q.   What information do you think Gavin Anderson
24   will testify to at trial?
25        A.   I don't know.
```

Ira Kleiman
January 10, 2020                                59

```
 1        Q.   What testimony do you think Bob Rendowski will
 2   testify to at trial?
 3        A.   I don't know.
 4        Q.   What testimony do you think Courtney --
 5        A.   Carr.
 6        Q.   Carr I'm guessing you spelled her name wrong?
 7        A.   What's that?
 8        Q.   Did you spell her name wrong?
 9        A.   No, that's how you spell it.
10        Q.   It's not Kirsten?
11        A.   Yes, the first name, yes.  It is Kirsten.
12   It's not Courtney.
13        Q.   That's Dave's fiancee; right?
14        A.   I heard that -- Dave never mentioned that to
15   me, yes.
16        Q.   What information do you think she'll testify
17   to at trial?
18        A.   I don't know.
19        Q.   Do you know what Mr. Karp is going to testify
20   to at trial?
21        A.   No.
22        Q.   Do you know what Mr. David Kurick will testify
23   to at trial?
24        A.   No.
25        Q.   Do you know what Mr. Andrew Hagen will testify
```

Ira Kleiman
January 10, 2020                                    60

1  to at trial?

2      A.   No.

3      Q.   Do you know what Ramona Watts will be

4  testifying to at trial?

5      A.   No.

6      Q.   Do you know what Mr. Jimmy Nguyen will be

7  testifying to at trial?

8      A.   No.

9      Q.   Do you know what Robert McGregor will be

10 testifying to at trial?

11     A.   No.

12     Q.   Do you know what Jamie Wilson will be

13 testifying to at trial?

14     A.   No.

15     Q.   Do you know what Jonathan Wynn will be

16 testifying to at trial?

17     A.   No.

18     Q.   Do you know what Brendan Sullivan will be

19 testifying to at trial?

20     A.   No.

21     Q.   Can you turn to page to section C.

22     A.   Okay.

23     Q.   Here you say "plaintiff's investigation is

24 ongoing and plaintiff reserves the right to supplement

25 information provided concerning damages."  You then

1    allege that your damages are somewhere between

2    201 billion -- 21,728,000,000?

3            MR. FREEDMAN:  Million, Bryan.

4    BY MR. PASCHAL:

5        Q.   Million.  That is a big number, million.

6    Before punitive and treble damages and exclusive of

7    attorney's fees and costs but you don't have an expert

8    who is going to testify to damages at trial; is that

9    accurate?

10       A.   I guess if that's what it says.

11       Q.   You testified earlier that Dave didn't talk

12   about his finances to you?

13       A.   Yes.

14       Q.   When was the first time you learned that

15   Patrick Paige and Carter Conrad had to pay Dave's cell

16   phone bill because he could not?

17       A.   I don't remember.

18       Q.   Was it during the deposition or did you learn

19   before that?

20       A.   I don't know.

21       Q.   When did you first learn that Dave's house was

22   in foreclosure?

23       A.   After he passed away I think.

24       Q.   But you knew it was in foreclosure before he

25   passed away; right?

Dave Kleiman
January 10, 2020                                             62

1         A.    No.   Did I know that it was in foreclosure
2    before he passed away?
3         Q.    Testifying today with everything you know did
4    you know his house was in foreclosure before he passed
5    away?
6         A.    I don't think I did.   I don't remember.
7         Q.    I'm not asking past tense.   As you're sitting
8    here right now did you -- do you know that Dave
9    Kleiman's house was in foreclosure before he passed
10   away?
11        A.    No, I didn't know before he passed away.
12        Q.    So today is the first time you're hearing that
13   Dave Kleiman's house was in foreclosure before he passed
14   away?
15        A.    Now I'm getting confused.   I knew he was in
16   foreclosure after he passed away.   My attorney let me --
17        MR. FREEDMAN:   Please don't discuss anything
18        your attorney told you.
19   BY MR. PASCHAL:
20        Q.    I'm asking you sitting here today can you say
21   yes or no was Dave Kleiman's house in foreclosure before
22   he passed away?
23        A.    That I don't know.
24        Q.    Do you know that he was -- his mortgage was
25   past due before he passed away?

Dave Kleiman
January 10, 2020                                        63

```
 1        A.   I don't know.
 2        Q.   You've been sitting in most of the depos in
 3   this case; right?
 4        A.   Yes.
 5        Q.   Did you know that he tried to refinance his
 6   home before he passed away but couldn't?
 7             MR. FREEDMAN:  Objection.
 8             THE WITNESS:  I think I heard someone say
 9        that.
10   BY MR. PASCHAL:
11        Q.   Did you know that his electricity was getting
12   cut off because he couldn't afford to pay his
13   electricity?
14        A.   I didn't know that.
15        Q.   He couldn't afford to pay his water bill?
16        A.   I didn't know that.
17        Q.   His cable and internet, it was getting cut
18   off?
19             MR. FREEDMAN:  Objection.
20             THE WITNESS:  I didn't know that.
21   BY MR. PASCHAL:
22        Q.   Have you ever seen Dave's credit report?
23        A.   I don't think so.
24        Q.   So as the personal representative of the
25   estate of Dave Kleiman what steps have you taken to
```

Ira Kleiman
January 10, 2020                                    64

1    locate assets of Dave Kleiman?

2        A.   Well, my attorney was assisting me with that.

3    I think we --

4            MR. FREEDMAN:  Ira, do not go into discussions

5        you've had with your lawyers.  Just say that I've

6        hired lawyers to handle that.

7            MR. PASCHAL:  That's coaching.  You can't --

8            MR. FREEDMAN:  Let me revise.

9            MR. PASCHAL:  That was coaching.

10           MR. FREEDMAN:  To the extent I'll give you

11       clear instructions.

12           MR. PASCHAL:  You just told him --

13           MR. FREEDMAN:  Let me answer the question.

14       Let me tell the witness what he can do.  To the

15       extent you can answer the question without going

16       into things you've done with your lawyers then you

17       certainly should answer the questions.  To the

18       extent what you -- you were going to say goes into

19       what you hired lawyers to do or what you have

20       lawyers to do for you do not answer that question.

21       Let me clarify my previous instruction because

22       Mr. Paschal is right, it was misstated.  Go ahead.

23           MR. PASCHAL:  Just to be clear I reserve my

24       right to move to reopen this deposition for what

25       Mr. Freedman just did and been doing on several

Ira Kleiman
January 10, 2020                              65

```
 1      occasions.
 2              THE WITNESS:  I recall like reaching out to I
 3      think a couple of his banks to just see if there
 4      was any funds in them.
 5  BY MR. PASCHAL:
 6      Q.   Which banks did you reach out to?
 7      A.   I don't remember the exact -- I think one was
 8  maybe Wells Fargo.
 9      Q.   Do you remember if there were any funds in
10  that bank?
11      A.   I don't remember.  If there was it wasn't
12  much.
13      Q.   Are you aware that on April -- do you know the
14  day that Dave Kleiman died?
15      A.   Yes, April 26.
16      Q.   That was when he was found; right?
17      A.   Yes.  So I imagine that he died several days
18  or maybe a week earlier.
19      Q.   Do you know that on April 22nd he applied for
20  credit or a loan from Spring Leaf Financial?
21      A.   I didn't know that.
22      Q.   Have you ever heard of Spring Leaf Financial?
23      A.   No.
24      Q.   Do you know they're kind of like a payday
25  lender?
```

Dave Kleiman
January 10, 2020                                    66

```
 1        A.   Okay.
 2        Q.   We don't know the exact date he died but we
 3   know he was alive on April 22nd; right?
 4        A.   I don't know.
 5        Q.   Well, if he is applying for credit from Spring
 6   Leaf Financial he is alive; right?
 7             MR. FREEDMAN:  Objection.
 8             THE WITNESS:  I don't know.  I wasn't aware of
 9        any activities he had done or maybe someone did on
10        his behalf, I don't know.
11   BY MR. PASCHAL:
12        Q.   Do you have any reason to believe that
13   somebody would apply for a payday loan on his behalf?
14        A.   I don't know what kind of communications he
15   had with other people.
16        Q.   Do you know why would apply for a payday loan
17   on what might have been the day that he died?
18        A.   No.
19             (Defendant's Exhibit No. 7 was
20             marked for identification.)
21   BY MR. PASCHAL:
22        Q.   We're going to use one of your e-mails --
23   going to go back over some of your testimony you just
24   gave.  Going to mark this as Exhibit 7.  Who is Andy
25   Kush?
```

1        A.   I think he was a reporter for Gizmodo Magazine

2    or a writer or something.

3        Q.   What is the date of this e-mail?

4        A.   December 4, 2015.

5        Q.   Can you look at that last paragraph I want to

6    go through it?

7        A.   Okay.

8        Q.   Did you send this to Mr. Andy Kush?

9        A.   I believe so.

10       Q.   The first sentence you said "if my brother had

11   Bitcoin of any value he wouldn't have died with only

12   debts."  Is that an accurate statement?

13       A.   It's an accurate statement here in this

14   e-mail, yes.

15       Q.   Then you just testified a moment ago that you

16   didn't learn about his foreclosure until after he died

17   but you're telling Mr. Andy Kush who is a reporter that

18   and shortly before he died I learned his house was in

19   foreclosure.  Is your testimony today accurate or is

20   your e-mail to this reporter accurate?

21       A.   I think the testimony that I gave you today is

22   accurate.  I could have been mistaken in this e-mail.

23       Q.   This e-mail that's what over four years ago?

24       A.   "Uh-uh."

25       Q.   Closer in time to when Dave had died?

Dave Kleiman
January 10, 2020                                    68

1        A.   Yes.

2        Q.   Your memory improved since then?

3        A.   Possibly.  I mean I know a lot more

4   information now than I did then.  I didn't have

5   documents and a lot of information that I do now.

6        Q.   I'm not asking about documents or information.

7   I am just asking you a simple question when did you know

8   that Dave Kleiman's house was in foreclosure and you

9   said shortly before he died I learned his house was in

10  foreclosure.  Today under the penalty of perjury you

11  told me that it was after he died, I asked you several

12  times.

13       A.   Yes, I believe the testimony I gave you today

14  is accurate.

15       Q.   Your memory improved since 2015 to today?

16       A.   I believe the testimony I gave is accurate.

17       Q.   I asked if your memory improved from 2015 to

18  today?

19       A.   I don't know.

20       Q.   I'm trying to figure out how the answers are

21  different and what changed?

22       A.   I can't tell you.

23       Q.   Then you said "if David owned a great number

24  of Bitcoin why wouldn't he sell a few to help pay off

25  his bills."  Is that an accurate statement?

David Kleiman
January 10, 2020                                    69

```
 1        A.   Yes.
 2             MR. FREEDMAN:  Objection.
 3             MR. PASCHAL:  Form?
 4             (Defendant's Exhibit No. 8 was
 5             marked for identification.)
 6   BY MR. PASCHAL:
 7        Q.   I'm handing you what we're marking as Exhibit
 8   8.  Is Joseph Karp your lawyer?
 9        A.   Yes, he was.
10        Q.   He was not currently your lawyer?
11        A.   I don't know if he's still my active -- he's
12   like my estate planner.
13        Q.   He is authorized to speak on your behalf,
14   isn't he?
15             MR. FREEDMAN:  Objection.
16             THE WITNESS:  I don't know.
17   BY MR. PASCHAL:
18        Q.   Joseph Karp he is a family friend; right?
19        A.   Yes.
20        Q.   You've known him for a very long time, right?
21        A.   Yes.
22        Q.   And if you needed legal advice would you call
23   him?
24        A.   Yes.
25        Q.   He wouldn't send out false statements on your
```

1   behalf, would he?

2           MR. FREEDMAN:  Objection.

3           THE WITNESS:  I don't believe so.

4   BY MR. PASCHAL:

5       Q.   This letter to the Department of Treasury of

6   the IRS is dated June 18, 2015?

7       A.   Okay.

8       Q.   It's addressed to Mr. Tosi?

9       A.   Okay.

10      Q.   This is from the Karp Law Firm which is

11  Mr. Karp's law firm.  He says in the very first line

12  "I'm writing on behalf of Ira Kleiman."  In the third

13  paragraph last sentence you say -- he says his and he is

14  referring to you "only knowledge was that David was

15  financially strapped and had limited resources."  Is

16  that accurate?

17          MR. FREEDMAN:  Objection.

18          THE WITNESS:  I believe so.

19  BY MR. PASCHAL:

20      Q.   The last paragraph on this same page can you

21  go to the -- third sentence.

22      A.   Okay.

23      Q.   It says "there was no formal probate

24  proceeding whatsoever.  The reason for this was quite

25  simple.  After checking records David was deep in debt

```
 1   and had outstanding mortgage and liens on his home which

 2   exceeded his assets and it made no sense."  Is that an

 3   accurate statement?

 4           MR. FREEDMAN:  Objection.

 5           THE WITNESS:  I believe so.

 6   BY MR. PASCHAL:

 7       Q.  Did you ever open a probate for the estate of

 8   Dave Kleiman?

 9       A.  I think in 2000 -- around 2016 I think so.

10       Q.  Are you a member of W&K?

11       A.  Yes.

12       Q.  Are you the member of W&K or is the estate the

13   member of W&K?

14           MR. FREEDMAN:  Objection, calls for a legal

15       conclusion.

16           THE WITNESS:  I believe the estate.

17   BY MR. PASCHAL:

18       Q.  Are on the SunBiz.org it only lists you as a

19   member, are you aware of that, as the managing member?

20       A.  I don't know.

21       Q.  Let me proffer to you it lists only you as the

22   manager on SunBiz.org?

23       A.  Okay.

24       Q.  Is it your understanding that you are the

25   managing member?
```

Ira Kleiman
January 10, 2020                                72

1        A.   I believe so.

2        Q.   Was any interest in W&K passed through the

3   probate proceedings?

4        A.   That I don't know.

5        Q.   Who would know?

6        A.   What's that?

7        Q.   Who would know?

8        A.   Perhaps the individual you spoke to yesterday

9   about W&K.

10       Q.   He didn't know.

11       A.   Okay.

12       Q.   And you don't know.  And this letter that

13  Mr. Karp is sending to the IRS this is after you've

14  already learned about Dave's potential involvement in

15  Bitcoin; right?

16       A.   Can you repeat the question?

17       Q.   This letter that Mr. Karp is sending on your

18  behalf to the IRS is dated after you learned that Dave

19  may have had some involvement in Bitcoin; right?

20       A.   Yes.

21       Q.   Can you go to the second to last paragraph on

22  page two?

23       A.   Okay.

24       Q.   I think this is the second sentence.  It says

25  "please understand Ira's position he is not the executor

Ira Kleiman
January 10, 2020                                    73

```
 1    of Dave's estate.  He was designated as a personal

 2    representative but no probate occurred and he did not

 3    open up an estate."  At the time that was an accurate

 4    statement; right?

 5              MR. FREEDMAN:  Objection.

 6              THE WITNESS:  I believe so.

 7    BY MR. PASCHAL:

 8        Q.   Mr. Karp says "the reason no estate was opened

 9    up is the information that was had at the time was that

10    David had only debts and a homestead property which was

11    mortgaged in excess of its fair market value and had

12    also outstanding obligations to its homeowners

13    association.  There may have been other minor assets

14    which were not worth pursuing under the circumstances."

15        A.   Okay.

16        Q.   Is that an accurate statement?

17              MR. FREEDMAN:  Objection.

18              THE WITNESS:  These are all statements from

19    Joe Karp.

20    BY MR. PASCHAL:

21        Q.   On your behalf?

22        A.   I believe so.

23        Q.   So back to my question is that an accurate

24    statement?

