1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3               CASE NO. 9:18-cv-80176-BB/BR

4
   IRA KLEIMAN, as the personal representative
5  of the Estate of David Kleiman, and
   W&K Info Defense Research, LLC,
6
            Plaintiffs,
7
   -vs-
8
   CRAIG WRIGHT,
9
            Defendant.
10

11  * * * * * * * * * * * * * * * * * *

12  VIDEOTAPED DEPOSITION OF ZACHARY EISNER

13  DATE TAKEN: January 9, 2020

14  TIME: 10:05 a.m. - 3:27 p.m.

15  PLACE: 2525 Ponce de Leon Boulevard

16  Miami, Florida 33134

17
   TAKEN BEFORE: RICK E. LEVY, RPR, FPR
18               AND NOTARY PUBLIC

19

20  * * * * * * * * * * * * * * * * * *

21

22  Defendant's Designations

23  Plaintiffs' Objections
   Plaintiffs' Counters

24

25

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3        KYLE ROCHE, ESQUIRE
          ROCHE FREEDMAN, P.A.
 4        200 S. Biscayne Boulevard
          Suite 5500
 5        Miami, Florida 33131

 6

 7   On behalf of the Defendant:

 8        BRYAN PASCHAL, ESQUIRE
          AMANDA MCGOVERN, ESQUIRE
 9        RIVERO MESTRE, P.A.
          2525 Ponce de Leon Boulevard
10        Suite 1000
          Coral Gables, Florida 33134
11
     Also Present: Raul Torres, The Videographer
12                 Maria Sosa

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        -  -  -
                        I N D E X
 2                        -  -  -

 3   WITNESS:        DIRECT    CROSS    REDIRECT    RECROSS
     ZACHARY EISNER
 4   BY MR. PASCHAL:      4
     BY MR. ROCHE:              135
 5                        -  -  -
                      E X H I B I T S
 6                        -  -  -

 7
     NUMBER                              PAGE
 8   DEFENDANT'S EX. 1                    8
     DEFENDANT'S EX. 2                   18
 9   DEFENDANT'S EX. 3                   19
     DEFENDANT'S EX. 4                   43
10   DEFENDANT'S EX. 5                   44
     DEFENDANT'S EX. 6                   48
11   DEFENDANT'S EX. 7                   72
     DEFENDANT'S EX. 8                   74
12   DEFENDANT'S EX. 9                   76
     DEFENDANT'S EX. 10                  80
13   DEFENDANT'S EX. 11                  82
     DEFENDANT'S EX. 12                  83
14   DEFENDANT'S EX. 13                 103
     DEFENDANT'S EX. 14                 111
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                          - - -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                          - - -

 8            THE WITNESS:  Good morning.  Today is Thursday

 9        the 9th of January 2020.  The time is 10:04.  We

10        are here at 2525 Ponce De Leon Boulevard, Suite

11        1000 for the video deposition of Zach Eisner in

12        case number 9:18-cv-80176.  Would all counsel

13        please state appearances for the record.

14            MR. PASCHAL:  Bryan Paschal for Dr. Craig

15        Wright.

16            MR. KASS:  Zalman Kass for Dr. Craig Wright.

17            MS. SOSA:  Maria Sosa for Dr. Craig Wright.

18            MR. ROCHE:  Kyle Roche for plaintiffs.

19            THE WITNESS:  I do.

20                          - - -

21   Thereupon,

22                     (ZACHARY EISNER)

23                     having been first duly sworn or

24   affirmed, was examined and testified as follows:

25                     DIRECT EXAMINATION
```

```
 1    BY MR. PASCHAL:

 2        Q.   Sir, could you please state your name for the

 3    record?

 4        A.   Zach Eisner.

 5        Q.   Mr. Eisner, do you understand what this

 6    deposition is about?

 7        A.   Yes.

 8        Q.   You understand who you're representing?

 9        A.   Yes.

10        Q.   How are you connected to W&K Info Defense

11    Research?

12        A.   I'm their corporate representative.

13        Q.   Have you ever heard of W&K before this date?

14        A.   No.

15        Q.   When did you first learn about W&K?

16        A.   Two months ago.

17        Q.   How did you hear about W&K?

18        A.   Plaintiff contacted me to be the corporate

19    representative.

20             MR. ROCHE:  Bryan, I hate to -- do you mind,

21        my thing is not connected.

22             THE VIDEOGRAPHER:  Off the record 10:06.

23             (Discussion held off the record.)

24             THE VIDEOGRAPHER:  On record 10:06.

25
```

```
1    BY MR. PASCHAL:

2         Q.   I left off with you said plaintiffs contacted

3    you?

4         A.   Yes.

5         Q.   Who from plaintiffs contacted you?

6         A.   Mr. Freedman.

7         Q.   Did anyone else contact you?

8         A.   No.

9         Q.   How did he contact you?

10        A.   Phone.

11        Q.   Did he ever e-mail you?

12        A.   Possibly.

13        Q.   How long was the conversation on the phone?

14        A.   I know him from before so two minutes.  We

15   went out to lunch and he told me what he needed me for.

16        Q.   How did you you know Mr. Freedman from before?

17        A.   We're both on like a group chat, Jewish

18   lawyers chat.  Pretty much that.

19        Q.   How long did you know Mr. Freedman for?

20        A.   Close to a year.

21        Q.   What's your profession?

22        A.   I'm a lawyer.

23        Q.   Have you been deposed before?

24        A.   No.

25        Q.   Have you taken a deposition before?
```

1      A.    Yes.

2      Q.    So you know how a deposition works?

3      A.    Yes.

4      Q.    How long have you been a lawyer?

5      A.    Nine years.

6      Q.    Where did you go to law school?

7      A.    St. Johns New York.

8      Q.    Did you know Mr. Freedman when you were in law

9  school?

10     A.    No.

11     Q.    What is your practice?

12     A.    My practice currently?  Real estate and wills

13  and trust and probate litigation and civil litigation.

14     Q.    Say the last part.

15     A.    Civil litigation.

16     Q.    How much do you practice civil litigation?

17     A.    Right now probably 60/70 percent litigation

18  and real estate, wills and trust.

19     Q.    Is litigation of wills and trust?

20     A.    Yes.

21     Q.    So is your litigation practice related to

22  wills and trusts?

23     A.    Both civil litigation and probate litigation.

24     Q.    What is your litigation connected to, what

25  practice area?

1        A.    Contract disputes, corporate disputes,

2  partnership disputes and also -- probably more probate

3  litigation, guardianships.

4        Q.    Have you ever had a case involving Bitcoin?

5        A.    No.

6        Q.    Crypto currency?

7        A.    No.

8        Q.    Where is your practice?

9        A.    4770 Biscayne Boulevard.

10       Q.    Have you always practiced in Florida?

11       A.    No, I practiced in New York for three years.

12       Q.    When did you come to Florida?

13       A.    2014, 2015.

14       Q.    What's your home address?

15       A.    My home address?

16       Q.    Yes.

17       A.    ███████████████████████████████

18  ██████

                (Defendant's Exhibit No. 1 was

                marked for identification.)

21  BY MR. PASCHAL:

22       Q.    Handing you what we're marking as Exhibit 1.

23  Have you seen this document before?

24       A.    Yes.

25       Q.    When did you see this document?

 1       A.   About two months ago when Mr. Freedman

 2   contacted me to be the corporate representative.

 3       Q.   Can you turn to page five?

 4       A.   Yes.

 5       Q.   You see where it says designated topics?

 6       A.   Yes.

 7       Q.   On topic one the facts alleged in the

 8   complaint.  You see that?

 9       A.   Yes.

10       Q.   What did you do prepare for that topic?

11       A.   I read the complaint and all the exhibits.  I

12   read through the docket.  There was very large but I

13   went through some of the pleadings.  I went through

14   whatever corporate books that there were and all

15   available documentation regarding W&K.  I spoke with the

16   member manager currently.  There was a lot of

17   documentation.

18       Q.   About how long did that take you?

19       A.   About two months.

20       Q.   How many hours do you think you spent doing

21   that?

22       A.   15, 20.

23       Q.   Are you being paid for your time?

24       A.   Yes.

25       Q.   Who is paying you?

1      A.    The plaintiff.

2      Q.    How much are you being paid?

3      A.    $325 an hour, I believe.

4      Q.    When you say plaintiff who are you referring

5   to?

6      A.    The plaintiff's law firms, law firm.

7      Q.    Which law firm is that?

8      A.    Roche, Freedman and Boies, Schiller.

9      Q.    Did you sign any agreements with Ira Kleiman?

10     A.    No.

11     Q.    Did you sign an engagement letter with Boies,

12  Schiller and Roche, Freedman?

13     A.    Yes.

14     Q.    Do you have a copy of that engagement letter?

15     A.    I do not but I can provide it if need be.

16     Q.    Could you look at topic number two?  It says

17  W&K membership including identification of its current

18  formal members and communication with those members

19  relating to the facts alleged in the complaint.  What

20  did you do to prepare for that topic?

21     A.    I spoke with the manager and member currently.

22  I went through all the corporate records that we had.

23     Q.    What were those corporate records?

24     A.    Any documentation relating to W&K that was

25  available.

Q.   What does that include?

A.   If there were financial statements, if there were, you know, anything related to the complaint.  All the exhibits.

Q.   You said financial statements, what financial statements did you review?

A.   There were none it turned out.

Q.   So how did you review them?

A.   No, I'm saying if there were.

Q.   How long did you speak with Mr. -- when you say managing member currently who were you referring to?

A.   Ira Kleiman.

Q.   How long did you speak with Mr. Kleiman?

A.   It was brief.  Just some questions I needed clarification on.

Q.   What were those questions?

MR. ROCHE:  Objection.  To the extent obviously you can ask him how long, where, when. To the extent a question seeks privileged communication, you know, as far as what he did to prepare I would object on the basis of privilege.

BY MR. PASCHAL:

Q.   Are you Ira Kleiman's attorney?

A.   I am not.

Q.   So what questions did you ask Mr. Kleiman?

1    A.    I --

2          MR. ROCHE:  Objection, privilege.  Calls for

3    privileged communication.

4          MR. PASCHAL:  Kyle, how is that privileged?

5          MR. ROCHE:  He has been designated W&K's

6    30(b)6 rep.  Just like any other company what

7    communications we -- he has had with the company to

8    prepare for this litigation are privileged and

9    again this is, you know, not different than any

10   other expert -- an expert deposition you can ask

11   him the who, what, where, when but the substance of

12   the communication I am going to object on the basis

13   of privilege.

14         MR. PASCHAL:  What's the privilege?

15         MR. ROCHE:  The privilege is work product.

16         MR. PASCHAL:  Can we -- what's the time on

17   this?

18         MR. ROCHE:  One thing we can do is we have a

19   call with Judge Reinhart at 1:30.  We can bring

20   this issue up then.

21         MR. PASCHAL:  Yes.

22         MR. ROCHE:  Okay, cool.

23         MR. PASCHAL:  I'm going to go through the

24   questions and you can instruct him not to answer.

25         MR. ROCHE:  Understood.

```
 1              MR. PASCHAL:  What were the questions you
 2        spoke to Mr. Kleiman on?
 3              MR. ROCHE:  Objection, privilege.
 4              THE WITNESS:  Answer?
 5              MR. PASCHAL:  No.
 6              MR. ROCHE:  No.
 7   BY MR. PASCHAL:
 8        Q.   How many occasions did you speak with
 9   Mr. Kleiman?
10        A.   Once.
11        Q.   How did you speak with Mr. Kleiman?
12        A.   On the phone.
13        Q.   Did you ever meet him in person?
14        A.   No.
15        Q.   Did you ever exchange e-mails with
16   Mr. Kleiman?
17        A.   No.
18        Q.   Again how long did the conversation last with
19   Mr. Kleiman?
20        A.   It was brief.
21        Q.   Less than five minutes?
22        A.   Under 15 minutes.
23        Q.   When you said you reviewed documents related
24   to W&K how did you get those documents?
25        A.   They were provided to me by counsel.
```

Zachary Eisner
January 09, 2020                                          14

```
 1        Q.   Did you do anything else to search for
 2   documents?
 3        A.   I did go on SunBiz myself.  I don't think so,
 4   no.
 5        Q.   So the only information you have is coming
 6   from counsel?
 7        A.   I believe so, yes.
 8        Q.   On topic number three W&K's business purpose.
 9   What did you do to understand that topic, prepare for
10   that topic I should say?
11        A.   Go through the complaint and all the exhibits.
12        Q.   Did you go through anything else?
13        A.   No.
14        Q.   Do you understand that there's a database of
15   documents in this case, do you know that?
16        A.   Yes.
17        Q.   Were you given access to that database?
18        A.   No.
19        Q.   Do you know what W&K's business purpose is?
20        A.   Yes.
21        Q.   What is it?
22        A.   To mine Bitcoin and hold intellectual
23   property.
24        Q.   Topic number four, W&K's proprietary and
25   financial documents?
```

Zachary Eisner
January 09, 2020                                      15

A.   Yes.

Q.   What did you do to prepare for that topic?

A.   Go through all the documents provided.

Q.   What are those documents?

A.   All the complaints, all the exhibits, any
corporate records, any W&K records they possibly had.

Q.   What are those records when you refer to --
what are the documents that you reviewed that you said
you possibly had?

A.   There were no financial documents.  There were
no tax returns that were filed.  So in this regard they
would have no knowledge.

Q.   Did you do anything to look for any other
documents?

A.   No.

Q.   Topic number five W&K's tax files.  What did
you do to prepare for that topic?

A.   I believe that request was sent to the IRS for
W&K and Dave Kleiman individually's tax filings and
there was no information whatsoever from the IRS
regarding anything on W&K tax filings.

Q.   Was there any documents from the IRS related
to W&K?

A.   No.

Q.   So you're not aware of any communications with

1    the IRS for W&K?

2        A.   I'm aware of communications with the IRS and

3    W&K but there were no documents send back from the IRS

4    regarding from W&K.

5        Q.   I want to clarify what were those

6    communications with the IRS?

7        A.   Please provide any tax filings and

8    documentation you have regarding W&K.

9        Q.   That's it?

10       A.   I believe so, yes.

11       Q.   So you're not aware of any IRS investigation,

12   nothing?

13       A.   No.

14       Q.   So if I showed you those documents today would

15   be the first time that you've seen them?

16       A.   Yes.

17       Q.   Did you ask counsel if they did anything else

18   for tax documents?

19       A.   Probably, yes.

20       Q.   What was the answer?

21            MR. ROCHE:  Hold on one second.  You can

22       answer the question to the extent it calls for what

23       W&K did to request tax documents, not on any

24       response counsel for W&K or Ira Kleiman told you

25       about what they did for tax documents.

```
 1              THE WITNESS:  To the extent to prepare me to
 2         be most knowledgeable corporate representative I
 3         went through all the designated topics and
 4         requested all the documents that I would need from
 5         counsel and when they said that -- they requested
 6         from the IRS when they showed me the letter and
 7         nothing came back.  He showed me that.
 8    BY MR. PASCHAL:
 9         Q.   Did the letter say -- did the letter say Dave
10    Kleiman or did it say W&K?
11         A.   It said both if I remember correctly.
12              MR. PASCHAL:  Could we take a quick break?
13              MR. ROCHE:  Yes.
14              THE VIDEOGRAPHER:  Off record 10:20.
15              (Discussion held off the record.)
16              THE VIDEOGRAPHER:  On record 10:32.
17    BY MR. PASCHAL:
18         Q.   So we just spoke about IRS documents that you
19    said the only document you saw was an IRS request form?
20         A.   And a letter back.
21         Q.   And a letter back.  What did the letter back
22    say?
23         A.   To my recollection, you know, I guess here are
24    the documents requested and it was not W&K documents.
25
```

Zachary Eisner
January 09, 2020                                              18

```
 1              (Defendant's Exhibit No. 2 was

 2              marked for identification.)

 3   BY MR. PASCHAL:

 4       Q.   So I'm showing you a document from the IRS and

 5   you haven't seen this document, have you?

 6              MR. ROCHE:  Objection, form.

 7              THE WITNESS:  I don't think I saw this

 8       document, no.

 9   BY MR. PASCHAL:

10       Q.   Can you look at the bottom of the document and

11   do you see the date?

12       A.   Yes.

13       Q.   You recognize this document as being from the

14   IRS?

15       A.   Not necessarily.  I mean it looks like it but

16   I don't know for sure.

17       Q.   Well, at the top of the document --

18       A.   Right.

19       Q.   -- what does it say?

20       A.   Department of Treasury, Internal Revenue

21   Service information document request.

22       Q.   You don't think this is from the IRS?

23       A.   It looks like it.

24       Q.   Do you see if you go in the body of the

25   document you see there's numbers one, two, three, four,
```

```
 1  five, six, seven and eight?

 2       A.   Yes.

 3       Q.   You see in question number one they're asking

 4  for W&K Info Defense?

 5       A.   Yes.

 6       Q.   Do you see in question four they are again

 7  asking about W&K, LLC?

 8       A.   Yes.

 9       Q.   Do you see in question number seven they're

10  again asking about W&K, LLC?

11       A.   Yes.

12       Q.   In question eight they're asking again about

13  W&K, LLC?

14       A.   Yes.

15       Q.   You're not prepared to talk about this

16  document because you never saw it; right?

17       A.   This document, no.

18            (Defendant's Exhibit No. 3 was

19            marked for identification.)

