1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3

4        IRA KLEIMAN, as the
         personal representatige
5        of the Estate of David
         Kleiman, and W&K Info
6        Defense Research, LLC,
                                        CASE NO.:
7             Plaintiffs,               9:18-cv-80176-BB/BR

8        vs.

9        CRAIG WRIGHT,

10            Defendant.

11       _____

12

13                    Videotaped Deposition of

14                       Deborah Kobza

15                  10:06 a.m. - 11:17 a.m.

16            Wednesday, December 18, 2019

17          1301 Riverplace Boulevard, Suite 1610
                   Jacksonville, Florida
18
             Sandra G. Pemberton, RPR, CRR, FPR
19

20

21

22
         Plaintiffs' Designations
23
         Defendant's Counter-Designations
24
         Defendant's Objections
25
         Redacted



```
 1                    APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiffs:
                 Joseph Delich, Esquire
 4               Velvel (Devin) Freedman, Esquire (by
                    telephone)
 5               Kyle W. Roche, Esquire (by telephone)
                 ROCHE FREEDMAN LLP
 6               185 Wythe Avenue F2
                 Brooklyn, New York 11249
 7               929.457.0051
                 jdelich@rochefreedman.com
 8

 9   On behalf of the Defendant:
                 Bryan Paschal, Esquire
10               RIVERO MESTRE LLP
                 2525 Ponce de Leon Boulevard, Suite 1000
11               Coral Gables, Florida 33134
                 305.445.2500
12               bpaschal@riveromestre.com

13

14   Also Present:

15               Kenneth S. Sarsony, Videographer

16

17

18

19

20

21

22

23

24

25
```



```
 1                              INDEX

 2    EXAMINATIONS                                      PAGE

 3       DIRECT EXAMINATION BY MR. DELICH                  5

 4       CROSS EXAMINATION BY MR. PASCHAL                 33

 5       REDIRECT EXAMINATION BY MR. DELICH               48

 6

 7    DESCRIPTION OF EXHIBITS

 8    EXHIBIT                    DESCRIPTION           PAGE

 9       Plaintiffs' Exhibit-1     Emails                 9

10       Plaintiffs' Exhibit-2     Emails                12

11       Plaintiffs' Exhibit-3     Email                 15

12       Plaintiffs' Exhibit-4     Emails                20

13       Plaintiffs' Exhibit-5     Intellectual Property 22

14                                 License

15       Plaintiffs' Exhibit-6     ATO Document          27

16       Plaintiffs' Exhibit-7     Plaintiffs' Rule      36

17                                 26(A)(1) First Amended

18                                 Initial Disclosures

19       Plaintiffs' Exhibit-8     Emails                39

20

21          (Original exhibits attached to the original

22    transcript.)

23

24

25
```



1          THE VIDEOGRAPHER:  This is disc No. 1 to the

2      videotaped deposition of Deborah Kobza in the

3      matter of Kleiman versus Wright, being heard before

4      the U.S. District Court, Southern District of

5      Florida, Case No. 9:18-CV-80176-BB/BR.

6          This deposition is being held at Esquire

7      Deposition Solutions, 1301 Riverplace Boulevard,

8      Suite 1610, Jacksonville, Florida, 32207, on

9      December 18th, 2019.  The time is approximately

10     10:06 a.m.

11         The court reporter is Sandi Pemberton.  My name

12     is Kenneth S. Sarsony, the videographer.

13         Counsel, please introduce yourselves and

14     affiliations and then the witness will be sworn.

15         MR. DELICH:  This is Joseph Delich from Roche

16     Freedman for the plaintiffs.

17         MR. PASCHAL:  Bryan Paschal -- go ahead.

18         MR. ROCHE:  Kyle Roche, plaintiff.

19         MR. PASCHAL:  Bryan Paschal for defendant.

20                   Deborah Kobza,

21 having been produced and first duly sworn as a witness,

22 testified as follows:

23         THE WITNESS:  I do.

24         THE REPORTER:  Thank you.

25         THE VIDEOGRAPHER:  Thank you, Counselor.



1                    DIRECT EXAMINATION

2   BY MR. DELICH:

3        Q.   So, Ms. Kobza, can you state your name and

4   date of birth for the record?

5        A.   Deborah Kobza, ███████████████

6        Q.   And what is your home address?

7        A.   ████████████████████████████████

8        Q.   Have you ever been deposed before?

9        A.   No.

10       Q.   So you understand that you're under oath and

11   you've sworn to tell the truth?

12       A.   Absolutely.

13            MR. DELICH:  Hi.  Who just joined?

14            MR. FREEDMAN:  Vel.

15   BY MR. DELICH:

16       Q.   So it's just like you're in a courtroom before

17   a judge.

18       A.   Uh-huh.

19       Q.   And so you understand your examination is

20   being recorded for that purpose and may be shown to a

21   jury at some point?

22       A.   Yes.

23       Q.   Are you currently taking any medications right

24   now?

25       A.   No.



1    Q.    Is there anything that would impair your

2    ability to tell the truth at this deposition today?

3    A.    No.

4    Q.    If I ask you a question and you don't

5    understand it, please just ask me to repeat it or -- or

6    rephrase it.

7    A.    Uh-huh.

8    Q.    If you don't ask me to repeat it or rephrase

9    it, I'm going to assume that you understood the

10   question and we'll rely on that.

11   A.    Okay.

12   Q.    Does that make sense?

13   A.    Uh-huh.

14   Q.    I'm also going to ask, for the sake of the

15   court reporter here, that whenever you respond to

16   questions, that you do with a yes, no, or a verbal

17   response rather than a nodding or a shaking, so --

18   A.    Okay.

19   Q.    And sometimes, either myself or my colleague

20   here might object to a question, but you should just

21   feel free to go ahead and answer the question unless

22   you're specifically instructed not to by one of us.

23   A.    Okay.

24   Q.    We make objections to preserve them for the

25   record, but they're not intended to interrupt you or



1  prevent you from answering the question for the most

2  part.  Does that make sense?

3      A.   Uh-huh.

4      Q.   All right.  So have you always lived in

5  Florida?

6      A.   No.

7      Q.   So how long have you lived in Florida?

8      A.   Probably close to 20 years.

9      Q.   Okay.  And did you attend any college or

10  university?

11      A.   No, just seminar courses.

12      Q.   Okay.  Now, you're aware this deposition is

13  being taken in connection with an active litigation?

14      A.   Yes, but I don't understand all that's going

15  on because it was all a surprise to me when I got a

16  phone call.

17      Q.   So have you communicated with anyone about the

18  litigation?

19      A.   I communicated with someone calling me from

20  Miami, I guess, through your offices.  And I got a call

21  from somebody saying that they were representing Mr.

22  Wright, Craig Wright, but --

23      Q.   Do you remember -- do you remember the name of

24  the person you talked to who was representing Mr.

