LYNN CARROLL WRIGHT                    1                    January 13, 2020



08:38:02

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
~~~~~~~~~~~~~~~~~~~

IRA KLEIMAN, as the personal      ) CASE NO.:
representative of the Estate      )
of David Kleiman, and W&K Info    ) 9:18-cv-8016-BB/BR
Defense Research, LLC             )
                                  )
          Plaintiffs,             )
                                  )
                                  )
v.                                )
                                  )
                                  )
CRAIG WRIGHT                      )
                                  )
          Defendant.              )
_____   )


VIDEOTAPED DEPOSITION OF MS LYNN CARROLL WRIGHT


ON:        Monday, January 13, 2020

AT:        8.57am (Australian Eastern Daylight Savings
           Time)

TAKEN AT:  ██████████████████

COURT REPORTER:   Sally Hicks, JP

Defendant's Designations        Plaintiffs' Counter-Designations

Defendant's Counter- Designations   Plaintiffs' Objections

Defendant's Objections          Plaintiffs' Objections to Counters

Plaintiffs' Designations
Redacted-In black

```
1                 A-P-P-E-A-R-A-N-C-E-S

2      ON BEHALF OF THE PLAINTIFFS:

3              ROCHE FREEDMAN LLP
               185 WYTHE AVENUE
4              BROOKLYN, NY11249
               PH:   +1 716 348-6003
5
       BY:    MR KYLE W. ROCHE
6
               BOIES SCHILLER FLEXNER LLP
7              100 SE 2ND STREET, SUITE 2800
               MIAMI, FLORIDA 33131
8              PH:   +1 305 539-8400

9      BY:    MR ANDREW S.  BRENNER

10
       ON BEHALF OF THE DEFENDANT:
11
               RIVERO MESTRE LLP
12             2525 PONCE DE LEON BOULEVARD,
               SUITE 1000,
13             MIAMI, FLORIDA 33134
               +1 305 445-2500
14
       BY:    MS ZAHARAH R. MARKOE
15

16

17     ALSO PRESENT:

18             (IN AUSTRALIA)
               Mr Wayne Matthews, Videographer
19             Ms Sati Nagra (Solicitor) King & Wood Mallesons
               Mr Nathan Sexton (Solicitor) Piper Alderman
20
               (IN THE USA)
21             Mr Joe Delich (with Mr Kyle Roche)
               Ms Amanda McGovern (with Ms Zaharah Markoe)
22

23

24

25
```

**WITNESS INDEX**

| Deponent | Examined by | Page |
|---|---|---|
| Lynn Carroll Wright | Ms Zaharah Markoe | 6 |
| | Mr Kyle Roche | 40 |
| | Ms Zaharah Markoe | 138 |

**E X H I B I T   I N D E X**

| No. | Description | Page |
|---|---|---|
| 1 | Series of emails dated February 15, 2015 commencing with Bates stamp DEF_00009663 | 10 |
| 2 | Email dated February March 24, 2014 commencing with Bates stamp DEFAUS_00706832 | 13 |
| 3 | Agreed Property Settlement and Terms commencing with Bates stamp DEFAUS_01518187 | 22 |
| 4 | Plaintiffs' Cross-Notice of Taking Video Deposition Duces Tecum (not Bates stamped) | 85 |
| 5 | Series of emails dated April 20 2015 Bates stamp DEFAUS_00640897 | 86 |
| 6 | Affidavit of Lynn Wright dated November 5, 2013 commencing with Bates stamp DEFAUS_01070641 | 93 |
| 7 | Agreement between Craig Steven Wright and Carroll Lynn Wright dated June 30, 2009 (Bates stamp reference not provided) | 101 |
| 8 | Email dated October 23, 2013 commencing with Bates stamp ending 75974 | 109 |
| 9 | Paper titled "How can the Australian Tax Office benefit from Bitcoin Currency?" commencing with Bates stamp ending 75975 | 109 |
| 10 | Series of emails dated October 18, 2011 and October 19, 2011 commencing with Bates stamp ending 01210717 | 113 |
| 11 | Series of emails dated February 4, 2014 commencing with Bates stamp ending 01559220 | 119 |

LYNN CARROLL WRIGHT                    4                    January 13, 2020

```
 1
      12        Email dated November 21, 2011,              121
 2              Bates stamped DEFAUS_00698432

 3    13        Sale Agreement between Information Defense   131
                Pty Ltd and Lynn Wright/Cloudcroft Pty Ltd
 4              commencing with Bates stamp ending 01212940

 5    14        Letter from Lynn Wright to the Australian    138
                Taxation Office dated March 22, 2011
 6              commencing with Bates stamp DEFAUS_01559250

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LYNN CARROLL WRIGHT                 5                  January 13, 2020

1     (8.57am)

08:57:46   2          THE VIDEOGRAPHER:   This is videotape number 1 in

08:57:48   3     the deposition of Lynn Carroll Wright in the matter of

08:57:52   4     Ira Kleiman, as the personal representative of the Estate

08:57:56   5     of David Kleiman, and W&K Info Defense Research, LLC,

08:58:05   6     versus Craig Wright, in the United States District Court,

08:58:08   7     Southern District of Florida.  The case number is

08:58:15   8     9:18-cv-80176-BB/BR.  Today's date is the 13th day

08:58:26   9     of January 2020, and the time on the video monitor is

08:58:30  10     8.58am.

08:58:31  11          This deposition is taking place at ██████████

08:58:35  12     ████████████████████████████████████████  The

08:58:39  13     videographer today is Wayne Matthews from Epiq Australia.

08:58:43  14     Would counsel please identify yourselves and state whom

08:58:45  15     you represent.

08:58:49  16          MS MARKOE:   Zaharah Markoe on behalf of

08:58:52  17     Dr Craig Wright, and with me is my colleague,

08:58:55  18     Amanda McGovern, also on behalf of Dr Craig Wright, in

08:58:59  19     Florida from Rivero Mestre.

08:59:00  20          MR ROCHE:   Kyle Roche, on behalf of plaintiffs.

08:59:01  21     I'm here with Joe Delich.

08:59:05  22          MR BRENNER:   Andrew Brenner on behalf of the

08:59:07  23     plaintiffs.

08:59:09  24          THE VIDEOGRAPHER:   Do we have anybody else in the

08:59:11  25     USA on the phone?  No?  All right.  In Australia we have

LYNN CARROLL WRIGHT                                    January 13, 2020

6

| | | |
|---|---|---|
| 08:59:15 | 1 | in the room -- |
| 08:59:19 | 2 | MR SEXTON:   Nathan Sexton from Piper Alderman. |
| 08:59:25 | 3 | MS NAGRA:   Sati Nagra from King & Wood Mallesons. |
| 08:59:27 | 4 | THE VIDEOGRAPHER:   The court reporter today is |
| 08:59:29 | 5 | Sally Hicks from the firm of Epiq Australia.  Would the |
| | 6 | court reporter please swear in the witness. |
| | 7 | (The witness was sworn) |
| | 8 | THE VIDEOGRAPHER:   Proceed, ladies and gentlemen. |
| 08:59:51 | 9 | MR ROCHE:   I also just wanted to declare that Ira - |
| 08:59:55 | 10 | I didn't hear it.  Ira Kleiman is also on.  He informed |
| 08:59:59 | 11 | me he tried to speak up, but I don't know if the court |
| 09:00:04 | 12 | reporter caught it. |
| | 13 | THE COURT REPORTER:   No, I didn't.  Thank you. |
| | 14 | LYNN CARROLL WRIGHT, |
| | 15 | having been duly sworn, |
| | 16 | testified as follows: |
| | 17 | DIRECTION EXAMINATION BY MS MARKOE: |
| 09:00:06 | 18 | Q.   Good morning, Lynn - if that's okay, that |
| 09:00:12 | 19 | I call you Lynn? |
| 09:00:14 | 20 | A.   Yes, yes. |
| 09:00:16 | 21 | Q.   My name is Zaharah Markoe.  I'm with the law |
| 09:00:17 | 22 | firm of Rivero Mestre in Miami, Florida, United States of |
| 09:00:21 | 23 | America.  My firm represents Dr Craig Wright.  I am going |
| 09:00:24 | 24 | to ask you some questions.  If you do not understand my |
| 09:00:26 | 25 | questions, please let me know, and I will try to clarify |

LYNN CARROLL WRIGHT                    7                    January 13, 2020

09:00:29  1   or rephrase my question for you.

09:00:32  2        A.   Yes.

09:00:33  3        Q.   If I have got something wrong in my question,

09:00:35  4   you correct it.  If you need a break for any reason,

09:00:40  5   please let me know and we can take a break at any time

09:00:43  6   you wish, but I would request that the - if there is a

09:00:46  7   question pending, that prior to taking a break, you

09:00:50  8   answer the question that is currently pending.

09:00:53  9        A.   Yes, okay.

09:00:55 10        Q.   Are you represented by counsel here today?

09:00:58 11        A.   No.

09:01:00 12        Q.   Do you understand that you are here to provide

09:01:02 13   testimony in a case pending in the United States District

09:01:06 14   Court, for the Southern District of Florida in the United

09:01:09 15   States, titled "Ira Kleiman, as the personal

09:01:11 16   representative for the Estate of David Kleiman, and

09:01:14 17   W&K Information Defense Research Limited (Plaintiffs),

09:01:17 18   versus Craig Wright (Defendant)"?

09:01:21 19        A.   Yes, I'm aware of that.

09:01:23 20        Q.   And do you understand that the testimony you

09:01:24 21   provide today may be used in that trial and presented

09:01:27 22   before the jury?

09:01:28 23        A.   Yes, I'm aware of that.

09:01:34 24        Q.   Your only job today is to provide truthful and

09:01:36 25   accurate testimony, based on your personal knowledge.

LYNN CARROLL WRIGHT                    8                    January 13, 2020

09:01:39  1    Please do not speculate or guess.  If you don't know the

09:01:43  2    answer to the question, just say you don't know or don't

09:01:46  3    recall.  Whatever answer is accurate is all you need to

09:01:48  4    do.  I am providing you some of this information because

09:01:52  5    you are not represented here by counsel.

09:01:54  6              Do you have any medical conditions that affect

09:01:56  7    your ability to provide truthful and accurate testimony

09:01:58  8    today?

09:01:59  9         A.   No.

09:02:06  10        Q.   Have you and I met personally before?

09:02:08  11        A.   Never.

09:02:10  12        Q.   Have you met my colleague, Ms McGovern, in

09:02:12  13   person before?

09:02:13  14        A.   No.

09:02:13  15        Q.   Have we spoken by telephone before?

09:02:16  16        A.   Yes.

09:02:18  17        Q.   And have you spoken with my colleague,

09:02:19  18   Ms McGovern, by telephone before?

09:02:24  19        A.   Yes.

09:02:25  20        Q.   Approximately how many times have you spoken

09:02:26  21   with either or both of us collectively?

09:02:31  22        A.   Three, maybe four times.  I'm not - I don't

09:02:33  23   recall.

09:02:42  24        Q.   Can you please state your legal name for the

09:02:45  25   record?

LYNN CARROLL WRIGHT                    9                 January 13, 2020

| | | |
|---|---|---|
| 09:02:46 | 1 | A.    Lynn Carroll Wright. |
| 09:02:49 | 2 | Q.    Are you a resident of Australia? |
| 09:02:51 | 3 | A.    Yes. |
| 09:02:55 | 4 | Q.    Were you previously married to Dr Craig Steven |
| 09:03:00 | 5 | Wright? |
| 09:03:00 | 6 | A.    Yes. |
| 09:03:01 | 7 | Q.    From when to when were you married to Craig? |
| 09:03:06 | 8 | A.    End of '96 to - 2011 I think was the divorce. |
| 09:03:19 | 9 | Q.    Was that when you had a formal separation or |
| 09:03:23 | 10 | was that when you had a formal divorce decree, or do you |
| 09:03:26 | 11 | not recall? |
| 09:03:27 | 12 | A.    The formal separation, I believe, started in |
| 09:03:37 | 13 | November of 2010. |
| | 14 | (Muffled discussion heard through Skype link) |
| | 15 | MR ROCHE:   Oh, sorry. |
| | 16 | MS MARKOE:   Kyle, we can hear you. |
| | 17 | MR ROCHE:   Yeah, I'll make  sure to mute next time. |
| | 18 | BY MS MARKOE: |
| 09:04:09 | 19 | Q.    Are you familiar with a company called |
| 09:04:13 | 20 | W&K Information Defense Research, LLC? |
| | 21 | A.    Yes. |
| 09:04:20 | 22 | Q.    Do you have personal knowledge of the formation |
| 09:04:23 | 23 | of - I'm going to - if you don't mind, I will just call |
| 09:04:25 | 24 | it "W&K", it's a little shorter -- |
| 09:04:28 | 25 | A.    No, no, that's fine. |

LYNN CARROLL WRIGHT                    10                    January 13, 2020

Q.    -- than that whole long spiel.

A.    Yeah, okay.

Q.    Do you have personal knowledge of the formation
of that company?

A.    Yes.

Q.    Do you recall approximately when W&K was
formed?

A.    Oh, it - I - I don't know the date.  It's
probably around 2008/2009.  I'm not really sure.

Q.    So it could have been in 2008/2009, it could
have been later than that.  You just - you don't have a
good recollection for the date of when it was formed?

A.    That's - that's right, yes.

Q.    I'm going to have - and this may help refresh
your recollection a little bit, hopefully.  I'm going to
have counsel from Piper Alderman - I believe they have
hard copies of some documents for you, to show you.  I'm
going to have them show you what I have called "tab 4",
but we will mark it as exhibit 1 for this exhibit -
exhibit 1 to this deposition.

        (Exhibit 1 marked for identification)

MS MARKOE:   Counsel, I believe we have sent these
documents over to you by email, but if you prefer it,
I will read out the Bates number, if that's easier for
you guys, too?

| | |
|---|---|
| 09:05:55 1 | MR BRENNER:   Yeah, can you read out the Bates |
| 09:05:57 2 | number? |
| 09:05:58 3 | MS MARKOE:   Sure.  DEF_00009663 through 4. |
| 4 | BY MS MARKOE: |
| 09:06:12 5 | Q.    Lynn, do you have that document in front of |
| 09:06:14 6 | you? |
| 09:06:15 7 | A.    Yes, I do.  It's - I'm just going over it. |
| 09:06:17 8 | It's just very small print. |
| 09:06:19 9 | Q.    It is very small print.  I apologize for that. |
| 09:06:23 10 | If you take a moment and just read over it, you start at |
| 09:06:28 11 | the bottom and read from the top, because it is an email |
| 09:06:31 12 | chain. |
| 09:06:31 13 | A.    Oh, okay. |
| 09:06:32 14 | Q.    And just let me know when you're done. |
| 09:07:28 15 | A.    Okay. |
| 09:07:37 16 | Q.    Ms Wright, before I actually turn to this |
| 09:07:39 17 | document, I have another quick question for you.  You |
| 09:07:44 18 | said you're familiar with the company named W&K |
| 09:07:50 19 | Information Defense Research and you have personal |
| 09:07:51 20 | knowledge of its formation? |
| 09:07:52 21 | MR ROCHE:   Objection.  Form. |
| 22 | BY MS MARKOE: |
| 09:08:00 23 | Q.    Do you know what the "W" in W&K Information |
| 09:08:05 24 | Defense Research stood for? |
| 09:08:06 25 | A.    For Wright. |

09:08:10 1        Q.    Okay.  And did that stand for Craig Wright or

09:08:14 2     Lynn Wright?

09:08:16 3        A.    Lynn Wright.

09:08:20 4        Q.    For Lynn Wright?

09:08:20 5        A.    Yes.

09:08:23 6        Q.    And what did the "K" stand for?

09:08:26 7        A.    For Dave Kleiman.

09:08:29 8        Q.    And what did "Information Defense" stand for?

09:08:33 9        A.    That was Craig.

09:08:37 10       Q.    So the company W&K Information Defense Research

09:08:42 11    stood for Lynn Wright, Dave Kleiman and Craig Wright; is

09:08:47 12    that correct?

09:08:47 13       A.    Yes.

09:08:52 14       Q.    Turning back to what has been marked as

09:08:54 15    exhibit 1, does this document refresh your recollection

09:09:01 16    that W&K was formed in or about February of 2011?

09:09:08 17       A.    It doesn't.  I - I - honestly, I don't remember

09:09:12 18    it, seeing it, but that doesn't mean I didn't see it.

09:09:21 19    I - I - I thought that we - I guess it's - it's hard to

09:09:25 20    say for me.  I think we did some work together before

09:09:30 21    that date but they only, I guess, got - got together

09:09:39 22    with - to - to establish on that date.

09:09:45 23       Q.    Do you see in the second part of the email

09:09:49 24    down, from Dave Kleiman to Craig Wright and Lynn Wright,

09:09:55 25    it says:

09:09:58  1          *Last page of attached.  Do you think I can*
09:10:00             *list you as mgr or mgrm with a foreign*
09:10:05  2          *address, or do you think they would kick it*
09:10:07             *back?*
09:10:09  3          *Dave.*

09:10:09  4     Do you see that part?

09:10:10  5          A.   Yes.

09:10:15  6          Q.   Do you know if you were ever - or if you or

09:10:21  7     Craig were ever listed as a manager or managing member in

09:10:25  8     W&K Information Defense?

09:10:29  9          A.   I - no, I - I don't recall that.  Sorry, I -

09:10:37 10     I - I mean, I just don't have any memory of that.

09:11:03 11          Q.   I'm going to just have them show you what is in

09:11:06 12     tab 21.  I'm going to mark that as exhibit 2.

09:11:10 13               (Exhibit 2 marked for identification)

09:11:28 14          THE DEPONENT:   Again, I read from the bottom up,

09:11:29 15     do I?

09:11:29 16     BY MS MARKOE:

09:11:29 17          Q.   Yes, you do.  And actually - yes, from the

09:11:32 18     bottom up.  Read from the bottom and then go to the

09:11:35 19     second page and then you can continue back to the first

09:11:37 20     page and read up.

         21          A.   Yes.

09:11:40 22          MR BRENNER:   Zaharah, I'm sorry, can you - sorry,

09:11:41 23     which Bates stamp is this?

09:11:44 24          MS MARKOE:   Yes, it's DEFAUS_00706832.

09:11:50 25          MR BRENNER:   Thank you.

LYNN CARROLL WRIGHT 14 January 13, 2020

09:11:52 1   MS MARKOE: Kyle, do you want to just forward

09:11:55 2 Andrew the email that I sent you with the documents?

3 That might be easier.

09:12:00 4   MR BRENNER: I just - no, I have it, I have

09:12:01 5 everything, I just didn't know which - because there was

09:12:01 6 three documents, I just didn't know which one you went

09:12:04 7 to. I have it, though, thank you.

09:12:26 8   THE DEPONENT: Question for the - just something

09:12:28 9 about the email, and you guys would probably be able to

09:12:30 10 tell me. When he - when Dave states, "I have files [in]

09:12:35 11 3 fictitious business names", is that like shelf

09:12:39 12 companies?

13 BY MS MARKOE:

09:12:43 14   Q. I can't speak for Dave Kleiman. If you have

09:12:47 15 any idea of what you think that means, I'm happy to ask

09:12:52 16 you that question, but you are the star witness here,

09:12:57 17 Lynn.

09:12:59 18   A. Yeah. Okay, I don't - I don't know what that

09:13:01 19 means, so. Okay.

09:13:44 20   Q. Okay. Do you recognize this email?

09:13:51 21   A. No, I don't. I mean - no, I don't remember it.

09:13:54 22 I don't recall it. But there's a lot of things back then

09:14:02 23 I don't recall.

09:14:05 24   Q. Okay. Fair enough. You may not recall, but do

09:14:17 25 you dispute anything that's on the email itself?

09:14:18  1      A.   Sorry, what was that?

09:14:19  2      Q.   Do you dispute anything that's on the email

09:14:21  3  itself?  I understand you don't specifically recall this

09:14:24  4  email, because, you know, it was nine years ago almost.

09:14:28  5      A.   Yeah, no, I - I --

09:14:30  6      MR ROCHE:   Objection.  Form.

09:14:31  7      THE DEPONENT:   No, I don't dispute anything that's

09:14:33  8  there.  As I said, I just don't recall it.

9  BY MS MARKOE:

09:14:56 10      Q.   Do you recall that Dave would email you

09:15:00 11  sporadically about W&K, particularly during its formation

09:15:08 12  period?

09:15:09 13      A.   I - I have a very - I remember only a - one

09:15:15 14  particular email, and it had nothing to do with W&K.

09:15:20 15  Other ones that - that were sent I really don't remember;

09:15:28 16  at least these ones I don't.

09:15:32 17      Q.   Okay.  What was your role in W&K?  It was the

09:15:44 18  three of you, but what was your particular role within

09:15:47 19  it - within it?

09:15:48 20      MR ROCHE:   Objection.

09:16:03 21      MS MARKOE:   Kyle, what's wrong with that question?

09:16:04 22      MR ROCHE:   You - I mean, you're, I guess,

09:16:06 23  testifying for her; you're saying, "it was the three of

09:16:08 24  you", and I don't believe the witness testified to that.

25  BY MS MARKOE:

LYNN CARROLL WRIGHT                    16                    January 13, 2020

09:16:15  1      Q.    Lynn, what was your role in W&K?

09:16:17  2      A.    My role was as an - administration, really.

09:16:24  3  I did all the, I guess, research for - for tenders, for -

09:16:35  4  that we thought that the company could do.  And, in fact,

09:16:40  5  it was through one of the tenders that - that we worked -

09:16:49  6  that we included Dave in, because it was a - it was

09:16:53  7  tenders that were put out by Homeland Security.  And for

09:16:59  8  obvious reasons, they - they wanted to have it - an

09:17:05  9  American company with, you know, represented in the -

09:17:10 10  from the States, obviously.  So we - that's when - to the

09:17:14 11  best of my knowledge, that's when we included Dave in,

09:17:19 12  and they - in the proceedings.  Because it would look

09:17:25 13  better for any tender to come from the US, from a vet,

09:17:31 14  and from a disabled vet as a result of his service.  So -

09:17:38 15  and he - that's what - when he sort of came on board.

09:17:45 16      Q.    When you say "tender", what do you mean by the

09:17:48 17  term "tender"?  What does that term mean?

09:17:52 18      A.    There was an information - I - I went on the

09:17:54 19  Homeland Security site and they had asked for - well,

09:18:01 20  I call them a tender when they ask for work to be done

09:18:04 21  and you have to submit the - the outline of the work and

09:18:11 22  how you can accomplish it and that sort of thing.

09:18:21 23      Q.    What was the purpose - just - let me just make

09:18:27 24  sure I understand what you've said.

09:18:28 25      A.    Yes.

LYNN CARROLL WRIGHT                    17                January 13, 2020

| | | |
|---|---|---|
| 09:18:28 | 1 | Q.   Is it fair to say that the purpose of W&K, when |
| 09:18:35 | 2 | it was formed, was to prepare tenders, as you call them, |
| 09:18:43 | 3 | for the Department of Homeland Security? |
| 09:18:47 | 4 | MR ROCHE:   Objection.  Form. |
| 09:18:56 | 5 | THE DEPONENT:   Have we lost you guys? |
| 09:18:58 | 6 | BY MS MARKOE: |
| 09:19:01 | 7 | Q.   Did you hear me? |
| 09:19:02 | 8 | A.   No, you went quiet and then the - both pictures |
| 09:19:05 | 9 | froze for a second. |
| 09:19:06 | 10 | Q.   Okay.  I will reframe my question.  I just want |
| 09:19:12 | 11 | to make sure I understand what you just testified about. |
| 09:19:21 | 12 | Is it fair to say that, to the best of your knowledge, |
| 09:19:28 | 13 | W&K was formed to present or respond to tenders by the |
| 09:19:37 | 14 | Department of Homeland Security? |
| 09:19:39 | 15 | MR ROCHE:   Objection.  Form. |
| | 16 | BY MS MARKOE: |
| 09:19:48 | 17 | Q.   Did I break up again? |
| 09:19:51 | 18 | A.   Yes, you did.  We got - I heard the objection |
| 09:19:53 | 19 | but then I don't know if you said anything |
| 09:19:55 | 20 | Q.   I just said, "Is that correct"? |
| 09:20:01 | 21 | A.   Yes, that's - to the best of my knowledge, that |
| 09:20:04 | 22 | was - that was the reason for W&K, it was to be able to |
| 09:20:07 | 23 | apply for or respond to requests for tenders in the US, |
| 09:20:14 | 24 | and it was for information security purposes. |
| 09:20:19 | 25 | Q.   What do you mean by "information security |

Leading

LYNN CARROLL WRIGHT                    18                    January 13, 2020

Leading (if prior objection is sustained)

purposes"?

A.    Well, like - like we - what we did over here was 24/7 monitoring for secure - to secure companies' Internet - Internet presence, I guess, if you will, because - like anti-hacking stuff, that sort of thing.

Q.    So what was your understanding of Dave's role in W&K, or what did you know Dave's role to be?  Can I just - let me strike that.  Let me reframe the question.  Based on your personal knowledge, what was Dave's role in W&K?

A.    Dave was - he was - he was there to submit the tenders.  He did, from time to time - Craig would throw - would sort of throw ideas off of - you know, between the two of them.  Dave was not an academic, and Craig would do all of the writing of the tenders and then I would edit them, or - or "proofread" them is a better word, and then we would send them off to Dave and he would then send them to the appropriate companies.  In this case, there was two tenders that went to Homeland Security.  So he would send them off - off - and provided, basically, an American presence in the - in the tender process.

