**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.  18-cv-80176-BLOOM/Reinhart**

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendant's Motion for Summary Judgment, ECF No. [487] ("Defendant's Motion"), and Plaintiffs' Motion for Partial Summary Judgment on Defendant's Affirmative Defenses, ECF No. [498] ("Plaintiffs' Motion")[1] (collectively, the "Motions"). The Court has considered the Motions, all supporting and opposing submissions (ECF Nos. [526], [533], [560], and [561]),[2] the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendant's Motion is denied, and Plaintiffs' Motion is granted in part and denied in part.

---

[1] Plaintiffs' Motion was filed under seal. On May 12, 2020, the Court denied Plaintiffs' motion to seal Plaintiffs' Motion, ECF No. [493], and directed Plaintiffs to refile the Motion with redactions. *See* ECF No. [502]. On May 18, 2020, Plaintiffs' Motion was refiled with redactions. *See* ECF No. [511]. For ease of reference, the Court cites to ECF No. [498].

[2] Plaintiffs' response to Defendant's Motion was filed under seal, ECF No. [533], and Plaintiffs' reply in support of Plaintiffs' Motion was filed under seal, ECF No. [560]. On May 25, 2020, the Court denied Plaintiffs' motion to seal Plaintiffs' response, ECF No. [530], and directed Plaintiffs to refile the response with redactions. *See* ECF No. [538]. The Court similarly denied Plaintiffs' motion to seal their reply, ECF No. [563]. On June 1, 2020, Plaintiffs' response was refiled. *See* ECF No. [549]. For ease of reference, the Court cites to ECF No. [533]. On June 12, 2020, the Court ordered the Clerk of Court to unseal Plaintiffs' reply. *See* ECF No. [579].

## <u>TABLE OF CONTENTS</u>

I.      **BACKGROUND AND MATERIAL FACTS**……………………………………**3**

II.     **LEGAL STANDARD**……………………………….........................**25**

III.    **DISCUSSION**…………………………………………...............**28**

A.      **Defendant's Motion**……………………………………………**28**

      1.      *Subject matter jurisdiction and Ira Kleiman's authority to file the*
             *action on behalf of W&K*………………………………………**32**

      2.      *Statute of limitations*………………………………….................**36**

           a.      A genuine dispute of material fact exists whether the alleged
                  partnership ended in 2011………………………………………..**40**

           b.      The Australian judgments did not trigger a statute of limitations
                  commencing on November 6, 2013……………………………..**41**

      3.      *Oral partnership and statute of frauds*………………………...............**52**

           a.      A genuine dispute of material fact exists whether Defendant and
                  Mr. Kleiman entered into an oral partnership…………………**54**

                i.      Plaintiffs' approach………………………………**54**

                ii.     Defendant's approach…………………………………**57**

           b.      The statute of frauds does not bar claims based on the oral
                    partnership………………………………………………………**62**

      4.      *Preemption*……………………………………………… **64**

      5.      *Fraud claim*…………………………………………………...**68**

           a.      Fraud………………………………………………………**69**

           b.      Constructive fraud……………………………………………**74**

B.      **Plaintiffs' Motion**…………………………………………**77**

      1.      *Accord and satisfaction, release, waiver, payment, set-off, and failure*
             *to mitigate damages*……………………………………………**77**

      2.      *Estoppel*…………………………………………………**79**

      3.      *Res judicata and collateral estoppel*………………………………**83**

      4.      *Statute of limitations and laches*……………………………………**85**

      5.      *Good faith*………………………………………………………**86**

      6.      *Unclean hands*………………………………………………**87**

**7.**   *Statute of frauds*……………………………………………………………**90**

**8.**   *Personal jurisdiction*………………………………………………………**92**

**CONCLUSION**………………………………………………………………………**93**

*****************************

## I.   BACKGROUND AND MATERIAL FACTS

The Court assumes the parties' familiarity with the general factual allegations and nature of this case. *See, e.g.*, ECF Nos. [68],[83], [87], [265], and [373]. The initial complaint was filed on February 14, 2018. ECF No. [1]. On January 14, 2019, Plaintiffs filed the operative Second Amended Complaint ("Complaint"), ECF No. [83]. The Complaint alleges that Defendant and David Kleiman ("David Kleiman" or "Mr. Kleiman") were former business partners that created Bitcoin[3] under the pseudonym Satoshi Nakamoto. Between 2008 and before David Kleiman's death in April 2013, the two allegedly worked together on Bitcoin, mining bitcoins and developing blockchain related intellectual property. Starting in 2008 through February 2011, they allegedly worked together as a partnership, and from February 2011 until Mr. Kleiman's death in 2013, they conducted their work through Plaintiff W&K Info Defense Research LLC ("W&K"). During this period, significant amounts of bitcoins allegedly were mined and acquired by Defendant and Mr. Kleiman and valuable intellectual property was developed. This lawsuit concerns a dispute over the ownership of bitcoins and Bitcoin-related intellectual property.

The Complaint alleges that following David Kleiman's death, Defendant perpetrated a fraudulent scheme to seize Plaintiffs' bitcoins and their rights to certain blockchain related intellectual property. This scheme included, among other things, producing fraudulent documents

---

[3] "Bitcoin" can refer to both a computer protocol and a unit of cybercurrency. The Court uses "Bitcoin" to refer to the particular cybercurrency system (like "the U.S. Dollar") and "bitcoin" to refer to the unit of exchange (like "dollars").

and forging David Kleiman's signatures on documents to purportedly show that David Kleiman transferred to Defendant bitcoins and intellectual property rights belonging to David Kleiman and W&K before David Kleiman's death. Since then, Defendant has taken sole ownership and control over the bitcoins and related intellectual property and refuses to return any bitcoins or intellectual property to either the estate or W&K. Plaintiffs seek relief against Defendant through various causes of action:[4] conversion (Count I); unjust enrichment (Count II); misappropriation (Count III); violation of the Defend Trade Secrets Act (Count IV); breach of fiduciary duty (Count V); breach of partnership duties of loyalty and care (Count VI); fraud (Count VII); constructive fraud (Count VIII); permanent injunction (Count IX); and civil theft (Count X).

On May 8, 2020, the parties filed the instant Motions and accompanying statements of material fact. *See* ECF Nos. [488] ("Def.'s SOMF") and [495] ("Pls.' SOMF").[5] The parties then filed responses to the Motions on May 22, 2020, *see* ECF Nos. [526] ("Defendant's Response") and [533] ("Plaintiffs' Response"),[6] and counterstatements of material facts. *See* ECF Nos. [531] ("Def.'s CSOMF") and [534] ("Pls.' CSOMF").[7] On June 2, 2020, the parties filed replies in

---

[4] On December 27, 2018, the Court dismissed with prejudice as time barred Plaintiffs' claims for misappropriation (Count III) and violation of the Defend Trade Secrets Act (Count IV) under a preceding version of the Complaint. *See* ECF No. [68].

[5] Plaintiffs' Statement of Undisputed Material Facts, ECF No. [495], was originally filed under seal. On May 25, 2020, the Court directed the Clerk of Court to unseal this filing. *See* ECF No. [539].

[6] Plaintiffs' Response was originally filed under seal. On June 1, 2020, Plaintiffs refiled this filing without redactions. *See* ECF Nos. [549] and [566].

[7] Plaintiffs' Opposing Statement of Material Facts, ECF No. [534], was filed under seal. On June 1, 2020, Plaintiffs refiled this filing with redactions. *See* ECF No. [550].

support of the Motions. *See* ECF No. [560] ("Plaintiffs' Reply")[8] and ECF No. [561] ("Defendant's Reply").

Defendant makes six primary arguments: (1) Plaintiffs' claims are time-barred, and the statute of limitations accrued no later than November 6, 2013; (2) Plaintiffs cannot establish that an oral partnership existed between Defendant and Mr. Kleiman, but even if there was such a partnership, it would be void for vagueness and claims based on it would be barred by the statute of frauds; (3) Plaintiffs' common law claims are preempted and displaced by Fla. Stat. § 688.008; (4) the Court lacks subject matter jurisdiction based on evidence of W&K's membership; (5) Ira Kleiman, Mr. Kleiman's brother and the estate's personal representative, lacked authority to file this action on behalf of W&K; and (6) Plaintiffs' fraud and constructive fraud claims cannot be established based on the record. *See generally* ECF No. [487].

Plaintiffs respond as follows: (1) their claims are not barred by the statute of limitations, and regardless their claims would be tolled by the doctrines of fraudulent concealment and equitable estoppel; (2) the record contains sufficient evidence to support the existence of a partnership under Florida law; (3) claims based on the alleged partnership are not barred by the statute of frauds; (4) Defendant fails to present any credible evidence that diversity jurisdiction is lacking, and supplemental jurisdiction should be exercised alternatively; (5) Ira Kleiman had authority to file this action on behalf of W&K; (6) Plaintiffs' fraud and constructive fraud claims are well supported by record evidence; and (7) Plaintiffs' claims are not preempted. *See generally* ECF No. [533]. Defendant replies that Plaintiffs' claims are time-barred, neither fraudulent

---

[8] Plaintiffs' Reply was originally filed under seal. On June 15, 2020, the Court directed the Clerk of Court to unseal this filing. *See* ECF No. [579].

concealment nor equitable estoppel apply to toll the limitations period, there is no evidence of an oral partnership, and the statute of frauds applies. *See generally* ECF No. [561].

Plaintiffs seek summary judgment on each of Defendant's fourteen affirmative defenses: accord and satisfaction; release; waiver; payment; set-off; failure to mitigate damages; estoppel; res judicata and collateral estoppel; statute of limitations; laches; good faith; unclean hands; statute of frauds; and lack of personal jurisdiction. *See generally* ECF No. [498]. Defendant responds that Plaintiffs' claims are time-barred; laches and unclean hands bar Plaintiffs' claims for equitable relief; the statute of frauds applies; W&K's claims are barred by res judicata; Plaintiffs are judicially estopped and equitably estopped from asserting their claims; Defendant did not abandon his "Coin-Exch" defenses; and he is entitled to preserve his defense of lack of personal jurisdiction. *See generally* ECF No. [526]. Plaintiffs reply as follows: (1) the Court should deem admitted facts in their statement of material facts; (2) they are entitled to summary judgment on the Coin-Exch defenses; (3) Defendant's statute of limitations and laches defenses fail because of lack of evidentiary support, the doctrines of equitable estoppel and fraudulent concealment, Plaintiffs' claims are timely and, in any event, Defendant was not prejudiced by any delayed filing; (4) the statute of frauds defense fails; (5) Defendant's estoppel defense is legally unavailing; (6) Defendant cannot establish his res judicata defense because he forfeited any opposition to Plaintiffs' arguments that preclusion would defeat the ends of justice and the claims were not decided on the merits, res judicata cannot apply based on the Australian lawsuits given the lack of service of process, and Defendant's extrinsic fraud precludes applying res judicata; (7) Defendant's "new" unclean hands defense fails; (8) the personal jurisdiction defense cannot stand; and (9) summary judgment is warranted on Defendant's good faith defense. *See generally* ECF No. [560].

Case No.  18-cv-80176-BLOOM/Reinhart

Based on the parties' statements and counterstatements of material facts,[9] along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### A.   The relationship between David Kleiman and Defendant

In January and February 2013, Defendant referred to Mr. Kleiman as his "partner." Pls.' CSOMF at ¶ 51 (citing ECF Nos. [534-1]; [534-2]; [534-3]). Defendant considered Mr. Kleiman to be his "best friend." ECF Nos. [511-1] at 200:3; [534-4] at 140:14; 149:15-22; 193:7-9; 196:9-10; 198:2-5; 202:25-203:1. In January 2013, Defendant emailed Mr. Kleiman to ask, "I know you have been paying people from Bitcoin in your own wallet, is this enough to account for it all? It has been a shitload of work." Pls.' CSOMF at ¶ 142 (citing ECF No. [534-1] at 3).

Defendant told Ira Kleiman in May 2014 that he "did partner ;)" with David Kleiman. *Id.* at ¶ 89 (citing ECF No. [83-2]). Further, in May 2015, Defendant wrote an email to Michele Seven in which he stated that "[i]n the past, David Kleiman was my best friend and business partner." *Id.* at ¶ 90 (citing ECF No. [534-9] at 1). In that same email, Defendant stated that he had known Mr. Kleiman since the 1990s and they "have many shared secrets." *Id.* at ¶ 128 (citing ECF No. [534-9] at 1). He also texted Mark Ferrier in February 2013 that "my partner Dave and I have been

---

[9] In Plaintiffs' Opposing Statement of Material Facts, ECF No. [534], Plaintiffs asserted additional material facts, *see id.* at 12-26, in response to Def's SOMF. Defendant did not file a reply statement of material facts to Pls.' CSOMF in violation of Local Rule 56.1(a)(3) and 56.1(b)(3)(A). A party's failure to controvert an opposing statement of material facts deems those facts admitted. *See* L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts[.]"). This is so even for purposes of a cross-motion for summary judgment. *See, e.g.*, *Franklin v. CitiMortgage, Inc.*, No. 1:15-CV-4396-LMM-WEJ, 2016 WL 11577288, at *1 n.1 (N.D. Ga. Sept. 8, 2016), *report and recommendation adopted*, No. 1:15-CV-4396-LMM-WEJ, 2016 WL 11577241 (N.D. Ga. Oct. 12, 2016); *Cohen v. DeKalb Cty. Sch. Dist.*, No. 1:09-CV-1153-WSD, 2012 WL 12948996, at *1 n.1 (N.D. Ga. June 26, 2012) (collecting cases). Thus, facts alleged in Pls.' CSOMF that Defendant failed to address with a reply statement of material fact are deemed admitted where they are otherwise supported by evidence in the record as are facts elsewhere that have not been controverted properly by a party.

working on something of a while now. . . . my business partner Dave . . . Sorry. My best frined [sic] and business partner died a few days back." *Id.* at ¶ 91 (citing ECF No. [534-3] at 2-3). He also told Australian police, in the context of a police investigation, that "[t]his is an idea that I had developed with my business partner David KLEINMAN [sic] (David) for a period of over a decade." *Id.* at ¶ 93 (citing ECF Nos. [534-11] at 4; [534-12] at 4; and [534-47] at 4).

When asked in a media training session whether he was "trying to claim all the credit" for Bitcoin or if Satoshi Nakamoto was instead a "combination of people and minds," Defendant responded that he "had a lot of help. In particular a friend of mine who died a few years ago, Dave Kleiman, gave me a lot of help[.]" *Id.* at ¶ 96 (citing ECF No. [534-13] at 1). In that same session, when asked how many bitcoins he mined, Defendant stated that he "mined quite a number and I was with my partner, so to speak, in all of this, Dave, we mined quite a lot." ECF No. [534-13] at 6. He also stated that "[h]ow many people were involved in Satoshi is probably a better question. That was two of us." *Id.* Defendant further stated that "Dave was a key part of everything that I did. Dave spoke as Satoshi," and he and Mr. Kleiman are Satoshi Nakamoto. *Id.* at 7. Additionally, when asked who created the pseudonym Satoshi, he stated "[m]ostly myself, and a little bit with Dave. Both of us acted. Dave was the nice version of Satoshi." *Id.* at 20.

In October 2013, Defendant wrote an email to Michael Hardy and others in which he stated, "David Reese and David Kleiman have both been essential parts of this project. . . . David Kleiman was my best friend." *Id.* at ¶ 100 (citing ECF No. [534-16] at 1). In March 2014, Defendant wrote an email to Ira Kleiman in which he stated "I will not take from Dave. I had an idea, but it would never have executed without Dave[.] Dave was my sounding board, he fixed my errors." *Id.* at ¶ 102 (citing ECF No. [534-17] at 3). Additionally, in an interview with the ATO, Defendant reportedly stated, "[w]hen we were starting originally, we looked at bitcoin value of probably $20

million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million." *Id.* at ¶ 104 (citing ECF No. [534-18] at 11). He also told the ATO that "[t]here was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies," and that the trust was set up as a "funding mechanism . . . for research." *Id.* at ¶¶ 105, 132 (citing ECF No. [534-18] at 7).

In April 2014, Defendant wrote to Ira Kleiman that the "Tax office know[s] that Dave and I have been working on this since 2008." *Id.* at ¶ 106 (citing ECF No. [83-20] at 1). He also wrote to Ira Kleiman in March 2014 that "I am not a team player. I am a terrible boss and slave driver, but with Dave I was far more." *Id.* at ¶ 108 (citing ECF No. [534-17] at 4). In May 2017, when Ira Kleiman asked Defendant if Mr. Kleiman had compiled the code for the first version of Bitcoin, Defendant replied, "Yes. We both played. Dave compiled. He never just used binaries." *Id.* at ¶ 111 (citing ECF No. [534-19]). Relatedly, in March 2014, Defendant told Ira Kleiman that Defendant "had math skills and some coding, that frankly was crud" but "Dave could edit his way through hell and back." *Id.* at ¶ 112 (citing ECF No. [534-17] at 4).

In November 2015, Defendant told Mr. Paige that reporters "ignored the stuff Dave and I did when he was alive. . . . Dave helped design the firm one and as you know did a fair amount of research with me. Most yet to be completed and published." *Id.* at ¶ 125 (citing ECF No. [83-8] at 13). He later wrote "[w]hen it all comes out, there is no way Dave will be left out. We need at least a year more." *Id.* at ¶ 125 (citing ECF No. [83-8] at 12). Defendant credited Mr. Kleiman with their shared work on "smart contracts." *Id.* at ¶ 126 (citing ECF No. [534-12]). In February 2014,

Defendant wrote an email to Mr. Conrad and Mr. Paige stating "Dave and I had a project in the US. He ran it there. We kept what we did a secret." *Id.* at ¶ 127 (citing ECF No. [534-24] at 3).

In April 2014, Defendant wrote to Ira Kleiman that he had "convinced [Mr. Kleiman] that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time." *Id.* at ¶ 152 (citing ECF No. [83-20] at 7). In June 2015, Ramona Watts (Defendant's wife) wrote to Ira Kleiman, stating "Craig and I have put our entire life savings into this business, as did Dave[.]" *Id.* at ¶ 147 (citing ECF No. [534-31] at 1).

Defendant and Mr. Kleiman shared control over the bitcoin private keys that were shared online. *Id.* at ¶ 149 (citing ECF Nos. [534-32] and [534-33] at 1). In April 2014, Defendant wrote to Ira Kleiman that "[i]n doing what we wanted to do, Dave and I arranged for the sale or [sic] around 500,000 BTC." *Id.* at ¶ 150 (citing ECF No. [534-26] at 1). Defendant told the ATO that "Dave has . . . an estate . . . and I wanted to make sure I didn't rip off his estate and just go, 'Ha ha, it's my software.'" ECF No. [534-18] at 42. Further, in a February 2019 blogpost, Defendant stated that "[i]n order to fund my work, Dave Kleiman and I sold code that was used in gaming illegal out of countries such as Costa Rica. David took the biggest risk because gambling is not illegal in Australia. Nothing he was able to earn in Panama was able to be repatriated legally in the USA." Pls.' CSOMF at ¶ 153 (citing ECF No. [534-34] at 4).

According to Plaintiffs, Satoshi Nakamoto is known to have communicated from at least two email addresses, Satoshi@vistomail.com and Satoshin@gmx.com. *Id.* at ¶ 154 (citing ECF No. [500-5]). In February 2014, Defendant wrote an email to Ira Kleiman stating that Mr. Kleiman "had the vistomail account" and Defendant "had the gmx one." *Id.* at ¶ 155 (citing ECF No. [534-

35] at 1). Defendant told James Nguyen that he and Mr. Kleiman "both posted from Satoshi account sometimes." *Id.* at ¶ 156 (citing ECF No. [534-16] at 197:34).

### B.   David Kleiman's experience

A declaration submitted by Mr. Kleiman in a Florida state court lawsuit stated that he is a "recognized computer security expert who has worked in the Information Technology sector since 1990. I specialize in computer forensics, data security, and analysis. I have been accepted to testify as a computer expert witness in the United States federal courts, Florida state courts, and United States military courts. I have also served as a court-appointed neutral expert on computer forensic matters. I am a former Florida Certified Law Enforcement Officer, and I have assisted law enforcement agencies in computer crime analysis. Additionally, I am a published author on the subjects of information security and computer forensics." ECF No. [488-12] at 15-16.

