# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

### OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Plaintiffs' Omnibus Daubert Motion to Strike Defense Experts, ECF No. [492] ("Plaintiffs' Motion")[1] and Defendant's Motion to Exclude the Opinion Testimony of Plaintiffs' Expert Witnesses, ECF No. [500] ("Defendant's Motion") (collectively, "Motions"). The Court has considered the Motions, all supporting and opposing submissions (ECF Nos. [528],[2] [529], [554], and [556][3]), the record in this case, the applicable

---

[1] Plaintiffs' Motion was filed under seal. On May 12, 2020, the Court denied Plaintiffs' motion to seal Plaintiffs' Motion and directed Plaintiffs to refile it with redactions. *See* ECF No. [502]. On May 18, 2020, Plaintiffs' Motion was refiled with redactions. *See* ECF No. [509]. For ease of reference, the Court cites to ECF No. [492].

[2] Plaintiffs' Response to Defendant's Motion was filed under seal, ECF No. [528]. On May 26, 2020, the Court denied Plaintiffs' motion to seal Plaintiffs' response and directed Plaintiffs to refile it with redactions. *See* ECF No. [538]. On June 1, 2020, Plaintiffs refiled their Response. ECF No. [548]. For ease of reference, the Court cites to ECF No. [528].

[3] Plaintiffs' Reply in support of Plaintiffs' Motion was filed under seal, ECF No. [556]. On June 3, 2020, the Court denied Plaintiffs' motion to seal the Reply and directed Plaintiffs to refile it with redactions. *See* ECF No. [563]. On June 10, 2020, the Reply was refiled with redactions. *See* ECF No. [549]. For ease of reference, the Court cites to ECF No. [556].

law, and is otherwise fully advised. For the reasons set forth below, Plaintiffs' Motion is granted

in part and denied in part, and Defendant's Motion is granted in part and denied in part.

## TABLE OF CONTENTS

**BACKGROUND**..................................................................................................**3**

**LEGAL STANDARD**........................................................................................**4**

**DISCUSSION**.....................................................................................................**9**
A.   **Plaintiffs' Motion**......................................................................................**9**
    1.   *Dr. Ami Klin*.......................................................................................**9**
        a.   Witness exclusion is unwarranted and too harsh a remedy................**12**
        b.   Portions of Opinion #2 exceed the purview of expert testimony.............**19**
    2.   *Kevin Madura*....................................................................................**24**
        a.   Mr. Madura was not required to disclose information considered
            in the capacity of a consulting expert............................................**27**
        b.   Mr. Madura's opinion is not speculative and unreliable......................**30**
    3.   *F. Harley Norwitch*............................................................................**33**
        a.   Mr. Norwitch's reports fail to comply with Rule 26.........................**36**
        b.   Defendant fails to carry his burden to avoid Rule 37 sanctions..............**39**
        c.   Defendant fails to show that Mr. Norwitch's opinions are based
            on a reliable methodology............................................................**40**
    4.   *Dr. Stewart MacIntyre*......................................................................**44**
        a    Dr. MacIntyre's opinions regarding Mr. Kleiman's health and
            effects of medication...................................................................**47**
        b    Dr. MacIntyre's opinions regarding lack of care by family and
            friends and Mr. Kleiman's "disruptive" behavior............................**49**
B.   **Defendant's Motion**....................................................................................**50**
    1.   *Gordon Klein*.....................................................................................**50**
    2.   *Dr. Matthew Edman*...........................................................................**58**
    3.   *Andreas Antonopoulos*.......................................................................**62**
        a.   Mr. Antonopoulos' qualifications and alleged bias...........................**66**
        b.   Section XI of Mr. Antonopoulos' report regarding public

statements by Satoshi Nakamoto……………………………………………**67**

   c.     Bitcoin lists and bitcoin message……………………………………**68**

**4.**    ***Stefan Boedeker***………………………………………………………………**70**

**5.**    ***Dr. Robert Leonard***………………………………………………………....**74**

**CONCLUSION**………………………………………………………………………**78**

## I.    BACKGROUND

The Court assumes the parties' familiarity with the general factual allegations and nature of this case. *See, e.g.*, ECF Nos. [68]; [83]; [87]; [265]; [373].

Plaintiffs seek to strike defense experts, Dr. Ami Klin, Kevin Madura, F. Harley Norwitch, and Dr. Stewart MacIntyre, pursuant to Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Civ. P. 37(c)(1). Plaintiffs represent that they do not bring their motion "on the basis that the opinions offered contradict the evidence the Defendant has produced in this litigation," but rather because "these experts either (1) failed to comply with the bare minimum requirements imposed by Fed. R. Civ. P. 26, and therefore must be excluded on fairness or reliability grounds under Rule 37 or *Daubert*; or (2) issued opinions that are irrelevant to the issues in this litigation." *Id.* at 3-4.

Defendant seeks to exclude the opinions of Plaintiffs' experts, Gordon Klein, Dr. Matthew Edman, Andreas Antonopoulos, Stefan Boedeker, and Dr. Robert Leonard because their testimony is inadmissible under Rule 702 and *Daubert*. ECF No. [500]. In Defendant's view, Plaintiffs' experts' opinions are "products of methods of inquiry that are not generally accepted as valid in their fields," and they "improperly seek to influence the jury with unsupported, results-driven conclusions and flawed methodologies." *Id.* at 2.

## II.      LEGAL STANDARD

### A.      Rule 702 and *Daubert*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

An expert in this Circuit may be *qualified* "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-21089-CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); Fed. R. Evid. 702). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the

expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *1 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion." *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).[4]

When determining whether an expert's testimony is *reliable*, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation omitted) (quotation marks omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, these factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho Tire Co.*, 526 U.S. at 152).

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Court of Appeals for the Fifth Circuit rendered prior to October 1, 1981.

The final element, *helpfulness*, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision*

*I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Estate of Tessier*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

### B.    Rules 26 and 37

Federal Rule of Civil Procedure 26 requires a party to disclose to the other parties the identity of any witness it may use at trial to present expert testimony. *See* Fed. R. Civ. P. 26(a)(2). To make a proper disclosure, parties must disclose an expert's identity "accompanied by a written report." *Id.* at Rule 26(a)(2)(B). The written report must contain an array of information, including a "complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," and the witness' qualifications, lists of cases where the witness testified as an expert, the expert's fee arrangement, and exhibits used to summarize or support the expert's opinions. *See id.* at Rule 26(a)(2)(B)(i)-(vi).

Parties must supplement their expert disclosures when required under Rule 26(e). *Id.* at Rule 26(a)(2)(E). That rule, in turn, imposes a duty on a party to supplement or correct its expert disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or as ordered by the court." *Id.* at Rule 26(e)(1). Further, for an expert whose report must be disclosed under Rule 26(a)(2)(B), "the party's duty to supplement extends both to information included in the report and to information given during the expert's depositions," and any "additions or changes to this information must be disclosed by the time the party's pretrial disclosures under

Rule 26(a)(3) are due." *Id.* at Rule 26(e)(2). Under that rule, unless ordered otherwise by the court, pretrial disclosures must be made at least 30 days before trial. *Id.* at Rule 26(a)(3)(B).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." *See id.* at Rule 37(c)(1). The non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009). In making this determination, the Court considers four factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Torres v. First Transit, Inc.*, No. 17-CV-81162, 2018 WL 3729553, at *2 (S.D. Fla. Aug. 6, 2018) (citation omitted). "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question." *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1260 (S.D. Fla. 2015) (citation omitted).

"Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there is [a] genuine dispute concerning compliance." *Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc.*, No. 603CV1860ORL19KRS, 2005 WL 2465020, at *2 (M.D. Fla. Oct. 6, 2005) (quoting *Ellison v. Windt*, No. 6:99-cv-1268-Orl-KRS, 2001 WL 118617, at *2 (M.D. Fla. Jan. 24, 2001)) (citation omitted). "Failure to timely make the required expert witness disclosures is harmless when the party entitled to the disclosure suffers no prejudice." *Id.*

Ultimately, the "determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Smith v. Jacobs Eng'g Grp., Inc.*, No. 4:06CV496-WS/WCS, 2008 WL 4264718, at *6 (N.D. Fla. Mar. 20, 2008), *report and recommendation adopted*, No. 4:06 CV 496 WS, 2008 WL 4280167 (N.D. Fla. Sept. 12, 2008) (citation omitted); *Warren v. Delvista Towers Condo. Ass'n, Inc.*, No. 13-23074-CIV, 2014 WL 3764126, at *1-2 (S.D. Fla. July 30, 2014) (noting that while the "failure to comply with the expert witness disclosure requirements may result in the striking of expert reports or the preclusion of expert testimony," a court has "great discretion in deciding whether to impose such a sanction").

Through this lens, the Court considers the Motions and the parties' arguments.

## III.    DISCUSSION

### A.    Plaintiffs' Motion

#### 1.    Dr. Ami Klin

Dr. Klin, a licensed clinical psychologist, was retained by Defendant to "address two questions: (1) does Dr. Wright meet criteria for Autism Spectrum Disorder (ASD), and (2) if so, how would this diagnosis impact his presentation in legal proceedings such as depositions and court appearances." ECF No. [492-1] at 1. Dr. Klin diagnosed Defendant with ASD and opined how it affects Defendant's behavior, including issues related to answering questions asked of him. Plaintiffs argue that Dr. Klin's report should be stricken because it violates Fed. R. Civ. P. 26(a)(2)(B) by "fail[ing] to include essentially all the factual materials or data Dr. Klin relied upon in forming his opinions," and his proposed testimony is "improper because [it] invades the province of the jury by opining extensively on Defendant's credibility." ECF No. [492] at 6.

Plaintiffs make four arguments for striking Dr. Klin's report. First, they maintain that Dr. Klin's destruction of materials he relied upon in forming his opinions was improper. *Id.* at 6-9.

Specifically, the "Klin Binder" of materials produced to Plaintiffs did not include seven categories of documents, including Dr. Klin's contemporaneous notes of his interview with Defendant nor the contemporaneous notes of his colleague, Dr. Saulnier, who interviewed Defendant's family members. *Id.* at 7. Dr. Klin testified that he destroyed the notes of all the interviews he and Dr. Saulnier conducted as it is his "standard practice" to destroy such items. ECF No. [492-2] at 124-25, 312-13, 368-69. Dr. Klin also destroyed materials related to certain ADI-R and ADOS-2 psychological assessments. ECF No. [492] at 8-9. Second, Plaintiffs argue that Dr. Klin's destruction of materials he relied upon has irreparably prejudiced Plaintiffs and justifies striking him as a witness because they "are unable to test any of the bases for Dr. Klin's opinions." *Id.* at 9. They assert that Dr. Klin "intends to come to trial and base sweeping opinions regarding Dr. Wright's mental health on information to which Plaintiffs have no access to." *Id.* at 10. Moreover, there is "no way" to "test the veracity of" his opinions and they "should not have to 'take Dr. Klin's word for it' and hope they are not ambushed at trial." *Id.* at 11. *See also* ECF No. [556] at 6-8 (arguing that Plaintiffs' prejudice is not "harmless" and that there was no substantial justification for Dr. Klin's actions). Third, Plaintiffs contend that Defendant should not be able to "evade the requirements of Rule 26 by hiring an expert whose practice is to discard records." ECF No. [492] at 11-12. Plaintiffs suggest that Dr. Klin's actions fall short of the American Psychological Association's ethical guidelines. *Id.* Fourth, Plaintiffs maintain that Dr. Klin's "Opinion #2," which addresses how Defendant's ASD diagnosis impacts his presentation in legal proceedings, including depositions and court proceedings, ECF No. [492-1] at 14-17, is improper expert witness testimony because it invades the province of the jury by opining on Defendant's credibility. ECF No. [492] at 12. According to Plaintiffs, "Defendant intends to put forward an expert witness to 'explain' to the jury how Dr. Wright's well-documented challenges with telling the truth are not

evidence that he lacks credibility but are instead just an unfortunate symptom of a mental health disorder." *Id.*

Defendant responds that Dr. Klin's testimony "will help the jury understand how [Defendant's ASD] disability affects behavior" and will be "critical for the jury to fairly weigh the evidence" and "evaluate his credibility." ECF No. [529] at 2, 4. Dr. Klin has studied ASD for over 35 years and completed over 2,000 ASD diagnostic evaluations. *Id.* at 4. He and Dr. Saulnier used the "gold standard" methodology when evaluating Defendant. *Id.* Defendant adds that even though Dr. Klin discarded certain handwritten notes and raw scores as a matter of routine practice, he "integrated those notes into his final expert report before discarding them and [] his report contains the 'totality' of the information used to generate his opinions." *Id.* at 2. Defendant makes six core arguments. First, Defendant argues that expert testimony regarding autism is admissible under Rule 702, Fed. R. Evid, Dr. Klin is qualified, and the method he applied is reliable. Second, Dr. Klin's expert testimony is admissible under Rule 608(a), Fed. R. Evid., which provides that a "witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." *Id.* Third, Defendant contends the cases Plaintiffs cited are distinguishable as they do not involve "behavioral (or analogous) testimony" and Dr. Klin "does not purport to testify as to Dr. Wright's truthfulness" but instead "as to how ASD causes certain behavior that is outside the common knowledge of jurors." *Id.* at 9. Fourth, Dr. Klin's opinions are not speculative as he relied upon testing instruments, such as ADOS, ADI-R, and the Vineland Adaptive Behavioral Scales. *Id.* at 9-10. Fifth, the requirements of Rule 26 are "unequivocally met" despite Plaintiffs' complaint that the report and disclosures did not contain handwritten notes and raw scores. *Id.* at 11-15. He adds that the raw scores from the testing instruments were incorporated

into Dr. Klin's report, he provided over 208 pages of expert materials to Plaintiffs, *id.* at 13, and the purpose of Rule 26's expert witness disclosure requirements "has been served by the contents of Dr. Klin's report and related disclosures." *Id.* at 14. In this respect, he contends that the missing handwritten notes and raw scores are not a "disclosure violation" and do "not detract from the completeness of the report, especially since that data was incorporated into the report itself." *Id.* at 14. Finally, Defendant argues that even if the absence of the handwritten notes could amount to a discovery violation, the absence of materials does not warrant Rule 37 sanctions. *Id.* at 15. In particular, he maintains that there is "substantial justification" given Dr. Klin's "routine practice" to destroy handwritten notes, and any disclosure deficiency is "harmless" because "the substance of the notes is *not absent* from Dr. Klin's report." *Id.* at 16-17 (emphasis in original; citing ECF No. [529-2] at 123-26, 368). Further, Plaintiffs deposed Dr. Klin for seven hours and can cross-examine him at trial. *Id.* at 17. He posits that excluding Dr. Klin's testimony is "too harsh a remedy that is disproportionate to the alleged disclosure violation," and there is no showing of bad faith. *Id.* at 17-18.

### a.      Witness exclusion is unwarranted and too harsh a sanction

Plaintiffs first argue that Opinion #1 should be stricken and Dr. Klin excluded as a witness because of his alleged "willful destruction" of materials he relied upon to reach his conclusion that Defendant has ASD. *Id.* at 2, 6-8. *See also* ECF No. [492] at 9-11. The Court does not agree.

Plaintiffs have failed to demonstrate how Dr. Klin's expert report or expert opinions are unreliable or unhelpful without the underlying handwritten notes or raw testing data. The Court has no reason to find that Dr. Klin did not follow the established "gold standard" for evaluating Defendant, and his report reflects Defendant's scores on various metrics and what the scores mean. *See, e.g.*, ECF No. [492-1] at 7-10. Likewise,  the report sets forth that "Drs. Klin and Saulnier

also had an opportunity to discuss all materials at the end of the consultation and prior to summary report writing in order to clarify any matters associated with the various procedures that Dr. Saulnier had carried out, and in order to perform a clinician-best estimate diagnosis across the two clinicians (a consensus diagnosis as per 'gold standard' practices). . . . Dr. Klin integrated all findings and observations in the final report." *Id.* at 3; *See also* ECF No. [529-1] at 123-125. Moreover, while Plaintiffs challenge the usefulness of the documentation provided to them, the record does support that numerous records were produced. ECF No. [492-3]. These records consisted of a draft component report sent to Dr. Klin by Dr. Saulnier; correspondence between Dr. Saulnier and Defendant; correspondence between Dr. Saulnier and Defendant's wife; Defendant's SRS-2 self-report and score report; Defendant's wife's SRS-2 report and score report; a Vineland-3 Comprehensive Interview Report; a Vineland-3 form; and an ADI-R form. *Id.* The blank assessment forms reflected the questions used in the evaluations, which final scores were later included in the report. Further, according to Dr. Klin, "the gold standard clinical judgment using the ADOS makes use of its algorithm scores—his total scores, not item by item. The validity of an instrument is maximized by using the totality of information and not any of the items in isolation." *See* ECF No. [492-2] at 368:2-8. Accordingly, that some blank forms were produced does not mean that the materials provided were meaningless or that Plaintiffs were unduly prejudiced.

