UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Ira Kleiman, as Personal Representative of )
the Estate of David Kleiman, )
 )
 )
and )
 )
 ) **Case No.: 18-cv-80176-BB**
W&K Info Defense Research, LLC )
 )
 )
     Plaintiffs, )
 )
v. )
 )
Craig Wright, )
 )
 )
     Defendant. )
_____ )

**NON-PARTY ANDREW O'HAGAN'S MOTION FOR ORDER COMPELLING
PLAINTIFFS TO PAY FEES AND COSTS RELATED TO
DOCUMENT AND DEPOSITION DISCOVERY IN ENGLAND
AND INCORPORATED MEMORANDUM OF LAW**

    Non-party witness Andrew O'Hagan ("O'Hagan"), asks this Court to enter an Order compelling Plaintiffs to pay the fees and costs borne by O'Hagan in resisting an application to submit documents and provide testimony sought by Plaintiffs in this action pursuant to letters rogatory – fees and costs that Plaintiffs agreed to pay and were later ordered to pay a specific sum assessed by a judge in England. In support, O'Hagan states the following:

                           **I.     Introduction**

    Plaintiffs applied to this Court, in this action, to issue letters rogatory to compel a number of witnesses out of the country, including O'Hagan, to produce documents and provide testimony. O'Hagan, a well-respected journalist and Editor-at-Large and Director of the London Review of Books, wrote an article in 2016, entitled "The Satoshi Affair," that addressed the invention of Bitcoin, its technology and its impact on those involved in the process. One of O'Hagan's main

sources for the article was Dr. Craig Wright, the purported founder of Bitcoin and a party to this action.

Unlike Plaintiffs or Dr. Wright, O'Hagan does not have, and never had, any financial interest in this action; nor did he stand to gain or lose anything, however this action is determined. His participation in discovery here could not benefit him in any manner.

Because of the encyclopedic nature of the discovery Plaintiffs sought, O'Hagan hired counsel in England and there was contentious litigation there over the breadth and scope of the materials and information that O'Hagan would be required to provide. During that litigation, the Plaintiffs and O'Hagan agreed he would attend a strictly defined and limited deposition ***and that Plaintiffs would pay O'Hagan's reasonable fees and costs to be assessed if not agreed***. The agreement was memorialized by a Consent Order in the English court.

In advance of the deposition, Plaintiffs' counsel, Boise Schiller Flexner, LLP, in acknowledgment of the payment obligation they had assumed, made a partial payment toward O'Hagan's fees and costs, and O'Hagan sat for the deposition testifying fully on the subjects agreed to in response to Plaintiffs' requests.

But after the deposition concluded, Plaintiffs simply refused to pay the balance of O'Hagan's fees and costs. Plaintiffs had what they'd come for – testimony and evidence for use in the action now being tried before this Court – but despite their agreement, which had been memorialized in the Consent Order, they contested the amount and did not pay

O'Hagan was then forced to proceed in the English courts to obtain another order, a final judgement of fees and costs for a specified sum (the "Judgment") and to domesticate the Judgment in the United States. Despite repeated demands, Plaintiffs still refuse to pay what they agreed – and were later ordered – to pay.

Plaintiffs used the process and authority of this Court to seek witness evidence by deposition and very broad discovery of O'Hagan in England. O'Hagan properly disputed and successfully opposed the breadth of the discovery. Plaintiffs agreed to pay O'Hagan's fees and costs and then refused to do so, despite having the benefit of the deposition obtained from him for use in the action before this Court.

This Court should therefore enter an Order compelling Plaintiffs to reimburse O'Hagan for these fees and costs.

## II. Factual Background

### A. O'Hagan and his work

1. O'Hagan is a journalist, a published novelist, and Editor/Director of the London Review of Books, the biggest literary and journalistic periodical in Europe.

2. In June 2016, the London Review of Books published an article written by O'Hagan, "The Satoshi Affair." This article sought to address important issues of public interest, such as the creation of Bitcoin, the development of Bitcoin technology and its impact on those involved in that process, the ways in which people may invent themselves or aspects of their lives, and the ways in which people can fictionalize themselves (especially in the online world).

3. During the preparation of the article, O'Hagan took many individuals into his confidence, including many who wished for their identities to be kept out of the public domain. One of the main sources of journalistic material for "The Satoshi Affair" was Dr. Craig Wright, the purported founder of Bitcoin and the subject of the article.

