# EXHIBIT C

1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3              CASE NO. 9:18-cv-80176-BB/BR

 4
      IRA KLEIMAN, as the personal representative
 5    of the Estate of David Kleiman, and
      W&K Info Defense Research, LLC,
 6
                Plaintiffs,
 7
      -vs-
 8
      CRAIG WRIGHT,
 9
                Defendant.
10

11    * * * * * * * * * * * * * * * * * *

12    VIDEOTAPED DEPOSITION OF DAVID KUHARCIK

13    DATE TAKEN: December 9, 2019

14    TIME: 1:05 p.m. - 2:25 p.m.

15    PLACE: 401 East Las Olas Boulevard

16    Ft. Lauderdale, Florida 33301

17
      TAKEN BEFORE: RICK E. LEVY, RPR, FPR
18                 AND NOTARY PUBLIC

19

20    * * * * * * * * * * * * * * * * * *

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3        ANDREW BRENNER, ESQUIRE
          BOIES SCHILLER & FLEXNER, P.A.
 4        100 S.E 2nd Avenue
          Suite 2800
 5        Miami, Florida 33131
          abrenner@bsfllp.com

 6

 7        VEL FREEDMAN, ESQUIRE (via phone)
          ROCHE FREEDMAN, P.A.
 8        200 S. Biscayne Boulevard
          Suite 5500
 9        Miami, Florida 33131

10

11    On behalf of the Defendant:

12        ZALMAN KASS, ESQUIRE
          RIVERO MESTRE, P.A.
13        2525 Ponce de Leon Boulevard
          Suite 1000
14        Coral Gables, Florida 33134

15    Also Present: Carlos Coello, The Videographer

16

17

18

19

20

21

22

23

24

25
```

```
 1                        -  -  -
                       I N D E X
 2                        -  -  -

 3  WITNESS:        DIRECT    CROSS    REDIRECT    RECROSS
    DAVID KUHARCIK
 4  BY MR. KASS:       5                  53
    BY MR. BRENNER:            48
 5

 6                        -  -  -
                   E X H I B I T S
 7                        -  -  -

 8
    NUMBER                          PAGE
 9  DEFENDANT'S EX. 1                8
    DEFENDANT'S EX. 2                37
10  DEFENDANT'S EX. 3                38

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

⌂

```
 1                              - - -

 2          THE VIDEOGRAPHER:  Good afternoon.  We are now

 3     on the video record.  Today is Monday the 9th day

 4     of December 2019.  The time is 1:05 p.m.  We are

 5     here at 401 East Las Olas Boulevard,

 6     Ft. Lauderdale, Florida for the purpose of taking

 7     the video deposition of David Kuharcik taken by the

 8     defendant in case number 9:18-cv-80176-BB/BR case

 9     Ira Kleiman as Representative of the Estate of

10     David Kleiman versus Craig Wright which is filed in

11     the United States District Court Southern District

12     of Florida.

13          The court reporter is Rick Levy of US Legal

14     Support.  The videographer is Carlos Coello of US

15     Legal Support.  Will all counsel please state their

16     appearance for the record?

17          MR. KASS:  Zalman Kass for Dr. Craig Wright.

18          MR. BRENNER:  Andrew Brenner on behalf of

19     plaintiffs.

20          THE WITNESS:  I do.

21

22

23

24

25
```

1    Thereupon,

2                        (DAVID KUHARCIK)

3                        having been first duly sworn or

4    affirmed, was examined and testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. KASS:

7        Q.   Mr. Kuharcik, would you be able to state your

8    full name for the record?

9        A.   Yes, it's David Kuharcik.

10       Q.   Have you ever been deposed before?

11       A.   Yes.

12       Q.   When?

13       A.   In the last ten or 20 years.

14       Q.   How many times have you been deposed?

15       A.   Two or three.

16       Q.   Were you a witness?

17            MR. FREEDMAN:  Sorry, on the phone it's

18       extraordinarily difficult to hear.  Can we possibly

19       move the phone closer to the witness?

20            MR. KASS:  It's as far as it goes.

21            MR. BRENNER:  It's as far it as goes in our

22       conference room.  I'll try to turn the volume up.

23       Go ahead.

24    BY MR. KASS:

25       Q.   In what type of cases were those depositions?

```
1        A.   Civil.

2        Q.   And what was your connection to the case in

3   each three?

4        A.   I was the accountant.

5        Q.   Were you an expert witness?

6        A.   No.

7        Q.   So what was your role?

8        A.   Appearing with respect to work done for one of

9   the parties.

10        Q.   These three cases, were they connected?

11        A.   No, and I'm speculating on three.  I've been

12   deposed a couple times over the years.  This is not a

13   regular occurrence in my practice.

14        Q.   Thank you for clarifying that.

15        A.   Yes.

16        Q.   Were you a party to those lawsuits?

17        A.   No.

18        Q.   Since those depositions took place a little

19   while back I'm going to go over some groundrules as to

20   the deposition just to make sure we're all on the same

21   page.

22             So I'm going to need you to give clear, oral

23   responses so the court reporter can take down what you

24   are stating and also try to wait for me to ask the

25   question then if you can just pause a second so opposing
```

1    counsel may object and then respond.  Unless opposing

2    counsel or I tell you do not respond to an objection you

3    can just continue with your answer.

4         If at any time I ask you a question and you

5    don't understand please let me know because otherwise

6    I'm going to assume that you understood the question.

7    A.   (Indicating).

8    Q.   As for verbal responses can you please say yes

9    instead of nodding your head just so the court reporter

10   can take it down.

11   A.   Yes.

12   Q.   If at any point you remember something or if

13   you want to clarify something you previously said please

14   let me know.

15   A.   Okay.

16   Q.   If you need to take a break at any time please

17   let me know also.

18   A.   Okay.

19   Q.   Is there any reason -- strike that.  Is there

20   anything that would be preventing you from giving your

21   best testimony today?

22   A.   No.

23   Q.   Are you currently on any prescribed

24   medications that could affect your memory?

25   A.   No.

⌂

1      Q.   Is there any medical condition or any other

2   reason why it would be difficult for you to understand

3   my questions today?

4      A.   No.

5      Q.   Do you recall receiving a subpoena for the

6   production of documents in this case?

7      A.   Yes.

8         MR. KASS:   I would like to mark as Exhibit 1

9      the subpoena.

10         (Defendant's Exhibit No. 1 was

11         marked for identification.)

12   BY MR. KASS:

13      Q.   Do you recognize this document?

14      A.   Yes, I do.

15      Q.   What is it?

16      A.   This is the subpoena and request for

17   production of some documents.

18      Q.   Now, can you please turn to page number five

19   where it says documents requested?

20      A.   Yes.

21      Q.   Have you produced any documents in response to

22   this subpoena?

23      A.   Yes.

24      Q.   What documents have you produced?

25      A.   Income tax returns, two copies of income tax

1    returns and a chain of e-mails with your opposing

2    counsel.

