# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K INFO DEFENSE RESEARCH, LLC | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT | |
| *Defendant.* | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

In his opening statement, Defendant promised there would be "no evidence that David Kleiman contributed to the development of Bitcoin," "no evidence that David Kleiman formed a partnership with Dr. Wright for the purpose of creating or developing Bitcoin," and "no evidence that David Kleiman made a single financial contribution to the invention of Bitcoin." (Trial Tr. Day 1 at 235:9-15.) Rather than engage with the voluminous evidence admitted in Plaintiffs' case-in-chief, Defendant takes the same approach in his Motion for Judgment as a Matter of Law—just pretend that the evidence in support of Plaintiffs' claims does not exist and depict the evidence he does mention in misleading ways to mask its relevance. For example, the Motion cites just six trial exhibits out of the more than 300 admitted during Plaintiffs' case-in-chief. The Motion also rehashes arguments the Court already rejected in denying summary judgment, and ignores compelling evidence of Defendant's continuing misrepresentations to this Court and jury, evidenced particularly during Defendant's own testimony. The jury has more than sufficient evidence to find for Plaintiffs in all of the areas Defendant challenges in his nebulous and wide-ranging Motion.

First, as to all of Plaintiffs' claims, Defendant argues that no competent evidence supports damages, but he ignores the evidence of publicly-available Bitcoin prices, his own waiver of any defense that those prices should be discounted in measuring damages, the inapplicability of the "reasonable certainty" or "blockage" rules, multiple appraisals of the intellectual property at issue (at least one by Defendant himself) along with Defendant's own statements and testimony on the

topic, and the availability of equitable remedies in addition to legal remedies.

Second, Defendant challenges Plaintiffs' claims individually, largely again challenging the evidence supporting monetary remedies. On each claim, Defendant again misrepresents the law and the evidence, both of which plainly support a jury verdict in favor of Plaintiffs and the remedies they seek.

Finally, Defendant argues that the statute of limitations bars Plaintiffs' claims as a matter of law, rehashing the same arguments the Court has previously rejected. Moreover, the evidence proves Plaintiffs' claims are brought within the statute of limitations including because Ira Kleiman was not appointed personal representative of the Estate until 2016, and because Defendant fraudulently concealed the claims from Plaintiffs. Indeed, Plaintiffs—not Defendant— should be granted judgment as a matter of law and equity on these defenses.

## LEGAL STANDARDS

"[T]he standard for judgment as a matter of law" is the same as the standard for summary judgment, "such that the inquiry under each is the same." *Chapman v. AI Transport*, 229 F.3d 1012, n.11 (11th Cir. 2000) (en banc) (quotation marks omitted). "[T]he court must view all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party," and judgment "is appropriate only if the evidence so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Eghnayem v. Bos. Sci. Corp.*, 2016 WL 4051311, at *3 (S.D. Fla. Mar. 17, 2016), *aff'd*, 873 F.3d 1304 (11th Cir. 2017) (quotation marks omitted). Further, "because entering judgment as a matter of law deprives the nonmoving party of a determination of the facts by a jury, it is to be granted sparingly and cautiously." *Edwards v. Shanley*, 2013 WL 12200645, at *4 (M.D. Fla. Aug 21, 2013), *aff'd*, 580 F. App'x 816 (11th Cir. 2014).[1]

---

[1] The two cases Defendant cites granting judgment as a matter of law are easily distinguishable. *See Kellner v. NCL (Bahamas), Ltd.*, 2016 WL 4440510, at *2 (S.D. Fla. Aug. 22, 2016), *aff'd*, 753 F. App'x 662 (11th Cir. 2018) (plaintiff failed to present "any admissible evidence" of medical causation or resulting damages); *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1352 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (only evidence of damages was expert opinion based on unsupported assumptions about lost profits).

## ARGUMENT

### I.  Plaintiffs' Damages Are Not Impermissibly Speculative.

Defendant argues "Plaintiffs failed to carry their burden of offering any evidence" to permit the jury to value the bitcoins and intellectual property ("IP") at issue in this case. Mot. at 1-7. Specifically, he argues the jury should be prohibited from calculating and awarding damages using the number and market price of bitcoins and his own valuations of the IP at issue under the "reasonable certainty" rule and the "blockage" rule. Each of these arguments fails.[2]

#### A.  The blockage discount theory is inapplicable.

Defendant argues that the jury cannot rely on the market price of Bitcoin to calculate damages under "Florida's 'blockage rule' for valuing large blocks of traded assets." Mot. at 2-3. But the blockage rule, or "blockage discount theory," is only "used in determining stock valuation in cases involving estate or inheritance taxes . . . ." 72 Am. Jur. 2d State and Local Taxation § 646.[3] Further, the party seeking to apply a "blockage" rule bears the burden of showing that the market value of the stock at issue should be discounted. *See Fla. Nat. Bank of Jacksonville v. Simpson*, 59

---

[2] Defendant also filed a Notice of Supplemental Authority citing a 1985 state case to argue that "expert testimony is necessary to prove the value of bitcoin and intellectual property at issue." ECF No. [782], at 1. The notice is improper and should be stricken. *See Durham Com. Cap. Corp. v. Select Portfolio Servicing, Inc.*, 2016 WL 6071633, at *9 n.8 (M.D. Fla. Oct. 17, 2016) (striking notice that "attempted to raise a new argument and present otherwise irrelevant information"). In any event, the case is entirely inapposite. It concerned the fair market valuation of real property, not assets like Bitcoin or IP. *See Port Largo Club, Inc. v. Warren*, 476 So. 2d 1330, 1334 (Fla. 3d DCA 1985) (expert testimony of fair market value of time-share units was necessary where there was no other evidence of fair market value at time of breach); *see also In re Standard Jury Instructions--Cont. & Bus. Cases*, 116 So. 3d 284, 337-38 (Fla. 2013) (real property damages are difference between fair market value and contract price).

[3] The two blockage cases Defendant cites (Mot. at 3) are tax cases. The only other case he cites is an inapposite New York state case from 1934 stating that the market price of certain shares could not be used to show the value of a "tremendous block of 1,600,000 [fraudulently-issued] shares, which were twice as many as were then on the market." *Cleary v. Higley*, 154 Misc. 158, 161, 166 (N.Y. Sup. Ct. 1934). Further, even if this were a tax case, Defendant cites no case in which the blockage rule has been applied to a commodity. *See Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) ("Virtual currencies are 'goods' exchanged in a market for a uniform quality and value. They fall well-within the common definition of 'commodity' as well as the [Commodity Exchange] Act's definition of 'commodities'").

So. 2d 751, 767 (Fla. 1952)[4]; *Est. of Sawade v. Comm'r*, T.C. Memo. 1984-626, 1984 WL 15317, *aff'd*, 795 F.2d 45 (8th Cir. 1986) ("Blockage is not a rule of law, but a question of fact. There is no presumption of blockage. . . . Petitioners bear the burden of proof.") (citations omitted). In other words, even if blockage applied (it does not), *Defendant* "must affirmatively show that the block is so big in comparison with the amounts of the stock which have been traded in on [sic] the exchange where it is listed that it could not be sold on such market at its quoted prices *within a reasonable time* by skilled brokers following prudent practices for liquidation." *Sawade*, 1984 WL 15317 (emphasis added). Defendant has not affirmatively introduced any such evidence, instead citing only Mr. Antonopoulos's testimony that a person would not be able sell 10,000 bitcoins for the market price on a single date, and someone "probably" could not sell one million bitcoins in a day. Mot. at 2. Even in a tax case, that showing would be wholly inadequate to invoke the blockage discount theory because there is no evidence in the record that the bitcoins at issue could not be sold "*within a reasonable time* by skilled brokers."

