**Application Notice**

- You must complete Parts A **and** B, **and** Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| In the | High Court of Justice Business and Property Courts of England and Wales Commercial Court (QBD) |
|---|---|
| **Claim No.** | |
| **Warrant no.** (if applicable) | |
| **Claimant(s) / Applicants** (including ref.) | (1) Mr. Ira Kleiman, as the personal representative of the Estate of David Kleiman (2) W&K Info Defense Research, LLC |
| **Defendant(s) / Respondent(s)** (including ref.) | Mr. Andrew O'Hagan |
| **Date** | 11 November 2019 |

### You should provide this information for listing the application

Time estimate          (hours)          (mins)

Is this agreed by all parties?  Yes [ ]     No [X]

Please always refer to the Commercial Court Guide for details of how applications should be prepared and will be heard, or in a small number of exceptional cases can be dealt with on paper.

**The Claimants believe that the application can and should be dealt with on paper.**

## Part A

**1. Where there is more than one claimant or defendant, specify which claimant or defendant**

The Claimants/Applicants

**2. State clearly what order you are seeking (if there is room) or otherwise refer to a draft order (which must be attached)**

intend to apply for an order without notice (a draft of which is attached) that pursuant to Section 2(2) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, and CPR 34.17 and 34.18(b), the Respondent:

a. be examined by way of deposition, in a manner consistent with the United States Federal Rules of Civil Procedure relating to the examination and cross-examination of witnesses, before Mr Allen Dyer, an examiner of the Court, at the offices of Boies Schiller Flexner (UK) LLP, 5 New Street Square, London, EC4A 3BF, for a period of no longer than 7 hours, at a date and time to be agreed between the Applicant and the Respondent, on certain categories of questions; and

b. produce certain categories of documents;

for use in proceedings instituted in the United States District Court, Southern District of Florida.

**3. Briefly set out why you are seeking the order. Identify any rule or statutory provision**

For the reasons more fully set out in the attached Witness Statement of Velvel Freedman dated 11 November 2019.

The court office at the Admiralty and Commercial Registry, The Rolls Building, 7 Rolls Building, Fetter Lane, London, EC2A 1NL is open from 10am to 4.30pm Monday to Friday. When corresponding with the court please address forms or letters to the Clerk to the Commercial Court and quote the claim number.

**14**

N244 (CC) Application Notice (04.14)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v2.0

## Part B

The Claimants wish to rely on: *tick one:*

the attached witness statement [X]
(the claimant)(the defendant)'s[1] statement of case [ ]
evidence in Part C overleaf in support of this application [ ]

| Signed | | Position or office held (if signing on behalf of firm, company or corporation) | Partner, Boies Schiller Flexner (UK) LLP |
|---|---|---|---|
| | Applicant's legal representative | | |

Address to which documents about this claim should be sent (including reference if appropriate)[4]

| 4. If you are not already a party to the proceedings, you must provide an address for service of documents | Boies Schiller Flexner (UK) LLP 5 New Street Square London Ref: 15000.0056 | | if applicable | |
|---|---|---|---|---|
| | | | Tel no. | 020 3908 0800 |
| | | | Fax no. | |
| | | | DX no. | |
| | Postcode | EC4A 3BF | e-mail | mgetz@bsfllp.com; kfearnside@bsfllp.com |

**15**

Claim No. [                    ]

## Part C

**(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)**

*(The claimant)(The defendant)[(1)] wishes to rely on the following evidence in support of this application:

[                                                                              ]

---

**Statement of Truth**

*The applicant believes that the facts stated in this application notice are true

*I am duly authorised by the applicant to sign this statement

Full name MATTHEW HOWARD GETZ

Name of Applicant's legal representative

| Signed | *mmhs* | Position or office held | Partner, Boies Schiller Flexner (UK) LLP |
|---|---|---|---|
| | Applicant's legal representative | (If signing on behalf of firm, company or corporation) | |
| *delete as appropriate | | Date | 11/11/19 |

**16**

<div align="right">

Applicants
Velvel (Devin) Freedman
First VDF1
11 November 2019

</div>

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**Claim No.: [●]**

**BETWEEN:**

*IRA KLEIMAN, as the personal representative of the Estate of*
*David Kleiman, and W&K Info Defense Research, LLC*                    **Applicants**

-and-

**Respondent**

*ANDREW O'HAGAN*

_____

**FIRST WITNESS STATEMENT OF VELVEL (DEVIN) FREEDMAN**

_____

**I, Velvel (Devin) Freedman,** of Roche Freedman LLP, 200 South Biscayne Boulevard, Suite 5500, Miami, Florida 33131, United States of America **WILL SAY** as follows:

1. **INTRODUCTION**

1.1     I am a Partner of Roche Freedman LLP, which acts for Ira Kleiman, as the personal representative of the Estate of David Kleiman, and for W&K Info Defense Research, LLC (the "**Applicants**"), who are the plaintiffs in litigation in the United States District Court Southern District of Florida (the "**SDF Court**") against Dr Craig Wright (the "**Defendant**") as defendant (Case No.: 9:18-cv-80176-BB) (the "**SDF Proceedings**").

1.2     In the SDF Proceedings, the Applicants allege that the Defendant has unlawfully withheld Bitcoins and intellectual property assets rightfully belonging to the Applicants.  I am the attorney with knowledge of the conduct of the SDF Proceedings on behalf of the Applicants and am duly authorised to make this witness statement on their behalf.

1.3     Save where otherwise stated, the facts and matters contained in this witness statement are based upon information provided to me by the Applicants and are true to the best of my knowledge and belief.  Nothing in this witness statement is intended to constitute any waiver of privilege.

1.4     There is now shown to me marked "**VDF1**" a bundle of copy documents to which I refer in this statement by page numbers in square brackets.

**17**

2.   **APPLICATION**

2.1   This Application (the "**Application**") is made pursuant to s.1 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "**1975 Act**") and Part 34 of the Civil Procedure Rules (the "**CPR**") in pursuance of a request issued by the SDF Court by way of a sealed Letter of Request dated 22 July 2019 (the "**Letter of Request**") [**VDF1/1-16**], for an order that Mr Andrew O'Hagan:

(a)   Be examined by way of deposition in a manner consistent with the US Federal Rules of Civil Procedure before an examiner of the Court to be appointed pursuant to CPR 34.18(1)(b), at the offices of Boies Schiller Flexner (UK) LLP, 5 New Street Square, London EC4A 3BF (the "**O'Hagan Deposition**"); and

(b)   Produce certain categories of documents (described more fully at paragraphs 4.13 below, pursuant to s. 2(2)(b) of the 1975 Act (the "**O'Hagan Documents**") (together, the "**O'Hagan Evidence**").

2.2   I believe that the Hon. Bruce E. Reinhart, United States Magistrate Judge has fully considered the matters in dispute and the requests as set out in the Letter of Request and considers the evidence sought to be relevant to the proceedings. As Judge Reinhart noted in the first page of the Letter of Request: "*The Court has presided over this matter since February 2018 and has carefully reviewed the categories of evidence listed below and considers the evidence sought is directly relevant to the issues in dispute and is not discovery within the meaning of Article 23 of the Hague Evidence Convention, that is, discovery 'for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.'*" [**VDF1/1**]

2.3   In this Witness Statement, I set out the following:

(a)   A short background to the SDF Proceedings for which the O'Hagan Evidence is required to be taken (paragraphs 3.1 to 3.4);

(b)   The expected contents and nature of the O'Hagan Evidence and how it will be relevant for trial in the SDF Proceedings (paragraphs 4.1 to 4.20);

(c)   Why an order to take the O'Hagan Evidence would be proportionate in respect of the Court's overriding objective (paragraphs 5.1 to 5.2); and

(d)   An explanation of the relevant US federal rules relating to evidence in federal civil actions, and why the O'Hagan Deposition would be permitted as evidence at trial under those rules (paragraphs 6.1 to 6.16).

3.   **BACKGROUND TO THE SDF PROCEEDINGS**

3.1   By a Complaint in the SDF Proceedings dated 14 February 2018 (the "**Complaint**" [**VDF1/17-54**], and by an amended Complaint dated 14 May 2018 (the "**Amended Complaint**") [**VDF1/55-107**], and a second amended Complaint dated 14 January 2019 (the "**Second Amended Complaint**") [**VDF1/108-156**], the Applicants commenced an action for damages and other equitable relief in the SDF Court against Dr Wright.

3.2   The Applicants allege that Dr Wright has unlawfully taken bitcoins and intellectual property assets rightfully belonging to the Applicants, and claim that his actions amount to conversion,

**18**

2

unjust enrichment, breach of fiduciary duty, breach of partnership duties of loyalty and care, and fraud. As at the date of filing the Second Amended Complaint, the value of these assets exceeded $11.4 billion; at their highest potential value, they could be worth more than $27 billion (before punitive or treble damages, which may be available in the SDF Court).

3.3     The full details of the claims set forth in the SDF Proceedings are set out in the Second Amended Complaint. In brief:

   (a)     The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent a protocol to a mailing list of cryptography enthusiasts. The Defendant has alleged that he is Satoshi Nakamoto [**VDF1/140-141**].

   (b)     Mr David Kleiman and the Defendant were friends and business partners. Together, they developed the Bitcoin technology, and between 2009 and 2013 mined a large amount of Bitcoin for their joint benefit [**VDF1/111, 120, 121-127, 252-261**].

   (c)     Mr David Kleiman died on 26 April 2013 [**VDF1/111**]. At that point, the Bitcoin mined by the Defendant and Mr Kleiman was not worth as much as it is today.

   (d)     The Defendant then took possession and control of the Bitcoins and bitcoin-related intellectual property which rightfully belonged to the Applicants. [**VDF1/111**] He did so through various means, including by forging a series of contracts that purported to transfer all the bitcoins and intellectual property assets to the Defendant and/or companies controlled by him. [**VDF1/111, 131**]

   (e)     In May 2014, the Defendant disclosed to Mr Ira Kleiman that he had partnered with Mr David Kleiman to create Bitcoin, to mine Bitcoin, and to create valuable intellectual property, but claimed that Mr David Kleiman had signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company [**VDF1/111-112, 120, 262-265**] The Second Amended Complaint alleges that the Defendant knew this to be untrue. [**VDF1/112**]

   (f)     In May 2016, the defendant publicly revealed himself and Mr David Kleiman as the creators of Bitcoin. [**VDF1/118**]

   (g)     To date, the Defendant has not returned any of the mined bitcoins or intellectual property rights belonging to the Applicants. [**VDF1/112**]

3.4     The pleadings in the SDF Proceedings have closed, and trial has been set for March 2020. The current deadline for disclosure (known as "discovery" in the United States) is set for 3 January 2020. The Applicants have not made this Application before now because until recently the parties were engaged in good faith settlement discussions and had reached a non-binding settlement in principle [**VDF1/266-268, 269-270**], for which reason the SDF Court had partially granted the parties' joint requests for extensions of time [**VDF1/271-273, 274-275**]. On 30 October 2019, the Applicants were informed that the Defendant could not finance the settlement [**VDF1/416**], and the parties have returned to active litigation. The Applicants therefore request that this Application be granted as a matter of urgency.

**19**

4.     **EXPECTED CONTENTS AND NATURE OF THE O'HAGAN EVIDENCE**

4.1    Andrew O'Hagan is a reputable, thorough and highly regarded author. He has authored numerous fiction and non-fiction books and won numerous prestigious prizes for his work [**VDF1/411-414**]. Mr O'Hagan is the author of *The Satoshi Affair* [**VDF1/157-251**], a book-length article published in the *London Review of Books* in June 2016. *The Satoshi Affair* contains much information relevant to the SDF Proceedings.

4.2    In *The Satoshi Affair*, Mr O'Hagan writes in detail about Dr Wright's claims to have invented Bitcoin and his relationship with Mr David Kleiman.

4.3    The primary source of Mr O'Hagan's article was hours of conversation with the Defendant, much of which was recorded. [**VDF1/181**] Mr O'Hagan also interviewed and may have recorded numerous other individuals[1] with knowledge of the subject matter of the Second Amended Complaint, including the Defendant's relationship with Mr David Kleiman.

**4.4**    Mr O'Hagan was also sent written communications and provided with evidence relating to Dr Wright and Mr Kleiman from various parties. [**VDF1/164, 167, 169, 170,176,250**].

4.5    The article itself includes evidence relevant to the Applicants' claim, and has already been cited as evidence in the Second Amended Complaint. For example: "*[The Defendant] has readily admitted [Mr David Kleiman] was intimately involved in the creation of Bitcoin. In numerous interviews with Andrew O'Hagan, documented in The Satoshi Affair, [the Defendant] told O'Hagan that '[the Defendant] did the coding and that Kleiman helped him to write the white paper'*" [**VDF1/140-141**].

4.6    The raw material of the article – the Defendant's own words, those of others, and original documentation – will prove invaluable to the SDF Proceedings in two ways. First, it will enable the SDF Court to verify the accuracy of evidence derived from the article. Second, the raw material is likely to contain further relevant evidence that Mr O'Hagan chose not to include in the published version of *The Satoshi Affair*. Mr O'Hagan referred to such material in the article: "*There were many things that were said to me by every party in this story that I would choose not to print. Not only things they said about one another, but business arrangements and unsubstantiated allegations about the past, and things I knew in the present. But I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December. Now I was being told that my material was too hot and my story posed a threat.*" [**VDF1/245**]. Mr O'Hagan also stated: "*In fairness to Wright, Matthews might just have been running his mouth off, and I've left out the worst of what he said, now and later.*" [**VDF1/204**]

4.7    The Defendant has claimed in a deposition that *The Satoshi Affair* is a "*work of fiction*" and has made numerous statements at odds with statements he is reported in *The Satoshi Affair* as having made [**VDF1/279, 285**].

---

[1]    These include (a) Mr Stefan Matthews [**VDF1/158,160, 163, 165-169, 203-205, 208, 211, 218-220**]; (b) Mr Allan Pederson [**VDF1/159, 162, 195-200**]; (c) Mr Robert MacGregor [**VDF1/167-173, 185, 198-199, 205-206, 209-210, 218, 220-221, 239-240, 249**]; and (d) (e) Mr Gavin Andresen [**VDF1/216-221**]. , Mr O'Hagan noted that he had "*many hours of tape*" and wrote, "*But I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December.*" [**VDF1/181, 245**].

**20**

**Documentary Evidence**

4.8    The Applicants seek the production of certain documents or limited categories of documents, all of which fall within the scope of the Letter of Request [**VDF1/1-16**]. The Applicants expect these documents to be used in trial, as they are likely to be highly probative of numerous elements of the Second Amended Complaint.

4.9    The Letter of Request seeks categories of documents rather than identifying individual documents. As a matter of US federal law, this is standard and permissible. By issuing the Letter of Request, the SDF Court has shown that it considers the categories in the Letter of Request to be relevant, appropriate and proportionate to the matter. I also understand that requests for documents from the English courts in aid of foreign proceedings, whether set out as single documents or categories, should be as specific as possible. In certain instances, therefore, the Applicants propose alternative, narrower categories than those articulated in the Letter of Request.

4.10    As a preliminary point, the requests are by definition narrowly tailored since they all relate solely to documents prepared or received in connection with a single article: *The Satoshi Affair*.

4.11    I set out here the categories described in the Letter of Request [**VDF1/5**], explain why each category of documents is relevant, and where appropriate propose alternative, narrower categories.

4.12    I understand that the English High Court case of *Atlantica Holdings, Inc et al v Sovereign Wealth Fund et al* [2019] EWHC 319 (QB) states at paragraph 80 that "*[i]f an examination of the terms of the [Letter of Request] and any other relevant material shows that the matter has been considered on the merits by the requesting court, and the topics found by it to be relevant, then the English Court should respect that determination because the requesting court is in the best position to judge relevance*". As noted above at paragraph 2.2, Judge Reinhart, who has extensive knowledge of the SDF Proceedings, considered the evidence requested and determined that the evidence sought is directly relevant to the issues in dispute.[2] Given that, I consider this Court should respect Judge Reinhart's determination and grant this Application. Nonetheless, in order to help the Court consider the Application, I set out in detail why the requested categories (and later, the subjects for questioning in deposition) are relevant.

4.13    The topics are as follows:

    (a)    *All video and/or audio recordings of interviews related to Mr O'Hagan's work in writing The Satoshi Affair. Specifically, including, but not limited to, the "many hours of tape"* [**VDF1/181**] *of the Defendant referenced in The Satoshi Affair.*

---

[2]    *Cf. Atlantica Holdings, Inc et al v Sovereign Wealth Fund et al* [2019] EWHC 319 (QB) at paragraphs 99-100 ("*These paragraphs are an explicit statement that Judge Furman considered the topics and found them to be relevant. I completely reject the suggestion that I should infer he merely rubber-stamped the Plaintiffs' application without applying his mind to the merits. Ms Fatima at one point in her submissions said that there was 'no evidence' that the judge had considered relevance. The short answer is that there did not need to be. The LORs are, as I have said, written by the judge in the first person and they contain his reasoning and conclusions that the topics are relevant. Nothing more is required, any more than it would be if this Court were to issue an LOR to Judge Furman setting out a list of topics said to be relevant to litigation here. In conclusion, I am entirely satisfied that the issue of relevance was considered on the merits by Judge Furman and the topics found by him to be relevant, and thus that as a matter of comity I must respect that determination because he was in the best position to judge relevance.*")

<div align="right">21</div>

(i)　　These recordings will enable the SDF Court to assess the accuracy and veracity of the contents of *The Satoshi Affair*, which is already evidence in the SDF Proceedings, as well as the reliability of the Defendant's evidence. This is especially important since the Defendant has claimed the article is a work of fiction (see above, paragraph 4.7).

(ii)　　The recordings are also expected to include further relevant information relating to the following topics, each of which was part of the final published version of *The Satoshi Affair*:

    (A)　　the creation of Bitcoin and Dave Kleiman's participation therein[**VDF1/164, 180-181, 186, 192-193**];

    (B)　　the personal and business relationship between the Defendant and Mr David Kleiman, including W&K Info Defense Research, and how they all conducted their Bitcoin mining activities and intellectual property research and development [**VDF1/121**, **181, 185-187, 192**];

    (C)　　the Bitcoin allegedly mined by the Defendant and Mr David Kleiman [**VDF1/191**];

    (D)　　the Tulip Trusts and any other trusts into which the Defendant purportedly placed Bitcoin mined by him and Mr David Kleiman (the "**Trusts**") [**VDF1/190**]; and

    (E)　　the intellectual property alleged to have been created by the Defendant and Mr David Kleiman. [**VDF1/186-187**]

(iii)　　**Alternatively**, the Court may require that Mr O'Hagan produce only those parts of the recordings that relate to the above topics. However, such an order may be more burdensome on Mr O'Hagan, as he will be required to conduct an extensive search, which the Applicants would be better placed to conduct.

(b)　　*All documents relied on or reviewed in preparing for, and drafting, The Satoshi Affair. This includes contemporaneous notes taken by Mr O'Hagan or others, and any documents or communications reviewed or relied upon when preparing the story.*

(i)　　The request for *"contemporaneous notes"* should be read as *"contemporaneous notes of interviews"*.

(ii)　　These documents would be useful at trial for the same reasons set out above.

(iii)　　**Alternatively**, the Court may require that Mr O'Hagan produce only those parts of the documents that relate to the topics set out in paragraph 4.13(ii). However, such an order may be more burdensome on Mr O'Hagan, as he will be required to conduct an extensive search, which the Applicants would be better placed to conduct.

**22**

(iv)     Further, in respect of the request for contemporaneous notes, the Court may **alternatively** require that Mr O'Hagan produce only notes of interviews for which recordings do not exist.

(c)     *All emails between Mr O'Hagan, and each of the Defendant, Ms. Ramona Watts, Mr Robert MacGregor, Mr Stefan Matthews or Mr Calvin Ayre.*

(i)     The relevance of e-mails with the Defendant is clear. As one example, the Defendant sent Mr O'Hagan copies of numerous emails between him and Mr David Kleiman [**VDF1/187, 190, 191**].

(ii)     The Respondent may consider that he does not need to produce certain communications with the Defendant because the Defendant has disclosure obligations in the SDF Proceedings which would include producing relevant emails between himself and the Respondent (and he has in fact produced some emails). Nonetheless, we do not consider this request will duplicate what the Applicants already have received in discovery, for the following reasons.

(A)     *First*, the Defendant has not always conducted himself honestly in the SDF Proceedings, including in regard to documents. The Applicants therefore consider it likely that he has not honestly and diligently observed his disclosure obligations. I understand this is a serious allegation to make, but it is supported by the evidence, including findings of both a US Magistrate Judge and a District Judge.

(B)     In March 2019, after the Defendant moved to dismiss the case[3] based on new allegations as to who the members of the W&K Applicant were,[4] United States District Judge Beth Bloom denied the Defendant's motion, stating the following: "*Indeed, the Court notes that the defendant has made **several conflicting statements** regarding even his own ownership of W&K.... Unfortunately, the record is replete with instances in which the defendant has proffered conflicting sworn testimony before this Court. In weighing the evidence, the Court simply does not find the defendant's testimony to be credible.*" (emphasis in the original) [**VDF1/300-301, 306**]

There was credible evidence that the Defendant attempted to use at least two forged documents in support of his allegations.[5]

---

[3]     In US terms, he moved for judgment on the pleadings.

[4]     If it could be shown that there were non-American members of the W&K Applicant, that would have shown there was not complete "*diversity of citizenship*" and would have defeated the subject matter jurisdiction of the US federal court.

[5]     The first document (referred to in the relevant papers as "Exhibit A") purported to be an email between Mr David Kleiman and Uyen Nguyen sent on 20 December 2012. A computer science expert retained by the Applicants found the following, which he testified in two sworn affidavits to the SDF Court: "*This email [Exhibit A] includes a digital signature allegedly belonging to Dave Kleiman as an attempt to prove its authenticity. Based on my analysis of this document and the signature on it, this document was digitally signed in early 2014, almost a year after Dave Kleiman died.... I have also conducted a forensic analysis of Exhibit F to Defendant's Motion for Judgment on the Pleadings (ECF No. [144-6], hereafter referred to as "Exhibit F") and determined that it was created by further modifying Exhibit A to make it appear as if Exhibit F is actually a separate email sent from Dave Kleiman*

**23**

(C)     Further, in an order dated 27 August 2019 sanctioning the Defendant for failing to comply with an earlier court order, US Magistrate Judge Reinhart found: "*There was substantial credible evidence that documents produced by Dr. Wright to support his position in this litigation are fraudulent. There was credible and compelling evidence that documents had been altered… [T]here is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents.*" [**VDF1/351-352**]. Further, "*the evidence establishes that he has engaged in a willful and bad faith pattern of obstructive behavior, including submitting incomplete or deceptive pleadings, filing a false declaration, knowingly producing a fraudulent trust document, and giving perjurious testimony at the evidentiary hearing . . . I have found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony.*" [**VDF1/358-359**]

(D)     If the Defendant is willing to submit fraudulent documents in order to help his defence, there is a good chance that he will conceal documents that do exist in order to avoid harming his defence. Therefore, the Court should require the Respondent to produce the requested emails.

(E)     *Second*, in the ordinary course of things, emails are sometimes deleted, mislaid, or not found when looked for (perhaps because of being poorly located or not including expected keywords). Therefore, it is to be expected that the sets of responsive emails held by the Respondent and the Defendant would not be identical.

(iii)   The Applicants no longer seek emails between Mr O'Hagan and Mr Ayre.

(iv)    The other individuals named above would have relevant knowledge, which can be expected to be revealed in the emails, as follows:

(A)     Ms Watts is the Defendant's wife and has been involved in his companies since approximately 2011 [**VDF1/286, 363**]. She shared information with Mr O'Hagan relating to issues in the SDF Proceedings, including the creation of Bitcoin and the Trusts, and

---

to Uyen Nguyen, when, in my opinion, it is simply another revision to the PDF created from an email the Defendant sent to himself on or about April 16, 2014. In sum, Exhibit A and Exhibit F, which appear to be emails sent from Dave Kleiman to Uyen Nguyen on December 20, 2012, are manipulations of a PDF created from an email the Defendant sent from himself to himself on or about April 16, 2014." (footnote omitted) [**VDF1/ 321, 310**]. The Court was not required to determine whether the expert was correct, because the Defendant, after including both documents as exhibits to his motion to dismiss the case, then withdrew both documents, one at the hearing to decide the motion. [**VDF1/302**]. But the Court nonetheless indicated its concerns about the Defendant's behaviour thus: "*The Court also notes that the emails in question were produced by the defendant during discovery. The defendant, however, is not the sender, recipient, nor copied to the emails. At the Hearing, given that the Defendant claims he has not been in contact with Nguyen "in years," the Court questioned how the defendant came into possession of the emails. The Defendant claimed he received them as "records" from companies when he left Australia.*" [**VDF1/302-303**]          **24**

communicated with Mr O'Hagan, *inter alia*, by email [**VDF1/173, 245, 250**].[6]

(B)    Mr MacGregor was the Defendant's business partner and was made privy to details about the creation and mining of Bitcoin by the Defendant and Mr David Kleiman, and intellectual property developed by them [**VDF1/167, 289**]. He was a *"generous source of information"* to Mr O'Hagan, and shared information with Mr O'Hagan relating to issues in the SDF Proceedings, including the creation of Bitcoin, Satoshi Nakamoto, the Trusts, and the intellectual property created by the Defendant and Mr David Kleiman, and communicated with Mr O'Hagan, *inter alia*, by email [**VDF1/167, 172-173,199, 249**].

(C)    Mr Matthews is an IT expert and a long-time friend of the Defendant [**VDF1/163**] who cooperated with Mr O'Hagan in the process of compiling information for the authoring of *The Satoshi Affair*, including by giving him evidence [**VDF1/167**]. He shared information with Mr O'Hagan relating to issues in the SDF Proceedings, including the creation of Bitcoin, Mr David Kleiman, and the Trusts [**VDF1/166, 205, 207, 249**].

(v)    **Alternatively**, the Court may require that Mr O'Hagan produce only those parts of the emails that relate to the topics set out in paragraph 4.13(ii). However, such an order may be more burdensome on Mr O'Hagan, as he will be required to conduct an extensive search, which the Applicants would be better placed to conduct.

(d)    *All drafts of The Satoshi Affair, any edits received, and comments thereto.*

(i)    The Applicants no longer seek this category of documents.

4.14    I consider that these documents are in Mr O'Hagan's possession based on the following averments he made in *The Satoshi Affair*:

(a)    For all stories written under his name, including *The Satoshi Affair*, Mr O'Hagan takes notes and makes recordings; he made *"many hours of tape"* in preparing for the article [**VDF1/169, 181**];

(b)    Mr O'Hagan sent and received emails to and from Dr Wright [**VDF1/184-187**];

(c)    Mr O'Hagan sent and received emails to and from Mr MacGregor [**VDF1/167, 198-199, 209**].

(d)    Mr O'Hagan sent emails to and received evidence from Mr Matthews [**VDF1/167, 205**].

(e)    Mr O'Hagan received emails from Ms Watts [**VSF1/250**].

---

6    The Applicants are seeking a separate order from the Court under CPR 34 to acquire evidence from Ms Watts.

**25**

4.15   I am aware that English law generally protects a journalist from disclosing his sources unless such disclosure is deemed to be in the interests of justice. For the avoidance of doubt, and without making any admission that *The Satoshi Affair* is a work of journalism, the Applicants do not seek, either through the O'Hagan Documents or the O'Hagan Deposition, the disclosure by Mr O'Hagan of any hitherto-undisclosed source. If, which is unexpected, it later emerges that the identity of such a source becomes relevant to any of the issues in the SDF Proceedings, the Applicants will seek agreement with Mr O'Hagan in that regard, or will return to the Court for a further order.

**Deposition**

4.16   The Applicants seek to take a deposition of Mr O'Hagan, over a period of one day not to exceed seven hours, at the offices of Boies Schiller Flexner (UK) LLP in London, or another venue convenient for Mr O'Hagan and suitable for the taking of a deposition.

4.17   The Applicants expect to use the O'Hagan Deposition as evidence at trial. As explained at paragraph 6.10, the relevant United States federal laws of evidence would allow the Applicants to use portions of the O'Hagan Deposition as part of their evidence if Mr O'Hagan is unavailable to testify at trial.

4.18   The deposition of Mr O'Hagan will be limited to the issues set out in the Letter of Request. Although, as noted, Judge Reinhart has already determined relevance, I explain why each issue is relevant below:

(a)   *Mr O'Hagan's educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contact he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).*

(i)   This evidence will be useful for the SDF Court in determining the reliability and trustworthiness of Mr O'Hagan and the contents of *The Satoshi Affair*.

(b)   *The accuracy of the quotes and factual assertions contained within his article The Satoshi Affair.*

(i)   As noted, *The Satoshi Affair* has already been proferred in evidence in the SDF Proceedings. This evidence will assist the SDF Court in assessing its reliability, veracity and weight as evidence, and the reliability of the Defendant's evidence, especially in light of his characterisation of the article as a work of fiction (see above, paragraph 4.7).

(c)   *Statements made, or documents provided, by Mr Wright (and his agents), Ms Lynn Wright* [**VDF1/188-189**]*, or Ms Watts* [**VDF1/171-174, 180, 244-247**] *that relate to Satoshi Nakamoto, the creation of Bitcoin, Mr David Kleiman, W&K Info Defense Research, the Tulip Trusts, the Bitcoin allegedly mined by Mr Wright and/or Mr David Kleiman, and the intellectual property alleged to have been created by Mr Wright and/or Mr David Kleiman.*

(d)   *Statements made, or documents provided, by anyone interviewed in connection with the drafting of The Satoshi Affair that relate to Satoshi Nakamoto, the creation of Bitcoin, Mr David Kleiman, W&K Info Defense Research, the Tulip Trusts, the Bitcoin*

26

*allegedly mined by Mr Wright and/or Mr David Kleiman, and the intellectual property alleged to have been created by Mr Wright and/or Mr David Kleiman.*

*(i)* These two issues can be considered together. Each of the topics noted is highly specific, was written about by Mr O'Hagan in *The Satoshi Affair*,[7] and is clearly relevant to the Applicants' allegations regarding the partnership between the Defendant and Mr David Kleiman, the Bitcoins and intellectual property generated as a result thereof, and the actions taken by the Defendant in respect of the Bitcoins.

*(ii)* Ms Wright is the Defendant's former wife. She shared information with Mr O'Hagan relating to issues in the SDF Proceedings, including the relationship between the Defendant and Mr David Kleiman [**VDF1/188-189**].

4.19 In accordance with the English case cited previously, *Atlantica Holdings, Inc et al v Sovereign Wealth Fund et al* [2019] EWHC 319 (QB), I believe that the issues are sufficiently specific and certain.

4.20 I also consider that all these issues are within Mr O'Hagan's personal knowledge since they relate to his personal background and dealings, and to an article that he prepared and wrote.

5. **PROPORTIONALITY**

**Previous Steps Taken By the Applicants to Obtain the O'Hagan Evidence**

5.1 Matthew Getz, a partner at Boies Schiller Flexner (UK) LLP in London, previously made attempts to contact Mr O'Hagan through his literary agent, Peter Straus of Rogers, Coleridge & White. Mr Getz sent emails to Mr Straus on 23 and 31 July 2018 [**VDF1/366-367**]. The emails were not answered.

**Cost and Proportionality**

5.2 I understand that the courts in England and Wales look, under CPR 1.1, to the overriding objective of ensuring that cases are dealt with justly and at proportionate cost. Granting the Applicants' Application would, in my view, meet this objective for the following reasons:

(a) **Equal footing:**

(i) Mr O'Hagan is a well-known and well-respected author whose work appears in prestigious publications around the world. He will not be at a disadvantage vis-à-vis the Applicants.

(ii) Mr O'Hagan is the only person able to provide the recordings that he created as part of the process of writing *The Satoshi Affair*, verify under oath that the statements attributed to Craig Wright therein are accurate, and provide relevant documents and emails he received in connection with the drafting of *The Satoshi Affair*.

---

[7] See paragraph 4.5 above.

**27**

    (iii)    Mr O'Hagan will not need to fear widespread disclosure of his working papers. A protective order has been entered in this case by the SDF Court allowing any party to designate testimony or documents as confidential, if appropriate, in order to protect confidentiality and privacy [**VDF1/368-385**]. To the extent necessary, the Applicants are willing to work with Mr O'Hagan to see if any such material requires such designation.[8]

    (iv)    By contrast, the Applicants would be seriously disadvantaged in their pursuit of justice in the SDF Proceedings if they were unable to obtain the O'Hagan Documents and testimonial evidence.

(b)    **Saving expense**:

    (i)    Ordering production of the O'Hagan Documents will not create disproportionate expense for Mr O'Hagan (or any party) as these are documents already in his possession, and relating to a single article. The Applicants seek to depose Mr O'Hagan for a maximum of seven hours, on a mutually convenient date. The Applicants propose that the Deposition take place at the offices of their solicitors in London, the city in which Mr. O'Hagan lives and works.

    (ii)    The Applicants, on the other hand, have already incurred substantial expense in the SDF Proceedings, in obtaining the Letter of Request and in bringing this present application, in order to recover the assets which the Defendant has unlawfully taken. It would also be more expensive for the Applicants to seek to procure the information from each named source, especially as many of the sources will not have taken notes or recorded the conversation.

(c)    **Proportionality**: An order from this Court to obtain the O'Hagan Documents is proportionate for the following reasons:

    (i)    <u>Amount of money involved</u>: the Applicants allege that the Defendant has unlawfully taken assets worth at least $11 billion.

    (ii)    <u>Importance of the case</u>: this case is plainly a significant case, involving very large sums of money and the genesis of one of the most important financial and technological innovations of our time. The case has generated significant media attention.

    (iii)    <u>Financial position of each party</u>: We are not aware of Mr O'Hagan's financial position. However, complying with an order from the Court should not significantly affect him, as the Applicants would pay for the reasonable costs of copying and transmitting the O'Hagan Documents (and will pay Mr O'Hagan's costs of attending the deposition, as per CPR 34.8(6)). Mr Ira Kleiman is not wealthy [**VDF1/387**], and W&K Info Defense Research, LLC has no assets available to it.

---

[8]    The materials will of course not be confidential as to the Defendant or the SDF Court.

**28**

(d)   **Ensuring the application is dealt with expeditiously and fairly**: The Applicants are willing to provide all necessary assistance to Mr O'Hagan in order to facilitate the production of the O'Hagan Documents and the taking of the O'Hagan Deposition.

6.   **RELEVANT US FEDERAL EVIDENCE RULES**

**Federal Rules of Civil Procedure**

6.1   The Applicants seek an order that Mr O'Hagan's evidence should be taken as a deposition in accordance with the US Federal Rules of Civil Procedure. CPR 34.18(2)(a) permits the Court to order a deposition under rules other than the CPR. It is my understanding that the English courts will usually allow foreign rules for evidence-taking so long as they do not conflict with basic English principles. It may therefore assist the Court if I explain the nature of US depositions briefly, albeit that I anticipate the Court will already enjoy considerable familiarity therewith.

6.2   I emphasise that in this section, and in the section of my statement below addressing the differences between the English and US procedural rules, I am seeking to provide an overview only; this does not purport to be an exhaustive analysis, which would of course run to many pages.

6.3   In civil litigation in the United States, depositions are routinely employed as a way to procure admissible evidence to be used at trial and obtain relevant information related to the case. In the federal court system, both parties have an automatic right and power to subpoena 10 witnesses each, and to take their deposition.

6.4   Specifically, for litigation in the federal courts, Rule 30(a)(1) of the Federal Rules of Civil Procedure ("**Fed. R. Civ. P.**") states:

*"A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). The deponent's attendance may be compelled by subpoena under Rule 45."*

[VDF1/394]

6.5   Rule 30(a)(2), Fed. R. Civ. P. states:

*"A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2): (A) if the parties have not stipulated to the deposition and: (i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants; (ii) the deponent has already been deposed in the case; or (iii) the party seeks to take the deposition before the time specified in Rule 26(d), unless the party certifies in the notice, with supporting facts, that the deponent is expected to leave the United States and be unavailable for examination in this country after that time; or (B) if the deponent is in prison."*

[VDF1/394]

6.6   Under Rule 45(a)(3) subpoenas are issued from the court where the action is pending. Alternatively, *"[a]n attorney also may issue and sign a subpoena if the attorney is authorized*

**29**

to practice in the issuing court."  Accordingly, attorneys for each party can issue subpoenas under the relevant court's authority to take the deposition of up to 10 people without leave of court [**VDF1/407**].

6.7   A subpoena must "command each person to whom it is directed to the following a specified time and place: attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody or control; or permit the inspection of premises" (Rule 45(a)(1)(A)(iii)) [**VDF1/406**]).

6.8   Subpoenas may be served not only on parties to the proceedings, but also non-parties, thereby allowing for depositions of, and discovery of documents from, non-parties such as Mr O'Hagan (Rule 30(a)(1)) [**VDF1/394**]).

6.9   Under Rule 32(a)(1), a deposition may be used at trial against a party if: (a) the party was represented at or had reasonable notice of the deposition; (b) the deposition is used to the extent it would be admissible if the deponent were testifying; and (c) the use is allowed by one of the provisions of Rule 32(a)(2)-(8) [**VDF1/399-401**].

6.10   In this case, either of two provisions of Rule 32(a)(2)-(8) will apply.  If Mr O'Hagan testifies, under Rule 32(a)(2) the deposition may be used "*to contradict or impeach*" his testimony.  If Mr O'Hagan does not testify, under Rule 32(4)(B) the deposition may be used "*for any purpose...if the court finds...that the witness...is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition.*" [**VDF1/399**].

**Distinction Between English and US Procedural Rules**

6.11   The English and US procedural rules for the taking of evidence by way of deposition are similar in most respects.  In both instances, the deposition must be conducted on oath, before an officer appointed by the court,[9] as if the deponent were giving evidence at trial (CPR 34.9(1); Fed. R. Civ. P., Rule 30(c)(1) [**VDF1/396**]).  The deponent may be required to produce documents (CPR 34.8(4); Fed. R. Civ. P., Rule 30(b)(2) [**VDF1/395**]).  The deposition must be recorded in full and the recording provided to the deponent (CPR 34.9(4)&(6); Fed. R. Cv. P., Rules 30(c)(1), 30(e)(1) [**VDF1/394-398**]).

6.12   Under both English and US rules, a deponent may not be required to answer any question (or produce any document) which is subject to privilege (CPR 34.20; Fed. R. Civ. P., Rule 30(c)(2) [**VDF1/396**]).  As the deposition will be taken in England, I understand English as well as Florida privilege laws will apply (Evidence (Proceedings in Other Jurisdictions) Act 1975, s. 3).

6.13   The primary distinction between the English and US rules is the manner in which the rules deal with objections.  In England, if there is an objection to a deponent answering a question, the party requiring the deposition may apply to the Court for an order requiring the deponent to answer (CPR 34.10(1); see also *R v Rathbone ex parte Dikko* [1985] QB 630).  Under the US Federal Rules, where there is an objection, the objection will be noted in the record but the deponent must answer anyway, unless the objection is: (a) to preserve a privilege; (b) to enforce a limitation ordered by the court; or (c) based upon an allegation of bad faith,

---

[9]   Under CPR 34.18, a deposition taken in England for use in foreign proceedings may also be taken before "*any fit and proper person*" nominated by the applicant. In the present case, however, the Applicants ask the Court to order deposition before an examiner of the Court under CPR 34.18(1)(b).

**30**

unreasonably annoying or embarrassing questioning, or oppression (Fed. R. Civ. P., Rule 30(c)(2) [**VDF1/396**]).

6.14    This difference is more formal than real.  The carve-out under the US Federal Rules for oppressive or unreasonably annoying or embarrassing questions protects the deponent from irrelevant or vexatious lines of questioning.  So too does the carve-out for any limitations imposed by the court.  In the present case, the Applicants are seeking an order to question Mr O'Hagan only on limited categories of questions, so that under either the English or US rules, the Applicants could not require answers on wholly irrelevant questions.  Moreover, under the Federal Rules, deposition testimony may only be used at trial to the extent that the testimony would otherwise be admissible under the Federal Rules of Evidence. (Fed. R. Civ. P., Rule 32(a)(1)(B) [**VDF1/399**]).  Finally, under both the English and US rules, the court has the power to hold a deponent in contempt of court where he or she refuses to answer a question without any valid ground for refusal (CPR 34.10(2), 81(4); Fed. R. Civ. P., Rule 37(b)(1) [**VDF1/403**]).

### Depositions in the SDF Proceedings

6.15    The case has already had numerous depositions.  To date, the Applicants have taken the deposition of Dr Wright (twice), Mr Jonathan Warren, Mr James Wilson, and the Defendant has taken the deposition of Mr Ira Kleiman. The Defendant has also set the depositions of other witnesses in this case to take place at a later date. It is therefore understood by all parties that depositions, including those of non-parties, are necessary in this case.

6.16    In view of the above, the Applicants make the present Application to this Court so that the Evidence may be obtained for use at trial.  As noted, the trial is currently scheduled for March 2020 and the discovery period is due to close on 3 January 2020 (though extensions can be applied for) [**VDF1/271-273**]. The Applicants therefore seek to obtain the Evidence as soon as possible.  For that reason, time is of the essence in respect of this Application.

### STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true.

*Devin Freedman*

Name:  Devin Freedman
Dated:  11/11/2019

**31**

<div style="text-align: right">

Applicants
Velvel (Devin) Freedman
First VDF1
11 November 2019

**Claim No.: [●]**

</div>

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
COMMERCIAL COURT (QBD)

BETWEEN:

*IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC*     **Applicants**

-and-

*ANDREW O'HAGAN*     **Respondent**

---

**EXHIBIT VDF1**

---

**BSF**

Boies Schiller Flexner (UK) LLP
5 New Street Square
London EC4A 3BF

32

## EXHIBIT VDF1 INDEX

| TAB | DOCUMENT | DATE | PAGE |
|---|---|---|---|
| 1. | Letter of Request in signed and redacted form, and in unsigned and unredacted form | 22 July 2018 | 1-16 |
| 2. | Complaint | 14 February 2018 | 17-54 |
| 3. | Amended Complaint | 14 May 2018 | 55-107 |
| 4. | Second Amended Complaint ("**SAC**") | 14 January 2019 | 108-156 |
| 5. | 'The Satoshi Affair' Article in the London Review of Books (as Exhibit 1 to the SAC) | 30 June 2016 | 157-251 |
| 6. | Agreement between Dave Kleiman, Craig Wright and W&K Info Defense LLC (as Exhibit 5 to the SAC) | 2 April 2013 | 252-261 |
| 7. | Email chain between Ira Kleiman and Craig Wright (as Exhibit 2 to SAC) | 20 May 2014 | 262-265 |
| 8. | Joint Motion for a 30-day Extension of all Discovery and Case Deadlines, and Trial Setting (filed on docket at DE284) | 17 September 2019 | 266-268 |
| 9. | Joint Motion for an Additional 30-day Extension of all Discovery and Case Deadlines, and Trial Setting (filed on docket at DE287) | 8 October 2019 | 269-270 |
| 10. | Order relating to Joint Mention for 30-Day extension (filed on docket at DE286) | 17 September 2019 | 271-273 |
| 11. | Order relating to Joint Mention for 30-Day extension for Discovery Deadlines (filed on docket at DE 289) | 8 October 2019 | 274-275 |
| 12. | Deposition Transcription of Craig Wright (pages 71, 186, 193, 299 only) | 4 April 2019 | 276-280 |
| 13. | Plaintiffs' Motion And Incorporated Memorandum Of Law For Issuance Of Letter Rogatory To Subpoena Foreign Third Parties (filed on docket at DE250) | 19 July 2019 | 281-296 |
| 14. | Order Denying Motion for Judgment on the Pleadings (filed on docket as DE265) | 15 August 2019 | 297-308 |
| 15. | Supplemental Affidavit of Dr. Matthew J. Edman (as Exhibit 2 to Order Denying Motion) | 9 July 2019 | 309-317 |
| 16. | Affidavit of Dr. Matthew J. Edman (as Exhibit 9 to Order Denying Motion) | 25 April 2019 | 318-331 |

33

| 17. | Order on Plaintiffs' Motion to Compel (filed on docket at DE 277) | 27 August 2019 | 332-360 |
|-----|---|---|---|
| 18. | Deposition Transcription of Craig Wright (pages 423, 424, 429, 430 only) | 28 June 2019 | 361-365 |
| 19. | Email from Matthew Getz to Mr Straus | 23 July 2018 | 366 |
| 20. | Email from Matthew Getz to Mr Straus | 31 July 2018 | 367 |
| 21. | Stipulated Confidentiality Order (filed on docket as DE 105-1) | 22 February 2019 | 368-385 |
| 22. | Declaration of Ira Kleiman (filed on docket as DE 50-1) | 17 July 2018 | 386-393 |
| 23. | Federal Rules of Civil Procedure, Extract of Rule 30 | N/A | 394-398 |
| 24. | Federal Rules of Civil Procedure, Extract of Rule 32 | N/A | 399-401 |
| 25. | Federal Rules of Civil Procedure, Extract of Rule 37 | N/A | 402-405 |
| 26. | Federal Rules of Civil Procedure, Extract of Rule 45 | N/A | 406-410 |
| 27. | Copy of Wikipedia entry about Mr O'Hagan | N/A | 411-414 |
| 28. | Plaintiffs' Expedited Motion to Depose Out of State Witness (filed on docket as DE 290) | 1 November 2019 | 415-420 |

34

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal
representative of the Estate of David
Kleiman, and W&K Info Defense Research,
LLC

        Plaintiffs,

v.

CRAIG WRIGHT

        Defendant.

CASE NO.: 9:18-cv-80176-BB/BR

### REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE

To: The Senior Master of the Queen's Bench Division of the High Court, Royal Courts of Justice, Strand, London, WC2A 2LL, United Kingdom.

From: Hon. Bruce E. Reinhart, United States Magistrate Judge, 701 Clematis Street, West Palm Beach Florida 33401, United States.

Request for Judicial Assistance Pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters Concluded 19 March 1970.

The United States District Court, Southern District of Florida presents its compliments to you and requests your assistance in the following manner:

### I. Information Provided Pursuant to Convention Article 3(a)

*Requesting Court:*

In conformity with Article 3 of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, concluded 18 March 1970 (the "Convention"), the United States District Court, Southern District of Florida (United States District Judge Beth Bloom and Magistrate Judge Bruce Reinhart, presiding), respectfully requests the assistance of your honorable court with regard to the matters set forth below. The Court has presided over this matter since February 2018 and has carefully reviewed the categories of evidence listed below and considers the evidence sought is directly relevant to the issues in dispute and is not discovery within the meaning of Article 23 of the Hague Evidence Convention, that is, discovery "for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries."

1

*Full title of action:*

The full title of the action in which international judicial assistance is requested is Ira Kleiman, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, against Craig Wright. The case number of this action in the United States District Court, Southern District of Florida, is Case No. 9:18-cv-80176-BB/BR.

## II. Information Provided Pursuant to Convention Article 3(b)

*Plaintiffs*

Plaintiffs are Ira Kleiman, acting in his capacity as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, a Florida limited liability corporation ("Plaintiffs"). Ira Kleiman resides at 5104 Robino Circle, West Palm Beach, Florida 33417, United States. Ira Kleiman also serves as the registered agent for W&K Info Defense Research LLC.

Plaintiffs are represented in this action by Devin (Velvel) Freedman, Kyle Roche, and Stephen Zack of Boies Schiller Flexner LLP.

*Defendant*

Defendant is Craig Wright. Craig Wright resides at ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

Defendant is represented by Andres Rivero, Alan Rolnick, Amanda McGovern, Bryan Paschal, Schneur Kass, and Zahrah Markoe of Rivero Mestre LLP.

## III. Information Provided Pursuant to Convention Article 3(c)

*Plaintiffs' Claims asserted in the United States District Court, Southern District of Florida:*

Plaintiffs' Second Amended Complaint ("SAC") includes claims for Conversion, Unjust Enrichment, Breach of Fiduciary Duty, Breach of Partnership Duties of Loyalty and Care, Fraud, Constructive Fraud, Permanent Injunction, and Civil Theft. A copy of the SAC is attached as Exhibit 1.

The SAC alleges that from circa 2008 and on, Dave Kleiman and Craig Wright partnered to create Bitcoin and that through their partnership they mined over a million bitcoins together. *Exhibit 1* at ¶¶ 53-57, 65. The SAC alleges that after Dave's death, Craig unlawfully and without permission took control of, and exercised exclusive possession over, the bitcoins that allegedly belonged to the Estate and W&K *Id.* at ¶ 111. It also alleges that Craig holds the stolen bitcoin in trusts only known and controlled by him. *Id.* While the SAC alleges that the exact number of bitcoins stolen remains to be determined, the SAC contends that the Estate is entitled to at least 300,000 bitcoins, along with their forked assets. *Id.* at ¶ 112.

2

The Amended Complaint also alleges that "Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K." *Id.* at ¶¶ 65-66. Plaintiffs allege the Defendant unlawfully took these assets as well.

## IV. Information Provided Pursuant to Convention Article 3(d)

It is necessary for the purpose of justice and for the due determination of the matters in dispute between the parties that you cause the witnesses listed below, who are residents within your jurisdiction, to be subject to oral examinations which will be scheduled to commence on a date to be determined in consultation with this Court. After considering the requests, the case, and the matters to be proven, I have determined that the evidence sought is relevant to the proceedings, will be used to prove Plaintiffs' case, and is permissible under the Convention. Furthermore, there is a protective order entered in this case that any party may use to designate testimony or documents as confidential, if appropriate, in order to protect their confidentiality and/or privacy.

*Andrew O'Hagan*: Andrew O'Hagan is a novelist and author of *The Satoshi Affair* (attached hereto as Exhibit 2). In *The Satoshi Affair*, Mr. O'Hagan recounts a detailed story involving, *inter alia*, Wright, his claim to have created Bitcoin, and Wright's relationship with Kleiman (*See e.g.*, 15-17, 25-34 36, 39) Mr. O'Hagan writes that he was contacted to "write the life of Satoshi Nakamoto," was provided extensive access to the Defendant, his wife, and other associates, and was provided documents to review as well. (See Ex. 2). During this 6-month process, O'Hagan recorded "many hours of tape" of his "many dozens of hours of conversations with Wright" where they discussed information relevant to the lawsuit (*Id.* at 26, 36, 96).

*Ramona Watts*: Ms. Watts is the Defendant's wife and was identified in his initial disclosures as an individual with knowledge of the facts underlying Plaintiffs' claims. (Ex. 3 at 2). Additionally, the Defendant has testified that Ms. Watts worked with the Defendant and has been involved in his companies since 2011, that before they married, he: (i) discussed Kleiman with her, (ii) she learned he created Bitcoin, (iii) gave her detailed accounts of what he'd done to create Bitcoin, and (iv) that he "talked to [Ms. Watts] about everything, including my past, before we got married." Furthermore, the Defendant testified that after they were married, they (i) carried on as co-directors of bitcoin related companies, and that (ii) Ms. Watts was involved in the business interactions among the Defendant, MacGregor, and Matthews, and the sale of Satoshi Nakamoto's life rights. Finally, Plaintiffs have alleged that Ms. Watts communicated directly with Ira Kleiman and directed him to take certain actions while the Defendant was being investigated by the ATO. (Ex. 4.)

*Robert MacGregor*: Based on the testimony and documents reviewed, Robert MacGregor is the Defendant's business associate who entered into a transaction with the Defendant whereby the Defendant sold Satoshi Nakamoto's life rights. (Ex. 1 at 12.) Mr. MacGregor was also involved in the purchasing intellectual property from the Defendant and facilitating his coming out as Satoshi Nakamoto in 2016. (*Id.*) During this timeframe, Mr. MacGregor was privy to details surrounding bitcoins creation, the alleged Satoshi Nakamoto partnership, and the trusts at the heart of the dispute in this case.

## V.   Information Provided Pursuant to Convention Article 3(e)

*Names and addresses of the witnesses:*



**Andrew O'Hagan**

**Ramona Watts**

**Robert MacGregor**

## VI.   Information Provided Pursuant to Convention Article 3(g)

*Testimony to be provided by the witnesses:*

Accordingly, I request that the Order of this Court permit questioning of the witnesses regarding the following areas:

Andrew O'Hagan

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2. The accuracy of the quotes and factual assertions contained within his work *The Satoshi Affair*.

3. Statements made, or documents provided, by Craig Wright (and his agents), Ms. Lynn Wright, or Ms. Watts that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

4. Statements made, or documents provided, by anyone interviewed in connection with the drafting of *The Satoshi Affair* that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by

4

Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

Ramona Watts

1. Her educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications)

2. Non-privileged statements made by the Defendant about W&K Info Defense Research, LLC, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, his and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, Uyen Nguyen, the ATO investigations, and the business deal with MacGregor, Matthews, and Ayre.

3. Her knowledge of the issues in No. 2 above through other means, including through review of relevant documents.

Robert MacGregor

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2. Statements made by Defendant, Ms. Watts, and Defendant's agents that relate to W&K Info Defense Research, LLC, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, his and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

*Documents to be produced*:

I also request that the identified witnesses produce and authenticate the following documents, described below, which are in the custody, possession, or control of the witnesses:

Andrew O'Hagan

1. All video and/or audio recordings of interviews related to Mr. O'Hagan's work in writing *The Satoshi Affair*. Specifically, including, but not limited to, the "many hours of tape" of the Defendant referenced in *The Satoshi Affair*.

2. All documents relied on or reviewed in preparing for, and drafting, The Satoshi Affair. This includes contemporaneous notes taken by Mr. O'Hagan or others, and any documents or communications reviewed or relied on when preparing the story.

5

3. All emails between O'Hagan, and either the Defendant, Ms. Watts, MacGregor, Matthews, or Ayre.

4. All drafts of *The Satoshi Affair*, any edits received, and comments thereto.

Ramona Watts

1. All documents and communications between Ms. Watts and Dave Kleiman.

2. All documents and communications between the Defendant and Ms. Watts that predate her marriage to the Defendant and relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

3. All documents and communications, dated prior to February 14, 2018, between Ms. Watts and either (i) Robert MacGregor, (ii) Stefan Matthews, (iii) Calvin Ayre, (iv) or their agents that relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

4. All documents and communications, dated prior to February 14, 2018, between Ms. Watts and Andrew O'Hagan that relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

Robert MacGregor

1. All documents and communications between MacGregor and Defendant or Ms. Watts that mention W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

2. All documents and communications between MacGregor and either Matthews or Ayre that mention W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

3. All documents reviewed by MacGregor, Matthews, and Ayre (or companies they represent) to conduct due diligence over the deal with Defendant, that were created for purposes of facilitating that deal, and the "who knows what list" referenced above.

## VII.    Information Provided Pursuant to Convention Article 3(h)

*Form of the deposition*:

The witness should be examined under oath. I respectfully request that you cause the evidence of the witness to be reduced into writing, cause all documents produced on such examination to be duly marked for identification, and cause copies of the documents to be made. I further request that you authenticate such examination by the seal of your Court in such way as is in accordance with your procedure, and return the written evidence and documents produced to me addressed as follows:

The Honorable Bruce Reinhart
United States District Court
Southern District of Florida
701 Clematis Street
West Palm Beach, Florida 33401
United States of America

## VIII.    Information Provided Pursuant to Convention Article 3(i)

*Procedure*:

The witness should be given an oath before testifying, the testimony should be transcribed by a stenographer, and the testimony should be recorded on video by a videographer. In addition, I request that the attorneys for the parties in this action should be permitted to be present and to conduct examination and cross-examination of the witness.

*Specification of privilege or duty to refuse to give evidence under the laws of the State of origin*:

Under the laws of the United States, a party has a privilege to refuse to give evidence if the evidence discloses a confidential communication between that party and an attorney for that party that was made for the purpose of obtaining legal advice and which privilege has not been waived explicitly or implicitly. Parties also enjoy a privilege not to testify to the confidential communications made during the marriage.

Parties also enjoy limited privileges on other grounds not relevant here such as communications between physician and patient, psychotherapist and patient, or clergy and penitent.

US law also recognizes a privilege against criminal self-incrimination.

Outside the strict area of privilege, certain limited immunities are available that may place restrictions on the giving of evidence, such as the limited protection of documents created as the work product of attorneys during or in anticipation of litigation.

*Details*:

It is proposed that the examination take place at the offices of Boies Schiller Flexner LLP at 5 New Street Square London, EC4A 3BF United Kingdom, on dates to be agreed between the parties and the witness.

*Fees and costs*:

The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by Plaintiffs.

## IX. Conclusion

This Court expresses its appreciation for this assistance. The courts of the United States are authorized by Section 1782 of title 28 of the United States Code to extend similar assistance to the courts of England and Wales. This Court is prepared to provide reciprocal assistance to the English courts in any circumstances where it may be required, and extends to the judicial authorities of England the assurances of the highest consideration.

Date of Request:

July 22, 2019

Signature and seal of the requesting authority

The Honorable Bruce Reinhart
United States District Court
Southern District of Florida
701 Clematis Street
West Palm Beach, Florida 33401
United States of America

Done in Chambers in Florida this 22nd day of July, 2019.

Seal of the Court



Bruce Reinhart
United States Magistrate Judge



8

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal
representative of the Estate of David
Kleiman, and W&K Info Defense Research,
LLC

**CASE NO.:  9:18-cv-80176-BB**

      Plaintiffs,

v.

CRAIG WRIGHT

      Defendant.

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE

To:    The Senior Master of the Queen's Bench Division of the High Court, Royal Courts of
Justice, Strand, London, WC2A 2LL, United Kingdom

From:  Hon. Beth Bloom, United States District Judge, 400 North Miami Avenue, Chambers 10-
2, Miami, Florida 33128, United States

Request for Judicial Assistance Pursuant to the Hague Convention on the Taking of Evidence
Abroad in Civil or Commercial Matters Concluded 19 March 1970.

The United States District Court, Southern District of Florida presents its compliments to you and
requests your assistance in the following manner:

## I.   Information Provided Pursuant to Convention Article 3(a)

*Requesting Court*:

In conformity with Article 3 of the Hague Convention on the Taking of Evidence Abroad in Civil
or Commercial Matters, concluded 18 March 1970 (the "Convention"), the United States District
Court, Southern District of Florida (United States District Judge Beth Bloom, presiding),
respectfully requests the assistance of your honorable court with regard to the matters set forth
below. The Court has presided over this matter since February 2018 and has carefully reviewed
the categories of evidence listed below and considers the evidence sought is directly relevant to
the issues in dispute and is not discovery within the meaning of Article 23 of the Hague Evidence
Convention, that is, discovery "for the purpose of obtaining pre-trial discovery of documents as
known in Common Law countries."

*Full title of action*:

The full title of the action in which international judicial assistance is requested is Ira Kleiman, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, against Craig Wright. The case number of this action in the United States District Court, Southern District of Florida, is Case No. 9:18-cv-80176-BB.

## II. Information Provided Pursuant to Convention Article 3(b)

*Plaintiffs*

Plaintiffs are Ira Kleiman, acting in his capacity as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, a Florida limited liability corporation ("Plaintiffs"). Ira Kleiman resides at 5104 Robino Circle, West Palm Beach, Florida 33417, United States. Ira Kleiman also serves as the registered agent for W&K Info Defense Research LLC.

Plaintiffs are represented in this action by Devin (Velvel) Freedman, Kyle Roche, and Stephen Zack of Boies Schiller Flexner LLP.

*Defendant*

Defendant is Craig Wright. Craig Wright resides at 21 Harebell Hill, Cobham, United Kingdon.

Defendant is represented by Andres Rivero, Alan Rolnick, Amanda McGovern, Bryan Paschal, Schneur Kass, and Zahrah Markoe of Rivero Mestre LLP.

## III. Information Provided Pursuant to Convention Article 3(c)

*Plaintiffs' Claims asserted in the United States District Court, Southern District of Florida:*

Plaintiffs' Second Amended Complaint ("SAC") includes claims for Conversion, Unjust Enrichment, Breach of Fiduciary Duty, Breach of Partnership Duties of Loyalty and Care, Fraud, Constructive Fraud, Permanent Injunction, and Civil Theft. A copy of the SAC is attached as Exhibit 1.

The SAC alleges that from circa 2008 and on, Dave Kleiman and Craig Wright partnered to create Bitcoin and that through their partnership they mined over a million bitcoins together. *Exhibit 1* at ¶¶ 53-57, 65. The SAC alleges that after Dave's death, Craig unlawfully and without permission took control of, and exercised exclusive possession over, the bitcoins that allegedly belonged to the Estate and W&K *Id.* at ¶ 111. It also alleges that Craig holds the stolen bitcoin in trusts only known and controlled by him. *Id.* While the SAC alleges that the exact number of bitcoins stolen remains to be determined, the SAC contends that the Estate is entitled to at least 300,000 bitcoins, along with their forked assets. *Id.* at ¶ 112.

The Amended Complaint also alleges that "Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K." *Id.* at ¶¶ 65-66. Plaintiffs allege the Defendant unlawfully took these assets as well.

2

## IV. Information Provided Pursuant to Convention Article 3(d)

It is necessary for the purpose of justice and for the due determination of the matters in dispute between the parties that you cause the witnesses listed below, who are residents within your jurisdiction, to be subject to oral examinations which will be scheduled to commence on a date to be determined in consultation with this Court. After considering the requests, the case, and the matters to be proven, I have determined that the evidence sought is relevant to the proceedings, will be used to prove Plaintiffs' case, and is permissible under the Convention. Furthermore, there is a protective order entered in this case that any party may use to designate testimony or documents as confidential, if appropriate, in order to protect their confidentiality and/or privacy.

*Andrew O'Hagan*: Andrew O'Hagan is a novelist and author of *The Satoshi Affair* (attached hereto as Exhibit 2). In *The Satoshi Affair*, Mr. O'Hagan recounts a detailed story involving, *inter alia*, Wright, his claim to have created Bitcoin, and Wright's relationship with Kleiman (*See e.g.,* 15-17, 25-34 36, 39) Mr. O'Hagan writes that he was contacted to "write the life of Satoshi Nakamoto," was provided extensive access to the Defendant, his wife, and other associates, and was provided documents to review as well. (See Ex. 2). During this 6-month process, O'Hagan recorded "many hours of tape" of his "many dozens of hours of conversations with Wright" where they discussed information relevant to the lawsuit (*Id.* at 26, 36, 96).

*Ramona Watts*: Ms. Watts is the Defendant's wife and was identified in his initial disclosures as an individual with knowledge of the facts underlying Plaintiffs' claims. (Ex. 3 at 2). Additionally, the Defendant has testified that Ms. Watts worked with the Defendant and has been involved in his companies since 2011, that before they married, he: (i) discussed Kleiman with her, (ii) she learned he created Bitcoin, (iii) gave her detailed accounts of what he'd done to create Bitcoin, and (iv) that he "talked to [Ms. Watts] about everything, including my past, before we got married." Furthermore, the Defendant testified that after they were married, they (i) carried on as co-directors of bitcoin related companies, and that (ii) Ms. Watts was involved in the business interactions among the Defendant, MacGregor, and Matthews, and the sale of Satoshi Nakamoto's life rights. Finally, Plaintiffs have alleged that Ms. Watts communicated directly with Ira Kleiman and directed him to take certain actions while the Defendant was being investigated by the ATO. (Ex. 4.)

*Robert MacGregor*: Based on the testimony and documents reviewed, Robert MacGregor is the Defendant's business associate who entered into a transaction with the Defendant whereby the Defendant sold Satoshi Nakamoto's life rights. (Ex. 1 at 12.) Mr. MacGregor was also involved in the purchasing intellectual property from the Defendant and facilitating his coming out as Satoshi Nakamoto in 2016. (*Id.*) During this timeframe, Mr. MacGregor was privy to details surrounding bitcoins creation, the alleged Satoshi Nakamoto partnership, and the trusts at the heart of the dispute in this case.

## V. Information Provided Pursuant to Convention Article 3(e)

*Names and addresses of the witnesses*:

**Andrew O'Hagan**

10 Norwich Street
London, United Kingdom, EC4A 1BD

**Ramona Watts**
21 Harebell Hill
Cobham, United Kingdom

**Robert MacGregor**
Tyche Consulting Limited
5th & 6th Floor, Regent Arcade House
19-25 Argyll St
London, United Kingdom W1F 7TS

## VI. Information Provided Pursuant to Convention Article 3(g)

*Testimony to be provided by the witnesses*:

Accordingly, I request that the Order of this Court permit questioning of the witnesses regarding the following areas:

Andrew O'Hagan

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2. The accuracy of the quotes and factual assertions contained within his work *The Satoshi Affair*.

3. Statements made, or documents provided, by Craig Wright (and his agents), Ms. Lynn Wright, or Ms. Watts that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

4. Statements made, or documents provided, by anyone interviewed in connection with the drafting of *The Satoshi Affair* that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

4

Ramona Watts

1. Her educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications)

2. Non-privileged statements made by the Defendant about W&K Info Defense Research, LLC, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, his and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, Uyen Nguyen, the ATO investigations, and the business deal with MacGregor, Matthews, and Ayre.

Her knowledge of the issues in No. 2 above through other means, including through review of relevant documents.

Robert MacGregor

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications)
2. Statements made by Defendant, Ms. Watts, and Defendant's agents that relate to W&K Info Defense Research, LLC, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, his and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

*Documents to be produced:*

I also request that the identified witnesses produce and authenticate the following documents, described below, which are in the custody, possession, or control of the witnesses:

Andrew O'Hagan

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2. The accuracy of the quotes and factual assertions contained within his work *The Satoshi Affair.*

3. Statements made, or documents provided, by Craig Wright (and his agents), Ms. Lynn Wright, or Ms. Watts that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

4. Statements made, or documents provided, by anyone interviewed in connection with the drafting of *The Satoshi Affair* that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

Ramona Watts

1. All documents and communications between Ms. Watts and Dave Kleiman.

2. All documents and communications between the Defendant and Ms. Watts that predate her marriage to the Defendant and relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

3. All documents and communications, dated prior to February 14, 2018, between Ms. Watts and either (i) Robert MacGregor, (ii) Stefan Matthews, (iii) Calvin Ayre, (iv) or their agents that relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

4. All documents and communications, dated prior to February 14, 2018, between Ms. Watts and Andrew O'Hagan that relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

Robert MacGregor

1. All documents and communications between MacGregor and Defendant or Ms. Watts that mention W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

2. All documents and communications between MacGregor and either Matthews or Ayre that mention W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

3. All documents reviewed by MacGregor, Matthews, and Ayre (or companies they represent) to conduct due diligence over the deal with Defendant, that were created for purposes of facilitating that deal, and the "who knows what list" referenced above.

## VII. Information Provided Pursuant to Convention Article 3(h)

*Form of the deposition*:

The witness should be examined under oath. I respectfully request that you cause the evidence of the witness to be reduced into writing, cause all documents produced on such examination to be duly marked for identification, and cause copies of the documents to be made. I further request that you authenticate such examination by the seal of your Court in such way as is in accordance with your procedure, and return the written evidence and documents produced to me addressed as follows:

The Honorable Beth Bloom
United States District Court
Southern District of Florida
400 North Miami Avenue
Chambers 10-2
Miami, Florida 33128
United States of America

## VIII.    Information Provided Pursuant to Convention Article 3(i)

*Procedure*:

The witness should be given an oath before testifying, the testimony should be transcribed by a stenographer, and the testimony should be recorded on video by a videographer. In addition, I request that the attorneys for the parties in this action should be permitted to be present and to conduct examination and cross-examination of the witness.

*Specification of privilege or duty to refuse to give evidence under the laws of the State of origin*:

Under the laws of the United States, a party has a privilege to refuse to give evidence if the evidence discloses a confidential communication between that party and an attorney for that party that was made for the purpose of obtaining legal advice and which privilege has not been waived explicitly or implicitly. Parties also enjoy a privilege not to testify to the confidential communications made during the marriage.

Parties also enjoy limited privileges on other grounds not relevant here such as communications between physician and patient, psychotherapist and patient, or clergy and penitent.

US law also recognizes a privilege against criminal self-incrimination.

Outside the strict area of privilege, certain limited immunities are available that may place restrictions on the giving of evidence, such as the limited protection of documents created as the work product of attorneys during or in anticipation of litigation.

*Details*:

It is proposed that the examination take place at the offices of Boies Schiller Flexner LLP at 5 New Street Square London, EC4A 3BF United Kingdom, on dates to be agreed between the parties and the witness.

*Fees and costs*:

The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by Plaintiffs.

## IX. Conclusion

This Court expresses its appreciation for this assistance. The courts of the United States are authorized by Section 1782 of title 28 of the United States Code to extend similar assistance to the courts of England and Wales. This Court is prepared to provide reciprocal assistance to the English courts in any circumstances where it may be required, and extends to the judicial authorities of England the assurances of the highest consideration.

Date of Request:

_____, 2019

Signature and seal of the requesting authority

The Honorable Beth Bloom
United States District Court
Southern District of Florida
400 North Miami Avenue
Chambers 10-2
Miami, Florida 33128
United States of America

Done in Chambers in Florida this _____ day of _____, 2019.

Seal of the Court                          Beth Bloom
                                           United States District Judge

8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of Dave Kleiman, | **CASE NO.:** |
| Plaintiff, | **COMPLAINT AND JURY DEMAND** |
| v. | |
| CRAIG WRIGHT | |
| Defendant. | |

Plaintiff, Ira Kleiman, brings this action as the personal representative of David Kleiman's estate. The following allegations are based on personal knowledge as to his own acts and observations and are made on information and belief as to all other matters based upon the undersigned counsels' investigation:

## INTRODUCTION

1. This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of filing, the value of these assets far exceed $5,118,266,427.50 USD (before punitive or treble damages).

2. At the heart of these claims is the relationship between Craig Wright ("Craig") and David Kleiman ("Dave"). This relationship, born out of a mutual obsession with cryptography and data security, remained mostly hidden from the outside world. Craig, a computer scientist in Australia, and Dave, a paralyzed IT security expert in Pam Beach, Florida, communicated almost exclusively through various private email accounts.

3. Bitcoin is the world's first decentralized cryptocurrency. The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a

---

[1] The term "Bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoins" to label the units of exchange.

mailing list of cryptography enthusiasts. That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

4. It is unclear whether Craig, Dave, and/or both created Bitcoin. For reasons not yet completely clear, they chose to keep their involvement in Bitcoin hidden from most of their family and friends. It is undeniable, however, that Craig and Dave were involved in Bitcoin from its inception and that they both accumulated a vast wealth of bitcoins from 2009 through 2013.

5. In April 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a long battle with MRSA. At the time of his death, no one in his family was aware of the extent of his involvement in creating Bitcoin. Nor were they aware that he had accumulated, with Craig, an incredible sum of bitcoins.

6. Recognizing that Dave's family and friends weren't aware of this, Craig perpetrated a scheme against Dave's estate to seize Dave's bitcoins and his rights to certain intellectual property associated with the Bitcoin technology.

7. As part of this plan, Craig forged a series of contracts that purported to transfer Dave's assets to Craig and/or companies controlled by him. Craig backdated these contracts and forged Dave's signature on them.

8. Shortly after Dave's death on April 26, 2013, Craig reached out to Ira, Dave's brother. Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable IP. But, he claimed Dave signed all these property

3

rights away in exchange for non-controlling share of a non-operational Australian company worth "millions." Craig told Ira he'd be able to sell Dave's stake in the company in a few months.

9.   This was a lie. The company went bankrupt after Craig apparently misled the Australian Tax Office ("ATO").

10.  The ATO's investigation of Craig led them to raid Craig's home in late 2015. Craig fled Australia for London.

11.  Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself as the alleged creator of Bitcoin. He currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

12.  To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Dave's estate. This action is brought to rectify that injustice.

## PARTIES

13.  Plaintiff Ira Kleiman is a resident of Palm Beach County, Florida. He is Dave's brother and the personal representative of his Estate.

14.  Defendant Craig Steven Wright is a resident of London, United Kingdom. He is Dave's former business partner in W&K Info Defense Research LLC, a company operating in the state of Florida and formed pursuant to its laws. This

4

Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within the state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within the state.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

16. Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District. These events are included, but not limited to: the wrongful taking of property belonging to a Florida estate within this District; the operation of W&K Info Defense Research LLC by Dave and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District; and the development of certain blockchain related intellectual property within this District.

## FACTUAL ALLEGATIONS

### BITCOIN

17. Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of February 14, 2018.[2] At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the bitcoin blockchain.

18. In order to transact with bitcoins, you must have a bitcoin wallet. Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would like to receive bitcoin from others. Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet.

19. Each wallet is also assigned a "private key." Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

20. There are two methods of acquiring bitcoin. The first involves simply receiving bitcoin from someone who has. In fact, there are many businesses that operate

---

[2] https://coinmarketcap.com/.

"bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from other individuals looking to sell.

21. The second way one can acquire bitcoin is by "mining" them.

22. There is no centralized authority that curates the bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

23. Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoin (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

24. When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions processed. This mining reward is cut in half approximately once every four years. Today, the mining reward 12.5 bitcoins. Obviously, it was easier to amass significant amounts of bitcoin in 2009, than now.

7

25. To date almost 17 million of the total 21 million bitcoins have been mined.

### HISTORY OF BITCOIN

26. On October 31 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

27. Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

28. Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

29. Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the bitcoin protocol until mid-2010. Around this time, he handed control of the bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent

8

on April 23, 2011. It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

30. For most of its early history, bitcoins were of relatively little value. Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoin to purchase two Domino's pizzas on May 22, 2010. At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

31. During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoin." Thus, individuals mining bitcoin through 2013 could expend relatively minor resources to accumulate large sums of bitcoin.

32. It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

## BACKGROUND ON PARTIES AND KEY INDIVIDUALS

33. Dave Kleiman was born in 1967. Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

---

[3]   *See*   *e.g.*   http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

34. A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound. After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

35. Dave began working in the information technology security sector in 1990. He was a frequent speaker at national security conferences and was a regular contributor to many security related newsletters, websites, and online forums.

36. Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

37. Dave was also a Secure Member and Sector Chief for Information Technology at The FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA). When he attended conferences, he was known as "Dave Mississippi," a nickname referring to the long string of three letter certificates that followed his name.

38. He co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[4] and Security Log Management: Identifying Patterns in the Chaos.[5]

39. In 2010, Dave was hospitalized. He was in and out of medical facilities due to MRSA infected sores. On March 22, 201 3, Dave signed out of the hospital against medical advice. He was unstable and nearing death. A friend asked him if the Hospital had discharged him and he responded with "no . . . I told the doctors to go fuck themselves."[6] On April 26, 2013, Dave passed away.

40. Ira Kleiman is Dave's brother and the personal representative of his estate.

41. Craig is a 46-year-old Australian computer scientist and businessman. Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.

42. In May 2016, Craig claimed to be Satoshi Nakamoto—the pseudonymous name behind the creation of Bitcoin.

### DAVE AND CRAIG'S RELATIONSHIP

43. Dave and Craig met in an online cryptography forum in 2003. Both men had a longtime interest in cyber security, digital forensics, and the future of money.

---

[4] https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[5] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[6] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

44. For years, they communicated on various topics related to the internet and file sharing. For example, in 2007, they coauthored a paper on the mechanics of overwriting hard drive data.[7]

45. Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography.

46. In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig wrote Dave an email stating: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all."[8]

47. After leaving his job in late 2008, Craig wrote to Dave: "I need your help. You edited my paper and now I need to have you aid me build this idea." (Ex. 1 at 30). For the next few months, Craig and Dave worked to get Bitcoin operational.

48. On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain. (Ex. 1 at 31).

---

[7] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[8] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

12

49. On Thanksgiving Day 2009, Dave told Ira he was creating "digital money" with a wealthy foreign man, i.e., Craig.

50. In April 2013, Dave was found dead in his home. The scene of Kleiman's death was gruesome. His body was decomposing, there were wheelchair tracks of blood and fecal matter, open bottles of alcohol, and a loaded handgun next to him. A bullet hole in his mattress was found. The exact details surrounding his death remain unknown.

51. After Dave's death, Craig posted an emotional video on Craig's YouTube channel. In the video, Craig narrates footage from Dave's various TV appearances, growing increasingly emotional. At the end, Craig concludes "I'm proud to say I knew Dave Kleiman . . . I'll miss you, Dave. You were my friend, and I'll miss you."[9]

52. On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[10] Both articles also articulated Dave's integral role in the development of Bitcoin. They described numerous details and leaked communications implicating David and Craig's roles in creating and

---

[9] https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[10] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/; https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

13

developing bitcoin; they also discussed their accumulation of a vast hoard of bitcoin.

53. On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[11]

54. Craig has readily admitted Dave was intimately involved in the creation of Bitcoin. In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 30).

55. From their collaboration in 2008 until Dave's death in 2013, Craig and Dave would go on to mine over a million of the initial bitcoins.

## W&K INFO DEFENSE AND RESEARCH LLC

56. On February 14, 2011, over two years after the first bitcoins were mined, Dave formed W&K Info Defense Research LLC ("W&K") in Florida (company number: L11000019904). The Articles of Incorporation for W&K list Dave as the sole member of the LLC. (Ex. 2). Dave was also listed as the registered agent for W&K and his home address was listed as its place of business. (*Id.*)

---

[11] https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/ .

57. However, in an email to Ira on February 15, 2014, Craig represented that "Dave owned 50% of [W&K]." (Ex. 3). Craig did not identify in this email who owned the other half.

58. According to documents produced by Craig, W&K engaged in the business "known as Bitcoin mining and Software development / Research." (Ex. 4).

59. Craig identified certain R&D projects and the associated intellectual property owned by W&K. (Ex. 3).

60. On March 28, 2014, nearly a year after Dave died, W&K was reinstated by an individual named Uyen Nguyen ("Uyen"). (Ex. 5). Uyen removed Dave as the registered agent for W&K and listed herself. *Id.* Uyen added both herself and an entity named Dr. Coin-Exch Pty Ltd. as authorized persons for W&K.

61. On September 23, 2016, W&K was administratively dissolved by Uyen.[12]

## DAVE OWNED A SUBSTANTIAL AMOUNT OF BITCOIN

62. The exact number of bitcoins belonging to Dave's estate will be determined at trial. That said, various documents including private emails and transcripts from 2014 Australian Tax Office ("ATO") meetings with Craig, his counsel, and his accountant evidence Dave and Craig owned and controlled over 1,100,000 Bitcoins.

---

[12] https://www.flbusinessgo.com/gg?utm_term=L11000019904.

63. In a 2015 article, *Gizmodo* reported it had confirmed the authenticity of an email from Craig to Dave's other business partners stating that Dave *"had mined an enormous amount of bitcoins – an amount 'too large to email.'"* In the email, Craig asked Dave's business partners to secure Dave's hard drives and check for Bitcoin wallet files. He later stated he wasn't after the funds, and only wanted to ensure the bitcoins entered Dave's estate.[13]

64. Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper obtained by Gizmodo confirm that Dave owned a substantial amount of bitcoins. At the meeting, Craig's accountant, John Chescher, stated:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there. Mr Kleiman would have had a similar amount. However, Mr Kleiman passed away during that time. (Ex. 6 at 3).

65. Further, meeting minutes from a February 18, 2014 meeting between the ATO and Craig's bookkeeper also obtained by Gizmodo further reveal that Craig has let others understand that he took ownership of Dave's bitcoin. The ATO investigator states:

> We thought yes, you've picked up some bitcoin ownership from the deceased director so we were trying to, you know, get the picture and connect all the dots. (Ex. 7 at 19).

---

[13]   https://www.gizmodo.com.au/2015/12/this-australian-says-he-and-his-dead-friend-invented-bitcoin/.

16

66. As reflected in the February 18, 2014 transcript, in the meeting, Craig's counsel states that the bitcoins W&K mined was held by Seychelles, Singapore, and UK trusts. As Dave owned between 50% to 100% of W&K, *at least* half of the bitcoins transferred to the trusts belonged to Dave.

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as . . . effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts. Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately Dave . . . dies in the US towards the end of April 2013. (*Id.* at 6).

67. Years later, Craig admitted to Andrew O'hagan that "his and Kleiman's mining activity ha[d] led to a complicated trust." (Ex. 1 at 35).

68. In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint nature of the bitcoin held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the fuck *we* are doing with it all. So, a good tax deductible way to have a visit and also write a paper. (Ex. 7(a))

69. In fact, Craig consistently referred to the trust as both Craig and Dave's, for example in another email Craig forwarded to Ira (emphasis added):

17

**67**

From: Craig S Wright
To: dave@davekleiman.com
Subject: This week
Date: Tue, 22 May 2012 09:45:31 +1000

Dave,

A recycled rant. I have done the same to Ramona . . . The meeting with the AAT should have occurred weeks ago, but the ATO have stalled and put it off. John has all the materials and the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try shit **on us** then. FUCKING DICKS. Bloody lying ATO cock sucking bastards! They lost evidence and use my temper against me. I hate their lies. I did everything right and I am STILL punished. . . (Ex. 8).

70. Finally, in a 2014 email exchange with Ira, Craig admitted that at least 300,000 of the 1,000,000+ bitcoins held in trust belong to David:

From: Ira K <█████████████████>
To: Craig S Wright <craig.wright@hotwirepe.com>
Subject: Bond villains
Date: Sat Mar 01 19:42:27 +0000 2014

Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours. Is that correct?

Ira

---

From: Craig S Wright <craig.wright@hotwirepe.com>
To: Ira K <█████████████████>
Subject: Re: Bond villains

18

Date: Sat Mar 01 20:00:48 +0000 2014

Around that. Minus what was needed for the company's use
Sent from my HTC. (Ex. 9).

71. As discussed below in more detail, Craig provided fraudulent contracts to the ATO in an attempt to substantiate his ownership of bitcoins and IP assets that belonged to Dave. Their authenticity aside, however, these "contracts" produced by Craig constitute his admission that Dave, Craig, and W&K collectively owned hundreds of thousands of bitcoins.

72. For example, a 2011 contract produced by Craig includes a provision stating W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of over two years (312,000 bitcoin). (Ex.10).

73. Further, a 2012 contract produced by Craig lists Bitcoin wallets containing over 650,000 bitcoins. Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*" (Ex. 11 at 8). This annotation is in Craig's handwriting.

74. A 2013 contract contains Craig's admission that W&K's "[o]wnership is 50% in [Dave's] name and 50% in trust held for [Craig]." (Ex. 4 at 2). And that W&K "is the owner and conducts the business known as Bitcoin mining and Software development / Research." (*Id.*)

## AFTER DAVE'S DEATH, CRAIG FRAUDULENTLY CONVERTED THE BITCOIN AND IP THAT BELONGED TO DAVE

75. After Dave's death, Craig concocted a scheme to claim sole ownership of all bitcoins owned by Dave, to steal Dave's share of IP assets that belonged to Dave and Craig jointly through W&K.

76. To accomplish this scheme, he drafted and backdated at least three contracts to create a paper trail purporting to document that many of Dave's bitcoins and IP rights were to be transferred, sold, and/or returned to himself. Specifically, he fraudulently created:

   a. 2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

   b. 2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 10); and

   c. 2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 4).

20

77. On their face, these contracts strain credulity in a number of manners.

78. *First*, the electronic signatures that appear on these documents are substantially different than known examples of Dave's electronic and written signatures:



| **Authentic Signatures** 2/1/2013[14] & 7/30/2003[15] & 2/22/2012 | **Signature on Fraudulent Contracts** 4/22/2011 & 04/2/2013 |
|---|---|

79. In reality, this signature appears to be a near identical copy of a computer-generated font called Otto, available here: https://www.wfonts.com/font/otto. When computer generated, this Otto font produces the signature:

Otto.ttf

Dave Kleiman

---

[14] See Ex. 19 (signature on Computer Forensics LLC Operating Agreement).
[15] See Ex. 20 (signature on Dave's last will and testament).

21

80. When confronted with this information by Ira, Craig admitted the signature was computer generated, but claimed there were other ways to prove its veracity.

81. Craig has never provided additional evidence of their legitimacy.

82. *Second*, the fraudulent signatures aren't witnessed or notarized. Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

83. *Third*, the terms of the 2011 IP Agreement are nonsensical. While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time. Thus, no one could "finance" or "fund" anything with bitcoins then. This calls the 2013 Sales Contract's purported "release" of this nonsensical "financing arrangement" into question.

84. *Fourth*, the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other. The 2011 IP Agreement provides that Bitcoin wallet 1933***XYa8 would be held by Craig in escrow and revert to him if W&K defaulted, but the 2013 W&K Sale Agreement provides that it will be "released to" Craig despite satisfaction of the liability, and the 2012 Deed of

22

Loan shows the wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up joint-companies later.

85.  *Fifth*, the 2013 agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

86.  *Lastly*, many of the contractual terms are extremely convenient for Craig.  For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

87.  These internal red flags are rendered even more suspicious by the fact that the 2013 agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

88.  Craig has a documented history of backdating contracts and documents to suit his needs.  In its 2015 audit of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information. Among other wrongs, the ATO found Craig had backdated numerous documents. (Ex. 12):

   a.  "Craig Wright, has admitted that he backdated these invoices";

   b.  "the court case was not finalised until 6 Nov 2013; after the deed date of 22 August 2013.  That is, the licence agreement makes

23

specific reference to an event which had not yet occurred, raising questions as to its validity";

c.   "[Craig's trust] purports to have acquired the software . . . from Craig Wright, pursuant to a contract . . . which predates its existence and establishment as a trust.";

d.   "Craig Wright purports to have received a loan of 650,000 Bitcoin from the Seychelles Trust pursuant to a Deed of Loan entered into with the Trustee for the Seychelles Trust; a company called Design by Human Ltd (DBH). However, records show Craig Wright was only informed of the existence of this company on a date after the purported Deed of Loan was entered into.";

e.   "Furthermore, information obtained from Her Majesty's Revenue and Customs ... suggests [Craig] backdated the Directorship of Uyen Nguyen and Dave Kleiman."

89.  In addition, during the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices. (Ex. 7). Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[16]

---

[16] https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

24

## CRAIG SECURES DEFAULT JUDGMENTS AGAINST W&K WITH FRAUDULENT CONTRACTS

90. In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each. (Ex. 13).

91. In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]." (*Id.* at 2, 8). The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]." (*Id.* at 3, 9). The complaints alleged that the IP at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." (*Id.*)

92. These claims, submitted by Craig, are based on demonstrably false factual allegations.

93. The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2). However, W&K did not exist in 2008.

94. Also, the July 2013 claim alleges:

> "[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

25

    a. BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance: Software Assurance through Economic Measures

    b. BAS 11-02-TTA 05-0155-WP  TTA 05 – Secure Resilient Systems and Networks

    c. BAA 11-02-TTA 09-0049-WP TTA 09 – Cyber Economics

    d. BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 8-9).

95. The July 2013 claim goes on to state that "these funds were rated as:

    a.  TTA 01    US$ 650,000

    b.  TTA 05    US$ 1,8000,000 (*sic*)

    c.  TTA 09    US$ 2,200,000

    d.  TTA 14    US$ 1,200,000." (*Id.* at 9).

96. However, these statements were false.  The 2017 results of a Freedom of Information Act request by Ira to the DHS reveals that TTA 01, TTA 05, and TTA 09 were all denied by the DHS. (Ex. 14).

97. The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 9, 2009 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (Ex. 2). But again, W&K did not exist until 2011.

98. On August 28, 2013, a Consent Order was entered for the July 2013 claim by the Supreme Court of New South Wales. (Ex. 15). The Order states it was "made by the court by consent." (*Id.* at 1). In support of that "consent" the order purports to be signed by an "authorised officer" of W&K, a "J Wilson." (*Id.* at 2). But J Wilson, whoever he is, was not authorized. No public record for W&K identifies him as an individual with any capacity to act for W&K.

99. On November 6, 2013, a Judgment was entered for the August 2013 claim by the Supreme Court of New South Wales. (Ex. 16). In the decision, the Court "note[d] the agreement of the parties that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*). However, as with the August judgment, there was never authorized consent to the judgment.

100. Further, W&K was never properly served with either the complaints or the judgments in these actions.

101. Thus, the contents of the claims submitted to the court are demonstrably false and Craig obtained both of these judgments by perpetuating a fraud on the New South Wales court.

102. To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K. For example, in the February 18, 2014 meeting with the ATO, Craig's attorney

27

77

represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on." (Ex. 7 at 6). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." *(Id.* at 17).

103. Craig also used this judgment, supported by the fraudulent contracts between him and Dave, to claim millions in tax rebates for his other Australian based companies.

### CRAIG REACHES OUT TO IRA TO COVER UP THE FRAUD

104. Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis ＜███████████＞
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.

28

> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA. (Ex. 17).

105. This was the first time anyone in Dave's family learned of either (1) his friendship with Craig or (2) the extent of his involvement in the creation of Bitcoin.

106. As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

107. Craig told Ira that he was partners with Dave in W&K and that no one knew about the company. He explained to Ira that the business was involved in Bitcoin mining and that it was quite successful.

108. Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch." He explained to Ira that Dave's estate would receive shares in it.

109. On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira < █████████████████ >

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims. (Ex. 18).

110. On April 15, 2014, an auditor from the Australian Taxation Office, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

111. On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . .".

112. On the same day, Ira wrote ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."

113. Craig responded 11 minutes later "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned."

30

114. To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." He then told Ira "October [2014 would be] the first payment."

115. The payment never came. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

116. On October 9, 2015, Craig ceased responding to Ira's email correspondence. Shortly thereafter, *Gizmodo* and *Wired* published the articles outing Craig and Dave's involvement in the beginnings of Bitcoin.

117. Craig currently serves as Chief Scientist of a UK company called nChain in London, where he has filed hundreds of patents related to Bitcoin and blockchain technology through this entity.[17]

118. To date, Dave's estate has received none of the assets belonging to him as a result of Dave's early involvement in Bitcoin and bitcoin mining.

### CLAIMS FOR RELIEF

### COUNT I
### Conversion (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

119. Dave lawfully mined and possessed hundreds of thousands of bitcoins both individually and as a member of W&K.

---

[17] https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V

31

120. Craig unlawfully and without permission converted this property from Dave's estate by exercising exclusive possession over the private keys necessary to own, move, or spend the bitcoins belonging to Dave.

121. While the exact number of bitcoins remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of at least 300,000 bitcoins. Further, Craig's admission that Ira owned 50% of W&K entitles Dave to possession of at least 550,055.5 Bitcoin. Finally, pursuant to the formation documents of W&K, Dave is the sole member of W&K and would therefore be entitled to possession of all 1,100,111 Bitcoin mined by W&K.

122. To Plaintiff's best knowledge, information, and belief, these bitcoins are worth approximately $10,236,532,855.00.

123. Ira has demanded Craig return these bitcoins, but Craig has not done so.

124. Further, Craig has, and continues to, exercise authority over Dave's bitcoins by claiming them as his own and moving them into other wallets. Craig has therefore wrongfully deprived Dave's estate from the Bitcoins belonging to Dave.

125. Dave's estate is entitled to actual damages, amounting in either return of all bitcoins converted from Dave's possession or the fair market value of the bitcoin.

WHEREFORE, Plaintiff demands judgment against Defendant for damages in the amount of at least $10,236,532,855.00 and/or return of the wrongfully converted Bitcoin, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT II
## Misappropriation

Plaintiff incorporates paragraphs 1 to 118.

126. After David's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave's estate relating to blockchain based technologies by using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

127. These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies. These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets. some of which have resulted in the filing of new patents, through his work at nChain.

128. Dave made reasonable efforts to maintain the secrecy of these trade secrets. Outside of W&K's applications to the Department of Homeland Security, Dave made no other disclosures of the nature of these trade secrets to anyone but Craig.

129. As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

130. As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

131. As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiff demands judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

## COUNT III
## Replevin (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

132. Dave lawfully mined and possessed a massive amount of bitcoins both individually and as a partner in W&K. These bitcoins belonged to David as evidenced by Craig's various admissions.

34

133. While the exact number of bitcoins remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of at least 300,000 bitcoins. Further, Craig's admission that Ira owned 50% of W&K entitles Dave to possession of at least 550,055.5 bitcoins. Finally, pursuant to the formation documents of WK, Dave is the sole member of W&K and would therefore be entitled to possession of all 1,100,111 Bitcoin mined by WK.[18]

134. To Plaintiff's best knowledge, information, and belief, these bitcoin are worth approximately $10,236,532,855.00.

135. To Plaintiff's best knowledge, information, and belief, these bitcoins, and the private keys associated with these bitcoins, are in Craig's exclusive possession.

136. These bitcoins are wrongfully detained by Craig. Craig has maintained possession of these bitcoins by using the private keys he had access to and has since refused to return these assets to Dave's estate after Dave's death. To Plaintiff's best knowledge, information, and belief, Craig detains the property because of its significant economic value.

137. These bitcoins have not been taken for any tax, assessment, or fine pursuant to law, nor under an execution or attachment against Plaintiff's property.

---

[18] Should discovery reveal additional bitcoin were mined, Plaintiff may amend this complaint to assert a claim over those as well.

WHEREFORE, Plaintiff demands judgment against Defendant for the return of the wrongfully withheld Bitcoin, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IV
## Breach of Fiduciary Duty (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

138. As a Dave's partner in W&K, Craig owed fiduciary duties of care, loyalty and good faith to Dave by virtue of their joint venture.

139. Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate out of W&K and to himself personally.

140. Dave's estate has been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiff demands judgment against Defendant for damages and/or return of the wrongfully taken bitcoins and IP, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT V
## Breach of Partnership Agreement (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

141. Pursuant to Fla. Stat. § 620.8202, Craig and Dave had a valid partnership through their bitcoin mining activities that were carried out with the intention of generating a profit.

36

142. Craig breached this partnership duties to Dave under Fla. Stat. § 620.8202 when he illegally transferred all bitcoin related assets to himself personally.

143. Pursuant to Fla. Stat. § 620.1704 Dave's estate is entitled to enforce the rights associate with his Partnership with Craig.

144. Pursuant to Fla. Stat. § 620.8405, Ira's estate is entitled to seek purchase of the partnership interest under Fla. Stat. § 620.8701.

WHEREFORE, Plaintiff demands judgment against Defendant for purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VI
### Unjust Enrichment (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

145. Dave mined over one million bitcoin into an account that Craig obtained access to and Dave developed IP that Craig obtained copies of.

146. Dave therefore conferred a substantial benefit upon Craig through his unauthorized use of the bitcoins and intellectual property belonging to Dave's estate.

147. Craig had knowledge of, retained, and accepted that benefit by, without Plaintiff's prior knowledge or consent, using and distributing his bitcoin and intellectual property that belonged to Dave's estate for his own economic benefit and trade purposes.

37

148. It would be inequitable to allow Craig to retain this benefit without paying the value of these bitcoin and IP.

WHEREFORE, Plaintiff demands judgment against Defendant for the value of the wrongfully retained Bitcoin and IP, together with court costs, interest, and any other relief this Court deems just and proper.

Plaintiff demands a trial by jury for all issues triable by right.

Dated: February 14, 2018

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.   (305)539-8400
Fax.   (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.   (914)749-8200
Fax.   (914)749-8300
Email: kroche@bsfllp.com
*pro hac vice pending*

Attorneys for Plaintiff
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of Dave
Kleiman

38

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC | **CASE NO.: 9:18-cv-80176-BB** |
| Plaintiffs, | **AMENDED COMPLAINT AND JURY DEMAND** |
| v. | |
| CRAIG WRIGHT | |
| Defendant. | |

Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.    (305)539-8400
Fax.    (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.    (914)749-8200
Fax.    (914)749-8300
Email: kroche@bsfllp.com

**ATTORNEYS FOR PLAINTIFFS**

## AMENDED COMPLAINT

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and Plaintiff W&K Info Defense Research, LLC ("W&K") hereby sue Defendant Craig Steven Wright ("Craig") and state as follows:

## PARTIES

1.      Plaintiff Ira Kleiman, as personal representative, is a resident of Palm Beach County, Florida. He is David Kleiman's ("Dave") brother and the personal representative of his estate ("the estate").

2.      Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company incorporated in 2011. During the times relevant to this Amended Complaint, W&K operated in Florida. This entity is one vehicle through which Defendant and Dave mined hundreds of thousands of bitcoins and created valuable blockchain intellectual property.

3.      Defendant Craig Steven Wright is a resident of London, United Kingdom. He is Dave's former business partner in W&K and otherwise.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000; this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Plaintiffs' Defense of Trade Secrets Act claim arises under the laws of the United States.

2

5.      Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District. These events include, but are not limited to: the wrongful taking of property belonging to a Florida estate and/or LLC within this District; the partnership of Dave and Craig within this District; the operation of W&K by Dave and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District and/or by equipment owned and/or operated by a Florida resident (Dave) or Florida LLC (W&K); the development of certain blockchain related intellectual property within this District; and the commission of a fraud against an estate in this District.

6.      This Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within this state.

## INTRODUCTION

7.      This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of this filing, the value of these assets far exceed $11,427,755,048.02 USD (before punitive or treble damages); at their highest value they were worth over

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

$27,332,125,781.93. Plaintiffs allege Defendant has stolen these bitcoins and intellectual property assets from them.

8.      After Ira filed this claim, Craig committed a fraud on this Court in an attempt to circumvent its jurisdiction. As detailed in paragraphs 160 to 170 Craig filed a sworn declaration that is incontrovertibly false based on an affidavit (and supporting evidence) he previously submitted to an Australian court. The boldfaced misrepresentations Craig has told this Court demonstrate his desperation to avoid this suit.

9.      Bitcoin is the world's first decentralized cryptocurrency. The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a mailing list of cryptography enthusiasts. That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

10.     Based on information Ira Kleiman received directly from Dave, it is undeniable that Craig and Dave were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013.

11.     On April 26, 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a battle with MRSA.

12.     Recognizing Dave's family and friends weren't aware of the extent of Dave's Bitcoin and blockchain related activities, Craig perpetrated a scheme against Plaintiffs to seize their bitcoins and their rights to certain blockchain related intellectual property.

13.     As part of this plan, Craig took control of Plaintiffs' bitcoins and forged a series of contracts that purported to transfer Plaintiffs' bitcoins and intellectual property

4

assets to Craig and/or companies controlled by him. Craig backdated these contracts and forged Dave's signature on them.

14. About a year after Dave's death, and under pressure from an Australian Tax Office investigation, Craig reached out to Ira, Dave's brother. Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable intellectual property. But, he claimed Dave signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company worth "millions."

15. Craig told Ira he'd be able to sell Dave's stake in the company in a few months. This was a lie in several respects. First, Dave had not in fact traded his bitcoin and intellectual property rights for an interest in the Australian company. Second, the company went bankrupt shortly after Craig misled the Australian Tax Office ("ATO").

16. The ATO raided Craig's home in late 2015 and Craig fled Australia for London. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself and Dave as the alleged creators of Bitcoin.

17. Craig currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

18. To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Plaintiffs. This action is brought to rectify that injustice.

19. As described in detail below, Craig's pattern of lies, deception, and fraudulent conduct continues even against this Court. His fraud on this Court is simply the latest step taken in Florida to defraud the estate and W&K.

## FACTUAL ALLEGATIONS

### Bitcoin

20.     Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of March 14, 2018.[2] At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the bitcoin blockchain.

21.     In order to transact with bitcoins, you must have a bitcoin wallet. Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would like to receive bitcoin from others. Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet. Wallets are separate computer files dedicated to storing information about specific bitcoins.

22.     Each wallet is also assigned a "private key." Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

23.     There are two methods of acquiring bitcoins. The first involves simply receiving bitcoins from someone. In fact, there are many businesses that operate "bitcoin

---

[2] https://coinmarketcap.com/.

exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

24.     The second way one can acquire bitcoins is by "mining" them.

25.     There is no centralized authority that curates the Bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

26.     Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

27.     When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger. The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million. At the current mining rate and reward algorithm, this maximum circulation will be reached in circa 2140.

28.     Today, the mining reward is 12.5 bitcoins for each block added to the blockchain. That, together with rising competition in mining bitcoins means it was easier to amass significant amounts of bitcoins in 2009, than now.

7

29. To date, just over 17 million of the total 21 million bitcoins have been mined.

## History of Bitcoin

30. On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

31. Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

32. Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

33. Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010. Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent on April 23, 2011. It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

8

34.    For most of its early history, bitcoins were of relatively little value. Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010. At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

35.    During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

36.    It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

### Bitcoin "forks"

37.    Since its inception in 2009, Bitcoin has inspired the creation of over one thousand other digital currencies. Many of these new cryptocurrencies use characteristics of the initial Bitcoin program, but have made significant changes to the original model in an attempt to create an entirely new cryptocurrency with distinct functions or ones better suited to a specific market niche.

---

[3]    *See    e.g.*    http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://cklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

38.     In other cases, individuals have taken the actual Bitcoin protocol and modified it in a way they believed would improve Bitcoin itself, *e.g.*, by allowing more transactions into a single "block" of the blockchain.

39.     If the "improved" Bitcoin protocol garners significant support, but less than a majority of support, a new version of "Bitcoin" is created. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. The result is that any individual who owned the original Bitcoin, now owns an identical amount of the new Bitcoin. After the point of the "fork," the ledgers will diverge as owners "spend" the two assets differently.

40.     This has happened numerous times to Bitocin. To date, however, the original Bitcoin protocol remains the most valuable in terms of its correlation to the US dollar, with a market capitalization of ~$150 billion at the time of filing. However, other noteworthy Bitcoin forks include Bitcoin Cash (market cap. of ~$25 billion), Bitcoin Gold (market cap. of ~$1.0 billion), Bitcoin Private (market cap of ~$510 million), and Bitcoin Diamond (market cap. of ~$650 million).

41.     As explained below, the bitcoins at the heart of this dispute were all mined prior to the creation of any of the aforementioned Bitcoin forks.   Consequentially, Plaintiffs' claims of ownership over these original bitcoins necessarily implicates ownership over their "forked" counterparts ("forked assets").[4]

---

[4] Consequently, where appropriate, the word "bitcoins" should be construed to include claims over the "forked assets" as well.

## Background on parties and key individuals

42.     Dave Kleiman was born in 1967.  Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

43.     A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound.  After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

44.     Dave began working in the information technology security sector in 1990.  He was a frequent speaker at national security conferences and was a regular contributor for many security related newsletters, websites, and online forums.

45.     Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

46.     Dave was also a Secure Member and Sector Chief for Information Technology at the FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA).  When he attended conferences, he was known as "Dave Mississippi," a nickname referring to the long string

11

of three letter certificates that followed his name; which could literally be used to spell Mississippi.

47.     Dave co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[5] and Security Log Management: Identifying Patterns in the Chaos.[6]

48.     In 2010, Dave was hospitalized. He was in and out of medical facilities due to MRSA infected sores. On March 22, 2013, Dave signed out of the hospital against medical advice. He was unstable and nearing death.[7] On April 26, 2013, Dave passed away.

49.     Ira is Dave's brother and the personal representative of his estate.

50.     Craig is a 46-year-old Australian computer scientist and businessman. Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange. Craig claims to have many degrees, including doctorates, masters, and technical certifications; these claims are disputed.[8]

51.     In May 2016, Craig claimed that he and Dave were Satoshi Nakamoto—the venerated creator of Bitcoin.

---

[5] https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[6] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[7] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

[8] https://www.forbes.com/sites/thomasbrewster/2015/12/11/bitcoin-creator-satoshi-craig-wright-lies-hoax/#12e524116794.

### Dave and Craig's early relationship

52.     Dave and Craig met in or around 2003. Both men had a longtime interest in cyber security and digital forensics, and the future of money. (Ex. 1 at 26).[9]

53.     For years, they communicated on various topics related to the internet and file sharing. For example, in 2008 they co-authored a paper on the mechanics of overwriting hard drive data.[10]

54.     Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography. (Ex. 1 at 27).

55.     In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig emailed Dave saying: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all." (Ex. 32).[11]

56.     After leaving his job in late 2008, Craig wrote to Dave: "I need your help. You edited my paper and now I need to have you aid me build this idea." (Ex. 1 at 31). For the next few months, Craig and Dave worked to get Bitcoin operational.

57.     On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain. (Ex. 1 at 32).

---

[9] All Exhibit citations refer to the as filed ECF pagination.

[10] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[11] Craig sent a "copy" of this communication to Ira on March 6, 2014.

58.   On November 26, 2009 (Thanksgiving Day), Ira Kleiman and Dave met at their father's home for an early dinner. He and Dave discussed Facebook's recent success and Ira asked Dave if he was working on anything interesting. Dave responded by telling Ira he was working on "something bigger" than Facebook, that he was "creating his own money."

59.   Ira asked Dave to clarify and jokingly asked if Dave was making counterfeit money.

60.   Dave responded by saying he was making "digital money." He then opened his wallet, took out a business card, flipped it over, drew a "B" with a line or two through it, and commented on how "we" were working on a logo.

61.   Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. Ira asked Dave why he didn't partner with this wealthy individual. Dave was silent, which Ira understood to be Dave's concession they were already partners.

62.   On May 20, 2014, Ira shared this story with Craig via email. (Ex. 2).

63.   Craig responded that same day stating "we did partner ;)". (*Id.*). Craig then commented on the "properties" stating, *inter alia*, that he owned 550 acres. (*Id.*). He then said, "I will have to see what I can dig up. The old Bitcoin logo we did is no longer used. I have a copy." (*Id.*). Craig later provided Ira with a copy of this Bitcoin logo. (*Id.*).

64.   This independent verification that Dave was creating "digital money" with Craig in 2009, Craig's admissions that he and Dave were "partners" in this venture, part of the Satoshi team, and that they were mining bitcoin through W&K, all lead to the

14

inescapable conclusion that their collaboration in "creating" or "mining" bitcoin and intellectual property was continuous from 2009 until Dave's passing in 2013.

65. From their collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (personally and through W&K). These bitcoins were, as all bitcoin are, stored in specifically identifiable bitcoin wallets that Craig has now asserted ownership over.

66. Further, Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K. As Craig email to Ira on March 7, 2014, "I had an idea, but it would never have executed without Dave." The estate and/or W&K owns all this intellectual property.[12]

### Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property

67. The exact structure of their joint mining activities, intellectual property development, and "partnership" from c. 2008 until February 2011 requires discovery to fully reveal.

68. From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K.

---

[12] The exact division of intellectual property ownership between Dave's estate and/or W&K will be determined at trial. Accordingly, some counts contain a request for relief from both Plaintiffs, and it will be for the final finder of fact to determine what each Plaintiff is entitled to recover.

69. On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. (Ex. 3).

70. W&K has no operating agreement and its exact ownership structure is unclear due to Craig's contradictory statements. In an affidavit Craig filed in Australian court proceedings, Craig stated he and Dave each owned 50% of W&K. (Ex. 4 at 5). But in a fake "contract" produced by Craig, he states Dave owned legal title to 100% of W&K, while holding 50% in trust for Craig. (Ex. 5 at 3). He doubled down on some form of this equal split in a 2014 email to Ira, where he represented that "Dave owned 50% of" W&K. (Ex. 6 at 2),[13] and when both he and his counsel referred to it as a "joint venture." (Ex. 4 at 50, 57, 64, 71, 77, 84; Ex. 9 at 6). In contrast, Craig has testified to this Court that he does not have, and never has had, any interest in W&K.[14] (Ex. 29 ¶ 10). But it makes sense Craig would have some form of indirect interest as the entity appeared to be named after them both: **W**right & **K**leiman.

71. As best as can presently be discerned, Dave was the sole "member" of W&K, but Craig maintained some kind of beneficial ownership interest in W&K, which he subsequently disclaimed.

---

[13] This Amended Complaint attaches certain emails with timestamps from Australian time zones. For consistency, the Amended Complaint has converted various timestamps to Eastern Standard Time.

[14] When confronted with the claims in this lawsuit, Craig didn't hesitate to continue his fraud against W&K and Dave's estate by perjuring himself in a sworn declaration filed with this Court, wherein he now swears, in absolute conflict with his Australian affidavit, that he never had any interest in W&K. See *Infra*, 160-170. It seems that whatever interest he once held in W&K, he has disclaimed it.

16

72.    Regardless of its exact ownership structure, the purpose of W&K was clear: Craig and Dave created it to mine bitcoin and develop intellectual property.

73.    *First*, on telephone conversations with Ira, Craig admitted this was W&K's purpose.

74.    *Second*, Craig has admitted this in writing multiple times. For example, in a "chronology" Craig sent to Ira, he wrote that that W&K "was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies, and to mine Bitcoin." (Ex. 7). Craig also put this admission into legal documents he claims are valid stating that W&K "is the owner of and conducts the business known as Bitcoin mining and Software development / Research." (Ex. 5 at 3). Finally, Craig has admitted this to third parties where, e.g., on February 12, 2014, he emailed Dave's former business partners stating "Dave and I had a project in the US. He ran it there . . . The company he ran there mined Bitcoin." (Ex. 8 at 5).

75.    *Third*, in leaked ATO transcripts, Craig's bookkeeper states that "W&K was an entity created for the purpose of mining Bitcoins." (Ex. 9 at 3).

76.    Dave and Craig collaborated within W&K to create intellectual property. Craig then used W&K and this intellectual property to personally solicit business from the United States Department of Homeland Security ("DHS"). (Ex. 4 at 40-43).

77.    Craig acted as W&K's "authorized representative," its "lead researcher," and its "technical contact." (*Id.* at 45-46, 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90). Further, Craig repeatedly used W&K's Florida address as his own, *e.g.*, identifying it as his

"mailing address." (*Id.* at 50, 57, 64, 71, 77, 84). Craig has also held himself out as W&K's

"legal agent and representative" and its "Director/Australian Agent." (Ex. 30).

78.     Craig also claimed to have (i) delivered servers and other computer hardware

to Florida for W&K's use (Ex. 10 at 3 (Recital L)); (ii) provided "contract labour services"

to W&K (Ex. 11 at 2); (iii) licensed software for W&K's use (Ex. 10 at 3 (Recital M)); and

(iv) loaned money to W&K for use in its Florida mining operation (Ex. 10 at 3 (Recital L);

Ex. 11 at 3).

## Dave and/or W&K owned a substantial amount of bitcoin

79.     The exact number of bitcoins belonging to Dave's estate and/or W&K will

be determined at trial.[15]   That said, various documents including emails, "contracts,"

spoken admissions, and transcripts from 2014 ATO meetings with Craig, his counsel, and

his accountant evidence Dave and Craig owned and controlled approximately 1,100,111

bitcoins (either together personally or through their shared interest in W&K).

80.     As discussed above, Craig admitted that he "did partner" with Dave in 2009

to create/mine "digital money," i.e., bitcoins.   And Craig has also admitted in multiple

documents that W&K (beneficially owned, at the time, and in some form, by Dave and

Craig) mined bitcoin.   Due to the historically larger mining reward and low competition

existing during that time, Craig and Dave's continuous joint bitcoin mining activity since

2009 would have resulted in an unparalleled fortune of bitcoins.

---

[15] Accordingly, some counts contain a request for relief for both Plaintiffs, and it will be for the
final finder of fact to determine how much each Plaintiff is entitled to recover.

18

81.     Furthermore, in February 2014, Craig emailed two of Dave's other business partners stating Dave had mined an enormous amount of bitcoins, an amount *"far too large to email."* (Ex. 8 at 5).

82.     In addition, a transcript of a February 18, 2014 meeting between the ATO and Craig demonstrates that Craig has led others to believe he took ownership of Dave's bitcoin. The ATO investigator states:

> We thought yes, *you've picked up some bitcoin ownership from the deceased director* so we were trying to, you know, get the picture and connect all the dots. (Ex. 12 at 20) (emphasis added).

83.     Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper (John Chester), document Craig's bookkeeper stating that Dave had an incredible amount of bitcoin, and implying that Craig assumed ownership of them when he died:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there. Mr Kleiman *would have had* a similar amount. *However*, Mr Kleiman *passed away* during that time. (Ex. 9 at 3) (emphasis added).

84.     At the February 18, 2014 meeting, Craig's counsel states that W&K's bitcoins were transferred to Seychelles, Singapore, and UK trusts. As Dave owned between 50% to 100% of W&K, *at least* half of the bitcoins allegedly transferred to the trusts belong to Dave (and/or they all belong to W&K):

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as . . . effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually

19

trusts. Trustee companies and trusts established = or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately Dave . . . dies in the US towards the end of April 2013. (*Id.* at 6).

85.     Years later, Craig admitted to Andrew O'Hagan that "his and Kleiman's mining activity ha[d] led to a complicated trust." (Ex. 1 at 36).

86.     In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint nature of the bitcoin allegedly held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the [expletive] *we* are doing with it all. So, a good tax deductible way to have a visit and also write a paper. (Ex. 31)

87.     In fact, Craig consistently referred to the "trust" as both Craig and Dave's, for example in another email Craig forwarded to Ira (emphasis added):

> From: Craig S Wright
> To: dave@davekleiman.com
> Subject: This week
> Date: Tue, 22 May 2012 09:45:31 +1000
>
> Dave,
> A recycled rant . . . the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try [expletive] **on us** then. . . (Ex. 13) (bold emphasis added; profanity redacted).

20

88.     In a 2014 email exchange with Ira, Craig *admitted* that at least 300,000 of

the 1,000,000+ bitcoins allegedly held in trust belong to Dave:

> From: Ira K <REDACTED@REDACTED>
> To: Craig S Wright <craig.wright@hotwirepe.com>
> Subject: Bond villains
> Date: Sat, Mar 1, 2014 at 2:42 PM
>
> Just to clarify on thoughts from previous email... In one of the email
> exchanges between Dave and you, he mentioned that you had 1
> million Bitcoins in the trust and since you said he has 300,000 as his
> part. I was figuring the other 700,000 is yours.  Is that correct?
> Ira
>
> ---
>
> From: Craig S Wright <craig.wright@hotwirepe.com>
> To: Ira K <REDACTED@REDACTED>
> Subject: Re: Bond villains
> Date: Sat, Mar 1, 2014 at 3:00 PM
>
> Around that. Minus what was needed for the company's use
> Sent from my HTC.  (Ex. 14).

89.     As discussed below in more detail, Craig provided fraudulent contracts to the

ATO in an attempt to substantiate his ownership of bitcoins and intellectual property assets

that belonged to Dave and/or W&K.  Their authenticity aside, however, these "contracts"

produced by Craig constitute his admission that Dave, Craig, and W&K collectively owned

hundreds of thousands of bitcoins.

90.     For example, a 2011 contract produced by Craig includes a provision stating

W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of

over two years (312,000 bitcoin).  (Ex.10).

21

91.     Further, a 2012 contract provided to Ira by the ATO lists Bitcoin wallets containing over 650,000 bitcoins (the "2012 Deed of Loan"). Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*" (Ex. 15 at 9). This annotation is in Craig's handwriting.

92.     As can be seen, Dave, in partnership with Craig, lawfully mined and possessed hundreds of thousands of bitcoins both in his individual capacity and through W&K.

93.     The mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts. These wallets were not used for any purpose but to store the bitcoins for sale at some future date.

94.     As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined. As demonstrated from emails produced by Craig, his ability to control the bitcoins continued once they were, allegedly, placed in trust.

### After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K

95.     After Dave's death, Craig took sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K and those that were held in trust for Dave and/or W&K and refuses to return any bitcoins or intellectual property to the estate or W&K.

96.     It appears that Craig needed to use W&K and Dave's assets to try and justify certain tax positions he claimed in Australia. To that end, he instituted an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property.

97.     To accomplish this scheme, Craig drafted and backdated at least three contracts, and forged Dave's signature on at least two, to create a fraudulent "paper trail" purporting to show that Dave transferred bitcoins and intellectual property rights that belonged to Dave and W&K, to Craig. These fraudulent contracts include:

      a.     2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

      b.     2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 15); and

      c.     2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 5).

98.     On their face, these contracts are demonstrably fraudulent in a number of manners.

99.     *First*, the electronic signatures on these documents are not Dave's. They are substantially different than known examples of Dave's electronic and written signatures:

23

| Authentic Signatures<br>2/1/2013[16] & 7/30/2003[17] & 2/22/2012 | Signature on Fraudulent Contracts<br>4/22/2011 & 04/2/2013 |
|---|---|
|  |  |

100.     In fact, this signature is a near identical copy of a computer-generated font

called Otto, available here: https://www.wfonts.com/font/otto. When computer generated,

this Otto font produces the signature:

Otto.ttf



101.     When confronted with this information by Ira, Craig admitted the signatures

were computer generated, but claimed there were other ways to prove their veracity.

102.     Craig has never provided additional evidence of their legitimacy.

---

[16] See Ex. 16 (signature on Computer Forensics LLC Operating Agreement).

[17] See Ex. 17 (signature on Dave's last will and testament).

24

103. *Second*, the "Purchaser" listed in the 2013 W&K Sale Agreement is "Craig Wright R&D" and is further identified by its Australian Business Number (ABN) 97 481 146 384. However, the entity associated with this ABN was not identified as "Craig Wright R&D" until September 2, 2013 – over three months after Dave died.[18]

104. *Third,* the terms of the 2011 IP Agreement are nonsensical. While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time. Thus, no one could "finance" or "fund" anything with bitcoins then. This calls the 2013 W&K Sale Agreement's purported "release" of this nonsensical "financing arrangement" into question.

105. *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other. The 2011 IP Agreement provides that Bitcoin wallet 1933***XY8a would be held by Craig in escrow and revert to Craig only if W&K defaulted, but the 2013 W&K Sale Agreement provides that it will be "released to" Craig *despite* satisfaction of the liability, and the 2012 Deed of Loan shows that same wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up a joint-company later.

106. *Fifth,* the 2013 W&K Sale Agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

---

[18] https://abr.business.gov.au/SearchByAbnHistory.aspx?abn=97481146384

107.    *Sixth*, the fraudulent signatures aren't witnessed or notarized. Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

108.    *Lastly*, many of the contractual terms are extremely convenient for Craig. For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 AUD (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

109.    These red flags are rendered even more suspicious by the fact that the 2013 W&K Sale Agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

110.    Craig has a documented history and habit of backdating contracts and documents to suit his needs. During the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices. (Ex. 12). Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[19] Finally, in its 2015 audit of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information by, *inter alia*, backdating numerous documents. (Ex. 18).

---

[19]    https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

111. As described herein, after Dave died, Craig unlawfully and without permission took control of the bitcoins from Dave's estate and from W&K by exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K; actually using those private keys to move these bitcoins out of their wallets; claiming to own bitcoins really owned by W&K and/or Dave by virtue of fraudulent contracts Craig created; refusing to return bitcoins that belonged to the estate and W&K; moving them to, or holding these bitcoins in, "trusts" known only to him and controlled by him and preventing these assets from being returned to the estate and/or W&K; and using those bitcoins (or the "rights" to them) to make large trades for his Australian businesses.

112. While the exact number of bitcoins stolen remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of *at least* 300,000 bitcoins that Craig controls in a trust (along with their forked assets). But the estate may be entitled to even more bitcoins based on Dave and Craig's partnership from 2009 until 2011.

113. Further, as Craig's admitted that the mining continued within W&K from 2011, W&K is entitled to the possession of all bitcoins mined through its operations since 2011 (along with their forked assets).

114. To Plaintiffs' best knowledge, information, and belief, these bitcoins could number around ~1,100,111.[20] Together, these bitcoins and their forked assets are worth

---

[20] Should discovery reveal additional bitcoin were mined, either by Dave individually, or by W&K after Dave died, Plaintiffs may amend their Complaint to assert a claim over those bitcoins and their forked assets as well.

27

approximately $11,427,755,048.02, though at their peak in December 2017 they were worth ~$27,332,125,781.68.

115.    Ira has requested Craig return these bitcoins, but Craig has not done so. In light of this refusal, demanding the return of the forked assets would be futile.

116.    Thus, Craig has wrongfully asserted dominion over Dave and W&K's bitcoins forked assets, and intellectual property in a way that is inconsistent with Dave and W&K's ownership of those bitcoins, forked assets, and intellectual property which has damaged them both.

### Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts

117.    In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each.  (Ex. 11).

118.    In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]."  (Ex. 11 at 3, 9).  The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]."  (*Id.* at 4, 10). The statements of claim allege that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties."  (*Id.*).

119.    W&K was never served, validly or otherwise, with these proceedings; Dave's estate was not even aware of them until long after the judgments had been entered.

28

120.    Craig prevented W&K from participating in these proceedings as, *inter alia*, he filed, in both lawsuits, a false "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims. (Ex. 30). In these filings, Craig falsely identified himself as the "legal agent and representative for the defendant" and its "Director/Australian Agent" and falsely stated that "I acknowledge the whole of the amount being claimed by the plaintiff." (*Id.*). Further, he falsely identified his Australian address and email as the "Address for service" for W&K. (*Id.*).

121.    Craig further prevented W&K from participating in the proceedings, by filing, on August 28, 2013, Consent Orders in both cases. (Ex. 19). These filings represent to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer," a "J Wilson." (*Id.* at 2). But J Wilson – Craig's employee – was not authorized. Instead, Craig "elected" him a director at a "shareholder meeting" where only Craig was present and only Craig voted. (Ex. 4 at 5-6).

122.    Craig did this even though (i) Craig did not have any direct or voting interest in this Florida LLC (only an indirect or beneficial interest), (ii) Dave's estate (which held at least 50% of the interest in the LLC) was not notified of the meeting, and (iii) even if Craig had a 50% voting interest in W&K, the election of Wilson was void because the "meeting" lacked a quorum.

123.    In April 2014, Ira first learned of these court proceedings, when the ATO sent him some of the court documents. Ira confronted Craig for taking Dave and W&K's assets and concealing the court proceedings from Dave's estate. Craig admitted his subterfuge, but defended himself by claiming the ends justified the means:

> Ira: ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."
>
> Craig: "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." (Ex. 20 at 18).

124.  Importantly, these Australian claims, like the sworn testimony he submitted to this Court, are based on demonstrably false factual allegations. Specifically:

125.  The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2). However, W&K did not exist in 2008.

126.  Also, the July 2013 claim alleges:

> "[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:
>
> a.  BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance: Software Assurance through Economic Measures
>
> b.  BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks
>
> c.  BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics
>
> d.  BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 9-10).

127.  The July 2013 claim goes on to state that "these funds were rated as:

> a.  TTA 01      US$ 650,000
>
> b.  TTA 05      US$ 1,8000,000 (*sic*)

30

> c.  TTA 09      US$ 2,200,000
>
> d.  TTA 14      US$ 1,200,000." (*Id.* at 10).

128.   However, these statements were false.   The results of Freedom of Information Act requests by Ira to the DHS reveals that W&K's applications for TTA 01, TTA 05, TTA 09, and TTA 14 were all denied by the DHS. (Ex. 21).

129.   The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 8, 2009 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (Ex. 11 at 2). But again, W&K did not exist until 2011.

130.   On November 6, 2013, judgments appear to have been entered for both Australian claims. (Ex. 22). Craig's fraud to keep W&K and Dave's estate out of the litigation was successful as, in the judgment, the Court "note[d] the agreement of the parties that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*) (emphasis added).

131.   To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K and Dave. For example, in the February 18, 2014 meeting with the ATO, Craig's attorney represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on." (Ex. 12 at 7). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust

into Hotwire . . ." (*Id.* at 18). Further, as discussed in para 142-143, the ATO has provided Ira with "deeds" drafted and executed by Craig which show that his companies have taken ownership over the intellectual property created by W&K and "transferred" by virtue of these fraudulently obtained "judgments."

### Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, and secure an ally in his fight against the ATO

132.    With the ATO closely auditing Craig's activities, Craig knew he had to reveal some of his and Dave's bitcoin mining and blockchain work to justify various tax positions he took in Australia. Realizing this would lead the ATO to contact the Kleimans, Craig reached out first.

133.    Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <REDACTED@REDACTED>
>
> Hello Louis,
> Your son Dave and I are two of the three key people behind Bitcoin
> . . .
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.

I will let you know when I am in the USA. (Ex. 23).

134.    As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

135.    Craig told Ira he was partners with Dave and that no one knew about their collaboration or W&K. He explained to Ira that W&K was involved in Bitcoin mining and that it was quite successful.

136.    Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch." He explained to Ira that Dave's estate would receive shares in it worth millions.

137.    On April 23, 2014, Craig wrote to Ira:

Date: April 23, 2014 8:56pm
From: Craig <craig@rcjbr.org>
To: Ira <REDACTED@REDACTED.com>

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims. (Ex. 24).

138.    At the same time Craig was defrauding the Kleimans, Craig also reached into Florida though an agent, Uyen Nguyen, to revive W&K after it had been administratively dissolved – to ensure he had control over it if necessary.

139.    Consequently, on March 28, 2014, nearly a year after Dave died, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen"). (Ex. 25). Uyen removed Dave as the

registered agent for W&K and listed herself. (*Id.*). She then added herself as manager and secretary and an entity named Coin-Exch Pty Ltd as director. (*Id.*; ECF 12 at 11 n3). But Coin-Exch Pty Ltd was merely Craig seizing control of W&K from the shadows, as it's well established "Craig Wright" was the "director and controlling mind" of Coin-Exch Pty Ltd. (Ex. 18 at 5).[21]

140.    Of course, despite Ira and Craig being in regular email contact at the time, Craig concealed this action from Ira.

## The ATO reached out to Ira to verify Craig's allegations over W&K, and provided Ira with documents that demonstrate Craig assumed control over intellectual property that belonged to W&K and/or Dave

141.    As Craig expected, on April 15, 2014, an auditor from the ATO, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

142.    The ATO also provided Ira with three deeds, each titled "IP Deed of Assignment" and each executed on September 15, 2013 – nearly four months after Dave's death. (Ex. 26; Ex. 27; & Ex. 28). Each of these IP Deeds of Assignments assigned various intellectual property rights from DeMorgan Ltd to three entities: Coin-Exch Pty Ltd (Ex. 26), Hotwire Preemptive Intelligence Pty Ltd (Ex. 27), and Cloudcroft Pty Ltd (Ex. 28).

143.    The deeds also described the source and nature of this IP: "The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have

---

[21] https://www.arnnet.com.au/article/621503/australian-bitcoin-figure-supercomputing-company-enters-liquidation/.

been obtained by Craig Wright R&D (ABD 97 481 146 384) through the following unrelated entities . . . W&K Information Defense Research LLC [as two batches]." (Ex. 26 at 4; Ex. 27 at 4; & Ex. 28 at 4).

### Craig continues to assure Ira and reveals the nature of the intellectual property owned by, and misappropriated from, W&K and Dave

144.    On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ," (Ex. 24 at 20).

145.    To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." (*Id.* at 12). On April 23, 2014, Craig told Ira that he would receive the first $12 million payment in October 2014. (*Id.* at 8).

146.    On the same day, trying to further placate Ira, and further evidencing Dave and the estate's claim to W&K's transferred intellectual property, Craig wrote Ira stating:

> The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level . . . Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. (*Id.* at 2).

147.    On April 25, 2014, still trying to reassure Ira, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property. In this document, Craig wrote:

> There is a lot of IP and 'stuff' in the mix. All up, it's around a hundred million dollars' worth. This IP originates in work CSW

> has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired. The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch. Cloudcroft gets the security related IP, Coin-Exch gets the banking and Hotwire gets all of the automation R&D based stuff. (Ex. 7).

148.    The nature of this intellectual property transferred from W&K to DeMorgan, Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft was further explained by Craig in a letter he published on DeMorgan's website in 2015. This letter demonstrates that Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft were involved in building out W&K's intellectual property with R&D efforts targeted at "the development of smart contract and Blockchain based technologies" and "commercialisation of our Blockchain and smart contract systems research."[22]

149.    Craig's promise of a multi-million dollar payment by October 2014, never came true. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

150.    On October 9, 2015, Craig essentially stopped responding to Ira.

151.    In November 2015, Dave's friend and business partner, Patrick Paige reached out to Craig when a reporter called him inquiring about Craig and Dave's involvement in Bitcoin. Craig responded:

> Thanks for the heads up. Reporters are always troubling. They ignored the stuff Dave and I did when he was alive. I don't know what has started to interest them now . . . as you know[, **Dave] did**

---

[22]http://www.businessinsider.com/craig-steven-wright-rumoured-bitcoin-creator-was-commercialising-blockchain-research-and-reviving-company-hotwire-2015-12; https://prwire.com.au/pr/51565/the-demorgan-ltd-group-of-companies-to-receive-up-to-54–million-from-ausindustry-r-amp-d-tax-rebate-scheme-1.

> **a fair amount of research with me. Most yet to be completed and published**. (Ex. 8 at 13 (emphasis added)).

152.    After Craig yet again confirmed Dave's involvement in Bitcoin and the intellectual property they developed, Patrick wrote back:

> . . . . I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins. I realize there is a lot of things to consider releasing this information but my question is when? (*Id.* at 12).

153.    Craig responded: "When it all comes out, there is no way Dave will be left out. **We need at least a year more**." (*Id.* (emphasis added)).

### Craig claims that he and Dave are Satoshi Nakamoto

154.    On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[23]   Both articles also articulated Dave's integral role in the development of Bitcoin.  They described numerous details and leaked communications implicating Dave and Craig's roles in creating and developing Bitcoin; they also discussed Dave and Craig's accumulation of a vast hoard of bitcoin.

155.    On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[24]

156.    Craig has readily admitted Dave was intimately involved in the creation of Bitcoin. In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair,*

---

[23] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/;  https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[24] https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/.

Craig told O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 31).

157.    Further, in numerous emails to Ira, Craig admitted the same.

158.    Craig currently serves as Chief Scientist of a UK company called nChain in London, where, in 2016, he filed dozens of patents related to Bitcoin and blockchain technology through this entity.[25] The public filing of these patents disclosed to the public intellectual property belonging to Dave and W&K without the permission of Dave's estate and/or W&K.

159.    To date, neither Dave's estate nor W&K have received the assets belonging to them as a result of their early involvement in Bitcoin and bitcoin mining.

### Fraud on this Court[26]

160.    In Ira's initial Complaint, as in this one, he alleged that (i) Craig and Dave held some form of interests in a Florida LLC called W&K, that (ii) through this LLC, and otherwise, they mined over 1.1 million bitcoins and developed extremely valuable intellectual property, that (iii) after Dave died, Craig took unlawful possession of all the bitcoins the Florida LLC mined and intellectual property it created (along with the bitcoin and intellectual property they mined/developed together personally), that (iv) Craig then tried to "launder" this stolen intellectual property by defrauding the Australian courts into

---

[25]  https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V.

[26] The emphases appearing in this section have been added.

entering consent orders transferring clean title over W&K's intellectual property to Craig; and that (v) Craig needs to return the stolen property.

161.    In response to this Complaint, Craig filed a motion to dismiss alleging he has essentially **no** connection to Florida or W&K.  His motion stated Plaintiff's jurisdictional allegations were "frivolous" and "sanctionable." (ECF D.E. 12 at 36).  Craig supported these assertions with a sworn declaration stating he was never a shareholder, member, agent, employee, or representative of W&K. (Ex. 29 ¶¶ 11-12).  He swore, under penalty of perjury under the laws of the United States, that he's never exercised authority or control over W&K. (*Id.* ¶ 13).

162.    He perjured himself.

163.    To procure his fraudulent Australian judgments, Craig submitted an affidavit to the Supreme Court of New South Wales where Craig affirmed that:

> "The **shareholding** of 'W&K Info Defense LLC' was:
>
> 1.  **Craig S Wright**        **50.0%**
> 2.  David A Kleiman        50.0%"

(Ex. 4 at 5).

164.    Craig then doubled down on this ownership structure affirming further that "W&K Info Defense LLC was an incorporated partnership. **All shares are held jointly.**" (*Id.*). He then affirmed that **he called a "shareholders meeting"** on August 16, 2013 at which only he and Jamie Wilson were present. (*Id.*). Craig affirmed **he was the sole vote**

that nominated Jamie Wilson to act as a director "for purposes of consenting to orders and the company to be wound down." (*Id.* at 5).[27]

165.    These affidavit statements directly contradict his sworn statements to this Court that (i) "I have never been a . . . **shareholder** . . . of W&K," (ii) "I have never been a **member** of W&K," and (iii) "I have never **exercised authority or control** over W&K . . ." (Ex. 29 ¶¶ 11-13).

166.    But the perjury doesn't end there.

167.    Craig attached voluminous records to his Australian affidavit. These attachments evidence Craig signed as the "**authorized representative**" of W&K six (6) times (Ex. 4 at 56, 63, 70, 76, 83, 90), identified himself as W&K's "**lead researcher**" twice (*id.* at 45-46), its "**technical contact**" six (6) times (*id.* 50, 57, 64, 71, 77, 84), affiliates himself with **W&K's Florida address** as, *e.g.*, his "**mailing address**" twelve (12) times (*id.* at 49, 56-57, 63-64, 70-71, 76-77, 83-84, 90), includes detailed descriptions of the computer programs and research Craig was **attempting to get DHS to fund** (*id.* at 50-94), and includes four (4) emails from DHS confirming Craig had **uploaded various proposals on behalf of W&K attempting to secure funding** (*Id.* at 40-43). Collectively, these documents clearly evidence Craig's participation in operating W&K from Florida to solicit business from the United States DHS.

---

[27] Under Florida law, there is no such thing as an "incorporated partnership" and an LLC does not have "shares" or "directors" or hold shareholders' meetings. The "owners" of an LLC are called "members."

168.     Obviously, these affidavit attachments are in direct conflict with Craig's sworn statements to this Court that (i) "I have never been a . . . **employee, or** representative of W&K," (ii) "I have never been an **agent** of W&K," (iii) "I have never . . . **developed software for** any purpose relating to a Florida business, including **W&K**," (iv) "I have never **advertised services in Florida**," (v)  "I have never had an **office in Florida**," and (vi) "I have never **exercised authority or control over W&K** . . ."  (Ex. 29 ¶¶ 6, 8, 11-13, 15).

169.     As mentioned in ¶ 120, Craig also filed submitted two "Acknowledgment of Liquidated Claim" filings in Australia where he signed as the "**legal agent and representative**" of W&K and as its "**Director/ Australian Agent**." (Ex. 30). As set forth in ¶¶ 138-139 he also acted as the "**director**" of W&K when he had his agent put Coin-Exch, his company, as its director.  These also directly conflict with his sworn testimony above.

170.     Craig's boldfaced misrepresentations and perjury before this Court constitute a continuation of his grand fraud to unlawfully take Plaintiffs' assets.  Said differently, Craig's latest fraud on this Florida Court is simply one more action he's taken in Florida to defraud Dave's estate and W&K.

## CLAIMS FOR RELIEF

### COUNT I
### Conversion
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

171.    On or about April 2013 through the present day, Defendant converted to his own use, bitcoins, forked assets, and intellectual properties that was then the property of, and owned by, the estate and/or W&K.

172.    The property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets. Plaintiffs demands the return of the IP, or its fair market value. Plaintiffs also demand punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT II
### Unjust Enrichment
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

173.    Plaintiffs have conferred a benefit on the Defendant, who has knowledge thereof.

174.    Defendant voluntarily accepted and retained the benefit conferred.

175.    The circumstances render Defendant's retention of the benefit inequitable unless the Defendant pays to Plaintiffs the value of the benefit.

42

176.     Defendant has been unjustly enriched at Plaintiffs' expense.

177.     Plaintiffs are entitled to damages as a result of Defendant's unjust enrichment, including disgorgement of all monies and or properties unlawfully accepted and retained by Defendant from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant for the return of the wrongfully retained property or monetary damages equaling to the value thereof, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT III
### Misappropriation
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

178.     After Dave's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave and/or W&K relating to blockchain based technologies and smart contracts by using them for himself and using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

179.     These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

43

**131**
Page 97 of 420

180.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

181.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

182.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and/or W&K have suffered actual losses consisting of the loss in economic value associated with the trade secrets.

183.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and W&K are informed and believe that Craig has been unjustly enriched.

184.    As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiffs demand judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

**COUNT IV**
**Federal Defense of Trade Secrets Act**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

185.    Craig's conduct described in this Amended Complaint constitutes misappropriation of trade secrets under the Defend Trade Secrets Act. 18 U.S.C. §§ 1832.

186.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts which is a product used and intended to be used in interstate and foreign commerce. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

187.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

188.    Craig caused many of these patents to be filed *after* May 11, 2016.

189.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

190.    As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

191.    As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

WHEREFORE, Plaintiffs demand judgment against Defendant for the value of the wrongfully taken intellectual property, together with court costs, interest, attorney's fees, and any other relief this Court deems just and proper.

## COUNT V
### Breach of Fiduciary Duty
*(Asserted by the Estate and W&K)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

192.    Although Craig did not have a direct ownership interest in W&K, he owed fiduciary duties to the LLC, as, *inter alia*, its agent, its purported "authorized representative," "lead researcher," "technical contact," "legal agent and representative" and "Director/Australian Agent." Although lacking any authority to do so, upon Dave's death Craig assumed *de facto* control and management of W&K and thereby incurred fiduciary duties to act in the LLC's, and its member's, best interests.

193.    In the alternative, just as the shareholders of a closely held corporation have partnership-like fiduciary duties to each other, Craig and Dave acted as partners in the management and operation of W&K, and thus Craig owed fiduciary duties of care, loyalty, and good faith to Dave, his estate, and W&K, by virtue of their joint venture.

46

194.     In the alternative, if Craig *was* an actual member in W&K Info Defense LLC, Craig owed fiduciary duties of care, loyalty, and good faith to W&K, Dave, and his estate pursuant to Fla. Stat. § 605.04091.

195.     Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate and/or W&K to himself and/or companies controlled by him.

196.     Dave's estate and or W&K have been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages and/or return of the wrongfully taken bitcoins, forked assets, and intellectual property, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VI
### Breach of Partnership Duties of Loyalty and Care
*(Asserted by the Estate)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

197.     From c. 2008 until at least the creation of W&K in 2011, Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property. Pursuant to Fla. Stat. § 620.8202, and Craig's admission of same, this formed a partnership.

198.     Pursuant to Fla. Stat. § 620.8404(2), Craig owed Dave a duty of loyalty to, *inter alia*, "account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership

47

business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

199.    Pursuant to Fla. Stat. § 620.8404(3), Craig owed Dave a duty of care to refrain from engaging in intentional misconduct, or a knowing violation of law.

200.    Craig breached these duties of loyalty and care by, *inter alia*, stealing Dave's bitcoins and any intellectual property Dave owned and or designed during the c. 2008-2011 timeframe (or any other time they partnered).

201.    Pursuant to Fla. Stat. §§ 620.8405, Dave's estate brings this action for breach of the duties of loyalty and care owed under Fla. Stat. § 620.8404, including but not limited to its rights pursuant to Fla. Stat. §§ 620.8401, 620.8403, 620.8807, its right to have its partnership interest purchased pursuant to § 620.8701, and to otherwise enforce the rights and protect the interests of Dave's estate.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, and purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT VII
### Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

202.    As detailed above, Defendant made knowing false statements of fact, intentional omissions of material facts, and falsely promised future action with no intention of performing and/or specifically intending not to perform. These included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred,

48

sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

203.   Defendant took these actions/omissions with the purpose of inducing Plaintiffs to rely on these fraudulent acts and omissions.

204.   Plaintiffs acted in reliance on Defendant's fraudulent representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

205.   As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

<div align="center">

**COUNT VIII**
**Constructive Fraud**
*(Asserted by the Estate and W&K)*

</div>

Plaintiffs incorporate paragraphs 1 to 170, and 192-205.

206.   As detailed above, a fiduciary relationship existed between Craig and W&K and Craig and Ira.

207.   Craig invited W&K and Ira's utmost trust and loyalty as their fiduciary.

208.   Plaintiffs reposed the utmost trust and loyalty in Craig.

209.   Craig intentionally violated Plaintiffs trust and confidence, took unconscionable advantage of Plaintiffs, abused and took improper advantage of their confidential and fiduciary relationship, and materially breached his fiduciary duties to them both by knowingly making false statements of fact, intentional omissions of material facts, remaining silent in light of a duty to speak, falsely promising future action with no intention of performing and/or specifically intending not to perform, and by engaging in unfair methods against them. These fraudulent representations/omissions included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this

<div align="center">50</div>

Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

210.    As detailed above, at the time Craig made those false statements and material omissions, and concealed his misconduct, a fiduciary relationship existed between Craig and Ira, and Craig and W&K, as Craig owed fiduciary duties and duties of care and loyalty to the estate and W&K. Craig induced Ira's reliance and Craig took an improper/unconscionable/unfair advantage of, and abused, the fiduciary and confidential relationship at Ira and W&K's expense. Craig's misrepresentations and omissions were intentional, for the specific purpose of defrauding the estate and W&K of their property, but in any event, regardless of intent, Craig is liable for constructive fraud.

211.    Plaintiffs acted in reliance on Defendants fraudulent and unfair representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

212.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IX
### Permanent Injunction
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

213.    Craig's unlawful taking of the bitcoins and intellectual property belonging to Plaintiffs has resulted in great and irreparable injury to them both as they have been deprived of unique, limited, and valuable digital assets.

214.    Neither Plaintiff can be fully compensated in damages and is without adequate remedy at law.

WHEREFORE, Plaintiffs request this Court enter an injunction ordering Defendant to return all bitcoins, forked assets, and intellectual property unlawfully taken from Plaintiffs.

**Plaintiffs demand a trial by jury for all issues triable by right.**

52

Dated: May 14, 2018

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.     (305)539-8400
Fax.     (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.     (914)749-8200
Fax.     (914)749-8300
Email: kroche@bsfllp.com
*Admitted pro hac vice*

Attorneys for Plaintiffs
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of David Kleiman
and W&K Info Defense Research, LLC.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC | **CASE NO.:  9:18-cv-80176-BB** |
|       Plaintiffs, | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| v. | |
| CRAIG WRIGHT | |
|       Defendant. | |

Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.  (305)539-8400
Fax.  (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.  (914)749-8200
Fax.  (914)749-8300
Email: kroche@bsfllp.com

**ATTORNEYS FOR PLAINTIFFS**

## SECOND AMENDED COMPLAINT

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and Plaintiff W&K Info Defense Research, LLC ("W&K") hereby sue Defendant Craig Steven Wright ("Craig") and state as follows:

## PARTIES

1.     Plaintiff Ira Kleiman, as personal representative, is a resident of Palm Beach County, Florida. He is David Kleiman's ("Dave") brother and the personal representative of his estate ("the estate").

2.     Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company incorporated in 2011. During the times relevant to this Second Amended Complaint, W&K operated in Florida. This entity is one vehicle through which Defendant and Dave mined hundreds of thousands of bitcoins and created valuable blockchain intellectual property.

3.     Defendant Craig Steven Wright is a resident of London, United Kingdom. He is Dave's former business partner in W&K and otherwise.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000; this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Plaintiffs' Defense of Trade Secrets Act claim arises under the laws of the United States.

5.     Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District. These events include, but are not limited to: the wrongful taking of property belonging to a Florida estate and/or LLC within this District; the partnership of Dave and Craig within this District; the operation of W&K by Dave

2

and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District and/or by equipment owned and/or operated by a Florida resident (Dave) or Florida LLC (W&K); the development of certain blockchain related intellectual property within this District; and the commission of a fraud against an estate in this District.

6.        This Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within this state.

## INTRODUCTION

7.        This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of the Amended Complaint filing, the value of these assets far exceed $11,427,755,048.02 USD (before punitive or treble damages); at their highest value they were worth over $27,332,125,781.93. Plaintiffs allege Defendant has stolen these bitcoins and intellectual property assets from them.

8.        After Ira filed this claim, Craig committed a fraud on this Court in an attempt to circumvent its jurisdiction. As detailed in paragraphs 160 to 170 Craig filed a sworn declaration that is incontrovertibly false based on an affidavit (and supporting evidence) he previously submitted to an Australian court. The boldfaced misrepresentations Craig has told this Court demonstrate his desperation to avoid this suit.

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

9.     Bitcoin is the world's first decentralized cryptocurrency. The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a mailing list of cryptography enthusiasts. That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

10.     Based on information Ira Kleiman received directly from Dave, it is undeniable that Craig and Dave were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013.

11.     On April 26, 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a battle with MRSA.

12.     Recognizing Dave's family and friends weren't aware of the extent of Dave's Bitcoin and blockchain related activities, Craig perpetrated a scheme against Plaintiffs to seize their bitcoins and their rights to certain blockchain related intellectual property.

13.     As part of this plan, Craig took control of Plaintiffs' bitcoins and forged a series of contracts that purported to transfer Plaintiffs' bitcoins and intellectual property assets to Craig and/or companies controlled by him. Craig backdated these contracts and forged Dave's signature on them.

14.     About a year after Dave's death, and under pressure from an Australian Tax Office investigation, Craig reached out to Ira, Dave's brother. Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable intellectual property. But, he claimed Dave signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company worth "millions."

4

15.     Craig told Ira he'd be able to sell Dave's stake in the company in a few months. This was a lie in several respects. First, Dave had not in fact traded his bitcoin and intellectual property rights for an interest in the Australian company. Second, the company went bankrupt shortly after Craig misled the Australian Tax Office ("ATO").

16.     The ATO raided Craig's home in late 2015 and Craig fled Australia for London. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself and Dave as the alleged creators of Bitcoin.

17.     Craig currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

18.     To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Plaintiffs. This action is brought to rectify that injustice.

19.     As described in detail below, Craig's pattern of lies, deception, and fraudulent conduct continues even against this Court. His fraud on this Court is simply the latest step taken in Florida to defraud the estate and W&K.

## FACTUAL ALLEGATIONS

### Bitcoin

20.     Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of March 14, 2018.[2] At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the bitcoin blockchain.

21.     In order to transact with bitcoins, you must have a bitcoin wallet. Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would

---

[2] https://coinmarketcap.com/.

5

like to receive bitcoin from others. Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet. Wallets are separate computer files dedicated to storing information about specific bitcoins.

22.     Each wallet is also assigned a "private key." Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

23.     There are two methods of acquiring bitcoins. The first involves simply receiving bitcoins from someone. In fact, there are many businesses that operate "bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

24.     The second way one can acquire bitcoins is by "mining" them.

25.     There is no centralized authority that curates the Bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

26.     Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

27.     When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger. The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million. At the current mining rate and reward algorithm, this maximum circulation will be reached in circa 2140.

28.     Today, the mining reward is 12.5 bitcoins for each block added to the blockchain. That, together with rising competition in mining bitcoins means it was easier to amass significant amounts of bitcoins in 2009, than now.

29.     To date, just over 17 million of the total 21 million bitcoins have been mined.

### History of Bitcoin

30.     On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

31.     Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

32.     Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

7

33.     Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010. Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent on April 23, 2011. It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

34.     For most of its early history, bitcoins were of relatively little value. Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010. At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

35.     During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

36.     It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

### Bitcoin "forks"

37.     Since its inception in 2009, Bitcoin has inspired the creation of over one thousand other digital currencies. Many of these new cryptocurrencies use characteristics of the initial Bitcoin program, but have made significant changes to the original model in an attempt to create

---

[3]     *See*     *e.g.*     http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

8

an entirely new cryptocurrency with distinct functions or ones better suited to a specific market niche.

38. In other cases, individuals have taken the actual Bitcoin protocol and modified it in a way they believed would improve Bitcoin itself, *e.g.*, by allowing more transactions into a single "block" of the blockchain.

39. If the "improved" Bitcoin protocol garners significant support, but less than a majority of support, a new version of "Bitcoin" is created. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. The result is that any individual who owned the original Bitcoin, now owns an identical amount of the new Bitcoin. After the point of the "fork," the ledgers will diverge as owners "spend" the two assets differently.

40. This has happened numerous times to Bitcoin. To date, however, the original Bitcoin protocol remains the most valuable in terms of its correlation to the US dollar, with a market capitalization of ~$150 billion at the time of filing. However, other noteworthy Bitcoin forks include Bitcoin Cash (market cap. of ~$25 billion), Bitcoin Gold (market cap. of ~$1.0 billion), Bitcoin Private (market cap of ~$510 million), and Bitcoin Diamond (market cap. of ~$650 million).

41. As explained below, the bitcoins at the heart of this dispute were all mined prior to the creation of any of the aforementioned Bitcoin forks. Consequentially, Plaintiffs' claims of

ownership over these original bitcoins necessarily implicates ownership over their "forked" counterparts ("forked assets").[4]

## Background on parties and key individuals

42. Dave Kleiman was born in 1967. Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

43. A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound. After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

44. Dave began working in the information technology security sector in 1990. He was a frequent speaker at national security conferences and was a regular contributor for many security related newsletters, websites, and online forums.

45. Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

46. Dave was also a Secure Member and Sector Chief for Information Technology at the FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA). When he attended conferences, he was known as "Dave

---

[4] Consequently, where appropriate, the word "bitcoins" should be construed to include claims over the "forked assets" as well.

Mississippi," a nickname referring to the long string of three letter certificates that followed his name; which could literally be used to spell Mississippi.

47.     Dave co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[5] and Security Log Management: Identifying Patterns in the Chaos.[6]

48.     In 2010, Dave was hospitalized. He was in and out of medical facilities due to MRSA infected sores. On March 22, 2013, Dave signed out of the hospital against medical advice. He was unstable and nearing death.[7] On April 26, 2013, Dave passed away.

49.     Ira is Dave's brother and the personal representative of his estate.

50.     Craig is a 46-year-old Australian computer scientist and businessman. Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange. Craig claims to have many degrees, including doctorates, masters, and technical certifications; these claims are disputed.[8]

51.     In May 2016, Craig claimed that he and Dave were Satoshi Nakamoto—the venerated creator of Bitcoin.

---

[5] https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[6] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[7] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

[8] https://www.forbes.com/sites/thomasbrewster/2015/12/11/bitcoin-creator-satoshi-craig-wright-lies-hoax/#12e524116794.

### Dave and Craig's early relationship

52.     Dave and Craig met in or around 2003. Both men had a longtime interest in cyber security and digital forensics, and the future of money. (Ex. 1 at 26).[9]

53.     For years, they communicated on various topics related to the internet and file sharing. For example, in 2008 they co-authored a paper on the mechanics of overwriting hard drive data.[10]

54.     Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography. (Ex. 1 at 27).

55.     In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig emailed Dave saying: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all." (Ex. 32).[11]

56.     After leaving his job in late 2008, Craig wrote to Dave: "I need your help. You edited my paper and now I need to have you aid me build this idea." (Ex. 1 at 31). For the next few months, Craig and Dave worked to get Bitcoin operational.

57.     On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain. (Ex. 1 at 32).

58.     On November 26, 2009 (Thanksgiving Day), Ira Kleiman and Dave met at their father's home for an early dinner. He and Dave discussed Facebook's recent success and Ira asked

---

[9] All Exhibit citations refer to the as filed ECF pagination.

[10] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[11] Craig sent a "copy" of this communication to Ira on March 6, 2014.

12

Dave if he was working on anything interesting. Dave responded by telling Ira he was working on "something bigger" than Facebook, that he was "creating his own money."

59.     Ira asked Dave to clarify and jokingly asked if Dave was making counterfeit money.

60.     Dave responded by saying he was making "digital money." He then opened his wallet, took out a business card, flipped it over, drew a "B" with a line or two through it, and commented on how "we" were working on a logo.

61.     Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. Ira asked Dave why he didn't partner with this wealthy individual. Dave was silent, which Ira understood to be Dave's concession they were already partners.

62.     On May 20, 2014, Ira shared this story with Craig via email. (Ex. 2).

63.     Craig responded that same day stating "we did partner ;)". (*Id.*). Craig then commented on the "properties" stating, *inter alia*, that he owned 550 acres. (*Id.*). He then said, "I will have to see what I can dig up. The old Bitcoin logo we did is no longer used. I have a copy." (*Id.*). Craig later provided Ira with a copy of this Bitcoin logo. (*Id.*).

64.     This independent verification that Dave was creating "digital money" with Craig in 2009, Craig's admissions that he and Dave were "partners" in this venture, part of the Satoshi team, and that they were mining bitcoin through W&K, all lead to the inescapable conclusion that their collaboration in "creating" or "mining" bitcoin and intellectual property was continuous from 2009 until Dave's passing in 2013.

65.     From their collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (personally and through W&K). These bitcoins were, as all bitcoin are, stored in specifically identifiable bitcoin wallets that Craig has now asserted ownership over.

13

66.     Further, Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K. As Craig email to Ira on March 7, 2014, "I had an idea, but it would never have executed without Dave." The estate and/or W&K owns all this intellectual property.[12]

### Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property

67.     The exact structure of their joint mining activities, intellectual property development, and "partnership" from c. 2008 until February 2011 requires discovery to fully reveal.

68.     From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K.

69.     On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. (Ex. 3).

70.     W&K has no operating agreement and its exact ownership structure is unclear due to Craig's contradictory statements. In an affidavit Craig filed in Australian court proceedings, Craig stated he and Dave each owned 50% of W&K. (Ex. 4 at 5). But in a fake "contract" produced by Craig, he states Dave owned legal title to 100% of W&K, while holding 50% in trust for Craig. (Ex. 5 at 3). He doubled down on some form of this equal split in a 2014 email to Ira,

---

[12] The exact division of intellectual property ownership between Dave's estate and/or W&K will be determined at trial. Accordingly, some counts contain a request for relief from both Plaintiffs, and it will be for the final finder of fact to determine what each Plaintiff is entitled to recover.

where he represented that "Dave owned 50% of" W&K. (Ex. 6 at 2),[13] and when both he and his counsel referred to it as a "joint venture." (Ex. 4 at 50, 57, 64, 71, 77, 84; Ex. 9 at 6). In contrast, Craig has testified to this Court that he does not have, and never has had, any interest in W&K.[14] (Ex. 29 ¶ 10). But it makes sense Craig would have some form of indirect interest as the entity appeared to be named after them both: **W**right & **K**leiman.

71.     As best as can presently be discerned, Dave was the sole "member" of W&K, but Craig maintained some kind of beneficial ownership interest in W&K, which he subsequently disclaimed.

72.     Regardless of its exact ownership structure, the purpose of W&K was clear: Craig and Dave created it to mine bitcoin and develop intellectual property.

73.     *First*, on telephone conversations with Ira, Craig admitted this was W&K's purpose.

74.     *Second*, Craig has admitted this in writing multiple times. For example, in a "chronology" Craig sent to Ira, he wrote that that W&K "was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies, and to mine Bitcoin." (Ex. 7). Craig also put this admission into legal documents he claims are valid stating that W&K "is the owner of and conducts the business known as Bitcoin mining and Software development / Research." (Ex. 5 at 3). Finally, Craig has admitted this to third parties where, e.g.,

---

[13] This Second Amended Complaint attaches certain emails with timestamps from Australian time zones. For consistency, the Second Amended Complaint has converted various timestamps to Eastern Standard Time.

[14] When confronted with the claims in this lawsuit, Craig didn't hesitate to continue his fraud against W&K and Dave's estate by perjuring himself in a sworn declaration filed with this Court, wherein he now swears, in absolute conflict with his Australian affidavit, that he never had any interest in W&K. See *Infra*, 160-170. It seems that whatever interest he once held in W&K, he has disclaimed it.

15

on February 12, 2014, he emailed Dave's former business partners stating "Dave and I had a project in the US. He ran it there . . . The company he ran there mined Bitcoin." (Ex. 8 at 5).

75. *Third*, in leaked ATO transcripts, Craig's bookkeeper states that "W&K was an entity created for the purpose of mining Bitcoins." (Ex. 9 at 3).

76. Dave and Craig collaborated within W&K to create intellectual property. Craig then used W&K and this intellectual property to personally solicit business from the United States Department of Homeland Security ("DHS"). (Ex. 4 at 40-43).

77. Craig acted as W&K's "authorized representative," its "lead researcher," and its "technical contact." (*Id.* at 45-46, 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90). Further, Craig repeatedly used W&K's Florida address as his own, *e.g.*, identifying it as his "mailing address." (*Id.* at 50, 57, 64, 71, 77, 84). Craig has also held himself out as W&K's "legal agent and representative" and its "Director/Australian Agent." (Ex. 30).

78. Craig also claimed to have (i) delivered servers and other computer hardware to Florida for W&K's use (Ex. 10 at 3 (Recital L)); (ii) provided "contract labour services" to W&K (Ex. 11 at 2); (iii) licensed software for W&K's use (Ex. 10 at 3 (Recital M)); and (iv) loaned money to W&K for use in its Florida mining operation (Ex. 10 at 3 (Recital L); Ex. 11 at 3).

### Dave and/or W&K owned a substantial amount of bitcoin

79. The exact number of bitcoins belonging to Dave's estate and/or W&K will be determined at trial.[15] That said, various documents including emails, "contracts," spoken admissions, and transcripts from 2014 ATO meetings with Craig, his counsel, and his accountant

---

[15] Accordingly, some counts contain a request for relief for both Plaintiffs, and it will be for the final finder of fact to determine how much each Plaintiff is entitled to recover.

evidence Dave and Craig owned and controlled approximately 1,100,111 bitcoins (either together personally or through their shared interest in W&K).

80.     As discussed above, Craig admitted that he "did partner" with Dave in 2009 to create/mine "digital money," i.e., bitcoins. And Craig has also admitted in multiple documents that W&K (beneficially owned, at the time, and in some form, by Dave and Craig) mined bitcoin. Due to the historically larger mining reward and low competition existing during that time, Craig and Dave's continuous joint bitcoin mining activity since 2009 would have resulted in an unparalleled fortune of bitcoins.

81.     Furthermore, in February 2014, Craig emailed two of Dave's other business partners stating Dave had mined an enormous amount of bitcoins, an amount *"far too large to email."* (Ex. 8 at 5).

82.     In addition, a transcript of a February 18, 2014 meeting between the ATO and Craig demonstrates that Craig has led others to believe he took ownership of Dave's bitcoin. The ATO investigator states:

> We thought yes, *you've picked up some bitcoin ownership from the deceased director* so we were trying to, you know, get the picture and connect all the dots. (Ex. 12 at 20) (emphasis added).

83.     Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper (John Chester), document Craig's bookkeeper stating that Dave had an incredible amount of bitcoin, and implying that Craig assumed ownership of them when he died:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there. Mr Kleiman *would have had* a similar amount. *However*, Mr Kleiman *passed away* during that time. (Ex. 9 at 3) (emphasis added).

84.     At the February 18, 2014 meeting, Craig's counsel states that W&K's bitcoins were transferred to Seychelles, Singapore, and UK trusts. As Dave owned between 50% to 100% of

17

W&K, *at least* half of the bitcoins allegedly transferred to the trusts belong to Dave (and/or they all belong to W&K):

> In 2009 the mining of bitcoin commences \*\*\* 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as . . . effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts. Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately Dave . . . dies in the US towards the end of April 2013. (*Id.* at 6).

85.     Years later, Craig admitted to Andrew O'Hagan that "his and Kleiman's mining activity ha[d] led to a complicated trust." (Ex. 1 at 36).

86.     In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint nature of the bitcoin allegedly held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the [expletive] *we* are doing with it all. So, a good tax deductible way to have a visit and also write a paper. (Ex. 31)

87.     In fact, Craig consistently referred to the "trust" as both Craig and Dave's, for example in another email Craig forwarded to Ira (emphasis added):

> From: Craig S Wright
> To: dave@davekleiman.com
> Subject: This week
> Date: Tue, 22 May 2012 09:45:31 +1000
>
> Dave,
> A recycled rant . . . the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try

[expletive] **on us** then. . . (Ex. 13) (bold emphasis added; profanity redacted).

88.     In a 2014 email exchange with Ira, Craig *admitted* that at least 300,000 of the

1,000,000+ bitcoins allegedly held in trust belong to Dave:

> From: Ira K <REDACTED@REDACTED>
> To: Craig S Wright <craig.wright@hotwirepe.com>
> Subject: Bond villains
> Date: Sat, Mar 1, 2014 at 2:42 PM
>
> Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours. Is that correct?
> Ira
> ---
> From: Craig S Wright <craig.wright@hotwirepe.com>
> To: Ira K <REDACTED@REDACTED>
> Subject: Re: Bond villains
> Date: Sat, Mar 1, 2014 at 3:00 PM
>
> Around that. Minus what was needed for the company's use
> Sent from my HTC. (Ex. 14).

89.     As discussed below in more detail, Craig provided fraudulent contracts to the ATO

in an attempt to substantiate his ownership of bitcoins and intellectual property assets that belonged

to Dave and/or W&K. Their authenticity aside, however, these "contracts" produced by Craig

constitute his admission that Dave, Craig, and W&K collectively owned hundreds of thousands of

bitcoins.

90.     For example, a 2011 contract produced by Craig includes a provision stating W&K

expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of over two years

(312,000 bitcoin). (Ex.10).

91. Further, a 2012 contract provided to Ira by the ATO lists Bitcoin wallets containing over 650,000 bitcoins (the "2012 Deed of Loan"). Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*" (Ex. 15 at 9). This annotation is in Craig's handwriting.

92. As can be seen, Dave, in partnership with Craig, lawfully mined and possessed hundreds of thousands of bitcoins both in his individual capacity and through W&K.

93. The mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts. These wallets were not used for any purpose but to store the bitcoins for sale at some future date.

94. As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined. As demonstrated from emails produced by Craig, his ability to control the bitcoins continued once they were, allegedly, placed in trust.

**After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K**

95. After Dave's death, Craig took sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K and those that were held in trust for Dave and/or W&K and refuses to return any bitcoins or intellectual property to the estate or W&K.

96. It appears that Craig needed to use W&K and Dave's assets to try and justify certain tax positions he claimed in Australia. To that end, he instituted an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property.

97. To accomplish this scheme, Craig drafted and backdated at least three contracts, and forged Dave's signature on at least two, to create a fraudulent "paper trail" purporting to show

20

that Dave transferred bitcoins and intellectual property rights that belonged to Dave and W&K, to

Craig. These fraudulent contracts include:

    a.    2011 contract titled "Intellectual Property License Funding Agreement"

(the "2011 IP Agreement") (Ex. 10);

    b.    2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 15);

and

    c.    2013 contract titled "Contract for the Sale of Shares of a Company Owning

Business" (the "2013 W&K Sale Agreement") (Ex. 5).

98.    On their face, these contracts are demonstrably fraudulent in a number of manners.

99.    *First*, the electronic signatures on these documents are not Dave's. They are

substantially different than known examples of Dave's electronic and written signatures:

| Authentic Signatures 2/1/2013[16] & 7/30/2003[17] & 2/22/2012 | Signature on Fraudulent Contracts 4/22/2011 & 04/2/2013 |
| --- | --- |
|  |  |

---

[16] See Ex. 16 (signature on Computer Forensics LLC Operating Agreement).

[17] See Ex. 17 (signature on Dave's last will and testament).

100.    In fact, this signature is a near identical copy of a computer-generated font called Otto, available here: https://www.wfonts.com/font/otto. When computer generated, this Otto font produces the signature:

Otto.ttf



101.    When confronted with this information by Ira, Craig admitted the signatures were computer generated, but claimed there were other ways to prove their veracity.

102.    Craig has never provided additional evidence of their legitimacy.

103.    *Second,* the "Purchaser" listed in the 2013 W&K Sale Agreement is "Craig Wright R&D" and is further identified by its Australian Business Number (ABN) 97 481 146 384. However, the entity associated with this ABN was not identified as "Craig Wright R&D" until September 2, 2013 – over three months after Dave died.[18]

104.    *Third,* the terms of the 2011 IP Agreement are nonsensical. While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time. Thus, no one could "finance" or "fund" anything with bitcoins then. This calls the 2013 W&K Sale Agreement's purported "release" of this nonsensical "financing arrangement" into question.

105.    *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other. The 2011 IP Agreement provides that Bitcoin wallet 1933***XY8a would be held by Craig in escrow and revert to Craig only if W&K defaulted, but

---

[18] https://abr.business.gov.au/SearchByAbnHistory.aspx?abn=97481146384

the 2013 W&K Sale Agreement provides that it will be "released to" Craig *despite* satisfaction of the liability, and the 2012 Deed of Loan shows that same wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up a joint-company later.

106. *Fifth*, the 2013 W&K Sale Agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

107. *Sixth*, the fraudulent signatures aren't witnessed or notarized. Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

108. *Lastly*, many of the contractual terms are extremely convenient for Craig. For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 AUD (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

109. These red flags are rendered even more suspicious by the fact that the 2013 W&K Sale Agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

110. Craig has a documented history and habit of backdating contracts and documents to suit his needs. During the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices. (Ex. 12). Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[19] Finally, in its 2015 audit

---

[19] https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information by, *inter alia*, backdating numerous documents. (Ex. 18).

111.     As described herein, after Dave died, Craig unlawfully and without permission took control of the bitcoins from Dave's estate and from W&K by exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K; actually using those private keys to move these bitcoins out of their wallets; claiming to own bitcoins really owned by W&K and/or Dave by virtue of fraudulent contracts Craig created; refusing to return bitcoins that belonged to the estate and W&K; moving them to, or holding these bitcoins in, "trusts" known only to him and controlled by him and preventing these assets from being returned to the estate and/or W&K; and using those bitcoins (or the "rights" to them) to make large trades for his Australian businesses.

112.     While the exact number of bitcoins stolen remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of *at least* 300,000 bitcoins that Craig controls in a trust (along with their forked assets). But the estate may be entitled to even more bitcoins based on Dave and Craig's partnership from 2009 until 2011.

113.     Further, as Craig's admitted that the mining continued within W&K from 2011, W&K is entitled to the possession of all bitcoins mined through its operations since 2011 (along with their forked assets).

114.     To Plaintiffs' best knowledge, information, and belief, these bitcoins could number around ~1,100,111.[20]  Together, these bitcoins and their forked assets are worth approximately

---

[20] Should discovery reveal additional bitcoin were mined, either by Dave individually, or by W&K after Dave died, Plaintiffs may amend their Complaint to assert a claim over those bitcoins and their forked assets as well.

$11,427,755,048.02, though at their peak in December 2017 they were worth ~$27,332,125,781.68.

115.     Ira has requested Craig return these bitcoins, but Craig has not done so. In light of this refusal, demanding the return of the forked assets would be futile.

116.     Thus, Craig has wrongfully asserted dominion over Dave and W&K's bitcoins forked assets, and intellectual property in a way that is inconsistent with Dave and W&K's ownership of those bitcoins, forked assets, and intellectual property which has damaged them both.

### Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts

117.     In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each. (Ex. 11).

118.     In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]." (Ex. 11 at 3, 9). The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]." (*Id.* at 4, 10). The statements of claim allege that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." (*Id.*).

119.     W&K was never served, validly or otherwise, with these proceedings; Dave's estate was not even aware of them until long after the judgments had been entered.

120.     Craig prevented W&K from participating in these proceedings as, *inter alia*, he filed, in both lawsuits, a false "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims. (Ex. 30). In these filings, Craig falsely identified himself as the "legal agent and representative for the defendant" and its

25

"Director/Australian Agent" and falsely stated that "I acknowledge the whole of the amount being claimed by the plaintiff." (*Id.*). Further, he falsely identified his Australian address and email as the "Address for service" for W&K. (*Id.*).

121. Craig further prevented W&K from participating in the proceedings, by filing, on August 28, 2013, Consent Orders in both cases. (Ex. 19). These filings represent to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer," a "J Wilson." (*Id.* at 2). But J Wilson – Craig's employee – was not authorized. Instead, Craig "elected" him a director at a "shareholder meeting" where only Craig was present and only Craig voted. (Ex. 4 at 5-6).

122. Craig did this even though (i) Craig did not have any direct or voting interest in this Florida LLC (only an indirect or beneficial interest), (ii) Dave's estate (which held at least 50% of the interest in the LLC) was not notified of the meeting, and (iii) even if Craig had a 50% voting interest in W&K, the election of Wilson was void because the "meeting" lacked a quorum.

123. In April 2014, Ira first learned of these court proceedings, when the ATO sent him some of the court documents. Ira confronted Craig for taking Dave and W&K's assets and concealing the court proceedings from Dave's estate. Craig admitted his subterfuge, but defended himself by claiming the ends justified the means:

> Ira: ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."

> Craig: "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." (Ex. 20 at 18).

124. Importantly, these Australian claims, like the sworn testimony he submitted to this Court, are based on demonstrably false factual allegations. Specifically:

125.    The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2). However, W&K did not exist in 2008.

126.    Also, the July 2013 claim alleges:

> "[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:
>
>   a.  BAA 11-02-TTA 01-0127-WP TTA 01 - Software Assurance: Software Assurance through Economic Measures
>
>   b.  BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks
>
>   c.  BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics
>
>   d.  BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 9-10).

127.    The July 2013 claim goes on to state that "these funds were rated as:

>   a.  TTA 01        US$ 650,000
>
>   b.  TTA 05        US$ 1,8000,000 (*sic*)
>
>   c.  TTA 09        US$ 2,200,000
>
>   d.  TTA 14        US$ 1,200,000." (*Id.* at 10).

128.    However, these statements were false. The results of Freedom of Information Act requests by Ira to the DHS reveals that W&K's applications for TTA 01, TTA 05, TTA 09, and TTA 14 were all denied by the DHS. (Ex. 21).

129.    The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 8, 2009 contract between Craig and W&K, claiming that "[W&K] agreed

27

to pay [Craig] for property and consulting services." (Ex. 11 at 2). But again, W&K did not exist until 2011.

130.    On November 6, 2013, judgments appear to have been entered for both Australian claims. (Ex. 22). Craig's fraud to keep W&K and Dave's estate out of the litigation was successful as, in the judgment, the Court "note[d] the agreement of the parties that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*) (emphasis added).

131.    To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K and Dave. For example, in the February 18, 2014 meeting with the ATO, Craig's attorney represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on." (Ex. 12 at 7). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." (*Id.* at 18). Further, as discussed in para 142-143, the ATO has provided Ira with "deeds" drafted and executed by Craig which show that his companies have taken ownership over the intellectual property created by W&K and "transferred" by virtue of these fraudulently obtained "judgments."

### Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, and secure an ally in his fight against the ATO

132.    With the ATO closely auditing Craig's activities, Craig knew he had to reveal some of his and Dave's bitcoin mining and blockchain work to justify various tax positions he took in Australia. Realizing this would lead the ATO to contact the Kleimans, Craig reached out first.

133.   Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to

Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <REDACTED@REDACTED>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA. (Ex. 23).

134.   As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

135.   Craig told Ira he was partners with Dave and that no one knew about their collaboration or W&K. He explained to Ira that W&K was involved in Bitcoin mining and that it was quite successful.

136.   Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch." He explained to Ira that Dave's estate would receive shares in it worth millions.

137.   On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira <REDACTED@REDACTED.com>

29

> The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer
>
> What company owns right now is:
>
> - Software – incl source code and perpetual licenses valued at over $50 million.
> - Intellectual Property, design, codes etc
> - Research claims. (Ex. 24).

138.  At the same time Craig was defrauding the Kleimans, Craig also reached into Florida though an agent, Uyen Nguyen, to revive W&K after it had been administratively dissolved – to ensure he had control over it if necessary.

139.  Consequently, on March 28, 2014, nearly a year after Dave died, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen"). (Ex. 25). Uyen removed Dave as the registered agent for W&K and listed herself. (*Id.*). She then added herself as manager and secretary and an entity named Coin-Exch Pty Ltd as director. (*Id.*; ECF 12 at 11 n3). But Coin-Exch Pty Ltd was merely Craig seizing control of W&K from the shadows, as it's well established "Craig Wright" was the "director and controlling mind" of Coin-Exch Pty Ltd. (Ex. 18 at 5).[21]

140.  Of course, despite Ira and Craig being in regular email contact at the time, Craig concealed this action from Ira.

**The ATO reached out to Ira to verify Craig's allegations over W&K, and provided Ira with documents that demonstrate Craig assumed control over intellectual property that belonged to W&K and/or Dave**

141.  As Craig expected, on April 15, 2014, an auditor from the ATO, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

---

[21] https://www.arnnet.com.au/article/621503/australian-bitcoin-figure-supercomputing-company-enters-liquidation/.

142.     The ATO also provided Ira with three deeds, each titled "IP Deed of Assignment" and each executed on September 15, 2013 – nearly four months after Dave's death. (Ex. 26; Ex. 27; & Ex. 28). Each of these IP Deeds of Assignments assigned various intellectual property rights from DeMorgan Ltd to three entities: Coin-Exch Pty Ltd (Ex. 26), Hotwire Preemptive Intelligence Pty Ltd (Ex. 27), and Cloudcroft Pty Ltd (Ex. 28).

143.     The deeds also described the source and nature of this IP: "The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABD 97 481 146 384) through the following unrelated entities . . . W&K Information Defense Research LLC [as two batches]." (Ex. 26 at 4; Ex. 27 at 4; & Ex. 28 at 4).

**Craig continues to assure Ira and reveals the nature of the intellectual property owned by, and misappropriated from, W&K and Dave**

144.     On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ." (Ex. 24 at 20).

145.     To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." (*Id.* at 12). On April 23, 2014, Craig told Ira that he would receive the first $12 million payment in October 2014. (*Id.* at 8).

146.     On the same day, trying to further placate Ira, and further evidencing Dave and the estate's claim to W&K's transferred intellectual property, Craig wrote Ira stating:

> The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level . . . . Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. (*Id.* at 2).

31

147.     On April 25, 2014, still trying to reassure Ira, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property. In this document, Craig wrote:

> There is a lot of IP and 'stuff' in the mix. All up, it's around a hundred million dollars' worth. This IP originates in work CSW has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired. The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch. Cloudcroft gets the security related IP, Coin-Exch gets the banking and Hotwire gets all of the automation R&D based stuff. (Ex. 7).

148.     The nature of this intellectual property transferred from W&K to DeMorgan, Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft was further explained by Craig in a letter he published on DeMorgan's website in 2015. This letter demonstrates that Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft were involved in building out W&K's intellectual property with R&D efforts targeted at "the development of smart contract and Blockchain based technologies" and "commercialisation of our Blockchain and smart contract systems research."[22]

149.     Craig's promise of a multi-million dollar payment by October 2014, never came true. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

150.     On October 9, 2015, Craig essentially stopped responding to Ira.

151.     In November 2015, Dave's friend and business partner, Patrick Paige reached out to Craig when a reporter called him inquiring about Craig and Dave's involvement in Bitcoin. Craig responded:

---

[22]http://www.businessinsider.com/craig-steven-wright-rumoured-bitcoin-creator-was-commercialising-blockchain-research-and-reviving-company-hotwire-2015-12; https://prwire.com.au/pr/51565/the-demorgan-ltd-group-of-companies-to-receive-up-to-54-million-from-ausindustry-r-amp-d-tax-rebate-scheme-1.

Thanks for the heads up. Reporters are always troubling. They ignored the stuff Dave and I did when he was alive. I don't know what has started to interest them now . . . as you know[, **Dave] did a fair amount of research with me. Most yet to be completed and published**. (Ex. 8 at 13 (emphasis added)).

152.    After Craig yet again confirmed Dave's involvement in Bitcoin and the intellectual property they developed, Patrick wrote back:

. . . I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins. I realize there is a lot of things to consider releasing this information but my question is when? (*Id.* at 12).

153.    Craig responded: "When it all comes out, there is no way Dave will be left out. **We need at least a year more**." (*Id.* (emphasis added)).

## Craig claims that he and Dave are Satoshi Nakamoto

154.    On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[23] Both articles also articulated Dave's integral role in the development of Bitcoin. They described numerous details and leaked communications implicating Dave and Craig's roles in creating and developing Bitcoin; they also discussed Dave and Craig's accumulation of a vast hoard of bitcoin.

155.    On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[24]

156.    Craig has readily admitted Dave was intimately involved in the creation of Bitcoin. In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told

---

[23] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/; https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[24] https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/.

O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 31).

157.    Further, in numerous emails to Ira, Craig admitted the same.

158.    Craig currently serves as Chief Scientist of a UK company called nChain in London, where, in 2016, he filed dozens of patents related to Bitcoin and blockchain technology through this entity.[25] The public filing of these patents disclosed to the public intellectual property belonging to Dave and W&K without the permission of Dave's estate and/or W&K.

159.    To date, neither Dave's estate nor W&K have received the assets belonging to them as a result of their early involvement in Bitcoin and bitcoin mining.

### Fraud on this Court[26]

160.    In Ira's initial Complaint, as in this one, he alleged that (i) Craig and Dave held some form of interests in a Florida LLC called W&K, that (ii) through this LLC, and otherwise, they mined over 1.1 million bitcoins and developed extremely valuable intellectual property, that (iii) after Dave died, Craig took unlawful possession of all the bitcoins the Florida LLC mined and intellectual property it created (along with the bitcoin and intellectual property they mined/developed together personally), that (iv) Craig then tried to "launder" this stolen intellectual property by defrauding the Australian courts into entering consent orders transferring clean title over W&K's intellectual property to Craig; and that (v) Craig needs to return the stolen property.

161.    In response to this Complaint, Craig filed a motion to dismiss alleging he has essentially **no** connection to Florida or W&K.  His motion stated Plaintiff's jurisdictional

---

[25]  https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V.

[26] The emphases appearing in this section have been added.

allegations were "frivolous" and "sanctionable." (ECF D.E. 12 at 36). Craig supported these assertions with a sworn declaration stating he was never a shareholder, member, agent, employee, or representative of W&K. (Ex. 29 ¶¶ 11-12). He swore, under penalty of perjury under the laws of the United States, that he's never exercised authority or control over W&K. (*Id.* ¶ 13).

162.    He perjured himself.

163.    To procure his fraudulent Australian judgments, Craig submitted an affidavit to the Supreme Court of New South Wales where Craig affirmed that:

"The **shareholding** of 'W&K Info Defense LLC' was:

| 1. | **Craig S Wright** | **50.0%** |
|----|---------------------|-----------|
| 2. | David A Kleiman    | 50.0%"    |

(Ex. 4 at 5).

164.    Craig then doubled down on this ownership structure affirming further that "W&K Info Defense LLC was an incorporated partnership. **All shares are held jointly.**" (*Id.*). He then affirmed that **he called a "shareholders meeting"** on August 16, 2013 at which only he and Jamie Wilson were present. (*Id.*). Craig affirmed **he was the sole vote** that nominated Jamie Wilson to act as a director "for purposes of consenting to orders and the company to be wound down." (*Id.* at 5).[27]

165.    These affidavit statements directly contradict his sworn statements to this Court that (i) "I have never been a . . . **shareholder** . . . of W&K," (ii) "I have never been a **member** of W&K," and (iii) "I have never **exercised authority or control** over W&K . . ." (Ex. 29 ¶¶ 11-13).

166.    But the perjury doesn't end there.

---

[27] Under Florida law, there is no such thing as an "incorporated partnership" and an LLC does not have "shares" or "directors" or hold shareholders' meetings. The "owners" of an LLC are called "members."

167.    Craig attached voluminous records to his Australian affidavit. These attachments evidence Craig signed as the **"authorized representative"** of W&K six (6) times (Ex. 4 at 56, 63, 70, 76, 83, 90), identified himself as W&K's **"lead researcher"** twice (*id.* at 45-46), its **"technical contact"** six (6) times (*id.* 50, 57, 64, 71, 77, 84), affiliates himself with **W&K's Florida address** as, *e.g.*, his **"mailing address"** twelve (12) times (*id.* at 49, 56-57, 63-64, 70-71, 76-77, 83-84, 90), includes detailed descriptions of the computer programs and research Craig was **attempting to get DHS to fund** (*id.* at 50-94), and includes four (4) emails from DHS confirming Craig had **uploaded various proposals on behalf of W&K attempting to secure funding** (*Id.* at 40-43). Collectively, these documents clearly evidence Craig's participation in operating W&K from Florida to solicit business from the United States DHS.

168.    Obviously, these affidavit attachments are in direct conflict with Craig's sworn statements to this Court that (i) "I have never been a . . . **employee,** or **representative** of W&K," (ii) "I have never been an **agent** of W&K," (iii) "I have never . . . **developed software for** any purpose relating to a Florida business, including **W&K**," (iv) "I have never **advertised services in Florida**," (v) "I have never had an **office in Florida**," and (vi) "I have never **exercised authority or control over W&K . . .**"   (Ex. 29 ¶¶ 6, 8, 11-13, 15).

169.    As mentioned in ¶ 120, Craig also submitted two "Acknowledgment of Liquidated Claim" filings in Australia where he signed as the **"legal agent and representative"** of W&K and as its **"Director/ Australian Agent."** (Ex. 30). As set forth in ¶¶ 138-139 he also acted as the **"director"** of W&K when he had his agent put Coin-Exch, his company, as its director.  These also directly conflict with his sworn testimony above.

170.    Craig's boldfaced misrepresentations and perjury before this Court constitute a continuation of his grand fraud to unlawfully take Plaintiffs' assets.  Said differently, Craig's latest

fraud on this Florida Court is simply one more action he's taken in Florida to defraud Dave's estate and W&K.

## CLAIMS FOR RELIEF

### COUNT I
**Conversion**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

171.    On or about April 2013 through the present day, Defendant converted to his own use, bitcoins, forked assets, and intellectual properties that was then the property of, and owned by, the estate and/or W&K.

172.    The property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets. Plaintiffs demands the return of the IP, or its fair market value. Plaintiffs also demand punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT II
**Unjust Enrichment**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

173.    Plaintiffs have conferred a benefit on the Defendant, who has knowledge thereof.

174.    Defendant voluntarily accepted and retained the benefit conferred.

175.    The circumstances render Defendant's retention of the benefit inequitable unless the Defendant pays to Plaintiffs the value of the benefit.

176.    Defendant has been unjustly enriched at Plaintiffs' expense.

177. Plaintiffs are entitled to damages as a result of Defendant's unjust enrichment, including disgorgement of all monies and or properties unlawfully accepted and retained by Defendant from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant for the return of the wrongfully retained property or monetary damages equaling to the value thereof, together with court costs, interest, and any other relief this Court deems just and proper.

<div align="center">

**COUNT III**
**Misappropriation**
*(Asserted by the Estate and W&K)*

</div>

Plaintiffs incorporate paragraphs 1 to 170.

178. After Dave's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave and/or W&K relating to blockchain based technologies and smart contracts by using them for himself and using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

179. These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

180. These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. As evidence of the substantial economic value relating to these trade

<div align="center">38</div>

secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

181.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

182.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and/or W&K have suffered actual losses consisting of the loss in economic value associated with the trade secrets.

183.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and W&K are informed and believe that Craig has been unjustly enriched.

184.    As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiffs demand judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

### COUNT IV
### Federal Defense of Trade Secrets Act
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

185.    Craig's conduct described in this Second Amended Complaint constitutes misappropriation of trade secrets under the Defend Trade Secrets Act. 18 U.S.C. §§ 1832.

186.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts which is a product used

and intended to be used in interstate and foreign commerce. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

187.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

188.    Craig caused many of these patents to be filed *after* May 11, 2016.

189.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

190.    As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

191.    As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

WHEREFORE, Plaintiffs demand judgment against Defendant for the value of the wrongfully taken intellectual property, together with court costs, interest, attorney's fees, and any other relief this Court deems just and proper.

**COUNT V**
**Breach of Fiduciary Duty**
*(Asserted by the Estate and W&K)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

192.     Although Craig did not have a direct ownership interest in W&K, he owed fiduciary duties to the LLC, as, *inter alia*, its agent, its purported "authorized representative," "lead researcher," "technical contact," "legal agent and representative" and "Director/Australian Agent." Although lacking any authority to do so, upon Dave's death Craig assumed *de facto* control and management of W&K and thereby incurred fiduciary duties to act in the LLC's, and its member's, best interests.

193.     In the alternative, just as the shareholders of a closely held corporation have partnership-like fiduciary duties to each other, Craig and Dave acted as partners in the management and operation of W&K, and thus Craig owed fiduciary duties of care, loyalty, and good faith to Dave, his estate, and W&K, by virtue of their joint venture.

194.     In the alternative, if Craig *was* an actual member in W&K Info Defense LLC, Craig owed fiduciary duties of care, loyalty, and good faith to W&K, Dave, and his estate pursuant to Fla. Stat. § 605.04091.

195.     Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate and/or W&K to himself and/or companies controlled by him.

196.     Dave's estate and or W&K have been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages and/or return of the wrongfully taken bitcoins, forked assets, and intellectual property, together with court costs, interest, and any other relief this Court deems just and proper.

41

## COUNT VI
### Breach of Partnership Duties of Loyalty and Care
*(Asserted by the Estate)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

197. From c. 2008 until at least the creation of W&K in 2011, Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property. Pursuant to Fla. Stat. § 620.8202, and Craig's admission of same, this formed a partnership.

198. Pursuant to Fla. Stat. § 620.8404(2), Craig owed Dave a duty of loyalty to, *inter alia*, "account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

199. Pursuant to Fla. Stat. § 620.8404(3), Craig owed Dave a duty of care to refrain from engaging in intentional misconduct, or a knowing violation of law.

200. Craig breached these duties of loyalty and care by, *inter alia*, stealing Dave's bitcoins and any intellectual property Dave owned and or designed during the c. 2008-2011 timeframe (or any other time they partnered).

201. Pursuant to Fla. Stat. §§ 620.8405, Dave's estate brings this action for breach of the duties of loyalty and care owed under Fla. Stat. § 620.8404, including but not limited to its rights pursuant to Fla. Stat. §§ 620.8401, 620.8403, 620.8807, its right to have its partnership interest purchased pursuant to § 620.8701, and to otherwise enforce the rights and protect the interests of Dave's estate.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, and purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT VII
### Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

202.    As detailed above, Defendant made knowing false statements of fact, intentional omissions of material facts, and falsely promised future action with no intention of performing and/or specifically intending not to perform. These included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

203.    Defendant took these actions/omissions with the purpose of inducing Plaintiffs to rely on these fraudulent acts and omissions.

204.    Plaintiffs acted in reliance on Defendant's fraudulent representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

205.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT VIII
### Constructive Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170, and 192-205.

206.    As detailed above, a fiduciary relationship existed between Craig and W&K and Craig and Ira.

207.    Craig invited W&K and Ira's utmost trust and loyalty as their fiduciary.

208.    Plaintiffs reposed the utmost trust and loyalty in Craig.

209.    Craig intentionally violated Plaintiffs trust and confidence, took unconscionable advantage of Plaintiffs, abused and took improper advantage of their confidential and fiduciary relationship, and materially breached his fiduciary duties to them both by knowingly making false statements of fact, intentional omissions of material facts, remaining silent in light of a duty to speak, falsely promising future action with no intention of performing and/or specifically intending not to perform, and by engaging in unfair methods against them. These fraudulent representations/omissions included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid

44

contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

210.    As detailed above, at the time Craig made those false statements and material omissions, and concealed his misconduct, a fiduciary relationship existed between Craig and Ira, and Craig and W&K, as Craig owed fiduciary duties and duties of care and loyalty to the estate and W&K. Craig induced Ira's reliance and Craig took an improper/unconscionable/unfair advantage of, and abused, the fiduciary and confidential relationship at Ira and W&K's expense. Craig's misrepresentations and omissions were intentional, for the specific purpose of defrauding the estate and W&K of their property, but in any event, regardless of intent, Craig is liable for constructive fraud.

211.    Plaintiffs acted in reliance on Defendants fraudulent and unfair representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

212.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court

45

judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IX
### Permanent Injunction
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

213.    Craig's unlawful taking of the bitcoins and intellectual property belonging to Plaintiffs has resulted in great and irreparable injury to them both as they have been deprived of unique, limited, and valuable digital assets.

214.    Neither Plaintiff can be fully compensated in damages and is without adequate remedy at law.

WHEREFORE, Plaintiffs request this Court enter an injunction ordering Defendant to return all bitcoins, forked assets, and intellectual property unlawfully taken from Plaintiffs.

## COUNT X
### Civil Theft - § 772.11 Fla. Stat.,
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

215.    On or about April 2013 through the present day, Defendant knowingly and wrongfully took, with felonious criminal intent, bitcoins, forked assets, and intellectual properties that were then the property of, and owned by, the estate and/or W&K.

216. Defendant took these with the intent to deprive Plaintiffs of the right to these properties and to appropriate the properties to his own use and the use of others not entitled to use the properties.

217. Defendant also trafficked in, and endeavored to traffic in, properties that he knew were stolen and properties that he initiated, organized, planned, financed, directed, managed, and supervised, the theft of.

218. The properties were worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over them.

219. The actions taken by Defendant were done intentionally and maliciously as part of a scheme designed to defraud Plaintiffs of their assets.

220. On June 19, 2018, pursuant to § 772.11 Fla. Stat., counsel for Plaintiffs sent the demand required by Florida Law required to initiate a claim for civil theft. (Ex. 33.)

221. Defendant has not complied with that demand.

222. Plaintiffs have been damaged as a result of Defendants actions.

223. Plaintiffs have retained the undersigned to represent them in this action and in so doing have incurred an obligation for the payment of attorney's fees and costs.

WHEREFORE, Plaintiffs demand judgment against Defendant awarding damages, including treble damages and attorney's fees pursuant to § 772.11 Fla. Stat. as well as ordering Defendant to divest himself of relevant enterprise(s), as well as granting such other relief as the Court deems just, equitable and proper.

**Plaintiffs demand a trial by jury for all issues triable by right.**

Dated: January 14, 2019

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.    (305)539-8400
Fax.    (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.    (914)749-8200
Fax.    (914)749-8300
Email: kroche@bsfllp.com
*Admitted pro hac vice*

Attorneys for Plaintiffs
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of David Kleiman and
W&K Info Defense Research, LLC.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 14, 2019, a true and correct copy of the foregoing

was filed with CM/ECF, which caused a copy to be served on all counsel of record.

/s/ *Velvel (Devin) Freedman*
Velvel (Devin) Freedman

49

# The Satoshi Affair

## Andrew O'Hagan on the many lives of Satoshi Nakamoto

### The Raid

Ten men raided a house in Gordon, a north shore suburb of Sydney, at 1.30 p.m. on Wednesday, 9 December 2015. Some of the federal agents wore shirts that said 'Computer Forensics'; one carried a search warrant issued under the Australian Crimes Act 1914. They were looking for a man named Craig Steven Wright, who lived with his wife, Ramona, at 43 St Johns Avenue. The warrant was issued at the behest of the Australian Taxation Office. Wright, a computer scientist and businessman, headed a group of companies associated with cryptocurrency and online security. As one set of agents scoured his kitchen cupboards and emptied out his garage, another entered his main company headquarters at 32 Delhi Road in North Ryde. They were looking for 'originals or copies' of material held on hard drives and computers; they wanted bank statements, mobile phone records, research papers and photographs. The warrant listed dozens of companies whose papers were to be scrutinised, and 32 individuals, some with alternative names, or alternative spellings. The name 'Satoshi Nakamoto' appeared sixth from the bottom of the list.



*Craig Wright in the Oxford Circus office.*

Some of the neighbours say the Wrights were a little distant. She was friendly but he was weird – to one neighbour he was 'Cold-Shoulder Craig' – and their landlord wondered why they needed so much extra power: Wright had what appeared to be a whole room full of generators at the back of the property. This fed a rack of computers that he called his 'toys', but the real computer, on which he'd spent a lot of money, was nearly nine thousand miles away in Panama. He had already taken the computers away the day before the raid. A reporter had turned up at the house and Wright, alarmed, had phoned Stefan, the man advising them on what he and Ramona were calling 'the deal'. Stefan immediately moved Wright and his wife into

a luxury apartment at the Meriton World Tower in Sydney. They'd soon be moving to England anyway, and all parties agreed it was best to hide out for now.

At 32 Delhi Road, the palm trees were throwing summer shade onto the concrete walkways – 'Tailor Made Office Solutions', it said on a nearby billboard – and people were drinking coffee in Deli 32 on the ground floor. Wright's office on level five was painted red, and looked down on the Macquarie Park Cemetery, known as a place of calm for the living as much as the dead. No one was sure what to do when the police entered. The staff were gathered in the middle of the room and told by the officers not to go near their computers or use their phones. 'I tried to intervene,' one senior staff member, a Dane called Allan Pedersen, remarked later, 'and said we would have to call our lawyers.'

Ramona wasn't keen to tell her family what was happening. The reporters were sniffing at a strange story – a story too complicated for her to explain – so she just told everyone that damp in the Gordon house had forced them to move out. The place they moved into, a tall apartment building, was right in the city and Wright felt as if he was on holiday. On 9 December, after their first night in the new apartment, Wright woke up to the news that two articles, one on the technology site *Gizmodo*, the other in the tech magazine *Wired*, had come out overnight fingering him as the person behind the pseudonym Satoshi Nakamoto, who in 2008 published a white paper describing a 'peer-to-peer electronic cash system' – a technology Satoshi went on to develop as bitcoin. Reading the articles on his laptop, Wright knew his old life was over.

By this point, cameras and reporters were outside his former home and his office. They had long heard rumours, but the *Gizmodo* and *Wired* stories had sent the Australian media into a frenzy. It wasn't clear why the police and the articles had appeared on the same day. At about five that same afternoon, a receptionist called from the lobby of Wright's apartment building to say that the police had arrived. Ramona turned to Wright and told him to get the hell out. He looked at a desk in front of the window: there were two large laptop computers on it – they weighed a

few kilos each, with 64 gigabytes of RAM – and he grabbed the one that wasn't yet fully encrypted. He also took Ramona's phone, which wasn't encrypted either, and headed for the door. They were on the 63rd floor. It occurred to him that the police might be coming up in the elevator, so he went down to the 61st floor, where there were office suites and a swimming pool. He stood frozen for a minute before he realised he'd rushed out without his passport.

Ramona left the apartment shortly after Wright. She went straight down to the basement car park and was relieved to find the police weren't guarding the exits. She jumped into her car, a hire vehicle, and, in her panic, crashed into the exit barrier. But she didn't stop, and was soon on the motorway heading to north Sydney. She just wanted to be somewhere familiar where she would have time to think. She felt vulnerable without her phone, and decided to drive to a friend's and borrow his. She went to his workplace and took his phone, telling him she couldn't explain because she didn't want to get him involved.

Meanwhile, Wright was still standing beside the swimming pool in his suit, with a laptop in his arms. He heard people coming up the stairs, sped down the corridor and ducked into the gents. A bunch of teenagers were standing around but seemed not to notice him. He went to the furthest cubicle and deliberately kept the door unlocked. (He figured the police would just look for an engaged sign.) He was standing on top of the toilet when he heard the officers come in. They asked the youngsters what they were doing, but they said 'nothing' and the police left. Wright stayed in the cubicle for a few minutes, then went out and used his apartment keycard to hide in the service stairwell. Eventually, a call came from Ramona on her friend's phone. She was slightly horrified to discover he was still in the building and told him again to get out. He, too, had a rental car, and had the key in his pocket. He went down sixty flights of stairs to the car park in the basement, unlocked his car and opened the boot, where he lifted out the spare wheel and put his laptop in the wheel cavity. He drove towards the Harbour Bridge and got lost in the traffic.



*Craig Wright in 2016.*

As Ramona drove along she began texting the mysterious Stefan, who was at Sydney Airport, having already checked in for a flight to Manila, where he lived. Stefan had to make a fuss to get his bag removed from the plane and then he spoke to Ramona, telling her that Wright would have to get out of the country. She didn't argue. She called the Flight Centre and asked what flights were leaving. 'To where?' asked the saleswoman.

'Anywhere,' Ramona said. Within ten minutes she had booked her husband on a flight to Auckland.

In the early evening, Wright, scared and lost, made his way to Chatswood. He texted Ramona to come and meet him, and she immediately texted back saying he should go straight to the airport. She'd booked him a flight. 'But I don't have my passport,' he said. Ramona was afraid she'd be arrested if she returned to their apartment, but her friend said he'd go into the building and get the passport. They waited until the police left the building, then he went upstairs. A few minutes later he came back with the passport, along with the other computer and a power supply.

They met Wright in the airport car park. Ramona had never seen him so worried. 'I was shocked,' he later said. 'I hadn't expected to be outed like that in the media, and then to be chased down by the police. Normally, I'd be prepared. I'd have a bag packed.' As Ramona gave him the one-way ticket to Auckland, she was anxious about when she would see him again. Wright said New Zealand was a bit too close and wondered what to do about money. Ramona went to an ATM and gave him $600. He bought a yellow bag from the airport shop in which to store his computers. He had no clothes. 'It was awful saying goodbye to him,' Ramona said.

In the queue for security, he felt nervous about his computers. His flight was about to close when the security staff flagged him down. He was being taken to an interview room when an Indian man behind him started going berserk. It was just after the Paris bombings; the man's wife was wearing a sari and the security staff wanted to pat her down. The man objected. All the security staff ran over to deal with the situation and told Wright to go. He couldn't believe his luck. He put his head down and scurried through the lounge.

Back at Wright's office, Allan Pedersen was being interviewed by the police. He overheard one of them ask: 'Have we got Wright yet?'

'He's just hopped a flight to New Zealand,' his colleague said.

Wright was soon 30,000 feet above the Tasman Sea watching the programmer Thomas Anderson (Keanu Reeves) being chased by unknowable agents in *The*

*Matrix.* Wright found the storyline strangely comforting; it was good to know he wasn't alone.

At Auckland Airport, Wright kept his phone on flight mode, but turned it on to use the airport's wifi to Skype with Stefan, using a new account. They had a discussion about how to get him to Manila. There was a big rock concert that night in Auckland, and all the hotels were full, but he crossed town in a cab and managed to get a small room at the Hilton. He booked two nights, using cash. He knew how to get more cash out of ATMs than the daily limit, so he worked several machines near the hotel, withdrawing $5000. He ordered room service that night and the next morning went to the Billabong store in Queen Street to buy some clothes. He felt agitated, out of his element: normally he would wear a suit and tie – he enjoys the notion that he is too well dressed to be a geek – but he bought a T-shirt, a pair of jeans and some socks. On the way back to the hotel he got a bunch of SIM cards, so that his calls wouldn't be monitored. Back at the Hilton he was packing up his computers when the dependable Stefan came on Skype. He told Wright to go to the airport and pick up a ticket he'd left him for a flight to Manila. His picture was all over the papers, along with the story that he was trying to escape.

Within hours of Wright's name appearing in the press, anonymous messages threatened to reveal his 'actual history'. Some said he had been on Ashley Madison, the website that sets up extramarital affairs, others that he'd been seen on Grindr, the gay hook-up app. During a six-hour layover in Hong Kong, he killed his email accounts and tried to wipe his social media profile, which he knew would be heavy with information he wasn't keen to publicise: 'Mainly rants,' he said later. When he got to Manila airport, Stefan picked him up. They went to Stefan's apartment and the maid washed Wright's clothes while he set up his laptops on the dining-room table. They spent the rest of Saturday wiping his remaining social media profile. Stefan didn't want any contact to be possible: he wanted to cut Wright off from the world. The next day he put him on a plane to London.

**Mayfair**

Technology is constantly changing the lives of people who don't really understand it – we drive our cars, and care nothing for internal combustion – but now and then a story will break from that frontier. I was one of the people who had never heard of Satoshi Nakamoto or the blockchain – the invention underlying bitcoin, which verifies transactions without the need for any central authority – or that it is the biggest thing in computer science. It was news to me that the banks were grabbing onto the blockchain as the foundation of a future 'internet of value'. The story of a mythical computer scientist was an odd one to come my way. I'm not much detained by thoughts of new computer paradigms. (I'm still getting the hang of the first one.) But to those who are much more invested in the world of tomorrow, the Satoshi story has the lineaments of a modern morality tale quite independent of stock realities. There are things, there are always things, that others assume are at the centre of the universe but don't make a scratch on your own sense of the everyday world. This story was like that for me, enclosing me in an enigma I couldn't have named. A documentary is a fashioned thing, of course, as fashioned as fiction in its own ways, but I had to overcome my own bafflement – as will you – to enter this world.

A few weeks before the raid on Craig Wright's house, when his name still hadn't ever been publicly associated with Satoshi Nakamoto, I got an email from a Los Angeles lawyer called Jimmy Nguyen, from the firm Davis Wright Tremaine (self-described as 'a one-stop shop for companies in entertainment, technology, advertising, sports and other industries'). Nguyen told me that they were looking to contract me to write the life of Satoshi Nakamoto. 'My client has acquired life story rights ... from the true person behind the pseudonym Satoshi Nakamoto – the creator of the bitcoin protocol,' the lawyer wrote. 'The story will be [of] great interest to the public and we expect the book project will generate significant publicity and media coverage once Satoshi's true identity is revealed.'

Journalists, it turned out, had spent years looking for Nakamoto. His identity was one of the great mysteries of the internet, and a holy grail of investigative reporting, with writers who couldn't dig up evidence simply growing their own. For the *New*

*Yorker*'s Joshua Davis the need to find him seemed almost painful. 'Nakamoto himself was a cipher,' he wrote in October 2011:

Before the debut of bitcoin, there was no record of any coder with that name. He used an email address and a website that were untraceable. In 2009 and 2010, he wrote hundreds of posts in flawless English, and though he invited other software developers to help him improve the code, and corresponded with them, he never revealed a personal detail. Then, in April 2011, he sent a note to a developer saying that he had 'moved on to other things'. He has not been heard from since.

Davis went on to examine Satoshi's writing quite closely and concluded that he used British spelling and was fond of the word 'bloody'. He then named a 23-year-old Trinity College Dublin graduate student, Michael Clear, who quickly denied it. The story went nowhere and Clear went back to his studies. Then Leah McGrath Goodman wrote a piece for *Newsweek*claiming Satoshi was a maths genius called Dorian Nakamoto, who lived in the Californian suburb of Temple City and didn't actually know, it turned out, how to pronounce bitcoin. When Goodman's article ran on the magazine's cover reporters from all over the world arrived on Dorian's doorstep. He said he would give an interview to the first person who would take him to lunch. It turned out that his hobby wasn't alternative currencies but model trains. Someone calling himself Satoshi Nakamoto, and using Satoshi's original email address, visited one of the forums Satoshi used to haunt and posted the message: 'I am not Dorian Nakamoto.' Other commentators, including Nathaniel Popper of the *New York Times*, named Nick Szabo, a cool cryptocurrency nut and the inventor of Bit Gold, but he denied it profusely. *Forbes* believed it was Hal Finney, who, the blockchain irrefutably showed, was the first person in the world to be sent bitcoin by Satoshi. Finney, a native Californian, was an expert cryptographer whose involvement in the development of bitcoin was vital. He was diagnosed with motor neurone disease in 2009 and died in 2014. It came to seem that the holy grail would remain out of reach. 'Many in the bitcoin community … in deference to the bitcoin creator's clear desire for privacy … didn't want to see the wizard unmasked,' Popper wrote in the *New York Times*. 'But even among those who said this, few could resist debating the clues the founder left behind.'

The 'Stefan' who was hovering during the raid on Craig Wright's house and office is Stefan Matthews, an IT expert whom Wright had known for ten years, since they both worked for the online gambling site Centrebet. In those days, around 2007, Wright was often hired as a security analyst by such firms, deploying his skills as a

199

computer scientist (and his experience as a hacker) to make life difficult for fraudsters. Wright was an eccentric guy, Stefan Matthews remembered, but known to be a reliable freelancer. Matthews said that Wright had given him a document to look at in 2008 written by someone called Satoshi Nakamoto, but Matthews had been busy at the time and didn't read it for a while. He said that Wright was always trying to get him interested in this new venture called bitcoin. He tried to sell him 50,000 coin for next to nothing, but Matthews wasn't interested, he told me, because Wright was weird and the whole thing seemed a bit cranky. A few years later, however, Matthews realised that the document he had been shown was, in fact, an original draft of the by now famous white paper by Satoshi Nakamoto. (Like the governments they despise, bitcoiners deal – when it comes to ideas – in 'white papers', as if they were issuing laws.) Last year, when Wright was in financial trouble, he approached Matthews several times. By that time, Matthews had become friendly with Robert MacGregor, the founder and CEO of a Canada-based money-transfer firm called nTrust. Matthews encouraged MacGregor to come to Australia and assess Wright's value as an investment opportunity. Wright had founded a number of businesses that were in trouble and he was deeply embedded in a dispute with the ATO. Nevertheless, Matthews told MacGregor, Wright was almost certainly the man behind bitcoin.

Matthews argued that since Satoshi's disappearance in 2011, Wright had been working on new applications of the blockchain technology he had invented as Satoshi. He was, in other words, using the technology underlying bitcoin to create new versions of the formula that could, at a stroke, replace the systems of bookkeeping and registration and centralised authority that banks and governments depend on. Wright and his people were preparing dozens of patents, and each invention, in a specific way, looked to rework financial, social, legal or medical services, expanding on the basic idea of the 'distributed public ledger' that constitutes the blockchain. This is utopian thinking, even by normal geek standards,

but it's a hot topic in computer science and banking at the moment, and hundreds of millions of dollars are being invested in such ideas. Thus: Matthews's proposal.

After initial scepticism, and in spite of a slight aversion to Wright's manner, MacGregor was persuaded, and struck a deal with Wright, signed on 29 June 2015. MacGregor says he felt sure that Wright was bitcoin's legendary missing father, and he told me it was his idea, later in the drafting of the deal, to insist that Satoshi's 'life rights' be included as part of the agreement. Wright's companies were so deep in debt that the deal appeared to him like a rescue plan, so he agreed to everything, without, it seems, really examining what he would have to do. Within a few months, according to evidence later given to me by Matthews and MacGregor, the deal would cost MacGregor's company $15 million. 'That's right,' Matthews said in February this year. 'When we signed the deal, $1.5 million was given to Wright's lawyers. But my main job was to set up an engagement with the new lawyers … and transfer Wright's intellectual property to nCrypt – a newly formed subsidiary of nTrust. 'The deal had the following components: clear the outstanding debts that were preventing Wright's business from getting back on its feet, and work with the new lawyers on getting the agreements in place for the transfer of any non-corporate intellectual property, and work with the lawyers to get Craig's story rights.' From that point on, the 'Satoshi revelation' would be part of the deal. 'It was the cornerstone of the commercialisation plan,' Matthews said, 'with about ten million sunk into the Australian debts and setting up in London.'

The plan was always clear to the men behind nCrypt. They would bring Wright to London and set up a research and development centre for him, with around thirty staff working under him. They would complete the work on his inventions and patent applications – he appeared to have hundreds of them – and the whole lot would be sold as the work of Satoshi Nakamoto, who would be unmasked as part of the project. Once packaged, Matthews and MacGregor planned to sell the intellectual property for upwards of a billion dollars. MacGregor later told me he was speaking

to Google and Uber, as well as to a number of Swiss banks. 'The plan was to package it all up and sell it,' Matthews told me. 'The plan was never to operate it.'



*Clockwise from top left: Hal Finney, Gavin Andresen, Robert MacGregor, Stefan Matthews*
*

Since the time I worked with Julian Assange, my computers have been hacked several times. It isn't unusual for me to find that material has been wiped, and I was careful to make sure the lawyer's approach wasn't part of a sting operation. But I was curious to see what these men had. I assumed MacGregor – or someone behind him – must be the 'client' referred to in the email I had received from California. On Thursday, 12 November, I turned up at MacGregor's office near Oxford Circus, where I signed in under a pseudonym and made my way to a boardroom wallpapered with mathematical formulae. MacGregor came into the room wearing a tailored jacket and jeans, with a blue-edged pocket square in his breast pocket, a scarf and brown brogue boots. He was 47 but looked about 29. There was something studied about him – the Alexander McQueen scarf, the lawyerly punctilio – and I'd never met anyone who spoke so easily about such large

sums of money. When I asked him the point of the whole exercise he said it was simple: 'Buy in, sell out, make some zeroes.'

MacGregor described Wright to me as 'the goose that lays the golden egg'. He said that if I agreed to take part I would have exclusive access to the whole story, and to everyone around Wright, and that it would all end with Wright proving he was Satoshi by using cryptographic keys that only Satoshi had access to, those associated with the very first blocks in the blockchain. MacGregor told me this might happen at a public TED talk. He said it would be 'game over'. Wright's patents would then be sold and Wright could get on with his life, out of the public eye. 'All he wants is peace to get on with his work,' MacGregor told me at that first meeting. 'And how this ends, for me, is with Craig working for, say, Google, with a research staff of four hundred.'

I told MacGregor that there would have to be a process of verification. We talked about money, and negotiated a little, but after several meetings I decided I wouldn't accept any. I would write the story as I had every other story under my name, by observing and interviewing, taking notes and making recordings, and sifting the evidence. 'It should be warts and all,' MacGregor said. He said it several times, but I was never sure he understood what it meant. This was a changing story, and I was the only one keeping account of the changes. MacGregor and his co-workers were already convinced Wright was Satoshi, and they behaved, to my mind, as if that claim was the end of the story, rather than the beginning.

I don't mean to imply anything sinister. The company was excited by the project and so was I. Very quickly we were working hand in hand: I reserved judgment (and independence) but I was very caught up in the thought of the story unfolding as planned. At this point, nobody knew who Craig Wright was, but he appeared, from the initial evidence, to have a better claim to being Satoshi Nakamoto than anyone else had. He seemed to have the technical ability. He also had the right social history, and the timeline worked. The big proof was up ahead, and how could it not be spectacular? I went slowly forward with the project, and said no to everything 203

that would hamper my independence. This would become an issue later on with MacGregor and Matthews, or the men in black, as I'd taken to calling them, but for those first few months, nobody asked me to sign anything and nobody refused me access. Mysteries would open up, and some would remain, but there seemed no mystery about the fact that these people were confident that a supremely important thing was happening and that the entire process should be witnessed and recorded. My emails to MacGregor took it for granted that what would be good for my story, in terms of securing proof, would also be good for his deal, and that seemed perfectly true. Yet I feel bad that I didn't warn him of the possibility that this might not be what happened, that my story wouldn't die if the deal died, that human interest doesn't stop at success.

It was at this point, four weeks after my first meeting with MacGregor, that *Wired* and *Gizmodo* reported that he might be Satoshi. The news unleashed a tsunami of responses from the cryptocurrency community, and most of it was bad for Wright's credibility. Had he left artificial footprints to suggest his involvement with bitcoin had been earlier than it was? Had he exaggerated the number and nature of the degrees he'd accumulated from various universities? Why did the company that supplied the supercomputer he claimed to have bought with amassed bitcoin say it had never heard of him?

'The smell,' as one commentator said, 'was a mile high.' The nCrypt people were unfazed by this mudslinging, believing that every one of the charges made against Wright could be easily disproved. Wright produced an impressive paper showing that his 'footprint' wasn't faked and that the 'cryptographic' evidence against him was bogus (people continue to argue on this point). He produced a letter from the supercomputer supplier acknowledging the order. Charles Sturt University provided a photocopy of his staff card, proving he had lectured there, and Wright sent me a copy of the thesis he'd submitted for a doctorate his critics claim he doesn't have.

\*

I had arrived five minutes early at 28-50 Degrees, a wine bar and restaurant in Mayfair. It was just before 1 p.m. on 16 December and the lunchtime crowd, men in blue suits and white shirts, were eating oysters and baby back ribs and drinking high-end wine by the glass. A jeroboam of Graham's ten-year-old tawny port stood on the bar, and I was inspecting it when MacGregor arrived with Mr and Mrs Smith. That's what he'd been calling them in his emails to me. Craig Wright, 45 years old, wearing a white shirt under a black jacket, a pair of blue chinos, a belt with a large Armani buckle and very green socks, wasn't the kind of guy who seems comfortable in a swish restaurant. He sat across from me and lowered his head and at first he let MacGregor do the talking. Ramona was very friendly, chatting about their time in London as if they were a couple of holidaymakers who'd just blown into Mayfair. She wasn't drinking, but the rest of us ordered a glass of Malbec each. When Wright lifted his head to laugh at something, I noticed he had a nice smile but uneven teeth, and a scar that climbed from the top of his nose to the area just above his left eyebrow. He hadn't shaved since he'd left Sydney.

Wright told me he was rubbish at small talk. He too wanted what I wrote to be 'warts and all'; he felt he was being misunderstood by everybody, and normally that wouldn't bother him but he had to consider the respectability of his work, and his family's rights. He appeared to ponder this for a moment, then he told me his old neighbours at the house in Gordon hadn't been friendly.

'They barely even knew your name,' Ramona said.

'They do now,' he replied.

I found him easier to talk to than I'd expected. He said his father had worked for the NSA (he couldn't explain this), but that, to this day, his mother thinks he worked for Nasa. 'The few people I care about I care about a lot,' he said, 'and I care about the state of the world. But there's not much in between.' He said he was happy I was writing about him because he wanted 'to step into history', but mainly because he wanted to tell the story of the brilliant people he had collaborated with. He and

205

Ramona were both jet-lagged and anxious about things back home. 'We should have been having our company's Christmas party today,' Ramona said.

MacGregor asked Wright if being a libertarian had influenced his work, or if the work had turned him into a libertarian. 'I was always libertarian,' he replied, and then he told me his father had more or less kidnapped him after his parents got divorced. He hated being told what to do – that was one of his main motivations. He believed in freedom, and in what freedom would come to mean, and he said his work would guarantee a future in which privacy was protected. 'Where we are,' he said, 'is a place where people can be private and part of that privacy is to be someone other than who they were. Computing will allow you to start again, if you want to. And that is freedom.' In fact he never stopped imagining different lives for himself. That afternoon he seemed preoccupied by the case people were making against his being Satoshi. He shook his head a lot and said he wished he could just get on in silence with his work. 'If you want to stay sane through this, ignore Reddit,' his wife told him.

The next day, 17 December, we met again, in a private room in Claridge's. You could see outside, over the rooftops, cranes garlanded in fairy lights. Ramona came in looking tired and totally fed up. From time to time, especially when exhausted, she would resent the hold these people had over them. 'We have sold our souls,' she said to me in a quiet moment.

MacGregor said he would spend the evening preparing paperwork to be signed by Wright the following day. This would effectively be the final signing over to nCrypt of the intellectual property held by Wright's companies. This was the main plank in the deal. MacGregor was confident the work was 'world historical', that it would change the way we lived. He regularly described the blockchain as the greatest invention since the internet. He said that what the internet had done for communication, the blockchain would do for value.

MacGregor explained that Wright's Australian companies were being signed over to nCrypt and that he'd extended an 'olive branch' to the ATO, which had responded quickly and positively. A lot of trouble with the ATO had to do with whether bitcoin was a commodity or a currency and how it should be taxed. It also had doubts about whether Wright's companies had done as much research and development as they claimed, and whether they were therefore entitled to the tax rebates they had applied for. The ATO had said it couldn't see where the spending was going. Some critics in the media claimed Wright's companies had been set up only for the purpose of claiming rebates, though not even the ATO went that far.

Wright told me that thanks to the tax office they'd had to lay out all the research for their patents, which had been useful since the nCrypt team was in a hurry: the banks, now alert to cryptocurrencies and the effectiveness of the blockchain, are rushing to create their own versions. At that moment, Bank of America was patenting ten ideas for which Craig and his team told me they had a claim to 'prior art'. Governments spent a long time denying the value of bitcoin – seeing it as unstable, or the currency of criminals – but now they celebrate the potential of the technology behind it.

'They're behaving like children,' Wright said of the ATO.

MacGregor looked at his watch. He straightened his cuffs. 'I see this as a pivotal moment in history … It's like being able to go back in time and watch Bill Gates in the garage.' He turned to Wright. 'You released this thing into the wild. Some people got it right and some people got it wrong. But you've got a vision of where it's going next and next and next.'

'None of this would have worked without bitcoin,' Wright said, 'but it's a wheel and I want to build a car.'

Ramona looked depressed. She was worried that her husband, as the person claiming to have invented bitcoin, might be held liable for the actions of those who'd

used the currency for nefarious purposes. 'He didn't issue a currency,' MacGregor assured her. 'This is just technology – it is not money.' Ramona was still anxious. 'We're talking about legal risk … I'm giving you the legal answer,' MacGregor said. 'I would stake my career on the fact that the creation of bitcoin is not a prosecutable event.'

Right to the end, the Wrights would express worries about things Craig did as a young computer forensics worker. Much of his professional past looked questionable, but in the meeting room at Claridge's he simply batted the past away. 'It's what you're doing now that matters. I'm not perfect. I never will be … All these different people arguing about what Satoshi should be at the moment, it's crazy.'

### Ninjutsu

Wright's father, Frederick Page Wright, was a forward scout in Vietnam, serving with the 8th Battalion of the Australian army. 'He lost all his friends,' Wright told me, 'every single one of them' – and before long he was drinking and being violent towards Wright's mother, who eventually left him. Both Wright and his mother, when I went to meet her in Brisbane in March, told me about his father's anger at his own mother: he sent all his army pay cheques home to her and she spent them while he was away. He also dreamed of a football career that never happened. 'I have a chip on my shoulder,' Wright said, 'but his was bigger.'

'Did you admire him?'

'He never admired me. I was never fucking good enough. We played chess from when I was three or four and if I made a wrong move he'd wallop me. We clashed right from the beginning.'

The boy had two great influences. The first was his grandfather Ronald Lyman, who his family claims received the first degree awarded by the Marconi School of Wireless in Australia, and who served in the army as a signals officer. They also say he later became a spy with the Australian security services. Craig's favourite place

was his grandfather's basement, a paradise of early computing. 'We'd sit there and look at these books of log tables,' he told me. 'I loved doing it.' Captain Lyman had an old terminal and a Hayes 80-103A modem that they used to connect to the University of Melbourne's network. To keep Craig quiet while he worked, Pop, as the children called him, would let him write code. 'I found this community of hackers,' Wright says, 'and I worked out how to interact with them. I started building games and hacking other people's games. In time, I'd be pulling apart hacker code, and eventually I did this for companies, to help them create defences against hackers.'

His mother told me he was sometimes picked on at school. 'He struggled,' she said, 'but after a while I sent him to Padua College' – a private Catholic college in Brisbane – 'and he shone there. I mean, he was different. He used to dress up and he had an obsession with Japanese culture. He had big samurai swords.'

'As a teenager?'

'Dressed up in samurai clothes, with the odd wooden shoes and everything. Making all the noises. His sisters would complain about him embarrassing them: "We're down the park, we've got friends down there, and he's walking around with webbed feet." He used to have this group of nerdy friends in the 1980s: they'd come around in horn-rimmed glasses and play Dungeons & Dragons for hours.'

He had a karate teacher called Mas who moved him quickly from karate through judo to Ninjutsu. Craig broke his knuckles over and over again and 'became stronger', he told me, because 'the pain led to a "me" that could handle more.' The thing that attracted him most to martial arts was the discipline. Learning to become a ninja involves 18 disciplines, including *bōjutsu*(tactics), *hensōjutsu* (disguise and impersonation), *intonjutsu*(escape and concealment) and *shinobi-iri* (stealth and infiltration). He walked home from his lessons feeling stronger, like another self.

209

When he was 18, Wright joined the air force. 'They locked me in a bunker,' he told me, 'and I worked on a bombing system. Smart bombs. We needed fast code, and I did that.' When he was in his twenties a melanoma appeared on his back and he had several skin grafts. 'This was after he got out of the air force,' his mother told me, 'and when he recovered he was off to university, and it's been degrees, degrees, degrees since then.' He went to the University of Queensland to study computer systems engineering. And over the following 25 years he would finish, or not finish, or finish and not do the graduation paperwork for degrees in digital forensics, nuclear physics, theology, management, network security, international commercial law and statistics. After our first full interview, he went home to work on an assignment for a new course he was taking at the University of London, a masters in quantitative finance.

Over the months I spent with him, I noticed that he loved the idea of heroism and was strongly attracted to creation myths. One of the first things he emailed me was a copy of one of his dissertations, 'Gnarled Roots of a Creation Mythos'. I noticed it was dedicated to Mas, his martial arts instructor. The text wasn't merely an argument for self-invention, but a feminist exegesis that railed against patriarchal views of the Fall. Wright also speaks of the pilgrim-visitor in the 'world garden'. 'While in the garden, the pilgrim almost inevitably suffers deception. His or her senses, enchanted by illusory and transitory formal appearances, betray his or her soul and lead to sin.'

Wright said he had never expected the myth of Satoshi to gather such force. 'We were all used to using pseudonyms,' he told me. 'That's the cypherpunk way. Now people want Satoshi to come down from the mountain like a messiah. I am not *that*. And we didn't mean to set up a myth that way.' Satoshi was loved by bitcoin fans for making a beautiful thing and then disappearing. They don't want Satoshi to be wrong or contradictory, boastful or short-tempered, and they don't really want him to be a 45-year-old Australian called Craig.

While reading Wright's ideas on creation, I kept thinking of his karate teacher and the position he had in the young man's life. An offhand remark Wright made had stayed with me. It was about storytelling and how a possible meaning of freedom might reside not only in martial arts, in the ability to defend oneself, but in the ability to make oneself. Mas 'taught me a lot of Eastern philosophy and gave me the means to become myself', Wright said. One day Mas told him about Tominaga Nakamoto. 'He was a Japanese merchant philosopher,' Wright told me. 'I read translations of his stuff, material from the 1740s.'

Weeks later, I was in the kitchen of the house Wright was renting in London drinking tea with him when I noticed a book on the worktop called *Visions of Virtue in Tokugawa Japan*. I'd done some mugging up by then and was keen to nail the name thing.

'So that's where you say you got the Nakamoto part?' I asked. 'From the 18th-century iconoclast who criticised all the beliefs of his time?'

'Yes.'

'What about Satoshi?'

'It means "ash",' he said. 'The philosophy of Nakamoto is the neutral central path in trade. Our current system needs to be burned down and remade. That is what cryptocurrency does – it is the phoenix ...'

'So *satoshi* is the ash from which the phoenix ...'

'Yes. And Ash is also the name of a silly Pokémon character. The guy with Pikachu.' Wright smiled. 'In Japan the name of Ash is Satoshi,' he said.

'So, basically, you named the father of bitcoin after Pikachu's chum?'

'Yes,' he said. 'That'll annoy the buggery out of a few people.' This was something he often said, as if annoying people was an art.

Wright's generation, now in their mid to late forties, are seeing a world that enlarges on their teenage kicks. For Wright, as for Jeff Bezos, the rules of how to shop and how to think and how to live are extrapolations of dreams they had sitting in a box room somewhere. 'The person who experiences greatness must have a feeling for the myth he is in,' Frank Herbert wrote in *Dune*, Wright's favourite novel as a teenager. '*Dune* was really about people,' Wright told me. 'It was about the idea that we don't want to leave things to machines and [should instead] develop as humans. But I see things a little differently from Mr Herbert. I see that it's not one or the other – man or machines – it's a symbiosis and a way of becoming something different together.' This kind of cyberpunk energy – as opposed to cypherpunk, which came later – delivered Wright's generation of would-be computer scientists into the brightness of the future.

After getting his first degree, Wright settled into IT roles in a number of companies. He became a well-known 'go-to guy' among startups and security firms: he always solved the problem and they always came back for more. 'When I've characterised Craig to colleagues and friends,' Rob Jenkins, who worked with Wright in this period and now holds a senior position in Australia's Westpac Bank, told me, 'I've always described him as the most qualified person I've ever known. I've worked with other smart people but Craig has such a strong desire to pursue knowledge. He has passion. And bitcoin was just another one of those bright things he was talking about.'

'Sketch it out for me,' I said to Wright. 'Those years before bitcoin. What was happening that would later have an influence? I want to know about all the precursors, all the previous attempts to solve the problem.'

'Back in 1997 there was Tim May's BlackNet ...' May was a crypto-anarchist, who had been operating and agitating in the cypherpunk community since the mid-1980s. 'Computer technology is on the verge of providing the ability for individuals and groups to communicate and interact with each other in a totally anonymous manner,' he wrote in the *Crypto-Anarchist Manifesto in 1988*. BlackNet

operated like a precursor to WikiLeaks, soliciting secret information with payments made by untraceable, digital money.

'We all have a narcissistic hubris,' Wright told me. He wanted to take May's BlackNet idea further. He was also enthusiastic, in those early days, about Hashcash and B-money. The idea behind Hashcash, a 'proof of work' algorithm where each of a group of computers performs a small task that can be instantly verified (thus making life impossible for spammers, who depend on multiple emails going out with little to no work involved), was 'totally necessary for the building of bitcoin'. Wright said that he spoke to Adam Back, who proposed Hashcash in 1997, 'a few times in 2008, whilst setting up the first trials of the bitcoin protocol'.

B-Money was invented by a man called Wei Dai. At the time of its creation, Wei wrote a paper which assumed 'the existence of an untraceable network, where senders and receivers are identified only by digital pseudonyms (public keys) and every message is signed by its sender and encrypted to its receiver.' The public key, or address, is matched, as John Lanchester handily described it in the *LRB*, to 'a private key which provides access to that address'. A key is really just a string of numbers and digits: the public key demonstrates ownership of any given address; the private key can only be used by the owner of that address. Wei went on to suggest a system for the exchange and transfer of money. 'Anyone can create money by broadcasting the solution to a previously unsolved computational problem,' he wrote. The system had methods for rewarding work and keeping users honest. 'I admired B-Money,' Wright told me, 'and he definitely gave me some of the cryptographic code that ended up in the first version of bitcoin.' Wright was always careful to give credit to those early developers. 'Wei was very helpful,' he went on, but 'to people like that bitcoin seems a bit of a fudge. It works, but it's not mathematically elegant.'

'Wei said that?'

'Wei was very polite. But others said it: Adam Back, Nick Szabo. They would probably like to find a more elegant solution to the problem. Perhaps they see the mining system in bitcoin as wasteful: there's wasted computation in my system –

213

machines which are trying to solve problems and not winning. But that's like society.'

'Are these early cryptocurrency people in a state of rivalry?'

'Yes, but it doesn't matter.'

### Kleiman

The flat in Marylebone where I interviewed Wright had wooden shutters and modern ornaments and pictures, mainly of crows. I set the flat up for work while Craig and Ramona were in the City signing over his intellectual property, and all his companies, to MacGregor. They arrived at the flat a couple of hours late. 'When did you realise the whole Satoshi thing wasn't going to be a secret for ever?' I asked.

'Very recently,' Wright said. 'I didn't really believe it would need to come out. What we believed is that we could leave it in doubt – we wouldn't have to sign using the Satoshi keys or anything else. We have hundreds of patents and papers in progress – research from the beginning – and in the next year we're going to start releasing them. We thought people could suspect and people could query and we could leave it like that.'

'And how did that change?'

Ramona said a single word: 'Rob.'

The days in St Christopher Place were almost languorous. We would bring coffee back to the flat and spread out, and I'd try to build a picture of how he did what he said he did. We put up whiteboards and he bamboozled me with maths. Sometimes he would write at the board for hours, then tear open books and point to theories and proofs. I talked to the scientists he worked with, many of whom were better explainers than he was. One of the things I noticed was that Wright hated claiming outright to be Satoshi and would spend hours giving credit to everyone who had

ever contributed. It was odd: we were in the room because he was coming out as Satoshi, yet the claim embarrassed him and I have many hours of tape in which he deflects it. I felt this unwillingness supported his claim because it showed a proper regard for the communal nature of the work. He was contradictory enough sometimes to enjoy the limelight and actively court it, and this would cause trouble for him, but the idea of speaking directly as Satoshi seemed to fill him with dread. 'I'm afraid that they're just going to look at my papers because I've got Satoshi after my name,' he told me. 'I've got my little Satoshi mask on, and people go "Aren't you wonderful?" because you were Satoshi. I wanted the doubt. When I released future papers, I wanted people to go: "Oh, fuck, he could be, and these papers are so good he might be."'

Dave Kleiman was to become the most important person in Wright's professional life, the man he says helped him do Satoshi's work. They met online: they visited the same cryptography forums and had interacted since 2003. Both men were interested in cyber security, digital forensics and the future of money, but Kleiman was a boy's boy, an army veteran who loved contact sports and fast living. Five foot ten and weighing 200 pounds, he lived in Riviera Beach, Florida, and from 1986 to 1990 he was an army helicopter technician. When I looked into Kleiman's life, I discovered he had also done computer forensics work for Homeland Security and the army. After active service he became a deputy in the Palm Beach County sheriff's office. A motorcycle crash in 1995, when he was 28, left him in a wheelchair. Kleiman was a drug user and one source told me he was heavily into online gambling and various illicit activities; there is evidence he was associated with Silk Road, the online marketplace for all things illegal. After the accident he devoted himself to computers, and set up a company called Computer Forensics LLC.

Until Napster (the brainchild of a teenager called Shawn Fanning) came along in 1999, enabling users to share music files across the internet without a central server, the phrase 'peer-to-peer sharing' was familiar only to the early internet's true believers. Napster, with its user-friendly interface, brought file-sharing to the

masses. The old model of copyright and revenue generation became obsolete overnight: people stopped buying CDs; young people got music through the internet for free. The music industry had to reinvent itself or die. Wright told me that his earliest conversations with Kleiman were about file-sharing. In 2007 they wrote a study guide together on hacking. 'I used to fire ideas off him,' Wright said. 'I'm pretty good at maths but I'm not very good at people.' Kleiman, he said, could put up with his temper, which not everybody could. They began to speak of ways to use the Napster idea in other areas and solve some old problems in cryptography. Wright never, I have to say, made it fully clear how they had collaborated on building bitcoin. I kept returning to the subject, and my doubts would flare up when he failed to be explicit.

'Give me a sense of how the idea of Satoshi formed,' I said.

'I guess,' Wright replied, 'the initial idea was having a pseudonymous head that wouldn't be cut off.'

'More your idea than his?'

'Probably mine.'

'And was there a point you realised you needed a figurehead?' I asked.

'We needed people to respond to us,' he said. 'But I didn't really want people to respond to me. There are a couple of reasons for that. I don't think I would really have sold the idea to anyone. If I'd come out originally as Satoshi without Dave, I don't think it would have gone anywhere. I've had too many conversations with people who get annoyed because it's me.'

'The blockchain came about as an idea of a ledger,' he said. 'But there were a number of problems that needed to be solved. It needed to be distributed, but how do you make sure people don't collude – it may seem awful but you don't put trust in people, you incentivise people to act. And you incentivise people to act by giving them the opportunity to earn something. It's as Adam Smith says: it's not through the goodness of the heart, it's not the baker caring about you, it's not the butcher

caring about you, it's them caring about their own families. Together, as he put it, the invisible hand controls the way society works.'

I asked him to explain the distributed ledger in layman's terms and he went into an algorithmic paroxysm of verbal ingenuity. Ignoring all that, a distributed ledger is a database that is shared between multiple users, with every contributor to the network having their own identical copy of the database. Any and all additions or alterations to the ledger are mirrored in every copy as soon as they're made. No central authority is in charge of it, but no entry on it can be disputed. Adam Smith's point about 'incentive' is embedded in the way bitcoin works: people do not just buy coins or use them; they 'mine' them. Miners use their computers to solve increasingly difficult mathematical problems, the reward for the solving of which can be paid in bitcoin. This keeps the currency honest and, ideally, stops it from being dominated by any single entity.

I had brought rolls of disposable whiteboard and stuck it up around the flat, and, while we were speaking, he would jump up and cover the walls in formulae, along with arrows, arcs and curves. His wife told me she sometimes goes into the shower room and finds him standing there, stark naked, writing on the steamed glass. 'Was there a primary person doing the maths?' I asked.

'Me,' he said. 'Dave wasn't really a mathematician. What he did was make me simplify it.'

'How did he know how to make you simplify it?'

'We got to a point in the writing of the Satoshi white paper where it was … People say that it was hard.'

'He wanted you to bring the language down a little bit?'

'A lot. It's very simple. The elliptical curve stuff is not described in the paper at all, it's just there. The crypto stuff isn't described either.' I asked him to show me the

217

trail of ideas that led to their collaboration. 'So all these things are there,' he said, pointing to a 337-page thesis on his computer called 'The Quantification of Information Systems Risk', which he had recently submitted in partial fulfilment of a philosophy doctorate at Charles Sturt University. 'Application to audits, how you analyse failures, deriving the mathematics behind it, simplifying the mathematics and there you go … The core of the bitcoin paper is a Poisson model based on binomial distribution. That's how it got solved.'

In 2008 it was a 'hodgepodge', he said. I asked him if he felt the development of bitcoin was, at some level, a response to the financial crisis. 'It was already in process. I saw [the crisis] coming though. It was a kind of perfect storm. During that year, I spoke to Wei Dai. So between him and Hal Finney there were a lot of really good ideas about making money work … [Finney] was the one who actually took what I said seriously. He received the first bitcoin.'

Craig started turning up to our interviews in a three-piece suit. His suits were unfashionable and his ties even more so – 1970s-style yellow, sometimes paisley – and he would ramble on a range of subjects. On his own subject, he could be brilliant, but he was wayward: he would side-track, miss the point and never come back to it. He was nothing like people imagine the mythical Satoshi to be – in fact, he was Satoshi's comic opposite. He told stories against himself that weren't really against himself. He was obsessed with his opponents' views but had no skill at providing a straight answer to their questions. 'I'm an arsehole,' he said many times, as if saying so were a major concession. But he wasn't really, he was actually pretty nice. He was arrogant about maths and computing, which wasn't so surprising. He also had a habit of dissembling, of now and then lying about small things in a way that cast shade on larger things. At one point, I asked him to send me an email from the original Satoshi account.

'Can you do that?' I asked.

'Yes,' he said. 'But I'd need Rob's permission.' When I asked MacGregor he said that was absurd. He simply didn't want to – or couldn't – give too much away, and that was unfortunate in someone who'd agreed to sit down every day with a writer. He seemed to have full knowledge of that email account, in a way that made it seem unquestionably his. But somehow, it offended his sense of personal power to prove it. At first, I thought he was a man in existential crisis, like the hero of Bellow's *Dangling Man*, brilliant but antisocial, waiting to be drafted. But as the months passed I began to think of him more as a Russian 'superfluous' man of the 1850s, a romantic hero out of Turgenev, constantly held back from self-realisation by some blinding secret, showing himself not by action but in speech. Wright talked all day and he scribbled on the board and he called me his friend. He cried and he shouted and he unloaded his childhood and spoke about his father. He claimed to be Satoshi and he spoke Satoshi's thoughts and described what he did and gave an account of what people misunderstood about his invention and where bitcoin needed to go now. I moved to an office in Piccadilly – it was like something out of John le Carré, all those rooftops and fluttering Union Jacks – and we continued to do interviews. He talked without cease, without direction, and continued to find it difficult to land near the spot where my question was marked on the ground. When I asked to see the emails between him and Kleiman, he shrugged. He said he wasn't getting on well with his first wife when he wrote them and I assumed that meant they were full of talk about her. 'Just edit them down for me,' I said.

'I don't know if I can find them,' he said. But I wouldn't let it go and eventually he sent me a selection and they certainly seem to be authentic. A few of the emails were obviously the same as those quoted in the *Wired* and *Gizmodo* stories before Christmas. Wright always said these stories had been provoked by a 'leak', the work of a disgruntled employee of his who had stolen a hard drive. In any case, the emails he sent me show a pair of men with shadowy habits – socially undernourished men, I'd say, with a high degree of intellectual ability – operating in a world where the line between inventing and scamming is not always clear. The first email Wright sent me was from 27 November 2007, when he was working for

219

the Sydney accountancy firm BDO Kendalls and the two men were working on a paper on 'Cookies in Internet Banking'. 'Next year Dave, we come out with something big. I will tell you, but not now,' he wrote to Kleiman on 22 December 2007. Kleiman's reply told him what he was reading – 'Sagan, Feynman, Einstein' – and added: 'I hope we make an event together this year so we can "break some bread" and have a casual conversation, instead of the brain dump middle of the night email exchanges we normally have.' On 1 January 2008, Wright closed an email: 'Nothing now, but I want your help on something big soon.'

The subject of bitcoin came up – quite starkly – in an email from Wright dated 12 March 2008. 'I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, bitcoin ... you are always there for me Dave. I want you to be part of it all. I cannot release it as me. GMX, vistomail and Tor. I need your help and I need a version of me to make this work that is better than me.' Wright told me that he did the coding and that Kleiman helped him to write the white paper and make the language 'serene'. With a protocol as clever as the one underlying bitcoin, you would imagine the work was complex and endlessly discussed. But Wright says they mainly talked about it by direct message and by phone. Wright had been fired from his job at BDO (the crash was taking effect) and had retired with his then wife, Lynn, and many computers to a farm in Port Macquarie. It was there, Wright says, that he did the majority of the work on bitcoin and where he spoke to Kleiman most regularly. The Satoshi white paper, 'Bitcoin: A Peer-to-Peer Electronic Cash System', was published on a cryptography mailing list on 31 October 2008.

On 27 December 2008, Wright wrote to Kleiman: 'My wife will not be happy, but I am not going back to work. I need time to get my idea going ... The presentation was good and the paper is out. I am already getting shit from people and attacks on what we did. The bloody bastards are wrong and I friken showed it, they should stick to the science and piss off with their politicised crap. I need your help. You edited my paper and now I need to have you aid me build this idea.' Wright told me

that it took several attempts to get the protocol up and running. He began to test it early in January 2009. 'That was where the real money started rolling in,' he told me. The originating block in the blockchain – the file that provably records every transaction ever made – is called the Genesis block. 'There were actually a few versions of the Genesis block,' Wright told me. 'It fucked up a few times and we reviewed it a few times. The Genesis block is the one that didn't crash.' There from the beginning was Hal Finney, who would receive the first bitcoin transaction, on block 9. This was a key moment for the new cryptocurrency: block 9 for ever shows that Satoshi sent Finney ten bitcoin on 12 January 2009 – it is the first outgoing transaction we know to have come from Satoshi. Satoshi also sent four other transactions on the same day. I asked Wright who the recipients were – who the four addresses belonged to. 'Hal, Dave, myself,' he replied. 'And another I cannot name as I have no right to do so.' Wright told me that around this time he was in correspondence with Wei Dai, with Gavin Andresen, who would go on to lead the development of bitcoin, and Mike Hearn, a Google engineer who had ideas about the direction bitcoin should take. Yet when I asked for copies of the emails between Satoshi and these men he said they had been wiped when he was running from the ATO. It seemed odd, and still does, that some emails were lost while others were not. I think he believed it would be more interesting to play hide and seek than to be a man with a knowable past.

Wright's emails to Kleiman suggest that by this point he was starting to mine the million or so bitcoins that are said to be owned by Satoshi Nakamoto. 'I have a few potential clients in gaming and banking,' he wrote to Kleiman. 'I figure I can work ten to 15 hours a week and pretend to have a consultancy and use this to build and buy the machines I need. If I automate the code and monitoring, I can double the productivity and still offer more than others are doing … The racks are in place in Bagnoo and Lisarow. I figure we can have 100 cores a month setup and get to around 500.' Kleiman replied the same day to affirm their vows.

'Craig, you always know I am there for you. You changed the paradigm that was held for over a decade and destroyed the work of a couple [sic] academics. Do you really think they will just take this happily? I know you will not, but try not to take the comments to heart. Let the paper speak for itself. Next time you need to get me a copy of the conference proceedings as well. You know it is not easy for me to travel.' A picture emerges of an ailing Kleiman sitting at his computer day and night in his small ranch-style house in Riviera Beach, Florida. After writing this last email, he spent a frighteningly long period in hospital. The two men agreed to meet up at a conference in Florida on 11 March 2009 and Kleiman wrote expressing his excitement at the prospect of a few beers with Wright. Craig and Lynn stayed at Disney's Coronado Springs Resort Hotel and Kleiman drove there in his customised van, rolling into the bar with a big smile: Kleiman was the brother and drinking buddy and like-minded computer nerd Wright had never had. Not even Lynn had a clue what they were talking about.

During my visit to Australia I met Lynn in Chatswood, on Sydney's north shore, a busy commercial district that heaves with eager shoppers on a Saturday morning. She had met Wright on the internet while she was working as the nursing manager of the ICU in a military hospital in Ottawa. She told me Wright asked her to marry him about six weeks after they met online. When she eventually went to Sydney to visit him, he brought a ring to the airport. 'He was 26 and I was 44,' she said. Neither of them had been married before.

'He was very mature for 26,' Lynn told me. 'He always has to be the best. And the hard part about that is he left bodies by the wayside. He stepped on people.' She began working for him – 'he was the geek and I was the gofer' – and he got a lot of work in information security, working for the Australian Securities Exchange, and Centrebet, which is where he first got to know Stefan Matthews. Wright told me he was afraid some of the things he did for those online betting companies would come back to bite him, if and when he was outed as Satoshi. Other sources told me that he and Kleiman had had some involvement with illegal gambling. 'I knew Dave

222

Kleiman and he were working together,' Lynn told me, 'and I remember them saying that digital money was the way of the future. I've never said this to anybody, but I knew he was working on it and I didn't ask, because I knew he would bite my head off if I didn't understand it. He's got a very sociopathic personality.'

Lynn said her husband had admired Kleiman. And she admired him too: 'He loved life,' she said, 'and he had a brilliant mind, like Craig, but he had a gentler soul.' She remembered the Orlando conference. 'We stayed in a hotel that looked like a giant cartoon,' she told me. 'We met in one of the bars. He was a young guy, in his thirties or early forties, brown hair and moustache, average-looking. And boy, he loved to have a good time. It might have been his birthday. I went into the Disney store and bought some hats – Craig had Pluto, and Dave had one in the shape of a giant birthday cake.' Wright stepped out of himself for Kleiman: 'I'd never seen him like that with anybody. It was like, "I wanna grow up to be just like him." Dave softened Craig. A lot of what they wrote together was in his voice. I'd never seen Craig react like that to anybody. When he felt unsure of himself he went and talked to Dave. I think he wanted to be like Dave, but he knew he couldn't be.'

'In terms of having that kind of temperament?'

'Yeah. Dave was good for him. It made him realise that life doesn't go your way all of the time.'

I asked her if she thought he was a flawed person. 'Yes,' she said. 'He's starting to realise it. He knows he's done well in his work but he hasn't done well as a human being.' She stared into her cup. 'When we were at the farm,' she said, 'I was interested in finding four-leaf clovers. I would never find any, but Craig would just step out of the house and find three.'

In mid-2011 Satoshi suddenly disappeared from view. Apart from one or two emails denouncing fake Satoshis, he wasn't heard from again. Control of the network alert key is said to have been passed at this time to Andresen – possession of this key

223

makes its holder the closest thing bitcoin has to a chief. Wright sent Kleiman an email on 10 September 2011: 'It is recorded. I cannot do the Satoshi bit any more. They no longer listen. I am better as a myth. Back to my lectures and rants that everyone ignores as me. I hate this Dave, my pseudonym is more popular than I can ever hope to be.'

For some reason – possibly fear of the ATO – Wright set up a trust fund called the Tulip Trust in June 2011, and asked Kleiman to sign an agreement stating that he, Kleiman, would hold 1,100,111 bitcoin (then valued at £100,000, currently worth around $800 million). For clarity: there is no evidence that Kleiman ever took custody of that amount. However, there was a separate agreement that Kleiman would receive 350,000 bitcoin and this transaction was made. 'All bitcoin will be returned to Dr right on 1 January 2020,' it says in the trust document.

> No record of this arrangement will be made public at any time ... Dr Wright MAY request a loan of bitcoin for the following reasons (and no others): Furthering research into peer to peer systems ... commercial activities that enhance the value and position of bitcoin. In all events, all transactions in loaned funds will be concluded outside of Australia and the USA until and unless a clear and acceptable path to the recognition of bitcoin as currency has occurred ... I lastly acknowledge that I will not divulge the identity of the Key with ID C941FE6D nor of the origins of the satoshin@gmx.com email.

Kleiman signed it. 'I think you are mad and this is risky,' he wrote in an email to Wright on 24 June 2011, perhaps spying a possible illegality. 'But I believe in what we are trying to do.' Wright meanwhile seemed to get more and more frustrated. He both wanted fame and repudiated it, craving the recognition he felt was his due while claiming his only wish was to get back to his desk. 'I have people who love my secret identity and hate me,' he wrote to Kleiman on 23 October that year. 'I have hundreds of papers. Satoshi has one. Nothing, just one bloody paper and I cannot associate myself with ME! I am tired of all these dicks Dave. Tired of academic attacks. Tired of tax fuckwits. Tired of having to do shenanigans like moving stuff overseas IN CASE it works.'

I came to feel that there were secrets between Wright and Kleiman that might never be revealed. Wright usually clammed up when asked about Kleiman and money. One day, in a fit of high spirits, he showed me a piece of software he said that US Homeland Security had ripped off from him and Kleiman. He smiled when I asked if they'd done government security work. The first thing most people ask about when you mention Satoshi is his alleged hoard of bitcoin: he invented the thing, and created the Genesis block, and mined bitcoin from the start, so where was Wright's money and where was Kleiman's? The emails, when I got them, seemed to clear this up slightly, but, during many dozens of hours of conversation with Wright, he never properly told me how many bitcoin he mined. I was aware – and he knew I was aware, because I told him several times – that he wasn't giving me a full account of everything that had occurred between him and Kleiman. He said it was complicated.

Somewhat more helpful are minutes taken during a meeting between the ATO and representatives from Wright's Australian companies in Sydney on 26 February 2014. According to the minutes, Wright's representative John Cheshire went into detail about the financial collaboration between Wright and Kleiman. This was a story that Wright, for some reason, didn't want to tell me. Cheshire said that Wright and Kleiman had set up a company called W&K Info Defense LLC (W&K), 'an entity created for the purpose of mining bitcoins'. Some of these bitcoins were put into a Seychelles trust and some into one in Singapore. Wright, according to Cheshire, 'had gotten approximately 1.1 million bitcoins. There was a point in time when he had around 10 per cent of all the bitcoins out there. Mr Kleiman would have had a similar amount.'

I asked Wright about this and he told me it was true that his and Kleiman's mining activity had led to a complicated trust. The trust question was persistently vague: not only how many trusts but the names of the trustees, and the dates of their formation. The only consistent thing is the amount of bitcoin Wright is said to have had at one time, 1.1 million. He said that his bitcoin could not now be moved without

225

the agreement of the (several) trustees. He also said that Kleiman had been given 350,000 bitcoin but had not moved them. He kept them on a personal hard drive.

Wright also set up a shell company in the UK. 'I know what you want and I know how impatient you can be,' Kleiman wrote on 10 December 2012, 'but really, we need to do this right. If you fail you can start again. That is the real beauty of what you have.' It's possible Kleiman was referring to their ability to mine bitcoins and then squirrel them away. But he was evidently worried about Wright's ability to cope with all the flak, and about Wright's kamikaze attitude to the tax authorities. 'I love you like a brother Craig,' he added, 'but you are a really difficult person to be close to. You need people. Stop pushing them away. You have over one million bitcoin now in the trust. Start doing something for yourself and this family you have.'

Around this time, an 18-year-old IT enthusiast called Uyen Nguyen began working with them. Very quickly, Kleiman made her a co-director of their company and she later became a powerful figure in the trust. It's unclear how such a young and inexperienced person came to have so much influence. Wright told me she was 'volatile, capricious and beyond control' and added that Kleiman liked young women and that she was loyal and trusted – but that 'she wants to help and this always leads to trouble.' While I was preparing this story, Wright began to seem worried about Nguyen. I always felt he was in the middle of a very complicated lie when he talked about her. 'My way of lying,' he told me one day, 'is to let you believe something. If you stop questioning and then you go off, and I don't correct you – that's my lie.'

Towards the end of 2012, Dave began to fail. 'Paraplegics get sick a lot,' Lynn Wright had told me, speaking as a nurse. 'The bedsores get bad and they can't fight infections. Dave was in and out of hospital a lot and I don't know what his life was really like.' Wright told me that Kleiman had girlfriends, but admitted he didn't really know much about his life. Like Wright and his first wife, they had met in a chatroom. They met in the flesh no more than half a dozen times. Kleiman seems to have lived in front of his computer day and night, and the sicker he got the more isolated he

seemed to be. Just after 6 p.m. on 27 April 2013 he was found dead by a friend who'd been trying to contact him for several days. He was sitting in his wheelchair and leaning to the left with his head resting on his hand. Lying next to him on the bed was a 0.45 calibre semi-automatic handgun, a bottle of whisky and a loaded magazine of bullets. In the mattress a few feet from where he sat, a bullet hole was found, but Kleiman had died from coronary heart disease. There were prescription medicines in his bloodstream and a modest amount of cocaine.

'We never really thought that "we made Satoshi,"' Wright told me once. 'It was good. It was done. It was cool. But I don't think we realised how big it would be.'

'There was no conversation between you about how it was going over? That Satoshi was becoming a guru?'

'We thought it was funny.'

Wright paused, shook his head, and broke down. 'I loved Dave,' he said. 'I would have seen him more. I would have talked to him more. I would've made sure he had some fucking money to go to a decent hospital. I don't think he had the right to choose not to tell me.'

'What was happening to him?'

'Neither of us had any money, physical money. We had money in Liberty, an exchange in Costa Rica, but the Americans closed it down as a money-laundering operation. Dave had a number of bitcoins on the hard drive he carried with him. Probably about 350,000.'

'Hoping it would …'

'As I said, it wasn't worth that much then. Dave died a week before the value went up by 25 times.' Wright kept wiping his eyes and shaking his head. He emphasised something he said the commentators never understood: for a long time, bitcoin

wasn't worth anything, and they constantly needed money to keep the whole operation going. They feared that dumping their bitcoin hoard would have flooded the market and devalued the currency. One of the things Wright and Kleiman had in common is that they had a problem turning their ideas into cash and were always being chased by creditors. Kleiman died feeling like a failure. No one in his family has the passwords to release the bitcoins on his computer. After he died, his family didn't open probate on his estate because they believed it had no value. Kleiman's supposed personal bitcoin holdings are worth $260 million at today's prices.

**The London Office**

In January this year, on a rainy London afternoon, Wright took me to see the large office that was being set up for him as part of the deal with nCrypt. It hadn't taken long for the world to forget that they'd once thought Wright was Satoshi. One or two of the media organisations that had 'outed' him in December had taken down the original articles from their websites, stung by the cries of fraud. After only a few days' interest in the notion, most people had made up their minds that Wright had nothing to do with Satoshi. Wright – under strict advisement – had said nothing in response to the media reports accusing him of perpetrating a hoax, but when we were alone, which was most of the time, he would launch into point-by-point rebuttals of what his critics had been saying. In the end he would shrug, as if the most obscure things were actually obvious.

The press coverage of Wright and Wright himself had something in common: they succeeded in making him seem less plausible than he actually was, and, to me, that is a general truth about computer geeks. They are content to know what they know and not to explain it. They will answer a straightforward slur with an algorithm, or fail to claim credit for something big then spend all night trying to claim credit for something small. Many of the accusations of lying that were thrown at Wright last December were thrown by other coders. And that's what they're like – see Reddit, or any of the bitcoin forums. Much of what these people do they do in the dark, beyond scrutiny, and, just as it's against their nature to incriminate themselves, it is

equally unnatural for them, even under pressure, to de-incriminate themselves. They just shrug.

Coders call one another liars, when all they really mean is that they disagree about how software should work. During the time I was working with Wright in secret, I would text my colleague John Lanchester, who I knew I could trust to keep the secret but also to understand what was at stake in the story. 'Imagine a situation,' I wrote to John, 'where novelists were strangely invested in denying the plausibility of each other's books. There's no "proof" as such that one is right and the other is wrong, but they could argue fiercely and accuse each other of all sorts of things while not really settling the problem.'

'Edmund Wilson says somewhere that the reason poets dislike each other's books is because they seem wrong, false – a kind of lie,' John replied. 'If you were telling the truth you would be writing the same poems as me.'

So the world that Wright knew best thought he was a liar. And the day we visited his new offices he seemed resigned to the fact. Much later, he told me that these months were the high-point of his career in computer science: he was working in secret on material that seemed to be coming together beautifully and profitably. It irked him that people called him a fraud and it irked him, just as much, that his deal with nCrypt would require him to prove that he was Satoshi. He hated being accused of being a fraud *and* he hated having to prove that he wasn't a fraud. Having it both ways is a life, a life that requires a certain courage as well as shamelessness, and Wright was living his double life to the hilt.

Wright introduced me to Allan Pedersen, who'd been his project manager in Sydney. We were in the Workshop – a floor above MacGregor's office near Oxford Circus – standing at a glass workbench beside a whiteboard covered in writing. The opposite wall was stencilled with a quote from Henry Ford: 'Whether you think you can or think you can't, you are right.' Pedersen told me he had been brought over to direct a group preparing an initial batch of 32 patent applications, to be completed

229

by April. (This was in January.) Beyond that there were 'upwards of four hundred patents', ideas to do with using the blockchain to set up contracts that would come into action on specified dates years ahead, or using the blockchain to allow cars to tell their owners when they needed petrol and to debit the cost when they refuelled. At this point, and for several minutes afterwards, Wright spoke of himself in the third person. 'Craig has been given a big kick up the bum,' he said, 'because Craig, instead of doing tons of research and sticking it on a shelf, has to complete it and turn it into something.'

'How do you organise him?' I asked Pedersen.

'I'm the organised type,' he said. 'When Craig comes into the office he's always in the middle of a sentence. And I'm trying to work out what this sentence is and manage things around what he's saying. I'm sort of grounding his latest thoughts, placing them in what we're trying to do. I'm the glue between Craig and the developers.'

It had become obvious, mainly from things Wright himself had said, that he often found it difficult to get on with people who worked for him. He got rattled when they said things couldn't be done, or were too conventional in their thinking, or too stupid, as he saw it. Ramona told me that 40 per cent of his staff in Sydney had been in a state of rebellion. 'I'm an arsehole,' Craig said to me once again, 'and I know that.' Pedersen had the job of keeping things cool with the developers, whose job it was to turn Wright's ideas into a form in which they could be patented and eventually licensed. 'I'm making sure the ideas get executed,' he said. 'Craig's not that interested in that part. He's always moving on.'

'Craig's great at research,' Wright said, 'but his development and commercialisation sucks. I build it, and then it works, and then I walk off.'

'You're losing interest?'

'I've lost interest. I've proved it, and off I go.'

'It's getting easier,' Pedersen said, with a smile. 'It was quite complex in the beginning.' Wright had strong views about how the technology should develop, and how it could 'scale' to meet greater demand. 'It can go to any size,' Wright said that day. I've tested up to 340 gigabyte blocks, which is hundreds of thousands of times greater than it is now. It's every stock exchange, it's every registry rolled into one … Ultimately bitcoin is a 1980s program, because that's what I was trained in … The idea is good, the code is robust, it runs and does the job, but it's slow and cumbersome. There were some things early on that needed to be fixed and were, but it wasn't as perfect as everyone thinks. At the end of the day, it needs to be turned into professional code. It needs to move away from the home user network and into a server network environment. And then it can do much more and be faster.' There are those who feel it should remain small, and that making it bigger is a betrayal of its first principles.

'This is the future of the blockchain,' Pedersen said.

'People are saying, "It's not really something we can run yet,"' Wright said, 'but it's time that we grew up and that bitcoin becomes professional.'

Pedersen shook his head. 'We're not working in a world where we know exactly what we're doing,' he said. 'It's coming from Craig. And then I start establishing the ground rules and we begin rolling it out. I'm putting people on a certain track and I keep going back to Craig, saying, "We need to sort this or that out," and I'm constantly keeping them and him in the loop. The good thing about Craig is that he wants me to task him, so it's a very strange relationship we've got. I'm reporting to him but I'm tasking him at the same time and it seems to work beautifully.' He was tired, and so was the whole team, but they felt confident the patent applications would be filed on time.

When Craig left the room to take a phone call, Pedersen took pains to close the door properly. 'He's a really nice person,' he said, 'but he's a fucking nightmare. Every single morning he comes in and I think, "What is he talking about?"' Pedersen told me how he handled him, how he made him focus, and how he worked hard to keep him on track. 'When I've got new people here,' he said, and there were many new people, 'I have to train them how to talk to Craig. That's what I have to do. Sometimes, he can't explain things and this is where the anger comes from. It's the interesting part. You can't be in the same room with him. He's constantly telling you something. He's like Steve Jobs, you know – only worse.'

As we made our way to the new office – it was a building site that day, but would be up and running four weeks later – Wright presented himself as a man who was ready for anything. In a pinstripe suit and ruby tie, he looked like a hellbent 1980s bond dealer, except the cypherpunk glint in the eye suggested he was getting away with something. He wasn't the king of all he surveyed, he was the joker, and, crossing Oxford Street, he joked that he might be Moses. The traffic parted and he made his way to the promised land, a brand new suite of offices down a side street.

\*

Pedersen had come along. 'This is how it works in this company,' he said. 'You're sitting in Vancouver in October' – Vancouver is where nTrust, the parent company, is based – 'and suddenly Rob MacGregor says: "We need these thirty-odd patents by April and when can you go to London?"' The hurry for the patents was to help with the giant sale to Google or whomever. The men behind the deal were very keen to beat other blockchain developers to the punch, especially the R3 consortium of banks and financial institutions which late last year started spending a fortune trying to deploy the technology. We were accompanied by a young Irish woman who had been put in charge of designing the new office. MacGregor's firm had invested millions in Wright. The new company, nCrypt, had pretty much been built around him, and its offices showed it. He was to have the enormous corner office with a view all the way along Oxford Street. MacGregor clearly believed in

Wright, however obnoxious he could be, but I never understood why he wasn't interrogating his uncertainties before spending his money. He was a lawyer, but he put trust in front of diligence, which is unusual in someone so intelligent. MacGregor never, incidentally, used the words 'off the record' with me – only once, later on, did he imply it, when he said something and then said he'd deny saying it if I quoted him – and he was a generous source of information. At no point, however, did he tell me where the money for this project was coming from.

The designer was waving a colour swatch. 'We've gone for a kind of Scandi look,' she said.

'This place will work,' Wright said, striding through the open space, 'mainly when it comes to protecting me from myself.' Amid the hammering and drilling, Wright stood in an office about 20 feet by 20 feet, with floor to ceiling windows and a view down into the heart of Soho.

'You remember J.R. Ewing in *Dallas*?' I asked.

Wright laughed. What he most enjoyed, he said, was that all this was going on in secret while the world outside had written him off as a mug and a fantasist. 'If Satoshi has to come out, he'll come out in style.' He turned back to the designer to tell her how the frosted glass should work in the meeting room. 'We do a lot of work on whiteboards,' he said. He pursed his lips, then smiled. 'Will the interactive whiteboards be set up so that I can contact the guys in Sydney?'

We spent an hour at the new office. 'And they say *nothing is going on*,' Wright said as we stepped back into the elevator. 'It's all a *figment of our imagination*. I'm not Satoshi, and none of this is real.' Out on the street again, he told me he had all the money he would ever need. 'And I'll have the monkeys off my back for ever and just get on with the one thing I'm good at, not business, not managing people, but doing research and honouring this thing we made.' Wright was enjoying himself, but nCrypt was already, as MacGregor told me repeatedly, negotiating the sale of the

233

whole package to the highest bidder: 'Buy in, sell out, make some zeroes,' as he had said, and he'd always been honest about that goal. Wright wasn't facing up to this. The next time I visited his corner office it was finished and decked out with claret-red leather armchairs and sofas flown in from Sydney. It looked, as I'd joked earlier, like the office of a Texan oil magnate. A host of management certificates were framed on the wall next to a signed photograph of Muhammad Ali.

I told Pedersen I thought Wright was struggling with the fine print of the deal – coming out. 'He's sold his soul,' Pedersen said. 'That's how simple this is. And the combination of Craig and Ramona is dangerous here. They can't just sign all these [legal] papers and think it's going to be all right, that they'll sort something out. It doesn't work that way. They now have to go to the end and live with it. But they're doing it on first class. When this Satoshi thing comes out I can see a lot of bad things happening, and they are not geared up for this, any of them.'

'I'm concerned for him,' I said.

'There's not really a happy ending here,' Pedersen said.

'Was it the same in Australia?'

'It was the exact same,' he said, 'except in Australia you could say he was in control. He's learned absolutely nothing. He's now in this box, he can't move, he can't do anything, and this box is getting smaller and smaller.'

'Do you think he wants to be outed as Satoshi?'

'Yes I do. It's in in his personality. He wants to be recognised. He says too much. After two weeks of working with him, I knew.'

'He and Ramona tell me they had a pact never to come out.'

'My feeling is that she doesn't want him to come out, but he does. He's been pushing for this to happen.'

I spoke to one of the scientists, a shy, unexcitable man in his late fifties, who has been working on this technology for several years. He and Pedersen are old-school IT people, quiet-spoken and completely uninterested in the limelight. Both of them thought Wright was working at a different level from everybody else. The scientist, who spoke to me from the beginning on condition that he wouldn't be named, worried about Wright's attention to detail and about his conspiratorial nature, but he had no doubts about Wright's command of the big picture. The scientist was helping to oversee all the white papers and patent applications and managing a large team of IT specialists and mathematicians. I asked him if he was worried about the R3 consortium's work on blockchain technology. 'They are going to fail,' he said. 'They don't have Satoshi. There is a panic out there, a misunderstanding about how the blockchain and bitcoin works. They hire people who know about bitcoin and are attempting to buy into it rather than being left behind. I've read some patent applications that are pending, applied for by the Bank of America. What I saw was ultimately unimpressive in comparison to what Craig is trying to do with the blockchain.'

The scientist described how the staff try to get the ideas out of Wright's head. 'You can't say: "Explain this to me." If you ask a question like that, he'll just go off on giant tangents. First, he'll have difficulty explaining what's in his head. Often he's just coming up with ideas on the spot that he'll throw into conversation. You want to try to get yes and no answers from him. We film him at the whiteboard and someone will type out the text.'

He described moments when everyone in the research team thought what Wright was saying was impossible. It couldn't be done, the software wasn't up to it, the blockchain couldn't scale to the task, and then suddenly everyone would understand what he was saying and appreciate its originality. 'I need to be able to go over what he's said,' the scientist told me, 'to find the pearls of wisdom and find out what the

235

hell he means. If I don't get it then I might have to make some guesses. I had to train my team to work in that mode. They have to be good researchers. They have to *understand* the technology as well as be able to work with it.'

Often, the scientist said, the staff were amazed by an unexpected turn in Wright's thinking. But he admitted to being amazed, too, by certain gaps in Wright's technical knowledge. It was bizarre. Wright had what the scientist and the team regarded as vast experience and command of the blockchain, which he spoke of as his invention and appeared to know inside out, but then he would file a piece of maths that didn't work. Or he would show a lack of detailed knowledge of something the team took for granted. Nobody I spoke to could explain this discrepancy. 'One of the problems with him is that he's a terrible communicator,' the scientist said. 'He's invented this beautiful thing – the internet of value. But sometimes he'll just talk in equations but can't or is unwilling to explain their content and application.' His mistakes could also, he implied, be a result of laziness and lack of attention to detail.

I knew this for myself, but I was, to some extent, vexed that the technologists had the same experience. At the same time, I was impressed that people like the scientist and Pedersen could live with such a high degree of ambivalence about their boss. When I asked Pedersen if he thought the work was truly revolutionary, a non-native weariness came into his blue eyes. 'I think so,' he said. 'But I don't think he'll get the Nobel Prize because he's too political. He's coming out as a street fighter and could end up in prison or whatever.'

*

The main players in this story were keen to help me, to talk about what they knew and to show me the documents, but, in every case, there were topics they would avoid, and that were never cleared up. One of the most helpful individuals was Stefan Matthews. He pointed me in the direction of people from Wright's personal life, and sent me a typed history of his association with the man who would be Satoshi. Matthews noted that, when he signed the deal with MacGregor, Wright didn't have a feasible business plan for any of his companies. The Wrights' financial situation was dire. They couldn't pay their staff and a number had already left.

Pedersen and some others had stayed on without pay; Wright owed his lawyers $1 million. Superannuation remittances were overdue and loan repayments unpaid; the companies needed £200,000 just to make it to next week. Craig and Ramona had sold their cars. One of the companies was already in administration and, with the ATO closing in, 'all related entities were on the brink of collapse.' Before signing the deal, MacGregor, sources say, tried to assess the value of Wright's research, commissioning a 'high-level overview' of the companies. MacGregor instructed Matthews to be in Sydney on 24 June 2015, when a final appraisal of the businesses was undertaken and a draft arrangement negotiated for nTrust 'to acquire the intellectual property and the companies themselves'.

One night I went to have dinner with Matthews on my own. We met in the restaurant at the back of Fortnum & Mason, 92 Jermyn Street, and he seemed incongruous among the red banquettes – a large, bald Australian with a rough laugh and wearing a plaid shirt, keen to tell me everything he thought useful. Matthews seemed a much more affable character than MacGregor, both upfront and very loyal, without perhaps seeing how the two might cancel each other out. One of the tasks of the eager businessman is to make himself more sure of his own position, and Matthews spent a lot of time, as did MacGregor, selling the idea of Wright as Satoshi rather than investigating it. They drafted me into telling the world who Wright was, but they didn't really know for sure themselves, and at one point their seeming haste threatened to drive a wedge between us. It seemed odd that they would ask a writer to celebrate a truth without first providing overwhelming evidence that the truth was true. I took it in my stride, most of the time, and enjoyed the doubts, while hoping for clarity.

Matthews drank a little wine but not much. He was talking about the night in Sydney when they signed the deal. 'We pulled up outside Rob's hotel. He said: "Do you realise what you have just done? You have just done the deal of a career. This is a billion dollar deal. Fucking more. Billion dollars plus."'

'Why is Rob so convinced?'

237

'Don't know, don't know.' (MacGregor later told me he was convinced because Wright had shown Matthews the draft Satoshi white paper. 'I always had that,' MacGregor said.) 'If it turns out that he's a fraud, I don't know how he's managed to do it because you couldn't make this up.'

Matthews told me about a meeting at the Bondi Iceberg Club in Sydney that Wright had with Ross Ulbricht, the founder of Silk Road, now serving two life sentences. Silk Road used bitcoin to trade all kinds of contraband items because the transactions could be made anonymously. Wright later confirmed that this meeting took place, but said only that Ulbricht was full of himself and they didn't discuss bitcoin. Matthews seemed to think this was unlikely. He wondered whether Kleiman had had more to do with Ulbricht; other sources suggested the same.

'Wright signed a deal to come out as Satoshi,' I said to Matthews. 'Does he realise everything that involves?'

'You're gonna have criminal groups that paid him lots of money and there are people who know about that,' Matthews alleged. 'If they quack? You've got Ross Ulbricht who's in prison and apparently going to appeal trial this year or next. What happens when Ross sees Satoshi's name splashed everywhere and Craig's name everywhere? Is he going to say "I had lunch with that guy. We made a deal"? I'm not worried about what Craig has done, I worry about people who have associated with him.' It was very strange to do an interview with someone who would come out with this stuff, given that he was also trying to market the guy. In fairness to Wright, Matthews might just have been running his mouth off, and I've left out the worst of what he said, now and later.

We talked about some of the difficulties that had arisen between Wright and MacGregor. 'Craig and Ramona are in a state about the keys leaving the room,' I said. 'He feels it is an act of self-annihilation to let them go. Rob has a Hollywood ending in mind and it's looking incredibly unlikely. You can't go into a marketplace claiming full legitimacy when the proof hasn't been produced.' I told Matthews that

there were emails still missing between Wright and Kleiman, emails that the public would want to see before accepting him as Satoshi, because the correspondence would presumably go into the kind of detail about the invention that only the inventors could know. Wright had told me he would produce the missing emails by the following Wednesday, but he never did.

'I know what's in there,' Matthews told me. 'It will be chatter to do with illegal stuff that he and Dave were doing in Costa Rica – particularly around Costa Rican casinos where they got $23 million of income. And you don't get paid that amount just for doing a security review ... He mined all those bitcoins himself using equipment that he bought with money that he got from Costa Rica.' Again: why was Matthews saying this? It was obvious to me that Wright was going to have a problem telling the full story, whatever it was. I wasn't even sure he'd told the full story to his wife, but perhaps he had, because she referred, several times, to the fact that there were things that she just couldn't tell me. 'They'll come after us,' she said, in a state of high emotion. 'They'll destroy us.' Matthews said he didn't know what that was about. He did tell me something he said he had told MacGregor when MacGregor asked him what he was getting out of the deal. 'Absolutely nothing,' Matthews said. 'I get what I get paid by Calvin. Calvin is the only allegiance I have, then and now.'

Calvin Ayre is one of the topics the team routinely went dark on. When I first met Wright, he called him 'the man in Antigua'. MacGregor never mentioned him at all during our early meetings. When I later told him that Ramona had mentioned a big man in Antigua, he said he didn't mind talking about him, but didn't bring his name up again. When, in February this year, they took Wright to Antigua for a pep talk, I emailed Matthews to ask if I could come too, and he didn't reply. Wright, in a low moment, later asked me if I'd told MacGregor they were the ones who let the cat out of the bag about Ayre. I said it wasn't them: Ayre's name had first been mentioned to me by Matthews. The Antigua meeting was being arranged when I went out for dinner with Matthews, and he referred to Ayre freely without ever asking that it be

239

off the record. MacGregor never went into detail about Ayre's involvement but both men's regular visits to Antigua made me wonder about the extent of the connection. Matthews, explicit as usual, always spoke about Ayre as if he was the *capo di tutti capi* of the entire affair, though I have no other evidence that Ayre was anything but an interested observer. Interestingly, nCrypt's only shareholder (one share worth one pound) is nCrypt Holdings, registered in Antigua.

Like MacGregor, Calvin Ayre is Canadian. His father, a pig-farmer, was convicted in 1987 of smuggling large amounts of Jamaican marijuana to Canada. When Calvin left college he went to work for a heart-valve manufacturer called Bicer Medical Systems and was later charged with insider trading, agreeing a deal where he was fined $10,000 and barred from running a public company listed on the Vancouver Stock Exchange until 2016. 'I clearly made some mistakes,' Ayre told the Vancouver *Sun*, 'but it was not a criminal issue and nobody got hurt from anything I did.' Ayre later started a software development company intended to help offshore betting companies take online bets. He relocated to Costa Rica in 1996, where he worked with two online casinos, WinSports and GrandPrix. Unlike most bookmakers, Ayre would send cheques directly, without using Western Union or an equivalent. He then set up Bodog, which would become the biggest name in the online gambling industry. (It's the company Matthews worked for after Centrebet.) Bodog was a huge success. In 2005, it handled more than $7 billion. Ayre appeared on the *Forbes* billionaires' list in 2006. In the same year, Bodog moved its global headquarters to Antigua. The IRS had started following the company in 2003 and US Customs and Immigration were also on his tail. A joint inquiry was started in 2006 and, in 2012, Ayre, along with two of the website's operators, was indicted on money-laundering charges. He entered no plea, but he maintains his innocence, seeing the indictment as 'an abuse of the criminal justice system'. In one profile of Ayre, we find him drinking coffee and paraphrasing Sun Tzu's *The Art of War*. 'I've put a lot of energy into finding ways not to fight my enemies,' he says. My researcher Josh showed me this interview, then remembered a note from my first meeting with MacGregor, in which he, too, had quoted Sun Tzu. 'You build your enemy a golden bridge to

retreat over,' MacGregor had said, drinking coffee. When he said this, I wasn't sure who the enemy was. The only person MacGregor had built a golden bridge for, so far as I knew, was Wright.

At the Jermyn Street dinner, Matthews didn't tell me any of Ayre's history, referring to him simply as a great guy. 'Do you know how many bitcoins Craig's got left of the original 1.1 million?' he asked later on. There are conflicting stories about the 'Satoshi millions'. Many people refer to a Satoshi-mined hoard that has never been spent, and the figure – always around a million bitcoin – is the same one admitted to by Wright and Kleiman. The difference is that Wright says he spent a lot of his. This was what Matthews was getting at. 'He told me last week,' Matthews said, 'and I've been having some sledgehammer conversations with Craig. I said to him: "Time for straight answers on this one, my friend. How many coins are left under the control of the Seychelles trust? And don't tell me you don't know because you're a grown man, and don't lie to me." And his answer was 100,000. I know that 650,000 was taken out to fund all the research and development stuff. And 350,000 is on Dave's hard drive. "Why has Dave got 350,000 of your coins on his encrypted hard drive?" Because he gave them to him. They're Dave's. Those wallets are encrypted on his hard drive, with three or four keys to his trust. Now, why did Dave die in squalor?'

'Why?'

'Because bitcoins weren't worth that much when Dave died. They skyrocketed around that time and in the weeks thereafter. But he was a man of principle apparently and wouldn't spend those coins unless Craig told him to.'

'And you don't think Dave mined coins himself?'

'Of course he did. No doubt. But how many? Who knows ... We know they ran a business together based in Florida. They did stuff for contractors. We know that they lost money jointly in Liberty Reserve. And they would both have lost money in Mt Gox.'

241

Wright had told me he'd lost quite a bit when the bitcoin exchange Mt Gox was hacked and then collapsed. He also referred, in a later email, to information that was seeping from the collapsed Mt Gox database, some of it linking him to Ulbricht. 'The amount to a large wallet was me,' Wright told me. I took him to mean that there was evidence of a bitcoin transaction between him and Ulbricht. He wouldn't explain further.

As I was paying the bill, Matthews reared up. 'You know Craig has gone out and bought himself some cars? One hundred and eighty thousand dollars' worth of cars.' (When I checked this with Wright he said the cars were leased.) 'One of them stands out like the dog's balls in the proverbial moonlight, and this is from the man we're trying to keep fucking secret. How many custom BMW i8s are going around London? He's spending every fucking penny that we've paid him … Does he think this is just a game? You know, these guys have gone from being backyard scrappers and they've suddenly found themselves in a high-stakes poker game.' Matthews said he wouldn't take any rubbish from the Wrights, and that they'd end up on a plane back to Australia and jail if they didn't fulfil their end of the bargain, to reveal Satoshi. 'The people that I work with are capable of deciding this was a $30 million bad decision and write it off,' he said. I thought this a curiously revealing line, and wondered again just how he expected me to use such information.

'You haven't asked me why I'm doing this,' Matthews said at the end of the evening. He worked his way round to an answer, but it wasn't an answer, just more questions. 'Part of me,' he said, 'has asked over the past three or four months, why did I ever get involved in this? Why did Craig keep coming back to me? Why did he never shake out of my life? Why did he show me the Satoshi white paper in 2008? Why was he delivered back to me in 2015? I didn't go looking for it.'

*

Satoshi Nakamoto is not really a man; he is a manifestation of public acclamation, an entity made by technology, and a myth. Old-fashioned journalism might bring you

to him – or cause you to miss him altogether – but he was born of relationships that depend on concealment. A reporter was once a person who could rely on visible evidence, recordings, notes, statements of fact, and I gathered these assiduously, but this was a story that challenged the foundations on which reporting depends. I fought to uphold familiar standards of truth, and fought to discover new ways to uncover it in this underworld of companies with a vested interest in disclosing some things but not others, but it felt like the walls of virtual reality were forever pressing in on my notepad. It is standard practice in Silicon Valley for everyone, from bagel boy to research chief, to sign a Non-Disclosure Agreement. This is because every company – Apple or Microsoft or Google or Facebook – has a mission not only to make money but to control the narrative of who they are. A writer requires determination if he is to write anything about that world that isn't paid for or manufactured by a company. There is nothing particularly underhand about this: they offer you big money up front and ask you to sign over your allegiance. But when you turn down this offer and they don't banish you from the court, your version of reality might end up clashing with theirs. This happened several times during the months I was working on the Craig Wright story. Wright himself never mentioned rights or agreements or privacy – until the very end, when he asked for two particular aspects of his private life not to be discussed – but when I went to Australia at the end of February to talk with Wright's family and friends, the nCrypt men began insisting I sign an NDA.

Why they hadn't asked me to sign one at the beginning I'll never know. I had roamed freely for three months, noting and recording, going to meetings and interviewing everyone, and only now did they want me to sign. Early on, MacGregor told me in an email that he had advised Craig and Ramona to tell me 'everything'. He went on to express, on Wright's behalf, worries about how the material would be used. This was especially sensitive, I gathered, because of the government security work Wright had done. I replied that we would be judicious about what was published. MacGregor still wanted to discuss contractual issues, and I replied, on 6 March, that I would have to see proof that Wright was Satoshi, and see it presented

243

before his peers and selected journalists. MacGregor replied that the proof package was in train and that he didn't understand why I wouldn't sign. I replied on 7 March that I couldn't write the story, no matter how good my access, if there wasn't proof that Wright was Satoshi, and I was still waiting for evidence. 'My commitment is clear,' I wrote, 'but the book turns to dust if we do not have unanswerable and generous proof.' I insisted that I wouldn't sign any document and eventually MacGregor accepted this. We fell out over it, but I saw their point and I still do. Despite my refusal they continued, without binding agreements or legal constraints, to provide me with access to every meeting and every aspect of the story, which was set to change faster and in ways none of us could ever have prepared for. My story and nCrypt's deal seemed to be on the same track, aligned and friendly, but none of us discussed what would happen if the deal came unstuck.

### Proof

When I asked Wright what kind of martial arts he did as a kid he gave the following answer. 'I did a few actually. I have studied in the Chinese forms Wing Chun, *Tánglángquán*, Kuo Shu, Duan Da, Zui Quan and *lóng xíng mó qiáo*. I have also mastered Muay Thai, Kenpo and Taekwondo and Chito-ryu style karate. I started with karate and Ninjutsu.' As with most things about him, it's not that it's not true, it just smells of self-doubt and a need not to hide anything positive about himself. It's the kind of truth-telling that expresses fear and gives rise to doubt, but it's not the same as a lie.

Wright's mother had told me about her son's long-standing habit of adding bits on to the truth, just to make it bigger. 'When he was a teenager,' she said, 'he went into the back of a car on his bike. It threw him through the window of a parked car. That's where his scar comes from. His sister accompanied him to the hospital and he's telling the doctor that he's had his nose broken twenty or so times, and the doctor is saying "You couldn't possibly have had it broken." And Craig says: "I sew myself up when I get injured."' What his mother said connected with something I'd noticed. In what he said, he often went further than he needed to; further than he

ought to have done. He appeared to start with the truth, and then, slowly, he would inflate his part until the whole story suddenly looked weak.

In the time since I'd last seen Matthews, he and MacGregor had been to Antigua with Wright and had agreed a 'proof strategy'. I had been pushing hard for the proof, and Ramona had asked me several times what Wright could do to prove to me that he was Satoshi. MacGregor asked the same thing during a meeting I attended with him and the public relations firm they'd hired, the Outside Organisation. 'It's not about proving it to me,' I said. 'It's about proving it – full stop. You just prove it for the whole world to see and then everybody goes home.' The nCrypt guys, pointing out that they had always intended to set up a proof session, organised a series of events with the help of the PR company, intended to bring Satoshi into the open. Originally, the plan was for the London School of Economics to host a panel discussion about the evidence and the findings, but someone seems to have blabbed to the *Financial Times*, which ran an article on 31 March. 'After nearly four months of silence,' the *FT* blogger Izabella Kaminska wrote, 'and a bitcoin community mostly resigned to the notion that the story was an elaborate hoax – conditional approaches are being made to media and other institutions in connection to an upcoming "big reveal" of Wright as Satoshi Nakamoto.' Her source was clearly inside the project. 'Wright will publicly perform a cryptographic miracle which proves his identity once and for all,' she wrote. MacGregor was outraged, and the LSE was sacked from the project. But the first and biggest of these proofs was to involve Wright using Satoshi's private encryption keys in sessions with key members of the bitcoin community. Jon Matonis, former head of the Bitcoin Foundation, agreed to take part. So did Gavin Andresen, one of the most respected bitcoin core developers, someone who had been there since its inception. These proof sessions would begin the denouement of this search for Satoshi.

Just before these sessions took place, in April, I asked Wright what had happened in Antigua. 'We discussed the whole PR strategy,' he said. 'The truth thing is going to happen.' He talked about Matonis and Andresen. 'We're going to bring them in on

245

reveal sessions in the next few weeks. I guess that's the way it has to be. Do I like it? No. But I haven't really been given a choice. I'm between a rock and a hard place because of whoever outed me last year.' He said very clearly at a meeting with me that he would not sign with the key in public. We agreed that he would do it for me at home, signing with the private key from one of Satoshi's original blocks. He would do for me what he was going to do for Matonis and Andresen, and this would prove beyond doubt, he said, that he was Satoshi. We made a plan, then Wright asked me to come to his office so he could draw something for me on his whiteboard, a new timelock encryption scheme he'd come up with. He wanted to add it to the list of patent applications. I didn't always know what he was talking about, but his expertise in certain areas was startling, and so were his obfuscations.

\*

It was exactly 9 a.m. when I turned up at his house in South London, on one of those clear mornings when the planes leave trails in the sky. I knew his house by the BMW in the driveway, and I pressed the bell. He opened the door and a cloud of cologne came to meet me. In his study, there were three computers and seven screens. *Options, Futures and Other Derivatives* by John C. Hull was sitting on a grey sofa. There were rows of computing books and seven dead laptops stacked on top of a bookshelf. Even after all these months, Wright couldn't really do small talk, finding it hard to summon anything easy in himself. I asked him about his sofa and told him about a pain in my shoulder and he just said: 'Very good.' He made me a cup of tea and then beckoned me over to his main computer: it was time for him to prove to me that he was Satoshi. His manner was still that of a man who mildly resented having to prove anything. He smiled and pointed to the screen. 'This is his wallet, which is open,' he said. I saw a list of transactions with addresses specified. 'The initial Genesis block was hardcoded,' he said. 'There are no conflicting Genesis blocks. If a piece of code crashed on this machine it would still start on another machine with the same Genesis block. Always.' As I was looking at the screen in front of me and watching his hand move the mouse, lines from the

Wikipedia entry on the blockchain came into my head. 'The blockchain consists of blocks that hold time-stamped batches of recent valid transactions. Each block includes the hash of the prior block, linking the blocks together. The linked blocks form a chain, with each additional block reinforcing those before it.'

'It can't be moved or changed?'

'No. It's hardcoded into the original program,' he said.

Everything on his screen was time-stamped. I was looking at transactions from early January 2009. 'I was officially canned from my job at BDO on 3 January,' he said. He told me he went to his house at Port Macquarie and settled down to do the final work to get the bitcoin software up and running. 'The original definition was published by Satoshi Nakamoto in 2008 and implemented in the original source code of bitcoin published in 2009,' the Wikipedia entry said. As he explained what was in front of me, he clicked through the sequential blocks, the transactions database that underlies bitcoin. He was looking at the very earliest ones and all included dates, amounts of bitcoin and addresses. A long list of transactions showed incoming small amounts to Satoshi's wallet. 'Lots of people send micro payments to me,' he said. 'They think so much of Satoshi that they want to burn their pennies.'

'So these fans are sending tiny payments to that known address? It is the first generated and the first known address?'

'Yes. They're hoping I'll do something – out myself.'

The address was 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX. I could see that people had left messages – 'public notes' – for Satoshi: 'Hey satoshi, change my life, send me some bitcoins!' 'God bless you, China.' 'If you are reading this, please take some time to remember those who died 12 years ago today in the WTC attacks.'

247

'The bitcoin blockchain can be used as a trusted timestamp for arbitrary messages,' Wikipedia said.

If you scroll back to the very first transaction associated with this address – 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX – you find that it is the first bitcoin transaction recorded. It was for 50 bitcoin and remains unspent. Anyone can enter that bitcoin address into a search engine and inspect the history of transactions associated with it. 'The Genesis block was hardcoded on 3 January 2009,' Wright said to me, 'and that was the first run. There was no previous block.' (Under the heading 'Previous Block', there is a line of 74 zeros.) 'Then the code was reworked,' he continued, 'and fired up and the first address that was ever created from the hardcoded Genesis block – the first mined address – is the one I'm sending you a message from.' He was about to use the original cryptographic key to sign a message to me and it was as if he was dropping a sugar lump into my tea. He typed the words, 'Here I am, Andrew,' and rested his fingers. 'This gives us that little block there,' he said, before verifying the signature. He looked sheepish and resigned in his blue checked shirt. 'Welcome to the bit I was hoping to bury,' he said. He leaned back and I noticed a samurai sword by the desk.

I shook his hand. Then I stared at the screen and considered how strange it would be to live with a secret for seven years and then feel no relief when it finally came out. Perhaps it never felt like a professional secret; it felt like a part of his being, and now he was giving it up. 'I want it in layman's terms,' I said. 'Explain what you just did.'

'I just digitally signed a message using the first ever mined address on bitcoin.'

If he had done what he appeared to have done, and what he said he'd done, then his claim to be Satoshi was strong. For a moment, the amassed unlikelihoods and dissemblings seemed circumstantial, and the case against him suddenly much more fanciful than the idea of him being the famously secret man who invented this protocol. An alternative Satoshi would have had to share his entire password hoard

with him, and synchronised his 'real world' timeline in order to be placed where Wright was placed and align with his email existence and his expertise. It wasn't merely that Wright had been in the right place at the right time: he had been in the only place at the only time, and that time was stamped not only into the blockchain but into his correspondence and the experiences of those around him. He sat back in his large black chair and asked me if I wanted more tea. 'I could have been working with Satoshi, I guess,' he said, 'who told me he was going to fire it up at this time and I had all my machines ready and just took over from him. But that would make me Satoshi anyway.' He stared into the bank of screens and seemed nostalgic for a more ghostly self, and I asked him if it felt overwhelming.

'I don't care – whatever,' he said. But of course he did care – care is what he did most. He was agitated through the whole process, mainly, I guessed, from an old cypherpunk embarrassment at having to bend to authority. He wasn't satisfied when he sat back in his chair, he was annoyed and already making his detractors' arguments for them. 'They'll say I killed Satoshi and stole the keys. Having them doesn't prove I created them. Maybe it was a collaboration between me, Dave, Hal and some random person. Maybe I compromised Hal's machine and stole everything and his family didn't know. Maybe, maybe, fucking maybe. All that bullshit. Those people don't believe in Occam's razor. I've seen Reddit. They want the most convoluted explanation. But they can say what they want; I've got nothing more to prove.'

There is a message embedded in the Genesis block, a headline from the *Times* of 3 January 2009, the day the block was mined: 'Chancellor on brink of second bailout for banks.' I later asked Wright why he'd chosen that particular headline. 'As you know, I am rather anti-central/reserve bank,' he wrote to me. 'I see them as the true cause of these issues and the bubbles and collapses. But the date was important as a timestamp. It means that I could not have been "pre-mining" and gaming the system. The first iteration of the code was *finalised* on 9 January 2009. The run was started when I was at the farm in Macquarie later that week. It means that I cannot have been mining for months ahead and had collected a pre-mined set of solved

hashes to game the system. I ran more than fifty machines, so the headline was a marker.'

The question of proof in a story about computer science is a question for the birds. If you can't check the maths, how can you be sure? I wrote to four Princeton and Stanford cryptocurrency experts during the preparation of this story and sent them some of Wright's white papers. These men, who are together about to publish a textbook on bitcoin and blockchain technology, are obsessed with who Satoshi is, and obsessed with who he isn't. But they behave like visitors to a funhouse: they see distorting mirrors everywhere and hear distant laughter and weird music. Some of them did want to see the evidence, but they didn't want to be seen responding to it and I never heard from them again. And that is the kind of attitude that pervades the not entirely adult world of new inventions in the highly contested world of computer science.

Another thing: when such people want to make a point, they often want to destroy those they disagree with. It's clear how paranoia-inducing it is to be constantly assaulted by people who hate you for thinking your thoughts. Geek culture in general is fantastically vitriolic: even an issue that seems pretty marginal to the rest of us – like the question of who might play Captain America's love interest – can easily spiral into death threats. In the world of cryptography, this has been a bar to invention and progress: developers are hung, drawn and quartered every day on the internet and they have to be unusually robust to take it. The question of how to take bitcoin forward has been riven with opposing views, and after Satoshi disappeared there was no central authority to lead the discussion or calm the waters. By increments, the task fell to Gavin Andresen, a Princeton graduate with experience in Silicon Valley. Andresen only gradually accepted the role of lead core bitcoin developer. This is not an official designation and he appears to have got none of the thanks and all the flak, but by general consensus he is the most level-headed thinker in the bitcoin world. One insider said there was an irony in Andresen's situation that few people realised. 'The word is that Satoshi passed the torch to

Gavin before he retired in 2011,' he said. 'In fact, it was more like Satoshi threw the torch at Gavin and ran away leaving him holding it.'

From time to time during those months, I wondered what if, in some brutally postmodern way, the true identity of Satoshi could never be fully ascertained? What if Wright had every single element necessary to prove himself, but somehow couldn't? Anonymity – or at least pseudonymity – is an essential part of the cryptographic world. I had a job on my hands – as did MacGregor and Matthews, as would the core developers, as would the press – to establish the truth. Any narrative that is dependent on 'outing' such secretive people is at the mercy of their basic hatred of being controlled or being known, and Wright was a spectacular example of this.

*

Andresen had been in touch with Satoshi in the early days and would have records of their conversations. He would presumably be able to ask Wright questions that only Satoshi could answer. In December, after *Wired* published the story about Wright possibly being Satoshi, Andresen told the magazine he'd never heard of Craig Wright. But he began to believe in Wright once he started corresponding with him by email in early April. At one point, Wright sent him two emails, one written in his own Craig Wright way, and another one, with essentially the same content, written as Satoshi would have written it. They discussed maths and the history of the invention and the problems it had faced. Within a week, Andresen was sufficiently convinced to get on a plane to London. He was ready to see Wright sign a message to him using the original Satoshi cryptographic keys.

At this point, I began talking to Andresen. He told me he had written an email to Wright before getting on the plane, asking for a little more of his backstory and for his thoughts on 'the state of bitcoin in 2016'. 'He replied with a longish email,' Andresen told me, 'on the state of bitcoin and why he decided to reveal his secret now, then followed up with a couple of in-progress research papers. The email

251

"sounded like" the Satoshi I worked with, and the papers matched his academic, math-heavy voice, too.'

Andresen crossed the Atlantic overnight, arriving at the Covent Garden Hotel at 11 a.m. on 7 April. He went to his room – which had been booked, as had his flight, by nCrypt – and had two hours' sleep, after which MacGregor and Matthews turned up. 'They gave me a lot of the background and explained their involvement,' Andresen told me. When Wright turned up at the hotel, Andresen found it easy to talk to him, 'although I was so jet-lagged at one point,' he wrote, 'I had to stop him from diving deep into a mathematical proof he'd worked out related to how blocks are validated in bitcoin.'

Matthews had booked a conference room in the basement, and MacGregor could see that Wright was very emotional when he entered the room. 'He knew this was it,' MacGregor said to me. 'It's one thing to prove his identity to you and me, but the bitcoin community is something else. He knew that they would believe Gavin. He knew was it – that he would have no plausible deniability after he'd talked to Gavin and shown him the keys.' Before the meeting in the basement properly started, Andresen said to MacGregor – as he said to me – that some of the phrases Wright had used in their email exchange had been 'familiar' to him; he sounded like the Satoshi he had been in contact with before. Andresen asked MacGregor and Matthews a few questions about what nCrypt hoped to achieve with this in the future. They didn't go into detail about the company's business plans, but they spoke about the future of bitcoin and alternative projects. Wright and Andresen quickly started scribbling on pieces of paper. Wright was using his big laptop to show his access to certain addresses. It was a strange situation in all sorts of ways, and the main one, perhaps, was that Andresen, who had, once upon a time, left behind high-paying job opportunities to work on the bitcoin project for free, was possibly about to meet his hero. But he stuck to practical questions. He asked Wright about the trust and about his bitcoin holdings and what had happened to them. MacGregor later told me that his first question after Matthews told him that

Wright was Satoshi was: 'Well, why isn't he sitting on an island surrounded by piles of gold?'

Wright became quite relaxed. He explained what it had cost him to keep his companies alive and to pay for research and development, and the supercomputer. It was about 5.30 p.m. when he finally logged on to his laptop to do for Andresen what he had done for me in his office at home, sign a message with the key and have it verified. Andresen looked on. Wright had just used Satoshi's key. At that point, it seemed to some of those in the room that Andresen's body language had changed; he seemed slightly awed by the situation. He reached over to his bag and took out a brand-new USB stick and removed it from its wrapping. He took out his own laptop. 'I need to test it on my computer,' he said. He added that he was convinced, but that if people were going to ask him, he had to be able to say that he'd checked it independently. He pointed to Wright's laptop and said it could all have been pre-loaded on there, though he knew that was unlikely. But he had to check on his own computer and then they would be done. He said the key could be used on his laptop and saved to the memory stick and that Wright could keep it. But for his own peace of mind, and for due diligence, so that there wasn't a chance of fraud, he had to see it work on a computer that wasn't Wright's own.

Wright suddenly baulked. He had just signed a message to Andresen from Satoshi, he said, and had demonstrated his complete familiarity with their correspondence, but, in his mind, what Andresen was now asking for was of a different order. 'I had vowed,' Wright told me, 'never to show the key publicly and never to let it go. I trusted Andresen, but I couldn't do it.' Wright got up from the table and started pacing. He had clearly believed he would be able to get through the proof session without this. In fact, he had said in my presence several times over the preceding months that he would never hand the key over to anyone or allow it to be copied or used on someone else's machine. 'I do not want to categorically prove keys across machines,' he wrote to me in an email. To him, this would be to give Satoshi away and perhaps to dilute his own proclaimed connection to him. He went to a chair in

253

the corner of the room and looked up at Andresen. 'Maybe you and I could get to know each other better,' he said.

Andresen just nodded his assent. 'Like, trade more emails,' Wright said, 'and I can sign more messages to you.'

At this point, Matthews's blood ran cold. 'It was the only time during all the years that I thought: "Jesus Christ, has he been spinning us the whole time?"' MacGregor too felt this was a very risky moment. He glanced at Matthews. There was no way he was going to let Andresen get back on the plane with *that* as a punctuation mark. They all felt Wright's behaviour was ludicrous: he'd demonstrated that he was Satoshi and only had to let this be verified on Gavin's laptop. End of story. But Wright spoke to me later in a way that showed his old cypherpunk suspicion had reared its head: what if Gavin was a plant? What if the whole thing was a plot to rob him of Satoshi's keys and exploit him or deny him? Wright told me he felt strong-armed and that, for some reason, he couldn't let this thing go and remain himself.

Afterwards, Andresen was sanguine. 'The proof session took longer than expected,' he told me. 'I insisted that the verification happen on a computer that I was convinced hadn't been tampered with. And they' – Wright, Matthews and MacGregor – 'insisted that the signed message never touch a computer that could have been tampered with (the risk would be that the proof might leak out before the official announcement). So we waited a bit while an assistant went to a computer shop and got a brand-new laptop.' The idea had been MacGregor's. He said the tension in the room was unbelievably high. Wright was refusing to do the one thing that would guarantee the success of his mission. He hadn't seen it coming, but Andresen wouldn't blindly trust Wright's hardware, and Wright wouldn't blindly trust Andresen's. The solution had to be a fresh computer straight out of the box. MacGregor called his assistant and gave her the task. 'This is how you get your One,' he said to her. (In his company the best score you could get in a staff appraisal was a One.) It was just before 6 p.m. on a Friday night and they needed a

brand-new laptop in Covent Garden. The assistant got hold of one and rushed over from Oxford Circus to the hotel.

The new laptop was lifted out of the box. It took a while to connect it to the hotel's wifi and to load the basic software. 'During all that time,' Andresen told me, 'it was obvious Craig was still, even then, deeply hoping his secret identity could remain secret. It was emotionally difficult for him to perform that cryptographic proof.'

'It was tense and there was a bit of shouting. There were a few drops during the day about "the evil businessman in the room",' MacGregor said. 'He stopped short of accusing Gavin of having a key-logger, but he clearly wasn't going to do it. He said he had trust issues, and he'd been attacked, and it had been so long, and he just couldn't bring himself over the line today, but they should keep talking. And Gavin was willing to do that. But we were like: "No, no, no". I remember what I said. I said, "Look, Craig, you've just been alone for way too long. Gavin has dedicated a huge chunk of his life to what you invented. I think he has the right to see this. He is the friend you don't have: Stefan and I can't fill that role for you; Ramona can't. This is someone who really understands what you have been trying to do."'

There were long silences. 'He was on the edge,' MacGregor said. Matthews was practically holding his breath. He didn't want to say too much out loud, so he texted MacGregor. The text said: 'He should call Ramona.' While MacGregor was out of the room Wright phoned his wife, and she said: 'Do it.' Everyone waited with bated breath as Wright used the new laptop to open the Satoshi wallet and set about signing a new message to Andresen. It failed. It wouldn't verify. He tried it again and again, until Andresen remembered that Wright hadn't typed 'CSW' at the end of the message the way he had in the original, the one he was seeking to verify. When he put 'CSW' at the end of his message to Gavin it said: 'Verified'. Wright had demonstrated, on a brand-new laptop, that he held Satoshi's private key. They stood up and shook hands and Gavin thanked him for all he had done. There were tears in Wright's eyes. 'His voice was breaking,' MacGregor told me. 'Gavin could see he was going though something.' Both MacGregor and Matthews later said that

Wright was turned inside out by the session. 'I didn't want to just put him in a taxi,' MacGregor said. Andresen was wiped out, so he went to get some fish and chips, and then headed to bed. 'Craig broke down,' MacGregor told me. 'He said he thought he'd never have to do this. He said he never knew how to trust people in his life.' Wright and Matthews and MacGregor went off to find a bottle of wine. 'He was semi-apologising for being a pain in the ass,' MacGregor told me, 'but I understood more than ever, at that point, how hard the whole thing was for him.'

When I asked Andresen if he thought ending the Satoshi mystery might be good for the technology, he wasn't sure. 'On one hand,' he said, 'having a mysterious founder is a great creation myth. People love a creation myth. Knowing the real story might make bitcoin less interesting to people. On the other hand, money is supposed to be boring – something that "just works", used by most people without understanding how or why it works. I'm excited to see how Craig contributes to making bitcoin work even better than it does today.' I later met with Jon Matonis, who had been through his own proof session with Wright. He was equally impressed and relieved. He too believed the search for Satoshi had come to an end and he was looking forward to working with Wright, to seeing the patents and the new blockchain ideas. During our lunch in Notting Hill, Matonis suggested that this technology would change the world. One of the scientists said to me, 'This isn't Bitcoin 2.0. This is something magnificent that will change who we are. This is Life 2.0,' and Matonis agreed.

The idea was now to use the 'proofs' – the gathered papers, the testimonies of the two bitcoin experts, the use of the keys, plus solid, document-heavy answers to every criticism previously made of Wright – and roll them out to selected members of the press on a certain day. I told MacGregor and Matthews I didn't want to go first with the story. I wanted to sit in on the interviews and proof sessions with the media organisations, and fold their reports, and the response to their reports, into my story.

Wright began to fade as we entered the proof sessions. He went from being a man with a clear picture of himself, to being a fuzzy screen. He would email me at all

hours with a pressing sense of anxiety. He seemed to be losing it. Yet we all forged ahead to a conclusion that seemed much more conclusive to him than anything he had ever expected, or could ever bear. He had signed up for it and was now faced with a full-frontal assault of cameras and lights. I had once asked him if he felt happy hiding in the internet and he said yes, it was his home. On a good day it is the bright field that contains all souls but on a bad day it is the final darkness, where misery is gapingly exposed. I came to believe that Wright, this last year, was fighting for his soul on that plain, like Aeneas with his ships at his back and all hell in front of him, going down to an underworld where he might meet his own father. Wright told me, without demur, that his life had been an attempt to prove himself to his father. In the wee small hours, he seemed like a child whose fantasy had gone too far. And the fantasy was not that he is Satoshi. He may well be Satoshi. The fantasy was that he could live as Satoshi, and take his place among the great men, and forget the little boy who was slapped for losing at chess. Like Aeneas, he knew that his journey was as much ordeal as opportunity, and though, again like Aeneas, he had asked for it, the process was increasingly unendurable. 'It is easy to descend into Avernus,' the Sibyl in Seamus Heaney's translation of Book VI of the *Aeneid* tells Aeneas:

Death's dark door stands open day and night.

But to retrace your steps and get back to upper air,

That is the task, that is the undertaking.

Only a few have prevailed, sons of gods

Whom Jupiter favoured, or heroes exalted to glory

By their own worth.

**The Reveal**

257

By my last weeks with Craig Wright, I was in two minds about the money men, probably because I liked them. And while I wanted to assert my journalistic doubts – preserve my innocence, stand back from the parade – my wish for the reveal to turn out well was beginning to cajole my judgment. I was wise enough to say no to the world exclusive; I still wanted material I didn't have and I was convinced that the real proof of the pudding would be in the world's tasting of it. The internet is great at crowdsourcing facts and establishing the accuracy of stories, and I had always felt this could be important. But in the meantime, I had to fight to give my doubts the oxygen they needed. The nCrypt boys said they understood – but did they? They appeared to have no Plan B if Wright couldn't prove to the world that he was who he said he was. People can start off by saying, 'Write everything, warts and all,' and end by saying: 'I don't exist, maybe you shouldn't mention me.' In a conversation with MacGregor at this point, I allowed for the possibility that I might give him a made-up name in the story. I said it because he seemed anxious, and because, as I told him at the time, he had brought the story to me and I meant him no harm – but this possibility depended on its being proved that Wright was Satoshi. Our discussion about using real names was inconclusive – during a later meeting at Berners Tavern, Matthews expressed the view that I should put their names in and make a final decision later – but the decision was really made by what the story became. The men in black seemed not to have prepared for any of that. They believed that only one big thing was going to happen: Craig Wright was going to emerge as Satoshi Nakamoto, the great mystery figure of the digital age, and the evidence would be 'overwhelming'. In the final week, as the men prepared the reveal, I found my independence slipping. No doubt about it: I felt like part of the team. I wanted to please MacGregor – pleasing people is my chief vice as a man and my main virtue as a reporter – but I could have told him my work so far might only be fieldwork. I wouldn't know how the story would turn out until it had turned out. Only in public relations is the story straight in advance.

In private, Wright was still saying he wouldn't 'jump through hoops', but then I'd find him agreeing to do exactly what was asked of him. Only a few nights before the

media appointments, I was sitting with him in the Coach & Horses in Greek Street. The PR company, he told me, had asked if he wanted to go on TV, and he'd said there was no way in hell they'd get him in front of a TV camera. Yet it was all happening. I mentioned the fact that MacGregor, when I first met him, had spoken about all this ending with a TED talk in which Satoshi would be revealed.

'Rob always said "eventually",' Wright replied.

'But what does "eventually" mean?' I asked.

'It originally meant, "*if* you came out",' Craig said.

The PR team, at MacGregor's behest, had been in touch with a number of journalists; the ones who were interested were from the BBC, the *Economist* and *GQ*. The inclusion of *GQ* had irked Wright from the start (he sees himself as an academic), but the PR company, the Outside Organisation, had a connection there – their founder was a contributing editor – and said the magazine would love the story. But did the PR men explain to the editors there who was behind this project to out Satoshi, and who was paying their fee? I later asked them by email and one of them replied: 'It is not at all unusual to be instructed to represent an individual through an independent company. Our conversation with [*GQ*] and the other journalists was about the proposed story.'

I emailed him again. 'But did you tell them,' I wrote, 'that the outing of Satoshi was being done at the behest of a commercial company?' He didn't reply.

All the journalists had signed NDAs and embargos. They would each be allowed a brief interview with Wright after he had demonstrated to them his use of the Satoshi key. These meetings would take place at the offices of the PR company in Tottenham Court Road on Monday, 24 April and Tuesday, 25 April. I found all this a bit odd: Wright was being difficult, for sure, but the PR strategy was crazily old-fashioned. Everyone in the cryptography world knew that all Wright had to do was send an email from the famous Satoshi email address, alert people he was

259

going to sign a message using Satoshi's keys, do so online and move a single bitcoin from an early block, and the entire internet would light up like Coney Island for the World's Fair. The piecemeal feeding of 'proof' to these journalists was compelling but anachronistic. I supposed it was an attempt to get the story out of the world of crypto-gab and into the real media, but it was set up with an alarming sense of security paranoia. Wright could never have handled a celebration, but the journalists were being managed to an extent that might have raised more questions than it answered. I was just an observer, and was worried about Wright by then, and, though I believed in him, I felt distinctly that there was something missing and something wrong.

When I turned up at Starbucks in Tottenham Court Road, Wright, Ramona and Matthews were already there. Wright was sulking a little. It had been decided that, as well as the demonstration, the journalists would be given a memory stick to take away with them, showing the signed Satoshi message. (Wright later told me the stuff he put on it was fake. There wasn't anything on there they could understand, but it certainly bore no relation to any of Satoshi's keys.) Matthews was dressed smartly and wearing dark glasses and Wright was wearing a gold tie and a business suit. Ramona sat beside him stroking his ear. 'Let me know if you have trouble with the guys upstairs,' Matthews said. He meant the PR guys. 'Sometimes they forget their role.' As usual, I found Matthews likeable and easy to talk to, but he seemed not to appreciate the difference between his way of talking and the circus of manipulation surrounding us.

Rory Cellan-Jones, the BBC's technology correspondent, was led into a conference room with his producer, Priya Patel, and Mark Ward, a technology correspondent for the BBC News website. Wright sat at his laptop, hardly looking up, and a screen on the wall showed what he was looking at. Matonis was in the room, and so was Matthews. Ramona had gone upstairs. Cellan-Jones was decent and professional, ready to get to the bottom of the story. He appeared to feel the tension, with Wright already behaving as if being asked questions was grossly humiliating and the

questioner openly hostile. But Cellan-Jones was not hostile: if anything, he was mildly pre-convinced, and just going about capturing the story for the layman.

'When I started out I asked myself what I'd need to see to know if someone who claimed to be Satoshi was Satoshi,' Matonis said. 'And you can break down three distinct lines of evidence: the cryptographic line, the social line and the technical line. Obviously, the social and technical lines are going to be more subjective … On the cryptographic side, I'll explain what I witnessed personally and give you a lead up to what Craig's going to demonstrate this morning.'

He then went into more detail about the cryptographic proof. 'The Genesis block is block zero,' Matonis said. 'And you can't spend any of the blocks in that chain – which means that the ones that come after that (which are spendable) can be attributed to the creator of bitcoin.'

'And what would they be called?' Cellan-Jones asked.

'In succession they'd be called block 1, block 2 etc. Now this morning, Craig is going to demonstrate signing blocks 1 through 9. I personally witnessed the signing of blocks 1 and 9, so this is not going to be a transfer of bitcoins, it's going to involve a signing of a message, which he'll do with the private key and which will be verified by the public key. Are we clear on that?'

Eventually, Wright asked Cellan-Jones to give him a message. 'Um. "Hi, historic message to the BBC."' Wright typed the message and added a bit of commentary as he did so.

'This message will verify, but if I change a single digit, it won't,' Wright said as he signed the message using block 9.

'This is the only key that we know is definitely owned by Satoshi because it was used with Hal Finney,' Matonis added.

'So,' Cellan-Jones said, 'just getting this clear in my mind. We've seen Craig use a private key known to have been used with Hal Finney. And we've seen it verified with the public key.'

'Yes,' Craig said. Then he proceeded to sign a message with the key associated with the first ever mined bitcoin.

'Out of interest,' Cellan-Jones said. 'How many bitcoins do you have?'

'Well, that would be telling,' Wright said.

'Do you still mine bitcoins?'

'Only for fun.'

Wright then went into an aria about Sartre's speech when he turned down the Nobel Prize. He planned to use a hash function – which turns information into a unique set of letters and numbers – to attach Sartre's famous speech cryptographically to block 9, and then later verify it publicly on his blog. 'He gave up the prize,' Wright said, 'because "If I were to accept it, I'd become the institution." I never wanted to sign Craig Wright as Satoshi,' he continued. 'I haven't done this because it's what I wanted, I just can't refuse it. Because I've got staff, I've got family. It's what I am and I'm not going to deny it because that's not the truth. So I'm choosing to sign Sartre because it's not my choice, I'm not choosing to come out, I've been thrust into it.'

'In what way have you been forced into it?' Cellan-Jones asked, quite reasonably.

'I've got people mudslinging,' Wright said. But that wasn't true: he wasn't feeling forced because of what people said. He felt forced, or obliged, to come out because he'd signed the deal with nCrypt in June 2015. And he deepened the lie when Cellan-Jones asked him why he hadn't revealed himself before. 'I liked to go to

conferences, put out papers,' he said. 'I can't do that now. I can never just be Craig again.'

He was asked whether he wanted to be the public face of bitcoin.

'I don't want to be the public face of anything.' He paused and looked down. He then said that his blog would explain everything and help people to download the material and understand how the keys work.

'When does that go live?' Cellan-Jones asked.

'Monday or Tuesday.'

'There will be people out there who will try desperately to prove this isn't the case. Are you confident that there are no chinks in your armour?'

'They'll say I stole keys, that I buried Satoshi in a ditch, they'll say all sorts of things.'

The BBC planned to come back the next day with cameras. Then a man arrived from the *Economist*, Ludwig Siegele, a man in a grey suit. He was less immediately friendly but his questions were fine-grained. You could see he wasn't entirely comfortable with this very PR-managed way of outing Satoshi. Wright signed a message for Siegele using block 9, and had the private key verified by the computer. 'I'm sorry,' Siegele said, 'but I'm still a little unsure what that proves.'

'It proves I have the private keys,' Wright said. 'All the original private keys.'

'OK, so. The first question that my readers are going to ask is: "Why now?"'

Wright didn't hesitate. He was using his media training. 'I've tried to avoid media,' he said, 'but it's starting to affect other people. I'd prefer to stay quiet. Why now? I have staff, I have family ... All the innuendo, the falsehoods.' He had never suggested to me, in all our months of interviews, that he was outing himself because of media misrepresentation. I accepted it, though, when he said it to these journalists,

263

imagining that perhaps he had realised that the tax office pressure was the real pressure in his life, the thing that forced the outing. I said this later to the nCrypt guys and they agreed.

'Why conceal your identity anyway?' Siegele asked.

'I don't want to be a public figure,' Wright said. 'I hope people don't listen to Craig Wright. They will look at the facts, not decide based on what Satoshi says.'

That afternoon, I went to another appointment while Wright went off to Parsons Green to have his photograph taken for *GQ*. The next morning, at Starbucks again, Matthews was ridiculing the whole business with the photographs, and making fun of the magazine's original idea that he wear a mask in one photograph and rip it off in another. Matthews described what happened at the interview with the magazine's senior commissioning editor, Stuart McGurk. 'It actually went quite well,' Wright told me. 'The journalist was nice, but he brought along this complete wanker of an "expert".'

The man they were talking about is a university lecturer in cryptology. McGurk brought him along to help verify the claims. 'It was hilarious,' Matthews said. 'Craig threw the guy out.' According to one witness, he'd questioned Wright quite forcefully about his understanding of public and private encryption keys. 'He was totally in the guy's face at one point.'

'He was telling me he was more qualified than I am,' Wright said. 'It became a nice interview but this guy was a complete idiot and I told him to get the fuck out.' Matonis – who was there – said the scene was intense. I wasn't sure it was wise to greet dissenters and opponents, even ones who might be wrong, that way, but Wright was roundly applauded for doing so. I confess I felt it was wrong to tell journalists only half of the story, allowing them to misunderstand the reason he was suddenly coming out as Satoshi.

\*

That day, the BBC came back. Wright was more irate than he had been the day before and less co-operative now that the camera crew was here. He felt he had done much more than he had ever wanted to and he said so, mainly under his breath. The cameraman set up the camera and then Cellan-Jones got into position. 'So who are you? And what are you about to show me?' he asked.

'My name's Craig Wright, and I'm about to demonstrate the signing of the message with a key that is associated with the first transaction ever done on bitcoin – a transaction of ten bitcoin to Hal Finney.'

'And who did that first transaction?'

'I did.'

'And whose name is associated with that transaction?'

'The moniker is Satoshi Nakamoto.'

'So you're going to show me that Satoshi Nakamoto is you?' Craig looked bewildered for a second and hesitated.

'Yes,' he said.

'Are you confident that this will prove to the world that you are Satoshi?'

'It proves I have keys … other things we'll be releasing will help … Some people will believe and some people won't, and, to tell you the truth, I don't really care.'

'But you can say, hand on heart, I am Satoshi Nakamoto?'

265

'I was the main part of it. Other people helped. At the end of the day, none of this would have happened without Dave Kleiman, without Hal Finney, and without those who took over – like Gavin and Mike.'

'And this is going to have a huge effect on your life?'

'Unfortunately, yes.'

Something changed in Wright in those few minutes. With these direct questions about Satoshi, his sense of himself – I don't know how else to put it – had come unstuck and he became noticeably uncomfortable. He said that he wanted to make the point that people should stop looking to him for answers.

'Make that point upstairs,' Cellan-Jones said.

'Upstairs?'

'We're going to film a straightforward interview upstairs, without the computer.'

Wright muttered something and stared into the depths of his computer as if he wanted to escape into it and never come out. 'I just want the basis to be on the computer,' he said.

The female producer interjected. 'Because we haven't actually done that bit on camera yet,' she said.

The PR executive came over, a little red in the face. 'Can we do that bit upstairs?' he asked. 'Are we all right to do the "why now?" question upstairs? And we'll be done?'

'You know, I don't actually watch TV,' Wright said.

The BBC left the room to scout out the location for the proper 'sit-down' interview. Wright complained to me that he was being pushed. 'I just didn't want a big facial

shot of me,' he said to the PR man. 'I preferred to be behind the screen a little bit ...
I'm not against it, as long as I can hide behind the screen.' The PR man said he
didn't have to do anything he didn't want.

'I'm just doing the one question,' Wright said. The PR man left the room leaving me
alone with him.

'Does it feel completely against the grain of your nature to be asked, "Are you
Satoshi?" like that?'

'Yes.'

'Is it a crude question to you?'

'Why does it matter, other than that you need someone to attack, someone to deify.
I mean, fuck's sake. I'll do this. That's it. Fuck off. I can dance around saying
"please believe me." But it's more than absurd, it's melting clocks on a landscape.'
At that point, the door opened and the PR consultant came in.

'Craig,' he said, 'we've explained to the BBC that you want to stay down here, and
they're all making the point that this is the last thing you'll ever do ...'

Craig started shaking and pushed his chair back. 'No! No! No!' His face was pale.
'You see this door,' he said. 'I don't want to hear another word. It's here, it's my
way.' Then he walked out and slammed the door, leaving me alone in the room with
the PR boss.

'We're only doing our job,' the boss said, with a shrug. Wright came back a second
later and his microphone pack was trailing behind him.

'It's my way or I don't come back. OK? I'm not doing this for fucking PR stuff, I'm not
doing this for anyone else. I don't give a fucking shit about what people say, I'd
rather not do it. One word about it and I'll never come back. Not exaggeration. I will

267

never enter this office again. I'll never answer an email again, and I'll never talk to another PR person in my life again ... Got it?'

'Yeah,' the boss said.

'Thank you.'

He went out and I was alone with Wright again. 'They've already pushed me,' he said. 'I'm already beyond where I want to be: I'm already doing a TV thing. And everything is always: "Let's take it a little bit further, a little bit further." Which bit of "Go away" don't they get?'

I asked him if Kleiman would have handled it better. 'Better than I do,' he said. 'He would still have told them to fuck off. But in a nicer way. Hal would have done it far better.'

'What do you think they're talking about up there?' I asked.

'The fact that I don't want to jump through their fucking bloody crap. "This man has a big credibility gap he's got to overcome, I'm open to being convinced he's Satoshi but ..."'

The BBC came back downstairs to ask their 'one question' and, naturally, Cellan-Jones asked more than one. In the panicked and hostile mood Wright was in, he needed scapegoats, and the PR weren't meat enough and Matthews was too much the boss. So he scapegoated the BBC, saying, as soon as they left the room, that they had broken their 'contract' with him, that they were liars. 'I'll never do any television interviews again in my life,' he said. 'Never.' And as he said it, I was imagining him with Fox News or the rottweiler interviewers. 'The whole thing was just an attempt to expose me as being something I'm not,' he said.

'That was actually a pretty softball interview, Craig,' I said. 'You can't blame them for turning up and asking for proof.'

'Are you talking about proof or evidence? You're conflating the two. They're not the same and that's one of the things I'm saying. I gave them proof. They want more.'

Wright was happy to lecture you day and night about algorithms, but he wouldn't name names, and he struggled to provide real-world evidence of Satoshi's footprints. The more I thought about it, the more I realised something was wrong, for him, with the footprints analogy, because if Satoshi was only one man he would only have one set of prints. The Satoshi who existed online could be any number of people. But there was something revealing about his treatment of the BBC – something not very nice in his attitude to people who make it their business to ask straight questions – and the handling of the proof sessions made it clear how much of a danger he was to his own credibility. A month later, when I asked Cellan-Jones if the PR company had ever explained to him that there was a commercial company behind the outing of Satoshi, he said he had never been given that information, 'just that they were representing the man who was Satoshi'.

**Life Rights**

At 7.51 A.M. on 2 May 2016 all was quiet on the Twitter front. Well, not quiet, but the names Satoshi Nakamoto and Craig Wright were nowhere to be seen. This was the day of reckoning, the day the embargo would lift and the media outlets could run their pieces and name Satoshi. At 7.55, *Game of Thrones* was trending and so was Gerry Adams, for allegedly using the word 'nigger'. Also trending was a wildfire in Fort McMurray and a bombing in West Bengal. There's a strange feeling of supreme calm before a storm breaks. At 8 a.m., Wright posted a blog containing the supposed hash of the Sartre speech and various postings about himself as Satoshi. At the same moment, Gavin Andresen posted a message to his blog. Title: 'Satoshi'. 'I believe Craig Steven Wright is the person who invented bitcoin,' it began.

I was flown to London to meet Dr Wright a couple of weeks ago, after an initial email conversation convinced me that there was a very good chance he was the same person

269

I'd communicated with in 2010 and early 2011. After spending time with him I am convinced beyond a reasonable doubt: Craig Wright is Satoshi.

Part of that time was spent on a careful cryptographic verification of messages signed with keys that only Satoshi should possess. But even before I witnessed the keys signed and then verified on a clean computer that could not have been tampered with, I was reasonably certain I was sitting next to the father of bitcoin.

During our meeting, I saw the brilliant, opinionated, focused, generous – and privacy-seeking – person that matches the Satoshi I worked with six years ago. And he cleared up a lot of mysteries, including why he disappeared when he did and what he's been busy with since 2011. But I'm going to respect Dr Wright's privacy, and let him decide how much of that story he shares with the world.

We love to create heroes – but also seem to love hating them if they don't live up to some unattainable ideal. It would be better if Satoshi Nakamoto was the codename for an NSA project, or an artificial intelligence sent from the future to advance our primitive money. He is not, he is an imperfect human being just like the rest of us. I hope he manages to mostly ignore the storm that his announcement will create, and keep doing what he loves – learning and research and innovating.

I am very happy to be able to say I shook his hand and thanked him for giving bitcoin to the world.

Also at 8 a.m., with the embargo lifted, the first tweet appeared, from Rory Cellan-Jones: 'Craig Wright tells BBC I am bitcoin inventor Satoshi Nakamoto, publishes evidence backing his claim.' One minute later, a tweet appeared from @CalvinAyre, naming Craig Wright as the proven Satoshi. The *Economist* went one minute later, with a link to Ludwig Seigele's open-minded piece asking for more and better evidence. At 8.09 a.m. Radio 4's *Today* programme broadcast Cellan-Jones's report. 'I'm about to demonstrate the signing of a message with a key that is associated with the first transaction ever done on bitcoin.' The report was brief and quoted Wright once. It said Wright hoped to disappear and that that would be

difficult. They played the part of the interview where Wright said he was part of the group behind Satoshi.

'He sounds plausible,' Justin Webb, the presenter, said, laughing. Then they played part of the interview with Matonis, who said he was '100 per cent convinced'.

'Why should people be excited by this?'

'I put it on the level of the Gutenberg printing press,' Matonis said.

'Quite a lot of people are saying that this is as important as the internet,' Cellan-Jones reported, 'and that this man – if he is the man – should be celebrated like Tim Berners-Lee.'

'Craig Wright has just outed himself as the leader of the Satoshi Nakamoto team,' the bitcoin insider Ian Grigg wrote on his blog:

> Sometime in summer of 2015 the secret started to spread, and the writing was on the wall. An extortionist and a hacker started attacking, perhaps together, perhaps apart; to add to the woes, Dr Wright and his companies were engaged in a long harsh bitter battle with the Australian Tax Office. Since then, the team has been more or less in hiding, guarded, at great expense and at some fear … Satoshi Nakamoto dies with this moment. Satoshi was more than a name, it was a concept, a secret, a team, a vision. Now Satoshi lives on in a new form – changed. Much of the secret is gone, but the vision is still there. Satoshi Nakamoto is dead, long live Satoshi. Yet, a warning to all. Satoshi was a vision, but Craig is a man. The two are not equal, not equivalent, not even close … It is true that Craig is the larger part of the genius behind the team, but he could not have done it alone.

Over the following two hours the words 'Craig Wright' were typed into search engines tens of thousands of times, and the Reddit forums and the cryptocurrency community got to work. Meanwhile, I was being copied into the emails sent from the PR company to nCrypt and the Wrights. It issued a press release spreading the news to less favoured outlets. 'Wright's decision to go public follows a series of

271

misleading statements that are circulating and which he seeks to set straight,' the release said. 'Wright has also launched a blog, with a vision to create a forum about bitcoin, which dispels myths and helps to unleash its full potential. He will create a space to provide developers and producers with the real facts about the technology so as to encourage the widespread use of bitcoin and the blockchain.'

'Great start!' the top PR man wrote to the group at 9.31 a.m.

'Ta. All going well,' Wright wrote just before ten.

'All going to plan,' the second PR man echoed a few minutes later.

'Right on course so far,' the first PR man wrote at 10.13 a.m. And that was the last of the good news to come from the world of public relations.

By midday the blog was receiving the wrong sort of attention. A number of researchers had studied what Wright had written and noticed that the explanation was fudged – worse than fudged, it was faked. Something that he said was signed with the Satoshi key had, in fact, been cut and pasted from an old, publicly available signature associated with Nakamoto. It was astonishing and the buzz quickly grew fierce. All those hours in secret flats scrolled through my head. There had always been something missing, something he hadn't wanted to show. But was that because he wouldn't, or because he couldn't? The thought that he would fake proof so publicly and so coarsely was hard to comprehend. He sent me an email. 'They changed my blog post,' he wrote. 'It will be back as I wanted. But first I need to negotiate with Stefan.' And I replied: 'How did they change it?'

I thought he was lying. He had lied before, but to lie so transparently and so publicly made me think he had lost his mind. There was no way to square such actions with his wish to have no publicity. He had faked his own proof, and now he was being ripped apart on the internet. I briefly wondered if he might be enjoying the cries of execration, but how could he do that to Andresen and Matonis? Suddenly his opponents seemed wiser and greater in number. It took me a few days to see that

Wright's action might be consistent with something deeper in his character. He never wanted to come out and when it came to it he flunked his own paternity test. But I had a feeling that that he was too close to the invention to be a simple hoaxer.

'I will explain why I think he's probably not Satoshi,' said Vitalik Buterin, a big wheel in the cryptocurrency scene, speaking at Consensus, a bitcoin conference in New York that day. A friend of mine was there. He said that men had started the day high-fiving and shouting 'Satoshi, baby', but that as the long day closed, his name became the punchline of every joke. Core developers and others were calling for him to sign something new and in public right away, using the Genesis block, which is unquestionably Nakamoto's. One of them, Peter Todd, was quoted by *Forbes*: 'All Wright needs to do, says Todd, is to provide a signature on the message "Craig Wright is Satoshi Nakamoto" signed by a key known to be Satoshi's. "This is *really* easy to do ... if you're actually Satoshi. Also, you'll know sufficient proof has been provided when it actually happens, because cryptographers will be convinced."'

That was the strangest element of all: Wright must have known, having been a cryptographer all his adult life, that his fraud would be spotted immediately. But when I asked him about it he said it wasn't a fraud, it was a mistake. 'I cut and pasted something just for the time being but knew I would change it later,' he said. 'But then it went up.' That rang hollow to me, the words of a falling man. He intentionally faked it. I believed at that point that he had misled his colleagues and tried to get out of being Satoshi, which isn't necessarily the same thing as not being him. 'I can't think of a more convoluted way to go about claiming one is Satoshi than what Craig Wright has done so far,' Jerry Brito, the executive director of Coin Center, told the *Daily Beast*. 'He's provided no cryptographic evidence verifiable by the public, and many of his answers sound plain fishy.' Emin Gün Sirer, a Cornell professor who had criticised Wright before, referred to Wright's 'meta-modernist play'.

The next day, I turned up at MacGregor's office and found him sitting with Matthews in a dark meeting room. They were hunched over the desk, exhausted and  273

shellshocked. When I asked them what happened MacGregor shook his head. It was the first time in six months I'd heard him sounding incoherent. 'Craig happened,' he said. 'He got cute with the math. He has been trying to get consent from the trustees to get the private keys ... But he wasn't allowed access to coin or to do anything other than that. So what he was trying to do was re-sign a message ...' Matthews butted in, saying Wright never had authorisation from the trust to use the key publicly or let anyone take it away.

'Why didn't he just say that?' I asked.

'You tell me,' Matthews said. MacGregor went on to explain how a signed message can be used nefariously by people with enough computing power. He said the trustees didn't want anyone analysing those blocks. I'm not sure if he was grasping at straws, but what he said didn't explain the suddenness or the fraudulence of what Wright had done. MacGregor said that he and Matthews had since been with Wright and indicated that the encounter had been shouty and ugly. But he said it was OK now. 'We have verbal consent from the trustees to move coin, and we're just waiting on the written consent.'

MacGregor and Matthews had been in the meeting room for hours trying to work everything out. They thought it could all still be kept on track. MacGregor was writing new blog posts for Wright. He asked for my help with one of them and I explained that I had now to distance myself from the whole thing. I had got too close. MacGregor said they were going to 'flood the blog with evidence' and get Wright to 'move' some of the Satoshi bitcoin, to transfer it to someone else in a way that only someone in possession of Satoshi's private keys could do. Andresen had agreed to be on the other end of the coin transaction.

'Craig is being mauled out there,' I said.

Rob removed his glasses. 'The first meeting we had with him yesterday ended with: "You're fired. Buy a ticket to Sydney. You fucked us. Good luck with the ATO."'

'He didn't sleep last night,' Matthews said. 'He looks fucking terrible.'

'He risks destroying his entire reputation.'

'His and ours,' MacGregor said. 'I've been taking meetings with investment bankers for the last two months. I've pulled every string I know to get meetings with Google and Uber. If he goes down in flames, I'll go down with him. I mean, he's fucked me. Millions of dollars out of my pocket, nine months out of my life. But what we have now is a very pliant Craig Wright. We're going to drag this back from the brink.'

'It's a big task, Rob,' I said.

'We finally beat him to a pulp today. No more decisions. This is what we're going to do, because he knew the next move was pack your toothbrush and get on a plane and good luck in Australia.' MacGregor told me he'd started Monday morning on an unbelievable high. 'I can't believe we kept all the puppies in the box this whole time,' he'd thought to himself. 'Nobody broke embargo, holy shit this is going to work. And then … '

We spoke about Wright's possible lies. I said that all through these proof sessions, he'd acted this like this was the last thing he ever wanted.

'That's not true,' MacGregor said. 'He freaking loves it. Why was I so certain he'd do that BBC interview the next day? It's adoration. He wants this more than we want this, but he wants to come out of this looking like he got dragged into it.' He told me if everything had gone to plan, the groundwork was laid for selling the patents. It was a really big deal. He said Ramona had said that if Wright doesn't come out you still have this really smart guy who has made all these patents, who knows all about bitcoin. 'Yeah,' MacGregor said. 'You and five hundred other guys who have called today.' I shook their hands and wished them luck, thinking I would probably never see the men in black again. And as I descended in the lift, I thought I would miss their brio and their belief, despite everything.

Craig was lost in some labyrinth of his own making, or mostly of his own making. He didn't want to be Satoshi. And he didn't want to be Craig. And he didn't want to be a letdown. And yet the message boards lit up and the walls closed in. Over the next 24 hours, he agreed to move Satoshi's coin and his blog advertised the fact. It said, 'Extraordinary claims require extraordinary proof,' and he was set to provide it.

The next day, Wednesday, 4 May, Matthews was at Wright's house organising the movement of coin. The new (and final) proof session was intended to blow away the doubts created by the first. Many commentators felt it was too late, that Wright was beyond the pale, but Matthews and MacGregor had agreed with Andresen that the movement of coin, to Andresen and also to Cellan-Jones at the BBC, would undo the damage. Wright spoke to Andresen on the phone from his house – Andresen was in New York – and told him he was worried about a security flaw in the early blockchain, a problem in the way those first blocks were constructed that would make it dangerous for him to move coin, exposing him to exploitation or theft. My sources say that Andresen understood the problem and confirmed that it was all right, it had been fixed. But Wright continued to worry and was showing great reluctance about offering the final proof. Then he left the room abruptly and didn't come back.

The next day, he sent me an email. It linked to an article headlined 'UK Law Enforcement Sources Hint at Impending Craig Wright Arrest'. The article suggested that the father of bitcoin might be liable, under the Terrorism Act, for the actions of people who used bitcoin to buy weapons. Under the link, Wright had written an explanation: 'I walk from 1 billion or I go to jail. I never wanted to be out, but if I prove it, they destroy me and my family. I am the source of terrorist funds as bitcoin creator or I am a fraud to the world. At least a fraud is able to see his family. There is nothing I can do.'

He was devastated. He was the runner who failed twenty yards short of the finishing tape, the man who froze at the moment of truth, and started walking backwards. He said he feared prosecution on the one hand and humiliation on the other. The

borstal boy in Alan Sillitoe's 'The Loneliness of the Long Distance Runner' comes from a family who make much of running, 'especially running away from the police'. He hates being understood, feels authority is only there to grind you down, and holds on to his essential privacy, knowing 'they can't make an X-ray of our guts to find out what we're telling ourselves.' The boy lives on his own terms, which means not faking it for power, even when the pressure is high and the rewards are obvious. So he refuses to win. Representing the borstal in a championship race he is well ahead of the other runners, but he stops, and lets them pass, and at the end jogs up to the tape: 'I got to the rope,' Sillitoe writes, 'and collapsed, with a murderous-sounding roar going up through my ears while I was still on the wrong side of it.' In another email that day Wright wrote: 'Andrew, I don't know what I can say. If I was to do the proof and save myself, I damn myself.' That afternoon, he closed down the blog – the one that was intended to lead cryptocurrency fans into a new era – but left a final posting:

I'm sorry. I believed that I could do this. I believed that I could put the years of anonymity and hiding behind me. But, as the events of this week unfolded and I prepared to publish the proof of access to the earliest keys, I broke. I do not have the courage. I cannot. When the rumours began, my qualifications and character were attacked. When those allegations were proven false, new allegations have already begun. I know now that I am not strong enough for this. I know that this weakness will cause great damage to those that have supported me, and particularly to Jon Matonis and Gavin Andresen. I can only hope that their honour and credibility is not irreparably tainted by my actions. They were not deceived, but I know that the world will never believe that now. I can only say I'm sorry.

And goodbye.

*

The next morning I drove through the traffic to a London suburb. It was early in the day and the high streets were empty, the happy boutiques, the delis and the wicker-and-candle dens where people come to improve their mood or do something

277

about their lifestyle. Craig and Ramona were sitting in the corner of a popular café. They were holding hands and staring at the table. He was wearing his Billabong T-shirt – I remembered it from his description of the clothes he'd bought in Auckland when he began his long-distance run last December. He looked as he'd looked the first night I met him in Mayfair: unshaven, unslept, the scar on his face more livid, his pupils like pinpricks and his breathing heavy. He wasn't just white, he was empty-looking, and his hands were trembling. Ramona was crying. The light of the café seemed too much for the darkness enclosing them. I went to shake his hand but we hugged instead, and it was like embracing a drowning man. He hadn't really slept since Monday and this was Friday. He wasn't drinking his latte, he made clouds on the spoon, and stared.

'Well, it was worth about a billion dollars to them,' he said. Ramona talked about jail and I asked if they were afraid of being prosecuted.

'They say it'll never happen,' she said. 'Of course it will … So how can he? How can he?' He spoke of men he knew who had sold bitcoin and had been prosecuted for money-laundering and said they might try to do that to him. 'It was always a present danger,' Ramona said. MacGregor, Wright alleged, had always had a plan to move him if necessary to Manila or Antigua if it looked like he might be arrested.

'It's always been incremental,' Craig said. 'One step, one step, and nobody realises that eventually that takes you over a precipice.'

'That's the thing,' Ramona said. 'Your happiness doesn't count at all. But now we're stuck. You come out – you go to jail. You don't come out – you're a fraud. It's got to the point where it's almost better if he's a fraud.'

'So what happened on Monday,' I asked, 'when it came to writing that blog?'

'I gave them the wrong thing,' he said. 'Then they changed it. Then I didn't correct it because I was so angry. Which was stupid. I put up the wrong one. No one wants

SN. I will never be SN. I'm not personable. You can lock me in a room and I'll write papers, I'll never be personable.'

Ramona was crying. 'They could take us down,' she said. 'They could really take you down if they want to.'

They spoke about moneymaking ventures Wright was involved in a long time ago. Wright alleged Matthews knew about these activities, which was true, because Matthews had mentioned them to me.

'I just couldn't do things anymore,' he said. 'That's all.'

They wanted to talk about the trust, but they didn't really explain it. He said it was to hide the bitcoin. 'It's not meant to be spent,' he said. 'Too many problems.'

'It's also a guarantee that you can't flood the market,' Ramona said. 'That we can't use it to pay the bills, no matter how desperate things get.' When I asked who the trustees were they went quiet.

Ramona began to worry about my story. She tried to strong-arm me. She began to tell me what I should say and what I shouldn't say and how I should hide from MacGregor and Matthews the comments she and Wright had made about them. 'I want to write the truth,' I said.

She said I knew too much. She said that Craig would go to jail or harm himself if I told everything I knew. I was stunned. There were many things that were said to me by every party in this story that I would choose not to print. Not only things they said about one another, but business arrangements and unsubstantiated allegations about the past, and things I knew in the present. But I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December. Now I was being told that my material was too hot and my story posed a threat.

Craig suddenly got very upset. His face crumpled and he put his head in his hands. 'And the Brits have their equivalent of Guantánamo Bay as well,' he said, 'I'll never write, I'll never see anyone. I'll be in a little room. I won't even have a pen and paper. I won't see my wife again. I'll never see ...' He sobbed and was inconsolable. 'I'll never write again.'

'They won't do that,' Ramona said. I suggested they might get a lawyer to advise them on the possible threats they faced. Ramona said it was too expensive. She said the bills would run into the millions. Craig talked about Ian Grigg and others who'd 'outed' him last year by nominating him for various awards. Satoshi was nominated for a Nobel Prize and a Turing Prize. Wright told me that people in the bitcoin community wanted him to come out and receive recognition. He said it had never been in his interest to come out, but in other people's interest. 'I don't care if people like my work,' he said. 'I just have to *do* my work. That's the only thing that'll keep me sane.'

'I would like that his reputation gets redeemed but I don't know if that's possible,' Ramona told me. 'This is what I propose, if you can do it, you do it, if you can't, it's up to you. If [you say] he didn't choose to come out ... then the company gets put in the spotlight. If you say you know he is Satoshi then we're in trouble. If you say you have your doubts then he looks like a fool.'

I'm sure I looked at her disbelievingly. 'You're basically saying that every version of the truth of this story is untellable.'

'But if you say it, Andrew ...'

'If you were sure that this could never be said in the end, then you should never have allowed it to happen.'

'It was one step, then one step ...' Craig said, again.

'And you let a writer into your life?' I said.

'Do you know how much this meant to me?' Craig said. 'The company. The people. To be doing that. To get all these papers out. To be in that position. It's my idea of heaven, but the cost is hell.'

'If we didn't co-operate with you,' Ramona said, 'they'd stop …'

I reminded them that every time I'd tried to walk away from this story – like when they tried to make me sign an NDA – she'd begged me to come back. I told them that full disclosure was much less damaging than any other option. Naturally enough, that was my view.

'No one wants to believe me,' Craig said.

'And I think that's great,' Ramona said. 'It's great that no one wants to believe you.'

Craig said he'd **filed all these patents** and they were all from him, 'not just Dave'.

'What do you mean,' I asked. '"Not just Dave?"'

'I mean I wrote those patents,' he said. 'It means I knew all this shit.'

'Have you been able to talk to Matonis or Andresen?' I asked.

'No,' Ramona said. 'I don't know if they'll even talk to us.'

'I think you should have some crisis management advice.'

'From who?'

'From a therapist.'

'We don't have time for that,' she said.

I walked home with them and he slumped on a sofa, looking wan, gone. 'His mental health is fucked,' she said to me when he was out of the room. 'If he goes to jail, he'll kill himself. I can't leave him alone.'

When he returned he seemed almost paler than before. 'This is all because I wrote code,' Craig said. 'Not because I blew up something, because I wrote code.'

'Just out of interest,' I said. 'If you are a fraud ... How hard a fraud would it have been to perpetrate?'

'It would be the best one in human history,' Craig said. 'It'd be Ronnie Biggs on steroids times a million. I invented a new form of money. Who has ever had anything to do with money that wasn't to do with government? Who has ever really succeeded?'

'You mean it's a thankless task?'

'It's always Prometheus,' he said.

*

This was a story in which everybody wanted their story told, then untold, then hidden, back in the vaults. It seemed like a very new story, but, in fact, it was a very old one, a story of metamorphosis, and of Prometheus unbound. Craig Wright proved cryptographically that he had Satoshi's keys, his emails seemed to show his involvement, his science extrapolated on the technology of the blockchain, and he spent a full year engaged in a business plan to reveal it all. But, when it came to it, he behaved like a fraud, he shape-shifted and he dissolved.

I began to wonder whether Craig Wright might be a man who had never known who he was, a missing person, constantly in discussion with some inner lost boy, unable to bear the conditions which forced him to say definitively who he was. Some people, it could be said, *really* aren't anyone, in the sense that the complications of

being themselves have wiped them out. The internet eats its own ciphers, and Wright is one of them. He might have sabotaged his own proof or simply flunked the paternity test because he isn't the right man, but his own doubts about himself are the real drama. He was sick, he was brilliant, he was manipulative – but much of what he said was true. And as I drove away that morning, it was the sickness that seemed predominant. Wright was a clever man who had gone to the very end of himself to prove who he wasn't. 'We are all Satoshi now,' became a tagline for bitcoin's early fans. And in the end we all are Satoshi, and we'll begin to accept it as paper currency starts to look stale, and our minds merge with our computers. There are new networks up ahead that will have grown from the seed Satoshi planted, and it was odd, after all my travels, to believe that the only man who wanted to opt out of being Satoshi was Craig Wright. A week after his 'proof sessions' with the BBC and others, he was in complete disgrace, his corner office at nCrypt had been emptied and his leather sofas had disappeared, removed from the building with the signed Muhammad Ali picture and the rest of his stuff. Without ceremony, the best room in the office became a conference room and his name was spoken in whispers.

My last meeting with MacGregor and Matthews was a time of conjecture and anger, devastation and apology. They felt Wright had perjured himself, and for no good reason. He had never admitted to problems with the trust, problems that would, though he hadn't admitted it, make the Satoshi reveal very difficult for him. They still believe, as do Andresen and Matonis, that he is Satoshi. To them, there is just too much evidence to accept Wright's late attempt to cloak himself in deniability. But no matter. He was now fired, they said, and the deal with Google was off. 'He put a gun to our head and pulled the trigger,' MacGregor told me. 'The world is still going to think we got fooled, but I know the facts. He has the keys.' There was a moment in our meeting when I realised this had gone all the way to the bone with MacGregor. He said he never wanted to see Wright again. 'This was supposed to be so noble,' he said, 'and it became so dark.' Matthews told me that Wright's office, his house, his job, his work visa, everything, was set to go. They had spent as much as $15 million and maybe lost a billion. MacGregor said the PR company would never deal

283

with him again, and there were investment bankers who weren't picking up his calls. A way would be found, however, to continue developing the blockchain technology. The company would go on. MacGregor shook his head. The whole thing was unfathomable. It was baffling. For no obvious reason Wright had found a way to disappear back into the shadows.

### Coda

He seemed to miss me. Craig wanted to meet. It was a few weeks after the abortive 'reveal' and I saw when I got to Patisserie Valerie that he was happy again and ready to take on the world. 'It was unfair of me to request you not to publish certain things about our situation,' Ramona had written to me in an email. 'As you said, you have a debt to the truth, and that is as it should be.' And yet, as we all know, the truth has more faces than the town clock.

Wright told me in Patisserie Valerie that he felt free again. He had lost a third share in a billion dollars but he felt unburdened. He was sorry to have let good people down but now he could work in peace. Sherlock Holmes's central precept came into my mind. 'When you have eliminated the impossible, whatever remains, however improbable, must be the truth.'

'Do you want to know what I think?' I said to him after he told me again that all would be well from now on.

'Yes.'

'What if you were 30 per cent Satoshi. You were there at its formation and you were part of a brilliant group. You coded and you synthesised other people's work and you shared in the encryption keys. Then, some time in the last year, you upgraded yourself to 80 or 90 per cent. You were already a lot more Satoshi than anybody else has been hitherto, but the deal, in your eyes, required you to be more and in the end you couldn't carry that off.'

'No,' he said. And he flew off on a tangent about elliptical curves and the nature of the blockchain and how he never wanted to be a deity. I turned off my recording head at that point and stared through him.

Outside the café, he shook my hand. I knew I would never see him again. For six months we had allowed each other to think we were friends – subjects need storytellers, and storytellers need subjects. There had been a time when he'd imagined that I could free him from his fictions and build him a new story in reality. I was a willing stenographer, thinking Wright was something perhaps bigger than Satoshi. He was the internet's habit of self-dramatisation and self-concealment all at once; its new sort of persona. What he actually did may never be known. Either he's one of the greatest computer scientists of his generation, or he's a reckless opportunist, or he's both. We can't be sure. But there he was, standing in Old Compton Street in the pouring rain, saying sorry.

# CONTRACT FOR THE SALE OF SHARES OF
## A COMPANY OWNING BUSINESS

**PARTIES**

**Dave Kleiman for W & K Info Defense LLC**
(Vendor)

**AND**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Purchaser)

**AND**

**W&K Info Defense LLC**
(Company)

Ref: CEWK03

286

**THIS AGREEMENT** dated 02 day of April 2013

**BETWEEN**

Dave Kleiman of W&K Info Defense LLC (Florida)

And                                                                                        (Vendor)

Craig Wright of Craig Wright R&D
ABN 97 481 146 384

And                                                                                        (Purchaser)

W&K Info Defense LLC

                                                                                              (Company)

**RECITALS**

A.  The vendor is the owner of all issued shares in the company being ordinary class shares. Ownership is 50% in the vendor's name and 50% in trust held for the purchaser.

B.  The company is the owner of and conducts the business known as Bitcoin mining and Software development / Research.

C.  The vendor has agreed to sell and the purchaser has agreed to purchase the vendor's shares for the price and upon the terms set out hereunder.

D.  As the purchaser will succeed to the business of the company on completion of the acquisition of these shares, the parties agree that they will incorporate into this agreement those agreements contained in the attached contract for the sale of a business to the intent that they shall in relation to the sale of the shares have the rights and obligations contained in such contract as part of this agreement.

E.  The company has consented to and agreed to be bound by the terms of this agreement.

F.  The company includes all software, research material and other aspects of the business.

G.  The parties wish to commit the terms of their agreement to writing in the manner hereinafter set out.

287

## OPERATIVE PART

### 1. Interpretation

This agreement is governed by the laws of the state of NSW, and the parties, submit to the non-exclusive jurisdiction of the courts of that state/country.

In the interpretation of this agreement:

(a) References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under, the legislation;

(b) Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or agreements also mean those documents or agreement as changed, novated or replaced, and words denoting one gender include all genders;

(c) Grammatical forms of defined words or phrases have corresponding meanings;

(d) Parties must perform their obligations on the dates and times fixed by reference to the capital city of the state of Sydney;

(e) Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

(f) If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

(g) References to a party are intended to bind their executors, administrators and permitted transferees; and

(h) Obligations under this agreement affecting more than one party bind them jointly and each of them severally.

2. The vendor hereby agrees to sell and the purchaser hereby agrees to purchase ordinary class shares in the company for the purchase price as noted below:

(a) Two (2) loans issued under deed "CEWK01" are agreed to be repaid in full for the consideration of 300,000 Bitcoin agreed in the contract. The repayments as a one off of both loans for $20,000,000 with a total value of

$40,000,000 are deemed paid in full for the above value. This is noted as consideration from the purchaser and is issued in forbearance of the requirements of the contract signed 22 April 2011 between the Vendor/Company and the purchaser (designated CEWK01).

(b) The vendor agrees that the paper wallet with address "1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a" held in escrow will be released to the purchaser.

(c) Due to the unexpected rise in the value of Bitcoin, it is agreed that two transfers (in Bitcoin) of BTC 125,000 and BTC 125,500 when taken in conjunction with the supply of the software, will suffice to fulfil the contract.

3. Hence, the vendor will:

(a) Pay (transfer to) the purchaser 250,500 BTC on 30 April 2013,

(b) Accept transfer of the escrowed Bitcoin paper wallet to the purchaser,

(c) Transfer the ASC hardware to the purchaser,

(d) Release the source code to the purchaser.

(e) Transfer the Vistomail email account.

(f) Transfer all research materials from the four (4) DHS BAA research projects to the purchaser with all notes, data and results, and

(g) Transfer any shares in the company to the purchaser by 30 April 2013.

4. The Purchaser will:

(a) Accept the new terms in full satisfaction of the contract with Reference CEWK01 made between the vendor/company and the purchaser on 22 April 2013.

(b) Accept the vendor's 323,000 remaining "mined" Bitcoin as a 49.5% stake in a new venture to be formed in Australia (to be called Coin-Exch Pty Ltd) between the vendor and the purchaser for the exploitation of the joint and to be pooled Bitcoin

(c) Accept the transfer of the 323,000 Bitcoin (to be made on the 30th April 2013) as capital and note that shares in the new enterprise will be issued at this point.

289

    (d)   Provide \$30,000,000 in capital into Coin-Exch Pty Ltd (to be formed) and the software developed in the prior venture.

5.   Settlement shall be effected on 30 April 2013.

6.   So far as they are relevant the agreements contained in the incorporated contract for the sale of a business shall be agreements between the parties herein.

7.   In the event of either party failing to complete this agreement on the settlement date then the other shall be entitled at any time thereafter to serve a notice to complete requiring the other to complete within 14 days from the date of service of the notice, which time period is considered reasonable by both parties. For the purpose of this contract, such notice to complete shall be deemed both at law and in equity sufficient to make time of the essence of this contract.

8.   On the settlement date the vendors shall:
    (a)   Deliver up to the purchaser possession of the business conducted by the company and in all respects shall have complied with the terms of the business sale contract incorporated herein;
    (b)   Deliver up to the purchaser duly executed instruments of transfer of their shares;
    (c)   Cause a meeting of the directors of the company to be held at which the directors shall approve and consent to the sale and transfer by the vendors to the purchaser of the vendors' shares.
    (d)   Send all software developed under the various DHS BAA filings to the purchaser (incl. source code and documentation).
    (e)   Provide the location and access rights to the ASC mining hardware hosted at a site known to Mr Kleiman will be returned with this transfer. This has a nominal value of \$8,828,571.29 before depreciation. This is a
    (f)   Solutions to the Agent and Merkle Tree problems developed by Professor David Reese.
    (g)   Bitcoin agent software and suit of C/C++/C# and Python Blockchain software source codes.

(h) Exchange Bitcoin holdings as noted in the contract.

9. The company hereby agrees to take all steps and carry out all acts to procure the registration on the settlement date of the purchaser as the registered holder of tile to the vendors' shares.

10. The purchaser will make all reasonable endeavours to have the new venture (Coin-Exch Pty Ltd) registered for GST and under the Australian Corporations act provisions before settlement on the 30th April 2013.

11. The parties hereto agree to execute and perform all such acts, deeds, documents and things whatsoever as may be necessary and desirable to better carry into effect the provisions of this agreement.

12. **Vendor's warranties**

   (a) **Vendor's authority to sell**

      (i) The vendors are the registered and beneficial owners of their shares in the company.

      (ii) The vendors have full power and authority to sell and transfer to the purchaser good legal and equitable title to the shares without the consent or authorisation of any person except only consents required by the company.

   (b) **The company's financial statements**

      Other than matters disclosed to the purchaser in writing the books and accounts of the company truly and fairly reflect the company's affairs.

   (c) **Books and records**

      The company's books, records and registers are in the possession of the company, and accurately record the details of all of the company's transactions, finances, assets and liabilities.

   (d) **Taxation**

      (i) Other than disclosed to the purchaser in writing the company has lodged or filed all tax and duty returns for all taxes including GST, income tax, sales tax, fringe benefits tax, payroll tax, group tax and WorkCare levies.

291

(ii) No claim has or will be made against the company for payment by the company pursuant to the provisions of the Income Tax Assessment Act 1936 of any tax which is not shown or included as a liability or provision in the balance sheet contained in the accounts.

(iii) Neither the commissioner nor any federal, state or municipal body has any dispute with the company concerning the company's affair.

(e) **Compliance with applicable laws**

(i) Neither the vendor nor the company has breached, or caused a breach of the company's memorandum or articles of association; any contract, agreement or instrument which binds the company; or any judgment, order, injunction or decree of any court, commission or administrative body relating to the company or to the shares.

(ii) Neither the company nor any of its officers, agents or employees (while performing their duties for the company) has breached the law. The company has not been notified that it has, or may have, breached the law regulating its affairs or the conduct of its business.

(f) **Litigation and indebtedness**

Other than as disclosed to the purchaser in writing:

(i) The company is not a party to, or threatened with, any claim, litigation, prosecution or arbitration in any court, tribunal or otherwise;

(ii) There are no unsatisfied judgments or arbitral awards against the company;

(iii) The company is not being investigated for any breach of the law. Neither the company nor any of its directors is aware of any breach of the law or of any circumstances, which would give rise to a breach of the law other than as disclosed to the purchaser in writing;

(iv) The company has met all deadlines for repayment of its debts;

(v) No petitions, notices or proceedings have come to the company's notice, which could result in it being wound up. No orders or resolutions have been made or passed to place the company in liquidation or provisional liquidation.

(g) **Accuracy of disclosed information**

    (i)   The vendor has disclosed to the purchaser all information, which would be material for a purchaser in forming a decision whether or not to purchase the shares.

    (ii)   If either the vendor or the company becomes aware of anything which may constitute a breach of, or be inconsistent with any representation, warranty or undertaking in this agreement, they will notify the purchaser of its particulars promptly in writing.

(h) **Warranties and indemnities**

    (i)   It is a condition of this agreement that each warranty is true and correct in every respect and shall be construed separately.

    (ii)   The vendor acknowledges that the warranties have been given with the intention and for the purpose of inducing the purchaser to enter into this agreement.

    (iii)   The purchaser has entered into this agreement and agreed to the purchase price payable for the shares on the basis of and in full reliance upon the warranties.

    (iv)   Prior to the settlement date the vendor will take all such steps and provide all such information and documents with regard to the company as the purchaser may reasonably require and will give the purchaser and its professional advisers full and free access to the records and accounts of the company (whether financial or otherwise) to enable them to fully investigate the accuracy of the warranties.

**13.   Notices**

A communication required by this agreement, by a party to another, must be in writing and may be given to them by being:

(a)   Delivered personally; or

(b)   Posted to their address specified in this agreement, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

293

(c)   Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending; or

(d)   Sent by email to their email address, when it will be treated as received on that day.

## 14.   Waiver or variation

(a)   A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)   The exercise of a power or right does not preclude:

(i)   Its future exercise; or

(ii)   The exercise of any other power or right.

(c)   The variation or waiver of a provision of this agreement or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

## 15.   Counterparts

This agreement may be executed in any number of counterparts each of which will be an original but such counterparts together will constitute one and the same instrument and the date of the agreement will be the date on which it is executed by the last party.

## 16.   Further assurance

Each party will from time to time do all things (including executing all documents) necessary or desirable to give full effect to this agreement.

## 17.   Costs

Each party will pay their own costs in relation to this agreement.

Case 9:18-cv-80176-BB   Document 816-1   Entered on FLSD Docket 12/08/2021   Page 282 of
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 11 of 11
441

**SIGNED AS AN AGREEMENT**

Executed by
W & K Info Defense LLC              )

Dave Kleiman

Dave Kleiman
DIRECTOR

Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)

Craig S Wright

295

Page 9 of 9

Page 261 of 420

From: **Ira K** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: Tue, May 20, 2014 at 11:20 AM
Subject: Re: memory recall
To: Craig S Wright <craig@rcjbr.org>

Thanks. I guess the one he drew for me could have looked like that.

Wish I kept the card.

On Tue, May 20, 2014 at 3:25 AM, Craig S Wright <craig@rcjbr.org> wrote:
Neither of us were graphic artists ...

**From:** Ira K ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, 20 May 2014 5:03 PM
**To:** Craig Wright
**Subject:** Re: memory recall

i think the logo he drew for me only had only line going through the B, not two.

On Tue, May 20, 2014 at 3:01 AM, Craig Wright <craig@rcjbr.org> wrote:

We did partner ;)

The properties were not magnificent, but I loved them. In total I had a few cattle ranches and farm. Up in Port Macquarie. Wonderful beaches, but underdeveloped unlike Florida. In total about 550 acres.

I will have to see what I can dig up. The old Bitcoin logo we did is no longer used. I have a copy somewhere.

Some of the issues we still face come from how people assume making money must be counterfeit or otherwise illegal.

Craig

On 20/05/2014 4:53 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
I thought I would share this memory of Dave I had.

I don't recall him ever saying the word Bitcoin to me, but I do have a memory where I think he told me he was working on it. We were visiting at my Dad's house I think for Thanksgiving, and I believe it was the first time he met my daughter ▮▮. We started talking about how successful Facebook had become and I asked him if he was working on anything interesting. He told me he was making his own money. I was like what? Are you making counterfeit money? I thought maybe he was up to something fishy. And then he said it was digital money and opened his wallet to show me something like a business card with a logo on it. But he couldn't find it so I think he just scribbled it on the back of a card, the B with lines through it.

He also said he was doing some work with a rich foreign guy. I asked him how rich is this guy? He said something like he's not super rich, but he owns some properties. Then he said some other stuff about the foreign guy

that I don't remember. I replied to him saying why don't you partner with this guy. With your brains and his money you guys could create the next big thing like Facebook. He gave me a blank look and was silent, which I thought unusual for Dave to stop talking. Maybe he didn't want to directly come out and say you guys were already partners. Anyway, that's the only time I can recall where he mentioned this stuff to me.

I was wondering if you were aware of any business cards ever being printed with the Bitcoin logo on it. I never found any in his belongings. I wasn't sure if he was opening his wallet to show me a Bitcoin business card or if he just wanted to grab an existing card to draw the logo on the back of it.

Thanks,
Ira

From: **Craig S Wright** <craig@rcjbr.org>
Date: Tue, May 20, 2014 at 3:23 AM
Subject: RE: memory recall
To: Ira K

Here you go – this is the first of the first.

The later version of the same

Case 9:18-cv-80176-BB   Document 83-2   Entered on FLSD Docket 01/14/2019   Page 5 of 5



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

       plaintiffs,

v.

                 **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

       defendant.

_____/

### JOINT MOTION
### FOR A 30-DAY EXTENSION OF ALL DISCOVERY AND
### CASE DEADLINES, AND TRIAL SETTING

The parties are currently engaged in good faith settlement discussions. To that end, Dr.

Wright and Plaintiffs respectfully request a 30-day extension of all discovery and case deadlines to

facilitate these discussions. In support of this request, the parties state as follows:

1.     The parties have been engaged in extensive settlement negotiations and have reached

a non-binding agreement in principle to settle this matter.

2.     The parties are continuing to negotiate, finalize all relevant terms, and document the

agreement appropriately.

3.     In the meantime, however, many important case deadlines are quickly approaching.

For example, expert disclosures are due on November 5, 2019, the discovery cutoff is set for

December 3, 2019, Dr. Wright's opposition to Judge Reinhart's sanctions order is due on September

24, 2019, and Plaintiffs' motion for attorneys' fees is due on September 20, 2019.

4.     Reaching a final binding settlement agreement is in the best interests of both parties,

and a 30-day extension of all case deadlines (including the trial setting) would enable both parties

to devote their full efforts to that goal.

5.    For the foregoing reasons, both parties jointly move for a 30-day extension of all discovery and case deadlines.

6.    This motion is brought in good faith and not for the purposes of delay.

### CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), I certify that counsel for the movant has conferred with all parties who may be affected by the relief sought in this motion. All parties agree to the relief sought.

*Attorneys for Plaintiffs*

s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman, Esq.
ROCHE FREEDMAN LLP
200 S. Biscayne Blvd.
Suite 5500
Miami, Florida 33131
vel@rochefreedman.com

Kyle W. Roche, Esq.
Admitted Pro Hac Vice
ROCHE FREEDMAN LLP
185 Wythe Avenue F2
Brooklyn, New York 11249
kyle@rochefreedman.com

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: arolnick@riveromestre.com
Email: amcgovern@riveromestre.com

Email: zmarkoe@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819
JORGE MESTRE
Florida Bar No. _____
AMANDA MCGOVERN
Florida Bar No. 964263
ZAHARAH MARKOE
Florida Bar No. 504734

## CERTIFICATE OF SERVICE

I certify that on September 17, 2019, I electronically filed this document with the Clerk of

the Court using CM/ECF. I also certify that this document is being served today on all counsel of

record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.


/s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819

3

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

#### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al.*,

     Plaintiffs,

v.

CRAIG WRIGHT,

     Defendant,

_____/

### ORDER

    **THIS CAUSE** is before the Court upon the parties Joint Motion for a 30-Day Extension of All Discovery and Case Deadlines, and Trial Setting, ECF No. [284], filed on September 17, 2019 ("Motion"). In the Motion, the parties represent that they have reached a settlement in principle and require an additional 30-days to finalize all relevant terms. The Court has reviewed the Motion, the record, and is otherwise fully advised.

    Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [284]**, is **GRANTED in part and DENIED in part.** The Court's Scheduling Order, **ECF No. [149]**, is **AMENDED** as follows:

| | |
|---|---|
| **December 5, 2019** | Parties disclose experts and exchange expert witness summaries or reports. |
| **December 19, 2019** | Parties exchange rebuttal expert witness summaries or reports. |
| **January 3, 2020** | All discovery, including expert discovery, is completed. |
| **January 17, 2020** | All pre-trial motions, motions *in limine*, and *Daubert* motions (which include motions to strike experts) are filed. **This deadline includes all dispositive motions.** Each party is limited to filing one motion *in limine* and one Daubert motion. If all evidentiary issues cannot be addressed in a 20-page memorandum, leave to exceed the page limit will be granted. |

Case No. 18-cv-80176-BLOOM/Reinhart

**The parties are reminded that motions *in limine* must contain the Local Rule 7.1(a)(3) certification.**

All other provisions in the Scheduling Order, **ECF No. [149]**, not amended in this Order,

shall remain in full effect.

Plaintiffs' Motion for Attorneys' Fees shall be due **no later than October 20, 2019** and

Defendant's Opposition to Judge Reinhart's Sanctions Order, **ECF No. [277]**, shall be due **no**

**later than October 24, 2019**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 17, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

     plaintiffs,

v.                            **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

     defendant.

_____/

### JOINT MOTION
### FOR AN ADDITIONAL 30-DAY EXTENSION OF
### ALL DISCOVERY AND CASE DEADLINES, AND TRIAL SETTING

As the parties previously informed the Court, they are currently engaged in good faith settlement discussions. To further facilitate these discussions, Dr. Wright and Plaintiffs respectfully request an additional 30-day extension of all discovery and case deadlines. In support of this request, the parties state as follows:

1. On September 17, 2019, the parties informed the Court that they had reached a non-binding agreement in principle to settle this matter and requested a 30-day extension of all case deadlines to facilitate the settlement discussions. D.E. 284.

2. On September 18, 2019, the Court granted a 30-day extension of time on all case deadlines, but kept the trial setting the same. D.E. 286.

3. Since that date, the parties have worked diligently on reaching an agreement on all terms. In that effort, the parties' counsel have met three times in person to go over the details of the final agreement and have made significant progress on reaching the form of what will become the final binding agreement. Due to the complexity of the settlement and associated documents, however, a bit more time is needed to finalize and memorialize the agreement.

4.      In the meantime, the extended case deadlines are quickly approaching. For example, plaintiffs' motion for attorneys' fees is due on October 20, 2019, Dr. Wright's opposition to Judge Reinhart's sanctions order is due on October 24, 2019, and expert disclosures are due on December 5, 2019.

5.      Additionally, the Jewish Holidays are upon us and members of the plaintiffs' and defendant's teams were, and will be, unable to work on September 30, and October 1, 9, 14, 15, 21, and 22.

6.      Reaching a final binding settlement agreement is in the best interests of both parties, and an additional 30-day extension of all case deadlines (including the trial setting) will enable both parties to devote their full efforts to that goal.

7.      For the foregoing reasons, the parties jointly move for an additional 30-day extension of all discovery and case deadlines.

8.      This motion is brought in good faith and not for the purposes of delay.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), I certify that counsel for the movant has conferred with all parties affected by the relief sought in this motion. All parties agree to the relief sought.

*Attorneys for Plaintiffs*

s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman, Esq.
ROCHE FREEDMAN LLP
200 S. Biscayne Blvd.
Suite 5500
Miami, Florida 33131
vel@rochefreedman.com


Kyle W. Roche, Esq.
Admitted Pro Hac Vice

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveromestre.com
Email: zmarkoe@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero

2

ROCHE FREEDMAN LLP
185 Wythe Avenue F2
Brooklyn, New York 11249
kyle@rochefreedman.com

ANDRES RIVERO
Florida Bar No. 613819
AMANDA MCGOVERN
Florida Bar No. 964263
ZAHARAH MARKOE
Florida Bar No. 504734

## CERTIFICATE OF SERVICE

I certify that on October 8, 2019, I electronically filed this document with the Clerk of the

Court using CM/ECF. I also certify that this document is being served today on all counsel of

record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

/s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819

3

307
Page 273 of 420

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al.*,

     Plaintiffs,

v.

CRAIG WRIGHT,

     Defendant.

_____/

## ORDER

**THIS CAUSE** is before the Court upon the Parties Joint Motion for an Additional 30-Day Extension of All Discovery and Case Deadlines, and Trial Setting, ECF No. [287], filed on October 8, 2019 ("Motion"). In the Motion, the parties request an additional 30-days to finalize their settlement agreement resolving all claims in the above-referenced action. The Court has reviewed the Motion, the record, and is otherwise fully advised. Accordingly, it is **ORDERED AND ADJUDGED** that:

1. The Motion, **ECF No. [287]**, is **GRANTED in part and DENIED in part.** Plaintiffs' Motion for Attorneys' Fees shall be due **no later than November 20, 2019**. Defendant's Opposition to Judge Reinhart's Sanctions Order, **ECF No. [277]**, shall be due **no later than November 25, 2019.**

2. All other provisions in the Scheduling Orders, **ECF No. [149], [286]**, not amended by this Order, shall remain in full effect.

Case No. 18-cv-80176-BLOOM/Reinhart

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 8, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

--------------------------------)
                                )
                                )
                                )
IRA KLEIMAN, as the personal    ) CASE NO:
representative of the Estate    ) 9:18-cv-80176-BB/BR
of David Kleiman, and W&K Info  )
Defense Research, LLC           )
                                )
         Plaintiffs,            )
                                )
v.                              )
                                )
                                )
CRAIG WRIGHT                    )
                                )
         Defendant.             )
                                )
                                )
--------------------------------)


Videotape Deposition of
CRAIG STEVEN WRIGHT

On Thursday, 4th April 2019


Taken at the offices of:

Boies Schiller Flexner LLP
5 New Street Square,
London EC4A 3BF

Reported by: Paula Foley



Page 71

1    addresses today.  If I was asked to swear or lose

2    everything I have, I could not even give you my sister's

3    e-mail address right now.

4            Q.    Dr. Wright, if you could answer the

5    question posed it would help us move forward.

6            A.    I believe I did.

7            Q.    No, actually, I do not have an answer.

8            A.    That is my total recollection ever on

9    e-mails.

10           Q.    You do not recall any of the e-mails Dave

11   Kleiman used to receive communications from you about

12   Bitcoin, blockchain or timechain technology in 2009?

13           MS. MARKOE:  Objection: asked and

14   answered.

15           THE WITNESS:  I have answered that.

16   BY MR. FREEDMAN:

17           Q.    Do you recall any of the e-mails Dave

18   Kleiman used to receive communications about Bitcoin,

19   blockchain or timechain technology from 2010 through

20   2013?

21           MS. MARKOE:  Objection.

22           THE WITNESS:  I cannot answer what Dave

23   received anything on.  Dave is an independent person.

24   He was never my partner.  I have never had any

25   relationship that way with him.  He was just a friend.



Page 186

1           A.      Yes.

2           Q.      Satoshi mined block one.  Were you the

3   one acting as Satoshi to mine block one?

4                   MS. MARKOE:  Objection.

5                   THE WITNESS:  There is no Satoshi that

6   way.  I was.

7   BY MR. FREEDMAN:

8           Q.      I am sorry?

9           A.      I was.  I used the pseudonym.  It did not

10  flip round like Dread Pirate Roberts or something like

11  this.  It was just me.  And it was not Satoshi mining

12  per se.  There was not any, other than me, apart from

13  block nine, which was then referenced by a transfer

14  I did.

15          Q.      So you mined block one?

16          A.      Yes.

17          Q.      Did you also mine block two?

18          A.      Relevance, please, give me ----

19                  MS. MARKOE:  Look, connect it up with a

20  relationship with Dave Kleiman or do not.

21                  THE WITNESS:  There were mining pools,

22  there were no shared mining.  Dave Kleiman and I could

23  not physically mine in any way.  Mining pools were not

24  developed until years after I disappeared, so there is

25  no joint mining.



Page 193

1    if you remember.

2                    THE WITNESS:  I cannot remember.

3    BY MR. FREEDMAN:

4        Q.    Do you know who is being referred to in

5    Plaintiff's Exhibit 3:  "... and another I cannot name

6    as I have no right to do so"?

7                    MS. MARKOE:  I just want to read the

8    question back.  (Pause) You can answer the question.  If

9    you need a read back, ask for a read back.

10                   THE WITNESS:  What I will say is this

11   work of fiction -- (Witness indicates Exhibit 3) -- was

12   created because Mr. O'Hagan refused to sign the

13   non-disclosure agreement, and basically took what he

14   thought would be a great story and created one.  It is

15   fiction.

16   BY MR. FREEDMAN:

17       Q.    Your position is the entire article is

18   fiction?

19                   MS. MARKOE:  Objection:  mischaracterises

20   his testimony.

21   BY MR. FREEDMAN:

22       Q.    Is it your position that the entire

23   article is fiction?

24       A.    No.

25       Q.    Did Mr. O'Hagan record sessions --

Page 299

1    page numbers or anything like that, so that is also out

2    of -- so there are possibly four documents constructed

3    into one.

4          Q.      Who has all the originals of these

5    documents?

6                  MS. MARKOE:  Objection.

7                  THE WITNESS:  I do not know.

8    BY MR. FREEDMAN:

9          Q.      Do you have the originals of these

10   documents?

11         A.      Unless my lawyers have gone through and

12   found things in boxes, then I do not know.

13         Q.      Does Ms. Nguyen have the originals of

14   this document?

15                 MS. MARKOE:  Objection.

16                 THE WITNESS:  I do not know what

17   Ms. Nguyen has.  I have not spoken to Ms. Nguyen in

18   three plus years.

19   BY MR. FREEDMAN:

20         Q.      Can you look at page 9 of 10.

21         A.      Yes.

22         Q.      There is a signature at the bottom; is

23   that your signature?

24         A.      Yes.

25         Q.      And there is a signature above that; is



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as the personal representative   **CASE NO.:  9:18-cv-80176-BB**
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

      Plaintiffs,

v.

CRAIG WRIGHT

      Defendant.

## PLAINTIFFS' MOTION AND INCORPORATED MEMORANDUM OF LAW FOR ISSUANCE OF LETTER ROGATORY TO SUBPOENA FOREIGN THIRD PARTIES

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and Plaintiff W&K Info Defense Research, LLC ("W&K," and collectively, "Plaintiffs"), pursuant to Federal Rule of Civil Procedure 28(b)(2), 28 U.S.C. § 1781(b)(2), and Chapter 1 of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), respectfully move this Court to issue a letter rogatory pursuant to Federal Rules of Civil Procedure 4(f)(2)(b). The proposed letter rogatory, attached hereto as Exhibit 1, requests that the appropriate Judicial Authority of the United Kingdom direct non-party witnesses Andrew O'Hagan, Ramona Watts, and Robert MacGregor, produce certain documents and provide testimony upon oral examination to be used at trial.

The inability of this Court to exercise compulsory process over these important international witnesses requires the assistance of an English court to compel their testimony and production. Plaintiff therefore seeks the issuance of the attached letter rogatory from this Court.

1

## BACKGROUND

As this Court is aware, Plaintiffs have alleged that Dave Kleiman and Craig Wright partnered in 2008 to release the bitcoin whitepaper under the Satoshi Nakamoto pseudonym, create the original bitcoin protocol, mine bitcoins, and create valuable intellectual property. In 2011, they formed W&K Info Defense Research, and continued their activities through that company until 2013, when Dave died, and Craig stole the assets belonging to W&K and Dave's estate. With Dave dead, Craig remains one of the very few sources of evidence to prosecute this case.

Discovery to date has revealed the existence of other individuals that have access to relevant information, but some of them live abroad. Consequently, Plaintiffs seek this Court's assistance in obtaining documents and testimony that will be used at trial to prove Plaintiffs' case from these key foreign witnesses: Andrew O'Hagan, Ramona Watts, and Robert MacGregor.

### Andrew O'Hagan

Andrew O'Hagan is a resident of the United Kingdom. O'Hagan is a novelist who authored *The Satoshi Affair*, a 96-page story recounting Craig and Dave's creation of Bitcoin, their joint mining activities, their development of intellectual property, and the Defendant's arrangement to sell that IP along with "Satoshi's life rights" to investors. The story has an over 14-page section entitled "Kleiman." (ECF No. [83-1], at 25-34.)

Craig and his business associates brought O'Hagan on board because "they were looking to contract [him] to write the life of Satoshi Nakamoto." (*Id.* at 9, 14.) They wanted to publish the story in furtherance of Craig's plan to "out" himself and Dave as Satoshi Nakamoto and then capitalize on this newfound publicity by selling the intellectual property he and Dave created at a heavy premium due to their newfound celebrity status. (*Id.* at 12-13). As catalogued in O'Hagan's story, Craig did just that on May 2, 2016. (*Id.* at 80-81.)

2

O'Hagan was afforded incredible access to Craig, his friends, and business associates to write the story. (*Id.* at 15 ("for those first few months . . . nobody refused me access.").) O'Hagan interviewed Craig for six months (*Id.* at 96). These interviews resulted in O'Hagan obtaining "many hours of tape," of Craig discussing the origin story of Craig and Dave's collaboration, the fruits of that collaboration, and the current location of those assets. (*Id.* at 25-28.) He was also afforded access to copies of relevant documents and communications Plaintiffs have not seen and the opportunity to confer about these issues (orally and in writing) with Craig's wife, close friends, and business associates. (*Id.* at 29-31.) Craig told O'Hagan that "he was happy [O'Hagan] was writing about him . . . mainly because he wanted to tell the story of the brilliant people he had collaborated with." (*Id.* at 16.) It for this reason, that as indicated above, there is an over 14-page section specifically about Dave Kleiman. (*Id.* at 25-34.)

*The Satoshi Affair* is a written work that reflects the portions of the interviews and documents O'Hagan deemed important enough to include in his story. Despite this limitation, *The Satoshi Affair* touches on extremely important issues in this litigation and demonstrates that O'Hagan and Craig – along with other interviewees – discussed extremely relevant and important topics to this litigation at length. For example, their discussions covered various trusts and companies Craig is using to hold the bitcoins and intellectual property he stole from Dave Kleiman:

> I asked Wright about this and he told me it was true that his and Kleiman's mining activity had led to a complicated trust. The trust question was persistently vague: not only how many trusts but the names of the trustees, and the dates of their formation. The only consistent thing is the amount of bitcoin Wright is said to have had at one time, 1.1 million.

(*Id.* at 36.) They also discussed the bitcoins at issue this litigation:

> The first thing most people ask about when you mention Satoshi is his alleged hoard of bitcoin: he invented the thing, and created the Genesis block, and mined bitcoin from the start, so where was Wright money and where was Kleiman's? The emails, when I got them, seemed to clear this up slightly, but, during many dozens of hours

3

> of conversation with Wright, he never properly told me how many bitcoin he mined. I was aware – and he knew I was aware, because I told him several times – that he wasn't giving me a full account of everything that had occurred between him and Kleiman. He said it was complicated.

(*Id.*) And it also includes quotes showing that Craig admitted to the joint nature of the bitcoins

mined:

> Dave died a week before the value went up by 25 times . . . Wright . . . emphasized something he said the commentators never understood: for a long time, bitcoin wasn't worth anything, and *they* constantly needed money to keep the whole operation going. *They* feared that dumping *their* bitcoin *hoard* would have flooded the market and devalued the currency.

(*Id.* at 39 (emphasis on joint "they" and single "hoard" added).) O'Hagan's discussions weren't

limited to just bitcoins either. His conversations with Craig and other interviewees touched on the

intellectual property Plaintiffs are seeking as well. He spoke with MacGreggor about a paperwork

signing that "would effectively be the final signing over to nCrypt of the intellectual property held

by Wright's companies." (*Id.* at 17). This is the intellectual property at the heart of this dispute

because Defendant's companies claim title to intellectual property through Plaintiff W&K in what

Plaintiffs allege were fraudulent and unauthorized transfers. (ECF No. [83] ¶ 142; ECF No. [83-

26] at 3; ECF No. [83-27] at 4; ECF No. [83-28] at 4.) Further, in the section entitled "Kleiman,"

Craig is quoted as saying "[w]e have hundreds of patents and papers in progress – *research from

the beginning* – and in the next year we're going to start releasing them." (ECF No. [83-1], at 25

(emphasis added).)

O'Hagan writes that he "came to feel that there were secrets between Wright and Kleiman

that might never be revealed. Wright usually clammed up when asked about Kleiman and money."

(*Id.* at 36.) Plaintiffs need access to the statements surrounding these interactions to know what

Craig said when he didn't "clam[] up" (he only "usually" did so) and what was said to cause him

to clam up.

To be clear, this is just some of the relevant portions of *The Satoshi Affair*. As admitted by O'Hagan, he has "hours of tape" of the Defendant brought about by spending "many dozens of hours of conversation with Wright." (Id. at 26, 36).

In stark contrast to the statements he made to O'Hagan, Craig now claims he had no partnership with Dave Kleiman (Craig Wright Dep. Tr. at 71:22-24 (April 4, 2019), attached as Exhibit 2), and that he and Dave never mined bitcoin jointly (*Id.* at 186:21-25). Furthermore, when Plaintiffs asked Craig about some of his statements in *The Satoshi Affair* at his preliminary deposition he responded by calling it a "work of fiction" that was "created" by O'Hagan. (*Id.* at 193:10-15.)

Consequently, Plaintiffs seek production of the abovementioned tape recordings and other contemporaneous notes or materials O'Hagan obtained while preparing *The Satoshi Affair* along with drafts of the final story for purposes of proving their case at trial. Plaintiffs also seek oral testimony and documents from O'Hagan related to statements and documents he heard and reviewed during this time for the same reason. Obtaining his sworn testimony that the statements and documents quoted in the article are accurate would, at a minimum, assist in the admissibility of those statements already in Plaintiffs' possession. Given the access O'Hagan had to Craig and his associates, O'Hagan possesses critical and relevant information within the scope of permitted discovery that Plaintiffs will use to prove Dave and Craig's partnership, the joint nature of the assets created by that partnership, and what Craig did with those assets after Dave died.

Finally, O'Hagan's tape recordings are critical because this case is built on admissions of Craig and his agents. Admissions he now inexplicably denies. (*See* ECF No. [87]; Ex. 2 at 193:10-15). As this Court is aware, Plaintiff is an estate and Dave is deceased. Thus, Craig's past

admissions, certainly ones made on tape, will be critical to proving Plaintiffs' case. Consequently,

Plaintiffs seek an order to take oral testimony from O'Hagan on the following three subject areas:

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

2. The accuracy of the quotes and factual assertions contained within his work *The Satoshi Affair*.

3. Statements made, or documents provided, by Craig Wright (and his agents), Ms. Lynn Wright, or Ms. Watts that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

4. Statements made, or documents provided, by anyone interviewed in connection with the drafting of *The Satoshi Affair* that relate to Satoshi Nakamoto, the creation of Bitcoin, Dave Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig and/or Dave, and the intellectual property alleged to have been created by Craig and/or Dave.

Plaintiffs also seek an order to obtain the following four categories of documents from O'Hagan:

1. All video and/or audio recordings of interviews related to Mr. O'Hagan's work in writing *The Satoshi Affair*. Specifically, including, but not limited to, the "many hours of tape" of the Defendant referenced in *The Satoshi Affair*.

2. All documents relied on or reviewed in preparing for, and drafting, The Satoshi Affair. This includes contemporaneous notes taken by Mr. O'Hagan or others, and any documents or communications reviewed or relied on when preparing the story.

3. All emails between O'Hagan, and either the Defendant, Ms. Watts, MacGregor, Matthews, or Ayre.

4. All drafts of *The Satoshi Affair*, any edits received, and comments thereto.

### Ramona Watts

Ramona Watts has worked with Craig and been involved in his companies since circa 2011.

(Craig Wright Dep. Tr. at 423:21-424:8, 427:5-428:9 (June 28, 2019), attached as Exhibit 3).

While they eventually married in November 2013, Craig testified that he discussed Dave with

6

Ramona before they married (*id.*, at 424:22-23), that she learned he created Bitcoin before they were married (*id.*, at 426:8-10), that he gave her detailed accounts of what he'd done to create Bitcoin before they were married (*id.*, at 426:18-23), that they had companies involved in Bitcoin together before they got married where they emailed about and discussed Bitcoin (*id.*, at 427:5-12), and that he "talked to [Ramona] about everything, including my past, before we got married" (*Id.*, at 426:18-20). In fact, at deposition, Craig specifically stated that even after they married they discussed Bitcoin related companies together as co-directors (*id.* at 427:13-428:9), and that Ramona was involved in business interactions among Craig, Robert McGregor, and Stefan Matthews which involved the sale of Satoshi Nakamoto's life rights, *i.e.*, the rights to tell the story of the Satoshi Nakamoto partnership in dispute. (*Id.* 429:7-14, 429:21-430:11). It is thus indisputable that Ms. Watts has observed and can testify to relevant information Plaintiffs will use to prove their case.

In mid-2015, Ms. Watts also engaged in direct communications with Ira. During these communications, Ramona provided Ira with information related to the ATO's investigation of Craig as well as updates concerning Ira's purported shares in an entity called Coin-Exch. Importantly, these shares form the basis for Craig's Fourth, Fifth, Sixth, Seventh, Eighth, and mis-numbered duplicate "Seventh" affirmative defenses. (ECF No. [87], at 33-34). She also appears to possess certain knowledge concerning Dave Kleiman's finances, claiming at one point in their correspondence that "[o]ne of Dave's companies had significant investments in Liberty Reserve [but] the US government shut that down and confiscated all his money." (Ex. 4 at KLEIMAN_00004792.) Her testimony and the documents in her possession are relevant and will

7

be important for proving Plaintiffs' claims and determining the merits of the Defendant's asserted defenses.[1]

In fact, Plaintiffs have just discovered that Ramona is intimately involved in the "Tulip Trusts" allegedly created by Craig to collectively hold over 1.9 million bitcoins, equal to over $19 billion dollars today. She is one of seven trustees of Tulip Trust 1 by virtue of her control over Panopticrypt Pty Ltd (ECF No. [222] at ¶¶ 7e, 11), one of the "primary beneficiaries" of Tulip Trust 2 (*id.* at ¶20), and is the "Appointer" of Tulip Trust 2 (ECF No. [237-22] at 2). These bitcoin constitute part of the wrongfully stolen bitcoin that belong to Plaintiffs. Accordingly, Ramona's knowledge regarding all aspects of the trust is both relevant and critical to proving Plaintiffs' case at trial.

Finally, Craig admits she's an important witness and identified her in his initial disclosures as an individual with knowledge of the core facts underlying Plaintiffs' claims, *e.g.*, stating that she has knowledge of the Defendant's "ownership of certain bitcoins referred to in the amended complaint."

For these reasons, Plaintiffs need oral testimony from Ms. Watts that covers the following three subjects:

1. Her educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications)

2. Non-privileged statements made by the Defendant about W&K Info Defense Research, LLC, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, his and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the

---

[1] Plaintiffs asked Defendant if, to save the Court, parties, and counsel the time and expense of this motion practice, he'd agree to facilitate answers to discovery requests issued to his wife under the Federal Rules of Civil Procedure. As is his right, Defendant has not agreed, necessitating this motion practice.

8

bitcoins/intellectual property at issue in this litigation, Uyen Nguyen, the ATO investigations, and the business deal with MacGregor, Matthews, and Ayre.

3. Her knowledge of the issues in No. 2 above through other means, including through review of relevant documents.

Plaintiffs are also requesting the following four categories of documents that are relevant to Plaintiffs claims, and will contain important admissions that are necessary to prove Plaintiffs' claims at trial:

1. All documents and communications between Ms. Watts and Dave Kleiman.

2. All documents and communications between the Defendant and Ms. Watts that predate her marriage to the Defendant and relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

3. All documents and communications, dated prior to February 14, 2018, between Ms. Watts and either (i) Robert MacGregor, (ii) Stefan Matthews, (iii) Calvin Ayre, (iv) or their agents that relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

4. All documents and communications, dated prior to February 14, 2018, between Ms. Watts and Andrew O'Hagan that relate to W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, or the Tulip Trusts.

### Robert MacGregor

Robert MacGregor is Craig's business partner, and is one of the first individuals to be privy to the details surrounding Craig and Dave's creation of Bitcoin, mining and owning millions of bitcoin, and co-creating valuable intellectual property. (ECF No. 83-1 at 12.) On or about June 29, 2015, Craig and Mr. MacGregor struck a deal that included transferring the life rights to Satoshi Nakamoto, the partnership directly in dispute in this case. (*Id.*; Ex. 3 at 429:3-9, 429:21-430:11). Additionally, as part of this deal, MacGregor paid the Defendant approximately $15 million to purportedly transfer intellectual property (including those at issue in this case) to a company MacGregor owned. (Ex. 5, DEF_00073807.) Indeed, documents produced by Craig demonstrate Mr. MacGregor was directly involved in "transfer[ing]" and "protecti[ing]" the intellectual

9

property at issue in this litigation. (Ex. 6 (Mr. Matthews saying he would discuss the details with Mr. MacGreggor).) These documents demonstrate that MacGregor was working on this deal in concert with Stefan Matthews and Calvin Ayre (*See e.g.* Ex. 7, DEF_00074731 (MacGregor emailing Mr. Ayre and Craig and indicating that initial term sheet and development agreement are in place and stating "[i]t's been a pleasure being part of the process and I have no doubt that this is the beginning of something absolutely remarkable; Ex. 8, DEF_00074716 (Craig emailing Mr. MacGreggor, Mr. Matthews, and Mr. Ayre discussing the need to "start filing patents").)

Further, it appears that Mr. MacGregor has intimate knowledge of the trusts potentially controlling the over 1.1 million bitcoin at issue in this litigation. In email correspondence with Craig, he discussed, asked, and received answers for detailed questions about how the trusts worked. (ECF No. 237-18; Ex. 9, DEF_00023290).

Based on email communications with Craig, Mr. MacGregor is aware of details surrounding Ms. Uyen Nguyen that haven't been shared with Plaintiffs. (Ex. 10, DEF_00022414\ ("We discussed the various options with Uyen this afternoon after the PR session. There are no good options *for reasons we all know*.") (emphasis added).) Ms. Nguyen worked intimately with Craig in deceiving the ATO (ECF No. [191-3]), defrauding Plaintiffs (ECF No. [83] at ¶¶138-39), was intimately involved in the tulip trusts (Ex. 11 at DEF_00050989; ECF No. [237-18] at 5-8), and is perhaps one of the most important witnesses in this case, but whom has disappeared, and Craig has alleged he hasn't communicated with her since 2016 (Ex. 2 at 299:16-18).

MacGreggor also compiled a "who knows what list" about who knew details surrounding Craig and Dave being Satoshi Nakamoto. (Ex. 12, DEF_00022650.)

Consequently, the details surrounding the sale of IP, Satoshi Nakamoto's life rights, the Tulip Trusts, Uyen Nguyen, and the statements and documents provided to Mr. MacGregor in

connection with that transaction and these subjects demonstrate that MacGregor's testimony is relevant to Plaintiffs claims and critical to proving them and defining the damages Plaintiffs are owed and the extent of the Defendant's unjust enrichment through property belonging to the estate.

Accordingly, Plaintiffs move this Court for letters rogatory to obtain testimony and documents that are relevant to Plaintiffs' claims and for purposes of proving their claims at trial. Specifically, Plaintiffs seek oral testimony from MacGregor on the following two subject areas:

1. His educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications)

2. Statements made by Defendant, Ms. Watts, and Defendant's agents (including Matthews and Ayre) that relate to W&K Info Defense Research, LLC, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, his and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

Plaintiffs are also requesting the following three categories of documents that are relevant to Plaintiffs claims, and will contain important admissions that are necessary to prove Plaintiffs' claims at trial:

1. All documents and communications between MacGregor and Defendant or Ms. Watts that mention W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

2. All documents and communications between MacGregor and either Matthews or Ayre that mention W&K Info Defense Research, Dave Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant and/or Dave's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO investigations, Uyen Nguyen, and the business deal with MacGregor, Matthews, and Ayre.

11

3. All documents reviewed by MacGregor, Matthews, and Ayre (or companies they represent) to conduct due diligence over the deal with Defendant, that were created for purposes of facilitating that deal, and the "who knows what list" referenced above.

## I. ARGUMENT

"Letters rogatory are the means by which a court in one country requests a court of another country to assist in the production of evidence located in the foreign country." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1273 (11th Cir. 2015).

This Court has both inherent and statutory authority to issue letters rogatory. *DBMS Consultants Ltd. v. Computer Assocs. Int'l, Inc.*, 131 F.R.D. 367, 369 (D. Mass. 1990) ("It is settled that the courts have inherent authority to issue letters rogatory."); Fed. R. Civ. P. 28(b); 28 U.S.C. § 1781(b).

Rule 28(b) of the Federal Rules of Civil Procedure specifically allows for depositions to be taken in foreign countries "under a letter of request,[2] whether or not captioned a 'letter rogatory.'" Further, the rule provides that a letter of request may be issued: 1) "on appropriate terms after an application and notice of it;" and 2) "without a showing that taking the deposition in another manner is impracticable or inconvenient." Fed. R. Civ. P. 28(b)(1)-(2). Likewise, 28 U.S.C. § 1781 specifically allows for "the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner." 28 U.S.C. § 1781(b)(2).

This Court also has authority to issue letters of request pursuant to the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), T.I.A.S.

---

[2] "The term 'letters rogatory' is synonymous with the term 'letter of request.'" *Lantheus Medical Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 775 n. 5 (S.D.N.Y. 2012); Fed. R. Civ. P. 28(b)(1)(B) (providing that a deposition may be taken in a foreign country "under a letter of request, whether or not captioned a 'letter rogatory.'").

12

7444, 23 U.S.T. 2555; *see Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. Of Iowa*, 482 U.S. 522, 541 (1987). The Hague Convention, of which both the United Kingdom and the United States are signatories,[3] provides the mechanism for the taking of evidence abroad in civil or commercial matters. *Societe Nationale*, 482 U.S. at 524. "[R]esort to the Hague Evidence Convention is particularly appropriate where, as here, a litigant seeks to depose a foreign non-party who is not subject to the court's in personam jurisdiction. *In re Chiquita Brands Int'l, Inc.*, No. 07-60821-CV, 2015 WL 12601043, at *8 (S.D. Fla. Apr. 7, 2015); *see also S.E.C. v. Leslie*, Case No. 07-03444, 2009 WL 688836, at *3 (N.D. Cal. March 16, 2009) ("Application for a letter rogatory to take testimony pursuant to the Hague Evidence Convention is an appropriate mechanism for obtaining discovery of a non-party witness in a foreign country." (internal quotations omitted)).

In considering the issuance of letters rogatory, U.S. courts apply the relevance and proportionality standards of Rule 26 of the Federal Rules of Civil Procedure. *Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *3 (S.D.N.Y. June 13, 2018). "Courts routinely grant motions for letters rogatory where the movant has made a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence." *Netherby Ltd. v. Jones Apparel Grp., Inc.*, Case No. 04-CIV-7028, 2005 WL 1214345, at *1 (S.D.N.Y. 2005); *see, e.g., In re Chiquita Brands Int'l, Inc.*, 2015 WL 12601043, at *8; *Villella*, 2018 WL 2958361, at *3 (granting defendant's request for letters rogatory to take testimony in the United Kingdom); *Elliott Assocs.*, 1997 WL 436493, at *2–*3 (S.D.N.Y. 1997) (granting plaintiff's request for letters rogatory to take testimony in the United Kingdom). "Although the party seeking

---

[3] *See* Hague Convention, Art. 42 (showing United States and United Kingdom are Contracting States).

the application of the Hague Convention procedures bears the burden of persuasion, that burden is not a heavy one." *Villella*, 2018 WL 2958361, at *3 (internal citations and quotations omitted). Here, Plaintiffs are seeking documents and testimony directly related to discovery of critical facts necessary for presenting his case at trial.

Furthermore, because of the significant sums of money and valuable intellectual property at stake in this matter, the request is proportional to the needs of the case. *See Villella*, 2018 WL 2958361, at *8 ("Because there is no dispute that the discovery Defendant seeks is relevant . . . and because significant sums of money are at stake in this matter, the Court finds that the request is relevant and proportional to the needs of the case.").

Finally, Courts in the United Kingdom will enforce a letter of request issued by this Court if the "court is satisfied" that the "requesting court [is] exercising jurisdiction . . . in a country or territory outside the United Kingdom; and "that the evidence [sought] is to be obtained for the purposes of civil proceedings which . . . have been instituted before the requesting court . . ." (Ex. 13 ¶¶ 55-56, *citing* parts 1 and 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975.)

When analyzing a specific request, the English courts will examine the "width of the request" to make sure that it's not "oppressive to the witness." Id. at ¶66. They will also make sure that the request seeks "relevant" evidence, *i.e.*, that "the witness can reasonably be expected to have relevant evidence to give on the topics mentioned in the schedule of request," and that "the intention . . . of these topics is an intention to obtain evidence for use at the trial . . ." Id. at ¶¶ 68-69.[4] That said, as a matter of international comity, the English courts will defer to the relevance determination of the requesting court, so that

---

[4] Id. at ¶71 ("There are numerous authorities which confirm that the examination must be confined to eliciting relevant evidence for trial and cannot extend to US style oral discovery by deposition.)".

> If an examination of the terms of the [letter of request] . . . shows that the matter has been considered on the merits by the requesting court, and the topics found by it to be relevant, then the English Court should respect that determination because the requesting court is in the best position to judge relevance.

*Id.* at ¶80; *see also, Id.* at ¶¶72-79. The English court will only review this Court's determination of relevance if "it is plain (and, I emphasize, plain) that the requesting court has not considered the question of relevance . . .". *Id.* at ¶83.[5]

## II.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests (1) that the Court review, approve, and sign the proposed letter of request attached as Exhibit 1; (2) that the Clerk of this Court authenticate the Court's signature under the seal of this Court; and (3) that the letter of request thereafter be returned to Plaintiff's counsel of record.[6]

## <u>S.D. FLA. L.R. 7.1 CERTIFICATION</u>

Pursuant to S.D. Fla. L.R. 7.1(a)(3), counsel for Plaintiffs conferred with counsel for Defendant who take no position with respect to the relief requested.

---

[5] Id. at ¶96. ("In my judgment it is apparent from the LORs that Judge Furman considered the question of relevance for himself and was satisfied that the topics on which the Applicants are to be examined are relevant to the issues arising in the US Proceedings. He did not merely rubber stamp the Plaintiffs' assertion that the topics were relevant. In those circumstances, it would be contrary to comity, and to the proper approach indicated by the cases that I discussed earlier in this judgment, for me to embark upon a process of trying to second guess whether he was right or wrong in his determinations.")

[6] Upon receipt of the Letter of Request from the Clerk of Court, Plaintiff will promptly cause the Letter of Request to be transmitted to the Competent Authority in conformity with Article 1 of the Hague Convention and pursuant to the laws of the United Kingdom. Plaintiff stands ready to reimburse the Court and/or the judicial authorities of the United Kingdom for any expenses incurred in connection with the execution of this Letter of Request.

Dated: July 19, 2019

Respectfully submitted,

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.
*Admitted Pro Hac Vice*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
kroche@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal
Representative of the Estate of David Kleiman
and W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 19, 2019, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being

served this day on all counsel of record via transmission of Notices of Electronic Filing generated

by CM/ECF.

*/s/ Velvel (Devin) Freedman*
VELVEL (DEVIN) FREEDMAN

16

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al.*,

     Plaintiffs,

v.

CRAIG WRIGHT,

     Defendant.

_____/

### ORDER

**THIS CAUSE** is before the Court upon Defendant Craig Wright's Motion for Judgment on the Pleadings, ECF No. [144] ("Motion"). The Court has reviewed the Motion, all supporting and opposing submissions, the record and applicable law, considered the arguments presented by counsel at the hearing on July 10, 2019, and is otherwise fully advised. For the reasons that follow, the Motion is denied.

### I.   BACKGROUND

The factual background giving rise to this action has been set forth previously in prior opinions issued by this Court and are incorporated by reference. *See e.g.* ECF No. [68]. The facts relevant to the instant Motion are as follows. On April 15, 2019, the Defendant filed the instant Motion challenging the Court's subject matter jurisdiction. Specifically, the Defendant argues that the record evidence demonstrates that Dave Kleiman was not the sole member of Plaintiff W&K Info Defense Research, LLC ("W&K"), and that other members of the company exist whose membership would destroy diversity. The other proposed members include: 1) Uyen Nguyen ("Nguyen"); 2) Coin-Exch PTY Ltd. ("Coin-Exch"); and 3) Lynn Wright.

Case No. 18-cv-80176-BLOOM/Reinhart

Further, the Defendant argues that the Second Amended Complaint ("SAC"), ECF No. [83], is deficient because it alleges that both that W&K's exact ownership structure is "unclear due to Craig's contradictory statements" and that "[a]s best as can presently be discerned, [Dave Kleiman] was the sole 'member' of W&K." ECF No. [83], at ¶¶ 70-71. Therefore, the Defendant challenges the Court's subject matter jurisdiction in both a factual and facial attack. On July 10, 2019, the Court held an extensive hearing ("Hearing") on the instant Motion.

## II.    LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). It is presumed that a federal court lacks jurisdiction in a particular case until the plaintiff demonstrates the court has jurisdiction over the subject matter. *See id.* (citing *Turner v. Bank of No. Am.*, 4 U.S. 8, 11 (1799); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 182 (1936) ("It is incumbent upon the plaintiff properly to allege the jurisdictional facts ....")). A district court may inquire into the basis of its subject matter jurisdiction at any stage of the proceedings. *See* 13 C. WRIGHT, A. MILLER & E. COOPER, Federal Practice & Procedure § 3522 (1975).

Attacks on subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either facial or factual. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Like a Rule 12(b)(6) motion, "[a] 'facial attack' on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in the complaint are taken as true...." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Factual attacks differ because they "challenge[ ] the existence of subject matter jurisdiction in fact ... and matters outside of the pleadings, such as testimony and affidavits, are

2

Case No. 18-cv-80176-BLOOM/Reinhart

considered." *Id.* If a defendant shows a lack of diversity by meeting its burden of production for a factual attack, then the plaintiff must respond with proof definitively evincing diversity exists. *See OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). Factual attacks also differ from facial attacks because "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891.

## III.    DISCUSSION

In the instant Motion, the Defendant argues that the SAC should be dismissed because the Court lacks subject matter jurisdiction over this action. Federal district courts have subject matter jurisdiction over civil actions where the amount in controversy exceeds $75,000.00 and the suit is between citizens of different states. *See* 28 U.S.C. § 1332(a). In analyzing diversity, the citizenship of a limited liability company is determined by the citizenship of its members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (requiring all LLC members to be diverse from all opposing parties). In the Defendant's Motion, he asserts a factual challenge on subject matter jurisdiction. However, in his Reply, the Defendant has focused on a facial challenge. *Compare* ECF No. [144], at 9-14 *with* ECF No. [171], at 5. As for his factual attack, the Defendant suggests that other foreign members of W&K exist and thus diversity jurisdiction is destroyed. ECF No. [144], at 9-14. As for the Defendant's facial argument, the Defendant contends that the SAC fails to allege the complete membership of W&K and includes language that reveals that the Plaintiff may be uncertain as to the company's actual ownership. ECF No. [171], at 5. Thus, the Defendant claims that the SAC is facially deficient by failing to adequately allege diversity jurisdiction exists. The Court addresses each argument in turn.

Case No. 18-cv-80176-BLOOM/Reinhart

### a) *Factual Attack*

Defendant first focuses his factual attack on the Court's subject matter jurisdiction. "While the plaintiff has the burden to prove diversity in a factual attack, that burden exists only if the defendant has first proffered evidence to show a lack of diversity." *JPMCC 2005-CIBC13 Collins Lodging*, 2010 WL 11452084, at *3 (denying motion because defendant's "factual attack on diversity of citizenship is *devoid of evidentiary support*") (emphasis added); *see also RG Martin Investments, LLC v. Virtual Tech. Licensing, LLC*, 2017 WL 7792564 at *2 (S.D. Fla. July 7, 2017) ("The burden of pleading diversity of citizenship is upon the party invoking federal jurisdiction, and if jurisdiction is *properly challenged*, that party also bears the burden of proof.") (emphasis added). For the reasons that follow, the Court finds that the Defendant has failed to provide *credible* evidence showing a lack of diversity. As such, he has failed to satisfy his burden of production.

In his Motion, Defendant argues that both Nguyen and Coin-Exch were members of W&K, and that their membership would destroy diversity in this action. ECF No. [144], at 11-13. Then, for the first time in his Reply, the Defendant argues that his ex-wife Lynn Wright was also a member of W&K. ECF No. [171], at 6-7.

> *"Oh! What a tangled web we weave when first we practice to deceive."*
> **Sir Walter Scott, Marmion (1808).**

This is not the first time that the Defendant has made certain representations regarding the membership of W&K. Indeed, the Court notes that the Defendant has made *several conflicting statements* regarding even his own ownership of W&K. ECF No. [256], at 29:24-25 ("Judge, I get that there are a number of different statements by Dr. Wright.")

4

Case No. 18-cv-80176-BLOOM/Reinhart

These statements include:

On **April 2, 2013**, the Defendant signed a contract, representing that Dave Kleiman is **100% owner** of W&K, which was filed before the Supreme Court of New South Wales. ECF No. [83-5], at 1.

On or about **July and August of 2013**, the Defendant filed a sworn affidavit in the Supreme Court of New South Wales declaring that he and Dave Kleiman each **owned 50%** of W&K. ECF No. [83-4], at 4.

On **April 16, 2018**, in a sworn affidavit the Defendant stated that he has "**never** been a member of W&K." ECF No. [12-2], at ¶ 12 (emphasis added).

On **June 28, 2019**, during his deposition the Defendant testified under oath that he has "**no idea**" who the owners of W&K were, and unequivocally stated that he was not an owner of W&K. *See* ECF No. [242-1], at (233:12-14) ("Q: Who owned W&K in reality? A. Not me.") and (233:22-23) ("Q. You have no idea who owns W&K? A. I do not know that.").

Now, in his Motion and contrary to the statements above, the Defendant argues that three additional parties may be members of W&K. Defendant claims that the record evidence supports the presence of the additional members. ECF No. [144], at 11-14. The Defendant recognizes, in both his Motion and at the Hearing, that in determining whether the Defendant has sufficiently challenged subject matter jurisdiction on a factual attack, the Court is "free to weigh the evidence" presented by the Defendant in his challenge. ECF No. [144], at n.3 (citing *RG Martin Inv., LLC v. Virtual Tech. Licensing, LLC*, 2017 WL 7792564, at *2); ECF No. [256], at 12:14 ("[M]y obligation is—initially to put this in play, is to show the Court evidence. The Court can weigh the evidence."). The Court has thus conducted a careful review of the evidence presented by the Defendant and the record in this case, and finds, however, that the Defendant has failed to present any *credible* evidence showing that any of the parties he suggests are *members* of W&K.

### i) Uyen Nguyen & Coin-Exch

In his Motion, the Defendant argues that Nguyen, a Vietnamese national, is a member of W&K and Coin-Exch, an Australian corporation, is a member of W&K. ECF No. [144], at 11-13.

Case No. 18-cv-80176-BLOOM/Reinhart

Because Nguyen is a foreign national and Coin-Exch is a foreign corporation, Defendant asserts that their membership in W&K destroys diversity jurisdiction. *Id.* At the time the Defendant filed his Motion, the Defendant's evidentiary support for these assertions included emails between Dave Kleiman, Craig Wright, and Lynn Wright, public filings available on the Florida Department of State Division of Corporations ("Sunbiz"), and several letters from Ira Kleiman to the Australian Tax Office ("ATO").

As for the emails, which were between Nguyen and Dave Kleiman, the Defendant claimed it evidenced Dave Kleiman extending an offer to serve as a "director" of W&K to Nguyen. ECF No. [144-1]. Three days after the instant Motion was filed, the Defendant filed a Notice Withdrawing Exhibit A. ECF No. [154] (the "Notice"). In the Notice, the Defendant indicated that Exhibit A was being withdrawn because the Defendant could not "verify the date of the email exchange." ECF No. [154]. At the Hearing, the Defendant also withdrew another exhibit (Exhibit F), ECF No. [144-6], attached to his Motion, which was an additional email exchange between Dave Kleiman and Nguyen for the same reasons presented in his Notice. ECF No. [256], at 39:6-9 ("We're not relying on [Exhibit F] ... I would withdraw it now."). In their Response to the Motion, Plaintiffs argued that Exhibit A was a forged email which came to light as a result of the public exposing it as a fraud. ECF No. [159], at 6-11. Specifically, the Plaintiffs claim Exhibit A was withdrawn after members of the public uncovered that the "PGP signature"[1] of the email, purported to be authored/sent by Dave Kleiman, was created *a year after his death. Id.* at 6-7. Nonetheless, because the Defendant has now withdrawn each of these exhibits[2] the Court will not consider either for the purposes of this Motion.

---

[1] "PGP" stands for "Pretty Good Privacy" and is a computer software program that allows a user to "encrypt and decrypt data such as emails, files, or documents." ECF No. [159], at 10.

[2] The Court also notes that the emails in question were produced by the Defendant during discovery. The Defendant, however, is not the sender, recipient, nor copied to the emails. At the Hearing, given that the

Case No. 18-cv-80176-BLOOM/Reinhart

As for the Sunbiz filings, the Defendant contends that the March 28, 2014, Sunbiz filing evidences that Nguyen and Coin Exch were members, because Nguyen listed herself as the registered agent and "MS," and Coin Exch as "DR." *Id.* At the Hearing, the Defendant argued that "DR" stood for "director" but that there was some ambiguity as to what "MS" possibly meant. Defendant claims that "M" could be an abbreviation for "manager," however, it could also stand for "member." ECF No. [256], at 35:13-16 ("But Judge, for the purpose of this discussion, we can think of 'M' as manager. But I just want to suggest to the Court the way the State sets this up there's an ambiguity and it could also mean member.").

Taking the 2014 Sunbiz filing at face value, it cannot be discerned that Nguyen nor Coin-Exch were listed as members of W&K. Indeed, in the March 2014 Sunbiz filing, Nguyen solely listed herself as W&K's "registered agent" and "MS." ECF No. [83-25]. Nguyen further listed Coin Exch as holding the position of "DR." *Id.* Sunbiz provides a "Title Abbreviations" index for the public to utilize. *See* ECF No. [159-3]. This index states that the list of abbreviations is not exhaustive and further, that other abbreviations "may be used that are not identified." However, the index provides that the listed abbreviations can hold the following meanings: 1) M = Manager; 2) S = Secretary; and 3) D = Director. ECF No. [159-3], at 3-4. Therefore, the evidence the Defendant attempts to utilize to support the additional membership of Nguyen and Coin-Exch in W&K is completely speculative in nature.

Concerning the May 1, 2014, letter from Ira Kleiman to the ATO, this document evidences solely Ira Kleiman's belief that Nguyen was a director of W&K. *See* ECF No. [144-7], at 2 ("I understand that Ms[.] Nguyen was appointed as a director [of W&K]."). Even the Defendant

---

Defendant claims he has not been in contact with Nguyen "in years," the Court questioned how the Defendant came into possession of the emails. The Defendant claimed he received them as "records" from companies when he left Australia.

testified during his deposition that he understood Nguyen to be the director and not the manager of W&K. *See* ECF No. [246-1] (287:24-288:1) ("Q. Are you aware of any role [Nguyen] played with W&K? A. I believe she was a director."). For purposes of diversity jurisdiction, it is the citizenship of an LLC's members—not its managers—that is relevant. *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1324 (S.D. Fla. 2018) (Martinez J.) (citing *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).

The Defendant also argues that the Court should look at the extrinsic evidence to demonstrate that Nguyen is a member of W&K. Specifically, he cites her reinstatement of W&K and the payment of the annual fees in 2014. ECF No. [171], at 7-8. The Court first notes that these filings occurred after Dave Kleiman's death. Further, it is disputed by the parties whether Nguyen or Coin-Exch were even authorized to file on behalf of W&K after Dave Kleiman's death. As such, the "extrinsic evidence" that the Defendant argues should be considered in his factual attack relating to whether Nguyen and Coin Exch were members of W&K is simply not credible. The Defendant also contends that Ira Kleiman did not have the authority to remove Nguyen and Coin-Exch as members of W&K. ECF No. [144], at 13. Because the Court finds that no credible evidence has been presented that Nguyen and Coin-Exch were even members of W&K it need not address this argument.

The evidence proffered by the Defendant is insufficient to meet his burden of production. If the evidence proffered is representative of anything, it does nothing more than represent that other people/entities held officer positions within the company. It does not evidence that W&K had other members.

Case No. 18-cv-80176-BLOOM/Reinhart

### ii) Lynn Wright

For the first time and in his Reply, the Defendant argues that his ex-wife, Lynn Wright, may also be a member of W&K. ECF No. [171], at 6-7. As evidence of Lynn Wright's membership, the Defendant proffered a February 16, 2011, email between Dave Kleiman, Lynn Wright, and the Defendant. *See generally* ECF No. [157-2]. At the Hearing, the parties disputed whether the email exchange was truly between Dave Kleiman, the Defendant, and Lynn Wright, or just Dave Kleiman and the Defendant due to the varying names that appear in the sender, recipient, and courtesy copy lines of the emails. The sum and substance of the email exchange includes the inquiry by Dave Kleiman as to whether he could list "you as mgr or mgrm with a foreign address." *Id.* at 2. First, the Court notes that it is unclear whether this question was directed to the Defendant or Lynn Wright.  Second, the email chain does not show the response by either the Defendant or Lynn Wright to this question. *See generally id.*

As for the parties surmising what Dave Kleiman intended, even the Defendant's counsel conceded at the Hearing that interpretation of these emails was "extremely speculative." *See* ECF No. [256], at 94:18-21 (". . . the series of emails is interpretations which are extremely speculative, about what was in David Kleiman's head."). Nonetheless, this email does not demonstrate what ultimately occurred. Indeed, upon the first registration of W&K as a limited liability company in Florida, Dave Kleiman listed himself as the "mgrm," the managing member. *See* ECF No. [83-3].

Further, in the Defendant's June 14, 2019 sworn affidavit, the Defendant identified "all potential witnesses relevant to this lawsuit." ECF No. [33-3], at ¶ 20. Of note is that while the Defendant now claims that this email evidences that his then wife Lynn Wright was a member of W&K, he did not list her as a relevant witness at that time. *Id.* Then at his April 4, 2019 deposition, the Defendant testified that he had no idea who owned W&K. *See* ECF No. [242-1], at 22-23 ("Q.

9

Case No. 18-cv-80176-BLOOM/Reinhart

You have no idea who owns W&K? A. I do not know that."). Similar to the claims made relating to Nguyen and Coin-Exch, the Defendant fails to proffer any credible evidence challenging the Court's subject matter jurisdiction.

At the Hearing, Defendant argued that the Court cannot both rely upon and find that the statements and evidence provided by him are untrue. *See* ECF No. [256], at 100:6-9 ("Judge, if everything's a lie, then the stuff they rely on when Wright files a contract, or when Wright makes a statement, can't be credited either."). Here, Defendant's argument is novel. He seems to argue that even though his numerous conflicting statements are the very reason confusion has been created as to the ownership of W&K, the Court should nonetheless use these statements as a basis to challenge the Court's subject matter jurisdiction. In essence, the Defendant uses the evidence proffered as both his sword and his shield. Unfortunately, the record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court. In weighing the evidence, the Court simply does not find the Defendant's testimony to be credible. As for the remaining "extrinsic evidence," none of the evidence demonstrates additional membership in W&K other than Dave Kleiman.

Accordingly, the Court finds that the Defendant's assertions in his Motion are insufficient as he has failed to provide any credible evidence showing a lack of diversity. While the plaintiff has the burden to prove diversity in a factual attack, that burden exists only if the defendant has first proffered evidence to show a lack of diversity. *See OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). The Defendant has utterly failed in his burden of production.

### b) Facial Attack

As for his facial attack, Defendant argues in his Reply that the SAC insufficiently alleges the citizenship of the parties. ECF No. [171], at 5. A complaint survives a facial attack on subject

matter jurisdiction if the plaintiff's allegations, which are taken as true, sufficiently provide a basis for subject matter jurisdiction. *See Menchaca*, 613 F.2d at 511. As a limited liability company, W&K's citizenship is determined by the citizenship of its members. The SAC alleges that the "exact ownership structure [of W&K] is unclear due to Craig's contradictory statements." ECF No. [83], at ¶ 70. However, the SAC then alleges in the next paragraph that "[a]s best as can presently be discerned, Dave was the sole 'member' of W&K." *Id.* at ¶ 71. During the Hearing, Plaintiff argued that the SAC was drafted to reflect that the only possible members of W&K could have been the Defendant or Dave Kleiman. ECF No. [256], at 84:17-22 ("And so we were just being careful, saying: "Look, as best as can be discerned, based on everything we have, on our information and belief, and on all the evidence available to us, [publicly] available and privately available, Dave Kleiman was the sole member."). Since the initiation of this case, however, the Defendant has unequivocally affirmed in a sworn affidavit that he has "never been a director, member, shareholder, officer, employee, or representative of W&K." ECF No. [12-2], at ¶ 12. A "[c]ourt may dismiss the complaint based on a facial challenge only if it is clear that no relief could be granted *under any set of facts that could be proven consistent with the allegations*." *World Fuel Servs., Inc. v. Pan Am World Airways Dominicana, S.A.*, No. 18-20321-Civ, 2018 WL 3730903, at *2 (S.D. Fla. Apr. 17, 2018) (Torres, J.) (emphasis added) (quoting *Hames v. City of Miami*, 479 F. Supp. 2d 1283-84 (S.D. Fla. 2007)).

Here, the Court is cognizant of the Defendant's argument that the SAC includes an allegation that the exact ownership structure of W&K is "unclear." However, by the Defendant's own admission, he was not an owner nor a member of W&K. Thus, any ambiguity in the SAC is easily dispelled. Further, the SAC also directly states that Dave Kleiman was the "sole owner" of

Case No. 18-cv-80176-BLOOM/Reinhart

W&K. As such, the Court concludes that the SAC survives the facial attack related to the Court's

diversity jurisdiction.

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [144]**, is

**DENIED**.

**DONE AND ORDERED** in Chambers, at Miami, Florida, on August 15, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

## SUPPLEMENTAL AFFIDAVIT OF DR. MATTHEW J. EDMAN

1

I, Dr. Matthew J. Edman, declare under penalty of perjury, as follows:

## I.    SUMMARY OF OPINION

1.    In my previous affidavit (ECF No. [159-9]) that I submitted in response to Defendant's Motion for Judgment on the Pleadings (ECF No. [144-1]), I determined that Exhibit A to that Motion (ECF No. [144-1], hereafter referred to as "Exhibit A") was likely created from an email the Defendant sent to himself on or about April 16, 2014 (UTC), which was then converted to a PDF and modified to appear to have been sent from "Dave Klieman (*sic*)" to Uyen Nguyen on or about December 20, 2012. I also determined that Exhibit A contained a PGP signature allegedly created by Dave Kleiman on or about March 12, 2014 – almost a year after he died.

2.    Since the submission of my previous affidavit, I have conducted further analysis of Exhibit A and identified additional forensic artifacts contained within the PDF itself that support my previous opinion. I have also conducted a forensic analysis of Exhibit F to Defendant's Motion for Judgment on the Pleadings (ECF No. [144-6], hereafter referred to as "Exhibit F") and determined that it was created by further modifying Exhibit A to make it appear as if Exhibit F is actually a separate email sent from Dave Kleiman to Uyen Nguyen, when, in my opinion, it is simply another revision to the PDF created from an email the Defendant sent to himself on or about April 16, 2014.[1]

3.    In sum, Exhibit A and Exhibit F, which appear to be emails sent from Dave Kleiman to Uyen Nguyen on December 20, 2012, are manipulations of a PDF created from an email the Defendant sent from himself to himself on or about April 16, 2014.

---

[1] I understand Exhibit A was subsequently withdrawn by the Defendant "because he cannot verify the date of that email exchange." To my knowledge, Exhibit F has not been withdrawn by the Defendant.

## II.   EXHIBIT A

4.      As described in my previous affidavit, Exhibit A is a PDF document that purports to be an email sent from "Dave Klieman (*sic*)" to Uyen Nguyen on or about 8:19:03 AM on Thursday, December 20, 2012. The metadata associated with the PDF, however, indicates the PDF was created on or about April 17, 2014 at 8:23:41 AM using Acrobat PDFMaker 11 for Microsoft Outlook on a computer whose time zone was consistent with Sydney, Australia (UTC+10), and then modified less than five minutes later. I have further analyzed the internal contents and structure of the PDF, and have now identified those specific portions of the PDF that were edited after the PDF was created.

5.      In general, when the text within a PDF document is modified using Adobe Acrobat, the software automatically adds a "marked-content point" (indicated by an "MP" operator in the PDF's internal document structure) and is labeled "TouchUp_TextEdit" to indicate the marked-content point was created using Adobe Acrobat's "Touch Up" text editing feature. The modified text is also often represented using a sequence of 4-digit "codes," each of which is mapped to a particular character to display in a PDF reader. For example, in the PDF associated with Exhibit A, the 4-digit code "0027" corresponds to an uppercase "D".

6.      I identified a "TouchUp_TextEdit" marked-content point in the PDF file associated with Exhibit A which indicated that the text associated with the "From:", "To:", and "Date:" fields at the top of Exhibit A were edited. Figure 1 shows an excerpt from the internal structure of Exhibit A with line numbers added for reference. Line 1 shows the "TouchUp_TextEdit" marked-content point, which indicates that what follows has been modified. The text highlighted in red on Lines 6, 8, 17, 21, and 27 contain the modified text. Figure 2 provides a screenshot of how the corresponding text object appears in a PDF reader, with the modified characters highlighted in red.

3

345

**FIGURE 1.** Excerpt from the source code contained within Exhibit A indicating where changes were made in the header for Exhibit A (highlighted in red).

```
1.    /TouchUp_TextEdit MP
2.    BT
3.    /CS1 cs 0 0 1  scn
4.    /C2_0 7.5 Tf
5.    155.85 771.598 Td
6.    <0027004400590048000300
2E004F004C0048005000440051>Tj
7.    0 -10.5 TD
8.    <0038005C004800510003003003
1004A0058005C004800510003000
B0058005C004800510011001
00510004A0058005C004800510057
0023005C004400048005200520011
004600520050000C>Tj
9.    /CS0 cs 0  scn
10.   /TT1 7.5 Tf
11.   T*
12.   (Apppointment letter)Tj
13.   T*
14.   (Thursday, )Tj
15.   /C2_0 7.5 Tf
16.   35.226 0 Td
17.   <00150013>Tj
18.   /TT1 7.5 Tf
19.   ( )Tj
20.   /C2_0 7.5 Tf
21.   <002700480046004800500045004
50048005005>Tj
22.   /TT1 7.5 Tf
23.   44.07 0 Td
24.   ( 201)Tj
25.   /C2_0 7.5 Tf
26.   14.626 0 Td
27.   <0015>Tj
28.   /TT1 7.5 Tf
29.   ( 8:19:03 AM)Tj
30.   ET
```

**FIGURE 2.** Screenshot of the rendered text object from Figure 1 with the corresponding text modifications again highlighted in red.

| From:    | Dave Klieman |
|----------|--------------|
| To:      | Uyen Nguyen (uyen.nguyent@yahoo.com) |
| Subject: | Apppointment letter |
| Date:    | Thursday, 20 December 2012 8:19:03 AM |

4

## III.  EXHIBIT F

7.  Exhibit F is alleged by the Defendant to be a second email from "Dave Klieman (*sic*)" to Uyen Nguyen sent less than an hour after Exhibit A in which Dave is purportedly thanking Nguyen for accepting a position as director of W&K Info Defense Research LLC.

8.  The version of Exhibit F filed by the Defendant does not bear a Bates label. DEF_00027288 was produced in this litigation by the Defendant and is visually identical to Exhibit F. I used the PDF file produced as DEF_00027288 in my analysis below.

9.  I determined that Exhibit F is a derivative of Exhibit A – which itself was based on an email sent from the Defendant to himself. Further, I have determined that Exhibit F contains additional modifications to the "Date:" field, as well as modifications to the body of the alleged email itself.

10.  As described in my previous affidavit, PDF files often contain metadata which provide information about the document, such as who created it and when, as well as when it was last modified. The metadata contained within the PDF files associated with Exhibit A and Exhibit F also contain "DocumentID" and "InstanceID" attributes. "DocumentID" is an identifier used to associate multiple versions or revisions of a particular document, whereas "InstanceID" is a unique identifier assigned to a specific version or revision of that document.

11.  As shown in Figures 3 and 4, Exhibit A and Exhibit F contain the same DocumentID but different InstanceID values, which indicates that they are both versions of the same original document. The metadata further shows that Exhibit A and Exhibit F were both created on the exact same date (as shown by the CreateDate fields), but the ModifyDate fields indicate that someone modified Exhibit F approximately five minutes after Exhibit A was last modified.

**FIGURE 4.** PDF metadata extracted from Exhibit A.

```
1 0 obj
<</Length 3320/Subtype/XML/Type/Metadata>>stream
<?xpacket begin="ï»¿" id="W5M0MpCehiHzreSzNTczkc9d"?>
<x:xmpmeta xmlns:x="adobe:ns:meta/" x:xmptk="Adobe XMP Core 5.4-c005 78.147326, 2012/08/23-13:03:03
">
    <rdf:RDF xmlns:rdf="http://www.w3.org/1999/02/22-rdf-syntax-ns#">
        <rdf:Description rdf:about=""
            xmlns:xmp="http://ns.adobe.com/xap/1.0/"
            xmlns:xmpMM="http://ns.adobe.com/xap/1.0/mm/"
            xmlns:dc="http://purl.org/dc/elements/1.1/"
            xmlns:pdf="http://ns.adobe.com/pdf/1.3/">
          <xmp:ModifyDate>2014-04-17T08:28:01+10:00</xmp:ModifyDate>
          <xmp:CreateDate>2014-04-17T08:23:41+10:00</xmp:CreateDate>
          <xmp:MetadataDate>2014-04-17T08:28:01+10:00</xmp:MetadataDate>
          <xmp:CreatorTool>Acrobat PDFMaker 11 for Microsoft Outlook</xmp:CreatorTool>
          <xmpMM:DocumentID>uuid:6a5e8226-043f-4de4-8879-3f41e143b0c3</xmpMM:DocumentID>
          <xmpMM:InstanceID>uuid:42c69e4f-6d06-4166-bcff-52c26160a0e9</xmpMM:InstanceID>
          <dc:format>application/pdf</dc:format>
          <dc:title>
            <rdf:Alt>
               <rdf:li xml:lang="x-default"/>
            </rdf:Alt>
          </dc:title>
          <pdf:Producer>Adobe PDF Library 11.0</pdf:Producer>
        </rdf:Description>
    </rdf:RDF>
</x:xmpmeta>
```

**FIGURE 3.** PDF metadata extracted from Exhibit F.

```
2 0 obj
<</Length 3320/Subtype/XML/Type/Metadata>>stream
<?xpacket begin="ï»¿" id="W5M0MpCehiHzreSzNTczkc9d"?>
<x:xmpmeta xmlns:x="adobe:ns:meta/" x:xmptk="Adobe XMP Core 5.4-c005 78.147326, 2012/08/23-13:03:03
">
    <rdf:RDF xmlns:rdf="http://www.w3.org/1999/02/22-rdf-syntax-ns#">
        <rdf:Description rdf:about=""
            xmlns:xmp="http://ns.adobe.com/xap/1.0/"
            xmlns:xmpMM="http://ns.adobe.com/xap/1.0/mm/"
            xmlns:dc="http://purl.org/dc/elements/1.1/"
            xmlns:pdf="http://ns.adobe.com/pdf/1.3/">
          <xmp:ModifyDate>2014-04-17T08:33:16+10:00</xmp:ModifyDate>
          <xmp:CreateDate>2014-04-17T08:23:41+10:00</xmp:CreateDate>
          <xmp:MetadataDate>2014-04-17T08:33:16+10:00</xmp:MetadataDate>
          <xmp:CreatorTool>Acrobat PDFMaker 11 for Microsoft Outlook</xmp:CreatorTool>
          <xmpMM:DocumentID>uuid:6a5e8226-043f-4de4-8879-3f41e143b0c3</xmpMM:DocumentID>
          <xmpMM:InstanceID>uuid:b2815a05-9c27-40fc-a085-140c7633e45a</xmpMM:InstanceID>
          <dc:format>application/pdf</dc:format>
          <dc:title>
            <rdf:Alt>
               <rdf:li xml:lang="x-default"/>
            </rdf:Alt>
          </dc:title>
          <pdf:Producer>Adobe PDF Library 11.0</pdf:Producer>
        </rdf:Description>
    </rdf:RDF>
</x:xmpmeta>
```

12.    I compared the edits made in Exhibit F to those previously made in Exhibit A and determined that the "Date:" field was modified to make it appear as if it were sent less than an hour after Exhibit A was allegedly sent. Figure 5 highlights in blue the "new" modifications made in Exhibit F. Figure 6 shows how that modified email header field appears in a PDF reader while also highlighting all the edits made to the email header field. In addition to the edits shown in Figure 5 and Figure 6, the data contained within the PDF file associated with Exhibit F also indicates that the body of the email was altered from the body of the email contained in Exhibit A.

**FIGURE 5.** Excerpt from the source code contained within Exhibit F showing a PDF text object which contains modifications. The modifications made previously in Exhibit A are highlighted in red. The edits subsequently made in Exhibit F are highlighted in blue.

```
1.    /TouchUp_TextEdit MP
2.    BT
3.    /CS1 cs 0 0 1   scn
4.    /C2_0 7.5 Tf
5.    155.85 771.598 Td
6.    <002700440059004800030002E004F004C004800050004400051>Tj
7.    0 -10.5 TD
8.    <0038005C004800510003003100044A0058005C004800510003000B8005B005C004800510011005
      1004A0058005B005C004800510057002300050C0044004004A00520052001180460052000050000C>Tj
9.    /C2_1 7.5 Tf
10.   140.533 0 Td
11.   <0003>Tj
12.   /CS0 cs 0   scn
13.   /TT1 7.5 Tf
14.   -140.533 -10.5 Td
15.   (Apppointment letter)Tj
16.   -0.009 Tw T*
17.   (Thursday, )Tj
18.   /C2_0 7.5 Tf
19.   0 Tw 1 0 0 1 191.076 740.098 Tm
20.   <00150013>Tj
21.   /TT1 7.5 Tf
22.   ( )Tj
23.   /C2_0 7.5 Tf
24.   <002700480046004800050004500480055>Tj
25.   /TT1 7.5 Tf
26.   0.008 Tw 44.07 0 Td
27.   ( 201)Tj
28.   /C2_0 7.5 Tf
29.   0 Tw 14.626 0 Td
30.   <0015>Tj
31.   /TT1 7.5 Tf
32.   ( )Tj
33.   /C2_1 7.5 Tf
34.   <001C>Tj
35.   /TT1 7.5 Tf
36.   (:1)Tj
37.   /C2_1 7.5 Tf
38.   17.278 0 Td
39.   <0014>Tj
40.   /TT1 7.5 Tf
41.   (:)Tj
42.   /C2_1 7.5 Tf
43.   <00140017>Tj
44.   /TT1 7.5 Tf
45.   ( AM)Tj
46.   ET
```

8

**FIGURE 6**. Screenshot of the rendered text object from Figure 5 with the text modifications from Exhibit A highlighted in red and the subsequent modifications made in Exhibit F highlighted in blue.

| | |
|---|---|
| **From:** | **Dave Klieman** |
| **To:** | **Uyen Nguyen (uyen.nguyent@yahoo.com)** |
| **Subject:** | Apppointment letter |
| **Date:** | Thursday, **20 December** 201**2 9:11:14** AM |

Dated:  July 9, 2019

Dr. Matthew J. Edman
Miami, Florida

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.: 9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

## **AFFIDAVIT OF DR. MATTHEW J. EDMAN**

I, Dr. Matthew J. Edman, declare under penalty of perjury, as follows:

## I.   BACKGROUND AND QUALIFICATIONS

1.   I am over the age of eighteen (18), not a party to this action, and currently reside in New York, NY.

2.   The facts and opinions set forth in this declaration are based upon my own personal knowledge, education, experience, and documents provided to me by counsel. If called as a witness, I could and would testify to the truth of these facts and opinions under oath.

3.   My education and experience fully qualify me to make the statements contained in this declaration.

4.   I received a B.S. in Computer Science from Baylor University in 2005, a M.S. in Computer Science from Rensselaer Polytechnic Institute in 2007, and a Ph.D. in Computer Science from Rensselaer Polytechnic Institute in 2011.

5.   I have authored or co-authored multiple research papers in peer-reviewed conferences and journals related to techniques for cryptographic security and authentication in wireless networks, and the design, implementation, and analysis of anonymous communication systems on the Internet.

6.   As a Lead Cyber Security Engineer at The MITRE Corporation I supported the FBI's Remote Operations Unit in the technical efforts of identifying the Tor hidden service hosting the Silk Road marketplace. I subsequently provided on-site support to the FBI's New York field office to effect the seizure of bitcoins located on Silk Road servers and Ross Ulbricht's personal laptop and other devices, as well as the Silk Road webserver itself. Later, as a Senior Director at FTI Consulting, I provided consulting to the U.S. Attorney's Office for the Southern District of New York to establish substantial and ongoing links between bitcoin wallets identified on Silk Road servers and Ulbricht's personal bitcoin wallets, which was presented at Ulbricht's trial.

2

7.     I have served as an invited member of the technical program committee for the Association for Computing Machinery's Conference on Computer and Communications Security. I have also served as an invited member of the technical program committee for the International Financial Cryptography Association's International Conference on Financial Cryptography and Data Security. Additionally, I have served as an external reviewer for several academic conferences and journals, including The Institution of Engineering and Technology's Information Security Journal and the Privacy Enhancing Technologies Symposium.

8.     Since 2015, I have been a Director in the Cyber Security & Investigations practice at Berkeley Research Group, LLC ("BRG"), a global strategic advisory and expert consulting firm. I regularly provide expert consultation to clients regarding computer and network security, as well as conduct cyber incident response and investigative analysis.

9.     From 2014 to 2015, I was a Senior Director in the Cyber Security & Investigations Group of FTI Consulting, Inc.'s Global Risk and Investigations Practice. I worked on numerous matters related to computer and network security, and forensic evidence collection and analysis.

10.     From 2013 to 2014, I was a Senior Vulnerability Engineer in Bloomberg LP's Vulnerability Analysis Team. I focused on data security and worked to protect sensitive data from both internal and external threats through continuous research and testing of the firm's network infrastructure, websites, software, and mobile applications.

11.     From 2009 to 2013, I was a Lead Cyber Security Engineer in The MITRE Corporation, a federally funded research and development center, where I specialized in research and development of systems for anonymous communication on the Internet.

12.     A copy of my curriculum vitae is attached below as Exhibit A.

3

## II.    SUMMARY OF OPINION

13.    ECF No. [144-1], which Defendant submitted in support of his motion for judgment on the pleadings, purports to be an email sent from Dave Kleiman to Uyen Nguyen on December 20, 2012 appointing her to be a "director" of W&K Info Defense Research, LLC. This email includes a digital signature allegedly belonging to Dave Kleiman as an attempt to prove its authenticity.

14.    Based on my analysis of this document and the signature on it, this document was digitally signed in early 2014, almost a year after Dave Kleiman died.

15.    As explained below, the digital signature used to "sign" this document includes a timestamp that, while present, takes some advanced computer knowledge to decode. This timestamp demonstrates that the signature was created on March 12, 2014 according to the computer it was created on.

16.    Furthermore, the actual document produced by the Defendant is a PDF, not an email file. The metadata associated with this PDF demonstrates that it was last modified on or about April 16, 2014 at 10:28 PM.

17.    Finally, Defendant has produced an actual email file to Plaintiffs that he sent from himself to himself. (Ex. 10, DEF_00030487.) This email is an identical copy of the body of ECF No. [144-1], except it is missing the part of ECF No. [144-1] that purports to show it was sent from Dave Kleiman, to Uyen Nguyen, on December 20, 2012. Instead, this email metadata demonstrates it was sent on April 16, 2014 at 10:22 PM, *i.e.*, approximately six minutes before ECF No. [144-1] was last modified and approximately one month after the PGP signature was created.

## III. PRETTY GOOD PRIVACY

18. Pretty Good Privacy ("PGP") is a computer software program that allows a user to, among other things, encrypt and decrypt data, such as emails, files, or documents.

19. OpenPGP is a universal message format that allows software programs to use PGP to exchange and verify encrypted messages.[1] There are multiple programs that do this, including GnuPG.

20. In addition to encrypting and decrypting data, these OpenPGP-based programs (such as GnuPG) can also be used to digitally "sign" data so that the recipient can verify the data received has (i) originated from the sender and (ii) not been altered.

21. In order to use most OpenPGP-based programs, the sender must first create a private key – kept secret and known only to the sender – and a corresponding public key, which is shared with the recipient and anyone else who may need to verify messages from the sender.[2] The private and public keys are mathematically related such that data encrypted with the private key can only be decrypted by the corresponding public key and *vice versa*.

22. In order to create a PGP digital signature of an email, for example, the sender creates a hash[3] of the email's content and other information specified by the OpenPGP message format. **This information includes a timestamp indicating when the digital signature was**

---

[1] https://tools.ietf.org/html/rfc4880.

[2] The OpenPGP standard also defines formats for exchanging public keys and related information.

[3] A "hash" (sometimes called a "digest" or "fingerprint") refers to the output of a mathematical function which computes a fixed-length output—a hash—for an arbitrarily long input (e.g. a message). A hash function has several important properties, including (a) the same input will always result in the same output, (b) a small change to the input results in a significantly different output which is uncorrelated with the previous output, and (c) it is difficult to determine the input (e.g. the message) with only the output (i.e. the hash).

5

created. The hash value is then encrypted with the sender's private key and the result is encoded and appended to the email. Upon receiving such a signed email, the recipient can use the sender's public key to decrypt the hash value included in the digital signature and verify that the decrypted hash matches the hash of the received email. If the two hash values do not match, then the recipient knows that the email or signature may have been altered.

## IV.  ECF NO. [144-1]

23.  I have reviewed ECF No. [144-1] which is a PDF document that purports to be an email sent from "Dave Klieman (*sic*)" to Uyen Nguyen on or about 8:19:03 AM on Thursday, December 20, 2012.[4] The email appears to be a "cleartext signed"[5] email message due to the presence of the line "-----BEGIN PGP SIGNED MESSAGE-----" at the beginning of the email, and the PGP signature block at the end of the email which is indicated by the lines "-----BEGIN PGP SIGNATURE-----" and "-----END PGP SIGNATURE-----." Within the signature block is the signature data, which is encoded using "Radix-64" to represent the signature data as a series of printable characters suitable for inclusion in an email or similar message.

24.  I decoded the Radix-64-encoded signature and analyzed it according to the OpenPGP standard. I determined that it represents a "Version 4 Signature" as defined in Section 5.2.3 of the OpenPGP standard. As mentioned previously, the signature includes a timestamp which records the time the alleged email was signed according to the computer on which the signature was created. A timestamp in a PGP signature is represented as a numeric value that indicates the number of seconds that have elapsed since midnight on January 1, 1970 UTC (also

---

[4] The time zone associated with this particular email is unclear based on the information available to me.

[5] A "cleartext signed" message refers to a message in which the content is unencrypted and readable without special software (such as PGP or GnuPG), but is digitally signed with the sender's private key and so its authenticity can still be verified using such software.

known as "Unix time" or the "Unix epoch"). In this instance, I determined the timestamp is 1394600848 which corresponds to 5:07:28 AM UTC on March 12, 2014—more than a year after the email was allegedly sent.

25.    The signature also includes a field which provides the "Key ID" of the public key corresponding to the private key used to create or "issue" the PGP signature. The Key ID is a numeric value which can be used by the recipient of a PGP-signed message to identify and download the public key of the sender. In ECF No. [144-1], the Key ID contained in the PGP signature is B885B17AC45BED1B. I then used GnuPG v2.2.15 to download the corresponding public key, which is purportedly associated with Dave Kleiman as shown in Figure 1.

**FIGURE 1** – GnuPG's "--receive-keys" option can be used to download a public key given its Key ID.



26.    I then converted the email message and corresponding signature to a text file ("message.txt") and verified the signature using GnuPG as shown in Figure 2.

7

**FIGURE 2** – GnuPG output demonstrating that the purported email was signed on or about March 12, 2014.



27.     The GnuPG output in Figure 2 further demonstrates: (a) the signature timestamp ("1394600848") indicates the signature in ECF No. [144-1] was created on or about March 12, 2014 according to the computer on which the signature was created, (b) the signature was created with Key ID B885B17AC45BED1B, and (c) the signature matches the content of the email shown in ECF No. [144-1].

28.     Many types of computer documents, including PDF files such as ECF No. [144-1], also contain hidden data called "metadata." Metadata provides additional information about the document itself, such as when the document was created and with what program, and can be viewed with many standard PDF viewers, including Adobe Acrobat. The metadata contained in ECF No. [144-1] is shown in Figure 3.

**FIGURE 3** – PDF metadata contained within ECF No. [144-1] as shown by Adobe Acrobat.



29.     The metadata shown in Figure 3 indicates that ECF No. [144-1] was created using Acrobat PDFMaker 11 for Microsoft Outlook on April 17, 2014 at 8:23:41 AM according to the local time of the computer on which it was created. It was last modified approximately five minutes later at 8:28:01 AM. The metadata further indicates that the local time zone of the computer on which the PDF was created was set to UTC+10, which is typically associated with eastern Australia, among other countries.

30.     Counsel for Plaintiff also provided me with the file DEF_00030487.mht, which appears to be a copy of an email sent from the Defendant to himself and that I understand was produced by the Defendant in discovery. The content of the email is identical to the content of ECF No. [144-1], including the PGP signature. The email was sent on April 16, 2014 at 10:22 PM UTC[6] according to the date in the email's header. If this time is adjusted to UTC+10, it shows that the Defendant sent this email to himself on April 17, 2014, at approximately 8:22 AM, *i.e.,* about two minutes before ECF No. [144-1] was created and six minutes before it was last modified.

---

[6] I understand that the parties agreed to process all email files produced in this litigation using Greenwich Mean Time (ECF No. [88] at 8), which for the purposes of this analysis is equivalent to UTC.

9

Dated: April 25, 2019

Dr. Matthew J. Edman
New York, NY

# EXHIBIT A

Curriculum Vitae



**MATTHEW J. EDMAN, PH.D.**
BERKELEY RESEARCH GROUP, LLC
810 Seventh Avenue, Suite 4100 | New York, NY 10019

Direct: 646.651.4754
medman@thinkbrg.com

## SUMMARY

Matthew J. Edman, Ph.D., is a Director at Berkeley Research Group LLC and is a member of BRG's Cyber Security and Investigations Group. Dr. Edman's areas of expertise include network security; penetration testing and vulnerability assessments; secure software development and source code audits; and software analysis, reverse engineering and exploitation. Dr. Edman also provides expert testimony on matters related to information and network security.

As a Lead Cyber Security Engineer for a federally funded research and development center, Dr. Edman conducted specialized computer network security research and development in support of federal law enforcement on a number of cutting-edge cases, providing critical intelligence in multiple high-profile cyber investigations. He has been recognized within law enforcement and the United States Intelligence Community as a subject matter expert on investigations related to anonymous communication systems, such as Tor, and virtual currencies like Bitcoin.

Prior to joining BRG, Dr. Edman also worked as a Senior Vulnerability Engineer for a global financial services, software, and media company based in New York. As a member of the firm's Vulnerability Analysis Team, his work focused on cyber security and the protection of sensitive client data from both internal and external threats through continuous vulnerability research and penetration testing of the firm's network infrastructure, websites, software, and mobile applications. He was also involved in software and network architecture design reviews.

Dr. Edman has published scientific articles in peer-reviewed conferences and journals, where his research areas have included novel techniques for cryptographic security and authentication in wireless networks, and the design, implementation and analysis of anonymous communication systems on the Internet. He has served as an invited program committee member for the ACM Conference on Computer and Communications Security and the IFCA International Conference on Financial Cryptography and Data Security. He has also served as an external reviewer for several academic conferences and journals, including IET Information Security and the Privacy Enhancing Technologies Symposium.

## EDUCATION

Ph.D., Computer Science        Rensselaer Polytechnic Institute, 2011
M.S., Computer Science         Rensselaer Polytechnic Institute, 2007
B.S., Computer Science         Baylor University, 2005



## PROFESSIONAL EXPERIENCE

Director, Berkeley Research Group LLC, 2015–present
Senior Director, FTI Consulting Inc., 2014 – 2015
Senior Vulnerability Engineer, Bloomberg LP, 2013 – 2014
Lead Cyber Security Engineer, The MITRE Corporation, 2009 – 2013

## EXPERT TESTIMONY

- Superior Court of California, County of San Francisco, **Rosebank Road Medical Services Ltd.** d/b/a Rosebank Road Medical Centre and Geeta Murali Ganesh v. Ramji Govindarajan and John Does 2-20, CGC-16-549755. (Deposition Testimony, Trial Testimony)
- United States District Court for the District of New Jersey, United States of America v. **Timothy Livingston** a/k/a "Mark Loyd", Criminal No. 15-626 (WJM). (Declaration)
- United States District Court for the District of Columbia, **Spanski Enterprises, Inc.** v. Telewizja Polska, S.A., 12-CV-957-TSC. (Expert Report, Deposition Testimony, Trial Testimony)

## OTHER SELECTED ENGAGEMENTS

- United States District Court for the Southern District Ohio, **Thomas Caracci**, derivatively and on behalf of The Wendy's Company v. Emil J. Brolick et al., C.A. No. 1:17-CV-00192.
- United States District Court for the Southern District of New York, **United States of America v. Gery Shalon**, 15-CR-333 (LTS).
- United States District Court for the Southern District of New York, **United States of America v. Arthur Budovsky**, 13-CR-268 (DLC).
- United States District Court for the Southern District of Indiana, Indianapolis Division, **Angie's List, Inc.** v. Amazon Local LLC et al., 1:15-CV-00968-JMS-DML.
- United States District Court for the Northern District of California, San Francisco Division, **craigslist, Inc.** v. 3taps, Inc. et al., 12-CV-03816-CRB.
- United States District Court for the Southern District of New York, **United States of America v. Ross William Ulbricht**, a/k/a Dread Pirate Roberts, a/k/a Silk Road, 14-CR-68 (KBF).
- United States District Court for the Southern District of Texas, Houston Division, W.L. Dogget LLC and Doggett Heavy Machinery Services LLC v. **Paychex, Inc.** and John Does 1-10, 4:14-CV-00506.

## PUBLICATIONS

- "On the Security of Key Extraction from Measuring Physical Quantities" (with Aggelos Kiayias, Qiang Tang, and Bülent Yener), IEEE Transactions on Information Forensics and Security (Volume 11, Issue 8), 2016.
- "On Passive Inference Attacks Against Physical-layer Key Extraction" (with Aggelos Kiayias and Bülent Yener), Proceedings of the 2011 European Workshop on System Security (EuroSec), 2011.



- "On Anonymity in an Electronic Society: A Survey of Anonymous Communication Systems" (with Bülent Yener), *ACM Computing Surveys 42(1)*, 2010.
- "AS-awareness in Tor Path Selection" (with Paul Syverson), *Proceedings of the ACM Conference on Computer and Communications Security (CCS)*, 2009.
- "Vidalia: Towards a Usable Tor GUI" (with Justin Hipple), *Proceedings of the Symposium on Usable Privacy and Security (SOUPS)*, 2007.
- "A Combinatorial Approach to Measuring Anonymity" (with Fikret Sivrikaya and Bülent Yener), *Proceedings of the IEEE International Conference on Intelligence and Security Informatics (ISI)*, 2007.

## PROFESSIONAL AFFILIATIONS

### *Present*

Member, *Association for Computing Machinery (ACM)*
Member, *Institute of Electrical and Electronics Engineers (IEEE)*
Member, *International Association for Cryptologic Research (IACR)*
Member, *Cyber Security & Privacy Industry Advisory Board, New Jersey Institute of Technology*

### *Prior*

Program Committee, *IFCA Conference on Financial Cryptography and Data Security*, 2009
Program Committee, *ACM Conference on Computer and Communications Security*, 2007-2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CIV-80176-Bloom/Reinhart

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and
W&K INFO DEFENSE RESEARCH, LLC,

           Plaintiffs,

v.

CRAIG WRIGHT,

           Defendant.
_____/

## ORDER ON PLAINTIFFS' MOTION TO COMPEL [DE 210][1]

    This matter is before the Court on the Plaintiffs' Motion to Compel, DE 210, and the

Court's Order dated June 14, 2019. DE 217. The Court has considered the totality of the docketed

filings, including all pleadings referenced herein and transcripts of all cited court proceedings. As

the judicial officer who presided at the relevant proceedings, I retain a current and independent

recollection of the events discussed below. I have reviewed all of the exhibits introduced into the

record at the evidentiary hearing, including the deposition excerpts filed in the record. *See* DE

270. Finally, I have carefully considered the arguments of counsel. The Court is fully advised

and this matter is ripe for decision. The Court announced its ruling from the bench on August 26,

---

[1] Magistrate judges may issue an order on any "pretrial matter not dispositive of a party's claim or
defense." Fed. R. Civ. P. 72(a). "Thus, magistrate judges have jurisdiction to enter sanctions orders
for discovery failures which do not strike claims, completely preclude defenses or generate
litigation-ending consequences." *Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285, 1295 (S.D. Fla.
2015) (J. Goodman).

2019. This Order memorializes that ruling. To the extent the relief granted in the written Order deviates from the oral pronouncement, the Order controls.

Two preliminary points. First, the Court is not required to decide, and does not decide, whether Defendant Dr. Craig Wright is Satoshi Nakamoto, the inventor of the Bitcoin cybercurrency.[2] The Court also is not required to decide, and does not decide, how much bitcoin, if any, Dr. Wright controls today. For purposes of this proceeding, the Court accepts Dr. Wright's representation that he controlled (directly or indirectly) some bitcoin on December 31, 2013, and that he continues to control some today.

## PROCEDURAL HISTORY

This case arises from a dispute over the ownership of bitcoin and Bitcoin-related intellectual property. Plaintiffs allege in the Second Amended Complaint that David Kleiman and Dr. Wright were partners in the creation of the Bitcoin cybercurrency and that they "mined" (i.e., acquired) a substantial amount of that currency together. DE 83. Dr. Wright denies any partnership with David Kleiman, and further denies that David Kleiman had an ownership interest in the bitcoin that was mined. Alternatively, Dr. Wright asserts that David Kleiman transferred any interest he had in the bitcoin and the intellectual property to Dr. Wright in exchange for equity in a company that ultimately failed. *See* DE 87. David Kleiman died in 2013.

As early as July 2018, Plaintiffs sought discovery to identify the bitcoin that Dr. Wright owned and controlled (his "bitcoin holdings"). In Ira Kleiman's First Set of Interrogatories served on July 31, 2018, he asked Dr. Wright to identify "public keys and public addresses" for any cryptocurrency he currently or previously owned. DE 91-2 at 8. Dr. Wright responded on

---

[2] A note on terminology. Unless otherwise specified, when I refer to units of the cybercurrency, I will use the lower-case "bitcoin" (like "dollars"). When I refer to the particular cybercurrency system, I will use the upper-case "Bitcoin" (like "the U.S. Dollar").

2

February 1, 2019, by objecting that the discovery request was "irrelevant, grossly overbroad, unduly burdensome, harassing and oppressive, and not proportional to the needs of the case." DE 91-2 at 14-19.[3] Under the procedures required by my Standing Discovery Order (DE 22, 102), the parties requested a discovery hearing to resolve their respective objections. That hearing was scheduled for February 20, 2019. DE 90.

Dr. Wright submitted his pre-hearing memorandum on February 14, 2019. DE 92. He noted that Plaintiffs had requested all documents relating to any bitcoin transactions by Dr. Wright between 2009 and 2014. *Id.* at 3. Dr. Wright argued that the discovery requests were disproportionate to the needs of the case. He represented that he "stands ready to produce documents in his possession, custody, or control that relate to Dave [Kleiman], any trust in which Dave [Kleiman] was a trustee or beneficiary, and W&K Info Defense Research, LLC." *Id.* at 4.

At the hearing on February 20, the Court and the parties had a discussion about Plaintiffs' request for evidence relating to Dr. Wright's bitcoin transactions. DE 123 at 120-123 (hearing transcript). I declined to order Dr. Wright to produce his current bitcoin holdings. Rather, I said Plaintiffs should identify a starting date and seek production of Dr. Wright's bitcoin holdings on that date. Plaintiffs could use the Bitcoin evidence trail to trace forward from there.

Running in parallel with the interrogatories, Plaintiffs served a Second Set of Requests for Production on Dr. Wright on or about January 17, 2019. DE 92-5 at 30. Request for Production #1 sought "All documents or communications that provide and/or estimate the value of your cryptocurrency holdings. This includes, but is not limited to, loan applications, financial statements, tax returns, life insurance applications, financing agreements, sale papers, assignment contracts, etc." 2 DE 114-1 at 5-6. On February 19, Dr. Wright served a written objection to

---

[3] Discovery was stayed from August 2, 2018, to December 31, 2018. DE 57, 72.

3

Request #1 based on relevance, over-breadth, harassment, and disproportionality. *Id.* at 5-6. The parties conferred but were unable to resolve the objection. *Id.* at 7. A discovery hearing was scheduled for March 6, 2019. DE 104.

On March 4, the parties submitted their Joint Discovery Memorandum. DE 109. They indicated that Plaintiffs' Request for Production #1 was still in dispute. *Id.* at 7. The hearing was held on March 6. DE 110, DE 122 (hearing transcript). The parties deferred the Request for Production issue to the next discovery hearing. DE 122 at 56. Plaintiffs explained that they were revising the Request for Production related to Dr. Wright's bitcoin holdings: "We have chosen – we have moved everything back to 2013, which is when Dave died. You Honor will have an opportunity to hear from both sides, but we basically said give us the information as of that date and then we will move forward from there." *Id.* at 62. Another discovery hearing was set for March 14.

On March 13, the parties submitted their Joint Discovery Memorandum for the March 14 discovery hearing. DE 114. Plaintiffs represented that they had "limited the request to: 'produce any documents that existed as of 12/31/13 which estimate the value of Defendant's bitcoin holdings.'" *Id.* at 3. Plaintiffs argued that this information was relevant to trace the assets of the alleged partnership between David Kleiman and Dr. Wright. *Id.* Dr. Wright argued that, even as limited, the request was "overly broad, unduly burdensome and harassing by seeking such personal financial information such as loan applications, financial statements, tax returns, life insurance applications, etc." *Id.*

At the hearing on March 14, Plaintiffs further explained that the purpose of this request for production was to help establish the universe of bitcoin that was mined during the alleged Kleiman-Wright partnership. DE 124 at 18-19 (hearing transcript). Plaintiffs agreed that what they were

really seeking was "a listing of all the bitcoin that was owned [by Dr. Wright directly or indirectly]
on December 31, 2013." *Id.* at 19-20. Dr. Wright objected on relevance grounds. The Court
found "what bitcoin existed on December 31, 2013, and where it's gone since then is relevant to
[Plaintiffs'] claim." *Id.* at 21. Turning to proportionality and undue burden, the Court asked Dr.
Wright's counsel, "[H]ow difficult would it be to come up with information? I assume it's just a
list of Bitcoin wallets from December 2013." *Id.* at 21. Dr. Wright's counsel responded, "Well,
it's a list of – it would be a list of public addresses, but it would identify Craig Wright as being the
owner of those addresses, which sort of like opens the door to, you know, a lot of financial
information, and without any evidence that all of those — or what portion of those Dave Kleiman
had an interest in." *Id.*

The Court ruled that Plaintiffs were entitled to a list of Dr. Wright's bitcoin holdings, but
granted Dr. Wright leave to file a motion for protective order based on undue burden. *Id.* at 22-
23. Notably, the Court did not specify the information Dr. Wright was required to use to generate
the list. Specifically, the Court did not order production of a list of public addresses. The Court
did not set a specific deadline for production or for the filing of the motion for protective order.

Dr. Wright was deposed on April 4. During his deposition, he testified that a trust called
the Tulip Trust was formalized in 2011, but never owned or possessed private keys to bitcoin
addresses. DE 270-1 at 22. He also testified that Uyen Nguyen had ceased to be a trustee of any
trust related to Dr. Wright in 2015. *Id.* at 24. He further testified that he had stopped mining
bitcoin in 2010. He declined to answer questions about how much bitcoin he mined in 2009-2010;
this issue was reported to the Court during the deposition. I deferred ruling on the issue. DE 137
at ¶ 1 ("The request to compel Dr. Wright to disclose the amount of bitcoin he mined during 2009
and 2010 is denied without prejudice. The Court will revisit this issue after the parties brief

5

whether production of a list of Dr. Wright's bitcoin ownership would be unduly burdensome."). Again, the Court referenced "a list of Dr. Wright's bitcoin ownership." The Court did not mention a list of public addresses.

A discovery hearing was held on April 11. DE 142. At that hearing, I set a deadline of April 19 for Dr. Wright to file a motion regarding Plaintiffs' request for a list of his bitcoin holdings on December 31, 2013. DE 146 at 38-39 (hearing transcript).

On April 18, Dr. Wright filed a Sealed Motion Regarding Production of a List of the Public Addresses of his Bitcoin as of December 31, 2013. DE 155.[4]   Dr. Wright incorrectly framed the issue as, "The Court has ordered Dr. Wright to identify all public addresses that he owned as of December 31, 2013 or, if he cannot do so, explain why identification is unduly burdensome." *Id.* at 1. He then stated:

> Dr.Wright does not have a complete list of the public addresses that he owned as of any date. To create such a list would be unduly burdensome. A Bitcoin public address is an identifier of 26-35 alphanumeric characters. Such addresses are not intended to be memorized and remembered for a period of nearly a decade. However, Dr. Wright knows that he mined the ▮▮▮▮▮ on the blockchain. Because the public addresses associated with blocks are publicly available, Dr. Wright is able to identify the public addresses associated with the ▮▮▮ blocks on the blockchain and provides those public addresses below, ▮▮▮▮▮ ▮▮▮▮▮ Dr. Wright did not keep track of which Bitcoin blocks he mined. Dr. Wright does not know any of the other Bitcoin public addresses.
>
> In 2011, Dr. Wright transferred ownership of all of his Bitcoin into a blind trust. Dr. Wright is not a trustee or a beneficiary of the blind trust. Nor does Dr. Wright know any of the public addresses which hold any of the bitcoin in the blind trust. Thus, Dr. Wright does not know and cannot provide any other public addresses.
>
> First, as of December 31, 2013, all of Dr. Wright's bitcoin had been transferred to the blind trust, and therefore are owned by the trusts, not by Dr. Wright. The public addresses referenced above are as follows:

---

[4] The motion was filed under seal. A redacted version of the motion is filed in the public record at Docket Entry 184.

[REDACTED][5]

DE 184 at 1-2. As shown above, the Court had not ordered Dr. Wright to produce a list of public addresses. Dr. Wright did not assert, then, that public addresses were a meaningless data point. He simply argued that he could not produce them.

Plaintiffs filed a response in opposition to the Motion, DE 162.[6] They sought an order requiring Dr. Wright to identify all bitcoins he owned as of December 31, 2013, to provide the trust documents, and to provide a sworn statement identifying all bitcoins he transferred to the blind trust as well as the identities of the trustees and trust beneficiaries. DE 183 at 5-6.

The Court denied Dr. Wright's Motion on May 3, 2019. DE 166. After reviewing the procedural history, the Court stated:

> Thereafter, Dr. Wright filed an unverified motion in which he identified a number of bitcoin public addresses that he mined. Although not delineated as a Motion for Protective Order, that is what the pleading is. Dr. Wright asserted that he does not have a complete list of the public addresses he owned on any date, including December 31, 2013. He further asserted that in 2011 he transferred ownership of all his bitcoin to a blind trust. Although he makes the conclusory statement that it would be unduly burdensome to produce a list of his bitcoin holdings as of December 31, 2013, this conclusion is not supported by facts. In essence, he does not argue undue burden, he argues impossibility. The argument that Dr. Wright is incapable of providing an accurate listing of his current or historical bitcoin holdings was never presented in any of the prior hearings before this Court, when the Court was crafting the scope of discovery. Notably, [Dr. Wright's motion] does not refute the obvious response to this argument – get the information from the trustee of the blind trust.

DE 166 at 2-3. Again, the Court referenced a "listing of" Dr. Wright's bitcoin holdings, not a list of public addresses. The Court ordered:

---

[5] Dr. Wright produced a partial list of bitcoin public addresses that he mined prior to 2011. DE 155 at 2-3.

[6] The Response was filed under seal. A redacted version is filed in the public record at Docket Entry 183.

7

- On or before May 8, 2019, at 5:00 p.m. Eastern time, Dr. Wright shall provide to Plaintiffs a sworn declaration identifying the name and location of the blind trust, the name and contact information for the current trustee and any past trustees, and the names and contact information of any current or past beneficiaries.

- On or before May 9, 2019, at 5:00 p.m. Eastern time, Dr. Wright shall produce to Plaintiffs a copy of any and all documents relating to the formation, administration, and operation of the blind trust. The production shall be accompanied by a sworn declaration of authenticity.

- On or before May 15, 2019, at 5:00 p.m. Eastern time, Dr. Wright shall produce all transactional records of the blind trust, including but not limited to any records reflecting the transfer of bitcoin into the blind trust in or about 2011. The production shall be accompanied by a sworn declaration of authenticity.

- Dr. Wright shall execute any and all documents, or other legal process, necessary to effectuate the release of documents in the possession, custody, or control of the Trustee.

*Id.* at 4.

Defendant's counsel sought an extension of time to comply with the May 3 Order so that they could fly to London to meet with their client in person to prepare the required declaration. DE 167. That request was granted. DE 195 (Telephonic Hearing Transcript), DE 172.

Dr. Wright provided a sworn declaration dated May 8, 2019. DE 222.[7] He swore that he had met with his counsel in person on May 7 and 8 to "provide them with additional details and clarity regarding trusts that I settled that hold or held Bitcoin that I mined or acquired on or before December 31, 2013." DE 222 at ¶ 3. Dr. Wright further swore:

- In 2009 and 2010 he had mined bitcoin directly into a trust in Panama, that there were no transactions related to those bitcoin, and that he later "transferred the encrypted files that control access to these Bitcoin in 2011, as explained below." *Id.* ¶ 4.

- In June 2011, he consolidated "the Bitcoin that I mined with Bitcoin that I acquired and other assets." *Id.* ¶ 5.

---

[7] A sealed copy was filed at DE 223. A redacted copy was filed at DE 222.

- To that end, "[i]n October 2012, a formal trust document was executed, creating a trust whose corpus included the Bitcoin that I mined, acquired and would acquire in the future. The name of that trust is Tulip Trust. It was formed in the Seycelles [sic]." *Id.*

- The trustees of Tulip Trust I are COIN Ltd. UK., Uyen Nguyen, Dr. Wright, David Kleiman, Panopticrypt Pty. Ltd, and Savannah Ltd. *Id.* ¶ 6. Dr. Wright is the contact person for COIN Ltd. UK. The contact person for Panoptycript Pty. Ltd. is Dr. Wright's wife. The contact person for Savannah Ltd. is Denis Mayaka. *Id.* ¶¶ 9-12.

- The beneficiaries of Tulip Trust I are Wright International Investments Ltd. and Tulip Trading Ltd. Dr. Wright is the point of contact for both of the beneficiaries. *Id.* ¶¶ 13-14.

- A second Tulip Trust exists. Dr. Wright and his wife are the beneficiaries. *Id.* at ¶¶ 19-20.

- "Access to the encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined, requires myself and a combination of trustees referenced in Tulip Trust I to unlock based on a Shamir scheme." *Id.* at ¶ 23.

He also provided certain documents related to the trust.[8]

On June 3, Plaintiffs filed a Motion to Compel Defendant to Comply with this Court's Orders Directing Him to Produce a List of the Bitcoins He Held as of December 31, 2013. DE 197 (sealed) (redacted version filed at DE 210). Plaintiffs asked the Court to impose sanctions under Rule 37 and to order Dr. Wright to provide a sworn statement identifying the public addresses of the bitcoin transferred into the Tulip Trusts, to provide transactional records and communications relating to the trusts, and to sit for a renewed deposition. DE 210 at 6. Although

---

[8] Plaintiffs represent, "In response to the Court's order, Craig produced two sworn statements, copies of various trust instruments, and a statement from the purported trustee re-attaching a trust instrument." DE 210 at 3. Dr. Wright's Response states that he "produced trust formation documents along with a sworn declaration of authenticity," as well as "documents reflecting the use of bitcoin rights from the trust to support research and development by his Australian entities." DE 211 at 3.

the Plaintiffs "defer[red] to the Court's judgment as to the appropriate sanction," they requested
that if Dr. Wright continued to refuse to comply that the Court deem all of Dr. Wright's holdings
in the Tulip Trust to be joint property belonging to both Dr. Wright and David Kleiman. DE 210
at 6; DE 221 at 15.

In his response, Dr. Wright conceded that he has not complied with the Court's order, but
argued that compliance was impossible. DE 204 (redacted version filed at DE 211). Expanding
on the representation made in Paragraph 23 of his declaration, he argued that information necessary
to produce a complete list of his bitcoin holding on December 31, 2011, was in the Tulip Trust I
in a file that is encrypted using "'Shamir's Secret Sharing Algorithm', an algorithm created by Adi
Shamir to divide a secret, such as a private encryption key, into multiple parts." DE 211 at 5. Dr.
Wright asserted that he could not decrypt the outer level of encryption because he did not have all
of the necessary decryption keys. *Id.* He stated that after using a Shamir system to encrypt this
information, "The key shares were then distributed to multiple individuals through the [blind]
trusts" and "he alone does not have ability to access the encrypted file and data contained in it."
*Id.*

The Court held a hearing on June 11 on the Motion. DE 221. Plaintiffs' counsel pointed
out that under oath in his deposition Dr. Wright denied ever putting bitcoin into a trust, and denied
putting any private keys into the Tulip Trust. DE 221 at 8-9. After hearing further oral argument
from the parties, the Court once again gave Dr. Wright an opportunity (and a deadline of June 17,
2019) to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." DE
217. Again, the Court did not order a list of public addresses. The Court simultaneously entered
an Order to Show Cause why it should not certify a contempt of court to the District Judge. The
Court also put Dr. Wright on notice that it was considering sanctions under Rule 37 for his

continued non-compliance with the Court's March 14 Order. DE 217 at 5; DE 221 at 32-33. An evidentiary hearing was scheduled for June 28.

Dr. Wright's deposition reconvened on June 28 immediately prior to the evidentiary hearing. I presided over the deposition to rule on any objections. Dr. Wright was asked about the trusts referenced in his declaration. He responded, "I'm not the trustee of these trusts." DE 270-2 at 7. Dr. Wright was asked if he transferred all of his bitcoin into blind trust in 2011. He responded, "What I actually did was, I transferred the algorithms and software that I had used, the nonpublic version of Bitcoin that I was working on, into an encrypted file. The encrypted file was then – basically the key was split so that other people could have it." DE 270-2 at 21-22.

## THE EVIDENTIARY HEARING

The Court heard from three live witnesses during two days of testimony: Dr. Wright, Steven Coughlan a/k/a Steve Shadders, and Dr. Matthew Edman. DE 236, 264. Plaintiffs also submitted excerpts from the depositions of Jonathan Warren and Dr. Wright. DE 261, 270. The Court heard oral argument on August 26, 2019.

Dr. Wright testified to his inability to comply with the Court's Orders. He claimed that after drug dealers and human traffickers began using Bitcoin, he wanted to disassociate himself completely from it. He engaged David Kleiman for that purpose. As part of that process, Dr. Wright put control over the bitcoin he mined in 2009-2010 into an encrypted file, which he put into a blind trust called the Tulip Trust. The encryption key was divided into multiple key slices. A controlling number of the key slices were given to Mr. Kleiman, who distributed them to others through the trust. Today, Dr. Wright does not have access to a sufficient number of the key slices to decrypt the file. Therefore, he cannot produce a list of his bitcoin holdings.

11

Mr. Shadders testified to efforts he made to filter the public Bitcoin blockchain to identify Dr. Wright's bitcoin. Dr. Edman testified about alleged alterations to documents.

## APPLICABLE LEGAL PRINCIPLES

The Court gave notice that it would consider discovery sanctions under Federal Rule of Civil Procedure 37, and independently consider sanctions for contempt.[9]

*Rule 37*

Rule 37 authorizes the Court to award attorney's fees against a party and/or the party's counsel as a sanction for certain discovery-related conduct. Additionally, the Court may impose sanctions that affect the further litigation of the merits (what I will call "substantive sanctions"), including:

(i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)    striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part;

(vi)    rendering a default judgment against the disobedient party; or

(vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

---

[9] Plaintiffs' Motion for Sanctions also references the Court's inherent power to sanction for bad faith conduct. DE 210 at 5. The June 14 Order on Plaintiff's Motion to Compel did not put Dr. Wright on notice that the Court would consider sanctions under its inherent power. The sanctions otherwise available under Rule 37 are sufficient to address Dr. Wright's behavior, so the Court would not impose additional sanctions even if it were to invoke its inherent power.

Fed R. Civ. P. 37(b)(2)(A).

The burden of proof for Rule 37 sanctions is a preponderance of the evidence. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016). Rule 37 sanctions "are intended to: (1) compensate the court and other parties for the added expense caused by discovery abuses; (2) compel discovery; (3) deter others from engaging in similar conduct; and (4) penalize the offending party or attorney." *Steward v. Int'l Longshoreman's Ass'n., Local No. 1408*, 306 Fed. Appx. 527, 529 (11th Cir. 2009). District courts possess wide discretion over the discovery process and when discovery sanctions are appropriate. *Dude v. Cong. Plaza, LLC*, 17-80522-CIV, 2018 WL 4203888, at *5 (S.D. Fla. July 20, 2018) (J. Matthewman), *report and recommendation adopted sub nom. Dude v. Cong. Plaza. LLC*, 17-CV-80522, 2018 WL 4203886 (S.D. Fla. Aug. 29, 2018). "The severe sanctions permitted by Rule 37(b) are usually only imposed by district courts upon a finding '(1) that the party's failure to comply with the order was willful or a result of bad faith, (2) the party seeking sanctions was prejudiced by the violation, and (3) a lesser sanction would fail to adequately punish and be inadequate to ensure compliance with court orders.'" *Id.* (citations omitted).

In a situation where a party asserts inability to comply with a discovery order, the proponent of sanctions bears the initial burden of making a *prima facie* showing that the opposing party failed to comply with the Court's order. Once the moving party makes that showing, the opposing must introduce evidence that it was impossible to comply. *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542-43 (11th Cir. 1993) (affirming sanctions where non-movant had "shown no evidence of inability to comply"); *Broadcast Music, Inc. v. Bourbon Street Station, Inc.*, 2010 WL 1141584, *2 (M.D. Fla. Mar. 23, 2010); *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)). That is, the

party must establish that he "has in good faith employed the utmost diligence in discharging his ... responsibilities." *Phoenix Marine Enterprises, Inc. v. One (1) Hylas 46' Convertible Sportfisherman Hull No. 1,* 681 F. Supp. 1523, 1528–29 (S.D. Fla. 1988) (J. Nesbitt) (quoting *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C. Cir. 1975)); *Piambino v. Bestline Prod., Inc.,* 645 F. Supp. 1210, 1214 (S.D. Fla. 1986).

> This burden is satisfied by making "in good faith *all* reasonable efforts to comply." *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir. 1976). We construe this requirement strictly. "Even if the efforts he did make were 'substantial,' 'diligent' or 'in good faith,' ... the fact that he did not make 'all reasonable efforts' establishes that [respondent] did not sufficiently rebut the ... prima facie showing of contempt. The ... use of a 'some effort' standard for measuring the strength of [the] defense [would be] an abuse of discretion."

*Id.* at 1213 (quoting *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984)).[10]

Several provisions of the Federal Rules of Civil Procedure authorize reasonable expenses, including attorney's fees, as a sanction for discovery violations. *See* Fed. R. Civ. P. 37(a)(5)(A) (expenses associated with motion to compel); Fed. R. Civ. P. 37(b)(2)(C) (expenses associated with failure to comply with discovery order); Fed. R. Civ. P. 26(c)(3) (expenses associated with motion for protective order); Fed. R. Civ. P. 26(g)(3) (expenses associated with non-compliance with discovery certification). Rule 37(a)(5) authorizes an award of expenses if a Motion to Compel is granted after a party "fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(iv). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). All of these rules apply the same structure: the prevailing party receives reasonable expenses, including attorney's fees, unless the

---

[10] Many of the cases addressing inability to comply involve contempt proceedings, not Rule 37 sanctions. Nevertheless, the situations are analogous and I will apply the same burden-shifting approach.

losing party's conduct was "substantially justified" and/or "other circumstances make an award of expenses unjust."

*Contempt*

Where, as here, the parties have not consented to have a United States Magistrate Judge preside over this civil case, I cannot hold a person in civil contempt or indirect criminal contempt (i.e., a contempt occurring outside the Court's presence). 28 U.S.C. § 636(e)(6)(B). Instead, if the person's conduct, "in the opinion of the magistrate judge," constitutes an indirect criminal contempt or a civil contempt, "the magistrate judge shall forthwith certify the facts to a district judge" for further proceedings. *Id.*

The sanction of civil contempt "may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986) (internal quotation marks omitted), *cited and quoted in F.T.C. v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013). "A finding of civil contempt must be supported by clear and convincing evidence . . . The evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order. The absence of willfulness is not a defense to a charge of civil contempt, and substantial, diligent, or good faith efforts are not enough; the only issue is compliance." *Jysk Bed'N Linen v. Dutta-Roy*, 714 Fed. Appx. 920, 922 (11th Cir. 2017) (citations omitted). Clear and convincing evidence is evidence that "place[s] in the mind of the ultimate factfinder an abiding conviction that the truth of its factual contentions is 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *Powell v. Home Depot U.S.A.*, 2009 WL 1515073, at *8 (S.D. Fla. June 1, 2009) (J. Hurley).

15

Criminal contempt is punitive. An alleged criminal contempt occurring outside the presence of the Court (i.e., an indirect contempt) must be proven beyond a reasonable doubt. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 834 (1994).

### FINDINGS

I make the following findings, each of which will be further explained below. First, I find that Dr. Wright has not met his burden of proving by a preponderance of the evidence that he is unable to comply with the Court's Orders. Second, in my opinion the evidence in the record before me does not rise to the level of proof beyond a reasonable doubt necessary for a criminal contempt. Although I find clear and convincing evidence that would support a civil contempt, the sanctions available under Rule 37 are sufficient, so I exercise my discretion and do not certify facts to Judge Bloom for civil contempt proceedings. Third, an award of attorney's fees is warranted against Dr. Wright, but not against his counsel. Fourth, I impose the following sanctions pursuant to Rule 37(b). For purposes of this action, it is established that (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin; (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership, (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them. To conform to these established facts, the Court strikes Dr. Wright's Third Affirmative Defense (Good Faith), Fourth Affirmative Defense (Accord and Satisfaction), Fifth Affirmative Defense (Release), Sixth Affirmative Defense (Payment), Seventh Affirmative Defense (Set-off), Eighth Affirmative Defense (Failure to Mitigate Damages), Seventh [sic] Affirmative Defense (Waiver), and Tenth Affirmative Defense (Statute of Frauds).

### DISCUSSION

The factual issue for decision is whether a preponderance of the evidence proves that Dr. Wright is incapable of complying with the Court's Orders, specifically, whether Dr. Wright proved that the evidence necessary to identify his bitcoin holdings on December 31, 2013, is encrypted in a file that is in a blind trust and for which Dr. Wright does not have (and cannot presently get) the decryption keys. The evidence offered in support of this hypothesis was (1) the testimony of Dr. Wright and (2) the testimony of Steven Coughlan a/k/a Steve Shadders.

A finder of fact must consider the following questions in assessing witness credibility:

1. Did the witness impress you as one who was telling the truth?

2. Did the witness have any particular reason not to tell the truth?

3. Did the witness have a personal interest in the outcome of the case?

4. Did the witness seem to have a good memory?

5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6. Did the witness appear to understand the questions clearly and answer them directly?

7. Did the witness's testimony differ from other testimony or other evidence?

Eleventh Circuit Pattern Civil Jury Instruction 3.4.   As will be discussed below, the evidence in the record demonstrated that Dr. Wright (directly and through counsel) made inconsistent statements about material matters. In considering that evidence, the Court is mindful "that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an

17

important fact or about an unimportant detail." Eleventh Circuit Pattern Civil Jury Instruction 3.5.1. A party's disbelieved testimony can be considered substantive evidence in support of the opposing party's burden of proof. *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt.") (emphasis in original).

Mr. Shadders testified that he was asked by Dr. Wright to try to reconstruct Dr. Wright's bitcoin holdings by applying six data filters to the public Bitcoin blockchain. Mr. Shadders is the Chief Technology Officer at nChain, Ltd., a Bitcoin technology company in London. DE 264 at 12. Dr. Wright is the Chief Scientist at nChain. DE 236 at 5.

Dr. Wright provided the six filter criteria. Mr. Shadders wrote computer code to apply the criteria to the master blockchain. Mr. Shadders devoted approximately 12-16 hours total to the project. DE 264 at 49. His analysis identified approximately 27,000 bitcoin public addresses that met all six criteria. Because one of the criteria was that the public address correspond to a newly mined Bitcoin block, each public address represents 50 bitcoin. Therefore, Mr. Shadders' analysis identified approximately 1,350,000 bitcoin. These could not be further distilled to identify bitcoin controlled by Dr. Wright.

I found Mr. Shadders' testimony about his effort to apply filter criteria to the public blockchain to be credible and worthy of belief. I understand the inference that Dr. Wright would not have wasted Mr. Shadders' time if Dr. Wright were capable of complying with the Court's Orders. I also accept that Mr. Shadders' efforts demonstrate a good faith attempt by Dr. Wright to comply. For the reasons discussed below, however, I give limited weight to these inferences.

I now turn to Dr. Wright's testimony.

18

Apparently, dead men tell no tales, but they (perhaps) send bonded couriers. *See* John Dryden, "The Spanish Fryar or The Double Discovery", Act IV, Scene 1 (1681) ("there is a Proverb, I confess, which says, That Dead men tell no Tales."). I completely reject Dr. Wright's testimony about the alleged Tulip Trust, the alleged encrypted file, and his alleged inability to identify his bitcoin holdings.

Dr. Wright's story not only was not supported by other evidence in the record, it defies common sense and real-life experience. Consider his claims. He designed Bitcoin to be an anonymous digital cash system with an evidentiary trail. DE 236 at 15. He mined approximately 1,000,000 bitcoin, but there is no accessible evidentiary trail for the vast majority of them. He is a latter-day Dr. Frankenstein whose creation turned to evil when hijacked by drug dealers, human traffickers, and other criminals. *Id.* at 16-17. To save himself, he engaged David Kleiman to remove all traces of his involvement with Bitcoin from the public record. *Id.* at 16. As part of his efforts to disassociate from Bitcoin and "so that I wouldn't be in trouble," he put all his bitcoin (and/or the keys to it – his story changed) into a computer file that is encrypted with a hierarchical Shamir encryption protocol. *See Id.* at 23. He then put the encrypted file into a "blind" trust (of which he is one of the trustees), gave away a controlling number of the key slices to now-deceased David Kleiman, and therefore cannot now decrypt the file that controls access to the bitcoin. His only hope is that a bonded courier arrives on an unknown dated in January 2020 with the decryption keys. If the courier does not appear, Dr. Wright has lost his ability to access billions of dollars worth of bitcoin, and he does not care. *Id.* at 21-22. Inconceivable.

During his testimony, Dr. Wright's demeanor did not impress me as someone who was telling the truth. When it was favorable to him, Dr. Wright appeared to have an excellent memory and a scrupulous attention to detail. Otherwise, Dr. Wright was belligerent and evasive. He did

not directly and clearly respond to questions. He quibbled about irrelevant technicalities. When confronted with evidence indicating that certain documents had been fabricated or altered, he became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers. None of these excuses were corroborated by other evidence.

Sadly, Dr. Wright does not write on a clean slate. As Judge Bloom recently noted in denying Dr. Wright's Motion for Judgment on the Pleadings, Dr. Wright has taken directly conflicting factual positions at different times during this litigation. DE 265 at 10 ("[T]he record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court.). As discussed below, that behavior continued before me.

Dr. Wright has a substantial stake in the outcome of the case. If Plaintiffs succeed on their claims, Dr. Wright stands to lose billions of dollars. That gives him a powerful motive not to identify his bitcoin. As long as the relevant addresses remain secret, he can transfer the bitcoin without the Plaintiffs being able to find them. After all, Bitcoin is an anonymous cybercurrency.

Similarly, Dr. Wright had many reasons not to tell the truth. Most notably, Dr. Wright might want to prevent the Plaintiffs (or others) from finding his Bitcoin trove. Alternatively, there was evidence indicating that relevant documents were altered in or about 2014, when the Australian Tax Office was investigating one of Dr. Wright's companies. Perhaps Dr. Wright's testimony here is motivated by certain legal and factual positions he took in the Australian Tax Office investigation and from which he cannot now recede.

There was substantial credible evidence that documents produced by Dr. Wright to support his position in this litigation are fraudulent. There was credible and compelling evidence that documents had been altered. Other documents are contradicted by Dr. Wright's testimony or

20

declaration. While it is true that there was no direct evidence that Dr. Wright was responsible for alterations or falsification of documents, there is no evidence before the Court that anyone else had a motive to falsify them. As such, there is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents.

One example is the Deed of Trust document for the Tulip Trust. Among the trust assets identified in the purported Deed of Trust creating the Tulip Trust on October 23, 2012, are "All Bitcoin and associated ledger assets transferred into Tulip Trading Ltd by Mr David Kleiman on Friday, 10th June 2011 following transfer to Mr Kleiman by Dr Wright on the 09th June 2011 . . .This incles [sic] the 1,200,111 Bitcoin held under the former arrangement and the attached conditions." P. Ex. 9 at 2. Notably absent from the list of trust assets is any encrypted file, software, public or private keys. The Deed of Trust states that the parties forming the Tulip Trust are Wright International Investments Ltd and Tulip Trading Ltd. *Id.* at 1. There was credible and conclusive evidence at the hearing that Dr. Wright did not control Tulip Trading Ltd. until 2014. P. Exs. 11-14; DE 236 at 88-96. Moreover, computer forensic analysis indicated that the Deed of Trust presented to the Court was backdated. The totality of the evidence in the record does not substantiate that the Tulip Trust exists. Combining these facts with my observations of Dr. Wright's demeanor during his testimony, I find that Dr. Wright's testimony that this Trust exists was intentionally false.[11]

Dr. Wright's false testimony about the Tulip Trust was part of a sustained and concerted effort to impede discovery into his bitcoin holdings. Start with Dr. Wright's deceptive and incomplete discovery pleadings. He testified at the evidentiary hearing that at least as early as

---

[11] Although I am only required to make this finding by a preponderance of the evidence, I find clear and convincing evidence to support it.

21

December 2018 he knew that he could not provide a listing of his bitcoin holdings. Yet, the Court was not told this "fact" until April 18, 2019. I give Dr. Wright the benefit of the doubt that prior to May 14 the Plaintiffs were seeking information that went beyond a list of his bitcoin holdings on December 31, 2013. After the May 14 discovery hearing, however, Dr. Wright was aware that the Court expected him to provide Plaintiffs with sufficient information so those bitcoin holdings could be traced.

Nevertheless, having failed to hold off discovery on legal grounds, after March 14, Dr. Wright changed course and started making affirmative misleading factual statements to the Court. His April 18 Motion argued for the first time, "In 2011, Dr. Wright transferred ownership of all his Bitcoin into a blind trust. Dr. Wright is not a trustee or beneficiary of the blind trust. Nor does Dr. Wright know any of the public addresses which hold any of the bitcoin in the blind trust. Thus, Dr. Wright, does not know and cannot provide any other public addresses." This pleading was intended to communicate the impression that Dr. Wright had no remaining connection to the bitcoin. It was also intended to create the impression that the bitcoin themselves had been transferred to the trust. [12]

Dr. Wright almost immediately made irreconcilable statements about the Tulip Trust. The April 18 Motion stated it was a blind trust and he was not a trustee. His sworn declaration three weeks later stated that he is one of the trustees of the Tulip Trust. The trust can hardly be considered "blind" (as represented in the April 18 Motion) if Dr. Wright is one of the trustees. At

---

[12] Although the pleading was not verified, it was signed by Dr. Wright's counsel. By signing the document, they certified that "the allegations and other factual contentions [in the pleading had] evidentiary support." Fed. R. Civ. P. 11. The sole source for that evidentiary support would have been Dr. Wright, so the Court finds that he provided the information contained in the April 18 Motion.

least one set of these representations about the trust and Dr. Wright's status as a trustee necessarily is intentionally misleading.

Dr. Wright also changed his story about what is in the alleged trust. The April 18 Motion states that Dr. Wright's *bitcoin* had been transferred to a blind trust, and therefore are owned by the trusts, not by Dr. Wright. The Court gave Dr. Wright an extension of time so he could meet with his counsel to draft and file a declaration about the trust. In the May 8 declaration, he swore that he met with counsel and that he provided counsel "with additional details and clarity regarding trusts that I settled that *hold or held Bitcoin* that I mined or acquired on or before December 31, 2013." DE 222 at ¶ 3 (emphasis added). He further swore, "In June 2011, I took steps to consolidate the Bitcoin I mined with Bitcoin that I acquired and other assets. In October 2012, a formal trust document was executed, creating a trust *whose corpus included the Bitcoin that I mined, acquired and would acquire* in the future. The name of that trust is Tulip Trust. It was formed in the Seycelles [sic]." *Id.* at ¶ 5 (emphasis added). His declaration was unequivocal that the trust held bitcoin. Nevertheless, at his deposition on June 26 (and at the evidentiary hearing), he changed his story to say that the trust contained an encrypted file with the keys to the bitcoin, not the bitcoin itself.

The hearing testimony that the trust holds only keys, not bitcoin, cannot be reconciled with the statements in the April 18 Motion and the May 8 declaration that it contains bitcoin. At least one of these representations is intentionally false. During his testimony at the evidentiary hearing, Dr. Wright made a point of being precise in his use of terms, including contesting whether a document was an email or a pdf of an email. It is not credible that, given his claim to have an unmatched understanding of Bitcoin, he would have mistaken the Bitcoin currency for the keys that control the ability to transfer the currency. I find instead that he belatedly realized that any

transaction(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain, that he would then be required to identify those transaction(s), and that Plaintiffs could use that information to trace the bitcoin. So, Dr. Wright changed his story to say that only the keys had been transferred.

Ultimately, Dr. Wright's claim of inability to comply with the Court's Orders relies on the existence of an encrypted file in the Tulip Trust containing the information necessary to reconstruct Dr. Wright's bitcoin holdings. I find that this file does not exist. Dr. Wright testified this file is an encrypted compressed file containing multiple sub-files. He swore, "Each of those files has a differently calculated encryption key . . . It's a hierarchical system, where, based on a combination of the file hash and the original encryption key – there are a variety of those – there are multiple Shamir schemes." DE 236 at 107. The Shamir scheme divides a single encryption key into multiple key slices; some subset of the total key slices is needed to decrypt the file.[13] Dr. Wright testified that 15 key slices existed for the outermost file, only eight key slices were needed to decrypt this file, but he only had access to seven key slices. DE 236 at 125-26; *see also* DE 236 at 114 ("The eight of 15 is the key that we're talking about to regenerate all of the addresses"). After observing Dr. Wright's demeanor and the lack of any other credible evidence in the record that this file exists, I find that a preponderance of the evidence establishes that no such file exists and that Dr. Wright's testimony was intentionally false.[14]

---

[13] For a more detailed discussion of the Shamir scheme see this Court's Order on Plaintiff's Motion to Compel, DE 217, and Appendix 1 to this Order.

[14] Here, too, although the necessary burden of proof is a preponderance of the evidence, there was clear and convincing evidence to support this finding. One other point. Dr. Wright testified that the key slices had to be applied in a particular order. DE 236 at 108, 125-26. This testimony is inconsistent with Dr. Shamir's paper describing his encryption scheme. *See* Adi Shamir, How to Share a Secret, Communications of the ACM, Vol 22, No. 11, Nov. 1979, at 612. According to the paper, a Shamir Scheme is decrypted by inserting each key slice into the same polynomial to

Another aspect of Dr. Wright's story also changed at the evidentiary hearing. He argued for the first time that a list of public addresses was meaningless. This position is particularly disturbing because it was Dr. Wright who first injected the idea of public addresses into this discovery matter. At the May 14 hearing, Dr. Wright's counsel first introduced the idea of compiling a list of his Bitcoin holdings by using public addresses. Admittedly, counsel answered the Court's question without consulting with Dr. Wright and without time to fully research the situation. If, as Dr. Wright now asserts, counsel was wrong, Dr. Wright (the self-proclaimed creator of Bitcoin and therefore a person who claims to have intimate knowledge of how Bitcoin works) should have corrected the record long before the evidentiary hearing. Instead, in his April 18 motion, Dr. Wright explained why he could not produce a list of public addresses. He never said that public addresses lacked evidentiary value. This behavior continued in Dr. Wright's May 8 declaration, where he again talked about public addresses, but never argued that they were meaningless.

Although Dr. Wright may not have an obligation to correct an opposing party if its discovery request is imprecise, the Court is different, particularly where (as here) the Court's intent was unmistakable. It was clear that the Court was ordering Dr. Wright to produce evidence to document the existence and extent of his bitcoin holdings, so that Plaintiffs could attempt to trace them through the master blockchain. If, as Dr. Wright now claims, the public addresses are not the proper data point to identify the bitcoin he held on December 31, 2013, he had an obligation

create a series of linear equations. These equations are then solved simultaneously. There is no ordering of the key slices. *See* Exhibit 1. That being said, I do not exclude the possibility that Dr. Wright could have employed a modified Shamir Scheme, so I do not consider this testimony in making my findings.

to tell the Court. Either his delay in to doing so is deceptive and misleading, or his testimony that the public address is a meaningless piece of evidence is intentionally false.

In sum, after days of testimony, multiple discovery hearings, and lengthy pleadings, the sole evidence supporting Dr. Wright's claim that he cannot comply with the Court's Orders is the uncorroborated word of Dr. Wright. That word is insufficient to meet his evidentiary burden. Moreover, the totality of the evidence, including a negative inference drawn from Dr. Wright's incredible testimony and use of fraudulent documents, is more than sufficient to meet Plaintiffs' burden.

Dr. Wright argues that he would never risk going to jail for contempt or having sanctions imposed against him if he could produce a list of his bitcoin holdings. He argues it would not be credible that anyone would make that choice. Equally, if not more incredible, is the idea that someone who controlled almost 1 million bitcoin would encrypt it in a way that he could not access it, and then would not care if he lost it all. Additionally, as discussed above, there are many reasons a person in Dr. Wright's situation would take that risk.

### REMEDY

I now turn to the question of a proper remedy. Plaintiffs' Motion asked the Court to declare that "the 1,100,111 bitcoin referenced to in to [sic] the Tulip Trust document is joint property belonging equally to both Dave Kleiman and Craig Wright." DE 210 at 6. On August 26, at oral argument on the Motion, Plaintiffs asked the Court to strike Dr. Wright's pleadings. Rule 37 specifically recognizes that an appropriate discovery sanction is for the Court to deem certain facts established for purposes of this action. Fed. R. Civ. P. 37(b)(2)(a)(i). Rule 37 also permits a Court to strike pleadings. Fed. R. Civ. P. 37(b)(2)(A)(iii).

I find without hesitation that sanctions are not warranted against Dr. Wright's counsel. Several Rules of Civil Procedure authorize the Court to require a party's counsel to pay expenses associated with discovery violations; the expense award can be separately against counsel or jointly against counsel and the client. *See* Fed. R. Civ. P. 37(a)(5)(A), (B); Fed. R. Civ. P. 37(b)(2)(C); Fed. R. Civ. P. 26(g)(3). The Court finds no basis to sanction Dr. Wright's counsel. I have conducted numerous hearings and have been able to closely observe counsel's conduct. Counsel has zealously and ethically advocated for their client. Counsel has unfailingly been candid with this Court, even when Dr. Wright's conduct and conflicting statements have created awkward situations for counsel. I find that counsel reasonably relied on Dr. Wright as a source of information. I find that Dr. Wright, alone, is fully responsible for any evasion, incomplete or false representations to the Court, or non-compliance with the Court's orders.

There is clear and convincing evidence that Dr. Wright's non-compliance with the Court's Orders is willful and in bad faith, that Plaintiffs have been prejudiced, and (particularly given the extended pattern of non-compliance and its egregiousness) a lesser sanction is not adequate to punish or to ensure future compliance with the Court's Orders. Therefore, sanctions under Rule 37(b) are warranted.

To this day, Dr. Wright has not complied with the Court's orders compelling discovery on May 14 and June 14. Rather, as described above, the evidence establishes that he has engaged in a willful and bad faith pattern of obstructive behavior, including submitting incomplete or deceptive pleadings, filing a false declaration, knowingly producing a fraudulent trust document, and giving perjurious testimony at the evidentiary hearing. Dr. Wright's conduct has prevented Plaintiffs from obtaining evidence that the Court found relevant to Plaintiffs' claim that Dr. Wright and David Kleiman formed a partnership to develop Bitcoin technology and to mine bitcoin.

27

Plaintiffs have also been prejudiced by not being able to try to trace the bitcoin that was mined. His conduct has wasted substantial amounts of the Court's and the Plaintiffs' time and resources. It has unnecessarily protracted this litigation.

Counsel for Dr. Wright argued that it would be fundamentally unfair to Dr. Wright, and contrary to concepts of justice to impose discovery sanctions that forfeited his right to fully litigate the merits of his case. I have found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony. No conduct is more antithetical to the administration of justice. The sanctions I am imposing are necessary to achieve the remedial and punitive purposes of Rule 37. No lesser sanction would suffice.

**WHEREFORE**, it is ordered that:

1. The Motion to Compel [DE 210] is GRANTED. The Court will consider an award of reasonable expenses, including attorney's fees, related to filing and litigating this motion. *See* Fed. R. Civ. P. 37(a)(5)(A).

2. The Court will consider an award of reasonable expenses, including attorney's fees, related to filing and litigating Dr. Wright's Motion Regarding Production of a List of the Public Addresses of his Bitcoin as of December 31, 2013 [DE 155], which the Court construes as a Motion for Protective Order. *See* Fed. R. Civ. P. 26(c)(3).

3. On or before **September 20, 2019**, Plaintiffs may submit a request for reasonable fees and costs. A Response and Reply may be filed in accordance with time frames in the Local Rules. The parties should indicate in their respective pleadings whether they believe an evidentiary hearing is needed.

4. Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i), the Court deems the following facts to be established for purposes of this action: (1) Dr. Wright and David Kleiman entered into

a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin; (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership, (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them.

5. Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii) and (iii), the Court strikes Dr. Wright's Third Affirmative Defense (Good Faith), Fourth Affirmative Defense (Accord and Satisfaction), Fifth Affirmative Defense (Release), Sixth Affirmative Defense (Payment), Seventh Affirmative Defense (Set-off), Eighth Affirmative Defense (Failure to Mitigate Damages), Seventh [sic] Affirmative Defense (Waiver), and Tenth Affirmative Defense (Statute of Frauds).

**DONE AND ORDERED** in Chambers this 27th day of August, 2019, at West Palm Beach in the Southern District of Florida.

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

Page 389

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:18-cv-80176-BB/BR

IRA KLEIMAN, as the Personal
Representative of the Estate
of DAVID KLEIMAN, and W&K
Info Defense Research, LLC,

          Plaintiffs,

v.

CRAIG WRIGHT,

          Defendant.
_____/

                    Paul G. Rogers Federal
                    Building and U.S. Courthouse
                    701 Clematis Street
                    West Palm Beach, Florida 33401
                    Friday, June 28, 2019
                    9:17 a.m. - 11:28 a.m.

              C O N F I D E N T I A L

          CONTINUED VIDEOTAPED DEPOSITION OF
                DR. CRAIG STEVEN WRIGHT

          Taken before Darline M. West,

Registered Professional Reporter, Notary Public

in and for the State of Florida At Large,

pursuant to Notice of Taking Deposition filed

by the Plaintiffs in the above cause.

                Magna Legal Services
                  www.MagnaLS.com
                   866.624.6221



Page 423

```
 1    to Miss Ramona Watts?
 2         A.   Yes.
 3         Q.   What's her date of birth?
 4         A.   Thirtieth of October 1970.
 5         Q.   What is her current address?
 6         A.   Current address is my address in the UK,
 7    which is Harebell Hill in Cobham.
 8         Q.   What is her current e-mail address?
 9         A.   Ramona@RCJBR.org.
10         Q.   What is her current phone number?
11         A.   +44 7505290071.
12         Q.   What was her last name at birth?
13         A.   A-N-G.
14         Q.   And how many times has she been married?
15         A.   I'm her second marriage.
16         Q.   What was her first married name?
17         A.   Watts.
18         Q.   Where did you first meet Ramona?  Is it
19    okay if I call her Ramona?
20         A.   Yes.
21         Q.   When did you first meet Ramona?
22         A.   I was doing charity work.
23         Q.   And when did you first meet her?
24         A.   I don't remember the exact date.  I was --
25         Q.   Go ahead.  Sorry.
```



Page 424

1        A.    I was doing charity work.  I set up
2   computers and did other things for a number of
3   charities, and my first time meeting her was with one
4   of those.  It wasn't -- I mean --
5        Q.    Was it in Australia?
6        A.    Yes.
7        Q.    In approximately what year was it?
8        A.    The first time I met her, probably 2011.
9        Q.    And when did you start dating her?
10       A.    The end of 2011.
11       Q.    And when did you get married?
12       A.    We got married in 2013.
13       Q.    When in 2013?
14       A.    23rd of November.
15       Q.    Did you have a prenuptial agreement with
16   Ramona?
17       A.    I've never had a prenuptial agreement.
18       Q.    Did you enter into a post-nuptial
19   agreement?
20       A.    I've never had any nuptial agreement.
21       Q.    Did you ever discuss Dave with Ramona
22   before you got married?
23       A.    Yes.
24       Q.    What -- tell me about that conversation.
25       A.    I don't really remember.  I've discussed



Page 429

1    BY MR. FREEDMAN:

2         Q.   Strike that.

3              Did you have business interactions with

4    Steven Matthews and Robert McGregor in 2016?

5         A.   I believe you're saying Stefan Matthews.

6         Q.   "Stefan Matthews."  Thank you, Dr. Wright.

7              Did you have business relationships with

8    Stefan Matthews and Robert McGregor in 2016?

9         A.   Yes.

10        Q.   Was Ramona involved in those business

11   interactions?

12        A.   Yes.  I had resigned as a director.

13        Q.   So the answer is yes?

14        A.   Yes.

15        Q.   Was she on e-mails between you and

16   Matthews?

17        A.   I don't know.

18        Q.   Was she on e-mails between you and

19   McGregor?

20        A.   I don't know.

21        Q.   What were those business dealings with

22   Matthews and McGregor about?

23        A.   They're about the companies.

24        Q.   What about the companies?

25        A.   Moving where we are now, setting up nChain.



Page 430

```
 1        Q.    Setting up nChain to do what?
 2        A.    To continue the creation of my intellectual
 3   property.
 4        Q.    Were those business directions -- sorry.
 5   Strike that.
 6              Did those business interactions involve the
 7   selling of Satoshi Nakamoto's life rights?
 8        A.    The rights were added later.
 9        Q.    So, at some point, they came to involve
10   Satoshi Nakamoto's life rights?
11        A.    Unfortunately, yes.
12        Q.    When did that occur?
13        A.    I don't remember the date.  It happened
14   because of the media interaction.  The original deal
15   had nothing to do with Satoshi Nakamoto.  I was in a
16   panic as various media entities started querying me
17   and people took advantage of me and said they
18   wouldn't help me unless I signed that over.
19        Q.    And who did you sign the life rights over
20   to?
21        A.    I don't remember the exact nature of the
22   contract.
23        Q.    But it had to do with business dealings
24   with Matthews and McGregor?
25        A.    I don't remember the exact nature of the
```



| | |
|---|---|
| **From:** | Matthew Getz |
| **To:** | matthew@rcwlitagency.com |
| **Subject:** | ATTN: Peter Straus |
| **Date:** | Monday, July 23, 2018 5:35:00 PM |

Dear Mr Straus

My name is Matt Getz. I am a partner at Boies Schiller Flexner, an American law firm with an office in London.

I am writing to you because I would like to speak to one of your writers, Andrew O'Hagan, to see if he can help us in a litigation relating to Bitcoin and Craig Wright. In this litigation, my firm represents Ira Kleiman, the brother of the late Dave Kleiman. I would be very grateful if you could put me in contact with Mr O'Hagan.

I'd be happy to provide you with more details – perhaps we could meet in your office, or if more convenient, have a chat on the phone at a time that suits you.

Thanks and regards

Matt Getz

**Matthew Getz**
Partner

## BOIES SCHILLER FLEXNER (UK) LLP

5 New Street Square
London EC4A 3BF
(DDI) +44 (0) 20 3908 0722
(M) + 44 (0) 7985 381 095
mgetz@bsfllp.com
www.bsfllp.com

| From: | Matthew Getz |
|---|---|
| To: | peters@rcwlitagency.co.uk |
| Subject: | Contact |
| Date: | Tuesday, July 31, 2018 6:47:00 PM |

Dear Mr Straus

My name is Matt Getz. I am a partner at Boies Schiller Flexner, an American law firm with an office in London.

I am writing to you because I would like to speak to one of your writers, Andrew O'Hagan, to see if he can help us in a litigation relating to Bitcoin and Craig Wright. In this litigation, my firm represents Ira Kleiman, the brother of the late Dave Kleiman. I would be very grateful if you could put me in contact with Mr O'Hagan.

I'd be happy to provide you with more details – perhaps we could meet in your office, or if more convenient, have a chat on the phone at a time that suits you.

Thanks and regards

Matt Getz

**Matthew Getz**
Partner

**BOIES SCHILLER FLEXNER** (UK) LLP
5 New Street Square
London EC4A 3BF
(DDI) +44 (0) 20 3908 0722
(M) + 44 (0) 7985 381 095
mgetz@bsfllp.com
www.bsfllp.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC,

      Plaintiffs,

**Case No. 18-cv-80176(BB/BR)**

v.

CRAIG WRIGHT,

      Defendant.

_____/

## STIPULATED CONFIDENTIALITY ORDER

THIS CAUSE comes before the Court upon the Parties' Joint Motion for Entry of a Stipulated Confidentiality Order to Govern Discovery (DE 105), filed February 22, 2019.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and Rule 5.4 of the Local Civil Rules ("L. Civ. R."), Plaintiffs, Ira Kleiman, as personal representative of the estate of David Kleiman and W&K Info Defense Research, LLC, ("Plaintiffs") and Defendant, Dr. Craig Wright ("Defendant") (individually, a "Party" and collectively, the "Parties"), agree that discovery in the above-entitled proceeding may result in the disclosure of certain documents that constitute trade secrets or other confidential research, development, or commercial information within the meaning of Fed. R. Civ. P. 26(c)(l)(G), as well as the production of confidential personal information. Consequently, to streamline the discovery process and avoid repeated disputes, the Parties agreed to jointly move for a Stipulated Confidentiality Order to be entered to govern the disclosure and use of discovery materials and testimony from a Party or non-party producing material that a Party or non-party regards as appropriately deemed confidential. (DE 105).

The Court has reviewed the Parties' agreement and while it finds good cause to enter the

stipulated confidentiality order to streamline the discovery process, the Court cautions the Parties that the "general policy" in this district is that "Court filings are matters of public record." L. Civ. R. 5.4 (a). As required under L. Civ. R. 5.4 (b), any party seeking to file information or documents under seal shall file a motion to file under seal and support such a motion with specific reasons to justify it. The Confidentiality Order binds the Parties, not the Court, and the standard set forth in L. Civ. R. 5.4 must still be shown before a filing is sealed.

Accordingly, pursuant to Fed. R. Civ. P. 26(c)(l)(G) the Court hereby enters the following Confidentiality Order:

1.    **Scope of Use.** All "Confidential" and "Highly Confidential—Attorneys' Eyes Only" information produced or exchanged in the course of this Proceeding shall be used solely for the purpose of trial preparation and trial in this Proceeding, including mediation, and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms of this Confidentiality Order.

2.    **Designation of Information.** A Party or non-party responding to a subpoena or request for documents or information served in this case, may, in accordance with this Stipulation, designate as "Confidential" or "Highly Confidential—Attorneys' Eyes Only," in the manner set forth in this Stipulation, any documents, testimony and other information furnished or disclosed to or by any other Party/non-party or their counsel during discovery, in disclosures, or in trial. In designating information as "Confidential" or "Highly Confidential—Attorneys' Eyes Only," a Party or non-party will make such designation only as to that information that it in good faith believes is confidential information.

3.    **"Confidential" Designation.** A Party or non-party responding to a subpoena or request for documents or information may designate as "Confidential" any document or any

2

portion of a document, and any other thing, material, testimony, or other information that it reasonably and in good faith believes contains or reflects (a) trade secrets (b) non-public commercial financial information; (c) private corporate information; (d) materials subject to a confidentiality or non-disclosure agreement with a non-party; (e) personal financial information; (f) communications that contain romantically or sexually intimate statements; or (g) information that, pursuant to state, federal, or foreign law, is entitled to confidential treatment.

4. Documents that are not otherwise Confidential but contain personally identifiable information such as social security numbers, physical addresses, e-mail addresses, phone numbers, and non-public social media accounts will not be marked as Confidential. However, if any such document is made public, all such personally identifiable information will be redacted.

5. A Party may designate as "Confidential" materials produced by a non-party to the extent such materials belong to that Party or a business entity or trust in which that Party has an interest or was made at that party or business entity/trust's request, and that it reasonably and in good faith believes contains or reflects Confidential Materials as defined in paragraph 3 of this Order.

6. The following information shall not be considered "Confidential": any information or thing that: (i) at the time of the entry of this Confidentiality Order is available to the public; (ii) after the entry of this Confidentiality Order, becomes available to the public not in violation of this Confidentiality Order.

7. The Parties and any producing non-parties shall make all designations of "Confidential" information and things in good faith and shall not knowingly make any designation (or shall promptly withdraw, upon request, any designation) in conflict with this Order.

3

8.     **"Highly Confidential—Attorneys' Eyes Only" Designation.** A Party or non-party responding to a subpoena may designate as "Highly Confidential—Attorneys' Eyes Only"[1] any document or portion of a document and any other thing, material, testimony or other information, that includes (1) trade secrets or (2) highly sensitive non-public commercial financial information or highly sensitive private corporate information relating to any current business in which a Party has an interest and which it reasonably and in good faith believes that disclosure to persons other than those specified herein in paragraph 14 could reasonably be expected to result in injury to that Party or non-party.

9.     **Time Period for Protection.** Except as otherwise provided below, any information, document, data, thing, deposition testimony, or interrogatory answer produced, given, or served pursuant to discovery requests in this litigation and designated by the producing Party or non-party as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" (the "Material"), or any information contained in or derived from any of the foregoing Material, shall be subject to the provisions of this Confidentiality Order until the Parties agree in writing or a court order otherwise directs.

10.     **Document Production and Exhibits.** Confidential Material shall be designated as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" by including a legend of "Confidential" or "Highly Confidential—Attorneys' Eyes Only" on each page thereof as to which confidentiality is claimed. All copies of Material stamped "Confidential" or "Highly Confidential—Attorneys' Eyes Only" shall also be designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only." Any mark made to identify a document as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" shall be made so as not to obscure any of the

---

[1] It shall suffice to mark any such material as "Highly Confidential" or "Attorneys' Eyes Only".

4

Material's content. With respect to any Materials designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" that are not produced in paper form (such as diskettes, magnetic media, and other Material not produced in paper form) and that is not susceptible to the imprinting of a stamp signifying its confidential nature, the producing Party shall, to the extent practicable, produce such Material with a cover labeled "Confidential" or "Highly Confidential—Attorneys' Eyes Only" and shall inform all counsel in writing of the "Confidential" or "Highly Confidential—Attorneys' Eyes Only" designation of such Material at the time such Material is produced.

11. **Documents Generated During Suit.** Any Party that seeks to file a document with the Court (the "Filing Party") that attaches, quotes, paraphrases, summarizes, or otherwise produces documents that have been designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" under this confidentiality order shall comply with the procedures laid out in Local Rule 5.4(b). If the Filing Party does not agree with the confidential designation, the Filing Party must still comply with Local Rule 5.4(b) and file a motion to seal referencing this confidentiality order, however, the Filing Party may note its disagreement with the confidential designation in that motion. The designating party may then respond to the motion to seal supporting its designation, to which the Filing Party may reply.

12. **Depositions.** Any Party or non-party deponent or its counsel may, consistent with the terms of this Confidentiality Order, designate a portion of a deposition of that party/non-party or of an employee, authorized representative, or business of that party or non-party, as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material by denominating by page and line those portions of the deposition which are to be considered "Confidential" or "Highly Confidential—Attorneys' Eyes Only" within thirty (30) days of conclusion of the

5

deposition, and so informing all other parties of such designation. Until the thirty-day period to designate deposition testimony as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" has passed, the deposition transcript and any exhibits not previously designated shall be treated as "Confidential", however, to the extent that the any "Highly-Confidential—Attorneys' Eyes Only" Materials were used during the deposition, those materials as well as any discussion of them in the deposition shall still be treated as "Highly-Confidential—Attorneys' Eyes Only." Any portion of a deposition so designated, shall not be filed with the Court, except in accordance with paragraph 11 of this Confidentiality Order. Persons attending depositions must leave the room before any discussion of any "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material that such person is not entitled to hear, see or review under the provisions of this Confidentiality Order, and the attorney taking the deposition must alert those participating in advance of any such upcoming discussion.

13. **Restrictions on Use of Confidential Material.** Except as agreed by the designating Party, designating non-party, or their counsel or as otherwise provided herein, information designated as "Confidential" or "Highly Confidential—Attorneys' Eyes Only":

    a. Shall be maintained in confidence by the counsel to which it is furnished;

    b. May be filed with the Court only as provided in paragraph 11, above and may be disclosed by such counsel only to Authorized Persons entitled to access thereto under this paragraph and paragraph 14 below;

    c. May be used by such counsel and the Authorized Person to whom it is disclosed only for the purposes of this Proceeding and for no other purpose; and

    d. May be photocopied or reproduced only as reasonably necessary for this Proceeding.

Nothing herein shall prevent disclosure beyond the terms of this Confidentiality Order if the Party or non-party designating the information as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" consents in writing to such disclosure. Nor shall anything herein prevent any counsel of record from utilizing "Confidential" or "Highly Confidential—Attorneys' Eyes Only" information in the examination or cross-examination of any person reasonably believed to be the author, original source, or a recipient of the "Confidential" or "Highly Confidential—Attorneys' Eyes Only" information, or the designated representative of the Party or non-party who produced the "Confidential" or "Highly Confidential—Attorneys' Eyes Only" information.

14.    **Authorized Users of Confidential Materials.** Except as agreed by the designating Party, designating non-party or their counsel or as otherwise provided herein, "Confidential" Material subject to this Confidentiality Order or extracts or summaries therefrom shall only be used or disclosed as provided herein and may not be given or shown to any person except the following:

   a.  Any Party and employees or independent contractors of a corporate Party actively engaged in assisting that Party's attorneys in the conduct of this litigation, to the extent reasonably necessary to enable the attorneys for that party to render professional services in the litigation.

   b.  Any Confidential Material to which the person to whom the Confidential Material is being disclosed was an original author or recipient of the Confidential Material.

   c.  Persons who are expressly retained to assist a Party's counsel ("Retaining Counsel") in the preparation of this Proceeding for trial including, but not limited to, consulting and testifying experts, independent auditors, accountants, statisticians, software engineers, economists, and other experts, and the

7

employees of such persons ("Outside Experts"), after such Outside Expert has signed and delivered to Retaining Counsel a statement in the form annexed hereto as Exhibit A. However, law firms or attorneys who have been retained to prosecute or defend any claims in this action or otherwise assist in the trial preparations, trial, or any other proceedings associated herewith, need not sign Exhibit A, but are bound by the terms of this Confidentiality Order nonetheless.

d. A Party's outside copy/document preparation service, which includes any e-discovery consultants, jury consultants, and video and court reporting services used at any deposition ("Vendors"), after such Vendor has signed and delivered to Retaining Counsel a statement in the form annexed hereto as Exhibit A.

e. The Court, other court officials (including court reporters) and the trier of fact.

f. Any other person who subsequently is designated by (i) written agreement of all the Parties after a request by one of them or (ii) by order of the Court upon motion by a Party and an opportunity to oppose by the objecting Party.

g. Mock jurors, after reviewing, signing and delivering a statement in the form annexed hereto as Exhibit A.

No person allowed to view "Confidential" Material shall use any "Confidential" Material for any purpose except as needed solely in connection with or to assist in the prosecution or defense of the claims between the Parties in this Proceeding, and each person shall make best efforts necessary to fully and completely protect the confidentiality of the designated Material.

The parties agree that no Confidential Material may be provided to litigation funders (i.e., persons or entities (i) providing financial support of any kind to Plaintiffs related to the above-captioned matter, (ii) purchasing a portion of Plaintiffs' rights to any judgment obtained in the

8

above-captioned matter, or (iii) providing a loan to Plaintiffs (including Ira Kleiman individually) where the collateral is related to the claims or any potential recovery in the above-captioned matter).

15. **Authorized Users of "Highly Confidential—Attorneys' Eyes Only" Material.** Except as agreed by the designating Party or designating non-party or its counsel or as otherwise provided herein, "Highly Confidential—Attorneys' Eyes Only" Material subject to this Confidentiality Order, or extracts or summaries therefrom, shall only be used or disclosed as provided herein and may not be given or shown to any person except the following:

  a. Attorneys employed by the law firms of Boies Schiller Flexner LLP, and Rivero Mestre LLP and the regular employees of such attorneys to whom it is necessary that the material be shown for purposes of the prosecution or defense of the claims between the Parties in this Proceeding.

  b. Those persons listed in sub-paragraphs 14(b), (c), (d), (e), (f), and (g) above.

No person allowed to view "Highly Confidential—Attorneys' Eyes Only" Material shall use any "Highly Confidential—Attorney's Eyes Only" Material for any purpose except as needed solely in connection with or to assist in the prosecution or defense of the claims between the Parties in this Proceeding, and each person shall make best efforts necessary to fully and completely protect the confidentiality of the designated Material. Nothing in the Confidentiality Order is intended to prevent a Party or its employees from reviewing the Party's own "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material.

16. **Disclosure of Confidential Material to Witnesses or Deponents.** If counsel wishes to disclose "Confidential" Material to a witness that it reasonably believes it may call at trial or a deponent not designated in paragraphs 14 or 15 above, the witness or deponent shall,

9

prior to the receipt of Material, execute and deliver to counsel a statement in the form annexed hereto as Exhibit A. Any Party whose designated materials were used at a deposition pursuant to this paragraph has the right to designate those portions of the transcript confidential in accordance with the procedure outlined in paragraph 12 herein, even if the material was used in a deposition that was not of that Party or of an employee, authorized representative, or business of that Party.

17. **Disclosure of "Highly Confidential—Attorneys' Eyes Only Material to Witnesses or Deponents.** If counsel wishes to disclose "Highly Confidential—Attorneys' Eyes Only" Material to a witness or deponent not designated in paragraphs 13 or 14 above, they must provide so in writing to counsel for all Parties ten (10) days in advance of any such proposed disclosure to afford counsel an opportunity to object to such disclosure: (i) the names of the persons to whom they wish to disclose "Highly Confidential—Attorneys' Eyes Only" Material, (ii) a description of the Material to be disclosed to such person, and (iii) a brief statement of the person's connection to the case. If no objection is made within 5 (five) days of notification, disclosure to such named persons may be made after the expiration of such 5-day period. If an objection is made, the Party proposing the disclosure must seek an order from the Court allowing the proposed disclosure, and the objecting Party must have an opportunity to present its objection to the Court thereafter. Once such a motion is filed, the Material shall not be disclosed pending a decision by the Court on such motion. Any person who becomes authorized to receive "Highly Confidential—Attorneys' Eyes Only" Material pursuant to this paragraph (whether such authorization arises from the lack of an objection or from the Court's ruling on a motion for disclosure) shall, prior to the receipt of Material, execute and deliver to counsel a statement in the form annexed hereto as Exhibit A.

10

18.    **Compelled Disclosure**. If a Party or its counsel receives a discovery request, subpoena, or order of any court or other tribunal in another case or proceeding for materials designated by another Party or non-party to this case as "Confidential" or "Highly Confidential—Attorney's Eyes Only," the Party receiving the request for such materials shall, if not prohibited by law, (a) within five (5) business days of the receipt of such request or demand, and prior to responding to the request or demand, notify in writing counsel for the designating and/or producing party or non-party and further provide a copy of the request or demand; (b) provide a reasonable time, in any event no later than fourteen (14) days after receiving such notice, for the designating and/or producing party non-party whose material is sought to seek to protect its material from disclosure prior to producing or disclosing the requested information; and (c) provided that the designating and/or producing party whose material is sought makes a timely motion or other application for relief from the request or demand in the appropriate forum, shall not produce or disclose the requested information without written consent of the Party whose material is sought or until ordered by a court.

19.    **Challenging Designation**. If any Party believes that any Material that has been designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" should not be subject to this Confidentiality Order, that Party must notify the producing and/or designating Party or the producing and/or designating non-party in writing and provide a description of the Material which the receiving Party believes should be freed from the constraints of this Confidentiality Order, and serve copies of such notice to counsel for all other Parties herein. Counsel shall confer in good faith in an effort to resolve any dispute concerning such designation. If the objection cannot be resolved by agreement within ten (10) days from the date of service of the written objection, the receiving Party shall move the Court for an order

11

determining whether the information at issue is subject to this Confidentiality Order. The Party asserting the "Confidential" or "Highly Confidential—Attorneys' Eyes Only" designation shall have the burden of showing why such information is entitled to confidential treatment. No presumption of weight will attach to the initial designation of material as "Confidential" or "Confidential – Attorney's Eyes Only." If such a motion is filed, the protection afforded by the Confidentiality Order shall continue until the Court makes a decision on the motion.

20. **Use of Confidential Material at Trial.** This Confidentiality Order does not govern use of discovery material at trial, where, subject to this Court's future rulings, any materials can be used publicly. That said, to the extent material is not used at trial, the protections of this Confidentiality Order shall remain unchanged.

21. **No Waiver.** The Confidentiality Order shall not be deemed a waiver of:

    a. Any Party's right to object to any discovery requests on any ground;

    b. Any Party's right to seek an order compelling discovery with respect to any discovery request;

    c. Any Party's right to object to the admission of any evidence on any ground;

    d. Any Party's right to use documents it designates as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" in its sole and complete discretion; or

    e. The status of any material as a trade secret.

22. **Retroactive Designation and Inadvertent Disclosure.** Documents or other information previously disclosed may be retroactively designated by the producing party by notice in writing of the designated class of each document (including by Bates number). The inadvertent or unintentional designation or production of documents containing, or other disclosure of, information without being designated as "Confidential" or "Highly Confidential—

12

Attorneys' Eyes Only" at the time of designation, production, or disclosure shall not be deemed a waiver in whole or in part of a Party's or non-party's claim of confidentiality or secrecy, either as to the specific information or as to any other information relating thereto or on the same or related subject matter. Any inadvertent designation or disclosure shall be corrected as soon as reasonably possible after the designating Party or designating non-party becomes aware of the error. The production of documents or other tangible things pursuant to a request for production by a Party herein shall not be deemed a waiver of any right by the producing Party or producing non-party to object to the admissibility of such document or other thing on grounds of relevancy, materiality, privilege or other valid ground of objection.

23.     **Inadvertent Production of Privileged Materials**. The Parties do not intend to disclose information subject to a claim of attorney-client privilege, work product protection, or any other privilege or protection. If a Party, or producing non-party ("Disclosing Party") inadvertently discloses such privileged or protected information ("Inadvertently Disclosed Information") to another party ("Receiving Party"), it shall promptly notify the Receiving Party and the following provisions will apply:

> a. The disclosure of Inadvertently Disclosed Information shall not constitute or be deemed a waiver or forfeiture in this proceeding or any other federal or state proceeding of any claim of attorney-client privilege, work product protection, or any other privilege or protection that the Disclosing Party would otherwise be entitled to assert with respect to the Inadvertently Disclosed Information and its subject matter.
>
> b. If a Disclosing Party notifies the Receiving Party of Inadvertently Disclosed Information, the Receiving Party shall:

13

    i.  immediately cease using, copying, or distributing the Inadvertently Disclosed Information; and

    ii.  shall return or certify the destruction of, within five (5) days, all copies of the Inadvertently Disclosed Information, including any documents created by the Receiving Party based upon such information to the Disclosing Party.

c.  The Receiving Party may move the Court for an order permitting it to retain and use the Inadvertently Disclosed Information. Such motion must be made within ten (10) days after the Disclosing Party first provides notice to the Receiving Party of the Inadvertently Disclosed Information. A motion filed by the Receiving Party under this provision, may reference the contents of and attach the challenged discovery material or information in any related submission to the Court, provided the filing is made under seal. The Receiving Party (i) may while the motion is pending, keep, but must not use or disclose, the Inadvertently Disclosed Information until the claim is resolved; and (ii) must take reasonable steps to retrieve the Inadvertently Disclosed Information if the Receiving Party disclosed it before being notified by the Disclosing Party.

If the Receiving Party discovers that it has received Inadvertently Disclosed Information, it shall immediately inform the Disclosing Party and follow the same procedures above. Where the Parties agree, or the Court orders, that Inadvertently Disclosed Information is protected by the attorney-client, work product, or other privilege, and such material was originally produced in electronic format on media containing production materials, the producing

14

Party or non-party shall promptly provide replacement production media, omitting the privileged material, to the receiving Party.

24. **Responsibility of Counsel.** Counsel for the Parties to whom "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material has been furnished shall be responsible for restricting use and disclosure of such Material in accordance with the provisions of this Confidentiality Order and for securing execution of and retaining the statement attached hereto as Exhibit A as and when required under the provisions of this Confidentiality Order. Counsel for the Parties will provide executed copies of Exhibit A to opposing counsel upon request.

25. **Modification of Order.** This Confidentiality Order may be modified or amended either by written agreement of the Parties or by order of the Court upon good cause shown. No oral waivers of the terms of this Confidentiality Order shall be permitted between the Parties.

26. **Non-Party Material.** To the extent that the Parties receive or, in turn, produce information or documents received from any non-parties that have been designated as "Confidential" or "Highly Confidential—Attorneys' Eyes Only," by that non-party, such information or documents shall be treated as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" in accordance with the terms of this Confidentiality Order and any deposition testimony concerning the contents of such documents shall likewise be treated as "Confidential" or "Highly Confidential—Attorneys' Eyes Only" in accordance with the terms of this Confidentiality Order.

27. **Conclusion of Proceeding.** The provisions of this Confidentiality Order shall continue in effect with respect to any "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material until expressly released by the Party furnishing such Material, and such effectiveness shall survive the final determination of this action. Within ninety (90) days of the

final determination of this action, including any appeal, all "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material, including all copies, derivations and summaries thereof, shall be either (a) returned to the disclosing party or disclosing non-party upon request; or (b) destroyed or deleted, with a written certification provided to the disclosing party or disclosing non-party upon request. This paragraph includes the return or destruction or deletion of all "Confidential" or "Highly Confidential—Attorneys' Eyes Only" material provided to any Authorized Person, including Outside Experts. However, counsel of record who are permitted to possess such information are permitted to retain a copy of their attorney file, including attorney work product, which may contain "Confidential" or "Highly Confidential—Attorneys' Eyes Only" information. For purposes of this Confidentiality Order, the "final determination of this action" shall be deemed to be the later of (i) the service and filing of a voluntary dismissal of all claims or other paper or pleading effectively denoting full settlement of all claims asserted in this proceeding; (ii) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials and reviews, if any, of this Proceeding; or (iii) the expiration of all time limits under federal law for the filing of or application for all appeals, rehearings, remands, trials or reviews of this Proceeding, including the time limits for the filing of any motions or applications for extension of time pursuant to applicable law. The Parties and any non-party invoking the terms of this Confidentiality Order agree that the Court shall have continuing jurisdiction over the Parties and recipients of "Confidential" or "Highly Confidential—Attorneys' Eyes Only" information for enforcement of the provisions of this Confidentiality Order following termination of this Proceeding.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated this ___ day of _____, 2019.

16

| **RIVERO MESTRE LLP** | **BOIES SCHILLER FLEXNER LLP** |
|---|---|
| /s/ Zaharah R. Markoe | /s/ Velvel (Devin) Freeman |
| Andres Rivero, Esq. (Fla. Bar No. 613819) | Velvel (Devin) Freeman, Esq. (Fla. Bar No.) |
| Alan Rolnick, Esq. (Fla. Bar No. 715085) | 100 SE Second Street, |
| Amanda McGovern (Fla. Bar No. 964263) | Miami, FL 33131 |
| Zaharah Markoe, Esq. (Fla. Bar No. 504734) | (305) 539-8400 (telephone) |
| 2525 Ponce de León Blvd., Suite 1000 | (305) 539-1307 (facsimile) |
| Miami, Florida 33134 | Email: vfreedman@bsfllp.com |
| | |
| *Counsel for Defendant* | Kyle W. Roche, Esq. |
| | *Admitted Pro Hac Vice* |
| | 333 Main Street |
| | Armonk, NY 10504 |
| | (914) 749-8200 (telephone) |
| | (914) 749-8300 (facsimile) |
| | Email: kroche@bsfllp.com |
| | |
| | *Attorneys for Plaintiffs* |

17

## EXHIBIT A – CONFIDENTIALITY AGREEMENT

1. I have been provided with a copy of and agree to be bound by the terms of the Stipulated Protective Order in Case No. 9:18-CV-80176-BLOOM/REINHART, *Ira Kleiman, et al. v. Craig Wright.* pending in the Southern District of Florida.

2. I will only make such copies of or notes concerning documents designated "Confidential" or "Highly Confidential—Attorneys' Eyes Only" as are necessary to enable me to render the assistance required in connection with this litigation, and, all such notes and copies shall be preserved in a separate file maintained as confidential and marked for disposal or destruction upon completion of this litigation. Upon the final determination of this action, I shall promptly destroy all "Confidential" or "Highly Confidential—Attorneys' Eyes Only" materials provided to me as well as any notes or derivations thereof.

3. I will not intentionally reveal the contents of "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material to any unauthorized person. I will not intentionally use "Confidential" or "Highly Confidential—Attorneys' Eyes Only" Material for any purpose other than the prosecution or defense of claims in this action.

4. I understand that failure to comply with the terms of the Stipulated Protective Order may result in civil liability against me to any party or person damaged thereby. I consent to the jurisdiction of the United States District Court for the Southern District of Florida (without any time limit) for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

DATED this ___ day of _____, 20___.

_____
(Print Name)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal
representative of the Estate of David
Kleiman, and W&K Info Defense Research,
LLC

      Plaintiffs,

v.

CRAIG WRIGHT

      Defendant.

**CASE NO.: 9:18-cv-80176-BB**

### DECLARATION OF IRA KLEIMAN

I, IRA KLEIMAN, declare as follows:

1. I submit this Declaration based on personal knowledge in support of Plaintiffs'

Opposition to Defendant's Motion to Dismiss the Amended Complaint in the above captioned

matter.

2. I am a citizen of the United States and a resident of the state of Florida.

3. I am the personal representative of the Estate of David Kleiman, a Florida Estate.

4. Dave Kleiman was a United States citizen and Florida resident. I am not aware of

him ever visiting Australia.

5. Acting in my capacity as personal representative to Dave's estate, I caused W&K

Info Defense Research, LLC to be reinstated on April 12, 2018 and paid all necessary fees to the

Florida Department of State.

6. Attached as Exhibit A to this declaration is the Certification from the Florida

Department of State declaring that W&K Info Defense Research has paid all fees due through

December 31, 2018, and that its status is active.

7.    I am currently the Registered Agent and sole Managing Member for W&K Info Defense Research.

8.    Acting in my capacity as the sole Managing Member, I caused W&K Info Defense Research to bring suit against Craig Wright on May 14, 2018. D.E. 24 ("AC").

9.    I am not wealthy and litigating this case in Australia is beyond my means; I would be severely prejudiced if I had to litigate this case there.

10.    I first became aware of the two claims Craig Wright filed in New South Wales Supreme Court on April 15, 2014 when the Australian Tax Office contacted me. I have never received service of process for any of these claims.

11.    Prior to February 2015, I was not aware of the extent of Dave's involvement in (1) the creation of Bitcoin, (2) the mining of a substantial number of bitcoins, or (3) the development of significant intellectual property related to blockchain technologies.

12.    Through my own investigations and with the assistance of counsel, I have identified the following list of Florida witnesses that I believe have critical information relevant to the central issues in this lawsuit:

   a.  **Patrick Page** – Mr. Page was Dave's business partner and confidant. Mr. Page was aware of Dave's friendship with Craig and was in direct contact with Craig after Dave died. Dave and Mr. Page founded a Florida business called Computer Forensics LLC. https://computerforensicsllc.com/.

   b.  **Carter Conrad** – Mr. Conrad was Dave's other business partner at Computer Forensics LLC. Mr. Conrad also had direct communication with Craig after Dave's death.

   c.  **Computer Forensics LLC** – Computer Forensics LLC is the business created by Dave with Mr. Conrad and Mr. Page. Computer Forensics LLC possesses numerous business records belonging to Dave, including emails he sent from the company account, and the dave@davekleiman.com address mentioned in the complaint.

   d.  **Global Institute for Cyber Security Research ("GICSR")** – GICSR is a Florida entity based out of the NASA / Kennedy Space Center. https://www.gicsr.org/.

2

**421**

Page 387 of 420

Craig was a director of GICSR and informed me there was a GISCR trust related to Dave's bitcoins. Craig possesses an email account associated with GISCR (craig.wright@gicsr.org) which I know he used to communicate with other individuals associated with GICSR and Dave.

e. **Deborah Kobza** – According to her Linkedin page, Ms. Kobza is listed as the CEO of GICSR, is based out of Merritt Island, Florida, and has been with GICSR since June 2010. I know Craig has communicated directly with her and Dave in his capacity as a GISCR Director. https://www.linkedin.com/in/deborah-kobza-cgeit-jiem-98b4a8/.

f. **Kourtney Karr** – Ms. Karr was Dave's girlfriend during the time in which he became friends with Craig and began to work with Craig on various business projects.

g. **Joseph Karp** – Mr. Karp was Dave's counsel and close friend. He also represented me for a period after Dave's death and had communications with both Craig and his counsel during 2014.

h. **David Kuharcik** – Mr. Kuharcik was Dave's accountant around the time of his involvement in the creation of Bitcoin and until his death in 2013.

13.   Through my own investigations and with the assistance of counsel, I have

identified the following list of United States witnesses, that likely have critical information

relevant to the key issues in this lawsuit:

a. **Uyen Nguyen** – On February 15, 2014, Ms. Nguyen told me, via email, that she knew Dave through her involvement with projects she worked on with Craig. In the *Satoshi Affair*, written by Andrew O'Hagan (described below), she is said to have begun working with Dave and Craig towards the end of 2012. AC Ex. 1 at 37. The author writes: "While I was preparing this story, Wright began to seem worried about Nguyen. I always felt he was in the middle of a very complicated lie when he talked about her." *Id*. O'Hagan also wrote that she was a "powerful figure in the trust," and a director of key companies. *Id*. He also stated that:

> [i]t's unclear how such a young and inexperienced person came to have so much influence. Wright told me she was volatile, capricious and beyond control' and added that Kleiman liked young women and that she was loyal and trusted – but that 'she wants to help and this always leads to trouble.' *Id*.

Ms. Nguyen's signature is identified on a trust document that identifies a number of bitcoin wallets and states "as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW." AC Ex. 15 at 9.

3

On March 28, 2014, more than a month after both Ms. Nguyen and Craig reached out to me, Ms. Nguyen, without notifying me, reinstated W&K Info Defense Research LLC here in Florida and listed herself as the registered agent. She also listed herself as its manager and secretary, and Craig's company as its director.

b. **Gavin Andresen** – Mr. Andresen is a software developer well known for his involvement in the early stages of Bitcoin. During that time, Mr. Andresen is widely known to have been in intimate contact with "Satoshi Nakamoto," i.e., Dave and Craig per the admissions cited in the AC.

Craig claimed to have been in communication with Mr. Andresen during the development of Bitcoin. AC Ex. 1 at 32.

Andrew O'Hagan writes that he witnessed Craig tell Mr. Andresen about the trust, his bitcoin holdings, and what happened to them. *Id.* at 63. On May 2, 2016, Mr. Andresen wrote a blog post stating that he witnessed Craig cryptographically verify his identity as Satoshi, and that Craig "cleared up a lot of mysteries, including why he disappeared when he did and what he's been busy with since 2011." *Id.* at 81.

Mr. Andresen witnessed Craig's use of private keys associated with the some of the bitcoins at issue in this case. *Id.* at 63-67.

c. **Bob Radvanovsky** – Craig reached out to Mr. Radvanovsky for his assistance with the funding proposals W&K Info Defense Research submitted to the Department of Homeland Security.

d. **U.S. Department of Homeland Security** – Craig and Dave, through W&K Info Defense Research, submitted funding proposals to the Department of Homeland Security. In the claims Craig submitted against W&K Info and Defense Research in the Supreme Court of New South Wales, Craig claimed that these projects were proscribed valuations ranging from $650,000 to $2.2 million. AC Ex. 11 at 10.

e. **Ross Ulbricht** – Mr. Ulbricht is the creator of the illicit drug market Silk Road. Craig and Mr. Ulbrict met in Australia at least once. AC Ex. 1 at 49. In an interview with one of Craig's associates documented in *The Satoshi Affair*, Craig's associate states "You've got Ross Ulbricht who's in prison and apparently going to appeal trial this year or next. What happens when Ross sees Satoshi's name splashed everywhere and Craig's name everywhere. Is he going to say 'I had lunch with that guy. We made a deal?'" *Id.*

Mr. Ulbricht is currently incarcerated in a Federal custody in the state of Colorado.

f. **Shyaam Sundhar** – Mr. Sundhar is an information technology professional who co-authored a paper with Dave Kleiman and Craig Wright that was published around October 2008, *i.e.*, during the time they were collaborating on the creation of Bitcoin.

g.  **Wei Dai** – Mr. Dai is another individual Craig claimed that he was in contact with while he and Dave were developing Bitcoin. AC Ex. 1 at 32.

h.  **Michele Seven** – Ms. Seven is a former confidant of Craig's who facilitated his first public appearance in which he revealed he was involved in the creation of Bitcoin.

14.  Through my own investigations and with the assistance of counsel, I have discovered that Jimmy Nguyen is a material witness to this litigation and likely has intimate knowledge concerning the intellectual property assets at issue in this litigation. A few weeks before the Australian Tax Office raided Craig's house, Jimmy Nguyen, then a partner in the Los Angeles office of the law firm Davis Wright Tremaine, reached out to Andrew O'Hagan explaining that his "client has acquired life story rights . . . from the true person behind the pseudonym Satoshi Nakamoto – the creator of the bitcoin protocol." AC Ex. 1 at 9. Recently, Mr. Nguyen was appointed the CEO of nChain, the company Craig has used to file dozens of patents related to Bitcoin and blockchain based technology. https://www.prnewswire.com/news-releases/nchain-group-appoints-jimmy-nguyen-as-chief-executive-officer-300566907.html.

15.  Through my own investigations and with the assistance of counsel, I have identified the following list of United Kingdom based witnesses that have, or may have, critical information relevant to this lawsuit:

a.  **Ramona Watts** – Ms. Watts is Craig's wife and currently lives with Craig in the United Kingdom. In 2015, Ms. Watts communicated with me about the ATO's investigation into Craig Wright and made multiple representations to me concerning the value of Coin-Exch. She appeared to be intimately familiar with Craig's actions. She provided me with a copy of AC Ex. 18.

b.  **Andrew O'Hagan** – Mr. O'Hagan is a well-known British journalist and author of *The Satoshi Affair*. He was contacted by Jimmy Nguyen in 2015 to document Craig Wright's public revelation of himself as Satoshi Nakamoto. Per his own writings, Mr. O'Hagan spent six months interviewing Craig shortly after he fled Australia and has intimate first-hand knowledge of Craig, his associates, and Craig's admissions regarding the actions he took with Dave as Satoshi, and thereafter.

5

    c. **Robert MacGregor** – Mr. MacGregor is an associate of Craig's who was involved in the purchase of the Satoshi Nakamoto life story rights. AC. Ex. 1 at 11. Mr. MacGregor has helped facilitate Craig's involvement in nChain.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th day

of July, 2018 at Palm Beach, Florida.

Ira Kleiman

# EXHIBIT A

# *State of Florida*
## *Department of State*

I certify from the records of this office that W&K INFO DEFENSE RESEARCH LLC is a limited liability company organized under the laws of the State of Florida, filed on February 16, 2011, effective February 14, 2011.

The document number of this limited liability company is L11000019904.

I further certify that said limited liability company has paid all fees due this office through December 31, 2018, that its most recent annual report was filed on April 12, 2018, and that its status is active.

*Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this
the Twelfth day of April, 2018*



Ken Detzner

**Secretary of State**

Tracking Number: CR3065128037

To authenticate this certificate,visit the following site,enter this number, and then follow the instructions displayed.

https://services.sunbiz.org/Filings/CertificateOfStatus/CertificateAuthentication

427

A deposition notice or a commission must designate by name or descriptive title the person before whom the deposition is to be taken.

(4) *Letter of Request—Admitting Evidence.* Evidence obtained in response to a letter of request need not be excluded merely because it is not a verbatim transcript, because the testimony was not taken under oath, or because of any similar departure from the requirements for depositions taken within the United States.

(c) DISQUALIFICATION. A deposition must not be taken before a person who is any party's relative, employee, or attorney; who is related to or employed by any party's attorney; or who is financially interested in the action.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Apr. 29, 1980, eff. Aug. 1, 1980; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 1, 2007, eff. Dec. 1, 2007.)

### Rule 29. Stipulations About Discovery Procedure

Unless the court orders otherwise, the parties may stipulate that:

(a) a deposition may be taken before any person, at any time or place, on any notice, and in the manner specified—in which event it may be used in the same way as any other deposition; and

(b) other procedures governing or limiting discovery be modified—but a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery, for hearing a motion, or for trial.

(As amended Mar. 30, 1970, eff. July 1, 1970; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007.)

### Rule 30. Depositions by Oral Examination

(a) WHEN A DEPOSITION MAY BE TAKEN.

(1) *Without Leave.* A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). The deponent's attendance may be compelled by subpoena under Rule 45.

(2) *With Leave.* A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2):

(A) if the parties have not stipulated to the deposition and:

(i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants;

(ii) the deponent has already been deposed in the case; or

(iii) the party seeks to take the deposition before the time specified in Rule 26(d), unless the party certifies in the notice, with supporting facts, that the deponent is expected to leave the United States and be unavailable for examination in this country after that time; or

(B) if the deponent is confined in prison

(b) NOTICE OF THE DEPOSITION; OTHER FORMAL REQUIREMENTS.

(1) *Notice in General.* A party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition and, if known, the deponent's name and address. If the name is unknown, the notice must provide a general description sufficient to identify the person or the particular class or group to which the person belongs.

(2) *Producing Documents.* If a subpoena duces tecum is to be served on the deponent, the materials designated for production, as set out in the subpoena, must be listed in the notice or in an attachment. The notice to a party deponent may be accompanied by a request under Rule 34 to produce documents and tangible things at the deposition.

(3) *Method of Recording.*

(A) *Method Stated in the Notice.* The party who notices the deposition must state in the notice the method for recording the testimony. Unless the court orders otherwise, testimony may be recorded by audio, audiovisual, or stenographic means. The noticing party bears the recording costs. Any party may arrange to transcribe a deposition.

(B) *Additional Method.* With prior notice to the deponent and other parties, any party may designate another method for recording the testimony in addition to that specified in the original notice. That party bears the expense of the additional record or transcript unless the court orders otherwise.

(4) *By Remote Means.* The parties may stipulate—or the court may on motion order—that a deposition be taken by telephone or other remote means. For the purpose of this rule and Rules 28(a), 37(a)(2), and 37(b)(1), the deposition takes place where the deponent answers the questions.

(5) *Officer's Duties.*

(A) *Before the Deposition.* Unless the parties stipulate otherwise, a deposition must be conducted before an officer appointed or designated under Rule 28. The officer must begin the deposition with an on-the-record statement that includes:

(i) the officer's name and business address;

(ii) the date, time, and place of the deposition;

(iii) the deponent's name;

(iv) the officer's administration of the oath or affirmation to the deponent; and

(v) the identity of all persons present.

(B) *Conducting the Deposition; Avoiding Distortion.* If the deposition is recorded nonstenographically, the officer must repeat the items in Rule 30(b)(5)(A)(i)–(iii) at the beginning of each unit of the recording medium. The deponent's and attorneys' appearance or demeanor must not be distorted through recording techniques.

(C) *After the Deposition.* At the end of a deposition, the officer must state on the record that the deposition is complete and must set out any stipulations made by the attorneys about custody of the transcript or recording and of the exhibits, or about any other pertinent matters.

429

(6) *Notice or Subpoena Directed to an Organization.* In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

(c) EXAMINATION AND CROSS-EXAMINATION; RECORD OF THE EXAMINATION; OBJECTIONS; WRITTEN QUESTIONS.

(1) *Examination and Cross-Examination.* The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615. After putting the deponent under oath or affirmation, the officer must record the testimony by the method designated under Rule 30(b)(3)(A). The testimony must be recorded by the officer personally or by a person acting in the presence and under the direction of the officer.

(2) *Objections.* An objection at the time of the examination—whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition—must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

(3) *Participating Through Written Questions.* Instead of participating in the oral examination, a party may serve written questions in a sealed envelope on the party noticing the deposition, who must deliver them to the officer. The officer must ask the deponent those questions and record the answers verbatim.

(d) DURATION; SANCTION; MOTION TO TERMINATE OR LIMIT.

(1) *Duration.* Unless otherwise stipulated or ordered by the court, a deposition is limited to one day of 7 hours. The court must allow additional time consistent with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination.

(2) *Sanction.* The court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent.

(3) *Motion to Terminate or Limit.*

(A) *Grounds.* At any time during a deposition, the deponent or a party may move to terminate or limit it on the

51                    FEDERAL RULES OF CIVIL PROCEDURE                **Rule 30**

ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. The motion may be filed in the court where the action is pending or the deposition is being taken. If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order.

(B) *Order*. The court may order that the deposition be terminated or may limit its scope and manner as provided in Rule 26(c). If terminated, the deposition may be resumed only by order of the court where the action is pending.

(C) *Award of Expenses*. Rule 37(a)(5) applies to the award of expenses.

(e) REVIEW BY THE WITNESS; CHANGES.

(1) *Review; Statement of Changes*. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) *Changes Indicated in the Officer's Certificate*. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

(f) CERTIFICATION AND DELIVERY; EXHIBITS; COPIES OF THE TRANSCRIPT OR RECORDING; FILING.

(1) *Certification and Delivery*. The officer must certify in writing that the witness was duly sworn and that the deposition accurately records the witness's testimony. The certificate must accompany the record of the deposition. Unless the court orders otherwise, the officer must seal the deposition in an envelope or package bearing the title of the action and marked "Deposition of [witness's name]" and must promptly send it to the attorney who arranged for the transcript or recording. The attorney must store it under conditions that will protect it against loss, destruction, tampering, or deterioration.

(2) *Documents and Tangible Things*.

(A) *Originals and Copies*. Documents and tangible things produced for inspection during a deposition must, on a party's request, be marked for identification and attached to the deposition. Any party may inspect and copy them. But if the person who produced them wants to keep the originals, the person may:

(i) offer copies to be marked, attached to the deposition, and then used as originals—after giving all parties a fair opportunity to verify the copies by comparing them with the originals; or

(ii) give all parties a fair opportunity to inspect and copy the originals after they are marked—in which event the originals may be used as if attached to the deposition.

431

(B) *Order Regarding the Originals.* Any party may move for an order that the originals be attached to the deposition pending final disposition of the case.

(3) *Copies of the Transcript or Recording.* Unless otherwise stipulated or ordered by the court, the officer must retain the stenographic notes of a deposition taken stenographically or a copy of the recording of a deposition taken by another method. When paid reasonable charges, the officer must furnish a copy of the transcript or recording to any party or the deponent.

(4) *Notice of Filing.* A party who files the deposition must promptly notify all other parties of the filing.

(g) FAILURE TO ATTEND A DEPOSITION OR SERVE A SUBPOENA; EXPENSES. A party who, expecting a deposition to be taken, attends in person or by an attorney may recover reasonable expenses for attending, including attorney's fees, if the noticing party failed to:

(1) attend and proceed with the deposition; or

(2) serve a subpoena on a nonparty deponent, who consequently did not attend.

(As amended Jan. 21, 1963, eff. July 1, 1963; Mar. 30, 1970, eff. July 1, 1970; Mar. 1, 1971, eff. July 1, 1971; Nov. 20, 1972, eff. July 1, 1975; Apr. 29, 1980, eff. Aug. 1, 1980; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 29, 2015, eff. Dec. 1, 2015.)

## Rule 31. Depositions by Written Questions

(a) WHEN A DEPOSITION MAY BE TAKEN.

(1) *Without Leave.* A party may, by written questions, depose any person, including a party, without leave of court except as provided in Rule 31(a)(2). The deponent's attendance may be compelled by subpoena under Rule 45.

(2) *With Leave.* A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2):

(A) if the parties have not stipulated to the deposition and:

(i) the deposition would result in more than 10 depositions being taken under this rule or Rule 30 by the plaintiffs, or by the defendants, or by the third-party defendants;

(ii) the deponent has already been deposed in the case; or

(iii) the party seeks to take a deposition before the time specified in Rule 26(d); or

(B) if the deponent is confined in prison.

(3) *Service; Required Notice.* A party who wants to depose a person by written questions must serve them on every other party, with a notice stating, if known, the deponent's name and address. If the name is unknown, the notice must provide a general description sufficient to identify the person or the particular class or group to which the person belongs. The notice must also state the name or descriptive title and the address of the officer before whom the deposition will be taken.

(4) *Questions Directed to an Organisation.* A public or private corporation, a partnership, an association, or a governmental agency may be deposed by written questions in accordance with Rule 30(b)(6).

(5) *Questions from Other Parties.* Any questions to the deponent from other parties must be served on all parties as follows: cross-questions, within 14 days after being served with the notice and direct questions; redirect questions, within 7 days after being served with cross-questions; and recross-questions, within 7 days after being served with redirect questions. The court may, for good cause, extend or shorten these times.

(b) DELIVERY TO THE OFFICER; OFFICER'S DUTIES. The party who noticed the deposition must deliver to the officer a copy of all the questions served and of the notice. The officer must promptly proceed in the manner provided in Rule 30(c), (e), and (f) to:

(1) take the deponent's testimony in response to the questions;

(2) prepare and certify the deposition; and

(3) send it to the party, attaching a copy of the questions and of the notice.

(c) NOTICE OF COMPLETION OR FILING.

(1) *Completion.* The party who noticed the deposition must notify all other parties when it is completed.

(2) *Filing.* A party who files the deposition must promptly notify all other parties of the filing.

(As amended Mar. 30, 1970, eff. July 1, 1970; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 29, 2015, eff. Dec. 1, 2015.)

### Rule 32. Using Depositions in Court Proceedings

(a) USING DEPOSITIONS.

(1) *In General.* At a hearing or trial, all or part of a deposition may be used against a party on these conditions:

(A) the party was present or represented at the taking of the deposition or had reasonable notice of it;

(B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and

(C) the use is allowed by Rule 32(a)(2) through (8).

(2) *Impeachment and Other Uses.* Any party may use a deposition to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence.

(3) *Deposition of Party, Agent, or Designee.* An adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4).

(4) *Unavailable Witness.* A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds:

(A) that the witness is dead;

(B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition;

433

(C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;

(D) that the party offering the deposition could not procure the witness's attendance by subpoena; or

(E) on motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used.

(5) *Limitations on Use.*

(A) *Deposition Taken on Short Notice.* A deposition must not be used against a party who, having received less than 14 days' notice of the deposition, promptly moved for a protective order under Rule 26(c)(1)(B) requesting that it not be taken or be taken at a different time or place—and this motion was still pending when the deposition was taken.

(B) *Unavailable Deponent; Party Could Not Obtain an Attorney.* A deposition taken without leave of court under the unavailability provision of Rule 30(a)(2)(A)(iii) must not be used against a party who shows that, when served with the notice, it could not, despite diligent efforts, obtain an attorney to represent it at the deposition.

(6) *Using Part of a Deposition.* If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts.

(7) *Substituting a Party.* Substituting a party under Rule 25 does not affect the right to use a deposition previously taken.

(8) *Deposition Taken in an Earlier Action.* A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.

(b) OBJECTIONS TO ADMISSIBILITY. Subject to Rules 28(b) and 32(d)(3), an objection may be made at a hearing or trial to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying.

(c) FORM OF PRESENTATION. Unless the court orders otherwise, a party must provide a transcript of any deposition testimony the party offers, but may provide the court with the testimony in nontranscript form as well. On any party's request, deposition testimony offered in a jury trial for any purpose other than impeachment must be presented in nontranscript form, if available, unless the court for good cause orders otherwise.

(d) WAIVER OF OBJECTIONS.

(1) *To the Notice.* An objection to an error or irregularity in a deposition notice is waived unless promptly served in writing on the party giving the notice.

(2) *To the Officer's Qualification.* An objection based on disqualification of the officer before whom a deposition is to be taken is waived if not made:

(A) before the deposition begins; or

(B) promptly after the basis for disqualification becomes known or, with reasonable diligence, could have been known.

(3) *To the Taking of the Deposition.*

(A) *Objection to Competence, Relevance, or Materiality.* An objection to a deponent's competence—or to the competence, relevance, or materiality of testimony—is not waived by a failure to make the objection before or during the deposition, unless the ground for it might have been corrected at that time.

(B) *Objection to an Error or Irregularity.* An objection to an error or irregularity at an oral examination is waived if:

(i) it relates to the manner of taking the deposition, the form of a question or answer, the oath or affirmation, a party's conduct, or other matters that might have been corrected at that time; and

(ii) it is not timely made during the deposition.

(C) *Objection to a Written Question.* An objection to the form of a written question under Rule 31 is waived if not served in writing on the party submitting the question within the time for serving responsive questions or, if the question is a recross-question, within 7 days after being served with it.

(4) *To Completing and Returning the Deposition.* An objection to how the officer transcribed the testimony—or prepared, signed, certified, sealed, endorsed, sent, or otherwise dealt with the deposition—is waived unless a motion to suppress is made promptly after the error or irregularity becomes known or, with reasonable diligence, could have been known.

(As amended Mar. 30, 1970, eff. July 1, 1970; Nov. 20, 1972, eff. July 1, 1975; Apr. 29, 1980, eff. Aug. 1, 1980; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

## Rule 33. Interrogatories to Parties

(a) IN GENERAL.

(1) *Number.* Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts. Leave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2).

(2) *Scope.* An interrogatory may relate to any matter that may be inquired into under Rule 26(b). An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.

(b) ANSWERS AND OBJECTIONS.

(1) *Responding Party.* The interrogatories must be answered:

(A) by the party to whom they are directed; or

(B) if that party is a public or private corporation, a partnership, an association, or a governmental agency, by

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Mar. 30, 1970, eff. July 1, 1970; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007.)

### Rule 37. Failure to Make Disclosures or to Cooperate in Discovery; Sanctions

(a) MOTION FOR AN ORDER COMPELLING DISCLOSURE OR DISCOVERY.

(1) *In General.* On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

(2) *Appropriate Court.* A motion for an order to a party must be made in the court where the action is pending. A motion for an order to a nonparty must be made in the court where the discovery is or will be taken.

(3) *Specific Motions.*

(A) *To Compel Disclosure.* If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions.

(B) *To Compel a Discovery Response.* A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if:

(i) a deponent fails to answer a question asked under Rule 30 or 31;

(ii) a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a)(4);

(iii) a party fails to answer an interrogatory submitted under Rule 33; or

(iv) a party fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34.

(C) *Related to a Deposition.* When taking an oral deposition, the party asking a question may complete or adjourn the examination before moving for an order.

(4) *Evasive or Incomplete Disclosure, Answer, or Response.* For purposes of this subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.

(5) *Payment of Expenses; Protective Orders.*

(A) *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).* If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

(B) *If the Motion Is Denied.* If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

(C) *If the Motion Is Granted in Part and Denied in Part.* If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

(b) FAILURE TO COMPLY WITH A COURT ORDER.

(1) *Sanctions Sought in the District Where the Deposition Is Taken.* If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court. If a deposition-related motion is transferred to the court where the action is pending, and that court orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of either the court where the discovery is taken or the court where the action is pending.

(2) *Sanctions Sought in the District Where the Action Is Pending.*

(A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

(B) *For Not Producing a Person for Examination.* If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may

issue any of the orders listed in Rule 37(b)(2)(A)(i)–(vi), unless the disobedient party shows that it cannot produce the other person.

(C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

(c) FAILURE TO DISCLOSE, TO SUPPLEMENT AN EARLIER RESPONSE, OR TO ADMIT.

(1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

(2) *Failure to Admit.* If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:

(A) the request was held objectionable under Rule 36(a);

(B) the admission sought was of no substantial importance;

(C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or

(D) there was other good reason for the failure to admit.

(d) PARTY'S FAILURE TO ATTEND ITS OWN DEPOSITION, SERVE ANSWERS TO INTERROGATORIES, OR RESPOND TO A REQUEST FOR INSPECTION.

(1) *In General.*

(A) *Motion; Grounds for Sanctions.* The court where the action is pending may, on motion, order sanctions if:

(i) a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition; or

(ii) a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.

(B) *Certification.* A motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action.

2

certificate of genuineness relates to the attestation or is in a chain of certificates of genuineness relating to the attestation. A final certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States.

(C) *Other Means of Proof.* If all parties have had a reasonable opportunity to investigate a foreign record's authenticity and accuracy, the court may, for good cause, either:

(i) admit an attested copy without final certification; or

(ii) permit the record to be evidenced by an attested summary with or without a final certification.

(b) LACK OF A RECORD. A written statement that a diligent search of designated records revealed no record or entry of a specified tenor is admissible as evidence that the records contain no such record or entry. For domestic records, the statement must be authenticated under Rule 44(a)(1). For foreign records, the statement must comply with (a)(2)(C)(ii).

(c) OTHER PROOF. A party may prove an official record—or an entry or lack of an entry in it—by any other method authorized by law.

(As amended Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 30, 2007, eff. Dec. 1, 2007.)

### Rule 44.1. Determining Foreign Law

A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

(As added Feb. 28, 1966, eff. July 1, 1966; amended Nov. 20, 1972, eff. July 1, 1975; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

### Rule 45. Subpoena

(a) IN GENERAL.

(1) *Form and Contents.*

(A) *Requirements—In General.* Every subpoena must:

(i) state the court from which it issued;

(ii) state the title of the action and its civil-action number;

(iii) command each person to whom it is directed to do the following at a specified time and place: attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control; or permit the inspection of premises; and

(iv) set out the text of Rule 45(d) and (e).

(B) *Command to Attend a Deposition—Notice of the Recording Method.* A subpoena commanding attendance at a deposition must state the method for recording the testimony.

(C) *Combining or Separating a Command to Produce or to Permit Inspection; Specifying the Form for Electronically Stored Information.* A command to produce documents, electronically stored information, or tangible things or to permit the inspection of premises may be included in a subpoena commanding attendance at a deposition, hearing, or trial, or may be set out in a separate subpoena. A subpoena may specify the form or forms in which electronically stored information is to be produced.

(D) *Command to Produce; Included Obligations.* A command in a subpoena to produce documents, electronically stored information, or tangible things requires the responding person to permit inspection, copying, testing, or sampling of the materials.

(2) *Issuing Court.* A subpoena must issue from the court where the action is pending.

(3) *Issued by Whom.* The clerk must issue a subpoena, signed but otherwise in blank, to a party who requests it. That party must complete it before service. An attorney also may issue and sign a subpoena if the attorney is authorized to practice in the issuing court.

(4) *Notice to Other Parties Before Service.* If the subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, then before it is served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party.

(b) SERVICE.

(1) *By Whom and How; Tendering Fees.* Any person who is at least 18 years old and not a party may serve a subpoena. Serving a subpoena requires delivering a copy to the named person and, if the subpoena requires that person's attendance, tendering the fees for 1 day's attendance and the mileage allowed by law. Fees and mileage need not be tendered when the subpoena issues on behalf of the United States or any of its officers or agencies.

(2) *Service in the United States.* A subpoena may be served at any place within the United States.

(3) *Service in a Foreign Country.* 28 U.S.C. §1783 governs issuing and serving a subpoena directed to a United States national or resident who is in a foreign country.

(4) *Proof of Service.* Proving service, when necessary, requires filing with the issuing court a statement showing the date and manner of service and the names of the persons served. The statement must be certified by the server.

(c) PLACE OF COMPLIANCE.

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

(d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(e) DUTIES IN RESPONDING TO A SUBPOENA.

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that,

without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(f) TRANSFERRING A SUBPOENA-RELATED MOTION. When the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances. Then, if the attorney for a person subject to a subpoena is authorized to practice in the court where the motion was made, the attorney may file papers and appear on the motion as an officer of the issuing court. To enforce its order, the issuing court may transfer the order to the court where the motion was made.

(g) CONTEMPT. The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Dec. 29, 1948, eff. Oct. 20, 1949; Mar. 30, 1970, eff. July 1, 1970; Apr. 29, 1980, eff. Aug. 1, 1980; Apr. 29, 1985, eff. Aug. 1, 1985; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 25, 2005, eff. Dec. 1, 2005; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 16, 2013, eff. Dec. 1, 2013.)

### Rule 46. Objecting to a Ruling or Order

A formal exception to a ruling or order is unnecessary. When the ruling or order is requested or made, a party need only state the action that it wants the court to take or objects to, along with the grounds for the request or objection. Failing to object does not prejudice a party who had no opportunity to do so when the ruling or order was made.

(As amended Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007.)

### Rule 47. Selecting Jurors

(a) EXAMINING JURORS. The court may permit the parties or their attorneys to examine prospective jurors or may itself do so. If the court examines the jurors, it must permit the parties or their attorneys to make any further inquiry it considers proper,

Page 410 of 420

WIKIPEDIA

# Andrew O'Hagan

**Andrew O'Hagan**, FRSL (born 1968)[1] is a Scottish novelist and non-fiction author. He is also an Editor at Large of *London Review of Books* and *Esquire Magazine*. O'Hagan is currently the Visiting Professor of Writing at King's College London.[2]

Three of O'Hagan's novels have been nominated for the *Booker Prize for Fiction*. He was selected by the literary magazine *Granta*[3] for inclusion in their 2003 list of the top 20 young British novelists. His novels have been translated into 15 languages. His essays, reports and stories have appeared in *London Review of Books*, *New York Review of Books*, *Granta*, *The Guardian* and *The New Yorker*.[4]

## Contents

Early Life
Writings
Adaptations
Connection to Julian Assange
Political views
Other activities
Works
    Fiction books
    Non-fiction books
    Other writings
Awards and honours
References
External links



**Andrew O'Hagan**

Andrew O'Hagan in 2009

| | |
|---|---|
| Born | 1968 (age 50–51) Glasgow, Scotland, UK |
| Occupation | Novelist, Essayist |
| Nationality | British |
| Alma mater | University of Strathclyde |
| Genre | Fiction, Non-fiction, Essay, Play |

## Early Life

O'Hagan was born in Glasgow, and grew up in Kilwinning, North Ayrshire. He is of Irish Catholic descent and attended St Michael's Academy in Kilwinning before studying at the University of Strathclyde.[5]

## Writings

In 1991, O'Hagan joined the staff of the *London Review of Books*, where he worked for four years.[6] In 1995, he published his first book, *The Missing*, which crossed genres by exploring the lives of people who have gone missing in Britain and the families left behind. *The Missing* was shortlisted for three literary awards. In 1999, O'Hagan's debut novel, *Our Fathers* was nominated for several awards, including the Booker Prize, the Whitbread First Novel Award and the International Dublin Literary Award. It won the Winifred Holtby Prize for Fiction.

In 2003, his next novel *Personality*, which has close similarities to the life of Lena Zavaroni, won the James Tait Black Memorial Prize for fiction. That same year, O'Hagan won the E. M. Forster Award from the American Academy of Arts and Letters.[7]

In 2006, his third novel, *Be Near Me*, was published by Faber and Faber and long-listed for that year's Booker Prize. It went on to win the *Los Angeles Times*'s 2007 Prize for Fiction.[8] In 2008, he edited a new selection of Robert Burns's poems for Canongate Books, published as *A Night Out with Robert Burns*. A copy was lodged in every secondary school in Scotland. Following on from this, he wrote and presented a three-part film on Burns for the BBC, *The World According to Robert Burns*, first on 5 January 2009. In January 2011, *Scotland on Sunday* gave away 80,000 copies of the book. Also in 2008, Faber & Faber also published O'Hagan's first non-fiction collection, *The Atlantic Ocean: Essays on Britain and America*. The latter was shortlisted for the 2008 Saltire Book of the Year Award.[9]

His 2010 novel, *The Life and Opinions of Maf the Dog, and of His Friend Marilyn Monroe*,[10] is told in the voice of a Scottish Maltese poodle ("Maf"), the name of the real dog given by Frank Sinatra to Marilyn Monroe in 1960. It was published by Faber & Faber in May 2010 and won O'Hagan a Glenfiddich Spirit of Scotland Award.

In March 2012, it was announced that O'Hagan is working on a theatrical production about the crisis in British newspapers, entitled *Enquirer* with the National Theatre of Scotland.[11]

In 2015, O'Hagan published his fifth novel *The Illuminations: A Novel*, which was longlisted for the Booker Prize.[12]

**445**

In June 2016, the *London Review of Books* published a 35,612 word essay by O'Hagan, titled *'The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto'*, which followed the events surrounding programmer Craig Wright's claim to be bitcoin founder, Satoshi Nakamoto.[13] In the article, O'Hagan, describes how he was approached by Wright and uTrust, a group that he was associated with, in order to cover the exposure of Craig Wright's identity as Satoshi. Though the article is inconclusive as to the true identity of Satoshi, some have taken it as evidence that Wright is a fraud.[14] 'The Satoshi Affair' is currently being produced as a TV series for Netflix.

In October 2017, O'Hagan published *The Secret Life: Three True Stories of the Digital Age* that includes stories about his attempt to help Julian Assange write his memoirs, the author using the identity of a deceased man to make a new life on the Internet and expanding on Craig Wright's claim to be Satoshi Nakamoto.[15]

## Adaptations

Three of O'Hagan's books have received adaptations into different media. In 1996, Channel 4 Television presented *Calling Bible John: Portrait of a Serial Killer*, nominated for a BAFTA award.[1][16] In 2009, his novel *Be Near Me* was adapted by Ian McDiarmid for the Donmar Warehouse and the National Theatre of Scotland.

In September 2011, the National Theatre of Scotland presented *The Missing* as a play adapted by O'Hagan and directed by John Tiffany at Tramway, Glasgow.[17] The play received favourable reviews. *The Daily Telegraph* called it "a profound act of mourning and memory."[18] *The Guardian* called the work "an arresting, genre-defying work – part speculative memoir, part Orwellian social reportage" that "induces the kind of shock he [the author] must have experienced..."[19]

## Connection to Julian Assange

In February 2014, O'Hagan wrote about his experience as a ghostwriter for Julian Assange's autobiography by Canongate and Knopf. His essay, entitled "Ghosting"[20] which was published in the *London Review of Books* gained significant media attention because of his description of Assange's character and his strained relationships with his past and present colleagues.[21][22][23]

## Political views

In August 2017, O'Hagan gave a speech at The Edinburgh International Book Festival, where he declared that he had become a supporter of Scottish independence.[24]

## Other activities

In 2008, O'Hagan was a visiting fellow in Creative Writing at Trinity College, Dublin.

- UNICEF  In 2001, O'Hagan was named as a Goodwill Ambassador by the UK branch of UNICEF, and he has since been involved in fundraising efforts for the organisation. He has travelled to the Sudan, India, Malawi and Mozambique and has joined fellow ambassadors Ewan McGregor, Ralph Fiennes, James Nesbitt, Martin Bell and Jemima Khan in campaigning for Unicef.
- Honours:
  - 2008: Made Honorary Doctor of Letters by University of Strathclyde
  - 2008: Joined Robert Burns Humanitarian Award judging panel
  - 2009: Made honorary lifetime member of Irvine Burns Club
  - 2010: Made Fellow of the Royal Society of Literature.[25]
  - undated: Trustee of George Orwell Trust[26]
  - undated: Patron of Scottish Book Trust

## Works

### Fiction books

- *Our Fathers*, 1999
- *Personality*, 2003
- *Be Near Me*, 2006
- *The Life and Opinions of Maf the Dog, and of His Friend Marilyn Monroe*, 2010
- *The Illuminations*, 2015

### Non-fiction books

- *The Missing*, 1995
- *The Atlantic Ocean, Essays*, 2008
- *The Secret Life: Three True Stories of the Digital Age*, 2017

446

Page 412 of 420
10/11/2019

### Other writings

- Short stories: online text (http://entertainment.timesonline.co.uk/tol/arts_and_entertainment/books/article5288626.ece) from *Sunday Times*, 7 December 2008
- As a ghostwriter: Julian Assange: The Unauthorised Autobiography, 2011
- Editing:
  - *New Writing 11*, 2002
  - *The Weekenders: Adventures in Calcutta*, 2004
  - *A Night Out with Robert Burns*, 2008
- Book Reviews:
  - "Racing against reality" *The New York Review of Books* 54/11 (28 June 2007): 4–8 [review of Don DeLillo, *Falling Man*]
  - "Run" *Publishers Weekly* Fiction Reviews: Week of 16 July 2007. Review of *Run* by Ann Patchett.[21]
- *The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto* (2016, non-fiction)[16]
- "Ghosting" London Review of Books, 6 March 2014[28]

## Awards and honours

The British Council lists the following awards and nominations for O'Hagan's work[1]

- 1995 – Esquire Award for *The Missing* (shortlist)
- 1995 – McVitie's Prize for Scottish Writer of the Year for *The Missing* (shortlist)
- 1995 – Saltire Society Scottish First Book of the Year Award for *The Missing* (shortlist)
- 1998 – BAFTA, *Calling Bible John* (winner)
- 1999 – Booker Prize for *Our Fathers* (shortlist)
- 1999 – Whitbread First Novel Award for *Our Fathers* (shortlist)
- 2000 – Mail on Sunday/John Llewellyn Rhys Prize for *Our Fathers* (shortlist)
- 2000 – Winifred Holtby Memorial Prize for *Our Fathers* (winner)
- 2001 – International Dublin Literary Award for *Our Fathers* (shortlist)
- 2003 – James Tait Black Memorial Prize (for fiction), *Personality* (winner)
- 2006 – Los Angeles Times Book Prize (for fiction), *Be Near Me* (winner)
- 2010 – Glenfiddich Spirit of Scotland Award for Writing (winner)

## References

1. "Writers: Andrew O'Hagan" (http://literature.britishcouncil.org/andrew-ohagan). British Council. Retrieved 13 November 2011.

2. "O'Hagan, Professor Andrew" (https://web.archive.org/web/20120111212429/http://www.kcl.ac.uk/artshums/depts/english/people/staff/academic/onagan/index.aspx). King's College London. Archived from the original (http://www.kcl.ac.uk/artshums/depts/english/people/staff/academic/ohagan/index.aspx) on 11 January 2012. Retrieved 13 November 2011.

3. "A 'Granta' Glimpse at Rising British Writers" (https://www.npr.org/templates/story/story.php?storyId=1251240).

4. "O'Hagan, Andrew" (https://web.archive.org/web/20120425161826/http://www.apwatt.co.uk/frame.asp?left=authors_left.asp%3Fauthor_id%3D270&right=author_full.asp%3Fauthor_id%3D270). A. P. Watt. Archived from the original (http://www.apwatt.co.uk/frame.asp?left=authors_left.asp?author_id=270&right=author_full.asp?author_id=270) on 25 April 2012. Retrieved 13 November 2011.

5. "Humanities English" (https://www.strath.ac.uk/humanities/schoolofhumanities/english). University of Strathclyde. Retrieved 2 February 2018.

6. *London Review of Books*, Vol. 33 No. 12: 16 June 2011, pp. 23–28.

7. "E. M. Forster Award" (https://web.archive.org/web/20111106111558/http://www.artsandletters.org/awards2_popup.php?abbrev=Forster). Arts and Letters. Archived from the original (http://www.artsandletters.org/awards2_popup.php?abbrev=Forster) on 6 November 2011. Retrieved 13 November 2011.

8. "Los Angeles Times – Festival of Books" (http://events.latimes.com/festivalofbooks/book-prizes-previous-winners/). *Festival of Books*.

9. Flood, Alison (1 December 2008). "Scottish book of the year goes to Kieron Smith, Boy" (https://www.theguardian.com/books/2008/dec/01/james-kelman-scottish-book-of-the-year). *The Guardian*. London. Retrieved 13 November 2011.

10. "St Marilyn, the canonisation of Monroe" (http://books.guardian.co.uk/lrb/articles/0,6109,116322,00.html). *The Guardian*. London. 16 January 2003.

11. Brown, Mark (16 March 2012). "Scottish National Theatre to tackle 'crisis in newspaper journalism'" (https://www.theguardian.com/stage/2012/mar/16/scottish-national-theatre-newspaper-journalism?newsfeed=true). *The Guardian*. London.

12. http://themanbookerprize.com/books/illuminations-by-andrew-o%E2%80%99hagan

13. Nakamoto, Andrew O'Hagan on the many lives of Satoshi (30 June 2016). "The Satoshi Affair" (http://www.lrb.co.uk/v38/n13/andrew-ohagan/the-satoshi-affair). pp. 7–28 – via London Review of Books.

14. "There could be a lot of money in claiming to have invented Bitcoin" (http://fusion.net/story/316272/craig-wright-bitcoin-creator-london-review-of-books/). Retrieved 28 June 2016.

15. The Secret Life: Three True Stories of the Digital Age by Andrew O'Hagan (https://www.amazon.com/Secret-Life-Three-Stories-Digital-ebook/dp/B06XRJTX45/) Retrieved 12 October 2017.

447

16. "Calling Bible John Portrait of a Serial Killer" (http://ftvdb.bfi.org.uk/sift/title/548804). British Film Institute. Retrieved 13 November 2011.

17. "The Missing" (http://www.nationaltheatrescotland.com/content/default.asp?page=home_TheMissing). National Theatre of Scotland. Retrieved 13 November 2011.

18. Crompton, Sarah (19 September 2011). "The Missing (Tramway review)" (https://www.telegraph.co.uk/culture/theatre/regional-shows/8774925/The-Missing-Tramway-Glasgow-review.html). Daily Telegraph. London. Retrieved 13 November 2011.

19. Hickling, Alfred (18 September 2011). "The Missing – review" (https://www.theguardian.com/stage/2011/sep/18/the-missing-theatre-review). The Guardian. London. Retrieved 13 November 2011.

20. "Ghosting" (https://www.lrb.co.uk/v36/n05/andrew-ohagan/ghosting). London Review of Books. pp. 5–26. Retrieved 12 April 2019.

21. Sawer, Patrick (22 February 2014). " 'Paranoid, vain and jealous' – the secret life of WikiLeaks founder Julian Assange" (https://www.telegraph.co.uk/news/worldnews/wikileaks/10655638/Paranoid-vain-and-jealous-the-secret-life-of-WikiLeaks-founder-Julian-Assange.html). The Daily Telegraph. London.

22. Smith, Lewis (22 February 2014). "WikiLeaks founder Julian Assange is a mad, sad and bad, claims ghost writer Andrew O'Hagan" (https://www.independent.co.uk/news/media/press/wikileaks-founder-julian-assange-is-mad-sad-and-bad-claims-ghost-writer-andrew-ohagan-9146457.html). The Independent. London.

23. ANI (22 February 2014). "Ghostwriter calls Assange 'mercurial character who could not bear his own secrets' " (http://www.business-standard.com/article/news-ani/ghostwriter-calls-assange-mercurial-character-who-could-not-bear-his-own-secrets-114022200302_1.html) – via Business Standard.

24. "How Andrew O'Hagan, one of Scotland's leading writers, went from No to Yes" (https://www.thenational.scot/news/15476265.how-andrew-ohagan-one-of-scotlands-leading-writers-went-from-no-to-yes/). The National. 16 August 2017. Retrieved 24 August 2019.

25. "Royal Society of Literature All Fellows" (https://web.archive.org/web/20100305070326/http://www.rslit.org/content/fellows). Royal Society of Literature. Archived from the original (http://www.rslit.org/content/fellows) on 5 March 2010. Retrieved 10 August 2010.

26. "Governance" (http://theorwellprize.co.uk/the-orwell-prize/about-the-prize/governance). The Orwell Prize. Retrieved 13 November 2011.

27. "Fiction Review: Run" (http://www.publishersweekly.com/978-0-06-134063-5). Publishers Weekly. Retrieved 13 November 2011.

28. "Ghosting" (https://www.lrb.co.uk/v36/n05/andrew-ohagan/ghosting). London Review of Books. pp. 5–26. Retrieved 12 April 2019.

## External links

- Profile at the Contemporary Writers website, including a critical assessment (https://web.archive.org/web/20050404164827/http://www.contemporarywriters.com/authors/?p=auth115)
- O'Hagan at the 2004 Republican National Convention: an article printed in the LRB (http://www.lrb.co.uk/v26/n18/ohag01_.html)
- Andrew O'Hagan interviewed with CBC Radio One's Eleanor Wachtel (http://cbc.ca/writersandcompany/media/080810_ohagan.ram)
- Video: Andrew O'Hagan on writing, reading and drinking in Scotland (http://www.scottishbooktrust.com/podcasts/video/andrew-ohagan) on Scottish Book Trust (http://www.scottishbooktrust.com)
- http://www.abc.net.au/radionational/programs/bestoffestivals/andrew-o'hagan-in-conversation/8054660

Retrieved from "https://en.wikipedia.org/w/index.php?title=Andrew_O%27Hagan&oldid=924818861"

This page was last edited on 6 November 2019, at 03:33 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

CASE NO.: 9:18-cv-80176-BB/BR

    *Plaintiffs,*

v.

CRAIG WRIGHT

    *Defendant.*

### PLAINTIFFS' EXPEDITED MOTION TO DEPOSE OUT OF STATE WITNESS IN UNDER 14 DAYS WHILE PROVIDING VIDEOCONFERENCE ACCESS TO DEFENDANT OR IN THE ALTERNATIVE TO DEPOSE VIA VIDEOCONFERENCE AT A LATER DATE

Plaintiffs respectfully request the Court grant them leave to depose James Wilson (a resident of Australia) in Washington D.C. on November 8, 2019 if they also arrange for defense counsel to attend the deposition via videoconference if they choose. This date is sooner than the 14 days required by Local Rule 26.1(h) for out of state depositions and therefore requires Court approval. In the alternative, Plaintiffs move for an order permitting his deposition be taken via videoconference on 14-days notice and on a convenient date for everyone.

### Background

In early September, the parties commenced what Plaintiffs, at the time, believed to have been good faith settlement discussions. These discussions began at Craig's request and due to the fact that Craig represented he had the means to finance a settlement.

On September 11, the parties reached a non-binding settlement in principle and then turned to drafting binding settlement papers. To facilitate these discussions, there were at least four in

1

person meetings and numerous telephonic conferences. Plaintiffs hired both U.S. tax counsel and foreign counsel and incurred the cost of their participation in the settlement process.

In reliance on these efforts and what seemed to be steady progress toward global resolution, Plaintiffs stopped active litigation, focused on settlement, and joined both of Craig's motions to extend the case deadlines by 30 days (ECF No. 284 and 287). The Court granted the first motion, but held the existing March 30, 2020 trial date; it all but denied the second motion, pushing off only the deadline for Plaintiffs to move for attorneys' fees and Defendant to appeal this Court's sanctions order (See ECF No. 286 and 289).

On October 30, without any advance notice, Plaintiffs were informed Craig could no longer finance the settlement and was "breaking" the non-binding settlement agreement.

To that end, Plaintiffs began shifting back into preparing for trial (with much lost time). One such action was to contact James Wilson, the CFO of Craig's companies in 2012-2013, *i.e.*, the time during which Dave was alive and Craig alleges he sold Dave interest in his companies in exchange for a fortune of Bitcoin.[1]

On October 31, 2019 at 7:37pm, Mr. Wilson, who lives in Australia, told counsel that he is traveling to the United States and will be in Washington D.C. and available for a deposition on November 8, 2019. Immediately thereafter (9:19am the next morning) Plaintiffs' counsel reached out to defense counsel to seek their consent to either take Mr. Wilson's deposition on November 8, or consent to taking it via videoconference at a later date.

---

[1] https://medium.com/@craig_10243/on-scammers-f5fca5801bb2 (article published by Craig stating Jamie Wilson was a CFO); *Craig Wright 4/4/19 Depo. Tran.*, at 103:5-7 ("Q. Did Jamie Wilson ever work as an accountant for you? A. Very briefly. Q. What time period was that? A. I dealt with Jamie Wilson some time between -- some time in 2012 into 2013.")

Five hours later, defense counsel informed Plaintiffs they would not consent to the deposition on November 8, 2019 and would need to revert next week on whether they would consent to a video deposition at a later date.

### Legal Standard

Under the Local Rules of this District, parties must have 7-days notice for a deposition in Florida, but 14-days notice for an out of state deposition. L.R. 26.1(h).

"The Court has 'broad discretion' in the scheduling of discovery," *TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 299 F.R.D. 692, 694 (S.D. Fla. 2014) citing *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1269 (11th Cir.2001). Further, "[e]xpedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.P.A. v. Helio Imp./Exp.*, 601 F. Supp. 1, 3 (S.D. Fla. 1983).

Additionally, pursuant to Fed. R. of Civ. Pro. 30(b)(4), "the court may on motion order – that a deposition be taken by telephone or other remote means." *Id.* "Nothing in the language of Rule 30 requires that a telephonic deposition may only be taken upon a showing of necessity, financial inability, or other hardship." *Cooney v. Barry Sch. of Law*, No. 614CV106ORL22KRS, 2015 WL 12835701, at *1 (M.D. Fla. Sept. 25, 2015); see G*raham v. Ocwen Loan Servicing, LLC*, No. 16-80011-CIV, 2016 WL 7443288 at *1 (S.D. Fla. July 1, 2016) citing *Guillen v. Bank of Am. Corp. et al.*, Civ. No. 10-05825-EJD PSG, 2011 WL 3939690, at *1 (N.D. Cal. Aug. 31, 2011) ("emphasizing that [a] desire to save money constitutes good cause to depose [an] out-of-state witness via ... remote means and that a videoconference deposition is cost-effective since it avoids or minimizes expensive travel time and costs").

3

### Argument

Mr. Wilson resides in Sydney Australia, where obtaining his deposition will be time consuming and extremely expensive.[2] Due to the unexpected failure of settlement negotiations, and the soon approaching discovery cutoff, the parties are short on time. Mr. Wilson's presence in the United States next week obviates the need for the parties to go through the legal, logistical, and expensive steps of securing a deposition in Australia. And while Craig won't have been afforded a full 14-days notice, he has received 7-days notice.

Importantly the fact that Craig doesn't have 14-days notice of this deposition is a product of his own conduct. He asked the parties to pause the litigation process and concentrate on amicably resolving this dispute, only to pull his consent with no advance notice, without good cause, and at a time when it simply wasn't possible to give him the full 14-days notice.

The "unusual circumstance" of (i) an important deponent who (ii) normally lives on the other side of the world, that (iii) is one of the few individuals (outside of Craig) with first-hand knowledge of the facts, who (iv) is present in the United States, and who (v) if not deposed will result in significant expense and time to depose, justifies allowing Plaintiffs to proceed with the deposition on 7-days notice especially since Plaintiffs are more than happy to arrange for defense counsel to attend the deposition via videolink so they don't even have to leave Florida (where only 7-days notice is required to depose a witness).

In the alternative, if the Court is not inclined to allow the deposition to move forward on November 8, Plaintiff requests an order pursuant to Fed. R. of Civ. Pro. 30(b)(4) allowing the deposition to proceed via video conference on a date to be coordinated with defense counsel and the witness when he returns to Sydney Australia.

---

[2] It may also be legally complex.

4

## CONCLUSION

Plaintiffs respectfully request that the Court allow them to depose Mr. Wilson on November 8, 2019 in Washington D.C. on condition they provide Defense counsel with the ability to attend the deposition via videolink. In the alternative, Plaintiffs request an order authorizing the deposition to proceed via videoconference at a later date pursuant to Rule 30(b)(4). Pursuant to Local Rule 7.1(d), this motion is time sensitive and requires a ruling before November 7, 2019 or the issue will become moot as the deponent will no longer be available for deposition in the United States.

## S.D. FLA. L.R. 7.1 CERTIFICATION

In accordance with S.D. Fla. L.R. 7.1(a)(3), counsel for Plaintiffs has conferred with counsel for Defendant, and they object to the deposition proceeding on November 8, 2019. They have indicated they need until next week to revert on their position as to whether they will agree to a videoconference deposition at a later date.

Dated: November 1, 2019

Respectfully submitted,

**ROCHE FREEDMAN LLP**

By: ___ /s/ Velvel (Devin) Freedman ___
    Velvel (Devin) Freedman
    Florida Bar No.: 99762
    200 South Biscayne Blvd., Suite 5500
    Miami, Florida 33131
    Tel.:   (305) 357-3861
    Email:  vel@rochefreedman.com

    Kyle W. Roche
    Joes Delich
    *Admitted Pro Hac Vice*
    185 Wythe Avenue F2
    Brooklyn, New York 11249
    kyle@rochefreedman.com

5

Jdelich@rochefreedman.com

**and**

### BOIES SCHILLER FLEXNER LLP

By: ___/s/ *Andrew S. Brenner*___
Andrew S. Brenner
Fla. Bar No: 978663
100 SE Second Street, Suite 2800
Miami, Florida 33131
Tel.:     (305) 539-8400
Email:  abrenner@bsfllp.com

*Attorneys for Plaintiffs*
IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K
Info Defense Research, LLC

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2019, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record via transmission of Notices of Electronic Filing

generated by CM/ECF.

*s/ Velvel (Devin) Freedman*___
VELVEL (DEVIN) FREEDMAN