## Application Notice

- You must complete Parts A **and** B, **and** Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| In the | High Court of Justice<br>Business and Property Courts of<br>England and Wales<br>Commercial Court (QBD) |
|---|---|
| Claim No. | CL-2019-000695 |
| Warrant no.<br>(if applicable) |  |
| Claimant(s)<br>(including ref.) | (1) Mr Ira Kleiman, as the personal representative of the Estate of David Klieman<br><br>(2) W&K Info Defense Research, LLC |
| Defendant(s)<br>(including ref.) | Andrew O'Hagan |
| Date | 22 November 2019 |

**You should provide this information for listing the application**

Time estimate    2  (hours)    30  (mins)

Is this agreed by all parties?  [ ] Yes  [✔] No

Please always refer to the Commercial Court Guide for details of how applications should be prepared and will be heard, or in a small number of exceptional cases can be dealt with on paper.

### Part A *The Respondent*

1. Where there is more than one claimant or defendant, specify which claimant or defendant

~~(The claimant)(The defendant)~~(1)

2. State clearly what order you are seeking (if there is room) or otherwise refer to a draft order (which must be attached)

intend(s) to apply for an order (a draft of which is attached) that(2)

The order of Mr Justice Butcher, dated 14 November 2019, be revoked or, in the alternative, be varied so as to limit any questioning of Mr Andrew O'Hagan to matters that do not reveal or require the production of source material or journalistic material.

The Court is respectfully invited to consider this application at an oral hearing, with a time estimate of half a day.

3. Briefly set out why you are seeking the order. Identify any rule or statutory provision

because(3)

The order of Mr Justice Butcher, dated 14 November 2019, was granted on an ex parte basis and without the benefit of submissions from Andrew O'Hagan. As a result, the order was wrongly made. In particular, the order sought by the Applicants against Mr O'Hagan was unlawful in that:

(a) The order was inconsistent with s.3(1) Evidence (Proceedings in Other Jurisdictions) Act 1975, in that Andrew O'Hagan could not be compelled to give evidence that reveals source material or other journalistic material on this basis in civil proceedings in England and Wales;

(b) The order was inconsistent with article 10 of Schedule 1 of the Human Rights Act 1998 in that it represents a disproportionate interference with Andrew O'Hagan's right to freedom of expression and/or was not "in accordance with the law";

(c) The order represents an order for general discovery against a mere witness and is an impermissible "fishing expedition";

(d) The order is oppressive.

This application is made pursuant to paragraph 3 of the order of Mr Justice Butcher.

The court office at the Admiralty and Commercial Registry, The Rolls Building, 7 Rolls Building, Fetter Lane, London, EC2A 1NL is open from 10am to 4.30pm Monday to Friday. When corresponding with the court please address forms or letters to the Clerk to the Commercial Court and quote the claim number.

455

N244(CC) Application Notice (04.14)    © Crown copyright 2018

**Part B**

*_Respondent_*
*(The ~~claimant~~)(~~The defendant~~)(1) wishes to rely on: tick one

the attached (witness statement)(affidavit) ☐

✓ (the claimant)(the defendant)'s(1) statement of case ☐

evidence in Part C overleaf in support of this application ☐

**Signed** _[signature]_
(Applicant) ('s legal representative)

**Position or office held** _Managing Partner_
(if signing on behalf of firm, company or corporation)

4. If you are not already a party to the proceedings, you must provide an address for service of documents

Address to which documents about this claim should be sent (including reference if appropriate)(4)

| Simons Muirhead & Burton LLP<br>87-91 Newman Street<br>London W1T 3EY<br><br>Ref: MS.EH.18208.3 | | If applicable |
|---|---|---|
| | Tel. no. | +44 (0)20 3206 2700 |
| | Fax no. | +44 (0)20 3206 2800 |
| | DX no. | DX 144060 Soho Square 5 |
| Postcode W1T 3EY | e-mail | Martin.Soames@smab.co.uk |

456

**Part C**  |  Claim No.  CL-2019-000695

**(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)**

*(The claimant)(The defendant)(1) wishes to rely on the following evidence in support of this application:

