Applicants
Velvel (Devin) Freedman
Second VDF2
6 December 2019

**IN THE HIGH COURT OF JUSTICE**                           Claim No.: CL-2019-000695
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

**and**

**IN THE MATTER OF A CIVIL PROCEEDING PENDING BEFORE THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA ENTITLED AS: -**
**(1) Ira Kleiman (as the personal representative of the Estate of David Kleiman) and (2) W&K Info Defense Research LLC, Plaintiffs, v Craig Wright, Defendant (Case No.: 9:18-cv-80176-BB)**

**BETWEEN:**

**IRA KLEIMAN, as personal representative of the Estate of David Kleiman, and W&K INFO DEFENSE RESEARCH, LLC**                **Applicants**

**-and-**

**ANDREW O'HAGAN**                **Respondent**

_____

**SECOND WITNESS STATEMENT OF VELVEL (DEVIN) FREEDMAN**

_____

**I, Velvel (Devin) Freedman**, of Roche Freedman LLP, 200 South Biscayne Boulevard, Suite 5500, Miami, Florida 33131, United States of America **WILL SAY** as follows:

**1.      INTRODUCTION**

1.1     I am the same Velvel Freedman who made the first witness statement dated 11 November 2019 ("**Freedman 1**") in support of the Application issued of the same date for an order pursuant to s.1 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "**1975 Act**") and Part 34 of the Civil Procedure Rules in pursuance of a request issued by the Southern District of Florida Court by way of a sealed Letter of Request dated 22 July 2019 (the "**Letter of Request**"). The defined terms used in my first witness statement are used herein unless otherwise specified.

1.2     Save where otherwise stated, the facts and matters contained in this witness statement are based upon information provided to me by the Applicants and are true to the best of my

knowledge and belief.  Nothing in this witness statement is intended to constitute any waiver of privilege.

1.3     The remainder of this witness statement shall be structured as follows:

(a)     Section 2 sets out the background to this witness statement;

(b)     Section 3 describes the narrowed scope of the Applicants' requests for testimony and documentary information;

(c)     Section 4 explains why the Applicants' requests do not comprise an impermissible interference with journalistic material; and

(d)     Section 5 sets out the Applicants' position on why compliance with their requests would not, contrary to what is suggested by the Respondent, be unduly burdensome or impractical for him.

1.4     There is now shown to me marked "**VDF2**" a bundle of copy documents to which I refer in this statement by page numbers in square brackets. In this witness statement I also refer to pages from copy documents included in "**VDF1**", exhibited to Freedman 1.

**2.      BACKGROUND**

(a)     The Respondent's Application

2.1     On 14 November 2019, Mr Justice Butcher made an order (the "**Disclosure Order**") requiring the Respondent, by 20 December 2019, to submit to oral examination on the following topics (paragraphs 1 (a) to (d) of the Disclosure Order):

(a)     *His educational background, employment history, professional qualifications, persona preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).*

(b)     *The accuracy of the quotes and factual assertions contained within his work The Satoshi Affair.*

(c)     *Statements made, or documents provided, by Craig Wright (and his agents), Ms Lynn Wright, or Ms Ramona Watts that relate to Satoshi Nakamoto, the creation of Bitcoin, David Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig Wright and/or David Kleiman, and the intellectual property alleged to have been created by Craig Wright and/or David Kleiman.*

(d)     *Statements made, or documents provided, by anyone interviewed in connection with the drafting of The Satoshi Affair that relate to Satoshi Nakamoto, the creation of Bitcoin, David Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig Wright and/or David Kleiman, and the intellectual property alleged to have been created by Craig Wright and/or David Kleiman.*

2.2     In addition, the Disclosure Order required that the Respondent produce the following documents (paragraphs 1 (e) to (g) of the Disclosure Order):

2

472

> (a) All video and/or audio recordings of interviews related to Mr O'Hagan's work in writing The Satoshi Affair, including but not limited to, the "many hours of tape" of Craig Wright referenced in The Satoshi Affair.
>
> (b) All documents relied on or reviewed in preparing for, and drafting, The Satoshi Affair. This includes contemporaneous notes taken by Mr O'Hagan or others, and any documents or communications reviewed or relied on when preparing the story.
>
> (c) All emails between Mr O'Hagan, and either Craig Wright, Ms Ramona Watts, Mr Robert MacGregor, or Mr Stefan Matthews.

2.3   These categories are referred to in Freedman 1 as the "O'Hagan Deposition" and the "O'Hagan Documents" respectively, and the "O'Hagan Evidence" collectively.

2.4   The Disclosure Order was personally served on the Respondent on Friday 15 November 2019.

2.5   On 22 November 2019, pursuant to paragraph 3 of the Disclosure Order, the Respondent applied to set aside the Disclosure Order, on the basis that:

(a)   The Disclosure Order was inconsistent with s.3(1) of the 1975 Act, in that the Respondent could not be compelled to give evidence that reveals source material or other journalistic material on this basis in civil proceedings in England and Wales;

(b)   The Disclosure Order was inconsistent with article 10 of Schedule 1 of the Human Rights Act 1998 in that it represents a disproportionate interference with the Respondent's right to freedom of expression and/or was not "*in accordance with the law*";

(c)   The Disclosure Order represents an order for general discovery against a mere witness and is an impermissible "*fishing expedition*"; and

(d)   The Disclosure Order is oppressive.

2.6   The Respondent's Application is supported by a witness statement of the Respondent, dated the same date ("**O'Hagan 1**").

(b)   <u>Developments in the SDF Proceedings</u>

2.7   To assist the Court, I set out here in more detail events in the SDF Proceedings (referred to in paragraph 3.4 of Freedman 1).

(a)   The SDF Court issued the Letter of Request on 24 July 2019, and it was provided to the Applicants' English legal representatives on 1 August 2019.

(b)   Pursuant to the terms of the Letter of Request, the Applicants prepared three separate applications for an order under CPR 34.17. Those three applications were substantially in final form by 23 August 2019. However, on 27 August 2019, Magistrate Judge Reinhart made a ruling in response to the Applicants' motion to compel Dr Wright to produce a list of the bitcoins he held as of 31 December 2013 [**VDF1/332-360**]. In his order, as a sanction for Dr Wright's repeated failures of compliance, Judge Reinhart made a number of factual findings in the Applicants' favour. (Those findings were the subject of an appeal by Dr Wright dated 25

3
473

November 2019 [**VDF2/437**], and thus their application cannot be relied on for purposes of trial until that appeal is resolved.)

(c)     Those factual findings prompted the start of settlement discussions shortly thereafter, as noted [**VDF1/266-268**]. While the settlement discussions were ongoing, the Applicants did not seek new disclosure.

(d)     But on 30 October 2019, the Applicants were informed by the Respondent that he could not finance the settlement, despite earlier representations to the contrary [**VDF1/416**]. Active litigation resumed, so the Applicants considered it necessary to pursue the disclosure orders pursuant to the Letter of Request.

(e)     As the Applicants informed the Court at paragraph 3.4 of Freedman 1, the deadline for disclosure in the SDF Proceedings had been set for 3 January 2020 [**VDF1/266-270**]. The deadline for disclosure has since been revised to 17 January 2020. The order of District Court Judge Bloom states: "***The Court takes this time to also caution the parties that no further extensions of time shall be granted as to the pretrial deadlines in effect***." (emphasis in the original) [**VDF2/2**].

(f)     The trial is scheduled to commence on 30 March 2020.

**3.      THE APPLICANT'S NARROWED CATEGORIES OF REQUESTS**

3.1     In view of the limited time now available to secure the evidence sought given the tight timetable in the SDF Proceedings, and having considered the matters raised in O'Hagan 1, the Applicants consider it appropriate and now intend to narrow the scope of their requests sought under the Letter of Request. This approach is a practical one and brings with it no concession as to the validity of any of the points made in O'Hagan 1.

3.2     The Applicants now seek evidence solely in relation to Craig Wright, the defendant in the SDF Proceedings. The Applicants therefore do not seek documentary or testimonial evidence relating to any other sources of *The Satoshi Affair*. Accordingly, in respect of the Disclosure Order, they maintain their requests only in relation to:

(a)     Paragraphs 1(a) and (b) in their original form;

(b)     Paragraph 1(e), in relation to the video and/or audio recordings of interviews of Dr Wright only; and

(c)     Paragraph **1(g) in relation only to emails with Dr Wright.**

3.3     Proposed revisions to paragraph 1 of the Disclosure Order are included as Appendix 1 to this witness statement (the "**Revised Request**").

3.4     Further, to the extent the Court considers appropriate, the Applicants repeat their **alternative** request (paragraph 4.13(a)(iii) of Freedman 1) of a further narrowing of paragraph 1(e) of the Disclosure Order: that the Respondent disclose only those parts of the recordings of the interviews with Dr Wright that relate to:

(a)     the creation of Bitcoin and David Kleiman's participation therein [**VDF1/164, 180-181, 186, 192-193**];

(b)   the personal and business relationship between Craig Wright and David Kleiman, including W&K Info Defense Research, and how they all conducted their Bitcoin mining activities and intellectual property research and development [**VDF1/121, 181, 185-187, 192**];

(c)   the Bitcoin allegedly mined by Craig Wright and David Kleiman [**VDF1/191**];

(d)   the Tulip Trusts and any other trusts into which Craig Wright purportedly placed Bitcoin mined by him and Mr David Kleiman [**VDF1/190**]; and

(e)   the intellectual property alleged to have been created by Craig Wright and David Kleiman. [**VDF1/186-187**].

3.5   As the Applicants have previously noted (paragraph 4.13(a)(iii) of Freedman 1), this narrower order may be <u>more</u> burdensome for the Respondent, as he will be required to conduct his own search of the recordings.

**4.   THERE IS NO IMPERMISSIBLE ENCROACHMENT INTO JOURNALISTIC MATERIAL**

4.1   The gist of the Respondent's objections (save the objection of onerousness, dealt with separately) is that the Applicants have no right to any of the evidence sought because it is journalistic material and as such receives near-absolute protection. The Respondent does not take adequate account of the fact that different journalistic materials are treated quite differently, receiving more or less protection, and that none are absolutely protected from disclosure (unlike, say communications protected by legal professional privilege).

4.2   In any event, I am aware that journalistic material can receive protection, and have approached this application accordingly.

4.3   *First*, before issuing the application, the Applicants tried, first through Matthew Getz of Boies Schiller Flexner (UK) LLP and then through me, to contact the Respondent, first through his literary agent and second directly, in order to see if the Respondent would assist the Applicants in any way.  In particular, and as explained at paragraph 5.1 of Freedman 1:

(a)   On 23 July 2018, Mr Getz sent an email to Rogers, Coleridge & White Literary Agents, for the attention of Mr Peter Straus, Mr O'Hagan's agent, as listed on their website. In that email, Mr Getz identified himself and said that he was writing "*because I would like to speak to one of your writers, Andrew O'Hagan, to see if he can help us in a litigation relating to Bitcoin and Craig Wright. In this litigation, my firm represents Ira Kleiman, the brother of the late Dave Kleiman. I would be very grateful if you could put me in contact with Mr O'Hagan. I would be happy to provide you with more details - perhaps we could meet in your office, or if more convenient, have a chat on the phone at a time that suits you.*" [**VDF1/366**]

(b)   On 31 July 2018, Mr Getz sent an email directly to Peter Straus along the same lines, expressing his offer to meet up or speak on the phone to provide more details. [**VDF1/367**]

(c)   On 5 March 2019 and 5 April 2019, I sent emails to the Respondent. I identified myself as counsel to the Applicants and asked if he could speak with me. It was my

hope that the Respondent would respond and we could work out a method of amicably sharing the information the Applicants sought.  [**VDF2/466-467**]

(d)     No response was received to any email.

4.4     The Respondent confirms at paragraph 35 of O'Hagan 1 that he was made aware of at least the approaches through his agent, stating that he "*did not give any statements*". That is not the whole story: the Respondent did not even acknowledge these approaches, and neither I nor Mr Getz received a response from the Respondent or his agent (presumably at the Respondent's instruction). Whilst the Respondent was under no duty to respond, the tone and intent of the communications were clearly to invite cordial discussion and attempt to reach a mutually acceptable arrangement. The Respondent ignored this friendly attempt to reach agreement, with the predictable result that the Applicants were forced to turn to the court for assistance pursuing the necessary disclosure.

4.5     *Secondly*, the Applicants expressly disclaimed the intent to seek material about anonymous sources, at paragraph 4.15 of Freedman 1.

4.6     *Thirdly*, the Applicants were careful to request information that did not attract the same protection as other journalistic materials, as explained below.

(c)     The Source Requested Does Not Require or Requires Only Minimal Protection

4.7     I understand and understood that journalistic sources have a right to protection from disclosure, and that the strength of this right varies according to the degree to which the source needs protection. Sources who provide information anonymously require the most protection, and indeed I indicated at paragraph 4.15 of Freedman 1 that I was not asking the Respondent to disclose material related to such sources.[1] Conversely, I consider, and considered when I prepared my first witness statement, that those of the Respondent's sources who were most likely to have had relevant discussions with the Respondent – Craig Wright, Stefan Matthews, Robert MacGregor, Ramona Watts and Lynn Wright (see paragraphs 1(c) and 1(g) of the Disclosure Order) – had no expectation of confidentiality and therefore did not need protecting. While I did not explicitly limit the relevant requests[2] to information received from those five individuals, the fact that I expressly disclaimed the desire for anonymous sources meant the request was in practice limited to information received from those individuals. In respect in particular of Dr Wright, who is now the only source of statements from whom the Applicants seek recordings, the evidence is very strong that he had no expectation of confidentiality, as can be seen from the Respondent's own reporting in *The Satoshi Affair*.

4.8     In *The Satoshi Affair*, the Respondent repeatedly makes clear that he would not be swayed by offers of financial compensation, the imposition of a non-disclosure agreement ("**NDA**") or any obligation of confidentiality to Dr Wright, and that Dr Wright would have no control or even influence over what the Respondent chose to disclose. This was understood and accepted in plain terms by Dr Wright. Indeed, since it was Dr Wright who approached the Respondent and asked him to write the article on this basis, Dr Wright naturally could not

---

[1]     I noted that if the Applicants later determined that such would be relevant, I would seek agreement with the Respondent or seek a new Court order.

[2]     At paragraphs 4.13(a) and (b) and 4.18(d) of Freedman 1.

have any legitimate expectation of confidence in the information provided. Relevant excerpts are set out here (emphasis in bold):

(a)     Dr Wright "*wanted what I wrote to be 'warts and all*'" [**VDF1/171**]. "***Wright himself never mentioned rights or agreements or privacy ...** Early on, MacGregor told me in an email that **he had advised Craig and Ramona to tell me 'everything'**.*" [**VDF1/209**].

(b)     Dr Wright and his team – Messrs MacGregor and Matthews and Ms Watts - "*were confident that a supremely important thing was happening and **that the entire process should be witnessed and recorded.**" [**VDF1/170**]

(c)     While there was a request for an NDA (from "*the nCrypt men*", not Dr Wright), that was firmly, affirmatively and openly rejected by the Respondent, as set out in these paragraphs from *The Satoshi Affair*

> "*Wright himself never mentioned rights or agreements or privacy – until the very end, when he asked for two particular aspects of his private life not to be discussed – but when I went to Australia at the end of February to talk with Wright's family and friends, the nCrypt men began insisting I sign an NDA.*
>
> *Why they hadn't asked me to sign one at the beginning I'll never know. I had roamed freely for three months, noting and recording, going to meetings and interviewing everyone, and only now did they want me to sign. Early on, MacGregor told me in an email that he had advised Craig and Ramona to tell me 'everything'. He went on to express, on Wright's behalf, worries about how the material would be used. This was especially sensitive, I gathered, because of the government security work Wright had done. I replied that we would be judicious about what was published. MacGregor still wanted to discuss contractual issues, and I replied, on 6 March, that I would have to see proof that Wright was Satoshi, and see it presented before his peers and selected journalists. MacGregor replied that the proof package was in train and that he didn't understand why I wouldn't sign. I replied on 7 March that I couldn't write the story, no matter how good my access, if there wasn't proof that Wright was Satoshi, and I was still waiting for evidence. 'My commitment is clear,' I wrote, 'but the book turns to dust if we do not have unanswerable and generous proof.' **I insisted that I wouldn't sign any document and eventually MacGregor accepted this**. We fell out over it, but I saw their point and I still do. **Despite my refusal they continued, without binding agreements or legal constraints, to provide me with access to every meeting and every aspect of the story**, which was set to change faster and in ways none of us could ever have prepared for. My story and nCrypt's deal seemed to be on the same track, aligned and friendly, but none of us discussed what would happen if the deal came unstuck.*" [**VDF1/209-210**].

The Respondent's reference to being "*judicious*" appears at odds not only with other statements in *The Satoshi Affair* but also with the statement in O'Hagan 1 that he would "*report the story as I found it, even if it did not tell the story which they hoped it would tell*" (paragraph 21, O'Hagan 1).

(d)     At some stage, the individuals did not want their real names used, but: "***Our discussion about using real names was inconclusive – during a later meeting at Berners Tavern, Matthews expressed the view that I should put their names in and make a final decision later – but the decision was really made by what the story became***." [**VDF1/224**]

(e)     The Respondent described a meeting with Ms Watts and Dr Wright, in which Ms Watts "*tried to strong-arm me. She began to tell me what I should say and what I shouldn't say and how I should hide from MacGregor and Matthews the comments she and Wright had made about them. **'I want to write the truth,' I said... I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December.***" [**VDF1/245**]

(f)     Finally: "*I reminded them* [Ms Watts and Dr Wright] *that every time I'd tried to walk away from this story – like when they tried to make me sign an NDA – she'd begged me to come back*." [**VDF1/247**] [3]

4.9     I nonetheless understand and understood that even someone such as Dr Wright, who has approached a writer, has been refused his requests for confidentiality, and has accepted that the writer has the absolute right to publish whatever he learns as he sees fit, is nevertheless due some protection. I understand that the protection is assured by ensuring that materials requested are necessary in the interests of justice, which includes seeking justice for a civil litigant in court. Hence, I took care to ensure that the evidence request was narrowly tailored to be directly relevant for the SDF Proceedings, as explained in Freedman 1 and below.

4.10    Furthermore, it is my belief that the rules of discovery applicable in the SDF Proceedings would require Dr Wright to produce these recordings to Applicants if he had possession of them. Thus, the fact that these recordings are now held by the Respondent should not provide them with more protection than they would be entitled to if Dr Wright held them.

4.11    Finally, Dr Wright is protected by a robust confidentiality order which enables even non-parties to designate materials confidential or highly confidential and thereby limit their dissemination. [**VDF1/368**].[4]

(d)     <u>The Applicants do not seek disclosure of anonymous sources</u>

4.12    Much of O'Hagan 1 concerns sources who have been promised anonymity or some other form of confidentiality. As noted above and expressly in Freedman 1, the Applicants in their application have not sought any information from such sources, nor have they sought documents which may lead to the revelation of those sources' identity.

---

[3]     For completeness, the following excerpts show that the same understanding was held by other individuals (Mr MacGregor, Ms Watts and Mr Matthews): (i) Mr MacGregor discussed payment with the Respondent for the article. The Respondent wrote: "*I decided I wouldn't accept any. I would write the story as I had every other story under my name, by observing and interviewing, taking notes and making recordings, and sifting the evidence. **'It should be warts and all,'** MacGregor said. He said it several times, but I was never sure he understood what it meant.*" [**VDF1/169**]; (ii) Mr MacGregor "*never, incidentally, used the words 'off the record' with me*" [**VDF1/199**]; (iii) The Respondent described his interactions with Mr Matthews in one instance: "*The Antigua meeting was being arranged when I went out for dinner with Matthews, and **he referred to Ayre freely without ever asking that it be off the record**.*" [**VDF1/205**]; (iv) Ms Watts sent Mr O'Hagan an email: "***It was unfair of me to request you not to publish certain things about our situation,' Ramona had written to me in an email. 'As you said, you have a debt to the truth, and that is as it should be***.'" [**VDF1/250**].

[4]     While this order does not govern what may be used at trial, Dr Wright will have the ability to seek to prevent these materials from being disclosed publicly at trial if he can show such protection is justified.

4.13   The Respondent wrote in O'Hagan 1 that he interviewed "*dozens of people*" (paragraph 22) and gathered the bulk of the core material on the understanding that he could give valid assurances of protection to certain sources (paragraph 24). Since the Applicants have not sought such materials (since they would disclose the respondent's confidential sources), that means that the bulk of his core material has never been and is not a subject of the Application. This also bears on the Respondent's arguments regarding onerousness, which are addressed below. Inadvertently, the draft order sought from the Court, and the terms of the sealed Disclosure Order, do not expressly limit the source of such information to interviewees that did not provide information in confidence. However, the Order is to be seen in the context of the witness statement, where that point was made clear.  It was never the intention of the Applicants to procure confidential source material, as my witness statement made abundantly clear.  Further, the Applicants had deliberately structured the dates for compliance so that there was more than sufficient time for the Respondent and the Applicants to refine the scope of the requests if necessary and appropriate in order to exclude such material. The Application Notice was issued on 11 November 2019, with suggested compliance by 20 December 2019, almost six weeks after issue, and long after the time for any application or request by Mr O'Hagan for the Order to be set aside or varied. The Disclosure Order did not require the Respondent to disclose documents immediately.

4.14   Thus, the Revised Request limits further the source evidence sought to that relating to Dr Wright only. In no way does it attempt to reach material provided by sources who have been provided assurances of confidence.  So that there can be no doubt about that, a proviso has been added stating "*nothing within this Order shall require Mr O'Hagan to disclose any material which reveals a confidential journalistic source.*"

(e)   <u>The Revised Request does not comprise an interference with the Respondent's Rights or create a chilling effect</u>

4.15   I understand that the Respondent is concerned that his rights under article 10 of the European Convention of Human Rights (as embodied in Schedule 1 of the Human Rights Act 1998) are at risk as a result of the Disclosure Order. He states succinctly at paragraph 2 of O'Hagan 1 that such right "*permits me to protect my sources and to protect the confidential information I gathered*".

4.16   As explained above, the Applicants are not seeking disclosure of any of the Respondent's sources, and are seeking only relevant information that was provided to the Respondent by Dr Wright without a reasonable expectation of confidentiality. As such, and whilst recognising this is a matter for the Court, the engagement of the Respondent's article 10 rights appears substantially more limited than is suggested in O'Hagan 1. This issue will of course be developed more fully in submissions.

4.17   In formulating the categories requested, the Applicants weighed up what was truly necessary to seek from a third-party writer, living in another country from the locus of their claim, with the attendant costs and difficulties of doing so. I have no reason to believe the SDF Court did not do the same:[5] Judge Reinhart, who issued the Letter of Request, has been the assigned judge for the SDF Proceedings since early 2018, and has determined a variety of discovery-related issues in this matter. In my view, he has a close understanding of the relevant issues in dispute, the parties' efforts to obtain responsive material through discovery, and the

---

[5]   At **VDF1/281-296**. The motion was unopposed by Dr Wright, the Defendant in the SDF Proceedings. Judge Reinhart issued the Letter of Request upon due consideration of the relevant Motion and supporting material.

content of the categories included in the Motion for a Letter of Request, and he stated the same in the Letter of Request.

4.18    This weighing exercise fell heavily in favour of the Applicants.

4.19    When applying for the Letter of Request from the SDF Court, the Applicants carefully considered the specific topics; the discussion of such topics is included in the Applicants' Motion, at **pages 281 to 296 of VDF1**. In seeking their application before this Court, the Applicants narrowed their requests even further. And now, as noted, the Applicants have narrowed their requests still further in the Revised Requests to ensure they are seeking only the most probative material for the purpose of their claim. This is described further below.

4.20    From the point of view of the Respondent's rights and obligations, he expressly and repeatedly gave no promises of confidentiality to Dr Wright so cannot withhold relevant material responsive to the Revised Request on the basis that he owes an obligation of confidentiality. I note too that Dr Wright provided his information with no expectation of confidence and in a fully informed manner. As the Respondent himself stated: "*I warned them I would report the story as I found it, even if it did not tell the story which they hoped it would tell.*" (paragraph 21, O'Hagan 1) Dr Wright knowingly and willingly opened himself up.

4.21    It should also be noted that the Applicants have not simply chosen the easy route of going to a writer for information they could have got elsewhere. In respect of Dr Wright, the Applicants have relentlessly pursued him for discovery, yet he has proved dishonest and evasive to the extent that the SDF Court was required to sanction him for his misbehaviour [**VDF1/306**]. Dr Wright's non-compliance and dishonesty in the SDF Proceedings, and his dubbing *The Satoshi Affair* a "*work of fiction*", necessarily throwing it into doubt, have contributed to the need for the Applicants to approach the Respondent.  (As noted, the Applicants also tried to contact the Respondent directly before issuing an application, but he did not respond.)

(f)    The evidence sought is relevant and necessary

4.22    The Respondent has contended at paragraphs 33-34 of O'Hagan 1, that the O'Hagan Evidence would not contain any relevant material to the SDF Proceedings, and that the application is a mere fishing expedition. That is not the case.

4.23    It is my understanding, as I explained in Freedman 1 (paragraph 4.12), that the question of relevance is generally one for the court of the requesting country, since that court is much more likely to be aware of the underlying facts, unless it can be shown that that court merely rubber-stamped the letter of request.  As I explained in Freedman 1 and as is clear from the Letter of Request, the SDF Court, which had deep knowledge of the SDF Proceedings, gave consideration to the evidence requested and determined that it was relevant. I understand that should be the end of the story. Nonetheless, I explained in Freedman 1 why the evidence is relevant and indeed necessary. I will not repeat those explanations here, save to add the following observations.

4.24    In the SDF Proceedings, the Applicants are attempting to prove that Dr Wright and Mr David Kleiman formed a partnership where they mined a fortune of bitcoin together and created bitcoin related intellectual property together, *i.e.*, they both owned these assets which Dr Wright has taken unlawfully.

4.25    I ask the Court to take into account the context of this claim, and the unique evidential challenges that have faced the Applicants' attempts to receive justice. There are two key witnesses to the relevant facts: Dave Kleiman is dead and Craig Wright has been found to be dishonest and unreliable by the SDF Court. As far as the Applicants are aware, there are no other witnesses who can speak with first-hand knowledge to the critical events underlying the claim. Dr Wright is certainly the only person alive with first-hand knowledge of the intellectual property created, and bitcoin mined, yet he has refused to willingly provide this information in the SDF Proceedings, and has found to have perjured himself and to have wilfully submitted false evidence to the Court. Any pre-litigation admissions made by him are extremely important to the Applicants' ability to prove their claim. Documentary evidence (including recordings) showing what Dr Wright said when he did not consider himself under threat of losing his ill-gotten assets is of acute importance to assist the SDF Court in finding the truth, and achieving a just outcome for the Applicants. And this is no small matter: as noted in paragraph 3.2 of Freedman 1, the Applicants seek the return of assets valued in excess of US$10 billion.

4.26    The Respondent acknowledges that the single objective of *The Satoshi Affair* was to tell the true story of Bitcoin's self-claimed inventor, Craig Wright (paragraph 23, O'Hagan 1). *The Satoshi Affair*, which contains many indications of what actually happened, along with signposts to further evidence as to what happened, is tremendously useful to the Applicants to prove their case. Yet Dr. Wright has called *The Satoshi Affair* a "*work of fiction*", calling its truth into doubt. Furthermore, as a matter of Florida law, *The Satoshi Affair* is inadmissible hearsay for the purposes of the trial. Therefore, confirmation of its accuracy by the Respondent in a sworn deposition or through his source material – especially where it has been challenged by Dr Wright – will be necessary to allow the Applicants to use its contents in court. For example:

(a)    In a deposition for the SDF Proceedings, Dr Wright testified that he did not remember if he sent bitcoin to himself or to Dave Kleiman on 12 January 2009, the date of the first bitcoin transactions [**VDF2/195-196**]. Yet in *The Satoshi Affair*, he is quoted as telling the Respondent that bitcoins were sent on that date to "*Hal, Dave, [Wright]*" and another unnamed person [**VDF1/187**] – Dr Wright said in his deposition that this quote was only a "*half-truth version*" [**VDF2/192-193**]. Whether Dr Wright sent the first bitcoin to Dave Kleiman is directly relevant to prove the Applicants' claims that Dave Kleiman participated in the creation of bitcoin, and it is likely that the recordings show further discussion of the first bitcoin circulation.

(b)    Dr Wright also testified that he "*did not collaborate with Dave on anything*" [**VDF2/219**]. However, in *The Satoshi Affair*, Dr Wright was quoted as saying that if he had "*come out originally as Satoshi without Dave, [Wright didn't] think it would have gone anywhere*" [**VDF1/182**], and the Respondent wrote: "*Dave Kleiman was to become the most important person in Wright's professional life, the man [Wright] sa[id] helped him do Satoshi's work*." (emphasis added) [**VDF1/181**]. The statements made to the Respondent, along with other statements on that topic that were not selected for publication, are directly relevant to proving that the two men worked together to create bitcoin in partnership.

(c)    Dr Wright testified in the SDF Proceedings that there "*was no mining of bitcoin between [Wright] and Dave ever*" [**VDF2/245**] and "*Dave Kleiman was not involved in the Tulip Trust . . . Dave was never a beneficiary of the trust. Dave never put money into the trust. Dave never had any Bitcoin in the trust. Dave never mined any Bitcoin*

11
481

*that had anything to do with the trust . . . Nothing Dave owned was involved with the trust. Dave had no rights to the trust, no ownership of the trust, no knowledge of the set-up of the trust.* [**VDF2/295-296**]. However, in *The Satoshi Affair*, Dr Wright was quoted as telling the Respondent that "*his and Kleiman's mining activity had led to a complicated trust*" [**VDF1/191**]. The statements allegedly made to the Respondent go directly both to whether Dave Kleiman mined bitcoin with Dr Wright, and to Dr Wright's claims regarding bitcoin placed within a trust. Given the summary nature of this description in *The Satoshi Affair*, the Applicants expect that the recordings show further discussion on these issues, later summarised for publication by the Respondent.

4.27    As a general matter, the Respondent's contention that "*there is nothing further to be gained from the study of my archive*" (paragraph 33, O'Hagan 1) appears to be at odds with his statement in *The Satoshi Affair* that there were many things that he would "*choose not to print*", including "*unsubstantiated allegations about the past*", and that he has "*hundreds of hours of tape*". It is unlikely to be the case following an eight-month investigation concerning Dr Wright's claim to be the creator of Bitcoin that all material of relevance, including details provided by Dr Wright of his relationship with Dave Kleiman, is in print.

4.28    Finally, I would state that the Applicants have been assiduous at all times, even before narrowing the Revised Request, to make sure they do not seek more than would be necessary and appropriate. Before issuing their application, the Applicants disclaimed the desire for certain categories that appeared in the Letter of Request. In the application itself, the Applicants also suggested the narrowest possible order to the Court (see 4.13(a)(iii), 4.13(b)(iii), 4.13(c)(v) of Freedman 1).

**5.    THE DISCLOSURE ORDER IS NOT OPPRESSIVE NOR IMPRACTICAL**

5.1    The Respondent states in O'Hagan 1 that his compliance with the Disclosure Order would be oppressive and impractical. The Respondent cites the fact that he is an independent writer, with no employed staff and such an exercise would be unduly burdensome.

5.2    The Court is invited to consider the following matters.

5.3    The manner in which the Respondent describes that he would need to "*go back into that archive and dig for material*" (paragraph 32, O'Hagan 1) appears inconsistent with the meticulous and careful record-keeping fashion in which his original investigation was conducted. It would be reasonable to infer that the Respondent archived his material in a logical and easily accessible manner. This is to be expected for a journalist and publication which frequently engages with frank and potentially provocative reporting that may expose them to legal claims, which the Respondent has clearly anticipated  (paragraph 30, O'Hagan 1). Moreover, the Applicants have never sought material subject to confidentiality, and that, according to the Respondent, forms the bulk of his core materials. That is, the bulk was never a subject of the Applicants' requests.

5.4    In any event, the documentary evidence sought in the Revised Request only requires the Respondent to produce recordings of interviews with Dr Wright taken in preparation for *The Satoshi Affair*, along with emails to or from him. It would not appear onerous to locate solely recordings with the individual who is the subject of the article.

5.5    Moreover, the Respondent is represented by an able law firm who will be able to assist him. To the extent he is concerned about the costs of using his solicitors, see below. The Applicants have also made clear (at paragraph 5.2(c)(iii) and (d) of Freedman 1) and repeat their offer that they will reimburse the Respondent for costs relating to the copying and transmission of documentary evidence (which includes recordings), and reimbursement for the Respondent's own time in travelling to and attending a deposition – in both instances in respect of compliance with the Disclosure Order in the form of the Revised Request, the Applicants are also willing to offer:

(a)    administrative or other assistance in carrying out the search and review exercise if and to the extent the Court considers it appropriate to narrow the topics for the purpose of paragraph 1(e) of the Disclosure Order (see paragraph 3.4 above); and

(b)    reimbursement of the Respondent's reasonable legal costs relating to compliance with the Disclosure Order.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

*Devin Freedman*

Name: Devin Freedman
Dated: 06/12/2019

**APPENDIX 1**

1.  Pursuant to section 2(2) of the Evidence (Proceedings in Other Jurisdictions) Act 1975, the Respondent, Mr Andrew O'Hagan, attend before Mr Allen Dyer, who is hereby appointed examiner pursuant to CPR 34.18.1(b), at the offices of the solicitors for the Applicants, for no longer than 7 hours, at a date and time to be agreed by the Applicants and the Respondent but no later than 20 December 2019, to be examined on oath in a manner consistent with the United States Federal Rules of Civil Procedure and on the following topics of questioning:

    (a)  His educational background, employment history, professional qualifications, persona preparation for the deposition (to include any contacts he may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).

    (b)  The accuracy of the quotes and factual assertions contained within his work *The Satoshi Affair*.

    (c)  ~~Statements made, or documents provided, by Craig Wright (and his agents), Ms Lynn Wright, or Ms Ramona Watts that relate to Satoshi Nakamoto, the creation of Bitcoin, David Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig Wright and/or David Kleiman, and the intellectual property alleged to have been created by Craig Wright and/or David Kleiman.~~

    (d)  ~~Statements made, or documents provided, by anyone interviewed in connection with the drafting of *The Satoshi Affair* that relate to Satoshi Nakamoto, the creation of Bitcoin, David Kleiman, W&K Info Defense Research, the Tulip Trusts, the bitcoin allegedly mined by Craig Wright and/or David Kleiman, and the intellectual property alleged to have been created by Craig Wright and/or David Kleiman.~~

    and that Mr O'Hagan produce the following documents:

    (e)  All video and/or audio recordings of interviews of Craig Wright, ~~Ramona Watts, Robert MacGregor or Stefan Matthews~~ related to Mr O'Hagan's work in writing *The Satoshi Affair*, including but not limited to, the "*many hours of tape*" of Craig Wright referenced in *The Satoshi Affair*.

    (f)  ~~All documents provided by Craig Wright, Ramona Watts, Robert MacGregor or Stefan Matthews and relied on or reviewed in preparing for, and drafting, *The Satoshi Affair*. This includes contemporaneous notes taken by Mr O'Hagan or others, and any documents or communications reviewed or relied on when preparing the story.~~

    (g)  All emails between Mr O'Hagan, and ~~either~~ Craig Wright, ~~Ms Ramona Watts, Mr Robert MacGregor, or Mr Stefan Matthews~~.

    SAVE THAT nothing within this Order shall require Mr O'Hagan to disclose any material which reveals a confidential journalistic source.

Applicants
Velvel (Devin) Freedman
Second VDF2
6 December 2019

**Claim No.: CL-2019-000695**

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**BETWEEN:**

*IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC*

<u>**Applicants**</u>

**-and-**

***ANDREW O'HAGAN***

<u>**Respondent**</u>

---

**EXHIBIT VDF2**

---



Boies Schiller Flexner (UK) LLP
5 New Street Square
London EC4A 3BF

| EXHIBIT VDF2 INDEX | | | |
|---|---|---|---|
| **TAB** | **DOCUMENT** | **DATE** | **PAGE** |
| 1. | Order Denying Further Extensions of Pretrial Deadlines | 27 Nov 2019 | 1 - 3 |
| 2. | Deposition Transcript of Craig Wright | 04 Apr 2019 | 4 - 436 |
| 3. | Craig Wright's Objection to Magistrate Order "Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses | 25 Nov 2018 | 437 - 465 |
| 4. | Email chain between Velvel (Devin) Freedman to Andrew Hagan | 05 Mar 2019 | 466 - 467 |

Case 9:18-cv-80176-BB Document 836-4 Entered on FLSD Docket 12/08/2021 Page 17 of
Case 9:18-cv-80176-BB Document 320 Entered on FLSD Docket 12/09/2021 Page 1 of
483

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

   Plaintiffs,

v.

CRAIG WRIGHT,

   Defendant.

_____/

### OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Plaintiffs' Motion for Leave to Extend the Time

Limit for Defendant's Deposition and to Appoint a Special Master, ECF No. [307], filed on

November 21, 2019 ("Motion"). Defendant has filed a Response to Plaintiffs' Motion, ECF No.

[314]. The Court has reviewed the Motion, the record and applicable law, and is otherwise fully

advised.

  In the Motion, Plaintiffs request the Court enter an order extending the time limit for the

Defendant's deposition to fourteen hours and for the Court to appoint a special master to oversee

the deposition. *See generally*, ECF No. [307]. Defendant does not oppose the extension of the time

limit for Defendant's deposition, however, requests that such extension not exceed ten hours. *See*

*generally*, ECF No. [314]. The Defendant also argues that a special master should be appointed to

oversee the depositions of all the parties in this case.[1] ECF No. [314], at 4. The Defendant does

not oppose the appointment of a special master to oversee his own deposition but proposes that

---

[1] The Court notes that there is no motion presently pending addressing such request, and therefore the
request is improperly raised at this time. However, after a review of the record, the Court disagrees that it
reflects the need to appoint a special master to oversee the depositions of *all parties* in this case

Case 9:18-cv-80176-BB Document 826-4 Entered on FLSD Docket 12/08/2021 Page 19 of
483
Case 9:18-cv-80176-BB Document 320 Entered on FLSD Docket 11/27/2019 Page 2 of 9

any costs related to such appointment be split by the parties. *Id.* After a review of the Motion and the Response, the Court finds a reasonable basis for the limited extension of the time limit for Defendant's deposition and for the appointment of a special master as specified below.

On November 26, 2019, the parties filed a Joint Motion for an Extension of Time for Certain Pretrial Deadlines, ECF No. [316], which the Court subsequently denied, ECF No. [317]. The Court appreciates the parties' efforts in working to provide dates for the Defendant's deposition to take place. Upon review of the filings, and in light of the parties' varying scheduling conflicts, the Court finds good cause exists to extend the Court's deadlines. Thus, the Court will vacate its prior order, and extend the Court's deadlines to accommodate the parties. ***The Court takes this time to also caution the parties that no further extensions of time shall be granted as to the pretrial deadlines in effect***.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Motion, **ECF No. [307]**, is **GRANTED IN PART AND DENIED IN PART.**

2. The deposition time limit of Defendant Craig Wright shall be extended to 12 (twelve) hours over the course of two (2) days.

3. **The Honorable Bruce E. Reinhart** is **APPOINTED** as Special Master in this case to oversee the deposition of the Defendant Craig Wright. The Special Master shall appear at the deposition via videoconference.[2]

**IT IS FURTHER ORDERED** that the Court's Order, **ECF No. [317]**, is **VACATED**, the Motion, **ECF No. [316]**, is **GRANTED**, and the Court's Scheduling Order, **ECF No. [286]**, is **AMENDED** as follows:

---

[2] The parties shall be responsible to ensure that the location where the Defendant's deposition is to take place has the appropriate video conferencing technology and capability.

| **December 13, 2019** | Parties disclose experts and exchange expert witness summaries or reports. |
| **January 3, 2020** | Parties exchange rebuttal expert witness summaries or reports. |
| **January 14-15, 2020** | The Defendant's Deposition shall take place on January 14-15, 2020 from 1:00 p.m. (GMT) – 7:00 p.m. (GMT) each day. |
| **January 17, 2020** | All discovery, including expert discovery, is completed. All party and expert depositions shall be completed by this date. |
| **January 21, 2020** | All pre-trial motions, motions *in limine*, and *Daubert* motions (which include motions to strike experts) are filed. **This deadline includes all dispositive motions.** Each party is limited to filing one motion *in limine* and one Daubert motion. If all evidentiary issues cannot be addressed in a 20-page memorandum, leave to exceed the page limit will be granted. **The parties are reminded that motions *in limine* must contain the Local Rule 7.1(a)(3) certification.** |

All other provisions in the Scheduling Orders, **ECF Nos. [149], [286]**, not amended in this Order, shall remain in full effect.

**DONE AND ORDERED** in Chambers at Miami, Florida, on November 27, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


------------------------------)
                              )
                              )
                              )
IRA KLEIMAN, as the personal  )CASE NO:
representative of the Estate  )9:18-cv-80176-BB/BR
of David Kleiman, and W&K Info)
Defense Research, LLC         )
                              )
          Plaintiffs,         )
                              )
v.                            )
                              )
                              )
CRAIG WRIGHT                  )
                              )
          Defendant.          )
                              )
                              )
------------------------------)




Videotape Deposition of
CRAIG STEVEN WRIGHT

On Thursday, 4th April 2019


Taken at the offices of:

Boies Schiller Flexner LLP
5 New Street Square,
London EC4A 3BF

Reported by:  Paula Foley



Page 2

```
 1              A P P E A R A N C E S
 2    On behalf of the Plaintiffs:
 3           VELVEL (DEVIN) FREEDMAN, ESQ.
             Boies Schiller Flexner LLP
 4           100 SE Second Street, Suite 2800,
             Miami, Florida 33131
 5
             KYLE W. ROCHE, ESQ.
 6           Admitted Pro Hac Vice
             Boies Schiller Flexner LLP
 7           333 Main Street
             Armonk, NY 10504
 8
 9    On behalf of the Defendant:
10           ANDRÉS RIVERO
             ZAHARAH R. MARKOE
11           Rivero Mestre LLP
             2525 Ponce de Leon Blvd.
12           Ste. 1000 Miami,
             FL 331134
13
14
      Court Reporter:
15
             PAULA FOLEY
16           Magna Legal Services
             1635 Market Street,
17           Philadelphia,
             PA 19103
18           United States
19
      Also Present:
20
             PHILIP HILL (Videographer, Magna Legal
21           Services)
22           ANDREW S. BRENNER, ESQ (Boies Schiller
             Flexner LLP) for the Plaintiff By Telephone
23
             JOHN MCADAMS, ESQ (Boies Schiller Flexner
24           LLP) By Telephone
25           IRA KLEIMAN (Plaintiff) By Telephone
```



Page 3

1                            I N D E X
2

     Deponent                                   Page
3

     DR. CRAIG STEVEN WRIGHT
4

     Questions by MR. FREEDMAN              5 - 385
5

6

7                   - - - - - - - - - -

8

9        Exhibits marked during this deposition
10          Exhibit                        Page
11            1                              78
              2                             126
12            3                             189
              4                             227
13            5                             239
              6                             259
14            7                             296
              8                             314
15            9                             333
             10                             347
16

17

18

19

20

21

22

23

24

25

Page 4

1                    THE VIDEOGRAPHER:  We are now on the

2    record.  This begins the video card number 1, volume 1,

3    in the video deposition of Dr. Craig Wright.  This is

4    taken in the matter of Ira Kleiman et al versus Craig

5    Wright.  This case is being heard in the United States

6    District Court Southern District of Florida.  Case

7    number 9:18-cv-80176-BB/BR.  Today's date is April 4,

8    2019.  The time on the video screen is 10.37 a.m.  Local

9    time is London.  This video deposition is taking place

10   at the London offices of Boies Schiller Flexner at the

11   request of Boies Schiller Flexner. The videographer is

12   Philip Hill representing Magna Legal Services and the

13   court reporter is Paula Foley, also representing Magna

14   Legal Services.  Please will counsel introduce

15   themselves and state whom they represent at the Boies

16   Schiller offices in London and those present via the

17   telephone conference link.  Thank you.

18                    MR. FREEDMAN:  Vel Freedman for the

19   plaintiffs.

20                    MR. ROCHE:  Kyle Roche for the

21   plaintiffs.

22                    MR. RIVERO:  Andrés Rivero for Craig

23   Wright.

24                    MS. MARKOE:  Zaharah Markoe for

25   Dr. Wright.



1               MR. BRENNER:  (By Telephone) Andrew

2    Brenner for the plaintiff.

3               MR. FREEDMAN:  Did we loose Mr. McAdams?

4               MR. BRENNER:  John McAdams is here.

5               THE VIDEOGRAPHER:  Please will the court

6    reporter swear in the witness.

7          DR. CRAIG STEVEN WRIGHT, SWORN

8             QUESTIONS BY MR. FREEDMAN

9               MR. FREEDMAN: Thank you very much.

10              MS. MARKOE:  Point of order before we get

11   started.  We are going to mark the entire deposition

12   confidential and then once we have the transcript we

13   will de-designate.

14              MR. FREEDMAN:  That is fine.

15        Q.    Good morning, Dr. Wright.

16        A.    Good morning.

17        Q.    We met earlier.  My name is Vel Freedman.

18   I represent the plaintiffs in this action.

19        A.    Hello Vel.

20        Q.    Can you please state your name and date

21   of birth for the record?

22        A.    My name is Craig Steven Wright.  I was

23   born in Brisbane, Australia, on 23rd October 1970.

24        Q.    Can you tell us your home address?

25        A.    I live currently in 21 Harebell Hill,



Page 6

1    which is in Cobham, UK.

2          Q.     And your work address?

3          A.     I mainly work from home.  To tell you the

4    truth I do not know the office address, I just walk

5    there, it is in Oxford Circus at nChain.  There is

6    another one at Golden Square.  I do not actually know,

7    I am sorry.

8          Q.     That is fine.  Doctor, you understand

9    today that you are under oath and that you have taken an

10   oath to tell the truth?

11         A.     I understand perfectly well the meaning

12   of an oath.

13         Q.     You understand that your examination

14   today is being recorded both via stenographer and

15   videographer and that at some point this testimony may

16   be shown to a jury?

17         A.     I understand that perfectly, thank you.

18         Q.     Are you taking any medication today?

19         A.     No.  I do not take medication.

20         Q.     Is there anything today that I do not

21   know about that would -- let me strike that.  Is there

22   anything today that would in fact affect your ability to

23   tell the truth at this deposition?

24         A.     No, nothing will affect my ability to

25   tell the truth.



1          Q.     If I ask you a question and you do not

2     understand it, please let me know, and I will repeat it

3     or rephrase it?

4          A.     I shall.

5          Q.     If you do not ask me to do that, I will

6     assume you understand the question and I will rely on

7     your response?

8          A.     (The witness nodded)

9          Q.     In deposition-taking, it is not

10    intuitive, but we need you to verbally say your

11    responses on the record, so that the court reporter can

12    take them, so I will try to remind you to do it, and if

13    you could just try to answer with an affirmative yes or

14    no?

15         A.     Yes.

16         Q.     Thank you.  If at any time today you need

17    to take a break or you feel like you need to get a drink

18    or stretch your legs, just let me know and we will stop;

19    okay?

20         A.     Shall do.  Thank you.

21         Q.     You said you were born in Australia.  Did

22    there come a time when you stopped living in Australia?

23         A.     I am not living in Australia at the

24    moment.

25         Q.     When did you stop living in Australia?



Page 8

```
 1            A.     We moved from Australia in October 2015.

 2            Q.     Let me go back to about 2006.  In 2006

 3     where were you living in Australia?

 4            A.     In Wimbledon.

 5            Q.     In Wimbledon.  Did there come a time when

 6     you moved from Wimbledon?

 7                   MS. MARKOE:  Objection.  This is not part

 8     of the deposition topics that we agreed to.  This is a

 9     limited deposition.  I am not really sure how this line

10     of questioning fits in with any of the topics that you

11     proposed.

12                   MR. FREEDMAN:  So, we are trying to

13     establish where Dr. Wright was so we can identify the

14     location of computers, locations of servers and

15     locations of all kinds of other things he may have used

16     to create Bitcoin to collaborate with David Kleiman.

17                   THE WITNESS:  Anything that I have moved

18     with has moved with me in full.  I have only had one

19     residence at any location, so anywhere I have been is

20     irrelevant.  Everything has moved, full stop.

21     BY MR. FREEDMAN:

22            Q.     Dr. Wright, I am going to ask, if it is

23     possible, if you could wait until I ask a question to

24     respond.  I know you know where I may be going and you

25     know what I may be getting at, you want to try to
```



Page 9

1    short-circuit it, but unfortunately I have to ask the

2    question and you have to respond.  You were living in

3    Wimbledon in 2006.  Did there come a time when you moved

4    from Wimbledon?

5          A.    Yes.

6          Q.    When did you move from Wimbledon?

7                MS. MARKOE:  I am continuing to object to

8    this line of question.

9                MR. FREEDMAN:  Are you instructing him

10   not to answer or are you noting an objection?

11               MS. MARKOE:  I am noting an objection and

12   I am giving you a little bit of leeway.  If we get to a

13   point where I feel you are abusing that leeway then

14   I will instruct him not to answer.

15               MR. FREEDMAN:  Okay.

16         Q.    When did you move after 2006?

17         A.    I do not remember the exact date.

18         Q.    Where did you move to?

19         A.    Cobham.

20         Q.    Did there come a time when you moved from

21   Cobham?

22         A.    I moved to another address in Cobham.

23         Q.    Do you remember the address in Cobham

24   that you moved to first?

25               MS. MARKOE:  Objection.



```
 1                    THE WITNESS:  KT11 3AZ.  Number 7 on that
 2   street.
 3   BY MR. FREEDMAN:
 4          Q.     And then the second house in Cobham?
 5          A.     Is the one I said I am at now.
 6          Q.     So Cobham is in the UK?
 7          A.     That is correct.  I have been living in
 8   Cobham.  I was in Cobham.  I was in Wimbledon.  All of
 9   those are in the UK.  That is correct.
10          Q.     I am confused.  This may be my fault.  In
11   2006 you were living in the UK?
12          A.     I am sorry, that is my fault I was
13   thinking 2016.  2006 I was living in Australia.
14          Q.     Okay, where in Australia?
15          A.     A number of different locations.
16          Q.     Can you let me know where those were?
17          A.     I do not remember.  I know approximate
18   locations.  I have had several houses.
19          Q.     Can you give me the approximate
20   locations?
21          A.     New South Wales.
22          Q.     From 2006 -- did there come a time when
23   you left New South Wales for another part of Australia,
24   or were you in New South Wales until you moved to the UK
25   in 2015?
```



1          A.      I was in New South Wales until then.

2          Q.      But you do not recall the exact

3    addresses?

4          A.      Not off the top of my head, no.

5          Q.      Do you have those records available that

6    you could look up and then tell your counsel later?

7                  MS. MARKOE:  Objection.

8                  THE WITNESS:  I have no computers in any

9    other residence.  Everything I have had moved with me.

10   There is nothing to be found, there are no computers

11   there, and, no, I do not try and remember addresses.

12   BY MR. FREEDMAN:

13         Q.      So you took every computer storage

14   device, every system you had, has moved with you and you

15   currently have it with you in London?

16                 MS. MARKOE:  Objection:  mischaracterises

17   the testimony.

18                 THE WITNESS:  No, that is not what

19   I said.  I do not keep machines.  The average age of my

20   computers is one year.  After a year, quite often

21   I trash them.  I have a new phone every single year.

22   I have a new computer, at maximum, 18 months.

23   BY MR. FREEDMAN:

24         Q.      What do you do with the old equipment?

25         A.      In the past I used to donate those to



Page 12

1    charity.  Now, sometimes they go to charity, sometimes

2    they just get trashed.

3         Q.     What do you do with the data on those old

4    computers or hardware?

5         A.     It is wiped.

6         Q.     Do you save a copy of it?

7         A.     Not always, no.  If I do not need it, I

8    do not save it.

9         Q.     But whatever you need, you save?

10        A.     Yes.

11        Q.     Were you employed between 2006-2015, when

12   you left Australia?

13        A.     Yes.

14               MS. MARKOE:  Objection.

15   BY MR. FREEDMAN:

16        Q.     Where were you employed?

17        A.     At what point?

18               MS. MARKOE:  Objection.

19   BY MR. FREEDMAN:

20        Q.     From 2006, I guess in 2006, where were

21   you employed?

22        A.     I worked for a company or a partnership

23   called BDO, which was an accounting firm.

24        Q.     How long were you with BDO?

25        A.     From some time in 2005 until December



1   2008, when I left.

2         Q.    When you left BDO in 2008, were you

3   employed by another organisation or employer?

4         A.    No.

5         Q.    Did there come a time when you were,

6   again, employed by an employer?

7               MS. MARKOE:  Objection.

8               THE WITNESS:  I am nominally employed by

9   nChain.

10  BY MR. FREEDMAN:

11        Q.    That was the next time after BDO?

12        A.    I was a director of my own company, so if

13  you want to call that employment, then ----

14        Q.    That is a good critique and a bad

15  question.  Besides working for your own companies and

16  yourself, have you worked for anyone else besides BDO

17  and nChain ----

18        A.    No.

19        Q.    ---- from 2006 on.  Where did you

20  maintain -- so you said that between 2008 you left BDO,

21  and then in 2000 -- when did you begin working for

22  nChain?

23        A.    Well, I did not really begin working for

24  nChain, I founded nChain.

25        Q.    When did you found nChain?



Page 14

1          A.      nChain was founded effectively in a

2    number of different forms in around May 2015.

3          Q.      So between December of 2008 and May of

4    2015, you worked for yourself in companies that you

5    created?

6          A.      I worked for the companies I created,

7    yes.  I did not work for myself per se, I was not

8    working for my own business, if that is what you are

9    asking.

10         Q.      Did these companies have offices in

11   Australia?

12         A.      Yes, some of them did.

13         Q.      Do you recall the addresses of those

14   offices?

15         A.      In North Ryde I do not remember the exact

16   address.

17         Q.      Were there more than one address?

18         A.      In some of them, yes.

19         Q.      Were they all in North Ryde?

20         A.      No.

21         Q.      Where else were they?

22         A.      I honestly do not remember.  I do not try

23   and remember addresses.  I do not remember, as I said,

24   the address at Oxford Circus where I drive into work

25   every week.  I just go there.



Page 15

1           Q.     Do you have records that you could look

2    this up and let your counsel know later?

3                  MS. MARKOE:  Objection.

4                  THE WITNESS:  No, but I am sure it is on

5    the internet.

6    BY MR. FREEDMAN:

7           Q.     How many times have you been married?

8           A.     Twice.

9                  MS. MARKOE:  Objection.

10   BY MR. FREEDMAN:

11          Q.     What is the name of your first wife?

12          A.     Carol Lynne Wright.

13          Q.     What was her maiden name?

14          A.     Black.

15          Q.     When did you first meet her?

16                 MS. MARKOE:  Objection.  What is the

17   relevance of when he met an ex-wife?  And how does that

18   relate to any of the topics that you have purported that

19   you are planning on covering today?

20                 MR. RIVERO:  Instruct not to answer.

21   Next question, please.

22                 MR. FREEDMAN:  Andrés?

23                 BY MR. RIVERO:  Please ask the next

24   question.  That we will take up with the court if you

25   wish to.



```
1                  MR. FREEDMAN:  Okay.  Are you going to

2       instruct him not to answer any question about his first

3       wife?

4                  MR. RIVERO:  Mr. Freedman, you have the

5       right to ask questions.  Ask the questions.  You are

6       wasting your own time.  If you want to take up that

7       question with the court I am ready to call now if you

8       want to find the judge.  When did he meet his first

9       wife?  Please, move on.

10                 MR. FREEDMAN:  We will deal with it in

11      the court.

12                 MR. RIVERO:  Please move on.  Next

13      question.

14      BY MR. FREEDMAN:

15          Q.     When did you get married to

16      Ms. Lynne Black?

17          A.     In the '90s.  I have an oath, as part of

18      my divorce settlement, that I will not discuss anything

19      about my wife or my former marriage.  I will not break

20      that.  Thank you.

21          Q.     When did you get divorced?

22          A.     I have an oath with my wife that I am

23      divorced from that I will not discuss anything about her

24      or my former marriage that is part of our settlement.

25      Thank you.
```



1        Q.      Including the date of the divorce?

2        A.      I have an oath with my former wife that

3    I will not discuss anything about her or my former

4    marriage.  I will not break that.

5        Q.      Have you stayed in touch with your

6    ex-wife after the date of the divorce?

7                MS. MARKOE:  Objection.

8                THE WITNESS:  I have an oath with my

9    former wife that I will not discuss anything about her

10    in any way or my marriage, and I will not break an oath.

11   BY MR. FREEDMAN:

12       Q.      So we do not have to go through every

13    single question.  Are you refusing to answer any

14    questions about Ms. Lynne Black?

15       A.      I am not refusing to answer questions.

16    I have an oath that has been filed within a court in

17    Australia.  I will not breach oath and perjure myself or

18    break oath.  You are asking me to break oath, and unless

19    instructed by a judge, etcetera, etcetera, I will not do

20    that.

21       Q.      What is the name of your second wife?

22       A.      My second wife is called Ramona.

23       Q.      When did you meet Ramona Wright?

24                MS. MARKOE:  Objection.

25   BY MR. FREEDMAN:



1      Q.     What is her last name?

2      A.     Watts.

3      Q.     Was it always Watts?

4      A.     No.

5      Q.     What was it before it was Watts?

6      A.     It was Ang.

7      Q.     Can you spell that, please?

8      A.     A-N-G.

9      Q.     When did it change to Watts?

10            MS. MARKOE:  Objection.

11            THE WITNESS:  I am not answering

12   questions about my wife.  My wife is privileged in the

13   UK.  My marriage is privileged.  You should know that,

14   as a lawyer.  Are you seeking to have me breach marital

15   privilege?

16   BY MR. FREEDMAN:

17      Q.     Dr. Wright, it will not be productive for

18   us to have a conversation about whether or not the time

19   of when your wife's name changed from Ang to Watts is

20   covered by spells of privilege, but ----

21      A.     I do not discuss my family, full stop.

22      Q.     Dr. Wright, you understand that you are

23   being sued in this case?

24      A.     I understand perfectly well that a con

25   man in America has made up a fraudulent claim, yes.



1          Q.      And you understand that you tried to

2     dismiss this case?

3                  MS. MARKOE:  Objection.  Sir, Vel, we

4     have a lit of topics.  These were approved by the court.

5     This is not part of your list of topics.

6                  MR. FREEDMAN:  It certainly is,

7     Ms. Markoe.

8                  MS. MARKOE:  Explain to me in what way.

9                  MR. FREEDMAN:  Because the list of topics

10    approved by the court approved the inquiry into

11    witnesses and Ms. Ramona Watts is heavily and was

12    heavily involved with Dr. Wright's businesses.

13                 MS. MARKOE:  That topic says:

14    "Identification of witnesses, including information

15    about their whereabouts and roles in the subject matter

16    of the pleadings".  Your questions do not go ----

17                 MR. FREEDMAN:  Sure they do.

18                 MS. MARKOE:  ---- to those issues.  Your

19    questions do not go to those issues.  Ask questions that

20    go to those issues and he will answer the questions that

21    go to those issues to the extent that they are not part

22    of a privilege.  Continue.

23                 MR. FREEDMAN:  We are trying to determine

24    at what point she entered into this circle of companies

25    and this helps us determine that.



Page 20

1           MS. MARKOE:  When her name changed from
2    Ang to Watts helps you determine ----
3           MR. FREEDMAN:  Helps us identify her and
4    her history and learn about her, so that we can
5    eventually, if possible, take her deposition, yes.
6           MS. MARKOE:  And that has nothing to do
7    with these topics.  That has absolutely nothing to do
8    with these topics.  You can ask the questions that go to
9    these topics and go to the specific issues, period.
10           MR. FREEDMAN:  We will take it up with
11   court.
12           MS. MARKOE:  Take it up with the court.
13   BY MR. FREEDMAN:
14        Q.    Dr. Wright, do you have any computers
15   that existed as of 2006 that are still in your
16   possession today?
17           MS. MARKOE:  Objection: asked and
18   answered.
19           MR. FREEDMAN:  Ms. Markoe, I would if you
20   would just limit your objection to form as per the
21   rules.
22           THE WITNESS:  No.
23   BY MR. FREEDMAN:
24        Q.    Do you have any computers in your
25   possession from 2007?



Page 21

```
 1          A.    No.

 2          Q.    2008?

 3                MS. MARKOE:  Objection.

 4                THE WITNESS:  Any computer that I have

 5    had has been imaged and taken.  I do not know if there

 6    is any old hard drives or whatever else from any

 7    particular date.  Every single computer has been taken,

 8    imaged, etcetera.

 9          Q.    I understand, but that is not my

10    question.  My question is if you have any -- let me

11    rephrase it, maybe it is easier.  What is the oldest

12    computer that you have in your possession?

13          A.    I do not know.

14          Q.    What is the oldest hard drive that you

15    have in your possession?

16          A.    I do not know.

17          Q.    What is the oldest media device that you

18    have in your possession?

19          A.    I do not know.

20          Q.    Did you use any cloud storage services in

21    the 2006 -- in 2006?

22          A.    Yes.

23          Q.    What were those services?

24          A.    I do not remember.

25          Q.    Did you use any cloud storages in 2007?
```



Page 22

```
 1            A.    Yes.

 2            Q.    What were the names of those storage

 3    services?

 4            A.    I do not remember.

 5            Q.    Did you use cloud storages in 2008?

 6            A.    Yes.

 7            Q.    What were the names of those storages?

 8            A.    I do not remember.

 9            Q.    Did you use cloud storages in 2009?

10            A.    Yes.

11            Q.    What were the names of those cloud

12    storages?

13            A.    I do not remember.

14            Q.    Did you use cloud storages in 2010?

15            A.    Yes.

16            Q.    What were the names of those cloud

17    storages?

18            A.    I do not remember.

19            Q.    Did you use cloud storages in 2011?

20            A.    Yes.

21            Q.    What were the names of those cloud

22    storages?

23            A.    I do not remember.

24            Q.    Did you use cloud storage services in

25    2012?
```



Page 23

1          A.     Yes.

2          Q.     What were the names of those cloud

3     storages?

4          A.     I do not remember.

5          Q.     Did you use cloud storages in 2013?

6          A.     Yes.

7          Q.     What were the names of those cloud

8     storages?

9          A.     I do not remember.

10         Q.     From 2006 until 2013, did you ever use

11    cloud computing services?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  Yes.

14    BY MR. FREEDMAN:

15         Q.     What were the names of those cloud

16    computing services?

17         A.     I do not remember.

18         Q.     What did you use cloud computing services

19    for?

20                MS. MARKOE:  Objection.

21                THE WITNESS:  To store data, to analyse

22    data.

23    BY MR. FREEDMAN:

24         Q.     What data did you store?

25         A.     A wide variety of all different things



Page 24

1    I was analysing.

2            Q.     Can you list for me the types of data you

3    stored?

4                   MS. MARKOE:  Objection.

5                   THE WITNESS:  0s and 1s.

6    BY MR. FREEDMAN:

7            Q.     And at a higher level?

8                   MS. MARKOE:  Objection.

9                   THE WITNESS:  I do not remember the exact

10   composition of data that I had at any period.  I do not

11   try and remember these things.

12   BY MR. FREEDMAN:

13           Q.     Do you remember any of the data that you

14   stored during that period?

15           A.     I, at most of these periods that you are

16   talking about, have staff.  I ask for things to happen,

17   things happen.

18           Q.     So, is it your testimony today that from

19   2006 until 2013, you do not recall any of the data that

20   you stored on cloud storage devices?

21                  MS. MARKOE:  Objection:  mischaracterises

22   the testimony.

23                  MR. FREEDMAN:  I asked him if that was

24   his testimony.  I would ask again, Ms. Markoe, that you

25   limit your objection to form.



Page 25

1              MS. MARKOE:  And I would ask that you ask

2       proper questions.  Continue.

3              THE WITNESS:  Very simply, you have tried

4       to twist my words, that is not what I said.

5              MR. FREEDMAN:  Ms. Markoe, this is the

6       issue with objecting beyond form, because you are

7       coaching the witness and it is inappropriate under the

8       local rules.

9              MS. MARKOE:  I am not coaching the

10      witness at all.

11             THE WITNESS:  I would have said that

12      either way.

13             MS. MARKOE:  I am telling you what my

14      objection is and I am allowed to record my objection for

15      the record.

16             MR. FREEDMAN:  Just to form.  It is part

17      of the local rules.  It is quite clear.  You are only

18      allowed to object to form.

19             MS. MARKOE:  Take it up with the judge,

20      then.

21             MR. FREEDMAN:  I will, but I am hoping I

22      do not have to.

23        Q.    Dr. Wright, is it your testimony today

24      that from 2006-2013 that you do not recall any of the

25      data you stored on cloud storage devices?



Page 26

1               MS. MARKOE:  Objection.

2               THE WITNESS:  I do not recall the data,

3    no.

4    BY MR. FREEDMAN:

5        Q.    Is it your testimony today that from

6    2006-2013 you do not recall any of the functions that

7    you used cloud computing services for?

8               MS. MARKOE:  Objection.

9               THE WITNESS:  That is not what I actually

10   said.  I said I do compute and storage.  They are

11   functions.

12   BY MR. FREEDMAN:

13       Q.    Do you recall what data you computed

14   during the 2006-2013 time period?

15              MS. MARKOE:  Objection.

16              THE WITNESS:  The purpose of storing data

17   and doing compute is so that I do not need to recall it.

18   BY MR. FREEDMAN:

19       Q.    So do you recall what you stored from

20   2006-2013?

21              MS. MARKOE:  Objection.

22              THE WITNESS:  Again, I do not recall,

23   because I do not need to.  The whole purpose of storing

24   information is so that you do not need to think about

25   it.



Page 27

1   BY MR. FREEDMAN:

2          Q.      So you do not recall?

3                  MS. MARKOE:  Objection.

4                  THE WITNESS:  I just said that.

5   BY MR. FREEDMAN:

6          Q.      Did any of the data stored, or any of the

7    cloud computing services used, relate to Bitcoin?

8          A.      Yes.

9                  MS. MARKOE:  Objection.

10  BY MR. FREEDMAN:

11         Q.      Do you recall how it related to Bitcoin?

12                 MS. MARKOE:  Objection.

13                 THE WITNESS:  Define that.  Define what

14   you mean by how it related to Bitcoin.

15  BY MR. FREEDMAN:

16         Q.      Did it relate to the mining of Bitcoin?

17                 MS. MARKOE:  Objection.

18                 THE WITNESS:  No.

19  BY MR. FREEDMAN:

20         Q.      Did it relate to blockchain-based

21   intellectual property?

22                 MS. MARKOE:  Objection.

23                 THE WITNESS:  Define what

24   blockchain-based intellectual property means, please.

25  BY MR. FREEDMAN:



1          Q.      What does the term blockchain mean to

2   you?

3          A.      Blockchain is a misrepresentation of the

4   use of timechain that is defined within the word

5   Bitcoin.  It is effectively, people not understanding

6   what the technology is, and calling it something that it

7   is not.

8          Q.      So would timechain be a more accurate

9   term to use?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  For the general

12  representation, yes.

13  BY MR. FREEDMAN:

14         Q.      Did any of the cloud computing and cloud

15  storage services that you used between 2006 until 2013

16  relate to timechain intellectual property?

17                 MS. MARKOE:  Objection.

18                 THE WITNESS:  Again, what you are trying

19  to do is multiple things, and are you talking about the

20  development of what became Bitcoin, or are you talking

21  about something else, such as documenting or writing

22  papers on the topic?

23  BY MR. FREEDMAN:

24         Q.      Let us start with the development of

25  Bitcoin.  Did any of those cloud storages and cloud



1    computing services relate to the development of what

2    became Bitcoin?

3              MS. MARKOE:  Objection.

4              THE WITNESS:  The cloud storages did not

5    relate to the development of Bitcoin.  The development

6    of Bitcoin was not done by cloud storages.

7    BY MR. FREEDMAN:

8         Q.    What was the development of it being done

9    by?

10             MS. MARKOE:  Objection.

11             THE WITNESS:  Humans.

12   BY MR. FREEDMAN:

13        Q.    Was any of the information relating to

14   the development of Bitcoin stored on cloud computing

15   services?

16        A.    Yes.

17        Q.    Do you recall what those cloud computing

18   services were called?

19             MS. MARKOE:  Objection.

20             THE WITNESS:  No.

21   BY MR. FREEDMAN:

22        Q.    Do you still have access to those cloud

23   computing services?

24        A.    No.

25        Q.    Do you have copies of the data that were



Page 30

```
 1    on those cloud computing services?

 2            A.    The data that I have at my house has been

 3    analysed.  I do not recall what every bit of that data

 4    is.  The analysis of that data has either been taken or

 5    not.  I have not gone through what the lawyers have

 6    copied, so I cannot answer that question.

 7            Q.    So, sitting here today, you do not know

 8    whether the data that was on the cloud computing storage

 9    -- strike that.  Sitting here today, you do not know

10    whether the data that was on the cloud storage services

11    resides on the data that was imaged by your lawyers?

12                  MS. MARKOE:  Objection.

13                  THE WITNESS:  I do not know what my

14    lawyers imaged, so I cannot answer that question.

15                  May I have a glass of water, please?

16                  MS. MARKOE:  Yes.

17                  MR. RIVERO:  Sparkling or still?

18                  THE WITNESS:  Sparkling, thank you.

19    BY MR. FREEDMAN:

20            Q.    Dr. Wright, how did you identify for your

21    lawyers what devices to image?

22                  MS. MARKOE:  Can you repeat the question,

23    I am sorry?

24    BY MR. FREEDMAN:

25            Q.    How did you identify for your lawyers
```



1    what devices they should image for this litigation?

2              MR. RIVERO:  Dr. Wright, you cannot go

3    into conversations with your lawyers, because that would

4    be privileged.  So I am instructing you on that, but

5    answer to the extent that you can without going into any

6    communications with counsel.

7              THE WITNESS:  I was given a set of

8    instructions.  I told the people what matched the

9    instructions.

10   BY MR. FREEDMAN:

11        Q.    Are there devices at your home or office

12   here in the United Kingdom that have not been imaged?

13             MS. MARKOE:  Objection.

14             THE WITNESS:  Yes.

15   BY MR. FREEDMAN:

16        Q.    Can you list those devices for me?

17             MS. MARKOE:  Objection.

18             THE WITNESS:  No.

19   BY MR. FREEDMAN:

20        Q.    Why not?

21        A.    I do not know them.

22        Q.    Would you be able to provide a list of

23   those devices to your lawyers?

24             MS. MARKOE:  Objection.

25             THE WITNESS:  No.



1   BY MR. FREEDMAN:

2          Q.     Why not?

3          A.     My wife has machines, they are not mine,

4   they have nothing to do with Bitcoin or this case.

5   I will not list her machines.  I will not ask her to

6   list her machines.

7          Q.     Do you have access to your wife's

8   machines?

9          A.     No.

10         MS. MARKOE:  Objection.

11  BY MR. FREEDMAN:

12         Q.     Did your wife use those machines for the

13  ----

14         A.     No.

15         Q.     Sorry?

16         A.     There are no machines at my house that

17  are that old.  There are no machines that have been

18  older than 2015, as you are trying to imply.  So, the

19  data that I had was copied to companies.  Those

20  companies in Australia have been imaged by the

21  Australian Tax Office for whatever they have done.  I do

22  not have them.

23         Q.     From 2006 until 2014, did you make any

24  trips to the United States?

25         A.     Yes.



1                    MS. MARKOE:  Objection.

2    BY MR. FREEDMAN:

3            Q.     How many trips did you make to the United

4    States?

5            A.     I do not know.

6            Q.     Did you travel to the United States in

7    2006?

8                    MS. MARKOE:  Objection.  Again, we are

9    talking about ----

10                   THE WITNESS:  I do not know.

11                   MS. MARKOE:  ---- a list of topics.  This

12   is not related to your list of topics.  Stick to the

13   topics that you agreed to.  There were ten of them.

14   This is not one of them.

15                   MR. FREEDMAN:  This relates to the

16   formation of the partnership with Dave Kleiman, so ----

17                   MS. MARKOE:  How does it relate to the

18   formation of the partnership with Dave Kleiman when you

19   are asking about his trips to the United States from

20   2006-2014?

21                   MR. FREEDMAN:  Because that is when we

22   allege the formation of the partnership eventually took

23   place.

24                   MS. MARKOE:  Why do not you ask about the

25   formation of the partnership rather than random trips



Page 34

1    that he might have taken to the United States.

2              MR. FREEDMAN:  Ms. Markoe, I do not have

3    to ask the questions the way you would like me to ask

4    the questions.  If you instruct the witness not to

5    answer we will take it up with the court.  Otherwise

6    please either object or instruct.

7         Q.    In 2006, did you travel to the United

8    States?

9              MS. MARKOE:  Objection.

10             THE WITNESS:  I do not know.

11   BY MR. FREEDMAN:

12        Q.    In 2007, did you travel to the United

13   States?

14        A.    I do not know.

15             MS. MARKOE:  Objection.

16   BY MR. FREEDMAN:

17        Q.    In 2008, did you travel to the United

18   States?

19             MS. MARKOE:  Objection.

20             THE WITNESS:  Yes.

21             THE COURT REPORTER:  Slow down, please.

22   I cannot keep up.

23             MR. FREEDMAN:  Sorry.

24        Q.    In 2008, you travelled to the United

25   States?



1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  Yes.

3    BY MR. FREEDMAN:

4         Q.    Where in the United States did you

5    travel?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  I do not remember.

8                    MR. RIVERO:  Dr. Wright, the most

9    important person is actually the court reporter, who

10   makes the official record.  So you have to allow a beat

11   for objections, because our court reporter cannot take

12   you and the objection simultaneously, so I think it is

13   helpful if we all take a breath.  I speak very quickly,

14   so I have to take a breath.  It is very natural.

15   BY MR. FREEDMAN:

16        Q.    Do you recall the purpose of travel in

17   2008?

18                   MS. MARKOE:  Objection.

19                   THE WITNESS:  I went to various different

20   trips around the world.  I have been to over 100

21   countries.  I travel, even now, probably 30-50 countries

22   every year.  I do six countries a month, some months.  I

23   do not remember my trips.  I know I do presentations,

24   I met with government officials, I met with the FBI at

25   one point, I met with people in a number of three-letter



1    agencies.  If you are asking did I meet with Dave

2    Kleiman then, no.

3    BY MR. FREEDMAN:

4         Q.    You remember very specifically to have

5    taken a trip to the United States in 2008?

6              MS. MARKOE:  Objection.

7    BY MR. FREEDMAN:

8         Q.    How do you recall that you were

9    travelling to the United States in 2008?

10        A.    One of my trips was to meet people at

11   Microsoft.

12        Q.    Where did you meet people at Microsoft?

13             MS. MARKOE:  Objection.

14             THE WITNESS:  At Microsoft.

15   BY MR. FREEDMAN:

16        Q.    Where at Microsoft?  At Microsoft

17   headquarters?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  At Microsoft headquarters.

20             MS. MARKOE:  I am going to instruct the

21   witness not to answer this.  It has absolutely nothing

22   to do with this case and it has nothing to do with topic

23   number 3 which you are purporting this line of

24   questioning is related to.  He has already answered your

25   question that he did not meet with Mr. Kleiman during



1   any of his trips to the United States in 2008,

2   I believe, but the record will state what he said.

3                  MR. FREEDMAN:  Ms. Markoe, I am not going

4   to argue with you about it but we were given some leeway

5   to press Dr. Wright's initial representation of what he

6   did and did not do.

7                  MS. MARKOE:  And he answered your

8   question by telling you that he met with people at

9   Microsoft.  That is enough pressing.

10  BY MR. FREEDMAN:

11          Q.     In 2009, did you travel to the United

12  States?

13          A.     Yes.

14          Q.     For what purpose?

15          A.     I do not remember all the conferences,

16  etcetera, that I went to in 2009.

17          Q.     Where in the United States did you travel

18  to?

19                  MS. MARKOE:  Objection.

20                  THE WITNESS:  I do not have my travel

21  records in front of me.  I cannot answer that.

22  BY MR. FREEDMAN:

23          Q.     Did you travel to Florida in 2009?

24          A.     Either then or 2010, I cannot remember

25  the exact dates.



1          Q.      Did you travel to Florida in 2008?

2                  MS. MARKOE:  Objection.

3                  THE WITNESS:  No.  I do not believe

4     I did.

5     BY MR. FREEDMAN:

6          Q.      When you travelled to Florida in 2009 or

7     2010, did you meet with Dave Kleiman?

8          A.      Yes.

9          Q.      What did you discuss with Dave Kleiman?

10         A.      We drank.

11         Q.      Where did you drink?

12         A.      A pub.

13         Q.      Where was the pub located?

14         A.      I do not know.

15         Q.      In what city was the pub located?

16         A.      It was somewhere that Dave drove to, with

17    another person called Paul Henry.

18         Q.      Did you discuss anything related to

19    Bitcoin?

20         A.      No.

21         Q.      Did you discuss anything related to

22    blockchain or timechain?

23         A.      No.

24                 MS. MARKOE:  Objection.

25    BY MR. FREEDMAN:



1          Q.     How long did you meet with Dave Kleiman

2     for?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  I do not remember.  We

5     drank a lot.

6     BY MR. FREEDMAN:

7          Q.     Was that the only time you saw

8     Dave Kleiman?

9          A.     No.

10         Q.     That was a bad question.  Strike that.

11    Was that the only time you saw Dave Kleiman on that

12    trip?

13         A.     Yes.

14         Q.     Did you travel to the United States in

15    2010?

16                MS. MARKOE:  Objection.

17                THE WITNESS:  As I said, 2009/10.

18    BY MR. FREEDMAN:

19         Q.     Sorry, yes, you are right.  Beyond the

20    2009/2010 trip to the United States where you met with

21    Dave Kleiman, was there another time that you travelled

22    to the United States and met with Dave Kleiman?

23         A.     No.

24         Q.     In 2011, did you travel to the United

25    States?



Page 40

1                    MS. MARKOE:  Objection.  You can answer.

2                    THE WITNESS:  Yes.

3     BY MR. FREEDMAN:

4          Q.    Did you meet with Dave Kleiman in 2011?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  Briefly.

7     BY MR. FREEDMAN:

8          Q.    Where did you meet with Dave Kleiman?

9          A.    I need to obstruct -- this is one of

10    those matters.

11                   MS. MARKOE:  Okay.  This is a matter that

12    I am going to instruct him not to answer.  He will

13    discuss the basis for his refusing not to answer in

14    camera with the court.  It involves issues of national

15    security and he is not permitted to answer these

16    questions.  He can give a more fulsome explanation to

17    the court in camera and the court can make a ruling

18    based on that in camera discussion.

19                   Can I just consult with my client for one

20    second to see if I can get you some sort of an answer

21    that might be of assistance to you?

22                   MR. FREEDMAN:  Sure.

23                   MS. MARKOE:  Let us go off the record.

24                   MR. FREEDMAN:  You want to take a break?

25                   THE VIDEOGRAPHER:  Going off the record.



Page 41

1    The time is 11.12.

2                    (A Short Break)

3                    THE VIDEOGRAPHER:  Going back on the

4    record.  The time is 11.23.  Thank you.

5    BY MR. FREEDMAN:

6           Q.    Dr. Wright ----

7                    THE VIDEOGRAPHER:  Sorry, sir ----

8                    MR. FREEDMAN:  Oh, my mic!

9                    MS. MARKOE:  Why do we not read back that

10   last question before the objection and we can take it

11   from there.

12                   MR. FREEDMAN:  Actually, before we go

13   there, I just want to double back on something I left

14   out initially, which is earlier you told me that you

15   instructed employees how to store things on cloud

16   storage devices; do you recall that?

17                   MS. MARKOE:  Objection.

18                   THE WITNESS:  No, that is not what

19   I said.

20   BY MR. FREEDMAN:

21          Q.    What did you say?

22          A.    I said I instruct employees to do things

23   and things happened.

24          Q.    Who were those employees?

25          A.    I do not remember the names of all my



1    employees.

2         Q.    Do you remember the names of the

3    employees that dealt with cloud storage devices?

4         A.    No.

5         Q.    Cloud storage services?

6         A.    No.

7         Q.    Cloud computing services?

8         A.    No.

9         Q.    In 2011 you met with Dave Kleiman?

10             MR. RIVERO:  Objection.

11             Paula, would you please go back.  As we

12   requested, there was a pending question at which point

13   there was a request to take a break.  We asked that the

14   last question be read back.  I will read back but

15   I would ask the court reporter to confirm.  The next to

16   last question:  "Did you meet with Dave Kleiman in

17   2011?" The witness: "Briefly".  Next question:  "Where

18   did you meet with Dave Kleiman?"  That is where that

19   took up.  We would like to go back so it is clear on the

20   record what he is and is not answering.  So if you can

21   read it.  We want to do this formally.  That is where we

22   were.

23             MR. FREEDMAN:  Mr. Rivero, this is my

24   deposition.  I strike the question.  We will go back

25   now.



Page 43

1                   MR. RIVERO:  No, Mr. Freedman ----

2                   MR. FREEDMAN:  Mr. Rivero, this is my

3     deposition.  I ask the questions I would like to ask.

4                   MR. RIVERO:  Mr. Freedman, you need to

5     hear me on this.  There was a pending question.  We

6     asked for and took time to address it.  We want to

7     respond so it is clear to the court what our position is

8     on your pending question.  Please, let us go back and do

9     it right.

10                   MR. FREEDMAN:  I do strike the question

11     and you can take up my striking the question with the

12     court, Mr. Rivero.

13                   MR. RIVERO:  We are not going to ----

14                   MR. FREEDMAN:  Mr. Rivero, I am not going

15     to continue arguing.

16                   MR. RIVERO:  Mr. Freedman, there was a

17     pending question.  We asked for permission to break to

18     address the pending question.  If you are withdrawing

19     the line of questioning, I am perfectly happy to go on,

20     but I am not going to have an unclear record.  He is

21     prepared to answer the last question.

22                   MR. FREEDMAN:  In the interests of time,

23     let us go back.  Can you please read back the question.

24         (The court reporter read back as requested)

25                   THE WITNESS:  I had a video conference



Page 44

1    while in New York that involved Mr. Kleiman.

2    BY MR. FREEDMAN:

3         Q.    Where was Mr. Kleiman when you video

4    conferenced him?

5         A.    Exactly where I do not know.

6         Q.    How long did the video conference last?

7         A.    Probably 30-45 minutes.

8         Q.    Did the video conference have anything to

9    do with Bitcoin?

10              MS. MARKOE:  Objection.

11              THE WITNESS:  The video conference was

12   not about Bitcoin.

13   BY MR. FREEDMAN:

14        Q.    Did the video conference have anything to

15   do with blockchain or timechain technology?

16              MS. MARKOE:  Objection.

17              THE WITNESS:  The video conference was

18   not about those topics.

19   BY MR. FREEDMAN:

20        Q.    Was there anyone else on the conference?

21        A.    Yes.

22        Q.    Who else was on the conference?

23        A.    I cannot answer that.  That is part of

24   what we need to ----

25        Q.    Okay.



Page 45

1          A.     That individual has nothing to do with

2    Bitcoin in any way.

3          Q.     Can you tell me the subject matter of the

4    discussion?

5          A.     No.

6          MS. MARKOE:  That is the in camera part.

7    BY MR. FREEDMAN:

8          Q.     Was there any other time in 2011 that you

9    met with Dave Kleiman?

10         A.     No.

11         Q.     In 2012, did you meet with Dave

12   Kleiman -- strike that.  In 2011, was there any other

13   time when you travelled to the United States?

14         MS. MARKOE:  Objection.

15         THE WITNESS:  I do not know.  I travel a

16   lot.  I cannot remember exactly where I travel when.

17   I have been to the US many times.  I do not know when

18   I have and have not been at particular times.

19   BY MR. FREEDMAN:

20         Q.     In 2012, did you travel to the United

21   States?

22         MS. MARKOE:  Objection.

23         THE WITNESS:  Again, I travelled a lot.

24   I do not remember.

25   BY MR. FREEDMAN:



Page 46

1      Q.    Did you travel to Florida in 2012?

2      A.    No.

3      Q.    Did you travel a lot between ----

4      A.    I travelled a lot.

5      Q.    ---- 2006 and 2013?

6            MS. MARKOE:  Objection.

7            THE WITNESS:  I have travelled a lot all

8   my life.

9   BY MR. FREEDMAN:

10     Q.    In 2013, did you travel to the United

11  States?

12           MS. MARKOE:  Objection.

13           THE WITNESS:  I believe so.  I did not

14  travel to Florida, however.

15  BY MR. FREEDMAN:

16     Q.    Why did you travel to the United States

17  in 2013?

18           MS. MARKOE:  Objection.

19           THE WITNESS:  I travel a lot.

20  I presented conferences.  I meet government officials.

21  I do all sorts of things.

22  BY MR. FREEDMAN:

23     Q.    Did you meet with Dave Kleiman in 2013?

24     A.    Physically, no.

25     Q.    Did you meet with Dave Kleiman via video



Page 47

1    conference in 2013?

2         A.    Yes.

3         Q.    How many times in 2013 did you meet with

4    Dave Kleiman via video conference?

5         A.    More than I can remember.

6         Q.    Approximately how frequently would you

7    meet with Dave Kleiman via video conference in 2013?

8         A.    There was only a small amount of time

9    before he died.

10        Q.    How many times a week approximately would

11   you meet with Dave Kleiman via video conference in 2013?

12             MS. MARKOE:  Objection.

13             THE WITNESS:  Not many.  Dave died.  He

14   was sick.

15   BY MR. FREEDMAN:

16        Q.    Dave died in April of 2013?

17        A.    Yes.

18        Q.    So, between January of 2013 and April of

19   2013, approximately how many times did you meet with

20   Dave Kleiman via video conference?

21        A.    Not many.

22             MS. MARKOE:  Objection.

23   BY MR. FREEDMAN:

24        Q.    Ten times?

25             MS. MARKOE:  Objection.



1                    THE WITNESS:  Less.

2    BY MR. FREEDMAN:

3           Q.    Five times?

4           A.    I do not remember.

5           Q.    Some amount of times between five and ten

6    to the best of your recollection?

7                    MS. MARKOE:  Objection.

8                    THE WITNESS:  Somewhere around less than

9    ten.

10   BY MR. FREEDMAN:

11          Q.    Okay.  In 2012, did you meet via video

12   conference with Dave Kleiman?

13          A.    Yes.

14          Q.    Approximately how often would you meet

15   via video conference with Dave Kleiman in 2012?

16                   MS. MARKOE:  Objection.

17                   THE WITNESS: Dave was my best friend.  We

18   talked a lot.

19   BY MR. FREEDMAN:

20          Q.    So, once a week?

21                   MS. MARKOE:  Objection.

22                   THE WITNESS:  I do not recollect.  I do

23   not try to think about these things.  I work.  I work

24   100 hour weeks.  At the moment my work is 108 hours.

25   I work less now than I used to.  I call people, I do



1  things, I produce.  I do not sit there recording and

2  remembering what I did.  I do not remember how many

3  times I have called my mother.  I do not remember how

4  many times I have talked to my wife.  I do not remember

5  any of these things.

6  BY MR. FREEDMAN:

7      Q.     In 2011, besides from the video

8  conference we have just discussed that you want to talk

9  to the court about in camera, how many times did you

10 meet via video with Dave Kleiman?

11     A.     I do not know.

12            MS. MARKOE:  Objection.

13 BY MR. FREEDMAN:

14     Q.     Is it safe to say a lot?

15            MS. MARKOE:  Objection.

16            THE WITNESS:  Define "a lot".

17 BY MR. FREEDMAN:

18     Q.     You said you met with him a lot in 2013.

19 Was the frequency of meeting with Dave Kleiman via video

20 conference in 2012 the same as it was in 2013?

21            MS. MARKOE:  Objection.  The record will

22 speak for itself.

23            MR. FREEDMAN:  Let me strike that and

24 start again.

25     Q.     Approximately how many times did you meet



Page 50

1    with Dave Kleiman via video conference in 2011?

2                   MS. MARKOE:  Objection.

3                   THE WITNESS:  I do not know.

4    BY MR. FREEDMAN:

5          Q.    More than ten times?

6                   MS. MARKOE:  Objection.

7                   THE WITNESS:  I believe so.

8    BY MR. FREEDMAN:

9          Q.    More than 20 times?

10         A.    I do not know.

11         Q.    Is it safe to say it was somewhere

12   between ten to 20 times?

13                  MS. MARKOE:  Objection.

14                  THE WITNESS:  I do not know.

15   BY MR. FREEDMAN:

16         Q.    Could it have been more than 20 times?

17                  BY MS. MARKOE:  Objection: calls for

18   speculation.

19                  MR. FREEDMAN:  Please, Ms. Markoe, limit

20   your objections to form.

21                  MR. RIVERO:  Proceed.

22                  THE WITNESS:  Could this be the Cartesian

23   abstraction, a projection, yes, that is a possibility.

24   The possibility of my putting my hand through the wall

25   exists.  Is that a probability: no.  Please ask me



Page 51

1    something that is not fluffy.

2    BY MR. FREEDMAN:

3            Q.    Was it probable that you spoke with Dave

4    Kleiman more than 20 times in 2011?

5                 MS. MARKOE:  Objection.

6                 THE WITNESS:  I do not know.  It was

7    definitely more than 10 times.

8    BY MR. FREEDMAN:

9            Q.    In 2010, how many times did you meet with

10   Dave Kleiman via video conference?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  Again, even less

13   recollection.  I do not know.

14   BY MR. FREEDMAN:

15           Q.    More than 10 times?

16                MS. MARKOE:  Objection.

17                THE WITNESS:  I do not know.

18   BY MR. FREEDMAN:

19           Q.    Do you have any recollection at all of

20   the frequency in which you talked to Dave Kleiman via

21   video conference in 2010?

22           A.    I could not even answer the recollection

23   of what I have talked to my wife in the last six months,

24   so, no.  What I do recollect is I wrote 64 papers that

25   will go to patent last month.



Page 52

1          Q.     Doctor ----

2          A.     I wrote 18 papers that have been

3   published last month.  That I recollect.  I recollect my

4   work.

5          Q.     If you could try to answer the question

6   that is posed, that would help us move quicker.  Did you

7   speak with Dave Kleiman via video conference in 2010

8   routinely?

9                 MS. MARKOE:  Objection.

10                THE WITNESS:  Define the word "routine".

11  BY MR. FREEDMAN:

12         Q.     As you understand the word "routine"?

13                MS. MARKOE:  Objection.

14                THE WITNESS:  I have a full 21 volume

15  copy of the Oxford greater dictionary.  "Routine" is

16  actually about 1.5 pages worth of definitions going back

17  to the 16th century.  Which particular use of "routine"

18  would you like me to have?  As in per route, as in as a

19  directed, something that is not a common used word, or

20  what?

21  BY MR. FREEDMAN:

22         Q.     Let us just jump to 2009.  Do you recall

23  how many times you spoke with Dave Kleiman via video

24  conference in 2009?

25                MS. MARKOE:  Objection.



1                    THE WITNESS:  As with everyone else, I do

2      not recall exact details.  I do not even remember how

3      many times I have spoken to my mother in the last six

4      months.

5      BY MR. FREEDMAN:

6           Q.     You did not create Bitcoin with your with

7      mother, did you?

8                    MS. MARKOE:  Objection.  Move to strike.

9      BY MR. FREEDMAN:

10          Q.     In 2008, do you recall how many times you

11     met with Dave Kleiman via video conference?

12                   MS. MARKOE:  Objection.

13                   THE WITNESS:  The same answer applies

14     with even less recollection.  I think about my work.

15     People do not always like it, but I do not think about

16     people.

17     BY MR. FREEDMAN:

18          Q.     In 2008, do you recall how many times you

19     had video conferences with Dave Kleiman?

20                   MS. MARKOE:  Objection.

21                   THE WITNESS:  Again, I do not recollect

22     exactly how many times.

23     BY MR. FREEDMAN:

24          Q.     When did you first meet Dave Kleiman?

25          A.     Exactly when, I do not remember.  Define



1    "meet".

2          Q.      What year?

3          A.      Physically meet, meet online, meet by

4    e-mail, meet by video conference, meet by phone.

5          Q.      When were you first introduced to Dave

6    Kleiman in any capacity, in what year?

7          A.      I was never introduced to Dave Kleiman.

8          Q.      How did you come to meet Dave Kleiman in

9    any capacity?

10         A.      We started talking on mailing lists, IRC

11   chats and other such things.

12         Q.      When did you begin that conversation?

13                 MS. MARKOE:  Objection.

14                 THE WITNESS:  I do not remember exactly.

15   It has been 15 years.

16   BY MR. FREEDMAN:

17         Q.      Do you remember the year?

18         A.      No.

19         Q.      How did you communicate during that time?

20                 MS. MARKOE:  Objection: vague.

21                 THE WITNESS:  In English.

22   BY MR. FREEDMAN:

23         Q.      From 2006, were you in regular contact

24   with Dave Kleiman?

25                 MS. MARKOE:  Objection.



1                    THE WITNESS:  Define "regular".

2    BY MR. FREEDMAN:

3           Q.    Once a week?

4           A.    No.

5           Q.    Twice a week -- once a month?

6           A.    Most likely, yes.

7           Q.    How were you in contact with him

8    approximately once a month in 2006?

9           A.    We spoke over IRC, we spoke over video

10   chats, we spoke over chats.

11          Q.    You said "chats".  Can you drill down on

12   that for me; what do you mean by chats?

13          A.    Digital chat media.  IRC is an example of

14   an early chat format.  It has rooms, some of those are

15   public, some of those are private.  Would you like me to

16   detail the format of the protocol any more?

17          Q.    No, but would I like you to drill down a

18   little more on the type of chats besides IRC that you

19   used to discuss with Dave Kleiman?

20                MS. MARKOE:  Objection.

21                THE WITNESS:  I do not remember.  These

22   things have changed.

23   BY MR. FREEDMAN:

24          Q.    Do you have access to any of these IRC

25   chats?



Page 56

```
 1              A.      No, that is the nature of IRC.

 2              Q.      Do you have access to any of these video

 3      chats?

 4              A.      No, that is nature of video chats.

 5              Q.      Do you have access to any of the other

 6      chat forms that you used to discuss with Dave Kleiman in

 7      2006?

 8              A.      No, we made sure we talked on things that

 9      were chats.

10              Q.      Meaning there was no record?

11              A.      Meaning that there was no record.

12              Q.      In 2007, did the frequency with which you

13      spoke to Dave Kleiman increase?

14              A.      No.

15              MS. MARKOE:  Objection.

16      BY MR. FREEDMAN:

17              Q.      Did it stay the same?

18              A.      I do not have a record of how many times

19      I spoke to him.  As a statistician, I would have to

20      analyse that as a hypothesis taking one versus the

21      other, but I do not have the data.

22              Q.      Did you speak to Dave Kleiman

23      approximately once a month in 2007?

24              A.      I have no idea how many times I spoke to

25      anyone at any of those times.  Very simply, I am not
```



Page 57

1    able to answer that.

2         Q.    You have no recollection of the frequency

3    with which you spoke to Dave Kleiman in 2007; is that

4    correct?

5              MS. MARKOE:  Objection.

6              THE WITNESS:  I remember talking to

7    people.  I do not remember each of the talks.

8    BY MR. FREEDMAN:

9         Q.    But I am asking you to give me your best

10   recollection of the frequency with which you spoke to

11   Dave Kleiman in 2007?

12             MS. MARKOE:  Objection.

13             THE WITNESS:  I do not have a best

14   recollection.  I do not think about people that way.

15   I think about numbers.  I think about algorithms.

16   I remember those.

17   BY MR. FREEDMAN:

18        Q.    How often did you speak to Dave Kleiman

19   in 2008?

20             MS. MARKOE:  Objection.

21             THE WITNESS:  I do not remember.  The

22   same thing applies.  The same thing will apply to 2009.

23   BY MR. FREEDMAN:

24        Q.    How often did you speak to Dave Kleiman

25   in 2010?



Page 58

```
 1                    MS. MARKOE:  Objection.

 2                    THE WITNESS:  I do not know.

 3      BY MR. FREEDMAN:

 4           Q.    How often did you speak to Dave Kleiman

 5      in 2011?

 6           A.    I do not know.

 7           Q.    How often did you speak to Dave Kleiman

 8      in 2012?

 9           A.    I do not know.

10           Q.    How often did you speak to Dave Kleiman

11      in 2013?

12           A.    Not terribly much.

13           Q.    When I say "speak to Dave Kleiman",

14      I also mean telephonically.  Does that change any of

15      your answers?

16           A.    No, I do not use telephone much at all.

17           Q.    Did there come a time when you began

18      e-mailing Dave Kleiman?

19                    MS. MARKOE:  Objection.

20                    THE WITNESS:  Yes.

21      BY MR. FREEDMAN:

22           Q.    When did you begin e-mailing Dave

23      Kleiman?

24           A.    I do not remember.

25           Q.    Did you e-mail Dave Kleiman in 2006?
```



Page 59

1          A.      I would have to say most likely, yes.

2          Q.      Did you e-mail Dave Kleiman in 2007?

3          A.      Definitely yes.

4          Q.      What about?

5          A.      I do not remember all the topics that

6    I spoke to Dave in 2007.  I did discuss a cookie recipe.

7          Q.      Why did you say "definitely yes" in 2007?

8          A.      Because there was a cookie recipe

9    discussed in 2007 that was published.

10          Q.      Whose cookie recipe was it?

11          A.      Mine.

12          Q.      Why did you discuss a cookie recipe with

13    Dave Kleiman?

14                  MS. MARKOE:  Objection.

15                  THE WITNESS:  He was asking about

16    cookies.

17    BY MR. FREEDMAN:

18          Q.      Did you e-mail Dave Kleiman in 2008?

19          A.      Yes.

20          Q.      Do you know how frequently you e-mailed

21    him in 2008?

22          A.      No.

23          Q.      Do you know what you spoke about with

24    Dave Kleiman in 2008?

25                  MS. MARKOE:  Objection.



Page 60

1                    THE WITNESS:  I do not know the range of

2      topics I spoke to Dave in 2008, no.

3      BY MR. FREEDMAN:

4            Q.    Did you speak to Dave Kleiman -- did you

5      e-mail Dave Kleiman in 2009?

6            A.    Yes.

7            Q.    From 2006 until 2009, what e-mails did

8      you use to communicate with Dave Kleiman?

9            A.    I do not remember.

10           Q.    Do you remember the e-mails you used to

11     communicate with Dave Kleiman?

12           A.    No.

13           Q.    Do you remember the e-mails Dave Kleiman

14     used?

15           A.    No, I have used multiple e-mail

16     addresses, I do not try and remember them.

17           Q.    In 2010, did you e-mail Dave Kleiman?

18           A.    Yes.

19           Q.    In 2011, did you e-mail Dave Kleiman?

20           A.    Yes.

21           Q.    Do you remember the frequency of e-mails

22     that you -- strike that.  Do you remember how frequently

23     you e-mailed Dave Kleiman in 2010?

24           A.    No.

25           Q.    Do you remember the frequency with which



1    you e-mailed Dave Kleiman in 2011?

2         A.    No.

3         Q.    Do you remember what you spoke to Dave

4    Kleiman in 2010 and 2011 about?

5         A.    Again, I spoke with a number of topics.

6    I do not try and recollect all the things that are

7    spoken about.

8         Q.    What can you recollect?

9              MS. MARKOE:   Objection.

10             THE WITNESS:   We spoke about his problems

11   and going into hospital quite a number of times.

12   BY MR. FREEDMAN:

13        Q.    In 2012 -- did you e-mail Dave Kleiman in

14   2012?

15        A.    Yes.

16        Q.    Did you e-mail Dave Kleiman in 2013?

17        A.    I do not remember.

18        Q.    Do you remember the frequency with which

19   you e-mailed Dave Kleiman in 2012?

20        A.    No.

21        Q.    Do you remember the topics you e-mailed

22   Dave Kleiman about in 2012?

23        A.    No.

24        Q.    None of them?

25        A.    I know there were a couple of things



Page 62

1    about companies that I wanted to set up but none of them

2    is not do I remember them all, no.

3          Q.    Which companies do you recall speaking

4    about in 2012 with Dave Kleiman?

5          A.    I spoke to him about a company called

6    Design by Human that he was supposed to set up for me,

7    which he did not end up paying for.

8          Q.    What do you mean "paying for"?

9          A.    To set up a company you need to pay for

10   it.  The exchange of goods and services generally

11   requires the exchange of money.  The exchange of money

12   is generally considered paying for something.

13         Q.    Do you mean a registration?

14         A.    Yes.

15         Q.    Did you e-mail Dave Kleiman about

16   timechain, blockchain or Bitcoin in 2006?

17         A.    Yes.

18         Q.    How did you communicate with Dave --

19   strike that.  What method did you use to communicate

20   with Dave Kleiman in 2006 about blockchain ----

21         A.    Sorry, 2006, no, I did not.  I was

22   thinking about the last year, sorry, about that,

23   I thought it was 2012.  In 2006, no, I did not talk

24   about blockchain or timechain or anything like that with

25   Dave.



Page 63

1          Q.    In 2007, did you speak with Dave Kleiman?
2    And when I say "speak", I want you to include any form
3    of communication; do we understand each other?
4          A.    Yes.
5          Q.    In 2007, did you speak with Dave Kleiman
6    about blockchain, timechain or Bitcoin?
7          A.    I do not remember the first time that
8    I actually mentioned it to Dave.
9          Q.    It could have been in 2007?
10         A.    It was either 2007 or 2008.  There's an
11   e-mail that I believe people have a copy of.  I do not
12   remember the date of the e-mail.
13         Q.    What does the e-mail say?
14               MS. MARKOE:  Objection.
15               THE WITNESS:  I do not remember what the
16   e-mail says.  I think it speaks for itself.
17   BY MR. FREEDMAN:
18         Q.    What was the purpose of e-mailing Dave
19   Kleiman?
20               MS. MARKOE:  Objection.
21               THE WITNESS:  I wanted Dave to give me
22   some help with editing a paper.
23   BY MR. FREEDMAN:
24         Q.    Which paper?
25         A.    In this particular e-mail that I believe



1    you are saying, the Bitcoin white paper.

2         Q.    The date of that e-mail -- does it help

3    you recollect if I tell you that that e-mail is in March

4    of 2008?

5         A.    Yes, I will believe that that is the

6    date, then, and the date about that was March 2008 if

7    that is what it says.

8         Q.    Was that e-mail the very first time you

9    spoke to Dave Kleiman about Bitcoin, blockchain or

10   timechain technology?

11              MS. MARKOE:  Objection.

12              THE WITNESS:  I had not been talking to

13   Dave before that point, so those topics were not

14   something I discussed with Dave before that e-mail.

15   BY MR. FREEDMAN:

16        Q.    So that was the very first time you spoke

17   to Dave Kleiman about Bitcoin, blockchain or timechain

18   technology?

19        A.    I do not recollect whether I talked about

20   BlackNet at any point before that, I do not know.

21        Q.    What is BlackNet?

22        A.    BlackNet is a research project I started

23   in 1998.

24        Q.    What about?

25        A.    Digital electronic cash.



Page 65

1              Q.    I am looking at an e-mail from you to

2     Dave Kleiman dated 12th March 2008.  The subject is

3     "Forward deformation and the difficulties of law on the

4     internet".  It states:  "I need your help editing a

5     paper I am going to release later this year.  I have

6     been working on a new form of electronic money, BitCash,

7     Bitcoin ..."  And the e-mail goes on.  Is that the

8     e-mail you are referring to?

9              MS. MARKOE:  Objection.  If you want to

10    show him a document, you can show him a document.

11             MR. FREEDMAN:  Zaharah, please limit your

12    objection to form.

13             MS. MARKOE:  If you want to show him a

14    document, show him a document.

15             BY MR. FREEDMAN:  Zaharah, this is my

16    deposition.

17             MS. MARKOE:  If you want to have him

18    presume ----

19             THE WITNESS:  Can I see the document.

20             MS. MARKOE:  ---- that what you are

21    reading on a screen is accurate and correct, then he can

22    make that presumption if you ask him to, but if you are

23    going to be referencing a document you have to show the

24    witness the document.

25             MR. FREEDMAN:  Thank you, Zaharah.



Page 66

1          Q.     Is that the e-mail that we are referring
2     to?

3          A.     Can I see the e-mail?

4          Q.     Not at this time.

5                 MS. MARKOE:  Objection.  I am going to
6     instruct him not to answer the question.

7                 MR. FREEDMAN:  Then instruct him and just
8     instruct him.  Zaharah, either object to form or
9     instruct him not to answer.  There is no need for
10    dialogue between us.  We can take it up with the court
11    once you instruct him not to answer.

12                MS. MARKOE:  He can answer if you give
13    him the document.  He has asked for the document and you
14    are refusing to give it to him.

15                MR. FREEDMAN:  Zaharah, just instruct him
16    not to answer or object.

17         Q.     Does the e-mail I quoted to you refresh
18    your recollection of the date of the e-mail?

19         A.     Will you show me the e-mail?

20         Q.     Not at this time.

21         A.     Then I cannot answer that question.

22         Q.     So it does not refresh your recollection?

23                MS. MARKOE:  Objection.  You cannot have
24    a recollection refreshed without showing a document.
25    That is basic evidence.



Page 67

1              MR. FREEDMAN:  Zaharah, limit your

2    objection to form.

3              THE WITNESS:  If you wish to show me the

4    document, I will comment on the document.

5    BY MR. FREEDMAN:

6         Q.    In 2009, did you communicate with Dave

7    Kleiman about Bitcoin, blockchain or timechain

8    technology?

9         A.    Yes.

10        Q.    Do you recall the method of

11   communication?

12        A.    Are we talking e-mail or chats?

13        Q.    However you communicated with him about

14   Bitcoin, blockchain or timechain, please tell me all

15   methods.

16        A.    I do not remember all methods.  We used

17   IRC.  We used e-mail.  We used other -- I cannot even

18   remember the chats at the time.  It could have been

19   Facebook.  I do not have that Facebook account any more.

20        Q.    What was the account with Facebook?

21             MS. MARKOE:  Objection.

22             THE WITNESS:  I do not remember.  It is

23   been gone four or five years now.

24   BY MR. FREEDMAN:

25        Q.    Do you remember the name?



Page 68

1          A.     Yes, Dr. Craig Wright.

2          Q.     What e-mails did you use to communicate

3   with Dave Kleiman?

4                 MS. MARKOE:  Objection.

5                 THE WITNESS:  I do not remember.

6   BY MR. FREEDMAN:

7          Q.     Not even one.

8          A.     No, I had many e-mails.  I do not

9   remember which ones I actually used to communicate with

10  Dave.

11         Q.     Do you remember what e-mails Dave used to

12  receive these communications?

13                MS. MARKOE:  Objection.

14                THE WITNESS:  No, I do not.

15  BY MR. FREEDMAN:

16         Q.     Not even one?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  I do not type in things in

19  my e-mail and bring up the whole name, I have contacts.

20  BY MR. FREEDMAN:

21         Q.     So you do not remember any e-mails?

22                MS. MARKOE:  Objection.

23                THE WITNESS:  I do not remember phone

24  numbers.  I do not remember e-mails.  I save those in

25  context.



1   BY MR. FREEDMAN:

2          Q.     You do not remember any of Dave Kleiman's

3   e-mails that you communicated with to him about Bitcoin,

4   blockchain or timechain technology ----

5          A.     I even cannot tell you ----

6          Q.     Dr. Wright, if you could let me finish so

7   we have a clean record, I am sorry.  Do you recall any

8   of the e-mails Dave Kleiman used to receive

9   communications about Bitcoin, blockchain or timechain

10  technology from you in 2009?

11                MS. MARKOE:  Objection: asked and

12  answered.

13                MR. FREEDMAN:  Please limit your

14  objection to form.

15                MS. MARKOE:  I am allowed to preserve my

16  objection for the record.

17                MR. FREEDMAN:  By form, Zaharah.

18                MS. MARKOE:  And I am describing what the

19  form of the objection is.

20                MR. FREEDMAN:  No, that is not permitted

21  by the local rules.

22                MS. MARKOE:  Show me the local rule you

23  are referring to, then.

24                MR. RIVERO:  Please show us the local

25  rule.



Page 70

1                MR. FREEDMAN:  Okay.  We will show it to

2     you at the break.

3                MR. RIVERO:  There is no such local rule.

4                MR. FREEDMAN:  There certainly is.  Even

5     the Federal Civil Procedure require you to limit your

6     objection.

7                MR. RIVERO:  Show us ----

8                MR. FREEDMAN:  No, we will do this off

9     the record because I am not going to waste my time with

10    it.

11               MR. RIVERO:  I am not wasting my time

12    with foolishness.  Please show us the rule.  If you say

13    this again show us the rule.

14    BY MR. FREEDMAN:

15         Q.    Did we get an answer to that question?

16    (Pause) Do you recall any of the e-mails Dave Kleiman

17    used to receive communications about Bitcoin, blockchain

18    or timechain technology from you in 2009?

19               MS. MARKOE:  Objection: asked and

20    answered.

21               MR. FREEDMAN:  You can answer.

22               THE WITNESS:  I do not remember my

23    mother's e-mail address.  I do not remember my son's

24    e-mail address.  I do not remember either of their phone

25    numbers.  I do not remember friends over here's e-mail



Page 71

1  addresses today.  If I was asked to swear or lose

2  everything I have, I could not even give you my sister's

3  e-mail address right now.

4       Q.    Dr. Wright, if you could answer the

5  question posed it would help us move forward.

6       A.    I believe I did.

7       Q.    No, actually, I do not have an answer.

8       A.    That is my total recollection ever on

9  e-mails.

10       Q.    You do not recall any of the e-mails Dave

11  Kleiman used to receive communications from you about

12  Bitcoin, blockchain or timechain technology in 2009?

13            MS. MARKOE:  Objection: asked and

14  answered.

15            THE WITNESS:  I have answered that.

16  BY MR. FREEDMAN:

17       Q.    Do you recall any of the e-mails Dave

18  Kleiman used to receive communications about Bitcoin,

19  blockchain or timechain technology from 2010 through

20  2013?

21            MS. MARKOE:  Objection.

22            THE WITNESS:  I cannot answer what Dave

23  received anything on.  Dave is an independent person.

24  He was never my partner.  I have never had any

25  relationship that way with him.  He was just a friend.



Page 72

1    I have never formed a partnership.  I will never form a

2    partnership.  I hate the whole concept of partnership.

3    I will never be a partner.  I will never have a partner.

4    The only partner I have is my wife.  That is the form of

5    partnership I am in.  I have never been in a

6    partnership.  I do not want to know what other people

7    do.  I do not care what other people do.  I do not ask

8    what other people do.  I do not ever go into any details

9    of what other people do.

10   BY MR. FREEDMAN:

11          Q.    Did you communicate with Dave Kleiman on

12   Bitmessage?

13          A.    Yes.

14          Q.    What was your Bitmessage user name?

15          A.    There is not a Bitmessage user name.

16          Q.    What is there?

17          A.    Addresses.

18          Q.    What is your Bitmessage address?

19          A.    I cannot, from the top of my head, tell

20   you a many, many character long address.  That is not

21   how the thing works.

22          Q.    Do you recall Dave Kleiman's address on

23   Bitmessage?

24          A.    Again, no.  If I cannot recall an e-mail,

25   I definitely cannot recall a 30-something character



1    address.

2              Q.    Could you look the addresses up and

3    inform your counsel of them after this deposition?

4              MS. MARKOE:  Objection.

5              THE WITNESS:  No, I could not.

6    BY MR. FREEDMAN:

7              Q.    Why not?

8              A.    I do not have Bitmessage any more.

9              Q.    When did you lose Bitmessage?

10             MS. MARKOE:  Objection.

11             THE WITNESS:  I did not lose Bitmessage.

12   BY MR. FREEDMAN:

13             Q.    Why do not you have Bitmessage any more?

14             MS. MARKOE:  Objection.

15             THE WITNESS:  I stopped using it in 2015.

16   BY MR. FREEDMAN:

17             Q.    Why did you stop using it in 2015?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  Because I decided to stop

20   using it.

21   BY MR. FREEDMAN:

22             Q.    What did you do with all of the

23   Bitmessage communications that were in Bitmessage?

24             MS. MARKOE:  Objection.

25             THE WITNESS:  I do not keep all those



1    communications.

2    BY MR. FREEDMAN:

3            Q.      What do you do with them?

4            A.      I do not do anything with them.

5            Q.      So?

6            A.      So they do not exist.

7            Q.      In 2015, did any Bitmessages exist?

8            A.      Yes.

9            MS. MARKOE:  Objection.

10   BY MR. FREEDMAN:

11           Q.      What happened to them?

12           A.      I do not know.

13           Q.      Did you delete them?

14           MS. MARKOE:  Objection.

15           THE WITNESS:  I wiped hard drives.

16   BY MR. FREEDMAN:

17           Q.      When, in 2015, did you wipe hard drives?

18           A.      I wiped hard drives all the time.

19   I worked as a digital forensic expert for a part of my

20   time.  I donated my time to working on child

21   exploitation cases, etcetera.  I did many of those.

22   Every time I did something like that, I wiped my hard

23   drive.

24           Q.      Have you wiped any hard drives since the

25   beginning of this litigation?



1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  No.

3   BY MR. FREEDMAN:

4         Q.    So, in 2015, you wiped a hard drive and

5   destroyed all electronic records of Bitmessage?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  I do not know whether all

8   electronic messages have been destroyed.

9   BY MR. FREEDMAN:

10        Q.    Where would they be if they still resided

11  on a computer?

12        A.    I do not know.  Dave could have a copy.

13  That would be given on his drive.

14        Q.    Let us limit your responses to your

15  drives for now.  In 2015, you wiped all electronic

16  Bitmessages from all of your electronic media?

17                   MS. MARKOE:  Objection: mischaracterises

18  testimony.

19                   MR. FREEDMAN:  Go ahead.  You can answer.

20                   THE WITNESS:  My media, yes.  My media

21  has been wiped.  I wipe my media.

22  BY MR. FREEDMAN:

23        Q.    When did you begin discussing Bitcoin --

24  strike that.  Did you discuss Bitcoin, blockchain or

25  timechain technology with Dave Kleiman on Bitmessage?



Page 76

```
 1            A.     Yes.

 2            Q.     When did those discussions begin on

 3    Bitmessage?

 4            A.     I do not know.

 5            Q.     In 2009?

 6            A.     Bitmessage did not exist in 2009.

 7            Q.     When did Bitmessage begin to exist?

 8            MS. MARKOE:  Objection.

 9            THE WITNESS:  I cannot remember.

10    BY MR. FREEDMAN:

11            Q.     In 2010?

12            A.     I do not remember when Bitmessage

13    started.

14            Q.     It started some time after 2009.

15            MS. MARKOE:  Objection.

16            THE WITNESS:  Bitmessage was based on

17    Bitcoin.  Bitcoin was launched in 2009.  Nobody knew

18    about Bitcoin prior to its public launch.  Developers

19    were unable to take the technology in Bitcoin and create

20    something that they did not know existed.  So, I would

21    say it would be rather difficult for someone to invent

22    something using technology that they have never heard

23    of.  That is what you call magic.  I do not believe in

24    magic.

25    BY MR. FREEDMAN:
```



1          Q.    Just so you know where I am going, I am

2    going to switch gears now to start talking about the

3    various entities that have been touched on in the

4    litigation.

5               MS. MARKOE:  Why do we not take a

6    restroom break now ----

7               MR. FREEDMAN:  Sure.

8               MS. MARKOE:  ---- if this is a good time

9    to stop.

10              MR. FREEDMAN:  That is fine.  Let us go

11   off the record.

12              THE VIDEOGRAPHER:  Going off the record.

13   The time is 11.57.  End of video card number 1, volume 1

14   of the video deposition of Dr. Craig Wright.

15                   (A Short Break)

16              THE VIDEOGRAPHER:  This is the beginning

17   of video card number 2, volume 1, in the video

18   deposition of Dr. Craig Wright.  Going on the record.

19   The time is 12.11.  Thank you.

20              MR. FREEDMAN:  Just a small housekeeping

21   matter before we get back to the line of questioning.

22   I figured out an easy way to resolve our objection

23   issue.  I am giving you on the record a standing

24   objection to form to every single one of my questions at

25   this deposition, so you no longer need to object to



Page 78

1   anything.  You can instruct the witness not to answer

2   obviously by the court's directive, but you have an

3   objection preserved as to every single question.

4               MS. MARKOE:  I do not think that that is

5   how it works, and I appreciate the effort, but I will

6   still make objections as I feel and deem necessary.

7               MR. FREEDMAN:  And we will raise with the

8   court that the only reason you are doing so is to coach

9   the witness.

10              MS. MARKOE:  It is not, it is because not

11  every single one of your questions is objectionable.  I

12  have not objected to every single one of your questions.

13              MR. FREEDMAN:  We will let the judge

14  decide.

15        Q.    Dr. Wright, before we took a break -- can

16  you mark this as Plaintiff's Exhibit 1.

17  (Plaintiff's Exhibit 1 marked for identification)

18        Q.    -- we were discussing ----

19              MR. RIVERO:  Sorry, I have a housekeeping

20  question myself.  I want the citation on the rule.

21              MR. FREEDMAN:  Sure.  Do you know what, I

22  will give it to you in the break.  I have it but I am

23  not going to waste my time on the record for it.  I will

24  give it to you.

25              MR. RIVERO:  Please.  I want it on the



1   record ----

2                    MR. FREEDMAN:  Do problem, we will give

3   it to you on the next break.

4                    MR. RIVERO:  Please.

5   BY MR. FREEDMAN:

6           Q.    I am handing you what is marked as

7   Plaintiff's Exhibit 1.  This purports to be an e-mail

8   from you to Dave Kleiman dated 12th March 2008.  Do you

9   recognise this e-mail?

10          A.    I recognise what you have there.

11          Q.    Is this the e-mail that you sent?

12                   MS. MARKOE:  Objection.

13                   THE WITNESS:  No.

14  BY MR. FREEDMAN:

15          Q.    Why is it not the e-mail you sent?

16          A.    Because this is an import into a

17  different mail server that existed at a later time.

18          Q.    Is this an identical copy of the e-mail

19  you sent to Dave Kleiman?

20                   MS. MARKOE:  Objection.

21                   THE WITNESS:  No, because when you import

22  something from one exchange server to another it is not

23  identical.

24  BY MR. FREEDMAN:

25          Q.    Is the text of the e-mail identical?



 1                    MS. MARKOE:  Objection.

 2                    THE WITNESS:  I am unable to say whether

 3    it is identical.  It looks the same.

 4   BY MR. FREEDMAN:

 5        Q.    Did you send this original e-mail on 12th

 6    March 2008?

 7                    MS. MARKOE:  Objection.

 8                    THE WITNESS:  This is not an e-mail.

 9   BY MR. FREEDMAN:

10        Q.    Did you send an e-mail that looks the

11    same as this on 12th March 2008?

12                    MS. MARKOE:  Objection.

13                    THE WITNESS:  I sent an e-mail that

14    contains the body that was approximately like that, if

15    not like that.  I cannot say exactly because this is a

16    copy and whatever else, but that is very familiar, and

17    that would appear to be the e-mail I sent, yes.

18   BY MR. FREEDMAN:

19        Q.    On 12th March 2008?

20                    MS. MARKOE:  Objection.

21                    THE WITNESS:  Yes.

22   BY MR. FREEDMAN:

23        Q.    Do you have the original copy of this

24    e-mail?

25        A.    No, the original was moved from a former



Page 81

1    exchange mailbox by one of my staff, Nicholas, I do not

2    remember his last name; hence the change in e-mail

3    address.

4         Q.    What do you mean change in e-mail

5    address?

6         A.    The "from" address changes when you move

7    OST files within Microsoft Exchange.  When you preserve

8    exchange of information but change the domains, because

9    you move companies, it alters the sort of domain record

10   within exchange.

11        Q.    So, if I am understanding you correctly,

12   and correct me if I am wrong, the original e-mail was

13   not sent from craig.wright@information-defense.com?

14        A.    That would be correct.

15        Q.    What was the original e-mail it was sent

16   from?

17        A.    I cannot remember which domains I had

18   back then.

19        Q.    Do you have the OST file that was moved

20   by Nicholas?

21        A.    No.

22        Q.    What happened to it?

23        A.    I have no idea.

24        Q.    Did you not think this was an important

25   e-mail to preserve?



Page 82

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  No, I did not.

3   BY MR. FREEDMAN:

4          Q.     Why not?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  Why would I?  It does not

7   add any value to anything I am doing.

8   BY MR. FREEDMAN:

9          Q.     Do you recall Nicholas's last name?

10         A.     It might be Desmond.  I do not remember.

11         Q.     D-E-S-M-O-N-D?

12         A.     You are asking me to spell someone's name

13   that I can barely remember.

14         Q.     How would we find Nicholas's last name,

15   if we needed to?

16         A.     Look up old records on the internet.

17         Q.     What company did he work for?

18         A.     The question you are, I believe, asking

19   is, which of my companies did he work for, which

20   I believe he worked for Hotwire, Integers and maybe

21   Pholus, P-H-O-L-U-S.  It is one of the Greek gods.  He

22   was a centaur.  He was a wise centaur.

23         Q.     Please, Dr. Wright, if we could have this

24   discussion on the break.  It is interesting but I want

25   to get us through.



Page 83

```
 1          A.      Certainly.

 2          Q.      Do you have records from Hotwire,

 3   Integers and Pholus that would enable us to look up

 4   Nicholas's last name?

 5          A.      Unless there is something that the

 6   lawyers have captured.  I have never looked at the

 7   records in those boxes.  They were delivered to me and

 8   they remained sealed until the lawyers opened them.

 9          Q.      What boxes are you referring to?

10          A.      The boxes that they took copies of

11   documents from.

12          Q.      You said you received sealed boxes?

13          A.      Yes.

14          Q.      Where did you receive sealed boxes from?

15          A.      When the companies in Australia were shut

16   down, boxes of information were sent to me.

17          Q.      By whom?

18          A.      Someone in Australia, to do with the old

19   company.  I do not know.

20          Q.      I do not recall, I may have asked this:

21   the date of this e-mail, 12th March 2008, was this the

22   first time you reached out to Dave Kleiman about

23   Bitcoin, blockchain or timechain technology?

24          A.      I may have talked to him about BlackNet;

25   I do not recall.
```



Page 84

1          Q.      This is the first written communication?

2          A.      Again, I do not recall.

3          Q.      There is a company called Craig Wright

4     R&D?

5          A.      There were multiple companies.  There are

6     no longer those companies.

7          Q.      There were multiple companies called

8     Craig Wright R&D?

9          A.      There are multiple companies called Craig

10    Wright R&D.

11         Q.      When was the first Craig Wright R&D

12    founded?

13         A.      In the '90s.

14         Q.      When did it cease to exist?

15         A.      A variety of these companies have ceased

16    at different times.

17         Q.      How many of Craig Wright R&Ds have there

18    been?

19         A.      Seychelles, Panama, Belize, Kenya,

20    Australia, Singapore, a couple of Eastern European ones,

21    Hungary, Hong Kong.  More than that, I do not remember.

22         Q.      Okay.  Craig Wright R&D in the

23    Seychelles, when was it formed?

24         A.      A long time ago.  We are talking

25    20 years.



Page 85

1          Q.      When was the one in Panama formed?

2          A.      About 1998.  My exact recollection of

3    time is ----

4          Q.      When did the one in the Seychelles cease

5    to exist?

6          A.      Somewhere between 2011 and 2013.

7          Q.      When did the one in Belize -- when was

8    the Craig Wright R&D in Belize formed?

9          A.      I do not remember.

10         Q.      When did it cease to exist?

11         A.      I do not exactly remember.

12         Q.      When did Craig Wright R&D in Kenya --

13   strike that.  When was Craig Wright R&D in Kenya formed?

14         A.      Again, I do not remember the exact times

15   on that one.

16         Q.      Approximate year do you recall?

17         A.      Not off the top of my head, no.

18         Q.      Do you have any way to look that up?

19                 MS. MARKOE:  Objection.

20                 THE WITNESS:  No.

21   BY MR. FREEDMAN:

22         Q.      When did it cease to exist?

23         A.      I do not remember.

24         Q.      What was the purpose of Craig Wright R&D

25   in the Seychelles?



Page 86

1        A.      The purpose of all of these was to hold

2    intellectual property.

3        Q.      What type of intellectual property were

4    they holding?

5               MS. MARKOE:  Objection.

6               THE WITNESS:  Any type of intellectual

7    property I held.

8    BY MR. FREEDMAN:

9        Q.      Were they patents?

10       A.      No.

11              MS. MARKOE:  Objection.

12   BY MR. FREEDMAN:

13       Q.      Were they trade secrets?

14              MS. MARKOE:  Objection.

15              THE WITNESS:  Define what you mean by

16   "trade secrets".  That is a very wide area.  I have a

17   masters in intellectual property law, I could spend a

18   long time detailing that if you wish, but please define

19   what you actually mean by "trade secrets" or I will just

20   have to say yes and leave it at that.

21   BY MR. FREEDMAN:

22       Q.      Were they all computer related?

23       A.      No.

24              MS. MARKOE:  Objection.

25   BY MR. FREEDMAN:



Page 87

1          Q.     Did they relate to Bitcoin?

2          A.     Which one?

3          Q.     You said the purpose of all of these

4   entities -- strike that.  Did any of them hold Bitcoin

5   related intellectual property?

6                 MS. MARKOE:  Objection.

7                 THE WITNESS:  That, again, is a very wide

8   question.  Did they hold any assets relating to Bitcoin

9   in any way: yes.

10  BY MR. FREEDMAN:

11         Q.     Which ones?

12         A.     Panama, Costa Rica, Australia.  The

13  others I could not say off the top of my head.

14         Q.     Did any of these Craig Wright R&D

15  entities hold blockchain or timechain-related

16  intellectual property?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  It is the same question.

19  Just ask me Bitcoin, because the only thing I do is

20  Bitcoin.

21  BY MR. FREEDMAN:

22         Q.     So, when I say "Bitcoin", you will take

23  it to mean Bitcoin, blockchain and timechain?

24                MS. MARKOE:  Objection.

25                THE WITNESS:  Yes.  I will answer per



1    Bitcoin.  I only work on Bitcoin.  Some of the things

2    I do apply to any blockchain, but I do not develop for

3    Ethereum, I do not develop for other things.  I never

4    have, I never will.  I solely do one single system which

5    is Bitcoin.

6    BY MR. FREEDMAN:

7         Q.    Why did you create multiple entities to

8    hold Bitcoin-related intellectual property in different

9    countries?

10              MS. MARKOE:  Objection.

11              THE WITNESS:  I create multiple entities

12   all the time so that I can protect my assets.  I have

13   what people have called a web of companies because that

14   is the best way to ensure that when someone is doing

15   something that governments may not like, to protect

16   those assets and ensure that they remain protected.

17   BY MR. FREEDMAN:

18        Q.    In what way were you seeking to protect

19   these intellectual property assets?

20              MS. MARKOE:  Objection.  You are going

21   beyond the scope of the topics in this deposition.

22              MR. FREEDMAN:  Zaharah, just instruct him

23   not to answer.

24              MS. MARKOE:  The judge said you can get

25   some leeway with regard to entities that do not relate



Page 89

1    to Dave Kleiman.

2                 MR. FREEDMAN:  Zaharah, either instruct

3    him not to answer or object.  That is it.  Well,

4    actually, do not object because ----

5                 MS. MARKOE:  I can explain the basis of

6    my objection.

7                 MR. FREEDMAN:  I do not need to hear it.

8    I give you a standing objection.

9                 MS. MARKOE:  But the court does.  But the

10   court needs to hear it and I need to make my record.

11                MR. FREEDMAN:  So write it down.

12                MS. MARKOE:  So I am entitled to make my

13   record on the record.

14                MR. FREEDMAN:  Okay, we are going to move

15   on.

16                MS. MARKOE:  You are not permitted to

17   stop me.  I will not allow you to stop me.  I am

18   instructing the witness not to answer that question.

19   You have gone beyond the scope.

20                MR. FREEDMAN:  Which question are you

21   instructing him not to answer?

22                MS. MARKOE:  The last question, I

23   believe, which was -- if the court reporter could kindly

24   read it back to me I would appreciate it.

25      (The court reporter read back as requested)



Page 90

```
 1    BY MR. FREEDMAN:

 2           Q.     Did any of these Craig Wright R&Ds

 3     involve Dave Kleiman?

 4                  MS. MARKOE:  Objection.

 5                  THE WITNESS:  No.

 6    BY MR. FREEDMAN:

 7           Q.     Did they involve W&K?

 8                  MS. MARKOE:  Objection.

 9                  THE WITNESS:  No.

10    BY MR. FREEDMAN:

11           Q.     Did they ever enter into transactions

12     with Dave Kleiman or W&K?

13                  MS. MARKOE:  Objection.

14                  THE WITNESS:  They enacted transactions

15     with W&K, of which Dave was a member.

16    BY MR. FREEDMAN:

17           Q.     What were the transactions they entered

18     into W&K with?

19           A.     They had contracts with W&K.

20           Q.     Which entities specifically had contracts

21     with W&K?

22           A.     I do not remember each of the contracts.

23           Q.     Which entity had the contract?

24                  MS. MARKOE:  Objection.

25                  THE WITNESS:  I do not remember each of
```



Page 91

1    the contracts.

2    BY MR. FREEDMAN:

3             Q.     Was the ownership of all these Craig

4    Wright R&D entities identical?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  No.

7    BY MR. FREEDMAN:

8             Q.     Who owned the Craig Wright R&D in the

9    Seychelles?

10                   MS. MARKOE:  Objection.

11                   THE WITNESS:  I am unable to answer the

12   "who owned" because each of the companies, or whatever

13   else I have, has a complex ownership structure.  At the

14   end of the day, I own nothing.  I do not own a single

15   share in any company that I know of.  I do not own a

16   single disposition of a trust that I know of.  I have no

17   ownership of anything, which is what you are trying to

18   get at.  I have very carefully constructed something

19   where I get to direct my research and own nothing.

20   BY MR. FREEDMAN:

21            Q.     So I appreciate, again, that you are

22   anticipating where I am going, but please just answer

23   the question.

24            A.     I believe that was answering the

25   question.



Page 92

1          Q.     Actually, I just want to know who owns

2    them, not if you own them.  Who owns them?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  I believe I was ----

5                 MS. MARKOE:  You may answer.

6                 THE WITNESS:  I believe I was answering.

7    My answer is I have set up something so that I do not

8    need to know who owns them.  I do not know who owns

9    nChain now.

10   BY MR. FREEDMAN:

11         Q.     Who knows who owns Craig Wright R&D?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  I have ensured that I know

14   nothing about the ownership of the companies I am with.

15   BY MR. FREEDMAN:

16         Q.     Who did you make that arrangement with?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  Other individuals.

19   BY MR. FREEDMAN:

20         Q.     What are the names of those individuals?

21                MS. MARKOE:  Objection.

22                THE WITNESS:  I do not remember all of

23   their names.  Those people are no longer part of my

24   life.

25   BY MR. FREEDMAN:



1          Q.    Do you remember any of their names?

2                MS. MARKOE:  Objection.

3                THE WITNESS:  Yes.

4    BY MR. FREEDMAN:

5          Q.    Can you tell me the names that you do

6    recall?

7                MS. MARKOE:  Objection.

8                THE WITNESS:  There was a Mark in High

9    Secured in Panama.

10   BY MR. FREEDMAN:

11         Q.    Anyone else?

12         A.    I am thinking.  (Pause) No, I do not

13   remember the names.

14         Q.    Do you remember Mark's last name?

15         A.    No, I do not.

16         Q.    Mark was part of the people that took

17   care of the ownership of Craig Wright R&D for you?

18               MS. MARKOE:  Objection.

19               THE WITNESS:  I do not know exactly what

20   they did.  People set up structures.

21   BY MR. FREEDMAN:

22         Q.    You trusted these people to set up

23   structures for your companies?

24               MS. MARKOE:  Objection.

25               THE WITNESS:  High Secured was a law



```
 1   firm.
 2   BY MR. FREEDMAN:
 3          Q.     So you trusted a law firm to set up
 4   ownership structures for your companies?
 5          A.     Yes.
 6          Q.     And you have no way to get those records
 7   today?
 8          A.     Not that I know of.
 9          Q.     Did Craig Wright R&D ever mine Bitcoin?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  No.
12   BY MR. FREEDMAN:
13          Q.     Was Craig Wright R&D ever audited by the
14   Australian Tax Office?
15          MS. MARKOE:  Also, I just want to make
16   sure for the court reporter, it is High Secured.
17   BY MR. FREEDMAN:
18          Q.     Were any of the Craig Wright R&D entities
19   ever audited by the Australian Tax Office?
20          A.     No.
21          Q.     Were they ever the subject of an
22   Australian Tax Office investigation?
23          A.     I do not know what the tax office
24   investigates.
25          Q.     I just want to know what you know.  Are
```



Page 95

1    you aware of ----

2            A.    I do not know what the tax office

3    investigates.

4            Q.    Are you aware of any Australian Tax

5    Office investigation over any of the Craig Wright R&D

6    entities?

7            A.    I do not know what the tax office

8    investigates.

9            Q.    So you are not aware of any such

10   investigation?

11               MS. MARKOE:  Objection.

12               THE WITNESS:  I do not know what the tax

13   office investigates.  I will not speak for the tax

14   office.

15   BY MR. FREEDMAN:

16           Q.    I am not asking you to speak for the tax

17   office, I am just ask you to tell me if you are aware of

18   an investigation?

19               MS. MARKOE:  Objection.

20               THE WITNESS:  You are asking me to

21   express awareness of a federal body's investigations.

22   I have no interest in those unless it involves me

23   personally, in which case they will audit me first or do

24   something else.  I will not speculate as to the nature

25   of what a government body will do.



1          Q.     Did any of these Craig Wright R&D

2     entities ever go by another name?

3          A.     No.

4          Q.     I am going to the next entity.  It is

5     called Chaos and Non-Linear FNE & Finance.

6          A.     That is not the correct company name.

7          Q.     What is the correct company name?

8          A.     The exact reference I cannot remember,

9     but that is not it.

10          Q.     When was it founded?

11          A.     I do not remember.  The records will be

12     on ASIC, A-S-I-C.

13          Q.     What was the purpose of this entity?

14          A.     To use non-linear forecasting, which is

15     probably the word, in the creation of models for

16     determining different linear risk effects.

17          Q.     Does this have to do with Bitcoin?

18          A.     No.

19          Q.     Does it have to do with blockchain or

20     timechain?

21               MS. MARKOE:  Objection.

22               THE WITNESS:  Again, the same question.

23     BY MR. FREEDMAN:

24          Q.     Who owns Chaos and Non-Linear FNE &

25     Finance?



Page 97

1          A.      Nobody as far as I know.  I believe it is

2    already liquidated.  If not, it is in the process of

3    being liquidated.

4          Q.      Who owned it at the time it was

5    established?

6          A.      You would need to look at the

7    shareholding.

8          Q.      How do I obtain the shareholding?

9          A.      I do not know.

10         Q.      Do you have access to the shareholding?

11         A.      If those records that the lawyers have

12   copied has any copy, then that would have it, otherwise

13   I do not know.  I have not looked at those records.

14   I do not intend to.

15         Q.      Did you use lawyers to form that entity?

16              MS. MARKOE:  Objection: relevance.

17              THE WITNESS:  You are asking whether I --

18   that would be a privileged thing, whether I used lawyers

19   or not and what I use them for, so are you asking me to

20   breach privilege?

21   BY MR. FREEDMAN:

22         Q.      Dr. Wright, you have to allow your own

23   counsel to object.  You cannot object as a witness.

24         A.      I did not object.  I just said, are you

25   asking me to ----



1          Q.     I am asking ----

2                 MR. RIVERO:  Let me step in a second.

3     Dr. Wright, the question as posed is, did you use

4     lawyers?  You may answer that, but please avoid going

5     into any communications with the lawyers.

6                 THE WITNESS:  Mmm-hmm, okay.  I do not

7     remember.

8     BY MR. FREEDMAN:

9          Q.     Did W&K or Dave Kleiman ever own a

10    percent of this entity?

11         A.     No.

12         Q.     Did this entity ever enter into a

13    relationship with Dave Kleiman or W&K?

14                MS. MARKOE:  Objection.

15                THE WITNESS:  It was formed after

16    Mr. Kleiman died.

17    BY MR. FREEDMAN:

18         Q.     Do you remember when it was formed?

19         A.     No.

20         Q.     Did this entity ever go by another name?

21         A.     No.

22         Q.     Did this entity ever mine Bitcoin?

23                MS. MARKOE:  Objection.

24                THE WITNESS:  No.

25                MS. MARKOE:  He has already said that



1   this entity was established after Mr. Kleiman's death.

2   Therefore, I am going to instruct him not to answer any

3   further questions about this entity.  I believe you have

4   asked all the questions that are sort of permitted under

5   sub-(2) as envisioned by the court, as I understood it.

6                   MR. FREEDMAN:  Your recollection is

7   wrong, but we will take it up with the court.

8           Q.      I am going to move on to the next entity,

9   Cloudcroft.  When was Cloudcroft founded?

10          A.      I do not remember the date on any of

11  these companies.  All of them would be listed on ASIC.

12  It is a public record.  You can pay for it.  I am not

13  going to pay for it to hand it to you.

14          Q.      What was the purpose of this entity?

15          A.      Cloudcroft was designed -- well, created

16  for the development of large storage in high compute

17  devices.  It was so that you would have machines that

18  could hold multiple petabytes of data and process those

19  using an optical backend at high speed.

20          Q.      Did this entity ever mine Bitcoin?

21                  MS. MARKOE:  Objection.

22                  THE WITNESS:  No.

23  BY MR. FREEDMAN:

24          Q.      Did this entity ever create intellectual

25  property related to Bitcoin?



Page 100

1                     MS. MARKOE:  Objection.  You may answer.

2                     THE WITNESS:  The nature of Bitcoin goes

3     to what we have dubbed Metanet.  That requires storage.

4     To do that, to have large blocks and to scale Bitcoin

5     requires the creation of machines that can handle very

6     large transaction volumes and eventually be able to send

7     terabyte and larger block sizes in milliseconds.

8     BY MR. FREEDMAN:

9          Q.    So, did the entity ever create

10    intellectual property that relates to Bitcoin?

11                    MS. MARKOE:  Objection.

12                    THE WITNESS:  I believe I just said yes,

13    even if you did not understand it.

14    BY MR. FREEDMAN:

15         Q.    Was this entity ever audited by the

16    Australian Tax Office?

17         A.    Yes.

18         Q.    When?

19         A.    I do not remember the dates of the

20    audits.

21         Q.    Were there multiple audits?

22                    MS. MARKOE:  Objection: vague.

23                    THE WITNESS:  I have accountants in the

24    past, and I have them now.  They do these things.  I do

25    not necessarily, apart from when I am pulled up to



1    things, go in and I definitely do not try to remember

2    the dates of when all this happened.

3    BY MR. FREEDMAN:

4         Q.    So your accountants would be aware of

5    this information?

6              MS. MARKOE:  Objection.

7              THE WITNESS:  I do not know.

8    BY MR. FREEDMAN:

9         Q.    Which accountants did you use to handle

10   the Australian Tax Office investigations?

11             MS. MARKOE:  Objection.  Are you

12   referring to this entity or are you referring to

13   generally?  It is just very unclear what you are talking

14   about and we need to have a clear record so that there

15   are no misunderstandings.

16   BY MR. FREEDMAN:

17        Q.    What accountants did you use to handle

18   Australian Tax Office investigations and audits of

19   Cloudcroft?

20        A.    If you are going to ask it that way,

21   I will say I do not remember.

22        Q.    What accountants do you recall using to

23   handle any Australian Tax Office investigation or audit?

24        A.    I did not use accountants to handle tax

25   office audits; I used accountants to be accountants and



1    auditors.  Would you like me to answer that?

2           Q.    Yes, please.

3           A.    During the time that we were there, we

4    used KPMG, we used Ernst & Young, we used Harry

5    something, I do not remember the name exactly, which is

6    in the records, and we had internal audit and accounts.

7           Q.    What are the names of the internal

8    auditing accounts?

9                 MS. MARKOE:  Objection.

10                THE WITNESS:  I do not know what the

11   auditing accounts are, but if you are asking what is the

12   name of the person who was the CFO or accountant, at one

13   point that was John Cheshire, and we had a bookkeeper

14   Ann, and I do not remember her last name.  I am sure it

15   is on record somewhere.

16   BY MR. FREEDMAN:

17          Q.    Is that Ann Wrightson?

18          A.    That would be it, yes.

19                MR. RIVERO:  Can I just say to keep the

20   record clear, I believe he said "internal audit and

21   accounts", as opposed to "internal auditing accounts",

22   although I have old ears.

23                THE WITNESS:  That is correct.

24   BY MR. FREEDMAN:

25          Q.    Was there anyone else that worked



1    internally as an accountant or CFO for your companies?

2         A.     Yes.

3         Q.     What were their names?

4         A.     I do not remember.

5         Q.     Did Jamie Wilson ever work as an

6    accountant for you?

7         A.     Very briefly.

8         Q.     What time period was that?

9         A.     I dealt with Jamie Wilson some time

10   between -- some time in 2012 into 2013.

11        Q.     Why did he stop working for you?

12               MS. MARKOE:  Objection.

13               THE WITNESS:  He was fired.

14   BY MR. FREEDMAN:

15        Q.     Why was he fired?

16               MS. MARKOE:  Objection.  This is really

17   going beyond the scope now.

18   BY MR. FREEDMAN:

19        Q.     Why was he fired?

20               MS. MARKOE:  I am going to instruct the

21   witness not to answer.  It goes beyond the scope.

22   BY MR. FREEDMAN:

23        Q.     Did KPMG interact with the Australian Tax

24   Office -- strike that.  When your companies were under

25   audit by the Australian Tax Office, did KPMG handle



Page 104

```
 1    interactions with the tax office?

 2            A.      No.

 3            Q.      Same question for Ernst & Young?

 4            A.      No.

 5                    MS. MARKOE:  Objection.

 6    BY MR. FREEDMAN:

 7            Q.      Did Harry, and we do not recall his last

 8    name, interact with the ATO in regard to their audits?

 9            A.      He interacted, but that is different than

10    your former question.

11            Q.      I know.  Did he interact -- he did?

12            A.      Interact means he communicated in some

13    way.  He e-mailed, he phoned, he had lunch, he passed

14    them in the street and said "Hi".  So, being an auditor,

15    I would say he interacted with the ATO many times.

16            Q.      Did Harry handle the Australian Tax

17    Office investigation on your behalf or your companies'

18    behalf?

19            A.      No.

20                    MS. MARKOE:  Objection.

21    BY MR. FREEDMAN:

22            Q.      Did John Cheshire handle the Australian

23    Tax Office investigation for you or your companies'

24    behalf?

25            A.      He did some of that.
```



1          Q.      Did Ann Wrightson?

2          A.      No.

3          Q.      Did Jamie Wilson?

4          A.      No.

5          Q.      What time period did John Cheshire work

6     for your companies or yourself?

7                  MS. MARKOE:  Objection: compound.

8     BY MR. FREEDMAN:

9          Q.      What time period did John Cheshire work

10    for you?

11                 MS. MARKOE:  Objection.

12                 THE WITNESS:  John, I believe, would have

13    first been about 2008 until 2015, in different roles.

14                 MS. MARKOE:  Can you please just spell

15    for the record how you spell Cheshire, because I think

16    it is being misspelt right now, if you remember.

17                 THE WITNESS:  I am sorry, I cannot tell

18    you how I would spell John Cheshire.  I could make a

19    guess, but then I am just guessing.

20                 MR. RIVERO:  Do not guess.

21    BY MR. FREEDMAN:

22         Q.      Did Ray Hong work for you at Cloudcroft?

23         A.      He worked in one of my companies.

24         Q.      Do you recall which company?

25         A.      No.



Page 106

1          Q.     Do you recall what he did for your

2     companies?

3          A.     Yes.

4          Q.     What did he do for your companies?

5          A.     He was a programer and graphic designer.

6          Q.     What did he program for you?

7          A.     Code.

8                 MS. MARKOE:  Objection.

9     BY MR. FREEDMAN:

10         Q.     Did it relate to Bitcoin?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  Yes.

13                MR. RIVERO:  One moment.  Dr. Wright,

14    I can only instruct you.  I would be happy to instruct

15    everyone else.  The court reporter can only take one of

16    us at a time.  You have to pause a beat to allow the

17    objection.

18                THE WITNESS:  Certainly.

19                MR. RIVERO:  I do not mean to single you

20    out because everyone is doing it.

21                THE WITNESS:  Yes.  My apologies.

22    BY MR. FREEDMAN:

23         Q.     Who owned Cloudcroft on its founding?

24         A.     You would have to look at the records.  I

25    do not remember.



Page 107

1              Q.      Did the ownership ever change?

2              A.      I would believe so, but again you would

3      have to look at the records.  I do not remember.

4              Q.      Was Cloudcroft ever owned by

5      Tulip Trading?

6              A.      You would have to look at the records.  I

7      do not remember.  I do not do the company secretarial.

8              Q.      Do you have any recollection of the

9      ownership of Cloudcroft at any point in time?

10             A.      I do not speculate on these things.

11     I instruct people to do stuff.  I hire company

12     secretarial when I need to.  I do not remember.

13             Q.      Did Lynne Wright ever own any portion of

14     Cloudcroft?

15             A.      I do not remember.

16             Q.      Was this entity related to Dave or W&K in

17     any way?

18             A.      Not at any point.

19             Q.      Did this entity ever go by another name?

20             A.      I do not remember.

21             Q.      Is this entity still in existence?

22             A.      I have not checked.

23             Q.      I am going to move to the next entity.

24     This is ----

25                     MS. MARKOE:  Before we move to the next



Page 108

1    entity, it is getting on to be about 1 o'clock.  Do you

2    want to go till 1 o'clock and then I do not know if we

3    are breaking for lunch, if they are bringing lunch in,

4    what the story is, but ----

5                     MR. FREEDMAN:  Let us go off the record.

6                     THE VIDEOGRAPHER:  Going off the record.

7    The time is 12.45.

8                     (A Short Break)

9                     THE VIDEOGRAPHER:  Going back on the

10   record.  The time is 12.46.  Thank you.

11   BY MR. FREEDMAN:

12        Q.    Did a woman with the first name of Ellen

13   ever work at any of your companies?

14                     MS. MARKOE:  Objection.

15                     THE WITNESS:  I do not know all the staff

16   at my companies now, so I cannot answer that.

17   BY MR. FREEDMAN:

18        Q.    You have no recollection of a woman named

19   Ellen working at your companies?

20                     MS. MARKOE:  Objection.

21                     THE WITNESS:  Do you have a last name?

22   BY MR. FREEDMAN:

23        Q.    I do not.

24        A.    I have no idea.

25        Q.    No recollection?



Page 109

1          A.     You realise that I have companies across

2     the world, and I meet people all the time in my

3     companies, and have no idea about all the people.

4     I shake hands, I speak in front of staff, I do all this

5     sort of stuff and people go, "Hey, I am such and such",

6     and a year later I do not remember.

7          Q.     Doctor, I am a bit confused because

8     earlier I thought you told me you do not own any

9     companies and now you have referring to your companies

10    so can you explain how that works?

11               MS. MARKOE:  Objection.

12               THE WITNESS:  I founded them.  You are

13    trying to confuse or confound people with the notion

14    that a company that I own shares of, or the company that

15    I have set up to do my research, are separate.  The fact

16    that I do not own, that I have set up trusts and

17    whatever else out of my control, does not remove the

18    fact that I will call them "my companies".

19    BY MR. FREEDMAN:

20         Q.     Okay.  I am going to move to the next

21    entity.  This is called C01N.

22         A.     C01N.

23         Q.     When was C01N founded?

24               MS. MARKOE:  Objection.

25               THE WITNESS:  I do not remember the date



Page 110

1    and which C01N in particular you are talking about.

2    BY MR. FREEDMAN:

3         Q.    Is there more than one C01N?

4         A.    Yes.

5         Q.    Please list them for me?

6         A.    I do not remember them all.  I would need

7    to look at records.

8         Q.    Please list the ones you recall?

9         A.    UK, Australia.

10        Q.    When was the UK C01N formed?

11        A.    Under a different name, that is either

12   Permanent Success or Design by Human or whatever else, I

13   do not remember which exactly it was, which would have

14   been 2012.

15        Q.    So, why did you change the name in 2012?

16               MS. MARKOE:  Objection:  mischaracterises

17   the record.

18               THE WITNESS:  I did not change the name

19   in 2012.

20   BY MR. FREEDMAN:

21        Q.    Why was the name changed in 2012?

22               MS. MARKOE:  Objection:  mischaracterises

23   the testimony.

24               THE WITNESS:  As I just said, I did not

25   change the name in 2012, the name was not changed in



1    2012.  Nor did I say ----

2    BY MR. FREEDMAN:

3           Q.     How did Permanent Success Limited or

4    Design by Human become C01N?

5           A.     The name was changed.

6           Q.     Who changed the name?

7           A.     I instructed a person in the UK to change

8    the name.

9           Q.     When did you make that instruction?

10          A.     After Dave's death.

11          Q.     Do you have ----

12          A.     I do not have the records in front of me.

13   I do not remember.

14          Q.     Who did you instruct to change the name?

15          A.     I have no idea.

16          Q.     You said a person in the UK?

17          A.     Yes.

18          Q.     But you do not recall who it was?

19          A.     I do not have the records in front of me.

20   If it is company secretarial, then all those records

21   would have been there at the time.  I have no idea.

22          Q.     What was the purpose of Permanent Success

23   Limited or Design by Human when it was formed?  You know

24   what, strike that.  What was the purpose of Permanent

25   Success Limited when it was formed?



Page 112

1           A.      Is that C01N?  I cannot remember if that
2    is the exact one.  I do not remember which one is which.
3           Q.      Let us forget about C01N for a moment.
4    I am talking about Permanent Success Limited.
5           A.      Is that separate to C01N?  I am asking
6    that question.  I do not remember otherwise.
7           Q.      I do not know.  It is your companies.
8           MS. MARKOE:  Objection:  mischaracterises
9    the testimony.
10   BY MR. FREEDMAN:
11          Q.      When Permanent Success Limited was
12   formed, what was its purposes?
13          A.      What was the rename of that company?  I
14   do not know otherwise.  I did not name it.
15          Q.      Permanent Success Limited and Design by
16   Human were both renamed?
17          A.      Yes.
18          Q.      What were the two renames?
19          A.      You would need to tell me.  I do not
20   remember off the top of my head.  One of them became
21   C01N.  If you can give me the name that you are talking
22   about that it later became, I could give you
23   information.
24          Q.      The one that later became C01N?
25          A.      Yes.



1        Q.      What was the purpose at formation?

2        A.      The purpose was to hold assets because

3   I wanted to eventually form something as a wallet for

4   Bitcoin.  So a custodial wallet service.

5        Q.      What assets did it hold?

6        A.      None.

7        Q.      Did it ever hold assets?

8        A.      It never held assets.

9        Q.      So what purpose did C01N serve?

10       A.      I believe I have said exactly what it

11   served.

12       Q.      You said why you formed it.  Did it end

13   up serving the purpose you formed it for?

14       A.      No.

15       Q.      So what purpose did it serve?

16       A.      It was there while I was creating.  We

17   did not end up launching C01N as a wallet.

18       Q.      So did C01N ever hold assets -- any type

19   of asset?

20       A.      Hold?  No.

21       Q.      Did it ever own assets?

22       A.      Yes.

23       Q.      What assets did it own?

24               MS. MARKOE:  Objection.

25               THE WITNESS:  It owned rights.



1  BY MR. FREEDMAN:

2          Q.    It owned rights to what?

3          A.    It owned rights to other assets.

4          Q.    What assets did it own rights to?

5          A.    I would need to look up the list.

6          Q.    Was it Bitcoin?

7          A.    Was what Bitcoin?

8          Q.    Did it own rights to Bitcoin?

9          A.    In part.

10               MS. MARKOE:  Objection.

11 BY MR. FREEDMAN:

12         Q.    Did it own rights to intellectual

13 property?

14               MS. MARKOE:  Objection.

15               THE WITNESS:  I would need to look at the

16 list of what was actually deposited into that company to

17 answer that question.

18 BY MR. FREEDMAN:

19         Q.    Who has the list of what was deposited

20 into that company?

21         A.    Unless it is in any of the records that

22 have been given to the lawyers, I cannot answer.

23         Q.    So are those assets lost to you now?

24               MS. MARKOE:  Objection.

25               THE WITNESS:  What assets?



1    BY MR. FREEDMAN:

2              Q.     The Bitcoin assets?

3                     MS. MARKOE:  Objection.

4                     THE WITNESS:  What Bitcoin are you

5      referring to?

6    BY MR. FREEDMAN:

7              Q.     C01N holds rights to Bitcoin; is that

8      correct?

9                     MS. MARKOE:  Objection.

10                    THE WITNESS:  No, C01N does not hold

11     rights to Bitcoin.

12   BY MR. FREEDMAN:

13             Q.     What does C01N hold rights to?

14             A.     C01N is a liquidated company.  It holds

15     rights to nothing.

16             Q.     When C01N was operational?

17             A.     I have already stated C01N was never

18     operational.

19             Q.     At some point in time C01N owned rights;

20     is that a correct statement?

21                    MS. MARKOE:  Objection.

22                    THE WITNESS:  That is a correct

23     statement.

24   BY MR. FREEDMAN:

25             Q.     When did it own those rights -- during



Page 116

1    what period of time?

2                    MS. MARKOE:  Objection.

3                    THE WITNESS:  I would need to look at the

4    records.  I do not know the date of the transfers off

5    the top of my head.

6    BY MR. FREEDMAN:

7         Q.    Before Dave died or after Dave died?

8                    MS. MARKOE:  Objection.

9                    THE WITNESS:  After Dave died.

10   BY MR. FREEDMAN:

11        Q.    When was it liquidated?

12        A.    I do not know that.

13        Q.    Was it operational in 2008?

14                   MS. MARKOE:  Objection.

15                   MR. FREEDMAN:  Sorry, 2018.

16                   THE WITNESS:  The company has never been

17   operational.

18   BY MR. FREEDMAN:

19        Q.    Was it in existence in 2018?

20        A.    I do not believe so, but you would need

21   to look at the records.  Companies House in the UK holds

22   records.  You can obtain them.

23                   MR. RIVERO:  I think the last question

24   was in existence in 2018, but I do not want to misstate

25   it.  The record is showing 2008.



Page 117

```
 1                    MS. MARKOE:  He corrected it.

 2                    MR. RIVERO:  I apologise, sorry about

 3    that.

 4   BY MR. FREEDMAN:

 5          Q.    In 2013, C01N was in existence?

 6                    MS. MARKOE:  Objection.

 7                    THE WITNESS:  It was not called C01N at

 8    that time, I believe.  I do not know when the change was

 9    made to the name, but the company had been formed.

10   BY MR. FREEDMAN:

11          Q.    Once it had been formed, it held rights?

12          A.    No.

13                    MS. MARKOE:  Objection.

14   BY MR. FREEDMAN:

15          Q.    When did it obtain rights?

16          A.    Again, I would need to look at the

17    accounts and records to say when rights were issued.

18          Q.    But at some point it held rights?

19          A.    Yes.

20          Q.    It held rights to Bitcoin?

21          A.    At some point it held rights to Bitcoin.

22          Q.    What does that mean?

23          A.    The term "rights" is defined in property

24    law rather succinctly.  Would you like me to start

25    quoting maybe Black's Law Dictionary on the nature of
```



Page 118

1    rights?

2         Q.    I would like you to tell me what was the

3    nature of the rights C01N held?

4              MS. MARKOE:  Objection.

5              THE WITNESS:  It had rights.  I do not

6    have the records.  I cannot read the exact stipulations.

7    BY MR. FREEDMAN:

8         Q.    So, in your own terms, describe to me

9    what C01N was able to do with its rights?

10             MS. MARKOE:  Objection.

11             THE WITNESS:  C01N cannot do anything.

12   It is a legal entity, which means by itself it cannot

13   actually do anything.  An individual, a person, needs to

14   direct and make things happen.

15   BY MR. FREEDMAN:

16        Q.    Yes, but they did so under the auspices

17   of C01N?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  Did what under the auspices

20   of C01N exactly, please?  Be specific.

21   BY MR. FREEDMAN:

22        Q.    Should C01N have exercised its rights --

23   strike that.  If an individual of the appropriate

24   authority directed C01N to exercise its rights to

25   Bitcoin, what could they have done with it?



Page 119

1                    MS. MARKOE:  Objection: calls for

2      speculation.

3                    MR. FREEDMAN:  You can answer.

4                    THE WITNESS:  If someone has rights to an

5      asset, they can do all sorts of things.  As a

6      speculative dive, someone with assets can destroy

7      assets, move assets, give them away.  So on a pure

8      speculative form in the way that you are asking this,

9      what could be done?  They could be made into a

10     charitable trust.  They could be shot into space as a

11     certain Tesla is believed to be up there.  They could be

12     given away to children's charities in Africa.

13     BY MR. FREEDMAN:

14           Q.    So, how much Bitcoin did C01N hold rights

15     over?

16                    MS. MARKOE:  Objection.

17                    THE WITNESS:  I would need to look at the

18     accounts.  I do not know off the top of my head.

19     BY MR. FREEDMAN:

20           Q.    Who has the accounts?

21           A.    I do not know.  It is a liquidated

22     company.  It has been closed.

23           Q.    So, where did the rights that C01N had

24     go?

25           A.    They have been moved.  I would need to



1    look at the individual records to say what transfers

2    have occurred.  What you are trying to ask is about

3    Mr. Kleiman.  Mr. Kleiman had no ownership in that

4    company at any point.  He no assets in that company.

5    Nothing of his ever transferred to that company, or out

6    of that company.  He had no shareholding.  He had no

7    employee nature.  There was no contracts with

8    Mr. Kleiman.  There was no depositing of assets, removal

9    of assets, there was nothing that he owned ever went

10   into it.  A cent of his money or more never was involved

11   with anything to do with it.  He did not pay for the

12   formation.  He was asked to, he did not, because he got

13   sick, and that never occurred.

14          Q.    Did W&K have any relationship with C01N?

15                MS. MARKOE:  Objection.

16                THE WITNESS:  No.

17   BY MR. FREEDMAN:

18          Q.    Did C01N ever mine Bitcoin?

19                MS. MARKOE:  Objection.

20                THE WITNESS:  No.

21   BY MR. FREEDMAN:

22          Q.    Was C01N ever audited by the ATO?

23          A.    I do not know how that would be possible.

24   If you are talking about C01N UK, then C01N UK is a

25   British entity.



Page 121

1          Q.     Was it ever audited?  A simple yes or no

2     suffices.

3          A.     I would not be able to answer that.

4     I have no idea how the Australian government could ever

5     audit a British company, and if they did it would not

6     involve me.

7          Q.     You told me there is a UK entity C01N and

8     an Australian entity C01N?

9          A.     And I was very specific because we were

10    talking about the UK entity, you had not switched back

11    to the Australian entity, and I answered saying the UK

12    C01N.

13         Q.     So the Australian C01N, did it ever mine

14    Bitcoin?

15              MS. MARKOE:  Objection.

16              THE WITNESS:  No.

17    BY MR. FREEDMAN:

18         Q.     Was the Australian C01N ever audited by

19    the ATO?

20         A.     Yes.

21         Q.     When did that audit begin?

22         A.     I do not have the records in front of me.

23    I cannot answer any of those details.

24         Q.     Where do those records exist?

25              MS. MARKOE:  Objection.



1                    THE WITNESS:  I have no idea, other than

2     the documents that have been handed to my lawyers.  That

3     is all I have.

4     BY MR. FREEDMAN:

5            Q.     Who were the directors of C01N?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  Again, I do not remember

8     which directors were directors at any particular time.

9     I do not do company secretarial.  I pay other people to

10    do company secretarial.  As such, other people,

11    including professional companies that were there doing

12    that, would know these things, not me.

13    BY MR. FREEDMAN:

14           Q.     Who are those companies, so we can reach

15    out to them?

16                    MS. MARKOE:  Objection.

17                    THE WITNESS:  If you look up the records

18    on ASIC you will see a record that notes a company.

19    I am not going to pay for the record for you to download

20    one that anyone can go and pay for.

21    BY MR. FREEDMAN:

22           Q.     Who owned C01N Australia when it was

23    founded?

24           A.     Again, I do not have the shareholding

25    structure in front of me.  I will not speculate on which



Page 123

1   particular company out of which one I set up was owned

2   in what way.

3           Q.     Who owned C01N UK when it was initially

4   set up?

5           A.     Again, I do not have the records in front

6   of me.  If you are asking about either of those having

7   anything to do with W&K or Dave, zero.  Dave owned zero

8   in either C01N, nothing, nada, null, blank.

9           Q.     Did either C01N UK or C01N Australia have

10  ownership over Bitcoin IP?

11          MS. MARKOE:  Objection.  He has already

12  responded this had nothing to do with Dave Kleiman.  You

13  have gotten some leeway into your questions about this

14  topic, and I am going to instruct him not to answer any

15  further questions about the assets of companies that had

16  nothing to do with Dave Kleiman or W&K.

17          MR. RIVERO:  It is just after one, and

18  I think we are wearing our court reporter out.  At a

19  good stopping point, let us take a break.

20          MR. FREEDMAN:  That is fine, we can stop

21  now.

22          THE VIDEOGRAPHER:  Going off the record.

23  The time is 13.02.  End of video card number 2, volume

24  1, in the video deposition of Dr. Craig Wright.

25          (Luncheon adjournment)



Page 124

1              THE VIDEOGRAPHER:  This is the beginning

2       of video card number 3, volume 1, in the video

3       deposition of Dr. Craig Wright.  Going on the record.

4       The time is 14.07.  Thank you.

5    BY MR. FREEDMAN:

6              Q.    Good afternoon, Dr. Wright.  Welcome

7       back.  I had one last question about C01N.  You were

8       referring me to ASIC.  Who has the non-public records of

9       C01N?

10             MS. MARKOE:  Objection.  You may answer.

11             THE WITNESS:  Anything that I do not have

12      in that pile, I do not know.

13   BY MR. FREEDMAN:

14             Q.    So if you did not give it to your

15      lawyers, you do not know where it is?

16             A.    I have no idea.

17             Q.    Whose idea was it to create Bitcoin?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  I have been working on this

20      since 1998.

21   BY MR. FREEDMAN:

22             Q.    So it was your idea?

23             A.    Other people have wanted to create

24      digital money beforehand.  Bitcoin differs in that

25      everyone wanted an anonymous cash system.  I made sure



Page 125

1    that it was a legal system.  I have had other ideas that

2    were different to create what is Bitcoin meant

3    blockchain and that required being different than things

4    like e-cash, in a completely different way.

5              Q.    When did you decide to go from working on

6    it to bringing it public?

7                    MS. MARKOE:  Objection.

8                    MR. FREEDMAN:  You can answer.

9                    THE WITNESS:  2008.

10   BY MR. FREEDMAN:

11             Q.    In 2008, did you believe what you were

12   doing would be successful?

13             A.    I had no idea.

14             Q.    Did you hope it would be successful?

15             A.    Of course you hope, or you would not work

16   on it otherwise.

17             Q.    Did you believe it would become a real

18   alternate currency?

19                   MS. MARKOE:  Objection.

20                   THE WITNESS:  I do not know; it is still

21   not a currency.  I hope.

22   BY MR. FREEDMAN:

23             Q.    Did you believe it would become a real

24   alternate method of exchange?

25                   MS. MARKOE:  Objection.



```
 1                    THE WITNESS:  I always hoped.

 2   BY MR. FREEDMAN:

 3         Q.    Do you recall reaching out to

 4   Louis Kleiman in February 2014?

 5         A.    I do not remember the exact date, but

 6   some time around then, yes.

 7         Q.    I am handing you what we can mark as

 8   Plaintiff's Exhibit 2.

 9   (Plaintiff's Exhibit 2 marked for identification)

10   This is docket entry 83-23.  Do you recognise the

11   e-mail on the second half of page 2?

12                    MS. MARKOE:  Objection.  You may answer.

13                    THE WITNESS:  I recognise the printout of

14   the e-mail.

15   BY MR. FREEDMAN:

16         Q.    And it says:  "Hello Louis, your son Dave

17   and I are two of the three key people behind Bitcoin."

18   Did you write that?

19         A.    I typed that.

20         Q.    Who is the third person?

21                    THE WITNESS: Is it one of those things?

22                    MS. MARKOE:  Okay.  Dr. Wright is not in

23   a position to answer that question.  He will provide a

24   fulsome explanation to the court in camera.

25                    MR. FREEDMAN:  Do we know the basis for
```



Page 127

1    refusing to answer?

2                    MS. MARKOE:  My understanding -- and he

3    will correct me if I am wrong -- is security.

4                    MR. FREEDMAN:  National security?

5                    MS. MARKOE:  Yes.

6                    MR. FREEDMAN:  Of which country?

7                    THE WITNESS:  In this particular case,

8    the USA.

9    BY MR. FREEDMAN:

10        Q.    Do you have a formal security clearance

11   from the USA?

12        A.    I am not going to be discussing any of

13   this stuff.

14                    MS. MARKOE:  Okay, so he will discuss

15   details regarding that in camera with the court, and the

16   court will make a determination as to what parts of that

17   he can answer, if any.

18   BY MR. FREEDMAN:

19        Q.    Is the third person still alive?

20        A.    I do not know.

21        Q.    Is the third person a member of the US

22   government?

23        A.    If I do not know if they are alive I do

24   not know if they are a member of the US government.

25        Q.    Were they ever a member of the US



Page 128

1   government?

2              MS. MARKOE:  If you can answer, answer.

3   If you cannot answer, then you will answer ----

4              THE WITNESS:  Yes.

5   BY MR. FREEDMAN:

6       Q.   What body of the government?

7              MS. MARKOE:  Answer until you feel that

8   you need to answer in front of the court ----

9              THE WITNESS:  I will leave that one for

10  the court.

11             MS. MARKOE: ---- in camera.

12  BY MR. FREEDMAN:

13      Q.   Was Dave aware of this third person's

14  involvement?

15             MS. MARKOE:  Objection.

16             THE WITNESS:  Again, I will leave that to

17  the court.

18  BY MR. FREEDMAN:

19      Q.   Was this third person aware of Dave's

20  involvement?

21      A.   Again, I am going to leave any of this to

22  the court.

23      Q.   Between 1998 and 2008, when you decided

24  to take Bitcoin public, who did you speak to about the

25  idea?



1          A.      The idea is a very wide topic.  Who did

2    I speak to between 1998 and 2008?  Apart from e-mails to

3    Wei Dai and others who were seemingly public, such as

4    Hal Finney and John MacDonald and Bear ----

5          Q.      I am sorry?

6          A.      Bear.

7          Q.      Bear?  Is that a first name or a last

8    name?

9          A.      That is his nickname.  Also Cryptonaut.

10   If you search up you will find who it is.  That is Ray.

11         Q.      Ray who, I am sorry?

12         A.      Do a search on big time talk and say the

13   name, but "Bear Cryptonaut", you will find it.

14         Q.      This is a user name?

15         A.      Yes.

16         Q.      And Cryptonaut and Bear are the same

17   people?

18         A.      Yes.

19         Q.      I apologise, because I did not catch

20   Bear, but I interrupted you.

21         A.      B-E-A-R.

22         Q.      Thank you.  Wei Dai, Hal Finney, John

23   MacDonald, Bear Cryptonaut; was there anyone else you

24   spoke to during that time?

25         A.      In a 20-year period there were lots of



Page 130

1    other people.

2           Q.     I am talking just about 10 years from

3    1998-2008?

4           A.     Yes.

5           Q.     Were there any others that you recalled,

6    besides these four?

7           A.     I discussed things with Allan Granger.

8           Q.     Who is Allan Granger?

9           A.     He is a former partner of BDO.

10          Q.     Is Mr. Granger still alive?

11          A.     Yes.

12          Q.     When did you contact Mr. Granger about

13   Bitcoin?

14          A.     I worked for Mr. Granger.

15          Q.     What time did those communications with

16   Mr. Granger take place?

17          A.     Between times when we were working

18   together.

19          Q.     So 2008?

20                 MS. MARKOE:  Objection.

21   BY MR. FREEDMAN:

22          Q.     When was the timeframe you worked at BDO?

23   Remind me, I forget.

24          A.     2005.

25          Q.     2005-2008.  Do you have contact



Page 131

1    information for Mr. Granger?

2          A.    I do not know.  I am not sure.  He is not

3    at BDO any more.  I do not know if he is still where he

4    was.

5          Q.    Does he still live in Australia?

6          A.    I have not talked to him in a couple of

7    years.

8          Q.    When was the last time you spoke to

9    Mr. Granger?

10         A.    2016, I believe.

11         Q.    At that time, was he living in Australia?

12         A.    Yes.

13         Q.    Do you have contact information for

14   Wei Dai?

15         A.    Just the e-mail.

16         Q.    Do you know that e-mail by heart?

17         A.    No.

18         Q.    Can you provide it to your lawyers?

19         A.    I will just do an internet search.

20         Q.    Do you have contact information for John

21   MacDonald?

22         A.    Again, I would do an internet search.

23         Q.    Do you have contact information for Bear?

24         A.    Again, I would do an internet search, and

25   he has not changed his address.



1          Q.     When you contacted Bear, did you contact

2      him as Dr. Craig Wright or in some alias?

3                 MS. MARKOE:  Objection.

4                 MR. FREEDMAN:  You can answer.

5                 THE WITNESS:  Both.

6      BY MR. FREEDMAN:

7          Q.     What method do you use to communicate

8      with Bear?

9          A.     Bitcointalk, IRC, e-mail.

10         Q.     Do you have any of those records still?

11         A.     Bitcointalk is public, IRC does not have

12     records, unless someone has captured them, and, no, I do

13     not have those e-mails, although some of them are still

14     available.

15         Q.     What was the user name on Bitcointalk

16     that you used?

17         A.     Satoshi.

18         Q.     Do you still have access to the Satoshi

19     account on Bitcointalk?

20                MS. MARKOE:  Objection.  You can answer.

21                THE WITNESS:  I have not tried logging in

22     in a long time.

23     BY MR. FREEDMAN:

24         Q.     Do you have the old credentials?

25         A.     I have not even looked whether I would.



Page 133

1          Q.      Where would they be, if you had them?

2          A.      Most likely in my head.

3          Q.      Can you look now and tell me if they are

4     there?

5          A.      I would need to try and see if I do not

6     log myself out.  I have used a lot of passwords in the

7     past and I can remember some of  the mnemonics from some

8     of them.  Have I tried: no; would I want to: no.

9          Q.      Did anyone else have access to the

10    Satoshi account on Bitcoin.com?

11                 MS. MARKOE:  Objection.

12                 MR. FREEDMAN:  Sorry, Bitcointalk, is it?

13                 THE WITNESS:  Bitcointalk.  Yes.

14    BY MR. FREEDMAN:

15         Q.      Who else had access?

16         A.      Dave.

17         Q.      When did Dave have access to the Satoshi

18    account?

19         A.      The exact set-up time, I do not remember,

20    but we stopped using it in December 2010.

21         Q.      Why did you stop using it in December

22    2010?

23         A.      I was disillusioned with Bitcoin and

24    I needed to test whether I had completely fucked up.

25         Q.      So did you have a conversation with Dave?



1   How did you mutually come to the agreement not to use it

2   any more?

3               MS. MARKOE:  Objection:  mischaracterises

4   the testimony.

5               MR. FREEDMAN:  You can answer.

6               THE WITNESS:  It was my account, so there

7   is no -- should not be used any more.  Did I go off and

8   stop interacting: yes.  A number of things had occurred.

9   WikiLeaks, Silk Road and a number of other dark websites

10  were starting to be created.  The reason I created

11  Bitcoin was to ensure a form of money that had an

12  evidence trail stopped all that.  And what I saw was my

13  creation being used for everything I hated and nothing

14  valid at the time, and I thought I had failed.

15  BY MR. FREEDMAN:

16          Q.    Did Dave share this  disappointment?

17               MS. MARKOE:  Objection.

18               MR. FREEDMAN:  You can answer.

19          A.    No.  Dave was the reason I kept going.

20  BY MR. FREEDMAN

21          Q.    Did you ask Dave to stop -- strike that.

22  Did Dave ever communicate with the Satoshi account on

23  Bitcointalk?

24               MS. MARKOE:  Objection.

25               MR. FREEDMAN:  You can answer.



```
 1                    THE WITNESS:  You are asking, did he

 2    communicate with the account?

 3    BY MR. FREEDMAN:

 4         Q.    Did he ever write a post?  Did he ever

 5    send a message as Satoshi?

 6                    MS. MARKOE:  Objection.

 7                    THE WITNESS:  That is a different

 8    question again.  Did he send a message as Satoshi is not

 9    did he answer on the Bitcoin account.

10    BY MR. FREEDMAN:

11         Q.    You are right.  Bad question. Strike it.

12    Did Dave ever post as Satoshi on the Bitcointalk forum?

13         A.    No.

14         Q.    Did Dave ever send a message as Satoshi

15    on the Bitcointalk forum?

16         A.    No.

17         Q.    What did Dave do with his access?

18                    MS. MARKOE:  Objection.

19                    THE WITNESS:  He checked what I was

20    doing.

21    BY MR. FREEDMAN:

22         Q.    Why did you give Dave access to the

23    Bitcointalk Satoshi account?

24         A.    Because I can be hot-headed.

25         Q.    And?
```



Page 136

1           A.     Dave is -- Dave was a rambunctious bugger

2    at times too, but Dave did the e-mail rule of reread

3    before you send.

4           Q.     So how did his access facilitate that?

5           A.     He cut out a whole lot of stupid things

6    that I would have sent to people.

7           Q.     So he edited the communications before

8    you sent them?

9                  MS. MARKOE:  Objection.

10                 THE WITNESS:  Not all, some.

11   BY MR. FREEDMAN:

12          Q.     Did you have a process in place where you

13   would draft responses, he would review  it and then you

14   would send it?

15                 MS. MARKOE:  Objection.

16                 THE WITNESS:  No, there was no formal

17   anything like that.

18   BY MR. FREEDMAN:

19          Q.     How did he see what you were going to

20   send to edit it?

21                 MS. MARKOE:  Objection.

22                 THE WITNESS:  If you have an account you

23   can see things.

24   BY MR. FREEDMAN:

25          Q.     You would save drafts?



Page 137

1            A.    If I was annoyed, I was able to contact

2     him and say I was annoyed before I sent something.

3            Q.    Did there come a time in December 2010

4     you asked Dave to stop using the account?

5                  MS. MARKOE:  Objection.

6                  THE WITNESS:  No.

7     BY MR. FREEDMAN:

8            Q.    You just never called him to log into the

9     account again?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  No.

12    BY MR. FREEDMAN:

13           Q.    So, do you know if he stopped logging in?

14           A.    No one was logging in.

15           Q.    How do you know that he was not logging

16    in?

17           A.    The account has account details.  You can

18    log in and have a look at those if you want.

19           Q.    Do those account details exist today?

20           A.    Yes.

21           Q.    Are those public?

22           A.    Yes.

23           Q.    Did anyone else have access to the

24    Satoshi account at Bitcointalk?

25           A.    Yes.



1          Q.     Who else?

2          A.     It's run on a common forum, so

3    administrators, whatever else, could have gained access.

4          Q.     Administrators could view the private

5    account of Satoshi?

6                 MS. MARKOE:  Objection.

7                 THE WITNESS:  A Google administrator

8    could view Google e-mail from anyone.  Whether they get

9    fired for doing it is another question.  You said

10   "could".

11   BY MR. FREEDMAN:

12         Q.     Who were the administrators of Bitcoin --

13   strike that.  Whose idea was it to write the Bitcoin

14   white paper?

15         A.     Mine.

16         Q.     When did you begin drafting the Bitcoin

17   white paper?

18         A.     2002.

19         Q.     Did you speak with anybody about the

20   Bitcoin white paper?

21                MS. MARKOE:  Objection.

22                THE WITNESS:  Yes, I have spoken to

23   people about the Bitcoin white paper.  I was on a call

24   last night doing just that.

25   BY MR. FREEDMAN:



1          Q.      Did you send a draft of the Bitcoin white

2     paper to anyone from 2002 until 2007?

3                  MS. MARKOE:  Objection.

4                  THE WITNESS:  It was not complete at that

5     stage.

6     BY MR. FREEDMAN:

7          Q.      But did you share any form of any draft

8     of the white paper from 2002 until 2007?

9          A.      Yes.

10         Q.      With who?

11         A.      The Australian government.

12         Q.      How did you share it with the Australian

13    government?

14         A.      I sought funding from ITOL.

15         Q.      From, I am sorry?

16         A.      I-T-O-L.

17         Q.      What does that stand for?

18         A.      Off the top of my head, I have no idea.

19    It has been a long time.

20         Q.      Do you have the records of that

21    submission?

22         A.      Some exist, yes.

23         Q.      Do you have them?

24         A.      I know they are on ITOL.

25         Q.      Is ITOL publicly available?



Page 140

1          A.      No.

2          Q.      Can you request them from ITOL?

3          A.      I do not know.  I have not done that.

4          Q.      Did you get the funding?

5          A.      No.

6          Q.      Why not?

7                  MS. MARKOE:  Objection:  foundation.

8                  THE WITNESS:  The government decided not

9     to fund it.

10    BY MR. FREEDMAN:

11         Q.      Did you share the white paper with anyone

12    else from 2002-2007?

13         A.      Other people had helped me.

14         Q.      Who?

15         A.      In parts, I do not know.  I have talked

16    to many people in the past.  There are bits of things

17    that I have given over.  I cannot remember all the

18    details of that.

19         Q.      Do you remember anyone?

20         A.      In whole, no.

21         Q.      What do you mean "in whole"?

22         A.      You asked me if I have sent paragraphs to

23    people and things like this.

24         Q.      Who did you send paragraphs to?

25                 MS. MARKOE:  Objection.  Vel, I would ask



1    that you limit your questions to the timeframe of this

2    litigation, which begins, I think per your request, in

3    2006 or 2007.  So, anything prior to those years are

4    irrelevant, and beyond the scope.  I will instruct the

5    witness not to answer.

6    BY MR. FREEDMAN:

7         Q.    In 2006, did you share drafts of the

8    white paper with anyone?

9         A.    I do not know.  I discussed it.

10        Q.    Who did you discuss it with?

11        A.    I discussed some of the concepts that

12   became Bitcoin with Allan Granger, with Stefan Matthews,

13   with a person called Joseph Vaughn Perling.

14        Q.    How did you make those ----

15             MR. RIVERO:  He has not finished.

16             THE WITNESS:  Michael Shehadie.

17             MR. FREEDMAN:  Can you spell that for me.

18             THE WITNESS:  No.  S-H-E-H-A-D-I-E,

19   I believe, but quote me, it could have more Hs!

20   BY MR. FREEDMAN:

21        Q.    Anyone else?

22        A.    Yes, I am thinking, sorry.  (Pause)

23   Sorry, I just need to -- it has been a long time. A

24   person from the Australian Federal Police, I cannot

25   remember his name, he is in the financial crime



1    division.

2                    MR. RIVERO:  Can I ask for the court

3    reporter, is Mr. Granger's first name Allan or Allen, if

4    you know?

5                    THE WITNESS:  It is an AN, not an EN, but

6    I cannot remember off the top of my head whether it is a

7    LL or a single L.

8    BY MR. FREEDMAN:

9           Q.    Is there anyone else?

10          A.    Yes, but I cannot remember.  I know there

11   were a couple of people that I spoke to when I was doing

12   some financial crime work with BDO, and it was loosely

13   about not Bitcoin but the topics in there and I cannot

14   remember their name off the top of my head.

15          Q.    You showed these individuals drafts of

16   the white paper?

17          A.    I had shown them aspects.

18          Q.    Aspects.  How did you share aspects of

19   the white paper with Joseph Vaughn Perling?

20          A.    Exactly how I do not remember.  I met him

21   in person, exactly where back then I cannot remember.

22   It has been a long time.  I have been to a lot of

23   conferences, I do not remember each one.  I think other

24   people remember more than I do, because, as I said, I go

25   to so many conferences each month that when you are



1   asking me more than 10 years ago, I do not remember

2   which particular conference or which particular paper.

3          Q.     How did you ----

4          A.     Likely on a tablet.

5          Q.     How did you share portions of the white

6   paper with Michael Shehadie?

7          A.     He is my lawyer.

8          Q.     Okay.  Where does he work?

9          A.     Australia.

10          Q.     What law firm?

11          A.     Michie Shehadie and Co.

12          Q.     Without revealing anything about your

13   discussions between yourself and Mr. Shehadie, why did

14   you discuss it with him?

15                 MS. MARKOE:  Objection.  If you can

16   answer that question without revealing the contents and

17   legal purpose of your communication with him, then do

18   so.  If you cannot then I would instruct you not to

19   answer.

20                 THE WITNESS:  It was all to do with legal

21   stuff.

22   BY MR. FREEDMAN:

23          Q.     Did you ever consider patenting the white

24   paper?

25          A.     Yes.



Page 144

1          Q.      When did you consider patenting the white

2    paper?

3                  MS. MARKOE:  Objection.  I think we are

4    sort of getting beyond, again, the topics.  This is a

5    limited deposition.  Can you please explain to me how

6    that question relates to any one of these topics.

7                  MR. FREEDMAN:  It has to do with -- well,

8    my next question was going to be, if it was Dave's idea

9    to patent it ----

10                 MS. MARKOE:  I am asking about this

11   question, I am not asking about the next question.

12                 MR. FREEDMAN:  Zaharah, I do not have

13   time, so either instruct him not to answer or object.

14   Choose.

15                 MR. RIVERO:  We are asking you to connect

16   it up to the topics, and that is a fair question.

17   Connect it up if you have another question.

18                 MR. FREEDMAN:  It has to do with quickly

19   details surrounding Craig and Dave's partnership to

20   create Satoshi Nakamoto.

21                 MR. RIVERO:  Ask the question that makes

22   the connection of a predicate to why this is relevant.

23   We are not trying to stop you.  Go ahead.

24                 MR. FREEDMAN:  I am not going to do it.

25         Q.      When did you contemplate patenting the



Page 145

1   white paper?

2               MS. MARKOE:  Objection.  You can answer.

3               THE WITNESS:  I considered patenting

4   Bitcoin in 2002.

5   BY MR. FREEDMAN:

6        Q.    Did you consider patenting it in 2008?

7               MS. MARKOE:  Objection.

8               THE WITNESS:  I considered patenting it

9   in 2007, but not in 2008.

10  BY MR. FREEDMAN:

11       Q.    When did Dave first become involved with

12  the white paper?

13       A.    2008.

14       Q.    Why did you decide not to patent Bitcoin?

15              MS. MARKOE:  Objection.

16              THE WITNESS:  Because ----

17              MS. MARKOE:  How does this relate in any

18  way to any purported partnership between Dave and

19  Dr. Wright?

20              MR. FREEDMAN:  I do not yet know the

21  answer.  Once I know I will let you know.

22              MS. MARKOE:  You have to actually

23  establish any sort of connection between the limited

24  topics.  I am giving you leeway here but this is not a

25  merits deposition on every topic that you want to ask



Page 146

1   about.  It is a limited deposition on ten specific

2   topics.  I have given you plenty of leeway but if you

3   cannot connect how a particular question, after that

4   leeway, relates to one of these topics then I will

5   instruct the witness not to answer.

6   BY MR. FREEDMAN:

7          Q.    Did you speak to anyone about patenting

8   Bitcoin?

9                MS. MARKOE:  Objection.  Do not answer

10  that.

11               THE WITNESS:  Lawyers.

12  BY MR. FREEDMAN:

13         Q.    Did you speak to anyone besides lawyers?

14               MS. MARKOE:  Objection.  Do not answer

15  that, except as it relates to Dave Kleiman.

16               MR. RIVERO:  Can you answer that, as

17  instructed by Ms. Markoe.

18               THE WITNESS:  No relation to Mr. Kleiman,

19  only to do with lawyers.

20  BY MR. FREEDMAN:

21         Q.    When did Dave become involved in the

22  white paper?

23               MS. MARKOE:  Objection: asked and

24  answered.

25               THE WITNESS:  2008.



1  BY MR. FREEDMAN:

2          Q.     How did he become involved with the white

3  paper?

4          A.     That is a rather wide question.  How do

5  you -- sorry, how do you become involved with the white

6  paper?  Can you clarify that a bit please?

7          Q.     How did Dave find out about the white

8  paper?

9          A.     You have already given me an e-mail that

10  I have sent.  The white paper was not public before

11  that, so ----

12          Q.     Did you attach the white paper to that

13  e-mail?

14          A.     No.

15          Q.     So how did he obtain the white paper?

16          A.     It was put online.

17          Q.     When was it put online?

18          A.     2008.

19          Q.     Where was it put online?

20          A.     A server in Melbourne upload.ae.

21          Q.     How did he find the location of the white

22  paper?

23                 MS. MARKOE:  Objection.  You can answer

24  if you understand the question.

25                 THE WITNESS:  How did he find it?  Well,



Page 148

1   he typed in a link into a browser and it magically came

2    from the ether of the internet.

3   BY MR. FREEDMAN:

4        Q.    And he magically found out about the

5    hyperlink?

6              MS. MARKOE:  Objection:  argumentative.

7              MR. FREEDMAN:  Withdrawn.

8        Q.    How did he find the specific URL he was

9    supposed to type in?

10       A.    As I have been saying, we discussed

11   things over IRC.

12       Q.    Did you give him the address over IRC?

13       A.    Yes.

14       Q.    When did that take place?

15       A.    Shortly after that e-mail.

16       Q.    Why did you e-mail him the initial

17   communication and follow up with IRC?

18             MS. MARKOE:  Objection: compound.

19             MR. FREEDMAN:  You can answer.

20             THE WITNESS:  I sent him that original

21   e-mail because I wanted his help.  I then followed up

22    because I would chat with him live over IRC.

23   BY MR. FREEDMAN:

24       Q.    How long was the Bitcoin white paper when

25    you contacted Dave in 2008?



1            MS. MARKOE:  Objection.  You can answer

2    if you can.

3            THE WITNESS:  The same length as it is

4    now, approximately.

5    BY MR. FREEDMAN:

6        Q.    Why did you reach out for Dave's help

7    about the white paper?

8            MS. MARKOE:  Objection.  You can answer.

9            THE WITNESS:  I was not so much asking

10   for his help about the white paper.

11   BY MR. FREEDMAN:

12       Q.    What were you reaching out for?

13       A.    His help in other ways.

14       Q.    What were the ways you were seeking Dave

15   Kleiman's help?

16       A.    I am not a likeable person.  Dave was.

17   I put people off.  I care about my business, my work, my

18   maths, my papers, my patents, and not much more, so

19   unfortunately dealing with people and dealing with

20   people in open source communities is something I am

21   very, very bad at.

22       Q.    This was something Dave was good at?

23       A.    That is something Dave could help me

24   with.

25       Q.    Did he help you with that?



Page 150

1            MS. MARKOE:  Objection.  You can answer.

2            THE WITNESS:  Dave has helped me with

3    that many times in the past.  The e-mail that you are

4    referencing, I believe I saw the defamation and whatever

5    is the title.

6            MS. MARKOE:  Exhibit 1.  I believe it is

7    right in front of you.

8            THE WITNESS:  "Defamation and the

9    difficulties of law on the Internet".  Around the same

10   time I was having other troll fights as I have had many

11   times, and Dave helped there as well.

12   BY MR. FREEDMAN:

13       Q.    Why did Dave need to review the white

14   paper to help you interact with open source communities?

15           MS. MARKOE:  Objection.  You may answer.

16           THE WITNESS:  Dave was not the only

17   person who reviewed the white paper.

18   BY MR. FREEDMAN:

19       Q.    Who else reviewed the entire white paper,

20   as uploaded to upload.ae?

21           THE WITNESS:  I do not know.

22           BY MS. MARKOE:  Objection.

23   BY MR. FREEDMAN:

24       Q.    Who else did you give the upload.ae

25   address to?



Page 151

1          A.      It was put on a public mailing list.

2          Q.      Which public mailing list?

3          A.      The cryptography mailing list, it was put

4    on the Usenet sites.  It was in an IRC chat group.  It

5    was sent to Wei Dai.  It was sent to Adam Back.

6          Q.      Did Dave put it on the cryptography

7    mailing list?

8          A.      No.

9          Q.      Who did?

10         A.      Me.

11         Q.      Did Dave put it on IRC?

12         A.      Yes.

13         Q.      Was there a chat on IRC?

14         A.      There were multiple chats on IRC.

15         Q.      Do you remember the chats he put them on?

16         A.      You have not used IRC, have you?

17         Q.      I have not.

18         A.      I suggest you look at how IRC works and

19   then you will see why I am sighing when you ask that.

20         Q.      Did Dave send it to Adam Back?

21                 MS. MARKOE:  Objection.

22                 THE WITNESS:  No.

23   BY MR. FREEDMAN:

24         Q.      Who did?

25         A.      I already said.



Page 152

1          Q.     I missed it.  Can you repeat it?

2          A.     Me.

3          Q.     When did you send it to Adam Back?

4                 MS. MARKOE:  Objection.  You may answer.

5                 THE WITNESS:  2008.

6    BY MR. FREEDMAN:

7          Q.     Did Adam Back comment on the white paper?

8                 MS. MARKOE:  Objection.  You are getting

9    beyond the scope again.

10                MR. FREEDMAN:  Okay.

11                MS. MARKOE:  So, I would instruct the

12   witness not to answer.  You are going beyond the scope.

13   BY MR. FREEDMAN:

14         Q.     Did Dave interact with Adam Back?

15                MS. MARKOE:  Objection:  foundation.  You

16   can answer.

17                THE WITNESS:  Yes.

18   BY MR. FREEDMAN:

19         Q.     Did Dave interact with Adam Back about

20   the white paper?

21                MS. MARKOE:  Objection.  If you know.

22                THE WITNESS:  I do not know exactly what

23   Dave wrote.  I am not Dave.

24   BY MR. FREEDMAN:

25         Q.     How do you know that Adam Back



1   communicated with Dave?

2              MS. MARKOE:  Objection:  mischaracterises

3   the testimony.

4              MR. FREEDMAN:  You can answer.

5              THE WITNESS:  I spoke with Dave.

6   BY MR. FREEDMAN:

7         Q.    And what did Dave say about Adam Back?

8              MS. MARKOE:  Objection.

9              THE WITNESS:  Do I have to say it?

10             MR. RIVERO:  Yes, go ahead.

11             MS. MARKOE:  Just answer.

12             THE WITNESS:  He said something along the

13   lines of, to characterise what you bloody Aussies say,

14   he is a wanker and we got the wrong person.

15   BY MR. FREEDMAN:

16        Q.    What did he mean by saying you have the

17   wrong person?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  Hal Finney wrote the R

20   proof of work code that I used as a basis, not Adam.

21   BY MR. FREEDMAN:

22        Q.    Did you confuse the R proof of work code

23   as having been authored by Adam Back?

24             MS. MARKOE:  Objection.  You can answer.

25             THE WITNESS:  I did not check.  I chucked



Page 154

1    in a reference after doing a quick search.  The work by

2    Aurora et al had been implemented by a site I saw

3    referenced as Adam Back.  I put that down.  I did not

4    check that that did not actually work, and that it was

5    Hal Finney who actually fixed it and had it working.

6    BY MR. FREEDMAN:

7         Q.    Did Dave have any further interactions

8    with Adam Back about the white paper that you are aware

9    of?

10         MS. MARKOE:  Objection.  You can only

11   state stuff that you know.

12         THE WITNESS:  I do not know.

13   BY MR. FREEDMAN:

14         Q.    Did Dave reach out to Hal Finney about

15   the R proof of work?

16         MS. MARKOE:  Objection:  foundation.

17   BY MR. FREEDMAN:

18         Q.    Withdrawn.  Do you know whether Dave he

19   reached out to Hal Finney about the R proof of work

20   code?

21         A.    No, he would not need to reach out to

22   Hal Finney.

23         Q.    Why not?

24         A.    Because Hal Finney reached out to us.

25         Q.    How did Hal Finney reach out to you and



Page 155

1    Dave?

2                        MS. MARKOE:  Objection.

3                        MR. FREEDMAN:  You can answer.

4              A.      He talked over public forums, IRC and

5    e-mail.

6    BY MR. FREEDMAN:

7              Q.      What did he say, in his initial

8    communication?

9                        MS. MARKOE:  Objection.

10                       THE WITNESS:  He thought Bitcoin could

11   work but there would be a few problems.

12   BY MR. FREEDMAN:

13             Q.      Did you and Dave work on those problems?

14                       MS. MARKOE:  Objection: assumes facts not

15   in evidence.

16                       MR. FREEDMAN:  You can answer it.

17                       THE WITNESS:  There were no problems.

18   Actually ----

19   BY MR. FREEDMAN:

20             Q.      Hal Finney was wrong?

21             A.      There were problems but not the problems

22   he was stating.  So, yes, Hal Finney was wrong.

23             Q.      What were the problems Hal Finney thought

24   were with the protocol?

25                       MS. MARKOE:  Objection: relevance.  This



Page 156

1    is now again, you are getting beyond the scope.  I am

2    going to ask him not to answer that question.

3    BY MR. FREEDMAN:

4         Q.    Do you maintain any of the correspondence

5    with Hal Finney back in 2008?

6         A.    No.

7         Q.    Did Dave edit the white paper?

8         A.    A few people edited the white paper,

9    including Dave.

10        Q.    What were Dave's edits to the white

11   paper?

12        A.    I do not exactly remember.  There were

13   six different versions.

14        Q.    Sorry?

15        A.    There were six different versions.

16        Q.    When did version 1 come out?

17              MS. MARKOE:  Objection.

18              THE WITNESS:  2002.

19   BY MR. FREEDMAN:

20        Q.    When did version 2 come out?

21              MS. MARKOE:  Objection.

22              THE WITNESS:  I do not remember the exact

23   dates of all of these.

24   BY MR. FREEDMAN:

25        Q.    Do you recall when version 3 came out?



```
 1                   MS. MARKOE:  Objection.
 2                   THE WITNESS:  Again, I do not remember
 3     all of it.  I had multiple versions, all simultaneously
 4     running.  If you ask any of my staff, my document
 5     management is shit.  I save and then update the old
 6     version sometimes and then go back to the first one.
 7     I then re-edit a later one.  I have people bitch at me
 8     and I have been banned from document management
 9     altogether by my staff, who have basically just about
10     threatened to walk out if I am allowed to touch a
11     document ever again.
12  BY MR. FREEDMAN:
13          Q.    Did Dave help you keep track of the six
14     different versions of the white paper?
15                   MS. MARKOE:  Objection.
16                   THE WITNESS:  No; hence why it was a
17     fucking mess.
18  BY MR. FREEDMAN:
19          Q.    How did you compile all versions into
20     one?
21                   MS. MARKOE:  Objection.
22                   THE WITNESS:  I did not.
23  BY MR. FREEDMAN:
24          Q.    Who did?
25          A.    Nobody.
```



Page 158

1          Q.      So how did you get the final version?

2          A.      The same way I do every single time,

3     I finish up a version.

4          Q.      Which is the version that is public?

5                  MS. MARKOE:  Objection.

6                  THE WITNESS:  It is the one that is still

7     public as the Bitcoin white paper.

8     BY MR. FREEDMAN:

9          Q.      Of the six, which one was that?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  Exactly where each bit

12    came, I could not answer.

13    BY MR. FREEDMAN:

14         Q.      If you had a copy of the white paper in

15    front of you, would it help identify Dave's

16    contributions?

17         A.      No.  More than anything else, what Dave

18    helped me with was, it is like legal things.  I have

19    been an expert witness many, many times, and that is way

20    easier than being your own witness.  There is no emotion

21    in talking about someone else's things.  It is easy to

22    make mistakes when you are doing your own thing.  And it

23    is critical to get rid of the metadata.  If you want to

24    not be found, not have something point back, then it is

25    absolutely critical to strip anything that can identify



1    a document.  Dave was also very good at that.  Dave

2    helped double-check that all the PDFs, etcetera, had

3    nothing to tie anything back.

4         Q.    Was there anyone else besides Dave that

5    you could have used to do those two functions?

6              MS. MARKOE:  Objection.

7              THE WITNESS:  I believe there is a world

8    full of editing services, so if you are saying anyone

9    could do that, then of course there are.  There are

10   commercial companies, but then if I am going to someone

11   and going, "Hey, I have this supersecret document that

12   I want you to sort of sit on", it does not work too

13   well.

14   BY MR. FREEDMAN:

15        Q.    Was there anyone you could trust to keep

16   it secret and who had these abilities besides Dave?

17             MS. MARKOE:  Objection.

18             MR. FREEDMAN:  You can answer.

19             THE WITNESS:  Yes.

20   BY MR. FREEDMAN:

21        Q.    Who?

22        A.    I have a lot of friends in the computer

23   forensics industry.

24        Q.    Why did you not use them?

25             MS. MARKOE:  Objection.



1                   THE WITNESS:  Because I asked Dave.

2    BY MR. FREEDMAN:

3         Q.     Was it because Dave was your best friend?

4         A.     In part, yes.

5         Q.     I want to direct your attention back to

6    Plaintiff's Exhibit 1, which is the 2008 e-mail.  When

7    did you settle on the name Bitcoin?

8                   MS. MARKOE:  Objection.  You can answer.

9                   THE WITNESS:  I thought about the name

10   Bitcoin for a while.  It was actually B-i-t-C-o-i-n,

11   which I got a lot shit for.  I believed we discussed

12   that sort of thing when naming.  Other people over here

13   in Britain seemed to like to capitalising in the middle

14   of things.  Americans think I am stupid for doing it.

15   BY MR. FREEDMAN:

16        Q.     So Dave eventually talked you into not

17   capitalising the C?

18                  MS. MARKOE:  Objection: mischaracterises

19   the testimony.

20                  THE WITNESS:  No, it was capitalised in

21   many places.

22   BY MR. FREEDMAN:

23        Q.     Did Dave prefer BitCash or Bitcoin?

24                  MS. MARKOE:  Objection.  You can answer.

25                  THE WITNESS:  Bitcoin.



Page 161

1    BY MR. FREEDMAN:

2              Q.     Did Dave prefer capital C or lower case

3    C?

4                     MS. MARKOE:  Objection.

5                     THE WITNESS:  Dave was American.

6    BY MR. FREEDMAN:

7              Q.     He liked lower case C?

8              A.     Yes.

9              Q.     Did you ultimately decide on a version?

10             A.     No, I used both.

11             Q.     When you sent this file to Ira, where did

12   you get the actual file from?

13                    MS. MARKOE:  Objection.

14                    THE WITNESS:  Which file?

15                    MS. MARKOE:  Are you referring to a

16   different e-mail or Exhibit 1?

17                    MR. FREEDMAN:  We are still on Exhibit 1.

18             Q.     When you sent Exhibit 1 to Ira, where did

19   you get the e-mail from to send to Ira?

20             A.     That would have been on our server.

21             Q.     Which server is "our" server?

22             A.     The company at the time.  That was

23   Hotwire, I believe.  We are talking about Hotwire time,

24   so it would have been on a Hotwire server.

25             Q.     Do you still have access to Hotwire



Page 162

1    servers?

2         A.    It does not exist.

3         Q.    Does anyone still have access to Hotwire

4    servers?

5         A.    I do not know.

6         Q.    Are you aware of anyone who has access to

7    a Hotwire server?

8         A.    No, I am not.  Actually, strike that, it

9    is possible that there are copies, because we had a

10   member of staff who stole information, but I do not know

11   whether they have it still or not.

12        Q.    What are the names of the staff that

13   stole information?

14             MS. MARKOE:  Objection.

15             MR. FREEDMAN:  Potential witnesses,

16   Zaharah.

17             MS. MARKOE:  I did not instruct him not

18   to answer.  Are you objecting to my objections now?

19             MR. FREEDMAN:  I am anticipating.

20             THE WITNESS: I would need to double-check

21   that.  I do not want to go on record defaming someone

22   who has not been formally charged or anything like this.

23   BY MR. FREEDMAN:

24        Q.    I understand that it is not confirmed,

25   but who do you recall at the moment as being those



1   witnesses?

2                 MS. MARKOE:  Objection.  You can answer,

3   if you can.

4                 THE WITNESS:  I am trying to remember his

5   name.  There were two people in particular.  Both of

6   them were systems engineers.  I really do not remember

7   their names.

8   BY MR. FREEDMAN:

9         Q.    How would you look them up to confirm

10  them?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  I would not.

13  BY MR. FREEDMAN:

14        Q.    Is there any way to find out their names?

15        A.    I am sure there is.

16        Q.    Are you aware of any way to find out

17  their names?

18        A.    One can do lots of searches for a start.

19  I mean, there is lots of stuff about me, my company,

20  people complaining, liquidation documents, etcetera, all

21  on the internet, that would list all the staff.

22        Q.    Are the names of these two staff members

23  and their potential taking of information publicly

24  available?

25                MS. MARKOE:  Objection.  You can answer.



Page 164

1                THE WITNESS:  If you consider public

2    includes liquidation files that would be publicly

3    available, then yes.

4    BY MR. FREEDMAN:

5           Q.     What liquidation files would have these

6    two ----

7           A.     Hotwire.

8           Q.     Would Ms. Watts know the name of these

9    two individuals?

10               MS. MARKOE:  Objection.

11               THE WITNESS:  I am not going to bring

12   anything about my wife into this.  I am not going to

13   answer anything about my wife's state of mind, my wife's

14   anything.  I have already noted that my family is

15   something I will not touch.

16   BY MR. FREEDMAN:

17          Q.     Was Ms. Watts involved with Hotwire?

18               MS. MARKOE:  Objection.

19               THE WITNESS:  You can check those

20   records.

21   BY MR. FREEDMAN:

22          Q.     How?

23          A.     They are public.

24          Q.     Are all of Hotwire's records are public?

25               MS. MARKOE:  Objection:  mischaracterises



1    the testimony.

2    BY MR. FREEDMAN:

3         Q.    Are all of Hotwire's records public?

4         A.    No.

5         Q.    When did you decide to start programing

6    the Bitcoin protocol?

7         A.    Can you be a bit more specific about what

8    you are saying there.  That is actually a wider question

9    and more nebulous than you seem to think.

10        Q.    When did you start writing the code that

11   became the Bitcoin protocol?

12        A.    Again, do you mean the node software?

13        Q.    When I say "Bitcoin protocol", what does

14   that mean to you?

15        A.    Bitcoin protocol is a set of rules that

16   nodes will interact by.  It will be not things like

17   block size, but rather the real sets that allow a

18   transaction signed, and not settled, to chain now to be

19   valid in 20-year time.  So, it is like the internet

20   protocol itself has a set of rules as well as

21   structures.  So things can happen within protocols but

22   also be dictated differently in rules.  For instance,

23   the limitation of HTML for Apple and Microsoft, although

24   on the same protocol, have different rule sets.  That

25   could be constructed such that the rules for one miner



Page 166

1    would allow something to be offered or rejected, but a

2    protocol would be the same for all systems and nodes.

3          Q.    If going forward I use the word "Bitcoin"

4    protocol to refer to all of those things, will you

5    understand what I mean?

6                MS. MARKOE:  Objection.

7                THE WITNESS:  No.

8    BY MR. FREEDMAN:

9          Q.    What is the way I should refer to the

10   code and programing that became the Bitcoin client?

11         A.    If you were talking about the original

12   one then I would say the node software.

13         Q.    When did that turn into something besides

14   the node software?

15               MS. MARKOE:  Objection.

16               THE WITNESS:  When did what turn into

17   something?

18   BY MR. FREEDMAN:

19         Q.    Going forward, if I use the word "node"

20   software, would you understand that to mean the computer

21   protocols and codes that people downloaded and used to

22   mine and use Bitcoin?

23               MS. MARKOE:  Objection.

24               THE WITNESS:  In the original version?

25   BY MR. FREEDMAN:



1          Q.      In the original version.

2          A.      So we are talking the Satoshi client,

3     yes.

4          Q.      The Satoshi client.  That was made public

5     in 2009?

6          A.      In some parts it was actually made public

7     in, as early -- the first distribution was August 2008.

8          Q.      So before we get there, when did you

9     decide to start writing that node software, the Satoshi

10    client?

11         A.      In 2002.

12         Q.      How did you make it public in August of

13    2008?

14         A.      It was given to a few people.

15         Q.      Who was it given to?

16         A.      Parts were given to Wei Dai.

17         Q.      Wei Dai, is that his legal name or is

18    that a screen name?

19         A.      I have never really asked.  He publishes

20    papers under that.  So he could be a pseudonym like me,

21    but the thing is he has worked for companies under that.

22    I believe that is his real name.  I have never

23    physically -- actually, I have met him once, but that

24    was in the '90s, and I did not ask whether he used a

25    pseudonym or not.



Page 168

1          Q.     Who else besides Wei Dai?

2          A.     In August, there were other people, I do

3     not remember the names.

4          Q.     Did you give it to Dave in August?

5          A.     No.

6          Q.     When did Dave first receive it?

7          A.     May, end of, beginning of June.

8          Q.     May/June of 2008?

9          A.     Yes.

10         Q.     What did Dave do to develop the Satoshi

11    client?

12                MS. MARKOE:  Objection:  foundation.

13                THE WITNESS:  Dave did not develop the

14    Satoshi client.

15    BY MR. FREEDMAN:

16         Q.     Did Dave edit the Satoshi client code at

17    all?

18         A.     It is an open source project.

19         Q.     Prior to it becoming public -- strike

20    that.  When did the Satoshi client become publicly

21    available to everyone?

22                MS. MARKOE:  Objection: vague.

23                THE WITNESS:  I am sorry, "everyone" is

24    too vague.

25    BY MR. FREEDMAN:



Page 169

1          Q.     When was the first time you publicly

2     posted the Satoshi client?

3                MS. MARKOE:  Objection: asked and

4     answered.  You can answer.

5                THE WITNESS:  In full, was not until

6     January 2009.

7     BY MR. FREEDMAN:

8          Q.     What should we call that event so we know

9     we are talking about the same thing?

10         A.     You could say the public publishing of

11    the Bitcoin node software.

12         Q.     Can I call it Satoshi client so we are

13    consistent?

14         A.     Yes.

15         Q.     Did Dave edit the Satoshi client at any

16    point before the public posting of the Satoshi client?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  Him and others could have,

19    yes.  Did I review whose changes: no.

20    BY MR. FREEDMAN:

21         Q.     Where did you publicly post it so that

22    others could contribute to it?

23         A.     It was given privately after a post that

24    was public.

25         Q.     Where was the public post made?



 1          A.     The public post was made on the mailing

 2   list.

 3          Q.     What was the mailing list?

 4          A.     It is the cryptography mailing list.

 5   There are other ones as well, but that was the main one.

 6          Q.     Where were the other ones?

 7          A.     I do not remember.

 8          Q.     Did Dave post it on other ones or did you

 9   post it on other ones?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  I do not know what Dave

12   did.

13   BY MR. FREEDMAN:

14          Q.     Are you aware of Dave posting it on other

15   mailing lists?

16          A.     No.

17          Q.     After you posted it on a mailing list,

18   you then hosted the Satoshi client somewhere for others

19   to collaborate on?

20                 MS. MARKOE:  Objection.

21                 THE WITNESS:  I am not sure what you are

22   asking, sorry.

23   BY MR. FREEDMAN:

24          Q.     You told me that people collaborated on

25   this open source software?



Page 171

1                      MS. MARKOE:  Objection.

2                      THE WITNESS:  The full software was not

3      given.  I said that.

4      BY MR. FREEDMAN:

5           Q.     So where did you post parts of the

6      software?

7                      MS. MARKOE:  Objection: mischaracterises

8      the testimony.

9      BY MR. FREEDMAN:

10          Q.     I am just trying to figure out ----

11          A.     I said they were e-mailed or given, I did

12     not say they were posted.  There is a big difference.

13          Q.     Okay, so then you e-mailed Dave portions

14     of the Satoshi client; is that correct?

15          A.     Yes.

16          Q.     And he e-mailed you back edits?

17          A.     No, he communicated with other people.

18          Q.     Who did he communicate with?

19          A.     I do not know.  That would be Dave.

20          Q.     How did Dave get you back his edits to

21     the Satoshi client?

22                      MS. MARKOE:  Objection.

23                      THE WITNESS:  We discussed things over

24     IRC.

25     BY MR. FREEDMAN:



```
 1          Q.      So his feedback was through IRC?

 2          A.      Yes.

 3          Q.      So there is no record of his feedback?

 4          A.      No, not that I know of.  There could be.

 5     It is not impossible for IRC to be recorded and kept.

 6          Q.      You kept no record of his ----

 7          A.      I do not keep my IRC chats, no.

 8          Q.      Do you know if Dave kept them?

 9          A.      I do not know what Dave did with his IRC

10     chats.  If you are asking for every line of code Dave

11     changed, there would be at least 100 changes by

12     Hal Finney, there would be at least 80 changes by Bear,

13     etcetera.  There would be at least 1,000 changes by

14     other people for every one that Dave did.  So 0.1%.

15          Q.      0.1% of the edits are attributable to

16     Dave?

17          A.      Yes.  That was not the primary task that

18     Dave did.

19          Q.      Is it possible that it is more than 1%?

20                  MS. MARKOE:  Objection: calls for

21     speculation.

22     BY MR. FREEDMAN:

23          Q.      You have a clear recollection of it being

24     exactly 1% of the code that Dave edited?

25                  MS. MARKOE:  Objection.  You can answer.
```



Page 173

1                    THE WITNESS:  I did not say exactly 1%.

2     And Dave was not a C++ coder.

3     BY MR. FREEDMAN:

4          Q.    Could it have been 5%?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  No.

7     BY MR. FREEDMAN:

8          Q.    Could it have been 2%?

9                    MS. MARKOE:  Objection.

10                   THE WITNESS:  You are calling for

11    speculation on probabilities of that where other people

12    did far more code.  Basically you want to characterise

13    Dave as having written a lot more of the software.  That

14    is not what Dave did.

15                   MS. MARKOE:  Can we take a bathroom

16    break?

17                   MR. FREEDMAN:  Sure.

18                   THE VIDEOGRAPHER:  Going off the record.

19    The time is 15.04.  End of video card number 3, volume 1

20    of the video deposition of Dr. Craig Wright.

21                   (A Short Break)

22                   THE VIDEOGRAPHER:  This is the beginning

23    of video card number 4, volume 1, in the video

24    deposition of Dr. Craig Wright.  Going on the record.

25    The time is 15.20.  Thank you.



Page 174

```
 1                    MR. RIVERO:  Yes, please, identification
 2       of persons on the line.
 3                    MR. BRENNER:  (By Telephone) Sure.  This
 4       is Andrew Brenner of Boies Schiller and to my knowledge
 5       I have been on the line for all of the time that the
 6       deposition has been in session.
 7                    MR. RIVERO:  Thank you, Mr. Brenner.
 8                    MR. BRENNER:  You are welcome.
 9                    MR. MCADAMS:  (By Telephone) This is John
10       McAdams, also from Boies Schiller, and also have been on
11       the line for all sessions.
12                    MR. KLEIMAN:  (By Telephone) This is Ira
13       Kleiman.  I have been on the line since the beginning.
14                    MR. RIVERO:  Anyone else?
15                    MS. MARKOE:  Is there a reason why,
16       Mr. Kleiman, you failed to identify yourself previously?
17                    MR. FREEDMAN:  Ira, do not answer that.
18       I think they asked for lawyers to make their
19       appearances.  I am not sure he knew.
20                    THE WITNESS:  That is not correct.
21                    MR. FREEDMAN:  Either way, we can deal
22       with this later, obviously.  He has been on the line, we
23       have disclosed it and you can do what you like with it.
24                    MR. RIVERO:  Note our objection.
25                    MS. MARKOE:  I would like to note our
```



Page 175

1    objection and I would also like to note that Mr. Kleiman

2    I am instructing you that this deposition is

3    confidential and you are bound by the confidentiality

4    order in this case.  We presume that you are aware of it

5    and will abide by it.

6                  MR. FREEDMAN:  Okay.

7                  MR. KLEIMAN:  Yes.

8    BY MR. FREEDMAN:

9         Q.    Dr. Wright, the A Back cited in the

10   Bitcoin white paper, is that a reference to the same

11   Adam Back we were previously discussing?

12                 MS. MARKOE:  Objection.

13                 THE WITNESS:  Yes.

14   BY MR. FREEDMAN:

15        Q.    Is it your testimony here today that that

16   is a mis-cite and it should instead be to Mr. Finney?

17                 MS. MARKOE:  Objection.  You can answer.

18                 THE WITNESS:  It should have Aurora in

19   the R PoW, that is R as in R, PoW should be cited to

20   Mr. Finney.

21   BY MR. FREEDMAN:

22        Q.    In response to interrogatory requests,

23   Dr. Wright, you said that "there was an individual who

24   helped me in the very early stages of my research well

25   before the release of the Bitcoin protocol.  As far as



Page 176

1    I know, that individual never met or interacted with

2    Dave Kleiman."  Who was that individual?

3              MS. MARKOE:  Objection.

4              MR. FREEDMAN:  You can answer.

5              THE WITNESS:  No, I cannot.

6              MS. MARKOE:  This is part of what you

7    need to discuss with the court in camera?

8              THE WITNESS:  Yes.

9              MS. MARKOE:  Okay.

10   BY MR. FREEDMAN:

11        Q.    Dr. Wright, whose idea was it to register

12   the Bitcoin.com domain name?

13        A.    Mine.

14        Q.    When did you first register that domain?

15        A.    I would have to look up the date.  I do

16   not remember.

17        Q.    Do you still have the records associated

18   with that original registration?

19              MS. MARKOE:  Objection.  You may answer.

20              THE WITNESS:  They are online.

21   BY MR. FREEDMAN:

22        Q.    Where are they online?

23              MS. MARKOE:  Objection.  You may answer.

24              THE WITNESS:  Again, I assume you do not

25   know technical name records or how these are



Page 177

1    constructed.  They are public records.

2    BY MR. FREEDMAN:

3         Q.    That is all right but you can still

4    explain it to me.  Where are they publicly available?

5         A.    Whois.

6         Q.    And what information did you give -- did

7    you do it under a private Whois registration or did you

8    do it publicly, and I give identification to Whois?

9              MS. MARKOE:  Objection: compound.

10             THE WITNESS:  There is no such thing as a

11   private versus a public Whois.

12   BY MR. FREEDMAN:

13        Q.    There is no way to privately register

14   domain names?

15             MS. MARKOE:  Objection.  You may answer.

16             THE WITNESS:  Define what you mean by

17   "private".

18   BY MR. FREEDMAN:

19        Q.    Is there a way to not give identifying

20   information for the owner of the domain name or the

21   registrant of the domain name?

22             MS. MARKOE:  Objection.

23             THE WITNESS:  Define what you mean by

24   that.  You are doing a whole lot of waffly fluffy crap,

25   excuse the language, that says private when you probably



1    mean anonymous.  And can you do something about that

2    phone, please, or I am going to have to throw it out of

3    a window because it keeps flashing and it is really,

4    really annoying.

5                    MR. FREEDMAN:  My apologies.

6         Q.    What information did you give Whois when

7    you registered the Bitcoin.com domain name?

8                    MS. MARKOE:  Objection.

9                    THE WITNESS:  If you have a look at it,

10   you will see the information from the Vistomail or

11   anonymousspeech.com server.  That is provided from that

12   server and the Whois that they allow goes across into

13   the Whois that is, or was there.  I do not know about

14   the updates that have occurred since.

15   BY MR. FREEDMAN:

16        Q.    Did you communicate with Dave Kleiman

17   about the domain name?

18                    MS. MARKOE:  Objection.

19                    THE WITNESS:  Define what you mean by

20   "communicate about the domain name".

21   BY MR. FREEDMAN:

22        Q.    Did you communicate with him about the

23   registration of the domain name?

24        A.    I am not sure what you would be asking?

25        Q.    Did you send any communications to Dave



1    Kleiman about the registration of Bitcoin.com?

2         A.    I did not register Bitcoin.com.

3         Q.    Who registered Bitcoin.com?

4         A.    It was not me.

5         Q.    Who was it?

6         A.    You are now asking me who registered

7    random e-mail -- sorry, domain name dot com, and expect

8    me to know.

9         Q.    Do you know who registered Bitcoin.com?

10        A.    No.

11        Q.    Do you know who registered

12   Bitcointalk.com?

13        A.    No.  I mean, I am dot org.  I think you

14   have those wrong.

15        Q.    It could be.  Did you register

16   Bitcoin.org?

17        A.    Yes.

18        Q.    Let me ask all the questions over because

19   I may have misspoken.  When did you first register

20   Bitcoin.org?

21        A.    Again, that is public record on Whois and

22   I do not remember the exact date.

23        Q.    Any answers you gave before about the

24   Vistomail account apply to Bitcoin.org?

25              MS. MARKOE:  Objection.



Page 180

1                    THE WITNESS:  Yes.

2    BY MR. FREEDMAN:

3           Q.    Did you ever communicate with

4    Dave Kleiman about Bitcoin.org registration?

5           A.    No.  I registered my first domain name in

6    the '80s.  I do not need help registering domains.

7           Q.    Did there come a time when you

8    transferred ownership of the Bitcoin.org domain name?

9                    MS. MARKOE:  Objection.

10                   THE WITNESS:  There is not really

11   ownership of that domain.

12   BY MR. FREEDMAN:

13          Q.    Control of the domain?

14                   MS. MARKOE:  Objection.

15                   THE WITNESS:  Yes.

16   BY MR. FREEDMAN:

17          Q.    When did you transfer control of the

18   Bitcoin.org domain name?

19          A.    When I stopped being involved with the

20   community.

21          Q.    Which was?

22          A.    2011.  It was actually a little bit

23   before that that information had been handed over.

24          Q.    Information had been handed over, what do

25   you mean by that?



Page 181

```
 1              A.      Domain keys, etcetera.

 2              Q.      Who did you hand them over to?

 3              A.      That was to Theymos, originally.

 4              Q.      Did Dave Kleiman ever have the control

 5      over the Bitcoin.org domain name?

 6                      MS. MARKOE:  Objection.  You can answer.

 7                      THE WITNESS:  No.

 8      BY MR. FREEDMAN:

 9              Q.      Who is Theymos?

10                      MS. MARKOE:  Objection.  This is again

11      now you are going beyond the scope.  We have already

12      established that Dave Kleiman did not have control over

13      the Bitcoin.org domain name and you can move on now.

14      BY MR. FREEDMAN:

15              Q.      Who is Theymos?

16                      MS. MARKOE:  Objection.  I will instruct

17      you not to answer.  Beyond the scope.

18      BY MR. FREEDMAN:

19              Q.      Why did you transfer the Bitcoin.org

20      domain name?

21                      MS. MARKOE:  Objection: beyond the scope.

22      Do not answer.

23      BY MR. FREEDMAN:

24              Q.      Who mined the genesis block of the

25      Bitcoin timechain?
```



Page 182

```
 1                    MS. MARKOE:  Objection.

 2                    MR. FREEDMAN:  You can answer.

 3                    MS. MARKOE:  Can you connect that to one

 4       these topics, please.

 5                    MR. FREEDMAN:  Formation of the Satoshi

 6       Nakamoto partnership.  It is literally the first block

 7       of Bitcoin.

 8                    THE WITNESS:  It is not mine.

 9                    MS. MARKOE:  The question you asked does

10       not make that connection, so why do you not try to make

11       that connection and then we can have a conversation.

12                    MR. FREEDMAN:  Do not tell me how to ask

13       my questions.  Instruct him not to answer or object.

14            Q.      Who mined the genesis block of the

15       Bitcoin timechain?

16                    THE WITNESS:  Nobody.

17                    MS. MARKOE:  Objection.

18  BY MR. FREEDMAN:

19            Q.      I am sorry?

20            A.      Nobody.

21            Q.      Who programed the genesis block of the

22       Bitcoin timechain?

23                    MS. MARKOE:  Objection.

24                    THE WITNESS:  Nobody, because that is

25       again wrong.
```



Page 183

1    BY MR. FREEDMAN:

2            Q.    How did the Bitcoin genesis block come

3    into existence?

4                  MS. MARKOE:  Objection.

5                  THE WITNESS:  Answer or not? Instruction?

6    Do I answer this or not?

7                  MS. MARKOE:  My suggestion would be that

8    someone relate this ----

9                  MR. FREEDMAN:  Please do not suggest ----

10                 MS. MARKOE:  ---- to Dave Kleiman or

11   I will strict him not to answer.

12                 MR. FREEDMAN:  Then do what you will.  We

13   will raise it with the court.

14                 MS. MARKOE:  Relate your question to Dave

15   Kleiman and whether or not there was a partnership or

16   I will strict him not to answer.

17                 MR. FREEDMAN:  Do what you will.

18                 MS. MARKOE:  Okay.  Then ask your

19   questions properly related to the scope as you prepared

20   this.

21   BY MR. FREEDMAN:

22           Q.    How did the genesis block come into

23   existence?

24                 MS. MARKOE:  Objection.  Do not answer

25   that.



Page 184

1    BY MR. FREEDMAN:

2           Q.    What was the first Bitcoin block Satoshi

3    mined?

4                 MS. MARKOE:  You can answer that.

5                 THE WITNESS:  Block one.

6    BY MR. FREEDMAN:

7           Q.    Is that also referred to as the genesis

8    block?

9           A.    No.

10          Q.    Is it the second block?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  It is the first block -- it

13   is block one.

14   BY MR. FREEDMAN:

15          Q.    Block one.  Do you know what computer

16   mined block one?

17          A.    I know what, out of a group of computers,

18   mined block one.

19          Q.    Where was that group of computers

20   located?

21          A.    Port Macquarie just outside a small town

22   called Bagnoo.

23                MS. MARKOE:  Can you spell those names

24   for the court reporter, please.

25                THE WITNESS: B-A-G-N-O-O.



1   BY MR. FREEDMAN:

2           Q.    How many computers were in Bagnoo?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  I do not know how many

5   computers I had in Bagnoo.  I do not know how many

6   computers I have now.

7   BY MR. FREEDMAN:

8           Q.    Did anyone else know about the computer

9   set-up in Bagnoo?

10                MS. MARKOE:  Objection.

11                MR. FREEDMAN:  You can answer.

12                THE WITNESS:  Yes.

13  BY MR. FREEDMAN:

14          Q.    Who else?

15          A.    Many people knew that I had a computer

16  set-up in Bagnoo.  I had spent a lot of money getting

17  fibre laid into a completely rural area, that basically

18  was never going to have fibre, that opened up maybe

19  50,000 people in the community to low cost, high-speed

20  internet, because I had the whole road ripped up and

21  paid for to lay fibre to my home, the power run into it,

22  etcetera, so many would have known.

23          Q.    You had a home in Bagnoo?

24          A.    Yes.

25          Q.    Is it Bagnoo in New South Wales?



1          A.      Yes.

2          Q.      Satoshi mined block one.  Were you the

3     one acting as Satoshi to mine block one?

4                  MS. MARKOE:  Objection.

5                  THE WITNESS:  There is no Satoshi that

6     way.  I was.

7     BY MR. FREEDMAN:

8          Q.      I am sorry?

9          A.      I was.  I used the pseudonym.  It did not

10    flip round like Dread Pirate Roberts or something like

11    this.  It was just me.  And it was not Satoshi mining

12    per se.  There was not any, other than me, apart from

13    block nine, which was then referenced by a transfer

14    I did.

15         Q.      So you mined block one?

16         A.      Yes.

17         Q.      Did you also mine block two?

18         A.      Relevance, please, give me ----

19                 MS. MARKOE:  Look, connect it up with a

20    relationship with Dave Kleiman or do not.

21                 THE WITNESS:  There were mining pools,

22    there were no shared mining.  Dave Kleiman and I could

23    not physically mine in any way.  Mining pools were not

24    developed until years after I disappeared, so there is

25    no joint mining.



Page 187

1   BY MR. FREEDMAN:

2           Q.     That was not my question.  It was just

3   whether ----

4           A.     Yes, it is, basically you are trying to

5   find out what I do and do not have, which is none of

6   your God damn business.  There is nothing to do with

7   Dave Kleiman.  Dave Kleiman never had a machine access

8   code.  He never went on those machines.  He never

9   accessed those machines.  He never touched those

10  machines.  Nothing.

11          Q.     Are you aware of anyone else who mined

12  Bitcoin in January of 2009?

13                 MS. MARKOE:  Objection.  That is again

14  well beyond the scope of what this deposition is about.

15                 MR. FREEDMAN:  To witnesses.

16                 MS. MARKOE:  Of anyone who mined Bitcoin?

17                 MR. FREEDMAN:  It literally came out days

18  ago, Zaharah; it came out in January 2009, so anybody

19  who was mining then was ----

20                 MS. MARKOE:  Okay.  How would he know who

21  is doing what?

22                 MR. FREEDMAN:  If he does not know he

23  does not know.

24                 THE WITNESS:  The whole nature of the

25  system is that you do not register.



Page 188

1    BY MR. FREEDMAN:

2         Q.    Do you know anyone who was mining in

3    January 2009?

4              MS. MARKOE:  Objection.

5              THE WITNESS:  Yes.  Hal Finney.

6    BY MR. FREEDMAN:

7         Q.    Besides Hal Finney, was there anyone

8    else?

9              MS. MARKOE:  Objection.

10              THE WITNESS:  No, I do not know.  I did

11   not even ask Dave if he was doing it.

12   BY MR. FREEDMAN:

13        Q.    You do not know if Dave was mining in

14   January 2009?

15        A.    No, I do not.

16        Q.    Did he ever tell you if he was mining in

17   January 2009?

18              MS. MARKOE:  Objection: asked and

19   answered.

20              MR. FREEDMAN:  You can answer.

21              THE WITNESS:  No idea.

22   BY MR. FREEDMAN:

23        Q.    Dr. Wright, did there come a time when

24   you discussed Satoshi Nakamoto and the origin of Bitcoin

25   with a gentleman named Andrew O'Hagan?



1            MS. MARKOE:  Objection.  What exactly

2    does this have to do with the topic?  I presume you are

3    talking about topic 3.  So can you please explain to me

4    what this has to do with any of the subtopics under

5    topic 3.

6            MR. FREEDMAN:  Yes.  I am handing you

7    what has been marked as Plaintiff's Exhibit 4.

8            MS. MARKOE:  Please explain it.

9            MR. FREEDMAN:  I will.  One second.

10   I think this is 4; right?  Is it 3 or 4?  3.  This goes

11   to relevant witnesses.

12           MS. MARKOE:  What goes to relevant

13   witnesses?

14           MR. FREEDMAN:  You will see when the

15   question comes.  Mr. O'Hagan himself is a relevant

16   witness if the answer is yes.

17   (Plaintiff's Exhibit 3 marked for identification)

18       Q.    Can you take a look at page 32, please.

19   The page numbering is in the upper right-hand corner of

20   the document.

21           MR. RIVERO:  You are referring to 32 of

22   96?

23           MR. FREEDMAN:  Correct.  This is docket

24   entry 83-1.

25       Q.    About halfway down that first paragraph



Page 190

```
1    it starts off with:  "Satoshi also sent four other

2    transactions on the same day.  I asked Wright who the

3    recipients were -- who the four addresses belonged to.

4    'Hal, Dave, myself', he replied.  'And another I cannot

5    name as I have no right to do so'."  Do you recognise

6    this conversation?

7                   MS. MARKOE:  Objection.

8                   THE WITNESS:  I remember a half-truth

9    version of this conversation.

10   BY MR. FREEDMAN:

11        Q.    What was the truth of the conversation?

12                   MS. MARKOE:  Objection.  You are going

13   beyond the scope.  I am going to instruct him not to

14   answer.

15                   MR. FREEDMAN:  You are not going to let

16   me find out who the name of the other person is?

17                   MS. MARKOE:  I am going to instruct him

18   not to answer your question which, if I can see it,

19   says, "What was the truth of the conversation?"  You are

20   limited to the details surrounding Craig and Dave's

21   partnership to create Satoshi Nakamoto, in your words,

22   the general process of their collaboration, in your

23   words, the accounts that they held to collaborate

24   technological and money, in your words, methods of

25   communication they used during that period, in your
```



1    words ----

2                    MR. FREEDMAN:  Zaharah, you do not need

3    you to read the entire -- I am familiar with it.

4                    MS. MARKOE:  ---- and to identify the

5    computers and servers Satoshi Nakamoto used to draft the

6    white paper ----

7                    MR. FREEDMAN:  I am going to ask you to

8    stop wasting my time.

9                    MS. MARKOE: ---- program Bitcoin and mine

10   the first few Bitcoin.  Your question does not go to any

11   of those topics.

12                    MR. FREEDMAN:  It goes to the first one.

13                    MS. MARKOE:  I am instructing the witness

14   not to answer.

15                    MR. FREEDMAN:  Then just instruct him not

16   to answer, Zaharah.  That is all you need to do and I

17   will move on.

18                    MS. MARKOE:  I will also put on the

19   record my objection which I am entitled to do and you

20   are not entitled to stop me from doing.  As to the first

21   question, you have already identified, and he has

22   already said, he had a conversation with Mr. O'Hagan,

23   this is not an accurate representation of that

24   conversation.  That is your identity of your witness.

25   You are done now.



1                    MR. FREEDMAN:  Zaharah, if you continue

2       speaking we are going to ask the court for more time.

3                    MS. MARKOE:  Ask the court for more time.

4       I am allowed to state my objection for the record and

5       the basis for it so that I have an accurate record to

6       share with the court.

7                    MR. FREEDMAN:  We will.

8            Q.    On January 12th, 2009, did you send

9       Bitcoin to anyone?

10           A.    Yes.

11           Q.    Who did you send it to?

12           A.    Hal Finney.

13           Q.    Who else?

14                   MS. MARKOE:  Answer if you can.

15                   THE WITNESS:  I do not actually remember.

16      BY MR. FREEDMAN:

17           Q.    Did you send Bitcoin to Dave Kleiman on

18      January 12th, 2009?

19                   MS. MARKOE:  Objection, but you may

20      answer if you remember.

21                   THE WITNESS:  I cannot remember.

22      BY MR. FREEDMAN:

23           Q.    Did you send Bitcoin to yourself on

24      January 12th, 2009?

25                   MS. MARKOE:  Objection.  You can answer



1    if you remember.

2                    THE WITNESS:  I cannot remember.

3    BY MR. FREEDMAN:

4         Q.    Do you know who is being referred to in

5    Plaintiff's Exhibit 3:  "... and another I cannot name

6    as I have no right to do so"?

7                    MS. MARKOE:  I just want to read the

8    question back.  (Pause) You can answer the question.  If

9    you need a read back, ask for a read back.

10                    THE WITNESS:  What I will say is this

11   work of fiction -- (Witness indicates Exhibit 3) -- was

12   created because Mr. O'Hagan refused to sign the

13   non-disclosure agreement, and basically took what he

14   thought would be a great story and created one.  It is

15   fiction.

16   BY MR. FREEDMAN:

17        Q.    Your position is the entire article is

18   fiction?

19                    MS. MARKOE:  Objection:  mischaracterises

20   his testimony.

21   BY MR. FREEDMAN:

22        Q.    Is it your position that the entire

23   article is fiction?

24        A.    No.

25        Q.    Did Mr. O'Hagan record sessions --



Page 194

1    interview sessions with you?

2           A.    No, and if he did so that would be a

3    criminal act.

4           Q.    There are no recordings that you are

5    aware of?

6           A.    If he did so, that would be a criminal

7    act.

8           Q.    In January of 2009, until 2011, was there

9    anywhere you mined Bitcoin besides Bungaloo -- help me

10   please?

11          A.    Bagnoo.

12          Q.    Bagnoo?

13          A.    Yes.

14          Q.    Where else?

15          A.    At one stage, I had mining software I was

16   playing with on my phone.  It did not actually mine any

17   Bitcoin.

18          Q.    Was there any other locations of

19   computers that you mine Bitcoin in?

20          A.    No.

21          Q.    Only Bungaloo?

22          A.    Bagnoo.

23          Q.    Bagnoo.  Only Bagnoo?

24          A.    Yes.

25          Q.    That started in January 2009.  When did



Page 195

1    you stop, if ever, mining Bitcoin in Bagnoo?

2          A.    I stopped everything to do with Bagnoo in

3    December.

4          Q.    Of?

5          A.    2010.  Or probably not everything to do

6    with because I still owned part of the property and

7    whatever else, but I was not doing any IT stuff there at

8    all.

9                MR. RIVERO:  I want to note that we are

10   giving a lot of leeway, even though there is already

11   testimony disconnecting the subject of these questions

12   from Dave Kleiman.  But go ahead with your next

13   question.

14   BY MR. FREEDMAN:

15         Q.    In December of 2010 -- strike that.  Did

16   you stop mining entirely in December of 2010?

17         A.    No.

18         Q.    Where did the mining continue?

19         A.    The mining restarted later, by me, with

20   pools that I now run.

21         Q.    When did that start up?

22         A.    2016 on.

23         Q.    So is it your testimony here today that

24   from December of 2010 until the mining pools in 2016,

25   you never mined Bitcoin?



Page 196

1              MS. MARKOE:  Objection.

2              THE WITNESS:  That is not correct.  I did

3    not earn any Bitcoin because running a node in certain

4    configurations means that you are also mining.

5    BY MR. FREEDMAN:

6         Q.    Okay.  So ----

7         A.    Running testnet is also mining.  This is

8    not public Bitcoin.

9         Q.    So as I understand it, from December of

10   2010, until 2016, you never earned the mining reward for

11   mining a block of Bitcoin; is that correct?

12             MS. MARKOE:  Objection.  You can answer.

13             THE WITNESS:  That is correct.

14   BY MR. FREEDMAN:

15        Q.    At any point in time, was Dave involved

16   in the mining that took place in Bagnoo from 2009 until

17   to 2010?

18        A.    Nobody was ever involved in that.

19        Q.    Approximately how much Bitcoin were mined

20   from 2009 ----

21             MS. MARKOE:  Objection.  I am going to

22   instruct you not to answer.

23             MR. RIVERO:  I instruct you not to

24   answer.

25   BY MR. FREEDMAN:



Page 197

1          Q.     I am going to ask you another question.
2     Your attorneys may instruct you not to answer so take a
3     second ----
4                 MS. MARKOE:  Do not ask it.
5                 MR. FREEDMAN:  I do not think you are
6     right to instruct him not to answer but I am going to
7     ask it.
8          Q.     Do you know the amount of Bitcoin that
9     was mined from 2009 until 2010 in Bagnoo?
10                MS. MARKOE:  Objection.
11                MR. RIVERO:  Same instruction.
12    BY MR. FREEDMAN:
13         Q.     Have you ever mined Bitcoin out of
14    Australia?
15         A.     No.
16                MS. MARKOE:  Objection.  You can answer.
17                THE WITNESS:  Well, back then, no.  Now,
18    the pools are outside of Australia, but that is 2016 on.
19    So, when I say no to mining or anything like this,
20    I will just make it clear now I am talking about before
21    2016.
22    BY MR. FREEDMAN:
23         Q.     I understand.  Thanks for the
24    clarification.  I know we understood each other, but it
25    is important that the record is clear.



1           A.      I got told to make sure I am clear,

2    so ----

3           Q.      From 2009 until 2010, when you were

4    mining in Bagnoo, was that a full-time job for you?

5                   MS. MARKOE:  Objection.

6                   THE WITNESS:  It was not a job at all.

7    BY MR. FREEDMAN:

8           Q.      Did it take any time?

9                   MS. MARKOE:  Objection.

10                  THE WITNESS:  Sneezing takes time.

11   BY MR. FREEDMAN:

12          Q.      Touché.  Did it take a significant amount

13    of your time?

14                  MS. MARKOE:  Objection.

15                  THE WITNESS:  No.

16   BY MR. FREEDMAN:

17          Q.      Did you discuss the details of your

18    mining activity with Dave Kleiman?

19          A.      Define what you mean by "discuss the

20    details of my mining activity".

21          Q.      Did you discuss the Bagnoo computers and

22    servers with Dave Kleiman?

23          A.      No.

24          Q.      To the best of your recollection, did

25    Dave Kleiman have any knowledge of the mining you were



1    doing in Bagnoo?

2              MS. MARKOE:  Objection.

3              THE WITNESS:  Yes, he did.

4    BY MR. FREEDMAN:

5         Q.    How did he come to find out about that?

6         A.    He knew I had a property in Bagnoo and

7    that I was running Bitcoin nodes.

8         Q.    Did you discuss the amount of Bitcoin you

9    had amassed with Dave Kleiman?

10             MS. MARKOE:  Objection.  Again, I am

11   going to instruct the witness not to answer these

12   questions.  You are now going well beyond the scope of

13   what is permitted in this deposition.

14             MR. FREEDMAN:  Communication between him

15   and Dave Kleiman.

16             MS. MARKOE:  You are not asking about

17   every communication that he had between himself and Dave

18   Kleiman.  That is not one of your topics.  Look at your

19   topics again.  This is not a merits deposition.  That

20   has been made very clear by the court.

21   BY MR. FREEDMAN:

22        Q.    Did Dave Kleiman mine any of the first 50

23   Bitcoin ----

24             MS. MARKOE:  Objection.  You can answer

25   if you know.



1   BY MR. FREEDMAN:

2         Q.     ---- blocks.

3         A.     Thank you for the clarification,

4   otherwise I would have to say no, because no one mined

5   the first 50 Bitcoin.

6         Q.     I saw that look.

7         A.     I cannot help rolling my eyes,

8   I apologise.  I do not know.

9         Q.     Did there come a time when Dave Kleiman

10  began mining Bitcoin?

11        A.     Yes.

12        Q.     When did he begin mining Bitcoin?

13        A.     I do not know.

14        Q.     Do you know approximately when he began

15  mining Bitcoin?

16        A.     I did not ask him.

17        Q.     Do you know what computer he used to mine

18  Bitcoin?

19        A.     No.

20        Q.     Do you know what hardware he used to mine

21  Bitcoin?

22        A.     Not really, no.

23        Q.     How do you know that he eventually began

24  mining Bitcoin?

25        A.     Because eventually we spoke about it and



Page 201

1    he had told me he had mined Bitcoin.

2         Q.    Where did that communication take place?

3         A.    Most of my communications, including this

4    one, were on IRC.

5         Q.    There is no record of it?

6              MS. MARKOE:  Objection.

7              THE WITNESS:  I cannot answer that one, I

8    do not know.

9    BY MR. FREEDMAN:

10        Q.    You have no record of it?

11        A.    I do not have any records of many of

12   these things, as I have already stated.  That is why

13   I used IRC.

14        Q.    Do you know if Dave Kleiman ever used

15   cloud computing to mine Bitcoin?

16        A.    I do not know -- actually, we are talking

17   about a period where nobody used cloud computing to mine

18   Bitcoin.  There was no cloud computing to mine Bitcoin

19   at that stage.  Pool software did not exist.  The person

20   who created some of the first pool software was after

21   I disappeared the first time, and ----

22             MR. RIVERO:  Please finish.

23             THE WITNESS:  ---- that person had

24   nothing to do with Dave or anything like that, and

25   created pool mining and I am sorry to tell you that



Page 202

```
 1    there was no cloud mining at that stage.

 2                  MR. RIVERO:  Just to make sure the record

 3    is clear, I heard at line 23 of the prior page, I heard

 4    "many".  I think it is transcribed as "any".  I just

 5    would like clarification.

 6                  MR. FREEDMAN:  It is the hour.

 7                  MR. RIVERO:  I am looking at the record

 8    to make sure.

 9                  MR. FREEDMAN:  It is rough.

10         Q.     Do you know how Dave stored any of the

11    Bitcoins he mined?

12         A.     No.

13         Q.     And remind me, I do not recall if I asked

14    this, do you have any idea when Dave began mining

15    Bitcoin?

16         A.     No, I do not.

17         Q.     Was it before 2011?

18         A.     I do not know.

19         Q.     Do you recall when he told you he had

20    began mining Bitcoin?

21         A.     Not exactly, no.

22         Q.     Was it early on, after ----

23         A.     It would have been early on, yes.

24         Q.     Did Dave ever share the private keys of

25    Bitcoin with you?
```



Page 203

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  You do not share private

3     keys, ever.

4     BY MR. FREEDMAN:

5           Q.     So is the answer no?

6           A.     The answer is no.

7           Q.     Did you ever share private keys with

8     Dave?

9                    MS. MARKOE:  Objection: asked and

10    answered.

11                   THE WITNESS:  I do not share private keys

12    with my wife.

13    BY MR. FREEDMAN:

14          Q.     What is a paper wallet?

15                   MS. MARKOE:  Objection.  I am going to

16    give you a little bit of leeway here, but again we are

17    going beyond the scope of this deposition.  You get

18    another shot at him.  I will certainly instruct him, if

19    you continue along these lines, to not answer those

20    questions at the later deposition, if you get answers to

21    them now.

22                   THE WITNESS:  A paper wallet is a key

23    that is printed on a piece of paper.

24    BY MR. FREEDMAN:

25          Q.     Have you ever used a paper wallet?



1          A.     Yes.

2          Q.     Did you ever use a paper wallet with Dave

3     Kleiman?

4                 MS. MARKOE:  Objection.

5                 THE WITNESS:  Please explain what you

6     actually mean in that fluffy nebulous sentence.

7     BY MR. FREEDMAN:

8          Q.     Did you ever exchange a printed -- strike

9     that.  Did you ever exchange a key that is printed on a

10    piece of paper with Dave Kleiman?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  Mr. Kleiman and I had been

13    in the country together once since the creation of

14    Bitcoin, where neither of us handed over any Bitcoin on

15    paper wallets, neither of us handed pieces of paper

16    together as we were drinking and getting drunk, to each

17    other on that day, and the value of the entire Bitcoin

18    market at that stage, when we got together, was,

19    I think, about $100, which was millions of Bitcoin, for

20    the entire value $100 was it.  So, did I hand him a

21    piece of paper when we were in foreign countries:  I do

22    not know how I could possibly do that.

23    BY MR. FREEDMAN:

24         Q.     I am going to ask you just concisely, did

25    you ever exchange a key that is printed on a piece of



Page 205

1    paper with Dave Kleiman in any way?

2              MS. MARKOE:  Objection.  I am going to

3    instruct the witness not to answer at this point.  We

4    have given you a lot of leeway.  These questions are not

5    going to subjects 3 or 4 which are the only ones I could

6    possibly see any relevance to.  If you would like to

7    explain how they relate to those topics or any other

8    topics, I would reconsider my objection, but at this

9    point in time I just do not see it.

10             MR. FREEDMAN:  It goes to the methods --

11   it goes to 4.

12             MS. MARKOE:  Explain how whether he ever

13   exchanged a paper wallet goes to 4.  4 relates to mining

14   of Bitcoins, not paper wallets.  There is a distinction.

15             MR. FREEDMAN:  It goes to the general

16   process of their collaboration.

17             MS. MARKOE:  We have already established

18   that there was no mining together.

19             MR. FREEDMAN:  I am just trying to figure

20   out whether or not they collaborated in another way.

21             MS. MARKOE:  How does one collaborate in

22   terms of holding a paper wallet or sharing information

23   about a paper wallet?  I am instructing the witness not

24   to answer.  You can move on.

25   BY MR. FREEDMAN:



1         Q.     Did you ever use any other methods for

2    the offline exchange of Bitcoins with Dave?

3               MS. MARKOE:  Objection.

4               THE WITNESS:  Again, I did not exchange

5    Bitcoins with Dave the way you are suggesting.  The way

6    that you exchange Bitcoin is you a send transaction from

7    one address to another.  I would never exchange private

8    keys with Dave.

9    BY MR. FREEDMAN:

10        Q.     Did you ever send Bitcoin to public

11   addresses that you knew controlled?

12              MS. MARKOE:  Objection.

13              THE WITNESS:  I do not know what

14   addresses Dave controlled, so how could I do that?

15   BY MR. FREEDMAN:

16        Q.     Did Dave ever provide you with public

17   addresses that he controlled?

18              MS. MARKOE:  Objection.  You can answer.

19              THE WITNESS:  One.

20   BY MR. FREEDMAN:

21        Q.     Which one?

22        A.     I do not remember.

23        Q.     Why did he provide it to you?

24              MS. MARKOE:  Objection.

25              THE WITNESS:  It was for testing.



Page 207

1   BY MR. FREEDMAN:

2           Q.      When did he provide it to you?

3           A.      2009.

4           Q.      What were you testing?

5           A.      Testnet.

6           Q.      What is testnet?

7           A.      Testnet is the development version of

8   Bitcoin, that runs alongside, that we had our own

9   version of in the world to create a test of Bitcoin.

10  So, when I am saying "we" there, I mean the Bitcoin

11  community.  I started with my own multiple versions,

12  which I firewalled off, and eventually they became a

13  public testnet which was a second version of Bitcoin,

14  you could say, but a valueless version of Bitcoin that

15  was easier to mine, so you could test the software and

16  the code.

17          Q.      Who had access to testnet?

18          A.      Everyone.

19                  MS. MARKOE:  Objection.

20                  THE WITNESS:  It is possible.

21  BY MR. FREEDMAN:

22          Q.      And Dave's public address was a testnet

23  address.

24                  MS. MARKOE:  Objection: mischaracterises

25  the testimony.



1           THE WITNESS:  Testnet addresses are real

2    addresses and vice-versa, blah, blah, blah.  There is no

3    distinction.

4    BY MR. FREEDMAN:

5           Q.     What were the primary ways Satoshi

6    Nakamoto communicated with people?

7           A.     Which people?

8           Q.     What is the primary way Satoshi Nakamoto

9    communicated?

10          A.     Again, which people?  So, how did

11   I communicate?  Which people?  I mean, if you are

12   getting the "I am Satoshi", then that could be anything.

13   I primarily communicate with people without saying I am

14   Satoshi and I walk up like I am now and I open my mouth

15   and words come out.

16          Q.     I understand that.  When I say Satoshi

17   Nakamoto now, I am referring to the internet presence of

18   Satoshi Nakamoto.

19          A.     So you mean the pseudonym?

20          Q.     The pseudonym.

21          A.     Can you please be explicit in saying

22   that.

23          Q.     What was the primary way in which you

24   communicated through the pseudonym?

25          MS. MARKOE:  Objection.  You can answer.



Page 209

1           THE WITNESS:  Well, by definition, the

2    pseudonym was primarily done depending on which one it

3    was, by e-mail, or the Bitcoin forums, or the P2P

4    forums, or those other things.  So, it depends on which

5    one you are talking about, but online things that are

6    there, so ----

7   BY MR. FREEDMAN:

8           Q.     What are the e-mail addresses that you

9    used as the pseudonym Satoshi Nakamoto?

10          A.     They are all public.  The GMX account and

11   the Vistomail accounts are all public.

12          Q.     Please state them for the record.

13                 MS. MARKOE:  If you recall.

14                 THE WITNESS:  I do not remember which one

15   is Satoshi or Satoshi N off the top of my head.  I have

16   not used them in years.  I do not look at them any more.

17   And I am not going to even try and think about it.  They

18   are there.  Everyone knows them.  Look it up.

19   BY MR. FREEDMAN:

20          Q.     Was there a third account?

21          A.     Used for public communications?

22          Q.     What was that third account?

23          A.     There was not a third -- sorry.  What

24   third account?  I did not say there was a third account.

25          Q.     I asked if there was a third -- strike



Page 210

```
1    that.  It may be I misunderstood your answer.  Did

2    Satoshi Nakamoto, the pseudonym, have a third e-mail

3    account, besides GMX and Vistomail?

4                   MS. MARKOE:  Objection.  Answer if you

5    can recall.

6                   THE WITNESS:  I used multiple e-mail

7    accounts.

8    BY MR. FREEDMAN:

9         Q.    Can you list what they were?

10                  MS. MARKOE:  Objection.

11                  THE WITNESS:  No.

12   BY MR. FREEDMAN:

13        Q.    Did you use an e-mail account

14   satoshi@anonymousspeech.com?

15        A.    Yes, that one sounds about right.

16        Q.    Do you still have access to these

17   accounts?

18                  MS. MARKOE:  Objection: vague.

19                  THE WITNESS:  As I stated earlier, no.

20   I stopped accessing them a long time.

21   BY MR. FREEDMAN:

22        Q.    Do you have the ability to access these

23   accounts?

24        A.    I very much doubt it.

25        Q.    Why do you doubt it?
```



Page 211

```
 1          A.     Because GMX has been compromised and the
 2     other one has been compromised.  They have been reset
 3     over time.  So, I do not actually want to access them.
 4          Q.     Have you tried to access them?
 5          A.     No.
 6          Q.     Does that go for the GMX account, the
 7     Vistomail account and the Anonymous Speech accounts?
 8          A.     Yes.
 9          Q.     Do you know who has control over these
10     accounts now?
11          A.     No.  If anyone.
12          Q.     Did there come a time when you provided
13     Dave Kleiman with access to any of these accounts?
14          A.     Yes.
15          Q.     Which accounts?
16          A.     Dave was given the GMX account access for
17     a little while.
18          Q.     When was he given access to the account?
19          A.     I do not remember exactly.
20          Q.     Who gave him access to the account?
21          A.     If I am the person with it, then it has
22     to be me.
23          Q.     You gave him access to the GMX account?
24          A.     Yes.
25          Q.     Why?
```



Page 212

1          A.      Because I asked him to check it for me.

2          Q.      For what?

3          A.      To read an e-mail.

4          Q.      Which e-mail?

5                  MS. MARKOE:  Objection.  You can answer

6      if you recall.

7                  THE WITNESS:  I do not recall which

8      e-mail.

9      BY MR. FREEDMAN:

10         Q.      How many times did Dave access the GMX

11     account?

12                 MS. MARKOE:  Objection:  foundation.

13                 THE WITNESS:  How many hairs do you have

14     in your beard?

15     BY MR. FREEDMAN:

16         Q.      Did you provide access to anyone else --

17     strike that.  Did anyone else -- strike that.  Did you

18     ever give anyone else access to the GMX account?

19         A.      No.

20         Q.      Did you ever give anyone else access to

21     the Vistomail account?

22         A.      Yes.

23         Q.      Who?

24         A.      I think the only other person who had

25     access at that stage for a little bit was Uyen.



Page 213

```
1              Q.     Can you spell that?

2              A.     No.

3              Q.     Is that Uyen Nguyen?

4              A.     Yes.

5              Q.     Who gave Uyen access to the Vistomail

6      account?

7                     MS. MARKOE:  Objection: asked and

8      answered.

9                     THE WITNESS:  I am not sure of the exact

10     details.  It was Uyen -- what is his name -- I cannot

11     remember his name -- the old Japanese guy, the one that

12     they pulled up as Satoshi?

13     BY MR. FREEDMAN:

14             Q.     Dorian.

15             A.     Dorian, that is it.  Sorry, I had

16     forgotten his name.  I instructed people to send a

17     message saying "I am not Dorian" because he was getting

18     a lot of shit.

19             Q.     You instructed Uyen Nguyen to do that?

20             A.     Yes.

21             Q.     And provided her with the log in

22     credentials?

23             A.     I gave her some, yes.

24             Q.     Did you ever provide anyone else with

25     access to the Anonymous Speech account?
```



Page 214

```
 1          A.     No.
 2          Q.     Did you ever use these accounts to
 3   communicate with Dave Kleiman?
 4          A.     I do not remember.
 5          Q.     Did you ever ask Dave Kleiman to stop
 6   accessing the GMX account?
 7          A.     No.
 8          Q.     Even when you stepped back from the
 9   community you still did not ask him to stop accessing
10   the account?
11                 MS. MARKOE:  Objection.
12                 THE WITNESS:  It was not used at that
13   stage -- by anybody.
14   BY MR. FREEDMAN:
15          Q.     You trusted Dave Kleiman?
16          A.     Dave was my friend.
17          Q.     Best friend?
18          A.     Fairly much, yes.
19          Q.     Did you trust Uyen Nguyen?
20                 MS. MARKOE:  Objection: you are going
21   beyond the scope.  I am going to instruct him not to
22   answer.
23                 MR. FREEDMAN:  We agree for once!
24                 MS. MARKOE:  I am sorry.  What?
25                 MR. FREEDMAN:  We agree for once!
```



1               BY MS. MARKOE:  That is a miracle in and

2       of itself.

3    BY MR. FREEDMAN:

4               Q.    After the creation of Bitcoin, what was

5       the first Bitcoin-related intellectual property you

6       worked on with Dave?

7               MS. MARKOE:  Objection: assumes facts not

8       in evidence.

9               THE WITNESS:  I did not ever work on

10      Bitcoin IP with Dave.

11   BY MR. FREEDMAN:

12              Q.    Did you ever work on any intellectual

13      property with Dave?

14              A.    Yes.

15              Q.    What were those projects, in short?  What

16      were the names?  Strike that.  What were the names of

17      those projects?

18              A.    SWAMP, software assurance marketplace.

19      Basically, there are a number of projects that are all

20      public and all have had their papers published.

21              Q.    Is one of them a metered payment system?

22              A.    No.

23              Q.    Do you know what I am referring to when

24      I say a metered payment system?

25              A.    I know what a metered payment system is.



1          Q.     Is there value to intellectual property

2    about a metered payment system?

3                 MS. MARKOE:  Objection.  I am going to

4    instruct the witness not to answer.  He has already

5    stated he did not create any intellectual property with

6    Dave Kleiman on metered payment systems and therefore

7    any discussion of that would go beyond the scope of this

8    deposition.

9    BY MR. FREEDMAN:

10         Q.     Did you collaborate with Dave Kleiman on

11   intellectual property entitled "Software Derivative

12   Markets and Information Security Risk Systems"?

13         A.     I did not collaborate with Dave on

14   anything.  I created software and Dave, who was a vet,

15   was able to try and file, so that he would have had some

16   money to help him out.  Dave was not a mathematician.

17   Dave had no knowledge of that area, so there was no

18   collaboration at all in that way for research.

19         Q.     Did there come a time when Dave Kleiman

20   took two millions lines of code and turned it into six

21   million lines of code?

22                MS. MARKOE:  Objection.  But you can

23   answer if you recall.

24                THE WITNESS:  No one could actually do

25   that.  Four million lines of code would be approximately



Page 217

1   4,000 years worth of work.

2   BY MR. FREEDMAN:

3        Q.    So, Dave Kleiman never turned two

4   millions lines of code into six million lines of code;

5   is that your testimony?

6        A.    No person can change four million

7   themselves into six million.

8        Q.    Did Dave Kleiman cause two million lines

9   of code to turn into six million lines of code?

10            MS. MARKOE:  Objection.

11            THE WITNESS:  Is Dave, in your

12   assumption, a wizard?

13   BY MR. FREEDMAN:

14        Q.    If you could just answer the question,

15   Dr. Wright.

16        A.    I believe I just did.

17        Q.    The answer is no?

18        A.    The answer is unless he is already 4,000

19   years old and he started coding at the time of the sort

20   of exodus or whatever else, then probably not.

21        Q.    Was it possible he supervised the

22   creation of four million lines of code?

23            MS. MARKOE:  Objection.  You can answer.

24            THE WITNESS:  Yes.

25   BY MR. FREEDMAN:



Page 218

1          Q.     Did he supervise the creation of four

2    million lines of code?

3               MS. MARKOE:  Objection.  You can answer

4    if you know.

5               THE WITNESS:  I do not know.

6    BY MR. FREEDMAN:

7          Q.     Whose idea was it to create W&K US?

8          A.     Dave's.

9          Q.     How did that idea get initially

10   communicated to you by Dave?

11              MS. MARKOE:  Objection.  You can answer.

12              THE WITNESS:  I do not really remember.

13   BY MR. FREEDMAN:

14         Q.     Was anyone else involved in the initial

15   communications about W&K?

16         A.     Yes.

17         Q.     Who?

18         A.     My ex-wife.

19         Q.     What was the purpose of starting W&K?

20         A.     Dave was a vet.  As a vet, he was able to

21   theoretically access funding from the US government.

22   I was working on a number of different projects that

23   aligned with what the Department of Homeland Security

24   was seeking to be developed.  I said I would aid Dave

25   because he was in a bit of trouble, and that we could do



Page 219

1    a few different projects together, including that, that

2    would enable him to hopefully get some money to be able

3    to work less, as he was in the hospital.

4              Q.    What was your involvement in W&K?

5              A.    Very little.

6              Q.    How much was your involvement?  What was

7    your involvement in W&K?

8              A.    Talking about it and then going off and

9    writing some papers, full stop.

10             Q.    Did you have any ownership in W&K?

11             A.    No.

12             Q.    Who owned W&K?

13             A.    The records for W&K exist.  I do not know

14   if the records are accurate.

15             Q.    Who owned W&K in reality?

16             A.    Not me.

17             MS. MARKOE:  Objection.

18   BY MR. FREEDMAN:

19             Q.    Who?

20             A.    Who owns BHP Billiton in reality?  It is

21   not my company.  I do not care.

22             Q.    You have no idea who owns W&K?

23             A.    I do not know that.

24             MS. MARKOE:  Objection.

25             THE WITNESS:  If I do not own it, I do



Page 220

1    not care about it.

2    BY MR. FREEDMAN:

3            Q.      Did W&K ever mine Bitcoin?

4            A.      I do not know what other companies that

5    are not mine do.

6            Q.      Did you ever tell anyone that W&K mined

7    Bitcoin?

8                    MS. MARKOE:  Objection.  You can answer

9    if you remember.

10                   THE WITNESS:  I have no idea.

11   BY MR. FREEDMAN:

12           Q.      Is there a reason you would have told

13   somebody why W&K mined Bitcoin?

14                   MS. MARKOE:  Objection.  If he does not

15   know if he has told anyone then the question lacks a

16   predicate.

17                   MR. FREEDMAN:  He does not recall.  I am

18   asking if there is a reason why he might have said it.

19                   MS. MARKOE:  Answer if you can, but I am

20   objecting.

21                   THE WITNESS:  The nature of Bitcoin is a

22   predicate-based system.  It either fails true or false.

23   If it is true, a transaction is valid.  If it is false,

24   it is rejected and never talked of again.  This will be

25   never talked of again.



Page 221

1                    Can we have a break in a moment?

2                    MR. FREEDMAN:  Absolutely.  Let us take

3     one now.

4                    THE VIDEOGRAPHER:  Going off the record.

5     The time is 16.14.  End of video card number 4, volume

6     1, in the video deposition of Dr. Craig Wright.

7                         (A Short Break)

8                    THE VIDEOGRAPHER:  This is the beginning

9     of video card number 5, volume 1, in the video

10    deposition of Dr. Craig Wright.  Going back on the

11    record.  The time is 16.29.  Thank you.

12    BY MR. FREEDMAN:

13         Q.    Do you feel better, Dr. Wright, for the

14    break?

15                    MS. MARKOE:  Objection.

16                    THE WITNESS:  Mmm-hmm, definitely.

17    BY MR. FREEDMAN:

18         Q.    Did W&K ever work on Bitcoin IP?

19         A.    What do you mean by did W&K ever work on

20    Bitcoin IP?

21         Q.    Did the company W&K ever work with you in

22    any way on Bitcoin IP?

23         A.    No.

24                    MS. MARKOE:  Objection.  You can answer.

25    BY MR. FREEDMAN:



Page 222

1          Q.     Did you work with W&K on any IP?

2          A.     No.  I did not work with W&K at all.

3          Q.     Did you create intellectual property

4     called a metered payment system?

5          A.     No.

6          Q.     Did you create intellectual property

7     called Software Derivative Markets and Information

8     Security Risk Systems?

9          A.     Yes.

10              MS. MARKOE:  Objection.

11   BY MR. FREEDMAN:

12         Q.     Do you know who created a metered payment

13    system's intellectual property?

14              MS. MARKOE:  Objection.  I am going to

15    instruct the witness not to answer.  It has no relevance

16    to either Dave Kleiman, W&K or even the witness.  He

17    said he had not create that intellectual property called

18    a metered payment system.

19   BY MR. FREEDMAN:

20         Q.     Did Dave Kleiman create a metered payment

21    system?

22              MS. MARKOE:  Objection.  Answer if you

23    know.

24              THE WITNESS:  I do not know what Dave

25    Kleiman created.



Page 223

1   BY MR. FREEDMAN:

2           Q.    The intellectual property Software

3    Derivative Markets and Information Security Risk

4    Systems, is it valuable?

5                   MS. MARKOE:  Objection.

6                   THE WITNESS:  It is put out open source

7    and the paper was published in an academic conference.

8   BY MR. FREEDMAN:

9           Q.    Does that mean it has no private value?

10                  MS. MARKOE:  Objection.  You can answer

11   if you can.

12                  THE WITNESS:  I am not an IP valuer.

13   BY MR. FREEDMAN:

14          Q.    Do you have a claim to it, a title, a

15   patent?

16          A.    No.  It is public.

17          Q.    Did you create intellectual property

18   called Software Assurance Marketplace?

19          A.    Yes.

20          Q.    Who has title to this intellectual

21   property now?

22                  MS. MARKOE:  Objection.

23                  THE WITNESS:  Public domain.

24   BY MR. FREEDMAN:

25          Q.    Did you create intellectual property



Page 224

```
1    called Software Assurance Through Economic Measures and

2    Anti-Fraud System?

3                   THE WITNESS:  Yes.

4                   MS. MARKOE:  Objection.

5    BY MR. FREEDMAN:

6         Q.     Who has title to it now?

7         A.     Public domain.

8         Q.     Did you create intellectual property

9    called Risk Quantification System for Financial

10   Modelling in Bitcoin?

11                  MS. MARKOE:  Objection.  Look, can you

12   tell me what topics this relates to?

13                  MR. FREEDMAN:  The collaboration in W&K.

14                  MS. MARKOE:  But you have not connected.

15   You are asking has he created things.  Connect it to W&K

16   or I will instruct him not to answer.

17                  MR. RIVERO:  Let me stop one second.

18   What topic about the collaboration on W&K?  I see W&K

19   referred to in a couple of spots.  Which topic?

20                  MR. FREEDMAN:  You know what, we will

21   look it up and we will get back to you after the break

22   because I do not want to just waste time on the record

23   for now.  We will skip it.

24                  THE WITNESS:  Can I just say there have

25   been no collaborations.
```



1              BY MR. RIVERO:  I just want to say very

2     inefficient to do a series of questions and when you ask

3     you specifically what topics so we can figure it out, it

4     is not there.  That is the problem.  Just as the rule

5     that you referred to is not there.  You are wasting

6     time.  Let us get going.

7              MR. FREEDMAN:  No, we are not going to

8     keep going because I am going to respond to that on the

9     record.

10             MR. RIVERO:  State the rule.

11             MR. FREEDMAN:  I told you it is  rule 30

12    of the Rule of Civil Procedure and the local rule 30.1

13    which was amended and specifically stated that this was

14    not meant to take away the fact that you cannot lead the

15    witness.  There are many court opinions on point which

16    say you cannot make speaking objections because it leads

17    the witness.  Second of all ----

18             MR. RIVERO:  Let me respond to that.

19             MR. FREEDMAN:  No, no, I am  responding

20    to everything.

21             MR. RIVERO:  Let me respond to number 1.

22    Despite repeated statements on the record that a local

23    rule prohibited ----

24             MR. FREEDMAN:  It does.

25             MR. RIVERO: ---- any statement beyond



Page 226

1    form, you are entirely wrong.  I have asked repeatedly.

2    There is no rule, it is not in the discovery handbook

3    and the case authority is definitely not the way you

4    describe it.  So let us keep going.  Number two.

5                    MR. FREEDMAN:  I am not going to waste my

6    time but I will tell you the case authority you can look

7    up.

8                    MR. RIVERO:  That already answers that

9    when you stated there was a rule prohibiting it you were

10   absolutely wrong.

11                   MR. FREEDMAN:  No, that is not true.  It

12   is cites ----

13                   MR. RIVERO:  It is not in 30.1, it is not

14   in 30, it is not in the discovery handbook.

15                   MR. FREEDMAN:  It certainly is.

16                   MR. RIVERO:  No, it is not.

17                   MR. FREEDMAN:  Let us just put it on the

18   record.  It is Flexiteek Americas Inc v Plastique Inc.

19                   MR. RIVERO:  We are now way off in case

20   law which is in dispute.

21                   MR. FREEDMAN:  The citation would be 2009

22   WL 10667524.

23                   THE WITNESS:  I am the only person with a

24   British legal degree in ----

25                   THE COURT REPORTER:  You are both



Page 227

1    speaking at the same time.  I cannot do that.

2                    MR. FREEDMAN:  That is all right.  The

3    videographer got it.  That is all I needed.  You will

4    get it later.

5                    MR. RIVERO:  I object to the process that

6    has been conducted.  Next question.

7    (Plaintiff's Exhibit 4 marked for identification)

8    BY MR. FREEDMAN:

9        Q.    I have handed you what we have marked as

10   Plaintiff's Exhibit 4.  Can you go to the bottom,

11   please, of page 4.  Do you recognise what this document

12   is?

13       A.    Yes.  This was a document put together by

14   staff at one of my companies.

15       Q.    Did you send this document to

16   Ira Kleiman?

17       A.    I presume so, seeing as it is chronology

18   of Craig Wright to Ira K.

19       Q.    Can you look at the bottom of page 4,

20   where it says:  "There is a lot of IP and 'stuff' in the

21   mix.  All up, it's about a hundred million dollars'

22   worth.  This IP originates in work CSW has been doing

23   for more than 10 years; it originates in things that

24   came from W&K; it has to do with the software acquired."

25   Do you see that?



```
 1                    MS. MARKOE:  Objection.  Can you re-point
 2      us to where you are.
 3                    MR. FREEDMAN:  Bottom of page 4.
 4                    MS. MARKOE:  Bottom of page 4.
 5                    MR. FREEDMAN:  Last paragraph, page 4.
 6                    MS. MARKOE:  Okay.  I will just state
 7      that the document speaks for itself.  I was unable to
 8      track what you were saying, so the document will speak
 9      for itself.
10      BY MR. FREEDMAN:
11           Q.    Can you break down that $100 million
12      worth for me into the three buckets that you have put
13      forward in that chronology: the work you have been doing
14      for 10 years, the work that originates from W&K and the
15      software acquired?
16                    MS. MARKOE:  Objection.
17                    THE WITNESS:  I did not put forth the
18      chronology.
19      BY MR. FREEDMAN:
20           Q.    So is it inaccurate?
21           A.    Yes.  You will note that work for more
22      than 10 years and originates in W&K, which was not 10
23      years old, so therefore there is a discrepancy in that
24      very sentence you are pointing out.  I did not create
25      the document.
```



Page 229

```
 1           Q.     So was there not $100 million worth of IP
 2    in the mix?
 3                  MS. MARKOE:  Objection.
 4                  THE WITNESS:  Which mix?
 5    BY MR. FREEDMAN:
 6           Q.     It says "'stuff' in the mix".  You tell
 7    me.
 8           A.     What is the mix?
 9           Q.     I am asking you, it is your staff that
10    did it.  What did they mean by "IP and 'stuff' in the
11    mix"?
12                  MS. MARKOE:  Objection.
13                  THE WITNESS:  I do not know the state of
14    mind of my staff at all times.
15    BY MR. FREEDMAN:
16           Q.     You sent this to Ira without knowing what
17    it meant?
18                  MS. MARKOE:  Objection.
19                  THE WITNESS:  I sent quite a few things
20    to Ira.  I did not check all of them for all the details
21    at any point.
22    BY MR. FREEDMAN:
23           Q.     So W&K had no IP of value?
24                  MS. MARKOE:  Objection.
25                  THE WITNESS:  I am not W&K.
```



Page 230

BY MR. FREEDMAN:

2          Q.     To the best of your knowledge did W&K

3    ever have valuable intellectual property?

4                 MS. MARKOE:  Objection.  You can answer.

5                 THE WITNESS:  I have stated before,

6    I care about my own companies.  I really do not care

7    about any other in existence anywhere on the planet that

8    has nothing to do with my companies, or cannot hand me

9    something.

10   BY MR. FREEDMAN:

11         Q.     Did you ever obtain valuable intellectual

12   property from W&K?

13                MS. MARKOE:  Objection.  You can answer.

14                THE WITNESS:  Yes.

15   BY MR. FREEDMAN:

16         Q.     How?

17         A.     I paid for work to be done through my

18   companies.

19         Q.     Was W&K your company?

20                MS. MARKOE:  Objection.

21                THE WITNESS:  No.

22   BY MR. FREEDMAN:

23         Q.     So how did you get W&K's valuable

24   intellectual property?

25                MS. MARKOE:  Objection: asked and



Page 231

1    answered.

2                 THE WITNESS:  As I have just stated,

3    companies I own dealt with W&K.  W&K provided

4    intellectual property.

5    BY MR. FREEDMAN:

6         Q.    What was the intellectual property W&K

7    provided?

8         A.    Source code.

9         Q.    For?

10        A.    Primarily it enhanced some of the gaming

11   operations I was doing.  It improved upon a lot of the

12   poker operations.  We built a back door so that we could

13   get through the Chinese firewall.  That enabled a number

14   of Costa Rica gaming operations to basically deal with

15   online casinos in a number of places, not just sort of

16   in Costa Rica, but America and China.  It enabled

17   Sportsbooks to access things without putting their IP

18   better than Tor.  It enabled us to have monitoring and

19   software that was put onto WebMoney, and Liberty

20   Reserve.  It enabled the capture of information from

21   many of these networks.

22        Q.    What was the value of this intellectual

23   property?

24        A.    I am not an intellectual property valuer.

25        Q.    Who created this intellectual property?



Page 232

1          A.     Which part?

2          Q.     Who created the intellectual property

3   that enhanced some of the gaming operations you were

4   doing?

5          A.     I do not know.

6          Q.     Who created the intellectual property

7   that improved upon a lot of the poker operations?

8          A.     I do not know.

9          Q.     Who created the intellectual property

10  that built the back door so that you could get through

11  the Chinese firewall?

12         A.     Who built it or who enhanced it or who

13  distributed it?  They are different things.

14         Q.     Tell me who built it?

15         A.     Me.

16         Q.     Who enhanced it?

17         A.     People Dave was dealing with out of

18  Russia.

19         Q.     Who distributed it?

20         A.     Quite a number of sites, including some

21  associated with the US government.

22         Q.     Can you list those sites for me?

23                MS. MARKOE:  Objection.

24                THE WITNESS:  No.

25  BY MR. FREEDMAN:



1          Q.      Because you do not know them?

2          A.      Some I do.  Those ones we will have to

3     deal with in camera.  Other ones, no.

4          Q.      The distribution of these technologies

5     relates to national security?

6          A.      The poker stuff, no.  The back doors,

7     some could.

8          Q.      Can you tell me about Dave's interaction

9     with the folks in Russia?

10              MS. MARKOE:  Objection.  Answer if you

11     can.

12              THE WITNESS:  I do not know about what

13     other people do.  I do not follow my own staff at the

14     moment, so you are asking me -- I mean, do you actually

15     know the size of my operations?

16     BY MR. FREEDMAN:

17          Q.      No.

18          A.      Then that is why you have no idea what

19     you are asking.  Do you know how many countries I have

20     operations in now?

21          Q.      I want you to focus on what you had in

22     2013 and before.

23          A.      In Australia, do you know how many people

24     I had at the end of 2013?

25          Q.      How many?



Page 234

1           A.     Over 50.  Do you know how many countries
2     I had operations in in 2013?
3           Q.     No.
4           A.     Around 60.
5                  MS. MARKOE:  Guys, seriously, Vel is
6     taking this deposition.  You are not taking the
7     deposition.  Let him ask his questions.
8     BY MR. FREEDMAN:
9           Q.     Who created the intellectual property
10    that enabled Sportsbooks to access things without
11    putting their IP better than Tor?
12          A.     Again, I did not follow up who was
13    individually creating anything.
14          Q.     Was Dave responsible for the creation of
15    this intellectual property?
16                 MS. MARKOE:  Objection.
17                 THE WITNESS:  Can you specify that in a
18    better, more clear manner.
19    BY MR. FREEDMAN:
20          Q.     W&K created all this intellectual
21    property; is that correct?
22          A.     A lot of that, yes.
23          Q.     Who was responsible for W&K's operations?
24                 MS. MARKOE:  Objection.
25                 THE WITNESS:  Again, you are asking me



Page 235

1   something -- who was responsible for the operations in

2   this office.

3   BY MR. FREEDMAN:

4       Q.    So you do not know who was responsible

5   for the operations at W&K to create this intellectual

6   property?

7           MS. MARKOE:  Objection.

8           THE WITNESS:  I have already said I do

9   not know who is responsible for half the things that

10  happen in my own office right at the moment, nor do

11  I intend to be.

12  BY MR. FREEDMAN:

13      Q.    Who was your contact at W&K to create all

14  this intellectual property?

15          MS. MARKOE:  Objection:  mischaracterises

16  the testimony.

17          MR. FREEDMAN:  You can answer.

18          THE WITNESS:  Dave.  By Dave, I mean Dave

19  Kleiman.

20  BY MR. FREEDMAN:

21      Q.    Did the Sportsbooks program intellectual

22  property enable betting with -- strike that.  Did any of

23  the poker-related technology involve the use of Bitcoin?

24          MS. MARKOE:  Objection.  You can answer

25  if you can.



1                    THE WITNESS:  Yes.

2    BY MR. FREEDMAN:

3            Q.    How did it involve Bitcoin?

4            A.    You could take Bitcoin and bet.

5            Q.    What was this called, this intellectual

6    property?

7                    MS. MARKOE:  Objection: vague.

8                    THE WITNESS:  Texas hold'em.

9    BY MR. FREEDMAN:

10            Q.    Did you file a patent?  Was it a code?

11    How did you -- strike that.

12            A.    Do you understand that this is ----

13                    MS. MARKOE:  There is no question

14    pending.  He struck his question.  Let him ask a

15    question and you can answer it.

16    BY MR. FREEDMAN:

17            Q.    How did you obtain the intellectual

18    property that relates to poker?

19                    MS. MARKOE:  Objection: mischaracterises

20    the testimony.

21                    THE WITNESS:  Can you ask something a bit

22    less vague.

23    BY MR. FREEDMAN:

24            Q.    How did you obtain -- strike that.  You

25    obtained intellectual property from W&K that involved



Page 237

1   poker and Bitcoin; is that correct?

2                   MS. MARKOE:  Objection.

3                   THE WITNESS:  Are you talking about me or

4   a company that I owned?

5   BY MR. FREEDMAN:

6       Q.     Or a company that you -- I thought you

7   did not own any companies.

8       A.     I said owned.  And that is not own.

9       Q.     Which company did you own previously but

10  no longer do?

11                  MS. MARKOE:  Objection.

12      A.     There are over 100 of those.

13  BY MR. FREEDMAN:

14      Q.     Over 100 companies that you owned but no

15  longer do?

16      A.     Yes.

17      Q.     Who owns them now?

18      A.     I do not know.

19                  MS. MARKOE:  Objection.

20  BY MR. FREEDMAN:

21      Q.     This is because you put in place a

22  structure so you do not know who owns them?

23                  MS. MARKOE:  Objection.  This question is

24  overbroad and is going to result in a very unclear

25  answer when you are talking about over 100 companies.



Page 238

1    They cannot possibly all have the same answer.

2                      MR. FREEDMAN:  Maybe it does.

3                      THE WITNESS:  It does not.

4                      MR. RIVERO:  What topic does it relate

5    to?

6                      MR. FREEDMAN:  The court has specifically

7    directed us to be able to ask all about Dr. Wright's

8    entities at hearings and even beyond here.

9                      MR. RIVERO:  No.

10                     MR. FREEDMAN:  But at subsequent hearings

11   and you can ask Ms. Markoe about this.  He specifically

12   authorised inquiry into the companies.

13                     MS. MARKOE:  He authorised limited

14   inquiry into those companies and it needs to be clear

15   inquiry, so if you would like to ask a question that

16   will result in a clear answer I am sure he can answer on

17   a limited basis.  You are limited, if my recollection is

18   correct, in asking questions about those once we have

19   established that those companies do not relate to Dave

20   Kleiman or W&K.

21                     MR. FREEDMAN:  I am not sure that is

22   correct, but let us not waste time on that.

23            Q.    When was the first time you contracted

24   with W&K?

25            A.    I do not know.  You would have to look at



Page 239

1    the date of the contract.  (Pause).

2    (Plaintiff's Exhibit 5 marked for identification)

3            Q.    I have just handed you Plaintiff's

4    Exhibit 5.  Do you recognise this contract?

5            A.    I recognise this contract.

6            Q.    What is the date of this contract?

7            A.    22nd April 2011.

8            Q.    Can you tell me in your own words what

9    the bargain in this contract was?

10                 MS. MARKOE:  Objection.  You can answer.

11                 THE WITNESS: This is an agreement between

12   Craig Wright R&D, a company, and W&K Info Defense, an

13   LLC in the US, for provision of services.

14   BY MR. FREEDMAN:

15           Q.    On page 15 of this document is that your

16   signature?

17                 MS. MARKOE:  Do you mean 15 at the top?

18                 MR. FREEDMAN:  15 at the top.

19                 THE WITNESS:  That is signed by me, yes.

20   BY MR. FREEDMAN:

21           Q.    Can you go back to page 3, please.

22   Sorry, take that back, can you go to page 4.  I am

23   looking at L.

24                 MS. MARKOE:  You are referring to page 4

25   at the top.  There is just different paginations.



Page 240

1                    MR. FREEDMAN:  Always at the top.

2                    MS. MARKOE:  Okay.  I just want to make

3    sure we have a clear record.

4    BY MR. FREEDMAN:

5           Q.    This is docket entry 83-10.  Do you need

6    a second to familiarise yourself with paragraph L?

7           A.    I have read it.

8           Q.    What is going on here?

9           A.    Sorry, what do you mean what is going on?

10   It is a piece of paper.  Nothing is going on.

11          Q.    Can you tell me, as I read this paragraph

12   of the contract, you are providing, you are the

13   financier; is that correct?

14                   MS. MARKOE:  Objection.

15                   THE WITNESS:  No.

16   BY MR. FREEDMAN:

17          Q.    Craig Wright R&D is the financier?

18          A.    That is what it states, yes.

19          Q.    Craig Wright R&D is providing 1,024 core

20   Xeon and GPU based hardware solution.  (a) It is

21   acknowledged that two SGI ICE XE310-512 core hosts have

22   been provided and are in a data centre specified by the

23   provider."  What is SGI ICE XE310?

24          A.    A computer.

25          Q.    Is it a special computer or just a



Page 241

1    regular computer?

2         A.    It is an HPC, high memory, high core

3    computer.

4         Q.    (b) states the purpose of the provision

5    of these hardware systems; is that correct?

6         A.    It is a possible use that by the time

7    that this was implemented was not available.

8         Q.    So (b) says -- can you read (b) for me?

9         A.    "The provider will use these systems to

10   mine Bitcoin."

11        Q.    And then (c) says the expected amount of

12   the Bitcoin; is that correct?

13        A.    No.

14        Q.    Well, can you read (c) for me?

15        A.    "The provider expects to earn" -- that is

16   not correct because by the time this was implemented,

17   ASICs, FPGAs and other things had been developed which

18   would make this about one Bitcoin a year.

19        Q.    (c) says that you expect it to earn

20   12,000 Bitcoin per month; is that correct?

21             MS. MARKOE:  Objection: misstates what

22   the document says.

23             THE WITNESS:  I did not expect to earn

24   anything.

25   BY MR. FREEDMAN:



Page 242

1          Q.     M states that W&K are supposed to pay for

2    these systems with 300,000 Bitcoin; is that correct?

3          A.     That is what it states.

4          Q.     Did W&K ever pay 300,000 Bitcoin?

5          A.     No.

6          Q.     Why not?

7          A.     David died.

8          Q.     How did W&K get 300,000 Bitcoin if

9    this -- strike that.  Did W&K put these computers listed

10   in L to work to mine Bitcoin?

11                MS. MARKOE:  Objection: foundation and

12   you are going beyond the scope again.  Would you like to

13   connect it to one of the topics, please.

14                MR. FREEDMAN:  This is 4, the location

15   and duration of Dave, W&K and Craig's mining of Bitcoin

16   from 2009 till April 2013.

17                MS. MARKOE:  You can answer the question

18   if you know the answer.

19                THE WITNESS:  There was no mining of

20   Bitcoin between myself and Dave ever.  There was no

21   mining at all in any way that I know of on those

22   machines, ever.

23   BY MR. FREEDMAN:

24          Q.     So, as far as you are aware, Dave never

25   used those machines to mine Bitcoin?



1          A.     It would be totally stupidly foolish to

2     mine anything once ASICs came out on those machines.  It

3     would probably set me back around $4 million a month for

4     something, at the time, worth less than $12,000.

5          Q.     What was the purpose of this clause at

6     the time the contract was entered into?

7          A.     Which clause?

8          Q.     L?

9          MS. MARKOE:  Objection.

10         MR. RIVERO:  You may answer.

11         THE WITNESS:  The clause was there to

12    have machines that would be run and managed.  The

13    primary purpose would be I was using scaling tests and

14    other such things.  Those machines were running enhanced

15    versions of Bitcoin that I was creating, the node

16    software, so that I could see how far I could scale

17    Bitcoin as a blockchain.  Any other side use, while not

18    being used, was originally envisioned that others could

19    mine Bitcoin with.

20    BY MR. FREEDMAN:

21         Q.     In clause B, on page 3, the contract

22    states that "The provider desires the intellectual

23    property for the permitted use ..."  What was the

24    intellectual property referred to here?

25         MS. MARKOE:  Objection.  You can answer.



Page 244

1              THE WITNESS:  Some of that is the things

2      we have already talked about, including gaming software.

3      Dave was running operations that I helped set him up in

4      Costa Rica.

5   BY MR. FREEDMAN:

6          Q.     Craig Wright R&D paid for this

7      development in paragraphs F and G; is that correct?

8              MS. MARKOE:  Objection.  You can answer.

9              THE WITNESS:  I instructed people who

10     were with the company to pay for machines to be

11     purchased.

12  BY MR. FREEDMAN:

13         Q.     Where did this Bitcoin come from?

14             MS. MARKOE:  Objection.  I am going to

15     instruct the witness not to answer.  It goes beyond the

16     scope.

17             MR. FREEDMAN:  Of 10 as well?

18             MS. MARKOE:  Where in 10 does it

19     reference ----

20             MR. FREEDMAN:  Inquiry into the entities

21     and projects referenced in Exhibits 5, 10 and 15 in a

22     second I am going to complain.

23             MS. MARKOE:  Right, and your question, if

24     I recall correctly -- let me just see -- actually, would

25     you mind reading it back; I cannot locate it at the



1    moment.

2      (The court reporter read back as requested)

3                    MR. RIVERO:  Just give us a moment.

4                    MR. FREEDMAN:  Let me take a break

5    because I have to use the restroom.

6                    THE VIDEOGRAPHER:  Going off the record.

7    The time is 16.58.

8                         (A Short Break)

9                    THE VIDEOGRAPHER:  Going back on the

10   record.  The time is 17.09.  Thank you.

11   BY MR. FREEDMAN:

12      Q.    Before the break, Dr. Wright, I asked you

13   where the Bitcoin mentioned in paragraphs F and G --

14   sorry, take that back.

15                    MS. MARKOE:  It might be easier just to

16   have her read back the last question.

17                    MR. FREEDMAN:  I looked at it, though.  I

18   just said:  "Where did this Bitcoin come from?"  Let us

19   start again with a clear record.

20                    MS. MARKOE:  Okay.

21   BY MR. FREEDMAN:

22      Q.    Let us look at paragraph A.  Paragraph A,

23   Dr. Wright, says:  "The Financier controls the following

24   Bitcoin (BTC) addresses."  How did Craig Wright R&D come

25   to possess these Bitcoin addresses?



Page 246

1           A.      I do not know.

2           Q.      Paragraph F says that the financier will

3    send 165,140 Bitcoin to the 1MSU address by 30th April

4    2011.  Did Craig Wright R&D send 165,140 Bitcoin to the

5    1MSU address?

6           A.      I do not know.

7           Q.      Did you cause or request that Craig

8    Wright R&D make this transfer?

9           A.      I requested that people pay the amounts

10   that they are meant to pay, yes.

11          Q.      Where did this request go to?

12          A.      It went to Craig Wright R&D.

13          Q.      Who at Craig Wright R&D?

14          MS. MARKOE:  Objection.  You can answer.

15          THE WITNESS:  I do not know.  This is

16   years ago.  I do not remember the people in that

17   company.

18   BY MR. FREEDMAN:

19          Q.      Which company was it?

20          A.      Craig Wright R&D.

21          Q.      But there were many of them.

22          A.      Which Craig Wright R&D is I believe what

23   you are asking.

24          Q.      Mmm-hmm.

25          A.      That was in Panama.



1          Q.     And Craig Wright R&D Panama had control

2     over these Bitcoin addresses?

3                 MS. MARKOE:  Objection.  You can answer

4     if you know.

5                 THE WITNESS:  I told people what to do.

6     They told me they had done it.  That is as far as I go.

7     BY MR. FREEDMAN:

8          Q.     And then did Craig Wright R&D deliver the

9     50,000 Bitcoin referenced in paragraph G?

10         A.     Again, I do not have much to do with

11    finance in the companies other than people giving me

12    reports saying it has all been done or not, and if I do

13    not get complaints about finance by creditors or debtors

14    or whatever else going, "Why the hell it has not

15    happened", etcetera, then I am a happy guy and I stay

16    out of people's way.

17         Q.     Can you go to page 13 for me, please,

18    Dr. Wright.

19                MS. MARKOE:  Again, just for clarity's

20    sake, that is 13 at the top.

21    BY MR. FREEDMAN:

22         Q.     Top of the page.  I am looking at

23    paragraph 18(a).

24         A.     Mmm-hmm.

25         Q.     It says:  "The paper Bitcoin Wallet with



1    address 1933ph", and so on ----

2          A.    Yes.

3          Q.    ---- "will be held by the financier as

4    assurance or the contract and will convert to the

5    ownership of the financier on default of the provider."

6    So, Craig Wright R&D held the 1933 wallet as collateral?

7                MS. MARKOE:  Objection.  You can answer.

8                THE WITNESS:  That would be the finance

9    people over in Panama, not me.

10   BY MR. FREEDMAN:

11         Q.    Who were the finance people at Panama?

12         A.    Some of those were associated with a

13   company called High Secured, and there were other people

14   who used to work for Liberty Reserve.

15         Q.    So the folks at High Secured and Liberty

16   Reserve controlled this Bitcoin wallet address?

17                MS. MARKOE:  Objection: mischaracterises

18   the testimony.

19   BY MR. FREEDMAN:

20         Q.    Did the folks at High Secured and Liberty

21   Reserve control this wallet address?

22         A.    I have stated my involvement with finance

23   which is exactly as it is now, is, I say do things;

24   things either happen or do not happen.  If they do not

25   happen Craig gets all yelly and screamy and everyone



Page 249

1    gets upset, and when they do happen, things are good.

2            Q.    So the folks at finance controlled the

3    wallets listed at A on page 3; is that correct?

4            MS. MARKOE:  Objection: mischaracterises

5    the testimony.  You can answer.

6            THE WITNESS:  Again, I basically go to

7    finance people, they tell me things, I trust what my

8    people tell me, and if no one complains, no one says it

9    is not real, then I have to believe what I am told by

10   people I contract or paid.

11   BY MR. FREEDMAN:

12           Q.    How did this amount of Bitcoin end up in

13   these wallets?

14           MS. MARKOE:  Objection.  You can answer

15   if you know.

16           THE WITNESS:  There are two problems with

17   what you have just said.  This amount of Bitcoin in

18   18(a) is not -- that is an address, not an amount of

19   Bitcoin, and, secondly, they are an address, not a

20   wallet.

21   BY MR. FREEDMAN:

22           Q.    How did Bitcoin end up in the wallets

23   listed at A(a) and A(b)?

24           MS. MARKOE:  Objection.

25           THE WITNESS:  My assumption is that a



Page 250

1   transaction would be sent to the Bitcoin ledger.  Miners

2   would take that transaction and send into a block which

3   would be mined, updating the ledger.

4   BY MR. FREEDMAN:

5         Q.    Did you cause the Bitcoin to end up in

6   those wallets?

7                 MS. MARKOE:  Objection.

8                 THE WITNESS:  These are not wallets.

9   BY MR. FREEDMAN:

10        Q.    Addresses.  Did you cause the Bitcoin to

11  end up in these addresses?

12                MS. MARKOE:  Objection.  Answer if you

13  can.

14                THE WITNESS:  If you are saying did

15  I tell someone to do something and things happened, to

16  the best of my knowledge, no one complained.  I told

17  people in a group of companies in Panama to do things to

18  make sure Dave was happy.  Things happened.  No one

19  complained.  Dave did not complain to me.  I am happy.

20  Everyone is happy.

21  BY MR. FREEDMAN:

22        Q.    I am trying to figure out how the folks

23  in Panama ended up with that much Bitcoin at their

24  disposal?

25                MS. MARKOE:  Objection.



Page 251

1                    THE WITNESS:  Sorry, what is that much

2      Bitcoin?

3  BY MR. FREEDMAN:

4           Q.    It is 165,140 and then 50,000, so a total

5      of 215,140.

6           A.    You are asking how an organisation that

7      was turning over probably $20 million a month managed to

8      obtain $80,000 worth of Bitcoin?

9           Q.    Yes.

10          A.    Well, if you had offered someone 100,000,

11     they would have given you no questions asked.  You could

12     have gone to LocalBitcoins.  You could have gone to

13     Mt. Gox.  You could have gone to a number of criminal

14     organisations that were selling it.  Libya Reserves had

15     quite a number of Bitcoin.  How would you do that?

16     Well, people exchange goods and services.  You take US

17     dollars and you make a trade.

18                    MR. RIVERO:  There is a question from the

19     court reporter.

20                    THE WITNESS:  Mt. Gox.

21  BY MR. FREEDMAN:

22          Q.    In April of 2011, was it possible to

23     acquire 165,000 Bitcoin on the open market?

24          A.    Yes.  In fact, around that sort of time,

25     50,000 Bitcoin was swapped for two pizzas.



Page 252

1            Q.     Do you have any information on how the

2     165,140 and 50,000 ended up in the two addresses at A(a)

3     and A(b)?

4                      MR. RIVERO:  Objection.  Did you say A(a)

5     and A(b)?

6                      MR. FREEDMAN:  Yes, on page 3.

7                      MR. RIVERO:  I am sorry, I do not

8     understand the question.  I do not understand your

9     question.  I cannot form an objection.  Do you mean F(b)

10    and G(b)?  Oh, I see.  Withdraw.  Go ahead.  Yes?

11                     THE WITNESS:  My statement is very

12    simple: they are addresses; no amount is claimed at

13    those addresses.

14    BY MR. FREEDMAN:

15            Q.     These addresses transferred these

16    amounts -- sorry, let us make that clear.  The 12h

17    address transferred 165,140 Bitcoin to the 1MSU address?

18                     MR. RIVERO:  Objection: mischaracterises

19    the testimony.  You may answer.

20                     MR. FREEDMAN:  Do you mind, I did not

21    quite finish yet.

22                     MR RIVERO:  Oh!

23    BY MR. FREEDMAN:

24            Q.     Do you know how the Bitcoin ended up in

25    the 12h address?



Page 253

1           A.      Well, a transaction would be sent to the

2      blockchain.  Miners will take their transaction for

3      transaction fees.

4           Q.      Let me be clear, doctor, because you

5      explained this before.  I am not asking for the

6      technical explanation of how the Bitcoin ends up, I am

7      asking for the practical explanation.  Everyday people

8      like me would say, how did the Bitcoin end up in that

9      wallet address, or that public address; who sent it

10     there?

11                  MR. RIVERO:  Objection.

12                  THE WITNESS:  I am saying, where is a

13     block explorer to tell me it actually went on any

14     particular date?

15     BY MR. FREEDMAN:

16          Q.      Sitting here today -- strike that.  Did

17     any of the Bitcoin you mined in Australia end up at

18     these public addresses?

19          A.      No.

20                  MR. RIVERO:  Object to the form.  Just

21     give me one moment to state the objection.  (Pause)

22     BY MR. FREEDMAN:

23          Q.      Can you go with me to page 14 at the top.

24     Can you look at the definition of "Product", or the

25     listing of what product is.  Can you read that for me,



Page 254

1    please.

2            A.      "Bitcoin and Exchange Software in

3    C/C++/C#/R code."

4            Q.      How did Bitcoin and Exchange Software fit

5    into this contract?

6                    MR. RIVERO:  Misstates the document.

7    Objection.

8                    MR. FREEDMAN:  You can answer.

9                    THE WITNESS: Sorry, how did Bitcoin and

10   Exchange Software fit into this document?

11   BY MR. FREEDMAN:

12           Q.      Yes.  It just says "Product".  What does

13   that mean?

14           A.      It means exactly what it says there.

15           Q.      Is this the product that Dave Kleiman was

16   producing for you at W&K?

17                   MR. RIVERO:  Objection.

18                   THE WITNESS:  I need more of an

19   explanation than that.  Exchange Software, I mean that

20   is a very wide -- that is like saying ----

21   BY MR. FREEDMAN:

22           Q.      You do not know what the contract means?

23           A.      I do not know what you are trying to

24   classify it as.

25           Q.      You tell me what the contract you signed



Page 255

1   means.  It says: "Product:  Bitcoin and Exchange

2   Software in C/C++/C#/R code."  What does that mean?

3            A.     If you want to cherry pick, that is a

4   different thing than saying this line means something

5   out of sort of the rest.  What the contract was about

6   was the production of code at the end.

7            Q.     For Bitcoin?

8            A.     Define "for Bitcoin".

9            Q.     I do not know, it says "Bitcoin",

10   "Product: Bitcoin"?

11            A.     Mmm-hmm.

12            Q.     Is that because the contract was creating

13   Bitcoin?

14            A.     No, Bitcoin was already created.

15            Q.     Is that because the contract was for the

16   purpose of creating mining Bitcoin?

17            A.     No, you cannot mine Bitcoin that way.

18   I have already stated this.

19            Q.     Was it for a Bitcoin exchange?

20            A.     No.  There were certain things that were

21   to do with a Bitcoin exchange, and some other aspects of

22   poker software, other aspects of the software I have

23   mentioned before, and the other stuff, intellectual

24   property, under the unawarded DHS projects.

25            Q.     Can you go with me to page 15.



Page 256

1          A.     Yes.

2          Q.     Do you see Dave Kleiman's name about a

3    quarter of the way down from the top of the page?

4          A.     Yes.

5          Q.     Do you see the signature there?

6          A.     What I see is his name written there,

7    yes.

8          Q.     Is that Dave Kleiman's signature?

9          A.     The definition of signature, if we take,

10   for instance, Salinger v Golden Mining, what you will

11   see is if I type "Regards, Craig", that is deemed a

12   signature under the law.  That was upheld in 2011 in the

13   British courts to be a signature.  A signature is an

14   attestation.  If I tell my EA, as I do every now and

15   again, "Please send in this document, I cannot get into

16   the office, I have noted in this e-mail I am authorising

17   you to sign", and she puts my name at the bottom, that

18   is legally a signature.  When I go "Regards, Dr. Craig

19   Wright" on an e-mail and it is typed, that is legally a

20   signature.  If I have a video attestation and I say, "I,

21   Craig Wright, agree to this contract", that is legally a

22   signature.  A signature in writing, basically,

23   incorporates, in this country at least, and as well

24   Australia, the incorporation of anything in any media,

25   including video attestation, that will allow one to



Page 257

1    prove that they agreed to be bound.  The definition of

2    signature is actually an agreement to be bound.  So,

3    what you are saying is, did Dave agree to be bound?  And

4    if he was part of this contract that would be that he

5    agreed to be bound.  If he was not, then he had no part

6    in the contract, and then has no rights under that

7    contract.  Which would you prefer to choose?

8           Q.    Actually, I would just prefer you to

9    answer the question.  Is that Dave Kleiman's signature?

10          A.    I have answered the question in detail.

11          Q.    I do not think so.  Can you give me a yes

12   or no; is that Dave Kleiman's signature?

13              MS. MARKOE:  Objection.  You can answer.

14              THE WITNESS:  I have answered the

15   question.

16   BY MR. FREEDMAN:

17          Q.    How did that mark get to be made on the

18   page?

19          A.    I do not really care.  If someone sends

20   me a contract and I haven't witnessed it personally or

21   noted that I witnessed it, then I have not witnessed it.

22   I am not going to give a rat's rectum about the origin

23   of something that someone does not dispute.  Dave had

24   many years to say, "Hey, I did not sign".  At some point

25   he could have put his hand up and said, "I do not agree



Page 258

1    with this".  At no point did he.  Of course, the

2    argument here when we were talking about the creation of

3    software that is legal in Australia, but illegal in the

4    USA, brings into a difficult position with contracts.

5    Although it is a legal contract in New South Wales, one

6    could argue that the creation of a prohibitive product,

7    that is actually a crime for an American citizen to

8    create, or be involved with, or distribute, or actually

9    fairly much anything to do with, would actually

10   invalidate Dave's contract but that is a different

11   issue.

12        Q.    Did you witness Dave Kleiman sign this

13   contract?

14        A.    It does not say witnessed at any point.

15        Q.    So you did not witness him sign the

16   contract?

17        A.    I believe I have noted that I was never

18   in Australia -- sorry, Dave was not in Australia, and

19   that I was not on the signing date of this contract in

20   the US.  At the time, witnessing over video was not

21   legal, and although the law has been updated and now in

22   the UK and Australia that is possible, it was not

23   possible at the time.  So, without being in the same

24   room as Dave, I would not be able to witness.

25        Q.    Dr. Wright, it would help us get through



Page 259

1    this deposition if you gave shorter answers that address

2    the exact question targeted.

3            A.      I do not believe I can without being

4    vague.

5            Q.      If I asked you to, how could you prove to

6    me that Dave Kleiman signed this contract?

7                    MS. MARKOE:  Objection.

8                    THE WITNESS:  I do not need to.

9    BY MR. FREEDMAN:

10           Q.      List to me all the ways in which you

11   could demonstrate Dave Kleiman signed this contract?

12                   MS. MARKOE:  Objection.

13                   MR. RIVERO:  Objection.

14                   MS. MARKOE:  I am going to instruct the

15   witness not to answer unless you can show me where in

16   the topics this relates.

17   (Plaintiff's Exhibit 6 marked for identification)

18                   MR. FREEDMAN:  We believe this question

19   relates to section 10 that authorises us to ask about

20   the projects referenced in 5, 10 and 15, but if you are

21   instructing the witness not to answer, in the interests

22   of time, we will move on.

23                   MS. MARKOE:  Can we go back and look at

24   the question again, based on what he said.  (Pause) The

25   last question by Mr. Freedman was:  "List to me all the



Page 260

1    ways in which you could demonstrate Dave Kleiman signed

2    this contract."  I objected and instructed you not to

3    answer.  I will remove my instruction not to answer and

4    you can answer if you can.

5                    MR. RIVERO:  We maintain the objection.

6                    MS. MARKOE:  We maintain the objection,

7    correct.

8                    MR. RIVERO:  The form is completely

9    defective, but answer if you can.

10                   THE WITNESS:  I have just published to

11   two papers on electronic signatures that were presented

12   in Oxford last month.  That involves an analysis of many

13   ways of signing digitally.  So, basically, any way that

14   you can say that someone signed.  Now, a signature is

15   very simple.  It does not need to be a handwritten

16   thing, and in fact a handwritten thing is the antithesis

17   of the idea of what it was.  The history of signatures

18   goes back to allowing Jews to sign with their name and

19   Christians would put an X.  In fact, only those who were

20   literate signing with Xs in medieval England.  So, the

21   reason for that is that you were taking an attestation

22   or an oath.  So, the history of signatures is such that

23   you are saying that you agree to be bound.  Can you say

24   that you agree to be bound?  Was there any evidence to

25   the contrary where someone could bring up saying there



Page 261

1    was no evidence of agreement to be bound?  In the case

2    of someone like Mr. Kleiman, did Mr. Kleiman ever stand

3    up and say, "I do not agree to be bound"?  In years of

4    dealing, contracting, etcetera, did he say, "No, this

5    was not my contract"?  You would want to show the

6    absence of anything like that.  You would want to show

7    the absence of e-mails saying, "I disagree with this

8    thing.  I did not agree to be bound by the contract.

9    That is not my signature".

10             Of course, that is a signature not being

11   this handwritten thing that people try and say, but

12   rather the agreement to be bound.  I would look for the

13   absence, and hope that if you were trying to contest a

14   signature, and say that someone did not agree to be

15   bound, there would be something, some evidence, in the

16   wide swathe of communications that can occur over years,

17   of anyone at any point going, "I do not agree with

18   this", that there were some communications with other

19   people saying, "I do not agree", where Dave would say,

20   "I did not agree to this contract", where maybe Ira or

21   whatever else had been communicating and going, "Dave,

22   what do you mean he says you are under contract?"  And

23   then Dave would go, "No, I did not actually sign that".

24   BY MR. FREEDMAN:

25             Q.    Okay, I am going to cut you up.



Page 262

1            MR. RIVERO:  Wait, do not cut the

2    witness -- hold on.  You ask about tell me all the ways

3    you can prove it and he is answering your question.  He

4    is going to finish his answer.  Whenever you feel like

5    it, Dr. Wright.  You asked the question.  We objected to

6    it because it is a completely defective question.  You

7    answer it until you feel satisfied.

8            THE WITNESS:  So, I would start by

9    analysing every bit of media Dave has ever had.  Was

10   there any social media where Dave had online -- and he

11   was very prolific online -- stated, "I do not agree to

12   this contract.  Someone is saying I am bound but I am

13   not".  So, you would go through all of his Facebook

14   posts, all of his Twitter, all of his communications

15   with other partners that he had in Australia, because

16   Dave did have partners.  I was not one of them, but Page

17   and Connor and things like that, maybe he would go to

18   them and say, "I was not bound by this", or mutual

19   friends we had, like Paul Henry, would Dave talk to

20   these guys, who were really good friends with us, who

21   had been in the industry a long time, "I did not agree

22   to this", he would say.  He would go up there and go,

23   "I did not agree to this contract and yet people are

24   claiming that I did".  You would find some evidence.

25   You would analyse all his hard drives, all his e-mails.



Page 263

1    You would look to what other people might say.  You

2    would find somewhere where someone had said, "I do not

3    agree to be bound", or Dave had gone to them, "I do not

4    agree to be bound"; why?  You would find something in

5    communications where that has occurred.  Thank you.

6                 MR. FREEDMAN:  Thank you.  If you do that

7    again, Dr. Wright, Andrés, we will bring it up with the

8    court.  It is purposely wasting time.

9                 MR. RIVERO:  The question asked for

10   proof.  The witness has answered exactly.  But you

11   allowed him to finish, so we are going to continue.

12   BY MR. FREEDMAN:

13         Q.     I believe we handed you Plaintiff's

14   Exhibit 6.  Do you recognise this exhibit?

15         A.     I do.

16         Q.     What is this exhibit?

17         A.     It is a contract.

18         Q.     Made between who and who?

19         A.     Between W&K Info Defense in Florida and

20   Craig Wright R&D, which would be an Australian entity.

21         Q.     Is there another party to the contract?

22         A.     And W&K Info Defense LLC company.

23         Q.     I think you have misstated the first

24   party to the contract.  Perhaps take a look again at the

25   first party to the contract.



1           MS. MARKOE:  Objection.

2           THE WITNESS:  W&K Info Defense LLC.

3    BY MR. FREEDMAN:

4      Q.    I believe it says Dave Kleiman of W&K

5    Info Defense LLC.

6           MS. MARKOE:  Objection.

7           THE WITNESS:  That is still the company,

8    which, under Commonwealth law means the legal entity

9    being represented by Dave Kleiman, not Dave Kleiman, is

10   being bound.  Dave Kleiman is not being bound by this

11   contract in any way.  Sorry, I do have a masters degree

12   and I am a legal scholar, and I am doing my doctor of

13   law at the moment.  If you want to discuss British or

14   Australian law I am quite happy to.

15          MS. MARKOE:  I would also like to note

16   for the record that it actually says that the entirety

17   of that first party, which is defined as the vendor, is

18   "Dave Kleiman of W&K Info Defense LLC (Florida)".

19   BY MR. FREEDMAN:

20     Q.    Can you take a look at paragraph B for

21   me, please, Dr. Wright.

22     A.    Yes.

23     Q.    Can you read that out loud for the

24   record?

25     A.    "The company is the owner of and conducts



1    business known as Bitcoin mining and Software

2    Research/development (sic)."

3         Q.    I think it says "Software

4    development/Research"?

5         A.    Correct, I am sorry about that error.

6         Q.    Dr. Wright, this contract was signed two

7    years after, approximately, the last contract we just

8    looked at?

9         A.    Where is the date?  Yes.

10        Q.    You told me the April 2011 contract,

11   although it provides for Bitcoin mining hardware, could

12   not be used for Bitcoin mining hardware because ASIC

13   miners came along and rendered that technology obsolete;

14   is that correct?

15             MS. MARKOE:  Objection: the record will

16   speak for itself.

17             MR. FREEDMAN:  You can answer.

18             THE WITNESS:  I told you exactly as

19   I told you, yes.

20   BY MR. FREEDMAN:

21        Q.    Now two years later you are signing a

22   contract that says that the company does conduct the

23   business as Bitcoin mining.  Can you explain that to me?

24             MS. MARKOE:  Objection.

25   BY MR. FREEDMAN:



Page 266

```
 1            Q.     Did something change?

 2            A.     I do not have any care about what Dave

 3     said his business was.

 4            Q.     Can you go with me to page 11 of the

 5     contract up on the top page.

 6            A.     Yes.

 7            Q.     Down the bottom, it says "Craig S

 8     Wright"; is that your signature?

 9            A.     Yes.

10            Q.     How do you know that Dave Kleiman has

11     entered into this contract?

12                   MS. MARKOE:  Objection.  Answer if you

13     can.

14                   THE WITNESS:  We communicated.

15     BY MR. FREEDMAN:

16            Q.     How did you communicate about it?

17            A.     As I have noted before, we would talk

18     over IRC and Skype.

19            Q.     So you have no record of those

20     communications?

21            A.     I do not have many records of anything

22     from that period.

23            Q.     Or a record of those communications?

24            A.     I do not have a record of practically

25     anything from that period.
```



Page 267

1          Q.     Do you have a record of the communication
2    between yourself and ----
3          A.     I do not know.  Unless my lawyers ----
4          Q.     Dr. Wright, please let me finish the
5    question.  Do you have a record of the communication
6    between yourself and Dave Kleiman where he assented to
7    the terms of this contract?
8                 MS. MARKOE:  Objection.
9                 THE WITNESS:  If my lawyers have any
10   record of what they have imaged, etcetera, then yes,
11   otherwise no.  I do not know.
12   BY MR. FREEDMAN:
13         Q.     Can you go with me to page 5, please.
14                MS. MARKOE:  Again, for the record, that
15   is page 5 at the top.
16                THE WITNESS:  Yes.
17   BY MR. FREEDMAN:
18         Q.     Can you look at (b) of paragraph 2.  Let
19   me know when you have familiarised yourself with it.
20         A.     Yes.
21         Q.     This is the 1933 wallet that we saw in
22   the 2011 contract?
23         A.     Yes.
24         Q.     In the 2011 contract it was being held by
25   Craig Wright R&D as a collateral?



1          A.      In Panama, yes.

2          Q.      Can you explain to me why it is being

3     released to Craig Wright R&D if there is no default on

4     the contract?

5                  MS. MARKOE:  Objection.

6                  THE WITNESS:  The contract speaks for

7     itself.

8     BY MR. FREEDMAN:

9          Q.      I am trying to understand the negotiation

10    that went on.  The wallet was a collateral in 2011 and

11    now it is being given to the holder of the collateral.

12    I do not understand why.  Why?

13                 MS. MARKOE:  Objection.

14                 THE WITNESS:  It is a negotiation, it is

15    a contract.  You are saying, why did we negotiate

16    something?

17    BY MR. FREEDMAN:

18         Q.      Yes.  It was held as collateral.  Usually

19    collateral is returned at the fulfillment of the

20    contract.  Why are you keeping the collateral?

21                 MS. MARKOE:  Objection.

22                 THE WITNESS:  I did not keep the

23    collateral.

24    BY MR. FREEDMAN:

25         Q.      Who kept the collateral?



Page 269

```
 1          A.      Again you will note that I am not the
 2    person here, sorry.
 3          Q.      You signed the contract?
 4          A.      I signed for a legal entity.  Please be
 5    specific.
 6          Q.      Who owned Craig Wright R&D at the time
 7    you signed this contract -- Craig Wright R&D Panama at
 8    the time you signed this contract?
 9          A.      I do not remember.
10          Q.      Have you any way to look that up?
11          A.      Not now, no.
12          Q.      Was it a trust?
13          A.      No.
14          Q.      It was people or corporations?
15                  MS. MARKOE:  Objection.  You can answer.
16                  THE WITNESS:  Companies are always
17    people.
18    BY MR. FREEDMAN:
19          Q.      Natural persons?
20          A.      Companies always have natural persons.  I
21    do not know any unnatural persons that can actually act.
22          Q.      Dr. Wright, my question was, did natural
23    persons own Craig Wright R&D Panama?
24                  MS. MARKOE:  Objection.  You can answer.
25                  THE WITNESS:  I do not remember.  I have
```



1   already stated I do not have any involvement with the

2   company structures or whatever else after I have set

3   them up and handed them off to be mixed up and created

4   so that we have companies.

5   BY MR. FREEDMAN:

6          Q.    Can you look at paragraph 3(a).

7          A.    Yes.

8          Q.    Was the 250,5000 -- well, tell me if you

9   are familiar with 3(a) and I can ask you questions on

10  it.

11         A.    It is right in front of me.

12         Q.    Can you tell me, did this 250,500

13  Bitcoin, was it ever transferred?

14         A.    No.

15         Q.    Can you tell me 3(b), did Craig Wright

16  R&D accept the 1933 paper Bitcoin wallet?

17         A.    I am not Craig Wright R&D.  I cannot

18  speak for other people.

19         Q.    Do you know if Craig Wright R&D  accepted

20  the paper Bitcoin wallet?

21               MS. MARKOE:  Objection.

22               THE WITNESS:  I am not Craig Wright R&D.

23  I cannot speak for other people.

24  BY MR. FREEDMAN:

25         Q.    I am just asking what your knowledge is,



Page 271

1    Dr. Wright.  Please tell me only what your knowledge is.

2    If you know, you do not know.  If you know, let me know.

3           A.     I do not know.

4           Q.     Can you look at 3(c)?

5           A.     Yes.

6           Q.     Can you read that for me?

7           A.     "Transfer the ASC hardware to the

8    purchaser".

9           Q.     What is "ASC hardware"?

10          A.     It should be ASIC.

11          Q.     It is ASIC mining hardware?

12                 MS. MARKOE:  Objection.

13                 THE WITNESS:  Yes.

14   BY MR. FREEDMAN:

15          Q.     What ASIC mining hardware is it referring

16   to?

17          A.     I do not know.

18          Q.     It says in 3(d):  "Release the source

19   code to the purchaser."  What source code is it talking

20   to?

21          A.     That was a variety of source code that

22   I already had in my possession as well as other source

23   code that I did not.

24          Q.     What was the source code you had in your

25   possession?



Page 272

```
1            A.    That includes all the things we have
2    already detailed, I would need to look through the list
3    to go through without missing anything, but it included
4    the covert channel software, the recording software, the
5    poker software, etcetera.
6            Q.    Were you authorised to enter contracts
7    for Craig Wright R&D Panama?
8            A.    Yes.
9            Q.    How did you come to be authorised to
10   enter into contracts for Craig Wright R&D Panama?
11               MS. MARKOE:  Objection.  But you can
12   answer.
13               THE WITNESS:  I set up the system so that
14   I would be.
15   BY MR. FREEDMAN:
16           Q.    You set up Craig Wright R&D Panama?
17               MS. MARKOE:  Objection.
18               THE WITNESS:  That is not what I said.
19   BY MR. FREEDMAN:
20           Q.    You said:  "I set up the system so that
21   I would be".
22           A.    Correct.
23           Q.    Can you look at 3(e)?
24           A.    Yes.
25           Q.    Can you read it for the record, please.
```



Page 273

```
 1              A.      "Transfer the Vistomail e-mail account."

 2              Q.      Which Vistomail e-mail account is it

 3      referring to?

 4              A.      I think it was Sakura.

 5                      BY MS. MARKOE:  Can you spell that, if

 6      you can.

 7                      THE WITNESS:  It is the name of the

 8      Japanese flowers, the ones with the cherry blossoms in

 9      spring.

10      BY MR. FREEDMAN:

11              Q.      Sakura; is that correct?

12              A.      Yes, I am not going try and spell it.

13              Q.      I think it is S-A-K-U-R-A.  What was

14      Sakura used for?

15              A.      Discussing some of the work that was

16      being done.

17              Q.      By whom?

18              A.      By people in Panama.

19              Q.      Did you get access to the Vistomail

20      e-mail account?

21              A.      I did.

22              Q.      Do you still have access to the Sakura

23      Vistomail e-mail account?

24              A.      No, I do not.

25              Q.      What happened to the access?
```



1          A.      No one paid for the account so it lapsed.

2          Q.      And Vistomail delete it if you do not

3     pay?

4          A.      I have no idea.

5                  MS. MARKOE:  Objection.

6     BY MR. FREEDMAN:

7          Q.      When did it lapse?

8          A.      I don't know.

9          Q.      Have you tried to get the account back

10    from Vistomail?

11                 MS. MARKOE:  Objection.

12                 THE WITNESS:  Why would I do that?

13    BY MR. FREEDMAN:

14         Q.      Because you have been sued in this

15    lawsuit.

16                 MS. MARKOE:  Objection.

17                 THE WITNESS:  You are saying you want me

18    to pay to get evidence that you want.

19    BY MR. FREEDMAN:

20         Q.      All right, going back to 3(c), did you

21    obtain the ASIC hardware back from the purchaser?

22         A.      No, I specifically, when I went to the

23    court, etcetera, said I do not really care about

24    anything other than the IP, and said that anyone there

25    could keep it because I do not want it.

Page 275

1         Q.      What was the ASIC hardware worth?

2         A.      I do not know.

3         Q.      Did you get the source code back?

4                 MS. MARKOE:  Objection.

5                 THE WITNESS:  I had the source code that

6    I had.  I did not get any extra.

7    BY MR. FREEDMAN:

8         Q.      3(f), can you read that for me, please.

9         A.      "Transfer all research materials from the

10   four (4) DHS BAA research projects to the purchaser with

11   all notes, data and results."

12        Q.      Did this transfer occur?

13        A.      No.

14        Q.      What are the four DHS BAA projects that

15   are being referred to?

16        A.      They are the ones that have been noted

17   before, SWAMP, the other software risk ones, etcetera.

18        Q.      Did Dave build those out for you?

19                MS. MARKOE:  Objection: asked and

20   answered.  You can answer.

21                THE WITNESS:  I do not know, because

22   I did not get it.

23   BY MR. FREEDMAN:

24        Q.      Can you look at 4(b) for me?

25        A.      Yes.



1          Q.      Tell me when you are familiar with it?

2          A.      It is right in front of me.

3          Q.      Craig Wright R&D is to accept the

4    vendor's 323,000 remaining mined Bitcoin as a 49.5%

5    stake in a new venture, and that venture was called

6    Coin-Exchange; is that correct?

7          A.      Yes.

8          Q.      Did you get the 323,000 Bitcoin?

9          A.      No.

10          Q.      So you were now aware that there were

11   323,000 Bitcoin mined by Dave Kleiman?

12               MS. MARKOE:  Objection.

13               THE WITNESS:  He had stated that.

14   BY MR. FREEDMAN:

15          Q.      Did he use the ASIC mining hardware --

16   strike that.  The ASIC mining hardware referred to at

17   3(c), did you provide that to Dave Kleiman?

18          A.      No.

19          Q.      Do you know how he obtained that

20   hardware?

21          A.      I knew people who developed chips and

22   I put them in contact with Dave.

23          Q.      Who are those people?

24               MS. MARKOE:  Objection.  You can answer

25   if you know.



1                    THE WITNESS:  I do not remember their

2    name.

3    BY MR. FREEDMAN:

4         Q.    Do you remember anything about them?

5         A.    Yes.

6         Q.    Can you tell me any contact details you

7    have about them?

8         A.    No.

9         Q.    Do you remember any identifying features

10   about them?

11                  MS. MARKOE:  Objection.  Like a tattoo?!

12                  MR. FREEDMAN:  Judging by Dr. Wright's

13   previous answers, if I asked him what he remembered he

14   would launch into an irrelevant tirade about all kinds

15   of other things.

16                  MR. RIVERO:  Please ask your questions.

17   BY MR. FREEDMAN:

18        Q.    Can you go to page 6 for me.

19        A.    Yes.

20        Q.    Top of page 6, 4(d).  Can you read that

21   for me.

22        A.    "Provide $30,000,000 in capital into

23   Coin-Exch Pty Ltd (to be formed) and the software

24   developed in the prior venture."

25        Q.    This is an obligation by Craig Wright R&D



1    to provide $30 million to Coin-Exchange?

2         A.    In capital.

3         Q.    Did Craig Wright R&D provide $30 million

4    in capital to Coin-Exchange?

5         A.    Yes.

6         Q.    How?

7              MS. MARKOE:  Objection.  Can you tie this

8    to one of your topics in the scope?

9              MR. FREEDMAN:  We are allowed to ask

10   about the projects in Exhibits 5, 10 and 15.  This is

11   Exhibit 10 -- 5.

12             MS. MARKOE:  Right, but this is not a

13   project.  This is a capital infusion into a company that

14   did not ----

15             MR. FREEDMAN:  It is part of the project,

16   it is part of the contractual agreement of the project.

17             THE WITNESS:  It was not part of a

18   project.

19             MS. MARKOE:  What project?  This is not

20   referring to a project, so can you tie it.

21             MR. FREEDMAN:  This is the Coin-Exchange

22   project.  This is an agreement with Coin-Exchange ----

23             THE WITNESS:  There is no such thing as a

24   Coin-Exchange project.

25             MS. MARKOE:  It does not say the



Page 279

 1   Coin-Exchange project.

 2              MR. FREEDMAN:  Okay, we will take it with

 3   the court if you instruct him not to answer.  So, just

 4   choose if you will or not.

 5              MS. MARKOE:  I am not instructing him not

 6   to answer.  I am asking you ----

 7              MR. FREEDMAN:  I am not going to alter my

 8   questions any more.  The question is what it is.

 9              MR. RIVERO:  You have to give the court

10   reporter a break.  Again I am as guilty as everyone

11   else.

12              THE WITNESS:  I am starting to see smoke.

13   BY MR. FREEDMAN:

14       Q.    How did Craig Wright R&D provide the $30

15   million in capital to Coin-Exchange?

16              MS. MARKOE:  Objection.

17              THE WITNESS:  You would need to go to the

18   financial records and accounts of the companies.

19   BY MR. FREEDMAN:

20       Q.    Which companies?

21              MS. MARKOE:  Objection.

22              THE WITNESS:  Coin-Exch for a start.

23   BY MR. FREEDMAN:

24       Q.    Who has access to Coin-Exchange records?

25       A.    I do not know.



Page 280

1          Q.     Sitting here today you have no idea

2     whether or not Craig Wright R&D -- how Craig & Wright

3     R&D provided the $30 million in capital to

4     Coin-Exchange?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  If you go through the

7     records you will be able to track all that.

8     BY MR. FREEDMAN:

9          Q.     I do not have the records.  I am not

10    asking you for what is in the records.  I am asking you

11    for what you recollect.  Do you ----

12                    MS. MARKOE:  Objection.  Vel do not

13    testify.

14    BY MR. FREEDMAN:

15         Q.     Are you sitting here today able to

16    recollect anything about how Craig Wright R&D

17    transferred $30 million in capital to Coin-Exchange?

18                    MS. MARKOE:  Objection.

19                    THE WITNESS:  I instruct people to do

20    things.  Things happened.

21    BY MR. FREEDMAN:

22         Q.     Did you instruct someone to transfer?

23                    MS. MARKOE:  Objection.  You can answer.

24                    THE WITNESS:  I would need to look at the

25    records.



Page 281

1   BY MR. FREEDMAN:

2          Q.     Sitting here today, you do not know

3   whether that 30 million was provided?

4                MS. MARKOE:  Objection.

5                THE WITNESS:  That is not what I said.

6   You are again misstating what I said.  I said all of

7   this had been completed, the company had been set up.  I

8   do not know the exact process off the top of my head.  I

9   do not try and remember my finances.  I instruct people

10  to do things.  They get paid.  I instruct my lawyers to

11  get paid.  Magic happens, they get paid.

12  BY MR. FREEDMAN:

13         Q.     Was the $30 million provided in cash or

14  in Bitcoin?

15               MS. MARKOE:  Objection.

16               THE WITNESS:  Again, I would need to look

17  at the accounts.  I do not know the breakdown of what

18  the capital per company was.

19  BY MR. FREEDMAN:

20         Q.     Can you take a look at 8(e) for me.

21         A.     Yes.

22         Q.     Let me know when you are familiar with

23  it.

24         A.     I am fine with it.

25         Q.     This indicates that the ASIC mining



Page 282

1    hardware will be returned with this transfer.  You told

2    me Craig Wright R&D did not provide it?

3                   MS. MARKOE:  Objection.

4                   THE WITNESS:  I do not know what happened

5    with companies.  You are asking whether I did.  Return

6    can be taken in many ways.  It could be returned to

7    other people or myself.  I do not really care.  I did

8    not get, it was never given back, and if you notice "at

9    a site known to Mr. Kleiman", who died before anything

10   occurred.  Unfortunately, post his death Mr. Kleiman was

11   not forthcoming in giving up that information.

12   BY MR. FREEDMAN:

13        Q.    So, sitting here today, do you know

14   whether or not Craig Wright R&D provided Mr. Kleiman

15   with ASIC mining hardware?

16                   MS. MARKOE:  Objection: asked and

17   answered.  You may answer.

18                   THE WITNESS:  I do not know.  I do not

19   look at the records of companies.  I do not believe so.

20   And I do not believe that "returned" means what you are

21   saying it does.  And I think you are miscategorising the

22   contract.

23   BY MR. FREEDMAN:

24        Q.    Can you explain to me what 8(f) means?

25        A.    "Solutions to the Agent and Merkle tree



Page 283

```
 1    problems development by Professor David Reese."  It is
 2    saying the vendors shall deliver up and it means that
 3    certain problems to do with agent-based software and
 4    Merkle tree problems, which are mathematical constructs
 5    that can be put into code, that had originally been
 6    worked on by David Reese and were to be formulated into
 7    code, David Reese having written these, not so much the
 8    -- it was -- I think the language was CoCo if I remember
 9    it right.  Dr. Reese or Professor Reese had created
10    software in mathematics in a language earlier called
11    CoCo.  CoCo was a horrendous, awful, awful piece of --
12    I will not even go there -- that needed to be changed
13    into something usable and constructed into something
14    that could actually be deployed.  There are a number of
15    interesting things that can be done with Merkle trees.
16    So, the solutions would be taking something that
17    Dr. Reese had developed around 2004, back when he was a
18    lot, sharper, I am not trying to sound mean or anything
19    like that, but he was old at the end, and then taken by
20    others and constructed into software.
21                MS. MARKOE:  I think the court reporter
22    needs a break.
23                MR. FREEDMAN:  Let us take a break.
24                THE VIDEOGRAPHER:  Going off the record.
25    The time is 17.55.  End of video card number 5, volume
```



1   1, in the video deposition of Dr. Craig Wright.

2                  (A Short Break)

3                  THE VIDEOGRAPHER:  This is the beginning

4   of video card number 6, volume 1, in the video

5   deposition of Dr. Craig Wright.  Going on the record.

6   The time is 18.08.  Thank you.

7   BY MR. FREEDMAN:

8          Q.     Dr. Wright, before the break we were

9   looking at Plaintiff's Exhibit 6.  Can you look at page

10   6.  I am looking at 8(g) at the very bottom.

11                 MS. MARKOE:  That is 6 at the top, for

12   the record.

13   BY MR. FREEDMAN:

14         Q.     Can you read that sentence for me.

15         A.     "Bitcoin agent software and suit of

16   C/C++/C# and Python Blockchain software source codes."

17         Q.     Did you receive these?

18         A.     I already had those.

19         Q.     Why were they included in the contract,

20   then?

21                 MS. MARKOE:  Objection.  You may answer,

22   if you know.

23                 THE WITNESS:  Because, quite simply, the

24   fact that you own -- so you have a copy of source code

25   does not mean that you own copy of source code.



Page 285

1    BY MR. FREEDMAN:

2           Q.     Doctor, I would like to talk you a little

3    bit about Ms. Uyen Nguyen.  Do you know who I am

4    referring to when I say that?

5           A.     I do.

6           Q.     How did you first meet or come to know

7    Ms. Nguyen?

8                  MS. MARKOE:  Objection.  You can answer.

9                  THE WITNESS:  I do not remember when

10   I first met her.  I came to know her because she tracked

11   me down way back.  I cannot remember exactly when.  Like

12   2011, 2012.  Because of my background and history in

13   information security, she wanted to learn from myself

14   and Dave.  She knew about all of the courses I have done

15   with SANS, all of the publications I had been doing, and

16   came to the belief that I was Satoshi.

17   BY MR. FREEDMAN:

18          Q.     Ms. Nguyen deduced on her own that you

19   were Satoshi?

20                 MS. MARKOE:  Objection.  Again you are

21   going beyond the scope.  Please tell me what topic it is

22   that you are referring to.

23                 MR. FREEDMAN:  I am trying to determine a

24   relevant witness and what her knowledge is.

25                 MS. MARKOE:  That is not within the



Page 286

1   scope.  The scope of number 1, which is the one that you

2   are referring to:  "The location and existence of

3   documents along with the identification of witnesses,

4   including information about their whereabouts, and roles

5   in the subject matter of the pleadings."

6                    MR. FREEDMAN:  Roles in the subject

7   matter of the pleadings.

8                    MS. MARKOE:  So, let me see the question.

9   (Pause) Fine, you can answer that one.  I am going to

10  give you some limited scope here, but let us keep it

11  tight everyone.

12                   THE WITNESS:  Can you ask that again,

13  please.

14  BY MR. FREEDMAN:

15        Q.    Sure.  Did Ms. Nguyen determine on her

16  own that you were Satoshi?

17                   MS. MARKOE:  Objection.  You can answer.

18                   THE WITNESS:  I do not know.

19  BY MR. FREEDMAN:

20        Q.    When did she first meet -- sorry, when

21  did she first come to know Dave Kleiman?

22                   MS. MARKOE:  Objection.  You can answer

23  if you know.

24                   THE WITNESS:  I do not know.

25  BY MR. FREEDMAN:



1          Q.     You said she reached out to you and Dave

2     Kleiman in 2011 or 2012?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  Yes.

5     BY MR. FREEDMAN:

6          Q.     How did she reach out to you both?

7                 MS. MARKOE:  Objection.

8                 THE WITNESS:  I am not trying to sound

9     rude, but the only way to put it she cyberstalked me.

10    BY MR. FREEDMAN:

11         Q.     Can you drill down on that a little bit?

12         A.     Cyberstalking is well developed as a sort

13    of discipline.  She followed me on every bit of social

14    media, e-mailed me a lot, kept asking and talking about

15    what I was doing.  Asked lots of questions.

16         Q.     Did Ms. Nguyen have a role in W&K?

17         A.     W&K is not my company.  I cannot talk

18    about W&K.

19         Q.     So you are not aware of any role she

20    played with W&K?

21                MS. MARKOE:  Objection: mischaracterises

22    his testimony.

23    BY MR. FREEDMAN:

24         Q.     Are you aware of any role she played with

25    W&K?



1          A.     I believe she was a director.

2          Q.     Was Ms. Nguyen ever appointed as a

3    director of any of your companies?

4          A.     I believe so.

5                 MS. MARKOE:  Objection.

6    BY MR. FREEDMAN:

7          Q.     Which companies?

8          A.     I would need to look at the records.

9          Q.     Sitting here today, you are not aware

10   which companies she was a director of?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  I have no idea what the

13   directorships of each of my companies were multiple

14   years ago.  I do not know what the directorship of

15   nChain is today.

16   BY MR. FREEDMAN:

17         Q.     Did Ms. Nguyen ever become a trustee for

18   you?

19                MS. MARKOE:  Objection.

20                THE WITNESS:  In what sense?

21   BY MR. FREEDMAN:

22         Q.     Was she ever a trustee that you were --

23   strike that.  Was she ever the trustee over a trust that

24   you were the beneficiary of?

25         A.     What sort of trust are we talking about?



1          Q.     Any.

2          A.     Then yes.

3          Q.     Can you tell me what that trust was

4    about?

5                 MS. MARKOE:  Objection.  You can answer.

6                 THE WITNESS:  That trust was holding a

7    number of slices of early Bitcoin keys.

8    BY MR. FREEDMAN:

9          Q.     Does that mean that it controlled

10   Bitcoin?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  Nobody controls Bitcoin.

13   BY MR. FREEDMAN:

14         Q.     Does that mean it owned Bitcoin?

15                MS. MARKOE:  Objection.

16                THE WITNESS:  No, that does not mean it

17   owned Bitcoin.

18   BY MR. FREEDMAN:

19         Q.     What was the name of the trust?

20         A.     Which trust?

21         Q.     How many was Uyen a trust on?

22         A.     I do not know.

23         Q.     How many are you aware of her being a

24   trustee on?

25         A.     At least one.



Page 290

```
 1            Q.      What is the name of that trust?

 2            A.      There was a trust called the Tulip Trust.

 3            Q.      Is that trust no longer in existence?

 4            A.      The trust was formalised early on and is

 5     not the informal thing from 2011.

 6            Q.      I am not following. When was the

 7     Tulip Trust created?

 8            A.      2011.

 9            Q.      Who created it?

10            A.      Me.

11            Q.      Who were the trustees when you created

12     it?

13            A.      I do not remember.  I would need to look

14     at the document.

15            Q.      Where are the documents?

16            A.      I do not have the documents.

17            Q.      Who has the documents?

18            A.      I do not know.

19            Q.      Who were the beneficiaries of the

20     Tulip Trust in 2011?

21            A.      I do not have the document.  I cannot

22     answer that.

23            Q.      What assets were controlled by the

24     Tulip Trust in 2011?

25            A.      Companies that I hold overseas, such as
```



1    Wright International Investments that I founded in 2009,

2    and Tulip Trading.

3              Q.     What is Tulip Trading?

4              A.     It is a company.

5              Q.     So, when it was founded in 2011, it never

6    controlled the rights to any Bitcoin?

7                     MS. MARKOE:  Objection: vague.

8                     THE WITNESS:  That is not what I said.

9    The rights ----

10   BY MR. FREEDMAN:

11             Q.     How did -- sorry, go ahead.

12             A.     The rights to Bitcoin and controlled are

13   different.  You are mixing all your bits and pieces,

14   yes.

15             Q.     Did the Tulip Trust own any Bitcoin at

16   any point from 2011 until 2013?

17             A.     The trust does not own generally.  A

18   trust holds in trust.

19             Q.     I do not want to get into an argument

20   with you about the structure of trusts, I am just trying

21   to get to the bottom of, did the trust have control over

22   Bitcoin?

23             A.     Which Bitcoin?

24             Q.     Any Bitcoin.

25             A.     Yes.



Page 292

1          Q.     How much Bitcoin did the trust control
2     between 2011 and 2013?

3                MS. MARKOE:  Objection.  Where is this
4     related to the scope of this deposition?

5                MR. FREEDMAN:  Ms. Nguyen is a trustee of
6     the trust and we are authorised under number 6:
7     "Inquiry into the scope of knowledge and information
8     possessed by the individuals."  So, I am trying to
9     determine what her scope of knowledge was.

10                MS. MARKOE:  Her scope of knowledge is
11     not related to how much Bitcoin the trust controlled.
12     If you would like to ask, do you know if Ms. Nguyen
13     knows how much Bitcoin the trust controlled, you can ask
14     that question and he can answer that question.  However,
15     I will instruct him not to answer the question as asked.

16                MR. FREEDMAN:  You instruct how you need
17     to instruct.

18          Q.     Was Dave Kleiman ever involved with the
19     Tulip Trust?

20                MS. MARKOE:  Objection.  You may answer.

21                THE WITNESS:  Dave Kleiman was not
22     involved in the Tulip Trust as it is.  What you are
23     trying to get at was because I asked him to hold
24     documents for a while does that make him part of the
25     trust.  Dave was never a beneficiary of the trust.  Dave



Page 781 of 980

Page 293

1    never put money into the trust.  Dave never had any

2    Bitcoin in the trust.  Dave never mined any Bitcoin that

3    had anything to do with the trust.  None of the Bitcoin

4    was ever involved with any mining in the US.  No Bitcoin

5    was post 2010 from that trust.  No company Dave owned

6    was involved with the trust.  No shares Dave owned was

7    involved with the trust.  Nothing Dave owned was

8    involved with the trust.  Dave had no rights to the

9    trust, no ownership of the trust, no knowledge of the

10   set-up of the trust.  He did not know about the

11   companies in the trust.  He did not know about Wright

12   International Investments that I set up in 2009.  Dave

13   did not know about any of those details.  Dave was asked

14   simply to hold a part of some documents and keys that

15   were split using Shamir's Secret Sharing scheme so that

16   he did not even know what he was actually holding.

17              MS. MARKOE:  Can you spell Shamir's for

18   the court reporter, please.

19              THE WITNESS:  S-H-A-M-I-R-S.

20   BY MR. FREEDMAN:

21        Q.    Did you put Bitcoin into the trust in

22   2011?

23              MS. MARKOE:  Objection.  You may answer.

24              THE WITNESS:  I founded the trust.

25   BY MR. FREEDMAN:



Page 294

1          Q.    Did you put Bitcoin into the trust in

2    2011?

3                MS. MARKOE:  Objection.

4                THE WITNESS:  No.

5    BY MR. FREEDMAN:

6          Q.    Did you put Bitcoin into the trust in

7    2012?

8                MS. MARKOE:  Objection.

9                THE WITNESS:  No.

10   BY MR. FREEDMAN:

11         Q.    Did you ever put Bitcoin into the trust?

12               MS. MARKOE:  Objection.

13               THE WITNESS:  No.

14   BY MR. FREEDMAN:

15         Q.    Did anyone ever put Bitcoin into the

16   trust?

17               MS. MARKOE:  Objection.

18               THE WITNESS:  No.

19   BY MR. FREEDMAN:

20         Q.    Did the Tulip Trust ever come to hold

21   private keys to Bitcoin wallets?

22         A.    No.

23         Q.    Did it ever come to own or possess

24   private keys to Bitcoin addresses?

25         A.    No.



1          Q.    What is the relationship between the

2    Tulip Trust and Bitcoin?

3               MS. MARKOE:  Objection.  Again, where are

4    we on the topics?

5               THE WITNESS:  What the hell does that

6    question even mean?

7               MR. FREEDMAN:  We are permitted to

8    enquire into Dr. Wright's companies.

9               THE WITNESS:  That is not a company.

10               MR. RIVERO:  Hold on, Dr. Wright.  Tell

11    us what topic or tell us where in the transcripts

12    because we can review the transcript.

13               MR. FREEDMAN:  Number 10.

14               MS. MARKOE:  Number 10?  Can you point

15    out where the Tulip Trust is referenced in the exhibits

16    that are referenced in topic 10?  It could be there.

17    I just do not recall.

18               MR. FREEDMAN:  We just do not have time,

19    so I guess you are going to instruct him not to answer?

20               MR. RIVERO:  If we do not get some

21    connection ----

22               MR. FREEDMAN:  The court has authorised

23    us.  I do not know which number it is because I do not

24    have it in front of us.  I believe Ms. Markoe has been

25    at many hearings where the court has authorised us to



Page 296

1   enquire into -- let me finish -- Dr. Wright's various

2   entities and trusts.  Specifically at the last hearing

3   he authorised us to do because Ms. Markoe refused to

4   turn over a compilation of those entities on

5   work-product grounds and he specifically authorised me

6   to enquire into the trust and companies.

7                   MR. RIVERO:  With respect ----

8                   MS. MARKOE:  Right, but ----

9                   MR. RIVERO:  Let me please address.

10  Counsel today has referred to a rule that does not

11  exist.  He has referred to it without a number.  Now he

12  refers to transcripts without a certain page number.

13  I have been reviewing transcripts.  I do not find the

14  reference.  Unless there is a basis, the instruction is

15  do not answer.  Let us move on to the next question.

16                  MR. FREEDMAN:  We will just move on.  We

17  will raise it with the court.

18  (Plaintiff's Exhibit 7 marked for identification)

19                  MR. FREEDMAN:  For the record,

20  Mr. Rivero, you can look this over later, but just so

21  the record reflects, it is at the last hearing,

22  transcript pages 55 and 56, and I will give you the ----

23                  MR. RIVERO:  I have the transcript.

24                  MR. FREEDMAN:  It is for your own

25  knowledge and for the record, we can look at it and



Page 297

1    discuss it later.

2                  MR. RIVERO:  Now you have identified a

3    page I will review it and we will come back to it.

4                  MR. FREEDMAN:  We will return to it.

5                  MR. RIVERO:  Yes.

6    BY MR. FREEDMAN:

7         Q.    Dr. Wright, do you recognise Plaintiff's

8    Exhibit 7 which has been just marked and placed before

9    you?

10        A.    I recognise two documents joined

11   together, yes.

12        Q.    What are the two documents that are

13   joined together?

14        A.    You have deed of loan as a front page.

15   Page 1 of 7, 2 of 7, 3 of 7, 4 of 7, 5 of 7, 6 of 7 of a

16   document, and then page 7 of 7 of a separate document.

17   So, potentially two, if not three, documents, put

18   together as one.

19        Q.    Page 7 of 7 belongs to what document?

20        A.    Not this one.

21        Q.    Do you know what document it does belong

22   to?

23        A.    I would need to look at records.  I do

24   not know.

25        Q.    Looking at the first six pages, which you



Page 298

1    say are one document; is that correct?

2           A.    The first six pages, you mean not the

3    first six, but the cover page does not have a thing, and

4    then that starts at page 1.  So, page 2, which is on

5    here as page 3 of 10, page 4 of 10, page 5 of 10, page 6

6    of 10, page 7 of 10, and page 8 of 10 are parts of the

7    same document that is not complete.

8           Q.    Sitting here today you have no idea what

9    page 9 of 10 document is -- strike that.  Sitting here

10   today you have no idea what page 9 of 10 -- strike that

11   again.  Sitting here today you have no idea what

12   document page 9 of 10 belongs to; is that correct?

13          A.    That is not what I said.

14          Q.    What document does page 9 of 10 belong

15   to?

16          A.    A different document that is not this

17   one.

18          Q.    Which document?

19          A.    I do not have documents in front of me.

20   I cannot match them.

21          Q.    So, sitting here today you do not know

22   what that document -- what that page -- what document

23   that page belongs to?

24          A.    I cannot match them, no, and page 10 of

25   10 is a separate document as well.  You will notice no



Page 299

1    page numbers or anything like that, so that is also out

2    of -- so there are possibly four documents constructed

3    into one.

4           Q.    Who has all the originals of these

5    documents?

6                 MS. MARKOE:  Objection.

7                 THE WITNESS:  I do not know.

8    BY MR. FREEDMAN:

9           Q.    Do you have the originals of these

10   documents?

11          A.    Unless my lawyers have gone through and

12   found things in boxes, then I do not know.

13          Q.    Does Ms. Nguyen have the originals of

14   this document?

15                MS. MARKOE:  Objection.

16                THE WITNESS:  I do not know what

17   Ms. Nguyen has.  I have not spoken to Ms. Nguyen in

18   three plus years.

19   BY MR. FREEDMAN:

20          Q.    Can you look at page 9 of 10.

21          A.    Yes.

22          Q.    There is a signature at the bottom; is

23   that your signature?

24          A.    Yes.

25          Q.    And there is a signature above that; is



Page 300

1    that Ms. Nguyen's signature?

2           A.     I believe so.

3           Q.     The handwriting on the right-hand side of

4    all the Bitcoin wallets listed there, whose handwriting

5    is that?

6           A.     That looks like mine.

7           Q.     Do you recognise what this appendix list

8    of Bitcoin is?

9                  MS. MARKOE:  Objection.  Answer if you

10   can.

11                 THE WITNESS:  I think you are confounding

12   two different things.  There is a random note talking

13   about wallets and a set of addresses.  Where I talk

14   about wallets, wallets are files, computer files,

15   etcetera, so you have done a typical error that most

16   people do in calling Bitcoin addresses wallets.  So, you

17   have taken two completely separate things, because

18   I have this habit of writing wherever the hell I feel

19   like it, usually over documents people complain that

20   I write on, because I write notes whenever I feel like

21   writing notes, and saying that they are related.

22   BY MR. FREEDMAN:

23          Q.     So, is it your testimony here today that

24   the note in your handwriting on the right-hand side of

25   this document is completely unrelated to the list of



Page 301

1    Bitcoin block addresses on the left-hand side of the

2    document?

3              MS. MARKOE:  Objection.

4              THE WITNESS:  I cannot say what it is.

5    It is all wallets, and then there is a list of

6    addresses.  They are two different things.  I have made

7    a note.  I would need to look at records to be able to

8    match up what that was.  I have left myself a note at

9    some point.  I cannot necessarily say what my note was.

10   BY MR. FREEDMAN:

11            Q.    Do you have those records that you could

12   look that up?

13             MS. MARKOE:  Objection.  You can answer.

14             THE WITNESS:  My lawyers have all the

15   records I have.  If anything is in there that goes to

16   further, then that would be there.

17   BY MR. FREEDMAN:

18            Q.    Did you have counsel help you draft this

19   document?

20             MS. MARKOE:  Objection.  He has already

21   testified that this appears to be a compilation of

22   multiple documents that were put together in error.

23   BY MR. FREEDMAN:

24            Q.    Did counsel help you draft page 9 of the

25   document?



Page 302

1                    MS. MARKOE:  Objection.  Answer if you

2      can.

3                    THE WITNESS:  There is no page 9 of the

4      document.  This is a compilation of multiple documents.

5      BY MR. FREEDMAN:

6             Q.    Exhibit.  Did counsel help you draft page

7      9 of the exhibit?

8                    MS. MARKOE:  He is referring to page 9 at

9      the top.

10                    THE WITNESS:  By "counsel", do you mean

11      my lawyers?

12      BY MR. FREEDMAN:

13             Q.    Yes.

14             A.    Possibly.  I had lists of different

15      addresses done by lawyers at different times.

16             Q.    Which lawyers created lists of different

17      addresses?

18                    MS. MARKOE:  Objection.  You can answer.

19                    THE WITNESS:  I do not know which lawyers

20      produced different lists at different times.  I have had

21      more lawyers than birthdays!

22      BY MR. FREEDMAN:

23             Q.    Can you list all the lawyers that you

24      have had that helped you draft lists of Bitcoin

25      addresses?



 1                    MS. MARKOE:  Objection.  You can answer,

 2      to the extent you remember.

 3                    THE WITNESS:  That would be Clayton Utz.

 4      There would be M & K.  There would be the split off from

 5      M & K that I cannot remember the name of -- one of the M

 6      & K partners split off and formed his own firm -- and

 7      I used both those firms.  There would be High Secured.

 8      There would be -- I should remember the name.  The most

 9      famous law firm in Panama that got into the Panama

10      papers, I used them too.

11   BY MR. FREEDMAN:

12           Q.    Do you recall the name?

13           A.    No, I do not.  I should do, because it

14      was a big thing of discussion including everyone, and

15      I think I blocked it out of my mind because of that.

16      There were more law firms than I care to remember.

17           Q.    Can you tell me what you meant by your

18      handwritten note:  "As agreed.  All wallets ..."  What

19      do you mean "All wallets"?

20                    MS. MARKOE:  Objection.  You can answer.

21                    THE WITNESS:  "All wallets" means all

22      wallets, as in files, computer files, or other such

23      things, that hold Bitcoin.

24   BY MR. FREEDMAN:

25           Q.    And you say "As agreed".  Agreed with



Page 304

```
 1    who?

 2           A.    I would need to look at the rest of the

 3    document.  I am not going to speculate what a page out

 4    of a mysterious document, where this is page 7 of 7 that

 5    has been attached incorrectly to a different document,

 6    means.

 7           Q.    So, sitting here today you do not recall

 8    what "As agreed" means; is that correct?

 9           MS. MARKOE:  Objection: mischaracterises

10    his testimony.

11           THE WITNESS:  I understand what

12    "As agreed" means.

13    BY MR. FREEDMAN:

14           Q.    You do not recall who the agreement was

15    made with?

16           A.    This is a note written on a thing that

17    may or may not have any relationship to the original

18    document, that I have one page of addresses, that I do

19    not memorise all the addresses from, that has been

20    constructed between four other documents and handed to

21    me.

22           Q.    And:  "... held in UK in trust ..."  Are

23    you aware, sitting here today, of moving wallets to be

24    held in a UK trust?

25           MS. MARKOE:  Objection.  Answer if you
```



1    can.

2                    THE WITNESS:  No UK trust was ever set

3    up.

4    BY MR. FREEDMAN:

5           Q.     Can you go to page 2 of 10 for me at the

6    top.

7           A.     Yes.

8           Q.     Do you see where it says the last party,

9    Denariuz Seychelles Trust?

10          A.     Yes.

11          Q.     Who are the trustees of this trust?

12          A.     I do not know.

13          Q.     Who are the beneficiaries of this trust?

14          A.     Another trust.

15          Q.     What is the trust's name that is a

16    beneficiary?

17          A.     I would need to look at records.

18          Q.     Do you have those records?

19          A.     Not on me.

20          Q.     Have you given those records to your

21    lawyers?

22          A.     I have a box of -- well, actually, I had,

23    I do not know how many boxes.  There were many, many

24    boxes that they spent many days going through, and if it

25    is in there, it would be there.



Page 306

1          Q.      And if it is not there?

2          A.      When things get closed down, the

3    requirement is for Australian records to be kept for a

4    number of years afterwards and British records to be

5    kept for a number of years afterwards.  The Seychelles

6    records requirement is under a year, and once anything

7    hits a period of one year, and the Seychelles trust is

8    no more, it goes the way of anything that is no longer

9    needed to be held, which generally means the shredder.

10         Q.      The Denariuz Seychelles Trust, does it no

11   longer exist?

12         A.      It no longer exists.

13         Q.      When did it cease to exist?

14         A.      Probably around December 2013.

15         Q.      And the wallet existed, what assets did

16   it hold?

17         A.      Again, I could not answer that.

18                 MS. MARKOE:  Objection.

19   BY MR. FREEDMAN:

20         Q.      So, sitting here today, you have no idea

21   what assets the Denariuz Seychelles Trust held?

22         A.      Sitting here today, I could not answer

23   what assets the companies I founded hold.

24         Q.      Okay.  At the top, "Design by Human Ltd"?

25         A.      Yes.



1          Q.     What is this?

2                 MS. MARKOE:  Objection.  You can answer.

3                 THE WITNESS:  It is a company name.

4    BY MR. FREEDMAN:

5          Q.     Was it a trust?

6          A.     It is a company.

7          Q.     Did it ever change its name?

8          A.     You have already covered that one.  Yes,

9    Design by Human had changed its name.

10         Q.     To?  What did it change its name to?

11         A.     Again, I do not remember which one is

12   which.  We covered that as well.  I do not remember

13   which particular one changed its name to C01N or

14   Denariuz, so I would need the records to check those

15   facts, otherwise I will be saying it changed to C01N

16   when in fact it changed to Denariuz and I will get it

17   wrong, and I do not want to do that.

18         Q.     Dr. Wright, you keep saying you checked

19   the records but then tell me that you do know where the

20   records are.  What would you do if you needed to figure

21   this information out?

22         A.     I do not need to figure this information

23   out.

24         Q.     Why not?

25                MS. MARKOE:  Objection.  You can answer.



Page 308

1                    THE WITNESS:  Because we are talking

2    about companies that have been liquidated and no longer

3    need to hold records.

4    BY MR. FREEDMAN:

5         Q.    The assets held by the Denariuz

6    Seychelles Trust where are they currently held?

7                    MS. MARKOE:  Objection.

8                    THE WITNESS:  Again, I do not even know

9    where the current assets of my current things that

10   I have founded happen to be right now.  So you are

11   asking me when I do not know my current company, and

12   what it holds in four continents, where did this other

13   trust that has now gone years ago, where does it have

14   assets that you cannot even tell me what they are.

15   BY MR. FREEDMAN:

16        Q.    Under this trust document, Dr. Wright,

17   you are entitled to borrow 650,000 Bitcoin; is that

18   right?

19                    MS. MARKOE:  Objection.

20                    THE WITNESS:  Which trust document?

21   There is no full document here.

22   BY MR. FREEDMAN:

23        Q.    Sorry, I misspoke.  I strike that.  Under

24   this deed of loan you are entitled to borrow up to

25   650,000 Bitcoin; is that correct?



1          A.      The partial deed of loan, yes.

2          Q.      Did you in fact borrow 650,000 Bitcoin?

3                  MS. MARKOE:  Objection.

4                  THE WITNESS:  How does this relate to

5    anything, sorry?

6    BY MR. FREEDMAN:

7          Q.      Dr. Wright, please answer the question

8    unless you are instructed otherwise by your counsel.

9          A.      I did not borrow 650,000 Bitcoin.

10         Q.      How much did you borrow?

11                 MS. MARKOE:  Objection.

12                 THE WITNESS:  I do not know how much

13   I actually borrowed.

14   BY MR. FREEDMAN:

15         Q.      To take these loans, did you have to

16   communicate with Ms. Nguyen?

17         A.      No.

18         Q.      Who was the one who you spoke to in order

19   to take the loans?

20         A.      I do not remember his last name.  He

21   worked for a company called High Secured.  His first was

22   Mark.

23         Q.      Was it Mark Ferrier?

24         A.      No.  He had nothing to do with anything

25   in Panama, nor did he have anything to do with High



1    Secured.

2            Q.     Can you go to page 7 of 10 for me.

3                   MS. MARKOE:  At the top again for the

4    record.

5                   MR. FREEDMAN:  Yes, at the top, thank

6    you.

7                   THE WITNESS:  Yes.

8    BY MR. FREEDMAN:

9            Q.     Do you see the reference at the bottom to

10   Permanent Success Limited?

11           A.     Yes.

12           Q.     What was Permanent Success Limited?

13           A.     A company.

14           Q.     Was it related to a trust in any way?

15           A.     I do not know.

16           Q.     Can you let me know what it says at the

17   bottom there, "and all related trusts"; what does that

18   mean?

19                  MS. MARKOE:  Objection.

20                  THE WITNESS:  It means any related

21   trusts.

22   BY MR. FREEDMAN:

23           Q.     Were there trusts related to Permanent

24   Success Limited?

25                  MS. MARKOE:  Objection: rule of



Page 311

1    completeness.

2              MR. FREEDMAN:  You can answer.

3              THE WITNESS:  I do not know.  I cannot

4    take part of a document, and part of other things, and

5    incomplete records and then construct everything you

6    expect me to know.  As I have stated before, I do not

7    know the structure of BITC or nChain or nChain Holdings

8    or any other company that exists right now, so I cannot

9    actually even tell you what I have now, and yet you are

10   saying, "What happened years ago?"

11   BY MR. FREEDMAN:

12        Q.    Do you have any way of contacting Mark

13   from High Secured?

14        A.    He is in a federal penitentiary in the

15   USA.

16        Q.    Which federal penitentiary?

17        A.    I do not know.  I did not follow his

18   case.

19        Q.    Is there a way you can determine his last

20   name and let us know what it is later?

21             MS. MARKOE:  Objection.

22             THE WITNESS:  You can do searches on High

23   Secured.  There is this thing called Google.  You go

24   into this task bar, you type in "High Secured", and

25   search.



1   BY MR. FREEDMAN:

2          Q.     Did you pay back the loans that you took

3   under this deed of loan?

4                 MS. MARKOE:  Objection.  You may answer.

5                 THE WITNESS:  None of your God damn

6   business.  This has nothing to do with anything there.

7   Does it say that it has to be paid back?  Does it say

8   what it is?  You are asking about the management of a

9   trust that has no relationship to Mr. Kleiman, no

10  relationship to a company Dave Kleiman has worked for,

11  no relationship to anyone who has ever been in the USA

12  as a resident or a citizen at any point in human

13  history, no relationship to anyone who has been in North

14  America from Mexico up in human history, that entire

15  continent.  No person who has ever been anything to do

16  with residing or citizenship in that part of the world

17  has had anything at all to do with this trust, assets in

18  this trust, management of this trust, control of this

19  trust, etcetera.  And then you want me to talk about

20  incomplete records that have been constructed in bits

21  and chucked together from four different documents as if

22  this is real evidence.

23  BY MR. FREEDMAN:

24         Q.     Did you pay back the loans that you took

25  from under this deed of loan, Dr. Wright?



Page 313

1              MS. MARKOE:  Objection.  You can answer

2    if you can.

3              THE WITNESS:  I do not have any records

4    in front of me.  I do not have the rest of the records

5    for this, so ----

6  BY MR. FREEDMAN:

7         Q.    So?  Could you finish your response,

8    please.

9         A.    So when you can give me all the financial

10   records of things, I will answer against them.

11             MS. MARKOE:  Objection.  Okay, withdrawn.

12   I strike my own.

13  BY MR. FREEDMAN:

14        Q.    Do you go where Ms. Nguyen is now,

15   Dr. Wright?

16        A.    Earth.

17        Q.    Do you know where on earth she is?

18        A.    I am assuming land.

19        Q.    Dr. Wright, I would appreciate if you

20   would co-operate with me so we could get this done.  Do

21   you know the whereabouts of Ms. Nguyen?

22        A.    I stated earlier I have not had any

23   contact with Ms. Nguyen for over three years.  That

24   would generally mean I do not have any knowledge.  I can

25   restate in other forms if you want or I can be narky



1    about it.

2           Q.     Does Ms. Nguyen still maintain a trust

3    role in relation to companies that are related to you?

4                  MS. MARKOE:  Objection.  You can answer.

5                  THE WITNESS:  No.

6    BY MR. FREEDMAN:

7           Q.     She is no longer a trustee of any trusts

8    related to you?

9                  MS. MARKOE:  Objection.  You may answer.

10                 THE WITNESS:  That is what I just said.

11   BY MR. FREEDMAN:

12          Q.     When did she stop becoming a trustee of

13   trusts related to you?

14          A.     2015.

15          Q.     Did you help Ms. Nguyen disappear?

16                 MS. MARKOE:  Objection.

17                 THE WITNESS:  You are presuming that she

18   has disappeared.  I do not know.  You are asking me

19   about someone I have not had contact with.  My sister --

20   I have not had contact with my older sister in four

21   years.  She has not disappeared.  She is a hippy, and

22   I am a hypercapitalist.  We get on like oil, water,

23   petrol and a match.  But my mother would know so she has

24   not actually disappeared.

25   (Plaintiff's Exhibit 8 marked for identification)



Page 315

1    BY MR. FREEDMAN:

2            Q.    Dr. Wright, I am handing you what has

3    been marked now as Plaintiff's Exhibit 8.  This is some

4    exchange of e-mails between you and Ira Kleiman; do you

5    recognise that?

6            A.    Yes.

7            Q.    Can you go to 3 of 5 of the document?

8            A.    Yes.

9            Q.    Do you see there at the bottom it says:

10   "1.)  GICSR Trust in Belize"?

11           A.    Yes.

12           Q.    Can you explain to me what the GICSR

13   trust in Belize is?

14           A.    It was a trust set up in Belize.

15           Q.    By whom?

16           A.    I do not know.

17           Q.    Why did you give this information to Ira?

18                 MS. MARKOE:  Objection.

19   BY MR. FREEDMAN:

20           Q.    Why was this information relevant to Ira?

21                 MS. MARKOE:  Objection.

22                 MR. FREEDMAN:  You can answer.

23                 THE WITNESS:  There was a person

24   I thought would be interested in Dave's past, which was

25   his father, who then put me onto Ira, who was a greedy



Page 316

```
 1   person who wished not to have shares that would vest
 2   over a long time but instructed me to hide assets
 3   because he would have to pay tax.  So, I stopped talking
 4   to Ira because basically I had this fraud, con man,
 5   trying to take money that he was not owed and trying to
 6   hide things from the tax office in America and lying and
 7   cheating and whatever else to make up things to try and
 8   get more.
 9   BY MR. FREEDMAN:
10          Q.    Dr. Wright, I do not understand how that
11   is related to my question, so let us try ----
12          A.    It is related perfectly well.
13          Q.    Let us try one more time.  Did Dave
14   Kleiman have anything to do with the GICSR trust in
15   Belize?
16          A.    Yes.
17          Q.    What was his relationship to the GICSR
18   trust in Belize?
19          A.    We organised putting information onto
20   computers because of it.
21          Q.    I am sorry, what type of information?
22          A.    This is, again, something we will need to
23   talk about with the judge.
24                MS. MARKOE:  Okay.  That is going to be
25   one of the in camera conversations.
```



Page 317

1    BY MR. FREEDMAN:

2           Q.     Okay, Dr. Wright, are there  reasons ----

3           A.     What I will say is there a reason if you

4    look at the GICSR website that used to be up in the

5    past, it had Department of Homeland Security, NSA and

6    other things on the website.

7           Q.     Do you know Deborah Kobza from GICSR?

8           MS. MARKOE:  Can you spell that for the

9    court reporter.

10          MR. FREEDMAN:  D-E-B-O-R-A-H -- I could

11   not tell you.  K-O-B-Z-A, I think.

12          THE WITNESS:  Not personally.

13   BY MR. FREEDMAN:

14          Q.     Can you look at page 2 of 5, please.

15          A.     Yes.

16          Q.     Can you look at the message that comes

17   from Ira to you at March 2nd, 2014.  Can you read that

18   for the record?

19          A.     "From: '----'".

20          Q.     Dr. Wright, please just read the body of

21   the e-mail.

22          A.     "Just to clarify on thoughts from

23   previous e-mail... In one of the email exchanges between

24   Dave and you, he mentioned that you had 1 million

25   Bitcoins in the trust and since you said he has 300,000



Page 318

1    as his part I was figuring the other 700,000 is yours.

2    Is that correct?  Ira."

3         Q.    Can you read above that your response at

4    March 1st, 2014 at 3 p.m.?

5         A.    Mine.  "Around that.  Minus what was

6    needed for the company's use."

7         Q.    So, where is the 300,000 that belonged to

8    Dave?

9              MS. MARKOE:  Objection.  Can you tie that

10   to one your topics, please?

11             MR. FREEDMAN:  4: "The location and

12   duration of Dave, W&K and Craig's mining of Bitcoin from

13   2009 until 2013."

14             MS. MARKOE:  You are not talking about

15   mining now, you are talking about actual Bitcoin.  Those

16   are two separate topics.  This does not relate to number

17   4.

18             MR. FREEDMAN:  Okay, so either instruct

19   him not to answer or allow the question.

20             MS. MARKOE:  I am going to instruct him

21   not to answer.

22   BY MR. FREEDMAN:

23        Q.    Can you go down to the February 28th,

24   2014 e-mail.

25        A.    Mmm-hmm.



Page 319

1          Q.      You say:  "The trust Dave setup should

2    have around 300,000."  Do you see that?

3          A.      Yes.

4          Q.      Is that 300,000 Bitcoin?

5          A.      Yes.

6          Q.      Where is the trust Dave set up?

7          A.      Dave set up a series of trusts as well.

8    One was in Belize, which was not GICSR, he also had one

9    in Panama and companies in Costa Rica.

10          Q.      Do you have any information on who helped

11    him set those up?

12          A.      No.

13          Q.      Can you read the next sentence for me?

14          A.      "We moved everything offshore as a result

15    of my early fight with the Tax office.  This was back in

16    2011.  The BTC would be on a server on hard drive, just

17    the rights are overseas."

18          Q.      Here you say:  "We moved everything

19    offshore"?

20          A.      I use a royal "we" all the time, so if

21    you are taking "we", "we" rarely means, for me, multiple

22    people.  I talk.  As my lawyers keep instructing me,

23    stop saying "we".

24              MS. MARKOE:  Objection.

25              THE WITNESS:  I say "we" all the time.



Page 320

1                    MS. MARKOE:  Do go into what we talked

2    about.

3                    THE WITNESS:  Sorry.

4                    MS. MARKOE:  Our conversations are

5    privileged.  And there is just a correction.

6                    THE WITNESS:  I was not talking just

7    about you!

8                    MS. MARKOE:  Nonetheless, any

9    conversations you have with lawyers are privileged, the

10   contents thereof.

11                   MR. RIVERO:  Move to strike your client's

12   testimony.

13                   MR. FREEDMAN:  Any move to just strike is

14   objected to.

15                   MS. MARKOE:  Also, I would just like to

16   point out that there is an error in the transcript.  It

17   says "really means", and he said "rarely means".

18   BY MR. FREEDMAN:

19        Q.    So is it your testimony here today,

20   Dr. Wright, that when you used "we" here, you were

21   referring only to yourself?

22        A.    Independently Dave set up his own trust.

23        Q.    I am talking about your use of the word

24   "we".

25        A.    I am talking, and explaining this.



Page 321

1    I moved my things, Dave moved his things, independently.

2    We did not do it together.  It was a quick, flippant

3    e-mail to a con man who will take things out of context.

4    Basically, as this says, BTC would be on a server or

5    hard drive.  My suspicion is that it is the one Dave had

6    with him at nearly all time.

7           Q.    Can you go to page 4 for me.  Can you

8    look at, toward the bottom of the page, it says:  "Look

9    up Wotty - it is not a mistake"; do you see that?

10          A.    Yes.

11          Q.    What is Wotty?

12          A.    It is a word.

13          Q.    Why is it not a mistake?

14          MS. MARKOE:  Objection.

15          THE WITNESS:  What do you mean, why is it

16   not a mistake?

17   BY MR. FREEDMAN:

18          Q.    This is an e-mail that Dave Kleiman sent

19   to you; is that correct?

20          A.    That is what it appears to be.

21          Q.    Did you know what Dave Kleiman meant when

22   he wrote to you:  "Look up Wotty - it is not a mistake"?

23          MS. MARKOE:  Objection.  Answer if you

24   can.

25          THE WITNESS:  I am being told to look up



Page 322

1    the word "Wotty".

2    BY MR. FREEDMAN:

3         Q.    Did you know what Dave Kleiman meant when

4    he told you this?

5         A.    Yes, he asked me to look up the word

6    "Wotty."

7         Q.    Did you understand the implication of

8    what that meant?

9         A.    Yes, it meant I would go to probably

10   volume 20 of the Oxford greater dictionary.

11        Q.    Dr. Wright, I mean what Dave Kleiman

12   meant when he -- let me phrase it another way.  Why did

13   Dave Kleiman want you to look up the word "Wotty"?

14             MS. MARKOE:  Objection.  Answer if you

15   can.

16             THE WITNESS:  You are asking me why

17   someone else asked me to look up something.

18   BY MR. FREEDMAN:

19        Q.    Do you know?  If the answer is no, then

20   just say no.

21        A.    Because he did silly things like that and

22   so did I.  So, my suspicion is without looking it up and

23   trying to figure out, because I cannot remember what

24   Wotty actually is, I would need to look up the word

25   again and try and guess what he was saying.



Page 323

1              MR. FREEDMAN:  Can we take a five-minute

2    break.  I need a drink of water.

3              MS. MARKOE:  Sure.

4              THE VIDEOGRAPHER:  Going off the record.

5    The time is 18.50.

6                   (A Short Break)

7              THE VIDEOGRAPHER:  This is the beginning

8    of video card number 7, volume 1, in the video

9    deposition of Dr. Craig Wright.  Going on the record.

10   The time is 19.05.  Thank you.

11   BY MR. FREEDMAN:

12        Q.    Dr. Wright, who is Ian Grigg?

13        A.    Ian Grigg is a person currently involved

14   with the cryptocurrency called EOS.

15        Q.    Have you ever met Ian Grigg?

16        A.    Yes.

17        Q.    Did Ian have any involvement in the

18   development of the Bitcoin protocol or the Satoshi

19   client?

20        A.    Involvement, as I said, is a big word.

21   Ian Grigg wrote a whole lot of things, like Ricardian

22   contracts.  I have used some of Ian Grigg's writings.

23   I have used contacts I got from Ian.  I have used other

24   such things.  Bitcoin was not developed because of Ian

25   but I used some of the things that Ian had published.



Page 324

1          Q.     Did you converse directly with Ian before

2     the public posting on the Satoshi client?

3                 MS. MARKOE:  Objection, but you can

4     answer.

5                 THE WITNESS:  I talked to Ian in the

6     '90s, which had nothing to do with Bitcoin.

7     BY MR. FREEDMAN:

8          Q.     Did you talk to Ian about -- strike that.

9     Was Ian aware that you were Satoshi Nakamoto?

10                MS. MARKOE:  Objection:  foundation.

11                THE WITNESS:  I cannot state his state of

12    mind.

13    BY MR. FREEDMAN:

14         Q.     Did you reveal yourself as Satoshi

15    Nakamoto to Ian Grigg?

16                MS. MARKOE:  Objection.

17                THE WITNESS:  I did not reveal myself to

18    anyone.  It was revealed.

19    BY MR. FREEDMAN:

20         Q.     Did you tell Ian Grigg that you were the

21    creator of Bitcoin?

22                MS. MARKOE:  Objection.

23                THE WITNESS:  I did not tell anyone until

24    this year that I was the creator of Bitcoin.

25    BY MR. FREEDMAN:



1          Q.     Do you know when Ian Grigg came to learn

2     that you were Satoshi Nakamoto?

3               MS. MARKOE:  Objection.

4               THE WITNESS:  Strike the last one.

5     I have talked to my wife, but that is a different

6     matter, and I have talked to Dave, so they are anyones,

7     but, I mean, outside of the people that we are not

8     talking about, generally, in public, I did not talk to

9     anyone.  Ian Grigg came to believe that some time on his

10    own.  I do not remember the exact timing of that.

11    I know I had been talking to him about Bitcoin before

12    all the outing, etcetera.  I do not know when he decided

13    that I was.

14    BY MR. FREEDMAN:

15         Q.     Do you know whether Ian Grigg knew Dave

16    Kleiman?

17         A.     I believe he did.  I do not know.

18         Q.     Do you know whether Ian Grigg and Dave

19    Kleiman had any direct correspondence?

20         A.     I do not know.  Dave was known by

21    practically everyone in the industry.

22         Q.     To your best knowledge, does Ian Grigg

23    have any personal knowledge concerning the use of the

24    Satoshi e-mail addresses?

25         A.     I do not know what Ian knows.  I have not



Page 326

1    talked to Ian since he started bloody EOS.

2         Q.    When you first met Joseph Vaughn Perling,

3    did you introduce yourself as Satoshi Nakamoto?

4         A.    I do not remember what I said I was.

5    I used a number of silly pseudonyms in the past, Satoshi

6    being one of them, Toshi being another one, Toshi Gati

7    being another one.  Yes, I used a lot of Japanese

8    pseudonyms.

9         Q.    Did Mr. Vaughn Perling have any

10   involvement in the development of the Satoshi client?

11             MS. MARKOE:  Objection.

12             THE WITNESS:  I do not know what he did

13   online.  I believe he probably did.  He was very

14   interested in this.  He was one of the reasons that

15   I stayed secret as long as I did.

16   BY MR. FREEDMAN:

17        Q.    Mr. Vaughn Perling knew you were Satoshi

18   before the world did?

19             MS. MARKOE:  Objection.

20             THE WITNESS:  That is not what I said.

21   BY MR. FREEDMAN:

22        Q.    Did Mr. Vaughn Perling know you were

23   Satoshi Nakamoto before the world did?

24             MS. MARKOE:  Objection.

25             THE WITNESS:  I do not know.



Page 327

1    BY MR. FREEDMAN:

2              Q.    Do you know whether Mr. Vaughn Perling

3     knows Uyen Nguyen?

4                    MS. MARKOE:  Objection.

5                    THE WITNESS:  I believe he does.

6    BY MR. FREEDMAN:

7              Q.    Do you know when they came to meet?

8              A.    I do not know that.

9              Q.    Do you know whether Mr. Vaughn Perling

10    knows about the Tulip Trust?

11             A.    I believe he does.

12             Q.    Is Mr. Vaughn Perling a trustee of the

13    Tulip Trust?

14             A.    No, he is not.

15             Q.    Is he a trustee of any trust related to

16    you?

17             A.    No.

18             Q.    Do you know a gentleman named G Mark

19    Hardy?

20             A.    G Mark Hardy?  The name is familiar.

21             Q.    Do you ever e-mail with him?

22             A.    If I have in the past, I do not any more.

23             Q.    Do you know whether G Mark Hardy is a

24    trustee of any trust related to you?

25             A.    He is not.  Oh, Mark Hardy he is from the



Page 328

1    tax office.

2            Q.     No, this is a different Mark Hardy.  G

3    Mark Hardy I am talking about.

4            A.     G Mark Hardy?

5            Q.     Did Nick Szabo have any involvement in

6    the development of the Bitcoin protocol?

7                   MS. MARKOE:  Objection.

8                   THE WITNESS:  Nick Szabo ----

9    BY MR. FREEDMAN:

10           Q.     Let me clarify that though before, and I

11   do not mean that you used his prior work.  I mean, did

12   Nick Szabo have any direct involvement in the programing

13   of the Satoshi client?

14                  MS. MARKOE:  Objection.  You can answer

15   if you can.

16                  THE WITNESS:  Nick Szabo could not

17   program himself out of a wet paper bag if he was given

18   his children about to be hung and he had to save himself

19   by getting out of the wet paper bag, and having to type

20   a simple one-line C code.  He did not have anything to

21   do with Bitcoin.  He does not understand Bitcoin.  He

22   has no clue about what Bitcoin is, how it works or

23   anything more.  He is probably the most clueless guy who

24   has latched on to Bitcoin ever.

25   BY MR. FREEDMAN:



Page 329

1          Q.     Am I understanding you correctly, that

2     Satoshi Nakamoto would have to have a deep understanding

3     of C computer language?

4                    MS. MARKOE:  Objection.

5                    THE WITNESS:  C++.

6     BY MR. FREEDMAN:

7          Q.     C++; is that correct?

8          A.     Yes.

9                    MS. MARKOE:  Objection.

10    BY MR. FREEDMAN:

11         Q.     Did you ever e-mail with Jeff Garzik

12    about the Satoshi client?

13         A.     Yes.

14         Q.     Before it was released or after it was

15    released?

16         A.     I do not believe Jeff was e-mailed before

17    it was released.  I do not think he was on that list.

18         Q.     Did there come a time -- strike that.

19    Did Mr. Garzik learn you were Satoshi before the world

20    learned you were Satoshi?

21                   MS. MARKOE:  Objection.

22                   THE WITNESS:  I do not know.  I did not

23    ever tell him.

24    BY MR. FREEDMAN:

25         Q.     Did you ever discuss the amount of



Page 330

1     Bitcoin you had with Mr. Garzik?

2                    MS. MARKOE:  Objection.

3                    THE WITNESS:  No.

4     BY MR. FREEDMAN:

5          Q.    Did you ever discuss the Tulip Trust with

6     Mr. Garzik?

7          A.    No.

8                    MS. MARKOE:  Objection.

9     BY MR. FREEDMAN:

10         Q.    Did you discuss any trust with

11    Mr. Garzik?

12         A.    No.

13         Q.    Do you know whether Mr. Garzik and Dave

14    Kleiman had any direct communication between 2009 and

15    2013?

16         A.    Dave was on IRC groups that Jeff was on.

17    More than that, I could not say.

18         Q.    Have you ever met with Gavin Andresen?

19         A.    I have.

20         Q.    Did you ever speak with Gavin Andresen

21    about you being Satoshi Nakamoto?

22                    MS. MARKOE:  Objection.  You can answer.

23                    THE WITNESS:  I did.

24                    MS. MARKOE:  Craig, just give me a minute

25    to object before you answer so we are not driving the



Page 331

1    court reporter crazy, please.

2                    THE WITNESS:  Sorry, yes.

3    BY MR. FREEDMAN:

4         Q.    Did you ever discuss the amount of

5    Bitcoin that you have with Mr. Andresen?

6                    MS. MARKOE:  Objection.  You may answer.

7                    THE WITNESS:  No.

8    BY MR. FREEDMAN:

9         Q.    Did you ever discuss the Tulip Trust with

10   Mr. Andresen?

11        A.    I do not believe so.

12        Q.    Did you ever discuss any other trusts

13   with Mr. Andresen?

14                   MS. MARKOE:  Objection.  You may answer.

15                   THE WITNESS:  No, and I do not discuss my

16   trusts with anyone outside my family, unless I am

17   required to by law.

18   BY MR. FREEDMAN:

19        Q.    Do you know if Uyen Nguyen ever reached

20   out to Mr. Andresen?

21                   MS. MARKOE:  Objection: foundation.

22                   THE WITNESS:  No.

23   BY MR. FREEDMAN:

24        Q.    Do you know if she would have a reason to

25   reach out to Mr. Andresen?



Page 332

1                    MS. MARKOE:  Objection:  foundation.

2                    THE WITNESS:  I do not know.

3     BY MR. FREEDMAN:

4          Q.    Doctor, I want to direct your attention

5     the Australian Tax Office investigations.  How many

6     investigations were undertaken by the tax office of

7     yourself personally?

8          A.    I do not know.

9          Q.    How many investigations were undertaken

10    by the tax office of your companies?

11         A.    I do not know.

12         Q.    Are you -- let me rephrase that question.

13    How many investigations are you aware that the tax

14    office has conducted against yourself?

15         A.    I do not know.  I do not know.

16         Q.    And are you aware of how many

17    investigations the tax office has conducted against your

18    companies?

19         A.    No.  What I do know is, for instance, on

20    myself, they have taken me to court multiple times, and

21    multiple times they have been forced basically to

22    apologise.  Multiple times they have doctored records.

23    They have constructed records.  They have done anything

24    possible, since the time I told them about Bitcoin,

25    before it was called Bitcoin, to basically find



Page 333

1    something to get me on.  Because little things like

2    where I said Bitcoin means we do not need as many

3    auditors because it gets rid of fraud, means that they

4    do not like what it is.

5           Q.    Dr. Wright, you swore to the court in the

6    Southern District of Florida that you do not have any

7    Australian Tax Office documents; do you recall that?

8           A.    No, I do not.  Can you show me the

9    document.

10          MR. FREEDMAN:  Sure.  Let us take a

11   break.  I will go get it for you.

12          THE VIDEOGRAPHER:  Going off the record.

13   The time is 19.15.

14               (A Short Break)

15   (Plaintiff's Exhibit 9 marked for identification)

16          THE VIDEOGRAPHER:  Going back on the

17   record.  The time is 19.31.  Thank you.

18   BY MR. FREEDMAN:

19          Q.    Dr. Wright, before the break we were

20   discussing a sworn statement you submitted to the court,

21   and now you have what has been marked as Plaintiff's

22   Exhibit 9.

23          A.    I do.

24          Q.    If you would turn, please, to page 4.

25          A.    Page 4 of 7.



Page 334

1          Q.      Okay.  If you read for me ----

2                  MS. MARKOE:  And that is at the top;

3      correct?

4      BY MR. FREEDMAN:

5          Q.      Do you recognise this as your sworn

6      statement?

7          A.      I do.

8          Q.      Do you recognise that at the very

9      beginning of this statement you swore:  "I, Craig

10     Wright, declare under penalty of perjury under the laws

11     of United States of America that the following is true

12     and correct"?

13         A.      I do.

14         Q.      And if you see on page 4 of this

15     document, paragraph 18, can you read that for me?

16         A.      Sorry, number 19?

17         Q.      Number 18.

18         A.      18.  "I have no documents in my

19     possession from any ATO investigation.  To the extent

20     that my attorneys have any documents from any ATO

21     investigation related to me, those documents would be

22     located in Australia."

23         Q.      So, Dr. Wright, here you have sworn that

24     you have no documents in your possession from any ATO

25     investigation; is that correct?



1          A.      That is correct.

2          Q.      But that is not entirely true; is that

3    not right?

4                  MS. MARKOE:  Objection.

5                  THE WITNESS:  I am sorry, I object to the

6    fact personally that you are implying that I have

7    perjured myself or lied.  I do not have documents from

8    any ATO investigation at all.  I do not have them now;

9    I did not have them in the past.

10   BY MR. FREEDMAN:

11         Q.      Dr. Wright, are you aware that your

12   lawyers have produced documents from the Australian Tax

13   Office investigation that they collected from your

14   house?

15                 MS. MARKOE:  Objection.

16                 THE WITNESS:  No, they have corporate

17   documents and e-mails back and forwards from the ATO.

18   You are saying that I have investigation files.  I do

19   not.

20   BY MR. FREEDMAN:

21         Q.      Okay, so I am trying to understand

22   exactly what you have and what you do not have.  Can you

23   tell me what it is you do have in regards to the

24   Australian Tax Office investigation?

25         A.      I have what my lawyers have, which is not



Page 336

1    ATO documents, or documents from an investigation.

2         Q.    In this you say that to the extent that

3    your attorneys have documents from the ATO, those

4    documents would be located in Australia.  Which

5    attorneys are those?

6              MS. MARKOE:  You can identify the names

7    of the attorneys.  You cannot identify the contents of

8    the conversations.

9              THE WITNESS:  I do not know which

10   documents would be with which attorneys.

11   BY MR. FREEDMAN:

12        Q.    You swore that you have no documents in

13   your possession from any ATO investigation.  What

14   documents did you mean that you do not have and what

15   documents do you have?

16             MS. MARKOE:  Objection: compound.

17   BY MR. FREEDMAN:

18        Q.    What documents do you not have in your

19   possession from the ATO?

20             MS. MARKOE:  Objection.

21        A.    I am a scientist, I cannot answer a

22   negative.  I do not know what documents I do not have.

23   BY MR. FREEDMAN:

24        Q.    You said: "I have no documents in my

25   possession from any ATO investigation."  What did you



Page 337

1    mean?

2            A.     An ATO investigation is where a group of

3    federal investigators decide to investigate.  That would

4    be material from what the ATO has.  That would be things

5    such as records of the ATO.  They can be given to you

6    after an investigation has happened.  You can ask for

7    them.  For instance, I could have, when I won the case

8    in 2012, asked for records.  I did not.

9            Q.     So you have the ability to ask the

10   Australian Tax Office for records?

11                  MS. MARKOE:  Objection: mischaracterises

12   the testimony.

13   BY MR. FREEDMAN:

14           Q.     Do you have the ability to ask the

15   Australian Tax Office for records?

16           A.     I am an Australian citizen and I have my

17   rights under Australian law which includes asking

18   government officials, including freedom of information

19   and personal records, to be delivered to me, yes.

20           Q.     Did you ask for those records to be

21   collected from the Australian Tax Office when responding

22   to discovery requests in this lawsuit?

23                  MS. MARKOE:  Objection.

24                  THE WITNESS:  No.

25   BY MR. FREEDMAN:



1          Q.     I believe the witness answered the

2     question.  Can you answer again?

3          A.     No.

4          Q.     Dr. Wright, have you asked your attorneys

5     to collect documents from -- have you asked your

6     attorneys whether they hold any Australian Tax Office

7     documents?

8                    MR. RIVERO:  Objection.

9                    MS. MARKOE:  Objection.  I am instructing

10    the witness not to answer.  Communications between

11    counsel are privileged and are not to be disclosed.

12                   MR. FREEDMAN:  Requesting whether or not

13    his lawyers have documents in the investigation?

14                   MS. MARKOE:  Your question was:

15    "Dr. Wright, have you asked your attorneys to collect

16    documents ..."  That is ----

17                   MR. FREEDMAN:  I disagree, but let me see

18    if I can make it so you do not object.

19         Q.     Dr. Wright, have you contacted your

20    Australian counsel to determine whether they have

21    documents in their possession from an Australian Tax

22    Office investigation?

23         A.     No.

24                   MS. MARKOE:  Objection.

25                   THE WITNESS:  And nor would I be sort of



1    able to at the moment, because I resigned as a director

2    of all those companies before the end of those

3    companies.

4    BY MR. FREEDMAN:

5            Q.    Who took over the directorship after you

6    resigned?

7                  MS. MARKOE:  Objection.  You can respond

8    if you recall.

9                  THE WITNESS:  That would be in public

10   records.

11   BY MR. FREEDMAN:

12           Q.    So you do not know sitting here today?

13           A.    I do not follow-up these things.  I did

14   not look at the shareholding after I left.  Again, as

15   I said, I really do not care what it is after I have

16   done whatever else, as long as things get run and things

17   happened.  I do not care.  It is magic.

18           Q.    Dr. Wright, have you ever met

19   Ross Ulbricht in person?

20                 MS. MARKOE:  Objection.

21                 MR. RIVERO:  Can we ask what ----

22                 MR. FREEDMAN:  Identification of the

23   witnesses and their knowledge base.

24                 MS. MARKOE:  It has already been pretty

25   well established that Ross Ulbricht has no relevance.  I



Page 340

1    will allow him to answer this question.  Tread lightly,

2    please.

3              THE WITNESS:  Yes, once.

4    BY MR. FREEDMAN:

5         Q.    What was that meeting about?

6              MS. MARKOE:  Objection.  You do not need

7    to answer that question.

8    BY MR. FREEDMAN:

9         Q.    Did that meeting involve Bitcoin?

10             MS. MARKOE:  Objection.  You may answer.

11             THE WITNESS:  I mentioned Bitcoin.

12   BY MR. FREEDMAN:

13        Q.    In what way did you mention Bitcoin?

14             MS. MARKOE:  Objection.  I am going to

15   instruct the witness not to answer.  It goes beyond the

16   scope, unless you can point me to something.

17             MR. FREEDMAN:  To determine

18   Ross Ulbricht's knowledge.  It is clearly within the

19   scope.

20             MS. MARKOE:  It talks about his role in

21   the subject matter, not about his ----

22             MR. FREEDMAN:  No, no.  Where is the

23   list?  6.  Sorry, that is the wrong one, my apologies.

24   It is 1.  So, the question was:  "In what way did you

25   mention Bitcoin?"



Page 341

1              MS. MARKOE:  Right, and I am instructing

2    him ----

3              MR. FREEDMAN:  You are instructing him

4    not to answer.

5              MS. MARKOE:  I am instructing him not to

6    answer.

7    BY MR. FREEDMAN:

8         Q.    When did this meeting take place?

9              MS. MARKOE:  If you can recall, you can

10   answer.

11             THE WITNESS:  I do not recall exactly.

12   It was at the Bondi Icebergs, so therefore I pretty much

13   say not in the middle of winter.

14   BY MR. FREEDMAN:

15        Q.    Do you know what year it was?

16        A.    It would be 2010 off the top of my head.

17        Q.    Did Dave know you discussed Bitcoin with

18   Ross Ulbricht?

19             MS. MARKOE:  Objection.

20             THE WITNESS:  Dave's not my wife.  I do

21   not sit there and go, "Hey, Dave, I discussed something

22   with this guy who one day will be famous for doing shit

23   because he is a criminal."

24   BY MR. FREEDMAN:

25        Q.    I just asked the question, Dr. Wright,



Page 342

```
1    whether or not Dave knew you had spoken with Ross

2    Ulbricht about Bitcoin.  If the answer is no, it is no.

3    If it is yes, it is yes.  Please answer the question?

4                 MS. MARKOE:  Objection ----

5                 THE WITNESS:  I do not know.

6                 MS. MARKOE:  ---- you are asking him to

7    get into someone else's head.  He can answer if he

8    knows.

9                 THE WITNESS:  I do not know.

10   BY MR. FREEDMAN:

11        Q.     You do not know; okay.  Did you ever tell

12   him you spoke to Ross Ulbricht about Bitcoin?

13        A.     No.  I did not like Ross Ulbricht.

14        Q.     Why did you not like Ross Ulbricht?

15                 MS. MARKOE:  Objection.

16                 MR. FREEDMAN:  He said he did not like

17   him.

18                 MS. MARKOE:  I am going to instruct the

19   witness not to answer.

20   BY MR. FREEDMAN:

21        Q.     Have you ever communicated with Ross

22   Ulbricht by e-mail or other communications protocol?

23                 MS. MARKOE:  Objection.  You may answer.

24                 THE WITNESS:  No, I did not like him.

25   I did not really try and communicate with people I do
```



Page 343

1    not like.

2    BY MR. FREEDMAN:

3         Q.    Did you use Liberty Reserve with Dave

4    Kleiman?

5         A.    No.

6         Q.    Did you ever send money to Dave Kleiman

7    through Liberty Reserve?

8         A.    I sent money to a -- well, I instructed a

9    group to send money to a group that Dave Kleiman was

10   involved.

11        Q.    Which group did you instruct?

12        A.    Craig Wright R&D.

13        Q.    Which one?

14        A.    Panama.

15        Q.    And you instructed Craig Wright R&D

16   Panama to send money to who?

17        A.    Dave's company in Panama.

18        Q.    Which was?

19        A.    I cannot remember off the top of my head.

20   I would need to see the record.

21        Q.    Where do those records exist?

22             MS. MARKOE:  Objection.  You may answer

23   if you know.

24             THE WITNESS:  I believe the lawyers have

25   taken a copy.



1    BY MR. FREEDMAN:

2          Q.    How many times did you instruct Craig

3    Wright R&D to send money to Dave's company in Panama?

4                MS. MARKOE:  Objection.  You can answer

5    if you know.

6                THE WITNESS:  I do not know.

7    BY MR. FREEDMAN:

8          Q.    How much money did you instruct Craig

9    Wright R&D to send to Dave's company in Panama?

10               MS. MARKOE:  Objection.  Is this at a

11   particular time or is this overall or over the course of

12   a period time?  Your question is unclear.

13   BY MR. FREEDMAN:

14         Q.    You said that you instructed Craig Wright

15   R&D, so at all times, how many times -- well, you know

16   what, strike that.  How much money in total did you

17   instruct Craig Wright R&D to transfer to Dave's company

18   in Panama in the transaction you referenced earlier?

19               MS. MARKOE:  Objection.  You can answer

20   if you understand.

21               THE WITNESS:  I do not remember the exact

22   amount.  It was like, I think it was about US$5 million.

23   BY MR. FREEDMAN:

24         Q.    Why did you have Craig Wright R&D make

25   this transfer?



Page 345

```
 1          A.      To have machines built.

 2          Q.      What type of machines?

 3          A.      HPCs.

 4          Q.      What purpose were you building HPCs for?

 5          A.      To test scaling.

 6          Q.      Scaling for what?

 7          A.      Bitcoin.

 8          Q.      And when you say scaling, does that mean

 9  bigger blocks?

10          A.      That is the only way Bitcoin scales.

11          Q.      Did Dave make the machines?

12          A.      No.

13                  MS. MARKOE:  Objection.

14  BY MR. FREEDMAN:

15          Q.      Why not?

16                  MS. MARKOE:  Objection.

17  BY MR. FREEDMAN:

18          Q.      Do you know why Dave did not make the

19  machines?

20          A.      Because to make the machines would

21  basically mean that you have a company that goes out

22  there and smelts iron and forms that into shapes and

23  then has silicon fabs and ----

24          Q.      Dr. Wright, did he cause them to be made?

25  I think you understood what I meant.
```



Page 346

1                   MS. MARKOE:  Objection.  You cannot

2    testify as to what our client understood.

3                   MR. RIVERO:  And you cannot cut-off the

4    answer.

5    BY MR. FREEDMAN:

6          Q.     Did Dave cause the machines to be built?

7          A.     You want to know if Dave or Dave's

8    company bought them and I am going to have to interrupt

9    this way because I cannot stand this any more.  He did

10   not cause them to be built.  That would be an incorrect

11   characterisation, because companies make machines and

12   then they sell them.  He caused a number of machines to

13   be sent through grey markets from SGI, and then people

14   put them together.

15         Q.     And what happened to those machines?

16         A.     The last I know of, the American

17   government has them.

18         Q.     How did the American government come to

19   possess the machines?

20         A.     The American government started a number

21   of investigations.  One was into High Secured where they

22   have arrested the founders, another was into Arthur

23   Budovsky in Liberty Reserve, and due to money laundering

24   charges, a lot of people were arrested.

25         Q.     So, of the 5 million that you caused to



Page 347

1    be transferred, do you know approximately how much of it

2    Dave Kleiman spent on purchasing these machines?

3           A.     All of my machines ended up costing

4    around 60 million.

5           Q.     So the full 5 million was spent?

6           MS. MARKOE:  Objection:  mischaracterises

7    the testimony.

8    BY MR. FREEDMAN:

9           Q.     Was the full 5 million spent?

10          MS. MARKOE:  Objection.  You may answer

11   if you understand.

12          THE WITNESS:  I would assume so, but

13   I did not actually do that, and Dave obviously managed

14   to get something somewhere and other people got money

15   together to put, well, all those machines together.  So,

16   therefore, someone spent money.  Either that or there is

17   a debt, and which I do not care because it is not my

18   company.

19   (Plaintiff's Exhibit 10 marked for identification)

20   BY MR. FREEDMAN:

21          Q.     Mr. Wright, I have handed you what has

22   been marked now as Plaintiff's Exhibit 10.

23          A.     Yes.

24          Q.     Do you recognise what these are?

25          A.     Yes, they are a statement of claim.



Page 348

```
 1          Q.    Who is the plaintiff in this action?

 2          A.    The plaintiff is Craig Steven Wright.

 3          Q.    Is that yourself?

 4          A.    Yes, via ---

 5                MS. MARKOE:  Objection.  You can answer.

 6                THE WITNESS:  Yes, via a business trust.

 7   BY MR. FREEDMAN:

 8          Q.    What business trust?

 9          A.    The one associated with ABN 97 481 146

10   384.

11          Q.    Can you go with me to page 3?

12                MS. MARKOE:  Are we talking about on the

13   top?

14                MR. FREEDMAN:  On the top.

15                MS. MARKOE:  On the top.

16   BY MR. FREEDMAN:

17          Q.    Paragraph 1 says that "the plaintiff",

18   Craig Steven Wright, "provided contract labour services

19   to the defendant."  Do you see that?

20          A.    I see that.

21          Q.    What were the labour services you

22   provided?

23          A.    The document is badly drafted.

24          Q.    Who drafted this document?

25          A.    Myself.
```



Page 349

```
 1          Q.     What does it mean to say, or why is it
 2    badly drafted?
 3          A.     Because some of the things were in error,
 4    it was rushed, I was trying to get through a document so
 5    that I could simply just state the intellectual property
 6    that I had and start moving forward.
 7          Q.     So, is the sentence, "Between 2011 and
 8    2013 the plaintiff provided contract labour services to
 9    the defendant" incorrect?
10               MS. MARKOE:  Objection.  What topic are
11    we talking about now?
12               MR. FREEDMAN:  These are the Australian
13    tax proceedings -- sorry, the Australian court
14    proceedings.
15               MS. MARKOE:  The Australian court
16    proceedings, so that would be number 7, allows inquiry
17    into individuals and entities identified in the
18    proceedings, along with what documents exist relevant to
19    the lawsuit and where those documents are held.  These
20    questions do not address those topics.
21               MR. FREEDMAN:  He is saying the contract
22    was badly drafted, so I am trying to understand what it
23    was about so I can ask ----
24               THE WITNESS:  I did not say contract.
25               MR. FREEDMAN:  Sorry, statement of claim.
```



Page 350

1                     MS. MARKOE:  Objection.  I am going to

2     instruct him not to answer.  Your inquiry can be limited

3     to those specific topics.

4                     MR. FREEDMAN:  Okay.

5             Q.      Can you go down to paragraph 5, please.

6             A.      Yes.

7             Q.      "By contract dated" -- can you read

8     paragraph 5 for me, please?

9             A.      "By contract dated 8 January 2009, the

10    Defendant agreed to pay the Plaintiff for property and

11    consulting services to complete research.  The contract

12    was bonded against the intellectual property of the

13    defendant."

14            Q.      Where is that contract between Craig

15    Steven Wright and W&K Info Defense Research?

16                    MS. MARKOE:  Objection.  You may answer.

17                    THE WITNESS:  As stated, there was an

18    error in drafting.

19    BY MR. FREEDMAN:

20            Q.      So there is no contract?

21                    MS. MARKOE:  Objection: mischaracterises

22     the testimony.  You may answer.

23                    THE WITNESS:  No, I have the wrong date.

24    BY MR. FREEDMAN:

25            Q.      What date was it supposed to be?



Page 351

1          A.     I do not remember the date of the

2    contract.

3          Q.     Is it one of the contracts we looked at

4    today?

5          A.     Yes.

6          Q.     Is there anything else wrong with the

7    document?

8                 MS. MARKOE:  Objection.

9                 THE WITNESS:  I do not know.  I would

10   need to read through everything line-by-line and match

11   it all up.

12   BY MR. FREEDMAN:

13         Q.     Can you look at paragraph 7, please.

14         A.     Yes.

15         Q.     Can you read it for me?

16         A.     "The plaintiff conducted a project for

17   the development of a Bitcoin SDK in exchange".

18         Q.     What is SDK?

19         A.     Software development kit.

20         Q.     Do any documents exist as to this

21   development, software development kit?

22         A.     Again, this is an error.  The plaintiff

23   is mixed up with the defendant.

24         Q.     So, W&K conducted a project for the

25   development of the Bitcoin SDK?



Page 352

1          A.     Again what you are doing is the initial

2    horrible, horrible statement of claim that I had to go

3    into court and have multiple other documents done to

4    correct because we were not expecting anything fought,

5    it was just to basically end a contract saying anything

6    that W&K has they can keep; the things I have got,

7    I keep.  We all move on, happy, the end.

8          Q.     So is it fair to say that you were trying

9    to get this done and it is not accurate?

10              MS. MARKOE:  Objection.

11              THE WITNESS:  This is part of a

12   proceedings.

13   BY MR. FREEDMAN:

14         Q.     Why did you file a statement of claim

15   that was inaccurate?

16              MS. MARKOE:  Objection.  I am going to

17   instruct the witness not to answer.  You are limited in

18   this deposition.  You are going to get another bite at

19   this apple in terms of a full merits deposition of

20   Dr. Wright.  Move on.  Limit your questions to the

21   topics you identified to the court and the court

22   approved.

23   BY MR. FREEDMAN:

24         Q.     Can you go to page 9, please, for me and

25   paragraph 1.



Page 353

1           A.      And again, the same errors were made when

2    these were filed.

3           Q.      I need to know if any documents exist, so

4    I am trying to understand what it is really supposed to

5    say.  So you say it is an error.  What should it say?

6           A.      I do not know what the court may or may

7    not have document-wise.  A lot of documents were

8    produced for the court.  A lot of changes were made.

9    The register required that I went back several times and

10   corrected things.  I handed all those documents to the

11   register.  I do not know what the court has or has not

12   kept.

13          Q.      I want to know what you have kept?

14          A.      If my lawyers have it, I have it.

15          Q.      Which lawyers would this be?

16          A.      These ones right here.

17          Q.      Can you go down to paragraph 3, please.

18   You said -- can you read paragraph ----

19                  MR. RIVERO:  This I think ----

20                  MR. FREEDMAN:  Let us go off the record.

21                  THE VIDEOGRAPHER:  Going off the record.

22   The time is 19.53.

23                  (A Short Break)

24                  THE VIDEOGRAPHER:  Going back on the

25   record.  The time is 19.55.



1   BY MR. FREEDMAN:

2           Q.      Can I direct your attention to paragraph

3     3.

4           A.      Yes.

5           Q.      And can you read that for me?

6           A.      Again, this is the same error as before.

7     The wrong date is in this version of the statement of

8     claim.

9           Q.      Did you take the 27th October 2008 date

10    from a document?

11          A.      There is no 27th October 2008 document

12    that I know of.  It could have been taken from a

13    different document and put in in error.  This does not

14    refer to that document.

15          Q.      Can you go to 6, please, on page 10 at

16    the top.

17          A.      Yes.

18          Q.      Can you read 6 for me?

19          A.      "In May 2013 the primary director of the

20    defendant died leaving the project not transferred to

21    the plaintiff and not returning funds.  These funds were

22    rated as: a. TTA 01 ----"

23          Q.      That is fine.  Just 6, not the a, b, c,

24    d.  There is then a list of funds below that in a, b, c

25    and d; is that not correct?



1          A.     Yes.

2          Q.     Do any documents exist that validate that

3     these funds were provided?

4                 MS. MARKOE:  Objection: mischaracterises

5     the document and what it states.  You can answer.

6                 MR. FREEDMAN:  You can answer.

7                 THE WITNESS:  Basically, this says funds

8     were meant to be given from Department of Homeland

9     Security if Dave had gone through with things.

10    Unfortunately Dave did not continue with the filing

11    after he went into hospital, so the payment lapsed.

12    This was not funds from me, this was funds that would

13    have been completed.  I completed those things, the

14    papers are published, and the other material was

15    produced.

16    BY MR. FREEDMAN:

17          Q.     You said the payment lapsed.  What

18    payment are you referring to?

19                 MS. MARKOE:  Objection.  You can answer.

20                 THE WITNESS:  The Department of Homeland

21    Security fund that Dave was there, which was because he

22    was a veteran.  None of that can be filed on a veteran

23    who is dead, and I believe part of the problem was he

24    did not file any taxes at all in any of the companies,

25    which invalidated any of the things he was going for.



 1   BY MR. FREEDMAN:

 2            Q.    Could you look at 8 for me?

 3            A.    Yes.

 4            Q.    Can you read it for the record?

 5            A.    "The contract set the interest rate at 8%

 6   calculated annually."

 7            Q.    Can you tell me what contract sets the

 8   interest rate at 8% annually?

 9                  MS. MARKOE:  Objection.  You may answer.

10                  THE WITNESS:  When you are talking about

11   New South Wales, the New South Wales contract rate was

12   about 8%.  It fluctuates between 7 and 9%.  This is a

13   court proceeding-type thing and if you are talking about

14   setting government mandated things we have high interest

15   rates in Australia because we have a crappy banana

16   republic-type economic.

17   BY MR. FREEDMAN:

18            Q.    So, "the contract" is not a reference to

19   the actual contract that is between you and W&K?

20                  MS. MARKOE:  Objection.  You may answer.

21                  THE WITNESS:  When you are stating that

22   certain things apply as in jurisdiction in Australia and

23   this sort of X, Y, Z, then it also implies interest,

24   which, when you are putting interest -- when you are

25   doing this sort of stuff, has to be put into court for



Page 357

1    statement of claim.

2   BY MR. FREEDMAN:

3           Q.    Can you look at 13 for me, please?

4           A.    Yes.

5           Q.    Can you read it for the record?

6           A.    "The IP is software and code used by the

7    US Military, [Department of Homeland Security] and other

8    associated parties."

9           Q.    Do any documents exist that substantiate

10   that this ----

11          A.    I will have to take this offline.

12          Q.    Does this relate to the matters you want

13   to speak to the court about in camera?

14          A.    Yes.

15          Q.    Can you go to page 13 for me.  The

16   signature in the middle of the page, is that your

17   signature?

18          A.    Yes.

19          Q.    Can you go to page 6 for me.  Is that

20   signature in the middle of the page your signature?

21          A.    Yes.

22                MR. FREEDMAN:  I need a drink and a

23   bathroom break.  If we could ----

24                THE VIDEOGRAPHER:  Going off the record.

25   The time is 19.59.



1                    (A Short Break)

2                    THE VIDEOGRAPHER:  Going back on the

3     record.  The time is 20.09.  Thank you.

4                    THE JUDGE: (By Telephone) Okay, counsel,

5     what can I do for you today?

6                    MR. FREEDMAN:  Your Honour, this is

7     Mr. Freedman.  We had a couple of questions that the

8     witness has either just refused to answer or has been

9     instructed not to answer, and there is one particular

10    issue that I will let defence counsel talk to you about,

11    but ----

12                    THE JUDGE:  Okay.

13                    MR. FREEDMAN:  ---- if I could raise the

14    questions that the witness has refused to answer or has

15    been instructed not to answer.  There are only a couple

16    of them.

17                    THE JUDGE:  Sure.

18                    MR. FREEDMAN:  We asked Dr. Wright --

19    and, your Honour, just so you are aware Dr. Wright is

20    here in the room.

21                    THE JUDGE:  Okay.  Hello, Dr. Wright.

22                    THE WITNESS:  Hello.  How are you?

23                    MR. FREEDMAN:  We asked Dr. Wright how

24    much Bitcoin he mined from January of 2009 until

25    December of 2010, which was his testimony on the time he



Page 359

1    mined Bitcoin.  He was instructed not to answer the

2    question.  We believe this goes to the tracing forward

3    issue and we were told this morning that we were not

4    receiving the list of Bitcoin wallets we were supposed

5    to receive before the deposition.  We never got the

6    list.

7              THE JUDGE:  Okay, so I am clear, the

8    question is, how much Bitcoin did he mine in 2009 and

9    2010?

10             MR. FREEDMAN:  Correct.  That is the

11   first question.

12             THE JUDGE:  Why do you not give me all

13   the questions.  That way I can have Mr. Rivero or

14   Ms. Markoe respond to all of them, then I will have you

15   address all of them and then I will come to a conclusion

16   about all of them.

17             MR. FREEDMAN:  Sure.

18             MR. RIVERO:  Judge, just before the

19   listing -- this is Andrés Rivero -- I believe by

20   telephone as well we have Mr. Brenner and Mr. McAdams

21   who are lawyers at Boies Schiller and, at least as of

22   some point during the deposition, the plaintiff Ira

23   Kleiman also by telephone.

24             MR. BRENNER:  That is right.  This is

25   Andrew Brenner for Boies Schiller by telephone.



Page 360

1                    MR. MCADAMS:  John McAdams by telephone.

2                    MR. KLEIMAN:  (By Telephone) Ira Kleiman.

3                    THE JUDGE:  Thank you all very much.

4                    MR. FREEDMAN:  The second question, your

5       Honour, was, did you ever tell Dave Kleiman how much

6       Bitcoin you had mined, and the witness was instructed

7       not to answer.  The witness informed us ----

8                    THE JUDGE:  I am sorry, was there a

9       timeframe attached to that question?  During what time

10      period did he mine it or just general?

11                   MR. FREEDMAN:  I would have to check the

12      record, your Honour, but the question is just from 2009

13      until 2010, because Dr. Wright's testimony was that he

14      stopped mining and then did not begin again until 2016

15      when Dave Kleiman was already dead.

16                   THE JUDGE:  Okay.

17                   MR. FREEDMAN:  The third question was

18      that Dr. Wright had testified that his ex-wife, Lynne

19      Wright, had been on e-mail communications with Dave

20      Kleiman about the founding of W&K, but then refused to

21      answer any questions about Lynne Wright due to -- and if

22      I am misstating this please correct me defence

23      counsel -- an oath that he filed with the courts in

24      Australia not to talk about his ex-wife.

25                   THE JUDGE:  Okay.



Page 361

1              MR. FREEDMAN:  And then Dr. Wright also

2     refused to answer any questions about his current wife,

3     Ms. Ramona Watts, who is listed as a director of many

4     different companies.  He was not instructed not to

5     answer, he just refused to answer the questions.

6              THE JUDGE:  Okay.

7              MR. FREEDMAN:  Those are the four

8     questions that do not touch on this other issue.

9     Briefly, there are other questions that Dr. Wright has

10    refused to answer, on national security grounds, and

11    defence counsel has requested an in camera discussion

12    with you about them.  I will let them talk to that, but

13    those first four are the questions the plaintiff is

14    raising now.

15             THE JUDGE:  Again, so our record is

16    clear, the plaintiff is asking me to compel Dr. Wright

17    to provide truthful answers to those four areas of

18    questioning?

19             MR. FREEDMAN:  Correct.

20             THE JUDGE:  Okay.  Let me hear from

21    counsel for Dr. Wright.

22             MS. MARKOE:  Your Honour, this is Zaharah

23    Markoe.  How are you this afternoon?  For us very late

24    in the evening.

25             THE JUDGE:  I am fine, Ms. Markoe.  Thank



Page 362

1   you.  Good afternoon.

2                MS. MARKOE:  Good afternoon.  Your

3   Honour, it is our position that this is a

4   limited-in-scope deposition, primarily targeted at

5   discovery issues, opening doors, closing doors, the

6   location of documents, and the location and

7   identification of witnesses, with some leeway, which we

8   believe we have been more than fair in providing.

9                With regard to the first question, which

10  is how much Bitcoin did Dr. Wright mine between 2009 and

11  2010, that goes beyond the scope.  We allowed him to

12  answer questions about the location of the computers

13  that were used to mine, and we also allowed him to

14  answer questions about whether or not he mined in any

15  way in conjunction with either Dave Kleiman or W&K.  And

16  the answer was there was no mining with Dave Kleiman or

17  with W&K.  Therefore, it is our position that how much

18  he mined on his own between 2009 and 2010 is both beyond

19  the scope and further irrelevant.

20                THE JUDGE:  Okay.  His testimony was that

21  he never mined anything with Mr. Kleiman?

22                MS. MARKOE:  Correct.

23                THE JUDGE:  Okay.

24                MS. MARKOE:  With regard to the second

25  question, did you ever tell Dave Kleiman how much



Page 363

1   Bitcoin you mined between 2009 and 2010, again this is a

2   limited-in-scope deposition, as I understood it.  It is

3   not going to the merits and we believe that that

4   question went too far into the merits, and is not

5   appropriate for this deposition.

6           THE JUDGE:  Okay.

7           MS. MARKOE:  With regard to the questions

8   about Lynne Wright, I believe specifically one of those

9   questions was how did they meet; (a) that is irrelevant

10  and then, (b), Dr. Wright has testified in this

11  deposition that he has in his divorce settlement

12  agreement agreed not to discuss Lynne Wright, so he

13  believes he is bound by that agreement, and that divorce

14  settlement.  With regard to his current wife, his

15  position is that he made an oath to his wife not to

16  discuss her, so he would like to honour that oath.

17  Again, one of the specific questions that was objected

18  to further goes beyond the scope in terms of how did he

19  meet.  These witnesses have already been identified.

20  There is no further information that is required as it

21  relates to this deposition, which again limited in

22  scope.  So, that is my response to those four questions.

23          THE JUDGE:  Let me start off with one or

24  two follow-up questions I have for you.  As to his

25  current wife, Ramona Wright, are you invoking any sort



Page 364

1    of marital privilege under US law or are you simply

2    relying upon some other basis upon which he is legally

3    bound?

4                    MS. MARKOE:  I believe it depends on the

5    question.  I think that there were a couple of questions

6    that went into spousal communications, certainly, and

7    again as I said, I think that the question regarding how

8    they met certainly is, (a), irrelevant, and (b) goes

9    beyond the scope of this deposition.

10                    THE JUDGE:  Okay, put aside the spousal

11   communications, are you also invoking the spousal

12   testimonial privilege?

13                    MS. MARKOE:  Yes.

14                    THE JUDGE:  In terms of his ex-wife,

15   Lynne Wright -- and I understand there may be some sort

16   of court proceeding in Australia that he feels bound

17   by -- what is your position as to whether I can order

18   him to do something even if the Australian court has

19   said or his agreement in Australia said that he cannot,

20   even if I have that authority?

21                    MS. MARKOE:  It would be our position

22   that you do not have that authority, your Honour,

23   respectfully, of course.

24                    THE JUDGE:  That is why I am asking.

25   What about the issue -- we have had so many hearings in



1   this case that I do not remember everything, but I do

2   recall that I had ordered the production of a list of

3   Bitcoin.  Was that not done?

4            MS. MARKOE:  Your Honour, you had ordered

5   production of a list of his Bitcoin at a particular

6   point in time or allow us the opportunity to make an

7   objection probably by formal motion as to

8   burdensomeness.  We will probably be filing that motion

9   soon.  There is no such document that exists regarding

10  his list of public addresses at, I believe it was

11  December 31st, 2013, and to compile that list would be

12  incredibly burdensome.  We will be filing a motion to

13  that effect.

14            However, more importantly, with regard to

15  the questions that were at issue in this deposition,

16  they did not relate to addresses.  The questions were

17  about how much Bitcoin Dr. Wright mined and whether he

18  ever told Dave Kleiman how much Bitcoin he mined, and it

19  was our position, and remains our position, that those

20  go beyond the scope of this deposition.

21            THE JUDGE:  Okay.  I have heard you on

22  that.  Let me turn back to Mr. Freedman before I make my

23  rulings.  Mr. Freedman?

24            MR. FREEDMAN:  Your Honour, this is

25  Mr. Freedman.  First of all, I do not know if the court



1   recalls, but the court set a deadline on when that

2   motion for burdensomeness would have had to have been

3   filed and it was purposely set in advance so that this

4   issue could be dealt with in advance of this deposition.

5   The motion was never filed.  We thought it would be

6   coming.  The list never came.

7          MS. MARKOE:  I would like a point of

8   clarification.  We had actually asked  Mr. Freedman for

9   an extension of time to file that motion, because that

10  motion was contemplated to be filed after our last

11  hearing.  Mr. Freedman needed to move that last hearing

12  for religious purposes and we accommodated that request.

13  We asked for a similar extension of time with regard to

14  filing our motion.  To be frank, Mr. Freedman never got

15  back with us and I think this is just something that

16  slipped through the cracks.

17          THE JUDGE:  No problem.  I know counsel

18  in this case have a lot going on and are working very

19  hard.  I hear you as to that, but the fact is it was not

20  yet produced and you are asking for leave to file a

21  motion.  I understand the structure of where we are.

22  Mr. Freedman, is there anything else you want to address

23  on the merits of these four things -- areas?

24          MR. FREEDMAN:  Yes, your Honour,

25  absolutely.  As the court is aware, it is our contention



1   that the Bitcoin mined by Dr. Wright from 2009, and he

2   testifies until the end of 2010, was done in partnership

3   with Dave Kleiman, and so the amount of Bitcoin that was

4   mined during that period is relevant to plaintiff's

5   claims.   Whether or not he informed Dave Kleiman about

6   this amount is relevant, again, to the partnership and

7   in particular for this deposition, whether those

8   communications still exist anywhere.

9           As to questions about Ms. Wright, there

10  were initial questions about how they had met to

11  determine the timeframe of when she came in.  Obviously

12  I am happy not to ask those questions.  The purpose

13  would be to understand what she knows about and what she

14  does not know about to see whether or not she is a

15  witness for the case.

16          As to questions about Ms. Watts,

17  obviously if counsel invokes spousal privilege that is

18  one thing, but questions were not about communications,

19  they were questions about what companies she was a

20  director on, I believe, and certainly we would explore

21  that topic, but after asking a few questions and being

22  given the same mantra, "I will not discuss anything

23  about my wife", we moved on, so we never got a chance to

24  fully explore those topics.

25          THE JUDGE:  Okay, thank you.  Anything



1    further, Mr. Freedman?

2                    MR. FREEDMAN:  No, your Honour.

3                    THE JUDGE:  Thank you.  Let me rule.  As

4    to the first area, which is enquiring of Dr. Wright

5    under oath how much Bitcoin he mined in 2009/2010,

6    I will defer that.  I will not require him to answer

7    that question today because I believe if I determine

8    that as a proper subject matter area, that can be

9    responded to through a targeted interrogatory and if

10   I determine that it is relevant, I would require him to

11   respond to that interrogatory under oath as if he were

12   asked the question live.  Since that is simply a fairly

13   straightforward question of how much Bitcoin that should

14   not be too burdensome to respond to, but I will deal

15   with that in the context of any motion and I will grant

16   leave for the defence to file a motion relating to

17   providing a list of the Bitcoin, because again obviously

18   if I order him to provide the list you are going to get

19   a lot more detail than just the final number.  So, as to

20   that issue, I will not require him to answer those

21   questions today.

22                    As to the area of questioning about

23   whether he told Dave Kleiman how much he mined, I will

24   direct him to answer those questions.  I believe that

25   is not unduly burdensome.  I believe it is relevant to



Page 369

1    the plaintiff's theory that there was a partnership

2    here, and his answers are what they are.  If he told

3    Mr. Kleiman what he was doing he should answer that and

4    if he did not he can answer that.

5                   As to the issues relating to the ex-wife,

6    Lynne Wright, I will allow the defence to file a

7    briefing as to whether, as a matter of law, I am

8    precluded from compelling this testimony.  I will not

9    opine as to whether -- I would probably be inclined to

10   compel the testimony if the law allows me to do so, but

11   I cannot claim to be an expert on Australian law or the

12   interactions between US law and Australian law on this

13   issue.  Given that I have already said that Dr. Wright

14   can be deposed a second time, I will defer that issue

15   and allow the defence time to file any motion they want

16   to file on that.

17                   My ruling will be the same as to the

18   questions relating to any communications or testimony

19   relating to his current wife.  Again I will allow the

20   defence to flush out any privilege arguments they want

21   to make.  I will allow the plaintiffs to respond only to

22   any privilege arguments as to either the current or past

23   wife and I will rule on that at a later time.

24                   I think I have now dealt with the four

25   areas that were raised.



Page 370

```
 1                    In terms of the national security

 2       issues -- sorry, Mr. Freedman, not waiving any

 3       objections to my ruling, were there any other issues

 4       that you require me to rule on or you request that I

 5       rule on this afternoon?

 6                    MR. FREEDMAN:  Just the national security

 7       stuff, your Honour.

 8                    MS. MARKOE:  And your Honour for that --

 9       sorry, go ahead.

10                    THE JUDGE:  Can you ask me the context --

11       the kinds of questions for which the national security

12       issues are going to relate.  Let us start with that.

13                    MS. MARKOE:  I believe it came up in four

14       contexts.  One related to the -- well, two questions

15       related to the identity of particular people.  I believe

16       one related to a trust called GICSR, and the third

17       related to Exhibit 11 (sic) to the complaint, and it is,

18       I believe, page 10 of 15, on paragraph 13:  "The IP is

19       software and code used by the US Military, DHS and other

20       associated parties."  Certainly Mr. Freedman should

21       correct me if I either misstated or missed a general

22       topic area.

23                    THE JUDGE:  Okay, you said there were

24       four, but there are only two.  Maybe you are merging

25       them together.
```



1          MS. MARKOE:  So one was the identity of

2    particular people who may have had involvement in

3    particular projects.  Two was related to a trust called

4    GICSR.  The third was related to Exhibit 11 (sic), and

5    then maybe I misspoke when I said four, I could have

6    misspoken.

7          THE JUDGE:  Okay.

8          MS. MARKOE:  I have three.

9          THE JUDGE:  I have not committed a

10   complaint on all of its attachments to memory.  Can you

11   help me out with what is on page 10 of 15 at paragraph

12   13?

13         MS. MARKOE:  Yes.  It says:  "The IP" --

14   and this is regarding the New South Wales statement of

15   claim -- "is software and code used by the US Military,

16   DHS and other associated parties."

17         THE JUDGE:  Okay.  Mr. Freedman?

18         MR. FREEDMAN:  Yes, your Honour, I think

19   Mr. Markoe laid it out, but just to give a little bit of

20   gloss on it, the identity of the first person was when

21   Dr. Wright first reached out to Louis Kleiman, which is

22   Dave and Ira's father.  He said to him: "Your son Dave

23   and I are two of the three key people behind Bitcoin."

24   We asked the identity of the third person and were told

25   we were not able to know that information for national



1    security reasons.

2              The second is that in response to an

3    interrogatory request that the court ordered Dr. Wright

4    to respond to at the last hearing, Dr. Wright wrote:

5    "There was an individual who helped me in the very early

6    stages of my research, well before the release of the

7    Bitcoin protocol.  As far as I know, that individual

8    never met or interacted with Dave Kleiman."  And the

9    defendant refused to identify that individual on

10   national security grounds.

11             THE JUDGE:  Okay.

12             MR. FREEDMAN:  The statement of claim

13   that Ms. Markoe was talking about is the Australian

14   statement -- a lawsuit where Dr. Wright sued W&K and

15   collected its consent judgment on its intellectual

16   property valued at tens of millions of dollars, and as

17   part of that statement of claim said that part of the IP

18   at issue was IP of software and code used by the US

19   Military, DHS and other associated parties.  It was

20   intellectual property that title was taken, as

21   I understand it, from W&K pursuant to these consent

22   judgments, and so it is directly relevant to the

23   intellectual property claims that plaintiff have brought

24   in this case.

25             Then finally, I do not have the e-mail in



Page 373

1    front of me, your Honour, but when Ira Kleiman was

2    conversing with Dr. Wright before the lawsuit was

3    initiated, Dr. Wright told him that there was a GICSR

4    trust that would be related to Dave's Bitcoin holdings

5    or intellectual property -- I do not have it in front of

6    me -- and when Dr. Wright was questioned about the trust

7    and who set it up, he refused to answer questions on

8    national security grounds.

9             MS. MARKOE:  Just one point of clarity.

10   We believe that Mr. Freedman incorrectly stated that

11   title was taken.  It is not quite that simple, and it is

12   certainly not entirely accurate, but that is the only

13   clarification I have for the moment.

14             THE JUDGE:  Okay.  Any further argument,

15   Ms. Markoe?

16             MS. MARKOE:  No, we just request that

17   Dr. Wright be permitted to speak with you in camera in a

18   separate room, without counsel for plaintiffs present,

19   without plaintiff on the phone, and without the court

20   reporter and you can get more information about this and

21   then render your decision.

22             THE JUDGE:  Okay.  I will respectfully

23   decline to have an off-the-record conversation with

24   Dr. Wright.  These are all topics that if I determine

25   that the information needs to be turned over, it can



1   either be turned over in the nature of an interrogatory

2   response, or a continuation of this deposition by video

3   teleconference, or in the subsequent deposition of

4   Dr. Wright.  What I am going to do is I am going to not

5   rule on any of these national security arguments,

6   because I think there is one and only one person I need

7   to hear from as to whether there is a national security

8   interest here, and it is not Dr. Wright, it is the

9   United States Government.

10          So, I will defer ruling, I will give the

11  defence leave to file a motion with any sort of

12  supporting affidavits or whatever else you want to

13  supply me with that comes from a responsible party of

14  the US government who tells me that US national security

15  interests require that these questions not be answered.

16  That obviously is not going to happen today.

17          I think I have now ruled on all the

18  issues that were presented this afternoon.  I know you

19  all worked very hard to get this accomplished and get it

20  done and I appreciate everyone's efforts.  Counsel, when

21  you are back in the country or while you are there and

22  you have some time, talk about how much time you think

23  is appropriate for the filing of the motions that we

24  discussed today, and when you get back we can do a quick

25  phone call and I can enter an order with an operational



Page 375

1    schedule.

2              Is there anything further I need to rule

3    on this afternoon?  Mr. Freedman?

4              MR. FREEDMAN:  No, your Honour.

5              THE JUDGE:  Ms. Markoe?  Mr. Rivero?

6              MR. RIVERO:  No, your Honour, and thank

7    you so much for helping us with these issues.

8              THE JUDGE:  No, like I said, thanks to

9    the parties.  I know this is a really heavy effort to

10   get this done but I really think it is going to help

11   move this case forward.  I will get off the phone.  You

12   can continue with whatever is left of the deposition.

13   Everyone have a safe trip home and we will be in touch

14   when you get back.  Thank you.

15             MS. MARKOE:  Thank you, your Honour.

16             MR. RIVERO:  Thank you.

17             MR. FREEDMAN:  I think the only thing we

18   are entitled to ask about now is whether Dr. Wright

19   communicated -- okay.

20             MS. MARKOE:  How much Bitcoin he mined,

21   yes.

22             MR. RIVERO:  One subject.

23             MR. FREEDMAN:  One subject, yes.

24             MR. RIVERO:  Dave Kleiman did.  So let us

25   do this.  Because they have been running -- I think it



Page 376

1    was 30 left at that time.  Why do we not just run -- it

2    is going to be -- as a matter of fact just ask your

3    question and it is 30 minutes.

4                    MR. FREEDMAN:  I have 30 minutes?  I am

5    going to use 30 minutes.

6                    MR. RIVERO:  No, no, I am not going to

7    count ----

8                    MS. MARKOE:  Let us just move on so that

9    we can get everyone out of here.

10                   MR. RIVERO:  Just do it and we will say

11   it is 30 minutes.

12                   MS. MARKOE:  Let us just get it done.

13   BY MR. FREEDMAN:

14        Q.    Dr. Wright, did you ever tell Dave

15   Kleiman how much Bitcoin you mined?

16        A.    No.

17                   MR. RIVERO:  30 minutes left.

18                   MR. FREEDMAN:  30 minutes, okay.

19                   MS. MARKOE:  29:46.

20   BY MR. FREEDMAN:

21        Q.    Dr. Wright, do you have a trust that is

22   based in Singapore?

23        A.    No.

24        Q.    Have you ever had a trust that is based

25   in Singapore?



Page 377

1         A.      No, I have never had a Singapore trust.

2         Q.      Do you have a trust based in the

3    Seychelles?

4         A.      Yes.

5         Q.      How many?

6         A.      I do not know.

7         Q.      Dr. Wright, do you remember telling Ira

8    Kleiman that you have back-up files of Dave's drives?

9         A.      No, I told Ira Kleiman that he needed to

10   keep back-up files of Dave's drives.

11               MR. RIVERO:  Just a point of order,

12   I have got 29 minutes, but are you going to reserve some

13   time against a ruling by the court?

14               MR. FREEDMAN:  I do not think that would

15   -- no.

16               MR. RIVERO:  So your position is you get

17   this time plus more time?

18               MR. FREEDMAN:  I think if the court rules

19   we get more time, yes.

20               MR. RIVERO:  I do not agree.

21               MR. FREEDMAN:  Okay.  Understood.  Noted.

22               MR. RIVERO:  We object and we think you

23   should reserve time in case you win something.

24   BY MR. FREEDMAN:

25        Q.      Dr. Wright, do you have a Twitter



Page 378

1    account?

2         A.      Not any more, no.

3         Q.      Did you have a Twitter account?

4         A.      Yes.

5         Q.      What was it called?

6                 MS. MARKOE:  Objection.  You may answer.

7                 THE WITNESS:  I have had multiple Twitter

8    accounts.

9    BY MR. FREEDMAN:

10        Q.      What was the last Twitter account you

11   had?

12        A.      Dr. Craig S Wright.

13        Q.      What happened to Dr. Craig S Wright

14   Twitter account?

15        A.      I got suspended after I threatened Jack

16   with DMCA violations.

17        Q.      Who is Jack?

18        A.      One of the founders of Twitter.

19        Q.      What was the name of that handle?  Was it

20   at ----

21        A.      At probably Dr. Craig S Wright.  I do not

22   remember exactly.  I do not type the things in.

23        Q.      Does that "@ProfFaustus" mean anything?

24        A.      It was before that, yes.

25        Q.      Before Dr. Craig S Wright you had



1    @ProfFaustus?

2          A.    Professor Faustus, yes.

3          Q.    And what happened to Professor Faustus?

4          A.    I started complaining about the fact that

5    I had bots on the account.

6          Q.    Okay.  And?

7          A.    And Twitter will not take them down and

8    I started complaining and now I have suspended accounts.

9          Q.    So Twitter suspended your @ProfFaustus

10   account?

11         A.    The account went up, down, and all over

12   the place, so I do not know what is happening with it,

13   and I do not particularly want an account full of bots

14   back.

15         Q.    Did you take down the account?

16               MS. MARKOE:  Objection.  You may answer.

17               THE WITNESS:  I threatened Twitter with a

18   lawsuit.

19   BY MR. FREEDMAN:

20         Q.    And Twitter suspended your account?

21         A.    I do not know what has happened with that

22   account.  I cannot access it.

23         Q.    Did you save copies of your direct

24   messages in that account?

25         A.    No.



Page 380

1              MS. MARKOE:  Objection.

2    BY MR. FREEDMAN:

3        Q.    Did you give your lawyers copies of the

4    direct messages in that account?

5        A.    No.

6              MS. MARKOE:  Objection.

7    BY MR. FREEDMAN:

8        Q.    Did you save messages in the Dr. Craig S

9    Wright account?

10       A.    It was up for a day.  There was no direct

11   messages that I know of.

12       Q.    When did the @ProfFaustus account start?

13       A.    It was originally started, I think, in

14   2011, but no posts were done until 2016.

15       Q.    Did you have a Twitter account when Dave

16   Kleiman was alive before 2013?

17       A.    Yes.

18       Q.    What was it called?

19       A.    Dr. Craig S Wright, I believe.

20       Q.    Do you still have access to that account?

21       A.    No.  That account was cancelled in

22   December 2015 when I was exposed to the media.

23       Q.    Dr. Wright, do you an individual called

24   Marco Bianchi?

25       A.    Marco is a familiar name.



Page 381

```
 1                    MS. MARKOE:  That is my name!
 2    BY MR. FREEDMAN:
 3          Q.    Was there a Marco Bianchi who helped you
 4    set up trusts?
 5          A.    What trusts, sorry?
 6          Q.    Are you familiar with a Marco Bianchi
 7    helping you set up any trusts?
 8          A.    No.
 9          Q.    Dr. Wright, do you have a supercomputer
10    called C01N?
11          A.    No.
12          Q.    Do you have any supercomputer?
13          A.    No.
14          Q.    Have you ever had a supercomputer?
15                MS. MARKOE:  Objection.
16                THE WITNESS:  Yes.
17    BY MR. FREEDMAN:
18          Q.    When did you have a supercomputer?
19          A.    Back in 2013.  Sorry, end of 2012, but it
20    was not working.  2013, 2014, 2015.
21          Q.    What was it called?
22          A.    Tulip and C01N.  There were two.
23          Q.    So, you did have a supercomputer called
24    C01N?
25          A.    That is what I just said.
```



Page 382

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  You before that said "do

3      I have".  "Did I have" and "do I have" are different.

4      BY MR. FREEDMAN:

5           Q.    When did you get rid of these

6      supercomputers?

7                    MS. MARKOE:  Objection.

8                    THE WITNESS:  I did not.

9      BY MR. FREEDMAN:

10          Q.    You still have them?

11          A.    I do not have them.

12          Q.    Who has them?

13          A.    I do not know.

14          Q.    What happened to them at the end of 2015?

15                   MS. MARKOE:  Objection.

16                   THE WITNESS:  I do not know.

17     BY MR. FREEDMAN:

18          Q.    Did you ever discuss your supercomputers

19     with Dave?

20          A.    Dave basically died before I had

21     everything built and operating, so I discussed creating

22     them, but it is hard to discuss something, I do not

23     believe in seances, with dead people.

24          Q.    Dr. Wright, in 2016 you came forward and

25     claimed to be Satoshi Nakamoto; is that correct?



Page 383

1                     MS. MARKOE:  Objection.

2                     THE WITNESS:  I did not come forward.

3     BY MR. FREEDMAN:

4            Q.    You gave an interview to the BBC where

5     you said you were Satoshi Nakamoto; is that correct?

6                     MS. MARKOE:  Objection.  Can you tie this

7     to one our topics, please.

8                     MR. FREEDMAN:  Yes, request for

9     production 88 goes into the relationship with

10    Robert MacGregor and the court said we should ask about

11    the deferred ruling in advance of the deposition.

12                    MR. RIVERO:  Hearing transcript

13    citements?

14                    MR. FREEDMAN:  I do not have time.  Look

15    for it if you can find it.  86, 16-19.

16                    MR. RIVERO:  Which date?

17                    MS. MARKOE:  It is this one.

18                    MR. FREEDMAN:  Last one.  In the meantime

19    we will keep moving.

20           Q.    As a consequence of coming out, you

21    provided cryptographic proof that you were in fact

22    Satoshi Nakamoto?

23                    MS. MARKOE:  Objection: goes beyond the

24    scope.

25                    THE WITNESS:  I did not come out.



Page 384

1   BY MR. FREEDMAN:

2           Q.     And people have tried to debunk your

3   claim of being Satoshi Nakamoto?

4                  MS. MARKOE:  Objection: goes beyond the

5   scope.

6                  MR. FREEDMAN:  Are you instructing him

7   not to answer?

8                  MS. MARKOE:  Can we just get out of here.

9   Will it make it move faster if he can answer?

10                 MR. FREEDMAN:  Yes, it is going to go

11  pretty quick.

12                 MS. MARKOE:  This is beyond the scope.

13  It is public information.  This is a colossal waste of

14  our time.

15                 MR. FREEDMAN: I do not agree.

16                 MS. MARKOE:  But if you would like you

17  may answer.

18                 THE WITNESS:  There is public information

19  to say that.

20  BY MR. FREEDMAN:

21          Q.     And they have called you Faketoshi

22  because of that?

23                 MS. MARKOE:  Objection.  First of all,

24  I am going to instruct him not to answer.  You are

25  harassing him now.  It is offensive.  It is very late.



Page 385

1    You have limited topics.  This does not go to any of

2    these topics.

3             MR. RIVERO:  Can I say another thing, Ms.

4    Markoe.  Especially giving that you are not reserving

5    time against disputes, this kind of harassment is not

6    appropriate.  We are going to argue very forcefully that

7    you wasted time you could have reserved for things the

8    court may rule on.

9             MR. FREEDMAN:  We will reserve the rest

10   of our time, then.  Thank you.

11            MS. MARKOE:  Okay.  Great.  Thank you.

12            MR. FREEDMAN:  How much time is left?

13   Let us note it on the record.

14            MS. MARKOE:  22 minutes, 19 seconds.

15            MR. ROCHE:  That is what I have.

16            MR. FREEDMAN:  Great.

17            THE VIDEOGRAPHER:  Are we off the record?

18            MR. RIVERO:  We are off the record.

19            MS. MARKOE:  Off the record.

20            THE VIDEOGRAPHER:  Going off the record.

21   The time is 20.42.  End of the hearing card number 7,

22   volume 1.  This is the end of volume 1 video deposition

23   of Dr. Craig Wright.

24            ----------

25



Page 386

```
 1              CERTIFICATE OF WITNESS

 2

 3         I, Craig Steven Wright, am the deponent in

 4    the foregoing deposition.  I have read the

 5    foregoing deposition and, having made such changes

 6    and corrections as I desired, I certify that the

 7    transcript is a true and accurate record of my

 8    responses to the questions put to me on 4th April,

 9    2019.

10

11

12

13

14

15

16

17

18

19    Signed ...........................

20         Craig S. Wright

21

22

23

24    Dated this ....... day of ............. 2019

25
```



Page 387

1                    CERTIFICATE OF COURT REPORTER

2

3           I, Paula Foley, Accredited Court Reporter,

4    do hereby certify that I took the Stenograph Notes

5    of the foregoing, and that the transcript thereof

6    is a true and accurate record transcribed to the

7    best of my skill and ability.

8

9           I further certify that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to the action in which the deposition

12   was taken and that I am not a relative or employee

13   of any attorney or counsel employed by the parties

14   hereto, nor financially or otherwise interested in

15   the outcome of the action.

16

17

22

23   Signed .................................

24           Paula Foley

25



Page 388

1                         E R R A T A

2

3              (Please make any corrections here,

4                 not in the transcript)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**A**

**abide** 175:5
**abilities** 159:16
**ability** 6:22,24
    210:22 337:9,14
    387:7
**able** 31:22 57:1
    100:6 118:9 121:3
    137:1 216:15
    218:20 219:2
    238:7 258:24
    280:7,15 301:7
    339:1 371:25
**ABN** 348:9
**absence** 261:6,7,13
**absolutely** 20:7
    36:21 158:25
    221:2 226:10
    366:25
**abstraction** 50:23
**abusing** 9:13
**academic** 223:7
**accept** 270:16
    276:3
**accepted** 270:19
**access** 29:22 32:7
    55:24 56:2,5
    97:10 132:18
    133:9,15,17
    135:17,22 136:4
    137:23 138:3
    161:25 162:3,6
    187:7 207:17
    210:16,22 211:3,4
    211:13,16,18,20
    211:23 212:10,16
    212:18,20,25
    213:5,25 218:21
    231:17 234:10
    273:19,22,25
    279:24 379:22
    380:20
**accessed** 187:9
**accessing** 210:20
    214:6,9

**accommodated**
    366:12
**accomplished**
    374:19
**account** 67:19,20
    132:19 133:10,18
    134:6,22 135:2,9
    135:23 136:22
    137:4,9,17,17,19
    137:24 138:5
    179:24 209:10,20
    209:22,24,24
    210:3,13 211:6,7
    211:16,18,20,23
    212:11,18,21
    213:6,25 214:6,10
    273:1,2,20,23
    274:1,9 378:1,3
    378:10,14 379:5
    379:10,11,13,15
    379:20,22,24
    380:4,9,12,15,20
    380:21
**accountant** 102:12
    103:1,6
**accountants** 100:23
    101:4,9,17,22,24
    101:25,25
**accounting** 12:23
**accounts** 102:6,8
    102:11,21,21
    117:17 119:18,20
    190:23 209:11
    210:7,17,23 211:7
    211:10,13,15
    214:2 279:18
    281:17 378:8
    379:8
**Accredited** 387:3
**accurate** 28:8
    65:21 191:23
    192:5 219:14
    352:9 373:12
    386:7 387:6
**acknowledged**
    240:21

**acquire** 251:23
**acquired** 227:24
    228:15
**act** 194:3,7 269:21
**acting** 186:3
**action** 5:18 348:1
    387:11,15
**activity** 198:18,20
**actual** 161:12
    318:15 356:19
**Adam** 151:5,20
    152:3,7,14,19,25
    153:7,20,23 154:3
    154:8 175:11
**add** 82:7
**address** 5:24 6:2,4
    9:22,23 14:16,17
    14:24 43:6,18
    70:23,24 71:3
    72:18,20,22 73:1
    81:3,5,6 131:25
    148:12 150:25
    206:7 207:22,23
    246:3,5 248:1,16
    248:21 249:18,19
    252:17,17,25
    253:9,9 259:1
    296:9 349:20
    359:15 366:22
**addresses** 11:3,11
    14:13,23 60:16
    71:1 72:17 73:2
    190:3 206:11,14
    206:17 208:1,2
    209:8 245:24,25
    247:2 250:10,11
    252:2,12,13,15
    253:18 294:24
    300:13,16 301:1,6
    302:15,17,25
    304:18,19 325:24
    365:10,16
**adjournment**
    123:25
**administrator**
    138:7

**administrators**
    138:3,4,12
**Admitted** 2:6
**advance** 366:3,4
    383:11
**affect** 6:22,24
**affidavits** 374:12
**affirmative** 7:13
**Africa** 119:12
**afternoon** 124:6
    361:23 362:1,2
    370:5 374:18
    375:3
**age** 11:19
**agencies** 36:1
**agent** 282:25
    284:15
**agent-based** 283:3
**ago** 84:24 143:1
    187:18 246:16
    288:14 308:13
    311:10
**agree** 214:23,25
    256:21 257:3,25
    260:23,24 261:3,8
    261:14,17,19,20
    262:11,21,23
    263:3,4 377:20
    384:15
**agreed** 8:8 33:13
    257:1,5 303:18,25
    303:25 304:8,12
    350:10 363:12
**agreement** 134:1
    193:13 239:11
    257:2 261:1,12
    278:16,22 304:14
    363:12,13 364:19
**ahead** 75:19 144:23
    153:10 195:12
    252:10 291:11
    370:9
**aid** 218:24
**al** 4:4 154:2
**algorithms** 57:15
**alias** 132:2

**aligned** 218:23
**alive** 127:19,23
    130:10 380:16
**Allan** 130:7,8
    141:12 142:3
**allege** 33:22
**Allen** 142:3
**allow** 35:10 89:17
    97:22 106:16
    165:17 166:1
    178:12 256:25
    318:19 340:1
    365:6 369:6,15,19
    369:21
**allowed** 25:14,18
    69:15 157:10
    192:4 263:11
    278:9 362:11,13
**allowing** 260:18
**allows** 349:16
    369:10
**alongside** 207:8
**alter** 279:7
**alternate** 125:18,24
**alters** 81:9
**altogether** 157:9
**amassed** 199:9
**amended** 225:13
**America** 18:25
    231:16 312:14
    316:6 334:11
**American** 161:5
    258:7 346:16,18
    346:20
**Americans** 160:14
**Americas** 226:18
**amount** 47:8 48:5
    197:8 198:12
    199:8 241:11
    249:12,17,18
    252:12 329:25
    331:4 344:22
    367:3,6
**amounts** 246:9
    252:16
**analyse** 23:21

MAGNA ›
LEGAL SERVICES

56:20 262:25
**analysed** 30:3
**analysing** 24:1
262:9
**analysis** 30:4
260:12
**Andresen** 330:18
330:20 331:5,10
331:13,20,25
**Andrew** 2:22 5:1
174:4 188:25
359:25
**Andrés** 4:22 15:22
263:7 359:19
**ANDRÉS** 2:10
**Ang** 18:6,19 20:2
**Ann** 102:14,17
105:1
**annoyed** 137:1,2
**annoying** 178:4
**annually** 356:6,8
**anonymous** 124:25
178:1 211:7
213:25
**anonymousspeec...**
178:11
**answer** 7:13 9:10
9:14 15:20 16:2
17:13,15 19:20
30:6,14 31:5 34:5
36:21 37:21 40:1
40:12,13,15,20
43:21 44:23 51:22
52:5 53:13 57:1
66:6,9,11,12,16
66:21 70:15,21
71:4,7,22 75:19
78:1 87:25 88:23
89:3,18,21 91:11
91:22 92:5,7 98:4
99:2 100:1 102:1
103:21 108:16
114:17,22 119:3
121:3,23 123:14
124:10 125:8
126:12,23 127:1

127:17 128:2,2,3
128:3,7,8 132:4
132:20 134:5,18
134:25 135:9
141:5 143:16,19
144:13 145:2,21
146:5,9,14,16
147:23 148:19
149:1,8 150:1,15
152:4,12,16 153:4
153:11,24 155:3
155:16 156:2
158:12 159:18
160:8,24 162:18
163:2,25 164:13
169:4 172:25
174:17 175:17
176:4,19,23
177:15 181:6,17
181:22 182:2,13
183:5,6,11,16,24
184:4 185:11
188:20 189:16
190:14,18 191:14
191:16 192:14,20
192:25 193:8
196:12,22,24
197:2,6,16 199:11
199:24 201:7
203:5,6,19 205:3
205:24 206:18
208:25 210:1,4
212:5 214:22
216:4,23 217:14
217:17,18,23
218:3,11 220:8,19
221:24 222:15,22
223:10 224:16
230:4,13 233:10
235:17,24 236:15
237:25 238:1,16
238:16 239:10
242:17,18 243:10
243:25 244:8,15
246:14 247:3
248:7 249:5,14

250:12 252:19
254:8 257:9,13
259:15,21 260:3,3
260:4,9 262:4,7
265:17 266:12
269:15,24 272:12
275:20 276:24
279:3,6 280:23
282:17 284:21
285:8 286:9,17,22
289:5 290:22
292:14,15,20
293:23 295:19
296:15 300:9
301:13 302:1,18
303:1,20 304:25
306:17,22 307:2
307:25 309:7
311:2 312:4 313:1
313:10 314:4,9
315:22 318:19,21
321:23 322:14,19
324:4 328:14
330:22,25 331:6
331:14 336:21
338:2,10 340:1,7
340:10,15 341:4,6
341:10 342:2,3,7
342:19,23 343:22
344:4,19 346:4
347:10 348:5
350:2,16,22
352:17 355:5,6,19
356:9,20 358:8,9
358:14,15 359:1
360:7,21 361:2,5
361:5,10 362:12
362:14,16 368:6
368:20,24 369:3,4
373:7 378:6
379:16 384:7,9,17
384:24
**answered** 20:18
36:24 37:7 69:12
70:20 71:14,15
121:11 146:24

169:4 188:19
203:10 213:8
231:1 257:10,14
263:10 275:20
282:17 338:1
374:15
**answering** 18:11
42:20 91:24 92:6
262:3
**answers** 58:15
179:23 203:20
226:8 259:1
277:13 361:17
369:2
**anticipating** 91:22
162:19
**antithesis** 260:16
**Anti-Fraud** 224:2
**anybody** 138:19
187:18 214:13
**anyones** 325:6
**apart** 100:25 129:2
186:12
**apologies** 106:21
178:5 340:23
**apologise** 117:2
129:19 200:8
332:22
**appear** 80:17
**appearances**
174:19
**appears** 301:21
321:20
**appendix** 300:7
**apple** 165:23
352:19
**applies** 53:13 57:22
**apply** 57:22 88:2
179:24 356:22
**appointed** 288:2
**appreciate** 78:5
89:24 91:21
313:19 374:20
**appropriate** 118:23
363:5 374:23
385:6

**approved** 19:4,10
19:10 352:22
**approximate** 10:17
10:19 85:16
**approximately**
47:6,10,19 48:14
49:25 55:8 56:23
80:14 149:4
196:19 200:14
216:25 265:7
347:1
**April** 1:18 4:7
47:16,18 239:7
242:16 246:3
251:22 265:10
386:8
**area** 86:16 185:17
216:17 368:4,8,22
370:22
**areas** 361:17
366:23 369:25
**argue** 37:4 258:6
385:6
**arguing** 43:15
**argument** 258:2
291:19 373:14
**argumentative**
148:6
**arguments** 369:20
369:22 374:5
**Armonk** 2:7
**arrangement** 92:16
**arrested** 346:22,24
**Arthur** 346:22
**article** 193:17,23
**ASC** 271:7,9
**ASIC** 96:12 99:11
122:18 124:8
265:12 271:10,11
271:15 274:21
275:1 276:15,16
281:25 282:15
**ASICs** 241:17
243:2
**aside** 364:10
**asked** 20:17 24:23



42:13 43:6,17
66:13 69:11 70:19
71:1,13 83:20
99:4 120:12 137:4
140:22 146:23
160:1 167:19
169:3 174:18
182:9 188:18
190:2 202:13
203:9 209:25
212:1 213:7 226:1
230:25 245:12
251:11 259:5
262:5 263:9
275:19 277:13
282:16 287:15
292:15,23 293:13
322:5,17 337:8
338:4,5,15 341:25
358:18,23 366:8
366:13 368:12
371:24
**asking** 14:9 17:18
33:19 36:1 57:9
59:15 82:12,18
95:16,20 97:17,19
97:25 98:1 102:11
112:5 119:8 123:6
135:1 143:1
144:10,11,15
149:9 170:22
172:10 178:24
179:6 199:16
220:18 224:15
229:9 233:14,19
234:25 238:18
246:23 251:6
253:5,7 270:25
279:6 280:10,10
282:5 287:14
308:11 312:8
314:18 322:16
337:17 342:6
361:16 364:24
366:20 367:21
**aspects** 142:17,18

142:18 255:21,22
**assented** 267:6
**asset** 113:19 119:5
**assets** 87:8 88:12
88:16,19 113:2,5
113:7,8,18,21,23
114:3,4,23,25
115:2 119:6,7,7
120:4,8,9 123:15
290:23 306:15,21
306:23 308:5,9,14
312:17 316:2
**assistance** 40:21
**associated** 176:17
232:21 248:12
348:9 357:8
370:20 371:16
372:19
**assume** 7:6 176:24
347:12
**assumes** 155:14
215:7
**assuming** 313:18
**assumption** 217:12
249:25
**assurance** 215:18
223:18 224:1
248:4
**ATO** 104:8,15
120:22 121:19
334:19,20,24
335:8,17 336:1,3
336:13,19,25
337:2,4,5
**attach** 147:12
**attached** 304:5
360:9
**attachments**
371:10
**attention** 160:5
332:4 354:2
**attestation** 256:14
256:20,25 260:21
**attorney** 387:13
**attorneys** 197:2
334:20 336:3,5,7

336:10 338:4,6,15
**attributable** 172:15
**audit** 95:23 101:23
102:6,20 103:25
121:5,21
**audited** 94:13,19
100:15 120:22
121:1,18
**auditing** 102:8,11
102:21
**auditor** 104:14
**auditors** 102:1
333:3
**audits** 100:20,21
101:18,25 104:8
**August** 167:7,12
168:2,4
**Aurora** 154:2
175:18
**auspices** 118:16,19
**Aussies** 153:13
**Australia** 5:23 7:21
7:22,23,25 8:1,3
10:13,14,23 12:12
14:11 17:17 32:20
83:15,18 84:20
87:12 110:9
122:22 123:9
131:5,11 143:9
197:14,18 233:23
253:17 256:24
258:3,18,18,22
262:15 334:22
336:4 356:15,22
360:24 364:16,19
**Australian** 32:21
94:14,19,22 95:4
100:16 101:10,18
101:23 103:23,25
104:16,22 121:4,8
121:11,13,18
139:11,12 141:24
263:20 264:14
306:3 332:5 333:7
335:12,24 337:10
337:15,16,17,21

338:6,20,21
349:12,13,15
364:18 369:11,12
372:13
**authored** 153:23
**authorised** 238:12
238:13 272:6,9
292:6 295:22,25
296:3,5
**authorises** 259:19
**authorising** 256:16
**authority** 118:24
226:3,6 364:20,22
**available** 11:5
132:14 139:25
163:24 164:3
168:21 177:4
241:7
**average** 11:19
**avoid** 98:4
**aware** 95:1,4,9,17
101:4 128:13,19
154:8 162:6
163:16 170:14
175:4 187:11
194:5 242:24
276:10 287:19,24
288:9 289:23
304:23 324:9
332:13,16 335:11
358:19 366:25
**awareness** 95:21
**awful** 283:11,11
**A(a)** 249:23 252:2,4
**A(b)** 249:23 252:3
252:5
**A-N-G** 18:8
**A-S-I-C** 96:12
**a.m** 4:8

___

**B**

**b** 241:4,8,8 243:21
264:20 267:18
354:23,24 363:10
364:8
**BAA** 275:10,14

**back** 8:2 41:3,9,13
42:11,14,14,19,24
43:8,23,23,24
52:16 77:21 81:18
89:24,25 108:9
121:10 124:7
142:21 151:5,20
152:3,7,14,19,25
153:7,23 154:3,8
156:5 157:6
158:24 159:3
160:5 171:16,20
175:9,11 193:8,9
193:9 197:17
214:8 221:10
224:21 231:12
232:10 233:6
239:21,22 243:3
244:25 245:2,9,14
245:16 259:23
260:18 274:9,20
274:21 275:3
282:8 283:17
285:11 297:3
312:2,7,24 319:15
333:16 335:17
353:9,24 358:2
365:22 366:15
374:21,24 375:14
379:14 381:19
**backend** 99:19
**background** 285:12
**back-up** 377:8,10
**bad** 13:14 39:10
135:11 149:21
**badly** 348:23 349:2
349:22
**bag** 328:17,19
**Bagnoo** 184:22
185:2,5,9,16,23
185:25 194:11,12
194:22,23,23
195:1,2 196:16
197:9 198:4,21
199:1,6
**banana** 356:15



**banned** 157:8
**bar** 311:24
**barely** 82:13
**bargain** 239:9
**base** 339:23
**based** 40:18 76:16
240:20 259:24
376:22,24 377:2
**basic** 66:25
**basically** 157:9
173:12 185:17
187:4 193:13
215:19 231:14
249:6 256:22
260:13 316:4
321:4 332:21,25
345:21 352:5
355:7 382:20
**basis** 40:13 89:5
126:25 153:20
192:5 238:17
296:14 364:2
**bathroom** 173:15
357:23
**BBC** 383:4
**BDO** 12:23,24 13:2
13:11,16,20 130:9
130:22 131:3
142:12
**Bear** 129:4,6,7,13
129:16,20,23
131:23 132:1,8
172:12
**beard** 212:14
**beat** 35:10 106:16
**becoming** 168:19
314:12
**began** 58:17 200:10
200:14,23 202:14
202:20
**beginning** 74:25
77:16 124:1 168:7
173:22 174:13
221:8 284:3 323:7
334:9
**begins** 4:2 141:2

**behalf** 2:2,9 104:17
104:18,24
**belief** 285:16
**believe** 37:2 38:3
46:13 50:7 63:11
63:25 64:5 71:6
76:23 82:18,20
89:23 91:24 92:4
92:6 97:1 99:3
100:12 102:20
105:12 107:2
113:10 116:20
117:8 125:11,17
125:23 131:10
141:19 150:4,6
159:7 161:23
167:22 217:16
246:22 249:9
258:17 259:3,18
263:13 264:4
282:19,20 288:1,4
295:24 300:2
325:9,17 326:13
327:5,11 329:16
331:11 338:1
343:24 355:23
359:2,19 362:8
363:3,8 364:4
365:10 367:20
368:7,24,25
370:13,15,18
373:10 380:19
382:23
**believed** 119:11
160:11
**believes** 363:13
**Belize** 84:19 85:7,8
315:10,13,14
316:15,18 319:8
**belong** 297:21
298:14
**belonged** 190:3
318:7
**belongs** 297:19
298:12,23
**beneficiaries**

290:19 305:13
**beneficiary** 288:24
292:25 305:16
**best** 48:6,17 57:9
57:13 88:14 160:3
198:24 214:17
230:2 250:16
325:22 387:7
**bet** 236:4
**better** 221:13
231:18 234:11,18
**betting** 235:22
**beyond** 25:6 39:19
88:21 89:19
103:17,21 141:4
144:4 152:9,12
156:1 181:11,17
181:21 187:14
190:13 199:12
203:17 214:21
216:7 225:25
238:8 242:12
244:15 285:21
340:15 362:11,18
363:18 364:9
365:20 383:23
384:4,12
**BHP** 219:20
**Bianchi** 380:24
381:3,6
**big** 129:12 171:12
303:14 323:20
**bigger** 345:9
**Billiton** 219:20
**birth** 5:21
**birthdays** 302:21
**bit** 9:12 30:3 109:7
147:6 158:11
165:7 180:22
203:16 212:25
218:25 236:21
262:9 285:3
287:11,13 371:19
**BITC** 311:7
**BitCash** 65:6
160:23

**bitch** 157:7
**Bitcoin** 8:16 27:7
27:11,14,16 28:5
28:20,25 29:2,5,6
29:14 32:4 38:19
44:9,12 45:2 53:6
62:16 63:6 64:1,9
64:17 65:7 67:7
67:14 69:3,9
70:17 71:12,18
75:23,24 76:17,17
76:18,19 83:23
87:1,4,8,19,20,22
87:23 88:1,1,5
94:9 96:17 98:22
99:20,25 100:2,4
100:10 106:10
113:4 114:6,7,8
115:2,4,7,11
117:20,21 118:25
119:14 120:18
121:14 123:10
124:17,24 125:2
126:17 128:24
130:13 133:23
134:11 135:9
138:12,13,16,20
138:23 139:1
141:12 142:13
145:4,14 146:8
148:24 155:10
158:7 160:7,10,23
160:25 165:6,11
165:13,15 166:3
166:10,22 169:11
175:10,25 181:25
182:7,15,22 183:2
184:2 187:12,16
188:24 191:9,10
192:9,17,23 194:9
194:17,19 195:1
195:25 196:3,8,11
196:19 197:8,13
199:7,8,23 200:5
200:10,12,15,18
200:21,24 201:1

201:15,18,18
202:15,20,25
204:14,14,17,19
206:6,10 207:8,9
207:10,13,14
209:3 215:4,10
220:3,7,13,21
221:18,20,22
224:10 235:23
236:3,4 237:1
241:10,12,18,20
242:2,4,8,10,15
242:20,25 243:15
243:17,19 244:13
245:13,18,24,25
246:3,4 247:2,9
247:25 248:16
249:12,17,19,22
250:1,5,10,23
251:2,8,15,23,25
252:17,24 253:6,8
253:17 254:2,4,9
255:1,7,8,9,10,13
255:14,16,17,19
255:21 265:1,11
265:12,23 270:13
270:16,20 276:4,8
276:11 281:14
284:15 289:7,10
289:12,14,17
291:6,12,15,22,23
291:24 292:1,11
292:13 293:2,2,3
293:4,21 294:1,6
294:11,15,21,24
295:2 300:4,8,16
301:1 302:24
303:23 308:17,25
309:2,9 318:12,15
319:4 323:18,24
324:6,21,24
325:11 328:6,21
328:21,22,24
330:1 331:5
332:24,25 333:2
340:9,11,13,25



341:17 342:2,12
345:7,10 351:17
351:25 358:24
359:1,4,8 360:6
362:10 363:1
365:3,5,17,18
367:1,3 368:5,13
368:17 371:23
372:7 373:4
375:20 376:15
**Bitcoins** 202:11
205:14 206:2,5
317:25
**Bitcointalk** 132:9
132:11,15,19
133:12,13 134:23
135:12,15,23
137:24
**Bitcointalk.com**
179:12
**Bitcoin-related**
88:8 215:5
**Bitcoin.com** 133:10
176:12 178:7
179:1,2,3,9
**Bitcoin.org** 179:16
179:20,24 180:4,8
180:18 181:5,13
181:19
**bite** 352:18
**Bitmessage** 72:12
72:14,15,18,23
73:8,9,11,13,23
73:23 75:5,25
76:3,6,7,12,16
**Bitmessages** 74:7
75:16
**bits** 140:16 291:13
312:20
**Black** 15:14 16:16
17:14
**BlackNet** 64:20,21
64:22 83:24
**Black's** 117:25
**blah** 208:2,2,2
**blank** 123:8

**block** 100:7 165:17
181:24 182:6,14
182:21 183:2,22
184:2,5,8,10,12
184:13,15,16,18
186:2,3,13,15,17
196:11 250:2
253:13 301:1
**blockchain** 28:1,3
38:22 44:15 62:16
62:20,24 63:6
64:9,17 67:7,14
69:4,9 70:17
71:12,19 75:24
83:23 87:15,23
88:2 96:19 125:3
243:17 253:2
284:16
**blockchain-based**
27:20,24
**blocked** 303:15
**blocks** 100:4 200:2
345:9
**bloody** 153:13
326:1
**blossoms** 273:8
**Blvd** 2:11
**body** 80:14 95:25
128:6 317:20
**body's** 95:21
**Boies** 1:21 2:3,6,22
2:23 4:10,11,15
174:4,10 359:21
359:25
**bonded** 350:12
**Bondi** 341:12
**bookkeeper** 102:13
**born** 5:23 7:21
**borrow** 308:17,24
309:2,9,10
**borrowed** 309:13
**bots** 379:5,13
**bottom** 227:10,19
228:3,4 256:17
266:7 284:10
291:21 299:22

310:9,17 315:9
321:8
**bought** 346:8
**bound** 175:3 257:1
257:2,3,5 260:23
260:24 261:1,3,8
261:12,15 262:12
262:18 263:3,4
264:10,10 363:13
364:3,16
**box** 305:22
**boxes** 83:7,9,10,12
83:14,16 299:12
305:23,24
**breach** 17:17 18:14
97:20
**break** 7:17 16:19
17:4,10,18,18
40:24 41:2 42:13
43:17 70:2 77:6
77:15 78:15,22
79:3 82:24 108:8
123:19 173:16,21
221:1,7,14 224:21
228:11 245:4,8,12
279:10 283:22,23
284:2,8 323:2,6
333:11,14,19
353:23 357:23
358:1
**breakdown** 281:17
**breaking** 108:3
**breath** 35:13,14
**Brenner** 2:22 5:1,2
5:4 174:3,4,7,8
359:20,24,25
**briefing** 369:7
**briefly** 40:6 42:17
103:7 361:9
**bring** 68:19 164:11
260:25 263:7
**bringing** 108:3
125:6
**brings** 258:4
**Brisbane** 5:23
**Britain** 160:13

**British** 120:25
121:5 226:24
256:13 264:13
306:4
**brought** 372:23
**browser** 148:1
**BTC** 245:24 319:16
321:4
**buckets** 228:12
**Budovsky** 346:23
**bugger** 136:1
**build** 275:18
**building** 345:4
**built** 231:12 232:10
232:12,14 345:1
346:6,10 382:21
**Bungaloo** 194:9,21
**burdensome**
365:12 368:14,25
**burdensomeness**
365:8 366:2
**business** 14:8
149:17 187:6
265:1,23 266:3
312:6 348:6,8
**businesses** 19:12
**B-A-G-N-O-O**
184:25
**B-E-A-R** 129:21
**B-i-t-C-o-i-n**
160:10

---

**C**

**c** 2:1 160:17 161:2
161:3,7 173:2
241:11,14,19
254:3 255:2
284:16 328:20
329:3,5,7 354:23
354:24
**calculated** 356:6
**call** 13:13 16:7
48:25 76:23
109:18 138:23
169:8,12 374:25
**called** 12:23 17:22

29:18 38:17 49:3
62:5 84:3,7,9
88:13 96:5 109:21
117:7 137:8
141:13 184:22
222:4,7,17 223:18
224:1,9 236:5
248:13 276:5
283:10 290:2
309:21 311:23
323:14 332:25
370:16 371:3
378:5 380:18,23
381:10,21,23
384:21
**calling** 28:6 173:10
300:16
**calls** 50:17 119:1
172:20
**camera** 40:14,17,18
45:6 49:9 126:24
127:15 128:11
176:7 233:3
316:25 357:13
361:11 373:17
**cancelled** 380:21
**capacity** 54:6,9
**capital** 161:2
277:22 278:2,4,13
279:15 280:3,17
281:18
**capitalised** 160:20
**capitalising** 160:13
160:17
**capture** 231:20
**captured** 83:6
132:12
**card** 4:2 77:13,17
123:23 124:2
173:19,23 221:5,9
283:25 284:4
323:8 385:21
**care** 72:7 93:17
149:17 219:21
220:1 230:6,6
257:19 266:2



274:23 282:7
303:16 339:15,17
347:17
**carefully** 91:18
**Carol** 15:12
**Cartesian** 50:22
**case** 1:6 4:5,6 18:23
19:2 32:4 36:22
95:23 127:7 161:2
161:7 175:4 226:3
226:6,19 261:1
311:18 337:7
365:1 366:18
367:15 372:24
375:11 377:23
**cases** 74:21
**cash** 64:25 124:25
281:13
**casinos** 231:15
**catch** 129:19
**cause** 217:8 246:7
250:5,10 345:24
346:6,10
**caused** 346:12,25
**cease** 84:14 85:4,10
85:22 306:13
**ceased** 84:15
**cent** 120:10
**centaur** 82:22,22
**centre** 240:22
**century** 52:17
**certain** 119:11
196:3 255:20
283:3 296:12
356:22
**certainly** 19:6 70:4
83:1 106:18
203:18 226:15
364:6,8 367:20
370:20 373:12
**CERTIFICATE**
386:1 387:1
**certify** 386:6 387:4
387:9
**CFO** 102:12 103:1
**chain** 165:18

**chance** 367:23
**change** 18:9 58:14
81:2,4,8 107:1
110:15,18,25
111:7,14 117:8
217:6 266:1 307:7
307:10
**changed** 18:19 20:1
55:22 110:21,25
111:5,6 131:25
172:11 283:12
307:9,13,15,16
**changes** 81:6
169:19 172:11,12
172:13 353:8
386:5
**channel** 272:4
**Chaos** 96:5,24
**character** 72:20,25
**characterisation**
346:11
**characterise**
153:13 173:12
**charged** 162:22
**charges** 346:24
**charitable** 119:10
**charities** 119:12
**charity** 12:1,1
**chat** 55:13,14 56:6
148:22 151:4,13
**chats** 54:11 55:10
55:10,11,12,18,25
56:3,4,9 67:12,18
151:14,15 172:7
172:10
**cheating** 316:7
**check** 153:25 154:4
164:19 212:1
229:20 307:14
360:11
**checked** 107:22
135:19 307:18
**cherry** 255:3 273:8
**Cheshire** 102:13
104:22 105:5,9,15
105:18

**child** 74:20
**children** 328:18
**children's** 119:12
**China** 231:16
**Chinese** 231:13
232:11
**chips** 276:21
**choose** 144:14
257:7 279:4
**Christians** 260:19
**chronology** 227:17
228:13,18
**chucked** 153:25
312:21
**circle** 19:24
**Circus** 6:5 14:24
**citation** 78:20
226:21
**cited** 175:9,19
**citements** 383:13
**cites** 226:12
**citizen** 258:7
312:12 337:16
**citizenship** 312:16
**city** 38:15
**Civil** 70:5 225:12
**claim** 18:25 223:14
347:25 349:25
352:2,14 354:8
357:1 369:11
371:15 372:12,17
384:3
**claimed** 252:12
382:25
**claiming** 262:24
**claims** 367:5
372:23
**clarification** 197:24
200:3 202:5 366:8
373:13
**clarify** 147:6
317:22 328:10
**clarity** 373:9
**clarity's** 247:19
**classify** 254:24
**clause** 243:5,7,11

243:21
**Clayton** 303:3
**clean** 69:7
**clear** 25:17 42:19
43:7 101:14
102:20 172:23
197:20,25 198:1
199:20 202:3
234:18 238:14,16
240:3 245:19
252:16 253:4
359:7 361:16
**clearance** 127:10
**clearly** 340:18
**client** 40:19 166:10
167:2,4,10 168:11
168:14,16,20
169:2,12,15,16
170:18 171:14,21
323:19 324:2
326:10 328:13
329:12 346:2
**client's** 320:11
**closed** 119:22 306:2
**closing** 362:5
**cloud** 21:20,25 22:5
22:9,11,14,16,19
22:21,24 23:2,5,7
23:11,15,18 24:20
25:25 26:7 27:7
28:14,14,25,25
29:4,6,14,17,22
30:1,8,10 41:15
42:3,5,7 201:15
201:17,18 202:1
**Cloudcroft** 99:9,9
99:15 101:19
105:22 106:23
107:4,9,14
**clue** 328:22
**clueless** 328:23
**coach** 78:8
**coaching** 25:7,9
**Cobham** 6:1 9:19
9:21,22,23 10:4,6
10:8,8

**CoCo** 283:8,11,11
**code** 106:7 153:20
153:22 154:20
165:10 166:10
168:16 172:10,24
173:12 187:8
207:16 216:20,21
216:25 217:4,4,9
217:9,22 218:2
231:8 236:10
254:3 255:2,6
271:19,19,21,23
271:24 275:3,5
283:5,7 284:24,25
328:20 357:6
370:19 371:15
372:18
**coder** 173:2
**codes** 166:21
284:16
**coding** 217:19
**Coin-Exch** 277:23
279:22
**Coin-Exchange**
276:6 278:1,4,21
278:22,24 279:1
279:15,24 280:4
280:17
**collaborate** 8:16
170:19 190:23
205:21 216:10,13
**collaborated**
170:24 205:20
**collaboration**
190:22 205:16
216:18 224:13,18
**collaborations**
224:25
**collateral** 248:6
267:25 268:10,11
268:18,19,20,23
268:25
**collect** 338:5,15
**collected** 335:13
337:21 372:15
**colossal** 384:13



**com** 179:7
**come** 7:22 8:5 9:3
9:20 10:22 13:5
54:8 58:17 134:1
137:3 156:16,20
180:7 183:2,22
188:23 199:5
200:9 208:15
211:12 216:19
244:13 245:18,24
272:9 285:6
286:21 294:20,23
297:3 329:18
346:18 359:15
383:2,25
**comes** 189:15
317:16 374:13
**coming** 366:6
383:20
**comment** 67:4
152:7
**commercial** 159:10
**committed** 371:9
**common** 52:19
138:2
**Commonwealth**
264:8
**communicate**
54:19 60:8,11
62:18,19 67:6
68:2,9 72:11
132:7 134:22
135:2 171:18
178:16,20,22
180:3 208:11,13
214:3 266:16
309:16 342:25
**communicated**
67:13 69:3 104:12
153:1 171:17
208:6,9,24 218:10
266:14 342:21
375:19
**communicating**
261:21
**communication**

63:3 67:11 84:1
143:17 148:17
155:8 190:25
199:14,17 201:2
267:1,5 330:14
**communications**
31:6 68:12 69:9
70:17 71:11,18
73:23 74:1 98:5
130:15 136:7
178:25 201:3
209:21 218:15
261:16,18 262:14
263:5 266:20,23
338:10 342:22
360:19 364:6,11
367:8,18 369:18
**communities**
149:20 150:14
**community** 180:20
185:19 207:11
214:9
**companies** 13:15
14:4,6,10 19:24
32:19,20 62:1,3
81:9 82:19 83:15
84:5,6,7,9,15
88:13 91:12 92:14
93:23 94:4 99:11
103:1,24 104:17
104:23 105:6,23
106:2,4 108:13,16
108:19 109:1,3,9
109:9,18 112:7
116:21 122:11,14
123:15 159:10
167:21 220:4
227:14 230:6,8,18
231:3 237:7,14,25
238:12,14,19
247:11 250:17
269:16,20 270:4
279:18,20 282:5
282:19 288:3,7,10
288:13 290:25
293:11 295:8

296:6 306:23
308:2 314:3 319:9
332:10,18 339:2,3
346:11 355:24
361:4 367:19
**company** 12:22
13:12 62:5,9
82:17 83:19 84:3
91:15 96:6,7
105:24 107:7,11
109:14,14 111:20
112:13 114:16,20
115:14 116:16
117:9 119:22
120:4,4,5,6 121:5
122:9,10,18 123:1
161:22 163:19
219:21 221:21
230:19 237:4,6,9
239:12 244:10
246:17,19 248:13
263:22 264:7,25
265:22 270:2
278:13 281:7,18
287:17 291:4
293:5 295:9 307:3
307:6 308:11
309:21 310:13
311:8 312:10
343:17 344:3,9,17
345:21 346:8
347:18
**company's** 318:6
**compel** 361:16
369:10
**compelling** 369:8
**compilation** 296:4
301:21 302:4
**compile** 157:19
365:11
**complain** 244:22
250:19 300:19
**complained** 250:16
250:19
**complaining**
163:20 379:4,8

**complains** 249:8
**complaint** 370:17
371:10
**complaints** 247:13
**complete** 139:4
298:7 350:11
**completed** 281:7
355:13,13
**completely** 125:4
133:24 185:17
260:8 262:6
300:17,25
**completeness** 311:1
**complex** 91:13
**composition** 24:10
**compound** 105:7
148:18 177:9
336:16
**compromised**
211:1,2
**compute** 26:10,17
99:16
**computed** 26:13
**computer** 11:13,22
21:4,7,12 75:11
86:22 159:22
166:20 184:15
185:8,15 200:17
240:24,25 241:1,3
300:14 303:22
329:3
**computers** 8:14
11:8,10,20 12:4
20:14,24 184:17
184:19 185:2,5,6
191:5 194:19
198:21 242:9
316:20 362:12
**computing** 23:11
23:16,18 26:7
27:7 28:14 29:1
29:14,17,23 30:1
30:8 42:7 201:15
201:17,18
**con** 18:24 316:4
321:3

**concept** 72:2
**concepts** 141:11
**concerning** 325:23
**concisely** 204:24
**conclusion** 359:15
**conduct** 265:22
**conducted** 227:6
332:14,17 351:16
351:24
**conducts** 264:25
**conference** 4:17
43:25 44:6,8,11
44:14,17,20,22
47:1,4,7,11,20
48:12,15 49:8,20
50:1 51:10,21
52:7,24 53:11
54:4 143:2 223:7
**conferenced** 44:4
**conferences** 37:15
46:20 53:19
142:23,25
**confidential** 5:12
175:3
**confidentiality**
175:3
**configurations**
196:4
**confirm** 42:15
163:9
**confirmed** 162:24
**confound** 109:13
**confounding**
300:11
**confuse** 109:13
153:22
**confused** 10:10
109:7
**conjunction** 362:15
**connect** 144:15,17
146:3 182:3
186:19 224:15
242:13
**connected** 224:14
**connection** 144:22
145:23 182:10,11



295:21
**Connor** 262:17
**consent** 372:15,21
**consequence**
383:20
**consider** 143:23
144:1 145:6 164:1
**considered** 62:12
145:3,8
**consistent** 169:13
**construct** 311:5
**constructed** 91:18
165:25 177:1
283:13,20 299:2
304:20 312:20
332:23
**constructs** 283:4
**consult** 40:19
**consulting** 350:11
**contact** 54:23 55:7
130:12,25 131:13
131:20,23 132:1
137:1 235:13
276:22 277:6
313:23 314:19,20
**contacted** 132:1
148:25 338:19
**contacting** 311:12
**contacts** 68:19
323:23
**contains** 80:14
**contemplate**
144:25
**contemplated**
366:10
**contention** 366:25
**contents** 143:16
320:10 336:7
**contest** 261:13
**context** 68:25 321:3
368:15 370:10
**contexts** 370:14
**continent** 312:15
**continents** 308:12
**continuation** 374:2
**continue** 19:22

25:2 43:15 192:1
195:18 203:19
263:11 355:10
375:12
**continuing** 9:7
**contract** 90:23
239:1,4,5,6,9
240:12 243:6,21
248:4 249:10
254:5,22,25 255:5
255:12,15 256:21
257:4,6,7,20
258:5,10,13,16,19
259:6,11 260:2
261:5,8,20,22
262:12,23 263:17
263:21,24,25
264:11 265:6,7,10
265:22 266:5,11
267:7,22,24 268:4
268:6,15,20 269:3
269:7,8 282:22
284:19 348:18
349:8,21,24 350:7
350:9,11,14,20
351:2 352:5 356:5
356:7,11,18,19
**contracted** 238:23
**contracting** 261:4
**contracts** 90:19,20
90:22 91:1 120:7
258:4 272:6,10
323:22 351:3
**contractual** 278:16
**contrary** 260:25
**contribute** 169:22
**contributions**
158:16
**control** 109:17
180:13,17 181:4
181:12 211:9
247:1 248:21
291:21 292:1
312:18
**controlled** 206:11
206:14,17 248:16

249:2 289:9
290:23 291:6,12
292:11,13
**controls** 245:23
289:12
**conversation** 18:18
54:12 133:25
182:11 190:6,9,11
190:19 191:22,24
373:23
**conversations** 31:3
316:25 320:4,9
336:8
**converse** 324:1
**conversing** 373:2
**convert** 248:4
**cookie** 59:6,8,10,12
**cookies** 59:16
**copied** 30:6 32:19
97:12
**copies** 29:25 83:10
162:9 379:23
380:3
**copy** 12:6 52:15
63:11 75:12 79:18
80:16,23 97:12
158:14 284:24,25
343:25
**core** 240:19,21
241:2
**corner** 189:19
**corporate** 335:16
**corporations**
269:14
**correct** 10:7,9 57:4
65:21 81:12,14
96:6,7 102:23
115:8,20,22 127:3
171:14 174:20
189:23 196:2,11
196:13 234:21
237:1 238:18,22
240:13 241:5,12
241:16,20 242:2
244:7 249:3 260:7
265:5,14 272:22

273:11 276:6
298:1,12 304:8
308:25 318:2
321:19 329:7
334:3,12,25 335:1
352:4 354:25
359:10 360:22
361:19 362:22
370:21 382:25
383:5
**corrected** 117:1
353:10
**correction** 320:5
**corrections** 386:6
388:3
**correctly** 81:11
244:24 329:1
**correspondence**
156:4 325:19
**cost** 185:19
**Costa** 87:12 231:14
231:16 244:4
319:9
**costing** 347:3
**counsel** 4:14 11:6
15:2 31:6 73:3
97:23 296:10
301:18,24 302:6
302:10 309:8
338:11,20 358:4
358:10 360:23
361:11,21 366:17
367:17 373:18
374:20 387:10,13
**count** 376:7
**countries** 35:21,21
35:22 88:9 204:21
233:19 234:1
**country** 127:6
204:13 256:23
374:21
**couple** 61:25 84:20
131:6 142:11
224:19 358:7,15
364:5
**course** 125:15

159:9 258:1
261:10 344:11
364:23
**courses** 285:14
**court** 1:1 2:14 4:6
4:13 5:5 7:11
15:24 16:7,11
17:16 19:4,10
20:11,12 34:5,21
35:9,11 40:14,17
40:17 42:15 43:7
43:12,24 49:9
66:10 78:8 89:9
89:10,23,25 94:16
99:5,7 106:15
123:18 126:24
127:15,16 128:8
128:10,17,22
142:2 176:7
183:13 184:24
192:2,3,6 199:20
225:15 226:25
238:6 245:2
251:19 263:8
274:23 279:3,9
283:21 293:18
295:22,25 296:17
317:9 331:1
332:20 333:5,20
349:13,15 352:3
352:21,21 353:6,8
353:11 356:13,25
357:13 364:16,18
365:25 366:1,25
372:3 373:19
377:13,18 383:10
385:8 387:1,3
**courts** 256:13
360:23
**court's** 78:2
**cover** 298:3
**covered** 18:20
307:8,12
**covering** 15:19
**covert** 272:4
**co-operate** 313:20



**cracks** 366:16
**Craig** 1:11,17 3:3
  4:3,4,22 5:7,22
  68:1 77:14,18
  84:3,8,9,11,17,22
  85:8,12,13,24
  87:14 90:2 91:3,8
  92:11 93:17 94:9
  94:13,18 95:5
  96:1 123:24 124:3
  132:2 144:19
  173:20,24 190:20
  221:6,10 227:18
  239:12 240:17,19
  244:6 245:24
  246:4,7,12,13,20
  246:22 247:1,8
  248:6,25 256:11
  256:18,21 263:20
  266:7 267:25
  268:3 269:6,7,23
  270:15,17,19,22
  272:7,10,16 276:3
  277:25 278:3
  279:14 280:2,2,16
  282:2,14 284:1,5
  323:9 330:24
  334:9 343:12,15
  344:2,8,14,17,24
  348:2,18 350:14
  378:12,13,21,25
  380:8,19 385:23
  386:3,20
**Craig's** 242:15
  318:12
**craig.wright@inf...**
  81:13
**crap** 177:24
**crappy** 356:15
**crazy** 331:1
**create** 8:16 53:6
  76:19 88:7,11
  99:24 100:9
  124:17,23 125:2
  144:20 190:21
  207:9 216:5 218:7

222:3,6,17,20
  223:17,25 224:8
  228:24 235:5,13
  258:8
**created** 14:5,6
  99:15 134:10,10
  193:12,14 201:20
  201:25 216:14
  222:12,25 224:15
  231:25 232:2,6,9
  234:9,20 255:14
  270:3 283:9 290:7
  290:9,11 302:16
**creating** 113:16
  234:13 243:15
  255:12,16 382:21
**creation** 96:15
  100:5 134:13
  204:13 215:4
  217:22 218:1
  234:14 258:2,6
**creator** 324:21,24
**credentials** 132:24
  213:22
**creditors** 247:13
**crime** 141:25
  142:12 258:7
**criminal** 194:3,6
  251:13 341:23
**critical** 158:23,25
**critique** 13:14
**cryptocurrency**
  323:14
**cryptographic**
  383:21
**cryptography**
  151:3,6 170:4
**Cryptonaut** 129:9
  129:13,16,23
**CSW** 227:22
**currency** 125:18,21
**current** 308:9,9,11
  361:2 363:14,25
  369:19,22
**currently** 5:25
  11:15 308:6

323:13
**custodial** 113:4
**cut** 136:5 261:25
  262:1
**cut-off** 346:3
**cyberstalked** 287:9
**Cyberstalking**
  287:12
**C/C** 254:3 255:2
  284:16
**C01N** 109:21,22,23
  110:1,3,10 111:4
  112:1,3,5,21,24
  113:9,17,18 115:7
  115:10,13,14,16
  115:17,19 117:5,7
  118:3,9,11,17,20
  118:22,24 119:14
  119:23 120:14,18
  120:22,24,24
  121:7,8,12,13,18
  122:5,22 123:3,8
  123:9,9 124:7,9
  307:13,15 381:10
  381:22,24

———————————
**D**
———————————
**d** 3:1 354:24,25
**Dai** 129:3,22
  131:14 151:5
  167:16,17 168:1
**damn** 187:6 312:5
**dark** 134:9
**data** 12:3 23:21,22
  23:24 24:2,10,13
  24:19 25:25 26:2
  26:13,16 27:6
  29:25 30:2,3,4,8
  30:10,11 32:19
  56:21 99:18
  240:22 275:11
**date** 4:7 5:20 9:17
  17:1,6 21:7 63:12
  64:2,6,6 66:18
  83:21 99:10
  109:25 116:4

126:5 176:15
  179:22 239:1,6
  253:14 258:19
  265:9 350:23,25
  351:1 354:7,9
  383:16
**dated** 65:2 79:8
  350:7,9 386:24
**dates** 37:25 100:19
  101:2 156:23
**Dave** 33:16,18 36:1
  38:7,9,16 39:1,8
  39:11,21,22 40:4
  40:8 42:9,16,18
  45:9,11 46:23,25
  47:4,7,11,13,16
  47:20 48:12,15,17
  49:10,19 50:1
  51:3,10,20 52:7
  52:23 53:11,19,24
  54:5,7,8,24 55:19
  56:6,13,22 57:3
  57:11,18,24 58:4
  58:7,10,13,18,22
  58:25 59:2,6,13
  59:18,24 60:2,4,5
  60:8,11,13,17,19
  60:23 61:1,3,13
  61:16,19,22 62:4
  62:15,18,20,25
  63:1,5,8,18,21
  64:9,13,14,17
  65:2 67:6 68:3,10
  68:11 69:2,8
  70:16 71:10,17,22
  71:23 72:11,22
  75:12,25 79:8,19
  83:22 89:1 90:3
  90:12,15 98:9,13
  107:16 116:7,7,9
  123:7,7,12,16
  126:16 128:13
  133:16,17,25
  134:16,19,21,22
  135:12,14,17,22
  136:1,1,2 137:4

145:11,18 146:15
  146:21 147:7
  148:25 149:14,16
  149:22,23 150:2
  150:11,13,16
  151:6,11,20
  152:14,19,23,23
  153:1,5,7 154:7
  154:14,18 155:1
  155:13 156:7,9
  157:13 158:17
  159:1,1,4,16
  160:1,3,16,23
  161:2,5 168:4,6
  168:10,13,16
  169:15 170:8,11
  170:14 171:13,19
  171:20 172:8,9,10
  172:14,16,18,24
  173:2,13,14 176:2
  178:16,25 180:4
  181:4,12 183:10
  183:14 186:20,22
  187:7,7 188:11,13
  190:4 192:17
  195:12 196:15
  198:18,22,25
  199:9,15,17,22
  200:9 201:14,24
  202:10,14,24
  203:8 204:2,10
  205:1 206:2,5,8
  206:14,16 211:13
  211:16 212:10
  214:3,5,15,16
  215:6,10,13 216:6
  216:10,13,14,16
  216:17,19 217:3,8
  217:11 218:10,20
  218:24 222:16,20
  222:24 232:17
  234:14 235:18,18
  235:18 238:19
  242:15,20,24
  244:3 250:18,19
  254:15 256:2,8



257:3,9,12,23
258:12,18,24
259:6,11 260:1
261:19,21,23
262:9,10,16,19
263:3 264:4,9,9
264:10,18 266:2
266:10 267:6
275:18 276:11,17
276:22 285:14
286:21 287:1
292:18,21,25,25
293:1,2,5,6,7,8,12
293:13 312:10
316:13 317:24
318:8,12 319:1,6
319:7 320:22
321:1,5,18,21
322:3,11,13 325:6
325:15,18,20
330:13,16 341:17
341:21 342:1
343:3,6,9 345:11
345:18 346:6,7
347:2,13 355:9,10
355:21 360:5,15
360:19 362:15,16
362:25 365:18
367:3,5 368:23
371:22,22 372:8
375:24 376:14
380:15 382:19,20
**Dave's** 111:10
128:19 144:8,19
149:6 156:10
158:15 190:20
207:22 218:8
233:8 258:10
315:24 341:20
343:17 344:3,9,17
346:7 373:4 377:8
377:10
**David** 1:7 8:16
242:7 283:1,6,7
**day** 91:14 190:2
204:17 341:22

380:10 386:24
**days** 187:17 305:24
**de** 2:11
**dead** 355:23 360:15
382:23
**deadline** 366:1
**deal** 16:10 174:21
231:14 233:3
368:14
**dealing** 149:19,19
232:17 261:4
**dealt** 42:3 103:9
231:3 366:4
369:24
**death** 99:1 111:10
282:10
**Deborah** 317:7
**debt** 347:17
**debtors** 247:13
**debunk** 384:2
**December** 12:25
14:3 133:20,21
137:3 195:3,15,16
195:24 196:9
306:14 358:25
365:11 380:22
**decide** 78:14 125:5
145:14 161:9
165:5 167:9 337:3
**decided** 73:19
128:23 140:8
325:12
**decision** 373:21
**declare** 334:10
**decline** 373:23
**deduced** 285:18
**deed** 297:14 308:24
309:1 312:3,25
**deem** 78:6
**deemed** 256:11
**deep** 329:2
**defamation** 150:4,8
**defaming** 162:21
**default** 248:5 268:3
**defective** 260:9
262:6

**defence** 358:10
360:22 361:11
368:16 369:6,15
369:20 374:11
**defendant** 1:12 2:9
348:19 349:9
350:10,13 351:23
354:20 372:9
**Defense** 1:7 239:12
263:19,22 264:2,5
264:18 350:15
**defer** 368:6 369:14
374:10
**deferred** 383:11
**define** 27:13,13,23
49:16 52:10 53:25
55:1 86:15,18
177:16,23 178:19
198:19 255:8
**defined** 28:4
117:23 264:17
**definitely** 51:7 59:3
59:7 72:25 101:1
221:16 226:3
**definition** 209:1
253:24 256:9
257:1
**definitions** 52:16
**deformation** 65:3
**degree** 226:24
264:11
**delete** 74:13 274:2
**deliver** 247:8 283:2
**delivered** 83:7
337:19
**demonstrate**
259:11 260:1
**Denariuz** 305:9
306:10,21 307:14
307:16 308:5
**Department** 218:23
317:5 355:8,20
357:7
**depending** 209:2
**depends** 209:4
364:4

**deployed** 283:14
**deponent** 3:2 386:3
**deposed** 369:14
**deposited** 114:16
114:19
**depositing** 120:8
**deposition** 1:16 3:9
4:3,9 5:11 6:23
8:8,9 20:5 42:24
43:3 65:16 73:3
77:14,18,25 88:21
123:24 124:3
144:5 145:25
146:1 173:20,24
174:6 175:2
187:14 199:13,19
203:17,20 216:8
221:6,10 234:6,7
259:1 284:1,5
292:4 323:9
352:18,19 359:5
359:22 362:4
363:2,5,11,21
364:9 365:15,20
366:4 367:7 374:2
374:3 375:12
383:11 385:22
386:4,5 387:11
**deposition-taking**
7:9
**Derivative** 216:11
222:7 223:3
**describe** 118:8
226:4
**describing** 69:18
**Design** 62:6 110:12
111:4,23 112:15
306:24 307:9
**designed** 99:15
**designer** 106:5
**desired** 386:6
**desires** 243:22
**Desmond** 82:10
**Despite** 225:22
**destroy** 119:6
**destroyed** 75:5,8

**detail** 55:16 257:10
368:19
**detailed** 272:2
**detailing** 86:18
**details** 53:2 72:8
121:23 127:15
137:17,19 140:18
144:19 190:20
198:17,20 213:10
229:20 277:6
293:13
**determination**
127:16
**determine** 19:23,25
20:2 285:23
286:15 292:9
311:19 338:20
340:17 367:11
368:7,10 373:24
**determining** 96:16
**develop** 88:2,3
168:10,13
**developed** 186:24
218:24 241:17
276:21 277:24
283:17 287:12
323:24
**Developers** 76:18
**development** 28:20
28:24 29:1,5,5,8
29:14 99:16 207:7
244:7 283:1
323:18 326:10
328:6 351:17,19
351:21,21,25
**development/Res...**
265:4
**device** 11:14 21:17
**devices** 24:20 25:25
30:21 31:1,11,16
31:23 41:16 42:3
99:17
**DEVIN** 2:3
**de-designate** 5:13
**DHS** 255:24 275:10
275:14 370:19



371:16 372:19
**dialogue** 66:10
**dictated** 165:22
**dictionary** 52:15
117:25 322:10
**died** 47:9,13,16
98:16 116:7,7,9
242:7 282:9
354:20 382:20
**difference** 171:12
**different** 10:15
14:2 23:25 35:19
79:17 84:16 88:8
96:16 104:9
105:13 110:11
125:2,3,4 135:7
156:13,15 157:14
161:16 165:24
218:22 219:1
232:13 239:25
255:4 258:10
291:13 298:16
300:12 301:6
302:14,15,16,20
302:20 304:5
312:21 325:5
328:2 354:13
361:4 382:3
**differently** 165:22
**differs** 124:24
**difficult** 76:21
258:4
**difficulties** 65:3
150:9
**digital** 55:13 64:25
74:19 124:24
**digitally** 260:13
**direct** 91:19 118:14
160:5 325:19
328:12 330:14
332:4 354:2
368:24 379:23
380:4,10
**directed** 52:19
118:24 238:7
**directive** 78:2

**directly** 324:1
372:22
**director** 13:12
288:1,3,10 339:1
354:19 361:3
367:20
**directors** 122:5,8,8
**directorship**
288:14 339:5
**directorships**
288:13
**disagree** 261:7
338:17
**disappear** 314:15
**disappeared**
186:24 201:21
314:18,21,24
**disappointment**
134:16
**discipline** 287:13
**disclosed** 174:23
338:11
**disconnecting**
195:11
**discovery** 226:2,14
337:22 362:5
**discrepancy** 228:23
**discuss** 16:18,23
17:3,9 18:21 38:9
38:18,21 40:13
55:19 56:6 59:6
59:12 75:24
127:14 141:10
143:14 176:7
198:17,19,21
199:8 264:13
297:1 329:25
330:5,10 331:4,9
331:12,15 363:12
363:16 367:22
382:18,22
**discussed** 49:8 59:9
64:14 130:7 141:9
141:11 148:10
160:11 171:23
188:24 341:17,21

374:24 382:21
**discussing** 75:23
78:18 127:12
175:11 273:15
333:20
**discussion** 40:18
45:4 82:24 216:7
303:14 361:11
**discussions** 76:2
143:13
**disillusioned**
133:23
**dismiss** 19:2
**disposal** 250:24
**disposition** 91:16
**dispute** 226:20
257:23
**disputes** 385:5
**distinction** 205:14
208:3
**distribute** 258:8
**distributed** 232:13
232:19
**distribution** 167:7
233:4
**District** 1:1,1 4:6,6
333:6
**dive** 119:6
**division** 142:1
**divorce** 16:18 17:1
17:6 363:11,13
**divorced** 16:21,23
**DMCA** 378:16
**docket** 126:10
189:23 240:5
**doctor** 6:8 52:1
109:7 253:4
264:12 285:2
332:4
**doctored** 332:22
**document** 65:10,10
65:14,14,19,23,24
66:13,13,24 67:4
67:4 157:4,8,11
159:1,11 189:20
227:11,13,15

228:7,8,25 239:15
241:22 254:6,10
256:15 290:14,21
297:16,16,19,21
298:1,7,9,12,14
298:16,18,22,22
298:25 299:14
300:25 301:2,19
301:25 302:4
304:3,4,5,18
308:16,20,21
311:4 315:7 333:9
334:15 348:23,24
349:4 351:7
354:10,11,13,14
355:5 365:9
**documenting** 28:21
**documents** 83:11
122:2 163:20
286:3 290:15,16
290:17 292:24
293:14 297:10,12
297:17 298:19
299:2,5,10 300:19
301:22 302:4
304:20 312:21
333:7 334:18,20
334:21,24 335:7
335:12,17 336:1,1
336:3,4,10,12,14
336:15,18,22,24
338:5,7,13,16,21
349:18,19 351:20
352:3 353:3,7,10
355:2 357:9 362:6
**document-wise**
353:7
**doing** 26:17 78:8
82:7 88:14 106:20
122:11 125:12
135:20 138:9,24
142:11 154:1
158:22 160:14
177:24 187:21
188:11 191:20
195:7 199:1

227:22 228:13
231:11 232:4
264:12 285:15
287:15 341:22
352:1 356:25
369:3
**dollars** 227:21
251:17 372:16
**domain** 81:9
176:12,14 177:14
177:20,21 178:7
178:17,20,23
179:7 180:5,8,11
180:13,18 181:1,5
181:13,20 223:23
224:7
**domains** 81:8,17
180:6
**donate** 11:25
**donated** 74:20
**door** 231:12 232:10
**doors** 233:6 362:5,5
**Dorian** 213:14,15
213:17
**dot** 179:7,13
**double** 41:13
**double-check** 159:2
162:20
**doubt** 210:24,25
**download** 122:19
**downloaded** 166:21
**Dr** 3:3 4:3,25 5:7
5:15 8:13,22
18:17,22 19:12
20:14 25:23 30:20
31:2 35:8 37:5
41:6 68:1 69:6
71:4 77:14,18
78:15 82:23 97:22
98:3 106:13
123:24 124:3,6
126:22 132:2
145:19 173:20,24
175:9,23 176:11
188:23 217:15
221:6,10,13 238:7



245:12,23 247:18
256:18 258:25
262:5 263:7
264:21 265:6
267:4 269:22
271:1 277:12
283:9,17 284:1,5
284:8 295:8,10
296:1 297:7
307:18 308:16
309:7 312:25
313:15,19 315:2
316:10 317:2,20
320:20 322:11
323:9,12 333:5,19
334:23 335:11
338:4,15,19
339:18 341:25
345:24 352:20
358:18,19,21,23
360:13,18 361:1,9
361:16,21 362:10
363:10 365:17
367:1 368:4
369:13 371:21
372:3,4,14 373:2
373:3,6,17,24
374:4,8 375:18
376:14,21 377:7
377:25 378:12,13
378:21,25 380:8
380:19,23 381:9
382:24 385:23
**draft** 136:13 139:1
139:7 191:5
301:18,24 302:6
302:24
**drafted** 348:23,24
349:2,22
**drafting** 138:16
350:18
**drafts** 136:25 141:7
142:15
**drank** 38:10 39:5
**Dread** 186:10
**drill** 55:11,17

287:11
**drink** 7:17 38:11
323:2 357:22
**drinking** 204:16
**drive** 14:24 21:14
74:23 75:4,13
319:16 321:5
**drives** 21:6 74:15
74:17,18,24 75:15
262:25 377:8,10
**driving** 330:25
**drove** 38:16
**drunk** 204:16
**dubbed** 100:3
**due** 346:23 360:21
**duration** 242:15
318:12
**D-E-B-O-R-A-H**
317:10
**D-E-S-M-O-N-D**
82:11
_____
**E**
**E** 2:1,1 3:1 388:1
**EA** 256:14
**earlier** 5:17 41:14
109:8 210:19
283:10 313:22
344:18
**early** 55:14 167:7
175:24 202:22,23
289:7 290:4
319:15 372:5
**earn** 196:3 241:15
241:19,23
**earned** 196:10
**ears** 102:22
**earth** 313:16,17
**easier** 21:11 158:20
207:15 245:15
**Eastern** 84:20
**easy** 77:22 158:21
**economic** 224:1
356:16
**EC4A** 1:22
**edit** 136:20 156:7

168:16 169:15
**edited** 136:7 156:8
172:24
**editing** 63:22 65:4
159:8
**edits** 156:10 171:16
171:20 172:15
**effect** 365:13
**effectively** 14:1
28:5
**effects** 96:16
**effort** 78:5 375:9
**efforts** 374:20
**either** 25:12 30:4
34:6 37:24 63:10
66:8 70:24 89:2
110:11 123:6,8,9
144:13 174:21
220:22 222:16
248:24 318:18
347:16 358:8
362:15 369:22
370:21 374:1
**electronic** 64:25
65:6 75:5,8,15,16
260:11
**Ellen** 108:12,19
**else's** 158:21 342:7
**email** 317:23
**emotion** 158:20
**employed** 12:11,16
12:21 13:3,6,8
387:10,13
**employee** 120:7
387:12
**employees** 41:15,22
41:24 42:1,3
**employer** 13:3,6
**employment** 13:13
**EN** 142:5
**enable** 83:3 219:2
235:22
**enabled** 231:13,16
231:18,20 234:10
**enacted** 90:14
**ended** 250:23 252:2

252:24 347:3
**ends** 253:6
**engineers** 163:6
**England** 260:20
**English** 54:21
**enhanced** 231:10
232:3,12,16
243:14
**enquire** 295:8
296:1,6
**enquiring** 368:4
**ensure** 88:14,16
134:11
**ensured** 92:13
**enter** 90:11 98:12
272:6,10 374:25
**entered** 19:24
90:17 243:6
266:11
**entire** 5:11 150:19
191:3 193:17,22
204:17,20 312:14
**entirely** 195:16
226:1 335:2
373:12
**entirety** 264:16
**entities** 77:3 87:4
87:15 88:7,11,25
90:20 91:4 94:18
95:6 96:2 238:8
244:20 296:2,4
349:17
**entitled** 89:12
191:19,20 216:11
308:17,24 375:18
**entity** 90:23 96:4
96:13 97:15 98:10
98:12,20,22 99:1
99:3,8,14,20,24
100:9,15 101:12
107:16,19,21,23
108:1 109:21
118:12 120:25
121:7,8,10,11
263:20 264:8
269:4

**entry** 126:10
189:24 240:5
**envisioned** 99:5
243:18
**EOS** 323:14 326:1
**equipment** 11:24
**Ernst** 102:4 104:3
**error** 265:5 300:15
301:22 320:16
349:3 350:18
351:22 353:5
354:6,13
**errors** 353:1
**Especially** 385:4
**ESQ** 2:3,5,22,23
**establish** 8:13
145:23
**established** 97:5
99:1 181:12
205:17 238:19
339:25
**Estate** 1:6
**et** 4:4 154:2
**etcetera** 17:19,19
21:8 37:16 74:21
159:2 163:20
172:13 181:1
185:22 247:15
261:4 267:10
272:5 274:23
275:17 300:15
312:19 325:12
**ether** 148:2
**Ethereum** 88:3
**European** 84:20
**evening** 361:24
**event** 169:8
**eventually** 20:5
33:22 100:6 113:3
160:16 200:23,25
207:12
**Everyday** 253:7
**everyone's** 374:20
**evidence** 66:25
134:12 155:15
215:8 260:24

261:1,15 262:24
274:18 312:22
**exact** 9:17 11:2
14:15 24:9 37:25
53:2 85:2,14 96:8
112:2 118:6 126:5
133:19 156:22
179:22 213:9
259:2 281:8
325:10 344:21
**exactly** 44:5 45:16
53:22,25 54:14
80:15 85:11 93:19
102:5 110:13
113:10 118:20
142:20,21 152:22
156:12 158:11
172:24 173:1
189:1 202:21
211:19 248:23
254:14 263:10
265:18 285:11
335:22 341:11
378:22
**examination** 6:13
**example** 55:13
**exchange** 62:10,11
62:11 79:22 81:1
81:7,8,10 125:24
204:8,9,25 206:2
206:4,6,7 251:16
254:2,4,10,19
255:1,19,21 315:4
351:17
**exchanged** 205:13
**exchanges** 317:23
**excuse** 177:25
**exercise** 118:24
**exercised** 118:22
**exhibit** 3:10 78:16
78:17 79:7 126:8
126:9 150:6 160:6
161:16,17,18
189:7,17 193:5,11
227:7,10 239:2,4
259:17 263:14,14

263:16 278:11
284:9 296:18
297:8 302:6,7
314:25 315:3
333:15,22 347:19
347:22 370:17
371:4
**exhibits** 3:9 244:21
278:10 295:15
**exist** 74:6,7 76:6,7
84:14 85:5,10,22
121:24 137:19
139:22 162:2
201:19 219:13
296:11 306:11,13
343:21 349:18
351:20 353:3
355:2 357:9 367:8
**existed** 20:15 76:20
79:17 306:15
**existence** 107:21
116:19,24 117:5
183:3,23 230:7
286:2 290:3
**exists** 50:25 306:12
311:8 365:9
**exodus** 217:20
**expect** 179:7
241:19,23 311:6
**expected** 241:11
**expecting** 352:4
**expects** 241:15
**expert** 74:19
158:19 369:11
**explain** 19:8 89:5
109:10 144:5
177:4 189:3,8
204:5 205:7,12
265:23 268:2
282:24 315:12
**explained** 253:5
**explaining** 320:25
**explanation** 40:16
126:24 253:6,7
254:19
**explicit** 208:21

**exploitation** 74:21
**explore** 367:20,24
**explorer** 253:13
**exposed** 380:22
**express** 95:21
**extension** 366:9,13
**extent** 19:21 31:5
303:2 334:19
336:2
**extra** 275:6
**ex-wife** 15:17 17:6
218:18 360:18,24
364:14 369:5
**eyes** 200:7
**e-cash** 125:4
**e-mail** 54:4 58:25
59:2,18 60:5,15
60:17,19 61:13,16
62:15 63:11,12,13
63:16,25 64:2,3,8
64:14 65:1,7,8
66:1,3,17,18,19
67:12,17 68:19
70:23,24,25 71:3
72:24 79:7,9,11
79:15,18,25 80:5
80:8,10,13,17,24
81:2,4,12,15,25
83:21 126:11,14
131:15,16 132:9
136:2 138:8 147:9
147:13 148:15,16
148:21 150:3
155:5 160:6
161:16,19 179:7
209:3,8 210:2,6
210:13 212:3,4,8
256:16,19 273:1,2
273:20,23 317:21
317:23 318:24
321:3,18 325:24
327:21 329:11
342:22 360:19
372:25
**e-mailed** 59:20
60:23 61:1,19,21

104:13 171:11,13
171:16 287:14
329:16
**e-mailing** 58:18,22
63:18
**e-mails** 60:7,10,13
60:21 68:2,8,11
68:21,24 69:3,8
70:16 71:9,10,17
129:2 132:13
261:7 262:25
315:4 335:17

## F

**F** 244:7 245:13
246:2
**fabs** 345:23
**Facebook** 67:19,19
67:20 262:13
**facilitate** 136:4
**fact** 6:22 109:15,18
225:14 251:24
260:16,19 284:24
307:16 309:2
335:6 366:19
376:2 379:4
383:21
**facts** 155:14 215:7
307:15
**failed** 134:14
174:16
**fails** 220:22
**fair** 144:16 352:8
362:8
**fairly** 214:18 258:9
368:12
**Faketoshi** 384:21
**false** 220:22,23
**familiar** 80:16
191:3 270:9 276:1
281:22 327:20
380:25 381:6
**familiarise** 240:6
**familiarised** 267:19
**family** 18:21
164:14 331:16

**famous** 303:9
341:22
**far** 97:1 173:12
175:25 242:24
243:16 247:6
363:4 372:7
**faster** 384:9
**father** 315:25
371:22
**fault** 10:10,12
**Faustus** 379:2,3
**FBI** 35:24
**features** 277:9
**February** 126:4
318:23
**federal** 70:5 95:21
141:24 311:14,16
337:3
**feedback** 172:1,3
**feel** 7:17 9:13 78:6
128:7 221:13
262:4,7 300:18,20
**feels** 364:16
**fees** 253:3
**Ferrier** 309:23
**fibre** 185:17,18,21
**fiction** 193:11,15
193:18,23
**fight** 319:15
**fights** 150:10
**figure** 171:10
205:19 225:3
250:22 307:20,22
322:23
**figured** 77:22
**figuring** 318:1
**file** 81:19 161:11,12
161:14 216:15
236:10 352:14
355:24 366:9,20
368:16 369:6,15
369:16 374:11
**filed** 17:16 353:2
355:22 360:23
366:3,5,10
**files** 81:7 164:2,5



300:14,14 303:22
303:22 335:18
377:8,10
**filing** 355:10 365:8
365:12 366:14
374:23
**final** 158:1 368:19
**finally** 372:25
**finance** 96:5,25
247:11,13 248:8
248:11,22 249:2,7
**finances** 281:9
**financial** 141:25
142:12 224:9
279:18 313:9
**financially** 387:14
**financier** 240:13,17
245:23 246:2
248:3,5
**find** 16:8 82:14
129:10,13 147:7
147:21,25 148:8
163:14,16 187:5
190:16 199:5
262:24 263:2,4
296:13 332:25
383:15
**fine** 5:14 6:8 77:10
123:20 281:24
286:9 354:23
361:25
**finish** 69:6 158:3
201:22 252:21
262:4 263:11
267:4 296:1 313:7
**finished** 141:15
**Finney** 129:4,22
153:19 154:5,14
154:19,22,24,25
155:20,22,23
156:5 172:12
175:16,20 188:5,7
192:12
**fired** 103:13,15,19
138:9
**firewall** 231:13

232:11
**firewalled** 207:12
**firm** 12:23 94:1,3
143:10 303:6,9
**firms** 303:7,16
**first** 9:24 15:11,15
16:2,8 53:24 54:5
63:7 64:8,16
83:22 84:1,11
95:23 105:13
108:12 129:7
142:3 145:11
157:6 167:7 168:6
169:1 176:14
179:19 180:5
182:6 184:2,12
189:25 191:10,12
191:20 199:22
200:5 201:20,21
215:5 238:23
263:23,25 264:17
285:6,10 286:20
286:21 297:25
298:2,3 309:21
326:2 359:11
361:13 362:9
365:25 368:4
371:20,21 384:23
**fit** 254:4,10
**fits** 8:10
**five** 48:3,5 67:23
**five-minute** 323:1
**fixed** 154:5
**FL** 2:12
**flashing** 178:3
**Flexiteek** 226:18
**Flexner** 1:21 2:3,6
2:22,23 4:10,11
**flip** 186:10
**flippant** 321:2
**Florida** 1:1 2:4 4:6
37:23 38:1,6 46:1
46:14 263:19
264:18 333:6
**flowers** 273:8
**fluctuates** 356:12

**fluffy** 51:1 177:24
204:6
**flush** 369:20
**FNE** 96:5,24
**focus** 233:21
**Foley** 1:24 2:15
4:13 387:3,24
**folks** 233:9 248:15
248:20 249:2
250:22
**follow** 148:17
233:13 234:12
311:17
**followed** 148:21
287:13
**following** 245:23
290:6 334:11
**follow-up** 339:13
363:24
**foolish** 243:1
**foolishness** 70:12
**forced** 332:21
**forcefully** 385:6
**forecasting** 96:14
**foregoing** 386:4,5
387:5
**foreign** 204:21
**forensic** 74:19
**forensics** 159:23
**forget** 112:3 130:23
**forgotten** 213:16
**form** 20:20 24:25
25:6,16,18 50:20
63:2 65:6,12 66:8
67:2 69:14,17,19
72:1,4 77:24
97:15 113:3 119:8
134:11 139:7
226:1 252:9
253:20 260:8
**formal** 127:10
136:16 365:7
**formalised** 290:4
**formally** 42:21
162:22
**format** 55:14,16

**formation** 33:16,18
33:22,25 113:1
120:12 182:5
**formed** 72:1 84:23
85:1,8,13 98:15
98:18 110:10
111:23,25 112:12
113:12,13 117:9
117:11 277:23
303:6
**former** 16:19,24
17:2,3,9 80:25
104:10 130:9
**forms** 14:2 56:6
313:25 345:22
**formulated** 283:6
**forth** 228:17
**forthcoming**
282:11
**forum** 135:12,15
138:2
**forums** 155:4 209:3
209:4
**forward** 65:3 71:5
166:3,19 228:13
349:6 359:2
375:11 382:24
383:2
**forwards** 335:17
**fought** 352:4
**found** 11:10 13:25
148:4 158:24
299:12
**foundation** 140:7
152:15 154:16
168:12 212:12
242:11 324:10
331:21 332:1
**founded** 13:24 14:1
84:12 96:10 99:9
109:12,23 122:23
291:1,5 293:24
306:23 308:10
**founders** 346:22
378:18
**founding** 106:23

360:20
**four** 67:23 130:6
190:1,3 216:25
217:6,22 218:1
275:10,14 299:2
304:20 308:12
312:21 314:20
361:7,13,17
363:22 366:23
369:24 370:13,24
371:5
**FPGAs** 241:17
**frank** 366:14
**fraud** 316:4 333:3
**fraudulent** 18:25
**Freedman** 2:3 3:4
4:18,18 5:3,8,9,14
5:17 8:12,21 9:9
9:15 10:3 11:12
11:23 12:15,19
13:10 15:6,10,22
16:1,4,10,14
17:11,25 18:16
19:6,9,17,23 20:3
20:10,13,19,23
23:14,23 24:6,12
24:23 25:5,16,21
26:4,12,18 27:1,5
27:10,15,19,25
28:13,23 29:7,12
29:21 30:19,24
31:10,15,19 32:1
32:11 33:2,15,21
34:2,11,16,23
35:3,15 36:3,7,15
37:3,10,22 38:5
38:25 39:6,18
40:3,7,22,24 41:5
41:8,12,20 42:23
43:1,2,4,10,14,16
43:22 44:2,13,19
45:7,19,25 46:9
46:15,22 47:15,23
48:2,10,19 49:6
49:13,17,23 50:4
50:8,15,19 51:2,8



51:14,18 52:11,21
53:5,9,17,23
54:16,22 55:2,23
56:16 57:8,17,23
58:3,21 59:17
60:3 61:12 63:17
63:23 64:15 65:11
65:15,25 66:7,15
67:1,5,24 68:6,15
68:20 69:1,13,17
69:20 70:1,4,8,14
70:21 71:16 72:10
73:6,12,16,21
74:2,10,16 75:3,9
75:19,22 76:10,25
77:7,10,20 78:7
78:13,21 79:2,5
79:14,24 80:4,9
80:18,22 82:3,8
85:21 86:8,12,21
86:25 87:10,21
88:6,17,22 89:2,7
89:11,14,20 90:1
90:6,10,16 91:2,7
91:20 92:10,15,19
92:25 93:4,10,21
94:2,12,17 95:15
96:23 97:21 98:8
98:17 99:6,23
100:8,14 101:3,8
101:16 102:16,24
103:14,18,22
104:6,21 105:8,21
106:9,22 108:5,11
108:17,22 109:19
110:2,20 111:2
112:10 114:1,11
114:18 115:1,6,12
115:24 116:6,10
116:15,18 117:4
117:10,14 118:7
118:15,21 119:3
119:13,19 120:17
120:21 121:17
122:4,13,21
123:20 124:5,13

124:21 125:8,10
125:22 126:2,15
126:25 127:4,6,9
127:18 128:5,12
128:18 130:21
132:4,6,23 133:12
133:14 134:5,15
134:18,20,25
135:3,10,21
136:11,18,24
137:7,12 138:11
138:25 139:6
140:10 141:6,17
141:20 142:8
143:22 144:7,12
144:18,24 145:5
145:10,20 146:6
146:12,20 147:1
148:3,7,19,23
149:5,11 150:12
150:18,23 151:23
152:6,10,13,18,24
153:4,6,15,21
154:6,13,17 155:3
155:6,12,16,19
156:3,19,24
157:12,18,23
158:8,13 159:14
159:18,20 160:2
160:15,22 161:1,6
161:17 162:15,19
162:23 163:8,13
164:4,16,21 165:2
166:8,18,25
168:15,25 169:7
169:20 170:13,23
171:4,9,25 172:22
173:3,7,17 174:17
174:21 175:6,8,14
175:21 176:4,10
176:21 177:2,12
177:18 178:5,15
178:21 180:2,12
180:16 181:8,14
181:18,23 182:2,5
182:12,18 183:1,9

183:12,17,21
184:1,6,14 185:1
185:7,11,13 186:7
187:1,15,17,22
188:1,6,12,20,22
189:6,9,14,23
190:10,15 191:2,7
191:12,15 192:1,7
192:16,22 193:3
193:16,21 195:14
196:5,14,25 197:5
197:12,22 198:7
198:11,16 199:4
199:14,21 200:1
201:9 202:6,9
203:4,13,24 204:7
204:23 205:10,15
205:19,25 206:9
206:15,20 207:1
207:21 208:4
209:7,19 210:8,12
210:21 212:9,15
213:13 214:14,23
214:25 215:3,11
216:9 217:2,13,25
218:6,13 219:18
220:2,11,17 221:2
221:12,17,25
222:11,19 223:1,8
223:13,24 224:5
224:13,20 225:7
225:11,19,24
226:5,11,15,17,21
227:2,8 228:3,5
228:10,19 229:5
229:15,22 230:1
230:10,15,22
231:5 232:25
233:16 234:8,19
235:3,12,17,20
236:2,9,16,23
237:5,13,20 238:2
238:6,10,21
239:14,18,20
240:1,4,16 241:25
242:14,23 243:20

244:5,12,17,20
245:4,11,17,21
246:18 247:7,21
248:10,19 249:11
249:21 250:4,9,21
251:3,21 252:6,14
252:20,23 253:15
253:22 254:8,11
254:21 257:16
259:9,18,25
261:24 263:6,12
264:3,19 265:17
265:20,25 266:15
267:12,17 268:8
268:17,24 269:18
270:5,24 271:14
272:15,19 273:10
274:6,13,19 275:7
275:23 276:14
277:3,12,17 278:9
278:15,21 279:2,7
279:13,19,23
280:8,14,21 281:1
281:12,19 282:12
282:23 283:23
284:7,13 285:1,17
285:23 286:6,14
286:19,25 287:5
287:10,23 288:6
288:16,21 289:8
289:13,18 291:10
292:5,16 293:20
293:25 294:5,10
294:14,19 295:7
295:13,18,22
296:16,19,24
297:4,6 299:8,19
300:22 301:10,17
301:23 302:5,12
302:22 303:11,24
304:13 305:4
306:19 307:4
308:4,15,22 309:6
309:14 310:5,8,22
311:2,11 312:1,23
313:6,13 314:6,11

315:1,19,22 316:9
317:1,10,13
318:11,18,22
320:13,18 321:17
322:2,18 323:1,11
324:7,13,19,25
325:14 326:16,21
327:1,6 328:9,25
329:6,10,24 330:4
330:9 331:3,8,18
331:23 332:3
333:10,18 334:4
335:10,20 336:11
336:17,23 337:13
337:25 338:12,17
339:4,11,22 340:4
340:8,12,17,22
341:3,7,14,24
342:10,16,20
343:2 344:1,7,13
344:23 345:14,17
346:5 347:8,20
348:7,14,16
349:12,21,25
350:4,19,24
351:12 352:13,23
353:20 354:1
355:6,16 356:1,17
357:2,22 358:6,7
358:13,18,23
359:10,17 360:4
360:11,17 361:1,7
361:19 365:22,23
365:24,25 366:8
366:11,14,22,24
368:1,2 370:2,6
370:20 371:17,18
372:12 373:10
375:3,4,17,23
376:4,13,18,20
377:14,18,21,24
378:9 379:19
380:2,7 381:2,17
382:4,9,17 383:3
383:8,14,18 384:1
384:6,10,15,20



385:9,12,16
**freedom** 337:18
**frequency** 49:19
51:20 56:12 57:2
57:10 60:21,25
61:18
**frequently** 47:6
59:20 60:22
**friend** 48:17 71:25
160:3 214:16,17
**friends** 70:25
159:22 262:19,20
**front** 37:21 109:4
111:12,19 121:22
122:25 123:5
128:8 150:7
158:15 270:11
276:2 295:24
297:14 298:19
313:4 373:1,5
**fucked** 133:24
**fucking** 157:17
**fulfillment** 268:15
**full** 8:18,20 18:21
52:14 159:8 169:5
171:2 219:9
308:21 347:5,9
352:19 379:13
**fully** 367:24
**full-time** 198:4
**fulsome** 40:16
126:24
**functions** 26:6,11
159:5
**fund** 140:9 355:21
**funding** 139:14
140:4 218:21
**funds** 354:21,21,24
355:3,7,12,12
**further** 99:3 123:15
154:7 301:16
362:19 363:18,20
368:1 373:14
375:2 387:9
**F(b)** 252:9

## G

**G** 244:7 245:13
247:9 327:18,20
327:23 328:2,4
**gained** 138:3
**gaming** 231:10,14
232:3 244:2
**Garzik** 329:11,19
330:1,6,11,13
**Gati** 326:6
**Gavin** 330:18,20
**gears** 77:2
**general** 28:11
190:22 205:15
360:10 370:21
**generally** 62:10,12
101:13 291:17
306:9 313:24
325:8
**genesis** 181:24
182:14,21 183:2
183:22 184:7
**gentleman** 188:25
327:18
**getting** 8:25 108:1
144:4 152:8 156:1
185:16 204:16
208:12 213:17
328:19
**GICSR** 315:10,12
316:14,17 317:4,7
319:8 370:16
371:4 373:3
**give** 10:19 40:16
57:9 63:21 66:12
66:14 71:2 78:22
78:24 79:2 89:8
112:21,22 119:7
124:14 135:22
148:12 150:24
168:4 177:6,8,19
178:6 186:18
203:16 212:18,20
245:3 253:21
257:11,22 279:9

286:10 296:22
313:9 315:17
330:24 359:12
371:19 374:10
380:3
**given** 31:7 37:4
75:13 114:22
119:12 140:17
146:2 147:9
167:14,15,16
169:23 171:3,11
205:4 211:16,18
251:11 268:11
282:8 305:20
328:17 337:5
355:8 367:22
369:13
**giving** 9:12 77:23
145:24 195:10
247:11 282:11
385:4
**glass** 30:15
**gloss** 371:20
**GMX** 209:10 210:3
211:1,6,16,23
212:10,18 214:6
**go** 8:2 12:1 14:25
17:12 19:16,19,20
19:21 20:8,9 31:2
40:23 41:12 42:11
42:19,24 43:8,19
43:23 51:25 72:8
75:19 77:10 96:2
98:20 101:1
107:19 108:2,5
109:5 119:24
122:20 125:5
134:7 142:24
144:23 153:10
157:6 162:21
191:10 195:12
211:6 216:7
227:10 239:21,22
246:11 247:6,17
249:6 252:10
253:23 255:25

256:18 259:23
261:23 262:13,17
262:22,22 266:4
267:13 272:3
277:18 279:17
280:6 283:12
291:11 305:5
310:2 311:23
313:14 315:7
318:23 320:1
321:7 322:9
333:11 341:21
348:11 350:5
352:2,24 353:17
353:20 354:15
357:15,19 365:20
370:9 384:10
385:1
**God** 187:6 312:5
**gods** 82:21
**goes** 65:7 100:2
103:21 178:12
189:10,12 191:12
205:10,11,13,15
244:15 260:18
301:15 306:8
340:15 345:21
359:2 362:11
363:18 364:8
383:9,23 384:4
**going** 5:11 8:22,24
16:1 31:5 36:20
37:3 40:12,25
41:3 43:13,14,20
52:16 61:11 65:5
65:23 66:5 70:9
77:1,2,12,18
78:23 88:20 89:14
91:22 96:4 98:4
99:2,8,13 101:20
103:17,20 107:23
108:6,9 109:20
122:19 123:14,22
124:3 127:12
128:21 134:19
136:19 144:8,24

152:12 156:2
159:10,11 164:11
164:12 166:3,19
173:18,24 178:2
181:11 185:18
190:12,13,15,17
191:7 192:2
196:21 197:1,6
199:11,12 203:15
203:17 204:24
205:2,5 209:17
214:20,21 216:3
219:8 221:4,10
222:14 225:6,7,8
225:8 226:4,5
237:24 240:8,9,10
242:12 244:14,22
245:6,9 247:14
257:22 259:14
261:17,21,25
262:4 263:11
273:12 274:20
279:7 283:24
284:5 285:21
286:9 295:19
304:3 305:24
316:24 318:20
323:4,9 333:12,16
340:14 342:18
346:8 350:1
352:16,18 353:21
353:24 355:25
357:24 358:2
363:3 366:18
368:18 370:12
374:4,4,16 375:10
376:2,5,6 377:12
384:10,24 385:6
385:20
**Golden** 6:6 256:10
**good** 5:15,16 13:14
77:8 123:19 124:6
149:22 159:1
249:1 262:20
362:1,2
**goods** 62:10 251:16



**Google** 138:7,8
311:23
**gotten** 123:13
**government** 35:24
46:20 95:25 121:4
127:22,24 128:1,6
139:11,13 140:8
218:21 232:21
337:18 346:17,18
346:20 356:14
374:9,14
**governments** 88:15
**Gox** 251:13,20
**GPU** 240:20
**Granger** 130:7,8,10
130:12,14,16
131:1,9 141:12
**Granger's** 142:3
**grant** 368:15
**graphic** 106:5
**great** 193:14
385:11,16
**greater** 52:15
322:10
**greedy** 315:25
**Greek** 82:21
**grey** 346:13
**Grigg** 323:12,13,15
323:21 324:15,20
325:1,9,15,18,22
**Grigg's** 323:22
**grounds** 296:5
361:10 372:10
373:8
**group** 151:4 184:17
184:19 250:17
337:2 343:9,9,11
**groups** 330:16
**guess** 12:20 105:19
105:20 295:19
322:25
**guessing** 105:19
**guilty** 279:10
**guy** 213:11 247:15
328:23 341:22
**guys** 234:5 262:20

**G(b)** 252:10

**H**

**habit** 300:18
**Hac** 2:6
**hairs** 212:13
**Hal** 129:4,22
153:19 154:5,14
154:19,22,24,25
155:20,22,23
156:5 172:12
188:5,7 190:4
192:12
**half** 126:11 235:9
**halfway** 189:25
**half-truth** 190:8
**hand** 50:24 99:13
181:2 204:20
230:8 257:25
**handbook** 226:2,14
**handed** 122:2
180:23,24 204:14
204:15 227:9
239:3 263:13
270:3 304:20
347:21 353:10
**handing** 79:6 126:7
189:6 315:2
**handle** 100:5 101:9
101:17,23,24
103:25 104:16,22
378:19
**hands** 109:4
**handwriting** 300:3
300:4,24
**handwritten**
260:15,16 261:11
303:18
**happen** 24:16,17
118:14 165:21
235:10 248:24,24
248:25 249:1
308:10 374:16
**happened** 41:23
74:11 81:22 101:2
247:15 250:15,18

273:25 280:20
282:4 311:10
337:6 339:17
346:15 378:13
379:3,21 382:14
**happening** 379:12
**happens** 281:11
**happy** 43:19
106:14 247:15
250:18,19,20
264:14 352:7
367:12
**harassing** 384:25
**harassment** 385:5
**hard** 21:6,14 74:15
74:17,18,22,24
75:4 262:25
319:16 321:5
366:19 374:19
382:22
**hardware** 12:4
200:20 240:20
241:5 265:11,12
271:7,9,11,15
274:21 275:1
276:15,16,20
282:1,15
**Hardy** 327:19,20
327:23,25 328:2,3
328:4
**Harebell** 5:25
**Harry** 102:4 104:7
104:16
**hate** 72:2
**hated** 134:13
**head** 11:4 72:19
85:17 87:13
112:20 116:5
119:18 133:2
139:18 142:6,14
209:15 281:8
341:16 342:7
343:19
**headquarters**
36:17,19
**hear** 43:5 89:7,10

**heard** 4:5 76:22
202:3,3 365:21
**hearing** 296:2,21
366:11,11 372:4
383:12 385:21
**hearings** 238:8,10
295:25 364:25
**heart** 131:16
**heavily** 19:11,12
**heavy** 375:9
**held** 86:7 113:8
117:11,18,20,21
118:3 190:23
248:3,6 267:24
268:18 304:22,24
306:9,21 308:5,6
349:19
**hell** 247:14 295:5
300:18
**Hello** 5:19 126:16
358:21,22
**help** 52:6 63:22
64:2 65:4 71:5
148:21 149:6,10
149:13,15,23,25
150:14 157:13
158:15 180:6
194:9 200:7
216:16 258:25
301:18,24 302:6
314:15 371:11
375:10
**helped** 140:13
150:2,11 158:18
159:2 175:24
244:3 302:24
319:10 372:5
381:3
**helpful** 35:13
**helping** 375:7
381:7
**helps** 19:25 20:2,3
**Henry** 38:17
262:19

**hereto** 387:14
**Hey** 109:5 159:11
257:24 341:21
**Hi** 104:14
**hide** 316:2,6
**high** 93:8,25 94:16
99:16,19 241:2,2
248:13,15,20
303:7 309:21,25
311:13,22,24
346:21 356:14
**higher** 24:7
**high-speed** 185:19
**Hill** 2:20 4:12 5:25
**hippy** 314:21
**hire** 107:11
**history** 20:4 260:17
260:22 285:12
312:13,14
**hits** 306:7
**hold** 86:1 87:4,8,15
88:8 99:18 113:2
113:5,7,18,20
115:10,13 119:14
262:2 290:25
292:23 293:14
294:20 295:10
303:23 306:16,23
308:3 338:6
**holder** 268:11
**holding** 86:4
205:22 289:6
293:16
**holdings** 311:7
373:4
**holds** 115:7,14
116:21 291:18
308:12
**hold'em** 236:8
**home** 5:24 6:3
31:11 185:21,23
375:13
**Homeland** 218:23
317:5 355:8,20
357:7
**honestly** 14:22



**Hong** 84:21 105:22
**honour** 358:6,19
  360:5,12 361:22
  362:3 363:16
  364:22 365:4,24
  366:24 368:2
  370:7,8 371:18
  373:1 375:4,6,15
**hope** 125:14,15,21
  261:13
**hoped** 126:1
**hopefully** 219:2
**hoping** 25:21
**horrendous** 283:11
**horrible** 352:2,2
**hospital** 61:11
  219:3 355:11
**hosted** 170:18
**hosts** 240:21
**Hotwire** 82:20 83:2
  161:23,23,24,25
  162:3,7 164:7,17
**Hotwire's** 164:24
  165:3
**hot-headed** 135:24
**hour** 48:24 202:6
**hours** 48:24
**house** 10:4 30:2
  32:16 116:21
  335:14
**housekeeping**
  77:20 78:19
**houses** 10:18
**HPC** 241:2
**HPCs** 345:3,4
**Hs** 141:19
**HTML** 165:23
**human** 62:6 110:12
  111:4,23 112:16
  306:24 307:9
  312:12,14
**Humans** 29:11
**hundred** 227:21
**hung** 328:18
**Hungary** 84:21
**hypercapitalist**

314:22
**hyperlink** 148:5
**hypothesis** 56:20

### I

**Ian** 323:12,13,15
  323:17,21,22,23
  323:24,25 324:1,5
  324:8,9,15,20
  325:1,9,15,18,22
  325:25 326:1
**ICE** 240:21,23
**Icebergs** 341:12
**idea** 56:24 81:23
  108:24 109:3
  111:15,21 121:4
  122:1 124:16,17
  124:22 125:13
  128:25 129:1
  138:13 139:18
  144:8 176:11
  188:21 202:14
  218:7,9 219:22
  220:10 233:18
  260:17 274:4
  280:1 288:12
  298:8,10,11
  306:20
**ideas** 125:1
**identical** 79:18,23
  79:25 80:3 91:4
**identification** 19:14
  78:17 126:9 174:1
  177:8 189:17
  227:7 239:2
  259:17 286:3
  296:18 314:25
  333:15 339:22
  347:19 362:7
**identified** 191:21
  297:2 349:17
  352:21 363:19
**identify** 8:13 20:3
  30:20,25 158:15
  158:25 174:16
  191:4 336:6,7

372:9
**identifying** 177:19
  277:9
**identity** 191:24
  370:15 371:1,20
  371:24
**illegal** 258:3
**image** 30:21 31:1
  30:11,14 31:12
  32:20 267:10
**imaged** 21:5,8
**implemented** 154:2
  241:7,16
**implication** 322:7
**implies** 356:23
**imply** 32:18
**implying** 335:6
**import** 79:16,21
**important** 35:9
  81:24 197:25
**importantly** 365:14
**impossible** 172:5
**improved** 231:11
  232:7
**inaccurate** 228:20
  352:15
**inappropriate** 25:7
**inclined** 369:9
**include** 63:2
**included** 272:3
  284:19
**includes** 164:2
  272:1 337:17
**including** 17:1
  19:14 122:11
  156:9 201:3 219:1
  232:20 244:2
  256:25 286:4
  303:14 337:18
**incomplete** 311:5
  312:20
**incorporates**
  256:23
**incorporation**
  256:24
**incorrect** 346:10

349:9
**incorrectly** 304:5
  373:10
**increase** 56:13
**incredibly** 365:12
**independent** 71:23
**independently**
  320:22 321:1
**indicates** 193:11
  281:25
**individual** 45:1
  118:13,23 120:1
  175:23 176:1,2
  372:5,7,9 380:23
**individually** 234:13
**individuals** 92:18
  92:20 142:15
  164:9 292:8
  349:17
**industry** 159:23
  262:21 325:21
**inefficient** 225:2
**Info** 1:7 239:12
  263:19,22 264:2,5
  264:18 350:15
**inform** 73:3
**informal** 290:5
**information** 19:14
  26:24 29:13 81:8
  83:16 101:5
  112:23 131:1,13
  131:20,23 162:10
  162:13 163:23
  177:6,20 178:6,10
  180:23,24 205:22
  216:12 222:7
  223:3 231:20
  252:1 282:11
  285:13 286:4
  292:7 307:21,22
  315:17,20 316:19
  316:21 319:10
  337:18 363:20
  371:25 373:20,25
  384:13,18
**informed** 360:7

367:5
**infusion** 278:13
**initial** 37:5 148:16
  155:7 218:14
  352:1 367:10
**initially** 41:14
  123:3 218:9
**initiated** 373:3
**inquiry** 19:10
  238:12,14,15
  244:20 292:7
  349:16 350:2
**instance** 165:22
  256:10 332:19
  337:7
**instruct** 9:14 15:20
  16:2 34:4,6 36:20
  40:12 41:22 66:6
  66:7,8,9,11,15
  78:1 88:22 89:2
  99:2 103:20
  106:14,14 107:11
  111:14 123:14
  141:4 143:18
  144:13 146:5
  152:11 162:17
  181:16 182:13
  190:13,17 191:15
  196:22,23 197:2,6
  199:11 203:18
  205:3 214:21
  216:4 222:15
  224:16 244:15
  259:14 279:3
  280:19,22 281:9
  281:10 292:15,16
  292:17 295:19
  318:18,20 340:15
  342:18 343:11
  344:2,8,17 350:2
  352:17 384:24
**instructed** 17:19
  41:15 111:7
  146:17 213:16,19
  244:9 260:2 309:8
  316:2 343:8,15



344:14 358:9,15
359:1 360:6 361:4
**instructing** 9:9
31:4 89:18,21
175:2 191:13
205:23 259:21
279:5 319:22
338:9 341:1,3,5
384:6
**instruction** 111:9
183:5 197:11
260:3 296:14
**instructions** 31:8,9
**Integers** 82:20 83:3
**intellectual** 27:21
27:24 28:16 86:2
86:3,6,17 87:5,16
88:8,19 99:24
100:10 114:12
215:5,12 216:1,5
216:11 222:3,6,13
222:17 223:2,17
223:20,25 224:8
230:3,11,24 231:4
231:6,22,24,25
232:2,6,9 234:9
234:15,20 235:5
235:14,21 236:5
236:17,25 243:22
243:24 255:23
349:5 350:12
372:15,20,23
373:5
**intend** 97:14
235:11
**interact** 103:23
104:8,11,12
150:14 152:14,19
165:16
**interacted** 104:9,15
176:1 372:8
**interacting** 134:8
**interaction** 233:8
**interactions** 104:1
154:7 369:12
**interest** 95:22

356:5,8,14,23,24
374:8
**interested** 315:24
326:14 387:14
**interesting** 82:24
283:15
**interests** 43:22
259:21 374:15
**internal** 102:6,7,20
102:21
**internally** 103:1
**International** 291:1
293:12
**internet** 15:5 65:4
82:16 131:19,22
131:24 148:2
150:9 163:21
165:19 185:20
208:17
**interrogatory**
175:22 368:9,11
372:3 374:1
**interrupt** 346:8
**interrupted** 129:20
**interview** 194:1
383:4
**introduce** 4:14
326:3
**introduced** 54:5,7
**intuitive** 7:10
**invalidate** 258:10
**invalidated** 355:25
**invent** 76:21
**investigate** 337:3
**investigates** 94:24
95:3,8,13
**investigation** 94:22
95:5,10,18 101:23
104:17,23 334:19
334:21,25 335:8
335:13,18,24
336:1,13,25 337:2
337:6 338:13,22
**investigations**
95:21 101:10,18
332:5,6,9,13,17

346:21
**investigators** 337:3
**Investments** 291:1
293:12
**invokes** 367:17
**invoking** 363:25
364:11
**involve** 90:3,7
121:6 235:23
236:3 340:9
**involved** 19:12 44:1
120:10 145:11
146:21 147:2,5
164:17 180:19
196:15,18 218:14
236:25 258:8
292:18,22 293:4,6
293:7,8 323:13
343:10
**involvement**
128:14,20 219:4,6
219:7 248:22
270:1 323:17,20
326:10 328:5,12
371:2
**involves** 40:14
95:22 260:12
**IP** 123:10 215:10
221:18,20,22
222:1 223:12
227:20,22 229:1
229:10,23 231:17
234:11 274:24
357:6 370:18
371:13 372:17,18
**Ira** 1:6 2:25 4:4
161:11,18,19
174:12,17 227:16
227:18 229:16,20
261:20 315:4,17
315:20,25 316:4
317:17 318:2
359:22 360:2
373:1 377:7,9
**Ira's** 371:22
**IRC** 54:10 55:9,13

55:18,24 56:1
67:17 132:9,11
148:11,12,17,22
151:4,11,13,14,16
151:18 155:4
171:24 172:1,5,7
172:9 201:4,13
266:18 330:16
**iron** 345:22
**irrelevant** 8:20
141:4 277:14
362:19 363:9
364:8
**issue** 25:6 77:23
258:11 358:10
359:3 361:8
364:25 365:15
366:4 368:20
369:13,14 372:18
**issued** 117:17
**issues** 19:18,19,20
19:21 20:9 40:14
362:5 369:5 370:2
370:3,12 374:18
375:7
**ITOL** 139:14,24,25
140:2
**I-T-O-L** 139:16

**J**

**Jack** 378:15,17
**Jamie** 103:5,9
105:3
**January** 47:18
169:6 187:12,18
188:3,14,17 192:8
192:18,24 194:8
194:25 350:9
358:24
**Japanese** 213:11
273:8 326:7
**Jeff** 329:11,16
330:16
**Jews** 260:18
**job** 198:4,6
**John** 2:23 5:4

102:13 104:22
105:5,9,12,18
129:4,22 131:20
174:9 360:1
**joined** 297:10,13
**joint** 186:25
**Joseph** 141:13
142:19 326:2
**judge** 16:8 17:19
25:19 78:13 88:24
316:23 358:4,12
358:17,21 359:7
359:12,18 360:3,8
360:16,25 361:6
361:15,20,25
362:20,23 363:6
363:23 364:10,14
364:24 365:21
366:17 367:25
368:3 370:10,23
371:7,9,17 372:11
373:14,22 375:5,8
**Judging** 277:12
**judgment** 372:15
**judgments** 372:22
**jump** 52:22
**June** 168:7
**jurisdiction** 356:22
**jury** 6:16

**K**

**K** 227:18 303:4,5,6
**keep** 11:19 34:22
73:25 102:19
157:13 159:15
172:7 225:8 226:4
268:22 274:25
286:10 307:18
319:22 352:6,7
377:10 383:19
**keeping** 268:20
**keeps** 178:3
**Kenya** 84:19 85:12
85:13
**kept** 134:19 172:5,6
172:8 268:25



287:14 306:3,5
353:12,13
**key** 126:17 203:22
204:9,25 371:23
**keys** 181:1 202:24
203:3,7,11 206:8
289:7 293:14
294:21,24
**kind** 385:5
**kindly** 89:23
**kinds** 8:15 277:14
370:11
**Kingdom** 31:12
**kit** 351:19,21
**Kleiman** 1:6,7 2:25
4:4 8:16 33:16,18
36:2,25 38:7,9
39:1,8,11,21,22
40:4,8 42:9,16,18
44:1,3 45:9,12
46:23,25 47:4,7
47:11,20 48:12,15
49:10,19 50:1
51:4,10,20 52:7
52:23 53:11,19,24
54:6,7,8,24 55:19
56:6,13,22 57:3
57:11,18,24 58:4
58:7,10,13,18,23
58:25 59:2,13,18
59:24 60:4,5,8,11
60:13,17,19,23
61:1,4,13,16,19
61:22 62:4,15,20
63:1,5,19 64:9,17
65:2 67:7 68:3
69:8 70:16 71:11
71:18 72:11 75:25
79:8,19 83:22
89:1 90:3,12 98:9
98:13,16 120:3,3
126:4 146:15,18
174:12,13,16
175:1,7 176:2
178:16 179:1

180:4 181:4,12
183:10,15 186:20
186:22 187:7,7
192:17 195:12
198:18,22,25
199:9,15,18,22
200:9 201:14
204:3,10,12 205:1
211:13 214:3,5,15
216:6,10,19 217:3
217:8 222:16,20
222:25 227:16
235:19 238:20
254:15 258:12
259:6,11 260:1
261:2,2 264:4,9,9
264:10,18 266:10
267:6 276:11,17
282:9,10,14
286:21 287:2
292:18,21 312:9
312:10 315:4
316:14 321:18,21
322:3,11,13
325:16,19 330:14
343:4,6,9 347:2
359:23 360:2,2,5
360:15,20 362:15
362:16,21,25
365:18 367:3,5
368:23 369:3
371:21 372:8
373:1 375:24
376:15 377:8,9
380:16
**Kleiman's** 69:2
72:22 99:1 149:15
256:2,8 257:9,12
**knew** 76:17 174:19
185:15 199:6
206:11 276:21
285:14 325:15
326:17 342:1
**know** 6:4,6,21 7:2
7:18 8:24,24,25
10:16,17 15:2

18:13 21:5,13,16
21:19 30:7,9,13
31:21 33:5,10
34:10,14 35:23
38:14 44:5 45:15
45:17 49:11 50:3
50:10,14 51:6,13
51:17 58:2,6,9
59:20,23 60:1
61:25 64:20 72:6
74:12 75:7,12
76:4,20 77:1
78:21 83:19 91:15
91:16 92:1,8,8,13
93:19 94:8,23,25
94:25 95:2,7,12
97:1,9,13 101:7
102:10 104:11
108:2,15 111:23
112:7,14 116:4,12
117:8 119:18,21
120:23 122:12
124:12,15 125:20
126:25 127:20,23
127:24 131:2,3,16
137:13,15 139:24
140:3,15 141:9
142:4,10 145:20
145:21,21 150:21
152:21,22,25
154:11,12,18
162:5,10 164:8
169:8 170:11
171:19 172:4,8,9
176:1,25 178:13
179:8,9,11 184:15
184:17 185:4,5,8
187:20,22,23
188:2,10,13 193:4
197:8,24 199:25
200:8,13,14,17,20
200:23 201:8,14
201:16 202:10,18
204:22 206:13
211:9 215:23,25
218:4,5 219:13,23

220:4,15 222:12
222:23,24 224:20
229:13 232:5,8
233:1,12,15,19,23
234:1 235:4,9
237:18,22 238:25
242:18,21 246:1,6
246:15 247:4
249:15 252:24
254:22,23 255:9
266:10 267:3,11
267:19 269:21
270:19 271:2,2,2
271:2,3,17 274:8
275:2,21 276:19
276:25 279:25
281:2,8,17,22
282:4,13,18
284:22 285:3,6,10
286:18,21,23,24
288:14 289:22
290:18 292:12
293:10,11,13,16
295:23 297:21,24
298:21 299:7,12
299:16 302:19
305:12,23 307:19
308:8,11 309:12
310:15,16 311:3,6
311:7,17,20
313:17,21 314:18
314:23 315:16
317:7 321:21
322:3,19 325:1,11
325:12,15,17,18
325:20,25 326:12
326:22,25 327:2,7
327:8,9,18,23
329:22 330:13
331:19,24 332:2,8
332:11,15,15,19
336:9,22 339:12
341:15,17 342:5,9
342:11 343:23
344:5,6,15 345:18
346:7,16 347:1

351:9 353:3,6,11
353:13 354:12
365:25 366:17
367:14 371:25
372:7 374:18
375:9 377:6
379:12,21 380:11
382:13,16
**knowing** 229:16
**knowledge** 174:4
198:25 216:17
230:2 250:16
270:25 271:1
285:24 292:7,9,10
293:9 296:25
313:24 325:22,23
339:23 340:18
**known** 185:22
265:1 282:9
325:20
**knows** 92:11
209:18 292:13
325:25 327:3,10
342:8 367:13
**Kobza** 317:7
**Kong** 84:21
**KPMG** 102:4
103:23,25
**KT11** 10:1
**Kyle** 2:5 4:20
**K-O-B-Z-A** 317:11

--- L ---

**L** 142:7 239:23
240:6 242:10
243:8
**labour** 348:18,21
349:8
**lacks** 220:15
**laid** 185:17 371:19
**land** 313:18
**language** 177:25
283:8,10 329:3
**lapse** 274:7
**lapsed** 274:11
355:11,17



large 99:16 100:4,6
larger 100:7
latched 328:24
late 361:23 384:25
launch 76:18
    277:14
launched 76:17
launching 113:17
laundering 346:23
law 65:3 86:17
    93:25 94:3 117:24
    117:25 143:10
    150:9 226:20
    256:12 258:21
    264:8,13,14 303:9
    303:16 331:17
    337:17 364:1
    369:7,10,11,12,12
laws 334:10
lawsuit 274:15
    337:22 349:19
    372:14 373:2
    379:18
lawyer 18:14 143:7
lawyers 30:5,11,14
    30:21,25 31:3,23
    83:6,8 97:11,15
    97:18 98:4,5
    114:22 122:2
    124:15 131:18
    146:11,13,19
    174:18 267:3,9
    281:10 299:11
    301:14 302:11,15
    302:16,19,21,23
    305:21 319:22
    320:9 335:12,25
    338:13 343:24
    353:14,15 359:21
    380:3
lay 185:21
lead 225:14
leads 225:16
learn 20:4 285:13
    325:1 329:19
learned 329:20

leave 86:20 128:9
    128:16,21 366:20
    368:16 374:11
leaving 354:20
ledger 250:1,3
leeway 9:12,13 37:4
    88:25 123:13
    145:24 146:2,4
    195:10 203:16
    205:4 362:7
left 10:23 12:12
    13:1,2,20 41:13
    301:8 339:14
    375:12 376:1,17
    385:12
left-hand 301:1
legal 2:16,20 4:12
    4:14 118:12 125:1
    143:17,20 158:18
    167:17 226:24
    258:3,5,21 264:8
    264:12 269:4
legally 256:18,19
    256:21 364:2
legs 7:18
length 149:3
Leon 2:11
level 24:7
Liberty 231:19
    248:14,15,20
    343:3,7 346:23
Libya 251:14
lied 335:7
life 46:8 92:24
lightly 340:1
likeable 149:16
liked 161:7
limit 20:20 24:25
    50:19 65:11 67:1
    69:13 70:5 75:14
    141:1 352:20
limitation 165:23
limited 8:9 111:3
    111:23,25 112:4
    112:11,15 144:5
    145:23 146:1

190:20 238:13,17
    238:17 286:10
    310:10,12,24
    350:2 352:17
    363:21 385:1
limited-in-scope
    362:4 363:2
line 8:9 9:8 36:23
    43:19 77:21
    172:10 174:2,5,11
    174:13,22 202:3
    255:4
linear 96:16
lines 153:13 203:19
    216:20,21,25
    217:4,4,8,9,22
    218:2
line-by-line 351:10
link 4:17 148:1
liquidated 97:2,3
    115:14 116:11
    119:21 308:2
liquidation 163:20
    164:2,5
list 19:5,9 24:2
    31:16,22 32:5,6
    33:11,12 110:5,8
    114:5,16,19 151:1
    151:2,3,7 163:21
    170:2,3,4,17
    210:9 232:22
    259:10,25 272:2
    300:7,25 301:5
    302:23 329:17
    340:23 354:24
    359:4,6 365:2,5
    365:10,11 366:6
    368:17,18
listed 99:11 242:9
    249:3,23 300:4
    361:3
listing 253:25
    359:19
lists 54:10 170:15
    302:14,16,20,24
lit 19:4

literally 182:6
    187:17
literate 260:20
litigation 31:1
    74:25 77:4 141:2
little 9:12 55:18
    180:22 203:16
    211:17 212:25
    219:5 285:2
    287:11 333:1
    371:19
live 5:25 131:5
    148:22 368:12
living 7:22,23,25
    8:3 9:2 10:7,11,13
    131:11
LLC 1:7 239:13
    263:22 264:2,5,18
LLP 1:21 2:3,6,11
    2:22,24
loan 297:14 308:24
    309:1 312:3,25
loans 309:15,19
    312:2,24
local 4:8 25:8,17
    69:21,22,24 70:3
    225:12,22
LocalBitcoins
    251:12
locate 244:25
located 38:13,15
    184:20 334:22
    336:4
location 8:14,19
    147:21 242:14
    286:2 318:11
    362:6,6,12
locations 8:14,15
    10:15,18,20
    194:18
log 133:6 137:8,18
    213:21
logging 132:21
    137:13,14,15
London 1:22 4:9,10
    4:16 11:15

long 12:24 39:1
    44:6 72:20 84:24
    86:18 132:22
    139:19 141:23
    142:22 148:24
    210:20 262:21
    316:2 326:15
    339:16
longer 77:25 84:6
    92:23 237:10,15
    290:3 306:8,11,12
    308:2 314:7
look 11:6 15:1 73:2
    82:16 83:3 85:18
    97:6 106:24 107:3
    107:6 110:7 114:5
    114:15 116:3,21
    117:16 119:17
    120:1 122:17
    133:3 137:18
    151:18 163:9
    176:15 178:9
    186:19 189:18
    199:18 200:6
    209:16,18 224:11
    224:21 226:6
    227:19 238:25
    245:22 253:24
    259:23 261:12
    263:1,24 264:20
    267:18 269:10
    270:6 271:4 272:2
    272:23 275:24
    280:24 281:16,20
    282:19 284:9
    288:8 290:13
    296:20,25 297:23
    299:20 301:7,12
    304:2 305:17
    317:4,14,16 321:8
    321:8,22,25 322:5
    322:13,17,24
    339:14 351:13
    356:2 357:3
    383:14
looked 83:6 97:13



132:25 245:17
265:8 351:3
**looking** 65:1 202:7
239:23 247:22
284:9,10 297:25
322:22
**looks** 80:3,10 300:6
**loose** 5:3
**loosely** 142:12
**lose** 71:1 73:9,11
**lost** 114:23
**lot** 39:5 45:16,23
46:3,4,7,19 48:18
49:14,16,18 133:6
136:5 142:22
159:22 160:11
173:13 177:24
185:16 195:10
205:4 213:18
227:20 231:11
232:7 234:22
283:18 287:14
323:21 326:7
346:24 353:7,8
366:18 368:19
**lots** 129:25 163:18
163:19 287:15
**loud** 264:23
**Louis** 126:4,16
371:21
**low** 185:19
**lower** 161:2,7
**lunch** 104:13 108:3
108:3
**Luncheon** 123:25
**lying** 316:6
**Lynne** 15:12 16:16
17:14 107:13
360:18,21 363:8
363:12 364:15
369:6

**M**
**M** 242:1 303:4,5,5
**MacDonald** 129:4
129:23 131:21

**MacGregor** 383:10
**machine** 187:7
**machines** 11:19
32:3,5,6,8,12,16
32:17 99:17 100:5
187:8,9,10 242:22
242:25 243:2,12
243:14 244:10
345:1,2,11,19,20
346:6,11,12,15,19
347:2,3,15
**Macquarie** 184:21
**magic** 76:23,24
281:11 339:17
**magically** 148:1,4
**Magna** 2:16,20
4:12,13
**maiden** 15:13
**mail** 79:17
**mailbox** 81:1
**mailing** 54:10
151:1,2,3,7 170:1
170:3,4,15,17
**main** 2:7 170:5
**maintain** 13:20
156:4 260:5,6
314:2
**man** 18:25 316:4
321:3
**managed** 243:12
251:7 347:13
**management** 157:5
157:8 312:8,18
**mandated** 356:14
**manner** 234:18
**mantra** 367:22
**March** 64:3,6 65:2
79:8 80:6,11,19
83:21 317:17
318:4
**Marco** 380:24,25
381:3,6
**marital** 18:14
364:1
**mark** 5:11 78:16
93:8,16 126:7

257:17 309:22,23
311:12 327:18,20
327:23,25 328:2,3
328:4
**marked** 3:9 78:17
79:6 126:9 189:7
189:17 227:7,9
239:2 259:17
296:18 297:8
314:25 315:3
333:15,21 347:19
347:22
**market** 2:16 204:18
251:23
**marketplace**
215:18 223:18
**markets** 216:12
222:7 223:3
346:13
**Markoe** 2:10 4:24
4:24 5:10 8:7 9:7
9:11,25 11:7,16
12:14,18 13:7
15:3,9,16 17:7,24
18:10 19:3,7,8,13
19:18 20:1,6,12
20:17,19 21:3
23:12,20 24:4,8
24:21,24 25:1,5,9
25:13,19 26:1,8
26:15,21 27:3,9
27:12,17,22 28:10
28:17 29:3,10,19
30:12,16,22 31:13
31:17,24 32:10
33:1,8,11,17,24
34:2,9,15,19 35:1
35:6,18 36:6,13
36:18,20 37:3,7
37:19 38:2,24
39:3,16 40:1,5,11
40:23 41:9,17
44:10,16 45:6,14
45:22 46:6,12,18
47:12,22,25 48:7
48:16,21 49:12,15

49:21 50:2,6,13
50:17,19 51:5,11
51:16 52:9,13,25
53:8,12,20 54:13
54:20,25 55:20
56:15 57:5,12,20
58:1,19 59:14,25
61:9 63:14,20
64:11 65:9,13,17
65:20 66:5,12,23
67:21 68:4,13,17
68:22 69:11,15,18
69:22 70:19 71:13
71:21 73:4,10,14
73:18,24 74:9,14
75:1,6,17 76:8,15
77:5,8 78:4,10
79:12,20 80:1,7
80:12,20 82:1,5
85:19 86:5,11,14
86:24 87:6,17,24
88:10,20,24 89:5
89:9,12,16,22
90:4,8,13,24 91:5
91:10 92:3,5,12
92:17,21 93:2,7
93:18,24 94:10,15
95:11,19 96:21
97:16 98:14,23,25
99:21 100:1,11,22
101:6,11 102:9
103:12,16,20
104:5,20 105:7,11
105:14 106:8,11
107:25 108:14,20
109:11,24 110:16
110:22 112:8
113:24 114:10,14
114:24 115:3,9,21
116:2,8,14 117:1
117:6,13 118:4,10
118:18 119:1,16
120:15,19 121:15
121:25 122:6,16
123:11 124:10,18
125:7,19,25

126:12,22 127:2,5
127:14 128:2,7,11
128:15 130:20
132:3,20 133:11
134:3,17,24 135:6
135:18 136:9,15
136:21 137:5,10
138:6,21 139:3
140:7,25 143:15
144:3,10 145:2,7
145:15,17,22
146:9,14,17,23
147:23 148:6,18
149:1,8 150:1,6
150:15,22 151:21
152:4,8,11,15,21
153:2,8,11,18,24
154:10,16 155:2,9
155:14,25 156:17
156:21 157:1,15
157:21 158:5,10
159:6,17,25 160:8
160:18,24 161:4
161:13,15 162:14
162:17 163:2,11
163:25 164:10,18
164:25 166:6,15
166:23 168:12,22
169:3,17 170:10
170:20 171:1,7,22
172:20,25 173:5,9
173:15 174:15,25
175:12,17 176:3,6
176:9,19,23 177:9
177:15,22 178:8
178:18 179:25
180:9,14 181:6,10
181:16,21 182:1,3
182:9,17,23 183:4
183:7,10,14,18,24
184:4,11,23 185:3
185:10 186:4,19
187:13,16,20
188:4,9,18 189:1
189:8,12 190:7,12
190:17 191:4,9,13



191:18 192:3,14
192:19,25 193:7
193:19 196:1,12
196:21 197:4,10
197:16 198:5,9,14
199:2,10,16,24
201:6 203:1,9,15
204:4,11 205:2,12
205:17,21 206:3
206:12,18,24
207:19,24 208:25
209:13 210:4,10
210:18 212:5,12
213:7 214:11,20
214:24 215:1,7
216:3,22 217:10
217:23 218:3,11
219:17,24 220:8
220:14,19 221:15
221:24 222:10,14
222:22 223:5,10
223:22 224:4,11
224:14 228:1,4,6
228:16 229:3,12
229:18,24 230:4
230:13,20,25
232:23 233:10
234:5,16,24 235:7
235:15,24 236:7
236:13,19 237:2
237:11,19,23
238:11,13 239:10
239:17,24 240:2
240:14 241:21
242:11,17 243:9
243:25 244:8,14
244:18,23 245:15
245:20 246:14
247:3,19 248:7,17
249:4,14,24 250:7
250:12,25 257:13
259:7,12,14,23
260:6 264:1,6,15
265:15,24 266:12
267:8,14 268:5,13
268:21 269:15,24

270:21 271:12
272:11,17 273:5
274:5,11,16 275:4
275:19 276:12,24
277:11 278:7,12
278:19,25 279:5
279:16,21 280:5
280:12,18,23
281:4,15 282:3,16
283:21 284:11,21
285:8,20,25 286:8
286:17,22 287:3,7
287:21 288:5,11
288:19 289:5,11
289:15 291:7
292:3,10,20
293:17,23 294:3,8
294:12,17 295:3
295:14,24 296:3,8
299:6,15 300:9
301:3,13,20 302:1
302:8,18 303:1,20
304:9,25 306:18
307:2,25 308:7,19
309:3,11 310:3,19
310:25 311:21
312:4 313:1,11
314:4,9,16 315:18
315:21 316:24
317:8 318:9,14,20
319:24 320:1,4,8
320:15 321:14,23
322:14 323:3
324:3,10,16,22
325:3 326:11,19
326:24 327:4
328:7,14 329:4,9
329:21 330:2,8,22
330:24 331:6,14
331:21 332:1
334:2 335:4,15
336:6,16,20
337:11,23 338:9
338:14,24 339:7
339:20,24 340:6
340:10,14,20

341:1,5,9,19
342:4,6,15,18,23
343:22 344:4,10
344:19 345:13,16
346:1 347:6,10
348:5,12,15
349:10,15 350:1
350:16,21 351:8
352:10,16 355:4
355:19 356:9,20
359:14 361:22,23
361:25 362:2,22
362:24 363:7
364:4,13,21 365:4
366:7 370:8,13
371:1,8,13,19
372:13 373:9,15
373:16 375:5,15
375:20 376:8,12
376:19 378:6
379:16 380:1,6
381:1,15 382:1,7
382:15 383:1,6,17
383:23 384:4,8,12
384:16,23 385:4
385:11,14,19
**Mark's** 93:14
**marriage** 16:19,24
  17:4,10 18:13
**married** 15:7 16:15
**masters** 86:17
  264:11
**match** 298:20,24
  301:8 314:23
  351:10
**matched** 31:8
**material** 337:4
  355:14
**materials** 275:9
**mathematical**
  283:4
**mathematician**
  216:16
**mathematics**
  283:10
**maths** 149:18

**matter** 4:4 19:15
  40:11 45:3 77:21
  286:5,7 325:6
  340:21 368:8
  369:7 376:2
**matters** 40:10
  357:12
**Matthews** 141:12
**maximum** 11:22
**May/June** 168:8
**McAdams** 2:23 5:3
  5:4 174:9,10
  359:20 360:1,1
**mean** 27:14 28:1
  55:12 58:14 62:8
  62:13 81:4 86:15
  86:19 87:23
  106:19 117:22
  140:21 153:16
  163:19 165:12,14
  166:5,20 177:16
  177:23 178:1,19
  179:13 180:25
  198:19 204:6
  207:10 208:11,19
  221:19 223:9
  229:10 233:14
  235:18 239:17
  240:9 252:9
  254:13,19 255:2
  261:22 283:18
  284:25 289:9,14
  289:16 295:6
  298:2 302:10
  303:19 310:18
  313:24 321:15
  322:11 325:7
  328:11,11 336:14
  337:1 345:8,21
  349:1 378:23
**meaning** 6:11
  56:10,11
**means** 27:24
  104:12 118:12
  196:4 254:14,22
  255:1,4 264:8

282:20,24 283:2
303:21 304:6,8,12
306:9 310:20
319:21 320:17,17
333:2,3
**meant** 125:2
  225:14 229:17
  246:10 303:17
  321:21 322:3,8,9
  322:12 345:25
  355:8
**Measures** 224:1
**media** 21:17 55:13
  75:16,20,20,21
  256:24 262:9,10
  287:14 380:22
**medication** 6:18,19
**medieval** 260:20
**meet** 15:15 16:8
  17:23 36:1,10,12
  36:25 38:7 39:1
  40:4,8 42:16,18
  45:11 46:20,23,25
  47:3,7,11,19
  48:11,14 49:10,25
  51:9 53:24 54:1,3
  54:3,3,4,4,8 109:2
  285:6 286:20
  327:7 363:9,19
**meeting** 49:19
  340:5,9 341:8
**Melbourne** 147:20
**member** 90:15
  127:21,24,25
  162:10
**members** 163:22
**memorise** 304:19
**memory** 241:2
  371:10
**mention** 340:13,25
**mentioned** 63:8
  245:13 255:23
  317:24 340:11
**merging** 370:24
**merits** 145:25
  199:19 352:19



Merkle 282:25
363:3,4 366:23
283:4,15
mess 157:17
message 135:5,8,14
213:17 317:16
messages 75:8
379:24 380:4,8,11
Mestre 2:11
met 5:17 15:17
35:24,24,25 37:8
39:20,22 42:9
45:9 49:18 53:11
142:20 167:23
176:1 285:10
323:15 326:2
330:18 339:18
364:8 367:10
372:8
metadata 158:23
Metanet 100:3
metered 215:21,24
215:25 216:2,6
222:4,12,18,20
method 62:19
67:10 125:24
132:7
methods 67:15,16
190:24 205:10
206:1
Mexico 312:14
Miami 2:4,12
mic 41:8
Michael 141:16
143:6
Michie 143:11
Microsoft 36:11,12
36:14,16,16,19
37:9 81:7 165:23
middle 160:13
341:13 357:16,20
Military 357:7
370:19 371:15
372:19
million 216:21,25
217:4,6,7,8,9,22

218:2 227:21
228:11 229:1
243:3 251:7 278:1
278:3 279:15
280:3,17 281:3,13
317:24 344:22
346:25 347:4,5,9
millions 204:19
216:20 217:4
372:16
milliseconds 100:7
mind 164:13
229:14 244:25
252:20 303:15
324:12
mine 32:3 59:11
94:9 98:22 99:20
120:18 121:13
138:15 166:22
176:13 182:8
186:3,17,23 191:9
194:16,19 199:22
200:17,20 201:15
201:17,18 207:15
220:3,5 241:10
242:10,25 243:2
243:19 255:17
300:6 318:5 359:8
360:10 362:10,13
mined 181:24
182:14 184:3,16
184:18 186:2,15
187:11,16 194:9
195:25 196:19
197:9,13 200:4
201:1 202:11
220:6,13 250:3
253:17 276:4,11
293:2 358:24
359:1 360:6
362:14,18,21
363:1 365:17,18
367:1,4 368:5,23
375:20 376:15
miner 165:25
miners 250:1 253:2

265:13
mining 27:16
186:11,21,22,23
186:25 187:19
188:2,13,16
194:15 195:1,16
195:18,19,24
196:4,7,10,11,16
197:19 198:4,18
198:20,25 200:10
200:12,15,24
201:25 202:1,14
202:20 205:13,18
242:15,19,21
255:16 256:10
265:1,11,12,23
271:11,15 276:15
276:16 281:25
282:15 293:4
318:12,15 360:14
362:16
Minus 318:5
minute 330:24
minutes 44:7 376:3
376:4,5,11,17,18
377:12 385:14
miracle 215:1
miscategorising
282:21
mischaracterises
11:16 24:21 75:17
110:16,22 112:8
134:3 153:2
160:18 164:25
171:7 193:19
207:24 235:15
236:19 248:17
249:4 252:18
287:21 304:9
337:11 347:6
350:21 355:4
misrepresentation
28:3
missed 152:1
370:21
missing 272:3

misspelt 105:16
misspoke 308:23
371:5
misspoken 179:19
371:6
misstate 116:24
misstated 263:23
370:21
misstates 241:21
254:6
misstating 281:6
360:22
mistake 321:9,13
321:16,22
mistakes 158:22
misunderstandings
101:15
misunderstood
210:1
mis-cite 175:16
mix 227:21 229:2,4
229:6,8,11
mixed 270:3 351:23
mixing 291:13
Mmm-hmm 98:6
221:16 246:24
247:24 255:11
318:25
mnemonics 133:7
Modelling 224:10
models 96:15
moment 7:24 48:24
106:13 112:3
162:25 221:1
233:14 235:10
245:1,3 253:21
264:13 339:1
373:13
money 62:11,11
65:6 120:10
124:24 134:11
185:16 190:24
216:16 219:2
293:1 316:5 343:6
343:8,9,16 344:3
344:8,16 346:23

347:14,16
monitoring 231:18
month 35:22 51:25
52:3 55:5,8 56:23
142:25 241:20
243:3 251:7
260:12
months 11:22
35:22 51:23 53:4
morning 5:15,16
359:3
mother 49:3 53:3,7
314:23
mother's 70:23
motion 365:7,8,12
366:2,5,9,10,14
366:21 368:15,16
369:15 374:11
motions 374:23
mouth 208:14
move 9:6,16,18
16:9,12 52:6 53:8
71:5 81:6,9 89:14
99:8 107:23,25
109:20 119:7
181:13 191:17
205:24 259:22
296:15,16 320:11
320:13 352:7,20
366:11 375:11
376:8 384:9
moved 8:1,6,17,18
8:20 9:3,20,22,24
10:24 11:9,14
80:25 81:19
119:25 319:14,18
321:1,1 367:23
moving 304:23
349:6 383:19
Mt 251:13,20
multiple 28:19
60:15 84:5,7,9
88:7,11 99:18
100:21 151:14
157:3 207:11
210:6 288:13



301:22 302:4
319:21 332:20,21
332:22 352:3
378:7
**mutual** 262:18
**mutually** 134:1
**mysterious** 304:4

**N**

**N** 2:1 3:1 209:15
**nada** 123:8
**Nakamoto** 144:20
182:6 188:24
190:21 191:5
208:6,8,17,18
209:9 210:2 324:9
324:15 325:2
326:3,23 329:2
330:21 382:25
383:5,22 384:3
**name** 5:17,20,22
15:11,13 17:21
18:1,19 20:1
67:25 68:19 72:14
72:15 81:2 82:9
82:12,14 83:4
93:14 96:2,6,7
98:20 102:5,12,14
104:8 107:19
108:12,21 110:11
110:15,18,21,25
110:25 111:5,6,8
111:14 112:14,21
117:9 129:7,8,13
129:14 132:15
141:25 142:3,14
160:7,9 163:5
164:8 167:17,18
167:22 176:12,25
177:20,21 178:7
178:17,20,23
179:7 180:5,8,18
181:5,13,20 190:5
190:16 193:5
213:10,11,16
256:2,6,17 260:18

273:7 277:2
289:19 290:1
303:5,8,12 305:15
307:3,7,9,10,13
309:20 311:20
327:20 378:19
380:25 381:1
**named** 108:18
188:25 327:18
**names** 22:2,7,11,16
22:21 23:2,7,15
41:25 42:2 92:20
92:23 93:1,5,13
102:7 103:3
162:12 163:7,14
163:17,22 168:3
177:14 184:23
215:16,16 336:6
**naming** 160:12
**narky** 313:25
**national** 40:14
127:4 233:5
361:10 370:1,6,11
371:25 372:10
373:8 374:5,7,14
**natural** 35:14
269:19,20,22
**nature** 56:1,4 95:24
100:2 117:25
118:3 120:7
187:24 220:21
374:1
**nChain** 6:5 13:9,17
13:22,24,24,25
14:1 92:9 288:15
311:7,7
**nearly** 321:6
**nebulous** 165:9
204:6
**necessarily** 100:25
301:9
**necessary** 78:6
**need** 7:10,16,17
12:7,9 26:17,23
26:24 40:9 43:4
44:24 62:9 65:4

66:9 77:25 89:7
89:10 92:8 97:6
101:14 107:12
110:6 112:19
114:5,15 116:3,20
117:16 119:17,25
128:8 133:5
141:23 150:13
154:21 162:20
176:7 180:6 191:2
191:16 193:9
240:5 254:18
259:8 260:15
272:2 279:17
280:24 281:16
288:8 290:13
292:16 297:23
301:7 304:2
305:17 307:14,22
308:3 316:22
322:24 323:2
333:2 340:6
343:20 351:10
353:3 357:22
374:6 375:2
**needed** 82:15
133:24 227:3
283:12 306:9
307:20 318:6
366:11 377:9
**needs** 89:10 118:13
238:14 283:22
373:25
**negative** 336:22
**negotiate** 268:15
**negotiation** 268:9
268:14
**neither** 204:14,15
387:9
**networks** 231:21
**never** 54:7 71:24,24
72:1,1,3,3,5 76:22
83:6 88:3,4 113:8
115:17 116:16
120:10,13 137:8
167:19,22 176:1

185:18 187:7,8,8
187:9 195:25
196:10 206:7
217:3 220:24,25
242:24 258:17
282:8 291:5
292:25 293:1,1,2
359:5 362:21
366:5,6,14 367:23
372:8 377:1
**new** 1:22 10:21,23
10:24 11:1,21,22
44:1 65:6 185:25
258:5 276:5
356:11,11 371:14
**Nguyen** 213:3,19
214:19 285:3,7,18
286:15 287:16
288:2,17 292:5,12
299:13,17,17
309:16 313:14,21
313:23 314:2,15
327:3 331:19
**Nguyen's** 300:1
**Nicholas** 81:1,20
**Nicholas's** 82:9,14
83:4
**Nick** 328:5,8,12,16
**nickname** 129:9
**night** 138:24
**nine** 186:13
**nodded** 7:8
**node** 165:12 166:12
166:14,19 167:9
169:11 196:3
243:15
**nodes** 165:16 166:2
199:7
**nominally** 13:8
**non-disclosure**
193:13
**non-linear** 96:5,14
96:24
**non-public** 124:8
**North** 14:15,19
312:13

**note** 174:24,25
175:1 195:9
228:21 264:15
269:1 300:12,24
301:7,8,9 303:18
304:16 385:13
**noted** 164:14
256:16 257:21
258:17 266:17
275:16 377:21
**notes** 122:18
275:11 300:20,21
387:4
**notice** 282:8 298:25
**noting** 9:10,11
**notion** 109:13
**NSA** 317:5
**null** 123:8
**number** 4:2,7 10:1
10:15 14:2 35:25
36:23 61:5,11
77:13,17 123:23
124:2 134:8,9
173:19,23 215:19
218:22 221:5,9
225:21 226:4
231:13,15 232:20
251:13,15 283:14
283:25 284:4
286:1 289:7 292:6
295:13,14,23
296:11,12 306:4,5
318:16 323:8
326:5 334:16,17
346:12,20 349:16
368:19 385:21
**numbering** 189:19
**numbers** 57:15
68:24 70:25 299:1
**NY** 2:7

**O**

**oath** 6:9,10,12
16:17,22 17:2,8
17:10,16,17,18,18
260:22 360:23



363:15,16 368:5
368:11
**object** 9:7 25:18
34:6 66:8,16
77:25 89:3,4
97:23,23,24
144:13 182:13
227:5 253:20
330:25 335:5
338:18 377:22
**objected** 78:12
260:2 262:5
320:14 363:17
**objecting** 25:6
162:18 220:20
**objection** 8:7 9:10
9:11,25 11:7,16
12:14,18 13:7
15:3,9,16 17:7,24
18:10 19:3 20:17
20:20 21:3 23:12
23:20 24:4,8,21
24:25 25:14,14
26:1,8,15,21 27:3
27:9,12,17,22
28:10,17 29:3,10
29:19 30:12 31:13
31:17,24 32:10
33:1,8 34:9,15,19
35:1,6,12,18 36:6
36:13,18 37:19
38:2,24 39:3,16
40:1,5 41:10,17
42:10 44:10,16
45:14,22 46:6,12
46:18 47:12,22,25
48:7,16,21 49:12
49:15,21 50:2,6
50:13,17 51:5,11
51:16 52:9,13,25
53:8,12,20 54:13
54:20,25 55:20
56:15 57:5,12,20
58:1,19 59:14,25
61:9 63:14,20
64:11 65:9,12

66:5,23 67:2,21
68:4,13,17,22
69:11,14,16,19
70:6,19 71:13,21
73:4,10,14,18,24
74:9,14 75:1,6,17
76:8,15 77:22,24
78:3 79:12,20
80:1,7,12,20 82:1
82:5 85:19 86:5
86:11,14,24 87:6
87:17,24 88:10,20
89:6,8 90:4,8,13
90:24 91:5,10
92:3,12,17,21
93:2,7,18,24
94:10 95:11,19
96:21 97:16 98:14
98:23 99:21 100:1
100:11,22 101:6
101:11 102:9
103:12,16 104:5
104:20 105:7,11
106:8,11,17
108:14,20 109:11
109:24 110:16,22
112:8 113:24
114:10,14,24
115:3,9,21 116:2
116:8,14 117:6,13
118:4,10,18 119:1
119:16 120:15,19
121:15,25 122:6
122:16 123:11
124:10,18 125:7
125:19,25 126:12
128:15 130:20
132:3,20 133:11
134:3,17,24 135:6
135:18 136:9,15
136:21 137:5,10
138:6,21 139:3
140:7,25 143:15
144:3 145:2,7,15
146:9,14,23
147:23 148:6,18

149:1,8 150:1,15
150:22 151:21
152:4,8,15,21
153:2,8,18,24
154:10,16 155:2,9
155:14,25 156:17
156:21 157:1,15
157:21 158:5,10
159:6,17,25 160:8
160:18,24 161:4
161:13 162:14
163:2,11,25
164:10,18,25
166:6,15,23
168:12,22 169:3
169:17 170:10,20
171:1,7,22 172:20
172:25 173:5,9
174:24 175:1,12
175:17 176:3,19
176:23 177:9,15
177:22 178:8,18
179:25 180:9,14
181:6,10,16,21
182:1,17,23 183:4
183:24 184:11
185:3,10 186:4
187:13 188:4,9,18
189:1 190:7,12
191:19 192:4,19
192:25 193:19
196:1,12,21
197:10,16 198:5,9
198:14 199:2,10
199:24 201:6
203:1,9,15 204:4
204:11 205:2,8
206:3,12,18,24
207:19,24 208:25
210:4,10,18 212:5
212:12 213:7
214:11,20 215:7
216:3,22 217:10
217:23 218:3,11
219:17,24 220:8
220:14 221:15,24

222:10,14,22
223:5,10,22 224:4
224:11 228:1,16
229:3,12,18,24
230:4,13,20,25
232:23 233:10
234:16,24 235:7
235:15,24 236:7
236:19 237:2,11
237:19,23 239:10
240:14 241:21
242:11 243:9,25
244:8,14 246:14
247:3 248:7,17
249:4,14,24 250:7
250:12,25 252:4,9
252:18 253:11,21
254:7,17 257:13
259:7,12,13 260:5
260:6 264:1,6
265:15,24 266:12
267:8 268:5,13,21
269:15,24 270:21
271:12 272:11,17
274:5,11,16 275:4
275:19 276:12,24
277:11 278:7
279:16,21 280:5
280:12,18,23
281:4,15 282:3,16
284:21 285:8,20
286:17,22 287:3,7
287:21 288:5,11
288:19 289:5,11
289:15 291:7
292:3,20 293:23
294:3,8,12,17
295:3 299:6,15
300:9 301:3,13,20
302:1,18 303:1,20
304:9,25 306:18
307:2,25 308:7,19
309:3,11 310:19
310:25 311:21
312:4 313:1,11
314:4,9,16 315:18

315:21 318:9
319:24 321:14,23
322:14 324:3,10
324:16,22 325:3
326:11,19,24
327:4 328:7,14
329:4,9,21 330:2
330:8,22 331:6,14
331:21 332:1
335:4,15 336:16
336:20 337:11,23
338:8,9,24 339:7
339:20 340:6,10
340:14 341:19
342:4,15,23
343:22 344:4,10
344:19 345:13,16
346:1 347:6,10
348:5 349:10
350:1,16,21 351:8
352:10,16 355:4
355:19 356:9,20
365:7 378:6
379:16 380:1,6
381:15 382:1,7,15
383:1,6,23 384:4
384:23
**objectionable**
78:11
**objections** 35:11
50:20 78:6 162:18
225:16 370:3
**obligation** 277:25
**obsolete** 265:13
**obstruct** 40:9
**obtain** 97:8 116:22
117:15 147:15
230:11 236:17,24
251:8 274:21
**obtained** 236:25
276:19
**obviously** 78:2
174:22 347:13
367:11,17 368:17
374:16
**occur** 261:16

275:12
occurred 120:2,13
  134:8 178:14
  263:5 282:10
October 5:23 8:1
  354:9,11
offensive 384:25
offered 166:1
  251:10
office 6:4 31:11
  32:21 94:14,19,22
  94:23 95:2,5,7,13
  95:14,17 100:16
  101:10,18,23,25
  103:24,25 104:1
  104:17,23 235:2
  235:10 256:16
  316:6 319:15
  328:1 332:5,6,10
  332:14,17 333:7
  335:13,24 337:10
  337:15,21 338:6
  338:22
offices 1:20 4:10,16
  14:10,14
official 35:10
officials 35:24
  46:20 337:18
offline 206:2
  357:11
offshore 319:14,19
off-the-record
  373:23
Oh 41:8 252:10,22
  327:25
oil 314:22
okay 7:19 9:15
  10:14 16:1 40:11
  44:25 48:11 70:1
  84:22 89:14 98:6
  109:20 126:22
  127:14 143:8
  152:10 171:13
  175:6 176:9
  183:18 187:20
  196:6 228:6 240:2

245:20 261:25
  279:2 306:24
  313:11 316:24
  317:2 318:18
  334:1 335:21
  342:11 350:4
  358:4,12,21 359:7
  360:16,25 361:6
  361:20 362:20,23
  363:6 364:10
  365:21 367:25
  370:23 371:7,17
  372:11 373:14,22
  375:19 376:18
  377:21 379:6
  385:11
old 11:24 12:3 21:6
  32:17 82:16 83:18
  102:22 132:24
  157:5 213:11
  217:19 228:23
  283:19
older 32:18 314:20
oldest 21:11,14,17
once 5:12 48:20
  55:3,5,8 56:23
  66:11 117:11
  145:21 167:23
  204:13 214:23,25
  238:18 243:2
  306:6 340:3
ones 68:9 84:20
  87:11 110:8 170:5
  170:6,8,9 205:5
  233:2,3 273:8
  275:16,17 353:16
one-line 328:20
online 54:3 147:16
  147:17,19 176:20
  176:22 209:5
  231:15 262:10,11
  326:13
open 149:20 150:14
  168:18 170:25
  208:14 223:6
  251:23

opened 83:8 185:18
opening 362:5
operating 382:21
operational 115:16
  115:18 116:13,17
  374:25
operations 231:11
  231:12,14 232:3,7
  233:15,20 234:2
  234:23 235:1,5
  244:3
opine 369:9
opinions 225:15
opportunity 365:6
opposed 102:21
optical 99:19
order 5:10 175:4
  309:18 364:17
  368:18 374:25
  377:11
ordered 365:2,4
  372:3
org 179:13
organisation 13:3
  251:6
organisations
  251:14
organised 316:19
origin 188:24
  257:22
original 80:5,23,25
  81:12,15 148:20
  166:11,24 167:1
  176:18 304:17
originally 181:3
  243:18 283:5
  380:13
originals 299:4,9
  299:13
originates 227:22
  227:23 228:14,22
OST 81:7,19
outcome 387:15
outing 325:12
outside 184:21
  197:18 325:7

331:16
overall 344:11
overbroad 237:24
overseas 290:25
  319:17
owed 316:5
owned 91:8,12 97:4
  106:23 107:4
  113:25 114:2,3
  115:19 120:9
  122:22 123:1,3,7
  195:6 219:12,15
  237:4,8,14 269:6
  289:14,17 293:5,6
  293:7
owner 177:20
  264:25
ownership 91:3,13
  91:17 92:14 93:17
  94:4 107:1,9
  120:3 123:10
  180:8,11 219:10
  248:5 293:9
owns 92:1,2,8,8,11
  96:24 219:20,22
  237:17,22
Oxford 6:5 14:24
  52:15 260:12
  322:10
o'clock 108:1,2
O'Hagan 188:25
  189:15 191:22
  193:12,25

— P —

P 2:1,1
PA 2:17
page 3:2,10 126:11
  189:18,19 202:3
  227:11,19 228:3,4
  228:5 239:15,21
  239:22,24 243:21
  247:17,22 249:3
  252:6 253:23
  255:25 256:3
  257:18 262:16

266:4,5 267:13,15
  277:18,20 284:9
  296:12 297:3,14
  297:15,16,19
  298:3,4,4,5,5,5,5
  298:6,6,9,10,12
  298:14,22,23,24
  299:1,20 301:24
  302:3,6,8 304:3,4
  304:18 305:5
  310:2 317:14
  321:7,8 333:24,25
  334:14 348:11
  352:24 354:15
  357:15,16,19,20
  370:18 371:11
pages 52:16 296:22
  297:25 298:2
paginations 239:25
paid 185:21 230:17
  244:6 249:10
  274:1 281:10,11
  281:11 312:7
Panama 84:19 85:1
  87:12 93:9 246:25
  247:1 248:9,11
  250:17,23 268:1
  269:7,23 272:7,10
  272:16 273:18
  303:9,9 309:25
  319:9 343:14,16
  343:17 344:3,9,18
paper 63:22,24
  64:1 65:5 138:14
  138:17,20,23
  139:2,8 140:11
  141:8 142:16,19
  143:2,6,24 144:2
  145:1,12 146:22
  147:3,6,8,10,12
  147:15,22 148:24
  149:7,10 150:14
  150:17,19 152:7
  152:20 154:8
  156:7,8,11 157:14
  158:7,14 175:10



191:6 203:14,22
203:23,25 204:2
204:10,15,15,21
205:1,13,14,22,23
223:7 240:10
247:25 270:16,20
328:17,19
**papers** 28:22 51:24
52:2 149:18
167:20 215:20
219:9 260:11
303:10 355:14
**paragraph** 189:25
228:5 240:6,11
245:22,22 246:2
247:9,23 264:20
267:18 270:6
334:15 348:17
350:5,8 351:13
352:25 353:17,18
354:2 370:18
371:11
**paragraphs** 140:22
140:24 244:7
245:13
**part** 8:7 10:23
16:17,24 19:5,21
25:16 44:23 45:6
74:19 92:23 93:16
114:9 160:4 176:6
195:6 232:1 257:4
257:5 278:15,16
278:17 292:24
293:14 311:4,4
312:16 318:1
352:11 355:23
372:17,17
**partial** 309:1
**particular** 21:7
45:18 52:17 63:25
110:1 122:8 123:1
127:7 143:2,2
146:3 163:5
253:14 307:13
344:11 358:9
365:5 367:7

370:15 371:2,3
**particularly** 379:13
**parties** 357:8
370:20 371:16
372:19 375:9
387:11,13
**partner** 71:24 72:3
72:3,4 130:9
**partners** 262:15,16
303:6
**partnership** 12:22
33:16,18,22,25
72:1,2,2,5,6
144:19 145:18
182:6 183:15
190:21 367:2,6
369:1
**parts** 127:16
140:15 167:6,16
171:5 298:6
**party** 263:21,24,25
264:17 305:8
374:13
**passed** 104:13
**passwords** 133:6
**patent** 51:25 144:9
145:14 223:15
236:10
**patenting** 143:23
144:1,25 145:3,6
145:8 146:7
**patents** 86:9 149:18
**Paul** 38:17 262:19
**Paula** 1:24 2:15
4:13 42:11 387:3
387:24
**pause** 70:16 93:12
106:16 141:22
193:8 239:1
253:21 259:24
286:9
**pay** 62:9 99:12,13
120:11 122:9,19
122:20 242:1,4
244:10 246:9,10
274:3,18 312:2,24

316:3 350:10
**paying** 62:7,8,12
**payment** 215:21,24
215:25 216:2,6
222:4,12,18,20
355:11,17,18
**PDFs** 159:2
**penalty** 334:10
**pending** 42:12 43:5
43:8,17,18 236:14
**penitentiary**
311:14,16
**people** 28:5 31:8
35:25 36:10,12
37:8 48:25 53:15
53:16 57:7,14
63:11 72:6,7,8,9
88:13 92:23 93:16
93:20,22 107:11
109:2,3,5,13
122:9,10 124:23
126:17 129:17
130:1 136:6
138:23 140:13,16
140:23 142:11,24
149:17,19,20
156:8 157:7
160:12 163:5,20
166:21 167:14
168:2 170:24
171:17 172:14
173:11 185:15,19
208:6,7,10,11,13
213:16 232:17
233:13,23 244:9
246:9,16 247:5,11
248:9,11,13 249:7
249:8,10 250:17
251:16 253:7
261:11,19 262:23
263:1 269:14,17
270:18,23 273:18
276:21,23 280:19
281:9 282:7
300:16,19 319:22
325:7 342:25

346:13,24 347:14
370:15 371:2,23
382:23 384:2
**people's** 247:16
**percent** 98:10
**perfectly** 6:11,17
18:24 43:19
316:12
**period** 20:9 24:10
24:14 26:14 103:8
105:5,9 116:1
129:25 190:25
201:17 266:22,25
306:7 344:12
360:10 367:4
**periods** 24:15
**perjure** 17:17
**perjured** 335:7
**perjury** 334:10
**Perling** 141:13
142:19 326:2,9,17
326:22 327:2,9,12
**Permanent** 110:12
111:3,22,24 112:4
112:11,15 310:10
310:12,23
**permission** 43:17
**permitted** 40:15
69:20 89:16 99:4
199:13 243:23
295:7 373:17
**person** 35:9 38:17
71:23 102:12
111:7,16 118:13
126:20 127:19,21
128:19 141:13,24
142:21 149:16
150:17 153:14,17
190:16 201:19,23
211:21 212:24
217:6 226:23
269:2 312:15
315:23 316:1
323:13 339:19
371:20,24 374:6
**personal** 1:6

325:23 337:19
**personally** 95:23
257:20 317:12
332:7 335:6
**persons** 174:2
269:19,20,21,23
**person's** 128:13
**petabytes** 99:18
**petrol** 314:23
**Philadelphia** 2:17
**Philip** 2:20 4:12
**Pholus** 82:21 83:3
**phone** 11:21 54:4
68:23 70:24 178:2
194:16 373:19
374:25 375:11
**phoned** 104:13
**phrase** 322:12
**physically** 46:24
54:3 167:23
186:23
**pick** 255:3
**piece** 203:23
204:10,21,25
240:10 283:11
**pieces** 204:15
291:13
**pile** 124:12
**Pirate** 186:10
**pizzas** 251:25
**place** 4:9 33:23
130:16 136:12
148:14 196:16
201:2 237:21
341:8 379:12
**placed** 297:8
**places** 160:21
231:15
**plaintiff** 2:22,25
5:2 348:1,2,17
349:8 350:10
351:16,22 354:21
359:22 361:13,16
372:23 373:19
**plaintiffs** 1:8 2:2
4:19,21 5:18



369:21 373:18
**plaintiff's** 78:16,17
79:7 126:8,9
160:6 189:7,17
193:5 227:7,10
239:2,3 259:17
263:13 284:9
296:18 297:7
314:25 315:3
333:15,21 347:19
347:22 367:4
369:1
**planet** 230:7
**planning** 15:19
**Plastique** 226:18
**played** 287:20,24
**playing** 194:16
**pleadings** 19:16
286:5,7
**please** 4:14 5:5,20
7:2 15:21,23 16:9
16:12 18:7 27:24
30:15 34:6,21
42:11 43:8,23
50:19,25 65:11
67:14 69:13,24
70:12 78:25 79:4
82:23 86:18 91:22
98:4 102:2 105:14
110:5,8 118:20
144:5 147:6 174:1
178:2 182:4 183:9
184:24 186:18
189:3,8,18 194:10
201:22 204:5
208:21 209:12
227:11 239:21
242:13 247:17
254:1 256:15
264:21 267:4,13
269:4 271:1
272:25 275:8
277:16 285:21
286:13 293:18
296:9 309:7 313:8
317:14,20 318:10

331:1 333:24
340:2 342:3 350:5
350:8 351:13
352:24 353:17
354:15 357:3
360:22 383:7
388:3
**plenty** 146:2
**plus** 299:18 377:17
**point** 5:10 6:15
9:13 12:17 19:24
35:25 42:12 64:13
64:20 102:13
107:9,18 115:19
117:18,21 120:4
123:19 158:24
169:16 196:15
205:3,9 225:15
229:21 257:24
258:1,14 261:17
291:16 295:14
301:9 312:12
320:16 340:16
359:22 365:6
366:7 373:9
377:11
**pointing** 228:24
**poker** 231:12 232:7
233:6 236:18
237:1 255:22
272:5
**poker-related**
235:23
**Police** 141:24
**Ponce** 2:11
**pool** 201:19,20,25
**pools** 186:21,23
195:20,24 197:18
**Port** 184:21
**portion** 107:13
**portions** 143:5
171:13
**posed** 52:6 71:5
98:3
**position** 43:7
126:23 193:17,22

258:4 362:3,17
363:15 364:17,21
365:19,19 377:16
**possess** 245:25
294:23 346:19
**possessed** 292:8
**possession** 20:16,25
21:12,15,18
271:22,25 334:19
334:24 336:13,19
336:25 338:21
**possibility** 50:23,24
**possible** 8:23 20:5
120:23 162:9
172:19 207:20
217:21 241:6
251:22 258:22,23
332:24
**possibly** 204:22
205:6 238:1 299:2
302:14
**post** 135:4,12
169:21,23,25
170:1,8,9 171:5
282:10 293:5
**posted** 169:2
170:17 171:12
**posting** 169:16
170:14 324:2
**posts** 262:14
380:14
**potential** 162:15
163:23
**potentially** 297:17
**PoW** 175:19,19
**power** 185:21
**practical** 253:7
**practically** 266:24
325:21
**precluded** 369:8
**predicate** 144:22
220:16
**predicate-based**
220:22
**prefer** 160:23
161:2 257:7,8

**prepared** 43:21
183:19
**presence** 208:17
**present** 2:19 4:16
373:18
**presentations**
35:23
**presented** 46:20
260:11 374:18
**preserve** 69:15
81:7,25
**preserved** 78:3
**press** 37:5
**pressing** 37:9
**presume** 65:18
175:4 189:2
227:17
**presuming** 314:17
**presumption** 65:22
**pretty** 339:24
341:12 384:11
**previous** 277:13
317:23
**previously** 174:16
175:11 237:9
**primarily** 208:13
209:2 231:10
362:4
**primary** 172:17
208:5,8,23 243:13
354:19
**printed** 203:23
204:8,9,25
**printout** 126:13
**prior** 76:18 141:3
168:19 202:3
277:24 328:11
**private** 55:15 138:4
177:7,11,17,25
202:24 203:2,7,11
206:7 223:9
294:21,24
**privately** 169:23
177:13
**privilege** 18:15,20
19:22 97:20 364:1

364:12 367:17
369:20,22
**privileged** 18:12,13
31:4 97:18 320:5
320:9 338:11
**Pro** 2:6
**probabilities**
173:11
**probability** 50:25
**probable** 51:3
**probably** 35:21
44:7 96:15 177:25
195:5 217:20
243:3 251:7
306:14 322:9
326:13 328:23
365:7,8 369:9
378:21
**problem** 79:2 225:4
355:23 366:17
**problems** 61:10
155:11,13,17,21
155:21,23 249:16
283:1,3,4
**Procedure** 70:5
225:12
**Proceed** 50:21
**proceeding** 364:16
**proceedings** 349:13
349:14,16,18
352:12
**proceeding-type**
356:13
**process** 97:2 99:18
136:12 190:22
205:16 227:5
281:8
**produce** 49:1
**produced** 302:20
335:12 353:8
355:15 366:20
**producing** 254:16
**product** 253:24,25
254:12,15 255:1
255:10 258:6
**production** 255:6



365:2,5 383:9
productive 18:17
professional 122:11
Professor 283:1,9
  379:2,3
ProfFaustus
  378:23 379:1,9
  380:12
program 106:6
  191:9 235:21
  328:17
programed 182:21
programer 106:5
programing 165:5
  166:10 328:12
prohibited 225:23
prohibiting 226:9
prohibitive 258:6
project 64:22
  168:18 278:13,15
  278:16,18,19,20
  278:22,24 279:1
  351:16,24 354:20
projection 50:23
projects 215:15,17
  215:19 218:22
  219:1 244:21
  255:24 259:20
  275:10,14 278:10
  371:3
prolific 262:11
proof 153:20,22
  154:15,19 263:10
  383:21
proper 25:2 368:8
properly 183:19
property 27:21,24
  28:16 86:2,3,7,17
  87:5,16 88:8,19
  99:25 100:10
  114:13 117:23
  195:6 199:6 215:5
  215:13 216:1,5,11
  222:3,6,13,17
  223:2,17,21,25
  224:8 230:3,12,24

231:4,6,23,24,25
232:2,6,9 234:9
234:15,21 235:6
235:14,22 236:6
236:18,25 243:23
243:24 255:24
349:5 350:10,12
372:16,20,23
373:5
proposed 8:11
protect 88:12,15,18
protected 88:16
protocol 55:16
  155:24 165:6,11
  165:13,15,20,24
  166:2,4 175:25
  323:18 328:6
  342:22 372:7
protocols 165:21
  166:21
prove 257:1 259:5
  262:3
provide 31:22
  126:23 131:18
  206:16,23 207:2
  212:16 213:24
  276:17 277:22
  278:1,3 279:14
  282:2 361:17
  368:18
provided 178:11
  211:12 213:21
  231:3,7 240:22
  280:3 281:3,13
  282:14 348:18,22
  349:8 355:3
  383:21
provider 240:23
  241:9,15 243:22
  248:5
provides 265:11
providing 240:12
  240:19 362:8
  368:17
provision 239:13
  241:4

pseudonym 167:20
  167:25 186:9
  208:19,20,24
  209:2,9 210:2
pseudonyms 326:5
  326:8
Pty 277:23
pub 38:12,13,15
public 55:15 76:18
  99:12 125:6
  128:24 129:3
  132:11 137:21
  147:10 151:1,2
  155:4 158:4,7
  164:1,23,24 165:3
  167:4,6,12 168:19
  169:10,16,24,25
  170:1 177:1,11
  179:21 196:8
  206:10,16 207:13
  207:22 209:10,11
  209:21 215:20
  223:16,23 224:7
  253:9,18 324:2
  325:8 339:9
  365:10 384:13,18
publications
  285:15
publicly 139:25
  163:23 164:2
  168:20 169:1,21
  177:4,8
published 52:3
  59:9 215:20 223:7
  260:10 323:25
  355:14
publishes 167:19
publishing 169:10
pulled 100:25
  213:12
purchased 244:11
purchaser 271:8,19
  274:21 275:10
purchasing 347:2
pure 119:7
purported 15:18

145:18
purporting 36:23
purports 79:7
purpose 26:16,23
  35:16 37:14 63:18
  85:24 86:1 87:3
  96:13 99:14
  111:22,24 113:1,2
  113:9,13,15
  143:17 218:19
  241:4 243:5,13
  255:16 345:4
  367:12
purposely 263:8
  366:3
purposes 112:12
  366:12
pursuant 372:21
put 147:16,17,19
  149:17 151:1,3,6
  151:11,15 154:3
  191:18 223:6
  226:17 227:13
  228:12,17 231:19
  237:21 242:9
  257:25 260:19
  276:22 283:5
  287:9 293:1,21
  294:1,6,11,15
  297:17 301:22
  315:25 346:14
  347:15 354:13
  356:25 364:10
  386:8
puts 256:17
putting 50:24
  231:17 234:11
  316:19 356:24
Python 284:16
P-H-O-L-U-S
  82:21
p.m 318:4
P2P 209:3

─────────
Q
─────────
Quantification

224:9
quarter 256:3
question 7:1,6 8:23
  9:2,8 13:15 15:21
  15:24 16:2,7,13
  17:13 21:10,10
  30:6,14,22 36:25
  37:8 39:10 41:10
  42:12,14,16,17,24
  43:5,8,10,11,17
  43:18,21,23 52:5
  66:6,21 70:15
  71:5 78:3,20
  82:18 87:8,18
  89:18,20,22 91:23
  91:25 96:22 98:3
  104:3,10 112:6
  114:17 116:23
  124:7 126:23
  135:8,11 138:9
  143:16 144:6,8,11
  144:11,16,17,21
  146:3 147:4,24
  156:2 165:8 182:9
  183:14 187:2
  189:15 190:18
  191:10,21 193:8,8
  195:13 197:1
  217:14 220:15
  227:6 236:13,14
  236:15 237:23
  238:15 242:17
  244:23 245:16
  251:18 252:8,9
  257:9,10,15 259:2
  259:18,24,25
  262:3,5,6 263:9
  267:5 269:22
  279:8 286:8
  292:14,14,15
  295:6 296:15
  309:7 316:11
  318:19 332:12
  338:2,14 340:1,7
  340:24 341:25
  342:3 344:12



359:2,8,11 360:4
360:9,12,17 362:9
362:25 363:4
364:5,7 368:7,12
368:13 376:3
**questioned** 373:6
**questioning** 8:10
36:24 43:19 77:21
361:18 368:22
**questions** 3:4 5:8
16:5,5 17:14,15
18:12 19:16,19,19
19:20 20:8 25:2
34:3,4 40:16 43:3
77:24 78:11,12
99:3,4 123:13,15
141:1 179:18
182:13 183:19
195:11 199:12
203:20 205:4
225:2 234:7
238:18 251:11
270:9 277:16
279:8 287:15
349:20 352:20
358:7,14 359:13
360:21 361:2,5,8
361:9,13 362:12
362:14 363:7,9,17
363:22,24 364:5
365:15,16 367:9
367:10,12,16,18
367:19,21 368:21
368:24 369:18
370:11,14 373:7
374:15 386:8
**quick** 154:1 321:2
374:24 384:11
**quicker** 52:6
**quickly** 35:13
144:18
**quite** 11:20 25:17
61:11 229:19
232:20 251:15
252:21 264:14
284:23 373:11

**quote** 141:19
**quoted** 66:17
**quoting** 117:25

———————
**R**
**R** 2:1,10 153:19,22
154:15,19 175:19
175:19,19 254:3
255:2 388:1,1
**raise** 78:7 183:13
296:17 358:13
**raised** 369:25
**raising** 361:14
**rambunctious**
136:1
**Ramona** 17:22,23
19:11 361:3
363:25
**random** 33:25
179:7 300:12
**range** 60:1
**rarely** 319:21
320:17
**rate** 356:5,8,11
**rated** 354:22
**rates** 356:15
**rat's** 257:22
**Ray** 105:22 129:10
129:11
**reach** 122:14 149:6
154:14,21,25
287:6 331:25
**reached** 83:22
154:19,24 287:1
331:19 371:21
**reaching** 126:3
149:12
**read** 41:9 42:14,14
42:21 43:23,24
89:24,25 118:6
191:3 193:7,9,9
212:3 240:7,11
241:8,14 245:2,16
253:25 264:23
271:6 272:25
275:8 277:20

284:14 317:17,20
318:3 319:13
334:1,15 350:7
351:10,15 353:18
354:5,18 356:4
357:5 386:4
**reading** 65:21
244:25
**ready** 16:7
**real** 125:17,23
165:17 167:22
208:1 249:9
312:22
**realise** 109:1
**reality** 219:15,20
**really** 8:9 13:23
103:16 163:6
167:19 178:3,4
180:10 200:22
218:12 230:6
257:19 262:20
274:23 282:7
320:17 339:15
342:25 353:4
375:9,10
**reason** 78:8 134:10
134:19 174:15
220:12,18 260:21
317:3 331:24
**reasons** 317:2
326:14 372:1
**recall** 11:2 14:13
24:19 25:24 26:2
26:6,13,17,19,22
27:2,11 29:17
30:3 35:16 36:8
41:16 52:22 53:2
53:10,18 62:3
67:10 69:7 70:16
71:10,17 72:22,24
72:25 82:9 83:20
83:25 84:2 85:16
93:6 101:22 104:7
105:24 106:1
110:8 111:18
126:3 156:25

162:25 202:13,19
209:13 210:5
212:6,7 216:23
220:17 244:24
295:17 303:12
304:7,14 333:7
339:8 341:9,11
365:2
**recalled** 130:5
**recalls** 366:1
**receive** 68:12 69:8
70:17 71:11,18
83:14 168:6
284:17 359:5
**received** 71:23
83:12
**receiving** 359:4
**recipe** 59:6,8,10,12
**recipients** 190:3
**recognise** 79:9,10
126:10,13 190:5
227:11 239:4,5
263:14 297:7,10
300:7 315:5 334:5
334:8 347:24
**recollect** 48:22
51:24 52:3,3
53:21 61:6,8 64:3
64:19 280:11,16
**recollection** 48:6
51:13,19,22 53:14
57:2,10,14 66:18
66:22,24 71:8
85:2 99:6 107:8
108:18,25 172:23
198:24 238:17
**reconsider** 205:8
**record** 4:2 5:21
7:11 25:14,15
35:10 37:2 40:23
40:25 41:4 42:20
43:20 49:21 56:10
56:11,18 69:7,16
70:9 77:11,12,18
77:23 78:23 79:1
81:9 89:10,13,13

99:12 101:14
102:15,20 105:15
108:5,6,10 110:17
116:25 122:18,19
123:22 124:3
162:21 172:3,6
173:18,24 179:21
191:19 192:4,5
193:25 197:25
201:5,10 202:2,7
209:12 221:4,11
224:22 225:9,22
226:18 240:3
245:6,10,16
264:16,24 265:15
266:19,23,24
267:1,5,10,14
272:25 283:24
284:5,12 296:19
296:21,25 310:4
317:18 323:4,9
333:12,17 343:20
353:20,21,25
356:4 357:5,24
358:3 360:12
361:15 385:13,17
385:18,19,20
386:7 387:6
**recorded** 6:14
172:5
**recording** 49:1
272:4
**recordings** 194:4
**records** 11:5 15:1
37:21 75:5 82:16
83:2,7 94:6 96:11
97:11,13 102:6
106:24 107:3,6
110:7 111:12,19
111:20 114:21
116:4,21,22
117:17 118:6
120:1 121:22,24
122:17 123:5
124:8 132:10,12
139:20 164:20,24



165:3 176:17,25
177:1 201:11
219:13,14 266:21
279:18,24 280:7,9
280:10,25 282:19
288:8 297:23
301:7,11,15
305:17,18,20
306:3,4,6 307:14
307:19,20 308:3
311:5 312:20
313:3,4,10 332:22
332:23 337:5,8,10
337:15,19,20
339:10 343:21
**rectum** 257:22
**Reese** 283:1,6,7,9,9
283:17
**refer** 166:4,9
354:14
**reference** 96:8
154:1 175:10
244:19 296:14
310:9 356:18
**referenced** 154:3
186:13 244:21
247:9 259:20
295:15,16 344:18
**referencing** 65:23
150:4
**referred** 184:7
193:4 224:19
225:5 243:24
275:15 276:16
296:10,11
**referring** 65:8 66:1
69:23 83:9 101:12
101:12 109:9
115:5 124:8
161:15 189:21
208:17 215:23
239:24 271:15
273:3 278:20
285:4,22 286:2
302:8 320:21
355:18

**refers** 296:12
**reflects** 296:21
**refresh** 66:17,22
**refreshed** 66:24
**refused** 193:12
296:3 358:8,14
360:20 361:2,5,10
372:9 373:7
**refusing** 17:13,15
40:13 66:14 127:1
**regard** 88:25 104:8
362:9,24 363:7,14
365:14 366:13
**regarding** 127:15
364:7 365:9
371:14
**regards** 256:11,18
335:23
**register** 176:11,14
177:13 179:2,15
179:19 187:25
353:9,11
**registered** 178:7
179:3,6,9,11
180:5
**registering** 180:6
**registrant** 177:21
**registration** 62:13
176:18 177:7
178:23 179:1
180:4
**regular** 54:23 55:1
241:1
**rejected** 166:1
220:24
**relate** 15:18 27:7
27:16,20 28:16
29:1,5 33:17 87:1
88:25 106:10
145:17 183:8,14
205:7 238:4,19
309:4 318:16
357:12 365:16
370:12
**related** 27:11,14
33:12 36:24 38:18

38:21 86:22 87:5
99:25 107:16
183:19 292:4,11
300:21 310:14,17
310:20,23 314:3,8
314:13 316:11,12
327:15,24 334:21
370:14,15,16,17
371:3,4 373:4
387:10
**relates** 33:15
100:10 144:6
146:4,15 205:13
224:12 233:5
236:18 259:16,19
363:21
**relating** 29:13 87:8
368:16 369:5,18
369:19
**relation** 146:18
314:3
**relationship** 71:25
98:13 120:14
186:20 295:1
304:17 312:9,10
312:11,13 316:17
383:9
**relative** 387:12
**release** 65:5 175:25
271:18 372:6
**released** 268:3
329:14,15,17
**relevance** 15:17
97:16 155:25
186:18 205:6
222:15 339:25
**relevant** 144:22
189:11,12,15
285:24 315:20
349:18 367:4,6
368:10,25 372:22
**religious** 366:12
**rely** 7:6
**relying** 364:2
**remain** 88:16
**remained** 83:8

**remaining** 276:4
**remains** 365:19
**remember** 9:17,23
10:17 11:11 14:15
14:22,23,23 21:24
22:4,8,13,18,23
23:4,9,17 24:9,11
24:13 35:7,23
36:4 37:15,24
39:4 41:25 42:2
45:16,24 47:5
48:4 49:2,3,4 53:2
53:25 54:14,17
55:21 57:6,7,16
57:21 58:24 59:5
60:9,10,13,16,21
60:22,25 61:3,17
61:18,21 62:2
63:7,12,15 67:16
67:18,22,25 68:5
68:9,11,21,23,24
69:2 70:22,23,24
70:25 76:9,12
81:2,17 82:10,13
84:21 85:9,11,14
85:23 90:22,25
92:22 93:1,13,14
96:8,11 98:7,18
99:10 100:19
101:1,21 102:5,14
103:4 105:16
106:25 107:3,7,12
107:15,20 109:6
109:25 110:6,13
111:13 112:1,2,6
112:20 122:7
126:5 133:7,19
140:17,19 141:25
142:6,10,14,20,21
142:23,24 143:1
151:15 156:12,22
157:2 163:4,6
168:3 170:7
176:16 179:22
190:8 192:15,20
192:21 193:1,2

206:22 209:14
211:19 213:11
214:4 218:12
220:9 246:16
269:9,25 277:1,4
277:9 281:9 283:8
285:9,11 290:13
303:2,5,8,16
307:11,12 309:20
322:23 325:10
326:4 343:19
344:21 351:1
365:1 377:7
378:22
**remembered**
277:13
**remembering** 49:2
**remind** 7:12 130:23
202:13
**removal** 120:8
**remove** 109:17
260:3
**rename** 112:13
**renamed** 112:16
**renames** 112:18
**render** 373:21
**rendered** 265:13
**repeat** 7:2 30:22
152:1
**repeated** 225:22
**repeatedly** 226:1
**rephrase** 7:3 21:11
332:12
**replied** 190:4
**Reported** 1:24
**reporter** 2:14 4:13
5:6 7:11 34:21
35:9,11 42:15
43:24 89:23,25
94:16 106:15
123:18 142:3
184:24 226:25
245:2 251:19
279:10 283:21
293:18 317:9
331:1 373:20



387:1,3
reports 247:12
represent 4:15 5:18
representation
28:12 37:5 191:23
representative 1:6
represented 264:9
representing 4:12
4:13
republic-type
356:16
request 4:11 42:13
140:2 141:2 246:7
246:11 366:12
370:4 372:3
373:16 383:8
requested 42:12
43:24 89:25 245:2
246:9 361:11
Requesting 338:12
requests 175:22
337:22
require 70:5 368:6
368:10,20 370:4
374:15
required 125:3
331:17 353:9
363:20
requirement 306:3
306:6
requires 62:11
100:3,5
reread 136:2
research 1:7 64:22
91:19 109:15
175:24 216:18
275:9,10 350:11
350:15 372:6
Research/develo...
265:2
reserve 231:20
248:14,16,21
343:3,7 346:23
377:12,23 385:9
reserved 385:7
Reserves 251:14

reserving 385:4
reset 211:2
resided 75:10
residence 8:19 11:9
resident 312:12
resides 30:11
residing 312:16
resigned 339:1,6
resolve 77:22
respect 296:7
respectfully 364:23
373:22
respond 8:24 9:2
43:7 225:8,18,21
339:7 359:14
368:11,14 369:21
372:4
responded 123:12
368:9
responding 225:19
337:21
response 7:7
175:22 313:7
318:3 363:22
372:2 374:2
responses 7:11
75:14 136:13
386:8
responsible 234:14
234:23 235:1,4,9
374:13
rest 255:5 304:2
313:4 385:9
restarted 195:19
restate 313:25
restroom 77:6
245:5
result 237:24
238:16 319:14
results 275:11
return 282:5 297:4
returned 268:19
282:1,6,20
returning 354:21
reveal 324:14,17
revealed 324:18

revealing 143:12
143:16
review 136:13
150:13 169:19
295:12 297:3
reviewed 150:17,19
reviewing 296:13
reward 196:10
re-edit 157:7
re-point 228:1
Rica 87:12 231:14
231:16 244:4
319:9
Ricardian 323:21
rid 158:23 333:3
382:5
right 16:5 39:19
43:9 71:3 105:16
135:11 150:7
177:3 189:10
190:5 193:6 197:6
210:15 227:2
235:10 244:23
270:11 274:20
276:2 278:12
283:9 296:8
308:10,18 311:8
335:3 341:1
353:16 359:24
rights 113:25 114:2
114:3,4,8,12
115:7,11,13,15,19
115:25 117:11,15
117:17,18,20,21
117:23 118:1,3,5
118:9,22,24 119:4
119:14,23 257:6
291:6,9,12 293:8
319:17 337:17
right-hand 189:19
300:3,24
ripped 185:20
risk 96:16 216:12
222:8 223:3 224:9
275:17
Rivero 2:10,11 4:22

4:22 15:20,23
16:4,12 30:17
31:2 35:8 42:10
42:23 43:1,2,4,12
43:13,14,16 50:21
69:24 70:3,7,11
78:19,25 79:4
98:2 102:19
105:20 106:13,19
116:23 117:2
123:17 141:15
142:2 144:15,21
146:16 153:10
174:1,7,14,24
189:21 195:9
196:23 197:11
201:22 202:2,7
224:17 225:1,10
225:18,21,25
226:8,13,16,19
227:5 238:4,9
243:10 245:3
251:18 252:4,7,18
252:22 253:11,20
254:6,17 259:13
260:5,8 262:1
263:9 277:16
279:9 295:10,20
296:7,9,20,23
297:2,5 320:11
338:8 339:21
346:3 353:19
359:13,18,19
375:5,6,16,22,24
376:6,10,17
377:11,16,20,22
383:12,16 385:3
385:18
road 134:9 185:20
Robert 383:10
Roberts 186:10
Roche 2:5 4:20,20
385:15
role 287:16,19,24
314:3 340:20
roles 19:15 105:13

286:4,6
rolling 200:7
room 258:24
358:20 373:18
rooms 55:14
Ross 339:19,25
340:18 341:18
342:1,12,13,14,21
rough 202:9
round 186:10
route 52:18
routine 52:10,12,15
52:17
routinely 52:8
royal 319:20
rude 287:9
rule 69:22,25 70:3
70:12,13 78:20
136:2 165:24
225:4,10,11,12,12
225:23 226:2,9
296:10 310:25
368:3 369:23
370:4,5 374:5
375:2 385:8
ruled 374:17
rules 20:21 25:8,17
69:21 165:15,20
165:22,25 377:18
ruling 40:17 369:17
370:3 374:10
377:13 383:11
rulings 365:23
run 138:2 185:21
195:20 243:12
339:16 376:1
running 157:4
196:3,7 199:7
243:14 244:3
375:25
runs 207:8
rural 185:17
rushed 349:4
Russia 232:18
233:9
Ryde 14:15,19



**R&D** 84:4,8,10,11
84:22 85:8,12,13
85:24 87:14 91:4
91:8 92:11 93:17
94:9,13,18 95:5
96:1 239:12
240:17,19 244:6
245:24 246:4,8,12
246:13,20,22
247:1,8 248:6
263:20 267:25
268:3 269:6,7,23
270:16,17,19,22
272:7,10,16 276:3
277:25 278:3
279:14 280:2,3,16
282:2,14 343:12
343:15 344:3,9,15
344:17,24
**R&Ds** 84:17 90:2

**S**

**S** 2:1,22 266:7
378:12,13,21,25
380:8,19 386:20
**safe** 49:14 50:11
375:13
**sake** 247:20
**Sakura** 273:4,11,14
273:22
**Salinger** 256:10
**SANS** 285:15
**satisfied** 262:7
**Satoshi** 132:17,18
133:10,17 134:22
135:5,8,12,14,23
137:24 138:5
144:20 167:2,4,9
168:10,14,16,20
169:2,12,15,16
170:18 171:14,21
182:5 184:2 186:2
186:3,5,11 188:24
190:1,21 191:5
208:5,8,12,14,16
208:18 209:9,15

209:15 210:2
213:12 285:16,19
286:16 323:18
324:2,9,14 325:2
325:24 326:3,5,10
326:17,23 328:13
329:2,12,19,20
330:21 382:25
383:5,22 384:3
**satoshi@anonym...**
210:14
**save** 12:6,8,9 68:24
136:25 157:5
328:18 379:23
380:8
**saw** 39:7,11 134:12
150:4 154:2 200:6
267:21
**saying** 64:1 121:11
148:10 153:16
159:8 165:8
207:10 208:13,21
213:17 228:8
247:12 250:14
253:12 254:20
255:4 257:3
260:23,25 261:7
261:19 262:12
268:15 274:17
282:21 283:2
300:21 307:15,18
311:10 319:23
322:25 335:18
349:21 352:5
**says** 19:13 63:16
64:7 126:16
177:25 190:19
227:20 229:6
241:8,11,19,22
245:23 246:2
247:25 249:8
254:12,14 255:1,9
261:22 264:4,16
265:3,22 266:7
271:18 305:8
310:16 315:9

320:17 321:4,8
348:17 355:7
371:13
**scale** 100:4 243:16
**scales** 345:10
**scaling** 243:13
345:5,6,8
**schedule** 375:1
**scheme** 293:15
**Schiller** 1:21 2:3,6
2:22,23 4:10,11
4:16 174:4,10
359:21,25
**scholar** 264:12
**scientist** 336:21
**scope** 88:21 89:19
103:17,21 141:4
152:9,12 156:1
181:11,17,21
183:19 187:14
190:13 199:12
203:17 214:21
216:7 242:12
244:16 278:8
285:21 286:1,1,10
292:4,7,9,10
340:16,19 362:11
362:19 363:18,22
364:9 365:20
383:24 384:5,12
**screamy** 248:25
**screen** 4:8 65:21
167:18
**SDK** 351:17,18,25
**se** 2:4 14:7 186:12
**sealed** 83:8,12,14
**seances** 382:23
**search** 129:10,12
131:19,22,24
154:1 311:25
**searches** 163:18
311:22
**second** 2:4 10:4
17:21,22 40:20
98:2 126:11
184:10 189:9

197:3 207:13
224:17 225:17
240:6 244:22
360:4 362:24
369:14 372:2
**secondly** 249:19
**seconds** 385:14
**secret** 159:16
293:15 326:15
**secretarial** 107:7
107:12 111:20
122:9,10
**secrets** 86:13,16,19
**section** 259:19
**Secured** 93:9,25
94:16 248:13,15
248:20 303:7
309:21 310:1
311:13,23,24
346:21
**security** 40:15
127:3,4,10 216:12
218:23 222:8
223:3 233:5
285:13 317:5
355:9,21 357:7
361:10 370:1,6,11
372:1,10 373:8
374:5,7,14
**see** 40:20 65:19
66:3 122:18 133:5
136:19,23 151:19
178:10 189:14
190:18 205:6,9
224:18 227:25
243:16 244:24
252:10 256:2,5,6
256:11 279:12
286:8 305:8 310:9
315:9 319:2 321:9
334:14 338:17
343:20 348:19,20
367:14
**seeing** 227:17
**seeking** 18:14
88:18 149:14

218:24
**seemingly** 129:3
**sell** 346:12
**selling** 251:14
**send** 80:5,10 100:6
135:5,8,14 136:3
136:14,20 139:1
140:24 151:20
152:3 161:19
178:25 192:8,11
192:17,23 206:6
206:10 213:16
227:15 246:3,4
250:2 256:15
343:6,9,16 344:3
344:9
**sends** 257:19
**sense** 288:20
**sent** 79:11,15,19
80:13,17 81:13,15
83:16 136:6,8
137:2 140:22
147:10 148:20
151:5,5 161:11,18
190:1 229:16,19
250:1 253:1,9
321:18 343:8
346:13
**sentence** 204:6
228:24 284:14
319:13 349:7
**separate** 109:15
112:5 297:16
298:25 300:17
318:16 373:18
**series** 225:2 319:7
**seriously** 234:5
**serve** 113:9,15
**served** 113:11
**server** 79:17,22
147:20 161:20,21
161:21,24 162:7
178:11,12 319:16
321:4
**servers** 8:14 162:1
162:4 191:5



198:22
**service** 113:4
**services** 2:16,21
4:12,14 21:20,23
22:3,24 23:11,16
23:18 26:7 27:7
28:15 29:1,15,18
29:23 30:1,10
42:5,7 62:10
159:8 239:13
251:16 348:18,21
349:8 350:11
**serving** 113:13
**session** 174:6
**sessions** 174:11
193:25 194:1
**set** 31:7 62:1,6,9
92:7 93:20,22
94:3 109:15,16
123:1,4 165:15,20
243:3 244:3 270:2
272:13,16,20
281:7 293:12
300:13 305:2
315:14 319:6,7,11
320:22 356:5
366:1,3 373:7
381:4,7
**sets** 165:17,24
356:7
**setting** 356:14
**settle** 160:7
**settled** 165:18
**settlement** 16:18,24
363:11,14
**setup** 319:1
**set-up** 133:19 185:9
185:16 293:10
**Seychelles** 84:19,23
85:4,25 91:9
305:9 306:5,7,10
306:21 308:6
377:3
**SGI** 240:21,23
346:13
**shake** 109:4

**Shamir's** 293:15,17
**shapes** 345:22
**share** 91:15 134:16
139:7,12 140:11
141:7 142:18
143:5 192:6
202:24 203:2,7,11
**shared** 186:22
**shareholding** 97:7
97:8,10 120:6
122:24 339:14
**shares** 109:14
293:6 316:1
**sharing** 205:22
293:15
**sharper** 283:18
**Shehadie** 141:16
143:6,11,13
**shit** 157:5 160:11
213:18 341:22
**short** 41:2 77:15
108:8 173:21
215:15 221:7
245:8 284:2 323:6
333:14 353:23
358:1
**shorter** 259:1
**Shortly** 148:15
**short-circuit** 9:1
**shot** 119:10 203:18
**show** 65:10,10,13
65:14,23 66:19
67:3 69:22,24
70:1,7,12,13
259:15 261:5,6
333:8
**showed** 142:15
**showing** 66:24
116:25
**shown** 6:16 142:17
**shredder** 306:9
**shut** 83:15
**sic** 265:2 370:17
371:4
**sick** 47:14 120:13
**side** 243:17 300:3

300:24 301:1
**sighing** 151:19
**sign** 193:12 256:17
257:24 258:12,15
260:18 261:23
**signature** 239:16
256:5,8,9,12,13
256:13,18,20,22
256:22 257:2,9,12
260:14 261:9,10
261:14 266:8
299:22,23,25
300:1 357:16,17
357:20,20
**signatures** 260:11
260:17,22
**signed** 165:18
239:19 254:25
259:6,11 260:1,14
265:6 269:3,4,7,8
386:19 387:23
**significant** 198:12
**signing** 258:19
260:13,20 265:21
**silicon** 345:23
**Silk** 134:9
**silly** 322:21 326:5
**similar** 366:13
**simple** 121:1
252:12 260:15
328:20 373:11
**simply** 25:3 56:25
284:23 293:14
349:5 364:1
368:12
**simultaneously**
35:12 157:3
**Singapore** 84:20
376:22,25 377:1
**single** 11:21 17:13
21:7 77:24 78:3
78:11,12 88:4
91:14,16 106:19
142:7 158:2
**sir** 19:3 41:7
**sister** 314:19,20

**sister's** 71:2
**sit** 49:1 159:12
341:21
**site** 154:2 282:9
**sites** 151:4 232:20
232:22
**sitting** 30:7,9
253:16 280:1,15
281:2 282:13
288:9 298:8,9,11
298:21 304:7,23
306:20,22 339:12
**six** 35:22 51:23
53:3 156:13,15
157:13 158:9
216:20 217:4,7,9
297:25 298:2,3
**size** 165:17 233:15
**sizes** 100:7
**skill** 387:7
**skip** 224:23
**Skype** 266:18
**slices** 289:7
**slipped** 366:16
**Slow** 34:21
**small** 47:8 77:20
184:21
**smelts** 345:22
**smoke** 279:12
**Sneezing** 198:10
**social** 262:10
287:13
**software** 165:12
166:12,14,20
167:9 169:11
170:25 171:2,6
173:13 194:15
201:19,20 207:15
215:18 216:11,14
222:7 223:2,18
224:1 227:24
228:15 231:19
243:16 244:2
254:2,4,10,19
255:2,22,22 258:3
265:1,3 272:4,4,5

275:17 277:23
283:3,10,20
284:15,16 351:19
351:21 357:6
370:19 371:15
372:18
**solely** 88:4
**solution** 240:20
**solutions** 282:25
283:16
**somebody** 220:13
**someone's** 82:12
**son** 126:16 371:22
**son's** 70:23
**soon** 365:9
**sorry** 6:7 10:12
30:23 32:15 34:23
39:19 41:7 62:21
62:22 69:7 78:19
105:17 116:15
117:2 129:5,11
133:12 139:15
141:22,23 147:5
156:14 168:23
170:22 179:7
182:19 186:8
201:25 209:23
213:15 214:24
239:22 240:9
245:14 251:1
252:7,16 254:9
258:18 264:11
265:5 269:2
286:20 291:11
308:23 309:5
316:21 320:3
331:2 334:16
335:5 340:23
349:13,25 360:8
370:2,9 381:5,19
**sort** 40:20 81:9
99:4 109:5 144:4
145:23 159:12
160:12 217:19
231:15 251:24
255:5 287:12



288:25 338:25
356:23,25 363:25
364:15 374:11
**sorts** 46:21 119:5
**sought** 139:14
**sound** 283:18 287:8
**sounds** 210:15
**source** 149:20
150:14 168:18
170:25 223:6
231:8 271:18,19
271:21,22,24
275:3,5 284:16,24
284:25
**South** 10:21,23,24
11:1 185:25 258:5
356:11,11 371:14
**Southern** 1:1 4:6
333:6
**space** 119:10
**Sparkling** 30:17,18
**speak** 35:13 49:22
52:7 56:22 57:18
57:24 58:4,7,10
58:13 60:4 63:1,2
63:5 95:13,16
109:4 128:24
129:2 138:19
146:7,13 228:8
265:16 270:18,23
330:20 357:13
373:17
**speaking** 62:3
192:2 225:16
227:1
**speaks** 63:16 228:7
268:6
**special** 240:25
**specific** 20:9
118:20 121:9
146:1 148:8 165:7
269:5 350:3
363:17
**specifically** 36:4
90:20 225:3,13
238:6,11 274:22

296:2,5 363:8
**specified** 240:22
**specify** 234:17
**speculate** 95:24
107:10 122:25
304:3
**speculation** 50:18
119:2 172:21
173:11
**speculative** 119:6,8
**Speech** 211:7
213:25
**speed** 99:19
**spell** 18:7 82:12
105:14,15,18
141:17 184:23
213:1 273:5,12
293:17 317:8
**spells** 18:20
**spend** 86:17
**spent** 185:16
305:24 347:2,5,9
347:16
**split** 293:15 303:4,6
**spoke** 51:3 52:23
55:9,9,10 56:13
56:19,24 57:3,10
59:6,23 60:2 61:3
61:5,10 62:5 64:9
64:16 129:24
131:8 142:11
153:5 200:25
309:18 342:12
**spoken** 53:3 61:7
138:22 299:17
342:1
**Sportsbooks**
231:17 234:10
235:21
**spots** 224:19
**spousal** 364:6,10,11
367:17
**spring** 273:9
**Square** 1:22 6:6
**staff** 24:16 81:1
108:15 109:4

157:4,9 162:10,12
163:21,22 227:14
229:9,14 233:13
**stage** 139:5 194:15
201:19 202:1
204:18 212:25
214:13
**stages** 175:24 372:6
**stake** 276:5
**stand** 139:17 261:2
346:9
**standing** 77:23
89:8
**start** 28:24 49:24
77:2 117:24
163:18 165:5,10
167:9 195:21
245:19 262:8
279:22 349:6
363:23 370:12
380:12
**started** 5:11 54:10
64:22 76:13,14
194:25 207:11
217:19 326:1
346:20 379:4,8
380:13
**starting** 134:10
218:19 279:12
**starts** 190:1 298:4
**state** 4:15 5:20 37:2
154:11 164:13
192:4 209:12
225:10 228:6
229:13 253:21
324:11,11 349:5
**stated** 115:17
201:12 210:19
216:5 225:13
226:9 230:5 231:2
248:22 255:18
262:11 270:1
276:13 311:6
313:22 350:17
373:10
**statement** 115:20

115:23 225:25
252:11 333:20
334:6,9 347:25
349:25 352:2,14
354:7 357:1
371:14 372:12,14
372:17
**statements** 225:22
**states** 1:1 2:18 4:5
32:24 33:4,6,19
34:1,8,13,18,25
35:4 36:5,9 37:1
37:12,17 39:14,20
39:22,25 45:13,21
46:11,16 65:4
240:18 241:4
242:1,3 243:22
334:11 355:5
374:9
**stating** 155:22
356:21
**statistician** 56:19
**stay** 56:17 247:15
**stayed** 17:5 326:15
**Ste** 2:12
**Stefan** 141:12
**Stenograph** 387:4
**stenographer** 6:14
**step** 98:2
**stepped** 214:8
**Steven** 1:17 3:3 5:7
5:22 348:2,18
350:15 386:3
**Stick** 33:12
**stipulations** 118:6
**stole** 162:10,13
**stop** 7:18,25 8:20
18:21 73:17,19
77:9 89:17,17
103:11 123:20
133:21 134:8,21
137:4 144:23
191:8,20 195:1,16
214:5,9 219:9
224:17 314:12
319:23

**stopped** 7:22 73:15
133:20 134:12
137:13 180:19
195:2 210:20
316:3 360:14
**stopping** 123:19
**storage** 11:13 21:20
22:2,24 24:20
25:25 26:10 28:15
30:8,10 41:16
42:3,5 99:16
100:3
**storages** 21:25 22:5
22:7,9,12,14,17
22:19,22 23:3,5,8
28:25 29:4,6
**store** 23:21,24
41:15
**stored** 24:3,14,20
25:25 26:19 27:6
29:14 202:10
**storing** 26:16,23
**story** 108:4 193:14
**straightforward**
368:13
**street** 1:22 2:4,7,16
10:2 104:14
**stretch** 7:18
**strict** 183:11,16
**strike** 6:21 30:9
39:10 42:24 43:10
45:12 49:23 53:8
60:22 62:19 75:24
85:13 87:4 103:24
111:24 118:23
134:21 135:11
138:13 162:8
168:19 195:15
204:8 209:25
212:17,17 215:16
235:22 236:11,24
242:9 253:16
276:16 288:23
298:9,10 308:23
313:12 320:11,13
324:8 325:4



329:18 344:16
**striking** 43:11
**strip** 158:25
**struck** 236:14
**structure** 91:13
122:25 237:22
291:20 311:7
366:21
**structures** 93:20,23
94:4 165:21 270:2
**stuff** 107:11 109:5
127:13 143:21
154:11 163:19
195:7 227:20
229:6,10 233:6
255:23 356:25
370:7
**stupid** 136:5
160:14
**stupidly** 243:1
**sub** 99:5
**subject** 19:15 45:3
65:2 94:21 195:11
286:5,6 340:21
368:8 375:22,23
**subjects** 205:5
**submission** 139:21
**submitted** 333:20
**subsequent** 238:10
374:3
**substantiate** 357:9
**subtopics** 189:4
**Success** 110:12
111:3,22,25 112:4
112:11,15 310:10
310:12,24
**successful** 125:12
125:14
**succinctly** 117:24
**sued** 18:23 274:14
372:14
**suffices** 121:2
**suggest** 151:18
183:9
**suggesting** 206:5
**suggestion** 183:7

**suit** 284:15
**Suite** 2:4
**supercomputer**
381:9,12,14,18,23
**supercomputers**
382:6,18
**supersecret** 159:11
**supervise** 218:1
**supervised** 217:21
**supply** 374:13
**supporting** 374:12
**supposed** 62:6
148:9 242:1
350:25 353:4
359:4
**sure** 8:9 15:4 19:17
40:22 56:8 77:7
78:21 94:16
102:14 124:25
131:2 163:15
170:21 173:17
174:3,19 178:24
198:1 202:2,8
213:9 238:16,21
240:3 250:18
286:15 323:3
333:10 358:17
359:17
**surrounding**
144:19 190:20
**suspended** 378:15
379:8,9,20
**suspicion** 321:5
322:22
**SWAMP** 215:18
275:17
**swapped** 251:25
**swathe** 261:16
**swear** 5:6 71:1
**switch** 77:2
**switched** 121:10
**swore** 333:5 334:9
336:12
**sworn** 5:7 333:20
334:5,23
**system** 11:14 88:4

124:25 125:1
187:25 215:21,24
215:25 216:2
220:22 222:4,18
222:21 224:2,9
272:13,20
**systems** 163:6
166:2 216:6,12
222:8 223:4 241:5
241:9 242:2
**system's** 222:13
**Szabo** 328:5,8,12
328:16
**S-A-K-U-R-A**
273:13
**S-H-A-M-I-R-S**
293:19
**S-H-E-H-A-D-I-E**
141:18

---

**T**

**T** 388:1
**tablet** 143:4
**take** 6:19 7:12,17
15:24 16:6 20:5
20:10,12 25:19
34:5 35:11,13,14
40:24 41:10 42:13
43:11 66:10 76:19
77:5 87:22 99:7
106:15 123:19
128:24 130:16
148:14 173:15
189:18 197:2
198:8,12 201:2
221:2 225:14
236:4 239:22
245:4,14 250:2
251:16 253:2
256:9 263:24
264:20 279:2
281:20 283:23
309:15,19 311:4
316:5 321:3 323:1
333:10 341:8
354:9 357:11

379:7,15
**taken** 1:20 4:4 6:9
21:5,7 30:4 34:1
36:5 282:6 283:19
300:17 332:20
343:25 354:12
372:20 373:11
387:12
**takes** 198:10
**talk** 49:8 62:23
129:12 262:19
266:17 285:2
287:17 300:13
312:19 316:23
319:22 324:8
325:8 358:10
360:24 361:12
374:22
**talked** 48:18 49:4
51:20,23 56:8
64:19 83:24 131:6
140:15 155:4
160:16 220:24,25
244:2 320:1 324:5
325:5,6 326:1
**talking** 24:16 28:19
28:20 33:9 54:10
57:6 64:12 67:12
77:2 84:24 101:13
110:1 112:4,21
120:24 121:10
130:2 158:21
161:23 166:11
167:2 169:9 189:3
197:20 201:16
209:5 219:8 237:3
237:25 258:2
271:19 287:14
288:25 300:12
308:1 316:3
318:14,15 320:6
320:23,25 325:8
325:11 328:3
348:12 349:11
356:10,13 372:13
**talks** 57:7 340:20

**targeted** 259:2
362:4 368:9
**task** 172:17 311:24
**tattoo** 277:11
**tax** 32:21 94:14,19
94:22,23 95:2,4,7
95:12,13,16
100:16 101:10,18
101:23,24 103:23
103:25 104:1,16
104:23 316:3,6
319:15 328:1
332:5,6,10,13,17
333:7 335:12,24
337:10,15,21
338:6,21 349:13
**taxes** 355:24
**technical** 176:25
253:6
**technological**
190:24
**technologies** 233:4
**technology** 28:6
44:15 64:10,18
67:8 69:4,10
70:18 71:12,19
75:25 76:19,22
83:23 235:23
265:13
**teleconference**
374:3
**telephone** 2:22,24
2:25 4:17 5:1
58:16 174:3,9,12
358:4 359:20,23
359:25 360:1,2
**telephonically**
58:14
**tell** 5:24 6:3,10,23
6:25 11:6 45:3
64:3 67:14 69:5
72:19 93:5 95:17
105:17 112:19
118:2 133:3
182:12 188:16
201:25 220:6



224:12 226:6
229:6 232:14
233:8 239:8
240:11 249:7,8
250:15 253:13
254:25 256:14
262:2 270:8,12,15
271:1 276:1 277:6
285:21 289:3
295:10,11 303:17
307:19 308:14
311:9 317:11
324:20,23 329:23
335:23 342:11
356:7 360:5
362:25 376:14
**telling** 25:13 37:8
377:7
**tells** 374:14
**ten** 33:13 47:24
48:5,9 50:5,12
146:1
**tens** 372:16
**terabyte** 100:7
**term** 28:1,9 117:23
**terms** 118:8 205:22
267:7 352:19
363:18 364:14
370:1
**terribly** 58:12
**Tesla** 119:11
**test** 133:24 207:9
207:15 345:5
**testified** 301:21
360:18 363:10
**testifies** 367:2
**testify** 280:13 346:2
**testimonial** 364:12
**testimony** 6:15
11:17 24:18,22,24
25:23 26:5 75:18
110:23 112:9
134:4 153:3
160:19 165:1
171:8 175:15
193:20 195:11,23

207:25 217:5
235:16 236:20
248:18 249:5
252:19 287:22
300:23 304:10
320:12,19 337:12
347:7 350:22
358:25 360:13
362:20 369:8,10
369:18
**testing** 206:25
207:4
**testnet** 196:7 207:5
207:6,7,13,17,22
208:1
**tests** 243:13
**Texas** 236:8
**text** 79:25
**thank** 4:17 5:9 6:17
7:16,20 16:20,25
30:18 41:4 65:25
77:19 108:10
124:4 129:22
173:25 174:7
200:3 221:11
245:10 263:5,6
284:6 310:5
323:10 333:17
358:3 360:3
361:25 367:25
368:3 375:6,14,15
375:16 385:10,11
**thanks** 197:23
375:8
**theoretically**
218:21
**theory** 369:1
**thereof** 320:10
387:5
**Theymos** 181:3,9
181:15
**thing** 57:22,22
72:21 87:19 97:18
158:22 160:12
167:21 169:9
177:10 255:4

260:16,16 261:8
261:11 278:23
290:5 298:3
303:14 304:16
311:23 356:13
367:18 375:17
385:3
**things** 8:15 23:25
24:11,16,17 28:19
41:15,22,23 46:21
48:23 49:1,5
54:11 55:22 56:8
61:6,25 68:18
88:1,3 100:24
101:1 107:10
118:14 119:5
122:12 125:3
126:21 130:7
134:8 136:5,23
140:16,23 148:11
158:18,21 160:14
165:16,21 166:4
171:23 201:12
209:4,5 224:15
227:23 229:19
231:17 232:13
234:10 235:9
241:17 243:14
244:1 248:23,24
249:1,7 250:15,17
250:18 255:20
262:17 272:1
277:15 280:20,20
281:10 283:15
299:12 300:12,17
301:6 303:23
306:2 308:9 311:4
313:10 316:6,7
317:6 321:1,1,3
322:21 323:21,24
323:25 333:1
337:4 339:13,16
339:16 349:3
352:6 353:10
355:9,13,25
356:14,22 366:23

378:22 385:7
**think** 26:24 35:12
48:23 53:14,15
57:14,15,15 63:16
78:4 81:24 105:15
116:23 123:18
141:2 142:23
144:3 160:14
165:9 174:18
179:13 189:10
197:5 202:4
204:19 209:17
212:24 257:11
263:23 265:3
273:4,13 282:21
283:8,21 300:11
303:15 317:11
329:17 344:22
345:25 353:19
364:5,7 366:15
369:24 371:18
374:6,17,22
375:10,17,25
377:14,18,22
380:13
**thinking** 10:13
62:22 93:12
141:22
**third** 126:20
127:19,21 128:13
128:19 209:20,22
209:23,24,24,25
210:2 360:17
370:16 371:4,24
**thought** 62:23
109:8 134:14
155:10,23 160:9
193:14 237:6
315:24 366:5
**thoughts** 317:22
**threatened** 157:10
378:15 379:17
**three** 126:17
228:12 297:17
299:18 313:23
371:8,23

**three-letter** 35:25
**throw** 178:2
**Thursday** 1:18
**tie** 159:3 278:7,20
318:9 383:6
**tight** 286:11
**till** 108:2 242:16
**time** 4:8,9 7:16,22
8:5 9:3,20 10:22
12:25 13:5,11
16:6 18:18 26:14
39:7,11,21 41:1,4
43:6,22 45:8,13
47:8 54:19 58:17
63:7 64:8,16 66:4
66:20 67:18 70:9
70:11 74:18,20,20
74:22 76:14 77:8
77:13,19 78:23
79:17 83:22 84:24
85:3 86:18 88:12
97:4 102:3 103:8
103:9,10 105:5,9
106:16 107:9
108:7,10 109:2
111:21 115:19
116:1 117:8 122:8
123:23 124:4
126:6 129:12,24
130:15 131:8,11
132:22 133:19
134:14 137:3
139:19 141:23
142:22 144:13
150:10 158:2
161:22,23 165:19
169:1 173:19,25
174:5 180:7
188:23 191:8
192:2,3 196:15
198:8,10,13 200:9
201:21 205:9
210:20 211:3,12
216:19 217:19
221:5,11 224:22
225:6 226:6 227:1



238:22,23 241:6
241:16 243:4,6
245:7,10 251:24
258:20,23 259:22
262:21 263:8
269:6,8 283:25
284:6 295:18
316:2,13 319:20
319:25 321:6
323:5,10 325:9
329:18 332:24
333:13,17 344:11
344:12 353:22,25
357:25 358:3,25
360:9 365:6 366:9
366:13 369:14,15
369:23 374:22,22
376:1 377:13,17
377:17,19,23
383:14 384:14
385:5,7,10,12,21
**timechain** 28:4,8
28:16 38:22 44:15
62:16,24 63:6
64:10,17 67:7,14
69:4,9 70:18
71:12,19 75:25
83:23 87:23 96:20
181:25 182:15,22
**timechain-related**
87:15
**timeframe** 130:22
141:1 360:9
367:11
**times** 15:7 45:17,18
47:3,10,19,24
48:3,5 49:3,4,9,25
50:5,9,12,16 51:4
51:7,9,15 52:23
53:3,10,18,22
56:18,24,25 61:11
84:16 85:14
104:15 130:17
136:2 150:3,11
158:19 212:10
229:14 302:15,20

332:20,21,22
344:2,15,15 353:9
**timing** 325:10
**tirade** 277:14
**title** 150:5 223:14
223:20 224:6
372:20 373:11
**today** 6:9,14,18,20
6:22 7:16 15:19
20:16 24:18 25:23
26:5 30:7,9 71:1
94:7 137:19
175:15 195:23
253:16 280:1,15
281:2 282:13
288:9,15 296:10
298:8,10,11,21
300:23 304:7,23
306:20,22 320:19
339:12 351:4
358:5 368:7,21
374:16,24
**Today's** 4:7
**told** 31:8 41:14
109:8 121:7
170:24 198:1
201:1 202:19
220:12,15 225:11
247:5,6 249:9
250:16 265:10,18
265:19 282:1
321:25 322:4
332:24 359:3
365:18 368:23
369:2 371:24
373:3 377:9
**top** 11:4 72:19
85:17 87:13
112:20 116:5
119:18 139:18
142:6,14 209:15
239:17,18,25
240:1 247:20,22
253:23 256:3
266:5 267:15
277:20 281:8

284:11 302:9
305:6 306:24
310:3,5 334:2
341:16 343:19
348:13,14,15
354:16
**topic** 19:13 28:22
36:22 123:14
129:1 145:25
189:2,3,5 224:18
224:19 238:4
285:21 295:11,16
349:10 367:21
370:22
**topics** 8:8,10 15:18
19:4,5,9 20:7,8,9
33:11,12,13 44:18
59:5 60:2 61:5,21
64:13 88:21
142:13 144:4,6,16
145:24 146:2,4
182:4 191:11
199:18,19 205:7,8
224:12 225:3
242:13 259:16
278:8 295:4
318:10,16 349:20
350:3 352:21
367:24 373:24
383:7 385:1,2
**Tor** 231:18 234:11
**Toshi** 326:6,6
**total** 71:8 251:4
344:16
**totally** 243:1
**touch** 17:5 157:10
164:15 361:8
375:13
**touched** 77:3 187:9
**Touché** 198:12
**town** 184:21
**tracing** 359:2
**track** 157:13 228:8
280:7
**tracked** 285:10
**trade** 86:13,16,19

251:17
**Trading** 107:5
291:2,3
**trail** 134:12
**transaction** 100:6
165:18 206:6
220:23 250:1,2
253:1,2,3 344:18
**transactions** 90:11
90:14,17 190:2
**transcribed** 202:4
387:6
**transcript** 5:12
295:12 296:22,23
320:16 383:12
386:7 387:5 388:4
**transcripts** 295:11
296:12,13
**transfer** 180:17
181:19 186:13
246:8 271:7 273:1
275:9,12 280:22
282:1 344:17,25
**transferred** 120:5
180:8 252:15,17
270:13 280:17
347:1 354:20
**transfers** 116:4
120:1
**trash** 11:21
**trashed** 12:2
**travel** 33:6 34:7,12
34:17 35:5,16,21
37:11,17,20,23
38:1 39:14,24
45:15,16,20 46:1
46:3,10,14,16,19
**travelled** 34:24
38:6 39:21 45:13
45:23 46:4,7
**travelling** 36:9
**Tread** 340:1
**tree** 282:25 283:4
**trees** 283:15
**tried** 19:1 25:3
132:21 133:8

211:4 274:9 384:2
**trip** 36:5 39:12,20
375:13
**trips** 32:24 33:3,19
33:25 35:20,23
36:10 37:1
**troll** 150:10
**trouble** 218:25
**true** 220:22,23
226:11 334:11
335:2 386:7 387:6
**trust** 91:16 119:10
159:15 214:19
249:7 269:12
288:23,25 289:3,6
289:19,20,21
290:1,2,2,3,4,7,20
290:24 291:15,17
291:18,18,21
292:1,6,11,13,19
292:22,25,25
293:1,2,3,5,6,7,8
293:9,9,10,11,21
293:24 294:1,6,11
294:16,20 295:2
295:15 296:6
304:22,24 305:2,9
305:11,13,14
306:7,10,21 307:5
308:6,13,16,20
310:14 312:9,17
312:18,18,19
314:2 315:10,13
315:14 316:14,18
317:25 319:1,6
320:22 327:10,13
327:15,24 330:5
330:10 331:9
348:6,8 370:16
371:3 373:4,6
376:21,24 377:1,2
**trusted** 93:22 94:3
214:15
**trustee** 288:17,22
288:23 289:24
292:5 314:7,12



327:12,15,24
**trustees** 290:11
305:11
**trusts** 109:16
291:20 296:2
310:17,21,23
314:7,13 319:7
331:12,16 381:4,5
381:7
**trust's** 305:15
**truth** 6:4,10,23,25
190:11,19
**truthful** 361:17
**try** 7:12,13 8:25
11:11 14:22 24:11
48:23 52:5 60:16
61:6 101:1 133:5
182:10 209:17
216:15 261:11
273:12 281:9
316:7,11,13
322:25 342:25
**trying** 8:12 19:23
28:18 32:18 91:17
109:13 120:2
144:23 163:4
171:10 187:4
205:19 250:22
254:23 261:13
268:9 283:18
285:23 287:8
291:20 292:8,23
316:5,5 322:23
335:21 349:4,22
352:8 353:4
**TTA** 354:22
**Tulip** 107:5 290:2,7
290:20,24 291:2,3
291:15 292:19,22
294:20 295:2,15
327:10,13 330:5
331:9 381:22
**turn** 166:13,16
217:9 296:4
333:24 365:22
**turned** 216:20

217:3 373:25
374:1
**turning** 251:7
**Twice** 15:8 55:5
**twist** 25:4
**Twitter** 262:14
377:25 378:3,7,10
378:14,18 379:7,9
379:17,20 380:15
**two** 112:18 126:17
159:5 163:5,22
164:6,9 186:17
216:20 217:3,8
226:4 240:21
249:16 251:25
252:2 260:11
265:6,21 297:10
297:12,17 300:12
300:17 301:6
318:16 363:24
370:14,24 371:3
371:23 381:22
**type** 55:18 68:18
86:3,6 113:18
148:9 256:11
311:24 316:21
328:19 345:2
378:22
**typed** 126:19 148:1
256:19
**types** 24:2
**typical** 300:15

_____ U _____

**UK** 6:1 10:6,9,11
10:24 18:13 110:9
110:10 111:7,16
116:21 120:24,24
121:7,10,11 123:3
123:9 258:22
304:22,24 305:2
**Ulbricht** 339:19,25
341:18 342:2,12
342:13,14,22
**Ulbricht's** 340:18
**ultimately** 161:9

**unable** 76:19 80:2
91:11 228:7
**unawarded** 255:24
**unclear** 43:20
101:13 237:24
344:12
**understand** 6:8,11
6:13,17 7:2,6
18:22,24 19:1
21:9 52:12 63:3
100:13 147:24
162:24 166:5,20
196:9 197:23
208:16 236:12
252:8,8 268:9,12
304:11 316:10
322:7 328:21
335:21 344:20
347:11 349:22
353:4 364:15
366:21 367:13
372:21
**understanding**
28:5 81:11 127:2
329:1,2
**understood** 99:5
197:24 345:25
346:2 363:2
377:21
**undertaken** 332:6
332:9
**unduly** 368:25
**unfortunately** 9:1
149:19 282:10
355:10
**United** 1:1 2:18 4:5
31:12 32:24 33:3
33:6,19 34:1,7,12
34:17,24 35:4
36:5,9 37:1,11,17
39:14,20,22,24
45:13,20 46:10,16
334:11 374:9
**unnatural** 269:21
**unrelated** 300:25
**update** 157:5

**updated** 258:21
**updates** 178:14
**updating** 250:3
**upheld** 256:12
**uploaded** 150:20
**upload.ae** 147:20
150:20,24
**upper** 189:19
**upset** 249:1
**URL** 148:8
**USA** 127:8,11
258:4 311:15
312:11
**usable** 283:13
**use** 21:20,25 22:5,9
22:14,19,24 23:5
23:10,18 28:4,9
32:12 52:17 58:16
60:8 62:19 68:2
96:14 97:15,19
98:3 101:9,17,24
132:7 134:1
159:24 166:3,19
166:22 204:2
206:1 210:13
214:2 235:23
241:6,9 243:17,23
245:5 276:15
318:6 319:20
320:23 325:23
343:3 376:5
**Usenet** 151:4
**user** 72:14,15
129:14 132:15
**usually** 268:18
300:19
**US$5** 344:22
**Utz** 303:3
**Uyen** 212:25 213:3
213:5,10,19
214:19 285:3
289:21 327:3
331:19

_____ V _____

**v** 1:9 226:18 256:10

**vague** 54:20 100:22
168:22,24 210:18
236:7,22 259:4
291:7
**valid** 134:14 165:19
220:23
**validate** 355:2
**valuable** 223:4
230:3,11,23
**value** 82:7 204:17
204:20 216:1
223:9 229:23
231:22
**valued** 372:16
**valueless** 207:14
**valuer** 223:12
231:24
**variety** 23:25 84:15
271:21
**various** 35:19 77:3
296:1
**Vaughn** 141:13
142:19 326:2,9,17
326:22 327:2,9,12
**Vel** 4:18 5:17,19
19:3 140:25 234:5
280:12
**VELVEL** 2:3
**vendor** 264:17
**vendors** 283:2
**vendor's** 276:4
**venture** 276:5,5
277:24
**verbally** 7:10
**version** 156:16,20
156:25 157:6
158:1,3,4 161:9
166:24 167:1
190:9 207:7,9,13
207:14 354:7
**versions** 156:13,15
157:3,14,19
207:11 243:15
**versus** 4:4 56:20
177:11
**vest** 316:1



vet 216:14 218:20
  218:20
veteran 355:22,22
Vice 2:6
vice-versa 208:2
video 4:2,3,8,9
  43:25 44:3,6,8,11
  44:14,17 46:25
  47:4,7,11,20
  48:11,15 49:7,10
  49:19 50:1 51:10
  51:21 52:7,23
  53:11,19 54:4
  55:9 56:2,4 77:13
  77:14,17,17
  123:23,24 124:2,2
  173:19,20,23,23
  221:5,6,9,9
  256:20,25 258:20
  283:25 284:1,4,4
  323:8,8 374:2
  385:22
videographer 2:20
  4:1,11 5:5 6:15
  40:25 41:3,7
  77:12,16 108:6,9
  123:22 124:1
  173:18,22 221:4,8
  227:3 245:6,9
  283:24 284:3
  323:4,7 333:12,16
  353:21,24 357:24
  358:2 385:17,20
Videotape 1:16
view 138:4,8
violations 378:16
Vistomail 178:10
  179:24 209:11
  210:3 211:7
  212:21 213:5
  273:1,2,19,23
  274:2,10
volume 4:2 52:14
  77:13,17 123:23
  124:2 173:19,23
  221:5,9 283:25

284:4 322:10
  323:8 385:22,22
volumes 100:6

_____

**W**

W 2:5
waffly 177:24
wait 8:23 262:1
waiving 370:2
Wales 10:21,23,24
  11:1 185:25 258:5
  356:11,11 371:14
walk 6:4 157:10
  208:14
wall 50:24
wallet 113:3,4,17
  203:14,22,25
  204:2 205:13,22
  205:23 247:25
  248:6,16,21
  249:20 253:9
  267:21 268:10
  270:16,20 306:15
wallets 204:15
  205:14 249:3,13
  249:22 250:6,8
  294:21 300:4,13
  300:14,14,16
  301:5 303:18,19
  303:21,22 304:23
  359:4
wanker 153:14
want 8:25 13:13
  16:6,8 40:24
  41:13 42:21 43:6
  49:8 63:2 65:9,13
  65:17 72:6 78:20
  78:25 82:24 92:1
  94:15,25 108:2
  116:24 133:8
  137:18 145:25
  158:23 159:12
  160:5 162:21
  173:12 193:7
  195:9 211:3
  224:22 225:1

233:21 240:2
  255:3 261:5,6
  264:13 274:17,18
  274:25 291:19
  307:17 312:19
  313:25 322:13
  332:4 346:7
  353:13 357:12
  366:22 369:15,20
  374:12 379:13
wanted 62:1 63:21
  113:3 124:23,25
  148:21 285:13
waste 70:9 78:23
  224:22 226:5
  238:22 384:13
wasted 385:7
wasting 16:6 70:11
  191:8 225:5 263:8
water 30:15 314:22
  323:2
Watts 18:2,3,5,9,19
  19:11 20:2 164:8
  164:17 361:3
  367:16
way 17:10 19:8
  25:12 34:3 45:2
  57:14 71:25 77:22
  85:18 87:9 88:14
  88:18 94:6 101:20
  104:13 107:17
  119:8 123:2 125:4
  145:18 158:2,19
  163:14,16 166:9
  174:21 177:13,19
  186:6,23 205:1,20
  206:5,5 208:8,23
  216:18 221:22
  226:3,19 242:21
  247:16 255:17
  256:3 260:13
  264:11 269:10
  285:11 287:9
  306:8 310:14
  311:12,19 322:12
  340:13,24 345:10

346:9 359:13
  362:15
ways 149:13,14
  208:5 259:10
  260:1,13 262:2
  282:6
wearing 123:18
web 88:13
WebMoney 231:19
website 317:4,6
websites 134:9
week 14:25 47:10
  48:20 55:3,5
weeks 48:24
Wei 129:3,22
  131:14 151:5
  167:16,17 168:1
welcome 124:6
  174:8
went 35:19 37:16
  120:9 187:8
  246:12 253:13
  268:10 274:22
  353:9 355:11
  363:4 364:6
  379:11
wet 328:17,19
whereabouts 19:15
  286:4 313:21
white 64:1 138:14
  138:17,20,23
  139:1,8 140:11
  141:8 142:16,19
  143:5,23 144:1
  145:1,12 146:22
  147:2,5,7,10,12
  147:15,21 148:24
  149:7,10 150:13
  150:17,19 152:7
  152:20 154:8
  156:7,8,10 157:14
  158:7,14 175:10
  191:6
Whois 177:5,7,8,11
  178:6,12,13
  179:21

wide 23:25 86:16
  87:7 129:1 147:4
  254:20 261:16
wider 165:8
wife 15:11 16:3,9
  16:19,22 17:2,9
  17:21,22 18:12,12
  32:3,12 49:4
  51:23 72:4 164:12
  203:12 325:5
  341:20 361:2
  363:14,15,25
  367:23 369:19,23
wife's 18:19 32:7
  164:13,13
WikiLeaks 134:9
Wilson 103:5,9
  105:3
Wimbledon 8:4,5,6
  9:3,4,6 10:8
win 377:23
window 178:3
winter 341:13
wipe 74:17 75:21
wiped 12:5 74:15
  74:18,22,24 75:4
  75:15,21
wise 82:22
wish 15:25 67:3
  86:18
wished 316:1
Withdraw 252:10
withdrawing 43:18
withdrawn 148:7
  154:18 313:11
witness 5:6 7:8 8:17
  10:1 11:8,18 13:8
  15:4 17:8 18:11
  20:22 21:4 23:13
  23:21 24:5,9 25:3
  25:7,10,11 26:2,9
  26:16,22 27:4,13
  27:18,23 28:11,18
  29:4,11,20 30:13
  30:18 31:7,14,18
  31:25 33:10 34:4

34:10,20 35:2,7
35:19 36:14,19,21
37:20 38:3 39:4
39:17 40:2,6
41:18 42:17 43:25
44:11,17 45:15,23
46:7,13,19 47:13
48:1,8,17,22
49:16 50:3,7,14
50:22 51:6,12,17
52:10,14 53:1,13
53:21 54:14,21
55:1,21 57:6,13
57:21 58:2,20
59:15 60:1 61:10
63:15,21 64:12
65:19,24 67:3,22
68:5,14,18,23
70:22 71:15,22
73:5,11,15,19,25
74:15 75:2,7,20
76:9,16 78:1,9
79:13,21 80:2,8
80:13,21 82:2,6
85:20 86:6,15
87:7,18,25 88:11
89:18 90:5,9,14
90:25 91:6,11
92:4,6,13,18,22
93:3,8,19,25
94:11 95:12,20
96:22 97:17,23
98:6,15,24 99:22
100:2,12,23 101:7
102:10,23 103:13
103:21 105:12,17
106:12,18,21
108:15,21 109:12
109:25 110:18,24
113:25 114:15,25
115:4,10,22 116:3
116:9,16 117:7
118:5,11,19 119:4
119:17 120:16,20
121:16 122:1,7,17
124:11,19 125:9

125:20 126:1,13
126:21 127:7
128:4,9,16 132:5
132:21 133:13
134:6 135:1,7,19
136:10,16,22
137:6,11 138:7,22
139:4 140:8 141:5
141:16,18 142:5
143:20 145:3,8,16
146:5,11,18,25
147:25 148:20
149:3,9 150:2,8
150:16,21 151:22
152:5,12,17,22
153:5,9,12,19,25
154:12 155:10,17
156:18,22 157:2
157:16,22 158:6
158:11,19,20
159:7,19 160:1,9
160:20,25 161:5
161:14 162:20
163:4,12 164:1,11
164:19 166:7,16
166:24 168:13,23
169:5,18 170:11
170:21 171:2,23
173:1,6,10 174:20
175:13,18 176:5,8
176:20,24 177:10
177:16,23 178:9
178:19 180:1,10
180:15 181:7
182:8,16,24 183:5
184:5,12,25 185:4
185:12 186:5,21
187:24 188:5,10
188:21 189:16
190:8 191:13,24
192:15,21 193:2
193:10,11 196:2
196:13 197:17
198:6,10,15 199:3
199:11 201:7,23
203:2,11,22 204:5

204:12 205:3,23
206:4,13,19,25
207:20 208:1
209:1,14 210:6,11
210:19 212:7,13
213:9 214:12
215:9 216:4,24
217:11,24 218:5
218:12 219:25
220:10,21 221:16
222:15,16,24
223:6,12,23 224:3
224:24 225:15,17
226:23 228:17
229:4,13,19,25
230:5,14,21 231:2
232:24 233:12
234:17,25 235:8
235:18 236:1,8,21
237:3 238:3
239:11,19 240:15
241:23 242:19
243:11 244:1,9,15
246:15 247:5
248:8 249:6,16,25
250:8,14 251:1,20
252:11 253:12
254:9,18 257:14
258:12,15,24
259:8,15,21
260:10 262:2,8
263:10 264:2,7
265:18 266:14
267:9,16 268:6,14
268:22 269:16,25
270:22 271:13
272:13,18 273:7
274:12,17 275:5
275:21 276:13
277:1 278:17,23
279:12,17,22
280:6,19,24 281:5
281:16 282:4,18
284:23 285:9,24
286:12,18,24
287:4,8 288:12,20

289:6,12,16 291:8
292:21 293:19,24
294:4,9,13,18
295:5,9 299:7,16
300:11 301:4,14
302:3,10,19 303:3
303:21 304:11
305:2 307:3 308:1
308:8,20 309:4,12
310:7,20 311:3,22
312:5 313:3 314:5
314:10,17 315:23
317:12 319:25
320:3,6 321:15,25
322:16 324:5,11
324:17,23 325:4
326:12,20,25
327:5 328:8,16
329:5,22 330:3,23
331:2,7,15,22
332:2 335:5,16
336:9 337:24
338:1,10,25 339:9
340:3,11,15
341:11,20 342:5,9
342:19,24 343:24
344:6,21 347:12
348:6 349:24
350:17,23 351:9
352:11,17 355:7
355:20 356:10,21
358:8,14,22 360:6
360:7 367:15
378:7 379:17
381:16 382:2,8,16
383:2,25 384:18
386:1
**witnessed** 257:20
257:21,21 258:14
**witnesses** 19:11,14
162:15 163:1
187:15 189:11,13
286:3 339:23
362:7 363:19
**witnessing** 258:20
**wizard** 217:12

**WL** 226:22
**woman** 108:12,18
**won** 337:7
**word** 28:4 52:10,12
52:19 96:15 166:3
166:19 320:23
321:12 322:1,5,13
322:24 323:20
**words** 25:4 190:21
190:23,24 191:1
208:15 239:8
**work** 6:2,3 14:7,24
48:23,23,24,25
52:4 53:14 82:17
82:19 88:1 103:5
105:5,9,22 108:13
125:15 142:12
143:8 149:17
153:20,22 154:1,4
154:15,19 155:11
155:13 159:12
193:11 215:9,12
217:1 219:3
221:18,19,21
222:1,2 227:22
228:13,14,21
230:17 242:10
248:14 273:15
328:11
**worked** 12:22
13:16 14:4,6
74:19 82:20
102:25 105:23
130:14,22 167:21
215:6 283:6
309:21 312:10
374:19
**working** 13:15,21
13:23 14:8 65:6
74:20 103:11
108:19 124:19
125:5 130:17
154:5 218:22
366:18 381:20
**works** 72:21 78:5
109:10 151:18



328:22
**work-product**
296:5
**world** 35:20 109:2
159:7 207:9
312:16 326:18,23
329:19
**worth** 52:16 217:1
227:22 228:12
229:1 243:4 251:8
275:1
**Wotty** 321:9,11,22
322:1,6,13,24
**Wright** 1:11,17 3:3
4:3,5,23,25 5:7,15
5:22 8:13,22
15:12 17:23 18:17
18:22 20:14 25:23
30:20 31:2 35:8
41:6 68:1 69:6
71:4 77:14,18
78:15 82:23 84:3
84:8,10,11,17,22
85:8,12,13,24
87:14 90:2 91:4,8
92:11 93:17 94:9
94:13,18 95:5
96:1 97:22 98:3
106:13 107:13
123:24 124:3,6
126:22 132:2
145:19 173:20,24
175:9,23 176:11
188:23 190:2
217:15 221:6,10
221:13 227:18
239:12 240:17,19
244:6 245:12,23
245:24 246:4,8,12
246:13,20,22
247:1,8,18 248:6
256:19,21 258:25
262:5 263:7,20
264:21 265:6
266:8 267:4,25
268:3 269:6,7,22

269:23 270:15,17
270:19,22 271:1
272:7,10,16 276:3
277:25 278:3
279:14 280:2,2,16
282:2,14 284:1,5
284:8 291:1
293:11 295:10
297:7 307:18
308:16 309:7
312:25 313:15,19
315:2 316:10
317:2,20 320:20
322:11 323:9,12
333:5,19 334:10
334:23 335:11
338:4,15,19
339:18 341:25
343:12,15 344:3,9
344:14,17,24
345:24 347:21
348:2,18 350:15
352:20 358:18,19
358:21,23 360:18
360:19,21 361:1,9
361:16,21 362:10
363:8,10,12,25
364:15 365:17
367:1,9 368:4
369:6,13 371:21
372:3,4,14 373:2
373:3,6,17,24
374:4,8 375:18
376:14,21 377:7
377:25 378:12,13
378:21,25 380:9
380:19,23 381:9
382:24 385:23
386:3,20
**Wrightson** 102:17
105:1
**Wright's** 19:12
37:5 238:7 277:12
295:8 296:1
360:13
**write** 89:11 126:18

135:4 138:13
300:20,20
**writing** 28:21
165:10 167:9
219:9 256:22
300:18,21
**writings** 323:22
**written** 84:1 173:13
256:6 283:7
304:16
**wrong** 81:12 99:7
127:3 153:14,17
155:20,22 179:14
182:25 226:1,10
307:17 340:23
350:23 351:6
354:7
**wrote** 51:24 52:2
152:23 153:19
321:22 323:21
372:4
**W&K** 1:7 90:7,12
90:15,18,19,21
98:9,13 107:16
120:14 123:7,16
218:7,15,19 219:4
219:7,10,12,13,15
219:22 220:3,6,13
221:18,19,21
222:1,2,16 224:13
224:15,18,18
227:24 228:14,22
229:23,25 230:2
230:12,19 231:3,3
231:6 234:20
235:5,13 236:25
238:20,24 239:12
242:1,4,8,9,15
254:16 263:19,22
264:2,4,18 287:16
287:17,18,20,25
318:12 350:15
351:24 352:6
356:19 360:20
362:15,17 372:14
372:21

**W&K's** 230:23
234:23

**X**

**X** 3:1 260:19
356:23
**Xeon** 240:20
**XE310** 240:23
**XE310-512** 240:21
**Xs** 260:20

**Y**

**Y** 356:23
**year** 11:20,20,21
35:22 54:2,6,17
62:22 65:5 85:16
109:6 241:18
306:6,7 324:24
341:15
**years** 54:15 67:23
84:25 130:2 131:7
141:3 143:1
186:24 209:16
217:1,19 227:23
228:14,22,23
246:16 257:24
261:3,16 265:7,21
288:14 299:18
306:4,5 308:13
311:10 313:23
314:21
**yelly** 248:25
**York** 44:1
**Young** 102:4 104:3

**Z**

**Z** 356:23
**Zaharah** 2:10 4:24
65:11,15,25 66:8
66:15 67:1 69:17
88:22 89:2 144:12
162:16 187:18
191:2,16 192:1
361:22
**zero** 123:7,7

**$**

**$100** 204:19,20
228:11 229:1
**$12,000** 243:4
**$20** 251:7
**$30** 278:1,3 279:14
280:3,17 281:13
**$30,000,000** 277:22
**$4** 243:3
**$80,000** 251:8

**0**

**0s** 24:5
**0.1** 172:14,15
**01** 354:22

**1**

**1** 3:11 4:2,2 77:13
77:13,17 78:16,17
79:7 108:1,2
123:24 124:2
150:6 156:16
160:6 161:16,17
161:18 173:19,23
221:6,9 225:21
284:1,4 286:1
297:15 298:4
315:10 317:24
323:8 340:24
348:17 352:25
385:22,22
**1MSU** 246:3,5
252:17
**1s** 24:5
**1st** 318:4
**1%** 172:19,24
173:1
**1,000** 172:13
**1,024** 240:19
**1.5** 52:16
**10** 3:15 51:7,15
130:2 143:1
227:23 228:14,22
228:22 244:17,18
244:21 259:19,20
278:10,11 295:13



295:14,16 298:5,5
298:5,6,6,6,9,10
298:12,14,24,25
299:20 305:5
310:2 347:19,22
354:15 370:18
371:11
**10.37** 4:8
**100** 2:4 35:20 48:24
172:11 237:12,14
237:25
**100,000** 251:10
**1000** 2:12
**10504** 2:7
**10667524** 226:22
**108** 48:24
**11** 266:4 370:17
371:4
**11.12** 41:1
**11.23** 41:4
**11.57** 77:13
**12h** 252:16,25
**12th** 65:2 79:8 80:5
80:11,19 83:21
192:8,18,24
**12,000** 241:20
**12.11** 77:19
**12.45** 108:7
**12.46** 108:10
**126** 3:11
**13** 247:17,20 357:3
357:15 370:18
371:12
**13.02** 123:23
**14** 253:23
**14.07** 124:4
**146** 348:9
**15** 54:15 239:15,17
239:18 244:21
255:25 259:20
278:10 370:18
371:11
**15.04** 173:19
**15.20** 173:25
**16th** 52:17
**16-19** 383:15

**16.14** 221:5
**16.29** 221:11
**16.58** 245:7
**1635** 2:16
**165,000** 251:23
**165,140** 246:3,4
251:4 252:2,17
**17.09** 245:10
**17.55** 283:25
**18** 11:22 52:2
334:15,17,18
**18(a)** 247:23
249:18
**18.08** 284:6
**18.50** 323:5
**189** 3:12
**19** 334:16 385:14
**19.05** 323:10
**19.15** 333:13
**19.31** 333:17
**19.53** 353:22
**19.55** 353:25
**19.59** 357:25
**19103** 2:17
**1933** 248:6 267:21
270:16
**1933ph** 248:1
**1970** 5:23
**1998** 64:23 85:2
124:20 128:23
129:2
**1998-2008** 130:3

――――――――――
**2**
――――――――――

**2** 3:11 77:17 99:5
123:23 126:8,9,11
156:20 267:18
297:15 298:4
305:5 317:14
**2nd** 317:17
**2%** 173:8
**20** 50:9,12,16 51:4
84:25 322:10
**20-year** 129:25
165:19
**20.09** 358:3

**20.42** 385:21
**2000** 13:21
**2002** 138:18 139:2
139:8 145:4
156:18 167:11
**2002-2007** 140:12
**2004** 283:17
**2005** 12:25 130:24
**2005-2008** 130:25
**2006** 8:2,2 9:3,16
10:11,13,22 12:20
12:20 13:19 20:15
21:21,21 23:10
24:19 28:15 32:23
33:7 34:7 46:5
54:23 55:8 56:7
58:25 60:7 62:16
62:20,21,23 141:3
141:7
**2006-2013** 25:24
26:6,14,20
**2006-2014** 33:20
**2006-2015** 12:11
**2007** 20:25 21:25
34:12 56:12,23
57:3,11 59:2,6,7,9
63:1,5,9,10 139:2
139:8 141:3 145:9
**2008** 13:1,2,20 14:3
21:2 22:5 34:17
34:24 35:17 36:5
36:9 37:1 38:1
53:10,18 57:19
59:18,21,24 60:2
63:10 64:4,6 65:2
79:8 80:6,11,19
83:21 105:13
116:13,25 125:9
125:11 128:23
129:2 130:19
145:6,9,13 146:25
147:18 148:25
152:5 156:5 160:6
167:7,13 168:8
354:9,11
**2009** 22:9 37:11,16

37:23 38:6 52:22
52:24 57:22 60:5
60:7 67:6 69:10
70:18 71:12 76:5
76:6,14,17 167:5
169:6 187:12,18
188:3,14,17 192:8
192:18,24 194:8
194:25 196:16,20
197:9 198:3 207:3
226:21 242:16
291:1 293:12
318:13 330:14
350:9 358:24
359:8 360:12
362:10,18 363:1
367:1
**2009/10** 39:17
**2009/2010** 39:20
368:5
**2010** 22:14 37:24
38:7 39:15 51:9
51:21 52:7 57:25
60:17,23 61:4
71:19 76:11
133:20,22 137:3
195:5,15,16,24
196:10,17 197:9
198:3 293:5
341:16 358:25
359:9 360:13
362:11,18 363:1
367:2
**2011** 22:19 39:24
40:4 42:9,17 45:8
45:12 49:7 50:1
51:4 58:5 60:19
61:1,4 85:6
180:22 194:8
202:17 239:7
246:4 251:22
256:12 265:10
267:22,24 268:10
285:12 287:2
290:5,8,20,24
291:5,16 292:2

293:22 294:2
319:16 349:7
380:14
**2012** 22:25 45:11
45:20 46:1 48:11
48:15 49:20 58:8
61:13,14,19,22
62:4,23 103:10
110:14,15,19,21
110:25 111:1
285:12 287:2
294:7 337:8
381:19
**2013** 23:5,10 24:19
28:15 46:5,10,17
46:23 47:1,3,7,11
47:16,18,19 49:18
49:20 58:11 61:16
71:20 85:6 103:10
117:5 233:22,24
234:2 242:16
291:16 292:2
306:14 318:13
330:15 349:8
354:19 365:11
380:16 381:19,20
**2014** 32:23 126:4
317:17 318:4,24
381:20
**2015** 8:1 10:25 14:2
14:4 32:18 73:15
73:17 74:7,17
75:4,15 105:13
314:14 380:22
381:20 382:14
**2016** 10:13 131:10
195:22,24 196:10
197:18,21 360:14
380:14 382:24
**2018** 116:15,19,24
**2019** 1:18 4:8 386:9
386:24
**21** 5:25 52:14
**215,140** 251:5
**22** 385:14
**22nd** 239:7



**227** 3:12
**23** 202:3
**23rd** 5:23
**239** 3:13
**250,500** 270:12
**250,5000** 270:8
**2525** 2:11
**259** 3:13
**27th** 354:9,11
**28th** 318:23
**2800** 2:4
**29** 377:12
**29:46** 376:19
**296** 3:14

---
**3**
---

**3** 3:12 36:23 124:2
 156:25 173:19
 189:3,5,10,10,17
 193:5,11 205:5
 239:21 243:21
 249:3 252:6
 297:15 298:5
 315:7 318:4
 348:11 353:17
 354:3
**3AZ** 10:1
**3BF** 1:22
**3(a)** 270:6,9
**3(b)** 270:15
**3(c)** 271:4 274:20
 276:17
**3(d)** 271:18
**3(e)** 272:23
**3(f)** 275:8
**30** 225:11 226:14
 281:3 376:1,3,4,5
 376:11,17,18
**30th** 246:3
**30-something**
 72:25
**30-45** 44:7
**30-50** 35:21
**30.1** 225:12 226:13
**300,000** 242:2,4,8
 317:25 318:7

 319:2,4
**31st** 365:11
**314** 3:14
**32** 189:18,21
**323,000** 276:4,8,11
**331134** 2:12
**33131** 2:4
**333** 2:7 3:15
**347** 3:15
**384** 348:10
**385** 3:4

---
**4**
---

**4** 3:12 4:7 173:23
 189:7,10,10 205:5
 205:11,13,13
 221:5 227:7,10,11
 227:19 228:3,4,5
 239:22,24 242:14
 275:10 297:15
 298:5 318:11,17
 321:7 333:24,25
 334:14
**4th** 1:18 386:8
**4(b)** 275:24
**4(d)** 277:20
**4,000** 217:1,18
**481** 348:9
**49.5** 276:4

---
**5**
---

**5** 1:22 3:4,13 221:9
 239:2,4 244:21
 259:20 267:13,15
 278:10,11 283:25
 297:15 298:5
 315:7 317:14
 346:25 347:5,9
 350:5,8
**5%** 173:4
**50** 199:22 200:5
 234:1
**50,000** 185:19
 247:9 251:4,25
 252:2
**55** 296:22

**56** 296:22

---
**6**
---

**6** 3:13 259:17
 263:14 277:18,20
 284:4,9,10,11
 292:6 297:15
 298:5 340:23
 354:15,18,23
 357:19
**60** 234:4 347:4
**64** 51:24
**650,000** 308:17,25
 309:2,9

---
**7**
---

**7** 3:14 10:1 296:18
 297:8,15,15,15,15
 297:15,15,16,16
 297:19,19 298:6
 304:4,4 310:2
 323:8 333:25
 349:16 351:13
 356:12 385:21
**700,000** 318:1
**78** 3:11

---
**8**
---

**8** 3:14 298:6 314:25
 315:3 350:9 356:2
**8%** 356:5,8,12
**8(e)** 281:20
**8(f)** 282:24
**8(g)** 284:10
**80** 172:12
**80s** 180:6
**83-1** 189:24
**83-10** 240:5
**83-23** 126:10
**86** 383:15
**88** 383:9

---
**9**
---

**9** 3:15 298:9,10,12
 298:14 299:20
 301:24 302:3,7,8

 333:15,22 352:24
**9%** 356:12
**9:18-cv-80176-B...**
 1:6 4:7
**90s** 16:17 84:13
 167:24 324:6
**96** 189:22
**97** 348:9



Case 9:18-cv-80176-BB Document 316-4 Entered on FLSD Docket 12/08/2021 Page 453 of
Case 9:18-cv-80176-BB Document 351 Entered on FLSD Docket 11/29/2019 Page 1 of 29
483

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

      plaintiffs,

v.                                                   **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      defendant.

_____/

**DR. CRAIG WRIGHT'S OBJECTION**
**TO MAGISTRATE ORDER "DEEMING" CERTAIN FACTS**
**ESTABLISHED AND "STRIKING" CERTAIN AFFIRMATIVE DEFENSES**

Case 9:18-cv-80176-BB   Document 316-4   Entered on FLSD Docket 12/08/2021   Page 454 of
483
Case 9:18-cv-80176-BB   Document 316-4   Entered on FLSD Docket 11/29/2019   Page 2 of 29

## INTRODUCTION

A two-day evidentiary hearing yielded uncontroverted testimony and other evidence establishing that (1) it was impossible for Dr. Craig Wright to produce a complete list of all bitcoin that he mined nearly a decade ago, and (2) even though producing such a list was impossible, Dr. Wright had taken extraordinary steps to create a list of the most probable Bitcoin addressees that he had mined. In those two days, plaintiffs failed to rebut either of these facts, or demonstrate that a list of Dr. Wright's mined Bitcoin addresses would have any connection to any allegation in their complaint. Instead, plaintiffs focused on purported bad acts they allege Dr. Wright committed, none of which had anything to do with the discovery issue that was the subject of the evidentiary hearing.

Despite this, the Order [D.E. 277] (the "Order") rejected uncontroverted evidence of the impossibility of producing a list of all bitcoin that Dr. Wright mined nearly a decade ago. Compounding this plain error, the Order obliterated the boundaries of the limited discovery issue before the Magistrate, by making four findings of fact and purporting to strike eight of Dr. Wright's affirmative defenses, despite confirming that it had no jurisdiction to do so. *See* Order at n.1 (stating that "magistrate judges have jurisdiction to enter sanctions orders for discovery failures which ***do not*** strike claims, completely preclude defenses or generate litigation-ending consequences.") (citing *Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285, 1295 (S.D. Fla. 2015) (emphasis added)).

The Order's findings would deprive Dr. Wright of his fundamental rights to procedural due process, and to have a jury resolve factual disputes in this case. Moreover, the Order would operate to turn inconceivable "facts" that are wholly unrelated to the discovery issue, into

924

Case 9:18-cv-80176-BB   Document 836-4   Entered on FLSD Docket 12/08/2021   Page 455 of
483
Case 9:18-cv-80176-BB   Document 831-1   Entered on FLSD Docket 11/29/2019   Page 3 of 29

indisputable "facts" that are diametrically opposed to the actual evidence. The Order's resolution

of a narrow discovery issue may not establish "facts" that otherwise never would exist.

As more fully demonstrated below, the Order was (1) wholly without evidentiary support,

(2) improperly exceeded the scope of the matters before the Magistrate and the Magistrate's

jurisdiction, and (3) would improperly deprive Dr. Wright of fundamental due process rights and a

fair trial. It should be vacated to prevent a miscarriage of justice.

## DISCUSSION

**A. There Is Absolutely No Basis for Imposing Any Sanctions on Dr. Wright, Because the Uncontroverted Evidence Shows that He is Unable to Access a Listing of the Bitcoin that He Mined**

There was only *one narrow discovery issue* before the Magistrate: Dr. Wright's stated

inability to comply with the Court's discovery order to "produce a complete list of all bitcoin that

he mined prior to December 31, 2013." D.E. 217 at 5.  On that single issue, Dr. Wright

unequivocally testified in detail as to why he was unable to comply. The algorithm necessary to

generate a complete list of his Bitcoin public addresses is in an encrypted file that is protected by a

Shamir encryption scheme.[1] June 28, 2019, Hr. Tr. 11:13-12:20. To unlock the encrypted file, Dr.

Wright would need at least 8 of the 15 key slices, but he has only 7. *Id.*107:20-108:4; 122:4-17;

126:16-17. His best friend, Dave Kleiman, set up a system whereby Dr. Wright would, at the

---

[1] A Shamir encryption scheme is an additional layer of encryption that can be used to protect sensitive information, such as cryptographic keys. The scheme works by generating a pre-determined number of "key slices," and defining the number of slices required to reveal the original secret, known as the threshold. Without enough key slices to meet the threshold, the original secret will not be divulged. In practice, one would first encrypt a file with a cryptographic key. That encryption key would then be further encrypted using the Shamir encryption scheme, resulting in multiple key slices. To decrypt the file, one would need to combine enough key slices to meet the threshold and reveal the original encryption key. The revealed key can then be used to decrypt the file. *See* Adi Shamir, How to Share a Secret, Communications of the ACM, Vol 22, No. 11, Nov. 1979, at 612.

Case 9:18-cv-80176-BB   Document 836-4   Entered on FLSD Docket 12/08/2021   Page 456 of
483
Case 9:18-cv-80176-BB   Document 831-1   Entered on FLSD Docket 11/29/2021   Page 456 of
483

earliest, start to receive the remaining key slices in January of 2020 by bonded courier, at which

point, Dr. Wright would be able to comply with the Court's order. *Id.* at 23:23-24:7. Dr. Wright is

unable to circumvent this system to obtain the eighth key slice at an earlier date because he was

not involved in setting up the courier system and because Dave Kleiman is no longer alive. *Id.* at

125:20-126:3.

Dr. Wright also testified as to his substantial good faith efforts to comply with the Court's

order. The bitcoin that Dr. Wright mined can be identified by six select criteria, such as the node

values and date mined. Aug. 5, 2019, Hr. Tr. 16:3-20:2. At Dr. Wright's direction, Steve Shadders,

the Chief Technology Officer of nChain, created a computer script to analyze the blockchain for

bitcoin that met those six criteria, identifying approximately 27,000 matching Bitcoin addresses.[2]

June 28, 2019, Hr. Tr. 172:10-173:9; Aug. 5, 2019, Hr. Tr. 13:17-25:11. Dr. Wright produced a

list of those bitcoin to plaintiffs in June of 2019. Dr. Wright also provided plaintiffs a list of all

bitcoin that he definitively knows he mined, which includes the first 3,500 bitcoin mined and

bitcoin that he sent to Mike Hearn. D.E. 211 at 3; June 25, 2019 email from Z. Markoe to V.

Freedman, attached as Exhibit A. Dr. Wright also produced all non-privileged documents (more

than 2,500) that contained the word "Tulip" or "Seychelles" and were related to trusts or bitcoin.[3]

D.E. 211 at 3; June 3, 2019 email from Z. Kass to V. Freedman, attached as Exhibit B.

---

[2] The list is overinclusive because there are a number of bitcoin that may match the six
characteristics but were not mined by Dr. Wright. What is certain, however, is that all bitcoin Dr.
Wright mined are on the list he produced, excluding a few he mined on his laptop. Aug. 5, 2019,
Hr. Tr. 25:15-22.
[3] The documents produced included documents plaintiff used in the evidentiary hearing to try and
show that certain other documents were altered. If Dr. Wright had been trying to deceive this
Court, as the Order suggests, one would have expected him to withhold the supposedly
incriminating documents. Dr. Wright did not.

Case 9:18-cv-80176-BB Document 816-4 Entered on FLSD Docket 12/08/2021 Page 457 of
483
Case 9:18-cv-80176-BB Document 831-4 Entered on FLSD Docket 11/29/2021 Page 457 of

It is well-established in the 11th Circuit that there is no basis for sanctioning a party unable

to comply with a court order. *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (citing

*Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991); *United States*

*v. Roberts,* 858 F.2d 698, 701 (11th Cir.1988)). A party shows that it is unable to comply by

demonstrating that it has "made 'in good faith all reasonable efforts to comply.'" *Id.* (quoting

*Watkins*, 943 F.2d at 1301). Specifically, that demonstration can be made through the party's

testimony. *United States v. Rizzo,* 539 F.2d 458, 466 (5th Cir. 1976) (There was no basis for

contempt sanctions after the noncompliant party testified that he searched for, and was unable to

locate, patient forms that the court ordered produced.); *United States v. Spilotro*, 1985 WL 384, at

*4 (N.D. Ill. 1985) ("Respondent has satisfied his burden of production with regard to his defense

that he is unable to comply with the production order," by testifying that the records were

destroyed by the "fire and flood that struck his home."); *United States v. Barnette*, 902 F. Supp.

1522, 1538 (M.D. Fla. 1995) ("[T]he Court finds that [the non-compliant party] has satisfied his

burden of production by introducing evidence supporting his claim of inability to comply with the

court order," namely his own testimony as to his "attempts to obtain the stock" that the court

ordered produced.); *United States Commodity Futures Trading Comm'n v. Capital Blu Mgmt.,*

*LLC*, 2010 WL 11508136, at *2 (M.D. Fla. 2010) (The court "cannot find, on this record, that

these Defendants are likely in contempt for failing" to produce the computers ordered by the court

when the noncompliant party has "testified that all of the computers from the Melbourne office . . .

were turned over to the United States Attorney's Office."); *In re Coastal Land Dev. Corp.,* 2009

WL 2985700, at *3–4 (Bankr. S.D. Miss. 2009); *Liberty Mut. Ins. Co. v. Aventura Eng'g &*

*Constr. Corp.*, 2009 WL 10697338, at *3-4.  (S.D. Fla. 2009).

927

Case 9:18-cv-80176-BB   Document 836-4   Entered on FLSD Docket 12/08/2021   Page 459 of
Case 9:18-cv-80176-BB   Document 351   Entered on FLSD Docket 11/29/2019   Page 458 of
483

Dr. Wright unequivocally testified that he was unable to comply with the Court's order, explained in detail why compliance was not possible, and testified about his good faith efforts to comply. ***That testimony stands unrebutted by plaintiffs***. While plaintiffs challenge the veracity of certain documents related to the formation of the Tulip Trusts, they have not introduced ***any evidence*** challenging Dr. Wright's testimony regarding his inability to produce a complete list of all bitcoin that he mined prior to December 31, 2013, ***which was the only issue before the Magistrate***. Plaintiffs have neither introduced any evidence showing that Dr. Wright can access a complete list of bitcoin that he mined, nor have they introduced any evidence that he didn't make good-faith reasonable efforts to comply with the Court's order by providing an overinclusive list of Bitcoin addresses, providing his best, a partial list of the bitcoin that he mined, and producing the documents related to the Tulip trusts. For these reasons, there simply was no basis to sanction Dr. Wright, and the sanctions imposed by the Order are contrary to law.

This conclusion is unchanged by the supposedly "inconceivable" nature of Dr. Wright's testimony, which supposedly defies "real-life experience." *See* Order at 19 (Making a "finding" that no one would set up a system where they could potentially lose "billions" of dollars "if [a] bonded courier does not appear."). Moreover, as a factual matter, Dr. Wright's testimony is not inconceivable.

The Order failed to consider five important facts. First, it failed to consider that the bitcoin were worth around a million dollars—not billions—when Dr. Wright started the process of putting them in the trust.[4] Second, the Order failed to consider the redundant nature of the Shamir

---

[4] In the end of April 2011, the value of one bitcoin ranged from $1.18 to $2.03. https://99bitcoins.com/bitcoin/historical-price/ (last visited Nov. 21, 2019). Thus, the 821,050 bitcoin in the Tulip Trust were worth between $968,839 and $1.6 million dollars when the trust was created, as opposed to the approximately 8 billion dollars they were worth when the Order

Case 9:18-cv-80176-BB   Document 836-4   Entered on FLSD Docket 12/08/2021   Page 459 of
483
Case 9:18-cv-80176-BB   Document 831   Entered on FLSD Docket 11/29/2021   Page 45 of 29

Scheme. Dr. Wright testified that there were 15 available key slices, of which, only a threshold number of 8 were necessary to decrypt the files. June 28, 2019, Hr. Tr. 106:17-108:4. As such, **even if 7 keys were permanently lost**, Dr. Wright still would be able to decrypt the file—so long as he received the other 8 keys. Third, the Order failed to consider that when Dr. Wright asked Dave Kleiman to set up the courier system, he had no way of knowing that Dave would die only a few years later, which would make Dr. Wright totally reliant on the system Dave set up.  Fourth, the Order fails to consider that the Bitcoin blockchain contains 1.3 million bitcoin that share the six unique characteristics to which Mr. Shadders testified, and that those unique characteristics make it probable that one person mined a vast majority of those bitcoin—yet those bitcoin have not been spent in almost ten years. Those bitcoin **must belong to somebody**, and that somebody likely has a good reason for having not spent them. Dr. Wright's testimony as to his inability to access his bitcoin and their addresses fits perfectly with this provable (and proven) reality. Fifth, as to what's conceivable or not, the Order fails to consider that the Magistrate's life experience and, frankly, most people's life experience, may not correspond to that of the inventor of Bitcoin.

It is beyond dispute that the inventor of Bitcoin is not a typical person. Bitcoin is a pseudonymous, revolutionary digital currency that is not reliant on a central institution to control it. Instead, it is secured by powerful encryption comprised of public and private key pairs and maintained by miners. In other words, the Bitcoin system was set up by a security-conscious contrarian. Against that backdrop, it is not at all inconceivable that Dr. Wright (the professed inventor of Bitcoin), would use powerful and complex encryption to protect his bitcoin—even if a typical person might not. In fact, the idea of using a Shamir scheme to protect bitcoin has recently

was issued, when one bitcoin was worth approximately $10,000. Further, when the trust was created, the very concept of cryptocurrency was extremely novel, and it was far from certain that the bitcoin would even maintain their value—let alone appreciate nearly ten thousand-fold.

Case 9:18-cv-80176-BB Document 816-4 Entered on FLSD Docket 12/08/2021 Page 460 of
483
Case 9:18-cv-80176-BB Document 361-4 Entered on FLSD Docket 11/29/2019 Page 3 of 29

gone mainstream in the Bitcoin community. *See* Trezor Blog, *Shamir Backup—Our Newest
Security Standard,* https://blog.trezor.io/shamir-backup-the-revolution-of-private-keys-backup-is-
here-858687ed7fe7 (last visited Oct. 10, 2019).

**B. The Draconian Sanctions the Order Purported to Impose Would Violate Dr.
Wright's Due Process Rights Because They Improperly Went Far Beyond the Single,
Narrow, Discovery Issue Before the Magistrate and Amounted to a Determination of
Liability Without an Opportunity to Defend on the Merits**

There was only *one, narrow discovery issue* before the Magistrate: Dr. Wright's asserted
inability to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E.
217 at 5. Nonetheless, citing Rule 37, the Order imposed draconian sanctions in the form of
deemed facts (the "Deemed Facts")[5] that went *far beyond* the one, narrow discovery issue before
the Magistrate, made extensive purported findings on the merits of the case, and purported to
strike eight affirmative defenses for being "inconsistent" with the Deemed Facts. *See* Order at 29.
The Deemed Facts would establish that: 1) a partnership existed between Dr. Wright and Dave; 2)
plaintiffs have an ownership interest in the bitcoin that Dr. Wright mined prior to Dave's death;
and 3) plaintiffs have an ownership interest in Dr. Wright's bitcoin-related intellectual property
developed prior to Dave's death. *See* Order at 28-29.

---

[5] The Magistrate "deemed" the following facts established:
    (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin
    intellectual property and to mine bitcoin;
    (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David
    Kleiman's death was property of the partnership,
    (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's
    bitcoin") was property of the partnership when mined; and,
    (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any
    assets traceable to them.
Order at 28-29.

Case 9:18-cv-80176-BB   Document 836-4   Entered on FLSD Docket 12/08/2021   Page 462 of
483
Case 9:18-cv-80176-BB   Document 831-1   Entered on FLSD Docket 11/29/2021   Page 461 of
483

In imposing sanctions that far exceeded the scope of the single, narrow discovery issue before the Magistrate, the Order violated Dr. Wright's due process rights. More than sixty years ago, the Supreme Court made clear that the "provisions of Rule 37 . . . must be read in light of the provisions of the Fifth Amendment that ***no person shall be deprived of property without due process of law . . . .***" *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 209 (1958) (emphasis added). "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Id.* Under Rule 37(b)(2), "the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 708 (1982). In other words, there must be a "nexus between the information [] not produced" and the sanction imposed. *C & M Oil Co. v. CITGO Petroleum Corp.*, 2007 WL 9751801, at *5 (S.D. Fla. 2007); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 2009 WL 982460, at *4 (S.D. Fla. 2009).

There is no nexus between the single, narrow discovery issue before the Magistrate and the broad sanctions the Order purported to impose through the Deemed Facts. Starting with the Deemed Facts regarding ownership of Dr. Wright's intellectual property and a purported partnership between Dr. Wright and Dave, there is absolutely ***no evidence*** that a listing of the bitcoin ***that Dr. Wright mined*** would have aided plaintiffs in establishing that Dave had any ownership interest in any of Dr. Wright's intellectual property or that there was any partnership between them to do anything. In fact, there is no logical connection between the two subjects.

As for the Deemed Facts granting plaintiffs an ownership interest in Dr. Wright's bitcoin, there is no record evidence showing that a listing of bitcoin ***that Dr. Wright mined*** would have

helped plaintiffs prove that Dave had an ownership interest in those bitcoin, let alone that Dave mined them. Bitcoin is a pseudonymous currency, which does not contain the names of the bitcoin miners or owners. [6] Aug. 5, 2019, Hr. Tr. 26:14-27:2. At most, the discovery ordered would have shown that bitcoin Dr. Wright had mined were moved from one pseudonymous public address to another pseudonymous public address.[7] Even if plaintiffs knew the identity of Dave's public addresses (they have failed to introduce **any** such evidence) and were able to strip away the pseudonymity, showing that bitcoin *Dr. Wright mined* were later transferred into Dave's public addresses[8] would not show that Dr. Wright stole bitcoin from Dave. If anything, **it would show that Dave stole bitcoin from Dr. Wright**.

### C. The Draconian Sanctions the Order Purported to Impose Also are Improper Because There is No Record Evidence of Any Prejudice to Plaintiffs, which is an Essential Requirement for Imposing Sanctions under Rule 37(b)

As shown above, the Order's draconian sanctions would violate Dr. Wright's due process rights, because there is no nexus between the discovery ordered and the sanctions imposed for being unable to provide it. Those sanctions also are improper because there is no evidence of any prejudice to plaintiffs—and this is evident from the face of the Order.

"The severe sanctions permitted by Rule 37(b) are usually only imposed" when "the party seeking sanctions was prejudiced by the violation." *Dude v. Cong. Plaza, LLC*, 2018 WL

---

[6] Further, there are no "accounts" on the Bitcoin network. Bitcoin are cryptographically locked on the blockchain and can be identified by their public addresses, which is a template used to represent the unlocking script for the bitcoin.

[7] That is assuming that the bitcoin were in fact moved. Dr. Wright testified that they were not, and plaintiffs have not introduced **any** evidence to the contrary.

[8] As stated in the Bitcoin white paper, Bitcoin public addresses are designed to be only used one time. *See* D.E. 238-1 at 6 ("a new key pair should be used for each transaction to keep them from being linked to a common owner"). As such, it is highly unlikely that Dave would have reused his Bitcoin addresses, which would make plaintiffs hypothetical tracing impossible—even if they knew some of his Bitcoin addresses.

4203888, at *5 (S.D. Fla. 2018), *report and recommendation adopted*, *Dude v. Cong. Plaza. LLC*, 2018 WL 4203886 (S.D. Fla. 2018) (citations omitted); *Wouters v. Martin Cty., Fla.*, 9 F.3d 924, 934 (11th Cir. 1993) (The district court abused its discretion in dismissing 14 plaintiffs because "plaintiffs' noncompliance with the discovery order did not prejudice defendant.").

The 29-page Order dedicates *just one conclusory line* to discussing plaintiffs' purported prejudice, stating that "plaintiffs have also been prejudiced by not being able to try and trace the bitcoin that was mined." Order at 28. The lack of any detail is telling.

At the evidentiary hearing, plaintiffs failed to introduce any evidence as to 1) how their purported bitcoin tracing would work, 2) how it would help them prove any of their claims, or 3) how they would be prejudiced in its absence. Like the Order, plaintiffs merely assumed that this purported tracing was important, without providing any logical, much less factual, basis for that assumption.

As the parties and the Court are aware, Bitcoin is a pseudonymous currency, which does not contain the names of the bitcoin miners or owners. There is nothing in the record that even hints at how tracing[9] bitcoin that Dr. Wright mined, from one pseudonymous public address to another pseudonymous public address, would aid plaintiffs in establishing that Dr. Wright stole any bitcoin from Dave, let alone that they mined any bitcoin together.

In dispositive contrast, Dr. Wright **did submit evidence** at the evidentiary hearing which showed that bitcoin tracing would be useless to plaintiffs because of the pseudonymous nature of Bitcoin. Steve Shadders testified that the Bitcoin public addresses would not provide the identity of the owner or miner of a bitcoin. Aug. 5, 2019, Hr. Tr. 26:14-27:2. That testimony stands

---

[9] Again, plaintiffs' "tracing" theory assumes that the bitcoin was moved from one public address to another public address and could thus be traced. But Dr. Wright testified that the bitcoin never was moved. That testimony has not been contradicted.

unrebutted, and demonstrates that the Order's conclusory statement about purported prejudice to plaintiffs is contradicted by the *only evidence* on this issue.

Further, even if there were a way to somehow trace Dr. Wright's bitcoin to Dave (there isn't), and also assuming that tracing would somehow help plaintiffs establish their claims (it wouldn't), plaintiffs could simply perform that analysis on the overinclusive list of Bitcoin addresses that Dr. Wright provided. As noted above, in a good faith effort to comply with the Magistrate's order, Dr. Wright had the Chief Technology Officer of nChain, Steve Shadders, prepare a list of Bitcoin addresses using select criteria that Dr. Wright provided. *See* Aug. 5, 2019 Hr. Tr. 11:6-28:16. Mr. Shadders was able to compile a list of 1,263,650 bitcoin,[10] which includes all of the 821,050 bitcoin that Dr. Wright mined. Aug. 5, 2019, Hr. Tr. 25:15-22. There is no reason why plaintiffs could not conduct their "tracing" on that list of 1,263,650 bitcoin, nor is there any reason why they could not conduct "tracing" on the Bitcoin addresses Dr. Wright already had provided.[11] In fact, plaintiffs failed to introduce *any evidence* at the hearing that they *even tried* to conduct any tracing—despite having had the overinclusive list of bitcoin for more than a month.

---

[10] The list of bitcoin that was introduced as defendants Exhibit 2 contained 27,973 Bitcoin addresses. D.E. 266-1. Mr. Shadders testified that he was able to further reduce that list by 2,700 addresses. Aug. 5, 2019 Hr. Tr. 23:8-24:19. Thus, the total amount of Bitcoin addresses identified by Mr. Shadders was 25,273 (27,973-2,700=25,273). Each of the Bitcoin addresses contained 50 bitcoin, which resulted in a total of 1,263,650 bitcoin (25,273x50=1,263,650).

[11] The possibility that the Magistrate might not have believed that the overinclusive list contained Dr. Wright's Bitcoin address (despite the fact that the criteria matched the Tulip Trust documents), begged the question whether the Magistrate would have believed that any list of Bitcoin addresses were Dr. Wright's. It well may be that the Magistrate only would have been satisfied if Dr. Wright had produced a list of Bitcoin addresses that showed a large number of bitcoin transfers between April 2013 (Dave's death) and December 31, 2013 (the cut-off date ordered by the Magistrate). Of course, that would be putting the cart before the horse, as it would assume such transfers demonstrated a theft.

Case 9:18-cv-80176-BB   Document 816-4   Entered on FLSD Docket 12/08/2021   Page 465 of
483
Case 9:18-cv-80176-BB   Document 811-4   Entered on FLSD Docket 11/25/2019   Page 13 of 29

Finally, Dr. Wright testified that he should be receiving, at the earliest, the missing key slices that would enable him to generate a list of his bitcoin holdings in January of 2020. June 28, 2019, Hr. Tr. 23:23-24:7. At a minimum, Dr. Wright should have been afforded the opportunity to wait until that date to see if he receives the key slices to generate the list of his bitcoin holdings, which he could then provide to plaintiffs. At that point, even plaintiffs would have to concede that Dr. Wright's inability to do the impossible and comply with the discovery order caused them absolutely no prejudice.

### D. The Order's Attack on Dr. Wright's Character Has no Bearing on Whether he Could Produce the List of Bitcoin Addresses, and is Without Record Support

It is undisputed that there was only *one, narrow discovery issue* before the Magistrate: Dr. Wright's stated inability to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5. Moreover, it also is undisputed that Dr. Wright's testimony regarding his inability to provide a list of his bitcoin holdings is uncontroverted and unchallenged by any record evidence. Yet, the vast majority of the Order focuses on supposed "bad acts" by Dr. Wright *that had absolutely nothing to do with whether he could access a list of his bitcoin holdings*. For that reason, those purported "bad acts" are simply irrelevant. Yet, despite their irrelevance, Dr. Wright is compelled to address those purported "bad acts" due to the extreme nature of the Order's findings and the extreme prejudice those findings would cause him.

According to the Order, Dr. Wright is a conniving and uncooperative defendant who "changed his story," provided the Court with "inconsistent," "intentionally misleading," and "perjurious" statements, and who "intentionally submitted fraudulent documents to the Court," as "part of a sustained and concerted effort to impede discovery into his bitcoin holdings." Order at 17-28. Yet, in reaching those "conclusions," the Order overlooked critical evidence and misstated

the record. Specifically, it cited six instances of purported "bad conduct" by Dr. Wright. They are as follows:

i) "Inconsistencies" as to the identities of the Tulip Trust trustees [Order at 22-23];
ii) "Inconsistencies" in the manner that Dr. Wright described the transfer of the bitcoin holdings into the Tulip Trust [Order at 23];
iii) The "lack" of record support for the encrypted file containing Dr. Wright's Bitcoin addresses [Order at 21];
iv) Dr. Wright's "intentional submission" of fraudulent documents [Order at 20-21, 26-28];
v) Dr. Wright's failure to tell the Court prior to the evidentiary hearing that a list of public addresses would not aid plaintiffs' case [Order at 25-26]; and,
vi) Dr. Wright's failure to tell the Court in March that a list of his bitcoin holdings was inaccessible [Order at 21-22].

We address each of these purposed instances of "bad conduct" below.

### i. The Purported "Inconsistencies" as to the Identities of the Tulip Trust Trustees

The Order found that Dr. Wright made "irreconcilable statements about the Tulip Trust," stating that "[t]he April 18 Motion stated it was a blind trust and he was not a trustee. His sworn declaration three weeks later stated that he is one of the trustees of the Tulip Trust." Order at 22. In making this finding, the Order failed to consider that there are two Tulip Trusts. *See* D.E. 237-22; 237-9. As shown by the trust documents, Dr. Wright is the trustee of one of the Tulip Trusts but is not a trustee of the other.

### ii. Purported "Inconsistencies" in the Manner that Dr. Wright Described the Transfer of Bitcoin Holdings to the Tulip Trust

The Order found that Dr. Wright "changed his story" as to what assets were transferred into the trusts, and that he provided an "intentionally false" representation on that issue. Order at 23. According to the Magistrate, Dr. Wright "unequivocal[y]" stated in his April 18th motion and May 8th declaration that the "trust held bitcoin," but "testified at his deposition and the evidentiary hearing that "the trust only holds keys," not actual bitcoin. *Id.*

Having purportedly "caught" Dr. Wright in this inconsistency, the Order then speculated as to Dr. Wright's purported motivation. It speculated that Dr. Wright "belatedly realized that any transactions(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain . . . so he changed his story to say only the keys had been transferred." Order at 23-24.

This finding reflects a misunderstanding of Bitcoin technology and is unsupported by the record.  First, it is impossible to hold or store bitcoin. The bitcoin *always remains on the Bitcoin blockchain*. In common parlance, when someone states that their bitcoin is stored on a hard drive, what they mean is that the hard drive contains the private keys that can be used to transact with corresponding bitcoin on the Bitcoin blockchain. Thus, there is no basis for attempting to distinguish between a trust holding bitcoin or Bitcoin keys. *They are the same thing.*

For that reason, there also is no difference between bitcoin transferred on the blockchain into a new set of public addresses controlled by a trust, and bitcoin transferred off the blockchain by transferring the Bitcoin private keys. In both instances, *the only thing held by the trust would be private keys*.

Second, even assuming arguendo that there were a difference between holding actual bitcoin and holding Bitcoin private keys (there is not), the Order's conclusion that Dr. Wright made inconsistent statements as to the trust holdings is unsupported by the record. The Order reached its conclusion by cherry-picking sentences from two documents, Dr. Wright's May 8th Declaration and his April 18th motion, but those very same documents contain other sentences that undermine the Order's conclusion.

In Dr. Wright's May 8, 2019 declaration (produced long before the evidentiary hearing where Dr. Wright supposedly "changed his story), Dr. Wright stated that "I later transferred the

encrypted files that control access to these bitcoin in 2011 . . . " and that "access to the encrypted file that contains the ***public addresses and their associated private keys to the bitcoin that I mined***, requires myself and a combination of trustees referenced in Tulip Trust 1 to unlock based on a Shamir scheme." D.E. 222 at 1, 2, 4 (emphasis added). Dr. Wright's declaration was unequivocal. The trust contained the ***private keys*** associated with the ***bitcoin that he mined***—not the "actual" bitcoin (which have no physical existence in the usual sense).[12] Additionally, Dr. Wright's April 18th motion states that he "transferred *ownership* of all his Bitcoin into a blind trust." D.E. at 184 at 2 (emphasis added). Transferring "ownership" of bitcoin is accomplished by transferring the private keys.

Further, there are additional documents that undermine with the Order's speculation that Dr. Wright "changed his story" because he "belatedly realized that any transactions(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain." Order at 23, 24. The trust documents (also produced long before the evidentiary hearing) make it clear that the bitcoin never moved (*i.e.,* were not transferred on the blockchain). One document describes the trust assets as follows: 1) "the settlor has had paid the trustee the sum of XBT 821,050" and 2) "the XBT (bitcoin) have ***never been spent or moved***." D.E. 237-22 at 2 (emphasis added).  And if the bitcoin "never moved," the only other method of transfer could have been an off-blockchain transfer of the private keys—to which Dr. Wright testified.

---

[12] We emphasize that Dr. Wright stated in the declaration that he transferred the private keys to *the bitcoin that he mined*, not the private keys to the ***bitcoin that were currently in the trust***. If Dr. Wright had meant to state that he'd transferred the bitcoin on the blockchain into the trust, as the Order incorrectly concluded [Order at 23, 24], then the correct terminology would have been the latter, not the former. This is so, because transferring the bitcoin on the blockchain would have required ***a new set of public addresses and corresponding private keys***.

### iii.  The Purported "Lack" of Record Support for the Encrypted File Containing Dr. Wright's Bitcoin Addresses

The Order found that "notably absent" from the trust documents "is any encrypted file, software, public or private keys," and that there was no "other credible evidence" that the file existed. Order at 21, 24. Thus, the Order concluded that the "file does not exist." Order at 24.

The Order's conclusion is unsupported and contradicted by the record evidence. First, one of the trust documents refers to an encrypted file that can be accessed by private keys. *See* 237-9. This document states that the trust is "DAC formed using a split key cryptographic process," which is controlled by the distribution of keys. *Id.* at 2. That high-level description fits perfectly with a split-key Shamir-Scheme encryption of the software necessary to generate Dr. Wright's Bitcoin addresses.

Second, numerous documents that were produced early on in discovery and introduced during the evidentiary hearing make reference to the Shamir Scheme for protecting the trust assets. For example, a document that appears to be a Bitmessage exchange between Dr. Wright and Dave states "[t]he keys are divided using the SSSS (Shamir's secret sharing scheme) scheme you had us work on." D.E. 237-16 at 8.[13]

Third, plaintiffs' counsel is currently in possession of the encrypted file that Dr. Wright stated contains the software necessary to generate his public Bitcoin addresses.[14] Dr. Wright's

---

[13] Plaintiffs claim that the received date on the Bitmessage pre-dates the public release of the Bitmessage software, however, Jonathan Warren, the creator of Bitmessage, testified that the software was stored on an unprotected server in his parents' home and that it may have been released on the dark web prior to the public release. D.E. 261-1 at 89:24-90:2; 104:22-107:19.

[14] Dr. Wright's discovery vendors produced the file to plaintiffs on August 27, 2019, the same day the Court issued its Order. Dr. Wright had not previously produced the file to plaintiffs because his discovery vendors had not been able to decrypt it, making it of little use to anyone, including plaintiffs. Upon receiving the Magistrate's order that doubted the existence of the encrypted file, Dr. Wright promptly produced that file to plaintiffs.

discovery vendor also is in possession of that file and has been working on decrypting the file (so far without any success).

### iv.    *Dr. Wright's Purported "Intentional Submission" of Fraudulent Documents*

The Order repeatedly found that Dr. Wright "intentionally submitted fraudulent documents to the Court." Order at 28, 27, 26, 21, and 20. This conclusion appears to be based on the testimony of plaintiffs' expert, Matthew Edman, who testified as to inconsistencies with several documents. However, Edman *also testified* that he was unable to conclude who had created these inconsistencies, he conceded that many of them could have innocent explanations, and he failed to analyze the original ESI emails.[15]

Notably, the Order addresses only one of the supposedly "fraudulent documents," a document dated October 23, 2012 establishing one of the Tulip Trusts. D.E. 237-9. According to the Order, "computer forensic analysis indicated that the Deed of Trust presented to the Court was backdated." Order at 21.  The Order appears to be relying on the testimony of Edman, who testified that the font files embedded in the document were copyrighted in 2015, implying that the document really was drafted in 2015. Aug. 5, 2019, Hr. Tr. 181:11-184:20. However, Edman conceded that the document could have been drafted in 2012, but simply OCR'd in 2015, which could have embedded the 2015 fonts into the document. *Id.* at 239:16-240:16. As such, Edman's testimony is not conclusive of anything.

---

[15] The timing inconsistencies in the PGP signatures could have been caused by a poorly configured computer clock. The supposed issues with the PGP version histories could have been caused by an Alpha or Beta version of the software. The supposed timing issues with the Bitmessages could be due to a pre-release version of the Bitmessage software. The supposed changes to the Tulip Trust email could have been caused by forwarding the original native email and then PDFing it. Each of these plausible explanations contradicts the "Fraudulent documents" accusation. None of them even were considered by the Order.

Further, even if there were no innocent explanations for the purportedly "fraudulent" documents (there are), the mere fact that a document may be altered—does not make that document "fraudulent." "Fraud" is a legal term of art that requires four elements to be met. "The elements of fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement is false; (3) defendant's intent that the statement induce the plaintiff to act; and (4) plaintiffs' reliance on the statement." *JPMorgan Chase Bank, N.A. v. Hayhurst Mortg., Inc.*, 2010 WL 2949573, at *3 (S.D. Fla., 2010) (citing *Parham v. Fla. Health Scis. Ctr., Inc.*, 35 So.3d 920, 928 (Fla. 2d DCA 2010)).

Here, the only evidence introduced at the evidentiary hearing was that certain documents purportedly were altered. There was absolutely no evidence as to any of the other elements of fraud.[16] The Order fails to even address the elements of fraud, let alone analyze whether the purportedly altered documents satisfied any of those elements.

> **v.** *Dr. Wright's Purported Failure to Tell the Court Prior to the Evidentiary Hearing that a List of Public Addresses Would Not Aid Plaintiffs' Case*

The Order chastises Dr. Wright for "changing his story" at the evidentiary hearing regarding the utility of public addresses, where he purportedly "argued for the first time that a list of public addresses was meaningless." Order at 25. The Order found this "particularly disturbing because it was Dr. Wright who first injected the idea of public addresses into this discovery matter," and "the Court did not order production of a list of public addresses." *Id.* at 25, 5, 10.

---

[16] In fact, the Magistrate ruled at the evidentiary hearing that he would not permit plaintiffs' expert to testify that a document was purportedly "fraudulent" because the expert could not know Dr. Wright's "state of mind, which is what is necessary for testimony that it was fraudulent." Aug. 5, 2019, Hr. Tr. 112:22-113:19. Further, while many of the documents were produced by Dr. Wright in this case as part of his discovery obligations, his document production included documents from computers and servers that were used and maintained by others in Dr. Wright's various companies. Thus, even if one were able to ascertain a "state of mind," there is no basis to concluded that it was ***Dr. Wright's state of mind***.

The Order stated that the Court had ordered Dr. Wright to produce "a listing of [his] bitcoin holdings." *Id.* at 7 (internal quotations omitted). That statement is contradicted by the record, misconstrues Dr. Wright's arguments, and reflects a lack of understanding as to the workings of Bitcoin.

*First,* it was plaintiffs—not Dr. Wright—who injected the idea of public addresses into this discovery matter. In January 2019, Plaintiffs asked Dr. Wright to "identify the public keys and *public addresses* for any cryptocurrency that (i) you possess the private keys to . . . ." D.E. 91-2 at 8 (emphasis added). It was *this very discovery request* that formed the basis of plaintiffs' motion to compel, and which then led to the evidentiary hearing that resulted in the Order. *See* D.E. 210 at 2.

*Second,* in adjudicating plaintiffs' motion to compel, the Magistrate *did in fact order* Dr. Wright to produce a list of Bitcoin addresses:

> "So back in March -- March 14th, I think it was – I ordered Dr. Wright to produce a listing of the *public addresses* of his Bitcoin holdings as of December 31, 2013."

> "I will give Dr. Wright until June 17, 2019 to produce a complete list of the *public addresses* of all Bitcoin that he mined prior to December 31, 2013."

June 11, 2019 Hearing Tr. at 5:1-4, 31:13-15 (emphasis added).[17]

*Third,* Dr. Wright did not wait until the hearing to argue "for the first time" that the list of public addresses was irrelevant.  Order at 25. Dr. Wright raised that objection in *February 2019,* in responding to Plaintiffs' interrogatory asking for a listing of public addresses. *See* D.E. 91-2 at 15. Dr. Wright's counsel further articulated his relevancy objection at the March 14, 2019,

---

[17] Further, the Order again reveals that the central issue was the public addresses of Dr. Wright's bitcoin, and not his bitcoin holdings. On page 20, the Order speculates about his "powerful motive not to identify his bitcoin," for "as long as the *relevant addresses* remain secret, he can transfer the bitcoin without the Plaintiffs being able to find them." Order at 20 (emphasis added).

hearing. *See* March 14, 2019, Hearing Tr. at 20:11-22:8. But the Magistrate overruled those objections, stating "I think it's relevant," and ordered Dr. Wright to produce the listing of his bitcoin or to file a motion arguing undue burden. *Id.* at 22:10-23:7 (emphasis added). Dr. Wright filed that motion on April 18, 2019. D.E. 155. In light of the Magistrate's ruling, Dr. Wright reasonably concluded that it would be inappropriate to again raise relevancy objections in his motion.

Dr. Wright did, however, again raise relevancy objections at the next appropriate moment. On June 11, 2019, plaintiffs filed their motion to compel, arguing—for the first time—that the list of Bitcoin addresses went to "the heart of Plaintiffs' case," and that not having the list of Bitcoin addresses was "frustrating Plaintiffs' ability to prove their case," two statements plaintiffs never supported with evidence (because there isn't any). *See* D.E. 210 at 2, 4.  In responding to that motion, Dr. Wright argued that plaintiffs had neither demonstrated any harm, nor "how they will use those addresses to determine which particular bitcoin were purportedly mined by Dave or belonged to Dave." D.E. 211 at 6. In other words, plaintiffs' claim of "harm" was unfounded because they had not demonstrated how the Bitcoin addresses even were relevant.

Dr. Wright's counsel further elaborated at the June 11th hearing before the Magistrate:

> Let's assume we had the addresses that contained the Bitcoin that was mined during the relevant time period. What information would the plaintiffs be able to discern? Specifically, would they be able to discern the information they're claiming they desperately need and we are stonewalling to give. That is to say, **evidence that would show the Bitcoin in those public addresses was mined in partnership.**

> Without wanting to raise an objection, so I'll say it myself, **counsel has been able to confirm unequivocally that having that public address is not going to give plaintiffs that information**, and we've actually asked to do the following study of our experts. All Bitcoin mined during the relevant time period that did not move.

June 11, 2019, Hr. Tr. 20:8-20 (emphasis added). Nonetheless, the Magistrate ruled that he wasn't "going to resolve that issue today," and summarily ordered Dr. Wright to produce a list of his Bitcoin addresses for bitcoin he mined prior to December 31, 2013. *Id.* at 30: 9-10, 31:13-15.

Dr. Wright again raised the relevancy issue at the evidentiary hearing that resulted in the Order, when Steve Shadders testified that the Bitcoin public addresses would not provide the identity of the owner or miner of a bitcoin. Aug 5, 2019, Hr. Tr. 26:14-27:2. Dr. Wright's counsel raised it yet again in closing arguments. Aug 26, 2019, Hr. Tr. 11:2-12:1.

*Fourth*, putting aside the fact that 1) it was *plaintiffs* that initially asked for a list of public addresses, 2) the Magistrate *did order* Dr. Wright to produce a list of Bitcoin addresses, and 3) Dr. Wright objected *long before* the evidentiary hearing on the basis of relevancy and lack of prejudice to plaintiffs, the Order's attempt to split hairs and distinguish between ordering a list of Bitcoin addresses and a list of bitcoin holdings not only reflects a lack of understanding of how Bitcoin works, but is a distinction without a difference.

There are only four ways to identify a list of Bitcoin holdings: 1) a list of public addresses; 2) a list of public keys; 3) a list containing bitcoin block height and transaction number; or 4) a transaction ID. Even if it were true (it isn't) that the Magistrate ordered only a listing of Dr. Wright's bitcoin holdings, the only way Dr. Wright could have complied with that order would have been by providing one of these four datapoints. And regardless of which datapoint he chose, that information still would be meaningless (and useless) to plaintiffs—because none of those datapoints contain personally identifying information.[18] Moreover, none of them would show who mined or owns the bitcoin.

---

[18] See Exhibit C, showing what a Bitcoin transaction looks like. Regardless of which datapoint one chooses, the fact remains that nowhere does it contain any personally identifying information.

### vi. *Dr. Wright's Purported Failure to Tell the Court in March 2019 that a List of His Bitcoin Holdings was Inaccessible*

The Order claims that Dr. Wright failed to promptly inform the Court that he was unable to provide plaintiffs with a list of his bitcoin holdings. Order at 21-22. Specifically, the Order cites the one-month period between the March 14th hearing[19] and the April 18th motion when Dr. Wright informed the Court that the bitcoin was held in trust and that he did not have access to their addresses.[20]

Dr. Wright acknowledges that a sooner response would have aided the Court and apologizes for the delay. He notes, however, that the one-month delay occurred during an extremely busy discovery period. His counsel was preparing him for his deposition, which occurred on April 4, 2019 in London. Moreover, after the deposition, the Court ordered Dr. Wright to file multiple motions on issues related to that deposition. *See* D.E. 137.

### E. The Magistrate Improperly Relied on Inadmissible Hearsay Evidence in Issuing the Sanctions

As noted above, the Order repeatedly labels documents that Dr. Wright produced as "fraudulent" based on metadata that plaintiffs' expert claims to have extracted from documents produced by Dr. Wright.[21] Those documents, and the metadata that Edman extracted, are inadmissible hearsay. Dr. Wright made that very objection during the evidentiary hearing, but the Magistrate overruled it, finding the documents and metadata to be business records. Aug. 5, 2019, Hr. Tr. 155:5-15. But that ruling was contrary to law. "Business records are only admissible if the

---

[19] The Order states "May 14th", but that hearing actually occurred on March 14th.

[20] As for the time period between December 2018 and March 14th, 2019, the Order gave Dr. Wright the benefit of the doubt, because "Plaintiffs were seeking information that went beyond a list of his bitcoin holdings on December 31, 2013." Order at 22.

[21] Those Exhibits are: 3, 4, 7, 8, 27, 28, 29, 31, 33, 34, 35, 37, 39; 40 and 43, which can be found at D.E. 237-3; 237-3; 237-7, 237-8; 268-4; 268-5; 268-6; 268-8; 268-10; 268-11; 268-12; 268-14; 268-16; 268-17; 268-20.

record (1) was made at or about the time of the event it describes; (2) was made by a person with knowledge of that event; (3) was made and kept in the course of a regularly conducted business activity; and (4) has an indicia of trustworthiness." *Acciard v. Whitney*, 2011 WL 13294620, at *2 (M.D. Fla. 2011) (citing Fed. R. Evid. 803(6); *United States v. Fernandez*, 392 Fed. Appx. 743, 746 (11th Cir. 2010)) (emphasis added). "A party lays the proper foundation for the trustworthiness of computer generated business records and the records are admissible, in the following circumstances: '(1) The records must be kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion.'" *Fernandez*, 392 F. App'x at 745–46 (citing *United States v. Glasser*, 773 F.2d 1553, 1559 (11th Cir.1985)).

Plaintiffs did not establish that the computer-generated documents were trustworthy, nor did they establish the remaining elements of the business record exception. *First*, plaintiffs introduced no evidence as to how the documents were stored or the motivation for creating the documents. More importantly, plaintiffs affirmatively argued that the electronically stored documents and their associated metadata ***were not trustworthy***. In fact, Plaintiffs' *own expert testified that the metadata was altered and manipulated*. For example, Edman testified that the metadata he extracted from Exhibit 2 and introduced as Exhibit 3 was altered in the following method: "a significant portion of the mail transport header had been truncated or removed," and the "data in the mail transport header . . . contain[ed] the date Thursday, June 24th, 2011," when that date really was a Friday. Aug. 5, 2019, Hr. Tr. 148:18-149:11. After having "established" that the documents contain altered metadata, there simply is no way that plaintiffs could simultaneously establish that the metadata was trustworthy.

*Second*, plaintiffs failed to introduce evidence as to the remaining elements of the business record exception, nor could they. Plaintiffs contend that the documents were backdated, so they clearly couldn't ever establish that this document was "made at or about the time of the event it describes." *Acciard,* 2011 WL 13294620, at *2. They also contend that the communications never occurred, so the document couldn't have been "made by a person with knowledge of that event." *Id.* They further contend that the documents were intentionally altered, and there is no evidence that altering records was a "regularly conducted business activity." *Id.*

Of course, plaintiffs introduced these documents and metadata for *the truth of the matter asserted*, and thus they are inadmissible absent a hearsay exception. Continuing with the example of the metadata extracted from Exhibit 2, plaintiffs relied on the metadata to suggest that the email was modified in 2014 by Dr. Wright. According to Edman, "the modified date and metadata dates on lines 12 and 14 indicate that the document was modified October 22nd, 2014" and the email return path "contain[s] the e-mail address craig@panopticrypt.com." Aug. 5, 2019, Hr. Tr. 148:3-5; 149:24-150:2.

Finally, the Magistrate also erred when he permitted plaintiffs to introduce as exhibits hearsay documents that plaintiffs' expert found online,[22] on the basis that the documents fell under Rule 803(18)'s exception for learned treatises, periodicals, or pamphlets. Aug. 5, 2019, Hr. Tr. 135:1-138:15. First, that exception only permits statements to be read into evidence. It does not permit a document to be introduced as an exhibit—as the Magistrate permitted here. Second, it is highly unlikely that most of those documents, consisting of website printouts, are reliable authorities.

---

[22] The Exhibits are: 25, 26, 41, and 44, which can be found at D.E. 268-2; 268-3; 268-18; 268-21.

**F.  The Court Should Reverse and Vacate the Order Because It Exceeded the Magistrate's Jurisdiction and Authority by Issuing Case-Ending Dispositive Sanctions in a Discovery Order**

Magistrate judges have limited authority, pursuant to Rule 72 of the Federal Rules of Civil Procedure. As to non-dispositive matters, a magistrate may issue a ruling in an order. Fed. R. Civ. P. 72(a). As to dispositive matters, a magistrate may issue only a recommended disposition, usually termed a Report and Recommendation, and only after an assignment of those dispositive matters by a district judge. Fed. R. Civ. P. 72(b).

Thus, magistrates exceed their authority by issuing dispositive sanctions in discovery orders. This is so, *even if* the magistrate has the authority to hear the underlying discovery dispute. *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 594, 599–600 (W.D.N.Y. 1996) ("Discovery is clearly a pretrial matter, and magistrate judges have general authority to order discovery sanctions, however, a magistrate judge cannot issue sanctions which fall within the eight so-called dispositive motions[23]. . . ."); *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462 (10th Cir. 1988) ("Discovery is clearly a pretrial matter, and magistrates thus have general authority to order discovery sanctions. They may not do so, however, if those sanctions fall within the eight dispositive motions . . . ."); *Bennett v. Gen. Caster Serv. of N. Gordon Co.*, 976 F.2d 995, 998 (6th Cir. 1992).

---

[23] The eight dispositive motions are set out in 28 U.S.C.A. § 636. They are motions for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. Many courts also have included in the list of "dispositive motions," any motion that would have the same effect as those eight dispositive motions. *E.g., Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462-63 (10th Cir. 1988) (Striking pleadings with prejudice has the same effect as dismissing an action and thus "constitutes an involuntary dismissal . . . .").

The Order exceeded the Magistrate's authority because it imposed dispositive sanctions. Starting with the most obvious, the Magistrate purported to strike eight of Dr. Wright's affirmative defenses. *See* Order at 29. It is well-settled that "strik[ing] an affirmative defense is clearly 'dispositive of a ... defense of a party.'" *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005) (citing *United States v. Davis,* 794 F. Supp. 67, 68 (D.R.I.1992)); *Jeeper's of Auburn, Inc. v. KWJB Enter., L.L.C.*, 2011 WL 1899195, at *1 (E.D. Mich. 2011), *report and recommendation adopted,* 2011 WL 1899531 (E.D. Mich. 2011) (collecting cases)).

Further, even if the Order hadn't exceeded the Magistrate's authority by striking eight of Dr. Wright's affirmative defenses, the Deemed Facts would have the same effect as striking the affirmative defenses. This is so, because if those facts were to be deemed established without trial (or even a summary judgment motion), it would be futile for Dr. Wright to put on evidence in support of those defenses, which renders them effectively stricken.[24] In fact, these improper "findings of fact" were the very basis for the Magistrate's *ultra vires* decision to "strike" eight of Dr. Wright's affirmative defenses: "these affirmative defenses are inconsistent with the facts *as I have deemed them*, *so they are stricken*." *Id.*; August 26, 2019, Hr. Tr. 89:4-8 (emphasis added); Order at 16 ("To confirm to these established facts, the Court strikes . . . .").

Finally, if the Court were to ignore this reversible error, the standard of review would be de novo. Rule 72(a) provides that orders on non-dispositive matters (e.g., discovery disputes) are reviewed for clear error or for being contrary to law, while Rule 72(b) subjects reports and

---

[24] For example, one of Dr. Wright's affirmative defenses is accord and satisfaction, based on the plaintiffs' having received corporate shares from Dr. Wright as compensation for rights of David Kleiman. D.E. 87 at 33. This defense plainly is inconsistent with the Magistrate's Deemed Facts that half of Dr. Wright's bitcoin and intellectual property (as of a certain date) belong to plaintiffs. The affirmative defenses that would be vitiated by the Deemed Facts are on page 29 of the Order.

recommendations on dispositive matters to de novo review. The Order doesn't cleanly fit into either rule, because it exceeded the Magistrate's jurisdiction and authority, and purported to issue dispositive sanctions in a discovery order (a legal impossibility). However, because the Magistrate attempted to impose dispositive sanctions, the proper reference would be to Rule 72(b), which requires de novo review. *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1463 (10th Cir. 1988); *Boxer F2, L.P. v. Bronchick,* 722 F. App'x 791, 796 (10th Cir. 2018).

## CONCLUSION

For all the foregoing reasons, the Court should reverse and vacate the Order, which amounted to a judgment of liability without trial in the guise of a discovery order. There was no basis for the Order's sanctions of Dr. Wright, which far exceeded the scope of the single, limited discovery issue before the Magistrate and would violate Dr. Wright's due process rights.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), I certify that counsel for the movant has conferred with all parties who may be affected by the relief sought in this motion. Plaintiffs' counsel does not agree with the relief sought.

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: arolnick@riveromestre.com
Email: amcgovern@riveromestre.com
Email: zkass@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO

Case 9:18-cv-80176-BB Document 816-4 Entered on FLSD Docket 12/08/2021 Page 481 of
483
Case 9:18-cv-80176-BB Document 811-4 Entered on FLSD Docket 11/25/2019 Page 948 of 29

Florida Bar No. 613819
JORGE MESTRE
Florida Bar No. _____
AMANDA MCGOVERN
Florida Bar No. 964263
ALAN ROLNICK
Florida Bar No. 715085
SCHNEUR KASS
Florida Bar No. 100554

## CERTIFICATE OF SERVICE

I certify that on November 25, 2019, I electronically filed this document with the Clerk of

the Court using CM/ECF. I also certify that this document is being served today on all counsel of

record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

  /s/ Andres Rivero_____
ANDRES RIVERO
Florida Bar No. 613819

| | |
|---|---|
| **From:** | Velvel (Devin) Freedman <fee2cb505725469781410cff456cf459-vfreedman@bsfll@d3---bsf> |
| **Sent:** | 05 April 2019 19:33 |
| **To:** | 'andrewohagan@me.com' |
| **Cc:** | Kyle Roche |
| **Subject:** | RE: Kleiman v. Wright -- Request? |

Mr. O'Hagan,

I just wanted to follow up on the note below. I'd be most appreciative if we could speak for a few minutes.

Many thanks,
-Vel
**Velvel (Devin) Freedman**
Counsel

**BOIES SCHILLER FLEXNER** LLP
100 SE 2ND Street Suite 2800
Miami, FL 33131
(t) +1 305 357 8438
(m) +1 305 753 3675
vfreedman@bsfllp.com
www.bsfllp.com

---

**From:** Velvel (Devin) Freedman
**Sent:** Tuesday, March 5, 2019 7:08 PM
**To:** 'andrewohagan@me.com'
**Cc:** Kyle Roche
**Subject:** Kleiman v. Wright -- Request?

Dear Mr. O'Hagan:

I received your email from Gavin Andresen and apologize for the cold email.

If you'll excuse the informality of the request, I represent the estate of David Kleiman and W&K Information Defense Research LLC in litigation against Craig Wright pending in the United States District Court for the Southern District of Florida. The lawsuit (attached) alleges that Dr. Wright stole billions of dollars' worth of bitcoins and intellectual property from Dave and W&K. The allegations of the lawsuit rely heavily on Dr. Wright's own statements and while Dr. Wright moved to dismiss the claim, his motion was denied and the Court has allowed the litigation to proceed.

I was hoping you might have a few minutes to speak with me this week? I'll do my best to accommodate your schedule?

Many thanks,
-Vel
**Velvel (Devin) Freedman**
Counsel

**BOIES SCHILLER FLEXNER** LLP
100 SE 2ND Street Suite 2800
Miami, FL 33131
(t) +1 305 357 8438
(m) +1 305 753 3675
vfreedman@bsfllp.com
www.bsfllp.com