IN THE HIGH COURT OF JUSTICE  Claim No. CL-2019-000695
QUEEN'S BENCH DIVISION
MEDIA & COMMUNICATIONS LIST

IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975

and

IN THE MATTER OF A CIVIL PROCEEDING PENDING BEFORE THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA ENTITLED AS: -

(1) Ira Kleiman (as the personal representative of the Estate of David Kleiman) and (2) W&K Info Defense Research LLC, Plaintiffs, v Craig Wright, Defendant (Case No.: 9:18-cv-80176-BB)

BETWEEN:

IRA KLEIMAN, as personal representative of the Estate
of David Kleiman, and W&K INFO DEFENSE
RESEARCH, LLC

**Applicants**

And

ANDREW O'HAGAN

**Respondent**

_____
**SECOND WITNESS STATEMENT OF ANDREW O'HAGAN**
_____

I, **ANDREW O'HAGAN**, of Primrose Hill Studios, Fitzroy Road, London, NW1 8TR, **WILL SAY**:

1. I am the Respondent in these proceedings. I am making this statement in support of my application to set aside or vary the Order of Mr Justice Butcher dated 14 November 2019 ("the Order"). This statement is made further to my first witness statement dated 22 November 2019. The purpose of this statement is to respond to, and correct, the assertions and facts set out in the second witness statement of Velvel Freedman, which was served on me via my lawyers on Friday 6 December.

**Protection for my journalistic rights to impart and receive information**

2. In his second statement, Mr Freedman seems to be approaching the question of my journalistic rights to freedom of expression and information as a question of whether Craig Wright has a right to privacy over the information he shared with me. Whether or not this is the correct approach will be a matter for legal submissions. In the meantime, I want to be clear so that the Court and the Applicants understand that I am not seeking to set aside the Order of Mr Justice Butcher to protect Craig Wright's right to privacy, or to just try and stand in the Applicants' way. I have no wish to take sides in any way in the dispute between Ira Kleiman and Craig Wright, nor do I have any opinion on the merits of that dispute. I have no position on it, and I was at no point a participant in the life around Satoshi Nakamoto, Craig Wright or Dave Kleiman. I reported independently, taking up neither's case, as I sought information for the article I wrote some years ago.

3. The reason I have applied to set aside Mr Justice Butcher's order is to protect my own rights as a journalist, and the public's rights more broadly, to receive and impart information and ideas without interference. I am seriously concerned that an order requiring me to hand over material and information which I have gathered and curated to prepare for publication would undermine the process of investigation which is central to my working methods in running deep and considered investigations involving multiple sources supplying often contradictory accounts. My confidential sources would dry up if they knew the information they gave to me would be disclosed, and the public would thereby be prevented from having the truth of very serious public interest matters revealed. More generally, if parties to legal claims were free to obtain material from the press at will, it would likely become standard operating procedure for those litigating to sift through press files in search of information supporting their claims. This would impair the ability of the press to perform its duties and would make journalists appear to be an investigative arm of private litigants. As a journalist, I have an obligation which I take extremely seriously to resist something that runs so counter to my professional obligations and that risks exposing my professional integrity to ridicule.

4. I accept, as I said in my first witness statement, that the right to protection of journalistic material are not absolute. I am aware there are situations in which other rights may trump those rights. I am aware that it is a balancing exercise. As a professional journalist for nearly 30 years, I have lived always with these truths and traditions, and I have spent my career making judgements based on my understanding of these truths and traditions, without once being sued.

5. In his second statement, Mr Freedman has revised and narrowed down the scope of the journalistic material that they are seeking be disclosed. The Applicants now seek an Order compelling me to:

(a) Attend before an examiner for no longer than 7 hours, to be examined on oath in a manner consistent with the US Federal Rules of Civil Procedure on the following topics of question:

    i. my educational background, employment history, professional qualifications, persona preparation for the deposition (to include any contacts I may have had with the parties, their lawyers, insurers, representatives, but excluding any privileged content of such communications)

    ii. the accuracy of the quotes and factual assertions contained within my work *The Satoshi Affair*.

(b) Produce the following documents:

    i. all video and/or audio recordings of interviews of Craig Wright related to My work in writing *The Satoshi Affair,* including but not limited to, he "many hours of tape" of Craig Wright referenced in *The Satoshi Affair*; and

    ii. all emails between Craig Wright and me,

save that nothing within this Order shall require me to disclose any material which reveals a confidential journalistic source.

