**From:** Craig S. Wright [craig.wright@Information-Defense.com]
**Sent:** 4/18/2010 11:18:18 AM
**To:** 'Dave Kleiman' [dave@davekleiman.com]; 'Bob Radvanovsky' [rsradvan@unixworks.net]
**Subject:** Papers so far.
**Attachments:** 212478522.pdf; 1569310276(2).pdf; CCS 2010.pdf; IWSEC 2010 a.pdf; SCN 2010.pdf; NSS 2010a1.pdf

Hi,
I have sent some of these to each of you, but here is the compilation of completed papers thus far for the year.

I have 2 more papers that I will have completed tomorrow. I will send these then, but I have some sleep to catch up on presently. (I have not found a means of totally eliminating sleep, but I am working on it...)

So you may have noticed I have been a little quite on the lists etc this year. This is why.

Regards,
...
Dr. Craig S Wright GSE-Malware, GSE-Compliance, LLM, & ...
Information Defense Pty Ltd
Mobile: 0417 683 914

Dr. Wright Ex.
D326

# Cybercrime Specialization as a Corollary of Rational Choice

Craig S Wright
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
cwrigh20@postoffice.csu.edu.au

Tanveer A Zia
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
tzia@csu.edu.au

***Abstract*—Organized criminal groups can be modeled using rational choice theory. Criminal groups act as profit seeking enterprises, and the ability to shift the economic returns away from this activity results in a lower amount of crime. Criminal behavior does not need to rely on social deviance, but is moving towards the greatest financial rewards. As a consequence, as criminal groups face few financial disincentives, a growing class of criminal specialists has resulted. The course of action to best minimize the online criminal threat can be linked to minimization of economic returns from cybercrime.**

***Index Terms*—Cybercrime, Economics, Rational Choice Theory, Information Security**

## I. Introduction

Rational choice theory can provide a basis for an amalgamated and inclusive theory of behavior related to cybercrime. Rational choice centers on instrumental rationality [1] as the choice of the most efficient and effective means to achieve a set of particular ends. These ends include the acquisition of wealth or other scarce resources. The decision of an individual or criminal group to engage in socially detrimental criminal activity is not based on social deviance, but rather a perceived rational choice that such activities are most likely to provide the desired outcome. Cohen [7] asserted that conduct is rational if it involves the choice of means to achieve an end.

Grabosky and Broadhurst [18] argued that cybercrime reflects any profit based criminal activity. In this way it can be explained by three factors, motive, opportunity and an absence of capable governance or guardianship. Any one of these can be shown to increase the costs associated with criminal actions and hence reduce the profitability of cybercrime. This reflects the state of mind of the '*rational criminal*'.

Rational choice theory assumes that an agent can be modeled as *Homo economicus* [2]. This is an individualistic passive agent who is moved by the conditions experienced. These experiences and circumstances coupled with the rational agents assumptions lead to a series of rational choices that are believed to be optional by the agent, but may be detrimental to society as a whole [19]. '*Rational man*' is thus an '*economic man*'. Instrumental rationality is used by the rational agent to gauge the ends and means that establish the actions used to plot one's course through life [6]. Choice involves an active progression in which each agent evaluates (consciously or subconsciously) the benefits and costs, and then makes a continuing series of conscious decisions [12]. Each agent reflects on his or her current circumstances as evaluated against the attainment of his or her goals as a set of composite goods. That agent alone can establish whether the price can be afforded [2].

Rational choice theory is based on the assumption an agent as *Homo economicus* holds particular sets of discrete, fixed, hierarchical predilections [24]. The assumption is that the agent will select the action with the preferred outcome. This outcome (if achieved) optimizes the difference between the costs and benefits [6] associated with the action. Rationality is achieved in a series of actions that remain consistent with the agent's stable preference rankings in a manner that is designed to return the optimal relation between the goals and beliefs of the agent [17]. This ideally returns the largest set of composite goods (as determined by the rational agent) for the lowest cost.

Actions including crime can be '*rational*' for agents at the individual level. These when combined across a group coalesce to generate a variety of systemic social outcomes. At times (such as may result from cyber-terror and DDoS attacks), many of the ill effects are intended by agents. More often, the result is an unintended consequence that may be either socially optimal or more commonly socially non-optimal [8]. Ill effects from the actions of socially focused agents (such as police and 'white-hat' hackers taking vigilante action) can also frequently result in unintended sub-optimal social responses.

## II. Cybercrime as a Rational Choice

### A. *Modeling Cybercrime*

Rational choice models can be created in order to study some of the decision processes used by cyber-criminals [22]. This can pertain to the levels and type of activity as well as the

target of an attack. The choice of actions (DDoS, intrusion etc.) can be coupled with the selection of individual or multiple targets [4]. Starting with an initially optimized model, various aspects of information security and cyber-crime can be investigated through the modification of the model parameters such as earnings, costs and preferences.

Whether taken as an individual or criminal group, decisions have to be made concerning the allocation of revenue (R) across criminal actions (C) and the composite good (G). This dichotomy is represented in Fig.1. In these examples, G is measured as a (real) inflation-adjusted expenditure for the goods that could be substituted for the expenditure on criminal activity (whether through direct expenditure or when lost earnings are substituted) against other desirable goods (shelter, food, etc).

In all instances, the cybercriminal is constrained by

Figure. 1. Optional choice modeling for a cyber-criminal of activity against composite good.

economic limitations. Time is a necessary condition in the attainment of goods. This results in the creations of constraints on the most unconstrained attackers. Even the socially inept high school hacker is limited by time. The attackers economic constraints can be modelled by the limits, $H \leftrightarrow N$ as displayed in Fig. 1. This constraint can be expressed as,

$$P_G.g + P_N.n = R$$

(1)

In (1), $P_G$ is defined as the alternative good goods that the attacker could have selected or the cost of investing in future attacks. $P_N$ is the averaged per unit cost of completing an attack. The attackers preference in selecting between G and N are represented in the standard manner by the excepted indifference functions. A negative slope to the indifference curve represents a propensity of the attackers to sacrifice current goods for an investment in a payoff from ongoing attacks. The larger the slope of the indifference curve, the greater the inclination of the attacker to engage in criminal activity. As the curvature of the indifference function increases, the degree of substitutability between G and N decreases. For a rational player, the optimum decision point $O_P$ occurs at point $(c_0, y_0)$ where the marginal rate of substitution between N and G equals the relative cost of the attack, $P_N / P_G$ .

An attacker also has a choice of targets, $T_1$, $T_2$, ... of which the total resources R must necessarily be divided. In this case, the economic cost equation becomes,

$$P_1.T_1 + P_2.T_2 + \ldots = R$$

*hence*

$$R = \sum_{i=1}^{n} P_i.T_i.$$

(2)

Where the number of targets is defined as the value "n" and the cost of attacking each respective target is defined by $P_i$ . The indifference curves and the associated values for multiple targets are individually suboptimal. In total, the sum of all individual activities $N_i$ against the respective target $T_i$ sums to the total choice of criminal activity at point N no matter how many targets are selected.

The attacker can either choose to divide the amount of individual effort and resources across multiple targets by limiting the effort on any individual target or reduce the amount of composite goods that the attacker consumes. By

Fig. 2. Optional choice modeling for a cyber-criminal of activity against composite good as preferences change.

choosing to sacrifice the attacker moves the amount of criminal activity that they can engage in from N to N' (see Fig. 2).

The addition of income from either an external source or the successful completion of prior attacks moves the attackers budget constraints from HN to H'N' (Fig. 3). This jointly allows the attacker to consume a greater quantity of composite goods as well as increasing the amount of criminal activity that is engaged in. For instance, the additional financial

Fig. 3. The addition of income achieved by successful cybercriminals changes the levels of economic constraints and leads to increasing levels of crime.

resources allow the attacker to recruit resources and to develop new exploits and tools (including rootkits, malware etc).

Conversely, processes that limit the resources available to the cybercriminal move the criminals budget constraints from H'N' to HN and thus reduce the amount of criminal activity that the group can conduct. These processes include actions that freeze the assets of criminal groups, disrupting the flows of funds [5] and the capacity to trace settlements such as through the restraint of money laundering [23]. Furthermore, the limitation of cybercriminal activity limits the returns on investment further limiting future investments in criminal activity [21].

## III. PRICE CHANGE AND CYBERCRIME

Organizations defend themselves though a process that may be thought of as price policies. The addition of defensive technologies (such as Firewalls) increase the price or unit cost of conducting cybercrime $P_N$. The limitations restricting the ability of organizations to respond to an attack through some form of retaliation place constraints on the ability to increase the price controls against cybercrime. Deterrence activities in an organization have a dual effect, first it increases the opportunity cost of attacking the organization and next it decreases the probability of successfully attacking the organization, $\theta$. Where few organizations take adequate deterrence measures, the effect is that an attacker becomes less likely to attack the organization and moves to an easier target

Fig. 4. Economic constraints and price policies through increases in the expected cost of criminal activity leads to lower rates of cybercrime.

or limits the total number and effort per target. In cases where deterrence is common, the opportunity costs for all organizations related to an attack are increased.

Consequently, the attacker has to incorporate the probability of success into the choice of targets [3]. The alternative to composite goods N expended in conducting an attack is expected to return a larger final return of composite good H. As a result, the expected amount of criminal activity $C_0$ against an organization will be engaged if the expected return from the activity equals $\left(1/\theta\right)$ times the expense. This may be represented by,

$$\begin{cases} \left(1/\theta\right)(1+\beta)C_0 > E(y_0) & Attack \\ \left(1/\theta\right)(1+\beta)C_0 < E(y_0) & Consider \end{cases} \quad (3)$$

As a consequence, an attacker may be constrained by limiting the expected return from the attack $E(y_0)$ to be less than $\frac{(C_0+\beta C_0)}{\theta}$. Where this is achieved, the cost of the attack exceeds the expected returns, and makes an attack unprofitable.

The introduction of additional deterrence costs through the addition of security controls moves the criminal activity from HN to HN' (Fig. 4). The steeper slope of the budget line reflects the additional opportunity costs of an attack. This can be expressed as the decreased probability of an attack succeeding where the previous chance of success $\theta$ becomes $(\theta - \varphi)$ where the new controls reduce the likelihood of an attack succeeding by $\varphi$. A consequent expenditure in additional security controls move the aggregate amount of criminal activity experienced from $C_0$ to $C_1$. This is expressed




Fig. 5. Economic constraints and price policies can create a steeper budget line and reduce the overall level of cybercrime.

by equation 4 and is consistent with the economic law of demand.

$$\frac{C_1(1+\beta)}{\theta - \varphi} = \frac{C_0(1+\beta)}{\theta}$$

*hence*,

$$C_1 = \frac{(\theta - \varphi)C_0}{\theta}$$

(4)

Likewise, any practice that increases the opportunity cost of cybercrime will result in a reduction of criminal activity. This occurs through an increase in the cost of accessing the common good. Anti-money laundering policies for example lower the availability of ready cash [5]. This causes the costs of the common good to rise in respect of the proceeds of crime and thus creating an inflationary effect against the criminal proceeds. The overall consequence is the creation of a steeper budget line with reduced rates of cybercrime.

## IV. Game Theoretic Models of Appropriation and Exchange

If we can assume that player A's resources are secure but player B's resources are vulnerable to attack, player A is cast as the attacker/predator and player B the defender or prey. Government bodies may be able to act against player A (through legislation, proceed of crime constraints, anti-money laundering etc.), but most companies and other organizations cannot engage player A other than through defensive actions. If player B does take vigilante action, they then also become liable to government responses against criminal activity.

The possible outcomes of the relationship between A and B include fighting over resources (player A attacks player B) or A and B avoid fighting (A could attack an alternative target or engage in alternative activities). A peaceful settlement of an attack is also not possible as negotiation with criminal groups is illegal and ineffective (such as protection money in Mafia controlled communities [13, 14]). Settlement is ineffective as cybercrime groups cannot effectively stop actions from alternative criminal groups (as would occur in a controlled physical community [15, 16]).

Player B (the company) makes the first move by diverting resources into security controls $S_B$ that could be used to invest. These controls are thus used in order to defend player B's remaining investments. A schematic of the predator - prey game is expressed in Fig. 6.

Player A moves after B and gauges players A's position (reconnaissance or social engineering can be used to estimate the security controls at B). Player A either attacks B, diverting




Fig. 6. Predator - Prey Games as a model for cybercrime.

some of its resources into attacking the security controls of B ($S_A$ >0) or relents (which could be attacking another target or engaging in legitimate activities).

The decisions of A and B when taken together result in either an attack against B or A engaging in alterative activities and are displayed in the upper and lower branches of the game tree (Fig. 6). As B makes the first move, player B can anticipate player A's reaction and choose a level of expenditure on security controls that selects the outcome. When it is profitable, player B chooses a level of security controls that induce A to either attack an alternative (a party who has spent less on controls than B) or to engage in legitimate activity (such as trade). If an attack occurs, the expected level of loss is set by the multiplier $\delta$ .

Where it is not possible for player B to implement a level of controls that ensure A does not attack, B will select a level of security controls that minimizes it's loss from an attack by A. If an attack ensues, the security success functions;

$$p_A = \frac{S_A}{(S_A + ZS_B)}, \quad and$$
$$p_B = \frac{ZS_B}{(S_A + ZS_B)} \quad (5)$$

establish the level of player B's loss function, $(R_B - S_B)(1-\delta)$ where the starting level of resources held by player B is defined as $R_B$ and the resulting level of production and hence available common goods has been diminished for all parties. The Z parameter in the equation reflects the existing level of security of B's systems (where $0 \le Z \le 1$).

From (5), we can see that if player B's security controls fall below an equilibrium point determined by the destructiveness of play from A's attack and B's security expenditure, player B's systems will be seen as vulnerable to attack and the only equilibrium result that can occur is an attack by player A. This effect in interrelated to the loss function as when player B expends too much on security in the present, future growth can result in a point where attack becomes inevitable.

The solution is to increase the cost of engaging in cybercrime whilst also minimizing the expected returns to criminal groups. If all players engage in a level of controls that lower the expected returns by A to less than that of valid trade, the incentives to engage in criminal actions vanish [10].

## V. CONCLUSION

Present crime statistics for cybercrime more correctly reflect the political state than the actual extent of computer based crime [8]. This is a direct consequence of both low reporting and response rates. Many organizations fail to report any computer based incidents. This can result through a lack of knowledge of the event, a desire to avoid potentially adverse publicity or related consequences or a failure to meet an economically or legislatively set minimum loss value. These factors undervalue the losses to criminal activity.

Crime is explained by three factors, motive, opportunity and an absence of capable governance or guardianship. An increase in defenses that lowers the effect of any of these factors moves the amount of composite goods that can be obtained by the cybercriminal for any set level of criminal activity [20]. The rational choices made by agents considering criminal actions are decreased through a combination of price policy and benevolence policy. This applies at both a societal level and to individual organizations where increased defenses lower an organizations probability of attack by making their competitors more attractive lower cost opportunities.

## REFERENCES

[1] H. Adabinsky. *The Criminal Elite*. Westport, CT: Greenwood Press 1983.

[2] M. S. Archer. "Homo economicus, Homo sociologicus and Homo sentiens." *Rational Choice Theory: Resisting Colonization*. Ed., Margaret S. Archer and Jonathan Q. Tritter. London: Routledge 2000.

[3] R. Badonnel, R. State, R. Chrisment, I. Festor, O. "A Management Platform for Tracking Cyber Predators in Peer-to-Peer Networks" : Internet Monitoring and Protection, 2007. ICIMP 2007. Second International Conference on, 2007, San Jose, CA.

[4] P. M. Bednar, V. Katos, C., Hennell. "Cyber-Crime Investigations: Complex Collaborative Decision Making" Digital Forensics and Incident Analysis, 2008. WDFIA '08. Third International Annual Workshop. 2008

[5] R. G. Broadhurst. International Cooperation in Cyber-crime Research. In Proceedings 11th UN Congress on Crime Prevention and Criminal Justice, Workshop 6: 'Measures to Combat Computer Related Crime', pages pp. 1-12, Bangkok, 2005.

[6] R. Clarke and D. Cornish. "Modelling offender's decisions: A framework for research and policy." *Crime and Justice: An Annual Review of Research*. Ed., M.Tonry and N. Morris. Chicago: University of Chicago Press 1985.

[7] P. S. Cohen. "Rational conduct and social life." Rationality and the Social Sciences: Contributions to the Philosophy and Methodology of the Social Sciences 1976.

[8] D. J. Neufeld. "Understanding Cybercrime," hicss, pp.1-10, 2010 43rd Hawaii International Conference on System Sciences, 2010.

[9] D. Matthew.."Hackers as a National Resource. Information Warfare – Cyberterrorism: Protecting Your Personal Security in the Electronic Age". WinnSchwartau (Ed). Second Trade Paperback Edition. New York: Thunder's Mouth Press, 1996.

[10] Einstadter, Werner and Stuart Henry. *Criminological Theory*. Fort Worth: Harcourt Brace 1995.

[11] C. A. Fowler& R. F. Nesbit. "Tactical Deception in Air-Land Warfare" Journal of Electronic Defense. June 1995.

[12] M. Friedman. "The Methodology of Positive Economics." In his Essays in Positive Economics. Chicago and London: Chicago University Press, 1953.

[13] D. Gambetta. *The Sicilian Mafia: The Business of Protection*. London: Harvard University Press 1993. 41

[14] D. Gambetta. *The Origins of the Mafias*. Cambridge: Mimeo 1991.

[15] D. Gambetta. "Mafia: the price of distrust." *Trust: Making and Breaking Cooperative Relationships*. Ed., Diego Gambetta. New York: Basil Blackwell 1988.

[16] D. Gambetta. "Fragments of an economic theory of the mafia." *Archives Europeennes de Sociologie* 24 (1988).

[17] S. Gordon. & R. Ford. "Cyberterrorism?" Symantec Security Response White Paper 2002.

[18] P. Grabosky & R.G. Broadhurst. 'The Future of Cyber-crime in Asia', in Broadhurst, R.G & P. Grabosky [Eds.], Cybercrime: The Challenge in Asia, The University of Hong Kong Press, pp. 347-360. 2005.

[19] M. Hechter and S. Kanazawa. "Sociological rational choice theory." *Annual Review of Sociology* 23 (1997).

[20] M. D. Lymanand G. W. Potter. *Organized Crime*. New Jersey: Prentice Hall 1997.

[21] M. Morash. "Organized crime." *Major Forms of Crime*. Ed., Robert F. Meier. California: Sage Publications 1984.

[22] R. Kumar G. Pillai, P. R. Kumar, "Simulation of Human Criminal Behavior Using Clustering Algorithm," iccima, vol. 4, pp.105-109, International Conference on Computational Intelligence and Multimedia Applications (ICCIMA 2007), 2007

[23] J. R. Richards. *Transnational Criminal Organizations, Cybercrime, and Money Laundering*. Boca Raton, Florida: CRC Press LLC 1999.

[24] M. Zey. *Rational Choice Theory and Organizational Theory: A Critique*. Thousand Oaks: Sage Publications 1988.



Information Defense Pty Ltd

Eternal Vigilance is the cost of Liberty

DEF_01281890

BEV_00901015

D326 Page 7 of 57

# Rationally opting for the insecure alternative: Negative externalities and the selection of security controls

Craig S Wright
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
cwright20@postoffice.csu.edu.au

Tanveer A Zia
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
tzia@csu.edu.au

***Abstract*— As with all aspects of business and the economy, information security is an economic function. Security can be modeled as a maintenance or insurance cost as a relative function but never in absolute terms. As such, security can be seen as a cost function that leads to the prevention of loss, but not one that can create gains (or profit). With the role of a capital investment to provide a return on investment, security is a defense against unforeseen losses that cost capital and reduce profitability.**

***Index Terms*— Economics, Information Security, Modeling, Risk**

## I. Introduction

Absolute security does not exist and nor can it be achieved. The statement that a computer is either secure or not is logically falsifiable[9], all systems exhibit a level of insecurity. An attacker with sufficient resources can always bypass controls. The goal is to ensure that the economic constraints placed upon the attacker exceed the perceived benefits to the attacker. This generates a measure of relative system security in place of the unachievable absolute security paradigm that necessarily results in a misallocation of resources.

Relative computer security can be measured using six factors [A]:

1. *What is the importance of the information or resource being protected?*
2. *What is the potential impact, if the security is breached?*
3. *Who is the attacker likely to be?*
4. *What are the skills and resources available to an attacker?*
5. *What constraints are imposed by legitimate usage?*
6. *What resources are available to implement security?*

The result is that security is a relative risk measure that is related to organisational economics at the micro level and the economics of national security toward the macro level. This consequentially leads to a measure of security in terms of one's neighbour. The question is not, "*am I secure*", but rather, "am *I more secure than my neighbour*?"

This can be assessed in many ways as any other system is your neighbour on the Internet when viewed from the perspective of a Worm. Conversely, targeted attacks have a purpose. Neighbours may be other government systems, critical infrastructure, a class of companies or an industry sector. In each instance, security is achieved in relative terms.

