UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Ira Kleiman, as Personal Representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC <br><br> Plaintiffs, <br><br> v. <br><br> Craig Wright, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) **Case No.: 18-cv-80176-BB** |

**NON-PARTY ANDREW O'HAGAN'S OBJECTION
TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
AND INCORPORATED MEMORANDUM OF LAW**

Non-party witness Andrew O'Hagan ("**O'Hagan**"), respectfully OBJECTS to the Report and Recommendation of the Magistrate Judge [DE 818] (the "**R&R**")[1] and asks this Court to overrule the R&R and to enter an Order compelling Plaintiffs to pay the fees and costs borne by O'Hagan in defending his journalistic privileges by opposing the unjustifiably broad scope of discovery Plaintiffs sought and providing testimony on limited topics in this action pursuant to letters rogatory. In support, O'Hagan states the following:

### I.    Introduction

O'Hagan respectfully submits that the Magistrate Judge erred in five fundamental respects. First, the R&R states (at 3) that Fed. R. Civ. P. 45 does not confer on the Court authority to enter the order O'Hagan seeks, when it does precisely that. Second, the R&R

---

[1] The R&R was entered with respect to O'Hagan's MOTION FOR ORDER COMPELLING PLAINTIFFS TO PAY FEES AND COSTS RELATED TO DOCUMENT AND DEPOSITION DISCOVERY IN ENGLAND [DE 768] (herein the "**Motion**"). Plaintiffs filed a Response [DE 806] (herein the "**Response**). O'Hagan filed a Reply [DE 816] (herein the "**Reply**").

states (at 2) that the Court does not have jurisdiction over O'Hagan, when jurisdiction over O'Hagan isn't relevant to the analysis here, since it is an order compelling parties before the Court that O'Hagan seeks. Third, the R&R states (at 3) that the Court cannot "discern the precise relief O'Hagan seeks," when the relief he seeks is just what he has stated: an Order compelling Plaintiffs to pay the fees and costs associated with defending his journalist privileges by resisting the overbroad discovery they sought and with providing the limited deposition discovery they employed before this Court. Fourth, the R&R states (at 3) that O'Hagan's remedy is solely to be found in the execution of his domesticated judgment, when nothing about that state court judgment precludes a co-sovereign federal court from issuing orders regarding the discovery practices before it. And fifth, the R&R fails anywhere to address O'Hagan's appeal to this Court's inherent authority to manage the matters before it, when those inherent powers provide more than sufficient basis for the Court to grant the relief O'Hagan seeks.

## II.   Factual and Procedural Background

O'Hagan is a journalist, and Editor/Director of the London Review of Books, the biggest literary and journalistic periodical in Europe.

In June 2016, the London Review of Books published an investigative article written by O'Hagan, "The Satoshi Affair," which was the result of many months of research in several countries. This article sought to address important issues of public interest, such as the development of Bitcoin technology and its impact on those involved in that process, the ways in which people may invent themselves or aspects of their lives, and the ways in which people can fictionalize themselves (especially in the online world).

2

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

During the preparation of the article, O'Hagan took many individuals into his confidence, including many who wished for their identities to be kept out of the public domain. One of the main sources of journalistic material for "The Satoshi Affair" was Dr. Craig Wright, the purported founder of bitcoin and the subject of the article.

Plaintiffs in the case in chief before this Court wanted to learn everything O'Hagan knew, everything he had done, and everyone to whom he had spoken. On July 19, 2019, they filed a motion under the Hauge Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "**Hague Convention**"), and on July 24, 2019, Magistrate Judge Reinhart signed a Request for International Judicial Assistance. ("**Request**") [DE 253]. The Request sought questioning of O'Hagan in four extensive categories – general background, the accuracy of quotes in the article, all statements made by Craig Wright and his agents, and all statements by anyone else O'Hagan interviewed. Request at pp. 4-5. The Request also sought the video and audio recordings of O'Hagan's interviews, as well as all the documents upon which O'Hagan relied. *Id.* at p. 5.

Plaintiffs provided O'Hagan no notice of their motion or the Request, but they did promise in the Request, which Magistrate Judge Reinhart signed, that the "fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention *will be borne by Plaintiffs*."[2] *Id.* at 8 (emphasis supplied).

