

**P-078**

Case No. 9:18-CV-89176-BB

EXHIBIT
11
Wilson
4/8/19

**From:** Craig Wright
**Sent:** Thursday, July 18, 2013 5:06 AM
**To:** fhalyce.dempster@ato.gov.au
**CC:** jamie.wilson@hotwirepe.com
**Subject:** Evidence.

Hello,

|  | Bitcoin Value (Holding) | Mt Gox Value | Mt Gox Value |
|---|---|---|---|
|  |  | 18-Jul-13 | 1/07/2013 |
| Coin-Exch | 438,857 | $47,649,574.61 | $50,907,412 |
| Exchange Value |  | $108.58 116 | $116.00 |
| CSW (Personal) | 57,000 | $6,188,862.78 | $6,612,000 |
| Total |  | $53,838,437.39 |  |

The transfers are to be based on the values in the private ruling.

My wallet is listed below.

<<...>>

Regards,

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914

http://www.rcjbr.org

<<...>>   <<...>>   <<...>>

CONFIDENTIAL

**P-094**
Case No. 9:18-CV-89176-BB

EXHIBIT 7
ALL-STATE LEGAL®
Wilson
11/8/19 LG

| | |
|---|---|
| **From**: | Craig S Wright [craig@rcjbr.org] |
| **Sent**: | 10/2/2013 3:12:39 PM |
| **To**: | jenna.spears@ato.gov.au |
| **CC**: | 'Jamie Wilson' [jamie.wilson@hotwirepe.com]; 'Hardy, Michael' [Michael.Hardy@ato.gov.au] |
| **Subject**: | Discussion |

Hello Jenna,
As discussed just now on the phone, I would like to have a meeting with Mr Jordan. I have had discussions with Michael Hardy and others, and now we need to move this discussion upstairs.

The group I head has a holding of over $Au 100,000,000 in XBT (Bitcoin).

We are in the process of becoming a fully regulated exchange and bank under APRA provisions.

What most people do not realise is what can be done in the Bitcoin scripting language. Basically, we can have a compliant series of transactions that are managed and mapped to company details such as a TFN for a business.

I would like to discuss this with Mr Jordan and also ensure that we have a regime that suits the needs of the ATO when we go live later in the financial year. We are also offering to teach your people how BTC works and to help you regulated this as a tool in an electronic economy.

Regards,

**Dr. Craig S Wright GSE LLM**
**Chief Executive Officer**
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com



**Hotwire PE**
*Hotwiring the World*

P-096

Case No. 9:18-CV-89176-BB

**From:** Craig S Wright
**Sent:** Sunday, October 6, 2013 1:07 AM
**To:** Italia, Mark <Mark.Italia@ato.gov.au>
**CC:** Jamie Wilson; Ramona Watts; Hardy, Michael <Michael.Hardy@ato.gov.au>
**Subject:** Email 7: RE: Notification of audit ABN 48 164 068 348
**Attachments:** SaaS Master Agreement Hotwire Final.pdf

**SysUserProp:** 88334F2CCA0D8E51C8530404366F9B82

Hello Mark,
This is the 7th email.
Jamie can get you the original signed copy of the Rubik agreement if you require it. It applied to the following:
http://www.rubik.com.au/Products/Temenos-T24.aspx
This should provide you with an idea of what we are and what we are doing. We have a capitalisation in the group of $230 million and will be filing as a Large Entity and ADI in June 2014. We control $165million in XBT (Bitcoin). We are becoming a regulated and licensed bank.
As you will have noted, all other XBT companies globally are not seeking regulation. The business will be live soon and we have a job and a half ensuring we are ready for the media circus that will ensure. I hope you understand the need for secrecy.
I will call tomorrow (Monday) to ensure that you have all you require.
We can get you more project charters, Ausindustry Advance findings, etc. Just let me know, we have voluminous quantities of documents here.
You should have received 7 emails in total.
Regards,
Craig

**From:** Italia, Mark [mailto:Mark.Italia@ato.gov.au]
**Sent:** Friday, 4 October 2013 1:18 PM
**To:** Craig S Wright
**Subject:** Notification of audit ABN 48 164 068 348

Hi Craig,

Further to our discussion, attached is a letter outlining the information we require as part of the audit.

<<Confirm - audit - post issue SR.pdf>>
<<Acrobat Document.pdf>>

Regards

*Mark Italia*
Indirect Tax | Refund Integrity
Australian Taxation Office
Phone 03 9275 4243

ATO Centenary | *Working for all Australians*

*********************************************************************
IMPORTANT
The information transmitted is for the use of the intended
recipient only and may contain confidential and/or legally
privileged material. Any review, re-transmission, disclosure,
dissemination or other use of, or taking of any action in
reliance upon, this information by persons or entities other
than the intended recipient is prohibited and may result in
severe penalties. If you have received this e-mail in error
please notify the Privacy Hotline of the Australian Taxation
Office, telephone 13 2869 and delete all copies of this
transmission together with any attachments.
*********************************************************************

DEF_00046098

# SaaS Master Agreement

**Core In A Box Pty Ltd**
Rubik

**The party specified at item 2 of the Agreement Details**
Licensee

i

DEF_00046099

## Contents

| | | |
|---|---|---|
| 1. | **Definitions and interpretation** | **1** |
| | 1.1 Definitions | 1 |
| | 1.2 Interpretation | 7 |
| | 1.3 Precedence | 8 |
| 2. | **Term** | **8** |
| 3. | **Services** | **8** |
| | 3.1 Initial Term | 8 |
| | 3.2 Scope of this agreement | 8 |
| | 3.3 Hosting Infrastructure | 9 |
| | 3.4 Maintenance Services | 9 |
| | 3.5 Support Services | 9 |
| | 3.6 Training | 10 |
| 4. | **Service Levels** | **10** |
| 5. | **Business continuity** | **10** |
| 6. | **Statement of Work** | **11** |
| | 6.1 Statement of Work | 11 |
| | 6.2 Incorporation of Statements of Work into the agreement | 12 |
| | 6.3 Variation to Statement Work | 12 |
| | 6.4 No Obligation | 12 |
| 7. | **Acceptance Testing** | **12** |
| | 7.1 Pre-delivery testing | 12 |
| | 7.2 Acceptance Criteria | 12 |
| | 7.3 Software and Managed Services | 12 |
| | 7.4 Rubik to assist | 13 |
| | 7.5 Acceptance Testing successful | 13 |
| | 7.6 Notification of Defects | 13 |
| | 7.7 Continued failure | 13 |
| | 7.8 Deemed acceptance | 14 |
| | 7.9 Correction of Defects | 14 |
| 8. | **Delay** | **14** |
| | 8.1 Notification of delay | 14 |
| | 8.2 Minimise length of delay | 14 |
| | 8.3 Claim for extension of time | 14 |
| | 8.4 Parties to discuss | 15 |
| 9. | **Security** | **15** |
| | 9.1 Security | 15 |
| | 9.2 Harmful Code | 16 |
| 10. | **Licensee Data** | **16** |
| | 10.1 Rubik's obligations | 16 |
| | 10.2 Data Defects | 17 |
| | 10.3 Rectification at the Licensee's request | 17 |
| 11. | **Other Obligations** | **18** |
| | 11.1 Rubik to comply | 18 |
| | 11.2 Co-operation with third parties | 18 |
| | 11.3 Reference | 18 |
| | 11.4 Personnel | 18 |

CONFIDENTIAL

DEF_00046100

12.    Documentation .................................................................................................. 19

13.    Fees and expenses ........................................................................................... 19

    13.1    Fees ...................................................................................................... 19
    13.2    Payment ................................................................................................ 19
    13.3    Hourly rates .......................................................................................... 19
    13.4    Disputed Invoices ................................................................................. 20
    13.5    GST ....................................................................................................... 20
    13.6    Interest on overdue amounts ................................................................ 21
    13.7    No additional charge ............................................................................ 21
    13.8    Amounts due to be payable on demand ............................................... 21

14.    Confidentiality and Privacy ............................................................................ 21

    14.1    Confidentiality ....................................................................................... 21
    14.2    Confidentiality agreement ..................................................................... 22
    14.3    Privacy .................................................................................................. 22
    14.4    Changes to the Licensee's Privacy Policy ............................................ 23
    14.5    Publicity ................................................................................................ 23

15.    Escrow of Source Code ................................................................................... 23

16.    Intellectual Property ........................................................................................ 24

    16.1    Intellectual Property Rights in the Software ......................................... 24
    16.2    Licence to use the Software ................................................................. 24
    16.3    Restrictions on use of the Software ..................................................... 24
    16.4    The Licensee Data ............................................................................... 25
    16.5    Use of Software .................................................................................... 25

17.    Warranties ........................................................................................................ 25

    17.1    Rubik's Warranties ............................................................................... 25
    17.2    Exclusion of warranties ........................................................................ 26
    17.3    General ................................................................................................. 26
    17.4    Additional obligations in respect of IP warranty ................................... 27
    17.5    Change to Laws .................................................................................... 27

18.    No reliance by Licensee .................................................................................. 27

19.    Limitation of Liability ....................................................................................... 27

    19.1    Limitation on IP warranty ...................................................................... 27
    19.2    Limitation of statutory guarantees ........................................................ 27
    19.3    Consequential Damages ....................................................................... 28
    19.4    Annual cap on liability for Losses ......................................................... 28

20.    Indemnities ....................................................................................................... 28

    20.1    The Licensee indemnifies Rubik ........................................................... 28
    20.2    Rubik indemnifies the Licensee ............................................................ 28

21.    Insurance .......................................................................................................... 29

22.    Termination ....................................................................................................... 29

    22.1    Termination by the Licensee ................................................................. 29
    22.2    Termination without cause ..................................................................... 29
    22.3    Termination by Rubik ............................................................................ 29
    22.4    Termination for Force Majeure Event .................................................... 30
    22.5    Effect of expiry or termination ............................................................... 30

23.    Audit .................................................................................................................. 30

    23.1    Records ................................................................................................. 30
    23.2    General ................................................................................................. 30

CONFIDENTIAL

DEF_00046101

|  | 23.3 | Rubik to comply with APRA (or comparable NZ regulatory body) requests | 30 |
|  | 23.4 | Assurance | 31 |
| 24. | **Dispute resolution** | | **31** |
|  | 24.1 | Dispute Procedure | 31 |
|  | 24.2 | Urgent relief | 31 |
|  | 24.3 | Continued performance | 31 |
| 25. | **Force Majeure** | | **32** |
|  | 25.1 | No liability for breach during Force Majeure Event | 32 |
|  | 25.2 | Obligations on party claiming force majeure | 32 |
| 26. | **Transition Out Services** | | **32** |
|  | 26.1 | Services provided by Rubik | 32 |
|  | 26.2 | Transition Out on Licensee default | 32 |
|  | 26.3 | Examples of Transition Out Services | 33 |
| 27. | **Benefit** | | **33** |
| 28. | **Change Control** | | **33** |
|  | 28.1 | Out of scope work | 33 |
|  | 28.2 | Either party may request a Change | 34 |
|  | 28.3 | Rubik must notify the Licensee of a required Change | 34 |
|  | 28.4 | Licensee must notify Rubik of change in circumstances | 34 |
|  | (a) | The Licensee agrees to promptly notify Rubik of any changes in circumstances including that of its Related Body Corporate in relation to: | 34 |
|  | 28.5 | Change Proposal | 34 |
|  | 28.6 | Acceptance or rejection of Change Proposal | 34 |
| 29. | **General** | | **35** |
|  | 29.1 | Governing law | 35 |
|  | 29.2 | Jurisdiction | 35 |
|  | 29.3 | Notices | 35 |
|  | 29.4 | Amendments | 36 |
|  | 29.5 | Subcontracting | 36 |
|  | 29.6 | Waiver | 36 |
|  | 29.7 | Further acts and documents | 36 |
|  | 29.8 | Consents | 36 |
|  | 29.9 | Assignment | 36 |
|  | 29.10 | Counterparts | 37 |
|  | 29.11 | Entire agreement | 37 |
|  | 29.12 | Remedies Cumulative | 37 |
|  | 29.13 | Indemnities | 37 |
|  | 29.14 | Construction | 37 |
|  | 29.15 | Costs | 37 |
|  | 29.16 | Severability | 37 |
|  |  | If any provision in this agreement is invalid, void or unenforceable, all other provisions which are capable of separate enforcement without regard to an invalid, void or unenforceable provision are and will continue to be of full force and effect in accordance with their terms | 37 |
| **Schedule 1 - Agreement Details** | | | **39** |
| **Schedule 2 - Service Description** | | | **41** |
| **Schedule 3 - Service Level Agreement** | | | **44** |
| **Schedule 4 - Rate Card** | | | **46** |

iv

v

DEF_00046103

**SaaS Master Agreement dated**

**Parties**        **Core In A Box Pty Ltd ABN 60 133 382 788** of Level 1, 1 Eden Park Drive, Macquarie Park, NSW, 2113 **(Rubik)**

**The party specified at item 2 of the Agreement Details (Licensee)**

## Background

A.        Rubik is a provider of software-as-a-service solutions to financial institutions.

B.        The Licensee wishes to appoint Rubik to provide the Services on the terms and subject to the conditions of this agreement.

**Operative provisions**

## 1.        Definitions and interpretation

## 1.1        Definitions

In this agreement:

**Acceptance or Accept** means acceptance by the Licensee evidenced by the issuance of a notice in accordance with clause 7.5(a).

**Acceptance Criteria** has the meaning given in clause 7.2.

**Acceptance Date** means the date that the Software and the Managed Services are accepted in accordance with clause 7.5(a).

**Acceptance Testing** has the meaning given to it in clause 7.3(a).

**Acceptance Test Period** means 30 (thirty) days from the date that the Licensee receives the Software or access to the Managed Services (as applicable) and Rubik has notified the Licensee that the Software or Managed Services are ready for testing.

**Account** means an individual active account configurable to be accessed by the Software and the Managed Services and undertake transactions.

**Amended Licensee Privacy Policy** means any version of the Licensee's privacy policy which is agreed to be an Amended Licensee Privacy Policy in accordance with clause 14.4.

**APRA** means the Australian Prudential Regulation Authority.

**Agreement Details** means the details set out in Schedule 1.

**Available** means the Managed Services are substantially available for use by the Licensee for production purposes.

**Business Continuity Plan** has the meaning given in clause 5(a).

**Business Day** means a day that is not a Saturday, Sunday or public holiday and on which banks are open for business generally in Sydney.

**Change** has the meaning given in clause 28.2;

**Change Notice** has the meaning given in clause 28.6.

DEF_00046104

**Change Proposal** has the meaning given in clause 28.5(a).

**Close of Business** means the set of procedures run by Rubik at the end of every Business Day which set the start of the following Business Day and where interest accruals are calculated and/or daily reports are produced.

**Commencement Date** means the date specified at item 1 of the Agreement Details.

**Confidential Information** means, with respect to a party:

(a)     all information relating to the operations or affairs of the party including all financial or accounting information, all customer names and lists, terms and conditions of supply, sales records, marketing analysis and research and reports and other marketing information and all trade secrets, know how, operating procedures and technical information; and

(b)     all other information:

     (i)     treated by the party as confidential;

     (ii)     which is capable of being protected at Law or equity as confidential information;

     (iii)     in respect of which the party owes a duty of confidence to a third party; or

     (iv)     the disclosure of which might cause loss or damage to or otherwise adversely affect the party,

in whatever form.

**Consequential Damages** means incidental, indirect, exemplary or consequential damages, loss of revenue, loss of profits, loss of production, loss of Data, loss of goodwill or credit, loss of reputation or future reputation or publicity, loss or denial of opportunity; or which relates to additional expenses incurred or rendered futile; or which is not a natural or immediate consequence of the cause of action.

**Core Hours** are 8:00 am to 6:00 pm EST on Business Days;

**Corporations Act** means the Corporations Act 2001 (Cth).

**Corrected Material** has the meaning given in clause 7.6(b).

**CPI means the most recent weighted average Consumer Price Index released by the Australian Bureau of Statistics.**

**Data** means numbers, characters, images, or other information recorded in a form that can be printed, input into a CPU/processor, stored and processed there, or transmitted on some digital or analogue channel on or in any storage media (of whatever nature) whether in a human or machine readable form.

**Data Defect** has the meaning given in clause 10.2.

**Defect** means a failure of the Software or the Managed Services to meet the Specifications, Service Description or Acceptance Criteria.

**Dispute** means any dispute, difference or issue between the parties concerning or arising out of or in connection with or relating to this agreement or a Statement of Work or the subject matter

2

DEF_00046105

of this agreement or a Statement of Work or the breach, termination, validity, repudiation, rectification, frustration, operation or interpretation of this agreement or a Statement of Work and a reference to a Dispute, where the Dispute is partly resolved, refers to the unresolved part of the Dispute.

**Documentation** means any training manuals, user manuals, operating manuals, technical manuals, reports or other documentation specified in the Service Description or provided by Rubik to the Licensee as part of the Services.

**Escrow Agreement** has the meaning given in clause 15.

**Fees** has the meaning given in clause 13.1.

**Force Majeure Event** means an unforeseeable event or circumstance beyond the reasonable control of a party including:

(a)     an act of God, lightning strike, meteor strike, earthquake, storm, flood, landslide, explosion or fire;

(b)     strikes or other industrial action, other than strikes or other industrial action of some or all of a party's employees; and

(c)     war, terrorism, sabotage, blockade, revolution, riot, insurrection, civil commotion or epidemic,

but excludes any act or omission of a subcontractor (except where that act or omission was caused by a Force Majeure Event).

**GST** has the meaning given in the GST Act.

**GST Act** means the A New Tax System (Goods and Services Tax) Act 1999 (Cth).

**Hosting Infrastructure** means hardware, software, communications services (including internet access) and other resources, services and facilities necessary or desirable for providing the Managed Services.

**Initial Term** means the initial term specified at item 3 of the Agreement Details.

**Insolvency Event** means any of the following:

(a)     a person is or states that the person is unable to pay from the person's own money all the person's debts as and when they become due and payable;

(b)     a person is taken or must be presumed to be insolvent or unable to pay the person's debts under any applicable legislation;

(c)     an application or order is made for the winding up or dissolution or a resolution is passed or any steps are taken to pass a resolution for the winding up or dissolution of a corporation;

(d)     an administrator, provisional liquidator, liquidator or person having a similar or analogous function under the laws of any relevant jurisdiction is appointed in respect of a corporation or any action is taken to appoint any such person and the action is not stayed, withdrawn or dismissed within seven (7) days;

(e)     a controller is appointed in respect of any property of a corporation;

3

DEF_00046106

(f)   a corporation is deregistered under the Corporations Act or notice of its proposed deregistration is given to the corporation;

(g)   a distress, attachment or execution is levied or becomes enforceable against any property of a person;

(h)   a person enters into or takes any action to enter into an arrangement (including a scheme of arrangement or deed of company arrangement), composition or compromise with, or assignment for the benefit of, all or any class of the person's creditors or members or a moratorium involving any of them;

(i)   a petition for the making of a sequestration order against the estate of a person is presented and the petition is not stayed, withdrawn or dismissed within seven (7) days or a person presents a petition against himself or herself;

(j)   a person presents a declaration of intention under section 54A of the Bankruptcy Act 1966 (Cth); or

(k)   anything analogous to or of a similar effect to anything described above under the law of any relevant jurisdiction occurs in respect of a person.

**Intellectual Property Rights** means:

(a)   patents, designs, trade marks and service marks (whether registered or unregistered) and any applications for, or rights to apply for, registration of any patent, design, trade mark or service mark;

(b)   copyright (including copyright in software, websites, databases and advertising and other promotional materials);

(c)   all rights to have information (including trade secrets, know-how, operating procedures and technical information) kept confidential; and

(d)   all other rights or protections having similar effect anywhere in the world.

**Invoice** has the meaning given in clause 13.2(a).

**Key Personnel** means Rubik's Personnel who are key to performance under this agreement, as specified in the Service Description or a Statement of Work.

**Key Rubik Subcontractor** means a key Rubik Subcontractor set out in clause **Error! Reference source not found.** or as otherwise agreed between the parties.

**Key Rubik Subcontractor Agreements** means each of the agreements between Rubik and a Key Rubik Subcontractor for services described in clause **Error! Reference source not found.**.

**Law** means any applicable statute, regulation, by-law, ordinance, policy or subordinate legislation in force from time to time in Australia, whether made by a State, Territory, the Commonwealth or a local government, and includes the common law and equity as applicable from time to time, and any mandatory standards or industry codes of conduct.

**Licensee Data** means all data and information (whether or not Confidential Information) relating to any Licensee Group member and their respective operations, facilities, customers, personnel, assets, products, sales and transactions in whatever form such information may exist and whether entered into, stored in, generated by or processed as part of the Services, and includes any information stored by the Licensee using the Managed Services.

4

**Licensee Group** means the Licensee and each of its Related Bodies Corporate (provided that they remain a Related Body Corporate of the Licensee).

**Locations** means the location(s) specified at item 8 of the Agreement Details.

**Loss** means, in relation to any fact, matter or circumstance, all losses, costs, charges, damages, expenses and other liabilities arising out of or in connection with that fact, matter or circumstance including all legal and other professional expenses on a solicitor-client basis incurred in connection with investigating, disputing, defending or settling any claim, action, demand or proceeding relating to that fact, matter or circumstance (including any claim, action, demand or proceeding based on the terms of this agreement).

**Maintenance Services** means:

(a)        diagnosing and correcting any errors, defects or failures of the Software; and

(b)        implementing any patches, workarounds and updates.

**Managed Services** means:

(a)        configuring, hosting and maintaining the Software;

(b)        providing the Licensee with access to and use of the Software; and

(c)        storing the Licensee Data,

in accordance with the Specifications.

**Maintenance Window** means a time period outside the Core Hours as agreed between the parties acting reasonably during which essential maintenance such as Operating System patches and or System upgrades are performed. The time window is dependent on the scope of the upgrade.

**Material Defect** means a Defect which results in a Severity Level 1 or Severity Level 2 service level failure (as defined in Schedule 3).

**Milestone Due Date** has the meaning given in clause 8.1.

**Notice of Delay** has the meaning given in clause 8.1.

**Notice of Dispute** has the meaning given in clause 24.1(a).

**Personal Information** has the meaning given in clause 14.3.

**Personnel** means officers, employees, secondees, agents and contractors.

**Project Timetable** means the project timetable set out in the Service Description or a Statement of Work.

**Qualifying Cause of Delay** means:

(a)        a Force Majeure Event (subject to Rubik being able to rely on such Force Majeure Event in accordance with clause 25);

(b)        any Change requested by the Licensee under clause 28; or

(c)        a breach of this agreement by the Licensee to the extent that it contributes to Rubik failing to meet a Milestone Due Date.

5

DEF_00046108

**Related Body Corporate** has the meaning given to that term in section 50 of the Corporations Act.

**Rate Card** means the rate card set out in Schedule 4 as may be updated by Rubik from time to time in accordance with Schedule 4.

**Rubik Software** means the software described at item 6 of the Agreement Details.

**Rubik Subcontractor** means any subcontractor or agent of Rubik that provides any of the Services to, or on behalf of, Rubik.

**Service Credits** means any service credits payable by Rubik to the Licensee as a consequence of any failure to meet the Service Levels, as calculated in accordance with Schedule 3.

**Service Description** means the description of the Services (including any Services agreed under a Statement of Work) set out in Schedule 2 or a Statement of Work (as applicable).

**Service Levels** means the service levels in respect of the Services set out in Schedule 3 and the Service Description.

**Services** means:

(a)       the Managed Services;

(b)       the Maintenance Services; and

(c)       the Support Services.

**Software** means the software specified at item 6 of the Agreement Details.

**Source Code** means computer programs expressed in a source language or form which can be interpreted or compiled and then executed by a computer as commands and all documentation and tools reasonably required to enable a person having commercially available computer programming skills to read, understand and modify such computer programs.

**Specifications** means:

(a)       in respect of Software or Services, the requirements for that Software or Services set out or referred to in the Service Description or a Statement of Work, including all agreed requirements as to quality, functionality, performance, interoperability, testing and other matters;

(b)       all Documentation relating to the Software;

(c)       any published specifications of Rubik or a third party manufacturer or supplier relating to the Software; and

(d)       any user requirements of the Licensee as set out in a Statement of Work.

**Statement of Work** means a statement of work agreed between the parties in accordance with clause 6.

**Successor Supplier** means a person (including the Licensee) whom the Licensee appoints or nominates to provide:

(a)       any or all of the Services; or

(b)       a replacement for any or all of the Services.

6

DEF_00046109

**Support Services** means the support services set out in the Service Description.

**Taxes** means any taxes, levies, imposts, charges and duties (including stamp and transaction duties, but excluding GST) imposed by any authority together with any related interest, penalties, fines and expenses in connection with them except if imposed on, or calculated having regard to, the net income of the Licensee.

**Tax Invoice** has the meaning given to that term in the GST Act.

**Third Party Software** means the software which Rubik licenses from third parties and sublicenses to the Licensee under this agreement, as specified at item 7 of the Agreement Details

**Term** has the meaning given in clause 2(a).

**Transition Out Services** has the meaning given in clause 26.1.

**Virus** includes any files, programs or program code designed to affix themselves to, bury themselves within or send instructions to, other files, other computers, or other programs or program code in order to cause malfunctions, errors or destruction or corruption of Data or enabling unauthorised access to or use when affixed or at a later time including but not limited to worms, cancelbots, trojan horses, phishers, bombs, trapdoors, spyware, harmful contaminants (whether self replicating or not) and nuisance causing or otherwise harmful applets.

**Year** means the 12 month period commencing on the Commencement Date, and each subsequent 12 month period (or part thereof where this agreement terminates or expires) which commences on an anniversary of the Commencement Date.

## 1.2   Interpretation

In this agreement:

(a)         headings are for convenience only and do not affect interpretation;

and unless the context indicates a contrary intention:

(b)         an obligation or a liability assumed by, or a right conferred on, 2 or more persons binds or benefits them jointly and severally;

(c)         "**person**" includes an individual, the estate of an individual, a corporation, an authority, an association or a joint venture (whether incorporated or unincorporated), a partnership and a trust;

(d)         a reference to a party includes that party's executors, administrators, successors and permitted assigns, including persons taking by way of novation;

(e)         a reference to a document (including this agreement) is to that document as varied, novated, ratified or replaced from time to time;

(f)         a reference to a statute includes its delegated legislation and a reference to a statute or delegated legislation or a provision of either includes consolidations, amendments, re-enactments and replacements;

(g)         a word importing the singular includes the plural (and vice versa), and a word indicating a gender includes every other gender;

7

DEF_00046110

(h)     a reference to a party, clause, schedule, exhibit, attachment or annexure is a reference to a party, clause, schedule, exhibit, attachment or annexure to or of this agreement, and a reference to this agreement includes all schedules, exhibits, attachments and annexures to it;

(i)     if a word or phrase is given a defined meaning, any other part of speech or grammatical form of that word or phrase has a corresponding meaning;

(j)     "**includes**" in any form is not a word of limitation; and

(k)     a reference to "**$**" or "**dollar**" is to Australian currency.

## 1.3     Precedence

To the extent of any inconsistency between any of the following documents, the inconsistency is to be resolved in the following descending order of precedence:

(a)     the clauses of this agreement;

(b)     the Schedules to this agreement;

(c)     any Statement of Work; and

(d)     any other documented incorporated into this agreement.

## 2.     Term

(a)     This agreement commences on the Commencement Date and continues for the Initial Term unless terminated earlier in accordance with clause 22 (**Term**).

(b)     The Term will be automatically extended by successive periods of three years unless either party gives the other party at least 6 months' written notice that it does not wish to extend the Term.

## 3.     Services

### 3.1     Initial Term

The initial term of this agreement is for a period of five (5) years, from the date of this agreement.

### 3.2     Scope of this agreement

Rubik must, in accordance with the agreed Project Timetable and SOW:

(a)     design, implement and provide the Managed Services;

(b)     provide the Licensee, each member of the Licensee Group and their Personnel with a licence to use the Software in accordance with clause 16.2;

(c)     provide the Hosting Infrastructure in accordance with clause 3.3;

(d)     provide the Maintenance Services in accordance with clause 3.4

(e)     provide the Support Services in accordance with clause 3.5;

(f)     provide training in accordance with clause 3.6; and

8

DEF_00046111

(g)      supply the Documentation in accordance with clause 12.

## 3.3      Hosting Infrastructure

Rubik will

(a)      provide, maintain and manage the Hosting Infrastructure using a Key Rubik Subcontractor;

(b)      ensure that the Hosting Infrastructure is properly installed and configured, and otherwise complies with the Specifications; and

(c)      ensure that the Hosting Infrastructure has sufficient capacity, availability and quality during the Term to meet the requirements of the Service Levels and the Specifications.

## 3.4      Maintenance Services

(a)      Subject to clause 3.3(b), Rubik shall perform the Maintenance Services in the Maintenance Window and otherwise at such times and in the manner specified in the Service Description or as otherwise agreed by the Licensee.

(b)      If Rubik, acting reasonably, considers that it is necessary to undertake Maintenance Services outside of any period specified in clause 3.3(a) for reasons including, but not limited to, ensuring that the Services or the Software continue to operate error free and in accordance with the Specifications and the Service Description, then Rubik will give the Licensee at least four (4) hours' notice via email or phone of its intentions to provide Maintenance Services and the Licensee must provide all such assistance reasonably required by Rubik to implement such Maintenance Services.

(c)      The Licensee acknowledges that the Services and the Software may be unavailable to the Licensee and its Personnel for the duration of any period in which Rubik conducts Maintenance Services in the Maintenance Window or as otherwise agreed. Where any Maintenance Services are conducted otherwise than during the Maintenance Window or as otherwise agreed, the Service Levels will continue to apply with respect to the period in which the Maintenance Services are conducted.

(d)      Where Rubik is not provided with access to provide Maintenance Services it shall not be held liable for any failure to maintain the Service Levels.

## 3.5      Support Services

(a)      Rubik will provide the Support Services in accordance with the Service Description, provided that the Licensee:

(i)      notifies Rubik maintenance Personnel about any problems in respect of the Software or the Services by logging in to the Rubik support system located at www.rubik.com.au/support (or by way of telephone, email or fax if the support system is unavailable); and

(ii)      provides such authorisation or remote access which is necessary for Rubik to carry out its obligations under this agreement with respect to the provision of Support Services.

(b)      Apart from database monitoring functions and the running of Close of Business processes, Rubik may not access any Licensee Data without the prior consent of the Licensee. Such consent is deemed to be automatically granted with respect to

9

DEF_00046112

specific Licensee Data when any member of the Licensee Group or any of their Personnel log an issue relating to such Licensee Data.

(c)     Support Services do not include correction of errors or Defects to the extent they are caused by:

(i)     the incorrect use of, or operation of, the Software or the Services contrary to this agreement; or

(ii)    any hardware or software not provided by Rubik or a Rubik Subcontractor.

## 3.6     Training

(a)     Where specified in the Service Description, Rubik will provide such training reasonably required by the Licensee to enable the Licensee Personnel to properly use the Managed Services (including any training required by the Specifications). Rubik will also provide any additional training reasonably required by the Licensee for the Licensee to enjoy the benefit of any updates implemented in the course of Rubik providing the Maintenance Services.

(b)     If the Licensee requests any training that is in addition to the training specified in the Service Description, then Rubik will use reasonable endeavours to provide such training at a time and location convenient to both parties. Rubik will invoice the Licensee for any such training in accordance with clause 13.3.

## 4.     Service Levels

(a)     Rubik must perform the Services to meet the applicable Service Level.

(b)     If Rubik fails to perform the Services to meet the applicable Service Level, Rubik must, within the period specified in Schedule 3 (or promptly, if no period is specified):

(i)     notify the Licensee in writing;

(ii)    allocate such resources which are reasonably necessary to remedy the failure, and any consequences of such failure; and

(iii)   accrue to the Licensee any applicable Service Credits set out in Schedule 3 . The Service Credits will be credited against the next invoice issued by Rubik.

(c)     The Licensee's rights in this clause 4 remain subject to the exclusions and limitations set out in clause 19.

## 5.     Business continuity

(a)     Rubik will develop, establish, maintain and carry out a business continuity plan specifying the procedures to predict, avoid, remedy and mitigate internal or external problems that may have a material adverse affect on the Services, including addressing any business continuity requirements in the Specifications (**Business Continuity Plan**).

(b)     Rubik will provide the Licensee with a copy of the Business Continuity Plan within seven (7) days of the Commencement Date and within seven (7) days after any amendment to the Business Continuity Plan.

10

(c)      Rubik will test the Business Continuity Plan:

      (i)      on a regular basis (not less than annually); and

      (ii)      when reasonably requested by the Licensee (at the cost of the Licensee),

to ensure that the Business Continuity Plan complies with the requirements of clause 5(a) and is consistent with the Service Description. Rubik will provide the results of the Business Continuity Plan testing to the Licensee upon request.

(d)      Rubik will report to the Licensee in relation to the Business Continuity Plan on a regular basis (not less than annually), including providing details of:

      (i)      Rubik's communication plan if the Business Continuity Plan is invoked;

      (ii)      timeframes for service to be restored if the Business Continuity Plan is invoked;

      (iii)      Rubik's disaster recovery site (if applicable);

      (iv)      testing of the Business Continuity Plan (including test results); and

      (v)      the process for review and updating of the Business Continuity Plan.

(e)      On the occurrence of a Service interruption, Rubik will immediately:

      (i)      implement any measures set out in the Business Continuity Plan to the extent that they are appropriate to the particular Service interruption; and

      (ii)      notify the Licensee that such an event has occurred.

# 6. Statement of Work

## 6.1 Statement of Work

(a)      Subject to clause 6.1(b), if and when the Licensee wishes to obtain any services other than the Services, the Licensee may:

      (i)      request Rubik to provide it with a draft Statement of Work. If so, Rubik will, within 7 days (or such other agreed period) of receiving that request, prepare and provide the Licensee with a draft Statement of Work; or

      (ii)      provide Rubik with a draft Statement of Work for the services it wishes to obtain from Rubik. If so, then Rubik agrees to update such draft Statement of Work within 7 days of the date the Statement of Work is provided to Rubik (or such other agreed period) so that it accurately describes the services that the Licensee proposes to obtain from Rubik.

(b)      If Rubik, acting reasonably, determines that significant effort is required to produce a Statement of Work or update a Statement of Work under clause 6.1(a), then Rubik may elect to provide a cost estimate to the Licensee for approval prior to carrying out such work (**Cost Estimate**).

(c)      If the Licensee accepts the Cost Estimate then:

11

(i)      Rubik will carry out the work set out in Cost Estimate in accordance with clause 6.1(a); and

(ii)     the Licensee will agree to pay to Rubik the amount set out in the Cost Estimate,

otherwise, Rubik will not be required to carry out the work, and the Licensee will not be required to pay the amounts, set out in the Cost Estimate.

## 6.2    Incorporation of Statements of Work into the agreement

When a draft Statement of Work has been agreed by the parties, the parties will sign the draft Statement of Work and it will be incorporated into this agreement and will be governed by the terms and conditions of this agreement.  Any services under the Statement of Work will become Services under this agreement.

## 6.3    Variation to Statement Work

Any variations to a Statement of Work are to be mutually agreed in writing by the parties, in accordance with clause 28.

## 6.4    No Obligation

There is no obligation on the Licensee to request that Rubik provide it with any Statement of Work or to agree to any Statement of Work.

# 7.    Acceptance Testing

## 7.1    Pre-delivery testing

Prior to commencement of the Managed Services to the Licensee, Rubik will conduct testing of all components of the Software and the Managed Services, individually and in combination to validate that the Software and Managed Services are free from Material Defects and identify any other Defects.

## 7.2    Acceptance Criteria

(a)      Rubik will in accordance with the Project Timetable develop and provide to the Licensee an appropriate set of acceptance criteria which are designed to demonstrate that the Software and the Managed Services do not contain any Material Defects (**Acceptance Criteria**).

(b)      Rubik will make any changes to the Acceptance Criteria which are reasonably requested by the Licensee provided that such changes are consistent with the Statement of Work and the Service Description.

## 7.3    Software and Managed Services

(a)      Rubik must provide the Licensee with access to the Software and the Managed Services for acceptance testing at such times as are necessary to meet the Project Timetable.  The Licensee may conduct testing of the Software and Managed Services for Defects (**Acceptance Testing**) during the Acceptance Test Period.

(b)      Rubik will provide a test environment for the Licensee to conduct Acceptance Testing.

CONFIDENTIAL

(c)     The Licensee may as part of Acceptance Testing conduct performance testing on the Software by arrangement with Rubik. Performance testing is at the cost of the Licensee

## 7.4     Rubik to assist

Rubik will provide reasonable support during the Acceptance Testing period.

## 7.5     Acceptance Testing successful

(a)     If the Acceptance Testing reasonably demonstrates to the Licensee that the Software and the Managed Services are free from Material Defects, then within 2 days (or such other agreed period) of successful completion of the Acceptance Testing, the Licensee will issue a notice to Rubik confirming its acceptance of the Software and the Managed Services.

(b)     The parties acknowledge and agree that the Software and the Managed Services have not been accepted unless:

(i)      the Licensee has issued the notice of acceptance in respect of the Software and the Managed Services pursuant to clause 7.5(a); or

(ii)     the Software and the Managed Services are deemed to be accepted in accordance with clause 7.8.

## 7.6     Notification of Defects

(a)     The Licensee must notify Rubik of a Defect it has identified during Acceptance Testing within 7 days (or such other agreed period) of the Defect being discovered and will promptly provide Rubik with all reasonable information concerning the Defect.

(b)     In respect of the Software or Managed Service, Rubik must rectify all Material Defects (including Material Defects identified by itself or other third parties) at its own cost and re-submit the Software and the Managed Services to the Licensee (**Corrected Material**) within seven days of becoming aware of the Material Defect (or such other agreed period).

(c)     The Licensee will conduct Acceptance Testing on the Corrected Material and the parties will comply with clauses 7.2 to 7.6 (inclusive) in respect of the Corrected Material and further Material Defects (the duration of such testing is not to exceed fourteen (14) days).

## 7.7     Continued failure

If any Material Defect remains in the Corrected Material after the Licensee has conducted at least two (2) rounds of Acceptance Testing in relation to that Corrected Material, then without limiting any other right or remedy, the Licensee may:

(a)     accept the Corrected Material;

(b)     accept the Corrected Material subject to Rubik agreeing to fix any Material Defect in the Corrected Material within a time specified by the Licensee; or

(c)     reject the Corrected Material, in which case Rubik must refund to the Licensee within 7 days the amounts paid by the Licensee to Rubik in respect of the components of the Corrected Material which contain Material Defects which cannot be rectified.

13

DEF_00046116

## 7.8    Deemed acceptance

The Licensee is deemed to have accepted the Software and the Managed Services (including where relevant, any Corrected Material) when the Licensee operates any part of the Software or the Managed Services in a production environment.

## 7.9    Correction of Defects

During the course of releasing updates to the Software and where relevant, the Services, Rubik will use reasonable endeavours to correct any Defects in the Software and the Services which are identified but not corrected during the course of Acceptance Testing.

# 8.    Delay

## 8.1    Notification of delay

As soon as either party becomes aware of any matter that will, or is likely to, cause Rubik to fail to meet any milestone or deadline set out in the Project Timetable (**Milestone Due Date**), that party must inform the other party in writing (**Notice of Delay**). Each Notice of Delay must include:

(a)    details of the matter that may cause Rubik to fail to meet the Milestone Due Date;

(b)    the steps which Rubik or the Licensee (as applicable) is taking to minimise the delay;

(c)    recommendations to minimise any adverse effects that may result from the delay; and

(d)    the period, if any, by which the relevant Milestone Due Date should be extended.

## 8.2    Minimise length of delay

Rubik will use its best endeavours to minimise the length of any delay specified in a Notice of Delay, which will include implementing any steps to minimise the delay which Rubik has specified in the Notice of Delay in accordance with clause 8.1(b), provided that such steps are within Rubik's reasonable control.

## 8.3    Claim for extension of time

Rubik will be entitled to an extension of time to a Milestone Due Date if:

(a)    either party has given the other party a Notice of Delay (which in the case of Rubik, must be given within 5 Business Days of when Rubik first became aware of the delay);

(b)    Rubik is or will be delayed in meeting the Milestone Due Date by a Qualifying Cause of Delay; and

(c)    Rubik gives the Licensee within 5 Business Days of the cessation of the delay:

(i)    a written claim for extension of time specifying the number of days claimed, the date on which the cause of the delay first arose and the date of the cessation of the delay; and

(ii)    a statement of the facts on which the claim is based.

14

DEF_00046117

**8.4     Parties to discuss**

(a)     The parties will, within 10 Business Days of receipt of a written claim given by Rubik under clause 8.3(c), meet and discuss in good faith:

     (i)     Rubik's entitlement to any extension of time; and

     (ii)     any new Milestone Due Dates.

(b)     Where the parties agree on the matters referred to in clause 8.4(a), then any Milestone Due Dates will be extended by the period(s) agreed by the parties. If the parties are unable to agree then the matter will be considered a Dispute to be dealt with pursuant to clause 24.

# 9.     Security

**9.1     Security**

(a)     Rubik will implement reasonable measures to ensure that no unauthorised party is allowed physical or electronic access to the:

     (i)     Hosting Infrastructure; or

     (ii)     the Licensee Data.

(b)     The reasonable measures referred to in clause 9.1(a) include:

     (i)     complying with ISO 27001 and providing reasonable evidence of same to the Licensee;

     (ii)     installing and maintaining adequate security features within the Software and on the Hosting Infrastructure, including as required by the Specifications;

     (iii)     complying with the Licensee's reasonable directions from time to time relating to security;

     (iv)     conducting regular testing of the security measures (include regular penetration testing); and

     (v)     any specific requirements set out in the Specifications.

(c)     Rubik must implement reasonable measures to restrict its Personnel from accessing any Licensee Data which they are not permitted to access under this agreement.  If such access is obtained, Rubik must, immediately upon becoming aware, report the incident to the Licensee, describe in detail any accessed Licensee Data and return to the Licensee any hard copies of such copied or removed Licensee Data that are within Rubik's possession or control.

(d)     Rubik must (including by means of systems security measures) guard against the unauthorised access, alteration or destruction of Licensee Data.  The measures must include the installation of software which:

     (i)     requires all users to enter a user identification and password prior to gaining access to the relevant systems; and

     (ii)     controls and tracks user access.

15

DEF_00046118

(e)     The Licensee has the right, at its own cost, to establish backup security for Licensee Data and to keep back-up Licensee Data in its possession if it chooses.

(f)     Where an asset of Rubik which has been used in the provision of the Services is designated for disposal or for use other than in connection with the provision of the Services, Rubik must ensure that all Licensee Data (and any other information from or relating to the Licensee) held in or on such asset is expunged or purged prior to the disposal or use.

(g)     Except and to the extent otherwise specified in this agreement or to the extent required by law or required to fulfil Rubik's obligations under this agreement, upon the Licensee's request, and in any event on termination of this agreement, Rubik must carry out the following actions (and must procure that its sub-contractors and employees do so also):

   (i)     promptly return to the Licensee all or any specified part of Licensee Data and all physical and written records containing that Licensee Data; and

   (ii)    if requested by the Licensee, destroy or delete all or any specified part of Licensee Data in a manner specified by the Licensee (acting reasonably) and promptly certify to the Licensee that this has been done.

(h)     The Licensee will take reasonable steps within its control to protect the Software from destruction, damage, misuse, unauthorised use or security being compromised.

## 9.2   Harmful Code

(a)     Rubik will implement reasonable measures to ensure that no Virus is allowed in or access to the Software.

(b)     The reasonable measures referred to in clause 9.2(a) include conducting regular Virus scans of the Hosting Infrastructure with an up to date Virus scanner.

(c)     If a Virus is found in or to have had access to the Software, Rubik will immediately notify the Licensee and use reasonable endeavours to eliminate the Virus and ameliorate its effect.

# 10.   Licensee Data

## 10.1  Rubik's obligations

(a)     No Licensee Data may be:

   (i)     assigned, leased, or otherwise disposed of to third parties by Rubik, any Rubik Subcontractor or any employee of Rubik;

   (ii)    commercially exploited by or on behalf of Rubik, any Rubik Subcontractor or any employee of Rubik; or

   (iii)   used by Rubik, any Rubik Subcontractor or any employee of Rubik for any purpose other than for providing the Software and the Services under this agreement.

16

DEF_00046119

(b)   Rubik must make sure that at all times during the Term, all Licensee Data which is in the possession or control of Rubik from time to time is stored in a manner which enables the Licensee Data to be easily:

    (i)   identified as Licensee Data (and not Data of Rubik or any third party); and

    (ii)   removed from Rubik's systems and files and transferred to the Licensee or an alternative service provider.

(c)   Rubik must provide the Licensee with access to the Licensee Data (including the provision of accurate and complete copies of the Licensee Data) as and when and in the form required by the Licensee from time to time.

(d)   Throughout the Term Rubik must back-up the Licensee Data in accordance with the Specifications and the Service Description.

## 10.2   Data Defects

Without limiting clause 10.1(d), if the Licensee informs Rubik in writing, or if Rubik becomes aware, that any Licensee Data (in any form) contains any errors or is corrupted, lost or functionally disabled as a result of the Services or the Software (other than in the course of any member of the Licensee Group using the Software or the Services other than in accordance with this agreement or any guidelines or instructions provided by Rubik) (Data Defect), Rubik must immediately advise the Licensee of whether or not Rubik can remedy the Data Defect and how long it will take to remedy the Data Defect. Without limiting any of the Licensee's rights under this agreement, Rubik agrees:

(a)   to remedy the Data Defect by reloading the affected Licensee Data from the last available backup;

(b)   where the Data Defect cannot be remedied by reloading the last available backup, to use its best efforts to immediately restore (including by manually re-keying) the affected Licensee Data;

(c)   where the remedies at clauses 10.2(a) and 10.2(b) do not recover the affected Licensee Data, Rubik will, at its own cost, engage a data recovery expert or other appropriate third party to recover the affected Licensee Data; and

(d)   where the remedies at clauses 10.2(a), 10.2(b) and 10.2(c) do not recover the affected Licensee Data, or Rubik fails to recover the affected Licensee Data in a reasonable timeframe, to provide the Licensee with a refund or credit equivalent to the amount of the direct labour costs (including the costs of specialist data recovery experts or other third party) incurred by the Licensee in recovering the affected Licensee Data and to co-operate (including providing such access as is reasonably required and on reasonable terms) at its own cost with the Licensee in procuring the recovery of the affected Licensee Data.

## 10.3   Rectification at the Licensee's request

If the Licensee informs Rubik in writing, or if Rubik becomes aware, that any Licensee Data (in any form) contains any errors or is corrupted, lost or functionally disabled other than as a result of the Services or the Software, Rubik will, at the request of the Licensee, use all appropriate procedures and care and employ appropriate resources to rectify the Data loss or error. Rubik will invoice the Licensee in respect of taking such actions in accordance with clause 13.3.

17

CONFIDENTIAL

## 11.    Other Obligations

### 11.1    Rubik to comply

Whilst on the Licensee's premises, using its systems or performing any Services, Rubik must comply, and procure its Personnel comply, with the Licensee's general policies and procedures, including policies in relation to security, occupational safety and health and information technology provided that the Licensee provides Rubik with a copy of such policies within a reasonable period prior to Rubik and its Personnel entering upon any of the Licensee's premises.

### 11.2    Co-operation with third parties

(a)    The Licensee may retain third parties, including auditors or quality assurance consultants, from time to time to provide it with goods and services, including goods and services related to the Software and Services. Rubik must, in accordance with the Licensee' reasonable directions:

(i)    cooperate with any such third parties and provide such third parties access to and use of the Software and Services; and

(ii)    comply with all other reasonable directions of the Licensee with respect to such third parties.

(b)    The Licensee must provide three (3) weeks advance notice (or such other period agreed by the parties in writing) of its intention to engage any third party retained by the Licensee with whom Licensee requires Rubik to cooperate in accordance with clause 11.2(a).

### 11.3    Reference

(a)    If Rubik requests that the Licensee act as a reference site for Rubik:

(i)    the Licensee may give or withhold its consent; and

(ii)    if written consent is given, Rubik will provide details to the Licensee of the specific person to whom the reference is to be provided.

### 11.4    Personnel

(a)    Rubik must ensure that its Key Personnel are available during the Core Hours for performance of Rubik's obligations under this agreement.

(b)    Rubik will use reasonable endeavours to ensure that at all times outside of the Core Hours at least one Key Person is available to deal with any Material Defects that arise outside of the Core Hours and which are notified to Rubik.

(c)    Upon becoming aware that any of its Key Personnel will not be available under clause 11.4(a), Rubik must:

(i)    notify the Licensee; and

(ii)    replace such Key Personnel at no additional charge and at the earliest opportunity, and clause 11.4(a) will apply to such Key Personnel.

18

DEF_00046121

## 12.   Documentation

(a)   Rubik will provide the Licensee with the Documentation and any updated Documentation (including Documentation which is required to be updated in the course of Rubik providing the Maintenance Services).

(b)   The Licensee must not modify or alter the Documentation nor remove, obliterate or alter any proprietary notice on the Documentation.

(c)   The Licensee may copy the Documentation as it requires but may only distribute or disclose the contents of the Documentation as reasonably necessary for the purposes contemplated by this agreement (such consent not to be unreasonably withheld or delayed).

## 13.   Fees and expenses

### 13.1   Fees

The fees payable by the Licensee under this agreement are:

(a)   the fees set out at item 9 of the Agreement Details in respect of the Services; ;

(b)   any fees set out in a Statement of Work; and

(c)   any fees in respect of Time and Material Services,

**(Fees)**.

### 13.2   Payment

(a)   Rubik will provide the Licensee with a Tax Invoice on the fifteenth calendar day of each calendar month (and where that day falls on a day that is not a Business Day, the next Business Day) in respect of the Fees which are due for payment in respect of the next calendar month (**Invoice**).  Each Invoice must:

(i)   correctly and accurately identify the Services to which it relates;

(ii)   specify the number of Accounts as at the date of the Invoice; and

(iii)   include only those amounts correctly calculated in accordance with this agreement and which are due for payment.

(b)   Notwithstanding the mechanism at clause 13.4, the Licensee must pay Rubik the full amount of any Fees under an Invoice within fourteen (14) days of the date of receipt of such Invoice (or such longer period agreed by Rubik in writing).

(c)   Where an Invoice is found to have been incorrectly rendered after payment by the Licensee, the underpayment or overpayment will be recovered by or from Rubik.

### 13.3   Hourly rates

(a)   Where any services provided by Rubik under this agreement are to be charged at an hourly rate (**Time and Material Services**) they will be charged in accordance with the Rate Card and in accordance with this clause 13.3.  Any such Services must be pre-approved in advance by the Licensee or agreed as part of a Statement of Work.

(b)   Rubik:

19

DEF_00046122

(i)      will perform the Time and Material Services in a reasonable number of person hours; and

(ii)      will provide to the Licensee on a weekly basis, or at such other interval as the parties agree, details of the work performed by its Personnel (including their position and the number of hours of work performed) as well as the total Fees accrued to date in respect of the Time and Material Services.

## 13.4    Disputed Invoices

(a)      If the Licensee disputes the amount of any Invoice in good faith (**Disputed Amount**), including because the Licensee reasonably believes that there is an error in the Invoice, the Licensee must notify Rubik within 10 Business Days from date of the invoice and in each case provide sufficient details and information regarding the dispute and its nature to enable Rubik to undertake an investigation to determine whether the dispute is valid (**Disputed Invoice Notice**).

(b)      Within 5 Business Days of receipt of the Disputed Invoice Notice, a senior representative of each party will meet, discuss the Disputed Amount in good faith and attempt to resolve the relevant dispute within 10 Business of receipt of the Disputed Invoice Notice.

(c)      If the parties are unable to resolve the dispute within the period specified in clause 13.4(a), then either party may refer the matter as a Dispute to be dealt with in accordance with clause 24.

(d)      In no event shall the Licensee be entitled to dispute any invoice more than six months after receipt of the invoice.  Rubik may not invoice the Licensee for any Services more than six months after the Services are provided.

## 13.5    GST

(a)      Terms used in this clause 13.5 have the meaning given to them in the GST Act.

(b)      If a party is a member of a GST group, references to GST which the party must pay and to input tax credits to which the party is entitled, include GST which the representative member of the GST group must pay and input tax credits to which the representative member of the group is entitled.

(c)      All amounts stated in and payable under this agreement exclude GST unless otherwise indicated. Where GST is payable by an entity in relation to a supply that it makes under or in connection with this agreement, and the consideration for that supply excludes GST, the party providing the consideration will pay an additional amount equal to the GST when any part of the consideration is first payable.

(d)      The amount of GST will be calculated at the prevailing GST rate. If the GST rate is varied, the consideration payable for any supply under this agreement will be varied to reflect the change of rate and any reduction in any other tax, duty or statutory charge connected with the rate change.

(e)      Where GST applies to any supply made under this agreement, the supplier will deliver to the recipient a valid Tax Invoice or adjustment note at or before the time payment for the supply is required.

20

DEF_00046123

(f)     If this agreement requires a party to reimburse or indemnify the other party for any expense, loss or outgoings (**Reimbursable Expense**) the amount required to be paid by the first party will be the sum of:

    (i)     the amount of the Reimbursable Expense net of input tax credits (if any) to which the other party is entitled in respect of the Reimbursable Expense; and

    (ii)    if the other party's recovery of the Reimbursable Expense from the first party is a taxable supply, any GST payable in respect of that supply.

## 13.6   Interest on overdue amounts

If the Licensee does not pay an amount payable under this agreement when it is due, the Licensee must pay interest on that amount to Rubik on demand, such interest to be calculated from the due date for payment until the amount is paid in full. Interest is calculated on daily balances at the rate of 2% above the Reserve Bank of Australia cash rate target and is capitalised on the last day of each month if unpaid.

## 13.7   No additional charge

If this agreement requires Rubik to provide a benefit or do an act, and no additional charge is stated, then this is to be performed as part of the Fees set out in this agreement.

## 13.8   Amounts due to be payable on demand

Each amount payable by either party under an indemnity, warranty, reimbursement, rebate or refund obligation, or default event under this agreement (other than Service Credits) is a debt due and payable to the other party on demand. Each party must pay or credit the amount to the other party, at that party's option, within the period set out in this agreement and where no time is specified for payment, within fourteen (14) days of receipt of a demand.

# 14.   Confidentiality and Privacy

## 14.1   Confidentiality

(a)     Each party (**receiving party**) must keep confidential, and not disclose, any Confidential Information of the other party (**disclosing party**) except:

    (i)     as permitted under this agreement;

    (ii)    where the receiving party has obtained the prior written permission of the disclosing party;

    (iii)   to the receiving party's officers, agents, professional advisers, employees, contractors, subcontractors and insurers;

    (iv)    to the receiving party's Related Bodies Corporate;

    (v)     to the receiving party's auditors; or

    (vi)    where the receiving party is compelled to do so by Law, provided that it gives the disclosing party written notice prior to disclosure.

(b)     Each party must only use Confidential Information of the other party for the purpose for which it was disclosed in connection with this agreement.

21

(c)     A receiving party disclosing information as permitted by clause 14.1 must use all reasonable endeavours to ensure that persons receiving Confidential Information from it do not disclose the information except in the circumstances permitted in clause 14.1.

(d)     Subject to clause 14.1(e), on the disclosing party's request, the receiving party must, immediately deliver to the disclosing party all documents or other materials containing or referring to the disclosing party's Confidential Information which are:

  (i)     in the receiving party's possession, power or control; or

  (ii)    in the possession, power or control of persons who have received Confidential Information from the Recipient under clause 14.1.

(e)     The obligation in clause 14.1(d) does not apply to Confidential Information of the disclosing party that the receiving party requires in order to perform its obligations under this agreement or is otherwise entitled to retain.

## 14.2     Confidentiality agreement

(a)     Rubik must ensure that each of its Personnel that are involved in the Software or the provision of the Services are bound by an obligation to keep confidential any Confidential Information of the Licensee that is disclosed to them (whether as a term of their employment with Rubik or otherwise) and where such obligation does not already exist, Rubik must procure that such Personnel deliver to Rubik a duly executed confidentiality agreement in such reasonable form as may be requested by the Licensee.

(b)     If a member of Rubik's Personnel does not deliver the relevant document referred to in this clause 14.2 to the Licensee, then Rubik must:

  (i)     not use such Personnel for providing the Services; and

  (ii)    subject to this clause 14.2, procure a suitable replacement for such Personnel as soon as practicable.

## 14.3     Privacy

(a)     If, as a result of this agreement, Rubik is able to access any information about identifiable individuals (**Personal Information**) held by or on behalf of the Licensee, then Rubik:

  (i)     must comply with the Privacy Act 1988 (Cth) and all other applicable privacy laws and such other data protection laws as may be in force from time to time which regulate the collection, storage, use and disclosure of Personal Information;

  (ii)    subject to clause 14.4, must comply with the Licensee's privacy policy as at the Commencement Date and any Amended Licensee Privacy Policy;

  (iii)   must use the Personal Information only for the purposes of performing its obligations under this agreement;

  (iv)    must restrict access to any Personal Information to its Personnel who need to access the Personal Information to fulfil Rubik's obligations under this agreement;

22

(v)     must promptly notify the Licensee in writing of any request made by such an individual for access to the information; and

(vi)    must co-operate with the Licensee in the resolution of any complaint under, or relating to, any of the laws, codes or policies referred to in clause 14.3(a)(i) or14.3(a)(ii).

(b)     The Licensee will bear any reasonable cost associated with Rubik cooperating with the Licensee in the resolution of any complaint to the extent that such complaint is not due to the fault of Rubik.

## 14.4    Changes to the Licensee's Privacy Policy

(a)     If the Licensee changes its privacy policy then it must notify Rubik.

(b)     Within 10 Business Days of receipt of a notice under clause 14.4(a), Rubik must respond to such notice in writing setting out:

(i)     any additional costs which Rubik will reasonably incur in complying with the amended privacy policy, such costs to be borne by the Licensee; and

(ii)    sufficient details and information regarding the basis of such additional costs.

(c)     If the Licensee agrees to bear the additional costs set out in clause 14.4(b), then the amended privacy policy notified to Rubik will become an Amended Licensee Privacy Policy for the purpose of this Agreement.

## 14.5    Publicity

Rubik must not make any public statement or issue any press release concerning or relating to this agreement or its relationship with the Licensee unless it has first obtained the written consent of the Licensee, except as required to comply with its any Listing Rule of the Australian Securities Exchange.

## 15.    Escrow of Source Code

(a)     Rubik will, where specified in the Service Description or otherwise requested by the Licensee, procure that the Source Code for the Rubik Software is placed in escrow under an escrow agreement (**Escrow Agreement**) which:

(i)     entitles the Licensee to access the Source Code for the Rubik Software from escrow if:

A.      Rubik becomes subject to an Insolvency Event such that an Administrator is appointed; or

B.      Rubik ceases to support and maintain the Rubik Software as required under this agreement;

(ii)    grants the Licensee a non-exclusive and royalty-free licence to exercise the Intellectual Property Rights comprised in the Source Code for the Rubik Owned Software (including the right to modify the Source Code for the Rubik Owned Software) which are necessary for the Licensee to use and maintain the relevant Rubik Software;

23

> (iii)   provides that:
>
>> A.   Rubik must ensure that at all times the Source Code for the Rubik Software which is placed in escrow is kept fully up-to-date and accurately reflects the Rubik Software in use by the Licensee; and
>>
>> B.   the Licensee must pay all amounts charged by the relevant escrow agent under or in relation to the Escrow Agreement.

(b)   The Licensee will bear all costs associated with the preparation and execution of the Escrow Agreement, including all of Rubik's legal costs, other than the costs set out in clause 15(c).

(c)   The Licensee will bear all costs associated with preparing the Source Code for the Rubik Owned Software for lodgement in accordance with the terms of the Escrow Agreement.

# 16.   Intellectual Property

## 16.1   Intellectual Property Rights in the Software

Except as otherwise set out in this agreement, all Intellectual Property Rights in the Software remain vested in Rubik or its licensors.

## 16.2   Licence to use the Software

(a)   Subject to clause 16.3, Rubik grants the Licensee and each member of the Licensee Group an Australian country and non-exclusive licence or sub-licence to use the Software through the Hosting Infrastructure, as reasonably necessary for the Licensee and each member of the Licensee Group to use the Managed Services, for the Term.

(b)   Customers of a member of the Licensee Group may use the Managed Services for accessing their accounts using on-line banking services. For the purposes of this agreement such use by a customer will be considered to be use by the Licensee.

## 16.3   Restrictions on use of the Software

(a)   The Licensee and each member of the Licensee Group must not:

> (i)   use, or attempt to use, the Software at any location other than the Locations; Global use based in Australia
>
> (ii)   use or modify the Software or the Documentation, except as expressly permitted in this agreement;
>
> (iii)   sell, lease, transfer, assign, license, sub-license or otherwise part with possession of the Software, except as expressly permitted in this agreement;
>
> (iv)   attempt to disassemble, decompile or otherwise reverse engineer any of the Software; or
>
> (v)   remove, obliterate or alter any proprietary notice on any of the Software,
>
> except as permitted under this agreement or by the Copyright Act 1968 (Cth).

24

(b)     The Licensee must comply with any restrictions on use of the Software or additional licence terms specified in the Service Description.

## 16.4    The Licensee Data

(a)     Licensee Data is and remains, as between the parties, the property of the Licensee, and nothing in this agreement grants to Rubik, any Rubik Subcontractor or any employee of Rubik any right, title or interest in Licensee Data other than the rights set out in clause 16.4(b).

(b)     The Licensee grants Rubik a non-exclusive licence to use the Licensee Data (and where Licensee Data is owned by a third party, the Licensee will procure the right for Rubik to use such Licensee Data), only for the purposes of carrying out its obligations under this agreement, for the Term.

## 16.5    Use of Software

Rubik acknowledges that the Licensee may increase or decrease the number of Accounts used to access the Software and the Managed Services. If any increase causes performance issues then Rubik shall ensure system performance can be aligned to meet or exceed any applicable Service Level and will negotiate with the Licensee any increase in costs associated with meeting those Service Levels.

# 17.    Warranties

## 17.1    Rubik's Warranties

Rubik warrants to the Licensee that:

(a)     the supply of the Software and the Services, the use of such Software and Services and the licence rights granted under this agreement, do not and will not infringe any rights of a third person (including any Intellectual Property Rights);

(b)     the Software and the Services will be substantially free of defects and errors and will operate substantially in accordance with the Specifications and all other applicable requirements under this agreement;

(c)     as at the Commencement Date, it has not intentionally mislead or deceived the Licensee with respect to:

(i)      the ability of the Software and the Services to meet the Licensee's requirements which are specified in detail or known to Rubik as at the Commencement Date;

(ii)     the accuracy or completeness of any information which it has, or which any of its Personnel have provided to the Licensee in connection with this agreement prior to the Commencement Date (including any response to an RFP); and

(iii)    the existence or nature of any matters relating to the commercial, technical or financial capacity of Rubik that may materially affect Rubik's ability to perform any of its obligations under this agreement;

(d)     as at the date of execution of each Statement of Work, it has not intentionally mislead or deceived the Licensee with respect to:

25

DEF_00046128

(i)      the ability of any software or services to be provided under the Statement of Work to meet the Licensee's requirements with respect to that particular Statement of Work which are specified in detail or are known to Rubik as at the date of execution of the Statement of Work;

(ii)      the accuracy or completeness of any information which it has, or which any of its Personnel have provided to the Licensee in connection with this agreement prior to the execution of the Statement of Work; and

(iii)      the existence or nature of any matters relating to the commercial, technical or financial capacity of Rubik that may materially affect Rubik's ability to perform any of its obligations under the Statement of Work;

(e)      it will maintain the capacity and continue to provide the Services to meet the Service Levels to the extent that a reasonably prudent person supplying software and services the same as, or similar to, the Services would maintain;

(f)      the Documentation is current, complete and accurate and sufficient to enable a suitably trained representative of the Licensee or its suppliers to make full and proper use of the Software and Services;

(g)      it is able to lawfully grant the licences in this agreement;

(h)      the Services will be performed with due care and skill and in a professional, efficient and safe manner;

(i)      it will ensure that all its Personnel performing the Services are appropriately qualified and skilled to do so; and

(j)      no Licensee Data will be hosted at a location outside Australia/NZ.

## 17.2    Exclusion of warranties

To the extent permitted by Law, Rubik excludes all express or implied representations, conditions, warranties and guarantees arising from or in connection with this agreement, whether based in statute, regulation, common law or otherwise (other than the warranties given in clause 17.1) and in particular, Rubik does not warrant that:

(a)      the Services and the Software will be free from all errors or that all errors can or will be corrected;

(b)      use of the Services and the Software will be uninterrupted or will not result in loss of Data;

(c)      the Services and the Software will meet the Licensee's particular requirements, whether known to Rubik or not;

(d)      the Services and the Software will function correctly on the Licensee's particular computer equipment; and

(e)      the Services and the Software will provide any function not specified in the Service Description, Specifications or the Documentation.

## 17.3    General

Each party warrants to the other party that:

26

(a)     it has the full right, power and authority to enter into and perform its obligations under this agreement; and

(b)     it will use its best endeavours to engage and retain appropriately qualified and skilled Personnel and utilise such other facilities, systems, technical knowledge, expertise and all other resources which are reasonably necessary to meet each milestone and deadline set out in the Project Timetable.

## 17.4    Additional obligations in respect of IP warranty

In the case of a breach of the warranty in clause 17.1(a) Rubik must, at its option:

(a)     modify the Software or the Services to be non-infringing; or

(b)     procure a licence for the Licensee to continue to use the Software and the Services.

## 17.5    Change to Laws

If any Laws with which the Software and the Services are required to comply change after the date of this Agreement; the change will be agreed as a Change in accordance with clause 28.

## 18.    No reliance by Licensee

The Licensee acknowledges that it has not relied on any term, condition, representation, warranty, matter, statement or conduct in entering into this agreement that is not expressly stated in this agreement, the Service Description, any Statement of Work or any documents specifically referred to in a Statement of Work. In particular, the Licensee has not relied on any descriptions, illustrations or specifications contained in any document (including any catalogues or publicity material produced by Rubik).

## 19.    Limitation of Liability

### 19.1    Limitation on IP warranty

The full extent of Rubik's liability to the Licensee for a breach of the warranty in clause 17.1(a) is limited, at the option of Rubik, to Rubik:

(a)     modifying the Software or the Services to be non-infringing; or

(b)     procuring a licence for the Licensee to continue to use the Software and the Services.

### 19.2    Limitation of statutory guarantees

(a)     To the extent permitted by Law the liability of Rubik to the Licensee for any non-compliance with a statutory guarantee or any related loss or damage is limited to:

(i)     in the case of services, at the option of Rubik:

A.      the resupply of the services; or

B.      the payment of the cost of resupply; and

(ii)    in the case of goods, at the option of Rubik:

A.      the replacement of the goods or the supply of equivalent goods;

27

DEF_00046130

B.      the repair of the goods;

C.      the payment of the cost of replacing the goods or of acquiring equivalent goods; or

D.      the payment of the cost of having the goods repaired.

### 19.3      Consequential Damages

To the extent permitted by Law, neither Rubik nor the Licensee nor any of their Personnel are liable for Consequential Damages even if the other party or its Personnel are aware of the possibility of those Consequential Damages.

### 19.4      Annual cap on liability for Losses

(a)      To the extent permitted by Law, Rubik's aggregate liability to the Licensee in any Year in respect of any and all Losses suffered or incurred by the Licensee arising from or in connection with this agreement (whether that liability arises in contract, tort (including negligence), at common law, in equity, under statute, under an indemnity or otherwise) is limited for all claims to the least of:

(i)      the Fees paid by the Licensee in that Year; and

(ii)      the aggregate amount that Rubik receives from its insurer(s) in respect of such claims.

(b)      Where the aggregate amount of all Losses suffered or incurred and claimed by the Licensee arising from or in connection with this agreement in any Year exceeds the limit set out in clause 19.4(a)(i), then Rubik must take reasonable steps to maximise the amount that Rubik is entitled to recover under the relevant policies of insurance.

## 20.      Indemnities

### 20.1      The Licensee indemnifies Rubik

The Licensee must pay to Rubik on demand the amount of any Loss suffered or incurred by Rubik arising from or in connection with:

(a)      any breach by the Licensee (or any member of the Licensee Group) of this agreement;

(b)      any death or injury to any Personnel of Rubik caused by the Licensee; or

(c)      any loss or damage to the real or personal property of Rubik,

except to the extent that such Loss is caused by Rubik or its Personnel.

### 20.2      Rubik indemnifies the Licensee

Rubik must pay to the Licensee on demand the amount of any Loss suffered or incurred by the Licensee (or any member of the Licensee Group) arising from or in connection with:

(a)      any breach by Rubik of this agreement;

(b)      any death or injury to any Personnel of the Licensee (or any member of the Licensee Group) caused by Rubik; or

28

(c)    any loss or damage to the real or personal property of a party (or a member of the Licensee Group),

except to the extent that such Loss is caused by the Licensee, any member of the Licensee Group or any of their Personnel.

## 21.  Insurance

Rubik will effect and maintain with a reputable authorised insurer(s) during the Term, the insurance set out at item 10 of the Agreement Details.  The Licensee must contribute to the cost of Rubik's insurances as provided for in item 11 of the Agreement Details.

## 22.  Termination

### 22.1   Termination by the Licensee

The Licensee may terminate this agreement immediately by notice in writing to Rubik if:

(a)    Rubik breaches a material term of this agreement and, where the breach is capable of being remedied, has failed to remedy the breach within Sixty (60) days after notice by the Licensee;

(b)    Rubik becomes subject to an Insolvency Event such that an Administrator is appointed; or

(c)    Rubik breaches a Severity Level 1 Service Level:

(i)    five times in any 6 month period; or

(ii)    in any 4 consecutive months.

Notification of Termination must be provided to Rubik within 30 days of the final such Service Level failure.

### 22.2   Termination without cause

Either party may terminate this agreement without cause by giving the other party no less than thirty six (36) months notice provided that the effective date of such termination is after the end of the Initial Term. The Initial Term is for a five (5) year period from the date of this agreement.

### 22.3   Termination by Rubik

Rubik may terminate this agreement immediately by notice in writing to the Licensee:

(a)    where:

(i)    the Licensee has not paid a correctly rendered Invoice within one month of its due date and has not by that time notified Rubik that it disputes that invoice; and

(ii)    Rubik has issued a notice to the Licensee requiring payment within a further one month period and the Licensee fails to pay the Invoice within such further period;

(b)    the Licensee becomes subject to an Insolvency Event or an Administrator is appointed;

29

CONFIDENTIAL

(c)     in the opinion of Rubik, acting reasonably, the change in circumstance of the Licensee or any member of the Licensee Group may expose Rubik to disproportionate level of risk relative to the Services it is providing to the Licensee including without limitation uninsurable risk.

## 22.4     Termination for Force Majeure Event

During the term of any Force Majeure Event, either party may terminate this agreement immediately on written notice if the Force Majeure Event causes Rubik to be materially unable to provide the Services and has subsisted for a period of one (1) year or more.

## 22.5     Effect of expiry or termination

Termination or expiry of this agreement will not affect the operation of the provisions of this agreement which by their nature survive termination or expiry of this agreement (including clauses 1, 14, 17, 18, 20, 23, 24 and 26, and this clause 22.5) or any rights or remedies already accrued to either party under, or in respect of any breach of, this agreement.

Rubik has no rights to terminate other than as set out in Clause 22.2, 22.3 and 22.4

# 23.     Audit

## 23.1     Records

Rubik will keep records and reports specifically related to the Services (excluding information in respect of Rubik's costs and margins) in sufficient detail to enable the Licensee to examine Rubik's compliance with its obligations under this agreement.

## 23.2     General

Each party will, upon seven (7) days' notice during normal business hours or as otherwise agreed, permit and provide persons nominated by the other party supervised access to its premises, books, records, documents, computer systems, equipment and other property to verify compliance with this agreement.  Any such audit may not be requested more than once in any 12 month period.

## 23.3     Rubik to comply with APRA requests

(a)     Where Rubik receives a request from APRA in connection with this agreement for information, access to documents or records, to conduct an on-site visit or other request which an applicable APRA prudential standard relating to outsourcing or business continuity contemplates occurring by direct contact between APRA and Rubik (**APRA Request**), Rubik will:

(i)     immediately notify the Licensee with details of the APRA Request; and

(ii)     comply with the APRA Request or procure compliance with the APRA Request by its Personnel unless otherwise directed by the Licensee.

(b)     Rubik will comply with directions by the Licensee necessary or desirable to assist the Licensee in its dealings with APRA.

(c)     Rubik must not disclose or advertise that APRA has conducted an audit of Rubik, except as necessary to coordinate with other institutions also regulated by APRA which are existing customers of Rubik.

30

(d)     APRA compliance requirements will be assessed on a case by case basis and the allocation of the costs of compliance are to be agreed between the parties.

## 23.4    Assurance

(a)     Rubik will make available to the Licensee through the Rubik intranet (www.rubik.com.au/information) the following:

    (i)     regular (at least quarterly) reports on the performance of the Services;

    (ii)     copies of any third party certifications (such as ISO); and

    (iii)     results of business continuity and disaster recovery tests (per clause 5 above).

(b)     The Licensee will have access to issues logged by the Licensee in Rubik's support system located at www.rubik.com.au/support. Access includes the ability to query Licensee ticket history.

(c)     Rubik will undertake business continuity and data recovery tests annually as outlined in the Business Continuity Plan.

## 24.    Dispute resolution

## 24.1    Dispute Procedure

If a Dispute under this agreement arises:

(a)     the party claiming that a Dispute has arisen must give notice to the other party indicating the nature of the Dispute (**Notice of Dispute**);

(b)     within 5 Business Days of receipt of the Notice of Dispute, a senior representative of each party must meet and attempt to resolve the Dispute within 10 Business Days of receipt of the Notice of Dispute;

(c)     if the parties fail to resolve the Dispute within 10 Business Days of the receipt of the Notice of Dispute, the Managing Director or Chief Executive Officer of each party (or his or her nominee) must meet and attempt to resolve the Dispute within 15 Business Days of receipt of the Notice of Dispute; and

(d)     if the parties fail to resolve the Dispute within 15 Business Days of receipt of the Notice of Dispute, the parties may take whatever action they consider necessary to resolve the Dispute.

## 24.2    Urgent relief

Nothing in this clause 24 prevents a party issuing proceedings where the only relief sought is urgent injunctive or urgent declaratory relief.

## 24.3    Continued performance

(a)     The parties must continue to perform their obligations under this agreement while any dispute is being resolved, except that where the dispute relates to an invoice, the Licensee may withhold payment of any disputed amount until the dispute is resolved.

31

## 25.   Force Majeure

### 25.1   No liability for breach during Force Majeure Event

Subject to clause 25.2, a party will not be liable for any delay in or for any failure to perform its obligations under this agreement to the extent that the party is able to demonstrate that such delay or failure has been caused by a Force Majeure Event.

### 25.2   Obligations on party claiming force majeure

A party prevented from performing any of its obligations under this agreement by a Force Majeure Event must:

(a)   notify the other party's representative as soon as practicable, describing in a reasonable level of detail the nature of the Force Majeure Event and its likely effect on that non-performing party's obligations under this agreement;

(b)   continue to perform all unaffected obligations in accordance with this agreement;

(c)   use reasonable endeavours to continue to perform the affected obligations;

(d)   use reasonable endeavours to overcome the effects of the Force Majeure Event as soon as possible; and

(e)   notify the other party as soon as it is no longer affected by the Force Majeure Event.

## 26.   Transition Out Services

### 26.1   Services provided by Rubik

Where the Licensee terminates this agreement under clause 22.1 Rubik will:

(a)   provide the Licensee or a Successor Supplier with cooperation, assistance, advice, explanations and information reasonably requested by the Licensee;

(b)   do acts and things and execute deeds, documents and instruments as are necessary or desirable;

(c)   comply with the Licensee's reasonable requests; and

(d)   do all such other things as Licensee may reasonably require to facilitate a transition to a Successor Supplier,

to ensure the completion and continuity of the Services required to be provided under this agreement (**Transition Out Services**) which will be charged in accordance with clause 13.3.

### 26.2   Transition Out on Licensee default

Where Rubik terminates this agreement under clauses 22.2 or 22.3 or otherwise for the Licensee's default, Rubik, if requested by the Licensee, will provide the Transition Out Services to the Licensee (in whole or part) provided that Rubik will have no obligation to provide any Transition Out Services unless and until the Licensee pays to Rubik the cost of the Transition Out Services (as estimated by Rubik acting reasonably) monthly in advance. Such services will be charged in accordance with clause 13.3.

32

DEF_00046135

### 26.3    Examples of Transition Out Services

Without limiting the generality of clause 26.1, the Transition Out Services will, if required by the Licensee, include:

(a)     developing or modifying, together with the Licensee, a plan for the continuity and orderly transition of responsibility for the Services, where appropriate to the Licensee or another person;

(b)     providing cooperation, assistance, advice, access to equipment and systems, explanations, information, documentation (not confidential IPR), training, details of data formats and fields, reasonably necessary or desirable in order to ensure the efficient continuity and transition; and

(c)     transferring Data, documentation and records to the Licensee or its nominee..

## 27.    Benefit

(a)     Rubik agrees that any member of the Licensee Group may make use of the Software or Services under, and in accordance with, this agreement.

(b)     Rubik acknowledges and agrees that a breach of this agreement, or negligence by Rubik in relation to performance, or failure to perform, this agreement may result in loss being suffered by a member of the Licensee Group.

(c)     In addition to entering into this agreement in its own right, the Licensee also enters into this agreement as agent for each member of the Licensee Group for the sole purpose of each member of the Licensee Group obtaining (and being able to enforce through the Licensee) any rights granted to the member.

(d)     The Licensee agrees that any claim a member of the Licensee Group may have against Rubik in connection with this agreement is brought by the Licensee itself as agent under clause 27(c).  In any claim brought against Rubik by the Licensee in its capacity of agent for a member of the Licensee Group, Rubik will have the benefit of the limitations and exclusions of liability set out in clause 18, and any claim, defence, counter-claim or right of set-off which at law, in equity or under statute would be available to Rubik, if the relevant member of the Licensee Group were the Licensee.

(e)     The Licensee must ensure that each member of the Licensee Group using the Software or Services will comply with the Licensee's obligations under this agreement in respect of that use.  The Licensee acknowledges that any breach of the Licensee's obligations under this agreement by a member of the Licensee Group in connection with that member's use of the Software or Services will be taken to be a breach by the Licensee of this agreement.

## 28.    Change Control

### 28.1    Out of scope work

Rubik is not required to carry out, and the Licensee is not required to pay any amount in respect of, equipment, services or software outside the scope of this agreement or a Statement of Work unless and until a Change Notice has been executed by the parties.

33

## 28.2     Either party may request a Change

Either party may request a change to:

(a)        the scope or description of any of the Software or Services;

(b)        any of the Specifications; or

(c)        any of the Service Levels,

(each a **Change**) by issuing a notice in writing to the other party.

## 28.3     Rubik must notify the Licensee of a required Change

If Rubik becomes aware of any circumstances which indicate that a Change is required in order for the Licensee to achieve its objectives as identified in this agreement, then Rubik must promptly notify the Licensee in writing of those circumstances, in which case the Licensee may issue a request for a Change.

## 28.4     Licensee must notify Rubik of change in circumstances

(a)        The Licensee agrees to promptly notify Rubik of any changes in circumstances including that of its Related Body Corporate in relation to:

(i)        the use of the Services by the Licensee or its Related Body Corporate; or

(ii)       the change of the Licensee and its Related Body Corporate's risk profile since the Commencement Date of this agreement.

(iii)      Any adverse audit findings to "going concern"

(iv)      Any breach of its corporate loans, notes, or covenants

(b)        Rubik is to assess the notification provided by the Licensee under this clause 28.4(a) against the impact on the Services and acting reasonably and at its discretion, may either request a Change under clause 28.2 or terminate the Services under clause 22.3.

## 28.5     Change Proposal

(a)        If a Change is requested by the Licensee (whether or not as a consequence of a notice from Rubik under clause 28.3 above), then Rubik must provide to the Licensee within 14 days of receiving the notice of request, or such other period as the parties may agree, a change proposal (each a **Change Proposal**).

(b)        Each Change Proposal must:

(i)        set out a full description of the Change; and

(ii)       specify all changes to the Fees and any other changes to conditions which Rubik reasonably requires in order to perform the Change and must detail reasons for those changes.

## 28.6     Acceptance or rejection of Change Proposal

Neither party is obliged, acting reasonably, to accept a Change Proposal.  Where the parties agree on a Change Proposal, the parties will execute a change notice (**Change Notice**) on

34

DEF_00046137

those terms and this agreement will be varied accordingly, with effect from the date of execution of the Change Notice.

## 29. General

### 29.1 Governing law

This agreement is governed by and must be construed according to the law applying in New South Wales, Australia.

### 29.2 Jurisdiction

Each party irrevocably:

(a)     submits to the non-exclusive jurisdiction of the courts of New South Wales, and the courts competent to determine appeals from those courts, with respect to any proceedings that may be brought at any time relating to this agreement; and

(b)     waives any objection it may now or in the future have to the venue of any proceedings, and any claim it may now or in the future have that any proceedings have been brought in an inconvenient forum, if that venue falls within clause 29.2(a).

### 29.3 Notices

Each communication (including each notice, consent, approval, request and demand) under or in connection with this agreement:

(a)     must be in writing;

(b)     must be addressed as follows (or as otherwise notified by that party to each other party from time to time):

**Rubik**

| | |
|---|---|
| Name: | Core In A Box Pty Ltd |
| Address: | Level 21, 321 Kent Street Sydney, NSW, 2001 |
| Fax: | |
| For the attention of: | Managing Director, Banking |

**Licensee**

The address specified at item 4 of the Agreement Details

(c)     must be signed by the party making it or (on that party's behalf) by the solicitor for, or any attorney, director, secretary or authorised agent of, that party;

(d)     must be delivered by hand or posted by prepaid post to the address, or sent by fax to the number, of the addressee, in accordance with clause 29.3(b); and

(e)     is taken to be received by the addressee:

(i)     (in the case of prepaid post sent to an address in the same country) on the third day after the date of posting;

(ii)     (in the case of prepaid post sent to an address in another country) on the fifth day after the date of posting by airmail;

35

DEF_00046138

(iii) (in the case of fax) at the time in the place to which it is sent equivalent to the time shown on the transmission confirmation report produced by the fax machine from which it was sent; and

(iv) (in the case of delivery by hand) on delivery,

but if the communication is taken to be received on a day that is not a working day or after 5.00 pm, it is taken to be received at 9.00 am on the next working day ("working day" meaning a day that is not a Saturday, Sunday or public holiday and on which banks are open for business generally, in the place to which the communication is posted, sent or delivered).

## 29.4 Amendments

This agreement may only be varied by a document signed by or on behalf of each party.

## 29.5 Subcontracting

Rubik may use subcontractors to perform certain functions. Rubik reserves the right to use appropriately qualified subcontractors, and will ensure that they are informed of the commitments made under this agreement.

## 29.6 Waiver

(a) Failure to exercise or enforce, or a delay in exercising or enforcing, or the partial exercise or enforcement of, a right, power or remedy provided by Law or under this agreement by a party does not preclude, or operate as a waiver of, the exercise or enforcement, or further exercise or enforcement, of that or any other right, power or remedy provided by Law or under this agreement.

(b) A waiver or consent given by a party under this agreement is only effective and binding on that party if it is given or confirmed in writing by that party.

(c) No waiver of a breach of a term of this agreement operates as a waiver of another breach of that term or of a breach of any other term of this agreement.

## 29.7 Further acts and documents

Each party must promptly do all further acts and execute and deliver all further documents (in form and content reasonably satisfactory to that party) required by Law or reasonably requested by another party to give effect to this agreement.

## 29.8 Consents

A consent required under this agreement from a party may be given or withheld, or may be given subject to any conditions, as that party (in its absolute discretion) thinks fit, unless this agreement expressly provides otherwise.

## 29.9 Assignment

(a) Subject to clause 29.9(b), the Licensee cannot assign, novate or otherwise transfer any of its rights or obligations under this agreement without the prior consent of the other party which will not be unreasonably withheld.

(b) The Licensee may novate this agreement to a member of the Licensee Group provided that:

36

DEF_00046139

(i)      the assignee has the ability to perform all of the Licensee's obligations under this agreement to the reasonable satisfaction of Rubik; and

(ii)     The Licensee provides prior written notice to Rubik.

(c)     In the event that the Licensee's corporate structure changes including the merger with or acquisition by another company that is not a Related Body Corporate of the Licensee (including without limitation a reverse takeover), the Licensee cannot assign, novate or otherwise transfer any of its rights or obligations under this agreement without the prior consent of Rubik and it will be at the sole discretion of Rubik whether such consent will be granted to the Licensee.

## 29.10   Counterparts

This agreement may be executed in any number of counterparts and by the parties on separate counterparts. Each counterpart constitutes an original of this agreement, and all together constitute one agreement.

## 29.11   Entire agreement

To the extent permitted by Law, in relation to its subject matter, this agreement:

(a)     embodies the entire understanding of the parties, and constitutes the entire terms agreed by the parties; and

(b)     supersedes any prior written or other agreement of the parties.

## 29.12   Remedies Cumulative

The rights and remedies provided in this agreement are in addition to other rights and remedies given by law independently of this agreement.

## 29.13   Indemnities

The indemnities in this agreement are continuing obligations, independent from the other obligations of the parties under this agreement and continue after this agreement ends.  It is not necessary for a party to incur an expense or make payment before enforcing a right of indemnity under this agreement.

## 29.14   Construction

No rule of construction applies to the disadvantage of a party because that party was responsible for the preparation of, or seeks to rely on, this agreement or any part of it.

## 29.15   Costs

The parties agree to pay their own legal and other costs and expenses in connection with the preparation, execution and completion of this agreement and other related documentation (other than any costs associated with preparing a Statement of Work which will be determined in accordance with clause 6.1).

## 29.16   Severability

If any provision in this agreement is invalid, void or unenforceable, all other provisions which are capable of separate enforcement without regard to an invalid, void or unenforceable provision are and will continue to be of full force and effect in accordance with their terms.

37

**Signed** as an agreement.

**Executed** by **Core In A Box Pty Ltd** in
accordance with section 127 of the Corporations
Act 2001 (Cth):

_____          _____
Signature of director                       Signature of company secretary/director


_____          _____
Full name of director                       Full name of company secretary/director


**Executed** by **the party specified at item 2
of the Agreement Details** in accordance with
section 127 of the Corporations Act 2001 (Cth):

_____          _____
Signature of director                       Signature of company secretary/director


_____          _____
Full name of director                       Full name of company secretary/director

38

DEF_00046141

## Schedule 1 - Agreement Details

| 1. | Commencement Date | 1st December 2013 |
|----|-------------------|-------------------|
| 2. | Licensee | Hotwire Preemptive Intelligence Pty Ltd |
| 3. | Term | Initial term: Five (5) years |
| 4. | Notice Details | For the attention of: |
| 5. | Licensee Contact | Name: Craig S Wright<br>Title / Position: Chief Executive Officer<br>Phone: +61 417 683 914<br>Email: craig.wright@hotwirepe.com |
| 6. | Rubik Software | The SaaS offering in this agreement is Rubik's Bank in a Box with the functions and configuration described in the Statement of Work (To be defined). |
| 7. | Third Party Software | N/A |
| 8. | Location(s) | The Licensee will be able to use the Software from Level 21, 321 Kent Street, Sydney, NSW, 2001 and web based components will be accessible world-wide where an authorised user has adequate internet connectivity and a compliant browser (including for the purposes of accessing internet banking services). |
| 9. | Fees | See Schedule 2 Service Description. Please note that all transactional services rates will be subject to an increase of CPI +1% indexation on each anniversary of the Commencement Date. |
| 10. | Rubik Insurance | Rubik must (at its own cost) effect and maintain the following insurance policies and provide the Licensee on request with a copy of the certificate of currency and the terms and conditions of the insurance policy:<br><br>(a)    professional indemnity or errors and omissions insurance:<br><br>    (i)    covering the Rubik's legal liability however arising in connection with the provision of services (including professional services and breach of professional duty) under this agreement; and<br><br>    (ii)    with a limit of indemnity of not less than $5,000,000 for each claim and $5,000,000 in the aggregate in any one policy period; and<br><br>(b)    public liability with a limit of indemnity of not less than $5,000,000 for each claim and $5,000,000 in the aggregate in any one policy period; and<br><br>(c)    workers' compensation insurance in accordance with all relevant laws.<br><br>(d)    Claims under (a) or (b) shall be a minimum of $20,000, any claims below that will not be considered. |

39

| 11. | **Insurance Costs** | Any further insurance indemnity will be chargeable to the Licensee |
|-----|---------------------|--------------------------------------------------------------------|

40

DEF_00046143

## Schedule 2 - Service Description

Hotwire Preemptive Intelligence Pty Ltd  (Hotwire) is a company that will establish an online banking business based around the Bitcoin crypto-currency, where the creation and transfer of Bitcoins is based on an open-source cryptographic protocol (to be managed and controlled by Hotwire) that is independent of any central authority. Whilst Bitcoins can be transferred through a computer or Smartphone without an intermediate financial institution, Hotwire will establish an intermediate company called "Denariuz Coin-Exch" (Denariuz) using the Rubik Bank in a Box service.

Rubik's Bank-in-a-Box (BiaB) Service will be configured to cater for Denariuz's products and functionality, where this is appropriate and practical. Rubik and Denariuz will work together in good faith to establish a proof of concept in Australia. Rubik envisage that Denariuz will change as many of its business processes as possible to conform to the BiaB capability.

**Table 1: Bank in a Box Software modules used in providing the Service**

| | |
|---|---|
| Internet banking for personal and business | |
| IVR Phone Banking | |
| AA Deposits | |
| AA Retail Loans | |
| Product Bundling | |
| AA Simulation | |
| Integration Framework | |
| Multi Company | |
| Teller | |
| Funds Transfer | |
| Document Management | |
| Collateral | |
| Image | |
| Connection to SQL Server | |
| Accounts | |
| Data Capture | |

41

DEF_00046144

| | |
|---|---|
| Delivery | |
| Systems Core | |
| Interest and Charges | |
| Limits | |
| Open Financial Services | |
| Position Management | |
| Post Closing | |
| Process Workflow | |
| Development Tool Kit | |
| Factor 2 Authentication | |
| Tax engine | |
| Direct Debits | |
| Security Management System | |
| Temenos Enterprise Consol | |
| Reporting | |
| System Tables | |
| T24 Application Framework | |
| IB Manager | |
| RTI | |
| CRM (Operational and Analytical) | |
| Card Management System (CMS) | |
| Mobile Banking | |
| SMS Banking | |
| General Ledger (T24) | |
| Monthly per account services fee | AUD $0.25 |

42

| Monthly service fee (up to 1,000,000 accounts) | AUD $250,000 |
|---|---|
| TOTAL ANNUAL FEE | AUD $3,000,000 |

**Note: The pricing is account based and is based on the total licensed services used and then by the number of accounts on the system. The total annual fee of $3,000,000 is the minimum annual fee applicable and is based on up to 1,000,000 accounts.**

**Fee structure:**

- **A once only Establishment Fee of $420,000 will be invoiced on the 1st November and is due and payable on the 15th November 2013. Thereafter the following fees are applicable:**

- **$3,000,000 is on 30th June 2014.**

- **$1.5M is due and payable on 30th June 2015 (representing 50% of the annual fee)**

- **$250,000 per month is applicable from 30th December 2015 until 30th May 2016 inclusive (ie. 6 monthly payments)**

- **$1.5M is due and payable on 30th June 2016, (representing 50% of the annual fee)**

- **The monthly fee of $250,000 per month will then be applicable from 30th December 2016 for the remainder of the term of this contract unless volumes increase beyond the minimum fee.**

- **Should the volume of accounts increase based on the existing configuration, the monthly account fee will increase at the following rate:**

**Accounts above 1,000,000          POA**

**Table 2: Bank in a Box optional modules**

| **OPTIONAL (but not limited to)** | |
|---|---|
| Treasury Operations | Private and Wealth |
| Collections | Asset Management |
| Business Intelligence | Securities |
| Other Treasury capabilities | Fiduciaries |

43

CONFIDENTIAL

## Schedule 3 - Service Level Agreement

**Availability**

The Managed Services will be Available 99.9%, calculated on a 24x7 basis, but not including any agreed Maintenance Windows.
If failover is required the DR SLA is invoked which is 95.0%.

Rubik Standard Software Support – Response Service Levels

| Severity | Description | 1. Response/Estimate | 2. Work Around/Fix | 3. Full Resolution |
|---|---|---|---|---|
| Level 1 - Blocker | Production environment with errors/issues that cause customer outage or potential loss of revenue | 1 hour | 6 hours | 1 week |
| Level 2 - Critical | Has potential to impact customers or create poor user experience while still functional | 2 hours | 1 day | 1 week |
| Level 3 - Major | Has some customer operational impact, does not materially have impact on base function of software, or effects delivery of small number of users | 2 day | 2 days | 2 weeks |
| Level 4 – Minor | Product Questions, nice to have functionality, issues that could be fixed to improve operations | 2 weeks | N/A | Version release cycle |
| Level 5 - Trivial | Little or no impact on client services | 2 weeks | N/A | Version release cycle |

Notes:

1. Response/Estimate. Time elapsed between issue being logged to Rubik's issue logging system and Rubik responding to the problem.
2. Work Around/Fix. Time elapsed between issue being logged to Rubik's issue logging system and Rubik restoring service to an acceptable level, as determined by the Licensee. Work around does not imply that the fault has been fixed. It may involve implementation of a workaround solution to resume service to an acceptable level as determined by the Licensee.
3. Resolution. Time elapsed between issue being logged to Rubik's issue logging system and Rubik providing a permanent resolution/closure.

Rubik Standard Software Response Performance Targets

| Severity | 1. Response / Estimate | 2. Work Around / Fix | 3. Full Resolution (if required) |
|---|---|---|---|
| Level 1 - Blocker | 95% | 95% | 95% |

44

DEF_00046147

| Level 2 - ☝ Critical | 90% | 90% | 90% |
| Level 3 - ☝ Major | 80% | 80% | 80% |

An incident can only result in a single service failure at any time (beyond the root cause incident, subsequent impacted Service Level misses in relation to the same incident do not count as multiple misses).  The client will not be entitled to multiple service failures for any one incident.

Rubik will provide a Service Credit for 1 day of the Fees payable for the particular Service which is unavailable for every Business Hour or part thereof beyond four hours of the Managed Services not being Available in each month, to a maximum of 50% of the monthly charges.  Rubik may contact the Licensee after the four hour period has elapsed to determine if the incident should be re-categorised to a lower severity level (with such choice to be in the sole discretion of the Licensee).

## Escalation

Any customer can choose to escalate an issue from its perceived severity level to the next level up, however, if the issue is found to not relate to the base functionality of the system, or is a fault at a different provider, the time will be charged to the customer (post resolution).  This allows rapid problem resolution at the time of issue leaving the severity to the client's discretion.

## Scheduled Downtime

## Exclusions

In addition to any other conditions detailed within the agreement, the following are excluded from the measurements relating to the Service Targets:
- Damage or loss of data due to the presence of a virus
- Any time delay due to third parties apart from Rubik's sub-contractors.
- Disaster Recovery mode apart from the SLA's that relate to the Disaster Recovery mode

## Service Performance Measurements and Reporting

Rubik shall monitor the Service Targets and will provide reports via Rubik's issue management and reporting systems that will include:
- Summary of the issues raised and closed during the period
- issues opened during the period
- All Blocker and Critical issues
- Performance vs. SLA
- Summary of problems reported, closed and unresolved (as at end of the period) together with details of problems open from previous period(s)
- Scheduled outages and changes

## Review of Service Levels

Throughout the Term the parties may agree to negotiate in good faith to add new Service Levels or to amend existing Service Levels.  Unless otherwise agreed in writing, any variation to the Service Levels, defect severity classifications and the allocation weighting percentages will apply from the start of the second month after the variation has been agreed.

45

DEF_00046148

## Schedule 4 - Rate Card

Prices reviewed annually. Rubik will notify the Licensee in September of each calendar year for implementation on 1 January the following year if an increase is to occur.  The rates may not increase by more than the increase in CPI + 1%or 3.5% whichever is greater in that year. All rates in the table below are in AUD$ and for the purpose of this contract will be reduced by 25%.

## Time and Materials

| Resource | Basic Service Plan |
|---|---|
| Telephone / Email Support | Free during support hours, $250 per call outside support hours** |
| Maintenance Releases | Included |
| **Roles** | |
| **Level 1**<br><br>Developer, BA, Domain Consultant, Database Administrator, Usability Designer | $220ph |
| **Level 2**<br><br>Project Manager, Senior Developer, Senior Consultant, Architect | $275ph |
| **Level 3**<br><br>Senior Management (excluding CEO) | $360ph |

**Notes**:

Expenses for travel or accommodation will be paid for by the Licensee and be pre-approved in advance.  Client may also choose to provide travel and accommodation through their providers.

These rates are for roles based in Australia.  Any use of local resources will be based off the Rubik Standard Rate card for that region.

All Professional services fees are payable fourteen (14) days from the date of the Invoice and are applicable in advance for the following month's forecasted services. Any difference between the services used and those paid for will be credited or added to the next months invoice.

** Rubik provides free 24/7 support for Blocker and Critical issues that are caused by defects in the Rubik system.  Any Blocker or Critical raised out of business hours will be responded to without question by Rubik to allow rapid resolution.  If it is subsequently discovered that the issue relates to the customers infrastructure or a third party issue, or it is not a Blocker or Critical item, Rubik will charge the callout fee and any time/materials used for resolution.

46

DEF_00046149

**P-127**
Case No. 9:18-CV-89176-BB

**From:** Craig S Wright
**Sent:** Monday, January 18, 2016 8:21 PM
**To:** 'nCrypt a'
**Subject:** FW: Transcript and Meeting Minutes [DLM=Sensitive]
**Attachments:** 20140226 Meeting Minutes.pdf; 20140218 Transcript.pdf


-----Original Message-----
From: Craig S Wright
Sent: Thursday, 6 March 2014 5:13 AM
To: 'Ramona Watts' <ramona.watts@hotwirepe.com>
Subject: FW: Transcript and Meeting Minutes [DLM=Sensitive]


-----Original Message-----
From: Miller, Andrew [mailto:Andrew.Miller@ato.gov.au]
Sent: Thursday, 6 March 2014 10:50 AM
To: John Chesher
Cc: Trinh, Jenifer; McMaster, Des
Subject: Transcript and Meeting Minutes [DLM=Sensitive]

John,

For your reference, I have attached the transcript of your meeting with us
on 18 February 2014. It has been transcribed from the recording by Auscript.

Also, please see attached, the minutes of our meeting on 26 February 2014.
Could you please review these and advise of any errors or omissions. If you
are satisfied that the minutes are an accurate reflection of the discussion,
please advise as such.


Thanks and regards,


---------------------------------------------
Andrew Miller
Auditor | Indirect Tax
Australian Taxation Office
Phone: (02) 9354 6379 | Mobile: 0401 684 338
Facsimile: (02) 6225 0929
ATO | Working for all Australians


************************************************************************
IMPORTANT
The information transmitted is for the use of the intended recipient
only and may contain confidential and/or legally privileged material. Any
review, re-transmission, disclosure, dissemination or other use of, or
taking of any action in reliance upon, this information by persons or
entities other than the intended recipient is prohibited and may result in
severe penalties. If you have received this e-mail in error please notify
the Privacy Hotline of the Australian Taxation Office, telephone 13 2869 and
delete all copies of this transmission together with any attachments.
************************************************************************

*DLM = Sensitive – when completed*

# Record of client contact

☐ **Interview**　　　　　☐ **Telephone call**　　　☑ **Other meeting**

| Person/s Interviewed | Authorised contact, John Chesher<br>Bookkeeper, Ann Wrightson |
|---|---|
| Representatives for the ATO | Andrew Miller and Jenifer Trinh |
| Date:<br>Location: | 26 February 2014<br>Interview Room 1, ATO Parramatta Office<br>2-12 Macquarie Street<br>Parramatta NSW 2150 |
| Start time:<br>End time: | 1:00PM<br>2:50PM |

*Important: Interview notes are an important part in gathering evidence to support your decisions. Consider the following issues and ensure an accurate and contemporaneous record is kept.*

**Contact summary:**

**__Purpose of the contact__**
Meeting was for John Chesher to explain workings in the revised activity statements sent to the ATO on 25 February 2014

**Issues Discussed:**

1. Craig Wright
2. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)
3. The Trustee for the Wright Family Trust (DeMorgan)
4. Coin-Exch Pty. Ltd. (Coin-Exch)
5. Cloudcroft Pty. Ltd. (Cloudcroft)
6. Strasan Pty Ltd (Strasan)
7. Pholus Pty. Ltd. (Pholus)

**Record of Conversation:**

ATO auditor, Andrew Miller (AM) brought authorised contact (John Chesher) and bookkeeper, Ann Wrightson (AW) into Interview Room 1 at 1:00pm on 26 February 2013.  AM and ATO auditor, Jenifer Trinh (JT) then introduced themselves to JC and AW.

After the introduction, the meeting commenced. To the best of my recollection, and

1

based on notes I made during the meeting, the conversation was as follows:

**JC:** Have you been able to have a chance to look at the briefing report sent earlier today?

**AM:** I did have a chance to look at the briefing before the meeting. I will be holding a meeting with Marina Dolevski and Hoa Do tomorrow and will raise the issues raised in the briefing at the meeting.

**JC:** We have gone through various stages of how the Bitcoins are viewed. We have gotten our legal adviser, Andrew Sommer to have a final look at it and he has advised us that our previous treatment of the Bitcoins was incorrect and that it should have been treated as an assignment of right of Bitcoins as no Bitcoins were actually physically exchanged between the related entities.

**AM:** I have had a brief look into the revised activity statements sent by you yesterday. Our meeting today is an opportunity for you to walk through the revisions made on the activity statements for the various entities.

**JC:** There is not much difference between the revised activity statements and the original activity statements. Initially, we treated the Bitcoins as money. Now, we will be treating them as an assignment of right of Bitcoins. The outcome to the ATO would not be much different. The focus on the audits should be on the external transaction, that is, the transactions made with MJF Consulting Pty Ltd (MJF).

**AM:** We will first start with the GST worksheet provided for Craig Wright himself. *AM then shows JC a relationship map titled 'Other Observations'.* This is my understanding of the relationship amongst the related entities. I may be making changes to it or adding things to the current diagram during the meeting. I can give you a copy of this as well.

*JC looks at the diagram and points at Craig Wright on the diagram.*

**JC:** This all starts with Craig Wright. Craig Wright started all this in 2009 when he started mining Bitcoins. There was a previous GST audit conducted on Craig Wright. The audit was in relation to transactions that occurred relating to Intellectual Property. The auditor took an adverse view. The auditor and Craig Wright had a difference of personality. The outcome of the audit resulted in allowable deductions and GST acquisitions revised to nil. Craig Wright couldn't save the two entities. We took the audits to objection but the objection officer agreed with the auditor. The decision was upheld in objections. We then took the matter to the AAT and the court allowed some of the deductions. The audit resulted in liabilities being raised and your debt department was onto us immediately. However, the AAT decision changed this. From owing the ATO hundreds of thousands, we were now allowed a net loss to be carried forward to future years.

We were apprehensive about director Des McMaster's involvement with the current audits due to his past involvement with the previous GST audit.

**AM:** That shouldn't be a problem. I am the auditor conducting the audit, not Des.

**JC:** We understand. Craig Wright took the Bitcoins that he had mined offshore. At the time, it was worth 3-4 cents. The total value of this was around $5000. He then started up W&K Info Defense LLC (W&K) with Mr Dave Kleiman. W&K was an entity created for the purpose of mining Bitcoins. Craig Wright is a forensic computer expert. He is constantly updating himself attending courses, workshops and training sessions. He is also a university lecturer at Charles Sturt University and conducts courses. He even provides services to some Australian government agencies including the ATO and the Defence Force. However, this is all done on a very high level.

2

Craig Wright had mined a lot of Bitcoins. Craig then took the Bitcoins and put them into a Seychelles Trust. A bit of it was also put into Singapore. This was run out of an entity from the UK. Craig had gotten approximately 1.1 million Bitcoins. There was a point in time, when he had around 10% of all the Bitcoins out there. Mr Kleiman would have had a similar amount. However, Mr Kleiman passed away during that time. He was a war veteran; he was wheel chair bound.

The deed between Craig Wright and W&K was created in 2012. W&K gave Craig Wrights rights to the Bitcoins and he has used the Bitcoins to do all this stuff.

Mr Kleiman and Craig Wright decided to start up W&K because they both wanted to get involved with Bitcoins. They recognised that this industry was not regulated and they wanted to start up a regulated Bitcoin bank. They knew they couldn't do this in the US so they wanted to do this in Australia.

In the agreement entered into, it was stated that Strasan Pty Ltd (Strasan) was to perform the ground work and create the e-learning package for them. W&K was responsible for providing funding. It was decided that one entity will also be created to be banking front. This was basically the reason why Coin-Exch Pty. Ltd. (Coin-Exch) was created. W&K then bought all the work done by Strasan.

A deed was then entered into with Hotwire. It is noted that at the time, Strasan did not belong to Craig Wright. It was an independent entity at the time. Panopticrypt is a shareholder of Strasan. Craig had a minor shareholding in Panopticrypt Pty Ltd (Panopticrypt). He was only a minor shareholder at the time and did not control have control of this entity at the time.

Strasan then got a person from the UK by the name of David Rees to create a pathway outline to go forward with the e-learning process.

Craig Wright was speaking in a conference in Melbourne. He was giving a talk about Bitcoins and mining. He was then approached by a man by the name of Mark Ferrier and that was how they met. This was how the relationship was formed. They started talking. Craig Wright told Mark Ferrier that he wanted to start up a Bitcoin bank. They then started emailing. Mark Ferrier told him that he knew someone who could help him start up the bank. This was all done in early June 2013. Everything was done very quickly- most of it was done in one weekend. Craig Wright, with the help of Mark Ferrier, agreed to purchase banking software from Al Baraka. Mark Ferrier also convinced him to purchase gold ore. He also offered Ian Ferrier's services to Mark Ferrier. Ian Ferrier is Mark Ferrier's father. Before engaging in Mark Ferrier's services, Craig Wright had conducted lots of checks on him and everything came up clean. So in essence, Craig Wright wanted the banking software and Mark Ferrier wanted Bitcoins.

Around mid-July/August, Craig Wright released funds from an entity located in the UK to MJF Consulting. This was all going through a server located in Central West Africa.

Mark Ferrier was then arrested in September 2013. Craig Wright then started to take action to protect his own rights. Your director, Des McMaster has informed us that ASIC documents show that Mark Ferrier was only put on as a director for one day. Craig Wright then contacted Pitcher Partners in Brisbane and asked them for an explanation. We found out that Mark Ferrier was never a director. The address that he had on ASIC was false as well.

Craig Wright was able to get hold of the banking software and automation system. He has everything but not the gold ore. He was expected to receive the gold ore in 2015 but now that's not happening as the gold can't be delivered. Craig Wright has also contacted Ian Ferrier. Ian Ferrier advised us that he has not spoken to Mark Ferrier for 2 years and wants nothing to do with him. We have a case against MJF Consulting with the Supreme Court of NSW and also the Federal Court. The case with the Federal Court is for deceptive conduct against Mark Ferrier

CONFIDENTIAL

DEF_00051771

personally as an individual.

Due diligence was conducted on Mark Ferrier before we engaged him. We have done all we could to protect ourselves.

If you look at the transactions made, you will see that every transaction was pegged against the currency exchange rate at the time. Craig Wright has already advised you that the accounting method for this personal enterprise should be changed from cash to accruals. The accounts should be on accruals from the start of the 2013 income year. Craig Wright has previously informed the ATO of this.

We have previously been dealing with ATO officers from different sites at first, e.g. some initial work was being conducted from the Hurstville office, Brisbane office etc. But then Des McMaster made a decision for all the audits to be done from Parramatta. The audits were then being conducted by Celso. I am uncomfortable with the fact that Des McMaster is looking after these audits. We have had past dealings with him in the previous audits.

**AM:** That is why I'm coming in with a fresh pair of eyes.

**JC:** Des' judgment is tainted due to his involvement with the old audits. We don't want the current audits to be tainted by the past audits.

**AM:** Yes, I understand.

**JC:** We want to make sure that you are comfortable with all the transactions.

**AM:** We should have all the documents already provided on our systems. I have a question to ask. Were actual Bitcoins physically paid to MJF Consulting or Mark Ferrier?

**JC:** Yes. We paid Bitcoins to him. We paid the Bitcoins to where he directed for the Bitcoins to be paid into.

**AM:** Just to confirm, was it actual physical Bitcoins that was paid?

**JC:** Yes.

*JC then opened his folder and showed AM written communication between Craig Wright and Mark Ferrier. He first showed a letter dated 1 June 2013 from MJF Consulting. His second (dated 1 June 2013) and subsequent documents were email correspondence between Mark Ferrier and Craig Wright.*

**JC:** *(referring to an email correspondence between Mark Ferrier and Craig Wright)* After the deal was signed, Mark Ferrier signed the agreement. Popal *(the name was referenced in one of email correspondence between Craig Wright and Mark Ferrier showed to AM )* is the person responsible for bringing Mark Ferrier into the deal. From our correspondence and understanding of Mark Ferrier, it appears that the person behind this is much smarter than Mark Ferrier. There was a spike in the value of shares at the time from $2 to $6 in the weekend that we signed the deal. We believe that this was done intentionally. We are now dealing with Al Baraka ourselves. We are liaising with the people in Turkey. I hope that you've been able to get an understanding of how this all started now.

**AM:** I have an understanding of the background now.

**JC:** Craig Wright has a Blockchain view of this. In relation to the transactions done with Mark Ferrier, the Bitcoins left Doncaster in UK and was transferred to West Africa. Craig Wright

4

 DEF_00051772

obtained the automation and banking software through Mark Ferrier. The software first goes to Craig Wright and then he transfers them into The Wright Family Trust (DeMorgan) for distribution. The banking software was transferred into Coin-Exch as this company is acting as the banking front. The automation and exchange software was transferred to Hotwire. Basically, everything goes through Craig Wright and then into the trust. The security work was performed by W&K.

In relation to the valuation of the software, Al Baraka determined the value of the software that was obtained from them. The Supreme Court of NSW determined the value of the software obtained from W&K. You should already have copies of the two Supreme Court of NSW judgments.

**AM:** When was the Supreme Court judgments made? On the invoices you provided us, they appear to be dated sometime in mid-to-late 2013?

**JC:** The W&K transactions were dated 1 September 2013. The judgments came through in November/ December 2013. There is a time difference of a few months here as Craig Wright had to demonstrate the value of the claims to the Court. He was dealing with this matter from 1 September 2013.

So essentially to sum it up, software and intellectual property were sitting in DeMorgan and was distributed out as follows:
- A third was distributed to Hotwire.
- A third went to Coin-Exch.
- A third went to Cloudcroft. Craig Wright may be the sole director of this entity at the moment but he was not the sole director at the time the company started. This company was responsible for performing security work at the time it was first established.

Most of the intellectual property and software were licensed to the three entities and not sold. The reason for this is because the licenses costs will be considered an expense and not an asset and this protects the R&D position.

Cloudcroft was actually started-up by his ex-wife, Lynn Wright. It was 100% owned by Lynn Wright at the time. They were separating at the time it started. He was dealing with clients including Hoyts in his security role. Lynn Wright had 100% ownership of the company until late 2012 when the company was put into liquidation. The liquidators decided to pursue Cloudcroft and Lynn Wright for the contract to sell from W&K to Cloudcroft. However, no deal came out of this.

Lynn Wright then went bankrupt. This was when Craig Wright took over Cloudcroft. It is possible that he may currently be the sole shareholder.

Coin-Exch is the banking front of the group and is holding the banking software.

Hotwire has the exchange and automation software and is also the R&D engine for the group. Hotwire came into existence because of the contract entered into between W&K and Strasan. It was stipulated in the contract, that a company would be created; and consequently, Hotwire was formed as a result. Hotwire is funded by a Deed of Assignment. The initial funding was by an equity distribution of rights in late July/ August.

## 1. Craig Wright

**AM:** I will start by going through the revised activity statement for Craig Wright.

**JC:** All the transactions made amongst the related entities are GST neutral. The overall GST

5

credit expected from the related entities is around $5.5 million. The sum total of the GST on the Al Baraka deal is around $5.346 million.

*(JC then looks at the revised GST ledger (sent on 25 February 2014) for Craig Wright)* You can see this at the bottom of page 3 and top of page 4 of the GST ledger. The total amount as stated on page 4 is $5.376 million.

**AM:** The original activity statement lodged for Craig Wright resulted in a GST payable amount of $2.3 million. The new revised activity statement results in an increased payable amount of around $4.2 million. Just to clarify, do you want this to be amended on our systems? Or are you just putting forward these figures for us to consider?

**JC:** I want you to revise the activity statements for us. The process for us to change the accounting method from cash to accruals and then to request a new activity statement to be generated on our system is just too complicated. We were not able to change to accruals on the Portal and we already requested many times for this to be changed to accruals. However, at the moment, the accounting method is still cash on your system.

**AM:** To confirm, the new revised statement is on accruals basis?

**JC:** Yes, it's on accruals. We have previously advised of this before. Craig Wright has been asking for this consistently.

You should also note that I have only come on board after October/November 2013. Jamie Wilson was previously responsible for the accounts for the entities. Jamie was responsible for introducing Xero. His role fell apart around October 2013 due to his personal situation. His spouse fell sick and then they decided to separate.

**AM:** I had a quick look at the revised activity statements. It looks like the main difference between the two is that there is now an additional $31 million included under the accruals method. In the current statement, there are two lots of income received from DeMorgan of $34.1 million each. The cash version only showed one lot of $34.1 million. Why is there an additional sale made to DeMorgan in the current statement?

**JC:** *(JC checks this on his laptop for a few moments.)* I believe this is in relation to the international payments made. Those were external payments made. It came in externally and went out externally.

## 2. The Trustee for Wright Family Trust (DeMorgan)

**AM:** Let's move on to the second entity, The Trustee for Wright Family Trust (DeMorgan). Who is the trustee of the trust?

**JC:** I think it may be Panopticrypt or Craig Wright himself. I'm not uncertain of this though. I will get back to you on this.

**AM:** No changes were made from the original activity statement. There is nothing to discuss on this one.

## 3. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)

**AM:** I'll move onto Hotwire now. The combined total of G10 and G11 has decreased. The end result is a slight increase in refund.

6

DEF_00051774

**JC:** *(JC checks this on his laptop for a few moments.)* This is for minor expenses, like general expenses. These were previously sitting in GST-free. We have moved all the computer equipment of the group to Pholus Pty. Ltd. (Pholus). Pholus will be providing the funding for the IT services. We initially went to the bank to get a lease. But the bank told us that they will give us $90,000 in return for $90,000. If we give them $90,000.00, they will lend us $90,000. That didn't make sense to me. We didn't get a lease from them. We are currently setting up Pholus to do the IT side of things. Our next task is to move the assets to Pholus. The leasing expenses for the equipment will be treated as a liability.

**AM:** There were four invoices issued from DeMorgan to Hotwire on the same day. Just out of curiosity, why was it separated into four tax invoices? The payments made added up to approximately $37 million. It was for tax invoices numbered 1, 2, 3 and 4.

**JC:** *(checks laptop for a few moments)* This is because they obtained a three year licence for the intellectual property. It was $10 million per annum. One tax invoice is for payment for the current year and the other two are prepaid payments made. They moved in as a lump. For the R&D side of things, it is considered to be a prepayment. A similar situation has occurred in Coin-Exch as well.

## 4. **Coin-Exch Pty. Ltd. (Coin-Exch)**

**AM:** We will now move on to Coin-Exch. The revised calculation shows a significant increase in capital purchases of $21.8 million. This is marked as a GST-free capital expense for Bitcoin Assignment. However, there is no change in the overall GST refund as the new $21.8 million is marked as GST-free.

**JC:** That is an assignment of right. It reflects the Bitcoin assignment made.

**AM:** Did Craig Wright make a Bitcoin right assignment to Coin-Exch?

**JC:** Yes.

**AM:** What was this in exchange for? If Craig Wright made an assignment to Coin-Exch, what did he get back in return?

**JC:** Let me check this. *(JC checks this on his laptop)*

**AM:** Could this be for the IP Licence obtained from DeMorgan?

**JC:** So what happened is that Coin-Exch has an assignment of right and the corresponding transaction made against it is marked as a loan. It is a loan from Craig Wright for the right to use it.

**AM:** This is different to what happened to Hotwire. Was there a written agreement between Craig Wright and Hotwire for the assignment? Were they both marked as GST-free?

**JC:** Yes. They were moving through as a series of loans made. The Deed moved from the UK to Craig Wright and then he distributes this.

**AM:** The word 'loan' was not used in the briefing paper that you sent earlier today. 'Loan' and 'Rights' have different meanings.

**JC:** They are not loans, they are Assignment of Rights. I got confused as the assignment of rights is categorised as a liability and consequently, I called it a loan. But it's not actually a loan.

7

DEF_00051775

**AM:** Okay. So to confirm, Coin-Exch acquired intellectual property from DeMorgan. The right to call BTC is then assigned to Coin-Exch?

**JC:** Yes.

**AM:** Jenifer do you have any questions to ask?

**JT:** No.

**JC:** She is too busy writing up the minutes.

**AM:** We can send you a copy of today's minutes if you like?

**JC:** Yes, that would be appreciated.

### 5.  Cloudcroft Pty. Ltd. (Cloudcroft)

**AM:** We will now move onto Cloudcroft. Overall sales reported in the revised statement have decreased. The export sale on the original ledger is no longer included in the revised calculation. The previous statement showed export sales of $3.1 million. However, this does not affect the final GST amount.

**JC:** *(JC checks this on his laptop)* I have no reference on my report of this amount.

**AM:** If you go back to the original statement, you will see that there is export income of $3.1 million reported.

**JC:** That may have been a mistake. The only thing that jumps to me is the Strasan transaction which was also for $3.1 million.

**AM:** The amount is GST-free. For your record, GST refund remains the same.

**JC:** We have an entity in Singapore. The export sales may have been made to that entity.

**AM:** Was it for a sale of a software package to Singapore?

**JC:** This is possible, but I can't confirm.

### 6.  Strasan Pty Ltd (Strasan)

**AM:** I have no more questions to ask in relation to Cloudcroft. I will now move on to Strasan. You provided us revised GST ledgers for the tax periods ended 30 June 2013 and 30 September 2013. However, I noticed just before the meeting that the two PDF documents are the same.

**JC:** I must have forgotten to change the header. I will send this to you again. Nothing happened in the first quarter of 2014 except for sales.

**AM:** As I only have the revised June 2013 quarter, I will just be asking questions in relation to that. I can see that the sales have been reduced to $nil.

**JC:** *(Checks his laptop)* This was for payment to Strasan from Hotwire for work performed. They issued a Deed of Assignment at the end of June 2013. It was paid out of the wallets given to you in July/August.

CONFIDENTIAL

**AM:** Who were the expenses incurred to? Was it Hotwire or Craig Wright?

**JC:** Strasan got the benefit of 'DeMorgan Info Security Services' which was otherwise known as DISS. This entity does not exist anymore. Craig Wright was involved with this entity in early 2000s. DeMorgan is Craig Wright's grandmother's name. The company created a bunch of stuff. Craig had a dispute with the director and then got out even though he had 75% of the shareholding. They ended up stripping the company. Craig Wright then had a ten year court case against DISS and had legal fees incurred for the ten years. A judgement made in Court assigned the right of 4 projects to Craig Wright and Strasan got the benefit of the 4 different projects.

**AM:** In relation to the expenses reported, which entity is responsible for reporting the corresponding sales made for the June 2013 quarter?

**JC:** Strasan was working for Hotwire and received payment which was the Right of Assignment of $3.8 million.

**AM:** There is no income reported by Strasan in the revised statement. There were $5.3 million in sales reported in the original statement. The revised BAS has no sales but does have expenses.

**JC:** That's odd. I have the $5.3 million in sales on the laptop as well. This amount is not part of the GST audit so it must be GST-free. The amount was for export sales made.

**AM:** It would most likely be a G2 amount then.

*JC then shows AM the laptop screen.*

**JC:** This amount shows up as an export sale made. I will need to get back to you on this. In August, there was an invoice with a due date for payment at 30 October 2013. There was another amount to Hotwire but that was for the previous year. In the fourth quarter in 2013, there was a sale amount made of $3.2 million. There should be a corresponding amount in June for Hotwire for $3.2 million.

**AM:** In the original statement lodged, there was a GST-free amount of $5.3 million reported. The description provided for the transaction is 'Dallah Group (INV-0001)'.

*JC then checks this on his laptop.*

**JC:** That invoice was voided. *(JC then shows AM the invoice on the laptop.)* This was entered into the wrong entity. See the bottom note made here, it states that the invoice has been voided. Dallah has nothing to do with Strasan. You will see the transaction in another entity. It would be in either Coin-Exch or Hotwire.

**AM:** Let's have a look now. *(AM then looks at the revised statements provided for Hotwire and Coin-Exch.)* It doesn't appear to be in Hotwire or Coin-Exch.

**JC:** It was voided in November 2013 because it didn't exist and there was no Dallah at that point in time. Micropayment system was part of the stuff that came in. It if went anywhere, it would have gone to Coin-Exch or Hotwire. We are looking to do micropayments in Bitcoins. The micropayment system allows people to buy fractions of a Bitcoin. The smallest fraction is a satoshi. The micropayment system was about half the value of the software package.

9

CONFIDENTIAL

### 7. **Pholus Pty Ltd (Pholus)**

**AM:** Now, we'll be moving onto the final entity, which is Pholus. Sales and export sales made have remained the same. Export purchase reported in original statement of $2.3 million has now decreased to nil. G10 was originally $2.3 million and has been revised to nil. The reverse has occurred for label G11. The amount reported was originally nil and has been revised to $2.3 million. The description provided is 'university software- install system design and deployment'.

**JC:** We had a bunch of chords as inventory. There are around a thousand of them. We moved them to Pholus as part of their inventory. These chords are similar to CPUs. Each chord is a data miner. We changed it from G10 to G11 as they are inventory and should have been classified as a non-capital purchase instead of a capital purchase as they are not capital. The other stuff reported was for accounting and consulting services.

**AM:** That's all the questions I have. Do you have any questions to ask Jenifer?

**JT:** No.

**JC:** After the meeting, we will get back to you on the following:
- Who the shareholders of Cloudcroft are;
- Clarification of the loan or rights issue;
- The discrepancy identified in relation to the Dallah Group invoice;
- The anomalies not appearing in Coin-Exch or Hotwire; and
- Who the trustee of DeMorgan is.

You should have the backup for everything with you. You can see that the fundamental issue is the external transaction made with MJF Consulting.

**AM:** I will be having a discussion tomorrow with our AC, Marina Dolevski and Hoa Do in relation to the Assignment of Rights. I am happy to relay the outcome back to you after the meeting.

**JC:** That would be much appreciated if you could do so. Craig Wright has been moving stuff around but if you look at in holistically, he isn't moving anything around at all. The only external transaction is with MJF Consulting and to David Rees. The transaction with David Rees was GST-free as it was for educational stuff.

So, what's next from here?

**AM:** I can't say at the moment. This will be dependent on the meeting to be held tomorrow. We will make a decision as to how to go forth from there.

**JC:** There is an amount coming our way. We want to propose receiving 20% of this amount first. I will be putting this forth to Marina. If this is not a reality, we will have further discussions but if it is, we want it released immediately. We have spent a lot of money during this process and we need the funds to ease our cash flow. The Bitcoin industry is very volatile and there is no clear picture as to the future. Our bank options are limited. Everything we have been doing is legitimate. If you were able to come out to our premise today to hold the meeting, you would have seen 40 to 50 people working out there. We have lots of activity happening at the moment. $5 million does make a difference. We need to recover the money already spent.

**AM:** I can't comment on this. This discussion is best held with Marina Dolevski.

**JC:** We need to be back in a position of control.

CONFIDENTIAL

**AM:** I will be having a meeting with Marina and Hoa Do tomorrow at 2pm. I will let you know of the outcome of tomorrow's meeting.

*AM then thanked JC and AW for their time.*

Meeting concluded at 2:50pm.

**Include reference/hyperlink to main documents relied upon:**

Relationship_Diagram_No_Markings
Relationship_Diagram_with_Markings


**Author's name: Jenifer Trinh**
**Date of document:   27 February 2014**
_____

CONFIDENTIAL                                                                                    DEF_00051779

**AUSCRIPT AUSTRALASIA PTY LIMITED**

ABN 72 110 028 825

Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003

**T:** 1800 AUSCRIPT (1800 287 274)    **F:** 1300 739 037
**E:** clientservices@auscript.com.au    **W:** www.auscript.com.au

AUSCRIPT
FASTER, BETTER EVIDENCE DELIVERY SINCE 1921

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT IN CONFIDENCE

O/N H-356057

**AUSTRALIAN TAXATION OFFICE**

**RECORD OF INTERVIEW**

**INTERVIEWER:**    **DES McMASTER**
**MARINA DOLEVSKI**
**HOA DOA**

**INTERVIEWEE:**    **CRAIG WRIGHT**
**JOHN CHESTER**
**ANDREW SOMMER**

**CONDUCTED AT:**    **SYDNEY**

**DATE:**    **TUESDAY, 18 FEBRUARY 2014**

**TRANSCRIBED BUT NOT RECORDED BY
AUSCRIPT AUSTRALASIA PTY LIMITED**

.WRIGHT 18.02.14

CONFIDENTIAL

# Interview conducted with Craig WRIGHT

On the 18th February 2014

Sydney

Interviewers: Des McMaster, Marina Dolevski, Hoa Doa

5

| | |
|---|---|
| Sommer | Okay, well, if everyone's happy, I really wanted to sort of – I know you've had a number of different discussions and I really wanted to sort of make this as productive as possible for everybody's time so I thought I would put as much as I can up on the slides and at least that way we've got a process for discussing things.  The agenda that John sent through to Marina yesterday afternoon, basically, I thought it would be useful just to highlight some of our current issues, go through quickly the history of development, our current state, vis a vis audits, the relevance of bitcoin treatment which I think is critical to where we are and what's going on;  looking at current transactions, both – at a high level.  So what I would like to do is agree, the in-principle treatment of various types of transactions and then – you know, it is undoubted that there is going to have to be revisions for the BASs that are lodged so a lot of the process and a lot of the grinding of wheels that's going on at the moment is information requests and stuff about BASs that have been lodged and simply they've got to be changed anyway.  So we're spending a lot of energy worrying about BASs that, on the Tax Office's view of the law, are wrong and so therefore we need to change those BASs anyway.  So if we can agree a process for actually the way in which those BASs should be filed what I would like to do is then have someone from a fresh team sit down with John and rebuild the BAS, so somebody from within the Tax Office who understands the way we've agreed the way that these transactions should be done sit down with John - it's only a hundred lines of transactions, rebuild the relevant BASs and resubmit them on the basis of – on an agreed basis so we can actually do something else without going - - - |
| Dolevski | So if I just understand that correctly, Andrew - - - |
| Sommer | Yep. |
| Dolevski | So just basically on the tax view, which is outlined in the private binding rulings you're saying - - - |
| Sommer | Being singular, but we will get to that, yep. |
| Dolevski | Yep.  So you're saying that the BASs – you're accepting that the current BASs lodged are obviously not in line with the rulings and the ATO view so you're proposing - - - |
| Sommer | I don't think that's controversial, is it? |
| Dolevski | No. |
| Sommer | No. |
| Dolevski | No. |
| Sommer | Okay.  Yep. |
| Dolevski | No, just wanting to clarify. |
| Sommer | Yep |
| Dolevski | And therefore, based on that, you would be – you're proposing to revise the BAS, the BASs that have already been lodged? |

Line numbers: 10, 15, 20, 25, 30, 35, 40, 45 appear in left margin.

CONFIDENTIAL                                                                              DEF_00051781

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | If we can reach an agreed treatment about the way in which things need to be done, yeah, sure, let's just move on.  Do we think bitcoin is money?  Yes.  Can I stand here for four hours and argue with the three of you that I think bitcoin is money and, you know, it passes the test established by Emmett at Travelex, the landmark case referred to in the ruling of facility and all that sort of – the landfill case facility.  Yeah, I can do all that but that's not going to progress the issue and I want to get these guys back to doing business and we can have the esoteric discussion about the nature of bitcoin and whether or not it's money later but let's free up this process because it's drowning them in unproductive wheel-grinding, constantly frustrating on both sides and I would like today to break that cycle. |
| | Dolevski | So rather than having the changes made from a compliance perspective it would just be a revision of BAS that you would want some assistance? |
| | Sommer | Yes. |
| 15 | Dolevski | Is that right?  Yep. |
| | Sommer | I think that - - - |
| | Chester | And rather than us ..... something and resubmitting it, let's just sit down and let's go, "Okay, tick, tick, tick, tick, done" and we can go, "That looks good.  That's good.  Fine.  We're done".  I think, as Andrew said, there's not many – it's not like there's thousands of transactions out there.  There's none. |
| | Dolevski | No, no. They're the first quarter BASs that were lodged. |
| | Sommer | Yeah.  That's right. |
| | Dolevski | And there's a couple – I think there's one that's a post issue. |
| | Sommer | Yep. |
| 25 | McMaster | There are a couple of post issues. |
| | Dolevski | That have gone through. |
| | Sommer | Yep.  And we will get to that. |
| | McMaster | Yeah. |
| | Dolevski | Yeah. |
| 30 | Sommer | Okay.  So a simple without prejudice meeting intended to resolve the issues that can be resolved, narrow the scope of issues that are under review and focus on the areas in which we can agree rather than issues of general grievance I think, you know.  I get the impression from having looked at some of the stuff that there's a bit of frustration in the Tax Office.  I don't know from talking to my clients if there's a bit of frustration on our side.  You know, let's just put all that to one side and try and work on those things that we can agree on and move this along.  The current issues:  we've got formal notices regarding retention of refunds.  We've got a multiplicity of audits.  We've got the issue for these guys being cash flow as a new business.  We're really struggling from a cash flow perspective and also from a resources perspective.  We need to sort of ..... for the guys to do it.  Now, the retention of refunds is troubling because the current – we don't have any revised assessments yet and just from a process perspective a number of the documents that have been issued I think are wrong as a matter of law and we need to sort of tighten that process up.  So these are notices issued to Hotwire, Coin Exchange, Cloudcroft whereby – and I will show you an extract in a minute – whereby the decision to retain the refund is based on an |

CONFIDENTIAL

DEF_00051782

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 | | interpretation of the law rather than the pending verification of information. Now, section 8AALZGA entitles you to retain a refund in certain circumstances pending verification of information.  It doesn't entitle you to retain a refund without issuing an amended assessment in instances where you just happen to ..... the law.  Now, you can go away and have a look at that.  The notices that were issued purports to give the taxpayer an objection right. |
| | Dolevski | An objection right? |
| | Sommer | Against the - - - |
| 10 | Dolevski | It's retaining. |
| | Sommer | Yeah. |
| | Dolevski | Yeah. |
| 15 | Sommer | Now, the only – my only understanding is that you get – we hadn't looked into AALZGA ..... objection ..... process in relation to that decision doesn't apply generally and so even the decision to withhold it under that section ..... because there's no information verification referred to or it's not something else so it's just one of those process issues that I think needs to be cleaned up and it's a relatively new section.  And certainly some of the ..... and some of the other notices refer to specific bits of information but the ones to Coin Exchange, Hotwire and Cloudcroft don't. |
| 20 | | |
| | Dolevski | The actual retention and the notice - - - |
| 25 | Sommer | Yeah.  So we've got a bit of a problem there because we haven't got anything we can object to.  Now, I don't want to go down the objection and appeals path because it's too slow and, as I say, if we can agree a basis, excellent, we don't have to worry about it. |
| | Dolevski | Well, the objection to hold isn't going to give you any technical clarity on the issue itself. |
| | Sommer | No.  Look, it's a bit - - - |
| | Dolevski | There's just – yeah.  But, I mean - - - |
| 30 | Sommer | It's a bit of a silly provision and I don't know why we put it in there in the first place.  But we haven't got - - - |
| | Dolevski | But in terms of us speeding the assessments, I mean, we're ready to go with the imposition papers that were issued. |
| | Sommer | Yeah.  No, no, but that's an interim .....  What I'm saying is - - - |
| 35 | Dolevski | We can get to final quite quickly. |
| 40 | Sommer | Yeah.  Well, you probably shouldn't, on the basis of what they say, but the problem is the guys have got nothing to object against.  They've got notices and they keep saying to me, "I've got this letter from the Tax Office that says I have an objection right" and  I'm saying actually you don't have an objection right.  There is nothing you can object to at the moment".  There isn't.  The assessment that was made when the return was lodged, the deemed self-assessment, is in accordance with their duty and there's nothing ..... to which they can object. |
| 45 | Dolevski | Well, we would say that under 8AAZLGA that that gives us the right to hold, under - - - |
| | Sommer | For what purpose? |

Page 3 of 40

DEF_00051783

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | For us to substantiate that the refund is in fact valid. |
| | Sommer | I don't think it really says that. |
| | Dolevski | Well, I don't have the Act – we don't actually have it there - - - |
| | Doa | No, I've got the GST - - - |
| 5 | McMaster | What Marina is saying is the commonly-held view within the office, okay, and has been since the legislation came into being - you do have rights of objection on the private binding rulings which would go to the heart of issue. |
| 10 | Sommer | Yes, but not – true, but not for where there's an assessment that has been issued and our assessment doesn't line up with the private ruling and the private ruling was only issued on 23 September – December, I think. |
| | McMaster | Yeah. |
| | Sommer | So – anyway.  Have a look at 8AALZGA. |
| 15 | Wright | And the private ruling didn't actually align.  It was a totally separate thing to the companies, anyway, because it was unrelated and never was related, which was informed right back to the beginning, before Selso even came on. |
| | McMaster | Okay. |
| | Dolevski | So - - - |
| | Wright | So that private ruling had nothing to do with any of the other transactions. |
| 20 | Dolevski | So under those provisions the Commissioner may retain an amount and we go through and address all of the 10 factors under - - - |
| | Sommer | Yep.  And which one of them says because you formed a different view of the law? |
| 25 | Dolevski | So we say – so the first one, "The Commissioner may retain an amount that he or she otherwise would have to refund to an entity if the entity has given the Commissioner notification that affects or may affect the amount".  Sorry, I haven't gone into this - - - |
| | Sommer | Yep.  Anyway, I don't want to get tied up on that today.  You guys have a look at it. |
| | Dolevski | Yep. |
| 30 | Sommer | But I don't think those notices as they are issued to Cloudcroft Coin Exchange - - - |
| | Dolevski | I will check them. |
| | Sommer | - - - and Hotwire - - - |
| | Dolevski | So you're saying only three of them are defective as far as you're concerned? |
| 35 | Sommer | Yep.  Yep, those three. |
| | Dolevski | And the others, we've actually got it right? |
| | Sommer | Yep.  Well, the others - - - |
| | Dolevski | We need to check what letters - - - |
| | McMaster | I think they would have been identical letters. |
| 40 | Dolevski | That's right. |
| | Sommer | ..... I can check. |

CONFIDENTIAL                                                                                              DEF_00051784

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| | McMaster | Okay.  I will double check.  That's okay. |
| | Sommer | Yep. That's okay. |
| | Dolevski | Unless we've used incorrect letters.  I don't know - - - |
| | McMaster | I would be surprised but I will double check. |
| 5 | Dolevski | Yep.  All right. |
| | Sommer | Okay.  So - - - |
| | Wright | There were three different people issued the three different initial letters and then Selso issued subsequent different ones. |
| | Sommer | Yeah. |
| 10 | McMaster | The initial ones would have been the retention of refund letter which would have come from, highly likely, the Refund Integrity Team.  The subsequent ones that Selso would have issued would be providing you with the objection rights to the decision to withhold because it met the various requirements of timeframes. |
| 15 | Sommer | Yep. |
| | Dolevski | But we will look into that. |
| | McMaster | Yep. |
| 20 25 30 35 40 45 | Sommer | Good.  Okay.  So the objective is to try and free up the cash flow and try and free up the resources so we can get all these issues ..... rather than continually dealing with various ongoing issues.  So just to sort of – for those players who are new to it, I thought it was useful just to quickly walk through the chronology of where we got to, or how we got to here.  In 2009 the mining of bitcoin commences.  There's audit and ensuing disputes with the Tax Office regarding information defence ..... and Dr Wright personally back in 2009 and that dragged on for a couple of years.  2011, bitcoin was transferred overseas.  R and D then conducted in the US under – by a joint venture company formed as ..... effectively info defence research LOC.  Bitcoin mining continues throughout 2011.  The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts.  Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles.  Further work was planned.  In early April 2013 unfortunately David ..... dies in the US towards the end of April 2013.  In July we have the MJF transactions which are germane to the returns that are being looked at currently.  They involve software services and ..... and in July discussions commenced between – with the Tax Office about the nature of bitcoin.  September, following the death of David ..... in the US, there was a transfer of intellectual property out of a US entity to Dr Wright pursuant to orders granted in the New South Wales Supreme Court.  Those orders in the New South Wales Supreme Court substantiated value of the claims being made for that intellectual property in the amounts shown there, roughly 28 million a piece.  2013, September, intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on.  2013, December, 23 December, while I was having Christmas with my family, private ruling issued on the nature of bitcoin and January 2014 we got the retention refund notices and so on.  And that's how we got to – all right.  So these are the entities that I think are the key players in these transactions.  So we've got the UK companies;  we've got Singaporean |

---

CONFIDENTIAL                                                                                                    DEF_00051785

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| | | companies; we've got Seychelles, so they're all on the outside of the dotted line. We've got Craig which we've referred to with the ..... as CSW ..... is the trustee of the Wright Family Trust. We've got Hotwire PE, Coin Exchange, Cloudcroft, Strasan, Denariuz and if you look at it ..... audit, audit, audit, |
| 5 | | refund to ..... and audit. So we're busy, and this is my point, that we're stretched in terms of our resources to answer these questions at the moment and it would be nice if we could wrap this up and get these audits sorted. So we've got copies of all those notices. I don't think anyone's worried about it but those are effectively the current drain on our compliance resources to deal |
| 10 | | with all these questions. Okay. This is the refund retention letter that I was referring to in relation to – this one's the Cloudcroft one and letters in the same form were issued to Hotwire and Coin Exchange. A couple of issues. One is, "We've decided retaining a refund for the following reasons: we are maintaining our interim position with treating the transfer of bitcoin to pay for |
| 15 | | your acquisitions in accordance with ....." etcetera. So it doesn't refer to any clarification of information. |
| | Dolevski | So that's our objection letter. |
| | Sommer | That's the objection letter, yeah. |
| | Dolevski | Yeah, but that's not the retention letter. |
| 20 | Sommer | Yeah, but this is saying – it also says, "How to object, and your objection", right? |
| | Dolevski | Yep. |
| | Sommer | Absent the mechanism provided by 8AALZGA how can I object to that notice? |
| | Dolevski | Why would you say "absent to 8AAALZGA"? |
| 25 | Sommer | Well, if the only – if you're – the reason you've decided to retain my refund - - - |
| | Dolevski | Is to verify - - - |
| | Sommer | No, no, it doesn't say verify, and we're just maintaining our view about the treatment of bitcoin. |
| | Dolevski | So - - - |
| 30 | McMaster | No, no. The reason that that objection letter has gone out is simply that we have exceeded the 75 days with the information held in the office and at that point in time there is a right to review the decision to retain the refund. |
| | Dolevski | Retain. That's right. |
| | McMaster | Within the office. |
| 35 | Sommer | I agree. I agree with that. |
| | Dolevski | So the objection - - - |
| | McMaster | The other part is actually irrelevant for the purpose of what we're looking at. |
| | Sommer | Well, the indication of a decision – well, that says to me that, "We have decided to retain your refund for the following reasons. We have a view of the law" and that bullet point is a view of the law, okay? I don't know how to |
| 40 | | object to that. |
| | Mr .......... | And the other problem is the private ruling was never issued - - - |
| | Sommer | Well, I will get to that. So I've got two problems with it. One is that that decision to maintain – to retain the refund because of a view of the law is not |
| 45 | | a decision ..... 8AALZGA, okay? The problem was that 30 – the other |

CONFIDENTIAL

DEF_00051786

Interview Conducted with Craig WRIGHT

|   | | |
|---|---|---|
| 5 | | problem is that 30 September 2013 ruling was never received.  It was never issued by the Tax Office and it was never received by the taxpayer.  Even if it had been, we've got a letter from Mr Walmsley dated 15 October 2013 specifically saying that he – oops, sorry – that we weren't going to be getting that ruling.  So it says in that highlighted paragraph, "However, any" – you know, "You may have got this ruling" in the first para.  "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked but that is not correct".  The final sentence there, "However, any private ruling made on the basis of the existing application would be either invalid or worthless so the obtaining of additional information is unavoidable".  So both the – the notice refers to a ruling that was never issued and even if it had been issued it was – we got subsequent correspondence saying it was invalid or worthless in the Tax Office's view.  That - - - |
| 15 | Wright | And the actual ruling was actually created in November and backdated. |
|   | Sommer | So that being – even as recently as last Friday we've got the interim report still making reference to this private ruling that was never issued to us and even if it had been issued to us it was declared by Mr Walmsley that it would be invalid or worthless.  So I'm – it's just – there seems to be a bit of a - - - |
| 20 | Wright | I had the particular authorisation number investigated.  I have – I know people in the ATO because I've been training for years and that was actually issued on 29 November as a backdated ..... internally. |
|   | McMaster | Who provided that to you? |
|   | Dolevski | To who, worry? |
| 25 | McMaster | To you, Craig. |
|   | Wright | No one I will be saying until we go to court. |
|   | McMaster | So you've approached a personal contact in the office and obtained information? |
|   | Wright | No.  I went to Internal Fraud and Investigations. |
| 30 | McMaster | Okay. |
|   | Sommer | In any event – let's leave - - - |
|   | McMaster | Well, no, that's very important because you shouldn't be doing that and whoever gave you information should not be doing that either, okay? |
| 35 | Dolevski | Anyway, let's deal with this issue.  So we've made reference to a ruling dated 30 September. |
|   | Wright | That was never issued. |
|   | Dolevski | It was never issued, and then was there something issued in December? |
| 40 45 | Sommer | Yes, so there – about 23 December 2013 the private ruling was.  But the important thing about that is, that was long after the first batch of BASs were submitted so it's a bit different getting one on 30 September and then lodging BASs on 28 October that are different to the one in which a private ruling was issued, which is the imputation that that carries, versus getting one two months after you've lodged the first quarter's BASs which is the way in which it seems to have happened.  So I'm – it's a bit – I think there's something strange going on where that private ruling keeps popping up in references there - - - |

CONFIDENTIAL

DEF_00051787

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Well, it's still sitting on our records. |
| | McMaster | That's why.  It's on the single case management system. |
| | Dolevski | On the – that's right. |
| 5 | McMaster | And it's sitting there as not withdrawn.  It's sitting there as a valid PBR.  Unfortunately, I don't recall seeing from Peter Walmsley - - - |
| | Dolevski | So, Andrew – sorry – that letter - - - |
| | Sommer | So that's the - - - |
| | Dolevski | That letter that you made reference to from Peter Walmsley, are you saying that it said disregard the previous, it's not accurate? |
| 10 | Sommer | Well, it says, "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked, but that is not correct".  That's the first paragraph.  And then even if we had got one he's saying that, "Any private ruling we made would be invalid or worthless". |
| | Dolevski | Okay. |
| 15 | Wright | And the particular ruling there, if you read it, doesn't say "bitcoins";  it says "commodities". |
| | Dolevski | Okay. |
| 20 | Sommer | So we've got some strange things going on there but that continued reference to 30 September is frustrating to the client because it was never received.  However it's represented in your system, it wasn't sent to us and even if it had been sent to us we would have been instructed by Mr Walmsley's letter to ignore it. |
| | Dolevski | So, sorry, just that date from Peter Walmsley saying - - - |
| | Sommer | 15 October. |
| 25 | Dolevski | 15 October. |
| | Chester | We even met with him .....  Was it about that time, or shortly after that?  Discussing bitcoin in general ..... |
| | Wright | The two rulings, if you actually read the public thing or whatever else – what has happened is the one on the 23rd has been copied and backdated. |
| 30 | Mr .......... | I think – I – I - - - |
| | Dolevski | Sorry, the one on 23 December you're saying has been - - - |
| | Wright | Has been copied. |
| | Dolevski | - - - copied. |
| | Wright | And ..... to look like it was issued before. |
| 35 | Dolevski | Well, it was authored by Peter Walmsley so I'm not sure that I can - - - |
| | McMaster | Sorry, could you re-state that please, Craig?  I didn't quite understand - - - |
| | Dolevski | Craig is saying that the 23 December ruling is a copy of the September ruling yet he has got a letter from Peter Walmsley saying that the 30 September ruling is inaccurate.  That's the statement you're making. |
| 40 | McMaster | Well, at that point in – okay.  So at that point in - - - |
| | Wright | No, we've got nothing issued. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Is it?  Sorry? |
| | Sommer | Nothing was issued so - - - |
| | McMaster | So not even the letter of 23 December? |
| | Sommer | No, no.  No, no, 23 December was certainly issued.  I remember this - - - |
| 5 | McMaster | Okay.  And it basically was verbatim of this other particular - - - |
| | Sommer | Well, we don't – we - - - |
| | Dolevski | They never received the 30 September. |
| | Sommer | We never received the 30 September ruling is my instruction. |
| | Ms .......... | Actually, yeah. |
| 10 | McMaster | I'm just trying to understand how, if you've never received it – how you know it's a copy. |
| | Sommer | I think Craig's saying that he publicly – the version that's on the public PBR - - - |
| | McMaster | Okay. |
| 15 | Sommer | - - - the register on the internet is verbatim to the version of 23 December ruling that – so it seems to be the same ruling. |
| | McMaster | Okay. |
| | Sommer | We never got it – based on the edited version on the website. |
| | McMaster | But you would accept that that ruling is a valid private binding ruling? |
| 20 | Sommer | Which one?  23 December? |
| | McMaster | Yes. |
| | Sommer | I'm not contesting that at all, no. |
| | McMaster | Okay. |
| | Sommer | I'm not accepting it but I'm not contesting it either. |
| 25 | McMaster | And that's fair enough.  And that's fair enough. |
| 30<br><br>35<br><br>40 | Sommer | I don't accept anything that I don't have to but I'm not presently objecting to the form, content or otherwise of the 23 December ruling other than the fact that it's wrong as a matter of fact but we will get to that ..... Okay.  So treatment of bitcoin.  Wherever we go with that first quarter of transactions there is nothing more fundamental to it than the way in which we're going to end up treating bitcoin in one sense because it creates all these interdependencies between the various entities and the way in which things were moved around.  We've made submissions to the Tax Office regarding the fact that it's broad - the definition of money for GST purposes is broad enough.  For my part I think it's simpler, I think it's more certain, and I think it's more predictable to treat bitcoin like money.  I think it's almost inevitable that it's going to – if it hasn't crossed the threshold ..... we're going to have to do it ..... and treat it like money for the purposes of it, but this isn't the forum to do that.  You know, as I say, that's where I would rather devote my resources as to esoteric questions of law because that's far more interesting to me.  But, really, I mean, we've got three options and, you know, I've been working with friends of mine who are on the OECD and representing various countries and talking to them about bitcoin because we had nothing else to do over Christmas and, really, the world is looking at it in three different ways.  One, |

CONFIDENTIAL

DEF_00051789

Interview Conducted with Craig WRIGHT

_____

| | | |
|---|---|---|
| 5 | | you're treating it like a taxable barter, which is the way in which the UK initially tried to treat it and then they've recanted, bless them.  I think in Europe there's an option to treat it as money but not input taxed and I think that's probably where this concept of private money which exists under European law, which is probably where the Germans are going, probably where the English will follow the Germans, and it will be effectively in our purposes not fiat currency but treated as an input tax for exempt supplier to avoid the problems that arose in the UK. |
| | Wright | The same as barter dollars. |
| 10 | Sommer | Yeah, with the HCMEU of it being a taxable barter that caused everybody to get upset and they seem to be moving inexorably and you don't know what it is, but it's exempt.  Under our system that's probably a little bit more complicated because of our exemption rules and I'm not entirely sure how we would make it exempt input tax if it's not money.  I don't know how we're going to do that but that's ..... and maybe one we will throw at the feet of Mr ..... in due course.  The other option is money.  Now, we have – and I think with all due respect to Mr Walmsley, Mr Walmsley is coming ..... from an income tax perspective and the income tax ..... he sees things like income tax and he sees things in delineation between Australian currency and foreign currency which is, you know, an all-encompassing – it has either got to be issued by the Australian Government or it has got to be the currency of another country, which I think is the way in which he sees the income tax world and I think that colours the way in which the definition of "money" is being approached.  But the definition of "money" for the GST purposes is very different and I think we owe to the issue to look at the GST definition of "money" rather than this notion of currency that we find in the income tax law.  I say that because of the references in the private ruling and in the – what I will call interim activity audit report that make reference to the New South Wales landfill case which is a stamp duty case which is – and the payment instrument in that case was found not to be money for stamp duty purposes but it would still be within the definition of money for GST purposes because it's a promissory note which is specifically picked up.  So I'm not quite sure why we're fixating on that case and saying, "Oh, see, it's not money" but it is money because that thing would have been ..... under our law but no bitcoin.  Anyway.  That's a question.  More relevant for present purposes is where are they?  How are they supplied?  What are consequences of ..... supplied?  The ATO view is expressed in the private ruling which it's not property.  Personally, I have the greatest difficulty accepting a proposition that bitcoin isn't property.  How the Tax Office can form the view that it's not property in any form I struggle with.  They say it's akin to confidential information because you need the private key.  Well, a private key attaches to the wallet not the bitcoin itself.  The bitcoins themselves, you know, aren't confident information.  The bitcoins are different to the wallets.  The bitcoins carry with them their own history of the wallets to which they've been allocated.  So I just think there's real problems in the private ruling about what bitcoin are and how they work and so on.  There's - - - |
| 15 | | |
| 20 | | |
| 25 | | |
| 30 | | |
| 35 | | |
| 40 | | |
| 45 | | |
| | Wright | And one of the other difficulties is at the moment we're looking at doing it in a trust.  We will hold that in Singapore and we will issue trust rights in Australia.  A trust is – you know, unit trusts are input taxed and I will automate them.  I will build the software the same as bitcoin, as a wrap-around bitcoin, and we will have a GST-free bitcoin because it's attached to a trust. |
| 50 | | |

_____

Page 10 of 40

Interview Conducted with Craig WRIGHT

| | Sommer | Yeah. So I think – as far as I'm concerned the bitcoins display the characteristics of property in the sense that they can be owned, they can be transferred, and you can work out who owns them. They're functionable like money because if they're stolen, you know, they're – you know, like – much like currency. If, you know, John was to pinch the $10 from my wallet the presumption would be that he owns that money because that's the way in which the property law acts on money and money is slightly different and bitcoins follow that path but they do ..... the characteristics of money and we can talk elements of property but for the sake of time we will skip on. Even if we were to perceive that bitcoin isn't money, which I think is – I can – you know, we're never going to agree a treatment for the BASs on the – if I – if we for the present purposes hold the line that we think bitcoin is money. We do think bitcoin is money but we might have to go with the Tax Office view for the sake of resolving these outstanding BASs. For the purposes of a without prejudice discussion, to move things along, we could adopt a view that a bitcoin is a form of intangible property which I think probably is a better view than trying to argue that bitcoin isn't property in any form. That – again, my reason for going over all of that is that we need to work where it is, how it's applied and those sorts of things. Even if we're going to adopt your view as to it not being money, we still need to work out the operation of the nexus test in 9-25, the operation ..... and so on in relation to bitcoin in order to get any traction or any progress at all. Mostly the bitcoin haven't been brought to Australia by Dr Wright so mostly bitcoin is subsisting in entities that exist outside of Australia. So you will recall that on those opening slides we talked about bitcoin mining commenced and then they were transferred out of Australia to other overseas entities. Mostly they have remained outside there. They are held in wallets owned by non-resident entities outside of Australia. An exception is the bitcoin brought to Australia for the purpose of the Denariuz transaction, which we will get to at the end. Now, I think, Marina, you were talking about – that there is one BAS for the second quarter. That is the one that I think has been – that is the one you're referring to, the Denariuz transaction, the Denariuz BAS that was lodged for the period ending 31.12.2013 and that contains a specific-purpose transaction which was done to demonstrate the way in which the Tax Office view of bitcoin ..... But as far as I know that's the one that you've got ..... in dispute with you guys. |
| | McMaster | There was a BAS lodged prior to 30 June for a previous quarter in which a refund claim was made and released for one of the entities. |
| | Sommer | Okay. |
| | Dolevski | Yeah. |
| 40 | McMaster | And I just can't remember exactly which one it is. |
| | Sommer | Okay. |
| | Chester | That was the R and D claim that was released. |
| | Wright | That wasn't GST. |
| | Dolevski | No, that was - - - |
| 45 | McMaster | There was a GST. |
| | Dolevski | Panopticrypt. |
| | Chester | Panopticrypt. |
| | Dolevski | Yep. So 157,368 refund was issued. |

CONFIDENTIAL                                                                                                                    DEF_00051791

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | Okay. |
| | McMaster | Okay. And - - - |
| | Doa | So you say they're held in wallets outside. You're saying that where the wallets are held is basically where the bitcoins are located? |
| 5 | Sommer | Well, yeah, I suppose. I mean, it's like an intangible asset sitting in a trust in the sense that if the trust is a non-resident, it has got no relevant connection with Australia and it's holding an intangible asset the assumption is that the intangible asset is sitting outside of Australia. Yeah - - - |
| | Doa | So all the private keys are being held - - - |
| 10 | Sommer | By the non - - - |
| | Doa | By the non-resident trust account. |
| | Sommer | True. |
| | McMaster | So how are you trading the bitcoins between the entities? |
| 15 | Sommer | This is the point to which we will soon come. Current transactions. Right. In my view they seem to break down into three types of transactions. There is – what I want to do, as I said, agree a basis for transaction in principle and then ..... All right  How do we do it?  Capitalisation of the ..... seems to happen in the following way.  Craig holds an interest in – sorry, Dr Wright holds an interest in the offshore trust which holds the bitcoins so Craig is there holding a bitcoin and sitting overseas.  Craig has an equitable interest in that trust and what seems to be happening, because there is no physical transfer of the bitcoin, is that the equitable interest in the offshore trust is transferred to the subsidiary in consideration for the issuance of shares.  So they are capitalised, not with actual bitcoin because as I understand it there is no transfer of the bitcoin into the vehicles and there is no movement of the bitcoin, except for the Denariuz transaction to which we will return, and Hotwire in this case – and I have to choose that as indicative of the others – receives that equitable interest in the offshore bitcoin which still sits out there and issues shares to Dr Wright in return.  So the supply of shares is clearly going to be taxed.  Dr Wright didn't supply actual bitcoin to the company, as I understand it.  Rather, Dr Wright transferred some of the equitable interest that he holds in the offshore trust to the company in consideration for the shares.   The company could then call for a transfer of bitcoin to it absolutely or it could direct the offshore trust to transfer the bitcoin to a third party purchaser at the company's direction.  Now - - - |
| 35 | McMaster | Excuse me ..... |
| | Sommer | Sure. |
| | McMaster | Do you have copies of this – Marina is busy drawing ..... |
| | Sommer | Yeah, I will give you copies afterwards if that's okay. |
| 40 | Dolevski | Okay.  Terrific, yep. |
| | McMaster | Excellent.  Thank you. |
| 45 | Sommer | Yeah.  Des, you would be entitled to say that, "Andrew, you guys have always told us that we transferred bitcoin" and I think that's right and I think that's largely because we saw bitcoin as money and transferring balances around and ledger amounts of money from one entity to another entity if it's done on paper is done on paper and is still there, kind of – it's still money moving around.  It doesn't change the character of it.  But once you start saying, |

CONFIDENTIAL

DEF_00051792

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| 5 | | "Okay, bitcoin is some form of non-money, it's some form of intangible rights that subsist out there" you have to then start saying, "Well, did you actually get legal title to it or did you get something less than legal title to it?"  And we got – the problem is Dr Wright does not hold the legal title to those bitcoin.  They sit in the trust sitting in the UK or the Seychelles or in Singapore or wherever and so he couldn't transfer the actual bitcoin into the entities.  The rights that were transferred were the right to call for that bitcoin in accordance with the existing trust arrangements that are there. |
| 10 | McMaster | So Dr Wright would have the appropriate agreements etcetera with these entities that are overseas? |
| | Sommer | I think they're – with the entities that overseas, absolutely. |
| | McMaster | Because this is the first time - - - |
| | Sommer | Yeah.  No, I - - - |
| | McMaster | - - - I've heard of the overseas trusts. |
| 15 | Wright | Okay.  Well - - - |
| | McMaster | I suspect it's probably the first time Michael Hardy would have heard of these. |
| | Sommer | I don't think so, no.  I - - - |
| | Wright | Yeah, it was emailed to Michael and it was emailed to the people before Michael on 17 July. |
| 20 | Sommer | Okay. |
| | Wright | We have those emails where I communicated ..... |
| | McMaster | Well, that would be nice to get hold of because I've not seen those emails. |
| 25 30 35 40 45 | Sommer | I understand all of that and I understand that unfortunately – because – I think the problem is because everybody has been around the bitcoin issue rather than tackling the bitcoin issue everything has become fragmented and so what I'm desperately trying to do with all this is to try and put it all together because I can't understand it until it's in a cohesive framework, which means I can't communicate it to you guys until it's in a cohesive framework, and I'm trying to put this in a way that I – I have come to terms with what seems to be happening.  I am totally conscious of the fact that some of this information and some of the way in which we're looking at this is different and it's because changing that – pulling out that peg of bitcoin as money and saying, "All right, well, it's not money"  fundamentally changes the way in which a lot of this is seen from a legal perspective.  And, as I said, I'm – you know, if we, you know, had a million years to resolve this, which Craig tells me I don't, I could happily with, you know, as many people from the Tax Office as possible and we could debate and go and get declaratory relief and all that sort of stuff, and that's stuff we will have to do if we can't reach some sort of agreement.  But I would – I owe it to my client to say, "Look, there is a way through this where we can agree a treatment with the Tax Office while we work on the treatment of bitcoin".  Now, the treatment of bitcoin is really, really important because without it our business model doesn't work, but that's a business problem, that's not a tax-compliance problem.  I'm here to try and solve the tax-compliance problem in the short term and then we can, you know, have agents dancing on pinheads for the purposes of working out the definition of "money" later.  Right.  Again, purchased by the Australian companies of third party suppliers in Australia.  So if we have a supply of goods and services in Australia from an Australian supplier, the box in the bottom right, to the |

---

CONFIDENTIAL

DEF_00051793

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | | companies – Hotwire again used as indicative – what seems to be happening – and, you know, we can go through the documentation with this – is that there is the supply that takes place here;  there is no transfer of bitcoin out of Hotwire because Hotwire aint got none.  What it does is it says to the |
| 5 | | Australian supplier, "I will grant you a right which you can exercise against the offshore trust to have them transfer bitcoin to you in satisfaction of my interest in the trust".  It's something different to the intragroup transactions so as you go here, see what there is from Craig to Hotwire, is a supply of the interest in the overseas trust.  I don't think there's any intention to have the Australian |
| 10 | | supplier a beneficiary of that but what it's doing is saying, "I will nominate you as the person to receive bitcoin in satisfaction of my interest in the trust" and the offshore trust then, you know, does what needs to be done in order to transfer the bitcoin out of the trust and at the direction of the Australian supplier.  Whether it goes to the Australian supplier there's ..... whatever, you |
| 15 | | know, is a whole other question. |
| | McMaster | By "Aus supply" do you mean a related entity or a totally unrelated - - - |
| | Sommer | No, no, no.  So these are third-party suppliers. |
| | McMaster | Okay.  So the only one that I'm reasonably certain of is MJF at the moment. |
| | Sommer | MJF is the one - - - |
| 20 | McMaster | The prime one, obviously. |
| | Sommer | The prime one, yeah.  So - - - |
| | Wright | Some of the others  - - - |
| | Sommer | Again, I'm trying to set up a framework for understanding when we do this - - - |
| | McMaster | Sure.  Sure.  I understand. |
| 25 | Sommer | If we ever do this again.   But, yeah, MJF is the principal one that we're worried about for the purposes of the outstanding BASs. |
| | McMaster | Okay. |
| | Sommer | Supplied by the Australian supplier will be a taxable supply ..... payable.  A supply by the undertaking of ..... is not a supply of bitcoin because they aint |
| 30 | | got any but there's a supply of right and supply is a right for use outside of Australia, the enforcement of transfer of bitcoin in accordance with agreement. Supply of that right is probably GST free on the basis of section 38-190 item 4, you know, supply in relation to rights for use outside of Australia, much like Travelex and so on.  So that's where we would see that going.  Again, |
| 35 | | purchased by an Australian company and the third-party supply is from an offshore supplier.  Again, very similar other than we have, you know, possibly – whether or not the supplier is connected with Australia is another approach under section 9-555 and all those sort of things – again, there is supply of a right as against the offshore trust by the Australian company to the offshore |
| 40 | | supplier so again, you know, 38-190 item 4 or even 38-190 item 2(b) as well in relation to the GST-free treatment of a supply of that right. |
| | Wright | And the IP ID which is ..... location information assigned to an IP address, for the date of the supply is matching all the emails to do with the transfers etcetera is – matches Doncaster, UK where the entity that manages the trust |
| 45 | | happens to be sitting. |
| | Sommer | So - - - |
| | Wright | As are the dates and it's public information that can't be changed ..... |

Page 14 of 40

CONFIDENTIAL

DEF_00051794

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Sommer | | So they're the different ways.  So the outstanding – a number of BASs that have been lodged by the various entities, they're held up and all that ..... numerous ..... variables which start to go crazy.  But if you look at Hotwire when it was lodged, right – so the basis underpinning the lodgement of the Hotwire was that there was an issue of shares;  there was a transfer of bitcoin but there was software coming from the Wright Family Trust in the far left of the screen;  there were transactions with Coin Exchange and Panopticrypt.  There are also some other little transactions that are immaterial and admitted for the purposes of the diagram.  I think – and, you know, I wasn't involved in the original lodgement and I'm coming to it with reasonably fresh eyes and going through the legal arrangements and so on.  This is the way I see it, that there's – at the top of the screen you see the capitalisation transaction that we have looked at and then you have a range of intragroup supplies across the bottom, Panopticrypt , Coin Exchange and the Wright Family Trust where there is a transfer of the equitable interest in the offshore trusts made in consideration for various supplies being made in and out of Hotwire.  Within the group, as Des is saying, there is a transfer of the equitable interests.  That's not intended to be the case for MJF Mining Services.  I think we've all had enough to do with Mark Ferrier that we don't want to provide him with any equitable interests in anything and so he got the right to have bitcoin transferred out of the offshore trust, which is what in fact happened but it was transferred to him in satisfaction of the invoices that were issued.  So that's the way I would see it working, that there are a whole lot of supplies being made between the related entities in consideration for basically rebalancing the ledger of the equitable interests held in those Seychelles' trusts, for example, so that, you know, there's very little that actually moves.  It just depends at which point who is entitled to how much of the interest in the bitcoin sitting in the Seychelles.  As regards third parties there is in fact a physical transfer of bitcoin out of those trusts to those third-party suppliers where there is, you know, something real happening.  Now, that something real that happens does not seem to have a relevant connection with Australia in the sense that things are moving out of the Seychelles' trusts to, you know, the wallets designated by the relevant contractual counter party.  There's nothing that touches Australia.  The only thing that happens in Australia is the grant of that right to have the bitcoin transferred out of the trust.  Bitcoin didn't move, except in relation to the Al Baraka transactions and the MJF transactions.  The capitalisation ..... were covered.  Intragroup payments are affected by the transfer of equitable interests in the offshore trust and Dr Wright acted as agent of Hotwire in negotiating the Al Baraka transaction which is, "Andrew, that's all very well but show me the proof" which we will come to in a minute.  As such, no acquisition ..... supply by Dr Wright or the Wright Family Trust in relation to the Al Baraka ..... software and that is different to the way in which the BAS was lodged. There was an assumption I think that there was an acquisition and a ..... supply.  Having looked at the agreement there and the parties, I don't think that's right.  So I think that, really, Dr Wright personally was in there as the negotiating party on behalf of the end recipients and that seems to be the clear agreement between the parties, that Hotwire PE is acting through its agent, Craig Wright, R and D. Craig Wright ..... is authorised to represent Hotwire, etcetera, etcetera.  So the contractual – the interpretation of that as a matter of law, when I come to have a look at that agreement, says there's an agreement between the contracting parties and there are agents in there acting on their behalf. |
| Wright | | If I can just show you something.  This is Mr Ferrier ..... you can take it down and copy it later.  You will notice the dates.  It's a Telstra thing.  I don't have |

CONFIDENTIAL                                                                                             DEF_00051795

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
|  |  | any access to the Telstra systems.  1 June 2013 we talked about the contract which is ..... |
|  | Dolevski | I think we've got that anyway. |
|  | Wright | This is an email.  This is - - - |
| 5 | Dolevski | Have you been – have you sent ..... |
|  | Wright | You probably have it. |
|  | McMaster | There was an image of - - - |
|  | Doa | Yeah.  I thought - - - |
|  | McMaster | I think you've sent that image to Michael Harding. |
| 10 | Wright | I have, yes. |
|  | Doa | Yeah.  Yep. |
|  | McMaster | And Michael has provided that to us. |
|  | Doa | Yep. |
|  | Wright | Okay.  I didn't know if you had or not. |
| 15 | McMaster | No, that's okay, because we've asked Michael to give us everything - - - |
|  | Wright | Because - - - |
|  | McMaster | So that we can form an appropriate opinion. |
| 20 | Wright | What happened was the day before sort of everything else we did the contract exchange but I formed the company the day after, so we had an agreement that I would form this company, which I then did, but – so I was acting for a company I was going to form, which was sort of out there but not out there, if that makes sense. |
|  | McMaster | A slight timing difference. |
|  | Doa | Yep. |
| 25 | Wright | Yes.  But the idea was to bring it into the company, so to speak. |
|  | McMaster | I remember reading this and I formed the same view as you, Andrew, that the thing that sort of still sticks with me is the ..... contracting so obviously there must have been some contact between them and Al Baraka. |
|  | Sommer | One would imagine. |
| 30 | McMaster | But - - - |
|  | Sommer | I don't know.  My Saudi Islamic law is not so good so - - - |
|  | McMaster | No.  Better than mine. |
| 35 40 | Sommer | So I think that's the way I see that, and then I see no acquisition, no taxable supply by the Wright Family Trust into Hotwire or other stuff, so there are other transactions.  Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire in consideration of the transfer of the interest in the offshore bitcoin trust so I think that filtered through.  There's lots of reasons I understand that took place and that is that there – you know, the combined 56 million worth of IP that came out of WK Info Defence was then broken up by Craig and put into different entities that were going to need the |

CONFIDENTIAL                                                                                           DEF_00051796

Interview Conducted with Craig WRIGHT

|   | | |
|---|---|---|
| | | different bits.  That's the way I'm instructed that that happened and that seems - - - |
| | Wright | I wasn't intending to make it messy.  It was just trying – I had a big pool of stuff and I wanted to split it into each of the things that we're doing, each of the bits, so that - - - |
| 5 | | |
| | Sommer | Messy was a by-product rather than an objective.  That's good. |
| | Chester | ..... |
| | Wright | But you will be happy to know I agreed that I don't touch any of these things ever again and Andrew and John and ..... |
| 10 | Chester | But one thing they were broken up for is – it wasn't just convenience;  it's that there was differential IP for – one was for security and it was all security-based stuff.  That went into the security entity and the stuff that was learning, that went into the learning environment.  There was – so each of those different things was – it was – it was – they were sectioned out based on content rather than, "Oh, let's throw some of that over here and some of that over there".  That was the idea, put them where they were going to be used. |
| 15 | | |
| | Sommer | So at this point we're really saying, "I can understand how this all got a little bit out of – confused between ..... auditors" and Craig, you know ..... quick responses and so it's very easy to misunderstand what's going on. |
| 20 | McMaster | Got a habit of ..... too much. |
| | Sommer | It's very confusing.   It has got to be done and try and put it in some sort of cohesive framework so if you've got any questions about that framework as we go, please let me know. |
| 25 | Dolevski | I think the fundamental difference in our understanding is that we actually thought bitcoins were being ..... |
| | Sommer | Me too, until recently. |
| | Dolevski | Whereas an interest now in bitcoins via a trust. |
| | Sommer | It was when I had a conversation with Dr Wright where he said that nothing has even moved because – and I've got - - - |
| 30 | Wright | Apart from the external stuff. |
| | Sommer | Apart from the external stuff and then it's just, like, "Okay, look" – I then literally at that point – I went back – had to go back to the drawing board and reconstruct all the diagrams because until then I had, like you, assumed – and Des has assumed and we've probably, you know, caused you to believe that bitcoin had been moving around.  But it seems that part from the Denariuz transaction, which is different, we will get to that, nothing seems to have moved and so therefore we are dealing in subsidiary interests in these things that remain and that in one sense is consistent with the way in which it has been done, that it's effectively ledger entries in the equitable – moving around an equitable interest rather than actually conducting the transfers.  Okay.  Which then brings us to the - - - |
| 35 | | |
| 40 | | |
| | Wright | Just as an aside now I was going to say from all of that my assumption is that it's money. |
| | Sommer | Yeah. |
| 45 | Wright | So therefore if I treat it as money then it's how I move it so - - - |
| | Sommer | Yeah. |

CONFIDENTIAL

DEF_00051797

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | I just assumed that - - - | |
| Dolevski | I have to say it took me a while to get my head around bitcoins and them moving so you can imagine where I'm at at the moment. | |
| Sommer | Yeah.  See – no, you – this ..... | |
| 5 | Dolevski | Which from an audit perspective of is – we were kind of having discussions about what's your starting point, your stops and blows, which is why we thought in your particular entity as a sole trader we would have to actually – or start from a point of how many do you own.  We thought yes, you've picked up some bitcoin ownership from the deceased director so we were trying to, you know, get the picture and connect all the dots. |
| 10 | | |
| | Wright | ..... and buckets. |
| | Dolevski | That's right, you know, but now I - - - |
| | Wright | Yeah.  After the first instance I moved everything offshore just because – well - - - |
| 15 | Dolevski | Well, I'm kind of now starting – if the trust actually is even offshore and it's all paper transaction what's the fundamental reason that you're moving around interests, really? |
| | Sommer | Oh, well, to pay for stuff.  It's not an unusual – I mean, if you think about a large corporate group that has got a single bank account you have a ledger of the transactions when those – you know, for intragroup transactions.  You know, one may rent property to another and the payment is on a ledger but no money actually leaves the account. |
| 20 | | |
| | Dolevski | I know.  There's actually no movement. |
| | Sommer | That's exactly right, and that happens all the time.  It's just – and that's why I think there was – these things were documented in the way they were documented because, really, it was just a ledger interest between effectively related parties. |
| 25 | | |
| | Wright | And - - - |
| | Sommer | And moving around those subsidiary interests of the offshore trusts so it's – I think of it much like that corporate group with a single bank account.  No money is moving but payment of consideration is clearly made;  just at any one point which company – the extent of each company's interest in that agglomerated bank account is then – can only be ..... by going through their individual accounting records so - - - |
| 30 | | |
| 35 | Wright | It was never the intention to make it more complex but when I spoke to you guys in July last year I said this is what I want to do and I was told I had to account for all these separately.  I said, "Why can't I just record ..... there" and I got sort of a blank look and – like I was the anti-Christ. |
| | Sommer | Yeah - - - |
| 40 | Dolevski | Well, we have to consider it separately because when you're moving it in different entities - - - |
| | Wright | Because they're – of course.  They're separate, yes. |
| | Dolevski | Every entity is a taxpayer so we have to separate it that way. |
| | Sommer | Yeah. |
| 45 | Wright | And they have different shareholders.  Not every company has - - - |

CONFIDENTIAL

DEF_00051798

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Dolevski | But, I mean, even the private binding ruling is based on bitcoins. |
| Wright | Yeah. |
| Dolevski | Certainly not on interest. |
| Wright | And the other issue is each of the companies has different shareholdings. Hotwire has other shareholders; Coin Ex has other shareholders. It's not just me in any of these so – I mean, that was the other thing when I was talking to people because what I've moved into Hotwire has nothing to do with any of the other companies so if for instance someone who has shares in Denariuz can't then claim against Hotwire or vice versa because I'm not the only shareholder. I might be the major shareholder in everything but I'm not the only one. |
| Sommer | Yeah. So that seems to be how all that has happened so – in terms of the transfer of those subsidiary interests because nothing seems to have moved. I mean, if nothing has moved I need to be able to tell you guys what it was that has moved. It seems to me that there's trusts, that there's an equitable interest in the trust, that the idea was that each of those persons could call directly for the transfer to them absolutely. As you see – you will see that they've effected payment by instructing that trust to make payment to third-party contractual counter parties and so there was a transfer of a beneficial interest in – or part of a beneficial interest held by Dr Wright or held by one of the other contractual counter parties to the other group companies. You know, these group companies ..... related companies, I suppose, is probably the ..... I should adopt. |
| Wright | I will interrupt and say the reason for the PR was on a wallet that I do hold in Australia and I've dealt with – that's the only one I hold in Australia but I haven't transferred it yet. |
| Dolevski | So that has got nothing to - - - |
| Wright | No. |
| Dolevski | The private binding ruling on the 55,000 wallet - - - |
| Wright | I still have that one. |
| Dolevski | - - - of bitcoins has nothing to do with these transactions. |
| Wright | No. And that didn't go through because I – the private ruling. I want to use it and that's part of where we're trying to figure out for selling the damn things in Australia versus overseas versus all the rest. |
| Sommer | Yeah. So the relevance, the – our real need for clarification on the treatment of bitcoin isn't so much for some of these transactions, which are some of these transactions because they were conducted with actual bitcoins but most of those bitcoins were offshore. The Australian legal treatment of bitcoin is critical to the business model because you can't have - - - |
| Dolevski | But not in respect of these group entities. |
| Sommer | No, not in relation to – yeah, not in relation to the intragroup transactions. |
| Dolevski | But isn't this – aren't we now talking about a trust and group of entities that's actually paying the things out of an interest in a trust - - - |
| Sommer | Sure. |
| Dolevski | - - - that owns property? |
| Sommer | Yep. |

Page 19 of 40

CONFIDENTIAL

DEF_00051799

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | And fundamentally, if we're just talking theoretically - - - |
| | Sommer | It could be ..... |
| | Dolevski | It could be anything. |
| | Sommer | Exactly. |
| 5 | Dolevski | And so bitcoins is really a side issue which has perhaps confused us all but not relevant to - - - |
| | Sommer | Not relevant to the audits. |
| | Dolevski | No. |
| 10 | Sommer | But absolutely critical to what Dr Wright wants to do with his business because if you want to try and create a bitcoin exchange the whole liquidity and the convertibility of the currency is only going to be achieved if it's treated like money. |
| | Wright | If - - - |
| 15 | Sommer | The liquidity – if every time you transact, if every time I buy a bitcoin from you I have to pay you 110 per cent of its value because you've got a taxable supply then we've got a problem with the transactability of it. |
| | Wright | Which means you will go to Singapore or the US. |
| 20 | Dolevski | But, Andrew, if we raise these assessments or not release the refunds and revise the BASs, say – you know, whether the interim position paper read – I mean, if we take out that paragraph about the reference to the September ruling or whatever, it will clean up our system, but – so we take that out and our bottom line is not going to change with the revised – okay? |
| | Sommer | No. |
| 25 | Dolevski | That's still – even if you dispute that, that's still not going to get you your technical clarity on bitcoins because we literally have to walk away from here. |
| | Sommer | We're not dealing with bitcoin. |
| | Dolevski | We're not dealing with bitcoins here. |
| | Sommer | Except for Denariuz, and we will get to Denariuz because Denariuz is the answer. |
| 30 | Wright | Denariuz is – like, I did - - - |
| | Sommer | They actually did a physical transfer of bitcoin. |
| | Dolevski | So there has been lots of – and dare I say a lot of heated conversations amongst different people - - - |
| | Sommer | A lot of colour ..... movement but not a lot of progress and that's - - - |
| 35 | Dolevski | No. |
| | McMaster | But there was no clarity. |
| | Dolevski | No. |
| | Sommer | Hence why I wanted to – and that's why .... |
| | Wright | I apologise for that but - - - |
| 40 | Sommer | It's just that that's why – and I think there has been so much grinding of the wheels and that's why I really wanted to have this circuit-breaker meeting to |

CONFIDENTIAL                                                                                        DEF_00051800

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
|   |   | actually say, "Let's just really try and put it in some sort of cohesive framework and actually understand at law what really happened" because that's why I ..... |
|   | Dolevski | Well, we're getting back to you and your facts of what has happened. |
|   | Sommer | Well, that kind of helps so - - - |
| 5 | Dolevski | It does. |
|   | Sommer | So this is where things start to get to where we really – so all of those intragroup transactions, intra-related party transactions, whether or not they produce – you know, if they're bitcoins that are taxable then they're taxable on both sides.  They're probably not taxable on both sides in the present |
| 10 |   | circumstances because we're dealing with subsidiary interests in offshore bitcoin rather than actual bitcoin.  All of that nets out to a whole bunch of not very much.  So there's rats and mice stuff where we've paid for parking and rent and photocopiers and those sorts of things.  There's intragroup stuff.  The real refund that the guys need is in relation to the MJF transactions.  The rest |
| 15 |   | of it is more a spinning of the wheels.  So these things are the things where we have paid GST-inclusive amounts to our supplier and they're considerable and we need those, you know, refunds ..... to us is to try and get those refunds back so they continue funding activities in Australia.   So that – that's – but this is the real pain of the retained refunds.  A lot of those – you know, |
| 20 |   | there's 60 million here and you can flick through the BASs.  They're huge numbers but most of that is a lot of, you know, intragroup circling around of stuff and - - - |
|   | Dolevski | Plus ..... |
|   | Sommer | Exactly.  Moving stuff around between - - - |
| 25 | Dolevski | Yep. |
|   | Sommer | Moving those large lumps of IP around whereas these MJF ones are the ones that, you know, I'm particularly focused on making sure - - - |
|   | Dolevski | And so MJF – because obviously we can't discuss - - - |
|   | Sommer | No. |
| 30 | Wright | That's right. |
|   | Dolevski | It's a separate taxpayer but - - - |
|   | Sommer | Yep. |
|   | Dolevski | So where does this connect in terms of which of Craig Wright's entities? |
|   | Sommer | Okay.  So this was – and that's exactly where these lines are going.  So MJF |
| 35 |   | contracting so the tax invoice that they issued and so there's two highlighted ones there, are acquisitions by Dr Wright personally.  So those acquisitions are valuation services by Ferrier for fifty five thousand or fifty thousand dollars in the top line there which – I'm sorry, you can't quite read. |
|   | Wright | Can we focus that any better, do you think? |
| 40 | Sommer | I will be gentle - - - |
|   | McMaster | We've seen that invoice today. |
|   | Wright | You should have it. |
|   | Dolevski | Yeah, the one that you showed me.  Yeah. |
|   | McMaster | Yep. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | I will be gentle.  I will be gentle.  That's about the best we're going to do there. |
| | Dolevski | Yep. Yep. |
| | McMaster | Yeah. |
| | Sommer | Okay.  So - - - |
| 5 | Chester | And one of those is – the top one is Ferrier promising his Ian Ferrier services to ..... as a consultant ..... |
| | Dolevski | And we've got a copy of that. |
| | Sommer | Yeah. |
| | McMaster | Yeah, we've got - - - |
| 10 | Chester | You've got all the stuff. |
| | Dolevski | Yep, yep. |
| | McMaster | Yes, we do. |
| | Chester | You've got all the stuff. |
| 15 / 20 | Sommer | So this is why I say that I think some of Dr Wright's confusion related to just how these were transacted and so some of these are Dr Wright transacting on his own account;  some of these are Dr Wright transacting as agent of the other entities.  So these two are, as I understand it, personal transactions for Dr Wright.  They relate to the valuation services because I think they couldn't – they weren't going to be allocated to any particular entity at that point, where this was something to have up your sleeve, you know, if you need valuation services which, you know, in a world of intellectual property are always useful. |
| | McMaster | So was there any valuation done? |
| | Sommer | It was - - - |
| | Wright | No. |
| 25 | Sommer | It's due for March 2014 so it's prepayment against future delivered services so, as I understand it, they haven't been delivered as yet.  And the last one, the last line there, is gold ore. |
| | McMaster | That would have been the Payne - - - |
| 30 | Sommer | The Payne ..... gold transaction and that's clear from the last line of that tax invoice and, again, I think – sorry, when I say "I think", I'm instructed that that was a transaction that Dr Wright was doing for his own - - - |
| | Wright | And that was my trust. |
| | Sommer | That was to go into the Wright Family Trust, was it? |
| | Wright | Yes. |
| 35 | Sommer | Okay.  I apologise.  So that the right to that gold ..... so I will revise that – were to go into the Wright Family Trust.  Okay.  Then supply in 1B, so just working through that tax invoice – supply of the automation software was a supply made to Hotwire again for five – this one for $5.5 million including GST and that's from Siemens – is that right? |
| 40 | Wright | Yes. |
| | Sommer | And then it was supplied through MJF. |
| | McMaster | Sorry. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Sorry? |
| | McMaster | What did you say?  Siemens? |
| | Sommer | Siemens. |
| | Wright | Siemens. |
| 5 | Sommer | S-i-e-m-e-n-s, the - - - |
| | Wright | They're a German software – or Germany everything group. |
| | Sommer | That's - - - |
| | Wright | I have that software sitting in the office at the moment. |
| | McMaster | So how did you acquire that software? |
| 10 | Wright | We were given a licence key which was emailed – I believe John has got it – and a download link. |
| | McMaster | Okay.  And that came from Siemens or from MJF? |
| | Wright | That came through MJF. |
| | McMaster | And it worked?  Okay. |
| 15 | Wright | It does ..... |
| | McMaster | I accept what you're saying.  It's just given Mark's prior history I'm a little bit surprised. |
| | Wright | We were very careful with the software.  When I did the software stuff I made sure I – the payments happened as I got the software. |
| 20 | McMaster | Okay. |
| | Wright | And then what happened was - - - |
| | McMaster | Wise. |
| | Wright | Yeah.  And then I trusted them and the gold is a different issue. |
| | McMaster | The gold futures.  Okay. |
| 25 | Chester | It was the classic works, works, works, doesn't work routine, yeah. |
| | McMaster | Okay. |
| | Wright | So I kept going through and, "Wow, this is good.  This is good.  This is – he's disappeared". |
| | McMaster | Unfortunately. |
| 30 | Sommer | Okay.  And then my 1C, that's - - - |
| | Wright | Which I just made the assumption if you keep paying someone and they keep coming through they must be trustworthy. |
| | Sommer | That seems to be an acquisition by Coin Exchange through Dr Wright acting as its agent and eleven and a half million dollars plus GST.  That's - - - |
| 35 | McMaster | Is that the Al Baraka? |
| | Sommer | That is from Al Baraka and that's clear on the tax invoice there.  In the last line of the highlighted section there it says "Dallah Al Baraka Group" so – and that's the Microfinance software so the accounting packages. |
| | Chester | ..... my glasses ..... |
| 40 | Sommer | Okay.  And then - - - |

CONFIDENTIAL

DEF_00051803

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | We will also admit that since everything we've spent an inordinate amount of time rather than building on our damn software at the moment going through it with a fine-tooth comb trying to make sure there's no back doors or such other such things after finding out what Mark Ferrier is actually like. |
| 5 | Sommer | Yeah. |
| | McMaster | That would be a priority, I would suspect. |
| | Sommer | It's – yes. |
| | Wright | Yes.  We can't go live with it until we can trust it. |
| | Sommer | It has been a disappointing contractual experience - - - |
| 10 | Wright | Yes.  I don't want to run something that we have 100,000 bitcoin one day and the next day, oops, it's gone. |
| | McMaster | I know there has been some issues overseas with Mount  Cox. |
| | Sommer | Mount Cox. |
| | Wright | Mount Cox, yeah. |
| 15 | Sommer | Yeah, Mount Cox is causing us trouble for all other sorts of reasons at the moment. |
| | Wright | Yes.  The little buggers won't release my fucking money. |
| 20 | Sommer | Acquisition by Coin Ex so this is – I think this is the second of the MJF contracting invoices and I've put this one as an acquisition by – well, I've got Coin Exchange but actually there is – some of that was broken up and apportioned to the other entities as well because there's a commitment fee in there and so from an audit perspective – and this is why I think it's really important to agree the principles and then go – have someone sit down with John and rebuild everything from scratch because it seems perfectly reasonable to apportion commitment fees from this one across some of the other acquisitions but it means none of the numbers line up neatly and, you know, I'm a ..... so I like things to match up really nicely and of course they don't.  So the idea is yes, some of that gets broken up and apportioned to the other acquisitions included on there which is why I think one of them is 5.3 in the accounts instead of five even but I – you know, if we can agree the big issues, minor issues about the apportionment of the commitment fees services and the basis on which that gets spread out, I don't think is going to be too controversial and there's certainly nothing too intellectually difficult about any of that;  it's just a matter of explaining why nothing particularly lines up.  Now - - - |
| 25 | | |
| 30 | | |
| 35 | | |
| 40 | Wright | And that sort of thing, Alan .....  program manager, has been dealing with people in Turkey at Al Baraka.  It's definitely the Turkish Al Baraka website but whether they have any other dealings with Mr Ferrier I have no idea.  All I know is I've got this offer and I believe it's right and if they haven't – what they've done internally, I have no idea, but we have the people there and we have been dealing with the people there and I can pass all that info. |
| 45 | Sommer | So we've got the software.  We've got that line 2 there, line 3 there we've got. Line 1 is not due for performance yet.  Line 4 technically isn't due for performance yet but it would be fair to say that reasonable minds have suspicion as to whether or not that's going to be performed in accordance with the terms of that contract such that we've engaged litigators to secure what performance we can. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | What it looks like and what we have information from at the moment that we would be happy to hand over is there are three directors at Payne who have a history of pump and dump schemes as well.  Just on the first, when I signed my contract, they bought up massively.  When it was depressed they issued a "everything's terrible" release.  Then, when I signed my contract, on the day of, they started buying even though there was a stop order, so I don't know how they bought.  So they weren't meant to be doing anything until releasing the fourth but they – whatever.  And then when the final contract came through with Mark and everything like that, everyone did the – waited and then sold at really high prices and that was, like, a 300 per cent increase and they made about another 20 million that way. |
| | Sommer | Yeah.  And that's the subject of ..... being taken. |
| | Chester | Which we're happy to help you with if you would like to explore. |
| | Wright | And from my point of view those action – you know, if we can get someone tied into Payne then we can try and recover something there because - - - |
| | Sommer | That's about making sure that we get the .....  We paid for it.  It hasn't failed yet.  We're a bit squeamish about it, given some of the changes in character and the disappearance with Ferrier at different banks. |
| | Wright | Again |
| | Sommer | And just to be clear, because Mr Ferrier – people by the name of Ferrier are, you know, scattered throughout the tax world.  We're talking about a completely different Mark Ferrier to the one in charge of tax ..... or special projects and - - - |
| | Wright | The one whose dad's a rather high-profiled - - - |
| | Sommer | Yep. |
| | McMaster | Yeah. |
| | Sommer | So – right.  So we have got those details of the payments that were made in satisfaction of those tax invoices so 245,000 bitcoin on 30 August and 135,000 bitcoin on 15 September.  Again, no bitcoin transferred directly by Dr Wright to Hotwire and Coin Exchange.  Bitcoin was transferred for a trust ..... the trustee of which I believe is the entity by the name of ..... Limited. |
| | Wright | Not any more. |
| | Sommer | Not any more.  Right. |
| | Wright | We changed the names of the two companies. |
| | Sommer | Okay.  So it's the - - - |
| | Wright | To ..... and Coin. |
| | Sommer | Right.  So it's the same company, it has just got a less weird name.  Yes? |
| | Wright | Now you've - - - |
| | Sommer | I'm not doubting it was designed by .....  It's just one of those names that - - - |
| | McMaster | So there was a separate transfer of bitcoin to Al Baraka? |
| | Sommer | There was a transfer of bitcoin to the wallets nominated by Ferrier so he nominated wallets into which the money should be transferred.  We asked for confirmation and we received confirmation from Ferrier that all the transfers had gone through and all was tickety boo. |

CONFIDENTIAL

DEF_00051805

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay.  So that amount up there includes the Al Baraka? |
| | Sommer | All of it. |
| | McMaster | Okay. |
| | Wright | Yeah.  That was - - - |
| 5 | Sommer | So - - - |
| | McMaster | And that all went to Ferrier? |
| | Sommer | Yep. |
| | Wright | My - - - |
| | Sommer | As I understand it those - - - |
| 10 | McMaster | Okay. |
| | Sommer | Those amounts should line up to the totals invoiced on each one. |
| | Wright | My understanding was Mr Ferrier didn't actually want any bitcoin.  He wanted the monetary value that he was going to get from these other guys for doing all the stuff, these things, so he was going - - - |
| 15 | Sommer | We weren't involved in paying Ferrier. |
| | McMaster | Sure. |
| | Sommer | Whatever Ferrier got he got from Al Baraka. |
| | McMaster | Okay. |
| | Wright | All he had to do was ..... |
| 20 | Sommer | From the other people that we had paid into the wallets that were nominated by him, got confirmation we've got the software keys, got the downloads and the, you know, source code that we needed. |
| | McMaster | Exactly.  So we would be able to get those wallet address, I would presume? |
| | Sommer | I've got them with but - - - |
| 25 | McMaster | Later on - - - |
| | Sommer | - - - subject to – in fact, I think they've been provided but again let's try and do it in a cohesive way and - - - |
| | McMaster | Yes. That's okay. |
| 30 | Wright | They go right back to July where I did the – these are my things and whatever and I did actually tell someone but it's like everything you tell random people at the Tax Office what you're doing and - - - |
| | Sommer | Unsurprisingly - - - |
| | Wright | - - - it goes randomly into buckets of - - - |
| 35 | McMaster | Well, there are 26-odd – well, 20,000-odd of us floating around so that could easily happen. |
| | Sommer | Because of the enforcement proceedings that we are preparing in case it's not – the gold one is not performed in accordance with ..... my litigation colleagues have all those records being dug out and - - - |
| | McMaster | Excellent. |

CONFIDENTIAL                                           DEF_00051806

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I'm happy to share all the litigation stuff that we have, that we are chasing ..... with, if we can actually find him again because he seems to have vanished again. |
| | Sommer | Okay.  So any questions about any of that?  Do you need to change - - - |
| 5 | McMaster | No, it's good for another 15 minutes. |
| | Sommer | Okay.  Good.  This is going to make riveting listening. |
| | McMaster | Well, the Aus transcript person is going to love it. |
| | Sommer | Excellent.  I always – you know, my students sometimes hate my lectures and just cannot understand why it is unless they're suffering from, you know - - - |
| 10 | McMaster | Insomnia? |
| | Sommer | Sleep deprivation. |
| | Wright | I did my best to try and hide the fact that I've been running bitcoin since 2009 but I think it's getting – most – most – by the end of this I think half the world is going to bloody know. |
| 15 | Sommer | Yeah, well. |
| | McMaster | So your mining would have started at Lisarow, at the server farm? |
| | Wright | Lisarow was part of it where you have the garage full of computers and the other was at Bagnu. |
| | McMaster | Okay. |
| 20 | Wright | That's why we had that big fibre cabling put in and - - - |
| | McMaster | Yes, you want to speed. |
| | Wright | Yeah.  And we changed the – the whole area.  Like, Telstra is not going to do anything for the area.  No wireless or whatever else it was – a community of 20 people so "stuff you" basically. |
| 25 | McMaster | Yeah. |
| | Wright | Until we put the fibre in and suddenly ADSL and everything ..... |
| | Sommer | Okay. So a similar situation.  So we've been through Hotwire in detail. |
| | McMaster | Yep. |
| 30 | Sommer | So a similar situation now of understanding at lodgement – a revised understanding – oops, sorry.  There's twitching in my fingers.  I need more caffeine.  Right to have bitcoin transferred, issue of shares, essentially the same.  Exactly the same pattern in relation to it.  It just seems that for – as you see there, which we did and those wallet addresses, I'm instructed, were overseas and were in Africa and seemed to have been effectively at the direction of Al Baraka and our informal – our contractual arrangements were with Al Baraka and it seems that the money that went to Ferrier went to Ferrier from Al Baraka.  So they collected all the money and then, "Here's your cut" and - - - |
| 35 | | |
| 40 | Wright | I got told, "This is how, you know, we do it.  This is how we check.  This is where they go.  This is what we're doing". |
| | Sommer | Yep. |
| | Wright | And my understanding - - - |
| | McMaster | So would that have – sorry to interrupt.  Go on. |

CONFIDENTIAL                                                                          DEF_00051807

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I was going to say my understanding was - somehow he got paid.  He got – I don't know what his cut was or anything like this but – or even if he got paid in Australia.  All I know is he supposedly got paid into a trust somewhere. |
| 5 | McMaster | Okay.  So the Siemens and the Al Baraka one would have went to different wallets and the personal services - - - |
| | Wright | ..... |
| | McMaster | - - - and the gold - - - |
| | Sommer | There's a series of recipients but they don't – as I understand it they don't line up with each of those line items there. |
| 10 | McMaster | Okay. |
| | Sommer | They line up – those two transfers there line up with the invoiced amounts. |
| | McMaster | Okay. |
| | Sommer | The total invoiced amounts rather than the line items. |
| | McMaster | Okay. |
| 15 | Sommer | So we were – because we were told, dealing with MJF, put the money here in satisfaction of the invoice that MJF had issued to us, and we did. |
| | McMaster | Okay. |
| | Wright | I could explain it slightly differently but I think I will confuse the buggery out of everyone. |
| 20 | Sommer | Is what I said right? |
| | Wright | Right at what level?  Right at my level or right at - - - |
| | McMaster | Let's try our level. |
| | Wright | It's sort of right.  It covers things and yes, but is it actual – exactly how the things occur? |
| 25 | Sommer | Does it correctly describe the legal relationships? |
| | Wright | From a lawyer's point of view, yes. |
| | Sommer | Thank you.  I will take that as endorsement.  Right.  So again that's just the text describing what's on the previous slide so – all that.  I haven't finished this one yet.  Like I said, this is all a work in progress as I'm still trying to isolate the similar issues in relation to the Wright Family Trust.  I think there are clearly some software transactions between it and Hotwire Coin Exchange which is effectively the proceeds of the Supreme Court, New South Wales Supreme Court action which seems to have been broken up and transferred out of the Wright Family Trust.  My understanding, and we are being totally frank here – it is my understanding of those proceedings that they seem to be by Dr Wright personally and may have involved Dr Wright personally getting them and then on-supplying them to the Wright Family Trust.  I'm not entirely certain that's the case.  I would need to get clarification from my client as to that but I think that's one of the things – but that seems to be one of the inter-related party transactions that's going to go around in loops and circles and whichever way we look at it it's probably not going to produce any net tax across the different entities.  Yes, one entity might end up owing something and the other one will have an offsetting credit but I'm trying to aggregate stuff as much as possible for the purposes of resolving concepts and then we can try and line up ..... |

CONFIDENTIAL

DEF_00051808

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | And part of the whole finalising ..... and whatever else was my wife – now – made the comment that if I don't clean these up and get them out of the way then she doesn't marry me so – so we settled for – without going after any directors.  We settled without a whole lot of other things and with the understanding that if I wanted to get married I get the bullshit out of the way. |
| 5 | | |
| | Sommer | Fair enough.  Okay.  Denariuz.  Now, this is the only one where we've actually got an actual transfer of actual bitcoin, just to show that we actually do have them, and this is the one that was done as I understand it after the 23 December 2013 private ruling was issued to us.  And the intention of the parties was to demonstrate the way in which this would operate, and I think just by aside this does demonstrate why treating it as money is a much better idea.  So if you've got a sale of $38 million worth of bitcoin from the Wright Family Trust into an Australian registered entity it then takes that and then, you know, if you've got an output tax liability in relation – from the trust, input tax credit entitlement for the Australian company who then sells the bitcoin to a non ..... not carrying on an enterprise in Australia you've got an input tax credit entitlement in Denariuz that's not offset by any output tax liability because you've got a GST-free supplier on the way out and you've got a massive – like $19 million is a $1.9 million refund because you've sold half of the - - - |
| 10 | | |
| 15 | | |
| 20 | | |
| | Wright | ..... |
| | Sommer | - - - bitcoin rather than all of it.  If we had sold all of it we would have, you know, effectively a $4 million refund due to Denariuz and no output tax liability.  I just think that's inexorably the consequences of the 23 December ruling, that if you're going to treat it as a taxable supply, you know, you're going to have these very lumpy transactions that are going to give rise to a whole lot – you know, I could preach for hours on the fact that it's a consumption tax - - - |
| 25 | | |
| | Dolevski | So, Andrew - - - |
| 30 | Sommer | - - - and there has been no consumption so - - - |
| | Dolevski | So, so far in the Wright Family Trust only interest to the trust that actually owned or - - - |
| | Sommer | I can only assume - - - |
| | Dolevski | How did the bitcoins then get into the Wright Family Trust - - - |
| 35 | Sommer | This is the - - - |
| | Dolevski | - - - for them to be able to sell them - - - |
| | Sommer | This is a question I haven't asked, that I – I can only assume that they called for a transfer to them absolutely of part of the interest that they hold in those trusts. |
| 40 | Dolevski | Well, that's the part we would need substantiated for obvious reasons. |
| | Sommer | Understood but they haven't lodged their BAS for that tax period yet and so we will no doubt get to that in due course. |
| | Dolevski | So that will be in the January quarter? |
| | Sommer | No, no.  That will be in the December that - - - |
| 45 | McMaster | No. |
| | Sommer | It will be a 28 February BAS. |

CONFIDENTIAL

DEF_00051809

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Their quarter - - - |
| | Sommer | 28 February. |
| | Dolevski | Their quarterly lodges so, yeah, February. |
| | Sommer | Yeah, yep.  28 February.  28 February BAS. |
| 5 | McMaster | Yep. |
| | Sommer | So, yeah, that's something that will have to be addressed shortly, included in the return that's lodged for the 31 December - - - |
| | Wright | And the idea there was not to – just as a demonstration, yeah, and one that I think ..... the tourist refund scheme ..... |
| 10 | Dolevski | Well, I mean, with those export – I mean, we – you know, that's clear legislation in terms of - - - |
| | Sommer | I know, but - - - |
| | Dolevski | - - - products that are exported are entitled to the ITC scheme but - - - |
| 15 | Sommer | It's just - my point is this:  creating these lumpy supplies where there's no actual consumption where, you know, it's basically – you know, moneys are ..... value and what we've done is move a ..... value from one entity to another entity or a third entity where it retains its value without any consumption and you've got – the whole idea of the consumption tax is not to drag that sort of transaction into the system and by treating as something other than money, that's what we're doing.  And I take ..... entirely that, you know, that – refunds, sure.  And if it was $38 million worth of goods I wouldn't have a problem but it's $38 million of stuff that can't be consumed - - - |
| 20 | | |
| | Wright | But that's why I've made it a paper wallet so that it is a thing. |
| 25 | McMaster | But a paper wallet, if I understand it correctly, is the private key, okay, and you can - - - |
| | Wright | That stores within it, yes. |
| | McMaster | Okay.  And so you would have stored it on a USB stick or something like that or - - - |
| | Wright | No, no, actual paper wallet. |
| 30 | McMaster | - - - you physically wrote it down? |
| | Wright | I physically made a paper wallet containing the keys. |
| | McMaster | Okay. |
| 35 | Wright | And actually took that to the guys at the tourist fund scheme thing and sort of handed it over and said, "This is what it is.  This is how we can validate it and here's the QR code" and they went, "What's a QR code?"  And then I said, "Well, okay.   If we do our phone here, and what you do is you take a photo of it so that you can check later if you can't figure it now and here's what we do" and I stepped them all through it and they called their manager and said, "What the hell is this?" |
| 40 | McMaster | They would have been flustered. |
| | Wright | Yeah, and then we - - - |
| | McMaster | Okay. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Then we did the 10 million plus bit and then we – "There's no enough digits, sir" and called over someone else and then the whole team got over there and then I held up the line for half an hour and everyone must have hated me - - - |
| | Chester | Anything just to prove a point. |
| 5 | Sommer | I don't think it's – I don't - - - |
| | McMaster | Was that - - - |
| | Sommer | - - - think it's goods anyway. |
| | McMaster | Was that wallet registered anywhere, by the way?  With Blockchain, for instance? |
| 10 | Wright | Is it - - - |
| | McMaster | A registered wallet with Blockchain. |
| | Wright | Yes, yeah. |
| | McMaster | Because I had a look at the invoice you provided to the Customs people and unless I've mis-keyed it I can't locate it. |
| 15 | Wright | You should be able to. |
| | McMaster | Yeah.  It may be that I've mis-keyed it but I will have another go. |
| | Sommer | I don't think it matters in the sense that it's not goods.  I don't care what you – I don't care how much paper Craig creates, it's not goods.  It doesn't qualify but it was transferred between legal people. |
| 20 | McMaster | Yeah |
| | Wright | That's the number down the bottom if you want to take it. |
| | McMaster | That's okay.  I will go back to the invoice that you had on you at the time and if I still can't get it – and it could simply be that I'm keying it in - - - |
| | Wright | I could have typed it wrong in the invoice too because - - - |
| 25 | McMaster | You could have done. |
| | Wright | A capital in the wrong place or - - - |
| | McMaster | Yeah.  It's easy enough. |
| | Wright | But, yeah, the one we handed over had the correct thing. |
| | Chester | They're not like ..... PIN numbers ..... |
| 30 | McMaster | Yeah, they are. |
| | Dolevski | No, unfortunately. |
| | McMaster | Now, we're coming to the end of recording here. |
| | Sommer | Yeah. Do you want to change it and then I will wrap up? |
| | McMaster | Yeah.  I will wait till it stops first. |
| 35 | Sommer | Okay. |
| | McMaster | It has got to go through its process and then we can wrap.  I know, I know. |
| | Sommer | Even the CDs are bureaucratic here.  Sorry. |
| | McMaster | Well, you've got to write them.  What can I say? |
| | Sommer | Oh, that was recorded too. |

CONFIDENTIAL

DEF_00051811

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | That's okay, Andrew.  It won't be held against you. |
| | Sommer | Don't tell James I said that.  Okay.  So Denariuz is the first BAS to be lodged after receiving a private ruling on the bitcoin transaction ..... blah, blah, blah, we've done all of that.  Transfer the supply from Denariuz Australia to Denariuz Singapore is going to be GST-free ..... liability ..... and all of that. Okay.  So where are we?  Clearly, revisions are going to be necessary to all the BASs that we've lodged.  Some transactions are uncontroversial and should give rise to immediately available ..... day-to-day transactions ..... stuff and we intend to buy a lot of computers and we intend t buy, you know, a lot of those sorts of things in order to ..... but, you know.  Day-to-day transactions we paid cash out of the entities and it's all fairly simple. |
| | Wright | We just like ..... |
| | Sommer | Some transactions are more complicated but still give rise to the import tax credits and net input tax credits such as the MJF transactions, they need to be documented properly into the BASs.  Some transactions need to be removed ..... So where some of the ways in which I think the BASs have reflected some of the transactions needs to change.  So what would we want?  I would like to reach an agreed position in relation to these transactions that we can then sit down and it really should only be a matter of a couple of hours to sit down with someone to work through how these BASs should be re-lodged and have the Tax Office happy with them so we can say, "All right.  Here's the principles.  Let's apply them to these transactions".  As John said, I think there's about a hundred transactions and so get them into the right BASs. Let's get them in and get them lodged and correct the issues and then we can then have the agreed principles for the lodging of future BASs so we don't have to do this again.  And then the third point there is to continue dialogue about the treatment of bitcoin, whether it should be treated as money, because that's not critical necessarily to the resolution of the BASs and I think subject to the discussion before we're probably happy to re-lodge the BASs on that basis, on the basis that bitcoin is money but because we've been dealing with subsidiary interests, apart from Denariuz, they're minimising a number of taxable supplies that actually occurred of bitcoin but, as I say, it's critical to the business that the guys want to do that we try and convince you guys that it's money, but that's more from a broad policy perspective rather than an immediate audit perspective.  And that's really it.  So - - - |
| | Wright | The other bit I've offered a few times is if you have anything that you want to do with Mr Ferrier – I know I can't get any information on other taxpayers but there's nothing stopping me from giving you information.  I'm happy for - - - |
| | Dolevski | True, there's nothing stopping you from giving us information. |
| | Wright | No.  So I'm happy for Nick - - - |
| | Dolevski | Everyone's entitled to make a dob – you know, dob in or whatever - - - |
| | McMaster | Well, they call them Turks. |
| | Dolevski | Dob in a Turk. |
| | Sommer | So - - - |
| | Wright | I'm not friendly with the guy at the moment so I'm happy to give over anything. Trust me. |
| | McMaster | Understandable. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | And simply as a by-product if you like of some of the heat and light and frustration that seems to have gone on, I think we would like to have an independent person come in and assist with the preparation of those revised BASs. |
| 5 | Dolevski | So, Andrew, would you be proposing that your firm put the revised BASs together? |
| | Sommer | No, I'm not a BAS agent. I don't do that sort of stuff. |
| | Wright | Have someone who does it. |
| | Sommer | No. John will sit - - - |
| 10 | Dolevski | Well, it would actually need someone to provide the information and we've got – I mean, who I'm thinking of is Andrew. |
| | McMaster | Yeah. He would be a good person and he's independent of Selso so it's not a problem. |
| | Sommer | Andrew? |
| 15 | McMaster | Miller. |
| | Sommer | Okay. |
| | Dolevski | He's from Parramatta and he's from our audit area. |
| | Wright | What I would like to say is - - - |
| 20 | Dolevski | Because, I mean, I don't think it's – there's no bias here in terms of – let me put that on the table. |
| | Sommer | Yep. |
| 25 | Dolevski | There's certainly not bias in terms of the way these audits are being conducted. I think there has been a lack of clarity and understanding and even what we thought we actually had understood and we had put our own structure together from what we could put together - - - |
| | Sommer | Yep. |
| | Dolevski | But - - - |
| | McMaster | This is what we thought it was. |
| | Dolevski | But it was all pretty much around bitcoins. |
| 30 | Sommer | Yep. |
| | Dolevski | I have to say that I think we haven't been too off the mark in terms of - - - |
| | Wright | One for John. |
| | Dolevski | - - - how things have flowed. |
| | Sommer | Yep. |
| 35 | Wright | Yeah. |
| | McMaster | But obviously that's no longer the - - - |
| | Dolevski | But I think - - - |
| | Sommer | No, no, no. |
| | Dolevski | No. |
| 40 | Sommer | And we're not ..... |

CONFIDENTIAL

DEF_00051813

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | But I think from my perspective – and Andrew is the one that, you know, independently took all the information and, with another officer - - - |
| | McMaster | And prepared this flowchart. |
| 5 | Dolevski | - - - you know, assisted him and prepared this so I think with now at least having that background - - - |
| 10 | Sommer | Yep.  I think my – I'm instructed to request as humbly as possible that we move away from Parramatta and that may simply be a matter of perception rather than anything else but given some of the complicated history and particularly given some of the difficulties with some of the previous interactions with the Tax Office prior to these issues we would ask if it's at all possible to have it transferred to an audit team in a different ..... |
| | Dolevski | Well, all of the audit teams reported to me so - - - |
| | Sommer | I don't - - - |
| | Dolevski | Yeah. |
| 15 | Sommer | That would be something we would appreciate. |
| | Dolevski | Okay. |
| | Sommer | With the greatest of respect to the team that has been doing it it would give an additional degree of comfort to the taxpayer to have it relocated to a different team. |
| 20 | Dolevski | Even though we're now talking about a pure revision of BASs? |
| | Sommer | Yep. |
| | Dolevski | Accepting the ATO view and purely - - - |
| | Sommer | Yep. |
| 25 | Dolevski | - - - advising the BAS is based on that, you would still feel uncomfortable with - - - |
| | Sommer | I wouldn't put it like that - - - |
| | Dolevski | We would remove Selsa as the - - - |
| | Sommer | - - - but I would say I would feel more comfortable - - - |
| | Dolevski | Well, your request – yep. |
| 30 | Sommer | - - - if it was in one of the other offices, is what we're requesting. |
| | Chester | But ..... what we can do, though, because we're using zero ..... base, we can do it anyway ..... we just sit there and do it, just – I don't know .....  It doesn't have to be one of these .....  We could do it in this room ..... |
| 35 | Wright | And, see, you've got here, "Have not even acquired it yet".  I mean, I've already - - - |
| | Sommer | ..... |
| | Dolevski | Yeah.  It has been – we acknowledge that it's – yeah. |
| | McMaster | Well, it's based on what information we had. |
| | Wright | Yeah. |
| 40 | Dolevski | We've had misunderstandings and - - - |

CONFIDENTIAL

DEF_00051814

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Look, I would like not to have to do a, you know, line-by-line response to the interim audit report and all those sorts of things - - - |
| | Dolevski | No.  We were just - - - |
| | Sommer | If we can withdraw that and then, you know ..... |
| 5 | Wright | And the other bit is - - - |
| | Dolevski | So, Andrew, just on the interim report, though - - - |
| | Sommer | Yep. |
| | Dolevski | Well, I suppose it's riddled with reference to ..... isn't it? |
| 10 | McMaster | Well, it is. What has been presented today - - - |
| | Doa | Yeah. |
| | Dolevski | It's factually incorrect. |
| | McMaster | What has been presented today is factually incorrect, yeah. |
| | Dolevski | Instructions that have been put forward today ..... in light of those. |
| 15 | Sommer | Yeah. |
| | Dolevski | Agreed that the facts are wrong. |
| | McMaster | Totally. |
| | Dolevski | Okay.  I hear what you're saying and I still think it's a little bit unfair to judge the auditors based on the information they weren't given. |
| 20 | Sommer | No, no, no, it's not so much that.  It's just that the point – and we're not saying that they're – we're not making any allegation of impropriety.  It's merely – I think it would be seen as a nice fresh start if we could start in a different office ..... |
| 25 | Dolevski | It's just the timing aspect.  We would lose so much time with people that, you know - - - |
| | Sommer | I understand that but it would be - - - |
| | Dolevski | - - - have to come to grips of - - - |
| | Sommer | In many ways it would be nice to start with people who start afresh with what we now understand to be the way in which it happened ..... |
| 30 | Chester | But they're not going to review any of ..... confusion.  We're just going through an audit revision based on an agreed process ..... |
| | Dolevski | Well, leave that one with me. |
| | McMaster | Can I suggest we take it on advisement? |
| 35 | Dolevski | Yeah, absolutely.  We will have to look at it because, I mean, I have to look at what capacity auditors have and - - - |
| | Sommer | Sure.  Understood.  Resources. |
| | Dolevski | There is a – yeah.  There is an element of urgency in withholding refunds. |
| | Sommer | Yep. |
| | Chester | ..... so we would like to get that as quickly as possible. |
| 40 | Wright | And especially ..... of their money so - - - |

CONFIDENTIAL

DEF_00051815

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Chester | ..... | |
| Dolevski | We will consider it.  I mean, that's why I thought Andrew.  You know, he's fresh.  He hasn't done any of this. | |
| 5 | Sommer | I mean, but if he prepared those on the basis of the previous submissions then he has already - - - |
| Dolevski | Well, I mean, but - - - | |
| McMaster | Only the documents received. | |
| Dolevski | Yeah, absolutely. | |
| 10 | Sommer | Yeah, and I'm not – and, as I say, I'm not - - - |
| Dolevski | Yeah.  And this is purely – I mean, we all in this room – we all thought it was bitcoins we're talking about so – I mean, this presentation has certainly shed quite a, you know, different light on things so - - - | |
| McMaster | Dramatically. | |
| 15 | Dolevski | Yeah. |
| Wright | See, but part of this is – I still see it as bitcoins. | |
| Dolevski | Shh.  Yeah. | |
| Wright | You have the lawyer hassling.  I mean, it's rights and - - - | |
| Dolevski | Yeah, but - - - | |
| 20 | Wright | I have the technology - - - |
| Sommer | You see it as ..... until the point you say to me, "Andrew, nothing has ever moved and nothing has ever come to Australia" at which point I have to say, "Is there a taxable supply in Australia", and if nothing is here then I can't apply the nexus tests to that so what has actually transpired as the supply between those two entities?  It can only be, you know, the – you know, what is it, the nemo dat principle, you can only supply what you've got.  They don't have actual bitcoin.  They've only got rights to call for bitcoin.  Those rights came from you.  Those rights subsist against the trusts and that's – again, that's how, you know, I've – I – Craig's entirely right.  This is my legal analysis of the facts as I understand them, based on what seems to have happened. | |
| | | |
| 25 | | |
| 30 | | |
| Wright | See, I have the car in the UK and I had a piece of paper and whatever else and I sold – I – rather than say that I'm selling you a car, it may stay in the UK and everything like that and – but anyway. | |
| Dolevski | It has got nothing to do with tax in Australia then if you sold that car in the UK. | |
| 35 | Sommer | ..... |
| Chester | What happened is that there's a whole treatment and the – I suppose the response that we got from Craig in terms of information generally has been a paranoia process based on prior experience and ..... taking things out or leave them, in 2010 or whatever it was, off to America and other places was a response to the experience that he had the last time ..... and the way he set things up was ..... | |
| 40 | | |
| McMaster | Well, the auditors that were involved in that prior one are nowhere near involved in this one. | |
| Chester | Well, you were involved in it. | |

CONFIDENTIAL                                                                                    DEF_00051816

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Well, only as a director, but I wasn't an auditor. |
| | Wright | I guess I gained a little bit of paranoia on that one - - - |
| 5 | McMaster | Look, I can understand where you're coming from, okay, and I can also understand the communication confusion because you clearly see these things as bitcoins. |
| | Wright | I see them as money. |
| 10 | McMaster | You see them as currency and you treat them in the same way and when you talk to us about them, that's how you talk about them and, unfortunately, that has created a confusion around what actually occurred, and that's all that me as a director and Marina as my Assistant Commissioner are trying to clarify. What are the true facts here and if at the end of the day you've got a refund, you've got a refund. End of story. You're entitled. |
| 15 20 25 | Sommer | And all we're trying to do, all I'm trying to do is, you know – you know, if I was a nefarious litigator – and I know lots of them – there's nothing I would rather do than run a declaratory proceeding against you guys about ..... money. However, with Craig and John in their current situation that's going to tie more of their money up and, you know, I don't work for free, and that's not going to progress things. I would rather come to you guys and say, "Look, listen, the whole treatment of bitcoin is not what we anticipated but if we actually look at what you've said and try and make it work" – and I'm a big fan of trying to make things work as far as we can. We can always ..... you know, when you guys lose in the Federal Court and, you know, you decide not to appeal and bitcoin is money, we can always go back and revise the BASs again but at least we can make some progress and actually stop this business being strangled, and that's really what I want to achieve. I just want to actually let these guys escape from under six different audits and try and get back to the business. That's my objective. |
| | Chester | And whatever ..... so if Andrew's the guy and you vouch for Andrew. He's the guy? |
| 30 | McMaster | He is a very good top-notch person. |
| | Chester | And make no mistake, there's nothing wrong with Selsa. |
| | McMaster | Yep. |
| 35 | Chester | We've had some good work with Selsa. The problem is the way that he received things at the outset was ..... and we tried to explain on many different occasions and there was no – the difficulty is that it's – for all of us, that we're dealing in cyberspace and the problem with cyberspace is that it's out there some place but – and it doesn't exist, but it does exist; and it doesn't exist, but it does. It's like Europe. The Euro isn't fiat money either. It's just that people agree that it's money. |
| 40 | Dolevski | But, John, I don't think we actually even need to get confused by that. |
| | Chester | Yeah. We can ignore it. |
| | Dolevski | You know, I think if we just look at the documents and what they're telling us, that's what we need to form a view on. Just what Andrew has done, he has looked at, and that's what we need to do as tax administrators. |
| 45 | Wright | Yep. And unfortunately there was bad timing as well. |

---

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | What  - you guys get on with your business, we don't need to be involved in; we just need to understand the transactions and then we can see how they apply and what is the relevant tax, if any. |
| 5 | Wright | And unfortunately there was also a bad situation in that just as all this happened the guy who was the CFO of the company, Jamie, had a family breakdown and death and all sorts of fun things and disappeared on me and I'm the first to acknowledge I'm not good at getting things to you guys.  I just dump everything.  I don't structure anything properly and that's ..... job. |
| 10 | Dolevski | Look, I mean – you know.  Anyway, look, I will discuss it with Des but my preference still, and I would strongly recommend that you agree about Andrew.  He's an excellent auditor which is why we actually had him review this and, you know, a very different way of working so - - - |
| | McMaster | Why don't my clients confer and they can - - - |
| | Dolevski | Yep. |
| 15 | McMaster | They can confirm or disavow .....  But, yeah. |
| | Dolevski | But I would love your presentation, please. |
| | Sommer | Yeah, yeah.  I will just – I will clean it up and - - - |
| | Dolevski | I think that's certainly – yeah. |
| | Sommer | - - - get Craig's authority to provide it to you and then I will send it to you. |
| 20 | McMaster | That would be good because we will need that sort of information in what we're doing because we still need to run that past yourself. |
| | Sommer | Yep.  And we've built this up – I mean, John and I built this up yesterday afternoon from the documents so we can provide you with the documents and I've tried to, as much as possible, put them up on the screen for you. |
| 25 | McMaster | Sure. |
| 30 | Sommer | So you can actually – because, you know, there's a difference between ..... and making assertions and actually giving you documents so where I've got easy extraction documents to show you I've tried to do that.  There are other documents behind all of that but I was pretty confident that once – if we could actually do this – and thank you for accommodating me with the projector because it – and I just thought if we could do it this way – I'm quite sure everything ..... |
| | McMaster | Visual is so much better. |
| | Sommer | Yeah, well, you know - - - |
| 35 | Dolevski | Which is why we tried to draw - - - |
| | Sommer | Yeah, exactly, and I've got – like, I could – I won't, but I could show you my notes going back from the start of January where I've completely scratched everything out and started again now that I understand what's going on, so - - - |
| 40 | McMaster | Which is what we've got to do. |
| | Sommer | Exactly.  All right.  Well - - - |
| | Wright | And I admit my problem is – I mean, I will point you to Economics 101 which says money is a stored value of blah blah blah and whether the – whatever you say, I will get stuck on that bit and ..... we will get nowhere. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | Sommer | But we will do is we will drive Michael Harding mad with that and we will try and keep you sane and get the audits process - - - |
| | Dolevski | That would be good. |
| | Sommer | I always enjoy - - - |
| 5 | McMaster | Sounds reasonable to me. |
| | Dolevski | Yeah. |
| | Sommer | I thought you would like that.  All right. |
| | McMaster | Okay. So any other discussion, because I will stop this and start recording it. |
| | Dolevski | Well, Hoa, have you got any questions considering you've come from Perth? |
| 10 | McMaster | Yeah, exactly. |
| | Doa | So did you want us to have another look at the objection right issues? |
| | Sommer | I think you should.  I think you should have a look at those notices. |
| | Doa | Yeah. |
| | Dolevski | Yep. |
| 15 | Doa | Yeah - - - |
| | Sommer | Call for a copy of those notices and actually have a look at whether or not you're happy with them. |
| | Doa | Yeah. |
| 20 | Sommer | Because John sent an email saying, "I can't see where the objection rights are in this because you don't seem to be telling me you need any information. You're telling me you formed a view as to the operation of the law". |
| | Doa | Yep. |
| 25 | Sommer | Tell me where my objection right is and then we will – so don't ..... refer to 8AALZGA and then if you're happy with them, send me an email saying, you know, you've looked at them and you're happy with them and if you're not happy with them then, you know, at least give us something that we can choose to object to if we want to. |
| | Doa | Sure.  Yep. |
| 30 / 35 | Sommer | But all of that, hopefully, if we can – my preference is just to raise that as a systems issue for you guys because I know it's a new provision.  I've never seen these notices before but when I got them I said, "I don't think these work".  But when – and I was involved in the drafting of it.  When we drafted the part ..... you into that section I thought it was a waste of time anyway because, you know, with a good conscious how do I tell the client that they should spend their money on a procedural review rather than answering the damn questions.  So it's always easier just to answer the questions. |
| | Doa | Yeah. |
| | Sommer | So, yeah. |
| | McMaster | Not a problem then. |
| 40 | Doa | Yeah.  And if we could that, that would be really good to review the transactions based on the new understanding.  And with the interim audit reports we will just leave them sitting to the side for a minute? |

Page 39 of 40

DEF_00051819

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Well, probably best to send the letter saying – if you don't mind just sending a letter saying - - - |
| | Doa | ..... withdrawn. |
| 5 | Sommer | "We will withdraw these to reconsider the additional information we've provided". |
| | Wright | And just on a different note, but you want a formal – I'm happy for Nick, who is the litigator, to give you all the evidence that we have ..... to tie that together too. |
| 10 | Sommer | I think that will just bury you guys but if – once we've prepared the brief, because we are – you know, the full brief. If you guys want a copy of the proof we have against ..... of MJF and so on because it may be of assistance to you in any action you may or may not choose to take in relation to a taxpayer who's not in the room - - - |
| | Wright | And you don't need to give me information about - - - |
| 15 | Sommer | - - - then I suppose we can do that but I think we're still working on putting all that together at the moment. And if you think that would be useful from a – can I say interest perspective – we can probably do that in due course. |
| | McMaster | Okay. |
| 20 | Wright | Because the current one is – we might have it against the company but we're trying to build a unconscionable conduct-type thing against the individual so that – because if you're just a director you ..... and - - - |
| | Sommer | Okay. Thank you so much. I really appreciate - - - |
| | McMaster | Not a problem. |

CONFIDENTIAL

DEF_00051820

P-137
Case No. 9:18-CV-89176-BB

GPO Box 9990 IN YOUR CAPITAL CITY



**Australian Government**
**Australian Taxation Office**

Craig Wright
C/- John Chesher
Suite 502, 32 Delhi Road
North Ryde NSW 2113

| | |
|---|---|
| Reply to: | PO Box 9977 |
| | Parramatta NSW 2124 |
| Our reference: | 1-55NM97X |
| Contact officer: | Andrew Miller |
| Phone: | (02) 9354 6379 |
| Fax: | (02) 6225 0929 |
| | |
| ABN: | 97 481 146 384 |

11 March 2014

**Questions relating to our audit**

Dear Mr Chesher,

As part of our audit process, we would like to request some further information and documentation in relation to Dr Craig Wright. We thank you for the information already provided to us. We have examined each of those documents and any questions in relation to those are simply to further clarify their contents and context.

In this regard, could you please answer the questions set out in the attachment to this letter, and return them by 25 March 2014.

Your response can be posted to Andrew Miller at PO Box 9977 Parramatta NSW 2124.

Alternatively you may email your reply to Andrew Miller at Andrew.Miller@ato.gov.au

If you have any queries in relation to this, please contact Andrew Miller, on (02) 9354 6379.

Yours sincerely

James O'Halloran
Deputy Commissioner of Taxation

CONFIDENTIAL

DEF_00068419

**Attachment – Questions for Dr Craig Wright**

W&K Info Defense LLC (W&K)

1. In the statements of claim lodged with the Supreme Court of New South Wales (Supreme Court) you name the defendant as 'W&K Info Defence Research LLC'.  In the Intellectual Property Licence Funding agreement and the Contract for Sale of Shares of a Company Owning Business you refer to an entity called 'W&K Info Defense LLC'.
   a. Are they the same entity?
   b. If they are the same entity, why have they been referred to by different names?
   c. Are either of these entities registered as a limited liability company (LLC), and if so, where are they registered?

2. In the Supreme Court Statement of Claims for case numbers 2013/225983 and 2013/245661 you state that you provided contract labour services and loaned money to the defendant. It is not clear from these documents whether you had received any payment in respect of your contract labour services or the loaned money during the term of the contract. If you had received payment:
   a. How were you paid? (In Bitcoin, cash or other?)
   b. When were you paid?
   c. Have you returned this income in your Australian or the United States of America (USA) income tax returns?
   d. If so please provide a copy of these returns.

3. As a Director of W&K, please provide copies of:
   a. Copies of tax returns lodged in the USA at both state and federal levels, if any;
   b. its Employer Identification Number (EIN), also known as a Federal Tax Identification Number, used in the USA for lodgement of tax returns;
   c. The operating agreement for W&K

4. When did you develop the Intellectual Property (IP) which was provided under the agreement with W&K? Has the value of this IP been determined or reviewed by a Government body?

5. Where did you obtain the two bonds of Au $20 million, comprising Bitcoins and Gold bonds, from which to fund the research? Please provide evidence of these bonds being transferred and their respective values at the time.

6. According to a document you have supplied to the ATO, Uyen T Nguyen accepted a position of US resident Director of W&K on 1 July 2013. You have also advised us of this fact in relation to R&D claims.
   a. Who asked her to be a Director and under what authority?
   b. What is her address and telephone number?
   c. Were there any other Directors as at 1 July 2013?
   d. If so who were they?

7. Based on a document you provided, Uyen T Nguyen, in her capacity as Director of W&K, accepted the offer to transfer 'all agreed items' to you for 'the agreed consideration'. (reproduced below)

2 of 7

DEF_00068420



As director of W&K Info Defense LLC I accept the consent orders in:

2013/225983

2013/243661

In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all

agreed items to Craig Wright R&D for the agreed consideration.

Date

Signature

9/1/2013

Uyen. T. Nguyen

    a.  Is this date September 1st 2013 or the 9th of July 2013?
    b.  What were 'all agreed items'?
    c.  When were the items transferred?
    d.  What was the 'agreed consideration'?
    e.  When was consideration paid?

8.  The following questions relate to the 'Intellectual Property Licence Funding Agreement' between you (as Financer) and 'W&K Info Defence LLC' (as Provider) (Ref: CEWK01):

    a)  The Deed is dated 22 April 2011, but the schedule is dated 1 April 2011 – why is there a difference in these two dates? When was the Deed signed?
    b)  Why wasn't the deed notarized when signed?
    c)  Who witnessed the signatures?
    d)  At what location was it signed?
    e)  Who created this document?
    f)  Please provide the original paper agreement.
    g)  Do you still hold the wallets/BTC Addresses referred to in the Recitals?
    h)  The deed is not clear as to the link between the $40,000,000 and the 300,000 Bitcoin. Could you explain the link between the two and whether the value of one is reflective of the other?
    i)  The deed refers only to Australian Legislation, including the law of New South Wales (NSW) and Commonwealth legislation. Why doesn't the deed refer to any American legislation or taxation obligations?
    j)  Please provide the address where the 'hardware' referred to in this agreement is or was physically located (as opposed to where it was hosted).
    k)  How many Bitcoins were held in the Escrow Wallet referred to in cl 18 and do you still own this wallet?

    l)  Please provide copies of the Patents referred to in the Deed (BAA-001 / 002 / 003 / 004).
    m)  What is the full name of the entity referred to as 'C01N' in the Deed, and was the trademark ever filed?
    n)  Where did you obtain the funding to finance this agreement?

9.  The following questions relate to the 'Contract for the Sale of Shares of a Company Owning Business' between you (as Purchaser) and 'W&K Info Defence LLC' (as Company) (Ref:CEW03):

    a)  The Deed is dated 2 April 2013, however, it refers to other contracts entered into on 22 April 2013 in the past tense (see cl 4(a)) - when was the Deed signed?
    b)  Why wasn't the deed notarized when signed?
    c)  Who witnessed the signatures?
    d)  At what location was it signed?

3 of 7

CONFIDENTIAL

    e)   Who created this document?

    f)   Please provide the original paper agreement.

    g)   In 'Operative Part' Paragraph 4 of this Deed, reference is made to the contract in CEWK01 and it is agreed that the loans referred to in CEWK01 are 'deemed paid in full' for $40 million (cl 2). It is then stated that the purchaser will accept the new terms as 'full satisfaction of the contract with Reference CEWK01'. This suggests that all the terms of CEWK01 were satisfied by the operation of this new Deed – is this correct?

    h)   The deed refers only to Australian Legislation, including the law of New South Wales (NSW) and Commonwealth legislation. Why doesn't the deed refer to any American legislation?

    i)   How and when did you acquire the source codes referred to in the agreement, which are said to be held by Mr Kleiman?

    j)   Was this deed given to the Supreme Court in your claim against W&K?

    k)   The agreement stipulates that you will accept Mr Kleiman's 323,000 mined Bitcoin as a 49.5% stake in Coin-Exch Pty Ltd (Coin-Exch). Was Mr Kleiman given this stake in Coin-Exch? If so, has the Executor of his Estate made any claims in relation to this?

    l)   Please provide the contact details (including name, address and telephone number) of the executor of Mr Kleiman's estate.

10. Please provide copies of all agreements (other than CEWK01 and CEWK03) between you and W&K or Dave Kleiman.

11. Please provide copies of all agreements between W&K and entities for which you are or were a Director or shareholder. (If you have already provided these documents to the ATO state what they are and when and to whom they were provided).

12. Other than you and Mr Kleiman who were the directors of W&K just prior to Mr Kleiman's death?

13. Were notices pertaining to this court case served on the Defendant? If so, how and where?

14. Is the 'deed of transfer of intellectual property' referred to in the court case the agreement with Uyen T Nguyen referred to in question 7 above? If not, please provide a copy of this deed.

    <u>Judgement 1:</u> (NSWSC 2013/00225983)

15. Was the IP the subject of the NSWSC Case 2013/00225983 specifically designed for the contracts referred to in the statement of claim?

16. You state in the claim that you and the defendant conducted four projects for the Department of Homeland Security USA (DHS and that the IP is software and code used by the US Military and DHS. Do these USA Government bodies own the IP and if not, why not?

17. Please provide the document dated 27 October 2008, referred to in the statement of claim.

18. Who represented the defendant (W&K) in the Supreme Court of NSW 2013/00225983?

19. According to copies of invoices you provided to the ATO, you issued a tax invoice to the Trustee for Wright Family Trust (DeMorgan), dated 1 July 2013 (INV-00096). Was the invoice for the IP referred to the aforementioned court case? If not, please explain what this invoice was for.

20. Did you or W&K hold the IP on 1 July 2013? If held by you at 1 July 2013 please explain how you acquired the IP at that date.

CONFIDENTIAL

21. If you did not hold the rights to this IP at 1 July 2013, how were you able to transfer it to another party on that date?

22. You sold the IP to the Trustee for the Craig Wright Family Trust (DeMorgan) on 1 July 2013, as evidenced by a tax invoice you have provided (INV-0096).   In this invoice you reference the court case number for the statement of claim filed on 25 July 2013 and ratified on 8 November 2013.  Please explain how you knew the court case number for the sale that occurred prior to its allocation?

23. How did you determine the value of the IP in the invoice INV-00096, dated 1 July 2013? If it was independently valued, please provide a copy of the valuation.

Judgement 2: (NSWSC 2013/00245661)

24. Please supply the document dated 8 January 2009 referred to in the statement of claim.

25. Who represented the defendant (W&K) in the Supreme Court of NSW 2013/00245661?

26. What is the item described as SNSWSC Trans sold by you, to Cloudcroft Pty Ltd, on 31 July 2013 (as per your tax invoice INV-00097 provided to us)?

27. What is the item described as 2013/Judgement 2 sold by you to DeMorgan on 1 September 2013 (as per your tax invoice INV-00098 provided to us)?

28. Did you or W&K hold the IP on 31 July 2013?  If held by you at 31 July 2013 please explain how you acquired the IP at that date.

29. If you did not hold the rights to this IP at 31 July 2013, how were you able to transfer it to another party on that date?

30. How was the value of the transaction on this invoice determined? If it was independently valued, please provide a copy of the valuation.

Bitcoins:

31. Were the Bitcoin you have obtained declared as income in Australia or the USA?

32. You have previously provided a number of wallet addresses to the ATO; however some of these addresses have been incomplete, incorrect or duplicated. Please provide a single list of all wallets you personally hold now and those you held since 1st January 2011?

33. What evidence do you have that you hold these Bitcoins?

Christopher McArdle:

34. What are Christopher McArdle's contact details? (phone number, address, e-mail)

35. Please provide a copy of the deed, or other information, showing satisfaction of the court order (District Court of NSW 2012/00356004), by Christopher McArdle?

36. What is the IP subject to this case, and how does it differ to the IP previously queried in this request?

Seychelles Trust:

37. You have advised, in a briefing paper received 26 February 2014, that the Bitcoin available to you is held in a trust formed in the Seychelles. You further advised the trustee of this trust is a UK company 'Design By Human Ltd' which has since changed its name. Please provide a

5 of 7

copy of the trust deed for this trust, including amendments, annexures and other attachments and the memorandum of association and incorporation documents for the Trustee Company.

38. Are you a Director or Shareholder of the trustee company?

39. How many Bitcoin are held in this trust and how were they acquired?

40. When did the trust acquire these Bitcoin and from whom?

41. What other trust property is held?

42. Please provide evidence of all trust property held (this may be in the form of a comprehensive list of Bitcoin wallets)

43. Please provide a list of all of the beneficiaries of this Trust

44. Who established the trust?

45. When was it established?

46. Who holds the wallet addresses?

47. Please provide a copy of the 'Deed of Loan', entered into between you and the trust.

48. Are you the trustee or beneficiary of any other offshore trusts? If so, please provide details of these trusts, including the trust deeds, names of the trust(s), beneficiaries and trustee(s).

49. Are you a director or shareholder of any off shore companies, whether held in your own right or beneficially for you?  If so please provide a list of these companies detailing their names, where they are registered and their business activities.

<u>Mark Ferrier and MJF Mining Services WA Pty Ltd (MJF):</u>

50. You have advised that you met Mark Ferrier while speaking at a conference in Melbourne, Victoria. What was the name of this conference and on what date did you meet Mr Ferrier?

51. Please provide all correspondence between yourself and Mark Ferrier regarding the provision of the various goods and services for which you or your related entities are or will be claiming input tax credits.

52. Please provide copies of all contracts entered into between you or your related entities and Mark Ferrier or MJF.

53. You have advised that you conducted tracing activities on the Bitcoin payments you made to Mark Ferrier/MJF. Please provide copies of any documents showing the movement of Bitcoin, following your payment.

<u>Al Baraka and Siemens:</u>

54. Did you ever meet with anyone from the Al Baraka group? If so, please provide details (name, phone number, e-mail) of all contacts, where you meet and when.

55. In the meeting on 11 February 2014 it was stated that the payment to Al Baraka was made in two transfers of Bitcoin.  Please provide the wallet addresses from which these payments were made, the wallet(s) to which they were transferred, the amount transferred each time and the date of the transfer.

6 of 7

DEF_00068424

56. Were there any other payments to Al Baraka? In what form did these payments take (e.g.: in Bitcoins, cash or other)?

57. When, where and before whom was the agreement signed?

58. Please provide us with a copy of (or access to) the 'user manual' referred to in the agreement.

59. Please provide copies of all contracts with Siemens.

60. What functions did the software from Al Baraka and Siemens perform, that the software from W&K did not?

<u>Tourist Refund Scheme Application:</u>

61. On 10 January 2014, you made a claim under the Tourist Refund Scheme (TRS) for your acquisition of rights to a Bitcoin wallet, from Hotwire Pre-Emptive Intelligence Pty Ltd (Hotwire).
    a. Was this a wallet for Australian-held Bitcoin (as opposed to Bitcoin held in the aforementioned Seychelles trust)?
    b. Was the invoice issued by Hotwire for rights to a wallet or ownership of the wallet?
    c. Where did Hotwire acquire this wallet from and when?
    d. How did you pay for the wallet, as per this invoice?
    e. Was there a purpose for this transaction, other than to claim a refund of GST under the TRS?
    f. Who holds this wallet (and/or rights to it) currently?

<u>Other Issues:</u>

62. In the briefing paper (received 26 February 2014), you refer to 'other transactions that have involved the actual transfer of Bitcoin'. Please provide a comprehensive list of all of these transactions, including dates, amounts, wallet addresses, transferor and transferee names and the reason for the transfer.

63. In an email to Rosa Solomon of the ATO on 29 October 2013, your representative John Chesher provided an electronic copy of an agreement between you and Dave Kleiman (collectively as 'the client') and Strasan Pty Ltd. This Software Development Agreement is dated 4 April 2013. John Chesher advised in this email that this document is scanned from an original which is available for inspection. Please provide this original paper document, signed by Dave Kleiman.

64. In your tax invoices (INV-00099 and INV-00100) you provide goods GST free to DeMorgan. Please supply your reasons and evidence to support your contention.

CONFIDENTIAL

DEF_00068425

**P-143**

Case No. 9:18-CV-89176-BB

**From:** Craig S Wright
**Sent:** Wednesday, April 23, 2014 10:41 AM
**To:** Ramona Watts
**Subject:** Fwd: Transcript of Interview - 28 March 2014 [DLM=Sensitive]
**Attachments:** WRIGHT 20140328.pdf

SysUserProp: 88334F2CCA0D8E51C8530404366F9B82

Sent from my HTC

----- Forwarded message -----
From: "John Chesher" <john.chesher@hotwirepe.com>
To: "Craig S Wright" <craig.wright@hotwirepe.com>, "Ramona Watts" <ramona.watts@hotwirepe.com>
Subject: Transcript of Interview - 28 March 2014 [DLM=Sensitive]
Date: Wed, Apr 23, 2014 16:21

-----Original Message-----
From: Miller, Andrew [mailto:Andrew.Miller@ato.gov.au]
Sent: Tuesday, 22 April 2014 11:54 AM
To: John Chesher; Sommer, Andrew
Cc: McMaster, Des
Subject: Transcript of Interview - 28 March 2014 [DLM=Sensitive]

John and Andrew,

I received the transcript of our interview on 28 March 2014, from Auscript this morning. As agreed, we are providing you with a copy of the transcript for your records.

Please advise if you have any further queries in relation to this.

Thanks and regards,

_____
Andrew Miller
Auditor | Indirect Tax
Australian Taxation Office
Phone: (02) 9354 6379 | Mobile: 0401 684 338
Facsimile: (02) 6225 0929
ATO | Working for all Australians

DEF_00053141

**AUSCRIPT AUSTRALASIA PTY LIMITED**

ABN 72 110 028 825

Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003

**T:** 1800 AUSCRIPT (1800 287 274)     **F:** 1300 739 037
**E:** clientservices@auscript.com.au      **W:** www.auscript.com.au

AUSCRIPT
FASTER, BETTER EVIDENCE DELIVERY SINCE 1921

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT IN CONFIDENCE

O/N H-368645

**AUSTRALIAN TAXATION OFFICE**

**RECORD OF INTERVIEW**

| | |
|---|---|
| **INTERVIEWER:** | **ANDREW MILLER** |
| | **DES MCMASTER** |
| | **JENIFER TRINH** |
| | |
| **INTERVIEWEE:** | **CRAIG WRIGHT** |
| | **JOHN CHESTER** |
| | |
| **ALSO PRESENT:** | **ANDREW SOMMER** |
| | |
| **DATE:** | **FRIDAY, 28 MARCH 2014** |

**TRANSCRIBED BUT NOT RECORDED BY
AUSCRIPT AUSTRALASIA PTY LIMITED**

.WRIGHT 28.3.14

CONFIDENTIAL

# Interview conducted with Craig WRIGHT

On the 28th March 214

Australian Taxation Office

Interviewers: ANDREW MILLER, DES MCMASTER, JENIFER TRINH.

5

| | | |
|---|---|---|
| McMaster | As you can see, I don't use that thing very much at all. |
| Sommer | And I would have thought the – the least you had to use it the better ..... |
| McMaster | I totally agree with you there, Andrew. |
| Miller | Okay.  So - - - |
| Sommer | ..... |
| Miller | Just for the purpose of our - - - |
| Chester | ..... |
| Miller | Yes.  Just for the purpose of the recording and especially when it gets transcribed it helps if everyone can just introduce themselves then that way Auscript can use our name and – and reference it against what's said.  So, if we just go around the table.  My name is Andrew Miller from the ATO. |
| Trinh | Jenifer Trinh from the ATO. |
| McMaster | Des McMaster from the ATO. |
| Chester | John Chester from Hotwire. |
| Wright | Craig Wright, the person from everything here in the folder. |
| Sommer | Andrew Sommer from Clayton Utz. |
| Miller | Thanks. |
| Sommer | So what I thought we would do is if you can update us on your discussions ..... around the – around the treatment of the ..... equitable interests and then we could move – move onto the material in the folders. |
| Miller | Yes.  We can do that.  I suppose the ATO's position hasn't changed on the way it would treat an equitable interest or the way it would treat Bitcoin or the way it would treat money if it was money. |
| Sommer | Yes. |
| Miller | I – I guess probably the better way of starting might be to look at this other document you've prepared in response to our questions and that might help us better understand what the position is.  Whether it was the exchange of rights in the trust as opposed to the exchange of Bitcoin. |
| McMaster | Well, maybe it's best if – if we could get a better understanding.  Obviously in our communications we talk about the equitable rights in the Bitcoins and that's not the reality from my understanding.  It's the equity in the unit trust in the Seychelles. |
| Sommer | No.  It's not a unit trust.  But - - - f |
| McMaster | Sorry - - - |
| Sommer | But - - - |
| McMaster | I will be best if you gave us a ..... |

CONFIDENTIAL

DEF_00053143

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Let's – let's start from the beginning and this is consistent with the document we got back in February that there is a trust over – there – there was a trust in the Seychelles.  That trust held a number of Bitcoin.  There is a deed of loan which you've seen. |
| 5 | Miller | Yes. |
| | Sommer | Under that deed of loan the trustee agreed to loan to Craig a number of Bitcoins.  650,000.  Under that – that deed of loan resulted in the full and immediate drawdown of those Bitcoin but they didn't move anywhere.  All right.  So they're still sitting with that same trustee and they're just sitting there.  So they hadn't moved.  They haven't been transferred.  They haven't gone from one wallet to another wallet.  Any of that sort of thing.  They're just still sitting - - - |
| 10 | | |
| | Wright | Apart from the ones that went to ..... |
| 15 | Sommer | Yes.  But at the moment the deed .... was drawn down, they're sitting there.  So there is a trustee with a separation of legal title and beneficial interest.  They're being held for Craig transferred at Craig's direction but the legal interest in those Bitcoin is – it hasn't moved.  And so they've transferred presumably out of whatever trust they were in to a separate trust where they're being held for Craig.  Now, those haven't moved except for those ..... ones which – but – the – Craig has dealt with the equitable interests in them and, as I said in my email to you the other day, I mean that's – that's a wholly unremarkable characterisation from the Commissioner's perspective ..... the goal would be whatever is sitting in there.  So that's why I was surprised that there was any – any need ..... a good, long, hard think about it and that's why, when I saw those references in the questions to Bitcoin rights, I thought, "Oh, they've missed – missed this."  So they're not Bitcoin rights.  They're equitable interests in property which is held overseas.  So from that – you guys still think Bitcoin isn't currency.  With respect, I don't think you know much beyond that and that's fine.  That – that's a separate process but I'm not quite sure what else you're thinking in relation to the residuary rights. |
| 20 | | |
| 25 | | |
| 30 | | |
| | Wright | I think what you're confusing is my idea of creating an overseas limit trust that will be put on the block chain to effectively allow a coloured Bitcoin that has no GST. |
| | Sommer | Yes.  Well - - - |
| 35 | Wright | Is a separate issue. |
| | Sommer | We will stop there.  That's a whole separate problem. |
| | Miller | Sure. |
| | Sommer | But so – yes.  So maybe if you can update us with that discussion that would be useful. |
| 40 | Miller | Sure.  Well, first and foremost, I don't think the ATO's position on one particular treatment has changed and in that regard there is nothing on which to update you. |
| 45 | Sommer | Well, you've – you've never said – so – and this is what I was concerned about in relation to this reference to Bitcoin rights and you were saying your email says you need to go and have a good, long, hard think about what this Bitcoin rights are and how they should be treated and that's what concerned me.  So we – and they you were having ..... to discuss that. |
| | Miller | That's right. |

CONFIDENTIAL

DEF_00053144

Interview Conducted with Craig WRIGHT

| | Sommer | So that's – that's what I need to – the information from. |
|---|---|---|
| | Miller | So – so in that regard I mean you've just explained that it was the equitable interest in the trust that were exchanged not the ..... so I apologise for that statement. |
| 5 | Sommer | That's all right. |
| | Miller | And where the evidence shows that that's simply what it was - - - |
| | Sommer | Yes. |
| | Miller | - - - then there's no problem in the ATO's position on that. |
| | Sommer | Right. |
| 10 | Miller | And you're already aware of. |
| | Sommer | Yes. |
| | Miller | So that – that's not really an issue. |
| 15 | McMaster | The intervention or discussions around what's occurring with Wa in regard to the actual contracts for various deeds and things so that the ATO can understand that. No doubt you're fully aware of form and substance. It's, you know, the basics of what we do and so we need to understand exactly what has occurred. Match that up to the form – being the various deeds, whatever, and then, once we're okay with that, then the ATO view on the equitable interest is, you know, out there already. So - - - |
| 20 | Sommer | Yes. That's okay. That's - - - |
| | McMaster | It's simply a matter of applying that and that's what it - - - |
| 25 | Sommer | That's - that's really all I needed to know was that, you know, that you're not – I didn't – didn't want us to be in a position where you guys were heading off on a tangent thinking that there was some new form of property that we've created. |
| | Miller | No. |
| | McMaster | No. |
| | Wright | Just to interject as well. |
| | Miller | Sure. |
| 30 | Wright | I have, as our evidence in what you've asked, put in emails and other such things poorly - - - |
| | Miller | Yes. |
| 35 | Wright | And I will apologise in advance for – for my comments and statements in those emails from 2011 when you knew everything was being closed down and then a whole lot of things were happening but my opinions back then wasn't necessarily my opinions at the moment and it was under a stressful time. |
| | McMaster | ..... |
| 40 | Sommer | There are some private comments made by Craig that are a part of the evidence that is being submitted that he never intended the Tax Office to see and I've assured Craig you've all seen worse. |
| | McMaster | Yes. |
| | Sommer | So - - - |

CONFIDENTIAL

DEF_00053145

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Chester | And it's nothing to do with your familial background or your heritage or anything ..... | |
| Sommer | ..... | |
| McMaster | And I can assure Craig that none of that will colour any of our decisions. | |
| 5 | Sommer | All right.  So where - - - |
| | Miller | Start with DeMorgan. |
| | Sommer | Okay. |
| | Miller | And do you want to just – do you want to work from these?  Are they the ones that Andrew - - - |
| 10 | Sommer | Yep. |
| | Miller | We will give to Andrew. |
| | Sommer | Yes. |
| | Miller | All right. |
| 15 | Sommer | Well, why don't you hand those to Andrew and I will come around and sit with you and ..... |
| | McMaster | Would it make it easier if I was sit over there out of your way? |
| 20 | Chester | We've gift wrapped all these for you.  You can see .....  Rather the usual strip that you've had in the past from me which is scrolls of colours it's now all ..... and it goes through each of those things and – and the attachments hopefully tabbed with those little signature tabs and you will find the right spot. |
| | Miller | Sure.  So just for clarity this is your response to our most recent request for information and documents. |
| | Chester | Yes. |
| | Miller | In relation to the – to the entities. |
| 25 | Chester | Yes. |
| | Miller | And we're starting with DeMorgan. |
| | Chester | DeMorgan. |
| | Miller | Yes. |
| 30 | Chester | Start with the trust and see where we go.  So the question on this one the trust you provided shows the trustee of .....  Please explain discrepancy.  Provide any additional documents necessary to inform who the trustee is and whether it has changed and on that you've got a couple of documents that are the DeMorgan memos and they're numbered 1 through 5, I suppose, and then a couple from .....  So, if you just go on those - - - |
| 35 | Miller | The yellow tabs. |
| | Chester | The yellow tabs should say the DeMorgan memos.  Yes. |
| | Miller | Yes. |
| | Chester | Yes.  So there's effectively - - - |
| | Miller | So that's the appointment of DeMorgan as – sorry.  Of ..... Group as trustee. |
| 40 | Chester | And Craig as the trust manager. |
| | Miller | Yes. |

CONFIDENTIAL

DEF_00053146

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | And the settlement process and - - - |
| | Wright | And being that I'm the one acting ..... of the company - - - |
| | Miller | Mmm. |
| | Wright | ..... to say I'm the trustee ..... it's not strictly correct ..... interpretation ..... |
| 5 | Miller | And that's fine. And that was the purpose of the question. We – we understood that Craig was the trustee but then I got the trust deed - - - |
| | Chester | Yes. |
| | Miller | - - - and it said ..... |
| | Chester | Yes. |
| 10 | Miller | So we were just clarifying whether there has been any amendments to the trust or - - - |
| | Chester | So you will find that that basically covering ..... |
| | Miller | Yes. |
| | Chester | Background discussions that went with it. |
| 15 | Miller | No. That's good. Thank you. Yes, yes. |
| | Chester | And then the second question, the original trustee conflicts with trust deed. I think that follows the same process. That – that's explained in these – in that same exercise. |
| | Miller | All right. Yes |
| 20 | Chester | So he is the - - - |
| | Miller | Yes. |
| | Chester | He is – he was appointed. And the trust is the assignor of the software or the companies or group. What you've got there to show there is that the memos that precede it and then some documents that followed it up. There is – if you go into memos from 6 through 8 which are the little yellow tabbed ones. Okay. ..... same order, are they? |
| 25 | | |
| | Sommer | No. Well - - - |
| | Chester | Of course not. |
| | Sommer | I've been – been here printing out documents since 6.30. So - - - |
| 30 | Chester | Good. Okay. So, at any rate, it wanders through the various – the various assignments and there are – there's basically three deeds that go through that and then some - - - |
| | Miller | So you've attached ..... |
| | Chester | ..... are attached. |
| 35 | Miller | Have you? Yes. |
| | Chester | They're – they're about at the ..... |
| | Miller | ..... pink tabs. |
| | Chester | Yes. |
| | Miller | ..... |
| 40 | Sommer | That's from Craig into the trust, I think, that one. |

Page 5 of 96

CONFIDENTIAL

DEF_00053147

Interview Conducted with Craig WRIGHT

---

| Miller | On 15 July.  Yes.  Okay. |
| Sommer | And then there's – there's three - - - |
| Miller | Deed assignment.  I see. |
| Chester | From 15 September ..... |
| 5  Sommer | From the trust.  ..... |
| Miller | Okay.  So just to aid in my understanding the question was essentially that the IP licences that we had been provided by yourself explained that it was an assignment of an IP licence from Craig Wright personally to a trust or at – at least ..... personal ABN and you've provided this deed of assignment and |
| 10 | charged to state that it was assigned to DeMorgan Trust - - - |
| Wright | So I believe - - - |
| Miller | ..... transaction. |
| Wright | Into the trust and then some of it I put as a – a licence ongoing which at the end of it is all paid, everything is done, goes in full to Hotwire and - - - |
| 15  .......... | Coin-Ex. |
| Wright | Coin-Ex and then the other one I moved over directly into Cloudcraft as a whole ....  That's what ..... |
| Miller | And all of these are dated 15 September 2013? |
| Wright | That's correct.  We had had the idea and all the verbal stuff that it was going |
| 20 | happen on 1 July. |
| Miller | Right. |
| Wright | And then we finalised the deed then but I didn't want to finalise the deed until I actually had all the software. |
| Miller | Okay. |
| 25  Wright | So, although I was saying I'm going to do this and that was the plan – that was happening, until I actually physically got all ..... until I had the software I didn't – I didn't think I could move it from there.  But, when I had received everything, then I completed it. |
| Miller | Yes.  So can I ask when you created the deed of assignment? |
| 30  Wright | 15 September. |
| Miller | Okay.  Yes, I see the date.  Okay.  All right.  Yes. |
| Chester | So that – that basically covers the questions around DeMorgan, I think.  ..... sole rights and ownership over the following software.  This is the response which is Swamp and the derivative and the software assurance, etcetera, |
| 35 | etcetera, etcetera.  That basically is the - - - |
| Miller | ..... document.  So that would also be the assignment ..... |
| Chester | ..... part of the assignment process.  Yes. |
| Miller | Okay. |
| Chester | And included in that – Swamp and stuff is part of WOK which is – you |
| 40 | understand, was a – a process – which was a validation process which you've got .....  The back page is double-sided.  You're not ..... and I apologise for that. |

---

CONFIDENTIAL

DEF_00053148

Interview Conducted with Craig WRIGHT

|   | .......... | ..... |
|---|---|---|
|   | Chester | ..... and the last one is mentioned – your response mentions an off-shore trust. Please confirm whether it's the same trust and which rights are assigned by other group and the response to that is that Mr Clymont was a trustee for a trust in the Panama and we have no idea of the details of this trust and all of its distributions. |
| 5 |   |   |
|   | Miller | That's correct.  Which ..... |
|   | Chester | That's number 12. |
|   | Miller | All right.  Just briefly on question 9. |
| 10 | Chester | Yes. |
|   | Miller | Well, 8, really.  ..... |
|   | .......... | ..... |
|   | Miller | Question 5. |
|   | .......... | Yes. |
| 15 | Miller | Sorry.  These assignments deeds how have they affected the previous licences from Craig to ..... or to Hotwire? |
|   | Wright | There's – there's an assignment right through. |
|   | Miller | Okay. |
|   | Wright | So the assignment then from the trust out to the other.  There is also – there's a whole – right through to what gets done and how much in each year and whatever else ..... |
| 20 |   |   |
|   | Miller | Okay. |
|   | Wright | So, if you have a look, it says also with a .....  So – so all the debts ..... goes where and how much in each period is owed there's all details in there. |
| 25 | Miller | Sure.  Okay. |
|   | Wright | ..... |
|   | Chester | Is that in the SOW? |
|   | Wright | Sorry? |
|   | Chester | Is that in the ..... document? |
| 30 | Wright | Yes. |
|   | Chester | The statement of work document for the – for the ..... entities. |
|   | Wright | Ah - - - |
|   | Sommer | Yes.  Because that arrangement is there. |
|   | Wright | Yes. |
| 35 | Miller | Okay.  Sorry.  As you were and I ..... |
|   | Sommer | And – and I think the answer to 12 is ..... because I think question 12 – I'm just going through our – the original questions and answers - - - |
|   | Miller | Sure. |
|   | Sommer | - - - was how did you pay for this invoice?  This is invoice 98.  Is that what ..... |
| 40 | Miller | ..... issued from Dr Wright to DeMorgan. |

Page 7 of 96

CONFIDENTIAL                                                                                                DEF_00053149

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | And then question 12 was how did you pay for this invoice and our answer was, "This invoice was paid on 4 October 2013 by way of assignment of equitable interest in an offshore trust over Bitcoin." |
| | Miller | Yes. |
| 5 | Sommer | So I think that part there - - - |
| | Chester | ..... |
| | Sommer | It is the same. So they're not talking about ..... Panamanian trust - - - |
| | Miller | Yes. |
| | Sommer | - - - in relation to question 12. It's actually - - - |
| 10 | Chester | Talking about the - - - |
| | Sommer | The – the Seychelles. |
| | Chester | ..... just clarifying ..... |
| | Miller | .... Seychelles trust. ..... by saying it's the Seychelles - - - |
| | Sommer | Yes. So just - - - |
| 15 | Miller | Yes. We will take note of that for question 12. The answer here is ..... it was Seychelles trust. That's fine. |
| | Wright | So ..... |
| | Sommer | ..... I've only just got back last night and - - - |
| | Chester | Right. |
| 20 | Sommer | - - - so that's why I'm sort of working through these - - - |
| | Miller | Yes. No. That's okay. |
| | Sommer | And – and the guys are very keen to get back to you as quickly as possible. So - - - |
| | Miller | Yes. It's appreciated. |
| 25 | Sommer | All right. Hotwire. |
| | Miller | Sure. |
| | Sommer | Sorry. I should have asked. Do you have any questions on DeMorgan? Is there anything that you don't understand? Because one of the things I'm really keen to do is – is just to ensure that we don't have any |
| 30 | | miscommunications or – you know. So I know it's – it – it's really hard to sort of think of all your questions as you're going. |
| | Miller | Yes. |
| | Sommer | But, if we're talking about Hotwire and you think about, "Oh, there's something I had to ask about DeMorgan," please let's sort it out - - - |
| 35 | Miller | I will let you know. |
| | Sommer | - - - as we go today. |
| | Miller | Yes. |
| | Sommer | Because I – I – I would really - - - |
| | Miller | Yes. |

CONFIDENTIAL

DEF_00053150

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | - - - really like to get as much of this squared away as possible and make sure we don't have any - - - |
| | Miller | Sure. |
| | Sommer | - - - misunderstandings.  So anything else you want to ask about DeMorgan? |
| 5 | Miller | I don't think so.  We will have to just go through those documents - - - |
| | Sommer | Yes. |
| | Miller | - - - when we get back.  There's no point in going through them now. |
| | Sommer | No, no, no. |
| 10 | Miller | I feel I understand the process.  It's just a matter of going through what the documents say. |
| | Sommer | And – and prima facie you think that those documents – I mean I know you haven't had a chance to look at them but they seem responsive to what you were – they're responsive to what we thought you were asking and so we just want to make sure that - - - |
| 15 | Miller | I feel you answered the questions. |
| | Sommer | Good. |
| | Miller | If that's what you're asking. |
| | Sommer | Yes. |
| | Chester | Part 2. |
| 20 | .......... | Hotwire. |
| | Chester | Hotwire. |
| | Miller | Thank you. |
| | Chester | ..... technicolour.  With lots of tabs and ..... |
| | Miller | Yes. |
| 25 | .......... | ..... |
| | .......... | ..... |
| | .......... | That's it. |
| | Chester | Okay.  Your question was, "What documentation was provided in each transact to substantiate the transfer of right to Bitcoin other than Xero records?  You provided a deed which evidences the licence.  However, this does not detail the transfer of rights.  Also the deed specifies that payments to be issued in Bitcoin.  You've advised did not occur and that only ever an assignment of rights.  We request any evidence to this transfer be ..... rights."  Okay.  So you've got the deed. |
| 30 | | |
| 35 | Miller | Yes.  We do. |
| | Chester | The assignment which ..... for you again.  Which is ..... deed of assignment from Craig to DeMorgan. |
| | Miller | Assignment of equitable interests. |
| | McMaster | No, that's – we didn't have that document. |
| 40 | Miller | No, we haven't. |

CONFIDENTIAL

DEF_00053151

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | That's why we asked for the – the deed.  So I think you see in your response that it had already been provided but we couldn't locate it within the office. |
| | Wright | I talked to so many people at different times. |
| | McMaster | It's easy enough to get confused about it all.  I totally agree. |
| 5 | Wright | Well, we had three different initial auditors and - - - |
| | McMaster | Yes. |
| | Wright | - - - then someone else came in.  So which particular person I gave things to. |
| | McMaster | As long as we ultimately get it. That's – that's what really is the issue and – and thank you for providing it, Andrew, and then ..... |
| 10 | Miller | Yes. |
| | Chester | That's not the same thing. |
| | Sommer | No, no.  It will – it will be in there.  I just may not have put them in the right order ..... so I was pulling them out of a director rather than .....  Sorry, John. ..... |
| 15 | Chester | .....  That's a statement of work.  Deed of assignment.  And that's not here. |
| | Sommer | Oh. |
| | Chester | .....  So you've got that .....  And that's Coin-Ex.  It's the same exercise. |
| | Sommer | Yes. |
| | Chester | All right. |
| 20 | Miller | Perhaps I'm a little bit confused.  So maybe you could help me in that regard but I thought – my recollection was from the discussion that you had with Des ..... which was recorded previously I think Craig said something to the effect that he always viewed it as Bitcoin not as rights. |
| | Wright | ..... a whole lot of cash. |
| 25 | Miller | Okay. |
| | Wright | Even the equity ..... relative to the an equitable interest as cash. |
| | Miller | Okay. |
| | Wright | But, if you get me into these things, I will still tell you that ..... money isn't real money ..... gold is. |
| 30 | Miller | Okay. |
| | Wright | ..... money is just paper. |
| | Miller | Mmm. |
| | Wright | ..... |
| 35 | Miller | Yes.  But that isn't correct.  You still created this deed of assignment by way of evidencing that the transaction – at the time. |
| | Wright | Yes. |
| | Miller | Okay. |
| | Wright | In my opinion, that is a transfer of cash as an equitable transfer of cash. |
| | Miller | Okay.  Yes. |
| 40 | Sommer | If you go back to the – you know that deed of loan document - - - |

Page 10 of 96

CONFIDENTIAL

DEF_00053152

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | Yes. |
| | Sommer | - - - the design by ..... |
| | Chester | Yes. |
| 5 | Sommer | And to the – the last page of that ..... you know, "We're not going to bring any actual Bitcoin into the country until ....." |
| | Miller | Yes.  There's a note written on the side. |
| | Sommer | ..... regulatory issues. |
| | Miller | Yes. |
| | Sommer | So - - - |
| 10 | Wright | When the trust was set up in 2011, that was - ..... and because of my arguments with the ATO ..... |
| | Miller | Okay. |
| 15 | Wright | And although it wasn't exactly worth ..... I still believed it to be of value .....  I was a little bit paranoid and anti-everything ..... after it ..... just go through the whole – you – I- I had been working on this stuff for 10 years.  You guys said it was worth nothing and .....  So, yes.  So - - - |
| 20 | Miller | All right.  Well, that certainly responds to our question because all we had previously to substantiate these transactions was the Xero accounting records.  So we just wanted to see whether there was anything else exchanged at the time and it's that each party agreed to exchange the equitable interests in – in the trust.  So, if that's what that is, then, yes.  Thank you. |
| | Wright | So ...... |
| | Miller | Yes. |
| 25 | Chester | ..... turn sideways. |
| | Sommer | It should go sideways. |
| | Chester | Okay.  ..... number 2 is the valuation of IP. |
| | Miller | Mmm. |
| 30 | Chester | ..... etcetera, however sold for a specified value before the statement of claim was filed, dat, dat, dah, on 1 July versus – negotiated the value is the question. |
| | Miller | Yes. |
| 35 | Chester | There's a non sequitur there regarding Mr Wilson but below that is the board notes and the email shows it's attached and – no, sir.  At this point, ..... signed contract was in place.  So what it's saying is that there was a – between Clymont and Wright there was understanding of what they were doing, what the values were that they working with which is quite clear in documentation and I really think that what was happening in the court exercise was just really validating what was already know., |
| 40 | Miller | Okay. |
| | Chester | So the valuation was done prior to that and it was done in contract and that the – and really the court case was just really – as – as we've mentioned and you will find that we answered the questions throughout this – like that court case wasn't about determining anything other than essentially - - - |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

_____

| | | |
|---|---|---|
| | Wright | Making sure nothing ..... |
| | Chester | Making sure - - - |
| | Wright | ..... |
| 5 | Chester | That was no other – there were no -  yes.  And no other entities in terms of the estate side of ..... Clymont's life that came into the exercise or made any claims, etcetera, on this stuff and it was just to preserve that.  That the values and the determinations had already been done.  They had already exchanged most of the details of the – the contract, the last one, there were some things that needed to be tied up where – and I've given you some examples of that |
| 10 | | through this as well.  I think the – an example of that would be where Clymont was to get an – an interest in one of the – one of the entities in Australia - - - |
| | Miller | Yes.  ..... |
| | Chester | - - - and he was to do that.  He was to pay ..... 250,000 Bitcoin for that.  Well, that didn't happen.  So that was one of the loose ends that needed to be tied |
| 15 | | up and, etcetera. |
| | Miller | Sure. |
| | Chester | So those processes were – were really the object of the – of the – the court actions. |
| | Sommer | ..... |
| 20 | Chester | ..... |
| | Sommer | The court was ..... to issue the – I think what was intended was ..... |
| | Chester | ..... |
| | .......... | ..... |
| | Sommer | Very important difference between those two. |
| 25 | .......... | Extremely ..... |
| | Miller | We will make note of that.  That's fine. |
| | Wright | Yes.  ..... |
| | Chester | So there was a lot of stuff going back and forth between Craig and the courts to establish the validity, etcetera. |
| 30 | Miller | Okay. |
| | Chester | And you've got the deeds, etcetera, around that. |
| | Miller | ..... |
| | Chester | So this is this – the deed of charge and the attachment is – that's just really a sort of a restatement of what you've seen in DeMorgan from the – from the |
| 35 | | Hotwire side. |
| | Miller | So that's these. |
| | Sommer | No, no.  There are copies. |
| | Miller | There are - - - |
| | Chester | The copy is there. |
| 40 | Miller | ..... |
| | Sommer | Each folder should be complete. |

_____

CONFIDENTIAL

DEF_00053154

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Deed of assignment and charge ..... |
| | Sommer | And it's the same document ..... a photocopy in each folder where it's relevant, I think, and then - - - |
| | Chester | 15 July. |
| 5 | Sommer | Then there would be the IP specific deed from ..... 1 September.  Yes. |
| | Miller | So was this put together on 15 July? |
| | Sommer | Well, that's the same document you've seen. |
| | Chester | It's just a photocopied set of documents. |
| | Miller | Okay. |
| 10 | Sommer | So that's – that's - - - |
| | Miller | Sure. |
| | Sommer | - - - Craig to the trust. |
| | Miller | Mmm. |
| 15 | Sommer | And then in the Hotwire response there's the trust to Hotwire but in the trust one you've already seen the trust to Hotwire and the trust to Craig and the trust to Coin-Ex. |
| | Miller | Mmm. |
| | Sommer | So it's documents with which you're ..... |
| | Chester | So each of the entities should have the same batch of documents. |
| 20 | Miller | Was it also signed on 15 July 2013?  It's got the date - - - |
| | Wright | They've been signed about that date, yes. |
| | Miller | Okay.  Sure. |
| | Sommer | Which one is that?  That was the deed of charge - - - |
| | Miller | The deed. |
| 25 | Sommer | - - - and assignment - - - |
| | Miller | Deed of charge, yes. |
| | Sommer | All right. |
| | Miller | Okay. |
| | Chester | All righty.  Three.  Hotwire was to do – we're onto question 4. |
| 30 | Miller | Yes. |
| 35 | Chester | Is that where we are?  All right.  The contract was signed – executed.  Consideration passed.  The transfer of software was not complete.  That's not the case.  The transfer of software was complete.  There were just some other extraneous issues.  So the sole purpose of the ..... was the sole purpose of the court case to obtain rights to the software?  It was just to basically secure all the terms of the contract. |
| | Miller | Okay. |
| | Chester | Rather than the – I mean the rights to the software was one of the exercises. |
| | Miller | Mmm.  And that's - - - |
| 40 | Wright | I know Ira and others – like, Ira is Dave's brother and executor now. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Okay. |
| | Wright | But I have no idea about his father or brother.  David warned me about his father can be a bit whatever at times.  So until I knew these people I didn't want – a whole lot of things with an estate. |
| 5 | Miller | Mmm. |
| | Wright | And I was going to eff up everything. |
| | Miller | Yes. |
| | Wright | Since then I've come to understand that, yes, they're actually reasonable people and all the rest but I didn't know that at that time. |
| 10 | Miller | Fair enough.  Okay. |
| | Chester | ..... appears again which is ..... and it basically falls to the same discussion.  And it's – it just says that the – most of the elements of the ..... were completed in April. |
| | Miller | Mmm. |
| 15 | Chester | And it was just purely to secure things without – without question. |
| | Miller | Sure. |
| | Chester | Question 5.  The ..... was paid in shares ..... from an assignment. |
| | Miller | Mmm. |
| | Chester | And there is an assignment document in here for - - - |
| 20 | Miller | ..... |
| | Chester | Well, that same document. |
| | Miller | Yes.  Sorry.  Can I just confirm which one it is that's referred to in question 5?  09, deed of assignment, CSW R & D. |
| | Chester | Have you got that in your - - - |
| 25 | .......... | Yes. |
| | Chester | That one, I think.  .....  That one. |
| | Miller | Okay.  Assignment of equitable interests. |
| | Chester | Yes. |
| 30 | Miller | Sure.  Yes.  So this is all – well, sorry.  I shouldn't say all.  Some of these documents are new to me.  Is there a reason you weren't able to provide them before? |
| | Wright | ..... to so many different people - - - |
| | Miller | Okay.  So you just thought that this was given to someone else. |
| | Wright | If you look at my first pile of ..... and ..... |
| 35 | Miller | Okay. |
| | Wright | There was three different auditors.  Then another couple of auditors came in.  Then – so I don't know who has got what at the moment? |
| | Miller | Yes.  Okay.  That's fine. |
| | Wright | And if you – if you haven't got it, then you've got it now. |

CONFIDENTIAL

DEF_00053156

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Mmm.  No.  I will put it on the system and scan it in so we've – we've definitely got it. |
| | Wright | I mean I've also – you see I've got some things going back to before we did this with ATO people ..... |
| 5 | Miller | Okay. |
| | Wright | - - - and before I knew Michael Hardy and all the rest.  So - - - |
| | Miller | Mmm. |
| | Wright | - - - I've given things to them back in - - - |
| | Miller | All right. |
| 10 | Wright | - - - April, stuff in May.  I gave stuff to Michael and so at the moment I'm just going to give it to you all again.  No – I mean I'm not going to do the – I've given you this before.  If you ask me now, I've learnt to just go, "Here have it again." |
| | Miller | That's appreciated.  Thank you. |
| 15 | Chester | And I think what is different at the moment is that we're actually giving it to you in some semblance of order which in your questions are helping to formulate that.  Thanks very much.  But it – the – the sort of – one of the sides of – of the nature of what Craig is and what he does is that he's constantly out there somewhere.  He's – he's constantly working ahead of this game and, once he has done something notionally, in his mind he thinks it's done and so, when you – when you ask for information, you could have all this just as an assortment of papers dumped on your desk and say, "Well, it's in there," which is probably the way the first way batch went through. |
| 20 | | |
| | Wright | ..... |
| 25 | Chester | But to ..... but this is now sort of putting into an order, straightened out, sorted out and – that you can - - - |
| | Miller | We all work differently. |
| | Chester | That you can work with.  Yes.  Exactly. |
| | Miller | Well, it's - - - |
| 30 | Chester | Okay.  16. |
| | Miller | All right. |
| | Chester | Shares acquired by Robert Urquhart, Dave Perry, and Jamie Wilson, it is. |
| | Miller | ..... as well. |
| | .......... | Yes. |
| 35 | Chester | Well, Urquhart and Perry.  "On 15 August were transferred as shares owned by Dr Wright ..... did not suggest any shares were transferred."  There were a series of – it was all done at once and essentially what – what probably should have done with the ASIC lodgement would have been to - ..... and then move them in a separate lodgement. |
| 40 | Miller | I see. |
| | Chester | But what was done was that he – the – the discussion was held.  It was agreed that it was going and there was a distribution moment and I think it goes to there's a – there was a – you will see a minute in there. |

CONFIDENTIAL

DEF_00053157

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | .......... | 12, nine. |
| | Chester | Which is 12, nine and 15 ..... but 15 ..... there's two – there's six and seven. |
| | Miller | Mmm. |
| | Chester | And six and seven go through the discussions that were there. |
| 5 | Wright | Unfortunately with some of these things that – that is a quicker way in which – the same as the ..... but the end result is that it's going into entity, then another entity and I've got black and because I cancelled – I've just gone black which I know now is not so rare and the same with this.  So I've got all the notes and then I've just gone black.  Everyone has pulled me up and took me over the coals about it already.  So - - - |
| 10 | | |
| | Miller | When you say black, you mean in the sense that you have – you've just - - - |
| | Wright | I've just gone - - - |
| | Miller | - - - ..... to the end entity - - - |
| | Wright | Yes. |
| 15 | Miller | - - - and worked backwards. |
| | Wright | Well, like the Cloudcraft one. |
| | Miller | Yes. |
| | Wright | You will see that the deeds say Craig to trust to Cloudcraft. |
| | Miller | Mmm. |
| 20 | Wright | And what I've done is I've done an invoice to Cloudcraft because I've made entries – I'm the trustee for the deed.  So therefore everything just goes straight through anyway.  I understand and everyone has pulled me up and whatever else.  Invoice, deed.  Deed, the other.  Yes, they cancelled.  Yes, it makes a zero amount but – and the same here.  Shares.  Yes.  I issued a – instead of doing one big black, I have to do all the different names. |
| 25 | | |
| | Chester | So what happened at any rate the sum total is – is correct and you – there's – there were 10 million shares issued on the day. |
| | Miller | Okay. |
| | Chester | And then they were distributed out to – Wilson got a million shares, Urquhart got 250,000, Perry got 306, and 774 ..... |
| 30 | | |
| | Miller | Okay.  Sure. |
| | Chester | And the balance – rested with Craig and then subsequent to that Perry's were rescinded because he essentially didn't fulfil the terms of the – his agreement. |
| | Miller | Sure. |
| 35 | Chester | And Urquhart's are still there.  Wilson rescinded as well because he basically withdrew from the – from the entities in – in October. |
| | Miller | Mmm. |
| | Chester | So that's – that stuff is all ..... |
| | Miller | Yes.  Okay.  Question 8. |
| 40 | Chester | You've said that ..... was paid in Bitcoin Vietnam ..... pay.  She's paid ..... an amount of between 200 and – or 2000 and 2015 Bitcoin and these are held in |

CONFIDENTIAL

DEF_00053158

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
|   |   | an overseas trust.  She's after the .....at this point in time and the second point is, yes, when ..... has also called ..... sister. |
|   | Miller | Yes. |
|   | Chester | So that all fits.  And I think that's Hotwire. |
| 5 | Miller | That is.  Yes.  Yes.  No questions at this point.  I will just have to go through those documents but – yes, I'm satisfied - - - |
|   | Chester | Okay. |
|   | Miller | - - - you've – you've answered my questions. |
|   | Chester | Okay. |
| 10 | Miller | ..... |
|   | Chester | And you've got – and you've got the ..... and sort of Jamie's minute of his million shares - - - |
|   | Miller | Mmm. |
|   | Chester | - - - and the minutes that these guys and so on. |
| 15 | Miller | Yes.  Okay. |
|   | Wright | And I will also just say ..... – when you look at what businesses we bought and everything like that, you ..... on that and you will probably guess from my thing I've got a long history with gaming companies with the Playboy Gaming ..... But gaming is illegal in Australia and ..... that we bought from her was ..... |
| 20 |   | which is a – idea of an escort agency based on distribution of Bitcoin ..... |
|   | Miller | Okay. |
|   | Chester | ..... Coin-Ex. |
|   | Sommer | It's just another profession. |
|   | Wright | Not everyone feels that way. |
| 25 | Sommer | We all have to live. |
|   | Wright | Exactly.  And, if it's legal, I have no problems. |
|   | Sommer | Exactly. |
|   | Chester | Okay.  So the questions are – this – in this group.  "You advised that ..... engaged Hotwire provide services and ..... provided ..... provided a memo."  Okay.  A copy of memo is attached.  A company board memo and Coin-Ex and the project details.  So what we've got here is a Cloudcraft agreement. |
| 30 |   | And that's a Cloudcraft agreement.  Thank you.  And there's – is it – is it ..... No.  ..... |
|   | .......... | ..... |
| 35 | McMaster | Look, it's entirely possible.  We – I was ..... |
|   | Chester | So there's – there is a R & D agreement between Hotwire and Coin-Ex. |
|   | Miller | Okay. |
|   | Chester | And you will find that in the blue – or the – yes, it's in the pink ...., I think. |
|   | Miller | Yes.  With the agreement. |
| 40 | Chester | No.  Come back.  That's part of it.  There you go. |
|   | Miller | Yellow tab. |

CONFIDENTIAL

DEF_00053159

Interview Conducted with Craig WRIGHT

| | Chester | And it has got the – the details and it has also got stuff from our - - - |
|---|---|---|
| | .......... | ..... |
| | Chester | - - - working schedules.  So this is - - - |
| | .......... | It's a living document. |
| 5 | Chester | Part of this is the stuff that's been brought in recently ..... authorisation stuff at the back is – is current.  ..... going on.  And it's what it's based on. |
| | Miller | Yes.  I haven't come across Interconnected Research Proprietary Limited before. |
| | Wright | It - - - |
| 10 | Chester | It exists. |
| | Wright | It's 100 per cent owned by Hotwire. |
| | Miller | Okay. |
| | Chester | It doesn't do anything.  It hasn't done anything to date. |
| | Miller | All right.  That's fine. |
| 15 | Wright | It's just there for the future. |
| | Miller | Yes. |
| | Wright | It's planning. |
| | Miller | Okay. |
| | Wright | We're planning on having it doing things but it's connected to - - - |
| 20 | Miller | Yes. |
| | Wright | It will be the accidental research ..... so we sell research services and it's outside of Hotwire as well to bring revenue in. |
| | Miller | Okay. |
| | Wright | It will be where the revenue goes. |
| 25 | Miller | Yes.  Okay.  That's - - - |
| | Chester | So, as you can see from the – the emails set up on that, it was generated by – well, the licensed documents were generated by Jamie. |
| | Miller | Sorry.  Which email is that? |
| 30 | Chester | There's emails in the tabs.  You will see there's an email from Jamie, one dated and one undated, about the assignment. |
| | Miller | ..... on that one. |
| | .......... | 15 October. |
| | Chester | Yes.  And then there's 15 September.  ..... different. |
| | Miller | Sorry.  I can't see it there. |
| 35 | Chester | That's all right.  .....  Okay.  That's a reference in the – in the .....  The creating of the deed and assignment between the two which is that and then this follows. |
| | McMaster | Yes.  The Jamie emails are in the folder ..... but not ..... |
| | Chester | Yes.  ..... |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | ..... |
| | Chester | Those two. |
| | McMaster | That one.  Yes.  Okay.  That one is there. |
| | Miller | Okay. |
| 5 | Wright | ..... |
| | Chester | Those two.  So what – by the reference is is that there is costs associated with the development of about three million bucks because – determined by the relationship with Rubic. |
| | .......... | Yes. |
| 10 | Chester | And there was ..... between Hotwire and Rubic and notified between – and notified to Coin-Ex. |
| | Miller | Mmm. |
| | Chester | And basically that's when it flowed to the - - - |
| 15 | Wright | So the idea was we – we knew there was a definitive – it's going to be at least this amount and then at the end of the year we square off whatever it is ..... so. |
| | Chester | Okay. |
| | Miller | Yes. |
| | Chester | Um - - - |
| 20 | Miller | Question 4. |
| | Chester | 4.  "Who requested that you become a director?"  That's discussed further in one of the documents, I think, but basically it was through the relationship of Hotwire and Coin-Ex and his entity YBF which you've – we've discussed in the past but the – your document file ..... |
| 25 | Miller | ..... |
| | Chester | Your digital file and that was going to get merged with these entities.  There was some shares going back and forth.  Some directorships and that fell through. |
| 30 | Wright | And Jamie got a tentative offer and basically said, "I'm going to take it and screw you," effectively.  And that then fell through and then he came back with the, "Oh, well, this didn't work.  How can we come back now?" |
| | Miller | So I take it then the answer that it was Craig who had that discussion with Jamie about – about this deal. |
| | Chester | It's two people sitting down and talking about - - - |
| 35 | Miller | Yes. |
| | Chester | - - - what they're going to do.  Craig was adding value to YBF.  He was doing some work with them on their project. |
| | Miller | Okay. |
| | Wright | ..... |
| 40 | Chester | And – and he was seen to be able to add value in his role as a – as a – as an accountant CPA and he was going to take on that CFO role. |
| | Miller | Yes. |

CONFIDENTIAL

DEF_00053161

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | And – and obviously that would be a really nice fit.  Logistics got in the way of that a little bit, I think, one person being in Brisbane and the other one being in Sydney and they - - - |
| | Wright | And his marriage fell apart. |
| 5 | Chester | All kinds of bits and pieces ..... conspired to make that not a reasonable thing but I don't think ..... is part of the primary one.  I don't think you can be in two places at once.  It doesn't work.  So that's where it – that's where it was issued and that's where it – that's what transpired.  Question 8.  "We advised issue ..... for cash so we considered Bitcoins and rights of Bitcoin as cash. |
| 10 | | Deed for assignment is attached.  The deed was completed by Mr Wilson and included assignments for IP that were done."  So that – that relates to - - - |
| | Miller | So, in relation to your initial response, there was a cash assignment but there wasn't cash for the purpose of the GST Act or - - - |
| | Chester | Exactly. |
| 15 | Miller | Yes.  It was - - - |
| | Wright | ..... I'm not going to budge on that one.  I don't care what you guys say. |
| | Miller | No. |
| | Wright | .... and I think everyone else is wrong and it's their money ..... |
| | Miller | I understand.  And – but you're saying it was Bitcoin and rights to the Bitcoin |
| 20 | | as cash. |
| | .......... | Are we?  No, no. |
| | Miller | We considered Bitcoin as rights to ..... |
| | Sommer | Yes.  And I think we – well, we're saying the same thing that it's – that it – is it – is it that that you're saying that was the document? |
| 25 | Miller | We consider it - - - |
| | Wright | An assignment – equitable assignment of money in a – a bank account to another bank account is a transfer of cash in my opinion.  So, therefore, moving stuff in a trust equitably is a transfer of cash.  Still, in my opinion.  ..... |
| | .......... | In other words - - - |
| 30 | Wright | ....., "You're wrong, Craig."  But I don't – I'm not going to budge on that one.  I don't care.  You're saying until the end of time Bitcoin is cash.  Equitable assignment of Bitcoin is cash.  It is cash. |
| | .......... | Okay. |
| | Wright | Also - - - |
| 35 | .......... | For the purposes of this discussion, it's not. |
| | Miller | Okay. |
| | Sommer | So – but – what – what's - - - |
| | Sommer | Issued for cash ..... a deed of assignment that states it's attached.  Is that a deed of assignment that we're talking about? |
| 40 | .......... | I believe so. |
| | McMaster | So who drew up these deeds?  Did you, Craig, or – or did you get a solicitor to do it for you? |

CONFIDENTIAL

DEF_00053162

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| | Wright | Jamie used solicitors and I went back and ..... with them on some of the bits. So - - - |
| 5 | McMaster | So, if – if a solicitor – an Australian solicitor, I assume, drew up the deeds, then I would have thought that, if they're using a term like cash that that would be cash in the normal sense not necessarily in the sense that you believe Bitcoins to be cash. |
| | Wright | Well, they have no idea about whether it is cash, isn't cash, whatever else. |
| | McMaster | Yes. |
| | Wright | So ..... |
| 10 | McMaster | ..... Look, I understand how you feel that Bitcoins are cash and, you know, that's fair enough.  That's not ..... or any issue.  I just sort of thought that a firm of solicitors would have been tighter around their phraseology. |
| 15 | Wright | Well, we sort of merged what we said and how we went to the firm .....  I mean when – well, I think Jamie mostly used ..... up in Brisbane but then once we got the base document then we played with it. |
| | McMaster | Okay.  All right.  Okay. |
| | Miller | Just so you're aware ..... because I know you can't see all these documents from there, the deed of assignment does talk about equitable interests not – not cash. |
| 20 | .......... | Okay. |
| | Wright | Not – yes.  So the solicitors put equitable interest and I still say it's cash. |
| | McMaster | That's fair enough.  I can understand why. |
| | .......... | So was that in Queensland that Jamie had those done or - - - |
| 25 | Wright | Yes.  It would have been – Dianne's Queensland solicitor up there at – somewhere in Brisbane or Gold Coast or - - - |
| | .......... | ..... |
| | McMaster | Okay. |
| | Wright | I think she mentioned the Gold Coast.  She works in Brisbane but she lives in Gold Coast or something like that. |
| 30 | McMaster | So that's an easy thing ..... |
| | .......... | ..... |
| | .......... | ..... |
| | McMaster | The train is quite fast. |
| | .......... | ..... by train, too. |
| 35 | McMaster | Yes. |
| | Miller | So do you know if this particular one was signed in Brisbane or Sydney or elsewhere? |
| | Wright | Jamie came down. |
| 40 | Miller | Okay.  I'm just curious because it has got Gwen Nguyen's signature.  You know. |
| | Wright | We scanned and sent.  So the way it works with – with Gwen for some of these things is we scan everything and sent it over.  So - - - |

---

CONFIDENTIAL

DEF_00053163

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Okay.  Just it says, "In the presence of Gwen T Nguyen".  The deed - - - |
| | Wright | In my opinion, a Skype meeting is in the presence of. |
| | Miller | Okay. |
| 5 | Wright | Just – I notice it seems to be pushing everything for what people's view is but a group of people sitting around a table with a group of people via Skype in my – in my opinion is still in the presence of even though they're half way around the world. |
| | Miller | Yes.  Okay.  I understand that.  Is there a reason you got her to sign it as opposed to someone else that was available to witness the signature? |
| 10 | Wright | She was involved.  She was in the Skype meeting and things.  So - - - |
| | Miller | Okay.  All right. |
| | Wright | And we had a video conference.  She was there. With Skype, you just flip a document back and forwards and - - - |
| | Miller | Okay. |
| 15 | Wright | I still say it's in the presence of.  At least it's a virtual presence anyway.  I know I push these terms to the limit but - - - |
| | McMaster | That's okay.  It's a – it's a brave new world ..... |
| | Chester | Well, that virtual reality or ..... is taxable now anyway so virtuality is okay.  It's real.  ..... |
| 20 | Wright | Second life. |
| | Chester | Second life.  Yes. |
| | McMaster | Yes. |
| | Chester | The first life for many people.  It's amazing. |
| 25 | Miller | Okay.  And that's the extent of questions for Coin-Ex.  Okay.  So again I'm happy that you've answered the questions based on what I can see. |
| | .......... | ..... |
| | Miller | So do you want to move on to the next entity? |
| | Chester | Yes.  ..... |
| | Sommer | And, again, I haven't had time to check these or ..... |
| 30 | .......... | ..... |
| | Miller | We will get through it. |
| | Sommer | My secretary wants to hear that ..... |
| | Chester | I've long meant – I've long meant to ..... runs the show anyway. |
| 35 | Wright | As I've stated, everyone pulled me up saying, "You did this the wrong way, Craig."  But it still works out exactly the same.  If something goes from me to Cloudcraft – if there's an extra set of invoices that should have been there, they all cancel each other.  So I know you're going to ..... on that one and I still say it works out exactly the same. |
| 40 | Chester | Okay.  So, question 3.  Start at the back.  "We advise that payment is yet to be made to Denariuz for the software you provided by way of an arrangement between the parties and the ..... of payments to be made by mid-year.  If this arrangement was in writing, please provide a copy of the arrangement ..... to |

CONFIDENTIAL

DEF_00053164

Interview Conducted with Craig WRIGHT

|    |          |                                                                                                                                                                                             |
|----|----------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    |          | form this payment ..... Australia's ..... Bitcoins suggesting a payment may be made in the form of equitable interests in an offshore trust.  Does Denariuz currently hold equitable interest in this trust?"  Etcetera. |
| 5  | Miller   | And you said, "At present, Singapore entity holds capital in the form of Bitcoin."                                                                                                           |
|    | Chester  | Yes.                                                                                                                                                                                         |
|    | Miller   | "As legal and equitable rights and not simply to a trust."                                                                                                                                   |
|    | Chester  | Yes.                                                                                                                                                                                         |
|    | Wright   | Yes.                                                                                                                                                                                         |
| 10 | Chester  | Method of payment is yet to be determined and again that's a situation that is contingent on stuff happening here.                                                                           |
|    | Miller   | Okay.                                                                                                                                                                                        |
|    | Chester` | And I think that the – the view on Bitcoin is still a moveable feast in – in your game and we understand that there's a determination - - -                                                  |
| 15 | ..........| In June.                                                                                                                                                                                    |
|    | Chester  | In June which will – will basically shed some more light on that.                                                                                                                            |
|    | Miller   | That bottom line, Denariuz Singapore entity doesn't hold any trust interests.                                                                                                               |
|    | Chester  | But I think you're viewing – when you say this trust, what trust - - -                                                                                                                        |
|    | Miller   | Yes.  All right.  I've noticed - - -                                                                                                                                                         |
| 20 | Chester  | I think you're thinking - - -                                                                                                                                                                |
|    | Miller   | - - - a comment down the bottom.  I said this trust and I'm sorry I didn't specify.  I was just – I was saying it was the Seychelles trust.                                                   |
|    | Chester  | Okay.                                                                                                                                                                                        |
|    | Miller   | But, yes.  You are right.  I didn't ..... which one.  So - - -                                                                                                                                |
| 25 | Chester  | And I think if that's the one you're referring to I think the answer to that is no.                                                                                                           |
|    | Miller   | Yes.                                                                                                                                                                                         |
|    | McMaster | So what other trust are there other than the Seychelles one and the family trust that ..... trusts, etcetera?                                                                                 |
|    | Chester  | There's the two trusts here.  There's the one over there.                                                                                                                                    |
| 30 | Wright   | There's the one in Panama.  They've got a .....                                                                                                                                              |
|    | Miller   | Yes.  And - - -                                                                                                                                                                              |
|    | Chester  | .....                                                                                                                                                                                        |
|    | Miller   | ..... trust.                                                                                                                                                                                 |
|    | Chester  | And that trust was .....                                                                                                                                                                      |
| 35 | Miller   | No.  That's completely understood.  Yes.                                                                                                                                                      |
|    | Chester  | Yes.  So that's that.  Four is M & A for the ..... SG.  I don't think that Cloudcraft can do that but I think that Craig might be able to do that.  So it's on that basis that we're giving you that stuff. |
|    | Wright   | ..... because I am a director of .....                                                                                                                                                       |
| 40 | Miller   | Yes.                                                                                                                                                                                         |

Page 23 of 96

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | Chester | Yes. |
|---|---|---|
| | Wright | So it is not Cloudcraft giving you this.  This is me - - - |
| | Miller | Yes. |
| | Wright | - - - being a director of both. |
| 5 | Miller | Okay. |
| | Chester | Yes. |
| | Wright | Because I don't want to have any legal issues by Cloudcraft giving that ..... |
| | Miller | Yes. |
| | Wright | Yes. |
| 10 | Miller | That's fine. |
| | Chester | So you've rephrased that question to being, "Is there anybody who could" - - - |
| | Miller | Yes. |
| | Chester | - - - rather than, "Will you – will Cloudcraft do that?"  All right. |
| 15 | Miller | Yes.  Understood.  Craig has provided it.  He is the ..... director of Denariuz PTE Limited." |
| | Chester | That's it. |
| | Miller | Yes. |
| 20 | Chester | And that goes through the – and the M & As are very straightforward ..... document and you can see there who the directors are.  You've had those in the past I think – a list of the directors of that entity which is Craig Wright, ....., Ramona, which is Ramona ..... and ..... |
| | Wright | ..... not going to pronounce names. |
| | Chester | Yes.  Yes. |
| | Wright | And I used to try hard with Chinese names ..... about as good as my Chinese. |
| 25 | Chester | So that's – that's those – that's that entity. |
| | Miller | Okay. |
| | Chester | So – okay.  ..... being Cloudcraft and Hotwire. |
| | Miller | Which is question 6. |
| | Chester | Which is 6.  There's an RD, one which you've got.  Which will be - - - |
| 30 | Miller | ..... service agreement between Cloudcraft and Hotwire. |
| | Chester | Yes. |
| | Miller | Yes. |
| | Chester | Which is the other side of the same document which you've got in there – file. |
| | Miller | Yes. |
| 35 | Chester | And there's a minute.  There is a minute as well from 1 August and which determined the consideration.  Considers a million shares to be paid on completion or the transfer as beneficial to a – the transfer is not beneficial until completed.  So those shares are existing in Hotwire's distribution. |
| | Miller | Mmm. |

CONFIDENTIAL

DEF_00053166

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| | Chester | But they're not ..... until completed. |
| | .......... | ..... |
| | Miller | Yes.  All righty.  Okay. |
| 5 | Chester | And that explains question 7.  Hotwire does not hold its shared beneficially.  It doesn't because it's conditional upon the completion of that agreement. |
| | Miller | Yes.  Okay. |
| | Chester | Okay. |
| | Miller | Yes.  That's fine. |
| | Chester | That's okay.  Number 9. |
| 10 | Miller | Yes. |
| | Chester | The deed reference HWG was into about August.  However the transaction related to this agreement occurred 31 July.  And that is – why was it created after the transaction has already occurred? |
| | Miller | Mmm. |
| 15 | Chester | Okay. |
| | Miller | And you've said the agreement was made in July 2013, a verbal and email agreement is contract under law. |
| | Chester | Yes. |
| | Miller | And you provided the email .....to formalise things. |
| 20 | Chester | Yes. |
| | Miller | Sorry? |
| | Chester | And it was then – it was then formalised by Jamie following the – you've got the  -  I think it's there. |
| 25 | Wright | Yes.  To provide evidence and whatever else.  Although we have the whole contract – there's a contract even if – by .....  If I make a deal with you and you say we will exchange and whatever else, you've got all the problems of going up ..... I said, you said and whatever else.  So we did the – this is going to be a bit company.  This is going to be formal.  We're going to document everything so that no one can - - - |
| 30 | Miller | Yes. |
| | Wright | In – in two or three years, we got all this and going to the stock market and going, "Well, we had a contract but, you know, Jamie who isn't here and ..... said and I said and" – we had that covered.  So - - - |
| | Miller | Yes.  No, it's definitely good to put these things in writing.  The email - - - |
| 35 | Wright | You guys are much happier anyway. |
| | Miller | Yes.  The email you refer to is that something you have a copy of? |
| | Chester | No.  That's a good question.  There's nothing in – nothing for question 9. |
| | Wright | So which one are we looking at? |
| 40 | Chester | This is the – the agreement was made in an verbal agreement and email agreement between Cloudcraft and Hotwire which was then formalised and there's some to – to and fro emails between you and Jamie and/or - - - |

---

CONFIDENTIAL

DEF_00053167

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | So which question 9 for which ..... |
| | Miller | For Cloudcraft. |
| | Chester | For Cloudcraft. |
| | Wright | ..... when I get back to the office. |
| 5 | Miller | Okay.  If you wouldn't mind sending us that and it is possible you've sent it to us before but just for the sake of completing these documents. |
| | Wright | .....  All right.  So I've got that noted.  Thank you. |
| | Miller | Thank you. |
| | Wright | I'm surprised they ..... miss it. |
| 10 | Miller | Sorry. |
| | Wright | ..... |
| | Chester | That's Cloudcraft Hotwire.  Okay.  So that's - - - |
| | Miller | ..... Cloudcraft.  Question 9. |
| | Sommer | Cloudcraft and Hotwire. |
| 15 | Chester | It's the – it's the - it's the preamble to the agreement between Cloudcraft and Hotwire.  The preamble to the deed. |
| | Sommer | Refer HWG. |
| | Miller | So we do have that agreement.  It just refers to an email that was pre-dating that agreement. |
| 20 | Wright | ..... say anything about what the agreement really is any detail.  Just that we have an agreement. |
| | Miller | Yes.  That's okay. |
| | Wright | That's not like a 20 page email. |
| | Miller | Yes.  Whatever it is, it is.  ..... to provide it though, it would be great. |
| 25 | Wright | Hence why we got the longer document afterwards. |
| | Miller | Yes. |
| | Wright | Because the email just says, "Yes, we're going to do X, Y, Z." |
| | Miller | Yes.  That's fine. |
| | Chester | Okay. |
| 30 | Miller | Question 10. |
| | Chester | 10.  Question.  "Did he represent himself personally as licensor and as licensee in this agreement?"  And this is the IP going into Cloudcraft. |
| | Miller | Yes.  So there is an agreement between Craig Wright personally. |
| | Chester | Yes. |
| 35 | Miller | And Cloudcraft. |
| | Chester | Yes. |
| | Miller | And I believe the original question stated that at the time the owner/director of Cloudcraft was Dr Wright. |
| | Chester | Mmm. |

CONFIDENTIAL

DEF_00053168

Interview Conducted with Craig WRIGHT

| | Miller | So we're just - - - |
|---|---|---|
| | Sommer | What's the question? |
| | Miller | Yes.  I will have to go back - - - |
| | Wright | ..... myself and myself. |
| 5 | Sommer | Well, just – just explain what the purpose of that question is. |
| | Miller | The question was to the best of my memory was the original agreement between Craig Wright and Cloudcraft an agreement between Craig Wright personally and also signed by Craig Wright as director - - - |
| | Sommer | Yes. |
| 10 | Miller | - - - of Cloudcraft. |
| | Sommer | So what's the question? |
| | Miller | That is the question. |
| | Sommer | Was it – was that the case? |
| | Miller | Yes. |
| 15 | Sommer | Okay.  Well, is the document – you've got the document, haven't you? |
| | Miller | We've got the - - - |
| | .......... | Well, there was no other person who was a director of Cloudcraft. |
| | Miller | Yes. |
| | .......... | So there's no one else who can actually - - - |
| 20 | Miller | Okay. |
| | .......... | - - - act for Cloudcraft other than Craig. |
| | Sommer | But I'm asking what the purpose of the question is.  It's just it's not unusual for someone - - - |
| | Miller | Okay.  Craig - - - |
| 25 | Sommer | - - - to deal with the company - - - |
| | Miller | No.  It's not. |
| | Sommer | - - - you know, on both sides. |
| | Miller | Yes. |
| 30 | Sommer | So I'm just concerned that there's some imputation in that question that did Craig – did Dr Wright represent himself personally as licensor and as your sole director? |
| | McMaster | We understand the issue about - - - |
| | Miller | Yes. |
| | McMaster | - - - wearing two different hats. |
| 35 | Sommer | I'm just – I'm just – to me, it sounded like a – there was some – some imputation in that question - - - |
| | Miller | I wasn't trying to ..... anything.  Okay.  It's just different from the other - - - |
| | Sommer | Yes. |
| | Miller | - - - the other agreements where it was Jamie. |

CONFIDENTIAL

DEF_00053169

Interview Conducted with Craig WRIGHT

---

| | Wright | Well, that one only involved me. |
| | Miller | Yes. |
| | Wright | And Jamie was never involved in Cloudcraft - - - |
| | Miller | Yes.  So we're just confirming.  Thank you.  ..... |
| 5 | Chester | ..... |
| | Miller | It's a long question.  Invoice 97 is a reflection of the agreement.  However, invoice 97 is dated 31 July. |
| | Chester | Yes. |
| | Miller | And the agreement was created in late August 2013. |
| 10 | Chester | Yes. |
| | Miller | So if you could just explain how a July invoice can reflect an August agreement.  Now, just for the sake of our discussion, you've since also advised that invoice 97 was replaced by invoice 97A. |
| | Chester | Yes. |
| 15 | Miller | And that was for the purpose of making the invoice date follow or coincide with the agreement. |
| | Chester | Yes. |
| | Miller | All right. |
| | Chester | And, again, it's - - - |
| 20 | Wright | I knew what I was doing so to speak or at least I believed I did and I was in the process of doing this and I invoiced before I should have. |
| | Miller | Okay. |
| | Chester | The – it falls in the same period.  It was an issue of – of timing.  The agreements were being drawn up.  It was really - ..... it was created - - - |
| 25 | Wright | So they – they had the agreements being drawn up and I just pre-empted all that and just invoiced it anyway.  Knowing that I wasn't going dispute myself. |
| | Chester | But - - - |
| | Wright | And, yes, I know – everyone has drawn my over the coals many times for this.  Until I get the piece of paper saying, I don't do anything anymore.  I have agreed to that.  I do accept that. |
| 30 | | |
| | Chester | It's also a ..... to the fact that you're not allowed to touch the accounts anymore. |
| | Wright | Yes.  And I got antsy about coming in to the auditors and we do all that stuff and Craig never lodges anything ever again ..... |
| 35 | Chester | .....  So in that instance that – there's a – the long statement there which basically says that. |
| | Miller | Yes. |
| | Chester | And the – the issue with that one is the – I think it comes back to 97, 98 and 99 as well which we will get to when we talk about Craig at the tail of this. |
| 40 | Miller | Yes.  We will – we will get to that. |
| | Chester | Which is the issue of those three invoices - - - |

---

CONFIDENTIAL

DEF_00053170

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| | Miller | Yes. |
| | Chester | - - - and how they ..... |
| | Miller | Okay.  We will discuss that - - - |
| | Wright | Do you mind if I just walk out to the toilet for a minute? |
| 5 | Chester | ..... |
| | Miller | Do you want us to continue or do you want us to wait? |
| | Wright | You can if you want.  If there's anything that you need to ask me when I get back, you can. |
| | Miller | Sure. |
| 10 | Sommer | But again we – I'm – I'm just not sure where you're going with some of these questions.  Yes.  It's – it's not necessarily ideal but it doesn't change anything from a GST perspective.  ..... agreement and you might just say, "I'm not paying not invoice until we've formalised the terms of the arrangement."  I mean it's – there's a lot of questions here that just don't seem to be relevant from the purposes of working out whether or not there was a supply, whether or not there's a creditable acquisition.  I understand that you want to understand the picture of things and that's fine. |
| 15 | | |
| | Miller | Yes, yes. |
| 20 | Sommer | But, you know, a question like, "Please explain how a July invoice can reflect an August agreement?"  Well, really, that – that has a tone to it that I don't appreciate and I just think it's just like, well, it's not unusual for – you know, like an invoice a client before they've signed their engagement letter – well, I can't ..... because our system would stop it but, you know, I – I can do that.  It doesn't change anything from a GST perspective.  It may change the enforceability of the arrangement but generally closely held companies and individuals and – it just – it seems – it's not that surprising a thing to have happened. |
| 25 | | |
| | Miller | Okay.  With that – with that particular question at least it was replaced by a 97A and, as John as alluded to - - - |
| 30 | Sommer | Yes.  I know ...... |
| | Miller | - - - subsequently so - - - |
| | Sommer | ..... 97, 97A and 98 and there's a whole lot of complexity that I don't understand and John – John can speak to that quite happily. |
| | Miller | Sure. |
| 35 | Sommer | I just – I think there's – there's an aggressive tone to these questions that I think is inappropriate. |
| | Miller | Okay.  Well, I apologise if it was taken that way and, as I say, that wasn't intended to.  I would – I could be wrong but I think that particular statement you referred to was just – it was – originated from the original answer to the question. |
| 40 | | |
| | Sommer | Yes.  I know. |
| | Miller | So it's - - - |
| | Sommer | ..... |
| | Miller | I need to get my head around exactly what the answer is. |

---

CONFIDENTIAL                                                            DEF_00053171

Interview Conducted with Craig WRIGHT

| | Sommer | I understand.  I understand that but I in |
|---|---|---|
| | Miller | There was certainly no intention to be offensive or anything like that. |
| | Chester | Are we set for 12? |
| | Miller | Mmm. |
| 5 | Chester | Okay.  The court case reference was 225, 93.  Judgment date, 6 November.  Transfer to occur on or before 1 September.  And that's – that's where there's a kind of a – that – that ..... on or before in terms of the judgment - - - |
| | Miller | Yes. |
| | Chester | And you're thinking it's on 1 September but it's really – it's on or before. |
| 10 | Miller | On or before. |
| | Chester | Well, before – by that date.  Is to be completed by that date.  Anything – anything to do with it. |
| | Miller | Mmm. |
| 15 | Chester | And the – so all this stuff was – was dealt with in days that – the preceded the judgment and, as – as mentioned at the – the – these – the two judgments that we're talking about, the Supreme Court, were to essentially ultimately validate something that had already been completed - - - |
| | Miller | Okay. |
| 20 | Chester | - - - but  people knew where the boundaries were.  They knew what the values were and this was just a – it was a formality and – and – but yet – and yet – and yet the court was quite clear in making sure that – that Craig jumped through hoops to demonstrate the validity of what he was claiming. |
| | Miller | Sure. |
| | Chester | And so that took a period of time. |
| 25 | Miller | Yes. |
| | Chester | And they were quite - - - |
| | Wright | Well, really it came down to – I was under the belief really it was effectively .....  Unfortunately Dave died a few days beforehand which meant lawyers go, "Oh, you had better make sure X, Y, Z happens."  So we made sure X, Y, Z happens. |
| 30 | | |
| | Miller | Yes. |
| | Wright | Personally I think – I got the software, I had done the payment, blah, blah, blah.  Everything is fine and I just let them know but everyone has to make sure ..... |
| 35 | Chester | And so they should have.  That's a - - - |
| | Wright | I know. |
| | Chester | It's a good process to follow through. |
| | Wright | I know ..... |
| 40 | Sommer | We had actually .....  I mean that's effectively a copy of an answer we had provided previously as well. |
| | Miller | Okay.  All right. |

CONFIDENTIAL                                                              DEF_00053172

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | And, again, it's no – you can assign – you can assign future property and the – it doesn't change the ..... GST perspective. So - - - |
| | Wright | ..... doing things just to keep lawyers and accountants ..... in jobs, aren't we, Andrew? |
| 5 | Sommer | ..... lovely job. Clayton Utz is extremely grateful. |
| | Wright | A very good job. |
| | .......... | We haven't even got the litigators yet. So - - - |
| | Wright | Yes. |
| | .......... | - - - we will get to that shortly but - - - |
| 10 | Chester | Yes. Okay. I think that takes care of Cloudcraft. Do you have any questions around the balance. |
| | Miller | No. ..... So ..... those questions ..... the documents later on. I don't think there will be anything ..... in that regard. ..... |
| | Wright | Okay. |
| 15 | Chester | An easy one. Pholus. You're going to love this. I love this. This - - - |
| | .......... | Well, the - - - |
| | Chester | The – the issue in the first instance is – is about the incorporation and there – there was a – there was a delay in the incorporation and it was put through ASIC and do you know what the problem was? |
| 20 | Miller | Mmm. |
| | Chester | They interpreted Pholus as being something other than that. To be a - - - |
| | Sommer | An inappropriate name. |
| | Wright | Yes. |
| | Chester | - - - an inappropriate name and they were thinking phallus instead of Pholus. |
| 25 | Wright | Pholus is the name of a centaur in Greek myth. |
| | Miller | ..... |
| | Sommer | Yes. |
| | Chester | So it went around the traps for a while. |
| 30 | Wright | I had to go through all of that with bloody ASIC too to get ..... with the whole phallus bit. |
| | Chester | So, at any rate, what happened is that it went through a process where it was banned, it was – the thing was – and the next thing you know it's, "Oh, well, we're not able to give you that, sir." So that's why there was a – there was an interval ..... |
| 35 | Miller | Okay. |
| | Chester | ..... |
| | Miller | Okay. |
| | Chester | How you want to phrase that I don't know. But there are - - - |
| | Wright | ..... |

CONFIDENTIAL

DEF_00053173

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | There are notes around it and the – the E-company things are there for you to see.  So it was applied for. |
| | Miller | Okay. |
| 5 | Chester | And – and the – it wasn't like it was – so there's a – there's an application which you will have there as well. |
| | Miller | Yes. |
| | Chester | Those ones.  Yes.  So the application is there on 28 July. |
| | Miller | Mmm. |
| | Chester | And all done. |
| 10 | Miller | Yes. |
| | Chester | And so in ..... of the ..... directors it was – it existed - - - |
| | Wright | Hold on.  ..... |
| | Chester | And so there's a couple of minutes to that effect. |
| | Wright | You see, no one has a classical education anymore ..... |
| 15 | .......... | I knew what Denarius but - - - |
| | Sommer | I knew Denariuz was but - - - |
| | .......... | ..... |
| | Sommer | - - - I just didn't know what – I don't know what Pholus was. |
| | .......... | No, no. |
| 20 | .......... | ..... creates a whole different issue though. |
| | Wright | That was .... |
| | .......... | Okay. |
| | Wright | I don't take any responsibility for that one. |
| | .......... | Ghostbusters for – for ....., is she? |
| 25 | Wright | It's also a – a name of a god from Babylon. |
| | .......... | Yes.  They based it on that.  Yes. |
| | Wright | Yes.  I know.  ..... |
| | .......... | ..... |
| | Wright | And given her – her business before you – you might guess what ..... also ..... but that one got through without issue. |
| 30 | .......... | Well, they – they wouldn't have recognised that. |
| | Wright | I don't think they did. |
| | .......... | That was the first Ghostbusters movie.  They were the ..... of – you just happened to be a very big marshmallow man. |
| 35 | Wright | Yes. |
| | Chester | So the documentation is there for you - - - |
| | Miller | Yes.  Thank you. |
| | Chester | All right. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | Miller | Yes. |
|---|---|---|
| | Chester | ..... |
| | Wright | At least it has some meaning.  Google just got some bloody ..... kid said Google and he's pulled the name Google.  So at least mine has something ..... |
| 5 | Chester | Okay.  So the question 4 is then to do with copy of ..... licence ..... in relation to invoice 1 and also the ..... a copy of the second one.  There's a couple of notes on that.  And there's some ..... in mid-September. |
| | Miller | Yes.  30 September.  Both of them. |
| | Chester | Yes. |
| 10 | Miller | Yes.  Okay. |
| | Chester | And Denariuz.  Okay.  .....  With those ones, the both of those – I think the invoice has said and licence – and the licence and that I think – I might have pointed out to you the licence was the right for them to licence – they have had a right to use and right to licence. |
| 15 | Miller | Okay. |
| | Chester | So there wasn't the licence going from here to them.  It was not a licence ..... The right extended beyond it.  And there's a long diatribe that follows this regarding GST. |
| | .......... | ..... |
| 20 | Chester | Which goes on - - - |
| | Wright | ..... |
| | Chester | That says that's the basis upon which – contends that they're GST free. |
| | Miller | Okay. |
| | Chester | Upon which it goes on to discuss all of that. |
| 25 | Wright | .....  In which case I will apply the GST to one and negative it to the other and it all balances out anyway but I – whichever way you want. |
| | Chester | Okay. |
| | Wright | That's my reasoning. |
| 30 | Chester | And the other question was did the ..... run Denariuz SG versus Denariuz in Australia. |
| | Miller | Yes. |
| | Chester | And it's ..... SG didn't ..... the two rather than going through the PTE limited and PTY Limited, etcetera. |
| | Miller | Yes. |
| 35 | Chester | So that's the basis of that. |
| | Miller | Okay. |
| 40 | Chester | And 5 you said that Denariuz has not yet provided a consideration for the supply and I think we previously responded in question 6 about that.  But it's – it's essentially – Pholus has been prevented from doing anything because of the ..... and the requirement and this – this process and the previous process has – has effectively prevented a lot of our activities along that line and we've got – we expected to have had this settled a long time ago.  There was a – |

CONFIDENTIAL   DEF_00053175

Interview Conducted with Craig WRIGHT

_____

|    |          |                                                                                              |
|----|----------|----------------------------------------------------------------------------------------------|
| 5  |          | there were orders for some – for some – for some computer facilities and whatever.  We've got a data ..... sitting in – in Macquarie Park with – with 10 cages there that are empty and it's basically because our – our cash flow processes have been severely impaired by this process.  Well, we're now into six months, I think.  So one could reasonably expect that and it's because of that that there has been no supply and it's because of that that – well, this – this circumstance has arisen and then nicely - so Pholus has not asked for payment and Denariuz has agreed not to sue effectively.  We're – we're prevented from doing anything. |
| 10 | Miller   | Okay.  All right.                                                                            |
|    | Chester  | So the agreement is there.                                                                   |
|    | Miller   | Yes.                                                                                         |
| 15 | Chester  | But there's nothing that can be done about it until we get this sorted.  And that question 6 goes back to that same exercise.  The things are – from a – from a – an ..... point of view a lot of that stuff has been developed and is ready to – is – but we can't even run it up on the – on the facilities that we've got to play with it or experiment with it.  Question 8.  The question on ..... and she's – she's a resident of Vietnam and she's also a resident of the United States. ..... |
| 20 | Sommer   | Well, again, what's the relevance of that?                                                   |
|    | Wright   | She has never been to Australia.                                                             |
|    | Miller   | Okay.                                                                                        |
|    | Wright   | Ever.                                                                                        |
|    | Sommer   | And - - -                                                                                    |
| 25 | Wright   | I've invited her here but she doesn't want – she doesn't trust this country.                 |
|    | Sommer   | What – why do you need to know Ms Nguyen's residency?                                         |
|    | Miller   | Well, firstly, in one document it said Vietnam and the other the United States.  So just - - - |
|    | Sommer   | I understand that.  But I'm asking you why you need to know her residency.                    |
| 30 | Miller   | For clarification purposes.                                                                   |
|    | McMaster | And if we also need to contact her to - - -                                                  |
|    | Sommer   | But we've given you an address.                                                              |
|    | McMaster | - - - discuss things with her.                                                              |
|    | Sommer   | You have an address.                                                                         |
| 35 | Miller   | You have given a Skype address.                                                              |
|    | Sommer   | Yes.  So I'm – I – it just goes to – there has just been so much request and it's just like you – you guys really have an obligation to try and keep your questions to that which is relevant - - - |
|    | Miller   | No.  I understand.                                                                           |
| 40 | Sommer   | ..... answered these but a lot of them – I mean really.  If you want to know whether Ms Nguyen is a resident of a particular country for a particular purpose you can ask her but you shouldn't really be asking, you know, Pholus what - - - |

_____

CONFIDENTIAL

DEF_00053176

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Okay. We do conduct some third party inquiries in relation to some of these questions. So that's - - - |
| | Sommer | And, if you want her address because she's a, you know, related to one of the companies, we will give you her – you know, what details we have for her. |
| 5 | Miller | Yes. |
| | Sommer | But residence is a legal question. |
| | Miller | Yes. |
| | Sommer | All right. And that's a matter for her. |
| | Miller | Okay. Understood. |
| 10 | McMaster | You know, we should have ..... for her address. |
| | Miller | We've asked for that. |
| | McMaster | I will - - - |
| | Miller | But you're - - - |
| | McMaster | Will find out but all of these questions were cleared by our own legal branch. |
| 15 | Sommer | Okay. |
| | McMaster | Before they came to you. |
| | Sommer | All right. And, again, that may well be the case but they're – they also had non sequiturs – unfinished bits and all I'm saying is that doesn't seem right to me that you should be asking that question and I've – for the purposes of working out whether or not Pholus is entitled to an ..... tax, whether they're liable for GST, the residence of Ms Nguyen seemed to be entirely irrelevant. |
| 20 | | |
| | McMaster | I understand where you're coming from. |
| | Chester | Well, I think that what we – what we're not understanding is where you're coming from. |
| 25 | McMaster | Okay. I can – I – look, let's continue with what we're doing and at the end Andrew has things that he needs to clarify with you. |
| | Chester | Okay. |
| | McMaster | And then we can have a – a bit of a general discussion if that's what you want. |
| | Chester | Okay. I think that's Pholus. |
| 30 | Miller | Okay. |
| | Chester | Strasan Coin. |
| | .......... | ..... |
| | Chester | ..... we ran out of money ..... |
| | Miller | That's all right. |
| 35 | Chester | ..... |
| | Miller | It's only a small set of documents anyway. |
| | Chester | Yes. |
| | Sommer | We probably would have preferred that sort of ..... in the others anyway. |
| | Miller | ..... |
| 40 | Wright | ..... Didn't need a big ..... |

CONFIDENTIAL

DEF_00053177

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | Okay. So this one in the agreement reference CWK01 between Wright and – and W & K. A trademark coin is referred to and is this reference to your trading name? What's the big deal about coin? Coin is just coin. It was planned as a trading name and it's part of the coin exchange. Coin bits and pieces bitten – coin and it's – it's – it has no – had no legal - - - |
| 5 | | |
| | Wright | I just liked the idea - - - |
| | Chester | - - - exercise. |
| | Wright | - - - of Bitcoin. C01 because it's digital and - - - |
| | Miller | Yes. |
| 10 | Wright | - - - did we file any trademarks? No. Actually I tried to and they rejected it. They said it's too late to come and work. Piss off. And we could have spent lots of money fighting that and all the rest and I didn't bother. |
| | Miller | Okay. |
| | Sommer | There's no point. |
| 15 | Miller | Sure. |
| | Chester | So ..... C01. |
| | Wright | So I just registered it everywhere. |
| | Miller | Yes. |
| | Wright | If I can't have trademark, at least I can have it registered everywhere and then it's a Commonwealth trademark. |
| 20 | | |
| | Chester | Question 5 is relating to a transaction that disappeared and that's the Dalla transaction noted in the thing and it was a cancelled transaction and it related to something that may have been done by Jamie. I don't know. And it's – it was ..... and so it was removed. But looked around in the other – in the other entities to see if it followed anywhere else but it doesn't. |
| 25 | | |
| | Miller | Okay. |
| | Chester | ..... cancelled transaction. |
| | Miller | Yes. And to explain that question a bit further your original answer just sort of said it was put into the wrong tab and ..... works just like a tab browser, so we were just clarifying, well, which tab should it have been. |
| 30 | | |
| | Chester | Where – where should it be. |
| | Miller | ..... |
| | Chester | ..... should it be anywhere. |
| | Wright | It shouldn't be anywhere because, if you look at the date, it was from 1 April. |
| 35 | Miller | Mmm. |
| | Wright | It involved WK. |
| | Miller | Mmm. |
| | Wright | WK was Dave. |
| | Miller | Mmm. |
| 40 | Wright | Dave died. |
| | Chester | Yes. |

CONFIDENTIAL                                                                 DEF_00053178

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | So nothing finished. |
| | Miller | Okay. |
| | Chester | But there was no ..... relationship at that stage. |
| | Miller | Okay. |
| 5 | Chester | In terms of - - - |
| | Wright | Yes. |
| | Chester | ..... |
| | Miller | So it was just a mistake or - - - |
| | Chester | Yes. |
| 10 | Wright | Yes. |
| | Miller | - - - something like that.  Okay. |
| | Wright | It was do with some of the other stuff that I entered wrong and did whatever else.  At that stage I was trying to bring the – the accounts from one system to another and – in my working notes ..... I was trying to enter things and fucked up right royally. |
| 15 | | |
| | Chester | Question 7.  Recorded a transaction that was removed ..... working papers.  This ..... transaction which you already – the order was changed from ..... Bitcoin rights ..... value occurred.  A transaction in your working papers.  Well, I ..... but this was noted many times as Bitcoin is ..... blah, blah, blah.  That's a preamble.  Planned transfer of actual Bitcoin ..... by way of capital.  This did not occur.  And it was basically to treat - ..... the treatment of the ATO.  Do you want to address that?  This goes to the - - - |
| 20 | | |
| | Sommer | ..... answer to question 7. |
| | Chester | Yes.  It was related to the Dave exercise.  That transaction didn't happen.  Was it dated 1 April? |
| 25 | | |
| | Sommer | Right. |
| | Wright | Yes.  So I had – I had moved over everything including all the working notes and everything that I had which I shouldn't have because it integrated things that weren't meant to be there and ..... |
| 30 | Miller | And you've put in bold and underline, "The answer is simple.  It did not occur."  So - - - |
| | Wright | Yes. |
| | Miller | - - - that's essentially the answer. |
| | Wright | Yes. |
| 35 | Miller | The transaction did not occur. |
| | Trinh | Yes. |
| | Sommer | Yes.  So I mean the answer to question 8 last time was, "No, this transaction was cancelled."  ..... |
| | Chester | This is 7. |
| 40 | Sommer | No, no.  I know but it – it's a – that's a follow-on to our question – answer to question 7 last time. |
| | Chester | Mmm. |

CONFIDENTIAL

DEF_00053179

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | But our answer to question 8 last time was, "No, this transaction was cancelled.  It did not proceed." |
| | Miller | Okay. |
| | Sommer | Just - - - |
| 5 | Wright | I had contracted Dave to do further work ..... however he was going to do it and it didn't occur because strangely enough Dave stopped doing any work for me. |
| | Miller | Mmm. |
| | .......... | He's a ghost rider now. |
| 10 | Chester | Okay.  Number 9. |
| | Miller | Yes. |
| | Chester | You've listed one of your contractors as David Rees.  We understand that this person is deceased and that's true.  He died in – in August. |
| | Miller | Mmm. |
| 15 | Chester | We found out 30 August. |
| | Wright | A week later his wife died.  Some of his children have now died.  .....  I don't have luck with people ..... |
| | Sommer | I mean again that's a very odd question to ask, Andrew. |
| 20 | Miller | Well, it's just listed as one of the employees and again we conduct third party checks.  So if people are - - - |
| | Sommer | But you knew he died on 30 August.  Why would you ask if he was a contractor until 31 December? |
| | Miller | Well, it might have been a different David Rees. |
| | Sommer | Right.  Okay.  Well - - - |
| 25 | Miller | ..... question. |
| | McMaster | I'm sure there's a lot of David Reeses - - - |
| | Miller | That's it. |
| | Chester | ..... common name. |
| | McMaster | And – and we did a Google on Dave Rees and there are quite ..... |
| 30 | Miller | ..... |
| | McMaster | In Australia. |
| | Miller | ..... Rees.  Even Dr David Reeses. |
| | Sommer | Okay.  ..... there's a several Dr David Reeses. |
| | Chester | Okay.  ..... |
| 35 | Wright | So we hired someone else who is a mathematician. |
| | Miller | All right.  But – and he was in – in his - - - |
| | Chester | ..... |
| | McMaster | He was a nice age. |
| | Chester | Yes.  ..... |

CONFIDENTIAL

DEF_00053180

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| McMaster | ..... | |
| Chester | Okay. All right. What business or what purchase – what kind of purchasing from Gwen. | |
| Miller | Mmm. | |
| 5 | Chester | That's responded to. She's not ..... software business. She had two business lines and those are noted. |
| Miller | Online escort service using Bitcoin ..... as the main payment. | |
| Chester | Yes. And - - - | |
| Miller | ..... Okay. | |
| 10 | Wright | ..... is the mock up ..... of it. ..... as whatever else ..... |
| Miller | All right. | |
| Wright | And you can – contracting and everything is built into Bitcoin. So, if someone gets beaten up as an escort, you can actually have a situation where the payment doesn't go through and you can then tie back the person and we can make it all nice. | |
| 15 | | |
| Miller | Okay. | |
| Wright | And it is a legal entity, you know, a legal whatever you call it thing in Australia. | |
| Miller | Mmm. | |
| Wright | ..... | |
| 20 | Miller | Okay. |
| Wright | ..... so ..... paid our taxes. | |
| Sommer | That's exactly right. | |
| Wright | Okay. And that's the extent of the questions for Strasan Coin. | |
| Chester | In there also was that agreement between - - - | |
| 25 | Miller | Yes. I – I did notice that. Thank you. |
| Wright | Yes. | |
| Miller | ..... | |
| Wright | ..... that agreement isn't complete. | |
| Chester | No. I feel like a kid handing out Christmas parcels. This is one. | |
| 30 | Sommer | As long as Andrew feels the same way ..... |
| Miller | Okay. So this is to Craig Wright - - - | |
| Wright | Yes. | |
| Miller | R & D. | |
| Wright | Lots of trees killed in this one. | |
| 35 | Miller | All right. Take it from the top. |
| Chester | Yes. | |
| Miller | Which is question 4. | |
| Chester | Okay. Advised Dr Wright transferred ..... in 2010 year. Please provide evidence to transfer. Well, see the ..... at zero and it went. | |

Page 39 of 96

DEF_00053181

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | So the audit reports are not something you've attached but obviously it's something that we can easily access back at the office. |
| | Wright | Well, ..... |
| | Miller | It is.  Okay. |
| 5 | Wright | Probably - - - |
| | Chester | It is. |
| | Wright | It may be in there.  I think I – no, I didn't attach the whole report.  I just put the page. |
| | Miller | Well, that's right.  I can go back and search for those reports. |
| 10 | Wright | ..... the whole lot .... |
| | McMaster | Is that relating back to the two prior companies - - - |
| | Wright | Yes. |
| | McMaster | We – we've got that on the systems back at work.  So that's fine. |
| 15 | Wright | I got a – a thing saying ..... and you guys were zero, zero, zero, zero.  So I went FU if you're going to zero I will transfer it at zero. |
| | Chester | So you've got these which look like that.  There's one for ..... |
| | Miller | Mmm. |
| | Chester | There's one for a company called Information Defence. |
| | Miller | Yes. |
| 20 | Chester | And then there is Craig Wright as an individual and – and a value ..... those was stated as – as ..... zero.  So that's what moved.  And in terms of evidence of its movement what would you like? |
| 25 | Miller | Well, was there a – an agreement to transfer it or a deed?  Was there an invoice?  Was there an email when – when you said it was transferred?  Or was it simply put on a CD and – and given to W & K or is there anything further that - - - |
| | Wright | ..... |
| | Miller | - - - as far as a paper trial or - - - |
| | Chester | Yes. |
| 30 | Miller | - - - anything like that? |
| | Sommer | There's another email ..... those ones. |
| | Chester | There's – yes.  There – there is a trail and you will find in the – in the - - - |
| | Miller | Yes.  So, if I go to that orange notes.  No? |
| | Chester | These aren't in the same folder. |
| 35 | Sommer | No, no, they're not.  ..... |
| | Wright | ..... |
| | Chester | We might have – we might have excluded the emails. |
| | Miller | Okay. |
| 40 | Chester | We might have – we might have excluded the emails that relate to that and if there was ..... most are directed at people involved beyond ..... enterprise. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | I can assure you we will not take offence or anything like that. |
| | Chester | But, at any rate, it – it went.  Okay.  There were some value that went.  It follows on in - - - |
| | Wright | ..... |
| 5 | Chester | - - - some of the – some of the other questions that you will see where – you will some of that stuff. |
| | Wright | ..... |
| | Chester | So next question, question 5.  So - - - |
| | Miller | Sorry.  Just to clarify in my mind in relation to question 4. |
| 10 | Chester | Yes. |
| | Miller | The IP that was transferred to W & K is that the same IP that was subject to these two orders which you refer to? |
| | Chester | Yes.  You will find question 5 a lot of that comes up. |
| | Miller | Will you?  All right.  We will move to that then.  It's more about the bond. |
| 15 | Chester | You advised that ..... of 20 million and from who were these acquired and when were they acquired and how much the bond were in Bitcoin and how much in dah, dah, dah.  So this is the preamble to that question. |
| | Wright | ..... |
| 20 | Chester | .....  If you read through this.  The bond ..... primarily based on IP transfer into the trust from ..... value is zero at the time.  Dave had all the details.  Dr Wright has a 15 year history of risk .... security and his clients have included – and there's a list of clients. |
| | Wright | As an example, I .... |
| | Chester | And last year was just one of those - - - |
| 25 | Wright | ..... |
| | Chester | And the intellectual property valued ..... but zero interest for the following was for algorithmic code, risk analysis, ..... analysis and gaming and this included the source code for several Bitcoin-based systems and Dr Wright created many of the systems used in Lassisters.  He owned gaming source codes.  Some of these codes are still used, etcetera.  And so Mr Clymont and the Panama Trust received this in 2010 for ..... $5000 which was in excess of the zero dollars ATO valued it at and this was listed as income.  Source code included Bitcoin systems, security systems, ..... control systems and risk systems.  He used that code through his trust in Panama to have bonded funding for the research and development to be completed.  The trust in the Panama used code, etcetera, to secure the bonds. The name of the person we had as a contact was – and that's listed for you. |
| 30 35 | | |
| | Miller | Mmm. |
| 40 | Chester | And he's – and ..... used a sale of the licence in ..... future bonds to fund the bonds and .....  So Dr Wright designed the world's first online casino, blah, blah, blah.  That person's detail.  So that's the stuff that got exported. |
| | Miller | Okay.  So what was exported to W & K in 2010 was the software listed here in question 5. |
| | Chester | And Bitcoin. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Miller | Being ..... and everything below that, algorithmic code and everything below that.  Rand online casino on that list. | |
| Chester | ..... | |
| Miller | ..... | |
| 5 | Chester | Hang on a second.  No. |
| Miller | ..... No. | |
| Chester | So what it is is the client list is above – is at the top there and - - - | |
| Miller | That's their client. | |
| Chester | Yes.  Those are clients. | |
| 10 | Miller | Sorry.  Yes. ..... |
| Chester | Okay.  And then you go down below for some background and then the two paragraphs at the bottom give you some idea as to what it includes. | |
| Miller | Okay. | |
| Chester | And it sort of includes ..... plus it includes Bitcoin and Bitcoin systems, security systems, control systems and risk systems, etcetera. | |
| 15 | | |
| Miller | Mmm. | |
| Chester | And all of that in part was used to secure – Mr Clymont used that to secure the bonds that he wanted. | |
| McMaster | So do we know who he secured the bonds from? | |
| 20 | Chester | Um - - - |
| Wright | My understanding is Playboy Gaming.  Who I've had dealings with in the past. | |
| McMaster | Mmm. | |
| Wright | Who we were actually going to set up a casino for here in Australia until I found Mr Olsten decided to put a moratorium on gambling – on online gambling anyway because Mr Packer did the – no, that would affect my – my whole business with ..... and all the rest and basically said, "Screw everything," and killed off all those industries. | |
| 25 | | |
| .......... | All right. | |
| Wright | But I've got no ..... response at all ..... | |
| 30 | Miller | Okay.  All right. |
| Chester | So it gives you basically a background for both 4 and 5. | |
| Miller | You also say on page 4 a trust has been set up in the Seychelles.  Just for clarity that is the same – excuse me – the same – the same Seychelles trust we've been referring to for the other entities. | |
| 35 | Chester | Yes. |
| Miller | Is that correct? | |
| Sommer | Sort of.  It's the same Seychelles trust in the sense that the same trust – if you think about it go back to that deed of loan.  All right. | |
| Miller | Mmm. | |
| 40 | Sommer | So the deed of loan is between the trustee on both trust and Dr Wright. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Yes. |
| | Sommer | And so there was a drawdown of Bitcoin out of the trust into a separate trust if you like for Dr Wright.  So there's an – there's a existing, ongoing substantive trust. |
| 5 | Miller | Mmm. |
| | Sommer | Plus there's the Bitcoin – the 650,000 Bitcoin that Dr Wright has dispositive power over via – that are held by the trustee.  So you need to keep those two things separate.  So there are in fact – there's one substantive trust plus there's the 650,000 Bitcoin that are effectively held on trust for Dr Wright after that deed of loan was entered into. |
| 10 | | |
| | Miller | Okay. |
| | Sommer | Does that make sense? |
| | McMaster | Is that held by the Seychelles trust itself? |
| | Sommer | Not by the trust but - ..... held things by trust. |
| 15 | McMaster | Yes. |
| | Sommer | Held by a – designed by a him which is - - - |
| | McMaster | Okay. |
| | Sommer | - - - a UK entity which is the trustee of that trust. |
| | McMaster | Okay.  So you're – is that where the comment about the bare trust comes in? |
| 20 | Sommer | Yes.  Indeed.  I don't know .....  It's – it's – is it a constructive trust?  Is it a resulting trust?  Is it a bare trust?  Let's not get - - - |
| | McMaster | Okay. |
| | Sommer | - - - into the finer points of, you know, ..... heard of them.  Let's just leave – we will leave all that.  It's held but it's not held as primary assets of that original trust. |
| 25 | | |
| | McMaster | Okay. |
| | Sommer | So that's all I'm sort of trying to say in relation to that.  So, when Andrew is saying is that the same trust, I just want to make sure that in your mind you're drawing a distinction between the Seychelles trust that is there and which – for which, you know, we don't have – Dr Wright can't just say transfer 30,000 Bitcoin to whatever and the 650,000 Bitcoin which are held by that same legal person for the benefit of Dr Wright as the amount that has been drawn down under that deed of loan over which Dr Wright has had a dispositive power and which then formed the basis of the equitable assignments that we're talking about.  So we're not talking about a disposition of interest in that substantive trust.  We're talking about the disposition of interests in that – you know, of that 650,000 we've – we've moving it around a bit. |
| 30 | | |
| 35 | | |
| | McMaster | So that I think – I will say how I think it is. |
| | Sommer | Yes. |
| 40 | McMaster | And then you can correct me if I'm wrong.  So, essentially, designed by human holds those Bitcoins in trust for Craig. |
| | Sommer | Yes. |
| | McMaster | Okay. |

CONFIDENTIAL

DEF_00053185

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | And for whomever else Craig might move them around to. |
| | McMaster | Might assign them to. |
| | Sommer | So, when that - - - |
| | McMaster | Yes. |
| 5 | Sommer | It's in – it becomes important because you say, "Well, does Cloudcraft benefit under the Seychelles trust?"  It's – that's where we get into that ambiguity.  Does Cloudcraft – has Cloudcraft received an assignment of equitable interest in the 650,000 Bitcoin?  Yes.  Does it benefit under the Seychelles trust?  That's – that's a different question. |
| 10 | McMaster | I understand. |
| | Sommer | Good. |
| | Miller | Okay.  Question 8. |
| 15 | Chester | Okay.  This is regarding signatures, I believe.  You advise AB – BCD deed and the deed was electronically assigned or a document contains what appears to be handwritten signature ..... in the document, what locations, etcetera, etcetera, etcetera.  Okay.  So the documents were done between an entity in Australia and an entity in the US and the entity in Australia dictated the deal that had to be – UA – AU based.  The US entity agreed to that and Australia ..... occur.  The AU entity did not want to have this adjudicated under US law and there's no need to have it under US law.  There is and never was a paper copy.  I mean you can print it off if you want to but the group of companies - - - |
| 20 | | |
| | .......... | ..... |
| 25 | Chester | - - - started printing these for your benefit but effectively there's a document that goes back and forth and gets signed even initialled and it – it runs the same way as if you've ever received a package from Australia Post you signed for it on their little unit - - - |
| | McMaster | I understand. |
| 30 | Chester | - - - and the whole bit and basically on one of these tablets you go through and initial documents with the whole bit that goes through – at the end of the day goes off to somebody else who does the same thing and gets results in a – in an agreement. |
| | McMaster | Would that be in the same way that Gwen signed her documents as well? |
| 35 | Wright | We Skyped or emailed stuff over to her and she then sends it back as an image.  So we don't get a – the actual handwritten signature.  We get a - - - |
| | McMaster | Yes. |
| | Wright | - - - an image. |
| | McMaster | Yes. |
| | Wright | And for this exercise we've printed out those image files. |
| 40 | McMaster | Okay.  I understand. |
| | Chester | ..... |
| | Miller | Yes. |
| | Chester | Okay.  And question 8 is essentially the same thing.  Signed electronically.  It contains handwritten electronic signatures and they are electronic signatures. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Mmm. |
| | Wright | Does anyone else want to ..... |
| | Miller | That's okay. |
| 5 | Chester | Okay. And also a question following on that is you advised that you acquired source code. How did you get – acquire that if he's in the US and it's – so the electronic signature thing is – is pretty straightforward. We've discussed that. In terms of the source code, it's downloadable. It's just FTP site or – or whatever. I think Craig ..... facetious. We use a thing called the internet. |
| 10 | Sommer | You – you know I haven't been through been these ..... used this thing called the internet. |
| | McMaster | Yes. Yes. |
| | Chester | Well, the internet. |
| | Wright | This was the last of the piles. By then I was getting a little bit antsy. |
| | Miller | I understand. |
| 15 | Chester | But you're going to have to remember that 10 years ago that would have been a normal answer. |
| | McMaster | Yes, that's right. |
| | Chester | They used what? |
| | Wright | I was using the internet in '79. |
| 20 | Miller | Yes. '79? |
| | Wright | '79. |
| | McMaster | So that was in regard to the software from WK across to you, I think. |
| | Chester | Yes. |
| | McMaster | Yes. So did that occur when Dave was alive or after he is dead? |
| 25 | Wright | WK was after Dave's death. |
| | Chester | No. The software coming to you is before he died. |
| | Wright | Sorry. I keep mixing up ..... WK. Dave's software was while he was alive. |
| | McMaster | Okay. |
| | Wright | It was about two weeks before he died. |
| 30 | McMaster | Mmm. And what was the WK software? Was that – is that the same software we're talking about? |
| | Wright | It was enhanced versions ..... that he had done up and all the rest. |
| | McMaster | Mmm. |
| 35 | Wright | Which included Bitcoin Co, Casino Co, ..... Co, Swap, marketplace stuff, all that. |
| | McMaster | Okay. |
| 40 | Wright | And guys in places like Playboy were happy to bond money because basically I gave them source code – well, Dave gave them because he had it – source code for an online casino and because it was worth more than they were bonding anyway. So - - - |

CONFIDENTIAL

DEF_00053187

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| McMaster | I understand what you're saying. |
| Wright | Mmm. |
| Chester | Now, 10 is a – 10 was one that – as – was a bit of an odd one but we've answered.  And again that comes back to the – the view that Andrew is taking here.  Some of these things tend to be a bit obscure.  Does not have access to agreements.  Well, he's – you've got all the agreements that he has got. |
| Miller | Okay. |
| Chester | And you're suggesting that there are other agreements then I guess that's a suggestion that you're making but the idea is that these guys are – are doing stuff back and forth.  There will be emails going back and forth between them as there are between you and I and - - - |
| Miller | Of course. |
| Chester | - - - there are between Andrew and we will discuss things.  We will agree to do stuff, etcetera.  So agreement is a very – is a very novel word - - - |
| Miller | Okay. |
| Chester | - - - and it ..... very ambiguous.  If you're suggesting other – any other written contractual agreements, etcetera, he has not got access to anything that's..... there. |
| Miller | Okay.  That's fine.  And just to put you at ease with that because I understand what you've saying I suppose it was providing you an opportunity to provide anything that – else that you might have had, for example, with Craig and W & K, that we're seeing WK01 agreement and then see WK03 - - - |
| Chester | What about 2? |
| Miller | I wondered if there was a 2.  All right.  If there wasn't, that's just the way of referencing, that's fine.  But we were just asking if there was anything else that might be pertinent. |
| Chester | Well, you've got a copy now ..... basically ..... in the coin file.  There was a – there is an agreement in there that they've not enacted because that's why. |
| Miller | Yes. |
| Chester | But that's - - - |
| Wright | But the other point you will probably get is that although gambling ..... and all that sort of stuff was actually legal in Australia and places like ..... operate out of here.  It's illegal in America.  So part of that whole free stuff back ..... to Australia is the fact that we can exploit ..... we can't in the US.  People get arrested for sort of online gambling over there. |
| Miller | Okay. |
| Wright | Actually people get arrested in ..... when they ..... in Australia  - from Australia to the US ..... exporting ..... got arrested by the yanks.  Got off again but they do these sort of little wanky exercises ..... to say that we own the internet. |
| Chester | Okay.  So 11 – or 13 rather.  How and in what form are the notices pertaining to court cases served?  Blanket, emails, emails ..... and emails to Dave ..... even though he didn't exist at that stage and paper copies to his address. |
| Miller | Sure. |
| Chester | 17 and 24.  In this we're looking for – is to the document from 2008/2009. |

CONFIDENTIAL

DEF_00053188

Interview Conducted with Craig WRIGHT

---

| | Miller | Mmm. |
| | Chester | And those are the agreements that were presented and they are ..... documents but there is a clear outline of offer, acceptance and – and consideration in those documents. |
| 5 | Miller | Okay. |
| | Chester | So they- they are - - - |
| | Wright | ..... |
| | Miller | ..... Sorry. |
| 10 | Wright | At that point everything ..... in relation to ..... hadn't fallen down the toilet yet so we didn't really go into all the details that we had to later.  We just did the simple things. |
| 15 | Miller | Mmm.  Yes.  I remember we spoke about this on the phone.  John, you were sort of wanting to clarify exactly what we were asking for.  From what I could see in the statements of claim they refer to it as a contract and then later in the statement of claim there was a purchase contract and that was - - - |
| | Wright | ..... |
| 20 | Miller | - - - provided was a statement of works.  So I know these legal proceedings can be very particular about the way things are phrased and I just wondered if there was a purchase contract or whether the statement of work is essentially the same - - - |
| | Chester | Yes.  SOW is it. |
| | Miller | Okay. |
| | Chester | And it's probably – I mean it did take them what two – a month or two to go through all your evidentiary stuff in terms of the – of the court cases as well. |
| 25 | Miller | Mmm. |
| | Chester | So it wasn't like they just sort of went, "Oh, yes.  That's good," and time goes by.  "Oh, quick.  Stamp that.  No one – no one has shown up yet or ..... around anymore to stamp."  There was a – they went through a – an evidentiary base that was rigorous.  Okay.  This refers to question 22. |
| 30 | Miller | Mmm. |
| | Chester | Refers to the invoice issued 1 July.  Court case number of case filed 25 July.  Did you make supply?  Etcetera.  And again we've gone through the same process and you've got the assignments and the copies of all the assignments are there. |
| 35 | Miller | Mmm. |
| | Chester | And I think this all gets down to the bottom of an equitable assignment perfected at the moment of title transfer.  Is the kindest way to say that.  They knew what the result was going to be effectively.  There wasn't going to be anybody jump up and say anything about it. |
| 40 | Miller | Mmm. |
| | Wright | ..... We will ignore the ..... |
| | Sommer | That's a joke ..... for the purposes of the recording.  Yes.  Because I mean, as I understand it, you were in possession of the software. |
| | Wright | Yes. |

---

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Sommer | So you had control over it. You just – the purposes of the Supreme Court proceedings were to clarify as against you and any other administrator of W & K or Mr Clymont's estate - - - | |
| Wright | Yes. | |
| 5 | Sommer | - - - that it was absolutely yours. |
| Wright | Mmm. | |
| Sommer | And, you know – so there's nothing – nothing remarkable in those circumstances about agreeing to transfer it on the basis that, you know, you can – it will be perfected when – when you actually get full legal title. Is that – do you – I mean do you understand how an equitable assignment works? | |
| 10 | | |
| Miller | Well - - - | |
| Sommer | I don't – I don't mean to be rude but I mean do you - - - | |
| Miller | Yes. So – there's an assignment of the equitable interest in – in this case ..... talking about the - - - | |
| 15 | Sommer | No, no. I – and equitable assignment of legal property. Do you know how - - - |
| Miller | Yes. So it becomes perfected at the point that - - - | |
| Sommer | Yes. | |
| Miller | - - - in this case the court ruled based on that judgment that Craig would be the ultimate owner of that – of the title to that software. | |
| 20 | Sommer | Yes. |
| Miller | And they agreed that that would be backdated to - - - | |
| Sommer | Not backdated, no, no. | |
| Miller | Sorry. I won't use that word. Okay. But - - - | |
| Sommer | So, if I expect to get something from John - - - | |
| 25 | Miller | Mmm. |
| Sommer | - - - and I have a contract with John to get something, I can enter into an agreement with you today - - - | |
| Miller | Yes. | |
| Sommer | - - - to sell you that thing and describe it with sufficient specificity so that even thought I don't have it when – at the time I agreed to sell it to you, as soon as I have that – that thing comes into my possession - - - | |
| 30 | | |
| Miller | Mmm. | |
| Sommer | - - - it – it moves to you and you have immediate interest in – in that property provided that you've provided me with the consideration for it. It's a common – a common means – particularly in this instance where we had possession – we expected to get clear legal title, we hadn't got it at that point. | |
| 35 | | |
| Miller | Mmm. | |
| Sommer | You know, agreement was entered into and so on. | |
| Miller | Yes. Understood. | |
| 40 | Chester | All right. So we're good with that one and then you've got the assignments and etcetera that go with that in terms of - - - |

CONFIDENTIAL

DEF_00053190

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Yes. |
| | Chester | - - - those will all be in there which are effectively the same ones you've got there.  27. |
| | Miller | Mmm. |
| 5 | Chester | Okay.  You said invoice 98 is provision of software related dah, dah, dah.  You've also advised the invoice should represent the MJF content however this court case makes no reference to MJF.  Could you please confirm - - - |
| | Wright | The invoices were very ..... but in the contracts that are attached to them, the ..... assignments it goes into all the detail.  The - - - |
| 10 | Miller | What - - - |
| | Wright | - - - consideration that ..... contract which ..... invoice associating and I've just wrote a quick one liner. |
| | Chester | Okay.  What happened is that in this instance so there were three – there were three invoices which you and I have discussed at length, 96, 97, 98. |
| 15 | Miller | Mmm. |
| | Chester | And 97 became 97A and they represent the three ..... of assets that were to go through Wright into the trust and then distribute.  Two of those represented by the court case and one for the acquisitions from MJF excluded in the ..... and the consulting services.  All three invoices should have gone through the trust as a – as mentioned in – in 26 and then the DeMorgan answers included the IP transfer contracts and these detailed the transactions as referenced in the invoices.  98 should be the MJF content.  It shouldn't make reference to the – to the Supreme Court action.  That's effectively what should happen.  And we just need to fix it.  So - - - |
| 20 | | |
| 25 | Wright | ..... |
| | Chester | Post this process, we will fix that or - - - |
| | Wright | It doesn't change the amounts or anything like that ..... |
| | Chester | It doesn't affect what it is at any rate.  So it's – it's not a – not unlike the idea of the – the stuff going straight from Wright to Cloudcraft. |
| 30 | Miller | Mmm. |
| | Chester | All this stuff that should have gone through the trust should be inappropriately based on the – the content that was going to be used by each of the entities.  That's it. |
| | Miller | Okay.  All righty. |
| 35 | Chester | And advise valuation.  Number question 30.  Advise the valuation was in accordance with a project plan and cost model however the court proceedings referred to only four projects which we understand to be with dah dah, dah, with ..... security.  You've provided the four proposal documents.  Were these projects accepted?  If so, please provide any acceptance documents from DHS.  Well, that's something that would be in – in Mr Clymont's area and W & K and, as we've stated, we've got no - - - |
| 40 | | |
| | Wright | We have all the hard drives which – we've got all the .....  We've got everything else but ..... |
| | Miller | Okay. |
| 45 | Wright | - - - everything is encrypted.  So one day we will get in but we haven't yet. |

CONFIDENTIAL

DEF_00053191

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | So the answer to that question is, yes, they were accepted by DHS and funded? |
| | Wright | ..... I don't know all the details.  We – particularly kept me out of all the American stuff and whatever else ..... after the ATO ..... |
| 5 | Chester | ..... hearsay on that.  That's just something that has happened – occurred within W & K.  It's nothing to do with – it's nothing to do with him. |
| | McMaster | Well, he is a shareholder. |
| | Miller | Yes. |
| | McMaster | Of W & K. |
| 10 | Chester | Yes.  But at the end of the day that process was handled totally by - - - |
| | McMaster | Well, Dave. |
| | Chester | Dave. |
| | McMaster | Yes. |
| | Sommer | And there's some emails ..... |
| 15 | Miller | And we will just refer to those memo/emails as well. |
| | Sommer | So have a look at those emails.  There was a couple there where Craig has been corresponding with the executor in order to try and get those drives decrypted but that's been unable to occur. |
| | Chester | ..... |
| 20 | Sommer | I can. |
| | McMaster | So is this software, the DHS stuff – and I will just refer to it as DHS – been ..... – is that different to the software that you had already downloaded?  You - - - |
| | Wright | No, it's all part of the same. |
| | McMaster | It's all part - - - |
| 25 | Wright | All the WK is one big .....  You've got a lot of different things. |
| | McMaster | ..... |
| | .......... | ..... |
| | McMaster | So you would have essentially had all of that information or the majority of it that was on the hard drive.  Is that - - - |
| 30 | Wright | I've got all the software.  I don't have all the .....  I have none of the company files on - - - |
| | McMaster | Okay. |
| | Wright | All I've got is the source code.  There's documentation, the file notes, the - - - |
| 35 | McMaster | I understand.  So obviously all the day-to-day running activities of the company, etcetera, you wouldn't have because they're encrypted. |
| | Wright | And I guess partly because Dave is American. |
| | McMaster | Mmm. |
| | Wright | And Americans have this big thing against gambling apart from in their official casinos. |
| 40 | McMaster | Mmm. |

CONFIDENTIAL

DEF_00053192

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | So - - - |
| | Sommer | Paranoia. |
| | McMaster | ..... |
| | Wright | ..... |
| 5 | Chester | Political influence, perhaps. |
| | Sommer | Yes.  That could be it too. |
| | Wright | And the Americans were on a big crackdown against ..... and all that sort of stuff. |
| | McMaster | Okay. |
| 10 | Wright | And I think, although Playboy gaming is actually an American company, they have more clout than we have. |
| | McMaster | Mmm.  I understand. |
| | Wright | They can afford more lawyers than I can. |
| 15 | Chester | And the memos that are attached to that are really back and forth between ..... and Craig and Patrick Page who had some – some sort of relationship with Dave as well.  They're really just talking about their ability to access and the fact that - - - |
| | Miller | Can I ask what the dates were for those emails?  What - - - |
| | Chester | These are - - - |
| 20 | Miller | ..... in the file. |
| | Chester | These are currently.  They're the February – February 2014 in the emails and – and really what all – what they're doing is – is the - - - |
| | Wright | ..... |
| 25 | Chester | Trying to find passwords.  Trying to find some way in.  Trying to find a way to get – to get access to ..... and unable to do so.  So ..... after the fact. |
| | Sommer | Even his phone is encrypted ..... |
| | Wright | Worse than me ..... |
| | Chester | That – you did – you did see – we gave you the coversheets for those DHS projects. |
| 30 | Miller | Yes.  The proposal .... |
| | Chester | The proposal exercises. |
| | Miller | Yes. |
| | Chester | And – and you understand – I think that there's a – a – the DHS exercise is not unlike ..... |
| 35 | McMaster | Mmm. |
| | Miller | Okay. |
| 40 | Chester | So it's not – it's not like contracting to the FBI to create some exercise for them.  It is a – it's a process where they – they do a funding exercise and one of the reasons that Clymont was – was doing that and – and going – and applying for the – the actually for DHS stuff was that it – he had a lot of advantages because he – (a) he was a vet which gives you a big tick; (b) he |

CONFIDENTIAL

DEF_00053193

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
| | | was an injured vet which gives you two ticks;  (b) he was – yes.  And all those other things.  So he had a lot of advantage to be doing work for them and – and getting the benefit of those – of that - - - |
| | Miller | So did DHS provide that funding to W & K? |
| 5 | Chester | I don't know. |
| | Miller | Okay. |
| | Wright | I don't know.  I don't know whether Dave got it all from ..... Playboy or whether he got the other as well. |
| | .......... | The answer to that is ..... |
| 10 | McMaster | If you don't know, how could that form part of the statement of claim in the Supreme Court? |
| | Wright | Because that's – it was put in.  I know it was put in and that's what we were doing. |
| | McMaster | Yes. |
| 15 | Wright | I don't know where it went from there. |
| | McMaster | Mmm. |
| | Wright | I know this is the work we were doing.  These are the results we've got. |
| | McMaster | Mmm. |
| | Wright | This is how Dave and I planned to fund it. |
| 20 | McMaster | Mmm. |
| | Wright | Whether he got enough from ..... gaming companies.  Whether he did something else.  Whether he did tell the ....., I don't know. |
| | McMaster | Okay. |
| 25 | Wright | I know that's how we started and then we did – everything fell apart with ..... events and I said I don't want to know anymore.  You keep it aside.  This – this is what we need to do. |
| | McMaster | Mmm.  Look, and – and I understand that.  I will pre-empt Andrew for a little bit.  We have been in contact with DHS and none of the proposals were accepted. |
| 30 | Wright | So then he probably did it just through the other. |
| | McMaster | Mmm. |
| | Wright | So that's all I know. |
| | McMaster | Okay.  And – and that's fair enough.  Dave was effectively running the company in America. |
| 35 | Wright | Mmm. |
| | Miller | Okay.  Did you want to move on to 35 – yes, question 35? |
| | Chester | So why did you ask that question then?  If you – you were already aware - - - |
| | McMaster | Well, we didn't know at that time. |
| | Chester | If you were already aware of that. |
| 40 | McMaster | We weren't aware of it at that time. |

CONFIDENTIAL

DEF_00053194

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | This is a week ago. |
| | Miller | Yes. |
| | McMaster | Yes.  We were only aware of it in the last couple of days. |
| | Chester | All right.  I had sent them a – a request.  I haven't received anything. |
| 5 | McMaster | The information has only just come through to us. |
| | Chester | Mmm.  Okay.  Next one.  Mr McCardle.  Yes. |
| | Wright | ..... |
| | Chester | Um - - - |
| 10 | Sommer | Strangely enough on the drive here we saw a truck with McCardle written on it.  I presume it wasn't the - - - |
| | Chester | Was it a hearse? |
| | Sommer | No. |
| | Chester | I'm sorry. |
| | Sommer | That's all right, John. |
| 15 | Chester | Needed some levity.  Okay.  So, with regard to Mr McCardle, we've enclosed the deed for you.  There's a letter and a – a deed you will find in the tabs and there's some snapshots of the judgments. |
| | Miller | Mmm. |
| | Chester | Okay. |
| 20 | Miller | Are these the same assignments of deed and charge that were provided in the - - - |
| | Chester | No. |
| | Miller | No. |
| | Chester | This is the – this is the McCardle - - - |
| 25 | Miller | I'm looking at the wrong one. |
| | Chester | Yes.  You will find that there's a – there's a cover letter from the – from a company called MR – from the lawyers called M & K and there's a deed of settlement release and you just went past it. |
| | Miller | There's this one. |
| 30 | Chester | I think it's that one. |
| | Miller | Is that it? |
| | Chester | McCardle. |
| | Miller | The assignment and release.  Yes. |
| 35 | Chester | And I think that the issue around this one is you want to know if the – I think the ultimate exercise on this one, if I'm not mistaken, is that you want to know if the IP is the same IP. |
| | McMaster | Yes. |
| 40 | Chester | Yes.  Yes.  Isn't that what you want to know?  Yes.  And what this is is a – this is a settlement between McCardle who was a solicitor for people associated with this and he and Craig had a – well, sorry.  Craig had a long-standing legal |

Page 53 of 96

CONFIDENTIAL

DEF_00053195

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 | | battle with that company even though he was a majority shareholder in it seeking to protect his IP and then at the end of the day that was – so that company – he resigned as a director in 2003.  In 2006 that company was liquidated and that company was in the hands of a – of a liquidator for a period of time.  Mr McCardle apparently ..... paid his legal fees by the other side and his means of – of dealing with that in his own small way was to buy the – from what understand, he bought the – the debtors ledger from the – the liquidator which – of which these people were listed as – as – as debtors and then pursued them for that debt through to – through to – and bankruptcy proceedings and he also ..... – he also ..... DeMorgan as an entity and - - - |
| 10 | | |
| | Wright | ..... reinstated ..... |
| | Chester | - - - somehow reinstated the – the rights as – as directors with no consent or anything on their part but that's not of interest - - - |
| | Wright | ..... on the other side can consent ..... |
| 15 | Sommer | Is this the solicitor that struck off. |
| | Wright | No.  That was – that was his - - - |
| | Sommer | Yes.  His - - - |
| | Wright | McCardle's solicitor got struck off.  Yes. |
| | Sommer | Yes.  It sounds like there's a bit of backhand dealing in there, doesn't there? |
| 20 | Wright | ..... |
| 25 | Chester | So, at any rate, the process is one where again what Craig was seeking to do with all of this exercise was to protect his IP which he had control of at that – all through that period of time which he was working with all through that period of time but again he didn't have anybody coming at him in any way, shape or form.  So after the fact knowing what these guys are like coming back and going, "Oh, well, look, we've just finished the company again.  We ditched you as director and we're now directors and we think that that's ours now."  So there was a lot of - - - |
| 30 | McMaster | I can understand.  I suspect, if I was in Craig's shoes, I would have done the same. |
| | Chester | So that's what that is.  And it goes back to the- there were four bits which is Spider, Triple S, Black Mit, and Red something. |
| | Wright | Redback. |
| | Chester | Redback.  Okay.  Which came out of this - - - |
| 35 | Wright | Yes.  Everyone loved my names. |
| | Chester | Yes.  It's like DeMorgan.  It's a bit overdone.  At any rate - - - |
| | Wright | It still beats Google. |
| | Chester | Yes.  So that's what that relates to.  That's who he is and that's all it is. |
| | Miller | Okay. |
| 40 | Chester | Okay.  And so – and that is brought in as a value that relates to the asset being that stuff and that's why it comes into the accounts, that's why it gets dealt with and in the – and in this process it was done as a GST-able item you see in the deed and the good news, if Craig has any, sort of ..... victory in that is that the moneys went – that he paid to this guy went into the trust of the – of |

CONFIDENTIAL                                                          DEF_00053196

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
|  |  | the other lawyer who got struck off and that trust has been tied up and so he hasn't – this guy hasn't seen that money. |
|  | Wright | No. |
|  | Sommer | That's a bonus. |
| 5 | Wright | ..... had actually - - - |
|  | Chester | Absconded with it anyway. |
|  | Wright | Absconded with some of it.  So it has to be a legal services claim to the law society.  So it will take years. |
|  | Sommer | Yes. |
| 10 | Chester | Ever hopeful. |
|  | Wright | So I'm happy about that one. |
|  | Chester | Okay. |
|  | McMaster | A small victory but a victory nonetheless. |
|  | Wright | Yes.  After 10 years.  Yes. |
| 15 | Chester | 36. |
|  | Miller | Yes. |
|  | Chester | Is McCardle still. |
|  | Wright | ..... |
|  | Chester | Um - - - |
| 20 | .......... | ..... |
|  | Chester | You can run somebody else down.  McCardle ..... |
|  | Wright | ..... |
|  | Chester | .... people who afflicted with ..... words off – just out of nowhere.  They've got a - - - |
| 25 | Sommer | Tourette Syndrome. |
|  | Chester | Tourette, yes.  That's your Tourette moment.  This is really - ..... 36 is basically a follow-on from ..... |
|  | Miller | It is.  It is.  So we can skip over that. |
| 30 | Chester | We can skip over that one. "We asked you when the trust acquired Bitcoin and from whom the trust acquired it and your response did not answer either of these questions."  The trust.  I'm assuming that you mean one of those ones overseas. |
|  | Sommer | They've got – just going back to the original question, 37, which says – and this is why I was trying to delineate between - - - |
| 35 | Miller | Sure. |
| 40 | Sommer | - - - that answer before.  So your original question 37 said, "You have advised in a briefing paper received 26 February 2014 that the Bitcoin available to you is held in trust ..... Seychelles.  You further advise the trustee of this trust is a UK company ..... human which has since changed its name .....  Please provide a copy of the trust deed for this trust including attachments, annexures and other attachments ..... of the trustee company."  And our |

Page 55 of 96

DEF_00053197

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| | | answer was, "In that briefing paper, it was made clear that Bitcoin was held for Dr Wright in a bare trust and ..... with the deed of loan and, as such, there is no trust deed." |
| | Miller | Sorry.  Was the question not – when did the trust acquire the Bitcoin? |
| 5 | Sommer | Well, you see, you've got the trust – you've got the deed of loan.  Yes. |
| | Miller | Yes. |
| | Sommer | All right.  There you go.  There's the answer. |
| | McMaster | Well, when did the Seychelles trust acquire the Bitcoins that under the deed alone - - - |
| 10 | Wright | Well, I don't know. |
| | Sommer | Do we know?  How – I mean - - - |
| | Wright | When I rolled them in in 2011 after everything ..... these are a value which I claimed $5000 on my tax for and everything was moot. |
| | McMaster | Okay.  So you - - - |
| 15 | Chester | But that didn't go there though.  That – that went to – that just went to Dave. |
| | Wright | The Bitcoin? |
| | Chester | This – this is – they're talking about the Bitcoin – this is the trust was settled in 2010.  The trust acquired IP – I think there were three ..... |
| | Wright | ..... |
| 20 | Chester | ..... initial stuff but all that stuff – all the asset which is question 5 went to – essentially went to WK and I believe that that stuff went – and – and - - - |
| | Sommer | ..... |
| | Chester | - - - and Simon disposition to Panama or wherever it went.  I don't know. |
| 25 | McMaster | Okay.  Can we – can we jump back to what the question was, please.  So you've got the Seychelles Trust. |
| | Chester | Yes. |
| | McMaster | Which loans the Bitcoins under the deed of loan to Craig. |
| | Chester | Yes. |
| | Miller | Yes. |
| 30 | McMaster | Okay.  Where did the Seychelles trust acquire the Bitcoins from? |
| | Wright | Originally, me. |
| | McMaster | Mmm. |
| | Sommer | From – from you or from - - - |
| | Wright | Well, $5000. |
| 35 | Sommer | Into the trust or up to WK - - - |
| | Wright | It went through WK then to - - - |
| | Sommer | All right.  So you need – you just need to be clear about that - - - |
| | Chester | Yes. |
| | Sommer | - - - because these guys are going to be - - - |

Page 56 of 96

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | All right. |
| | Sommer | They – their - - - |
| | Wright | I sent everything to WK.  WK put it into the other thing. |
| | Sommer | All right.  Okay. |
| 5 | McMaster | So it goes Craig to WMK to Seychelles. |
| | Wright | Yes.  Did - - - |
| | Chester | Well, to wherever Dave directed it. |
| | McMaster | And – well - - - |
| | Chester | To wherever - - - |
| 10 | McMaster | How did it end up in the Seychelles trust? |
| | Chester | What ended up in the Seychelles trust? |
| | McMaster | The Bitcoins. |
| | Chester | What Bitcoin? |
| | McMaster | The ones that they've loaned to Craig. |
| 15 | Chester | That's the trust's - - - |
| | McMaster | Yes.  And where did they acquire it from? |
| | Sommer | Well, do we assume – we assume – do we know for sure or are we assuming? |
| 20 | Wright | Well, Dave was set up to mine and everything into there as well as the other ones. |
| | Sommer | All right. |
| | Wright | So some were spent, some were transferred directly, some were replaced. |
| | Sommer | So let's just be clear.  Our – are we to – before – this is a draft answer. |
| | Wright | Sure. |
| 25 | Sommer | Are we saying that we assume but we don't have first-hand knowledge of but we assume that they came from W & K into that Seychelles trust because that was the plan that you – that you and Dave had agreed? |
| | Wright | Yes. |
| | Sommer | So we assume.  We don't have documentation in relation to it? |
| 30 | Wright | No. |
| | Sommer | But – because we weren't a party – you weren't a party to either of these transactions and you were not a trustee and you – but they moved from – all the Bitcoin-related material went from you to W & K and then we assume that they went – some portion of the Bitcoin mined, as part of the W & K exercise. |
| 35 | Wright | Mmm. |
| | Sommer | Went from W & K to this trust. |
| | Wright | Yes. |
| | Sommer | All right. |
| | Wright | And some to Panama. |

Page 57 of 96

CONFIDENTIAL

DEF_00053199

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay. |
| | Wright | Well - - - |
| | McMaster | So who then set up the Seychelles trust? |
| | Chester | I think that you will need – there are some memos here. |
| 5 | McMaster | Okay. |
| | Chester | Some emails that - - - |
| | Wright | Well, they're the people I know about.  There's a total of 17 people.  I don't know any other people other than the ones listed there. |
| | McMaster | Okay. |
| 10 | Miller | I think they have already have answered that question. |
| | McMaster | Okay. |
| | Miller | And ..... pursuant to a deed of loan.  Is that correct? |
| | Chester | ..... |
| | Sommer | Well, it depends whether you're talking about - - - |
| 15 | McMaster | No, no. |
| | Sommer | I think Des is asking about the substantive trust. |
| | Miller | Okay.  Sorry.  I - - - |
| | Sommer | As opposed to the loan trust.  So, yes.  If we call then substantive trust and loan trust |
| 20 | Miller | Let's do that. |
| | Sommer | Rather than – so the substantive trust was formed by that ..... |
| | Wright | It was formed by entities that have got no – those other entities. |
| | McMaster | So where have you got a list of the people who - - - |
| | Wright | I've got a list. |
| 25 | McMaster | - - - or the entities. |
| | Wright | ..... |
| | Chester | ..... |
| | McMaster | Some of them.  Okay. |
| | Wright | Some of them. |
| 30 | McMaster | Were you one of those people? |
| | Wright | Who formed it?  No. |
| | McMaster | Mmm. |
| | Wright | It was done so that I was not to be - - - |
| | McMaster | Involved. |
| 35 | Wright | Sorry.  .....  Yes.  I'm – I just get stuff after – after 2015 I can make claims and all that sort of stuff. |
| | McMaster | Mmm. |

CONFIDENTIAL

DEF_00053200

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Under certain conditions and as long as I don't bring it into any country that has certain taxes on it, blah, blah, blah, and blah. |
| | McMaster | And I don't know a lot about the Seychelles.  So do we know if that trust has to be registered in the Seychelles? |
| 5 | Wright | Um - - - |
| | McMaster | I certainly know the companies have to be. |
| | Wright | The – I know companies have to be.  I don't know all the details. |
| | McMaster | Okay. |
| 10 | Sommer | Well, again – and just – I'm not entirely sure what Craig is supposed to know about that Seychelles trust given that - - - |
| | McMaster | Well, Craig entered into a – a loan deed – a deed of loan with the Seychelles trust. |
| | Sommer | Yes. |
| | McMaster | Okay.  So who was Craig dealing with? |
| 15 | Sommer | The – well, you've got the deed of loan. |
| | McMaster | Yes. |
| | Sommer | So you know that and that it was trustee which is Designed by Human. |
| | McMaster | Okay.  And who is Designed by Human? |
| | Sommer | That's a company in the UK. |
| 20 | McMaster | Yes. |
| | Sommer | The director of which is - - - |
| | Wright | Now me.  One of - - - |
| | Sommer | You're now one of. |
| | Wright | Yes. |
| 25 | Sommer | But were you back then? |
| | Wright | No. |
| | Sommer | And that was Ms Nguyen back then as I understand it. |
| | Chester | No.  It was formed – it was formed here by – it was formed here by Dave Clymont.  You've got a copy of that email in your documents. |
| 30 | McMaster | Mmm. |
| | Miller | Can you refer me to it? |
| | Chester | Um - - - |
| | Miller | Because - - - |
| | McMaster | We need to understand - - - |
| 35 | Miller | Maybe by date. |
| | McMaster | - - - the who transaction. |
| | Chester | It's 10 December '12. |

CONFIDENTIAL   DEF_00053201

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| McMaster | We can then understand where everything comes from and that there is actually Bitcoins involved or whether the source – a whole range of issues like that which then go back to the heart of the GST claimants themselves. | |
| Wright | There's no Bitcoin in Australia though. | |
| 5 | McMaster | No.  That's fair enough. |
| Wright | Yes.  There can't be until we get this sorted. | |
| Sommer | Well, the only – the only thing we've relied on from the perspective of the GST transactions is the – the loan trust. | |
| McMaster | Yes. | |
| 10 | Sommer | And Craig's interest in the loan trust. |
| McMaster | Yes. | |
| Sommer | He has not relied on – I don't see any relevance of any aspect of the substantive trust - - - | |
| McMaster | Well - - - | |
| 15 | Sommer | - - - in – in relation to any GST issue. |
| McMaster | Well, if the substantive trust didn't have anything to loan - - - | |
| .......... | Right. | |
| McMaster | - - - then the loan trust has nothing to use for its equitable rights and that's where we want – need to have a look at - - - | |
| 20 | Sommer | That's true.  So you – okay.  So you're doubting the veracity of the loan document as a – as a document. |
| McMaster | We're not doubting any veracity.  We're doing our third party checks and our form and substance verifications. | |
| Sommer | Yes. | |
| 25 | McMaster | Craig has told us how things have worked.  We need to go through to verify that. |
| Miller | Yes. | |
| Sommer | And so - - - | |
| 30 | McMaster | That's where we're coming from and we don't know – we need to – well, we may potentially need to contact the Seychelles trust people who is now Denariuz being Craig.  Okay.  So, if Craig has taken over as director of the trustee, then Craig should know all about the Seychelles trust - - - |
| Miller | Not the - - - | |
| McMaster | Whether they have – well - - - | |
| 35 | Miller | The original trust. |
| McMaster | Well, it – you would have access to all of the records of that Seychelles trust and you would be able to show us where the various Bitcoins come from.  Now, there's various wallets attached to that deed of loan. | |
| Chester | Yes. | |
| 40 | McMaster | Which have been subsequently used - - - |
| Chester | Which were verified by lawyers and stat dec and everything ..... | |

Page 60 of 96

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Mmm. |
| | Chester | But - - - |
| | Sommer | Sorry.  So you've verified the – so you've verified that these - - - |
| | Miller | Wallets. |
| 5 | Sommer | - - - wallets.  Thank you. |
| | .......... | Exist. |
| | McMaster | Exist. |
| | Sommer | And that's ..... |
| | McMaster | No.  We have a statutory declaration - - - |
| 10 | Miller | From lawyers. |
| | McMaster | - - - from a lawyer – and if I remember correctly, Craig, you showed them - - - |
| | Wright | Sure. |
| | McMaster | - - - your phone and you told them that you had – and I forget the exact words. |
| | Wright | I showed them - - - |
| 15 | McMaster | But essentially had all control over these wallets that you could do what you pleased with them. |
| | .......... | So, sorry.  I'm - - - |
| | Wright | I showed – I showed them that I could control. |
| | McMaster | Yes. |
| 20 | Wright | Certain wallets, yes. |
| | McMaster | Yes. |
| | Sommer | So - - - |
| | Wright | Which didn't mean I owned those wallets just that I had access to the private keys. |
| 25 | McMaster | Yes. |
| | Wright | That's correct, yes. |
| | McMaster | Okay. |
| | Sommer | Des, just going back to your point which was that you need to verify that the Seychelles trust had assets that it would loan.  So have you investigated these wallets? |
| 30 | | |
| | McMaster | We've had a look at the wallets but, as you are quite aware, there is no way of knowing who is the entity behind any particular wallet because of their anonymous nature. |
| | Wright | Yes.  ..... |
| 35 | McMaster | We need – well, until somebody tells us, "That's my wallet," we – we have no idea - - - |
| | Sommer | Yes. |
| | McMaster | Neither does any government around the world. |
| 40 | Wright | You will remember though that I did actually back – about a year ago go to the ATO and say, "These are wallets." |

CONFIDENTIAL

DEF_00053203

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | You sent in a list of wallets, yes.  So I think it went to Michael Hardy. |
| | Chester | Before that. |
| | McMaster | Well, even before that. |
| | Wright | ..... |
| 5 | McMaster | Okay.  That's fair enough. |
| | Chester | They went to ..... a girl in Townsville. |
| | McMaster | And now I'm – yes.  That's right.  The initial IA person I think it was. |
| | Wright | Well – so that was actually back to about April or March or whatever of last year before I did the transactions. |
| 10 | McMaster | Mmm.  Yes.  But what I'm – we're looking at here is that you have a Seychelles entity.  A trust.  Which has – and has assets been presumably the wallets. |
| | Wright | Mmm. |
| | McMaster | Okay?  Which ended back in Craig's control through the deed of loan. |
| 15 | Chester | Yes. |
| | McMaster | So that Craig could then use the equitable interests in the loan trust.  I think that's the correct word. |
| | Miller | Yes. |
| | McMaster | To finance the various operations within Australia. |
| 20 | Sommer | Well – and just – just to be clear, it's not that – to use the equitable interest.  The purpose was to use the actual Bitcoin.  It's just because we can't get clarification on the treatment of Bitcoin - - - |
| | McMaster | Yes. |
| | Sommer | - - - that would – that Craig is dealing in the equitable interests - - - |
| 25 | McMaster | Yes. |
| | Sommer | - - - rather than the substantive Bitcoins. |
| | McMaster | And - - - |
| | Sommer | It's not a plan to just keep it – it – it's actually that we need to - - - |
| | Wright | Yes. |
| 30 | Sommer | There's a pre-condition to actually – bringing the actual Bitcoin in. |
| | McMaster | And – and - - - |
| | Wright | ..... able to get pass the – we can do it and then you can tax me on that and etcetera, etcetera. |
| | Sommer | Yes. |
| 35 | Wright | Yes. |
| | McMaster | And that's fair enough.  And what we're looking at here is how did the Seychelles trust acquire those Bitcoins. |
| | Sommer | Yes. |

CONFIDENTIAL

DEF_00053204

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | And Craig has effectively told us that it went via him to W & K and potentially through other sources and ended up in the Seychelles trust which, as director of the trustee company, he effectively now controls. |
| 5 | Sommer | Well, I – I don't know.  That's – I mean I've only just found out that Craig is the director of – of the company that was Designed by Human. |
| | McMaster | Yes. |
| | Sommer | But are you the sole director or are there other directors?  Or - - - |
| | Wright | I'm now the director. |
| | Sommer | ..... |
| 10 | Wright | But I don't have all the trust ..... |
| | Sommer | ..... |
| | Wright | I have ..... to the trust ..... after 2015. |
| | Sommer | All right.  Okay. |
| | McMaster | That's for the deed of loan. |
| 15 | Wright | No.  For the trust itself. |
| | McMaster | But you are the director of the trustee company though, are you not? |
| | Wright | Yes.  But there are other trustees in there in that trust. |
| | McMaster | Well, you've only told us of Denariuz – what's it called? |
| | .......... | ..... |
| 20 | McMaster | Designed by Human.  I will get it right yet.  As being the trustee of that entity. |
| | Wright | Yes.  I get full - - - |
| | McMaster | Okay. |
| | Wright | - - - control at 2015. |
| 25 | McMaster | Okay.  So whereabouts is that?  Is that in the deed of loan that you're talking about or is there another document where you get full control of the trust? |
| | Wright | There's other documents.  I don't get the full deed.  I don't get the full anything until that date.  I can make the loan with pre-conditions. |
| | McMaster | Mmm. |
| | Wright | About where, when and how the Bitcoin gets used. |
| 30 | McMaster | Okay.  All right. |
| | Wright | I'm not allowed to bring them in – I can now bring them into Britain only because that doesn't apply anymore. |
| | McMaster | Mmm. |
| | Wright | Um - - - |
| 35 | McMaster | So somebody is obviously giving you instructions as to where you can or can't take them.  So you're now – now allowed to bring them into Great Britain. |
| | Wright | Mmm. |
| | McMaster | So who instructed you that that wasn't possible? |
| | Wright | The people on that list. |

CONFIDENTIAL

DEF_00053205

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay.  So we've got a list of names. |
| | Wright | Yes. |
| | McMaster | Okay. |
| | Wright | So those people are on the list. |
| 5 | McMaster | Okay. |
| | Sommer | So – and just to understand, Des, the purpose for which you are asking this question is what? |
| | McMaster | We're trying to identify that there is something that can be traded.  The equitable part of it. |
| 10 | Sommer | Yes.  So - - - |
| | McMaster | And so we're seeing the -  the entity – moneys flow through. |
| | Sommer | Yes. |
| | McMaster | Or – or – sorry.  I won't call them moneys. |
| | Sommer | ..... |
| 15 | McMaster | I should call them as - - - |
| | Sommer | Yes.  So you want to make sure that there's $650,000 or 650,000 Bitcoin that, pursuant to which the – the trustee who – and it was signed by Ms Nguyen at the time, was able to loan that number of Bitcoin to Craig.  So that's the purpose - - - |
| 20 | McMaster | That's the central purpose.  Yes. |
| | Sommer | Okay.  I – it's just because again we're getting way out of the scope of what we need – you know, I - - - |
| | McMaster | Well - - - |
| 25 | Sommer | You know, there's 17 other people.  I just – so your purpose – the Tax Office's purpose of this verification check is to check that there was substance to that deed of loan. |
| | McMaster | That's correct. |
| | Sommer | Okay.  Because I can see the relevance of that question. |
| | McMaster | Yes.  And that's what we're – we're - - - |
| 30 | Sommer | Yes. |
| | McMaster | - - - looking at. |
| | Sommer | Good.  Okay. |
| | McMaster | Okay. |
| 35 | Sommer | It's just – it's useful for us to know what the precise – what you really need to understand so that we don't get distracted by pre-conditions for the repatriation of - - - |
| | McMaster | Yes. |
| | Sommer | - - - Bitcoin into Australia and - - - |
| | McMaster | Well - - - |
| 40 | Sommer | - - - all those sorts of things - - - |

CONFIDENTIAL

DEF_00053206

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Well, again – well, it – in a sense it maybe it is irrelevant but it also indicates to us that there is a trust in the Seychelles that held these coins but there are other people who are trustees other than your UK company and that these transactions did actually occur. |
| 5 | Sommer | Yes. |
| | McMaster | Which is all form and - - - |
| | Wright | ..... at the time I set up a whole lot of conditions based on the fact that I was rather paranoid after ..... |
| | McMaster | Mmm. |
| 10 | Wright | And I made sure that Dave was as well and we began when we were ..... stuff even more so. |
| | McMaster | Okay.  And I can understand where you're coming from there. |
| | Wright | And, yes, it's really difficult at the moment in that I would like to repatriate some of them and all the rest and, you know, I would like to do more.  I would |
| 15 | | like to actually directly spend Bitcoin and all the rest but - - - |
| | McMaster | Well, didn't you directly spend Bitcoin with JF? |
| | Wright | No.  I didn't directly spend Bitcoin within JF because stuff needed to come overseas in that direction and nothing come to Australia. |
| | McMaster | Okay. |
| 20 | Sommer | Look, I ..... he has ..... he would like to pay me in Bitcoin amongst other things. |
| | McMaster | Whether you're willing to accept it is another matter. |
| | Chester | Yes. |
| | McMaster | But, anyway, I will go back to Andrew again.  I just needed to understand – excuse me.  My voice is going again.  Understand that entire process. |
| 25 | | Because at the end of the day it's critical to the claims that go through. |
| | Chester | Often – well, often times they were from an accounting standpoint you can – you can limit the – the transaction from the other side and say, "Did the other entity receive consideration and are they happy with it?" and I think there's a – there's a train of discussion that you can perceive there - - - |
| 30 | Wright | ..... |
| | Chester | - - - which shows that they did and they are.  And so it's – it didn't come out of thin air.  It came out of somewhere and so therefore it must have had substance and if the – if the – if the recipient says, "Great," and the person on the end of it says, "Yes.  I caused that to happen," then it happened. |
| 35 | McMaster | And in a third party world where entities trading between each other unrelated then that's a – a very firm idea. |
| | Chester | Yes. |
| | McMaster | But unfortunately with related entities there are concerns that - - - |
| | Chester | Which is the related entity? |
| 40 | McMaster | Well - - - |
| | Chester | I'm talking about the MJF transaction.  Is that – is that a related - - - |
| | McMaster | No.  Sorry.  I thought we were talking about all of the other transactions that were - - - |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Chester | They're just the – that's the major exercise of it.  That's – that's an – that's an instance where there's a – there was a transfer from – to a third party for – for a product and the - - - | |
| McMaster | Yes. | |
| 5 | Chester | - - - the recipient is – the respondent said, "Yes.  Thank you." |
| McMaster | Yes.  And that – and, sorry.  I didn't understand that you were talking about MJF in that aspect. | |
| Chester | When - - - | |
| 10 | McMaster | I thought you were talking about the transactions that have been occurring between Cloudcraft and Coin and so on. |
| Chester | No.  I was trying to – I was trying to get to the point of the – the quantum that may or may not be there in this trust and the – and the ability to direct it and – and I guess that – that's an – that's an example of where there was a – an ability to direct and it sort of ..... | |
| 15 | McMaster | Sure.  And I understand where you're coming from. |
| Sommer | And – and in relation to the MJF transaction we can demonstrate the movement of the Bitcoin.  We've gone to some lengths for that and one of the folders sitting over there which you can look at ..... is the proof of evidence in relation to MJF ..... enforcing a contract. | |
| 20 | McMaster | Sure. |
| Sommer | And so – that's why – I mean I understand that that's a relevant question.  I – I can't imagine that it's a big concern because, you know, you've seen wallets.  You've seen things round.  You've seen things come out of those wallets at Craig's direction.  So I understand that from the Commissioner's perspective | |
| 25 | | you need to accept that there is some substance - - - |
| McMaster | Sure. | |
| Sommer | - - - to that deed of loan. | |
| McMaster | Yes. | |
| 30 | Sommer | But, again, it's – to me, it's a bit of a – you know, we – we've – we've demonstrated that things move in and out of that - - - |
| McMaster | Sure. | |
| Sommer | - - - that account and so - - - | |
| McMaster | I understand. | |
| 35 | Wright | I notice that ..... 100,000 have left because they've gone off to bloody ..... and whatever else. |
| Sommer | Yes.  That's right. | |
| Wright | And I've got confirmation and you've seen the source codes and seen how much crap there is there and, no, ..... within a year I couldn't have put that together. | |
| 40 | Sommer | Yes. |
| Chester | So the other side of that too is that you've got – you will have – there are emails that you've got in here which are from Clymont to Craig. | |
| Miller | Okay. | |

CONFIDENTIAL

DEF_00053208

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | Which turn around and say, "Here is" – "You've got" – okay. "I've got – I've got some – of these that we're looking at setting up. I'm setting up this company." He set up the Design by Humans - - - |
| | Miller | Sorry. "He" being? |
| 5 | Chester | Clymont. |
| | Miller | Clymont. |
| | Chester | And there's – there's a – there is a – there are a series of ..... which are all around - - - |
| | Sommer | Is that the – have you got the - - - |
| 10 | Chester | September through - - - |
| | Miller | That's referred to in May - - - |
| | Chester | ..... |
| | Miller | .... December 2012. |
| | Sommer | Yes. So you've got the 10 December one there. |
| 15 | Chester | So they're talking about it back in May 2012. |
| | McMaster | So who's - - - |
| | Chester | They is Clymont and Wright. |
| | McMaster | Okay. Thank you. |
| 20 | Chester | Where they're discussing what they're going to do and – and Wright to Clymont – from Wright – to Wright from Clymont or from – no, sorry. From Wright to Clymont. "I will get a list of companies," etcetera, later." And, "Craig, can you let me know which of your contacts are from ....., etcetera." It goes on. There are – there are a number of discussions that were then – you've got copies of these which go through the process of what gets set up, when it gets set up from their point of view and the – the major point from your point of view is that – Clymont in September goes through, "Here's our agreement. You will have various BAA projects. I can keep all the Bitcoin and assets and hand them on, etcetera. You set the exchange up in Australia. I get 10 per cent of the company to be issued, etcetera, which you're aware of, to be split 80/20 between myself and my father when it's running. It's confirmed that I have 320,000 of Bitcoin and, as agreed, I will not tell you who the others are that I've used here in the US and will exchange ..... when you come over." Blah, blah, blah. So that's essentially him saying this stuff here ..... set up and he goes through a process of setting up the companies and the entities, etcetera, that relate to it. |
| | McMaster | Okay. And that will go a long way to explaining or answering several of our questions. |
| | Chester | That's right. |
| | Miller | And - - - |
| 40 | Wright | Please, again, yes, I bitch about the ATO ..... and please understand - - - |
| | Sommer | ..... is lot more sympathetic - ..... a lot more sympathetic to the Commissioner's ..... perspective. So - - - |
| | McMaster | It's okay. You probably – we've probably been called lot worse. |
| | Wright | Probably. |

CONFIDENTIAL

DEF_00053209

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | So I wouldn't be fazed about it and, again, I reassure you that none of that will ever colour what we're doing.  We're purely interested in the facts and the evidence so that we can make - - - |
| | Wright | And I hope you understand - - - |
| 5 | McMaster | - - - a decision based on that. |
| | Wright | After Mr Westwood and interviews and everything like that, yes, I was a bit paranoid and angry. |
| | McMaster | People get that way.  I understand that.  That's human nature.  So at the end of the day - - - |
| 10 | Wright | I mean - - - |
| | McMaster | - - - again, it's not going – it's nothing that waivers what we're doing. |
| | Wright | ..... 15 years working on some of these things ..... IP, whatever else. |
| | McMaster | Mmm. |
| 15 | Wright | And having you guys then go, "It's worth zero ....."  ..... too many years fighting in court and all the rest. |
| 20 | Chester | To answer that question, if there was a question to answer which is 39 is that the value that may or – that exists was generated by the induction of some of Craig's assets and IP into a process with – with Mr Clymont.  We don't know where that went but we do know that what he was doing was mining Bitcoin and the proceeds of that wound up. |
| | Miller | So can I ask – it says in your answer here the trust acquired IP valued at zero by the ATO in May 2011. |
| | Wright | Yes. |
| 25 | Miller | So that is the Seychelles trust not – not the – not the one pursuant to the deed of loan. |
| | Sommer | The substantive trust. |
| | Miller | The substantive - - - |
| | McMaster | The substantive as opposed to - - - |
| | Miller | ..... the IP. |
| 30 | Chester | Anything that is – what you're doing is you're driving to a – to a - - - |
| | Miller | No, no.  Just wanting to clarify what – okay.  So the trust ..... IP. |
| | McMaster | No, the - - - |
| | Chester | The assets that – the assets that – that Wright had went off to Clymont. |
| | Sommer | To W & K. |
| 35 | Chester | Okay.  To W & K.  Where they went from there he does not know. |
| | Miller | Okay. |
| | Chester | Okay.  What wound up is - - - |
| | Wright | ..... |
| 40 | Chester | - - - the product of that – the product of that wound up in that – in the substantive trust and that is the product of whatever was done there.  Some |

Page 68 of 96

DEF_00053210

Interview Conducted with Craig WRIGHT

|   |  |  |
|---|---|---|
| | | mining of Bitcoin.  There were some other assets that may or may not have wound up in that trust and - - - |
| | Miller | Okay. |
| 5 | Chester | - - - to this day, the substantive trust, I don't know that he knows the contents of. |
| | Miller | Okay. |
| | Wright | Well, yes.  No. |
| | Miller | Okay. |
| 10 | Chester | And that's where it winds up.  But it's not – and I guess what I want to try to say is there isn't a point where I can say, "Oh, here you go ,mate.  You've got it.  It's now from here to there."  It didn't go there.  It went to him.  He did whatever he did with it and what came to you is the product of that.  It's not this. Does that make sense? |
| | Miller | Okay.  Understood. |
| 15 | McMaster | Yes.  So, from my point of understanding, essentially it went from Craig to W & K.  The updated or – or refined IP came back to Craig and the Bitcoins went from W & K ultimately ended up into the substantive trust. |
| | Wright | Yes. |
| 20 | McMaster | Does – so – so my understanding is then that the substantive trust wouldn't hold the IP that's currently – well – well, it came back to you. |
| | Wright | Yes. |
| | McMaster | Okay. |
| | Wright | ..... |
| | McMaster | With improvements. |
| 25 | Wright | ..... with improvements. |
| | McMaster | Yes, yes. |
| | Sommer | So do we want to revise this answer ..... in here trust acquired IP. |
| | Miller | That seems to give a different flavour to what you've described.  So did you want to revise it? |
| 30 | Sommer | Just – just – what do we mean by the statement of trust acquired IP in May 2011?  Was it really just the Bitcoin ..... so the output of the IP ..... the IP itself or do you want to just want to delete that sentence? |
| | Wright | No.  I told you what – what happened. |
| | Sommer | Yes.  Okay.  So I think we – I think – in fact, I - - - |
| 35 | Wright | ..... |
| | Sommer | I would – I wouldn't – that entire sentence there justifies IP and justified Bitcoin.  Neither of those seems to be correct.  I think what we want to say – what we say is the – the trust – the IP was provided to W & K.  We understand W & K put – the actions of W & K resulted in Bitcoin movement into the trust. |
| 40 | Wright | Yes. |
| | Miller | Okay.  I will cross that sentence out then. |
| | Sommer | Thank you. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | And also the one that says the trust acquired Bitcoin from Dr Wright for $5000. |
| | Sommer | Yes. |
| | Wright | W & K did and then – yes. |
| | Chester | 43. Yes. |
| 5 | Wright | So much more easier if we could just all agree that ..... |
| | Chester | Okay. Who are the names of persons on the ..... trust ..... dah, dah, dah. This is the substantive trust we're discussing. |
| | Wright | I believe so. |
| 10 | Chester | And that was established in 2010 and the membership finalised in 2011. Mr Clymont involved the construction of ..... the trust was set up to hold IP. The trust has 17 members and there's five of them – they've given – they're listed for you. The trust was specifically constructed to promote Bitcoin. The terms of the trust are set up such that Dr Wright's cannot access it until ..... |
| 15 | Wright | And that means that ..... which means gaming. Which means legal pornography which means anything legal. If it's illegal, then no. So that precludes anything like Silk Road and other such things and – because what we want to get to is a totally legal ..... money. That is triple entry bookkeeping and there. |
| | Chester | So that gives you some people. |
| 20 | Miller | It does. Thank you. And can I also just ask it says the trust was settled or established in 2010. |
| | Wright | Mmm. |
| | Miller | Can I clarify that's the substantive trust or is that the trust pursuant to the deed of loan? |
| 25 | Wright | The substantive. |
| | Sommer | It would have to be the substantive. |
| | Miller | So was there a trust deed for that substantive trust? |
| | Wright | ..... I'm not allowed to get it until 2015. |
| | Miller | Okay. |
| 30 | Wright | I don't know what the ..... Seychelles or anything are or even if I can do a – please get me out of it thing because I'm over 21 or whatever the hell – and nor am I interested in fighting any battle because it will be after 2015 anyway by the time ..... to get anything through ..... |
| | Miller | Okay. All righty. |
| 35 | Chester | ..... in your answer. That date is there. Agreed to move what he did to - ..... May 2011. ..... |
| | Wright | Excuse me. |
| 40 | Miller | So in question 44 you say the trust has a corporate member as at January 2014 and that is DeMorgan Limited, Seychelles. So that's a Seychelles company. |
| | Wright | ..... yes. So that's how I get to be ..... |
| | Miller | Okay. All right. |

CONFIDENTIAL

DEF_00053212

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | But I don't do all the stuff ..... |
| | Miller | Mmm. |
| | Wright | Which is also quite annoying in some ways but it was my own paranoia that set up this in the first place.  So I have to live with my own ..... |
| 5 | McMaster | So everything goes to you in 2015. |
| | Wright | Minus whatever the fees are.  Minus whatever ..... yes. |
| | McMaster | Fair enough. |
| | Wright | Sometime in 2015 as long as other stipulations are met which I get ..... then, yes. |
| 10 | McMaster | Okay. |
| | Wright | And I was very strict with Dave about how I deal with this stuff and, even though he was not anywhere near as paranoid as I was, in some ways I was extremely paranoid and I thought all you guys were out to get me so I made him do it. |
| 15 | McMaster | I understand where you're coming from. |
| | Wright | Which doesn't necessarily help me now but anyway I can't change the past. |
| | McMaster | Okay. |
| | Miller | All right.  That's fine for that question 46.  Do you want to go on to 48? |
| 20 | Chester | Yes.  The director of any offshore companies we advise ..... available, Coin Limited, Denariuz Limited, Denariuz SG. |
| | Sommer | Again, what's the purpose of that question? |
| | Miller | One – well, in the previous answers, Craig or whoever wrote the answers advised that ..... he was a director of any other offshore companies. |
| | Sommer | Mmm. |
| 25 | Wright | ..... they didn't have that information at the time. |
| | Miller | Mmm. |
| | Wright | Okay. |
| | Miller | It just varies here.  It seems to have - - - |
| | Wright | I - - - |
| 30 | Sommer | Just stop.  Rewind.  What did you say?  It varies here? |
| | Miller | Well, in your initial answer - - - |
| | Sommer | We said information – information not immediately available. |
| | Miller | I don't think it was to that question and I will have to get back to you on which one it was. |
| 35 | Sommer | Okay.  And I'm just checking. |
| | Miller | If you've got the document, I think I can find it.  We asked whether Craig was aware of any directorships he held in any offshore companies. |
| | Sommer | It says, "This information is not immediately available.  The response to - - - |
| | Miller | Okay. |
| 40 | Sommer | - - - question 48.  And I know it is - - - |

CONFIDENTIAL

DEF_00053213

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | I will - - - |
| | Sommer | - - - I wrote it. |
| | Miller | Okay. |
| | Sommer | The reason I wrote that - - - |
| 5 | Miller | For the purposes of the recording I will - - - |
| | Sommer | - - - is because I didn't have that information and I hadn't been through it with Craig and - - - |
| | Miller | Yes. |
| 10 | Sommer | - - - again, I still want to know why you need to know that information in relation to the GST audit. |
| | Miller | Well - - - |
| | Sommer | We know that there's some sort of prurient interest.  I mean what's – what's the purpose of the question? |
| | Miller | From what we understand, Coin is the trustee of the Seychelles trust. |
| 15 | Sommer | Yes. |
| | Miller | And we were wanting to clarify whether he was the director of - - - |
| | Sommer | Then ask that question, Andrew. |
| | Miller | Okay. |
| 20 | Sommer | If you – if you want to know is Craig a director of X, that's a question that is clear. |
| | Miller | Yes. |
| | Sommer | It's concise and it has a defined scope. |
| | Miller | Sure. |
| | Sommer | Is Craig the director of any other company anywhere else in the world? |
| 25 | Miller | Mmm. |
| | Wright | Yes. |
| | Sommer | And list them.  I mean that's a completely different question.  Can you see that? |
| | Miller | Yes.  I do. |
| 30 | Sommer | So that they're – one of them has a clear and immediate nexus to the – the matters at hand.  The other is massively out of scope to what you should be asking.  So that's why I'm asking the question. |
| | Miller | Sure. |
| 35 | Sommer | The way you phrased it I think is inappropriate.  If you want to know – and it goes back to, you know, what I – my ..... earlier about the 650,000 Bitcoin.  If you ask that – say, "Demonstrate that the trustee could satisfy that obligation."  That's something – and we would demonstrate that there's a subsequent deed of loan.  No problem. |
| | Miller | Mmm. |
| 40 | Sommer | If you want to know if Craig is an entity – a director of a specific entity, then ask that question. |

CONFIDENTIAL

DEF_00053214

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Okay. |
| | Sommer | Don't ask the more general question. |
| | Miller | All right.  That's understood.  And thank you for answering regardless. |
| | Chester | Yes.  Otherwise it looks like a fishing trip. |
| 5 | Miller | I understand. |
| | Chester | 49. |
| | Miller | Question 49. |
| | Chester | The name of the conference. |
| | Sommer | All right. |
| 10 | Chester | So the answer to that is that there are a - - - |
| | Sommer | Do you want to - - - |
| | Chester | - - - significant number - - - |
| | Sommer | Sorry – do you – do you want to explain why – why you can't answer that question with as much certainty as you would like - - - |
| 15 | Wright | In about the week where the – all those conferences I went to around six conferences I was speaking at - - - |
| | Miller | Okay. |
| | Wright | I went to Sydney, Melbourne, Perth, Sydney, Perth, etcetera. |
| | Miller | Mmm. |
| 20 | Wright | And there's a bit pile of conferences and people come up to me when I'm talking because I've been a speaker.  I only go to conferences where I'm a speaker. |
| | Miller | Mmm. |
| 25 | Wright | And they say, "Hey, Craig.  Blah, blah, blah."  And they know me, so to speak, because you meet someone, you hand them your business card and suddenly you know them. |
| | Miller | Mmm. |
| 30 | Wright | And I've learnt over the years just to go, "Hey, such and such.  Yes, I know you."  Because everyone says, "You have to be more personable, Craig."  So, yes, I know everyone laughs ..... |
| | Sommer | That's all right.  If I had to meet - - - |
| | .......... | Yes.  I wouldn't worry about it. |
| 35 | Wright | So, basically, I know it was one of the conferences and I suspect whichever one and I know there was a later one which is in my thing but which of the bloody ones I'm not quite sure.  All I do know is – I mean I've got my SMS from the wanker.  Excuse me.  Dickhead for the other guy and arsehole and wanker for this one.  And ..... because that's all you will get. |
| | Sommer | .....  I don't want to give you this because, (1) I don't think it's relevant and (2) I haven't been through it - - - |
| 40 | Wright | Okay. |
| | Sommer | - - - (3) it's - - - |

CONFIDENTIAL

DEF_00053215

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | No, that's fine. |
| | Sommer | - - - it relates to proceedings that are on foot but I mean I know from – you guys, you want to know, well, what are these guys all just sort of waxing lyrical about it.  So this isn't prepared by me.  This was prepared by my litigation colleagues separately acting for Craig in relation to MJF.  But the whole purpose of it is to substantiate the MJF transaction.  So you can see here - - - |
| 5 | | |
| | Chester | Andrew has actually got a copy of that so - - - |
| | Wright | Yes. |
| 10 | Sommer | You've got all that?  Well, there you go.  So you've got it.  Excellent.  Just – just this.  Not the whole proof of evidence? |
| | Miller | No. |
| | Sommer | Okay.  So you've seen the ..... history.  You've seen - - - |
| | Chester | We went through any emails that they .... |
| | Wright | Yes.  Some emails. |
| 15 | Chester | Yes. |
| | Wright | So we were in the process of winding them up already.  We've issued statutory demands.  Will I actually ever see a cent out of all this?  Probably fucking not.  Excuse my language.  Because, well, I'm sure the little bugger has actually hidden things.  I don't give a shit what they say.  I think his frigging father is involved.  I think Payne is involved.  His father is involved because there's no way on bloody earth anyone has a record that frigging clean and has done all the crap that this frigging guy has done.  He doesn't have a ..... fucking credit card payment on his damn frigging file.  That's why I bloody dealt with him. |
| 20 | | |
| 25 | McMaster | He's - - - |
| | Sommer | All right. |
| | McMaster | - - - very much off the grid by this ..... |
| | Sommer | So this is the proof of evidence that - - - |
| 30 | Wright | Mother Theresa has worse fucking credit record than this guy here.  And that was when she was alive. |
| | McMaster | I understand.  Okay.  And so basically ..... by the whole thing - - - |
| | Wright | Mmm. |
| | McMaster | - - - for the purposes of substantiating the claims against you.  So the purpose is – look, I know – it – from your perspective it seems weird that, you know, we can't say with certainty which conference it was but - - - |
| 35 | | |
| | Wright | Like, I know - - - |
| | McMaster | - - - if you spoke to - - - |
| | Wright | - - - it was after the 23rd as we've gone through.  Although it's misspelt.  As half his crap is. |
| 40 | Sommer | It's terrible. |
| | Wright | 23 February.  That's his number. |
| | Miller | Yes.  Which you've given to us before. |

CONFIDENTIAL

DEF_00053216

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | We can call him now and see if he answers if you want. |
| | Miller | No. That's okay. |
| | McMaster | I suspect he won't. |
| | Sommer | A quite unhelpful screech - - - |
| 5 | Wright | Well, he probably – yes. He probably will. I'm thinking about something else that - - - |
| | Sommer | Anyway - - - |
| | Wright | He probably hangs up if I say, "I've got the ATO here." |
| | Sommer | And so there is in substance to - - - |
| 10 | Miller | Yes. |
| | Sommer | - - - what we're trying to do in relation to this. |
| | Wright | So when – when we did all this stuff - - - |
| | McMaster | Mmm. |
| | Wright | - - - he was listed as a director of this fucking company. |
| 15 | McMaster | Yes. |
| | Wright | It was after I started suing and everything that suddenly somehow he's not a director of this frigging company anymore and there's no bloody directors. I don't even know how the hell you do that. How do you have a company that's still running and has no directors? |
| 20 | McMaster | It's very hard. |
| | Wright | So he – this is why – I think his father is bloody involved. I don't – I don't - - - |
| | Sommer | Okay. Stop. |
| | Wright | We're not saying that I know. Sorry. |
| | Sommer | Stop. |
| 25 | Wright | I'm not – I'm not - - - |
| | .......... | ..... |
| | Wright | ..... before I get to - - - |
| | Sommer | None of that conversation will leave the room. |
| | Wright | Good. Yes. Because that will get me sued. I know. But anyway - - - |
| 30 | Sommer | All right. So I don't know - - - |
| | Wright | I will calm down and shut up for a bit. |
| | Sommer | Okay. I suppose the – all right. Beyond the obvious, I mean the purpose of your question is – is what? |
| | Miller | I'm just wanting to establish a timeline of what was discussed. |
| 35 | Sommer | Right. |
| | Miller | And we do have some emails and ..... those are legal proceedings separate from what we're looking at. So I – there's no need to - - - |
| | Sommer | No, no. Other than you want – well, Andrew, you say that but then you say you want a timeline. What I'm saying is - - - |

CONFIDENTIAL

DEF_00053217

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| | Wright | ..... |
| | Sommer | - - - this is – this is the – this is the draft affidavit of the timeline.  So, if – if a timeline is what you want, then the timeline is best evidenced by this which is not in a form ready for execution but I'm happy for you to have that as soon as it's available. |
| 5 | | |
| | Miller | Okay. |
| | Wright | And we're getting it ready because we're going down the whole ..... |
| | Sommer | Yes. |
| | Wright | And whatever else.  We've already been to the Supreme Court, the Federal Court, everything else.  And we - - - |
| 10 | | |
| | Sommer | So I suppose my question is - - - |
| | McMaster | Have you tracked him down though is the question. |
| | Wright | Yes and - - - |
| | McMaster | He keeps moving. |
| 15 | Wright | He keeps moving. |
| | McMaster | Yes. |
| | Sommer | So ..... |
| | McMaster | Our problem as well. |
| | Wright | I can't even – I can't go to a fucking hotel without giving them my frigging credit card and paying.  This guy pretty – bums his way everywhere and to staying for months. |
| 20 | | |
| | McMaster | Right.  Some people have the gift of the gab. |
| | Sommer | So you've got the answer to question 49 there. |
| | McMaster | Mmm. |
| 25 | Sommer | Do you have remaining questions - - - |
| | Wright | So, if I'm angry, I apologise. |
| | Sommer | - - - or - - - |
| | Wright | You can understand why - - - |
| | Miller | No, no. |
| 30 | McMaster | Yes.  Okay. |
| | Sommer | So, yes.  So I – I've – Craig has explained, you know, if you speak at six conferences - - - |
| | Wright | Yes. |
| | Sommer | - - - in a week, you sort of forget which one you met people at and - - - |
| 35 | Wright | ..... |
| | Sommer | - - - they say that they met you – "I met you at the conference." |
| | Miller | If there had been one, the name would be helpful. |
| | Sommer | Yes. |
| | Miller | If there were multiple. |

---

Page 76 of 96

Interview Conducted with Craig WRIGHT

---

| | | |
|---|---|---|
| | Sommer | Yes. ..... |
| | Wright | I can give you a list of all the conferences I spoke at but - - - |
| | Miller | Let's not.  Let's move on. |
| | Sommer | Okay. |
| 5 | Wright | So - - - |
| | Miller | So that brings up to the end of that set of documents. |
| | Sommer | Denariuz. |
| | Wright | And – I followed it up with - - - |
| | .......... | Did you want to go through that? |
| 10 | Wright | I got the loan ..... – the contacts and everything by SMS and just remember me and whatever else.  And I just say yes.  You know, I – I don't do the, "No, I don't remember you.  Who the fuck are you?" anymore because I go to these things and everyone thinks you're their friend and they come up to you and they talk and, if you go, "Who the fuck are you?", you never hear from anyone again. |
| 15 | | |
| | McMaster | They need name tags. |
| | Wright | Yes. |
| | Sommer | All right.  Denariuz. |
| | Miller | Mmm. |
| 20 | .......... | ..... |
| | Wright | It looks like him. |
| | Miller | Okay. |
| | Wright | So, if you don't mind, I'm just going to go for a walk outside because - - - |
| | McMaster | That's – that's fine. |
| 25 | Sommer | We can't – we can't let you out these doors because these doors are locked in case you jump but you can go through those doors in there. |
| | Wright | I do apologise but ..... gets my goat. |
| | McMaster | I can understand why, Craig. |
| | Wright | I mean it's not like I don't have everything.  It's frigging - - - |
| 30 | Sommer | Yes.  Go for your walk.  Take off. |
| | Chester | He's – but, Des, the issue with him – this is as an aside is that we pointed you at him number of times and when he has been some place and where he has been and there has been no action.  We've pointed it – we've pointed him out to a number of entities and – and there's no action - - - |
| 35 | McMaster | Well, we're – we can't tell you what action we're taking. |
| | Chester | Of course not. |
| | McMaster | Okay.  But I can assure you that we are doing what we need to do in regard to taxation obligations. |
| | Chester | Mmm. |

---

CONFIDENTIAL

DEF_00053219

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Whether we find him is another matter.  Just like you, we have problems pinning people down in any one place. |
| | Chester | The – the – and the other – the other entities that one should examine and relate to that should also be explored by ..... |
| 5 | .......... | That's happening as well. |
| | McMaster | I can't say yes or no - - - |
| | .......... | Okay. |
| | Sommer | So Denarius. |
| | Chester | Denariuz. |
| 10 | Sommer | Is a bit difficult for me because – because Craig and I have a different view as to whether or not ..... but nonetheless it seems to have been documented on the basis that - a Bitcoin wallet because it's tangible personal property perhaps because it's a piece of paper.  It was treated as goods.  Would that be fair to say, John?  And that's why – anyway.  So I think I just - - - |
| 15 | Chester | I think it was a fit of ..... to demonstrate the irrelevance of it – the – the PR from 23 December. |
| | Sommer | Yes. |
| | Chester | Question number 2.  Who has undertaken the R & D system – system development?  We refer to your response and that ..... and you've got a project and there's an R & D agreement and there's a project outline for that. You have that ..... |
| 20 | | |
| | Wright | I will just interrupt.  I apologise for that.  There's a lot of things ..... |
| | Chester | ..... might do that do that to you.  Okay.  So that – that carries you through that. |
| 25 | Miller | Yes, yes. |
| | Chester | "You provided invoice 1 which shows sales of Bitcoin in Denariuz.  What consideration was given to the supply?  How was it exported?  Please provide evidence."  So delivered to a director of Denariuz ..... Singapore Airlines. However, when the wallet was loaded on the product refund scheme, etcetera, etcetera.  Does that get you there? |
| 30 | | |
| | Miller | Yes. |
| | Chester | Okay.  The – question 9 is – that refers to the purchase of the rights of 46 million and the – and then the signed export of the sold of 19 five and it's not the same entity.  So it would have the same exercise.  "Please explain how and why the value is so different."  Yes.  That's just the – "Sold the ..... the wallets on the Bitcoin account before this wallet was sold to Wright and was exported.  All the Bitcoin associated with this wallet were outside Australia and remain so." |
| 35 | | |
| | Miller | So what was the reason that that value changed from 46 to 19 million? |
| 40 | Chester | Um - - - |
| | Wright | ..... |
| | Miller | In the sense that was ..... still a proportion of the wallet? |
| | Wright | Yes. |
| | Miller | Okay. |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | 10. "You advised you provided consideration to form an interest in an offshore trust." |
| | Miller | What was 10 originally? |
| | Chester | .... somewhere else? |
| 5 | Sommer | Change ..... – not it was in the new one ..... |
| | Chester | Sorry. |
| | Sommer | Question 10 originally was, "How did you pay for this?"  The answer was, "The acquisition of Bitcoin ..... by Denariuz will be paid for by an assignment of equitable interest .... by Denariuz in an offshore trust." |
| 10 | Chester | "When will you provide this?" |
| | Miller | Mmm. |
| | Chester | And I think that was .....  And there's some details around there.  The trust ..... |
| | Sommer | So June 2014 is the answer to A?  When will you provide this?  And B I think the answer is yes. |
| 15 | Wright | Yes. |
| | Sommer | Notwithstanding what it says there. |
| | Miller | Okay. |
| | Sommer | B - - - |
| | Chester | It's going to be the - - - |
| 20 | Sommer | Because I think, if you go back to the original question, that's basically just how did Denariuz pay for it - - - |
| | Chester | That fact is it hasn't paid for it yet. |
| | Sommer | And it hasn't paid for it but chances are it's going to pay for it – if it needs to pay for anything, it's going to pay for it via - - - |
| 25 | Chester | Direction. |
| | Sommer | - - - the same – the same mechanism everybody has paid for – for things which is the – a future – an assignment of the - - - |
| | Wright | ..... seen as me ..... |
| | Chester | Yes.  ..... |
| 30 | Miller | Okay. |
| | Sommer | Does that make sense? |
| | Chester | Yes.  15 is the same and - - - |
| | Miller | Yes. |
| | Chester | - - - your responses to question is there's the details of ..... |
| 35 | Miller | Okay. |
| | Chester | 19. "You said that you had no formal agreements.  You have informal agreements.  If so, provide ....."  Well, a person – no company ..... trade against.  There were no agreements.  Australian ..... Denariuz ..... act as a banking entity for the region. |
| 40 | Miller | Mmm. |

CONFIDENTIAL

DEF_00053221

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | If this – that changes, things will happen.  At the moment - - - |
| | Wright | At the moment, we don't know how things are going to be seen ..... whatever else. |
| | Chester | The ..... |
| 5 | Wright | ..... do it from here with them as a subsidiary ..... is the main thing ..... |
| | Chester | The exercise is really depending on what – what transpires here and how – how things get seen ..... in a couple of months. |
| | Miller | Mmm. |
| | Chester | It may – it may be that the next tax year he's not here. |
| 10 | Miller | Mmm. |
| | Wright | And quite simply going back to ..... stuck on and I admit that I'm stuck on it.  I know you can't tell me anything about other taxpayers.  I don't care.  I'm not saying I want you to tell me anything.  I would like to work with these guys to get the fucking evidence in place because we've got a pile of the frigging stuff |
| 15 | | – masses of it.  I would love to be able to get stuff on .....  Show how that ..... and all the rest.  Love to get all the stuff on ..... and now, yes, he's sighing and ranting but, look, you don't need to give me anything.  I just want - - - |
| | McMaster | If you want to pass information on to us, I will very happily take it and I will provide it to our risk area. |
| 20 | Wright | Mmm. |
| | McMaster | Okay.  They're the ones who will make a decision as to whether we go further with it.  If we go further with it and I'm speaking hypothetically, then appropriate audits will be conducted. |
| | Wright | And - - - |
| 25 | McMaster | And – and action taken. |
| | Wright | I would be happy to actually witness statements and swear affidavits and go into court and give up everything I've got and send emails and give you Skype logs.  Everything. |
| | McMaster | Yes. |
| 30 | Wright | I'm not saying I won't.  I'm saying I would love to. |
| | McMaster | Mmm. |
| | Wright | That - - - |
| | McMaster | And we accept that. |
| | Chester | There's some really important angst between the individual and the company that he was going to be doing work for and the individuals that were |
| 35 | | responsible for that company which we've given you that information in the past and we've given you the email that relates to that and we think it's – it is a key in the transactions that have occurred and we would hope that something has happened because in the interim what we believe is that the |
| 40 | | company that that was – the other party is in the process of being shut down or has been shut down.  No – you know, essentially.  Office closed.  People have moved on.  Computers disappeared.  ..... with it.  So that's an issue that – that - - - |
| | Wright | And ..... |

CONFIDENTIAL

DEF_00053222

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | That's – that's a reason why we ..... |
| | Wright | ..... everything from forensic stuff ..... |
| | Miller | .... |
| | Wright | On computers.  You have to have the computers. |
| 5 | McMaster | That's correct. |
| | Chester | And they're probably in the Swan River at this stage.  But that's neither here nor there.  Okay.  So that's - - - |
| | Wright | ..... |
| | Chester | You've now got it. |
| 10 | Miller | Okay.  Thank you. |
| | Sommer | ..... just said you now have questions for us. |
| | Miller | Yes.  I do.  So I've gone through what you've provided previously and I will preface this by saying that doesn't include what you've provided today.  So we're happy to take that and go back and have a further look at it.  I – I guess |
| 15 | | the purpose of my questions are to clarify the facts as we understand them are correct because that will help us in making the correct decision and applying the law to those facts.  So that – that's the sole purpose of these questions is to clarify that what I can see on a piece of paper - - - |
| | Wright | Yes. |
| 20 | Miller | - - - is your understanding and whether there's additional information I might need to then find documents ..... – I would ask that if you've got information that helps ..... appreciated. |
| | Wright | Yes.  And there's only really one external one that's – that leads to anything and we know which one that is. |
| 25 | Miller | Okay.  Craig, I know you don't like paper.  I'm trying to make this as easy as possible.  Where I've got a question on a document, I've printed it and highlighted the - - - |
| | Wright | Yes. |
| | Miller | - - - relevant bit.  Is it easiest if I just hand them to you as I speak? |
| 30 | Wright | Yes. |
| | Miller | And that – if you want to keep these afterwards you can keep them.  If you give them back or throw them - - - |
| | Wright | Yes. |
| | Miller | - - - ..... and such. |
| 35 | Wright | That's fine. |
| | McMaster | Okay.  I will preface these questions as please don't take offence over them.  Okay? |
| | .......... | ..... |
| | McMaster | They're only – we're finding the facts. |
| 40 | Wright | Mmm. |
| | McMaster | And we've - - - |

CONFIDENTIAL

DEF_00053223

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | Yes. | |
| McMaster | We need to understand the transactions and then talk to you about them. | |
| Miller | Yes. So I've provided you with a statement of claim that you've given us already. | |
| 5 | Wright | Mmm. |
| | Miller | In the New South Wales Supreme Court. Case number 2013/00225983. |
| | Wright | Mmm. |
| 10 | Miller | It stated that you, Craig Wright, conducted four projects associated with the Department of Home Land Security or DHS in the United States of America under contract. The projects are as follows, "DAA11-02-TTA01. Software assurance, software assurance through economic measures." |
| | Wright | Yes. |
| | Miller | "(b) BAA1102TTA05. Secure resilient systems and networks." |
| | Wright | Mmm. |
| 15 | Miller | "(c) BAA11-02-TTA09. Cyber economics." |
| | Wright | Mmm. |
| | Miller | And, "(d) BAA1102TAA14. Software assurance marketplace or Swamp." |
| | .......... | Yes. |
| 20 | Miller | Also in the statement of claim it says the funds associated with the projects are US650,000, 1.8 million, 2.2 million and 1.2 million respectively. |
| | Wright | Yes. That's what I was given by the original things. That's all the information I know. |
| | Miller | Okay. |
| 25 | Wright | As I've gone into – Dave didn't share the other things and I – we made sure that I didn't see it all. So I know what the projects were and I published papers to do with them. I did work to do with it. |
| | Miller | Okay. |
| | Wright | But - - - |
| | Miller | Well, that's - - - |
| 30 | .......... | ..... |
| | Miller | Yes. And I acknowledge that you've given further information today. So we will consider that but these questions were written in - - - |
| | Wright | Yes. |
| | Miller | - - - prior to that. This is a copy of your response on 17 March. |
| 35 | Wright | Yes. |
| | Miller | And I think on page 7 you advised that the intellectual property was designed with them being DHS in mind and customised to their needs. |
| | Wright | Mmm. |
| | Miller | And that the ownership of the IP remained with W & K. |
| 40 | Wright | Mmm. |

Page 82 of 96

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Also in that response you provided four proposal documents. |
| | Wright | Yes. |
| 5 | Miller | Which are these four and John referred me to them previously in a meeting. Which were submitted to the Department of Homeland Security, one for each of the above projects specifying funding amount. So my question is are these aforementioned facts correct according to you recollection of the records? |
| | Wright | Well, what I know what we filed was based on those. |
| | Miller | Okay. |
| 10 | Wright | What Dave didn't get – did not get through, what he did get as funding, where he got it, other than the fact I gave him things that he could use for bonding things - - - |
| | Miller | Yes. |
| | Wright | - - - I had the source code for a number of casinos. He used that for bonding stuff. I don't know which bits he did there or which bits he didn't do there. |
| 15 | Miller | Mmm. |
| | Wright | I know that he sold some of it. I know that he got other things and I know that he negotiated deals. |
| | Miller | Sure. |
| | Wright | So he – the whole point was to keep me out of all of this after ..... |
| 20 | Miller | Okay. Des has already alluded to perhaps what I might be getting to with this question but I will ask it anyway. To your – to your knowledge were any of these four proposals accepted by the Department of Homeland Security? |
| | Wright | I don't know. I had dealings with people in those areas. I had dealings with the Australian Government in a variety of areas. |
| 25 | Miller | Okay. |
| | Wright | I did presentations on some of the research here in Australia including with the ATO. |
| | Miller | Mmm. |
| 30 | Wright | With the Federal Police, with others, based on all this research. There are several published papers in – in each of these areas and you can check those and see where they're published and all the rest. All those published papers were funded. We paid for the research. When I went out to different organisations with the data, it was all paid for. |
| | Miller | Yes. |
| 35 | Wright | I didn't go into how. |
| | Miller | Okay. That's fine. I've already asked this and I believe your answer is going to be the same. What evidence do you have that they were accepted? You said that you don't - - - |
| | Wright | ..... |
| 40 | Miller | ..... Yes. That's fine. Is there any evidence that the funds were ever paid? |
| | Wright | Sorry. What funds |
| | Miller | From the Department of Homeland Security. |

CONFIDENTIAL                                                                                          DEF_00053225

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I have no idea. |
| | Sommer | What's the relevance? |
| | Wright | I just know I've got the - - - |
| 5 | Miller | I will try and get to that.  I'm just trying to establish that I understand things correctly. |
| | Wright | Okay. |
| | Miller | Okay. |
| | Wright | That was my belief.  But Dave died.  I couldn't talk to him at the end of it.  I know what we were doing.  I know what we had.  We didn't talk before the thing and then he died. |
| 10 | | |
| | Miller | Okay. |
| | Wright | I wasn't expecting him to die.  No one was expecting him to die.  He was only a few years older than I am.  So, yes, he was a vet.  Yes, he was wheelchair bound.  Yes, he had an infection.  The bastard didn't frigging tell anyone including his frigging family that he was sicker than he bloody was and he - - - |
| 15 | | |
| | McMaster | I know people like that. |
| | Wright | He was fucking stubborn. |
| | McMaster | I can understand that.  My brother did exactly the same thing.  Craig, do you want to take a minute.  I think - - - |
| 20 | Wright | He was my best friend - - - |
| | McMaster | And I understand that, Craig.  I read that in your .....  I have no doubt about that whatsoever.  Andrew, I think with this question, we just go straight through. |
| | Miller | Yes.  That's all right. |
| 25 | McMaster | It was never - - - |
| | Miller | Yes.  That's fine. |
| | Wright | ..... |
| | Miller | Did you want to take a short break? |
| | .......... | Sorry? |
| 30 | Miller | Would you like to take a short break? |
| | Wright | And because I was paranoid but .....  and he didn't take money he fucking needed and he didn't ask for it but he fucking needed it and - - - |
| | McMaster | He obviously was a very good friend of yours, Craig, and I knew that from the - - - |
| 35 | Wright | And he should have fucking taken the fucking money for the frigging trust and he fucking should have ..... |
| | Miller | Do you want to take a break? |
| | Wright | Yes. |
| | Sommer | We should have a break. |
| 40 | Miller | Thank you. |
| | Wright | I don't have a lot of friends.  I don't get on with many people.  Dave did - - - |

CONFIDENTIAL

DEF_00053226

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Sommer | Craig. | |
| McMaster | Come for a walk with Andrew, Craig. | |

### Suspension of Interview

5

| | | |
|---|---|---|
| Chester | How much time does it have?  Do you know? | |
| McMaster | We've got - - - | |
| Miller | I think it will alert us if the – if it's running out of recording space, it will – it beeps at you. | |
| McMaster | Yes.  We might take the questions down a bit.  Look, at the end of the day, with – as I've alluded this morning – my voice is coming back – DHS never accepted the proposals. | |
| .......... | ..... | |
| McMaster | And there never was any – any funding from. | |
| .......... | That's all right. | |
| McMaster | From them to W & K. | |
| .......... | Mmm. | |
| McMaster | Um - - - | |
| Chester | So where do you – where do you want to take that?  What's the nexus of your question?  Where are we going? | |
| McMaster | Well, it comes back to the software and the valuation of the software through the Supreme Court matters. | |
| Chester | Yes. | |
| McMaster | As to, well, what's all that about and that's why it's there. | |

10

15

20

25

### Suspension of Interview

| | | |
|---|---|---|
| McMaster | And that's where we're coming from.  Because we need to do ..... in all of this. | |
| Chester | So - - - | |
| McMaster | And, if I talk too much, my voice will start to go again. | |
| Chester | I understand. | |
| McMaster | Okay.  And there are several things which are inconsistent that we need to understand and follow through on.  So, if you don't mind, Andrew, I will take some of your glory or questions and cut them a little bit short. | |
| Miller | That's okay. | |
| McMaster | We know that W & K was dissolved well and truly prior to the agreements being entered into between Dave and Craig.  But the entity no longer existed.  The State Department of Florida had administratively dissolved the company and through notification to them. | |
| Chester | ..... | |

30

35

40

---

CONFIDENTIAL

DEF_00053227

Interview Conducted with Craig WRIGHT

| | Miller | .... it's a public record from the Florida Department of State ..... |
|---|---|---|
| | .......... | ..... |
| | McMaster | Yes. |
| | Miller | Yes. |
| 5 | McMaster | And that's why we're bringing this to your notice now.  We don't want any of these to be a surprise to you and Andrew wanted to understand how things pulled together.  You've given us a lot of information today which also then with the questions around the bonds explains a lot of the questions that we – we're looking at. |
| 10 | .......... | If that's the case, how on earth ..... Supreme Court matter action. |
| 15 | Miller | That's a good question.  I will just give you this as well.  This was just off the internet from – it's a media article in relation to the Department of Homeland Security, Science and Technology funding contracts and it just lists the successful applicants for those contracts.  And I wasn't able to see W & K on that – on that list.  So it appears to be a public record.  The source of that is not directly from DHS.  So I can't vouch for the complete validity of that particular document. |
| | McMaster | Okay. |
| 20 | Wright | I don't know how Dave – I didn't talk to him about it.  .....  All I can tell you is Dave had – had the idea that he was protecting me and I still don't have many good friends.  .....  And I don't know which ..... overseas and which bits he did there. |
| | McMaster | No.  That's fair enough. |
| 25 | Wright | I don't know if he did – if he – I know he was in hospital a lot at the end.  I don't know if he fucked up and didn't file the damn thing. |
| | Miller | That is a possibility. |
| | Wright | I don't know what has to be filed. |
| | Chester | ..... |
| 30 | Wright | .... he spent his last year in and out of hospital.  I found out afterwards he was having severe money problems.  I know he should have bloody gone and - - - |
| | McMaster | Some people are too proud to ask, Craig. |
| | Wright | He should have. |
| | McMaster | I understand. |
| 35 | Chester | So this is basically the – the stuff that comes up when you don't file your annual report on time.  .....  Yes. |
| | McMaster | And they do notify the – the LLC that they about to ..... etcetera. |
| | .......... | Yes. |
| | McMaster | So all of the paperwork would have went through. |
| 40 | Chester | Yes.  So it's like an ..... statement that comes out and says, "Lodge – lodge your annual report or blah, blah, blah." |
| | McMaster | Yes.  Anyway, so that – that is one of the inconsistencies that we're – we're finding and it's something for yourselves to look at. |

CONFIDENTIAL

DEF_00053228

Interview Conducted with Craig WRIGHT

| | Miller | In a similar vein, I might skip over some of the repetition of facts and just put this to you as well. This – you've already provided to us as well. That's the .... trust in |
|---|---|---|
| | Wright | Yes. |
| 5 | Miller | Or DeMorgan. It appears that it was created – or the trust was established on 9 August 2013. |
| | Wright | Mmm. |
| | Sommer | The DeMorgan trust. |
| 10 | Miller | Our records and what you've provided show that DeMorgan issued a – an invoice and that Craig invoiced the trust on 1 July 2013 and that was, from what we can see, before the trust was actually established. We're just wondering what the reason for that would be. |
| | Wright | ..... Hence why everyone makes me not do anything anymore. |
| | Miller | Okay. |
| 15 | Wright | And I don't always check all the bits and pieces. So, right, well, there's the code. This isn't ..... |
| | Miller | That's okay. |
| | Wright | ..... |
| | Chester | Which invoice was that? |
| 20 | McMaster | Number 96. |
| | Miller | 96. |
| | Chester | This is 96, 97, 98. ..... |
| | Miller | Not all of them are dated before - - - |
| | Wright | No. |
| 25 | Miller | - - - that date but there were a couple that were. |
| | Wright | .... |
| | Miller | Okay. |
| | Wright | And that came down to the ..... going back and forwards and arguing ..... |
| 30 | Miller | Okay. So were those invoices issued at the time in July or would they have been issued after the trust was established? |
| | Wright | That I put a little memo saying everything is ..... after the date of ..... |
| | Miller | So it was created before the trust was established. |
| | Chester | Well, it probably would have been just done as a – as an accounting process. If it was in Xero – if there's ..... |
| 35 | Wright | There was the idea of a trust. |
| | Chester | The - - - |
| | Wright | There's a trust that is being settled and whatever else. |
| | Miller | Because another observation I've got is a lot of these invoices have the ABN for DeMorgan and that ABN wasn't given until I think September of that year. |
| 40 | Wright | Well, that gets ..... |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Backdated in July. |
| | Wright | When you put it in the thing it – you had the ABN and then you printed out and – so it may not have had the ABN at first but when the ABN is there ..... |
| | Miller | Yes.  And that just would be an accounting system thing. |
| 5 | Wright | Yes. |
| | Miller | Sure.  I'm going to pause there ..... |

### Suspension of Interview

| | | |
|---|---|---|
| | Wright | All right. |
| 10 | Miller | That's okay.  We've also noticed that DeMorgan issued a number of invoices on 1 July which quote its ABN but again it wasn't yet established - - - |
| | Wright | No.  It was putting it in the system.  That was what I was attempting to set up and that's when it came through.  So the accounting system and the whatever else – the ABN gets added afterwards.  ..... |
| 15 | Chester | If he prints a – if he prints an – so, you're not getting an invoice that's printed out on a date. |
| | McMaster | Mmm. |
| | Miller | ..... when you put it in - - - |
| | Wright | ..... |
| 20 | McMaster | And it overwrites. |
| | Wright | I don't print it until it has to be printed.  Xero doesn't even need to print to just get it in the thing. |
| | Miller | Yes.  Now, there's a number of licences between Dr Craig Wright and in this case it was Hotwire. |
| 25 | Wright | Mmm. |
| | Miller | And it appears to be in a personal capacity in which he's licensing that software. |
| | Wright | ..... by R & D, yes. |
| | Miller | Yes.  Sorry.  That seems to - - - |
| 30 | Wright | There's the initial one Jamie did but it was supposed to be done up differently.  So in the black of everything you've got you've got all .... you will see that there's a – one where it goes to me and one where it goes to the trust.  What I wanted Jamie to do was do the trust and then the other - - - |
| | .......... | ..... |
| 35 | Wright | - - - and it didn't done correctly at first ..... the document. |
| | Miller | Okay. |
| | Wright | There's only one valid one which is where it goes – myself, trust and then - - - |
| | Miller | Yes.  Well, I did notice for one entity and I think it might have been Hotwire there was a subsequent - - - |
| 40 | Wright | Yes. |
| | Miller | - - - licence agreement which was given. |

CONFIDENTIAL                                                                                      DEF_00053230

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | Yes. | |
| Miller | In relaying that, are you saying the previous one is void ..... or just started or amended? | |
| Wright | A void ab initio.  .....  Not what we were meant to do. | |
| 5 | Miller | And yet ..... to the other entities they weren't a replacement licence agreement.  .... set up. |
| | Wright | ..... |
| | Sommer | Licensed agreement. |
| | Miller | Okay. |
| 10 | Sommer | What are you – what are you saying? |
| | Miller | ..... if that's right.  Okay.  So - - - |
| | Wright | If you look in ..... |
| | Sommer | ..... |
| | Miller | In the case of Hotwire there was an agreement to licence software between ..... R & D. |
| 15 | | |
| | Wright | Yes. |
| | Miller | And Hotwire Brand of Intelligence. |
| | Wright | Yes. |
| 20 | Miller | That doesn't appear to be reflected in the invoices.  Rather there's an invoice and sale from Craig Wright to DeMorgan and then an invoice from DeMorgan to ..... Software to Hotwire. |
| | Wright | Yes. |
| | Miller | And whereas the agreement only states that Craig Wright is the owner of the IP and he's licensing it to Hotwire. |
| 25 | Wright | All right. |
| | Miller | In the case of Hotwire, we've been provided with a subsequent agreement with the same reference number which says it's Craig Wright for DeMorgan. |
| | Wright | All right. |
| | Chester | ..... |
| 30 | Miller | And my question was does that replace the previous agreement and you're now stating that this agreement is DeMorgan licensing Hotwire. |
| | Wright | Yes.  .....  DeMorgan licence. |
| | Miller | Okay. |
| 35 | Wright | ..... it was always meant to go through the trust .....  Jamie was meant to be my CFO.  I trusted that he would get all these things right.  I thought everything went through correctly. |
| | Miller | Okay. |
| | Wright | The idea has always been ..... invoices and the way that it's in the other documents and all the rest.  There were a few fuck ups .....  I get that. |

CONFIDENTIAL

DEF_00053231

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Okay.  In the case of Coin Exchange and Cloudcraft, there were not these additional agreements.  So the – the ones that we currently have are still between Craig Wright, R & D, and either Coin Ex or Cloudcraft. |
| | Wright | You would be able to look at the Coin Ex ..... |
| 5 | Miller | Yes.  What you provided today might speak into that. |
| | Wright | Yes. |
| | Miller | So we will take that into - - - |
| | Sommer | Yes.  That's right. |
| | Wright | Yes.  It went back and forwards and we fucked up. |
| 10 | Miller | We've already spoken about the Seychelles trust so I'm just flicking over a couple of questions.  You've already answered them today.   I did ask whether you've got any other documents relating to the establishment of the trust and, Craig, you said that to your knowledge you don't have anything at the moment. |
| 15 | Wright | No. |
| | Miller | You might get access to it later.  So that's – that's understood. |
| | Wright | I have been trying.  I have been talking to ..... |
| | Miller | Yes.  That's okay. |
| | Wright | And even I ..... |
| 20 | Sommer | Obviously not.  .... |
| | Wright | So I don't know.  Dave didn't – Dave was in hospital most of the time in the last year before his death. |
| | Miller | Okay. |
| | Wright | I mean, if ..... |
| 25 | Miller | Yes.  Okay.  All right.  So I will move on to the Seychelles trust.  I've just given John the deed of loan. |
| | Chester | Mmm. |
| | Miller | So the loan trust which is what we've been calling it today was established pursuant to this deed of loan. |
| 30 | Chester | Yes. |
| | Miller | And from what I understand there's an older contract.  So all deeds or anything relating to this loan ..... it's solely created pursuant to this document. |
| | Chester | Yes. |
| 35 | Miller | The trustee, Designed by Human Limited, agrees to lend Dr Wright 650,000 Bitcoins and it's executed by Gwen Nguyen for Design by Human. |
| | Wright | Yes. |
| | Miller | Under what – what authority does she execute this agreement? |
| | Wright | She's the CEO. |
| 40 | Miller | I'm not trying to ..... you answering the question.  On the final page there is a consent to act. |
| | Wright | Mmm. |

CONFIDENTIAL

DEF_00053232

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Miller | That's signed by Gwen Nguyen. | |
| Wright | Yes. | |
| Miller | She agrees to be the chief operating officer from a date prior to the establishment of the trust and agrees to be the director in – from 1 July, is it, 2013. | |
| Sommer | 30 June. | |
| Miller | 30 June.  Okay. | |
| Sommer | Yes. | |
| Miller | So I therefore assume she is executing this deed in her position as the chief operating officer. | |
| Sommer | I would put to you that that's question for her. | |
| Miller | Okay. | |
| Sommer | But that seems a reasonable inference to draw. | |
| Miller | Okay. | |
| Wright | Dave and her worked together .....  He's the ..... | |
| Sommer | Yes.  So in | |
| Wright | ..... | |
| Miller | But we wouldn't know who requested that she hold those positions unless she was invited to ..... COO - - - | |
| Wright | You will have to talk to her. | |
| Miller | All right. | |
| Wright | Yes.  I - - - | |
| Miller | We can do that. | |
| Wright | The whole idea with all this was to keep me out of it. | |
| Miller | Okay.  Well, that's fine.  We might have to have a chat with her about it. | |
| McMaster | No doubt ..... | |
| Miller | Okay.  The last lot is information obtained from Companies House in the United Kingdom.  So that's – I guess they're the equivalent of ASIC.  This is all public information.  Yes, there's a copy for you to keep.  It's for – you do have that.  Okay. | |
| Sommer | Yes. | |
| Miller | So that's for Designed by Human Limited is the company under there. There's no record on these bits of information from Companies House of Gwen Nguyen ever holding the position of director. | |
| Wright | Yes. | |
| Miller | In her consent to act ..... | |
| Wright | ..... | |
| Sommer | Yes. | |
| Wright | Then I had better get that fixed. | |
| Sommer | ..... so - - - | |

Line numbers (left margin): 5, 10, 15, 20, 25, 30, 35, 40

CONFIDENTIAL

DEF_00053233

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | It could just be an administrative error but perhaps it's something to look into. |
| | Wright | ..... |
| | Miller | However, what we can see from these documents I'm unable to find any link between Craig or any of his associates until 7 January 2014. |
| 5 | Wright | ..... |
| | Miller | All right.  Before that, it was what appears to be a shelf company from CFS Securities. |
| | Sommer | Yes.  So is there a – what's – what's your question? |
| | Miller | Well, it's this entity that's acting as trustee in a deed of loan dated in 2012. |
| 10 | McMaster | So how could it have agreed to have sign the – to the loan deed if it was only a shelf company held by an entity that generates shelf companies available for sale? |
| | Wright | Those emails in there - - - |
| | Sommer | So - - - |
| 15 | McMaster | And that might answer that questions. |
| | Sommer | So – so your question is - - - |
| | Wright | Dave mentioned the shelf company. |
| | Sommer | Yes. |
| 20 | Wright | And he did say one of the – one of the emails he has a picture of the – that CFS company from ..... |
| | Miller | Okay.  Well - - - |
| | McMaster | And that could be the explanation that we're looking for. |
| | Miller | Yes. |
| | McMaster | And you - - - |
| 25 | Wright | I don't know how nominee shareholders or anything like that work in the UK .....  I know they're a bit different.  They are corporate and other things and rules we don't have in Australia. |
| | Miller | Yes. |
| | Chester | There is a screenshot of that and there is a – an email in your ..... to Craig. |
| 30 | Miller | Well, that's fine.  When we get back to the office, I will go through it all. |
| | Chester | Well, I would like you to have just a quick look at it now so that you're comfortable with it. |
| | Miller | Yes. |
| | Chester | Because - - - |
| 35 | Miller | I can see one from Dave Clymont on 10 December 2012. |
| | Chester | Yes. |
| | Miller | It says there is a shelf company, Designed by Human, that I like the name of. |
| | Wright | Yes. |
| | Miller | Is that the one that - - - |
| 40 | Chester | .....  There were two entities and - - - |

CONFIDENTIAL

DEF_00053234

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | No, neither of us were terribly good at .....  I keep all my emails though. |
| | Chester | That's the one.  It's ..... |
| | Sommer | ..... |
| 5 | Chester | The exercise is one where it was – it was held there but it was owned by these guys. |
| | Wright | ..... |
| | Chester | That had been reserved. |
| 10 | McMaster | So it looks like the answer to that question that you've provided in today's documents and so we will need to have a look at that and – and take it from there. |
| | Wright | So, I don't – I don't know whether Dave is terribly good at setting up trusts or not.  I know I'm not and I know I've issued documents that are issued days before they actually .....  It's not the intention to try and screw anyone out of ..... or anything like this.  It's just that paperwork is not my forte.  ..... |
| 15 | McMaster | I understand.  Well, that's why we – we employ people like Andrew here and John.  I understand that. |
| 20 | Wright | .....  Don't allow me to touch these things anymore for reason, as you see, and it's not – if I'm issuing something on 1 July and we finalised the contract three weeks later, then it's not like I'm trying to screw ..... or anything like that.  It's just that - - - |
| 25 | McMaster | I understand where you're coming from, Craig.  It's just that you need to understand from our point of view one or two inconsistencies.  You know, there's nothing in the scheme of things.  When it becomes a lot of inconsistencies, it raises some concern and we've got to understand why those inconsistencies occur. |
| | Wright | Just trying to set things up quickly - - - |
| | McMaster | Yes. |
| | Wright | - - - and go and get things running. |
| 30 | McMaster | And obviously you've leap-frogged some of the – the things by the sound of it.  Is effectively what you're saying and, look, we still need to understand that. |
| | Wright | Yes. |
| | McMaster | And you've given us a lot of information today which we previously didn't have which will assist us in making the decision.  Now - - - |
| 35 | Wright | And I'm shit with ASIC over here too.  That's why I've got other people – and ASIC says, "Have you filed your silly – whatever, end of year report?" |
| | McMaster | Mmm. |
| | Wright | And all it is is you click and pay them money and your company stays in existence.  If you don't click it, then it disappears and you have to fight to get it back. |
| 40 | Miller | Yes. |
| | McMaster | Mmm.  Understand.  So this will greatly assist us in coming to a – our decision.  Andrew, do you have any other questions? |
| | Miller | No.  There were no more questions. |

CONFIDENTIAL

DEF_00053235

Interview Conducted with Craig WRIGHT

| | McMaster | Okay. |
|---|---|---|
| | Miller | ..... |
| | McMaster | So it's - - - |
| | Miller | I will just leave that with you. |
| 5 | McMaster | Yes. |
| | Miller | We will go away and – and examine what you've give us today. |
| | Wright | Yes. |
| | Miller | And a lot of it, I think, will greatly assist in our questions.  I can't see us requiring any further communication at this point. |
| 10 | Wright | And I apologise again for breaking down ..... |
| | Miller | That's okay. |
| | McMaster | Great.  You can't help that. |
| | Chester | This – this – yes, this entity existed in the period that you're talking about.  It would seem unreasonable to assume that it was sitting on a shelf. |
| 15 | McMaster | Well, it existed but whether it was available for sale.  The particular entity, CFS, whatever they call themselves, has a list of entities that are available for sale. |
| | Miller | Yes. |
| 20 | McMaster | Okay.  And some of those entities go back past the date of the incorporation of this particular entity and it was still available for sale. |
| | Wright | And he should have really done it before 2012.  So - - - |
| | McMaster | So it just raises some questions for us - - - |
| | Sommer | Yes.  Yes - - - |
| 25 | McMaster | - - - but clearly you've got – you've got some other things that you've provided to us today that we – and excuse me if my voice is going – that we've not had the opportunity to see and so obviously we need to have a look at that.  I don't think it's going to generate any further questions and we're – I suspect would be very close to making our final decision. |
| | Miller | But we won't be able to do that until we've gone through these. |
| 30 | McMaster | Exactly.  We do need to go through those. |
| | Wright | At the end of the day I know there a whole lot of messy bits and pieces with each of the companies.  We're working now to get them all cleaned up.  Some of those things ..... change dates and invoices and whatever else - - - |
| | McMaster | Yes. |
| 35 | Wright | It doesn't mean all the periods or whatever – the whole thing was wrong.  It was just – that's why I now have ..... that's why I've got Andrew involved.  That's why I've got John involved.  I had bloody Jamie involved first and he didn't do what he was supposed to do.  I – I know his frigging marriage fell apart and all the rest but it's still not an excuse to saying, "Oh, well, my life has fallen apart and failing." |
| 40 | Chester | I think that with these as well though that the – that exercise – the – the MJF transaction, you're comfortable that that occurred. |

CONFIDENTIAL

DEF_00053236

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | Well, the documents seem to point that way, yes. |
| | Chester | But are you comfortable that it occurred or do you think that it didn't occur? Do you think that - - - |
| | Wright | ..... got the stuff ..... |
| 5 | Miller | I can see that you've acquired software. |
| | Chester | So is – is - - - |
| | Wright | Do you know how much banking software is worth? |
| | McMaster | No idea. |
| | Miller | No, I'm not - - - |
| 10 | McMaster | Absolutely no idea. |
| | Wright | Have a quick search for banking software. |
| | Miller | Okay. |
| | Wright | Have a look at some of the other things with Rubik and everything that we did. |
| 15 | Chester | I'm concerned that – well, I'm concerned that you think that the – that you don't think that exists.  Do you agree that it exists or not agree it – do you agree that the transaction occurred or not occurred? |
| | McMaster | On the basis - - - |
| | Miller | The documents that I've got substantiate the fact that it has occurred. |
| | Chester | It has occurred.  Okay.  So we're good with that. |
| 20 | Miller | At this point, yes. |
| | Chester | And that it went out through this character that we would all like to find? |
| | McMaster | We will certainly like to find him.  Look, at the end of the day - - - |
| | Wright | ..... |
| | McMaster | - - - I ..... |
| 25 | Wright | ..... have you got any closer to finding him?  Can you answer that one? |
| | McMaster | Just like you, he moves around a – sorry.  Just like your – your own looks at him, you find the location for him - - - |
| | Wright | And he's gone. |
| | McMaster | - - - and he's gone.  Okay. |
| 30 | Miller | We have a similar observations. |
| | McMaster | We have the same observations. |
| | Sommer | All right.  Shall we call it quits there? |
| | McMaster | I think we should. |
| | Sommer | All right. |
| 35 | Wright | If there's anything with him, I'm happy to give anything to you. |
| | McMaster | Okay.  And we appreciate that. |
| | Wright | I'm not trying to – I don't have any collusion with the ..... |
| | McMaster | No.  I understand. |

Page 95 of 96

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Miller | We're not alleging that at all. |
| | Wright | I know.  But I'm just trying to let you know I don't.  I want him taken him down several .....  I mean he has got another company now by the way that isn't actually a company.  MJF Surveyors.  It's – it's a business name run by someone else and they've got people calling themselves directors and it's not even a fucking company. |
| 5 | | |
| | Sommer | Do you and Craig want to go next door just while these guys turn off the machine and then pack everything up? |
| | Chester | Sure. |
| 10 | McMaster | And we will print off a – a copy of the DVD for you. |
| | Wright | Yes. |
| | McMaster | We will also provide our Auscript transcript as well. |
| | Wright | Yes. |
| | Sommer | Let me just check - - - |
| 15 | Miller | Okay.  12.54.  We will terminate recording. |

CONFIDENTIAL

DEF_00053238