**P-175**

Case No. 9:18-CV-89176-BB

| | |
|---|---|
| **From**: | Craig S Wright [craig.wright@hotwirepe.com] |
| **Sent**: | 9/17/2014 10:31:56 AM |
| **To**: | Ramona Watts [ramona.watts@hotwirepe.com] |
| **CC**: | Sommer, Andrew [asommer@claytonutz.com] |
| **Subject**: | FW: Our meeting Monday |
| **Attachments**: | Judgment-Order Case 2013-00348577.pdf; Consent order 2013-225983_245661.pdf; UTN as US resident Director.pdf |

Uyen was the director of WK and was the one who signed the consent order.

---

**From:** John Chesher
**Sent:** Thursday, 6 February 2014 1:15 PM
**To:** McMaster, Des
**Cc:** Sommer, Andrew; Craig S Wright
**Subject:** Our meeting Monday

Hi Des

Thank you for making the time to get together on Monday.  I have been out the loop since on other business hence my delay in getting back to you.

The following are the salient points in terms of time drawn from our meeting:
1. Interim decision on Cloudcroft, Coin Exch and Hotwire by midweek next week
2. Questions for Craig and DeMorgan trust  by end of this week
3. Strasan and Pholus more info.  Re W&K

You have since asked for the director details and consents for W&K (attached).  You have all of the agreements between W&K and Wright and copies of judgments.

Since our meeting, a Supreme court judgment against MJF Mining Services has been granted in Wright's favour.  (attached)   We do recommend that you pursue the company and Ferrier with vigour for their outstanding positions, as it will likely lead you to the perpetrator of this fiasco.  While we have protected our position, we would love to know the full story.  We are happy to work with you on this issue as you will have better avenues than we do.   Our alternative position is to move to wind up MJF and let the Liquidator pursue opportunities, which is clumsy both in tactic and in timing.

The whole process of audit and examination needs to be concluded without delay.  Everything that can be done on our part has been done.  The pace of the process and delay in forming a reasonable view on the overall position is impairing our ability to operate and complete our business objectives.   We ask that you expedite the program.


Best regards



**John Chesher**
**Finance**
**Hotwire Preemptive Intelligence Pty Ltd**
Mobile:  +61 414 663 663
John.chesher@hotwirepe.com

CONFIDENTIAL

DEFAUS_01861428



CONFIDENTIAL

DEFAUS_01861429

**P-191**

Case No. 9:18-CV-89176-BB

| **From**: | Heydon Miller [hdmiller@level22.com.au] |
|---|---|
| **Sent**: | 4/17/2015 11:34:05 AM |
| **To**: | Craig S Wright [craig.wright@hotwirepe.com] |
| **CC**: | Sommer Andrew [asommer@claytonutz.com]; Ramona Watts [ramona.watts@hotwirepe.com] |
| **Subject**: | Re: Meeting - possible investor |

Craig

I am out of town on Monday ad Tuesday but mostly available after that.  I am happy to assist in any way I can.

Cheers

Heydon

**Heydon Miller**

Barrister

# LEVEL 22 CHAMBERS

Level 22, 52 Martin Place, Sydney NSW 2000

DX: DX 222 Sydney

**D** 02 9151 2210 |**T** 02 9151 2222 |**M** 0419 449 860 |**E** hdmiller@level22.com.au

Liability limited by a scheme approved under Professional Standards Legislation

**IMPORTANT**
The information transmitted is for the use of the intended recipient only and may contain confidential and/or legally privileged material.  Any review, re-transmission, disclosure, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited and may result in legal action.  If you have received this email in error please notify our office immediately on telephone 61 2 9151 2210 and delete all copies of this transmission together with any attachments.

On 17 Apr 2015, at 11:16 am, Craig S Wright <craig.wright@hotwirepe.com> wrote:

Hello,
We have a face to face meeting with Stefan Mathews who represents and runs Calvin Ayres' investment trust next week. The call and email exchange is as positive as one can hope for right now. We will look at an initial bridging loan and a first round $2 million investment.

For some background, this is who Calvin is:
http://en.wikipedia.org/wiki/Calvin_Ayre
http://calvinayre.com/

Are either or both of you available next week?

I will need to offer an overview of the issues with the ATO and what it all means and you are as independent as can be expected Andrew.

DEFAUS_01867166

We have all the material ready for due diligence thanks in part to the ATO. The ATO have been probing the gaming links for my companies and questioning who these could be, so in part they may end up finding this very soon.

I have exchanged emails with Stefan over the last fortnight and he has a complete financial breakdown of the group and of the R&D we are doing. I had my second call today concerning investment. This has resulted in a further follow-up on Monday and a face to face meeting with Stefan here in Sydney next week. We will know the time of the meeting on Monday.

Regards,

Dr. Craig S Wright GSE LLM
Chief Executive Officer
**Hotwire Preemptive Intelligence (Group)**
Aust: +61 (02) 9188 2051
USA: +1 (408) 520-9521
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com
<image003.jpg>

CONFIDENTIAL

DEFAUS_01867167

**P-209**

Case No. 9:18-CV-89176-BB

**From**:       Sommer, Andrew [asommer@claytonutz.com]
**Sent**:       6/11/2015 7:50:32 AM
**To**:         Craig S Wright [craig.wright@hotwirepe.com]
**CC**:         Ramona Watts [ramona.watts@hotwirepe.com]
**Subject**:    Re: thinking from last night

Hi Craig

There is much to talk about in here.

I will try and send through some more thoughts but I am in meetings this morning until 2.30pm sydney time.

(1) If we put the IP in Antigua, you will have to start thinking about the licenses as international transfers of IP, thinking about transfer pricing etc.

(2) Why wouldn't the loan filter down to DeMorgan Limited?  Happy to have Antiguan NewCo as the borrower from C's group but would be better to be able to loan those monies into DeMorgan Limited to enable it to pay people here.

(3) Need to understand the payment terms.  If the ATO paid over $50m on 31/12, can you just pay out the loans from C's group?

(4) Not sure about the conversion arrangements and the security.  Does this mean that C's group can take Bitcoin out of the Trust at $100 per BTC to repay the loan?

(5) As flagged by Ramona, the exclusive licence is an issue – you need to think carefully about this, even if it is limited to the gaming arena.

Regards


Andrew

---

**From:** Craig Wright
**Date:** Thursday, 11 June 2015 12:13 am
**To:** Andrew Sommer
**Cc:** Ramona Watts
**Subject:** Fwd: thinking from last night


Fyi


Sent from Samsung Mobile


-------- Original message --------
From: c
Date:10/06/2015 07:09 (GMT-08:00)
To: Craig Wright
Cc: Stefan Matthews ,JLP ,Marco Bianchi ,Dr Errol Cort
Subject: thinking from last night

CONFIDENTIAL

DEFAUS_01868452

I suggested that we create an Antiguan IBC called something like "BlockChain Technologies Ltd".   Dr Cort can do this for us quickly once instructed.   The company will be in bearer form with the beneficial shareholdings being the same as the current parent in the Australian company.    This company is the one that applies for all the patents.

This company then borrows 8 Million Australian from us (payment terms based on the budget you gave us yesterday) and starts on our plan of going after the 50 M and getting all the patents filed.  In parallel we finish off the core platform and integrate this with Ntrust (subject to us getting Rob on side once you finish that white paper on this project for him to review).   If more money is released from the tax department we can discuss other projects to also move forward at the board level.

This loan is secured by the bitcoins you have in trust in Panama and are convertible at our sole choice,  to shares (or beneficial equity) in the Antigua IP company and the Australian parent company which we hope to convert to only a development operation.   The conversion price if we chose bit coin in 2020  is 100$ US or the price in 2020 when the trust dissolves at our choice.  This deal should be registered with the trust so this would be automatic if we do not convert to equity.

Any money released from the tax department from the current dispute or the new monies put in go straight to Development of the technology.   It is up to you to establish the proof of existence of the bit coin trust and who can sign on its behalf.

I would like Stefan and Marco in Zurich (should he accept...or someone else representing him like Dr Cort in Antigua) to be put on your board with you also (three person board for now).   I would get the right of first refusal to any new rounds of financing.


So  one thing that we need you to suggest to us is what you are willing to give up as a percent in the IP company and Australian parent company for this opportunity?  The other thing that needs more discussion is what is the BlockChain IP companies relationship with Ntrust?  Is Ntrust licensing the technology or do they have exclusive use of this for some period in exchange for something?   I would like your suggestions on both of these please.

Also...I would like our gaming group to get exclusive access to any technology or consulting from this operation related to block chain technology for online or land based gaming until 2020...gaming for this purpose means gambling and non gambling gaming.

We as a group can then plan how this evolves moving forward.   Our contributions will be more on the business development side.

If you could come up with something agreeable for the above issues today we could start this today.   This document should be considered the start of a legal process to define the contracts.

Thanks and looking forward to your response.   :-)

C....

**P-215**

Case No. 9:18-CV-89176-BB

**From**:          Craig S Wright [craig@rcjbr.org]
**Sent**:          6/20/2015 2:10:14 AM
**To**:            'c' [c@wyno.ca]
**CC**:            'JLP' [jlp@wyno.ca]; 'Stefan Matthews' [smatthews@sterling.ph]; 'Sommer, Andrew' [asommer@claytonutz.com]
**Subject**:       RE: OK...finished first cut of the LoI just now

Privilege and all that as Andrew Sommer is on this as well.

Stefan knows my history with Bitcoin from March 2009 on.

Calvin and Jim know late.

Under US law, the maximum timeframe for prosecution is 7 years. eGold and others such as Liberty Reserve have been indicted for illegal money operations.
Basically, the times are:

Jan 2009          Started mining, code used.
March 2011        Moved funds into Trust and BTC overseas.

The US would love to take me down and use this as a means to control BTC. After April 2018 this becomes difficult. After 2020, the trust ends and I have unfettered control of the BTC I own ongoing.

They could accept BTC as a form of currency now, esp if US VCs are the large players, but they would piece what I am doing together with my background and understand the bigger picture of authentication and peer encryption.

I will have this completed in under 2 years if I can focus on the tech and not have to fight all the time. After that, there is no way to stop what I am doing. Money and choice will be personal decisions. The Internet will be un filterable by governments and gaming and other moral choices will be left to the individual. It will stop any form of centralised prohibition.

The wallets I am using for escrow are all tagged.

I do not believe that I can spend them now without people knowing who I am and this would make my life difficult. Hal Finley's wife Fran and family have been getting death threats. If I come out now, I would not be able to focus on finishing the solutions.

So, in time I will have a lot of money either way, but if the US indicted me this would not mean a lot. Australia is very good at sending Australians to the US.

Craig

---

**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 11:40 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews; 'Sommer, Andrew'
**Subject:** Re: OK...finished first cut of the LoI just now

Can we have a list of all things like this for us to review.

Thanks,

C...

CONFIDENTIAL                                                                    DEF_01674223

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 6:37 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>, "'Sommer, Andrew'" <asommer@claytonutz.com>
**Subject:** RE: OK...finished first cut of the LoI just now

The last on HWPE.
Hotwire Preemptive Intelligence.

The company under a deed of company arrangement is owed $5.4 million from the ATO.

The amount to close this off and retake control should be around 300k max. This means we have all the IP in that entity without any future arguments.

The 5.4 million will return the company to us in time, but it is under the external control of an accounting firm until we close off their fees.

If the 5.4 million goes into their control now, we will have to wait as they check all the claims and do all they can to maximise their billing.

Basically, they will milk the company for all they can and are likely to run up a bill over  million dollars.

So, they have us over  barrel. We either give them money now and remove them or when they learn what the control in detail, the milk us for as much as they can


**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 10:11 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews
**Subject:** Re: OK...finished first cut of the LoI just now

Good.  Its a sunny Friday afternoon here so we will be heading out for dinner in  a bit...but we are going to be here another hour or so and would like to see this spread sheet.

C....

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 5:08 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>
**Subject:** RE: OK...finished first cut of the LoI just now

Thanks,
I am doing up a spreadsheet now.

I will do min as well as what makes it move faster as separate lines.

CONFIDENTIAL

**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 10:07 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews
**Subject:** Re: OK...finished first cut of the LoI just now

LoI should be here in one hour.

C...

---

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 5:04 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>
**Subject:** RE: OK...finished first cut of the LoI just now

I will send it to you in 15 mins

I can make the tech work :)

That is the easy part.

