P-296

Case No. 9:18-CV-89176-BB

Sydney

BAKER & M<sup>c</sup>KENZIE

# DeMorgan

## DeMorgan Group Intellectual Property Ownership Analysis [Draft 2~~1~~]

~~13 November 2015~~27 November 2015

Privileged and confidential



**Formatted:** DMReference

# Table of contents

| | | |
|---|---|---|
| Part A - Introduction and Commentary | | 3 |
| 1. | Introduction | 3 |
| | 1.1 Introduction | 3 |
| | 1.2 Definitions | 3 |
| | 1.3 The DeMorgan Group | 3 |
| | 1.4 Craig Wright Entities | 3 |
| | 1.5 Purpose | 3 |
| | 1.6 Out of scope issues | 4 |
| | 1.7 Red Flag Third Party Issues | 4 |
| | 1.8 Next steps following this report | 4 |
| | 1.9 Review Material | 76 |
| | 1.10 Reliance | 7 |
| | 1.11 Confidentiality | 7 |
| | 1.12 Questions | 7 |
| 2. | Definitions | 8 |
| 3. | The DeMorgan Group | 10 |
| | 3.1 Corporate structure and IP Assignments | 10 |
| | 3.2 DeMorgan Limited | 11 |
| | 3.3 Hotwire | 11 |
| | 3.4 Coin-Exch | 11 |
| 4. | Craig Wright Entities | 12 |
| | 4.1 Craig Wright | 12 |
| | 4.2 Wright Family Trust | 12 |
| 5. | Red Flag Third Party Issues | 13 |
| | 5.1 W&K | 13 |
| 6. | Employees | 1514 |
| | 6.1 Copyright | 1514 |
| | 6.2 Patents | 1514 |

| | | |
|---|---|---|
| | 6.3 Employment agreements | 1514 |
| Part B - DeMorgan Group Entities | | 1716 |
| 7. | DeMorgan Limited - overview of findings | 1716 |
| 8. | Hotwire - overview of findings | 2322 |
| 9. | Integyrz - overview of findings | 4542 |
| 10. | Daso - overview of findings | 5651 |
| 11. | Zuhl - overview of findings | 6156 |
| 12. | Interconnected Research - overview of findings | 6761 |
| 13. | Denariuz - overview of findings | 7770 |
| 14. | C01n - overview of findings | 8280 |
| 15. | Chaos - overview of findings | 10090 |
| 16. | Cloudcroft - overview of findings | 10393 |
| 17. | Pholus - overview of findings | 10494 |
| 18. | Coin-Exch - overview of findings | 110100 |
| 19. | Panopticrypt - overview of findings | 121111 |
| 20. | DeMorgan Holdings - overview of findings | 134122 |
| 21. | Misfit Games - overview of findings | 135123 |
| Part C - Craig Wright Entities | | 139127 |
| 22. | Craig Wright - overview of findings | 139127 |
| 23. | Wright Family Trust - overview of findings | 164148 |
| Schedule A | | 169153 |
| DeMorgan Group Corporate Chart | | 169153 |
| Schedule B | | 170154 |
| List of Documents Reviewed | | 170154 |
| Schedule C | | 186167 |
| RFI List | | 186167 |
| Schedule D | | 211192 |
| Trade Marks | | 211192 |

Formatted: DMReference

CONFIDENTIAL

DEF_01611950

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611951

# Part A - Introduction and Commentary

## 1. Introduction

### 1.1 Introduction

This report has been prepared for DeMorgan Limited, an unlisted Australian public company.

DeMorgan Limited's website states that the company is focussed on "alternative currency, next generation banking and reputational and educational products". A large part of DeMorgan Limited's focus to date has related to Bitcoin, and the website notes that in "the six years since the first company in the group started, we have completed several Bitcoin based research projects that have lasted over and are now ready to start commercialising". We have been instructed that the inventions and projects to date relate not only to Bitcoin itself, but also to related items such as wallets and transactions.

DeMorgan Limited is in the process of undertaking investigations to help it identify which intellectual property rights are currently owned by it, and certain related entities (being the DeMorgan Group Entities and the Craig Wright Entities each as defined below).

The purpose of this report is to assist with this process, as further detailed in this **section 1**.

Please note that a separate Draft IP Assignment Schedule Report will be provided in connection with this report as further described in **section 1.8**.

### 1.2 Definitions

Where terms or expressions beginning with a capital letter are not defined in the text of the report, they are defined in **section 2**.

### 1.3 The DeMorgan Group

A corporate chart (**DeMorgan Group Corporate Chart**) showing DeMorgan Limited and the related entities identified to us by DeMorgan Limited as owning relevant intellectual property rights (together, the **DeMorgan Group** or **DeMorgan Group Entities**) is attached at **Schedule A**.

Further relevant background regarding the DeMorgan Group is set out in **section 3** of this report.

### 1.4 Craig Wright Entities

In addition to the DeMorgan Group, we have been instructed that a number of other individuals and entities own intellectual property rights relevant to the work of the DeMorgan Group. Specifically, we have been instructed that:

(a)     much of the work undertaken by the DeMorgan Group to date has been driven by Craig Steven Wright (**Craig Wright**); and

(b)     Craig Wright has operated both in his individual capacity and also through the Wright Family Trust.

In this report, Craig Wright (in his personal capacity) and the Wright Family Trust are referred to as the **Craig Wright Entities**.

Further relevant background regarding the Craig Wright Entities is set out in **section 4** of this report.

### 1.5 Purpose

We have been instructed that the intellectual property rights arising from the projects undertaken by the DeMorgan Group and related work by the Craig Wright Entities to date (**Core IP Rights**) have developed somewhat organically over time so that the current ownership position is unclear. We have been instructed that none of the DeMorgan Group Entities or Craig Wright Entities holds any registered intellectual property rights such as trade marks, patents or designs at present, although there has been some uncertainty over the

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611952

registered trade mark position. We have commented on this further in the report, but have for the sake of certainty run trade mark searches which indicate that no registered trade marks are currently owned by the DeMorgan Group. Details of these searches are set out in Schedule D.

The purpose of this report is therefore to identify, to the extent possible based on our review of various documents provided to us by DeMorgan Limited, the Core IP Rights that are likely to be owned by:

(a) the DeMorgan Group Entities; and

(b) the Craig Wright Entities.

Our findings with respect to the DeMorgan Group Entities are set out in **Part B** of this report, and our findings with respect to the Craig Wright Entities are set out in **Part C** of this report. These findings are presented at a high level in summary form to enable DeMorgan to analyse and determine its strategy with regard to next steps.

## 1.6   Out of scope issues

This report is limited to the purpose outlined in section 1.5 above. For the sake of clarity (but without limiting the matters not covered by this report) we note that this report does not consider:

(a) whether any of the Core IP Rights owned by the DeMorgan Group Entities or the Craig Wright Entities infringe any third party rights; or

(b) subject to the red flag issues described in section 1.7 below, whether there are any intellectual property rights of relevance to the work of the DeMorgan Group that are owned by third parties (i.e. individuals or entities other than the DeMorgan Group Entities or the Craig Wright Entities) (**Third Parties**);

(c) the ability of the DeMorgan Group Entities and Craig Wright Entities to enter into the IP Assignments, and the necessary steps that they may be required to take to do so. However, we have flagged some initial relevant considerations for analysis

and discussion in this regard in section 3.1This will be the subject of further advice following this report;

(d) any tax advice which is outside the scope of this project. We understand that DeMorgan Limited is separately obtaining tax advice in relation to these arrangements; or

(e) issues arising under the laws of any jurisdiction other than Australia. Please note that this report is limited to advice on Australian law only. We note that a number of individuals referred to in the report below have been based in the United States of America when creating Core IP Rights, and as such, there is a possibility that US law could be relevant to some limited parts of the IP analysis. We have flagged in the report when the Review Material suggests that relevant individuals have been based in the USA.

## 1.7   Red Flag Third Party Issues

As noted above, the purpose of this report is to seek to identify the Core IP Rights currently owned by the DeMorgan Group Entities and Craig Wright Group Entities. The report does not focus on intellectual property rights owned by Third Parties.

However, where the documentation provided to us indicates that DeMorgan Limited believes that there are Core IP Rights owned by a DeMorgan Group Entity or Craig Wright Entity, and our review of the documentation provided to us indicates a material risk that this is not the case and that the relevant rights may be owned by Third Parties, we have flagged this in the report (**Red Flag Third Party Issue**).

Further comments on the Red Flag Third Party Issues are set out in **section 5** of this report.

## 1.8   Next steps following this report

A new company, Ncrypt Holdings Ltd (IBC number 16734), has been incorporated and registered under the laws of the State of Antigua and Barbuda with its registered address c/o Offshore Management & Trust

Formatted: DMReference

CONFIDENTIAL

DEF_01611953

Services Inc, Fitzgerald House, 44 Church Street, St John's Antigua (**New IP Co**).

Following DeMorgan ~~Limited~~'s consideration of this report, the following steps are envisaged:

(a) ~~Subject to our comments in (c) below with respect to intellectual property rights owned by DR Technologies Ltd,~~ ~~y~~You have instructed us that all Core IP Rights owned by the DeMorgan Group Entities and the Craig Wright Entities will be assigned to New IP Co (**IP Assignments**). In addition:

    (i) our expectation is that the IP Assignments will be drafted on a "blanket" basis to capture *all* intellectual property rights owned by each of the DeMorgan Group Entities and the Craig Wright Entities, but that there will be a schedule attached to each of the IP Assignments setting out a non-exhaustive list of key Core IP Rights included in the relevant assignment. In this regard we note as follows:

        (A) As you are aware, a first draft of the Craig Wright IP Assignment has already been prepared and is intended to operate on a slightly different basis to the IP Assignments from the DeMorgan Group Entities (in that it is intended to be executed prior to completion of the Assignment Schedules referred to in paragraph (ii) below and therefore includes a process for the Assignment Schedules to be finalised as well as protections (eg warranties) as to the included rights and obligations for Craig Wright to procure necessary IP Assignments, in order to provide protection given the absence of an Assignment Schedule at the time of signing). Given that Panopticrypt is owned by Craig Wright and Ramona Watts, the Craig Wright IP Assignment should be extended to ensure that Craig Wright procures an IP Assignment from Panopticrypt in addition to the Craig Wright Entities.

        (B) It is envisaged that the other IP Assignments from the DeMorgan Group Entities will simply be assignments of all intellectual property rights owned by those entities, and will not include completeness warranties or similar protections. This is because we assume it is not at this stage envisaged that recourse would be sought against the DeMorgan Group Entities at any point (if it became evident that one of the DeMorgan Group Entities did not own intellectual property rights it had previously purported to own) and, in addition, limiting each assignment only to the rights owned by the relevant entity including all intellectual property rights in a listed set of materials (rather than requiring each entity to assign a listed set of intellectual property rights which could require an entity to procure assignments from other entities) avoids any inconsistencies or uncertainties around how particular intellectual property rights are split between multiple DeMorgan Group Entities as flagged throughout this report; and

    (ii) in connection with this report, we intended to provide a separate Draft IP Assignment Schedule Report containing draft lists of the Core IP Rights likely to be owned by each of the DeMorgan Group Entities and the Craig Wright Entities. It is intended that each of the Schedules in the Draft IP Assignments Schedule

> **Formatted:** DMReference

Report will form the basis for the schedules to the IP Assignments (**Assignment Schedules**). We have cross-referenced the various draft Assignment Schedules contained in the Draft IP Assignment Schedule Report throughout this report. To assist with finalising the Assignment Schedules please note that we have highlighted next steps that are required to finalise the Assignment Schedules **in bold** throughout this report.

(b)     In parallel with work on this report, all employees of the DeMorgan Group have or will be moved to become employed by DeMorgan Limited with effect from 1 July 2015 (**Transfer Date**). Employment contracts for these employees are currently being amended to ensure, amongst other things, that all intellectual property rights that arise on and from the Transfer Date vest in DeMorgan Limited (**Future IP**).

(c)     As the employees will continue to be employed by DeMorgan Limited, a licence back will be entered into between New IP Co and DeMorgan Limited to enable DeMorgan Limited to continue to use the Core IP Rights. This licence will be limited to usage for research and development activity only, and DeMorgan Limited will not be granted rights to commercialise any of the Core IP Rights. As we have been instructed that some employees will be transferred in coming months to a subsidiary of New IP Co in the United Kingdom (and Craig Wright will become employed by this entity in December 2015) an additional licence will be required from New IP Co to this entity.

(c)(d)     With effect from the Transfer Date, all IP created under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) is assigned by DeMorgan Limited to DR Technologies Ltd. This means that, to the extent it relates to the work done

pursuant to the Research, Development and Technical Services Agreement, the Future IP is, or will on creation become, owned by DR Technologies Ltd. It is unclear if and when this part of the Future IP will be assigned to New IP CoWe have been instructed that there will be an assignment of all Core IP Rights owned by DR Technologies Ltd to New IP Co (Doc ID DM161) and that the Research, Development and Technical Services Agreement between DeMorgan Limited and New IP Co will be novated from DR Technologies Ltd to New IP Co (so that New IP Co will be the customer pursuant to that services arrangement going forwards, and will take an assignment of all of the intellectual property rights created pursuant to it).

(e)     Where a Red Flag Third Party Issue has been raised, we recommend that DeMorgan Limited consider the importance and value of the relevant Core IP Rights to which the Red Flag Third Party Issue relates and the risks associated with leaving the current position as it is. Where the relevant Core IP Rights are of material importance to the ongoing operations of the DeMorgan Group, one possibility may be considering whether the relevant Third Party would be willing to assign the relevant Core IP Rights to New IP Co in appropriate circumstances. If the Third Party is unwilling to do so, further consideration of the consequences of this refusal for the DeMorgan Group and DeMorgan Limited's strategy for addressing those consequences will need to be considered. Our instructions as to DeMorgan Limited's strategy for addressing identified Red Flag Third Party Issues is set out in this report. We note that DeMorgan Limited intends to seek separate assignments of relevant intellectual property rights from:

(i)     Uyen Nguyen (to address the Red Flag Third Party Issues identified in sections 8:3A and 11:3A); and

**Formatted:** Heading 5

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611955

(d)(ii)    W&K (to address the Red Flag Third Party Issues identified in sections 22.3A to 22.3C).

(e)(f)    The Summary of Agreed Terms between DeMorgan Ltd and The Sterling Group indicates that at some point in the future, the employees currently employed by DeMorgan Limited will have their employment transferred to a new company set up for research and development purposes (**New R&D Co**). Given this may be some years away, this additional transfer, and the consequences of this for the intellectual property rights ownership position, is not considered in this report. However, we note for completeness that if this occurs, consideration will need to be given to whether the intellectual property rights created by those employees need to be assigned from New R&D Co to New IP Co.

## 1.9    Review Material

This report has been prepared based on the factual background and assumptions outlined in this section 1, and is based solely on the information that has been provided to us by DeMorgan Limited.  A complete list of the documents on which this report is based is set out in **Schedule B** and a complete list of the responses to RFIs which have been considered in the preparation of this report is set out in **Schedule C**.  We have referred to those documents and RFI responses together in this report as the **Review Material**.

Please note that we have not, at this stage, conducted independent searches (such as company searches, or IP searches) to verify the Review Material other than the trade mark searches in Schedule D and therefore this report is solely based on the Review Material and assumes that it is accurate and complete.  If there are any alterations in the factual background or Review Material, please let us know as this may alter the advice.

We also note that the Review Material contains copies of some R&D incentive claims previously made by DeMorgan Group Entities and

Craig Wright Entities.  However, we have been instructed that more R&D incentive claims have been made than those included in the Review Material.  Whilst this does not alter the ownership position with respect to the Core IP Rights subsisting in the work created in the course of the research and development activity the subject of those R&D incentive claims that have not been provided, we note that to the extent that it is possible to provide the additional R&D incentive claims, this would assist to further itemise the Core IP Rights likely to be owned by each of the DeMorgan Group Entities and Craig Wright Entities.

## 1.10    Reliance

This report is intended as an aid for DeMorgan Limited in seeking to identify the intellectual property rights most likely owned by the DeMorgan Group Entities and the Craig Wright Entities.  Please note that, given it is based only on the Review Material, and it is therefore not definitive but rather reflects the most likely position based on the Review Material only.  We therefore recommend that all IP Assignments be drafted on a "blanket" basis to capture all Core IP Rights owned by the assigning entities, with a non-exhaustive list of included Core IP Rights scheduled to each IP Assignment by way of an Assignment Schedule.

## 1.11    Confidentiality

This report contains information that is confidential, commercially sensitive and subject to legal professional privilege.  Any solicitor/client privilege is not waived or lost by reason of delivery or transmission to any person whether mistaken or otherwise.

## 1.12    Questions

If you have any questions regarding this report, please contact Adrian Lawrence (+61 2 8922 5204) or Byron Angelopulo (+61 2 8922 5395).

Formatted: DMReference

CONFIDENTIAL

DEF_01611956

## 2.   Definitions

In addition to the terms defined in brackets throughout this report, the following definitions are used:

**Assignment Schedule** has the meaning given in section 1.8(a)(ii);

**Baker & McKenzie, we our, us** or **firm** means Baker & McKenzie a member firm of Baker & McKenzie International, a Swiss Verein;

**Chaos** means Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600516149) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Cloudcroft** means Cloudcroft Pty Ltd (ACN 149735365) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**C01n** means C01N Pty Ltd (ACN 152222421) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Coin-Exch** means Coin-Exch Pty Ltd (ACN 163338467) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Core IP Rights** has the meaning given at section 1.5;

**Craig Wright** means the individual identified at section 1.4(a);

**Daso** means Daso Pty Ltd (ACN 600512249) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**DeMorgan Group** or **DeMorgan Group Entities** has the meaning given in section 1.3;

**DeMorgan Group Corporate Chart** has the meaning given in section 1.3;

**DeMorgan Group Services Agreements** means services and consultancy agreements between DeMorgan Group Entities pursuant to which one DeMorgan Group Entity performs services for another DeMorgan Group Entity, as set out in the DeMorgan Group internal Agreements Register (Doc ID DM140) or otherwise contained in the Review Material;

**DeMorgan Holdings** means DeMorgan Holdings Pty Ltd (ACN 600655427) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**DeMorgan Limited** means DeMorgan Limited (ACN 601560525) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Denariuz** means Denariuz Pty Ltd (ACN 165471983) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Draft IP Assignment Schedule Report** means the report setting out initial drafts of each of the IP Assignment Schedules to be provided separately by Baker & McKenzie;

**Future IP** has the meaning given in section 1.8(b);

**Hotwire** means Hotwire Preemptive Intelligence Pty Ltd (ACN 164068348) of Macquarie Park, NSW 2113;

**Integyrz** means Integyrz Pty Ltd (ACN 165263007) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Interconnected Research** means Interconnected Research Pty Ltd (ACN 165472097) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**IP Assignments** has the meaning given in section 1.8(a);

**Misfit Games** means Misfit Games Pty Ltd (ACN 601677105) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**New IP Co** has the meaning given in section 1.8;

**New R&D Co** has the meaning given in section 1.8(f)1.8(e);

**Panopticrypt** means Panopticrypt Pty Ltd (ACN 151567118) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Pholus** means Pholus Pty Ltd (ACN 165472079) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Red Flag Third Party Issue** has the meaning given in section 1.7;

**Review Material** has the meaning given in section 1.9;

**Third Parties** has the meaning given in section 1.6(b);

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611957

**Transfer Date** has the meaning given in section 1.8(b);

**W&K** means W&K Info Defense Research LLC of 4371 Northlake Blvd #314, Palm Beach Florida 33410-6253 USA;

**Wright Family Trust** means the Wright Family Trust (noting that the ABN of the trustee for the Wright Family Trust is 72 433 066 448);

**Zuhl** means Zuhl Pty Ltd (ACN 165472006) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226.

Formatted: DMReference

CONFIDENTIAL

DEF_01611958

# 3.   The DeMorgan Group

As noted in section 1, a corporate chart (**DeMorgan Group Corporate Chart**) showing DeMorgan Limited and the related entities identified to us by DeMorgan Limited as owning relevant intellectual property rights (together, the **DeMorgan Group** or **DeMorgan Group Entities**) is attached at **Schedule A**. Some of the DeMorgan Group Entities are 100% owned by DeMorgan Limited. However, some are not (for example, Coin-Exch). In addition, whilst Panopticrypt is treated as a DeMorgan Group Entity for the purposes of internal group arrangements, it is in fact owned by Craig Wright and his wife, Ramona Watts (and therefore will not be treated as part of the DeMorgan Group for the purposes of the IP Assignments, but will be added to the list of IP Assignments that Craig Wright is to procure).

