| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

additional Information v2.0 as provided to AusIndustry). Note that this work had a completion date of 30 June 2017 and therefore may be incomplete; and

- Services Agreement with Interconnected Research (service provider): projects covered by this Agreement include (1) IT infrastructure proof-of-concept platform; (2) IT infrastructure; (3) Top 500 System (Tulip); (4) Hyper Croft Mark I (5.8 PB); (5) Hyper Croft Mark II (7.2 PB); (6) Hyper Croft Mark III (10.2 PB); (7) Thor Super Computer; and (8) Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for additional Information v2.0 as provided to AusIndustry). Note that this work had a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

ID DM151). However, please confirm that our assumption is correct particularly given, again, We note that the completion date for the work is not until 30 June 2017. If this assumption is incorrect please let us know as this will alter the ownership position. This could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above. We have added these into Schedule K of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here.

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

| Formatted: Font: Bold |
|---|

| Formatted: DMReference |
|---|

CONFIDENTIAL

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|
| **17:2B**<br><br>_Contractor created material_<br><br>Pholus has filed an R&D incentive claim which gives further detail regarding the work undertaken for the company.<br><br>Doc ID DM125 refers to the following Pholus projects (in summary):<br><br>• "Project - Network Design and Services Research"<br>   ○ "Core - Self Scaling Hyper V Domain system"<br>   ○ "Core - Interdependencies among Critical Infrastructures"<br>      ▪ "Supporting - Virtualised Modeling system"<br>   ○ "Core - NAP Domain tests"<br><br>In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications":<br><br>• "Universal P2P ledger"<br>• "Service provision - Pseduonomous"<br>• "Blockchain-based resource tracking"<br>• "Online distributed ledger"<br>• "A method to provide ad-hoc updates to source transactions against the blockchain"<br>• "Automated 3d fabrication system"<br>• "A method to efficiently allocate connections in a Gossip protocol network" | Please see comments above in section 17:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights. |
| **3. Red Flag Third Party Issues**    None identified in the Review Material. | N/A |

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612060

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

**4. Other issues to note**

17:2:4A

DeMorgan Group Services Agreements

In addition to the DeMorgan Group Services Agreements listed at 17:2A, the DeMorgan Group internal Agreements Register (Doc ID DM 140) identifies Pholus as the service provider under the following DeMorgan Group Services Agreements:

- Consultancy Agreement with C01n (services recipient) (Doc ID DM20)
- Consultancy Agreement with Cloudcroft (services recipient) (Doc ID DM13)
- Consultancy Agreement with Coin-Exch (services recipient) (Doc ID DM19)
- Consultancy Agreement with Daso (services recipient) (Doc ID DM18)
- Consultancy Agreement with Integyrz (services recipient) (Doc ID DM10)
- Consultancy Agreement with Panopticrypt (services recipient) (Doc ID DM11)
- Consultancy Agreement with Interconnected Research (services recipient) (Doc ID DM9)
- Consultancy Agreement with Zuhl (services recipient) (Doc ID DM12)
- Consultancy Agreement with Denariuz (services recipient) (Doc ID DM15)
- Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM17)
- Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM14)
- Consultancy Agreement with Chaos (services recipient)

There is a key initial question here relating to what, if any, services have actually been provided under these Consultancy Agreements.

Generally speaking, the entities that have acted as services provider under the DeMorgan Group Services Agreements are those with employees. However, we have been instructed that Pholus has never had any employees (and has never engaged independent contractors other than the services it itself obtains under DeMorgan Group Services Agreements). As such, we query what work Pholus has been performing under these Consultancy Agreements (if any).

~~At this stage, we have assumed that there has not been any work occurring under these Consultancy Agreements.  Please confirm whether or not this is correct.~~We have been instructed that limited services were performed under these Consultancy Agreements with the primary work relating to some R&D activity around computers (Doc ID DM205) and that the work was subcontracted via other DeMorgan Group Services Agreements.

Outsourcing to other DeMorgan Group Entities

Please therefore see our comments in section 9:2C above.

It is not possible to identify any additional Core IP Rights owned by Pholus from these Consultancy Agreements.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612061

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

(Doc ID DM16)  (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials).

All of these Agreements contain an assignment of intellectual property rights from Pholus (as service provider) to the DeMorgan Group Entity acting as services recipient.  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Pholus is acting as service provider.

There is a real question over what work is performed under these Consultancy Agreements given that Pholus has never had any employees.

### 17~~2~~:4B

### Grant of licences

The response to the initial information request at Doc ID DM152 states that Integyrz has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that many of the DeMorgan Group Services Agreements contain licences.

Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.

Consideration will need to be given moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited

| Formatted: Font: Not Bold |
|---|

| Formatted: DMReference |
|---|

CONFIDENTIAL

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|
| | will be put in place. |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612063

## 18. Coin-Exch - overview of findings

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | |

**1. Overview of company role**

**18:1A**

Business

The primary business of Coin-Exch relates to "Exchange" (Doc ID DM154).

**18:1B**

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):

- Coin-Exch has never had any employees.
- Work has been carried out for Coin-Exch under DeMorgan Group Services Agreements.
- Coin-Exch has previously had independent contractors - namely, the late Dave Kleiman (USA) and W&K.
- Coin-Exch has filed R&D incentive claims in the past and was intending to do so again in the 2015 financial year.

**2. Summary of IP likely to be**

**18:2A**

DeMorgan Group Services Agreements

*Comments regarding approach column:*

At a general level, for completeness, all of Coin-Exch's work relating to "Exchange" should be captured in the IP Assignment from Coin-Exch.

**We have added this into the draft Assignment Schedule in Schedule K of the Draft IP Assignment Schedule Report.**

It appears possible that R&D activity has occurred via Coin-Exch, both through its independent contractor (Dave Kleiman) and under DeMorgan Group Services Agreements, and as such Coin-Exch could own Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 18.2, 18.3 and 18.4 below.

General comments regarding employees

Please see our comments in section 9:2C regarding

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612064

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| **owned by the company**[13] Coin-Exch is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Coin-Exch has been the recipient of services under:<br><br>• Services Agreement with Integyrz (service provider) Doc ID DM57<br>• Services Agreement with Interconnected Research (service provider) Doc ID DM43<br>• Consultancy Agreement with Pholus (service provider) Doc ID DM19<br>• Consultancy Agreement with Panopticrypt (service provider) Doc ID DM24<br><br>All of these Agreements contain an assignment of intellectual property rights from the service provider to Coin-Exch (as services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).<br><br>As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Coin-Exch:<br><br>• Services Agreement with Integyrz (services provider) covers the following projects: (1) Exchange Server baseline and proof of concept; (2) Bitcoin Exchange Escrowed | employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.<br><br>Services Agreements<br><br>It is likely that these Core IP Rights in these listed projects will be owned by Coin-Exch (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Coin-Exch ~~and subject to our comment below regarding payment~~.<br><br>Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Coin-Exch IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Coin-Exch.  We have therefore added this into Schedule L of the Draft IP Assignment Schedule Report.**<br><br>As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made __,.~~ and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc |

---

[13] A draft Assignment Schedule for the Coin-Exch IP Assignment is set out in Schedule L of the Draft IP Assignment Schedule Report.

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT
118
Wright Family Trust - overview of findings

**Formatted:** DMReference

DEF_01612065

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| Marketplace; (3) Bitcoin Exchange Escrowed Marketplace (Regulated).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.<br><br>• Services Agreement with Interconnected Research (services provider) covers the following projects: (1) Exchange Server baseline and proof of concept; (2) Bitcoin Exchange Escrowed Marketplace; (3) Bitcoin Exchange Escrowed Marketplace (Regulated).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.<br><br>As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure). | ID DM151).  However, please confirm that our assumption is correct particularly given, again, tWe note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership position.  This could mean that the work is incomplete.<br><br>Consultancy Agreements<br><br>Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule L of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**<br><br>Third Party Licences<br><br>Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.<br><br>Outsourcing to other DeMorgan Group Entities<br><br>Please see our comments in section 9:2C above. |

Formatted: DMReference

CONFIDENTIAL

DEF_01612066

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**18:2B**

<u>Contractor created material</u>

Coin-Exch has filed R&D incentive claims which give further detail regarding the work undertaken for the company.

Doc ID DM118 and DM121 refers to the following Coin-Exch projects (in summary):

- "AF00053: Virtual Currency Economy"
  - o "Core - Bayesian Design"
    - ▪ "Supporting - Development of a virtualised multicore platform"
  - o "CORE-1: C01N - eWallet including NFC application"
  - o "CORE-2: Bitcoin marketing and exchange"
  - o "CORE-3: Bitcoin Payment and Merchant Gateway"
  - o "CORE-4: Bitcoin Banking (Super-Node Depository)"
  - o "CORE-5: Secure Wallet"
  - o "CORE-6: P2P Exchange"
- "FL7 Pi Calculus: Project"
  - o "Core FL7Pi Calculus"
    - ▪ "Supporting - Machine Launguage Coding"
- "Bitcoin Ex: Bitcoin Exchange Project"
  - o "Core - Bayesian Design"
    - ▪ "Supporting"
  - o "Core - payment system"
- "Proposed Project: Virtual Currency Economy (Virtual Payment)"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and

Please see comments in section 18:2A above regarding next steps regarding the Core IP Rights that subsist in this work

Formatted: DMReference

CONFIDENTIAL

DEF_01612067

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

prioritization) lists the following "pending patent applications":

- "System and method for managing lending in a non-debt system"
- "Peer to peer exchange - (a) Exchange model"
- "Bitcoin banking system"
- "Peer to peer exchange - (d) Automated self-enforcing derivatives"
- "Peer to peer exchange - (e) Collateralized debt obligation"
- "Method for coordinating smart property--guaranteed loans utilising the blockchain"
- "Peer to peer exchange - (b) Mobile ATM model"
- "Peer to peer exchange - (c) Insurance markets"
- "Method and system for managing spending through wallet allocation"
- "Chargeback and escrow system based on bitcoin"
- "Automated P2P cryptocurrency loan risk assessment system and method"
- "Systems and methods for credit worthiness scoring and non-debt and cryptocurrency loan facilitation"
- "Cyrptocurrency Accounting allocation accuracy methodology"
- "Intercompany loan management system that utilises the Blockchain"
- "Electronic P2P Margin Management System"
- "System, Method and computer program for operating web-based collective e-money lending/borrowing circles between members and non-members of social network sites and DASOs"
- "System and method for implementing a revenue recognition model based on hashed information stored in

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612068

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| Blockchain transactions" | |

- "General ledger (gl) journal delete/accounting line reversal blockchain service"
- "Pay yourself first with auto bill pay system and method for blockchain accounting and budget system"
- "Pay yourself first with revenue generation as a system to budget against the blockchain"
- "Blockchain integrated Budget management system and method"
- "Extensible object oriented framework for blockchain integrated general ledger"
- "Insurance monitoring system"
- "Online wallet User interface for processing request for approval in com[pany] accounts"
- "Apparatus and method for dynamically auditing blockchain accounts to produce metadata"
- "Cryptocurrency-implemented method and system for reading tr[a]nsactions posted into the blockchain and posting journal entries to general ledger"
- "An authentication system based on the use of crypto[currency] wallets"
- "Blockchain integrated revenue management systems and methods with re-rating and rebilling"
- "A blockchain and cryptocurrency Gift card assembly and method"
- "General ledger chart of accounts combination editing request response"

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612069

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**18:2C**

<u>Assignment from Hotwire</u>

In addition to the DeMorgan Group Services Agreements, Coin-Exch is party to a Research & Development Services Agreement with Hotwire (Doc ID DM7).

Please see our comments in section 8:4A in this regard. Those comments also apply here.

Whilst "Project Foreground IP" rights are transferred to Coin-Exch by both Hotwire and Interconnected Research on payment in full, Hotwire and Interconnected Research retain ownership of any "Provider IP" (being intellectual property rights in their methodologies, models and other confidential or proprietary information for the purposes of providing the services). The arrangement to services for a defined set of projects as follows, and therefore (subject to the retained "Provider IP") the "Project Foreground IP" rights being assigned are likely be those arising from this work:

- Cornerstone Firewall

We note that the Review Material does not contain an executed copy of this Agreement but we have been instructed that it has been executed in this form (Doc ID DM205).

---

Please see our comments in section 8:4B with respect to this agreement. These comments also apply here.

We assume that it has been executed in the form provided. Please let us know if this is incorrect.

It is likely that these Core IP Rights will be owned by Coin-Exch (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Hotwire and Interconnected Research and subject to our comment in section 8:4B regarding payment.

**We have therefore included these Core IP Rights in the Coin-Exch Assignment Schedule in Schedule L of the Draft IP Assignment Schedule Report.**

Formatted: DMReference

13 November 201327 November 2013
2636814-v1USYDDMS2635814-v1USYDDMS  DRAFT

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**18:3A**

<u>Assignment from the Wright Family Trust</u>

The response to our initial requirement request (Doc ID DM 152) states that intellectual property rights have been assigned to Coin-Exch by the "Wright Family Trust for DeMorgan".

Doc ID DM1 is an assignment from "the Wright Family Trust DeMorgan" to Coin-Exch Pty Ltd dated 15 September 2013 that purports to assign intellectual property rights in:

- <u>Category A:</u> "Core Banking and Exchange Software" (held by DeMorgan), being: MJF iMal (Source Code); MJF T24 updates and guides;
- <u>Category B:</u> WK (2) - Metered Payments system;
- <u>Category C:</u> WK (2) - Software Derivative Markets & Information Security Risk Systems;
- <u>Category D:</u> WK (2) - Software Assurance Marketplace (SWAMP).

The assignment is stated only to take effect once payment has been completed (operating as an exclusive licence until that point). RFI #25 instructed us that this has occurred which suggests that the assignment has~~was intended to have~~ taken effect.

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

There are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the

It is unclear why the contracting entity here is called "The Wright Family Trust DeMorgan" (given that is not the name of the Wright Family Trust). However, this is potentially related to the issues discussed at section 23:3A below. Please see comments in that regard, which also apply here.

There are a number of questions over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in sections 22:3B and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

As noted in those sections this means that there are significant ~~open~~ questions over whether all of these rights were originally assigned to Craig Wright, and if so, whether they were effectively assigned to the Wright Family Trust to enable this assignment to take effect. <u>Please see proposed steps in sections 22:3B and 22:3C in this regard.</u>

In addition, there are a number of issues raised by the drafting of the assignment itself.

- Firstly, there is a possibility that it itself does not assign any rights itself but rather is simply a confirmation that the assignor has completed, or

> **Formatted:** DMReference

DEF_01612071

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| Wright Family Trust to Hotwire had the desired effect.  This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.<br><br>Please see our comments in sections 22:3B and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright. | will complete at its earliest opportunity, an irrevocable assignment of any "existing and future Intellectual Property and Intellectual Property Rights".  We have not separately seen any other document under which the intellectual property rights are separately assigned and understand that there may not have been any such separate document.  This raises a question over whether the assignment has actually occurred or not.  However, even if it has not occurred, the assignor agrees pursuant to the IP Deed of Assignment to complete the assignment (and grants a licence to use the relevant rights until this is done) meaning it could be called on to perfect the assignment if necessary.  As such, we suggest that the Wright Family Trust and Coin-Exch check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed.  If it has not, please let us know as this could alter the position. |
|  | • Secondly, there is a risk that the assignment envisaged by the IP Deed of Assignment is broader than just the intellectual property rights in the "Core Technology" as the assignment is of both "Intellectual Property" (which is defined, in summary, as including certain property relating to the "Core Technology") and "Intellectual Property Rights" (which is not defined by reference to the "Core Technology" at all).  This opens a risk that more of Core IP Rights were assigned to Hotwire than just the Core IP Rights in the "Core Technology".  This risk is somewhat mitigated (although not removed entirely), |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612072

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| | however, by the fact that the IP Deed of Assignment states, in its background Recitals, that "the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology" which supports an interpretation that limits the assignment to the "Core Technology".

As noted in sections 22 and 23 below, our initial view is that there is a significant risk that the ownership of these Core IP Rights sits at law with Third Parties or Craig Wright ~~(and that even if that is not the case, there is a real question over whether this assignment to Coin-Exch has been effective)~~. **Despite the significant uncertainty over what (if any) Core IP Rights were assigned here, for completeness we recommend that any Core IP Rights that *were* assigned to Coin-Exch under this assignment agreement be included in the Hotwire Assignment Schedule. We have therefore added this into the draft Assignment Schedule in Schedule L of the Draft IP Assignment Schedule Report.**

As noted in section 23 below, we recommend that the assignment from Craig Wright and the Wright Family Trust also be expressly stated to include any of these Core IP Rights that they have retained. |
| **4. Other issues to note**<br><br>**18:4A**<br><br><u>Dave Kleiman and "W&K"</u><br><br>The response to our initial information request stated that, in addition to the DeMorgan Group Services Agreements noted in section 18:2A and the arrangement with Hotwire noted in section | ~~On the understanding that~~We have been instructed that no services were performed by Dave Kleiman or "W&K" for Coin-Exch ~~(Doc ID DM205). On this basis,~~ ~~then~~ no further steps are required here. |

Formatted: DMReference

CONFIDENTIAL

DEF_01612073

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

18:2C above, Coin-Exch had also engaged both Dave Kleiman (USA) and "W&K" (USA) as independent contractors utilised to perform services for Coin-Exch.  Please see our comments in section 5.1 above regarding confusion of which entity is "W&K".

However, we were subsequently instructed that Dave Kleiman died before this contract was finalised and "[t]herefore no services were performed to Coin-Exch by Dave Kleiman or W&K".

**18:4B**

Grant of licences

The response to the initial information request at Doc ID DM152 states that Coin-Exch has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that:

- many of the DeMorgan Group Services Agreements contain licences; and
- the Research and Development Services Agreement with Hotwire (Doc ID DM7) referred to in section 18:2C above also includes a licence from Coin-Exch to Hotwire.

Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.

Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612074

## 19.  Panopticrypt - overview of findings

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| **1.  Overview of company role** | |

**19:1A**

Business

The primary business of Panopticrypt relates to IT security services (Doc ID DM154).

At a general level, for completeness, Panopticrypt's work relating to IT security services should be captured in the IP Assignment from Panopticrypt.

**We have added this into the draft Assignment Schedule in Schedule M of the Draft IP Assignment Schedule Report.**

**19:1B**

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request Doc ID DM152):

- Panopticrypt has filed a number of R&D incentive claims in the past and was intending to do so again in the 2015 financial year.
- Panopticrypt has had employees in the past (in Sydney). However we have been instructed that Panopticrypt's employees were only ever "admin staff".
- Work has been carried out for Panopticrypt by other DeMorgan Group Entities under DeMorgan Group Services Agreements (and Panopticrypt has itself also provided services to other DeMorgan Group Entities under other DeMorgan Group Services Agreements).
- Panopticrypt has also engaged one independent contractor (Jamie Wilson).

It appears possible that a significant amount of R&D activity has occurred via Panopticrypt, particularly given the number of R&D claims that have been submitted in the past by this entity, and as such Panopticrypt could own significant Core IP Rights.  However, there are a number of uncertainties surrounding this as noted in sections 19:2, 19:3 and 19:4 below.

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1SYDDMS2635814-v1SYDDMS   DRAFT

128

Wright Family Trust - overview of findings

DEF_01612075

| PANOPTICRYPT | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 2. **Summary of IP likely to be owned by the company**[14] | **19:2A**<br><br>Employee created material generally<br><br>The response to the initial information request (Doc ID DM152) indicates that Panopticrypt has had a number of employees.<br><br>However, we have been instructed (in response to initial information request at Doc ID DM152) that Panopticrypt's employees were "admin staff only" which suggests that these employees may not necessarily have been involved in creating significant Core IP Rights.<br><br>We have, however, subsequently been informed that Craig Wright was himself an employee of Panopticrypt between late 2014 and mid 2015. | ~~As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns have been raised as to inconsistencies in the stated employer of listed individuals.~~<br><br>~~With regard to Panopticrypt, we note in particular our comments in section 14:4A above, with regards to statements that Craig Wright was at some point engaged by C01n "via Panopticrypt". We have not seen any other suggestion in the Review Material that Craig Wright was potentially employed by Panopticrypt at any point (and neither the response to the initial information request at Doc ID DM152 nor RFI #12 list Panopticrypt as one of Craig Wright's employers) and~~ **we have therefore proceeded on the understanding that Craig Wright was never an employee of Panopticrypt, but please let us know if that understanding is incorrect.**<br><br>~~(We note for completeness that if Craig Wright was at any stage an employee of Panopticrypt this could have resulted in some of the intellectual property rights in any material created by Craig Wright in the course of such employment vesting in Panopticrypt for the reasons outlined in section 6 above.)~~ Please see our comments in section 19.4E below regarding Craig Wright. It has been confirmed that Craig Wright was an employee of Panopticrypt between late 2014 and mid 2015.<br><br>Given the other employees were "admin staff" it appears |

---

[14] A draft Assignment Schedule for the Panopticrypt IP Assignment is set out in Schedule M of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

DEF_01612076

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

**COMMENTS REGARDING APPROACH**

likely that most of the research and development work carried out via Panopticrypt was done ~~either by Craig Wright himself, or~~ under the DeMorgan Group Services Agreements referred to in section 19:2B below.

As the Review Material does not contain a full list of employees, or a full copy of employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided. However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights.

**19:2B**

DeMorgan Group Services Agreements

Panopticrypt is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Panopticrypt has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM49
- Services Agreement with Interconnected Research (service provider) Doc ID DM40
- Consultancy Agreement with Pholus (service provider) Doc ID DM11

(We note that Doc ID DM152 also states that Panopticrypt was a recipient of services under a DeMorgan Group Services Agreement with itself. However, we have assumed this is simply an error.)