25              MR. FREEDMAN:  Objection.
```

Ira Kleiman
January 10, 2020                                        74

```
 1              THE WITNESS:  At the time I guess that's what
 2         I believed.
 3    BY MR. PASCHAL:
 4         Q.   Ira, would you ever tell a lie to a federal
 5    agency?
 6         A.   No.
 7         Q.   If you had misled a federal agency in any way
 8    would you correct the information that you told them?
 9         A.   Yes.
10         Q.   You understand that's your obligation?
11         A.   "Uh-uh."
12         Q.   You understand there would be some criminal
13    action --
14              MR. FREEDMAN:  Objection.
15    BY MR. PASCHAL:
16         Q.   With giving false information to --
17         A.   Yes.
18         Q.   Federal agency --
19              MR. FREEDMAN:  Objection.
20              THE WITNESS:  Yes.  Okay.
21    BY MR. PASCHAL:
22         Q.   Are there any letters to the IRS that says I
23    believe Dave Kleiman has billions of dollars worth of
24    Bitcoin?
25         A.   I don't remember sending the IRS any letters
```

Ira Kleiman
January 10, 2020                                                75

1   like that, no.

2        Q.   So you have never supplemented or amended this

3   letter in any way, have you?

4        A.   I think I did send a separate letter to the

5   IRS.  Actually I don't think I was aware that Joe sent

6   this letter because I think I sent my own letter that

7   did vary from this one.  It's quite different.

8        Q.   Have you produced that letter in this

9   litigation?

10        A.   I would imagine.

11        Q.   Mr. Karp was authorized to send this letter on

12   your behalf; right?

13        A.   I don't believe I was involved in this letter

14   but yes, he was my authorized attorney at the time.

15             MR. FREEDMAN:  Objection.

16   BY MR. PASCHAL:

17        Q.   On the last page he is CC'd there?

18        A.   Yes.

19        Q.   I want to have a clear record because you said

20   you sent a separate letter but did you ever tell the IRS

21   that Dave Kleiman was in possession or W&K was in

22   possession of billions of dollars worth of Bitcoin?

23        A.   I don't believe I ever mentioned billions of

24   dollars.

25        Q.   Or any Bitcoin, any Bitcoin?

Ira Kleiman
January 10, 2020                                  76

1          A.   I don't believe so.

2               (Defendant's Exhibit No. 9 was

3               marked for identification.)

4     BY MR. PASCHAL:

5          Q.   I'm handing you what we're marking as Exhibit

6     9.  These are your responses to interrogatories.  Can

7     you please turn to the last page?  On this last page are

8     you swearing under penalty of perjury that the foregoing

9     information in this document is correct?

10         A.   Yes.

11         Q.   Is that your signature?

12         A.   I think we're on different pages.

13         Q.   No, the very last page.

14         A.   I don't have my signature -- okay, yes.

15         Q.   It's dated March 21, 2019; right?

16         A.   Yes.

17         Q.   Can you turn to page three.  Do you see where

18    it says e-mail accounts?

19         A.   Yes.

20         Q.   Are all those e-mail accounts associated with

21    Dave Kleiman?

22         A.   I believe so.

23         Q.   What efforts have you made to access the first

24    e-mail account?

25         A.   I may have tried to log in to it.  I don't

David Kleiman
January 10, 2020                                         77

```
1    recall if I did or not.
2         Q.   Did you ever contact Yahoo to get access?
3         A.   I don't remember.
4         Q.   Did you issue a subpoena to Yahoo to get
5    access?
6         A.   No, I never subpoenaed Yahoo.
7         Q.   Did you ever seek a court order to get access
8    to the e-mail account?
9         A.   No.
10        Q.   The second e-mail
11   Dave'sdigitalforensics@          .  What did you do to
12   access that e-mail account?
13        A.   Probably -- I did the same with all of these
14   accounts.  If I thought that I had a password to it I
15   would access it.
16        Q.   I need to drill down what you did to get to
17   these e-mail accounts.  Again you're suing somebody
18   alleging theft.
19        A.   Right.
20        Q.   So for none of these accounts did you seek a
21   court order or subpoena or contact them to access Dave
22   Kleiman's e-mail accounts?
23        A.   No, I didn't seek --
24        Q.   If this is a private key or information about
25   a private key that Dave Kleiman may have had and it's on
```

David Kleiman
January 10, 2020                                    78

1    one of these e-mail accounts you wouldn't know; right?

2         A.    The one that I was primarily concerned was the

3    address that he used the most was Dave@DaveKleiman.com.

4    That's what I focused.

5         Q.    Back to my question.  I really need you to

6    answer my question.  Okay?  Because you are alleging

7    theft.  If there is a private key, Dave Kleiman private

8    key if there is information about how to get to his

9    private key, information about Bitcoin and it's on one

10   of these e-mail accounts you can't tell us one way or

11   the other whether it's there?

12             MR. FREEDMAN:  Objection.

13             THE WITNESS:  Yes, I don't know.

14   BY MR. PASCHAL:

15        Q.    You can't tell us whether it's there; right?

16             MR. FREEDMAN:  Objection.

17   BY MR. PASCHAL:

18        Q.    I need a clear answer.

19        A.    No, I can't tell you.

20        Q.    The only steps you took to access any of these

21   accounts were tried a couple passwords?

22        A.    Well, a lot of these accounts I think the

23   bottom two aren't even active.  The third one I got

24   access to after spending a long time trying to get it

25   and the other two I don't recall -- I -- yes, I don't

Dave Kleiman
January 10, 2020                                      79

1   remember if I got access to them or not.

2        Q.   When you say Dave used just one primarily if

3   Dave was keeping it a secret there's Bitcoin out there

4   you don't know what he was using these other e-mails

5   for, do you?

6        A.   No.

7        Q.   You don't know if there's any more e-mail

8   addresses out there that Dave Kleiman may have used;

9   right?

10        A.   No, I don't know.

11        Q.   Can you turn to page five.  Can you look at

12   request number five.  You see they were asking to

13   identify public addresses you believe belong to Dave

14   Kleiman or his estate.  You see that question?

15        A.   Yes.

16        Q.   Below subject to the discovery of ongoing and

17   your right to reserve you list 26 public addresses.

18        A.   Okay.

19        Q.   And you have never supplemented this answer in

20   any way; right?

21        A.   No.  At least not that I'm aware of.

22        Q.   And discovery ends as you may know next week?

23   I think next week.

24        A.   Yes.

25        Q.   Do you believe that these 26 addresses belong

Ira Kleiman
January 10, 2020                                        80

```
1    to the estate of Dave Kleiman or W&K?

2         A.   I believe at least a portion of them do

3    since --

4              MR. FREEDMAN:  Objection.

5              THE WITNESS:  W&K was a partnership.

6    BY MR. PASCHAL:

7         Q.   So they belong to W&K or the estate of Dave

8    Kleiman; right?  They have some ownership over these 26

9    addresses?

10        A.   I believe Bitcoin mined prior to February 2011

11   belonged to the estate.

12        Q.   Say that again, that belonged what?

13        A.   The Bitcoin mined prior to February -- prior

14   to the establishment of W&K should belong to the estate.

15        Q.   You believe the Bitcoin mined prior to the

16   establishment of W&K --

17        A.   From the beginning date that Bitcoin when they

18   started mining it, when it was invented up until the

19   formation of W&K at least Dave should be entitled to --

20        Q.   Before 2011 should belong to W&K?

21        A.   Yes.

22        Q.   But you gave me -- I want to go back to my

23   question, okay?  You've given me 26 public addresses.

24   Discovery ends next week.  Are these the public

25   addresses you believe belong to the estate or W&K?
```

Ira Kleiman
January 10, 2020                                    81

```
 1              MR. FREEDMAN:  Objection.
 2              THE WITNESS:  I believe at least a portion of
 3         them do.
 4    BY MR. PASCHAL:
 5         Q.   And that's also because -- would you -- is it
 6    your position that Craig Wright had mined these
 7    addresses as well?
 8              MR. FREEDMAN:  Objection.
 9              THE WITNESS:  That I don't know.
10    BY MR. PASCHAL:
11         Q.   What if I were to tell you all 26 -- a good
12    portion of these public addresses were created after
13    Dave died, would the estate believe that it's entitled
14    to those public addresses?
15              MR. FREEDMAN:  Objection, calls for expert
16         testimony.
17              THE WITNESS:  Are you saying that these
18         addresses were created after Dave died?
19    BY MR. PASCHAL:
20         Q.   I believe an expert will say that but I'm not
21    asking for that.  I'm asking for what the plaintiff, the
22    estate, is claiming belongs to it.
23              MR. FREEDMAN:  Objection.
24    BY MR. PASCHAL:
25         Q.   If a public address was mined after Dave died
```

David Kleiman
January 10, 2020                                              82

```
1   so first came in existence after Dave's death is the
2   estate claiming that belongs to Dave Kleiman?
3          MR. FREEDMAN:  Objection, calls for expert
4      testimony and a legal conclusion.
5          THE WITNESS:  That might belong to W&K.
6   BY MR. PASCHAL:
7      Q.   So W&K would have --
8      A.   Yes, if it was after.
9      Q.   What if all of these addresses it could be
10  proven that they never had any connection to W&K, Dave
11  Kleiman or Craig Wright and in fact they belong to other
12  people?
13     A.   That I don't know.
14     Q.   If that were proven would you still claim
15  ownership over these?
16         MR. FREEDMAN:  Objection, calls for
17     speculation.  Please let me object and then answer.
18     Go ahead, answer.
19         THE WITNESS:  If it had nothing to do with W&K
20     or Craig or Dave then no.  We're not entitled to
21     it.
22  BY MR. PASCHAL:
23     Q.   I believe the addresses were taken from
24  documents that Craig Wright created and sent to you;
25  right?
```

Ira Kleiman
January 10, 2020                                      83

```
 1        A.   Yes.

 2        Q.   Let me clarify.  That he -- lawyers or whoever

 3   drafted and sent to you?

 4        A.   Yes, this was in the contracts that the ATO

 5   sent me.

 6        Q.   Let's take address number two.  If I could

 7   prove that or if it was just obvious and public

 8   knowledge this 1933 address never belonged to Dave

 9   Kleiman or Craig Wright you're not asserting ownership

10   over that; right?

11             MR. FREEDMAN:  Objection, calls for a legal

12        conclusion and speculation.

13             THE WITNESS:  So you're saying the contract

14        Craig provided to me would be false?

15   BY MR. PASCHAL:

16        Q.   Not getting into that.  I'm just asking

17   hypothetical.  If an expert said whether it was false or

18   not separate the address because the bottom line is we

19   want to know whether they are Bitcoin or not Bitcoin.

20   Number two, this 1933 address if it could be proven it

21   belongs to an entity called Mount Gox and it was mined

22   after Dave died are you claiming ownership over that?

23             MR. FREEDMAN:  Objection, calls for a legal

24        conclusion and speculation.

25             THE WITNESS:  I don't know because I don't
```

Ira Kleiman
January 10, 2020                                      84

1       know if it was originally owned by Craig or Dave

2       and perhaps sold to another individual or --

3  BY MR. PASCHAL:

4       Q.   What I'm telling you it was mined by Mount

5  Gox.

6            MR. FREEDMAN:  Objection.

7  BY MR. PASCHAL:

8       Q.   Are you claiming ownership over that address?

9       A.   That I don't know.  I don't know the specifics

10  of it.

11      Q.   And you know Bitcoin -- you know about Bitcoin

12  now, right?

13      A.   (Indicating).

14      Q.   You've studied it?

15      A.   Yes, I've read about it.

16      Q.   Do you own any Bitcoin?

17      A.   A little bit.

18      Q.   How much?

19           MR. FREEDMAN:  Objection.  Why do you need to

20      know how much Bitcoin he is holding?  Don't answer

21      the question until Mr. Paschal engages me on this.

22      Why do you need to know how much Bitcoin he is

23      holding?

24           MR. PASCHAL:  I'm not doing that.  If you're

25      asserting a privilege you can instruct him not to

1    answer.  You have no basis.

2        MR. FREEDMAN:  I certainly do.  You're not

3    allowed to ask harassing questions.  I need to know

4    why you need to know the amount of Bitcoin he

5    currently has.  Why is that relevant to the suit?

6    If you don't answer the question and you're not

7    willing to explain to me your theory of relevance

8    and why it's not harassing then I will instruct him

9    not to answer.

10       MR. PASCHAL:  Vel, I don't need to explain

11   relevance and --

12       MR. FREEDMAN:  I believe that that question is

13   harassment so unless you tell me a reason why you

14   need to know it that's legitimate.

15       MR. PASCHAL:  Vel, I am going to have to file

16   a motion.

17       MR. FREEDMAN:  Okay.

18       MR. PASCHAL:  I don't want to get on the phone

19   with the Court.  Reinhart said he doesn't normally

20   do it.  I think this is an issue where this is a

21   clear example and there's plenty -- I think

22   Mr. Kleiman will have to come back for his depo.

23   Waste of time.  Can you write 10:58.

24       MR. FREEDMAN:  I'm asking you to state your

25   reasons.  You're refusing to do so.  You can bring

Ira Kleiman
January 10, 2020                                              86

1   it up with the Court.

2        MR. PASCHAL:  Mr. Freedman, in a deposition

3   there's no requirement for me to explain relevance.

4        MR. FREEDMAN:  It's harassment.

5        MR. PASCHAL:  And relevance is not a basis for

6   you to instruct the witness not to answer.

7        MR. FREEDMAN:  I'm allowed to instruct the

8   witness not to answer questions that I deem to be

9   harassing the witness.

10       MR. PASCHAL:  On what privilege?

11       MR. FREEDMAN:  It's not a privilege, Bryan.

12       MR. PASCHAL:  I'm trying to figure out his

13   familiarity with Bitcoin.

14       MR. FREEDMAN:  You asked him how much Bitcoin

15   he has.  That's like asking how much money he has

16   in his bank account.  You're not entitled to ask

17   that question unless you can show me why it's not

18   harassment.

19       MR. PASCHAL:  You know Vel, I have to take

20   this to Court.  We are on a tight schedule for

21   discovery and it's unfortunate you would force

22   that.  Are you instructing him not to answer?

23       MR. FREEDMAN:  I am instructing him not to

24   answer.

25       MR. PASCHAL:  On harassing?

Ira Kleiman
January 10, 2020                                    87

1        MR. FREEDMAN:  Yes.  Unless you can tell me a

2    grounds for why it's not harassment to know what

3    his amount of Bitcoin is.

4        MR. PASCHAL:  Let's go off the record for a

5    second.

6        THE VIDEOGRAPHER:  Off record 10:57.  We're

7    off.

8        (Thereupon, a brief recess was taken.)

9        THE VIDEOGRAPHER:  On record 11:02.

10       MR. FREEDMAN:  As I said just before off the

11   record I had an opportunity to talk with Ira.  He

12   disclosed to me how much Bitcoin he has and that he

13   does not mind telling you the amount as long as we

14   designate it confidential under the transcript so

15   with that I will allow him to answer that question.

16       MR. PASCHAL:  And Vel, I think your objection

17   you had no basis to instruct the witness not to

18   answer the amount of Bitcoin that he has.  It's

19   holding up this deposition.

20       We made an agreement that we can make a hard

21   stop at 4:00.  I make that as a last minute request

22   that you made of me but it's not fair the

23   deposition is getting held up because of objections

24   because of that have and we reserve our right to

25   file a motion to recall this witness.

                            Ira Kleiman
                        January 10, 2020                    88