20  BY MR. PASCHAL:

21       Q.   Now I'm handing you what we're marking as

22  Exhibit 3.  Are you familiar with the Karp Law Firm?

23       A.   No.

24       Q.   Do you know who Joseph Karp is?

25       A.   No.
```

Zachary Eisner
January 09, 2020                              20

1        Q.   But you see here that he is -- the regarding
2    line it says case number 362215?
3        A.   Yes.
4        Q.   Does that number match the IRS document that
5    you just saw?
6        A.   Yes.
7        Q.   And this letter is dated June 18th 2015?
8        A.   Yes.
9        Q.   Just about a month after the IRS sent a letter
10   to Ira Kleiman?
11           MR. ROCHE:  Going to instruct the witness to
12       the extent he needs to read the document please
13       feel free to take your time to do so.
14           THE WITNESS:  Yes, about a month later.
15   BY MR. PASCHAL:
16       Q.   Do you see that this Karp letter it's
17   addressed to Mr. Tosi?
18       A.   Yes.
19       Q.   Is that the person who sent the IRS letter on
20   May 20th 2015?
21       A.   Yes.
22       Q.   If you turn to page two and you go to the
23   first paragraph do you see that Mr. Karp is discussing
24   W&K, LLC?
25       A.   Yes.

Q.    And he is saying Ira has no personal knowledge

of W&K's business activities?

MR. ROCHE:   Objection, document speaks for

itself.

THE WITNESS:   It says with regard to W&K, LLC

or Bitcoin Ira has no personal knowledge of any of

this.

BY MR. PASCHAL:

Q.    You can keep reading.

A.    And has no proof or evidence of what Bitcoins

David may own or any information.

Q.    Okay, you haven't seen this document this

letter to the IRS, have you?

A.    Nothing.

Q.    You're not prepared to talk about this

document?

A.    No.

Q.    Earlier when I asked you about Bitcoin or

W&K's business purpose you said that its business

purpose was to mine Bitcoin?

A.    And hold intellectual property related to

Bitcoin and block chain.

Q.    How did you get that information again?

A.    From Craig Wright.

Q.    You spoke with Craig Wright?

1     A.   Through affidavits of Craig Wright and through

2   the complaint and through exhibits that exist.

3     Q.   Just stuff that was attached to the complaint?

4     A.   Yes.

5     Q.   Just the complaint?

6     A.   And the exhibits.

7     Q.   But you haven't looked at this document?

8     A.   No.

9     Q.   Could we go back to the Notice of Deposition

10   which was marked as Exhibit 1.  Can we look at topic

11   number six?

12     A.   Yes.

13     Q.   It says W&K's alleged ownership or development

14   of intellectual property?

15     A.   Yes.

16     Q.   What did you do to find out or prepare

17   yourself to talk about that topic today?

18     A.   The complaint and all the exhibits.

19     Q.   And that's it?

20     A.   Yes.

21     Q.   Did you review any patent applications or any

22   documents related to intellectual property?

23     A.   That were not attached to the complaint as

24   exhibits?

25     Q.   Yes.

Zachary Eisner
January 09, 2020                                    23

1          A.   No, I did not.

2          Q.   Did you do any online searches?

3          A.   No.

4          Q.   Did you look at any documents that have been

5    produced in discovery?

6          A.   Some.

7          Q.   What documents were those?

8               MR. ROCHE:  Objection.  Withdrawn.

9               THE WITNESS:  I guess communications with

10        Craig Wright.  I mean most of what I was focused on

11        was the complaint and the exhibits and any

12        corporate documents that were available.  That was

13        how I got my knowledge of the corporation to be

14        able to testify.

15   BY MR. PASCHAL:

16        Q.   What corporate documents?

17        A.   Well, there were no financial documents.

18   There was no operating agreements.  Went through the

19   SunBiz records and the reinstatement.

20        Q.   All you did you also spoke to --

21        A.   Spoke to the manager member, yes.

22        Q.   For 15 minutes?

23        A.   Yes.

24        Q.   Can I just say for purposes of this deposition

25   are those basically everything that -- that's everything

1  you've done?

2      A.   A lot of paper to be honest.  Quite a docket

3  but did I run through every piece of the docket no, I

4  didn't have to.  I focused only on W&K.

5      Q.   What else in the docket did you look at?

6      A.   The complaints in each form and the exhibits.

7  That's probably about it.  There is a couple complaints.

8  A lot of exhibits.

9      Q.   Did you look at W&K's interrogatory responses?

10     A.   No.

11     Q.   Did you look at Ira Kleiman's interrogatory

12  responses?

13     A.   No.

14     Q.   Did you look at Craig Wright's interrogatory

15  responses?

16     A.   To the extent they were in the exhibits, the

17  affidavits that he put in I did.

18     Q.   You're referring to affidavits that were --

19     A.   That were in the second amended complaint.

20     Q.   But back to my question you haven't looked at

21  any of his interrogatory responses; right?

22     A.   No.

23     Q.   For topic number seven W&K's alleged mining of

24  Bitcoin or any crypto currency.  What did you do to

25  prepare for that?

```
 1          A.    All the documents that I said.  All the
 2    complaints, all the exhibits.
 3          Q.    Just the complaint?
 4          A.    Yes.
 5          Q.    Nothing else?
 6          A.    There was a lot of documents.
 7          Q.    Just the complaint and its exhibits?
 8          A.    Yes.
 9          Q.    Nothing else.  For number eight W&K's
10    ownership of Bitcoin or any other crypto currency.  Did
11    you just review the complaint for that?
12          A.    Yes, all the complaints, all the exhibits,
13    yes.
14          Q.    For number nine W&K's reinstatement in 2018.
15    Did you just review the complaint?
16          A.    No, on SunBiz for that personally.  But again
17    all the complaints, all the exhibits, all the SunBiz
18    articles.
19          Q.    What did you view on SunBiz?
20          A.    The articles of organization, dissolution,
21    reinstatement, dissolution, reinstatement.
22          Q.    When did you go on SunBiz.org?
23          A.    Multiple times over the last month or so for
24    this purpose.
25          Q.    For topic number ten W&K's administrative
```

```
 1    dissolutions.  All you reviewed was the complaint?

 2         A.   And SunBiz.

 3         Q.   And SunBiz?  Did you talk to Ira Kleiman about

 4    the reinstatement?

 5         A.   The reinstatement?

 6         Q.   Reinstatement and dissolution.

 7              MR. ROCHE:  Objection.  I'm going to object to

 8         the extent you're going to ask specific things he

 9         discussed with Ira Kleiman.  You can ask him about

10         the facts, what he knows but to the extent this is

11         going to get into the specific discussion with

12         either counsel or Ira Kleiman we object it's

13         privileged.

14              MR. PASCHAL:  Are you instructing him not to

15         answer?

16              MR. ROCHE:  Instruct him not to answer,

17         correct.

18    BY MR. PASCHAL:

19         Q.   Just so the record is clear did you talk to

20    Ira Kleiman about W&K's administration dissolutions?

21              MR. ROCHE:  Objection, privileged.

22              MR. PASCHAL:  Are you instructing him?

23              MR. ROCHE:  Yes.  With any privilege

24         instruction it will be -- objection it will be an

25         instruction not to answer.
```

1    BY MR. PASCHAL:

2        Q.   Topic number 11 it says W&K Panama.  What did

3    you do to prepare yourself to discuss that?

4        A.   Spoke with counsel and Ira Kleiman.

5        Q.   What did you speak with Ira Kleiman about?

6             MR. ROCHE:  Objection, privileged.

7    BY MR. PASCHAL:

8        Q.   What did you speak to counsel about?

9             MR. ROCHE:  Objection, privileged.

10   BY MR. PASCHAL:

11       Q.   Number 12, any legal actions against W&K that

12   is related to its alleged intellectual property,

13   Bitcoin, or crypto currency.  What did you do to prepare

14   for that?

15       A.   Spoke to counsel and Ira Kleiman.

16       Q.   That's it?

17       A.   Again all the complaints, all the exhibits.

18       Q.   What did you speak to Ira Kleiman and counsel?

19             MR. ROCHE:  Objection, privilege.

20   BY MR. PASCHAL:

21       Q.   Did you review any other complaints of any

22   other lawsuits?

23       A.   No.

24       Q.   Did you take any steps to educate yourself

25   about any of the legal actions against W&K?

1    A.    To the extent it would help me in my knowledge

2    of the company I took steps to educate myself, yes.

3    Q.    What steps did you take?

4    A.    I learned a little bit about Bitcoin and --

5    most of it was about Bitcoin because the ten or so

6    counts that was more or less personally familiar with.

7    Q.    So you familiarized yourself with Bitcoin to

8    learn about legal actions against W&K?

9         MR. ROCHE:    Objection, mischaracterizes the

10        witness' testimony.

11        THE WITNESS:    I familiarized myself about

12        Bitcoin in order to be the best corporate

13        representative with knowledge of the company.

14   BY MR. PASCHAL:

15   Q.    But going back to my question.  Legal actions

16   against W&K what steps did you take to learn about legal

17   actions against W&K?

18   A.    Speaking with counsel and Ira Kleiman.

19   Q.    And you learned about Bitcoin?

20   A.    Maybe I'm confused.  I thought that was a

21   separate question.  Did you learn about anything to

22   educate yourself about the legal actions?

23   Q.    Yes.

24   A.    Any specific legal actions, no, other than

25   counsel and Ira Kleiman.  I don't think I understood

```
 1    your question.
 2         Q.   What did counsel and Ira Kleiman tell you
 3    about legal actions against W&K?
 4              MR. ROCHE:  Objection, privilege.  You can ask
 5         him are there other legal actions against W&K you
 6         other aware of but what we said privilege.
 7              MR. PASCHAL:  Just making the record.
 8              MR. ROCHE:  Okay.
 9    BY MR. PASCHAL:
10         Q.   Do you know about any legal actions brought by
11    W&K?
12         A.   To my knowledge this is the only one.
13         Q.   What steps did you take to learn about any
14    other legal actions taken by W&K?
15         A.   Speaking with counsel and Ira Kleiman.
16         Q.   Is that it?
17         A.   Yes.
18         Q.   And topic 14 any accounts that W&K had at
19    Liberty Reserve.  What steps did you take to educate
20    yourself on that topic?
21         A.   Speaking with counsel and Ira Kleiman that
22    there is no affiliation or no knowledge of anything
23    regarding Liberty Reserve.
24         Q.   Is that what they told you?
25              MR. ROCHE:  Objection, privilege.
```

```
 1            MR. PASCHAL:  He's already answered.
 2            MR. ROCHE:  I am going to instruct the witness
 3       to the extent I think some of these questions are
 4       dipping into your knowledge and conversations with
 5       Kleiman to try to keep clear on the facts rather
 6       than what counsel has shared with you.
 7   BY MR. PASCHAL:
 8       Q.   So you just said they told you that there was
 9   no knowledge of accounts at Liberty Reserve; right?
10       A.   The corporate -- the corporation has no
11   knowledge of any accounts at Liberty Reserve.
12       Q.   Did you do any online searches for accounts at
13   Liberty Reserve?
14       A.   Did I -- I don't know how I would look at
15   Liberty Reserve to see what W&K had.
16       Q.   Did you Google Liberty Reserve?
17       A.   I did.
18       Q.   What did you see?
19       A.   It's a bank.  It's a financial institution.
20       Q.   Can you tell us anything else about Liberty
21   Reserve?
22       A.   I don't remember much about it.  I just wanted
23   to see where it was located.
24       Q.   You did that by accessing its Web site?
25       A.   By Googling.  I really don't remember the Web
```

 1   site.

 2        Q.   Do you remember what you saw on the Web site?

 3        A.   No.

 4        Q.   Did you see like a picture of a bank?

 5        A.   If I saw it I would refresh my recollection.

 6   I sort of wanted to see where it was.  That was really

 7   my focus.

 8        Q.   Did you see where it was?

 9        A.   Yes.  Yes.

10        Q.   Where was it located?

11        A.   My purpose for it was just seeing if it had

12   branches or not.  And I really don't remember but from

13   my personal investigation there was no relevance.  So

14   that was pretty much it.

15        Q.   You're talking about locations.  Where were

16   the locations?

17             MR. ROCHE:  Just going to instruct the witness

18        to the extent you don't know just say you don't

19        know.

20             MR. PASCHAL:  Vel -- you mean sorry, Kyle,

21        that's coaching.  Let's not do that.  Not going to

22        do that.

23             THE WITNESS:  If I saw a Web site again I can

24        tell you exactly what I was looking for.  I really

25        don't remember exactly what I was looking for.  I

Zachary Eisner
January 09, 2020                                    32

1          think just went on to see what it was.  I have
2          never heard it before.
3     BY MR. PASCHAL:
4          Q.   There was nothing important about the Web site
5     when you saw it?
6          A.   Not that I can recall.
7          Q.   Sir, do you realize if you put in Liberty
8     Reserve Web site the Department of Justice notice comes
9     up and it's very noticeable?
10         A.   When you Google it, no.
11         Q.   When you actually -- if you Google --
12         A.   Not the Web site.  Not the Web site.  I didn't
13    check the Web site.  I just Googled Liberty Reserve.
14         Q.   If you Google it you'll see a lot of
15    Department of Justice articles and notices about it?
16         A.   I don't recall that.
17         Q.   You don't recall any of that?
18         A.   No.
19         Q.   Do you realize that the Department of Justice
20    has an account look up and let me be clear an account
21    look up.  Did you use the account look up to see if
22    there were any accounts with W&K?
23         A.   No.
24         Q.   Did you contact the Department of Justice
25    about W&K?

1    A.    No.

2    Q.    I just want to be clear if you go to the

3  Liberty Reserve Web site it says this domain has been

4  seized?

5    A.    Right.  I didn't go to the Liberty Reserve

6  domain Web site.  I just Googled it.

7    Q.    This is the first time you're realizing it was

8  seized?

9    A.    I think so, yes.  I just never heard of the

10  bank before.  So I just Googled the name.

11    Q.    When did you Google the name Liberty Reserve?

12    A.    A month ago.  I don't remember.  I knew it

13  wasn't in business.  That I remember but I don't

14  remember like it was shut down or anything.

15    Q.    Topic 15 W&K's membership meetings discussing

16  this action, Dr. Craig Wright, Bitcoin or

17  cryptocurrency.  What did you do prepare yourself for

18  that topic?

19    A.    Complaint, exhibits, speaking with counsel and

20  Mr. Kleiman.

21    Q.    Were there any exhibits that had board minutes

22  for W&K?

23    A.    No.

24    Q.    W&K had board minutes and they just weren't

25  attached to the complaint you would not have reviewed

1  them; is that correct?

2          MR. ROCHE:  Objection, form.

3  BY MR. PASCHAL:

4      Q.   You would?

5      A.   I would have reviewed them in my review of

6  other corporate documents that W&K had if they were

7  available.

8      Q.   So you reviewed more than the complaint?

9      A.   To the extent that there were other corporate

10  documents relating to W&K for example the IRS request.

11  I reviewed those as well.

12      Q.   But that doesn't answer my question.  I'm

13  talking about board minutes.  If it wasn't attached to

14  board minutes -- if it wasn't attached the complaint you

15  would have not reviewed them; is that correct.

16          MR. ROCHE:  Objection, form.

17          THE WITNESS:  I would say that they would be

18      part of the other corporate documents that I would

19      have reviewed if they were there.

20  BY MR. PASCHAL:

21      Q.   What are the other corporate documents?

22      A.   To the extent that there were corporate

23  documents such as financials or IRS requests or board

24  minutes if they existed I reviewed all those.

25      Q.   Did you review board minutes?

Zachary Eisner
January 09, 2020                                    35