25  Wright?



DEBORAH KOBZA  Confidential                    December 18, 2019
IRA KLEIMAN vs CRAIG WRIGHT                                    8

1      A.   No, because I didn't continue the

2  conversation.

H        3      Q.   And what did that conversation consist of?

4      A.   They were wanting to know if I would speak on

5  behalf of Mr. Wright.

H        6      Q.   And what did you say?

7      A.   I said no, because from what I understood,

UP-S-LEC-H   8  that he was committing fraud and identity theft on --

9  on me, you know, with whatever he was doing.  At least

10  from what I understood to date.  So I did not want to

11  represent him.

12      Q.   So what did you -- can you describe more your

13  understanding of -- of what had happened up to that

14  point?

15      A.   All I know from talking to the person, I

16  guess, from your office, I got a couple of calls, if I

17  remember correctly, that Ira Kleiman's brother was in

PK-H-F   18  business with Craig Wright on some type of

19  cryptocurrency thing and whatever trust or whatever

20  that they had opened up or Craig Wright had opened up,

21  that Ira Kleiman -- I mean, the brother had died and

22  his estate was -- was suing to, I guess, split those

23  funds or what was left, you know.  I don't really know

24  anything more than that.

UP-S-LEC   25      Q.   Okay.  And so what did you mean when you



1  referred to identity theft earlier?

2      A.   Well, as I understood in talking to people

3  from, I guess it was, your office out of Miami, that a

4  trust had been opened up in the name of GICSR, and that

5  was the first I had ever heard about that.  So if that

6  was the case, then, if my identity, personal or

7  organization identity, had been compromised and

8  something set up like that, that -- I work in cyber

9  security and -- and security and that's -- in my mind,

10  that's identity theft and fraud, to set something up

11  that you don't have the authority to do.

12      Q.   And so you referenced GICSR?

13      A.   Uh-huh.

14      Q.   What is that?

15      A.   It was a small nonprofit organization that

16  worked on best practice research.

17      Q.   And what was your relationship to that?

18      A.   I founded it, stood it up.

19      Q.   And do you remember when you did that, when it

20  was founded?

21      A.   Gosh, I'd have to go back and look.  I should

22  have looked.  It was probably in 2011, 2010.  I'm not

23  quite sure.  I'd have to go back and look.

24      Q.   So I have here what we'll mark as Exhibit 1.

25          (Plaintiff's Exhibit-1 was marked for



DEBORAH KOBZA  Confidential                    December 18, 2019
IRA KLEIMAN vs CRAIG WRIGHT                                    10

1        identification.)

2   BY MR. DELICH:

3        Q.   I'll hand this here to you.

4        A.   (The document was examined.)

5        Q.   Now, do you recognize this document?

6        A.   Wait a minute.  I have to look at it first.

7             (The document was examined.)

8        Q.   Take your time.

9             MR. DELICH:  For the record, this exhibit is

10       Bates stamped DEFAUS 01064605.

F-Inc. Desig.
     H

11       A.   (The document was examined.)

12            I don't remember.  I mean, obviously, it's an

13   email.  I don't remember the exact email, but, you

14   know, the 2011 time frame is about right, but the -- it

15   was an initiative that -- that I was wanting to stand

16   up before I even spoke to Richard Zaluski.  I was

17   introduced -- I don't know if you know how I know him

18   or anything.

19   BY MR. DELICH:

20       Q.   So -- so this email references GICSR starting

21   around early 2010?  Does that -- does this --

22       A.   2010, 2011.  I'd have to go back out and look

23   to see exactly when it was stood up as a -- you know,

24   here in the state of Florida.

25       Q.   So -- and -- so in broad strokes, what was the



1    purpose of GICSR?

2        A.    The purpose was to work on best practice

3    research and education.  At that time, there wasn't a

4    lot -- it wasn't called cyber security, it was called

5    IT security at that time, and there wasn't a lot going

6    on in that area.  And it was to try to bring industry

7    representatives together, academic representatives

8    together, and work on best practice that industry and

9    government could use and underpin that with education.

10   That was the purpose.

11       Q.    So I'm going to direct your attention to the

12   recipients on that email.

13       A.    Uh-huh.

14       Q.    Do you see that one of them is

15   Craig.Wright@GICSR.org?

16       A.    Yes, so I was introduced to Mr. Wright by Mr.

17   Zaluski.

18       Q.    So is -- so that email address you understand

19   to belong to the defendant in this case, Craig Wright?

20       A.    Yeah, I set up the email address for him in

21   order to help bring in people, sponsors, companies

22   to -- you know, to help work on the best practice

23   initiative.

24       Q.    So what was Mr. Wright's relationship to GICSR

25   at that point in time?



1    A.   He was, I'd say, a consultant to help.

2  Because at that time, I understood and had gone out and

3  checked that he did do work and all for a university in

4  Australia and that he could be instrumental in helping

5  to bring in, you know, industry and academic

6  representatives to comprise working groups and things

7  that -- you know, to work on the best practice

8  research.

9    Q.   So I'm now going to have what we're going to

10  mark as Plaintiff's Exhibit 2.

11         (Plaintiff's Exhibit-2 was marked for

12      identification.)

13    A.   (The document was examined.)

14  BY MR. DELICH:

15    Q.   So this is not an email you received, but do

16  you recognize the individuals involved in this email?

17    A.   I know Richard Zaluski and I know of Craig

18  White [sic].

19    Q.   And I'm going to direct your attention to the

20  email -- the message at the bottom of the first page.

21    A.   Uh-huh.  Okay.  That was from Richard Zaluski

22  to Craig White?

23    Q.   Uh-huh.  And it said it invited Mr. Wright to

24  be on the board of directors for GICSR.

25    A.   No in that --



1          MR. PASCHAL:  Objection, form.

2          THE WITNESS:  Oh, I'm sorry.

3   BY MR. DELICH:

4       Q.   So -- so in that email, Mr. Zaluski said he

5   had spoken with the GICSR management team.  Do you see

6   where it says that?

7       A.   Yeah, on that first paragraph.

8       Q.   Are you aware of any conversations that Mr.

9   Zaluski had about bringing Mr. Wright onto the board of

10  directors?

11      A.   Bringing Mr. Zaluski on?

12      Q.   So were you involved in any conversations with

13  Mr. Zaluski about inviting Mr. Wright to be on the

14  board of directors?

15      A.   There were conversations because what I had

16  told Richard was that to set them up on the board of

17  advisors because I was making a distinction between a

18  board of advisors and a board of directors.  That

19  anybody on the board of directors for GICSR was not

20  international, they had to be in the U.S., and, you

21  know, I wasn't bringing anybody on the board of

22  directors.  That they would be on the board of

23  advisors, but would have no governance, control, or

24  authority over the organization.