Q.    What was Craig's role in W&K?

A.    He wrote - he responded to the tenders.  He wrote the - he wrote everything up.  He did all the - responding to the type of questions and the type of work

09:22:27  1    that was needed, how it would be done, effectively how

09:22:34  2    much it would cost, that sort of thing.

09:22:40  3        Q.    During this time period when W&K was preparing

09:22:45  4    these tenders, through Craig preparing them and you

09:22:49  5    editing them and Dave submitting them, were you and Craig

09:22:54  6    submitting tenders in other places and through other

09:22:59  7    companies?

09:23:01  8        A.    No, not that I'm - I - not that I worked on,

09:23:04  9    no, and being the administration person, I think I would

09:23:14  10   have known that anything was done.  But the two big ones

09:23:17  11   were the two with Homeland Security, and that was all

09:23:22  12   that I'm aware of.

09:23:27  13       Q.    Are you aware whether or not the tenders were

09:23:30  14   accepted by the Department of Homeland Security?

09:23:33  15       A.    It took a long time.  We never heard back, and

09:23:38  16   we could - we tried and tried and tried to get in touch

09:23:41  17   with Dave, and he was not responding to phone messages

09:23:50  18   and - or to emails that I'm aware of, because at that

09:23:53  19   point he was very sick and he was in hospital.  But he

09:23:57  20   didn't let anybody know.  So to be - we don't know if the

09:24:02  21   tender was even submitted on his part.  But we never

09:24:07  22   heard anything back from - from them.

09:24:17  23       Q.    So - pardon me.  Excuse me a moment.  Lynn,

09:24:26  24   I want to sort of shift gears for a quick second.  What

09:24:29  25   is your academic background and professional background?

A.   My - I started out as a nurse.  I worked in a hospital here in Australia after we were married.  Then study - I - then Craig started the - the original company and I went to work for the original company.  At the same time I started doing an MBA in International Business and Marketing.  Previous to our marriage, I had done a Masters in Education, and - I didn't really want to mention this, but I also studied law here, and I - I left one course shy of graduating, because I just had no interest in it any more.

Q.   You mentioned an original company.  What company are you referring to?

A.   DeMorgan Proprietary Limited.

Q.   You mentioned a few minutes ago that you never heard back from Dave, or you had a very difficult time getting in touch with him.  I will let the - your testimony speak for itself, it is just me paraphrasing.  Did Dave ever talk to you about his health, you know, given your background as a nurse?

Relevance

A.   He emailed me once about a medical device, I guess, that was in the process of being developed, like, I think it was - the best way to describe it is an exoskeleton, where they attach devices, because he was a quadriplegic.  This would - they - they'd put devices on him.  It's like a - I guess sort of like casting, except

LYNN CARROLL WRIGHT                    21                    January 13, 2020

Relevance

09:26:55  1   it's metal and they have joints and it would - it would

09:27:01  2   able - enable him to move around.  He just - he

09:27:04  3   basically - it surprised me, and I remember this well,

09:27:10  4   because I was quite - I hadn't heard about those, let's

09:27:16  5   put it that way, and so I did some research into it and

09:27:20  6   then sent an email back to him saying, "Look, you know,

09:27:23  7   let me - if it works, go for it", and I said - I asked

09:27:27  8   him - I think I asked him to let me know what happens,

09:27:30  9   and I just never heard back from him.

09:27:33 10        Q.   Did you ever come to learn why he was in the

09:27:36 11   hospital during this general time frame?

09:27:38 12        A.   Sorry, did I ever what?

09:27:39 13        Q.   Come to learn why he was in the hospital during

09:27:44 14   this general time frame?

09:27:45 15        A.   No.  I - well, I heard that he had infections,

09:27:50 16   but that doesn't surprise - that didn't surprise me,

09:27:52 17   because I knew that - that quadriplegics get pressure

09:27:59 18   sores.  The pressure sores get very infected and they

09:28:02 19   become quite septic.  So it wasn't something that

09:28:05 20   surprised me.

09:28:22 21        Q.   Do you have any understanding as to why

09:28:24 22   Dave Kleiman didn't share with you and Craig, in

09:28:27 23   real time, that he was in the hospital and unable to

09:28:33 24   respond to your emails and calls and attempts to reach

09:28:36 25   out to follow up on the tenders?

LYNN CARROLL WRIGHT                 22                    January 13, 2020

```
09:28:40  1        A.   No, I - I don't know why.  I mean, you know,
09:28:43  2   I could suppose things, but that's - that's not what
09:28:46  3   should be done.  I - I don't know why he - he didn't
09:28:51  4   respond, other than he was - we had heard that he was
09:28:55  5   very ill.
09:28:59  6        Q.   All right.  How did you hear he was very ill,
09:29:10  7   if you recall?
09:29:11  8        A.   I don't recall.  I know - it was Craig that
09:29:14  9   told me, and it may be that - it may have been that he
09:29:19 10   got in touch with Craig.  I don't know.
09:29:31 11        Q.   Are you aware of any assets, IP, or anything of
09:29:35 12   value that W&K ever had?
09:29:38 13        A.   No.
09:29:45 14        Q.   Are you a shareholder in W&K?       Relevance
09:29:48 15        A.   Yes.
09:29:51 16        Q.   Do you know how you became a shareholder in
09:29:54 17   W&K?                                  Relevance
09:29:56 18        A.   When I - when the - the company was originally
09:29:59 19   set up, I think it was just divided between the three of
09:30:04 20   us, I guess.
09:30:09 21        Q.    I'm going to have the folks at Piper hand you
09:30:16 22   what I call tab 17.  It is - for the benefit of the
09:30:22 23   plaintiffs' counsel, it is DEFAUS_01518187 and through
09:30:38 24   188.  I'm going to have this marked as exhibit 3, please
09:30:42 25        (Exhibit 3 marked for identification)  Relevance
```

Relevance objection to
everything designated
through 28 : 6

09:30:45  1      THE DEPONENT:  Yes, okay.

        2  BY MS MARKOE:

09:30:48  3      Q.   On the first page, is that your signature on

09:30:51  4  that page?

09:30:52  5      A.   Yes, it is.

09:30:55  6      Q.   And I'd like to turn your attention to the

09:30:57  7  second page of the document.  Actually, go back to the

09:31:05  8  first page.  Who was Michael Shehadie?

09:31:08  9      A.   Michael Shehadie was our solicitor from - like,

09:31:17 10  we had retained him for quite a few years, and then

09:31:21 11  during the - our divorce, he represented - he - I thought

09:31:26 12  he was representing me, but I - I - I don't know, to be

09:31:31 13  honest.

09:31:44 14      Q.   And can you turn to the second page of the

09:31:47 15  document, which is actually page 1 of 2, it's just the

09:31:53 16  way the --

        17      A.   Yes.

09:31:54 18      Q.   -- document was Bates-stamped.  And what is

09:31:56 19  this document?

09:32:00 20      A.   This document is the settlement, our divorce

09:32:05 21  settlement.

09:32:11 22      Q.   And does this appear to be a true and accurate

09:32:14 23  representation of the division of assets that you and

09:32:17 24  Craig agreed to in or about June of 2011, as is noted at

09:32:23 25  the bottom of the document, the date?

LYNN CARROLL WRIGHT                    24          January 13, 2020

Relevance objection to
everything designated
through 28 : 6

09:32:26  1        A.    Yes.

09:32:38  2        Q.    And the document states at the top - actually,

09:32:41  3    can you read what the document states at the very top,

09:32:44  4    after "Appendix"?

          5        A.

09:32:46  6        *The following documents the agreed property*
09:32:49        *split for the Family law settlement between*
09:32:51  7     *Craig and Lynn Wright.*

09:32:54  8        Q.    And under "Lynn Wright", the first, I guess,

09:33:01  9    row under "Lynn Wright" says, "Cloudcroft Party Limited";

09:33:07 10    am I correct?

09:33:08 11        A.    "Proprietary Limited", yes

09:33:11 12        Q.    Proprietary Limited, okay.  What was Cloudcroft

09:33:18 13    Proprietary Limited?

09:33:18 14        A.    Cloudcroft was - was the company - it was

09:33:20 15    "Cloudcroft Proprietary Limited trading as Information

09:33:26 16    Security" - I can't recall what the whole name was back

09:33:29 17    then, but it was - it had been sort of like - this is

09:33:33 18    what I was asking you:  it was like a shelf company that

09:33:38 19    we bought from the Australian Securities Commission and

09:33:45 20    named it then "Cloudcroft", and then you could - here you

09:33:52 21    can have a company that is "trading as" and a different

09:33:58 22    name.  Do you understand?  Does that make sense to you?

09:34:03 23        Q.    Yes.  What was the business of Cloudcroft

09:34:14 24    Proprietary Limited?

09:34:16 25        A.    It was information security.  We had - it was

Relevance objection to
everything designated
through 28 : 6

1    the same - it was the same as DeMorgan - DeMorgan

2    Information Defense Systems and Information - and then

3    Information Defense.  It was always the same.  We did

4    24/7 monitoring of - for security purposes for companies

5    like the Australian stock exchange, some credit unions,

6    that sort of thing.

7        Q.    Did Cloudcroft Proprietary Limited have to do -

8    have anything to do with bitcoin or blockchain?

9        A.    Not that I'm aware of, no.

10       Q.    Under the terms of your family law settlement,

11   what happened to Cloudcroft Proprietary Limited?

12       A.    It went - it went back to Craig as - as -

13   I signed it back over to Craig because of financial

14   reasons that I was having.

15       Q.    Before you signed it back to Craig --

16       A.    Yes.

17       Q.    -- under the terms of the family law

18   settlement, was it your company?

19           MR BRENNER:    Objection.

20           THE DEPONENT:    Do I answer, or no?

21           MR BRENNER:    Yes.

22   BY MS MARKOE:

23       Q.    You do answer; correct.

24       A.    Yes, okay.  Yes, it was - I was listed as the

25   managing director.

LYNN CARROLL WRIGHT                    January 13, 2020
                          26

Relevance objection to everything designated through 28 : 6

```
09:36:35   1        Q.    And at a later date, due to certain personal

09:36:41   2   financial issues you were having, you signed it over to

09:36:44   3   Craig Wright; is that correct?

09:36:45   4        A.    That's correct, yes.

09:36:47   5        MR ROCHE:    Object.  Form.

09:36:50   6        THE DEPONENT:    Sorry, we didn't hear that, Kyle,

09:36:52   7   could you repeat, please?

09:36:56   8        MR ROCHE:    Yes.  Objection.  Form.

           9   BY MS MARKOE:

09:36:59  10        Q.    On the "Craig Wright" column, on the same row

09:37:01  11   involving Cloudcroft, do you see where it says, "All IP

09:37:06  12   to remain with Craig Wright".

09:37:09  13        A.    Yes.

09:37:13  14        Q.    Cloudcroft "to retain a right to use existing
09:37:15
09:37:16  15   IP"?
               A.    Yes.

09:37:16  16        Q.    Do you know what IP that's referencing, or do

09:37:21  17   you recall what IP - strike that.  Do you recall what IP

09:37:23  18   that is referencing?

09:37:25  19        A.    I - I - yeah, it was - it was the IP that was

09:37:29  20   involved with development of security systems.  We were -

09:37:36  21   we - Craig was developing, and it's listed further down,

09:37:40  22   "Spyder".  It was a hardware/software device that could

09:37:45  23   be plugged into a client's network.  It was like a

09:37:47  24   firewall type thing, but his own - he developed it

09:37:52  25   himself.
```

LYNN CARROLL WRIGHT                    27              January 13, 2020

Relevance objection to
everything designated
through 28 : 6

```
09:37:59   1        Q.   Did Dave Kleiman have anything to do with
09:38:02   2   Spyder?
09:38:04   3        A.   No, not to - not that I'm aware of, no.
09:38:08   4        Q.   Did Dave Kleiman have anything to do with
09:38:10   5   Cloudcroft Proprietary Limited?
09:38:13   6        A.   No.
09:38:14   7        Q.   Did Dave Kleiman have anything to do with
09:38:17   8   Information Defense Proprietary Limited?
09:38:19   9        A.   No.
09:38:21  10        Q.   Did Dave Kleiman have anything to do with
09:38:23  11   DeMorgan Proprietary Limited or DeMorgan Information
09:38:28  12   Defense Systems?
09:38:28  13        A.   No.
09:38:31  14        Q.   As far as you are - as far as you are aware,
09:38:36  15   did Dave Kleiman have anything to do with any company -
09:38:48  16   strike that.  As far as you are aware, did Dave Kleiman
09:38:55  17   have anything to do with any company other than W&K?
09:39:03  18        A.   Not that I'm - not that I'm aware of, no.
09:39:10  19        Q.   Sorry.  Under Cloudcroft Proprietary Limited,
09:39:14  20   in your column, it also says, "Use of Greyfog IP".  Do
09:39:21  21   you know what the Greyfog IP was?
09:39:24  22        A.   Greyfog was the company that we worked with who
09:39:27  23   was building the Spyder boxes.  They - they - you know,
09:39:33  24   it's - we're talking about geeks here.  They are all out
09:39:38  25   there - you know, he - he could put together the boxes,
```

Relevance objection to everything designated through 28 : 6

09:39:42  1    the hardware, and then between him and Craig, they would

09:39:49  2    download all the software and stuff, so that was

09:39:52  3    considered the IP from Greyfog as well.

09:39:58  4        Q.    Did Dave Kleiman have anything to do or any

09:40:01  5    interest in Greyfog?

09:40:03  6        A.    No.

09:40:16  7        Q.    In the "Intellectual Property" section, which

09:40:18  8    is I guess about - a few more rows down?

09:40:22  9        A.    Yes.

09:40:23 10        Q.    On the "Craig Wright" side, right below

09:40:26 11    "Spyder", it says "Blacknet"?

09:40:30 12        A.    Yes.

09:40:31 13        Q.    What was Blacknet, if you recall?

09:40:33 14        A.    I have no recollection of that at all.  I -

09:40:40 15    it's - I don't know.  I - I could assume things, but

09:40:43 16    that's - that's just silly.

09:40:46 17        Q.    Okay.  A few lines up, it says, "W&K

09:40:53 18    Information Defense, LLC"?

09:40:57 19        A.    Yes.

09:40:57 20        Q.    Do you see that?

09:40:58 21        A.    Yes.

09:40:59 22        Q.    And under the "Lynn Wright" section it says,

09:41:01 23    "50% of shares from Craig Wright"?

09:41:03 24        A.    Yes.

09:41:04 25        Q.    And then under the "Craig Wright" section it

LYNN CARROLL WRIGHT                    29                    January 13, 2020

1    has a similar entry:

2         *Existing shares to be split and divided -*
3         *50% to go to Lynn Wright.*

4    Do you see that?

5         A.   Yes.

6         Q.   Do you recall if that's the way that you

7    received the - your shares in W&K?

8         A.   Yeah.  I - that - I - look, when I - to -

9    I don't recall ever getting any paper, anything on, you

10   know, paper, other than this, saying that I - you know,

11   that - I mean, I knew I had had some interest in it, but

12   this is the first time that I saw it written down.

13        *Q.   Given that you have shares in W&K, have you

14   expressed any concern about those shares or anything that

15   you are owed by W&K before?*

16        MR ROCHE:   Objection, form.   Leading, foundation,
improper predicate,
17   BY MS MARKOE:                      relevance

18        Q.   You can answer.

19        A.   Oh, can I?  Okay.  Sorry, what was that - what

20   was the question again?

21        MS MARKOE:   Court reporter, do you mind reading

22   that question back?

23        (Question marked * read)

24        THE DEPONENT:   I didn't have any concerns until now

25   because I didn't think it was worth anything.

LYNN CARROLL WRIGHT                    30                    January 13, 2020

```
 1    BY MS MARKOE:
 2         Q.   Did Ira Kleiman or anyone from Dave's estate
 3    ever contact you about your shares in W&K after Dave
 4    died?
 5         A.   No.
 6         Q.   Okay.
 7         A.   Having said that, I did get some emails
 8    from a - and then letters, physical snail mail, from -
 9    two from Dave himself, which was rather upsetting for me
10    because he had been dead for quite a while, and another
11    one from a Gareth - I can't remember his last name - who
12    I later learned was also dead.  So it had nothing to do
13    with the shares but it had to do with - I don't know,
14    it's - it was - I don't know if it's mining of bitcoin or
15    what, but it meant nothing to me.
16         Q.   Has any lawyer, or someone purporting to be a
17    representative of Ira Kleiman, contacted you --
18         A.   No.
19         Q.   -- about - let me finish my question.
20         A.   Oh, sorry.
21         Q.   No, that's okay - contacted you about your
22    shares in W&K?
23         A.   Nobody, no.
24         Q.   Separate and apart from W&K, I'm going to ask
25    you some questions about your relationship with Dave and
```

09:45:03  1    Craig's relationship with Dave.  Is that all right with

09:45:05  2    you?

09:45:05  3         A.   Yes, yes.

09:45:19  4         Q.   Did you ever meet Dave Kleiman in person?

09:45:21  5         A.   Yes.  I think we've met on two occasions.

09:45:29  6    Definitely one time Craig and I were at a conference in

09:45:32  7    Orlando and we met him, and then I believe he came out to

09:45:38  8    Las Vegas for what's - for a SANS conference, which is a

09:45:43  9    big outfit in the States, a big company - well, it's

09:45:48 10    worldwide - on information security and stuff like that.

09:45:56 11         Q.   And in addition to meeting him in person on

09:46:03 12    some - one - at least one, perhaps two occasions --

09:46:05 13         A.   Yes.

09:46:06 14         Q.   -- did you correspond with him or talk on the

09:46:11 15    phone with him periodically?

09:46:13 16         A.   If he called - if he called Craig or if Craig

09:46:17 17    called him and it wasn't at an insane hour, I - I would

09:46:22 18    just, you know, say, "Hi" and that sort of thing, but not

09:46:26 19    for any big, heavy, long conversations or anything.

09:46:35 20         Q.   How frequently - do you know when Craig and

09:46:41 21    Dave first met?

09:46:44 22         A.   No, I don't.  I - I think they met in a - in a

09:46:50 23    security chat room type thing, where all the security

09:46:55 24    geeks go.

09:47:04 25         Q.   Did Dave ever speak to you about his family?

Relevance, unduly prejudicial

Entire page : Relevance, unduly prejudicial

```
09:47:10   1        A.    Yes.  When we were in Orlando.  He - he didn't
09:47:19   2   like to speak about his family.  I, you know, just as a -
09:47:22   3   as a kind of - I guess the type of person I am is I may
09:47:26   4   be a sticky beak, but I always ask people, you know, when
09:47:29   5   you're trying to get to know them more, I ask them about
09:47:32   6   their family and stuff, and he didn't like to speak about
09:47:35   7   his family.  He - so I didn't push it.
09:47:41   8        Q.    What did he tell you about his family?
09:47:43   9        A.    That he didn't get along with them.  He didn't
09:47:49  10   hold - I guess it's - no, that would be me assuming.  He
09:47:53  11   told me that he didn't get along with them.
09:47:58  12        Q.    Did he mention anything specifically about his
09:48:01  13   brother, Ira Kleiman?
09:48:06  14        A.    That he didn't care for him, but, again,
09:48:14  15   I didn't push too hard because I felt him getting upset.
09:48:22  16        Q.    Did he say anything about why he didn't like
09:48:26  17   his brother, Ira Kleiman?
09:48:29  18        A.    No.
09:48:32  19        Q.    Did you get the impression that Dave Kleiman
09:48:37  20   had a close relationship with Ira Kleiman or a distant
09:48:41  21   relationship with Ira Kleiman?
09:48:42  22        A.    I got the impression that there was no
09:48:45  23   relationship between them.
09:48:55  24        Q.    And that conversation, that happened during
09:48:57  25   your in-person meeting with him in Orlando in about 2009;
```

Relevance, unduly prejudicial

09:49:03  1    is that correct?

09:49:03  2        A.    Yes.

09:49:11  3        Q.    Based on your understanding of Dave's

09:49:13  4    relationship with Ira Kleiman, would you be surprised if

09:49:15  5    he left Ira Kleiman substantial assets with he died?

09:49:20  6                MR ROCHE:    Objection, form.

09:49:23  7                THE DEPONENT:    Can I answer?

       8    BY MS MARKOE:

09:49:24  9        Q.    Yes.    Whenever anyone says, "Objection.    Form",

09:49:28 10    you can answer.

09:49:29 11        A.    Okay.

09:49:30 12        Q.    The only time you should not answer a question

09:49:33 13    is when it would reveal communications between you and an

09:49:40 14    attorney or spousal communications while you were

09:49:43 15    married.

09:49:43 16        A.    Oh, okay.    So, yes - yeah, I was - I would have

09:49:51 17    been very surprised if he had left anything to - to his

09:49:55 18    brother.

09:50:07 19        MS MARKOE:    Can we take a five-minute break?

09:50:13 20        THE VIDEOGRAPHER:    Sure.    Going off the record at

09:50:14 21    9.49am.    Tape stopped.

       22    (9.49am)

       23        (A short break)

       24    (10.04am)

10:04:41 25        THE VIDEOGRAPHER:    Going back on the record at

LYNN CARROLL WRIGHT                    34              January 13, 2020

10:04:43  1     10.04am.  Proceed.

          2     BY MS MARKOE:

10:04:50  3         Q.   You mentioned when we were - when I asked you

10:04:54  4     some questions earlier about you would participate - and

10:04:59  5     again I'm just paraphrasing your testimony, just to get

10:05:02  6     you back to where you were --

10:05:04  7         A.   Okay.

10:05:09  8         Q.   -- that, you know, you'd sometimes say "Hi" to

10:05:12  9     Dave when he and Craig were speaking, when Craig called

10:05:17  10    Dave or Dave called Craig, if it wasn't an insane hour of

10:05:20  11    the day or evening.  What did you mean by that?

10:05:26  12        A.   What, just to say "Hi" or the time-wise?

10:05:29  13        Q.   The time-wise, thank you.

10:05:31  14        A.   Well, time-wise, if - generally, if we - Craig

10:05:38  15    wouldn't call Dave during our day because it would be his

10:05:43  16    night, okay?  So they would usually speak - I think when

10:05:49  17    they did speak it would be in the middle of our night so

10:05:53  18    that it was an easier time frame for David.

10:05:58  19        Q.   Did Craig typically stay up very, very late at

10:06:02  20    night?

10:06:03  21        A.   Yes, yes.  He - he would - I think at the time,

10:06:09  22    he probably slept about four hours at the most every

10:06:12  23    night.  He'd just always - he - you know, he'd wake up in

10:06:18  24    the middle of the night with an idea and rather than, you

10:06:20  25    know, just write it down on a piece of paper, he had to -

LYNN CARROLL WRIGHT                    35                    January 13, 2020

he didn't believe in paper, or writing, for that matter,
he had to put it down on, you know - put ideas down on -
on his computer.

Q.   Speaking of computers, did Craig have a lot of
computers?

A.   Yes, he did.  Well, we had to have servers in
here and at the farm that we had, because of the 24/7
monitoring of our clients.  He had to be available, if
something happened with one of the clients, that he could
do remote work from.

Q.   Do you recall approximately how many servers
you had at the farm?

A.   There was - what constitutes a server?  You
know, we had - we had a fair number of what I guess
I would call "desktops", but he used them as - as - he
would interconnect them all and use them as a - as
servers.  So at the farm, I'm just trying to - we'd keep
mine separate, because it wasn't hooked up to his
network, but he probably had about four or five, and then
he had his laptop.

Q.   What was Dave and Craig's relationship like?

A.   Craig had a great deal of respect for Dave.  He
respected his knowledge, his ability to intuitively solve
security issues, and just - they were good friends.

Q.   You said that Craig respected Dave's knowledge.

LYNN CARROLL WRIGHT                36                    January 13, 2020

10:08:29  1    Do you know what of Dave's knowledge he respected?

10:08:34  2        A.    The ability - well, the information security

10:08:38  3    side of things.  You know, firewalling, anti-hacking,

10:08:45  4    anything like that.  They'd talk - like, I mean, they

10:08:48  5    could talk for hours about that sort of thing, I think.

10:08:57  6        Q.    Did you ever hear them talk about bitcoin?

10:09:03  7        A.    No.

10:09:09  8        Q.    Do you have any personal knowledge of Craig

10:09:12  9    referring to Dave as his business partner?

10:09:14  10       A.    No.

10:09:15  11       Q.    Do you have any personal knowledge of Dave

10:09:17  12   referring to Craig as his business partner?

10:09:20  13       A.    No.

10:09:23  14       Q.    You mentioned that you were involved in a bunch

10:09:25  15   of Craig's businesses.  In fact, you sort of left your

10:09:29  16   nursing in order to get involved in his businesses; is

10:09:32  17   that right?

10:09:32  18       A.    Yes.

10:09:35  19       Q.    Do you have personal knowledge of how Craig          OS

10:09:38  20   entered into business relationships?

10:09:43  21       MR ROCHE:    Objection.  Form.

10:09:45  22       THE DEPONENT:    No.  Can you clarify that, though?        OS

10:09:49  23   I don't quite know what you mean.