### C.   Trusts and bitcoin mining

In May 2012, Defendant wrote an email to Mr. Kleiman in which he stated that "we do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions[.]" *Id.* at ¶ 133 (citing ECF No. [83-13]). Defendant told the ATO that all of the assets of the Tulip trust were sourced from him and Mr. Kleiman. *Id.* at ¶ 134 (citing ECF No. [534-25] at 7). He also told the ATO that he and Mr. Kleiman had 1.1 million bitcoin, which was worth approximately $20 million but by "Dave's death, that had gone up to . . . $100 million." *Id.* at ¶ 135 (citing ECF No. [534-18] at 11).

In March 2011, Mr. Kleiman wrote an email to Defendant in which he stated, regarding profits and losses, "[a]re we ever going to get a wage on this? Just kidding I trust you." *Id.* at ¶ 140 (citing ECF No. [534-28]). Defendant told the ATO that Mr. Kleiman put bitcoin into a trust to fund their joint research activities. *Id.* at ¶ 141 (citing ECF No. [534-18] at 7). In November 2012,

Mr. Kleiman purportedly wrote a bitmessage to Defendant stating "you funded the trust when Bitcoin was worth hardly anything, but we have all put all we have into this. So the gain is not yours, it remains with the trust[.]" ECF No. [534-30] at 5. In May 2013, shortly after Mr. Kleiman died, Defendant emailed Mark Ferrier stating, "I have a trust overseas. I moved it and the mining process to Dave Kleiman when I had a few issues with the tax ppl [sic]." Pls.' CSOMF at ¶ 114 (citing ECF No. [534-20] at 2). He later wrote in an email to Mark Ferrier that he "had Dave mine the Bitcoin overseas and all it has cost is sunk. . . . I have never touched the Bitcoin we created in the OS trust and companies[.]" *Id.* at ¶ 115 (citing ECF No. [534-20] at 2).

In a January 2014 LinkedIn message to Benjamin Wright, Defendant wrote, "Dave Kleiman and I started mining in 2009. So we have a few things that will interest them. It is a shame Dave died last year before fruition, but all is moving ahead." *Id.* at ¶ 116 (citing ECF No. [534-21] at 1). Additionally, in an email from December 2012, Mr. Kleiman told Defendant that "[w]e only need one dormant and untraded company to sit as a[n] owner of the bitcoin we are mining into them." *Id.* at ¶ 117 (citing ECF No. [534-22] at 1). In April 2014, Defendant told his wife, his company's CFO, and the company's lawyer that "Dave mined all of this outside Australia" and "I was not the person doing the mining. Dave was." *Id.* at ¶ 118 (citing ECF No. [534-22] at 1).

In April 2014, Defendant wrote an email to Ira Kleiman stating that "Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. I have sent the software analysis to you already." *Id.* at ¶ 119 (citing ECF No. [83-20] at 3). Defendant also reportedly told the ATO that a "long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform . . . Dave and I had been friends and sort of partners that way for a long time." *Id.* at ¶ 120 (citing ECF No. [534-18] at 5). He told the ATO that he and Mr. Kleiman "had worked on a number of patents together . . . We

had been planning putting together an exchange platform that would allow us ….. or bitcoin." *Id.* at ¶ 121 (citing ECF No. [534-18] at 5).

Defendant told Australian law enforcement that the "idea conceived by David and me, was to develop a system that integrated Supervisory Control and Data Acquisition (SCADA) software and a Bitcoin exchange." *Id.* at ¶ 123 (citing ECF No. [534-11] at 5). He also wrote to Mark Ferrier in 2013 that "what Dave and I want to do" included "creating autonomous agents in the Bitcoin block," developing "a completely open and malleable form of scriptable money," creating "ways to program a distributed contract using Bitcoin to form agreements with people via the block chain" as well as create "Smart property [that] is property that can be atomically traded and loaned via the block chain," and solve how "a transaction could be issued potentially even after a confirmation if the block chain is reorganized." *Id.* at ¶ 124 (citing ECF No. [534-3] at 2).

### D.      The communications between Defendant and Ira Kleiman

On February 11, 2014, Defendant contacted Ira Kleiman's father, Louis Kleiman, by email stating as follows:

Hello Louis,

Your son Dave and I are two of the three key people behind Bitcoin . . .

If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.

Know also that Dave was a key part of an invention that will revolutionise the world . . .
I will talk to you again soon.

When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.

I will let you know when I am in the USA.

ECF No. [83] at ¶ 133 (citing ECF No. [83-23]). On February 12, 2014, Louis Kleiman replied:

"After reviewing the information you sent, I want to thank you very much. . . . I look forward to

any information you can give me about my son DAVID. To me, he was alway's [sic] someone

special." Pls.' CSOMF at ¶ 76 (citing ECF No. [511-16]). Ira Kleiman took over corresponding

with Defendant after this because Louis Kleiman was elderly. ECF No. [83] at ¶ 134. In March

2014, Ira Kleiman wrote to Defendant that his "family is truly blessed to know you." ECF No.

[534-39] at 7.

> On April 23, 2014, Ira Kleiman wrote an email to Defendant stating as follows:
>
> Craig,
>
> Just as Dave believed in your vision and abilities, I share that same belief. There is
> no doubt in my mind that you are capable of achieving the goals you have set. And
> I am still in awe of your brilliance.
>
> However, since receiving the documents from the ATO and spending more time
> reviewing them, I feel like there are questionable discrepancies in the contracts
> between you and W&K such as Dave's signatures, his resignation, transfer of all
> accountable value, Uyen's role of Director, BAA projects, etc. No need to go into
> details.
>
> I can understand how you may have felt pressured to take actions to secure the
> business you and Dave started. And the last thing I want to do is stifle the growth
> of it. But I do believe we need to remedy the lopsided contractual exchange.

ECF No. [83-24] at 20. When asked, "you're saying that Craig made false statements and induced

you into doing certain things. What did he induce you into doing?[,]" Ira Kleiman stated "I guess

– well, I don't want to speculate. I don't know." ECF No. [488-13] at 164:14-19. In April 2014, in

response to an email from Ira Kleiman stating that "it appears clear to see a systematic transfer of

assets out of W&K back to you" and that Defendant "never mentioned any of the actions you were

taking against W&K prior to contacting us," Defendant wrote to Ira Kleiman that "[t]his was not

about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did

that action as accountants etc advised it was necessary." ECF No. [534-38] at 8-9.

In April 2014, Defendant further wrote to Ira Kleiman that "Dave died. I did the actions to

make sure the court signed off on what Dave and I planned." ECF No. [83-24] at 18. He also later

wrote, "I do not know what you have been led to believe. But I am not trying to take anything from

Dave's estate." *Id.* at 6. He also wrote to Ira Kleiman that "[t]he software Dave updated and which

I have transferred back in OUR company, and it is OURs as you are Dave's heir[.]" ECF No. [511-

8] at 1. According to Plaintiffs, Defendant promised to provide the estate with shares in a new

company he represented as having assets worth millions of dollars. Pls.' CSOMF at ¶ 81 (citing

ECF Nos. [511-2] at 50 and [511-8] at 7).

Defendant also wrote to Ira Kleiman that the "reason for the transfer is to use the R&D tax

credit on the value of the software Dave and I developed." Pls.' CSOMF at ¶ 137 (citing ECF No.

[83-20] at 18). Defendant wrote to Ira Kleiman stating that "Dave and I decided to start Coin-Exch

so that we could lock in some of the value. . . . We locked in the value of the software based on

the price of BTC then, which was less than now and if it was a year later we would have been

smart, but we took the option to cash out." *Id.* at ¶¶ 138, 148 (citing ECF No. [534-26] at 1).

Defendant stated in April 2014 that the idea of "locked in payments" was David Kleiman's

idea. ECF No. [511-8] at 8. In August 2015, Ira Kleiman wrote to Defendant that "I wish I could

believe that you have my best interest at heart . . . But after the long delays of promised payments

I was to receive each October and the strange offer to purchase my shares from a[n] undisclosed

investor, obviously I have my doubts." ECF No. [498-18] at 1. Defendant responded that "until

we sort out the ATO issues we just don't have any money to pay anyone. Unless we sort out the

ATO we are in a very difficult position, however frustrating this is for you[.]" *Id.* Defendant

stopped responding to Ira Kleiman's emails by October 9, 2015. Def.'s CSOMF at ¶ 51 (citing ECF No. [498-19] at 1).

### E.  David Kleiman's work papers and hard drives

Ira Kleiman testified that during Thanksgiving dinner in 2009, David Kleiman told him that he was working to develop digital money and that it would be "bigger than Facebook," and he drew for him what would become the symbol for Bitcoin. ECF No. [488-13] at 14:8-22:5. He stated that David Kleiman's involvement in Bitcoin was "secretive" according to what Defendant told him. *Id.* at 17:3-8. Ira Kleiman further testified that Mr. Kleiman "told me in a very vague way that he was working on Bitcoin. He didn't specifically say Bitcoin so I could never go back and attach it to him. During those next 2010, 2011 if I had heard of Bitcoin I wouldn't have thought oh, that's what Dave was working on." 20:14-22. After the Thanksgiving dinner, Ira Kleiman did not talk with Mr. Kleiman about his statements made during that dinner. *Id.* at 22:6-23. After Mr. Kleiman's death, Ira Kleiman was appointed the personal representative of the Estate of David Kleiman. Pls.' CSOMF at ¶ 24.

On February 18, 2014, Ira Kleiman wrote an email to Defendant stating that he felt "nervous about making mistakes," and that he "very well could have already made some months ago by throwing away a bunch of Dave's papers and format[ted] drives that I couldn't access." ECF No. [488-14] at 261-262. He testified that after Mr. Kleiman died, he discarded "some papers and hard drives" and that he "first examined to see if there was anything on them" and once he found out that there was not, he formatted two hard drives. *Id.* at 44:20-45:3; 53:3-4. He stated that he did not find evidence of the digital currency that Mr. Kleiman said would be bigger than Facebook before he formatted and threw those papers away. *Id.* at 45:5-8. He testified that the

papers he threw out "didn't look relevant to keeping," *id.* at 48:10-14, and that "a lot of the stuff [he] threw out could have just been like junk mail," such as advertisements. *Id.* at 49:13-17.

Regarding the two formatted drives, Ira Kleiman stated he was "concerned" because he was using them for his own personal uses, which uses occurred following Mr. Kleiman's death until after the lawsuit was filed. *Id.* at 53:6-54:23. He further testified that he "guess[ed]" "part of" the reason he stopped using the devices is because he was concerned it would appear that he was trying to delete things. *Id.* at 55:17-22. According to Nicholas Chambers, the formatting that occurred on the hard drives after Mr. Kleiman's death permanently overwrote data previously existing on them and rendered the data unrecoverable. ECF No. [488-15] at ¶ 45.

### F.   Australian lawsuits

In July and August 2013, Defendant filed two lawsuits against W&K after Mr. Kleiman died. Pls.' CSOMF at ¶¶ 52-53 (citing ECF Nos. [83-11]; [511-1]; [534-4]). Defendant filed two claims in New South Wales Supreme Court in Australia against W&K for approximately $28 million each. ECF No. [83] at ¶ 117 (citing ECF No. [83-11]). Defendant's employee, Jamie Wilson, signed two papers in August 2013 purportedly on behalf of W&K consenting to a transfer of all W&K's assets to Defendant. Pls.' CSOMF at ¶ 54 (citing ECF Nos. [83-19] and [511-9] at 68:15-69:21). The Consent Orders do not purport to transfer any bitcoin. *Id.* at ¶ 57 (citing ECF No. [83-19]). The Consent Orders reflect "consent" by W&K and Defendant to the entry of judgment against W&K. ECF No. [83-19] at 2, 4. Mr. Wilson testified that he was never a director, shareholder, or officer of W&K. ECF No. [498-9] at 33:9-16. When presented with a copy of an affidavit Defendant submitted in the Australian court proceeding stating that there had been an August 2013 meeting where it was moved that Mr. Wilson would "act as a director for purposes of consenting to orders and the company to be wound down," Mr. Wilson testified that "[t]his is

my first knowledge that I was acting as a director of the U.S. company." *Id.* at 69:22-70:10. He further stated that "[t]his is my first that I am being made aware that I was a director of the LLC company." *Id.* at 71:8-12.

In a court hearing on October 31, 2013, Defendant informed the Australian Registrar that he owned 51% percent of the shares of W&K. ECF No. [498-10] at 1. He also stated that "[w]e have actually taken control of the accounts and whatever else, which we've got stat decs for that, so effectively this is a formality because we have actually – the company has controlled all of the accounts now." *Id.* at 2. In a court hearing held on November 6, 2013, Defendant told the Registrar that he is "now the sole shareholder in an American company," and that he "own[s] all the shares over here and want[s] to bring everything back in." ECF No. [498-11] at 1. Judgments were then entered in the Australian court proceedings on November 6, 2013 reflecting the Consent Orders. ECF No. [83-22]. Specifically, the November 6, 2013 "Supreme Court of NSW Record of Proceedings" state that money judgments were entered in favor of Defendant and that it is "the agreement of the parties that [Craig Wright] will accept the transfer of intellectual property held by the plaintiff [Craig Wright] in full satisfaction of the judgment." *Id.* at 4-5, 8. The transcript from the November 6, 2013 hearing reflects that the entry of orders brought the Australian court proceedings "to a conclusion." ECF No. [498-11] at 2.

Mr. Conrad testified that Mr. Kleiman would use a "Drop Box . . . for his business and I guess personal items[.]" ECF No. [488-2] at 26:3-9 (the "Mailbox"). The Mailbox address was 4371 Northlake Blvd., Palm Beach, FL 33410. *Id.* According to Plaintiffs, W&K used a different address for service of process. *See* Pls.' CSOMF at ¶ 29 (citing ECF No. [83-3] at 2). W&K is a Florida limited liability company. ECF No. [83-3]. Zachary Eisner, W&K's corporate representative, testified that 4371 Northlake Blvd. is a "UPS store." [498-13] at 104:5-6. On

October 9, 2010, David Kleiman sent an email to Ira Kleiman and others that included the Mailbox address in his signature block. Pls.' CSOMF at ¶ 31. The Articles of Incorporation for W&K listed 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410 as the "mailing address of the Limited Liability Company." ECF No. [83-3] at 2. The "street address" for W&K was listed as 3119 Contego Lane, Palm Beach Gardens, FL 33418. *Id.* Further, Mr. Kleiman was listed as the registered agent for W&K, and the registered agent's address was listed as 3119 Contego Lane, Palm Beach Gardens, FL 33418. *Id.*

In Australia,[10] Defendant testified by affidavit that in July 2013, W&K was served by mailing a copy of the Statement of Claim to 437l Northlake Blvd. #314, Palm Beach Gardens, FL 33410. Pls.' CSOMF at ¶ 58 (citing ECF No. [83-4] at 4). He also testified that in July 2013, W&K was served by leaving a copy of the Statement of Claim at W&K's registered address for service of 3119 Contego Lane, Palm Beach Gardens, FL 33410. *Id.* In August 2013, in two documents titled Acknowledgement of Liquidated Claim from the Australian court proceedings, Defendant

---

[10] Australian attorney, Gordon Grieve, submitted an affidavit in this lawsuit stating that "[w]here a court process is required to be served outside Australia the document need not be served personally so long as the document is otherwise served in accordance with the laws of service applicable in the foreign jurisdiction in which service is to take place." ECF No. [33-1] at ¶ 49. He also stated that "where the method of service is not effective under the local law, this may affect the recognition of the Australian judgment in that jurisdiction." *Id.* at ¶ 50. Further, he stated that "[g]enerally, an Australian party commencing proceedings has to apply to the Supreme Court Registrar for service under the Hague Service Convention." *Id.* at ¶ 52. He added that "[t]his request is subject to certain mandatory form requirements. In particular, the litigant must include the following: a. model letter of request; b. Summary of Documents to be Served; c. Certificate of Service for the foreign court to complete; d. documents to be served; e. certified translations where necessary and f. an undertaking as to costs." *Id.* at ¶ 53.

Mr. Grieve stated that, if satisfied, the Registrar will sign the request for service abroad and the documents are to be forwarded to the designated Central Authority. *Id.* at ¶ 54. He further stated that the Central Authority will then make arrangements for service, and the Central Authority will then remit a Certificate of Service back to the Australian Registrar advising that service has or has not been effectuated. *Id.* at ¶¶ 55-56. Defendant asserts that service through the Central Authority is not the only acceptable method of service under the Hague Convention. Def.'s CSOMF at ¶ 31.

listed his Australian address as the "[a]ddress for service" for W&K, and he is labeled as W&K's "Director/Australian Agent." *Id.* at ¶ 59 (citing ECF Nos. [83-30] at 3 and [534-5] at 11). The documents also reflect that Defendant acknowledged that he is the "legal agent and representative" for W&K, the defendant in those proceedings. ECF No. [83-30] at 2, 4.

A Notice of Listing in one of the Australian lawsuits reflects that it was addressed to W&K at 4371 Norhtlake [sic] Blvd 314, Palm Beach, FL 33410. ECF No. [488-2] at 54. The Notice of Listing is dated September 3, 2013 and was issued in the case styled *Craig Steven Wright v W & K Info Defense Research LLC*. *Id.* The document states that "[t]he matter is listed for Directions (Common Law Register) on 30/10/2013 at 9:00 AM, Supreme Court – Civil, Supreme Court Sydney Court 9C Queens Square Sydney," and noted that "[i]f you do not appear at Court, this matter may be dealt with in your absence." *Id.* The Notice of Listing also stated that "[l]isting details for cases" are "published on the internet . . . on the afternoon before the case is listed." *Id.* The notice letter did not include a summons, a statement of claim, a notice of the alleged scope and grounds of jurisdiction, or the right to challenge service. Pls.' CSOMF at ¶ 61 (citing ECF No. [488-2] at 54). Mr. Eisner testified that the Notice of Listing was received at W&K's mailing address listed on its Articles of Incorporation, but W&K was not served with process. *Id.* at 107:12-18.

The Notice of Listing was received by Mr. Conrad, Mr. Kleiman's partner in Computer Forensics, LLC. Pls.' CSOMF at ¶ 67 (citing ECF No. [488-2] at 25:25-26:2). Mr. Conrad was not the registered agent for W&K and he was not authorized to accept service on W&K's behalf. *Id.* at ¶ 68 (citing ECF No. [83-3]). Mr. Conrad testified that he did not recall any conversations where he told Ira Kleiman about the Australian court document. *Id.* at ¶ 70 (citing ECF No. [488-2] at 26:19-21). Mr. Conrad testified that he recalled receiving the document and handwriting the

received date (October 10, 2013) on it with a Sharpie pen because "it looked like some sort of legal proceeding that was being instituted so [he] felt like it was important to document exactly when [he] received it[.]" ECF No. [488-2] at 25:20-26:17.

Ira Kleiman testified in a declaration that he never received service of process for any of the Australian lawsuits. ECF No. [50-1] at 2. He also testified that he first became aware of the claims Defendant filed in Australia on April 15, 2014 when he was contacted by the Australian Tax Office ("ATO"). ECF No. [50-1] at 2; *see also* ECF No. [83-20] at 18. Plaintiffs state that Mr. Kleiman's estate was not a party to the two consent proceedings filed by Defendant against W&K in Australia; however, Defendant asserts that W&K was served at Mr. Kleiman's mailing address. Def.'s CSOMF at ¶¶ 7, 22 (citing ECF No. [488] at ¶¶ 33-34).

Mr. Conrad testified that he had never heard of W&K until he received the Notice of Listing. Pls.' CSOMF at ¶¶ 64-65, 69 (citing ECF Nos. [488-2] at 26:6-9, 34:1-3). Mr. Paige stated that he first learned about W&K (based on the Notice of Listing) "[w]hen it showed up in a mailbox that was used by the company, Computer Forensics, LLC" in 2013. ECF No. [488-1] at 26:7-27:7, 41:6-13, 43:22-44:13, 115. He testified that the first communications he had with Ira Kleiman about W&K generally, and specifically about the Australian court notice, were in March 2016. Pls.' CSOMF at ¶ 72.