Additionally, Plaintiffs deposed Dr. Klin, which in turn enabled them to probe the extent and nature of his opinions. The Court is unwilling to exclude Dr. Klin as an expert witness on the ground that he did not preserve his notes, due to his expressed retention policy, where his report represents that he "integrated all findings and observations in the final report." ECF No. [492-1] at 3; ECF No. [529-1] at 123:9-16; 124:1-6; 125:2-8; 126:2-17; 368:2-8. *See, e.g.*, *Walker v. DDR*

*Corp.*, No. 3:17-CV-01586-JMC, 2019 WL 3409724, at *4-7 (D.S.C. Jan. 4, 2019), *reconsideration denied*, No. 3:17-CV-01586-JMC, 2019 WL 1349514 (D.S.C. Mar. 26, 2019) (denying motion to exclude expert testimony and rejecting argument that it was "impossible" to scrutinize expert's opinion "because his notes and underlying facts or data are destroyed" due to his retention policy where the notes were ultimately dictated and included in the final report and the expert had been deposed). Indeed, the report itself is comprised of an extensive "background for consultation" that identifies the scope of the assignment and materials reviewed; identification of the diagnostic consultants and their roles; identification of the procedures and notes on methodology; a summary of the ADI-R, including notes on Defendant's family history and genetic liabilities, his developmental history, communication skills, reciprocal interaction skills, and patterns of behavior; Defendant's ADI-R scores and SRS-2 scores; assessment of adaptive behavior on the Vineland Adaptive Behavior Scales, including his scores; direct interview and observation analysis of Defendant using the ADOS-2 Module 4, including Defendant's scores; Defendant's diagnostic evaluation in Opinion #1; and Opinion #2. *See* ECF No. [492-1].[5]

Next, although Plaintiffs argue that Defendant engaged in a "disclosure violation" of Rule 26, ECF No. [492] at 9, Rule 26 does not require an expert to provide "every scrap of paper with

---

[5] Plaintiffs' citation to *Capricorn Mgmt. Sys., Inc. v. Gov't Employees Ins. Co.*, No. 15CV2926DRHSIL, 2019 WL 5694256 (E.D.N.Y. July 22, 2019), *report and recommendation adopted*, 2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020) for support that Dr. Klin's failure to disclose the notes that form the basis for his opinions warrants his exclusion is misplaced. That court did not address whether the alleged destruction of an expert's notes warrants striking the expert. Instead, the expert reports in that case ran afoul of Rule 26(a)(2)(B) because they were submitted and signed by counsel rather than the experts, and they referred to the experts in the third-person, "which underscores that [Plaintiff's] lawyers, rather than the experts, prepared the reports." *Id.* at *5. Further, the reports did not provide a "substantive rationale in detail" or "explain factually why and how" the experts reached their opinions. *Id.* at *6. Additionally, the reports made "vague references" to "general items" that were considered. *Id.* Those features are not present in the instant case.

potential relevance to an expert's opinion." *Etherton v. Owners Ins. Co.*, No. 10-cv-00892-MSK-KLM, 2011 WL 684592, at *2 (D. Colo. Feb. 18, 2011). There is "no 'suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report.' Rule 26(a)(2) does not 'require that an expert report contain all the information that a scientific journal might require an author of a published paper to retain.'" *Id.* (citation omitted). "Rule 26 reports are not intended to be a substitute for an expert's trial testimony and can never realistically explore all nuances of the expert's opinions." *Ostroski v. United States*, No. 06-80327-CIV, 2007 WL 9701868, at *4 (S.D. Fla. Aug. 23, 2007). Nor does Rule 26 "require a party to disclose all of its expert's notes, calculations, and preliminary analysis." *Etherton*, 2011 WL 684592, at *2. Indeed, "Rule 26 merely requires the exp[e]rt report to contain a statement of the data or other information considered by the witness in forming the opinions. The plain language of the Rule does not require the expert to attach the data or other information to the opinion." *Corwin v. Walt Disney Co.*, No. 602CV1377ORL19KRS, 2004 WL 5486639, at *11 (M.D. Fla. Nov. 12, 2004) (denying motion to strike based on alleged disclosure violation).

Further, Rule 26(a)(2)(B) "does not require that a report recite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*. Nor does it require the expert to anticipate every criticism and articulate every nano-detail that might be involved in defending the opinion on cross examination at a *Daubert* hearing." *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 652 (D. Kan. 2003). Instead, under Rule 26(a)(2)(B), "[i]t is justifiable to produce a summary of an expert's data which is detailed enough to provide the opposing party an opportunity to adequately cross examine the expert without providing all the raw data the expert looked at while coming to his opinion." *In re*

*Nitro Leisure Prod., L.L.C.*, No. 02-14008-CIV, 2003 WL 25669322, at *1 (S.D. Fla. Dec. 16, 2003) (denying motion to exclude where party failed to disclose "completed questionnaires total[ing] 1953 pages" that the expert relied upon in forming his opinion).

The "expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise[.]" *W. Union Holdings, Inc. v. E. Union, Inc.*, 316 F. App'x 850, 854 (11th Cir. 2008) (citation omitted). Moreover, the "purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify" so as to "minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 7507848, at *4 (S.D. Fla. Aug. 1, 2016) (citations omitted). Here, the objectives of the expert discovery rules are not subverted. Moreover, the Court is unconvinced that Opinion #1 in Dr. Klin's expert report is facially inadequate. "The content of an expert report is adequate 'when it is sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced.'" *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *1 (M.D. Fla. Apr. 27, 2009) (citation omitted). Dr. Klin's report sufficiently identifies the procedures, methodology, diagnostic criteria, scores, analysis and assessments supporting Opinion #1. *See* ECF No. [492-1] at 2-14. As such, Dr. Klin's failure to preserve his handwritten notes or the answers to every question asked in the exams does not render the report and Opinion #1 unreliable or a "disclosure violation." *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 34-35 (1st Cir. 2004) (rejecting argument that Rule 26(a)(2)(B) requires that the expert report contain, or be accompanied by, all of the expert's working notes or recordings); *Etherton*, 2011 WL 684592, at *2; *McCoy*, 214 F.R.D. at 652; *see also Walker*, 2019 WL 3409724, at *7 n.9 ("Were the court to adopt Plaintiff's position—that the

absence of an expert's notes is insufficient to survive *Daubert* scrutiny—the consequences would be profound. Experts who decline to keep their notes would always be disqualified under the *Daubert* standard, and the court's ability to properly perform its 'gatekeeping' responsibilities would be undermined because there may be instances, such as here, in which an expert's report purportedly reflects handwritten notes. Federal courts have expressly rejected such a rigid application of *Daubert*.") (internal citation omitted).

Plaintiffs also have failed to present any evidence that Dr. Klin's destruction of his notes, which is his "standard practice," was done in bad faith or with wrongful intent. *See Etherton*, 2011 WL 684592, at *3 ("Without a finding of bad faith or gamesmanship . . . courts are loathe to invoke the strong medicine of precluding expert testimony.") (citation omitted). In this respect, while Plaintiffs argue that Defendant "cannot evade the requirements of Rule 26 by hiring an expert whose practice is to discard records," ECF No. [492] at 11 (citing *Whalen v. CSX Transp., Inc.*, No. 13CIV3784LGSHBP, 2016 WL 5660381, at *5 (S.D.N.Y. Sept. 29, 2016)), they fail to present any evidence that Defendant hired Dr. Klin because of his document retention policy.[6] Relatedly, to the extent Defendant's actions amount to a violation of Rule 26, the Court does not conclude that Rule 37 sanctions are appropriate. Although Plaintiffs do not possess every physical document

---

[6] *Whalen* does not support Plaintiffs' argument that Dr. Klin's retention policy requires his exclusion. In that case, the court rejected defendant's argument as "not credible" where the expert physician "charg[ing] thousands of dollars for [his] testimony" allegedly did not maintain a record of the prior cases in which he testified in the previous four years, and hence, did not disclose that information required by Rule 26(a)(2)(B)(v). The court explained that while the expert may not have been aware of Rule 26(a)(2)(B)(v), defendant's counsel was "unquestionably chargeable with knowledge of the Rule" and "was proceeding at its own risk." *Id.* Here, that specific provision of Rule 26 is not at issue, and unlike *Whalen*, where the expert did not provide any information at all concerning his prior casework, Dr. Klin's expert report contains his findings and observations. Further, the court in *Whalen* did not exclude the expert but instead granted defendant an opportunity to cure the disclosure issues.

from Defendant's evaluation, the record reflects that Dr. Klin incorporated his and Dr. Saulnier's findings into the expert report, and Plaintiffs later deposed Dr. Klin. Thus, under the facts at bar, Plaintiffs have not been irreparably prejudiced such that they cannot effectively cross-examine Dr. Klin or gauge his reasoning as to Opinion #1. *See, e.g.*, *Bona Fide Conglomerate, Inc. v. SourceAmerca*, No. 314CV00751GPCAGS, 2019 WL 1369007, at \*19-20 (S.D. Cal. Mar. 26, 2019) (denying exclusion of expert under Rule 37 and rejecting argument that party was prejudiced and could not meaningfully cross-examine an expert who did not disclose various notes and working papers); *Patel v. Verde Valley Med. Ctr.*, No. CV051129PHXMHM, 2009 WL 5842048, at \*1 (D. Ariz. Mar. 31, 2009) (declining to exclude expert's testimony "merely because he discarded his notes" and stating that defendants "are free to raise this issue as a means of attacking [the expert's] credibility with the jury if they so desire").[7]

Finally, even assuming that there was a discovery violation, the Court does not find striking the expert report or excluding Dr. Klin as a witness to be appropriate. *Chau v. NCL (Bahamas) Ltd.*, No. 16-21115-CIV, 2017 WL 3623562, at \*5 (S.D. Fla. May 3, 2017) ("[E]xclusion of a

---

[7] Plaintiffs' citation to *United States v. Batchelor-Robjohns*, No. 03-20164-CIV, 2005 WL 1761429 (S.D. Fla. June 3, 2005) to support their claim that Rule 37(c)(1) sanctions are warranted is misguided. In that case, plaintiff admitted that it failed to provide defendants with the expert's models and curves pursuant to Rule 26, and it likewise admitted that without the withheld information it was "impossible for another expert" to determine how the expert reached his opinion or to test the reliability or accuracy of the opinion. *Id.* at \*2-3. The expert, further, "unequivocally refused" to disclose the withheld information at his deposition "even if the parties entered into a protective agreement." *Id.* at \*3. Accordingly, that court noted that "it seems clear that Plaintiff's failure to disclose the . . . models was not harmless[.]" *Id.* Indeed, the court explained that without the models and curves, defendants would be prejudiced in their ability to adequately cross-examine the expert and prepare a defense. *Id.* at \*4. Here, by contrast, there is no such concession that Defendant did not comply with Rule 26(a)(2)(B) nor that Dr. Klin's methods are unreliable and "impossible" to determine how he reached his conclusions. Further, while the defendants in *Batchelor-Robjohns* were deprived of all information associated with the withheld models and curves, and the expert unconditionally refused to disclose this information, there is no corresponding deficiency in this case.

witness is not automatic when a party fails to comply with the applicable disclosure rules. . . . Rather, the court must first assess whether there was substantial justification for the failure to disclose or whether the failure to disclose was harmless. In so doing, courts typically consider four factors: (1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice."). Upon consideration of the factors, the Court determines that they do not weigh in favor of the harsh sanction Plaintiffs seek. *See, e.g.*, *Torres v. First Transit, Inc.*, No. 17-CV-81162, 2018 WL 3729553, at *3 (S.D. Fla. Aug. 6, 2018) (denying motion to strike where there was no surprise to the non-disclosing party, the testimony at hand was crucial to the party's claim, and "the potential prejudice to Plaintiffs of striking their experts far outweighs any prejudice to Defendant"). Accordingly, Plaintiffs' Motion is denied on this basis.

> **b.** **Portions of Opinion #2 exceed the purview of expert testimony**

Plaintiffs argue that Opinion #2 is improper because it is speculative, irrelevant to the issues in the case, and invades the province of the jury by "opining extensively on Defendant's credibility." ECF No. [492] at 12. Upon review and consideration of Dr. Klin's expert report and the parties' briefings, the Court agrees in part with Plaintiffs.

As a preliminary matter, the Court does not find that Opinion #2 is irrelevant to the ultimate issues in dispute in this case. Plaintiffs sue Defendant for a variety of alleged wrongdoings, including fraud and civil theft. Defendant's intent and his prior statements and actions are squarely disputed between the parties. In this respect, evidence relating to Defendant's state of mind, his ability to analyze questions asked of him and to respond intelligently and thoughtfully, and his ability to explain inconsistencies in his answers are relevant to resolving key issues in this case,

and ultimately, to the jury's credibility determinations. The Court also disagrees with Plaintiffs that Opinion #2 is inadequate because it does not cite to literature, *id.* at 15, or because Dr. Klin's interview of Defendant lasted less than three hours. ECF No. [556] at 6. Plaintiffs cite no authority directing that an expert's opinion must contain a literature review or that an examination must last a certain duration to be admissible. These are considerations that may affect the weight a fact finder accords Dr. Klin's testimony, but they do not operate to preclude his testimony.

The Court similarly notes that Dr. Klin, the Director of the Marcus Autism Center and Professor and Division Chief of Autism and Related Disorders at the Department of Pediatrics at Emory University School of Medicine, ECF No. [492-1], testified that he wrote a book, *Asperger Syndrome*, which "address[es] many issues regarding presentation, clinical presentation, treatments, challenges," including how high intellect ASD individuals present in legal proceedings, which "has been of subject of great interest in the past 10 years or so." ECF No. [529-2] at 62-63. He likewise noted that he has "been able to support colleagues who wrote books on those subjects." *Id.* at 63.

The Court also does not agree that Opinion #2 is inherently speculative and unreliable. In this regard, Plaintiffs fail to demonstrate why the materials Dr. Klin relied upon in forming his opinion, including reviewing an evidentiary hearing transcript and watching a videotaped deposition of Defendant, are insufficient for Dr. Klin to form his opinions and assess Defendant. But even if these materials or Dr. Klin's methodology were otherwise deficient, such as by "ignor[ing] voluminous amounts of publicly available videos" of Defendant, the weight given to Dr. Klin's opinion is for a fact finder to decide. As Defendant acknowledges, the jury "could very well reject" Dr. Klin's testimony. ECF No. [529] at 6. And Plaintiffs can undoubtedly use cross-examination to explore the limits and pitfalls of his opinion and analysis.

Nevertheless, Opinion #2 at times ventures too far into areas that are traditionally reserved for the jury. "Absent unusual circumstances, expert medical testimony concerning the truthfulness or credibility of a witness is inadmissible. Expert medical testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations." *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) (district court did not abuse its discretion in excluding expert testimony that an individual "was a psychopath who had no conception of the truth") (internal citations omitted); *see also Snowden v. Singletary*, 135 F.3d 732, 738-39 (11th Cir. 1998) (stating that "[w]itness credibility is the sole province of the jury" and determining that trial court erred by allowing expert to opine that 99.5% of children tell the truth especially as the "jury's opinion on the truthfulness of the children's stories went to the heart of the case"); *Bodner v. Royal Caribbean Cruises, Ltd.*, No. 17-20260-CIV, 2018 WL 2471215, at *3 (S.D. Fla. Apr. 10, 2018) ("'[C]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury' . . . The Federal Rules of Evidence preclude a witness from testifying as to the credibility of another witness.") (citations omitted).

Defendant maintains that Dr. Klin "does not purport to testify as to Dr. Wright's truthfulness" but instead "as to how ASD causes certain behavior that is outside the common knowledge of jurors." ECF No. [529] at 9. On its face, this statement complements the generic description of Opinion #2: "How does the diagnosis of ASD impact Dr. Wright's presentation in legal proceedings such as depositions and court appearances?" However, Dr. Klin does not merely opine that Defendant's ASD diagnosis causes Defendant to attribute a hyper-technical meaning to ordinary words or to scrutinize seemingly simple yes-or-no style questions due to imprecise

language. Nor does he merely opine that Defendant's struggle with the nuances of language is exacerbated by close-ended questioning. Rather, Dr. Klin's opinion provides impermissible credibility testimony as to the sincerity of Defendant's statements, his truthfulness, his ability to deceive others, and his belief as to how others will process his testimony. *See, e.g.*, ECF No. [492-1] at 11 ("[H]e is quite incapable of manipulating other people by being deliberately deceitful and contrived, and this blatant style is both a historical and a present source of negative reactions by others, as he comes across as arrogant, entitled, insensitive, and hurtful."); *id.* at 15 (Defendant has a "deferential attitude towards the judge, which is sincere . . . When Dr. Wright professes his utmost deference to the law, . . . he is making these statements with profound sincerity . . . and not contrived to manipulate the opinion of others"); *id.* at 16 ("Dr. Wright's frequent sparring with the deposing attorneys . . . invit[es] the judgment of contemptuous disregard for the proceedings and hostility to those attempting to uncover the truth from him."); *id.* (Defendant's "frequent struggle to answer questions that appear trivial" and to "describe past communications with others that contained important information on intentions, negotiations, decisions and plans" "fuels other people's impressions that he is not telling the truth"); *id.* at 17 ("Dr. Wright's focus on irrelevant 'parts' rather than meaningful 'wholes' should not be interpreted as blatant stonewalling;"); *id.* ("Unfortunately for Dr. Wright, others will once again see this behavior as intransigence, disingenuous effort, and contempt. . . . To others, the litigation and Dr. Wright's behavior in it, is about truthfulness of intention, intellectual property and monetary rights. To Dr. Wright, his behavior during this litigation is about others' understanding of his creations and of himself."); *id.* ("And yet, when Dr. Wright states that he remembers his math and his work, . . . he is being truthful."); *id.* at 18 ("In many instances during the deposition, Dr. Wright was respectful, truthful and made a real effort to answer questions and remember information[.]").