### B. Letters Rogatory proceedings before this Court

4. On or about July 19, 2019, Plaintiffs applied to this Court in this action to issue "letters rogatory," the effect of which would be to compel a number of witnesses out of the country,

3

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

including O'Hagan, to give evidence. D.E. 249. The letter of request was issued in England, despite O'Hagan having not been put on notice of the application nor provided with an opportunity to contest it.[1]

### C. The English court's discovery order

5.  On or about November 11, 2019, Plaintiffs issued an *ex parte* application seeking that O'Hagan be examined by way of deposition and that he produce certain categories of documents for use in this Court. The application was supported by the detailed first witness statement of Velvel Freedman, Esq. which provided a background to these proceedings, the expected contents and nature of O'Hagan's evidence, why an Order would be proportionate, and an explanation of the relevant rules relating to evidence in U.S. federal civil actions. The witness statement was accompanied by a 423-page exhibit.

6.  By way of a sealed Order dated November 14, 2019, Justice Butcher of the English Commercial Court ordered O'Hagan to provide certain categories of documents, and evidence by way of oral deposition, as per the categories of topics detailed within the Order.

### D. The extensive litigation to limit the discovery order

7.  O'Hagan's solicitors carefully considered the application, order and supporting evidence, and advised O'Hagan accordingly. Together with a United States attorney, David Korzenik, they prepared O'Hagan's detailed response and an application notice to the English court to set aside the Order.

8.  On or about November 22, 2019, O'Hagan filed and served an application to set aside the Order on the basis that the Order sought by Plaintiffs was unlawful in that:

---

[1] With the result that O'Hagan was deprived of the opportunity to seek before this Court the remedies available to non-party witnesses under Fed. R. Civ. P. 45.

4

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

a. The Order was inconsistent with s.3(1) Evidence (Proceedings in Other Jurisdictions) Act 1975, in that O'Hagan could not be compelled to give evidence that reveals source material or other journalistic material on this basis in civil proceedings in England and Wales;

b. The Order was inconsistent with article 10 of Schedule 1 of the Human Rights Act 1998 in that it represents a disproportionate interference with O'Hagan's right to freedom of expression and/or was not "in accordance with the law";

c. The Order represented an order for general discovery against a mere witness and was an impermissible "fishing expedition"; and

d. The Order was oppressive.

9. The application was supported by O'Hagan's detailed witness statement, which addressed his credentials as a journalist, what constitutes journalistic work, the importance of protecting the confidentiality of journalistic material, his work on "The Satoshi Affair," the implications of the Order for journalism and freedom of expression, and the relevance of the material sought.

10. On or about December 6, 2019, Plaintiffs served Velvel Freedman's second witness statement and an accompanying 469-page exhibit in response to O'Hagan's application to set aside the November 14 Order.

11. O'Hagan sought to have the case transferred to the Media and Communications List within the Queen's Bench Division of the High Court, as the appropriate forum for actions engaging freedom of expression. Plaintiffs refused to consent to the proposed transfer. O'Hagan submitted an application to transfer on or about December 10, 2019, to Justice Warby. On or about December 11, 2019, Justice Warby transferred the matter to the Media and Communications Court and set a hearing for December 20, 2019.

**E. Plaintiffs and O'Hagan reach an agreement and O'Hagan is deposed**

12. Prior to the Media and Communications Court hearing, Plaintiffs and O'Hagan engaged in settlement discussions and reached an agreement, whereby Justice Butcher's

5

November 14, 2019 Order was revoked, the application hearing set for December 20, 2019 was canceled, and O'Hagan agreed to attend a strictly defined and limited deposition at a date and time to be agreed. Furthermore, Plaintiffs agreed to pay O'Hagan's reasonable fees and costs for the application and the fees and costs incurred by him in preparing for, attending and being represented at the deposition.

13. The Plaintiffs and O'Hagan agreed he would attend a deposition on March 17, 2020, and that certain of O'Hagan's fees would be paid by Plaintiffs. O'Hagan's solicitors prepared and filed a Consent Order, dated December 17, 2019, which the Plaintiffs' solicitors countersigned, memorializing the deal and making it a part of the court record. ("Consent Order"). A copy of the Consent Order is attached as Exhibit A.

14. On March 2, 2020, Plaintiffs' solicitors proposed the deposition of O'Hagan should be taken by video link because of concerns about travel in the early stages of the Covid-19 crisis; this was agreed. The deposition hearing was hosted at the office of O'Hagan's solicitors in London and was attended virtually by lawyers for all interested parties.

15. Pursuant to the Consent Order, Plaintiffs' counsel Boise Schiller Flexner, LLP made a payment on account to O'Hagan of £34,988 on February 28, 2020, in advance of the deposition.