3         Q.   When did you produce those documents?

4         A.   Yesterday.

5         Q.   Who did you produce them to?

6         A.   Myself in order to bring with me.

7         Q.   So you --

8              MR. BRENNER:  I was wondering myself.

9    BY MR. KASS:

10        Q.   So you brought them with you?

11        A.   Yes, I did.

12        Q.   You have them right now?

13        A.   Yes, I do.

14        Q.   Thank you.  Could I see the e-mails?

15        A.   They're in approximate order.

16        Q.   Are these all the documents you have that are

17   responsive to the subpoena?

18        A.   Yes.

19        Q.   How did you determine that?

20        A.   I went through my computer system and was able

21   to find some PDF copies of these two tax returns.

22             MR. BRENNER:  Hold on one second.  May I just

23        take a quick glance?

24             MR. KASS:  Sure.

25             MR. BRENNER:  Just give me one second.  Thank

1      you.

2    BY MR. KASS:

3        Q.   I'm sorry, I believe you stated you went

4    through your computer system; is that accurate?

5        A.   Yes.

6        Q.   Did you run any searches?

7        A.   Yes.

8        Q.   Did those searches include your e-mails?

9        A.   Yes.

10       Q.   Now, if you look at document request number

11   three on page five of Exhibit 1 it says "all

12   communications that you sent or received from David

13   Kleiman."  So would it be accurate to state that you do

14   not have any communications with David Kleiman?

15       A.   I do not have any record of communications

16   with David Kleiman.

17       Q.   Did you previously have communications with

18   David Kleiman?

19       A.   Yes.

20       Q.   What happened to those communications?

21       A.   Well, those would have been purged from my

22   systems.

23       Q.   How often do you purge your system?

24       A.   For a non-client or somebody who has left

25   after three years I delete and dispose and shred.

1        Q.   And for a client?

2        A.   Pardon me?

3        Q.   And for a client?

4        A.   For a client?

5        Q.   I believe you said for a non-client so my

6    question --

7        A.   For somebody who is no longer a client.

8        Q.   So you no longer consider David Kleiman a

9    client of yours, is that accurate?

10       A.   That is correct.

11       Q.   When did he stop being a client of yours?

12       A.   When he passed away.

13       Q.   Now just focusing on request number one so it

14   would be accurate to state that you have never received

15   any communications from Dr. Craig Wright?

16       A.   Correct.

17       Q.   And as for number two with regards to Ira

18   Kleiman is he a client of yours?

19       A.   No.

20       Q.   Has he ever been a client of yours?

21       A.   No.

22       Q.   Other than the e-mails that you provided me do

23   you have any other communications with Ira Kleiman?

24       A.   No.

25       Q.   Or his counsel?

1      A.   No.

2           MR. BRENNER:  I think there was the one letter

3      that you were copied on but I believe it was

4      invoking the attorney-client privilege.

5           MR. KASS:  I don't recall that.

6           MR. BRENNER:  Maybe you weren't copied.  I

7      think you did receive a letter from me.

8           THE WITNESS:  Okay.  Yes.  There was a chain

9      of e-mails from --

10          MR. BRENNER:  I honestly don't remember

11     e-mails.  There may have been e-mails scheduling

12     but if you don't have that letter it's certainly

13     subject to production and I will get it for you.

14          MR. KASS:  Thank you.

15          MR. BRENNER:  I wanted to make sure the record

16     is clear.  I know that exists.  There may be some

17     scheduling e-mails that I don't recall if there are

18     there are but I know there's a letter.

19          MR. KASS:  There was an e-mail at least I was

20     copied on.

21          MR. BRENNER:  There was.

22     BY MR. KASS:

23     Q.   Scheduling one, one of them.  There may have

24     been other ones.  Other than what we just mentioned that

25     letter or possibly the one or two scheduling e-mails are

1    you aware of any other communications with Ira Kleiman

2    or his counsel?

3          A.    No.

4          Q.    Has Louis Kleiman ever been a client of yours?

5          A.    No.

6          Q.    Do you have any communications from him?

7          A.    No.

8          Q.    How about W&K Info Defense Research, LLC.  Has

9    that ever been a client of yours?

10         A.    No.

11         Q.    Any communications with them?

12         A.    No.

13         Q.    Now I want you to look at request number ten,

14   it's on the second page.  Page number six.  In this

15   request we're asking for any documentation related to

16   the allegations that Dr. Craig Wright stole or

17   misappropriated crypto currency that belonged to Dave

18   Kleiman from W&K Defense Research, LLC.  Do you have any

19   documents relating to that?

20         A.    No.

21         Q.    Request number 11 is very similar but the only

22   difference is with regards to misappropriating or

23   stealing intellectual property.  Do you have any

24   documents related to that?

25         A.    No.

```
 1        Q.   For number ten and number 11 did you ever have
 2   any documents relating to that?
 3        A.   No.
 4        Q.   What is your current profession?
 5        A.   I'm a certified public accountant.
 6        Q.   As a certified professional accountant what do
 7   you do?
 8        A.   General business consulting, done income tax
 9   preparation, tax planning, trusts, estates.
10        Q.   Since when have you been a practicing CPA?
11        A.   Since 1983.
12        Q.   Since 1983 have you continuously been a CPA?
13        A.   Yes.
14        Q.   What's your educational background?
15        A.   I have a Bachelor's Degree in accounting.
16        Q.   Do you have any other education, masters?
17        A.   No.
18        Q.   Do you take continuing education courses?
19        A.   Yes, I do.
20        Q.   How often?
21        A.   Every two years.
22        Q.   Is there a certain requirement that you need
23   to take?
24        A.   Yes, there is.
25        Q.   Are you aware of IRS bulletins?
```

1 A. Yes.

2 Q. What are they?

3 A. Pronouncements by the IRS providing guidance

4 on certain tax related topics.

5 Q. Is that something that you would keep up to

6 date with?

7 A. Yes, to some degree.

8 Q. So is it something that you would look to if

9 you had a question -- let's start with that.  Is it

10 something you would look to if you had a question and

11 you were looking for guidance, would that be a source of

12 information?

13 A. It could be a source of some information.

14 Q. Could you just read them because you happen to

15 just be reading through bulletins?

16 A. You could.

17 Q. Does the -- is there some sort of process

18 where if you have a question as to how the IRS would

19 treat a tax issue that you can reach out to the IRS?

20 A. Yes.

21 Q. What would that process be?

22 A. I believe you could apply for a ruling from

23 the IRS on a specific matter but it would be dependent

24 upon your matter that you're inquiring on.

25 MR. BRENNER:  I'll just lodge an objection for

1       the record to the extent the witness is here

2       testifying not as an expert witness to give opinion

3       on what accountants do and don't do.  He is here as

4       a fact witness.  You're obviously allowed to go

5       into his background but I would hope your

6       deposition would eventually get around to the facts

7       of the case.