If anything, the damages arguments Defendant advances in his Motion goes to the quantum of damages, and not whether Plaintiffs have met their evidentiary burden to submit this case to a jury.

### B. Defendant has waived application of the blockage discount theory.

Even if the blockage rule applied (again, it does not), Defendant has waived it because it is an affirmative defense that he failed to plead. Defendant pled 14 affirmative defenses but failed to raise any defense that damages should be reduced based on an alleged inability to sell certain assets until this midtrial motion. ECF No. [80], at 30-32; ECF No. [87], at 32-35. As explained above, the blockage rule is a defense on which Defendant has the burden, seeking to reduce the amount of damages (similar to mitigation of damages or offset), and so must be pled in the Answer. *See First Nat'l Bank of Oneida, N. A. v. Brandt*, 2020 WL 886482, at *1 (M.D. Fla. Feb. 24, 2020) (treating argument that fair market value of a property was higher than price of sale at auction as affirmative defense), *aff'd*, 851 F. App'x 904 (11th Cir. 2021); *Simpson*, 59 So. 2d at 767 (rejecting application of blockage rule because "the burden of showing the necessity or probability of a sale, or some facts which would make the rule or doctrine applicable was on the plaintiffs and that they

---

[4] *Simpson* also concerned Florida's intangible tax, repealed effective January 1, 2007. *See In re Cole*, 2020 WL 7233190, at *4 (Bankr. M.D. Fla. Dec. 8, 2020) ("Florida later repealed this intangible tax.").

not only failed to meet this burden but their positive testimony shows that there was no necessity or probability that the stock would be sold"). Because Defendant did not plead this defense and included it for the first time in his Rule 50 motion, it is waived. *See, e.g.*, *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010) ("Failure to plead an affirmative defense generally results in a waiver of that defense."); *Gottlieb & Gottlieb, P.A. v. Crants*, 657 F. App'x 920, 923 (11th Cir. 2016) (defendant "could not avoid waiver by asserting the affirmative defense in his opposition to [plaintiff's] motion for summary judgment" to say nothing of in the middle of trial); *Arias v. Alphine Towing, Inc.*, 2011 WL 11073004, at *6 (S.D. Fla. Feb. 8, 2011) ("allowing the defendants to amend their answer at this late stage in the proceedings would severely prejudice the plaintiff"). Defendant's Motion itself reflects the severe prejudice that Plaintiffs face from Defendant raising this issue for the first time midtrial after Plaintiffs' case-in-chief—the parties did not conduct focused fact or expert discovery on this newfound defense. *See* Mot. at 3-4. The Court should not permit the Defendant to resurrect a defense he forfeited, days before the close of trial.

### C. The "reasonable certainty" rule is inapplicable.

Defendant also argues without explanation that Bitcoin's market price cannot be used to calculate damages under the "reasonable certainty" rule. Mot. at 1-2. But "[t]he purpose of the reasonable certainty rule is to avoid making compensatory damages awards for *lost profits* which are fabricated or based on mere conjecture or speculation." *Best Beach Getaways LLC v. TSYS Merch. Sols., LLC*, 2021 WL 3206300, at *10 (D. Colo. July 29, 2021) (emphasis added); *see, e.g.*, Lost profits, 2 Damages Under UCC § 11:25 ("the certainty rule for damages has almost no application except with respect to proving lost profits") (citing McCormick, Handbook on the Law of Damages 105-06 (1935)). This case, unlike the ones Defendant cites (Mot. at 2), does not involve lost profits.[5]

More importantly, "the rule applies only to the fact of damages, not to the amount of damages. . . . While the proof of the fact of damages must be certain, proof of the amount can be an estimate, uncertain or inexact." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353,

---

[5] Defendant cites one case that did not involve lost profits, but it is inapposite. *See United Steel & Strip Corp. v. Monex Corp.*, 310 So. 2d 339, 342 (Fla. 3d DCA 1975) (plaintiff in bench trial "failed to establish what portion of the goods was received in bad condition, and therefore, there is no evidence on which to base an award of damages assuming arguendo liability had been established").

1367 (7th Cir. 1996) (alterations and quotation marks omitted); *see, e.g.*, Dunn, Recovery of Damages for Lost Profits § 1.6 (5th ed.) ("It would be misleading to discuss the 'reasonable certainty' rule without stating its most important qualification. Those courts that have gone farther than a simple statement that 'reasonable certainty' is required have almost invariably recognized that the rule applies only to the fact of damages, not to the amount of damages."); *see also, e.g.*, *Fid. Interior Const., Inc. v. Se. Carpenters Reg'l Council of United Bhd. of Carpenters & Joiners of Am.*, 675 F.3d 1250, 1265 (11th Cir. 2012) (even in lost profits cases, "proof of the amount of damages can be an estimate, uncertain, or inexact") (quotation marks and alteration omitted); *W. Boca Med. Ctr., Inc. v. Marzigliano*, 965 So. 2d 240, 244-45 (Fla. 3d DCA 2007) (even where the "reasonable certainty" rule applies, it "does not require mathematical precision"). Indeed, it is well-settled that "uncertainty as to the precise amount of, or difficulty in proving, damages does not preclude recovery if there is some reasonable basis in the evidence for the amount awarded." *Clearwater Assocs. v. Hicks Laundry Equip. Corp.*, 433 So. 2d 7, 8 (Fla. 2d DCA 1983).

Defendant does not—and cannot—reasonably dispute that the amount and market price of Bitcoin and the Bitcoin forked assets (together, "Bitcoin" or "bitcoin") at issue in this case do not supply an adequate basis for the jury to calculate damages. *Compare Rensel v. Centra Tech, Inc.*, 2019 WL 6828270, at *5 (S.D. Fla. Dec. 13, 2019) (calculating damages using "[t]he dollar value of [Bitcoin] and [Ether]") *and id.*, ECF No. [260-3], ¶ 9 (market price of Bitcoin used as evidence for damages was obtained from CoinCap.io) *with Trial Tr. Day 2 at 26:20-34:21 (Antonopoulos) (market prices of Bitcoin, Bitcoin Cash, Bitcoin Gold, and Bitcoin Satoshi Vision obtained from CoinCap.io).[6] *See also Ox Labs, Inc. v. Bitpay, Inc.*, 2019 WL 6729667, at *7 (C.D. Cal. Sept. 27, 2019) ("it seems equitable to determine the value of the 200 Bitcoins based on the market value of the 200 Bitcoins on the day that Plaintiff erroneously credited Defendant"); 17 Fla. Jur 2d Damages § 67 ("The appropriate economic market to be used in approximating its reasonable market value is the usual market where the property or goods had been purchased."). Similarly, Defendants fail

---

[6] Defendant falsely states that Mr. Antonopoulos "admitted that the historical 'price' was not equivalent to the market price of Bitcoin." Mot. at 4. To the contrary, Mr. Antonopoulos explained repeatedly that the Bitcoin prices he identified to the jury were the market prices. (*See, e.g.*, Trial Tr. Day 2 at 102:12-13 ("the information I presented was the market price on those dates").) Also, the Court previously rejected Defendant's arguments that Mr. Antonopoulos was "unqualified to testify about the spot market price of bitcoin and bitcoin forks." ECF No. [622], at 66.

to explain how the damages calculations—multiplying the number of bitcoins by its market price—involve anything but simple arithmetic, "a task the jury can handle without the aid of an expert." *Cont'l 332 Fund, LLC v. Kozlowski*, 2020 WL 1234808, at \*8 (M.D. Fla. Mar. 13, 2020), *aff'd sub nom. Cont'l 332 Fund, LLC v. Albertelli*, 2021 WL 3184586 (11th Cir. July 28, 2021) (excluding expert who did nothing more than apply simple arithmetic to pricing data).