## Statement of Truth

*(I believe)*(The applicant believes) that the facts stated in this application notice are true

*I am duly authorised by the applicant to sign this statement

Full name.  *R. Miruskandan*

Name of *(Applicant)(* s litigation friend)('s legal representative)

Signed  _[signature]_   Position or office held:  Managing Partner
*(Applicant)('s legal representative)   (if signing on behalf of firm, company or corporation)

*delete as appropriate   Date  22/11/2019

457

IN THE HIGH COURT OF JUSTICE					Claim No. HQ18M03343
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
COMMERCIAL COURT

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975

and

IN THE MATTER OF A CIVIL PROCEEDING PENDING BEFORE THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA ENTITLED AS: -

(1) Ira Kleiman (as the personal representative of the Estate of David Kleiman) and (2) W&K Info Defense Research LLC, Plaintiffs, v Craig Wright, Defendant (Case No.: 9:18-cv-80176-BB)

BETWEEN:

IRA KLEIMAN, as personal representative of the Estate
of David Kleiman, and W&K INFO DEFENSE
RESEARCH, LLC

<u>**Applicants**</u>

And

ANDREW O'HAGAN

<u>**Respondent**</u>

---

**WITNESS STATEMENT OF ANDREW O'HAGAN**

---

I, **ANDREW O'HAGAN**, of Primrose Hill Studios, Fitzroy Road, London, NW1 8TR, **WILL SAY**:

1. I am a journalist, a published novelist, Editor-at-Large and a Director of the *London Review of Books*, the biggest literary and journalistic periodical in Europe. I am making this statement in support of my application to set aside or vary the Order of Mr Justice Butcher dated 14 November 2019 ("the Order"), which ordered me to:

458

1

a. attend before Mr Allen Dyer, who has been appointed examiner pursuant to CPR r.34.18.1(b), at the office of the solicitors for the Applicants, for no longer than 7 hours to be examined on oath in a manner consistent with the United States Federal Rules of Civil Procedure on a number of prescribed topics which largely concern my journalistic processes and materials pertaining to the journalistic work I wrote called *The Satoshi Affair*; and

b. produce a very large number of documents described in three categories in the Order, all of which are journalistic materials created in the process of investigating and writing my article '*The Satoshi Affair*'.

2. As I explain below, the Order is aimed at journalistic material, including confidential source material. It constitutes an extremely serious intrusion on my right to freedom of expression, at common law and under article 10 of the European Convention on Human Rights. That right permits me to protect my sources and to protect the confidential information I gathered. More generally, that right permits me to receive, create, and work with journalistic materials on the basis they are privileged and not disclosable to third parties in civil litigation subject to an overriding requirement in the public interest.

**My credentials as a journalist, and what constitutes a journalistic work**

3. I have been an investigative journalist at the London Review of Books for 25 years. I have published eight books, have been nominated three times for the Booker Prize, and have won the Esquire Award for Non-Fiction Writing, the Glenfiddich Award, the Los Angeles Times Book Prize, and the E.M. Forster Award from the American Academy of Arts and Letters. I am a Fellow of the Royal Society of Literature and Visiting Professor of Writing at King's College London. I have an Honorary Doctorate from the University of Strathclyde and am Patron of the Boswell Book Festival and the Tidelines Book Festival, as well as the George Orwell Society. I am a member of the Professional Publishers Association (the PPA). A copy of my PPA-issued press pass, listing my title as journalist, is exhibited to this statement at exhibit AOH-1. For the last 20 years, I have been a goodwill Ambassador for Unicef. I have a 1st class degree from the University of

459

2

Strathclyde and have, for two decades, been a journalistic contributor to the *Guardian*, the *Daily Telegraph*, the *New Yorker* and the *New York Times*. I have presented arts and books programmes for the BBC, most recently a three-part documentary on the poet Robert Burns.

4. The *London Review of Books* was founded in 1979. It is a journal of essays, which is published twice a month. The majority of articles it publishes in each issue are long essays. Some of those essays are based on books, but other essays also address political, social, and wider cultural topics. As a result, it has developed a reputation as one of the most successful investigative journalism publishers in this country. It has a significant reputation for long-form investigative journalism and careful writing.