6. As set out above, I do not approach the Applicants' case through a position of bloody-minded refusal to assist. Rather, I am concerned that it tramples on important principles relating to the protection of journalistic material. I have been clear throughout this application that I am willing to assist in any questioning in relation to matters that do not reveal or require the production of source material or journalistic material. Accordingly, I have no objection in principle to attending a deposition to answer questions on the topics set out at paragraph 5(a), above, on the basis that I will not answer any questions about the contents of my source and journalistic material.

7. However, for the reasons explained in this witness statement, the Applicant's reduced application (as set out at paragraph 5(b) above) still constitutes an impermissible encroachment on my journalistic rights. Their requests are also inconsistent with the terms that they themselves have set out. They have gone about this application in a way that is oppressive and costly to me, without appearing to understand what a journalist's research materials represent, nor indeed what they may consist of. Theirs has been a haphazard application in which the Applicants appear not to know how protected sources work in the real world.

**The Applicants' reasons for saying it is permissible to order disclosure of my materials**

8. At paragraph 4 of his second statement, Mr Freedman sets out the reasons why he says "*there is no impermissible encroachment into [my] journalistic material*". He lists three reasons or factors: first, that his clients tried to obtain my agreement voluntarily; second because the Applicants say they have expressly disclaimed their intent to seek material about anonymous sources, and third, because they have not requested information that attracts protection, in that the information sought does not come from any source who has an expectation of confidentiality. I will address each of those points in turn.

<u>Attempts to contact me</u>

9. As I said in paragraph 35 of my first witness statement, I have been approached by both sides in this underlying financial dispute asking me to give witness statements. I have not given statements to either party. I do not believe it is appropriate for me to assist or

4

give character or hearsay evidence with my thoughts on the integrity or honesty of either side. I gathered the evidence I could in pursuance of my story, *The Satoshi Affair*, and wrote that article based on what I could discover at that time. I do not believe I am obliged to respond to cold call requests to assist in litigation which does not concern me and further I do not believe it has any relevance whatsoever to the exercise before the court at present. My own story was independently worked on and independently published by me, and was not written at the behest of any party or group of parties. Neither party in the overarching dispute here can be said to have enjoyed my support. I do not understand how any attempts to contact me assists the Court in assessing the extent to which this application involves any impermissible encroachment into journalistic material.

10. In any event, Mr Kleiman's lawyers failed to give me any notice of their intention to apply for a Court order for my material, including throughout the 4-month period which the court process took. I was not notified of the application against me at any stage of the process until I was served with Mr Justice Butcher's order on 15 November, and then I was given only 7 days to produce all the documentation needed to set that order aside. There was no indication, except via an email much earlier inviting me to "help" them, with no reasoning attached, that my "evidence" was thought anything but incidental in this case. It is a money dispute between individuals who have for years been out of my orbit. The Applicants knew my email address; must have known my personal address (as this is where Mr Justice Butcher's order was served); and were well aware of my place of work. Yet they took no steps at all to put me on notice of this application. The suggestion, in legal correspondence, that I should have been aware of this application through media reports, and/or articles published on the Freedman Roche website is, with respect, absurd.

11. It appears from the documents which were served on me that the Applicants first applied to the Florida Federal Court in or around 19 July 2019 for my journalistic materials. That application was made without notice to me in the Florida Federal Court. The Order was granted by the Florida Federal Court on 22 July. After that Order was granted, the

5

applicants then continued the process through Letters Rogatory dated 22 July 2019 sent to the High Court in London. Then, a further application was made by the Applicants to Mr Justice Butcher by application notice dated 11 November 2019. Mr Justice Butcher granted their application (which they requested be dealt with urgently on the papers) and made an order on the papers on 14 November 2019.  Again, this application to the High Court in London was made without notice to me, and without any disclosure or mention of my journalistic rights. There is no reason I can see for the Applicants not to have notified me of this application against me for my documents.  The lack of notice, and the expedited timetable on which the Applicants have insisted, have caused me considerable stress.

*Anonymous source information and information given under confidentiality agreements*

12. Mr Freedman says in his second witness statement, at paragraph 4.5, that the Applicants expressly disclaimed their intent to seek material about anonymous or confidential sources. He says, at paragraph 4.7, that now that his client has narrowed the request down to tapes of audio interviews with Craig Wright and emails with Craig Wright, they are also no longer seeking any material which is subject to confidentiality.  In relation to the latter point, Mr Freedman quotes from various extracts of my article and other sources to support his assumption that I did not give any confidentiality agreement or assurances to Mr Wright during the investigation.