## II. Assessing Individual Security Costs

The most effective security solution is that which provides the best level (that which is optimised) for "the least cost". Costs to the consumer are minimised at the point where security costs exactly equal the expected loss that is associated with the risk function.

**More security costs = higher costs to the consumer.**

**Higher expected loss from risk = higher costs to the consumer.**

As expenditure on security is expected to decrease the expected loss, the costs to the consumer are minimised were the additional expenditure of $1 on security reduces the expected risk based loss by exactly $1.

Security is a cost function that is passed to the consumer if profitability is to be retained or which reduces profit directly where alternatives exist (this is the product is elastic or consumers are willing to reduce their use if costs increase). The expected cost formula for the supply of these types of services against a loss function can be expressed by:

$$C_s = D(x, y) + x + y \quad (1)$$

Where the loss function $D(x, y)$ and the damage to x (the producer) and y (the consumer) are modelled arithmetically. As in all areas of economics, the marginal gains in $D_x$ offset those of $D_y$.

In these calculations, calculations, $D_{xy}D_{xy} > D_{xx}D_{yy}$, which

creates the inference that the inputs are substitutes. As the producer spends more on security, the consumer spends less and vice versa. The exact composition of these values varies based on the nature of the product with elastic supply being affected more than an inelastic supply.

The real issue and goal in security becomes the creation of a Cournot-Nash equilibria. This is an outcome where $X_e$ and $Y_e$ are together form a Cournot-Nash equilibria for a given value of $Y_e$; the $x$ which maximises X's utility is $X_e$ and given $X_e$ that y which maximises Y's utility is $y_e$. This does not require that the equilibria be pareto optimal.

At present, the cost functions directed towards many industries (such as banks in regulated countries including Australia) are sufficient in that there is but a trivial increase in marginal demand for the consumer for an incremental increase in security expenditure. The producing company is likely to do little and that which they do conduct has a minimal effect. For instance, Microsoft is unlikely to greatly improve the security of its operating system through minimising patches due to the increasing cost of finding additional bugs in its software. If it did so, the cost point is such that Microsoft's profit would be diminished as consumers are generally unwilling to bear the cost increment that this would entail. The incremental cost of finding additional bugs exceeds the total cost to all consumers of taking an alternative course of action (such as installing HIDS[1] and Host firewalls).

The loss for the consumer is lessened to a lower extent than the loss of the producer. With fraud loss limits of \$50 in countries such as Australia for online transactions, banks in these locations have an incentive to minimise the loss to the consumer. Perversely, this can incentivise the consumer against adequately securing their system. If the consumer expects to lose a maximum of $L_{iy}$ (which is set at \$50 for credit card transaction fraud in Australia) for any given incident (i) where the total expected damage is defined as

$$D_y = \sum_{i=1}^{n} L_{iy} \qquad D_x = \sum_{i=1}^{n} L_{ix} . \tag{2}$$

The expected annual number of incidents per consumer, n, can be calculated as the total number of incidents that have occurred divided by the total number of consumers of a class (i.e. the total pool of credit card users).

$$E(n) = \frac{\#incidents}{\#consumers} \tag{3}$$

Setting $C_{Ty}$ as the total cost to the consumer of implementing controls, if the expected total loss to the consumer $D_y < C_{Ty}$, it is doubtful that the consumer will pay for additional protection. For instance, if a high-end HIDS and anti-malware product costs $C_{Ty} = \$225$, and the consumer experiences n=4 incidents in a usual year, the expected damage $D_y = \sum_{i=1}^{n} L_{iy} = \$200$. As $D_y < C_{Ty}$, it is not in the interest of the consumer to adequately protect their system. The user of a system that requires more security then the mean level of control provided by a vendor can implement increased security controls on their system, but this would either require that the consumer experience other measurable losses or that $D_y > C_{Ty}$ for this consumer.

Here we see that the anti-fraud efforts by banks and credit card companies create a negative incentive to consumers. The loss to the vendor $L_{ix}$ currently averages \$237 [4] for each lost set of credentials. The result is that it is in the interest of the financial company to provide the consumer with a compensating control. Holding the consumer liable if they had failed to use the enhanced controls over security would result in $D_y > C_{Ty}$ and hence an incentive for the consumer to protect their system.

Fig. 1. Modeling software security.

Capital invested by the consumer in securing their system has a greater marginal effect than that of the producer in the case of an organisation such as Microsoft. A consumer can purchase HIDS and host firewall software for less than the cost that it would cost Microsoft to perfect their software through formal verification and hence remove more bugs.

The expected damage, $E(Damage)_i = P(x_{ai}).D_{Tot}$ or the expected damage is equal to the probability of a breach times the amount of damage suffered in a breach. This can be expressed as a function for each user or as a total cost function for all users, $E(Damage) = \sum_i (P(x_{ai}).D_{Tot})$. Here we can clearly see that the total amount of damage is a function of not only the producer, but also the consumer. The optimal solution is to find a point that minimises the total costs. This is the expected damage as a loss function plus the costs of damage prevention of a compromise of other loss. The damage can also be expressed as a function of both the producer and

[1] Host Intrusion Detection Software.

consumer (user) costs,

$$C_T = Cost_{Tot} = \sum_i [P(x_{ai})D(x_{ai})] + C_v + \sum_i [C_u(i)] \quad (4)$$

The first order conditions are

$$P'(x_{ai})D(x_{ai}) + 1 = 0 \quad (5)$$

$$D'(x_{ai})P(x_{ai}) + 1 = 0 \quad (6)$$

That is, the user should increase his expenditure on precaution (preventing a breach) until the last dollar spent on precaution by the user reduces the expected damage by $1. And the producer should increase her expenditure on reducing the possible damage in case of a breach until the last dollar spent on precaution by the producer reduces the expected damages by $1.

Clearly, the greater the likelihood of the user experiencing a breach, or the larger $P(x_{ai})$ is for the user, the greater the precaution that they should undertake. In the case of a producer who is a software vendor, they will (generally)sell their products to a wide range of users with varying levels of likelihood that each will experience a breach. That is, the software vendor is acting with imperfect information.

The optimal amount of precaution is the solutions to Equations (x.2) and (x.3) and is denoted by the expressions $C_v^\Omega$, $C_u^\Omega(i)$ and where the total costs for all users is optimised at $\sum_i [C_u^\Omega(i)]$.

The marginal utility expenditure of security means that the value of security decreases the more we add. There is reason for this. If we spend more than the value of the organisations capital, it is simple to see that the producer will not survive long. It is more than this, we only need to reduce profitability for a producer to fail, not the capital.

The level of damages suffered by a user depends on both the pre-breach behaviour of the user and the vendor. The vendor is in a position where reputation impacts sales (demand) and hence the willingness to add layers of testing and additional controls (all of which increase the cost of the software). As the market for software varies in its elasticity [13] from the highly inelastic in small markets with few competitors (e.g. Electricity markets) to highly elastic (e.g. Operating Systems), the user has the ability to best determine their needs. The user may select customised software with warranties designed to reduce the levels of breach that can occur[2]. This comes with an increased cost.

Software vendors (unless specifically contracted otherwise) do not face strict liability for the damage associated with a breach due to a software vulnerability [7,10]. Although negligence rules for software vendors have been called for [10], this creates a sub-optimal outcome. The user can (excepting certain isolated instances);

1. select different products with an expectation of increased security[3] [5],
2. add external controls (through the introduction of external devices, create additional controls or use other software that enhances the ability of the primary product),
3. Increase monitoring for attacks that may be associated with the potentially vulnerable services (such as by the use of an IDS[4]).

By limiting the scope of the user's responsibility[5], the user's incentive to protect their systems is also limited [7]. That is the user does not have the requisite incentive to take the optimal level of precautions. Most breaches are not related to zero day attacks [6]. Where patches have been created for known vulnerabilities that could lead to a breach, users will act in a manner (rational behaviour) that they expect to minimise their costs [15]. Whether risk seeking or risk adverse, the user aims to minimise the costs that they will experience. This leads to a wide range of behaviour with risk adverse users taking additional precautions and risk neutral users can accept their risk by minimising their upfront costs (which may lead to an increase in loss later).

In any event, the software vendor as the cause of a breach is not liable for any consequential damages[6]. This places the appropriate incentives on the user to mitigate the risk. At the same time, the vendor has a reputational incentive to minimise the risk to their reputation. This was seen a number of years ago where the costs of bugs to the consumer from Microsoft was deemed as being exceedingly high. The vendor response was to change their coding practices and to significantly reduce the number of vulnerabilities in their released code.

### *A. Rational Limits to Security*

Rational choice models can be applied to security. In this, security is the composite good that we seek to model. As we moving the security expenditure from a lower to a higher value, the returns on that expenditure increase to a maxima and then decrease.

The optimal point is one where security expenditure and expected returns result in positive growth. As expenditure on security increases, the expenditure increases, but the return approaches zero. That is, for each additional dollar spent, the return tends to 0.

The logic for this is simple. If we have a capital investment of I, as the amount spent on security approaches I, the amount of capital and hence the investment that remains tends to 0.

---

[2] This is the case in many of the former "Rainbow Book" A1 level software installs used in military installations

[3] The reputation of a secure product adds value or can conversely negate value if the product is seen as being insecure.

[4] Intrusion detection system (IDS).

[5] Strict liability for software vendors limits the user choice as the user expects the vendor to act and does not take the appropriate level of care.

[6] For instance, legal rules when a part is not supplied do not leave the supplier liable for the lost profits due to the unavailability of the part. This rule is ensconced in *Hadley v. Baxendale, 156 Eng. Rep. 145 (1854)*.

There is more to this however. The value that matters is not the capital, but rather the expected return on capital. Investors expect a return on their money. If the return is less than the risk associated with the investment, the capital will be withdrawn and the company will fold. Investment in security lowers the chance of loss, it does not create profit in itself.

The maximum loss is limited as the capital in a firm can only be extracted within set bounds which cannot become infinite. The maximum expenditure on security is not in theory limited, although practically there are limits to the amount of capital that can be raised. In any event, security expenditure has failed where it costs more than it could be expected to save

## III. Assessing Security

Being a relative function, not only does the profitability of an individual class (be that organization, group or nation) factor into the calculation of security risk, but the relation to a classes neighbors also needs to be measured.

The cost function is in the criminals favor without additional input from the consumer. There is no impetuous for the bank to move to a more secure (and also more costly) means of protecting consumers when the criminal can still gain to the consumers system. One part of the problem is the regulations that plague banking. The requirement to authenticate customers when calling for their privacy makes it simple for a criminal to pose as the bank and obtain the information. So even if a more secure means is selected, it is trivial to bypass many controls using social engineering and other less technical methods.

Whilst there are greater losses from consumer inaction then supplier inaction, the consumer's failure to secure their system and refrain from the use of systems at insecure locations all compound to make it more likely to have a loss though this means.

At all points of an assessment, we have to also take the time value of money into account. The value of capital is not set and fluctuates with time. To evaluate costs, we need to take both cost and the point at which the cost is expressed into account.

### *A. Economic Equivalence*

In order to compare any set of two or more alternatives, the financial characteristics of the alternatives must be compared on an equivalent basis. Two options are said to be equivalent when they have the same effect. Monetary values are termed as equivalent when they have the same exchange value. This can be defined as:

1. The comparative amount of each monetary sum,
2. The times of the occurrence of the sums can be aligned.
3. An interest rate can be used to compare differences in the time of payment.

The general equivalence function is defined as:

$$\text{PE, AE or FE} = f(F_t, i, n) \qquad \text{x.1}$$

This equation holds for values of t between 0 and n. The equivalence equation uses:

$F_t$ = the rate of monetary flow at the end of time period t.
i = the rate of interest for the time period.
n = the number of discrete time periods.

The security and risk product lifecycle defines the function of the acquisition and utilisation phases. A system with a longer MTBF[7] has a greater return on the initial investment. Similarly, larger upfront investments in security reduce the amount of capital available for investment. The financial present equivalent function [PE(i)] is defined as a value calculation that is related to the difference between the present equivalent capital value and the present equivalent costs for a given alternative at a given interest rate.

The present equivalent value at interest rate i over a total of n years is stated as:

$$PE(i) = F_0(^{P/F,i,0}) + F_1(^{P/F,i,1}) + \ldots + F_n(^{P/F,i,n})$$

$$= \sum_{t=0}^{n} F_t(^{P/F,i,t})$$

## IV. Stag Hunt

George Akerlof's model, "A Market for Lemons" [1] as was designed for modeling quality uncertainty has been proposed as a game model for the software industry [2]. This model is based on information asymmetry and the presumption that the vendor has more knowledge of the product than the user. This is a fallacy in that the software vendor is incentivized to correct bugs as early in the process as is possible (the later a bug is discovered in the development process, the more it costs to fix). Hence, the vendor does not have more of an idea of the expectations of flaws than a knowledgeable user. Further, the user knows how they plan to deploy the software; the vendor does not have this information and may have little insight into what other interactions may occur.

The software game is also sequential with multiple iterations. The vendor wants to maintain a relationship with the user and as the software is used, it can be assessed against the assertions of the vendor. Further, the user can generally compare the past performance of the vendor.

A better game model for the software industry is the "Stag Hunt". This was based on Jean Jacques Rousseau's postulations of a co-operation strategy between two hunters [11]. These individuals can either jointly hunt a stag or individually hunt a rabbit. The largest payoff is assigned against the capture of a stag which provides a larger return than the hare. The hunting of a stag is more demanding and requires mutual cooperation. If either player hunts a stag alone, the chance of success is negligible and sub-optimal.

[7] Mean time between failure

Hunting stags is most beneficial for society in that this activity creates the optimal returns. The problem with this game is that it requires a lot of trust among the players.

| | | User | |
|---|---|---|---|
| | | **Create Secure Software** | **Add Features** |
| **Software Vendor** | **Create Secure Software** | 10, 10<br>A, W | 1, 7<br>B, X |
| | **Add Features** | 7, 1<br>C, Y | 5, 5<br>D, Z |

Fig. 2. Software Markets as a "Stag Hunt".

This game has two pure strategy equilibria in which both of the players prefer the lower risk equilibrium to the higher payoff equilibrium. The game is both Pareto optimal and Hicks optimal, but the sub-optimal and hence inefficient equilibrium poses a lower risk to either player. As the payoff variance over the other player's strategies is less than that of the optimal solution, it is more likely that this option will be selected. Another way of stating this is that the equilibrium is payoff-dominant while the other strategy is risk-dominant.

The strategy between the vendor and the Software User is displayed in Fig 2. In this, the numerical representations represent the payoff figures for the specific case (the software market) and the generalized relations take the form:

$$A > C \geq D > B \qquad \text{... (1.1)}$$
$$W > X \geq Z > Y$$

The outcomes are not definitive statements of what will be produced. In this game, the "Stag" is a desire to "Create Secure Software" and the "Hare" the fallback to adding more features. A desire is not a case of creating fewer bugs by itself, but rather a combination of adding controls and testing to software. Such an example would be the addition of the XP to Windows XP SP2 by Microsoft. Additional testing is effective to a point and more can be done than is occurring at present.

The payoffs for creating more secure software are great for both the vendor and the user, but the risk of a misaligned strategy leads to the sub-optimal equilibria. What is needed is a signaling process. A signal will allow the players to align to the more optimal strategy. It is not only in the user's interest to have more secure software, but also is in the interest of the vendor. Patching is expensive and the vendor can reasonably charge more for secure software.

A problem with a sub-optimal equilibrium is that "talk is cheap". A player's strategy is not only whether to hunt stag or hare, but also what signal to send, and how to respond to signals he receives. In order to switch from the hare hunting equilibrium (more Features) to the other, over three quarters of the population must simultaneously switch strategy to require secure software. This is a simple situation when there are only 2 players, but becomes more complex in an n-player game.

As the ratio between the payoff for stag hunting and the payoff for hare hunting is reduced, the incentives to move towards stag hunting decreases. As a result, it becomes less likely that software security will be made into a primary goal of either party. As such, where the introduction of features and the "*new killer app*" occur more frequently, software security lags and it becomes more likely that a change from a stag hunting equilibrium to a hare hunting equilibrium will occur. It is hence less probable that an alteration of the players strategy from hare to stag.

Since neither player has an incentive to deviate, this probability distribution over the strategies is known as a correlated equilibrium of the game. Notably, the expected payoff for this equilibrium is 7(1/3) + 2(1/3) + 6(1/3) = 5 which is higher than the expected payoff of the mixed strategy Nash equilibrium.

## V. Conclusion

The addition on measures that take externalities into account act as a signaling instrument that reduce information asymmetry and improve the overall risk position of both the consumer and vendor. The development of a software risk derivative mechanism would be beneficial to security [8] through the provision a signaling process to security and risk.

## References

[1] Akerlof, George A. (1970). "The Market for 'Lemons': Quality Uncertainty and the Market Mechanism". Quarterly Journal of Economics 84 (3): 488–500. doi:10.2307/1879431

[2] Anderson, Ross. 2001. "Why Information Security is Hard – an Economics Perspective." 17th Annual Computer Security Applications Conference. New Orleans, LA, USA.

[3] Aycock John *Computer Viruses and Malware*, Advances in Information Security, Vol. 22, Springer US 2006.

[4] Ben-Itzhak, Y. (2009). "*Organised cybercrime and payment cards.*" Card Technology Today 21(2): 10-11.

[5] Devanbu, P. T. and S. Stubblebine (2000). Software engineering for security: a roadmap. Proceedings of the Conference on The Future of Software Engineering. Limerick, Ireland, ACM.

[6] DShield. http://www.dshield.org, 2006-2010.

[7] Hahn, Robert W.; Layne-Farrar, Anne, "*The Law and Economics of Software Security*", Harv. J.L. & Pub. Pol'y 283 (2006-2007)

[8] Jaziar, R. (2007). Understanding Hidden Information Security Threats: The Vulnerability Black Market. Paper presented at the 40th Annual Hawaii International Conference on System Sciences (HICSS07).

[9] Peisert, S. and Bishop, M. *How to Design Computer Security Experiments* WG 11.8 International Federation of Information Processing, Springer Boston, 2007.

[10] Scott, Michael D "*Tort Liability for Vendors of Insecure Software: Has the Time Finally Come*";, 67 Md. L. Rev. 425 (2007-2008)

[11] Skyrms, Brian (2004) "The Stag Hunt and the Evolution of Social Structure" Cambridge University Press

[12] Spitzner, L. Know your enemy: Honeynets. http://project.honeynet.org/papers/honeynet, 2005.

[13] Stolpe, M. (2000). "Protection Against Software Piracy: A Study Of Technology Adoption For The Enforcement Of Intellectual Property Rights." Economics of Innovation and New Technology 9(1): 25-52.

[14] Vinod Yegneswaran , Paul Barford , Johannes Ullrich, Internet intrusions: global characteristics and prevalence, Proceedings of the 2003 ACM SIGMETRICS international conference on Measurement and modeling of computer systems, June 11-14, 2003, San Diego, CA, USA

[15] White, Dominic Stjohn Dolin (2006) "Limiting Vulnerability Exposure through effective Patch Management: threat mitigation through vulnerability remediation" MASTER OF SCIENCE Thesis, Department of Computer Science, Rhodes University

# Current issues and liability facing Internet Intermediaries.

Craig S Wright
Charles Sturt University
Wagga Wagga
NSW Australia
+61 2 4362 1512
Craig@Integyrs.com

## ABSTRACT

As the Internet provides more and more of business, government and our personal lives, issues have started to arise within the courts and justice system. This is of particular interest to Internet Intermediary. This paper considers the effects of legal liability as it pertains to Internet Intermediaries. Such examples would include defamation and copyright violations on ISP's where a subscriber has breached their legal obligations as well as the hosting of illicit materials (such as child porn).

At one extreme of intermediaries there are the long distance telecommunications providers, at the other there are Internet publishers and other providers of material. In between there are a range of providers such as operators of node computers, Internet access providers, providers of bulletin boards, Usenet group organizers and providers of host computers for web pages.

New challenges arise through the nature of widely distributed networks such as the Internet for all of these players.

## General Terms

Management, Law, Liability, Internet, Legal Aspects.

## Keywords

Internet Intermediary, Liability, ISP, Law.

## 1. INTRODUCTION

The Internet is fundamentally a means of communication. Issues with law that have arisen because of the Internet are thus a result of the differences between communication in the physical world and communication using the Internet. Contractual negotiations are the result of a series of communications that create a legally binding agreement[i].

This paper will demonstrate that inaction from ISPs and other intermediaries is risky and that the most effective enforcement framework involves enforcement from the least cost provider as proposed by Mann & Belzley [22]. There are various kinds of services connected with the Internet, and the liability of the service provider may depend on what is being provided. At one extreme there are the long distance telecommunications providers, at the other there are Internet publishers and other providers of material. In between there are a range of providers such as operators of node computers, Internet access providers, providers of bulletin boards, Usenet group organizers and providers of host computers for web pages.

In many cases, liability will depend upon how a court faced with a case of first impression analogizes a particular Internet service provider to more conventional categories of information providers. For example, should the service provider be viewed as the equivalent of the telephone company, purely a conduit for information? This might be the right analogy for the telecommunications link provider, but clearly does not fit the publisher. On the other hand, if the provider is viewed as analogous to a publisher of a printed publication, there is a much greater exposure to liability[ii]. The provider of a host computer for third party web pages could be compared to a printer or perhaps a distributor of printed publications. It could also be argued that a Usenet group or bulletin board is analogous to a library, so that the provider should be treated as the librarian.