---

[2] Those provisions of the Hague Convention provide in pertinent part:

**Article 14**

\* \* \*

The requested authority whose law obliges the parties themselves to secure evidence, and which is not able itself to execute the Letter, may, after having obtained the consent of the requesting authority, appoint a suitable person to

3

Still without notice to O'Hagan, Plaintiffs then initiated an *ex parte* application in England on November 11, 2019, (the "**First Application**") seeking to compel O'Hagan to provide the same testimony and documents set forth in the Request. A copy of the 15-page First Application *with its more than 400 pages of exhibits* is attached as Exhibit A to the Reply. Plaintiffs omit from the Response that they again promised in *this* First Application to pay "O'Hagan's costs of attending the deposition." First Application at p. 12. Plaintiffs did not set forth in the First Application the substantial body of English law protecting journalistic sources and freedom of expression. On November 14, 2019, Justice Butcher of the English Commercial Court in London issued an Order compelling O'Hagan to provide the extensive and invasive testimony and documents Plaintiffs sought. A copy of the Order is attached as Exhibit B to the Reply. The Order was the first word O'Hagan had that Plaintiffs were using the Courts to go after him and it gave him just seven days to respond.

O'Hagan, who of course did not choose to be a witness – and certainly not on the Plaintiffs' invasive, privilege-busting terms – immediately hired counsel to address the

---

do so. When seeking this consent the requested authority shall indicate the approximate costs which would result from this procedure. If the requesting authority gives its consent it shall reimburse any costs incurred; without such consent the requesting authority shall not be liable for the costs.

**Article 26**
A Contracting State, if required to do so because of constitutional limitations, may request the reimbursement by the State of origin of fees and costs, in connection with the execution of Letters of Request, for the service of process necessary to compel the appearance of a person to give evidence, the costs of attendance of such persons, and the cost of any transcript of the evidence.

Where a State has made a request pursuant to the above paragraph, any other Contracting State may request from that State the reimbursement of similar fees and costs.

4

encyclopedic demands and Justice Butcher's order. They rushed to file O'Hagan's response on November 22, 2019 seeking to set aside the Order, which cut across key protections for journalistic materials under English law. A copy of his response is attached as Exhibit C to the Reply. In his 14-page response to the Order, O'Hagan argued strenuously that Plaintiffs were not entitled to his privileged journalistic materials and that his sources for the articles, as well as the information they provided, should remain confidential.

The proceedings, even at this stage, were very certainly "contentious, oppressive, and burdensome," despite Plaintiffs' claim to the contrary in the Response. O'Hagan was battling a voluminous surprise request that went to the very core of his professional privilege and practice. In response to this massed assault, he was mounting an urgent and full-throated defense. But this was only the beginning.

Despite the Response's false claims to the contrary (Response at p. 2), Plaintiffs did *not* react to O'Hagan's defense of his privacy by agreeing to limit "the deposition to protect O'Hagan's journalistic privileges." Instead, Plaintiffs fired another barrage. On December 6, 2019, they filed a second statement reiterating that the detailed source material should be produced in spite of O'Hagan's objections on grounds of journalistic privileges (the "**Second Application**"). The 13-page Second Application and its *over 400 entirely new pages of exhibits* are attached as Exhibit D to the Reply. At this point, O'Hagan was fighting off over 900 pages of submissions from the Plaintiffs who were seeking a plenary invasion of his most sacrosanct professional privileges – "contentious, oppressive, and burdensome" by any measure. Plaintiffs once again omit from the Response that their Second Application reiterated their promise to reimburse O'Hagan's "reasonable legal costs relating to compliance with [Justice Butcher's Order]." Second Application at p. 13.

And still Plaintiffs fought O'Hagan at every turn. For example, Plaintiffs would not even agree to transfer the case to the Media and Communications Court, where cases such as this must be heard. Over Plaintiffs' objections, O'Hagan had to work to secure this transfer, which was granted on December 11, 2019. A copy of this 5-page order of transfer is attached as Exhibit E to the Reply. There, on December 14, 2019, O'Hagan had to file a second statement in support of his arguments concerning his journalistic privileges. A copy of this 11-page statement is attached as Exhibit F to the Reply.