DEF_01674225

| Line item. | July | August | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Total. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Staff (Misc inc Payroll tax) | $15,000.00 | $22,500.00 | $25,000.00 | $26,250.00 | $27,500.00 | $30,000.00 | $30,000.00 | $32,500.00 | $40,000.00 | $40,000.00 | $45,000.00 | $45,000.00 | $378,750.00 |
| Employee Salaries and Commissions | $120,000.00 | $180,000.00 | $200,000.00 | $210,000.00 | $220,000.00 | $240,000.00 | $240,000.00 | $260,000.00 | $320,000.00 | $320,000.00 | $360,000.00 | $360,000.00 | $3,030,000.00 |
| Staff Advertising (New ppl) | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $6,000.00 |
| Building Down Payment | | | | | $90,000.00 | | | | | | | | $90,000.00 |
| Building Improvements/Remodeling | | | | | | $30,000.00 | | | | | | | $30,000.00 |
| Business Cards/Stationery | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $500.00 | $50.00 | $500.00 | $5,550.00 |
| Business Entity (Company Secretarial) | | | | | | | | | | | | | $0.00 |
| Business Licenses/Permits | | | | | | | | | | | | | $0.00 |
| Computer Hardware/Software | $45,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $200,000.00 |
| Decorating | | | | | | | | | | | | | $0.00 |
| Franchise Start Up Fees | | | | | | | | | | | | | $0.00 |
| Internet Setup Deposit | | | | | | | | | | | | | $0.00 |
| Lease Security Deposit | | | | | | | -$87,000.00 | | | | | | -$87,000.00 |
| Legal/Professional Fees | | | | | | | | | | | | | $0.00 |
| Machines & Equipment | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $9,000.00 |
| Office Furniture/Fixtures | | | | | | | | | | | | | $0.00 |
| Operating Cash (Working Capital) | $100,000.00 | | | | | | | | | | | | $100,000.00 |
| Point of Sale Hardware/Software | | | | | | | | | | | | | $0.00 |
| Prepaid Insurance | $15,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $20,000.00 |
| Public Utilities Deposits | | | | | | | | | | | | | $0.00 |
| Reserve for Contingencies | | | | | | | | | | | | | $0.00 |
| Security System Installation | | | | | | | | | | | | | $0.00 |
| Setup, installation and consulting fees | | | | | | | | | | | | | $0.00 |
| Signage | | | | | | | | | | | | | $0.00 |
| Starting Inventory | | | | | | | | | | | | | $0.00 |
| Telephone | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $18,000.00 |
| Tools & Supplies | | | | | | | | | | | | | $0.00 |
| Travel | $20,000.00 | $30,000.00 | $20,000.00 | $20,000.00 | $30,000.00 | $20,000.00 | $30,000.00 | $20,000.00 | $30,000.00 | $20,000.00 | $30,000.00 | $20,000.00 | $290,000.00 |
| Truck & Vehicle | | | | | | | | | | | | | $0.00 |
| **Total Costs** | $318,250.00 | $265,750.00 | $278,250.00 | $289,500.00 | $400,750.00 | $328,250.00 | $226,250.00 | $320,750.00 | $398,250.00 | $388,250.00 | $442,800.00 | $433,250.00 | $4,090,300.00 |
| | | | | | | | | | | | | | |
| Equipment Lease Payments | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $750.00 | $9,000.00 |
| Inventory, raw materials, parts | | | | | | | | | | | | | $0.00 |
| Internet Connection | $1,200.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $17,700.00 |
| Loan and Credit Card Interest & Principal | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $30,000.00 |
| Legal/Accounting Fees | | | | | | | | | | | | | $0.00 |
| Merchant Account Fees | | | | | | | | | | | | | $0.00 |
| Miscellaneous Expenses | | | | | | | | | | | | | $0.00 |
| Mortgage Payments | | | | | | | | | | | | | $0.00 |
| Lease Payment | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $15,500.00 | $186,000.00 |
| Postage/Shipping Costs | $75.00 | | | | | | | | | | | | $75.00 |
| Security System Monthly Payment | $200.00 | | | | | | | | | | | | $200.00 |
| Supplies | $300.00 | | | | | | | | | | | | $300.00 |
| Public Utilities | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $15,000.00 | $180,000.00 |
| Website Hosting/Maintenance | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $600.00 |
| Other 1 (specify) | | | | | | | | | | | | | |
| Other 2 (specify) | | | | | | | | | | | | | |
| **Total other** | $35,575.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $35,300.00 | $423,875.00 |

**Other options:**

| | | |
|---|---|---|
| Pay out former director | $300,000.00 | of this we get 45% back so a total over time of 165000 |
| | | This payment is not essential now, but makes it all cleaner. |
| HWPE | $300,000.00 | We have a deed of company arrangement on one of the early companies. Removing this makes any future dispute unlikely and removes risk. We need to pay it in time. |

P-219
Case No. 9:18-CV-89176-BB

| | | |
|---|---|---|
| Accounting | $250,000.00 | This sets everthing up cleanly and removes ongoing issues. |
| Lawyers | $1,200,000.00 | Ongoing and past debts |
| | | |
| Total costs | $4,090,300.00 | |
| Total other | $423,875.00 | |
| | | |
| Total 2015-2016 | $6,564,175.00 | |

**P-219**

Case No. 9:18-CV-89176-BB

**From**:         c [c@wyno.ca]
**Sent**:         6/22/2015 8:15:41 AM
**To**:           Robert MacGregor [rmacgregor@tyche.co.uk]
**CC**:           Craig S Wright [craig.wright@hotwirepe.com]; JLP [jlp@wyno.ca]; Stefan Matthews [smatthews@sterling.ph]
**Subject**:      FW: OK...finished first cut of the LoI just now
**Attachments**:  Budget.xlsx; Summary of issues and position.docx


How much money would we have to pay this week to keep the key staff around for another month so that we do this properly?

I am looping Rob into this as we really do need his advice on all of this.    It is my gut instinct in reading this that we should pay the key staff and you to move to Scotland where we set up a clandestine R&D that is not disclosed to the world unless and until we are ready.  We then clean up all the rest of the stuff in Auz in a precise measured and unhurried way so that we get it all right.   I do not think we should be wasting much energy fighting the Australian tax department.

I am thinking we need the Development out of the existing environment entirely and immediately.

C...


---

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 9:36 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>, "'Sommer, Andrew'" <asommer@claytonutz.com>
**Subject:** RE: OK...finished first cut of the LoI just now

The spreadsheet and the summary of issues are attached.

**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 11:45 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews; 'Sommer, Andrew'
**Subject:** Re: OK...finished first cut of the LoI just now

We need everything in nice clean lists or spread sheets so its easy to digest.  The easier you make this for us to understand the faster we can move.

C...

---

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 6:41 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>, "'Sommer, Andrew'" <asommer@claytonutz.com>
**Subject:** RE: OK...finished first cut of the LoI just now

I will add more explanation of the past however.

**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 11:40 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews; 'Sommer, Andrew'
**Subject:** Re: OK...finished first cut of the LoI just now

Can we have a list of all things like this for us to review.

Thanks,

C...

---

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 6:37 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>, "'Sommer, Andrew'" <asommer@claytonutz.com>
**Subject:** RE: OK...finished first cut of the LoI just now

The last on HWPE.
Hotwire Preemptive Intelligence.

The company under a deed of company arrangement is owed $5.4 million from the ATO.

The amount to close this off and retake control should be around 300k max. This means we have all the IP in that entity without any future arguments.

The 5.4 million will return the company to us in time, but it is under the external control of an accounting firm until we close off their fees.

If the 5.4 million goes into their control now, we will have to wait as they check all the claims and do all they can to maximise their billing.

Basically, they will milk the company for all they can and are likely to run up a bill over million dollars.

So, they have us over barrel. We either give them money now and remove them or when they learn what the control in detail, the milk us for as much as they can

---

**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 10:11 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews
**Subject:** Re: OK...finished first cut of the LoI just now

Good.  Its a sunny Friday afternoon here so we will be heading out for dinner in  a bit...but we are going to be here another hour or so and would like to see this spread sheet.

C....

CONFIDENTIAL

DEFAUS_01581819

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 5:08 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>
**Subject:** RE: OK...finished first cut of the LoI just now

Thanks,
I am doing up a spreadsheet now.

I will do min as well as what makes it move faster as separate lines.

---

**From:** c [mailto:c@wyno.ca]
**Sent:** Saturday, 20 June 2015 10:07 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews
**Subject:** Re: OK...finished first cut of the LoI just now

LoI should be here in one hour.

C...

---

**From:** Craig S Wright <craig@rcjbr.org>
**Date:** Friday, June 19, 2015 at 5:04 PM
**To:** c <c@wyno.ca>
**Cc:** Jim Philip <jlp@wyno.ca>, Stefan Matthews <smatthews@sterling.ph>
**Subject:** RE: OK...finished first cut of the LoI just now

I will send it to you in 15 mins

I can make the tech work :}

That is the easy part.

CONFIDENTIAL

DEFAUS_01581820

# PRODUCED IN NATIVE FORMAT

CONFIDENTIAL

DEFAUS_01581821

# Summary of issues and position.

With a significant cash injection - even if it is by loan secured by the BTC wallet - we can rebuild substance into the business as well as paying the lawyers off.  If the only capital we obtain is money for the base day to day expenses and for instructions allowing Clayton Utz to move forward against the ATO, it means that the companies remain in a weakened position commercially.

CONFIDENTIAL

DEFAUS_01581822

## Contents

Summary .................................................................................................................................... 3

Explanations of costs. ............................................................................................................... 4

    Pay out former director ......................................................................................................... 4

    Staff ....................................................................................................................................... 5

    Lawyers .................................................................................................................................. 6

    Hotwire Pre-Emptive Intelligence. (HWPE) ......................................................................... 7

    Accounting ............................................................................................................................ 8

    Australian Tax Office (ATO) ................................................................................................... 9

    Commercial Strength of Company ........................................................................................ 9

CONFIDENTIAL

DEFAUS_01581823

## Summary

What I am seeking to do is have the entity as clean and polished as I can before we start going forth. I do not want to have challenges to any IP later on when things start to get big.

I want to remove any ownership from former directors before they know what it could become, so they cannot challenge anything later.

It is also important to show the ATO (Australian Tax Office) that we are going to be strong and able to fight them. Going forth, if we can show strength, they (like all bullies) will back down. If we are only able to scrape enough together to resist and no more, they will see this as weakness and will not back off.

If we can show that we have support and can argue all the points, then they are forced to settle and allow us to move forward. They will not take us on without the ability to win. If they think they have an opportunity, they will take it.

If the ATO sees nothing but strength, they will try and save face and settle.

CONFIDENTIAL

DEFAUS_01581824

## Explanations of costs.

The following is a point by point summary of the costs we face to make the ATO settle quickly and to focus on the delivery of solutions and not face administrative constraints that stop us developing.


### Pay out former director

- We have a former director who is not a part of the group any more. He has back wages of $300,000
- There are no timeframes, but he is under the R&D provisions as a carry forward cost
- If we pay this, he will no longer be a shareholder and going forward it is all cleaner
- The amount is already audited, but as he is an associate, we cannot claim the R&D amount until after he is paid.
- The rebate for this would be 45% and this comes to $135,000 rebate.
- So the overall is an upfront payment that removes him cleanly and has a longer term cost to us of $165,000


Shoaib Yousef was a director with one of the early companies.

He would wait to be paid out, but there are a few reasons for doing this as soon as possible.

1. We lock in the amount from R&D and hence long term the overall cost is lower.
2. Removing him amicably now means that he cannot come back for a large slice later. The shares he has do not offer control of the companies, but I also do not want to have a former founder come back and argue more later (such as what was done in Facebook).
3. The ATO have argued that there is no intention to pay him out and it was a sham (though we have no benefit unless he is paid). So, this adds strength to the argument that we are an enterprise and removes one arm of the argument made by the ATO.

CONFIDENTIAL

DEFAUS_01581825

Staff

We have staff who have been on the edge for over 18 months now.

Allan in particular has been getting other offers and he knows the R&D inside out. The loss of key personal would be damaging. His wife is close to a nervous breakdown from the stress of her own job and the rollercoaster that has been the last 18 months combined.

They trust and believe in me as I do not lie to them as others have. They need to know we have a firm deal that is not just a small sum if I am to keep them.

I risk losing him and others if I cannot have a long term plan very soon.

CONFIDENTIAL

DEFAUS_01581826

Lawyers

The ATO have argued the lack of enterprise and have also held amounts associated with the GST (Vat) against the payments to the lawyers.