We are currently preparing advice as to the steps and documents that will need to be taken and prepared in order to undertake these transactions.

## 3.1   Corporate structure and IP Assignments

As noted in section 1.8 (Next Steps), you have instructed us that all Core IP Rights owned by the DeMorgan Group Entities and the Craig Wright Entities will be assigned to New IP Co by way of the IP Assignments once the draft Assignment Schedules have been finalised.

In addition to the IP considerations flagged throughout this report, please note that it will be necessary to also consider whether any steps are required (for instances under corporations law or from a tax perspective) in order for the DeMorgan Group Entities to transfer significant assets to New IP Co.  (Transfer of Core IP Rights by the Craig Wright Entities is a matter for such entities to consider).  This will be the subject of separate advice following this report

Whilst as noted in section 1.6 (Out of Scope Issues), such issues are outside the scope of this report, we note that, in addition to the taxation issues under consideration, next steps following this report will require consideration of the following:

(a)     It will be necessary to ensure that the directors of the various DeMorgan Group Entities are meeting their directors' duties under Australian corporations law when approving entry into the IP Assignments. In particular, the directors are obliged to exercise their powers and discharge their duties with a reasonable degree of care and diligence (section 180, Corporations Act) and in good faith in the best interests of the corporation and for a proper purpose (section 181, Corporations Act).  This requires consideration of the interests of the shareholders as a whole, including minority shareholders.  For example, to the extent that any of the shareholders in the current DeMorgan Group Entities will not be shareholders of New IP Co, their interests will also need to be considered.  In the event that the transaction is not at fair value, this could raise issues.

(b)     You have instructed us that DeMorgan Limited is an unlisted public company.  As a public company, DeMorgan Limited will be subject to additional restrictions on related party transactions as set out in Part 2E of the Corporations Act.  DeMorgan Limited, and any entities that it controls, will be prohibited from giving a financial benefit to a related party (including directors, entities that control DeMorgan Limited and entities that are controlled by the same entity as controls DeMorgan Limited) without shareholder approval, unless an exception applies.  One relevant exception arises where the transaction is on arm's length terms.  Whilst the shareholding of New IP Co is yet to be confirmed, given we have been instructed that the Wright Family Trust currently has a 63.1% interest in DeMorgan Limited, and the Summary of Agreed Terms indicates that a 37% interest in New IP Co is intended to be held on trust for "the Wrights" via a vehicle nominated by them, there is a possibility that the transfer of the Core IP

CONFIDENTIAL

DEF_01611959

Rights to New IP Co could be classified as giving a financial benefit to a related party. If there is any doubt over whether relevant transactions are on arm's length terms, such transactions are permissible with shareholder approval which is often a sensible path to take in any event to avoid issues arising. The resolution is only required to be passed by shareholders holding at least 50% of the voting shares in DeMorgan Limited, although related parties to whom the resolution would permit a financial benefit to be given, and their associates, cannot vote. The shareholder meeting and voting materials must also be lodged with ASIC, who may review and comment on them.

We also note that potential insolvency/winding up issues could be need to be considered, depending on the current status of the various entities.

We also note that there are a number of uncertainties relating to the DeMorgan Group Corporate Chart which should be noted and clarified as these could become important for the purposes of the analysis mentioned above. We have highlighted uncertainties arising from the Review Material below.

### 3.2   DeMorgan Limited

We have been instructed that the current shareholders of DeMorgan Limited are as set out in the DeMorgan Group Corporate Chart (RFI #33). However, we have been instructed that there have also been discussions regarding a potential employee share / option issue.

We have been instructed that the "*share options have been structured, but have not been paid for or issued. They are in the system as the directors had discussed them, but we will be forfeiting most of them as they are not going to be offered to all members of staff on that list [see (RFI #2]). We have only discussed and agreed with Allan Pedersen in terms of the share options below. Not issued, but discussed and*

*agreed. Not discussed with Ray, but we would like to have that option if possible*" (RFI #33).

This suggests that some commitment has been made to issue shares or options to certain employees. It is not clear when this will occur.

We assume that this will not be occurring prior to the IP Assignments being entered into, but **please confirm that our assumption is correct.** Please let us know if you require us to review any of the employment agreements or other arrangements with relevant employees to determine what commitments as to timing have already been given to any relevant employees We have subsequently been instructed that options have already been issued to Allan Pedersen (but are partly paid) (Doc ID DM204).

### 3.3   Hotwire

We have been instructed that Hotwire is currently in administration, but that DeMorgan Limited is currently in discussion with the expectation of communicating a proposal in relation to the Hotwire assets or business.

Our comments in this report are provided on the assumptionWe have been instructed that this has or will shortly occur, and on the assumption that Hotwire continues to own all Core IP Rights and that none of the Core IP Rights have been assigned or otherwise transferred to any third party in connection with the administration (Doc ID DM161). If this assumption is incorrect please let us know.

### 3.4   Coin-Exch

The DeMorgan Group Entity shareholding table (Doc ID DM154) indicates that the level of Craig Wright's shareholding in Coin-Exch is as set out in Schedule A (i.e. 26.5%). However, we have subsequently been instructed that Craig Wright's shares carry a "voting factor" of 10 and that this equates to 78% of the voting rights (Doc ID DM191).

> **Formatted:** Font: Not Bold

> **Formatted:** Font: Italic

> **Formatted:** Heading 2, Space Before: 0 pt, After: 0 pt, No bullets or numbering

> **Formatted:** Space Before: 3 pt, After: 3 pt, No bullets or numbering

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01611960

Clause 14.3 of the Coin-Exch Shareholders Agreement (Doc ID DM194) sets out that: "*each ordinary Shareholder has a number of votes equal to the number of ordinary Shares it holds. Each Preference Shareholder (FOU) has a number of votes equal to the number of ordinary Shares that their Preference Shares may convert into (whether or not they have been converted).*

> (a) *FOU shares will be issued with 10 ordinary share votes for each Founder Class preference share.*
> (b) *Founder Shares are not transferable and convert to Ordinary shares in any of the following events:*
>> 1. *The death or permanent mental incapacity of the holder.*
>> 2. *The sale of the company or merger.*"

This indicates that Craig Wright's shareholding (as a "Founding Shareholder") has voting rights equal to 10 times the number of shares that he holds.  We note that the other "Founding Shareholder" under the Shareholders Agreement is Dave Kleiman (who is now deceased).  According to clause 14.3(b)(1) of the Shareholders Agreement, Dave Kleiman's shares should have reverted to ordinary shares on his death.  Ira Kleiman (Dave Kleiman's brother) is listed as the current holder of Dave Kleiman's shares (which as noted above, would appear to have converted into ordinary shares).  However, we note there appears to be an inconsistency in the ASIC Company Extract (dated 16 July 2015) (Doc ID DM193), which lists Ira Kleiman as also holding "FOU Shares" rather than ordinary shares.

CONFIDENTIAL

DEF_01611961

## 4.   Craig Wright Entities

As noted in section 1.4, much of the work undertaken by the DeMorgan Group to date has been driven by an individual called Craig Wright, who has operated both in his individual capacity and also through the Wright Family Trust.

### 4.1   Craig Wright

In addition to appearing in the Review Material in his individual capacity, we note that "Craig Wright R&D" is also listed as a party to a number of contracts.

RFI #28 indicates that Craig Wright R&D is a registered business name used by Craig Wright.  As such, our understanding is that references to Craig Wright R&D should be read as references to Craig Wright in his individual capacity.

### 4.2   Wright Family Trust

We have been instructed that the Wright Family Trust was incorporated in 2013.  The Trust Deed for the Wright Family Trust identifies the trustee of the Wright Family Trust as Panopticrypt.  We have been instructed that this is still the case. However, there is some uncertainty surrounding the present trustee given RFI #27 notes that "Craig and Stefan are trustees of the WFT".  Please confirm the current trustee.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611962

## 5.   Red Flag Third Party Issues

Red Flag Third Party Issues have been identified throughout the report. Where a Red Flag Third Party Issue has been raised, we recommend that DeMorgan Limited consider the importance and value of the relevant Core IP Rights to which the Red Flag Third Party Issue relates and the risks associated with leaving the current position as it is. Where the relevant Core IP Rights are of material importance to the ongoing operations of the DeMorgan Group, one possibility may be considering whether the relevant Third Party would be willing to assign the relevant Core IP Rights to New IP Co in appropriate circumstances. If the Third Party is unwilling to do so, further consideration of the consequences of this refusal for the DeMorgan Group and DeMorgan Limited's strategy for addressing those consequences will need to be considered.

### 5.1    W&K

One key Third Party that appears a number of times in the review material is W&K.

We have been instructed (RFI #5) that W&K was an LLC incorporated in Florida, USA. The current status of the entity is uncertain, and we have been instructed that DeMorgan is unaware of its current details or status (RFI#15). However, we have been instructed that at some point the shareholders of W&K were as follows:

(a)     16% Craig Wright

(b)     16% Lynn Wright (Craig Wright's ex-wife)

(c)     33% Estate of the late Dave Kleiman

(d)     33% Uyen Thuc Nguyen

However, RFI #34 states that, currently, Craig Wright is only a minor shareholder in W&K and W&K has "[no] other relationship to the group".The DeMorgan Group internal agreements register (Doc ID

DM141) indicates that, as at 25 July 2013, the company operated from Palm Beach, Florida, and undertook research into homeland security.

We note that amongst the documents provided, there have been differing references to W&K. Namely:

(a)     the IP Deed of Assignment between The Wright Family Trust DeMorgan and Coin-Exch (Doc ID DM1) and IP Deed of Assignment between The Wright Family Trust DeMorgan and Hotwire (Doc ID DM2) which refer in their recitals to "W&K Information Defense LLC";

(b)     the Software Development Agreement between Craig Wright R&D/Dave Kleiman and Strasan Pty Ltd (Doc ID DM82), the Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D and Dave Kleiman of W&K Info Defense LLC (Doc ID DM86) and Contract for the Sale of Shares between Dave Kleiman for W&K Info Defense LLC, Craig Wright R&D and W&K Info Defense LLC (Doc ID DM87), and the consent order in response to the Judgment of the Supreme Court of New South Wales at Doc ID DM143 which refer to "W&K Info Defense LLC"; and

(c)     the Statements of Claim at Doc ID DM141, Doc ID DM142 and Judgment at Doc ID DM 143 which refer to "W&K Info Defense Research LLC".

It is unclear whether these different references are to separate entities, or, if there is only one "W&K" entity (and all other references are intended as references to that particular entity), which is the correct entity name.We have been instructed that there is, in fact, only one W&K entity and that all of these references are intended to be references to W&K (Doc ID DM161). This means that there are a number of errors in the documentation. We have assumed for the purposes of this report that there is only one entity, and the correct

Formatted: DMReference

CONFIDENTIAL

DEF_01611963

name is that provided in the Statements of Claim. ~~Please let us know~~   ~~if this is not correct.~~

Formatted: DMReference

DeMorgan                                                                          16                          Wright Family Trust - overview of findings
~~13 November 2015~~27 November 2015
~~2606814-v1\SYDDMS~~2635314-v1\SYDDMS_DRAFT

CONFIDENTIAL                                                                                                                                    DEF_01611964

# 6.   Employees

A number of the company summaries that follow in Part B and Part C of this report refer to ownership of intellectual property rights in work carried out by employees of the DeMorgan Group Entities.

We way of introduction we note that most of the intellectual property rights in work created by a DeMorgan Group Entity employee will have vested in that DeMorgan Group Entity on creation.  An employee may create a number of different types of intellectual property during their employment and, as a matter of law, the ownership test varies slightly between different categories of intellectual property.

Given the scope of this report as outlined in section 1, we have provided some brief comments below as to ownership of copyright and patents as the two most relevant sets of intellectual property rights under consideration here.

## 6.1   Copyright

Section 35 of the *Copyright Act 1968* (Cth) states the general proposition that the author of a literary, dramatic, musical or artistic work is the owner of any copyright subsisting in the work.

Section 35(6) of the Copyright Act sets out a key exception to the general rule in section 35 - that is, that when a literary work *"is made by the author in pursuance of the terms of his or her employment by another person under a contract of service or apprenticeship, that other person is the owner of any copyright subsisting in the work."*

This does not mean that copyright in <u>all</u> work created by employees is necessarily automatically owned by their employer, only work made "in pursuance of the terms of his or her employment".  Determining ownership of particular material will involve a factual inquiry into the particular terms of employment and whether the work in question was created by the employee acting in the course of that employment.

Some of the key factors that courts have considered when determining whether or not a particular piece of intellectual property was created in the course of employment include:

(a)   as a primary consideration, what was the employee employed to do – i.e. a careful consideration of the scope of work required of the employee pursuant to the terms of his/her employment;

(b)   to what extent was the work done in the employee's own time and for his/her own purposes;

(c)   to what extent was the work carried out during work hours; and

(d)   to what extent was the work carried out using the employer's resources.

The importance of factors (b), (c) and (d) varies depending on the particular circumstances.  However, factor (a) is a primary consideration in all cases.

## 6.2   Patents

Unlike the Australian law on copyright, there is no statutory provision granting an employer ownership in relation to patents for inventions created in the course of employment.  From an intellectual property perspective, it is therefore extremely important that employment agreements are clear in the way that they expressly deal with the issue of intellectual property ownership in relation to inventions.

## 6.3   Employment agreements

Whilst, as noted above, there will be a significant automatic assignment of at least copyright created by an employee to his or her employer, from a patent perspective specifically, but also more generally to limit disputes as to whether particular intellectual property

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611965

rights created by employees are automatically assigned to an employer (as being work made pursuant to the employee's contract of employment or not), it is standard practice for employment contracts to contain a clear and express assignment of relevant intellectual property rights to the employer (alongside related protections such as moral rights consents and confidentiality obligations).

Whilst we have not received copies of past employment contracts for all DeMorgan Group Entity employees (and the contracts we have seen are unexecuted, although we have been instructed they are in final form), all of the employment contracts that we have seen have included an intellectual property assignment clause which provides comfort that all intellectual property rights in material produced during the course of, in connection with, or in contemplation of the employee's employment have been assigned. ~~Given all of the employment contracts that we have been provided with in the Review Material are on substantially the same intellectual property terms, we have assumed that~~ We have been instructed that all employees of DeMorgan Group Entities have been dealt with on the same terms (and hence that all have executed intellectual property provisions on the same basis) {Doc ID DM161}. ~~Please let us know if this not correct.~~

~~However, w~~We do note that there are some risks with the current clause. In particular, it does not contain any moral rights consents and it is not drafted as broadly as it ideally would be (for instance it does not expressly include the right to apply for relevant intellectual property rights, and whilst it expressly includes work directly produced at the employer's direction during business hours or on the employer's property, this express inclusion could perhaps raise questions over whether it is intended to include work carried out remotely or outside business hours or at the direction of other entities in the DeMorgan Group).

As you are aware, we are currently seeking to rectify this with current employees by replacing the intellectual property rights assignment clause in their employment contracts with a broader assignment of all past and future Core IP Rights.

Despite the risks identified above, we have proceeded, for the purposes of this report, on the basis that all Core IP Rights have been assigned from employees to their relevant DeMorgan Group Entity employer[1]. However, whilst the risks here are relatively limited, DeMorgan should note that, to the extent that the clause is not replaced, some risk will remain (and that this will also be the position for any non-current employees who were only signed up to the old terms).

---

[1] We also note that the R&D applications made by DeMorgan Group Entities that have been provided, in many instances, identify certain numbers of R&D "employees" on the relevant DeMorgan Group Entity applications in circumstances where we have been instructed that the relevant DeMorgan Group Entity never had any employees. However, you have instructed us that these references are simply to the number of individuals working on the projects of that DeMorgan Group Entity (eg under DeMorgan Group Services Agreements) not the number of employees of the actual DeMorgan Group Entity making the relevant application (RFI#71). We have therefore disregarded these inconsistencies for the purposes of this report.

Formatted: DMReference

CONFIDENTIAL

DEF_01611966

# Part B - DeMorgan Group Entities

## 7. DeMorgan Limited - overview of findings

| DEMORGAN LIMITED | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. **Overview of company role** | **7:1A**<br><br>DeMorgan Limited is the head company in the DeMorgan Group.<br><br>However we have been instructed that, as at the Transfer Date, DeMorgan Limited had no employees, no contractors and had undertaken no R&D activity (RFI #6).<br><br>This position changed on the Transfer Date when certain employees from the DeMorgan Group were verbally "transferred" to become employed by DeMorgan Limited (with this "transfer" currently being documented in writing). | It appears likely that very limited, if any, Core IP Rights were owned by DeMorgan Limited prior to the Transfer Date but that this position changed on and from the Transfer Date when DeMorgan Limited employed its first employees.<br><br>However, there are a number of uncertainties with this position as outlined in sections 7:2, 7:3 and 7:4 below. |
| 2. **Summary of IP likely to be owned by the company[2]** | **7:2A**<br><br><u>Pre-Transfer Date</u><br><br>The Review Material does not identify any Core IP Rights owned by DeMorgan Limited as at the Transfer Date.<br><br>**7:2B**<br><br><u>On and from Transfer Date</u><br><br>There may be some Future IP owned by DeMorgan Limited arising from the work of employees who have been employed by | **Pre-Transfer Date**<br><br>Whilst no Core IP Rights have been identified, we recommend obtaining a blanket IP Assignment for completeness, particularly given the uncertainties noted in section 7.4.<br><br>**On and from Transfer Date**<br><br>Residual Future IP (i.e. Future IP since the Transfer Date including Future IP that arises going forwards, other than the Future IP transferred to DR Technologies Ltd) to be assigned by DeMorgan Limited to New IP Co. |

---

[2] A draft Assignment Schedule for the DeMorgan Limited IP Assignment is set out in Schedule A of the Draft IP Assignment Schedule Report.

**Formatted: DMReference**

CONFIDENTIAL

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| DeMorgan Limited since the Transfer Date, but only to the extent that it is not created under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) described at section 7:4A below. | **This has been added to the draft Assignment Schedule in Schedule A of the Draft IP Assignment Schedule Report.** |
| Note that the Summary of Agreed Terms between DeMorgan Limited and The Sterling Group appears to anticipate that most, if not all, work done by the employees since the Transfer Date will be done under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) stating that "IP and technology development done during this period will accrue under the agreement to DRTL".  This may mean that the residual Future IP that remains owned by DeMorgan Limited is quite limited. | |

**3.  Red Flag Third Party Issues**

**7:3A**

None identified in the Review Material.  However, note DR Technologies Ltd ownership of some Future IP as referenced below.

N/A.

**4.  Other issues to note**

**7:4A**

<u>DR Technologies Ltd</u>

To the extent that Future IP is, or has been, created under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) it will be assigned to DR Technologies Ltd.

In addition to the assignment, we note that there is a licence back from DR Technologies to DeMorgan Limited for the purposes of performing the relevant services (which cannot be assigned or sublicensed without consent).