- All of these Agreements contain an assignment of intellectual property rights from the service provider to Panopticrypt (as

General comments regarding employees

Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

Services Agreements

It is likely that the Core IP Rights in these listed projects will be owned by Panopticrypt (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Coin-Exch ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in**

> Formatted: DMReference

CONFIDENTIAL

DEF_01612077

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

- As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Panopticrypt:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) BODOG Security Assessment and Testing; (2) iVote System Security Review; and (iii) Panopticrypt Commercialisation (campaign).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

- Services Agreement with Interconnected Research (services provider) covers the following projects: (1) BODOG Security Assessment and Testing; (2) iVote System Security Review; and (3) Panopticrypt Commercialisation (campaign).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

**the Panopticrypt IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Panopticrypt.  We have therefore added this into Schedule M of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made~~, and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM161).  ~~However, please confirm that our assumption is correct~~ particularly given, again, We note that the completion date for the work is not until 30 June 2017.  ~~If this assumption is incorrect please let us know as this will alter the ownership position~~ This could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.  **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule M of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the**

Formatted: DMReference

CONFIDENTIAL

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| | **Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.** |
| | Third Party Licences |
| | Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here. |
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |
| **19:2C** | Please see comments above in section 19:2B (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights. |
| Contractor and employee created material | |
| Given the statement noted in section 19:2A above that, other than Craig Wright, all Panopticrypt employees were "admin staff" only, it appears possible that most of the research and development work carried out via Panopticrypt was carried out either by Craig Wright himself or under the DeMorgan Group Services Agreements noted in section 19:2B above. | Please see our additional comments in section 19:4D below regarding Craig Wright. |
| Panopticrypt has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company. | |
| Doc ID DM122 refers to the following Panopticrypt projects (in summary): | |
| • "Risk Project (as per 2012 review)" | |
| • "Core - Risk tests" | |
| ○ "Supporting - Editing and presentation" | |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT
130
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612079

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

- "Core - Registry design and test"
  - "Supporting - Editing and presentation"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications":

- "Smart contract registry"
- "A method and system to provide ECC/ECDH key exchange to three or more parties"
- "Secure video/audio"
- "Remote wipe system"
- "IoT remote control system"
- "A method to use wallet integrated ECC for lightweight Application authentication"
- "Integrated utility accounting, materials management, work management and regulatory reporting software that derives information and stores it into the blockchain"
- "A Method and system for providing Rational Secret Sharing with Repeated Games using the blockchain"
- "A method to encrypt and notorise messages using the bitcoin protocol"
- "Wallet based authentication system"
- "Bl[ock]chain based Incremental automata verification"
- "Unified, configurable services stack for integration of enterprise applications using a loop stack against the blockchain"
- "Blockchain based Deterministic finite automata graph traversal with nodal bit mapping into bitcoin addresses"
- "Method and apparatus for data encryption/decryption using cellular automata transform"
- "CGA++ cryptographic key"

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612080

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| • "Anti-theft system" <br> • "A method to create Efficient Wireless Security Protocols using the blockchain" <br> • "A blockchain wallet system to enable Object Signing and Encryption" <br> • "A system and methods to ensure High-priority communications sessions within a wireless communications system using ECCDSA based access with a blockchain integrated ledger" <br> • "Network and system modelling" <br> • "System and method for credential management and administration using the blockchain" <br> • "Analog and Preceptron nureal network logic automata (on the blockchain)" <br> • "Asynchronous logic automata" <br> • "Deterministic encoding of fuzzy finite state automata in continuous recurrent neural networks related to blockchains" | |

| | | |
|---|---|---|
| **3. Red Flag Third Party Issues** | **19:3A** <br><br> <u>Your Digital File</u> <br><br> The response to our initial information request (Doc ID DM152) stated that intellectual property rights in "Your Digital File" "Patent Registered by Craig Wright and Jamie Wilson" have been assigned by Panopticrypt to an unidentified third party. <br><br> Absent an assignment of these intellectual property rights to Panopticrypt in the first place (which we have not been provided with) it is unclear to us how any intellectual property rights in Craig Wright/Jamie Wilson created material could have been owned by Panopticrypt (in order to have been assigned out to a third party) | It is extremely unclear what this means for the ownership of the YDF IP. <br><br> As noted, it is unclear whether the YDF IP was created for FASV by Jamie Wilson and Craig Wright and, if so, whether this was done in the capacity of employees or some other capacity. <br><br> We note however that the response to RFI #52 states that "[a]ny IP that Craig created within that company initially remained within FASV".  It is unclear on what basis these Core IP Rights were assigned to FASV, and whether a similar assignment was given by Jamie Wilson.  If the YDF IP was created by them for FASV in |

**Formatted:** DMReference

CONFIDENTIAL

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |

given, as noted in section 19:2A above, we are not aware that Craig Wright has ever been an employee of Panopticrypt, and as noted in section 19:4A below we have been instructed that Jamie Wilson was never a contractor to Panopticrypt.

In response to RFI#21 in this regard, and our subsequent follow-up question in RFI#52, we were instructed that the relevant background was as follows:

- Jamie Wilson and Craig Wright previous worked for another company (which no longer exists and has been deregistered). This company was called "Family Affairs Security Vault" (**FASV**). It is unclear whether Jamie Wilson and Craig Wright worked for FASV in the capacity of employees or some other capacity.

- "There was a contract with [that] previous company". It is unclear whether this means a contract between Jamie Wilson and Craig Wright and that company or between Panopticrypt and that company. However RFI#52 clarifies that "[t]he contract mentioned shares in a company that Craig did not receive".

- Following deregistration of FASV "a new company, YDF" was started and there was a negotiation of a share agreement whereby Craig Wright was to have a 25% equity interest in "YDF" in exchange for ownership of the intellectual property rights (being initial cryptographic research as well as continuing research that led to the final patent) (the **YDF IP**).

- Jamie Wilson filed for a patent in the US in the name of "YDF" covering an invention that Craig Wright contributed to.

- "A new contract [was] drawn up with YDF". It is unclear if this was the shareholders agreement referred to in the preceding bullet point, a contract with Craig Wright and

the capacity of employees, subject to our comments in section 16, it is likely that the YDF IP vested in FASV. As noted elsewhere in the report, the position could be quite different if the YDF IP was created outside an employment relationship as this would be likely to mean that, absent an express assignment of these intellectual property rights from Craig Wright and Jamie Wilson to FASV, these rights remained owned by Craig Wright and Jamie Wilson.

Subsequently, RFI#52 states that the Core IP Rights owned by FASV were "transferred to YDF since its deregistration". Again, it is unclear how this was done.

Further we understand that Craig Wright never assigned any intellectual property rights to "YDF".

This gives rise to a significant risk that at least some of the YDF IP is owned by a, as yet unidentified, Third Party. This Third Party could be Jamie Wilson (to the extent that ownership of the YDF IP remains split between Craig Wright and Jamie Wilson, in the event that there was no valid assignment to FASV in the first place). Alternatively, if there was a valid assignment to FASV in the first place, ownership of the YDF could have been dealt with as part of the winding up of FASV. Or, alternatively, there could have been a valid assignment from FASV to YDF (meaning it remains owned by YDF).

We are happy to discuss this further. The first question here is whether the YDF IP is of ongoing importance to the operations of the DeMorgan Group and New IP Co. The fact that it is acknowledged to have been assigned to a third party (despite the

> Formatted: DMReference

CONFIDENTIAL

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| Jamie Wilson or a contract with Panopticrypt. | uncertainty over how this could have occurred and the identity of the third party suggests that perhaps these Core IP Rights are no longer used by or relevant to the DeMorgan Group - in which case, its status may not be a concern. |
| • That "new contract" was never signed and shares in "YDF" were never issued by Jamie Wilson.  "Hence the contract was never finalised". | However, if the DeMorgan Group still uses the YDF IP, we suggest the position here be clarified further to work out the likely current ownership position and how best to proceed.  We would recommend the following steps in the first instance:  (1) Provide full corporate details for FASV and YDF.  (2) Confirm whether the YDF IP created by Craig Wright and Jamie Wilson was assigned to FASV and provide a copy of the relevant assignment.  (3) Provide a copy of the assignment from FASV to YDF and details as to when this occurred (with respect to the deregistration of FASV).  (4) Provide details of the registered patent.  (5) Confirm how this is relevant to Panopticrypt, given as noted above, we have not seen any suggestion in the Review Material (other than the statement in initial information request at Doc ID DM152 that relevant Core IP Rights had been assigned by Panopticrypt) that the YDF IP was ever owned by Panopticrypt. |
| • We have been instructed that Jamie Wilson sought an assignment of Craig Wrights intellectual property rights in the YDF IP but that Craig Wright never signed this (Doc ID DM205). | We have been instructed that DeMorgan Limited is comfortable that it is not using the YDF IP or otherwise infringing it in any way.  As such DeMorgan Limited does not intend to investigate the ownership of the YDF IP further, or approach any Third Party of an assignment of relevant rights. |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612083

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

**4. Other issues to note**

**19:4A**

Jamie Wilson

The response to the initial information request (Doc ID DM152) stated that an independent contractor (Jamie Wilson) had been engaged to perform services for Panopticrypt.

However, we have subsequently been instructed (RFI#14) that Jamie Wilson was never a contractor for Panopticrypt, but rather acted as a director for Hotwire.

Given the response to RFI#14 we have assumed that Jamie Wilson never performed any work for Panopticrypt. **Please let us know if this assumption is incorrect.**

**19:4B**

DeMorgan Group Services Agreements

In addition to the DeMorgan Group Services Agreements listed at 19:2B, the DeMorgan Group internal Agreements Register (Doc ID DM140) identifies Panopticrypt as the service provider under the following DeMorgan Group Services Agreements:

- Consultancy Agreement with C01N (services recipient) (Doc ID DM25)
- Consultancy Agreement with Cloudcroft (services recipient) (Doc ID DM22)
- Consultancy Agreement with Coin-Exch (services recipient) (Doc ID DM24)
- Consultancy Agreement with Daso (services recipient) (Doc ID DM21)
- Consultancy Agreement with Interconnected Research (services recipient) (Doc ID DM26)
- Consultancy Agreement with Integyrz (services recipient) (Doc ID DM32)
- Consultancy Agreement with Pholus (services recipient)

There is a key initial question here relating to what, if any, services have actually been provided under these Consultancy Agreements and whether they have given rise to any significant Core IP Rights.

The reason for this question is the fact that, as noted in section 19:2A above, we have been instructed that the Panopticrypt employees are "admin staff only" (response to initial information request at Doc ID DM152) and as such, it is unclear what type of consultancy work they have been undertaking for the other DeMorgan Group Entities and an equal question as to whether it would have given rise to any significant Core IP Rights.

Given that Craig Wright has been confirmed as a Panopticrypt employee, Wwe recommend **proceeding on the basis that these DeMorgan Group Services Agreements could have given rise to some Core IP Rights and, as such, we recommend proceeding on the following basis.**

Consultancy Agreements

Formatted: DMReference

DEF_01612084

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| (Doc ID DM27) | Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. |
| • Consultancy Agreement with Zuhl (services recipient) (Doc ID DM29) | |
| • Consultancy Agreement with Denariuz (services recipient) (Doc ID DM30) | **As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreements) be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Panopticrypt to capture any residual intellectual property rights retained by Panopticrypt as services provider.  We have added a general description of these retained rights into Schedule M of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.** |
| • Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM31) | |
| • Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM28) | |
| • Consultancy Agreement with Chaos (services recipient) (Doc ID DM23) (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials). | |
| All of these Agreements contain an assignment of intellectual property rights from Panopticrypt (as service provider) to the DeMorgan Group Entity acting as services recipient.  However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Panopticrypt is acting as service provider. | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |
| **19:4C** | |
| New South Wales Electoral Commission Licence | Note that "New Contract Material" rights have already been assigned to the New South Wales Electoral Commission. |
| The response to our initial information request (Doc ID DM152) states that Panopticrypt has been granted a licence to use intellectual property rights under a "1 Vote contract". | The ongoing need for this licence needs to be considered.  **Please confirm whether there is still work occurring for the New South Wales Electoral Commission, and whether any of the DeMorgan** |
| The contract that has been provided in response to our request for | |

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612085

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| this is a Consultancy Agreement between Panopticrypt and the New South Wales Electoral Commission (Doc ID DM71).<br><br>We note that Panopticrypt has assigned the intellectual property rights in "New Contract Material" being material created, written or otherwise brought into existence by or on behalf of Panopticrypt in performing the agreement to the New South Wales Electoral Commission. | ~~Group Entities still requires a licence to this material.~~The Consultancy Agreement with the New South Wales Electoral Commission was stated to expire on 30 April 2015 unless otherwise agreed between the parties.  We have been instructed that the contract was not extended and there is no further work being undertaken for the New South Wales Electoral Commission, and no longer any need for the licence. |
| **19:4D**<br><br>Grant of licences<br><br>The response to initial information request (Doc ID DM152) states that Panopticrypt has not granted any intellectual property licences, or itself been granted any intellectual property licences other than the licence from the New South Wales Electoral Commission noted in section 19:4C above.  However, we note that the DeMorgan Group Services Agreements contain licences. | ~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.~~<br><br>~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.~~<br><br>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |
| 19:4E<br><br>We have been instructed that Craig Wright was employed by Panopticrypt between late 2014 and the end of June 2015. | It is unclear what work Craig Wright created pursuant to his contract of employment with Panopticrypt, and what work was created in his personal capacity.<br><br>There is therefore a possibility that some of the Core IP Rights created by Craig Wright have already vested in |

Formatted: Font: Not Bold

Formatted: DMReference

CONFIDENTIAL

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
|  | Panopticrypt due to the employment arrangement, for the reasons given in section 6 above. |
|  | Please see our comments in section 22:1A in this regard. |
|  | **As noted in section 22:1A, whilst these rights will also be included in the IP Assignment from Craig Wright, we recommend for completeness that any rights that *are* owned by Panopticrypt in the work described in section 22:2A be included in the Assignment Schedule for Panopticrypt in Schedule M of the Draft IP Assignment Schedule Report.** |

**Formatted:** DMReference

DeMorgan                                   138                        Wright Family Trust - overview of findings
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT

CONFIDENTIAL

DEF_01612087

## 20. DeMorgan Holdings - overview of findings

| DEMORGAN HOLDINGS | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. **Overview of company role** | DeMorgan Holdings appears to be the holding company of Misfit Games.<br><br>We have been instructed that DeMorgan Holdings has never, at any staged, engaged employees or contractors and has never been assigned or licensed any intellectual property rights or itself assigned or licensed any intellectual property rights (response to initial information request at Doc ID DM152). | Consideration should be given to obtaining an IP Assignment from DeMorgan Holdings for completeness. However, no ownership of Core IP Rights has been identified. |
| 2. **Summary of IP likely to be owned by the company[15]** | None identified in the Review Material. | N/A |
| 3. **Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| 4. **Other issues to note** | None identified in the Review Material. | N/A |

---

[15] A draft Assignment Schedule for the DeMorgan Holdings IP Assignment is set out in Schedule N of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636514 v1 SYDDMS2635514 v1 SYDDMS  DRAFT
130
Wright Family Trust - overview of findings

CONFIDENTIAL

# 21. Misfit Games - overview of findings

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **21:1A**<br><br>Business<br><br>The primary business of Misfit Games involves gaming technology (both hardware and software) including the "Super Cool Gaming" project (Doc ID DM154). We have further been instructed that this work relates to cooling systems research (Doc ID DM205). | At a general level, for completeness, all of Misfit Games' work relating to gaming technology and the "Super Cool Gaming" project should be captured in the IP Assignment from Misfit Games.<br><br>**We have added this into the draft Assignment Schedule in Schedule O of the Draft IP Assignment Schedule Report**. |
| | **21:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to the initial information request at Doc ID DM152):<br><br>• Misfit Games had employees (in Sydney) in 2014 and 2015.<br><br>• Misfit Games was intending to submit its first R&D incentive claim in the 2015 financial year.<br><br>• Whilst we were originally instructed that Misfit Games had never utilized any independent contractors, the DeMorgan Group internal Agreements Register (Doc ID DM140) indicates that work has been carried out for Misfit Games under DeMorgan Group Services Agreements. | It appears possible that some R&D activity has occurred via Misfit Games, both via its own employees and under DeMorgan Group Group Services Agreements, and as such Misfit Games could own Core IP Rights.<br><br>However, we have been instructed that the Core IP Rights owned by Misfit Games may not be used in the future (and the DeMorgan Group and New IP Co are not considering applying for any patents with respect to this work) so is considered to be of low value (Doc ID DM205).<br><br>HoweverIn addition, there are a number of uncertainties surrounding this as noted in sections 21:2, 21.3 and 21.4 below. |
| **2. Summary of IP likely to be owned by the** | **21:2A**<br><br>Employee created material (generally) | As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns |

Formatted: DMReference

CONFIDENTIAL

DEF_01612089

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|

**company**[16]  The response to the initial information request (Doc ID DM152) indicates that Misfit Games has had Australian employees in 2014 and 2015.

have been raised as to inconsistencies in the stated employer of listed individuals.

No particular inconsistencies have been noted with respect to Misfit Games, and we have proceeded on the assumption that no such inconsistencies exist. However, as the Review Material does not contain a full list of employees, or a full copy of employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided.  However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights.

**21:2B**

### DeMorgan Group Services Agreements

Misfit Games is party to a number of DeMorgan Group Services Agreements.  The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Misfit Games has been the recipient of services under:

- Consultancy Agreement with Integyrz (services provider) (Doc ID DM36)
- Consultancy Agreement with Interconnected Research (service provider) (Doc ID DM33)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM31)
- Consultancy Agreement with Pholus (service provider) (Doc

#### General comment regarding employees

Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

#### Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be added these into Schedule O of the Draft IP Assignment Schedule Report.  We note that it will**

---

[16] A draft Assignment Schedule for the Misfit Games IP Assignment is set out in Schedule O of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|

ID DM17)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Misfit Games (as services recipient).  However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly.

**only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

**21:2C**

Employee and contractor created material

Misfit Games has never filed R&D incentive claims but was intending to submit a claim for FYE 2015.

As no detail has been provided regarding the proposed claim we have not been able to include details of any work carried out in Schedule O of the Draft IP Assignment Schedule Report other than as set out in section 21:1A above.  Given, as noted in 21:2B, there is uncertainty over the scope of work carried out for Misfit Games under DeMorgan Group Services Agreements (particularly given they are all Consultancy Agreements which are not drafted by reference to particular projects) it would be useful to have more detail of Misfit Games' proposed claim if possible to give us some understanding of the work carried out by Misfit Games in the past.  **Please provide a copy if available.**

**21:2D**

Assignment from Denariuz

Please see comments in section 13:4B in relation to an IP Deed of Assignment (Doc ID DM147) that appears to relate to "Heat and

Please see our comments in section 13:4B.

As noted in section 13:4B, we suggest that Denariuz and Misfit Games **check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed.  If it**

Formatted: DMReference

CONFIDENTIAL

DEF_01612091

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|
| Power simulations to be conducted on the Denariuz SuperComputer system at a max load of 50TFlop for 3 months" being the "Core Technology".<br><br>Those comments and the issues raised also apply here. | has not, please let us know as this could alter the position.<br><br>Further, iFor the reasons set out in section 13:4B, we have added the Core IP Rights relating to the "Core Technology" only into the Assignment Schedule for Misfit Games in Schedule O of the Draft IP Assignment Schedule Report.<br><br>We have also, for completeness, added any Core IP Rights retained by Denariuz into the Assignment Schedule for Denariuz in Schedule G of the Draft IP Assignment Schedules Report. |

3. **Red Flag Third Party Issues**    None identified in the Review Material.    N/A

4. **Other issues to note**    None identified in the Review Material.    N/A

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636514-v1\SYDDMS2635514-v1\SYDDMS  DRAFT
143
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612092

# Part C - Craig Wright Entities
## 22. Craig Wright - overview of findings

| CRAIG WRIGHT | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. Overview of role | **22:1A**<br><br>As noted in section 1.4, much of the work undertaken by the DeMorgan Group to date has been driven by an individual called Craig Wright.<br><br>We have been instructed that Craig Wright has been employed, at various points, by both Hotwire and ~~DeMorgan Limited~~ Panopticrypt (RFI #61 as clarified and amended by Doc ID DM205). | There is a risk that some of the Core IP Rights created by Craig Wright have already vested in Hotwire and ~~DeMorgan Limited~~Panopticrypt due to the employment arrangement, for the reasons given in section 16 above.<br><br>**The "completeness" warranties that Craig Wright gives in his IP Assignment as to the fact that the IP Assignment includes all Core IP Rights he has created should exclude Core IP Rights that have already vested in Hotwire or ~~DeMorgan Limited~~Panopticrypt due to this employment relationship.  The initial draft prepared for the Craig Wright IP Assignment has been drafted on this basis.**<br><br>We also recommend that any rights that _are_ owned by Hotwire or Panopticrypt in the work described in section 22:2A below be included in the Assignment Schedule for Hotwire in Schedule B of the Draft IP Assignment Schedule Report and Panopticrypt in Schedule M of the Draft IP Assignment Schedule Report respectively.<br><br>~~Please also see our comments in section 19:2A regarding possible confusion over whether Craig Wright was also employed by Panopticrypt at some point.  As noted in section 19:2A, we have assumed for present purposes that he was not, but~~ **please let us know if** |

[Formatted: DMReference]

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS   DRAFT
144
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612093

| CRAIG WRIGHT | | COMMENTS REGARDING APPROACH |
|---|---|---|
| | | ~~that is incorrect.~~ |

**2. Summary of IP likely to be owned by the individual[17]**

**22:2A**

IP created by Craig Wright

Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) contains a list of "pending patent applications" in the name of Craig Wright:

- "A method to securely distribute keys and pins for online wallets"
- "Software signing on the Blockchain"
- "Anti-counterfeit system"
- "Autonomous machine based oracle"
- "A secure blockchain based medial record system"
- "Secure off-block transfers"
- "BOTMAN"
- "Blockchain computing as a basis for equipment health monitoring service"
- "Blockchain based medical insurance verification and processing system"
- "Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process"
- "System verification using one or more blockchain automata"
- "Blockchain based Deterministic finite automata (DFA) graph compression"

If these were created by Craig Wright then, subject to our comments in section 22:1A above, and any assignments out noted in section 22:4 below, it appears likely that these Core IP Rights remain owned by Craig Wright. **As such, we have added these into the Craig Wright IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

---

[17] A draft Assignment Schedule for the Craig Wright IP Assignment is set out in Schedule P of the Draft IP Assignment Schedule Report.