```
1              MR. FREEDMAN:  You can reserve your right.
2         We'll obviously oppose it.  The five minutes it
3         took to take this is a lot less than the breaks
4         you've been taking to work out your computer
5         issues.  The record will be what it will be and the
6         Court will rule what it will rule.
7              (Defendant's Exhibit No. 10 was
8              marked for identification.)
9    BY MR. PASCHAL:
10        Q.   I just handed you what we're marking as
11   Exhibit 10.  What do you recognize this document to be?
12        A.   The second amended complaint.
13        Q.   That you filed?
14        A.   Yes.  That my attorneys filed.
15        Q.   On your behalf; right?
16        A.   Yes.
17        Q.   Could you turn to paragraph two?
18        A.   Okay.
19        Q.   Actually skip that one.  Can you turn to
20   paragraph five?
21        A.   Okay.
22        Q.   On page three paragraph five goes into page
23   three.  You allege that -- you allege that certain
24   events happen in this district but one of them you say
25   that there was mining of a substantial amount of Bitcoin
```

 1    the use of computer equipment located within this
 2    district.  You see that?
 3         A.   Yes.
 4         Q.   What computer equipment is located in this
 5    district?
 6         A.   I don't know.
 7         Q.   Did you know when you filed this complaint?
 8         A.   Based off of information that Craig provided
 9    he said they did Bitcoin mining in the U.S.
10         Q.   When did Craig tell you that?
11         A.   I don't have the document in front of me.
12         Q.   Was it in an e-mail?
13         A.   I don't know.  I remember seeing some kind of
14    produced document stating that the mining took place.
15         Q.   Produced document.  When this document was
16    filed nothing had been produced.  What was your basis
17    for alleging there's a computer equipment located in
18    this district that mined substantial Bitcoin?
19         A.   It might be in an e-mail but I just don't
20    remember it.
21         Q.   Can you describe the computer equipment?
22         A.   I have never seen the computer equipment.
23         Q.   Have you done any -- have you taken any steps
24    to locate the computer equipment?
25         A.   No.

Lisa Kleiman
January 10, 2020                                    90

1        Q.   Let me ask a question about B.  Can you go to

2   paragraph 23.  You allege there are two methods of

3   acquiring Bitcoin.

4        A.   Okay.

5        Q.   How did you acquire your Bitcoin?

6        A.   You mean how did my brother?

7        Q.   How did you acquire your Bitcoin?

8        A.   I purchased my Bitcoin.

9        Q.   When did you purchase your Bitcoin?

10       A.   Several months after Craig contacted me.

11       Q.   How much Bitcoin did you purchase?

12            MR. FREEDMAN:

13

14            THE WITNESS:

15

16   BY MR. PASCHAL:

17       Q.

18       A.

19

20       Q.

21       A.

22       Q.

23

24       A.

25       Q.



David Kleiman
January 10, 2020                                     91

1    ████████████████████████

2        MR. FREEDMAN: ███████████████████████████████

3    ███████████████████████████████████

4        MR. PASCHAL: ██████████

5        MR. FREEDMAN: ██████████████████████████

6    ███████████████████████

7    BY MR. PASCHAL:

8        Q.   So in paragraph 23 basically you say you can

9    purchase Bitcoin from someone; right?  I don't want to

10   read the whole thing but you can purchase Bitcoin from

11   someone.  Do you agree with that?

12       A.   Yes, I believe so.

13       Q.   I guess the second way is to mine the Bitcoin;

14   right?

15       A.   Right.

16       Q.   For purposes of this lawsuit is W&K or the

17   estate seeking Bitcoin that were purchased or mined?

18           MR. FREEDMAN:  Objection.

19           THE WITNESS:  If there was participation -- if

20       there was participation involving W&K then whether

21       it was mined or purchased.

22   BY MR. PASCHAL:

23       Q.   Which of your claims do you allege -- which of

24   your claims do you assert a claim for purchased Bitcoin?

25           MR. FREEDMAN:  Objection, calls for a legal

David Kleiman
January 10, 2020                                       92

1          conclusion.

2                  THE WITNESS:  I don't know.

3     BY MR. PASCHAL:

4          Q.   So if Craig Wright purchased Bitcoin in 2016

5     does that belong to Bitcoin that W&K mined?

6                  MR. FREEDMAN:  Objection, calls for a legal

7          conclusion.

8                  THE WITNESS:  I don't know if that purchase

9          stemmed from funds that originated from W&K so I

10         don't know.

11    BY MR. PASCHAL:

12         Q.   Can you turn to paragraph 32?

13         A.   Okay.

14         Q.   You talk about Hal Finney.  Have you ever met

15    Hal Finney?

16         A.   No.

17         Q.   Have you ever spoken with him?

18         A.   No.

19         Q.   To your knowledge did Dave Kleiman ever meet

20    Hal Finney?

21         A.   Not that I'm aware of.

22         Q.   Did he ever speak to Hal Finney?

23         A.   Not that I'm aware of.

24         Q.   Can you turn to paragraph 48.  In the

25    second -- third sentence you allege that on March 22nd

Ira Kleiman
January 10, 2020                                         93

1    2013 Dave signed out of the hospital against medical

2    advice.  He was unstable and nearing death.  How did you

3    know that?

4         A.   I think I received some reports from the

5    hospital and I also from word of mouth.

6         Q.   When did you receive the reports from the

7    hospital?

8         A.   I think I may have requested them sometime

9    after 2016.  I don't recall the exact date.

10        Q.   Did you ever learn why Dave checked himself

11   out of the hospital?

12        A.   I can only guess.  I don't know why.

13        Q.   Is it your understanding that Dave did not

14   like being in the Miami V.A.?

15        A.   I would imagine anyone wouldn't want to be in

16   the hospital for a long period of time.

17        Q.   Can you go to paragraph 52.

18        A.   Okay.

19        Q.   You allege that Dave had a long time interest

20   in cyber security, digital forensics and in the future

21   of money.  What is your basis to say that Dave had a

22   long time interest in the future --

23        A.   I don't think I'm on the same --

24        Q.   52?

25        A.   Page 52?

Ira Kleiman
January 10, 2020                            94

1        Q.    No, paragraph 52.  I'm going to go by

2    paragraphs.

3        A.    Dave and Craig met in and around --

4        Q.    Yes.  You say both men had a long time

5    interest in cyber security and digital forensics and the

6    future of money?

7        A.    Okay.

8        Q.    What is your basis to allege that Dave had an

9    interest in the future of money?

10       A.    Based on the story that he told me in 2009

11   that he was creating his own money.

12       Q.    So from that one story you determined that he

13   had a long time interest in the future of money?

14       A.    Not just that.  Then after Craig contacted me

15   and told me about their partnership it appeared they

16   both had interest in it.

17       Q.    So the only time Dave ever told you he had an

18   interest in the future of money is at the Thanksgiving

19   dinner?

20       A.    Yes.

21       Q.    He's never mentioned that to you before?

22       A.    No.

23       Q.    He never mentioned that to you afterwards?

24       A.    No.

25       Q.    Can you go to paragraph 62.  You say that on

Ira Kleiman
January 10, 2020                                    95

1    May 20th 2014 Ira shared this story with Craig via mail.

2    Isn't it true Craig reached to you first or your father

3    and then you?

4         A.   Yes, he reached out to my father I think a

5    couple days first, yes.

6         Q.   Dr. Wright was the one who actually informed

7    you that Dave may have Bitcoin?

8         A.   I think the first person was Patrick Paige.

9         Q.   Because Craig contacted Patrick Paige?

10        A.   Yes.

11        Q.   Then Craig contacted you?

12        A.   Then I contacted Craig.

13        Q.   So Craig reached out to Dave's best friend to

14   tell him that Dave may have some involvement with

15   Bitcoin?

16        A.   Yes.

17        Q.   Then Patrick tells you --

18        A.   He first reached out to my dad.  He realized

19   my dad is I.T. illiterate.  That's why he reached out to

20   Patrick because Patrick knows computers.  So Patrick

21   could possibly help my dad.

22        Q.   So it was Craig Wright who told -- through

23   Craig Wright that you learned that Dave may have some

24   involvement in Bitcoin?

25        A.   Yes.

Ira Kleiman
January 10, 2020                                        96

1      Q.   If Craig never reached out to you would you

2  have learned about Dave's potential involvement in

3  Bitcoin?

4           MR. FREEDMAN:   Objection, calls for

5      speculation.

6           THE WITNESS:   I don't know.

7  BY MR. PASCHAL:

8      Q.   Can you go to paragraph 65.  "From the

9  collaboration in 2008 until Dave's death in 2013 Craig

10  and Dave mined over a million of initial Bitcoin

11  together personally and through W&K."  What is your

12  basis that Craig and Dave mined over a million initial

13  Bitcoin together?

14      A.   The basis is again falls back on Dave's story

15  to me telling me that he was creating his own money back

16  when Bitcoin was first being created.

17      Q.   Okay.  So your basis for this allegation --

18      A.   And based upon he said he was working with a

19  foreign individual and that when Craig contacted me it

20  matched up with his story.

21      Q.   And again have you identified any other

22  witness who heard or could testify that Dave said he was

23  working on creating digital money?

24      A.   No, I haven't.

25      Q.   None of his friends?

Dave Kleiman
January 10, 2020                                    97

```
 1       A.   Not that I'm aware of.

 2       Q.   Not his fiancee?

 3       A.   I don't know.  You would have to ask her.

 4       Q.   Not the child that lived with Dave?

 5       A.   You would have to ask him.

 6       Q.   None of his best friends; right?

 7       A.   You would have to ask them.

 8       Q.   Did anybody else at the Thanksgiving dinner

 9  hear this?

10       A.   Like I said my wife and my dad was in the

11  kitchen and my daughter is six months years old.

12       Q.   Did you tell your dad and your wife what --

13       A.   Did I --

14       Q.   -- what Dave told you?

15       A.   No.

16       Q.   So the only person who could testify that Dave

17  Kleiman told you about digital currency is you?

18       A.   It was a very brief conversation.

19       Q.   That somehow serves the basis for you to

20  allege that he mined a million Bitcoin?

21       A.   Yes.

22       Q.   At the end of this allegation you allege that

23  Craig has now -- Bitcoin is stored in specifically

24  identifiable Bitcoin wallets that Craig has now asserted

25  ownership over.  How has Craig asserted ownership over
```

Ira Kleiman
January 10, 2020                                          98

 1   those Bitcoin wallets?

 2        A.   He's taken control of them.  He's never

 3   returned anything to the estate.

 4        Q.   How has he taken control over them?

 5        A.   Transferring them out of W&K.

 6        Q.   The Bitcoin wallets?

 7        A.   Or he already had access to them.  That he

 8   shared with Dave.

 9        Q.   Do you think he took Dave's private keys?

10        A.   It's a possibility.

11        Q.   Do you have any evidence of that?

12        A.   I don't know.

13        Q.   You said it's a possibility but isn't it a

14   possibility that the private keys could be in the

15   encrypted files?

16        MR. FREEDMAN:  Objection, calls for

17        speculation.

18        THE WITNESS:  I don't know.

19   BY MR. PASCHAL:

20        Q.   So you have no evidence that Craig took the

21   private keys.  I need to understand what is your basis?

22   What are you going to tell the jury to establish that

23   Craig is now asserted ownership over?

24        MR. FREEDMAN:  Objection, mischaracterizes his

25        testimony.

 1              THE WITNESS:  Can you repeat the question?
 2    BY MR. PASCHAL:
 3         Q.   If this was a jury what are you going to tell
 4    them to explain that Craig Wright asserted ownership
 5    over Bitcoin wallet?
 6              MR. FREEDMAN:  Objection, calls for a legal
 7         conclusion.
 8              THE WITNESS:  I believe W&K was a partnership
 9         between Craig and Dave and I believe they mined
10         Bitcoin from the very beginning and my brother is
11         entitled to at least a portion of them.
12    BY MR. PASCHAL:
13         Q.   Where are the Bitcoin now?
14         A.   I believe Craig controls them.
15         Q.   You believe Dave and Craig created Bitcoin
16    together?
17         A.   Yes.
18         Q.   Would that make them Satoshi Nakamoto?
19         A.   I believe so.
20         Q.   So -- I don't know do you know that Satoshi
21    mined Bitcoin and never moved?
22         A.   Yes.
23         Q.   So how is Craig moving those Bitcoin if
24    they've never been moved?
25         A.   Just because they haven't moved yet doesn't

Ira Kleiman
                 January 10, 2020                          100

```
 1    mean he doesn't control them.
 2         Q.   So we're in 2020.  So for seven years they
 3    never moved and you think he controls them?
 4         A.   Yes.
 5         Q.   Based on what evidence?
 6         A.   I don't know.
 7         Q.   This is a jury trial.  What evidence can you
 8    tell the jury that Craig Wright stole Bitcoin that have
 9    never moved for seven years?
10         A.   I don't know.
11         Q.   And you know Craig Wright has an interest in
12    proving he is Satoshi Nakamoto; right?
13         A.   Yes.
14         Q.   Wouldn't it make sense for him to move one of
15    those Bitcoin if he could?
16              MR. FREEDMAN:  Objection.
17              THE WITNESS:  Not necessarily.
18    BY MR. PASCHAL:
19         Q.   Well, he would want to prove that those are
20    his Bitcoin.
21         A.   He might have reasons --
22              MR. FREEDMAN:  There's no question pending,
23         Ira.
24    BY MR. PASCHAL:
25         Q.   He would want to prove that he wanted to move
```

```
 1   those Bitcoin and prove he is Satoshi; right?
 2             MR. FREEDMAN:  Objection.
 3             THE WITNESS:  I don't know.
 4   BY MR. PASCHAL:
 5        Q.   So in this partnership -- let me ask you.
 6   Dave was obviously a very smart guy; right?
 7        A.   Yes.
 8        Q.   If Craig and Dave secured their Bitcoin
 9   together don't you think Dave would have a key too to
10   access that Bitcoin?
11        A.   I don't know.
12             MR. FREEDMAN:  Objection.
13   BY MR. PASCHAL:
14        Q.   And do you have any evidence to suggest that
15   Dave never had any keys to access this Bitcoin fortune?
16        A.   I don't know.
17        Q.   You're familiar with a safety deposit box;
18   right?
19        A.   Yes.
20        Q.   It takes two keys to open up the box?
21        A.   Yes.
22        Q.   What happens if you can't have one of the keys
23   you can't open the box, can you?
24        A.   Right.
25        Q.   So if Craig Wright had a key to the Satoshi
```

1    blocks and Dave had a key to the Satoshi blocks do you

2    know where Dave's key is?

3              MR. FREEDMAN:  Objection, calls for

4        speculation.

5              THE WITNESS:  I don't know where Dave's key

6        is.

7    BY MR. PASCHAL:

8        Q.   Could it be on the encrypted file?

9        A.   I don't know.

10             MR. FREEDMAN:  Objection.

11   BY MR. PASCHAL:

12       Q.   Could it be on the drives that you

13   reformatted?

14             MR. FREEDMAN:  Objection.

15             THE WITNESS:  I don't know.

16   BY MR. PASCHAL:

17       Q.   Could it be on any of the encrypted partitions

18   of the hard drives that Dave Kleiman has?

19             MR. FREEDMAN:  Objection, speculation.

20             THE WITNESS:  I don't know.

21   BY MR. PASCHAL:

22       Q.   But you could say possibly it's there?

23             MR. FREEDMAN:  Objection, speculation.

24             THE WITNESS:  Did you want me to guess?

25

Ira Kleiman
January 10, 2020                              103