```
 1        A.    No.   Because they -- to our knowledge there
 2   are -- to the corporation's knowledge there are no board
 3   minutes.
 4        Q.    Again you don't have access to the database of
 5   documents that are available in this case; right?
 6        A.    No.
 7        Q.    Are you aware of how many documents have been
 8   produced in this case?
 9        A.    I was told there was very voluminous.
10        Q.    But you haven't seen any of them?
11        A.    I've seen a good portion of them.   I haven't
12   seen --
13        Q.    What documents have you seen in the database?
14        A.    In the database?
15        Q.    Yes.
16        A.    I have not accessed the database.
17        Q.    When you say -- well, so all the documents
18   that are produced in our database you have not seen any
19   of them in discovery?
20             MR. ROCHE:   Objection, form.
21             THE WITNESS:   I don't believe so.
22   BY MR. PASCHAL:
23        Q.    So if Dr. Craig Wright and third parties
24   produced 800,000 documents you are not prepared to
25   testify on any of them?
```

Zachary Eisner
January 09, 2020                                    36

         1          A.    That's -- as corporate representative I will
         2    give my opinions as best as I can.
         3          Q.    But you haven't educated yourself based on any
         4    of those documents, have you?
         5          A.    Educated myself about the company.
         6          Q.    By reading the complaint?
         7          A.    And exhibits and the manager and the member
         8    the sole manager and sole member and counsel.
         9          Q.    I want to get that clear, let's break that
        10    down.  You read the complaint that plaintiffs filed?
        11          A.    Multiple iterations of the complaint.
        12          Q.    All the amendments of the complaint?
        13          A.    Yes.
        14          Q.    The exhibits to the complaint?
        15          A.    Yes.
        16          Q.    You spoke with the manager member for 15
        17    minutes?
        18          A.    (Indicating).
        19          Q.    Is that yes?
        20          A.    Yes.
        21          Q.    You spoke with counsel?
        22          A.    Yes.
        23          Q.    And other than that you have done nothing else
        24    to prepare yourself to testify today?
        25                MR. ROCHE:  Objection, form, mischaracterizes

1      his testimony.

2           THE WITNESS:  It's quite a lot of documents

3      and I believe that I am well prepared to answer on

4      behalf of the company as corporate representative.

5  BY MR. PASCHAL:

6      Q.   Did you review any corporate resolutions for

7  W&K?

8      A.   No.

9      Q.   You are aware that a corporate resolution is

10  attached as a exhibit to the complaint?

11      A.   Can you show me that, please?

12      Q.   In a second.  You didn't review any deposition

13  testimony to testify today?

14      A.   No.

15      Q.   We'll pull up the exhibit list in the

16  complaint.  The next topic is the assignment of any

17  rights asserted in the complaint.  What did you do to

18  prepare for that?

19      A.   Complaint, exhibits, counsel, Ira Kleiman.

20      Q.   You reviewed the complaint to determine that

21  there was any rights assigned in the complaint?

22      A.   In the corporate documents and speaking with

23  counsel.

24      Q.   What corporate documents did you review?

25      A.   There was nothing of any assignment of rights

because there were none.

2      Q.   Is your testimony today that W&K has assigned

3   no rights to anyone?

4      A.   Regarding Bitcoin or intellectual property,

5   yes, that is the --

6      Q.   About this case, the complaint.

7      A.   About -- I don't understand the question.

8      Q.   Has any right to recovery been assigned from

9   W&K to any other entity in this case?   Relevance, unduly prejudicial

10     A.   Are you asking if there was like a litigation

11  funding or something?   I don't understand.

12     Q.   That would be one potential assignment of

13  recovery.   Relevance, unduly prejudicial

14     A.   Yes, the company has litigation funding.

15     Q.   Is that an assignment of recovery?

16     MR. ROCHE:   So our position on this will be he

17     can identify a litigation funder, that litigation

18     funding exists and the name of the litigation

19     funder.

20     MR. PASCHAL:   Kyle, can't tell him what to

21     say.   If I ask a question --

22     MR. ROCHE:   This is privileged.

23     MR. PASCHAL:   Then assert the privilege.

24     MR. ROCHE:   Okay.

25

1    BY MR. PASCHAL:                          Relevance, unduly prejudicial

2        Q.    Who are the litigation funders?

3        A.    Parabellum is the name of the company.

4        Q.    Do you have any involvement in Parabellum?

5        A.    No.    Relevance, unduly prejudicial

6        Q.    When did you first learn about Parabellum?
              Relevance, unduly prejudicial

7        A.    In my getting familiar with the company.

8        Q.    Does W&K have an agreement with Parabellum?
                          Relevance, unduly prejudicial

9        A.    I believe so, yes.

10       Q.    What's the agreement?

11            MR. ROCHE:    Objection, privileged.

12   BY MR. PASCHAL:

13       Q.    Who signed the agreement with W&K and

14   Parabellum?

15            MR. ROCHE:    Hold on one second.    If you know

16       the answer to that question you can answer.

17            THE WITNESS:    I don't know the answer to that

18       question.

19   BY MR. PASCHAL:

20       Q.    The next topic is "all persons who are

21   believed or known by W&K to have any knowledge

22   concerning any of the issues in the complaint."    What

23   did you do to prepare for that topic?

24       A.    Complaint, exhibits, speaking with counsel and

25   Ira Kleiman.

Q.   Who are the people are or all persons who are
believed to have known by W&K to have knowledge
concerning the issues of the complaint?

A.   Dave Kleiman, Ira, Craig Wright, Gwen, the
woman who reinstated in 2014.  I may be mispronouncing
her name.  I guess, you know, Jay Wilson and -- Jamie
Wilson.  I guess that will be it right now to my
knowledge.

Q.   So topic 18 it says the location of documents
related to the complaint.  What did you do to prepare
for that topic?

A.   Speak to counsel.

Q.   What did counsel say?

A.   Online depository of documents.

Q.   So the documents produced in discovery?

A.   I would assume so.

Q.   You didn't review any of those documents?

A.   To the extent that they weren't relevant to my
knowledge of W&K I did not.

Q.   Did you access the database?

A.   No.

Q.   Did you look at documents in the database?

A.   While in the database?

Q.   Yes.

A.   No.  Were documents printed off from the

Zachary Eisner
January 09, 2020                                41

1   database and given to me I am sure, yes.

2        Q.   What documents were printed off the database

3   and given to you?

4        A.   Documents that I would need to familiarize

5   myself with.

6        Q.   What were those documents?

7        A.   Of -- for W&K's corporate information,

8   knowledge.

9        Q.   What were those documents?

10       A.   The IRS request form for example.

11       Q.   Was there any other documents?

12       A.   I don't know what's on the depository to be

13   able to answer that question.

14       Q.   Sorry, what was your answer?

15       A.   I don't know what's on the depository to be

16   able to answer what they gave to me what's on the

17   depository.

18       Q.   Counsel gave you an IRS form to prepare for

19   this deposition?

20       A.   Counsel gave me multitude of documents to

21   prepare for the deposition.

22       Q.   What are those documents?

23       A.   The complaints, the exhibits, any relevant

24   corporate documents, SunBiz records.

25       Q.   You said relevant corporate documents.  What

1    are those?

2         A.   IRS requests.  There were no organizational

3    documents.  The articles of organization, the

4    reinstatement.

5         Q.   That's it?

6         A.   The company didn't have tax records from the

7    IRS.  The company didn't have financials.  The company

8    didn't do minutes.

9         Q.   As far as you know?

10        A.   As far as -- I'm speaking on behalf of the

11   company.

12        Q.   Last topic W&K's administration and its

13   mailing address, physical address and mail received

14   relating to this action.

15        A.   Yes, that is -- I prepared myself by

16   complaint, documents, speaking with Ira, counsel and

17   going on SunBiz.

18             MR. PASCHAL:  Let's just take a break.

19             THE VIDEOGRAPHER:  Off the record.

20             (Thereupon, a brief recess was taken.)

21             THE VIDEOGRAPHER:  On record 11:15.

22             MR. PASCHAL:  Are we back on the record?

23             MR. ROCHE:  Yes.

24             MR. PASCHAL:  I'm handing you what is marked

25        as Exhibit 4.  Have you seen this document?

 1              THE WITNESS:  Yes.

 2              (Defendant's Exhibit No. 4 was

 3              marked for identification.)

 4    BY MR. PASCHAL:

 5         Q.   Under Article II where it says the mailing

 6    address of the Limited Liability Company is 4371

 7    Northlake Boulevard, #314, Palm Beach Gardens, Florida

 8    US 33410.  Is that the correct mailing address for W&K?

 9         A.   Yes.  You read that correctly.

10         Q.   So there is no dispute on that?

11         A.   You read the mailing address correctly.

12         Q.   So what do you understand this case to be

13    about?

14         A.   In broad terms the misappropriation of

15    conversion among other counts of Bitcoin, intellectual

16    property owned in some -- either by Dave Kleiman, W&K,

17    LLC jointly, separately somehow by Craig Wright.

18         Q.   Do you know when this case was filed?

19         A.   Yes.

20         Q.   Do you know how long we've been in discovery?

21         A.   Not exactly.  I assume from around then.

22         Q.   Do you know how many depositions have been

23    taken?

24         A.   No.

25         Q.   Do you know whether or not Craig Wright has

1    testified in this case?

2         A.   I know that he filed an affidavit.  I don't

3    know if he's been deposed or testified in the case.

4              MR. PASCHAL:  I want to break this down.

5         Maria, can you pass me a copy of the complaint?

6              (Defendant's Exhibit No. 5 was

7              marked for identification.)

8    BY MR. PASCHAL:

9         Q.   If you turn to page three of paragraph five.

10   It's marked as Exhibit 5.  If you look at the top of

11   page three.  I guess you can read the whole sentence

12   before that starting on page two.  Starting at "these

13   events" do you see on page two, paragraph five?

14             MR. ROCHE:  On page two?

15             MR. PASCHAL:  Yes, paragraph five.

16             THE WITNESS:  I see it.

17   BY MR. PASCHAL:

18        Q.   Second sentence "these events include but are

19   not limed to the wrongful taking of property belonging

20   to a Florida estate or LLC within this district."  When

21   you refer to a Florida estate or LLC what company are

22   you referring to?

23        A.   W&K.

24        Q.   "The partnership of Dave and Craig within this

25   district."  What is the partnership of Dave and Craig?

1        A.    Within W&K.

2        Q.    "The operation of W&K by Dave and Craig within

3   this district."  Was it just David and Craig who

4   operated W&K in this district?

5        A.    Can you repeat the question?

6        Q.    Was it just Dave and Craig who operated W&K in

7   this district?

8        A.    The operations of W&K were in this district.

9        Q.    By just Dave and Craig?

10       A.    To my knowledge, yes.

11       Q.    "The mining of a substantial amount of Bitcoin

12  through the use of computer equipment located within

13  this district and/or by equipment owned and operated by

14  Florida resident (Dave) or Florida LLC (W&K.)"  What

15  computer equipment is located in this district to mine

16  Bitcoin?

17       A.    I believe there are multiple affidavits

18  attached to this complaint that Craig states that he is

19  giving computer to W&K, excuse me, for the purposes of

20  mining Bitcoin and that he says that W&K's purpose is to

21  mine Bitcoin.

22       Q.    I'm not talking about Craig's affidavit.  I'm

23  asking for W&K's testimony.  As the 30(b)6 witness for

24  W&K can you identify the computer equipment located in

25  this district to mine Bitcoin?

Zachary Eisner
January 09, 2020                                              46

1          A.   Only from the testimony of Craig.

2          Q.   But you have no testimony or you cannot

3     testify about computer equipment located in this

4     district absent Craig's testimony?

5          A.   Which Craig testified about, yes, I cannot.

6          Q.   To your knowledge two years into this case,

7     we've done discovery for a very long time now can you

8     identify the computer equipment that's in this district?

9          A.   W&K's knowledge is based upon Craig's

10    admission of all the computers and I believe he lists

11    them in a couple of the exhibits that he gave to W&K.

12         Q.   What steps did you take to learn about the

13    computer equipment within this district that was owned

14    by W&K?

15         A.   Speaking to counsel.

16         Q.   And you did nothing else?

17         A.   No, nothing else.

18         Q.   Did you ask the managing member of W&K?

19              MR. ROCHE:  Objection.  Objection, that calls

20         for privileged information.

21    BY MR. PASCHAL:

22         Q.   You also state "there was mining of a

23    substantial amount of Bitcoin through the use of

24    computer equipment."  The substantial amount of Bitcoin

25    how much Bitcoin do you believe that -- what is the

1    substantial amount of Bitcoin?  What is the amount?

2         A.   Craig has stated approximately 300,000 to a

3    1,100,000.

4         Q.   Again I'm asking for your testimony not what

5    Craig said.  What is W&K's testimony, sworn testimony

6    today, as to the amount of Bitcoin it believes was

7    mined?

8         A.   W&K's knowledge of the amount of Bitcoin is

9    based upon Craig's admissions, multiple admissions, and

10   further discovery will show exactly the amounts.

11        Q.   When you say further discovery you do realize

12   discovery is over?

13            MR. ROCHE:  Objection, mischaracterizes this

14        litigation.

15   BY MR. PASCHAL:

16        Q.   As the W&K corporate representative and you're

17   going to be testifying in front of a jury your only

18   testimony would be what Craig said?

19        A.   Yes, the admission of the defendant that he --

20   at least 300 to a million.

21        Q.   You have no other evidence of W&K mining

22   Bitcoin?

23        A.   I believe multiple admissions are good enough

24   for us.

25        Q.   So if you take out Craig then the only

Zachary Eisner
January 09, 2020                              48

1   evidence you have is Craig?

2          MR. ROCHE:  Objection, form, calls for a legal

3      conclusion.

4          THE WITNESS:  I don't know the answer to that

5      question.

6          MR. PASCHAL:  Let me show you.  Kyle, I'm

7      using plaintiff's second amended.  Can I show it to

8      the witness?

9          MR. ROCHE:  Can you show it to me first?

10         MR. PASCHAL:  Yes.

11         MR. ROCHE:  Can you give me a second to pull

12     it up?  Can you tell me what the date is on that?

13     Is it March 20?

14         MR. PASCHAL:  March 21.

15         MR. ROCHE:  Hold on.

16         (Defendant's Exhibit No. 6 was

17         marked for identification.)

18  BY MR. PASCHAL:

19     Q.   Showing you what we're marking as Exhibit 6.

20  This is plaintiff's Second Amended Responses to

21  Interrogatories.  Can you please turn to page number

22  five.  You see on page five the request is to identify

23  public addresses W&K or estate believes that Bitcoin

24  holds?

25         MR. ROCHE:  What request are you on?

```
 1              MR. PASCHAL:  Let me see.  Request number

 2        five.

 3              MR. ROCHE:  Can you give me one second?  I

 4        have the wrong one.  I it have identified by --

 5              MR. PASCHAL:  Can we take a two second break,

 6        just going to get photocopies?

 7              THE VIDEOGRAPHER:  Off the record 11:28.

 8              (Thereupon, a brief recess was taken.)

 9              THE VIDEOGRAPHER:  On record 11:33.

10   BY MR. PASCHAL:

11        Q.   I'm handing you Exhibit 6 which is Plaintiff's

12   Second Amended Responses and Objections to Wright's

13   First Set of Interrogatories to Plaintiff Ira Kleiman.

14              Request number five we ask identify by public

15   address all cryptocurrency that you claim rightfully

16   belongs to Dave Kleiman or his estate.

17              Now, in response to number five you say

18   discovery is still ongoing some other stuff.  But then

19   you list 26 addresses.

20              MR. ROCHE:  26?  Didn't print the second page.

21              THE WITNESS:  Yes.

22   BY MR. PASCHAL:

23        Q.   So does W&K believe that any of these

24   addresses belong to the estate or W&K?

25        A.   Yes, in some part to the estate and W&K.
```

1      Q.   What's the make up between the estate and W&K?

2      A.   Unknown as of this time.

3      Q.   Have you seen any of these addresses before?

4      A.   I don't believe so but it's just sort of

5   numbers and letters.

6      Q.   Are there any additional addresses to this

7   list that W&K believes it's entitled to?

8      A.   Discovery is still ongoing in that regard.

9      Q.   But as of right now are there any additional

10   addresses that W&K believes it's entitled to?

11     A.   I don't know the answer to that question yet.

12     Q.   If I were to tell you that some of these

13   addresses were actually mined which means they first

14   came into existence after the death of Dave Kleiman

15   would the estate still believe or W&K still believe that

16   it has an ownership interest in any of those addresses?

17         MR. ROCHE:  Objection, calls for a legal

18     conclusion.

19         THE WITNESS:  Could I answer?

20         MR. PASCHAL:  Yes.

21         THE WITNESS:  To the extent that Dave and W&K

22     were mining Bitcoin from the inception all forked

23     derivative assets of Bitcoin would also belong to

24     them.  So if they were forked assets.

25

1    BY MR. PASCHAL:

2        Q.   Not forked assets.  I'll go back to my

3    question.  The very first time that some of these

4    addresses came into existence was after Dave Kleiman

5    died.  Does W&K or the estate believe that those

6    addresses belong to the estate or W&K?

7            MR. ROCHE:  Objection, calls for a legal

8        conclusion.

9            THE WITNESS:  If they were forked derivatives

10       then absolutely.  If not I don't know the answer to

11       that question.

12   BY MR. PASCHAL:

13       Q.   They're not forked derivatives.  These are

14   first time mined, first mined.  If they're mined after

15   the death of Dave Kleiman a year after he died does W&K

16   or the estate believe that they have an ownership

17   interest in those addresses?

18       A.   Were they mined using intellectual property

19   owned by W&K?

20       Q.   No.

21           MR. ROCHE:  Objection.  Again this calls for a

22       legal conclusion.

23           THE WITNESS:  I don't know the answer to that

24       question, of the company's position regarding that.

25

 1    BY MR. PASCHAL:

 2        Q.   So today W&K cannot tell me whether or not

 3    some of these addresses is that whether or not it has

 4    ownership interest in some of these addresses?

 5        A.   Company's position is here in the

 6    interrogatory.  The position of the assets that it

 7    believed they own ownership interest in.

 8        Q.   For deposition you do realize you're

 9    testifying on behalf of the company.  I'm asking your

10    position, okay?  If these addresses were mined a year

11    after Dave Kleiman's death does W&K believe it has an

12    ownership interest in that address?

13            MR. ROCHE:  Objection, calls for a legal

14        conclusion.

15            THE WITNESS:  I would answer that discovery is

16        still ongoing exactly on how they are owned but I

17        do believe and W&K believes that if they are forked

18        assets or derived intellectual property or derived

19        from original Bitcoins that W&K or Dave Kleiman

20        owns that it would be assets of W&K and Dave

21        Kleiman.

22    BY MR. PASCHAL:

23        Q.   I need an answer to this question.  They're

24    not forked assets as I said these are first mined.

25    They're not mined with any intellectual property from

```
 1    W&K.  They mined a year after Dave dies does W&K believe
 2    that it has an ownership interest in any of these
 3    addresses?
 4              MR. ROCHE:  Objection, calls for a legal
 5         conclusion.
 6              THE WITNESS:  I could only answer in a
 7         hypothetical.  I don't know the answer to that
 8         question.
 9    BY MR. PASCHAL:
10         Q.   Here, give you an example.  A number or all of
11    these addresses have been proven to have been mined
12    after Dave Kleiman died, that's first.  Secondly, the
13    identity of the people who mined these addresses have
14    nothing to do with Dave Kleiman or Craig Wright.  So
15    assume that's a hypothetical for you W&K still believe
16    that it has an ownership interest in addresses that it
17    never mined and that were mined by other people after
18    Dave Kleiman died?
19              MR. ROCHE:  Objection, form.
20              THE WITNESS:  Without knowing more information
21         about the intellectual property that W&K owned or
22         if they're forked assets or derivatives I cannot
23         answer the question.
24    BY MR. PASCHAL:
25         Q.   But as of today these addresses are the
```

1    addresses that W&K believes it's entitled to?

2            MR. ROCHE:  Objection, calls for a legal

3        conclusion.

4            THE WITNESS:  Yes, and discovery is still

5        ongoing.

6    BY MR. PASCHAL:

7        Q.  I gave you a copy of the complaint.  Can you

8    take a look at it?  Can you go to paragraph 11?  You say

9    on April 26, 2013 mere months prior to Bitcoin's entry

10   into the mainstream Dave died after a battle with MRSA?

11       A.  Yes.

12       Q.  What is your basis to believe that it was mere

13   months prior to Bitcoin's entry into the mainstream?

14   What do you mean by Bitcoin's entry into the mainstream?

15           MR. ROCHE:  Objection, form.

16           THE WITNESS:  I don't know if that's knowledge

17       that W&K as a corporation would be able to

18       identify.

19   BY MR. PASCHAL:

20       Q.  You do understand W&K is a plaintiff in this

21   case?

22       A.  Yes.

23       Q.  W&K drafted this complaint?

24       A.  Yes.

25       Q.  W&K is claiming ownership over Bitcoin?

Zachary Eisner
January 09, 2020                                           55

1         A.    Yes.

2         Q.    And you're prepared to testify today about

3    W&K's interest in Bitcoin?

4         A.    Yes.

5         Q.    And cryptocurrency.  So when W&K says mere

6    months prior to Bitcoin's entry into the mainstream what

7    does W&K mean?

8         A.    I would have to speculate.

9         Q.    What do you mean by entry into the mainstream?

10        A.    Public consciousness.

11        Q.    What basis do you have -- what basis does W&K

12   have to say that that's when Bitcoin entered the

13   mainstream?

14        A.    I would have to speculate public

15   consciousness, users, I don't know the answer to the

16   question.

17        Q.    So when W&K alleges it didn't really know that

18   it was mere months or when Bitcoin entered into the

19   mainstream; right?

20             MR. ROCHE:  Objection to form, he is answering

21        the question.

22             THE WITNESS:  I don't know if you can pinpoint

23        an exact date in time.  I think it's a general

24        statement to mainstream thought and usage.

25

BY MR. PASCHAL:

     Q.   Back to my question.  When W&K alleged when
Bitcoin became -- entered into the mainstream what basis
did W&K have to make that allegation?

          MR. ROCHE:  Objection, form.

          THE WITNESS:  Again I don't know the answer.
     I would have to speculate that mainstream means
     public consciousness and use, users.

BY MR. PASCHAL:

     Q.   You do realize you're testifying for W&K?

     A.   To this answer I would have to speculate.

     Q.   So you don't know the answer?

     A.   What it means by mainstream?

     Q.   No.  I'm asking not about mainstream, I'm
asking about your allegation.  You say an April 26, 2013
mere months prior to Bitcoin's entry into the mainstream
W&K you allege that; right?

     A.   To what fact are you asking?

     Q.   I'm asking -- just asking you did you allege
that in the complaint?

     A.   Is the complaint written like that, yes.  I
don't understand the question.

     Q.   You're the plaintiff W&K?

     A.   Yes.

     Q.   When W&K alleges on April 26th 2013 mere

Zachary Eisner
January 09, 2020                                    57