25      Q.   So --



1       A.    So they were never set up on the board of
2   directors.
3       Q.    Okay.  So this refers -- so your understanding
4   is that Craig Wright was on the board of advisors for
5   GICSR.
6       A.    For the international research thing, he was,
7   like, an advisor to help bring in companies and all for
8   that, but they were never on the board of directors.  I
9   mean, that's easily checked.
10      Q.    And do you recall when Craig first became
11  involved with GICSR in that capacity?
12      A.    I'm trying to remember.  I know I had a lot
13  more conversations with Richard Zaluski than I did with
14  Mr. Wright because Mr. Zaluski was the, I guess,
15  conduit, you know, out to reach out to him, so I talked
16  to him more, but I would say that we were talking about
17  that through 2011, maybe early 2012, but -- but Mr.
18  Zaluski did not have any authority to invite anyone to
19  be on the board of directors for GICSR.  He didn't have
20  any authority to do that.
21      Q.    And at some point, did Craig stop serving on
22  the board of advisors for GICSR?
23      A.    He just kind of -- it just kind of fizzled.
24  The research project kind of never went anywhere and it
25  just kind of fizzled away and then I never heard from

1    him anymore.

2        Q.    And do you remember around the last time you

3    heard from him?

4        A.    I'm not sure, but I -- because, like I said, I

5    lost all my computers and documents in the hurricane,

6    Hurricane Matthew, when it came through.

7        Q.    So --

8        A.    I think -- I'm not really sure.

9        Q.    I have here what we're going to mark as

10   Plaintiff's Exhibit 3.

11            (Plaintiff's Exhibit-3 was marked for

12       identification.)

13       A.    (The document was examined.)

14   BY MR. DELICH:

15       Q.    And do you recognize this document?

16       A.    I don't remember it, but -- I mean, I -- it

17   could be there.  It doesn't have a date on it or

18   anything.

19       Q.    So I'll represent to you that -- well, it

20   didn't print out the metadata for this email.  It shows

21   that it was sent --

22            MR. PASCHAL:  Objection, form.

23   BY MR. DELICH:

24       Q.    -- on February 26th, 2012.

25       A.    That's what I was going to say because I



1   mentioned, you know, maybe 2012, but, like I said, I

2   don't -- I don't specifically remember this, but I do

3   know that, you know, he says he hasn't seen anything

4   from GICSR for some time because that was because we

5   weren't getting -- I wasn't getting anything -- you

6   know, organizations that would participate maybe that

7   he had reached out to.  There wasn't anything to

8   discuss.

9          And he really didn't need to resign, it was

10  just -- you know, just advising that he didn't want to

11  serve on the advisory board anymore, so I guess that's

12  one and the same thing.

13      Q.   Okay.  Now -- so during the time about,

14  roughly, a year that you're saying Craig was involved

15  on the board of advisors --

16      A.   Uh-huh.

17      Q.   -- for GICSR, did he ever mention an

18  individual named David Kleiman?

19      A.   I do not remember a David Kleiman, no.

20      Q.   So were you -- when did you first become aware

21  of an individual named David Kleiman?

22      A.   Like I said, I don't remember anybody named

23  David Kleiman.  I believe it was in the conversation

24  with somebody from your office that called me and was

25  giving me the background on what was going on, but I



 1   don't specifically remember anybody.  Unless he -- I

 2   don't know if he was copied on an email that was sent

 3   to me, but I don't remember him specifically.

 4        Q.   So you don't recall ever meeting David

 5   Kleiman?

 6            MR. PASCHAL:  Objection, form.

 7        A.   Not unless he attended a conference or

 8   something that we had.  I don't remember.

 9   BY MR. DELICH:

10        Q.   Did GICSR ever conduct business with an

11   individual named David Kleiman?

12        A.   No.  Was there a company that he worked for?

13        Q.   So are you -- do you recognize a company named

14   W&K Info Defense Research?

15        A.   No.

16        Q.   Are you aware whether anybody else at GICSR

17   was communicating with David Kleiman?

18            MR. PASCHAL:  Objection, form.

19        A.   You said I could go ahead and answer?

20   BY MR. DELICH:

21        Q.   Uh-huh.

22        A.   Okay.  No, because I was the only one, you

23   know, doing the operations for GICSR.  The only other

24   person that I worked with on this best practice

25   initiative with Richard Zaluski was Gene Fredriksen,



```
 1   who is a colleague I've known for a long time.  I don't
 2   know if he ever talked to them or not, but he wasn't
 3   employed by or -- you know.
 4        Q.   Are you familiar with the term blockchain?
 5        A.   Oh, yes.
 6        Q.   When did you first become familiar -- aware of
 7   the term blockchain?
 8        A.   Gosh.  Maybe around, I don't know -- it's been
 9   in the last few years because, you know, I -- I work in
10   cyber security and do consulting and also blockchain is
11   a part of that, but it's only been in the last few
12   years.  I don't know how long it's been around, but I
13   can't pinpoint an exact date when I heard that term.
14        Q.   So would you -- would it have been -- let's
15   try it this way.
16        A.   Uh-huh.
17        Q.   Do you -- had you heard of blockchain before
18   2013?
19        A.   I doubt it very seriously, yeah.
20        Q.   Are you familiar with Bitcoin?
21        A.   Yes, of course, yeah, everybody is.
22        Q.   And do you remember when you first became
23   aware of Bitcoin?
24        A.   Just reading articles about it and research
25   and stuff I did on cyber security and about
```



1   cryptocurrency and how Bitcoin might be the, you know,

2   currency of the future, at least on the internet.  So

3   it was just in my own personal research.

4       Q.    And do you remember when, approximately,

5   that -- that you first encountered the concept of

6   Bitcoin?

7       A.    I guess when it was being talked about in the

8   news.  I mean, that's been several years back.

9       Q.    Okay.  Did Bitcoin or blockchain ever come up

10  in connection with your work at GICSR?

11      A.    No.  Other than -- well, we never even got to

12  that point with the best practice project because it

13  fizzled before that came out, but talking about IT

14  security best practice, you know, cryptocurrency would

15  come into that at some point, but just from a best

16  practice perspective.

17      Q.    So as part of your work with GICSR, did you

18  ever create any trusts?

19      A.    No.

20      Q.    You -- did you ever create any sort of vehicle

21  for the purpose of holding assets offshore?

22      A.    Oh, my gosh, no.

23      Q.    Did you ever collaborate with Mr. Wright to

24  create or establish any kind of vehicle for assets?

25      A.    No.



1    Q.   Has Craig Wright ever communicated to -- any

2    information to you about his ownership of Bitcoin?

3    A.   No.  The only time I knew about that was when

4    someone from your office, I assume, called me to tell

5    me about this lawsuit.

6            MR. DELICH:  What are we on?

7            THE REPORTER:  4.

8    BY MR. DELICH:

9    Q.   So I'm going to hand you what we're going to

10   mark as Plaintiff's Exhibit 4.

11           (Plaintiff's Exhibit-4 was marked for

12   identification.)