          24   BY MS MARKOE:

10:09:52  25       Q.    Yes.  So what I mean by that is did he enter         OS

LYNN CARROLL WRIGHT                    37                    January 13, 2020

10:09:55 | 1   into business relationships formally, with contracts and

10:09:59 | 2   corporate structures, or did he do things more    OS

10:10:04 | 3   informally, with handshake deals?

10:10:08 | 4       MR ROCHE:   Objection, form.

10:10:10 | 5       THE DEPONENT:   He - no, he was - I - he was

10:10:13 | 6   informal.  Like, he - there was never anything put in

10:10:17 | 7   writing except between him and myself when - like I would

10:10:23 | 8   be marked down as a director of the companies - until our    OS

10:10:29 | 9   divorce, obviously.  But otherwise, the only time that

10:10:36 | 10   anything was put in writing was when we were hiring

10:10:40 | 11   people.  So - and then they weren't clients or anything,

10:10:45 | 12   they were employees.

10:10:59 | 13      Q.   In any of your communications with Dave, did

10:11:02 | 14   Dave ever mention bitcoin?

10:11:06 | 15      A.   No.

10:11:17 | 16      Q.   Do you recall a time where Craig was shot?

10:11:23 | 17      A.   Yes.

10:11:27 | 18      Q.   Do you know - do you remember approximately

10:11:29 | 19   when that was?

10:11:33 | 20      A.   I'm just trying to think.  I think it was - it

10:11:41 | 21   might have been 2010, because I think we were still -

10:11:49 | 22   I think we were still in the house in - living together

10:11:52 | 23   here.  Because I remember getting the phone call and then

10:12:00 | 24   when he got back, so - but we - that was coming close to

10:12:03 | 25   the time we were separating.

10:12:08  1        Q.   Do you know where he got shot?  And by "where",

10:12:15  2   I don't mean where on his body, I mean where in the world

10:12:19  3   was he when he got shot?

10:12:21  4        A.   South America, I believe.  Either South or

10:12:26  5   Central America.  I can't - I can't --

10:12:29  6        Q.   Do you know what he was doing in South or

10:12:31  7   Central America when he got shot?

10:12:33  8        A.   No, not really.  I mean, he - he went to do

10:12:35  9   some work but I - I don't know what it was as, again, we

10:12:40 10   were - we were pretty much having trouble communicating

10:12:46 11   about anything, then.

10:13:00 12        Q.   Give me one second, please.

10:13:02 13        A.   Yep.

10:13:59 14        Q.   Lynn, I think I'm going to have just one or two

10:14:02 15   more questions for you.

10:14:03 16        A.   Yes, okay.

10:14:04 17        Q.   To the best of your knowledge and recollection,

10:14:06 18   aside from W&K, which is a more formal arrangement, did

10:14:13 19   Craig and Dave have any informal business relationship

10:14:18 20   regarding anything?

10:14:19 21        MR ROCHE:   Objection, form.

10:14:24 22        THE DEPONENT:   No, I don't believe - I mean, they

10:14:26 23   would bounce ideas off of each other over the phone and

10:14:29 24   stuff, but as for any arrangements, no.

         25   BY MS MARKOE:

10:14:43  1          Q.   Do you know what they bounced ideas about off

10:14:44  2     of each other?

10:14:46  3          A.   Usual - well, I assumed it was about

10:14:47  4     information security.  That's - you know, that's - he -

10:14:49  5     Craig liked to write articles, and I think he would

10:14:52  6     include Dave's input and stuff in the articles on

10:14:58  7     information security.

10:15:06  8          Q.   Do you know if they had any informal

10:15:08  9     arrangement regarding bitcoin?

10:15:10 10          A.   No, I don't.

10:15:11 11          Q.   Do you know if they had any kind of informal

10:15:13 12     arrangement regarding intellectual property?

10:15:15 13          A.   No, I don't know.

10:15:32 14          Q.   During your relationship with Craig, did you

10:15:35 15     ever hear either him or Dave talking about any informal

10:15:40 16     relationship they had whatsoever regarding any

10:15:43 17     intellectual property, bitcoin or other project?

10:15:47 18          A.   No.

10:16:06 19          Q.   All right, Lynn, thank you very much.

10:16:08 20     I actually have no further questions right now.

10:16:11 21     Depending on Mr Roche's questions, I may have a couple of

10:16:13 22     follow-ups thereafter, but thank you very much for your

10:16:16 23     time.

10:16:17 24          A.   You're welcome.

10:16:22 25          MR ROCHE:   Can we just take a quick five-minute

10:16:23  1     break and then we'll come back?

10:16:25  2          THE VIDEOGRAPHER:   Yes.

10:16:25  3          MR ROCHE:   It's quarter past the hour.  Let's come

10:16:28  4     back at 20 past the hour?

10:16:30  5          THE VIDEOGRAPHER:   Okay.  This is the videographer.

10:16:31  6     I will change tapes.  Going off the record at 10.16.  End

10:16:36  7     of tape 1.

          8     (10.16am)

          9          (A short break)

          10    (10.21am)

10:21:41  11         THE VIDEOGRAPHER:   Going back on the record at

10:21:43  12    10.21am.  Commencement of tape 2.  Proceed.

          13    **EXAMINATION BY MR ROCHE:**

10:21:48  14         Q.   Good morning, Ms Wright.  My name is

10:21:53  15    Kyle Roche.  I represent the plaintiffs in this matter.

10:21:55  16    And just as a housekeeping, so that we have the record

10:21:58  17    clear, Vel Freedman is either on the line now - I know

10:22:04  18    he's in a spot where his connection is a little spotty,

10:22:08  19    so he will be in and out of the call.

10:22:19  20         Ms Wright I've got a few questions to ask you

10:22:22  21    about your testimony today and a few other topics.  To

10:22:24  22    start, you testified earlier that you had approximately

10:22:28  23    three or four communications with Rivero Mestre; is that

10:22:35  24    correct?

10:22:35  25         A.   Yes.

CC

Q.   When was the first of those communications?

A.   When I received the - one of the - the -
I guess the first or second email or - from Dave and this
Gareth fellow, I - I didn't know what to do with it, so
I got in touch with Craig and he said to give it to - to
his solicitors.  Actually, I think I was - before then,
I was in - they were in touch with me, I think, because
they, for some - oh, they needed some information or
something, and I - and they sent me an email asking for
the information, and I said, "No," I would not give them
the information until I had permission from Craig,
because I'm just not going to speak to somebody I don't
know.  And so Craig then gave me permission to speak to
them, and I think it was Andres, Andreas, that called the
first time, or it might have been Amanda.  I can't
recall.

Q.   Okay.  And you say you needed permission from
Craig.  Why did you need permission from Craig?

A.   Because I'm not going to give information on
him or I'm not going to respond to questions about him
for all - because I was being harassed by - by
journalists and everything every time something came up
about - on the technical websites and stuff about
bitcoin.  People were calling saying, "I'm so-and-so.
Can you tell me this?" or, "Can you tell me that?", and

LYNN CARROLL WRIGHT                    42                    January 13, 2020

10:24:37  1    I wasn't going to do it.

10:24:38  2         Q.   When was the last time a reporter reached out

10:24:41  3    to you regarding Craig Wright?

10:24:45  4         MS MARKOE:   Objection.  Relevance.

          5    BY MR ROCHE:

10:24:50  6         Q.   You can answer.

10:24:51  7         A.   Okay.  Probably about five months ago now.

10:24:57  8         Q.   Okay.  And who - what reporter was that?

10:25:01  9         A.   It was a --

10:25:02 10         MS MARKOE:   Objection.  Relevance.  You can answer.

10:25:04 11         THE DEPONENT:   Okay.  It was the fellow that was -

10:25:07 12    I can't recall his name offhand.  He's - he's writing a

10:25:11 13    book about it.

         14    BY MR ROCHE:

10:25:14 15         Q.   Okay.  And did you provide any information to

10:25:16 16    him?

10:25:18 17         A.   I --

10:25:19 18         MS MARKOE:   Objection again.  Relevance.

         19    BY MR ROCHE:

10:25:25 20         Q.   Ms Wright, did you hear?

10:25:30 21         A.   I - yep, no, I - I heard.  Sorry, my mouth was

10:25:32 22    just dry.  Yes, I did.  After - after permission from

10:25:35 23    Craig, basically, you know, saying that, yeah, it's okay.

10:25:40 24         Q.   What information did you provide to the

10:25:41 25    reporter?

10:25:42  1          A.    Oh, he just asked questions about - about his -

10:25:47  2    sorry, the coffee machine is just going off in the

10:25:49  3    background.

10:25:52  4          Q.    That's okay.

10:25:52  5          A.    He just - it was - it was more about his life

10:25:55  6    and stuff, you know, that - that he wanted the

10:25:58  7    information.

10:26:00  8          Q.    Did he ask you - and are you aware that Craig

10:26:04  9    is a defendant in this litigation?

10:26:07 10          A.    Yes, I'm aware of that.

10:26:09 11          Q.    When did you first become aware of this

10:26:11 12    litigation?

10:26:15 13          A.    God, I don't know.  I have a sister-in-law up

10:26:19 14    in Ottawa that every time she sees anything about - about

10:26:22 15    bitcoin or anything, she sends me the information, and

10:26:25 16    I don't read half of it, I just delete it, so - but it's

10:26:30 17    been - it's probably been about six months, I guess, that

10:26:35 18    I've known about it.

10:26:39 19          Q.    Okay.  And you earlier, when you received those

10:26:42 20    emails from Gareth - and is that Gareth Williams?  Is

10:26:47 21    that the individual?

10:26:49 22          A.    Could be.  I think - I - it might be.  This

10:26:52 23    individual is dead now, I think.

10:26:55 24          Q.    Okay.  How do you know he's dead?

10:26:58 25          A.    Craig told me.

10:27:00  1      Q.    Okay.  Do you have written communications with

10:27:03  2  Craig regarding these emails?

10:27:07  3      A.    No.

10:27:10  4      Q.    How did you communicate with Craig?

10:27:12  5      A.    By phone.

10:27:14  6      Q.    Okay.  When would - how often do you speak with

10:27:16  7  Craig by phone?

10:27:18  8      A.    Very, very infrequently.

10:27:21  9      Q.    When was the last time you spoke with Craig by

10:27:25 10  phone?

10:27:27 11      A.    Just try - oh, probably about last month some

10:27:30 12  time.

10:27:32 13      Q.    And what did you talk about last month?

10:27:35 14      A.    His --

10:27:36 15  MS MARKOE:    Objection.

10:27:37 16  THE DEPONENT:    Can I answer?

10:27:41 17  MR ROCHE:    Yes.

10:27:42 18  MS MARKOE:    Yes.  Unless you are instructed not to

10:27:43 19  answer, you should answer.

10:27:45 20  THE DEPONENT:    Okay.  I - his mum was in the

10:27:47 21  hospital and had been in the hospital for a while, and

10:27:51 22  I - we discussed how she was.

         23  BY MR ROCHE:

10:27:55 24      Q.    Okay.  Did you talk about this litigation when

10:27:57 25  you were on that phone call with Craig?

LYNN CARROLL WRIGHT                45              January 13, 2020

| | |
|---|---|
| 10:28:00 1 | A.   He mentioned it, but he did not go into detail |
| 10:28:06 2 | about it. |
| 10:28:08 3 | Q.   What did he mention about the litigation? |
| 10:28:10 4 | MS MARKOE:   Objection. |
| 10:28:12 5 | THE DEPONENT:   He mentioned that he - it was |
| 10:28:14 6 | ongoing. |
| 7 | BY MR ROCHE: |
| 10:28:16 8 | Q.   Okay.  Anything else besides that, the fact |
| 10:28:20 9 | that it was still going? |
| 10:28:21 10 | A.   No. |
| 10:28:22 11 | MS MARKOE:   Objection. |
| 10:28:23 12 | BY MR ROCHE: |
| 10:28:24 13 | Q.   Okay.  So he just told you, "I'm still involved |
| 10:28:26 14 | in a lawsuit", and that was that? |
| 10:28:30 15 | A.   Yes. |
| 10:28:31 16 | MS MARKOE:   Objection.  Asked and answered. |
| 10:28:33 17 | BY MR ROCHE: |
| 10:28:34 18 | Q.   Okay.  I'd like to go back to the first time |
| 10:28:35 19 | you spoke with Rivero Mestre.  What was the - what was |
| 10:28:38 20 | that discussion about? |
| 10:28:41 21 | MS MARKOE:   Objection.  Asked and answered.  You |
| 10:28:43 22 | can answer. |
| 10:28:43 23 | THE DEPONENT:   I don't recall.  I mean, honestly, |
| 10:28:49 24 | I don't recall what it was about.  I think it was - well, |
| 10:28:53 25 | it's - no point in saying "I think", but I - I - I don't |

10:29:00  1    recall what it was about.

          2    BY MR ROCHE:

10:29:02  3        Q.   Okay.  Do you recall what any of your

10:29:05  4    conversations with Rivero Mestre were about?

10:29:11  5        A.   I - when we were - Amanda - I spoke to Amanda

10:29:15  6    when we were setting up this, this teleconference, and

10:29:20  7    why I couldn't travel to the States or to the UK, and

10:29:27  8    basically deciding on when it would be a good time.

10:29:32  9        Q.   Okay.  And when was that conversation?

10:29:36 10        A.   Last week some time.

10:29:39 11        Q.   Last week?  Do you recall what day?

10:29:43 12        A.   No, I don't.

10:29:45 13        Q.   Okay.  And when you say "last week", do you

10:29:48 14    mean - so it's Sunday our time.  I know it's Monday your

10:29:52 15    time?

10:29:53 16        A.   Okay, yeah.  All right, well it probably would

10:29:55 17    have been - actually, it probably would have been before

10:30:06 18    New Year's, then, because - I'm just trying to think when

10:30:10 19    it would have been.  May have been before New Year's.

10:30:12 20        Q.   Okay.  And why was - why did you decide this

10:30:15 21    time was a good time to have this deposition?

10:30:20 22        MS MARKOE:   Objection.  Relevance.

10:30:23 23        THE DEPONENT:   Because I have some health issues

10:30:26 24    that are interfering.

         25    BY MR ROCHE:

10:30:34 1      Q.  I'm sorry, I didn't get the answer. You broke

10:30:36 2  up?

10:30:37 3      A.  Sorry, I have - I have health issues that are

10:30:38 4  being investigated.

10:30:43 5      Q.  Okay. And do you have any emails with

10:30:46 6  Rivero Mestre?

10:30:51 7      A.  Just the - I - I think it was just the one that

10:30:53 8  they sent me with the - the date for the - for the

10:31:01 9  deposition. I don't recall any others.

10:31:05 10      Q.  Okay.

10:31:09 11      A.  I --

10:31:10 12      Q.  And I should --

10:31:11 13      A.  Sorry, there --

10:31:12 14      Q.  You go ahead.

10:31:13 15      A.  There may have - there may have been one from

10:31:15 16  Andres, the initial one, wanting some - requesting

10:31:21 17  information, from him - for, you know. That would be the

10:31:25 18  first time I got - I was approached by them.

10:31:30 19      Q.  And what information was requested?

10:31:33 20      A.  Just - I - they - he just wanted some

10:31:39 21  information about Craig and I guess about the - the

10:31:41 22  business, like the Information Defense and stuff like

10:31:46 23  that. But, again, my memory - I can't recall.

10:31:49 24      Q.  Okay. Did you provide them any documents?

10:31:51 25      A.  No. The only things I - I sent on to them were

10:31:55  1    the - were copies of those emails that I got with the -

10:32:00  2    and I scanned the hard copies.

10:32:04  3        Q.   Okay.  And in any of your conversations with

10:32:07  4    Rivero Mestre did you discuss any documents?

10:32:12  5        A.   No.  I think they asked me about the - they

10:32:15  6    asked if - about the - our divorce settlement.

10:32:20  7        Q.   And what did they ask you about your divorce

10:32:21  8    settlement?

10:32:22  9        A.   Just that - asked me about it and if I - if

10:32:25 10    I had a copy of it.

10:32:27 11        Q.   Did they ask you about W&K Info Defense?

10:32:32 12        A.   They mentioned W&K but they weren't asking me

10:32:37 13    definitive questions about it.

10:32:38 14        Q.   What did they mention about W&K?

10:32:42 15        A.   It was involved in the - that it was involved

10:32:45 16    with the lawsuit.

10:32:48 17        Q.   And did they discuss W&K - did they discuss the

10:32:51 18    membership of W&K with you?

10:32:54 19        A.   They asked if I was part of W&K.

10:32:58 20        Q.   Okay.  And what did you tell them?

10:33:01 21        A.   I told them, "Yes".

10:33:04 22        Q.   And how - what did you tell them about your

10:33:06 23    involvement in W&K?

10:33:07 24        A.   I told them that I was administrative - the -

10:33:11 25    an administrator.

LYNN CARROLL WRIGHT                49                January 13, 2020

10:33:13  1        Q.   Okay.  And did you - and was that the - your

10:33:16  2   only relationship with W&K was that you were an

10:33:19  3   administrator?

10:33:20  4        A.   Yeah.  Well --

10:33:22  5        MS MARKOE:   Objection.

10:33:26  6        THE DEPONENT:    -- plus - plus the work I did.

          7   BY MR ROCHE:

10:33:28  8        Q.   Plus the work you did.  Okay.  And you said you

10:33:30  9   had had about approximately three to four conversations

10:33:33 10   with Rivero Mestre?

10:33:34 11        A.   If that, yeah.  At the outside it probably

10:33:38 12   would have been four.

10:33:47 13        Q.   Have you ever been deposed before?

10:33:49 14        A.   No.

10:33:51 15        Q.   Have you ever been involved in a litigation?

10:33:57 16        MS MARKOE:   Objection.

10:33:59 17        THE DEPONENT:   No, not for anything like this.

10:34:02 18   From a - from a - an old company that we had.

          19  BY MR ROCHE:

10:34:08 20        Q.   And was that a company that you and Craig had?

10:34:10 21        A.   Yes.

10:34:11 22        Q.   What company was that?

10:34:13 23        A.   DeMorgan Information Security Systems.

10:34:17 24        Q.   And what was that litigation about?

10:34:20 25        MS MARKOE:   Objection.  Relevance.  You can answer.

R
OS

LYNN CARROLL WRIGHT                    50                    January 13, 2020

| | | |
|---|---|---|
| 10:34:23 | 1 | THE DEPONENT:   Okay.  The company - we had brought |
| 10:34:26 | 2 | in a - an investor who then did some what Craig |
| 10:34:37 | 3 | considered, I guess, illegal, where he was giving out |
| 10:34:40 | 4 | information and stuff about - so - about it, so we |
| 10:34:43 | 5 | resigned as directors.  We resigned from the company to - |
| 10:34:51 | 6 | working for the company, but we never gave up our |
| 10:34:54 | 7 | shareholding in the company, and they kept us from |
| 10:35:01 | 8 | working in the industry and then, basically, they were - |
| 10:35:09 | 9 | they were suing - the guy that took over sold the |
| 10:35:15 | 10 | business of that company to another company, and it's - |
| 10:35:23 | 11 | so that was the litigation that was - that was involved |
| 10:35:26 | 12 | for that. |
| | 13 | BY MR ROCHE: |
| 10:35:28 | 14 | Q.   Okay.  And do you know if you were plaintiffs |
| 10:35:30 | 15 | or defendants in that litigation? |
| 10:35:33 | 16 | MS MARKOE:   Objection.  Relevance. |
| 10:35:35 | 17 | THE DEPONENT:   We were defendants. |
| | 18 | BY MR ROCHE: |
| 10:35:40 | 19 | Q.   Okay.  And how was that litigation resolved? |
| 10:35:44 | 20 | A.   That -- |
| 10:35:46 | 21 | MS MARKOE:   Again, objection.  You can answer. |
| 10:35:50 | 22 | THE DEPONENT:   Okay.  The - he had brought suit |
| 10:35:53 | 23 | against both Craig and myself as separate entities.  The |
| 10:35:58 | 24 | case against me was dropped by the court and the case |
| 10:36:02 | 25 | against Craig, he was - he was - he had to - I guess he |

R
OS

R
OS

R, OS

R
OS

R
OS

LYNN CARROLL WRIGHT                         51                      January 13, 2020

| | |
|---|---|
| 10:36:10  1 | had to - he lost the case, I guess, and he had to do - |
| 10:36:17  2 | make some payment - legal payments and stuff for the |
| 10:36:21  3 | other guys. |

R OS

4  BY MR ROCHE:

| | |
|---|---|
| 10:36:23  5 | Q.   Do you know how much those legal payments were? |

R, OS

10:36:26  6      MS MARKOE:   Objection.  Relevance.

| | |
|---|---|
| 10:36:29  7 | THE DEPONENT:   Offhand, no, I can't recall. |

R, OS

8  BY MR ROCHE:

| | |
|---|---|
| 10:36:31  9 | Q.   Okay.  Do you know if Craig was held in |
| 10:36:33  10 | contempt as part of that litigation? |

R, OS, Inc. Desig,
MIS, UP

11      A.   I think he was.

10:36:38  12     MS MARKOE:   Objection.  Relevance.

| | |
|---|---|
| 10:36:42  13 | THE DEPONENT:   Yes, he was. |

R, OS, Inc. Desig,
MIS, UP

14  BY MR ROCHE:

10:36:44  15     Q.   And what was the result of that?

10:36:47  16     MS MARKOE:   Objection.  Relevance and confusing.

17  BY MR ROCHE:

10:36:50  18     Q.   You can answer.

10:36:51  19     A.   He had to - he had to do community work.

10:36:54  20     Q.   Why was Craig held in contempt?

10:36:57  21     MS MARKOE:   Objection.

10:36:58  22     THE DEPONENT:   I don't know, to be honest.  I -

10:37:04  23  it - I - honestly, I can't tell - I don't know - I didn't

10:37:09  24  understand why it was - he would have been held in

10:37:11  25  contempt.

LYNN CARROLL WRIGHT                52                January 13, 2020

1    BY MR ROCHE:

10:37:12   2        Q.    Okay.  And what was the general time frame that

10:37:15   3    all this happened with DeMorgan and the litigation?

10:37:26   4        A.    Oh, God, it's probably about 2010, but it

10:37:32   5    started before then, because - yeah.  I think it resolved

10:37:39   6    around 2010.

10:37:43   7        Q.    Okay.  And just as the - Rivero Mestre was -

10:37:49   8    showed you documents, I'm also going to introduce some

10:37:52   9    documents.

10:37:52  10        A.    Yes.

10:37:53  11        Q.    I've got my colleague, Sati, there and she's

10:37:55  12    going to - I'm going to refer to particular documents and

10:37:58  13    she's going to hand them to you.

10:38:00  14        MR ROCHE:    Sati, can you hand Ms Wright tab OO.

10:38:04  15        MS MARKOE:    Kyle, we haven't - we actually, about

10:38:10  16    five minutes ago, received your email with the documents.

10:38:13  17    I'm currently having them printed out.  Can you please

10:38:17  18    provide us with Bates numbers and we can try to look on

10:38:20  19    our Relativity database?  Otherwise, the other

10:38:23  20    alternative is we take a five-minute break while these

10:38:25  21    documents are printing out, because we don't have them in

10:38:29  22    front of us right now.

10:38:32  23        MR ROCHE:    So you - I'm just reviewing the subpoena

10:38:37  24    right now, so it doesn't have a Bates stamp on it.  Did

10:38:40  25    you want to take five minutes now and print everything up

R
OS

| | |
|---|---|
| 10:38:44 1 | or -- |
| 10:38:45 2 | MS MARKOE:   I'm having it printed up.  If it's just |
| 10:38:47 3 | the subpoena, I don't think that I need to have that in |
| 10:38:50 4 | front of me, but if we start getting into more |
| 10:38:52 5 | substantive documents we may need to take a break, |
| 10:38:55 6 | because we just received these documents I think five, |
| 10:38:58 7 | maybe 10 minutes ago. |
| 10:39:00 8 | MR ROCHE:   Okay. |
| 10:39:02 9 | MS MARKOE:   Thanks.  And I'm not really sure how |
| 10:39:04 10 | many documents you sent us. |
| 10:39:06 11 | MR ROCHE:   Okay. |
| 10:39:09 12 | MS MARKOE:   Actually, how many are there? |
| 10:39:10 13 | MR ROCHE:   How many documents did I send through? |
| 10:39:13 14 | MS MARKOE:   Yeah. |
| 10:39:14 15 | MR ROCHE:   I think there's about - north of 50 |
| 10:39:19 16 | documents in there. |
| 10:39:20 17 | MS MARKOE:   So we might need to take a longer |
| 10:39:22 18 | break, because that might take some time to print out, |
| 10:39:25 19 | given that we got it in the midst of the deposition. |
| 10:39:29 20 | MR ROCHE:   Okay. |
| 21 | BY MR ROCHE: |
| 10:39:32 22 | Q.   Ms Wright, do you have the document that Sati |
| 10:39:34 23 | just handed to you in front of you? |
| 10:39:36 24 | A.   Yes, I do. |
| 10:39:37 25 | Q.   Do you recognize this document? |

R

LYNN CARROLL WRIGHT                    54                    January 13, 2020

10:39:38  1       A.    Yes, I got it via email.

10:39:42  2       Q.    Okay.  And you understand that this is a notice

10:39:49  3  of our taking your deposition today?

10:39:52  4       A.    Yes.

10:39:54  5       Q.    And did you - if you can go to the last page,

10:39:58  6  page 3, "Schedule A"?