Ira Kleiman was not aware of W&K's existence until he learned about it from Defendant in 2014. *Id.* at ¶ 73 (citing ECF No. [488-14] at 33:3-4, 126:25-127:13, 144:8-10). He did not learn about the Australian Notice of Listing until 2016 when Mr. Paige first mentioned it to him. *Id.* at ¶ 74 (citing ECF No. [488-1] at 43:22-44:13, 115). Ira Kleiman was informed by Mr. Paige in late March 2016 that the "original court mailing about WK" had been located, and Ira Kleiman asked Mr. Paige if he could "keep that letter and envelope in a safe place" so that he could "check it out

sometime." ECF No. [488-1] at 115-17. In May 2014, Mr. Paige communicated with Ira Kleiman and asked him to take over control of the Mailbox and pay for its renewal, but Ira Kleiman declined to do so. *Id.* at 123-24.

On March 28, 2014, nearly a year after Mr. Kleiman died, W&K was reinstated by Uyen Nguyen. Pls.' CSOMF at ¶ 79 (citing ECF Nos. [83] at ¶ 139; [534-7]). Ms. Nguyen removed Mr. Kleiman as the registered agent for W&K and listed herself. ECF No. [534-7].

### G.   Ownership of W&K and Lynn Wright's testimony

Mr. Eisner testified that the only individuals who have ever been members of W&K are David Kleiman and Ira Kleiman, after Mr. Kleiman died. Pls.' CSOMF at ¶ 158 (citing ECF No. [498-13] at 91:19-21). Lynn Wright is Defendant's ex-wife. ECF No. [488-17] at 9:4-5. Defendant first testified that Ms. Wright held shares in W&K at his June 28, 2019 deposition. ECF No. [239] at 1-2. Defendant and Ms. Wright's divorce settlement is a document labeled as an "appendix" purporting to be a "family law settlement" between them from June 2011 and which mentions both of them having an interest in W&K. Pls.' CSOMF at ¶ 159 (citing ECF No. [488-17] at 147). Defendant testified in June 2019 that the divorce settlement did not deal with any blockchain intellectual property and only "indirectly" dealt with Bitcoin assets. *Id.* at ¶ 163 (citing ECF No. [534-37] at 408:9-11, 413:13-16). However, the "family law settlement" addresses "[a]ny and ALL Bitcoin, private keys, trusts and software associated with Bitcoin" and "any and all IP . . . including . . . . Bitcoin." *Id.* at ¶ 164 (citing ECF No. [488-17] at 148).

Ms. Wright testified that she is a shareholder of W&K. *Id.* at 22:14-15. She testified that she "knew [she] had had some interest in" W&K and that she "didn't have any concerns" about her ownership in W&K because she "didn't think" the shares were worth anything. *Id.* at 28:17-29:25. She denied that Ira Kleiman or anyone from Mr. Kleiman's estate had contacted her about

her shares in W&K after Mr. Kleiman died. *Id.* at 30:2-5. When asked when she obtained ownership in W&K, Ms. Wright stated that she "guess[ed]" it was when Mr. Kleiman and Defendant started discussions on putting "tenders in" and at that point, "there was the three of us that were still working on it." *Id.* at 98:1-7.

Ms. Wright testified that she does not have any documentation, outside the divorce settlement, related to ownership in W&K. *Id.* at 98:9-12. When asked if she still has ownership in W&K, she testified that she "guess[es] that [she] still [has] some interest in it[.]" *Id.* at 98:22-99:1. Her "basis" for assuming that she has ownership in W&K is that as far as she knows, "nothing has changed" from her "divorce settlement," which purportedly granted to her 50% of Defendant's shares in W&K. *Id.* at 23:18-24:7; 28:17-29:12; 99:2-5. *See also id.* at 147-48. However, Ms. Wright also testified that she declared bankruptcy in 2011 (finalized in January 2012), and as part of the bankruptcy, she had to list the assets she personally owned, but she did not list W&K as one of those assets "because everything had been handed back to [Defendant]" *Id.* at 105:3-18.

According to Plaintiffs, the June 2011 "family law settlement," ECF No. [488-17] at 147-48, is not included in the Australian federal Magistrates Court record, and the court file revealed that Defendant and Ms. Wright applied for divorce in 2013, which application listed "no" to the question whether "there are any . . . binding agreements . . . about family law . . . involving any of the parties" listed on the application. Pls.' CSOMF at ¶¶ 40, 160 (citing ECF No. [507-1] at 7). Ms. Wright testified that she did not have a copy of the "family law settlement" until approximately a week before her deposition when Defendant's counsel sent it to her by email. ECF No. [488-17] at 126:22-128:11. Defendant testified on June 28, 2019 that he did not have a copy of the agreement. ECF No. [534-37] at 409:11-15.

On March 3, 2020, Defendant produced a document he claimed he received from Ms. Wright's external devices that purported to be W&K's operating agreement, which identified Ms. Wright as a member of W&K and which was purportedly signed by Defendant and Mr. Kleiman. Pls.' CSOMF at ¶ 167 (citing ECF Nos. [507-2] and [511-1] at 177:23-25) ("W&K Operating Agreement"). The W&K Operating Agreement reflects that it was purportedly executed on February 15, 2011. *Id.* at ¶ 168. Defendant has previously sworn that he was never an owner, director, member, shareholder, employee or representative of W&K. ECF Nos. [12-2] at ¶ 12; [242-1] at 219:10-23; 287:16-18.

Ms. Wright testified that, at the time of her deposition, she was financially dependent on Defendant. *Id.* at 69:13-23, 70:3-5. She also testified that she previously complied with requests from Defendant because she did not "want to run the risk of him saying, 'I will just stop giving you the money," *id.* at 111:22-112:2, and she acknowledged that she had falsely confessed to a speeding infraction committed by him. *Id.* at 115-16. Ms. Wright stated that after she and Defendant separated in November 2010, she "rarely communicated" with Defendant, and she does not recall discussing business dealings with him after the separation. *Id.* at 91:3-16.

### H.    Intellectual property at issue

When asked to identify with specificity all intellectual property that Plaintiffs claims belongs to David Kleiman or his estate, they responded as follows:

> Based on information available to Plaintiffs today, however, Plaintiffs believe that the estate and/or W&K have an ownership interest in source code, compiler code, Machine Language (MASM/NASM), algorithms, manuals, trademarks, pending patents, granted patents, and other external filings associated with the following IP items:
> 1. A metered payments system;
> 2. Software derivative markets & information security risk systems;
> 3. Software assurance marketplace;
> 4. Software assurance through economic measures and anti-fraud system;
> 5. Risk quantification system (for financial modeling in Bitcoin)

6. SCADA measurements suite of software; and
7. Scriptable money.

More generally, Plaintiffs believe that the Defendant has taken intellectual property belonging to the estate and W&K that was created by Dave and Craig's partnership through research Dave Kleiman conducted with Craig Wright that was not completed or published as of 2015. Further discovery is needed to uncover the exact nature of this intellectual property, including discovery to uncover the exact nature of the 6,000,000 lines of code the Defendant has admitted David Kleiman created.

Furthermore, Plaintiffs believe they hold an interest in the security, banking, and automation intellectual property distributed to Cloudcroft, Hotwire, and Coin-Exch. Finally, Plaintiffs believe they hold an interest in the intellectual property, source code, algorithms, and patentable materials claimed by DeMorgan which relates to the development of smart contract and Blockchain based technologies and the commercialization of Blockchain and smart contract system research.

ECF No. [488-14] at 293-94.

## II.  LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility

determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the

non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is

under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331). In particular, where "the parties respond[] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.* Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan Fung*, 695 F.2d at 1296-97).

Through this lens, the Court considers the Motions and the parties' arguments.

## III.    DISCUSSION

### A.    Defendant's Motion

Defendant moves for summary judgment on six grounds. First, he contends that Plaintiffs' claims are time-barred. ECF No. [487] at 3-4. In his view, Plaintiffs were timely served with process in the Australian lawsuits in accordance with the Hague Convention because the September 3, 2013 Notice of Listing was received in Mr. Kleiman's mailbox in October 2013. *Id.* Defendant contends that this "forecloses any possibility that those lawsuits were 'fraudulently concealed' to toll the statute of limitations, rendering all but one of [P]laintiffs' claims time-barred." *Id.* at 3. He asserts that Plaintiffs' claims accrued no later than November 6, 2013 when the Australian judgments were entered, *id.* at 9-10, and the undisputed facts negate tolling the statute of limitations. *Id.* at 11-15. In particular, he maintains that there is no evidence that he

engaged in "active and willful concealment" of Plaintiffs' claims, and Plaintiffs did not "exercise reasonable care and diligence" in seeking to discover facts that form the basis of their claims. *Id.*

Second, Defendant challenges that Plaintiffs cannot establish that he and Mr. Kleiman had an oral partnership to mine bitcoin between 2008 and 2011. *Id.* at 4. According to Defendant, any claims based on the alleged partnership are time barred, violate the statute of frauds because there is no writing memorializing the purported three-year partnership, and fail for indefiniteness because no essential terms of the partnership have been evidenced. *Id.* He further argues that a theory that he and Mr. Kleiman worked on a "secretive" project is unavailing because Plaintiffs "may not bring an action claiming that a dead man told them he had a 'secret' three-year, oral contract with" Defendant. *Id.* at 5; *see also id.* at 15-20.

Third, he asserts that the Court previously dismissed with prejudice Plaintiffs' claims for misappropriation of trade secrets under Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et. seq.*, ("FUTSA"), and violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832 ("DTSA") because they were time barred. *Id.* at 5 (citing ECF No. [68] at 33). According to Defendant, the "only purportedly stolen intellectual property [P]laintiffs have identified is 'blockchain based technologies and smart contracts,' which is also what they alleged to be their trade secrets." *Id.* (internal citation omitted). Thus, he posits that because "the intellectual property at issue in all of [P]laintiffs' claims is their purported trade secrets, and all underlying facts of their trade secret claims are the same as those of their remaining claims, FUTSA preempts [P]laintiffs' remaining claims, which requires summary judgment to be granted." *Id. See also id.* at 20-22 (arguing that Fla. Stat. § 688.008 displaces and preempts Plaintiffs' common law claims that are based on the dismissed trade secret claims).

Fourth, Defendant maintains that this Court lacks subject matter jurisdiction because the record evidence concerning W&K's membership establishes that there is no complete diversity among the parties due to Ms. Wright's alleged membership in W&K. *Id.* at 5-6, 22-24.

Fifth, Defendant contends that "in light of Ms. Wright's uncontroverted testimony that she has an ownership interest in W&K, [Ira Kleiman] lacked the authority to file this action on behalf of W&K without her consent." *Id.* at 6. Indeed, he asserts that Ira Kleiman's actions in reinstating W&K to file this lawsuit is an *ultra vires* act and is, therefore, void. *Id.*; *see also id.* at 24.

Finally, he argues that even if Plaintiffs' fraud and constructive fraud claims were not preempted and time barred, the record establishes that summary judgment is warranted in his favor. *Id.* at 6. Specifically, he asserts that Defendant's alleged statements regarding possible future acts do not constitute fraud, Plaintiffs did not rely on any of his alleged statements, and there are no damages. *Id.* at 6-7, 24-30.

In response, Plaintiffs contend that "[a]t every turn, [Defendant's] motion distorts the law, ignores the evidence, and generally tries to leverage his various frauds and lies in an attempt to prevail. It should be denied in its entirety." ECF No. [533] at 4. They make seven overarching arguments.

First, Plaintiffs argue that their claims are not barred by the statute of limitations. *Id.* Specifically, they maintain that Defendant's claim that the alleged partnership dissolved in 2011 is unsupported by the record; Defendant's argument that the claims accrued in 2013 is unavailing; and regardless, Plaintiffs claims would be tolled under the doctrines of fraudulent concealment or equitable estoppel. *Id.* at 4-12. Second, they contend that Defendant is not entitled to summary judgment on the partnership claims. In particular, they contend that (1) there is sufficient evidence of Defendant and Mr. Kleiman's relationship as a whole to support the formation of a partnership

under Florida law; (2) there is sufficient evidence of a "common purpose" for the partnership, of a joint proprietary property interest, of a right to share profits and a duty to share losses, and of joint control to create a genuine dispute of material fact about the existence of the partnership; and (3) the cases Defendant cites bear no resemblance to the record here. *Id.* at 15-25.

Third, they argue that the alleged partnership is not barred by the statute of frauds. *Id.* at 25-26. Fourth, Plaintiffs maintain that Defendant's "continued attack on subject matter jurisdiction still fails to present any credible evidence that diversity is lacking." *Id.* at 26. In this regard, they argue that the Court previously held that Defendant "failed to present any *credible* evidence showing that" Lynn Wright was a member of W&K, *id.* (emphasis in original); Defendant has still not offered credible evidence that diversity is lacking; even if all indicia of fraud is ignored, Ms. Wright's testimony and documents fail to meet Defendant's burden of production for a factual attack because they do not reflect the membership of W&K at the time of filing; and this Court should exercise supplemental jurisdiction regardless. *Id.* at 26-32. Fifth, they contend that Ira Kleiman had authority to file this action on behalf of W&K. *Id.* at 33. Sixth, they assert that "overwhelming evidence" supports their fraud claims. *Id.* at 33-38. Finally, they allege that Plaintiffs' claims are not preempted. Specifically, they argue that Defendant waived his FUTSA preemption defense, and even if he had not, FUTSA does not displace or preempt the instant claims. *Id.* at 38-43.

In reply, Defendant contends that Plaintiffs' claims are time barred, their fraudulent concealment or equitable estoppel theories are unavailing, and there was no meeting of the minds and no evidence of an oral partnership. *See generally* ECF No. [561].

Defendant's Motion, accordingly, is ripe for consideration. Because Defendant argues that the Court lacks subject matter jurisdiction over this action, the Court will address that issue first and then turn to the remaining issues.

### 1. *Subject matter jurisdiction and Ira Kleiman's authority to file the action on behalf of W&K*

The Court previously entered an Order denying Defendant's motion for judgment on the pleadings in which he maintained that the Court lacked subject matter jurisdiction, in part, because Lynn Wright was supposedly a member of W&K. ECF No. [265] ("August 2019 Order"). After a hearing and briefings on that motion, the Court determined that Defendant "failed to present any *credible* evidence showing that any of the parties he suggests are *members* of W&K." *Id.* at 3 (emphasis in original). *See also id.* at 9-10.

According to Defendant, the August 2019 Order "did not apply Eleventh Circuit precedent, which holds that the citizenship of a limited liability company ('LLC') is the citizenship of each of its members, and that each must be diverse from parties on the other side of the action, or diversity is lacking." ECF No. [487] at 22.[11] He argues that although the Court previously ruled that complete diversity exists, the Court should "revisit" this issue and "consider the uncontroverted testimony" of Ms. Wright, an Australian citizen and alleged member of W&K, generated since then. *Id.* at 5-6, 24.  Defendant represents that Ms. Wright was "directly involved

---

[11] The Court rejects this argument as baseless. First, the August 2019 Order expressly noted that "[i]n analyzing diversity, the citizenship of a limited liability company is determined by the citizenship of its members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (requiring all LLC members to be diverse from all opposing parties)." *Id.* at 3. The Court also stated that for "purposes of diversity jurisdiction, it is the citizenship of an LLC's members—not its managers—that is relevant." *Id.* at 8. Likewise, the Court stated that as "a limited liability company, W&K's citizenship is determined by the citizenship of its members." *Id.* at 11. Second, to the extent the August 2019 Order was "incorrect," as Defendant contends, ECF No. [487] at 22, he failed to seek reconsideration of that Order.

in creating W&K. She has no reason to lie for Dr. Wright, given their divorce, and her testimony is corroborated by their divorce decree in Australia, her correspondence with [Mr. Kleiman] and Dr. Wright, and correspondence with the U.S. Department of Homeland Security. She testified that she has an ownership interest in W&K, and her testimony is uncontroverted." *Id.* at 5. Defendant further asserts that Plaintiffs' "only purported 'evidence' of W&K's members is its articles of incorporation, which evidences nothing, because 'Florida law does not require LLCs to publicly disclose their members.'" *Id.* at 23 (citation omitted). He adds that Florida's Division of Corporations "affirmatively instructs LLCs to not list their members in their articles of incorporation." *Id.* at 24 (emphasis omitted).

Plaintiffs respond that since the August 2019 Order was entered, Defendant still fails to offer any "credible evidence" that diversity is lacking. ECF No. [533] at 27. In their view, Defendant and Ms. Wright's divorce settlement is a forgery and, notably, it was not included in the Australian court file. *Id.* at 27-28. They add that Ms. Wright has a strong motive to lie for Defendant, and she has done so in the past. *Id.* at 28-29. Plaintiffs assert, additionally, that other testimony by Ms. Wright and "clearly forged documents [Defendant] claims he received from her strongly suggest that she was never a member of W&K and lacks any real knowledge of W&K's membership." *Id.* at 29. They point to the W&K Operating Agreement, which they assert is a "boldfaced forgery that contains anachronisms which could not possibly exist if the document was genuine." *Id.* They argue that forgeries and unreliable witness testimony do not meet the burden of production for a factual attack on diversity. *Id.* at 29-30.

Plaintiffs further argue that even if all the supposed "indicia of fraud is ignored, Ms. Wright's testimony and documents still fail[] to meet [Defendant's] burden of production for a factual attack because it does not reflect the membership of W&K at the time of filing." *Id.* at 30.

According to Plaintiffs, even if the June 2011 divorce settlement and Ms. Wright's testimony are "taken at face value," she was not a member of W&K at the time the lawsuit was filed because she testified that she declared bankruptcy in 2011, which was finalized in January 2012, and she did not list W&K as one of her assets "because everything had been handed back to" Defendant. *Id.* (citing ECF No. [488-17] at 105:3-18). Thus, they state the evidence "at most" shows that "Ms. Wright held shares in W&K that she transferred to [Defendant] prior to January 2012." *Id.* Plaintiffs additionally argue that the Court should exercise supplemental jurisdiction if it determines that diversity jurisdiction is lacking. *Id.* at 30-32.

Upon review and consideration, the Court does not find a basis to disturb its prior conclusion from the August 2019 Order that Defendant has failed to present credible evidence that Ms. Wright was a member of W&K. Placing aside her supposed role in W&K, knowledge of the business, or motives (which issues are disputed by the parties), assuming *arguendo* that Ms. Wright was in fact a member of W&K, the record reflects conflicting testimony from her regarding whether she was a member at the time the lawsuit was initiated. For instance, although she testified that she is a shareholder in W&K, ECF No. [488-17] at 22:14-15, she also "guessed" she still has "some interest" in W&K because "as far as [she] know[s]," "nothing has changed" from the June 2011 divorce settlement. *Id.* at 98:22-99:5. However, she also testified that she did not list W&K as one of her assets during her bankruptcy because "everything had been handed back" to Defendant prior to January 2012. *Id.* at 105:3-18. Further, her 2013 divorce application does not contain the purported divorce settlement agreement, ECF No. [507-1], and she additionally stated that she does not have any documentation, apart from the divorce settlement, related to ownership in W&K. ECF No. [488-17] at 98:9-12.

Mr. Eisner, W&K's corporate representative, separately testified that the only individuals who have ever been members of W&K are David Kleiman and Ira Kleiman, after Mr. Kleiman died. ECF No. [498-13] at 91:19-21. Based on the foregoing, the Court agrees with Plaintiffs that Defendant has presented "the same type of evidence it considered when it denied Defendant's motion for judgment on the pleadings." ECF No. [533] at 30. The Court, accordingly, concludes that subject matter jurisdiction is not lacking. But even if diversity jurisdiction was potentially insufficient, the Court agrees with Plaintiffs that the exercise of supplemental jurisdiction would be appropriate. *Id.* at 30-32. Defendant's Motion, therefore, is denied on this point.[12]

Likewise, the Court rejects Defendant's argument that Ira Kleiman lacked the authority to file this action on behalf of W&K without Ms. Wright's consent, which in his view requires dismissal of W&K's claims. ECF No. [487] at 24. This argument is predicated entirely on "Ms. Wright's uncontroverted testimony that she has an ownership interest in W&K[.]" *Id.* at 6, 24. However, as noted, her testimony is controverted. Additionally, Defendant provides no evidence that Ira Kleiman knew or should have known that she held ownership in W&K before filing this suit.