These opinions, often couched as observations, bear squarely on witness credibility. *See, e.g.*, *United States v. Falcon*, 245 F. Supp. 2d 1239, 1247 (S.D. Fla. 2003) ("[E]xtrinsic opinion evidence from a forensic psychologist as to a witness' psychological motivations for the way the witness testifies is not only irrelevant, but is clearly inadmissible under Federal Rule of Evidence 608."). Although Defendant asserts that Dr. Klin is "not telling the jury to believe Dr. Wright" or that "Dr. Wright is truthful or respectful," ECF No. [529] at 7-8, Dr. Klin's descriptions and characterizations of Defendant's thinking and actions certainly cast the impression that Defendant endeavors to be truthful and that he acts without ulterior motive in a judicial setting. While expert testimony is useful to provide context and a lens for evaluating Defendant's testimony as an individual with ASD, an expert is not needed to tell the jury if Defendant is sincere, truthful, respectful, a willing participant in the litigation process, or otherwise capable of manipulating others. Those determinations fall within the jury's province. Expert testimony, likewise, is not needed to decipher Defendant's testimony to specific questions and evidence.

Accordingly, while Opinion #2 can explain ASD's symptomology and how ASD generally affects Defendant's ability to process questions and respond in kind, ultimately it is up to the jury to probe Defendant's responses, demeanor, and credibility when weighing his testimony against the factual record. Indeed, as Plaintiffs correctly note, Defendant's "subjective intentions and testimonial sincerity is for the jury alone to decide and as such, this testimony from Dr. Klin should be excluded." ECF No. [492] at 14. To the extent Dr. Klin provides testimony that intrudes into realms traditionally reserved for the jury, Opinion #2 is improper and such testimony will not be permitted at trial. *See, e.g.*, *Bodner*, 2018 WL 2471215, at *3-4 (precluding expert from opining on the credibility of others).

2.      *Kevin Madura*

Mr. Madura was retained by Defendant to provide an opinion on whether David Kleiman ("Mr. Kleiman") "had the requisite skills and experience to have written the original Bitcoin core software application released in 2009." ECF No. [492-4] at 4. Mr. Madura opines that Mr. Kleiman's skills and experience are "highly inconsistent" with the skills and experience required to develop the Bitcoin code. *Id.* at 11. Plaintiffs argue that Mr. Madura's testimony is irrelevant and should be stricken because (1) he failed to comply with Rule 26 disclosure requirements by refusing to disclose documents and materials he reviewed in connection with work he performed in this litigation, and (2) his opinion is "speculative at best, as it fails to consider evidence that undermines his ultimate opinion." ECF No. [492] at 16.

Plaintiffs maintain that Mr. Madura was first engaged by Defendant as a consultant on the case in 2019. However, his role later morphed into that of a testifying expert. *Id.* at 16-17. According to Plaintiffs, "[Mr.] Madura admitted that his work as a consultant and his work as a testifying expert 'may share similarities'" and that "he himself was 'not sure' whether certain questions related to his consultant or expert role." *Id.* at 17 (internal citations omitted). Plaintiffs argue that Defendant's counsel "repeatedly" instructed Mr. Madura not to answer questions that probed the "potential relevance between his consulting work and the opinion he was offering" as an expert. *Id.* at 17-18. They assert that Mr. Madura has not disclosed the materials he reviewed while in the role of a consultant, *id.* at 17, and Mr. Madura did not answer questions such as whether he reviewed documents "relating to Dave Kleiman's involvement in the creation of Bitcoin" or "any emails from Craig Wright." *Id.* at 18-19. In Plaintiffs' view, such materials "go directly to [Mr. Madura's] core opinion" and "directly contradict" his opinion. *Id.* at 19; *see also*

ECF No. [556] at 8-10 (arguing that Mr. Madura failed to disclose information relevant to his opinion, and that it is "highly likely" he reviewed materials that undermine his opinion).

Plaintiffs argue further that despite Mr. Madura's alleged Rule 26 violations, his opinion is speculative and unreliable. ECF No. [492] at 19-22. Specifically, they assert that Mr. Madura's "methodology fails to pass *Daubert's* gatekeeping requirement because (1) Madura inappropriately 'cherry-picked' the evidence he relied on in forming his ultimate opinion and (2) such paltry materials are insufficient for reliably concluding anything about Dave's C++ programing skills. These deficiencies are even more glaring given his refusal to answer whether he reviewed evidence in this case that directly contradicts his opinion." *Id.* at 20. Plaintiffs contend that Mr. Madura "cherry-picked" evidence relating to Mr. Kleiman's programming skills such as ignoring statements from Defendant that characterized Mr. Kleiman as an excellent coder. *Id.* at 20-21. Additionally, they argue that Mr. Madura's testimony is unreliable because "it is simply not possible for him to reliably opine on Dave's coding skill set with the extremely limited and irrelevant information he was provided." *Id.* at 21. In this respect, they take issue with Mr. Madura's alleged failure to account for various possibilities explaining how Mr. Kleiman had the ability to develop Bitcoin and the "non-scientific methodology" he employed to form his opinion. *Id.* at 21-22. *See also* ECF No [556] at 10-11 (arguing that Mr. Madura's opinion is speculative, unreliable, based on cherry-picked "anecdotal evidence," and otherwise fails to satisfy *Daubert*'s gatekeeping functions).

In response, Defendant maintains that Mr. Madura's opinion is reliable and based on a comprehensive analysis of available information. ECF No. [529] at 19-22. He asserts that Mr. Madura is qualified to testify competently based on his experience, which involved working at IBM and assessing the skills and abilities of programmers. *Id.* at 19. He adds that courts have

flexibility in determining the reliability of an expert's opinion, and Mr. Madura considered a host of materials, including Mr. Kleiman's resume, professional certification, his publications, and the Bitcoin client application code and related materials. *Id.* at 20. He states that Plaintiffs own statistics reflect that most programmers have a college degree, and that Mr. Kleiman's ability to be self-taught in C++ programming language can be addressed on cross-examination. *Id.* at 20-21. Defendant denies that Mr. Madura "cherry-picked" evidence, and he argues that Plaintiffs mischaracterize his prior statement concerning Mr. Kleiman's extensive *editing* abilities, rather than his *coding* abilities. *Id.* at 21.

Defendant additionally argues that Mr. Madura disclosed all information he considered in his *testifying expert* role, and that information in his *consulting expert* role is privileged. *Id.* at 2, 22-26. He states that Mr. Madura's involvement as a consultant began in January 2019 but his involvement as a testifying expert began in December 2019, and between December 2019 and April 2020, Mr. Madura "allocated most of his time to writing the expert reports he has submitted" and his work as a consultant did not relate to the "drafting of the report." *Id.* at 22 (citations omitted). He submits that, to the extent there was a Rule 26 non-disclosure violation, Rule 37 sanctions are not warranted because "[t]here was a substantial justification for the non-disclosure given the information sought by the [P]laintiffs was: (1) not considered by Mr. Madura in rendering his expert opinion; (2) colorably privileged, at a minimum; and (3) not subject to Rule 26 disclosure" and was "further harmless because the assertion of privilege was not a deliberate or fraudulent attempt to gain an advantage and the assertion was known to opposing counsel, who could have addressed the issue after deposition with defense counsel, or with the Court in a motion to compel and re-open the deposition." *Id.* at 25. He adds that his counsel acted with the "utmost good faith" during Mr. Madura's deposition and made "every effort" to enable Plaintiffs' counsel

to "get all the answers they were entitled to without crossing the boundaries of privilege for consulting experts." *Id.* at 25-26. Thus, in his view, excluding Mr. Madura's testimony is "disproportionate" to the alleged disclosure violation. *Id.* at 26.

### a.   Mr. Madura was not required to disclose information considered in the capacity of a consulting expert

The first dispute centers on whether Mr. Madura, initially a consultant for Defendant but later a testifying expert, was required to disclose information reviewed as a consultant but which Plaintiffs believe may have potential bearing upon the opinions in the expert report. "When an expert serves as a testifying witness, Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires disclosure of material considered, reviewed or generated by the expert in forming the opinion, irrespective of whether the materials were actually relied on by the expert." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 08-81211-CIV, 2009 WL 10667552, at *2 (S.D. Fla. Dec. 30, 2009) (citation omitted). "When an expert witness serves the dual role of both a consultant and a testifying expert, the 'court shall only give force to this differentiation of roles if it is convinced that the information considered for consulting purposes was not also considered pursuant to the expert's testifying function.'" *Id.* (citation omitted). *See also Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, No. 18-63130-CIV, 2019 WL 6896299, at *3-4 (S.D. Fla. Dec. 18, 2019) ("[W]hen an expert serves as both a litigation consultant and a testifying witness, an issue arises as to whether the party relinquishes the privilege that would otherwise attach to the litigation consultant's work. . . . [T]he question is the extent of the substantive relationship between [the expert's] two expert roles. Disclosure is warranted 'when there is at least an ambiguity as to whether the materials informed the [testifying] expert's opinion.'") (internal citations omitted; emphasis omitted); *Sara Lee Corp. v. Kraft Foods Inc.*, 273 F.R.D. 416, 419–20 (N.D. Ill. 2011) ("Most courts have held that a single expert may serve in both

roles [as a non-testifying consultant and a testifying expert] but that the broader discovery for testifying experts applies to everything except 'materials generated or considered *uniquely* in the expert's role as consultant.'") (emphasis in original).

Here, the Court is "convinced" that the materials Mr. Madura considered for consulting purposes were not also considered pursuant to his testifying function. *Vision I Homeowners Ass'n, Inc.*, 2009 WL 10667552, at *2. As set forth in the expert report, the materials Mr. Madura reviewed in preparing his report included (1) Mr. Kleiman's resume, professional certification, and supporting documents; (2) an expert declaration from Mr. Kleiman; (3) a memorandum from the City of Lake Worth's human resources director regarding Mr. Kleiman's qualifications; (4) deposition transcripts of Mr. Andresen and Mr. Andreou; (5) Mr. Kleiman's professional biography; (6) copies of the S-Lok product technical documentation for which Mr. Kleiman was the product manager; (7) the Bitcoin client application code, documentation and annotations; (8) two publications on Bitcoin; and (9) Mr. Kleiman's publications. ECF No. [492-4] at ¶¶ 9-19. *See also* ECF No. [529-2] at 148:7-13 (Mr. Madura affirming that he "only identified documents that related to [his] opinion" and "not other documents [he] reviewed in this litigation").

When asked at his deposition if "any of the work [he] performed as a consultant in any way relate[d] to [his] testimony as an expert," Mr. Madura responded "[n]ot as it pertains to the drafting of the report." ECF No. [529-2] at 172:16-24. *See also id.* at 58:9-13 ("I reviewed the materials referenced in my report to determine whether or not [Mr. Kleiman's] skill set was consistent with the skills required to create a complex piece of software such as Bitcoin."). Moreover, when asked if "any of the work [he] reviewed in connection as a consultant inform[ed] [his] understanding of what this lawsuit is about," Mr. Madura responded that "[i]t likely increased [his] understanding

of it vaguely" but that he "can't pinpoint a specific instance of a clarity in [his] understanding." *Id.*
at 173:21-174:10.

Plaintiffs contend that the boundaries of Mr. Madura's roles are ambiguous given the
limited description of the nature of the work he performed as a consultant. ECF No. [556] at 9.
Without pointing to any specific evidence, they posit that it is "highly likely that Mr. Madura
reviewed evidence that undermines his opinion." *Id.* They also challenge that his deposition
testimony evidences an unclear line between his dual roles. *See* ECF No. [492] at 17 (citing ECF
No. [492-5] at 217:12-18 (Mr. Madura testified "I'm trying to determine whether it would be
considered part of the consulting work or the expert work. I think for these purposes, it's the
consulting work. I'm not sure[,]" in response to whether he "discuss[ed] with counsel anything
related to [his] work as a consultant during the breaks today?"). However, none of these instances
contradict Mr. Madura's testimony and statement in his report that he only considered the materials
listed in the report in generating his opinions. Indeed, Plaintiffs simply "suggest" that Mr. Madura
"may have been instructed to rely only on evidence that was helpful to his opinion and to ignore
any other documents or information he may have reviewed." ECF No. [492] at 18.

To be sure, while Mr. Madura acknowledged that his work as a consultant "may share
similarities in the technical understanding of certain topics," this is unsurprising given that Mr.
Madura's expertise involves an inherently technical subject—coding and programming skills—
and his role as a consultant involved providing his "technical opinion regarding various data." ECF
No. [529-2] at 145:2-10, 172:16-24. The mere overlap of a generic "technical" background,
however, does not in and of itself mean that Mr. Madura failed to disclose materials he reviewed
and considered as a consultant that relate to his present opinion as a testifying expert. Mr. Madura
sufficiently set forth the extent of materials he reviewed to formulate his opinion. Accordingly, the

Court agrees with Defendant that there "is no ambiguity as to the delineation of Mr. Madura's role as a testifying expert . . . and the work he performed as a consultant." ECF No. [529] at 23. Plaintiffs' Motion, thus, is denied on this basis.

### b.    Mr. Madura's opinion is not speculative and unreliable

Plaintiffs challenge that Mr. Madura's opinion involved "paltry materials" to assess Mr. Kleiman's programming abilities and Mr. Madura "cherry-picked" evidence to support his position. ECF Nos. [492] at 20; [556] at 10-11. The Court is unconvinced by Plaintiffs' arguments. First, Mr. Madura's "paltry materials" included, among others, materials directly from Mr. Kleiman, including his resume, professional certification, publications, professional website, and an expert declaration. ECF No. [492-4] at 4-5. It also included deposition transcripts of Mr. Kleiman's former colleagues. *Id.* Although Plaintiffs point out that the totality of Mr. Kleiman's skills and experiences may not be fully reflected in these materials, Mr. Madura did not opine that it was impossible for Mr. Kleiman to have contributed to Bitcoin. Instead, he opined that Mr. Kleiman's skills and experiences based off the materials available were "highly inconsistent" with the profile of a person that could have created Bitcoin. *See generally* ECF No. [492-4]. And as Defendant correctly points out, Plaintiffs' own statistics demonstrate that the vast majority of computer programmers are not wholly self-taught, as Plaintiffs claim was the case for Mr. Kleiman. *See* ECF Nos. [492] at 22; [529] at 21.

Second, Plaintiffs' assertion that Mr. Madura "cherry-picked" evidence is unsupported. Plaintiffs challenge that Mr. Madura's reliance on testimony from Mr. Andreou about a collaboration he and Mr. Kleiman worked on two years before Bitcoin was released "ignored statements" from Defendant that Mr. Kleiman "could edit his way through hell and back." ECF No. [492] at 20-21. However, as Defendant notes, when shown the email in question, Mr. Madura

testified that it "doesn't impact [his] conclusions or opinions" because that email is "not clear" whether "it's referring to editing words or code," but nonetheless Mr. Madura acknowledged that if it referred to code, "it would undermine [his] opinion[.]" ECF No. [529-2] at 95-97. Mr. Madura's reliance on Mr. Andreou's testimony, moreover, was not improper. Mr. Andreou, who worked with Mr. Kleiman at Securit-e-doc, testified that Mr. Kleiman was "not a programmer" and he "needed help many times [] creating a simple program." ECF No. [492-4] at ¶ 31.

Further, while Plaintiffs complain that Defendant's counsel instructed Mr. Madura not to answer certain deposition questions (which were objected on the basis that they were privileged or outside the scope of Mr. Madura's work), ECF No. [492] at 16-17, as Defendant notes, nearly every instance cited was before the parties agreed to the scope of permissible testimony. ECF No. [529] at 24 (citing ECF No. [524-2] at 188-94; [492-5] at 199). Additionally, Plaintiffs were given the opportunity to revisit questions where objections were previously asserted. ECF No. [524-2] at 192:8-13 (stating that questions related to Mr. Kleiman and Mr. Antonopoulos will be re-asked). And Mr. Madura answered certain of the questions previously identified, such as whether he reviewed evidence related to Mr. Kleiman's involvement in creating Bitcoin and his ownership of Bitcoin. ECF No. [529] at 24 (citing ECF No. [529-2] at 183:20-24; 185:20-25).