16. On March 17, 2020, O'Hagan and his legal team attended the deposition, which concluded the matter.

17. Plaintiffs have made no other payments to O'Hagan for his fees and costs after February 28, 2020. Plaintiffs also refused to agree to the amount of or reasonableness of O'Hagan's fees and costs as assessed by Court order. O'Hagan was forced to litigate these issues.

### F. O'Hagan obtains a judgment for fees and costs from the English court and domesticates it here

18. O'Hagan sought relief from the English court for Plaintiffs' violation of the Consent Order.

19. On or about March 26, 2021, the Court of England issued a Final Costs Certificate, akin to a Final Judgment. The Judgment noted that the total amount of fees and costs due to O'Hagan was £127,695.48, of which (as noted supra) £34,988 had been paid, leaving a balance due to O'Hagan of £92,707.48 pounds, with interest for so long as it remained unpaid. A copy of the Judgment is attached as Exhibit B.

20. Undersigned counsel domesticated the Judgment in Florida pursuant to the Uniform Out-of-Country Foreign Money-Judgment Recognition Act (Fla. Stat. 55.601). The Notice of Recording Foreign judgment is attached hereto as Exhibit C.

21. As of the March 23, 2021 domestication of the Judgment, the exchange rate for British Pounds Sterling to United States Dollars was 1 GBP = 1.3731 USD. Accordingly, the £92,707.48 Judgment was valued at $127,296.64.

22. To date, despite numerous demands – including most recently on November 2 and 3, 2021 – Plaintiffs have not paid O'Hagan the balance owing to him.

### III.   Memorandum of Law

#### A. Introduction

For at least three reasons, the Court should order Plaintiffs to pay O'Hagan's unpaid fees and costs for this discovery – an expense Plaintiffs already agreed to pay (even reducing their agreement to a consent order), a cost the English court ordered Plaintiffs to pay, and a sum then determined and reduced to a judgment by the English court.

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

First, requiring those who seek costly and burdensome discovery from disinterested non-parties to pay those non-parties' costs is a practice well-established in the Federal Rules of Civil Procedure. Second, this Court, under principles of international comity, should give effect to the orders of the English courts – orders rendered in direct support of *this* Court's judicial processes. Third, mindful of simple equity, this Court should use its inherent powers to require Plaintiffs to honor their agreement – to O'Hagan and to the English courts – to pay these costs; costs attendant to testimony and a burdensome and inappropriate request for discovery that was born of and taken in service to the action presently pending before this Court.

### B.  It is routine and equitable practice to relieve non-parties of the costs of discovery

While litigants are entitled to broad discovery under the Federal Rules of Civil Procedure, the Rules themselves anticipate and account for the potential for such discovery to impose unreasonable burdens – especially upon those who are not party to, and will not benefit from, the litigation the discovery is meant to serve:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

Fed. R. Civ. P 45(d)(1).[2]

---

[2]
> A non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court. This provision applies, for example, to a non-party required to provide a list of class members. The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party.

Fed. R. Civ. P. 45, Advisory Committee Notes to the 1991 Amendment, citing *United States v. Columbia Broadcasting Systems, Inc.*, 666 F.2d 364 (9th Cir.1982).

Accordingly, courts routinely shift the costs incurred by non-party targets of discovery to the party seeking the testimony or documents.

Indeed, the Court may, if it thinks just, require the party seeking discovery to advance the costs likely to be incurred by its non-party target as a pre-condition of obtaining the discovery. "The advancement of costs as a condition for the denial of a motion to quash is committed to the sound discretion of the court." *Cantaline v. Raymark Indus., Inc.*, 103 F.R.D. 447, 449–50 (S.D. Fla. 1984), *quoting United States v. International Business Machines*, 62 F.R.D. 507, 509 (S.D.N.Y.1974) (*citing Blank v. Talley Industries, Inc*., 54 F.R.D. 627 (S.D.N.Y.1972)). In exercising that discretion, the "[c]ourt must be sensitive to the potential burden imposed on a non-party during discovery, by balancing the need for the material against the burden (financial or otherwise) to be imposed, the possibility of lightening it through a protective order, the financial resources of the non-party, and the non-party's interest (if any) in the final outcome of the litigation." *Id., citing Pollitt v. Mobay Chemical Corp.,* 95 F.R.D. 101, 105 (S.D.Ohio 1982).