8            MR. KASS:  Objection noted.  It's my

9       deposition.

10           MR. BRENNER:  Sure is.

11           MR. KASS:  I'm entitled to ask any questions I

12      deem appropriate.  If the judge -- if you would

13      like to make a motion saying he is not an expert

14      that's fine.  Right now I am going to continue with

15      the deposition.

16           MR. BRENNER:  I didn't say he is not an

17      expert.  I said he was not being tendered as an

18      expert witness in any part of the litigation.

19           MR. KASS:  As of yet?

20           MR. BRENNER:  As of yet.  That's true, as of

21      yet.

22           MR. KASS:  Never know.

23           MR. KASS:  Going back to that.  You stated

24      that -- sorry, could you read -- Mr. Court

25      reporter, could you read back his answer.

1              (Thereupon, a portion of the record

2              was read back by the reporter.)

3    BY MR. KASS:

4         Q.   What would be a type of matter where you would

5    require -- you would inquire from the IRS?

6         A.   That's beyond the scope of my practice.

7         Q.   So have you ever made an inquiry to the IRS?

8         A.   No.

9         Q.   So other than reaching out to the IRS is there

10   anything else you could do to -- if you have a tax

11   question that you're not sure how to treat it are there

12   any other sources of information?

13        A.   Yes, there is libraries and periodicals and,

14   you know, of course your tax code and regulations and

15   IRS resource materials.

16             MR. FREEDMAN:  Sorry, it's impossible for me

17        to hear on the phone.  Maybe if Mr. Kuharcik can

18        speak a little louder or reposition things but very

19        difficult to hear the response.  I can hear

20        Mr. Kass but I can't hear the witness.

21             MR. BRENNER:  I put the speaker now right in

22        front of the witness.  Hopefully that will help.

23             MR. FREEDMAN:  Thanks.

24   BY MR. KASS:

25        Q.   Have you ever had to go through those

```
 1   periodicals that you mentioned?

 2        A.   Yes.

 3        Q.   About like what type of topics, do you recall?

 4        A.   Numerous topics.

 5        Q.   Could you give me one example?

 6        A.   Sure.  The applicable federal rate for a

 7   specific month.

 8        Q.   Did you ever have to do it for Bitcoin?

 9   Bitcoin?

10        A.   Yes.

11        Q.   How recent?

12        A.   Huh?

13        Q.   How recent?

14        A.   In the last few years.

15        Q.   Could you narrow that down a little bit?

16        A.   Two or three years.

17        Q.   Thank you.  Are there any regulatory agencies

18   that oversee your work?

19             MR. BRENNER:  Object to form.

20             THE WITNESS:  Yes.

21   BY MR. KASS:

22        Q.   What are they, if you're aware?

23        A.   Department of Business and Professional

24   Regulation, the Board of Accountancy.

25        Q.   Is that a Florida organization?
```

1      A.   That is a Florida organization.

2      Q.   Thank you.  Are you aware of any duties that

3  you owe your client when preparing tax returns?

4           MR. BRENNER:  Object to the form.

5           MR. KASS:  You can answer.

6           THE WITNESS:  Yes.

7  BY MR. KASS:

8      Q.   What would those duties be?

9      A.   Well, duty of ensuring the complete and

10 accurate return, complying with the internal revenue

11 laws.

12     Q.   Thank you.  Are you aware if you would have

13 the same responsibilities to the IRS?

14     A.   As a practitioner I have a responsibility to

15 the IRS to ensure compliance with the Internal Revenue

16 Code and any practitioner requirements as well.

17     Q.   What would you go about typically to ensure

18 that you complied with those responsibilities when

19 preparing a tax return?

20     A.   Well, I prepare a set of work papers

21 documenting the elements of the tax return.

22     Q.   So what are these work papers composed of?

23     A.   Copies of documents.  Perhaps printouts from

24 materials that have been researched.  Notes on

25 conclusions or elements of the tax return.

1    Q.   What would be your source of that

2    documentation that then gets put into your work papers,

3    if I'm understanding correctly?

4    A.   Could be original client source data.  Could

5    be information that's derived from third party sources.

6    Could be materials from my professional library.  Could

7    be from IRS Web site.

8    Q.   Now, I want to try and summarize a little bit

9    what you said and let me know if it's accurate.  You

10   obtain the source material from the client or any other

11   source or possible other sources.  Then you put it into

12   your work papers and you kind of play with the data

13   little bit and -- what happens?  Can you just -- let's

14   start like this.

15        I'm a new client, I come to you Mr. Kuharcik I

16   say I want you to prepare my tax return.  What do you

17   tell me?

18   A.   I ask to see a copy of your prior year's

19   return in order to, you know, see what -- how your tax

20   situation is.  I'll discuss with you your current

21   activities, anything related to your business interests

22   or earnings or investments or families.  We would go

23   from there.

24   Q.   At some point would you ask me for

25   documentation?

1           MR. BRENNER:  Object to form.

2           THE WITNESS:  Yes.

3    BY MR. KASS:

4        Q.   When would you ask for the documentation?

5        A.   Well, prior to beginning to prepare your

6    income tax records.

7        Q.   What type of documentation would you ask me

8    for?

9           MR. BRENNER:  Object to the form.

10           THE WITNESS:  Information returns.  I receive

11       from third party sources, banking records as

12       applicable.  Anything else that might be of tax

13       import depending upon your specific circumstance.

14    BY MR. KASS:

15        Q.   Would it be fair to say that you would ask me

16    or confirm with me to disclose to you all income that I

17    generated during the year?

18        A.   Yes.

19        Q.   You mentioned you ask for my prior year's tax

20    return.  Why would you do that?

21        A.   In order to ascertain what you've had in the

22    past which is sometimes a good source for determining

23    what you might have currently to try to ensure

24    completeness.

25        Q.   What if I gave you my past year's tax return

1    and this year the information I'm giving you for this

2    year is very different, what would you do?

3              MR. BRENNER:  Object to the form.

4              THE WITNESS:  Depending upon what information

5         I would inquire as to the rationale for the

6         difference.

7    BY MR. KASS:

8         Q.   If my response to you wasn't satisfactory what

9    would you do?

10             MR. BRENNER:  Object to the form.

11             THE WITNESS:  I wouldn't accept the

12        engagement.

13   BY MR. KASS:

14        Q.   Did you know Dave Kleiman?  Did you know Dave

15   Kleiman?

16        A.   Yes.

17        Q.   When did you first meet him?

18        A.   Probably the late '80s.

19        Q.   How did you meet him?

20        A.   I guess through mutual friends.

21        Q.   Do you recall how old Dave would have been at

22   that time?

23        A.   Twenties.

24        Q.   After you first met him in the late '80s how

25   frequently would you see Dave?

1      A.   It would vary.  Maybe every couple of months

2   or so.