Likewise, Defendant fails to explain how his own valuations of the IP at issue in this case are not "competent evidence of [its] alleged value." Mot. at 5. Putting aside the oddity of claiming that his own valuations are not credible, his arguments attacking those valuations now simply go to the weight of the evidence. In any event, his attacks fall short for a number of reasons.

*First*, Defendant ignores entirely that his own statements provide sufficient competent evidence of the value of the IP. Defendant told the Australian Taxation Office in August 2014 that, when he acquired the IP in 2013 after Dave's death, it was worth \$56 million. (*See* P173 at 42.) Then, in early 2014, Defendant circulated a report regarding "the valuation of the W&K software" (P166 at 1), which stated that, as of that date, the estimated market price for W&K's software was \$303,895,458 AUD. *See id.* at 56. Although Defendant now asserts that this report came from "an unknown source," the email correspondence attaching it makes clear that it was compiled for Defendant by Allan Pederson, the Project Director for one of Defendant's companies, and was based on data provided by Defendant himself. (*See id.* at 1, 5.) Further, just two days before trial, Defendant said "the intellectual property within the Kleiman case" is worth \$252 billion USD. (Trial Tr. Day 9 AM (Rough) at 109:5-111:14.) Defendant's statements of the value of IP that he and his companies purported to own are plainly competent evidence. *See, e.g.*, *Daniec v. Boatarama, Inc.*, 588 F. App'x 947, 950 (11th Cir. 2014) (holding owner can testify as to the value of his property, and affirming denial of motion for judgment as a matter of law that plaintiff failed to present competent evidence from which jury could calculate damages) (citing caselaw); *Meredith v. Hardy*, 554 F.2d 764, 765 (5th Cir. 1977) ("An owner is always competent to give his opinion on the value of his property. As to whether the owner's opinion is accurate, that is a matter for cross-examination and goes merely to the weight and not to admissibility.") (citation omitted); *Hoeltzell v. Caldera Graphics*, 2012 WL 13012759, at \*3 (S.D. Fla. Oct. 30, 2012) ("Although Plaintiff alone testified to damages, the testimony was not unduly speculative."); *accord, e.g.*, *Mary Ellen Enterprises v. Camex, Inc.*, 68 F.3d 1065, 1070 (8th Cir. 1995) (holding that a "copyright owner is competent to testify as to the copyright's value").

*Second*, the BRV report (P183) is also competent evidence of the value of the IP at issue in this case. That report was provided in late 2014 by Lee Goldstein (*id.* at 1), who Defendant hired and testified was "highly regarded" as a "valuer." (Trial Tr. Day 9 AM (Rough) at 45:22-25.) The report states in unequivocal terms that "[t]his software has a value of $378,745,713." (P183 at 24.) Defendant's argument that the BRV report merely speculates "as to future costs" that would be incurred in creating the IP (Mot. at 5) is baseless: the IP was already developed at that point, and nothing in the BRV report suggests otherwise. Further, the reference in the report to the relationship between the cost of developing software and the value of that software goes, at most, to the quantum of evidence—especially where the report expressly characterizes its methodology as "the only valuation approach" that could have been utilized under the circumstances. (P183 at 13.)

*Finally*, Baker McKenzie's IP valuation analysis (P457), which relies on a market-based approach, provides yet further competent evidence of the value of the IP. Although Defendant argues that the report does "not specify the IP it was valuing as it related to David Kleiman," Mot. at 6, Plaintiff has presented evidence linking the IP owned by EITC holdings to Dave Kleiman and W&K. (*See, e.g.*, P403 at 1 (EITC was renamed nChain); P469 at 1, 8 (Defendant's companies sold all IP to nChain); P183 at 17-20 (W&K's IP was allocated to Defendant's companies); P248 at 4 (W&K's IP concerned "core blockchain IP"). That Mr. Nguyen, Defendant's supposed "litigation liaison," said he disagreed with the valuation at his deposition in this case (Mot. at 6 n.6) is relevant, at most, to the weight of the evidence; it certainly is not a basis for judgment as a matter of law on damages.

## II. Defendant's Challenges to Plaintiffs' Individual Claims Fail.

Defendant's challenges to Plaintiffs' individual claims fare no better than his generalized argument about remedies. Because Plaintiffs have presented more than sufficient evidence at trial supporting all elements of their claims, none of these arguments have merit, and the Motion should be denied.

### A. The Jury Has Received Ample Evidence of Defendant's Willful and Wanton Conversion.

Defendant's sole challenges to Plaintiffs' conversion claim (Count I) are as to Plaintiffs' requests for compensatory and punitive damages. *See* Mot. at 7-8. Both of those challenges fail.

      i.  <u>The jury has evidence supporting an award of compensatory damages for conversion.</u>

Under Florida law, the appropriate time to value the Bitcoin and IP Defendant converted is at their highest market value between the time of the conversion and date of the verdict.

Longstanding Florida law provides that "[i]n the case of public stocks held as an investment, of rare pictures, jewels and like articles, held otherwise than for purposes of immediate commerce, it would be equitable and proper that the highest value after conversion should prevail, if the jury should be satisfied from the evidence that the plaintiff would have held the property up to the time of the advance in value; for the defendant should make good the actual loss sustained by reason of his act." *Moody v. Caulk*, 14 Fla. 50, 52-53 (1872); *see Haddad v. Cura*, 674 So. 2d 168, 169 (Fla. 3d DCA 1996); 2 Florida Forms of Jury Instruction § 61.40 cmt. (2021) ("if the value of the personal property has appreciated since the conversion, the highest value of the property after the conversion should be awarded to compensate the plaintiff for the actual loss"); *see also Wight v. Skinner*, 16 So. 335 (Fla. 1916); *Skinner v. Pinney*, 19 Fla. 42, 51 (1882); *Foley v. Dick*, 436 So. 2d 139, 141 (Fla. 2d DCA 1983). As the jury has learned, bitcoin and Bitcoin-related IP—like the types of assets described in *Moody*—were held "otherwise than for purposes of immediate commerce." *Id.*; *see* Mot. at 1 (relying on the "historically low trading volume" of Bitcoin); *see also, e.g.*, P320 at 26, 51-52 (1.1 million bitcoins to be held in trust until 2020); P042 at 1 (Defendant: "We do not touch the trusts. Not yet . . . ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions . . ."). The jury has more than sufficient evidence to conclude that the Estate and W&K "would have held the" bitcoins and intellectual property "up to the time of the advance in value" and so is entitled to "the highest value after conversion." *Moody*, 14 Fla. at 52-53. This market value of Bitcoin was admitted into evidence. (Trial Tr. Day 2 at 29:8-21, 35:18-36:9.)[7]

---

[7] Even under an alternative measure of damages for conversion that some courts have applied in certain circumstances, the relevant market price for Bitcoin would be the price of Bitcoin on the date Plaintiffs filed their complaint. *See Gary v. D. Agustini & Asociados, S.A.*, 865 F. Supp. 818, 826 (S.D. Fla. 1994) ("Where a person having a right to possession of property makes demand for its return and the property is not relinquished, a conversion has occurred.") (quotation marks omitted); *Spradley v. Spradley*, 213 So. 3d 1042, 1044 (Fla. 2d DCA 2017) ("For instance, a conversion of property may occur when a person with a right to possess property demands its return, and the demand is not or cannot be met.") (quotation marks omitted). That value is also in the record. (Trial Tr. Day 2 at 29:8-21, 35:18-36:9.)