5. As far as I am aware, with the exception of one or two other publications such as the *New Yorker* and the *New York Times Magazine*, the *London Review of Books* is one of the only publishers in the world producing and investing in this kind of long-form, serious public interest investigative journalism. Certainly, there is no other publication in Britain which publishes such in-depth stories as the *London Review of Books* does. The articles we publish are focused on serious public interest topics. We have been publishing in this way for 40 years, producing work from some of the greatest writers in the world, from Christopher Hitchens and Susan Sontag to Seymour Hersh and Hilary Mantel.

6. My stories have been some of the biggest the *London Review of Books* has published, and they have gained widespread notice and commendation. In recent years, I have written substantial public interest journalistic pieces on Julian Assange, the Grenfell Tower fire, and Craig Wright. Each of these articles shared the same characteristics. They were each long in form, forensic in focus, and based on many months of careful journalistic preparation. To give examples, my 30,000-word report on Julian Assange was among the most disseminated and commented-upon articles ever published by the *London Review of Books*. My in-depth report on the Grenfell Tower fire took up a whole issue of the *London Review of Books* in 2018 and ran to 65,000 words. It took me 12 months, working with five researchers and a team of editors, to research and write.

460

3

7. I have written over 250 articles for the paper and am well-known, in particular, for serious and detailed full-length investigations of public interest topics which are the product of many months of work. These pieces represent a substantial financial and editorial commitment for the London Review of Books and are a central part of its raison d'être. I am not aware of any other UK-based publication financing and running detailed, courageous, and controversial investigative reportage of this kind.

8. This application is based upon a witness statement from Mr Velvel Freedman, who is the lawyer for the applicants. At §4.1, Mr Freedman describes me as an "author" of "fiction and non-fiction books". At §4.15 of his witness statement, Mr Freedman states that no admissions are made that my article, The Satoshi Affair, is a work of journalism. Mr Freedman also asserts that Craig Wright has suggested, in another deposition, that my article was "a work of fiction". I find these assertions incredible.

9. For the avoidance of doubt, I am a journalist and The Satoshi Affair is a serious piece of investigative journalism. The subject matter of the article is journalistic, in that it seeks to address important issues of public interest, such as the development of bitcoin technology and its impact on those involved in the developmental process, and the ways in which people may invent themselves or aspects of their lives, in particular in the online world. As the article itself explains, it explores the ways in which people can fabricate or fictionalise themselves. Not only is the subject matter journalistic, but the process of writing it was journalistic. It is based on carefully investigated facts, researched and put together over an extended period of time.

10. The application itself seeks factual journalistic materials. Mr Freedman describes the application in his witness statement, at §4.6, as an application to obtain all the "*raw material of the article*". It is aimed at "*recordings*", "*documents prepared or received in connection with a single article*", "*recordings of interviews*" and the like. All of this "*raw material*" is plainly journalistic material created and collected in the course of investigating and writing this journalistic work. The suggestion that my article is a work

461

4

of fiction does not sit easily with the suggestion that it is necessary to raid my private papers and recordings for what the Applicants consider may be helpful facts.

11. Journalists, while preparing their stories, do not merely accept what is said to them. We will report what is said, but also take steps to verify it against what others say, as well as against available records. As journalists, we will interview sources who can affirm or contradict the given statements, and generally work to dig down into the claims being made. As part of this process, the journalist often meets with people who wish to tell the truth but demand to be protected through confidentiality. Alternatively, they may seek to give background information only or to give information, some of which is very sensitive, and which is expressly said to be "*not for publication*", or to provide other information which may not be revealed even possibly by being attributed to that source. This data, given in confidence, is the raw material for the final published piece.

12. In my practice, the undertaking of a journalistic article is a matter of intense discussion and preparation. I interview researchers, convene meetings with editors, and finally deploy myself in many months of scrutiny and interviewing of subjects relevant to the story. I am very much an 'on-site' journalist, staying in the locations of the story and investigating carefully over time and with the luxury of many thousands of words to properly write the complete story. I take many individuals into my confidence during this process, just as they take me into theirs. This allows me to curate the article with their help (but without their control) and very often with their express wish to remain nameless in the published piece.