13. Mr Freedman is wrong on both of these points. I think this is largely because he has misunderstood my journalistic processes.

14. Mr Freedman accepts that anonymous sources deserve a high level of protection. He says at paragraph 4.12 of his second statement that "*…the Applicants in their application have not sought any information from [anonymous] sources, nor have they sought any information which may lead to the revelation of those sources' identity*". I agree about the need to protect sources (although applications for journalistic material do not merely give rise to issues about the protection of anonymous sources, as shall be explained in

legal submissions). I consider it vitally important I am able to protect all my anonymous sources.

15. Without waiving any journalistic privilege, in order to assist the Court, I can confirm that, during this investigation, I did not approach my discussions with Mr Wright as straight-forward question and answer sessions. It was not a bilateral interview process. For the avoidance of doubt, my article was not simply about Mr Wright's relationship and past with Dave Kleiman. As the Court will note, it covered a wide array of topics, the vast majority of which have no apparent relevance to the Applicants' Florida proceedings. Because of the wide array of topics discussed and because Mr Wright was the subject of my article, and not just a source, I sat with Mr Wright for dozens of hours over many months in which we would discuss the subjects of my article at length, in long conversations.

16. During these conversations, I put to Mr Wright information from anonymous sources – some of whom I may have identified to him on a confidential "not for publication" basis with others not being identified. We would then discuss the information provided by such sources, including through the discussion of matters that would identify them. To disclose the tapes of my interviews with Craig Wright would reveal the identity of anonymous sources and/or the details and information which would be likely to lead to their identification. The same applies to my email exchanges with Mr Wright.

17. This is, and always is, for all journalists working on lengthy investigative articles, a multi-layered process, during which I would typically deploy source material from one unidentified source together with material from another unidentified source, and support it with a named source, and put a question to Craig Wright. I might mention any of the sources, to provoke him to answer truthfully, and the sources will thereby be named on the recording, on the understanding that the recording is completely private to me, not be disclosed or published, under strict agreement. References to those people and their information will be embedded throughout the discussions in such a way that I think would

make it impossible and extremely onerous to redact the tapes. I do not have transcripts of the tapes; I only have audio recordings.

18. This is the way my work always proceeds. In this case, there were at least 10 anonymous sources; people who gave me information because they felt it was important and because I was a journalist with a track record and with integrity, and that the *London Review of Books* would run my story telling the truth as I found it and would protect all those who helped me to establish the story. All over my recordings with Craig Wright, these sources are mentioned, and the idea that my discussions with him were Q & A's, based on some simplistic pre-arranged interview slot, with no references to confidential or anonymous source information is simply naïve.

19. Serious journalistic material, every day and all over the world, depends on 'fly on the wall' observation and fact-gathering, which is not simply about protecting the person in front of you, but about protecting all the sources whose names or identifying features may come up during the many weeks of conversations that lead to the story being complete. Insofar as the Applicants seek recordings of my discussion with Mr Wright and/or email exchanges between us, the Applicants therefore seek to obtain material provided by sources who have been provided with assurances of confidence. As set out above, that material is also likely to identify some of those sources.

20. Mr Freedman also states categorically in his statement that "*It was never the intention of the Applicants to procure confidential source material, as my witness statement made abundantly clear… In no way does [the Revised Request] attempt to reach material provided by sources who have been provided assurances of confidence*".

21. Mr Freedman is wrong in his assertions that I did not enter into any confidentiality agreements or assurances with Mr Wright. I did not (and would not) publish the details of confidentiality agreements that I enter into with my sources or subjects. Mr Freedman's misunderstanding on this point arises because I refused to enter into an NDA with Mr Wright or accept any money from him. In this sense, Mr Freedman confuses my refusal to essentially be a ghostwriter for Mr Wright (which is what he first invited me

8

to do) with a refusal to agree to keep certain matters confidential. The reason I refused to accept money or enter into an NDA is so that I could preserve my independence. That is essential in searching for the truth of a story.

22. However, that does not mean that along the way in my search for the truth, I did not agree to keep certain matters off limits for my journalistic investigations. Again without waiving any journalistic privilege, I am willing to confirm for the court that there were certain matters in respect of which I agreed to grant Mr Wright confidentiality. Our discussions did not only relate to the narrow topic of his past with Dave Kleiman, but to other topics including deeply personal topics. Those matters which are subject to my promises of confidence will be revealed if I am compelled to disclose the materials sought by the Applicants. These undertakings by me were never in the interests of protecting Mr Wright from any financial or legal challenges that may have been forthcoming. Indeed, they are completely irrelevant to any such challenges. On the contrary, they were to do with private matters, the revelation of which would have made him and members of his family vulnerable to harm. Again, these matters informed how I wrote the article and what I left out, but it would be harmful and invidious to break those confidences at any time.