The foremost dilemma with the study of electronic law is the complexity and difficulty in confining its study within simple parameters. Internet and e-commerce do not define a distinct area of law as with contract[iii] and tort law. Electronic law crosses many legal disciplines, each of which can be studied individually. Examples of a range of areas of law that electronic, e-commerce, and Internet law touch upon can be seen in the following pages.

In fact, existing laws already address the majority of situations that may impact an Internet intermediary. In most cases (for instance), cybercrimes are just age-old crimes committed using a new technology. Identity theft, for instance, has existed for hundreds of years, only now the speed and volume, and hence the consequence of the offence is increased. What is important to the intermediary is the increased scope of responsibility that many of them now face.

New challenges do arise through the nature of widely distributed networks such as the Internet. Some legal jurisdictions have addressed this issue through the enhancement of existing laws. Most however, have adopted an approach where they define solutions to a uniquely perceived legal difficulty through the creation of separate digital laws. In particular, these are manifest in the numerous additions to computer crime statutes that have recently populated the various criminal codes.

Of particular confusion to the internet intermediary is the distinction between what is illegal and what is criminal. This, however, is not a distinction solely confined to electronic law. It is important to note that although many actions are illegal, they may not be criminal in nature. This is important as the evidentiary requirements in criminal cases are far stricter than in civil litigation. This is also reflected in the actions that the intermediary will be required to take, both to stop another party[iv] who is involved in a criminal activity, and also counter to minimize the tortuous actions that they may be exposed to.

CONFIDENTIAL
BEV_00901017

DEF_01281896

## 2. The Changing Nature of the Internet and Opportunities for Transgressions

In the physical world, intermediaries are generally conscious players that are actively involved with a transaction. They will generally have some type of legal relationship with the other party that has been negotiated and agreed in advance. An Internet intermediary may not be consciously involved in the transaction and further may not have any pre-existing relationship[v].

### 2.1 The composition of the Internet

The Internet is formed from the interconnection of a succession of linked hosts. Originally envisaged by the United States government, The Internet was developed to offer a network solution to the military in time of war. It has been adapted to use by the general public opening up access to private companies hence creating an international commercial network.

The Internet has become a network of privately controlled networks and hosts that communicate using a TCP/IP (Transfer Control Protocol/Internet Protocol). A request from a host for data over the Internet involves the routing of data to the system that holds the requested content and then back from that system to the original user. The structure of the Internet and the common use of TCP/IP for transfer between networks create a common backbone that allows disparate systems to communicate seamlessly.

An Internet intermediary can in effect provide either of two services to either a single party or multiple parties. These services include the provision of access to communication channels or the provision of an additional service over these channels. In the first instance we are looking at a traditional Internet service provider or ISP. An ISP can provide general backbone routing services and connectivity. This is the most fundamental of the services as without a connection to the Internet no other Internet-based services may be accessed. Additionally, an ISP can also provide access to systems and storage space.

The second instance involves an Internet content provider or ICP. An ICP can cover a far wider range of activities than an ISP. In its most basic form this is the provision of transaction services between parties, identification and authorization of parties, the provision of search capabilities or a combination of any of the above. In effect, the addition of web portals to traditional banking systems has turned the banking industry into an Internet content provider. The bank provides authorization, identification and transaction processing capabilities. These capabilities extend beyond simple transaction processing and the accessing of one's own account. Services such as PayPal[vi] have emerged to offer intermediary payment facilities over the Internet allowing users to transact without developing these capabilities themselves and offering a service in such a manner that the end client may not even be aware of the existence of the payment intermediary.

### 2.2 Actors who define the Internet

Dr Russell Smith of the Australian Institute of Criminology [30] stated in 2000 that:

*"The perpetrators of many on-line scams ... are often not large corporations. They are able to close-down their operations quickly and easily, move assets to secure locations and use digital technologies to conceal their identities and disguise evidence. In such cases there is little likelihood of success whether civil or criminal proceedings are taken."*

Dr Smith noted that fraud may be committed both electronically and in paper based payment systems by individuals opening accounts with false identification details. These individuals may then exceed credit balances or alter instruments or messages used to authorize transactions. On the Internet, traditional methods of fraud and criminal activity have been updated such that they use this new technology capably. However, there are dilemmas other then fraud on the Internet. It is necessary to understand the relationship between the various parties on the Internet and how they interact if we are to gain an understanding of the issues facing Internet intermediaries.

#### *2.2.1 Primary Malfeasors*

The primary malfeasors that impact Internet content or service providers are those who proffer or obtain illicit material across the Internet. This material ranges from breaches of copyright, objectionable content, child pornography, unlicensed gambling, and trademark dilution or infringement as well as a number of less common offences including money laundering and terrorism. Most countries have strict licensing requirements for gambling sites if they allow this activity at all. A website can offer its services to any nation if it so chooses. As such, an online casino could be setup to solicit clients from other jurisdictions that do not allow online gambling (such as the USA).

In other cases, the provision may be legal in its own jurisdiction (such as the offering of "hard-core" pornography in Denmark) but breach the laws where it is being accessed. An individual that introduces malware into the Internet is also placing content onto the systems that comprise the Internet. This is an action that could threaten many other people and organizations. As many SCADA[vii] systems are connected to networks, an Internet worm could have the impact of affecting the physical world.

#### *2.2.2 Internet Intermediaries*

It was originally argued that widespread disintermediation [28] would occur over the Internet. It was originally believed that the Internet would provide a means to allow transacting parties to deal directly with each other. In reality the opposite has occurred with additional layers being formed rather than removed. There are two primary reasons for this growth of intermediaries, the first is related to the need to connect to the Internet and the second derives from both trust and the availability of payment. In either case any transaction conducted over the Internet will not be in person. The consequence being that cash exchanges cannot occur and the third-party will need to provide the trusted source of funds. The simple need to connect also derives from the distance that may be involved. When communicating across vast distances in small amounts of time and intermediary is always needed. In the past telecommunications carriers provided fax and phone services to satisfy this transaction. In effect what the Internet has done is to supplant fax, telephony, telex and electronic data interchange (EDI) with new and more universally accepted protocols. It would be rare to find any two parties with sufficient resources to construct and connect a global internetwork themselves.

CONFIDENTIAL
BEV_00901017

DEF_01281897

The issue of trust surrounds payments creating opportunities for both payment and auction intermediaries. In a contemporary transaction for the sale of a product any one individual would not be able to assemble the essential resources necessary to reach a global market. The growth of auction intermediaries such as eBay[viii] has created the ability to offer products and services internationally creating global markets. The consequence is that intermediaries have created market segments that were not thought possible and did not previously exist curtailing the expected disintermediation of the Internet.

### *2.2.2.1 Internet service providers*

An Internet service provider or ISP provides the communication backbone supporting the Internet.[ix] To end-users, the ISP is the entity responsible for opening access to the content on the Internet. Generally speaking, an end-user is unlikely to care about the true path traversed in receiving their data. Most users will not care about the nature of Internet protocols, how routing systems function, what type of physical infrastructure is in place as long as they receive their transmission. In becoming acquainted with the significance of a suitable regulatory design of sensitivity to context, it is imperative to differentiate distinct roles that an ISP can play in the provision of standard Internet services.

There are in effect three primary classifications and ways of distinguishing ISPs. It is likely that any Internet-based transaction will follow through a path of *Source ISP, Backbone Providers*, and arrive at a *Destination ISP* where both the source and destination ISPs are effectively *endpoints*. Backbone providers include the class of telecommunication carriers who deal solely with the transmission and routing of packets across provider networks. For purposes of liability, backbone providers offer little more than a conduit for contractual loss from other providers that they deal with. Backbone providers are unlikely to have the capabilities or capacity that will allow them to distinguish between data, traffic or protocol content making the ability to filter illicit activity next to impossible at this level.[x] Source and destination ISPs are in effect similar in many ways. In particular, any endpoint ISP will at some stage act as either and both source or destination ISP.

Any end-user request over the Internet is served by a destination ISP. A *Source ISP* is the organization that supplies access to the servers and systems where the unlawful content (both lawful and illicit) is presented or hosted.[34] There are two significant differences involving the Source ISP and the Destination ISP when viewed under a regulatory framework. Firstly the Destination ISP serving ordinary end-users is most unlikely to have any direct association with or precise information concerning the primary malfeasor. Any logs or materials that may be maintained are unlikely to hold the level of detail necessary to prove malfeasance. A Source ISP conversely is likely to maintain logs and track access to the content that it maintains. It is necessary to weigh any process of assessing how "*fair*" it would be to "*hold responsible*" the Source ISP for the misconduct of its clients or other parties and also in determining how successfully the Source ISP could serve as a regulator in controlling misconduct against a variety of factors. In many cases, the Source ISP may be located in a jurisdiction without reciprocal regulations thus preventing prosecution. Next, the Source ISP may itself be a victim of illicit activity.

In the instance that a Source ISP supplies both the host that contains content and also the access to that material, it is likely to be able to more effectively monitor and control the activity of its users than would an ISP that provides only access to the material. A Destination ISP can not readily remove itself from the authority of the regulatory regime in whose jurisdiction the users are situated. To do so would result it in also removing its ability to serve those end-users. A Source ISP and the content it hosts, if desiring to make possible prohibited conduct, can move itself to an alternate jurisdiction that does not disallow the illicit conduct. For instance, a Source ISP that wishes to implement access to Internet gambling can locate itself in a jurisdiction where these activities[xi] are legal and thus legitimized. This in effect places these organizations beyond the jurisdiction and capability of the majority international legal edicts and the related enforcement capabilities.[xii] The Destination ISP however is not beyond this reach. An ISP in London with local clients that allows its clients to connect to a child pornography site in Nigeria needs a local presence in London. At this least this would include a local sales office, local servers, cabling, power and equipment such as switches and routers.

*A Destination ISP* supplies an end-user with the data that they have requested from Internet. Many ISPs are merely resellers of Internet connectivity maintaining only simple connection, billing and routing systems. As such, Destination ISPs may be further subdivided into the additional subcategories of *Retail ISPs* and *Link ISPs*. A *Retail ISP* is the one that maintains and operates an end-user billing system. A *Link ISP* provides not just access but also hosts systems needed to access internet applications including SMTP, POP3 and World Wide Web systems (for e-mail and web access respectively). These organizations also act as the gateways allowing end-users to access the various internet protocols. As the administrators of systems that link disparate networks and the Internet backbone, as well as encapsulating application data into an arrangement that may be broadcast along the backbone, Destination ISPs are capable of averting selected attacks through the blocking of access to certain sites, hosts or even selected data available on the Internet. They may also aide in mitigating or at least slowing the transfer of certain other malicious classes of data such as worms or other malware.

Link ISPs and Retail ISPs need to integrate to present the end-user with access to the Internet and the related services[xiii]. It is possible to consider their functions to be either integrated or disintegrated based on the circumstances.

Where legislation is focused on stopping selected Internet access it is fitting to concentrate on those Retail ISPs dealing directly with those affected by the legislation. Legislation mandating IP address filtering (such as to block access to pornographic sites) is better directed to Link ISPs as they can process Internet traffic more effectively than Retail ISPs[xiv]. Ideally, it is beneficial to consider a single entity *Destination ISP* formulated from a collaborating Retail ISP and Link ISP group.

### *2.2.3 Payment intermediaries*

The difficulties in transferring cash payments over large distances and between people who may have never met and may never meet created the need for payment intermediaries in Internet transactions. Payment intermediaries provide both trust and some

realistic means for a purchaser to transfer consideration to the seller reliably. For instance, if a buyer on an online auction site comes up with the highest bid incurring a debt, a payment intermediary would be involved in order to arrange a transfer of funds either from the purchases banking account or via some payment card system cons making the transaction.

As an example, if party A located in Singapore was to sign up for an account with a licensed online casino such as Lasseter's online in Australia, party A would require some means of transferring funds from their banking account to a trust account managed and maintained by Lasseter's. When party A has subsequently been successful at their gambling pursuit playing online poker, the party would require some means of ensuring the return of their winnings. If on the other hand party A had accumulated gambling debts, Lasseter's would require some means of ensuring that funds in the trust account we used to pay those debts.

In the case of less significant amounts, this may be as simple as holding party A's credit card details in a database. In situations where the transactions a large, Lasseter's may wish to use party A's bank to transfer money in advance or otherwise to secure some assurance that A's potential gambling losses will be covered. The payment card company or bank in practice is an essential actor for the conduct in which "party A" desires to enact.

It was originally believed[1] that digital cash or electronic money would be created or minted allowing for some type of universal credit and would facilitate Internet transactions. Although a number of schemes did emerge, the vast majority of transactions that occur across the Internet are made by means of traditional means such as credit cards.[2] Rather than digital cash being minted, a new type of payment intermediary developed. Peer to peer (P2P) payment systems,[xv] such as PayPal, emerged allowing individuals to receive transactions directly [22], bypassing merchants and also act as a means of consolidating payment methods by providing a mechanism to interact with various banks and payment card institutions directly.

Peer-to-peer processing networks have aided the growth of auction intermediaries such as eBay. Payment card providers, P2P systems, and other entities that act as a mechanism to facilitate commercial transactions[xvi] also have the capability to stop illicit transactions and act as revelatory enforcement points. A commercial site distributing child pornography from Nigeria cannot be run profitably without an economical method of receiving consideration. If the site operators cannot reliably receive payment, they will quickly shut down. As the financial gatekeepers, payment intermediaries can be used to prevent illicit activity over the Internet. Either through proactive actions or upon the receipt of court orders and Internet payment intermediary could be used as an aid to curtail undesirable activities occurring across the Internet.

[1] Anderson et al. in their Dec 1997 presentation "*Exploring Digital Cash*" argued that digital cash would "*likely continue to evolve remarkably quickly*".

2 In 2002, roughly ninety percent of internet transactions used credit cards. Ronald J. Mann, *Regulating Internet Payment Intermediaries*, 82 TEXAS L. REV. 681, 681 (2004).

### *2.2.4 Auction intermediaries*

The auction intermediary has become the predominant means of matching buyers and sellers. These range from the classic option structure as defined by the industry leader, eBay, through to a more dynamic market structure more reminiscent of a stock exchange futures exchange trading floor. At the simplest, these parties provide client to client matching services allowing individuals and small corporations across the globe to deal (seemingly) directly.

These organizations are the target of most complaints concerning breaches of contract, illicit or illegal goods and even failure to act. One of the difficulties is the direct result of legislative differences between jurisdictions. In many cases, goods or services that may be legal in one jurisdiction could be controlled or proscribed in another. Liability for internet auction intermediaries mirrors those principles that have been created and applied in disputes concerning traditional or real-world auction intermediaries as may be seen in *Fonavisa*.[3]

### *2.2.5 Government and Regulators*

Many people believe that the Internet is a legislative nowhere land. The truth however is quite different with the majority of governments acting quickly correcting legal deficiencies and holes in recognition of the importance and value of information technology and the Internet. In many ways, law reform has moved faster around the Internet than many other technologies. The US in particular, has been quick to act introducing various specific immunities for Internet intermediaries. Many other jurisdictions including the EU have implemented substantial programs aimed at curtailing any legislative flaws.

The US has introduced a detailed set of immunities is a part of the online copyright infringement liability limitation act[xvii] (contained within the Digital millennium Copyright act) in order to ratify the provisions of the WIPO Copyright Treaty[xviii]. These provisions provide immunity from prosecution to Internet intermediaries involved in the *mere transmission* of packets[xix], who maintain automated cache Systems, who host third-party resources and those who provide search tools. There are conditions associated with these immunities. It is required that the Internet intermediary has a lack of knowledge of the transgression, but they do not receive direct financial benefit from it, and that they respect and do not try to bypass copyright protection technologies.

General immunity provisions have also been introduced within the US through the Communications Decency Act (1996)[4]. This act introduced new criminal offences of knowingly creating, sending, transmitting or displaying of obscene or indecent materials to minors. This act introduced a number of "*Good Samaritan*" provisions permitting ISPs to introduce blocking or filtering technology while not becoming classified by the courts to be a publisher or editor. This allows an ISP to filter this material without assuming any responsibility for third-party content.

3. Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996).

[4] Communications Decency Act (1996)

The EU E-Commerce Directive[5] provides a similar provisions offering protection for both packet transmitters and cache operators[xx]. It is still possible however that an ISP could be required to either actively monitor content or at the least to take down prescribed content following a notification or advice as to its existence. If, following being advised, the ISP had not removed the offending content, liability would still apply.

The US Senate has approved S.B. 2248, a measure that grants immunity from prosecution to telecommunications companies such as ISPs that cooperate with intelligence gathering requests from the government. This amendment to the Foreign Intelligence Surveillance Act (FISA)[xxi] would if passed increases government powers to eavesdrop on communications in certain cases without a warrant. Though there is an increase to selected protections for Internet intermediaries, there are still issues. If for instance an ISP sees an action to violate the constitutional rights of their clients and does not immediately respond, they do not receive immunity if eventually forced to respond. Further, the immunity only applies selectively to government agencies and no other actions.

The UK at the moment is in a state of flux. The release of the "*Creative Britain; new talents for the new economy*"[6] proposal carries with it the potential to create additional liabilities for Internet intermediaries. It is proposed that either Internet service providers engage in a voluntary code of conduct that provides security controls and monitoring, or else it is likely that the government will implement these controls. Ideally, intermediaries will work together formulate an industry code of practice thus negating the need for government intervention and also reducing their exposure to both contractual breaches[xxii] and tortuous liability.

### 2.2.6 Present Liability Schemes and Sanctions

The actor with the best capability to thwart most forms of internet-related misconduct is the primary malfeasor. The release of malware such as a "worm" is without doubt best prevented from causing harm by the person that created and released it against the Internet. For pornography sites to succeed there is a requirement for both a viewer and commercial website. If either party is absent, the commercial viewing of pornography and obscenity will not take place. This is even truer in the case of an interactive service such as gambling and online casinos. As such, direct control of either of these actors will thwart much of the social harm caused by this type of activity. This straightforward approach is the one most commonly utilized by the law.

Regulations attempting to avert misconduct through a process of protecting the primary malfeasors from their own actions are becoming less effective in the distributed world of the Internet, both when the actors are judgment proof and in cases where prosecution is unproductive due to a high degree of dealings or due to the low worth of each transaction, this legislative approach has proved ineffective. Consequently the direct regulation of individuals (such as in cases involving an infringement of copyrighted material) who use the Internet remains ineffective in diminishing undesired conduct.[xxiii] The result is that Internet Intermediaries are commonly seen as both the target of opportunity and also the answer to judgment proof actors.

### 2.2.7 Remedy in Tort and Civil Suits

The availability of the Internet Intermediary as co-targets for actions makes them susceptible to the actions of both their clients and also uninterested third parties for passing off and misleading and deceptive conduct. An action for intentional interference with business by unlawful means may also be possible. The tort of intentional interference with business by unlawful means may be available where the use of the trade mark is unlawful.

The courts generally seem willing to apply conventional fault-based tort principles to weigh up the behavior of intermediaries. The instances in which comparatively egregious conduct has ended in the liability of the intermediary are few,[7] and the majority of cases conclude with the absolution of the intermediaries from blame. Those circumstances that have resulted in a decision by the court that in effect declare that the intermediaries hold considerable accountability for the behavior of any primary malfeasors have mutually in the EU and the US Congress resulted in the respective parliaments acting to overrule the decision through the legislative conceding of expansive exemptions from liability to the intermediaries.[xxiv] "*The paths share not only the reflexive and unreflective fear that recognition of liability for intermediaries might be catastrophic to internet commerce; they also share a myopic focus on the idea that the inherent passivity of internet intermediaries makes it normatively inappropriate to impose responsibility on them for conduct of primary malfeasors. That idea is flawed both in its generalization about the passivity of intermediaries and in its failure to consider the possibility that the intermediaries might be the most effective sources of regulatory enforcement, without regard to their blameworthiness*"[22].

In the US, Congress has endorsed legislative protections for intermediaries from liability through defamation with the introduction of the Communications Decency Act[8]. In 47 U.S.C. §230, it is unambiguously positioned as regarding internet regulation[xxv] that the act introduced a series of "Good Samaritan provisions" as a part of the *Telecommunications Act of 1996*. This was tested in *DiMeo v Max* (2007),[9] in which the court found the defendant not liable for comments left by third parties on a blog. The plaintiff alleged that the defendant was a publisher of the comments hosted on the website but did not allege that the defendant authored the comments on the website or that the defendant was an information content provider. Under 47 U.S.C. § 230 (f)(3), the court determined "*the website posts alleged in the complaint must constitute information furnished by third party*

[5] Directive 2000/31/EC on Electronic Commerce OJ L 178 p1, 17 July 2000

[6] Department for Culture, Media and Sport, 22 Feb 2008

[7] *See* A & M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896 (N.D. Cal. 2000).