It was not until all of this briefing was complete, and the case was set for a hearing before the Media and Communications Court on December 20, 2019, that Plaintiffs *finally* conceded what they should have admitted at the start: that their quest to pierce O'Hagan's journalistic privileges was not supported by the law. Only then did Plaintiffs, reluctantly and at long last, agree to limit the deposition to background and the accuracy of the quotes in the article, and to withdraw their request for document discovery. O'Hagan had never objected to providing *this* limited testimony; the extensive and expensive fight to which Plaintiffs subjected him was all for naught.[3]

Crucially, Plaintiffs at this point *agreed* to pay all of O'Hagan's reasonable fees and costs. All of this was memorialized in a Consent Order dated December 18, 2019. A copy of the Consent Order, bearing the seal of the UK court, is attached as Exhibit G to the Reply.

But even though Plaintiffs were obligated (by their promises, by the Hague Convention, and by the order of the UK court) to pay O'Hagan's fees, Plaintiffs – having obtained the testimony they sought – then resisted making that payment at every turn,

---

[3] The R&R contains an important error of fact (at 1). O'Hagan never produced any documents in this matter. Despite Plaintiffs'' intensive efforts to force him to do so, his furious legal defense prevented this outcome – in accord with English law.

6

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

continuing their practice of subjecting O'Hagan to "contentious, oppressive, and burdensome" proceedings.

O'Hagan submitted his fees to Plaintiffs on March 30, 2020 in accordance with the Consent Order. Plaintiffs disputed the amount (but not their liability) and forced O'Hagan to proceed to a hearing where the English court determined the *balance* of fees owed was £92,707.48. See Order dated March 23, 2021 attached as Exhibit C to the Motion.[4] Extensive correspondence between Plaintiffs' and O'Hagan's counsel from March 30, 2020 to March 16, 2021, demonstrates Plaintiffs' refusal to pay what O'Hagan was fairly due in responding to Plaintiffs' onerous and legally unsupported discovery.

Finally, at the trial of this matter, Plaintiffs on November 8, 2021 made use in this Court of the testimony they obtained by way of their "contentious, oppressive, and burdensome" practices. On that day they played to the jury nearly an hour of O'Hagan's videotaped deposition as part of their case in chief. A minute entry of the Court reflecting this is attached as Exhibit H to the Reply. Plaintiffs thereafter obtained a verdict in their favor in the amount $100,000,000.00.

To date, despite numerous demands, Plaintiffs – who have never disputed their liability to O'Hagan – have refused to pay O'Hagan the balance owing to him. This Court can and should order them to do so by overruling the R&R.

---

[4] Plaintiffs did not simply "agree to advance £34,988 of O'Hagan's fees" as they falsely claim in the Response. Response at p. 2. This sum was merely an interim payment, it was accounted for in the March 23 Order, and never intended to be the total amount owed O'Hagan. Rather, the English court ordered Plaintiffs to pay *all* of O'Hagan's fees.

7

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

### III.   Memorandum of Law

**A. Introduction**

For at least three reasons, the Court should overrule the R&R and order Plaintiffs to pay O'Hagan's unpaid fees and costs for this testimony – a liability Plaintiffs already agreed to meet (even reducing their agreement to a consent order), a sum the English court ordered Plaintiffs to pay, and a sum then reduced to a judgment by the English court.

First, requiring those who seek costly and burdensome discovery from disinterested non-parties to pay those non-parties' costs is a practice well-established in the Federal Rules of Civil Procedure. The Magistrate Judge erred in finding otherwise.

Second, this Court, under principles of international comity, should give effect to the orders of the English courts – orders rendered in direct support of *this* Court's judicial processes. The Magistrate Judge erred in stating that the only way to do that was enforcement O'Hagan's Florida-domesticated foreign judgment. But this Court has concerns of its own here, has authority of its own, and may and should enter orders of its own, even as O'Hagan pursues relief in the Florida courts.

Third, mindful of simple equity, this Court should use its inherent powers to require Plaintiffs to honor their agreement – to O'Hagan and to the English courts – to pay these costs; costs attendant to discovery that was born of and taken in service to the action presently pending before this Court. The Magistrate Judge ignored the salient issue of the Court's inherent authority, while improperly focusing on whether this Court has – or could have had – jurisdiction over O'Hagan. But it is O'Hagan who has *come* into this court and now asks it to exercise that authority to issue an order to the Plaintiffs – parties over whom the Court clearly has jurisdiction.