So, I have been billed by Clayton Utz, but the amounts are outstanding. The ATO are arguing that I am not going to pay and am not able to pay the existing legal bills. It is their argument that I cannot without money from the tax return and though this is a terrible argument, it is one they are twisting.

In paying the lawyers, we do not just have the full support going forth, but also remove several arguments that the Tax office are using. If the amount is paid to Clayton Utz, then not only does Andrew get the support of other partners in the firm, but the argument that the Tax office have made that I am not intending to pay this other than though structuring tax returns is removed.

Without this argument, they lose many of the issues that they have been trying to attack me on and a fast settlement becomes more likely.

Andrew and his team are a part of Clayton Utz, but if we have the full force of the firm on this, then it is less likely to be drawn out and a fast settlement with the ATO could ensue.

If the accounting people in Clayton Utz reverse and write-off the bills, then the ATO can attack me on having claimed amounts that I never intended to pay. As Andrew knows, I do always pay, even when severely delayed, but this is not his call to make. If this occurs, I am left with a claim for GST (that I am legally meant to have lodged at the time) that I need to reverse. It is likely that the ATO will argue that this means I am "reckless" and seek penalties on this basis.

Clayton Utz managed the payment for the updates and power for the current year and they are a key step in having the R&D payment for the next year come through cleanly.

This amount is a return of $10 million all up and if we have this worked out cleanly, we can have the money in the current year EVEN if we are fighting the larger amount and did not manage to settle.

CONFIDENTIAL

DEFAUS_01581827

Hotwire Pre-Emptive Intelligence. (HWPE)
- The ATO have caused us pain and grief for several years now.
- One of the earlier companies is in a deed of company arrangement.
- By paying out any ongoing debt, we remove any challenges to the IP. Some was developed in this entity.

In March 2013, Mt Gox was placed into bankruptcy following a suspected fraud. This was nothing to do with us other than that we had been using Mt Gox to exchange Bitcoin into AUD. We had a little over AUD $4 million in account. The need to protect and secure the IP resulted in us placing the company that was employing the majority of staff into Administration and then a deed of company arrangement.

The company under a deed of company arrangement is owed $5.4 million from the ATO.

The amount to close this off and retake control should be around 300k max. This means we have all the IP in that entity without any future arguments. The 5.4 million will return the company to us in time, but it is under the external control of an accounting firm until we close off their fees.

If the 5.4 million goes into their control now, we will have to wait as they check all the claims and do all they can to maximise their billing. This is a part of the problem we got into. Basically, they will milk the company for all they can and are likely to run up a bill over million dollars.

So, they have us over a barrel. We either give them money now and remove them or when they learn what the control in detail, the milk us for as much as they can.

The ATO have been in the wings for some time. The collapse of Mt Gox and the loss of immediate funds was the first real salvo they offered. They prey on weakness and the lack of our ability to fight them lead to the series of battles we are in and the argument for not being an enterprise.

CONFIDENTIAL

DEFAUS_01581828

Accounting

- We have around $10,000,000 more due for this year and the claim we are lodging in July 2015 for this current tax year
- The lawyers would manage this so that any errors are fixed under privilege, leaving nothing that the ATO could use against us going forward.
- It is not just to have the accounts audited, but also to have them cleaned up and structured in such a manner that the ATO cannot reasonably hold up anything going forth.
- Basically this will be so we can obtain the funds and structure payments with some level of confidence going forward.
- The $250,000 covers having the accounts cleaned going forth and also closed so that we can move on without going into all the deals I did to make this happen.
- That is, we have the books spotless but from this point on. In getting to where I am now, I have dealt with organisations such as Liberty Reserve as there was nothing else a few years back that could move large amounts of value in Bitcoin.

The focus here is to have everything sound and error free. Not even immaterial errors as the ATO take errors of 1% in OUR FAVOR and use these against us. We have already faced attack for under-claiming as ridiculous as that is.

CONFIDENTIAL

DEFAUS_01581829

## Australian Tax Office (ATO)

As noted from the above, the ATO has used the attack that we are small, unlikely to receive funds and hence are unable to pay the future costs.

They have an attack that is based on showing we are not commercial.

A show of strength is the fastest means to make them back away and to settle.

If we pay the lawyers out, Andrew can approach the Commissioner and other top people in the tax office and force a settlement. He can do this if we have paid them as the arguments that the ATO have based their attack on fall apart if we can show strength.

Right now, even if we have them settle, they will just start other attacks against myself personally, in which case, I am not working on the technology.

## Commercial Strength of Company

If we can show a means to move forward, I can first and foremost hand off the day to day administrative tasks and start working on the technical aspects that we need to address. These will allow us to:

- Commercialise the code and APIs
- Start filing patents
- Issue papers that show the flaws in Ripple
- Respond to the issues with 51% attacks and other areas that are not flaws and strengthen Bitcoin

CONFIDENTIAL

DEFAUS_01581830

CONFIDENTIAL

DEFAUS_01581831

**P-223**

Case No. 9:18-CV-89176-BB

**From:** Craig S Wright
**Sent:** Wednesday, June 24, 2015 9:27 AM
**To:** Ramona Watts
**Subject:** FW: Transcript and Meeting Minutes [DLM=Sensitive]
**Attachments:** 20140226 Meeting Minutes.pdf

SysUserProp: 88334F2CCA0D8E51C8530404366F9B82

Page 10
The 11 page doc

20140226 MM.pdf

The term Chords is used - this is "cores"

This is in the 2013/2014 year.

I missed this as they transcribed CORES as CHORDS.

This is proof we did not make up the SGI, we had it in the earlier time.

-----Original Message-----
From: Miller, Andrew [mailto:Andrew.Miller@ato.gov.au]
Sent: Thursday, 6 March 2014 10:50 AM
To: John Chesher
Cc: Trinh, Jenifer; McMaster, Des
Subject: Transcript and Meeting Minutes [DLM=Sensitive]

John,

For your reference, I have attached the transcript of your meeting with us on 18 February 2014. It has been transcribed from the recording by Auscript.

Also, please see attached, the minutes of our meeting on 26 February 2014. Could you please review these and advise of any errors or omissions. If you are satisfied that the minutes are an accurate reflection of the discussion, please advise as such.


Thanks and regards,


Andrew Miller
Auditor | Indirect Tax
Australian Taxation Office
Phone: (02) 9354 6379 | Mobile: 0401 684 338
Facsimile: (02) 6225 0929
ATO | Working for all Australians


********************************************************************
IMPORTANT
The information transmitted is for the use of the intended recipient only and may contain confidential and/or legally privileged material. Any review, re-transmission, disclosure, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited and may result in severe penalties. If you have received this e-mail in error please notify the Privacy Hotline of the Australian Taxation Office, telephone 13 2869 and delete all copies of this transmission together with any attachments.
********************************************************************

DEF_00052514

*DLM = Sensitive – when completed*

# Record of client contact

☐ **Interview**          ☐ **Telephone call**          ☑ **Other meeting**

| | |
|---|---|
| **Person/s Interviewed** | Authorised contact, John Chesher<br>Bookkeeper, Ann Wrightson |
| **Representatives for the ATO** | Andrew Miller and Jenifer Trinh |
| **Date:**<br>**Location:** | 26 February 2014<br>Interview Room 1, ATO Parramatta Office<br>2-12 Macquarie Street<br>Parramatta NSW 2150 |
| **Start time:**<br>**End time:** | 1:00PM<br>2:50PM |

*Important: Interview notes are an important part in gathering evidence to support your decisions. Consider the following issues and ensure an accurate and contemporaneous record is kept.*

**Contact summary:**

**<u>Purpose of the contact</u>**
Meeting was for John Chesher to explain workings in the revised activity statements sent to the ATO on 25 February 2014

**<u>Issues Discussed:</u>**

1. Craig Wright
2. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)
3. The Trustee for the Wright Family Trust (DeMorgan)
4. Coin-Exch Pty. Ltd. (Coin-Exch)
5. Cloudcroft Pty. Ltd. (Cloudcroft)
6. Strasan Pty Ltd (Strasan)
7. Pholus Pty. Ltd. (Pholus)

**Record of Conversation:**

ATO auditor, Andrew Miller (AM) brought authorised contact (John Chesher) and bookkeeper, Ann Wrightson (AW) into Interview Room 1 at 1:00pm on 26 February 2013.  AM and ATO auditor, Jenifer Trinh (JT) then introduced themselves to JC and AW.

After the introduction, the meeting commenced. To the best of my recollection, and

1

based on notes I made during the meeting, the conversation was as follows:

**JC:** Have you been able to have a chance to look at the briefing report sent earlier today?

**AM:** I did have a chance to look at the briefing before the meeting. I will be holding a meeting with Marina Dolevski and Hoa Do tomorrow and will raise the issues raised in the briefing at the meeting.

**JC:** We have gone through various stages of how the Bitcoins are viewed. We have gotten our legal adviser, Andrew Sommer to have a final look at it and he has advised us that our previous treatment of the Bitcoins was incorrect and that it should have been treated as an assignment of right of Bitcoins as no Bitcoins were actually physically exchanged between the related entities.

**AM:** I have had a brief look into the revised activity statements sent by you yesterday. Our meeting today is an opportunity for you to walk through the revisions made on the activity statements for the various entities.

**JC:** There is not much difference between the revised activity statements and the original activity statements. Initially, we treated the Bitcoins as money. Now, we will be treating them as an assignment of right of Bitcoins. The outcome to the ATO would not be much different. The focus on the audits should be on the external transaction, that is, the transactions made with MJF Consulting Pty Ltd (MJF).

**AM:** We will first start with the GST worksheet provided for Craig Wright himself. *AM then shows JC a relationship map titled 'Other Observations'.* This is my understanding of the relationship amongst the related entities. I may be making changes to it or adding things to the current diagram during the meeting. I can give you a copy of this as well.

*JC looks at the diagram and points at Craig Wright on the diagram.*

**JC:** This all starts with Craig Wright. Craig Wright started all this in 2009 when he started mining Bitcoins. There was a previous GST audit conducted on Craig Wright. The audit was in relation to transactions that occurred relating to Intellectual Property. The auditor took an adverse view. The auditor and Craig Wright had a difference of personality. The outcome of the audit resulted in allowable deductions and GST acquisitions revised to nil. Craig Wright couldn't save the two entities. We took the audits to objection but the objection officer agreed with the auditor. The decision was upheld in objections. We then took the matter to the AAT and the court allowed some of the deductions. The audit resulted in liabilities being raised and your debt department was onto us immediately. However, the AAT decision changed this. From owing the ATO hundreds of thousands, we were now allowed a net loss to be carried forward to future years.

We were apprehensive about director Des McMaster's involvement with the current audits due to his past involvement with the previous GST audit.

**AM:** That shouldn't be a problem. I am the auditor conducting the audit, not Des.

**JC:** We understand. Craig Wright took the Bitcoins that he had mined offshore. At the time, it was worth 3-4 cents. The total value of this was around $5000. He then started up W&K Info Defense LLC (W&K) with Mr Dave Kleiman. W&K was an entity created for the purpose of mining Bitcoins. Craig Wright is a forensic computer expert. He is constantly updating himself attending courses, workshops and training sessions. He is also a university lecturer at Charles Sturt University and conducts courses. He even provides services to some Australian government agencies including the ATO and the Defence Force. However, this is all done on a very high level.

2

DEF_00052516

Craig Wright had mined a lot of Bitcoins. Craig then took the Bitcoins and put them into a Seychelles Trust. A bit of it was also put into Singapore. This was run out of an entity from the UK. Craig had gotten approximately 1.1 million Bitcoins. There was a point in time, when he had around 10% of all the Bitcoins out there. Mr Kleiman would have had a similar amount. However, Mr Kleiman passed away during that time. He was a war veteran; he was wheel chair bound.

The deed between Craig Wright and W&K was created in 2012. W&K gave Craig Wrights rights to the Bitcoins and he has used the Bitcoins to do all this stuff.

Mr Kleiman and Craig Wright decided to start up W&K because they both wanted to get involved with Bitcoins. They recognised that this industry was not regulated and they wanted to start up a regulated Bitcoin bank. They knew they couldn't do this in the US so they wanted to do this in Australia.

In the agreement entered into, it was stated that Strasan Pty Ltd (Strasan) was to perform the ground work and create the e-learning package for them. W&K was responsible for providing funding. It was decided that one entity will also be created to be banking front. This was basically the reason why Coin-Exch Pty. Ltd. (Coin-Exch) was created. W&K then bought all the work done by Strasan.