Query whether there will be an assignment of this Future IP from DR Technologies Ltd to New IP Co, or whether there is an intention for this Future IP to remain owned by DR Technologies Ltd.  To be discussed  We have been instructed that there will be an assignment of all Core IP Rights owned by DR Technologies Ltd to New IP Co (Doc ID DM161) and that the Research, Development and Technical Services Agreement between DeMorgan Limited and New IP Co will be novated from DR Technologies Ltd to New IP Co (so that New IP Co will be the customer pursuant to that

Formatted: DMReference

DEF_01611968

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|

services arrangement going forwards, and will take an assignment of all of the intellectual property rights created pursuant to it).

Please note that the copy of the Research, Development and Technical Services Agreement that we have been provided with has not been executed by DR Technologies Ltd. ~~We have assumed that it was executed in the form provided.~~  **~~Please let us know if that is not correct.~~**However, we have been instructed that this document was fully executed in the form provided (Doc ID DM161).

~~For present purposes, we assume that only DeMorgan Limited is performing services under the Research, Development and Technical Services Agreement.  We note for completeness that if there is any further restructuring, such that any other entities undertake services for DR Technologies, the scope of the licence back will need to be considered (noting that consent is required for any sublicensing).~~

**7:4B**

**DeMorgan Group Services Agreements**

We have been instructed that DeMorgan Limited has never undertaken any R&D activity prior to the Transfer Date and had no employees or contractors prior to that time (RFI #6).

However, despite this, we note that DeMorgan Limited is party to a number of the DeMorgan Group Services Agreements.  The DeMorgan Group internal Agreements Register (Doc ID DM 140) indicates that "DeMorgan" receives services under Consultancy

Given the statement that DeMorgan Limited has not undertaken any R&D activity prior to the Transfer Date (and had no employees or contractors), it appears unlikely (if not impossible) that any work of any significance has been carried out under these services agreements.  However, the mere fact that they exist raises a question over why they were put in place if no work was carried out.

~~DeMorgan Limited should confirm that~~We have been instructed that no ~~research or development~~ work has

| Formatted: Font: Not Bold |
|---|
| Formatted: Font: Not Bold |
| Formatted: DMReference |

CONFIDENTIAL

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |

Agreements with Integyrz (Doc ID DM38), Interconnected Research (Doc ID DM35), Panopticrypt (Doc ID DM28) and Pholus (Doc ID DM14). Those Consultancy Agreements confirm that these arrangements are with DeMorgan Limited as services recipient.

In addition, Doc ID DM58 – Doc ID DM70 comprise Business Service and Management Agreements between DeMorgan Group Entities as listed below, in which DeMorgan Limited is engaged by the relevant "Company" to provide services related to the management of the Company's technology research business ("Business"), namely:

- to provide all employees during the term whether full or part time as is reasonably required in order to properly and efficiently conduct the Business;
- to engage consultants and independent contractors from time to time to provide services for the conduct of the Business;
- to administer and manage all aspects of the Business during the term;
- to provide advice to the Company on all matters relating to the day to day conduct of the Business during the term;
- to maintain and keep in good repair all the chattels and leased equipment during the term and employ such persons as may be required to carry on such work; and
- to make recommendations to the Company concerning acquiring further chattels or leased equipment.

We note that none of the agreements contain any provisions relating to IP including any assignment or licence of IP which may be created pursuant to those Business Service and Management Agreements. There is a definition of "Intellectual Property" but no intellectual property rights provisions or references beyond that definition.

been carried out under the Consultancy Agreements between DeMorgan Limited and Integyrz, Interconnected Research, Panopticrypt and Pholus (Doc ID DM161) or, otherwise, provide details of the work that was carried out.

As such, the Consultancy Agreements should not have a material impact on the ownership position with respect to the Core IP Rights.

Similarly, DeMorgan should confirm thatWe have been instructed that no work hassome very minor administrative work has been carried out under the various Business Service and Management Agreements with DeMorgan Holdings, Chaos, Coin-Exch, C01n, Cloudcroft, Daso, Panopticrypt, Denariuz, Misfit Games, Pholus, EZAS Pty Ltd, Zuhl and Interconnected Research (Doc ID DM161). We note that this appears inconsistent with the instructions that DeMorgan Limited has not had any employees or contractors prior to the Transfer Date, as noted in section 7.1A above.

If work was carried out under these Agreements, it is likely that the Core IP Rights in that work product will be owned by DeMorgan Limited in which case they should be added to the Assignment Schedule for the DeMorgan Limited IP Assignment (and could impact other sections of this report below).It is therefore uncertain who has been carrying out these "minor administrative services" on behalf of DeMorgan Limited under these Business Service and Management Agreements.. However, regardless of the answer to this, if this work was purely "minor administrative work" it is unlikely to materially alter the ownership position with respect to the Core IP

> Formatted: Font: Not Bold
> Formatted: Font: Not Bold
> Formatted: Font: Not Bold
> Formatted: Font: Not Bold
> Formatted: DMReference

CONFIDENTIAL

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| **List of Business Service and Management Agreements**<br><br>Business Service and Management Agreement between DeMorgan Limited (Manager) and the following DeMorgan Group Entities as service recipients (Company):<br><br>• DeMorgan Holdings<br>• Chaos<br>• Coin-Exch<br>• C01n<br>• Cloudcroft<br>• Daso<br>• Panopticrypt<br>• Denariuz<br>• Misfit Games<br>• Pholus<br>• EZAS (as noted in section 7:4D below)<br>• Zuhl<br>• Interconnected Research | Rights. We have been instructed that this work has been limited to office work such as paying bills (Doc ID DM205) and as such seems unlikely to have a material impact on the ownership position.<br><br>As such we do not propose taking any particular steps with respect to these intellectual property rights, but rather relying on the "blanket" nature of the IP Assignment from DeMorgan Limited to capture any minor rights that do exist.<br><br>We note for completeness that the DeMorgan Group internal Agreements Register at Doc ID DM140 indicates that the Consultancy Agreements with "DeMorgan" each appear twice in the DeMorgan Group internal Agreements Register at Doc ID DM140, but ~~as~~ only one Consultancy Agreement with DeMorgan Limited has been provided in each case. We have been instructed that this was an error in the DeMorgan Group internal Agreements Register, and that there is only one Consultancy Agreement in each case (Doc ID DM161). ~~we have assumed that this is an error. Please let us know if that is not correct.~~ |
| **7:4C**<br><br>Other DeMorgan Group Services Agreements<br><br>The DeMorgan Group internal Agreements Register (Doc ID DM140) notes that there could be other DeMorgan Group Services Agreements other than those listed in the register. This is headed "Others (TBD)".<br><br>The only contract listed under this heading at present is a draft | We have ~~assumed~~ been instructed that the draft Business Service and Management Agreement between "DeMorgan and Hotwire" never came into effect ~~since it is listed as a draft only~~ (Doc ID DM161). ~~Please let us know if our assumption is incorrect.~~<br><br>We have also ~~assumed~~ been instructed that, despite this section of the DeMorgan Group internal Agreements Register (Doc ID DM140) being marked "TBC" that there |

**Formatted: DMReference**

CONFIDENTIAL

DEF_01611971

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| Business Service and Management Agreement between "DeMorgan and Hotwire".  No further information has been provided regarding this contract. | are no other DeMorgan Group Services Agreements other than as set out in the DeMorgan Group internal Agreements Register Doc ID DM140 or otherwise provided and listed in section 7:4B above.  Please let us know if our assumption is incorrect.  Please note that if there are other DeMorgan Group Services Agreements other than those listed, this could impact other sections of this report. |

*Formatted:* Font: (Default) +Headings (Arial)

As such, these documents appear unlikely to have an impact on the ownership position for the Core IP Rights.

**7:4D**

EZAS

We have been provided with a copy of a DeMorgan Group Services Agreement between a company called EZAS Pty Ltd and DeMorgan Limited (Doc ID DM68).  However, we have been instructed that this agreement can be ignored as EZAS Pty Ltd "*was formed with the intend to use for a specific area of R&D but nothing ever happened. The entity was never assigned any IP, never undertook any R&D (or any other activity), no staff, no consultants.  EZAS is a non-trading shell.  The intent was that it would be a 100% subsidiary of DeMorgan Ltd*".

We note that the Business Service and Management Agreement defines "Intellectual Property" but contains no intellectual property rights provisions or references beyond that definition.

Whist the current status of EZAS Pty Ltd is unclear, if it is correct that it has never been operational in any way (and that no work has ever been carried out under the Business Service and Management Agreement) this is unlikely to impact the ownership position with regard to any Core IP Rights.

*Formatted:* Font: Italic

*Formatted:* DMReference

CONFIDENTIAL

DEF_01611972

## 8.   Hotwire - overview of findings

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| **1.   Overview of company role** | **8:1A** |

**8:1A**

Business

The primary business of Hotwire relates to education and training, and in particular an eLearning Platform (DeMorgan Group Entity shareholding table at Doc ID DM154).

At a general level, for completeness, Hotwire's work relating to an eLearning Platform should be captured in the IP Assignment from Hotwire.

**We have added this into the draft Assignment Schedule in Schedule B of the Draft IP Assignment Schedule Report.**

**8:1B**

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):

- Hotwire has employed a number of individuals in the past but has not had any employees since May 2014.  A list of past Hotwire employees is set out in Doc ID DM153.  It appears from this document that the majority of past employees within the DeMorgan Group were employed by Hotwire.  All Hotwire employees were located in Australia.

- Hotwire has also engaged individual contractors in both Australia and the USA.

- Hotwire has filed a number of R&D incentive claims (and intended to do so again in the 2015 financial year) which suggests that it has been carrying out significant R&D activity.

It appears possible that a significant amount of R&D activity has occurred via Hotwire, particularly given this appears to be where the majority of the employees within the DeMorgan Group were employed, and as such Hotwire could own significant Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 8:2, 8:3 and 8.4 below.

**2.   Summary of IP likely to be**

**8:2A**

Subject to our comments in section 6 above, it is likely that the intellectual property rights in work carried out by

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611973

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| **owned by the company**[3] Employee created material (generally)<br><br>As noted above, the response to the initial information request at Doc ID DM152 indicates that Hotwire has, in the past, employed a relatively significant number of employees. A list of past Hotwire employees is set out in Doc ID DM153.<br><br>However, there is ~~has been~~ some uncertainty over whether that list is accurate. Whilst we do not have employment contracts for all past DeMorgan Group employees, a number of the employment contracts that we have been provided with are for employees listed on the Hotwire employee list in Doc ID DM153. The uncertainty ~~arises~~ arose because most (but not all) of these employment contracts are in the name of Interconnected Research and <u>not</u> Hotwire (as employer) including the employment contracts for:<br><br>• Olga Kuznetzova<br>• Trupti Birje<br>• Nicholas Desmond<br>• Stefane Savannah<br>• Allan Pederson<br><br>~~We have subsequently been instructed that the reason for this is that due to the Hotwire administration (as noted in section 3.3) Hotwire employees became employed by Interconnected Research, and the employment contracts provided are those contracts with Interconnected Research not the original employment agreements with Hotwire (Doc ID DM205).~~<br><br>In addition, whilst Doc ID DM152 (response to initial information request) states that the only contractors used to undertake work for Hotwire ~~work~~ are the individuals listed in section 8:3A below, Doc ID | Hotwire employees vested on creation in Hotwire.<br><br>~~However, there is a question over whether employees on the Hotwire employee list were, in fact, actually employed by Interconnected Research. In addition, as noted, there is some uncertainty over whether some of the Hotwire work has been outsourced to Interconnected Research without any written contract documenting this arrangement. As noted, we have been instructed that a number of Hotwire employees became employed by Interconnected Research (Doc ID DM205). The employment contracts that we have seen in this regard are dated in September or October 2014. We note that, as noted in section 8:1B, we have been instructed that Hotwire has not had any employees since May 2014 (leaving a gap of 4-5 months here).~~ **This gives rise to a risk that** ~~if those employees continued performing work for Hotwire after that time,~~ **the Core IP Rights identified in sections 8:2B and 8:2C below** ~~: (1) to the extent created after these individuals were employed by Interconnected Research,~~ **are actually owned in part or in whole by Interconnected Research (rather than Hotwire) because they were created by Interconnected Research employees (rather than Hotwire employees) and because there was no written assignment of those intellectual property rights from Interconnected Research to Hotwire;** ~~and (2) to the extent created during the "gap", are actually owned by the relevant individuals. However, we have been instructed that despite the~~ |

---

[3] A draft Assignment Schedule for the Hotwire IP Assignment is set out in Schedule B of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DEF_01611974

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |

DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system) indicates that work carried out by Hotwire included work outsourced to Interconnected Research. ~~No contract has been provided to us for this, and there has been no reference to such an arrangement in any of the other Review Material.  However, if this were not correct, we suggest that this could be consistent with the proposition that many of the listed individuals who "worked for Hotwire" as set out in the list of past Hotwire employees (Doc ID DM153) were in fact employed by Interconnected Research~~However, we have been instructed that, despite this reference, Hotwire in fact never outsourced any work to Interconnected Research (Doc ID DM161).

Finally, we note that Doc ID DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system), in addition to the reference to outsourcing to Interconnected Research, also refers more generally to collaboration with unspecified research organisations (with references to some projects being contracted to another type of publicly funded research organisation, to a research service provider and to another type of private research organisation). ~~We assume that these various references to unspecified research organisations are, in fact, intended to be references to Interconnected Research (given no other third party is referred to as providing services to Hotwire in any of the other Review Material).  However, as noted in our comments to the right, this should be confirmed.~~Despite this, we have been instructed that no Hotwire work has ever been performed by any contractor other than as set out in section 8:3A below (Doc ID DM161).

reference to outsourcing to Interconnected Research and other unspecified research organisations in Doc ID DM102, Hotwire in fact never actually outsourced any work to Interconnected Research or any other third party (Doc ID DM161).  Further, we have been instructed that there are no contractors to Hotwire other than as set out in section 8:3A below which suggests that no other individuals have performed work other than pursuant to an employment relationship.

**At this stage,** given it appears from these instructions that the work for Hotwire was primarily carried out by employees of the DeMorgan Group whilst such individuals were employed by Hotwire, **we have** ~~therefore~~ **included the IP identified in section 8:2B and 8:2C below in** ~~square brackets in both~~ **the draft Assignment Schedule for Hotwire in Schedule B of the Draft IP Assignment Schedule Report.**  However, due to the risk that some of this work could have occurred after those individuals became employed by Interconnected Research, as well as we have (for the sake of completeness) included a reference to the Core IP Rights in such work in **the draft Assignment Schedule for Interconnected Research in Schedule B of the Draft IP Assignment Schedule Report.**  We have drafted this only to catch such Core IP Rights to the extent they are in fact owned by Interconnected Research (due to this change in employment status).  We note that to the extent relevant individuals performed work during the "gap" period, and are signing up to the new employment terms, this should help to

| Formatted: Font: Bold |

| Formatted: DMReference |

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2835814-v1\SYDDMS_DRAFT
26
Wright Family Trust - overview of findings

CONFIDENTIAL

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
| | strengthen the IP position for such individuals further (but will obviously not assist with any individuals who are no longer employees). |
| | We recommend that Hotwire and Interconnected Research check their records to confirm: (1) whether the individuals listed in the list of past Hotwire employees at Doc ID DM153 as Hotwire employees were in fact Hotwire employees or Interconnected Research employees; (2) whether Hotwire has outsourced any work to Interconnected Research; and (3) whether there is a written services agreement between Hotwire and Interconnected Research. This will assist with determining whether the relevant Core IP Rights are currently owned by Hotwire, or Interconnected Research, or potentially both entities. |
| | As the Review Material does not contain a full list of employees, or a full copy of employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided. However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights. |
| | In addition, as noted, we have assumed that all of the references to third party input into Hotwire's research and development activity in Doc ID DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system) are references to Interconnected Research. Please let us know if this assumption is incorrect. If this is incorrect, and Hotwire work has |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611976

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

been performed by other third parties, this will need to be investigated separately.  Further, if any of those references are to other third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the Hotwire Core IP Rights.

**8:2B**

<u>Employee created material (category 1)</u>

The list of previous Hotwire employees at Doc ID DM153 indicates that the Hotwire employees have been engaged in working on the following:

- "IT infrastructure proof-of-concept platform;"
- "P-20140307-IT-Pholus-DC-Hotwire 2014";
- "P-20130005-Denariuz-Core-Banking";
- "P-20130006-Denariuz-Exchange-Server";
- "P-20140002-Hierarchical-Deterministic-eWallet";
- "P-20140003-Sochi-Bitcoin-Management-System";
- "P-20130001-Genoa-eWallet";
- "P-20130004-Beijing-eRedPacket";
- "P-20140004-Denariuz-eWallet";
- "Load Test and Distributed data design (Registration)";
- "Course Structuring";
- "P-20130002-Socrates-Adaptive eLearning (Phase 1)"; and
- "P-20130007-Plato-eLearning-Phase 2".

On its face, some of the listed work appears to be work for other DeMorgan Group Entities (eg work for Pholus or Denariuz).  However, Hotwire is not listed as a party to any of the DeMorgan Group Services Agreements other than the agreement with Coin-Exch referred into in section 8:4A below and Doc ID DM152 (response to initial information request) indicates that Hotwire has not assigned any intellectual property rights to any third party other than the assignment of intellectual property rights to Coin-Exch (as noted in section 8:4A below).

It therefore appears from the Review Materials that the Core IP Rights in this work were created by Hotwire employees (subject to our comments in 8:2A) and have not been assigned to any other DeMorgan Group Entity.

Please therefore see our comments above in section 8:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT
28
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611977

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**8:2C**

Employee created material (category 2)

Hotwire has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

The Hotwire Tax Incentive Application (2012-2013) (Doc ID DM129) and the Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system (Doc ID DM102) together refer to the following Hotwire projects (in summary):

- "Training B: Automated self matching learning system"
- "Core - Develop and tune Initial System and Software Engine"
- "Security N: Preemptive Security and Learning System"
- "Core - Collection system"
- "Load Test and Distributed Data Design"
- "Building a system to manage data analytics"
- "Building a system to store all the relevant data"
- "Testing of the combined data system"
- "Building a system to store all the relevant data"
- "Development of search and structure algorithms (Development of adaptive algorithms)"
- "Course development"

Please see comments above in section 8:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

**8:2D**

Core IP Rights assigned to Hotwire by "Craig Wright R&D"

Doc ID DM152 (response to initial information request) states that IP has been assigned to Hotwire by "Craig Wright R&D" under a

It is currently unclear what this document is.We were not provided with a copy of this assignment.

However, we have subsequently been instructed that One possibility here is that the reference in Doc ID DM152 (response to initial information request) which, in

Formatted: DMReference

CONFIDENTIAL

DEF_01611978

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

Deed of Assignment dated 1 July 2013.

However, no copy of this assignment has been provided.

full reads:

"Deed of Assignment (Craig Wright R&D) 1 July 2013

IP Deed of Assignment (Wright Family Trust for DeMorgan) 15 Sept 2013"

~~which could be a~~was in fact an incorrect reference to the fact that the Core IP Rights the subject of the IP Deed of Assignment (Wright Family Trust for DeMorgan) referred in section 8:3C below were previously assigned from Craig Wright to the Wright Family Trust ~~on 1~~in July 2013 (i.e. this is a "background assignment" to the document referred to in section 8:3C). ~~However, if this were the case, the date reference appears to be an error given our understanding that the "background" assignment is in fact Doc ID DM 148, being a Deed of Assignment from Craig Wright to the Wright Family Trust dated~~The error related to the date, which should have read 15 July 2013 (i.e. the Deed of Assignment from Craig Wright to the Wright Family Trust dated 15 July 2013 Doc ID DM148).