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT

145

Wright Family Trust - overview of findings

**Formatted:** DMReference

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

- "Blockchain based Deterministic finite automata graph traversal with nodal bit mapping"
- "Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process"
- "A point recording system and network graph analysis platform based on the Blockchain:
- "Plausible deniability wallet"
- "Intelligent blockchain graph walking"
- "Method and apparatus for traversing a deterministic finite automata (dfa) graph compression to find optimised blockchain exchange paths"
- "Blockchain automata Toilet and Facilities management systems, methods and techniques"

**22:2B**

**IP assigned to Craig Wright**

We have been instructed that Craig Wright has never been assigned any Core IP Rights of relevance (RFI #62).

However, this appears to be inconsistent with much of the Review Material noted above in this report.

**MJF and W&F assignments**

Please see our comments in section 22:3 below regarding various assignments to Craig Wright.  (For the reasons noted in section 22:3 there are questions over ~~all of~~ these.)

**C01n assignment**

In addition, as noted in section 8:2E, the response to our initial information request (Doc ID DM152) states that C01n has assigned and licensed Core IP Rights to Hotwire.  However, the Review Material provided as evidence of this assignment and licence constitutes a "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman (together, the

**MJF and W&F assignments**

Please see our comments in section 22:3 regarding the status of various assignments made to Craig Wright.  Our comments in that section apply to those assignments.  ~~As suggested,~~

**C01n assignment**

Please see our comments at section 8:2E regarding the status of the "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman.  Those comments also apply here.

Given Craig Wright and Dave Kleiman are listed as the "Client" in that "Software Development Agreement" there is at least a theoretical risk that the assignment could be construed as an assignment to them.  We believe that risk is relatively low and that, if an assignment has, in

<div style="border:1px solid; display:inline-block">Formatted: DMReference</div>

CONFIDENTIAL

DEF_01612095

## CRAIG WRIGHT

"Client").  Please see our comments in section 8:2E in this regard.

Cloudcroft

[Position with respect to Cloudcroft assignments still to be confirmed.]

**22:2C**

### Work for C01n

As noted in section 14:4A, the response to the initial information request (Doc ID DM152) states that Craig Wright worked as an independent contractor for C01n "via Panopticrypt".  It is therefore possible that he may have created some of the work outlined in section 14:2.

Please see our comments in section 14:4A in this regard.

We note that Craig Wright has now been confirmed as having been employed by Panopticrypt for a period.  It is unclear if this work was carried out during the time he was an employee.

## COMMENTS REGARDING APPROACH

fact, occurred (which as noted in section 8:2E there is some question over) it is likely to have been an assignment to Hotwire.

**For present purposes, we suggest proceeding on the basis that there has been a valid assignment of the Core IP Rights created by C01n pursuant to this Agreement to Hotwire.**

**However, given the identified risks, we also recommend expressly including any retained rights in the IP Assignment from C01n and we have therefore added such rights into the draft Assignment Schedule at Schedule H of the Draft IP Assignment Schedule Report.**

Cloudcroft

[Position with respect to Cloudcroft assignments still to be confirmed.]

Please see our comments in section 8:3A above regarding independent contractors.  Those comments also apply here.

This suggests, absent a separate assignment of intellectual property rights from Craig Wright to Panopticrypt and an additional assignment from Panopticrypt to C01n (neither of which has been provided us as part of the Review Material), that the intellectual property rights in this material are likely to still be owned by Craig Wright.  **We have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP**

> **Formatted:** Highlight

> **Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
26358 14-v1 SYDDMS26358 14-v1 SYDDMS  DRAFT
147
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612096

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | **Assignment Schedule Report.** |
| | To the extent that this work was carried out whilst Craig Wright was an employee it is possible that Core IP Rights in the work could vest in in Panopticrypt, unless the work was carried out pursuant to the Consultancy Agreement with Co1n (Doc ID DM25).  Please see our comments at section 19:4B in this regard.  For certainty, any retained rights in Panopticrypt should be included in the IP Assignment from Panopticrypt. **We have therefore added these into the Panopticrypt Assignment Schedule at Schedule M of the Draft IP Assignment Schedule Report.** |
| | **As noted in section 14:4A, we also note that this appears to relate to work for Hoyts and Qantas.** ~~We have not been provided with any contracts with Hoyts or Qantas governing such work.  We note for completeness that to the extent that such contracts exist, it is also possible that these could have an impact on the ownership position for these Core IP Rights.~~We are instructed that no work was undertaken for Hoyts and Qantas, meaning that if this is the only work undertaken, the impact on the ownership position for the Core IP Rights is likely to be minimal. |
| **22:2D** | Please see our comments in section 14:3C. |
| **Craig Wright Specifications** | **For completeness, we have added a reference to the specifications into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.** |
| Please see our comments in section 14:3C regarding specifications prepared by Craig Wright | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612097

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**CRAIG WRIGHT**

3. **Red Flag Third Party Issues**

**22:3A**

MJF Automation Software, WK Software Assurance and WK Risk Quantification

Please see our comments in section 8:3C above noting the assignment of Core IP Rights to Hotwire by the "Wright Family Trust DeMorgan" (Doc ID DM2). As noted in section 8:3C, Doc ID DM2 is an assignment from the "Wright Family Trust DeMorgan" to Hotwire dated 15 September 2013 that purports to assign intellectual property rights in three categories namely:

- Category A: "Automation Software" held by DeMorgan, being: MJF Siemens Control and Operations Suite;
- Category B: WK (1) - Software Assurance through Economic Measures and Anti-Fraud System; and
- Category C: WK (1) - Risk Quantification system (for financial modelling in Bitcoin)).

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

There are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

We note as follows with respect to the original assignments from the relevant Third Parties to Craig Wright.

- Category A: RFI #23 states that the Category A Core IP Rights were "purchased" from MJF Mining Pty Ltd and that

**COMMENTS REGARDING APPROACH**

Category A:

Based on the documentation provided, we think it is unlikely that the Category A Core IP Rights have been assigned at law from either of the listed MJF entities, to Craig Wright. From an intellectual property rights perspective, the Agreement at Doc ID DM151 is, in our opinion, most correctly described as a licence of intellectual property rights not an assignment (as the document does not include an assignment, but instead uses wording consistent with a licence such as "full use and source code provided" and "no restrictions on deployment or development"). Based on this documentation, we believe it likely that the Category A Core IP Rights remained owned by the relevant MJF entities.

This means that it would not have been possible for Craig Wright to assign these intellectual property rights to the Wright Family Trust, and similarly for the Wright Family Trust to assign these intellectual property rights to Hotwire.

We suggest we discuss. Unless there is a separate intellectual property assignment from relevant MJF entities to Craig Wright that has not yet been provided, it is likely that the Category A Core IP Rights remain owned by those MJF entities. It is possible, depending on the facts, that the parties have been mutually operating on the basis that an intellectual property rights assigned has taken place and therefore, even if this is not correct at law, there may potentially be grounds to argue that MJF should

| Formatted: DMReference |
|---|

CONFIDENTIAL

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| the "IP rights were included in the purchase".  However, the only documentation provided for this purchase is:<br><br>   ○  Doc ID DM 85: an invoice from MJF Contracting to Craig Wright R&D for "Supply of Automation Software" including "update and installation of Siemens control software for systems control for up to 2,048 cores" which references an agreement; and<br><br>   ○  Doc ID DM151: a contract provided in response to our request for a copy of the agreement referred to in the invoice, being an agreement dated 3 June 2013 between "Mark Ferrier of MJF Mining Services WA Pty Limited" and "Craig S Wright of Craig S Wright R&D".  The Agreement is for the sale of listed chattels namely, "Siemens control software", "Supply of Microfinance Software" and "Gold options".<br><br>Neither of these documents contains an express assignment of intellectual property rights.  Payment was to be in Bitcoin.<br><br>•  <u>Category B</u>:  The background recitals to the IP Deed of Assignment with Hotwire state that some of the Core IP Rights subject of the assignment were originally obtained from W&K Information Defense Research LLC noting that "*although the contract with W&K Information Defense Research LLC has been executed, the principal died before completion.  This has led to the filing of a Statement of Claim (SoC) against this entity for this IP … This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case … The deed may not have been invalidated once the judgement has been entered but the assignor can dispute the assignment if the judgment is not forthcoming.*"<br><br>Please see our comments in section 22:3C below regarding | ~~now be estopped from proceeding on another basis - however, the likelihood of such an argument will depend very closely on the detailed facts.  However, as noted in section 22:4C below there are inconsistent references in the review material given statements that Craig Wright has been granted a licence for "Scade" (from Siemens) and "iMal" (from Al Baraka) which appears to be inconsistent with the proposition that the rights from Siemens were assigned.  We suggest we discuss.~~ <u>We have been instructed that DeMorgan Limited accepts that there was not an assignment of these intellectual property rights to Craig Wright, but that instead Craig Wright was licensed by way of:</u><br><br>•  <u>a commercial licence to use the "SCALA" and "Automation" software suite from Siemens; and</u><br><br>•  <u>a licence to use the source code of core banking and microfinance software (Doc ID DM205).</u><br><br><u>Further, we have been instructed that Craig Wright utilised these products (eg by reverse engineering and running tests on them to understand how they worked) to create his own products and that it is the intellectual property rights in the work carried out by Craig Wright that was intended to be assigned from Craig Wright to the Wright Family Trust (and then to Hotwire) not the Third Party intellectual property rights (Doc ID DM205).  This is despite the fact that the relevant Core IP Rights are described in the relevant agreements by reference to the relevant Third Party intellectual property rights.</u><br><br><u>This leaves open a number of risks.  Most significantly, there is a risk that intellectual property rights in the Core</u> |

Formatted: Font: Bold

Formatted: Table Bullet 1, Space Before:  0 pt, After:  0 pt, No bullets or numbering

Formatted: Font: Bold

Formatted: Font: Not Bold

Formatted: DMReference

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| the W&K litigation generally.  We note as follows specifically with regard to the Core IP Rights stated to have been assigned on to Hotwire.<br><br>Doc ID DM 141 is a Statement of Claim (2013/225983) filed in the NSW Supreme Court by craig Steven Wright ABN 97 481 146 384 (Plaintiff) in proceedings against W&K Info Defense Research LLC relating to four projects associated with the Department of Homeland Security USA:<br><br> o BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures<br> o BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure Resilient Systems and Networks<br> o BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics<br> o BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP)<br><br>On its face, it appears that the first of these four projects could relate to the Category B Core IP Rights.  Consent Orders were made on 6 November 2013 including judgment in the sum of $28,254,666 in favour of Craig Wright.  The consent orders state that "The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment" and that "A deed of transfer for the Intellectual Property is to be completed before 1 September 2013".  We have been provided with a short document executed by Uyen Nguyen (as director of W&K Info Defense LLC) which reads "In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed consideration."<br><br> • <u>Category C:</u> Please see our comments in section 22:3C | IP Rights created by Craig Wright infringe the intellectual property rights of the relevant Third Parties.  We note that the exact scope of the licence granted to Craig Wright is not clear.  We note as follows:<br><br> • The contract at Doc ID DM151 states that "Mark Ferrier of MJF Mining Services WA Pty Limited" is "the owner of the chattels itemized in the schedule hereto and has agreed to sell them to the purchaser".  The "chattels" includes the "Siemens control software" which is stated to be "mining automation software" and the "Microfinance Software" that is "Developed by Dallah Al-Baraka".<br><br> • Whilst the vendor is stated to "own" the chattels, it appears possible (if not probable) that the intellectual property rights in the relevant items are actually owned by other Third Parties (i.e. Siemens and Dallah Al-Baraka respectively) and that it is only the physical chattels that are being "sold", as there is no reference to the intellectual property rights and no warranties or third party intellectual property indemnities that would suggest, in the normal way, that "Mark Ferrier of MJF Mining Services WA Pty Limited" has the right to grant licences for the relevant intellectual property rights from their owners.<br><br> • Despite this, somewhat confusingly, the contract does include some statements about the permitted use of the software which could suggest that the contract is purporting to grant Craig Wright a licence to use the software as follows: (1) Siemens: The contract states that "no warranty" is given as to use of the "Siemens |

Formatted: Font: Not Bold
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Table Bullet 1, Space Before:  0 pt,  After:  0 pt, No bullets or numbering
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Font: (Default) Arial, 10 pt, Not Bold, Italic
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: Font: 10 pt
Formatted: Font: 10 pt, Italic
Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, 10 pt, Not Bold
Formatted: DMReference

CONFIDENTIAL

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

below regarding the W&K litigation. On its face, Category C does not align with any of the Core IP Rights identified in either Claim A or Claim B (as described in section 22:3C). It is therefore unclear whether these Core IP Rights were intended to form part of the assignment to Craig Wright pursuant to the document executed by Uyen Nguyen (referred to in Category B above).

control software" but that it is "for development in systems automation". This could suggest that it is licensed "for development" relating to systems automation, or that its use is entirely at Craig Wright's own risk given that "no warranty" is given as to use., (2) Al-Baraka: The contract states that "Full use and source code" is provided for the Al-Baraka software and that there are "no restrictions on deployment or development".

**Formatted:** Font: 10 pt

The document therefore leaves open some significant uncertainty as to: (1) whether Siemens and Al-Baraka remain the owners of the relevant intellectual property rights; (2) whether they have granted "Mark Ferrier of MJF Mining Services WA Pty Limited" a licence to use those intellectual property rights that permits sublicensing; (3) whether "Mark Ferrier of MJF Mining Services WA Pty Limited" is actually purporting to grant a licence (or simply stating that use of the software is at the user's risk); and (3) whether the activities that have been undertaken breach the licence granted (if any). This risk is heightened by the fact that we have been instructed that Mark Ferrier and/or the "MJF" entities have subsequently gone into bankruptcy/insolvency (as applicable) leaving limited protection between Craig Wright and the relevant Third Parties (Doc cID DM205).

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**Formatted:** Font: 10 pt

**This leaves some risk of a Red Flag Third Party Issue open. We have been instructed that the only Core IP Rights being used in this regard are the Core IP Rights created by Craig Wright "using" the material referred to above. However, we note for completeness that this could still leave open an infringement risk. For example, we note that to the**

**Formatted:** Font: (Default) Arial, No underline

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612101

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | extent that there was copyright subsisting in the relevant material referred to above, and the version created from that material was an adaptation of it, it is possible for that adaptation to infringe the original even though there is separate copyright subsisting in the adaptation. |

**Formatted:** Font: Bold, No underline

### Category B

~~We have been instructed Firstly, please confirm~~ that the Category B Core IP Rights (i.e. WK (1) - Software Assurance through Economic Measures and Anti-Fraud System) are in fact those described in the Statement of Claim (i.e. BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures).

**Formatted:** Font: Not Bold

~~Assuming for present purposes that this is the case,~~ ~~g~~Given it does not appear that a separate "deed of transfer for the Intellectual Property" referred to in the consent orders was ever executed, there is a question mark over (1) whether the words "accepts the offer to transfer" is itself an effective assignment of those Core IP Rights or whether a separate deed of transfer was required; and (2) exactly what Core IP Rights were the subject of the "transfer". Whilst there could be some argument around point (1), there is at least a potential counterargument that the note executed by Uyen Nguyen was intended to (and in fact did) operate as an immediate assignment of the relevant Core IP Rights, and even if that is not correct, a strong argument that even if W&K Info Defense Research LLC ever sought to argue differently, that Craig Wright could immediately request the assignment of those Core IP Rights to

**Formatted:** DMReference

CONFIDENTIAL                                                                                                        DEF_01612102

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | himself (given the consent orders require the entry into a deed of transfer and W&K Info Defense Research LLC would be likely to be in contempt of court of it refused to enter into such a deed).  As such, we think the position with regard to these Core IP Rights is stronger than Category A above.  We therefore think there is some possibility that these Core IP Rights were assigned to Craig Wright, or at least, that there is an extremely low risk that any counterargument would be raised to that proposition. |

**Formatted:** Font: Bold

We have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property rights for this purpose.

**Formatted:** Font: Bold

**Formatted:** Font: Bold

Please see our comments in section 23:3A regarding the potential subsequent assignment of these any rights that were assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard.  As noted there, we believe there is a significant risk that, to the extent that there are any such rights, these rights were not validly assigned onto the Wright Family Trust and as such **we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.**

**Formatted:** Font: Bold

Please also see our comments in section 23:3C in this regard.

Category C

It is unclear whether these Core IP Rights were intended to be transferred as part of the document executed by

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1SYDDMS2635814-v1SYDDMS  DRAFT
154
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612103

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | Uyen Nguyen (referred to in Category B above) or not given, on their face, these Core IP Rights are not the subject of either Claim A or Claim B (referred to in section 23:3C below).  ~~Please confirm the basis on which DeMorgan believes that these rights were included in Claim A or Claim B (as described in section 23:3C below).~~ We have been instructed that these Core IP Rights were the same intellectual property rights that were the subject of the litigation (Doc ID DM205).  Please therefore see our comments in Category B above regarding approach to these rights. |
| | ~~To the extent that it is unclear whether these rights were included in Claim A or Claim B, there remains a possibility that these are still owned by W&K.~~ |
| | **We have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property rights for this purpose.** |
| | Please see our comments in section 23:3A regarding the potential subsequent assignment of any rights that *were* assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard.  As noted there, we believe there is a significant risk that, to the extent that there *are* any such rights, these rights were not validly assigned onto the Wright Family Trust and as such **we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.** |
| | Please also see comments in section 23:3C below in this |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612104

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

regard.

**22:3B**

**Core Banking and Exchange Software, WK Metered Payments, WK Software Derivative Markets & Information Security Risk Systems, WK SWAMP**

Please see our comments in section 18:3A above noting the assignment of Core IP Rights to Coin-Exch by the Wright Family Trust (Doc ID DM1). As noted in section 18:3A, Doc ID DM1 is an assignment from the "Wright Family Trust DeMorgan" to Coin-Exch dated 15 September 2013 that purports to assign intellectual property rights in:

- Category A: "Core Banking and Exchange Software" (held by DeMorgan, being: MJF iMal (Source Code); MJF T24 updates and guides;
- Category B: WK (2) - Metered Payments system;
- Category C: WK (2) - Software Derivative Markets & Information Security Risk Systems;
- Category D: WK (2) - Software Assurance Marketplace (SWAMP).

The assignment is stated only to take effect once payment has been completed (operating as an exclusive licence until that point). RFI #25 instructed us that this has occurred which suggests that the assignment has taken effect.

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

The IP Deed of Assignment to Coin-Exch states, by way of

**Category A**

It is not clear from the description of the items being sold by MJF Mining under the sale agreement at Doc ID DM151, that these include the intellectual property rights purportedly being assigned by the Wright Family Trust to Coin-Exch at Doc ID DM1. Please let us know if you are aware of a separate agreement between Craig Wright and MJF Mining which may cover the IP rights being assigned on to Coin-Exch at Doc ID DM1.

In any event, as noted in section 22:3A which addresses the same documentation, we think that, even if these rights were included in that assignment, it is unlikely that IP rights have been assigned at law from either of the listed MJF entities, to Craig Wright. From an intellectual property rights perspective, the Agreement at Doc ID DM151 is, in our opinion, most correctly described as a licence of intellectual property rights not an assignment. Please see our comments in section 22:3A with regard to next steps in this regard.

**Category D**

With respect to the Software Assurance Marketplace (SWAMP) which is listed as one of the projects comprising the Statement of Claim at Doc ID DM141, please refer to our comments at section 22:3A relating to Category B Core IP Rights. Those comments also apply here.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635314-v1SYDDMS  DRAFT
150
Wright Family Trust - overview of findings

CONFIDENTIAL

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

background that all of the intellectual property rights in the "core technology" the subject of the assignment has been assigned and transferred from Craig Wright and ~~is~~are therefore owned by the Wright Family Trust at the time of the assignment.

However, there are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

We note as follows with respect to the original assignments from the relevant Third Parties to Craig Wright:

Category A

- RFI #23 states that "Core Banking and Automation Software was purchased from MJF Mining Pty Ltd". The background recitals in the IP Deed of Assignment to Coin-Exch refer to this as as being assigned from "MJF Mining Services WA Pty Ltd" for Al Baraka and "MJF Mining Services WA Pty Ltd for Siemens". However, the only documentation provided for this purchase is the following (which as noted in section 22:3A is also provided with respect to the Core IP Rights the subject of the assignments referenced at section 22:3A):

   o Doc ID DM 85: an invoice from MJF Contracting to Craig Wright R&D for "Supply of Automation Software" including "update and installation of Siemens control software for systems control for up to 2,048 cores" which references an agreement; and

   o Doc ID DM151: a contract provided in response to our request for a copy of the agreement referred to

As noted in section 22:3A, we have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property rights for this purpose.

Please see our comments in section 23:3A regarding the potential subsequent assignment of any rights that *were* assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard. As noted there, we believe there is a significant risk that, to the extent that there *are* any such rights, these rights were not validly assigned onto the Wright Family Trust and as such **we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.**

~~Please also see comments in section 23.3C below in this regard please also see our comments in section 23:3A regarding the potential subsequent assignment of these rights to the Wright Family Trust and potential issues in that regard. As noted there, we believe there is a significant risk that these rights were not validly assigned onto the Wright Family Trust and as such **we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.**~~

Category B and C

It is very unclear whether the remainder of the Core IP Rights the subject of the assignment in Doc ID DM 1 were the subject of the ligitation commenced via the two Statements of Claim referred to in section 23:3C below.

CONFIDENTIAL                                                                                      DEF_01612106

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**CRAIG WRIGHT**

in the invoice, being an agreement dated 3 June 2013 between "Mark Ferrier of MJF Mining Services WA Pty Limited" and "Craig S Wright of Craig S Wright R&D".  The Agreement is for the sale of listed chattels namely, "Siemens control software", "Supply of Microfinance Software" and "Gold options".

On their face, neither of these documents appear to describe the intellectual property the subject of the assignment at Doc ID DM1 and it therefore unclear how the Category A Core IP Rights were assigned to Craig Wright.