```
 1    BY MR. PASCHAL:
 2         Q.   No, I'm just asking.  Do you have any evidence
 3    to say that it's definitely not there?
 4         A.   I don't know.
 5         Q.   You don't know if you have evidence to say
 6    that it's not there?
 7         A.   I don't know.  It could be -- you're asking
 8    about what's on the encrypted file?  Anything could be
 9    on the file.
10         Q.   Can you turn to paragraph 66.
11         A.   Paragraph what?
12         Q.   Paragraph 66.
13         A.   Okay.
14              MR. PASCHAL:  Off the record real quick.
15              (Discussion held off the record.)
16              MR. PASCHAL:  Back on the record.
17    BY MR. PASCHAL:
18         Q.   Paragraph 66 okay you allege that Dave in
19    partnership with Craig created intellectual property
20    both in his individual capacity and through W&K.  Can
21    you please -- let me say this.  You understand that this
22    case is filed in 2018; right?
23         A.   Yes.
24         Q.   We've had about a year of discovery; right?
25         A.   Yes.
```

David Kleiman
January 10, 2020                                    104

1       Q.    There's been ten -- hundreds of thousands of

2   documents produced in this case?

3       A.    Yes.

4       Q.    And discovery ends next week?

5       A.    Yes.

6       Q.    We have deposed numerous individuals?

7       A.    Yes.

8       Q.    Please identify the intellectual property that

9   Dave and Craig created.

10          MR. FREEDMAN:  Objection.

11          THE WITNESS:  I believe it was any block chain

12          Bitcoin related I.P. that was created prior to

13          mining Bitcoin and any I.P. that originated -- that

14          had to take place with the Australian judgment

15          against W&K.

16  BY MR. PASCHAL:

17      Q.    Okay.  Again we're at the close of discovery

18  and there's a jury trial.  Can you please explain to the

19  jury specifically what is it that was stolen, what

20  intellectual property was stolen, was it a trade secret?

21          MR. FREEDMAN:  Objection, calls for a legal

22          conclusion.

23          THE WITNESS:  I don't have the specific

24          details in front of me.  I believe there are some

25          documents that explain what the I.P. is.

Ira Kleiman
January 10, 2020                                  105

```
 1    BY MR. PASCHAL:
 2         Q.   What is the I.P. worth?
 3              MR. FREEDMAN:  Objection, calls for expert
 4         testimony.
 5              THE WITNESS:  An expert would have to evaluate
 6         it.
 7              MR. PASCHAL:  Didn't we have an agreement that
 8         it was objection to form?
 9              MR. FREEDMAN:  I thought we did but nobody
10         respected it on your side so.
11              MR. PASCHAL:  So that agreement is gone I
12         guess.
13    BY MR. PASCHAL:
14         Q.   So today you have no idea what the value of
15    the intellectual property would be?
16         A.   I could only guess.
17              MR. FREEDMAN:  If you give me a standing
18         objection to all questions I won't object.
19              MR. PASCHAL:  Whatever you want to do.  I
20         just --
21              MR. FREEDMAN:  Okay.
22              MR. PASCHAL:  Let's do that.  Standing -- I
23         don't mind.
24              MR. FREEDMAN:  Okay.
25
```

Ira Kleiman
January 10, 2020                                    106

BY MR. PASCHAL:

    Q.    Then the next paragraph you allege that the
exact structure of the joint mining activities,
intellectual property development partnership from 2008
to 2011 -- February 2011 requires discovery to fully
reveal.  Discovery again is ending next week.  What is
the exact structure of their joint mining activities,
intellectual property development and partnership from
2008 through February 2011?

    A.    What paragraph?

    Q.    67.

    A.    What's the question?

    Q.    You say the exact structure of the joint
mining activities, intellectual property development and
partnership from 2008 until February 2011 requires
discovery to fully reveal.

          As you know discovery ends next week.  Can you
please state the exact structure of their joint mining
activity intellectual property development and
partnership from 2008 until February 2011?

    A.    I don't know the inside details of how they
structured things but whatever mining occurred I believe
they both had rights to it.  Whatever I.P. was created
they both had rights to it.

    Q.    But you don't know what an I.P. is?

Ira Kleiman
January 10, 2020                         107

1        A.   I don't have the details right in front of me

2   but yes, I believe there are documents that detail some

3   of it.

4        Q.   What documents would that be?

5        A.   I don't recall at this moment what was on

6   them.

7        Q.   Since filing the complaint what evidence have

8   you obtained to support this allegation?

9        A.   What allegation?

10       Q.   The one we're talking about, 67.

11       A.   Like I said I believe there are documents that

12  refer to the I.P. that they created.

13       Q.   You don't know what documents those are?

14       A.   Not offhand.

15       Q.   Your next allegation in 68 you say "from

16  February 2011 Craig and Dave conducted their Bitcoin

17  mining activities, intellectual property research and

18  development through W&K."  In February 2011 was Dave in

19  the Miami V.A. hospital?

20       A.   I don't know.  I just knew it was routine for

21  him to go there and then return home but I don't know if

22  he was in the hospital on that date.

23       Q.   You said you got his medical records; right?

24       A.   Yes, but I don't remember all the details of

25  it.

Dave Kleiman
January 10, 2020                                    108

```
 1        Q.   In your complaint you alleged earlier in your

 2    complaint you said earlier you got the medical records.

 3    He was in the hospital continuously 2011 to 2013?

 4        A.   He was in the entire time from -- what's that?

 5        Q.   He would get a day pass to leave every once in

 6    a while from 2011 to 2013 he was in the hospital.

 7        A.   Okay.

 8        Q.   I mean I'm asking you is that portion of your

 9    complaint accurate, is the medical record accurate, I'm

10    not sure your understanding?

11        A.   You just don't remember.

12        Q.   So is it your position that Dave was

13    conducting Bitcoin mining activities and developing

14    intellectual property while he was in the Miami V.A.?

15        A.   I know that he kept his computer with him the

16    entire time that he was in the hospital so he could

17    certainly remotely log in to access mining server that's

18    stored wherever.

19        Q.   Let's break that down.  Mining server.  Where

20    is the mining server?

21        A.   I don't know.

22        Q.   Do you have any evidence that Dave had a

23    mining server?

24        A.   Well, if they were mining I would imagine they

25    had some kind of mining equipment.
```

Louis Kleiman
January 10, 2020                                      109

```
 1        Q.   Do you have any evidence that they have mining

 2   equipment?

 3        A.   I don't know.  I don't know if I've seen

 4   documentation that refers to mining equipment or not.

 5        Q.   Have you ever seen the mining equipment?

 6        A.   Have I personally, no.

 7        Q.   You're saying he is on his computer remoting

 8   into this hypothetical mining equipment --

 9        A.   That's just speculation.

10        Q.   You're guessing?

11        A.   Yes.

12        Q.   Dave his expertise was being a computer

13   forensic analyst or computer forensic expert; right?

14        A.   Yes.

15        Q.   So he would have to do work on his computer,

16   right?

17        A.   Yes.

18        Q.   When he was in the hospital he couldn't do his

19   work, could he?

20        A.   I don't know what he was doing.

21        Q.   Well, he couldn't make money to pay his bills.

22        A.   I don't know.  He didn't discuss his bills

23   with me.  I don't know what was occurring in his

24   financial situation.

25        Q.   Well, I mean -- he charged $450 an hour to be
```

Ira Kleiman
January 10, 2020                                    110

1    an expert don't you think he would do a couple hours of

2    work so he can pay his cell phone bill; right?

3         A.   I don't know.

4         Q.   But your position he was in the Miami V.A.

5    developing intellectual property and mining Bitcoin on

6    some hypothetical mining server that's located I don't

7    know where?

8         A.   The I.P. could have been created long before

9    he was in the hospital.

10        Q.   Here you're alleging in February 2011 is that

11   allegation wrong?

12        A.   Not necessarily because I don't know exactly

13   what he was doing in the hospital.

14        Q.   Under the penalty of perjury today can you say

15   that from its inception Dave Kleiman or you were the

16   only member of W&K?

17        A.   I believe Dave was the only member and that

18   I'm currently the only member.

19        Q.   Based on what evidence?

20        A.   Based on the documents.

21        Q.   What documents?

22        A.   When you go to the SunBiz Web site I thought

23   it listed Dave as the only member.

24        Q.   You're aware that not all members are required

25   to be listed on SunBiz.org, right?

Ira Kleiman
January 10, 2020                                    111

```
1        A.    I don't know.

2        Q.    So SunBiz and we'll find the e-mail.  Do you

3   recall sending an e-mail to the Department of Finance?

4        A.    No.

5        Q.    We'll get that for you in a second.  You don't

6   recall the Department of Finance telling you that all

7   members do not need to be listed on --

8        A.    They may have.

9        Q.    Okay.

10        A.    I won't rely just on the SunBiz stuff.  I

11  think there was also some other document stating Dave

12  was the only member.

13        Q.    What document is that?

14        A.    I'm not sure if it had -- I don't remember.

15        Q.    What did it look like?

16        A.    I don't remember but I do believe -- I did see

17  something stating Dave was the only member.

18        Q.    But you can't tell us anything about that

19  document?

20        A.    I don't have it in front of me.  I have to go

21  look for it.

22        Q.    Come back to W&K in a second.  Can you go to

23  paragraph 93?

24        A.    Okay.

25        Q.    You say "the mined Bitcoin was stored in
```

Ira Kleiman
January 10, 2020                                          112

```
1   wallets in possession of Craig, Dave and W&K and certain
2   trusts."  Where are those trusts?
3        A.   I only know the trusts that Craig has
4   mentioned.
5        Q.   You have no other evidence of trusts; right?
6        A.   No.
7        Q.   Then you say "these wallets were not used for
8   any purpose but store the Bitcoins for sale at a future
9   date."  What is your basis for that allegation?
10       A.   What number?
11       Q.   Same one, 93.
12       A.   These wallets were not used for any purpose.
13  I don't know what the exact purpose the wallets were
14  used for.
15       Q.   Since you made this you don't know -- so you
16  have no basis for this allegation?
17       A.   Well, I'm getting a little confused.  Which
18  wallets are we talking about?
19       Q.   The wallets that you are alleging in this
20  paragraph.
21       A.   Which wallets are those?
22       Q.   You say the mined Bitcoins are stored on
23  wallets in the possession of Dave, Craig, W&K and also
24  in trust.  These wallets were not used for any purpose
25  but to store the Bitcoin for sale at some future date.
```

Ira Kleiman
January 10, 2020                                    113

1    That second sentence what basis do you have to make that

2    allegation?

3        A.   Are we talking about the Bitcoin that has

4    never moved?

5        Q.   Whatever Bitcoin you're referring to in this

6    allegation.  Sir, this is your complaint.

7        A.   Yes, if they've never moved then perhaps there

8    was a purpose for not moving them.

9        Q.   So you're guessing in this allegation that

10   these wallets were not used for any purpose but to store

11   the Bitcoin for sale at some future date.  Was that a

12   guess?

13       A.   I don't know.

14       Q.   Sir, I just need the basis for the allegation

15   that you made against Dr. Craig Wright in this complaint

16   and you know discovery is one week away.  We need an

17   answer.  Either there's a basis or there is not.  You

18   allege these wallets were not used for any purpose but

19   to store the Bitcoins for sale at some future date.

20       A.   Yes, I don't know.  I don't have an answer.

21       Q.   So there's no basis for this allegation?

22       A.   I didn't say that.  I just said --

23       Q.   I'm asking --

24       A.   I don't know what the purpose.

25       Q.   Are you saying you don't know what the basis

Ira Kleiman
January 10, 2020                                    114

```
 1   is?
 2       A.   No.  I'm saying I don't know what the purpose
 3   of storing.
 4       Q.   Mr. Kleiman, I need an answer to my question,
 5   okay.  Just my question and it was a very narrow one.
 6   What is the basis for the second sentence in this
 7   allegation?  What evidence do you have to make this
 8   allegation?
 9       A.   I don't have an answer for it.
10       Q.   Do you understand in this deposition you have
11   to answer the question?
12       A.   Yes.
13       Q.   So you made an allegation and I'm asking you
14   what is the basis, what is the evidence for the
15   allegation that you've made against Dr. Craig Wright.
16   Sorry, in a deposition you can't say "I don't have an
17   answer for you?"
18           MR. FREEDMAN:  Not true.  Witness told you
19       multiple times he doesn't know the answer.  You can
20       ask one more time and then I'll ask you to move on.
21           THE WITNESS:  My answer is the same.  I don't
22       know.
23   BY MR. PASCHAL:
24       Q.   You don't know the basis for the allegation?
25       A.   No, I don't know what the -- what the purpose
```

```
1   of -- why they stored the Bitcoin.
2        Q.   Mr. Kleiman, that's not my question.  I'm not
3   asking you the purpose.  That is not my question, okay?
4   My question is what is the evidence and what is the
5   basis for the second sentence in this allegation?
6        A.   I don't know.
7        Q.   That's an answer.  In the next allegation you
8   say, 94, you say "as partners from 2008 to 2011 and then
9   in some form of co-owners, members of W&K from 2011 to
10  2013 Dave and Craig shared the private keys of the
11  Bitcoin they mined."  What is the basis for this
12  allegation?
13       A.   Because they -- they were mining from the very
14  beginning.  They had a partnership.
15       Q.   When you say they shared private keys do you
16  mean that Craig gave Dave his private keys or Dave gave
17  his private keys or they both had private keys?
18       A.   It was probably vice versa.
19       Q.   Can you explain?
20       A.   That you probably shared one another's keys.
21  They probably shared access somehow.
22       Q.   Why do you think they would both share that,
23  their own private keys with each other?
24       A.   I didn't say they -- the Bitcoin were owned by
25  both of them.  Therefore they both shared access to
```

Ira Kleiman
January 10, 2020                                    116

```
1    them.
2         Q.   How did they share access to them?
3         A.   There is multiple ways they can share access
4    to them.
5         Q.   Is one a Shamir Scheme?
6         A.   I don't know.
7         Q.   Because that's kind of like a safety deposit
8    box; isn't it?
9         A.   I don't really know what the Shamir Scheme is.
10        Q.
11
12        A.
13             MR. FREEDMAN:
14
15
16             THE WITNESS:
17   BY MR. PASCHAL:
18        Q.
19        A.
20
21        Q.
22        A.
23             MR. FREEDMAN:
24             MR. PASCHAL:
25             MR. FREEDMAN:
```



Ira Kleiman
January 10, 2020                           117

1    ████████████████████████████████████████

2    BY MR. PASCHAL:

3         Q.   To be clear you don't have any evidence that

4    Dave and Craig shared the private keys to the Bitcoin

5    they mined?

6         A.   I believe they did share.

7         Q.   Since filing this complaint through all the

8    discovery we've done what is that belief based on?

9         A.   I believe there are documents that refer to

10   them.

11        Q.   That refer to the private keys?

12        A.   Possibly.

13        Q.   What documents are those?

14        A.   May have been something documents produced to

15   us.

16        Q.   What document supports that allegation?

17        A.   I don't have the document in front of me.

18        Q.   You said you don't have the document in front

19   of you.  Can you tell us what any of these documents

20   look like that you're saying support this allegation?

21        A.   No.

22        Q.   So if you're testifying in front of a jury

23   right now your testimony would be there are documents I

24   just don't know what they are?

25        A.   If I was testifying in front of a jury I would

Ira Kleiman
January 10, 2020                                    118

```
 1    probably have the documents with me.
 2         Q.   I'm asking you -- that's the purpose of this
 3    deposition.  I'm trying to figure out what evidence do
 4    you have to support this?
 5         A.   Yes, I believe I've seen documents that refer
 6    to it.  I just don't have them with me.
 7         Q.   And you have no idea what those documents look
 8    like?
 9         A.   They look like the thousands of other
10    documents that were produced to us.
11         Q.   So you have these unidentified documents that
12    would support this allegation.  Do you have any witness
13    testimony?
14         A.   Witness testimony?
15         Q.   Yes.
16         A.   Not that I'm aware of.
17         Q.   Can you go to paragraph 70 so you have to go
18    back a few pages.  You've seen the e-mails between Craig
19    Wright and Lynn Wright and Dave Kleiman; right?
20         A.   Yes, I've seen some of them.
21         Q.   You saw the ones that were exchanged the day
22    before -- actually I think the same day of W&K's
23    formation; right?
24         A.   I'm not sure which specific one you're talking
25    about.
```

Dave Kleiman
January 10, 2020                                         119