```
 1   months prior to Bitcoin's entry into the mainstream what
 2   was W&K's basis to allege that?
 3        A.   What specifically are you asking?  Are you
 4   asking -- the complete sentence is "on April 26th 2013
 5   mere months prior to Bitcoin's entry into the mainstream
 6   Dave died after a battle of MRSA."  Are you asking what
 7   date Dave died?  Are you asking when does Bitcoin go
 8   mainstream?
 9        Q.   Not asking about when Dave died in any of the
10   series of my questions.  My question is you allege on
11   April 26th 2013 mere months prior to Bitcoin's entry
12   into the mainstream, you see that?
13        A.   Yes.
14        Q.   What is W&K's basis to make that allegation?
15        A.   To the extent that Bitcoin went mainstream in
16   terms of public conscious and let's say as a
17   hypothetical August that would be mere months before
18   Bitcoin went mainstream.
19        Q.   I'm not asking for hypotheticals.  You made an
20   allegation.  I want to know why are you saying that
21   Bitcoin went mainstream during that time?
22            MR. ROCHE:  Objection, the witness has given
23        you his understanding.
24            MR. PASCHAL:  Witness has not given me an
25        answer.
```

1          MR. ROCHE:  Told you what he knows and what he

2      doesn't know.

3          MR. PASCHAL:  He hasn't told me what he knows.

4          MR. ROCHE:  He quite literally said to the

5      extent I understand what this means.

6          MR. PASCHAL:  Kyle, that's fine.  You can make

7      your objection.  I want an answer to this question.

8          MR. ROCHE:  You're badgering the witness at

9      this point.

10          MR. PASCHAL:  I am not.  Make your objection.

11  BY MR. PASCHAL:

12      Q.   What is the basis -- just going to repeat the

13  question.  Allegation number 11 "on April, 26, 2013 mere

14  months prior to Bitcoin's entry into the mainstream."

15  What is W&K's basis to allege that Bitcoin went

16  mainstream mere months before Dave's death?

17      A.   I could only speculate that mainstream means

18  public consciousness and users.

19      Q.   What was the public consciousness?  What

20  triggered the public consciousness?

21      A.   I don't know how to measure that.  Perhaps

22  Google searches.  Perhaps user rates.  Perhaps use --

23      Q.   Did W&K use Google searches to figure that

24  out?

25      A.   I don't know.  It could have been one of many

1    things to determine what mainstream is.

2         Q.   So you do not know how --

3         A.   I don't know --

4              MR. ROCHE:   Objection.   This calls for

5         privileged information.   You're asking how we chose

6         to use -- in drafting of the complaint why we chose

7         to use the particular word choice.   Anything that

8         gets into how W&K and Ira drafted the complaint

9         that's privileged information.   To the extent the

10        witness knows --

11             MR. PASCHAL:   Kyle, what is the privilege on

12        that?

13             MR. ROCHE:   You're asking word choices related

14        to drafting of the complaint.   So the objection is

15        privileged.   You're asking why did W&K use that

16        word.

17             MR. PASCHAL:   I'm asking why W&K made an

18        allegation.   So I don't know how -- this is W&K's

19        allegation.   I can't imagine how that's privileged.

20        We have a hearing.

21             MR. ROCHE:   Right now there's not a question

22        pending.

23             MR. PASCHAL:   Do you want me to say it again?

24             MR. ROCHE:   It says so you don't know how

25        question.   So --

Zachary Eisner
January 09, 2020                                          60

1              MR. PASCHAL:  Want me to state the full
2         question and you can make your objection?
3              MR. ROCHE:  I think that makes sense, yes.
4    BY MR. PASCHAL:
5         Q.   W&K is a plaintiff in this case; correct?
6         A.   Correct.
7         Q.   At paragraph 11 W&K alleges on April 26th 2013
8    mere months prior to Bitcoin's entry into the mainstream
9    Dave died of a battle with MRSA.  My question is what is
10   W&K's basis to allege that mere months before Dave's
11   death Bitcoin went mainstream?
12             MR. ROCHE:  You can answer that question.
13             THE WITNESS:  I don't know what -- I don't
14        know the answer.
15   BY MR. PASCHAL:
16        Q.   Can you turn to paragraph 23.  The first
17   sentence says there are two methods of acquiring
18   Bitcoin.  Then it says the first involves simply
19   receiving Bitcoin from someone.
20             Is it W&K's position that if Craig Wright
21   purchased Bitcoin long after Dave died it has ownership
22   rights over those Bitcoin?
23             MR. ROCHE:  Objection, calls for a legal
24        conclusion.
25             THE WITNESS:  I don't know the answer to that

1         question.

2    BY MR. PASCHAL:

3         Q.   So if you go to the next paragraph you guys

4    allege -- W&K alleged that there is a second way Bitcoin

5    can be acquired and that's through mining.  You would

6    understand that you are alleging you can either purchase

7    Bitcoin or you can mine it, right?

8         A.   Yes.

9         Q.   Is it W&K's position that Bitcoin that Craig

10   Wright purchased, not mined just purchased, does W&K

11   have any ownership rights or does it believe it has any

12   ownership rights to the purchased Bitcoin?

13             MR. ROCHE:  Objection, calls for a legal

14        conclusion.

15             THE WITNESS:  I don't know -- to the extent

16        that there's, you know, intellectual property also

17        and forked derivatives also all of which would be

18        assets of W&K and Dave I don't know how to answer

19        the question.

20   BY MR. PASCHAL:

21        Q.   Not asking about forks or not asking about

22   intellectual property.  I'm asking if Craig Wright went

23   online and bought $100,000 worth of Bitcoin yesterday

24   does W&K believe that it has some entitlement to that

25   Bitcoin?

1        A.    In that hypothetical I would say no.

2        Q.    So is it W&K's position that it's just mined

3   Bitcoin that it is at issue in this case?

4              MR. ROCHE:  Objection, calls for a legal

5         conclusion.

6              THE WITNESS:  My understanding is that forked

7         derivatives are also extremely important and

8         valuable and while the mined Bitcoin is anywhere

9         from 300 to a million as Craig Wright said

10        intellectual property and the forked are themselves

11        very valuable streams.

12   BY MR. PASCHAL:

13        Q.    Can you go to paragraph 32.  32 mentions

14   Mr. Hal Finney.  Has W&K had any interaction with Hal

15   Finney?

16        A.    Not to my knowledge.

17        Q.    Can you go to paragraph 48?  Actually never

18   mind.  Skip that.  I'll withdraw that question.  Does

19   W&K believe that Dave Kleiman kept it secret that he was

20   mining Bitcoin?

21        A.    Does W&K believe that Dave Kleiman the sole

22   member and sole manager kept it secret that he was

23   mining the Bitcoin?  I mean Dave did tell Ira that he

24   was mining Bitcoin.

25        Q.    So it wasn't a secret; right?

Zachary Eisner
January 09, 2020                                    63

```
 1              MR. ROCHE:  Objection, form.
 2              THE WITNESS:  The corporation's knowledge
 3         doesn't -- I don't know the corporation's ability
 4         to answer the individual told.
 5    BY MR. PASCHAL:
 6         Q.   Was any officers of W&K keeping it secret that
 7    they were working on Bitcoin, on mining Bitcoin?
 8         A.   I don't believe so.
 9         Q.   As you said that's because Ira claims that
10    Dave told him at a 2009 Thanksgiving dinner that he was
11    working on Bitcoin?
12         A.   (Indicating).
13         Q.   You have to answer.
14         A.   Yes, that conversation happened.
15         Q.   So it was not a secret?
16              MR. ROCHE:  Objection, form.
17              THE WITNESS:  That W&K was mining Bitcoin?
18         Well, Dave told Ira that he was mining Bitcoin.  I
19         don't know if that transfers to W&K.  I can't make
20         that legal --
21    BY MR. PASCHAL:
22         Q.   Is W&K aware that Dave was keeping it a
23    secret?  Was there any -- does the company have
24    knowledge its manager member is keeping a secret that
25    it's mining Bitcoin?  Foundation, improper predicate,
                                argumentative
```

U.S. LEGAL SUPPORT
www.uslegalsupport.com

Zachary Eisner
January 09, 2020                                    64

     A.   The company has no knowledge they were keeping
a secret or not.

     Q.   Can you go to paragraph 65.  W&K alleges from
their collaboration in 2008 until the Dave's death in
2013 Craig and Dave mined over a million of the initial
Bitcoins together personally and through W&K.  Do you
know the division of how much Bitcoin were mined
personally and through W&K?

     A.   No.

     Q.   Again would a million Bitcoin be reflected in
the interrogatories that I showed you earlier, the
addresses in the interrogatories I showed you earlier?

     A.   It might be.  I don't know.

     Q.   When you allege at the end of this paragraph
Craig has now asserted ownership over the Bitcoin can
W&K explain how has Craig asserted ownership over the
Bitcoin?

     A.   By fraudulently obtaining judgments in
Australia and taking the intellectual property of W&K as
well as the ability to ever recover anything from W&K
that is Craig asserting ownership of W&K as well as
acting as manager or director or authorized agent none
of which Craig was ever allowed to do.

     Q.   Going back to my question.  You're saying
here -- you allege identifiable Bitcoin wallets that

1    Craig has now asserted ownership over.  Talking about

2    Bitcoin wallets not intellectual property, not

3    Australian judgments.  How has Craig Wright asserted

4    ownership over the Bitcoin wallets?

5              MR. ROCHE:  Objection, form.

6              THE WITNESS:  Not sure I understand the

7         question.  Can you repeat the question?

8    BY MR. PASCHAL:

9         Q.   You allege that they're identifiable Bitcoin

10   wallets that Craig has now asserted ownership over.  How

11   has Craig asserted ownership over those identifiable

12   Bitcoin wallets?

13             MR. ROCHE:  Objection, form.

14             THE WITNESS:  By not being able to access or

15        identify the specific Bitcoin that W&K owns because

16        Craig moved them or transferred them or usurped

17        them that is Craig asserting ownership over those

18        specific assets.

19   BY MR. PASCHAL:

20        Q.   To move Bitcoin you would need the Bitcoin's

21   private key; correct?

22             MR. ROCHE:  Objection, calls for expert

23        testimony.

24             THE WITNESS:  To my knowledge personally you

25        could -- you could sequester Bitcoin by hiding

```
 1        information.  If the person doesn't have the
 2        private key they can't access the Bitcoin it's the
 3        same thing.
 4   BY MR. PASCHAL:
 5        Q.   That's not my question.  My question is for me
 6   to send Bitcoin -- you allege it in your complaint we
 7   can go through it I'm just trying to get an answer.  To
 8   get Bitcoin to go from point A to point B you need a
 9   private key; right?
10        A.   Yes.
11        Q.   So when you allege that Craig has now asserted
12   ownership over identifiable Bitcoin wallets are you also
13   alleging that Craig Wright somehow has taken Dave
14   Kleiman's private keys?
15             MR. ROCHE:  Objection, form.
16             THE WITNESS:  Or -- that could be an avenue or
17        he could have taken the Bitcoin assets owned by W&K
18        and moved those Bitcoin assets to some other
19        location.
20   BY MR. PASCHAL:
21        Q.   How did he -- I'm asking what is W&K's theory
22   that Craig Wright moved W&K's assets or Bitcoin wallets?
23             MR. ROCHE:  Objection, asked and answered.
24             THE WITNESS:  I would say that there is
25        multiple ways that Craig Wright has asserted
```

1      ownership over Bitcoin and -- Bitcoin owned by W&K

2      and they can be whether moving the money -- moving

3      the Bitcoin wallets or just transferring them to

4      different companies so they're not accessible or

5      putting them in his trusts or just hiding them away

6      where they're not identifiable.  All of those even

7      if he can't access them would be ways of asserting

8      ownership.

9  BY MR. PASCHAL:

10      Q.   Does W&K believe that Dave Kleiman had any

11  keys to W&K's Bitcoin, private keys?

12      A.   Yes.

13      Q.   Where are those private keys?

14      A.   It's unknown now.

15      Q.   Where -- where would Dave Kleiman have stored

16  W&K's private keys?    Foundation, non-answer

17          MR. ROCHE:  Objection, calls for speculation.

18          THE WITNESS:  I don't know how to answer the

19      question.

20  BY MR. PASCHAL:

21      Q.   Let me ask you.  Where would Dave Kleiman have

22  stored W&K's private keys?

23      A.   I don't know the answer to that question.  I

24  could direct that Craig thought that Dave had -- had

25  private keys and he asked to save a wallet.dat file,

```
 1    D-A-T file, so he thought that Dave had Bitcoin and

 2    ownership.

 3         Q.   I'm talking about W&K's hardware and what did

 4    its managing member do, okay?

 5              MR. ROCHE:  Objection, calls for speculation.

 6              MR. PASCHAL:  I haven't asked a question.

 7    BY MR. PASCHAL:

 8         Q.   As W&K where did Dave Kleiman keep W&K's

 9    private keys?

10         A.   W&K doesn't know the answer to that question.

11         Q.   Do you know about Dave Kleiman?

12         A.   What I've learned and become -- understand in

13    order to be able to testify today, yes.

14         Q.   How did you learn -- what did you review to

15    learn about David Kleiman?

16         A.   The complaint, the documents, speaking with

17    counsel, with Ira.

18         Q.   Did you do any internet search?

19         A.   I believe he has a Wikipedia page.

20         Q.   Do you know if that page is edited by counsel?

21         A.   I don't know.

22         Q.   Did you speak to any of Dave Kleiman's close

23    friends?

24         A.   No.

25         Q.   Did you speak to his fiancee?
```

Zachary Eisner
January 09, 2020                                    69

1         A.   No.

2         Q.   Did you speak to the son who lived with him --

3    or his figuratively son that lived with him during the

4    entire relevant period?

5         A.   No.

6         Q.   Did you look at any of Dave Kleiman's computer

7    hard drives?

8         A.   No.

9         Q.   Did you look at any of his USB drives?

10        A.   No.

11        Q.   Did you ask to look at any of that stuff?

12        A.   I don't believe so.

13        Q.   So would it be correct to say that you took no

14   steps to locate whether Dave Kleiman's private keys?

15             MR. ROCHE:  Objection, form.

16             THE WITNESS:  I asked counsel --

17             MR. PASCHAL:  Other than asking counsel,

18        sorry.

19             THE WITNESS:  They may be aware of all facts

20        relevant for me to be able to testify.

21   BY MR. PASCHAL:

22        Q.   I'm just trying to figure out because -- so --

23   can you go back to Exhibit 6?  You have a page two?

24        A.   Yes.

25        Q.   So you see there's a chart that lists -- I'm

Zachary Eisner
January 09, 2020                                         70

```
 1    just focusing on the chart.  The chart that lists
 2    electronic equipment that Ira was able to recover.  On
 3    this list what electronic equipment belongs to W&K or
 4    would be W&K's property?
 5         A.   I don't know the exact breakdown.  I don't
 6    know.
 7         Q.   Have you seen this list before?
 8         A.   No.
 9         Q.   On page three when you see e-mail accounts?
10         A.   Yes.
11         Q.   What e-mail accounts would be associated with
12    W&K?
13         A.   I don't know.
14         Q.   What steps did you take to find out?
15         A.   Speaking with counsel.
16         Q.   So counsel doesn't know?
17              MR. ROCHE:  Objection, calls for privileged
18         information.
19    BY MR. PASCHAL:
20         Q.   What steps did W&K take to preserve its
21    electronic devices in advance of this litigation?
22         A.   I do not know.  I don't know.
23         Q.   Was W&K aware that Ira Kleiman re-formatted
24    Dave's hard drives?
25         A.   I am aware that Ira Kleiman attempted to
```

1   access Dave's hard drives.

2        Q.   My question is W&K aware that Ira Kleiman

3   re-formatted Dave's hard drives?

4        A.   No.

5        Q.   Is W&K aware that after reformatting Dave

6   Kleiman's hard drives Ira Kleiman continued to use those

7   hard drives until 2019?

8        A.   I don't know.

9        Q.   Is W&K aware that on a number of these USB

10  drives that are listed on this chart there are encrypted

11  files?

12       A.   No.  We are not aware.

13       Q.   Has W&K taken any steps to learn about the

14  encrypted files?

15       A.   I don't know the answer to that question.

16       Q.   So if Dave's private keys were in those

17  encrypted files W&K -- what would your answer be as to

18  whether or not those private keys may be in the

19  encrypted files?

20            MR. ROCHE:  Objection, that's -- to the extent

21       you understand the question you can answer.

22            THE WITNESS:  I'll answer that if relevant

23       information concerning W&K was in any way on any of

24       the hard drives or encrypted files I would have

25       been made aware of it by counsel in my preparation

1          to be corporate representative of W&K.

2     BY MR. PASCHAL:

3          Q.    W&K has access to the encrypted files?

4          A.    I don't know the answer to that question.

5          Q.    When W&K was created who were its members?

6          A.    Dave Kleiman was the sole member.

7          Q.    In 2012 who were the members?

8          A.    Dave Kleiman was the sole member up until

9     dissolution.

10         Q.    What documents have you reviewed to prepare

11    yourself or educated yourself to make that answer?

12         A.    There is no operating agreement to W&K's

13    knowledge.  So the only information we have that he was

14    a sole member is the sole manager and the disclaiming by

15    Craig of any interest in W&K leads us to believe there

16    is no other member other than Dave.

17         Q.    You have produced this -- actually plaintiff

18    produced this -- no, we produced this and plaintiff

19    produced this.  Can you --

20              MR. ROCHE:  Exhibit 7?

21              MR. PASCHAL:  Yes.

22              (Defendant's Exhibit No. 7 was

23              marked for identification.)

24    BY MR. PASCHAL:

25         Q.    Handing you what I'm marking as Exhibit 7.  At

1    the bottom of this e-mail chain who is the e-mail being

2    sent from?

3         A.    From Dave Kleiman.

4         Q.    Who is it being sent to?

5         A.    Craig Wright and CC Lynn Wright.

6         Q.    What is the domain name for Lynn Wright?

7         A.    Lynn.Wright@Information-defense.com.

8         Q.    Dave writes, "Hmmm, I am all ears on

9    suggestions but I see no way of filing for LLC or non

10   profit in time.  Do you have any ideas?  I have three

11   fictitious names I can easily apply for if needed" and

12   he links to SunBiz.  Did you see this e-mail?

13        A.    I don't believe so.

14        Q.    Since you pulled out the articles of

15   incorporation what's the date on the Articles of

16   Incorporation for W&K?

17        A.    February 16.

18        Q.    What year?

19        A.    2011.

20        Q.    What's the date on this e-mail?

21        A.    February 14, 2011.

22        Q.    The next e-mail Dave Kleiman writes to Craig

23   Wright and LynnWright@InformationDefense.com and he says

24   "I sent an e-mail to see if there is an expedited or

25   online way to accomplish in any case how about a name?"