13   A.   (The document was examined.)

14   BY MR. DELICH:

15   Q.   This is an email that Mr. Wright sent to one

16   of David Kleiman's coworkers --

17   A.   Uh-huh.

18   Q.   -- after Dave had died.

19           MR. PASCHAL:  Objection to that colloquy.

20   A.   (The document was examined.)

21   BY MR. DELICH:

22   Q.   So what I want to direct your attention to --

23   A.   Uh-huh.

24   Q.   -- is towards the top of the page --

25   A.   Uh-huh.



```
 1          Q.    -- where Craig Wright wrote GICSR trust.

 2          A.    Uh-huh.

 3          Q.    Do you know what that might refer to?

 4          A.    No.

 5                MR. PASCHAL:  Objection, form.

 6          A.    Others than -- wait a minute.  Other than what

 7    has been told to me by your office.

 8    BY MR. DELICH:

 9          Q.    Do you recognize the numbers below that,

10    274997114?

11          A.    No, not -- not off -- not offhand.  I don't

12    know that that was GICSR's EIN number or not, but I

13    don't -- I'd have to look it up.

14          Q.    So but sitting here today, those numbers have

15    no significance to you?

16          A.    No, I'd have to kind of validate what that is.

17          Q.    And what about below that where it says

18    TTA-1-14?

19          A.    I have no idea what that is.

20          Q.    And below that, it mentions Belize?

21          A.    Uh-huh.

22          Q.    Does Belize have any special meaning to you in

23    this context?

24                MR. PASCHAL:  Objection, form.

25    BY MR. DELICH:
```

F-H



1    Q.   So did GICSR ever have any business dealings

2    connected to Belize?

3    A.   Never.

4    Q.   Have you ever been to Belize?

5    A.   No.

6    Q.   Do you know anybody who's been to Belize?

7         MR. PASCHAL:  Objection, form.

8    A.   I don't think so, no.

9    BY MR. DELICH:

10   Q.   No?

11        Now, did GICSR ever enter into any intellectual

12   property agreements?

13   A.   No.

14   Q.   Have you ever heard of a company Cloudcroft

15   Party Limited?

16   A.   No.

17   Q.   Have you ever entered into any kind of

18   agreement with Mr. Wright?

19   A.   No, other than him, you know, working on

20   that -- I don't know if we call it an agreement, but,

21   you know, trying to help bring people in for that best

22   practice research project.  That was it.

23   Q.   So I'm going to hand you what we're going to

24   mark as Plaintiff Exhibit 5.

25        (Plaintiff's Exhibit-5 was marked for



1        identification.)

2        A.    (The document was examined.)

3    BY MR. DELICH:

4        Q.    So have you ever seen this document before?

5        A.    No.

6        Q.    I'm going to call your attention to below

7    parties --

8        A.    Uh-huh.

9        Q.    -- where it says Craig Wright R&D.

10       A.    Uh-huh.

11       Q.    Are you familiar with an entity by that -- by

12   that name?

13       A.    Craig Wright R&D?

14       Q.    Yes.

15       A.    No.

16             Can I ask a question about the line underneath

17   it?  I don't know what CSCSS is.

18       Q.    Okay.

19       A.    Okay.  So -- okay.  Sorry.

20       Q.    So -- you're okay.

21             So I'm going to ask you to turn to page 2.

22       A.    Okay.

23       Q.    And do you see the date?  It says August 22nd,

24   2013 at the top?

25       A.    Uh-huh.



F-R-H

```
 1        Q.    And so this is about a year after Craig's
 2   involvement with GICSR had ended?
 3        A.    Uh-huh.  Uh-huh.
 4        Q.    Do you see where it says, "GICSR (acting
 5   through Craig Wright R&D)"?
 6        A.    Yeah, at the top underneath, "Between," yeah.
```

R

```
 7        Q.    Are you aware of GICSR ever acting through
 8   Craig Wright?
 9        A.    Never.
10        Q.    Or through an entity called Craig Wright R&D?
11        A.    Never.
12        Q.    Would Craig Wright have been -- was Craig
13   Wright ever authorized to enter into contracts on
14   behalf of GICSR?
15        A.    No.
```

R-H-F

```
16        Q.    So I'm going to ask you to turn to page 7.
17        A.    (The document was examined.)
18        Q.    So do you see at the bottom there's a
19   reference to a license fee?
```

H

```
20        A.    Uh-huh.
21        Q.    And I'm going to ask you to turn to page 11.
22        A.    (The document was examined.)
23              Uh-huh.
24        Q.    And do you see there's --
25        A.    Wow.
```



1    Q.   -- a number?

2    A.   Where it says, "License fee"?

3    Q.   Yes.

4    A.   Yes.

5    Q.   What is that number?

6    A.   It looks to be -- God, $28,181,818.18.

7    Q.   Would this have been a notable transaction for

8  GICSR to engage in?  Would this -- let me --

9    A.   Yeah, I mean --

10   Q.   Strike that.

11        So did GICSR ever engage in business

12  transactions?

13   A.   Can you define, like, business transactions?

14  I mean, because we had people -- we did consulting and

15  had people sponsor workshops and things like that,

16  but...

17   Q.   Let me ask this:  How many times did GICSR

18  make a multimillion-dollar purchase?

19   A.   Never.

20   Q.   Do you see next to, "Product," where it says,

21  "ACSEO program IP and code"?

22   A.   Uh-huh.

23   Q.   Does that have any significance to you?

24   A.   No.  I mean, I know in the context of this, IP

25  would mean intellectual property?  Is that what that



1    refers to?

2        Q.   So --

3        A.   I don't know just from -- no, I don't know

4    what that is.

5        Q.   So are you aware of GICSR ever licensing such

6    a product?

7        A.   Never.

8        Q.   From anybody?

9        A.   No.

10       Q.   Now, I'll ask you to turn to the next page.

11       A.   (The document was examined.)

12       Q.   Have you ever seen this page before?

13       A.   No.

14       Q.   And can you see who is identified on the

15   signature lines?

16       A.   Yeah, I see Craig Wright, director, and

17   through GICSR, Deborah Kobza.  I don't know if it would

18   have executive director, NH-ISAC there.  That's a

19   completely different organization.  So I don't

20   understand why that's there.

21       Q.   So is that your signature?

22       A.   No, it's not.

23       Q.   Does it resemble your signature?

24       A.   No, it doesn't.  I mean, when I -- no.  This

25   definitely does not resemble my signature.

F-R-H



DEBORAH KOBZA  Confidential                    December 18, 2019
IRA KLEIMAN vs CRAIG WRIGHT                                   27

 1        Q.    I'm going to show you another exhibit which
 2    we're going to mark as Plaintiff's Exhibit 6.
 3            (Plaintiff's Exhibit-6 was marked for
 4        identification.)
 5                MR. PASCHAL:  I'm marking this portion of the
 6        deposition as confidential since we're using
 7        confidential documents.
 8    BY MR. DELICH:
 9        Q.    So have you ever seen this document before?
10        A.    No.
11        Q.    So I'll represent to you that it was -- it's a
12    chart that was prepared by the Australian Tax Office.
13        A.    Uh-huh.
14        Q.    And I'm going to ask you to turn to page 6 of
15    it.
16                MR. PASCHAL:  In this deposition, every time
17        we have a document, can you not give a proffer of
18        what you believe the document means to the witness?
19        Can the witness just testify about the document?
20        That's improper.
21                MR. DELICH:  So --
22                MR. PASCHAL:  It's improper coaching,
23        absolutely.
24                MR. DELICH:  So say that this is --
25                MR. PASCHAL:  To represent what you think a

F-H



 1    document is to the witness is improper coaching.