10:40:00  7       A.    Yes.

10:40:01  8       Q.    Did you review this in advance of today's

10:40:03  9  deposition?

10:40:04 10       A.    Yes, I did.

10:40:07 11       Q.    Okay.  And have you gathered or taken any

10:40:13 12  efforts to gather documents responsive to this request?

10:40:16 13       A.    No, because I'm not submitting any to you.

10:40:18 14       Q.    And why?  Why are you not submitting any to us?

10:40:21 15       A.    Because - because I'm doing this voluntarily,

10:40:24 16  and I don't - I don't have to submit anything to you.

10:40:28 17       Q.    Okay.  And if we had to get a court order for

10:40:34 18  Australia to have these documents submitted, would you

10:40:36 19  comply with the court order?

10:40:38 20       A.    I would comply with it as far as I possibly

10:40:41 21  could, yes.

10:40:42 22       Q.    Okay.  So I want to focus on the first

10:40:48 23  documents, because it requests, "Any and all documents

10:40:50 24  evidencing communications between you and Craig Wright".

10:40:52 25  Do you have your communications between you and

LYNN CARROLL WRIGHT                     55                    January 13, 2020

10:40:56  1    Craig Wright dating back to 2007?

10:40:59  2         A.   No, I don't.  I have --

10:41:01  3         Q.   What did you do --

10:41:02  4         A.   I have had multiple computers and the - I can't

10:41:08  5    afford a huge big computer, and the one that I have has

10:41:13  6    no emails on it from him at all.

10:41:16  7         Q.   Okay.  Do you have access to your emails on a

10:41:19  8    web-based platform?

10:41:22  9         A.   No.  No - well, I have - no, I don't.

10:41:26 10         Q.   Okay.  So you have no emails between you and

10:41:30 11    Craig Wright from 2007 to the present?

10:41:32 12         A.   Not that I'm aware of, no.

10:41:36 13         Q.   Okay.  But did you look, before today, to

10:41:39 14    confirm whether or not you had any emails from

10:41:42 15    Craig Wright?

10:41:43 16         A.   I - I did a very basic, very cursory look.

10:41:48 17         Q.   Okay.  And what did that look reveal?

10:41:52 18         A.   Well, I think it brought up stuff that - that

10:41:56 19    had his name in it, but nothing directly - there might

10:42:01 20    have been a couple of things directly from him, but that

10:42:06 21    were after we split up.

10:42:13 22         Q.   Okay.  So you have no emails dating back to

10:42:16 23    2007 in your possession?

10:42:18 24         A.   No, not that I can find.

10:42:21 25         Q.   Okay.  And if you go to the second topic, "Any

LYNN CARROLL WRIGHT                56                January 13, 2020

10:42:29  1    and all documents evidencing any communications between

10:42:31  2    you and counsel for Craig Wright", do you have those

10:42:34  3    communications?

10:42:35  4        A.   I have - I have a couple.  There wasn't a lot.

10:42:41  5        Q.   Okay.  And would you produce those documents in

10:42:49  6    response to the subpoena?

10:42:50  7        A.   Yes, I would.

10:42:51  8        Q.   Okay.  Would you mind sending those documents

10:42:53  9    along to us after this deposition is over?

10:42:59 10        A.   If I - no, I'm not unless you get a court

10:43:04 11    order.

10:43:04 12        Q.   Okay.  And, "Any and all documents referring" -

10:43:11 13    looking at topic 3 here - "Any and all documents

10:43:14 14    referring or related to W&K Info Defense Research, LLC".

10:43:17 15    Do you have any documents relating to W&K Info Defense

10:43:20 16    Research, LLC?

10:43:22 17        A.   No.

10:43:27 18        Q.   And topic 4, "Any and all documents referring

10:43:30 19    or relating to David Kleiman".  Do you have any documents

10:43:33 20    or communications relating to David Kleiman?

10:43:36 21        A.   No.

10:43:38 22        Q.   Okay.  Topic number 5, "Any and all documents

10:43:43 23    referring or relating to Ira Kleiman"?

10:43:45 24        A.   No.

10:43:46 25        Q.   Do you have any documents relating --

LYNN CARROLL WRIGHT                    57                    January 13, 2020

10:43:47  1          A.    No.

10:43:49  2          Q.    Okay.  "Any and all documents referring or

10:43:50  3    relating to Bitcoin".  Do you have any documents

10:43:53  4    referring or relating to bitcoin?

10:43:57  5          A.    No.  Nothing other than what's been printed,

10:44:00  6    you know, in articles.

10:44:04  7          Q.    Okay.  So you have nothing other than articles,

10:44:10  8    publicly available articles --

          9          A.    That's correct?

10:44:11 10          Q.    -- when it comes to anything relating to

10:44:14 11    bitcoin?

10:44:14 12          A.    That's right.

10:44:15 13          Q.    Do you own any bitcoin?

10:44:16 14          A.    No.

10:44:17 15          Q.    Do you own any cryptocurrency whatsoever?

10:44:19 16          A.    None.

10:44:20 17          MS MARKOE:    Objection.  Relevance.

         18    BY MR ROCHE:

10:44:23 19          Q.    Okay.  And the topic number 7, "Any and all

10:44:26 20    documents related to trusts established by Craig Wright

10:44:30 21    to hold bitcoin or bitcoin related intellectual property

10:44:34 22    that was mined and/or created prior to 2014".  Do you

10:44:37 23    have any documents related to that request?

10:44:40 24          A.    None.

10:44:41 25          Q.    Okay.  Topic number 8.

LYNN CARROLL WRIGHT 58 January 13, 2020

*Any and all documents that relate to*
*Satoshi Nakamoto, bitcoin mined by any*
*party to this suit ... or bitcoin related*
*intellectual property created and/or*
*developed by any party to this suit prior*
*to 2014.*

Do you have any documents related to that?

    A.    None.

    Q.    When was the first time you heard the term
"Satoshi Nakamoto"?

    A.    Probably around 2012.

    Q.    2012.  How did you hear about that term?

    A.    In an article that my sister-in-law sent me.

    Q.    Okay.  Did Craig ever mention the term
"Satoshi Nakamoto" to you?

    A.    No.

    Q.    And then the last one, "Any and all documents
relating to your divorce from Craig Wright".  Do you have
any documents relating to that?

    A.    Well, you saw the document that was - that we
looked - we discussed this morning.

    Q.    And did you have that document before today?

    A.    Yes.

    Q.    Okay.  And where - do you have other documents
relating to your divorce from Craig?

    A.    No.

    Q.    So is the document we looked at today the only
documents you have relating to your divorce from

OS

LYNN CARROLL WRIGHT                    59                January 13, 2020

10:46:05  1    Craig Wright?

10:46:06  2         A.   Other than the divorce decree itself, yes,

10:46:08  3    that's the only one.

10:46:10  4         Q.   Okay.  So the only two things you have are the

10:46:14  5    divorce decree and the document we looked at today?

10:46:16  6         A.   Yes.

10:46:18  7         Q.   What's - do you have a copy of the divorce

10:46:20  8    decree?

10:46:21  9         A.   Yeah.

10:46:23  10        Q.   And would you be willing to provide that to the

10:46:28  11   law firms in this litigation?

10:46:32  12        A.   Yeah, if I - if you get the court order.

10:46:36  13        MR ROCHE:   Okay.

10:46:38  14        MS MARKOE:   Kyle, we produced a copy to you of the

10:46:43  15   divorce decree many, many months ago.

          16        MR ROCHE:   Okay.

          17   BY MR ROCHE:

10:46:49  18        Q.   But absent a court order, you wouldn't produce

10:46:53  19   to us your copy of the divorce decree?

10:46:55  20        A.   Well, yeah, I could - that I don't mind sending

10:46:57  21   off to you.  I just have to locate it again.

10:47:00  22        Q.   Okay.  So we will have somebody, after this

10:47:02  23   deposition, send you a follow-up email, and if you could

10:47:05  24   please send that information back to that person, it

10:47:09  25   would be greatly appreciated.  I will have someone from

10:47:12  1    my firm send that email.

10:47:13  2         A.   Okay.  I just - to say, too, that I don't - my

10:47:17  3    scanner doesn't work, so it's going to be hard to scan it

10:47:21  4    and send it off to you.

10:47:23  5         Q.   Okay.  If - you know, obviously --

10:47:26  6         A.   What I can do is take a picture, a photo with

10:47:29  7    my phone?

10:47:30  8         Q.   That would be - if you could take a picture of

10:47:34  9    the pages and - with your phone and send it, that would

10:47:36 10    be appreciated.

10:47:36 11         A.   Okay.

10:47:47 12         Q.   Maybe we talked about your educational

10:47:49 13    background when Ms Markoe was questioning you.  What is

10:47:54 14    your employment history?

10:47:56 15         A.   For how long?

10:47:57 16         Q.   Let's start with when - what was your

10:48:03 17    employment when you first met Craig?

10:48:06 18         A.   I was nursing.

10:48:08 19         Q.   Okay.  And how long - are you still a nurse?

10:48:14 20         A.   I'm retired now, but you can never stop being a

10:48:17 21    nurse.

10:48:19 22         Q.   I have family members who are nurses and I can

10:48:22 23    relate to that.  So did you stay a nurse - when did you

10:48:28 24    retire from being a nurse, in the official capacity?

10:48:31 25         A.   Well, I stopped nursing in '98 when I went to

LYNN CARROLL WRIGHT                    61                   January 13, 2020

10:48:35 1    work for - for the initial company, and then, over the

10:48:41 2    years, when - you know, when the companies were not going

10:48:46 3    that well, I also went out and worked, not so much as a

10:48:51 4    nurse, but utilized my nursing working with insurance

10:48:57 5    claims companies.

10:49:01 6          Q.    Okay.  And I want to just quickly go back to

10:49:05 7    the divorce documents.  You said that there is a - you

10:49:12 8    have the divorce decree and the schedule that we looked

10:49:15 9    at today; correct?  Those are the two documents that you

10:49:18 10   have?

10:49:19 11         A.    Yes, yes.

10:49:21 12         Q.    And is the one that Rivero Mestre provided to

10:49:26 13   you the same as the one you have in your possession?

10:49:30 14         A.    Yes.

10:49:31 15         Q.    Okay.  There is no difference?

10:49:34 16         A.    No.

10:49:41 17         Q.    Okay.  And do you have a copy of that agreement

10:49:43 18   signed by Craig?

10:49:46 19         A.    I - I don't think so, because I think probably

10:49:54 20   Michael Shehadie may have that copy.

10:50:00 21         Q.    And why would he have that copy?

10:50:02 22         A.    Well, he was - he was acting for me in the

10:50:06 23   divorce.  But he --

10:50:10 24         Q.    Okay.  Was - go ahead, I'm sorry.

10:50:14 25         A.    He knew Craig as well, so that may be the

10:50:17  1   reason why.

10:50:19  2        Q.   Was he acting for both of you?   Relevance

10:50:23  3        A.   I think - I think he - he - I was - I thought

10:50:27  4   he was acting for me, but I think that was more - see, we

10:50:34  5   didn't - we did the divorce ourselves.  We - we didn't go

10:50:39  6   through a solicitor to go - to go to, you know, through

10:50:44  7   the courts for us.  We put the paperwork in ourselves,

10:50:49  8   and then the agreement was brought up - was developed

10:50:57  9   with Michael Shehadie.

10:51:01 10        Q.   So you submitted documents to Michael Shehadie

10:51:04 11   and he prepared that document?   Relevance

10:51:06 12        A.   We submitted divorce - request for divorce to

10:51:11 13   the courts ourselves.

10:51:14 14        Q.   Okay.  And was the document we looked at

10:51:16 15   earlier, the Schedule A - was that filed with the courts?

10:51:22 16        A.   I assume Michael did it.  I - I - look, I - I

10:51:26 17   never asked a lot - I suppose I didn't ask a lot of

10:51:31 18   questions I should have, but there was a lot of things

10:51:36 19   happening at the time.

10:51:38 20        Q.   Why do you think you should have asked

10:51:40 21   questions?

10:51:41 22        A.   Well, it probably would have been better for my

10:51:44 23   future.

10:51:45 24        Q.   Why?  Why do you think that?

10:51:49 25        MS MARKOE:   Objection.  Relevance.

LYNN CARROLL WRIGHT                    63                 January 13, 2020

10:51:51  1          THE DEPONENT:   Yeah, just - just for my own peace

10:51:53  2     of mind, I guess.

          3     BY MR ROCHE:

10:51:56  4          Q.   And what things about the divorce agreement

10:52:02  5     have affected your peace of mind?

10:52:05  6          MS MARKOE:   Objection.   Relevance.

          7     BY MR ROCHE:

10:52:10  8          Q.   You can answer.

10:52:11  9          A.   Nothing, really.   I - look, I was happy enough

10:52:17 10     with that.   I still am.   You know, my - my concern at the

10:52:23 11     time, I guess, was, "Where am I going to go?"   Because

10:52:28 12     I don't have family here; I don't - like, Craig got all

10:52:33 13     the friends in the divorce, too, so - I think it was just

10:52:39 14     a matter of my own insecurities.

10:52:48 15          Q.   Okay.   I want to switch gears here for a

10:52:53 16     second.   We talked a little bit about your history with

10:52:56 17     Craig, and when did you - you said you first met Craig in

10:53:00 18     1996?

10:53:01 19          A.   Yes.

10:53:02 20          Q.   What was his occupation at the time?

10:53:05 21          A.   He was working for a company called OzEmail,

10:53:15 22     which was a - I guess a - a web-based company here in

10:53:20 23     Sydney.   And he - I - I am not sure - I'm not sure what

10:53:26 24     he did for them.   I think he was - was a client manager -

10:53:34 25     client manager.   I'm not sure.

LYNN CARROLL WRIGHT       64       January 13, 2020

10:53:36   1      Q.   And at the time you met Craig, what was his

10:53:39   2   educational background?

10:53:42   3      A.   I believe he had an undergraduate degree which

10:53:48   4   he got through - through the military, because he was a

10:53:50   5   member of the military for a short time.

10:53:55   6      Q.   And this was before you met him?

10:53:56   7      A.   Yes.

10:53:57   8      Q.   Was he a member of the military when you met

10:53:59   9   him in 1996?

10:54:00   10      A.   No, he was not.

10:54:01   11      Q.   Okay.   And what was his degree in?

10:54:06   12      A.   I couldn't tell you.   I - I assume it was

10:54:09   13   probably some sort of science-based thing, but - because

10:54:13   14   he liked science and things like that.

10:54:17   15      Q.   And when did you get married?

10:54:20   16      A.   Late December '96.

10:54:24   17      Q.   Okay.   And do you know who Calvin Ayre is?

10:54:34   18      MS MARKOE:   Objection.   Relevance.   You can answer

10:54:37   19   it.

10:54:39   20      THE DEPONENT:   I don't know, no.   I don't know who

10:54:41   21   he is.   Oh, wait a minute.   Wait a minute.   That's the -

10:54:45   22   that's the Canadian guy with the bad hair, isn't it?

      23   BY MR ROCHE:

10:54:51   24      Q.   He is Canadian.

10:54:52   25      A.   Yeah, I've - I only - I'm only aware of him

LYNN CARROLL WRIGHT                    65                      January 13, 2020

10:54:55   1    through - through the articles that I've seen.

10:55:04   2        Q.    Okay.  Has Craig ever mentioned Calvin Ayre to

10:55:09   3    you?

10:55:09   4        A.    No.

10:55:10   5        Q.    Do you know who Steven Matthews is?

10:55:12   6        A.    He was a client of ours through - I forget if

10:55:19   7    he was working with a credit union or - I think it was

10:55:23   8    with a credit union.  But we did - we did - whatever

10:55:28   9    company he was working for at the time, we did - we did

10:55:35  10    monitor - 24/7 monitoring for his - for that company, if

10:55:41  11    it was the one that I'm thinking of.

10:55:43  12        Q.    Okay, Lynn, what's the one you're thinking of?

10:55:46  13        A.    I'm thinking of the credit union.

10:55:47  14        Q.    Okay.  And do you know approximately when you

10:55:51  15    met Steven Matthews?

10:55:53  16        A.    I've never met him in person.  I've only dealt

10:55:55  17    with him through - through the work and through - like,

10:56:02  18    through emails and stuff.

10:56:04  19        Q.    And when did you first email with

10:56:07  20    Steven Matthews?

10:56:11  21        A.    God, I don't know.  It's been a long, long

10:56:14  22    time, because it had to do with - with work, and mostly

10:56:21  23    invoices that weren't paid or something.

10:56:26  24        Q.    Invoices that weren't paid by Steven Matthews?

10:56:29  25        A.    By that - by his company.

LYNN CARROLL WRIGHT                66                January 13, 2020

10:56:31  1      Q.    What was his company?

10:56:32  2      A.    I can't recall if it was - if it was a credit

10:56:38  3  union or if it was an online casino that we did work for,

10:56:43  4  and that was one of our clients.  I can't recall which

10:56:46  5  one he worked for.

10:56:48  6      Q.    Okay.  What online casinos did Craig's

10:56:52  7  companies do work for?                    Relevance

10:56:54  8      A.    Lasseters.  It's the only legal online casino

10:56:58  9  in Australia - at that time.  I don't know if there is

10:57:02 10  any more that have been added to it.

10:57:05 11      Q.    Okay.  And are you aware of whether or not

10:57:09 12  Craig had any other dealings with Steven Matthews outside

10:57:14 13  of his role as a client?

10:57:18 14      MS MARKOE:    Objection.

10:57:19 15      THE DEPONENT:   I - can I answer that?

10:57:22 16      MR ROCHE:    Yes.

10:57:23 17      MS MARKOE:    You can answer any question unless

10:57:25 18  someone tells you not to.

10:57:27 19      THE DEPONENT:   Okay.  I couldn't - I was trying to

10:57:29 20  get a hold of Craig.  This is - oh, no, I wasn't trying

10:57:36 21  to get a hold of him, I had an email, I think, from

10:57:40 22  Steven Matthews when Craig went to the UK, and I just -

10:57:46 23  this email, I think it was just - I just - you know, he

10:57:51 24  was just letting me know that Craig had gone, I guess had

10:57:55 25  gone to the UK.  I guess because at the time there was

10:57:58  1    stuff in - in the news down here about it, and he wanted

10:58:04  2    to let me know that Craig was okay, and I - I - I hadn't

10:58:08  3    even heard the news, so it didn't bother me if he was

10:58:10  4    okay or not.

10:58:12  5         Q.    And was that the news relating to Craig and

10:58:14  6    bitcoin?

10:58:14  7         A.    Yeah - well, it was the news relating to the

10:58:18  8    ATO, the Australian Tax Office.

10:58:24  9         Q.    What news was that?

10:58:26 10         A.    The Australian Tax Office was auditing Craig

10:58:30 11    and the companies that we - that he had in - in the - in

10:58:37 12    Australia.  So that's what - like I don't know the extent

10:58:44 13    of what was going on, and I never asked, because I didn't

10:58:47 14    want to know.

10:58:49 15         Q.    Why didn't you want to know?

10:58:52 16         A.    Because I just didn't.  I had no interest.

10:58:56 17         Q.    Okay.  Did you have involvement in any of these

10:58:58 18    companies at that time?

10:58:59 19         A.    I had an - well, not the - what do you call

10:59:04 20    it - Information Security, my - by then, my involvement

10:59:10 21    was pretty well over, but the ATO was still - was still

10:59:17 22    interested in Craig.

10:59:20 23         Q.    Okay.  Do you still have a copy of that email

10:59:28 24    that Steven Matthews sent you?

10:59:31 25         A.    I don't know.

10:59:33  1        Q.    Okay.  Is it possible that you do?

10:59:40  2        A.    Possible.  "Probable" I'm not sure, because

10:59:47  3    my - my computer crashed and I had to get a new one a

10:59:50  4    couple of years ago.  So that would have been more than a

10:59:53  5    couple of years ago.

10:59:54  6        Q.    Okay.  And what email service do you use?

11:00:01  7        A.    Well, my - my Internet service is from Telstra,

11:00:05  8    which is the telephone company over here, but I - the

11:00:08  9    only other email thing I have is - is Gmail.

11:00:14 10        Q.    Okay.  Have you ever deleted your Gmail

11:00:18 11    documents?

11:00:20 12        A.    Only to - only to put - what do you call it? -

11:00:25 13    to make room on my computer, because I have such a crappy

11:00:30 14    amount of memory on it.

11:00:33 15        Q.    Does Gmail store the - your documents on your

11:00:38 16    computer?

11:00:40 17        MS MARKOE:   Objection.  Foundation.

11:00:44 18        THE DEPONENT:   I honestly couldn't tell you.

11:00:46 19    I mean, I can go in and bring up some emails, like, you

11:00:50 20    know, do a search on them, but I don't know if - how much

11:00:53 21    is stored.

         22    BY MR ROCHE:

11:00:56 23        Q.    Okay.

11:00:56 24        A.    I am not - I am by - I am the furthest thing

11:01:00 25    from computer savvy you would ever want to meet.

LYNN CARROLL WRIGHT                    69                    January 13, 2020

11:01:03  1          Q.   Okay.  Understood.  Do you know who Robert
11:01:07  2     MacGregor is?
11:01:08  3          MS MARKOE:   Objection.  Relevance.
11:01:10  4          THE DEPONENT:   The name rings a bell, but I'm not
11:01:13  5     sure.  I'm not sure if - is - is - he may have been the
11:01:19  6     one that did an article on Craig?
          7     BY MR ROCHE:
11:01:27  8          Q.   No, I'm asking --
11:01:29  9          A.   I'm not sure if - I know I did talk to somebody
11:01:31  10    that was doing an article, and he had a - he had a nice
11:01:36  11    Scottish accent, and "MacGregor" sounds Scottish, but
11:01:42  12    I couldn't - I don't know if it's the same person.
11:01:44  13         Q.   And when was the last time you received any
11:01:50  14    sort of financial payment from Craig?
11:01:52  15         A.   I - he pays me a monthly, I guess, sort of -
11:02:02  16    I don't know what you want to call it, but support, you
11:02:06  17    know, like alimony type thing.
11:02:09  18         Q.   And how much is the monthly support?
          19         A.   Five to six --
11:02:13  20         MS MARKOE:   Objection.
11:02:15  21         THE DEPONENT:   Five to six thousand a month, but
11:02:17  22    that would involve for the total care of this house and
11:02:20  23    stuff, so --
11:02:26  24    BY MR ROCHE:
11:02:27  25         Q.   Has Craig ever - strike that.  Has Craig ever

LYNN CARROLL WRIGHT                   70                    January 13, 2020

11:02:29  1    given you bitcoin?

11:02:30  2         A.   No.

11:02:33  3         Q.   And are you currently financially dependent on

11:02:35  4    Craig?

11:02:36  5         A.   Yes.

11:02:39  6         Q.   Has Craig ever been accused of theft?

11:02:44  7         MS MARKOE:   Objection.   Relevance, foundation

11:02:46  8         THE DEPONENT:   Of theft?   No.

          9    BY MR ROCHE:

11:02:49 10         Q.   Of theft?   Relevance, foundation

11:02:50 11         A.   No.   Not that I'm aware of.

11:02:52 12         Q.   Okay.   Relevance, foundation

11:02:53 13         A.   And it would surprise me, to be honest, if he

11:02:55 14    was.

11:02:57 15         Q.   Why would it surprise you?   Relevance, foundation

11:02:59 16         A.   Because he was just - he never struck me as the

11:03:02 17    type that would steal anything.

11:03:10 18         Q.   Okay.   I'd like to move on.   When did you first

11:03:19 19    learn of Craig's relationship with Ramona Watts?

11:03:24 20         MS MARKOE:   Objection.   Relevance.

11:03:28 21         THE DEPONENT:   In late 2010.

         22    BY MR ROCHE:

11:03:32 23         Q.   How did you learn about it?

11:03:36 24         MS MARKOE:   Objection.   Relevance.

11:03:40 25         THE DEPONENT:   I saw some - some pictures that one

LYNN CARROLL WRIGHT                    71                 January 13, 2020

11:03:46  1    of her kids drew for him, and --

      2    BY MR ROCHE:

11:03:52  3        Q.    Okay.  And did you - I'm sorry, go ahead?

11:03:55  4        A.    I - I knew her kids, I knew her and her

11:03:58  5    husband, or her now ex-husband, so --

11:04:01  6        Q.    How did you know Ms Watts?

11:04:06  7        MS MARKOE:    Objection.

11:04:07  8        THE DEPONENT:    We met through - just socially, you

11:04:10  9    know?

11:04:10 10    BY MR ROCHE:

11:04:13 11        Q.    Socially.  And you met in Australia?

11:04:14 12        A.    Yes, yes.

11:04:16 13        Q.    Did she live near you in Australia?

11:04:19 14        A.    She --

11:04:21 15        MS MARKOE:    Again, objection.  Relevance.

11:04:23 16        THE DEPONENT:    She - well, not "near".  I mean, you

11:04:26 17    know, about - about probably an hour or so away.  I mean,

11:04:30 18    she lived down on - in the northern parts of Sydney, and

11:04:34 19    I'm up in the Central Coast, which is, you know, a while

11:04:39 20    away.

      21    BY MR ROCHE:

11:04:44 22        Q.    And did you confront - and I'm sorry, you know,

11:04:46 23    that these questions bring up - if they bring up any

11:04:50 24    memories, but it is my job to ask them.  Did you confront

11:04:57 25    Craig on --

LYNN CARROLL WRIGHT                72                    January 13, 2020

11:04:59  1      A.   Yes.