---

[12] On August 4, 2020, Plaintiffs moved for leave to supplement the record with a Verified Petition filed by Ms. Wright in Florida state court on July 16, 2020, which reportedly represents that in December 2012, she transferred 100% of her interests in W&K to Craig Wright R&D, which later changed its name to Tulip Trust, but that as of July 10, 2020, she is a current owner of W&K. ECF Nos. [612] and [612-1]. Thus, Plaintiffs maintain that if Ms. Wright's sworn allegations in the state court action are to be believed, she "by her own admission, had no ownership interest in W&K at the time this lawsuit was filed" and "[s]ince diversity jurisdiction is determined at the time of filing, Ms. Wright's verified state court petition directly contradicts her deposition testimony and mandates denial of the Defendant's motion for summary judgment based on a lack of jurisdiction." ECF No. [612] at 2. Because the Court concludes that subject matter jurisdiction is not lacking based on the existing record, the Court denies Plaintiff's motion to supplement as moot.

## 2.    *Statute of limitations*

This Court previously entered an Order denying in part Defendant's motion to dismiss in which he argued that all of Plaintiffs' claims were barred by the statute of limitations. *See* ECF No. [68] at 28-33 ("December 2018 Order"). In the December 2018 Order, the Court noted that it "agree[d] that the wrong accrual date related to these claims has been identified by the Defendant and that Plaintiffs have alleged facts sufficient to demonstrate that under the doctrine of fraudulent concealment, the statute of limitations could have been tolled." *Id.* at 29-30. The Court explained that, at that stage, it was required to assume as true Plaintiffs' allegations that it became aware of facts giving rise to their claims in April 2014. *Id.* at 31. However, the Court also stated that "[i]f, during discovery, it becomes apparent that Plaintiffs became aware of the Defendant's conduct more than four years before the filing of the instant action, Defendant may raise the statute of limitations issue again in a motion for summary judgment." *Id.*

Defendant now argues that Plaintiffs' claims are time-barred. ECF No. [487] at 3-4, 7. Specifically, he contests that to the extent Mr. Kleiman's estate's claims rely on a purported oral partnership, any cause of action arising from it accrued in 2011 and is barred by a four-year statute of limitations. *Id.* at 7-8. In Defendant's view, the alleged partnership dissolved in 2011, and therefore, any claims related to the partnership expired in 2015. *Id.* He adds that the "very latest date on which any of [P]laintiffs' causes of action could possibly have accrued was November 6, 2013," which is when the Australian court judgments were entered. *Id.* at 8. Because Plaintiffs filed suit in February 2018, Defendant maintains that every claim is barred except for civil theft (Count X), which has a five-year limitations period. *Id.* He further asserts that Plaintiffs had "actual, timely notice of the Australian lawsuits on October 10, 2013, when they received service of process sent by the Australian court." *Id.* at 9.

Defendant argues that Plaintiffs' claims "boil down to the assertion that Dr. Wright stole bitcoin and intellectual property . . . through three purportedly forged contracts that were submitted in the Australian lawsuits, which were reduced to judgment on November 6, 2013." *Id.* Therefore, he posits that Counts I, II, V, VI, VII, and VIII are barred by a four-year limitations period. *Id.* at 10. Additionally, he asserts that the undisputed facts negate tolling the statute of limitations and that the doctrine of "fraudulent concealment" does not apply. *Id.* at 11 (citing *Razor Capital, LLC v. CMAX Fin. LLC*, No. 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017)). In this respect, he makes a two-fold argument: there is no evidence that Defendant engaged in "active and willful concealment" of their claims, and Plaintiffs failed to "exercise reasonable care and diligence in seeking to discover the facts that form the basis of the[ir] claim[s]." *Id.* at 11-15.

Regarding the former, he maintains that Plaintiffs "cannot rely on the allegation that Dr. Wright concealed the existence of the Australian lawsuits, because they were timely served with process in them[.]" *Id.* at 11 (emphasis omitted). In his view, service was perfected on W&K under the Hague Convention when the Notice of Listing was received in Mr. Kleiman's mailbox on October 10, 2013, and thus, Plaintiffs "had actual, timely notice of the Australian lawsuits[.]" *Id.* at 12. He adds that Ira Kleiman's refusal to take over control of the mailbox was "willful blindness," and that Plaintiffs' claim that Defendant did not "'tell them' about the Australian lawsuits is irrelevant" because the "Supreme Court of New South Wales told them, though valid service of process that was made and acknowledged." *Id.* at 13 (emphasis omitted). Regarding the latter, Defendant contends that Ira Kleiman failed to exercise reasonable care and diligence as a matter of law by failing to check the mailbox, refusing to accept his fiduciary duty to check the mailbox, and by "indiscriminately destroy[ing]" David Kleiman's work papers and permanently erasing some of his hard drives. *Id.* at 14.

In response, Plaintiffs contend that Defendant's Motion "primarily rehashes the same arguments this Court rejected in its denial of [Defendant's] motion to dismiss. To the limited extent [Defendant's] motion makes new arguments, they fail factually and legally." ECF No. [533] at 4. They make three primary arguments. First, Plaintiffs argue that Defendant's claim that the alleged partnership dissolved in 2011 is unsupported by the record. They argue that the record evidence demonstrates that the partnership lasted "well beyond 2011." *Id.* Second, they maintain that Defendant's argument that their claims accrued in November 6, 2013 when the Australian lawsuit concluded is "as audacious as it is meritless" because, effectively, Defendant "argues to this Court that the onus was on the Kleiman family to uncover his fraudulent 'consent judgment' scheme in real time if they wanted to reclaim what was stolen." *Id.* at 5. In their view, the Consent Judgments[13] are fraudulent, and while those judgments address the purported consent of transfers of intellectual property, they "cannot have any bearing on the accrual of Plaintiffs' claims for stolen bitcoin" because those judgments did not address bitcoins. *Id.* at 5-6.

Additionally, they assert that the Consent Judgments did not start the clock on Plaintiffs' intellectual property claims. *Id.* at 6-9. Specifically, they contend that the Notice of Listing was not legal process; it was not validly served under the Hague Convention or otherwise; it was not sent to the registered agent address designated for service of process by W&K; and "all this is beside the point, because the uncontradicted evidence is that Ira Kleiman did not see the 'notice of listing' until 2016, and therefore it cannot have caused Plaintiffs to 'become aware' of the consent judgments 'more than four years before the filing of the instant action.'" *Id.* at 6. Further, they

---

[13] Plaintiffs alternatively refer to the Consent Orders, ECF No. [83-19], as the "Consent Judgments." *See* ECF No. [533] at 5. The actual judgments entered in Australia are reflected in ECF No. [83-22]. However, these judgments are substantively identical to the Consent Orders regarding the terms of the judgments/orders.

argue that Defendant's "willfully blind" accusation against Ira Kleiman is "baseless," "makes no sense and is devoid of legal or evidentiary support." *Id.* at 10-11.

Third, Plaintiffs argue that regardless of whether their claims accrued on or before November 6, 2013, the claims "would still survive because the statute of limitations should be tolled based on [Defendant's] fraudulent concealment or equitable estoppel." *Id.* at 11-15. According to Plaintiffs, Defendant's "fraudulent scheme to cover up his theft, coupled with his post-theft fraudulent representations to the Kleiman family, undoubtedly rises to the level of 'willful concealment' necessary to show fraudulent concealment, and that same conduct both 'lull[ed Ira Kleiman] into a disadvantageous legal position' and was directly 'responsible for the tardiness of the filing,' if any. Because his 'behavior caused [Ira Kleiman] to delay filing suit,' [Defendant] would also be 'equitably estopped from raising the statute of limitations to bar [Ira Kleiman]'s claim.'" *Id.* at 12 (internal citations omitted).

In reply, Defendant maintains that Plaintiffs "continue to demand reversible error and bad law, arguing that their claims are not time-barred[.]" ECF No. [561] at 1. According to Defendant, the indisputable evidence shows that W&K was timely served with valid process in the Australian lawsuits on October 10, 2013, yet Plaintiffs "sat on their hands for more than four years, then filed this untimely action, whose only path to this Court required them to falsely swear that they were 'prevented' from appearing in the Australian Lawsuits, when the indisputable evidence shows they were timely served, told where and when to appear, urged to appear, and warned that their interests might be affected in their absence if they chose not to appear. They chose not to appear." *Id.* He adds that Plaintiffs "frivolous[ly] attempt to invoke the 'delayed discovery rule' to postpone accrual of their claims until March 2016, when they falsely claim to have first learned that W&K even existed[.]" *Id.* at 2. Defendant further contends that Plaintiffs' "lame name games" in

referring to the alleged partnership as the "Satoshi Nakamoto Partnership" supports his arguments that their claims are time barred because Plaintiffs "have conceded that 'Satoshi Nakamoto' stopped bitcoin mining in 2011." *Id.* at 4.[14] Thus, he states that the record establishes that the estate's partnership claim accrued in February 2011, and that W&K's claims accrued when the Australian judgments were entered in November 2013. *Id.* at 5. Defendant additionally asserts that Plaintiffs' arguments regarding fraudulent concealment and equitable estoppel are unavailing. *Id.* at 5-8.

### a.     A genuine dispute of material fact exists whether the alleged partnership ended in 2011

Defendant argues that the alleged partnership between Defendant and Mr. Kleiman terminated in February 2011, and thus, the estate's claims based on that partnership are time-barred. *See* ECF Nos. [487] at 7-8 and [561] at 3-5. He cites to allegations in the Complaint that, in his view, establish that the partnership ended in 2011. *See, e.g.*, ECF No. [83] at ¶¶ 67, 197. Plaintiffs respond that the Complaint's allegations do not represent that the partnership ended in 2011 but rather "demarcate[] an initial phase of the partnership that existed prior to when it began to operate, at least in part, through W&K." ECF No. [533] at 4 (citing ECF No. [83] at ¶¶ 67, 68). Regardless of the allegations' characterization, Plaintiffs have produced evidence that the alleged partnership continued beyond 2011. *See* ECF Nos. [534-1] at 3; [534-2] at 15; [534-3] at 2-3. For

---

[14] Defendant provides no record citation to support this statement. Instead, his brief simply says "*see* D.E. [I.K. depo]." ECF No. [561] at 4. This is patently insufficient. The Court will not scour the record to search for this supposed statement, especially where Defendant attaches two depositions from Ira Kleiman, not one, to his Statement of Material Facts. *See* ECF Nos. [488-13] and [488-14]. *See also Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("Judges are not like pigs, hunting for truffles buried in briefs.") (internal quotations omitted). "[D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

instance, a February 23, 2013 message from Defendant to Mark Ferrier reflects that Defendant stated, "my partner Dave and I have been working on something of a while now." *Id.* at ECF No. [534-3] at 2. Accordingly, a genuine dispute exists whether the alleged oral partnership actually ended in February 2011 or if it continued after that point. The Court, therefore, rejects Defendant's argument that the estate's claims are barred by a statute of limitations that expired in 2015.

> **b.** **The Australian judgments did not trigger a statute of limitations commencing on November 6, 2013**

Defendant argues that the "very latest" date that any of Plaintiffs' causes of action could have accrued was November 6, 2013, when the Australian judgments were entered. ECF No. [487] at 8. In his view, because the Notice of Listing was mailed to Mr. Kleiman's mailbox and was received on October 10, 2013 by Mr. Conrad, Plaintiffs had "actual, timely notice of the Australian lawsuits" and all their claims except civil theft are time barred. *Id.* at 9-10. Upon review of the record and the parties' briefings, the Court cannot conclude as a matter of fact and law that November 6, 2013 triggered the relevant statutes of limitations.

First, as Plaintiffs demonstrate, the Consent Judgments do not purport to transfer bitcoin but rather only intellectual property from W&K to Defendant. *See* ECF Nos. [83-19] at 2, 4; and [488-22] at 4-5, 8. The Complaint, in this regard, seeks a return of allegedly stolen bitcoin not just intellectual property. *See* ECF No. [83] at ¶¶ 171, 197, 202, 209, 215 and "wherefore" clauses following ¶¶ 172, 196, 214. The Australian lawsuits, consequently, did not start the clock on claims to the extent they seek a return of bitcoins.

Second, the Australian lawsuits' judgment date does not trigger the statute of limitations otherwise for claims seeking a return of intellectual property. Specifically, in July and August 2013, Defendant instituted the Australian lawsuits against W&K by filing two separate Statement of Claims. ECF No. [83-11]. Later, in August 2013, Defendant filed an Acknowledgement of

Liquidated Claim in each of those cases in which he acknowledged that he was the "legal representative and representative" for W&K, he was W&K's "Director/Australian Agent," and he listed his Australian address as W&K's address. *See* ECF No. [83-30]. That document reflected the "address for service" for W&K as an Australian address. *Id.* at 3, 5. Nonetheless, Defendant submitted an affidavit to the Australian court dated October 31, 2013 in which he stated that in July 2013—before W&K's "address for service" was changed to an Australian address—a Statement of Claim was "served" on W&K by "leaving it" at 3119 Contego Lane, Palm Beach Gardens, FL 33410 and by "mailing it" to 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410. ECF No. [83-4] at 4.

The record, however, does not reflect that any Statement of Claim from either lawsuit was received at either of these addresses. Instead, the record shows only that a Notice of Listing from one of the two lawsuits was received at 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410 by Mr. Conrad of Computer Forensics LLC. *See* ECF Nos. [488-2] at 25-26, 54-55. That address is a drop box at a UPS store, and it was used by both Mr. Kleiman and by Computer Forensics LLC. ECF Nos. [488-1] at 26-27, 41, 43-44, 115; [498-13] at 104:5-6. Mr. Conrad was not W&K's registered agent, and W&K's registered agent's address based on the Articles of Incorporation was 3119 Contego Lane, Palm Beach Gardens, FL 33410, not 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410. *See* ECF No. [83-3]. Therefore, on this basis alone, the record reflects that Mr. Conrad, who was not authorized to act on W&K's behalf, received the Notice of Listing without any accompanying statement of claim in a shared mailbox, which mailbox address was not listed as W&K's registered agent's address. Thus, the mere fact that one document from one of the two Australian lawsuits was ultimately received in a mailbox linked to

Mr. Kleiman and W&K (at the wrong address) and collected by a non-W&K affiliated individual does not dictate that W&K was served in October 2013.

More problematic is that even if that address could be used for service of legal documents against W&K, Defendant has not produced sufficient evidence for the Court to conclude that the Notice of Listing itself constituted legal process for purposes of service under Australian law[15] (or even American law). According to Rule 6.2, New South Wales Uniform Civil Practice Rules ("UCPR"), service of process requires the delivery of a summons or the statement of claim, and the "originating process" that is served must also include a court seal, a case number, and a listing date. *See* https://www.legislation.nsw.gov.au/#/view/regulation/2005/418/part6/div2. Additionally, Rule 11.7 of the UCPR directs that if "a person is to be served outside of Australia with an originating process, the person must also be served with a notice in the approved form informing the person of—(a)  the scope of the jurisdiction of the court in respect of claims against persons who are served outside Australia, and (b)  the grounds alleged by the plaintiff to found jurisdiction, and (c)  the person's right to challenge service of the originating process or the jurisdiction of the court or to file a conditional appearance." *See id.* at https://www.legislation.nsw.gov.au/#/view/regulation/2005/418/part11/div1a/rule11.7.

Here, the Notice of Listing is a one-page document that does not contain a summons, a statement of claim, a notice of the alleged scope and grounds of jurisdiction, or even a statement of the right to challenge service. ECF No. [488-2] at 54. It, thus, appears facially insufficient under Australian law (and American law) to act as legal process. To be sure, the document reflects a court seal, a case number, a date and time when the "matter is listed for Directions," and it sets

---

[15] On May 8, 2020, Plaintiffs filed a Notice of Intent to Raise an Issue of Australian Law, ECF No. [501], related to issues concerning service of process under Australian law.

forth three bullet points for "[l]isting details" for cases, including by checking an online link "on the afternoon before the case is listed." *Id.* But none of those components, based on this document alone, apprise the recipient or this Court about the nature of the lawsuit, the underlying issues in that case, the grounds for jurisdiction, or the specific motion or matters to be decided by the court in October 2013. Further, such a document only provides limited information about one of the two lawsuits. Indeed, the other lawsuit's existence remains entirely unknown even with this document. Accordingly, even if the Australian judgments could otherwise commence the statute of limitations in this case, the Court cannot conclude that this document would satisfy that trigger.

Although these issues alone provide sufficient grounds to deny Defendant's Motion on this point, the Court also finds Defendant's argument that service was perfected under the Hague Convention unconvincing. Article 10(a) states that "[p]rovided the State of destination does not object, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad[.]" *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508 (2017). In *Water Splash*, the Supreme Court held that while the Hague Convention does not prohibit service by mail, "this does not mean that the Convention affirmatively authorizes service my mail." *Id.* at 1513 (emphasis omitted). "In other words, in cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Id.* (vacating and remanding for a determination whether the law of the issuing state, Texas, authorized service by mail).

The parties appear to agree that the United States, the receiving state, has not objected to service by mail. However, they disagree whether the second prong of the *Water Splash* test is met. Australian law controls this determination because it is the issuing state and the jurisdiction where

the Australian lawsuits were pending. *See id.* Rule 11.8AC of the UCPR provides that a "document

to be served outside Australia need not be personally served on a person so long as it is served on

the person in accordance with the law of the country in which service is effected."

https://www.legislation.nsw.gov.au/#/view/regulation/2005/418/part11/div1a/rule11.8ac.  In this

instance, that would be the United States. Although the Federal Rules of Civil Procedure permits

service by mail on an international defendant outside the United States, *see* Fed. R. Civ. P. 4(f),

there is no corresponding provision authorizing service on a domestic defendant by mail. *See id.*

at Rule 4(e) (setting forth the manners of service, which includes "following state law" for service).

*See also* Fla. Stat. §§ 48.031; 48.062. Thus, the Court does not agree that service was perfected

under the Hague Convention.

Nonetheless, even if Rule 4(f) could apply to serving a domestic defendant by mail, service

under that method still requires confirmed proof of service for the court. *See TracFone Wireless,*

*Inc. v. CNT Wireless LLC*, No. 1:19-CV-24325-DPG, 2019 WL 5863911, at *3 (S.D. Fla. Nov. 8,

2019) ("The Court agrees that service by international mail or FedEx is appropriate on the

Canadian parties under Rule 4(f)(1) and Article 10(a) of the Convention . . . But to safeguard the

provisions of Rule 4(f), the delivery service must require a signed receipt or email delivery

confirmation (or substantially equivalent documents) as proof that service has been

effectuated. *See* Fed. R. Civ. P. 4(f)(2)(C)(ii) (noting that if not prohibited by federal law or the

foreign country's law, service may be made by 'using any form of mail that the clerk addresses

and sends to the individual and that requires a signed receipt') & 4(f)(2)(D) (noting that service

may be completed 'by other means not prohibited by international agreement, as the court

orders')."). Here, the record does not reflect a return receipt or any similar proof of service for the

Australian court that the Notice of Listing was received in Florida at the proper address. Instead,

Mr. Conrad, unaffiliated with W&K, received the document and wrote the date of October 10, 2013 on the envelope. Yet his collection of W&K's mail was not even confirmed in Australia. Therefore, even if the Notice of Listing constituted legal process and even if it was sent to the proper address and received by the proper party, it would not constitute perfected service on W&K under the Hague Convention based on this record.

Regardless of the foregoing, the Court agrees with Plaintiffs that the instant record reflects a genuine dispute as to whether the statute of limitations could be tolled by the doctrines of fraudulent concealment or equitable estoppel. As an initial matter, whether the statute of limitations is tolled based on a defendant's alleged fraudulent concealment is a question of fact for a jury to decide. *See Razor Capital*, 2017 WL 3481761, at *4 ("Whether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact.") (citing *Walker v. Dunne*, 368 So. 2d 640, 641 (Fla. 3d DCA 1979) (reversing summary judgment because there was a factual issue whether defendant's conduct tolled the statute of limitations, and noting that the trial court "should have left the questions to the trier of fact")). "Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontr[o]verted proof of a 'smoking gun'. Viewing all the circumstances, a reasonable fact finder will have to hear all the evidence, weigh it and draw all reasonable inferences therefrom, and judge a witness' credibility prior to determining such issues." *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1555 (S.D. Fla. 1990), *opinion amended on reconsideration in other parts*, 741 F. Supp. 220 (S.D. Fla. 1990). "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined [at] trial." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991).