Third, Plaintiffs' contention that Mr. Madura's methodology is "flawed" is misplaced. Although Mr. Madura admitted that he had not determined a "minimum requirement for contribution to the [Bitcoin] code," ECF No. [529-2] at 42:18-19, his testimony is based on an experience-driven evaluation of Mr. Kleiman's overall skills and abilities to create complex code rather than a scientific examination. *See, e.g.*, ECF No. [492-5] at 44:7-24 (Mr. Madura stating that he studied Mr. Kleiman's "background as a whole" and "in its entirety" "to determine whether or not it would be consistent with the skills required to meaningfully contribute or code the original

Bitcoin version"). In this respect, while Plaintiffs maintain that "it is simply not possible for [Mr. Madura] to reliably opine on [Mr. Kleiman's] coding skill set with the extremely limited and irrelevant information he was provided," ECF No. [492] at 21, a "trial judge must have considerable leeway" in evaluating reliability, including that of "non-scientific, experience-based testimony." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). Here, as noted, Mr. Madura reviewed numerous materials from Mr. Kleiman and others, including Mr. Kleiman's resume, professional certification, his publications, and his professional biography. None of these reflect experience coding Bitcoin or blockchain technology. Further, Mr. Madura testified that his background, including his experiences at IBM, required assessing the skill set, competencies, and capabilities of other coders and determining whether they could contribute to coding for the tasks involved. ECF No. [529-2] at 60:5-62:17. Because Mr. Kleiman is not alive, Mr. Madura unsurprisingly cannot directly "test" Mr. Kleiman's abilities. Nonetheless, Plaintiffs fail to demonstrate that the materials Mr. Madura relied upon render his opinions unreliable.

Plaintiffs argue that Mr. Madura did not review the classes Mr. Kleiman took while enrolled in college or whether he was otherwise self-taught. None of these features ultimately change the underlying nature of Mr. Madura's evaluation: whether Mr. Kleiman's skills and experiences are *consistent* with the background needed to develop Bitcoin. And yet, Plaintiffs' point is not well taken. Mr. Madura's report states that while Mr. Kleiman attended four different institutions between 1983 and 1992, "[n]one of the course work listed includes any relating to computer programming or C++ coding." ECF No. [492-4] at ¶ 38. Mr. Madura also testified that he "took [] into account" that Mr. Kleiman majored in computer science, and he "did not rule out th[e] possibility" that Mr. Kleiman attended programming courses. *Id.* at 44-46. He likewise agreed that it was "possible" that Mr. Kleiman taught himself C++. *Id.* at 57. Nonetheless, he concluded

Case No. 18-cv-80176-BLOOM/Reinhart

that it would be "inconsistent with the materials" he reviewed regarding Mr. Kleiman's background that Mr. Kleiman "taught himself C++, to an extent that he was able to contribute to the Bitcoin code base" given the "complex code that incorporates concepts across the field of computer science, as well as other fields[.]" *Id.* at 49, 57. Further, Defendant correctly states that "Plaintiffs are free to cross examine Mr. Madura on all of these points[.]" ECF No. [529] at 21. Plaintiffs' Motion is denied as to Mr. Madura.

### 3.     *F. Harley Norwitch*

Mr. Norwitch, a forensic document examiner, was retained by Defendant as an expert to evaluate signatures on certain documents. He disclosed three reports: one from December 2019, ECF No. [492-10] ("December Report"); one from March 2020, ECF No. [492-11] ("March Report");[8] and one from May 2020, ECF No. [492-12] ("May Report"). In the December Report, Mr. Norwitch opined that the questioned signature on a "Consent Order" dated August 28, 2013 is "very probably written by Jamie Wilson." ECF No. [492-10] at 6. In the March Report, Mr. Norwitch was requested to "ascertain, if possible, the authenticity of the questioned signatures" on an undated "Deed of Loan," an undated "Consent to Act," and a "Deed" dated October 23, 2012, all purporting to bear the signatures of both Defendant and Uyen Nguyen ("Ms. Nguyen"). ECF No. [492-11] at 35-37. Mr. Norwitch opined that Defendant's alleged signatures on these documents "are not genuine" but that Ms. Nguyen's signatures on the documents "were written" by her. *Id.* at 38.[9] In the May Report, Mr. Norwitch opined that Defendant's purported signature

---

[8] ECF No. [492-11] contains both the December Report, *id.* at 2-32, and the March Report, *id.* at 33-129. Plaintiffs refer to the March Report as the "April Report" because it was disclosed to them on April 10, 2020. ECF No. [492] at 22. However, the report is clearly dated March 21, 2020, and the Court will use that date when referring to that document.

[9] Plaintiffs maintain that Mr. Norwitch's conclusion as to Defendant's signature on the Deed of Loan is contradicted by Defendant's testimony that a handwritten annotation and signature on that

on an "Intellectual Property License Deed" dated August 22, 2013 "is not genuine." ECF No. [492-12] at 6.

Plaintiffs argue that Mr. Norwitch's expert reports and proposed opinions should be stricken "because (i) his reports fail to comply with Rule 26(a)(2)(B)(i)'s requirement that they contain 'the basis and reasons for' every opinion offered and (ii) his testimony fails to comply with the bare minimum requirements imposed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." ECF No. [492] at 23. According to Plaintiffs, Mr. Norwitch's reports do not provide "*any meaningful explanation* as to how or why he reached" his opinions. *Id.* (emphasis in original). For instance, they claim that the March Report "provides a bare-bones description of the technique generally underlying handwriting analysis" and "[b]eyond [] cryptic generalities" contained in "a few conclusory sentences that shed no light on his reasoning or methodology," the deficiencies "were not cured at this deposition." *Id.* at 24-25. Regarding the December and May Reports, they similarly challenge that Mr. Norwitch's "analysis" is threadbare and fails to "adequately disclose the reasons, basis, and methodology of his opinions." *Id.* at 26.

Regarding the Rule 26 deficiencies, Plaintiffs contend that an expert report "must include 'how and why the expert reached a particular result, not merely the expert's conclusory opinions,'" and reports that "furnish[] no real explanation" for an opinion are insufficient. *Id.* at 27 (citations omitted). In their view, Mr. Norwitch's reports contain "essentially no analysis, are cursory, and superficial." *Id.* at 28. They add that Defendant's alleged noncompliance with Rule 26 was not substantially justified or harmless. *Id.* at 31-33. Plaintiffs further assert that Mr. Norwitch's "inadequate reports rendered an effective deposition impossible" such that their "ability to effectively rebut the [r]eport[s] has been completely foreclosed and their ability to cross-examine

---

document were his own. ECF No. [492] at 22-23 (citing ECF No. [492-7] at 299:20-300:6).

Mr. Norwitch has been substantially harmed." *Id.* at 33; *see also* ECF No. [556] at 17-18 (asserting that Rule 37 sanctions are warranted). Finally, they maintain that Mr. Norwitch should be excluded from testifying because his opinions are not the product of a reliable methodology, ECF No. [492] at 33-37, and that "courts routinely exclude testimony from handwriting experts who fail to sufficiently explain their methodology." *Id.* at 34. *See also* ECF No. [556] at 12-17 (arguing that Defendant fails to carry his burden to establish that Mr. Norwitch's opinions are sufficiently reliable, and that his reports "raise far more questions than answers").

In response, Defendant asserts that Mr. Norwitch's "concise" reports and opinions meet the requirements of Rule 702. ECF No. [529] at 27-30. He states that each report lists the evidence Mr. Norwitch considered in preparing the report, explains the protocols used to analyze each questioned document, included a signature comparison chart, and "provided succinct, yet detailed, findings of each of the questioned signatures." *Id.* at 27. Defendant maintains that Mr. Norwitch is qualified to opine on handwriting analysis, he was deposed twice and testified that he employed a "side-by-side examination" method to compare signatures, and he relied on a strict visual examination without special equipment, software, or tools. *Id.* at 28-29 (citations omitted). In his view, Plaintiffs improperly focus on Mr. Norwitch's "brevity" while "failing to appreciate the detail" in his findings and observations. *Id.* at 29. Defendant contends that Plaintiffs' argument that the reports fail to satisfy Rule 26 "lacks credibility[.]" *Id.* at 31. He argues that "[t]his is not complex scientific analysis requiring complicated testing procedures" but rather naked visual comparison of signatures such that Plaintiffs cannot be "surprised" by Mr. Norwitch's testimony. *Id.* He adds that Mr. Norwitch provided "ample basis and reasons" for his opinions, and even if Defendant did not comply with Rule 26, Rule 37 sanctions are unwarranted. *Id.* at 31-32.

### a.     Mr. Norwitch's reports fail to comply with Rule 26

Rule 26 requires an expert witness to disclose an expert report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). The purpose of the expert disclosure rule is to "provide opposing parties 'reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (citation omitted). Expert reports must include "'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.'" *Calhoune v. Ford Motor Co.*, No. 17-61702-CIV, 2018 WL 7287871, at *1 (S.D. Fla. Dec. 26, 2018) (citation omitted). *See also Rinker v. Carnival Corp.*, No. 09-23154-CIV, 2011 WL 6370062, at *1 (S.D. Fla. Dec. 19, 2011) (striking expert report where "the majority of the opinions" are "conclusory without supporting reasons, facts, or data" and other opinions are inadequately explained); *Aponte v. Royal Caribbean Cruises, Ltd.*, No. 15-21854-CIV, 2019 WL 943267, at *3 (S.D. Fla. Feb. 26, 2019) (explaining that an expert report fell "far short" where it was "cursory and superficial," "briefly summarized" matters in the case, and "perfunctorily pointed" to broad non-specific categories that "generally support[ed]" the opinion but which "provided no further detail or analysis"); *Looking Good Properties LLC v. Ascot Corp. Names Ltd.*, No. CV412-138, 2013 WL 12214331, at *2 (S.D. Ga. July 23, 2013) (expert reports that are "a bit skeletal" and which "furnish[] no real explanation" are insufficient).

Mr. Norwitch's reports are largely conclusory and fail to adequately set forth the bases and reasons for his opinions other than through unhelpful platitudes. In the reports, the "Findings, Opinions" sections contain three to four short paragraphs that do not explain how Mr. Norwitch arrived at his opinions. For instance, in the May Report, in opining that Defendant's purported

signature was not genuine, Mr. Norwitch stated that the "questioned signature does not compare favorably with the individual characteristics present in the standard signature and, in fact, displays total departure and fundamental dissimilarity to the standard signatures in all areas." ECF No. [492-12] at 6. Relatedly, in the March Report, in opining that Defendant's purported signature was not genuine, Mr. Norwitch stated that the "questioned Craig Wright signatures, although bearing some pictorial resemblance to the standard Wright signatures, the questioned signatures do not compare favorably with the individual characteristics present in the standard signatures and, in fact, displays significant and fundamental departures from the genuine signatures. These dissimilarities are beyond the range of normal variation found within the standard signatures and are indicative and consistent with simulation." ECF No. [492-11] at 4. The reports reflect similarly bare and phrased opinions regarding Jamie Wilson's and Ms. Nguyen's alleged signatures. *See* ECF Nos. [492-10] at 3; [492-11] at 4.

The Court agrees with Plaintiffs that these representations (i) do not provide details about what "individual characteristics" are, what about the characteristics Mr. Norwitch examined, how those characteristics did not "compare favorably" or simply what that even entails; (ii) do not provide an explanation regarding what "significant and fundamental departures" were found let alone what the difference between a "significant" and insignificant departure is; (iii) do not describe alleged "dissimilarities," explain what "range of normal variation" is and how the questioned signatures exceed that "range;" and (iv) do not explain what would show "consistence" with a simulation or what "indicates" that a signature is "simulated." ECF No. [492] at 28-29. Indeed, like the expert report in *Aponte*, where the medical expert's report was "cursory and superficial" by pointing to items like the "patient's history, symptoms, physical exam, EMG studies. . . . and MRI scans and the intraoperative findings at surgery," 2019 WL 943267, at *3,

Mr. Norwitch's reports rely on non-descriptive generalities with little to no analysis undergirding his opinions. Although the December Report provides slightly more detail in the form of a one-sentence addition reporting that "[i]ndications normally associated with simulation, such as hesitation, tremor, and a slow 'drawn' appearance, are not present," he fails to explain how any of those features apply to the seven signatures under consideration. ECF No. [492-10] at 3. As Plaintiffs state, this sentence "raises more questions as [Mr. Norwitch] fails to explain what a hesitation, tremor, or drawn appearance look like." ECF Nos. [492] at 30; [556] at 15.

To be sure, Mr. Norwitch's reports each contain a half-page "Forensic Document Examination Protocol" section that overviews potential techniques to analyze handwriting:

> Handwriting and signatures examination and comparison procedures consist of examination of standard (known) material for consistency and normal variation, and then a side by side comparison of individual writing movements and inherent characteristics found in the questioned material with comparable writing movements found in the standard material, such as, but not limited to: form, height ratios, slant, proportions, skill level, movement, speed, pressure, and line quality, where possible and/or necessary.

> Examination, comparisons, and archival procedures may employ, but are not limited to, stereo microscopy, video-spectral comparison and electro-static instrumentation, transparency comparison, computer scanning, and photo microscopy (photomicrographs).

ECF Nos. [492-10] at 5; [492-11] at 37; [492-12] at 5. However, the reports fail to state which of the methodologies Mr. Norwitch actually used, which specific dimensions were analyzed, what was significant to each analysis, or how any of the features and traits in the comparator samples aligned or contrasted with the "questioned signatures." Further, none of these terms are defined nor specifically applied to demonstrate how Mr. Norwitch reached his conclusions. Additionally, the "comparison chart" of signatures does not actually make any comparisons or highlight any differences between signatures or even groups of signatures, but simply collects on a single document the signatures that are to be compared. *See, e.g.*, ECF No. [492-11] at 40. Courts have

excluded handwriting expert opinions that were supported by far more detailed charts than here. *See, e.g.*, *Agri-AFC, LLC v. Everidge*, No. 5:16-CV-00224-TES, 2019 WL 385421, at *15 (M.D. Ga. Jan. 30, 2019) (granting motion to strike where the report "offer[ed] several pages of signature samples with arrows and circles highlighting a particular part of each signature and noting the differences between them, but there is no explanation for why [the expert] chose those parts of the signature to highlight as opposed to others").

> ### b.   Defendant fails to carry his burden to avoid Rule 37 sanctions

Defendant maintains that even if he did not comply with Rule 26, sanctions are inappropriate "because there is no demonstrable harm to the [P]laintiffs." ECF No. [529] at 32. In support, he notes that Plaintiffs could have engaged a rebuttal expert and Mr. Norwitch was deposed more than once. *Id.* The Court does not agree. A party suffers prejudice from inadequate disclosures where it is deprived of the "ability to prepare for effective cross-examination and rebuttal[.]" *Brown v. NCL (Bahamas) Ltd.*, 190 F. Supp. 3d 1136, 1143 (S.D. Fla. 2016). *See also St. v. Drury Inns, Inc.*, No. CIV.A.08-0700-CG-N, 2009 WL 3784330, at *2 (S.D. Ala. Nov. 10, 2009) ("merely having to depose a party on information that should have been disclosed in a Rule 26 Report is a form of prejudice."). Here, the reports merely provide cursory background information about how handwriting analysis is performed and fail to provide a meaningful basis to understand how Mr. Norwitch reached any of his opinions.

Although the Court does not conclude that Plaintiffs were ambushed at Mr. Norwitch's depositions, their ability to prepare for effective cross-examination to rebut his opinions was impaired by the skimpy conclusion-laden nature of his reports. Indeed, the need to depose Mr. Norwitch twice underscores the glaring deficiencies. *See Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *3 (M.D. Fla. Apr. 27, 2009) (prejudice exists

when a party is furnished "with a woefully inadequate report" because it "adversely impacts upon its ability to prepare for and conduct the deposition"); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1323 (11th Cir. 2008) (holding that district court did not abuse its discretion in excluding experts under Rule 37 where each report "provided a single paragraph to explain the expert's anticipated opinion and the basis for it" and neither report "stated the expert's anticipated opinion with sufficient specificity" to allow preparation for rebuttal or cross-examination). Further, the fact that the May Report was issued only one week before the instant motion was filed cuts against Defendant's suggestion that a rebuttal expert could have been engaged. Defendant as the non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. That burden has not been met and Mr. Norwitch's opinions are stricken under Rule 37.

### c. Defendant fails to show that Mr. Norwitch's opinions are based on a reliable methodology

Even if Mr. Norwitch's reports complied with Rule 26's disclosure requirements, the Court finds that his reports fail to pass muster under Rule 702, Fed. R. Evid. "To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: . . . the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*[.]" *Rink*, 400 F.3d at 1291–92. The party offering the expert carries the burden to satisfy the reliability of the expert's opinions by a preponderance of the evidence. *Id.* at 1292. "In evaluating the reliability of an expert's method, however, a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Id.* at 1293 n.7.