After a deep discussion of the various approaches to cost-shifting the discovery burden of non-parties, and recognizing that everyone in society has an obligation to cooperate with the legal process in the interests of justice, the Court in *Cantaline* drew the line at imposing burdensome costs on such non-parties:

> But the duty owed to society and hence to the court is different from the duty owed to a particular party. Rule 45(b)(2) recognizes this difference, for it draws a distinction between a non-party's failure to initiate the search for requested materials . . . and that same party's refusal to turn over to the discovering party the documents collected pursuant to a court order ***unless the party first advances to the non-party the reasonable costs of compliance — a right accorded the non-party under the Rules.***
>
> To the court, party and non-party alike owe a duty of obedience borne of respect for the judicial institution, and necessitated lest the order and predictability of the Rules of Civil Procedure be compromised. In a practical sense, however, the duty of

9

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

obedience that a non-party owes a party differs from the duty the two owe the court. Most obviously, the non-party is not involved in any dispute with the discovering party. Indeed the non-party usually has little if any stake in the outcome of the case. Thus the rule as usually construed, generally compels a non-party to absorb costs even though it derives no benefit therefrom.

*Cantaline* at 451–52 (**emphasis supplied**).

In short, had O'Hagan been afforded the chance to come before the Court to challenge the discovery Plaintiffs sought through letters rogatory, it would have been a matter of routine for the Court to require Plaintiffs not only to ***pay***, but to ***advance***, the costs he was likely to incur for providing testimony and discovery in a matter where – it should go without saying – he had no interest in the outcome.[3] As it happened, because he had no notice the letters rogatory were being sought, O'Hagan never had that chance before the testimony and discovery process reached England.

But, once the application for testimony and discovery did come ashore in England, O'Hagan and the Plaintiffs eventually agreed to what the Plaintiffs had to know was predictable –

---

[3] This is a key distinction between parties and non-parties. A party to a litigation will, without some extraordinary showing, usually be required to pay the costs of complying with discovery demands from opposing parties. "Where a defendant in a proceeding performs the work necessary to respond to a subpoena duces tecum, ***his own case, to some degree at least, is benefited thereby***." *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 669 F.2d 620, 623–24 (10th Cir. 1982), *citing Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, (1978) (declining to shift defendant's costs of production) (***emphasis supplied***). But for ***non-parties***, the calculus is and should be different:

> We note also that Kerr-McGee is not a party to the underlying antitrust action. A literal reading of the discovery rules does not indicate that a nonparty responding to a subpoena duces tecum is in any different position than a party to the action. Nonetheless, the fact remains that in responding to the present subpoena duces tecum, Kerr-McGee is performing no work that conceivably could inure to its benefit.

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.* at 623.

10

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

to say nothing of just: They agreed that Plaintiffs would pay O'Hagan's fees and costs. Indeed, Plaintiffs even advanced a small portion of those fees and costs prior to O'Hagan's deposition, just as they likely would have been required to do in the normal course of Rule 45(d). Then, when Plaintiffs reneged on their promise, the English courts unsurprisingly reached the same conclusion an American court would have: that O'Hagan, although bound to bear the burden of giving testimony he'd rather not have given and of contesting a seriously chilling request to disclose documents which he was not legally required to produce, was not, at least, required to *pay* for the privilege.

In sum, the Plaintiffs' obligation to pay O'Hagan's fees and costs for the testimony and discovery they sought in aid of their case is clear in the law. Such relief is uncontroversial – even routine – and the Court should order it here.

### C. This Court should give meaning to the orders of the English court, especially as those orders were directly in service to this Court's judicial process

As set forth above, the Court could simply rely on the pedestrian authority of the routine application of the Federal Rules of Civil Procedure to grant the relief O'Hagan seeks here. But there are, in fact, more lofty considerations at stake.

> The comity doctrine "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."

*St. Martinus Univ., NV v. Caribbean Health Holding, LLC*, No. 19-22278-CIV, 2020 WL 956301, at *6 (S.D. Fla. Feb. 27, 2020), *appeal dismissed sub nom. St. Martinus Univ. v. Caribbean Health Holding, LLC*, No. 20-11991-EE, 2020 WL 7018197 (11th Cir. Sept. 28, 2020), quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (*1895*).

11

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

The standards for when and whether to afford international comity to the orders of a foreign court are well-established:

> In evaluating whether comity is appropriate, we consider "(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) (internal citations omitted). We also consider "whether 'the central issue in dispute is a matter of foreign law and whether there is a prospect of conflicting judgments.'" *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (*quoting Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

*EGI-VSR, LLC v. Coderch Mitjans*, 963 F.3d 1112, 1120 (11th Cir. 2020), *cert. denied sub nom. Mitjans v. EGI-VSR, LLC*, 141 S. Ct. 1075 (2021). It cannot be disputed that the orders of the English courts in this matter handily satisfy the factors set forth in *Turner* and recapitulated in *EGI-VSR*: There is no hint of fraud. English courts are every bit as competent and "civilized" as this Court. And the holdings of those courts – that the Plaintiffs should pay a non-party's fees and costs for testimony and discovery the Plaintiffs wanted – far from being "repugnant," are perfectly in line with the established law and routine practice in the courts of the United States. [Section III.B, *supra*.]