3      Q.   And what would be the reason for seeing him

4   every couple of months?

5      A.   Social.

6      Q.   And in addition to seeing him socially would

7   you also talk with him over the phone?

8      A.   Yes.

9      Q.   How about sending e-mails?

10      A.   We're talking the late '80s.

11      Q.   Starting late '80s but let's do like this.

12   Let's break it down in time.  So you had mentioned you

13   would see him every couple months starting late '80s.

14   Was there a point in time you stopped seeing him every

15   couple months?

16      A.   Yes, probably early '90s.

17      Q.   What happened in the early '90s?

18      A.   I was engaged in my practice and very busy.

19   Life happened so we were no longer as socially close.

20      Q.   So in the late '90s I believe you said is

21   when --

22      A.   Early '90s.

23      Q.   Thank you.  In the early '90s you started

24   seeing Dave a little bit less frequently.  How often

25   would you approximate you would see him?

```
 1            MR. BRENNER:  Object to the form.

 2            THE WITNESS:  Once a year.  Maybe even less.

 3    BY MR. KASS:

 4        Q.   Did there come a point in time from the early

 5    1990s until Dave's passing did there come a point in

 6    time when that frequency changed?

 7        A.   No.

 8        Q.   Now, through that period of time other than

 9    seeing him occasionally did you have contact with him

10    through any other forms?

11            MR. BRENNER:  Object to the form.

12            THE WITNESS:  Yes.

13    BY MR. KASS:

14        Q.   How would you be in contact with him?

15        A.   Maybe telephonic.

16        Q.   How often would you have telephonic

17    conversations with him?

18        A.   Couple times a year.

19        Q.   And that was consistent through that time

20    period early '90s until his passing?

21        A.   Yes.

22        Q.   Did it also include written communications?

23        A.   No.

24        Q.   How would you describe your relationship with

25    Dave?
```

1              MR. BRENNER:  Object to the form.

2              THE WITNESS:  We were buddies and I prepared

3        his income tax returns over the years.

4    BY MR. KASS:

5        Q.   When did you -- what year did you start

6    preparing his income tax returns?

7        A.   I'm not sure.

8        Q.   If you had to approximate.

9        A.   Sometime in the '90s.  I don't know early or

10   late.

11       Q.   From when you started preparing his tax

12   returns would you consistently prepare them every year?

13       A.   Yes.

14       Q.   You mentioned before that you had previously

15   produced two tax returns.  Do you remember which years

16   they were?

17       A.   Yes, they were 2010 and 2011.

18       Q.   Did you prepare a 2013 tax return?

19       A.   No.

20       Q.   Did you start preparing a 2013 tax return?

21       A.   No.

22       Q.   Do you know if the 2013 tax return was ever

23   filed with the IRS?

24       A.   No.

25       Q.   You stated that you were buddies with Dave.

1    Were there any things in particular that you had in

2    common with Dave?

3                 MR. BRENNER:  Object to the form.

4                 THE WITNESS:  Early on maybe a mutual interest

5         in computers and such.  We liked to drink beer

6         sometimes.

7    BY MR. KASS:

8         Q.    Are you aware that at some point in time Dave

9    was hospitalized?

10        A.    Yes.

11        Q.    What do you know about that hospitalization?

12        A.    I know that he had some undisclosed to me at

13   that point complications from his being an invalid.

14        Q.    Did this occur 2012, 2013; do you recall?

15        A.    It was sometime near the end.

16        Q.    Did you ever visit David in the hospital?

17        A.    No.

18        Q.    In general throughout the years when you

19   were -- stated that you were buddies with David would

20   you have conversations with him?

21        A.    Yes.

22        Q.    Were there any areas of conversation in

23   particular that you would have with Dave?

24                MR. BRENNER:  Just we're going to take this

25        slowly.  There could be certain communications you

1    had with Dave that will be privileged that the

2    we'll assert privilege.  I won't know that by how

3    he's asking.  The general thing we're going to

4    invoke privilege or at least decide whether to is

5    conversations regarding confidential accounting

6    type information.

7       So social conversations all that is fine.  So

8    if you go to a place that I may have to cut you off

9    or you think it's going to call for that I would

10   ask you to give me the heads up and then we can

11   confirm whether it does or whether to invoke the

12   privilege.

13      I don't know -- his question is fine because

14   it could call for both privileged and

15   non-privileged information.  I just don't know that

16   until you start answering.

17 BY MR. KASS:

18    Q.   I'll make this easier.  So putting aside any

19 communications related to accounting type stuff what

20 type of communications would you have with Dave?

21    A.   Talking about ex-wives, talking about some of

22 our history from back in the late '80s when we first got

23 together.  You know, just basic interactions on maybe

24 some computer related generalities.

25    Q.   You mentioned that you were -- I believe you

1     mentioned you were interested in computers?

2          A.   Yes.

3          Q.   So was that a point in common you had with

4     David?

5          A.   Yes.  Early on.

6          Q.   Would Dave ever talk to you about his work?

7          A.   As it pertained to his business and his

8     accounting or tax.

9          Q.   Other than where he's trying to get tax advice

10    from you related to his work would he just tell you the

11    type of work that he was doing?

12               MR. BRENNER:  And I appreciate the limitation

13          that counsel is making.  I would just add tax

14          advice or other accounting advice but other than

15          that you can answer the question.

16               THE WITNESS:  Repeat the question.

17    BY MR. KASS:

18          Q.   So other than tax advice or accounting related

19    activities would Dave just mention, you know, what type

20    of cases he's working on, what's going on at work,

21    things like that?

22          A.   No.

23          Q.   Would he talk to you about some sort of papers

24    that he was working on?

25          A.   No.

1      Q.    How about books that he was authoring?

2      A.    No.

3      Q.    How about technology related topics?

4      A.    Yes.

5      Q.    Do you recall any technology topics in

6   particular that he conversed about?

7      A.    Yes, virtual machines.

8      Q.    Do you recall any additional ones?

9      A.    No.

10      Q.    Did he ever speak to you about Bitcoin?

11      A.    No.

12      Q.    Did Dave ever talk to you about his friends?

13      A.    No.

14      Q.    Are you aware of any of Dave's friends as to

15   who they are?

16      A.    No.

17      Q.    Did Dave ever mention Craig Wright to you?

18      A.    No.

19      Q.    You mentioned that Dave and you would speak

20   about ex-wives; correct?

21      A.    Yes.

22      Q.    Could you give me a little bit more detail as

23   to what Dave would speak about?

24      A.    I don't really recall.  It was probably just

25   for comedic purposes.

1    Q.   Do you recall -- do you recall how many times

2    Dave was married?

3    A.   No.

4    Q.   Do you know if it was more than one?

5    A.   Yes, it was more than one.

6    Q.   Do you know what happened to his first

7    marriage?

8    A.   No.

9    Q.   Did you ever know?

10   A.   What do you mean what happened?

11   Q.   My question is it something you just don't

12   recall or it's something that never came up?