Defendant cites *Ox Labs Inc v. BitPay, Inc.*, 848 F. App'x 795, 797 (9th Cir. 2021), but this unpublished, out-of-circuit decision applying California (not Florida) law supports Plaintiffs here. As *Ox Labs* explains, it is appropriate to award conversion damages equal to the losses that are the "natural, reasonable and proximate result" of the conversion if awarding the value at the time of conversion would be manifestly unjust. *Id.* In *Ox Labs*, valuing damages at the time of conversion was *not* manifestly unjust because the defendant sold the converted bitcoins and there was no evidence the plaintiff would have held onto it. *Id.* More importantly, there was no attempt to hide the conversion. *Id.* Here, it *would* be manifestly unjust to award Defendant a windfall from the increased value of Bitcoin and Bitcoin-related IP since Dave Kleiman's death on the basis that he successfully hid the conversion from Plaintiffs and has delayed the process of recovering what the Estate and W&K are owed. And—again unlike in *Ox Labs*—Defendant has in fact retained the Bitcoin and IP and realized this windfall. (*See, e.g.*, P554 (list of Defendant's bitcoin holdings); P446 (Defendant's notice of compliance); P269 at 15 ("red flags" regarding Defendant's companies' purported ownership of W&K's IP); P459 at 9-11 (Defendant's sale of that IP to nChain).

The other cases Defendant cites are inapposite. *Saewitz v. Saewitz* involved damages estimates only with regard to the order of magnitude. 79 So. 3d 831, 833 (Fla. 3d DCA 2012) (involving testimony that assets at issue were worth "over a million dollars," "in the millions [of dollars]," "seven figures," and "millions of dollars," untethered to the legally relevant time period). The damages in *Saewitz* were thus far more indeterminate than the simple market price multiplied by the number of converted Bitcoin and the IP valuations that exist as measures of damages in this case. *See supra*, § I. In addition, *Talbot v. Rosenbaum*, 142 So. 3d 965, 967 (Fla. 4th DCA 2014), concerned whether any evidence at all was required to support damages in the default judgment context. And, as with *Ox Labs*, the conversion was immediately evident to the victim. *Id.* (involving refusals to turn over property demanded in satisfaction of interest on a defaulted loan).

In any event, Plaintiffs provided market values for Bitcoin at three other times—as of Dave's death, as of the filing of the Complaint, and as of Mr. Antanopoulos's testimony. (Trial Tr. Day 2 at 29:8-21, 35:18-36:9.) How the Court instructs the jury on which of these dates is

appropriate for damages on each count is for a later day.[8] Thus, Defendant's argument regarding conversion damages should be rejected.

        ii.  <u>The jury has more than sufficient evidence to support a punitive damages award.</u>

Defendant also argues in passing that there is insufficient evidence to support a punitive damages award. *See* Mot. at 8. To the contrary, the jury has reviewed copious evidence supporting Defendant's "willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, deliberate violence, moral turpitude, insult, or fraud." *Palm Beach Atl. Coll., Inc. v. First United Fund, Ltd.*, 928 F.2d 1538, 1546 (11th Cir. 1991) (quotation marks omitted). "Furthermore, whether a fraudulent act is sufficiently outrageous so as to justify an award of punitive damages is a question for the jury." *Id.* (quotation marks and alteration omitted). That evidence includes testimony and exhibits showing Defendant forged dozens of documents, made numerous misrepresentations to the Australian courts to obtain fraudulent judgments against W&K, involved innocent third parties such as Debra Kobza and her nonprofit to further his fraud against the Estate and W&K, and made numerous fraudulent misrepresentations to Ira Kleiman. (*See, e.g.*, P748 at 2 (Defendant swore that he has never been a director or shareholder of W&K, and never had authority to act on behalf of W&K); P710 at 138-39 (months after his supposed best friend died, Defendant acknowledged on behalf of W&K in Australian lawsuits that W&K owed his company millions of dollars); P710 at 29-30 (Defendant purported to appoint Jamie Wilson as a director of W&K "for the purposes of consenting to orders" on behalf of W&K); *id.* at 24-25 (Mr. Wilson purportedly consented on behalf of W&K to transfer millions of dollars in IP to Defendant's company); P509 at 1-2 (Australian court entered consent orders transferring IP to Defendant's company on that basis); J. Wilson Dep. at 20:9-11 (Mr. Wilson was never a director of W&K); P117 at 1 (Defendant told Kleiman family he wanted to help them find Dave's assets); P156 at 9 (Defendant did not tell Kleiman family about his lawsuits against W&K); *id.* at 1, 7 (Defendant told Estate that it owned shares in Coin-Exch and would receive millions of dollars as a result); P229 at 2-3 (Defendant executed agreement to sell Coin-Exch's assets); Trial Tr. Day 9 AM (Rough) at 67:16-23 (Defendant never told Estate about sale of those assets); P122 at 1 (Defendant told Dave's friends that Dave's assets were in the "GICSR Trust"); D. Kobza Dep. at

---

[8] Defendant does not identify any alternative date that he contends is appropriate in his Motion, instead apparently arguing—without any support—that no date would be appropriate.

19:9-25 (GICSR trust did not exist); Trial Tr. Day 10 AM (Rough) at 82:3-86:11 (Defendant forged documents purporting to show that he exclusively owned the partnership's 1.1 million bitcoin).)

Defendant makes no attempt to engage with this or any of the other evidence supporting a punitive damages award here. Further, all of the cases Defendant cites are inapposite. *See Sporting Goods Distribs., Inc. v. Whitney*, 498 F. Supp. 1088, 1089 (N.D. Fla. 1980) (involving conversion claim incidental to breach of contract); *Stearns v. Landmark First Nat'l Bank of Fort Lauderdale*, 498 So. 2d 1001, 1002 (Fla. 4th DCA 1986) (involving simple negligence, not gross negligence or intentional wrongdoing); *DeWitt v. Seaboard Coast Line R. Co.*, 268 So. 2d 177, 179 (Fla. 2d DCA 1972) (same). Thus, the Court should reject Defendant's conclusory argument on punitive damages.

### B.  Ample Evidence Supports Liability For Unjust Enrichment and Disgorgement.

Defendant's first argument regarding Plaintiffs' unjust enrichment claims—that they depend on an independent wrongful act—misunderstands these claims. The record is clear that Dave Kleiman conferred significant benefits on Defendant, which he accepted and wrongfully retained for himself through the present, and which he should be required to disgorge. *See, e.g.*, *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013) ("Florida courts have long recognized a cause of action for unjust enrichment to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity.") (quotation marks omitted).

Contrary to Defendant's assertion, the cases Defendant cites certainly do *not* stand for the proposition that "a claim of unjust enrichment cannot be predicated on wrongful acts," because unjust enrichment is itself wrongful. Instead, they simply reflect that theft—as opposed to a benefit voluntarily conferred on another and then unjustly retained, as here—does not constitute unjust enrichment. *See Grp. Assests, LLC. v. Fortress Inv. Grp.*, 2010 WL 2951508, at *4 (M.D. Fla. June 22, 2010) ("By premising their claim on the commission of a wrong, they seek restitution for wrongful enrichment rather than unjust enrichment."); *Fla. Off. of Atty. Gen., Dep't of Legal Affs. v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1309 (S.D. Fla. 2005) (dismissing unjust enrichment claim "premised on [defendant's] purported RICO violations and theft of outlier funds"). Moreover, these cases fail to recognize that the general rule that "equitable remedies are not available under Florida law when adequate legal remedies exist . . . does not apply to unjust enrichment claims." *State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc.*, 427 F. App'x

714, 722 (11th Cir. 2011), *rev'd in part on other grounds*, 824 F.3d 1311 (11th Cir. 2014); *see In re Monat Hair Care Prod. Mktg., Sales Pracs., and Prod. Liab. Litig.*, 2019 WL 5423457, at *5 n.10 (S.D. Fla. Oct. 23, 2019) (declining to follow *Tenet Healthcare* because it was contrary to other district court decisions and was decided before the Eleventh Circuit's contrary holding in *State Farm*).