13. I choose topics based on their interest alone, never for commercial or political reasons, and work in the knowledge that my investigation is undertaken for the benefit of the reader only. I gather material painstakingly, with the help of multiple witnesses, checking and re-checking their remarks whilst expanding my understanding of the topic over many months. The job is costly both in terms of the time it takes and the financial commitment it requires from my paper, and the materials I gather usually come from a long period of intense negotiation and professional relations that depend on trust. My subjects are

462

5

willing to talk, but what I will then do with their words is a matter of professional and moral judgement.

**The importance of protecting the confidentiality of journalistic material**

14. I believe that there is a significant public interest in having a free press in a democratic society. The essential function of the free press is to provide to the community information that it would not otherwise have. The public would not know about a great many matters if journalists did not report them. The work of journalists like me includes holding public bodies and private individuals to account, through a combination of informing the public (often of matters that public officers and private individuals would rather the public did not know) and challenging incorrect statements and narratives. This work has become even more important in recent years as various politicians and powerful individuals across the world attempt to discredit the facts reported by journalists.

15. A free press is also important to the proper functioning of a democracy. The better informed people are, the better the opportunity they have to participate in public debate, engage with important issues facing society, and make informed decisions as to who they elect to public office, how they invest their money, or which services they choose to use. It would not have been possible for me to publish articles about public interest topics, and it is not possible for journalists to carry out their function more generally, unless sources are willing to give us information. Journalists must, to carry out their function, be able to maintain confidentiality over sources and the information they provide. Even where some information is published, it is often necessary to keep other information from a source confidential because its disclosure in full would enable that source to be identified or because its disclosure in full would reveal sensitive private information that would damage that individual.

16. Maintaining the confidentiality of sources and the information they provide is essential to ensuring that they give information to journalists, from whom information can then flow to the public. Sources often provide information knowing that others would not be

463

6

pleased by its disclosure. They often face, and know they will face, retribution for disclosing information. This might be anything from a change to their relationship with their employer to losing their livelihood, pension, or their liberty or life, depending upon the nature of the activities or misconduct they are seeking to expose or other information they provide, who it relates to, and the power that party has. Despite these risks, sources nevertheless disclose information. Often, they need journalists to offer them as much protection as is possible.

17. When investigating articles, journalists therefore rely on the trust of the people we speak to; without their cooperation we could not write the articles we do. Our journalistic materials are the manifestation of the confidential relationship with our sources which is at the core of all our work. As a result, journalists' notes are full of private numbers, facts, details, statements, accusations and claims, many of which are not for publication, or were deemed unfit for publication either by me or my editors at the time. A journalist's notes will contain names and addresses and revealing facts about sources, as well as material of a highly sensitive nature (be it medical, personal, or otherwise) that the journalist agreed would never be revealed, and the implication for the freedom of the press in suddenly handing those notes and recordings over is very grave indeed. It would, put bluntly, make our future work impossible, if third parties were free to drag such private material, independently gathered, into the public domain or even simply to obtain it for their own ends. Whistle-blowers, disclosing wrongdoing, and sources of many kinds, risk losing their jobs or putting themselves in physical danger if they were known to have given information to me.

18. The protection of journalistic material is not just a matter of keeping the trust of those who have provided material to a journalist. It is also a matter of keeping the trust of the public. The ability of any journalist to produce public interest journalism depends on public trust that the journalist is independent of the state, independent of parties in litigation, and independent of their sources. The disclosure of source material would therefore have a very real impact on my ability to do my job. If a perception takes hold that journalists like me will hand material over to third parties involved in litigation,

464

7

sources are unlikely to co-operate with me. They will not supply me with material. I will find it more difficult to obtain access to confidential situations.