23. In paragraph 4.11 of his second witness statement Mr Freedman says that I should not be concerned about the release of confidential material to the Florida court because it would be protected by a robust confidentiality order which allows it to be designated confidential. I understand that the confidentiality order in the Florida case allows confidential material to be circulated widely, including for example to jurors in mock trials, and that the order falls away at trial. I am concerned that effectively this means any of my documents which are made available to the parties in the Florida proceedings will have limited protection before ultimately entering the public domain.

**The oppressive nature of the request**

24. I have set out above my concerns about the lack of notice provided to me of this application. The Applicants sought a very general order against me, requiring the

production of my journalistic material without putting me on notice of the application. They then sought the resolution of my application on an expedited basis outside of the Court list with the most obvious expertise to resolve it. This has caused me stress and has required me to incur significant legal costs.

25. The Applicants now suggest that they will assist with the further financial costs of complying with their widely drafted order. Mr Freedman states in his second witness statement, at paragraph 5.5, that the Applicants will reimburse me for the costs of copying and transmitting documentary evidence and for my time in travelling to and attending a deposition. He also suggests that he will reimburse me for my reasonable legal costs relating to compliance with the disclosure order.

26. While I am grateful for the offer of financial assistance, this does not undermine the oppressive nature of the Applicants' request. In particular:

    a. The Applicants' request, if granted, will have a significant impact on my professional reputation and on my ability to assure potential sources that our discussions will be confidential. I am currently involved in a number of important and sensitive investigations and I am concerned that this order would pose real damage to my ability to continue with them. The financial assistance set out in paragraph 5.5 of Mr Freedman's witness statement would not provide any assistance to this professional damage;

    b. The Applicants' request, if granted, will also have a significant impact on the press more widely. As set out above, it would set a precedent that private litigants are free to delve through journalistic material in order to see whether any information might assist their legal claims. If such orders were to become commonplace, it would be necessary for the press to set aside resources to protect itself against becoming an investigative arm for private litigants. The financial assistance offered by Mr Freedman would not address this danger;

    c. The Applicants' request requires a considerable investment of time and resources for me. It requires me to engage lawyers over a protracted period of

time; to review the material sought by the Applicants again myself (which includes dozens of hours of recordings and many pages of personal correspondence); to facilitate the review of that material by my legal representatives; to provide detailed instructions to my legal representatives about that material; to check any transcripts of the recordings that are prepared; to approve any suggested redactions to that material; and to attend at a law firm for seven hours to answer questions. It is unclear if the Applicants are offering to pay all of the costs I incur (or just those that they consider to be "*reasonable*"). Accordingly, the order exposes me to a considerable investment of time, personal resources, and money over the Christmas period and at a time in which I have considerable other professional and personal commitments. I have already lost significant time and spent significant sums of money in responding to this application. The cumulative impact of these matters is, on any view, oppressive.

**Statement of Truth**

I believe that the facts stated in this witness statement are true
Dated this 14th day of December 2019

Signed ......*[signature]*......
**Andrew O'Hagan**

A O'Hagan
Exhibit: AOH-1
Statement: 2nd
Date: 14 December 2019

**IN THE HIGH COURT OF JUSTICE**
**Claim No. CL-2019-000695**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT**

**IN THE MATTER OF THE EVIDENCE (PROCEEDINGS IN OTHER JURISDICTIONS) ACT 1975**

and

**IN THE MATTER OF A CIVIL PROCEEDING PENDING BEFORE THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA ENTITLED AS: -**

**(1) Ira Kleiman (as the personal representative of the Estate of David Kleiman) and (2) W&K Info Defense Research LLC, Plaintiffs, v Craig Wright, Defendant (Case No.: 9:18-cv-80176-BB)**

**BETWEEN:**

**IRA KLEIMAN, as personal representative of the Estate of David Kleiman, and W&K INFO DEFENSE RESEARCH, LLC**

<u>**Applicants**</u>

**And**

**ANDREW O'HAGAN**

<u>**Respondent**</u>

_____

**SECOND WITNESS STATEMENT OF ANDREW O'HAGAN**

_____