[8] The Communications Decency Act of 1996 (CDA)

[9] WL 2717865 (3rd Cir. Sept. 19, 2007); See also *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC* , CV-03-09386-PA (9th Cir. May 15, 2007); and *Universal Communication Systems, Inc. v. Lycos, Inc.* , 2007 WL 549111 (1st Cir. Feb. 23, 2007)

*information content providers*" and as a consequence immunity applied to the forum board operator. The Court upheld the dismissal of the suit.

The act, first passed in 1996[10] and subsequently amended in 1998,[11] has the apparent rationale of minimizing Internet regulations in order to promote the development of the Internet and safeguard the market for Internet service. The internet has consequently become so essential to daily life that it is improbable that the addition of extra legislation would intimidate service providers away from the provision of services at a competitive rate.[xxvi]

In the US, 47 U.S.C. § 230(c)(1) provides a defense for ISPs stating that, "*No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.*" This statute would seem[xxvii] to afford absolute immunity from any responsibility. Contrasting the DMCA, the ISP or ICP could chose not to do away with material in the event that the ISP or ICP has tangible awareness of the defamatory nature of material it is in fact hosting.[12] Notwithstanding the focal point of this legislation having been towards liability for defamation, it has pertained to seemingly unrelated auction intermediaries, including eBay.[13]

Inside the European Union, judgments obtained in the courts of one state are enforceable in any other state included within the Brussels Convention. If not, a judgment in one state will be enforceable in another only where there is a bilateral treaty creating the provision for such reciprocal enforcement between them. Frequently, these treaties add formalities surrounding the enforcement process that offer the courts of the jurisdiction in which the defendant is situated prudence both as to a decision to enforce, or to what degree. It is consequently vital when deciding on a jurisdiction to bring suit to decide if any judgment obtained is enforceable against a defendant who may in effect be judgment proof.

### *2.2.8 Cyber Negligence*

Not acting to correct a vulnerability in a computer system may give rise to an action in negligence if another party suffers loss or damage as the result of a cyber-attack or employee fraud. Given proximity[xxviii], a conception first established in *Caparo Industries Plc. v. Dickman*, [1990][14] and reasonable foreseeability as established in *Anns v. Merton London Borough Council*, [1978][15] A.C. 728, the question of whether there exists a positive duty on a party to act so as to prevent criminals causing harm or economic loss to others will be likely found to exist in the cyber world. The test of reasonable foreseeability has however been rendered to a preliminary factual enquiry not to be incorporated into the legal test.

10.1996, Pub. L. 104-104, Title I, § 509.

11.1998, Pub. L. 105-277, Div. C, Title XIV, § 1404(a).

12.Thus minimizing the likelihood of a decision such as *Godfrey* in the United States. *See supra* note 102.

13.Gentry v. eBay, Inc., 121 Cal. Rptr. 2d 703 (Ct. App. 2002)

[14] [1990] 2 A.C. 605

[15] [1978] A.C. 728

The Australian High Court regarded a parallel scenario, whether a party has a duty to take reasonable steps to prevent criminals causing injury to others in *Triangle Shopping Centre Pty Ltd v Anzil*[16]. The judgment restated the principle established by Brennan CJ in *Sutherland Shire Council v Heyman*[17]. The capacity of a plaintiff to recover hinges on the plaintiff's ability to demonstrate a satisfactory nexus (e.g. a dependence or assumption of responsibility) between the plaintiff and the defendant such that it gives rise to a duty on the defendant to take reasonable steps to prevent third parties causing loss to the plaintiff[xxix]. Consequently, if a plaintiff in a case involving a breach of computer security could both demonstrate that the defendant did not in fact take reasonable measures to ensure the security of their computer systems (as against both internal and external assault), and they show the act of the third person (e.g. an attacker/hacker or even a fraudulent employee) occurred as a direct consequence of the defendant's own fault or breach of duty, then an action in negligence is likely to succeed.

Many organizations state that current standards of corporate governance for IT systems pose a problem due to the large number of competing standards. However, it needs to be taken into account that all of these standards maintain a minimum set of analogous requirements that few companies presently meet. Most of these standards, such as the PCI-DSS[xxx] and COBIT[18], set a requirement to monitor systems. COBIT control ME2 (Monitor and Evaluate Internal Controls) is measured through recording the "*number of major internal control breaches*". PCI-DSS at 10.5.5 states a minimum requirement to "*use file integrity monitoring and change detection software on logs to ensure that existing log data cannot be changed without generating alerts (although new data being added should not cause an alert)*". As a general minimum, it may be seen that an organization needs to maintain a sufficiently rigorous monitoring regime to meet these standards.

Installation guidelines provided by the Centre for Internet Security (CIS)[19] openly provide system benchmarks and scoring tools that contain the "*consensus minimum due care security configuration recommendations*" for the most widely deployed operating systems and applications in use. The baseline templates will not themselves stop a determined attacker, but could be used to demonstrate minimum due care and diligence.

It is interesting to contrast this general proposition with a peculiar case where the plaintiff went to great lengths in an attempt to recover loss caused by its own negligence, namely loss suffered due to computer fraud perpetrated by its own employee in its own system.

In *Mercedes Benz (NSW) v ANZ and National Mutual Royal Savings Bank Ltd*[20] (unreported), the Supreme Court of New

[16] Modbury Triangle Shopping Centre Pty Ltd v Anzil *[2000] HCA 61.*

[17] (1985) 157 CLR 424.

[18] COBIT v 4.1 is the computer control objectives and standard maintained by ISACA at http://www.cobitonline.info

[19] CIS benchmark and scoring tools are available from http://www.cisecurity.org/

[20] No. 50549 of 1990.

CONFIDENTIAL
BEV_00901017

DEF_01281901

South Wales considered if a duty to avert fraud would occur in cases where there is an anticipated prospect of loss. The Mercedes Benz employee responsible for the payroll system fraudulently misappropriated nearly $1.5 million by circumventing controls in the payroll software. Mercedes Benz alleged that the defendants, ANZ and NMRB, were negligent in paying on cheques that where fraudulently procured by the employee and in following her direction. The plaintiff's claim was dismissed by the court. It was held that employers who are careless in their controls to prevent fraud using only very simple systems for the analysis of employee activities will be responsible for the losses that result as a consequence of deceitful acts committed by the organizations' employees. It takes little deliberation to extend this finding to payment intermediaries.

The decision was founded on the judgment of Holt CJ in *Hern v Nichols* (1701)[21] that stated in "*seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver should be a loser than a stranger*"[22]. The question remains open as to the position that may result from unsound practices operated not by the plaintiff but by an organization in supplying services under an outsourcing agreement. In either event, the requirement for an organization to provide controls to ensure a minimum level of system security is clear.

The situation is further compounded in instances of cyber-attack that lead to a loss. An innocent third party that suffers an attack that originates from an inadequately secured system would be able to easily demonstrate a lack of reasonable care if the minimum consensus standards mentioned above are not achieved. Coupled with facts demonstrating that the attack originated from the defendant's insecure system, the evidence would provide the requisite substantiation of both proximity and reasonable foreseeability.

### *2.2.9 Vicarious Liability*

Liability against an Intermediary, whether in the traditional view of ISP and ICP as well as that of employers and other parties remains a risk.

#### *2.2.9.1 Civil Liability*

The conduct of both agents and employees can result in situations where liability is imposed vicariously on an organization through both the common law[23] and by statute.[24] The benchmark used to test for vicarious liability for an employee requires that the deed of the employee must have been committed during the course and capacity of their employment under the doctrine *respondeat superior*. Principals' liability will transpire when a 'principal-agent' relationship exists. Dal Pont[25] recognizes three possible categories of agents:

(a) *those that can create legal relations on behalf of a principal with a third party;*

(b) *those that can affect legal relations on behalf of a principal with a third party; and*

(c) *a person who has authority to act on behalf of a principal.*

Despite the fact that a party is in an agency[xxxi] relationship, the principal is liable directly as principal as contrasting to vicariously, "*this distinction has been treated as of little practical significance by the case law, being evident from judges' reference to principals as vicariously liable for their agents' acts*"[26]. The consequence being that an agency arrangement will leave the principle directly liable rather than vicariously liable.

The requirement for employees to have acted "*within the scope of employment*" is a broad term without a definitive definition in the law, but whose principles have been set through case law and include:

- where an employer authorizes an act but it is performed using an inappropriate or unauthorized approach, the employer shall remain liable[27];
- the fact that an employee is not permitted to execute an action is not applicable or a defense[28]; and
- the mere reality that a deed is illegal does not exclude it from the scope of employment[29].

Unauthorized access violations or computer fraud by an employee or agent would be deemed remote from the employee's scope of employment or the agent's duty[xxxii]. This alone does not respectively absolve the employer or agent from the effects of vicarious liability. Similarly, it remains unnecessary to respond to a claim against an employer through asserting that the wrong committed by the employee was for their own benefit. This matter was authoritatively settled in the *Lloyd v Grace, Smith and Co.*[30], in which a solicitor was held liable for the fraud of his clerk, albeit the fraud was exclusively for the clerk's individual advantage. It was declared that "*the loss occasioned by the fault of a third person in such circumstances ought to fall upon the one of the two parties who clothed that third person as agent with the authority by which he was enabled to commit the fraud*"[31]. It would be interesting to see how the courts decide on the instance of a "security consultant" or penetration tester who had used the tools and access provided by the firm to conduct activities that were not authorized (such as breaching client networks in excess of authority).

[21] (1701) 1 Salk 289

[22] Id., at 358.

[23] Broom v Morgan [1953] 1 QB 597.

[24] Employees Liability Act 1991 (NSW).

[25] G E Dal Pont, Law of Agency (Butterworths, 2001) [1.2].

[26] Ibid [22.4].

[27] Singapore Broadcasting Association, SBA's Approach to the Internet, See Century Insurance Co Limited v Northern Ireland Road Transport Board [1942] 1 All ER 491; and Tiger Nominees Pty Limited v State Pollution Control Commission (1992) 25 NSWLR 715, at 721 per Gleeson CJ.

[28] Tiger Nominees Pty Limited v State Pollution Control Commission (1992) 25 NSWLR 715.

[29] Bugge v Brown (1919) 26 CLR 110, at 117 per Isaacs J.

[30] [1912] AC 716

[31] [1912] AC 716, Lord Shaw of Dunfermline at 739

*Lloyd v Grace, Smith and Co.*[32] was also referred to by Dixon J in the leading Australian High Court case, *Deatons Pty Ltd v Flew*[33]. The case concerned an assault by the appellant's barmaid who hurled a beer glass at a patron. Dixon J stated that a servant's deliberate unlawful act may invite liability for their master in situations where "*they are acts to which the ostensible performance of his master's work gives occasion or which are committed under cover of the authority the servant is held out as possessing or of the position in which he is placed as a representative of his master*"[34].

Through this authority, it is generally accepted that if an employee commits fraud or misuses a computer system to conduct an illicit action that results in damage being caused to a third party, the employer may be supposed liable for their conduct. In the case of the principles agent, the principle is deemed to be directly liable.

In the context of the Internet, the scope in which a party may be liable is wide indeed. A staff member or even a consultant (as an agent) who publishes prohibited or proscribed material on websites and blogs, changes systems or even data and attacks the site of another party and many other actions could leave an organization liable. *Stevenson Jordan Harrison v McDonnell Evans* (1952)[35] provides an example of this category of action. This case hinged on whether the defendant (the employer) was able to be held liable under the principles of vicarious liability for the publication of assorted "*trade secrets*" by one of its employees which was an infringement of copyright. The employee did not work solely for the employer. Consequently, the question arose as to sufficiency of the "*master-servant*" affiliation between the parties for the conditions of be vicarious liability to be met. The issue in the conventional "*control test*" as to whether the employee was engaged under a "*contract for services*", against a "*contract of service*" was substituted in these circumstances with a test of whether the tort-feasor was executing functions that were an "*integral part of the business*" or "*merely ancillary to the business*". In the former circumstances, vicarious liability would extend to the employer. Similarly, a contract worker acting as web master for an organization who loads trade protected material onto their own blog without authority is likely to leave the organization they work for liable for their actions.

In *Meridian Global Funds Management Asia Limited v Securities Commission*[36], a pair of employees of *MGFMA* acted without the knowledge of the company directors but within the extent of their authority and purchased shares with company funds. The issue lay on the qualification of whether the company knew, or should have known that it had purchased the shares. The Privy Council held that whether by virtue of the employees' tangible or professed authority as an agent performing within their authority[37] or alternatively as employees performing in the course of their employment[38], both the actions, oversight and knowledge of the employees may well be ascribed to the company. Consequently, this can introduce the possibility of liability as joint tort-feasors in the instance where directors have, on their own behalf, also accepted a level of responsibility[39] meaning that if a director or officer is explicitly authorized to issue particular classes of representations for their company, and deceptively issues a representation of that class to another resulting in a loss, the company will be liable even if the particular representation was done in an inappropriate manner to achieve what was in effect authorized.

The degree of authority is an issue of fact and relies appreciably on more than the fact of employment providing the occasion for the employee to accomplish the fraud. *Panorama Developments (Guildford) Limited v Fidelis Furnishing Fabrics Limited*[40] involved a company secretary deceitfully hiring vehicles for personal use without the managing director's knowledge. As the company secretary will customarily authorize contracts for the company and would seem to have the perceptible authority to hire a vehicle, the company was held to be liable for the employee's actions. Similarly, the unauthorized use of Internet bandwidth assigned to a client of an ISP by an employee of the ISP would seem to be covered under perceptible authority.

### *2.2.9.2 Criminal Liability*

As employers, Internet intermediaries can be held to be either directly or vicariously liable for the criminal behavior of their employees.

Direct liability for organizations or companies refers to the class of liability that occurs when it permits the employee's action. Lord Reid in *Tesco Supermarkets Limited v Nattrass*[41] formulated that this transpires when someone is "*not acting as a servant, representative, agent or delegate*" of the company, but as "*an embodiment of the company*"[42]. When a company is involved in an action, this principle usually relates to the conduct of directors and company officers when those individuals are acting for or "*as the company*". Being that directors can assign their responsibilities, direct liability may encompass those employees who act under that delegated authority. The employer may be directly liable for the crime in cases where it may be demonstrated that a direct act or oversight of the company caused or accepted the employee's perpetration of the crime.

Where the prosecution of the crime involves substantiation of *mens rea*[43], the company cannot be found to be vicariously liable for the act of an employee. The company may still be found

[32] [1912] AC 716

[33] (1949) 79 CLR 370 at 381

[34] Ibid.

[35] [1952] 1 TLR 101 (CA).

[36] [1995] 2 AC 500

[37] see Lloyd v Grace, Smith & Co. [1912] AC 716

[38] see Armagas Limited v Mundogas S.A. [1986] 1 AC 717

[39] Demott, Deborah A. (2003) "*When is a Principal Charged with an Agent's Knowledge*?" 13 Duke Journal of Comparative & International Law. 291

[40] [1971] 2 QB 711

[41] [1972] AC 153

[42] ibid, at 170 per Lord Reid

[43] See Pearks, Gunston & Tee Limited v Ward [1902] 2 KB 1, at 11 per Channell J, and Mousell Bros Limited v London and North-Western Railway Company [1917] 2 KB 836, at 843 per Viscount Reading CJ.

CONFIDENTIAL
BEV_00901017

DEF_01281903

vicariously liable for an offence committed by an employee if the offence does not need *mens rea*[44] for its prosecution, or where either express or implied vicarious liability is produced as a consequence of statute. Strict liability offences are such actions. In strict liability offences and those that are established through statute to apply to companies, the conduct or mental state of an employee is ascribed to the company while it remains that the employee is performing within their authority.

The readiness on the part of courts to attribute criminal liability to a company for the actions of its employees seems to be escalating. This is demonstrated by the Privy Council decision of Meridian Global Funds Management Asia Ltd v Securities Commission[45] mentioned above. This type of fraudulent activity is only expected to become simpler through the implementation of new technologies by companies. Further, the attribution of criminal liability to an organization in this manner may broaden to include those actions of employees concerning the abuse of new technologies.

It is worth noting that both the *Data Protection Act 1998*[46] and the *Telecommunications (Lawful Business Practice)(Interception of Communications) Regulations 2000*[47] make it illegal to use equipment connected to a telecommunications network for the commission of an offence. The *Protection of Children Act 1978*[48] and *Criminal Justice Act 1988*[49] make it a criminal offence to distribute or possess scanned, digital or computer-generated facsimile photographs of a child under 16 that are indecent. Further, the *Obscene Publications Act 1959*[50] envelops all computer material making it a criminal offence to publish an article whose effect, taken as a whole, would tend to deprave and corrupt those likely to read, see or hear it. While these Acts do not of themselves create liability, they increase the penalties that a company can be exposed to if liable for the acts of an employee committing offences using the Internet.

## 3. Conclusion

Although the Internet has changed the backdrop of the economy and society, it has not radically changed the nature of either civil or criminal transgressions. Rather it has added a layer of complexity through the speed and volumes of transactions that it has enabled. The issue for the law and society is not an introduction of new crimes or new transgressions, but an enhanced capability both to engage in these activities and also the increased capacity to find them. Here again another issue develops with the juxtaposition of security and privacy. The increased ability of the intermediaries to monitor and control our actions is directed by the need to protect personal liberty. The incorrect balance of these forces leading to either too little security and a possible finding of negligence (or worse) or the breach of controls designed to protect society and the possible criminal effects of these actions.

[44] See Mousell Bros Limited v London and North-Western Railway Company [1917] 2 KB 836, at 845 per Atkin J.

[45] [1995] 2 AC 500.

[46] Data Protection Act 1998 [UK]

[47] Telecommunications (Lawful Business Practice)(Interception of Communications) Regulations 2000 [UK]

[48] Protection of Children Act 1978 [UK]

[49] Protection of Children Act 1978 and Criminal Justice Act 1988 [UK]

[50] Obscene Publications Act 1959 [UK]

## 4. REFERENCES

[1] Barker, J. Cam, (2004) "Grossly Excessive Penalties in the Battle Against Illegal File-Sharing: The Troubling Effects of Aggregating Minimum Statutory Damages for Copyright Infringement", 83 Texas L. Rev. 525

[2] Bick, Jonathan D., (1998) "Why Should the Internet Be Any Different?" 19 Pace L. Rev. 41, 63

[3] Bowne, A (1997) "Trade Marks and Copyright on the Internet" 2 Media and Arts Law Review 135

[4] Collins M, (2000) "Liability of internet intermediaries in Australian defamation law" Media & Arts Law Review 209

[5] Cooney, K (1997) "Liability for On-line Images: How an Ancient Right Protects the Latest in Net Functions" 16 Communications Law Bulletin 5

[6] Demott, Deborah A. (2003) "When is a Principal Charged with an Agent's Knowledge?" 13 Duke Journal of Comparative & International Law. 291

[7] Eisenberg J, (2000) "Safely out of site: the impact of the new online content legislation on defamation law" UNSW Law Journal

[8] Gilchrist, Simon (1998) "Telstra v Apra –Implications for the Internet" [1998] CTLR 16.

[9] Hare, Christopher (2004) "Identity Mistakes: A Missed Opportunity?" The Modern Law Review, Volume 67 Page 993 - November 2004 Volume 67 Issue 6

[10] Harmon, Amy (2003) "Subpoenas Sent to File Sharers Prompt Anger and Remorse", N.Y. Times, July 28, 2003, at C1.

[11] Hazen, Thomas L. (1977) "Transfers of Corporate Control and Duties of Controlling Shareholders. Common Law, Tender Offers, Investment Companies. And a Proposal for Reform" University of Pennsylvania Law Review, Vol. 125, No. 5 (May, 1977), pp. 1023-1067

[12] Kao, A. (2005) "RIAA v. Verizon: Applying the Subpoena Provision of the DMCA", 19 Berkeley Tech. L.J. 405, 408.

[13] Kraakman, Reinier H. (1984) "857 CORPORATE LIABILITY STRATEGIES AND THE COSTS OF LEGAL CONTROLS", Yale Law Journal April, 1984 (93 Yale L.J. 857)

[14] Landes, William & Lichtman, Douglas, (2003) "Indirect Liability for Copyright Infringement: An Economic Perspective", 16 HARV. J.L. & TECH. 395.

[15] Lemley Mark A. & Reese, R. A., (2004) "Reducing Digital Copyright Infringement without Restricting Innovation", 56 STAN. L. REV. 1345.

[16] Leroux, Olivier (2004) "Legal admissibility of electronic evidence 1", International Review of Law, Computers & Technology; Volume 18, Number 2 / July 2004; Pp 193-220

[17] Lichtman, Douglas Gary & Posner, Eric A., (July 2004). "Holding Internet Service Providers Accountable". U Chicago Law & Economics, Olin Working Paper No. 217. Available at SSRN: http://ssrn.com/abstract=573502 or DOI: 10.2139/ssrn.573502 (viewed 15 Jan 2008)

[18] Lim, YF, (1997) "Internet Service Providers and Liability for Copyright Infringement through Authorisation" 8 Australian Intellectual Property Law Journal 192.