### B. It is routine and equitable practice, embedded in the Rules of Civil Procedure, to relieve non-parties of the costs of discovery

While litigants are entitled to broad discovery under the Federal Rules of Civil Procedure, the Rules themselves anticipate and account for the potential for such discovery to impose unreasonable burdens – especially upon those who are not party to, and will not benefit from, the litigation the discovery is meant to serve:

> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

Fed. R. Civ. P 45(d)(1).[5]

Accordingly, courts routinely shift the costs incurred by non-party targets of discovery to the party seeking the testimony or documents.

Indeed, the Court may, if it thinks just, *require* the party seeking discovery to *advance* the costs likely to be incurred by its non-party target as a pre-condition of obtaining the discovery. "The advancement of costs as a condition for the denial of a motion to quash is committed to the sound discretion of the court." *Cantaline v. Raymark Indus., Inc.*, 103 F.R.D.

---

[5]
> A non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court. This provision applies, for example, to a non-party required to provide a list of class members. The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party.

Fed. R. Civ. P. 45, Advisory Committee Notes to the 1991 Amendment, citing *United States v. Columbia Broadcasting Systems, Inc.*, 666 F.2d 364 (9th Cir.1982).

9

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

447, 449–50 (S.D. Fla. 1984), *quoting United States v. International Business Machines*, 62 F.R.D. 507, 509 (S.D.N.Y.1974) (*citing Blank v. Talley Industries, Inc.*, 54 F.R.D. 627 (S.D.N.Y.1972)). In exercising that discretion, the "[c]ourt must be sensitive to the potential burden imposed on a non-party during discovery, by balancing the need for the material against the burden (financial or otherwise) to be imposed, the possibility of lightening it through a protective order, the financial resources of the non-party, and the non-party's interest (if any) in the final outcome of the litigation." *Id., citing Pollitt v. Mobay Chemical Corp.,* 95 F.R.D. 101, 105 (S.D.Ohio 1982).

After a deep discussion of the various approaches to cost-shifting the discovery burden of non-parties, and recognizing that everyone in society has an obligation to cooperate with the legal process in the interests of justice, the Court in *Cantaline* drew the line at imposing burdensome costs on such non-parties:

> But the duty owed to society and hence to the court is different from the duty owed to a particular party. Rule 45(b)(2) recognizes this difference, for it draws a distinction between a non-party's failure to initiate the search for requested materials . . . and that same party's refusal to turn over to the discovering party the documents collected pursuant to a court order ***unless the party first advances to the non-party the reasonable costs of compliance — a right accorded the non-party under the Rules.***
>
> To the court, party and non-party alike owe a duty of obedience borne of respect for the judicial institution, and necessitated lest the order and predictability of the Rules of Civil Procedure be compromised. In a practical sense, however, the duty of obedience that a non-party owes a party differs from the duty the two owe the court. Most obviously, the non-party is not involved in any dispute with the discovering party. Indeed the non-party usually has little if any stake in the outcome of the case. Thus the rule as usually construed, generally compels a non-party to absorb costs even though it derives no benefit therefrom.

*Cantaline* at 451–52 (***emphasis supplied***).

In short, it should be a matter of routine for the Court to require Plaintiffs not only to *pay*, but to *advance*, the costs O'Hagan incurred for providing discovery in a matter where –

it should go without saying – he had no interest in the outcome.[6] As it happened, because he had no notice the letters rogatory were being sought, O'Hagan never had that chance before the discovery process reached England.

But, once discovery did come ashore in England, O'Hagan and the Plaintiffs eventually agreed to what the Plaintiffs had to know was predictable – to say nothing of just: They agreed that Plaintiffs would pay O'Hagan's fees and costs. Indeed, Plaintiffs even advanced a small portion of those fees and costs prior to O'Hagan's deposition, just as they likely would have been required to do in the normal course of Rule 45(d). Then, when Plaintiffs reneged on their promise, the English courts unsurprisingly reached the same conclusion an American court would have: that O'Hagan, although bound to bear the burden of giving testimony he'd rather not have given, was not, at least, required to *pay* for the privilege.