A deed was then entered into with Hotwire. It is noted that at the time, Strasan did not belong to Craig Wright. It was an independent entity at the time. Panopticrypt is a shareholder of Strasan. Craig had a minor shareholding in Panopticrypt Pty Ltd (Panopticrypt). He was only a minor shareholder at the time and did not control have control of this entity at the time.

Strasan then got a person from the UK by the name of David Rees to create a pathway outline to go forward with the e-learning process.

Craig Wright was speaking in a conference in Melbourne. He was giving a talk about Bitcoins and mining. He was then approached by a man by the name of Mark Ferrier and that was how they met. This was how the relationship was formed. They started talking. Craig Wright told Mark Ferrier that he wanted to start up a Bitcoin bank. They then started emailing. Mark Ferrier told him that he knew someone who could help him start up the bank. This was all done in early June 2013. Everything was done very quickly- most of it was done in one weekend. Craig Wright, with the help of Mark Ferrier, agreed to purchase banking software from Al Baraka. Mark Ferrier also convinced him to purchase gold ore. He also offered Ian Ferrier's services to Mark Ferrier. Ian Ferrier is Mark Ferrier's father. Before engaging in Mark Ferrier's services, Craig Wright had conducted lots of checks on him and everything came up clean. So in essence, Craig Wright wanted the banking software and Mark Ferrier wanted Bitcoins.

Around mid-July/August, Craig Wright released funds from an entity located in the UK to MJF Consulting. This was all going through a server located in Central West Africa.

Mark Ferrier was then arrested in September 2013. Craig Wright then started to take action to protect his own rights. Your director, Des McMaster has informed us that ASIC documents show that Mark Ferrier was only put on as a director for one day. Craig Wright then contacted Pitcher Partners in Brisbane and asked them for an explanation. We found out that Mark Ferrier was never a director. The address that he had on ASIC was false as well.

Craig Wright was able to get hold of the banking software and automation system. He has everything but not the gold ore. He was expected to receive the gold ore in 2015 but now that's not happening as the gold can't be delivered. Craig Wright has also contacted Ian Ferrier. Ian Ferrier advised us that he has not spoken to Mark Ferrier for 2 years and wants nothing to do with him. We have a case against MJF Consulting with the Supreme Court of NSW and also the Federal Court. The case with the Federal Court is for deceptive conduct against Mark Ferrier

3

DEF_00052517

personally as an individual.

Due diligence was conducted on Mark Ferrier before we engaged him. We have done all we could to protect ourselves.

If you look at the transactions made, you will see that every transaction was pegged against the currency exchange rate at the time. Craig Wright has already advised you that the accounting method for this personal enterprise should be changed from cash to accruals. The accounts should be on accruals from the start of the 2013 income year. Craig Wright has previously informed the ATO of this.

We have previously been dealing with ATO officers from different sites at first, e.g. some initial work was being conducted from the Hurstville office, Brisbane office etc. But then Des McMaster made a decision for all the audits to be done from Parramatta. The audits were then being conducted by Celso. I am uncomfortable with the fact that Des McMaster is looking after these audits. We have had past dealings with him in the previous audits.

**AM:** That is why I'm coming in with a fresh pair of eyes.

**JC:** Des' judgment is tainted due to his involvement with the old audits. We don't want the current audits to be tainted by the past audits.

**AM:** Yes, I understand.

**JC:** We want to make sure that you are comfortable with all the transactions.

**AM:** We should have all the documents already provided on our systems. I have a question to ask. Were actual Bitcoins physically paid to MJF Consulting or Mark Ferrier?

**JC:** Yes. We paid Bitcoins to him. We paid the Bitcoins to where he directed for the Bitcoins to be paid into.

**AM:** Just to confirm, was it actual physical Bitcoins that was paid?

**JC:** Yes.

*JC then opened his folder and showed AM written communication between Craig Wright and Mark Ferrier. He first showed a letter dated 1 June 2013 from MJF Consulting. His second (dated 1 June 2013) and subsequent documents were email correspondence between Mark Ferrier and Craig Wright.*

**JC:** *(referring to an email correspondence between Mark Ferrier and Craig Wright)* After the deal was signed, Mark Ferrier signed the agreement. Popal *(the name was referenced in one of email correspondence between Craig Wright and Mark Ferrier showed to AM )* is the person responsible for bringing Mark Ferrier into the deal. From our correspondence and understanding of Mark Ferrier, it appears that the person behind this is much smarter than Mark Ferrier. There was a spike in the value of shares at the time from $2 to $6 in the weekend that we signed the deal. We believe that this was done intentionally. We are now dealing with Al Baraka ourselves. We are liaising with the people in Turkey. I hope that you've been able to get an understanding of how this all started now.

**AM:** I have an understanding of the background now.

**JC:** Craig Wright has a Blockchain view of this. In relation to the transactions done with Mark Ferrier, the Bitcoins left Doncaster in UK and was transferred to West Africa. Craig Wright

4

DEF_00052518

obtained the automation and banking software through Mark Ferrier. The software first goes to Craig Wright and then he transfers them into The Wright Family Trust (DeMorgan) for distribution. The banking software was transferred into Coin-Exch as this company is acting as the banking front. The automation and exchange software was transferred to Hotwire. Basically, everything goes through Craig Wright and then into the trust. The security work was performed by W&K.

In relation to the valuation of the software, Al Baraka determined the value of the software that was obtained from them. The Supreme Court of NSW determined the value of the software obtained from W&K. You should already have copies of the two Supreme Court of NSW judgments.

**AM:** When was the Supreme Court judgments made? On the invoices you provided us, they appear to be dated sometime in mid-to-late 2013?

**JC:** The W&K transactions were dated 1 September 2013. The judgments came through in November/ December 2013. There is a time difference of a few months here as Craig Wright had to demonstrate the value of the claims to the Court. He was dealing with this matter from 1 September 2013.

So essentially to sum it up, software and intellectual property were sitting in DeMorgan and was distributed out as follows:
- A third was distributed to Hotwire.
- A third went to Coin-Exch.
- A third went to Cloudcroft. Craig Wright may be the sole director of this entity at the moment but he was not the sole director at the time the company started. This company was responsible for performing security work at the time it was first established.

Most of the intellectual property and software were licensed to the three entities and not sold. The reason for this is because the licenses costs will be considered an expense and not an asset and this protects the R&D position.

Cloudcroft was actually started-up by his ex-wife, Lynn Wright. It was 100% owned by Lynn Wright at the time. They were separating at the time it started. He was dealing with clients including Hoyts in his security role. Lynn Wright had 100% ownership of the company until late 2012 when the company was put into liquidation. The liquidators decided to pursue Cloudcroft and Lynn Wright for the contract to sell from W&K to Cloudcroft. However, no deal came out of this.

Lynn Wright then went bankrupt. This was when Craig Wright took over Cloudcroft. It is possible that he may currently be the sole shareholder.

Coin-Exch is the banking front of the group and is holding the banking software.

Hotwire has the exchange and automation software and is also the R&D engine for the group. Hotwire came into existence because of the contract entered into between W&K and Strasan. It was stipulated in the contract, that a company would be created; and consequently, Hotwire was formed as a result. Hotwire is funded by a Deed of Assignment. The initial funding was by an equity distribution of rights in late July/ August.

1. **Craig Wright**

**AM:** I will start by going through the revised activity statement for Craig Wright.

**JC:** All the transactions made amongst the related entities are GST neutral. The overall GST

5

credit expected from the related entities is around $5.5 million. The sum total of the GST on the Al Baraka deal is around $5.346 million.

*(JC then looks at the revised GST ledger (sent on 25 February 2014) for Craig Wright)* You can see this at the bottom of page 3 and top of page 4 of the GST ledger. The total amount as stated on page 4 is $5.376 million.

**AM:** The original activity statement lodged for Craig Wright resulted in a GST payable amount of $2.3 million. The new revised activity statement results in an increased payable amount of around $4.2 million. Just to clarify, do you want this to be amended on our systems? Or are you just putting forward these figures for us to consider?

**JC:** I want you to revise the activity statements for us. The process for us to change the accounting method from cash to accruals and then to request a new activity statement to be generated on our system is just too complicated. We were not able to change to accruals on the Portal and we already requested many times for this to be changed to accruals. However, at the moment, the accounting method is still cash on your system.

**AM:** To confirm, the new revised statement is on accruals basis?

**JC:** Yes, it's on accruals. We have previously advised of this before. Craig Wright has been asking for this consistently.

You should also note that I have only come on board after October/November 2013. Jamie Wilson was previously responsible for the accounts for the entities. Jamie was responsible for introducing Xero. His role fell apart around October 2013 due to his personal situation. His spouse fell sick and then they decided to separate.

**AM:** I had a quick look at the revised activity statements. It looks like the main difference between the two is that there is now an additional $31 million included under the accruals method. In the current statement, there are two lots of income received from DeMorgan of $34.1 million each. The cash version only showed one lot of $34.1 million. Why is there an additional sale made to DeMorgan in the current statement?

**JC:** *(JC checks this on his laptop for a few moments.)* I believe this is in relation to the international payments made. Those were external payments made. It came in externally and went out externally.

## 2. <u>The Trustee for Wright Family Trust (DeMorgan)</u>

**AM:** Let's move on to the second entity, The Trustee for Wright Family Trust (DeMorgan). Who is the trustee of the trust?

**JC:** I think it may be Panopticrypt or Craig Wright himself. I'm not uncertain of this though. I will get back to you on this.

**AM:** No changes were made from the original activity statement. There is nothing to discuss on this one.

## 3. <u>Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)</u>

**AM:** I'll move onto Hotwire now. The combined total of G10 and G11 has decreased. The end result is a slight increase in refund.

6

**JC:** *(JC checks this on his laptop for a few moments.)* This is for minor expenses, like general expenses. These were previously sitting in GST-free. We have moved all the computer equipment of the group to Pholus Pty. Ltd. (Pholus). Pholus will be providing the funding for the IT services. We initially went to the bank to get a lease. But the bank told us that they will give us $90,000 in return for $90,000. If we give them $90,000.00, they will lend us $90,000. That didn't make sense to me. We didn't get a lease from them. We are currently setting up Pholus to do the IT side of things. Our next task is to move the assets to Pholus. The leasing expenses for the equipment will be treated as a liability.

**AM:** There were four invoices issued from DeMorgan to Hotwire on the same day. Just out of curiosity, why was it separated into four tax invoices? The payments made added up to approximately $37 million. It was for tax invoices numbered 1, 2, 3 and 4.

**JC:** *(checks laptop for a few moments)* This is because they obtained a three year licence for the intellectual property. It was $10 million per annum. One tax invoice is for payment for the current year and the other two are prepaid payments made. They moved in as a lump. For the R&D side of things, it is considered to be a prepayment. A similar situation has occurred in Coin-Exch as well.

### 4. <u>Coin-Exch Pty. Ltd. (Coin-Exch)</u>

**AM:** We will now move on to Coin-Exch. The revised calculation shows a significant increase in capital purchases of $21.8 million. This is marked as a GST-free capital expense for Bitcoin Assignment. However, there is no change in the overall GST refund as the new $21.8 million is marked as GST-free.

**JC:** That is an assignment of right. It reflects the Bitcoin assignment made.

**AM:** Did Craig Wright make a Bitcoin right assignment to Coin-Exch?

**JC:** Yes.

**AM:** What was this in exchange for? If Craig Wright made an assignment to Coin-Exch, what did he get back in return?

**JC:** Let me check this. *(JC checks this on his laptop)*

**AM:** Could this be for the IP Licence obtained from DeMorgan?

**JC:** So what happened is that Coin-Exch has an assignment of right and the corresponding transaction made against it is marked as a loan. It is a loan from Craig Wright for the right to use it.

**AM:** This is different to what happened to Hotwire. Was there a written agreement between Craig Wright and Hotwire for the assignment? Were they both marked as GST-free?

**JC:** Yes. They were moving through as a series of loans made. The Deed moved from the UK to Craig Wright and then he distributes this.

**AM:** The word 'loan' was not used in the briefing paper that you sent earlier today. 'Loan' and 'Rights' have different meanings.

**JC:** They are not loans, they are Assignment of Rights. I got confused as the assignment of rights is categorised as a liability and consequently, I called it a loan. But it's not actually a loan.