~~Please provide a copy of the Deed of Assignment from Craig Wright to Hotwire dated 1 July 2013 or confirm that the reference in Doc ID DM152 (response to initial information request) was an error and was intended to simply be a reference to Doc ID DM 148.~~Please see our comments in section 23:3A regarding that document.

**8:2E**

Assignment to Hotwire by C01n

The response to the initial information request (Doc ID DM152)

There is some uncertainty over whether this document constitutes an assignment of intellectual property rights (and if so, which rights and which party took the

| | Formatted: Font: Not Bold |

| | Formatted: DMReference |

DeMorgan
~~13 November 2015~~27 November 2015
~~2636314-v1\SYDDMS~~2635314-v1\SYDDMS  DRAFT
30
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611979

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

states that C01N has assigned and licensed IP rights to Hotwire.

The Review Material provided as evidence of this assignment and licence constitutes a "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman (together, the "Client").

The Agreement is stated, in the Background recitals, to reflect Craig Wright and Dave Kleiman's "wish to develop an "Automated self-matching learning system" by engaging "Strasan and its selected contractors to start this project".

The Agreement contains a licence (which appears to have now expired) from C01n to "the Customer" for the "Developer Software" subject to payment in full by 30 June 2013. "The Customer" is not defined, but as noted above Craig Wright and Dave Kleiman are stated to be "the Client". The execution block for the "Customer" states "Write name of incorporated body when filed". There is a handwritten note next to this that reads "incp. Hotwire Premptive Intelligence Pty Ltd - 02 June 13 - Paid By [illegible]". Further, RFI#45 instructs us that the company that Craig Wright incorporated was Hotwire.

There is no express assignment of intellectual property rights in the operative provisions of the Agreement. However, in the background recitals it states that: "Craig Wright will arrange an Australian Company to be formed to host and own the intellectual property…The project is for the creation of intellectual property. All rights to said IP are to vest within the company Craig Wright incorporates when the payment of the contract (to occur before 30 June 2013) occurs. The incorporated entity will be incorporated within Australia and the ABN will be sent as formal notice to Strasan by the first week of June 2013. The formal invoice and payment will be made through the incorporated entity owned by the client and as

assignment).

In our view, there are some reasonable arguments in favour of it constituting a valid assignment (although these are not without risks as noted below). It includes a written statement that "the intellectual property" is to vest in a particular company and has been executed by the entity that is being engaged to do the relevant development work. Whilst the scope of the assignment is very unclear (given the document merely refers to "the intellectual property") it seems possible that it is intended to cover the intellectual property rights in the material developed under the Software Development Agreement. As such, the assignor of the relevant rights is most likely the developer (i.e. C01n).

Whilst the company in which the intellectual property rights are stated to vest does not yet exist at the point of signing, there are steps listed for it to be identified. Whilst it is unclear whether this process has been formally followed, as noted the signed copy of the Agreement in the Review Material contains a note (next to the "Customer" execution block) stating that "Hotwire Premptive Intelligence Pty Ltd" had been incorporated although the timing and origins of this note are unknown.

The biggest risks as we see it with the document are: (1) whether it was intended to constitute an assignment of Core IP Rights without further steps being taken to formalise that assignment, particularly given the reference to the rights vesting in a particular entity is included in the Background "recitals" not the operative provisions where the substantive provisions such as the licence are located; (2) uncertainty as to the scope of the

DeMorgan
13 November 201527 November 2015
2636814 v1 SYDDMS2635814 v1 SYDDMS DRAFT
31
Wright Family Trust - overview of findings

Formatted: DMReference

CONFIDENTIAL

DEF_01611980

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| notified to Strasan." | Core IP Rights being assigned; (3) given the developer was permitted to sub-contract work to third parties, and there are no express provisions requiring the developer to procure assignments of intellectual property rights in such work, uncertainty over the current ownership position with respect to any subcontracted work; (4) uncertainty over whether the assignment constituted an effective assignment to *Hotwire* given the Background recitals suggest it was executed prior to Hotwire being incorporated; and (5) uncertainty over whether valuable consideration has passed given payment was to be made in Bitcoin. |
| We have been instructed that payment was made by Hotwire "so by default, the IP vested in Hotwire" (RFI#45).  Payment was to be made in Bitcoin.  An invoice is attached, but the amount does not appear to reconcile with the contract amount. | **For present purposes, we suggest proceeding on the basis that there has been a valid assignment of the Core IP Rights created by C01n pursuant to this Agreement to Hotwire.** We have therefore added these Core IP Rights into the draft Assignment Schedule at Schedule B of the Draft IP Assignment Schedule Report. |
|  | **However, given the identified risks, we also recommend expressly including any retained rights in the IP Assignment from C01n and we have therefore added such rights into the draft Assignment Schedule at Schedule H of the Draft IP Assignment Schedule Report.** |

Formatted: DMReference

CONFIDENTIAL

DEF_01611981

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**8:2F**

Core IP Rights assigned to Hotwire by Craig Wright R&D for DeMorgan

Whilst not originally identified as an assignment of Core IP Rights to Hotwire in the response to the initial information request (Doc ID DM152), we note that Doc ID DM3 (Intellectual Property Licence between Craig Wright R&D for DeMorgan and Jamie Wilson and Ramona Watts for Hotwire Pre-emptive Intelligence Pty Ltd dated 22 August 2013) (which RFI #29 confirms to be the only valid licence between Craig Wright and Hotwire) contains an assignment of intellectual property rights from "Craig Wright R&D for DeMorgan" to Hotwire in any improvements, modification, enhancement or derivative developed by Hotwire, of the intellectual property the subject of the licence, being:

- Risk algorithms and C/C++/C#/R code;

- Training systems patent (in progress and covered under the AusIndustry Notice of Registration for the R&D Tax Incentive including IR1300282); and

- All trade marks associated with Integyrz and associated marks.

Payment was to be made in Bitcoin.

We note that it is unclear what would actually be included in this IP assignment that wouldn't otherwise be owned by Hotwire at law (given the assignment is limited to improvements, modifications, enhancements or derivative work developed by Hotwire, not the underlying Core IP Rights being licensed by Craig Wright).

Further, the identity of the party assigning Core IP Rights is quite unclear. The party is listed on the cover page as "C W R&D ABN 47 481 146 384 as trustee for DeMorgan ABN 62 433 066 448" and elsewhere as "CW R&D for DeMorgan" but is then executed simply by "Craig Wright R&D".

We have not seen any arrangement pursuant to which Craig Wright holds any Core IP Rights on trust for any of the DeMorgan Group Entities and we have assumed for present purposes, particularly given the document has been executed by Craig Wright, that Craig Wright does not hold any Core IP Rights on trust for any of the DeMorgan Group Entities. However, given the uncertainty over the contracting parties here **please confirm whether or not this is the case as this would alter the ownership position of relevant Core IP Rights.** We have been instructed that Craig Wright does not hold any Core IP Rights on trust for any of the DeMorgan Group Entities and that Craig Wright intended to execute this document in his personal capacity (Doc ID DM205).

In addition to the issues raised above, we note that there could be some question over whether consideration has passed given payment was to be in Bitcoin.

> Formatted: DMReference

CONFIDENTIAL

DEF_01611982

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
| | Despite this, and regardless of whether it is, in fact, Craig Wright or DeMorgan Limited (or DeMorgan Holdings) that is the assignor of relevant rights under this document, in our view there seems to be a reasonable likelihood that at least some of these Core IP Rights may have been assigned to Hotwire and as such these should for completeness be included in the Hotwire IP Assignment (even though they seem likely to be quite limited). **We have therefore added this into the draft Assignment Schedule in Schedule B of the Draft IP Assignment Schedule Report.** In addition we suggest that the licensed rights be added into the Craig Wright IP Assignment. Whilst there is uncertainty over the licensor entity, our instructions are that the licensor is intended to be Craig Wright (which suggests, although does not confirm, that Craig Wright is the owner of these Core IP Rights). We note for completeness that although the agreement is drafted as a licence, the fee is expressed as being "for exclusive assignment". Nonetheless, given this is the only reference to an assignment and the agreement is otherwise drafted as a licence, **we have added these licensed rights into the draft Craig Wright Assignment Schedule in Schedule P of the Draft IP Assignment Schedule Report.** We otherwise recommend relying on the "blanket" nature of the other IP Assignments to ensure that any other relevant Core IP Rights held within the DeMorgan Group are captured. |

**Formatted:** Font: Not Bold

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636314 v11SYDDMS2635314 v11SYDDMS  DRAFT
34
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611983

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| | We note that the rights licensed from Craig Wright include trade marks. ~~Given we had understood that there were not currently any registered trade marks of relevance as part of the Core IP Rights,~~ **please confirm whether there are any registered trade marks currently owned by the DeMorgan Group Entities or Craig Wright Entities.  Alternatively we can carry out trade mark searches on the DeMorgan Group Entities and Craig Wright Entities to confirm.** We have therefore run the trade mark searches outlined in Schedule D which, as noted therein, confirm that there are no current trade mark registrations owned by any DeMorgan Group Entity   Further, we have been instructed that there is no intention to continue to use any trade marks previously developed by or for the DeMorgan Group (Doc ID DM205) and, as such, regardless of the status of current trade marks, they are not material to the Core IP Rights ownership analysis. |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611984

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**8:3A**

David Perry and Uyen Nguyen

The response to the initial information request (Doc ID DM152) states that a number of individual contractors have also been engaged by Hotwire. It is therefore possible that they may have created some of the work outlined in section 2 above.

The contractors identified to us in the Review Material were David Perry (Australia) and Uyen Nguyen (USA). (We note that Ignatius Pang was also initially identified as a Hotwire contractor, but we were subsequently instructed that he was, in fact, an employee.)

RFI #10 indicated that no written contract was entered into between Hotwire and David Perry or Hotwire and Uyen Nguyen.

The position with respect to independent contractors is quite different from the position outlined in section 6 above. All intellectual property rights in material created by an independent contractor will generally vest in the independent contractor under Australian law. Therefore, absent an assignment of those intellectual property rights, they will remain owned by the independent contractor.

Therefore, in the absence of any written contract with David Perry or Uyen Nguyen, it is likely that under Australian law they remain the owner of all intellectual property rights in any material that they created for Hotwire. (We note for completeness that Uyen Nguyen was located in the USA. Whilst we have only considered the position under Australian law, please note that this could also raise US law considerations.)

~~Hotwire should assess the importance of the work undertaken by David Perry and Uyen Nguyen and determine whether it is necessary (and possible) to approach them to assign relevant Core IP Rights. In this regard we note: (1) RFI#10 indicated that David Perry did not do much and as such it is possible that he is the owner of only limited Core IP Rights; and (2) given Uyen Nguyen appears to have been a director of W&K at the time of the litigation that Craig Wright brought against it as described in section 22:3C we query, at least with regard to Uyen Nguyen, whether this raises a question mark over the likelihood of obtaining such an assignment.~~

We have been instructed that David Perry did not do

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT

36

Wright Family Trust - overview of findings

Formatted: Font: Not Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01611985

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
| | much work for Hotwire (RFI#10), and the work he did do was in the area of marketing communications not research and development.  As such, whilst it is possible that David Perry could own some intellectual property rights of relevance to the DeMorgan Group, it is less likely to be in the form of material Core IP Rights than if he had been engaged in research and development work (particularly given, as noted in section 8:2F above, we are instructed that there is no intention to retain or continue to use any existing branding or marketing materials moving forwards).  We are instructed that given David Perry was not involved in creating any material Core IP Rights, there is no intention to approach him for an assignment of any intellectual property rights (Doc ID DM205). |
| | We have been instructed that Uyen Nguyen did research work for Hotwire, and is willing to execute an IP assignment (Doc ID DM 161).  **We will therefore prepare an IP Assignment from Uyen Nguyen in addition to the other IP Assignments.** |
| | Further, we are instructed that Uyen Nguyen has continued to do contract work on an informal basis for the DeMorgan Group more generally, and has been paid via DeMorgan Limited (Doc ID DM205).  **We will therefore ensure that the IP Assignment from Uyen Nguyen captures not just work for Hotwire, but also work performed more generally for the DeMorgan Group.** |

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**Formatted:** Font: Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611986

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**8:3B**

<u>Third party research institutions</u>

Please see comments in 8:2A regarding research institutions utilised by Hotwire as referenced in Doc ID DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system). ~~As noted in 8:2A, we have assumed that these are references to Interconnected Research.~~ As noted, we have been instructed, however, that no Hotwire work has ever been performed by any contractor other than as set out in section 8:3A above (Doc ID DM161).

~~As noted in 8:2A, we have assumed that these are references to Interconnected Research. However, if this is incorrect, and any of those references are to other third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the Hotwire Core IP Rights.~~

~~Please see comments in 8:2A.~~

Given no other contractors or collaborators have been identified, no further steps have been taken at this stage.

**8:3C**

<u>Core IP Rights assigned to Hotwire by the Wright Family Trust</u>

The response to the initial information request (Doc ID DM152) states that IP has been assigned to Hotwire by the "Wright Family Trust for DeMorgan" under an IP Deed of Assignment dated 15 September 2013.

It is unclear why the contracting entity here is called "The Wright Family Trust DeMorgan" (given that is not the name of the Wright Family Trust). However, this is potentially related to the issues discussed at section 23:3A below. Please see our comments there which are also relevant here.

There are a number of question over whether the

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01611987

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

Doc ID DM2 is an assignment from the "Wright Family Trust DeMorgan" to Hotwire dated 15 September 2013 that purports to assign intellectual property rights in three categories namely:

- Category A: "Automation Software" held by DeMorgan, being: MJF Siemens Control and Operations Suite;

- Category B: WK (1) - Software Assurance through Economic Measures and Anti-Fraud System; and

- Category C: WK (1) - Risk Quantification system (for financial modelling in Bitcoin)).

The assignment is stated only to take effect once payment has been completed (operating as an exclusive licence until that point). RFI #25 instructed us that this has occurred which suggests that the assignment ~~has~~ was intended to have taken effect.

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

There are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in section 22:3A and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

*original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in sections 22:3A and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

As noted in those sections this means that there are significant ~~open~~ questions over whether all of these rights were originally assigned to Craig Wright, and if so, whether they were effectively assigned to the Wright Family Trust to enable this assignment to take effect. Please see proposed steps in sections 22:3A and 22:3C in this regard.

In addition, there are a number of issues raised by the drafting of this assignment itself.

- Firstly, there is a possibility that it itself does not assign any rights but rather is simply a confirmation that the assignor has completed, or will complete at its earliest opportunity, an irrevocable assignment of any "existing and future Intellectual Property and Intellectual Property Rights". We have not separately seen any other document under which the intellectual property rights are separately assigned and understand that there may not be any such separate document. This raises a question over whether the assignment has actually occurred or

Formatted: DMReference

DeMorgan                                           39                              Wright Family Trust - overview of findings
13 November 201527 November 2015
2636814-v1\SYDDMS2635314-v1\SYDDMS  DRAFT

CONFIDENTIAL

DEF_01611988

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
|         | not. However, even if it has not occurred, the assignor agrees pursuant to the IP Deed of Assignment to complete the assignment (and grants a licence to use the relevant rights until this is done) meaning it could be called on to perfect the assignment if necessary. ~~As such, we suggest that the Wright Family Trust and Hotwire check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed. If it has not, please let us know as this could alter the position.~~ |

- Secondly, there is a risk that the assignment envisaged by the IP Deed of Assignment is broader than just the intellectual property rights in the "Core Technology" as the assignment is of both "Intellectual Property" (which is defined, in summary, as including certain property relating to the "Core Technology") and "Intellectual Property Rights" (which is not defined by reference to the "Core Technology" at all). This opens a risk that more of Core IP Rights were assigned to Hotwire than just the Core IP Rights in the "Core Technology". This risk is somewhat mitigated (although not removed entirely), however, by the fact that the IP Deed of Assignment states, in its background Recitals, that "the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology" which supports an interpretation that limits the assignment to the "Core Technology".

As noted in sections 22 and 23 below, our initial view is

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT
40
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611989

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

that there is a significant risk that the ownership of these Core IP Rights sits at law with Third Parties or Craig Wright ~~(and that even if that is not the case, there is a real question over whether this assignment to Hotwire has been effective)~~. However, despite the significant uncertainty over what (if any) Core IP Rights were assigned here, for completeness we recommend that any Core IP Rights that *were* assigned to Hotwire under this assignment agreement be included in the Hotwire Assignment Schedule. **We have therefore added this into the draft Assignment Schedule in Schedule B of the Draft IP Assignment Schedule Report.**

**As noted in section 23 below, we recommend that the IP Assignment from Craig Wright and the Wright Family Trust also be expressly stated to include any of these Core IP Rights that they have retained.**

> Formatted: Font: Bold

### 4. Other issues to note

**8:4A**

Assignment to Coin-Exch

The response to the initial information request (Doc ID DM152) states that Hotwire has assigned Core IP Rights to Coin-Exch.

We have been instructed that this is a reference to the assignment of intellectual property rights from Hotwire to Coin-Exch contained in Doc ID DM7 (R&D Services Agreement between Coin-Exch Pty Ltd and Hotwire Preemptive Intelligence Ltd and Interconnected Research Pty Ltd) pursuant to which Hotwire and Interconnected Research provide services to Coin-Exch.

Whilst "Project Foreground IP" rights are transferred to Coin-Exch by both Hotwire and Interconnected Research on payment in full, Hotwire and Interconnected Research retain ownership of any

It is likely that these Core IP Rights will be owned by Coin-Exch (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Hotwire and Interconnected Research ~~and subject to our comment below regarding payment~~.

Without an extensive factual investigation into the manner in which all of this work was undertaken, it will not be possible to determine exactly where the line between "Project Foreground IP" and "Provider IP" sits. This is particularly the case given that the "Provider IP" is defined exceedingly broadly, and is not for instance tied to pre-existing rights that pre-dated the agreement/projects meaning there is a risk of significant overlap between the two categories. **However, for the**

> Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT
41
Wright Family Trust - overview of findings

DEF_01611990

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| "Provider IP" (being intellectual property rights in their methodologies, models and other confidential or proprietary information for the purposes of providing the services). The arrangement relates to services for a defined set of projects as follows, and therefore (subject to the retained "Provider IP") the "Project Foreground IP" rights being assigned are likely be those arising from this work:<br><br>• Cornerstone Firewall<br><br>We note that the Review Material does not contain an executed copy of this Agreement. | **purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Coin-Exch IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by Hotwire and Interconnected Research acting as service providers to Coin-Exch. We have therefore added this into Schedule L of the Draft IP Assignment Schedule Report.**<br><br>We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid". ~~Please note that we have assumed for present purposes that~~We have been instructed that all such amounts have been paid (and therefore that the assignments have taken effect) (Doc ID DM161). ~~However, please confirm that our assumption is correct noting~~We note that there is some confusion over when this arrangement was intended to be completed due to incorrect dates which we have been instructed were errors in the document. We have been instructed that the project is not intended to complete until 2017 (even though the completion date reads 30/06/11 (which is prior to the commencement date)). As such, this work may be incomplete. |
| **8:4B**<br><br>Licence from Craig Wright R&D for DeMorgan<br><br>The response to the initial information request (Doc ID DM152) states that IP is licensed from "Craig Wright R&D for DeMorgan" to | Please see comments in section 8:2F above regarding this document.<br><br>~~We also note that it will be necessary to consider whether this licence is still required or not. Presumably, the intellectual property rights that are licensed here are~~ |

Formatted: DMReference

CONFIDENTIAL

DEF_01611991

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| Hotwire under Doc ID DM3 (Intellectual Property Licence between CW R&D for DeMorgan (with the executing entity set out as Craig Wright R&D) and Jamie Wilson and Ramona Watts for Hotwire Pre-emptive Intelligence Pty Ltd dated 22 August 2013). We note that this is an exclusive licence with payment to be made in Bitcoin. | themselves Core IP Rights that will be transferred to New IP Co and as such, following that assignment, there will be no need for this licence.Moving forwards, we are instructed that the current licences between existing DeMorgan Group Entities and Craig Wright Entities are no longer needed.  The DeMorgan Group should therefore terminate its existing internal licensing arrangements. |
| | Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.Moving forwards, DeMorgan Limited will require a licence from New IP Co in order to continue its operations and research and development work. |
| | Further, we note that C/C++/C#/R Code is also referenced in the W&K litigation referred to in section 22:3C below.  It is not clear if this is the same code referenced here but we note for completeness, for the reasons outlined in section 22:3C, that if this is the same code that was assigned to Craig Wright coming out of the W&K litigation (in the manner, and subject to the issues identified in, section 22:3C) this could support the view that those relevant Core IP Rights remain owned by Craig Wright for the reasons identified in section 23 below. |
| **8:4C** | No comments. |
| No licences to third parties | |
| The response to the initial information request (Doc ID DM152) | |

Formatted: Pattern: Clear

Formatted: DMReference

CONFIDENTIAL

DEF_01611992

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| indicates that Hotwire has never granted any third party (individual or other entity) a licence to use any intellectual property rights. | |
| **8:4D** | Please see our comments at section 7.4C. |
| Other Group Services Agreements | |
| The DeMorgan Group internal Agreements Register (Doc ID DM140) notes that there could be other DeMorgan Group Services Agreements other than those listed in the register.  This is headed "Others (TBD)". | |
| The only contract listed under this heading at present is a draft Business Service and Management Agreement between "DeMorgan and Hotwire".  No further information has been provided regarding this contract. | |

8:4E

Craig Wright

We have been instructed that Craig Wright was an employee of Hotwire until late 2014.