Category B to D

- The background recitals to the IP Deed of Assignment from Coin-Exch state that the remainder of the Core IP Rights were originally obtained from W&K Information Defense Research LLC noting that "although the contract with W&K Information Defense Research LLC has been executed, the principal died before completion.  This has led to the filing of a Statement of Claim (SoC) against this entity for this IP … This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case … The deed may not have been invalidated once the judgement has been entered bu the assignor can dispute the assignment if the judgment is not forthcoming."  Please see our comments in section 22:3C below regarding the W&K litigation generally.  We note as follows specifically with regard to the Core IP Rights stated to have been assigned on to Coin-Exch.

  Please see section 23:3C below for a description of the W&K litigation and the Core IP Rights the subject of Claim A and Claim B (as described in section 23:3C).

**COMMENTS REGARDING APPROACH**

However, we have been instructed that this is the case (Doc ID DM205).

It is therefore unclear whether these Core IP Rights were intended to be transferred as part of the document executed by Uyen Nguyen (referred to in Category B above of section 22:3A above) or not given, on their face, these Core IP Rights are not the subject of either Claim A or Claim B (referred to in section 23:3C below).  Please confirm the basis on which DeMorgan believes that these rights were included in Claim A or Claim B (as described in section 23:3C below).  To the extent that it is unclear whether these rights were included in Claim A or Claim B, there remains a possibility that these are still owned by W&K.

As noted in section 22:3A, we have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property rights for this purpose.

Please see our comments in section 23:3A regarding the potential subsequent assignment of any rights that *were* assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard.  As noted there, we believe there is a significant risk that, to the extent that there *are* any such rights, these rights were not validly assigned onto the Wright Family Trust and as such we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.

Please also see comments in section 23:3C below in this

**Formatted:** Underline

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612107

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

Of the projects comprising the subject matter of the Statement of Claim for Claim A, item BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP) appears to describe part of the intellectual property the subject of Doc ID DM1. It is not clear whether all the rest of the intellectual property is covered by the subject matter of the Statements of Claim.

**22:3C**

Please see comments in section 23:3C below in this regard.

*Formatted: Underline*

**W&K litigation**

As noted in sections 22:3A and 22:3B above, part of the Core IP Rights stated to have been assigned to Craig Wright (and then subsequently to the Wright Family Trust and then Hotwire and Coin-Exch pursuant to the arrangements described in sections 22:3A and 22:3B above) are described in those arrangements as having originally been owned by W&K Information Defense Research LLC.

From the Review Materials, our understanding of the background to the assignment from W&K Information Defense Research LLC to Craig Wright is as follows:

**Claim A**

In 2013, Craig Wright filed proceedings in the NSW Supreme Court against "W&K Info Defense Research LLC" (Case number 2013/225983). The Statement of Claim stated (in summary) that:

- Between 2013 and 2013, Craig Wright provided contract labour services and loaned money (by way of Bitcoin and gold bonds) to W&K Info Defense Research LLC.
- By contract dated 27 October 2008, W&K Info Defense Research LLC agreed to pay Craig Wright for services with that contract "bonded against the intellectual property of the defendant". The contract included an agreement that all intellectual property rights would revert to ownership by

Please see comments in section 22:3A with respect to Category B Core IP Rights. Those comments apply here.

As noted above, it is impossible to confirm on the face of the documents whether the rights assigned to Craig Wright pursuant to the Consent Orders in the W&K litigation (noting our comments in this regard in section 22:3A and section 22:3B with respect to the validity of the assignment) were then all assigned onto the Wright Family Trust (and "on-assigned" to Hotwire and Coin-Exch). Please see comments in section 23:3A regarding the open questions over whether such Core IP Rights were assigned on to the Wright Family Trust. As such, we recommend including these rights in the Craig Wright IP Assignment Schedule for the sake of certainty. **As such, we have added these into the Craig Wright IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

*Formatted: Font: Bold*

As noted in section 22:3A and 223B, we are instructed that W&K will agree to formalise the assignment that was purported to occur at the conclusion of the litigation which will ensure that no relevant Core IP Rights (that were the subject of the litigation) remain owned by W&K.

*Formatted: Font: Bold*

*Formatted: DMReference*

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2635814 v1SYDDMS  DRAFT
150
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612108

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**CRAIG WRIGHT**

Craig Wright if the projects under the contract concluded without an assignment of shares in W&K Info Defense Research LLC.  Further, the contract stated that a breach would lead to liquidated damages and, if not paid, all intellectual property rights would return to be solely owned by Craig Wright.

- The services performed by Craig Wright related to projects associated with the Department of Homeland Security USA and included four projects:
  - BAA 11-02-TTA 01-0127-WP: TTA -1 - Software Assurance: Software Assurance through Economic Measures
  - BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure Resilient Systems and Networks
  - BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics
  - BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP)

and the relevant intellectual property rights included software and code used by the US military, Department of Homeland Security and other associated parties.

- In May 2013, Dave Kleiman died leaving the project incomplete and without repaying the loan.

The only other documentation provided in the Review Materials is:

- a set of consent orders whereby the parties have agreed that Craig Wright "will accept the transfer of intellectual property held by the plaintiff in full and final satisfaction of the judgment"; and

- a short document executed by Uyen Nguyen as director of W&K Info Defense LLC stating that W&K Info Defense LLC "accept[s] the consent orders in 2013/225983 and 2013/245661.  In consideration of the amounts due, W&K

**COMMENTS REGARDING APPROACH**

We also note that Claim A related to projects carried out for the US Department of Homeland Security.  The Review Material does not contain any contract between W&K and the US Department of Homeland Security, but to the extent that W&K was engaged to do work for the US Department of Homeland Security we would have expected that to be governed by contract leaving open a possibility that the contract dealt with intellectual property rights created in the course of those projects being carried out.  This leaves open a risk that some relevant Core IP Rights may have been assigned by W&K to the US Department of Homeland Security.  **We suggest this be confirmed.**

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT
160
Wright Family Trust - overview of findings

CONFIDENTIAL

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed consideration."

<u>Claim B</u>

Craig Wright also filed proceedings in the NSW Supreme Court against "W&K Info Defense Research LLC". The Statement of Claim stated (in summary) that:

- Between 2013 and 2013, Craig Wright provided contract labour services and loaned money (by way of Bitcoin and gold bonds) to W&K Info Defense Research LLC.

- By contract dated 8 January 2009, W&K Info Defense Research LLC agreed to pay Craig Wright for services with that contract "bonded against the intellectual property of the defendant". The contract included an agreement that all intellectual property rights would revert to ownership by Craig Wright if the projects under the contract concluded without an assignment of shares in W&K Info Defense Research LLC. Further, the contract stated that a breach would lead to liquidated damages and, if not paid, all intellectual property rights would return to be solely owned by Craig Wright.

- The services performed by Craig Wright related to the development of a "Bitcoin SDK and exchange" and the relevant intellectual property rights included software and code used in the creation of a Bitcoin system.

- The defendeant was unable to complete its responsibilities due to the death of its director, Mr Kleiman.

The Statement of Claim in the Review Materials for this Claim B is not dated or stamped. However, RFI #56 states that both Statements of Claim (i.e. both Claim A and Claim B) were filed and litigated. However, the judgment in relation to the Statement of Claim at Doc ID DM142 cannot be located and has therefore not been provided for review. ~~We do note that the document executed by Uyen Nguyen mentioned above with regard to Claim B refers to~~

**Formatted:** DMReference

CONFIDENTIAL                                                                 DEF_01612110

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

two separate Claims (which potentially suggests that the consent orders for Claim B were similar to Claim A, although this is purely speculation)We have been instructed that the consent orders for Claim B were in the same form and on the same terms as Claim A with respect to the transfer of intellectual property rights.

We have been provided with various background documents relevant to this litigation namely:

- A copy of a contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC ("Vendor") and Craig Wright R&D ("Purchaser") (Doc ID DM87).  As noted above, both Statements of Claim (for Claim A and Claim B) refer to an agreement that that all intellectual property rights would revert to ownership by Craig Wright if the projects under the contract concluded without an assignment of shares in W&K Info Defense Research LLC.  Whilst this is purely speculation (given the Statement of Claim does not refer to the specific agreement) it seems possible that this Sale of Shares of a Company Owning Business could be the agreement executed for the transfer of shares as referred to in the Statements of Claim.  This is supported by RFI #58 which notes that this, and the agreement noted in the second bullet point below, were "taken to court to finalise position".  We note that the recitals to the Sale of Shares of a Company Owning Business state that "*the parties agree that they will incorporate into this agreement those agreements contained in the attached contract for the sale of the business to the intent that they shall in relation to the sale of shares have the rights and obligations contained in such contract as part of the agreement. The company includes all software, research material and other aspects of the business*".  It is unclear whether any assets were intended to comprise part of the sale here but we assume that, as the body of the agreement contains only a sale of

Formatted: DMReference

CONFIDENTIAL

DEF_01612111

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

shares and no further details of a sale of assignment of IP that this agreement acts only as evidence of a share sale of Dave Kleiman's stake in W&K to Craig Wright.  Payment was to be in Bitcoin.

- An Intellectual Property Licence Funding Agreement" between Craig Wright of Craig Wright R&D (Financer) and Dave Kleiman for W&K Info Defense LLC (Provider) (Doc ID DM86) dated April 2011 with payment to be in Bitcoin. Under this Agreement:

  o Craig Wright agrees to fund Dave Kleiman's research and development of several software products – Bitcoin and Exchange Software in C/C++/C#/R Code.  Other IP the subject of the Agreement includes (1) all IP under the patent BAA-001/002/003/004 and (2) all trademarks associated with C01N and associated marks to be filed.  The funding is to be in the form of a loan repayable by Dave Kleiman on or before 1 July 2013 and 30 December 2013.  The recitals state that CW remains owner of all copyright in the Bitcoin and Exchange Software in C/C++/C#/R Code at all times.

  o Craig Wright also grants an "exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 1 July 2013" for a fee of $20,000,000.

We also note that the Statement of Claim for Claim A refers to a research consulting agreement between Craig Wright and W&K Info Defense Research LLC dated 27 October 2008 which was "secured against W&K's intellectual property".  We have been instructed that a copy of this agreement cannot be located (RFI #55).

Similarly the Statement of Claim for Claim B refers to a research

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1SYDDMS2635814-v1SYDDMS  DRAFT
163
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612112

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

consulting agreement between Craig Wright and W&K Info Defense Research LLC dated 8 January 2009, which was "secured against W&K's intellectual property". We have been instructed that a copy of this agreement cannot be located (RFI #56).

### 22:3D

<u>Overseas trust arrangements</u>

We have been instructed that prior to the establishment of the Wright Family Trust in August 2013, Craig Wright had "purchased software personally" (see section 22:2 in this regard) and also "had agreements (Bitcoin rights) with overseas trusts WII and Tulip Trading" (RFI #27).

The status of WII and Tulip Trading, and their relationship with Craig Wright, are very unclear.

We requested a copy of all documentation relating to any agreements between Craig Wright and WII and Tulip. Via RFI #60, we were instructed that Craig Wright "had a loan from the overseas trust. No BTC rights were purchased. Craig has a loan of BTC rights from the trust which he used to purchase software". This appears to be a reference to the arrangements with MJF (see sections 22:3A and 3B above).

We also requested details regarding WII and Tulip Trading and how they relate to the group. RFI #60 states that "they are companies in the Seychlles incorporated by Craig Wright. They are the main entities that Tulip Trust stems from. They do not relate to the other entities. They are asset management and holding companies."

Doc ID DM 156 contains an explanation of the "Tulip Trust" referenced in this response. It states that:

"The Seyshell's trust, also known as Tulip Trust, is not a standard

~~We suggest we discuss. It is extremely unclear whether these entities hold any interest in the Core IP Rights. To the extent that they do, Craig Wright should be obliged to obtain assignments of all such rights.~~ We have been instructed that these arrangements constitute a capital/funding source in relation to Bitcoin rights and ownership of shares, and they do not have any impact on the Core IP Rights ownership position (Doc ID DM205).

We also note for completeness that RFI#26 goes on to state that information regarding WII and Tulip Trading has not been disclosed to the ATO. We note for completeness that DeMorgan should **obtain advice from its tax advisors** as to the scope of the disclosures it is required to make to ensure compliance, to the extent it has not already done so.

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT
164
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612113

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

*trust. It is a homomorphic encryption scheme for the distribution of keys. It is a trust written into software and cryptographic code. It is a DAC (Distributed Autonomous Corporation). Each trustee has a slice of public keys which do not allow access to anything on their own. When ordered correctly, the correct sequence of keys allows for the release of certain other keys in the pool which then allows for the release of legal ownership of private keys to be issued. Therefore the recipient has received a private key that has never been held by another person. Ie. Nobody ever has your private key.*

*The Trust was established before DBH.*

*Wright International Investments was established in 2009. It was designed as the holding company. Tulip Trading was established in 2011. Tulip Trust was a blind trust planned in 2011 and set up by Dave Kleiman under in 2012 Tulip Trading. Craig is independent of the trust."*

**4. Other issues to note**

**22:4A**

IP assigned by Craig Wright

We have been instructed that Craig Wright has never assigned any Core IP Rights to any other person or entity (RFI#63).

However, this appears to be inconsistent with much of the Review Material noted above in this report.

We note in particular:

- [Cloudcroft position to be confirmed].
- Category 1: RFI#27 states that Craig Wright (trading as Craig Wright R&D) "sold to [the Wright Family Trust] the software, Bitcoin rights, W&K software, Albaraka, Siemens etc" noting that "The ATO are aware of this and have these invoices". This appears to be a reference to the Deed of

Category 1: Please see comments in section 23:3A in this regard. Those comments also apply here.

Category 2: Please see comments in section 8:2F in this regard. Those comments also apply here.

Category 3: Please see our comments in section 22:3C above in this regard. Those comments also apply here.

Category 4: Please see our comments in section 23:3A in this regard. Those comments also apply here.

Category 5: Please see our comments in section 8:2D in this regard. Those comments also apply here.

Formatted: DMReference

CONFIDENTIAL

DEF_01612114

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

Assignment from Craig Wright to The Wright Family Trust (dated 15 July 2013) (Doc ID DM 148).  Please see our comments at section 23:3A in this regard.  Those comments also apply here.

- Category 2: Please see our comments above in section 8:2F regarding a possible assignment of Core IP Rights to Hotwire by "Craig Wright R&D for DeMorgan".  Those comments also apply here.

- Category 3: We note that Doc ID DM86: Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D (ABN 97 481 146 384) (Financer) and Dave Kleiman of W&K Info Defense LLC (Provider) - contains an assignment of intellectual property rights from Craig Wright R&D to Dave Kleiman for W&K Info Defence LLC in any improvements, modification, enhancement or derivative developed by Dave Kleiman for W&K Info Defence LLC, of the intellectual property the subject of the Agreement, being:

  o Bitcoin and Exchange Software in C/C++/C#/R Code;

  o all trademarks associated with C01N and associated marks to be filed; and

  o all IP under the patent BAA-001/002/003/004.

  Payment was to be in Bitcoin.

  However, it appears possible (although unclear) that these Core IP Rights were subsequently assigned back to Craig Wright at the conclusion of the W&K litigation as outlined in section 22:3C.  Please see our comments in section 22:3C above in this regard.

- Category 4: Doc ID DM148: Deed of Assignment and Charge between Craig Wright (ABN 97 481 146 384) (Chargee) and DeMorgan Wright Family Trust (ABN 72 433 066 448) (Chargor) dated 15 July 2013 provides for the

Formatted: DMReference

CONFIDENTIAL

DEF_01612115

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

following IP to be transferred from Craig Wright to the Wright Family Trust upon payment of consideration in full (operating as an exclusive licence until that point). The Deed states that all IP will be transferred by the Chargee as assigned to the Chargor on or before 30 September 2013:

- o Core Software and training materials;
- o Source code developed under agreement with W&K Information Defence Research LLC:
    - WK - Software Assurance Market Place (SWAMP);
    - WK - Software Derivative Markets and Information Security Risk Systems;
    - WK - Software Assurance through Economic Measures and Anti-Fraud System;
    - WK - Risk Quantification System (for financial modelling in Bitcoin);
    - WK - Metered Payments System
- o Software being sourced from MJF Mining (MJF) which is to be assigned at cost:
    - iMAL Core Banking software source code;
    - SCADA automation software suite; and
    - Islamic and Micropayment software source code.

Please see our comments in section 23:3A in this regard. Those comments also apply here.

Category 5: The response to our initial information request stated that there had been an assignment from "Craig Wright R&D" to Hotwire dated 1 July 2013. However, as noted in section 8:2D above, no copy of this assignment has been provided. Please see our comments in section 8:2D in this regard.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS   DRAFT
167
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612116

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**22:4B**

IP licensed by Craig Wright

We have been instructed that Craig Wright is not currently party to any licence of Core IP Rights pursuant to which he licences Core IP Rights that he owns to any other person or entity (RFI#64).

However, this appears to be inconsistent with much of the Review Material noted above in this report.

- [Cloudcroft position to be confirmed.]

- Category 1: Please see our comments above in section 8:2F regarding a possible assignment of Core IP Rights to Hotwire by "Craig Wright R&D for DeMorgan". Those comments also apply here.

- Category 2: Doc ID DM86: Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D (ABN 97 481 146 384) (Financer) and Dave Kleiman of W&K Info Defense LLC (Provider) - as set out in section 22:2B, under the Intellectual Property Licence Funding Agreement at Doc ID DM86 Craig Wright also grants an "exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 1 July 2013." for a fee of $20,000,000. The licence was due to expire on 1 July 2013.

- Category 3: As noted in section 22:4A above under the Deed of Assignment and Charge between Craig Wright (ABN 97 481 146 384) (Chargee) and DeMorgan Wright Family Trust (ABN 72 433 066 448) (Chargor) dated 15 July 2013 (Doc ID DM148) the IP to be assigned is licensed to the Wright Family Trust on

**Category 1:** Please see our comments above in section 8:2F above. Those comments also apply here.

**Category 2:** This was a two year licence and should have now expired.

**Category 3:** Please see our comments in section 23:3A below in this regard. Those comments also apply here.

Formatted: DMReference

CONFIDENTIAL

DEF_01612117

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
| --- | --- |

an exclusive basis until payment of consideration in full.  Please see our comments in section 23:3A below in this regard.

**22:4C**

IP licensed to Craig Wright

We have been instructed that Craig Wright has been granted two licences to use Core IP Rights by third parties namely (RFI#65):

- A licence for "Scade" (from "Siemans")
- A licence for "iMal" (from "Al Baraka")

Copies of these have not been provided.

There is some confusion over whether the rights obtained by Craig Wright in this regard were a licence or an assignment given these seem to be the same rights the subject of the assignments noted in sections 23:3A and 3B above.  The fact that these are licences, not assignments, is consistent with our comments in sections 23:3A and 23:3B with regard to the Category A Core IP Rights, and supports the view that ownership of these materials remains with the relevant Third Parties.This is consistent with our finding above that the rights to the "Siemens" and "Al Baraka" software did not constitute an assignment.

Please see our comments in section 23:3A and 22:3B in this regard.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612118

## 23. Wright Family Trust - overview of findings

| WRIGHT FAMILY TRUST | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. **Overview of role** | **23:3A**<br><br>We have been instructed that the Wright Family Trust was established in August 2013 (RFI #27).<br><br>RFI #27 states that prior to the formation of the Wright Family Trust, Craig had "purchased" software personally but then "sold" the Wright Family Trust "the software, Bitcoin rights, W&K software, Albaraka, Siemens etc" which the Wright Family Trust then "collated and distributed these from the overseas trusts and overseas entities to the local companies in Australia". It appears from the Review Material that this is a reference to the assignments of Core IP Rights from the Wright Family Trust to Hotwire and Coin-Exch described in sections 8:3C and 18:3A above. | From the response to RFI #27 it appears likely that the main purpose of the Wright Family Trust was to take ownership of various Core IP Rights from Craig Wright, and then to assign those Core IP Rights to DeMorgan Group Entities. It remains unclear whether any Core IP Rights still vest in the Wright Family Trust or whether it has simply "on-assigned" all of the Core IP Rights that were previously assigned to it.<br><br>**Regardless, we recommend obtaining a blanket IP Assignment from the Trustee for the Wright Family Trust, particularly given the uncertainty over the validity of the assignment referred to in section 23:3A below.** |
| 2. **Summary of IP likely to be owned by the entity[18]** | **23:2A**<br><br>Please note Red Flag Third Party Issues below. | Please note Red Flag Third Party Issues below. |
| 3. **Red Flag Third Party Issues** | **23:3A**<br><br>Assignment from Craig Wright<br><br>We have been instructed that the only Core IP Rights assigned to the Wright Family Trust were assigned by Craig Wright to the Wright Family Trust under Doc ID DM 149 being a Deed of Assignment | As noted there is some confusion over whether this assignment actually took place. As noted, clause 14.5 suggested that Craig Wright would assign the relevant intellectual property rights on or before 30 September 2013. From the other remarks in the document, it |

---

[18] A draft Assignment Schedule for the Wright Family Trust IP Assignment is set out in Schedule Q of the Draft IP Assignment Schedule Report.

Formatted: DMReference

CONFIDENTIAL

DEF_01612119

| WRIGHT FAMILY TRUST | COMMENTS REGARDING APPROACH |
|---|---|

and Charge between Craig Wright (ABN 97 481 145 384) and DeMorgan Wright Family Trust (ABN 72 433 066 448) dated 15 July 2013 (RFI #67).

Whilst the party name here is "DeMorgan The Wright Family Trust" the ABN listed is simply the ABN for the Trustee for the Wright Family Trust.

We note:

- The recitals state that Craig Wright has agreed to "transfer IP" to "DeMorgan The Wright Family Trust" in terms of "a float for the value of the Intellectual Property (IP)". The recitals also state "*It is agreed that [DeMorgan Wright Family Trust] will have good title for all IP transferred in the deed at the completion of the deed and that a license to use the IP will be granted as an exclusive term prior to the completion of the deed.*" We have not seen any material confirming whether this has occurred.