```
 1              MR. PASCHAL:  Julio is going to get the
 2        attachment to this document but just assume the
 3        attachment is the draft of the articles of
 4        incorporation and I'll show it to you as soon as he
 5        gets it.
 6              (Defendant's Exhibit No. 11 was
 7              marked for identification.)
 8   BY MR. PASCHAL:
 9        Q.   You see this e-mail from Dave Kleiman it's to
10   CraigWright@█████████████████████and
11   LynnWright@███████████████████.  Do you see the date
12   on this e-mail?
13        A.   Yes.
14        Q.   February 15, 2011.  W&K was created on
15   February 16, 2011; right?
16        A.   Yes, I believe so.
17        Q.   You see Dave saying last page of the attached
18   "do you think I can list you as an MGR or MGRM with a
19   foreign address or do you think they would kick it
20   back?"  What do you think MGR means?
21        A.   Like manager.
22        Q.   What do you think MGRM means?
23        A.   Managing member.
24        Q.   Who is Dave asking this question to?
25        A.   Where is the -- where is it being -- who is
```

David Kleiman
January 10, 2020                                        120

```
 1   sending it?
 2        Q.   At the top.  It says from Dave Kleiman.
 3        A.   To Craig.
 4        Q.   Craig and who?
 5        A.   And Lynn.
 6        Q.   You see the domain name for Craig and Lynn?
 7        A.   Yes.
 8        Q.   What is the domain name?
 9        A.   ██████████████████████
10        Q.   Are you familiar with Information Defense PTY?
11        A.   I think I've heard of it.
12        Q.   You understand that was Craig and Lynn's
13   company?
14        A.   I believe so.
15        Q.   Dave was asking this of them right before --
16   the day before he files the articles of incorporation
17   for W&K; right?
18        A.   Yes.  Yes.
19        Q.   Now, we just spoke about Information Defense
20   PTY.  It would be helpful if you gave me the documents.
21   Do you realize there's a Court settlement divorce
22   settlement between Craig Wright and Lynn Wright?  Have
23   you heard of it?
24        A.   I've heard of it.  I don't know when it
25   occurred.
```

David Kleiman
January 10, 2020                                         121

1       Q.   Do you realize in that settlement Information

2  Defense PTY and W&K, any interest in W&K Craig disclaims

3  it?

4       A.   I don't know.

5       Q.   This is a public document, a part of their

6  divorce?

7       A.   Okay.

8       Q.   Now, Dave is talking to Craig and Lynn about

9  forming W&K Information Defense.  You see that?

10      A.   Yes.

11      Q.   Why is he asking him whether or not they can

12  be listed as a manager or managing member?

13      A.   I don't know.

14      Q.   Why is there a court settlement stating that

15 Lynn Wright would have anything to do with W&K and

16 Information Defense that's a part of the settlement?

17      A.   I don't know.

18      Q.   I need to know the answer to these questions

19 because in papers you've called my client a fraud

20 because you said he has no interest in W&K.  And here

21 and as soon as Julio comes back we're going to show you

22 the court settlement that says Lynn Wright has an

23 interest and he told Dave Kleiman that Lynn is going to

24 take this over, I don't want this.  Did you contact Lynn

25 Wright before you reinstated W&K?

1     A.   Did I, no.

2     Q.   You had this document though, right?

3     A.   Yes.  I have many documents from Craig.

4     Q.   You had --

5          MR. FREEDMAN:  Let the witness finish the

6     statement.

7  BY MR. PASCHAL:

8     Q.   Were you finished?

9     A.   Many of them are fraudulent e-mails.

10     Q.   Okay.  Do you have any reason to doubt this

11  e-mail?

12     A.   I don't know.  You would have to ask an expert

13  about it.

14     Q.   Are any of the fraudulent e-mails or

15  fraudulent -- purported fraudulent e-mails or fraudulent

16  documents, aren't they the same document you're using to

17  support your claims?

18     A.   I don't know.  There's a lot of e-mails and

19  documents.

20     Q.   I know.  I know you said that.  If there's a

21  lot of forged documents, a lot of false testimony and a

22  lot of forged documents how are they also supporting

23  your claims that Craig Wright and Dave or Satoshi with

24  millions of Bitcoin out there?  I want the jury to know

25  which truth -- which falsehood -- what should the jury

Ira Kleiman
January 10, 2020                            123

 1    believe?

 2         A.   It's up to the jury.

 3         Q.   I need to understand from you though because

 4    so far what I've gathered is the only evidence you have

 5    comes from Craig Wright.  Do you agree with that?

 6         A.   No.  Some of the evidence comes from what my

 7    brother told me.

 8         Q.   That conversation that nobody else heard and

 9    nobody else has spoken about and none of his friends,

10    his fiancee or the son -- the young man who calls him

11    father can corroborate?  Other than that is the only

12    evidence you have Craig Wright or stuff that Craig

13    Wright said?

14         A.   Yes.  Most of the evidence is from Craig and

15    my brother.

16         Q.   I need to break that up because there's one

17    conversation you claim to have had with your brother,

18    right?

19         A.   Yes.

20         Q.   That nobody heard; right?

21         A.   That I heard, yes.

22         Q.   And -- but that conversation didn't include

23    having millions of Bitcoin, did it?

24         A.   At that point they weren't worth anything.

25         Q.   I said millions of Bitcoin, doesn't matter

Ira Kleiman
January 10, 2020                                    124

1    what they're worth.

2         A.   I don't think they had millions of Bitcoin

3    even in -- I mean in late 2009.

4         Q.   Sorry, go ahead.

5         A.   By that time.  They probably didn't mine that

6    much yet.

7         Q.   But in that conversation about digital money

8    you did testify that he didn't mention a word about

9    Bitcoin.

10        A.   Can you say that again?

11        Q.   In that conversation you testified he didn't

12   mention anything about Bitcoin?

13        A.   Yes, correct, yes, digital currency or digital

14   money.

15        Q.   So he never told you anything about Bitcoin?

16        A.   Aside from the logo he drew, no.

17        Q.   So the other rest of the evidence comes from

18   Craig Wright?

19        A.   Yes.

20        Q.   Your documents, all of your documents --

21   evidence comes from Craig Wright?

22        A.   Yes, from his word.  He told me they were

23   partners.  They mined a lot of Bitcoin.

24        Q.   Now, if you're saying that Craig Wright and

25   you just said it and it is your belief and your

Ira Kleiman
January 10, 2020                                    125

1    counsel's argued it that he is lying, he is forging

2    documents why should the jury believe those documents or

3    what he is saying then?  I want to know which is --

4        A.   Because he has everything.  My brother's left

5    with nothing.  He's creating fraudulent documents that

6    benefit himself.

7        Q.   I mean some of the documents the fraudulent

8    documents they're attached to your complaint to support

9    your claims.

10       A.   I don't know exactly what specific documents

11   you're talking about.

12       Q.   What document do you have to show that there's

13   a million Bitcoin or any Bitcoin?

14       A.   I don't have the documents in front of me.

15       Q.   Can you name any document?

16       A.   Not off the top of my head, no.

17       Q.   You have hundreds of thousands of documents.

18   Sir, we've been litigating for two years.  You have --

19   you've been investigating this yourself for many years,

20   right?

21       A.   Yes.

22       Q.   You can't tell the jury a single one document

23   that says there's a lot of Bitcoin out there?

24       A.   Not at this moment.  I don't have them with

25   me.

Ira Kleiman
January 10, 2020                                126

1      Q.   When you look at -- could you go to paragraph

2   70.  You say "W&K has no operating agreement and its

3   exact ownership structure is unclear due to Craig's

4   contradictory statements."  Since you made this

5   allegation what evidence do you have to establish that

6   you are the sole owner of W&K?

7      A.   Based on the document that I saw that listed

8   my brother as the only member.

9      Q.   That document was attached with this

10   complaint.  So you had that document when you made this

11   statement that it's unclear -- that its ownership

12   structure is unclear.  Since you made that allegation

13   what evidence have you obtained to say that you are the

14   owner of W&K?

15      A.   I don't know.  Again I would have to go look

16   at all the documents.  I don't have them with me.

17      Q.   You can't name a single document that says you

18   own W&K?

19      A.   No.

20      Q.   And if Lynn Wright had an interest in W&K did

21   you on rob her of her interest when you reinstated the

22   company?

23      A.   Again I don't know if this is a fraudulent

24   e-mail or not.

25      Q.   Let's assume that it's an accurate e-mail,

Ira Kleiman
January 10, 2020                                    127

1    okay.

2         A.   You're asking me to speculate?

3         Q.   Not asking you to speculate.  If Lynn Wright

4    has an interest in the company did you steal her

5    interest in the company when you reinstated W&K?

6         A.   I'm not going to speculate.  I don't know what

7    Lynn Wright's situation is.

8         Q.   Since you made this allegation that it's

9    unclear the ownership structure of W&K what steps did

10   you take to investigate whether or not you are really in

11   fact the owner of W&K?

12        A.   Based on the information that my brother was

13   the sole managing member.

14        Q.   And again what information was that?

15        A.   I don't have the documents with me.

16        Q.   You can't name a single document?

17        A.   I don't remember thousands of documents.

18        Q.   You think there's thousands of documents that

19   show that you are the sole member of W&K?

20        A.   No.  No, I'm talking about everything that was

21   produced to us and just the totality of everything.

22   Just it's confusing stuff.  I don't remember all these

23   documents but don't worry, we'll produce it.

24        Q.   I don't care about producing documents.

25   You're here to testify.  We're done producing documents.

Craig Kleiman
January 10, 2020                                    128

```
 1   I need to know what you know based off those documents
 2   what evidence do you have to support these allegations.
 3   I mean if your answer is I don't know then just --
 4   that's what it is.  Is it, I don't know?
 5          MR. FREEDMAN:  Just for the record I don't
 6       think you are done producing documents.
 7          MR. PASCHAL:  Huh?
 8          MR. FREEDMAN:  I don't think you are done
 9       producing documents.  Are you making that
10       representation on the record?
11          MR. PASCHAL:  You know what I mean, Vel.
12          MR. FREEDMAN:  I want the record to be clear
13       that you're not done.
14          MR. PASCHAL:  Still producing documents.
15          MR. FREEDMAN:  Okay.  I understand the point.
16       I want the record to be clear.
17          MR. PASCHAL:  This is deposition time, not
18       document producing.
19          MR. FREEDMAN:  You told the witness we're done
20       producing documents.  That's not an accurate
21       statement.
22          MR. PASCHAL:  Guys want to take a break?
23          MR. FREEDMAN:  Sure.
24          THE VIDEOGRAPHER:  Off the record at 12:03.
25          (Thereupon, a brief recess was taken.)
```

                              Kleiman
                     January 10, 2020                          129

```
 1            THE VIDEOGRAPHER:  On the record at 12:59.
 2            (Defendant's Exhibit No. 12 was
 3            marked for identification.)
 4   BY MR. PASCHAL:
 5       Q.   Mr. Kleiman, I'm handing you what we're
 6   marking as Exhibit 12.  Do you recognize this document?
 7       A.   Yes.  Yes.
 8       Q.   This document was filed on February 16, 2011,
 9   right?
10       A.   Yes.
11       Q.   This is the day after Dave Kleiman sent the
12   e-mail to Lynn Wright and Craig Wright asking whether
13   they can be managers and managing members.
14       A.   Okay.
15       Q.   What is this document?
16       A.   Registration of W&K.
17       Q.   On the street address of principal office
18   of -- do you recognizes that first address?
19       A.   ███████████████████
20       Q.   Yes.
21       A.   Yes, that's where my brother lived.
22       Q.   Do you recognize the second address?
23       A.   That's the address of the UPS store I think he
24   shared access to with Patrick.
25       Q.   You heard Carter Conrad's testimony that that
```

Ira Kleiman
January 10, 2020                                    130

```
 1   mailbox was where Dave used for all of his business and
 2   some of his personal items; correct?
 3        A.   I don't recall that but --
 4             (Defendant's Exhibit No. 13 was
 5             marked for identification.)
 6   BY MR. PASCHAL:
 7        Q.   I'm handing you Exhibit 13.  Can you turn to
 8   the second page.  This envelope -- what is the address
 9   that's listed on the envelope?
10        A.   ███████████████████
11        Q.   Is that the same address that's listed on the
12   Articles of Incorporation for W&K mailing address?
13        A.   Yes.
14        Q.   Then on the top left corner what entity is
15   sending this envelope?
16        A.   Supreme Court of New South Wales.
17        Q.   The handwriting, what does that say?
18        A.   Received October 10, 2013.
19        Q.   Do you recognize that to be Carter Conrad's
20   handwriting?
21        A.   I have never seen Carter Conrad's handwriting.
22        Q.   Can you go to the first page.  At the top of
23   the -- at the top of the page in the top left corner
24   what does that logo say?
25        A.   Supreme Court of New South Wales.
```

1    Q.   The top right corner it has the contact

2    information for the Supreme Court of New South Wales?

3    A.   Yes.

4    Q.   What -- who is this letter addressed to?

5    A.   W&K Info Defense Research.

6    Q.   Again it has W&K mailing address, right?

7    A.   Yes.

8    Q.   What is the date on this letter?

9    A.   September 3rd 2013.

10   Q.   What is the case title?

11   A.   Craig Steven Wright vs. W&K Info Defense

12   Research.

13   Q.   In the body of this letter it instructs you

14   that if you do not appear in court this may be dealt

15   with in your absence; right?

16   A.   Yes.

17   Q.   Gives you the date and time for a court

18   hearing?

19   A.   Yes.

20   Q.   As the personal representative of the estate

21   of Dave Kleiman did you check the mailbox, the business

22   and sometimes personal mailbox of David Kleiman?

23   A.   I didn't have access to that mailbox.

24   Q.   Why didn't you have access to the mailbox?

25   A.   I was never given access to the mailbox.

Dave Kleiman
January 10, 2020                                    132

1        Q.   Somebody prevented you from having access?

2        A.   I think Patrick just retained control of it.

3        Q.   Did he ever keep you from accessing the

4   mailbox?

5        A.   No.

6        Q.   Did you ever ask him?

7        A.   I'm trying to remember if I even -- at what

8   date I even knew about it.  I have to go back and look

9   at the records to see when I first found out about it.

10       Q.   When did you know about Computer Forensics,

11  LLC, let me ask you that?

12       A.   That I knew about before -- well, I don't know

13  the exact date but I knew my brother was operating it.

14       Q.   And you knew Patrick Paige and Carter Conrad;

15  right?

16       A.   Yes.

17       Q.   You knew that Patrick Paige and Carter Conrad

18  shared a business with Dave Kleiman; right?

19       A.   Yes.

20       Q.   As the personal representative of the estate

21  of Dave Kleiman did you ask Patrick Paige or Carter

22  Conrad about where Dave was receiving all of his

23  business mail?

24       A.   No.

25       Q.   As the personal representative of the estate

```
 1    of David Kleiman -- strike that.  Checking all of his
 2    business mail as the personal representative that would
 3    be pretty important; right?
 4         A.   Well, I was led to believe that Dave just
 5    didn't have any assets and that included whatever was
 6    conducted at Computer Forensics.
 7         Q.   How were you led to believe that?
 8         A.   That involved communications with my attorney.
 9         Q.   The only way you would have wanted to check
10    the mailbox is if there were assets?
11         A.   No, I thought you meant if I was looking into
12    Computer Forensics assets.
13         Q.   I just want to know the personal -- the
14    mailbox?
15         A.   Yes.
16         Q.   My question to you was as the personal
17    representative of the estate of Dave Kleiman it's pretty
18    important you check the mailbox and have all his
19    business affairs and personal items?
20         A.   I thought the mailbox was only connected to
21    his business affairs tied to Computer Forensics and
22    that's why Patrick is the only one that I knew of that
23    had access to it.  So I wasn't going to ask Patrick if I
24    could access mail going to Computer Forensics.
25         Q.   What makes you think that it was just only
```

David Kleiman
January 10, 2020                                    134