```
1              MR. ROCHE:  Objection, mischaracterizes the

2         document.

3     BY MR. PASCHAL:

4         Q.   Do you see that?

5         A.   Yes.

6         Q.   Then Craig writes to Dave Kleiman and Lynn

7     Wright and he says Lynn, question mark.

8         A.   Yes, I see that.

9         Q.   What does Dave Kleiman say after that?

10        A.   Wright Kleiman Information Security dot, dot,

11    dot W&K Info Defense dot, dot, dot.

12        Q.   That is what one day before the Articles of

13    Incorporation are filed?

14        A.   Yes.

15        Q.   Then Lynn Wright says "either or, you choose."

16        A.   Yes.

17        Q.   Do you take that as they're letting Lynn

18    Wright choose the name of the company?

19        A.   Yes.

20        Q.   Then Craig responds and he says W&K Info

21    Defense Research.

22        A.   Yes.

23              (Defendant's Exhibit No. 8 was

24              marked for identification.)

25
```

1    BY MR. PASCHAL:

2        Q.   Showing you Exhibit 8.  Again this is

3    February 15, 2011, the day before Articles of

4    Incorporation are filed.  You see the subject says

5    registration TTA1?

6        A.   Yes.

7        Q.   Then Dave Kleiman says to Craig Wright and

8    Lynn Wright@InformationDefense.com last page of

9    attached.  "Do you think I could list you as an MGR or

10   MGRM with a foreign address or do you think they would

11   kick it back?"

12           MR. ROCHE:  Objection, mischaracterizes the

13       document.

14   BY MR. PASCHAL:

15       Q.   How long have you been practicing for nine

16   years; right?

17       A.   Yes.

18       Q.   What does MGR mean to you?

19       A.   Manager.

20       Q.   What does MGRM mean to you?

21       A.   Managing member.

22       Q.   Why would Dave Kleiman be asking Lynn Wright

23   that question?

24           MR. ROCHE:  Objection, calls for speculation.

25           THE WITNESS:  Can I answer?  He was asking --

1        reading it do you think I could list you as a

2        manager or not.  In fact, he ended up not listing

3        him as a manager.  He was the sole manager.

4    BY MR. PASCHAL:

5        Q.    You know as a matter of law you don't have to

6    actually list all of your members or managing members on

7    SunBiz.org document, right?

8              MR. ROCHE:   Objection, calls for a legal

9        conclusion.

10             MR. PASCHAL:   Coming from a lawyer.

11             THE WITNESS:   Me personally.

12   BY MR. PASCHAL:

13       Q.    You aware --

14       A.    I'm aware you don't have to list all the

15   members, not the managers.  You have to list the

16   managers.

17             (Defendant's Exhibit No. 9 was

18             marked for identification.)

19   BY MR. PASCHAL:

20       Q.    Handing you Exhibit 9.  I guess just start at

21   the top it's easier.  Dave Kleiman on the date that the

22   Articles of Incorporation are filed Dave sends an e-mail

23   to Craig Wright and Lynn Wright@informationdefense.com

24   and the subject is re: registration TTA1 and then he has

25   an attachment W&K Info Defense Research, LLC.

1   Representing to you because we don't have a computer in

2   front of us but the metadata for that attachment is that

3   Articles of Incorporation draft.  He says "look it over

4   real quick.  Let me know if it's okay or should the PoC

5   be in the US.  I see a non US vendor on the list.  Pay

6   special attention to additional authentication."

7           If Dave Kleiman was the only member of W&K why

8   is he sending the Articles of Incorporation to Lynn

9   Wright and Craig Wright and asking them if it's okay --

10  let me know if it's okay?

11          MR. ROCHE:  Objection, calls for speculation.

12          THE WITNESS:  May I ask where it says anything

13      about additional authentication in this Exhibit 4

14      document?

15  BY MR. PASCHAL:

16      Q.   I'll get to that in a second.

17      A.   You're telling me that the attachments is

18  Exhibit 4?

19      Q.   Yes.

20      A.   So it seems like he already filed it.  I don't

21  know what PoC means.  Sorry, what was the question?

22      Q.   Let me show you the TTA1.

23          MR. ROCHE:  In a few minutes can we take a

24      break?

25

1   BY MR. PASCHAL:

2        Q.   Yes.  When we get back I'll show you the

3   department of Homeland registration.  Why is he asking

4   for permission if he is the managing member why is he

5   asking Lynn Wright and Craig Wright to submit something

6   on behalf of W&K?

7             MR. ROCHE:  Objection, calls for speculation.

8             THE WITNESS:  Again I don't understand.  What

9        is the attachment?

10  BY MR. PASCHAL:

11       Q.   That is the attachment.

12       A.   Exhibit 4?

13            MR. ROCHE:  Counsel, you can represent that is

14       the exact attachment --

15            THE WITNESS:  Exhibit 4 is attached to Exhibit

16       9 you're saying?

17            MR. PASCHAL:  Yes, attachment W&K Info Defense

18       Research, LLC the Articles of Incorporation.

19            THE WITNESS:  Again I don't see -- I trust

20       you.  I don't know what PoC means.  I don't see

21       additional authentication.

22  BY MR. PASCHAL:

23       Q.   Even though it's a document that's being

24  submitted for W&K?

25       A.   Purpose of your question?

Zachary Eisner
January 09, 2020                                    79

1      Q.    Something being submitted on behalf of W&K;
2  right?
3      A.    He's sending them something about W&K, right?
4      Q.    If he is the managing sole member of the
5  company why is he asking for permission from Lynn Wright
6  and Craig Wright about submitting any document?
7           MR. ROCHE:  Objection, mischaracterizes the
8           document, calls for speculation.
9           THE WITNESS:  The sole manager who has all
10          legal authority was Dave Kleiman.  He can ask for
11          understanding or acceptance or does this look good
12          or do you approve this to anybody.  Doesn't
13          necessarily mean a legal right, rights to
14          ownership.
15          MR. PASCHAL:  Let's get into the development.
16          What time is it?
17          MR. ROCHE:  12:18.  We can either take the
18          break probably if this is going to be to four
19          minutes.
20          MR. PASCHAL:  Let's take a break.
21          THE VIDEOGRAPHER:  Off record at 12:16.
22          (Thereupon, a brief lunch recess was taken.)
23          THE VIDEOGRAPHER:  On record 1:34.
24  BY MR. PASCHAL:
25     Q.    So just I need to correct the record on

1    Exhibit 9 the e-mail chain?

2        A.   Yes.

3             MR. PASCHAL:  It says W&K Info Defense, LLC.

4        The actual attachment was application to Homeland

5        Security so I'm going to hand that to you as 10.

6             (Defendant's Exhibit No. 10 was

7             marked for identification.)

8    BY MR. PASCHAL:

9        Q.   Have you seen this document before today?

10       A.   No.

11       Q.   On page two what's identified as the company

12   name applying for this program?

13       A.   W&K Info Defense Research, LLC.

14       Q.   And the address 4371 Northlake Boulevard, #314

15   is that the same address that was listed on the Articles

16   of Organization?

17       A.   As the mailing address, yes.

18       Q.   As the mailing address.

19       A.   It's misspelled but yes.

20       Q.   This is the attachment that Dave Kleiman is

21   sending to Lynn Wright and Craig Wright?

22            MR. ROCHE:  You've made the representation

23       that this is --

24            MR. PASCHAL:  Clarified on the record this is

25       the actual attachment.  I was wrong.

1             THE WITNESS:  Not Exhibit 4?

2             MR. PASCHAL:  Not Exhibit 4.  This is the

3         attachment.

4    BY MR. PASCHAL:

5         Q.   You notice in the e-mail they reference point

6    of contact information?

7         A.   Yes.

8             MR. ROCHE:  Just so the record is clear I'm

9         going to object now that we know the previous

10        questions were based on the wrong attachment I am

11        going to preserve an objection all those answers

12        are objectionable based on wrong attachment.

13   BY MR. PASCHAL:

14        Q.   The point of contact who is listed as the

15   point of contact?

16        A.   Mr. Craig Wright.

17        Q.   What is his title?

18        A.   Lead researcher.

19        Q.   Again this is the document that Dave is

20   sending to Craig Wright and Ms. Lynn Wright?

21        A.   Yes.

22        Q.   And the e-mail this is the same e-mail where

23   Dave is asking for permission from Dave -- from Craig

24   and Lynn of whether or not he can submit this document?

25            MR. ROCHE:  Objection, form, calls for

Zachary Eisner
January 09, 2020                                    82

```
 1        speculation.
 2              THE WITNESS:  Let me know if this is okay but
 3        I would suppose more if this is accurate.
 4   BY MR. PASCHAL:
 5        Q.   Before today have you heard of Information
 6   Defense, PTY?
 7        A.   Before I was brought in for this, no.
 8        Q.   At any point have you heard of Information
 9   Defense?
10              MR. ROCHE:  Objection, form, vague.
11              THE WITNESS:  Have I heard of Information
12        Defense?  You mean in my review of company
13        materials?  I don't recall if it was part of Dave
14        Kleiman materials but I don't believe so.
15   BY MR. PASCHAL:
16        Q.   Were you aware that Craig Wright and Mrs. Lynn
17   Wright were going through a divorce at about the time
18   that W&K was being created?
19        A.   I know that they were divorced.  I don't know
20   the exact timeline.
21              MR. PASCHAL:  Going to show you what I'm
22        marking as Exhibit 11.
23              (Defendant's Exhibit No. 11 was
24              marked for identification.)
25
```

```
 1    BY MR. PASCHAL:
 2         Q.    At the top of this e-mail it says it's from
 3    Craig Wright; correct?
 4         A.    Yes.
 5         Q.    It's going to Dave Kleiman that is
 6    Dave@DaveKleiman.com address?
 7         A.    Yes.
 8         Q.    The date is 2011; correct?
 9         A.    Yes.
10         Q.    At the bottom you see Craig Wright's
11    signature; correct?
12         A.    Yes.
13         Q.    The company name is Information Defense PTY
14    LTD?
15         A.    Yes.
16         Q.    I'm just going to read this because it's going
17    to be significant in a second but do you see in the
18    second paragraph that in this e-mail to Dave Craig says
19    Lynn will be taking over the company?
20         A.    Yes, I do.
21              MR. PASCHAL:   This is a document that was
22         filed -- this is Exhibit 12.
23              (Defendant's Exhibit No. 12 was
24              marked for identification.)
25
```

Zachary Eisner
January 09, 2020                                    84

```
 1   BY MR. PASCHAL:
 2       Q.   This is a document that was filed as a part of
 3   Craig Wright and Lynn Wright's divorce.  This is an
 4   appendix and it's a Court document.  On this appendix
 5   it's summarizing the split of who would get what.
 6           MR. ROCHE:  Object, using this document to the
 7       extent it's unauthentic.
 8           MR. PASCHAL:  Kyle, according to Vel there was
 9       an agreement that it would be objections to form
10       only on all depositions.
11           MR. ROCHE:  I mean -- if you have an issue
12       with my objection you can raise it with the court.
13       I think we've all -- everybody in this case has
14       been stepping outside of the lines of just form
15       objections.
16           MR. PASCHAL:  All right.
17   BY MR. PASCHAL:
18       Q.   So this document that was filed in court do
19   you see where it says W&K?
20       A.   Yes.
21       Q.   What does it say about the shares of W&K?
22       A.   50 percent of shares from Craig Wright
23   existing shares to be split and divided 50 percent to go
24   to Lynn Wright.
25       Q.   Now, this document this divorce settlement --
```

 1   would divest Craig Wright of any interest in W&K;

 2   correct?

 3           MR. ROCHE:  Objection, calls for a legal

 4       conclusion.

 5           THE WITNESS:  Again to the extent that it's

 6       authentic I can't -- I don't know for sure as W&K I

 7       don't know exactly and also it seem -- it would

 8       seem to conflict with an affidavit that Craig did

 9       file saying it never had anything to do with W&K.

10   BY MR. PASCHAL:

11       Q.   Again his e-mail before was that he's stepping

12   away from Information Defense altogether; correct, that

13   Lynn was taking over Information Defense?

14           MR. ROCHE:  Objection, form.

15           THE WITNESS:  It says Lynn will be taking over

16       the company.  I don't know what company they're

17       referring to.  It's my understanding they had

18       multiple companies.

19   BY MR. ROCHE:

20       Q.   Do you understand that Information Defense

21   started in Australia between Craig and Lynn Wright?

22           MR. ROCHE:  Objection to form.

23           THE WITNESS:  I did not know that.

24   BY MR. PASCHAL:

25       Q.   And that -- what was the purpose of W&K

1   forming?

2       A.   To mine Bitcoin and hold intellectual

3   property.

4       Q.   That e-mail that we just went through with

5   Dave talking with Lynn Wright and Craig Wright can you

6   show me in in any point -- they're talking about forming

7   W&K can you show me any point in that e-mail where they

8   say the company is to mine Bitcoin?

9            MR. ROCHE:   Objection, form.

10  BY MR. PASCHAL:

11      Q.   If you go to Exhibit 9, Exhibit 8, Exhibit 7.

12      A.   Nowhere in the e-mail does it say to mine

13  Bitcoin.  On the business record it says any and all

14  lawful business.  I believe Craig Wright is to supposed

15  to mine Bitcoin.

16      Q.   Not talking about business record of Bitcoin.

17  Talking about this e-mail between Dave Kleiman and Lynn

18  Wright and Craig Wright and Info Defense?

19      A.   I thought we said this was recording

20  application for DHS.

21      Q.   That's this one e-mail.  These e-mails so if

22  you go to Exhibit 8?

23      A.   What attachment is that?  That's a different

24  attachment than before.

25      Q.   Talking about the e-mail.

1          A.    Exhibit 8.

2          Q.    Exhibit 7 for example.  If you go to Exhibit 7

3    at the bottom it says I sent -- Dave Kleiman says to

4    Craig Wright and Lynn "I sent an e-mail to see if

5    there's an expedited online way to accomplish.  In any

6    case how about a name" and eventually Lynn Wright

7    selects W&K Info Defense?

8          A.    Yes.

9          Q.    You recall this e-mail?

10         A.    Yes.

11         Q.    So at this point Craig Wright had no

12   involvement with W&K Info Defense?

13              MR. ROCHE:  Objection, form.

14              THE WITNESS:  What do you mean by involvement?

15   BY MR. PASCHAL:

16         Q.    It hasn't been created yet?

17         A.    Right.  Seems as of this date it wasn't

18   created.

19         Q.    In this e-mail do they mention anything about

20   Bitcoin?

21         A.    No.  Could have been bankrupt.

22         Q.    The very next day and you go back to Exhibit 9

23   as you pointed out what -- the first thing they do for a

24   business is apply to Department of Homeland Security an

25   application?

1      A.   Yes.  That was another one of their business

2  purposes to apply for the -- to the four DHS

3  applications.

4      Q.   Nowhere on that application does it mention

5  anything about Bitcoin.

6           MR. ROCHE:  Objection, form.

7           THE WITNESS:  I would need to see the

8      applications.  I did see them.  I don't recall them

9      perfectly.  I would argue that, you know,

10     businesses could have multiple purposes.

11  BY MR. PASCHAL:

12     Q.   When I asked you about the business purpose

13  you never told me this one, this specific business

14  purpose.

15     A.   Yes, I would like to amend my answer also to

16  apply to four DHS applications, yes.  Forgot about that

17  one.

18     Q.   Does the estate -- or does W&K have any

19  e-mails that Dave Kleiman the purpose of W&K was to mine

20  Bitcoin?      Relevance

21     A.   Not to my knowledge.

22     Q.   Does W&K have any documents saying that the

23  purpose of W&K is to mine Bitcoin?

24     A.   Does W&K have any documents -- if Craig's

25  multiple admissions that W&K was supposed to mine