 2    You can ask the witness does she know the document,

 3    has she seen the document.

 4         MR. DELICH:  So -- and she has not.

 5         MR. PASCHAL:  Okay.

 6         MR. DELICH:  Are you disputing whether it was

 7    created by the Australian Tax Office?

 8         MR. PASCHAL:  I'm not disputing anything.  I'm

 9    telling you in the deposition for every time you

10    show a document for you to then give an explanation

11    of what you believe that document means is improper

12    because if she doesn't know, she doesn't know.

13         MR. DELICH:  Okay.

14         MR. FREEDMAN:  Bryan, make your objection and

15    let Joe conduct the deposition.  It's his

16    deposition, not yours.  He can ask whatever he

17    wants and he can say what he wants and you can make

18    whatever objection you want.

19  BY MR. DELICH:

20    Q.   So I'm going to ask you to turn to page 6, row

21  12.

22    A.   It's small type.

23         (The document was examined.)

24         Okay.

25    Q.   So there's a sentence that says, "The software



1   concerned was clearly identified as BAA 3."

2        Do you see that?

3        A.   Yeah, about halfway down in that first

4   paragraph.

5        Q.   So do you know what BAA 3 is?

6        A.   No.

7        Q.   So the next sentence -- so do you see the next

8   sentence where it says, "The sale was for $31 million

9   and the invoice states, 'Transfer based on GICSR US

10  research NASA funding P2P system'"?

11       A.   What?

12       Q.   So do you see -- do you see that sentence?

13       A.   Yes.

14       Q.   So does that have any significance to you?

15       A.   None whatsoever.

16       Q.   Do you know what a NASA funding P2P system

17  refers to?

F-R-H
18       A.   No.  I've never done business with NASA

19  before.

20       Q.   And then can you see the next sentence after

21  that?

22       A.   (The document was examined.)

23            The ASCSEO [sic] PDF, that sentence?

24       Q.   Yeah.

25       A.   Yeah.



```
 1        Q.    Do you mind reading that sentence?
 2        A.    The AS -- ASCEO PDF provided indicates that
 3   the funding was from GICSR.
 4        Q.    So is that true?
 5        A.    No.
 6        Q.    How do you know that that's not true?
 7        A.    Because I've never -- I mean, you're saying
 8   that funding of $31 million was paid?  Is that what
 9   it's saying?
10        Q.    So I'll just refer you back to the document.
11        A.    Okay.
12              (The document was examined.)
13              No.  I know that it's not true because, you
14   know, I handled everything for GICSR.  I mean,
15   there's --
16        Q.    Can you define everything in a little bit more
17   detail?
18        A.    Well, I did the operations, I handled the bank
19   account, you know, I paid out invoices, I've sent out
20   invoices.  I did all of that.  There wasn't another
21   entity that did any of that.
22        Q.    Was there anybody else at GICSR who had access
23   to the bank accounts?
24        A.    No.
25        Q.    Did GICSR have a need for any software in
```



NA

1  connection with its best practices work?

2          MR. PASCHAL:  Objection, form.

3  BY MR. DELICH:

4      Q.   So, can you tell me a little bit more about

5  what your work at GICSR entailed in terms of the best

6  practices project?  I believe that's what you referred

7  to it as, right?

8      A.   Yeah, it was an effort to bring together

9  representatives from industry and academia to kind of

10  connect the dots to put together an IT security kind of

AA-R  11  framework, you know, best practices.  When you're

12  developing systems and that type of thing or -- or

13  doing your policies and procedures, what types of best

14  practices you need for IT security.  So that was the --

15  the effort to do that.

16          I used -- gosh, I think we used SharePoint for

17  a little bit just to help with, you know, doing some

18  research and putting best practices documents and

19  things like that up, but there wasn't any software we

20  needed, I mean, other than, you know, like Microsoft

21  Word, PowerPoint, you know, to do presentations and

22  things like that in.

23      Q.   Was GICSR a for-profit enterprise?

24      A.   No.  No.

25      Q.   What kind of --



DEBORAH KOBZA  Confidential
IRA KLEIMAN vs CRAIG WRIGHT

December 18, 2019
32

AA-R

1    A.    Nonprofit.

2    Q.    You've looked at a lot of documents today.

3    A.    Uh-huh.

R

4    Q.    What is your reaction to seeing some of these

5    for the first time?

6              MR. PASCHAL:  Objection, form.

NA-R

7    A.    My mouth is a little dry.

8              (Witness took a drink of water.)

9         It's a continuation of the shock that I

10   received when I got the first phone call about this.

11   Seeing written evidence of somebody that's stolen your

12   identity and is committing fraud and, you know, using

13   your name and the name of the small nonprofit I had

14   is -- is shocking and appalling.  I'm very, very upset.

15   To the point of filing my own lawsuit for fraud and

16   identity theft.  I mean, it's -- it's shocking that

UP-LEC-R

17   someone that was represented to me that worked for a

18   university could move on to do things like this.

19         You know, you see things about people getting

20   impacted by crime and things like that and how they

21   feel helpless, and that's how I feel.  It's -- it makes

22   me sick to my stomach.  I mean, I'm just being

23   perfectly honest.

24   Q.  I have nothing further.

25              MR. PASCHAL:  Okay.  Let's take a few minutes.



1    I have some questions.

2         THE VIDEOGRAPHER:  Okay.  We're going off the

3    record.  The time is approximately 10:45 a.m.

4         (Recess.)

5         THE VIDEOGRAPHER:  We're back on the record.

6    The time is approximately 10:51 a.m.

7                   CROSS EXAMINATION

8    BY MR. PASCHAL:

9    Q.   Can you say your last name again?  I don't

10   want to --

11   A.   Kobza.

12   Q.   Ms. Kobza, I represent Dr. Craig Wright.

13   A.   Uh-huh.

14   Q.   I just have a few questions for you.  And just

15   to be clear, you have no knowledge of Craig Wright's

16   involvement in Bitcoin, right?  And I should clarify.

17   Personal knowledge.  Not knowledge you received from

18   counsel or --

19   A.   No, no.  I don't believe in any of our, like,

20   phone conversations or anything -- I mean, I knew he

21   worked on other things, but I don't know of him, you

22   know, forming a Bitcoin organization or anything like

23   that.