       2      Q.   And what --

11:05:01  3      MS MARKOE:   Kyle.  Kyle.  Kyle.  Kyle.  These are

11:05:04  4  completely irrelevant.  They are incredibly personal and

11:05:09  5  invasive and they have no place whatsoever in this case

11:05:12  6  or in this deposition.  I have given you a lot of leeway.

11:05:15  7  I think you need to stop now, because you are going well

11:05:20  8  beyond the bounds and this is actually getting to the

11:05:22  9  point of harassing her.

11:05:24 10      MR ROCHE:   Okay.

11:05:31 11      MS MARKOE:   You're going to - because I've made

11:05:31 12  objections that strike this entire line of questioning.

11:05:36 13  This is entirely inappropriate.  We will bring it in

11:05:39 14  front of the court.  Stop it now.

11:05:41 15      MR ROCHE:   Okay.  I would ask that you object when

11:05:42 16  you have any issues with my questions, but otherwise

11:05:45 17  allow me to answer the - ask the questions.  This is my

11:05:47 18  part of the deposition.  I did not interrupt you during

11:05:48 19  your part.

      20  BY MR ROCHE:

11:05:52 21      Q.   And how - what was the nature of that

11:05:53 22  confrontation?

11:05:57 23      A.   What do you think it was?  Of course I brought

11:05:59 24  it up to him.  And I - and I - be honest with you, I'm·

11:06:04 25  getting a little pissed off right now with this.

LYNN CARROLL WRIGHT                    73                    January 13, 2020

11:06:07   1        Q.   Okay.  Did - is it that conversation and

11:06:14   2   Craig's relationship with Ms Watts - is that what

11:06:18   3   triggered your separation with Craig?

11:06:19   4        A.   Yes.

11:06:20   5        MS MARKOE:   Objection.

           6   BY MR ROCHE:

11:06:23   7        Q.   Did Ms Watts ever work with Craig?

11:06:28   8        A.   Not that I'm aware of.

11:06:37   9        Q.   And how long did you stay married to Craig

11:06:39  10   after you discovered the relationship with Ms Watts?

11:06:46  11        A.   I don't know.  She wasn't the first one that he

11:06:52  12   was mucking about with, and no doubt won't be the last,

11:06:57  13   but probably I found out about her in December - or in

11:07:04  14   November, and we separated then.

11:07:10  15        Q.   So you separated in November of 2010?

11:07:14  16        A.   Yes.

11:07:16  17        Q.   Okay.  When did Craig first mention bitcoin to

11:07:23  18   you?

11:07:25  19        A.   He never really mentioned it at all to me.

11:07:28  20   He - he - I don't recall him ever using that term.  What

11:07:36  21   I do recall is, years before, like around 2004/2005, he

11:07:47  22   said to me one day, he said, "You know that the way of

11:07:51  23   the future is digital currency?" and I said, "Well, what

11:07:56  24   do you mean, 'digital currency'?" and he kind of

11:07:59  25   explained it, "You know, just money sort of over the -

LYNN CARROLL WRIGHT                    74                    January 13, 2020

11:08:06  1    like in - on computers, type thing, rather than cash in

11:08:13  2    hand", and I --

11:08:19  3        Q.    And - I'm sorry?

11:08:21  4        A.    And I said, "Well, you know, that's fine, you

11:08:22  5    know, that's great for people that trust computers", but

11:08:27  6    I didn't.

11:08:30  7        Q.    Did - would you say that Craig had a strong

11:08:32  8    interest in digital money in 2004?    Speculation, foundation

11:08:37  9        A.    Well, Craig had a strong - his - I think his

11:08:40  10   primary interests were security at that point, but you

11:08:43  11   never knew what was going through his mind.  He was

11:08:46  12   always coming up with different ideas for stuff.  So, you

11:08:51  13   know, wouldn't - it - yeah, he - he probably was thinking

11:08:54  14   of ways of developing it.

11:08:57  15       Q.    And when was the - so you said you had - the

11:09:01  16   first conversation, time, he mentioned this was in

11:09:04  17   2004/2005.  When was the next time you recall Craig

11:09:08  18   mentioning bitcoin?

11:09:10  19       A.    He - not again.  I don't ever remember him

11:09:16  20   saying the word "bitcoin".  I know it's written in the -

11:09:20  21   into the divorce thing, but all - I just - there's a lot

11:09:26  22   of - you know, there was a lot of things that I guess

11:09:31  23   I just didn't put too much stock in, and that was one of

11:09:36  24   them.

11:09:40  25       Q.    So between 2004 and the divorce, there was no

1  mention of bitcoin --

2      A.   No.

3      Q.   -- by Craig to you?

4      A.   No.  I don't --

5      MS MARKOE:   Objection.

6      THE DEPONENT:   I don't ever remember him mentioning

7  it again after that "digital currency" remark that he

8  made.

9  BY MR ROCHE:

10     Q.   Do you know if Craig had any other projects

11 that he didn't mention to you?

12     MS MARKOE:   Objection.  Foundation.

13     THE DEPONENT:   He had that Spyder thing, but I knew

14 about it.  No, I don't - I - I don't - I don't recall

15 anything else.

16 BY MR ROCHE:

17     Q.   Did Craig ever tell you he was writing a paper

18 related to digital money?

19     A.   I don't recall that.  He was always writing

20 papers, but I don't ever recall him writing one about -

21 about  digital money or anything.

22     Q.   And did Craig ever tell you about a -

23 Dave Kleiman's involvement in bitcoin?

24     A.   No.

25     MS MARKOE:   Objection.  Asked and answered.

LYNN CARROLL WRIGHT                    76                 January 13, 2020

11:11:09  1        THE DEPONENT:   No, he never told me that there was

11:11:11  2    any involvement.

          3    BY MR ROCHE:

11:11:16  4        Q.   And when did Craig first mention Dave Kleiman

11:11:19  5    to you?

11:11:24  6        A.   Oh, I knew he - I - you know, when he first

11:11:30  7    started chatting with him.  It was mostly - I guess,

11:11:34  8    probably, most of it was online, and then they would

11:11:37  9    call, you know, and he would - I knew about him, and then

11:11:41 10    when we went to the States he said, "Oh, we're going to

11:11:44 11    meet him."  So --

11:11:48 12        Q.   So did he tell you before you were going to the

11:11:51 13    States that you were going to meet Dave Kleiman?

11:11:53 14        A.   Yes.  Yes.  Before - specifically, before we

11:11:56 15    went to Orlando, to the Orlando conference, because we

11:12:04 16    knew that he - that Dave lived relatively close to there.

11:12:10 17        Q.   Okay.  And so did Dave drive up to - did you

11:12:12 18    meet Dave at the conference itself?

11:12:14 19        A.   Yes, at the hotel, yes.

11:12:16 20        Q.   Okay.  And how many nights did you or - strike

11:12:20 21    that.  Did you just meet with Dave once or was it over

11:12:23 22    multiple days?

11:12:25 23        A.   It was over multiple days.  I think two or

11:12:27 24    three times we met with him for - you know, for supper or

11:12:32 25    for just - even just to sit around and chat and have

LYNN CARROLL WRIGHT                77              January 13, 2020

drinks, that sort of thing.

Q.    Was this at a restaurant?

A.    Was at the hotel.

Q.    At the hotel that you and Craig were staying at?

A.    Yes, yes.  And Dave - we went out driving with him because, having been from Canada, I - and we don't have Walmart over here - I had to have a Walmart hit, so he took me to a Walmart.

Q.    Okay.  And you discussed earlier that Dave discussed his relationship with his brother to you; correct?

A.    Yes.  Not in depth.

Q.    And which brother?

A.    Well, he - I didn't ask for names.  I wasn't sure if - which - I - I knew that he had two siblings. I thought that the other sibling - I knew he had a brother and I thought the other one was a sister, but it - I - I guess it was another brother that he had.

Q.    Okay.  So you don't know which brother Dave was mentioning when he discussed the relationship?

A.    No, no.  I didn't ask.  He didn't sound - I didn't want to go into it because it upset him.

Q.    Understood.  Did Craig and Dave discuss any of their business - businesses - when they were down in

LYNN CARROLL WRIGHT                    78                    January 13, 2020

11:14:17   1    Florida?

11:14:18   2          A.   Not in front of me, but --

11:14:19   3          Q.   And do you know if they had conversations

11:14:22   4    between themselves?

11:14:24   5          A.   No, I don't know.

11:14:26   6          Q.   You don't know.  Did Craig ever tell that you

11:14:31   7    he was mining bitcoin?

11:14:33   8          A.   He never said anything, no.

11:14:40   9          Q.   Did Craig ever discuss any businesses he had in

11:14:43   10   Florida?

11:14:47   11         A.   Not - not other than W&K and --

11:14:52   12         Q.   Did he - go ahead.

11:14:54   13         A.   Any businesses?  No, I don't - he never

11:14:58   14   mentioned anything.

11:15:06   15         Q.   Did he discuss any business activity he had in

11:15:10   16   Costa Rica?

11:15:12   17         A.   No.  No, not at all.

11:15:16   18         Q.   Did Craig discuss any businesses he had in any

11:15:19   19   other country besides Australia?

11:15:24   20         A.   No.  I mean, we did work for a company in

11:15:28   21   India, but it was only as DeMorgan Information Security

11:15:35   22   Systems that we did the work.  He didn't - he didn't

11:15:37   23   start companies over there.

11:15:43   24         Q.   DeMorgan was - had operations in India or did

11:15:48   25   work with clients in India?

LYNN CARROLL WRIGHT                    79                    January 13, 2020

11:15:49  1        A.    No, clients in India.

11:15:52  2        Q.    Okay.  And what was the nature of that work?

11:15:54  3        A.    Security - we did a security assessment of

11:15:56  4    their networks.

11:15:59  5        Q.    Okay.  And at any point in time, and this is up

11:16:07  6    to present day, has Craig ever told you how many - how

11:16:12  7    much bitcoin he has?

11:16:13  8        A.    No.

11:16:14  9        Q.    Have you ever asked him?

11:16:15  10       A.    No.

11:16:18  11       Q.    Do you - has Craig ever discussed his net worth

11:16:21  12   with you?

11:16:21  13       A.    No.

11:16:24  14       Q.    Has Craig ever discussed any of his current

11:16:26  15   business dealings with you?

11:16:27  16       A.    No.

11:16:33  17       Q.    What were your impressions of Dave Kleiman?

11:16:37  18       A.    I had so much respect for him.  I - I describe

11:16:46  19   him as a gentle soul, and the respect for him comes from

11:16:50  20   the fact that he was willing to serve his country, he

11:16:56  21   went over to the Gulf War, was horrendously wounded and

11:17:01  22   came back a quadriplegic, and he, to me, never seemed to

11:17:06  23   hold it against anybody.  Like he - he - you know, he -

11:17:13  24   it was sort of - I think it frustrated him at times, but

11:17:18  25   that's just my opinion.  But, again, he was a very gentle

LYNN CARROLL WRIGHT                    80                    January 13, 2020

```
11:17:24   1    soul.
11:17:26   2          Q.    And did Craig tell you that Dave was injured in
11:17:31   3    the Gulf War or did somebody else, or did Dave, excuse
11:17:37   4    me, tell you?
11:17:38   5          A.    Craig did, after - before the first time we
11:17:44   6    met, he said, "You know, Craig's in a" - "Dave's in a
11:17:50   7    wheelchair.  He's a quadriplegic", and he said that he
11:17:56   8    thinks that it had happened in the - in the Gulf War.
11:18:01   9          Q.    Okay.  And when you say Dave was a
11:18:07  10    quadriplegic, he was paralyzed from the neck down?
11:18:09  11          A.    Well, yes, he could use his arms but he didn't
11:18:12  12    have fine motor control of his hands.
11:18:16  13          Q.    Okay.  And did Craig admire Dave?
11:18:27  14          A.    Yes, he did.  He had --
11:18:31  15          Q.    And what --
11:18:32  16          A.    He had a lot of respect for Dave.
11:18:33  17          Q.    Okay.  And, you know, you mentioned one reason,
11:18:38  18    are there any other reasons why you understand Craig
11:18:41  19    admired Dave?
11:18:42  20          A.    Well, I think that - for his knowledge, too, in
11:18:47  21    information security, because that was Dave's field as
11:18:51  22    well.  So, you know, I think they had sort of a - a
11:18:55  23    mutual admiration club going on there.
11:19:03  24          Q.    Was Dave a brilliant person?
11:19:09  25          A.    Well, I mean, when it came to - when it came to
```

LYNN CARROLL WRIGHT                81              January 13, 2020

information security, I would say "Yes".  But then

that's - I mean, that's coming from somebody that, you

know, has trouble turning her computer on.

    Q.   And so what's the basis of your understanding

that Dave was brilliant in computer security?

    A.   I guess just, you know, talking to him when

I was over there.  They discussed a lot of - somebody

else joined the group, and I can't remember this man's

name, but he was also in information security, and the -

just the - I'd just sit back and listen to them talk

technical stuff.  So --

    MR ROCHE:   Okay.  If we can - how about we take a -

at some point, Zaharah - it's our dinner time here.  Have

you guys eaten?  It might make sense for us to take a

break now, because I think we're going to get into

documents, and if we take maybe a 20-, 25-minute break

for us to grab some food and you guys can print off the

documents?

    MS McGOVERN:   Kyle this is Amanda McGovern.  We

have the documents printed and, frankly, they are quite

voluminous.

    MR ROCHE:   Okay.

    MS McGOVERN:   Do you intend to go over every single

document in this deposition today?

    MR ROCHE:   I don't intend to go over every single

11:20:41  1    document.  I wanted to make sure you had them all so that

11:20:44  2    if I refer to one you can - it's there handy.

          3        MS McGOVERN:   Okay.  Well, just --

11:20:47  4        MR ROCHE:   But I have to admit, it's late over

11:20:51  5    here.

11:20:53  6        MS McGOVERN:   Yeah.  It's late, well, we're in the

11:20:55  7    same time zone.  Yeah.  So we're - you and I, we're in

11:20:57  8    the same time zone.

          9        MR ROCHE:   Yeah.

11:20:59 10        MS McGOVERN:   So it's late.  And so the question

11:21:01 11    is, it's 7.20pm.  We've spent time on Lynn's personal

11:21:04 12    relationship with Craig and the manner in which they got

11:21:07 13    divorced, which we find totally inappropriate.  We have

11:21:11 14    seen some documents here which further go into that,

11:21:13 15    which are going to be completely inappropriate.  How long

11:21:16 16    are you going to take with Ms Wright in this deposition?

11:21:22 17        MR ROCHE:   I imagine it will be a number of hours.

11:21:23 18    It's not going to be seven, but I imagine it will be a

11:21:26 19    number of hours.

11:21:29 20        MS McGOVERN:   What is "a number of hours", Kyle?

11:21:31 21    It's 7.30 in the evening --

11:21:33 22        MR ROCHE:   Amanda, I can't predict that.  You know,

11:21:37 23    I can - I'm trying to give you a rough ballpark, but I

11:21:40 24    can't predict.  I think we should take a break now and

11:21:42 25    then I can - we'll be good to go, and when the

LYNN CARROLL WRIGHT                    83                    January 13, 2020

11:21:44  1    deposition's over, it's over.

11:21:49  2        MS McGOVERN:   Okay.  Look, we're going to reserve

11:21:50  3    our rights on the record for any areas of testimony that

11:21:53  4    are personal in nature and that do not go to the issues

11:21:55  5    in this case regarding bitcoin and IP.  Just stating that

11:22:04  6    now.

          7        MR ROCHE:   Okay.

11:22:06  8        MS McGOVERN:   Particularly since it's 7.30 in the

11:22:08  9    evening on a Sunday, and you've already spent a lot of

11:22:11 10    time on stuff that's nothing to do with this case.

11:22:14 11    We're reserving our rights in front of judge -

11:22:17 12    Magistrate Reinhart.

11:22:17 13        MR BRENNER:   Amanda, just so the record is clear,

11:22:20 14    you guys did set the depo for 5 o'clock on a Sunday, so

11:22:23 15    let's not cry about it being 7.30.  And we objected to

11:22:29 16    it, by the way.  So we can - let's just - let's just be

         17    clear with each other.

         18        MS McGOVERN:  Andrew - yeah, I'm not - Andrew, I'm

11:22:33 19    not - I'm not crying, Andrew.  Don't refer to me as

11:22:36 20    "crying" on the record.  I find that highly insulting.

         21        MR BRENNER:   Those are crocodile tears.  Let's not

         22    get all sensitive.   You did set a deposition for

11:22:43 23    5 o'clock on a Sunday.  To start objecting after - and

11:22:43 24    you spent about an hour and a half on direct, I think.

11:22:47 25    To start objecting to the time and the date of it is just

11:22:49  1    not going to work.  We wanted you to get a normal time of

11:22:53  2    the day.  So --

          3         MS McGOVERN:   Talking to Lynn about the personal --

          4         MR BRENNER:   We've got seven hours to take the

          5    depo, hopefully it will take less.

          6         MS McGOVERN:   That's just not going to work.  Stop

          7    there right now.

11:23:00  8         MR BRENNER:   What are you telling me right now?

11:23:04  9    What are you talking about?

11:23:04 10         MS McGOVERN:   What is not going to work is some of

11:23:07 11    these deposition exhibits that go into the personal

11:23:10 12    circumstances surrounding the divorce between Lynn and

11:23:14 13    Craig Wright that have zero to do with bitcoin and IP and

11:23:20 14    are clearly meant to harass the witness.  That is not

11:23:23 15    going to work.

11:23:24 16         MR BRENNER:   That we'll take up as it happens.  But

11:23:26 17    the time is - the time is what it is.  It's not good for

11:23:28 18    anyone, but we will power through.

11:23:31 19         MR ROCHE:   All right.  Ms Wright --

11:23:34 20         MS McGOVERN:   Okay, Mr Brenner, let's go.

11:23:38 21         MR ROCHE:   -- I believe it's 23 minutes past the

11:23:40 22    hour.  Let's plan on reconvening at 50 minutes past the

11:23:44 23    hour and I will try to move the deposition along as

11:23:46 24    quickly as I can.

11:23:50 25         THE VIDEOGRAPHER:   Okay.  Going off the record at

11:23:54  1    11.23.  End of tape 2.

          2    (11.23am)

11:53:15  3        (A short break)

          4    (11.53am)

11:53:19  5        THE VIDEOGRAPHER:   Going back on the record at

11:53:21  6    11.53am.  Commencement of tape 3.  Proceed.

11:53:28  7        MR ROCHE:   Sati, if you could introduce tab 38.

          8    BY MR ROCHE:

11:53:32  9        Q.   Ms Wright, let me know when you have the

11:53:34 10    document that Sati is about to hand you in front of you.

         11        A.   Yes.

11:53:39 12        MR ROCHE:   For the record, this is document with

11:53:42 13    Bates stamp ending in 640897.

11:53:51 14        THE VIDEOGRAPHER:   USA, this is the videographer.

11:53:54 15    You are introducing documents.  Are you giving them

11:53:56 16    exhibit numbers for our court reporter?

11:54:00 17        MR ROCHE:   Yes.  Are you - what exhibit number are

         18    we on?

         19        THE COURT REPORTER:   You didn't tender the document

         20    that was the subpoena, you just produced it.  Do you want

         21    that marked as exhibit 4?

         22        MR ROCHE:   Yes.  Please mark that as exhibit 4,

11:54:23 23    and, for the record, exhibit 4 is the subpoena served by

11:54:24 24    plaintiffs to Miss Lynn Wright.

         25            (Exhibit 4 marked for identification)

LYNN CARROLL WRIGHT                    86                January 13, 2020

11:54:32  1        MR ROCHE:   And exhibit 5 is the document ending in

11:54:33  2   Bates stamp 640897.

11:54:45  3        (Exhibit 5 marked for identification)                    H
                                                                            OS
11:54:45  4   BY MR ROCHE:

11:54:49  5        Q.   Ms Wright do you recognize this document?

11:54:51  6        A.   No, I don't remember it.

11:54:54  7        Q.   Okay.  So I'm just going to read - it is an

11:54:55  8   email, it looks - it is an email chain between

11:54:59  9   craig.wright@hotwirepe.com - do you recognize that email

11:55:04 10   address?

11:55:08 11        A.   No.  I - I - very vaguely.  I have some vague

11:55:14 12   memory of the - of the - not the email address so much as    H
                                                                            OS
11:55:17 13   the "hotwire" name.

11:55:22 14        Q.   Okay.  And is Lynn - ████████████████ - is

11:55:28 15   that you?

11:55:29 16        A.   Yes, it is.

11:55:30 17        Q.   Okay.  And in this email, it's dated April

11:55:33 18   20th, 2015, Craig writes,

11:55:36 19        *Hi,*
11:55:37          *I own the... 'DeMorgan' etc again... It*
11:55:42 20       *took some time but I won.*

11:55:47 21       *What I will get you to confirm.*

11:55:48 22       *1.  That I dealt with Dave offshore from*
11:55:51          *2010 on.*
11:55:51 23
                  *2.  That Dave setup companies for me.*
11:55:51 24
11:55:53          *3.  That I had banking in Panama and*
11:55:58 25       *Guatemala before 2009.*
11:55:59

LYNN CARROLL WRIGHT                    87                    January 13, 2020

```
                    4.  That I was working on markets, Bitcoin
                and other areas in 2009 on.

        A.   Mmm-hmm.

        Q.   And then you write back:

        Will DeMorgan be taking over all the other
        companies you have?  What exactly do you
        [know] now?
```
H
OS
```
And then:

        Did we not start dealing with Dave in 2009?

So, first, what is this document in relation to?

        A.   I cannot - I don't know.  I have - I don't have

any memory of this.
```

    Q.   Okay.  Do you have any idea why Craig would

reach out to you in April 2015, to get you to confirm --

    MS MARKOE:   Objection.  Calls for speculation.

    THE DEPONENT:   Do I answer?

    MR ROCHE:   Yes.

    MS MARKOE:   Yes, you can answer the question unless

you are instructed not to.

    THE DEPONENT:   Okay.  Sorry, do I have - what was

the question again, Kyle?

BY MR ROCHE:

    Q.   Yes, do you know why Craig was reaching out to

in 2015?

    A.   No, I don't.

LYNN CARROLL WRIGHT                    88                    January 13, 2020

11:56:57   1     Q.    Okay.  Do you not know why he wrote:

11:57:00   2      *Did we not start dealing with Dave in 2009?*

11:57:04   3     MS MARKOE:   Objection.

11:57:06   4     THE DEPONENT:   No, I have - I have no memory of

11:57:07   5  this at all.

        6  BY MR ROCHE:

11:57:09   7     Q.    Okay.  Do you know what you're referring to

11:57:11   8  when - "banking stuff" - when you use the term "banking

11:57:17   9  stuff"?

11:57:18 10     MS MARKOE:   Objection.

11:57:21 11     MR ROCHE:   I - I would - no.  I would assume that

11:57:24 12  it had to do with bank accounts for - but 2015 doesn't

11:57:29 13  make sense, because I wasn't involved with anything then.

11:57:34 14     Q.    Okay.  So you don't know what banking stuff

11:57:39 15  Craig is referring to in this email?

11:57:41 16     A.    No.

11:57:42 17     MS MARKOE:   Objection.  She is referring to

11:57:44 18  "banking stuff".  You are misstating the document.

11:57:49 19     MR ROCHE:   Understood.

     20  BY MR ROCHE:

11:57:52 21     Q.    You don't know why - Ms Wright, do you know why

11:57:53 22  you used the term "the banking stuff".

11:57:57 23     MS MARKOE:   Objection.  Asked and answered.

11:57:59 24     THE DEPONENT:   No, I don't.

     25  BY MR ROCHE:

LYNN CARROLL WRIGHT                89                    January 13, 2020

| | |
|---|---|
| 11:58:00 1 | Q.   Do you know what dealings Craig had with Dave |
| 11:58:02 2 | in 2009? |
| 11:58:06 3 | A.   No.  No, I don't.  I could only assume, and |
| 11:58:11 4 | that's - I won't. |
| 11:58:14 5 | Q.   Okay.  And you - do you have any understanding |
| 11:58:18 6 | of what dealings Dave had with Craig in 2009? |
| 11:58:25 7 | MS MARKOE:   Objection.  Asked and answered. |
| 11:58:28 8 | THE DEPONENT:   No.  Again, I could only assume, but |
| 11:58:29 9 | that's not what you want. |
| 10 | BY MR ROCHE: |
| 11:58:37 11 | Q.   Well, what do you mean, you can "only assume"? |
| 11:58:41 12 | A.   Well, I would just - I would assume that it |
| 11:58:43 13 | had - it would have to do with information security, or - |
| 11:58:51 14 | or possibly the tenders that we put in. |
| 11:58:58 15 | Q.   Okay.  And it says at the bottom: |
| 11:59:02 16 | *I do remember you working privately on* |
| 11:59:05 17 | *Bitcoin and such well before 2009.* |
| 11:59:08 18 | Do you know what that statement is in reference to? |
| 11:59:11 19 | A.   No. |
| 11:59:15 20 | Q.   Okay.  So you don't know what you were talking |
| 11:59:17 21 | about in this email with Craig? |
| 11:59:20 22 | A.   I don't remember it. |
| 11:59:27 23 | Q.   And does the email refresh your recollection at |
| 11:59:29 24 | all? |
| 11:59:30 25 | A.   No. |

H
OS

LYNN CARROLL WRIGHT                    90                    January 13, 2020

11:59:31  1        MS MARKOE:   Objection.   She's already answered that

11:59:33  2     question.