Florida law permits the tolling of a statute of limitations "when a plaintiff alleges fraudulent concealment." *Razor Capital*, 2017 WL 3481761, at \*4; *see also Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) ("Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment.") (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811- 12 (Fla. 4th DCA 1995)); *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976) ("[T]he statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him for discovering his injury."); *Vargas By & Through Vargas v. Glades General Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990) ("[T]he courts will not protect defendants who are directly responsible for the delays of filing because of their own willful acts; it is a doctrine to prevent the court from participating in the fraud of the defendant."). Similarly, "[e]quitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position. . . . It is well settled in Florida and other jurisdictions that the statutes of limitation can be deflected by the doctrine of equitable estoppel. This proposition is supported by vast precedent from this Court, Florida district courts of appeal, and federal courts." *Fla. Dep't of Health & Rehab. Servs. v. S.A.P*, 835 So. 2d 1091, 1096–98 (Fla. 2002)) (footnotes omitted); *see also Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001) ("Equitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct. The doctrine bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct. Equitable estoppel thus functions as a shield, not a sword, and operates against the wrongdoer, not the victim.").

To show fraudulent concealment, a plaintiff must show "(1) successful concealment of the cause of action; (2) fraudulent means to achieve that concealment and (3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim." *Razor Capital*, 2017 WL 3481761 at \*4. Fraudulent concealment "goes beyond mere non-disclosure, and must constitute active and willful concealment." *Id.* at \*5 (citation omitted). Based on the record, the Court concludes that Plaintiffs have presented genuine issues of fact for this doctrine to apply.

Regarding the first element, as noted, the Court rejects Defendant's argument that Plaintiffs were served with process in the Australian lawsuits based on the Notice of Listing or that the estate "indisputably" "knew or had reason to know of those lawsuits when they were commenced and while they were pending." ECF No. [487] at 12. The record reflects that Ira Kleiman was not aware of the Australian lawsuits until April 2014 when he was contacted by the ATO. *See* ECF No. [50-1] at 2. *See also* ECF No. [488-14] at 33:3-4, 126:25-127:13, 144:8-10 (Ira Kleiman's testimony that he first learned about W&K from Defendant, which was after February 2014). Against this backdrop, the record further reflects that Defendant listed his address in Australia as the "address for service" for W&K in August 2013 even though W&K's Florida Articles of Incorporation provided otherwise, and in March 2014, Mr. Kleiman was removed as W&K's registered agent by Ms. Nguyen, an individual affiliated with Defendant. ECF No. [534-7]. There are thus facts supporting the notion of active concealment.

Plaintiffs have further provided grounds for a jury to determine that contracts purportedly signed by Mr. Kleiman were forged or were otherwise inauthentic. *See* ECF No. [534-6]. *See also* ECF No. [83-20] at 17-18 ("And the contract . . . is signed the same month of his death and without his real signature. Nor do I believe it to be a digital signature. It doesn't even come close to his

handwriting. That is obviously a females [sic] signature. Things just don't make sense."). Moreover, the record reflects that Mr. Wilson, who signed the Consent Orders purportedly on behalf of W&K consenting to transfer all of W&K's assets to Defendant, testified that he was never a director, shareholder, or officer of W&K. ECF No. [498-9] at 33:9-16. When presented with a copy of an affidavit Defendant submitted in the Australian court proceeding stating that there had been an August 2013 meeting where it was moved that Mr. Wilson would "act as a director for purposes of consenting to orders and the company to be wound down," Mr. Wilson testified that "[t]his is my first knowledge that I was acting as a director of the U.S. company." *Id.* at 69:22-70:10. He further stated that "[t]his is my first that I am being made aware that I was a director of the LLC company." *Id.* at 71:8-12.

In April 2014, Ira Kleiman wrote to Defendant that "since receiving the documents from the ATO and spending more time reviewing them, I feel like there are questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value, Uyen's role of Director, BAA projects, etc." ECF No. [83-24] at 20. Ira Kleiman later wrote to Defendant that "[t]he information I have to work with is what you have told me and the documents from the ATO office. From those documents it appears clear to see a systematic transfer of assets out of W&K back to you. Up until April 15 I was a complete believer in what you were telling me. But you never mentioned any of the actions you were taking against W&K prior to contacting us." ECF No. [83-20] at 18. Defendant responded that "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." *Id. See also* ECF No. [498-20] at 149 ("[A]t first I really bought into the stuff he was telling me. When I saw the video of Craig crying on that video he made after Dave died, he sounded so sincere. It seemed like he really cared about Dave and now he was contacting us to look out for his family. But that first

impression of him was short lived. Over time, he revealed his true intentions which were to turn W&K into just W."). Genuine issues of material fact exist regarding active and willful concealment by Defendant.

Regarding the second element, the record additionally contains evidence which could allow a jury to find that Defendant lulled Plaintiffs into inaction by promising multimillion-dollar future payments or by assuring the Kleimans that he only wanted to protect their interests. For instance, in February 2014 Defendant wrote that he "do[es] not seek anything other than to give you information about your son . . . I will also help you recover what Dave owned." ECF No. [83-23]. By April 2014, he told Ira Kleiman that "Dave['s] estate is only worth 12 million IF you want to cash out right now. IF you stay, you get the value AND the shares. I will list these in coming years and THEN they are worth more." *Id.* at 7. He also wrote to Ira Kleiman that he does "not know what you have been led to believe. But I am not trying to take anything from Dave's estate." *Id.* at 6. He further told Ira Kleiman that the "software Dave updated and which I have transferred back in OUR company . . . is OURs as you are Dave's heir[.]" *Id.* at 2. Additionally, the record reflects that after having promised payments of millions of dollars each October beginning in 2014, no such payments were made. Indeed, by August 2015, Ira Kleiman wrote to Defendant that "I wish I could believe that you have my best interest at heart as I was first led to believe in your early emails. But after the long delays of promised payments I was to receive each October . . . obviously I have doubts. It certainly seems like I am not wanted as part of this venture[.]" *See* ECF No. [511-18] at 1. In response, Defendant wrote that "until we sort out the ATO issues we just don't have any money to pay anyone." *Id.*

Similarly, regarding the third element, the record reflects evidence from which a jury could find that Plaintiffs exercised reasonable care and diligence in seeking to discover the facts that

form the basis of their claims. First, contrary to Defendant's assertion that Ira Kleiman was "willfully blind" in not checking Mr. Kleiman's mailbox following his death, Defendant has not cited to evidence in the record indicating that Ira Kleiman should have checked that mailbox in October 2013, or that he specifically knew Mr. Kleiman had that mailbox during that time. Indeed, an email from Mr. Kleiman to others, including Ira Kleiman, which listed the Mailbox address in the signature block, discussed organizing a BBQ, and that email was from October 2010. ECF No. [488-16]. And, as noted, the record shows that the estate had never heard of W&K or the Australian lawsuits until 2014. Further, Ira Kleiman's communication in May 2014 with Mr. Paige in which he declined to take control of the Mailbox and pay for its renewal, ECF No. [488-1] at 123-24, was months after the Notice of Listing had been sent and after the Australian judgments had been entered. Defendant, thus, fails to show how Ira Kleiman's "refusal" to take over the Mailbox in May 2014, ECF No. [487] at 13, evidences the estate's supposed "willful blindness" to seek out facts.[16]

Additionally, although the record shows that Ira Kleiman threw out some of Mr. Kleiman's papers and reformatted some hard drives, Ira Kleiman testified that he "first examined [the hard drives] to see if there was anything on them and once I found out that there wasn't," he formatted them. ECF No. [488-14] at 44:20-45:3; 53:3-4. He also testified that before he threw out Mr. Kleiman's papers, he did not find evidence related to digital currency. *Id.* at 45:5-8. Further, he testified that the papers he threw out included "junk mail" and materials that "didn't look relevant to keeping." *Id.* at 48:10-14, 49:13-17. Thus, the Court does not agree that Ira Kleiman's actions

---

[16] In any event, "whether a defendant has been willfully blind will depend on the circumstances and, like intent itself, will generally be a question of fact for the factfinder after trial." *Chanel, Inc.*, 931 F.2d at 1476 (footnote omitted).

establish that Plaintiffs failed to exercise reasonable care and diligence related to seeking out facts that could form the basis for their claims.

Accordingly, the Court does not find, as a matter of law, that the statute of limitations was triggered in November 2013 and that Plaintiffs' claims are untimely. But even if their claims accrued at that time, in viewing the evidence in a light most favorable to Plaintiffs as the non-moving party, a trier of fact could still find that Defendant's conduct could lead to the application of the doctrines of fraudulent concealment and equitable estoppel to bar a statute of limitations defense. *See, e.g.*, *Razor Capital*, 2017 WL 3481761; *Acoustic Innovations, Inc. v. Schafer*, 976 So. 2d 1139, 1144 (Fla. 4th DCA 2008). Therefore, Defendant's Motion is denied on this point.

### 3. *Oral partnership and statute of frauds*

In the December 2018 Order, the Court previously rejected Defendant's argument that Plaintiffs failed to allege a partnership between Defendant and Mr. Kleiman. ECF No. [68] at 10-13. As part of that Order, the Court also rejected his statute of frauds argument because "the Court cannot, as a matter of law, conclude that the terms of the oral partnership agreement, as pled, originally contemplated an agreement to be performed beyond one year." *Id.* at 12 n.1. Defendant now argues that Plaintiffs cannot establish that he and Mr. Kleiman had an oral partnership because there is no written proof of a partnership nor evidence of the alleged partnership's terms. ECF No. [487] at 15. He further adds that any partnership claims would be barred by Florida's statue of frauds because the partnership lasted over three years. *Id.*

Plaintiffs respond that Defendant's argument that there is no evidence of a partnership is "as baseless as it is shameless." ECF No. [533] at 15. They assert that there is sufficient evidence of Defendant and Mr. Kleiman's relationship as a whole to support the formation of a partnership under Florida law. *Id.* at 15-18. In this respect, they assert that to evaluate whether a partnership

existed, Florida law examines the parties' relationship as a whole rather than by assessing discrete elements in isolation. *Id.* at 15-16. In their view, the evidence squarely shows that a partnership existed based simply on Defendant's own statements and characterizations of his relationship with Mr. Kleiman. *Id.* at 17-18. Nonetheless, they maintain that "even if separate evidence is required regarding the particular elements of partnership Defendant lists in his motion, there is abundant evidence for each one." *Id.* at 18. Specifically, Plaintiffs contend that there is sufficient evidence of (1) a "common purpose" for the partnership; (2) a joint proprietary property interest; (3) a right to share profits and a duty to share losses; and (4) joint control, all of which are sufficient to create a genuine dispute of material fact about the existence of the alleged partnership. *Id.* at 19-24. They also contend that the cases Defendant cites are inapplicable. *Id.* at 25. Finally, Plaintiffs argue that the alleged partnership is not barred by the statute of frauds, even though the partnership lasted longer than one year, because there is no evidence that the partnership would have necessarily lasted longer than one year or that Defendant and Mr. Kleiman agreed to a fixed-duration partnership longer than one year. *Id.* at 25-26.

In reply, Defendant maintains that given the nature of Bitcoin and the multi-year project inherent in developing it, the statute of frauds applies to bar Plaintiffs' claims. ECF No. [561] at 8-9. Additionally, Defendant contends that even if the statute of frauds does not apply, the oral partnership "would fail for indefiniteness because [P]laintiffs could never prove any of its essential terms." *Id.* at 9. Upon consideration of the record and the parties' briefings, the Court concludes that a genuine dispute of material fact exists whether there was an underlying partnership between Mr. Kleiman and Defendant, and that the statute of frauds does not apply.

### a.   A genuine dispute of material fact exists whether Defendant and Mr. Kleiman entered into an oral partnership

The parties dispute what is sufficient to establish a partnership under Florida law. Defendant contends that a showing of four specific elements is required while Plaintiffs contend that a holistic examination of the parties' relationship without specific proof of all of the individual elements can establish a partnership. The Court need not expressly resolve which suggested approach is correct[17] because under either analysis, Plaintiffs have demonstrated a genuine dispute of material fact that a partnership existed between Defendant and Mr. Kleiman.

### i.   Plaintiffs' approach

In citing to the Florida Revised Uniform Partnership Act, Fla. Stat. § 620.81002 *et seq.*, Plaintiffs contend that "current Florida law looks at the parties' relationship as a whole, rather than each element in isolation" to determine whether a partnership exists. ECF No. [533] at 15-16. Specifically, Fla. Stat. § 620.8202(1), provides that an "association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." *Id.* Further, "joint property, common property, or part ownership does not, by itself, establish a partnership, even if the co-owners share profits made by the use of the property," and "sharing of gross returns does not, by itself, establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived." *Id.* at Fla. Stat. § 620.8202(3)(a)-(b). However, a "person who receives a share of the profits of a business is presumed to be a partner in the business," unless the profits were received in payment of rent, among other things. *Id.* at Fla. Stat. § 620.8202(3)(c). *See also* Fla. Stat. § 620.8401(2), (6)

---

[17] In Defendant's Reply, ECF No. [561], he does not address the cases and authorities Plaintiffs cite on pages 15-16 of Plaintiffs' Response, ECF No. [533], other than to reargue that Plaintiffs must establish "every element of a purported oral partnership" in order to survive summary judgment.

(noting that under the Revised Uniform Partnership Act, "[e]ach partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits" and "[e]ach partner has equal rights in the management and conduct of the partnership business"). Plaintiffs add that Florida standard jury instruction 401.14(d), which addresses vicarious liability in negligence actions, provides that a "partnership exists when two or more persons join together or agree to join together in a business or venture for their common benefit, each contributing property, money or services and each having an interest in any profits." *Id.*[18]

Here, the record reflects numerous instances in which Defendant stated that he and David Kleiman were partners. *See, e.g.*, ECF Nos. [83-2] at 2 (Defendant informing Ira Kleiman that he and Mr. Kleiman "did partner ;)"); [534-3] at 2-3 ("my partner Dave and I have been working on something of a while now . . . my business partner Dave . . . [my] business partner died a few days back"); [534-9] at 1 ("In the past, David Kleiman was my best friend and business partner . . . we have many shared secrets"); [534-11] at 4 ("This is an idea that I had developed with my business partner David KLEINMAN [sic] (David) for a period of over a decade."); [534-34] at 4 ("In order to fund my work, Dave Kleiman and I sold code[.]"). Based on these statements alone, a fact finder could conclude that a partnership existed involving Mr. Kleiman and Defendant.

The record reflects further evidence from which the existence of a partnership can be determined. For example, Defendant wrote to Louis Kleiman in 2014 that Mr. Kleiman and Defendant "are two of the three key people behind Bitcoin" and that Mr. Kleiman "was a key part of an invention that will revolutionise the world." ECF No. [83-23]. Similarly, when asked how

---

[18] The Court notes that pattern jury instructions, "[a]lthough generally considered a 'valuable resource,'" are not binding. *See United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007).

many bitcoins he mined, Defendant stated that he "mined quite a number and I was with my partner, so to speak, in all of this, Dave, we mined quite a lot." ECF No. [534-13] at 6. He also stated that "[h]ow many people were involved in Satoshi is probably a better question. That was two of us." *Id.* Defendant further stated that "Dave was a key part of everything that I did. Dave spoke as Satoshi," and he and Mr. Kleiman are Satoshi Nakamoto. *Id.* at 7. Likewise, when asked who created the pseudonym Satoshi, he stated "[m]ostly myself, and a little bit with Dave. Both of us acted. Dave was the nice version of Satoshi." *Id.* at 20. *See also* ECF Nos. [534-16] at 1 ("David Reese and David Kleiman have both been essential parts of this project."); [534-17] at 3 ("I had an idea, but it would never have executed without Dave[.] Dave was my sounding board, he fixed my errors.").

Additionally, the record reflects that Mr. Kleiman wrote an email to Defendant, regarding a financial statement, asking, "[a]re we ever going to get a wage on this? Just kidding I trust you." ECF No. [534-28]. Further, Mr. Kleiman purportedly wrote a bitmessage to Defendant stating "you funded the trust when Bitcoin was worth hardly anything, but we have all put all we have into this. So the gain is not yours, it remains with the trust[.]" ECF No. [534-30] at 5. Likewise, Defendant informed the ATO that "[t]here was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies," and that the trust was set up as a "funding mechanism . . . for research." ECF No. [534-18] at 7. He also stated that "[w]hen we were starting originally, we looked at bitcoin value of probably $20 million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million." *Id.* at 11.

Based on the foregoing, a fact finder can conclude that Mr. Kleiman and Defendant worked together as an "association of two or more persons to carry on as co-owners of a business for profit." *See* Fla. Stat. § 620.8202(1).

### ii.   **Defendant's approach**

Defendant argues that Florida law requires the express showing of specific elements to establish a partnership. Both parties acknowledge that the Eleventh Circuit has followed this approach. *See Williams v. Obstfeld*, 314 F.3d 1270 (11th Cir. 2002). In *Williams*, that court explained as follows:

> Under Florida law, a joint venture is a form of partnership, and both types of entities are generally governed by the same rules of law. *Kislak v. Kreedian*, 95 So.2d 510, 514 (Fla. 1957); *see also Pinnacle Port Cmty. Ass'n., Inc. v. Orenstein*, 872 F.2d 1536, 1539 n. 3 (11th Cir. 1989) ("[I]n general, the law governing partnerships is applicable to joint ventures."). A partnership is created only where "both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business." *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439 (Fla. Dist. Ct. App. 1997). A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control. *Pinnacle Port*, 872 F.2d at 1539; *Kislak*, 95 So. 2d at 515. Florida courts have interpreted these requirements to preclude a finding that a partnership or joint venture exists where any factor is missing. *See Kislak*, 95 So. 2d at 517; *Dreyfuss*, 701 So. 2d at 439; *Austin v. Duval County Sch. Bd.*, 657 So. 2d 945, 948 (Fla. Dist. Ct. App. 1995).

*Id.* at 1275–76. Defendant argues that because there is no written partnership agreement, Plaintiffs bear the "'burden of establishing the existence of such contract, including all of its essential elements,' which 'is indeed, as it should be, a heavy and difficult one.'" ECF No. [487] at 15 (citation omitted). In this regard, he maintains that Plaintiffs cannot establish the existence of a partnership because none of the four elements listed above are satisfied. The Court disagrees.

Regarding the first element, a common purpose, Defendant maintains that no evidence shows that the purpose of the alleged oral partnership was to mine bitcoin and create bitcoin-related intellectual property. *Id.* at 16. In his view, "not a single witness or document would show that the purported oral partnership's purpose had anything to do with bitcoin[.]" *Id.* As support, he contends that the people closest to David Kleiman "will all testify that [Mr. Kleiman] never mentioned bitcoin, never said he was working on bitcoin or bitcoin-related intellectual property, and never said he was in a partnership with Dr. Wright." *Id.* Plaintiffs respond that the record is "replete" with "substantial evidence that Defendant and Dave Kleiman formed a partnership for the common purpose of creating Satoshi Nakamoto, inventing Bitcoin, mining bitcoin, and developing related intellectual property." ECF No. [533] at 19.

For instance, they cite the following evidence: ECF No. [83-20] at 1 ("The Tax office know[s] that Dave and I have been working on this since 2008."); *Id.* at 3 ("Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code."); ECF No. [83-6] at 2 ("I have attached a little more of what we did together."); ECF No. [534-17] at 4 ("I had math skills and some coding, that frankly was crud . . . Dave could edit his way through hell and back. I am not a team player. I am a terrible boss and slave driver, but with Dave I was far more. Satoshi was a team. Without the other part of that team, he died."); *Id.* at 3 ("I had an idea, but it would never have executed without Dave[.]"); ECF No. [534-19] (when asked if Mr. Kleiman had compiled the code for the first version of Bitcoin, Defendant stated "Yes. We both played. Dave compiled"); ECF No. [534-20] at 2 ("I have a trust overseas. I moved it and the mining process to Dave Kleiman when I had a few issues with the tax ppl [sic]."); *Id.* ("I had Dave mine the Bitcoin overseas and all it has cost is sunk. . . . I have never touched the Bitcoin we created in the OS trust and companies[.]"); *Id.* at [534-22] at 1 ("We only need one dormant and

untraded company to sit as a[n] owner of the bitcoin we are mining into them."); *Id.* ("Dave mined all of this outside Australia . . . I was not the person doing the mining. Dave was."); ECF No. [534-21] at 1 ("Dave Kleiman and I started mining in 2009. So we have a few things that will interest them. It is a shame Dave died last year before fruition, but all is moving ahead."); ECF No. [534-18] at 5 ("A long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform . . . Dave and I had been friends and sort of partners that way for a long time."); *Id.* (Defendant and Mr. Kleiman "had worked on a number of patents together . . . We had been planning putting together an exchange platform that would allow us ….. or bitcoin. The idea would be to perform an alternative reserve currency, that's what we are trying to do"). *Id.* at ¶ 121 (citing ECF No. [534-18] at 5); ECF No. [534-3] at 2 ("what Dave and I want to do" included "creating autonomous agents in the Bitcoin block," developing "a completely open and malleable form of scriptable money," creating "ways to program a distributed contract using Bitcoin to form agreements with people via the block chain" as well as create "Smart property [that] is property that can be atomically traded and loaned via the block chain," and solve how "a transaction could be issued potentially even after a confirmation if the block chain is reorganized"). Based on the foregoing evidence, the Court finds a genuine dispute of material fact exists regarding the common purpose element.