Defendant maintains that handwriting analysis "is not complex scientific analysis requiring complicated testing procedures." ECF No. [529] at 31. However, while that may be so in his view,

like any other expert testimony, Mr. Norwitch's opinions must be the product of reliable principles and methods. Plaintiffs argument that Mr. Norwitch's reports fail to explain how or why he reached his conclusions or to otherwise demonstrate a reliable methodology is well-taken. ECF No. [556] at 12. Other courts in this circuit have excluded handwriting analysis experts that similarly failed to provide a sufficient explanation for the methodology employed. *See, e.g.*, *Agri-AFC, LLC*, 2019 WL 385421, at *15 (striking expert report that was "not based on any methodology that is readily apparent from the record"); *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1379-80 (M.D. Ga. 2006) (striking expert who failed to provide "any detailed explanation as to exactly *how* [he] evaluated the documents and drew his conclusions regarding authorship and sequence") (emphasis in original); *Am. Gen. Life & Acc. Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1314 (N.D. Ga. 2008) (striking expert report that "lack[ed]" "any identifiable 'methodology' to which the Court can apply the *Daubert* factors"). *See also Wheeler v. Olympia Sports Ctr., Inc.*, No. 03-265-P-H, 2004 WL 2287759, at *4 (D. Me. Oct. 12, 2004) (excluding testimony where the expert "offers no details about his methodology, beyond 'comparing' the handwriting on several documents," explaining that the report is "insufficient to allow the court to determine whether his methodology could be tested, has been subject to peer review, or is in accordance with applicable standards," and noting that "[a]ny individual, with no training or experience whatsoever, could 'compare' the handwriting of different documents and reach a conclusion").

In *Agri-AFC*, the expert explained that she examined and compared 81 documents "using magnification" and "evaluated the 'line quality, pressure patterns, rhythm, slant, size and proportions, utilization of space and spatial alignment, initial and terminal strokes, writing speed, legibility, skill level, letter forms, types of connectors, method of construction, and pattern formation' of the signatures on those documents," but the Court noted that "none of these terms

are defined or specifically applied in the report to show what exactly [she] did while evaluating the signatures." 2019 WL 385421, at *15.

In *Dracz*, the expert explained that he "determined whether the questioned document appeared to be distorted, and then evaluated the questioned document for the consistency, variation style, and peculiar or identifying characteristics using a stereo star zoom American Optical 7X 1030X Twin Microscope and a Micronata Illuminated Microscope at 30X," and his evaluation assessed the "comparability, quantity, and naturalness reviewing the Cumulative Range of Variation to determine the document handwriting probabilities and the physiological, neurological, and psychological factors peculiar to the writer." 426 F. Supp. 2d at 1379-80. According to that court, however, the expert "did not explain how he accomplished the comparison" and "[t]here is nothing in the record to allow the Court to conclude, based on [the expert's] vague and cursory explanation, that the techniques employed in his comparison are techniques that are generally accepted in the field, can be tested or subjected to peer review, are subject to standards or have an acceptable known or potential rate of error." *Id.* at 1380.

In *Ward*, the court explained that the expert's description of his methodology—"mentally compar[ing] [the questioned writing] with all the writing he has ever seen and be able to determine whether each feature is common, rare, or somewhat in between in order to determine how much significance to attribute to the feature"—"is not so much a 'methodology' as a general observation about handwriting that, while probably true, is not very enlightening." 530 F. Supp. 2d at 1314. Further, the court noted that while the report explained that a number of variables can factor into evaluating a person's handwriting, the expert "does not state what those variables are" and his "lack of specificity makes it difficult to evaluate his methodology, but suggests that his report is not reliable." *Id.*

These decisions are instructive. In this case, Mr. Norwitch's three reports examined twenty-six signatures overall to conclude that based on his visual side-by-side examination unaided by special equipment, software, or tools, Mr. Wilson and Ms. Nguyen's signatures were genuine, but Defendant's purported signatures were not. Although the Court does not have reason to believe that Mr. Norwitch's opinions were "contrived to reach a particular result," *Rink*, 400 F.3d n.7, the Court does have significant reasons to doubt the reliability of his methodology. First, his opinion in the March Report that Defendant's signature on the Deed of Loan is "not genuine" flies directly in the face of Defendant's testimony regarding his authorship of the signature. *See* ECF No. [492] at 22-23 (citing ECF Nos. [492-7]; [492-8] and [492-9]). Second, the Court is unable to determine the specific handwriting dimensions Mr. Norwitch actually examined, how they were scored or analyzed, or how they collectively were factored into arriving at each of his conclusions. Indeed, his "examination protocol" explains that handwriting and signature examination includes various factors "not limited to" height ratios, slant, line quality, among others "where possible and/or necessary." ECF Nos. [492-10] at 5; [492-11] at 37; and [492-12] at 5. However, those "various factors" are decidedly absent from the reports.

Third, none of the limited terminology contained in Mr. Norwitch's reports is defined nor specifically applied to the opinions to demonstrate how he reached his conclusions. Critically, the reports do not explain what specific aspects of the signatures are comparable or different, how so, why those dimensions were compared, and how the similarities or differences are material. The "charts" do not even contain arrows and circles around signatures, such as in *Agri-AFC*, that would annotate and highlight areas of examination and the points of comparison. Further, the reports fail to apprise the Court whether Mr. Norwitch's methodology has any indicia of reliability, such as if

the methodology is testable or subject to a known error rate. Accordingly, the Court concludes that Mr. Norwitch's opinions are unreliable and Plaintiffs' Motion, therefore, is granted.

### 4.     Dr. Stewart MacIntyre

Defendant retained Dr. MacIntyre, a medical doctor specializing in infectious diseases, for the purpose of "forming opinions as to [Mr. Kleiman's] medical conditions (relating to infectious disease) for a certain period of years." ECF No. [492-13] at 2. He issued his first report on December 13, 2019 and his second report on April 8, 2020. ECF No. [492-14]. As part of his evaluation, he reviewed medical records, various litigation documents, a police report, and an autopsy related to Mr. Kleiman's death. *Id.* at 2. Dr. MacIntyre opined as follows: (i) Mr. Kleiman had two basic types of chronic infections (soft tissue infection and bone infection relating to the pressure ulcers, and urinary tract infections); (ii) while hospitalized, Mr. Kleiman received medications "which could affect mental status and ability to do complex work;" (iii) Mr. Kleiman was given an "irregular discharge" from the hospital, which "could" have adversely affected his health; (iv) Mr. Kleiman's autopsy revealed the presence of cocaine metabolites in his urine; and (v) after his discharge from his "long and complex hospitalization," Mr. Kleiman's "lack of care by family, friends, or medical personnel" caused "uncontrolled infection" leading up to his death. ECF Nos. [492-13] and [492-14].

Plaintiffs argue that Dr. MacIntyre's opinions should be stricken. First, they contend that his opinions relating to Mr. Kleiman's physical health and capacity to work beginning in 2010 are irrelevant and contradicted by the record. ECF No. [492] at 38. They assert that "nothing about [Mr. Kleiman's] physical health is at issue in this case," and issues regarding Mr. Kleiman's "mental state and how it may have affected his capacity to work beginning in 2010 are irrelevant because the joint business relationship between Dave [Kleiman] and Dr. Wright was formed before

his hospitalization." *Id.* Plaintiffs add that any conclusion that Mr. Kleiman's mental state affected his ability to do work is "contradicted by both Dr. MacIntyre's own testimony and the records." *Id.* at 39. In particular, Plaintiffs state that Mr. Kleiman's hospital records are "replete" with "instances of clinicians noting how Dave was 'busy with work,' continually 'participate[d] in work-related activities,' and was 'productive in doing work regarding his business.'" *Id.* (citation omitted). *See also* ECF No. [556] at 20-21 (arguing that Dr. MacIntyre's opinions regarding the impact of prescription drugs on Mr. Kleiman's ability to perform complex tasks and Mr. Kleiman's medical conditions impeding Mr. Kleiman's "independence, mobility and ability to function at work" are irrelevant and unsupported).

Second, Plaintiffs argue that Dr. MacIntyre's testimony about Mr. Kleiman's lack of support by friends and family is irrelevant and contradicted by the record. *Id.* at 40. Regarding the former, according to Plaintiffs "whether Dave [Kleiman] had consistent visitors at the hospital has no bearing on whether [he] and Craig [Wright] co-created Bitcoin or formed a joint business relationship[.]" *Id.* Regarding the latter, they state that Mr. Andreou testified that he visited Mr. Kleiman at times, and Mr. Kleiman's medical records note the presence of visitors. *Id.* In Plaintiffs' view, Dr. MacIntyre's "opinion" is "not a medical opinion but instead is a back-door attempt to impermissibly inject the alleged lack of a close relationship between Ira [Kleiman] and Dave Kleiman into the case." *Id. See also* ECF No. [556] at 19-20 (arguing that Dr. MacIntyre's opinion that Mr. Kleiman's lack of support by friends and family contributed to his death is highly prejudicial, speculative, an attempt to "make the jury 'punish' Ira [Kleiman] for his alleged familial failings," and contrary to Mr. Kleiman's autopsy report that listed his cause of death as "coronary artery disease").

Finally, Plaintiffs maintain that testimony related to Mr. Kleiman's "disruptive" behavior in the hospital, his "irregular discharge," and cocaine found in his autopsy report is irrelevant and any probative value is substantially outweighed by its prejudicial effect. ECF No. [492] at 40-41.

In response, Defendant makes four main arguments. First, Dr. MacIntyre's testimony regarding Mr. Kleiman's medical history is relevant. ECF No. [529] at 33-34. He asserts that Plaintiffs' claims "are neither squarely limited to facts pre-dating 2010, nor are they limited to the formation of a purported joint business relationship prior to that year," and the complaint's allegations "implicate a timeframe that spans into 2013." *Id.* at 33. Defendant contends that while Dr. MacIntyre is not offering a stand-alone opinion on Mr. Kleiman's mental health or intellectual capacity, he is offering an opinion "on the inescapable consequences and burdens of the severe (physical) medical conditions and related issues plaguing Dave Kleiman," which includes impediments to his independence, mobility, ability to function and work, and side effects from prescribed medications. *Id.* at 33-34 (footnotes omitted; emphasis omitted). He adds that given Mr. Kleiman's paraplegia, the jury is "entitled to understand the chronic physical conditions that dominated Dave Kleiman's day-to-day life, including the final prolonged hospitalization involving 'multiple surgical procedures' and 'other traumatic incidents.'" *Id.* at 34. In his view, to exclude Dr. MacIntyre's testimony "will be to provide an incomplete account to the jury of substantial factors relevant to a fair determination of the issues in this case." *Id.*

Second, Defendant asserts that Dr. MacIntyre's testimony satisfies *Daubert*. In particular, he contends that the reports are within Dr. MacIntyre's experience and qualifications; his testimony is reliable because it is based on his background and specialization as an infectious disease specialist, including his forty-eight years of practice; and Dr. MacIntyre's testimony will be helpful to the jury in understanding the medical records and the "significance and severity" of

Mr. Kleiman's "prolonged medical complications." *Id.* at 35-36. Third, he maintains that Dr. MacIntyre's report and testimony does not contradict the record. Specifically, Defendant argues that Plaintiffs "confus[e] the issues by attempting to correlate a handful of references to 'work' to Dave Kleiman's 'ability to form a joint business relationship,'" and Mr. Kleiman's ability to use a computer or do some "work" "proves none of [P]laintiffs' points." *Id.* at 36-37. Further, he asserts that Plaintiffs point to nothing to contradict Dr. MacIntyre's statements regarding the lack of in-person visits not being reflected in the medical records because, for instance, Mr. Andreou testified that he would "just walk in" to the hospital because "security was pretty lax there[.]" *Id.*

Finally, Defendant contends that the probative value of Dr. MacIntyre's testimony outweighs any prejudice. Mr. Kleiman's "irregular discharge," autopsy report showing the presence of cocaine metabolites in Mr. Kleiman's system, and a "letter of warning" from the hospital's Disruptive Behavior Committee are not grounds to strike his opinions. *Id.* at 38-39. He adds that Plaintiffs' case authorities "are not instructive on the specific issue raised by them," and the fact that Mr. Kleiman's medical records "recite unfortunate events does not in and of itself create a prejudicial effect." *Id.* at 38. He concludes that Mr. Kleiman's medical issues were "an integral part of his life; they were neither in passing, nor were they peripheral," and they "necessarily influenced" his mobility and ability to perform complex tasks. *Id.* at 39.

Upon review and consideration, the Court agrees in part with Plaintiffs that certain portions of Dr. MacIntyre's opinions are irrelevant and the potential danger of unfair prejudice related to his testimony will substantially outweigh the probative value of his opinions.

### a.    Dr. MacIntyre's opinions regarding Mr. Kleiman's health and effects of medication

Although Plaintiffs are correct that the jury does not need an infectious disease specialist to opine that paraplegia impedes mobility, issues related to Mr. Kleiman's health, including his

"long and complex hospitalization," numerous surgeries and medical treatments, and the impact of medications "that could affect mental status and ability to do complex work" are not irrelevant to whether he in fact was able to develop intellectual property with Defendant and mine bitcoins. To state the obvious, it would be less likely that Mr. Kleiman could perform complex tasks during periods when he was recovering from surgery or while under the influence of medications, including opiates and other medications that "can dull mental acuity." ECF No. [492-14] at 3. Further, as Defendant correctly points out, Plaintiffs' claims are not limited to Mr. Kleiman's pre-hospitalization period but instead extend through 2013.

In this respect, although Plaintiffs focus on instances where Mr. Kleiman was using a computer or was visited by friends at the hospital, none of these features ultimately render Dr. MacIntyre's opinions unreliable or contradicted by the record. The medical records did not contain notations reflecting that Mr. Kleiman was specifically working on Bitcoin or with Defendant while using his computer in the hospital. In fact, Dr. MacIntyre's report states that while the content of Mr. Kleiman's work on his computer is "obviously not known," Mr. Kleiman "did note on occasion watching movies on his laptop." *Id.* And as noted, Dr. MacIntyre's statement that he did not find mentions of "in person visits" in the medical records does not mean that his testimony is inaccurate, especially given Mr. Andreou's testimony that he would "just walk in" to the hospital, "[n]obody would check him, there was "no real procedure" for visitations, and he was unaware of a visitor log. ECF No. [529-9] at 13:8-20.

Further, references to Mr. Kleiman's "irregular discharge" and the presence of illicit drugs in his system are relevant to determinations concerning Mr. Kleiman's ability to develop intellectual property and mine bitcoin while in his declining medical state. Indeed, Dr. MacIntyre opines that an "effect" of the "irregular discharge" is that Mr. Kleiman "had no outpatient medicine

prescriptions and no arrangements for nursing care" or wound care, he "would be expected to have uncontrolled infection . . . [and] benzodiazepine withdrawal symptoms (fever, mental status changes, possible seizures)[.]" ECF No. [492-14] at 4. Accordingly, those opinions will not be stricken, and Plaintiffs' Motion is denied on these points.

**b.      Dr. MacIntyre's opinions regarding lack of care by family and friends, and Mr. Kleiman's "disruptive" behavior**

The Court is mindful of Plaintiffs' concerns that Dr. MacIntyre's testimony operates as a "back-door" attempt to impugn Ira Kleiman's character. Although the Court is unconvinced that Dr. MacIntyre's reports and opinions function in that regard, it nonetheless agrees that Dr. MacIntyre's opinion that "lack of care" by family and friends after Mr. Kleiman's discharge would "clearly" contribute to Mr. Kleiman's death is likely to prejudice Plaintiffs and "make the jury 'punish' Ira [Kleiman] for alleged familial failings." ECF No. [556] at 19. Not only was Mr. Kleiman's cause of death determined to be coronary artery disease, there is nothing to suggest that Mr. Kleiman's family and friends were aware of his discharge or that anyone was neglectful in caring for him. But even if Mr. Kleiman's friends and family were somehow remiss, Dr. MacIntyre fails to point to anything in particular to substantiate this opinion. Moreover, the limited probative value of this opinion as to Mr. Kleiman's death is substantially outweighed by its prejudicial effect—attributing Mr. Kleiman's death, in part, to his brother's potential inaction. Therefore, this opinion is stricken. Likewise, Dr. MacIntyre's testimony related to Mr. Kleiman's "letter of warning" from the hospital's Disruptive Behavior Committee in May 2011 two years before his discharge for being "uncooperative with nurses and therapists" does nothing to make an ultimate issue in this case more or less probable. Indeed, whether Mr. Kleiman at one time was uncooperative with medical personnel (for some unstated reason) does not make it less likely that

49

he worked on Bitcoin or developed intellectual property with Defendant. As Plaintiffs states, this "attempt[] to depict Dave [Kleiman] as unruly and reckless, and otherwise attack [his] character" is of no consequence to issues in dispute. ECF No. [492] at 41. Accordingly, this opinion is also stricken, and Plaintiffs' Motion is granted on these points.