Comity is vital to the international rule of law, and, in particular, "[t]he concept of international comity is a central consideration in determining whether the Hague Convention procedures should be used" as they were here. *In re Photochromic Lens Antitrust Litig.*, No. 8:10-MD-2173-T-27EAJ, 2012 WL 12904331, at *3 (M.D. Fla. May 2, 2012).

In obtaining letters rogatory, Plaintiffs relied on the internationally respected authority and global reach of this Court to obtain discovery in a foreign land from a foreign citizen not otherwise subject to the compulsion of this Court. Respecting the processes and orders of this Court, the English courts acted to give meaning to those orders and processes and to compel that testimony.

Thus did Plaintiffs rely on international comity to get what they wanted and come back to this Court with evidence in hand for the trial now under way. It is a matter of purest international comity that this Court should now likewise give meaning to the orders the English courts, orders rendered in service to it.

### D. This Court has inherent power to order Plaintiffs to pay

Finally, though, this Court need turn neither to the deontological workings of the Federal Rules of Civil Procedure nor to the philosophical aspirations of international comity for guidance or authority here. Rather, the Court is sufficient unto itself to grant O'Hagan the relief simple fairness dictates he receive. Because, at bottom, this Court is the master of the proceedings before it, and to control those proceedings, this Court is imbued with broad inherent powers.

"That federal courts are accorded certain inherent powers is well-established." *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1244 (11th Cir. 2009). "Those [inherent] powers are not governed by rule or by statute, 'but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.,* quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962). Accordingly, "[a] court has inherent power to protect ***anyone*** from oppressive use of its process and ***may require a plaintiff to demonstrate he has made provisions for costs of discovery before directing the Clerk of Court to issue subpoenas.***" *Gregg v. Clerk of U.S. Dist. Court*, 160 F.R.D. 653, 654 (N.D. Fla. 1995) (***emphasis supplied***).

If this Court had the inherent power to require in advance that Plaintiffs play fair when they descended upon and burdened O'Hagan – a non-party with nothing to gain – then it certainly has the inherent power to make those Plaintiffs play fair now, by living up to the deal they made, and by obeying the orders of the English courts. The equities as between O'Hagan and Plaintiffs could

13

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

not be more clear.[4] And the implications for the Court's authority are all the more salient when those Plaintiffs have the temerity to bring before the Court the very evidence they obtained through this Court's authority while flaunting the authority of its sister court in England.

## IV.    Conclusion

For the reasons stated, O'Hagan respectfully requests the Court enter an order directing Plaintiffs to pay the fees and costs contained in Judgment; awarding O'Hagan the fees and costs associated with this Motion; and granting such other relief as the Court deems just.

### Certification pursuant to Local Rule 7.1(a)(3)

Undersigned counsel for O'Hagan has contacted counsel for Plaintiffs on two occasions via email, offering to forego this Motion if payment were made to O'Hagan and explaining the basis for this Motion and the relief sought herein. Plaintiffs oppose the relief sought herein.

---

[4]    Indeed, the equities here are *so* evident, and the Plaintiffs' obligation to pay is *so* clear, and their defiance of their obligation is *so* blatant, that O'Hagan should never have had to file this Motion. It is fully within the Court's inherent authority to order Plaintiffs not only to pay O'Hagan what they promised, and have been ordered, to pay, but the Court can and should order Plaintiffs to pay the fees and costs attendant to this Motion as well:

> [D]eeply rooted in the common law tradition is the power of any court to "manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985) (citation omitted). Courts' inherent power also extends to parties to litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, (1991). A court may appropriately sanction a party or attorney who "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Hutto v. Finney*, 437 U.S. 678, 689 n. 14 (1978).

*Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545–46 (11th Cir. 1993)

Dated: November 5, 2021.

        Respectfully submitted,

        DEVINE GOODMAN & RASCO, LLP
        2800 Ponce de Leon Blvd., Suite 1400
        Coral Cables, FL 33134
        Tel.: 305-374-8200
        grasco@devinegoodman.com

        */s/ Guy A. Rasco*
        Guy A. Rasco, Esq. (F.B.N.: 727520)
        Robert J. Kuntz, Jr., Esq. (F.N.B.: 094668)

        *Attorneys for Andrew O'Hagan*

15

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the CM/ECF Filing System this 5th day of November, 2021, on counsel of record.

/s/ *Guy A. Rasco.*
Guy A. Rasco

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208