13   A.   Yes, I don't know what their problems were

14   that they got divorced.

15   Q.   How would you describe Dave's personality?

16   A.   Fun guy.

17   Q.   Any other attributes that you would attach to

18   Dave?

19   A.   Very smart, quick.  The ladies loved him.

20   Q.   As far as his -- would you consider David

21   outgoing?

22   A.   Yes.

23   Q.   Would you consider him timid?

24   A.   No.

25   Q.   Was Dave one to speak his mind?

1          MR. BRENNER:  Object to the form.

2          THE WITNESS:  I don't know.

3     BY MR. KASS:

4          Q.   In all the years that you've known Dave

5     have -- are you aware of an instance where somebody

6     slighted him?

7          MR. BRENNER:  Object to the form.

8          THE WITNESS:  There was something that went on

9              with it was either a girlfriend or an ex-wife and

10             there was some sort of claim or something she was

11             making against him that -- I don't recall the

12             specifics.  I just remember there was some sort of

13             problem.

14    BY MR. KASS:

15         Q.   Do you recall what Dave did in response to

16    that problem?

17         A.   I think there was some sort of either

18    settlement or claim or judgment or something against

19    him.  I don't remember.

20         Q.   Was Dave the type of person who would stand up

21    for what he thought was right?

22         MR. BRENNER:  Object to the form.

23         THE WITNESS:  I don't know.  Actually check

24             that.  He was -- he stuck with his buddies.  When I

25             was going through a tough time going through a

1      divorce he was right there and basically, you know,

2      he was very responsive and helpful.  I think he

3      would stand up for what was right.

4   BY MR. KASS:

5      Q.   Thank you.  When you would meet up with Dave

6   did you have the opportunity to observe what type of

7   clothing he would wear typically?

8      A.   No.  Not consciously.

9      Q.   Was Dave the type of person, if you recall,

10  that would wear luxury clothing?

11     A.   Nothing stood out.

12     Q.   Did you ever visit Dave in his house?

13     A.   Yes.

14     Q.   How would you describe that house?

15          MR. BRENNER:  Object to the form.

16          THE WITNESS:  It was a basic townhouse.

17     Nothing remarkable.

18  BY MR. KASS:

19     Q.   Did you ever have the chance to observe Dave's

20  cars?

21     A.   Yes.

22     Q.   What type of car would he drive?

23     A.   He had a customized van for the handicapped.

24     Q.   My next question I'm going to give a little

25  disclaimer beforehand because I want to try to avoid an

⌂

```
 1    objection.  Other than what you're aware through Dave's

 2    I'll call professional relationship with you and being

 3    his accountant, how would you describe Dave's spending

 4    habits and I'll give you an example like if you went out

 5    to a bar or something like that or to a restaurant?

 6         A.   No, I don't recall.

 7         Q.   Did you ever go out with Dave to a bar?

 8         A.   Yes.

 9         Q.   Did you ever go out with him to a restaurant?

10         A.   Yes.

11         Q.   What type of restaurant would you typically go

12    out to?

13         A.   Only once or twice and just a regular sit down

14    restaurant.

15         Q.   Would you consider it an expensive place?

16              MR. BRENNER:  Object to the form.

17              THE WITNESS:  No be.

18    BY MR. KASS:

19         Q.   When you stated you would go out with him to a

20    bar what type of bar was it?

21         A.   We went to strip club once.

22         Q.   Did you -- other than that strip club did you

23    go anywhere else with him?

24         A.   No.

25         Q.   Going back to the professional relationship
```

1    you had with Dave you stated that you prepared his tax

2    returns for number of years.

3         A.   Yes.

4         Q.   Did you do any other type of work for him?

5         A.   No.

6         Q.   Those tax returns, would it just be after the

7    end of the year?

8         A.   Yes.

9         Q.   So my next question is other than that

10   information you received from Dave at the end of the

11   year how would you consider Dave's spending habits?

12        A.   I have no way of knowing.

13        Q.   That didn't -- would it be fair to say that

14   didn't come up in conversations with him?

15        A.   Correct.

16        Q.   And that's not something you observed?

17        A.   Correct.  Let me backtrack.  We might speak

18   during the year about estimated tax payments as well.

19        Q.   Do you know if Dave had any investments?

20        A.   No.

21        Q.   Let me re-ask that question.  When you state

22   no is that you don't know or he didn't have any?

23        A.   Based on the last two years of returns that I

24   prepared didn't look like any type of investment income

25   so I would say no.  I don't recall earlier years he

1    had --

2         Q.   Do you know how Dave obtained his income?

3              MR. BRENNER:  First just answer that question

4         yes or no if you know.  We can address further if

5         you do.

6              THE WITNESS:  Yes.

7    BY MR. KASS:

8         Q.   Is the source of that information from when

9    you prepared his tax returns?

10        A.   Yes.

11        Q.   Do you have any other source of information

12   other than preparing his tax returns where he obtained

13   his income?

14        A.   No.

15        Q.   Are you able to describe Dave's financial

16   situation in the years 2010 through 2013?

17             MR. BRENNER:  Again I guess first I need you

18        to ask if he has that information and how he has it

19        and then we'll assess it.

20   BY MR. KASS:

21        Q.   I'll ask the question again.  Are you able to

22   describe Dave's financial situation in the years 2010

23   through 2013?

24        A.   Only my impression.

25        Q.   What was -- how did you form that impression?

1        A.   Just through his income tax records.

2        Q.   Do you have any other information other than

3    his income tax records?

4        A.   No.

5        Q.   But that information that you formed your

6    impression, is that information that was actually on the

7    tax returns, the filed tax returns?

8        A.   Yes.

9        Q.   Based on his filed tax returns what is your

10   impression?

11       A.   I think he was struggling.

12       Q.   What do you mean by struggling?

13       A.   I think he was not making much income.  I

14   think there was a problem with his house, his house

15   payments and such.  He was having some financial

16   difficulty.

17       Q.   Do you know if he was having financial

18   difficulty with any other types of bills?

19       A.   No.

20       Q.   Do you know whether his Comcast bill was

21   overdue?

22       A.   No.

23       Q.   How about his cell phone bill?

24       A.   No.

25            MR. KASS:  I'm going to introduce as Exhibit

1        2.

2               (Defendant's Exhibit No. 2 was

3               marked for identification.)

4    BY MR. KASS:

5        Q.   Do you recognize Exhibit 2?

6        A.   Yes.

7        Q.   What is that?

8        A.   Appears to be copy of Dave Kleiman's 2010 tax

9    return.

10       Q.   The document that you had stated previously

11   that you provided in response to the subpoena?

12              MR. BRENNER:  One of the documents?

13              MR. KASS:  Yes.

14              THE WITNESS:  Yes.

15   BY MR. KASS:

16       Q.   Was this document filed with the IRS?

17       A.   Yes.

18       Q.   Is there any reason for you to doubt the

19   accuracy of this financial statement -- of this tax

20   return?