Defendant's second argument, related to that discussed *supra*, § I, is that no measure of restitution is available because there is a purported lack of evidence supporting any restitution amount "before the filing of the Complaint" (Mot. at 9) or "on (or after) the date when plaintiffs filed their Second Amended Complaint."[9] While Defendant cites cases about the *accrual* of an unjust enrichment claim, he fails to cite relevant authorities on the *measure* of restitution, which is "the benefit to the [person who was unjustly enriched], not the cost to the provider [of the benefit]." *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 807 (11th Cir. 1999); *see In re Horizon Organic Milk Plus DHA Omega-3 Mktg. and Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1336 ("The measure of damages for unjust enrichment is the amount of unfair gain received by those unjustly enriched."); Restatement (Third) of Restitution & Unjust Enrichment § 3 cmt. c (2011) ("the whole of the resulting gain is to be treated as unjust enrichment"). The parties appear to agree that Plaintiffs are entitled to the full benefit conveyed on Defendant even if that amount exceeds the damages that Plaintiffs sustained. ECF No. [618], at 74, 99 (parties' proposed jury instructions on the measure of restitution). And the jury has sufficient evidence to support a determination of the benefit Dave Kleiman and W&K conveyed on Defendant. *See supra*, § I.

### C. Ample Evidence Supports Liability and Damages for Defendant's Breach of His Fiduciary Duties.

Defendant's argument regarding his breach of fiduciary duties to W&K ignores both his representations to others about his role in W&K and his actions with respect to pilfering W&K's assets.

### i.  Defendant was in a fiduciary relationship with W&K.

Defendant first briefly challenges whether he was in a fiduciary relationship with W&K. Mot. at 10. Under Florida law, "[f]iduciary relationships are either expressly or impliedly created. Those expressly created are either by contract, such as principal/agent or attorney/client . . . .

---

[9] As with all claims discussed in the Motion, including unjust enrichment, Defendant ignores and does not challenge the availability of equitable remedies other than disgorgement.

Courts have found a fiduciary relationship implied in law when 'confidence is reposed by one party and a trust accepted by the other.'" *Regions Bank v. Kaplan*, 258 F. Supp. 3d 1275, 1293 (M.D. Fla. 2017) (citations omitted). While, as Defendant observes, a manager of a manager-managed LLC owes fiduciary duties to the LLC, Fla. Stat. § 605.04091(1), he does not and cannot argue that the only people owing such duties to an LLC are its managers. Here, Defendant repeatedly represented he was in a fiduciary relationship with W&K—for example, he told Ira that "Dave owned 50% of a US company that controlled a Belize based trust. I have attached a little more of what we did together," clearly implying Defendant had a key role in the "US company" W&K. (P120 at 1; *see* P122 at 4 (Defendant told Patrick Paige that he and Dave had a company in the U.S. that mined Bitcoin).) He additionally represented to the Australian courts that he held a position of trust with W&K, and variously told Australian judicial officers that he held half or all the shares in W&K. (*See* P105 at 1 (51%); P710 at 29 (50%); P509 at 1 (100%).) He represented he was a director and foreign agent of W&K. (*See* P710 at 139.) That he was W&K's authorized representative (P710 at 80, 88, 94, 107). And he submitted his own Australian address as W&K's address for service. *Id.* These actions are more than sufficient to show that Defendant assumed a position of trust with W&K before breaching his fiduciary duties to it.[10]

### ii.  Defendant is liable for his breach.

Defendant next argues that no reasonable jury could find he is liable for damages for breaching his fiduciary duties.[11] Mot. at 10-11. But the jury has more than sufficient evidence to award damages. Here, the appropriate measure of damages for Defendant's breach is the "benefit of the bargain" improperly received by Defendant. As in *Cabot E. Broward 2 LLC v. Cabot* ("*Broward*"), 2018 WL 11309825, at *4 (S.D. Fla. July 26, 2018), valuing fiduciary duty breach damages as of the date of Defendant's breach would not restore W&K to the position it would have been in had Defendant not breached his duties. And, as in *Broward*, the harm to W&K

---

[10] Even if the jury were to credit in any way Defendant's incredible self-serving statements that in appearing in the Australian proceedings he was actually acting as a representative of his ex-wife Lynn Wright, in her capacity as a member of W&K, that would still put him in a position of trust with respect to W&K since he was wielding Ms. Wright's authority. (*See* Trial Tr. Day 6 at 105:5-110:22 (Defendant: "I was standing in the shoes of Lynn Wright, who was standing in the shoes of W&K.").)

[11] Again, as he does throughout his Motion, Defendant ignores the available equitable remedies.

includes the loss of the increased value of its assets over time. (*Compare* P173 at 42, P166 at 1, P183 (BRV report), P457, Trial Tr. Day 9 AM (Rough) at 109:5-111:14.) *Broward* distinguished the fiduciary duty remedy set forth in *Haddad v. Rav Bahamas, Ltd.*, 589 F. Supp. 2d 1302, 1307 (S.D. Fla. 2008), cited by Defendant, on the ground that the breach in *Haddad* involved "a single unauthorized withdrawal of funds, which did not implicate the plaintiff's underlying equity interest in a related project, so the damages were the lost funds," whereas the breach in *Broward* involved "the loss of ownership rights in" properties "and lost profits." 2018 WL 11309825, at *4. Defendant's breach—wrongfully seizing control of W&K's assets—far more closely resembles the breach in *Broward* than the one in *Haddad*. Florida law recognizes that one remedy for breach of fiduciary duty is "the benefits derived by the fiduciary through the breach of duty." *King Mountain Condo Ass'n v. Gundlach*, 425 So. 2d 569, 571 (Fla. 4th DCA 1982) (quotation marks omitted). The jury has more than sufficient evidence to determine the benefit unjustly derived by Defendant from his breach.

### D. Ample Evidence Supports a Partnership Between Dave Kleiman and Craig Wright.

In his summary judgment motion, Defendant argued there was "zero evidence" to support the existence of a partnership between Dave Kleiman and himself. The Court rightly rejected that argument, recognizing the plentiful support for the partnership in the record. ECF No. [615], at 54-62. Almost all of that evidence is now before the jury, and much more. *See* App'x A at 55-62.

#### i. There is more than sufficient evidence to support the formation of a partnership under Florida law.

Defendant again focuses on individual factors identified in some Florida caselaw, and evidence supporting each of these factors is identified below. But in determining if a partnership exists, the law since Florida's enactment of the Revised Uniform Partnership Act ("RUPA") looks at the parties' relationship as a whole, rather than isolated elements because "an association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." Fla. Stat. § 620.8202. This view is supported by the standard Florida jury instruction on partnership, which asks the jury to determine whether the parties "join[ed] together or agree[d] to join together in a business or venture for their common benefit, each contributing property, money or services and each having interest in any profits." Fla Std. Jury Instr. in Civil Case 401.14(d) (Feb. 1, 2018). To the extent Defendant suggests that the absence from discovery of a written partnership agreement somehow precludes a partnership, a

partnership agreement may of course be oral. *See Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002).