19. Protecting sources' anonymity is not just a casual agreement we enter into, but it is also an important matter of security and well-being. In some situations, my safety could be put at risk. Journalists work in the vicinity of those who are prone to violence. At the moment, I am not at risk from such sources because I am perceived as being separate from the authorities and neutral in disputes. This allows me to carry out my task and, correspondingly, gives the public a greater opportunity to receive the work I intend to provide.

20. For these reasons, it has been a sacred obligation of my work for 25 years never to reveal a private source. This is not just my own personal approach; it is that of all journalists. The National Union of Journalists code of practice requires, at §7, that a journalist "*protects the identity of sources who supply information in confidence and material gathered in the course of her/his work.*" To equal effect, the "*Editorial Code of Practice*" of the Independent Press Standards Organisation provides, at §14, that, "*Journalists have a moral obligation to protect confidential sources of information*".

**My work on *The Satoshi Affair***

21. As '*The Satoshi Affair*' describes, I was approached in December 2015 by people representing Craig Wright in order to investigate and write the truth about him and the journey he says he went about the process of outing himself as the inventor of Bitcoin, 'Satoshi Nakamoto'. As described in my article, I was asked to take money and sign a Non-Disclosure Agreement, in return for which I would have signed away control of my materials and the story. I did neither. Instead, I chose to maintain my position as an investigative journalist. I told them that I would prepare the story of Mr Wright as a long piece of journalism for the *London Review of Books*. I warned them that I would report the story as I found it, even if it did not tell the story which they hoped it would tell.

22. I worked on the article in the same way that I have worked on all long-form journalistic stories for 25 years, interviewing people, taking notes, attending places of work, homes,

465

8

travelling to meet relatives and co-workers, reading reports, attending meetings. My aim was to get to the truth of Mr Wright's claims and write about his journey. That is what I intended and that is what my article does. The story took the better part of eight months, and enjoyed the professional involvement of about 12 people, including researchers, editors, fixers, lawyers, and editorial advisors. We set up an office in Piccadilly for the duration of the investigation. I travelled to the United States, to Australia, and to several parts of the UK in my pursuance of the story, interviewing dozens of people, and gathered over 100 hours of recordings and several hundred pages of documents and transcripts.

23. The whole project represented a major investment of time and resources by the *London Review of Books*, which saw it a major piece of reportage and an important story of our times. Our commitment was completely independent and not undertaken at the behest of any individual, or for the furtherance of any individual's financial claim. Consistent with the aims of a free press, we undertook this story with the single objective of telling the story of Bitcoin's self-claimed inventor, Craig Wright, and it represented one of the biggest single editorial investments ever made by the *London Review of Books*. It later formed a part of a book of my journalism, *The Secret Life,* which was published by Faber & Faber in the UK and by Farrar, Straus in the US.

24. With the Satoshi story, my aim was at all times to preserve my neutrality. I refused any attempts, whether by Mr Wright and his collaborators or by any other individual, to be swayed from my course of objective truth. I made this clear at an early stage of the relationship and without this clarity I doubt the piece would have been published at all. Establishing my independence was therefore essential to my journalistic role. I gathered the bulk of the core material for the piece on the understanding that I could give valid assurances of protection to sources. I developed the story on the basis that my working papers would remain as background material, confidential to me and my editorial colleagues. The understanding that they would not be revealed to anyone outside the investigative or editorial process was an integral element of this independence. 466

9

25. With this story, our purpose was to investigate the modern phenomenon of Bitcoin, by following the story of a man who claimed to have invented it. I worked with members of the highly secretive cryptocurrency community, many of whom spoke to inform me of the whys and wherefores of Mr Wright's claim, but who did so in the knowledge that I could protect them. Many of the individuals I met in the cryptocurrency world were secretive, and they live in a world which is generally hostile to outsiders asking questions. I worked hard to gain their trust and many of them gave it in the understanding that their identities would be kept out of the public domain. This was an essential element in the trust between us, and it often is in the kind of work I do. They spoke to me because they had faith in my record as a well-known journalist, someone with a history of protecting sources and getting to the heart of a story without compromising those who helped me with access to the facts. This was true in my experience on this story, working with the cryptocurrency community, where unnamed sources relied on my professional tact, but it was also true of certain individuals I met with during the preparing of the story in banking, in the Australian tax authority, in Mr Craig's private life, in Mr Kleiman's private life, in the fraternity around *nCrypt* and other organisations. I travelled to Australia to interview individuals who knew Mr Wright when he was a child. I spoke to his family. I spoke to people who knew him at university. Many of them spoke openly, and allowed themselves to be recorded, in the understanding that what they said might help me tell the story, but that it would not help them to be identified. I will stick by that. The order the court has made will put me in breach of existing confidentiality agreements that I entered into during the writing of this story.