[19] Loughnan, S., (1997) "Service Provider Liability for User Copyright Infringement on the Internet" 8 Australian Intellectual Property Law Journal 18

[20] MacMillian, Blakeney "The Internet and Communications Carriers' Copyright Liability" [1998] EIPR 52

[21] Mann, Ronald J., (2004) "Regulating Internet Payment Intermediaries", 82 Texas L. Rev. 681, 681

[22] 22Mann, R. & Belzley, S (2005) "The Promise of the Internet Intermediary Liability" 47 William and Mary Law Review 1 <http://ssrn.com/abstract=696601> at 27 July 2007]

[23] Olovsson, Tomas, (1992) "A Structured Approach to Computer Security", Department of Computer Engineering Chalmers University of Technology, Gothenburg SWEDEN, Technical Report No 122, 1992

[24] Paynter, H & Foreman, R (1998) "Liability of Internet Service Providers for Copyright Infringement", University of NSW Law Journal, [1998] UNSWLJ 61

[25] Quimbo, Rodolfo Noel S (2003) "Legal Regulatory Issues in the Information Economy", e-ASEAN Task Force, UNDP-APDIP (MAY 2003)

[26] Reidenberg, J (2004) "States and Internet Enforcement", 1 UNIV. OTTAWA L. & TECH. J. 1

[27] Scandariato, R.; Knight, J.C. (2004) "The design and evaluation of a defense system for Internet worms" Proceedings of the 23rd IEEE International Symposium on Reliable Distributed Systems, 2004. Volume, Issue, 18-20 Oct. 2004 Pp 164 - 173

[28] 28Shapiro, Andrew L., (1998) "Digital Middlemen and the Architecture of Electronic Commerce", 24 OHIO N.U. L. REV. 795

[29] Slawotsky, Joel (2005) "Doing Business around the World: Corporate Liability under the Alien Tort Claims Act" 2005 MICH. ST. L. REV. 1065

[30] 30Smith, Russell. (2000) "Confronting fraud in the digital age", Presented at Fraud prevention and control conference, Gold Coast Australia 24-25 August 2000

[31] Tickle, K. (1995) "The Vicarious Liability of Electronic Bulletin Board Operators for the Copyright Infringement Occurring on Their Bulletin Boards", 80 Iowa Law Review 391 at 397

[32] Williams, K. S. (2003) "Child Pornography and Regulation on the Internet in the United Kingdom: The Impact on Fundamental Rights and International Relations", Child Abuse Review, Volume 14, Issue 6 , Pages 415 – 429 (Special Issue: New Technologies . Issue Edited by Bernard Gallagher). Published Online: 20 Dec 2005, John Wiley & Sons, Ltd.

[33] Wu, Tim, (2003) "When Code Isn't Law", 89 Va. L. Rev. 679

[34] Zittrain, Jonathan (2003) "Internet Points of Control", 44 B.C. L. REV. 653

# Appendix

[i] An electronic contract has a twofold structure. Thought of electronically, the contract is a sequence of numbers and code saved to some electronic or magnetic medium. Alternatively, the contract becomes perceptible through a transformation of the numeric code when broadcast to a computer output device such as a printer or screen. Prior to the passing of the ECA, this dichotomy exasperated the uncertainty contiguous with whether an electronic contract can be regarded as being a contract in writing.

[ii] The distributed nature of the Internet means that a publisher can reach far more people. A company with a web site in the UK for instance has direct access to the US, Canada, Australia and many other countries with the primary limitations being language.

[iii] It has been argued that the digital contract may appear on the computer screen to consist of words in a written form but merely consist of a virtual representation. The **Electronic Communications Act 2000** [ECA] has removed the uncertainty and doubt surrounding the question as to the nature of electronic form used in the construction of a contract. In this, the ECA specifies that the electronic form of a contract is to be accepted as equivalent to a contract in writing

[iv] Such as with regards to taking action on notice of hosting child pornography.

[v] The inclusion of electronic agents makes the traditional requirement for a "meeting of minds" more difficult to prove. With many smaller vendors, hosting and creating their own e-commerce enabled web site requires the interaction of a third party. Often, this involves the use of an external service provider, which offloads the Internet shopping trolley function. In this way, smaller vendors can create an e-commerce enabled site quickly and simply.

The issue, which arises in this instance, is in determining the contracting parties. Many small vendors provide little more than billboards style advertising through their web site. The complex task of maintaining the databases, transaction processing, and the shopping cart function becomes simplified when outsourced to another provider. In some instances, a redirection takes the customer to a completely new site or domain.

[vi] PayPal is an online financial transaction broker, PayPal lets people send money to each other's e-mail addresses. At no time will either party see the other's credit card or bank information. Currently, 95% of eBay's purchases go through PayPal. Similar to an escrow service, PayPal acts as the middleman holder of money. Through its policies, practices, and business integrity, PayPal has earned the trust of both parties. See https://www.paypal.com/us/cgi-bin/webscr?cmd=xpt/cps/bizui/WhatIsPayPal-outside

[vii] Supervisory Control and Data Acquisition. These are systems that are used by many critical services, including power and emergency services.

[viii] Ebay.com states its purpose to be "the world's online marketplace; a place for buyers and sellers to come together and trade almost anything!" (for a detailed description, see http://pages.ebay.com/help/newtoebay/questions/about-ebay.html).

ix. Bick (1998) states that "*Even the simplest internet transaction usually involves a user's computer, an internet service provider's access computer, a regional router, a governmental backbone computer, another regional router, another internet service provider's computer, and a content provider's computer. So, even in the simplest transactions, there are many more intermediaries than users or content providers*".

x.Many researchers of the Internet hold the view that the difficulty of understanding the data that travels over ISP networks is an artifact of the internet's basic transmission protocol, under which the data that travels over those networks is in the forms of disintegrated packets of any particular file. It seems that regulation at the backbone level is likely in most cases to involve costs to *all* traffic that would outweigh the benefits reasonably attributed to the regulation.

xi. In such a structure, there is and has been an international race to the bottom to attract business to certain countries by decreasing the legal obstacles to their establishment. In the context of internet gambling, the winner of this race has arguably been the small island of Antigua in the British West Indies. *See* Don Yaeger, *Bucking the Odds*, SPORTS ILLUSTRATED, Jan. 8, 2001, at 26 ("Some 850 Web gambling sites are based [in Antigua] and an estimated 80% of all gaming URLs on the Web can be traced back to servers on the 108-square-mile island."); UNITED STATES GENERAL ACCOUNTING OFFICE, REPORT GAO-03-89, INTERNET GAMBLING: AN OVERVIEW OF THE ISSUES 52 (2002), *available at* http://www.gao.gov/new.items/d0389.pdf [hereinafter GAO REPORT] (listing 35 of 88 internet gambling websites as registered in either Antigua or Barbuda, but failing to report the percent of internet gambling taking place at these sites).

xii. Indeed the United States even brought a case against the country of Antigua and Barbuda before the WTO in an effort to curtail the proliferation of internet gambling operations on that tiny island nation. The United States lost that suit. *See* Naomi Rovnick, *Herbies Helps Antigua in WTO Outsourcing Victory*, LAWYER, April 5, 2004, at 10.

[xiii] Many ISPs were set up by the same kind of people who tend the carry out computer hacking, phone phreaking or similar activities. This group of people tends to believe that any kind of property rights in information are basically wrong, particularly if that information is owned by the Government or big business, and take great pride in discovering and making available such confidential information. It is, therefore, not surprising that there have been a number of cases in the United States, which involve the publication of stolen proprietary information.

[xiv] Many Retail ISPs maintain little or no technological capability to filter internet traffic.

xv In this context, P2P stands for "person-to-person." The term is to be distinguished from the more common use of the same acronym to describe the peer-to-peer file sharing discussed in the context of piracy.

xvi Because of the fluidity of payment mechanisms on the internet, there are a wide variety of service providers of various kinds (such as organizations like Checkfree, Cybernet & Authorize.net) that might or might not be regarded as intermediaries, depending on the circumstances. For purposes of this Essay, however, we focus on the dominant intermediaries like Visa, MasterCard, and PayPal.

[xvii] The Online Copyright Infringement Liability Limitation Act (OCILLA) is a portion of the Digital Millennium Copyright Act known as DMCA 512 or the DMCA takedown provisions. It is a 1998 United States federal law that provided a safe harbor to online service providers (OSPs, including ISPs, internet service providers) that promptly take down content if someone alleges it infringes their copyrights. Section 512 was added to the Copyright law in Title 17 of the United States Code (Public Law No. 105-304, 112 Stat. 2860, 2877).

[xviii] The European Union's Electronic Commerce directive contains similar notice and takedown provisions in its Article 14. In France, the Digital Economy Law ("Loi relative à l'économie numérique") implements this directive. In Finland "Laki tietoyhteiskunnan palvelujen tarjoamisesta" implements the directive.

[xix] The UK legislation, Statutory Instrument 2002 No. 2013, The Electronic Commerce (EC Directive) Regulations 2002 states in section, "Mere conduit" is functionally equivalent to this provision..

[xx] Statutory Instrument 2002 No. 2013, The Electronic Commerce (EC Directive) Regulations 2002 states in section, "Caching": "Where an information society service is provided which consists of the transmission in a communication network of information provided by a recipient of the service, the service provider (if he otherwise would) shall not be liable for damages or for any other pecuniary remedy or for any criminal sanction as a result of that transmission where -

(a) the information is the subject of automatic, intermediate and temporary storage where that storage is for the sole purpose of making more efficient onward transmission of the information to other recipients of the service upon their request, and

(b) the service provider -

(i) does not modify the information;

(ii) complies with conditions on access to the information;

(iii) complies with any rules regarding the updating of the information, specified in a manner widely recognized and used by industry;

(iv) does not interfere with the lawful use of technology, widely recognized and used by industry, to obtain data on the use of the information; and

(v) acts expeditiously to remove or to disable access to the information he has stored upon obtaining actual knowledge of the fact that the information at the initial source of the transmission has been removed from the network, or access to it has been disabled, or that a court or an administrative authority has ordered such removal or disablement."

[xxi] The Foreign Intelligence Surveillance Act (FISA) of 1978 is a U.S. federal law prescribing procedures for the physical and electronic surveillance and collection of "foreign intelligence information" between or among "foreign powers" on territory under United States control. FISA is codified in 50 U.S.C. §§1801–1811, 1821–29, 1841–46, and 1861–62.[1] The subchapters of FISA provide for Electronic Surveillance, Physical Searches, Pen Registers and Trap & Trace Devices for Foreign Intelligence Purposes, and Access to certain Business Records for Foreign Intelligence Purposes.

[xxii] The major uncertainty with electronic contracts stems from the facts of the individual dispute. This can lead to breaches as parties who do not understand the issues surrounding the contract seek to get around them. Fundamentally; offer, acceptance and consideration to fill the requirements of creation of the contract. Being that the offeror may stipulate the method of acceptance, it would be prudent for the contracting parties to agree to the form of acceptance prior to the conclusion of the contractual negotiations.

xxiii. A number of innovative approaches to solving the issue are provided by Lemley & Reese; WILLIAM W. FISHER III, PROMISES TO KEEP (2004).

xxiv.The most obvious example of this action can be found in the history of the Communications Decency Act. Congress directly responded to the ISP liability found in *Stratton Oakmont, Inc. v. Prodigy Services*, 23 Media L. Rep. (BNA) 1794 (N.Y. Sup. Ct. 1995), 1995 WL 323710, by including immunity for ISPs in the CDA, 47 U.S.C. § 230(c)(1) (2004) (exempting ISPs for liability as the "publisher or speaker of any information provided by another information content provider"), which was pending at the time of the case. Similarly, Title II of the Digital Millennium Copyright Act, codified at 17 U.S.C. § 512, settled tension over ISP liability for copyright infringement committed by their subscribers that had been created by the opposite approaches to the issue by courts. *Compare* Playboy Enters., Inc. v. Frena, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993) (finding liability), *with* Religious Tech. Ctr. v. Netcom, Inc., 907 F. Supp. 1361, 1372 (N.D. Cal. 1995) (refusing to find liability).

xxv.47 U.S.C. § 230(b) (2004)

xxvi.There remains, however, the fear that additional regulation will stifle innovation in the industry. Would, for instance, eBay enter the market as a new company today if it were liable for trademark infringement it facilitated? Such liability adds new start-up and ongoing costs that may make some new ventures unprofitable (or even more unprofitable). For an article addressing regulation in this way, see Lemley & Reese.

xxvii.There is at least the possibility that the statute would permit a State to require intermediaries to act. *See* Doe v. GTE Corp. 347 F.3d 655 (7th Cir. 2003) (per Easterbrook, J.) (suggesting that Section 230(e)(3) "would not pre-empt state laws or common-law doctrines that induce or require ISPs to protect the interests of third parties").

[xxviii] Proximity, a notion first established in *Caparo Industries Plc. v. Dickman*, [1990] 2 A.C. 605, is the initial phase of the assessment. The subsequent phase enquires as to whether there are policy considerations which would reduce or counteract the duty created under the initial stage. Mutually, the phases are to be met with reference to the facts of cases previously determined. The dearth of such cases would not however avert the courts from finding a duty of care.

[xxix] Dixon J elucidated how a "special relationship" of this variety may occur in Smith v Leurs (1945) 70 CLR 256. This case was derived from an indication of occurrences that entail a special danger and the control or of actions or conduct of the third person; See also [2000] HCA 61, para 140.

[xxx] PCI-DSS (version 1.1) is the Payment Card Industry Data Security Standard and is contractually required to be adhered to by all merchants that process VISA, Mastercard and other payment card products. This requirement and standard is maintained by the PCI Standards Council at https://www.pcisecuritystandards.org/

[xxxi] The inclusion of electronic agents makes the traditional requirement for a "meeting of minds" more difficult to prove.

[xxxii] Even in cases where the employee is engaged to break into systems legally, as in the case of a penetration tester or auditor, the employee will have received authorization – even where the people do not know of the deed, some level of management will have knowledge and have passed authority.

# Software, Vendors and Reputation: an analysis of the dilemma in creating secure software.

## Abstract

Market models for software vulnerabilities have been disparaged in the past citing how these do little to lower the risk of insecure software. We argue that the market models proposed are flawed and not the concept of a market itself. A well defined software risk derivative market would improve the information exchange for both the software user and vendor removing the oft touted imperfect information state that is said to belie the software industry. In this way, users could have a rational means of accurately judging software risks and costs and as such the vendor could optimally apply their time between delivering features and averting risk in a manner demanded by the end user. After all, it is of little value to increase the cost per unit of software by more than an equal compensating control.

## Keywords

Security, Derivatives, Vulnerability Market, Software Development, Game theory

## Glossary of Terms

| | |
|---|---|
| SDLC | Software Development Life Cycle |
| DMCA | Digital Millennium Copyright Act |
| IDS | Intrusion Detection System |
| MTBF | Mean Time To Failure |
| Ploc | per (source) Lines of Code |

CONFIDENTIAL
BEV_00901018

DEF_01281908

## Introduction

Arora, Telang and Xu [2, 3] asserted that a market based mechanism for software vulnerabilities will necessarily underperform a CERT-type mechanism. The market that they used was a game theoretic *pricing game* [14]. In the model reported, the players in the market do not report their prices[1]. These players use a model where information is simultaneously distributed to the client of the player and the vendor. The CERT model was touted as being optimal. It relies on waiting until a patch was publically released and only then releasing the patch to the public. This ignores many externalities and assumes the only control is a patch in place of other alternative compensating controls.

Consequently, the examined "market" model is in itself sub-optimal. It both creates incentives to leak information without proper safeguards and creates vulnerability black-markets. As criminal groups and selected security vendors (such as Penetration testers and IDS vendors) have an incentive to gain information secretly[2], they have an incentive to pay more for unknown vulnerabilities in a closed market. This means that a seller to one of these parties has a reputational incentive to earn more through not releasing information as the individual's reputation will be based on their ability to maintain secrecy.

This misaligned incentive creates a sub-optimal market. As a consequence, the market reported [2, 12] was sub-optimal to a CERT as this was an inefficient market and not that markets are less effective. The skewed incentivisation structure recommended in the paper was the source of the inefficiency and not the market itself. This simply highlights the need to allow efficient markets to develop rather than seeking to create these through design.

The other argument posed comes as a consequence of information asymmetry. It is asserted [14] that software vendors have an informational advantage over other parties. The vendor does have access to source code (which is also available for Linux and other open source providers), but it can be proved that this does not provide the levels of information asymmetry that are asserted. Software vendors have a reputational input to their value [8,20].

---

[1] E.g. iDefense Ltd. And other similar providers have a semi-closed market with limited information exchange.

[2] Criminal groups have an incentive to maximize the time that vulnerabilities remain unknown as this extends the time that they have to exploit these bugs. Penetration Testers etc. have similar incentives as the trade secret of an unknown zero day vulnerability can provide them with a competitive advantage. This also goes to reputational motives for both parties.

Telang & Wattal [20] did note that the market value of a software vendor is influences through reputational costs and those vulnerabilities correlate significantly with a decrease in the companies traded price, a view supported by others [8].

> "*Vulnerability disclosure adversely and significantly affects the stock performance of a software vendor. We show that, on average, a software vendor loses around 0.63% of market value on the day of the vulnerability announcement. This translates to a dollar amount of $0.86 billion loss in market value. We also show that markets do not penalize a vendor any more if the vulnerability is discovered by a third party than by the vendor itself.*"

These results demonstrate that a vendor has an incentive to minimize the vulnerabilities found in their products. If an excessive number of vulnerabilities continue to impact a vendor, their market capitalization suffers as a consequence. For this reason alone offers strong evidence that a vendor does not have an incentive to hide information (as third party vulnerability researchers cause an equal loss in capitalization). It has to be expected that any vulnerability known by the vendor will be uncovered. If the vendor fixes this flaw before release, the cost is minimized and at the limit approaches the cost of testing, (that is a zero incremental cost to that which would be expressed later).

**Figure 1 Decreasing utility of testing as the SDLC progresses**

If the vendor discovers a vulnerability in the software they produce, the result is a *'strongly dominated'* motive to fix the bug. Hence, any remaining bugs are those that have not been uncovered by the vendor and which are less economical to find (through an increase in testing). It can thus be demonstrated that the vendor knows no more than the user at the point of software release as to the state of bugs in a product.

CONFIDENTIAL
BEV_00901018

DEF_01281910

Testing is far less expensive earlier in the development cycle[3]. Figure 1 displays the expected utility of testing as the development progresses through an SDLC. Early in the process, the software developer has the greatest returns in testing and bug finding. As the development progresses, the returns are reduced as the process required and the costs associated with finding and correcting software vulnerabilities increases.

The utility is lowest when the software has been shipped to the user. At this point, fixing flaws is an expensive process for both the user and the vendor. This leaves the optimal solution to find as many bugs as possible as early in the development process as is feasible. This contrasts with the increasing costs of finding bugs (Figure 2). This leaves the optimal solution for the vendor based on the discovery of as many bugs as possible as early in the development process as is feasible (as a bug discovered early in the process can cost as much as 10x less [6] than one discovered later)[4]. It does not mean that all bugs or vulnerabilities will be found as the cost of finding additional vulnerabilities quickly exceeds the returns.

**Figure 2 Each vulnerability costs more than the last to mitigate**

The widespread use of Open Source software (such as Linux) and the limited differential in discovering bugs using source code reviews demonstrates that the vast majority of software flaws in commercial software are discovered early in the development process (it is highly unlikely that commercial software developers are less effective than open source developers and that the rate of errors is likely to be similar if not lower).

---

[3] NIST http://www.cse.lehigh.edu/~gtan/bug/localCopies/nistReport.pdf, see also Impact of Software Vulnerability Announcements on the Market Value of Software Vendors – an Empirical Investigation
[4] See http://www.cse.lehigh.edu/~gtan/bug/localCopies/nistReport.pdf

It has been estimated that it takes 5,000 man hours to discover the average software vulnerability. This amount of time creases a great amount of expense for software development when it has to be completely conducted internally. An open market on the other hand distributes this expense in an optimal manner and provides a source of information as to the true cost of the vulnerability. This information is created as the true costs of developing patches and can be compared to alternatives where patching is more costly.

A vulnerability market provides information on discovery and vendor action (for instance Microsoft vs. Adobe vs. Linux etc) allowing clients to better select software vendors, mitigating the "*Market for Lemons*" [15] that has been proposed. It has been demonstrated already that software vendors do not have more knowledge of bugs that users (or these would have been fixed prior to release) and hence do not have an advantage in information asymmetry when it comes to finding software flaws that may result through product interactions.

The market for lemons requires that the vendor knows the level of flaws better than the user. To many this may seem a common sense outcome, the vendor has access to source code, wrote he program and ran the development process. This is a flawed view as we have demonstrated as it is in the vendor's interest to mitigate vulnerabilities as early as possible. More importantly, the vendor is punished for bugs [19, 22].

### Software Derivative Markets

One possible solution to the limited and sub-optimal markets that currently exist would be the creation of Hedge funds for software security. Sales in software security based derivatives could be created on forward contracts. One such solution is the issuing of paired contracts (such as exist in short sales of stocks[5]). The first contract would be taken by a user and would pay a fixed amount if the software has suffered from any unmitigated vulnerabilities on the (forward) date specified in the contract. The paired contract would cover the vendor. If the vendor creates software without flaws (or at least mitigates all easily determinable flaws prior to the inception of the contract) the contract pays them the same amount as the first contract.