---

[6]    This is a key distinction between parties and non-parties. A party to a litigation will, without some extraordinary showing, usually be required to pay the costs of complying with discovery demands from opposing parties. "Where a defendant in a proceeding performs the work necessary to respond to a subpoena duces tecum, *his own case, to some degree at least, is benefited thereby*." *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 669 F.2d 620, 623–24 (10th Cir. 1982), *citing Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358, (1978) (declining to shift defendant's costs of production) (*emphasis supplied*). But for *non-parties*, the calculus is and should be different:

> We note also that Kerr-McGee is not a party to the underlying antitrust action. A literal reading of the discovery rules does not indicate that a nonparty responding to a subpoena duces tecum is in any different position than a party to the action. Nonetheless, the fact remains that in responding to the present subpoena duces tecum, Kerr-McGee is performing no work that conceivably could inure to its benefit.

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig*. at 623.

Nothing in the language of Rule 45(d) prevents this Court – where Plaintiffs made use of the evidence to obtain a verdict for nearly one thousand times the fees and costs with which they burdened O'Hagan to pay – from ordering Plaintiffs to pay O'Hagan's fees and costs.

In sum, the Plaintiffs' obligation to pay O'Hagan's costs for the discovery they obtained in aid of their case is clear in the law. Such relief is uncontroversial – even routine – and the Court should overrule the R&R and order it here.

### C. This Court should give effect to the orders of the English court, especially as those orders were directly in service to this Court's judicial process

As set forth above, the Court could simply rely on the pedestrian authority of the routine application of the Federal Rules of Civil Procedure to grant the relief O'Hagan seeks here. But there are, in fact, more lofty considerations at stake.

> The comity doctrine "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."

*St. Martinus Univ., NV v. Caribbean Health Holding, LLC*, No. 19-22278-CIV, 2020 WL 956301, at *6 (S.D. Fla. Feb. 27, 2020), *appeal dismissed sub nom. St. Martinus Univ. v. Caribbean Health Holding, LLC*, No. 20-11991-EE, 2020 WL 7018197 (11th Cir. Sept. 28, 2020), quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (*1895*).

The standards for when and whether to afford international comity to the orders of a foreign court are well-established:

> In evaluating whether comity is appropriate, we consider "(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) (internal citations omitted). We also consider "whether 'the central issue in dispute is a matter of foreign law and whether there is a

12

prospect of conflicting judgments.' " *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (*quoting Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

*EGI-VSR, LLC v. Coderch Mitjans*, 963 F.3d 1112, 1120 (11th Cir. 2020), *cert. denied sub nom. Mitjans v. EGI-VSR, LLC*, 141 S. Ct. 1075 (2021). It cannot be disputed that the orders of the English courts in this matter handily satisfy the factors set forth in *Turner* and recapitulated in *EGI-VSR*: There is no hint of fraud. English courts are every bit as competent and "civilized" as this Court. And the holdings of those courts – that the Plaintiffs should pay a non-party's fees and costs for discovery the Plaintiffs wanted – far from being "repugnant," are perfectly in line with the established law and routine practice in the courts of the United States.

Comity is vital to the international rule of law, and, in particular, "[t]he concept of international comity is a central consideration in determining whether the Hague Convention procedures should be used" as they were here. *In re Photochromic Lens Antitrust Litig.*, No. 8:10-MD-2173-T-27EAJ, 2012 WL 12904331, at *3 (M.D. Fla. May 2, 2012).

In obtaining letters rogatory, Plaintiffs relied on the internationally respected authority and global reach of this Court to obtain discovery in a foreign land from a foreign citizen not otherwise subject to the compulsion of this Court. Respecting the processes and orders of this Court, the English courts acted to give meaning to those orders and processes and to compel that testimony. Thus did Plaintiffs rely on international comity to get what they wanted and come back to this Court with evidence in hand that they used at trial. It is a matter of purest international comity that this Court should now likewise give meaning to the orders the English courts, orders rendered in service to it.