CONFIDENTIAL                                                                 DEF_00052521

**AM:** Okay. So to confirm, Coin-Exch acquired intellectual property from DeMorgan. The right to call BTC is then assigned to Coin-Exch?

**JC:** Yes.

**AM:** Jenifer do you have any questions to ask?

**JT:** No.

**JC:** She is too busy writing up the minutes.

**AM:** We can send you a copy of today's minutes if you like?

**JC:** Yes, that would be appreciated.

### 5. Cloudcroft Pty. Ltd. (Cloudcroft)

**AM:** We will now move onto Cloudcroft. Overall sales reported in the revised statement have decreased. The export sale on the original ledger is no longer included in the revised calculation. The previous statement showed export sales of $3.1 million. However, this does not affect the final GST amount.

**JC:** *(JC checks this on his laptop)* I have no reference on my report of this amount.

**AM:** If you go back to the original statement, you will see that there is export income of $3.1 million reported.

**JC:** That may have been a mistake. The only thing that jumps to me is the Strasan transaction which was also for $3.1 million.

**AM:** The amount is GST-free. For your record, GST refund remains the same.

**JC:** We have an entity in Singapore. The export sales may have been made to that entity.

**AM:** Was it for a sale of a software package to Singapore?

**JC:** This is possible, but I can't confirm.

### 6. Strasan Pty Ltd (Strasan)

**AM:** I have no more questions to ask in relation to Cloudcroft. I will now move on to Strasan. You provided us revised GST ledgers for the tax periods ended 30 June 2013 and 30 September 2013. However, I noticed just before the meeting that the two PDF documents are the same.

**JC:** I must have forgotten to change the header. I will send this to you again. Nothing happened in the first quarter of 2014 except for sales.

**AM:** As I only have the revised June 2013 quarter, I will just be asking questions in relation to that. I can see that the sales have been reduced to $nil.

**JC:** *(Checks his laptop)* This was for payment to Strasan from Hotwire for work performed. They issued a Deed of Assignment at the end of June 2013. It was paid out of the wallets given to you in July/August.

8

DEF_00052522

**AM:** Who were the expenses incurred to? Was it Hotwire or Craig Wright?

**JC:** Strasan got the benefit of 'DeMorgan Info Security Services' which was otherwise known as DISS. This entity does not exist anymore. Craig Wright was involved with this entity in early 2000s. DeMorgan is Craig Wright's grandmother's name. The company created a bunch of stuff. Craig had a dispute with the director and then got out even though he had 75% of the shareholding. They ended up stripping the company. Craig Wright then had a ten year court case against DISS and had legal fees incurred for the ten years. A judgement made in Court assigned the right of 4 projects to Craig Wright and Strasan got the benefit of the 4 different projects.

**AM:** In relation to the expenses reported, which entity is responsible for reporting the corresponding sales made for the June 2013 quarter?

**JC:** Strasan was working for Hotwire and received payment which was the Right of Assignment of $3.8 million.

**AM:** There is no income reported by Strasan in the revised statement. There were $5.3 million in sales reported in the original statement. The revised BAS has no sales but does have expenses.

**JC:** That's odd. I have the $5.3 million in sales on the laptop as well. This amount is not part of the GST audit so it must be GST-free. The amount was for export sales made.

**AM:** It would most likely be a G2 amount then.

*JC then shows AM the laptop screen.*

**JC:** This amount shows up as an export sale made. I will need to get back to you on this. In August, there was an invoice with a due date for payment as 30 October 2013. There was another amount to Hotwire but that was for the previous year. In the fourth quarter in 2013, there was a sale amount made of $3.2 million. There should be a corresponding amount in June for Hotwire for $3.2 million.

**AM:** In the original statement lodged, there was a GST-free amount of $5.3 million reported. The description provided for the transaction is 'Dallah Group (INV-0001)'.

*JC then checks this on his laptop.*

**JC:** That invoice was voided. *(JC then shows AM the invoice on the laptop.)* This was entered into the wrong entity. See the bottom note made here, it states that the invoice has been voided. Dallah has nothing to do with Strasan. You will see the transaction in another entity. It would be in either Coin-Exch or Hotwire.

**AM:** Let's have a look now. *(AM then looks at the revised statements provided for Hotwire and Coin-Exch.)* It doesn't appear to be in Hotwire or Coin-Exch.

**JC:** It was voided in November 2013 because it didn't exist and there was no Dallah at that point in time. Micropayment system was part of the stuff that came in. It if went anywhere, it would have gone to Coin-Exch or Hotwire. We are looking to do micropayments in Bitcoins. The micropayment system allows people to buy fractions of a Bitcoin. The smallest fraction is a satoshi. The micropayment system was about half the value of the software package.

CONFIDENTIAL

DEF_00052523

### 7. Pholus Pty Ltd (Pholus)

**AM:** Now, we'll be moving onto the final entity, which is Pholus. Sales and export sales made have remained the same. Export purchase reported in original statement of $2.3 million has now decreased to nil. G10 was originally $2.3 million and has been revised to nil. The reverse has occurred for label G11. The amount reported was originally nil and has been revised to $2.3 million. The description provided is 'university software- install system design and deployment'.

**JC:** We had a bunch of chords as inventory. There are around a thousand of them. We moved them to Pholus as part of their inventory. These chords are similar to CPUs. Each chord is a data miner. We changed it from G10 to G11 as they are inventory and should have been classified as a non-capital purchase instead of a capital purchase as they are not capital. The other stuff reported was for accounting and consulting services.

**AM:** That's all the questions I have. Do you have any questions to ask Jenifer?

**JT:** No.

**JC:** After the meeting, we will get back to you on the following:
- Who the shareholders of Cloudcroft are;
- Clarification of the loan or rights issue;
- The discrepancy identified in relation to the Dallah Group invoice;
- The anomalies not appearing in Coin-Exch or Hotwire; and
- Who the trustee of DeMorgan is.

You should have the backup for everything with you. You can see that the fundamental issue is the external transaction made with MJF Consulting.

**AM:** I will be having a discussion tomorrow with our AC, Marina Dolevski and Hoa Do in relation to the Assignment of Rights. I am happy to relay the outcome back to you after the meeting.

**JC:** That would be much appreciated if you could do so. Craig Wright has been moving stuff around but if you look at in holistically, he isn't moving anything around at all. The only external transaction is with MJF Consulting and to David Rees. The transaction with David Rees was GST-free as it was for educational stuff.

So, what's next from here?

**AM:** I can't say at the moment. This will be dependent on the meeting to be held tomorrow. We will make a decision as to how to go forth from there.

**JC:** There is an amount coming our way. We want to propose receiving 20% of this amount first. I will be putting this forth to Marina. If this is not a reality, we will have further discussions but if it is, we want it released immediately. We have spent a lot of money during this process and we need the funds to ease our cash flow. The Bitcoin industry is very volatile and there is no clear picture as to the future. Our bank options are limited. Everything we have been doing is legitimate. If you were able to come out to our premise today to hold the meeting, you would have seen 40 to 50 people working out there. We have lots of activity happening at the moment. $5 million does make a difference. We need to recover the money already spent.

**AM:** I can't comment on this. This discussion is best held with Marina Dolevski.

**JC:** We need to be back in a position of control.

CONFIDENTIAL

**AM:** I will be having a meeting with Marina and Hoa Do tomorrow at 2pm. I will let you know of the outcome of tomorrow's meeting.

*AM then thanked JC and AW for their time.*

Meeting concluded at 2:50pm.

**Include reference/hyperlink to main documents relied upon:**

Relationship_Diagram_No_Markings
Relationship_Diagram_with_Markings


**Author's name: Jenifer Trinh**
**Date of document:   27 February 2014**
_____

11

DEF_00052525

P-229

Case No. 9:18-CV-89176-BB

**From:** Robert MacGregor
**Sent:** Monday, June 29, 2015 5:13 AM
**To:** c <c@wyno.ca>; JLP <jlp@wyno.ca>; Stefan Matthews <smatthews@bodognation.com>; Craig S Wright; smathews@sterling.ph; Ramona Watts
**Subject:** Congratulations
**Attachments:** term sheet demorgan-29062015150010.pdf; term sheet a sommer-29062015145939[1].pdf

**SysUserProp:** 88334F2CCA0D8E51C8530404366F9B82

Congratulations to you all.

Initial term sheet, development agreement and bridge credit facility are now in place. Formal agreements to follow on the other elements, but there has been a meeting of the minds on all key issues, as captured in the LOI. Copies attached.

It's been a pleasure being part of the process and I have no doubt that this is the beginning of something absolutely remarkable. I'm grateful to have played my small part.

Kind regards,
Rob

## SUMMARY OF AGREED TERMS

### PHASE I – STABILIZE AND CLEAN UP

- **$1,500,000 Asset Purchase.** NewCo will purchase outright all IP and technology in deMorgan ("*Company*") and all Company subsidiaries and identified entities for $1,500,000[1]. This gets the IP out of danger and puts some capital back into the company. Standard warranties regarding validity and transferability of technology and IP. These funds should first and foremost be used to clear debts to all valid creditors in preparation for eventual subsequent wind-down.

  [Notes: This immediately gets the IP out of danger, should the ATO process not conclude as intended. This also provides the first of two significant arguments in the ATO matters, demonstrating that the development costs to date were indeed commercially viable.]

- **$4,800,000 Services Agreement.** DR TECHNOLOGIES LTD. will enter into a technology development, maintenance and consulting agreement with Company for up to two (2) years on a retainer basis at a monthly retainer rate of $200,000. This service agreement will allow us to re-hire staff and recommence development ASAP. IP and technology development done during this period will accrue under the agreement to DRTL, and development will be exclusive to DRTL.

  [Notes: Serves three purposes. Firstly, this provides a stable source of funding for the operation during this interstitial period. Secondly, by establishing a long-term client relationship such as this, the ATO cannot take the position that this is not an "enterprise". Finally, this ensures that any new IP or technology developed during this subsequent period is similarly protected and vests in DRTL]

- **$2,500,000 Convertible Loan.** NewCo issues a convertible loan for $1,500,000 AU to Company, with an option for up to 1,000,000 more. The conditions of the loan are as follows:

  - Maximum 3 year term, interest rate of 0.25% per annum
  - Unless otherwise agreed in writing with NewCo, the loan shall be used only to fund solicitor fees and disbursements associated with the ATO matters, any approved patent application preparation or filings, and any

---

[1] All amounts herein are denominated in AUD unless otherwise indicated.

DEF 00074671

consulting, etc.) can be contracted back to NewCo by way of services agreements, whether to arms-length third parties or internally by way of transfer pricing arrangements. NewCo will be initially capitalized to $1,000,000 USD by the investor, then subsequent R&D and operations will be initially funded by the payment received if the R&D claims in Company are successful or, if not, by subsequent direct cash infusion by investor.]

- **Equity in NewCo.** Upon incorporation, NewCo will immediately grant to the Wrights with 37% of issued and outstanding voting common stock. This 37% holding shall be subject to non-dilution protections and NewCo shall not issue common stock or voting stock of any kind in NewCo, unless otherwise expressly agreed in writing by the Wrights. These shares shall be held in a blind trust for the Wrights or for such holding vehicle the Wrights shall nominate until such time as Company and all subsidiaries of Company are wound up and all regulatory or tax matters have been finalized properly.

  [Notes: The intention is that, once the Australian companies are properly wound down, that the Wrights own a full 37% equity stake in this entity. Directorship appointments should be discussed, both internal and external, but this has not been canvassed here. The incremental 2% equity (from 35% to 37%) shall be made available to the Wrights to make equity in their vehicle available to key personnel or staff.]

- **$3,500,000 Rights and Services Agreement.** NewCo will enter into a direct exclusive services agreement with Craig as Chief Scientist.

  [Notes: This would consist of a $1,000,000 initial rights payment, followed by an annual services arrangement for R&D of $500,000 for five years, and renewable for subsequent periods. This would provide supplemental income to the Wrights and would cover any IP developed outside of Company, and would also grant NewCo the exclusive rights to Craig's life story for subsequent publication or release (suggest NewCo retain a researcher and ghost writer to begin background research and preparation, as precautionary measure).]

- **New Research Facility.** Going forward, set up a new company as a sub of NewCo in some favorable jurisdiction where talent is available for the R&D. This entity can employ the team as a service provider to NewCo, with the IP vesting back to NewCo.