It is unclear what work Craig Wright created pursuant to his contract of employment with Hotwire, and what work was created in his personal capacity.

> **Formatted:** Font: Bold, No underline
>
> **Formatted:** Font: Not Bold

There is therefore a possibility that some of the Core IP Rights created by Craig Wright have already vested in Hotwire due to the employment arrangement, for the reasons given in section 6 above.

Please see our comments in section 22:1A in this regard.

> **Formatted:** Font: Not Bold

As noted in section 22:1A, whilst these rights will also be included in the IP Assignment from Craig Wright, we recommend for completeness that any rights that *are* owned by Hotwire in the work described in section 22:2A be included in the Assignment Schedule for Hotwire in Schedule B of

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01611993

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
|         | the Draft IP Assignment Schedule Report. |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611994

## 9. Integyrz – overview of findings

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **9:1A**<br><br>Business<br><br>The primary business of Integyrz relates to an eLearning Training System (DeMorgan Group Entity shareholding table at Doc ID DM154). | At a general level, for completeness, Integyrz's work relating to the eLearning Training System should be captured in the IP Assignment from Integyrz.<br><br>**We have added this into the draft Assignment Schedule in Schedule C of the Draft IP Assignment Schedule Report.** |
| | **9:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Integyrz has had one employee, being Dr Stef Savanah. Dr Savanah has been located in Australia.<br><br>• Work has also been carried out for Integyrz by other DeMorgan Group Entities under DeMorgan Group Services Agreements (and Integyrz has itself also provided services to other DeMorgan Group Entities under other DeMorgan Group Services Agreements).<br><br>• Integyrz has submitted one previous R&D incentive claim and was intending to do so again in the 2015 financial year. | It appears possible that R&D activity has occurred via Integyrz, both through its employee (Dr Savanah) and under DeMorgan Group Services Agreements, and as such Integyrz could own Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 9:2, 9:3 and 9:4 below. |
| **2. Summary of IP likely to be** | **9:2A**<br><br>Employee created material (generally) | Subject to our comments in section 6 above, it is likely that the intellectual property rights in work carried out by |

Formatted: DMReference

DEF_01611995

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| **owned by the company**[4]  The response to the initial information request (Doc ID DM152) indicates that Integyrz has had one employee only, Dr Stef Savanah.<br><br>However, there is some uncertainty regarding whether this is accurate because the employment contract that we have been provided with for Dr Stef Savannah is in the name of Interconnected Research and not Integyrz.<br><br>We also note that the response to the initial information request (Doc ID DM152) states that there have been no assignments of intellectual property rights in or out of Integyrz, suggesting that there has been no assignment from Interconnected Research.  However, we do note that there is an assignment of intellectual property rights in the DeMorgan Group Services Agreement between Integyrz and Interconnected Research referred to in section 9:2C below which could, to the extent that Dr Savanah was performing work under that arrangement, constitute an assignment of the relevant intellectual property rights. | Integyrz employees vested on creation in Integyrz.<br><br>However, there is a question over whether Dr Savanah was, in fact, actually employed by Interconnected Research rather than Integyrz.  This gives rise to a risk that the Core IP Rights identified in section 9:2B above are actually owned in part or in whole by Interconnected Research (rather than Integyrz) because they were created by an Interconnected Research employee (rather than an Integyrz employee) and because there was no written assignment of those intellectual property rights from Interconnected Research to Integyrz.<br><br>~~However, at this stage, given the Review Material contains multiple references to Dr Savanah being employed by Integyrz, we have proceeded on basis that the most likely position is~~We have subsequently been instructed that the employment contract for Dr Savanah is incorrect (or that there was immediately a transfer in employment to Integyrz) (Doc ID DM205) and have therefore proceeded on the ~~assumption basis~~ that Dr Savanah was employed by Integyrz as instructed~~stated~~. ~~Please confirm whether or not our assumption is correct.  This will assist to confirm whether additional or different steps are required.~~<br><br>~~If this assumption is not correct, but the work performed by Dr Savanah was performed under the DeMorgan Group Services Agreement between Integyrz and Interconnected Research referred to in section 9.2C~~ |

_____

[4] A draft Assignment Schedule for the Integyrz IP Assignment is set out in Schedule C of the Draft IP Assignment Schedule Report.

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2635314-v1\SYDDMS   DRAFT
47
Wright Family Trust - overview of findings

> **Formatted:** DMReference

DEF_01611996

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | ~~below, we note that the intellectual property rights could have been assigned to Integyrz in any event subject to our comments in section 9:2C below.~~ |
| | **For these reasons, we have at this stage added the Core IP Rights identified in 9:2B below into the draft assignment schedule for Integyrz in Schedule C of the Draft IP Assignment Schedule Report.** |

**9:2B**

Employee created material (category 1)

Integyrz has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

The Integyrz Tax Incentive Application (2013-2014) (Doc ID DM96) refers to the following Integyrz projects (in summary):

- "Adaptive Delivery Platform":
  - o "Basic Platform"
    - ▪ "Supporting - Data centre and systems"
  - o "Online Learning Style model"
  - o "Product Offerings Research and Development:"
    - ▪ "SuperMOOC"
    - ▪ "Indie"
    - ▪ "Corporate"
    - ▪ "University Suite (layered offerings)"
  - o "Design research partnership program"

In addition Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) refers to the following "pending patent applications":

- "20. eLearning"

Please see comments above in section 9:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

Please also note that work may have been carried out under DeMorgan Group Services Agreements and see our comments in section 9:2C below in this regard.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611997

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|

**9:2C**

<u>DeMorgan Group Services Agreements</u>

Integyrz is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Integyrz has been the recipient of services under:

- Services Agreement with Interconnected Research (service provider) (Doc ID DM48)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM32)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM10)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Integyrz (as services recipient). However in terms of the scope of those assignments, we note that:

- pursuant to the *Services Agreements*, whilst "Project Foreground IP" rights are transferred to the services recipient by the service provider on payment in full, the service provider retains ownership of any "Provider IP" (being intellectual property rights in the service provider's methodologies, models and other confidential or proprietary information for the purposes of providing the services). The Services Agreements relate to services for a defined set of projects as follows, and therefore (subject to the retained "Provider IP") the "Project Foreground IP" rights being assigned are likely be those arising from this work:

  - Services Agreement with Interconnected Research: (i) MOOC 1.1; (ii) SuperMOOC 1.0; (iii) SuperMOOC 2.0; (iv) SuperMOOC 3.0; (v) LMS 1 (plug in); (vi) LMS 2 (full function). Note that this work had a

<u>General comment regarding employees</u>

As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns have been raised as to inconsistencies in the stated employer of listed individuals. We have assumed had initially worked on the assumption, for present the purposes of this report, that where a DeMorgan Group Entity acts as a service provider under a DeMorgan Group Services Agreement that it has only utilised its own employees to perform those services. However, we have subsequently been instructed that this may not have always been the case due to the fact that DeMorgan Group Entities have utilised employees from other DeMorgan Group Entities (although not contractors unless specifically identified in this report) to perform services (Doc ID DM205). wWe note for completeness that if a DeMorgan Group Entity has used other individuals (other than employees) to perform services under a DeMorgan Group Services Agreement and has not obtained an intellectual property assignment from those individuals, that this raises concerns that the ownership position for the intellectual property rights generated under that DeMorgan Group Services Agreement may be other than as set out below (as those individuals are likely to retain ownership of any intellectual property rights that they have created). We have proceeded on the assumption that this is not the case. Please, however, see our comments below regarding the consequences of outsourcing to other DeMorgan Group Entity employees.

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01611998

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|

**INTEGYRZ**

completion date of 30 June 2017 and therefore may be incomplete; and

- pursuant to the *Consultancy Agreements*, (1) all inventions, discoveries and novel designs (whether or not registrable as designs or patents) ("Inventions") and copyright ("Works") created by the service provider "as consulting company" are assigned to the service recipient, and this is backed up with (2) a separate obligation to disclose and assign all Inventions and Works and all intellectual property rights therein to the services recipient.

We also note that the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

**COMMENTS REGARDING APPROACH**

Services Agreement

It is likely that these Core IP Rights will be owned by Integyrz (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Integyrz and subject to our comment below regarding payment.

Without an extensive factual investigation into the manner in which all of this work was undertaken, it will not be possible to determine exactly where the line between "Project Foreground IP" and "Provider IP" sits. This is particularly the case given that the "Provider IP" is defined exceedingly broadly, and is not for instance tied to pre-existing rights that pre-dated the agreement/projects meaning there is a risk of significant overlap between the two categories. **However, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Integyrz IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Integyrz. We have therefore added this into Schedule C of the Draft IP Assignment Schedule Report.**

We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid". Please note that we have assumed for present purposesWe have been instructed that all such amounts have been paid (and therefore that the assignments

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611999

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | have taken effect) (Doc ID DM161). ~~However, please confirm that our assumption is correct particularly given~~We note that the completion date for this work is, as noted, not until 30 June 2017 meaning that the work may be incomplete. ~~If this assumption is incorrect please let us know as this will alter the ownership position.~~ |

Consultancy Agreements

In our view, there are issues with the drafting of the IP assignment under the Consultancy Agreements given the present assignment of rights is limited to "Inventions" and "Works" only, backed up by a separate agreement that the service provider "will assign" all intellectual property rights in those "Inventions" and "Works". Whilst this appears likely to be an effective assignment of copyright, there are some doubts over whether additional steps were required to perfect the assignment of other intellectual property rights. **However, for the purposes of the IP Assignments, we suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above. We have therefore added these into Schedule C of the Draft  IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

We have assumed that there are no additional third party

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612000

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | licences other than as provided as part of the Review Material.  (As noted, the Services Agreements envisage that third party licences may be required for some of the work product).  We note that, if there are any additional third party licences, it will be necessary to reconsider whether these licences remain licensed to the correct DeMorgan Group Entity following the present restructuring project.  (Obviously, to the extent that third party inputs have been included without relevant licences, we note for completeness that this would raise an infringement risk.) |

Outsourcing to other DeMorgan Group Entities

As noted above, we have been instructed that when acting as service provider under a DeMorgan Group Services Agreement, some DeMorgan Group Entities have themselves utilised the employees of other DeMorgan Group Entities to perform services.

There is no way, other than tracking back to an individual level to determine which individual has created which work and pursuant to which contractual arrangements (which may still not result in absolute certainty given the potential lack of records of relevant creation of work), to quantify the impact that the uncertainty over the use of employees has on the ownership position for the Core IP Rights.

However, we note, given the various DeMorgan Group Services Agreements also operate in the same manner (in that the Services Agreements are on the same intellectual property terms and the Consultancy Agreements are on the same intellectual property terms)

Formatted: Font: Bold

Formatted: Font: Bold

Formatted: Font: (Default) +Headings (Arial)

Formatted: Font: Bold

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT
52
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612001

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | that, to the extent that a DeMorgan Group Entity acting as service provider under a DeMorgan Group Services Agreement ("Agreement 1") has utilised the employees of other DeMorgan Group Entities to perform its services under that Agreement 1" and this subcontracting *has itself occurred* pursuant to a DeMorgan Group Services Agreements in the form of a Services Agreement ("Agreement 2"), the outsourced work under Agreement 2 will be assigned to the customer entity as "Project Foreground IP" (subject to any Core IP Rights retained as "Provider IP" in the same manner noted above) and will then be "on-assigned" to the actual client again pursuant Agreement 1 provided that the DeMorgan Group Entity acting as outsourced service provider is an "approved sub-contractor" for the purposes of Agreement 1   The assignment of intellectual property rights under the Consultancy Agreements extends to the DeMorgan Group Entity acting as service provider and its "employees, agents and consultants". |
| | There are a range of risks here (for instance, the risk that DeMorgan Group Entities have used employees of other DeMorgan Group Entities to perform services, *other than* pursuant to a DeMorgan Group Services Agreement; the risk that the subcontracted DeMorgan Group Entity under a Services Agreement is not an approved subcontractor; the risk of retained "Provider IP" acting to split the ownership of relevant Core IP Rights under a Services Agreement as noted above; and a risk that a subcontracted DeMorgan Group Entity may not be classified as an "employee, agent or consultant" under the Consultancy Agreements) which could result in Core |

**Formatted:** Font: Italic

**Formatted:** Font: Bold

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2635814 v1SYDDMS_DRAFT

53

Wright Family Trust - overview of findings

DEF_01612002

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | IP Rights being, in fact, split between different DeMorgan Group Entities other than in the manner set out in this report.  However, the contractual arrangements noted above mean that there is at least some argument that a significant part of the Core IP Rights created in projects under DeMorgan Group Services Agreements has been assigned "through" to the eventual client. |
| | As such, we have drafted throughout on the basis that each DeMorgan Group Entity that is customer under a DeMorgan Group Services Agreement owns the primary Core IP Rights in that work by including it in the draft IP Assignment Schedule for that customer entity, and then providing that retained Core IP Rights may be held by each entity acting as service provider under a DeMorgan Group Services Agreements.  The "blanket" nature of the IP Assignments will ensure that any other rights that are distributed throughout the DeMorgan Group due to the risks outlined above will be captured in the assignments. |

**Formatted:** Font: Bold

**Formatted:** Font: Bold

3.  **Red Flag Third Party Issues**

None identified in the Review Material.

N/A.

4.  **Other issues to note**

9:4A

DeMorgan Group Services Agreements

In addition to the DeMorgan Group Services Agreements listed at 9:2C, the DeMorgan Group internal Agreements Register (Doc ID DM140) identifies Integyrz as the service provider under the

Services Agreement

It is likely that these Core IP Rights will be owned by the DeMorgan Group Entities acting as services recipients (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Integyrz and subject

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612003

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|

**INTEGYRZ**

following DeMorgan Group Services Agreements:

- Services Agreement with C01N (services recipient) (Doc ID DM53)
- Services Agreement with Cloudcroft (services recipient) (Doc ID DM54)
- Services Agreement with Coin-Exch (services recipient) (Doc ID DM57)
- Services Agreement with Daso (services recipient) (Doc ID DM56)
- Services Agreement with Interconnected Research (services recipient) (Doc ID DM51)
- Services Agreement with Panopticrypt (services recipient) (Doc ID DM49)
- Services Agreement with Pholus (services recipient) (Doc ID DM50)
- Services Agreement with Zuhl (services recipient) (Doc ID DM52)
- Services Agreement with Denariuz (services recipient) (Doc ID DM55)
- Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM36)
- Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM38)
- Consultancy Agreement with Chaos (services recipient) (Doc ID DM37)  (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials).

All of these Agreements contain an assignment of intellectual property rights from Integyrz (as service provider) to the DeMorgan Group Entity acting as services recipient.  However in terms of the

**COMMENTS REGARDING APPROACH**

~~to our comment below regarding payment.~~

Please see our comments in section 9:2C above regarding issues regarding the distinction between "Project Foreground IP" and "Provider IP" under the DeMorgan Group Services Agreements.  The same issues arise here.

**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the "Project Foreground IP") be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Integyrz to capture any residual "Provider IP" retained by Integyrz (as service provider).  We have added a general description of these retained rights into Schedule C of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.**

We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid".  ~~Please note that we have assumed for present purposes~~We have been instructed that all such amounts have been paid (and therefore that the assignments have taken effect) (Doc ID DM161).  ~~However, please confirm that our assumption is correct particularly~~We note that the completion date for this work is ~~as noted,~~ not until 30 June 2017. ~~If this assumption is incorrect please let us know as this will alter the ownership position~~This could mean that the work is

Formatted: DMReference

CONFIDENTIAL

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Integyrz is acting as service provider. | incomplete.<br><br>**Consultancy Agreements**<br><br>Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.<br><br>**As per those comments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreements) be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Integyrz to capture any residual intellectual property rights retained by Integyrz as services provider.  We have added a general description of these retained rights into Schedule C of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.** |

Formatted: Font: Not Bold

Outsourcing to other DeMorgan Group Entities

Formatted: Font: Not Bold, Underline

Please see our comments in section 9:2C above.

Formatted: Underline

**9:4B**

Grant of licences

The response to the initial information request (Doc ID DM152) states that Integyrz has not granted any intellectual property licences, or itself been granted any intellectual property licences.

Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be

Formatted: DMReference

56

Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612005

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| However, we note that many of the DeMorgan Group Services Agreements contain licences. | rethought. |
| | Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with. Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT
57
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612006

## 10. Daso - overview of findings

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** <br><br> **10:1A** <br><br> <u>Business</u> <br><br> The primary business of Daso involves side projects split off from Denariuz (DeMorgan Group Entity shareholding table at Doc ID DM154). <br><br> **10:1B** <br><br> <u>Volume of likely Core IP Rights</u> <br><br> In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): <br><br> • Daso was intending to submit its first R&D incentive claim in the 2015 financial year. <br> • Work has been carried out for Daso by other DeMorgan Group Entities under DeMorgan Group Services Agreements. <br> • Daso has never had any employees. | Given we do not have any R&D claim documentation with respect to Daso, and the DeMorgan Group Services Agreements to which Daso is a party describe the projects in which it is involved as "TBD", it is difficult to provide any general description of the nature of Daso's work. <br><br> It appears that R&D activity has occurred via Daso, but only via DeMorgan Group Services Agreements. As such, it seems possible that Daso owns some Core IP Rights but these are perhaps more limited than some of the other DeMorgan Group Entities. However, there are a number of uncertainties surrounding the scope of these as noted in sections 10.2, 10.3 and 10.4 below. |
| **2. Summary of IP likely to be owned by the company[5]** <br><br> **10:2A** <br><br> <u>DeMorgan Group Services Agreements</u> <br><br> Daso is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register | <u>General comment regarding employees</u> <br><br> Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here. |

---

[5] A draft Assignment Schedule for the Daso IP Assignment is set out in Schedule D of the Draft IP Assignment Schedule Report.