- A separate "introduction" states that "*[Craig Wright] has granted or agreed to grant, during the pleasure of [Craig Wright], an exclusive license to use and exploit certain Intellectual Property (IP) to, for or on account of [DeMorgan The Wright Family Trust] and to secure such payment for the consideration associated with such, [DeMorgan The Wright Family Trust] has agreed to execute this Deed. It is further agreed that [DeMorgan The Wright Family Trust] will gain full title to all IP in this deed at or on the completion of the deed and when all consideration has passed in full.*"

- The operative provisions of the Deed do not contain an express assignment of any intellectual property rights other than the reference in the following bullet point. They provide that "*[DeMorgan The Wright Family Trust] charges to [Craig Wright] all the undertaking, property and assets of [DeMorgan The Wright Family Trust] both present and*

appears that this was intended to occur after full payment was received. ~~Please confirm whether this occurred and provide the relevant documentation.~~ We have been instructed that payment was made (Doc ID DM161) but that no separate document was entered into to document the assignment (Doc ID DM205).

If ~~this~~ the assignment from Craig Wright did not occur, there is a chance that these Core IP Rights are still owned by Craig Wright (subject to the Red Flag Third Party Issues outlined in section 22:3 above). **We therefore recommend that if the assignment cannot be confirmed, for completeness, any Core IP Rights retained by Craig Wright under this arrangement be included in the Craig Wright Assignment Schedule.**

Further, even if the Deed of Assignment and Charge *itself* constituted an assignment, there would be a question over which entity took the assignment ~~given~~:

- ~~t~~The Trust Deed for the Wright Family Trust is dated 9 August 2013 (nearly a month later than the Deed of Assignment and Charge) raising a question over whether the Wright Family Trust even existed at the time of the Deed of Assignment and Charge. However, we have been instructed that the Wright Family Trust was in existence prior to 9 August 2013 (pursuant to an earlier Trust Deed dated 1 July 2013 which does not form part of the Review Materials); and

- ~~t~~The party executing the document is "DeMorgan The Wright Family Trust". We note that the execution block indicates that it is being

<div style="text-align: right">

**Formatted: Font: Not Bold**

**Formatted: DMReference**

</div>

CONFIDENTIAL

| WRIGHT FAMILY TRUST | COMMENTS REGARDING APPROACH |
|---|---|

*future including the [DeMorgan The Wright Family Trust]'s Uncalled Capital to be called if so done for repayment of current amounts in the account".* "The charge secures the due and punctual payment of the Secured IP". We note that neither "Uncalled Capital" or "Secured IP" are defined. We also note that the Deed refers to a separate "Agreement" entered into on or around the same date. It is unclear what this is. Clause 15.1 stated that *"This Deed will be a continuing security despite any settlement of account, intervening payment or other matter or thing whatsoever until a final discharge of this Deed has been given by the Chargee."* We have not seen any documentation showing that "a final discharge of this Deed has been given by the Chargee" (i.e. Craig Wright).

- The only reference to a "transfer" in the operative provisions is a statement at clause 14.5 that *"All IP in this agreement will be transferred by the chargee as assigned to the charger On or before 30 September 2013".* This could suggest that a separate assignment was to be entered into at the relevant time. It is unclear whether this occurred.

Whilst the "Intellectual Property" to be assigned is not defined, it is described (in clause 14 of the Deed) as:

- Core Software and training materials
- Source code developed under agreement with W&K Information Defence Research LLC:
  - WK - Software Assurance Market Place (SWAMP)
  - WK - Software Derivative Markets and Information Security Risk Systems
  - WK - Software Assurance through Economic Measures and Anti-Fraud System
  - WK - Risk Quantification System (for financial modelling in Bitcoin)

signed by "Trustee (DeMorgan)". Given DeMorgan Limited is not the Trustee of The Wright Family Trust (and we do not understand it to have ever been the trustee) this raises a question over whether the incorrect entity has executed the Deed. We note that, next to the execution block, there is a handwritten note that reads "4 Panopticrypt" which could suggest an intention that "Trustee (DeMorgan)" was executing on behalf of Panopticrypt (which was the trustee of the Wright Family Trust) however this is unclear and it is uncertain how and when this note was added. It also appears that this party has failed to execute the document as a Deed.

For the reasons outlined above, we recommend, for completeness, that any Core IP Rights retained by Craig Wright under this arrangement be included in the Craig Wright Assignment Schedule. **As such, we have added the Core IP Rights identified in section 22.3 as potentially owned by Craig Wright (namely the source code and other material developed with regard to WK - Software Assurance through Economic Measures and Anti-Fraud System and WK - Software Assurance Market Place (SWAMP)) into the Craig Wright IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

For completeness, any rights that in this materials that do sit with the Wright Family Trust (which are likely to be minimal) should be captured in the Wright Family Trust IP Assignment. We have

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS   DRAFT
172
Wright Family Trust - overview of findings

CONFIDENTIAL

| WRIGHT FAMILY TRUST | COMMENTS REGARDING APPROACH |
|---|---|

|  |  |
|---|---|
| o  WK - Metered Payments System<br><br>• Software being sourced from MJF Mining (MJF) which is to be assigned at cost:<br>   o  iMAL Core Banking software source code;<br>   o  SCADA automation software suite;<br>   o  Islamic and Micropayment software source code. | therefore added this into Schedule Q of the Draft IP Assignment Schedule Report as noted in section 23:4A below. |

**4. Other issues to note**

**23:4A**

**Assignments to Hotwire and Coin-Exch**

Please see our comments in sections 8:3C and 18:3A above regarding the assignments of Core IP Rights to Hotwire and Coin-Exch of Core IP Rights acquired from Craig Wright under the assignment referred to in section 23:3A above.

There are real questions over whether the relevant Core IP Rights were effectively assigned to Craig Wright in the first place (as outlined in sections 22:3A, 22:3B and 22:3C) and, if they were, whether they were then assigned to the Wright Family Trust (for the reasons outlined in section 23:3A above).

However, to the extent those assignments were effective there is some risk that some of these Core IP Rights remain owned by the Wright Family Trust (due to the issues over the drafting of the assignments to Hotwire and Coin-Exch) as noted in sections 8:3C and 18:3A. Further, we note that there is some query over whether the Wright Family Trust executed these documents correctly (given Ramona Watts has executed one, and Craig Wright has executed the other, for the Wright Family Trust - it is unclear who the authorised signatories were).  As such, we recommend that any of these Core IP Rights that *are* retained by the Wright Family Trust be expressly referenced in the IP Assignment from the Wright Family Trust.  **As such, we have added a general reference to the retained rights into the Wright Family Trust IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612122



DeMorgan                                                        174                              Wright Family Trust - overview of findings
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612123

## Schedule A

### DeMorgan Group Corporate Chart

Note that Allan Pedersen also holds partially paid options in DeMorgan Limited.



Formatted: DMReference

CONFIDENTIAL

DEF_01612124

## Schedule B

### List of Documents Reviewed

| Doc ID Number | File Name | Description |
|---|---|---|
| DM1 | 20130915 IP Deed of Assignment DeMorgan Coin Exch | IP Deed of Assignment between The Wright Family Trust DeMorgan (ABN 72 433 066 448) and Coin-Exch Pty Ltd (ABN 31 163 338 467). |
| DM2 | 20130915 IP Deed of Assignment WFT to HW | IP Deed of Assignment between The Wright Family Trust DeMorgan (ABN 72 433 066 448) and Hotwire Preemptive Intelligence Pty Ltd (ABN 31 163 338 467). |
| DM3 | Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1) | Intellectual Property Licence between C W R&D (ABN 97 481 146 384) ATF DeMorgan (ABN 72 433 066 448) and Hotwire Preemptive Intelligence Pty Ltd |
| DM4 | Intellectual Property Licence b | |
| DM5 | Intellectual Property Licence | Intellectual Property Licence between C W R&D (ABN 97 481 146 384) and Hotwire Preemptive Intelligence Pty Ltd |
| DM6 | Intellectual Property Licence (1) | |
| DM7 | Hotwire and CoinEx Research and Development Services Agreement 15 Sept | R&D Services Agreement between Coin-Exch Pty Ltd (Client) and Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research Pty Ltd (Service Providers) |
| DM7 duplicate | Research and Development Services Agreement 15 Sept 2013 | R&D Services Agreement between Coin-Exch Pty Ltd (Client) and Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research Pty Ltd (Service Providers) |
| DM8 | Technical Services Agreement - 29062015145045 | Research, Development and Technical Services Agreement between DeMorgan Ltd (Service Provider) and Dr Technologies Ltd (Client). |
| DM9 | Pholus Consultancy Agreement V3.1 (ICR) | Consultancy Agreement between Interconnected Research Pty Ltd (ACN 165 472 097) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM10 | Pholus Consultancy Agreement V3.1 (Integyrz) | Consultancy Agreement between Integyrz Pty Ltd (ACN 165 263 007) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM11 | Pholus Consultancy Agreement V3.1 (Panopticrypt) | Consultancy Agreement between Panopticrypt Pty Ltd (ACN 151 567 118) (Company) and Pholus Pty Ltd |

> **Formatted:** DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2635814-v1\SYDDMS_DRAFT

176

CONFIDENTIAL

| Doc ID Number | File Name | Description |
|---|---|---|
| | | (ACN 165 472 079) (Consulting Company) |
| DM12 | Pholus Consultancy Agreement V3.1 (Zuhl) | Consultancy Agreement between Zuhl Pty Ltd (ACN 165 472 006) (Company) and Pholus Pty Ltd (ACN 165 472 079)  (Consulting Company) |
| DM13 | Pholus Consultancy Agreement V3.1 (Cloudcroft) | Consultancy Agreement between Cloudcroft Pty Ltd (ACN 149 732 365) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM14 | Pholus Consultancy Agreement V3.1 (DeMorgan) | Consultancy Agreement between DeMorgan Ltd (ACN 601 560 525) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM15 | Pholus Consultancy Agreement V3 (Denariuz) | Consultancy Agreement between Denariuz Pty Ltd (ACN 165 471 983) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM16 | Pholus Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600 516 149) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM17 | Pholus Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (ACN 601 677 105) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM18 | Pholus Consultancy Agreement V3 (DASO) | Consultancy Agreement between DASO Pty Ltd (ACN 600 512 249) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM19 | Pholus Consultancy Agreement V3 (Coin-Exch) | Consultancy Agreement between Coin-Exch Pty Ltd (ACN 163 338 467) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM20 | Pholus Consultancy Agreement V3.0 (C01N) | Consultancy Agreement between C01N Pty Ltd (ACN 152 222 421) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM21 | Panopticrypt Consultancy Agreement V3 (DASO) | Consultancy Agreement between DASO Pty Ltd (ACN 600 512 249) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM22 | Panopticrypt Consultancy Agreement V3 (Cloudcroft) | Consultancy Agreement between Cloudcroft Pty Ltd  (ACN 149 732 365) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |

Formatted: DMReference

CONFIDENTIAL

DEF_01612126

| Doc ID Number | File Name | Description |
|---|---|---|
| DM23 | Panopticrypt Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonliner Forecastability in Economics and Finance Pty Ltd (ACN 600 516 149) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM24 | Panopticrypt Consultancy Agreement V3 (Coin-Exch) | Consultancy Agreement between Coin-Exch Pty Ltd (ACN 163 338 467) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM25 | Panopticrypt Consultancy Agreement V3 (C01N) | Consultancy Agreement between C01N Pty Ltd (ACN 152 222 421) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM26 | Panopticrypt Consultancy Agreement V3 (ICR) | Consultancy Agreement between Interconnected Research Pty Ltd (ACN 165 472 097) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM27 | Panopticrypt Consultancy Agreement V3 (Pholus) | Consultancy Agreement between Pholus Pty Ltd (ACN 165 472 079) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM28 | Panopticrypt Consultancy Agreement V3 (DeMorgan) | Consultancy Agreement between DeMorgan Ltd (ACN 601 560 525) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM29 | Panopticrypt Consultancy Agreement V3 (Zuhl) | Consultancy Agreement between Zuhl Pty Ltd (ACN 165 472 006) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM30 | Panopticrypt Consultancy Agreement V3 (Denariuz) | Consultancy Agreement between Denariuz Pty Ltd (ACN 165 471 983) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM31 | Panopticrypt Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (ACN 601 677 105) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM32 | Panopticrypt Consultancy Agreement V3 (Integyrz) | Consultancy Agreement between Integyrz Pty Ltd (ACN 165 263 007) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM33 | ICR Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (ACN 601 677 105) (Company) and Interconnected Research Pty Ltd (ACN 165 472 097) (Consulting Company) |
| DM34 | ICR Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612127

| Doc ID Number | File Name | Description |
|---|---|---|
| | | 600 516 149) (Company) and Interconnected Research Pty Ltd  (ACN 165 472 097) (Consulting Company) |
| DM35 | ICR Consultancy Agreement V3 (DeMorgan) | Consultancy Agreement between DeMorgan Pty Ltd (ACN 601 560 525) (Company) and Interconnected Research Pty Ltd  (ACN 165 472 097) (Consulting Company) |
| DM36 | Integyrz Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (Company) and Integyrz Pty Ltd (ACN 165 263 007) (Consulting Company) |
| DM37 | Integyrz Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600 516 149) (Company) and Integyrz Pty Ltd (ACN 165 263 007) (Consulting Company) |
| DM38 | Integyrz Consultancy Agreement V3 (DeMorgan) | Consultancy Agreement between DeMorgan Pty Ltd (ACN 601 560 525) (Company) and Integyrz Pty Ltd (ACN 165 263 007) (Consulting Company) |
| DM39 | Denariuz Consultancy Agreement V4 (DASO) | Consultancy Agreement between DASO Pty Ltd  (CAN 600 512 249) (Company) and Denariuz Pty Ltd (ACN 165 471 983) (Consulting Company) |
| DM40 | Interconnected RD Service Agreement v3.0 (Panopticrypt) | Research and Development Services Agreement between Panopticrypt Pty Ltd (ABN 34 151 567 118) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM41 | Interconnected RD Service Agreement v3 (DASO) | Research and Development Services Agreement between DASO Pty Ltd (ABN 86 600 542 249) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM42 | Interconnected RD Service Agreement v3 (Cloudcroft) | Research and Development Services Agreement between Cloudcroft Pty Ltd (ABN 94 149 732 365) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM43 | Interconnected RD Service Agreement v3 (Coin-Exch) | Research and Development Services Agreement between Coin-Exch Pty Ltd (ABN 31 163 338 467) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM44 | Interconnected RD Service Agreement v3 (C01N) | Research and Development Services Agreement between C01N Pty Ltd (ABN 56 152 222 421) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM45 | Interconnected RD Service Agreement v3 (Zuhl) | Research and Development Services Agreement between Zuhl Pty Ltd (ABN 45 165 472 006) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612128

| Doc ID Number | File Name | Description |
|---|---|---|
| DM46 | Interconnected RD Service Agreement v3 (Denariuz) | Research and Development Services Agreement between Denariuz Pty Ltd (ABN 22 165 471 983) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM47 | Interconnected RD Service Agreement v3 (Pholus) | Research and Development Services Agreement between Pholus Pty Ltd (ABN 47 165 472 079) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM48 | Interconnected RD Service Agreement v3.0 (Integyrz) | Research and Development Services Agreement between Integyrz Pty Ltd (ABN 42 165 263 007) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM49 | Integyrz RD Service Agreement V3 (Panopticrypt) | Research and Development Services Agreement between Panopticrypt Pty Ltd (ABN 34 151 567 118) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM50 | Integyrz RD Service Agreement V3 (Pholus) | Research and Development Services Agreement between Pholus Pty Ltd (ABN 47 165 472 079) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM51 | Integyrz RD Service Agreement V3 (ICR) | Research and Development Services Agreement between Interconnected Research Pty Ltd (ABN 51 165 472 097) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM52 | Integyrz RD Service Agreement V3 (Zuhl) | Research and Development Services Agreement between Zuhl Pty Ltd (ABN 45 165 472 006) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM53 | Integyrz RD Service Agreement V3 (C01N) | Research and Development Services Agreement between C01N Pty Ltd (ABN 56 152 222 421) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM54 | Integyrz RD Service Agreement V3 (Cloudcroft) | Research and Development Services Agreement between Cloudcroft Pty Ltd (ABN 94 149 732 365) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM55 | Integyrz RD Service Agreement V3 (Denariuz) | Research and Development Services Agreement between Denariuz Pty Ltd (ABN 22 165 471 983) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM56 | Integyrz RD Service Agreement V3 (DASO) | Research and Development Services Agreement between DASO Pty Ltd (ABN 86 600 542 249) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM57 | Integyrz RD Service Agreement V3 (Coin-Exch) | Research and Development Services Agreement between Coin-Exch Pty Ltd (ABN 31 163 338 467) (Client) |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612129

| Doc ID Number | File Name | Description |
|---|---|---|
| | | and Integyrz Pty Ltd (ABN 42 165 263 007)  (Provider) |
| DM58 | Business Service & Management Agreement DeMorgan Holdings | Business Service and Management Agreement between DeMorgan Holdings Pty Ltd (ACN 600655427) (Company) and DeMorgan Ltd (ACN 601560525) (Manager) |
| DM59 | Business Service & Management Agreement CHAOS | Business Service and Management Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600516149) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM60 | Business Service & Management Agreement Coin-Exch | Business Service and Management Agreement between Coin-Exch Pty Ltd (ACN 163338467) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM61 | Business Service & Management Agreement C01N | Business Service and Management Agreement between C01N Pty Ltd (ACN 152222421) (Company) and DeMorgan Ltd (ACN 601560525) (Manager) |
| DM62 | Business Service & Management Agreement Cloudcroft | Business Service and Management Agreement between Cloudcroft Pty Ltd (ACN 149735365) (Company) and DeMorgan Ltd (ACN 601560525) (Manager) |
| DM63 | Business Service & Management Agreement DASO | Business Service and Management Agreement between DASO Pty Ltd (ACN 600512249) (Company) and DeMorgan Ltd (ACN 601560525)   (Manager) |
| DM64 | Business Service & Management Agreement Panopticrypt | Business Service and Management Agreement between Panopticrypt Pty Ltd (ACN 151567118) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM65 | Business Service & Management Agreement Denariuz | Business Service and Management Agreement between Denariuz Pty Ltd (ACN 165471983) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM66 | Business Service & Management Agreement Misfit Games | Business Service and Management Agreement between Misfit Games Pty Ltd (ACN 601677105) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM67 | Business Service & Management Agreement Pholus | Business Service and Management Agreement between Pholus Pty Ltd (ACN 165472079) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM68 | Business Service & Management Agreement EZAS | Business Service and Management Agreement between EZAS Pty Ltd  (ACN 602717788) (Company) and DeMorgan Ltd (ACN 601560525)  (Manager) |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612130

| Doc ID Number | File Name | Description |
|---|---|---|
| DM69 | Business Service & Management Agreement Zuhl | Business Service and Management Agreement between Zuhl Pty Ltd (ACN 165472006) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM70 | Business Service & Management Agreement ICR | Business Service and Management Agreement between Interconnected Research Pty Ltd (ACN 165472097) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM71 | Consultancy Agreement NSW Electoral Commission and Panopticrypt | Consultancy Agreement between NSW Electoral Commission (Principal) and Panopticrypt Pty Ltd (Consultant) |
| DM72 | Sale Agreement Info Defense Cloudcroft | Sale Agreement between Information Defense Pty Ltd (Seller) and Lynn Wright/Cloudcroft Pty Ltd (Buyer) |
| | | Agreement between Craig Steven Wright (Vendor) and Information Defense Pty Ltd (Purchaser) |
| | | Agreement between Craig Steven Wright and Carroll Lynn Wright |
| DM73 | Ignatius Pang - signed contract | Employment contract between Hotwire Preemptive Intelligence Pty Ltd and Chi Nam Ignatius Pang |
| DM74 | Olga Kuznetsova (Sep 1) | Employment contract between Interconnected Research Pty Ltd and Olga Kuznetsova |
| DM75 | Ray Hoang | Employment contract between Interconnected Research Pty Ltd and Ray Hoang |
| DM76 | Trupti Birje | Employment contract between Interconnected Research Pty Ltd and Trupti Birje |
| DM77 | Nicolas Desmond | Employment contract between Interconnected Research Pty Ltd and Nicolas Desmond |
| DM78 | Allan Pedersen | Employment contract between Interconnected Research Pty Ltd and Allan Pedersen |
| DM79 | Stef Savanah | Employment contract between Integyrz Pty Ltd and Stephane Savanah |
| DM80 | Viveca Magnusson - employment agreement - (Panopticrypt) | Employment contract between Panopticrypt Pty Ltd and Viveca Magnusson |
| DM81 | Intellectual Property Licence CW R&D Cloudcroft | Intellectual Property Licence between Craig Wright R&D (For GICSR/CSCSS) (ABN 97 481 146 384) (Licensor) and Cloudcroft Pty Ltd (ABN 48 164 068 348) (Licensee) |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612131

| Doc ID Number | File Name | Description |
|---|---|---|
| DM82 | Strasan Hotwire Agreement June 2013 [C01N Pty Ltd] | Software Development Agreement between Craig Wright R&D (ABN 97 481 146 384)/Dave Kleiman (W&K Info Def LLC) (Client) and Strasan Pty Ltd (ABN 56 152 222 421) (Strasan) |
| DM83 | Strasan and HW Software Development Plan- HotwirePE | Strasan Software Development Plan: An experimentation framework for the development of algorithmic systems based on the use of evolutionary process development [attachment to Software Development Agreement] |
| DM84 | Strasan and HW Invoice Automated self matching learning system (1) | Invoice between Hotwire Preemptive Intelligence Pty Ltd and David Rees (1 July 2013) |
| DM85 | MJF Invoices | Invoice between MJF Contracting and Craig Wright R&D |
| DM86 | 2.Intellectual Property Licence Funding Agreement_Ref CEWK01 | Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D (ABN 97 481 384) (Financer) and Dave Kleiman of W&K Info Defense LLC (Provider) |
| DM87 | 1.Contract for the Sale of Shares_ref-CEWK03 | Contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC (Vendor) and Craig Wright R&D (ABN 97 487 146 384) (Purchaser) and W&K Info Defense LLC (Company) |
| DM88 | R&D Tax Incentove (C01N 1) 2012-2013 | Strasan Pty Ltd R&D Tax Incentive Application (2012-2013) |
| DM89 | C01N 2014 | C01N Pty Ltd 2014 Company tax return |
| DM90 | R&D Tax Incentive - C01N 2 | C01N Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM91 | 20150730_C01N_S27F | Notification of examination of registrations under section 27F of the Industry Research and Development Act 1986 - C01N Pty Ltd |
| DM92 | C01N Notice of Registration R&D Tax Incentive 15 Oct 2014 | Notice of Registration for R&D Tax Incentive - C01n Pty Ltd |
| DM93 | R&D Cloudcroft Final Version 1 | Cloudcroft Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM94 | Cloudcroft 2014 | Cloudcroft Pty Ltd 2014 Company tax return |