```
 1    Computer Forensics that had access?
 2         A.   Because Patrick was the only other person who
 3    had access to it.
 4              (Defendant's Exhibit No. 14 was
 5              marked for identification.)
 6              MR. PASCHAL:  I'm showing you what we're
 7         marking as Exhibit 13 --
 8              MR. FREEDMAN:  14.
 9              MR. PASCHAL:  14.
10    BY MR. PASCHAL:
11         Q.   This is an e-mail exchange between you and
12    Patrick Paige; right?
13         A.   Yes.
14         Q.   That's your e-mail address DAX561@███████?
15         A.   Yes.
16         Q.   If you turn to the second page that's where
17    the e-mail starts.  So there's an automatic send from
18    the UPS store to Dave Kleiman's e-mail address.  It's
19    saying that the payment or that the mailbox needed to be
20    renewed by a certain date.
21              So then on the first page on May 1st 2014
22    Patrick tells you "I don't think we're going to renew
23    the mailbox.  I wanted to check to see if you wanted to
24    take it over.  Let me know if you do and I can meet you
25    there and transfer it to you.  Otherwise I think we will
```

Ira Kleiman
January 10, 2020                                    135

1    not renew it."  Then you responded "there's no need to

2    renew the mailbox."

3         A.   Yes.  If -- since I thought it was related to

4    just Computer Forensics related stuff that why would I

5    need to renew it.

6         Q.   Well, did you ask Patrick Paige and Carter

7    Conrad if it was only related to Computer Forensics

8    stuff?

9         A.   No, but just being that Patrick's the only

10   person who had access to it I guess that's what I

11   assumed.

12        Q.   I get you assumed but as a personal

13   representative you know you spoke to Carter Conrad and

14   Patrick Paige; right?

15        A.   Yes.

16        Q.   And did you ever ask them whether or not --

17   where Dave's business mail was going to?

18        A.   Did I ever specifically ask.  No, I don't

19   think so.  I imagine that Patrick was receiving it and

20   if he received anything of importance then he would

21   forward it to either me or my attorney.

22        Q.   I want to get this straight.  Did you ever

23   check the mailbox?

24        A.   No.  I never had access to it.

25        Q.   I want to clarify when you say you never had

Dave Kleiman
January 10, 2020                                    136

1    access so it's because you never asked?

2         A.   I never had --

3         Q.   If you would have went to Patrick Paige and

4    said can I get a key so I can look at Dave's mail?

5         A.   I didn't feel I needed to because Patrick had

6    access to it and if there was mail in there he would

7    then give it to me.

8         Q.   Is Patrick the personal representative of the

9    estate of Dave Kleiman?

10        A.   No.

11        Q.   You are, right?

12        A.   Yes.

13        Q.   So you would be sitting in the shoes of Dave

14   Kleiman in that capacity?  That is his mailbox where he

15   gets all of his business mail?

16        A.   As far as I knew it was just Computer

17   Forensics.  I didn't know of any other company.  So why

18   would I be asking for a Computer Forensics mail?

19        Q.   Well, it could have been mail related to --

20   even though he was in Computer Forensics; right?

21        A.   In the field, yes.

22        Q.   Wouldn't you want to know his business

23   dealings in Computer Forensics?

24        A.   As far as I knew they were just solely based

25   in Computer Forensics, LLC.

Ira Kleiman
January 10, 2020                                    137

1          Q.   What if there was a check for $10,000 for work

2     he did before he died and it went to the mailbox.  You

3     didn't want to check for that?

4          A.   Then Patrick would notify me if part of that

5     was entitled to Dave.

6          Q.   Was Patrick under any legal obligation to

7     handle the affairs of the estate of David Kleiman?

8          A.   No.

9          Q.   You were actually under legal obligation to do

10    that; right, as the personal representative?

11         A.   Yes.

12         Q.   And you didn't check his mailbox?

13         A.   Again I didn't have access to it.

14         Q.   Because you didn't ask?  I want to define

15    access.  Let's work on access because I'm trying to

16    figure out how you consider access.  So is it I don't

17    feel like walking to my mailbox and opening it up does

18    that mean I don't have access to my mailbox?

19         A.   I didn't have a key to open the locked

20    mailbox.

21         Q.   So if Patrick is ready and obviously willing

22    to give you a key because he wants you to take it over

23    and you just simply didn't care to ask is that somehow

24    denying you access?

25         A.   No, it's not denying me access but I just

Dave Kleiman
January 10, 2020                          138

 1    assumed he would tell me if there was mail and being
 2    that he had access so it he would tell me if there was
 3    mail there.
 4        Q.   Was the first time you heard about Craig
 5    Wright from Patrick Paige?
 6        A.   Yes.
 7        Q.   Did you ever know that Craig Wright -- when
 8    did you infer that Craig Wright was the wealthy
 9    foreigner that stemmed from the purported conversation
10    you had with Dave Kleiman in 2009?
11        A.   When Craig told me the story of them working
12    together on Bitcoin.
13        Q.   Did you ever ask --
14        A.   Go ahead.
15        Q.   Carter Conrad, Patrick Paige or any of Dave's
16    friends about Craig Wright -- strike that.  Did you ask
17    any of Dave's close friends about Craig working with a
18    wealthy foreigner?
19        A.   I don't think so.
20        Q.   Did you ask any of his friends if Dave knew a
21    wealthy foreigner?
22        A.   No.
23        Q.   Did you ask any of Dave's friends, business
24    partners, other family members whether Dave was working
25    with the wealthy business partner on something bigger

Dave Kleiman
January 10, 2020                          139

1   than Facebook?

2        A.   No.  I mean that memory of him working with a

3   foreigner only came back to me after some exchanges that

4   I had with Craig and I believe it was Craig I was first

5   to inform him about it.

6        Q.   So your brother telling you that he is working

7   on something bigger than Facebook -- strike that.  Dave

8   Kleiman was a very, very smart man, wasn't he?

9        A.   Yes.

10       Q.   He was one of the foremost experts in his

11  field; right?

12       A.   Yes.

13       Q.   And him telling you that he is working on

14  something bigger than Facebook it's your testimony that

15  you forgot all the way until Craig Wright told you

16  something?

17       A.   Yes.

18       Q.   So in 2010 did you remember that your brother

19  said he is working on something bigger than Facebook?

20       A.   No.

21       Q.   You remember then?

22       A.   No, I didn't remember until I had e-mail

23  exchanges with Craig.

24       Q.   I want to figure out exactly when you forgot.

25  Did you forget the day after the Thanksgiving?

David Kleiman
January 10, 2020                                          140

1        A.   It's not that I forgot the memory.  It's just

2   that I just didn't think about it.  It was nothing to

3   think about.  It would be different if I knew that Dave

4   had suddenly come into a lot of money in 2010, 2011,

5   2012 but that wasn't the case.

6        Q.   So it was only important to you if he had a

7   lot of money?

8        A.   No, it was just there was no reason for me to

9   reflect on his mentioning that he was working on a big

10  business if he wasn't generating anything from it.

11       Q.   So as the personal representative of the

12  estate of Dave Kleiman you didn't think it was important

13  to follow up on David Kleiman's purported claim to you

14  that he was working on something bigger than Facebook

15  with a wealthy foreigner?

16       A.   Again that memory didn't come back until Craig

17  contacted me.

18       Q.   Well, let me -- so you never really visited

19  Dave when he was in the hospital; right?

20       A.   Right, correct.

21       Q.   Did you ever see him when he had the passes

22  where he can leave for a day or two?

23       A.   I didn't see --

24       Q.   Okay.  Did you see or speak -- did you see

25  Dave in 2010?

```
 1        A.    I don't believe so.
 2        Q.    So the last time -- so from 2009 the
 3   Thanksgiving dinner all the way to his death the last
 4   time you saw Dave Kleiman was at the Thanksgiving
 5   dinner?
 6        A.    Yes.
 7        Q.    When he dies did you think about the memories
 8   you had with Dave?
 9        A.    Yes, I thought of lots of memories, yes.
10        Q.    Did you think about the last time you saw your
11   brother alive?
12        A.    I may have.
13        Q.    That would have been the time when he told you
14   he was working on something bigger than Facebook; right?
15        A.    Yes.
16        Q.    So how is it that you only remember in 2014
17   when Craig tells you that Dave may have been working on
18   Bitcoin?
19        A.    Because he was the foreigner that Craig had
20   mentioned.
21        Q.    When Dave died and you go back and you're
22   thinking of that memory this is the last time I saw my
23   brother and he told me he was working on something
24   bigger than Facebook what steps did you take to figure
25   out what it was that he was working on?
```

Dave Kleiman
January 10, 2020                                    142

1        A.   Can you repeat that?

2        Q.   When you find out that your brother has died

3   and you're thinking about the memories, the last memory

4   you saw him where he told you he is working on something

5   bigger than Facebook and as the personal representative

6   of the estate of Dave Kleiman what steps did you take to

7   find out what Dave Kleiman meant by he is working on

8   something bigger than Facebook with a wealthy foreigner?

9        A.   Yes, again because that recollection didn't

10   come back to me until Craig contacted me.  When I was

11   the personal representative like I said I had

12   communications with my attorney and I was led to believe

13   that --

14            MR. FREEDMAN:  Don't discuss anything that you

15       had your attorney.  It's privileged.

16   BY MR. PASCHAL:

17       Q.   Are you aware of the e-mail that Joseph Karp's

18   wife sent out to Dave's closest friends advising them

19   that Dave had died?

20       A.   No.

21       Q.   You're aware that subsequently there's a chain

22   of e-mails with Dave's closest friends speaking about

23   Dave's death?

24       A.   That one I recall.

25       Q.   And you recall that Craig Wright is on that

Ira Kleiman
January 10, 2020                                    143

1    e-mail?

2         A.   Yes.

3         Q.   That list of friends I mean -- I don't have it

4    in front of me have there were at least ten.  In fact I

5    remember now it was 14 because I tried to contact all

6    14.  14 did you ask any one of them about a wealthy

7    foreigner that Dave Kleiman was working on -- working

8    with about -- on something that was bigger than

9    Facebook?

10        A.   That e-mail was still in 2013.

11        Q.   Yes.

12        A.   My memory didn't come back until 2014.

13        Q.   So your memory got better as time went on?

14        A.   My recollection of Dave's story it just once

15   Craig the foreigner came back into the picture I said

16   ah, that's the guy Dave was talking about.

17             MR. PASCHAL:  Mind if I take a five minute

18        break?

19             MR. FREEDMAN:  Your depo.

20             THE VIDEOGRAPHER:  Off record 1:20.

21             (Thereupon, a brief recess was taken.)

22             THE VIDEOGRAPHER:  On record 1:28.

23   BY MR. PASCHAL:

24        Q.   Mr. Kleiman, can you go back to Mr. Karp's

25   letter to the IRS?

Ira Kleiman
January 10, 2020                              144

```
 1           MR. FREEDMAN:  What exhibit number?

 2           MR. PASCHAL:  That I don't know.

 3           MR. FREEDMAN:  8.

 4  BY MR. PASCHAL:

 5      Q.   If you go to the second page.  Mr. Karp says

 6  "with regard to W&K, LLC or Bitcoins Ira had no personal

 7  knowledge of any of this and has no proof or evidence of

 8  what Bitcoins David may own or any information."

 9           Why didn't you tell the IRS that Dave told you

10  in 2009 that he was working on something bigger than

11  Facebook that was digital money with a wealthy

12  foreigner?

13      A.   I didn't participate in this -- in this

14  communication.

15      Q.   So your lawyer sent this without your

16  authorization?

17      A.   I don't recall.

18      Q.   Did your lawyer show it to you before sending

19  it to the IRS?

20           MR. FREEDMAN:  Hold on a second.  Don't answer

21      the question yet.  I just want to think about this

22      Bryan because --

23           MR. PASCHAL:  I don't want communications --

24           MR. FREEDMAN:  I get what you're doing.  I'm a

25      little uncomfortable with it.  I'll let you go a
```

Ira Kleiman
January 10, 2020                                145

```
 1        little bit here but -- go ahead, you can answer if
 2        he showed it to you before he sent it out.
 3   BY MR. PASCHAL:
 4        Q.   Did your lawyer show this letter to you?
 5        A.   I don't remember.
 6        Q.   When your lawyer says he CC'd you on this
 7   communication is that false?
 8        A.   No, he may have but whether I took the time to
 9   read it I don't remember.
10        Q.   So is this statement to the IRS that you have
11   no personal knowledge of any of this, is that false?
12        A.   "No personal knowledge with regard to W&K."
13   It would appear to be inaccurate.  We had a little bit
14   of knowledge by this time, yes.
15        Q.   So at what point or did you ever make your
16   lawyer aware that this is inaccurate?
17             MR. FREEDMAN:  Don't answer that.  That's
18        asking for -- you're asking for direct
19        communications with counsel.
20             MR. PASCHAL:  I'm asking did he.
21             MR. FREEDMAN:  Did you tell your lawyer X, Y
22        or Z or is a direct communication with counsel.
23        Don't answer the question.
24             MR. PASCHAL:  This is not seeking legal
25        advice.
```

```
 1              MR. FREEDMAN:  That's not true.  If he said to
 2         Mr. Karp hypothetically saying to him hey, this is
 3         inaccurate do we need to do anything about it?
 4  BY MR. PASCHAL:
 5         Q.   To your knowledge did Mr. Karp send any
 6  supplement to the IRS to correct this letter on your
 7  behalf?
 8         A.   Not that I'm aware of.
 9         Q.   Did you send a letter to the IRS saying hey
10  that's not true, I do have personal knowledge?
11         A.   No.  But I did send my own -- I think a
12  separate letter because I don't remember this one being
13  sent.  That's why I think I followed up on my own
14  letter.
15         Q.   You sat -- you heard the deposition of
16  Mr. Karp; right?
17         A.   Yes.
18         Q.   You heard him testify that this was sent?
19         A.   I don't remember that particular portion
20  but --
21         Q.   So are there any follow up e-mails with the
22  IRS where you correct this statement?
23         A.   I don't remember this letter being sent.
24  That's why I sent my own letter.
25              MR. FREEDMAN:  Ira, you have to answer the
```

```
1        question.  He said is there follow up letters the
2        answer is yes or no.  Otherwise he has to ask a
3        million times.
4               THE WITNESS:  Sorry.  Can you repeat the
5        question?
6   BY MR. PASCHAL:
7        Q.   Are there any follow up letters with the IRS
8   that corrects this statement?
9        A.   No.
10       Q.   You said you sent some separate letter.  In
11  that separate letter did you tell the IRS that your
12  brother was working on something bigger than Facebook
13  digital money with a wealthy foreigner?
14       A.   I don't recall using those words.
15       Q.   And again you know that there are laws against
16  making misrepresentations to the IRS; correct?
17       A.   Yes.
18       Q.   You said yourself it's inaccurate for this
19  statement to be made; right?
20       A.   Yes.
21       Q.   Can you go to paragraph 119?
22       A.   Of what exhibit?
23       Q.   The complaint.  I don't know what exhibit that
24  is.
25              MR. FREEDMAN:  10.
```

David Kleiman
January 10, 2020                                    148

```
1              MR. PASCHAL:  It's 10.

2              THE WITNESS:  Paragraph?

3    BY MR. PASCHAL:

4         Q.    Paragraph 119.

5         A.    Okay.

6         Q.    On this allegation you say "W&K was never

7    served validly or otherwise with these proceedings."

8    Pause for that second.  I just showed you the envelope

9    from the Australian court; right?

10        A.    Yes.

11        Q.    That was sent to -- we established that

12   envelope was sent to the mailbox that Dave listed for

13   W&K Info Defense Research; right?

14        A.    Yes.

15        Q.    That's the mailbox that Dave uses for his

16   business affairs and sometimes for his personal items;

17   right?

18        A.    As I was aware of it it was being used for

19   Computer Forensics, LLC, yes.

20        Q.    You heard -- you know Carter Conrad testified

21   that it was for all his business and his personal

22   affairs?