```
 1   Bitcoin.
 2        Q.    I'm asking if W&K has any documents not Craig
 3   Wright, to say --
 4             MR. ROCHE:  Objection to form.
 5             THE WITNESS:  Not to my knowledge.
 6   BY MR. PASCHAL:
 7        Q.    You mentioned IRS tax requests.  Did W&K ever
 8   pay taxes for the Bitcoin that it purportedly mined?
 9             MR. ROCHE:  Objection, form.
10             THE WITNESS:  There were no tax records to
11        review.
12   BY MR. PASCHAL:
13        Q.    So back to my question.  Did W&K pay for any
14   of the -- pay taxes on any of the Bitcoin that it
15   purportedly mined?
16        A.    I don't know the answer to that question.
17        Q.    Do you know if Dave Kleiman filed for his tax
18   returns?
19        A.    I don't know the answer to that question.
20        Q.    Do you know if Dave Kleiman ever listed
21   Bitcoin as an asset on his taxes?
22        A.    I don't know the answer to that question.
23        Q.    When W&K was reinstated what efforts did W&K
24   take to locate the members of W&K?
25        A.    When W&K was reinstated in 2018?
```

Argumentative, improper predicate, question
wrongfully assumes mining bitcoin was a
taxable event

Argumentative, improper predicate,
question wrongfully assumes mining
bitcoin was a taxable event

1    Q.   Yes.

2    A.   Absent other evidence W&K believes that Dave

3  was the sole member and Ira was taking it over and who

4  is now the sole member.

5    Q.   But did you contact anyone about the

6  membership of W&K?

7    A.   I don't know the answer to that question.

8    Q.   So you wouldn't know if anyone contacted Lynn

9  Wright about reinstating W&K, would you?

10       MR. ROCHE:  Objection, form.

11       THE WITNESS:  I would not know.

12  BY MR. PASCHAL:

13   Q.   Can you turn to paragraph 72 in the complaint?

14  Sorry, it's paragraph 70.  That first sentence W&K

15  alleges that it has no operating agreement and its exact

16  ownership structure is unclear due to Craig's

17  contradictory statements.  So from the time you filed

18  this complaint to now what evidence does W&K have to

19  clear -- to make clear its ownership structure?

20   A.   Currently?

21   Q.   So you filed this complaint --

22   A.   Yes.

23   Q.   -- with Craig's affidavits and everything.

24  You're saying it's unclear the ownership structure;

25  correct?

1        A.    In 2011.

2        Q.    2011?  No.  W&K -- read the paragraph.  W&K

3   has no operating agreement and its exact ownership

4   structure is unclear due to Craig's contradictory

5   statements.  W&K made this allegation on January 14th

6   2019.  Okay?

7        A.    Correct.

8        Q.    So from January 14th 2019 to today what

9   evidence does W&K have to support that Ira Kleiman is

10  the only member of W&K?

11       A.    Other than Craig's statements disclaiming any

12  interest I do not know.

13       Q.    So -- but those statements disclaiming

14  interest you put that in the complaint but you did

15  recognize it's still unclear the ownership structure of

16  W&K?

17            MR. ROCHE:  Objection, form.

18            MR. PASCHAL:  Correct.

19            THE WITNESS:  It's our position that Dave

20       Kleiman was 100 percent the sole member and now IRA

21       is 100 percent the sole member.

22  BY MR. PASCHAL:

23       Q.    I'm trying to get to the basis of that

24  position.  You say on January 14, 2019 it's unclear you

25  do not know your ownership structure?

1        A.    Absence any other evidence Dave is 100 percent

2    the member and Ira is 100 percent the member.

3        Q.    You're saying it's unclear on January 14,

4    2019; correct?

5        A.    Yes, that's what it says.

6        Q.    Going forward what evidence do you have to

7    suggest that Ira Kleiman is the only managing member of

8    W&K?

9            MR. ROCHE:  Objection, form.

10           THE WITNESS:  Again the reason it's unclear is

11       because of the contradictory statements of Craig

12       Wright to our knowledge and our position is that

13       Dave is the 100 percent sole member and Ira is

14       100 percent the sole member.

15   BY MR. PASCHAL:

16       Q.    Has Ira opened up a probate to accept the

17   shares of W&K?

18           MR. ROCHE:  Objection, outside the scope of

19       the 30(b)6 topics.

20           MR. PASCHAL:  That's outside the scope.  Goes

21       to W&K whether it's even active.

22           MR. ROCHE:  Goes to what?

23           MR. PASCHAL:  W&K's proprietary information,

24       its membership.

25           MR. ROCHE:  How does Ira's opening up --

1          MR. PASCHAL:   I'm trying to figure out whether

2      it's the estate or Ira Kleiman.  He said Ira is the

3      managing member so I'm trying to figure that out if

4      you're going to instruct him not to answer.

5          MR. ROCHE:   I'm going to instruct him not to

6      answer because this is outside the scope of the

7      30(b)6.

8          MS. MCGOVERN:   Can you please mark this

9      question because there is a hearing?

10   BY MR. PASCHAL:

11       Q.    To be clear the only evidence you have of the

12   ownership of W&K as you sit here today is preparing the

13   complaint and talking to counsel; correct?

14       A.    And Ira.

15       Q.    The 15 minute conversation you had with Ira?

16       A.    I believe so, yes.

17       Q.    Again they never -- counsel never provided you

18   with any -- Ira never provided you with any of the

19   documents that we produced in discovery including the

20   e-mails that I showed you previously, 7, 8 and 9?

21       A.    No.

22       Q.    Is that a no?

23       A.    Yes, no.

24       Q.    Can you go to 79?  You're saying the exact

25   number of Bitcoin belonging to Dave's estate and or W&K

1    will be determined at trial.  How is that going to be

2    determined at trial?

3              MR. ROCHE:  Objection, calls for a legal

4         conclusion.  Withdraw that objection.

5              THE WITNESS:  That's for the judge to

6         determine.

7    BY MR. PASCHAL:

8         Q.   What evidence does W&K have to determine the

9    exact number of Bitcoins belonging to Dave's estate and

10   or W&K and how it will be determined at trial?

11        A.   Again that's for the judge to determine but

12   various documents, e-mails, contracts, admissions and

13   transcripts.

14        Q.   What e-mails are going to reflect the amount

15   of Bitcoin that belongs to Dave's estate and or W&K?

16        A.   I believe Craig said through Ira at least

17   300,000.  There is an e-mail saying I have a million.

18   Similar amounts multiple e-mails going through.  Whether

19   it in part owned by Dave.  Whether in part owned by W&K.

20   We're not sure yet.

21        Q.   How many e-mails -- how many e-mails exactly

22   state that?

23        A.   I could not tell exactly how many e-mails.  I

24   know multiple e-mails are attached to the complaint.

25        Q.   All those e-mails are from Craig Wright to Ira

 1   Kleiman?

 2       A.   If I saw the exhibits I would be able to

 3   better show but to my remembering there's also an

 4   Australian tax transcript of which he also says how much

 5   Bitcoin he has or something of the sort.  I would have

 6   to look at the exhibits again to --

 7       Q.   If we were at trial right now what will W&K

 8   tell the jury as to the amount of Bitcoin that it

 9   purportedly owns?

10       A.   Anywhere between 300 --

11            MR. ROCHE:  Objection, form.  You can go ahead

12       and answer.

13            THE WITNESS:  Anywhere between 300 and

14       1,100,000.

15   BY MR. PASCHAL:

16       Q.   Is the jury supposed to guess?

17            MR. ROCHE:  Objection, form.

18            THE WITNESS:  I don't know the answer to that

19       question.

20   BY MR. PASCHAL:

21       Q.   You're telling a jury they have to pick a

22   number between 300 and a million.  How are they supposed

23   to pick that number?

24            MR. ROCHE:  Objection, form.

25            THE WITNESS:  I don't know the answer to that

Zachary Eisner
January 09, 2020                              96

1        question.

2   BY MR. PASCHAL:

3        Q.   As W&K's corporate representative what are you

4   suing Craig Wright for?

5        A.   Anywhere between 300 and 1,100,000 Bitcoin.

6        Q.   How much of that belongs to Dave and how much

7   of that belongs to W&K?

8        A.   It's unknown exactly the split.

9        Q.   How are you going to clear that up?  How are

10  you going to figure that out?

11            MR. ROCHE:  Objection to form.

12            THE WITNESS:  I don't know the answer to that

13       question.

14  BY MR. PASCHAL:

15       Q.   So of that range that 700,000 range 300

16  between a million sitting here as the corporate

17  representative of W&K you can't tell the jury how much

18  of that belongs to you -- to W&K?

19            MR. ROCHE:  Objection, form.

20            THE WITNESS:  I don't think that's really

21       relevant.  If you took 300 to a million then it was

22       owed to W&K and/or Dave in some, you know, manner

23       that's for the jury to decide.

24  BY MR. PASCHAL:

25       Q.   How is the jury going to decide that?

```
 1              MR. ROCHE:  Objection, form.
 2              THE WITNESS:  Based on numerous, numerous
 3         affidavits and admissions on how much Bitcoin --
 4         that's for them to decide.
 5    BY MR. PASCHAL:
 6         Q.   When you say numerous like what are you
 7    referring to numerous what?  I know you mentioned the
 8    ATO transcript and some e-mails?
 9         A.   I point out paragraph 83 of the complaint that
10    says that Craig has 1.1 Bitcoin and Mr. Kleiman would
11    have a similar amount.  Point at multiple e-mails I
12    don't recall the exact exhibits but I know they're
13    attached to the complaint.  I don't have it in front of
14    me that he said to Ira that at least 300 -- there's
15    multiple, multiple -- there is the e-mail actually on
16    paragraph 88 Craig admitted 300,000 are held for Dave.
17         Q.   These are all e-mails that were --
18         A.   Sorry?
19         Q.   These are all e-mails that are with Ira?
20    E-mails between Craig and Ira?
21         A.   One of them was with the Australian tax
22    people.
23         Q.   He had an e-mail with the Australian tax
24    people?
25         A.   Craig and the Australian tax people the
```

```
 1   transcript.
 2        Q.   Australian -- were you aware that Craig Wright
 3   had issues with the Australian Tax Office?
 4        A.   Yes.
 5        Q.   Are you aware that counsel for plaintiffs have
 6   alleged that numerous of those documents in the ATO
 7   proceedings were forged or faked or fraud; correct?
 8             MR. ROCHE:  Objection, form.
 9             THE WITNESS:  I'm aware that -- they did
10        inform me that some of the documents were
11        manipulated.
12   BY MR. PASCHAL:
13        Q.   Can you go to paragraph 93?  You allege that
14   the mined Bitcoin was stored in wallets in the
15   possession of Dave, Craig, W&K and/or certain trusts.
16   What are the trusts that you're referring to?
17        A.   It's unknown at this time.
18        Q.   What steps have you taken to learn what the
19   trusts are?
20        A.   What steps has W&K the corporation taken?
21        Q.   Yes.  Or you as the corporate representative
22   to educate yourself on that topic?
23        A.   Asking counsel.
24        Q.   Does W&K believe that Dave had access to this
25   trust?
```

1          MR. ROCHE:  Objection, form.  Just testified
2     he doesn't know trusts.
3          MR. PASCHAL:  Not asking about them.
4          MR. ROCHE:  You said this trust.  Objection,
5     form.
6          THE WITNESS:  Can you repeat the question?
7     BY MR. PASCHAL:
8     Q.   Yes.  Does W&K believe that Dave Kleiman had
9     access to the trust?
10    A.   I don't know the answer to that question.
11    Q.   I don't know if I asked this before but has
12    W&K taken any steps to decrypt or recover any data from
13    Dave's electronic devices?
14    A.   I don't know the answer to that question.
15    Q.   Has W&K taken any steps to recover e-mails
16    from all of Dave's e-mail addresses?
17    A.   I don't know the answer to that question.
18    Q.   Throughout your complaint you allege that Dave
19    and Craig were mining at least from 2013; correct?
20    A.   Yes.
21    Q.   And developing intellectual property until
22    2013?
23    A.   Yes.
24    Q.   Are you aware that Dave Kleiman was in the
25    hospital from 2011 to 2013 consistently?

```
 1        A.   I am aware that he was in and out of the
 2   hospital over periods of this time.
 3        Q.   Do you realize -- do you know he was admitted
 4   from 2011 to 2013?
 5        A.   Do I know that he was admitted in the hospital
 6   for two straight years?
 7        Q.   Yes.
 8        A.   No.
 9        Q.   Did you know -- do you know anything about his
10   health condition during those years?
11        A.   I know that he was I believe a quadriplegic.
12   I know that he declined seriously in 2013.  I don't know
13   much more than that.
14        Q.   Do you know that he had serious financial
15   issues for the last couple years of his life?
16        A.   No.
17        Q.   Did you know that his home was going into
18   foreclosure?
19        A.   No.
20        Q.   Did you know that he was trying to refinance
21   his house during that time and he couldn't?
22             MR. ROCHE:  Objection, this is -- you can
23        answer but this is outside the scope of 30(b)6.
24             MR. PASCHAL:  Just asking whether he knows.
25             THE WITNESS:  I was going to say the
```

1          corporation's knowledge of that I don't know.  I

2          don't know all that.

3     BY MR. PASCHAL:

4          Q.   Is it W&K's position that during this time

5     that Dave Kleiman had financial trouble and serious

6     health conditions that he was mining Bitcoin out of the

7     Miami V.A. Hospital?

8               MR. ROCHE:  Objection, form.

9               THE WITNESS:  The mining could have been set

10         up and let to run.

11    BY MR. PASCHAL:

12         Q.   Like at his house?

13         A.   Among other places, sure.

14         Q.   Did you know that he couldn't pay his power

15    bills so his power was shut off?

16              MR. ROCHE:  Objection, outside the scope of

17         30(b)6.

18              THE WITNESS:  As corporate representative I

19         don't know.

20    BY MR. PASCHAL:

21         Q.   What other places could he have been set up to

22    mine?

23         A.   I don't know the answer to that question.

24         Q.   Going back to my question is it W&K's position

25    that with Dave's financial situation and his declining

1    health and his admittance in the Miami V.A. that he was

2    mining Bitcoin out of the Miami V.A.?

3              MR. ROCHE:  Objection, form.

4              THE WITNESS:  I don't think mining out of the

5         V.A. would be the correct usage but the corporation

6         was set up and mining was set up to continuously

7         mine.  That is the company's position from 2011

8         throughout.

9    BY MR. PASCHAL:

10        Q.   Where was the company storing these mined

11   Bitcoin?

12             MR. ROCHE:  Objection, form.

13             THE WITNESS:  We don't know the answer to that

14        question.  We don't know.

15   BY MR. PASCHAL:

16        Q.   Can you turn to paragraph 119?  Paragraph 117

17   you allege that in July August 2013 Craig filed two

18   claims in New South Wales Supreme Court against W&K for

19   $28 million each.  Are you aware of that lawsuit?

20        A.   I am aware of the lawsuit.

21        Q.   If you go down to 119 W&K alleges that W&K was

22   never served validly or otherwise with these

23   proceedings.  What steps did you take to determine

24   whether or not you were actually were served?

25        A.   By speaking with counsel and Ira regarding

```
 1    service that should have been processed.  There is no
 2    record of receiving any service whatsoever.
 3               (Defendant's Exhibit No. 13 was
 4               marked for identification.)
 5    BY MR. PASCHAL:
 6        Q.   Handing you Exhibit 13.  I want to just start
 7    on the second page of this.  So at top of the page you
 8    see Supreme Court of New South Wales; correct?
 9        A.   Second page, yes.
10        Q.   It says postage paid Australia at the top
11    right; correct?
12        A.   Yes.
13        Q.   The address that's on this envelope the 4371
14    Northlake Boulevard, Suite 314, is that the same address
15    that's the mailing address for W&K?
16        A.   It is but it's not the registered agent
17    address.  You would not be sending service of process to
18    the mailing address.
19        Q.   Just asking if it was the mailing address?
20        A.   It is.
21        Q.   It says it's addressed to W&K Info Defense
22    Research, LLC; right?
23        A.   Yes.
24        Q.   And there's handwriting that says received
25    10/10/13?
```

Zachary Eisner
January 09, 2020                                    104

1        A.   Yes.

2        Q.   Do you know who wrote that?

3        A.   I could only assume that it is the UPS store

4   of which 4371 Northlake Boulevard is.

5        Q.   Do you know what 4371 Northlake Boulevard is?

6        A.   It's a UPS store.

7        Q.   Do you know if anyone was checking that

8   mailbox after Dave's death?

9        A.   I believe that Dave's business partner was

10  checking that mailbox.

11       Q.   Do you know that Dave's business partner is

12  the one who wrote received 10/10/2013?

13       A.   No.

14       Q.   Are you aware that Dave's business partner is

15  also alerted Ira that -- about this mailbox, this UPS

16  mailbox?

17            MR. ROCHE:   Objection, form.

18  BY MR. PASCHAL:

19       Q.   Ira declined to pay for the mailbox for W&K's

20  mailing address?

21       A.   I'm not aware.  However again it's not service

22  of process because it could only be done to the

23  registered agent.

24       Q.   You're familiar with the Haigh Convention;

25  correct?

```
 1              MR. ROCHE:  Objection.  You can answer.

 2              THE WITNESS:  Vaguely.

 3   BY MR. PASCHAL:

 4        Q.   There's laws in the state of Florida; correct,

 5   right?

 6        A.   Yes, there are laws in the state of Florida.

 7        Q.   The Haigh Convention does trump those laws?

 8              MR. ROCHE:  Objection to the extent it calls

 9        for a legal conclusion.

10              THE WITNESS:  The little bit I know of the

11        Haigh Convention.

12   BY MR. PASCHAL:

13        Q.   Are you also aware that Carter Conrad and

14   Patrick Paige sent this to Ira, this actual -- sent this

15   envelope to Ira Kleiman?

16        A.   No, I'm not aware.

17        Q.   Ira never told you that?

18              MR. ROCHE:  Objection, calls -- instruction

19        not to answer.  Well, okay withdraw the objection.

20        To the extent that Ira ever told you that just

21        directed to the extent counsel was present don't

22        answer.

23              MR. PASCHAL:  I can withdrew the question.  He

24        kind of answered already.