24   Q.   Do you know of him doing any work with David

25   Kleiman?



1    A.    Not that I remember.

2    Q.    You don't know David Kleiman, right?

3    A.    Not that I remember, no.

4    Q.    Okay.  And you don't know anything about W&K

5    Info Defense Research, right?

6    A.    No, not that I can remember, no.

7    Q.    And you don't remember having personal

8    knowledge of Craig Wright and David Kleiman mining

9    Bitcoin?

10   A.    Mining Bitcoin?

11   Q.    Yeah.

12   A.    I would say no because I didn't even know

13   anything about mining Bitcoin probably until a couple

14   of years ago because I didn't -- I mean, I know there

15   was -- back in the -- 2010, 2014, you know, they were

16   talking about crypto -- well, not even 2010 -- talking

17   about cryptocurrency, but I didn't know how it worked,

18   didn't know what Bitcoin was, and I still don't quite

19   understand how the mining works because I don't -- I

20   think it's a scam.  I don't participate in it.

21   Q.    Okay.  And you mentioned that you've spoken

22   with counsel before this deposition, right?  With

23   this -- with plaintiff's counsel.

24   A.    Yeah, someone from their office in Miami had

25   contacted me.

1   Q.   Okay.  And when you had that conversation, was

2   it by phone?

3   A.   Yes.

4   Q.   How long was the conversation for; do you

5   remember?

6   A.   I don't know, maybe 15, 20 minutes or so.  It

7   had to be less than 30 minutes.

8   Q.   Okay.  And on that call, did you explain that

9   you did not know about Dave Kleiman's involvement with

10   Bitcoin?

11   A.   I don't think that was part of the

12   conversation.  I'm trying to remember.  Because I

13   was -- it took a good part of the conversation at the

14   beginning because I didn't know if it was a joke or

15   what it was because I never heard about this lawsuit or

16   anything like that and they were just, you know,

17   telling me about the lawsuit.  And they read off some

18   names, do you know this person, do you know this

19   person, do you know this person, so I don't remember if

20   he was one of the ones that they mentioned.

21   Q.   Okay.

22   A.   But --

23   Q.   But did you tell them that you really have no

24   knowledge of this lawsuit?

25   A.   Yes, I did not know anything about the lawsuit

1   until -- until then.

2      Q.   So I'm going to hand you what I'm going to

3   mark as Exhibit, I think, No. 4?

4           THE REPORTER:  Do you want to keep going?

5           MR. PASCHAL:  Yeah, keep going.

6      A.   I'm trying to remember when they served the --

7   the first subpoena, that was before or after I got that

8   phone call, but I can't remember.  But, anyway, okay.

9           (Plaintiff's Exhibit-7 was marked for

10          identification.)

11  BY MR. PASCHAL:

12     Q.   So the title of this document, do you see it?

13     A.   U.S. District Court, Southern District of

14  Florida?

15     Q.   Uh-huh.  Where it says Plaintiffs' Rule

16  26(a)(1)?

17     A.   Plaintiffs' -- like, that first paragraph

18  under that first title?  Is that what you're referring

19  to?

20     Q.   Yeah.

21     A.   Estate of David Kleiman and the research --

22  yeah, whatever it is.

23     Q.   It's not numbered by page, but could you go to

24  page 3 and look at paragraph 6?

25     A.   (The document was examined.)



1    Q.   Global Institute of Cyber Security Research,
2  that's a company that you funded?
3    A.   (The document was examined.)
4         I don't know how Craig Wright thinks he -- I
5  mean, that's -- that's a complete -- you know, I've
6  never worked with him and this Dave -- Dave person in
7  collaborating to creat Bitcoin, mining bitcoins, how he
8  saved the assets, trusts --
9    Q.   So is it fair to say that this paragraph is a
10  false statement?
11    A.   It definitely is.
12    Q.   Okay.  And then let's go to paragraph 7.  Is
13  that your name?
14    A.   Yeah.
15    Q.   And can you review -- well, I'll read it out.
16  "Information related to Craig and Dave's collaboration
17  of creating Bitcoin, mining bitcoins, and Craig's use
18  of intellectual property developed by Dave."
19         Do you have any information related to any of
20  that?
21    A.   No.
22    Q.   So that's a false statement?
23    A.   I don't know -- I don't know anything.
24         MR. DELICH:  Objection.
25  BY MR. PASCHAL:



1      Q.   So is that a false statement?

2      A.   (The document was examined.)

3           Yes, I have not worked with them in creating

4   Bitcoin, mining Bitcoin, or intellectual property.

5      Q.   Sorry.  And the next sentence, it says, "How

6   Craig has subsequently used and/or saved these assets."

7   Is that statement false?  Do you have any information?

8           MR. DELICH:  Objection.

9      A.   I don't know how he has used or saved assets.

10  I don't know.

11  BY MR. PASCHAL:

12     Q.   Okay.  And then the last sentence is, "And

13  various trusts where plaintiffs' Bitcoin may be held,"

14  is that false?

15          MR. DELICH:  Objection.

16  BY MR. PASCHAL:

17     Q.   Do you have information related to that?

18     A.   I have no information related to any trust, I

19  don't know what Craig Wright is doing or what this

20  David Kleiman is doing.

21     Q.   Is this last sentence right, "Ms. Kobza is

22  located in Merritt Island, Florida"?

23     A.   No, that's false.

24     Q.   Okay.

25     A.   I'm located in St. Augustine, Florida.



1    Q.   I just want to ask -- ask some questions about

2    your testimony earlier that --

3    A.   Uh-huh.

4    Q.   -- Dr. Wright was on the board of advisors and

5    not the board of directors?

6    A.   No, he was never on the board of directors.

7    He was never an officer of the -- of the organization

8    or on the board of directors.

9    Q.   He was on the board of advisors, you said.

10    A.   It was -- I wouldn't really say board of

11    advisors.  I would say an advisory board.  It's where

12    we had different folks that would help -- kind of help

13    guide the research and things that we were doing.

14    Q.   Okay.  And in your business, you understand

15    the importance of title and, you know, because it gives

16    someone the appearance that they have authority, right?

17    A.   Sure.

18    Q.   So you -- okay.

19         I'll show you what we're marking as 8.

20         (Plaintiff's Exhibit-8 was marked for

21    identification.)

22  BY MR. PASCHAL:

23    Q.   And this is in 2011.  Do you remember this

24    email?

25    A.   Well, wait a minute, let me look at it.



1        Q.   Uh-huh.

2        A.   (The document was examined.)

3             Yeah, it seems like I remember --

4        Q.   Okay.  Will you go to the second page of this

5    email, which is 00796833?

6        A.   Okay.

7        Q.   You sent an email to a group of people

8    including Dr. Wright about a meeting.  Do you see that?

9        A.   Down at the bottom?

10       Q.   Yeah.  Okay.

11       A.   Yeah.

12       Q.   And then Dr. Wright responds, "Hi.  I did not

13   get the webinar invite.  I have the other."