11:59:33  3        THE DEPONENT:   No, it confuses me more.

          4     BY MR ROCHE:

11:59:50  5        Q.   Do you have --

          6        MS MARKOE:   Can I just --

          7     BY MR ROCHE:

11:59:53  8        Q.   Do you believe this email is forged?

11:59:56  9        MS MARKOE:   Objection.

11:59:58  10       THE DEPONENT:   I wouldn't - I don't know.

12:00:00  11    I wouldn't - I wouldn't think it is, but I can't - I -

12:00:10  12    I don't understand the time frame.

          13    BY MR ROCHE:

12:00:18  14       Q.   What --

12:00:23  15       MS MARKOE:   Kyle, what exhibit number is this?

          16       THE DEPONENT:   I'm sorry?

          17       MS MARKOE:   What exhibit number is this?

          18    BY MR ROCHE:

12:00:27  19       Q.   What didn't you understand?

12:00:29  20       A.   Just the - the 2015 time frame.  Because it

12:00:40  21    was - I - I don't remember if - was he in - I don't know

12:00:46  22    if he was in the UK then or not.  It might have been when

12:00:51  23    he was still here.  What surprises me most is that we

12:00:59  24    rarely - we rarely communicated, he and I, so --

12:01:05  25       Q.   Okay.

LYNN CARROLL WRIGHT                91                    January 13, 2020

12:01:06  1          A.   And I guess I just tend to just forget

12:01:09  2   everything that he had to say.

12:01:13  3          Q.   And you rarely communicated after you

12:01:16  4   separated; correct?

12:01:17  5          A.   Yes.

         6          MS MARKOE:   Objection.

         7   BY MR ROCHE:

12:01:19  8          Q.   And that separation occurred in November 2010?

12:01:23  9          A.   Yes.  Officially, November 2010, but he didn't

12:01:29 10   leave the premises until May 2011.

12:01:36 11          Q.   Okay.  You didn't discuss business dealings

12:01:40 12   with him after you separated?

12:01:43 13          MS MARKOE:   Objection.

12:01:44 14          THE DEPONENT:   No, not unless it had directly to do

12:01:46 15   with what - well, I was working some place else by then

12:01:51 16   so, no, not that I recall about anything.

         17   BY MR ROCHE:

12:02:02 18          Q.   Where was W&K Info Defense Research

12:02:07 19   incorporated?

12:02:09 20          A.   I would assume that it was where Craig was

12:02:14 21   living.  He always worked from home.

12:02:19 22          Q.   When was it, W&K Info Defense Research,

12:02:23 23   incorporated?

12:02:24 24          A.   It wasn't --

12:02:26 25          MS MARKOE:   Objection.  Asked and answered.

12:02:29  1        THE DEPONENT:   It wasn't - it wasn't incorporated.

          2   BY MR ROCHE:

12:02:31  3        Q.   What was it?

12:02:32  4        A.   It was just - just W&K Information Defense.  It

12:02:38  5   was - it was not like - over here, it would have had to

12:02:41  6   have been a "proprietary limited" to be incorporated, and

12:02:43  7   it wasn't.

12:02:47  8        Q.   Okay, so what did - what type of entity was W&K

12:02:52  9   Info Defense Research?

12:02:53 10        A.   Part of Cloudcroft, as far as I know.

12:02:59 11        Q.   What was W&K's business purpose?

12:03:04 12        MS MARKOE:   Objection.  Asked and answered.

12:03:07 13        THE DEPONENT:   If you recall back to the tenders

12:03:09 14   that we were putting in, it would always - if we were

12:03:14 15   putting in a tender for an American firm or - or company

12:03:19 16   or - or government entity over there, that we could do

12:03:23 17   work for, it always - we would put it through Dave in the

12:03:28 18   US as - as the contact, because then, it comes from a US

12:03:37 19   company, I guess, for lack of a better term.

         20   BY MR ROCHE:

12:03:41 21        Q.   And that's because Dave ran it, the company in

12:03:43 22   the US?

12:03:45 23        MS MARKOE:   Objection.

12:03:46 24        THE DEPONENT:   No.  Craig ran the company.  Dave

12:03:48 25   was sort of the contact.  And he - I mean, I'm not - I'm

LYNN CARROLL WRIGHT                    93                    January 13, 2020

```
12:03:52   1    not saying he didn't have input into things, but he was
12:03:56   2    the central contact figure there.
12:04:02   3            MR ROCHE:   Could we introduce tab 2, please.
           4    Please mark that as exhibit 6.                              H-R
12:04:29   5            (Exhibit 6 marked for identification)
12:04:32   6    BY MR ROCHE:
12:04:33   7        Q.   Ms Wright, do you recognize this document?
12:04:43   8            MR BRENNER:   Kyle, can you read out the Bates
12:04:45   9    stamp, please?
12:04:47  10            MR ROCHE:   It's not Bates stamped.
          11            MR BRENNER:   Okay.
12:04:48  12            MR ROCHE:   Oh, strike that.  The Bates stamp is -
12:04:50  13    it's not marked on the document that I can present.  The    H-R
12:04:54  14    Bates stamp is DEFAUS_01070641.
          15    BY MR ROCHE:
12:05:08  16        Q.   Miss Wright, I apologize for interrupting.  Do
12:05:11  17    you recognize this document?
12:05:14  18        A.   No, I don't.  And it - no, I don't.  And
12:05:20  19    I don't know this Verne Tongood.
12:05:24  20        Q.   Okay.
12:05:25  21        A.   But --
12:05:26  22        Q.   Pardon me?
12:05:27  23        A.   But then that - they would - I don't know if
12:05:29  24    they were just a - a witness to it.  I don't know.
12:05:35  25        Q.   Okay.  If you could turn to page 2 of the
```

LYNN CARROLL WRIGHT                    94                    January 13, 2020

| | | |
|---|---|---|
| 12:05:38 | 1 | document? |
| 12:05:39 | 2 | A.   Yes. |
| 12:05:41 | 3 | Q.   Is that your signature? |
| 12:05:42 | 4 | A.   It certainly looks like it, yes. |
| 12:05:45 | 5 | Q.   Okay.  And is that how - is that how you sign |
| 12:05:50 | 6 | your name? |
| 12:05:51 | 7 | A.   Yes. |
| 12:06:08 | 8 | Q.   Do you recall signing this affidavit? |
| 12:06:10 | 9 | A.   No. |
| 12:06:12 | 10 | Q.   Are you aware that Craig filed claims in |
| 12:06:17 | 11 | Australia against W&K? |
| 12:06:19 | 12 | A.   Sorry, what was that? |
| 12:06:20 | 13 | Q.   Are you aware that Craig filed legal claims in |
| 12:06:25 | 14 | Australia against W&K Info Defense? |
| 12:06:30 | 15 | A.   No, I wasn't. |
| 12:06:40 | 16 | Q.   Okay, in this, your affidavit, you write - I'm |
| 12:06:46 | 17 | on page - the second page of the document at paragraph 6: |
| 12:06:50 | 18 | Mr Kleiman and Dr Wright engaged in |
| 12:06:53 |  | contracts under the US Dept of Homeland |
| 12:06:57 | 19 | Security BAA program through W&K Info |
| 12:07:04 |  | Defense LLC. |
|  | 20 | |
| 12:07:05 | 21 | Sorry, I didn't even see the second page.  Hang on a |
| 12:07:07 | 22 | second. |
| 12:07:11 | 23 | Q.   I'm looking at paragraph 6.  Have you reviewed |
| 12:07:28 | 24 | paragraph 6? |
| 12:07:29 | 25 | A.   Yes, I have.  To the best of my knowledge, we - |

H
OS

OS

LYNN CARROLL WRIGHT                    95                    January 13, 2020

12:07:32  1    yes, we put tenders in but we didn't get the tenders.

12:07:43  2        Q.    And do you know what those tenders were in

12:07:45  3    relation to?

12:07:52  4        A.    Information security.  I don't know the -

12:07:59  5    I can't remember what the specifics are, and I wouldn't

12:08:02  6    have understood them anyway.

12:08:05  7        Q.    Okay.  Have you read any of the filings related

12:08:11  8    to the litigation here in the United States against

12:08:15  9    Craig Wright?

12:08:16 10        A.    No.

12:08:16 11        Q.    Okay.

12:00:17 12        A.    I have - I don't think I - I haven't had access

12:08:20 13    to any of them and I haven't asked for any of them.

12:08:23 14        Q.    Understood.  And are you aware that Craig has

12:08:26 15    sworn that he never had any ownership in W&K?

12:08:30 16        MS MARKOE:    Objection.  Foundation.

12:08:36 17        THE DEPONENT:    Yeah, I think - I - yeah, he - I am

12:08:40 18    aware that he - that he didn't have - that he stated that

12:08:44 19    he hasn't had ownership in it.

         20    BY MR ROCHE:

12:08:52 21        Q.    Okay.  Do you know who Uyen Nguyen is?

12:08:56 22        A.    No.

12:08:57 23        Q.    And I will spell her name, just because I could

12:08:59 24    be butchering it, it is a Vietnamese name.  Uyen -

12:09:03 25    U-Y-E-N space N-G-U-Y-E-N.

LYNN CARROLL WRIGHT                96            January 13, 2020

12:09:06  1        A.    Yeah.

12:09:07  2        Q.    Have you heard that name before?

12:09:08  3        A.    No, not to the best of my knowledge, but - you

12:09:12  4    know.

12:09:14  5        Q.    Do you have any idea of whether or not she was

12:09:15  6    involved in W&K Info Defense Research?

12:09:20  7        MS MARKOE:    Objection.  Foundation.

12:09:23  8        THE DEPONENT:   I have no knowledge of that.

          9    BY MR WRIGHT:

12:09:29 10        Q.    And if somebody was involved in W&K Info

12:09:35 11    Defense Research, would you have not - would you know

12:09:38 12    whether or not they were involved?

12:09:41 13        MS MARKOE:    Objection.  Calls for speculation.

12:09:46 14        THE DEPONENT:   I think I probably would, but,

12:09:51 15    again, after we split up and after he was out of the

12:09:55 16    house, I was working some place else by then and didn't -

12:10:01 17    didn't pay a lot of attention.

         18    BY MR ROCHE:

12:10:06 19        Q.    Okay.  Besides yourself, Craig and Dave, were

12:10:10 20    there any other individuals involved in W&K, at any point

12:10:13 21    in time?

12:10:15 22        MS MARKOE:    Objection.  She's already said that

12:10:19 23    after a certain point she may not know.

12:10:24 24        MR ROCHE:   Ms Markoe, I have asked you not to use

12:10:26 25    speaking objections.

BY MR ROCHE:

12:10:29    Q.    And you can answer.

12:10:30    A.    To the best of my knowledge, there was nobody
else that was involved in it.

12:10:38    Q.    And if you could look at that, I'm on the
12:10:41    second page of that exhibit 6?

12:10:43    A.    Yeah.

12:10:44    Q.    If you could look at the eighth bullet, it
12:10:47    states:

12:10:48        *Between the start of 2011 and when*
12:10:50        *Mr Kleiman died in 2013, Dr Wright had*
12:10:53        *engaged significantly with Mr Kleiman in*
12:10:55        *the development of several software*
12:10:58        *products.*

12:11:00    Is that an accurate statement?

12:11:03    A.    I don't know.  He was gone from here, so it -
12:11:09    Craig - Craig was --

12:11:10    Q.    I'm sorry, can I --

12:11:12    A.    Sorry, Craig - I don't know if this is an
12:11:14    accurate statement, because Craig was - had left the
12:11:17    house.  He had - he moved, like, to a separate place, and
12:11:22    we didn't discuss a lot of the business stuff.

12:11:27    Q.    Did Craig Wright draft this document,
12:11:32    exhibit 6?

12:11:33    A.    I don't know.

12:11:38    MS MARKOE:    Objection.

BY MR ROCHE:

H

LYNN CARROLL WRIGHT                    98                    January 13, 2020

12:11:45  1          Q.   And when did you - when did you get ownership

12:11:50  2   in W&K?                                    Relevance

12:11:52  3          MS MARKOE:   Objection.

12:11:55  4          THE DEPONENT:   I guess when - when they - they

12:12:01  5   first started the - the discussions on - on putting the

12:12:07  6   tenders in.   At that point, there was the three of us

12:12:12  7   that were still working on it.

          8   BY MR ROCHE:

Plaintiffs conditionally withdraw the counters on L. 9-16 if the Court sustains Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K

12:12:23  9          Q.   Okay.   And - but you don't have any

12:12:25 10   documentation, outside the divorce settlement, related to

12:12:27 11   your ownership?

12:12:29 12          A.   That's right.

12:12:32 13          Q.   And just going back to exhibit 3 again --

12:12:38 14          A.   Yes.

12:12:39 15          Q.   -- you signed this affidavit; correct?

12:12:41 16          A.   Yes, I did.   It looks like my signature.

12:12:47 17          THE COURT REPORTER:   Did you mean exhibit 3 or the

         18   current document, which is exhibit 6?

12:12:53 19          MR ROCHE:   Exhibit 6, page 3.

         20          THE COURT REPORTER:   Thank you.

         21   BY MR ROCHE:

12:13:02 22          Q.   And do you still own W&K?        Relevance

12:13:09 23          A.   I guess I'm - I guess that I still have some

12:13:12 24   interest in it, but I never thought it would amount to

12:13:16 25   anything so I didn't pursue very - you know, anything

LYNN CARROLL WRIGHT                    99                January 13, 2020

12:13:21  1     about it.

12:13:23  2          Q.    And what's your basis for assuming you still

12:13:26  3     have ownership in W&K?

12:13:28  4          A.    The - nothing has changed, as far as I know,

12:13:35  5     from the divorce settlement.

12:13:38  6          Q.    Did you ever advance money to Craig Wright?

12:13:42  7          A.    Not for W&K.

12:13:46  8          Q.    And in any - in any capacity?

12:13:49  9          A.    Oh, we had --

12:13:51  10         MS MARKOE:    Objection.  Relevance.

11         THE DEPONENT:    Sorry, what?

12         MS MARKOE:    Objection.  Relevance.

12:13:58  13         THE DEPONENT:    Look, I - we - we would - not - not

12:14:02  14    huge amounts of money, no.  When I was - when we were

12:14:08  15    working separately and he wanted to set up the company

12:14:10  16    and stuff, and then we - we did a - we had a hobby farm,

12:14:18  17    and we were going to start doing some - what do you call

12:14:24  18    it? - climate, stuff for the - to prevent climate change

12:14:32  19    on the farm, like erosion, land erosion and things like

12:14:36  20    that, I - I bought from Craig the business of --

12:14:48  21    BY MR ROCHE:

12:14:48  22         Q.    The?

12:14:49  23         A.    The business.  The - the - like the equipment

12:14:51  24    and stuff for the farm.  But, again, that went nowhere

12:14:58  25    real quick.

LYNN CARROLL WRIGHT                    100                    January 13, 2020

| | | |
|---|---|---|
| 12:15:00 | 1 | Q.   About how much money was that? |
| 12:15:03 | 2 | A.   Oh, God -- |
| 12:15:04 | 3 | MS MARKOE:   Objection.   Relevance. |
| 12:15:06 | 4 | THE DEPONENT:   I - I can't remember, to be honest. |
| | 5 | BY MR ROCHE: |
| 12:15:09 | 6 | Q.   Okay. |
| 12:15:09 | 7 | A.   It - like I -- |
| 12:15:11 | 8 | Q.   Was there a -- |
| 12:15:12 | 9 | A.   It wasn't huge, huge amounts, and it was - it |
| 12:15:15 | 10 | was - yeah.   I mean, I can't - I can't recall what it |
| 12:15:19 | 11 | was. |
| 12:15:28 | 12 | Q.   Do you have any record of those advancements? |
| 12:15:30 | 13 | MS MARKOE:   Objection.   Relevance. |
| 12:15:32 | 14 | THE DEPONENT:   Not that I can - not that I remember |
| 12:15:33 | 15 | having, no.   We never - we never - I - I can't remember |
| 12:15:37 | 16 | if we ever even wrote it down.   I - I - no, I - I'm |
| 12:15:45 | 17 | sorry, I wish I could, but -- |
| 12:15:47 | 18 | BY MR ROCHE: |
| 12:15:48 | 19 | Q.   Understood.   And is there - are you aware of a |
| 12:15:52 | 20 | company called Information Defense Pty? |
| 12:15:58 | 21 | A.   Yes, that was - that was the one that was |
| 12:16:03 | 22 | Cloudcroft Proprietary Limited trading as Information |
| 12:16:08 | 23 | Defense. |
| 12:16:09 | 24 | Q.   Okay.   Did there ever come a time when Craig |
| 12:16:12 | 25 | transferred shares of Information Defense Pty to you? |

LYNN CARROLL WRIGHT                    101                January 13, 2020

12:16:16  1          A.   He transferred --

12:16:18  2          MS MARKOE:   Objection.

12:16:19  3          THE DEPONENT:    -- shares at the beginning of it,

12:16:21  4     because - at the start of it, because - at the start of

12:16:27  5     Cloudcroft, because I was the managing director for a

12:16:30  6     short period of time.

12:16:32  7          MR ROCHE:   Okay.  If we could hand the witness,

12:16:35  8     Ms Wright, tab 19?

12:16:44  9          MS MARKOE:   Kyle, can you give me a few minutes,

12:16:47 10     just - it is very difficult, given the late stage in

12:16:52 11     which you gave these to me, for me to pull them up so

12:16:57 12     quickly.  So give me a couple of seconds while she is

12:17:01 13     looking at it.

12:17:01 14          MR ROCHE:   We will mark this exhibit 7.

         15               (Exhibit 7 marked for identification)

         16     BY MR ROCHE:

12:17:40 17          Q.   And if you see at the top, it states:

12:17:45 18               *Over a number of years since 2002 Lynn has*
12:17:48                  *advanced moneys to Craig to assist Craig to*
12:17:50 19               *operate and maintain various businesses*
12:17:52                  *owned and operated by him.*
         20

12:17:56 21     Is that reference to the hog farm?

12:18:03 22          A.   The hobby farm?

12:18:03 23          Q.   Yes.

12:18:05 24          A.   Yes.  I would - I would - yeah, plus it may

12:18:08 25     have been other things, too.  But, yeah, I would say -

LYNN CARROLL WRIGHT                102                January 13, 2020

12:18:16  1    with the - with that being the date, I'd say that, yeah,

12:18:20  2    that's probably right.

12:18:22  3        Q.   Okay.  And if you look at paragraph D, it says:

12:18:24  4            *Craig wishes to secure in favour of Lynn*
12:18:28              *all monies owned to Lynn and all assets*
12:18:30  5            *owned by Lynn which have been excused as*
12:18:32              *security for loans made to Craig or Craig's*
12:18:34  6            *businesses.*

12:18:40  7        MS MARKOE:    Paragraph - pardon me, did you say in

12:18:41  8    paragraph C or paragraph D?

12:18:44  9        MR ROCHE:    D.

12:18:49 10        MS MARKOE:    Paragraph C?

12:18:51 11        MR ROCHE:    D.  Yes.

         12        MS MARKOE:    Oh, D.

         13    BY MR ROCHE:

12:18:53 14        Q.   And then, below that, it says

12:18:54 15            *Craig shall do all things and sign all*
12:18:57              *documents necessary to transfer to Lynn all*
12:18:59 16            *shares owned by Craig in the companies*
12:19:01              *Information Defense ... and Integyrs Pty*
         17            *Limited.*

12:19:07 18    Was that transfer made?

12:19:14 19        A.   I - I - look, I - I don't know.  I - this is

12:19:20 20    just confusing me.

12:19:24 21        Q.   Okay.  So you don't recognize this document?

12:19:30 22        A.   It's vaguely - it feels vaguely familiar,

12:19:42 23    but --

12:19:43 24        Q.   Okay.  If you could go to the last page of the

12:19:47 25    document.

12:19:48  1    A.    Mmm-hmm.

12:19:49  2    Q.    Page 4 of exhibit 7.

12:19:51  3    A.    Page 4?

12:19:53  4    Q.    Yes.

12:19:55  5    A.    Yeah.

12:19:58  6    Q.    Can you see it says, "Spyder", "Redback" - do

12:20:06  7    you recognize what "Spyder" is?

12:20:08  8    A.    "Spyder" is the hardware/software unit that

12:20:12  9    Craig developed in conjunction with Greyfog, who put the

12:20:19 10    units together, that were basically his sort of version

12:20:24 11    of a - of an upgraded firewall, I guess.

12:20:28 12    Q.    Okay.  And do you - do you see that there is a

12:20:33 13    valuation there?

12:20:35 14    A.    Yeah.

12:20:37 15    Q.    Do you have any understanding of where that

12:20:39 16    valuation originated?

12:20:43 17    A.    No.  I think that it was probably sort of

12:20:55 18    looking - you know, looking at the - the numbers, the

12:20:59 19    units sold times the continued 24/7 monitoring, that sort

12:21:06 20    of thing.  But where that specific number came from --

12:21:11 21    Q.    But did you own - is it your understanding that

12:21:15 22    Craig transferred to you the rights to Spyder?

12:21:18 23    A.    He didn't transfer - he - I think he

12:21:21 24    transferred the IP.  I could use the IP, I think, if I -

12:21:27 25    if - do you have the divorce settlement thing?  Hang on a

LYNN CARROLL WRIGHT                104                January 13, 2020

12:21:45   1   second.

           2        Q.    Mmm-hmm.

12:21:45   3        A.    Yeah, I think that's it.  Yeah.  If you'll -

12:21:46   4   under "Intellectual Property", he gave - he gave me the

12:21:51   5   rights for five years to use the IP.  But that - I didn't

12:21:56   6   use it because I very - I shortly - shortly thereafter

12:22:00   7   turned over the company back to him.

12:22:05   8        Q.    Okay.  And why did you turn the company back

12:22:07   9   over to him?

12:22:08  10        A.    Because I was having financial problems.

12:22:10  11        Q.    Okay.  Did he pay you for the company when you

12:22:14  12   turned it back over?

12:22:15  13        A.    No.

12:22:17  14        Q.    Okay.  So why - why did you turn it over

12:22:23  15   without consideration?

12:22:26  16        MS MARKOE:   Objection.  Asked and answered.

12:22:32  17        THE DEPONENT:   Because I was - I was - I had to

12:22:34  18   declare bankruptcy, and in Australia, you can't be a

12:22:39  19   director of a company and be bankrupt.

          20   BY MR ROCHE:

12:22:45  21        Q.    Okay.

12:22:45  22        A.    So everything went back to him.

12:22:48  23        Q.    Can you own any part of a company and be

12:22:51  24   bankrupt?

12:22:53  25        A.    I'm not sure.  Can you?  I guess you can own it

LYNN CARROLL WRIGHT                    105                    January 13, 2020

Plaintiffs conditionally withdraw the counters on L. 3-18 if the Court sustains Plts' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K.

12:22:58  1    but you can't be a director - or own part of it but you

12:23:02  2    can't be a director.  I don't know.

12:23:04  3         Q.   When did you declare bankruptcy?

12:23:09  4         A.   It started - well, it started in 2011 and then

12:23:17  5    went - it was - it finalized by the courts in

12:23:24  6    2012, January of 2012.

12:23:28  7         Q.   And as part of that bankruptcy, did you have to

12:23:32  8    list the assets that you - that you personally owned?

12:23:38  9         A.   Yes.

12:23:39 10         Q.   Okay.  Did you identify W&K as one of those

12:23:41 11    assets?

12:23:42 12         A.   No, because everything had been handed back to

12:23:44 13    Craig.  Basically, I had - what I listed was my - I was

12:23:51 14    working outside of the - outside of - like, outside of

12:23:56 15    the house, with an insurance company, so I listed my

12:24:00 16    salaries and plus stuff that was in the house against the

12:24:04 17    mortgages, and things like the mortgage and stuff like

12:24:07 18    that.

12:24:11 19         Q.   You were managing director at one point of

12:24:14 20    Information Defense Party - Pty; correct?

12:24:19 21         A.   Yes.

12:24:19 22         Q.   And when did you stop becoming director?

12:24:22 23         A.   I handed everything back to Craig, I believe it

12:24:25 24    was in December of - of 2011.  To be quite honest, I was

12:24:32 25    happy to hand everything back to him.  I didn't want to

12:24:34  1   have anything to do with any --

12:24:37  2          Q.   Who else was employed at the company?

12:24:42  3          MS MARKOE:   Objection.

          4          THE DEPONENT:   We had a - sorry?

          5          MS MARKOE:   Objection.

          6   BY MR ROCHE:

12:24:46  7          Q.   Who else was employed at that company?

12:24:49  8          A.   We had a - a tech - information security

12:24:52  9   technician, or, you know, specialist, I guess, if you

12:24:57 10   will, but he was working as a contractor.

12:25:01 11          Q.   Okay.  And after Information Defense Pty, you

12:25:08 12   went on to work at Cloudcroft; is that correct?

12:25:10 13          A.   No.  Cloudcroft --

12:25:12 14          MS MARKOE:   Objection.  That is not the testimony.

12:25:18 15          THE DEPONENT:   Cloudcroft was the parent company.