Regarding the second element, joint proprietary interest in the subject matter, Defendant argues that there is no evidence of joint ownership, thus precluding this element. ECF No. [487] at 17. He also adds that Mr. Kleiman's estate previously alleged in a state court lawsuit against Computer Forensics LLC, Mr. Conrad, and Mr. Paige that "David Kleiman created and maintained bitcoin wallets which were his personal property during the time he was a member of Computer Forensics." *Id.* (quoting ECF No. [144-5] at ¶ 32). In response, Plaintiffs argue that any purportedly

inconsistent statement made in a separate state court proceeding against different defendants for the return of any bitcoin owned by Mr. Kleiman to the extent such was in their possession is irrelevant here. ECF No. [533] at 22. They also state that Defendant and Mr. Kleiman "had a joint interest in the financial benefits and profits generated by the combination of their resources and services." *Id.* at 21 (citation omitted). They cite to the following evidence: ECF No. [534-18] at 7 ("There was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies[.]"); ECF No. [83-13] ("We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions[.]"); ECF No. [511-8] at 1 ("The software Dave updated and which I have transferred back in OUR company . . . is OURs as you are Dave's heir[.]"); ECF No. [83-20] at 18 (regarding the transfer of assets out of W&K, the "reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed"). Based on the foregoing, the Court finds a genuine dispute of material fact exists regarding the joint proprietary interest element.

Regarding the third element, the right to share profits and duty to share losses, Defendant contends that there is no evidence that Defendant and Mr. Kleiman agreed to share profits nor evidence as to distribution of profits. ECF No. [487] at 17. He adds that there is no evidence of sharing losses or liabilities. *Id.* at 18. Plaintiffs, in response, argue that record evidence shows that Defendant and Mr. Kleiman agreed to share profits and losses. For instance, they cite the following: ECF No. [534-26] at 1 ("Dave and I decided to start Coin-Exch so that we could lock in some of the value. . . . We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smart, but we took the

option to cash out."); ECF No. [534-18] at 7 (Defendant informing the ATO that Mr. Kleiman put

bitcoin into a trust to fund their joint research activities); ECF No. [534-1] at 3 ("I know you have

been paying people from Bitcoin in your own wallet, is this enough to account for it all? It has

been a shitload of work."); ECF No. [534-28] ("Are we ever going to get a wage on this? Just

kidding I trust you."); ECF No. [534-30] at 5 ("you funded the trust when Bitcoin was worth hardly

anything, but we have all put all we have into this. So the gain is not yours, it remains with the

trust[.]"); ECF No. [534-31] at 1 ("Craig and I have put our entire life savings into this business,

as did Dave[.]"); ECF No. [534-2] at 15 (Mr. Kleiman writing to Defendant that "I think I lost

money. At times I wonder if it is worth it. We have done deals together for years and we have

nothing but code to show for it all."); ECF No. [83-20] at 7 (Defendant writing to Ira Kleiman that

he had "convinced [Mr. Kleiman] that we could make it to Oct 2014 when if he needed we could

take some of the R&D money that comes as a rebate on what has been expended and we could

both spend a little time on us time"). In viewing this evidence in a light most favorable to Plaintiffs

as the non-moving party, the Court finds a genuine dispute of material fact exists regarding the

right to share profits and duty to share losses element.

As to the fourth element, joint control or right of control, Defendant contends that there is

no evidence that Defendant and Mr. Kleiman "had joint control over anything in this case, let alone

each other's bitcoin. Nor do they have any evidence that [Mr. Kleiman] and Dr. Wright had the

authority to 'bind one another' to anything." ECF No. [487] at 18-19. Plaintiffs, in response,

maintain that there is "abundant evidence" that Defendant and Mr. Kleiman "shared control over

the partnership's email accounts and assets, and that each of them influenced decisions about what

to do with the partnership and its assets." ECF No. [533] at 23. For instance, regarding shared

control over the partnership assets, they cite an email from Defendant stating that "Dave and I

decided to start Coin-Exch so that we could lock in some of the value" and that they "took the option to cash out." ECF No. [534-26] at 1. *See also* ECF No. [83-20] at 7 ("I convinced [Mr. Kleiman] that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time"). They also cite evidence of shared control over bitcoin private keys. ECF Nos. [534-26]; [534-32]; [534-33]. They further cite evidence of joint control over the partnership's software. ECF No. [534-18] at 42 ("Dave has . . . an estate . . . and I wanted to make sure I didn't rip off his estate and just go, 'Ha ha, it's my software.'").

Plaintiffs also note that Defendant stated "Dave Kleiman and I sold code . . . David took the biggest risk . . . Nothing he was able to earn in Panama was able to be repatriated legally in the USA." ECF No. [534-34] at 4. Further, regarding emails, they put forth evidence of two email addresses linked to Satoshi Nakamato, Satoshi@vistomail.com and Satoshin@gmx.com, and Defendant stating that Mr. Kleiman "had the vistomail account" and Defendant "had the gmx one." ECF No. [534-35] at 1. Defendant told James Nguyen that he and Mr. Kleiman "both posted from Satoshi account sometimes." ECF No. [534-16] at 197:34. Based on the foregoing and viewing all the evidence in a light most favorable to Plaintiffs as the non-moving party, the Court finds a genuine dispute of material fact exists regarding the joint control or right of control element. Accordingly, the Court denies Defendant's Motion on the grounds that there is insufficient evidence of a partnership.

### b.     The statute of frauds does not bar claims based on the oral partnership

The statute of frauds states, in pertinent part, that "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise . . . shall be in writing and signed by the party to be charged

therewith[.]" Fla. Stat. § 725.01. In *Browning v. Poirier*, 165 So. 3d 663 (Fla. 2015), the Florida

Supreme Court explained the statute of frauds' application as follows:

> It is well settled that the oral contracts made unenforceable by the statute because
> they are not to be performed within a year include only those which *cannot* be
> performed within that period. A promise which is not likely to be performed within
> a year, and which in fact is not performed within a year, is not within the statute if
> at the time the contract is made there is a possibility in law and in fact that
> full performance such as the parties intended may be completed before the
> expiration of a year. 9 *Williston on Contracts* § 24:3 (4th ed. 2011) (emphasis in
> original) (footnotes omitted).
>
> Stated otherwise, judging from the time the oral contract of indefinite duration is
> made, if the contract's full performance is possible within one year from the
> inception of the contract, then it falls outside the statute of frauds. *See Acoustic
> Innovations, Inc. v. Schafer*, 976 So.2d 1139, 1143 (Fla. 4th DCA 2008); *Wilcox v.
> Lang Equities, Inc.*, 588 So.2d 318, 320 (Fla. 3d DCA 1991); *Gulf Solar, Inc. v.
> Westfall*, 447 So.2d 363, 366 (Fla. 2d DCA 1984); *but see LynkUs Commc'ns, Inc.
> v. WebMD Corp.,* 965 So.2d 1161, 1165 (Fla. 2d DCA 2007); *Khawly v.
> Reboul*, 488 So.2d 856, 858 (Fla. 3d DCA 1986).

*Id.* at 665-66 (emphasis in original). *See also Alpha Data Corp. v. HX5, L.L.C.*, 139 So. 3d 907,

909–10 (Fla. 1st DCA 2013) ("The general rule is that the Statute of Frauds bars enforcement of

oral contracts which by their terms are not to be performed within a year. The fact that a contract

may not be performed within a year does not bring it within the statute. 'In other words, to make

a parol contract void, it must be apparent that it was the understanding of the parties that it was not

to be performed within a year from the time it was made.' Contracts for an indefinite period

generally do not fall within the Statute of Frauds.") (quoting *Yates v. Ball*, 132 Fla. 132, 181 So.

341, 344 (1937)).

Defendant has not presented evidence for the Court to conclude as a matter of law that the

statute of frauds bars Plaintiffs' claims. In fact, Defendant's argument is premised not on actual

record evidence but instead on the Complaint's allegation that the partnership lasted from 2008

until February 2011. ECF No. [487] at 4, 19 (citing ECF No. [83] at ¶ 67). In this regard, Defendant

inaccurately maintains that Plaintiffs "expressly alleged that this purported oral partnership was intended to last three years[.]" *Id.* at 4. The Complaint makes no such allegation.[19] That the Complaint alleges the mere fact that the alleged partnership lasted longer than one year is not dispositive of whether the statute of frauds applies. Rather, the salient issue is whether at the time of entering into the partnership, full performance within one year was not possible. Defendant fails to produce evidence that the alleged partnership was agreed to last for any particular duration much less a fixed duration longer than one year. Nor has he produced evidence that the parties intended the partnership to last longer than one year from the time of entering into the agreement. Similarly, he has not produced evidence demonstrating that full performance of the partnership within one year was impossible. Accordingly, the Court rejects Defendant's argument that the statute of frauds bars Plaintiffs' claims. Defendant's Motion is thus denied on this point.

### 4.    *Preemption*

In the December 2018 Order, the Court dismissed with prejudice Plaintiffs' claim for misappropriation of trade secrets under FUTSA because of a time bar. ECF No. [68] at 31-33. Defendant now contends that pursuant to Fla. Stat. § 688.008, all state-law claims based on misappropriation of trade secrets are displaced or preempted by FUTSA. ECF No. [487] at 20 (citing Fla. Stat. § 688.008 (providing that FUTSA "displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret," but FUTSA does not affect "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret" or "[o]ther civil remedies that are not based upon misappropriation of a trade secret")).

---

[19] The Complaint alleges that "[t]he exact structure of their joint mining activities, intellectual property development, and 'partnership' from c. 2008 until February 2011 requires discovery to fully reveal." ECF No. [83] at ¶ 67.

Defendant argues that other torts involving the same underlying factual allegations as a claim for trade secret misappropriation are preempted. *Id.* (citation omitted). In his view, the "only purportedly stolen intellectual property [P]laintiffs have identified is 'blockchain based technologies and smart contracts,' which is also what they alleged to be their trade secrets." *Id.* at 5. *See also id.* at 21. He, thus, maintains that because Plaintiffs' "purported trade secrets are their purported intellectual property, FUTSA pre-empts their remaining claims—except their claim for civil theft—because they are based on the 'same underlying factual allegations,' and there are no 'material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim." *Id.* at 21 (citation omitted). Defendant adds that Plaintiffs have previously represented that their state claims are related to the federal DTSA claim and have a "common nucleus of operative fact," which "admission requires granting summary judgment on the other claims[.]" *Id.* (citing ECF No. [159] at 11).

In response, Plaintiffs argue that Defendant's FUTSA preemption defense is waived because Defendant did not raise it as one of his affirmative defenses. ECF No. [533] at 38-40. According to them, Defendant's assertion of this defense at this time is "undoubtedly" prejudicial because Defendant "sat on this defense," which "could have easily been asserted [] two years ago," and his failure to assert this defense resulted in Plaintiffs not "seek[ing] to tailor discovery in any way toward obtaining information relevant to the defense[.]" *Id.* at 39. They argue that even if the FUTSA preemption defense was not waived, it would not bar any of the remaining claims. *Id.* Specifically, they assert that Counts I, II, V-VIII are not preempted by FUTSA because they are not based upon misappropriation of a trade secret, and they seek a return of allegedly stolen bitcoin. *Id.* at 40. They add that Defendant fails to show that the alleged wrongdoing in those counts is not

materially separate and distinct from their FUTSA claim. *Id.* at 40-43. Further, they contend that Count VI arises from a contractual relationship and is thus exempt from FUTSA. *Id.* at 43.

Upon review of the record and consideration of the parties' briefings, the Court agrees with Plaintiffs that Defendant's FUTSA preemption arguments fail. First, the Court concludes that this defense was waived because it was not timely asserted. "Preemption is an affirmative defense that usually must be raised in an answer or other responsive pleading and, if not so raised, the defense is considered waived." *Small v. Amgen, Inc.*, No. CV 2:12-476-FTM29-CM, 2016 WL 4942078, at *2 (M.D. Fla. Jan. 25, 2016) (citing *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010)). In Defendant's Amended Answer filed in January 2019, he did not raise a FUTSA defense or preemption defense. ECF No. [87]. The "Eleventh Circuit has only provided a narrow window to raise affirmative defenses during summary judgment." *Am. Auto. Ins. Co. v. Quality Plastering & Stucco, Inc.*, No. 611CV1767ORL22DAB, 2013 WL 12149411, at *6 (M.D. Fla. June 26, 2013). Specifically, the Court "'may consider an affirmative defense' not appearing in the answer, 'if the plaintiff has suffered no prejudice from the failure to raise the defense in a timely fashion.'" *Id.* (quoting *Miranda De Villalba v. Coutts & Co. (USA) Int'l*, 250 F. 3d 1351, 1353 (11th Cir. 2001)). Here, the Court finds that raising this defense at this "eleventh hour" after two years of extensive discovery is improper and prejudicial. *See, e.g.*, *Britt Green Trucking, Inc. v. FedEx Nat., LTL, Inc.*, No. 8:09-CV-445-T-33TBM, 2014 WL 3417569, at *12-13 (M.D. Fla. July 14, 2014) (rejecting argument that raising preemption defense at summary judgment was not prejudicial where defendant, after years of litigating, "waited until the eleventh hour to bring this issue to the attention of Plaintiffs and this Court").

Second, even if the preemption defense was timely asserted and not waived, it is still deficient. As Plaintiffs relay, Counts I, II, and V-VIII seek as part of their relief a return of bitcoins

allegedly stolen by Defendant. FUTSA, however, "does not affect . . . [o]ther civil remedies that are not based upon a misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). Defendant has made no showing that bitcoins are a trade secret, and in fact he represents that the "trade secrets are the purported intellectual property." ECF No. [487] at 21. The Court, therefore, concludes that even if FUTSA could apply, it would not displace Plaintiffs' claims to the extent they do not involve misappropriation of trade secrets, *i.e.*, recovery of misappropriated bitcoins. *See Pelfrey v. Mahaffy*, No. 17-CV-80920, 2018 WL 3110797, at *3 (S.D. Fla. Feb. 7, 2018) (conversion claim alleging identical misconduct as FUTSA misappropriation claim preempted only "to the extent" it alleges theft of the same trade secrets asserted in the misappropriation claim). In other words, it would act only as a partial preemption of those claims at most if the defense was viable.

Relatedly, Count VI, breach of partnership duties of loyalty and care, arises from a contractual relationship, and is thus exempted from FUTSA preemption. *See* Fla. Stat. § 688.008(2)(a); *Allied Portables, LLC v. Youmans*, No. 2:15-CV-294-FTM-38CM, 2016 WL 259548, at *3 (M.D. Fla. Jan. 21, 2016) ("FUTSA preempts all claims, other than claims *ex contractu*, based on misappropriation of trade secrets."); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005) ("Breach of an oral agreement sounds in contract and is therefore excepted from the preemptive effect of FUTSA."); *see also ThinkLite LLC v. TLG Sols., LLC*, No. 16-24417-CIV, 2017 WL 5972888, at *4 (S.D. Fla. Jan. 31, 2017) (denying preemption of claim for breach of good faith and duty of loyalty because it is based on "contractual and confidential-relationship duties and actions other than misappropriation of trade secrets").

Additionally, this Court has stated that "[t]o determine whether allegations of trade-secret misappropriation preempt a plaintiff from sufficiently pleading a separate, but related tort, the

Court must evaluate 'whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by § 688.008.' Thus, 'a plaintiff's separate tort claim is preempted by FUTSA if there is no 'material distinction' between the plaintiff's FUTSA claim and the other allegation." *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294–95 (S.D. Fla. 2018) (internal citations omitted); *see also XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1263 (S.D. Fla. 2016) ("In order to pursue claims for additional tort causes of action where there are claims for misappropriation of a trade secret, there must be *material distinctions* between the allegations comprising the additional torts and the allegations supporting the FUTSA claim.") (emphasis in original; citation omitted).

To conduct the FUTSA analysis, the Court must "compare the allegations of the [allegedly preempted] claim and the FUTSA claim to determine if the allegations are separate and distinct." *XTec*, 183 F. Supp. 3d at 1263 (denying preemption because even though there were "substantially similar allegations," a difference in the "*manner* in which" property was misappropriated renders a claim materially distinguishable) (emphasis in original). Defendant has failed to make this showing other than to note generally that Plaintiffs previously made a one-sentence statement in a brief regarding supplemental jurisdiction that their claims shared a common nucleus of operative fact with the DTSA claim. This limited showing does not suffice for preemption purposes. But in any event, the Court agrees with Plaintiffs that the claims at issue are materially distinct from the FUTSA claim. *See* ECF No. [533] at 41-42. Accordingly, Defendant's Motion is denied on this point.

### 5.    *Fraud claims*

Defendant argues that summary judgment is warranted on Plaintiffs' fraud and constructive fraud claims, Counts VII and VIII. Specifically, he contends that the common law fraud claim

cannot proceed because "(1) Dr. Wright's alleged misstatements are not promises but a 'prediction of future events;' (2) [P]laintiffs never had a 'right to rely on the [alleged] representations; and (3) the alleged statements did not induce [P]laintiffs to do anything that caused them damages." ECF No. [487] at 25 (internal citations omitted). He adds that the constructive fraud claim fails because there is no evidence that Defendant was a fiduciary to Plaintiffs, and Ira Kleiman has been adversarial with him since February 2014. *Id.* at 30. The Court will address each count separately.

### a.    Fraud

"An aggrieved party proves common law fraud by establishing that: (1) the opposing party made a misrepresentation of a material fact, (2) the opposing party knew or should have known the falsity of the statement, (3) the opposing party intended to induce the aggrieved party to rely on the false statement and act on it, and (4) the aggrieved party relied on that statement to his or her detriment." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 595 n.2 (Fla. 2013). *See also Pitts Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1362–63 (S.D. Fla. 2005) ("Under Florida law, the essential elements of a cause of action for fraud are: (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage or injury.") (citations omitted).

"Generally, the fraudulent statement must concern a past or existing fact." *Gemini Investors III, L.P. v. Nunez*, 78 So. 3d 94, 97 (Fla. 3d DCA 2012). "However, if the plaintiff can demonstrate that the person promising future action does so with no intention of performing or with a positive intention not to perform, such a promise may also constitute a fraudulent misrepresentation." *Prieto v. Smook, Inc.*, 97 So.3d 916, 917–18 (Fla. 4th DCA 2012) (quoting *Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001)); *See also Wadlington v.*

*Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632–33 (Fla. 4th DCA 2005) (explaining that "'where the promise to perform a material matter in the future is made without any intention of performing or made with the positive intention not to perform' a cause of action for fraud may proceed to a jury," and noting that these issues "are questions of fact to be determined by a jury"). "As a general rule, it is a matter for the jury to determine if an intentional misrepresentation has been made. In fraud cases, summary judgment is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." *Wadlington*, 907 So. 2d at 633 (citations omitted).

Further, "[f]raud also includes the intentional omission of a material fact." *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001). "[N]ondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact." *Ramel v. Chasebrook Const. Co.*, 135 So. 2d 876, 882 (Fla. 2d DCA 1961). Even if "a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth." *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. 5th DCA 1985). "The classic illustration of fraud is where one party having superior knowledge intentionally fails to disclose a material fact, which is not discoverable by ordinary observation[.]" *Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. 3d DCA 1980) (citations omitted). "Fraud may be proven by showing a series of distinct acts, each of which may be a badge of fraud and when taken together as a whole, constitute fraud." *Allen v. Tatham*, 56 So. 2d 337, 339 (Fla. 1952).