### B.    Defendant's Motion

#### 1.    *Gordon Klein*

Mr. Klein, a faculty member at UCLA's Anderson School of Management, was retained by Plaintiffs to "opine on whether the course of conduct and communications between Dave Kleiman, [Craig] Wright, and other relevant parties is consistent with a partnership and/or joint venture having been formed by [Mr.] Kleiman and Wright. . . . I have not been asked to give a legal opinion and do not purport to give one[.]" ECF No. [500-1] at ¶ 11. He opines that the "conduct of and communications by and between Dave Kleiman, Wright and other parties . . . are consistent with and indicative of a partnership and/or joint venture as the Satoshi Nakamoto Enterprise ('SN Enterprise'). The SN Enterprise appears to have been formed for multiple purposes, including the mining of bitcoin and the development of software and intellectual property related to bitcoin and blockchain technologies." *Id.* at ¶ 13. Defendant argues that based on Mr. Klein's report and testimony, he "admits that he was retained to give so-called 'legal opinion' testimony, which purports to state legal standards (the Court's province), and then weigh the evidence to determine if those standards were met (the jury's province). All of this is improper *vel non*. There is only one 'legal expert' in a federal court, and the expert is the judge." ECF No. [500] at 7 (citation omitted).

Defendant makes three overarching arguments for excluding Mr. Klein's testimony. First, Mr. Klein's report and testimony contain improper legal conclusions. Specifically, Defendant

asserts that Mr. Klein uses the term "guideposts" when referring to the legal elements of an oral partnership "[i]n an obvious attempt to conceal the fact that his proffered opinion is nothing more than improper legal argument[.]" *Id.* at 8. According to Defendant, the Court will instruct the jury on the proper elements of Florida partnership law, and unnecessarily states, Plaintiffs' "laughable subterfuge should fool no one." *Id.* He adds that an expert may not testify to the legal implications of a party's conduct and communications. *See also* ECF No. [554] at 2-3 (arguing that Mr. Klein's "guideposts" will confuse the jury, especially as they are "either identical to or share phrases and other parallels with[] the legal elements of a partnership") (citing ECF No. [500-1] at ¶¶ 19, 23, 25)).

Second, Defendant argues that Mr. Kleiman's testimony is unhelpful to the jury. In particular, he maintains that Mr. Klein's report "usurps the jury's role as finder of fact" by improperly weighing evidence and drawing conclusions by applying his "guideposts" to the facts at hand. ECF No. [500] at 9-10 (citing ECF No. [500-1] at ¶¶ 30, 59, 71). Third, he contends that Mr. Klein's report contains improper opinions on the "states of mind, motives or intent of Dr. Wright and others," and it acts as an improper "vehicle for factual narrative" especially for the alleged "main issue" in this case—the existence of an alleged partnership between Mr. Kleiman and Defendant. ECF No. [500] at 10-11 (citing ECF No. [500-1] at ¶¶ 33, 36); *see also* ECF No. [554] at 4 (arguing that "jurors are capable of reading and interpreting e-mails and correspondence.").

In response, Plaintiffs maintain that Defendant's arguments are "specious" and predicated on false premises. ECF No. [528] at 5. First, they argue that Mr. Klein does not offer a legal opinion that there was a partnership or joint venture. Instead, "using an unchallenged methodology, he provided an opinion following established guideposts that indicate whether or not Dave Kleiman

and Defendant's conduct was consistent with having formed a partnership or joint venture, 'leaving it to others to utilize that information in the context of the overall proceeding.'" *Id.* at 6 (citation omitted). Further, his opinion is "grounded in his business and accounting expertise and experience, not in his legal training from four decades ago," and Mr. Klein's "testimony will assist the jury in assessing whether the elements of a partnership are met, but it does not purport to supplant the jury's role to weigh the evidence with the benefit of Mr. Klein's expert opinion, or the role of this Court in establishing the law the jury must apply." *Id.* at 6-7. Second, Plaintiffs argue that Mr. Klein's testimony will be helpful to the jury because he "consistently applies an unchallenged methodology," the "DOGS framework."[10] *Id.* at 8. They add that Mr. Kleiman is permitted to identify evidence in the case and explain how it fits with his methodology, and the cases Defendant cites are inapposite. Third, Plaintiffs challenge that Mr. Klein is not offering an opinion about motive or credibility, and "none of the guideposts Mr. Klein uses rely on a determination of a party's state of mind or intent." *Id.* at 9.

Upon review, the Court agrees with Defendant that Mr. Klein's testimony impermissibly invades both the province of the Court and the jury regarding determinations as to whether Defendant and Mr. Kleiman entered into a partnership under Florida law. Testifying experts may not offer legal conclusions. *Cook ex rel. Estate of Tessier*, 402 F.3d at 1112 n.8, 1113 (affirming exclusion of opinion that pretrial detainee's constitutional rights were violated because such opinion was a legal conclusion). "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)

---

[10] This acronym refers to (1) decision-making that is shared; (2) ownership; (3) goals that are shared; and (4) skills that are complementary and non-ministerial. ECF No. [528] at 8 n.3 (citing ECF No. [528-2]).

(citing *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2nd Cir. 1977) ("expert testimony on law is excluded because 'the tribunal does not need the witness' judgment. The judge (or the jury as instructed by the judge) can determine equally well.'") (punctuation altered)). *See also Konikov v. Orange Cnty., Fla.*, 290 F. Supp. 2d 1315, 1317-18 (M.D. Fla. 2003) (explaining that the "Court's function is to instruct the jury on the law, and domestic law is not to be presented through testimony and argued to the jury as a question of fact. . . . [I]n the Eleventh Circuit, the judge is the jury's only source of law. The judge decides the content of the law, and instructs the members of the jury on the applicability of the law to the facts of the case."). Further, while an expert may testify as to his opinion on an ultimate issue of fact, he may not "merely tell the jury what result to reach" nor may he "testify to the legal implications of conduct," because the court "must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (holding that district court erred in admitting expert opinion that insurer had a duty to hire tax counsel under the policy because it was a legal conclusion).

Here, Mr. Klein maintains that he did not reach a "legal opinion" and that his opinions only concern "guideposts" to evaluate whether a partnership existed. However, the Court is unconvinced that these "guideposts" are substantively any different than legal elements that the jury must consider and analyze in making their determinations.[11] For instance, when asked whether his guideposts are the same as elements of a partnership or joint venture, Mr. Klein testified that he views "the word 'element' as a legalistic" term and that he "think[s] business people would call them guideposts[.]" ECF No. [528-1] at 266:13-24. He also stated that he "really couldn't tell you one way or the other" under Florida law if his guideposts are the same as the legal elements of a

---

[11] Some of Mr. Klein's guideposts include the joint pursuit of a common goal or set of interrelated goals, typically to achieve financial gain; shared decision-making and joint control and ownership; and sharing in profits. ECF No. [500-1] at ¶ 19, 23, 25.

partnership or joint venture. *Id.* at 267:1-6. In this respect, he testified that does not "know that people having complementary skill sets is a legal element of a partnership" but he "tend[s]" to see that feature in a "shared business relationship" and it is "typical" in a partnership. *Id.* at 267:21-268:23.

Mr. Klein's opinions, accordingly, run the risk of confusing the jury as to the elements of a partnership but also of encroaching on the Court's sole province in instructing the jury as to the relevant legal standards that will need to be analyzed. *See In re Rosenberg*, No. 09-13196-BKC-AJC, 2012 WL 3870351, at *1-2 (Bankr. S.D. Fla. Sept. 6, 2012) (noting that "instructing the jury on legal matters is the exclusive domain of the judge," and explaining that allowing expert testimony on issues related to requirements for filing an involuntary bankruptcy petition, the standard for determining whether an involuntary petition was filed in bad faith, and the consequences of such a filing "create[s] a risk of jury confusion" concerning the applicable law). *See also Burkhart*, 112 F.3d at 1213-14 (expert witness "misstate[d] relevant legal principles" regarding communication matters under the ADA and demonstrated "the danger in allowing expert witness to testify as to their understanding of the law"). Although Mr. Klein's "DOGS framework" may alert jurors to certain areas of inquiry that he believes they should pay particular attention to when evaluating evidence, ultimately Florida law as instructed by the Court creates the framework through which the jury must make their determinations. *Konikov*, 290 F. Supp. 2d at 1318 (excluding expert witness that opined that county ordinance was improperly applied against the plaintiff and that ordinance did not satisfy test for withstanding constitutional scrutiny). Mr. Klein's testimony is akin to the impermissible expert testimony at issue in *In re Rosenberg*, *Burkhart*, and *Konikov*.

The Court also agrees with Defendant that Mr. Klein's report essentially functions as a legal conclusion that a partnership was formed based on weighing "guidepost" evidence. *See, e.g.*, ECF No. [500-1] at ¶ 29 ("One partner's characterization of another as being a critical, or 'key,' co-contributor is typical of the praise that partners bestow on one another in a partnership or joint venture and consistent with Dave Kleiman having merited an equity stake as a co-owner of a joint business enterprise with Wright."); ¶ 34 ("Wright's description of his work with Dave Kleiman as a 'team' effort . . . is consistent with and indicative of the joint business relationship between the parties . . . and indicative of Dave Kleiman having had unique skills that were complimentary to Wright's, which is another important guidepost[.]"); ¶ 36 ("The conduct and communications between Wright and Dave Kleiman also reveal mutual decision-making by the men in their business activities . . . another guidepost that is consistent with and indicative of them having formed a partnership and/or joint venture."); ¶ 42 (explaining that the absence of a written partnership agreement is "not at all uncommon" and that "numerous partnerships" "never formalize their relationship in writing"); ¶ 71 (Mr. Kleiman and Defendant's "apparent pursuit of 'real money' wealth" through mining is "once again consistent with the SN Enterprise having a substantial profit-seeking motive"). It is the jury's province to examine the evidence, derive conclusions from it, and ultimately decide whether a partnership or joint venture existed as defined by Florida law. The jury does not need Mr. Klein to perform the relevant analysis for them. Indeed, expert testimony is not permitted, where like here, "the witness simply recounts the facts and then offers an opinion as to the conclusion which the jury should reach[.]" *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (affirming striking of portions of expert affidavit that contained legal conclusions as to whether appellants acted with deliberate indifference).[12]

---

[12] Plaintiffs' non-circuit cases where courts permitted expert testimony about whether a partnership

The jury, likewise, does not require an expert to help them interpret the meaning and implications of Defendant's communications, particularly as to whether he partnered with Mr.

---

was formed are distinguishable. Unlike here, the experts in those cases provided testimony regarding specialized industry terms, practices, or standards beyond the understanding of a lay person. *See Elia v. Roberts*, No. 1:16-CV-0557 AWI EPG, 2017 WL 4844296, at *5-6 (E.D. Cal. Oct. 25, 2017) (permitting accountant experts' testimony in case involving dispute as to whether plaintiff was an independent contractor versus a partner because "accounting is a field in which expert testimony can aid the trier of facts," the "significance of certain tax forms, the meaning of technical organizational documents, and whether the conduct of a business deviated from that organization would also be topics in which expert opinion would be useful," and limiting testimony as to explaining underlying entities' "accounting, taxes, organizational structure, and the general manner in which the business was run"); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 845, 852-53 (E.D. Mich. 2010) (permitting testimony in case involving multi-employer pension plans and three private equity investment partnerships because private equity fund expert's "opinions comparing the way the defendants operated the Haden Companies to the way private equity funds operate in general may shed some light on the defendants' intent in forming the limited partnerships (LP), the rationale for some of the LPs' management practices, and whether the LPs indeed intended to form a partnership or a joint venture," and noting that "[d]etails of private equity funds' investment and management practices are outside the domain of an ordinary person's knowledge, and might be helpful to a decisionmaker" such that the expert could "testify as to issues of structure and function of the defendants compared to comparable practices in the industry"); *Leeds LP v. United States*, No. 08CV100 BTM BLM, 2010 WL 3911429, at *1-3 (S.D. Cal. Oct. 5, 2010) (permitting estate planning expert's testimony in case where whether plaintiff is a "nominee of the taxpayers" was the "ultimate matter at issue," the expert's opinions were "limited to the structure of" the "documents used to create the limited partnerships, trusts, and corporations at issue" and did not include review of "financial documentation involved in the relevant transactions or how the entities were operated after formation," and the expert's "general testimony about the use of limited partnerships and trusts as 'good business practice'" was relevant because it "potentially could be used to rebut an assertion that the property was '"placed in the name of the nominee in anticipation of a suit or occurrence of liabilities'—a factor raised by Defendant as pertinent to the nominee analysis'" where "the Court has not yet had an opportunity to determine what specific factors of nominee ownership are applicable in this case"). Notably, none of those cases involved partnership "guideposts," Florida partnership law, or disputes related to alleged Bitcoin or blockchain-related partnerships. Further, *Kearney v. Auto-Owners Ins. Co.*, No. 8:06-CV-595T24TGW, 2009 WL 3712343, at *10 (M.D. Fla. Nov. 5, 2009), *aff'd*, 422 F. App'x 812 (11th Cir. 2011), is inapplicable because it involved expert testimony regarding insurance bad faith claims handling, not partnerships, and the court explained that because "[t]he lay person is not necessarily familiar with insurance claims handling," opinions "regarding what ordinary and reasonable claims handling practices consist of and whether or not Auto–Owners complied with those standards" would be "helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry[.]"

Kleiman. *See, e.g.*, ¶¶ 31-33 (explaining that Defendant's email to Ira Kleiman stating the work "we [Defendant and Mr. Kleiman] did together" expresses a "shared enterprise, built through shared effort" and is "consistent with and indicative of the joint business relationship between them," and "we did partner ;)" is "consistent with their joint efforts" and joint relationship); ¶ 41 (opining that Defendant's "emphatic use of words like 'OUR' and 'OURS'" in an email to Ira Kleiman that Mr. Kleiman's interest in the alleged partnership is "OURS as you [] are Dave's heir," is "indicative of Wright's recognition that Wright and Dave Kleiman were co-owners of a business enterprise"); ¶ 59 (noting that Defendant's email stating "I was with my partner, so to speak, in all of this, Dave, we mined quite a lot" "confirms that the acquisition of bitcoin through mining was an integral activity of their joint enterprise"); ¶ 60 (opining that Defendant's statement that his "life goal is to increase the value of the bitcoin I mined as Satoshi" "confirms the profit motive for their work"); ¶ 69 (commenting that Defendant's statement that Mr. Kleiman helped write the Bitcoin White Paper and make the language "serene" "confirms the synergistic nature of the relationship . . . and is consistent with them having chosen to work together"). Expert testimony is admissible where "it concerns matters that are beyond the understanding of the average lay person," but such testimony "generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Cook ex rel. Estate of Tessier*, 402 F.3d at 1111 (citation omitted). Nor does the jury require Mr. Klein to tell them whether Defendant is credible based on certain communications he had with third-parties. *See e.g.*, ¶ 43 ("Wright also made various statements to law enforcement and taxing authorities . . . [which] are particularly notable because the communications were made in a government proceeding that might have significant consequences to Wright if his statements were made recklessly or falsely."). Accordingly, Defendant's Motion is granted as to Mr. Klein.

## 2.    Dr. Matthew Edman

Dr. Edman, a cyber security engineer with a certification in forensics, was retained by Plaintiffs to "analyze certain documents submitted by [Defendant] in this litigation and determine, to the extent possible, whether they are authentic, including but not limited to whether the documents and/or their associated metadata have been manipulated or altered since their creation." ECF No. [500-2] at 5. He also examined cryptographic signatures and native files. *Id.*[13] Dr. Edman opines that certain documents produced by Defendant were "manipulated" and are "not authentic" or are "forgeries." *See, e.g.*, *Id.* at 5, 33, 36-37. Dr. Edman testified that he "is opining that a number of documents were manipulated in a manner that would be consistent with the defendant having performed those manipulations," and that while he does not "conclude decisively" that Defendant made modifications or altered documents, "the implication" is "clear" that Defendant "performed those manipulations." ECF No. [500-3] at 13:15-16:1. According to Defendant, Dr. Edman's reports and testimony should be excluded because "he lacks the requisite expertise to opine about the forensic analysis of documents, his opinions are not based on a reliable methodology, and his testimony will serve only to confuse the jury." ECF No. [500] at 12.

Regarding Dr. Edman's qualifications, Defendant asserts that he has "virtually no training in the forensic analysis of documents to determine whether they were altered or forged," and that his experiences include analyzing documents to detect malware, but he lacks various certifications. *Id.* Defendant contends that Dr. Edman failed to use industry "best practices" by not using a "clean workstation and write blocker to ensure that he didn't inadvertently alter the documents" and by not maintaining a log of hash values that he generated. *Id.* at 13. Defendant also asserts that Dr.

---

[13] ECF No. [500-2] contains Dr. Edman's reports dated December 13, 2019, January 13, 2020, and April 10, 2020.