21       A.   No.

22       Q.   Based on this tax return what was Dave's

23   income for the year of 2010?

24       A.   $14,000.

25              MR. KASS:  Now I'm going to introduce Exhibit

```
 1      3.

 2              (Defendant's Exhibit No. 3 was

 3              marked for identification.)

 4   BY MR. KASS:

 5      Q.   Do you recognize Exhibit 3?

 6      A.   Yes.

 7      Q.   What is that?

 8      A.   That's Dave Kleiman's 2011 personal tax

 9   return.

10      Q.   Did you prepare it?

11      A.   Yes, I did.

12      Q.   Was this filed with the IRS?

13      A.   Yes.

14      Q.   Do you have any reason to doubt its accuracy?

15      A.   No.

16      Q.   How much income is disclosed on this tax

17   return?

18      A.   6,300 bucks.

19      Q.   Do either of these tax returns make mention of

20   Bitcoin?

21      A.   No.

22      Q.   Do you recall the amount of income that was

23   disclosed on Dave's earlier tax returns?

24      A.   No.

25      Q.   Do you have a general idea as to how much
```

⌂

```
 1    income was stated on his previous tax returns?
 2              MR. BRENNER:  Object to form.
 3              THE WITNESS:  Generally, yes.
 4    BY MR. KASS:
 5         Q.   What would that be?
 6              MR. BRENNER:  Object to the form.
 7              THE WITNESS:  There are some years where Dave
 8         made some more decent money than 6,300 bucks.
 9    BY MR. KASS:
10         Q.   What would you consider decent money?
11         A.   Maybe 50, $60,000, perhaps more.
12         Q.   Do you recall if he ever earned more than
13    $100,000?
14         A.   No.
15         Q.   By no do you mean that he never stated that he
16    earned more than $100,000?
17              MR. BRENNER:  Object to the form.
18              THE WITNESS:  I just don't recall.
19    BY MR. KASS:
20         Q.   Do you recall if he ever put more than a
21    million dollars?
22              MR. BRENNER:  Put more than a million dollars
23         you said?
24              MR. KASS:  Disclosed more than a million
25         dollars on his tax return?
```

1          MR. BRENNER:  Object to the form.

2          THE WITNESS:  Yes.

3    BY MR. KASS:

4        Q.   And did he?

5        A.   No.

6        Q.   Do you recall if Dave ever disclosed Bitcoin

7    on any tax return?

8          MR. BRENNER:  Object to the form.

9          THE WITNESS:  I'm thinking of how you asked

10         that.  I would say yes.

11   BY MR. KASS:

12       Q.   What's your recollection?

13       A.   He did not.

14       Q.   I know sometimes it's tricky but you're doing

15   good.  Have you ever spoken with Ira Kleiman?

16       A.   Just in passing.

17       Q.   How many times did you speak with Ira Kleiman?

18       A.   Two or three.

19       Q.   When did these conversations take place?

20       A.   I recall at Dave's funeral and then I believe

21   I spoke to him telephonically back in April 2018 when I

22   was hearing from the attorney's office.  He had

23   authorization to speak to you guys or to provide

24   whatever I had.

25       Q.   Other than just arranging some sort of

1   authorization did he have any other conversation -- was

2   anything else mentioned in that conversation?

3        A.   No.

4        Q.   Have you spoken to any attorney that

5   represents Ira Kleiman?

6        A.   No.

7        Q.   Did you ever speak --

8        A.   Well, other than this.

9        Q.   Mr. Brenner.  When did you first speak to

10  Mr. Brenner or any other attorney that represents --

11       A.   April 2018.

12       Q.   What was the substance of that conversation?

13       A.   Just asking I guess if I had any information

14  sort of contained in that e-mail chain.

15       Q.   Was anything else discussed?

16       A.   No.

17       Q.   Did you speak with any attorney that

18  represents Ira Kleiman in the past three months?

19       A.   No.

20       Q.   Have you spoken with anyone --

21            MR. BRENNER:  Again I think you and I had a

22       short conversation.  I represent -- just so the

23       record is clear.

24            THE WITNESS:  Yes.

25

```
 1              MR. BRENNER:  I think it was probably barely
 2         in the last three months just so the record is
 3         clear?
 4              MR. KASS:  I appreciate that.
 5    BY MR. KASS:
 6         Q.   When do you recall that conversation taking
 7    place?
 8         A.   Okay, that was in the last two months.
 9    Whenever we first heard about the subpoena being sent
10    out.
11         Q.   How did that conversation come about?
12         A.   I called the number on here in order to see
13    what needs to be done for the deposition and see if we
14    need to change the location to something more convenient
15    for me.
16         Q.   Do you mind if I see that letter?
17              MR. BRENNER:  Is that the --
18              THE WITNESS:  That's the letter from the
19         office.
20              MR. BRENNER:  When you're done let me make
21         sure it's the same letter I'm talking about.
22              MR. KASS:  Yes, it's stating you're invoking
23         your --
24              MR. BRENNER:  Okay.
25
```

1    BY MR. KASS:

2        Q.   So you received this letter from that law firm

3    and then you made a call to an attorney at Boies,

4    Schiller; is that accurate?

5        A.   Yes.  Yes.

6        Q.   And was that attorney Mr. Brenner?

7        A.   Yes.

8        Q.   Do you recall anybody else being on the phone

9    call?

10       A.   No.

11      Q.   What did you speak about on that conversation

12   with Mr. Brenner?

13      A.   I don't recall specifically but it would have

14   been more than likely just as to my requirements under

15   the deposition.  At first I really wasn't sure whose

16   attorney was whose or anything because you guys called

17   me some time ago as well.

18      Q.   Yes, after Mr. Brenner had mentioned you

19   wanted to reschedule so we reached out to you, correct.

20          My question is when you called Mr. Brenner

21   what was the substance of that conversation?

22      A.   Probably seeing if I actually had to appear,

23   you know, because I had already provided to, you know,

24   his office all that I had in my possession and he said

25   that he would provide it to you guys as well and then he

1  said well, maybe an affidavit would be suitable as

2  opposed to deposition.

3          MR. BRENNER:  I told you they're so

4      unreasonable they would never agree to that, right?

5          MR. KASS:  Save this for the break.  Come on.

6      Don't mess up my transcript.

7  BY MR. KASS:

8      Q.   Did Mr. Brenner speak to you about the

9  lawsuit?

10     A.   No.

11     Q.   Did he speak to you about Dave?

12     A.   No.

13         MR. KASS:  I'm going to take a little break.

14     Do a five minute break off the record.

15         THE VIDEOGRAPHER:  Going off the video record.

16     The time is 2:03 p.m.

17         (Thereupon, a brief recess was taken.)