Defendant's arguments that certain select terms must be included in a partnership agreement also conflict with RUPA's provisions that create defaults for agreements not having those terms. *See, e.g.*, Fla. Stat. § 620.84(b)(2) (profits to be split evenly among partners and losses to be split in the same proportion); *id.* § 620.8401(b)(6) (equal rights in the management and conduct of the partnership); Derrick Hibbard, Bus. Litig. In Fla. § 18.2 (10th ed. 2021) ("if there is no partnership agreement, the Act [RUPA] will control"); *Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 6 (Fla. 4th DCA 2003) (distinguishing *Dreyfuss v. Dreyfuss*, 701 So. 2d 437 (Fla. 3d DCA 1997), in part based on RUPA's default partnership rules).

Under RUPA, "a person who receives a share of the business's profits is presumed to be a partner, unless the profits were received in payment of rent, among other things." *Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 8 So. 3d 1076, 1090 (Fla. 2008) (citing Fla. Stat. § 620.8202(3)(c)). RUPA and caselaw interpreting it make clear that even to the extent there is a requirement for certain evidence beyond an association in a profit-seeking business, it can be satisfied by inferences drawn from parties' shared business enterprise for profit. *See Rafael J. Roca, P.A.*, 856 So. 2d at 6 (finding existence of partnership based on sharing of profits among the parties); *see also* 8B Fla. Jur. 2d Bus. Relationships § 818 ("In the absence of an express agreement that the parties will share in any losses of a venture, such an agreement must be implied from the contract made and the circumstances surrounding its execution if a joint venture is to be established.").

Plaintiffs have introduced at trial the evidence the Court relied on as supporting a partnership between Defendant and Dave Kleiman, much of it from Defendant's own statements. *See* App'x A.[12]

In addition to the evidence that the Court cited in denying summary judgment, now almost all in the trial record, Plaintiffs presented additional evidence at trial supporting the partnership, including testimony regarding Defendant's own statements "that Dave did the mining" (Trial Tr. Day 4 at 43:24), and documents indicating that Defendant told the ATO that he and Dave were

---

[12] P097 at 1, P117, P134, P167 at 2, P172 at 7, P459 at 1-2, P200 at 1, P439 at 4, P464 at 5.

"partners for years" (P172 at 41). Patrick Paige also testified that Defendant wrote him to say that he and Dave had a secret project in the United States that mined Bitcoin. (Trial Tr. Day 2 at 156:18-158:16.) Defendant engages with none of this evidence, and it is more than sufficient to deny his Motion.

ii.   <u>There is sufficient evidence to find a common purpose.</u>

Even if the Court adopts Defendant's view of partnership law (and it should not), the same evidence supporting the satisfaction of these elements to deny summary judgment still supports it now, with additional evidence introduced at trial. As to a common purpose for the partnership, the Court cited several exhibits now in the record. *See* App'x A at 58-59.[13] Additional evidence includes:

- P172, at 7 (Defendant: "There was a trust set up to put a number of bitcoin that Dave was mining and everything like that into . . . , the idea being that we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies we have there.")

- P112 at 1 ("Dave Kleiman and I started mining in 2009.");

- P122 at 4 ("Dave and I had a project in the US. He ran it there. . . . The company he ran there mined Bitcoin.");

- P853.1 (stating "DK and I" wrote Bitcoin source code).

- D157 at 5 ("If you want to stay, then do so and come to know more of what Dave and I did."); and

- Trial Tr. Day 4 AM at 29:10-22 ("Q. Right. Well -- and you certainly don't know that your brother -- you never saw racks of servers in your brother's garage, did you? A. No. I didn't. But I have seen emails where I believe they remotely used a data center in Florida for bitcoin mining. Q. Okay. Sir, you believe you've seen an email about remote data centers in Florida; isn't that right? A. That is correct. Q. Yeah. And, sir, why don't you tell us where it is in Florida you thought that that remote center for mining was located. A. I think that the name of the company was like DSL, I think, in Tampa, Florida.").

---

[13] P074 at 5, P097 at 1, P117 at 1, P134 at 1, P138 at 1, P172 at 7, P167 at 2, P200 at 1, P439 at 4, P459 at 2-3, P464 at 5.

     iii. <u>There is sufficient evidence to find a joint proprietary interest.</u>

  As to joint proprietary interest, the Court relied on exhibits now before the jury. *See* App'x A at 59-60.[14] The jury has also seen P173 at 7 ("O'Mahoney: . . . are all the assets of the trust, they were originally sourced from you? Wright: And Dave. O'Mahoney: And David. Wright: Yes."); P464 at 7 (Defendant: "I told Mark that the only way in which I would be able to finance the deal would be by paying in Bitcoin that Dave and I held."); and P607 at 49-50 (ATO: "Dr. Wright has also stated that the trust's Bitcoin came from both him and Mr. Kleiman.").

     iv. <u>There is sufficient evidence to find a right to share profits and duty to share losses.</u>

  On the right to share partnership profits and duty to share losses, the Court identified several exhibits that are now in evidence as supporting this factor. *See* App'x A at 60-61.[15] The jury also has new evidence including P059 at 1 ("I know you have been paying people from Bitcoin in you, own wallet, is this enough to account for it all? It has been a shitload of work."), and Ramona Watts Dep. Tr. at 93:11-13 ("In 2012 here I am not being able to put decent food on the table for my kids and I'm, 12 saying, you know, 'If there's Bitcoin why can't we just spend it?'").

     v. <u>There is sufficient evidence to find joint control or right of control.</u>

  As to joint control or right to control, the Court relied on several exhibits now in evidence in denying summary judgment to Defendant. *See* App'x A at 61-62.[16] Additional evidence now before the jury includes P149 at 1 (Defendant: "I was not the person doing the mining. Dave was.") and P591 at 1 (Defendant: "We need to discuss the trust and work out what the [expletive] we are doing with it all.").

  In short, regardless of the partnership test that applies, and despite (or perhaps in part based on) Defendant's lies that were evident to the jury and his efforts to thwart discovery, the jury has more than enough evidence to find that a partnership existed between Dave Kleiman and Defendant.

---

[14] P042; P160 at 1, 18; P172 at 7.

[15] P051 at 15, P059 at 3, P074 at 5, P134, P157 at 1, P172 at 7, P731 at 7.

[16] P119 at 1, P157 at 1, P173, P172 at 42, P731 at 7.

vi. <u>Defendant's argument about damages from his breach of duties to the partnership relies on his continued misrepresentation of the partnership claim.</u>

While Defendant argues that Plaintiffs have "failed to prove any damages for the alleged breaches of the duties of care and loyalty" to the partnership and the Estate, his argument depends on his continued misrepresentation that the partnership between him and Dave necessarily ended in 2011, which the Court already rejected in its summary judgment order. ECF No. [615], at 40.

In a footnote here, Defendant argues that damages for breaching his partnership duties must be measured as of Dave's death under RUPA's provisions for buyout of a partner's interest in the partnership. Mot. at 13 n.8. But RUPA's buyout provisions do *not* apply to two-person partnerships where one person dies, because the partnership ceases to be a partnership. *Corrales v. Corrales*, 129 Cal. Rptr. 3d 428, 432 (Ct. App. 2011) (reversing judgment invoking buyout remedy and ordering judicial dissolution of the partnership because, upon withdrawal of one partner from a two-partner partnership, "the partnership dissolved by operation of law"); *Vesco v. San Diego Cmty. Corr. Ctr.*, 2008 WL 2547890, at *1 (Cal. Ct. App. June 26, 2008) ("under the applicable partnership law [RUPA] there can be no dissociation and buyout in a partnership of two individuals as there is no partnership that remains after one leaves"); *Wheatley v. Fink*, 2006 WL 3071451, at *4 (Cal. Ct. App. Oct. 31, 2006) (buyout remedy did not apply to partner departing a two-person partnership).