26. As a piece of journalism, it was carefully researched, written, edited, legally checked, all at the expense of the *London Review of Books*. People speak to us because of the reputation we have, for carefulness, for neutrality, for reputable writing and editing, and because we take pains in our search for the truth, and our respect for sources, as opposed to publishing rapid, unchecked stories or opinion pieces. We promise our sources protection and accuracy and they get it. Nobody who was written about in 'The Satoshi Affair' brought any proceedings against the paper for breach of confidence,

467

10

invasion of privacy, defamation or any other cause. The article reported accurately what happened, so far as I could find it out, and we honoured all agreements with sources in our pursuit of the truth. We curated the painstaking work with sources in a safe environment in which we could test, assess and edit it. This is how we do our work.

**The implications of the Order**

27. It is my working understanding that the English legal system provides a high degree of protection to journalistic materials. An order such as that made in this application, which effectively removes ownership of journalistic processes, would have very serious implications for my ability to do my job. It would also impact on the perception of journalists more widely in England and Wales. In particular, it would make it impossible for me (and my colleagues) to enter into future agreements with subjects or sources of articles and more generally, to do our jobs. Papers such as the *London Review of Books* are a 'safe space', where people with a story to tell can tell it to certain journalists without fear or favour, knowing that their names will be redacted and their safety protected, no matter what. Agreements to protect our sources and our journalistic material are our stock-in-trade.

28. We can only tell our stories because our material is not undertaken at the behest of interested parties, and our sources participate because they understand that the full details we gather will not be available to anyone other than the person to whom they are speaking, that we will honour the agreed rules and protections to the very letter, and that we will do everything in our power to ensure our sources, the confidential materials they provide to us, and the journalistic material we create as a result, are protected and remain confidential. I cannot emphasise enough the importance of journalistic neutrality and the impact a precedent for disclosure in civil proceedings would have on me and on the trade. The request contradicts many of the agreements which underpin journalist freedoms as they have been practised by me for 25 years, and by others for much longer than that.

468

29. I have been a professional journalist for a long time, and I am acutely aware of, and understand, that there are limits and restrictions on journalistic privilege, for example where there is threat to life under terrorism legislation or a serious threat to national security. Even in those situations, there is no automatic override to the protection of journalistic material, but I understand from time to time the court will order disclosure of privileged material if a high threshold is met. The facts in this case do not represent anything close to that high threshold.

30. I am a prize-winning writer, I have never been sued for libel, invasion of privacy, breach of confidence or appeared in court, except in the press box, and I have never handed a single page of research over to an interested party, no matter how extensive their pain or how ambitious their claim.

**The oppressive and impractical nature of the Order**

31. So as to assist the Court in understanding the implications of the Order, I would ask it to consider the oppressive nature of it upon me. I am an independent writer who has no case to answer, no staff to deploy, and a hefty archive of materials which have not been found at fault. Without waiving any privilege or confidentiality in my materials, I can confirm (as has already been noted at §4.13(a) of Mr Freedman's witness statement) that I have many – possibly hundreds – of hours of tape recordings and hundreds of pages of notes and other materials which I collected, created and collated during my investigation. The investigation itself was more than 3 years ago, my materials are archived, and I could no longer say what is what off the top of my head. It will take an enormous amount of time – weeks or months – for me to review all of the materials sought by the Applicants and separate out the specific tapes and documents they wish to see and hear. In any event, it is oppressive to expect any journalist to take an active role in supplying private materials.