This is in effect a 'bet' that the software will perform effectively. If a bug is discovered, the user is paid a predetermined amount. This amount can be determined by the user to cover the expected costs of patching and any consequential damages (if so desired). This

---

[5] Short selling involves an investor anticipating a decrease in the price or an item. This involves selling a chattel that the investor does not own through a contract agreement. If the goods sell higher than anticipated, the investor losses money as they have to purchase the goods at the (now higher) market rate.

allows the user to select their own risk position by purchasing more or less risk as suits both the risk tolerance and the nature of the user's systems.

Such a derivative (if an open market is allowed to exist) would indicate the consensus opinion as to the security of the software and the reputation of the vendor. Such an instrument would allow software vendors and users to hedge the risks faced by undiscovered software vulnerabilities. These instruments would also be in the interest of the software vendor's investors as the ability to manage risk in advance would allow for forward financial planning and limit the negative impact that vulnerability discovery has on the quoted prices of a vendors capital.

### Selective Survival

If the vendor creates the low feature version for $200 and the full featured secure version for $800, the user can choose the level of protection. Taking a survival model of Windows 98 and one for Windows XP [7], the client can calculate the expected difference from each product. If Windows 98 has an expected compromise rate (without other compensating controls) of once per 6.2 days and Windows XP has an expected rate of 52.5 days when the firewall is enabled[6] we can calculate the cost per incident. If the user has a mean cost per incident of $320[7], we see that the Windows 98 option has an expected annual cost to the organization of $19,040 ($18,840 damage plus $200) whereas Windows XP has an expected cost of $3,825 ($3,025 damage plus $800).

Hence, most companies with a need to secure systems selected the more secure option and installed Windows XP over Windows 98. The initial costs did not reflect the overall costs to the organization. Likewise, home users (who rarely calculate the costs of compromise) where more likely to install the cheaper option.

To extend the analogy, assume that a software vendor can create a perfect version of software for a mean cost of $20,000[8] and the flawed version at the standard costs of under $1,000. Where the expected damages do not exceed $19,000 per copy of software, we see that it remains in the user's interests to select the lower security option as the expected losses are lower. More generally, for an organization with ***n*** users and an expected cost $C_S = nP_S$ (where $P_S$ is the cost per user of the secure software product) against $C_I = nP_I$ (with $P_I$ being he cost per user of the insecure software product), the cost of deploying either option is based on the expected losses for each option with a loss function defined

[6] In each case we are presuming that the Centre for Internet Security (www.cisecurity.org) standards for installing the software have been reasonably met.
[77] Based on quantitative data to be released later this year.
[8] Which is an extremely low estimate.

as $D_S < D_I$. As such, if $(C_S - D_S) < (C_I - D_I)$ it is in the interest of the company to take the secure option. Where $(C_S - D_S) > (C_I - D_I)$, the economical solution is to install the less secure version of the software and self-insure against the loss.

As a means of maximizing the allocations of risk and costs, the vendor could offer liability-free and full-liability versions of their product, the later sold at a reduced price. The vendor could then control their risk using a hedging instrument[9]. A market evaluation of the risk being traded would provide better information than that which the vendor has alone[10]. With this in mind, the user could also purchase the same derivative as the vendor. The cost to the user to purchase the software plus risk insurance would be less than purchasing the "more secure" version from the vendor as the vendor would hedge the risk it faces and add a transactional cost as well as a return (at the firms IRR).

Both parties are better off where the vendor produces the optimized version of their product and where the vendor does not assume liability for bugs.

Simply put, the vendor will provide a warranty (which acts as an insurance policy for the user) in cases where it can charge more for the provision of the warranty than it costs to provide the warranty. This cost could be either from a hedging instrument or through an investment in more testing. However, it must be noted that no increasing testing will make software invulnerable to all attacks and remove the ability for flaws to be discovered. As such, the cost of the hedged derivative will decrease, but will not go to zero.

The argument against this form of market is imperfect information. Many people argue that the software vendor has more knowledge than the user. This is untrue for several reasons. The vendor has no incentive to hide vulnerabilities as each vulnerability impacts the share price of the vendor through a decrease in capital [20]. Next, the vendor would be competing on the same derivative markets as the users. The vendor's knowledge would be quickly and efficiently transferred through the market mechanism. The end result is that a derivatives based strategy does not allow for information asymmetry and would disprove entirely the assertion that software vendors operate a "*market for lemons*".

From this we can see that the lack of liability does not require that the software vendor does not have the appropriate incentive to provide the optimal amount of testing and hence security (as well as to add the optimal levels of external controls) to the user. If

---

[9] As discussed earlier

[10] Not only does the market pooled knowledge feed into the price of the derivative, but the vendor's knowledge of their own product does as well.

more testing is cost effective in economically providing more secure software, that is if the additional testing is cost effective, the software vendor will conduct this testing whether it is liable for security flaws or not.

The incentive to provide security is no different than the incentive to provide other characteristics and features. A vendor will add software extensions that can reduce the overall security of a system if the user values these to a greater extent than their costs.

Safety (and security in general) is a tie-in good. Amenities cost something. Vendors provide amenities if consumers (users) are willing to pay the cost of obtaining these.

> "*Cars come with batteries and tires, but not always with stereo equipment or antitheft devices and rarely with driving gloves and sunglasses*" [23].

What is demonstrated by those organizations with a defensive (and hence secure) coding regime is a lower variability in output. The mean coding time will remain similar, but the test time can be expected to be distributed differently for the organization that codes with a defensive posture than that of the organization that leaves too little time for testing. This increase in the standard deviation of produced results (or variability) increases the risk to the all parties (vendor and user).

### Optimal Derivatives Design under Dynamic Risk Measures

The game theoretic approach to this can be modeled looking at the incentives of the business and programming functions in the organization. Programmers are optimists [6]. As Brooks [6] noted, "*the first assumption that underlies the scheduling of systems programming is that all will go well*". Testing is rarely considered by the normal programmer as this would imply failure. However, the human inability to create perfection leads to the introductions of flaws at each stage of development.

In the model presented by Brooks [6], as a program moves to a "Programming Product" and then to "a Programming Systems Product"[11], there are incremental additions that extend the estimates of the programming team. At each phase these can be expressed as a function of effort expressed in the lines of code, $l_c$. We can express the mean effort $\overline{x}_{l_c}$ required to code a number of lines and the variability[12], $\sigma_{l_c}$ in achieving this outcome. This allows us to represent the coding effort as a representation of the stages of development:

---

[11] Through the addition of a "Programming System" with the addition of Interfaces and a System Integration Phase.

[12] Standard Deviation (where $\sigma = Variance^2$)

$$F(x) = 9H\left(\bar{x}_{l_c}, \sigma_{l_c}\right)G\left(\bar{x}_{l_c}, \sigma_{l_c}\right) + \varepsilon \qquad (1)$$

In (1), $H\left(\bar{x}_{l_c}, \sigma_{l_c}\right)$ is the function of systematizing [6, p6] the code. The expression $G\left(\bar{x}_{l_c}, \sigma_{l_c}\right)$ is the productization [6, p6] of the code.

The derivative would require the firm to publish their productivity figures;

- Lines of code per programmer (and standard Deviation); $l_c$, $\bar{x}_{l_c}$ and $\sigma_{l_c}$
- Bug-incidence figures; $\bar{b}_{l_c}$ and $\sigma_b$
- Estimating and project rules/methodology
- Software design methodology
- Secure Programmer measures[13]. $\bar{t}$ and $\sigma_t$

Many see this as proprietary data and would be loathe to share, but as more in the market take-up the use of such a derivative in managing their own risk, the incentives for others to follow increase. We can also demonstrate that as $\bar{t} \to \max_t$ and $\sigma_t \to 0$ that the volatility in coding $\sigma_{l_c}$ and $\sigma_b$ decrease with the number of reported bug incidents $\bar{b}_{l_c} \to 0$ as $\bar{t} \to \max_t$.

More metrics would be required based on the methodologies and coding practices used with different computer languages expected to exhibit different responses[14].

As the skill of the programming team ( $\bar{t} \to \max_t$ & $\sigma_t \to 0$ ) increases through group training, secure coding practices and in-line testing, the volatility in coding $\sigma_{l_c} \to 0$. As the incremental returns on $\bar{t}$ diminish as $\bar{t} \to \max_t$ and the cost of training continue to grow linearly[15], we can see that the optimal position for any software vendor is to have a skilled team that maximizes returns. At this point, additional training becomes economically unviable and does not create further returns for the organization[16]. We also see that it is in the interest of the firm to minimize the variance in skill levels between

---

[13] e.g. SANS Coding Methodology.

[14] Which would be quantified through the free market method.

[15] That is, $Cost(t) = at + b$ where there is an initial cost plus a linear increase in the costs of developing the programmer skills.

[16] This investment may still be made by the individual programmer with returns to the organization and also for further personal gains (investment in personal capital).

programming staff (aim to have $\sigma_t \rightarrow 0$ ). This of course adds costs as junior staff would be less productive in that they would have to work with more senior staff[17] in order to both cross train and to ensure that the junior employees maintain an acceptable level of production and testing.

Figure 3 Training Software developers in Security adds utility

This exercise of joining junior and senior staff would create a return function depicted by Brookes [6, p19] for a "*Time versus number of workers - task with complex interrelationships*". The output of the junior/senior staff unit would be lower than the senior staff level (initially) but would lower variability and increase the skill levels of the junior staff and hence over time $\sigma_t \rightarrow 0$ . Due to staff turn-over[18] and the increasing costs of maintaining more skilled programmers, this would also have a negative feedback on the vendor's production costs. This would also need to be optimized rather than maximized if the vendor is to maximize returns.

### No More Lemons

The fallacy of the mainstream analysis of deflation can be used to demonstrate the fallacy of aligning a market for lemons to computer software. This game model has people refrain from spending when they anticipate falling prices. As people expect prices to fall, they believe that they will get a better price if they consume later (or that they will get more secure software for the same price).This drop in consumption results in a

---

[17] Also reducing the output of the senior staff.
[18] F. J Corbato' (MIT) – "*A long duration project needs to incorporate a turnover rate of at least 20% per annum. New hires need to be technically trained and also require time to be able to effectively integrate into the existing team*".

consequential price fall, and the whole cycle repeats. The argument made is that prices will spiral uncontrollably downward.

Robert Murphy [14] addressed this issue and demonstrated its fallacy:

> *One could construct an analogous argument for the computer industry, in which the government passes regulation to slow down improvements in operating systems and processing speed. After all, how can computer manufacturers possibly remain viable if consumers are always waiting for a faster model to become available? ... The solution to this paradox, of course, is that consumers do decide to bite the bullet and buy a computer, knowing full well that they would be able to buy the same performance for less money, if they were willing to wait... (There's no point in holding out for lower prices but never actually buying!)* (pp. 68–9)

Some users do wait for patches to be proven and others use "*bleeding edge software*" (and some never patch). The model is more rightly based on a distribution of users centered on an install time slightly after the release date.

This model can help us combat George Akerlof's lemons model[19] of the used-car market has been applied to the computer industry. Akerlof argued that asymmetric information would result in the owners of good used cars being driven from the market. Contrary to the equilibrium suggested in this model, good used cars sell. One can state that just because owners of good cars may not be able to obtain as high a price as they would like, it does not follow that they will refuse to sell at all.

Likewise, just as users do not know the state of security or how many bugs exist in software, software is still sold.

**The "real balance effect": as prices fall, the value of money rises.**

People's demand to hold money can be satisfied with less money as price deflation occurs. This in part explains why people will eventually spend, even when they expect prices to continue to fall. The same process applies to software. Users see value in the features and processes they purchase software for. These are offset against the costs which include both the monetary costs as well as the costs of maintenance (patching) and security (and other) flaws. Failure has a cost and this is incorporated in to the price of software to the user. The result is that users buy and install software even when they expect more bugs/vulnerabilities to be found.

---

[19] See 15 for various derived models.

## Conclusion

Just as car dealers buff the exterior and detail the upholstery of a used car, neglecting the work that should be done on the engine, software vendors add features. Most users are unlikely to use even a small fraction of these features, yet they buy the product that offers more features over the more secure product with fewer features. The issue here is that users buy the features and his is a less expensive option for the vendor.

The creation of a security and risk derivative should change this. The user would have an upfront estimate of the costs and this could be forced back to the software vendor. Where the derivative costs more than testing, the vendor would conduct more in-depth testing and reduce the levels of bugs. This would most likely lead to product differentiation (as occurred in the past with Windows 95/Windows NT). Those businesses will to pay for security could receive it. Those wanting features would get what they asked for.

At the end of any analysis, security is a risk function and what is most important is not the creation of perfectly security systems, but the correct allocation of scare resources. Systems need to be created that allow the end user to determine their own acceptable level of risk based on good information.

## References

[ 1] Arora, A. & Telang, R. (2005), "Economics of Software Vulnerability Disclosure", IEEE Security and Privacy, 3 (1), 20-2

[ 2] Arora, A., Telang, R. & Xu, H. (2004) "Optimal Time Disclosure of Software Vulnerabilities", Conference on Information Systems and Technology, Denver CO, October 23-2

[ 3] Arora, A., Telang, R. & Xu, H. (2008), "Optimal Policy for Software Vulnerability Disclosure", Management Science 54(4), 642-6

[ 4] Bacon, D. F., Chen, Y., Parkes, D., & Rao, M. (2009). A market-based approach to software evolution. Paper presented at the Proceeding of the 24th ACM SIGPLAN conference companion on Object oriented programming systems languages and applications.

[ 5] Beach, J. R., & Bonewell, M. L. (1993). Setting-up a successful software vendor evaluation/qualification process for 'off-the-shelve' commercial software used in medical devices. Paper presented at the Computer-Based Medical Systems, 1993. Proceedings of Sixth Annual IEEE Symposium on.

[ 6] Brookes, F. (1995) "The Mythical Man-Month". Addison-Wesley

[ 7] Campodonico, S. (1994). A Bayesian Analysis of the Logarithmic-Poisson Execution Time Model Based on Expert Opinion and Failure Data. IEEE Transactions on Software Engineering, 20, 677-683.

[ 8] Cavusoglu, H., Cavusoglu, H. & Zhang, J. (2006) Economics of Security Patch Management, The Fifth Workshop on the Economics of Information Security (WEIS 2006)

[ 9] Cohen,. J. (2006). Best Kept Secrets of Peer Code Review (Modern Approach. Practical Advice.). Smartbearsoftware.com

[ 10] de Villiers, M (2005) "Free Radicals in Cyberspace, Complex Issues in Information Warefare" 4 Nw. J. Tech. & Intell. Prop. 13, http://www.law.northwestern.edu/journals/njtip/v4/n1/2

[ 11] Dijkstra, E. W. (1972). "Chapter I: Notes on structured programming Structured programming" (pp. 1-82): Academic Press Ltd.

[ 12] Kannan K & R Telang (2004) 'Market for Software Vulnerabilities? Think Again.' Management Science.

[ 13] Mills, H. D. (1971) "Top-down programming in large systems", Debugging techniques in large systems, R. Rustin Ed., Englewoods Cliffs, N.J. Prentice-Hall

[ 14] Murphy, R. & Regnery, P. (2009) "The Politically Incorrect Guide to the Great Depression and the New Deal".

[ 15] Nissan, N., Roughgarden, T., Tardos, E. & Vazirani, V. (Eds.) (2007) "Algorithmic Game Theory" Cambridge University Press, {P14, Pricing Game; P24, Algorithm for a simple market; P639 Information Asymmetry).

[ 16] Nizovtsev, D., & Thursby, M. (2005) "Economic analysis of incentives to disclose software vulnerabilities". In Fourth Workshop on the Economics of Information Security.

[ 17] Ounce Labs, 2. http://www.ouncelabs.com/about/news/337-the_cost_of_fixing_an_application_vulnerability

[ 18] Ozment, A. (2004). "Bug auctions: Vulnerability markets reconsidered". In Third Workshop on the Economics of Information Security

[ 19] Perrow, C. (1984/1999). Normal Accidents: Living with High-Risk Technologies, Princeton University Press.

[ 20] Telang, R., & Wattal, S. (2004) "Impact of Software Vulnerability Announcements on the Market Value of Software Vendors – an Empirical Investigation" http://infosecon.net/workshop/pdf/telang_wattal.pdf

[ 21] Turing, A (1936), "*On computable numbers, with an application to the Entscheidungsproblem*", Proceedings of the London Mathematical Society, Series 2, 42 pp 230–265

[ 22] Weigelt, K. & Camerer, C. (1988) "Reputation and Corporate Strategy: A Review of Recent Theory and Applications" Strategic Management Journal, Vol. 9, No. 5 (Sep. - Oct., 1988), pp. 443-454, John Wiley & Sons

[ 23] Donald, D. (2006), "Economic Foundations of Law and Organization" Cambridge University Press

# Modeling System Audit as a Sequential test with Discovery as a Failure Time Endpoint

Craig S Wright
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
+61 2 4362 1512
cwright20@postoffice.csu.edu.au

Tanveer A Zia
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
tzia@csu.edu.au

Phillip Charlton
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
pcharlton@csu.edu.au

## Abstract

Combining hazard models with SIR (Susceptible-Infected-Removed) epidemic modeling provides a means of calculating the optimal information systems audit strategy. Treating audit as a sequential test allows for the introduction of censoring techniques that enable the estimation of benefits from divergent audit strategies. This process can be used to gauge the economic benefits of these strategies in the selection of an optimal audit process designed to maximize the detection of compromised or malware infected hosts.

## Keywords

Modeling, Hazard, non-homogeneous Poisson process (NHPP), failure intensity, SIR (Susceptible-Infected-Removed), epidemic modeling

## Glossary

| | |
|---|---|
| Intensity | The Rate of a process |
| I.I.D | Independent and Identically Distributed |
| R.V.s | Random Variable(s) |

## Introduction

Computer systems are modeled through periodic audit and monitoring activities. This complicates the standard failure and hazard models that are commonly deployed [11]. A system that is found to have been compromised by an attacker, infected by malware or simply suffering a critical but unexploited vulnerability generally leads to early intervention. This intervention ranges from system patching or reconfiguration to complete rebuilds and decommissioning.

Audits and reviews of computer systems usually follow a prescribed schedule in chronological time. This may be quarterly, annually or to any other set timeframe. Further, periodic reviews and analysis of systems in the form of operational maintenance activities also provide for a potential intervention and discovery of a potential system failure or existing compromise.

Using a combination of industry and organizational recurrence rates that are stipulated from a preceding failure and covariate history as derived from the individual organization introduces a rational foundation in modeling current event data. By denoting the number of incidents[1] within the organization as $\tilde{N}(t)$ by follow-up time $t$ and $N(t)$ as the corresponding observed incidents in $(0,t]$ with regards to absolute continuous event times, the hazard or intensity process $\lambda(t)$ for the intervention time $t$ using the covariate data $X(t)$ can be expressed as:

$$\lambda(t) = P\left[d\tilde{N}(t)\right] = 1\left[\tilde{N}(u), 0 \le u < t, X(t)\right] \quad (1)$$

Taking the assumption that the administrative and audit staff are not the direct cause of an incident, a point process $(T_1, T_2, T_3, \ldots)$ will usually be observed for the system[2] being examined. Due to censoring through the audit process, $N(t)$ can be greater then $\tilde{N}(t)$.

Equation (9.1) has an assumption that only a single incident has occurred, that is, $\tilde{N}$ increments by units. Live systems can and do experience multiple incidents and compromises between detection events. Hence it is also necessary to model the mean increments in $\tilde{N}$ over time

$$d\Lambda(t) = E\left[\tilde{N}(t) \mid \tilde{N}(u), 0 \le u < t, X(t)\right] \quad (2)$$

---

[1] An incident as defined for the purposes of this paper is an event leading to the failure of the system. This can include a system compromise from an attacker or an infection process of malware (such as a scanning worm).

[2] A system is defined by an isolated and interactive grouping of computers and processes. This could be a collection of client and server hosts located at a specific location isolated by a common firewall.

with the cumulative intensity process $\Lambda$ .

In the case of a continuous-time process with unit jumps, expressions (1) and (2) can be expressed as

$$\Lambda(t) = \int_0^t \lambda(u)\,du \,. \qquad (3)$$

Independent censorship requires that $C \geq t$ [15]. This assumption of independent censorship allows the preceding covariate histories to be incorporated into the model. If we define $Y(t) = 1(0 < t \leq C)$, it is now necessary that

$$E\left[dN(t) \mid N(u), Y(u); 0 \leq u < t, X(t)\right] = Y(t)\Lambda(t) \qquad (4)$$

for all times ($t \leq C$ ) prior to the audit or review.

## NHPP, Non-homogeneous Poisson Process

Poison processes have been used to model software [11] and systems failures [16], but these models are too simplistic and it is necessary to vary the intensity (rate) based on historical and other data in order to create accurate risk models for computer systems. The non-homogeneous Poisson process (NHPP) can be used to model a Poisson process with a variable intensity. In the special case when $\lambda(t)$ takes a constant value $\lambda$ , the NHPP is reduced to a homogeneous Poisson process with intensity $\lambda(t) = \lambda$ .