The Magistrate Judge erred to suggest – as Plaintiffs did in the Response – that O'Hagan's vision of comity here is for the Court to enforce the domesticated judgment. That

13

isn't at all what O'Hagan is asking. The domesticated judgment is a handy reference for the amount to which the English court liquidated the costs and fees still owing O'Hagan. But this Court isn't being asked to enforce that judgment. Rather it is being asked to reiterate, reciprocate, endorse and enforce the order of the English court that Plaintiffs pay the cost of the discovery obtained there for use in this Court.

### D. This Court has inherent power to order Plaintiffs to pay

Finally, though, this Court need turn neither to the deontological workings of the Federal Rules of Civil Procedure nor to the philosophical aspirations of international comity for guidance or authority here. Rather, the Court is sufficient unto itself to grant O'Hagan the relief simple fairness dictates he receive. Because, at bottom, this Court is the master of the proceedings before it, and to control those proceedings, this Court is imbued with broad inherent powers. The Magistrate Judge erred by failing even to address this fundamental power and prerogative of the Court.

"That federal courts are accorded certain inherent powers is well-established." *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1244 (11th Cir. 2009). "Those [inherent] powers are not governed by rule or by statute, 'but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.*, quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962). Accordingly, "[a] court has inherent power to protect *anyone* from oppressive use of its process and *may require a plaintiff to demonstrate he has made provisions for costs of discovery before directing the Clerk of Court to issue subpoenas.*" *Gregg v. Clerk of U.S. Dist. Court*, 160 F.R.D. 653, 654 (N.D. Fla. 1995) (*emphasis supplied*).

14

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208

If this Court had the inherent power to require in advance that Plaintiffs play fair when they descended upon and burdened O'Hagan – a non-party with nothing to gain – then it certainly has the inherent power to make those Plaintiffs play fair now, by living up to the deal they made, by obeying the orders of the English courts. The equities as between O'Hagan and Plaintiffs could not be more clear.[7] And the implications for the Court's authority are all the more salient when those Plaintiffs have the temerity to bring before the Court the very evidence they obtained through this Court's authority while flaunting the authority of its sister court in England.

## IV.   Conclusion

For the reasons stated, O'Hagan respectfully requests the Court overrule the Report and Recommendation and enter an order directing Plaintiffs to pay the fees and costs with which O'Hagan was burdened because of their pursuit of discovery for use in this Court; awarding O'Hagan the fees and costs associated with the Motion; and granting such other relief as the Court deems just.

---

[7]     Indeed, the equities here are *so* evident, and the Plaintiffs' obligation to pay is *so* clear, and their defiance of their obligation is *so* blatant, that O'Hagan should never have had to file this Motion. It is fully within the Court's inherent authority to order Plaintiffs not only to pay O'Hagan what they promised, and have been ordered, to pay, but the Court can and should order Plaintiffs to pay the fees and costs attendant to this Motion as well:

> [D]eeply rooted in the common law tradition is the power of any court to "manage its affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985) (citation omitted). Courts' inherent power also extends to parties to litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, (1991). A court may appropriately sanction a party or attorney who "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Hutto v. Finney*, 437 U.S. 678, 689 n. 14 (1978).

*Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545–46 (11th Cir. 1993)

## Certification pursuant to Local Rule 7.1(a)(3)

Undersigned counsel for O'Hagan has contacted counsel for Plaintiffs stating our intent to object to the Report and Recommendation. Plaintiffs oppose the relief sought herein.

Dated:  December 20, 2021.

> Respectfully submitted,
>
> DEVINE GOODMAN & RASCO, LLP
> 2800 Ponce de Leon Blvd., Suite 1400
> Coral Cables, FL 33134
> Tel.:  305-374-8200
> grasco@devinegoodman.com
>
> */s/ Guy A. Rasco*
> Guy A. Rasco, Esq. (F.B.N.: 727520)
> Robert J. Kuntz, Jr., Esq. (F.N.B.: 094668)
> *Attorneys for Andrew O'Hagan*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the CM/ECF Filing System this 20th day of December, 2021, on counsel of record.

> */s/ Robert J. Kuntz, Jr.*
> Robert J. Kuntz, Jr., Esq.

16

Devine Goodman & Rasco, LLP 2800 Ponce De Leon Boulevard, Suite 1400, Coral Gables, Florida 33134 P 305.374.8200 F 305.374.8208