## INTERIM FINANCING OF LEGAL PROCESS

- **Bridge Financing.** Prior to the preparation of formal agreements for the Convertible Loan above, bridge financing will be made available through FIRSTLINE CONSULTANTS LTD. This loan will be paid out immediately with the proceeds of the final Convertible Loan advances once such formal agreement is in place.

IN WITNESS WHEREOF, the parties hereto have caused this letter of intent to be signed and sealed as 29 June 2015.

**DeMORGAN LTD.**

_per_

Signature

Name   Ramona Watts

Date   29/6/15

**THE STERLING GROUP**

_per_

Signature

Name   STEFAN MATTHEWI.

Date   29 JUNE 2015

**DR CRAIG WRIGHT**

Signature

Date   29 Jun 15

CONFIDENTIAL

DEF_00074673

# SUMMARY OF AGREED TERMS

## PHASE I – STABILIZE AND CLEAN UP

- **$1,500,000 Asset Purchase.** NewCo will purchase outright all IP and technology in deMorgan ("*Company*") and all Company subsidiaries and identified entities for $1,500,000[1]. This gets the IP out of danger and puts some capital back into the company. Standard warranties regarding validity and transferability of technology and IP. These funds should first and foremost be used to clear debts to all valid creditors in preparation for eventual subsequent wind-down.

- **$4,800,000 Services Agreement.** DR TECHNOLOGIES LTD. will enter into a technology development, maintenance and consulting agreement with Company for up to two (2) years on a retainer basis at a monthly retainer rate of $200,000. This service agreement will allow us to re-hire staff and recommence development ASAP. IP and technology development done during this period will accrue under the agreement to DRTL, and development will be exclusive to DRTL.

- **$2,500,000 Convertible Loan.** NewCo issues a convertible loan for $1,500,000 AU to Company, with an option for up to 1,000,000 more. The conditions of the loan are as follows:

  o Maximum 3 year term, interest rate of 0.25% per annum

  o Unless otherwise agreed in writing with NewCo, the loan shall be used only to fund solicitor fees and disbursements associated with the ATO matters, any approved patent application preparation or filings, and any subsequent corporate clean-up, consolidation and wind-down.

  o NewCo will deposit the loan advance directly into the solicitor's trust account and NewCo shall have the authority to direct the ATO matters, including prosecution or settlement of same.

  o In consideration of the loan and as interest, 75% of any historical or future amounts recovered from the ATO (GST or R&D credits or other) shall be due to NewCo. These amounts will form the capital basis for the long-term research project (see below). If withholding tax on this interest is payable, it will not be deducted, but grossed up.

---

[1] All amounts herein are denominated in AUD unless otherwise indicated.

o NewCo will be entitled to appoint will add up to two additional directors to Company, to be identified by NewCo. Company shall effect the resignations of existing directors only as and if requested by NewCo.

o Outstanding loan may be converted to common voting stock of deMorgan at any time at the election of NewCo at a rate of 10 shares per dollar. No new classes of shares may be created, nor new shares issued in deMorgan or any subsidiary of deMorgan during the loan period.

## PHASE II - GOING FORWARD

- **NewCo.** NewCo should exist in a tax-efficient jurisdiction and is intended to be the repository for IP once the asset purchase is completed and for all new development and technology. Patents for all existing or subsequent IP should be filed by NewCo.

- **$3,500,000 Rights and Services Agreement.** NewCo will enter into a direct exclusive services agreement with Craig as Chief Scientist.

- **New Research Facility.** Going forward, set up a new company as a sub of NewCo in some favorable jurisdiction where talent is available for the R&D. This entity can employ the team as a service provider to NewCo, with the IP vesting back to NewCo.

## INTERIM FINANCING OF LEGAL PROCESS

- **Bridge Financing.** Prior to the preparation of formal agreements for the Convertible Loan above, bridge financing will be made available through FIRSTLINE CONSULTANTS LTD. This loan will be paid out immediately with the proceeds of the final Convertible Loan advances once such formal agreement is in place.



IN WITNESS WHEREOF, the parties hereto have caused this letter of intent to be signed and sealed as 29 June 2015.

**DeMORGAN LTD.**

per

Signature

Ramona waite

Name

29/6/15

Date

**THE STERLING GROUP**

per

Signature

STEFAN MATTHEWS

Name

29 JUNE 2015

Date

**DR CRAIG WRIGHT**

Signature

29 Jun 15.

Date

CONFIDENTIAL

DEF_00074676

**P-230**

Case No. 9:18-CV-89176-BB

**From**: Stefan Matthews [Stefan Matthews]
**Sent**: 7/28/2015 6:00:43 AM
**To**: Ali Lodhi; Stef Savanah; Allan Pedersen
**CC**: Craig S Wright; Ramona Watts
**Subject**: RE: Current development
**Attachments**: technical services agreement-29062015145045.pdf

Sorry, I had intended to attached the "*Research, Development and Technical Services Agreement*" to the original email, but here it is now. Thks.

---

**From:** Stefan Matthews
**Sent:** Tuesday, 28 July 2015 3:06 PM
**To:** Ali Lodhi; stef.savanah@demorgan.com.au; Allan Pedersen
**Cc:** Craig S Wright; Ramona Watts
**Subject:** Current development

Hi All,

I want to formalise a discussion that I had earlier with Allan and Stef regarding development roadmap from 1st July 2015.

On 29th June 2015 DeMorgan Ltd entered into a Research, Development and Technical Services Agreement with DR Technologies Ltd (Antigua) where all IP and technology development going forward vests in and is exclusive to DR Technologies Ltd.

Subsequently, from 1 July 2015 all works programs should be consolidated under DeMorgan Ltd and all work is for DR Technologies Ltd.

This means that for the 2015/16 year there will be no continuation of the R&D Incentive scheme and associated processes. These ended 30 June 1015. Records and documentation related to the FY 2014/15 must be completed and filed in a format intended to support R&D Incentive claims for the FY 2014/15 as it is the intent to include claims in the tax returns of the various entities when they are filed in Feb 2016.

Ali, you might like to check all inter company billing and any auto billing functions in the accounting system/s and discuss these with myself and Craig later this week to ensure we don't create incorrect charges and introduce GST issues related to incorrect billing.

Thks.

CONFIDENTIAL

# RESEARCH, DEVELOPMENT AND
# TECHNICAL SERVICES AGREEMENT

**THIS AGREEMENT** is made effective 29 June 2015 (the "*Effective Date*") by and between:

## DeMORGAN LTD.

incorporated and registered under the laws of Australia

("*Service Provider*")

- and –

## DR TECHNOLOGIES LTD.

incorporated and registered under the laws of the State of Antigua and Barbuda
with IBC Number 15003

("*Client*")

**WHEREAS** Service Provider has specialist knowledge and experience associated with the provision of certain research facilities and related software development and technical support services as may be made available from time to time during the Term (the "*Services*") and is able and willing to provide such Services to Client pursuant to the terms of this Agreement;

**AND WHEREAS** Client wishes to retain Service Provider to provide Services pursuant to the terms of this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and Agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby by each party acknowledged, the parties hereto covenant and agree as follows:

---

1.    **DEFINITIONS**

In this Agreement (which expression includes the recitals and all Schedules hereto) the following words and phrases shall, unless the context otherwise requires, have the following meanings:

1.1.    "Applicable Laws" means all laws and regulations applicable within the Jurisdiction, the Legislation, and any other laws, regulations, regulatory policies, guidelines or industry codes which apply to the provision of the Services hereunder.

1.2.    "Best Industry Practice" means the standards that an experienced provider of the Services would consider to be best practice having regard to all relevant factors.

I

DEF_01108620

1.3. "Change of Control" means a change in Control of the Service Provider.

1.4. "Commitment Period" shall have the meaning ascribed thereto in Section 3.1.

1.5. "Control" in respect of the Service Provider means the acquisition of either:

    1.5.1. the voting rights attaching to 25% or more of the voting shares in the Service Provider, or

    1.5.2. the power to direct or cause the direction and management of the policies of the Service Provider in accordance with the acquirer's wishes, whether as a result of the ownership of shares, control of the board of directors, contract or any powers conferred by the articles of association or other constitutional documents of the Service Provider.

1.6. "Confidential Information" means any and all of a Discloser's or Discloser's licensors' or affiliated companies' business, proprietary and/or technical information, data and processes, whether tangible or intangible, including, without limitation, any and all corporate information, relationships with related or third party suppliers or other entities, communications from or requirements of regulatory bodies, techniques, discoveries, inventions, processes, patents, patent applications, copyrights, copyright applications, know-how, trade secrets, system designs, client or prospect lists, industrial designs, affiliate or partner lists, and software programs, products and the like, disclosed pursuant to this Agreement or in furtherance of this Agreement.

1.7. "Data Protection Legislation" means all applicable laws and regulations relating to the processing of personal data and privacy, including where applicable all relevant guidance and applicable codes of practice.

1.8. "Discloser" means a party hereto that discloses Confidential Information to the other party in furtherance of this Agreement.

1.9. "Fees" means the fees payable the fees payable by Client to the Service Provider in accordance with Section 4 hereof.

1.10. "Intellectual Property Rights" means copyrights (including copyright applications), patent rights (including patent applications and disclosures), trade-marks (including trade-mark applications), trade secrets, Moral Rights, know-how and any other similar rights or intangible assets recognized under any law(s) or international convention(s) in any country or jurisdiction in the world where rights of ownership accrue to intellectual creations, and including all associated goodwill.

1.11. "Internal Control System", "Control System" or "ICS" means Client internal control system, comprised of the Key Policies and all other operational procedures, technical standards or SLAs relating thereto, including, without limitation, any procedures or requirements necessary to ensure compliance with Applicable Laws, as may be amended by Client from time to time in its sole and absolute discretion.

2



CONFIDENTIAL

1.12.  "Jurisdiction" means Antigua and Barbuda.

1.13.  "Key Policies" means the policies or procedural requirements implemented and revised by Client from time to time relating to its internal operations and the operations of certain suppliers, specifically including, without limitation, the policies listed in Schedule "B".

1.14.  "Legislation" means all laws and regulations applicable to the provision of Client's services to its markets or to the provision of he Services hereunder, including, without limitation, the Data Protection Legislation, as may be amended during the Term hereof.

1.15.  "Licensed IP" means the any and all Client technology, data, information, know-how or any other material of any kind provided by Client to Service Provider hereunder to enable the provision of the Services, and all related Intellectual Property Rights, expressly including the goodwill and reputation subsisting therein throughout the world.

1.16.  "Moral Rights" means the right of integrity of authorship (i.e. not to have a work subjected to derogatory treatment), the right of attribution of authorship of a work, and the right not to have authorship of a work falsely attributed, which rights are created by any applicable copyright or other legislation, or in common law.

1.17.  "Recipient" means a party hereto that receives Confidential Information from the other party in furtherance of this Agreement.

1.18.  "Renewal Period" shall have the meaning ascribed thereto in Section 3.1.

1.19.  "Services" means those requested services provider hereunder by Service Provider to Client, as generally described in Schedule "C" hereto.

1.20.  "Software" means the source code and object code of any software developed pursuant to this Agreement.

1.21.  "Term" shall have the meaning ascribed thereto in Section 3.1.

1.22.  "Work Product" means the Software and any and all concepts, data, designs, ideas, information, inventions, know-how, processes, techniques, and works of authorship or the like developed or created by Service Provider during the course of performing Services, regardless of the form of embodiment. Work Product shall include all Intellectual Property Rights therein or associated therewith.

## 2.    APPOINTMENT AND STATUS

2.1.  Appointment. Subject to the terms and conditions of this Agreement, Client hereby appoints Service Provider to provide the Services and Service Provider hereby accepts that appointment in consideration of the payment of the Fees.

3

DEF_01108622

2.2.  Non-Exclusive Agreement. Service Provider expressly acknowledges and agrees that its appointment pursuant to this Agreement is on a non-exclusive basis and Client may make such additional or alternate appointments as it sees fit from time to time before, during, or after the Term.

2.3.  Independent Contractors. Service Provider is acting as an independent contractor and not as an agent, partner, or joint venturer with Client for any purpose. Neither party shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other. Without limiting the generality of the foregoing, the Service Provider shall not:

2.3.1.  hold itself out or permit any person to hold itself out as being authorised to bind Client in any way;

2.3.2.  pledge the credit of Client in any way;

2.3.3.  engage in any conduct which contravenes any Applicable Laws or which in the opinion of Client is inconsistent with Best Industry Practice or Client's obligations under the Control System or is in any way prejudicial to Client's business interests;

2.3.4.  make or give any warranties, guarantees or representations concerning the services offered from time to time by Client; or

2.3.5.  dispute or challenge the validity of the Intellectual Property Rights or the rights of Client to the Intellectual Property Rights, or apply for the registration of any Intellectual Property Rights related in any manner to the provision of Services hereunder.