> **Formatted:** DMReference

DeMorgan <br>
13 November 201527 November 2015 <br>
2636814-v11SYDDMS2635814-v1\SYDDMS  DRAFT <br>
58 <br>
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612007

| DASO | COMMENTS REGARDING APPROACH |
|---|---|

**DASO**

(Doc ID DM140) states that Daso has been the recipient of services under:

- Services Agreement with Integyrz (services provider) (Doc ID DM56)
- Services Agreement with Interconnected Research (service provider) (Doc ID DM41)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM21)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM18)
- Consultancy Agreement with Denariuz (service provider) (Doc ID DM39)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Daso (as services recipient). However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects. We note as follows regarding the projects carried out under the Services Agreements for Daso:

- Services Agreement with Integyrz (services provider): projects covered by this arrangement are simply described as "TBD". Note that this work had a completion date of 30 June 2017 and therefore may be incomplete; and
- Services Agreement with Interconnected Research (service provider): projects covered by this arrangement are simply described as "TBD". Note that this work had a completion date of 30 June 2017 and therefore may be incomplete.

**COMMENTS REGARDING APPROACH**

Services Agreement

It is likely that these Core IP Rights will be owned by Daso (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Daso and subject to our comment below regarding payment.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Daso IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Daso. We have therefore added this into Schedule D of the Draft IP Assignment Schedule Report. Given the projects under these agreements are defined as "TBC" we note that it is only possible to describe these very generally.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made , and we have assumed for present purposes We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM161). However, please confirm that our assumption is correct particularly given, again We note that the completion date for the work is not until 30 June

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2636814-v1\SYDDMS DRAFT
59
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612008

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure). | 2017.  If this assumption is incorrect please let us know as this will alter the ownership position This could mean that the work is incomplete.<br><br>Consultancy Agreements<br><br>Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule D of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**<br><br>Third Party Licences<br><br>Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.<br><br>Outsourcing to other DeMorgan Group Entities<br><br>Please see our comments in section 9:2C above. |
| **10:2B** | As no detail has been provided regarding the proposed claim we have not been able to include details of any |

> Formatted: Font: Bold

> Formatted: DMReference

DeMorgan
13 November 2015 27 November 2015
2636814-v1 SYDDMS 2635314-v1 SYDDMS  DRAFT
60
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612009

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| **Contractor created material** | ~~work carried out~~this has not provided any detail that can be included in Schedule D of the Draft IP Assignment Schedule Report. ~~Given~~In addition, as noted in 10.2A, there is uncertainty over the scope of work carried out for Daso under DeMorgan Group Services Agreements (particular given project descriptions under relevant Services Agreements are marked "TBC") ~~it would be useful to have more detail of Daso's proposed claim if possible to give us some understanding of the work carried out by Daso in the past.~~ **Please provide a copy if available.** |
| Daso has never filed R&D incentive claims but was intending to submit a claim for FYE 2015. | |
| We have been instructed, however, that the following following projects (noted in section 13.2B below) worked on via Denariuz were also worked on via Daso: | |
| • Decentralized Consensus (Distributed Autonomous Smart Organisation) Project | |
| • Core - Virtualised HPC: The development of a HPC (High Performance Computing) Platform | The projects listed as worked on via both Denariuz and Daso may have resulted in Core IP Rights arising from that work being either jointly owned by Denariuz and Daso, or in some Core IP Rights arising from that work being owned by Daso and some by Denariuz. **As such, we have reflected this in both the draft Daso IP Assignment schedule in Schedule D of the Draft IP Assignment Schedule Report and the draft Denariuz IP Assignment schedule in Schedule G of the Draft IP Assignment Schedule Report.** |
| • Supporting - Development of a virtualised multicore platform | |
| • Core - Decentralized Autonomous Consensus Platform (DACP) and associated experimental case studies | |
| • Core - DACP Assurance Contracts and associated experimental case studies | |
| • Core - Time Clock and Log-in based contractor DAC | |
| • Core - Peer to Peer Insurance Markets and DAC | |
| • Core - DASO employment and contractor Smart Contract | |
| • Core - Anti-Fraud loyalty DASO | |
| • Core - Smart Switch DASO | |
| • Core - Sportsbook | |
| • Distributed Autonomous Smart Organisation Project | |
| • Smart Contracts | |
| • Online Distributed Ledger DASO | |
| **10:2C** | **We have added these Core IP Rights into the draft Daso Assignment Schedule in Schedule D of the Draft IP Assignment Schedule Report.** |
| Assignment from Denariuz | |
| The response to the initial information request (Doc ID DM152) | |

CONFIDENTIAL

DEF_01612010

| DASO | | COMMENTS REGARDING APPROACH |
|---|---|---|
| | indicates that IP has been assigned to Daso by Denariuz.  Doc ID DM39 is a Consultancy Agreement between Daso and Denariuz.  Whilst it is unclear why this assignment has been singled out over the other DeMorgan Group Services Agreements referred to in section 10:2A  above, we have been instructed (RFI #9 and #47) that this is the only intellectual property rights assignment between these two entities.<br><br>Please see further comments in section 13:4A regarding the scope of this assignment. | Please see further comments in section 13:4A regarding the scope of this assignment. |
| **3.  Red Flag Third Party Issues** | None identified in the Review Material. | N/A. |
| **4.  Other issues to note** | **10:4A**<br><br><u>Grant of licences</u><br><br>Doc ID DM152 states that Daso has not granted any intellectual property licences, or itself been granted any intellectual property licences.  However, we note that the DeMorgan Group Services Agreements contain licences. | ~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.~~<br><br>**Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.**<br><br><u>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.</u> |

Formatted: Font: Not Bold

Formatted: Font: Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01612011



**Formatted:** DMReference

DeMorgan               63            Wright Family Trust - overview of findings
13 November 201527 November 2015
2635814-v1USYDDMS2635814-v1USYDDMS_DRAFT

CONFIDENTIAL

DEF_01612012

## 11. Zuhl - overview of findings

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** — **11:1A** <br><br>_Business_ <br><br>The primary business of Zuhl relates to an online academic network known as a social learning system (DeMorgan Group Entity shareholding tableDoc ID DM154). | At a general level, for completeness, Zuhl's work relating to an online academic network known as a social learning system should be captured in the IP Assignment from Zuhl. <br><br>**We have added this into the draft Assignment Schedule in Schedule E of the Draft IP Assignment Schedule Report.** |
| **11:1B** <br><br>_Volume of likely Core IP Rights_ <br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): <br><br>• Zuhl has filed an R&D incentive claim in the past and was intending to do so again in the 2015 financial year. <br>• Work has been carried out for Zuhl by other DeMorgan Group Services Agreements. <br>• Zuhl has never had any employees but has in the past engaged one independent contractor (in the USA). | It appears possible that R&D activity has occurred via Zuhl, but only via DeMorgan Group Services Agreements and one independent contractor rather than employees.  As such, Zuhl could own some Core IP Rights.  However, there are a number of uncertainties surrounding the scope of these as noted in sections 11.2, 11.3 and 11.4 below. |
| **2. Summary of IP likely to be** — **11:2A** <br><br>_DeMorgan Group Services Agreements_ | _General comment regarding employees_ <br><br>Please see our comments in section 9:2C regarding |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612013

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company**[6]

Zuhl is party to a number of DeMorgan Group Services Agreements. Doc ID DM140 states that Zuhl has been the recipient of services under:

- Services Agreement with Integyrz (services provider) (Doc ID DM52)
- Services Agreement with Interconnected Research (service provider) (Doc ID DM45)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM29)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM12)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Zuhl (as services recipient). However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects. We note as follows regarding the projects carried out under the Services Agreements for Zuhl:

- Services Agreement with Integyrz (services provider): projects covered by this arrangement are simply described as "TBD". Note that this work had a completion date of 30 June 2017 and therefore may be incomplete; and
- Services Agreement with Interconnected Research (service provider): projects covered by this arrangement are simply

employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

Services Agreement

It is likely that these Core IP Rights will be owned by Zuhl (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Zuhl ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Zuhl IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Zuhl. We have therefore added this into Schedule E of the Draft IP Assignment Schedule Report. Given the projects under these agreements are defined as "TBC" we note that it is only possible to describe~~s~~ these very generally.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made. ~~We~~

---

[6] A draft Assignment Schedule for the Zuhl IP Assignment is set out in Schedule E of the Draft IP Assignment Schedule Report.

Formatted: DMReference

CONFIDENTIAL

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| described as "TBD".  Note that this work had a completion date of 30 June 2017 and therefore may be incomplete. | have been instructed, and we have assumed for present purposes that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM 161).  However, please confirm that our assumption is correct particularly given, again,We note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership positionThis could mean that the work is incomplete. |

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.  **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule E of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.

> **Formatted:** Font: Bold
>
> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612015

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |

**11:2B**

Contractor created material

Zuhl has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

Doc ID DM113 (Zuhl Tax Incentive Application (2013-2014)) refers to the following Zuhl projects (in summary):

- "Project - Social Learning system"
  - o "Core - Integrating Distributed Autonomous Smart Organisation DASO to Zuhl"
  - o "Core - 3D Neural Network"
  - o "Supporting - Base system"

In addition Doc ID DM160 ((list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications":

- "P2P social network payment settlement system "
- "Distributed Reputation system"
- "Reputation based authentication system "
- "System and method for creating a secure trusted social network with reputation recorded into the blockchain"
- "Method of Sharing Possessions among "Friends" Connected through a Social Network using blockchain based tracking"
- "A method and system to allow for the exchange of personal information whilst maintaining [privacy] in social and dating networks"

Please see comments above in 11:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612016

| ZUHL | | COMMENTS REGARDING APPROACH |
|---|---|---|
| **3. Red Flag Third Party Issues** | **11:3A**<br><br>Uyen Nguyen<br><br>The response to the initial information request (Doc ID DM152) states that Uyen Nguyen (USA) was engaged as an individual contractor by Zuhl.  It is therefore possible that she may have created some of the work outlined in section 2 above.<br><br>RFI #11 indicated that no written contract was entered into between Zuhl and Uyen Nguyen. | As noted in 8:3A, all intellectual property rights in material created by an independent contractor will generally vest in the independent contractor under Australian law.  Therefore, absent an assignment of those intellectual property rights, they will remain owned by the independent contractor.<br><br>Therefore, in the absence of any written contract with Uyen Nguyen, it is likely that under Australian law she remains the owner of all intellectual property rights in any material that he created for Zuhl.  (We note for completeness that Uyen Nguyen was located in the USA.  Whilst we have only considered the position under Australian law, please note that this could also raise US law considerations.)<br><br>~~Zuhl should assess the importance of the work undertaken by Uyen Nguyen and determine whether it is necessary (and possible) to approach him to assign relevant Core IP Rights.  Given Uyen Nguyen appears to have been a director of W&K at the time of the litigation that Craig Wright brought against it as described in section 22:3C we query whether there raises a question mark over the likelihood of obtaining such an assignment.~~ <u>We have been instructed that Uyen Nguyen is willing to execute an IP assignment (Doc ID DM 161).</u>  **We will therefore prepare an IP Assignment from Uyen Nguyen in addition to the other IP Assignments.** |
| **4. Other issues to note** | **11:4A** | ~~Note that it will be necessary to consider whether licences are still required or not.  Given that the~~ |

Formatted: DMReference

CONFIDENTIAL

DEF_01612017

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| **Grant of licences**<br><br>The response to the initial information request (Doc ID DM152) states that Zuhl has not granted any intellectual property licences, or itself been granted any intellectual property licences.  However, we note that the DeMorgan Group Services Agreements contain licences. | intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.<br><br>**Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.**<br><br>**Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.** |

Formatted: Font: Not Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01612018

## 12. Interconnected Research - overview of findings

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **12:1A**<br>Business<br><br>The primary business of Interconnected Research involves research and development focussed on cryptocurrencies (DeMorgan Group Entity shareholding table at Doc ID DM154). | At a general level, for completeness, Interconnected Research's work relating to cryptocurrencies should be captured in the IP Assignment from Interconnected Research.<br><br>**We have added this into the draft Assignment Schedule in Schedule F of the Draft IP Assignment Schedule Report.** |
| | **12:1B**<br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Interconnected Research had employees in Australia in 2014 and 2015.<br><br>• Work has also been carried out for Interconnected Research under DeMorgan Group Services Agreements (and Interconnected Research has itself also provided services to other DeMorgan Group Entities under other DeMorgan Group Services Agreements).<br><br>• Interconnected Research has submitted one previous R&D incentive claim and was intending to do so again in the 2015 financial year. | It appears possible that R&D activity has occurred via Interconnected Research, both through via its employees and under DeMorgan Group Services Agreements, and as such Interconnected Research could own Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 12:2, 12:3 and 12:4 below. |
| **2. Summary of IP likely to be owned by the** | **12:2A**<br>Employee created material (generally) | As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns |

<div style="border:1px solid">Formatted: DMReference</div>

CONFIDENTIAL

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| **company**[7] The response to the initial information request (Doc ID DM152) indicates that Interconnected Research has had a number of employees, primarily being developers. | have been raised as to inconsistencies in the stated employer of listed individuals.<br><br>For instance, as noted in section 8:2A, a number of individuals listed as Hotwire employees have employment contracts that are actually with Interconnected Research. Please see comments in section 8:2A in this regard. For the reasons outlined in section 8:2A, we have therefore included the IP identified in sections 8:2B and 8:2C (as category 1 and category 2 created material) below in square brackets in both the draft Assignment Schedule for Hotwire as well as the draft Assignment Schedule for Interconnected Research in Schedule F of the Draft IP Assignment Schedule Report.<br><br>As noted in 8:2A, we recommend that both Hotwire and Interconnected Research check their records to confirm: (1) whether individuals listed in the list of previous Hotwire employees at Doc ID DM153 are in fact Hotwire employees or Interconnected Research employees; (2) whether Hotwire has outsourced any work to Interconnected Research; and (3) whether there is a written services agreement between Hotwire and Interconnected Research. This will assist with determining whether the certain Core IP Rights are currently owned by Hotwire, or Interconnected Research, or potentially both entities. |

> **Formatted:** Font: Not Bold

---

[7] A draft Assignment Schedule for the Interconnected Research IP Assignment is set out in Schedule F of the Draft IP Assignment Schedule Report.

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612020

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
| --- | --- |
| | At this stage, given it appears that the work for Hotwire was primarily carried out by employees of the DeMorgan Group whilst such individuals were employed by Hotwire, we have included the IP identified in section 8:2B and 8:2C in the draft Assignment Schedule for Hotwire in Schedule B of the Draft IP Assignment Schedule Report.  However, due to the risk that some of this work could have occurred after those individuals became employed by Interconnected Research, we have (for the sake of completeness) included a reference to the Core IP Rights in such work in the draft Assignment Schedule for Interconnected Research in Schedule B of the Draft IP Assignment Schedule Report.  We have drafted this only to catch such Core IP Rights to the extent they are in fact owned by Interconnected Research (due to this change in employment status). |
| | Further, as noted in section 9:2A, Dr Stef Savanah is stated to be an employee of Integyrz in the response to the intial information request at Doc ID DM152, but her employment contract is with Interconnected Research. Please note that, for the reasons given in section 9:2A, we have at this stage added the Core IP Rights identified at section 9:2B into the draft Assignment Schedule for Integyrz in Schedule C of the Draft IP Assignment Schedule Report, not the draft Assignment Schedule for Interconnected Research.  However, if there is any change to the position and assumptions outlined in section 9:2A in this regard, this could require changes to move or replicate this into the Assignment Schedule for |

Formatted: Font: Not Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01612021

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|

**Interconnected Research.**

The above are issues identified from the Review Material. As the Review Material does not contain a full list of employees, or a full copy of all employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided. However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights.

We have otherwise proceed, subject to our comments in section 6 above, on the basis that material created by its employees is owned by Interconnected Research as employer.

**12:2B**

Employee created material (category 1)

Interconnected Research has filed an R&D incentive claim which gives further detail regarding the work undertaken by the company.

Doc ID DM103 (Interconnected Tax Incentive Application (2013-2014)) refers to the following Interconnected Research projects (in summary):

- "BTC Accounting: XBT Accounting Project"
  - o "Core - Bitcoin daemon and mapping system"
  - o "Supporting - Development of a base accounting system that can be linked to the Blockchain"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) refers to the following "patent pending applications" for

Please see comments above in section 12:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS DRAFT
73
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612022

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| Interconnected Research:<br><br>• "blockchain based accounting system"<br>• "blockchain based accounting system" (a system and method to utilise the blockchain for an accounts receivable system)<br>• "System and method for conducting an electronic financial asset deposit auction using the Blockchain"<br>• "Method and electronic apparatus for performing automated book keeping utilising the Blockchain"<br>• "P2P System and method for facilitating the lending of digital content using contacts lists"<br>• "P2P Personal financial network"<br>• "A system [for] reading, organizing and manipulating accounting data held within the blockchain"<br>• "Blockchain based activity information accounting method and system"<br>• "System and method for automatically managing bad accounts of accounts receivable using the Blockchain"<br>• "Transaction accounting payment and classification system for Blockchain [based] accounting"<br>• "A method to Integrate utility accounting, materials management, work management and regulatory reporting software based on the Blockchain"<br>• "Automatic taxonomy merge system for blockchain based accounting"<br>• "Extensible vote based property ownership system"<br>• "Vote based blockchain requisition and authorization process"<br>• "Method and system to manage blockchain enabled services for multiple managed computer systems" | |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS   DRAFT
74
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612023

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|

- "XML mapping system block chain integration"
- "An integrated secure blockchain based voting system"
- "Auditable secret voting system"

**12:2C**

DeMorgan Group Services Agreements

Interconnected Research is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Interconnected Research has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM51
- Consultancy Agreement with Pholus (service provider) Doc ID DM9
- Consultancy Agreement with Panopticrypt (service provider) Doc ID DM26

All of these Agreements contain an assignment of intellectual property rights from the service provider to Interconnected Research (as services recipient). However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects. We note as follows regarding the projects carried out under the Services Agreements for Interconnected

General comments regarding employees

Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

Services Agreements

It is likely that the Core IP Rights in these listed projects will be owned by Interconnected Research (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Interconnected Research ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Interconnected Research IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Interconnected Research. We have therefore added this into Schedule F of the Draft IP Assignment Schedule Report.**

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814 v11SYDDMS2635814-v1 1SYDDMS  DRAFT
75
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612024

## INTERCONNECTED RESEARCH

Research:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) XBT Accounting System; (2) XBT Accounting System (regulated); and (iii) XBT Accounting System Commercialisation.  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

## COMMENTS REGARDING APPROACH

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made , and we have assumed for present purposes We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM161).  However, please confirm that our assumption is correct particularly given, again,We note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership positionThis could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule F of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third

| Formatted: DMReference |
| --- |

CONFIDENTIAL

DEF_01612025

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| | party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here. |
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |
| **3. Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| **4. Other issues to note** | **12:4A** | Services Agreement |
| | DeMorgan Group Services Agreements | It is likely that these Core IP Rights will be ~~owend~~ owned by the DeMorgan Group Entities acting as services recipients (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Interconnected Research ~~and subject to our comment below regarding payment.~~ |
| | In addition to the DeMorgan Group Services Agreements listed at 12:2C, Doc ID DM 140 identifies Interconnected Research as the service provider under the following DeMorgan Group Services Agreements: | |
| | • Services Agreement with C01N (services recipient) (Doc ID DM44) | Please see our comments in section 9:2C above regarding issues regarding the distinction between "Project Foreground IP" and "Provider IP" under the DeMorgan ~~Groupo~~ Group Services Agreements. The same issues arise here. |
| | • Services Agreement with Cloudcroft (services recipient) (Doc ID DM42) | |
| | • Services Agreement with Coin-Exch (services recipient) (Doc ID DM43) | |
| | • Services Agreement with DASO (services recipient) (Doc ID DM41) | **As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the "Project Foreground IP") be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Interconnected Research to capture any residual** |
| | • Services Agreement with Integyrz (services recipient) (Doc ID DM48) | |
| | • Services Agreement with Panopticrypt (services recipient) (Doc ID DM40) | |
| | • Services Agreement with Pholus (services recipient) (Doc | |

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT

77

Wright Family Trust - overview of findings

DEF_01612026

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|

ID DM47)

- Services Agreement with Zuhl (services recipient) (Doc ID DM45)
- Services Agreement with Denariuz (services recipient) (Doc ID DM46)
- Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM33)
- Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM35)
- Consultancy Agreement with Chaos (services recipient) (Doc ID DM34)  (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials).