Formatted: DMReference

CONFIDENTIAL

DEF_01612132

| Doc ID Number | File Name | Description |
|---|---|---|
| DM95 | Integyrz Notice of Registration for R&D Tax Incentive | Notice of Registration for R&D Tax Incentive - Integyrz Pty Ltd |
| DM96 | R&D Tax Incentive Integyrz (final) | Integyrz Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM97 | Integyrz 2014 | Integyrz Pty Ltd 2014 Company tax return |
| DM98 | Hotwire Advanced Finding 1314AF97440 22 April 2014 | Certificate for Advanced Finding under s28A of the Industry Reseach and Development Act 1986 dated 22 April 2014 |
| DM99 | Hotwire 2014 | Hotwire Preemptive Intelligence Pty 2014 Company tax return |
| DM100 | HotwirePE AF assessment report | Hotwire Preemptive Intelligence Pty Ltd R&D Tax Incentive Application: Advance/Overseas Finding |
| DM101 | Hotwire Core Technology Company notification | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 |
| DM102 | R&D Tax Incentive Hotwire final version | Hotwire Preemptive Intelligence Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM103 | R&D Tax Incentive - IR | Interconnected Research Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM104 | ICR Notice of Registration for R&D Tax Incentive 9 Oct 2014 | Notice of Registration for R&D Tax Incentive - Interconnected Research |
| DM105 | Registration for RSP (IR) | Notice of continuing registration as a Research Service Provider |
| DM106 | Interconnected Research 2014 | Interconnected Research Pty Ltd 2014 Company tax return |
| DM107 | Denariuz Core Tech Certificate CT00002 SIGNED | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 |
| DM108 | Denariuz 2014 | Denariuz Pty Ltd 2014 Company tax return |
| DM109 | Denariuz CoreTech cover letter Company Notice SIGNED | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 - Denariuz (2014) |
| DM110 | RRDAA-2523020-31340 | Denariuz Pty Ltd R&D Tax Incentive Application (2014-2015) |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT

184

| Doc ID Number | File Name | Description |
|---|---|---|
| DM111 | R&D Tax Incentive Denariuz | Denariuz Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM112 | Zuhl Notice of Registration for R&D Tax Incentive - Zuhl | Notice of Registration for R&D Tax Incentive - Zuhl |
| DM113 | R&d Tax Incentive- Zuhl | Zuhl Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM114 | Zuhl 2014 | Zuhl Pty Ltd 2014 Company tax return |
| DM115 | Coin-Exch 2014 | Coin-Exch Pty Ltd 2014 Company tax return |
| DM116 | Advanced finding Coin Exch R&D Tax Incentive Application - Coin Exch | Coin-Exch Pty Ltd R&D Tax Incentive Application: advanced/overseas finding |
| DM117 | Coin-Exch Pty Ltd _Core_Technology_FindingCertificate | Findings of the R&D Incentives Delegate |
| DM118 | RRDAA-1965982-23184 | Coin-Exch Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM119 | Certificate AF00053 Coin-Exch Pty Ltd | Certificate for advance finding under s28A of the Industry Reseach and Development Act 1986 |
| DM120 | Coin-Exch Pty Ltd_Core_Technology_Finding_Notification | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 |
| DM121 | RRDAA-2492759-31088 | Coin-Exch Pty Ltd R&D Tax Incentive Application (2014-2015) |
| DM122 | R&D Tax Incentive Panopticrypt | Panopticrypt Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM123 | Panopticrypt 2014 | Panopticrypt Pty Ltd 2014 Company tax return |
| DM124 | 20150730_Panopticrypt_s27f | Notification of examination of registrations under section 27F of the Industry Research and Development Act 1986 - Panopticrypt Pty Ltd |
| DM125 | R&D Tax Incentive - Pholus | Pholus Pty Ltd R&D Tax Incentive Application (2013-2014) |

Formatted: DMReference

CONFIDENTIAL

DEF_01612134

| Doc ID Number | File Name | Description |
|---|---|---|
| DM126 | Pholus 2014 | Pholus Pty Ltd 2014 Company tax return |
| DM127 | Notice AF53 Coin-Exch Pty Ltd | Certificate for advance finding under s28A of the Industry Reseach and Development Act 1986 |
| DM128 | Hotwire Notice of Registration 20 Oct 2014 | Notice of Registration for R&D Tax Incentive - Hotwire |
| DM129 | AusIndustry R&D Tax Incentive Application 2012-2013 | Hotwire Preemptive Intelligence Pty Ltd R&D Tax Incentive Application (2012-2013) |
| DM130 | Rees Purchase | Additional information regarding transaction between C01N and Professor Rees |
| DM131 | Rees transaction | Payments to Professor Rees |
| DM132 | David Rees Invoice 4501 30 June 2013 GBP… | Invoice from Professor Rees to Strasan (C01N) |
| DM133 | Intellectual property licence (4) | Additional copy of agreement between Craig Wright R&D and Hotwire |
| DM134 | Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (2) | Copy of Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1) |
| DM135 | Hotwire Preemptive Intelligence Pty Ltd - shareholding | Shareholder table |
| DM136 | View company details | ASIC Company details for DeMorgan Ltd (ACN 601 560 525) |
| DM137 | Xero_Balance Sheet_Australia_DeMorgan Limited | DeMorgan Ltd Balance Sheet |
| DM138 | DEMORGAN LTD | DeMorgan Ltd Minutes of a meeting of the directors (16/4/15) |
| DM139 | ADVANCE FINDING Misfit | Description of Misfit |
| DM140 | Agreements Register (1)(1) | Table of documents under RFI #8 |
| DM141 | Statement of Claim Case No 2013-225983 | Statement of Claim (2013/225983) between Craig Steven Wright (ABN 97 481 146 384) (Plaintiff) and W&K Info Defense Research LLC (Defendant) |
| DM142 | Consent order 2013-225983_245661 | Acceptance of 'consent orders' between W&K Info Defense LLC and Craig Wright R&D |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636514-v1SYDDMS2635514-v1SYDDMS  DRAFT

188

CONFIDENTIAL

DEF_01612135

| Doc ID Number | File Name | Description |
|---|---|---|
| DM143 | Judgement-Order_Supreme Court_Case No 2013-255983 | Judgment/order between Craig Steven Wright (ABN 97 481 146 384) (Plaintiff) and W&K Info Defense Research LLC (Defendant) |
| DM144 | Statement of Claim Case No 2013-245661 | Statement of Claim (2013/225983) between Craig Steven Wright (ABN 97 481 146 384) (Plaintiff) and W&K Info Defense Research LLC (Defendant) |
| DM145 | 20130915 IP Deed of Assignment DeMorgan - Coin-Exch Att (1) | Appendix 1 – DeMorgan Wright Family Trust: Coin-Exch Pty Ltd Statement of Work – Independent Verification and Validation (IV&V) Services -15 Sept 2013. |
| DM146 | Reactive and pre-emptive Security System based on choice theory | Pending patent application. |
| DM147 | Misfit and Denariuz IP Deed of Assignment | IP Deed of Assignment between Denariuz Pty Ltd (Assignor) to Misfit Games Pty Ltd (Assignee) of all IPR in and to heat and power simulations to be conducted on the Denariuz SuperComputer system. |
| DM148 | cw and WFT-09102015130851 | Deed of Assignment and Charge between Craig Wright (ABN 97 481 146 384) (Chargee) and DeMorgan Wright Family Trust (ABN 72 433 066 448) (Chargor) dated 15 July 2013. |
| DM149 - Duplicate of DM2 | WFT and Hotwire - 09102015131008 | Deed of Assignment between The Wright Family Trust DeMorgan (Assignor) and Hotwire Preemptive Intelligence Pty Ltd (Assignee) dated 15 September 2013. |
| DM150 | RDPlan - DeMorgan | R&D project plan for Project "Spyder" |
| DM151 | MJF agreement automation software 09102015125427 | Agreement between Mark Ferrier of MJF Mining Services WA Pty Limited (Vendor) and Craig S Wright of Craig S Wright R&D (Purchaser) |
| DM152 | Baker and McKenzie Questions | Initial information request completed by DeMorgan on 21 August 2015 |
| DM153 | Appendix A Final | Appendix A to initial information request (DM152) - Hotwire Pre-emptive Intelligence Pty Ltd resourcing diagram |
| DM154 | DeMorgan Group Entity shareholding table | Table showing shareholdings, directors and business descriptions of DeMorgan Group Entities |
| DM155 | Latest DeMorgan Holdings Pty Company Report | DeMorgan Holdings Pty Ltd Company Report at 14.10.2015 |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612136

| Doc ID Number | File Name | Description |
|---|---|---|
| | showing share capital | |
| DM156 | Explanation of Tulip Trust | Document explaining Tulip Trust and Wright International Investments (WII) |
| DM157 | Tulip Trust Attachment | Email from Dave Kleiman to Craig Wright dated June 24 2011 |
| DM158 | WFT | Trust Deed for Wright Family Trust dated 9 August 2013 |
| DM159 | Property split for the family law settlement between Craig and Lynn Wright | Schedule of asset-split between Craig Wright and Lynn Wright as part of family law settlement. |
| DM160 | DeMorgan Patents Roadmap and Status | List of DeMorgan Group Entity pending patent applications, progress, backlog, status and prioritization |
| DM161 | Email from Stefan Matthews to Adrian Lawrence dated 16 November 2015. Responses to IP Report | Email from Stefan Matthews dated 16 November 2015 setting out assumptions and responses to Baker and McKenzie IP report |
| DM162 | IP Acquisition Apportionment | Spreadsheet detailing R&D incentive analysis and apportionment of value of patents between DeMorgan Group Entities |
| DM163 | Email from Stefan Matthews to Adrian Lawrence dated 16 November 2015. Ausindustry responses | Email chain from Stefan Matthews dated 16 November 2015 setting out DeMorgan Group Entity R&D incentive responses to be finalised |
| DM164 | Ausindustry Response Interconnected | Letter to Ausindustry detailing Notification of examination of registrations for Interconnected Research Pty Ltd |
| DM165 | Interconnected Research and Contemporaneous Data Report | Report detailing subject matter of Ausindustry R&D Incentive Application |
| DM166 | Interconnected Research and Contemporaneous Data Report Attachment | Attachment to DM165 |
| DM167 | Ausindustry Response Integyrz | Letter to Ausindustry detailing Notification of examination of registrations for Integyrz Pty Ltd |
| DM168 | Design research partnership program (Integyrz) | Ausindustry response supplementary information (Integyrz) - design research partnership program |
| DM169 | Integyrz - RoadMap | Integyrz eLearning RoadMap 'Go-Live' Products |

Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: Font: (Default) +Headings (Arial), 8 pt
Formatted: DMReference

CONFIDENTIAL

DEF_01612137

| Doc ID Number | File Name | Description |
|---|---|---|
| DM170 | Online Learning Style Model | Suite of documents detailing online learning style model (Integyrz) (butterfly models) |
| DM171 | Product Offerings Research and Development | Chart depicting products and markets (Integyrz) |
| DM172 | AusIndustry Response Panopticrypt | Letter to AusIndustry detailing Notification of examination of registrations for Panopticrypt Pty Ltd |
| DM173 | PhD1_CSW Thesis | Craig Wright PhD thesis: The Quantification of Information Risk Systems |
| DM174 | Panopticrypt BTC vault Digital File (2013-14) | Panopticrypt BTC vault Digital File experiment summary |
| DM175 | AusIndustry Response Cloudcroft | Letter to AusIndustry detailing Notification of examination of registrations for Cloudcroft Pty Ltd |
| DM176 | AusIndustry Cloudcroft - Development of a Core harware platform | AusIndustry Cloudcroft - Development of a Core harware platform - experiment summary |
| DM177 | AusIndustry Response Denariuz | Letter to AusIndustry detailing Notification of examination of registrations for Denariuz Pty Ltd |
| DM178 | Supercomputer simulation platform | Denariuz supercomputer simulation platform experiment summary |
| DM179 | AusIndustry Response C01N | Letter to AusIndustry detailing Notification of examination of registrations for C01nPty Ltd |
| DM180 | Sukuripto okane Core - BTC Agents + Supporting Coding Test Site (2012-13 2013-14) | Sukuripto okane Core - BTC Agents + Supporting Coding Test Site (2012-13 2013-14)  experiment summary |
| DM181 | Sukuripto okane Core - Transaction Signing (2012-13 2013-14) | Sukuripto okane Core - Transaction Signing (2012-13 2013-14) experiment summary |
| DM182 | Sukuripto okane Core - Scriptable Money (2012-13 2013-14) | Sukuripto okane Core - Scriptable Money (2012-13 2013-14) experiment summary |
| DM183 | AusIndustry Response Coin Exch | Letter to AusIndustry detailing Notification of examination of registrations for Coin-exch Pty Ltd |
| DM184 | Bayesian Design (2013-14 2014 - 15) | Bayesian Design (2013-14 2014 - 15)  experiment summary |
| DM185 | Coin-Exch CORE Network Emulation | Coin-Exch CORE Network Emulation  experiment summary |

CONFIDENTIAL

DEF_01612138

| Doc ID Number | File Name | Description | |
|---|---|---|---|
| DM186 | Coin-Exch Experiment - Intermediate Node Test | Coin-Exch Experiment - Intermediate Node Test experiment summary | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM187 | Coin-Exch Experiment - Medium Node Test | Coin-Exch Experiment - Medium Node Test experiment summary | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM188 | Coin-Exch Experiment - Simple Node Test | Coin-Exch Experiment - Simple Node Test experiment summary | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM189 | Coin-Exch FL7 Pi Calculus | Coin-Exch FL7 Pi Calculus experiment summary | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM190 | Coin-Exch Payment System | Coin-Exch Payment System experiment summary | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM191 | DeMorgan Coin-Exch Shareholding Analysis | DeMorgan Coin-Exch Shareholding Analysis - list of shareholders and their shareholding | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM192 | Cloudcroft ASIC record | Historical Company Extract for Cloudcroft Pty Ltd | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM193 | Coin-Exch ASIC record | Historical Company Extract for Coin-Exch Pty Ltd | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM194 | Coin-Exch Shareholders Agreement | Coin-Exch Shareholders Agreement | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM195 | Cloudcroft Matter (Lynn Wright) - letter re bankruptcy | Letter from Andrew Aravanis of Aravanis Insolvency to Cloudcroft Pty Ltd dated 7 September 2015 | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM196 | Email from Kayal Sandhu of Aravanis Insolvency to Lynn Wright dated 18 December 2012 | Email from Kayal Sandhu of Aravanis Insolvency to Lynn Wright dated 18 December 2012 re: her bankrupt estate and appointment of trustee | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM197 | Certificate of Appointment of Trustee dated 11 December 2012 | Certificate of Appointment of Trustee dated 11 December 2012 | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM198 | Email from Craig S Wright to John Chesher dated 25 February 2014 | Email from Craig S Wright to John Chesher dated 25 February 2014 detailing "what occurred" re: Lynn Wright and Cloudcroft Pty Ltd | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM199 | Craig Wright - ASIC | Submissions on behalf of Craig Steven Wright - Clayton Utz draft dated 25 February 2014 | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM200 | Craig Wright - ASIC chronology | Chronology prepared by Clayton Utz re: Craig Wright/Lynn Wright/Cloudcroft, Interoyrz and Interconnected Research | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM201 | Email from Joseph Collins (Clayton Utz) to Chesher attaching Asic reports dated 24 February 2014 | Email from Joseph Collins (Clayton Utz) to John Chesher attaching Asic reports dated 24 February 2014 for: Interoyrz, Information Defense, Hotwire and Cloudcroft | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| DM202 | ASIC Change to Company Details dated 13 July 2015 - Cloudcroft Pty Ltd | ASIC Change to Company Details dated 13 July 2015 - Cloudcroft Pty Ltd | **Formatted:** Font: (Default) +Headings (Arial), 8 pt |
| | | | **Formatted:** DMReference |

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT

190

DEF_01612139

| Doc ID Number | File Name | Description | |
|---|---|---|---|
| DM203 | Separation Timeline | Email from John Chesher to Joseph Colline dated 27 February 2014 detailing Lynn Wright/ATO timeline. | **Formatted:** Font: 8 pt |
| DM204 | DeMorgan Ltd Register Documents | Register of Members for DeMorgan Limited | **Formatted:** Font: 8 pt |
| DM205 | Meeting notes and client instructions dated 19.11.2015 | Notes from meeting between B&M and S Matthews and C Wright held on 19 November 2015. | **Formatted:** Font: 8 pt |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612140

## Schedule C

### RFI List

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 1. | How does DeMorgan Holdings Pty Ltd relate to DeMorgan Limited? Please provide a copy of the share certificate which indicates that DeMorgan Holdings Pty Ltd is a 100% subsidiary of DeMorgan Ltd. | DeMorgan Holdings Pty Ltd is a 100% subsidiary of DeMorgan Ltd. The share certificate indicates that it is non beneficially held by Craig Wright, in effect, he is holding it for DeMorgan Ltd. | See RFI #32 | DM155 |
| 2. | Please list the shareholders in DeMorgan Limited (with relevant shareholding percentages). | The share options have been structured, but have not been paid for or exercised. They are in the system as the directors had discussed them, but we will be forfeiting some of them as they are not going to be offered to all members of staff on that list. For example, we had discussed with Stef the option of share options or being paid out for work done over the stand down period. He requested the money over the shares. Olga has had a pay raise in lieu of shares. We have only discussed and agreed with Allan Pedersen in terms of the share options below. | See RFI #33 | |

| Founder and Other Shareholders | Number and Class of Shares |
|---|---|
| The Wright Family Trust | 131,915,375 FOU |
| DENARIUZ SINGAPORE | 64,046,144 A |
| Uyen Ngyen | 1,800,000 A |
| C01N Ltd (UK) | 11,000,000 A |
| CRITICAL INFRASTRUCTURE SECURITY PTY LTD | 302,500 A |

| Employee share pool (Class EMP) | Number of Shares | Paid up initial |
|---|---|---|
| Allan Pedersen | 400,000 | 4,000 |
| Faye | 50,000 | 500 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612141

| RFI Number | Question | Answer | | | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|---|---|
| | | Stef | 125,000 | 1,250 | | |
| | | Nick | 50,000 | 500 | | |
| | | Trupti | 125,000 | 1,250 | | |
| | | Olga | 125,000 | 1,250 | | |
| | | Ray | 100,000 | 1,000 | | |
| | | Viveca | 50,000 | 500 | | |
| 3. | Please list the shareholders in Hotwire Pre-emptive Intelligence Pty Ltd (with relevant shareholding percentages). | Denariuz Sg | 1,000,000 | 10.0% | | |
| | | Ramona Watts | 306,000 | 3.1% | | |
| | | Uyen Thuc Nguyen | 774,000 | 7.7% | | |
| | | Robert Urquhart | 250,000 | 2.5% | | |
| | | Craig Steven Wright | 7,670,000 | 76.7% | | |
| | | | 10,000,000 | 100.0% | | |
| 4. | Please list the shareholders in DeMorgan Holdings Pty Ltd (with relevant shareholding percentages). | DeMorgan Holdings Pty Ltd is a 100 % subsidiary of DeMorgan Ltd. The share certificate indicates that it is non beneficially held by Craig Wright, in effect, he is holding it for DeMorgan Ltd. | | | Share certificate shows 723,059 shares held by DeMorgan Ltd; and 10,000 shares in name of Craig Steven Wright, Beneficial Owner: DeMorgan Ltd. | DM155 |
| 5. | Please provide details of W&K Information Defence Research LLC (including corporate registration details, details of shareholders and relevant percentage holdings). | I can't tell you much about W&K Information Defence Research LLC actually. I know it was an LLC in Florida. <br><br> I have no idea as to the corporate registration details or current status, however, I believe the shareholding was: <br><br> 16% Craig Wright <br> 16% Lynn Wright (ex wife) <br> 33% Dave's Estate (estate of the late Dave Kleiman) <br> 33% Uyen Thuc Nguyen | | | See RFI #34 <br><br> According to the pleadings in the Statement of Claim (2013-225983), the company operates from Palm Beach, Florida and does research in homeland security research. | |
| 6. | Please provide the same details for DeMorgan Limited as was provided for the other group companies (i.e. details of employees, contractors etc)? | Until 1st July 2015, DeMorgan Ltd had no employees, no contractors and had undertaken no R&D activity. <br><br> Olga Kuznetsova, Ray Hoang, Trupti Birje, Allan Pedersen (hired by | | | See RFI #35 | DM74-DM80 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612142

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | *Interconnected Research Pty Ltd)* | | |
| | | *Viveca Magnusson (hired by Panopticrypt Pty Ltd)* | | |
| | | *Stephane Savanah (hired by Intergyz)* | | |
| | | The employment contracts sent are the current and existing contracts for the staff "transferred" to DeMorgan as at 1st July 2015. Contracts have not been changed, amended etc. simply **assigned verbally**. | | |
| | | There is no other documentation. Any changes etc. will be recommended by Baker & McKenzie, this is part of the brief. | | |
| 7. | Please provide a short explanation of what Misfit Games Pty Ltd does?  This information is missing from the initial list of group companies and their shareholdings and operations. | "Misfit Games aims to be a world leader in gaming technology services covering aspects of both hardware and software. We take a holistic approach to our research and development programs in order to coordinate advances in both areas – that is, the hardware innovations will facilitate improvements in software and vice versa. | | |
| | | As games become more and more advanced the hardware and software requirements become ever more demanding. On one hand both PCs and game consoles are moving to a smaller form factor while on the other hand clock speeds are increasing. In addition, in an attempt to squeeze better performance from PCs, serious gamers have a tendency to 'overclock' them (adjust the CPU and/or GPU settings to run the clock speeds at faster rates than manufacturers' settings [1]). These factors lead to machines running hotter, risking damage to the CPU/GPU while also degrading software performance. Superior, affordable cooling solutions will protect computer hardware, enable safer overclocking and improve software performance. | | |
| | | Gaming software relies on solving mathematical equations in real time to simulate realistic actions and graphics. More complex problems traditionally result in requirements for faster processors. Moreover, software advances that require more intense CPU/GPU processing leads to faster overheating. Nevertheless, these problems can be mitigated by developing more efficient algorithms. Using our supercomputer resources and in-house expertise in computer programming, physics and | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612143