23        A.    I don't remember that testimony.

24        Q.    But knowing that the envelope was actually

25   sent to that address and that it was received by Carter
```

Dave Kleiman
January 10, 2020                                    149

1    Conrad is this allegation accurate?

2         A.   Yes, because if I was the member of W&K I was

3    never served.

4         Q.   On this day you were a member of W&K?

5         A.   No, but I mean if -- whoever was in control of

6    W&K or to take over Dave's role I would imagine they

7    would need to be served.  I never received service.

8         Q.   And the estate of Dave Kleiman would have been

9    the member of W&K; right?

10        A.   Yes.

11        Q.   Sitting in Dave Kleiman's shoes that mailbox

12   was the mailbox that Dave Kleiman used for his business;

13   right?

14        A.   As I was aware for his Computer Forensics

15   business, yes.

16        Q.   Computer Forensics was his business; right?

17        A.   Computer Forensics, LLC company, yes.

18        Q.   Can you turn to paragraph 171?

19        A.   Okay.

20             MR. PASCHAL:  Actually before we do that.  I'm

21        handing you what we're going to mark as Exhibit 15.

22             (Defendant's Exhibit No. 15 was

23             marked for identification.)

24   BY MR. PASCHAL:

25        Q.   Can you turn to the second page.

Ira Kleiman
January 10, 2020                                    150

```
 1        A.    Okay.

 2        Q.    Clocktime2020@█████████, is that your e-mail

 3   address?

 4        A.    Yes.

 5        Q.    You sent this e-mail I guess it's February 15,

 6   2014?

 7        A.    2015?

 8        Q.    '14.

 9        A.    Yes.

10        Q.    You say "knowing my brother if there was more

11   than a thousand dollars in the account he would have

12   sold it."  Was that the type of person Dave was?

13        A.    Yes.  He was not a saver.

14        Q.    If he had money he would spend it; right?

15        A.    Usually.

16        Q.    In fact at one point he had racked up $20,000

17   in debt?

18        A.    I don't know the specifics of what his debts

19   were.

20        Q.    Your father and Joseph Karp actually cleaned

21   the debt up for him; right?                Foundation

22        A.    They may have.  Probably.

23        Q.    As soon as he got the debt cleaned up he went

24   out and bought a motorcycle; right?

25        A.    Yes.
```

Ira Kleiman
January 10, 2020                              151

```
 1        Q.   You recall that?

 2        A.   Yes.

 3        Q.   You mentioned earlier that you weren't unaware

 4   that Dave had asked Patrick for money before he died?

 5        A.   I remember Patrick mentioning to me I think

 6   that he loaned Dave money once in a while.

 7        Q.   The next sentence you say "he didn't like

 8   asking people for help but during the last few months he

 9   borrowed money from both my dad and Patrick."

10        A.   Yes.

11        Q.   Also mentions in here he didn't mention the

12   account -- when you say account are you referring to

13   Bitcoin wallets?

14        A.   Can you point me to --

15        Q.   Second paragraph, the same e-mail.

16        A.   He didn't mention the account.  Yes, I guess I

17   was referring to the Bitcoin account.

18        Q.   So he didn't mention it to anyone or leave

19   some kind of note about it?

20        A.   Right.

21        Q.   That's true?

22        A.   Yes.

23        Q.   Then you say "I truly believe there's no

24   treasure to be found there."

25        A.   Right.
```

Dave Kleiman
January 10, 2020                                    152

```
 1        Q.   Did you know anything about Dave Kleiman using
 2   drugs?
 3        A.   No.
 4        Q.   When did you learn that he used drugs?
 5        A.   I never knew him to use drugs.
 6        Q.   But you learned that he did use drugs?
 7        A.   No.  I didn't learn that.
 8        Q.   Did you see his autopsy report?
 9        A.   Yes.
10        Q.   What was in his system when he died?
11        A.   Cocaine.
12        Q.   So if I told you that he used drugs frequently
13   through the years that would be a surprise for you?
14        A.   Definitely.
15        Q.   Before Dave was a computer forensics expert do
16   you know any of his other jobs?
17        A.   I mean there were mostly computer related.
18   Prior to the computer work he worked for the Palm Beach
19   police and I think he worked as like a bouncer at a
20   club.  Maybe some other jobs I don't remember.
21        Q.   That club is that where he met his fiancee?
22        A.   That I don't know.
23        Q.   What was the name of the club?
24        A.   I don't know.
25        Q.   How long was Dave a police officer?
```

```
 1        A.   I think just a few years.  Before he was in an
 2   accident.
 3        Q.   Do you know of any lawsuits that Dave Kleiman
 4   was involved in?
 5        A.   No.
 6        Q.   Do you know about a lawsuit -- do you know
 7   about a lawsuit that his fiancee had brought against
 8   him?
 9        A.   I remember Patrick mentioning that I think
10   they did have some kind of dispute.  I wasn't sure
11   exactly what it was about.
12        Q.   What happened in that dispute?
13        A.   That I don't -- I don't know.
14        Q.   Did Dave Kleiman throw a burning hot of grease
15   at her?
16        A.   I don't know.
17        Q.   The court documents show that there was a
18   settlement in that case the trust was set up for an
19   undisclosed amount.  Do you know anything about that?
20        A.   No.
21        Q.   Did Dave ever talk to you about his fiancee?
22        A.   No.
23        Q.   Did he talk to you about any of his
24   girlfriends?
25        A.   No, not really.
```

Lisa Kleiman
January 10, 2020                                154

1        Q.   We established already before Dave died the
2   last time you saw him in person was in 2009; right?
3        A.   Yes.
4        Q.   Did you exchange e-mails with him over that
5   time?
6        A.   Yes.
7        Q.   Did you have any phone calls with him?
8        A.   Yes.
9        Q.   What did you talk about?
10       A.   Just I guess random stuff.  I don't remember
11   exactly.
12       Q.   Did you ever follow up with him on his
13   statement that he was working on something bigger than
14   Facebook?
15       A.   No.
16       Q.   Did you ever follow up with him on the
17   statement he was working with a wealthy foreigner?
18       A.   No.
19       Q.   Did you ever follow up with him that he was
20   working on digital money?
21       A.   No.
22       Q.   Let's go to paragraph 171.
23       A.   Okay.
24       Q.   You there?
25       A.   Yes.

Kleiman
January 10, 2020                                    155

1     Q.    This is your Count I for conversion.  171 you

2   allege that "on or about April 2013 to the present day

3   defendant converted to his own use Bitcoins forked

4   assets and intellectual properties that was then the

5   property of and owned by the estate and/or W&K."  For

6   this count can you please explain how the defendant

7   converted to his own use Bitcoin, forked assets and

8   intellectual properties?

9     A.    From my understanding W&K -- well, actually

10  before W&K they were partners.  Whatever I.P. was

11  created Bitcoin was mined.  They both had rights to

12  Craig ends up controlling all of it.  Dave controls none

13  of it.

14    Q.    Well, I'm trying to figure out how -- what

15  evidence do you have to show that Craig controls all of

16  it?

17    A.    I believe it's in the documents.

18    Q.    What documents?

19    A.    I don't have them with me.

20    Q.    You're the plaintiff and suing for conversion

21  and civil theft against my client.  I need to know what

22  evidence establishes your belief that my client who is

23  the defendant in this case converted or took Bitcoin,

24  forked assets or intellectual properties?

25    A.    I think I answered.

                              Ira Kleiman
                        January 10, 2020                    156

1    Q.   Is it you don't know?

2    A.   No, they both shared an interest in I.P. and

3    Bitcoin.  Craig has stated that he controls it and

4    Dave's estate does not.

5    Q.   When did Craig say that he controls -- do you

6    have an e-mail where Craig says I control all of this

7    Bitcoin?

8    A.   He said he is a billionaire.

9    Q.   That's not my question.  That's not my

10   question.  My question to you is is there an e-mail that

11   shows that he has control over all of this Bitcoin?

12   A.   I'm not sure.  I have to go back and look at

13   the documents, e-mails, everything.

14   Q.   Do you have any -- are there any telephone

15   conversations where Craig Wright said I have control

16   over all of these Bitcoins, mind and Dave's?

17   A.   No, I don't have any telephone calls.

18   Q.   Did you have any Skype communications where

19   Craig Wright said I have control over my Bitcoin, Dave's

20   Bitcoin, our Bitcoin, the partnership's Bitcoin?

21   A.   No.

22   Q.   I've asked you this before I'm going to ask

23   you again.  What is the intellectual property you're

24   suing my client for?

25   A.   It's whatever block chain related Bitcoin

Ira Kleiman
January 10, 2020                                    157

1   related I.P. that was created prior to their mining of

2   Bitcoin.  Things related to the Australian Court

3   judgment against W&K, whatever banking I.P. metered

4   payment system I.P. and the other details I just don't

5   recall.

6        Q.   What are the total amount of Bitcoins that you

7   believe belong to the estate and W&K?

8        A.   At least like 300,000.

9        Q.   When you say at least you think it could be

10   more?

11        A.   Yes.

12        Q.   How much more?

13        A.   I have to look at the documents to -- again to

14   see the exact amounts.

15        Q.   So testifying in front of a jury today and

16   sitting here today your only answer is you have to look

17   at documents to know how much Bitcoin you're suing for?

18        A.   Yes.

19        Q.   What documents would that be?

20        A.   Documents in our e-mail exchanges and

21   documents that have been produced to us.

22        Q.   E-mail exchanges with who?

23        A.   With Craig.

24        Q.   And documents produced from who?

25        A.   From Craig.

Ira Kleiman
January 10, 2020                                158

1       Q.   Do you believe everything Craig says?

2       A.   No.

3       Q.   Count II unjust enrichment, you say that

4   "plaintiffs have conferred a benefit to defendant.

5   Defendant voluntarily accepted and retained the

6   benefit."  Then you have damages.  Is this count seeking

7   anything different than your Count I?

8       A.   I don't know.  My attorneys assisted --

9       Q.   Let me change that.  Is there any different

10  intellectual property at issue in Count II or is it the

11  same intellectual property?

12      A.   Again I don't know.  My attorneys assisted me

13  in all of this.

14      Q.   So in that wherefore clause where you say that

15  you want a judgment against the defendant for the return

16  of wrongfully obtained property monetary damages

17  equaling the value thereof.  What is the wrongfully

18  retained property?

19      A.   Where are you reading that?

20      Q.   In the next page under paragraph 177.

21      A.   Okay.

22      Q.   Where you see -- you see the wherefore at the

23  top right on 177?

24      A.   Yes.

25      Q.   You say "plaintiffs demand judgment against

1   defendant for the return of the wrongfully retained

2   property or monetary damages equaling to the value

3   thereof."  Can you please explain what is the wrongfully

4   obtained property?

5        A.   Again my attorneys assisted me in drafting

6   this.

7        Q.   I understand but you're the plaintiff and

8   you're suing my client.  I need to know what you're

9   suing him for.

10            MR. FREEDMAN:  He already answered the

11       question.

12            MR. PASCHAL:  He didn't answer the question.

13            MR. FREEDMAN:  He said he didn't know.  His

14       attorneys helped him answer.

15            MR. PASCHAL:  He didn't say he didn't know.

16            MR. FREEDMAN:  Okay.  Take it back, you're

17       right.

18            MR. PASCHAL:  Please answer the question.

19            THE WITNESS:  Let me read it again.  I don't

20       know.  My attorneys assisted me.

21            MR. PASCHAL:  Vel, that's the fourth or fifth

22       time.  That's coaching.  You just told him what to

23       say.

24            MR. FREEDMAN:  Bryan, the clear implication of

25       my attorney assisted me was I don't know, my

Ira Kleiman
January 10, 2020                                   160

1   attorneys know.

2       MR. PASCHAL:  You said I don't so he testified

3   I don't know.

4       MR. FREEDMAN:  Oh, please, he doesn't know.

5   You're asking him highly complex legal issues.

6   You're asking him for legal conclusions.  The

7   objections are objectionable.  Only reason I'm not

8   objecting is you gave me a standing objection.

9       MR. PASCHAL:  You can object if you want.

10      MR. FREEDMAN:  Okay.  So I'll start objecting

11  again.  The point is the questions you're asking

12  are highly technical and the statement my attorneys

13  drafted for me was clearly meant to imply I don't

14  know.  You're right, he didn't say the words I

15  don't know.  I let him answer the question.  You

16  can't then be upset he then said what he said

17  previously.

18      MR. PASCHAL:  Vel, stop.  There is no more

19  coaching.  Let him answer the question.

20      MR. FREEDMAN:  It's not coaching.

21      MR. PASCHAL:  Make an objection or instruct

22  him not to answer.

23      MR. BRENNER:  Bryan, you asked him.  He is

24  answering your question.  If you don't want him to

25  talk don't ask him a question.  Pretty simple.

Ira Kleiman
January 10, 2020                              161

BY MR. PASCHAL:

       Q.   Can you go to count three paragraph 178.

       A.   Okay.

       Q.   Here you allege that Craig unlawfully,
willfully and maliciously misappropriated trade secrets
belonging to Dave and or W&K.  What are the trade
secrets?

       A.   I don't know.  I'll leave it at I don't know.

       Q.   The next paragraph you say "these trade
secrets are generally described as programming methods,
techniques and process relating to block chain based
technologies and smart contracts."  My question to you
is this -- you mentioned earlier block chain technology
and intellectual property.  Would this refer to the
intellectual property that you described?

            MR. FREEDMAN:  Objection, calls for a legal
       conclusion.

            THE WITNESS:  I don't know.

BY MR. PASCHAL:

       Q.   Is the intellectual property that you
testified to earlier block chain based technologies?

            MR. FREEDMAN:  Objection, calls for a legal
       conclusion and expert testimony.

            THE WITNESS:  Can you repeat that?

Ira Kleiman
January 10, 2020                              162

1    BY MR. PASCHAL:

2         Q.   Yes, you testified earlier that intellectual

3    property included block chain based technologies?

4         A.   Yes.

5         Q.   Here you're saying the trade secrets relate to

6    block chain based technologies?

7              MR. FREEDMAN:  Objection, calls for a legal

8         conclusion and expert testimony.

9              THE WITNESS:  I don't know.

10   BY MR. PASCHAL:

11        Q.   You don't know what you just testified to?

12        A.   I don't know if the block chain technology is

13   referring to these trade secret stuff.

14        Q.   Is the block chain based technology a part of

15   the intellectual property?

16             MR. FREEDMAN:  Objection, calls for a legal

17        conclusion, expert testimony.

18             THE WITNESS:  I don't know.

19   BY MR. PASCHAL:

20        Q.   Can you turn to paragraph 185.  This is a

21   count under the Federal Defense of Trade Secrets Act.

22   186 you again mention trade secrets and block chain

23   based technologies and smart contracts.  You see that?

24        A.   Yes.

25        Q.   Do you know what a smart contract is?

Ira Kleiman
January 10, 2020                                    163

1     A.   I have heard of the term.  I don't really know

2   what it's used for.

3     Q.   What is your understanding of the smart

4   contract?

5     A.   I guess it's -- it's a more advanced type of

6   contract that somehow exists in the digital space.

7     Q.   Then can you go to 191.  In the wherefore

8   clause you say "plaintiffs demand judgment against the

9   defendant for the value of the wrongfully taken

10  intellectual property."  Do you see that?

11    A.   Yes.

12    Q.   So does the block chain based technology refer

13  to in this count intellectual property?

14         MR. FREEDMAN:  Objection, calls for expert

15         testimony, legal conclusion.

16         THE WITNESS:  I don't know.

17  BY MR. PASCHAL:

18    Q.   But it is alleged here, right?

19    A.   Yes.

20    Q.   Is this an inaccurate allegation?

21    A.   I don't know.

22    Q.   Can you go to paragraph 202.

23    A.   Okay.

24    Q.   So in 202 you're alleging that Craig made

25  false statements and other stuff.  You see that; right?

Ira Kleiman
January 10, 2020                            164

1      A.   Yes.

2      Q.   Then 203 you allege that the defendant took

3   these acts or these actions, omissions with purpose of

4   inducing plaintiffs to rely on these fraudulent acts and

5   omissions.  See that?

6      A.   Yes.

7      Q.   The next paragraph -- let me ask you.  What

8   were you induced in doing and relying on Craig's false

9   statements?

10          MR. FREEDMAN:  Objection.

11          THE WITNESS:  Again my attorneys assisted me

12      in drafting this.

13  BY MR. PASCHAL:

14      Q.   That doesn't answer my question.  My question

15  is you're saying that Craig made false statements and

16  induced you into doing certain things.  What did he

17  induce you into doing?

18      A.   I guess -- well, I don't want to speculate.  I

19  don't know.

20      Q.   Can you go to paragraph 215.

21      A.   Okay.

22      Q.   215 you allege that on or before -- on or

23  about April 2013 through the present day.  I want to

24  clarify.  You're not -- your claim doesn't center or

25  allege there's been any theft when Dave Kleiman was

Ira Kleiman
January 10, 2020                                      165

1   alive; right?

2       A.   That I don't know.

3       Q.   Did Dave ever tell you that somebody stole

4   from him?

5       A.   No.

6       Q.   Do you have any evidence that suggests that

7   defendant stole anything from Dave while he was alive?

8       A.   That I don't know.

9       Q.   Then you allege "defendant knowingly and

10  wrongfully took with felonious criminal intent Bitcoins,

11  forked assets, intellectual properties that were then

12  the property of and owned by the estate and/or W&K."

13  Can you please explain how defendant knowingly and

14  willfully took with felonious criminal intent the items

15  that you've listed here?

16          MR. FREEDMAN:  Objection, calls for a legal

17      conclusion.

18          THE WITNESS:  I don't know.

19          MR. PASCHAL:  Let's take a break.

20          THE VIDEOGRAPHER:  Off the record at 2:04.

21          (Thereupon, a brief recess was taken.)

22          THE VIDEOGRAPHER:  On the record 2:21.

23  BY MR. PASCHAL:

24      Q.   Mr. Kleiman, you are aware that in this case

25  the Court has entered an order finding that there is a

Ira Kleiman
January 10, 2020                              166

1   partnership between Dave Kleiman and Craig Wright;

2   correct?

3        A.   Yes.

4        Q.   What is your understanding of a partnership?

5             MR. FREEDMAN:   Objection, calls for a legal

6        conclusion.

7             THE WITNESS:   I believe they equally had

8        rights to intellectual property and mined Bitcoin.

9   BY MR. PASCHAL:

10       Q.   What personal knowledge do you have of a

11  partnership between Dave Kleiman and Craig Wright?

12       A.   Information given to me by Craig and based

13  upon Dave's story to me that he was working with a

14  foreign individual.

15       Q.   What personal knowledge do you have of Craig

16  Wright mining Bitcoin?

17       A.   I think there are e-mails or documents stating

18  that he mined Bitcoin.

19       Q.   What e-mails or documents?

20       A.   I don't have them with me.

21       Q.   What I want to focus on is not what Craig told

22  you.  I'm asking what is your personal knowledge that

23  Craig Wright mined Bitcoin?

24       A.   That would come from the e-mails and documents

25  that I don't have with me.

Ira Kleiman
January 10, 2020                                         167

1        Q.    Well, other than what Craig told you or

2    e-mails that he shared with you is it fair to say that

3    you have no personal knowledge of Craig Wright mining

4    Bitcoin?

5        A.    Outside of his e-mails there is other

6    documents that I believe state that he and Dave mined

7    Bitcoin.

8        Q.    What are those other documents?

9        A.    I don't have them with me.

10       Q.    So just going back to my question though other

11   than what Craig shared with you what personal knowledge

12   do you have of Craig Wright mining any Bitcoin?

13       A.    My personal knowledge comes from the

14   documents.

15       Q.    I just want a clean record so that's why I'm

16   trying to get an answer to the question.

17       A.    I thought that was an answer.

18       Q.    I'll rephrase it.  Do you have any personal

19   knowledge of Craig Wright mining Bitcoin?

20            MR. FREEDMAN:  Objection, asked and answered.

21            THE WITNESS:  My knowledge comes from the

22       documents that I've seen.

23   BY MR. PASCHAL:

24       Q.    Sir, that's -- other than those documents do

25   you have any other personal knowledge?

Ira Kleiman
January 10, 2020                              168

1        A.   Dave's story about him creating his own money

2   leads me to believe that meant mining Bitcoin.

3        Q.   So in that 2009 Thanksgiving dinner discussion

4   Dave told you that Craig Wright was mining Bitcoin?

5        A.   No.  He said he was creating his own money.

6        Q.   So how does that statement equal you having

7   personal knowledge of Craig Wright ever mining Bitcoin?

8        A.   Dave said he was creating his own money with a

9   foreign individual.  2014 that foreign individual

10  contacts me, tells me he was mining Bitcoin with my

11  brother.

12       Q.   Again that was back in 2009?

13       A.   David's story to me yes, 2009.

14       Q.   What personal knowledge do you have of Craig

15  Wright developing any intellectual property?

16       A.   That is also based on the documents that I've

17  seen.

18       Q.   Are those documents from Craig Wright?

19       A.   I believe some of them are and what was

20  produced to me from the ATO.

21       Q.   Again you've been investigating this whole

22  situation for many years, right?

23       A.   Yes.

24       Q.   We've been litigating for two years, right?

25       A.   Yes.