25              MR. ROCHE:  He did?  I didn't see it in the
```

1    transcript.

2           MR. PASCHAL:  When he said no.

3           MR. ROCHE:  Okay.

4    BY MR. PASCHAL:

5       Q.   If you look at the first page of the document

6    now at the top left corner what court is that coming

7    from?

8       A.   Supreme Court of New South Wales.

9       Q.   Who is it addressed to?

10      A.   W&K Info Defense Research, LLC 4371 Northlake

11   Boulevard -- again North is spelled incorrectly.  Yes,

12   Palm Beach, yes.

13      Q.   It was received at 4371 Northlake Boulevard?

14      A.   Second time.  Drawing my attention to it

15   that's all.  I apologize.

16      Q.   Top right corner it has the contact

17   information for court.  You see that?

18      A.   Yes.

19      Q.   What is the date of this document?

20      A.   September 3rd 2013.

21      Q.   It says Notice of Listing is the title; right?

22      A.   Yes.

23      Q.   What is the case title?

24      A.   Craig Steven Wright vs. W&K Info Defense

25   Research, LLC.

1      Q.   This is instructing you that the matters

2   listed for directions common law registrar on

3   October 30th 2013 at 9:00 a.m. Supreme Court civil,

4   Supreme Court Sydney Court, 9C Queens Square City.  Then

5   it says if you do not appear in court this matter may be

6   dealt with in your absence.

7      A.   To the extent that this entire lawsuit both

8   lawsuits are based on fraudulent forged contracts by

9   Craig Wright so all are totally void.  I see you're

10   reading correctly, yes.

11      Q.   Thank you for that.  Didn't have a question

12   pending.  But so W&K can't say that this document was

13   received at its mailing address listed on its Articles

14   of Incorporation?

15          MR. ROCHE:  Objection, form.

16          THE WITNESS:  Which isn't service of process

17      but it seems it was received at the mailing

18      address.

19          MR. PASCHAL:  Do you want to go ten more

20      minutes and then dial?

21          MR. ROCHE:  Let's go to 2:20.

22          MR. PASCHAL:  Kyle, I asked about the probate.

23      Was that the one you instructed him not to answer?

24          MR. ROCHE:  Correct.

25

1    BY MR. PASCHAL:

2        Q.    Can you turn to Count I, it's on page 37?

3        A.    Count number what?

4        Q.    Count I on page 37.  Paragraph 171 you say "on

5    or about April 2013 through the present date defendant

6    converted to his own use Bitcoin, forked assets and

7    intellectual properties that was then the property of

8    and owned by the estate and/or W&K."  As the corporate

9    representative what is your basis to say that Craig

10   Wright converted any of these things?

11       A.    By filing this fraudulent lawsuit and enabling

12   him to get the I.P. as well as access and perhaps other

13   Bitcoin as well from the W&K all of W&K's assets that I

14   would say is conversion of the assets of W&K.

15       Q.    So let's break that down.  There's a lawsuit

16   that transfers intellectual property.  What is the

17   intellectual property that was transferred?

18       A.    At least four patents associated with W&K were

19   transferred to CoinX and Hot Wire and some other company

20   I don't recall the exact name.

21       Q.    What are those --

22       A.    Among others.

23       Q.    What are those patents?

24       A.    I don't know specifically.  I would say at

25   least four.

1       Q.   How did you find out there were four patents?

2       A.   They're listed as an exhibit to the complaints

3    in the contracts of I.P. for sale or deed of sale.

4       Q.   You realize those companies went defunct so

5    what would you value the intellectual property at?

6            MR. ROCHE:  Objection to form, calls for

7       expert testimony.

8            THE WITNESS:  I don't know the answer but

9       Craig values it at 50 to $100 million in his

10      e-mails to Ira.

11   BY MR. PASCHAL:

12      Q.   Let me get this straight.  So you believe that

13   W&K had 50 to $100 million in intellectual property?

14      A.   I believe that the intellectual property that

15   Craig admits was put in -- was the purpose of W&K.

16      Q.   That's not my question.  My question is W&K --

17   as W&K is it your position that you have between 50 and

18   $100 million in intellectual property?

19      A.   I do not know the value if you're asking me a

20   specific number I don't know the answer to that

21   question.  It could be way more.  We don't know the

22   value.

23      Q.   Could be 500 million?

24      A.   I don't know the value of intellectual

25   property.  It's worth whatever the buyer pays; right?

Zachary Eisner
January 09, 2020                                    110

 1        Q.   You also think that W&K was mining between 300

 2   and a million Bitcoin?

 3        A.   I believe --

 4             MR. ROCHE:   Objection to form.

 5             THE WITNESS:   I believe Dave and/or W&K owned

 6        300 to a million Bitcoin.   W&K was mining I believe

 7        12,000 a month.   I believe it says somewhere in the

 8        complaint.   I don't recall Craig stated that it was

 9        12,000 a month.

10   BY MR. PASCHAL:

11        Q.   Given those activities why didn't W&K file any

12   of its annual reports and let itself go defunct?

13        A.   W&K went defunct in 2013 in September because

14   Dave died.

15        Q.   Went defunct in 2012.

16        A.   May I see the --

17        Q.   He didn't file his annual report for 2012?

18        A.   Can I see that, please?   I don't recall.   I do

19   not recall.

20        Q.   Could be that he didn't file in 2012 and

21   finally went defunct.

22        A.   I don't recall.

23        Q.   Well, 2012 he didn't file an annual report.

24   For 2013 he didn't file an annual report.   Is that

25   correct?

```
 1        A.   I don't know.  I need to see the document.  I

 2   also -- if I could refresh my recollection I also

 3   believe that I have a document.

 4             (Defendant's Exhibit No. 14 was

 5             marked for identification.)

 6   BY MR. PASCHAL:

 7        Q.   With Exhibit 14.  Document images after the

 8   company was formed in February 16, 2011 is there an

 9   annual report for February of 2012?

10        A.   No.

11        Q.   Is there an annual report for February of 2013

12   while Dave was still alive?

13        A.   Not that it appears here.  It doesn't

14   necessarily mean they filed an annual report or not.

15   Just mean -- doesn't say there was a dissolution but yet

16   there was a reinstatement in 2014.

17        Q.   You don't believe that W&K was -- there was --

18   W&K was dissolved or dissolution -- administrative

19   dissolution?

20        A.   I'm saying this document is incomplete because

21   we know it was dissolved but yet it doesn't list that

22   here.

23        Q.   These are documents that were filed on behalf

24   of Dave.  So -- or whoever.  You don't file your own

25   administrative dissolution.
```

1       A.    I don't know the answer to that question.  I

2  would have to see the complete documents.

3       Q.    But back to my point there's no annual report

4  for 2012 or 2013; correct?

5       A.    That is on this incomplete list, yes.  I do

6  believe that it was dissolved in September of 2013.

7       Q.    Again you can't identify any -- can you

8  identify -- when you say Bitcoin are the only Bitcoin

9  addresses you believe W&K at this moment owns are those

10 the ones we discussed in the interrogatory response that

11 W&K provided?

12      A.    I believe the interrogatory response was

13 discovery is still ongoing and not limited to these 26

14 addresses.

15      Q.    As of today because discovery is about to end

16 are those the public addresses?

17      A.    I don't know the answer to that question.

18      Q.    On the Bitcoin, what is W&K's theory that

19 Craig converted Dave or W&K's Bitcoins?

20      A.    I believe we spoke about this in terms of

21 ownership.  If you're sequestering it, you're hiding it,

22 if you're moving it you are depriving the right of

23 ownership to W&K or Dave or Ira.  That's a conversion.

24      Q.    I'm asking you to be more specific what

25 actually happened not theory.  How did Dave convert the

1      Bitcoin?  Did he go take the private keys?  Did he hide

2      the private keys?

3           A.   How did Craig convert?

4           Q.   How did he convert it?

5           A.   I --

6                MR. ROCHE:  Objection, asked and answered.

7                THE WITNESS:  To the extent -- I can only

8           speculate personally that we know there was Bitcoin

9           mined.  That was the purpose of the company.  We

10          know that there was between 300 to a million.  We

11          have no access to it.  He took the company from

12          them through fraudulent forged lawsuits therefore

13          he has taken their ownership of this Bitcoin away.

14     BY MR. PASCHAL:

15          Q.   Bitcoin is not a piece of paper; right?

16          A.   Right.  It was not a piece of paper.

17          Q.   It's a block chain?

18          A.   Right.

19          Q.   You need a private key to access it?

20          A.   Right.

21          Q.   So how did Craig Wright take the private key?

22               MR. ROCHE:  Objection, asked and answered.

23               THE WITNESS:  You're asking how he took the

24          private key is not the only way to take ownership.

25          You can also sequester the ability to access the

Zachary Eisner
January 09, 2020                                    114

1          funds.

2     BY MR. PASCHAL:

3          Q.   How is he doing that?

4          A.   By -- I understand a little bit about block

5     chain and Bitcoin, right.  To the extent that someone

6     has usurped ownership or moved or sequestered assets I

7     would say that is conversion.  W&K doesn't have access

8     any more to Bitcoin that we know they owned at some

9     point, that Craig admitted and that is conversion.

10         Q.   When Ira deleted stuff on Dave's hard drives

11    and destroyed working papers could that be the reason

12    why you cannot access W&K's Bitcoin?

13              MR. ROCHE:  Objection, calls for speculation.

14              THE WITNESS:  I don't know that fact.

15    BY MR. PASCHAL:

16         Q.   So you're saying that -- so your theory of W&K

17    is not that Craig stole private keys from W&K?  I'm

18    trying to pinpoint what is your theory?  Did he steal

19    private keys from W&K?  Argumentative, improper predicate

20              MR. ROCHE:  Objection, asked and answered.

21              THE WITNESS:  I don't know.

22    BY MR. PASCHAL:

23         Q.   Now you're talking about sequestering or

24    keeping access; right but could the reason that you can

25    not access W&K's purported Bitcoin be because you can't

Zachary Eisner
January 09, 2020                                    115

1    access Dave's hard drives?  Argumentative, improper predicate

2         A.    I don't know.

3         Q.    If Dave had private keys on his hard drive

4    that would unlock the whatever Bitcoin that W&K might

5    have had did Craig Wright sue W&K or Ira?

6              MR. ROCHE:  Objection, calls for legal

7         conclusion.

8    BY MR. PASCHAL:

9         Q.    Let me he strike that.  Is isn't the same

10   scenario if you can't access W&K's Bitcoin couldn't it

11   be you couldn't access it because you couldn't access

12   Dave's hard drives?  Argumentative, improper predicate

13        A.    I don't know.

14             MR. ROCHE:  Objection.

15             THE WITNESS:  The answer to that question.  I

16        would also say I don't know what wallets

17        theoretically might be found in the hard drives or

18        what access they have or whose ownership it is.

19             MR. ROCHE:  Just real quick.

20             MR. PASCHAL:  Step off.  We have a hearing.

21             THE VIDEOGRAPHER:  Off record 2:22.

22             (Discussion held off the record.)

23             THE VIDEOGRAPHER:  On record 2:43.

24   BY MR. PASCHAL:

25        Q.    I want to ask you about your 15 minute

1   conversation with Ira Kleiman.  What was discussed

2   during that conversation?

3          MR. ROCHE:  I'm going to instruct the witness

4      to the extent Ira Kleiman gave you facts related to

5      W&K you can answer that.  To the extent any legal

6      strategy was discussed I'm going to ask you to

7      refrain from answering that.

8          THE WITNESS:  I asked him about membership and

9      management of the company from reinstatement in

10     2018 and on.  I asked him if he ever received any

11     notice.  He said no.

12  BY MR. PASCHAL:

13     Q.   Just pause for a second.  When you said notice

14  are you referring to the Australian --

15     A.   Yes, Australian lawsuits.  Those are the two

16  things I remember discussing.  Little questions that I

17  had regarding the complaint.  I don't necessarily recall

18  every detail.  I know those two.

19     Q.   What did he tell you?

20     A.   That he never received notice and not

21  personally or on behalf of the company.  That membership

22  is 100 percent him.  I believe that's it.

23     Q.   Did you ask him if he did anything to verify

24  that the company is 100 percent his?

25     A.   I didn't ask him to verify that.

1      Q.   Did he tell you that the company was always

2   100 percent his?

3      A.   He told me since the reinstatement.  I asked

4   specifically any membership minutes, you know, meetings

5   or operating agreement from 2018 reinstatement on.  He

6   said no.  I said how is it held.  He said he is the sole

7   manager, sole member.

8      Q.   That was a phone call; right?

9      A.   Yes, phone call.

10     Q.   It was just you and him on the phone call?

11     A.   No, counsel was present.

12     Q.   Who was present?

13     A.   Vel Freedman, Kyle Roche, another attorney

14   Steven I forget his last name.

15          MR. ROCHE:  Lagos.

16   BY MR. PASCHAL:

17     Q.   Let's get back to the complaint.  So if you

18   can go to Count II unjust enrichment.

19     A.   Yes.

20     Q.   You allege that plaintiffs have conferred a

21   benefit on the defendant who has knowledge thereof.

22   What benefit did plaintiffs -- what benefit did

23   plaintiffs confer on defendant?

24     A.   Bitcoin intellectual property and however

25   amount of value they value it at.

```
 1        Q.   So this is essentially the same as Count I?
 2             MR. ROCHE:  Objection, calls for a legal
 3        conclusion.
 4             THE WITNESS:  Right.  I was going to say to
 5        the extent I can, you know, I don't know how to
 6        answer that question.
 7    BY MR. PASCHAL:
 8        Q.   Well, is the relief you're seeking in this
 9    count the same as the relief you're seeking in Count I
10    for conversion?
11             MR. ROCHE:  Objection, calls for a legal
12        conclusion.  You can answer.
13             THE WITNESS:  I don't know the answer.  It
14        sames that there are two conclusory paragraphs
15        labled wherefore under Count I and Count II that
16        are different although extremely similar calling
17        for monies or converted Bitcoin and asset IP, fair
18        market value and second one calls for monetary
19        damages.
20    BY MR. PASCHAL:
21        Q.   What I'm asking the assets, what subject of
22    Count I, the Bitcoin, intellectual property, forked
23    assets is that all the same as the stuff you're seeking
24    in Count II unjust enrichment or is there something
25    more?
```

```
 1        A.   I don't know how to answer that question.

 2        Q.   Are you seeking anything more in Count II than

 3   Count I?

 4        A.   I don't know how to answer that question.

 5        Q.   Count III misappropriation, can you turn to

 6   that.  In paragraph 178 you say "after Dave's death

 7   Craig unlawfully maliciously misappropriated trade

 8   secrets belonging to Dave and/or W&K relating to block

 9   chain based technologies, smart contracts by using them

10   for himself and using a series of fraudulent contracts

11   and fraudulently obtained court judgments to transfer

12   and acquire the property rights in these trade secrets

13   to himself."

14             Earlier you testified that it was your theory

15   that Craig Wright used the Australian proceedings to

16   acquire intellectual property from W&K?

17        A.   Among other assets, yes.

18        Q.   Did the intellectual property you're

19   discussing in Count III is that considered a trade

20   secret?

21             MR. ROCHE:  Objection, calls for legal

22        conclusion.

23             THE WITNESS:  I don't know how to answer that

24        question.

25
```

```
 1   BY MR. PASCHAL:
 2       Q.   The intellectual property that you're alleging
 3   in Count III -- if you look at 179 is 179 a description
 4   of the intellectual property that you believe W&K had?
 5       A.   It may be.   Intellectual property can be trade
 6   secrets, it could also be patents or something of the
 7   sort.
 8       Q.   Back to my point.   179 the intellectual
 9   property that you believe was misappropriated is some of
10   that a trade secret?
11       A.   It could possibly be.
12       Q.   There's a count here for misappropriation that
13   you allege against my client for billions of dollars.   I
14   need you to tell me what the trade secret is.
15           MR. ROCHE:   Objection, calls for a legal
16       conclusion.
17           THE WITNESS:   I don't know how to answer that
18       question.
19   BY MR. PASCHAL:
20       Q.   Count IV, Federal Defense of Trade Secrets
21   Act.   Is this seeking the same relief as your
22   misappropriation claim?
23           MR. ROCHE:   Objection to the extent it calls
24       for a legal conclusion.   You can answer.
25           THE WITNESS:   The conclusory paragraphs the
```

1            wherefores are different but similar calling for

2            all available damages in the first one.  Second one

3            calling for value of the wrongfully taking of

4            intellectual property.

5       BY MR. PASCHAL:

6            Q.    So here you're alleging misappropriation of

7       trade secrets but you only identify intellectual

8       property?

9            A.    What do you mean by here?

10           Q.    Just point to the wherefore clause.  This is

11      the Federal Defense Trade Secrets Act.  It says

12      "wherefore, plaintiffs demand judgment against defendant

13      for the value of the wrongfully taken intellectual

14      property together with costs, interest, attorney fees

15      and other relief."  The only thing you identify is the

16      intellectual property.  You see that?

17           A.    I see that word.  However, the paragraphs

18      before from 185 on describe trade secrets.

19           Q.    So can you say now reading that some of the

20      intellectual property is trade secret?

21                MR. ROCHE:  Objection to the extent it calls

22           for legal conclusion.

23                THE WITNESS:  Whether some of the property is

24           trade secret it could possibly be.

25

1    BY MR. PASCHAL:

2        Q.   So in this Federal Defense Trade Secret Act

3    claim what is it you're suing Dr. Wright for?

4        A.   I think the complaint speaks for itself.

5        Q.   Not asking what the complaint says.  I need to

6    know from you your testimony.  In this claim what are

7    you suing Dr. Wright for?

8        A.   Trade secrets that W&K owns or Dave Kleiman

9    had between him and Craig solely that were

10   misappropriated and taken by Craig.

11       Q.   What are those trade secrets?

12       A.   I don't know at this time.  I don't know how

13   to answer the question.

14       Q.   Count V breach of fiduciary duty.

15       A.   If I may reform -- complaint 186 paragraph 186

16   it does say trade secrets can be identified as software

17   that Dave personally developed through W&K.  Then Craig

18   transferred.

19       Q.   Is that considered intellectual property?

20       A.   It could possibly be.

21       Q.   Turn to Count V.  Ira told you that he was

22   100 percent the owner of W&K.  Did he ever tell you that

23   Craig was a member of W&K?

24       A.   To my recollection he said that Craig was

25   never -- I don't recall if he said that Craig was ever a

```
 1    member of W&K.  I believe the company's position that

 2    Dave was a sole member and Ira was a sole member.  If

 3    Craig was ever a member which doesn't appear that he

 4    ever was he disclaimed all of that.

 5         Q.   So in paragraph 194 you allege in the

 6    alternative Craig was an actual member of W&K.  Why are

 7    you alleging that if Craig was never a member?

 8         A.   If the fact comes out that requires the

 9    company to change its knowledge it will change its

10    knowledge.  As simple as that.

11         Q.   What fact will make the company change its

12    knowledge?