14            Do you see that?

15       A.   Yeah.

16       Q.   Okay.  And you see his signature block?

17       A.   Yeah.

18       Q.   It says Dr. Craig Wright, some letters, and

19   the second line it says, "Director, Australia - Asia

20   Pacific," and then right under that, it says, "GICSR."

21       A.   Uh-huh.

22       Q.   And that is the address for your company,

23   right?

24       A.   Yeah, at that time, it was that address.  We

25   have since moved from that address, but at that time,



1    it was.

2        Q.   Okay.  So when he responds that he's a

3    director of GICSR, your response to him was, "Hi,

4    Craig, Technology!  AUGH!!!"

5        A.   Yeah, because he said he didn't get the

6    invite.

7        Q.   Okay.  And then Dr. Wright responds, "Thanks,"

8    with the same signature block identifying himself as a

9    director of GICSR.

10       A.   So that is not board of directors.  Many

11   companies have -- when they have, like, a vice

12   president of operations or they have a director for

13   security operations, director of HR, those types of

14   things, they are not on the board of directors, they're

15   not an officer of the organization.

16           Like I said earlier, Richard Zaluski, who

17   introduced me to Craig White, he brought Craig Wright

18   in on that research project and they both said that

19   they would help build the research project and get

20   people to participate from the UK, you know, from

21   Europe.  And Craig was going to concentrate on

22   Australia and Asia Pacific to get folks from

23   universities and companies to maybe participate in

24   workshops and that type of thing.

25           So from that perspective, he was directing



1  that type of thing, but he was not on the board of

2  directors.

3      Q.   And I think -- I don't know, I think this may

4  be marked as 1.

5          MR. PASCHAL:  Do you have your exhibits?

6          MR. DELICH:  (A document was handed.)

7          MR. PASCHAL:  I think it was, like, 1 or 2.

8          MR. DELICH:  (A document was handed.)

9  BY MR. PASCHAL:

10     Q.   You mentioned Mr. Zaluski -- Zaluski?

11     A.   Uh-huh.

12     Q.   Okay.  And his email which is on March 24,

13 2011 to Dr. Craig Wright --

14     A.   Isn't this the one I looked at before?

15     Q.   Yes.

16     A.   Okay.

17     Q.   In the first paragraph, second sentence, he

18 says, "I have spoken with our GICSR management team and

19 our group and we would like to invite you to be on our

20 board of directors for GICSR."  Then -- I guess because

21 of the time difference, but shortly after, Dr. Wright

22 responds to Mr. Zaluski and says, "Consider it

23 accepted."

24     A.   Yes, and as you can see, I was not copied on

25 that email, and Mr. Zaluski had no authority to do



1    that.  If I had, you know, any -- anybody to -- that

2    would be on the board of directors would have to be

3    authorized by me.  Mr. Zaluski had no authority to do

4    that.

5         Q.   Okay.  And do you have any emails where you've

6    explained to Mr. Zaluski that he has no authority to do

7    that?

8         A.   I don't have any emails.  I know there's been

9    phone conversations because -- with Mr. Zaluski on that

10   because he -- I wasn't going to put him on the board of

11   directors and I told him I wasn't going to put him on

12   the board of directors.  And then we kind of -- after

13   things didn't go anywhere, we kind of parted ways and

14   the last I heard with him, he was -- I was told he was

15   standing up an organization in the UK that had a name

16   similar to GICSR, but I didn't investigate it or

17   anything.

18        Q.   Okay.

19        A.   Yeah, because if anybody was going to be on

20   the board of GICSR, it would be represented in a board

21   of directors agreement that they would have to sign.

22        Q.   Okay.

23             MR. PASCHAL:  And can you get this exhibit?

24             MR. DELICH:  (A document was handed.)

25   BY MR. PASCHAL:



1      Q.   (A document was handed.)

2           On Exhibit 5 --

3      A.   This is one I looked at before?

4      Q.   Yes.

5      A.   Okay.

6      Q.   Under parties, your name is not listed,

7   correct?

8      A.   That's right.

9      Q.   Okay.  Let me get to the exact page that

10  counsel was looking at.  Okay.  Can you turn to page

11  11, which is 00552206?

12     A.   Page 11, the reference schedule?

13     Q.   Yes.

14     A.   Okay.

15     Q.   GICSR did business around the world, right?

16     A.   No.

17          THE REPORTER:  Did business what?

18          MR. PASCHAL:  Around the world.

19     A.   No, we didn't do business around the world.

20  We worked -- we didn't have business transactions or

21  contracts or anything like that around the world at

22  all.

23  BY MR. PASCHAL:

24     Q.   But you had people that worked around the

25  world, right?



1     A.    No.  I mean, I had -- I didn't have people

2    that were employed by GICSR that worked around the

3    world.  We had volunteers and people, you know, that

4    worked to help advise on things, but -- but, no, I did

5    not have people employed around the world doing work.

6     Q.    So when Mr. Zaluski told Craig Wright that he

7    would be meeting up with Mr. Zaluski, the Australia and

8    Asia side of the company, was that completely false?

9     A.    That they would be leading the research part

10   for that -- you know, for the UK and for Australia

11   and -- and that type of thing, that they would be, you

12   know, directing, kind of bringing people together for

13   that research project, but they're not an officer of

14   the organization or had the authority to transact

15   business.  They didn't have the authority to enter into

16   any contracts.

17    Q.    My question is very -- you can finish.  I'm

18   sorry.

19    A.    No, go ahead, I'm sorry.

20    Q.    My question is very, very simple.

21        Were -- people affiliated with GICSR, did you

22   have people around the world?

23    A.    Well, I don't want to give a -- that was very,

24   very limited.  There were people that were

25   participating as far as research projects, but, you



1  know, like Richard Zaluski and like Dr. Wright.

2      Q.   So when Dr. Wright's title here, it says

3  "Director, Australia - Asia Pacific," in your email

4  chain that you have with him, is that false?

5      A.   Like I explained, he was not an officer of the

6  organization or on the board of directors.  That was to

7  help head up that research initiative for that best

8  practice research so he could help bring in

9  organizations from Australia or, you know, universities

10  or industry and that type of thing because I didn't

11  know anybody in that area.

12          So being that he was at a university and in

13  talking to Richard Zaluski who introduced me to him and

14  researching that Dr. Wright did -- was, in fact,

15  associated with that university, I felt like I had done

16  my due diligence, that he would be able to, you know,

17  maybe bring some people on board for that research

18  project.

19      Q.   Okay.  But just going back to my question --

20      A.   Uh-huh.

21      Q.   -- people -- the people that worked with GI --

22  GICSR, were they outside the United States?

23          MR. DELICH:  Objection.

24      A.   People that volunteered to help do work were

25  outside of the United States, yes.



 1  BY MR. PASCHAL:

 2      Q.   And Dr. Wright was one of them?

 3      A.   He was one person that was a volunteer to

 4  help.  I mean, he was never paid a salary or anything

 5  like that.  He was a volunteer.