12:25:20 16   It was Cloudcroft Proprietary Limited trading as

12:25:25 17   Information Defense.  So it was - they --

12:25:29 18   BY MR ROCHE:

12:25:30 19          Q.   So they were essentially the same company?

12:25:32 20          A.   Yes.

12:25:34 21          Q.   Did Cloudcroft ever receive intellectual

12:25:37 22   property belonging to W&K?

12:25:39 23          A.   No.

12:25:44 24          Q.   What IP did Cloudcroft own?

12:25:47 25          A.   We didn't own any.  We had the right to use -

LYNN CARROLL WRIGHT                 107                    January 13, 2020

12:25:54  1    mostly, the thing that I was trying to, I guess - that

12:25:57  2    I thought had the most promise, was Spyder.  But we

12:26:03  3    never - it went to a couple of clients, but never

12:26:10  4    really - I wanted to try to - to work on it to get it off

12:26:14  5    the ground - sorry, oh - to get it off the ground,  but

12:26:19  6    things fell apart for me.

12:26:21  7        Q.    And who worked for Cloudcroft?

12:26:24  8        A.    Hector --

12:26:26  9        MS MARKOE:   Objection.  Can we get a time frame on

12:26:28  10   some of this stuff?  Because you are asking these very

12:26:31  11   broad questions, and I think that to make the record

12:26:33  12   clear it would be useful to have a time frame in

12:26:38  13   which they're --

12:26:39  14       MR ROCHE:   I'm asking the questions.  If the - we

12:26:44  15   can establish the time frame.  If the witness needs

12:26:47  16   clarification, I will certainly provide clarification.

         17    BY MR ROCHE:

12:26:51  18       Q.    Who - let's start over, Ms Wright.  What

12:26:56  19   employees - when did you work for Cloudcroft?

12:27:03  20       A.    From the date of its - from - from I guess the

12:27:07  21   date of its inception to around - well, till I handed it

12:27:11  22   back to Craig.  Not that it - it wasn't a - it wasn't -

12:27:15  23   there wasn't any big successful company.

12:27:19  24       Q.    Understood.  And during that period of time,

12:27:23  25   did anybody else work at Cloudcroft besides yourself?

12:27:26  1        A.    We had a contractor that would go out and do

12:27:29  2    work.

12:27:32  3        Q.    What was the contractor's name?

12:27:35  4        A.    Hector.  I'm - it starts - I can't pronounce

12:27:42  5    his last name.  He's a Filipino fellow.  I think it's

12:27:46  6    "Moorabang", or something like that.

12:27:51  7        Q.    Okay.  Did Cloudcroft have any clients?

12:27:53  8        A.    Yeah, we had the Qantas Credit Union.  I'm just

12:28:02  9    trying to - they were on - they were 24/7 monitoring.

12:28:07 10    I'm just trying to think.  We did - Craig I think did

12:28:11 11    some work still at that time with the Australian stock

12:28:16 12    exchange, although we weren't - they - we were no longer

12:28:21 13    in - no longer doing 24 by 7 monitoring.  He basically

12:28:26 14    would go out for - what do you call it? - like if they

12:28:30 15    called and asked for a consultant to come out.

12:28:34 16        Q.    And during the time that you worked at

12:28:37 17    Cloudcroft, what was its yearly revenue?

12:28:42 18        A.    God, not a huge amount, hence why I had to go

12:28:48 19    out and find another job anyway.  I - I - honestly,

12:28:53 20    I don't recall.  Craig --

12:28:54 21        Q.    Okay.

12:28:55 22        A.    You know, Craig did the - the work on that.

12:29:00 23        MR ROCHE:    Okay.  Sati, if we could hand Ms Wright

12:29:04 24    tabs 24 and 25?

12:29:31 25        THE COURT REPORTER:  Separate exhibits, Mr Roche, or

LYNN CARROLL WRIGHT                    109                    January 13, 2020

12:29:32  1      one exhibit?

12:29:33  2          MS MARKOE:  Can we wait a second until I can get

12:29:36  3      these documents?  It's just going to take a couple of

12:29:39  4      seconds.

          5          MR ROCHE:   Yep.  Are we on exhibit 8?

          6          THE COURT REPORTER:   Yes.

12:29:45  7          MR ROCHE:   Okay, so exhibit 8 is the

12:29:46  8      one-page document.  It ends in Bates stamp 75974.

          9              (Exhibit 8 marked for identification)

12:29:56 10          MR ROCHE:   And exhibit 9 is Bates stamp ending in

12:29:58 11      75975.

         12              (Exhibit 9 marked for identification)

12:30:08 13          MS MARKOE:   Can you read exhibit 9 again?

         14      BY MR ROCHE:

12:30:15 15          Q.   Ms Wright, do you recognize the - I want to

12:30:18 16      start with exhibit 8.  Do you recognize this email?

12:30:26 17          A.   I have a vague recollection of that,                    H

12:30:28 18      specifically because it didn't open - I couldn't open it

12:30:31 19      up on my computer.

12:30:34 20          Q.   Okay.

12:30:36 21          MR BRENNER:   Can you just read the Bates stamp on

12:30:38 22      this one again, the one you are doing now?

12:30:41 23          MR ROCHE:   Yes.  I read into the record the Bates

12:30:43 24      stamp.  The one we are doing now is ending in 75974.

12:30:48 25          MR BRENNER:   Thank you.

12:30:50  1   BY MR ROCHE:

12:30:51  2       Q.    And if you - so this is an email from you to

12:30:53  3   Craig?

12:30:55  4       A.    Yeah - looks like it, yeah.

12:30:58  5       Q.    And you write:

12:30:59  6           *I have attached what I have so far and will*
12:31:02              *try to get more when I come home tomorrow*
12:31:04  7           *after the interview.  I know it doesn't*
12:31:07              *look like much but I have worked hard on*
12:31:09  8           *making it look professional and get as much*
12:31:11              *information as possible while keeping it*
12:31:13  9           *simple.*

12:31:19 10   What were - the date on this email is October 23rd, 2013?

12:31:22 11       A.    Yeah.

12:31:23 12       Q.    Do you know what this document is in relation

12:31:24 13   to?

12:31:24 14       A.    Yeah, actually, I think it's - it sort of

12:31:29 15   clicked something in my mind.  Craig had asked me to do

12:31:35 16   some research into how the ATO, or the Australian Tax

12:31:44 17   Office, how - I guess how bitcoin could be taxed.

12:31:51 18   I think it --

12:31:53 19       Q.    When did Craig - oh, go ahead, sorry.

12:31:56 20       A.    I think the - I think that was the - one of -

12:31:58 21   one of the problems between Craig and the ATO was this

12:32:00 22   bitcoin thing, and I think he asked me - their big issue

12:32:05 23   was, "How can we tax it?" and so I just did - I - I did

12:32:12 24   some research into it, into taxation more than - than -

12:32:22 25   you know, I - he sent - I think he sent me through some

H

LYNN CARROLL WRIGHT                111              January 13, 2020

of the stuff about what bitcoin is, and I put it
together, and I think - if this is the one, I think - I'm
just trying to - I don't remember the article that
I wrote being this long, but I think he probably
incorporated stuff that I said, I guess, into - into
the - into his article.

Q.   Okay.  When did Craig ask you to work on this
article?

A.   Would have been around that time, because he
always never gave me a whole lot of - of - a long time    H
frame to get things done.

Q.   And what did he tell you about - in relation to
his - his interaction with the ATO and bitcoin, at that
time?

A.   He - he told me very little.  I - I - the big
thing that I think was they wanted to know - like, they
were dead-set against bitcoin, because it couldn't be
taxed.  So that was my - that's the extent of my
knowledge of it, that I - you know.

Q.   And --

A.   Sorry, go ahead?

Q.   And what was your reason for agreeing to do
this research and write the paper?

MS MARKOE:   Objection.   Relevance.

THE DEPONENT:   Look, it - probably because Craig    H

LYNN CARROLL WRIGHT                    112                    January 13, 2020

1  was supporting me and I didn't want to run the risk of

2  him saying, "I will just stop giving you the money".

H

3  BY MR ROCHE:

4      Q.   Okay.  So besides - strike that.  Did you do

5  other work for Craig after the divorce because you were

6  afraid that he would stop giving you the money?

7      MS MARKOE:   Objection.

8      THE DEPONENT:   No, very little.  Very, very little.

9  We got further and further apart in the - and it had been

10 a long time between the - well, the whole - whenever he

11 went to the UK, I never heard from him until recently.

12 BY MR ROCHE:

13     Q.   Okay.  And did Craig tell you he had bitcoin at

14 this time?

15     MS MARKOE:   Objection.

16     THE DEPONENT:   Well, he intimated that he had lost

17 a lot of bitcoin when that Japanese company - when that

18 guy in Japan, I think the - the bitcoin - I don't know if

19 it was a bank or what sort of outfit it was, but he,

20 I guess, absconded with all the money, and Craig had kept

21 some of his - had - well, "some of it", I think he kept

22 all of his bitcoin there, and --

23 BY MR ROCHE:

24     Q.   And what's - and this is Mt. Gox?  Is that what

25 you're referring to?

12:36:03  1       A.   It might be.  That name sounds familiar.

12:36:07  2       Q.   And what's your basis for your understanding

12:36:10  3   that he kept a lot of his bitcoin there?

12:36:12  4       A.   Because he said he lost a fair - lost a fair

12:36:14  5   bit of money.

12:36:15  6       Q.   When did he tell you this?

12:36:17  7       A.   I don't know.  When we talk, I don't look at

12:36:19  8   the date and time.

12:36:21  9       Q.   Okay.  I understand.

12:36:43 10       MS ROCHE:   Okay, if we could hand Ms Wright

12:36:46 11   exhibit - tab 32, which will be marked as exhibit 10.

12:37:02 12            (Exhibit 10 marked for identification)

12:37:10 13   BY MR ROCHE:

12:37:10 14       Q.   And this is Bates stamp ending in 01210717.

12:37:23 15   Ms Wright, if you look at the top of this email, its

12:37:30 16   subject, "Integyrs Pty Limited"?

12:37:33 17       A.   Yes.

12:37:33 18       Q.   "Liquidation".  Let's start with "Integyrs".

12:37:37 19   What was Integyrs?

12:37:38 20       A.   Integyrs was another company that - that we had

12:37:41 21   started.  He wanted a name that sounded like a number, so

12:37:49 22   that's where "Integyrs" comes from.  And I - I don't have

12:37:56 23   a great deal of knowledge of what was done in that

12:37:58 24   company.

12:38:01 25       Q.   Do you know if Integyrs had revenue?

LYNN CARROLL WRIGHT                 114                 January 13, 2020

12:38:04  1        A.    I - no, I don't.  I - I would have been - I'd

12:38:07  2    be surprised if it did.

12:38:09  3        Q.    Okay.  Do you know if anyone else worked at

12:38:12  4    Integyrs besides Craig?

12:38:13  5        A.    No, I - I think it was just him.

12:38:17  6        Q.    And it says, in the subject, "(In

12:38:22  7    Liquidation)".

12:38:23  8        A.    Yeah.

12:38:23  9        Q.    Why was Integyrs in liquidation?

12:38:26 10    MS MARKOE:    Objection.  Foundation.

12:38:29 11        THE DEPONENT:    I don't - I - you know, look, my

12:38:32 12    first response would be a bit flip, so I'm not going to

12:38:35 13    respond to that, because I don't really know.

         14    BY MR ROCHE:

12:38:40 15        Q.    And what was your first response?

12:38:43 16    MS MARKOE:    Objection.

12:38:44 17        THE DEPONENT:    Probably because it wasn't making

12:38:45 18    any money.

         19    BY MR ROCHE:

12:38:48 20        Q.    Okay.

12:38:49 21        A.    But that's an - that's a personal opinion, so

12:38:52 22    it really doesn't belong in this.

12:38:54 23        Q.    I understand.  And if you look at, "Just" - I'm

12:39:00 24    on the first two sentences, "Just a question."

         25        A.    Yep.

12:39:03 1      Q.    "Why are you asking me to cop the points?"

12:39:06 2    What are you referring to when you say, "Why are you

12:39:09 3    asking me to cop the points"?

12:39:11 4      A.    He was caught speeding on a - on a speed

12:39:15 5    camera, and he only had - he - it was speeding in a

12:39:20 6    school zone, and he only had one - we have 12 points on

12:39:25 7    our licenses over here.  He only had 1 point left.  And

12:39:30 8    he was coming over here to - from - from Sydney to the

12:39:36 9    house here, to - for - for some meeting.  I think it was,

12:39:42 10   you know, something to do with - with Cloudcroft and -

12:39:50 11   and quite - because Hector was meeting us as well here.

12:39:53 12   So he got done - not that specific date, but he got done

12:39:59 13   earlier, and he wrote me this asking me to say it was

12:40:07 14   my - it was - I was driving the car.

12:40:10 15     Q.    Did you cop the points?

12:40:11 16     A.    Yes, I did.

12:40:14 17     Q.    Okay.

12:40:20 18     MR ROCHE:   If you could - if we could hand

12:40:22 19   Ms Wright tab 53, and this is Bates ending in 01559220.

12:40:56 20   I believe we're on exhibit 11 now.

12:41:01 21     MS NAGRA:   Can I just confirm that that was tab 53?

12:41:06 22     MR ROCHE:   Tab 53, yes.  An email.

12:41:08 23     MS NAGRA:   We do not have that available here.

12:41:10 24   Could you please send that through?

12:41:13 25     MR ROCHE:   Yes.  We will send that over in a

LYNN CARROLL WRIGHT                    116                    January 13, 2020

12:41:17  1    second.

12:41:18  2           MS NAGRA:    Thank you.

12:41:19  3           MR ROCHE:    We'll work on it.

          4    BY MR ROCHE:

12:41:28  5           Q.   Were you ever under investigation by the

12:41:30  6    Australian tax authorities?

          7           A.   Me --

12:41:33  8           MS MARKOE:   Objection.   Relevance.

          9           THE DEPONENT:   Sorry?

         10           MS MARKOE:   Objection.

         11    BY MR ROCHE:

12:41:36 12           Q.   Were you ever investigated by the Australian

12:41:38 13    tax authorities?

12:41:40 14           A.   I think once, I think, as - as sort of an

12:41:44 15    extension of Craig, but the - with the farm stuff, they

12:41:50 16    disallowed a lot of the transfer of - of - we - like

12:41:59 17    the - the - they disallowed the - I don't know if it's

12:42:06 18    interest or whatever on the transfer of the equipment

12:42:09 19    from - from Craig to me.  So then for - obviously I had

12:42:17 20    to - I was - I was unable to - we were unable to complete

12:42:23 21    the --

12:42:27 22           Q.   Transaction?

12:42:27 23           A.   The transaction, yeah.

12:42:30 24           Q.   Were you interviewed by somebody from the ATO?

12:42:33 25           A.   No.  No, it was all - I - we may have - I may

LYNN CARROLL WRIGHT                117                January 13, 2020

12:42:38  1     have had a phone call, but it was usually if - I'm just

12:42:44  2     trying to think back.  It was usually about specific -

12:42:50  3     something that I had - some information that I had sent

12:42:52  4     them.  But a formal interview, no.

12:42:59  5         Q.   Okay.  And are you aware that Craig Wright was

12:43:01  6     investigated by the ATO?

12:43:04  7         A.   Yes.

12:43:05  8         Q.   What is your knowledge of that investigation?

12:43:08  9         MS MARKOE:   Objection.

12:43:12 10         THE DEPONENT:   Look, it - it had to do, as far as

12:43:23 11     I am aware, with some research and development that they

12:43:26 12     were - that they - not the ATO, but the company that -

12:43:32 13     that did - gave research and development grants did give

12:43:38 14     us - give us a grant, or gave Craig a grant.  There was

12:43:45 15     also at that time - oh, God, there's - it was - it was

12:43:50 16     all to do with - with - as far as I knew, it was all to

12:43:58 17     do with the - the grant and transfer - the transfer of

12:44:05 18     businesses, or this - of - that happened had nothing to

12:44:10 19     do with bitcoin.  I didn't really understand or know too

12:44:18 20     much about bitcoin, and I just - I didn't even - you

12:44:23 21     know, like, until Craig asked me to do that article, and

12:44:28 22     it was just - it was so cursory, it was just, you know,

12:44:32 23     "Figure out how the ATO could benefit from this, and how

12:44:37 24     can they - how can they tax bitcoin?".  But I didn't

12:44:42 25     know the - the meat about everything.

LYNN CARROLL WRIGHT                    118              January 13, 2020

1    BY MR ROCHE:

12:44:48  2        Q.    Okay.  Do you know how much the grant was?

12:44:56  3        A.    Oh, no, I could - I could say a number, but I'm

12:44:59  4    not sure it's accurate.

12:45:02  5        Q.    Is it more than $100,000?

12:45:04  6        A.    Yes, I - I believe so.

12:45:06  7        Q.    More than a million dollars?

12:45:08  8        A.    Oh, God, no.

12:45:10  9        Q.    Okay.  More than $500,000?

12:45:12 10        A.    No, it was --

12:45:13 11        MS MARKOE:    Objection.

12:45:14 12        THE DEPONENT:    It was less than that.  It - I think

12:45:16 13    it was between a hundred thousand and 200,000.  I'm not -

12:45:21 14    I think around there.  But I never saw the - I never saw

12:45:24 15    the checks, so --

12:45:27 16    BY MR ROCHE:

12:45:28 17        Q.    And did the grant have to do with

12:45:30 18    bitcoin-related intellectual property?

12:45:32 19        A.    To the best of my knowledge, no.

12:45:34 20        MS MARKOE:    Objection.

21    BY MR ROCHE:

12:45:36 22        Q.    So how did bitcoin become involved with the ATO

12:45:39 23    investigation?

12:45:39 24        A.    I don't know.

12:45:41 25        MS MARKOE:    Objection.

LYNN CARROLL WRIGHT                    119                  January 13, 2020

12:45:42  1      THE DEPONENT:  I don't know.  It may have been
12:45:47  2  through Craig, you know, doing his - just trying to - to
12:45:58  3  develop it.  I don't know how it got involved with them.
         4  BY MR ROCHE:
12:46:05  5      Q.   Did you ever produce documents to the ATO?
12:46:07  6      A.   No, not that I recall.
12:46:12  7      MR ROCHE:  Sati, do you have tab 53 on your
12:46:17  8  computer that we can show Ms Wright?
12:46:19  9      MS NAGRA:  We have a copy available, yes.
        10      MR ROCHE:  Oh, you printed - you got a copy printed
        11  off?
12:46:26 12      THE DEPONENT:  Yes, she was smart.  She brought her
12:46:27 13  own printer.
12:46:30 14      MR ROCHE:  She's very smart.  Okay.  And this is -
        15  are we on exhibit 12?
        16      THE COURT REPORTER:  This will be exhibit 11.
12:46:44 17          (Exhibit 11 marked for identification)                 H
        18  BY MR ROCHE:
12:46:47 19      Q.   Ms Wright, you have exhibit 11 in front of you.
12:46:50 20  The Bates stamp is 01559220.  Do you recognize this
12:46:56 21  document?                                                      H
12:47:02 22      A.   Yeah.  I don't know what - I don't know what
12:47:06 23  the "At least as bitcoin" meant.
12:47:10 24      Q.   Okay.  Who is - it says "Eris" - "I had to
12:47:16 25  delay Eris' dental surgery".  Who is Eris?

LYNN CARROLL WRIGHT                120                January 13, 2020

```
12:47:19   1        A.   Oh, Eris is - Eris is my cat.  She's - I was
12:47:23   2   going to apologize, because she was roaming around here
12:47:26   3   crying before.  So --
12:47:28   4        Q.   The last time I did one of these depositions
12:47:30   5   I had a cat jump up on the table, and --
12:47:34   6        A.   Mine know they are not allowed on the table, so
12:47:36   7   they only do it when I'm not here.
12:47:39   8        Q.   And so this document is dated February 4th,
12:47:44   9   2014?
12:47:45  10        A.   Yes.
12:47:45  11        Q.   Do you see that?
12:47:46  12        A.   Yes.
12:47:47  13        Q.   And it states:
12:47:49  14             Just checking that things will be ok for
12:47:51           the money going into my account on the
12:47:53  15           15th ...
12:47:54  16        A.   Yes.
12:47:55  17        Q.   Does Craig pay you every month on the 15th?
12:47:58  18        A.   Yes.
12:48:00  19        Q.   Has he ever missed a payment?
12:48:02  20        A.   He's - he's not missed it, he's - it's been
12:48:07  21   delayed, sometimes for up to about - well, a couple of
12:48:11  22   times for up to about three months, in which case, you
12:48:16  23   know, I had to apply for assistance, and then I went out
12:48:20  24   and found work.
12:48:23  25        Q.   Okay.  And he writes you back, "At least as
```

H

LYNN CARROLL WRIGHT                    121                January 13, 2020

12:48:27  1    bitcoin"?

12:48:28  2        A.   I don't know what - I don't know what that is.

12:48:31  3    I never got any bitcoin from him.  I never wanted any

12:48:34  4    bitcoin from him, mainly because I didn't trust it.

12:48:40  5        Q.   Understood.  So he didn't pay you in bitcoin?

12:48:43  6        A.   Oh, God, no.  I - even if he offered it to me,

12:48:47  7    I would not take it, because, as I - as I said, I don't

12:48:52  8    trust - I don't trust computers.  I'm old-school.

12:48:59  9        Q.   And do you understand that he had - strike

12:49:07  10   that.  How much bitcoin did you understand Craig had at

12:49:09  11   this point in time?

12:49:11  12       A.   I had no idea.  I still have no idea.

          13        THE COURT REPORTER:   Was that an objection,

          14   Ms Markoe?

          15        MS MARKOE:  Yes.  He's asked this question several

          16   times and she has answered it several times, so --

12:49:27  17       MR ROCHE:  If we can hand Ms Wright tab 39?  This

12:49:50  18   is - we're on exhibit 12 now.  This is Bates stamp ending

12:49:54  19   in 698432.

12:49:58  20            (Exhibit 12 marked for identification)

          21   BY MR ROCHE:

12:50:01  22       Q.   Ms Wright, do you recognize this email?

12:50:05  23       A.   Hang on a second, I'm just reading it.

12:50:08  24       Q.   Take your time.

12:50:33  25       A.   Okay, yeah, vaguely recall it, yes.

LYNN CARROLL WRIGHT                    122                January 13, 2020

12:50:36  1       Q.    Okay.  What is a BAS statement?

12:50:38  2       A.    A BAS statement is a business - how do

12:50:43  3    I describe it?  It's - over here, you can have a business

12:50:48  4    number and not be incorporated.  So a BAS statement is -

12:50:54  5    is done either monthly or quarterly, and it's to pay - to

12:50:59  6    pay tax on the money that you've - the company has

12:51:02  7    earned, or the business has earned.

12:51:08  8       Q.    Okay.  And what are you referring to when you

12:51:10  9    say, "they are disallowing my claim and fining me 50% of

12:51:14 10    the claim"?

12:51:16 11       A.    Probably the - that had to do with the farm

12:51:19 12    equipment and business, the one that I was telling --

12:51:27 13       Q.    There was a slight disconnection there.  Can

12:51:29 14    you repeat your answer?

12:51:30 15       A.    Oh, yeah.  That had to do with the - with the

12:51:33 16    farm, the business that I spoke about earlier.

12:51:38 17       Q.    Understood.

12:51:39 18       A.    And they disallowed it anyway, but I wasn't

12:51:41 19    fined.

12:51:42 20       Q.    Do you know who John Chesher is?

12:51:46 21       A.    Yes, John was a - he did the finances.  He was

12:51:53 22    an accountant for the company.  He worked with Craig most

12:51:58 23    of the time.  He went through all the documents and

12:52:03 24    everything and - with Craig and the ATO.

12:52:13 25       Q.    Did you coordinate at all with Mr Chesher with

12:52:16  1    respect to the ATO investigation?

12:52:19  2        MS MARKOE:   Objection.   Which investigation?   And

12:52:24  3    foundation.

          4    BY MR ROCHE:

12:52:27  5        Q.   You can answer.

12:52:27  6        A.   He - he would come - he came here once because

12:52:30  7    there was going to be a conference call.  He wanted me to

12:52:33  8    sit in on it because Craig would lose his temper quite

12:52:42  9    frequently with the ATO, and so I would try to, I don't

12:52:52 10    know, mitigate things, I guess.  But, look, you know,

12:52:56 11    I hate to say it, but a lot of the stuff that went on

12:52:59 12    I didn't have - like I didn't have a big understanding of

12:53:02 13    it, so - but I think John - I knew John.  I mean, we

12:53:10 14    had - he was also involved in some of the meetings with

12:53:13 15    Greyfog.  But --

12:53:19 16        Q.   Did you sign any documents related to the ATO?

12:53:24 17        A.   I don't know.  I can't remember.  They were

12:53:28 18    focusing - they were focusing on Craig, mostly because

12:53:35 19    the - in my opinion, mostly because the guy that was

12:53:40 20    working at the ATO hated Craig.  They didn't get along,

12:53:45 21    so he would - you know what tax people are like, if they

12:53:49 22    don't like you, they will pick on everything.

12:53:53 23        Q.   Don't want to make an enemy of the taxman.

12:53:55 24        A.   No, this is true.

12:53:58 25        Q.   And when you sign documents, do you sign them

LYNN CARROLL WRIGHT                    124                    January 13, 2020

12:54:02   1    in pen?