Defendant first argues that his alleged statements regarding possible future acts cannot constitute actionable fraud as a matter of law because "fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events." ECF No. [487] at 25

70

(citation omitted). According to him, Plaintiffs "cannot rely on Dr. Wright's alleged statements regarding the future value of shares of a start-up company, whether those shares could be sold in the future, or whether the Estate could in the future participate in a start-up company, because they were mere hopeful predictions of possible future events" and they were "mere puffery." *Id.* at 25-26.

Plaintiffs respond that their fraud claim is not based primarily on promised future action, and Defendant's alleged fraud started well before February 2014, including by "altering and falsifying documents for the purpose of taking Dave's/W&K's property." ECF No. [533] at 33-34. For instance, they maintain that after Mr. Kleiman died, and "aware that Dave's estate had no knowledge of W&K or Dave's work with [Defendant] on bitcoin," Defendant enacted a "scheme to take sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K," which involved fabricated documents, false statements, fake emails, half-truths, and non-disclosures of material information. *Id.* at 34-35. They add that even Defendant's promises of future action are actionable fraud because Defendant "made these promises with no intention of performing, and, independently, because he had superior knowledge of the subject matter and knew what he was saying was false." *Id.* at 34; *see also Mejia*, 781 So. 2d at 1177 (recognizing exceptions to the general rule that fraud may not be based on statements of opinion or promises of future action, including "[w]here the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that said person knew or should have known from facts in his or her possession that the statement was false," and where "the person promising future action does so with no intention of performing or with a positive intention not to perform").

Upon consideration, the Court rejects Defendant's argument that his statements regarding possible future acts could not constitute actionable fraud as a matter of law. Plaintiffs invoke theories of liability that permit a jury to find fraud based on future-oriented promises and actions that were never intended to be performed. Additionally, they have produced evidence that could support such a finding, including Defendant's promises to pay the estate $10 million by October 2014, which were not fulfilled. ECF Nos. [511-8] at 14; [511-18] at 1. More importantly, this determination is a factual dispute for a jury to decide and is inappropriate for resolution at this juncture. *See, e.g.*, *Wadlington*, 907 So. 2d at 633 (citing cases); *Tew*, 728 F. Supp. at 1555.

Defendant next argues that Plaintiffs did not rely, and had no right to rely, on any of his alleged statements. ECF No. [487] at 26. First, he asserts that Plaintiffs' claim that his statements caused them to not challenge his legal claims in the Australian lawsuits is unavailing. Those proceedings terminated in November 2013, yet he contacted them in February 2014, Ira Kleiman had a lawyer at that time, and there was no confidential relationship between the two in February 2014. *Id.* at 26-27. Second, he maintains that Plaintiffs cannot rely on the allegedly forged contracts because Ira Kleiman purportedly "questioned those contracts the very first time he saw them." *Id.* at 27. In this respect, he contends that Plaintiffs were in an "adversarial relationship" with him in February 2014, and they even have "work product" from that time. *Id.* Third, he argues that Plaintiffs' claim that they failed to secure the bitcoin and intellectual property they purportedly owned due to his statements is "impossible" given that he merely advised the Kleimans to preserve Mr. Kleiman's devices, and Ira Kleiman "destroyed" David Kleiman's work papers and hard drives. *Id.* at 27-28. Finally, he asserts that as for Mr. Kleiman's devices that were not destroyed or overwritten, Defendant recommended to Ira Kleiman that he give them to Mr. Paige and Mr. Conrad but Ira Kleiman never followed that recommendation. *Id.* at 28.

Case No.  18-cv-80176-BLOOM/Reinhart

Plaintiffs respond that "[e]ven with respect to the post-2014 February emails, Plaintiffs had a 'right to rely' and did rely on [Defendant's] false statements, half-truths, non-disclosures, and promises of future action he had no intention of performing." ECF No. [533] at 35. They state that Defendant misstates the law, but regardless, "he cannot under the cover of law be permitted to retain the fruits of perfidy" where he has "tricked and deceived and dealt fraudulently" with those whom he owed fiduciary duties, Mr. Kleiman's estate. *Id.* at 35-36 (quoting *McLeod v. Gaither*, 113 So. 687, 688 (Fla. 1927)). Moreover, they contest Defendant's characterization of events. *Id.*

Upon review, the Court does not agree that the record establishes as a matter of law that Plaintiffs could not rely on Defendant's statements and representations. First, even though Defendant reached out to Plaintiffs several months after the Australian lawsuits concluded and Ira Kleiman expressed some suspicions in April 2014 regarding certain documents, that does not foreclose the possibility that Plaintiffs did not later timely challenge those judgments in Australia because of Defendant's statements. For instance, the record reflects that Defendant wrote to Ira Kleiman that after Mr. Kleiman died, "I did the actions [in Australia] to make sure the court signed off on what Dave and I planned," "[t]his was not about screwing Dave or his estate . . . I did that action as accountants etc. advised it was necessary," and "I am not trying to take anything from Dave's estate." ECF No. [83-24] at 6, 18. Second, although Ira Kleiman had counsel in February 2014, that does not support the proposition that the Kleimans are consequently barred from relying on Defendant's statements. Likewise, although Defendant asserts that the parties were "antagonistic" in February 2014, the record reflects that Ira Kleiman wrote to Defendant in March 2014 that his "family is truly blessed to know you." ECF No. [534-39] at 7. Third, as Plaintiffs note, even if Ira Kleiman was potentially negligent by not preserving Mr. Kleiman's devices or by not turning over the devices to Mr. Paige and Mr. Conrad, that does not preclude a fraud claim.

*See, e.g.*, *Cruise v. Graham*, 622 So. 2d 37, 40 (Fla. 4th DCA 1993) ("the defrauder should not be shielded by his victim's negligence") (citation omitted); *Cont'l Cas. Co. v. Cura Grp., Inc.*, No. 03-61846-CIV, 2005 WL 8155321, at *33 (S.D. Fla. Apr. 6, 2005) (comparative negligence is not a defense to "fraud-based torts").

Defendant next argues that Plaintiffs' purported reliance did not cause damages, and thus the fraud claim fails for lack of actual damages. ECF No. [487] at 28-29. In response, Plaintiffs maintain that Defendant has "stolen" and "deprived" them of assets worth "billions of dollars." ECF No. [533] at 37. For instance, they note that Defendant and Mr. Kleiman/W&K mined approximately 1.1 million bitcoins together, ECF No. [534-18] at 11, and that Defendant has even admitted that he "was not the person doing the mining. Dave was." *See* ECF No. [534-22] at 1. Plaintiffs add that the value of a bitcoin is determinable as is the value of misappropriated intellectual property. ECF No. [533] at 37. For instance, the "W&K Source" "software package" is valued between $126 million and approximately $304 million AUD. *Id.* Upon review, the Court rejects Defendant's argument that Plaintiffs have not been damaged by his alleged fraud.

### b. Constructive fraud

Under Florida law, constructive fraud occurs "when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Levy v. Levy*, 862 So. 2d 48, 53 (Fla. 3d DCA 2003). It "may be based on a misrepresentation or concealment, or the fraud may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding party." *Id.* The Florida Supreme Court has "characterized a fiduciary relationship in the following manner: [t]he relation and duties involved need not be legal; they may be moral, social, domestic, or personal." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). A fiduciary or confidential relationship exists where "confidence is reposed by one party and a trust is accepted

by the other, or where confidence has been acquired and abused." *Id.* The origin of the confidence

is immaterial. *See Id.* Thus, "[t]he term 'fiduciary or confidential relation' is a very broad one."

*Am. Honda Motor Co.*, 390 F. Supp. 2d at 1179 (quoting *Quinn v. Phipps*, 113 So. 419, 420 (Fla.

1927)). Constructive fraud, therefore, is "simply a term applied to a great variety of transactions

which equity regards as wrongful, to which it attributes the same or similar effects as those which

follow from actual fraud, and for which it gives the same or similar relief as that granted in cases

of real fraud." *Id.* (citation omitted).

Moreover, to state a claim for breach of a fiduciary or confidential relationship, "a party

must allege some degree of dependency on one side and some degree of undertaking on the other

side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat. Bank of Fla., N.A.*,

622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quoting *Bankest Imports, Inc. v. ISCA Corp.*, 717 F.

Supp. 1537, 1541 (S.D. Fla. 1989)). "The fact that one party places trust or confidence in the other

does not create a confidential relationship in the absence of some recognition, acceptance or

undertaking of the duties of a fiduciary on the part of the other party." *Lanz v. Resolution Trust

Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991). Additionally, constructive fraud "will not lie where

the parties are dealing at arms-length because there is no duty imposed on either party to protect

or benefit the other." *Am. Honda Motor Co.*, 390 F. Supp. 2d at 1179.

According to Defendant, Plaintiffs' claim for constructive fraud fails because there "is not

even a scintilla of evidence suggesting that Dr. Wright was a fiduciary to [P]laintiffs," there was

an "adversarial relationship" as of February 2014, and there is no evidence that Ira Kleiman was

the "weaker party." ECF No. [487] at 30. In response, Plaintiffs maintain that the record supports

a finding that Defendant and Mr. Kleiman were partners, and that while "'weakness' is not an

element of a constructive fraud claim," "Defendant was the only person with knowledge of Dave's

bitcoin activities; Ira knew nothing and depended on Defendant to fully inform him of the facts."
ECF No. [533] at 38.

Upon review, the Court find Defendant's arguments unpersuasive. As noted, the record reflects evidence for a jury to find that Defendant and Mr. Kleiman entered into a partnership. Partners and joint venturers owe fiduciary duties to each other. *See, e.g.*, *Hallock v. Holiday Isle Resort & Marina, Inc.*, 885 So. 2d 459, 462 (Fla. 3d DCA 2004) (explaining that "[r]egarding the general duties and obligations of joint adventurers toward each other, they, like co-partners owe to one another . . . the duty of the finest and highest loyalty") (citing *Donahue v. Davis*, 68 So. 2d 163, 171 (Fla. 1953)); *Grossman v. Greenberg*, 619 So. 2d 406, 408 (Fla. 3d DCA 1993). While the death of a partner normally terminates the partnership, a "surviving partner's fiduciary obligations extend to the deceased partner's heirs and beneficiaries." *Matter of Estate of Thomas*, 532 N.W.2d 676, 684 (N.D. 1995) (collecting cases).

The "rationale underlying this rule is based upon the surviving partner's superior knowledge: 'A surviving partner does not deal at arms-length with the heirs of a deceased partner, but must make an open and full disclosure to them. The heirs are at a big disadvantage in dealing with the surviving partners, lacking knowledge of the extent of the partnership property or information about the amount of business done or the value of the partnership. Thus, in regard to the deceased partner's interest in the partnership, the surviving partners are treated in equity as trustees of the decedent's representatives.'" *Id.* (quoting 59A Am. Jur. 2d Partnership § 1147 (1987)) (footnotes omitted); *see also Biers v. Sammons*, 242 So. 2d 158, 161 (Fla. 3d DCA 1970) (noting that "if the surviving or remaining partners continue the partnership business with the partnership assets they are required to account to the withdrawing or deceased partner's estate . . . [and] they act as trustees").

The record reflects evidence from which a jury could conclude that Defendant enacted a scheme against Plaintiffs, abuse of a confidential or fiduciary relationship, and that Plaintiffs were the "weaker party" in their dealings with him. *See, e.g.*, ECF Nos. [83-20] ("The information I have to work with is what you have told me and the documents from the ATO office."); [511-18] at 1 ("The frustrating part is not know what to believe. One moment I am told that you received funding for the next 5 years and are able to get back to work on building the business. And then the next second I am told there is no progress being made with the business because all your focus is on resolving the ATO disputes."). Accordingly, the Court rejects Defendant's assertion that Count VIII fails.

As set forth above, Defendant's Motion is denied on all grounds. The Court now turns to Plaintiffs' Motion, which contains certain overlapping issues.

### B.     Plaintiffs' Motion

Plaintiffs move for summary judgment on each of the fourteen affirmative defenses raised by Defendant in his Amended Answer, ECF No. [87].[20] According to Plaintiffs, the affirmative defenses fall into eight general categories. ECF No. [498] at 3. The Court will address each affirmative defense and the parties' arguments.

### 1.     *Accord and satisfaction, release, waiver, payment, set-off, and failure to mitigate damages*

Plaintiffs assert that the "Coin-Exch" defenses, Affirmative Defenses 4, 5, 6, 7-1, 7-2, and 8-1, were abandoned by Defendant and are contrary to law. *Id.* at 5. These defenses purportedly relate to Plaintiffs' alleged shares in Coin-Exch. *Id.* According to Plaintiffs, Defendant

---

[20] Defendant mislabels the numbering of several of his affirmative defenses. For instance, he asserts two "seventh" and "eighth" affirmative defenses. Accordingly, for purposes of this motion, set-off is Affirmative Defense 7-1, waiver is Affirmative defense 7-2, failure to mitigate is Affirmative Defense 8-1, and estoppel is Affirmative Defense 8-2.

"abandoned" these affirmative defenses during his March 18, 2020 deposition where he "repeatedly disclaimed having provided Plaintiffs with shares of Coin-Exch in exchange for a release of any claims." *Id.* at 6. In support, they cite Defendant's testimony that in response to a question if he "ever [told] Ira that he would be releasing you from claims if he accepted shares in Coin-Exch," Defendant stated "[n]o, I never made any such thing." *Id.* (quoting ECF No. [498-1] at 227:23-228:1). Likewise, when asked if he "ever [told] Ira that he would be waiving any claims against you if he accepted shares in Coin-Exch," Defendant responded, "[n]o, I did not say anything like that." *Id.* (quoting ECF No. [498-1] at 228:2-6). Plaintiffs add that Defendant has not produced evidence to support these defenses. *Id.* at 6-11.

In response, Defendant asserts that he did not abandon his Coin-Exch defenses. ECF No. [526] at 20. In his view, Plaintiffs have alleged that they suffered damages because of Defendant's promises of shares in a start-up company called Coin-Exch., Ira Kleiman received shares in that company, and thus, Plaintiffs "may not now claim he was damaged for not receiving those shares." *Id.* (emphasis omitted). In reply, Plaintiffs maintain that Defendant's arguments fail. First, they assert that Defendant has failed to put forth evidence showing that the receipt of shares in Coin-Exch was conditional on the release of Plaintiffs' claims or was intended as payment for those claims. ECF No. [560] at 5. Second, they assert that Defendant's representation that Plaintiffs have alleged damages from not receiving the Coin-Exch shares "is just untrue." *Id.* Specifically, they assert that they "have never sought damages relating to shares in the defunct and fraudulent Coin-Exch," and that allegations in the Complaint regarding Coin-Exch shares serve only to support the "many frauds designed to lull Ira Kleiman into believing that [Defendant] was trying to help the Kleiman family, not steal from it." *Id.* (citing ECF No. [83] at ¶¶ 202, 209).

Upon review, the Court finds no genuine dispute that these defenses fail. Defendant has not cited to any evidence in support of these defenses nor has he produced evidence to contradict his own deposition testimony. Likewise, the underlying "Transfer of Shares" document signed by Ira Kleiman and Defendant, ECF No. [498-7], does not include a statement that the shares were provided as part of an agreement, that they would constitute accord and satisfaction, or release claims that Plaintiffs assert in this case. Moreover, Defendant does not address any of the cases Plaintiffs cite nor does he attempt to refute their arguments regarding these defenses' insufficiencies. Therefore, Plaintiffs' Motion is granted on these defenses.

### 2.    *Estoppel*

Defendant asserts the affirmative defense of "estoppel." ECF No. [87] at 34. This defense states that "Plaintiffs are estopped from asserting their claims of fraud against Dr. Wright because they were aware of the Australian Taxation Office investigation, as well as the New South Wales lawsuit against W&K Info Defense Research, LLC, no later than April 2014, and took no action in those proceedings that are in any way consistent with the allegations they now make about those proceedings in this action." *Id.* Plaintiffs challenge that it is "unclear" if Defendant claims equitable or judicial estoppel, but regardless there is no evidence to support either estoppel theory. ECF No. [498] at 12. Specifically, they contend that the judicial estoppel[21] defense fails as a matter of law for three reasons. First, it cannot apply to the estate because it was not a party to either the Australian court proceedings or to the ATO investigation. *Id.* Further, as to W&K, they claim it

---

[21] "The Eleventh Circuit employs a two-prong test in applying the [judicial estoppel] doctrine: (1) whether 'the party took an inconsistent position under oath in a separate proceeding'; and (2) whether the 'inconsistent positions were calculated to make a mockery of the judicial system.'" *Apex Toxicology, LLC v. United Healthcare Ins. Co.*, No. 17-61840-CIV, 2018 WL 3199250, at *1 (S.D. Fla. June 29, 2018) (citing *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017)).

Case 9:18-cv-80176-BB   Document 615   Entered on FLSD Docket 09/21/2020   Page 80 of 93

too was not a party to the ATO investigation and it was not properly served in the lawsuits. *Id.* at

12-13. Second, they argue that Plaintiffs did not take an "inconsistent position" in any proceedings,

they had no standing to do anything in the ATO investigation, and the Australian proceedings were

closed by the time they learned of them. *Id.* at 13. They add that any positions Defendant took on

behalf of W&K in the Australian lawsuits is not, in fact, the actual position of W&K. *Id.* at 13-14.

Finally, even if there was any evidence of some inconsistent position Plaintiffs took under oath,

there is no evidence that it was "calculated to make a mockery of the judicial system." *Id.* at 15

(citation omitted). Regarding equitable estoppel,[22] they assert that Plaintiffs' alleged failure to

"take action" in the ATO investigation or Australian proceedings does not constitute actionable

misrepresentation nor can Defendant show that either Plaintiff had a duty to "take action" in the

ATO investigation or court proceedings. *Id.* Further, they contend that there is no evidence that

Defendant relied on Plaintiffs' inaction, that this supposed reliance caused a detrimental change in

his position, or that Plaintiffs reasonably anticipated that he would rely on their inaction. *Id.* at 16.

In response, Defendant contends that Plaintiffs are judicially estopped from asserting their

claims "for at least three reasons." First, he notes that Ira Kleiman filed a state court action (not

against Defendant) alleging that "whatever bitcoin [Dave Kleiman] supposedly mined were his

personal property, not the property of any purported oral partnership, as alleged here." ECF No.

[526] at 18. Second, Plaintiffs, in making an argument related to supplemental jurisdiction,

"expressly argued that their trade-secret allegations share a common nucleus of operative fact with

---

[22] "Equitable estoppel requires that Defendants prove: (1) [the plaintiff] misrepresented material facts; (2) [plaintiff] was aware of the true facts; (3) [plaintiff] intended that the misrepresentation be acted on or had reason to believe that Defendants would rely on the misrepresentation; (4) Defendants did not know, nor should they have known the true facts; and (5) Defendants reasonably and detrimentally relied on the misrepresentation." *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1376 (S.D. Fla. 2014).

their remaining claims." *Id.* And third, Plaintiffs are "equitably estopped" because for "six and a half (6 ½) years since the Australian judgments, [P]laintiffs haven't lifted a finger to undo them." *Id.* at 19. Thus, he asserts that the Court "should not reward their affirmative choice to sit on their hands instead of ever appearing in the Australian court to contest its judgments." *Id.*

In reply, Plaintiffs argue that Defendant's three points are unsupported by the evidence and are legally insufficient. ECF No. [560] at 13. First, they contend that the state court litigation is distinct from this case as it involved different parties (different defendants and W&K was not a party), and there are no inconsistencies regarding the estate's positions in this case and that one. *Id.* at 13-14, n.12. Indeed, they claim that the "only reference to 'bitcoin' in that [state court] case was a request that, '[t]o the extent' the defendants in that action had any of David's bitcoin, that they be enjoined from converting it to their own use." *Id.* at 14 n.12 (citation omitted). They add "[i]ronically, it was [Defendant] who suggested to Ira [Kleiman] that David may have had devices that contained bitcoin. The remainder of the suit was a request for David's fair share of Computer Forensics, LLC's profits." *Id.* (internal citation omitted). Second, they maintain that Defendant does not contest that estoppel from the Australian proceedings cannot apply to the estate as a non-party, and it is "mind-boggling" to argue that W&K took inconsistent positions in the court proceedings because "W&K did not take any positions in the lawsuits." *Id.* at 14 (emphasis omitted). Third, they argue that Defendant cannot attempt to insert a FUTSA preemption defense based on a "common nucleus of operative fact" to argue for estoppel. *Id.* at 14-15.