Edman exhibited a "complete lack of knowledge" regarding "basic terms and concepts of forensic analysis." *Id.* Regarding methodology, Defendant maintains that although his reports generally describe how Dr. Edman analyzed a document's metadata and human readable text, Dr. Edman was "incapable of describing with specificity his process for analyzing the metadata." *Id.* In Defendant's view, the metadata artifacts considered "do not have the required indicia of scientific reliability," and Dr. Edman's methodology to opine that alterations and forgeries were consistent with having been made by Defendant "rests on a non-existent foundation." *Id.* at 13-14. Specifically, Defendant challenges that associating IP addresses with geographic locations is improper. *Id.* Finally, he contends that Dr. Edman's testimony would confuse the jury because Dr. Edman "considers virtually any document edit to be a 'forgery,' regardless of the intent behind the edit," even to correct mistaken dates or incorrect figures reflected on a document. *Id.* at 14-15; *see also* ECF No. [554] at 4-5 (arguing that jurors cannot understand the difference between a forgery and a fraud).

In response, Plaintiffs argue that Dr. Edman has had a central role at various points in these proceedings in giving testimony concerning the authenticity of documents submitted by Defendant, such as for the motion for judgment on the pleadings and testifying at the Court's August 2019 show cause hearing. ECF No. [528] at 10. They represent that Defendant previously mounted an unsuccessful *Daubert* challenge against Dr. Edman, and that Judge Reinhart addressed the difference between a forgery and a fraud and allowed Dr. Edman to testify whether a document is a forgery but not whether he believes it was fraudulently prepared. *Id.* at 10-11 (citing ECF No. [264] at 112-13). According to Plaintiffs, Dr. Edman's testimony that he intends to present at trial "is materially the same type of testimony that he has already offered throughout the course of this litigation, and that this Court has already credited in finding that certain evidence was fabricated."

*Id.* at 11. Plaintiffs make two primary argument: Dr. Edman is qualified, and his methodology for analyzing documents produced by Defendant is reliable. *Id.* at 11-15.

First, Plaintiffs maintain that Dr. Edman is "clearly qualified" based on his degrees, including a Ph.D in computer science; his publications in peer-reviewed journals on topics including cryptographic security; his certification in digital forensics; his direct work with the FBI in a case involving forensic analysis and seizure of bitcoins; and his professional experiences reviewing manipulated emails and phishing-related investigations. They note that during the August 2019 hearing, Defendant did not challenge Dr. Edman's qualifications during his *Daubert* challenge even though Judge Reinhart expressly invited him to do so. *Id.* at 11. They add that Defendant "grossly mischaracterizes" Dr. Edman's deposition testimony regarding his training in forensic analysis of documents. *Id.* at 12-13. Second, Plaintiffs argue that Defendant has not put forward an expert to opine that the documents at issue are in fact authentic, and his challenges to Dr. Edman's methodology affect the weight of Dr. Edman's testimony, not its admissibility. *Id.* at 14 (citing *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 169 (D.N.J. 2008)). Finally, they assert that Defendant's claim that Dr. Edman's use of the word "forgery" will cause jury confusion is "misguided," especially as Judge Reinhart already determined that Dr. Edman's use of that word was not inappropriate. *Id.* at 15. They add that Defendant can cross-examine Dr. Edman about conclusions that can be drawn from the metadata he reviewed, just as they did at the August 2019 hearing. *Id.*

Upon review and consideration, the Court is unpersuaded that Dr. Edman is unqualified to opine about the forensic analysis of documents, that his opinions are not based on a reliable methodology, or that his testimony will serve only to confuse the jury. Plaintiffs have produced a sufficient basis for the Court to conclude that Dr. Edman is qualified to provide testimony

regarding the authenticity of documents produced by Defendant. Although Defendant challenges that Dr. Edman lacks certain certifications or that his training in forensic analysis is lacking, these are subject matters that Defendant may freely explore on cross-examination. Similarly, the Court does not conclude that Dr. Edman's methodology is unreliable. Whether Dr. Edman could have been more diligent in aspects of conducting his analysis, such as in using a write blocker, a "clean workstation," or maintaining a hash value log, these features go to questions of weight rather than admissibility. *See Floorgraphics, Inc.*, 546 F. Supp. 2d at 168-69 (rejecting argument that expert's testimony was unreliable because he failed to ensure or confirm the accuracy of the data upon which he relied in forming his opinions, and stating that whether the expert "should have more diligently researched the underlying facts given to him . . . is a question of weight, not admissibility"). Defendant does not point to any specific component of Dr. Edman's methodology that is inherently flawed or otherwise unaccepted in the field of forensic analysis. As Plaintiffs state, Defendant can cross-examine Dr. Edman about the metadata he reviewed and the conclusions to draw from it.

The Court also does not agree that Dr. Edman's testimony would confuse the jury because he defines a "forgery" as including an alteration, modification, or manipulation to a document irrespective of whether there is a benign intent behind the alteration. Dr. Edman's terminology can be explained to a jury and hypotheticals probing his reasoning can be employed. Notably, Judge Reinhart has already explained that a forgery "simply means the document is not what it purports to be," ECF No. [264] at 112-13, which is comparable to Dr. Edman's description of a forgery as a "document that has been manipulated to appear to be something other than what it actually is." ECF No. [500-3] at 55:16-61:12. While Defendant asserts that a jury will not be able to understand the nuance between a forgery and a fraudulent document, ECF No. [554] at 5, the Court is

confident that a jury has the capacity to differentiate between a fraud and a document that "is something other than what it actually is." To the extent Dr. Edman opines on someone's purported motives in altering a document (in other words, an individual's state of mind and intent), such testimony exceeds the boundaries of his expert opinion. But the mere reference to "forgery" in and of itself is not so confusing that Dr. Edman's testimony should be excluded. Defendant's Motion as to Dr. Edman, therefore, is denied.

### 3.   *Andreas Antonopoulos*

Andreas Antonopoulos, the author of the "world's most cited book on Bitcoin" and working in the field of blockchain technology, was retained by Plaintiffs to (i) "provide a description of the Bitcoin protocol, a high-level overview of the technology underpinning this protocol, and a brief history of its creation and existence;" (ii) describe the concept of a Bitcoin fork; (iii) review the known public communications, communication platforms and forums and email addresses used by Satoshi Nakamoto; and (iv) "analyze data sets produced by Defendant purporting to be lists of bitcoin addresses (and corresponding blocks) that were mined by Defendant, comment on the security of transferring private keys as a means to sell bitcoin and comment on and verify signed messages." ECF No. [500-5] at 2-4. Defendant makes four overarching arguments to exclude Mr. Antonopoulos.

First, Mr. Antonopoulos is not qualified to opine on purported damages. ECF No. [500] at 15-16; *see also* ECF No. [554] at 5-6. According to Defendant, Mr. Antonopoulos' opinion about the price of bitcoin on December 3, 2019 is irrelevant; he is not qualified to testify about damages because he is not an economist and lacks a "background in complex economic analysis" regarding bitcoin, which "has significant liquidity issues, is highly volatile, and whose price varies on different markets;" and even if Mr. Antonopoulos was qualified, he "never performed any analysis

to determine the actual realized value of a bitcoin transaction at any point in time." ECF No. [500] at 15-16. Additionally, Defendant contends that Mr. Antonopoulos "simply copied and pasted an inadmissible internet website's listing of bitcoin price as of December 3, 2019" but failed to verify the reliability of any of that data. *Id.*

Second, Mr. Antonopoulos has a "deeply rooted bias" against Defendant. *Id.* at 16-18. Defendant states that Mr. Antonopoulos has made "chronic, derogatory and defamatory statements about Dr. Wright in public forums, including his personal assessment of Dr. Wright's credibility (referring to him as a con artist and Faketoshi), prior to being engaged" by Plaintiffs. *Id.* at 16. In particular, he points to two tweets and a podcast segment in which Mr. Antonopoulos purportedly referred to Defendant as trying to "fool even the smartest people" and orchestrate a fraud. Defendant contends that permitting Mr. Antonopoulos to testify "would amount to [Defendant] impaling himself on Morton's Fork." *Id.* at 17. He adds that an expert's bias is an element the Court may consider in evaluating whether particular expert testimony is reliable. *Id.* at 18; Third, Defendant maintains that Section XI of Mr. Antonopoulos' report, titled "Analysis of Satoshi Public Communications," is unhelpful to the jury because Mr. Antonopoulos "concedes that he doesn't know who (or how many people) Satoshi is/are," and this methodology "consists of reading unidentified emails that he found in the public record and regurgitating their contents." ECF No. [500] at 18. In Defendant's view, Mr. Antonopoulos simply provides a timeline of Satoshi Nakamoto communications, and the jury is "quite capable of reading emails and forming their own conclusions" without the need for an expert to "tell jurors what an email says." *Id.* at 19; *see also* ECF No. [554] at 7 (contending that public statements regarding Satoshi Nakamoto are unhelpful to the jury and that Mr. Antonopoulos should not be permitted to testify to their authenticity). Finally, Defendant argues that Plaintiffs "should not be permitted to use Mr. Antonopoulos' report

and testimony as a backdoor through which to introduce inadmissible non-evidence of purported Bitcoin prices." ECF No. [500] at 19. S*ee also* ECF No. [554] at 6-7 (arguing that Mr. Antonopoulos' report and testimony cannot be used as a conduit to present inadmissible evidence). In particular, he asserts that Mr. Antonopoulos analyzed and relied on "documents from an anonymous source that cannot be authenticated," and a certain message contained in a May 4, 2019 bitcoin transaction stating that Defendant "is a liar and a fraud" is inadmissible unauthenticated hearsay and should not be used as a backdoor to "smear" and improperly attack Defendant's character. ECF No. [500] at 19-20.

In response, Plaintiffs contend that each of Defendant's arguments should be rejected. First, they assert that Mr. Antonopoulos is "plainly qualified" to opine about "the spot market price" of bitcoin and bitcoin forks. ECF No. [528] at 15-16. According to them, the spot trading price of bitcoin and bitcoin forks is "traceable through the use of sites such as coincap.io," which "identifies the market value in U.S. dollars of Bitcoin forks at different points in time." *Id.* at 15. Plaintiffs state that Mr. Antonopoulos has worked exclusively in the Bitcoin and blockchain industry since 2012, he published the "definitive guide" and "world's most cited book on Bitcoin," he has been interviewed by global media organizations for his expertise, and he "sits on oversight committee for the CME Bitcoin price index and reference rate, the world's first regulated price index by the world's largest derivatives marketplace." *Id.* at 15-16. They maintain that Mr. Antonopoulos is not opining on the ultimate damages, the number of bitcoin allegedly misappropriated, or the appropriate date to measure damages. *Id.* at 16. They add that they "only intend to rely on Mr. Antonopoulos's testimony to show how damages should be calculated *after* the Court determines the appropriate date on which damages should be measured." *Id.* (emphasis in original).

Second, Plaintiffs argue that Mr. Antonopoulos is not biased against Defendant and that none of his opinions are based on any bias against Defendant. *Id.* at 17 (citing ECF No. [528-6] at 264:6-12). They assert that even if he harbored bias, that is not a basis for exclusion because allegations of bias are attacks against credibility, not admissibility. *Id.* They contend that Defendant's cited authority is "wholly inapposite." Third, Plaintiffs maintain that Mr. Antonopoulos' testimony regarding public statements by Satoshi Nakamoto is relevant. Specifically, they state that the Second Amended Complaint "details how Satoshi Nakamoto created the bitcoin protocols . . . how Defendant years later came out and claimed he and Dave Kleiman were the individuals behind the Satoshi Nakamoto moniker," Mr. Antonopoulos "reviewed the archive of a cryptography mailing list that has been public since its inception and reviewed the original sources containing communications from Satoshi Nakamoto," and while he is "not opining on the substance of those communications, [] his testimony will be helpful for the jury and this Court to authenticate communications written by Satoshi Nakamoto." *Id.* at 18.

Finally, Plaintiffs assert that Mr. Antonopoulos' reliance on the allegedly inadmissible evidence, the "CW List" and "DK List" and a message contained in a particular bitcoin message, "does not offend the Federal Rules of Evidence." Specifically, the CW List and DK List were provided by Defendant, Mr. Antonopoulos did not opine who created them nor how so, he examined other bitcoin holding lists related to Defendant's bitcoin holdings (the "Shadders List" and the "CSW Filed List") and concluded that the "CW List, and the CSW Filed List . . . could not have plausibly been produced independently of the Shadders List." *Id.* at 18-19 (citing ECF No. [500-5] at 28). Regarding the bitcoin message, they argue that while Mr. Antonopoulos does not opine on the relevancy of the message, they intend to "use the signed message to show that an address that Defendant previously claimed to be his in fact belongs to someone else," and this

"transactional data" is admissible under Rule 803(6), Fed. R. Evid., as a record of a regularly conducted activity. *Id.* at 19.

> ### a.      Mr. Antonopoulos' qualifications and alleged bias

Defendant has provided evidence that Mr. Antonopoulos previously referred to Defendant as Faketoshi and doubted his claims, and Plaintiffs have conversely produced testimony that Mr. Antonopoulos harbors no personal animus against Defendant and that his opinions are not based on bias. Although Mr. Antonopoulos' two tweets and podcast remarks may offend Defendant, the Court does not agree that Defendant is "impaled" on a Morton's Fork, a "choice between two equally unpleasant alternatives." ECF No. [500] at 17 n.11 (citation omitted). Litigation necessarily invites "unpleasant" scenarios for all litigants, yet Defendant has not shown that Mr. Antonopoulos is truly a "partisan disguised as an expert." ECF No. [554] at 8 (citation omitted). But even so, Plaintiffs correctly note that "allegations of bias are attacks against credibility. And a witness's credibility goes to the weight of the evidence – not admissibility." *Zaccone v. Ford Motor Co.*, No. 2:15-CV-287-FTM-38CM, 2017 WL 11532918, at *1 (M.D. Fla. Apr. 17, 2017) (denying motion to strike) (citing *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986)). Defendant can readily address these issues of alleged bias on cross-examination.

Regarding qualifications, the Court does not agree with Defendant that Mr. Antonopoulos is unqualified to testify about the spot market price of bitcoin and bitcoin forks. Mr. Antonopoulos' background includes publishing the "world's most cited book on Bitcoin" and sitting on an oversight committee for the CME Bitcoin price index and reference rate. Although Mr. Antonopoulos is not an economist by trade, Defendant fails to persuade the Court why such a background is necessary to testify about spot prices, especially as Plaintiffs represent that Mr.

Antonopoulos is not opining on the ultimate damages to be awarded. Accordingly, Defendant's Motion is denied on these points.

> **b.**   **Section XI of Mr. Antonopoulos' report regarding public statements by Satoshi Nakamoto**

Mr. Antonopoulos' report notes that he was "asked to review the known public communications, communication platforms and forums and email addresses used by Satoshi Nakamoto," ECF No. [500-5] at ¶ 11. Further, in Section XI of his report, Mr. Antonopoulos states that he "was asked by Plantiff's [sic] attorneys to examine the publicly posted communications of Satoshi and the email addresses and accounts used by Satoshi in these communications." *Id.* at ¶ 88. His "analysis of Satoshi public communications" is functionally an eight-item chronology from the first Satoshi Nakamoto message announcing Bitcoin in October 2008 to Satoshi ending his communications on the BitcoinTalk.org forum in December 2010. *Id.* at ¶¶ 89-96. There is no "analysis" set forth other than roughly outlining a two-year timeline, and there is no discernable opinion rendered by Mr. Antonopoulos in this section.

The Court agrees with Plaintiffs that "[c]ommunications sent by Satoshi Nakamoto are plainly relevant to this litigation." ECF No. [528] at 18. Satoshi Nakamoto's public communications are certainly part of Bitcoin's history and provide relevant context for the jury to understand the parties' relationships and dealings. However, Plaintiffs represent that Mr. Antonopoulos is not opining on the substance of those communications. And Section XI of the report does not conduct any meaningful historical analysis of any of the described timeline moments. *See, e.g.*, ECF No. [500-5] at ¶ 90 ("Satoshi engages in conversations with several other users on the mailing list in response to questions, using 'satoshi@[]' as his email address."); ¶ 93 ("The Bitcoin Whitepaper linked in the Cryptography Mailing List announcement attributes the work to 'Satoshi Nakamoto satoshin[]www.bitcoin.org'"); ¶ 95 ("Satoshi announced the Bitcoin

v0.1 software on the P2P Foundation Forum with an account with the user name 'Satoshi Nakamoto[.]'"). It instead consists of a handful of cursorily described events involving Satoshi Nakamoto but without any clear direction as to its overall role for trial purposes. Further, while Plaintiffs represent that they requested Mr. Antonopoulos "retrieve and authenticate communications that are known to have originated from the Satoshi Nakamoto email accounts," ECF No. [528] at 18, that request is not expressly reflected in his report.

Accordingly, the Court grants in part Defendant's Motion on this point. While Mr. Antonopoulos is permitted to testify about Satoshi's public communications and the emails historically associated with Satoshi Nakamoto, an actual opinion must be connected to such testimony. *See, e.g.*, ECF No. [500-7] at 49:24-52:21 (Mr. Antonopoulos describing how he formed opinions based on public information, relied on his "broad range of [] professional experience" to evaluate public communications, and applied his prior experiences when evaluating the Satoshi communications). Merely reading a post or emails located on a public forum is not an "opinion" nor would the jury require expert assistance in performing such a task.