18         THE VIDEOGRAPHER:  Going on the video record.

19     The time is 2:09 p.m.

20  BY MR. KASS:

21     Q.   You had stated before that the 2013 tax

22  returns were never filed; is that accurate?

23         MR. BRENNER:  Object to the form.

24         MR. KASS:  Or prepared even.

25         MR. BRENNER:  What did you say?

1          MR. KASS:  Or prepared even.  Let's do it

2     again.

3          MR. BRENNER:  I believe the question was by

4     him as opposed to generally so that's my objection.

5          MR. KASS:  Maybe.

6          MR. BRENNER:  That's what you're asking.

7  BY MR. KASS:

8     Q.   Fair enough.  Did you ever prepare Dave's 2013

9  tax returns?

10    A.   No.

11    Q.   Do you know why?

12    A.   Yes.

13    Q.   Why?

14    A.   He died.

15    Q.   Were you in the process of preparing his tax

16 returns when he passed away?

17    A.   I called Dave coming up near the deadline to

18 say hey, we better get your stuff together.  He never

19 returned my call and next thing I heard was that he had

20 passed away.

21    Q.   How is it that you have the 2012 and 2011 tax

22 returns that have been marked as exhibits but you don't

23 have the previous years?

24         MR. BRENNER:  Just for clarification I don't

25    know if you're doing this on purpose what you're

⌂

1          calling -- what he produced was 2010 and 2011 not

2          2012.

3                  MR. KASS:  Really?

4                  MR. BRENNER:  Yes.  Maybe the confusion you

5          file your 2011 in 2012.

6                  THE WITNESS:  Let's backtrack.

7                  MR. BRENNER:  I think you should probably

8          start over.

9      BY MR. KASS:

10         Q.   Let's start again.  So -- how is it that you

11     have the 2010 and 2011 tax returns but not the previous

12     years?

13         A.   IRS transitioned to virtually a mandatory

14     E-filing requirement somewhere in that timeframe.  Up

15     until that time I would have paper filed tax returns and

16     so at some point when we started to e-file more returns

17     I would save a PDF copy of the file as opposed to hard

18     copy.

19              So these two returns were apparently e-filed

20     and I just happened to have these in a directory where I

21     had copies of PDF containing the E filed returns.

22         Q.   Thank you.  Previously when I was asking you

23     about the 2013 tax return that was never filed if I were

24     asking you about the 2012 tax return would your answer

25     still be the same?

⌂

```
 1        A.   Correct.  Because I was actually referring to

 2   2012.

 3        Q.   Thank you.  I had previously asked you if

 4   you -- if Dave ever disclosed a million dollars in his

 5   tax returns and you said no?

 6        A.   Yes.

 7        Q.   Did he ever disclose an amount higher than

 8   $500,000?

 9        A.   Not that I recall.

10        Q.   Did he ever disclose an amount higher than

11   $200,000?

12        A.   I don't recall.

13        Q.   Are you less sure about the $200,000?

14             MR. BRENNER:  Object to the form.

15             THE WITNESS:  Yes.

16   BY MR. KASS:

17        Q.   Is there an amount that you would feel

18   comfortable saying Dave never went above that?

19             MR. BRENNER:  Object to the form.

20             THE WITNESS:  Yes, I would say $200,000ish,

21        quarter million dollars.

22   BY MR. KASS:

23        Q.   So quarter million dollars Dave never made

24   more than that?

25             MR. BRENNER:  Object to the form.
```

```
 1              THE WITNESS:  Correct.
 2   BY MR. KASS:
 3       Q.   And that was throughout all the years you were
 4   preparing his tax returns?
 5       A.   Yes.
 6       Q.   Did Dave ever tell you that somebody stole
 7   anything from him?
 8       A.   No.
 9       Q.   Little bit more specifically did he ever state
10   someone stole Bitcoin from him?
11       A.   No.
12       Q.   Did he ever say that someone stole
13   intellectual property from him?
14       A.   No.
15           MR. KASS:  That's all I have.  Mr. Brenner,
16       anything?
17           MR. BRENNER:  Just give me two minutes.
18           THE VIDEOGRAPHER:  Going off the video record.
19       The time is 2:14 p.m.
20           (Thereupon, a brief recess was taken.)
21           THE VIDEOGRAPHER:  Going on the video record.
22       The time is 2:16 p.m.
23                CROSS (DAVID KUHARCIK)
24   BY MR. BRENNER:
25       Q.   Good afternoon, sir.  Again my name is Andrew
```

1    Brenner, I represent the Estate of David Kleiman in this

2    litigation.

3         A.   Okay.

4         Q.   In the deposition you've spoken about you and

5    I have had a conversation before; correct?

6         A.   Yes.

7         Q.   Today is the first day we met; correct?

8         A.   Yes.

9         Q.   You did mention in one of your answers you had

10   at least one conversation with the attorneys for

11   Dr. Wright; is that correct?

12        A.   Yes.

13        Q.   When was that?

14        A.   Got to be early this year.

15        Q.   They reached out to you?

16        A.   Yes.

17        Q.   What did they tell you or ask you?

18        A.   They called me.  They were trying to get

19   information on I guess Dave Kleiman and stuff and, you

20   know, once it became apparent that they were from the

21   opposing party I suggested that, you know, they get -- I

22   had no way to contact Ira or anything.  I suggested that

23   they get permission from Ira to authorize me to release

24   whatever information and that was the last I had heard.

25        Q.   At the time you were contacted by the

1   attorneys for Dr. Wright you think that was about the

2   beginning of this year, calendar year?

3        A.   Yes, it was early this year.

4        Q.   I'm just trying to understand your answer.  Is

5   it your recollection that when you got that contact you

6   realized they were not representatives of Dave Kleiman

7   you wanted permission from someone on the Kleiman side

8   to talk to them?

9        A.   Correct.

10        Q.   So prior to receiving that permission did you

11   have any substantive conversations with the attorneys

12   for Dr. Wright?

13        A.   No.

14        Q.   Now, you mentioned at this point you don't

15   really -- beginning of year you didn't have any sort of

16   ongoing personal relationship with Ira Kleiman, did you?

17        A.   No.

18        Q.   You didn't have an existing professional

19   relationship with Ira Kleiman, did you?

20        A.   No.

21        Q.   Did you eventually reach out to Ira Kleiman?

22        A.   No, that was the problem.  I had no way to

23   contact Ira Kleiman.

24        Q.   You did get contacted from someone from my

25   office, by Ira Kleiman's attorneys; correct?

1       A.   No.  The next I heard from the entire case was

2    the subpoena, the e-mail received from your office

3    saying that I was going to be subpoenaed for a

4    deposition.

5       Q.   That was in April?

6       A.   No, no, April 2018.  I was contacted by your

7    office.

8       Q.   So was that the first contact you had from

9    anyone regarding this case?

10      A.   Yes.

11      Q.   The next contact was --

12      A.   Early 2019 from I guess Craig Wright's

13   counsel.