Moreover, it is undisputed that Defendant did not—in fact—distribute the value of the Estate's interest in the partnership to the Estate as would be required by the buyout provisions, if they applied (again, they do not). Rather than provide a buyout, the surviving partner from a two-person partnership must dissolve the partnership and distribute to the estate of the deceased partner the value of that partner's interest in the partnership. If the surviving partner *instead* retains the partnership's assets—as Defendant did here—he must account to the deceased partner's estate. *See* ECF No. [615], at 76; *Biers v. Sammons*, 242 So. 2d 158, 161 (Fla. 3d DCA 1970) ("if the surviving or remaining partners continue the partnership business with the partnership assets they are required to account to the withdrawing or deceased partner's estate" and "they act as trustees"); *Hilgendorf v. Denson*, 341 So. 2d 549, 551 (Fla. 1st DCA 1977); *see also Matter of Estate of Moore*, 918 N.W.2d 69, 74 (requiring accounting to disassociated partner's estate through a later sale of the partnership property after the partnership had been carried on and not dissolved). Because there is no evidence that the Estate ever received the value of Dave's interest in the

partnership, the appropriate measure of damages is the current value of that interest. *See, e.g.*, *Biers*, 242 So. 2d at 161; *Broward*, 2018 WL 11309825, at *4; *King Mountain Condo Ass'n*, 425 So. 2d at 571.

### E. Ample Evidence Supports Plaintiffs' Fraud Claim.

Defendant argues that Plaintiffs' fraud claim fails because Ira Kleiman came to disbelieve him within months after he contacted Ira, and so Plaintiffs suffered no damages. This argument is both legally and factually erroneous. The Court should reject it for the same reason it rejected these arguments when Defendant raised them in his summary judgment motion. *See* ECF No. [615], at 69-74.

As a legal matter, Defendant ignores that—as the Court observed in its summary judgment order—fraud can result both from affirmative misrepresentations and from omissions. ECF No. [615], at 70. As the Court observed, "nondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact." *Id.* (quotation marks omitted). "The classic illustration of fraud is where one party having superior knowledge intentionally fails to disclose a material fact, which is not discoverable by ordinary observation[.]" *Id.* (quotation marks omitted). Here, Defendant's fraud encompassed both omissions and affirmative misrepresentations. (*See, e.g.*, P241 at 1 (emails among Defendant, his wife, and their agent regarding their deception of Ira Kleiman as of July 2015); P256 at 1 (Defendant in August 2015 representing to Ira Kleiman, "These are things I must sort out this end, however, at any time we believe your involvement or assistance will help you can be assured that I will be on the phone straight away. I am living this every day!"); Trial Tr. Day 4 at 246:7-15.)[17]

As a factual matter, Defendant ignores evidence that Ira Kleiman continued to trust and rely on him into 2015 and only in hindsight determined that Defendant had been lying to him to pilfer the Estate's and W&K's assets without challenge. (*See* P256 at 1 (Ira wrote Defendant in August 2015: "I wish I could believe that you have my best interest at heart as I was first led to believe in your early emails. But after the long delays of promised payments I was to receive each October and the strange offer to purchase my shares from a undisclosed investor, obviously I have

---

[17] Defendant improperly seeks reconsideration of the Court's evidentiary ruling on Plaintiffs' privilege log in a footnote, Mot. at 14 n.9, without citation to any new facts or law supporting reconsideration. In any event, the privilege log prepared by counsel does not support Defendant's argument on reliance including because, as Ira testified (Trial Tr. Day 4 at 114:23-115:6, 197:5-10, 199:20-25), his outreach to an attorney did not relate to any distrust of Defendant.

doubts."); P218 at 1 (Ramona Watts wrote Ira in June 2015 to reassure him and convince him to believe Defendant: "Rest assured we are doing all that we can. We will not give up without a fight – we are working 18 hour days, but at the moment it is taking a toll on our families and our health. It is a struggle.").)

This continued trust was based on Defendant's continuing representations to Ira about waiting for payments. (*See* P156 at 1 ("As for what Dave would do, well it was his idea that we crystallise some of it. This is a return of 10 million – if you think I did not want him to be a part of this you have no idea how much I cared for Dave.... That stated, the returns will get you $4 million a year for the next three years if this is all you want – this isNO matter what occurs in the BTC world.").) Defendant wrote to Ira that after Dave died, Defendant "did the actions [in Australia] to make sure the court signed off on what Dave and [he] had planned." (P160 at 9.) He also urged that he was "not trying to take anything from Dave's estate." (*Id.* at 5; *see id.* at 20.) Ira was ultimately persuaded. (*Id.* at 2 ("alright, thanks for explaining things").) These are all representations that the jury knows turned out to be fraudulent and that reflect the damages to the Estate and W&K including that they "did not later timely challenge those judgments in Australia because of Defendant's statements." ECF No. [615], at 73. As the Court observed in denying Defendant's summary judgment motion, Defendant's arguments that Ira cannot, as a matter of law, have relied on Defendant because he "had counsel in February 2014" for some matter, or "that the parties were 'antagonistic' in February 2014," fail based on the record, including Ira's statement to Defendant in March 2014 that his "family [was] truly blessed to know" Defendant. (P727 at 7.)

As the Court further recognized, there is plentiful evidence of damages from Defendant's fraud. ECF No. [615], at 74.[18] "[O]nce it has been determined that a purchaser acquired property by fraud, any profit subsequently realized by the defrauding purchaser should be deemed the proximate consequence of the fraud." *Pidcock v. Sunnyland Am., Inc.*, 854 F.2d 443, 446 (11th Cir. 1988); *see also Rensel*, 2019 WL 6828270, at *4 ("Here, [defendant] realized profits through the appreciation of the BTC and ETH it acquired from Plaintiffs through fraud. Plaintiffs are entitled to retain the benefit of that appreciation under both Section 12 of the Securities Act and Section 10(b) of the Exchange Act."). The evidence supporting fraud damages that the jury has seen

---

[18] As with damages for Plaintiffs' other claims, Defendant does not challenge the availability of equitable remedies. Nor does he address the availability of punitive damages for fraud.

includes that Defendant and Dave mined over 1.1 million bitcoin together (P172 at 11, 19; P173 at 7; P607 at 49-50), and Defendant "was not the person doing the mining. Dave was." (P149 at 1; *see also* P146 at 1, P464 at 31, P122 at 4.) The potential fraud damages also include "the value of misappropriated intellectual property." ECF No. [615], at 74. As reflected above, that IP was valued years ago at $126 million to $304 million AUD. (P457; Trial Tr. Day 9 AM (Rough) at 109:5-111:14, P166, P183.) And that value has increased to $252 billion USD as of this trial. (Trial Tr. Day 9 AM (Rough) at 109:5-111:14.) As it did on summary judgment, the Court should "reject[] Defendant's argument that Plaintiffs have not been damaged by his alleged fraud." ECF No. [615], at 74.

### F.   Ample Evidence Supports Defendant's Liability and Damages for Constructive Fraud.

As with the fraud and partnership claims, Defendant rehashes his failed arguments on constructive fraud from his summary judgment motion. If the jury concludes that Defendant partnered with Dave, then he owed fiduciary duties to the Estate that could give rise to a constructive fraud claim. *See* ECF No. [615], at 76; *Hallock v. Holiday Isle Resort & Marina, Inc.*, 855 So. 2d 459, 462 (Fla. 3d DCA 2004) (explaining that joint venturers "like co-partners owe to one another . . . the duty of the finest and highest loyalty"); *Biers*, 242 So. 2d at 161. And there is plenty of evidence that Plaintiffs were the "weaker party" in their dealings with Defendant. *See, e.g.*, P160 ("The information I have to work with is what you have told me and the documents from the ATO office."), P241, P246. Furthermore, Defendant's actions with respect to W&K placed him in a fiduciary role for W&K to the extent he was not in one already. *See supra*, § II.C. Both Plaintiffs suffered damages from Defendant's constructive fraud. *See supra*, § II.E.