32. These materials belong to me and the *London Review of Books*. It was for me to decide what of them to publish and which extracts best described the truth of the matter as I could discover it. The idea that I should now go back into that archive and dig for material

469

12

that we deemed to be private causes me distress. As I said, the practical implications are both oppressive and unacceptable. Meeting this application would undermine my ability to honour the confidentiality of my sources and the material they have given to me. Although it may seem an extreme suggestion, it would seriously impact on my career as a respectable journalist with a reputation for gathering material responsibly and honouring its confidentiality.

**Relevance of the material sought**

33. Without waiving any privilege or confidence in my materials, having carefully considered Mr Freedman's statement at §4.13, it is my view that in terms of relevance to the underlying US proceedings, there is nothing further to be gained from the study of my archive. During my investigation I was (obviously) keen to find out as much as I could about Craig Wright's claim to have created Bitcoin, to have mined Bitcoin, and to have worked with Mr Kleiman in doing so. The material I collected about these topics in the course of my investigations was of great journalistic importance to me. This is why I have included considerable detail about each of these issues in the article. The Court can assume that if I had obtained materials about these topics, I would have published those materials in the article. All the material I gathered that was relevant to Mr Wright's claim to be Satoshi – and all material I could find about his collaborators and family and co-workers, including Mr David Kleiman – was presented by me in the article. I held nothing back unless it failed when put to the test, was not properly part of the story, or it was agreed that it was confidential and/or would compromise the health or security of the individual who gave it.

34. Having considered the application carefully, I am concerned that it really represents a "*fishing expedition*", an attempt to obtain information that may be relevant and an attempt to find material that could provoke further investigations and inquiries. Insofar as it is said to be relevant, the material seems to be sought for the purposes of testing the consistency of Mr Wright's account. Neither the US State Court in Florida nor the High 470

13

Court in London have considered the implications of requiring a journalist to provide journalistic material in Court proceedings.

**Correspondence from the applicants**

35. Over the time since I wrote '*The Satoshi Affair*' I have been approached by both sides in this underlying financial dispute asking me to give witness statements about the integrity or character of either party. I have not given any such statements to any of the parties, as I do not believe it is a journalist's role to become a 'player' in such disputes. My job was to gather what evidence I could in the pursuance of my story, but not to become a witness based on the evidence I had gathered or seen. Ira Kleiman, whom I first contacted with a hope of speaking to him about his brother's life, first encouraged me to come and see him in Florida (I booked a flight) and later said he did not wish to speak. Several times he contacted me to ask me if I could tell him anything, based on my research, about the whereabouts of his brother's 'Bitcoin holdings' and whether Mr Wright had given me any clues that would help him understand, in layman's terms, where the money was. I did not encourage these exchanges. Since that time, I have heard from his lawyers, via my agents and publishers, asking me to help Mr Kleiman in his dispute with Mr Wright. I did not give any statements because it is my personal belief that journalists, who 'visit' a story for a certain period and get to know people only for the purpose of furnishing facts for the story they are writing, are not appropriate witnesses in disputes about related topics.

**Statement of Truth**

I believe that the facts stated in this witness statement are true
Dated this 22nd day of November 2019

Signed ..................................................
**Andrew O'Hagan**

471

14

A O'Hagan<br>
Exhibit: AOH-1<br>
Statement: 1st<br>
Date: 22 November 2019

IN THE HIGH COURT OF JUSTICE  
BUSINESS AND PROPERTY COURTS OF  
ENGLAND AND WALES  
COMMERCIAL COURT

Claim No. HQ18M03343

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975

and

IN THE MATTER OF A CIVIL PROCEEDING PENDING BEFORE THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA ENTITLED AS: -

(1) Ira Kleiman (as the personal representative of the Estate of David Kleiman) and (2) W&K Info Defense Research LLC, Plaintiffs, v Craig Wright, Defendant (Case No.: 9:18-cv-80176-BB)

BETWEEN:

IRA KLEIMAN, as personal representative of the Estate of David Kleiman, and W&K INFO DEFENSE RESEARCH, LLC

**Applicants**

And

ANDREW O'HAGAN

**Respondent**

---

**EXHIBIT AOH-1**

---

472

15



473

16