In the heterogeneous case, an NHPP with intensity $\lambda(t)$, the increment,

$N_t - N_u, 0 \leq u < t$ has a Poisson distribution with an intensity of $\lambda(t) = \int_u^t \lambda(x)\,dx$ .

Hence the distribution function of the incident discovery can be expressed as:

$$\begin{aligned}
\Lambda_u &= 1 - P\left(N_{u+t} - N_t = 0\right) \\
&= 1 - \exp\left(-\int_u^{u+t} \lambda(x)\,dx\right) \\
&= 1 - \exp\left(-\int_0^t \lambda(u+v)\,dv\right)
\end{aligned}$$

The NHPP format is better suited to information systems risk modeling then is the homogeneous Poisson Process as it can incorporate changes that occur over time across the industry.

This can also be modeled as the Poisson process with parameter $\lambda$ , $\left(N_t^{(\lambda)}, t \geq 0\right)$, is the unique (in law) increasing right continuous process with independent time homogeneous

increments. Each $t > 0$, $N_t^{(\lambda)}$ has a Poisson distribution with rate $\lambda t$. The process $\left(X_t^{(\lambda)}, t \geq 0\right)$ is also stationary with independent time increments.

With $t_0 = 0$ and $(t_1, \ldots, t_n) \in \mathbb{R}_+^n$, $t_1 < t_2 < \ldots < t_n$ the r.v.'s $\left[\left(X_{t_1}^{(\lambda)}\right), \left(X_{t_2}^{(\lambda)} - X_{t_1}^{(\lambda)}\right), \ldots, \left(X_{t_n}^{(\lambda)} - X_{t_{n-1}}^{(\lambda)}\right)\right]$ are independent and for each $k = 1, \ldots, n, \left(X_{t_n}^{(\lambda)} - X_{t_{n-1}}^{(\lambda)}\right)$ has the same distribution as $\left(X_{t_k - t_{k-1}}^{(\lambda)}\right)$.

The characteristic function of $\frac{1}{\sqrt{\lambda}}\left(X_{t_k - t_{k-1}}^{(\lambda)}\right)$ can be computed for any $\lambda_m \in \mathbb{R}$ as:

$$E\left[e^{\frac{i\lambda_m}{\sqrt{\lambda}}\left(X_{t_k - t_{k-1}}^{(\lambda)}\right)}\right] = e^{\left(-i\lambda^{1/2}\lambda_m(t_k - t_{k-1}) - \lambda(t_k - t_{k-1})\right)} \sum_{n=0}^{\infty}\left(\frac{\lambda^n (t_k - t_{k-1})^n}{n!} e^{\left(\frac{i\lambda_m n}{\sqrt{\lambda}}\right)}\right)$$

$$= e^{\left(-\lambda(t_k - t_{k-1})\left(1 - e^{\left(\frac{i\lambda_m}{\sqrt{\lambda}}\right)}\right) - i\lambda_m (t_k - t_{k-1})\sqrt{\lambda}\right)}$$

as $\lambda \to \infty$ the expression converges to $Exp\left(\frac{-\lambda_m^2}{2}(t_k - t_{k-1})\right)$, which is the characteristic function of a Gaussian variable with variance $\sigma^2 = (t_k - t_{k-1})$.

## Recurrent Events

In many cases, audit and review processes are limited in scope and may not form a complete report of the historical processes that have occurred on a system. The audit samples selected systems and does not check neighboring systems unless a failure is discovered early in the testing. In these instances, the primary interest resides in selected marginalized intensities that condition only on selected parts of the preceding histories. Some marginal intensity rates drop the preceding incident history all together

$$d\Lambda_m(t) = E\left[d\tilde{N}(t) \mid X(t)\right] \quad (5)$$

A common condition for the identification of $\Lambda_m$ is that

$$E\left\{dN(t) \mid \left[Y(u); 0 \leq u < t\right], X(t)\right\} = T(t)\, d\Lambda_m(t). \quad (6)$$

For (6) to be valid, censoring intensity cannot depend on the preceding incident history for the system $\left[N(u); 0 \leq u < t\right]$. The process of randomly selecting systems to audit makes it unlikely that particularly problematic systems will be re-audited on all occasions. This would include the exclusion of targeting client systems that have been compromised several times in the past or which have suffered more than one incident in

recent history. The result is that covariates that are functions of $\left[\tilde{N}(u); 0 \le u < t\right]$ will also have to be excluded from the conditioning event. Here

$$E\left[d\tilde{N}(u) \mid X(u)\right] = E\left[d\tilde{N}(u) \mid X(t)\right], \qquad \forall \qquad t \ge u. \tag{7}$$

When this occurs

$$\begin{aligned} E\left[d\tilde{N}(u) \mid X(u)\right] &= \int_0^t E\left[d\tilde{N}(u) \mid X(t)\right] \\ &= \int_0^t E\left[d\tilde{N}(u) \mid X(u)\right] \\ &= \Lambda_m(t) \end{aligned}$$

$\Lambda_m(t)$ models the expected number of incidents that have occurred in the system over $(0,t]$ as a function of $X(t)$.

## Cox Intensity Models

Using a Cox-type model

$$d\Lambda(t) = d\Lambda_0(t) e^{\left[Z(t)'\beta\right]}, \tag{8}$$

with $Z(t)' = \left[Z_1(t), \ldots, Z_p(t)\right]$ having been created using functions of $X(t)$ and $\left[N(u); 0 \le u < t\right]$, inference differs little to univariate failure time data. The log-partial likelihood function, score statistic and the integral notation for the information matrix may be written respectively as

$$\ell(\beta) = \log L(\beta) = \sum_{i=1}^{n}\left[\int_0^\infty \left\{Z_i(t)'\beta - \log\left[S^{(0)}(\beta,t)\right]\right\} dN_i(t)\right] \tag{9}$$

$$U(\beta) = \frac{\partial \ell(\beta)}{\partial \beta} = \sum_{i=1}^{n}\left[\int_0^\infty \left\{Z_i(t) - \xi(\beta,t)\right\} dN_i(t)\right] \tag{10}$$

and

$$I(\beta) = \frac{-\partial^2 \ell(\beta)}{\partial\beta\partial\beta'} = \sum_{i=1}^{n}\left[\int_0^\infty \left\{V(\beta,t)\right\} dN_i(t)\right] \tag{11}$$

where,

$$S^{(j)}(\beta,t) = \sum_{i=1}^{n} Y_i(t) Z_i(t)^{\otimes j} e^{Z_i(t)'\beta}$$

$$\xi(\beta,t) = \frac{S^{(1)}(\beta,t)}{S^{(0)}(\beta,t)}$$

and

$$V(\beta,t) = \frac{S^2(\beta,t)}{S^0(\beta,t)} - \xi(\beta,t)^{\otimes 2}.$$

By defining $Z(t)$ in terms of fixed or external time varying covariates, (8) can be further defined by adding additional elements $1\left[N\left(t^{-}\right)=1\right]\gamma_1 + 1\left[N\left(t^{-}\right)=2\right]\gamma_2 + \ldots$ to $Z(t)'\beta$. This would allow the intensity to be altered by a multiplicative factor $e^{\gamma_j}$ following the j[th] incident on an individual system when compared against another system without any incidents at the same point in time.

## SIR (Susceptible-Infected-Removed) epidemic modeling of incidents during Audit

Allowing that a compromised or infected system remains infected for a random amount of time $\tau$, the discovery of an incident by an auditor will be dependent on a combination of the extent of the sample tested during the audit[3] and the rate at which the incident impacts individual hosts. When a host in a system is infected, any neighboring hosts are attacked and infected at a rate r. The sample size selected in the audit is set as $\kappa$ and the total number of hosts in the system being audited is defined by $\mathrm{K}$ were $\kappa \leq \mathrm{K}$. The time between audits (the censor time) is defined by C.

If $C \leq \tau$, an infected or compromised system will be undiscovered and attacking other hosts within the system when the audit occurs. At the end of the time $\tau$, the system is removed as it is either 'dead' - that is decommissioned and reinstalled or it has been patched against the security vulnerability.

A NSW [17] random graph is obtained by investigating the neighboring systems in the SIR model. From this, the thresholds can be computed.

### Calculations with a constant $\tau$.

First, we shall consider the case where $\tau$ is a constant value, and without loss of generality scale time to make a constant. Start with letting $p_k$ be the degree of distribution.

Starting with a single infected host in a system, we can compute the probability that j of k neighboring hosts will be infected is given by:

$$\hat{p}_j = \sum_{k=j}^{\infty} p_k \binom{k}{j} \left(1-e^{-r}\right)^j e^{-(k-j)r} \tag{12}$$

Setting $\mu$ is the mean of p then the mean of $\hat{p}$ is $\hat{\mu} = \mu\left(1-e^{-r}\right)$

---

[3] We shall assume that the audit is effective and will uncover an incident if an infected host is reviewed.

With the network constructed as an NSW random graph, systems that are compromised in the first and subsequent iterations will each have k neighbors. The value k includes subsequently compromised machines and the host that compromised the existing system. The probability associated with these neighboring hosts is give by:

$$q_k = \frac{(k+1)\,p_{k+1}}{\mu} \qquad \forall \quad k \geq 0 \tag{13}$$

This allows us to calculate the probability that j neighboring hosts also become infected:

$$\hat{q}_j = \sum_{k=j}^{\infty} q_k \binom{k}{j} \left(1-e^{-r}\right)^j e^{-(k-j)r} \tag{14}$$

Setting $\nu$ to represent the mean of q, we get the mean of $\hat{q}$,

$$\hat{\nu} = \nu\left(1-e^{-r}\right).$$

From this we see that for the attack or malware to propagate and infect other systems, we have to have;

$$\nu\left(1-e^{-r}\right). \tag{15}$$

Using this, we can calculate the probability that a particular attack or type of malware resulting in an outbreak (such as[4] []). Setting $T = 1 - e^{-r}$ [][5] we get:

$$\begin{aligned} \hat{G}_0(z) = & \sum_{k=0}^{\infty}\sum_{j=0}^{\infty} p_k \binom{k}{j} T^j (1-T)^{k-j} z^j \\ = & \sum_{k=0}^{\infty} p_k \sum_{j=0}^{\infty} \binom{k}{j} (Tz)^j (1-T)^{k-j} \\ = & G_0\left(Tz + (1-T)\right). \end{aligned} \tag{16}$$

Similarly, we can prove that $\hat{G}_1(z) = G_1\left(Tz + (1-T)\right)$.

As such, we can state that the probability that an incident behaves as an epidemic is $1 - \hat{G}_0(\xi)$ where $\hat{G}_1(\xi) = \xi$ is the smallest fixed point in $[0,1]$.

**Calculations with a variable $\tau$ .**

Next we consider the effects of a variable or random value of $\tau$ . This is the probability that a compromised system causes a compromise in its neighboring system is:

$$T = 1 - \int_0^{\infty} dt P(\tau = t) e^{-rt} \tag{17}$$

---

[4] http://www.securecomputing.net.au/News/81027,google-warns-of-web-malware-epidemic.aspx

[5] Newman NSW

Again, T is the transmissibility factor.

Newman [17] asserted that the infection of neighbors was independent. This does not hold as valid for malware, but it gives a good approximation. Interactions in systems and the ability of software to rescan the same systems carry a degree of dependence. Here the time to compromise may be modeled exponentially with mean $\lambda$ , such that $P(\tau = t) = e^{-\lambda t}$.

From this we can see that the probability of a host not being compromised is,

$$1 - T = \int_0^\infty e^{-\lambda t} e^{-rt} dt = \int_0^\infty e^{-(\lambda + r)t} dt = \frac{1}{(\lambda + r)} \quad (18)$$

Likewise, the probability that n hosts in a system are not compromised is,

$$1 - T = \int_0^\infty e^{-\lambda t} e^{-nrt} dt = \int_0^\infty e^{-(\lambda + nr)t} dt = \frac{1}{(\lambda + nr)} \quad (19)$$

For cases where $\tau$ is not constant, Jensen's inequality [6] implies that for neighboring hosts, the probability of escaping compromise is positively correlated as

$$E\left(e^{-nrt}\right) > \left(Ee^{-rt}\right)^n \quad (20)$$

We can compute the expected number of systems that will be compromised by substituting $r_k$ for $p_k$ and $q_k$ which gives us,

$$\hat{G}(z) = \int_0^\infty P(\tau = 1)\, dt \sum_{j=0}^\infty z^j \sum_{j=0}^\infty r_k \binom{k}{j} \left(1 - e^{-rt}\right)^j e^{-r(k-j)t} \quad (21)$$

if $r_0 + r_1 > 1$, G is strictly convex as $\hat{\nu} = \nu T$ , $\tilde{G}_i = G_i\left(1 + (z-1)T\right)$.

## Applications to audit and review

The first case where $C > \tau$ has a host in the system being discovered as having been infected or compromised before the audit. Here, the rate of infection r determines the chance of other systems being uncovered during an audit. If the time between audits exceeds the time to compromise the first host is insufficient for the incident to spread (i.e. $\tau \le C, C < r$ ), then only the initial host will have been compromised and this will be known prior to the audit.

If $C \le \tau$ a compromised host in the system will be undiscovered and attacking other hosts within the system when the audit occurs. At the end of the time $\tau$ , the system is found.

As such, if $(C+c) \leq \tau$ (where c is the average time taken to conduct an audit), a compromised host is discovered during the audit through a process independent of the audit.

The alternative scenario and that which is of most interest is where $(C+c) < \tau$. In this case, the incident will not be discovered independent of the audit. In this instance, we can calculate the probability that an auditor will discover a compromised system during the audit process. In this instance we have a time limited network function which is coupled with a discovery process that is formulated using the Bayesian prior. That is we can calculate the probability that all systems are not compromised given a selected audit strategy that finds that none of the audited hosts have been compromised.

### False Negatives in an Audit

False negatives result in an audit where an incorrectly reported result is supplied noting the organization as safe when it is not (i.e. no compromise was detected where hosts have been compromised). If we let A represent the condition where the organization has been compromised and let B represent the positive evidence of a compromise being reported

$$P(A \mid \bar{B}) = \frac{P(\bar{B} \mid A) P(A)}{P(\bar{B} \mid A) P(A) + P(\bar{B} \mid \bar{A}) P(\bar{A})} \tag{22}$$

Here we can model the actual rate of compromise in the system, $P(A)$. Given a network compromise model (21) we can substitute the censored time

$$\hat{G}(z) = \int_0^C P(\tau \leq C)\, dt \sum_{j=0}^{\infty} z^j \sum_{j=0}^{\infty} r_k \binom{k}{j} \left(1-e^{-rt}\right)^j e^{-r(k-j)t} \tag{23}$$

From this we can see that the probability of a host not being compromised in the censor time is,

$$\begin{aligned} P(\bar{A}) = 1 - T &= \int_0^C e^{-\lambda t} e^{-rt}\, dt = \int_0^C e^{-(\lambda+r)t}\, dt \\ &= \left. \frac{e^{-(\lambda+r)t}}{-(\lambda+r)} \right|_0^C = \frac{e^{-(\lambda+r)C}}{-(\lambda+r)} + \frac{1}{(\lambda+r)}. \\ &= \frac{1-e^{-(\lambda+r)C}}{(\lambda+r)} \end{aligned} \tag{24}$$

Equation (24) also derives the probability of any single host being compromised between the audits

$$P(A) = 1 - \frac{1-e^{-(\lambda+r)C}}{(\lambda+r)}. \tag{25}$$

Depending on whether $\tau$ is constant or varies; we can calculate the expected number of hosts that will be compromised in the period between audits as a fixed or variable function. In either event, each calculation is an exercise in Bayesian estimation of the type where a random sample is selected and the defects or failures are analyzed

$$f(x) = \binom{n}{x} p^x q^{n-x}. \quad (26)$$

This binomial distribution is simplified in the case of a false negative (no failures or x=0 from a sample of n hosts)

$$f(x) = \binom{n}{0} p^x q^{n-x} = p^x q^{n-x}. \quad (27)$$

Based on the types of systems, the audit periods can be selected to create an economically optimal choice. In this, using an equation that calculates the expected number of compromised or infected hosts within a censor time we can select either a fixed audit schedule, C = Constant, or vary C over the course of the system life in order to maximize the detection, C=C(t).

In conducting this exercise, the cost of the audit, and differences that occur would also need to be modeled. The required effort for an audit of 10 hosts in a 1 month period is not necessarily linearly related to the audit of 60 hosts in a 6 month period. In each case, the individual constraints faced by the selected organization also need to be incorporated.

## Conclusion

These equations allow organizations to compare the deployed audit strategies against both their own historical data and that of third parties. In this manner, strategy can be formulated in order to optimize audits and system reviews in a manner that detects an incident in the most economical manner.

Modeling the failure rate of systems and the propagation rate of an attack, allows us to calculate an expected number of hosts that are anticipated to have been compromised in the time between an audit given a specified survival function or threat. Past data and comparisons from similar systems (such as survival data from DShield[6]) allow for the modeling of alternative systems where a reported number of events have been reported against those deployed.

Dependence, variation, randomness, and frailty add to the risk toolset of multivariate failure event analysis. Using frailty theory to model information system risk allows us to better predict risk and to more effectively allocate scarce resources through selecting the most economically viable targets to defend as well as choosing the optimal detection

[6] http://www.dshield.org/reports.html

strategies. The properties of censoring-handling and frailty modeling have turned multivariate survival analysis into an exceptional tool for the determination of system risk.

This paper has presented a number of methods that can be used to gauge the expected failure events in a system of computer hosts.

## References

1. Benveniste, A. and Jacod, J. (1973). Systèmes de Lévy des processus de Markov. *Invent. Math.* **21** 183--198. Mathematical Reviews
2. Brémaud, P. (1981). *Point Processes and Queues: Martingale Dynamics*. Springer, New York. Mathematical Reviews
3. Chakrabarty, A. and Guo, X. (2007). A note on optimal stopping times with filtration expansion. Preprint, Univ. California, Berkeley.
4. Corcuera, J. M., Imkeller, P., Kohatsu-Higa, A. and Nualart, D. (2004). Additional utility of insiders with imperfect dynamic information. *Finance and Stochastics* **8** 437--450.
5. Dellacherie, C. and Meyer, P. A. (1982). *Probabilities and Potential. B*. North-Holland, Amsterdam.
6. Dempster, A.P. and Laird, N.M. and Rubin, D.B. (1977).Maximum likelihood from incomplete data via the EM algorithm. Journal of the Royal Statistical Society, B39.
7. Elliott, R. J., Jeanblanc, M. and Yor, M. (2000). On models of default risk. *Math. Finance* **10** 179--195.
8. Grandell, J.: Aspects of Risk Theory. Springer, New York (1991)
9. Guo, X., Jarrow, R. and Zeng, Y. (2005). Modeling the recovery rate in a reduced form model. Preprint, Cornell Univ.
10. He, S. W., Wang, J. G. and Yan, J. A. (1992). *Semimartingale Theory and Stochastic Calculus*. Science Press, Beijing.
11. Hong Zhu, Yanlong Zhang, Qingning Huo, Sue Greenwood, "Application of Hazard Analysis to Software Quality Modelling," Computer Software and Applications Conference, Annual International, p. 139, 26th Annual International Computer Software and Applications Conference, 2002
12. Ikeda, N. and Watanabe, S. (1962). On some relations between the harmonic measure and the Lévy measure for a certain class of Markov processes. *J. Math. Kyoto Univ.* **2** 79--95.
13. Jacod, J. (1975). Multivariate point processes: Predictable projection, Radon--Nikodým derivatives, representation of martingales. *Z. Wahrsch. Verw. Gebiete* **31** 235--253.
14. Jeanblanc, M. and Valchev, S. (2005). Partial information and hazard process. *Int. J. Theor. Appl. Finance* **8** 807--838.
15. Kay, R. "Proportional Hazard Regression Models and the Analysis of Censored Survival Data" *Journal of the Royal Statistical Society. Series C (Applied Statistics)*, Vol. 26, No. 3 (1977), pp. 227-237 Blackwell Publishing.
16. Marti, K. (2008) "Computation of probabilities of survival/failure of technical, economic systems/structures by means of piecewise linearization of the

performance function",Structural and Multidisciplinary Optimization, Vol35/3, Pp 225 - 244.

17. Newman, M.E.J., Strogatz, S.H., and Watts, D.J. (2001) "Random graphs with arbitrary degree distributions and their applications". Phys. Rev. E 64. paper 026118
18. Revuz, D. and Yor, M. (1999). *Continuous Martingale and Brownian Motion*, 3rd ed. Springer, Berlin.