## 3.  TERM AND TERMINATION

3.1.  Term. The term of this Agreement ("*Term*") shall commence on the Effective Date of this Agreement and shall continue for a period of two (2) years from the Effective Date hereof (the "Commitment Period"), and thereafter shall automatically renew for successive one (1) year terms (each, a "Renewal Period") until terminated in accordance with the provisions hereof.

3.2.  Termination.

3.2.1.  *Upon Notice.* Either party may provide to the other party notice of termination and non-renewal of this Agreement by providing written notice thereof to the other party not less than ninety (90) days prior to the expiration of the Commitment Period or the then-current Renewal Period, as applicable.

3.2.2.  *Material Breach.* In the event that one party hereto breaches a material term of this Agreement, this Agreement may be terminated by the non-breaching party upon thirty (30) days' prior written notice to the breaching party, unless the breaching party cures such breach within the 30-day notice period. If such material breach is incapable of cure, the

4

non-breaching party may terminate the Agreement immediately upon written notice to the other party.

3.2.3. *Non-Payment.* If Client fails to pay any Fees or other amounts pursuant to this Agreement when due, this Agreement may be terminated or Services suspended by Service Provider upon forty-five (45) days' prior written notice to Client, unless Client pays such outstanding amounts within the 45-day notice period.

3.2.4. *Sustained Force Majeure Event.* This Agreement may be terminated in accordance with Section 10.2.3.

3.2.5. *Automatically.* This Agreement will terminate automatically and without further notice by either party in the event of the following:

    3.2.5.1. the Service Provider undergoes a Change of Control without Client's prior written consent, which consent may be granted or withheld in Client's sole and absolute discretion;

    3.2.5.2. Service Provider sells all or substantially all of its assets or is merged or reorganized in circumstances where it is not the surviving entity without Client's prior written consent, which consent may be granted or withheld in Client's sole and absolute discretion;

    3.2.5.3. a receiver is appointed for either party or its property;

    3.2.5.4. either party makes an assignment for the benefit of its creditors;

    3.2.5.5. any proceedings are commenced by, for, or against either party under any bankruptcy, insolvency, or debtor's relief law for the purpose of seeking a reorganization of such party's debts, and such proceeding is not dismissed within sixty (60) calendar days of its commencement; or

    3.2.5.6. either party is wound up, liquidated or dissolved.

3.2.6. *Consent.* The parties may elect to terminate this Agreement upon mutual written agreement at any time.

3.3. <u>Consequences of Termination</u>. On termination of this Agreement for any reason:

3.3.1. *Return of Confidential Information.* Service Provider shall immediately return to Client or destroy at Client's discretion all property and materials containing Confidential Information belonging to Client.

3.3.2. *Cease Provision of Services.* Service Provider shall immediately cease to provide the Services.

3.3.3. *No Claims.* To the maximum extent permitted by law, the Service Provider shall make no claim against Client for compensation for loss of agency

5

DEF_01108624

rights, loss of goodwill or any similar loss (except any earned but unpaid Fees).

3.4. <u>Vested Rights</u>. Any termination of this Agreement (howsoever occasioned) shall not affect any accrued rights or liabilities of either party, nor shall it affect the coming into force or the continuance in force of any provision of this Agreement that is expressly, or by implication, intended to come into force or continue in force on or after that termination.

3.5. <u>Termination Rights Absolute</u>.   Each party understands that the rights of termination or expiration hereunder are absolute.  Neither party shall incur any liability whatsoever for any damage, loss or expenses of any kind suffered or incurred by the other arising from or incident to any termination of this Agreement by such party or any expiration hereof which complies with the terms of the Agreement whether or not such party is aware of any such damage, loss or expenses. In particular, without in any way limiting the foregoing, neither party shall be entitled to any damages on account of prospective profits or anticipated sales arising from the termination or expiry of this Agreement in compliance with the terms set out herein.  To the extent permitted by law, the each party hereby waives the benefit of any law or regulation providing compensation to the other arising from the termination or expiry of, or failure to renew, this Agreement, and the parties hereby represent and warrant that such waiver is irrevocable and enforceable by the other party

## 4.   FINANCIAL PROVISIONS

4.1. <u>Payment of Fees.</u>

4.1.1. *Fees.*  The Fees for the licences and services to be provided under this Agreement shall be as provided on Schedule "A", which Schedule "A" may be amended by the parties from time to time during the Term by mutual written agreement.

4.1.2. *Schedule.*  Unless otherwise agreed, Client shall pay the Fees to the Service Provider monthly during the Term, as invoiced.  Payment of such Fees shall be within thirty (30) days the due date, unless otherwise agreed.

4.1.3. *Taxes.*  All amounts payable under this Agreement shall be exclusive of taxes, if any, which (if applicable) shall be paid at the rate and in the manner for the time prescribed by law.

4.2. <u>Records and Adjustments.</u>

4.2.1. *Record-Keeping.*  For the Term, and for a period of six (6) years from termination or expiry of this Agreement, the Service Provider shall maintain full records of all Fees, costs and expenses associated with and invoiced in respect of this Agreement, and the Service Provider shall keep these records available for examination by Client's authorised representatives at any time on reasonable notice from Client to the Service Provider.

6

DEF_01108625

        4.2.2.   *Adjustments.*  If, upon such above-noted examination, Client determines that any Fees, costs or expenses exceeds the amounts properly chargeable to, or recoverable from, Client, the Service Provider shall promptly refund to Client the amount of such over-charges.

## 5.   PROVISION OF SERVICES

5.1.    Provider Obligations.  The Service Provider shall:

        5.1.1.   use its best efforts to perform and provide all Services at all times during the Term and with all reasonable skill and care and in accordance with Best Industry Practice;

        5.1.2.   ensure that any and all Services provided hereunder are at all times in accordance and compliance with the Internal Control System, *mutatis mutandis*, and any updates thereto furnished by Client during the Term;

        5.1.3.   shall provide any information or reports, or attend such meetings or teleconferences, as Client may request from time to time to ensure compliance with this Agreement and with the Internal Control System, *mutatis mutandis*;

        5.1.4.   do all acts and things reasonably required by Client in order to ensure full compliance with the terms of this Agreement, the Control System and Best Industry Practice;

        5.1.5.   keep Client informed of any planned or actual technical or business developments, whether of the Service Provider or of any relevant third party, that may in the reasonable opinion of the Service Provider be likely to affect the provision of the Services; and

        5.1.6.   make its representatives available at the request of Client to attend meetings and/or conference calls with representatives of Client at such times and places as Client shall reasonably specify for the purposes of monitoring and discussing the provision of Services, or any other matter(s) arising out of this Agreement.

5.2.    Client Assistance.  The Client shall provide such documents and do all acts and things reasonably required by the Service Provider in order to ensure full compliance with the terms of this Agreement, the Applicable Laws, the Control System, and Best Industry Practice.

## 6.   SOFTWARE DEVELOPMENT

6.1.    Software and Intellectual Property.

        6.1.1.   *All Rights Reserved.*  The parties hereto agree and acknowledge that all right, title and interest in and to the Licensed IP and the Work Product

7

(including the Software) shall be and shall remain vested in Client exclusively.

6.1.2. *Residual Rights Assigned or Waived.* To the extent that, by operation of law, Service Provider is deemed to develop, hold or retain any Intellectual Property Rights in and to any Client Confidential Information, Work Product, or the Licensed IP, such rights are hereby irrevocably assigned to Client and, to the extent that any such rights are not assignable (including, without limitation, all Moral Rights or rights analogous thereto), such rights are hereby irrevocably waived by Service Provider in favour of Client, its successors and assigns in perpetuity and exclusively.

6.1.3. *Service Provider to Ensure Vesting.* The Service Provider shall ensure that all of the foregoing Intellectual Property Rights or rights in the nature of intellectual property rights created by the Service Provider or any employee, agent or subcontractor of the Service Provider in the course of performing the Services or for the purpose of performing the Services shall vest in Client absolutely upon creation.

6.2. Software Modifications.

6.2.1. *Testing.* Before issuing any New Version, the Service Provider shall test the same in order to ensure that it performs fully in accordance with its specification and/or the Technical Information, and shall:

6.2.1.1. inform the Client of successful completion of the testing, and

6.2.1.2. at the request of the Client, supply the Client with the test results.

6.2.2. *Installation and Integration.* At the Client's direction and at a time to be agreed between the Client and the Service Provider, the Service Provider shall install, integrate and test any New Version which the Client wishes to implement, and shall, if so required by the Client, assist the Client in testing the same.

6.2.3. *Acceptance/Rejection.* If the New Version fails to achieve acceptance by the Client, the Service Provider shall co-operate with the Client in decommissioning the New Version and returning the Software to its state prior to the acceptance tests, so that the Client can continue to operate the Software until a time for repeat installation, integration and testing. The Service Provider shall, without additional charge, co-operate fully with the Client in the Client's application of acceptance tests to any New Version under this paragraph. The processes set out above shall be repeated until either such New Version is accepted by the Client or, in the sole opinion of the Client, such New Version cannot achieve acceptance within a reasonable period, in which case,, the Client may reject the New Version.

6.3. Remedying Faults. The Service Provider must correct any Critical Faults as soon as reasonably possible. The Service Provider must use its best efforts to promptly

8

correct Non Critical Faults upon being notified of them and must, if necessary, issue Improvements to repair the Non Critical Fault and eliminate the adverse effects of such non-conformity.

6.4.   <u>Licensed IP License Grant</u>. Client hereby grants to Service Provider a non-transferrable, limited, revocable, non-exclusive sub-licence to use the Licensed IP solely in furtherance of the provision by Service Provider of the Services hereunder. As between Client and Service Provider, all Intellectual Property Rights in and to the Licensed IP are and shall remain in Client. Nothing in this Agreement, nor any consequence of any activity contemplated hereby, shall give the Service Provider, expressly, by implication, by operation of law or otherwise, any interest in any Intellectual Property Right in the Licensed IP or any goodwill associated therewith, except as may be expressly licensed hereunder. Service Provider hereby acknowledges that it shall acquire no interest in respect thereof and, as between Client and Service Provider, that all such interests and goodwill shall accrue to, and are and shall remain vested in Client at all times.

---

## 7.   NOTIFICATIONS

7.1.   <u>Notification Events</u>. The Service Provider shall promptly and fully notify Client of:

7.1.1.   any actual, threatened or suspected infringement of any Intellectual Property Rights relevant to the provision of the Services which comes to the Service Provider's attention;

7.1.2.   any claim coming to its attention that the provision of Services hereunder is infringes or is alleged to infringe the rights of any other person;

7.1.3.   any material complaint regarding the Services which is received by the Service Provider;

7.1.4.   any and all laws and regulations that may come to its attention from time to time relating to the provision of the Services; and

7.1.5.   if it becomes aware that any of the arrangements regarding the Services provided under this Agreement are or may be in breach of any Applicable Laws.

7.2.   <u>Assistance</u>. The Service Provider shall co-operate fully with Client in taking all steps required by Client, in its sole discretion, in connection with any infringement or claim referred to above, including, without limitation, legal proceedings in the name of Client or in the joint names of the parties. The Client shall be responsible for the cost of any legal proceedings it requires and is entitled to any damages, account of profits and/or awards of costs recovered. The Service Provider shall use its best endeavours to assist Client in any such proceedings and, for the avoidance of doubt, Client shall retain control over the conduct of such proceedings.



9

8.   **REPRESENTATIONS AND WARRANTIES**

8.1.   <u>Services Representations and Warranties</u>.   The Service Provider represents, warrants and undertakes to Client that the Services and any additional services performed under this Agreement will be performed:

8.1.1.   in accordance with all Applicable Laws;

8.1.2.   in accordance with the Internal Control System, mutatis mutandis;

8.1.3.   with all reasonable skill and care and in accordance with Best Industry Practice and/or in the manner envisaged under the Internal Control System;

8.1.4.   by such number of suitably competent, qualified and experienced staff as is necessary; and

8.1.5.   in such a way as not to cause any interruption to the business processes of Client (other than any agreed and unavoidable interruption which is required in order to perform the Services in a proper and efficient manner).