As referred to in section 8:4A there is also an R&D Services Agreement between Coin-Exch Pty Ltd and Hotwire Preemptive Intelligence Ltd and Interconnected Research Pty Ltd on similar terms where both Hotwire and Interconnected Research act as service provider.

All of these Agreements contain an assignment of intellectual property rights from Interconnected Research (as service provider) to the DeMorgan Group Entity acting as services recipient. However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Interconnected Research is acting as service provider.

**"Provider IP" retained by Interconnected Research (as service provider).  We have added a general description of these retained rights into Schedule F of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.**

We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid".  ~~Please note that we have assumed for present purposes that~~We have been instructed that all such amounts have been paid (and therefore that the assignments have taken effect) (Doc ID DM161). However, ~~please confirm that our assumption is correct particularly given~~We note that the completion date for this work is, ~~as noted,~~ not until 30 June 2017.  ~~If this assumption is incorrect please let us know as this will alter the ownership position.~~This could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.

**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreements) be included in the IP Assignments from the DeMorgan Group**

Formatted: DMReference

78

Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612027

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| | Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Interconnected Research to capture any residual intellectual property rights retained by Interconnected Research as services provider. We have added a general description of these retained rights into Schedule F of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained. |

**Formatted:** Font: Not Bold

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9.2C above.

**12:4B**

Grant of licences

The response to the initial information Doc ID DM 152 states that Interconnected Research has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that many of the DeMorgan Group Services Agreements contain licences.

Note that it will be necessary to consider whether licences are still required or not. Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.

Consideration will need to be given moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.

**Formatted:** Font: Not Bold

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612028

## 13. Denariuz - overview of findings

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | |

**13:1A**

Business

The primary business of Denariuz relates to a Bitcoin Banking System (response to initial information request at Doc ID DM152).

At a general level, for completeness, Denariuz's work relating to the Bitcoin Banking System should be captured in the IP Assignment from Denariuz.

**We have added this into the draft Assignment Schedule in Schedule G of the Draft IP Assignment Schedule Report.**

**13:1B**

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):

- Denariuz has never had any employees.
- Work has been carried out for Denariuz under DeMorgan Group Services Agreements (and Denariuz has itself also provided services to Daso under a DeMorgan Group Services Agreement).
- Denariuz has submitted one previous R&D incentive claim and was intending to do so again in the 2015 financial year.

It appears possible that R&D activity has occurred via Denariuz but only via DeMorgan Group Services Agreements. As such, Denariuz could own some Core IP Rights. However, there are a number of uncertainties surrounding the scope of these as noted in sections 13.2, 13.3 and 13.4 below.

**2. Summary of IP likely to be**

**13:2A**

DeMorgan Group Services Agreements

General comments regarding employees

Please see our comments in section 9:2C regarding

Formatted: DMReference

DEF_01612029

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company**[8]

Denariuz is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Denariuz has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM55
- Services Agreement with Interconnect☐d Research (service provider) Doc ID DM46
- Consultancy Agreement with Pholus (service provider) Doc ID DM15
- Consultancy Agreement with Panopticrypt (service provider) Doc ID DM30

All of these Agreements contain an assignment of intellectual property rights from the service provider to Denariuz (as services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Denariuz:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) Bitcoin Core banking; (2) Bitcoin Bank regulated; (3) Bitcoin Payment and Merchant

employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

Services Agreements

It is likely that the Core IP Rights in these listed projects will be owned by Denariuz (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Denariuz ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Denariuz IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Denariuz.  We have therefore added this into Schedule G of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made. We have been instructed, ~~and we have assumed for present purposes~~ that all payments have been made (and

---

[8] A draft Assignment Schedule for the Denariuz IP Assignment is set out in Schedule G of the Draft IP Assignment Schedule Report.

Formatted: DMReference

## DENARIUZ

Gateway; (4) Smart Contract (basic transactions).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

- Services Agreement with Interconnected Research (services provider) covers the following projects: (1) Bitcoin Core banking; (2) Bitcoin Bank regulated; (3) Bitcoin Payment and Merchant Gateway; (4) Smart Contract (basic transactions).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

We also note that Doc ID DM110 and DM111 (AusIndustry R&D Tax Incentive application forms 2014-2015 and 2013-2014 respectively) refer to collaborations with an unspecified "research service provider".  We assume that this reference to an unspecified "research service provider" is, in fact, a reference to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus) given it is clear that work has been outsourced to these entities (and given no other third party is referred to as providing services to Denariuz in any of the other Review Material).  However, as noted in our comments to the right, this should be confirmed.

## COMMENTS REGARDING APPROACH

therefore that the assignments have taken effect) (Doc ID DM161).  However, please confirm that our assumption is correct particularly given, again,We note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership position.This could mean that the work is incomplete.

### Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule G of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

### Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.

### Unspecified "Research Service Provider"

Formatted: DMReference

CONFIDENTIAL

DEF_01612031

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| | Finally, as noted to the left, we have assumed that the references to collaboration with an unspecified "research service provider" in Doc ID DM110 and DM111 in the course of research and development activity are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). ~~Please let us know if this assumption is incorrect.~~ ~~If this is incorrect, and Denariuz work has been performed by other third parties, this will need to be investigated separately.~~ ~~Further, if any of those references are to third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the Denariuz Core IP Rights.~~We have been instructed that no other Third Parties are involved. |
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |

| **13:2B** | Please see comments above in 13:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights. |
|---|---|
| Contractor created material | As noted in section 10:2B above, we have been instructed that some of this work has been conducted via *both* Daso and Denariuz (Doc ID DM205). The projects listed as worked on via both Denariuz and Daso (as set out in section 10:2B above) may have resulted in Core IP Rights arising from that work being either jointly owned by Denariuz and Daso, or in some Core IP Rights arising from that work being owned by Daso and some by Denariuz. **As such, we have reflected the "joint" projects identified in section 10:2B in both the draft** |
| Denariuz has filed an R&D incentive claim which gives further detail regarding the work undertaken by the company. | |
| Doc ID DM111 refers to the following Denariuz projects (in summary): | |
| • "DASO: Decentralized Consensus (Distributed Autonomous Smart Organisation) Project" | |
| ○ "Core - Virtualised HPC" | |
| ▪ "Supporting - Development of a virtualised multicore platform" | |
| ○ "Core - Decentralized Autonomus Consus Platform | |

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT
83
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612032

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| (DACP)" | Daso IP Assignment schedule in Schedule D of the Draft IP Assignment Schedule Report and the draft Denariuz IP Assignment schedule in Schedule G of the Draft IP Assignment Schedule Report. |

- "Core - DACP Assurance Contracts"
- "Core - Experimental Case Studies"
- "Core - Time Clock and Log-in based contractor DAC"
- "Core - Peer to Peer Insurance Markets and DAC"
- "Core - DASO employment and contractor Smart Contract"
- "Core - Anti-Fraud loyalty DASO"
- "Core - Smart Switch DASO"
- "Core - Triple entry distributed Ledger"
- "Core - Sub experiment and extension"
- "Core - Trustless Oracle"
- "Core - Smart Registry"
- "Core - Multi Signature Trust"
- "Core - Sportsbook"

Doc ID DM110 refers to the following Denariuz projects (in summary):

- "Distributed Autonomus Smart Organisation Project (DASO)"
- "Smart Contracts"
- "Multilayer Perceptrons for DASO"
- "Decentralized Autonomus Consensus Platform (DACP)"
- "Experimental DASO Case Studies"
- "Online Distributed Ledger DASO"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications" for Denariuz:

**Formatted:** DMReference

CONFIDENTIAL

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

- "Consolidated blockchain based accounting"
- "Multi signature trust"
- "Distributed financial distress rating system"
- "One-step posting for approval-based ledger transactions using multi-[signature] wallets"
- "Non-interest property purchase"
- "Lease and loan sub-ledger blockchain accounting methods and system"
- "A capital asset planning system for smart property contracts"
- "Combination cryptocurrency wallet and muli-account ledger balancing system for monitoring a user's spending habits in real-time"
- "System and method for capturing and storing casino information in a Blockchain"
- "Financial management system and method with blockchain transaction and non-debt management"
- "System and method for margin loan securitization using non-debt based allocation and account payment"
- "Blockchain mapped budgetary ledger"
- "Intercompany transactions elimination system"
- "A stock allocation and capitalisation system for a DAC"
- "A bond system for a DAC"
- "Sportsbook"
- "Method and system for using invoice categorization in blockchain accounting to deliver an automated management application"
- "Electronic P2P Margin Management System For Managing Actions Such As Margin Calls Under Margin Agreements"
- "Electronic P2P Martin Management System For Managing

**Formatted:** DMReference

CONFIDENTIAL

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

Actions Such As Margin Recalls Under Margin Agreements"

- "Method and system for facilitating commerce, social interaction and charitable acitivites as a distributed autonomous Social organisation"
- "Automata, system and Method for Equity-Based Compensation Accounting utilising the Bloc[k]chain"
- "Smart event ticketing"
- "Methods and systems for improving timely loan repayment by controlling online accounts, notifying social contacts, using loan repayment DASo's employing social graphs"
- "Verify signed software on the Blockchain"
- "System and method of tracking and recognizing the exchange of favours in a DASO"
- "DASO - (e) Sports bet (85%)"
- "User-controlled blockchain verified sweepstakes entries"
- "Blockchain enabled Enterprise information management system and methods"
- "System and method for international merchandise return service against the blockchain"
- "DASO - (a) Employment smart contract"
- "DASO - (c) Anti-fraud loyalty"
- "Blockchain verified Player reward program with loyalty-based reallocation"
- "Automatically verified Player reward program with loyalty-based reallocation"
- "DASO - (d) Smart switch"
- "DASO - (b) Time clock"
- "Vehicle history log"
- "Autonomous consensus platform"
- "Method and system for generating occupant schedules that

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612035

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| | |

are maintained in the blockchain"

- "DASO and method for collaborative shopping, business and entertainment"
- "Deterministic Finite Automata Graph Traversal with Nodal Bit Mapping based on a distributed block system"

**3. Red Flag Third Party Issues**

**13:3A**

Third party research service provider

Please see comments in section 13:2A regarding research service providers utilised by Denariuz as referenced in Doc ID DM110 and DM111.  As noted in section 13:2A, we have assumed that these are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus).

As noted in section 13:2A, we have assumed that these are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). However, if this is incorrect, and any of these references are to other third parties outside the DeMorgan Group, this raises a risk of a Red Flag Third Party Issue with regard to the Denariuz Core IP Rights.  We have been instructed that no Third Parties are involved.

Please see comments in section 13:2A.

**4. Other issues to note**

**13:4A**

Assignment to Daso

In addition to the DeMorgan Group Services Agreements listed in 13:2A, the DeMorgan Group internal Agreements Register (Doc ID DM 140) identifies Denariuz as the service provider under a Consultancy Agreement with Daso (services recipient) (Doc ID DM39).

This Agreement contains an assignment of intellectual property rights from Denariuz (as service provider) to Daso as services recipient.  However, in terms of the scope of the assignment, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements that are *Consultancy Agreements* operate in the same manner with regard to intellectual property rights) whilst also noting that in this instance Denariuz is acting as the

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.

**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreement between Daso and Denariuz) be included in the IP Assignment from Daso (as services recipient), leaving the blanket nature of the IP Assignment from Denariuz to capture any residual intellectual property rights retained by Denariuz as services provider.  We have added a general description of these retained rights into Schedule G of the Draft IP Assignment Schedule**

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT
87
Wright Family Trust - overview of findings

Formatted: DMReference

DEF_01612036

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

service provider.

**Report. We note that it will only be possible to describe these retained rights very broadly given the uncertainty regarding what has been retained.**

We note that the response to the initial information request at Doc ID DM152 specifically indicates that IP has been assigned to Daso by Denariuz. Whilst it is unclear why this assignment has been singled out over the other DeMorgan Group Services Agreements pursuant to which Daso obtains assignments of intellectual property rights from other DeMorgan Group Entities as outlined in section 13:2A above, we have been instructed (RFI #9 and #47) that Doc ID DM39 is the only assignment of intellectual property rights between these two entities.

Finally, we also note that some of the listed IP above in section 13:2B seems on its face to relate to Daso (given the word "Daso" forms part of the name of a number of the projects) has been identified to us as "jointly" created with Daso, but there is no way to tell from the face of the documents if this was created under the Consultancy Agreement with Daso or not. As such, we have at this stage dealt with such work as set out in section 13.2B above. However, if Denariuz is aware that some of this work was in fact carried out under the Consultancy Agreement with Daso please let us know as this is likely to change the ownership position.

**13:4B**

Assignment to Misfit Games

Despite the response to the initial information request stating that no intellectual property rights had been assigned by Denariuz to any other entity other than Daso (as noted in section 13:4A above) we note Denariuz has also entered into an IP Deed of Assignment under which it confirms that it has assigned certain intellectual property rights to Misfit Games (Doc ID DM147).

The IP Deed of Assignment intellectual property rights intended to be assigned appear intended to relate to "Heat and Power simulations to be conducted on the Denariuz SuperComputer system at a max load of 50TFlop for 3 months" being the "Core

There are a number of issues raised by the drafting of the assignment.

Firstly, there is a question over whether it itself assigns any rights given it appears to simply confirm that Denariuz has completed, or will complete at its earliest opportunity, an irrevocable assignment of any "existing and future Intellectual Property and Intellectual Property Rights". We have not separately seen any document under which the intellectual property rights are separately assigned and understand that there may not be any such separate document. This raises a question over whether the assignment has actually occurred or not (which is heightened due to the fact that Doc ID DM152 does not identify this in the list of assignments by

Formatted: DMReference

CONFIDENTIAL

DEF_01612037

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| Technology". | Denariuz).  However, even if it has not occurred, Denariuz agrees pursuant to the IP Deed of Assignment to complete the assignment (and grants a licence to use the relevant rights until this is done) meaning it could be called on to perfect the assignment if necessary.  ~~As such, we suggest that Denariuz and Misfit Games check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed.  If it has not, please let us know as this could alter the position.~~

Secondly, there is a risk that the assignment envisaged by the IP Deed of Assignment is broader than just the intellectual property rights in the "Core Technology" as the assignment is of both "Intellectual Property" (which is defined, in summary, as including certain property relating to the "Core Technology") and "Intellectual Property Rights" (which is not defined by reference to the "Core Technology" at all).  This opens a risk that more of Denariuz's Core IP Rights were assigned to Misfit Games than just the Core IP Rights in the "Core Technology".  This risk is somewhat mitigated (although not removed entirely), however, by the fact that the IP Deed of Assignment states, in its background Recitals, that "the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology they are createing" which supports an interpretation that limits the assignment to the "Core Technology".

**For the reasons set out above, we have added the Core IP Rights relating to the "Core Technology"** ~~only~~ **into the Assignment Schedule for Misfit Games** |

Formatted: DMReference

CONFIDENTIAL

DEF_01612038

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| | **in Schedule O of the Draft IP Assignment Schedule Report,** |

**Formatted:** Font: Not Bold

However, we have also, for completeness, added any Core IP Rights retained by Denariuz into the Assignment Schedule for Denariuz in Schedule G of the Draft IP Assignment Schedules Report.

**13:4C**

Grant of licences

The response to the initial information request at Doc ID DM152 states that Denariuz has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that many of the DeMorgan Group Services Agreements contain licences.

Note that it will be necessary to consider whether licences are still required or not. Given that the intellectual property rights being licenced under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.

Consideration will need to be given moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with,

**Formatted:** Font: Not Bold

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612039

## 14. C01n - overview of findings

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **14:1A** <br><br> <u>Business</u> <br><br> The primary business of C01n (previously called Strasan Pty Ltd) relates to eWallet and iDaemon (Doc ID DM154). | At a general level, for completeness, C01n's work relating to eWallet and iDaemon should be captured in the IP Assignment from C01n. <br><br> **We have added this into the draft Co1n Assignment Schedule in Schedule H of the Draft IP Assignment Schedule Report.** |
| | **14:1B** <br><br> <u>Volume of likely Core IP Rights</u> <br><br> In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): <br><br> • C01n has never had any employees but has in the past engaged two independent contractors in Australia. <br> • C01n has filed R&D incentive claims in the past and was intending to do so again in the 2015 financial year. <br> • Work has been carried out for C01n in the past by other DeMorgan Group Entities under DeMorgan Group Services Agreements. | It appears possible that R&D activity has occurred via C01n, but only via DeMorgan Group Services Agreements and two independent contractors rather than employees. As such, C01n could own some Core IP Rights. However, there are a number of uncertainties surrounding the scope of these as noted in sections 14.2, 14.3 and 14.4 below. |
| **2. Summary of IP likely to be** | **14:2A** <br><br> <u>DeMorgan Group Services Agreements</u> | <u>General comments regarding employees</u> <br><br> Please see our comments in section 9:2C regarding |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612040

| C01N | COMMENTS REGARDING APPROACH |
|------|------------------------------|
| **owned by the company**[9] C01n is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that C01n has been the recipient of services under:<br><br>• Services Agreement with Integyrz (service provider) Doc ID DM53<br>• Services Agreement with Interconnected Research (service provider) Doc ID DM44<br>• Consultancy Agreement with Pholus (service provider) Doc ID DM20<br>• Consultancy Agreement with Panopticrypt (service provider) Doc ID DM25<br><br>All of these Agreements contain an assignment of intellectual property rights from the service provider to C01n (as services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).<br><br>As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for C01n:<br><br>• Services Agreement with Integyrz (services provider) covers the following projects: (1) eWallet Secure; (2) iDaemon; and (3) 3D Transactions Analysis Tool.  Note that this work has | employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.<br><br>Services Agreements<br><br>It is likely that the Core IP Rights in these listed projects will be owned by C01n (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to C01n ~~and subject to our comment below regarding payment~~.<br><br>Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the C01n IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to C01n.  We have therefore added this into Schedule H of the Draft IP Assignment Schedule Report.**<br><br>As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made ~~, and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc |

---

[9] A draft Assignment Schedule for the Co1n IP Assignment is set out in Schedule H of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

DEF_01612041

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

a completion date of 30 June 2017 and therefore may be incomplete.

- Services Agreement with Interconnected Research (services provider) covers the following projects: (1) eWallet Secure; (2) iDaemon; and (3) 3D Transactions Analysis Tool.  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

We also note that Doc ID DM88 and DM90 (AusIndustry R&D Tax Incentive application form 2012-2013 and 2013-2014 respectively) refers to collaboration with an unspecified "private research organisation".  We assume that this reference to an unspecified "private research organisation" is, in fact, a reference to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus) given it is clear that work has been outsourced to these entities (and given no other third party is referred to as providing services to C01n in any of the other Review Material).  However, as noted in our comments to the right, this should be confirmed.

ID DM 161.  However, please confirm that our assumption is correct particularly given, again, We note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership position This may mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule H of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.

Unspecified "private research organisation"

Finally, as noted to the left, we have assumed that the

Formatted: DMReference

CONFIDENTIAL

DEF_01612042

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

COMMENTS REGARDING APPROACH

references to collaboration with an unspecified "private research organisation" in Doc ID DM88 and DM90 in the course of research and development activity are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). ~~Please let us know if this assumption is incorrect. If this is incorrect, and C01n work has been performed by other third parties, this will need to be investigated separately. Further, if any of those references are to third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the C01n Core IP Rights.~~ However, we have subsequently been instructed that two other Third Parties worked with C01n – one company undertook chip and board design work to C01n and Craig Wright's specifications, and another Chinese company put together boards and hardware (Doc ID DM205). This raises a risk of a Red Flag Third Party Issue as noted below in section 14:3C.