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | mathematics we will develop optimised code for these advances. These improvements will not only be commercially valuable to game developers but will also minimise the rate of increase in hardware cooling requirements.<br><br>Thus, by a combination of R&D in gaming hardware and software, the Super Cool Gaming project will be super cool both literally as well as colloquially."<br><br>[See "Advance Finding Company: Misfit Games Pty Ltd"] | | |
| 8. | The responses to the initial information request provided on Friday 21 August refer to a number of companies in the group having entered into Services Agreements with Pholus, Inter Connected Research, Panopticrypt and Integyrz.  Please provide copies of these agreements. | See table entitled "Agreements Register"  -  agreements provided | See RFI #36 | DM140<br>DM9 -<br>DM57 |
| 9. | The responses to the initial information request provided on Friday 21 August refer to an assignment of IP from Denariuz Pty Ltd to Daso Pty Ltd.  Please provide a copy of the agreement that documents this assignment. | Consultancy Agreement between DASO and Denariuz provided.<br><br>Confirmed as the only IP assignment between DASO Pty Ltd and Denariuz Pty Ltd (see RFI #37). | See RFI #37 | DM39 |
| 10. | The responses to the initial information request provided on Friday 21 August refer to three contractors (David Perry, Iggy Pang and Uyen Nguyen) being engaged by Hotwire Preemptive Intelligence Pty Ltd.  Please provide (i) a copy of their engagement contracts; and (ii) details of what they were engaged to do. | Igantius Pang contract received.<br><br>David Perry did not sign a contract or do much.  This was ongoing negotiation and he and Craig could not come to an agreement, so it fell through.<br><br>Uyen has no written agreement. | See RFI #38<br><br>No written contracts for Perry or Nguyen | DM73 |
| 11. | The responses to the initial information request provided on Friday 21 August refer to a contractor (Uyen Nguyen (USA)) being engaged by Zuhl Pty Ltd.  Please provide (i) a copy of his engagement contract | Same answer as #10 | No contracts for Nguyen | |

DeMorgan

13 November 201527 November 2015

2636814 v1SYDDMS2636814 v1SYDDMS  DRAFT

195

Formatted: DMReference

DEF_01612144

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | and (ii) details of what Uyen Nguyen was engaged to do. | | | |
| 12. | The responses to the initial information request provided on Friday 21 August refer to contractors (Shoab Mahammad and Craig Wright) being engaged by CO1N Pty Ltd.  Please provide (i) a copy of their engagement contracts; and (ii) details of what they were engaged to do. | Shaoib via Critical Infrastructure and CW via Panopticrypt were engaged by CO1N.  No written contracts available.<br><br>In the initial phase, Craig arranged design of Hardware modules for Hoyts and Qantas staff credit union.  Shaoib put together different versions of the modules and project managed the process.  Shaoib then left Coin as a contractor as he needed funds, but continued as a director.<br><br>Craig continued working on the virtualized platform and the creation of a cloud managed virtual supercomputer (our original supercomputer, not the current one.  We have merged this with a bigger one to create the current supercomputer Tulip that is ranked No 15 globally). | No written contracts available<br><br>See RFI #39 - 41 | |
| 13. | The responses to the initial information request provided on Friday 21 August refer to contractors (Dave Kleiman (USA) and W&K (USA)) being appointed to perform services for Coin-Exch Pty Ltd.  Please provide (i) a copy of their engagement contracts; and (ii) details of what they were engaged to do. | Dave Kleiman died before the contract was finalised.  Therefore no services were performed to CoinExch by Dave Kleiman or W&K. | | |
| 14. | The responses to the initial information request provided on Friday 21 August refer to a contractor (Jamie Wilson) being engaged by Panopticrypt Pty Ltd.  Please provide (i) a copy of his engagement contract; and (ii) details of what he was engaged to do. | Can I see this response?  Jamie was not a contractor for Panopticrypt.  He was a director for Hotwire. | Client confirmed Jamie Wilson was director for Hotwire and not contractor for Panopticrypt. | |
| 15. | The initial information request states that IP was assigned to Hotwire Preemptive Intelligence Pty Ltd by both Craig Wright R&D (Deed of Assignment July 2013) and Wright Family Trust for DeMorgan (IP Deed | IP Licence between Craig Wright R&D and Hotwire Pre-Emptive Intelligence Pty Ltd<br><br>IP Licence between CW R&D and Hotwire Pre-Emptive Intelligence Pty Ltd | See RFI #29 - client confirmed that the executed version is the only agreement on foot and the | DM3<br>DM4<br>DM5<br>DM6<br>DM133 |

Formatted: DMReference

CONFIDENTIAL

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | of Assignment 15 September 2013).<br><br>We have a copy of an IP Deed of Assignment between The Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd, but do not have a copy of an assignment from Craig Wright R&D to Hotwire Preemptive Intelligence Pty Ltd.  Please provide a copy of that agreement. | | others are drafts.<br><br>See also RFI #42 which states that the IP licences should be disregarded.<br><br>Client unable to locate July 2013 Deed of Assignment. | DM134 |
| 16. | The initial information request states that Hotwire Preemptive Intelligence Pty Ltd assigned IP to Coin-Exch Pty Ltd but that the documentation for this is still being sought.  Please provide a copy once available. | Research and Development Services Agreement between Coin-Exch Pty Ltd and Hotwire Pre-emptive Intelligence Pty Ltd | Not signed; had been provided previously.<br><br>See RFI #43 | DM7 |
| 17. | The responses to the initial information request provided on Friday 21 August refer to an assignment of IP from "W&K and Professor Rees" to C01N Pty Ltd.  Please provide a copy of the agreement(s) that documents this assignment(s). | Invoice from Professor Rees to "Strasan (Australia) c/o Craig S. Wright). <u>No contract was entered into.</u>  Background documents and invoices provided.<br><br>**Executive Summary**<br>On 30 June 2013 CO1N paid 19,470.12 XBT to Professor David Rees for research notes relating to Professor Rees' work related to cryptography. The Rees material is of immense importance to CO1N as it contains the key knowledge required to progress the company's long term ambitions. Furthermore, the material is inherently valuable due to its exclusivity to CO1N. Professor Rees stopped publishing in 1952 although he continued to research in his field of expertise well into the current century (he passed away in 2013). By purchasing Professor Rees' research notes CO1N is and will remain the *sole beneficiary* of this work.<br><br>The amount was agreed earlier in the same tax year in Bitcoin and was assigned in the 2013 income tax year.<br><br>The present document aims to explain at a high level the nature of the Rees material and show how it contributes to the solution sought by CO1N to enable its vision to be met.<br><br>**The CO1N Vision**<br>CO1N aims to create the infrastructure for a truly 'trustless', | See RFI #44<br><br>No formal assignment documentation; invoices for the subject matter received only. | DM130-DM132 |

DeMorgan

13 November 2015 27 November 2015

2635814-v1 SYDDMS 2635814-v1 SYDDMS  DRAFT

197

Formatted: DMReference

DEF_01612146

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | decentralised, optimally secure exchange mechanism. This will allow peer-to-peer transactions of any sort in an environment secure from cyber-attack and free from centralised governance or interference. The underlying protocol will be based on the Bitcoin Blockchain. Central to this vision is a cryptographic technique that is not only highly secure against cyber-attacks but also independent of centralised authorities. | | |

**Cryptography**

The fundamental principle of cryptography is the creation of encryption/decryption keys based on calculations that are easy in one direction but extremely difficult in the opposite direction. The original technique, invented in the 1970s, used prime number multiplication/factorisation. While it is easy to multiply two prime numbers together, it is much harder to factorise the result into the original two primes. Factorisation becomes exponentially more difficult the longer the primes, to the point where the task is so difficult as to be altogether impractical. The encryption/decryption keys are generated using the two prime numbers[19]. Newer techniques (such as those based on elliptic curves) are more efficient but still employ the same underlying principle[20].

In early implementations, cryptographic keys would be shared by each party, meaning that at time of set-up keys would need to be somehow securely transmitted. A major vulnerability in this system is that if either party loses a key or it is intercepted, the system is compromised. A more recent method known as PKI (public key infrastructure) uses a combination of public and private keys[21]. This method relies on a third party to issue certificates to authenticate the owners of keys that are made public (via issuance of digital certificates).

Although PKI solved the authentication problem, it was also vulnerable to

---

[19] http://en.wikipedia.org/wiki/RSA_(cryptosystem)

[20] http://en.wikipedia.org/wiki/Elliptic_curve_cryptography

[21] http://searchsecurity.techtarget.com/definition/PKI

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612147

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | attack (for example, in 2011 Certificate Authority DigiNotar was closed down after 500 fake certificates were discovered[22]). Furthermore, the reliance on a third party means that the communicating parties are beholden to a centralised authority (for example, a totalitarian government can force usage of their own PKI and thereby have access to all data traffic). As a result, techniques are in development using a three-pass protocol in which each party owns two private keys: an encryption key ($e_x$) paired with a decryption key ($d_x$). For the technique to work the encryption function must be *commutative*, meaning that changing the order of two successive encryptions yields the same result. | | |

**The Rees Material**

Commutative algebra was Professor Rees' field of expertise and this aspect of the three-pass protocol is critical. As such the three-pass protocol is worth further elaboration.

Let's denote the encryption of a message M with an encryption key $e_x$ as $e_x M$. Decrypting this encrypted message with the paired decryption key is denoted $d_x e_x M$. Since decrypting the encrypted message gives the original message, then $d_x e_x M = M$.

The three-pass protocol works as follows:

1.  Alice uses her encryption key $e_A$ to encrypt message M and sends $e_A M$ to Bob.

2.  Bob uses his encryption key $e_B$ to further encrypt this giving $e_B e_A M$ and sends it back to Alice.

3.  Alice decrypts this message using her decryption key $d_A$ to create $d_A e_B e_A M$. *This is where the commutative aspect comes in.* Since changing the order of encryption does not matter, $e_B e_A = e_A e_B$. So $d_A e_B e_A M = d_A e_A e_B M = e_B M$ (in other words, after Alice performs decryption we are left with a message encrypted

---

[22] http://en.wikipedia.org/wiki/DigiNotar

Formatted: DMReference

CONFIDENTIAL

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | with Bob's encryption key). Alice now sends this back to Bob. | | |
| | | 4.  Bob can now decrypt $e_BM$ with his paired decryption key $d_B$: $d_Be_BM = M$ | | |
| | | Note that Alice and Bob have each only used their own private keys in this exchange. Using this protocol we have the elements required to resolve the key issues mentioned earlier: *there is no need to transmit any keys at set-up and no reliance on a third party.* | | |
| | | Of course, the main requirement is to determine a suitable commutative function usable for an encryption algorithm. Moreover, this technique has to be integrated with the Bitcoin Blockchain protocol. The expertise and knowledge contained within the Rees material, exclusive to CO1N, was essential and invaluable to solving these problems. | | |
| 18. | The responses to the initial information request provided on Friday 21 August refer to CO1N Pty Ltd licensing and assigning IP rights to Hotwire Preemptive Intelligence Pty Ltd.  Please provide a copy of the agreement(s) that documents this assignment or licence. | 3 x documents provided. | See RFI #44 | DM82-DM84 |
| 19. | The responses to the initial information request provided on Friday 21 August refer to Cloudcroft Pty Ltd being assigned IP rights in a "Sale Agreement (Information Defense) March 2010".  Please provide a copy of the Sale Agreement. | Sale Agreement between Information Defense Pty Ltd and Lynn Wright /Cloudcroft Pty Ltd | See RFI #46, #48 and #50 Understanding of three agreements: Craig transfers all the IP in the Projects to Information Defense Pty Ltd [not in group chart] on 30/01/09. Craig agrees to transfer all his shares in Information Defense Pty Ltd to Lynn on 21/5/09. Lynn then buys the Information Defense Pty Ltd business (which "includes the IP") in | DM72 DM150 DM159 |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612149

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | | March 2010 (or 2011 – inconsistent dates). | |
| | | | Schedules appear to be attached to the wrong agreements | |
| | | | Refer to by-doc spreadsheet | |
| 20. | The responses to the initial information request provided on Friday 21 August appear to refer to Cloudcroft Pty Ltd granting W&K a licence to use intellectual property rights under the Intellectual Property Licence (Craig Wright R&D 22 Aug 2013). However, Cloudcroft Pty Ltd is not a party to any of the Intellectual Property Licences we have received. Please provide a copy of this licence(s). | IP Licence between Craig Wright R&D (for GICSR/CSCSS) and Cloudcroft Pty Ltd | See RFI #51 | DM81 |
| 21. | The responses to the initial information request in relation to Panopticrypt Pty Ltd provide that Panopticrypt has assigned IP rights to a third party, being "Your Digital File Patent Registered by Craig Wright and Jamie Wilson". Please provide a copy of the agreement(s) that documents this assignment. | The idea was to have the IP rights assigned to YDF. There was a contract with the previous company that Jamie and Craig had worked together at. That company has since been deregistered, and a new company, YDF was started. There was a negotiation of a share agreement where Craig was to have 25% of YDF in exchange for the IP (initial cryptographic research as well as continuing research that led to the final patent) and a new contract drawn up with YDF, but that was never signed as that was the time when Jamie was trying to "sell" our BTC in the US. And the fact that Jamie did not issue the shares as agreed. Hence that contract was never finalised. | See RFI #52 | |
| 22. | The responses to the initial information request in relation to Panopticrypt Pty Ltd refer to a "1 Vote contract" in response to a query on whether Panopticrypt has been granted a licence to use any IP rights by an third party. Please provide a copy of this contract. | Consultancy Agreement between New South Wales Electoral Commission and Panopticrypt Pty Ltd | See RFI #53 | DM71 |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS   DRAFT

201

CONFIDENTIAL

DEF_01612150

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 23. | Please provide copies of all documentation relating to the assignment/transfer of IP rights in the Core Banking and Exchange Software and Automation Software:<br><br>• from the unrelated entities (MJF Mining Services WA Pty Ltd for Al Bareka; MJF Mining Services WA Pty Ltd (MJF) for Siemens; and W&K Information Defense Research LLC) to Craig Wright R&D (ABN 97 481 146 384); and<br><br>• from Craig Wright R&D to the Wright Family Trust DeMorgan (ABN 72 433 066 448).<br><br>These transfers are referred to in the IP Deeds of Assignment. | • Invoices from MJF Contracting provided<br><br>• No deed or document exists that covers the assignment from Craig Wright R&D to the Assignor (ie The Wright family Trust DeMorgan)<br><br>• Core Banking and Automation Software was purchased from MJF Mining Pty Ltd. The IP rights were included in the purchase.2 invoices and a contract that you already have.<br><br>• -transfer of IP between W&K and Craig Wright R&D are the 2 statement of claims and 2 judgements mentioned in #  …….. | See RFI #54 | DM85<br>DM148<br>DM151 |
| 24. | The IP Deeds of Assignment between The Wright Family Trust DeMorgan and Coin-Exch Pty Ltd (Core Banking and Exchange Software) and The Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd (Automation Software) note that transfers of IP from W&K Information Defense Research LLC to Craig Wright R&D was not completed and a Statement of Claim has been filed against W&K Information Defense Research LLC. Please provide further details and documentation and confirm the outcome of those proceedings. | Documents received:<br><br>• Consent 'order'<br><br>• Statement of Claim (2013/245661) - not executed. Unclear whether litigated. No judgment provided.<br><br>• Statement of Claim (2013/225983) - Contractual dispute as a result of the death of primary director or W&K Info Defense Research LLC. Judgment was awarded in the sum of $28,254,666 in favour of Craig Steven Wright. Wright agreed to accept the transfer of IP held by Wright in full and final satisfaction of the judgment. [have not received copy of the transfer - unless dates in provided the IP Licence Funding Agreement are incorrect or the "consent order" document is a sufficient transfer]<br><br>• IP Licence Funding Agreement between Craig R&D and W&K Info Defense LLC<br><br>• Judgment/order (2013/225983) | See RFI #55 - #59 | DM141-145<br>DM86-87 |

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612151

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | • Contract for the sale of shares of a company owning business between Dave Kleiman for W&K Info Defense LLC and Craig Wright R&D | | |
| 25. | It is unclear whether the consideration due under each of the two IP Deeds of Assignment has been paid in full. Page 31 of the Appendix to the IP Deed of Assignment for the Core Banking and Exchange Software demonstrates that payments are due annually on 30 August each year (from 30 August 2013 to 30 August 2017), with the IP being assigned on full payment of the final invoice. Have all invoices been paid, including for future financial years, or have only some of the invoices been paid?  Please provide further details of which payments have been made. | Yes, there were invoices and prepaid in 2013 for the full term of the agreement. | Invoices not provided for review. Client confirmed that invoices were paid in 2013. | |
| 26. | Please provide the Appendix to the IP Deed of Assignment between the Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd (Automation Software).  The document we received does not include the Appendix. | Appendix 1 to DeMorgan Wright Family Trust / Coin-Exch Pty Ltd Statement of Work: Independent Verification and Validation (IV&V) Services | | DM145 |
| 27. | Can further details be provided regarding the entity "The Wright Family Trust DeMorgan" (ABN 72 433 066 448)? | WFT was established in August 2013.  At that point Craig (CW R&D) had purchased software personally as well as had agreements (Bitcoin rights) with overseas trusts WII and Tulip Trading.  (This information regarding the other two trusts has not been disclosed to the ATO).<br><br>CW R&D sold to WFT the software, Bitcoin rights, W&K software, Albaraka, Siemens etc .  The ATO are aware of this and have these invoices.<br><br>WFT then collated and distributed these from the overseas trusts and overseas entities to the local companies in Australia.<br><br>Craig and Stefan are trustees of the WFT. | Trustee listed in Trust Deed is Panopticrypt Pty Ltd.<br><br>Correct name of entity with ABN 72 433 066 448 is "The Wright Family Trust". | DM148<br>DM158 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612152

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 28. | Please provide further detail about the entity "C W R&D (ABN  97 481 146 384)".  Is this a company? | CW R&D (ABN 97 481 146 384) is a registered business name owned by Craig Wright.  It is still current in its registration and was also registered for GST but, since 1 July 2015, is in the process of being de-registered for GST. | | |
| 29. | We have been provided with four IP Licences, which are nearly identical:<br>- Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1);<br>- Intellectual Property Licence b;<br>- Intellectual Property Licence; and<br>- Intellectual Property Licence (1).<br>References above are to the names of the documents sent to us (i.e. the names the documents are saved under).<br>The only executed document is the Intellectual Property Licence DeMorgan and Hotwire 22 August 2013.  Are the others drafts?  Or are the others intended to licence separate IP (the Intellectual Property Licence and Intellectual Property (1) are expressed as also covering the Bitcoin Contract system and Escrow contract system, while the other two do not.)  Please explain the relationship between the four IP Licence documents. | Of the documents forwarded in relation to this question, the executed document is the one that is valid.  It is the final document.  The others are the various drafts that should not have been included. | A copy of Intellectual Property Licence was provided in response to RFI #15 [unexecuted].<br>A copy of Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1) was provided in response to RFI #15. | DM3 - DM6<br>DM133<br>DM134 |
| 30. | The R&D Services Agreement between Coin-Exch Pty Ltd (Client) and Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research Pty Ltd (Service Providers) has not been executed.  Please confirm the status of this agreement and, if possible, please provide an executed version of this agreement. | | Version thought to be executed does not actually contain signatures. | DM7 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612153

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 31. | The R&D Services Agreement distinguishes between:<br><br>• "Project Background Intellectual Property" being IP supplied by Coin-Exch Pty Ltd for use in conducting R&D;<br><br>• "Project Foreground Intellectual Property" being IP created by or on behalf of Coin-Exch by Hotwire and/or Interconnected (including that IP relating to the project created by the approved sub-contractors) during the term; and<br><br>• "Provider Intellectual Property" being IP in Hotwire / Interconnected's methodologies, models and other confidential or proprietary information made available to Coin-Exch as part of the services.<br><br>Please provide further information if available on these three categories and what IP has been supplied by Coin-Exch, created pursuant to the agreement, or made available by Hotwire / Interconnected under this Agreement? | | No response provided as at 06.10.15.<br><br>Services Agreements reviewed for further information. | DM9 - DM57 |
| 32. | Please provide a copy of the share certificate which indicates that DeMorgan Holdings Pty Ltd is a 100% subsidiary of DeMorgan Ltd. [Refer to RFI #1] | This is confirmed. Certificate attached. Note that Craig Wright is holding the shares for DeMorgan Ltd | | DM155 |
| 33. | We refer to your response to RFI #2 and understand that there have been discussions regarding potentially issuing share options for shares in DeMorgan Ltd. In light of this, could you please clarify:<br><br>(a) who the current shareholders of DeMorgan Ltd are;<br><br>(b) whether any of the discussed share options | Current shareholders confirmed and issued:<br><br>| Founder and Other Shareholders | Number and Class of Shares |<br>|---|---|<br>| The Wright Family Trust | 131,915,375 FOU |<br>| DENARIUZ SINGAPORE | 64,046,144 A |<br>| Uyen Ngyen | 1,800,000 A |<br>| C01N Ltd (UK) | 11,000,000 A |<br>| CRITICAL INFRASTRUCTURE SECURITY PTY LTD | 302,500 A | | | |