```
 1         Q.   We've been in discovery for a year?

 2         A.   Yes.

 3         Q.   Sitting here today through all the depositions

 4    and all the documents that have been produced what is

 5    the intellectual property that you are suing Craig

 6    Wright for?

 7              MR. FREEDMAN:  Objection, asked and answered,

 8         calls for a legal conclusion and expert testimony.

 9              THE WITNESS:  Do you want me to answer it

10         again?

11    BY MR. PASCHAL:

12         Q.   I want an answer, yes.

13         A.   Any block chain or Bitcoin related I.P that

14    they created together prior to their start of mining it

15    in 2009 and anything related to the Australian court

16    proceedings against W&K and I think W&K had possession

17    of some banking software and metered payment software

18    and I don't remember the rest of the details.

19         Q.   Do you have any personal knowledge of the

20    banking software, meter payment software that you just

21    spoke of?

22         A.   I have documentation referring to it, yes.

23         Q.   From Craig Wright?

24         A.   From multiple sources I think.

25         Q.   What are the multiple sources?
```

Ira Kleiman
January 10, 2020                                          170

```
 1        A.   Either from Craig or the ATO.
 2        Q.   The ATO got their information from who, Craig
 3   Wright, right?
 4        A.   Yes.
 5        Q.   Are there any other sources?
 6        A.   I don't remember.
 7        Q.   Have you spoken to any reporters about this
 8   case?
 9        A.   I may have.
10        Q.   Do you recall which reporters you spoke to?
11        A.   I think Andy Kush and I forget -- there was
12   another one.  I forgot her name.  Maybe Andy Greenberg.
13   I know there was a bunch of Andys.
14        Q.   Just based on this order that the Court
15   entered can you tell me today what are the partnership
16   assets?
17        A.   I thought we just -- the I.P. and the Bitcoin.
18        Q.   How much Bitcoin?
19        A.   At least 300,000.
20        Q.   But you said it could be more?
21        A.   It could be more.
22        Q.   What steps have you taken to figure out how
23   much Bitcoin are the partnership's assets?
24        A.   From reviewing documents and being that if
25   they were the team of Satoshi then it's publicly known
```

Ira Kleiman
January 10, 2020                                      171

1   that Satoshi mined a lot more than 300,000 Bitcoin.

2        Q.   Is it publicly known that none of Satoshi's

3   Bitcoin have ever moved?

4        A.   Yes.

5        Q.   I asked you what does a partnership mean but I

6   want to clarify.  You said there are equal rights to an

7   asset in a partnership?

8        A.   Yes.

9        Q.   That's like joint ownership?

10       A.   Yes.

11            MR. PASCHAL:  I'm done.

12            MR. FREEDMAN:  You want to give us like five

13       minutes and then we'll either close it or ask some

14       questions?

15            THE VIDEOGRAPHER:  Off record 2:31.

16            (Thereupon, a brief recess was taken.)

17            THE VIDEOGRAPHER:  On record 2:43.

18                     CROSS (IRA KLEIMAN)

19   BY MR. FREEDMAN:

20       Q.   Mr. Kleiman, a moment ago Mr. Paschal

21   mentioned Judge Reinhart's order to you.  Do you recall

22   that?

23       A.   Yes.

24       Q.   Do you remember Mr. Paschal asking you about a

25   partnership?

David Kleiman
                    January 10, 2020                    172

```
 1        A.   Yes.
 2        Q.   Is it your understanding that Dave and Craig
 3   had a partnership?
 4        A.   Yes.
 5        Q.   And that partnership mined Bitcoin?
 6        A.   Yes.
 7        Q.   And that partnership created intellectual
 8   property?
 9        A.   Yes.
10        Q.   Is it your claim that the estate is entitled
11   to half of the Bitcoin and intellectual property created
12   by that partnership?
13        A.   Yes.
14        Q.   No matter the time that intellectual property
15   was created?
16             MR. PASCHAL:  Objection to form.
17             MR. FREEDMAN:  It's okay.  You can answer.
18             THE WITNESS:  Yes.
19   BY MR. FREEDMAN:
20        Q.   Even if that intellectual property was created
21   by the partnership after the mining of the first
22   Bitcoin?
23             MR. PASCHAL:  Objection, form.
24             THE WITNESS:  Yes.
25
```

Ira Kleiman
January 10, 2020                              173

```
1   BY MR. FREEDMAN:
2        Q.   Ira, earlier in this deposition you testified
3   that you didn't try to locate any computer equipment in
4   this district.  Do you recall that?
5        A.   Yes.
6        Q.   That's not quite accurate; right?
7             MR. PASCHAL:  Objection, form.
8             THE WITNESS:  That I didn't try to locate?
9   BY MR. FREEDMAN:
10       Q.   Did you look through your brother's house for
11  computer equipment?
12            MR. PASCHAL:  Objection to form.
13            THE WITNESS:  Yes.
14  BY MR. FREEDMAN:
15       Q.   Did you talk to his partners?
16       A.   Yes.
17       Q.   Did you talk to Craig?
18       A.   Yes.
19       Q.   Have you reviewed Dave's documents?
20       A.   Yes.
21       Q.   And his e-mails?
22       A.   Yes.
23       Q.   Mr. Kleiman, there are a lot of documents that
24  have been produced in this litigation.  Is that an
25  accurate statement?
```

Ira Kleiman
January 10, 2020                                    174

```
 1        A.   Yes.

 2             MR. PASCHAL:  Object to the form.

 3    BY MR. FREEDMAN:

 4        Q.   Do you know all those documents by heart?

 5        A.   No.

 6             MR. PASCHAL:  Object to the form.

 7    BY MR. FREEDMAN:

 8        Q.   Are you rely on your team of lawyers to

 9    identify evidence in this case?

10             MR. PASCHAL:  Objection, form.

11             THE WITNESS:  Yes.

12    BY MR. FREEDMAN:

13        Q.   Mr. Kleiman, Mr. Paschal showed you a bunch of

14    documents that relate to W&K and Lynn Wright's purported

15    membership in W&K, do you remember that?

16        A.   Yes.

17        Q.   Those documents to the extent they aren't

18    forgeries were all created before you even knew what W&K

19    was; is that correct?

20             MR. PASCHAL:  Objection, form.

21             THE WITNESS:  Yes.

22             MR. FREEDMAN:  No further questions.

23             THE VIDEOGRAPHER:  Off record 2:45.

24             MR. FREEDMAN:  We'll read.

25             MR. PASCHAL:  Need it expedited.
```

Ira Kleiman
January 10, 2020                                    175

```
1    MR. FREEDMAN:  We need it ASAP as well.

2           (Witness excused.)

3       (Deposition was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ira Kleiman
January 10, 2020                                        176

1

2                    CERTIFICATE OF REPORTER

3              THE STATE OF FLORIDA

4              COUNTY OF DADE

5

6         I, Rick Levy, Registered Professional Reporter
   and Notary Public in and for the State of Florida at
7  large, do hereby certify that I was authorized to
   and did report said deposition in stenotype of IRA
8  KLEIMAN; and that the foregoing pages, numbered from
   1 to 174, inclusive, are a true and correct
9  transcription of my shorthand notes of said
   deposition.
10
          I further certify that said deposition was
11 taken at the time and place hereinabove set forth
   and that the taking of said deposition was commenced
12 and completed as hereinabove set out.

13        I further certify that I am not attorney or
   counsel of any of the parties, nor am I a relative
14 or employee of any attorney or counsel of party
   connected with the action, nor am I financially
15 interested in the action.

16        The foregoing certification of this transcript
   does not apply to any reproduction of the same by
17 any means unless under the direct control and/or
   direction of the certifying reporter.
18
          IN WITNESS WHEREOF, I have hereunto set my hand
19 this 19TH day of January, 2020.

20

21  _____

22        Rick Levy, RPR, FPR, Notary Public
          in and for the State of Florida
          My Commission Expires:  12/8/2023
23        My Commission No.:  GG937684

24

25

```
1                         CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3            COUNTY OF DADE

4

5        I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

6    Notary Public, State of Florida, certify that IRA

7    KLEIMAN personally appeared before me on the 10TH

8    day of JANUARY, 2020 and was duly sworn.

9

10           Signed this 19th day of January, 2020.

11

12

13

14                    _____

15

16                    Rick Levy, RPR, FPR
                      Notary Public - State of Florida
17                    My Commission Expires:  12/8/2023
                      My Commission No.:  GG937684

18

19                         RICK LEVY
                      Notary Public - State of Florida
                      Commission # FF 939483
20                    My Comm. Expires Dec 7, 2019
                      Bonded through National Notary Assn

21

22

23

24

25
```

```
 1              E R R A T A    S H E E T

 2   IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

 3   DEPOSITION OF:  IRA KLEIMAN

 4   TAKEN: 1/10/2020

 5      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 6   PAGE #  LINE #   CHANGE                REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   Please forward the original signed errata sheet to
     this office so that copies may be distributed to all
18   parties.

19   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
20   subject to   any changes in form or substance
     entered here.

21

22   DATE: _____

23

24   SIGNATURE OF
     DEPONENT:_____
25
```

Ira Kleiman
January 10, 2020                                    179

```
 1   DATE:        January 19, 2020

 2   TO:  VEL FREEDMAN, ESQUIRE
          ROCHE FREEDMAN, P.A.
 3        200 S. Biscayne Boulevard
          Suite 5500
 4        Miami, Florida 33131

 5   IN RE:      Ira Kleiman vs Craig Wright

 6   Dear Mr. Freedman:

 7   Enclosed please find the original errata page with
     your copy of the transcript so IRA KLEIMAN may read
 8   and sign their transcript.  Please have him/her make
     whatever changes are necessary on the errata page
 9   and sign it.  Then place the original errata page
     back into the original transcript.  Please then
10   forward the original errata page back to our office
     @1080 Woodcock Road, Suite 100, Orlando, Florida
11   32803.

12   If the errata page is not signed by the witness
     within 30 days after this letter has been furnished,
13   we will then process the transcript without a signed
     errata page.  If your client wishes to waive their
14   right to read and sign, please have him/her sign
     their name at the bottom of this letter and send it
15   back to the office.

16        Your prompt attention to this matter is

17   appreciated.

18   Sincerely,

19   _____
     RICK E. LEVY, RPR
20
     I do hereby waive my signature:
21
     _____
22   IRA KLEIMAN

23   cc via transcript:  Bryan Paschal, Esq.
                         Vel Freedman, Esq.
24   file copy

25
```