13              MR. ROCHE:  Objection, calls for speculation.

14              THE WITNESS:  Any multitude of facts.  An

15         operating agreement.  Discovery is ongoing.  I

16         don't know.

17    BY MR. PASCHAL:

18         Q.   Count VII, what is your basis for fraud?

19         A.   As set forth in paragraph 202 Dave and W&K's

20    Bitcoins, intellectual property rights are transferred

21    and sold to Craig and returned to Craig pursuant to

22    valid contracts that Dave signed those contracts it's

23    W&K's position those contracts with absolutely

24    fraudulent, forgeries.

25              Continuing to read, the estate will be able to
```

Zachary Eisner
January 09, 2020                                     124

1    sell shares in CoinX.  He would -- he Craig would help

2    the estate recover what Dave owned.  That the estate

3    could participate in CoinX.  All of these were

4    fraudulent statements that Craig made.

5         Q.  You're a lawyer you know fraud requires

6    reliance?

7              MR. ROCHE:  Objection.

8              MR. PASCHAL:  Right?

9              MR. ROCHE:  Objection, he is not here to

10        testify in his capacity as a lawyer.

11   BY MR. PASCHAL:

12        Q.  So in 2004 -- what were the damages -- what

13   was the reliance on fraudulent statements?  What was the

14   damages?

15        A.  Are you asking me personally?

16        Q.  As W&K.

17        A.  I don't know the answer to that question.  I

18   could answer personally that if plaintiff didn't

19   challenge an Australian lawsuit because Craig was

20   telling him don't worry, everything is going to be okay

21   during a period of e-mails that would be reliance and

22   damage.

23        Q.  Okay.  So he get as summons from a court

24   saying if you don't show up a judgment is going to be

25   entered against you.  But he relied on Craig to not show

```
 1    up to the hearing?

 2         A.   If he ever received such a summons if that

 3    ever happened yes, that would perhaps be a reliance and

 4    damage.

 5         Q.   So you're saying he didn't --

 6              MR. ROCHE:  Objection, legal conclusion.  Go

 7         ahead.

 8              THE WITNESS:  Speaking personally because --

 9    BY MR. PASCHAL:

10         Q.   I understand.  So if he didn't receive a

11    summons then how is he acting in reliance --

12         A.   Let's go back then because I was answering

13    questions -- W&K's answer -- sorry, what was the

14    question?

15         Q.   So for reliance on the -- you just mentioned

16    Australian judgment not challenging it.  If either Ira

17    or the estate or W&K more importantly that's the party

18    in Australian never received the summons in its mailbox

19    then how would anyone have acted on reliance to not

20    challenge the legal claims in Australia how would they

21    know about it?

22              MR. ROCHE:  Objection, calls for a legal

23         conclusion.  You can answer.

24              THE WITNESS:  That was a hypothetical that I

25         personally was saying would be possible reliance.
```

```
 1        If you want me to answer as W&K's corporate

 2        representative what was the original question?

 3   BY MR. PASCHAL:

 4        Q.   Well, okay.  Your personal knowledge was what

 5   the allegation says in 204 it says the reliance included

 6   was not limited to not challenging Craig's legal claim

 7   in Australia.  If you didn't know about it how could you

 8   have relied on -- about the proceeding in Australia then

 9   how could he have relied on Craig's statements to not

10   participate in the Australian proceeding?

11        A.   Among those -- among those statements that

12   Craig made there's a variety of statements I'll pay you

13   $12 million in six months time and other statements that

14   all of which were also fraudulent.  Fraudulent also

15   being the forgeries on those Australian judgments.  We

16   hold all those contracts were fraud and fraudulent.

17        Q.   If someone says I'll give you a million

18   dollars and they just don't give it to you you would

19   consider that fraud?

20        MR. ROCHE:  Objection, calls for a legal

21        conclusion.

22        THE WITNESS:  I don't know the answer to that

23        question.

24   BY MR. PASCHAL:

25        Q.   You say expended time and resources reviewing
```

1    fraudulent documents.  What time and resources did W&K

2    spend reviewing fraudulent documents?

3              MR. ROCHE:  Objection, form.  You can answer.

4              THE WITNESS:  I don't understand the question.

5    BY MR. PASCHAL:

6         Q.   You allege that part of the reliance included

7    expending time and resources reviewing fraudulent

8    documents.  What was the time and resources and what was

9    the fraudulent documents?

10        A.   The Australian judgments were fraudulent.

11   Most of what Craig says was fraudulent.  I would -- the

12   time and the resources I guess would be the time you

13   know that he was stringing Ira along but if not me --

14   not corporate -- of W&K that's Ira.  I don't know how

15   W&K would specifically answer that question.

16        Q.   I'm asking -- W&K is suing Craig Wright and

17   alleging so I need an answer from W&K.

18        A.   Perhaps that is a question that is more Ira's

19   claim.

20        Q.   So Ira -- W&K is withdrawing its claim against

21   Craig as to Count VII?

22             MR. ROCHE:  Objection, calls for a legal

23        conclusion.

24             THE WITNESS:  Again W&K absolutely alleges

25        fraud.  Fraud in the Australian contracts.

1          Fraudulent statement that did intend reliance but

2          to ask for a legal conclusion from W&K I don't know

3          the answer to that question.

4     BY MR. PASCHAL:

5          Q.   Not asking for a legal conclusion.  I want to

6     know the basis for W&K alleging that the reliance due to

7     expending time how much time W&K spent?

8          A.   I could only tell you my personal corporate

9     representative time.  I don't know the answer how much

10    time W&as entity spent.

11         Q.   What resources did W&K spend reviewing

12    fraudulent documents?

13         A.   I don't know the answer to that question.

14         Q.   You said -- a second ago you said most of what

15    Craig says was fraudulent.  Do you recall saying that?

16         A.   Yes.

17         Q.   Isn't the only basis --

18         A.   I want to be clear, you know, I don't mean

19    most as in -- I meant it as a general term that a lot of

20    what he was saying to Ira was clearly fraudulent in

21    terms of I will pay you $12 million in six months.

22         Q.   So if most of what he says is fraudulent and

23    he is the only person -- the only evidence you have that

24    have W&K ever had any Bitcoin what should the jury

25    believe that he is fraudulent or that he doesn't own a

```
 1    ton of Bitcoin out there?

 2             MR. ROCHE:  Objection to form.

 3             THE WITNESS:  None of what he said about W&K

 4        that W&K owns zero Bitcoin.  That in fact from my

 5        understanding all of what he said was W&K owns and

 6        Dave in some way, shape or form owns anywhere from

 7        300 to a million Bitcoin.

 8    BY MR. PASCHAL:

 9        Q.   You've testified gone through today he is the

10    only witness that you have or only evidence that that

11    there may have been some Bitcoin?

12        A.   Sorry, please?

13        Q.   Correct me if I'm wrong is there another piece

14    of evidence out there?

15        A.   No, his admissions.

16        Q.   His admissions.  Only what Craig Wright said

17    is your evidence, right, I'm asking as W&K?

18             MR. ROCHE:  Objection.  You can answer.

19             THE WITNESS:  I would say that discovery is

20        still ongoing but it seems that that is the bulk of

21        the claim.

22    BY MR. PASCHAL:

23        Q.   To be clear to the jury discovery is ongoing

24    for like a week, one week it will be over?

25        A.   I do not know that.
```

Zachary Eisner
January 09, 2020                                    130

         Q.   Been going on for about a year.  What I want
to ask you is if most of what he says is fraudulent what
should the jury believe from him, is it only there's
Bitcoin but nothing else?

         MR. ROCHE:  Objection, form.

         THE WITNESS:  So when he says there is Bitcoin
         and then he gives a range of numbers the jury
         believes that W&K has Bitcoin in that range of
         numbers, 300 to a million because he changes his
         story.

              He never says W&K has zero Bitcoin and never
         mined intellectual property at all.  In fact he
         says repeatedly that he and Dave definitely had
         Bitcoin.  They both had intellectual property in
         W&K.

BY MR. PASCHAL:

         Q.   I'm going back to my point.  You testified
that most of what Craig says is fraudulent.  Should the
jury believe -- tell me what the jury should believe
when you say that most of what Craig says is fraudulent?

         MR. ROCHE:  Objection to form.

         THE WITNESS:  If a person makes a repeated
         amount of contradictory statements but all the
         statements have the same fact which is W&K and Dave
         mined and owned Bitcoin in some range of amounts

1       and owned intellectual property then that is the

2       fact and the range of amounts and the quantity

3       thereof is for facts to be determined.

4    BY MR. PASCHAL:

5       Q.   Even if every witness in this case testified

6    that's not true you would still believe that's a fact?

7       A.   I don't know --

8            MR. ROCHE:  Objection to form.

9            THE WITNESS:  I don't know that if every

10      witness is saying that but I could say that.

11   BY MR. PASCHAL:

12      Q.   Hypothetical.

13      A.   Admission of Craig Wright himself the quote

14   unquote partner from the beginning would be -- would

15   bear more weight.

16      Q.   Dave Kleiman's fiance who lived with him

17   during the relevant period will testify that this is not

18   true, there's no Bitcoin he never mentioned Bitcoin?

19           MR. ROCHE:  Object.

20   BY MR. PASCHAL:

21      Q.   That's one.  The proverbial son who Dave took

22   in as a son who lived with him during the relevant

23   period who played video games with him, talked to him

24   every day will say he never mentioned a word about

25   Bitcoin or anything bad about Craig Wright or any

```
 1    partnership.  All of Dave's closest friends who visited
 2    him consistently in the hospital will testify that there
 3    are no Bitcoin, there was never any Bitcoin and they
 4    find it impossible there's Bitcoin because Dave was
 5    broke and couldn't even pay his cell phone.
 6            Now, you just said most of what Craig said was
 7    fraudulent.  My question to you is should the jury
 8    believe the only fact that the jury believe is that
 9    there's 300 to a million Bitcoin out there?
10            MR. ROCHE:  Objection to form.
11    BY MR. PASCHAL:
12       Q.   Even in light of all the other witnesses
13    testifying against that statement?
14            MR. ROCHE:  Objection to form.
15            THE WITNESS:  The admission of the person who
16        supposed ownership of the Bitcoin who is determined
17        through a bunch of contradictory facts but one sole
18        truth to all those facts is that yes, there was an
19        amount of 300 to a million Bitcoin and yes, there
20        was ownership of intellectual property in W&K I
21        think would trump these type of witnesses again
22        which I have no knowledge.
23    BY MR. PASCHAL:
24       Q.   Because you didn't read their deposition
25    transcripts before today?
```

1      A.    No.   They were not relevant to my corporate

2   representative role.

3      Q.    And W&K's interrogatory responses was that

4   relevant to your corporate representative?

5      A.    I believe they were discussed with me with

6   counsel.

7      Q.    You never reviewed them?

8      A.    I don't believe so.   There's a lot of

9   documents.

10     Q.    You testified you doesn't review them.   Can

11  you turn to paragraph 217 under civil theft?

12          MR. ROCHE:   What paragraph?

13          MR. PASCHAL:   Actually start with 215.

14          MR. ROCHE:   215.

15  BY MR. PASCHAL:

16     Q.    On 215 you say "on or about April 2013 through

17  the present day defendant knowingly and wrongfully took

18  with felonious criminal intent Bitcoins, forked assets,

19  intellectual property and property owned by the estate

20  and/or W&K."  Now you're saying that he actually took

21  with felonious criminal intent.  How did he take these

22  things with felonious criminal intent?

23     A.    I believe that's a legal conclusion.

24          MR. ROCHE:   Objection, calls for a legal

25      conclusion.

1   BY MR. PASCHAL:

2        Q.   How did he take them?  What is your basis for

3   saying that?

4        A.   I don't know the exact legal determination of

5   civil theft.

6        Q.   Not asking for legal.  I'm asking for --

7   you're alleging here he took it and you say felonious

8   criminal intent.  No legal conclusion that's how did he

9   take it?  Did he go in Dave Kleiman's house and take it?

10       A.   Same way it was misappropriated and -- Count I

11   and II.

12       Q.   Same way he misappropriated what?

13       A.   Same way he misappropriated and converted the

14   assets.

15       Q.   You said earlier that Craig didn't provide

16   access to Ira towards whatever Bitcoin might be out

17   there.  Here you're saying he took Bitcoins.

18       A.   I said previously that could be one of the

19   ways that he could have converted or misappropriated

20   those assets.  I don't know enough about Bitcoin to

21   speculate on what taking Bitcoin can mean.  It could

22   mean taking private keys.  It could mean taking access

23   away.

24       Q.   Let me just ask you.  As W&K's representative

25   you don't have a theory as to how Dr. Craig Wright took

Zachary Eisner
January 09, 2020                                    135

1    Bitcoin from W&K?

2         A.   I don't have the legal argument.  I leave that

3    to counsel.

4              MR. PASCHAL:  Can we take a break?

5              MR. ROCHE:  Yes.

6              THE VIDEOGRAPHER:  Off record 3:09.

7              (Thereupon, a brief recess was taken.)

8              THE VIDEOGRAPHER:  On record 3:26.

9              MR. PASCHAL:  I have no further questions at

10        this time.

11                   CROSS (ZACHARY EISNER)

12   BY MR. ROCHE:

13        Q.   Mr. Eisner, good afternoon.

14        A.   Good afternoon.

15        Q.   I just got a few quick questions to ask you.

16   If you could go back to Exhibit 6 if you have it handy.

17   It's the interrogatories.  If you could turn to page two

18   and three of those where there's I believe counsel for

19   Dr. Wright was asking questions concerning the list of

20   devices.  You see the list of devices?

21        A.   Yes.

22        Q.   As W&K's corporate representative do you have

23   any reason to believe that these devices were property

24   of W&K as opposed to Dave Kleiman's personal property?

25        A.   No.

1      Q.   Mr. Eisner, what did you do to educate

2   yourself about Bitcoin in preparation for your

3   deposition today?

4           MR. PASCHAL:  Objection, form.

5           THE WITNESS:  I knew a little bit already.

6       You know, you Google around and you learn what you

7       can online.

8   BY MR. ROCHE:

9      Q.   So did you read -- did you read anything, any

10  instructional stuff about Bitcoin online or any blogs or

11  posts about Bitcoin online?

12     A.   Yes.  Yes, both.

13     Q.   Are you here today to hold yourself out as an

14  expert on Bitcoin?

15     A.   Absolutely not.

16          MR. ROCHE:  No further questions.

17          MR. PASCHAL:  I have nothing.

18          THE VIDEOGRAPHER:  Off record 3:27.

19          MR. PASCHAL:  I'll take the transcript

20      expedited as soon as possible.

21          MR. ROCHE:  I will take a copy as well.

22              (Witness excused.)

23              (Deposition was concluded.)

24

25

Zachary Eisner
January 09, 2020                                           137

```
 1
 2                    CERTIFICATE OF REPORTER
 3           THE STATE OF FLORIDA
 4           COUNTY OF DADE
 5
 6        I, Rick Levy, Registered Professional Reporter
     and Notary Public in and for the State of Florida at
 7   large, do hereby certify that I was authorized to
     and did report said deposition in stenotype of
 8   ZACHARY EISNER; and that the foregoing pages,
     numbered from 1 to 136, inclusive, are a true and
 9   correct transcription of my shorthand notes of said
     deposition.
10
          I further certify that said deposition was
11   taken at the time and place hereinabove set forth
     and that the taking of said deposition was commenced
12   and completed as hereinabove set out.
13        I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
     connected with the action, nor am I financially
15   interested in the action.
16        The foregoing certification of this transcript
     does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
     direction of the certifying reporter.
18
          IN WITNESS WHEREOF, I have hereunto set my hand
19   this 13TH day of January, 2020.
20
21   _____
22        Rick Levy, RPR, FPR, Notary Public
          in and for the State of Florida
          My Commission Expires:  12/8/2023
23        My Commission No.:  GG937684
24
25
```

Zachary Eisner
January 09, 2020                                                        138

1                            CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3              COUNTY OF DADE

4

5        I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

6    Notary Public, State of Florida, certify that

7    ZACHARY EISNER personally appeared before me on the

8    9TH day of JANUARY, 2020 and was duly sworn.

9

10             Signed this 13th day of January, 2020.

11

12

13

14

15        _____

16             Rick Levy, RPR, FPR
               Notary Public – State of Florida
17             My Commission Expires:  12/8/2023
               My Commission No.:  GG937684

18

19

20

21

22

23

24

25

```
 1              E R R A T A   S H E E T

 2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

 3    DEPOSITION OF:  ZACHARY EISNER

 4    TAKEN: 1/9/2020

 5       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 6    PAGE #  LINE #   CHANGE              REASON

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    Please forward the original signed errata sheet to
      this office so that copies may be distributed to all
18    parties.

19    Under penalty of perjury, I declare that I have read
      my deposition and that it is true and correct
20    subject to   any changes in form or substance
      entered here.

21

22    DATE: _____

23

24    SIGNATURE OF
      DEPONENT:_____
25
```

```
 1    DATE:      January 14, 2020

 2    TO:  KYLE ROCHE, ESQUIRE
           ROCHE FREEDMAN, P.A.
 3         200 S. Biscayne Boulevard
           Suite 5500
 4         Miami, Florida 33131

 5    IN RE:     Ira Kleiman vs Craig Wright

 6    Dear Mr. Roche:

 7    Enclosed please find the original errata page with
      your copy of the transcript so ZACHARY EISNER may
 8    read and sign their transcript.  Please have him/her
      make whatever changes are necessary on the errata
 9    page and sign it.  Then place the original errata
      page back into the original transcript.  Please then
10    forward the original errata page back to our office
      @1080 Woodcock Road, Suite 100, Orlando, Florida
11    32803.

12    If the errata page is not signed by the witness
      within 30 days after this letter has been furnished,
13    we will then process the transcript without a signed
      errata page.  If your client wishes to waive their
14    right to read and sign, please have him/her sign
      their name at the bottom of this letter and send it
15    back to the office.

16         Your prompt attention to this matter is

17    appreciated.

18    Sincerely,

19    _____
      RICK E. LEVY, RPR
20
      I do hereby waive my signature:
21
      _____
22    ZACHARY EISNER

23    cc via transcript:  Bryan Paschal, Esq.
                          Kyle Roche, Esq.
24    file copy

25
```