 6      Q.   And Dr. Zaluski, he was one of them, as well?

 7      A.   Yes, he was -- well, Mr. Zaluski, he was a

 8  volunteer, as well.

 9      Q.   Okay.  So going back to this reference

10  schedule, you don't know the currency that that -- that

11  the license fee is in, do you?

12      A.   No.  When you say know the currency, I mean, I

13  don't know anything about it, if that's what you're

14  asking.

15      Q.   Yeah.

16      A.   Yeah.

17      Q.   But if it were in British pounds, you wouldn't

18  know.

19           MR. DELICH:  Objection.

20      A.   No, I don't understand how currency, you know,

21  changes for countries, so, no.  I have no need to know.

22  BY MR. PASCHAL:

23      Q.   And on page 12, you have your name and it

24  says, "Executive Director, NH-ISAC"?

25      A.   Yes, I don't know why that is there.



1    Q.   Okay.  That company isn't one of the parties
2  on the first page, is it?
3    A.   No.
4    Q.   It has nothing to do with these parties, does
5  it?
6    A.   No, nothing at all.  And that is not my
7  signature.  Far from it.  That's definitely identity
8  theft.
9    Q.   But you know nothing about this -- this
10  document.
11    A.   This document here?  No.
12    Q.   Okay.
13    A.   The first time I've ever seen it.
14         Oh, y'all need these back, right?
15    Q.   I think that's it.
16         MR. DELICH:  If we can just take a short break
17     and then I might have just a couple questions.
18         MR. PASCHAL:  Okay.
19         THE VIDEOGRAPHER:  We're going off the record.
20     The time is approximately 11:11 a.m.
21         (Recess.)
22         THE VIDEOGRAPHER:  We are back on the record.
23     The time is approximately 11:15 a.m.  Thank you.
24                    REDIRECT EXAMINATION
25  BY MR. DELICH:



H-F-R

LEC-L-H-F-R

R

1    Q.   So I'm going to hand you back Exhibit 5 again.
2    A.   Uh-huh.
3    Q.   The last page there.
4    A.   Yes, sir.
5    Q.   Is it your testimony that the signature on
6    that document is a -- is a forgery?
7    A.   Yes, absolutely.
8    Q.   Now, you just testified that GICSR had a
9    number of volunteers around the world who --
10   A.   It wasn't -- it was a handful.  I mean, it
11   wasn't -- that's why I was asking other -- another
12   question because I felt he was kind of representing we
13   had people all over the world, but it was, you know,
14   just a handful.
15   Q.   Were any of those volunteers authorized to
16   create or establish trusts on behalf of GICSR?
17   A.   Absolutely not.
18        MR. PASCHAL:  Objection, form.
19   A.   No.
20        MR. DELICH:  That's all I've got.
21        THE VIDEOGRAPHER:  Read or waive on record?
22   Did you want to put that on record, read or waive?
23        MR. PASCHAL:  Oh, yeah.
24        THE VIDEOGRAPHER:  Having heard the approval
25   of all attorneys to go off the record at this time,



1   this concludes disc 1, volume 1 of the deposition

2   of Deborah Kobza.  We're off the record.  The time

3   is approximately 11:16 a.m.

4        (Discussion off the video record.)

5        THE WITNESS:  I would like to attest to what I

6   said because I recorded what I said here, as well,

7   so you never assume, so -- I mean, I know what I

8   said, but if there's any question, I've got a way

9   to go back and make sure it is what I said.

10       MR. PASCHAL:  Just to be clear --

11       THE VIDEOGRAPHER:  That was not on video

12   record.

13       MR. PASCHAL:  -- I marked portions of the

14   deposition as confidential, and I don't have the

15   sheet, but I could send you a copy of the

16   confidentiality order.

17       THE WITNESS:  What do you mean, parts are

18   confidential?

19       MR. DELICH:  So one of the exhibits --

20       MR. PASCHAL:  Actually, I think it was two.

21       MR. DELICH:  -- two are subject to a

22   protective order.  So that section of the

23   recording, that he -- and he mentioned it on the

24   record as being subject to that protective order.

25       THE WITNESS:  So what you're saying is, like,



1   the recording would have that part removed?

2        MR. DELICH:  Yeah, you just --

3        MR. PASCHAL:  Well, no, it's more for the

4   deposition transcript, so --

5        MR. DELICH:  So, basically, it would be to not

6   disseminate that section to anybody and to keep it

7   confidential.

8        THE WITNESS:  Oh, absolutely.

9        MR. DELICH:  Okay.

10       (Witness excused.)

11       (The deposition was concluded at 11:17 a.m.)

12                       - - -

13

14

15

16

17

18

19

20

21

22

23

24

25



1                              CERTIFICATE

2

3

4     STATE OF FLORIDA)
      COUNTY OF DUVAL )

5

6              I, Sandra G. Pemberton, RPR, CRR, certify
      that I was authorized to and did stenographically

7     report the deposition of Deborah Kobza; that a review
      of the transcript was requested; and that the

8     transcript is a true and complete record of my
      stenographic notes.

9

10             I further certify that I am not a
      relative, employee, attorney, or counsel of any of the

11    parties, nor am I a relative or employee of any of the
      parties' attorneys or counsel connected with the

12    action, nor am I financially interested in the action.

13
               DATED this 31st day of December, 2019.
14
                     *Sandra G. Pemberton*
15

16             Sandra G. Pemberton, RPR, CRR, FPR

17

18

19

20

21

22

23

24

25



1                      CERTIFICATE OF OATH

2

3

   STATE OF FLORIDA   )
4  COUNTY OF DUVAL    )

5

6

           I, the undersigned authority, certify that
7  Deborah Kobza personally appeared before me and was
   duly sworn.
8

9

           WITNESS my hand and official seal this
10  31st day of December, 2019.

11

12                    _____
                      Sandra G. Pemberton
13                    Notary Public – State of Florida
                      My Commission No. GG169455
14                    Expires:  January 13, 2022

15

16

17

18

19

20

21

22

23

24

25



```
1                        ERRATA SHEET

2     IN RE:  Kleiman v. Wright

3     PAGE    LINE    CHANGE              REASON

4     _____  _____  _____  _____

5     _____  _____  _____  _____

6     _____  _____  _____  _____

7     _____  _____  _____  _____

8     _____  _____  _____  _____

9     _____  _____  _____  _____

10    _____  _____  _____  _____

11    _____  _____  _____  _____

12    _____  _____  _____  _____

13    _____  _____  _____  _____

14    _____  _____  _____  _____

15    _____  _____  _____  _____

16    _____  _____  _____  _____

17    _____  _____  _____  _____

18    _____  _____  _____  _____

19    _____  _____  _____  _____

20    _____  _____  _____  _____

21    _____  _____  _____  _____

22          Under penalties of perjury, I declare that
      I have read the foregoing pages of my deposition and
23    that it is true and correct, subject to any changes in
      form or substance entered here.

24    _____        _____

25    Date                        Deborah Kobza
```