12:54:04   2        A.    Yes.   Ballpoint pen, yes.   Never pencil, that

12:54:09   3    I can recall.   If I - if I'm going to be signing a

12:54:14   4    document, I'm smart enough to know that it doesn't go in

12:54:16   5    in pencil, I think.

12:54:28   6        MS MARKOE:    Kyle, can we take a break in a couple

12:54:31   7    minutes to use the restrooms?

12:54:33   8        MR ROCHE:    That's actually good.   I was just about

12:54:36   9    to suggest the same.   Can we take a - it is 54 minutes

12:54:38  10    past the hour.   Let's take a five-minute break and we

12:54:42  11    will come back on the hour.

12:54:44  12        THE VIDEOGRAPHER:    Going off the record at 12.54.

12:54:46  13    End of tape 3.

          14    (21.54pm)

13:00:52  15        (A short break)

          16    (1.07pm)

13:05:39  17        THE VIDEOGRAPHER:    Going back on the record at

13:08:06  18    1.07pm.   Commencement of tape 4.   Proceed.

13:08:11  19        MS MARKOE:    Kyle, just a point for the record.   The

13:08:14  20    way that the documents were sent to us and printed, they

13:08:18  21    don't have any confidentiality stamps on them.   So to the

13:08:21  22    extent that you are going to be showing or intend to show

13:08:25  23    Ms Wright any document that she is not specifically on,

13:08:30  24    we're going to need time to check the confidentiality

13:08:32  25    stamp and determine if that's an appropriate document for

LYNN CARROLL WRIGHT                    125                    January 13, 2020

13:08:34  1    her to look at under the confidentiality order.

13:08:39  2        MR ROCHE:   I don't - I don't intend to use any such

13:08:42  3    document.

13:08:44  4        MS MARKOE:   Okay.  That's good.  I just wanted to

13:08:50  5    make sure that - I'll just need some time, if you do, to

13:08:54  6    check it out.

13:08:55  7        MR ROCHE:   I will let you know if I'm going to use

13:08:57  8    any such document.

13:08:59  9        MS MARKOE:   Fantastic.  Thank you.

13:09:01 10        MR ROCHE:   No problem.

         11    BY MR ROCHE:

13:09:07 12        Q.   Ms Wright, was there ever a formal settlement

13:09:09 13    agreement between you and Craig?

13:09:11 14        A.   Other than the one that you've already shown

13:09:15 15    me, there is - there's just been a verbal agreement for

13:09:25 16    the - the monthly payments.

13:09:28 17        Q.   And when was that verbal agreement made?

13:09:35 18        A.   It was made probably about - I'm just trying to

13:09:39 19    think.  Probably about five years ago.  And it was - it

13:09:48 20    was never put through the courts or put an addendum onto

13:09:55 21    the - the written agreement.

13:09:59 22        Q.   What was the - how did that agreement come to

13:10:06 23    be?

13:10:08 24        MS MARKOE:   Objection.  Relevance.

13:10:11 25        THE DEPONENT:   Well, I - I'm older than Craig by

13:10:16  1    about 18 years, and I think he was concerned that - and

13:10:25  2    I was concerned, too, about my future, you know, like,

13:10:32  3    financially and - and everything like that.  So that's

13:10:36  4    why he - he came to that - that's why --

13:10:43  5    BY MR ROCHE:

13:10:44  6        Q.   And --

13:10:45  7        A.   Yeah, go ahead.

13:10:46  8        Q.   Did you reach out to him or did he reach out to

13:10:48  9    you?

13:10:48  10       A.   No, he reached out to me.

13:10:50  11       Q.   Okay.  And if we could - I believe exhibit 3 is

13:10:58  12   the settlement agreement?

13:11:09  13       A.   Yes.

13:11:12  14       Q.   Hold on, I'm just getting it up myself.  Did

13:11:23  15   you have the original of this document in your

13:11:26  16   possession?

13:11:27  17       A.   No, I have a copy.

13:11:30  18       Q.   You have a copy.  Do you know who has the

13:11:33  19   original?

13:11:35  20       A.   I don't know if it's Michael Shehadie or if

13:11:38  21   it's Craig.

13:11:41  22       Q.   Okay.  And if you see at the top, it says

13:11:43  23   "Appendix"?

13:11:44  24       A.   Yes.

13:11:45  25       Q.   What is this an appendix to?

Plaintiffs conditionally withdraw the counters on 126: 11-127 : 9 if the Court sustains Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K.

LYNN CARROLL WRIGHT                127                 January 13, 2020

Plaintiffs conditionally withdraw the counters on 126: 11-127 : 9 if the Court sustains Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K.

13:11:49  1          A.   I couldn't tell you.  I don't know.  This is

13:11:54  2      all I have, these two pieces.

13:12:01  3          Q.   You have a copy of it; correct?

13:12:03  4          A.   Yes.

13:12:03  5          Q.   And when did you get the copy of it?

13:12:07  6          A.   It was sent to me by Craig's solicitor a week

13:12:14  7      or so ago.  Because I - I guess I said I didn't have

13:12:21  8      any - I didn't have a copy of it.  I just had my divorce

13:12:25  9      decree.

13:12:27 10          Q.   Okay.  And if you can go to the second page of

13:12:36 11      this document?

13:12:37 12          A.   Yes.

13:12:42 13          Q.   Is that your signature?

13:12:45 14          A.   Yes.

13:12:49 15          Q.   And is that - did you sign that signature

13:12:51 16      yourself?

13:12:52 17          A.   Yes.  It looks like it, yep.

13:12:55 18          Q.   And did you sign that in pen?

13:12:58 19          A.   Yeah.

13:12:59 20          Q.   Okay.  Who reached out to you a week ago?

13:13:07 21          A.   I - I'm not sure.  I can't - I think - I think

13:13:09 22      it - I may have spoken to Amanda.  I guess it was during

13:13:16 23      the time of - of trying to arrange this, this deposition,

13:13:25 24      and something - I think somebody asked me if I had the -

13:13:29 25      my divorce decree, and I - I said I had the copy - I had

Plaintiffs conditionally withdraw the counters on 127: 20-129 : 9 if the Court sustains Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K.

LYNN CARROLL WRIGHT                128                January 13, 2020

Plaintiffs conditionally withdraw the counters on 127: 20-129 : 9 if the Court sustains Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K.

13:13:39   1   a divorce decree, but I didn't have the settlement, or

13:13:42   2   that I - I couldn't find a settlement, anyway.  So

13:13:47   3   I think that's when they sent that through to me.

13:13:49   4        Q.   Okay.  And do you have a copy of that email

13:13:53   5   from - with the document attached?

13:13:57   6        A.   Yeah.

13:13:59   7        Q.   Okay.  And that was Amanda who sent you the

13:14:04   8   email?

13:14:05   9        A.   I - I'm not sure who it was.  It might -

13:14:07  10   I think it was Amanda, but it could have been Zaharah.

13:14:14  11   Somebody from that office.

13:14:16  12        Q.   Understood.  And if we could go to the first

13:14:20  13   page of the document?

13:14:21  14        A.   Yeah.

13:14:25  15        Q.   Okay.  So as I understand it, the column on the

13:14:29  16   left is your property; correct?  And the column on the

13:14:33  17   right is Craig's property?

13:14:35  18        A.   Yes.

13:14:36  19        Q.   Okay.  And if we can go down, then, to W&K

13:14:42  20   Information Defense?

13:14:43  21        A.   Yes.

13:14:45  22        Q.   Okay.  And it says,

13:14:48  23        *Existing shares to be split and divided -*
13:14:50       *50% to go to Lynn Wright.*
13:14:53  24

13:14:53  25   And on the left, that's the 50 per cent of shares you

Plaintiffs conditionally withdraw the counters on 127: 20-129 : 9 if the Court sustains Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged ownership interest in W&K.

1  received from Craig Wright?

2       A.    Yeah, I guess so.

3       Q.    Okay.  And so you didn't have any shares until

4  Craig gave you the shares as part of the divorce?

5       A.    I don't - no, I - I don't know.  I guess -

6  I guess he was making it more explicit in here, but, like

7  I said, I didn't pay too much attention, because not a

8  lot - in my - in my understanding, not a lot came from

9  the company.

10      Q.    Okay.

11      A.    Or came --

12      Q.    But there was no - I'm sorry, go ahead?

13      A.    Or came from the association, I should say, you

14  know, because - because of Dave's illness.

15      Q.    Understood.  And - but this document, the

16  divorce settlement between you and Craig, doesn't

17  identify any shares that you had prior to the divorce;

18  correct?

19      A.    No, that's correct.  No.

20      Q.    And so you first got the shares as part of the

21  divorce - the formalized divorce?

22      MS MARKOE:    Objection.

23      THE DEPONENT:    I don't know - no, I think - I think

24  that I - I got a portion of the company when it was set

25  up, but this sort of puts it in writing, type thing.

1    BY MR ROCHE:

13:16:46  2        Q.   Understood.  And do you always - when did you

13:16:53  3    get your MBA?

13:16:54  4        A.   I finished the MBA in 2005 - 2004, I think,

13:17:00  5    2005 - around there.

13:17:02  6        Q.   Where did you get your MBA from?

13:17:05  7        A.   University of New England.

13:17:08  8        Q.   Is that in Australia?

13:17:10  9        A.   That's - yes, it's in - it's not the American

13:17:11  10   one; it's the Australian one.  Although the American one

13:17:15  11   sounds a whole lot more prestigious, doesn't it?

13:17:18  12       Q.   I don't know.  Australia - I know there is a

13:17:22  13   lot of good schools in Australia.  And do you always sign

13:17:27  14   your name with the MBA?

13:17:29  15       A.   I used to.  I don't anymore, because it's a

13:17:33  16   little bit stupid now.

13:17:46  17       Q.   Okay.  And if you go to the bottom of this

13:18:05  18   document - sorry, I'm just reading it, there is a lot of

13:18:08  19   text.  The very last box?

13:18:10  20       A.   Yeah.

13:18:11  21       Q.   It says:

13:18:13  22            *A formal property settlement may be drafted*
13:18:15             *to formalise these [agreements] but may not*
13:18:17  23         *materially alter this agreement.*

13:18:21  24   Was a formal property settlement ever drafted?

13:18:24  25       A.   Not to my knowledge, no.

Plaintiffs conditionally withdraw the counter on L.17-25 if the Court sustains
Pltfs' relevance objections to all testimony concerning Ms. Wright's alleged
ownership interest in W&K.

LYNN CARROLL WRIGHT                131              January 13, 2020

13:18:42  1          Q.    Sorry, I'm just - there is a lot of documents

13:18:45  2     I've got on my end and - yeah.

13:18:50  3          MR ROCHE:    Sati, if you could please introduce

13:18:57  4     tab 35, and I believe this - are we on exhibit 13 or 14.

13:19:11  5          THE COURT REPORTER:    Thirteen.

          6               (Exhibit 13 marked for identification)

13:19:15  7          MR BRENNER:    Kyle, which tab was that?

13:19:18  8          MR ROCHE:    Tab 35.

13:19:21  9          MR BRENNER:    Thank you.

13:19:28 10          MR ROCHE:    And this is Bates starting in - excuse

13:19:33 11     me, ending 01212940.

         12     BY MR ROCHE:

13:19:46 13          Q.    Do you recognize this document?

13:19:50 14          A.    Yes, it's - yeah, that was - that was when he

13:20:04 15     was turning over, sort of, Information Defense, so that

13:20:13 16     it will be - come under - it would come under Cloudcroft.

13:20:18 17     I think, you know, this would - this is mostly - looks

13:20:21 18     like it comes from a textbook.

13:20:25 19          Q.    The agreement comes from a textbook?

13:20:27 20          A.    No, it looks like it comes - a lot of it comes

13:20:30 21     from our - our - some of our textbooks and stuff over

13:20:37 22     here.

13:20:38 23          Q.    Okay.  And if we go to the second page of the

13:20:41 24     document?

13:20:43 25          A.    Yeah.

LYNN CARROLL WRIGHT                    132                    January 13, 2020

13:20:45  1        Q.   It says:

13:20:46  2            *The parties have entered into an agreement*
13:20:48               *for THE PURCHASER to purchase the business*
13:20:50  3            *of THE SELLER and not to obtain shares in*
13:20:52               *the Company.  This includes the IP and an*
13:20:55  4            *agreement to maintain the existing client*
13:20:58               *services.*
          5

13:21:00  6    So let's focus on it.  So what's the IP that this

13:21:04  7    agreement refers to?

13:21:05  8        A.   Probably for Spyder and - and for the other -

13:21:11  9    the other - the security IP and stuff that Craig

13:21:19 10    developed, that came under Information Defense.  And he -

13:21:28 11    he - as - as you saw from the divorce, the settlement, it

13:21:37 12    was on loan, basically.  The IP was on loan to Cloudcroft

13:21:43 13    for five years.  But as far as - the only - the only IP

13:21:50 14    that - that came over, that I was aware of --

13:21:57 15        Q.   Okay, and --

13:21:59 16        A.   -- was --

13:22:00 17        Q.   I'm sorry, go ahead.

13:22:01 18        A.   Is, like, the Spyder, "Security and risk" - he

13:22:11 19    puts his university studies as IP, but --

13:22:15 20        Q.   Okay.  And if we could go back to exhibit 3,

13:22:18 21    which is the settlement --

13:22:19 22        A.   Yes.

13:22:21 23        Q.   -- and under the very - the first big box says:

13:22:26 24            *Craig Wright to provide services ... to*
13:22:28               *Cloudcroft for 2 years.*
         25
13:22:31               *ALL IP to remain with Craig Wright.*

Does that relate to this agreement?

MS MARKOE:   Kyle, you have missed a couple of words there, but the document will speak for itself.

THE DEPONENT:   So I answer?

BY MR ROCHE:

Q.   You can answer.

A.   Yes.  Yeah, it would - because this was the - yes, it would pertain to this agreement, because it was when Information Defense was coming under Cloudcroft umbrella.

MR ROCHE:   Understood.  Okay.  I don't have many more questions, but let's take a quick break and let me just check my notes and we'll come back and I think we'll be pretty close to wrapping up.

THE DEPONENT:   Okay.

THE VIDEOGRAPHER:   Going off the record at 1.23pm.

MR ROCHE:   And - it's 9.23.  Let's come back at 30 minutes after the hour.

MS MARKOE:   Sounds good.

THE VIDEOGRAPHER:   Tape stopped.

(1.23pm)

        (A short break)

(1.32pm)

THE VIDEOGRAPHER:   Going back on the record at 1.32.  Proceed.

13:32:42 1       MR ROCHE:   Sati, do you have tab 54 printed up?

13:32:53 2       MS NAGRA:   I do indeed.  I'm just retrieving it.

3       MR ROCHE:   If you can hand - yes.

4  BY MR ROCHE:

13:32:57 5     Q.   Okay.  You have been handed what has been

13:32:58 6  marked as Bates ending in 01559250.  Do you see the first

13:33:09 7  page, it says:

13:33:10 8       *Dear Mr Westwood;*
13:33:12          *Please be advised that I, Lynn Wright, have*
13:33:16 9       *taken over the business of Information*
13:33:17          *Defense.  I acquired the business of the*
13:33:19 10      *company as part of a separation agreement*
13:33:20          *with Dr ... Wright.*
13:33:22 11      *Sincerely,*
13:33:23          *Lynn Wright.*

12

13:33:24 13  Do you recognize this document?

13:33:26 14     A.   Yes.

13:33:31 15     Q.   Okay.  And at the time this document was sent,

13:33:33 16  was your separation agreement with Craig Wright complete?

13:33:39 17     A.   It was on its - I guess it was on its way to

13:33:42 18  being - I didn't know what we were - what the separation

13:33:45 19  agreement was going to be.  He - we discussed Information

13:33:55 20  Defense, because he - he was going to hand that over to

13:33:57 21  me to try to give me some sort of an income stream.

13:34:03 22     Q.   Okay.

13:34:03 23     A.   But - but it didn't eventuate that way.

13:34:08 24     Q.   Was the agreement that - exhibit 3, was that

13:34:15 25  completed at the time this was sent to Mr Westwood?

LYNN CARROLL WRIGHT                135                    January 13, 2020

13:34:21  1          A.   Well, the date on this, on the - what do you

13:34:28  2     call it? - the agreement, is "June 2011", so this -

13:34:36  3     that - and this says "March 2011".  So it was in the

13:34:40  4     process of becoming complete, I guess.

13:34:43  5          Q.   Okay.  So was there any separation agreement

13:34:47  6     before March 2011?

13:34:50  7          A.   Nothing on paper.

13:34:54  8          Q.   Understood.  And I just - I wanted to talk

13:35:00  9     briefly about your communications with Dave Kleiman?

13:35:04 10          A.   Yes.

13:35:05 11          Q.   Did you communicate with Dave Kleiman over the

13:35:08 12     phone about W&K?

13:35:10 13          A.   No.

13:35:13 14          Q.   Did you communicate with him via email?

13:35:16 15          A.   No, not about W&K, no.

13:35:19 16          Q.   Okay.  Did you communicate with --

13:35:22 17          A.   I - hang on a second.  I'm just thinking.  It

13:35:24 18     didn't - it - I think I emailed him a couple of times

13:35:29 19     asking if he had gotten a response to the tenders that

13:35:34 20     were put in, but it didn't - I never heard back from him.

13:35:42 21     And it - it - I think it was just, "Hey, Dave, how are

13:35:46 22     you?  Have you heard anything?"

13:35:49 23          Q.   Understood.  Outside of that communication, was

13:35:51 24     there any other communications between you and Dave

13:35:54 25     related to W&K?

LYNN CARROLL WRIGHT                 136              January 13, 2020

13:35:55  1        A.    No.

13:36:05  2        Q.    Ms Wright, are you available at all, the rest

13:36:11  3   of the week, if the court orders another deposition?

13:36:15  4        A.    No.  I --

13:36:18  5        Q.    Okay.  Just so we can inform the court, maybe,

13:36:20  6   what are your conflicts for the rest of the week?

13:36:24  7        A.    I have medical issues that I'm going to be in -

13:36:28  8   I had - I had a positive mammogram, so I have to be in

13:36:33  9   for further tests and to see where we're going to go.

13:36:40 10        Q.    Okay.  And just so I know for scheduling

13:36:44 11   purposes, when - and I'm sorry to hear that - when - you

13:36:50 12   know, when are those anticipated to be complete?

13:36:53 13        A.    Well, it depends on what they need to do.

13:36:58 14        MS MARKOE:   Kyle, that's personal medical history,

13:37:00 15   and she has told that you she doesn't have availability.

13:37:03 16   What I'd like to understand also is why you think you are

13:37:07 17   entitled to another deposition under any circumstance,

13:37:11 18   when you have had an opportunity to ask her questions

13:37:14 19   now.

13:37:17 20        MR ROCHE:   I am not --

         21   BY MR ROCHE:

13:37:18 22        Q.    You can answer the question.

13:37:23 23        A.    I don't know.  I don't know.  It - as I said,

13:37:26 24   it depends on what they have planned and if I have to

13:37:30 25   have surgery or if I have to start chemo or anything like

LYNN CARROLL WRIGHT                137                January 13, 2020

13:37:33  1    that.

13:37:36  2        Q.   Understood.  Were you - did you have any

13:37:37  3    medical appointments last week?

13:37:41  4        MS MARKOE:   Kyle, enough.  I mean, really?

13:37:42  5    BY MR ROCHE:

13:37:45  6        Q.   Ms Wright, you can answer the question.

13:37:47  7        MS MARKOE:   Why wouldn't you just ask her this

13:37:49  8    question --

          9    BY MR ROCHE:

         10        Q.   Ms Wright --

13:37:49 11        MS MARKOE:   -- did she give any other date prior to

         12    today's --

         13    BY MR ROCHE:

         14        Q.   Ms Wright --

13:37:53 15        MS MARKOE:   -- prior to this deposition.  That's

13:37:54 16    really what your question is, and she can answer that

13:37:56 17    question.  We all know the answer to that question.

         18    BY MR ROCHE:

13:38:01 19        Q.   Okay.  Were you available at all last week for

13:38:03 20    a deposition?

13:38:05 21        A.   I'm just trying to think what went on last

13:38:08 22    week.  I think for two days I wasn't.

13:38:17 23        MR ROCHE:   Okay.  Understood.  No further

         24    questions.

         25        THE COURT REPORTER:   Mr Roche, you didn't mark that

LYNN CARROLL WRIGHT                138                January 13, 2020

1   last document.  Is that to be exhibit 14?

2        MR ROCHE:    That would be exhibit 14, yeah.  So,

13:38:34  3   yeah.  Let's just clean up the record.  Exhibit 14 is

13:38:36  4   Bates DEFAUS_01559250.

5            (Exhibit 14 marked for identification)

13:38:46  6        THE VIDEOGRAPHER:    This is the videographer.  Do we

13:38:48  7   have any other questions?

13:38:50  8        MS MARKOE:    I have a few very short follow-up

13:38:51  9   questions for you, and I promise I will be very, very

13:38:54 10   quick.

13:38:55 11        THE DEPONENT:    Okay.

12   EXAMINATION BY MS MARKOE:

13:38:57 13        Q.   I think with some of the names of the

13:38:59 14   companies, it gets a little confusing.  So we've talked

13:39:02 15   about two very similarly named companies - at least two

13:39:07 16   very similarly named companies - and the two that I want

13:39:10 17   to talk to you about right now are W&K Information

13:39:17 18   Defense - W&K Information Defense, LLC, and then there is

13:39:23 19   another company which is Information Defense Proprietary

13:39:32 20   Limited?

13:39:32 21        A.   Yes.

13:39:33 22        Q.   I understand - where was Information Defense

13:39:39 23   Proprietary Limited set up?

13:39:43 24        A.   When or where?

13:39:45 25        Q.   Where?

13:39:47  1          A.   It was set up here, and was - it was - it ran

13:39:57  2     sort of as a separate entity, and then it came under the

13:40:05  3     auspices, if you will, of Cloudcroft when it switched

13:40:11  4     over to me.

13:40:15  5          Q.   And W&K Information Defense, LLC, by contrast -

13:40:18  6     where was that set up?  In what country was that set up?

13:40:22  7          A.   As far as I know, it was set up here as well.

13:40:27  8          Q.   Are you aware - well, you testified that one of

13:40:32  9     the reasons for W&K - and let's just call it "W&K" to

13:40:39 10     avoid confusion --

13:40:40 11          A.   Yeah.

13:40:41 12          Q.   -- was so that you would have a US presence for

13:40:43 13     the tenders that you were submitting to the Department of

13:40:47 14     Homeland Security?

13:40:47 15          A.   Yeah.  Oh I see --

13:40:51 16          Q.   I think that's what your testimony was?

13:40:52 17          A.   Okay, I see what you are getting at now.  I -

13:40:55 18     it - I guess it - it was discussed between Craig and -

13:40:57 19     and Dave, and I - and Dave - I guess they - well,

13:41:03 20     obviously it's probably more beneficial if it had been

13:41:06 21     set up there, but that's something that you would have to

13:41:12 22     discuss with Craig, because I honestly don't know.

13:41:19 23          Q.   Okay.  All right.  Give me one quick second.

13:41:24 24          A.   Yep.

13:41:26 25          MS MARKOE:   All right.  I don't have any further

13:41:27   1      questions.

13:41:31   2            THE VIDEOGRAPHER:    Okay.

13:41:35   3            MR ROCHE:    I have no further questions as well.

13:41:37   4            THE VIDEOGRAPHER:    Okay.  Going off the record at

13:41:39   5      1.41pm.  End of video-taped deposition of Lynn Wright.

13:41:45   6      Total number of tapes, four.

13:41:48   7      Tape stopped.

           8      (1.41pm)

           9                    **(Deposition hearing concluded)**

          10                 **(Exhibits retained by the court reporter)**

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

LYNN CARROLL WRIGHT                    141                    January 13, 2020

1                          CERTIFICATE OF WITNESS

2

3       I, *Lynn Carroll Wright*, hereby certify that I have read
        the foregoing pages of my deposition of testimony taken
4       in these proceedings on January 13, 2020, and with the
        exception of the changes listed below and/or corrections,
5       if any, find them to be a true and accurate transcription
        thereof.

6

7                               ERRATA

8       Page/Line No.      Description          Reason for Change

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     Signed..............................

24

25     Date................................

*Epiq*
*Suite 204, Level 2, 105 Pitt Street, Sydney, NSW 2000*
*Phone: Int + 61-2-92253500*

LYNN CARROLL WRIGHT                    142                    January 13, 2020

1                       CERTIFICATE OF COURT REPORTER

2

3        I, *Sally Hicks of Epiq, hereby certify that the foregoing*
         *testimony was recorded by me stenographically and*
4        *thereafter transcribed by me, and that the foregoing*
         *transcript is a true and accurate verbatim record of the*
5        *said testimony, to the best of my skill and ability.*

6

         *I further certify that I am not a relative, employee,*
7        *counsel or otherwise financially involved with any of the*
         *parties of the within cause, nor am I an employee or*
8        *relative of any counsel for the parties, nor am I in any*
         *way interested in the outcome of the within cause.*

9

10

11

12

13

14
         *Signed* ................................
15                        *Sally Hicks*

16

17

18       *Date*.....................................

19

20

21

22

23

24

25

*Epiq*
*Suite 204, Level 2, 105 Pitt Street, Sydney, NSW 2000*
*Phone: Int + 61-2-92253500*