Upon review of the record and consideration of the parties' arguments, the Court agrees with Plaintiffs that this defense fails. Regarding judicial estoppel, Defendant must establish that "the party took an inconsistent position under oath in a separate proceeding," and that "these inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Slater*, 871

F.3d at 1181. In this case, Defendant focuses on Ira Kleiman's and the estate's state court lawsuit against Computer Forensics LLC and Mr. Conrad and Mr. Paige. ECF No. [488-1] at 97-112. However, Defendant fails to present evidence to show that Plaintiffs in this case are judicially estopped based on positions taken in that lawsuit. First, W&K is not a party to that lawsuit, so it cannot be judicially estopped as a matter of law. Second, that lawsuit was brought against Computer Forensics, LLC and Mr. Kleiman's former business partners relating to Mr. Kleiman's ownership interests in that company and the alleged conversion of certain property, including websites and a smartphone, that purportedly belonged to Mr. Kleiman.

To be sure, in seeking a permanent injunction against all the defendants, that lawsuit alleges that Mr. Kleiman "created and maintained bitcoin wallets which were his personal property during the time he was a member of Computer Forensics" and that "[t]o the extent that Computer Forensics, Paige, or Conrad have retained any bitcoin wallets that were the personal property of David Kleiman, Computer Forensics should be enjoined from monetizing, transferring or otherwise converting such bitcoin to its use of [sic] or the use of its principals or third parties." *Id.* at 104-05. However, while Defendant argues that these allegations invoke judicial estoppel, he fails to put forward evidence demonstrating that the allegations in that lawsuit are "inconsistent" with the claims in this case. But more importantly, he fails to produce evidence that the estate's supposedly inconsistent positions were calculated "to make a mockery of the judicial system." Additionally, the Court has already rejected Defendant's FUTSA preemption arguments. Accordingly, Plaintiffs' Motion is granted as to the judicial estoppel defense.

Regarding equitable estoppel, Defendant contends that "for six and a half (6 1/2) years since the Australian judgments, [P]laintiffs haven't lifted a finger to undo them." ECF No. [526] at 19. He adds that Plaintiffs were served and were "obviously under a duty to respond" and they

"failed to respond at their peril[.]" *Id.* The Court is unconvinced. As noted, Defendant has not

demonstrated that Plaintiffs were properly served in those lawsuits, the estate was not a party to

those actions, and Defendant fails to satisfy the elements of equitable estoppel. *Buccellati*, 5 F.

Supp. 3d at 1376 ("Equitable estoppel requires that Defendants prove: (1) [the plaintiff]

misrepresented material facts; (2) [plaintiff] was aware of the true facts; (3) [plaintiff] intended

that the misrepresentation be acted on or had reason to believe that Defendants would rely on the

misrepresentation; (4) Defendants did not know, nor should they have known the true facts; and

(5) Defendants reasonably and detrimentally relied on the misrepresentation."). Accordingly,

Plaintiffs' Motion is granted on this defense.

### 3.      *Res judicata and collateral estoppel*

In the December 2018 Order, the Court previously rejected Defendant's arguments that

Plaintiffs' claims were barred by the doctrines of res judicata and collateral estoppel. ECF No. [68]

at 13-15. Specifically, the Court could not conclude that the Australian judgments operated as a

judgment on the merits, which element is required to successfully assert these defenses. *Id.*

Likewise, the Court noted that res judicata does not apply "when its application would defeat the

ends of justice," and based on the pleading's allegations, "it would be an injustice to the Plaintiffs

to allow the doctrine of res judicata to be invoked." *Id.* at 15.

Plaintiffs now argue that the Court "should grant summary judgment to Plaintiffs on this

defense for the same reasons it previously rejected the defense: the consent orders in the Australian

Court Proceedings are void for lack of valid service, the claims or issues in this case were not

decided on the merits in those proceedings, and application of res judicata or collateral estoppel

would defeat the ends of justice." ECF No. [498] at 16. Likewise, they assert that preclusion

"cannot apply because of extrinsic fraud by Defendant in the Australian Court Proceedings." *Id.*

*See also id.* at 16-22. Defendant responds, without addressing all of Plaintiffs' arguments or this Court's December 2018 Order, that res judicata applies[23] because W&K was properly served under the Hague Convention and there was no extrinsic fraud. In reply, Plaintiffs contend that summary judgment is proper because he does not challenge two independent bases for rejecting these defenses, including that the Australian judgments were not decided on the merits or that preclusion would defeat the ends of justice; res judicata does not apply where W&K was not served with process during those proceedings; and Defendant's extrinsic fraud precludes res judicata. ECF No. [560] at 15-16.

"In determining whether an action is barred by res judicata, a federal court applies the law of the state in which it sits." *Laskar v. Peterson*, 771 F.3d 1291, 1299 (11th Cir. 2014). "The doctrine of res judicata applies when four identities are present: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of the quality of the persons for or against whom the claim is made." *Topps v. State*, 865 So. 2d 1253, 1255 (Fla. 2004). Additionally, "it is clear that a decision on the merits must have been made before res judicata becomes applicable[.]" *Id.* at 1256. Defendant has not shown that the instant claims are barred by res judicata. Not only has Defendant failed to demonstrate that any of the elements above are satisfied, he cannot do so as a matter of law. The estate was not a party to the Australian proceedings, the causes of action in those lawsuits and here are not identical, the relief requested in this action is different, and there was no judgment on the merits in those cases. Accordingly, Plaintiffs' Motion is granted on this defense.

---

[23] Defendant also makes no argument regarding collateral estoppel. Indeed, his response is dedicated only to res judicata. *See* ECF No. [526] at 2-3, 17-18. The Court, therefore, finds that Defendant has abandoned this defense and forfeited this point. *See Anderson v. Branch Banking and Tr. Co.*, 119 F. Supp. 3d 1328, 1345 (S.D. Fla. 2015) (collecting cases).

### 4.      *Statute of limitations and laches*

Plaintiffs argue that the Court previously rejected the statute of limitations argument in the December 2018 Order and that it should do so again here because there is no record evidence that the date of the Australian court judgments changed or that "Plaintiffs were aware of Defendant's conduct underlying their claims more than four years prior to the filing of this lawsuit." *Id.* at 22. Further, they contend that "[a]lthough the Court need not reach the issue, the record evidence also demonstrates that the statute of limitations was tolled until October 2015 because of Defendant's own misconduct" under the doctrine of fraudulent concealment or equitable estoppel. *Id.* at 23-24. They add that the record contains "irrefutable evidence" of Defendant's deception, "including obstructive behavior that has continued during this case, which was specifically aimed at defrauding the Estate and W&K and preventing discovery of Plaintiffs' claims." *Id.* at 23. Plaintiffs maintain that the laches[24] defense fails "for similar reasons" and that laches does not apply if the limitations period has not run or has been tolled. *Id.* at 25. *See also Briggs v. Estate of Geelhoed ex rel. Johnson*, 543 So. 2d 332, 334-35 (Fla. 4th DCA 1989) (laches did not apply where statute of limitations was tolled). They likewise add that Defendant has not provided evidence that he has been prejudiced or detrimentally relied on any inaction by Plaintiffs. *Id.*

In response, reciting substantially identical arguments asserted in his motion, Defendant maintains that Plaintiffs' claims are time-barred and that the latest date that the claims accrued was November 6, 2013, when the Australian judgments were entered, thus making all but one claim

---

[24] "Laches has four elements: (1) conduct on the part of the defendant giving rise to the situation of which the complaint is made; (2) failure of the plaintiff to assert his or her rights by suit, even though the plaintiff has had knowledge of the defendant's conduct and has been afforded the opportunity to institute suit; (3) lack of knowledge on the defendant's part that the plaintiff would assert the right on which he or she bases the suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the plaintiff or the suit is held not to be barred." *Dep't of Revenue ex rel. Thorman v. Holley*, 86 So. 3d 1199, 1203 (Fla. 1st DCA 2012).

time-barred by approximately three months. ECF No. [526]. In support, Defendant argues that the delayed discovery doctrine does not apply, there is no evidence of fraudulent concealment to toll the statutes of limitations, equitable estoppel does not apply to save the claims, and laches bars Plaintiffs' claims for equitable relief. *Id.* at 4-15. In reply, Plaintiffs assert that Defendant's opposition "fails because it depends on facts not supported by the undisputed record." ECF No. [560] at 5. They add that the statute of limitations defense lacks evidentiary support, equitable estoppel and fraudulent concealment apply to bar a statute of limitations defense, and the laches defense fails because the claims are not time barred and Defendant presents no evidence of prejudice from any delay. *Id.* at 5-12.

Upon review and consideration, and as set forth in the analysis on Defendant's Motion, the parties present a genuine dispute regarding whether the limitations periods are tolled by the doctrines of fraudulent concealment and equitable estoppel. Accordingly, Plaintiffs' Motion is denied on these defenses.

### 5.    *Good faith*

Defendant's third affirmative defense, good faith, asserts that "[t]o the extent Plaintiffs allege that the 2011 Intellectual Property License Funding Agreement, the 2012 Deed of Loan, and the 2013 Contract for the Sale of Shares of Company Owning Business ('the Contracts') are unenforceable, Dr. Wright acted in good faith to effectuate David Kleiman's intent after David Kleiman's death." ECF No. [87] at 33.

Plaintiffs argue that this defense is legally and factually unsupportable. ECF No. [498] at 2. They add that "no case support[s] the proposition that a Defendant's own self-serving, after-the-fact statements that the opposing party would have been supportive can create a disputed issue of material fact for a good faith defense. Indeed, no authority that Plaintiffs are aware of remotely

suggests that a fraudulent contract is valid so long as the defendant claims that he believes in 'good faith' he is effectuating the intent of the person whose signature he forged." *Id.* at 26. Defendant did not address his good faith affirmative defense in his response to Plaintiffs' Motion, ECF No. [526]. Accordingly, the Court agrees with Plaintiffs that Defendant has forfeited this defense. *See, e.g.*, *Pac. Employers Ins. Co. v. Wausau Bus. Ins. Co.*, 508 F. Supp. 2d 1167, 1174 (M.D. Fla. 2007) ("The other affirmative defenses that Defendants failed to support in the Response are waived and are no longer before the Court.") (citing *Gilbert v. Walt Disney Parks and Resorts, LLC*, 2005 WL 1863367, *7 (Aug. 3, 2005) (failure to respond to claim in an opposition memorandum results in the claim being waived)). Summary judgment in Plaintiffs' favor is granted on this defense.

### 6.    *Unclean hands*

Defendant's ninth affirmative defense, unclean hands and illegality, states that "Plaintiffs' claims are barred by the doctrine of unclean hands because, inter alia, Ira Kleiman, as the representative of David Kleiman's estate, manipulated his dead brother's estate to avoid payment of taxes and violated various laws, including, but not limited to, Florida and foreign laws that protect against the invasion of privacy and the misuse of private, personal, or confidential information." ECF No. [87] at 34-35.

"For a defendant to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements. First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by her conduct." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993) (internal citation omitted). "[C]ourts require the connection between the unclean-hands conduct and the

matter in litigation to be very close." *Bowe v. Pub. Storage*, No. 1:14-CV-21559-UU, 2015 WL 11233137, at *3 (S.D. Fla. June 26, 2015) (granting summary judgment to plaintiff on unclean hands defense because the alleged misrepresentation was not directly related to the lawsuit). *See also Freestream Aircraft USA Ltd. v. Chowdry*, No. 16-CV-81232, 2018 WL 1309921, at *3 (S.D. Fla. Mar. 12, 2018) ("[W]e're talking *really* directly related . . . It is, in essence, the reason for the lawsuit.") (emphasis in original; citation omitted).

Plaintiffs argue that this defense is lacking because the alleged bad acts, avoiding estate taxes and violating privacy laws, are "entirely unrelated" to their claims, and there is no evidentiary support that Defendant was harmed by the purported misconduct. ECF No. [498] at 26-28. Curiously, although not asserted as an affirmative defense, the Defendant responds that Ira Kleiman destroyed David Kleiman's papers and hard drives, and that this conduct is "a casebook paradigm of unclean hands. He destroyed key evidence and may well be sitting on key evidence that he refuses even to attempt to access." ECF No. [526] at 19.[25] In reply, Plaintiffs assert that Defendant's response "presents a new, speculative account of his unclean hands defense, abandoning both grounds for the defense alleged in his answer." ECF No. [560] at 16. According to Plaintiffs, Defendant fails to satisfy both elements to assert this defense, he waived the newfound arguments by not asserting them in the Amended Answer and Plaintiffs are prejudiced by it, and there is no evidence that anything in the mail disposed of by Ira Kleiman or on the hard drives creates a disputed material fact. ECF No. [560] at 16-17.

---

[25] Defendant does not cite any facts in particular to substantiate his assertions. His claim that Ira Kleiman "took possession of [Mr. Kleiman's] belongings, threw away his papers, erased two of his hard drives, and now admits that he never sought professional help to access [Mr. Kleiman's] other devices or several of his email accounts" references "Def. SMF ¶_" and not any record evidence. *See* ECF No. [526] at 19.

Upon review, the Court concludes that this defense fails. Defendant has not raised any genuine issue of fact as to the actual delineated theories underlying this affirmative defense—avoiding estate taxes and violation of privacy laws—as set forth in the Amended Answer, ECF No. [87] at 34-35. Indeed, Defendant's response to Plaintiffs' Motion focuses exclusively on alleged wrongdoing unrelated to tax evasion and privacy invasion, and not pleaded as an affirmative defense. Defendant neither cites evidence nor raises arguments in support of his actual defense. Therefore, he fails to present a genuine dispute of material fact as to either element of the unclean hands defense under *Calloway*, and summary judgment, accordingly, is warranted in Plaintiffs' favor. The Court, similarly, exercises its discretion and will not apply the unclean hands doctrine to bar equitable claims on grounds not actually pled in Defendant's pleading. *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th Cir. 1983) (explaining that "[a]pplication of the equitable doctrine of unclean hands lies within the sound discretion of the district court").

The failure to plead an affirmative defense generally results in a waiver of that defense. *Latimer*, 601 F.3d at 1239. Just as a party may not amend a pleading through a response brief, it may not avoid waiver of an affirmative defense by belatedly raising it in response to a summary judgment motion. *See Gottlieb & Gottlieb, P.A. v. Crants*, 657 F. App'x 920, 923 (11th Cir. 2016) (holding that district court did not abuse its discretion in determining that defendant waived an affirmative defense that was raised in an opposition to plaintiff's motion for summary judgment) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (concluding that a party may not amend a pleading "through argument in a brief opposing summary judgment")). *See also Keybank Nat'l Ass'n v. Hamrick*, 576 F. App'x 884, 888–89 (11th Cir. 2014) ("When an affirmative defense initially was raised pursuant to a summary judgment motion, we determined

that the defendant's 'failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense.'"). This is all the more so where, as here, Defendant's one-paragraph response fails to cite specifically to any actual record evidence supporting this newly asserted defense. Accordingly, Plaintiff's Motion is granted on the unclean hands defense.

### 7.    *Statute of frauds*

Plaintiffs maintain that Defendant's statute of frauds affirmative defense is legally and factually inapplicable. They argue that the "the fact the partnership lasted more than a year is not the relevant consideration. Instead, Courts must determine whether, at the time of formation, 'performance is possible within one year from the inception of the contract[.]'" ECF No. [498] at 28 (citation and emphasis omitted). If so, the contract falls outside the statute of frauds. *Id.* They note that there is no evidence that the alleged partnership "to create and mine Bitcoin necessarily required performance lasting more than one year," and "[a]t best, this was an oral contract for an indefinite time which is not barred by the Statute of Frauds." *Id.* at 29 (citation omitted).

Defendant responds that a "purported oral contract allegedly intended to last three years, which also is alleged to have lasted three years, violates Florida's statute of frauds, period, full stop." ECF No. [526] at 15. He also argues that there is no evidence that any bitcoin allegedly mined by Satoshi Nakamoto ever moved on the blockchain over the last nine years. *Id.* at 16. Because of this, he theorizes that the purported partners "also had to have had an oral agreement to not access the bitcoin for more than a year, which also would require dismissal of this claim for violating the statute of frauds." *Id.* In reply, Plaintiffs maintain that there "is still no evidence supporting an intent for a partnership to last for a definite period longer than one year, or that performance of the partnership agreement was impossible within one year." ECF No. [560] at 12. They also assert that there is no evidence that Defendant and Mr. Kleiman made any agreement to

not access mined bitcoin as part of forming their partnership, but even if there was such an agreement formed at a later date, that would not render the earlier-formed relationship unenforceable. *Id.* at 13.

Upon review and consideration, and for the reasons explained above regarding Defendant's Motion, Defendant has not presented record evidence supporting this defense other than a mischaracterization of the SAC's allegation, ECF No. [83] at ¶ 67, as to the parties' supposed intent for the alleged partnership's duration. In particular, Plaintiffs have shown the absence of evidence that full performance of the partnership within one year was impossible or that the parties intended the partnership to last for a particular duration especially one lasting longer than one year. Plaintiffs have, thus, discharged their burden on this defense. *See Electro Med. Assocs. v. Aetna Life Ins. Co.*, No. 8:09-CV-39-T-27AEP, 2010 WL 11508047, at *1 (M.D. Fla. May 17, 2010) ("The primary question raised by the parties is what evidence, if any, is Plaintiff required to submit when moving for partial summary judgment on Defendants' affirmative defenses. Because Defendants bear the burden of proof on their affirmative defenses, Plaintiff can simply point to the lack of supporting evidence. Plaintiff did so, but Defendants failed to submit any record evidence to establish several defenses. As to those defenses, the motion is due to be granted."). *See also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (where a summary judgment motion relates to issues on which the non-moving party will bear the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility" but rather "the moving party simply may show [] -that is, point[] out to the district court-that there is an absence of evidence to support the non-moving party's case") (emphasis in original; citation omitted); *Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001)

(the "burden is on defendant to adduce evidence supporting affirmative defenses, not upon movant

to negate its existence") (citing *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076,

1090–91 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir.1991)).

To avoid summary judgment, Defendant is required to either "show that the record in fact

contains supporting evidence sufficient to withstand a directed verdict motion" or submit

"additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency." *Fitzpatrick*, 2 F.3d at 1116-17. Defendant did neither. Accordingly,

because Plaintiffs have carried their initial burden and Defendant fails to demonstrate a genuine

issue of material fact regarding the statute of frauds, Plaintiffs are entitled to judgment as a matter

of law on this defense.

### 8.    *Personal jurisdiction*

Defendant's eleventh affirmative defense provides that the Court "lacks personal

jurisdiction over Dr. Wright under Fla. Stat. § 48.193(1)(a). Dr. Wright never performed any

relevant act while physically in the state of Florida, nor any tortious act causing injury in the state

of Florida, and does not possess minimum contacts with the state of Florida from which Plaintiffs'

claims arise or to which they relate." ECF No. [87] at 35. In the December 2018 Order, the Court

previously rejected Defendant's argument that the Court lacked personal jurisdiction. ECF No.

[68] at 27-28.

Plaintiffs argue that the record supports the exercise of personal jurisdiction over

Defendant because the alleged injuries occurred in Florida, Plaintiffs are located in this state,

Defendant affirmed in the Australian proceedings that he conducted business with Mr. Kleiman in

Florida, and the claims arise out of Defendant's alleged misappropriation of Mr. Kleiman and

W&K's assets. ECF No. [498] at 29-30. Defendant responds that he "has the right to, and does,

preserve this argument for appeal." ECF No. [526] at 20. Plaintiffs reply that Defendant "does not oppose summary judgment on his personal jurisdiction defense, but rather just wants to preserve it for appeal." ECF No. [560] at 17. They add that "summary judgment is appropriate because the record still supports the Court's denial of [his] motion to dismiss on personal jurisdiction." *Id.*

Upon review, Defendant presents no record evidence to support a defense that the Court lacks personal jurisdiction over him. Nor does he otherwise dispute Plaintiffs' facts supporting the exercise of personal jurisdiction. Accordingly, Plaintiffs' Motion is granted on this defense.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Defendant's Motion, **ECF No. [487]**, is **DENIED;**

2. Plaintiff's Motion, **ECF No. [498]**, is **GRANTED IN PART AND DENIED IN PART**.

3. Plaintiff's Motion for Leave to Supplement Record on Defendant's Pending Motion for Summary Judgment, **ECF No. [612]**, is **DENIED AS MOOT.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 18, 2020.

**BETH BLOOM
UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record