### c.   Bitcoin lists and bitcoin message

Defendant challenges that Section XII of Mr. Antonopoulos' report, titled "Analysis of Address Lists," relies on anonymously-sourced documents that cannot be authenticated and includes hearsay messages that attack Defendant's character. According to Defendant, the items Mr. Antonopoulos relied on are inadmissible and a "backdoor" effort to "smear" him. The Court agrees in part, particularly as it relates to the May 4, 2019 bitcoin message.

Regarding the bitcoin address lists—the CW List, DK List, Shadders List, and CSW Filed List—the Court is unconvinced that this evidence cannot be authenticated. Although Defendant asserts that the CW and DK Lists were received in an encrypted form and decrypted with

information received anonymously, Plaintiffs represent that these lists were provided by Defendant in the litigation. Indeed, as noted in Mr. Antonopoulos' report, he was informed that these lists "had been independently produced by the trust and delivered by Defendant to Plaintiff[s] during settlement negotiations[.]" ECF No. [500-5] at ¶ 103. Further, the CSW Filed List was "produced to the Court by Defendant as the list of addresses extracted from an encrypted communication delivered by 'bonded courier' from a trust[.]" *Id.* at ¶ 104. The Shadders List, moreover, was compiled by Steve Coughlan, one of Defendant's employees. *Id.* at ¶ 101. Defendant fails to show why Mr. Antonopoulos cannot rely on this type of evidence to form his opinions. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

Regarding the May 4, 2019 bitcoin message, however, the Court agrees with Defendant that the message itself is a backdoor attempt to attack Defendant's character for truthfulness. Although it is one thing for an expert to represent generally that a message was sent from an individual not purporting to be Defendant using a bitcoin address Defendant claimed as his own, it is entirely different to have an expert testify that, as part of forming his opinions, the message "Craig is a liar and a fraud" was transacted. *See id.* ("But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."). In this respect, the Court agrees that Plaintiffs have not shown that all of the elements of Fed. R. Evid. 803(6)[14] are satisfied. Specifically, Plaintiffs fail to demonstrate how the message was "kept in the

---

[14] "The following are not excluded by the rule against hearsay . . . (6) Records of a Regularly

course of a regularly conducted activity of a business, organization, occupation, or calling[.]" *Id.* at Rule 803(6)(B). As Defendant notes, the blockchain itself is not a business, organization, occupation, or calling. ECF No. [554] at 7. The bitcoin message reflected in paragraphs 147 through 158 of Mr. Antonopoulos' report, therefore, is inadmissible hearsay. But even if it was otherwise admissible evidence, Plaintiffs fail to persuade the Court that the probative value of the anonymously authored message is not substantially outweighed by its prejudicial effect. Accordingly, Defendant's Motion is granted on this point, and Mr. Antonopoulos may not disclose the content of the May 4, 2019 message.

### 4.    *Stefan Boedeker*

Stefan Boedeker, a statistician and economist, was retained by Plaintiffs to "review transaction data that the Defendant provided," specifically, a list of 16,404 bitcoin blocks allegedly mined by Defendant, "to statistically analyze gaps that are occurring between Transaction IDs and determine the likelihood that gaps exceeding a certain length occur." ECF No. [500-9] at ¶¶ 6-7. Mr. Boedeker concluded that "the observed patterns in the data have an infinitesimally small chance of occurring naturally without any outside intervention such as data manipulation after the fact." *Id.* at ¶ 9. In particular, he opined that "[b]ased on overwhelming statistical evidence derived from descriptive statistical analysis which identified highly unusual 'gaps' in the data, and from statistical hypothesis tests and exact probability calculations which proved that these 'gaps' would

---

Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

only appear by chance with a probability that is virtually zero, I conclude that some kind of data manipulation must have taken place to 'create' these gaps." *Id.* at ¶ 10.

Defendant argues that Mr. Boedeker's conclusion that the gaps were manipulated is unsupported. He contends that Mr. Boedeker is unqualified to opine about how SHA 256 hashes and bitcoin transaction IDs should be distributed because "he has no expertise in SHA 256 hashes or the hashing process," Mr. Boedeker improperly presumes that such data should always randomly evenly distribute across a range based on material he reviewed online, he was unfamiliar with certain individuals' credentials, and "he doesn't know anything about bitcoin mining or the data that serves as the input for the bitcoin transaction IDs." ECF No. [500] at 21; *see also* ECF No. [554] at 8 (arguing that Mr. Boedeker's "opinion that the list of bitcoin public addresses is manipulated is not expert testimony"). Defendant adds that Mr. Boedeker's supplemental report, ECF No. [500-11], is untimely and fails to "cure" Mr. Boedeker's "lack of expertise as to SHA-256 hashing, the bitcoin mining process, and his inability to conclude as a matter of fact that something was manipulated." ECF No. [500] at 22-24.

In response, Plaintiffs argue that Mr. Boedeker is qualified to perform statistical analyses on Defendant's bitcoin holdings lists to determine if there are any anomalies in the data. ECF No. [528] at 19-20. They make two main arguments. First, Mr. Boedeker properly relied on the uniformity of the SHA-256 hashing function. According to Plaintiffs, the premise that a SHA 256 output distribution should be random and evenly distributed is "true" and is "confirmed" by Dr. Edman and "[e]ven Defendant's own expert, Mr. Choi[.]" *Id.* at 20 (citations omitted). Further, they assert that Mr. Boedeker "*did* in fact ensure that SHA-256 hashes are 'approximately uniformly randomly distributed over their full range and independent" based on statistical testing that he performed. *Id.* at 21 (emphasis in original). Second, Plaintiffs state that their failure to

produce Mr. Boedeker's supplemental report prior to his deposition was substantially justified and harmless. In particular, they maintain that the supplemental report, which was issued the day after his deposition, is "not a 'new analysis,' but rather an explanation to an attack on his analysis that was first posed at his deposition." *Id.* In their view, the supplemental report was issued to "disprove [a] new theory by Defendant" regarding mining bitcoin. *Id.* Plaintiffs represent that Mr. Boedeker offered to sit for an additional deposition on various dates prior to the close of discovery, and they agreed to provide him for a deposition after the discovery deadline, but Defendant declined their invitations. *Id.* (citing ECF No. [528-9]).

Upon review and consideration, the Court does not find that Mr. Boedeker is unqualified to provide his expert testimony or that his analysis is unreliable. Although Defendant challenges the premise that transaction IDs should be uniformly and evenly distributed, he can explore this area on cross-examination just as he can cross examine Mr. Boedeker regarding whether the bitcoin lists statistically show "manipulation." The Court will not exclude Mr. Boedeker's testimony at trial.

However, Mr. Boedeker's April 23, 2020 supplemental report, ECF No. [500-11], is untimely. Mr. Boedeker's first report was issued on April 10, 2020 and he was deposed on April 22, 2020. The deadline to complete discovery was May 1, 2020 and the deadline to file all pre-trial motions, including motions in limine, *Daubert*, and dispositive motions was May 8, 2020. ECF No. [441]. The mere fact that Plaintiffs offered Defendant a handful of dates to re-depose Mr. Boedeker about his after-the-fact supplemental report does not avoid the bar of Rule 37 sanctions. Glaringly, Plaintiffs provided the supplemental report to Defendant at 10:02 P.M. on April 23, 2020 and gave Defendant until close of business on April 24, 2020 to schedule a second deposition against the press of all the numerous impending deadlines. *See* ECF No. [528-9]. Plaintiffs'

decision to have Mr. Boedeker perform last-minute analyses following his deposition to shore up his conclusions in the face of Defendant's challenges to the soundness of his opinions carries risk. This is particularly so where, as here, Mr. Boedeker had the Shadders List file at the time he initially drafted his April 10, 2020 report. *See* ECF No. [500-10] at 57:8-58:16, 60:8-14. Indeed, as Defendant states, Plaintiffs "should now be required to live with th[eir] decision" to not have Mr. Boedeker "timely analyze th[e] [Shadders List] file or offer an opinion on it" before the deposition. ECF No. [500] at 24. Accordingly, the disclosure of the after-the-fact analyses on the Shadders List is neither substantially justified nor harmless. *See Cook v. Royal Caribbean Cruises, Ltd.*, No. 11-20723-CIV, 2012 WL 2319089, at *3 (S.D. Fla. June 15, 2012) ("Because Defendant has already taken the depositions of these two experts and does not now have the ability to obtain additional experts to rebut the supplemental opinions or to arrange for supplemental opinions from its own witnesses, permitting Plaintiff to use these supplemental expert witness opinions would unduly prejudice Defendant. The Court is not inclined to cause this inequitable result.").

Plaintiffs' contention that Defendant launched a "deceptive attack on Mr. Boedeker's analysis in his deposition," ECF No. [528] at 22, is relatedly without merit. They fail to point to anything about Defendant's "attack" at the deposition that was "deceptive." Merely disagreeing with Defendant about the strength of Mr. Boedeker's analysis or of alternative potential explanations for data gaps is a far cry from Defendant having engaged in deception during the course of the deposition. Likewise, to the extent Plaintiffs argue that without the supplemental report, "Defendant will be given an opportunity to explain away Mr. Boedeker's testimony through falsehoods," *id.*, the Court is unconvinced. The adversarial system is designed to root out and expose lies. It also exists to enable a jury to thoughtfully consider evidence before it and to assess strengths and weaknesses of an expert's opinion. Plaintiffs fail to show that they cannot fairly or

effectively make their case with only Mr. Boedeker's opinions from his first report, which report was timely disclosed and thoroughly examined during his deposition. Defendant's Motion accordingly is granted in part, and Mr. Boedeker's supplemental report is stricken.

### 5.    Dr. Robert Leonard

Dr. Leonard, a linguistics professor at Hofstra University, was retained by Plaintiffs to conduct a forensic linguistic authorship analysis of certain documents associated with Defendant. *See* ECF No. [500-12]. In particular, he was "asked to give an opinion on whether any of the Q documents share likely common authorship with the K [documents]." *Id.* at 6. "K Documents" consist of documents known to have been authored by Defendant while "Q Documents" are comprised of documents Defendant denies authoring, Q1 documents; and documents that Defendant reports "are partly his own writing, but also partly written by an imposter," Q2 documents. *Id.* Dr. Leonard "analyzed the language patterns of all Ks and all Qs and compared them." *Id.* According to him, "[a]uthorship analysis proceeds by posing competing hypotheses and seeking to determine which hypothesis best explains the non-random distribution of the language data." *Id.* Based on his analysis, Dr. Leonard concluded that the "superior hypothesis for all Q documents (individual email threads) is Hypothesis 1. That is, the language patterns of the Q documents are consistent with the language patterns found in the documents known to have been written by Dr. Craig Steven Wright." *Id.* In reaching this opinion, Dr. Leonard considered different varieties of English, including Australian English, and he identified twelve "linking features"[15] in the data sets that he reviewed, such as "try and," "setup/backup" as a verb, "etc" without periods, "n-grams," among others. *Id.* at 8-9.

---

[15] Dr. Leonard described "linking features" as "similar instances of variation of language use in more than one data set." ECF No. [500-12] at 8.

Defendant makes three overarching arguments for excluding Dr. Leonard. First, Dr. Leonard's report is not based on sufficient facts or data. ECF No. [500] at 25. Specifically, Defendant contends that of the "millions" of words available from documents produced in this case, Dr. Leonard relied on approximately 8,200 words and yet he "does not make any effort to explain why this small data set for the *known* documents is sufficient for conducting his analysis, nor does he indicate in his report that the data set utilized by him is a representative sample." *Id.* (emphasis in original) He adds that the "linking features" do not reflect equal numbers of occurrences, and because the "linking features" are assessed in aggregate, "it flows that the aggregate can only be as 'probative' as the strength (or weaknesses) of its individual components, and there is no evidence that the resulting aggregate here has any deterministic connection to [his] conclusion." *Id.* at 25-26.

Second, Dr. Leonard's report and testimony do not meet the requirements of Rule 702 or the reliability standard of *Daubert*. *Id.* at 26. According to Defendant, Dr. Leonard uses a method known as "forensic stylistics," which has "various shortcomings" such as not "offer[ing] a standard reference set of stylemarkers to be reviewed in each case," it relies on subjectivity, and it has a "pick and choose" nature. *Id.* (citation omitted). In his view, Dr. Leonard fails to "specify, in precise terms, the methodology or guidelines utilized by him in identifying and selecting each linking feature other than a one-sentence explanation;" he "cherry-picked textual features, without stating why;" he "does not identify any cultural or situational contexts which linguists have shown to contribute significantly to individual variation in language behavior;" and his analysis is "plagued by a confirmation bias" because it "ignores evidence" that "tends to support" an alternative hypothesis regarding the data. *Id.* at 27-29; *see also* ECF No. [554] at 9-10 (arguing that federal courts that have not rejected experts adhering to the forensic stylistics methodology

did not give a "detailed explanation" of their *Daubert* ruling or a "meaningful examination" of this method). Finally, Defendant argues that Dr. Leonard's testimony should be excluded because it will serve to mislead or confuse the jury. ECF No. [500] at 29-30.

In response, Plaintiffs assert that Defendant's contention that Dr. Leonard's methodology is unreliable under *Daubert* is "patently false" because it is "peer-reviewed" and "has been accepted and relied upon by federal courts in major cases," it is "based on sufficient facts and data," and Defendant's remaining arguments "all go towards the weight of Dr. Leonard's opinions[.]" ECF No. [528] at 23. They first argue that Defendant's attacks on Dr. Leonard's methodology have been rejected by other federal courts. In particular, they cite to three federal district court cases, two from the District of Utah and one from the Western District of New York. *Id.* at 24-25. According to Plaintiffs, Defendant's challenges to Dr. Leonard's methodology are based on their rebuttal expert, Dr. Eggington, who "[b]y his own admission [] is part of one school of academics who disagrees with the methodologies used by a second school (forensic stylistics) that includes . . . [Dr.] Leonard." *Id.* at 25. They add that Defendant's failure to cite to these three known cases rejecting *Daubert* challenges grounded in Dr. Eggington's views showcases "hide and seek litigation" tactics. *Id.* at 25-26.

Plaintiffs maintain that Dr. Leonard's opinions are based on sufficient facts and data. In particular, he used a sample size of nearly 30 documents, which "well-exceed[s]" the minimum threshold of five documents that Dr. Eggington previously opined was sufficient to "conduct a scientifically sound authorial attribution analysis." *Id.* at 26. They further note that challenges to the sufficiency of an individual "linking feature" go to the weight of Dr. Leonard's opinion, and through cross-examination, the jury can "decide whether the frequency of the occurrences of the 12 linking features, on an individual and aggregate basis, support Dr. Leonard's opinion." *Id.* at

27. Next, Plaintiffs argue that Dr. Leonard's methodology satisfies *Daubert*. They contend that Dr. Leonard's methodology is "based in peer-reviewed literature and academic scholarship," it is "completely transparent and replicable," and while there is a "robust debate among academics regarding best practices for authorial attribution," a "debate in the scientific community . . . is not a basis for exclusion." *Id.* at 27-28 (citation omitted). Finally, they argue that Dr. Leonard's testimony does not violate Rule 403, and Dr. Leonard's opinions are "highly relevant" to "debunking" Defendant's claims that he did not author certain emails. *Id.* at 28-29.

Upon review and consideration, the Court finds Defendant's arguments to be unavailing. Dr. Leonard's testimony is plainly relevant to key issues in this case, particularly as Defendant has denied authoring certain emails relating to whether he partnered with Mr. Kleiman. Defendant fails to show how the sample size and quality of the documents that Dr. Leonard considered are insufficient to perform his analysis, and he fails to convince the Court that Dr. Leonard's methodology is unreliable under *Daubert*. Other federal courts have rejected efforts to exclude expert testimony on the basis that the forensic stylistics approach is unreliable. *See, e.g.*, *Dutcher v. Bold Films LP*, No. 2:15-CV-110-DB, 2019 WL 181353, at *1 (D. Utah Jan. 11, 2019). And the mere fact that Dr. Eggington adheres to a different school of thought regarding forensic analysis does not compel the conclusion that Dr. Leonard's analysis is unreliable or fundamentally flawed. Moreover, whether any of the identified "linking features" reflected in Dr. Leonard's report is commonplace in writing or a truly unique and distinctive feature can be pursued on cross-examination. The same is true regarding his alleged "confirmation bias." Accordingly, Defendant's Motion is denied as to Dr. Leonard.

Case No. 18-cv-80176-BLOOM/Reinhart

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion, **ECF No. [492]**, is **GRANTED IN PART AND DENIED IN PART** and Defendant's Motion, **ECF No. [500]**, is **GRANTED IN PART AND DENIED IN PART**, as set forth above.

**DONE AND ORDERED** in Chambers at Miami, Florida, on November 16, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record