14      Q.   Got it.  Other than that conversation you had

15   with Craig Wright's counsel at the beginning of 2019 I

16   think you mentioned at least one other conversation you

17   had with them?

18      A.   No.  Just recently to set up the deposition.

19      Q.   Right.  That second conversation was just

20   about scheduling?

21      A.   Correct.

22      Q.   You didn't discuss the case or did you?

23      A.   No.  No.  Other than maybe offering to

24   complete an affidavit in order to prevent me from having

25   to come here.  I think I spoke to you and maybe you

1   about it just trying to avoid the deposition.

2        Q.   Other than that do you remember anything else

3   about your conversation with Dr. Wright's counsel?

4        A.   No.

5        Q.   Just so I'm clear from about 19 -- early '90s

6   I think you called it until Dave passed away you

7   generally spoke with him about once a year maybe less?

8        A.   Maybe a couple times a year again for

9   estimated tax payments, his income tax.

10        Q.   On a day to day basis you weren't in contact

11   with him?

12        A.   No.

13        Q.   There was a time where you had a little bit of

14   a social relationship but that ended in the early '90s?

15        A.   Correct.

16        Q.   From early '90s through until Dave's death you

17   were doing your own business; correct?

18        A.   Yes.

19        Q.   And presumably he was doing his own business;

20   correct?

21        A.   Yes.

22             MR. KASS:  Objection.

23             MR. BRENNER:  I have nothing further.

24             MR. KASS:  Give me one second.

25

```
1                REDIRECT (DAVID KUHARCIK)

2    BY MR. KASS:

3        Q.   One follow up question.  As we discussed there

4    was one time period where you were closer with Dave when

5    Dave was in his twenties I believe -- what was that time

6    period again?

7        A.   Late '80s.

8        Q.   Late '80s?

9        A.   Early '90s.

10       Q.   After the late '80s you would still keep in

11   contact with Dave; right?

12       A.   Yes.

13       Q.   And at any point in time did you stop

14   considering him a buddy of yours?

15       A.   No.

16           MR. KASS:  That's it.

17           MR. BRENNER:  Okay.  You have the right at the

18   conclusion of the deposition to elect to read the

19   deposition once Mr. Levy types it up and to see if

20   there's any errors records or anything you want to

21   correct or you have the right to waive that

22   reading.  That's up to you.

23           If you choose to read it I believe Mr. Levy's

24   office will get in touch with you to make

25   arrangements for that.  All you have to do today is
```

1    make that election one way or the other to read or

2    waive.

3          THE WITNESS:  What do you think?

4          MR. BRENNER:  I really can't advise you on

5    that.

6          THE WITNESS:  Since I'm Ira's -- you guys are

7    sort of --

8          MR. BRENNER:  Why don't you read.  If you're

9    not entirely comfortable you should read.

10         THE WITNESS:  Okay.

11         MR. BRENNER:  Thank you so much.

12         THE VIDEOGRAPHER:  Going off the video record

13    the time is 2:00 p.m.

14         MR. KASS:  I will take it two day expedited.

15         MR. BRENNER:  I will take a copy as well.

16              (Witness excused.)

17              (Deposition was concluded.)

18

19

20

21

22

23

24

25

```
 1

 2                    CERTIFICATE OF REPORTER

 3               THE STATE OF FLORIDA

 4               COUNTY OF BROWARD

 5

 6        I, Rick Levy, Registered Professional Reporter
         and Notary Public in and for the State of Florida at
 7       large, do hereby certify that I was authorized to
         and did report said deposition in stenotype of DAVID
 8       KUHARCIK; and that the foregoing pages, numbered
         from 1 to 54, inclusive, are a true and correct
 9       transcription of my shorthand notes of said
         deposition.
10
             I further certify that said deposition was
11       taken at the time and place hereinabove set forth
         and that the taking of said deposition was commenced
12       and completed as hereinabove set out.

13           I further certify that I am not attorney or
         counsel of any of the parties, nor am I a relative
14       or employee of any attorney or counsel of party
         connected with the action, nor am I financially
15       interested in the action.

16           The foregoing certification of this transcript
         does not apply to any reproduction of the same by
17       any means unless under the direct control and/or
         direction of the certifying reporter.
18
             IN WITNESS WHEREOF, I have hereunto set my hand
19       this 9TH day of December, 2019.

20
                  _____
21
                  Rick Levy, RPR, FPR, Notary Public
22                in and for the State of Florida
                  My Commission Expires:  12/8/2023
23                My Commission No.:  GG937684

24

25
```

```
 1                      CERTIFICATE OF OATH

 2    THE STATE OF FLORIDA

 3           COUNTY OF BROWARD

 4

 5       I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

 6    Notary Public, State of Florida, certify that DAVID

 7    KUHARCIK personally appeared before me on the 9th

 8    day of December, 2019 and was duly sworn.

 9

10           Signed this 10th day of December, 2019.

11

12

13

14
               _____
15
                    Rick Levy, RPR, FPR
16                  Notary Public - State of Florida
                    My Commission Expires:  12/8/2023
17                  My Commission No.:  GG937684

18

19

20

21

22

23

24

25
```

```
1            E R R A T A   S H E E T

2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

3    DEPOSITION OF:  DAVID KUHARCIK

4    TAKEN: 12/9/2019

5       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

6    PAGE #  LINE #   CHANGE              REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   Please forward the original signed errata sheet to
     this office so that copies may be distributed to all
18   parties.

19   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
20   subject to   any changes in form or substance
     entered here.

21

22   DATE: _____

23

24   SIGNATURE OF
     DEPONENT:_____

25
```

```
 1   DATE:       December 10, 2019

 2   TO:         DAVID KUHARCIK
                 860 US Highway 1
 3               Suite 207B
                 North Palm Beach, Florida 33408
 4
     IN RE:      Ira Kleiman vs Craig Wright
 5

 6   Dear Mr. Kuharcik:

 7   Enclosed please find the original errata page with
     your copy of the transcript so DAVID KUHARCIK may
 8   read and sign their transcript.  Please have him/her
     make whatever changes are necessary on the errata
 9   page and sign it.  Then place the original errata
     page back into the original transcript.  Please then
10   forward the original errata page back to our office
     @1080 Woodcock Road, Suite 100, Orlando, Florida
11   32803.

12   If the errata page is not signed by the witness
     within 30 days after this letter has been furnished,
13   we will then process the transcript without a signed
     errata page.  If your client wishes to waive their
14   right to read and sign, please have him/her sign
     their name at the bottom of this letter and send it
15   back to the office.

16        Your prompt attention to this matter is

17   appreciated.

18   Sincerely,

19   _____
     RICK E. LEVY, RPR
20
     I do hereby waive my signature:
21
     _____
22   DAVID KUHARCIK

23   cc via transcript:  Kass Zalman, Esq.
                         Andrew Brenner, Esq.
24   file copy

25
```