Defendant also argues that Plaintiffs have not offered evidence to support damages. As he recognizes, however, the purpose of tort damages is to "restore the injured party to the position he would have been in had the wrong not been committed." Mot. at 17 (quotation marks omitted). Constructive fraud provides for similar relief to fraud. *See Am. Honda Motor Co.*, 390 F. Supp. 2d at 1179. For the reasons *supra*, § II.E, Plaintiffs have provided more than sufficient evidence of damages.[19]

---

[19] Defendant also suggests that punitive damages would not be proper, Mot. at 17, but his only argument on this point—that punitive damages rise and fall with compensatory damages—is

### G.  Ample Evidence Supports Damages For Civil Theft.

With respect to Plaintiffs' civil theft claim, Defendant's sole argument is that there is insufficient evidence of civil theft damages. Mot. at 17-18. As Defendant appears to recognize, the proper measures of civil theft damages are the same as for conversion. *See Anthony Distribs., Inc. v. Miller Brewing Co.*, 941 F. Supp. 1567, 1576-77 (M.D. Fla. 1996). Plaintiffs are therefore entitled to request that the jury award them the highest value of the assets taken by Defendant between the time of theft and the present, and evidence of that value is in the record. *See supra*, § II.A.i.

### III.  Defendant's Statute of Limitations Arguments Fail and the Court Should Equitably Estop Defendant From Continuing To Assert His Statute Of Limitations Defenses.

Defendant seeks judgment as a matter of law on his statute of limitations defense, arguing that "[t]o the extent plaintiffs' claims are based on the alleged wrongful transfer of bitcoins," Plaintiffs' claims for conversion, unjust enrichment, and breach of fiduciary and partnership duties "accrued on (or soon after) April 26, 2013 [the date of Dave Kleiman's death], and no later than November 4, 2013 [the date Defendant filed certain contracts in the Australian proceedings]." Mot. at 19. Defendant fails to point out that this Court has already held—twice—that these dates are "the wrong accrual date[s] related to these claims" as a matter of law. ECF No. [68], at 29; ECF No. [615], at 41-46 ("The Australian lawsuits, consequently, did not start the clock on claims to the extent they seek a return of bitcoins."). The Court should reject Defendant's argument once again.

Defendant also seek judgment as a matter of law on fraudulent concealment and equitable estoppel because "there were no communications between Dr. Wright and Ira Kleiman" before February 14, 2014, and because Ira purportedly "began to distrust Dr. Wright" by April 15, 2014. Mot. at 19-20. Defendant does not cite a single case (because there is none) suggesting that fraudulent concealment and equitable estoppel do not apply until the wrongdoer contacts the innocent party, or that tolling ceases immediately when the innocent party starts to question the wrongdoer. Instead, the only cases Defendant cites stand for the unremarkable proposition that, as this Court explained in its summary judgment order, ECF No. [615], at 48, fraudulent concealment

---

inconsistent with Florida law. *See Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1262 (Fla. 2006) ("A majority of the Court (Anstead, Pariente, Lewis, and Quince) concludes that an award of compensatory damages is not a prerequisite to a finding of entitlement to punitive damages.").

requires active and willful concealment. Based on the summary judgment record, the Court held that fraudulent concealment should go to the jury. *Id.* All of that evidence (and more) is now in the trial record. *See* App'x A at 48-51. Accordingly, the Court should deny Defendant's motion and instead grant judgment as a matter of law in Plaintiffs' favor and estop Defendant from continuing to assert his statute of limitations defenses. Alternatively, fraudulent concealment should go to the jury.

### A. Alternatively, the Court should grant Plaintiffs judgment as a matter of law against Defendant's statute of limitations defenses as to the Estate's claims.

As this Court recognized, the statute of limitations for a claim cannot accrue until a plaintiff exists who is able to sue on the claim. *See Doe No. 60 v. G-Star Sch. of Arts, Inc.*, 2017 WL 2212429, at *6 (S.D. Fla. May 19, 2017) ("[T]he Florida Supreme Court in *Berger* first articulated the principal that a cause of action cannot be said to have accrued until there exists some person capable of initiating the action (and some person or entity whom the action could be initiated against)."); *see Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 202 So. 3d 859, 861 (Fla. 2016) (a "cause of action cannot be said to have accrued, within the meaning of the statute of limitations, until an action may be brought") (quotation marks omitted). Thus, for example, "when a person dies before the accrual of a cause of action, the statute of limitations does not begin until the appointment of a personal representative of the estate." Roberto M. Vargas, Fla. Civ. Prac. Before Trial, Statutes of Limitations § 10.5(a) (13th ed. 2020) (citing *Berger v. Jackson*, 23 So. 2d 265, 269 (Fla. 1945) and *Loewer v. New York Life Ins. Co.*, 773 F. Supp. 1518 (M.D. Fla. 1991)); *see, e.g.*, *Onofrio v. Johnston & Sasser, P.A.*, 782 So. 2d 1019, 1021 (Fla. 5th DCA 2001) ("We conclude that the four year statute of limitations began running when Onofrio was appointed as personal representative."); *Matthews v. Matthews*, 177 So. 2d 497, 502 (Fla. 2d DCA 1965) (explaining "that the law in Florida" is that "[w]here a cause of action does not accrue until after the death of one of the parties, the limitations will not begin to run on the claim of the estate of the deceased person until an administrator or executor authorized to collect or enforce payment of the claim has been appointed") (quotation marks omitted).[20]

---

[20] *Accord* Bateman, *et al.*, 18 Fla. Jur. 2d Decedents' Property § 731 (2021 update) ("The statute of limitations does not commence to run on a cause of action accruing after the death of the decedent until a personal representative is appointed with authority to collect or enforce payment of the claim."); Eclavea, *et al.*, 51 Am. Jur. 2d Limitation of Actions § 129 (Feb. 2021 update)

Here, Ira Kleiman was appointed as personal representative of the Estate on February 4, 2016. (*See* P863.) Accordingly, the state of limitations on the Estate's claims did not begin to accrue until 2016. Because it is undisputed that the Estate's claims were filed on February 14, 2018, well within the applicable four- and five-year limitations periods, the Court should grant judgment as a matter of law against Defendant's statute of limitations defenses as to the Estate's claims.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion should be denied, and the Court should grant judgment as a matter of law and equity on Defendant's statute of limitations and laches defenses.

Dated:  November 19, 2021

Respectfully submitted,

By:___ */s/ Andrew Brenner*_____
Maxwell V. Pritt
Alexander J. Holtzman
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, Floor 41
San Francisco, CA 94104
mpritt@bsfllp.com
aholtzman@bsfllp.com

Andrew S. Brenner
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

Velvel (Devin) Freedman
**ROCHE FREEDMAN LLP**
200 S. Biscayne Blvd.
Suite 5500 Miami, Florida 33131
vel@rcfllp.com

---

(same); George Blum, *et al.*, 31 Am. Jur. 2d Executors and Administrators § 1099 (2021 update) (same).

Kyle W. Roche
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, New York 10016
kyle@rcfllp.com

*Counsel to Plaintiffs Ira Kleiman as*
*Personal Representative of the Estate of*
*David Kleiman and W&K Info Defense*
*Research, LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 19, 2021 a true and correct copy of the foregoing was filed with CM/ECF, which caused a copy to be served on all counsel of record.

*/s/ Andrew Brenner*
Andrew Brenner