# A quantitative analysis into the economics of testing software bugs

Craig S Wright
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
cwright20@postoffice.csu.edu.au

Tanveer A Zia
School of Computing and Mathematics
Charles Sturt University
Wagga Wagga, NSW, Australia
tzia@csu.edu.au

***Abstract*— Using a quantitative study of in-house coding practices, we demonstrate the notion that programming needs to move from "Lines of Code per day" as a productivity measure to a measure that takes debugging and documentation into account. This could be something such as "Lines of clean, simple, correct, well-documented code per day", but with bugs propagating into the 6th iteration of patches, a new paradigm needs to be developed. Finding flaws in software, whether these have a security related cost or not, is an essential component of software development. When these bugs result in security vulnerabilities, the importance of testing becomes even more critical.**

**Many studies have been conducted using the practices of large software vendors as a basis, but few studies have looked at in-house development practices. This paper uses an empirical study of in-house software coding practices in Australian companies to both demonstrate that there is an economic limit to how far testing should proceed as well as noting the deficiencies in the existing approaches.**

***Index Terms*— Software Development Life Cycle, Model Checking, Software Verification, Empirical studies.**

## I. Introduction

The deficiency of published quantitative data on software development and systems design has been a major ground for software engineering's failure to ascertain a proper scientific. Past studies into coding practice have focused on software vendors. These developers have many distinctions from in-house projects that are not incorporated into the practices and do not align well with in-house corporate code development. In the past, building software was the only option but as the industry developed, the build vs. buy argument has swung back towards in-house development. In general, this has been targeted towards specialized web databases and online systems with office systems and mainstream commercial applications becoming a 'buy' decision.

As companies move more and more to using the web and as 'cloud applications' become accepted, in-house development is becoming more common. This paper uses an empirical study of in-house software coding practices in Australian companies to both demonstrate

***Figure 1 Each vulnerability costs more than the last to mitigate***

that there is an economic limit to how far testing should proceed as well as noting the deficiencies in the existing approaches.

Using a quantitative study of in-house coding practices, we demonstrate the notion that programming needs to move from "Lines of Code per day" as a

***Figure 2 Program size against Coding time***

productivity measure to a measure that takes debugging and documentation into account. This could be

something such as "Lines of clean, simple, correct, well-documented code per day", but with bugs propagating into the 6th iteration of patches, a new paradigm needs to be developed. Finding flaws in software, whether these have a security related cost or not, is an essential component of software development. When these bugs result in security vulnerabilities, the importance of testing becomes even more critical.

A series of 277 coding projects in 15 companies with in-house developers was analyzed over multiple years. The costs, both in terms of time and as a function of

***Figure 3 Program size against Bugs***

financial expenditure were recorded. The analysis recorded:

- Format string errors
- Integer Overflows
- Buffer overruns
- SQL Injection
- Cross-Site scripting
- Race Conditions
- Command Injection.

The code samples were analyzed using a combination of static tools and manual verification to the OWASP[1] and SANS[2] secure coding guidelines.

For the 277 coding projects, the following data fields have been collected:

- the total number of hours
  - Coding
  - Debugging
- tloc (thousand lines of source code)
- the number of bugs (both initially and over time as patches are released

It is clear from the results that there is an optimized ideal for software testing. Figure 1 demonstrates the costs of testing and notes how each subsequent bug costs more to find than the previous one. The costs of finding bugs go up as the cost of software is tested to remove more bugs.

[1] http://www.owasp.org/index.php/Secure_Coding_Principles
[2] http://www.sans-ssi.org/

It has been noted that "*there is a clear intuitive basis for believing that complex programs have more faults in*

***Figure 4 Histogram of Bugs/TLOC***

*them than simple programs*" [10]. As the size and hence complexity of the code samples increased, the amount of time and costs required to write and debug the code increased (Figure 2). What was unexpected was that the number of bugs/LOC did not significantly change as the size of the program increased (Figure 3). Rather, there was a slight, but statistically insignificant decline in the number of bugs noted in more complex programs per line of code. So whilst the number of bugs did increase,

***Figure 5 Box plot of the distribution of Bugs/TLOC***

this occurred in a linear fashion to the cost increase which occurred exponentially.

The calculated number of hours per line of code (Figure 2) increased exponentially with an exponent of around 1.56. In this study, the largest program sampled was approximately 300,000 SLOC (source lines of code). This relates directly to complexity with longer programs costing more both in time and money.

A financial calculation of internal costs of mitigating

the bugs was also conducted based on the bugs found within a year of the code being released. This period was selected as it comes to reason that if the bug has not been found in a 12 month period, it would be expensive to find.

### A. Related Work

Other studies of coding processes and reliability have been conducted over the last few decades. The majority of these have been based either on studies of large systems [3, 9] and mainframe based operations [9] or have analyzed software vendors [8]. In the few cases where coding practices within individual organization have been quantitatively analyzed, the organizations have been nearly always large telecommunications firms [3, 6, 7, 9] or have focused on SCADA and other critical system providers [10].

Whilst these results are extremely valuable, they fail to reflect the state of affairs within the vast majority of organizations. With far more small to medium businesses coupled with comparatively few large organizations with highly focused and dedicated large scale development teams (as can be found in any software vendor), an analysis of in-house practice is critical to both security and the economics of in-house coding.

As the Internet comes to become all persuasive, internal coding functions are only likely to become more prevalent and hence more crucial to the security of the organization.

## II. AN ANALYSIS OF CODING PRACTICE

The results of the analysis of the data demonstrated that the costs of testing can be analyzed. In Figure 1, the cost (calculated as a function of analysis time) of finding each additional bug is exponentially more expensive than the last to find. As a consequence, this also increases the mean cost of the project. The more bugs are sought, the higher the cost. This is offset against the costs of fixing bugs in the field later in the paper.

Of particular interest is the distribution of bugs as a percentage of code. We can see that there is no strong correlation between the levels of bugs in code and the length of the code ($R^2 = -14.48$). There are more bugs in large code, but the number of bugs per line does not increase greatly.

The distribution of bugs was fairly even for all sizes of code in the study and was positively skewed. The numbers of bugs discovered was far too high. The reported numbers of bugs in large commercial software releases average around 4% [13]. The mean (figure 5) for the study was 5.529% (or 55 errors per 1,000 lines of source code). Many of these are functional and did not pose security threats, but the economics of repairing the remaining bugs remains.

We need to move from "*Lines of Code per day*" as a productivity measure to a measure that takes debugging and documentation into account. This could be something such as "*Lines of clean, simple, correct, well-documented code per day*" [4]. This also has problems, but it does go a long way towards creating a measure that incorporates the true costs of coding.

The primary issue comes from an argument to parsimony. The coder who can create a small, fast and effective code sample in 200 lines where another programmer would require 2,000 may have created a more productive function. The smaller number of lines requires less upkeep and can be verified far easier than the larger counterpart.

### A. Program Maintenance

Software maintenance introduces more bugs. Through an analysis of the debugging progresses and the program fixes, it was clear that systems deteriorate over time. What we see is that the first iteration of bug fixes leads to a second and subsequent series of fixes. In each set of fixes, there is a 20-50% (mean of 34% ± 8%[3]) of the fix creating another round of bugs (Figure 7). This drops on the second round of fixes, but starts to rise on the 3rd and subsequent rounds. In a smaller set of code, the low overall volume of bugs limits the number of iterations, but the larger code samples led to up to 6 iterations. This would be expected to be even larger on extremely large programs (such as an Operating System).

[3] 95% Confidence Interval or $\alpha = 5\%$

The ration of software bugs in the patching process was less than that of the initial release, but over the life of a program that has been maintained for several years, the total number of bugs introduced through patches can

| Year | Operating System | SLOC (Million) |
|---|---|---|
| 1993 | Windows NT 3.1 | 4-5 |
| 1994 | Windows NT 3.5 | 7-8 |
| 1996 | Windows NT 4.0 | 11-12 |
| 2000 | Windows 2000 | > 29 |
| 2001 | Windows XP | 40-45 |
| 2003 | Windows Server 2003 | > 50 |

***Table 1 The increase in OS Program size over time***

be larger than that of the initial release.

## III. Vulnerability Modeling

Vulnerability rates can be modeled extremely accurately for major products. Those with an extremely small user base can also be modeled, but the results will fluctuate due to large confidence intervals. What most people miss is that the number of vulnerabilities or bugs in software is fixed at release. Once the software has been created, the number of bugs is a set value. What

***Figure 6 A Box plot of the ratio of buggy patches***

varies stochastically is the number of bugs discovered at any time.

This is also simple to model, the variance being based on the number of users (both benign and malicious) of the software. As this value tends to infinity (a large user-base), the addition of any further users makes only a marginal variation in the function. Small user-bases of course have large variations as more people pay attention (such as the release of software vulnerability).

This is a Cobb-Douglass function with the number of users and the rate of decay as variables. For largely deployed software (such as Microsoft's Office suite or the Mozilla browser), the function of the number of vulnerabilities for a program given the size of the program can be approximated as a Poisson decay function.

### *A. Modeling the discovery of bugs/vulnerabilities in software*

The discovery of software bugs can be mapped to the amount of time that has been used in both actively examining the product as well as the passive search for bugs (using the software).

***Figure 7 Bug introduced through patching***

The study found that a Cobb Douglass function with $\alpha = 1.6$ and $F(x) = c \times TLOC + \varepsilon$ where c and C are constant values with the function $G(x)^{\beta}$ is constant for a given number of users or installations and expresses the rate at which users report bugs. This equation increases to a set limit as the number of users increase. In the case of widely deployed software installations (such as Microsoft Word or Adobe Acrobat) and highly frequented Internet sites, this value tends towards $G(x) = 1$.

### *B. Equations for Bug Discovery*

For a static software system under uniform usage the rate of change in, N, the number of defects is directly proportional to the number of defects in the system,

$$\frac{d}{dt} N(t) = \alpha N(t)$$

A Static system is defined as one that experiences no new development, only defect repair. Likewise, uniform usage is based on same number of runs/unit time. As the user-base of the product tends to infinity, this becomes a better assumption.

If we set time T to be any reference epoch, then N satisfies

$$N(t) = N(t)e^{-\alpha(t-T)}.$$

This means we can observe the accumulated number of defects at time t, A(t), where

$$A(t) = N(t)\left(1-e^{-\alpha(t-T)}\right)$$

With continuous development, an added function to model the ongoing addition of code is also required. Each instantaneous additional code segment (patch fix or feature) can be modeled in a similar manner.

What we do not have is the decay rate and we need to be able to calculate this. For software with a large user-base that has been running for a sufficient epoch of time, this is simple.

*Figure 8 Cost functions for finding bugs*

This problem is the same as having a jar with an unknown but set number of red and white balls. If we have a selection of balls that have been drawn, we can estimate the ratio of red and white balls in the jar.

Likewise, if we have two jars with approximately the same number of balls in approximately the same ratio, and we add balls from the second jar to the first periodically, we have a most mathematically complex and difficult problem, but one that has a solution.

This reflects the updating of existing software. In addition, with knowledge if the defect rates as bugs are patched (that is the rate of errors for each patch), we can calculate the expected numbers of bugs over the software lifecycle. In each case, the number of bugs from each iteration of patching added 34% ± 8% more bugs than the last iteration.

$$A(t) = \sum_{i=0}^{k} A_i(t) = A_0(t) + A_1(t) + \ldots + A_k(t)$$

$$\approx A_0(t) + \beta A_0(t) + \beta^2 A_0(t) + \ldots + \beta^k A_0(t)$$

$$\beta \le 1$$

In the study, this would come to

$$A(t) = A_0(t)\sum_{i=0}^{6}(0.34)^i = 1.514A_0(t).$$

So over the life of the software, there are 1.51 times the original number of bugs that are introduced through patching.

Where we have a new software product, we have prior information. We can calculate the defect rate per SLOC, the rate for other products from the team, the size of the software (in SLOC) etc. This information becomes the posterior distribution. This is where Bayesian calculations are used.

t = time

$\lambda_B$ = (Mean) Number of Bugs / TLOC (Thousand Lines of Code)

L = SLOC (Source Lines of Code)

So, more generally, if a software release has L lines of code and the expected number of lines of code per defect is $\lambda_B$, then the a priori distribution of defects in the release is a Poisson $P_\beta$ distribution where $\beta$ is the ratio of new lines of code to average number of lines/bug—L/ $\lambda_B$

$$P_\beta(n_{defects}) = \frac{\beta^n e^{-\beta}}{n!}$$

The conditional distribution for the number of defects in a software release given a defect discovery T units of time since the last discovery is

$$P_\beta(n_defects) = \frac{\beta^n}{n!}e^{-\beta}$$

Suppose the defect discovery (decay) constant is $\alpha$ and $\beta$ is the a priori expected number of defects (code size/lines of code per defect). If we observe defects at time intervals of $T_1, T_2, \ldots, T_k$ , then the conditional distribution of remaining defects is Poisson:

$$P_{(\beta e^{-\alpha(T_1+T_2+\ldots+T_k)})}(n_{defects}) = \frac{(\beta e^{-\alpha(T_1+T_2+\ldots+T_k)})^n}{n!}e^{-\beta e^{-\alpha(T_1+T_2+\ldots+T_k)}}$$

This is the a priori expected number of defects scaled by the decay factor of the exponential discovery model.

As new releases to the software are made, the

distribution of defects remains Poisson with the expected number of defects being the number remaining from the last release, $\gamma$ plus those introduced, $\beta$, by the independent introduction of new functionality.

$$P_{(\beta+\gamma)}[n] = \frac{e^{-(\beta+\gamma)}(\beta+\gamma)^n}{n!}$$

*C. Analyzing Program Errors*

It is thus possible to observe the time that elapses since the last discovery of a vulnerability. This value is dependent upon the number of vulnerabilities in the system and the number of users of the software. The more vulnerabilities, the faster the discovery rate of flaws. Likewise, the more users of the software, the faster the existing vulnerabilities are found (through both formal and adverse discovery).

If we let E stand for the event where a software vulnerability is discovered within the Times T and T+h for n vulnerabilities in the software

$$P(E \mid n) = \int_T^{T+h} n\alpha e^{-n\alpha t} dt \approx n\alpha e^{-n\alpha T} h$$

Where a vulnerability is discovered between time T and T+h we can use Bayes' Theorem to compute the probability that we have n bugs:

$$P(n_{vulnerabilities} \mid E) = \frac{ne^{-(n\alpha T+\beta)}\frac{\beta^n}{n!}}{\sum_{n=0}^{\infty}\left[ne^{-(n\alpha T+\beta)}\frac{\beta^n}{n!}\right]}$$

From this we see that:

$$P(n_{vulnerabilities} \mid E) = \frac{\frac{\left(\beta e^{-\alpha T}\right)^{n-1}}{(n-1)!}}{\sum_{n=0}^{\infty}\left[\frac{\left(\beta e^{-\alpha T}\right)^{n-1}}{(n-1)!}\right]}$$

By summing the denominator we can see that if we observe a vulnerability at time T after the release and the decay constant for defect discovery is $\alpha$, then the conditional distribution for the number of defects is a Poisson distribution with expected number of defects $\beta e^{-\alpha T}$.

Hence:

$$P_{\beta e^{-\alpha T}}(n) = e^{\beta e^{-\alpha T}}\frac{\left(\beta e^{-\alpha T}\right)^n}{n!}$$

The reliability function (also called the survival function) represents the probability that a system will survive a specified time t. Reliability is expressed as either MTBF (Mean time between failures) and MTTF (Mean time to failure). The choice of terms is related to the system being analyzed. In the case of system security, it relates to the time that the system can be expected to survive when exposed to attack. This function is hence defined as:

$$R(t) = 1 - F(t)$$

The function F(t) is the probability that the system will fail within the time 't'. As such, this function is the failure distribution function (also called the unreliability function). The randomly distributed expected life of the system (t) can be represented by a density function, $f(t)$ and thus the reliability function can be expressed as:

$$R(t) = 1 - F(t) = \int_t^{\infty} f(t)dt$$

The time to failure of a system under attack can be expressed as an exponential density function:

$$f(t) = \frac{e^{-t/\theta}}{\theta},$$

where $\theta$ is the mean survival time of the system when in the hostile environment and t is the time of interest (the time we wish to evaluate the survival of the system over). Together, the reliability function, R(t) can be expressed as:

$$R(t) = \int_t^{\infty} \frac{e^{-t/\theta}}{\theta} dt = e^{-t/\theta}$$

The mean ($\theta$) or expected life of the system under hostile conditions can hence be expressed as:

$$R(t) = \int_t^{\infty} e^{-t/M} dt = e^{-t\lambda}$$

Where M is the MTBF of the system or component under test and $\lambda$ is the instantaneous failure rate where Mean life and failure rate are related by the formula:

$$\lambda = \frac{1}{\theta}.$$

The failure rate for a specific time interval can also be expressed as:

$$\lambda = \frac{\#Failures}{\sum Operating \quad Hours}$$

As $R(t) = 1 - F(t)$ and $P_{\beta e^{-\alpha T}}(n) = e^{\beta e^{-\alpha T}}\frac{\left(\beta e^{-\alpha T}\right)^n}{n!}$, we can see that the reliability of the program can be expressed as:

$$R(t) = 1 - \int_0^\infty P_{\beta e^{-\alpha T}}(n) = 1 - \int_0^\infty e^{\beta e^{-\alpha T}} \frac{(\beta e^{-\alpha T})^n}{n!} dt$$

What this means is that the program only function has a limit at R(t)=0 as $t \to \infty$. This means that the longer the application is running, the less secure it is. However, the rate tends towards a limit over time.

## IV. The Economics of Software Security

To represent the effect of security expenditure in minimizing bugs (y) against investment over time (x) and the result (z) as expected returns (or profit) we see that there are expenditure inflection points. What we see is that spending too much on security has a limiting function on profit. Also too little expenditure has a negative effect on profit as the cost of discovering bugs post release increases.

This is where risk analysis comes into its own. The idea is to choose an optimal expenditure on security that limits the losses. Money should be spent on security until that last dollar returns at least a dollar in mitigated expected loss.

Once the expenditure of a dollar returns less than a dollar, the incremental investment is wasted. Here, the software coder has to optimize the testing process.

## V. Conclusion

Modeling and understanding program risks is essential if we are to minimize risk and create better code. It was clear from this study that organizational coding expresses a far higher rate of bugs per line of code than is expressed in specialized software companies. Insufficient testing is being conducted in many companies who have in-house coding teams. This is leading to higher costs and lower overall security.

The goal for any coding team should be how many lines of good code are produced, not how many lines of code are written and then sent to be fixed.

## VI. References

[1] Anderson., R. (2001) "Why information security is hard, an economic perspective". In 17th Annual Computer Security Applications Conf. Dec 2001 New Orleans LA.

[2] Cohen, J. (2006). "Best Kept Secrets of Peer Code Review (Modern Approach. Practical Advice.)". Smartbearsoftware.com

[3] Carman, D. W., Dolinsky, A. A., Lyu, M.R. & Yu, J.S. "Software Reliability Engineering Study of a Large-Scale Telecommunications System", Proc. Sixth Int'l Symp. Software Reliability Eng., pp. 350-359, 1995.

[4] Connell, C. "It's Not About Lines of Code." http://www.developer.com/java/other/article.php/988641 (Viewed 15 Mar 2010)

[5] Daskalantonakis, M. K. "A Practical View of Software Measurement and Implementation Experiences within Motorola", IEEE Trans. Software Eng., vol. 18, no. 11, pp. 998-1,010, Nov. 1992.

[6] Kaaniche, K. & Kanoun, K. "Reliability of a Telecommunications System", Proc. Seventh Int'l Symp. Software Reliability Eng., pp. 207-212, 1996.

[7] Khoshgoftaar, T.M., Allen, E.B., Kalaichelvan, K.S. & Goel, N. "Early Quality Prediction: A Case Study in Telecommunications", IEEE Trans. Software Eng., vol 13, no. 1, pp. 65±71, Jan. 1996.

[8] Levendel, Y. "Reliability Analysis of Large Software Systems: Defects Data Modeling," IEEE Trans. Software Eng., Vol. 16, No. 2, 1990, pp. 141-52.

[9] Mills, H. D. (1971) "Top-down programming in large systems", Debugging techniques in large systems, R. Rustin Ed., Englewoods Cliffs, N.J. Prentice-Hall

[10] Munson J.C.,, & Khoshgoftaar, T.M. The Detection of Fault-Prone Programs, IEEE Transactions on Software Engineering, v.18 n.5, p.423-433, May 1992

[11] Ozment, Andy & Schechter, S.E. (2002) "Milk or Wine: Does software security improve with age" In 15th Usenet Security Symposium, July 2006

[12] Perrow, C. (1984/1999). Normal Accidents: Living with High-Risk Technologies, Princeton University Press.

[13] Munson, J.C. & Khoshgoftaar, T.M. "The Detection of Fault-Prone Programs", IEEE Trans. Software Eng., vol. 18, no. 5, pp. 423-433, May 1999

[14] Raghuraman R. "EDA Software: Quality is Not Optional" http://www.acm.org/ubiquity/views/r_raghuraman_4.html (Viewed 15 Mar 2010)

[15] Sestoft, Peter (2008) Systematic software testing IT University of Copenhagen, Denmark1 Version 2, 2008-02-25

[16] Shen, V.Y., Yu, T. S., Thebaut, M. & Paulsen, L.R. "Identifying Error-Prone Software, An Empirical Study" IEEE Trans. Software Eng., vol 11, no. 4, pp. 317-323, Apr. 1985.