8.2.   <u>Service Provider Representations and Warranties</u>.   The Service Provider further represents, warrants and undertakes to Client that:

8.2.1.   the Software will conform in all respects to the agreed technical specifications and to Client's development specifications, and shall be free from defects for the duration of the Term;

8.2.2.   the media on which the Software is delivered under this agreement will be free from defects for the duration of the Term;

8.2.3.   the Software and the media on which the Software is delivered are free from viruses and other malicious code;

8.2.4.   all Work Product shall be free and clear of all encumbrances and shall not infringe the rights of any third party or parties, including, without limitation, any Intellectual Property Rights;

8.2.5.   Service Provider has obtained and will maintain for the duration of this Agreement all permissions, licences and consents necessary for the Service provider to perform it obligations under this Agreement;

8.2.6.   the Service Provider shall carry and maintain general liability insurance sufficient to cover its obligations under this Agreement and shall on request from Client provide a certificate confirming the existence of insurance in accordance with this Section;

8.2.7.   the Service Provider has adequate resources to meet its obligations under this Agreement; and

8.2.8.   the Service Provider shall indemnify Client against all costs, claims, liabilities, and expenses arising out of the Service Provider's activities

10

under this Agreement, or arising from personal injury, or from any infringement of any rights of Client or of any third party by the provision of the Services, or from the Service Provider's failure to comply with the terms of this Agreement.

8.3.    Client Representations and Warranties.    The Client represents, warrants and undertakes to the Service Provider that:

   8.3.1.    Client has adequate resources to meet its obligations under this Agreement; and

   8.3.2.    Client has all necessary rights to grant the license to the Licensed IP pursuant to Section 0.

8.4.    Limitation of Liability.    WITH THE EXCEPTION OF ANY CLAIMS PURSUANT TO SECTION 8.2.5 OR ANY BREACHES OF SECTIONS 6 OR 9, NEITHER PARTY NOR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, VENDORS, SUPPLIERS OR DISTRIBUTORS WILL BE LIABLE UNDER THIS AGREEMENT TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL LOSS OR DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY THEORY OF LIABILITY (WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR ANY OTHER THEORY), EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF OR IF SUCH DAMAGES WERE FORESEEABLE

9.    **CONFIDENTIAL INFORMATION**

9.1.    Non-Disclosure and Restriction on Use.    Recipient shall maintain in strict confidence all Confidential Information of Discloser and shall use Confidential Information only for the specific purpose of enabling the performance of Services hereunder unless specifically authorized in writing by Discloser.

9.2.    Existence and Content of Agreement. For the avoidance of doubt, notwithstanding any other term hereof, the existence and content of this Agreement shall be deemed to be Confidential Information of Client.

9.3.    No License. Except as otherwise expressly provided for herein, Recipient acknowledges and agrees all right title and interest (including all Intellectual Property Rights) in and to the Confidential Information of Discloser vests absolutely in Discloser and that no license or transfer of Intellectual Property Rights in or to Discloser's Confidential Information is provided to Recipient hereunder by implication, estoppel or otherwise.

9.4.    Irreparable Harm.    The parties hereto agree and acknowledge that misuse or disclosure of the Discloser's Confidential Information by Recipient shall cause irreparable harm to Discloser and Discloser shall be entitled to seek injunctive relief in respect of any misuse or disclosure of its Confidential Information.

9.5.    Exceptions. The restrictions on the use of Confidential Information contained in this Section shall not apply to information that Recipient can clearly establish:

11

DEF_01108630

9.5.1.   was known to Recipient at the time of disclosure;

9.5.2.   was independently developed by Recipient without use of the Discloser's Confidential Information;

9.5.3.   became known to Recipient from another source without confidentiality restriction on subsequent disclosure or use, provided that such disclosure was not in breach of obligations of confidence; or

9.5.4.   was or became part of the public domain through no wrongful act of Recipient.

## 10.   FORCE MAJEURE EVENTS

10.1.   Force Majeure.  Subject to due compliance with Section 10.1, neither party shall be liable to the other for any delay or non-performance of its obligations under this Agreement arising from any cause or causes beyond its reasonable control including, without limitation, any of the following: act of God, governmental act, strikes, lockouts, shortages of labour or raw materials, civil commotion, riot, invasion, war, threat of or preparation for war, act of terrorism, fire, explosion, storm, flood, earthquake, subsidence, epidemic or other natural physical disaster.

10.2.   Requirements.  In the event of either party being so delayed or prevented from performing its obligations such party shall:

10.2.1.   give notice in writing of such delay or prevention to the other party as soon as reasonably possible stating the commencement date and extent of such delay or prevention, the cause thereof and its estimated duration;

10.2.2.   use all reasonable endeavours to mitigate the effects of such delay or prevention upon the performance of its obligations under this Agreement, and

10.2.3.   resume performance of its obligations as soon as reasonably possible after the removal of the cause of the delay or prevention.

10.3.   Ongoing Delays.  In the event that such delay or prevention continues for more than eight weeks, the party whose performance is not delayed or prevented may terminate this Agreement on 30 days' written notice to the other party, in which case the provisions of Section 3.3 shall apply.

## 11.   ASSIGNMENTS AND SUBCONTRACTING

11.1.   Service Provider.  The Service Provider may not assign, sub-license, sub-contract, mortgage or otherwise transfer any of its rights or obligations under this Agreement without Client's prior written consent, which consent may be granted or withheld in Client's sole and absolute discretion.  Service Provider shall be responsible for management and oversight of any approved subcontractors, and shall ensure that such subcontractors are bound by written terms no less restrictive

12

DEF_01108631

than the terms hereof.  Notwithstanding any consent granted by Client in respect of such subcontractors, Service Provider shall be and shall remain directly liable for all acts or omissions of such subcontractors at all times.  Without limiting the generality of Section 12.5, such subcontractors shall not be entitled to rely upon or enforce this Agreement against Client and it is expressly acknowledged and agreed that they shall not constitute third party beneficiaries to this Agreement.

11.2.   Client.  The Client may assign, sub-license, sub-contract, mortgage or otherwise transfer any of its rights or obligations under this Agreement upon written notice to Service Provider.

## 12.   MISCELLANEOUS AND GENERAL

12.1.   Interpretation.

12.1.1.   *Headings.*   The headings in this Agreement do not affect its interpretation. Save where the context otherwise requires, references to Sections, sub-clauses, clauses and Schedules are to sections, sub-clauses, clauses and schedules of this Agreement.

12.1.2.   *References.*  Unless the context otherwise requires:

12.1.2.1. references to Client and the Service Provider include their permitted successors and assigns;

12.1.2.2. references to statutory or regulatory provisions include those statutory provisions as amended or re-enacted; and

12.1.2.3. references to any gender include all genders and use of the singular includes the plural and vice versa.

12.1.3.   *Precedence.*  In the case of conflict or ambiguity between any provision contained in the body of this Agreement and any provision contained in any Schedule, the provision in the body of this Agreement shall take precedence.

12.2.   Waiver.  No forbearance or delay by either party in enforcing its respective rights will prejudice or restrict the rights of that party, and no waiver of any such rights or of any breach of any contractual terms will be deemed to be a waiver of any other right or of any later breach.

12.3.   Severability.  If any provision of this Agreement is held to be illegal, void, invalid or unenforceable under the laws of any jurisdiction, the legality, validity and enforceability of the remainder of this Agreement in that jurisdiction shall not be affected and the legality, validity and enforceability of the whole of this Agreement shall not be affected in any other jurisdiction.

12.4.   Amendments.  Any amendment, waiver or variation of this Agreement shall not be binding on the parties unless set out in writing, expressed to amend this Agreement and signed by or on behalf of each of the parties.

13

12.5.   Third Party Beneficiaries.   No term of this Agreement is intended to confer a benefit on or to be enforceable by any person who is not a party to this Agreement.

12.6.   Notices. Any notice required to be given pursuant to this Agreement shall be in writing, and shall be sent to the other party marked for the attention of such person and at such address as provided to the parties from time to time in writing. Notices may be sent by prepaid, recorded delivery or by fax, provided that faxes are confirmed within 72 hours by confirmation of a copy sent by prepaid recorded delivery. Correctly addressed notices sent by prepaid recorded delivery shall be deemed to have been delivered 72 hours after posting and correctly directed faxes shall be deemed to have been received instantaneously on transmission, provided that they are confirmed in accordance with this Section. The provisions of this Section shall not apply to day-to-day communications between the parties in respect of the performance of the Service Provider's obligations hereunder.

12.7.   Entire Agreement.  This Agreement, together with any documents referred to in it, constitutes the whole Agreement between the parties relating to its subject matter and supersedes any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature, whether in writing or oral, relating to such subject matter. The parties have read this Agreement and agree to be bound by its terms, and further agree that it constitutes the complete and entire agreement of the parties relating to its subject matter and supersedes all previous communications, oral or written, between them relating to the subject matter hereof. No representations or statements of any kind made by either party that are not expressly stated herein shall be binding on such party

12.8.   Set-Off.  If any sums are due to Client from the Service Provider, Client shall be entitled to exercise the right to set-off such sums against any sums due to the Service Provider in relation to this Agreement.

12.9.   Governing Law and Jurisdiction.   This Agreement shall be governed by and construed in accordance with the laws of the Jurisdiction for purposes of any action commenced under this Agreement or with respect to any tort committed or alleged to be committed in the performance of this Agreement.   No choice of law rules of any jurisdiction shall apply hereto.

12.10.  Execution in Counterparts.  This Agreement may be executed in two or more counterparts (by original or facsimile signature), each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement.



14

By execution, signor certifies that signor is duly authorized to execute this Agreement on behalf of **CLIENT**:

_____
*Signature*

_____
Name

_____
Title

_____
Date

By execution, signor certifies that signor is duly authorized to execute this Agreement on behalf of **SERVICE PROVIDER**:

_____
Signature

_____
Name

_____
Title

_____
Date

15

## SCHEDULE "A"

## FEES

In consideration of all services performed by Service Provider pursuant to the Agreement, Service Provider shall be paid a standing monthly retainer of two hundred thousand Australian Dollars ($200,000), which shall be payable in advance on or before the first day of each calendar month during the Term.

Service provider shall remit the invoice for the upcoming calendar month not later than the fifteenth day of the preceding month.

CONFIDENTIAL

DEF_01108635

# SCHEDULE "B"

## KEY POLICIES

1. Information Security Policy

2. Network Security Policy

3. Disaster Recovery and Business Continuity Policy

4. Records Retention Policy

5. Facilities Security Policy

17

DEF_01108636

# SCHEDULE "C"

## SERVICES

The Services shall include:

- Assistance with the development of technical and functional specifications for ongoing development of software ("Software") by Service Provider at the direction of Client.

- Development and enhancement of the Software in accordance with Client's technical specifications;

- The provision by the Service Provider of all necessary advice and assistance to the Client for the purpose of developing written protocols and procedures to be used to maximize the capabilities of the Software and to ensure full compliance with the processes, tasks and obligations described in the Control System and in accordance with Best Industry Practice.

- The proper installation and execution by the Service Provider of the Software upon the specified equipment so as to ensure that the set-up does not in any way compromise the Software meeting its specifications or conflict with any of the descriptions, procedures or specifications described, outlined or specified in the Control System;

- Identification, assessment, contract negotiation and management of all vendors, subcontractors, and service providers necessary or ancillary to the provision of the Services at the direction of the Client as appropriate.

- The provision by the Service Provider of ongoing maintenance of the Software in order to ensure full compliance with the Control System and Best Industry Practice.

- Software, equipment and general network and technical support services, as agreed from time to time during the Term.

- The timely provision of all requested technical information, including updates to support improvements and new versions of the Software.

- Working with the Client to identify any additional tasks that might be facilitated through future modifications to the Software or the provision of additional services.

- The provision of such support services as the Client may require from time to time including, without limitation:

  o continuing development and supplementation of the Client's operating policies, procedures and protocols to reflect the Client's interaction with the Software and any improvements made thereto, as well as any changes to the Control System or Best Industry Practice;

18

CONFIDENTIAL

- o the supply of temporary personnel support pending replacement and training following the termination of any key employees.

- As reasonably requested by Client from time to time during the Term, the provision of operational or technical support services to Client or to one or more of Client's subsidiaries or service providers, which may include, without limitation, accounting, legal, compliance, or human resource support (e.g. advice and assistance in recruiting, hiring and remote training of applicable personnel, and/or development and supplementation of the Client's operating policies, procedures and protocols).



19

CONFIDENTIAL

DEF_01108638