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

**14:2B**

Contractor created material

C01n has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

Doc ID DM88 and DM90 refer to the following C01n projects (in summary):

- "Sukuriputo: Sukuriputo okane"
  - "Core - Scriptable Money"

Please see comments above in section 12:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights.

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT
94
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612043

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

      o  "Supporting - Coding test site"

      o  "Core - Transaction signing"

• "Sukuriputo: Sukuriputo okane"

      o  "Core - Scriptable Money"

      o  "Core - BTC Agents"

           ▪  "Supporting - Coding test side"

      o  "Core - Transaction Signing"

In addition Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) refers to the following "pending patent applications":

• "Method for the processing of allocated and automated collored coins"

• "Coloured coins"

• "System, method and computer program product for reconciling financial data from multiple sources and tagged "coloured coin" sources"

• "Colored coin exchange exception balancing system"

• "On block Future Derivative and risk instrument"

• "Programmable Bond system"

• "Single or multi-company business accounting system and method for same including account number maintenance"

• "Method and system for storing inventory holders against a tagged Blockchain token"

• "System and method for utilizing proforma processing of adjustments in consolidation processes based on colored coins"

• "Date effective quantity on hand and adjusted unit cost calculation system for cryptocurrencies"

• "Blockchain automata financial trading method and system"

• "System and method for synchronizing ledger accounts by

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612044

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

company group in blockchain allocated transactions"

- "Secure account aggregation using the Blockchain with one-way chains"
- "Programmable budget"
- "A method of automatic accounting that can be used for Input, Authorize and Settlement without need for reconciliation"
- "Method and system to allow for the adjustments to relational chart of accounts against the blockchain"
- "Selective Processing of Reverse Invoices in Computer Systems for Financial Transactions and implementing a chargeback system for merchant using a blockchain based system"
- "System and method for utilizing proforma processing of adjustments in blockchain based consolidation processes"
- "System, method and computer program product for automatically posting transactions associated with a transaction in the blockchain that is mapped to an account into a general ledger"
- "6. Intelligent bitcoin agents"
- "System and method for cryptocurrency business logic and validation"
- "Automated autromata and system and method for managing and monitoring financial performance associated with benefits"
- "Automated blockchain system for customizing and managing benefits"

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814 v11SYDDMS2635814 v1SYDDMS DRAFT
96
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612045

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**14.3A**

Shaoib Mahammad

The response to the initial information request (Doc ID DM152) states that Shaoib Mahammad worked as an independent contractor for C01n.  It is therefore possible that he may have created some of the work outlined in section 14:2 above.

RFI #12 indicates that Shaoib Mahammad worked on putting together "different versions of the modules and project managed the process".  The reference to "modules" appears to be a reference to "Hardware modules for Hoyts and Qantas staff credit union".

RFI #12, #39 and #41 indicate that Shaoib Mahammad was engaged "via Critical Infrastructure" in the sense that "any payment made would go to the company, not the individual", but that there is no written contract between C01n and Shaoib Mahammad or between C01n and Critical Infrastructure.  RFI #40 notes that "Critical Intrastructure" was "Shaoib's company" and had "[n]o relation to the group".

RFI #12 indicates that Shaoib Mahammad ceased working as a contractor for C01n, but continued in the capacity of a director.

Please see our comments in section 8:3A above regarding independent contractors.  Those comments also apply here.

Therefore, in the absence of any written contract with Shaoib Mahammad or Critical Infrastucture, it is likely that under Australian law Shaoib Mahammad or Critical Infrastructure (to the extent that it was his employer, or otherwise took an assignment of those rights) remains the owner of all intellectual property rights in any material that he created for C01n.

C01n should assess the importance of the work undertaken by Shoaib Mahammad and determine whether it is necessary (and possible) to approach him and/or Critical Infrastructure (as relevant) to assign relevant Core IP Rights.  We have been instructed that Shaoib Mahammad was a project manager, not a designer, architect or developer, and that he did not create any Core IP Rights that are of ongoing use to the DeMorgan Group (Doc ID DM205).  As such, we are instructed that the DeMorgan Group does not wish to approach Shoaib Mahammad for an assignment of any intellectual property rights (Doc ID DM205).

We also note that this appears to relate to work for Hoyts and Qantas.  We have not been provided with any contracts with Hoyts or Qantas governing such work.  We note for completeness that to the extent that such contracts exist, it is also would be possible that these could have an impact on the ownership position for these Core IP Rights.  However, we have been instructed that the work for Hoyts and Qantas never

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: Font: Not Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01612046

| C01N | COMMENTS REGARDING APPROACH |
|------|------------------------------|

eventuated, and that there are no contracts in this regard (Doc ID DM205). If no work was ever undertaken, this is unlikely to have an impact on the ownership of any Core IP Rights.

> **Formatted:** Font: Not Bold

**14:3B**

Assignment from Professor Rees

The response to our initial information request (Doc ID DM152) states that C01n has been assigned intellectual property rights by "W&K and Professor Rees".

However, we were subsequently instructed that W&K had no involvement and that this only related to an assignment from Professor Rees in his personal capacity (RFI #44).

RFI #17 states that *"On 30 June 2013 C01N paid 19,470.12 XBT to Professor David Rees for research notes relating to Professor Rees' work related to cryptography. The Rees material is of immense importance to C01N as it contains the key knowledge required to progress the company's long term ambitions. Furthermore, the material is inherently valuable due to its exclusivity to C01N. Professor Rees stopped publishing in 1952 although he continued to research in his field of expertise well into the current century (he passed away in 2013). By purchasing Professor Rees' research notes C01N is and will remain the sole beneficiary of this work."*

However, RFI #17 and RFI #44 both confirm that no contract or formal assignment agreement was ever entered into with Professor Rees. The only documentation provided as part of the Review Material has been a set of invoices and evidence of payment.

The invoice from David Rees to C01n (then called Strasan Pty Ltd)

Based on the documentation provided, there is a real question over whether there has been an assignment of any intellectual property rights from Professor David Rees to C01n. On the face of the documentation in the Review Material, we think it is unlikely that there is an effective assignment of intellectual property rights at law given there is nothing to suggest, on the face of the material, an intention to assign any intellectual property rights.

This gives rise to a serious risk that these Core IP Rights remained owned by Professor Rees (who passed away in 2013).

We suggest we discuss, particularly given the comments noted to the left that these Core IP Rights are of critical importance to C01n's work. It is possible, depending on the facts, that the parties have been mutually operating on the basis that an assignment of intellectual property rights has taken place and therefore, even if this is not correct at law, there may potentially be grounds to argue that the parties should be estopped from proceeding on another basis - however, the likelihood of such an argument being successful will depend very closely on the detailed facts, which are likely to be further complicated here due to Professor Rees' death in

> **Formatted:** DMReference

CONFIDENTIAL

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

is for:

- "License of software for research and development project. Automated design and BTC chain splitting.  Algebra known as semi-group theory and commutative algebra - For use in developing an automated self-matching learning System. Solutions using the Otway-Rees protocol and Northcott-Rees theory of reductions and integral closures".

The bill/final invoice attached to the transaction summary noting payment describes the material as "Algorithmic Matching system".

Payment is in Bitcoin.

2013.  We suggest we discuss further.

We have been instructed that Professor Rees was engaged to *verify* Craig Wright's mathematics in relation to commutative ring theory.

Whilst this gives rise to a potential Red Flag Third Party Issue we note that: (1) whilst the facts would need to be explored in more detail to determine the exact nature of Professor Rees' input (in order to determine whether any Core IP Rights arose from that input and whether this gives rise to any issues including as to patentability), if as instructed  Professor Rees' work related solely to verification of work originally conducted by Craig Wright, there is a reasonable argument that the Core IP Rights that are actually of ongoing relevance to the DeMorgan Group (and used by the DeMorgan Group) are owned by Craig Wright as the original creator; and (2) we are instructed that, given the death of both Professor Rees and his wife since this occurred, whilst there is a theoretical risk of a Red Flag Third Party issue arising via Professor Rees's estate, DeMorgan Limited's view is that the practical risk of a claim is low due to those with knowledge of the relevant circumstances now being deceased (with the exception of Craig Wright and individuals employed by the DeMorgan Group, and Uyen Nguyen).  As such, we are instructed that the DeMorgan Group does not intend to approach Professor Rees's estate for an assignment of any intellectual property rights.

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612048

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

**14:3C**

Third party "private research organisation"

Please see comments in section 14:2A regarding research service providers utilised by C01n as referenced in Doc ID DM88 and DM90.  As noted in section 14:2A, we have~~d~~ assumed that these a~~we~~re references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus).

As noted in section 14:2A, we ha~~d~~ve assumed that these a~~we~~re references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus).

~~However, if this is incorrect, and any of these references are to other third parties outside the DeMorgan Group, this raises a risk of a Red Flag Third Party Issue with regard to the C01n Core IP Rights.~~

~~Please see comments in section 14:2A~~ However, we have subsequently been instructed that two other Third Parties worked with C01n – one company undertook chip and board design work to C01n and Craig Wright's specifications, and another Chinese company put together boards and hardware (Doc ID DM205).  This raises a risk of a Red Flag Third Party Issue.

However, we have been instructed that the DeMorgan Group's view is that the intellectual property rights created by these Third Parties are not material, and that it is not used and there is no plan to use any of this intellectual property (Doc ID DM205).  Further, we are instructed that the DeMorgan Group's view, given the specifications for the work undertaken by these Third Parties was created by Craig Wright, and given Co1n paid for the work, is that the Core IP Rights in the work are owned by either C01n or Craig Wright (Doc ID DM205).  **We note for completeness that there is some risk with this proposition.  Whilst it is correct to say that, absent an assignment to any Third Party, Craig Wright will own the Core IP Rights in any specifications that he has created, there is still a possibility that separate Core IP Rights may subsist in subsequent work undertaken by these Third**

Formatted: DMReference

CONFIDENTIAL

DEF_01612049

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| | Parties and that those rights could be owned by the relevant Third Parties absent an assignment back to Co1n and/or Craig Wright. The mere fact that Co1n has paid for the work does not, at law, mean that it has been assigned any intellectual property rights. We have not seen any documentation pursuant to which such an assignment is purported to have occurred. |
| | Despite the above, given the instructions that this work is not being used by DeMorgan Group and will not be used going forwards, we confirm our understanding that Co1n does not plan to take any further steps in this regard to obtain assignments from these Third Parties. |
| | Therefore the only step we propose taking is to include a reference to the specifications in the Assignment Schedule for Craig Wright in Schedule P of the Draft IP Assignment Schedule Report. |

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**4. Other issues to note**

**14:4A**

<u>Craig Wright</u>

The response to the initial information request (Doc ID DM152) states that Craig Wright worked as an independent contractor for C01n. It is therefore possible that he may have created some of the work outlined in section 14:2 above.

RFI #12 indicates that Craig Wright "arranged design of Hardware modules for Hoyts and Qantas staff credit union" in "the initial phase" and then "continued working on the virtualized platform and the creation of a cloud managed virtual supercomputer".

Please see our comments in section 8:3A above regarding independent contractors. Those comments also apply here.

This suggests, absent a separate assignment of intellectual property rights from Craig Wright to Panopticrypt and an additional assignment from Panopticrypt to C01n (neither of which has been provided us as part of the Review Material), that the intellectual property rights in this material are likely to still be owned by Craig Wright. **We have therefore added these Core IP Rights into the Craig Wright**

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612050

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

RFI #12 and #39 state that Craig Wright was engaged by C01n "via Panopticrypt" in the sense that any payment made would go to the company, not to the individual.  However, this does not appear necessarily to have occurred via the Consultancy Agreement between C01n and Panopticrypt (referred to in section 14:2A above) since we have been instructed that there is no written contract available governing the arrangement with Craig Wright.

Further, when we sought confirmation of which DeMorgan Group Entities Craig Wright had been employed by in the past, Panopticrypt was not one of the listed employers of Craig Wright (RFI #61) and, further, we have been instructed (response to initial information request at Doc ID DM152) that Panopticrypt's employees were "admin staff only" as noted further in section 19 below We do note, however, that Craig Wright has been an employee of Panopticrypt (see section 19:4E).

**Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.**

We also note that this appears to relate to work for Hoyts and Qantas.  We have not been provided with any contracts with Hoyts or Qantas governing such work.  We note for completeness that to the extent that such contracts exist, it is also would be possible that these could have an impact on the ownership position for these Core IP Rights.  However, we have been instructed that the work for Hoyts and Qantas never eventuated, and that there are no contracts in this regard (Doc ID DM205).  If no work was ever undertaken, this is unlikely to have an impact on the ownership of any Core IP Rights.

**Formatted:** Font: Not Bold

**14:4B**

Assignment to Hotwire

The response to the initial information request (Doc ID DM152) states that C01N has assigned and licensed IP rights to Hotwire.

The Review Material provided as evidence of this assignment and licence constitutes a "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman (together, the "Client").

Please see comments in section 8:2E above.  Those comments also apply here.

For the reasons outlined in section 8:2E above, **for present purposes, we suggest proceeding on the basis that there has been a valid assignment of the Core IP Rights created by C01n pursuant to the Software Development Agreement at Doc ID DM82 to Hotwire.**

**However, given the identified risks, we also recommend expressly including any retained rights in the IP Assignment from C01n and we have therefore added such rights into the draft Assignment Schedule at Schedule H of the Draft IP Assignment Schedule Report.**

**14:4C**

Given that the intellectual property rights being licensed

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612051

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| **Grant of licences**<br><br>The response to the initial information request (Doc ID DM152) states that, other than the licence granted to Hotwire referenced in section 14:4B above, C01n has not ever granted any third party a licence to use any intellectual property rights.<br><br>However, we note that many of the DeMorgan Group Services Agreements also contain licences. | under the DeMorgan Group Services Agreements and the Software Development Agreement referred to in section 14:4B above are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.<br><br>**Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences form New IP Co and how the existing licences should be dealt with.**<br><br>**Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.** |

> **Formatted:** Font: Not Bold

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612052

# 15. Chaos - overview of findings

| CHAOS | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** **15:1A** <br><br> <u>Business</u> <br><br> The primary business of Chaos relates to 100% theory based, fractal patterns in finance and trade application to BTC and cryptocurrencies (Doc ID DM 154). | At a general level, for completeness, Chaos' work relating to theory based, fractal patterns in finance and trade application to BTC and cryptocurrencies should be captured in the IP Assignment from Chaos. <br><br> **We have added this into the draft Chaos Assignment Schedule in Schedule I of the Draft IP Assignment Schedule Report.** |
| **15:1B** <br><br> <u>Volume of likely Core IP Rights</u> <br><br> In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): <br><br> • Chaos has never had any employees. <br> • Work has been carried out for Chaos by other DeMorgan Group Entities under DeMorgan Group Services Agreements. <br> • Chaos has never filed any R&D incentive claim in the past but was intending to do so for the first time in the 2015 financial year. | It appears possible that R&D activity has occurred via Chaos, but only via DeMorgan Group Services Agreement rather than employees.  As such, it seems possible that Chaos could own some Core IP Rights but these are perhaps more limited than some of the other DeMorgan Group Entities.  However, there are a number of uncertainties surrounding the scope of these as noted in sections 15.2, 15.3 and 15.4 below. |
| **2. Summary of IP likely to be** **15:2A** <br><br> <u>DeMorgan Group Services Agreements</u> | <u>General comment regarding employees</u> <br><br> Please see our comments in section 9:2C regarding |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612053

| CHAOS | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company**[10]

Chaos is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) does not identify Chaos as a recipient of any services. However, we have been provided with the following Agreements:

- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM23)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM16
- Consultancy Agreement with Integyrz (service provider) (Doc ID DM37)
- Consultancy Agreement with Interconnected Research (service provider) (Doc ID DM34)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Chaos (as services recipient). However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, the work carried out under Consultancy Agreements is defined broadly.

**10:2B**

Contractor created material

Chaos has never filed R&D incentive claims but was intending to

employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we have added the Core IP Rights created under the Consultancy Agreements into the Chaos Assignment Schedule in Schedule I of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

> Formatted: Font: Not Bold

---

[10] A draft Assignment Schedule for the Chaos IP Assignment is set out in Schedule I of the Draft IP Assignment Schedule Report.

> Formatted: DMReference

CONFIDENTIAL

DEF_01612054

| CHAOS | COMMENTS REGARDING APPROACH |
|---|---|
| | submit a claim for FYE 2015. | |
| **3. Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| **4. Other issues to note** | **10:4A**<br><br>Grant of licences<br><br>Doc ID DM152 states that Chaos has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that the DeMorgan Group Services Agreements contain licences. | ~~Note that it will be necessary to consider whether licences are still required or not. Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.~~<br><br>~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.~~<br><br>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

## 16. Cloudcroft - overview of findings

| CLOUDCROFT | COMMENTS REGARDING APPROACH |
|---|---|
| 1. **Overview of company role** | To be completed pending separate Cloudcroft review |
| 2. **Summary of IP likely to be owned by the company**[11] | |
| 3. **Red Flag Third Party Issues** | |
| 4. **Other issues to note** | |

---

[11] A draft Assignment Schedule for the Cloudcroft IP Assignment is set out in Schedule J of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814 v11SYDDMS2635814 v11SYDDMS  DRAFT

107

Wright Family Trust - overview of findings

DEF_01612056

## 17. Pholus - overview of findings

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **17:1A** | At a general level, for completeness, Pholus' work relating to IT support, IPSEC and NAP systems should be captured in the IP Assignment from Pholus. |

**1. Overview of company role**

**17:1A**

Business

The primary business of Pholus relates to IT support, IPSEC and NAP systems research (Doc ID DM154).

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):

- Pholus has filed one previous R&D incentive claim and was intending to submit another in the 2015 financial year.
- Pholus has never had any employees.
- Work has been carried out for Pholus under DeMorgan Group Services Agreement. There is also a question as to whether Pholus has performed services for other DeMorgan Group Entities under other DeMorgan Group Services Agreements. This appears to be the case, but as noted above Pholus has never had any employees which raises questions over this.

At a general level, for completeness, Pholus' work relating to IT support, IPSEC and NAP systems should be captured in the IP Assignment from Pholus.

**We have added this into the draft Pholus Assignment Schedule in Schedule K of the Draft IP Assignment Schedule Report.**

It appears possible that R&D activity has occurred via Pholus, but only under DeMorgan Group Services Agreements, and as such it is possible that Pholus could own some Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 17.2, 17.3 and 17.4 below.

**2. Summary of IP likely to be**

**17:2A**

DeMorgan Group Services Agreements

General comment regarding employees

Please see our comments in section 9:2C regarding

Formatted: DMReference

CONFIDENTIAL

DEF_01612057

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company**[12]

Pholus is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Pholus has been the recipient of services under:

- Services Agreement with Integyrz (services provider) (Doc ID DM50)
- Services Agreement with Interconnected Research (service provider) (Doc ID DM47)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM27)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Pholus (as services recipient).  However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Pholus:

- Services Agreement with Integyrz (services provider): projects covered by this Agreement include: (1) IT infrastructure proof-of-concept platform; (2) IT infrastructure; (3) Top 500 System (Tulip); (4) Hyper Croft Mark I (5.8 PB); (5) Hyper Croft Mark II (7.2 PB); (6) Hyper Croft Mark III (10.2 PB); (7) Thor Super Computer; and (8) Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for

employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

Services Agreement

It is likely that these Core IP Rights will be owned by Pholus (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Pholus ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Pholus IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Pholus.  We have therefore added this into Schedule K of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made __.  and we have assumed for present purposes__ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc

---

[12] A draft Assignment Schedule for the Pholus IP Assignment is set out in Schedule K of the Draft IP Assignment Schedule Report.

Formatted: DMReference

CONFIDENTIAL