**Formatted:** DMReference

CONFIDENTIAL

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | have been issued; and<br><br>(c) whether the tables provided in response to RFI #2 indicate either the share options under discussion, the share options issued or current shareholders. (We understand from your response that it is likely to be a combination of the three but if you could clarify that would be much appreciated.) | Re employee share poll - The share options have been structured, but have not been paid for or issued. They are in the system as the directors had discussed them, but we will be forfeiting most of them as they are not going to be offered to all members of staff on that list. We have only discussed and agreed with Allan Pedersen in terms of the share options below. Not issued, but discussed and agreed. Not discussed with Ray, but we would like to have that option if possible. | | |
| 34. | We understand, based on your response to RFI #5, that you have limited information about the current legal status of W&K Information Defense Research LLC. However, it would be helpful if you could provide a general description of the company and its relationship to the group given that a number of the shareholders are connected to the group. We can conduct corporate searches but any background you can provide regarding the company's relationship to the group would be much appreciated. | Craig Wright is a minor shareholder of W&K. No other relationship to the group. | | |
| 35. | We received a number of unexecuted employment agreements in response to RFI #6. Please provide executed copies of these agreements (Olga Kuznetsova, Ray Hoang, Trupti Birje, Allan Pedersen, Viveca Magnusson, and Stephane Savanah). | It will take me time (that I don't have right now) to search for this. The executed copies are identical to the ones you have received. | Unexecuted versions reviewed. | DM74 - DM80 |
| 36. | We received a Business Service and Management Agreement between EZAS Pty Ltd (ACN 602717788) and DeMorgan Ltd  in response to RFI #8. Please clarify who EZAS Pty Ltd is and how it relates to the group (or whether it is simply an unrelated third party). | You can ignore this agreement with EZAS.<br><br>The entity was formed with the intent to use for a specific area of R&D but nothing ever happened. The entity was never assigned any IP, never undertook any R&D (or any other activity), no staff, no consultants.<br><br>EZAS is a non-trading shell.<br><br>The intent was that it would be a 100% subsidiary of DeMorgan Ltd. | | |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT

208

CONFIDENTIAL

DEF_01612155

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 37. | Please confirm our understanding that the only IP assignment between DASO Pty Ltd and Denariuz Pty Ltd is the Consultancy Agreement you provided in response to RFI #9? | This is confirmed. | | DM39 |
| 38. | We understand, based on your responses to RFI #10 and #11 that no written contracts were entered into in respect of Ignatius Pang's services engagement with Hotwire Preemptive Intelligence Pty Ltd or Uyen Nguyen's services engagement with Hotwire Preemptive Intelligence Pty Ltd and Zuhl Pty Ltd.<br><br>However, if possible, please provide details of what these contractors were engaged to do. | Ignatius Pang signed contract provided and is the ONLY document related to the services of Ignatius Pang. | | DM73 |
| 39. | We note in your response to RFI #12 that Shoab Mahmammad "via Critical Infrastructure" and Craig Wright "via Panopticrypt" were engaged by C01N. Please clarify what you mean in saying that these individuals were engaged "via" those third party companies.  You have noted that there were no written contracts with the individuals.  If there is any relevant documentation or agreements with companies who supplied the services of these individuals please provide copies. | "Via" – any payment made would go to the company, not to the individual.<br>None. | | |
| 40. | Please confirm who "Critical Infrastructure" is and how it relates to the group. [Refer to RFI #12] | Shaoib's company.  No relation to the group. | | |
| 41. | Please provide all service and consulting agreements, if any, between the group entities and Critical Infrastructure. [Refer to RFI #12] | None | | |
| 42. | In response to RFI #15, we received the following | (a)      a  and b should not be used. | | DM148 |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT

207

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | documents:<br><br>(a)  IP Licence between Craig Wright R&D and Hotwire Pre-Emptive Intelligence Pty Ltd; and<br><br>(b)  IP Licence between CW R&D and Hotwire Pre-Emptive Intelligence Pty Ltd.<br><br>Please confirm our understanding, following your response to RFI #29, that the document referred to in (a), which is unexecuted, is a draft only and therefore should not be considered.<br><br>Please also confirm that the document referred to in (b) (i.e. the IP Licence between CW R&D and Hotwire) is the "assignment" from Craig Wright R&D to Hotwire Preemptive Intelligence Pty Ltd that was referred to in the initial information request. | (b)  The document was signed but not executed, as it was incorrect. Another 2 documents were created – Assignment of IP from CW R&D to DeMorgan (WFT) and then DeMorgan (WFT) to Hotwire. I have the Assignment from DeMorgan (WFT) to Hotwire.<br><br>Both are attached as :<br><br>(a)  cw and WFT<br><br>(b)  WFT and Hotwire | | DM149 |
| 43. | We received the Research and Development Services Agreement between Coin-Exch Pty Ltd and Hotwire Pre-emptive Intelligence Pty Ltd in response to RFI #16 and 30. Please:<br><br>provide an executed copy as we have only received unexecuted versions;<br><br>clarify that this Services Agreement is the only assignment of IP that exists between the two entities; and<br><br>confirm why the Agreement lists the Completion Date (being the date that the Agreement will be terminated) as 30/6/11 but the Commencement Date as 1/7/13 (being the date that the Agreement will commence). | Cannot locate executed copy.  It would be identical.<br><br>Yes<br><br>Typo - Termination date should state 2017 | Treat unexecuted copies as final. | DM7 |
| 44. | We note that your response to RFI #17 refers to an assignment between Professor Rees and C01N Pty | Dave Kleiman communicated in his own capacity with Prof Rees to receive his advice re commutative ring algebra.  There was a verbal | | DM130-DM132 |

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2636314-v1\SYDDMS~~2635314-v1\SYDDMS_DRAFT

208

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | Ltd. Please clarify how W&K Information Defense Research LLC is involved in this assignment (given the initial information request stated that the assignment was from W&K and Professor Rees) noting that W&K is not mentioned in the documentation provided, and provide any relevant documents regarding W&K's involvement. | agreement to pay him. There is no assignment between Rees and coin. Coin paid Rees. There is an invoice.<br><br>Dave Kleiman was a principal of W&K, but W&K had no involvement. The initial information provided stating that the assignment was from W&K and Professor Rees is incorrect. | | |
| 45. | We note that three documents were provided in response to RFI #18. An invoice was provided between Professor David Rees and Hotwire Preemptive Intelligence Pty Ltd. However, the agreement provided in relation to this question is a Software Development Agreement between Craig Wright R&D, W&K Information Defense LLC and Strasan Pty Ltd (C01N). Please confirm:<br><br>(a)  how the David Rees invoice relates to the C01N agreement, given that Rees is not a party to that agreement; and<br><br>(b)  why the Rees invoice amount differs from the payment required under the Software Development Agreement. | Invoice was between Strasan and Hotwire simply mentioning Rees' name because the developed IP involved some of the solutions from Rees. It was purely a marker. It was NOT an invoice between Hotwire and Rees.<br><br>For the 3 attachments in #18 -<br><br>It comes in 3 parts. (note that Strasan is now called CO1N)<br><br>The first acknowledges that "the project is for the creation of intellectual property. All rights are said to vest within the company that Craig Wright incorporates when the payment of the contract (to occur before June 30 2013) occurs."<br><br>The company in question is of course Hotwire. But that is not specified. The invoice is attached. Payment was made as agreed, so by default, the IP vested in Hotwire.<br><br>The second attachment details the project.<br><br>So you need all 3 attachments to make sense of this. | | DM82 -<br>DM84 |
| 46. | We received one attachment containing the following three agreements in response to RFI #19:<br><br>(a)  Sale Agreement between Information Defense Pty Ltd (Seller) and Lynn Wright/Cloudcroft Pty Ltd (Buyer);<br><br>(b)  Agreement between Craig Steven Wright (Vendor) and Information Defense Pty Ltd (Purchaser); and<br><br>(c)  Agreement between Craig Steven Wright | (i)  Craig to provide<br>(ii)  Craig to provide<br>(iii)  Craig to provide<br><br>Not able to find executed copy of (b), or (c) but is identical to the one provided.<br><br>iii. I do not have access to what was sent, but if schedule following c looks like it belongs to a, then it is likely that.<br><br>iv. It was a Typo . Correct date is 2010 | Treat unexecuted versions as final. | DM72<br>DM150<br>DM159 |

Formatted: DMReference

CONFIDENTIAL

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | and Carroll Lynn Wright.<br>Can you please provide copies of the following.<br>(i)  Please provide an executed copy of document (b).<br>(ii)  Please provide an executed copy of document (c) which has only been signed by Craig Wright.<br>(iii)  Please also confirm which schedule belongs to which agreement, as it appears that the schedule following document (c) belongs to document (a).<br>(iv)  Document (a) is dated March 2010 on the cover sheet, but March 2011 on the execution page. Please confirm the appropriate date. | Email from Stefan re: Cloudcroft dated 20.10.15 stated that Lynn Wright transferred her shareholding in Cloudcroft by a share transfer dated 15 November 2012 whereby 620,000 shares were transferred from Lynn Wright to Panopticrypt (500,000) and Craig Wright (120,000).<br>Lynn Wright ceased as a director and secretary 11 December 2012.<br>Craig Wright subsequently transferred 120,000 shares to Panopticrypt 01 August 2013. | | |
| 47. | Please confirm who Information Defense Pty Ltd (ABN 90 135 141 347) is and how it relates to the group. [Refer to RFI #19] | Doesn't relate to group at all.  A company Craig owned in 2009, sold in 2010 | | |
| 48. | We note that in the Agreement between Craig Steven Wright and Carroll Lynn Wright provided in response to RFI #19, Craig Wright agrees to assign all his shares in Information Defense Pty Ltd and Integyrz Pty Ltd to Lynn Wright. Please confirm whether these transfers took place and provide all relevant documents (as we note that Lynn Wright purchased the Information Defense business in the subsequent Sale Agreement). | Transfers took place, will provide<br>These are deregistered companies - we no longer have those records | Client confirmed transfers took place, but that no record of such transfers are available. | |
| 49. | We further note that in the Agreement between Craig Steven Wright and Carroll Lynn Wright provided in response to RFI #19, Lynn Wright is described as | Contract employee, no contracts | Unclear whether she was a contractor or an employee. | |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT

210

CONFIDENTIAL

DEF_01612159

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | having worked in businesses owned and operated by Craig Wright. Please confirm whether Lynn Wright was engaged as a contractor by any of the group entities and, if so, provide the relevant agreements. | | Details of which entities within the group Lynn Wright worked for is outstanding. | |
| 50. | The Schedule to the Agreement between Craig Steven Wright and Information Defense Pty Ltd (see RFI #19) refers to an attachment entitled "DeMorgan R and D plan Appendix". Please provide a copy of this Appendix. | Byron, this is a highly sensitive document, I will provide this to you separately and we can discuss confidentially.<br><br>Provided as RDPlan - DeMorgan | Note this was provided to the wider group. | DM150 |
| 51. | We have received an Intellectual Property Licence between Craig Wright R&D (for GICSR/CSCSS) and Cloudcroft Pty Ltd. Please clarify who 'GICSR/CSCSS' are and how these entities relate to the group. [Refer to RFI #20]. | Not related<br><br>Craig Wright R&D acted as agent and local business for GICSR/CSCSS in a trust. This licence is irrelevant. Never utilised. Has expired | Term of licence at DM81 is indefinite. | DM81 |
| 52. | We note your response to RFI #21. Please provide a copy of the contract you refer to between Jamie Wilson, Craig Wright and the previous company they worked together.<br><br>Please also provide details of this company (which we understand is now deregistered). | Craig worked for company FASV (Family Affairs Security Vault). The contract mentioned shares in a company that Craig did not receive. Any IP that Craig created within that company initially remained within FASV – it has since been transferred to YDF since its' deregistration.<br><br>Can't locate contract | Contract cannot be located by client. | |
| 53. | The Consultancy Agreement between New South Wales Electoral Commission and Panopticrypt Pty Ltd provided in response to RFI #22 anticipates that the Commission may, upon request, require Panopticrypt to execute all necessary documents to permit the vesting of the intellectual property in the New Contract Material with the Commission. Please confirm whether the Commission ever made such requests and, if so, please provide the requested assignment documentation. | no | | |

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT

211

Formatted: DMReference

DEF_01612160

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 54. | MJF Contracting Invoice OB0188 refers to an "agreement" between MJF Contracting and Craig Wright R&D in respect of the Supply of Automation Software. Please provide a copy of this agreement. [Refer to RFI #23] | Provided as MJF agreement automation software | | DM151 |
| 55. | We note that Statement of Claim (2013/225983) refers to a research consulting agreement between Craig Steven Wright and W&K Info Defense Research LLC, dated 27 October 2008, which was secured against W&K's intellectual property. Please provide a copy of this agreement. [Refer to RFI #24] | Cannot locate contract | Contract cannot be located by client. | |
| 56. | In regards to Statement of Claim (2013/245661), please:<br><br>• confirm whether this Claim was filed and litigated as we have not received a judgment in respect of this claim, nor has the Claim been stamped by a court registry; and<br><br>• provide a copy of the research consulting agreement between Craig Steven Wright and W&K Info Defense Research LLC, dated 8 January 2009, which was secured against W&K's intellectual property. [Refer to RFI #24] | Yes. Filed and litigated. will try and locate judgement<br><br>Cannot locate contract. | Judgment outstanding - cannot be located currently.<br><br>Research consulting agreement cannot be located by client. | |
| 57. | Please confirm whether the "consent order" provided in response to RFI #24 is the "deed of transfer for the Intellectual Property" referred to in the Court Judgment (2013/225983) or otherwise provide a copy of the deed of transfer. | Yes | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612161

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 58. | We note that an Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D and Dave Kleiman of W&K Info Defense LLC, as well as a Contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC and Craig Wright R&D and W&K Info Defense LLC was provided in response to RFI #24. Please confirm how these documents relate to the litigation material. | Taken to court to finalise position.<br><br>Dave died, therefore needed consent orders to affirm position of agreements | | |
| 59. | We note that the Recitals in the Contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC and Craig Wright R&D and W&K Info Defense LLC provided in response to RFI #24 refer to "the attached contract". Please confirm our understanding that the attached contract is the actual Agreement that follows the Recitals, rather than a separate agreement. | Yes | | DM86<br>DM87 |
| 60. | According to your response to RFI #27, CW R&D purchased software and Bitcoin rights with overseas trusts WII and Tulip Trading. Please provide all documentation regarding:<br><br>these purchases;<br><br>WII and Tulip Trading and how these entities relate to the group; and<br><br>the subsequent sale of the software and Bitcoin rights by CW R&D to the Wright Family Trust. | CW has a loan from the overseas trust.  No BTC rights were purchased.  Craig has a loan of BTC rights from the trust with which he used to purchase software. See attachment "Explanation of Tulip Trust"  You will already have the contracts for CW purchase eg MJF, AlBaraka<br><br>They are companies in the Seychelles incorporated by Craig Wright.  They are the main entities that Tulip Trust stems from. They do not relate to the other entities. They are asset management and holding companies.<br><br>Attached as cw and WFT<br><br>Note: explanation of Tulip Trust (DM156) provides:<br><br>The Seyshell's trust, also known as Tulip Trust, is not a standard trust.  It is a homomorphic encryption scheme for the distribution of keys.  It is a trust written into software and cryptographic code.  It is a DAC (Distributed Autonomous Corporation). Each trustee has a slice of public | | DM156<br>DM157<br>DM148 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612162

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | keys which do not allow access to anything on their own.  When ordered correctly, the correct sequence of keys allows for the release of certain other keys in the pool which then allows for the release of legal ownership of private keys to be issued. Therefore the recipient has received a private key that has never been held by another person.  Ie. Nobody ever has your private key. | | |
| | | The Trust was established before DBH. | | |
| | | Wright International Investments was established in 2009.  It was designed as the holding company.  Tulip Trading was established in 2011. Tulip Trust was a blind trust planned in 2011and set up by Dave Kleiman under in 2012 Tulip Trading.  Craig is independent of the trust. | | |
| 61. | Has Craig Wright been an employee of any of the group entities at any stage? | Yes, Hotwire and DeMorgan as CEO | | |
| 62. | Has Craig Wright, in his _personal capacity_, ever been assigned any intellectual property rights: <br>(a)   from any individual (eg an employee or individual contractor); or <br>(b)   from any other company or other entity? | Nothing of relevance. | | |
| 63. | Has Craig Wright, in his _personal capacity_, ever assigned any intellectual property rights to any third party (individual, company or other entity)? | Yes, books and papers.  Nothing of relevance to this | | |
| 64. | Has Craig Wright, in his _personal capacity_, ever granted any third party (individual, company or other entity) a licence to use any intellectual property rights? | Nothing current, not relevant | | |
| 65. | Has Craig Wright, in his _personal capacity_, ever been granted a licence to use any intellectual property rights by any third party (individual, company or other entity)? | Yes.   Scade (Siemans) <br>          iMal (Al Baraka) | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612163

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 66. | Please provide a copy of the Wright Family Trust deed | Provided on 20.10.2015.<br>Name of Trust: Wright Family Trust<br>Date of Trust Deed: 9 August 2013<br>Trustee: Panopticrypt Pty Ltd<br>Primary Beneficiaries Craig Steven Wright and Ramona Wattd | | DM158 |
| 67. | Has the Wright Family Trust ever been assigned any intellectual property rights:<br>(a)  from any individual (eg an employee or individual contractor); or<br>(b)  from any other company or other entity? | Yes, from Craig Wright<br>Agreement attached as cw and WFT | | DM149 |
| 68. | Has the Wright Family Trust ever assigned any intellectual property rights to any third party (individual, company or other entity)? | DeMorgan (WFT) to Hotwire and Coin Exch  - provide this | | DM1<br>DM2 |
| 69. | Has the Wright Family Trust, ever granted any third party (individual, company or other entity) a licence to use any intellectual property rights? | As above | | |
| 70. | Has the Wright Family Trust ever been granted a licence to use any intellectual property rights by any third party (individual, company or other entity)? | Yes, by Craig Wright R&D – provided as cw and WFT | | DM149 |
| 71. | We have compared the information set out in the AusIndustry R&D Applications with the company data provided in response to our initial information request. We note that Zuhl Pty Ltd, Denariuz Pty Ltd, C01N Pty Ltd, Pholus Pty Ltd, Coin-Exch Pty Ltd and Panopticrypt Pty Ltd have identified R&D employees on the respective R&D applications - despite the fact that the response to our initial information request | No employees<br>What was listed on the AusIndustry applications was not employees, however, there were people working on the projects that were contracted through *other* companies to perform the work for the entities mentioned. There are intercompany contracts. | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612164

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | listed these companies as never having had any employees. Please confirm whether these entities have ever had employees and if not, why employees are listed on the R&D Applications. | | | |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT

218

## Schedule D

### Trade Marks

From a search of the trade marks database maintained by IP Australia conducted on 18 November 2015, for trade marks applied for and/or registered in the name of the companies listed below, disclosed no current trade mark registrations or pending applications in the name of these entities.

1. DeMorgan Limited (ACN 601 560 525)
2. Hotwire Preemptive Intelligence Pty Ltd (ACN 164 068 348)
3. DeMorgan Holdings Pty Ltd (ACN 600 655 427)
4. Misfit Games Pty Ltd (ACN 601 677 105)
5. Panopticrypt Pty Ltd (ACN 151 567 118)
6. Coin-Exch Pty Ltd (ACN 163 338 467)
7. Integryrz Pty Ltd (ACN 165 263 007)
8. Pholus Pty Ltd (ACN 165 472 079)
9. Cloudcroft Pty Ltd (ACN 149 732 365)
10. Chaos and Nonlinear Forecasting in Economics and Finance Pty Ltd (ACN 600 516 149)
11. C01N Pty Ltd (ACN 152 222 421) formerly Strasan Pty Ltd
12. Denariuz Pty Ltd (ACN 165 471 983)
13. Interconnected Research Pty Ltd (ACN 165 472 097)
14. Zuhl Pty Ltd (ACN 165 472 006)
15. Daso Pty Ltd (ACN 600 512 249)

Our searches disclosed a number of trade mark applications filed in the name of DeMorgan Pty Ltd or Hotwire Preemptive Intelligence Pty Ltd, which have now lapsed. Details of these applications marks are set out below:

Formatted: Indent: Left: 0.5", No bullets or numbering

Formatted: Font: (Default) Arial, 10 pt

Formatted: Normal, No bullets or numbering, Tab stops: 0", Left

Formatted: Indent: Left: 0.5", No bullets or numbering

Formatted: DMReference

CONFIDENTIAL

DEF_01612166

| Country | Trade mark/domain name/other | Application | Classes | Registered proprietor | Condition | Status/reason |
|---|---|---|---|---|---|---|
| Australia | TAIPAN24X7 | 881820 | 9, 42 | DeMorgan Pty Ltd | Lapsed | No response to examiner's report |
| Australia | Vocational learning guides | 1572473 | 1 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed | No response to examiner's report - filed in wrong class |
| Australia | Professional learning guides | 1572473 | 1 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed | No response to examiner's report - filed in wrong class |
| Australia | Hotwire Pre-emptive Intelligence | 1572635 | 41 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed - Accepted | No registration fees paid |
| Australia | INTEGYRS | 1572890 | 41 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed - Accepted | No registration fees paid |
| Australia | Integyre | 1572891 | 41 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed - Accepted | No registration fees paid |
| Australia | bits01n | 1584361 | 38 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed | No response to examiner's report |

Formatted: Font: (Default) Arial, 10 pt

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT

218

CONFIDENTIAL

DEF_01612167

bakermckenzie.com

**Baker & McKenzie has been global since inception.  Being global is part of our DNA.**

Our difference is the way we think, work and behave – we combine an instinctively global perspective with a genuinely multicultural approach, enabled by collaborative relationships and yielding practical, innovative advice.  Serving our clients with more than 4,200 lawyers in more than 45 countries, we have a deep understanding of the culture of business the world over and are able to bring the talent and experience needed to navigate complexity across practices and borders with ease.

Baker & McKenzie
ABN 32 266 778 912

AMP Centre
Level 27
50 Bridge Street
Sydney NSW 2000
Australia

P.O. Box R126
Royal Exchange NSW 1223
Australia

Tel: +61 2 9225 0200
Fax: +61 2 9225 1595
DX: 218 SYDNEY

**www.bakermckenzie.com**

Baker & McKenzie, an Australian Partnership, is a member firm of Baker & McKenzie International, a Swiss Verein with member law firms around the world.  In accordance with the common terminology used in professional service organisations, reference to a "partner" means a person who is a partner, or equivalent, in such a law firm.  Similarly, reference to an "office" means an office of any such law firm

© 2015 Baker & McKenzie
All rights reserved.
2636814-v1\SYDDMS 2636814-v1\SYDDMS_DRAFT

| Formatted: DMReference |
| --- |

DEF_01612168