**P-308**
Case No. 9:18-CV-89176-BB

18 December 2015

**PRIVATE AND CONFIDENTIAL**

The Directors
The entities as described
in the Schedule
C/- DeMorgan Limited
Suite 502, Level 5, 32 Delhi Road
North Ryde  NSW  2113

Dear Directors,

**Sale of assets to NCrypt Holdings Ltd - allocation of sale proceeds**

We refer to the IP Assignment Deed entered into by NCrypt Holdings Ltd (**Purchaser**), DeMorgan Limited (**DeMorgan**) and the entities as listed in Schedule 1 (**Additional Entities**) on or about 18 December 2015.

**1.     Background**

1.1     In order for the sale of intellectual property assets to proceed, DeMorgan requested that each of the Additional Entities sell certain of their respective intellectual property assets to the Purchaser. The Additional Entities co-operated in entering into those transactions, as set out in the IP Assignment Deed.

1.2     As you will be aware, however, the Purchaser was directed by DeMorgan and the Additional Entities to pay the purchase price of AU$1,500,000 under the sale (**Sale Proceeds**) to DeMorgan.  That direction was given by DeMorgan and the Additional Entities to the Purchaser in order to facilitate and simplify completion of the sale, and in the context of the agreement set out in this letter to allocate and distribute the Sale Proceeds to the Additional Entities (and to DeMorgan).

1.3     DeMorgan acknowledges that in consideration for their entry into the IP Assignment Deed, the Additional Entities have entitlements to receive an allocation of the Sale Proceeds.

1.4     Given the need, in the best interests of DeMorgan and of each of the Additional Entities, to complete the sale on 18 December 2015, there was not sufficient time for final agreement to be reached amongst the parties as to the exact allocation of the Sale Proceeds between themselves.

**2.     Sale Proceeds held in separate account pending allocation**

2.1     DeMorgan now holds the Sale Proceeds for itself and on trust for the Additional Entities on the terms of this letter.

2.2     Pending allocation and distribution to the Additional Entities and to DeMorgan in accordance with this letter, the Sale Proceeds will be held in a separate bank account maintained by DeMorgan, to be noted as being held on trust for the Additional Entities.

2.3     DeMorgan must not create or permit to exist any security interest or encumbrance over the bank account or the Sale Proceeds held in the bank account.

CONFIDENTIAL                                                                                                        DEF_01586025

**3.       Principles for allocation of Sale Proceeds**

3.1      The parties agree that as soon as practicable following the date of this letter and in any event, (unless otherwise agreed in writing as between DeMorgan and the Additional Entities) by 29 February 2016, they will negotiate in good faith to agree the allocation of the Sale Proceeds between themselves. Such negotiations will have regard to:

    (a)      the principles set out in the Annexure to this letter;

    (b)      the best interests of each of DeMorgan and the Additional Entities; and

    (c)      the ongoing solvency of each of the parties.

3.2      The parties further acknowledge and agree that Hotwire Preemptive Intelligence Pty Limited (subject to deed of company arrangement) **(Hotwire)** will also be selling intellectual property assets to the Purchaser, and that certain of the Sale Proceeds will be allocated to that entity in accordance with the above allocation principles.  It is intended that Hotwire will in due course accede to the agreement set out in this letter.

**4.       Expert determination**

4.1      If the parties cannot agree the allocation of the Sale Proceeds between themselves by 29 February 2016, any one of them may give written notice to the others that they wish to appoint an independent expert to determine the allocation.

4.2      The identity of the independent expert will be agreed between the parties and failing agreement between the parties within 15 Business Days of any party giving the notice referred to above, the independent expert will be appointed by the President of the Law Society of New South Wales.

4.3      The parties agree that the allocation of the Sale Proceeds will be determined by the independent expert in accordance with the Rules of Expert Determination published by the Law Society of New South Wales, as published at the date of this letter.

**5.       Representations and warranties**

5.1      DeMorgan represents and warrants to the Purchaser in respect of itself and each of the Additional Entities that:

    (a)      **status:**  if it is a corporation, it is a corporation with limited liability and is properly incorporated (or taken to be incorporated), registered and validly existing under the *Corporations Act* 2001 (Cth);

    (b)      **capacity and power:**  if it is a corporation, it has full legal capacity and power to own its assets and to carry on its business as it is presently being conducted and to enter into and perform this letter and the transactions contemplated by this letter;

    (c)      **authority:**  if it is a corporation, it has taken all corporate and other action necessary to authorise the execution and performance of this letter and to carry out the transactions contemplated by this letter;

    (d)      **documents binding:**  this letter constitutes (or will, when signed and delivered, constitute) its legal, valid and binding obligations enforceable against it in accordance with their terms;

    (e)      **transactions permitted:**  the execution of this letter and the performance by it of its obligations or the exercise of its rights under this letter do not:

CONFIDENTIAL                                                                                                          DEF_01586026

(i)     if it is a corporation, contravene its constitution or any of the provisions of the *Corporations Act* that apply to it as replaceable rules or mandatory rules;

(ii)     contravene a law, authorisation or any agreement or obligation binding on it;

(iii)    if it is a corporation, exceed any limits on its powers or the powers of its directors;

(f)    **benefit:** it benefits by entering into, exercising its rights and performing its obligations under the Transaction Documents;

5.2    The representations and warranties in this letter survive the execution of the letter and are repeated on the date of final agreement or determination of the allocation of the Sale Proceeds amongst DeMorgan and the Additional Entities.

## 6.    General provisions

6.1    This letter may be signed in counterparts and all counterparts taken together constitute one document.

6.2    This letter is governed by the laws of New South Wales.

6.3    The parties irrevocably and unconditionally:

(g)    submit to the non-exclusive jurisdiction of the courts in and of New South Wales; and

(h)    waive, without limitation, any claim or objection based on absence of jurisdiction or inconvenient forum.

6.4    A provision of or of a right under this letter may not be waived or varied except in writing signed by the person to be bound.

Please confirm your agreement to the terms of this letter by executing a copy of the letter in the space marked below.

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Signature of director

Allan Granger
Name of director

David Jensen
Name of director

CONFIDENTIAL       DEF_01586027

**Accepted and agreed by the Additional Entities:**

**Signed sealed and delivered**
by **DeMorgan Holdings Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Allan Granger
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director (please print)


**Signed sealed and delivered by**
**Misfit Games Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Craig Steven Wright
_____
Name of director (please print)

_____
Signature of director

Ramona Watts
_____
Name of director


**Signed sealed and delivered**
by **Panopticrypt Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Craig Steven Wright
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director

2653924-v4\SYDDMS

4

CONFIDENTIAL

DEF_01586028

**Signed sealed and delivered**
by **Coin-Exch Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Allan Granger
Name of director

Signature of director

Ramona Watts
Name of director

**Signed sealed and delivered**
by **Integyrz Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Allan Granger

Signature of director

Ramona Watts

**Signed sealed and delivered**
by **Pholus Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Allan Granger
Name of director

Signature of director

Ramona Watts
Name of director

2853924-v4\SYDDMS

5

CONFIDENTIAL

DEF_01586029

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

_____
Allan Granger

_____
Ramona Watts

Name of director

Name of director

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in**
**Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

_____
Allan Granger

_____
Craig Steven Wright

Name of director

Name of director

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of /director

_____
Allan Granger

_____
Ramona Watts

Name of director

Name of director

2653924-v4\SYDDMS

6

CONFIDENTIAL

DEF_01586030

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Signature of director

Allan Granger

Ramona Watts

Name of director

Name of director

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in
Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Signature of director

Allan Granger

Craig Steven Wright

Name of director

Name of director

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

Signature of director

Signature of /director

Allan Granger

Ramona Watts

Name of director

Name of director

CONFIDENTIAL

DEF_01586031

**Signed sealed and delivered**
by **Denariuz Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Allan Granger
Name of director

_____
Signature of director

_____
Ramona Watts
Name of director

**Signed sealed and delivered**
by **Interconnected Research Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Allan Granger
Name of director

_____
Signature of director

_____
Ramona Watts
Name of director

CONFIDENTIAL                                                                      DEF_01586032

**Signed sealed and delivered**
by **Zuhl Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Daso Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of secretary/director

Craig Steven Wright
_____
Name of director

Ramona Watts
_____
Name of director

2653924-v4\SYDDMS

8

CONFIDENTIAL

DEF_01586033

**Schedule - the Additional Entities**

DeMorgan Holdings Pty. Ltd. (ACN 600 655 427);

Misfit Games Pty. Ltd. (ACN 601 677 105);

Panopticrypt Pty Ltd (ACN 151 567 118);

Coin-Exch Pty. Ltd. (ACN 163 338 467);

Integyrz Pty Ltd (ACN 165 263 007);

Pholus Pty. Ltd. (ACN 165 472 079);

Cloudcroft Pty. Ltd. (ACN 149 732 365);

Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd. (ACN 600 516 149);

C01N Pty Ltd (ACN 152 222 421);

Denariuz Pty. Ltd. (ACN 165 471 983);

Interconnected Research Pty. Ltd. (ACN 165 472 097);

Zuhl Pty. Ltd. (ACN 165 472 006); and

Daso Pty. Ltd.(ACN 600 512 249).

CONFIDENTIAL                                                                    DEF_01586034

**Annexure - allocation principles**

<u>ALLOCATION OF IP ASSET PURCHASE</u>

This report outlies the process and logic in allocating a "pool" of funds associated with the acquisition of IP across DeMorgan Ltd and other entities pursuant to the Summary of Agreed Terms on 29th June 2015.

The first critical phase involved determining the existence of IP from research activity and from assignment and/or licensing of IP into and across related entities. For that purpose Baker & McKenzie was engaged to assist in determining the legal and ownership of relevant IP.

Then we considered several different methods for apportionment;

1. A measure of research undertaken by each entity. An indicator of the amount of research undertaken is the actual investment sunk into research activity, ie the actual cost of research. Each entity, in making claims for R&D Incentive payments filed claims in their respective Income Tax Returns. An analysis of the historical and expected R&D Incentive payments (45% of claimed eligible expenditure) here;

| Entity | FYE Jun 2011 | FYE Jun 2012 | FYE Jun 2013 | FYE Jun 2014 | TOTAL | | FYE Jun 2015 (forecast) | |
|---|---|---|---|---|---|---|---|---|
| Cloudcroft | | 114,507 | 369,134 | 14,729,781 | 15,213,422 | 29.2% | 500,000 | 4.51% |
| Coin | | 2,079,429 | 4,921,944 | 7,001,373 | 13.4% | | 100,000 | 0.90% |
| Coin-Exch | | | 145,943 | 17,000,000 | 17,145,943 | 32.9% | 4,950,000 | 44.70% |
| Denariuz | | | | 3,100,497 | 3,100,497 | 6.0% | 4,950,000 | 44.70% |
| Integyrz | | | | 434,069 | 434,069 | 0.8% | 50,000 | 0.45% |
| Inter Connected Research | | | | 377,549 | 377,549 | 0.7% | 75,000 | 0.68% |
| Panopticrypt | 5,120 | 51,678 | 241,399 | 669,268 | 962,345 | 1.9% | 100,000 | 0.90% |
| Pholus | | | | 295,737 | 295,737 | 0.6% | 50,000 | 0.45% |
| Zuhl | | | | 620,099 | 620,099 | 1.2% | 50,000 | 0.45% |
| Misfit Games | | | | | - | 0.0% | 75,000 | 0.68% |
| Chaos | | | | | - | 0.0% | 75,000 | 0.68% |
| Daso | | | | | - | 0.0% | 100,000 | 0.90% |
| Hotwire | | | 1,466,567 | 5,438,000 | 6,904,567 | 13.3% | - | 0.00% |
| | 5,120 | 166,185 | 4,302,472 | 47,586,944 | 52,055,601 | 100.0% | 11,075,000 | 100.00% |

Included in this table is the forecast R&D Incentive payments associated with claims (if they were made) related to the 2015 income tax year. (These forecasts were provided by Craig Wright during the due diligence phase leading up to the Summary of Agreed Terms).

2. A further option considered was the number of white papers potentially giving rise to patents of inventions flowing from the research undertaken by entities. Following the execution of the Summary of Agreed Terms, significant effort has been invested into planning a patent program. While the exact status is still in its very early stages of understanding, a significant portion of the research has been reviewed and broken into topics or white papers. From these it is not yet understood how many patents are likely to be filed, however, we have made the assumption that each white paper equates to one patent. We already know this is not precise as some white papers have identified multiple patent possibilities while others none, but on balance this is the only reasonable approximation for the purpose of allocation. The breakdown is shown in the following table;

CONFIDENTIAL

| Entity | Total Patents | FinTech | | Non Fintech | |
|---|---|---|---|---|---|
| Cloudcroft | 12 | 1 | 1.14% | 11 | 14.67% |
| Coin | 23 | 19 | 21.59% | 4 | 5.33% |
| Coin-Exch | 30 | 25 | 28.41% | 5 | 6.67% |
| Denariuz | 41 | 22 | 25.00% | 19 | 25.33% |
| Integyrz | 1 | 0 | 0.00% | 1 | 1.33% |
| Inter Connected Research | 19 | 13 | 14.77% | 6 | 8.00% |
| Panopticrypt | 24 | 5 | 5.68% | 19 | 25.33% |
| Pholus | 7 | 2 | 2.27% | 5 | 6.67% |
| Zuhl | 6 | 1 | 1.14% | 5 | 6.67% |
| Misfit Games | 0 | 0 | 0.00% | 0 | 0.00% |
| Chaos | 0 | 0 | 0.00% | 0 | 0.00% |
| Daso | 0 | 0 | 0.00% | 0 | 0.00% |
| Hotwire | 0 | 0 | 0.00% | 0 | 0.00% |
| | 163 | 88 | 100.00% | 75 | 100.00% |

For the purpose of commercialization, Fintech patents are separated from Non-FinTech patents due to the amount of venture capital investment flowing into FinTech block chain start-ups and the likely timing of commercialization opportunities.

It was decided to use a combination of criteria in order to arrive at a weighted and prioritized result that reflects the relative value (in commercialization terms) of the research undertaken across related entities.

The weighting scale is defined in the following table;

| WEIGHTING SCALE | |
|---|---|
| Patents; | |
| FinTech | 60% |
| Non-FinTech | 40% |
| | |
| Overall | |
| Patents | 80% |
| R&D Spend | 20% |
| | |
| R&D Spend | 20% |
| FinTech | 48% |
| Non-FinTech | 32% |

Patents;
1. FinTech patents (60%) are considered more valuable than non-FinTech patents (40%), hence this weighting was applied within this specific analysis of patents flowing from research.

Overall;
2. Patents (80%) were considered far more valuable than research spend (20%) as they represented a greater opportunity for commercialization, hence this weighting was applied.

Applying these weightings saw research spend at 20%, FinTech patents 48% and non-FinTech patents 32%. This gives rise to the following allocation of $1,500,000 between entities;

CONFIDENTIAL

DEF_01586036

| Weighted | Apportionment | Entity |
|---|---|---|
| 8.61% | $129,192 | Cloudcroft |
| 13.51% | $202,584 | Coin |
| 23.53% | $352,995 | Coin-Exch |
| 25.17% | $377,577 | Denariuz |
| 0.56% | $8,328 | Integyrz |
| 9.79% | $146,867 | Inter Connected Research |
| 11.11% | $166,637 | Panopticrypt |
| 3.33% | $49,893 | Pholus |
| 2.84% | $42,646 | Zuhl |
| 0.07% | $1,016 | Misfit Games |
| 0.07% | $1,016 | Chaos |
| 0.09% | $1,354 | Daso |
| 1.33% | $19,896 | Hotwire |
| 100.00% | $1,500,000 | |

CONFIDENTIAL

DEF_01586037

**P-315**

Case No. 9:18-CV-89176-BB

BAKER & McKENZIE

# Novation and Amendment Deed

**DR Technologies Ltd**

**Ncrypt Holdings Ltd.**

**DeMorgan Limited**

Baker & McKenzie
ABN 32 266 778 912
AMP Centre
Level 27
50 Bridge Street
Sydney NSW 2000
Australia
www.bakermckenzie.com

2650002-v5\SYDDMS

## Table of contents

| | | |
|---|---|---|
| 1. | Definitions and interpretation | 1 |
| 2. | Assumption of obligations | 2 |
| 3. | Continuing Party's consent | 3 |
| 4. | Releases | 3 |
| 5. | Amendments to Contract | 3 |
| 6. | General provisions | 7 |
| **Annexure 1** | | **10** |
| The Contract | | 10 |

CONFIDENTIAL                                                                                          DEF_01586039

| Title | **Novation and Amendment Deed** |
|---|---|
| Date | 8 March 2016 |
| Parties | **DR Technologies Ltd** (IBC N. 15003) of a company incorporated and registered under the laws of the State of Antigua and Barbuda with its registered address at Milburn House, Old Parham Road, St John' Antigua and Barbuda, 2735 (**Departing Party**) |
| | **Ncrypt Holdings Ltd** (IBC number 16734) of Offshore Management & Trust Services Inc, Fitzgerald House, 44 Church Street, St John's Antigua (**Incoming Party**) |
| | **DeMorgan Limited** (ACN 601 560 525) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Continuing Party**) |

## Recitals

| A | Departing Party and Continuing Party are parties to the Contract. |
|---|---|
| B | Departing Party wishes to be released and discharged from the Contract. |
| C | Incoming Party wishes to assume the rights, obligations and liabilities of Departing Party under the Contract from the Effective Date. |
| D | Continuing Party has agreed to release and discharge Departing Party on Incoming Party assuming the rights, obligations and liabilities of Departing Party under the Contract. |

## Operative provisions

### 1.   Definitions and interpretation

**Definitions**

1.1   In this Deed, unless the context indicates another meaning:

**Contract** means the Research, Development and Technical Service Agreement made between the Departing Party and the Continuing Party and dated with an effective date of 29 June 2015, a copy of which is annexed to this Deed as Annexure 1.

**Effective Date** means 18 December 2015.

**Interpretation**

1.2   In this Deed:

(a)   unless the context otherwise requires, a reference to:

(i)   the singular includes the plural and vice versa;

(ii)   a gender includes all genders;

*AC*

CONFIDENTIAL                                                                 DEF_01586040

(iii)  a document (including this Deed) is a reference to that document (including any Schedules and Annexures) as amended, consolidated, supplemented, novated or replaced;

(iv)  a party means a party to this Deed;

(v)  an item, Recital, clause, Schedule or Annexure is to an item, Recital, clause, Schedule or Annexure of or to this Deed;

(vi)  a person (including a party) includes an individual, company, other body corporate, association, partnership, firm, joint venture, trust and government agency and the person's successors, permitted assigns, substitutes, executors and administrators;

(vii)  a law includes any legislation, judgment, rule of common law or equity or rule of any applicable stock exchange, and is a reference to that law as amended, consolidated, supplemented or replaced and includes a reference to any regulation, by-law or other subordinate legislation;

(viii)  proceedings includes litigation, arbitration and investigation;

(ix)  time is to Sydney time;

(x)  day is to a day in Sydney;

(xi)  the words "including" and "includes" mean "including, but not limited to", and "includes, without limitation" respectively;

(b)  headings are for convenience only and do not affect interpretation of this Deed; and

(c)  if a period must be calculated from, after or before a day or the day of an act or event, it must be calculated excluding that day.

## 2.  Assumption of obligations

### Performance by Incoming Party

2.1  Incoming Party:

(a)  is substituted for Departing Party as a party to the Contract on and from the Effective Date; and

(b)  undertakes to perform Departing Party's obligations and be bound by Departing Party's liabilities arising under the Contract on and from the Effective Date.

### Performance by Departing Party

2.2  Departing Party:

(a)  consents to Incoming Party's substitution as a party to the Contract on and from the Effective Date; and

(b)  will comply with all its obligations and be bound by all its liabilities arising under the Contract up to, but excluding, the Effective Date.

*At*

CONFIDENTIAL                                                          DEF_01586041

## 3.      Continuing Party's consent

**Consent by Continuing Party**

3.1      Continuing Party:

      (a)      acknowledges that the Contract is in full force and effect;

      (b)      consents to the Incoming Party's substitution for Departing Party as a party to the Contract on and from the Effective Date;

      (c)      agrees that, on and from the Effective Date, Incoming Party will be bound by present and future obligations and liabilities and will be entitled to present and future benefits of (and causes of action relating to) the Contract, as if Incoming Party had been originally named in the Contract as the Departing Party; and

      (d)      acknowledges that Incoming Party will not be entitled to the benefits of, or be responsible for any obligations and liabilities, under the Contract for the period before the Effective Date,

## 4.      Releases

**Departing Party's release**

4.1      On and from the Effective Date, Continuing Party releases and discharges Departing Party from all Departing Party's obligations and liabilities under or in connection with the Contract except for:

      (a)      any obligation, liability or cause of action arising under or in connection with the Contract as a consequence of any event which occurred before the Effective Date, which is unsatisfied; and

      (b)      any default by Departing Party under the Contract which occurred before the Effective Date.

**Continuing Party's release**

4.2      On and from the Effective Date, Departing Party releases and discharges Continuing Party from all Continuing Party's obligations and liabilities under or in connection with the Contract except for:

      (a)      any obligation, liability or cause of action arising under or in connection with the Contract as a consequence of any event which occurred before the Effective Date, which is unsatisfied; or

      (b)      any default by Continuing Party under the Contract which occurred before the Effective Date.

## 5.      Amendments to Contract

5.1      With effect on and from the Effective Date, Continuing Party and Departing Party agree that the following amendments will be made to the Contract:

      (a)      Section 1.10 will be deleted and replaced with the following definition:

*AC*

CONFIDENTIAL                                                                                    DEF_01586042

*"Intellectual Property Rights"* means copyrights (including copyright applications), patent rights (including patent applications and disclosures), trade-marks (including trade-mark applications), trade secrets, Moral Rights, know-how and any other similar rights or intangible assets recognized under any law(s) or international convention(s) in any country or jurisdiction in the world where rights of ownership accrue to intellectual creations, and including all associated goodwill. Without limiting the foregoing, this includes all present and future rights in or to any copyright, database, patent, design, utility model, trade mark (including any rights in get up or trade dress), brand name, service mark, trade name, domain name, business name, eligible layout right, chip topography right, plant breeder's right, and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, wherever registered, patentable or not and wherever existing in the world, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights, including all rights in or to the Patent Rights.

(b)     Section 1.22 will be deleted and replaced with the following definition:

*"Work Product"* means the Software and any and all concepts, data, designs, ideas, information, inventions, know-how, processes, techniques, and works of authorship or the like developed or created by Service Provider during the Term (including but not limited to in the course of performing Services, or otherwise at the request of the Service Provider) regardless of the form of embodiment. Without limiting the foregoing, this includes the product or other result (whether tangible or intangible, and regardless of whether or not reduced to writing or other material form) of any work or other activity, including any know-how, discovery, design, improvement, formula, algorithm, process, technique, computer programs and software (whether comprising object code, source code, procedure language, job control language or any other form of computer code), documents, prototypes, methodologies, business plans, specifications, packaging, marketing materials, models, information, ideas and inventions as well as any other literary and artistic works and other items in which Intellectual Property Rights subsist or are capable of subsisting, to the extent authored or otherwise created, generated made or discovered by the Service Provider (or its employees) during the Term. Work Product shall include all Intellectual Property Rights therein or associated therewith.

(c)     A new Section 1.23 will be added as follows:

*"Patent Rights"* means any patents and patent applications in any jurisdictions, including without limitation, all patent applications and registrations (and any patents that issue from them) and all provisional applications, divisions, renewals, continuations, continuations-in-part, extensions, reissues, re-examinations, substitutions, confirmations, registrations, revalidations and additions of or to them, as well as the right to apply for any of the foregoing, as well as any patent term extension or supplementary protection certificate, or like form of protection, whether on file now or in the future with the appropriate governmental agencies in any jurisdiction.

(d)     A new Section 1.24 will be added as follows:

CONFIDENTIAL                                                                    DEF_01586043

*"Patentable Inventions"* has the meaning given in Section 6.5.1.

(e)   A new Section 1.25 will be added as follows:

*"Know-How"* means any confidential information, know-how or trade secret described or comprised in or relating to the Work Product, or the Work Product Information, or otherwise used by the Service Provider in relation to the performance of the Services, including all inventions whether or not patentable and including the Patentable Inventions, but excluding any such information or know-how:

(a) which is publicly known;

(b) which is disclosed to the Service Provider after the Effective Date without restriction by a third party and without any breach of confidentiality by the third party; or

(c) which is developed independently by the Service Provider after the Effective Date without reliance on:

(i) any of the Work Product Information or Work Product; or

(ii) any of the other Confidential Information of Client or any of Client's related entities or related bodies corporate (as that term is defined under the Australian Corporations Act 2001 (Cth)),

provided that such development occurs entirely independently from and outside any contractual arrangement with Client or any of Client's related entities or related bodies corporate (as that term is defined under the Australian Corporations Act 2001 (Cth)).

(f)   A new Section 1.26 will be added as follows:

*"Work Product Information"* means all information contained in or comprised by the Work Product, and any other information the benefit of which is to be transferred to Client.

(g)   A new Section 1.27 will be added as follows:

*"Third Party Interest"* means any Security Interest licence, option, covenant, notation, restriction, interest under any agreement, interest under any trust, or other right, equity, entitlement or other interest of any nature held by a third party.

(g)   A new Section 1.28 will be added as follows:

*"Security Interest"* means a right, interest, power of arrangement in relation to any property which provides security for, or protects against default by a person in, the payment or satisfaction of a debt, obligation or liability, including a mortgage, charge, bill of sale, pledge, deposit, lien, encumbrance or hypothecation.

(h)   The following will be added to the end of the existing Section 6.1.2 (which will otherwise continue to have effect without amendment):

The assignment the subject of this Section includes the right to take action and obtain relief (including to be paid all amounts recovered in any action

CONFIDENTIAL                                                                                    DEF_01586044

whether as damages, following an account of profits or on any other basis) in relation to infringements of the Assigned Rights which occurred on or before the Effective Date.

(i)     A new Section 6.5 will be added as follows:

*Patent Rights*

*6.5.1 The Service Provider agrees that Client, at its cost, is entitled to apply for patent protection anywhere in the world in respect of any Work Product that comprises inventions that are or may be patentable (**Patentable Inventions**).*

*6.5.2 The Service Provider must, at Client's cost and expense, cooperate with and do all things reasonably requested by Client in connection with such applications in any jurisdiction (and ensure that all employees who are inventors of such Patentable Inventions do the same) including by:*

*6.5.2.1 disclosing all relevant matters to Client in connection with such applications;*

*6.5.2.2 preparing any material or otherwise taking any steps reasonably requested by Client (or its patent agents) to enable such applications to be prepared and filed by Client, including by providing Client (or its patent agents) with a full description of each Patentable Invention accompanied by suitable drawings or sketches and such further explanation as they may require; and*

*6.5.2.3 by signing, confirming and authenticating all forms, declarations and papers reasonably requested by the Assignee (or its patent agents) including all such forms and documents as necessary for the making of the application and any other documentation properly required by any patent office in support of any such application.*

(j)     A new Section 6.6 will be added as follows:

*Know-How*

*6.6.1 The Service Provider agrees that:*

*6.6.1.1 the entire benefit and sole use of the Know-How will be enjoyed by the Client;*

*6.6.1.2 it must, during the Term, disclose to the Client all Know-How; and*

*6.6.1.3 it must (and must ensure that its employees also) at the Client's cost and expense, cooperate with and do all things reasonably requested by the Client in connection with the efficient exploitation of the Know-How and the Intellectual Property Rights assigned under this Agreement.*

*6.6.2 The Service Provider must hold all Know-How on a confidential basis in accordance with Section 9 of this Agreement and, without limiting the Service Provider's obligations under that Section, must not publish or disclose (or permit or assist any person to do so) any particulars of the*

*AL*

CONFIDENTIAL                                                                                            DEF_01586045

*Know-How (including any Patentable Inventions) to any person, except as expressly permitted in writing by the Client or as expressly permitted by Section 9.*

## 6.    General provisions

6.1    This Deed is the entire agreement of the parties about the subject matter of this Deed.  It supersedes all prior understandings, agreements, representations and correspondence.

6.2    Each party must, at its own expense, whenever requested by another party, promptly do or arrange for others to do, everything reasonably necessary to give full effect to this Deed.

6.3    Each party must pay its own costs in respect of this Deed and the documents and transactions contemplated by this Deed.

6.4    The warranties, other representations and promises by the parties in this Deed are continuing and will not merge or be extinguished on completion of this Deed.

6.5    A party must not assign or otherwise transfer, create any charge, trust or other interest in, or otherwise deal in any other way with any of its rights under this Deed without the prior written consent of the other parties.

6.6    To the extent permitted by law, a provision of a law is excluded if it does or may, directly or indirectly:

(a)     lessen or vary in any other way a party's obligations under this Deed; or

(b)     delay, curtail or prevent or adversely affect in any other way the exercise by a party of any of its rights, remedies or powers under this Deed.

6.7    If a provision of this Deed is invalid or unenforceable in a jurisdiction:

(a)     it is to be read down or severed in that jurisdiction to the extent of the invalidity or unenforceability; and

(b)     that fact does not affect the validity or enforceability of that provision in another jurisdiction or the remaining provisions.

6.8    A provision of or of a right under this Deed may not be waived or varied except in writing signed by the person to be bound.

6.9    This Deed may be amended only by a document signed by all parties.

6.10    This Deed may be signed in counterparts and all counterparts taken together constitute one document.

6.11    The rights, remedies and powers of the parties under this Deed are cumulative and do not exclude any other rights, remedies or powers.

6.12    A party may give its approval or consent conditionally or unconditionally or withhold its approval or consent in its absolute discretion unless this Deed expressly provides otherwise.

6.13    If there is any conflict or inconsistency between the terms of this Deed and the Contract, the terms of this Deed will prevail.

6.14    This Deed is binding on, and has effect for the benefit of, the parties and their respective successors and permitted assigns.

CONFIDENTIAL                                                                                 DEF_01586046

6.15   This Deed is governed by the laws of New South Wales.

6.16   Each party irrevocably and unconditionally:

    (a)    submits to the non-exclusive jurisdiction of the courts of New South Wales; and

    (b)    waives, without limitation, any claim or objection based on absence of jurisdiction or inconvenient forum.

6.17   Each party agrees that a document required to be served in proceedings about this Deed may be served:

    (a)    by being delivered to or left at its address for service of notices as set out in the introduction to this Deed; or

    (b)    in any other way permitted by law.

*AL*

CONFIDENTIAL        DEF_01586047

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by a director or authorized signatory of **DR Technologies Ltd**

_____
Signature of director / authorized signatory

_____
Signature of director / authorized signatory

_ARLENE  LAKE_
_____
Name of director / authorized signatory
(please print)

_____
Name of director / authorized signatory
(please print)

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd.**

_____
Signature of director

_____
Signature of director

Stefan Matthews
_____
Name of director

Robert MacGregor
_____
Name of director

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
_Corporations Act 2001_ by a director and
director:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

David Jensen
_____
Name of director

2650002-v5\SYDDMS

9

Novation and Amendment Deed
**Execution Counterpart**

CONFIDENTIAL

DEF_01586048

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by a director or authorized signatory of **DR Technologies Ltd**

_____          _____
Signature of director / authorized signatory          Signature of director / authorized signatory

_____          _____
Name of director / authorized signatory          Name of director / authorized signatory
(please print)          (please print)

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd.**

_____          _____
Signature of director          Signature of director

Stefan Matthews          Robert MacGregor
_____          _____
Name of director          Name of director

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
_Corporations Act 2001_ by a director and
director:

_____          _____
Signature of director          Signature of director

Allan Granger          David Jensen
_____          _____
Name of director          Name of director

CONFIDENTIAL                                                  DEF_01586049

**Annexure 1**

**The Contract**

CONFIDENTIAL                                                                        DEF_01586050

# RESEARCH, DEVELOPMENT AND TECHNICAL SERVICES AGREEMENT

**THIS AGREEMENT** is made effective 29 June 2015 (the "*Effective Date*") by and between:

## DeMORGAN LTD.

incorporated and registered under the laws of Australia

("*Service Provider*")

– and –

## DR TECHNOLOGIES LTD.

incorporated and registered under the laws of the State of Antigua and Barbuda
with IBC Number 15003

("*Client*")

**WHEREAS** Service Provider has specialist knowledge and experience associated with the provision of certain research facilities and related software development and technical support services as may be made available from time to time during the Term (the "*Services*") and is able and willing to provide such Services to Client pursuant to the terms of this Agreement;

**AND WHEREAS** Client wishes to retain Service Provider to provide Services pursuant to the terms of this Agreement;

**NOW THEREFORE**, in consideration of the mutual covenants and Agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby by each party acknowledged, the parties hereto covenant and agree as follows:

## 1.   DEFINITIONS

In this Agreement (which expression includes the recitals and all Schedules hereto) the following words and phrases shall, unless the context otherwise requires, have the following meanings:

1.1.    "Applicable Laws" means all laws and regulations applicable within the Jurisdiction, the Legislation, and any other laws, regulations, regulatory policies, guidelines or industry codes which apply to the provision of the Services hereunder.

1.2.    "Best Industry Practice" means the standards that an experienced provider of the Services would consider to be best practice having regard to all relevant factors.

1

CONFIDENTIAL

DEF_01586051

1.3.     "Change of Control" means a change in Control of the Service Provider.

1.4.     "Commitment Period" shall have the meaning ascribed thereto in Section 3.1.

1.5.     "Control" in respect of the Service Provider means the acquisition of either:

    1.5.1.    the voting rights attaching to 25% or more of the voting shares in the Service Provider, or

    1.5.2.    the power to direct or cause the direction and management of the policies of the Service Provider in accordance with the acquirer's wishes, whether as a result of the ownership of shares, control of the board of directors, contract or any powers conferred by the articles of association or other constitutional documents of the Service Provider.

1.6.     "Confidential Information" means any and all of a Discloser's or Discloser's licensors' or affiliated companies' business, proprietary and/or technical information, data and processes, whether tangible or intangible, including, without limitation, any and all corporate information, relationships with related or third party suppliers or other entities, communications from or requirements of regulatory bodies, techniques, discoveries, inventions, processes, patents, patent applications, copyrights, copyright applications, know-how, trade secrets, system designs, client or prospect lists, industrial designs, affiliate or partner lists, and software programs, products and the like, disclosed pursuant to this Agreement or in furtherance of this Agreement.

1.7.     "Data Protection Legislation" means all applicable laws and regulations relating to the processing of personal data and privacy, including where applicable all relevant guidance and applicable codes of practice.

1.8.     "Discloser" means a party hereto that discloses Confidential Information to the other party in furtherance of this Agreement.

1.9.     "Fees" means the fees payable the fees payable by Client to the Service Provider in accordance with Section 4 hereof.

1.10.    "Intellectual Property Rights" means copyrights (including copyright applications), patent rights (including patent applications and disclosures), trade-marks (including trade-mark applications), trade secrets, Moral Rights, know-how and any other similar rights or intangible assets recognized under any law(s) or international convention(s) in any country or jurisdiction in the world where rights of ownership accrue to intellectual creations, and including all associated goodwill.

1.11.    "Internal Control System", "Control System" or "ICS" means Client internal control system, comprised of the Key Policies and all other operational procedures, technical standards or SLAs relating thereto, including, without limitation, any procedures or requirements necessary to ensure compliance with Applicable Laws, as may be amended by Client from time to time in its sole and absolute discretion.

CONFIDENTIAL

DEF_01586052

1.12.   "Jurisdiction" means Antigua and Barbuda.

1.13.   "Key Policies" means the policies or procedural requirements implemented and revised by Client from time to time relating to its internal operations and the operations of certain suppliers, specifically including, without limitation, the policies listed in Schedule "B".

1.14.   "Legislation" means all laws and regulations applicable to the provision of Client's services to its markets or to the provision of he Services hereunder, including, without limitation, the Data Protection Legislation, as may be amended during the Term hereof.

1.15.   "Licensed IP" means the any and all Client technology, data, information, know-how or any other material of any kind provided by Client to Service Provider hereunder to enable the provision of the Services, and all related Intellectual Property Rights, expressly including the goodwill and reputation subsisting therein throughout the world.

1.16.   "Moral Rights" means the right of integrity of authorship (i.e. not to have a work subjected to derogatory treatment), the right of attribution of authorship of a work, and the right not to have authorship of a work falsely attributed, which rights are created by any applicable copyright or other legislation, or in common law.

1.17.   "Recipient" means a party hereto that receives Confidential Information from the other party in furtherance of this Agreement.

1.18.   "Renewal Period" shall have the meaning ascribed thereto in Section 3.1.

1.19.   "Services" means those requested services provider hereunder by Service Provider to Client, as generally described in Schedule "C" hereto.

1.20.   "Software" means the source code and object code of any software developed pursuant to this Agreement.

1.21.   "Term" shall have the meaning ascribed thereto in Section 3.1.

1.22.   "Work Product" means the Software and any and all concepts, data, designs, ideas, information, inventions, know-how, processes, techniques, and works of authorship or the like developed or created by Service Provider during the course of performing Services, regardless of the form of embodiment. Work Product shall include all Intellectual Property Rights therein or associated therewith.

2.   APPOINTMENT AND STATUS

2.1.   Appointment. Subject to the terms and conditions of this Agreement, Client hereby appoints Service Provider to provide the Services and Service Provider hereby accepts that appointment in consideration of the payment of the Fees.

CONFIDENTIAL

DEF_01586053

2.2.     Non-Exclusive Agreement. Service Provider expressly acknowledges and agrees that its appointment pursuant to this Agreement is on a non-exclusive basis and Client may make such additional or alternate appointments as it sees fit from time to time before, during, or after the Term.

2.3.     Independent Contractors. Service Provider is acting as an independent contractor and not as an agent, partner, or joint venturer with Client for any purpose. Neither party shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other. Without limiting the generality of the foregoing, the Service Provider shall not:

2.3.1.    hold itself out or permit any person to hold itself out as being authorised to bind Client in any way;

2.3.2.    pledge the credit of Client in any way;

2.3.3.    engage in any conduct which contravenes any Applicable Laws or which in the opinion of Client is inconsistent with Best Industry Practice or Client's obligations under the Control System or is in any way prejudicial to Client's business interests;

2.3.4.    make or give any warranties, guarantees or representations concerning the services offered from time to time by Client; or

2.3.5.    dispute or challenge the validity of the Intellectual Property Rights or the rights of Client to the Intellectual Property Rights, or apply for the registration of any Intellectual Property Rights related in any manner to the provision of Services hereunder.

3.    **TERM AND TERMINATION**

3.1.     Term. The term of this Agreement ("*Term*") shall commence on the Effective Date of this Agreement and shall continue for a period of two (2) years from the Effective Date hereof (the "Commitment Period"), and thereafter shall automatically renew for successive one (1) year terms (each, a "Renewal Period") until terminated in accordance with the provisions hereof.

3.2.     Termination.

3.2.1.    *Upon Notice.* Either party may provide to the other party notice of termination and non-renewal of this Agreement by providing written notice thereof to the other party not less than ninety (90) days prior to the expiration of the Commitment Period or the then-current Renewal Period, as applicable.

3.2.2.    *Material Breach.* In the event that one party hereto breaches a material term of this Agreement, this Agreement may be terminated by the non-breaching party upon thirty (30) days' prior written notice to the breaching party, unless the breaching party cures such breach within the 30-day notice period. If such material breach is incapable of cure, the

4

non-breaching party may terminate the Agreement immediately upon written notice to the other party.

3.2.3.   *Non-Payment.* If Client fails to pay any Fees or other amounts pursuant to this Agreement when due, this Agreement may be terminated or Services suspended by Service Provider upon forty-five (45) days' prior written notice to Client, unless Client pays such outstanding amounts within the 45-day notice period.

3.2.4.   *Sustained Force Majeure Event.* This Agreement may be terminated in accordance with Section 10.2.3.

3.2.5.   *Automatically.* This Agreement will terminate automatically and without further notice by either party in the event of the following:

    3.2.5.1.   the Service Provider undergoes a Change of Control without Client's prior written consent, which consent may be granted or withheld in Client's sole and absolute discretion;

    3.2.5.2.   Service Provider sells all or substantially all of its assets or is merged or reorganized in circumstances where it is not the surviving entity without Client's prior written consent, which consent may be granted or withheld in Client's sole and absolute discretion;

    3.2.5.3.   a receiver is appointed for either party or its property;

    3.2.5.4.   either party makes an assignment for the benefit of its creditors;

    3.2.5.5.   any proceedings are commenced by, for, or against either party under any bankruptcy, insolvency, or debtor's relief law for the purpose of seeking a reorganization of such party's debts, and such proceeding is not dismissed within sixty (60) calendar days of its commencement; or

    3.2.5.6.   either party is wound up, liquidated or dissolved.

3.2.6.   *Consent.* The parties may elect to terminate this Agreement upon mutual written agreement at any time.

3.3.   Consequences of Termination.   On termination of this Agreement for any reason:

3.3.1.   *Return of Confidential Information.* Service Provider shall immediately return to Client or destroy at Client's discretion all property and materials containing Confidential Information belonging to Client.

3.3.2.   *Cease Provision of Services.* Service Provider shall immediately cease to provide the Services.

3.3.3.   *No Claims.* To the maximum extent permitted by law, the Service Provider shall make no claim against Client for compensation for loss of agency

5

CONFIDENTIAL

DEF_01586055

rights, loss of goodwill or any similar loss (except any earned but unpaid Fees).

3.4.   Vested Rights. Any termination of this Agreement (howsoever occasioned) shall not affect any accrued rights or liabilities of either party, nor shall it affect the coming into force or the continuance in force of any provision of this Agreement that is expressly, or by implication, intended to come into force or continue in force on or after that termination.

3.5.   Termination Rights Absolute.   Each party understands that the rights of termination or expiration hereunder are absolute.  Neither party shall incur any liability whatsoever for any damage, loss or expenses of any kind suffered or incurred by the other arising from or incident to any termination of this Agreement by such party or any expiration hereof which complies with the terms of the Agreement whether or not such party is aware of any such damage, loss or expenses.  In particular, without in any way limiting the foregoing, neither party shall be entitled to any damages on account of prospective profits or anticipated sales arising from the termination or expiry of this Agreement in compliance with the terms set out herein.  To the extent permitted by law, the each party hereby waives the benefit of any law or regulation providing compensation to the other arising from the termination or expiry of, or failure to renew, this Agreement, and the parties hereby represent and warrant that such waiver is irrevocable and enforceable by the other party

4.   **FINANCIAL PROVISIONS**

4.1.   Payment of Fees.

4.1.1.   *Fees.*  The Fees for the licences and services to be provided under this Agreement shall be as provided on Schedule "A", which Schedule "A" may be amended by the parties from time to time during the Term by mutual written agreement.

4.1.2.   *Schedule.*  Unless otherwise agreed, Client shall pay the Fees to the Service Provider monthly during the Term, as invoiced.  Payment of such Fees shall be within thirty (30) days the due date, unless otherwise agreed.

4.1.3.   *Taxes.*  All amounts payable under this Agreement shall be exclusive of taxes, if any, which (if applicable) shall be paid at the rate and in the manner for the time prescribed by law.

4.2.   Records and Adjustments.

4.2.1.   *Record-Keeping.*  For the Term, and for a period of six (6) years from termination or expiry of this Agreement, the Service Provider shall maintain full records of all Fees, costs and expenses associated with and invoiced in respect of this Agreement, and the Service Provider shall keep these records available for examination by Client's authorised representatives at any time on reasonable notice from Client to the Service Provider.

6

DEF_01586056

    4.2.2.  *Adjustments.* If, upon such above-noted examination, Client determines that any Fees, costs or expenses exceeds the amounts properly chargeable to, or recoverable from, Client, the Service Provider shall promptly refund to Client the amount of such over-charges.

5.   **PROVISION OF SERVICES**

  5.1.  Provider Obligations. The Service Provider shall:

    5.1.1.  use its best efforts to perform and provide all Services at all times during the Term and with all reasonable skill and care and in accordance with Best Industry Practice;

    5.1.2.  ensure that any and all Services provided hereunder are at all times in accordance and compliance with the Internal Control System, *mutatis mutandis*, and any updates thereto furnished by Client during the Term;

    5.1.3.  shall provide any information or reports, or attend such meetings or teleconferences, as Client may request from time to time to ensure compliance with this Agreement and with the Internal Control System, *mutatis mutandis*;

    5.1.4.  do all acts and things reasonably required by Client in order to ensure full compliance with the terms of this Agreement, the Control System and Best Industry Practice;

    5.1.5.  keep Client informed of any planned or actual technical or business developments, whether of the Service Provider or of any relevant third party, that may in the reasonable opinion of the Service Provider be likely to affect the provision of the Services; and

    5.1.6.  make its representatives available at the request of Client to attend meetings and/or conference calls with representatives of Client at such times and places as Client shall reasonably specify for the purposes of monitoring and discussing the provision of Services, or any other matter(s) arising out of this Agreement.

  5.2.  Client Assistance. The Client shall provide such documents and do all acts and things reasonably required by the Service Provider in order to ensure full compliance with the terms of this Agreement, the Applicable Laws, the Control System, and Best Industry Practice.

6.   **SOFTWARE DEVELOPMENT**

  6.1.  Software and Intellectual Property.

    6.1.1.  *All Rights Reserved.* The parties hereto agree and acknowledge that all right, title and interest in and to the Licensed IP and the Work Product

7

(including the Software) shall be and shall remain vested in Client exclusively.

6.1.2.   *Residual Rights Assigned or Waived.* To the extent that, by operation of law, Service Provider is deemed to develop, hold or retain any Intellectual Property Rights in and to any Client Confidential Information, Work Product, or the Licensed IP, such rights are hereby irrevocably assigned to Client and, to the extent that any such rights are not assignable (including, without limitation, all Moral Rights or rights analogous thereto), such rights are hereby irrevocably waived by Service Provider in favour of Client, its successors and assigns in perpetuity and exclusively.

6.1.3.   *Service Provider to Ensure Vesting.* The Service Provider shall ensure that all of the foregoing Intellectual Property Rights or rights in the nature of intellectual property rights created by the Service Provider or any employee, agent or subcontractor of the Service Provider in the course of performing the Services or for the purpose of performing the Services shall vest in Client absolutely upon creation.

6.2.   Software Modifications.

6.2.1.   *Testing.* Before issuing any New Version, the Service Provider shall test the same in order to ensure that it performs fully in accordance with its specification and/or the Technical Information, and shall:

6.2.1.1.   inform the Client of successful completion of the testing, and

6.2.1.2.   at the request of the Client, supply the Client with the test results.

6.2.2.   *Installation and Integration.* At the Client's direction and at a time to be agreed between the Client and the Service Provider, the Service Provider shall install, integrate and test any New Version which the Client wishes to implement, and shall, if so required by the Client, assist the Client in testing the same.

6.2.3.   *Acceptance/Rejection.* If the New Version fails to achieve acceptance by the Client, the Service Provider shall co-operate with the Client in decommissioning the New Version and returning the Software to its state prior to the acceptance tests, so that the Client can continue to operate the Software until a time for repeat installation, integration and testing. The Service Provider shall, without additional charge, co-operate fully with the Client in the Client's application of acceptance tests to any New Version under this paragraph. The processes set out above shall be repeated until either such New Version is accepted by the Client or, in the sole opinion of the Client, such New Version cannot achieve acceptance within a reasonable period, in which case,, the Client may reject the New Version.

6.3.   Remedying Faults. The Service Provider must correct any Critical Faults as soon as reasonably possible. The Service Provider must use its best efforts to promptly

8

correct Non Critical Faults upon being notified of them and must, if necessary, issue Improvements to repair the Non Critical Fault and eliminate the adverse effects of such non-conformity.

6.4.    Licensed IP License Grant. Client hereby grants to Service Provider a non-transferrable, limited, revocable, non-exclusive sub-licence to use the Licensed IP solely in furtherance of the provision by Service Provider of the Services hereunder. As between Client and Service Provider, all Intellectual Property Rights in and to the Licensed IP are and shall remain in Client. Nothing in this Agreement, nor any consequence of any activity contemplated hereby, shall give the Service Provider, expressly, by implication, by operation of law or otherwise, any interest in any Intellectual Property Right in the Licensed IP or any goodwill associated therewith, except as may be expressly licensed hereunder. Service Provider hereby acknowledges that it shall acquire no interest in respect thereof and, as between Client and Service Provider, that all such interests and goodwill shall accrue to, and are and shall remain vested in Client at all times.

## 7.    NOTIFICATIONS

7.1.    Notification Events. The Service Provider shall promptly and fully notify Client of:

7.1.1.    any actual, threatened or suspected infringement of any Intellectual Property Rights relevant to the provision of the Services which comes to the Service Provider's attention;

7.1.2.    any claim coming to its attention that the provision of Services hereunder is infringes or is alleged to infringe the rights of any other person;

7.1.3.    any material complaint regarding the Services which is received by the Service Provider;

7.1.4.    any and all laws and regulations that may come to its attention from time to time relating to the provision of the Services; and

7.1.5.    if it becomes aware that any of the arrangements regarding the Services provided under this Agreement are or may be in breach of any Applicable Laws.

7.2.    Assistance. The Service Provider shall co-operate fully with Client in taking all steps required by Client, in its sole discretion, in connection with any infringement or claim referred to above, including, without limitation, legal proceedings in the name of Client or in the joint names of the parties. The Client shall be responsible for the cost of any legal proceedings it requires and is entitled to any damages, account of profits and/or awards of costs recovered. The Service Provider shall use its best endeavours to assist Client in any such proceedings and, for the avoidance of doubt, Client shall retain control over the conduct of such proceedings.

9

DEF_01586059

8.   REPRESENTATIONS AND WARRANTIES

8.1.   Services Representations and Warranties.   The Service Provider represents, warrants and undertakes to Client that the Services and any additional services performed under this Agreement will be performed:

8.1.1.   in accordance with all Applicable Laws;

8.1.2.   in accordance with the Internal Control System, mutatis mutandis;

8.1.3.   with all reasonable skill and care and in accordance with Best Industry Practice and/or in the manner envisaged under the Internal Control System;

8.1.4.   by such number of suitably competent, qualified and experienced staff as is necessary; and

8.1.5.   in such a way as not to cause any interruption to the business processes of Client (other than any agreed and unavoidable interruption which is required in order to perform the Services in a proper and efficient manner).

8.2.   Service Provider Representations and Warranties.   The Service Provider further represents, warrants and undertakes to Client that:

8.2.1.   the Software will conform in all respects to the agreed technical specifications and to Client's development specifications, and shall be free from defects for the duration of the Term;

8.2.2.   the media on which the Software is delivered under this agreement will be free from defects for the duration of the Term;

8.2.3.   the Software and the media on which the Software is delivered are free from viruses and other malicious code;

8.2.4.   all Work Product shall be free and clear of all encumbrances and shall not infringe the rights of any third party or parties, including, without limitation, any Intellectual Property Rights;

8.2.5.   Service Provider has obtained and will maintain for the duration of this Agreement all permissions, licences and consents necessary for the Service provider to perform it obligations under this Agreement;

8.2.6.   the Service Provider shall carry and maintain general liability insurance sufficient to cover its obligations under this Agreement and shall on request from Client provide a certificate confirming the existence of insurance in accordance with this Section;

8.2.7.   the Service Provider has adequate resources to meet its obligations under this Agreement; and

8.2.8.   the Service Provider shall indemnify Client against all costs, claims, liabilities, and expenses arising out of the Service Provider's activities

10

CONFIDENTIAL

DEF_01586060

under this Agreement, or arising from personal injury, or from any infringement of any rights of Client or of any third party by the provision of the Services, or from the Service Provider's failure to comply with the terms of this Agreement.

8.3. <u>Client Representations and Warranties.</u>  The Client represents, warrants and undertakes to the Service Provider that:

8.3.1. Client has adequate resources to meet its obligations under this Agreement; and

8.3.2. Client has all necessary rights to grant the license to the Licensed IP pursuant to Section 0.

8.4. <u>Limitation of Liability.</u>  WITH THE EXCEPTION OF ANY CLAIMS PURSUANT TO SECTION 8.2.5 OR ANY BREACHES OF SECTIONS 6 OR 9, NEITHER PARTY NOR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, VENDORS, SUPPLIERS OR DISTRIBUTORS WILL BE LIABLE UNDER THIS AGREEMENT TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL LOSS OR DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY THEORY OF LIABILITY (WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR ANY OTHER THEORY), EVEN IF SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY THEREOF OR IF SUCH DAMAGES WERE FORESEEABLE

## 9. CONFIDENTIAL INFORMATION

9.1. <u>Non-Disclosure and Restriction on Use.</u>  Recipient shall maintain in strict confidence all Confidential Information of Discloser and shall use Confidential Information only for the specific purpose of enabling the performance of Services hereunder unless specifically authorized in writing by Discloser.

9.2. <u>Existence and Content of Agreement.</u> For the avoidance of doubt, notwithstanding any other term hereof, the existence and content of this Agreement shall be deemed to be Confidential Information of Client.

9.3. <u>No License.</u>  Except as otherwise expressly provided for herein, Recipient acknowledges and agrees all right title and interest (including all Intellectual Property Rights) in and to the Confidential Information of Discloser vests absolutely in Discloser and that no license or transfer of Intellectual Property Rights in or to Discloser's Confidential Information is provided to Recipient hereunder by implication, estoppel or otherwise.

9.4. <u>Irreparable Harm.</u>  The parties hereto agree and acknowledge that misuse or disclosure of the Discloser's Confidential Information by Recipient shall cause irreparable harm to Discloser and Discloser shall be entitled to seek injunctive relief in respect of any misuse or disclosure of its Confidential Information.

9.5. <u>Exceptions.</u>  The restrictions on the use of Confidential Information contained in this Section shall not apply to information that Recipient can clearly establish:

11

DEF_01586061

9.5.1.   was known to Recipient at the time of disclosure;

9.5.2.   was independently developed by Recipient without use of the Discloser's Confidential Information;

9.5.3.   became known to Recipient from another source without confidentiality restriction on subsequent disclosure or use, provided that such disclosure was not in breach of obligations of confidence; or

9.5.4.   was or became part of the public domain through no wrongful act of Recipient.

10.   **FORCE MAJEURE EVENTS**

10.1.   Force Majeure.  Subject to due compliance with Section 10.1, neither party shall be liable to the other for any delay or non-performance of its obligations under this Agreement arising from any cause or causes beyond its reasonable control including, without limitation, any of the following: act of God, governmental act, strikes, lockouts, shortages of labour or raw materials, civil commotion, riot, invasion, war, threat of or preparation for war, act of terrorism, fire, explosion, storm, flood, earthquake, subsidence, epidemic or other natural physical disaster.

10.2.   Requirements.  In the event of either party being so delayed or prevented from performing its obligations such party shall:

10.2.1.   give notice in writing of such delay or prevention to the other party as soon as reasonably possible stating the commencement date and extent of such delay or prevention, the cause thereof and its estimated duration;

10.2.2.   use all reasonable endeavours to mitigate the effects of such delay or prevention upon the performance of its obligations under this Agreement, and

10.2.3.   resume performance of its obligations as soon as reasonably possible after the removal of the cause of the delay or prevention.

10.3.   Ongoing Delays.  In the event that such delay or prevention continues for more than eight weeks, the party whose performance is not delayed or prevented may terminate this Agreement on 30 days' written notice to the other party, in which case the provisions of Section 3.3 shall apply.

11.   **ASSIGNMENTS AND SUBCONTRACTING**

11.1.   Service Provider.  The Service Provider may not assign, sub-license, sub-contract, mortgage or otherwise transfer any of its rights or obligations under this Agreement without Client's prior written consent, which consent may be granted or withheld in Client's sole and absolute discretion.  Service Provider shall be responsible for management and oversight of any approved subcontractors, and shall ensure that such subcontractors are bound by written terms no less restrictive

12

DEF_01586062

than the terms hereof. Notwithstanding any consent granted by Client in respect of such subcontractors, Service Provider shall be and shall remain directly liable for all acts or omissions of such subcontractors at all times. Without limiting the generality of Section 12.5, such subcontractors shall not be entitled to rely upon or enforce this Agreement against Client and it is expressly acknowledged and agreed that they shall not constitute third party beneficiaries to this Agreement.

11.2.   Client. The Client may assign, sub-license, sub-contract, mortgage or otherwise transfer any of its rights or obligations under this Agreement upon written notice to Service Provider.

## 12.   MISCELLANEOUS AND GENERAL

12.1.   Interpretation.

12.1.1.   *Headings.* The headings in this Agreement do not affect its interpretation. Save where the context otherwise requires, references to Sections, sub-clauses, clauses and Schedules are to sections, sub-clauses, clauses and schedules of this Agreement.

12.1.2.   *References.* Unless the context otherwise requires:

12.1.2.1. references to Client and the Service Provider include their permitted successors and assigns;

12.1.2.2. references to statutory or regulatory provisions include those statutory provisions as amended or re-enacted; and

12.1.2.3. references to any gender include all genders and use of the singular includes the plural and vice versa.

12.1.3.   *Precedence.* In the case of conflict or ambiguity between any provision contained in the body of this Agreement and any provision contained in any Schedule, the provision in the body of this Agreement shall take precedence.

12.2.   Waiver. No forbearance or delay by either party in enforcing its respective rights will prejudice or restrict the rights of that party, and no waiver of any such rights or of any breach of any contractual terms will be deemed to be a waiver of any other right or of any later breach.

12.3.   Severability. If any provision of this Agreement is held to be illegal, void, invalid or unenforceable under the laws of any jurisdiction, the legality, validity and enforceability of the remainder of this Agreement in that jurisdiction shall not be affected and the legality, validity and enforceability of the whole of this Agreement shall not be affected in any other jurisdiction.

12.4.   Amendments. Any amendment, waiver or variation of this Agreement shall not be binding on the parties unless set out in writing, expressed to amend this Agreement and signed by or on behalf of each of the parties.

13

DEF_01586063

12.5.   Third Party Beneficiaries.   No term of this Agreement is intended to confer a benefit on or to be enforceable by any person who is not a party to this Agreement.

12.6.   Notices. Any notice required to be given pursuant to this Agreement shall be in writing, and shall be sent to the other party marked for the attention of such person and at such address as provided to the parties from time to time in writing. Notices may be sent by prepaid, recorded delivery or by fax, provided that faxes are confirmed within 72 hours by confirmation of a copy sent by prepaid recorded delivery. Correctly addressed notices sent by prepaid recorded delivery shall be deemed to have been delivered 72 hours after posting and correctly directed faxes shall be deemed to have been received instantaneously on transmission, provided that they are confirmed in accordance with this Section. The provisions of this Section shall not apply to day-to-day communications between the parties in respect of the performance of the Service Provider's obligations hereunder.

12.7.   Entire Agreement.  This Agreement, together with any documents referred to in it, constitutes the whole Agreement between the parties relating to its subject matter and supersedes any prior drafts, agreements, undertakings, representations, warranties and arrangements of any nature, whether in writing or oral, relating to such subject matter. The parties have read this Agreement and agree to be bound by its terms, and further agree that it constitutes the complete and entire agreement of the parties relating to its subject matter and supersedes all previous communications, oral or written, between them relating to the subject matter hereof. No representations or statements of any kind made by either party that are not expressly stated herein shall be binding on such party

12.8.   Set-Off.  If any sums are due to Client from the Service Provider, Client shall be entitled to exercise the right to set-off such sums against any sums due to the Service Provider in relation to this Agreement.

12.9.   Governing Law and Jurisdiction.   This Agreement shall be governed by and construed in accordance with the laws of the Jurisdiction for purposes of any action commenced under this Agreement or with respect to any tort committed or alleged to be committed in the performance of this Agreement.  No choice of law rules of any jurisdiction shall apply hereto.

12.10.   Execution in Counterparts.   This Agreement may be executed in two or more counterparts (by original or facsimile signature), each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement.

14

By execution, signor certifies that signor is duly authorized to execute this Agreement on behalf of **CLIENT**:

Signature

Name: ARLENE LAKE

Title: DIRECTOR

Date: Nov 13 2015

By execution, signor certifies that signor is duly authorized to execute this Agreement on behalf of **SERVICE PROVIDER**:

Signature

Name: CRAIG WRIGHT

Title: CEO

Date: 29 Jun 15

15

CONFIDENTIAL

DEF_01586065

## SCHEDULE "A"

## FEES

In consideration of all services performed by Service Provider pursuant to the Agreement, Service Provider shall be paid a standing monthly retainer of two hundred thousand Australian Dollars ($200,000), which shall be payable in advance on or before the first day of each calendar month during the Term.

Service provider shall remit the invoice for the upcoming calendar month not later than the fifteenth day of the preceding month.

16

CONFIDENTIAL

DEF_01586066

## SCHEDULE "B"

## KEY POLICIES

1. Information Security Policy

2. Network Security Policy

3. Disaster Recovery and Business Continuity Policy

4. Records Retention Policy

5. Facilities Security Policy

17

CONFIDENTIAL

DEF_01586067

## SCHEDULE "C"

## SERVICES

The Services shall include:

* Assistance with the development of technical and functional specifications for ongoing development of software ("Software") by Service Provider at the direction of Client.

* Development and enhancement of the Software in accordance with Client's technical specifications;

* The provision by the Service Provider of all necessary advice and assistance to the Client for the purpose of developing written protocols and procedures to be used to maximize the capabilities of the Software and to ensure full compliance with the processes, tasks and obligations described in the Control System and in accordance with Best Industry Practice.

* The proper installation and execution by the Service Provider of the Software upon the specified equipment so as to ensure that the set-up does not in any way compromise the Software meeting its specifications or conflict with any of the descriptions, procedures or specifications described, outlined or specified in the Control System;

* Identification, assessment, contract negotiation and management of all vendors, subcontractors, and service providers necessary or ancillary to the provision of the Services at the direction of the Client as appropriate.

* The provision by the Service Provider of ongoing maintenance of the Software in order to ensure full compliance with the Control System and Best Industry Practice.

* Software, equipment and general network and technical support services, as agreed from time to time during the Term.

* The timely provision of all requested technical information, including updates to support improvements and new versions of the Software.

* Working with the Client to identify any additional tasks that might be facilitated through future modifications to the Software or the provision of additional services.

* The provision of such support services as the Client may require from time to time including, without limitation:

  o continuing development and supplementation of the Client's operating policies, procedures and protocols to reflect the Client's interaction with the Software and any improvements made thereto, as well as any changes to the Control System or Best Industry Practice;

18

CONFIDENTIAL

DEF_01586068

      ◦   the supply of temporary personnel support pending replacement and training following the termination of any key employees.

* As reasonably requested by Client from time to time during the Term, the provision of operational or technical support services to Client or to one or more of Client's subsidiaries or service providers, which may include, without limitation, accounting, legal, compliance, or human resource support (e.g. advice and assistance in recruiting, hiring and remote training of applicable personnel, and/or development and supplementation of the Client's operating policies, procedures and protocols).

19

CONFIDENTIAL

DEF_01586069

P-337

Case No. 9:18-CV-89176-BB

**From**:        Matthews, Stefan [stefan.matthews@demorgan.com.au]
**Sent**:        4/18/2016 5:47:07 AM
**To**:          nCrypt Ramona [ramona@ncrypt.com]; David Jensen [david.jensen@mawsons-huts.org.au]; Allan Granger
                 [allan.granger@demorgan.com.au]
**CC**:          nCrypt Carla [carla@ncrypt.com]
**Subject**:     Minutes of Board Meeting 31 March 2016
**Attachments**: Minutes of Board Meeting 31 March 2016.pdf; Fully executed extension letter to allocation side letter_31 March
                 2016.pdf; Minutes of Board Meeting 15 April 2015.pdf

DEF_01605108

MINUTES OF BOARD MEETING

| Venue | Meeting Room, Suite 5.02, 32 Delhi Road, North Ryde  NSW |
|---|---|
| Date and Time | Thursday 31st March  2016 – 11:30am |
| Present | Stefan Matthews<br>Allan Granger<br>David Jensen<br>Ramona Watts (absent)<br><br>Carla Hontiveros-Orbeta (in attendance) |
| Chairperson | Stefan Matthews |
| TABLED AGENDA | Updates from previous meeting;<br>  &bull;  ATO Update<br>  &bull;  Hotwire Administration<br>  &bull;  Company files/ASIC records<br>  &bull;  Company Secretary<br>  &bull;  Finalisation of FY 2015 Accounts<br>  &bull;  Public Officers<br>  &bull;  Payroll Tax<br>  &bull;  PAYG<br>  &bull;  GST<br>  &bull;  Bank Accounts<br><br>New Business;<br>  &bull;  North Ryde Office<br>  &bull;  Staff Redundancies<br>  &bull;  Gordon property<br>  &bull;  Uyen Nguyen<br>  &bull;  Cloudcroft Pty Ltd<br>  &bull;  Documentation related to IP Transaction<br>  &bull;  Convertible Loan<br>  &bull;  Constitution of Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd<br>  &bull;  Allocation of IP transaction sale proceeds |

Agenda and action items from last meeting agreed.

| Welcome | Stefan welcomed everyone and opened the meeting. |
|---|---|
| Previous Minutes | All agreed. |



CONFIDENTIAL

| Business Arising from previous Minutes | **ATO update** |
|---|---|
| | The meeting was advised that Balazs Lazanas & Welch LLP submitted a letter to the ATO dated 30 March 2016 setting out matters relating to Income Tax (Research & Development) and GST disputes and proposing a framework for settlement. |
| | The ATO have acknowledged receipt, however, have get to provide a formal response. |
| | **Hotwire Administration** |
| | It was advised that The Deed Administrator has yet to complete their review of claims from creditors. |
| | **Company files/ASIC records** |
| | It was confirmed that the registered address for all related entities has been changed to the office of Companies by Quorum Services. |
| | It was confirmed that the contact and mailing addresses related to all ATO matters for all entities has been changed to the office of Balazs Lazanas & Welch LLP. |
| | It was confirmed that the business address for all entities has been changed to the Regis serviced office. |
| | **Company Secretary** |
| | It was reported that DeMorgan Ltd required a resident Secretary. It was proposed that David Jensen be appointed Secretary and David accepted. |
| | Relevant documents are to be prepared and filed with ASIC. |
| | **Finalisation of FY 2015 Accounts** |
| | Tax Returns for all entities are being prepared and filed by Elite Business Partners. |
| | At the Board meeting on 25 February 2016 it was noted that the directors were not fully comfortable with a series of transactions which took place in April 2015 transferring assets from the Wright Family Trust to DeMorgan Ltd. |
| | The meeting was made aware of the minutes of the Board meeting on 15 April 2015 (copy attached) wherein it was stated; |
| | *" ... proposed DeMorgan will roll over shares in each of the com[panies and issue shares on market value. Book value / current tax. – All in favour, motion carried".* |



DEF_01605110

Further;

> "Set up a special longer board meeting to specifically
> cover how we set this up with all the capitalisations etc.
> in the new year"

The intended *"special longer board meeting"* did not take place prior to accounting entries being made transferring shareholdings of the Wright Family Trust in various related entities to DeMorgan Ltd.

Copies of minutes have been provided to Baker & McKenzie for advice.

**Public Officers**

It was confirmed that Allan Granger is now Public Officer of DeMorgan Ltd and all related entities.

**Payroll Tax**

It was confirmed that all payroll tax payments have been made, including approx. $500 in interest for late payments. It is unclear at this stage as to whether there will be any additional penalty.

**PAYG**

It was confirmed that the following entities have been de-registered for PAYG;

> Panopticrypt
> Integyrz
> Interconnected
> DeMorgan Holdings

DeMorgan Ltd remain the only employer in the group.

**GST**

It was confirmed that Balazs Lazanas & Welch LLP were consulted and confirmed that we should proceed and deregister all the entities in the group except DeMorgan Ltd for GST.

The meeting was advised that documents required to deregister have been filed with the ATO.

**Bank Accounts**

At the Board meeting on 25 February 2016 it was resolved to

| | |
|---|---|
| | close all bank accounts except for DeMorgan Ltd. Since then the CBA have advised that they are closing all accounts, including DeMorgan Ltd, effective 16 April 2016.<br><br>It was resolved to proceed with opening an account in the name of DeMorgan Ltd with St George Bank and, as a safety, seek to open an offshore. |
| **New Business** | **North Ryde Office**<br>The meeting was advised that the closure of the North Ryde office was proceeding and that the office will be closed by 15 April 2016.<br><br>It was further advised that a Deed of Surrender had been negotiated with the landlord for the sale of office furniture, make good on handover, application of the security deposit and final calculation of rent.<br><br>**Staff Redundancies**<br>It was confirm that Viveca Magnussen and Nicolas Desmond would receive redundancy entitlements as of 05 April 2016.<br><br>**Gordon Property**<br>The meeting was advised that a Deed of Settlement and Release has been agreed with the landlord of the property previously leased by the Wright's and that DeMorgan Ltd will pay the Settlement Amount of $2,254.78 on 11 April 2016.<br><br>The Deed includes a confidentiality undertaking by the landlord and her representatives.<br><br>**Uyen Nguyen**<br>Baker & McKenzie have provided advice in respect to the IP Assignment Deed between nCrypt Holdings Ltd and W&K Info Defense Research LLC that has not been signed by Uyen Nguyen in her capacity as director of W&K Info Defense Research LLC.<br><br>Uyen Nguyen has signed the IP Assignment Deed between herself personally and nCrypt Holdings Ltd although the document is missing a signature from a witness. The risk is associated with Uyen asserting ownership over any IP created by herself personally while she was a contractor of Hotwire and Zhul and, more recently, DeMorgan Ltd. Given that she has undertaken no meaningful research this risk is not material. |



CONFIDENTIAL

**Cloudcroft Pty Ltd**

The meeting was advised that Baker & McKenzie have completed their follow up review of Cloudcroft Pty Ltd in respect to ownership of IP.

Determination of Cloudcroft Pty Ltd IP is complex and the approach taken, to simplify matters, was to identify any 3rd parties who may have a claim on IP ownership.

It was determined that any potential claimants of IP ownership were related entities or parties and therefore the matter has been closed as these are adequately dealt with within the relevant party IP Assignments.

**Documentation related to IP Transaction**

Baker & McKenzie have provided encrypted USB storage containing a copy of all documentation related to all entities involved in the IP transaction.

The meeting was advised that Baker & McKenzie will be holding all originals of executed documents for safe keeping.

**Convertible Loan**

The meeting was advised that Baker & McKenzie have provided draft documents related to funding provided by nCrypt Holdings Ltd to retain legal representation to address disputes with the ATO.

The intent is to finalise these Agreements within the next 60 days.

**Constitution of Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd**

The meeting was advised that Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd does not have a constitution in place and Baker & McKenzie have been instructed to put in place a pro forma constitution for completeness.



DEF_01605113

| | **Allocation of IP transaction sale proceeds**<br>The IP Assignment Deed dated 18 December 2015 and the Letter Agreement of the same date provide for the parties to negotiate and agree to the allocation of Sale Proceeds between themselves by 29 February 2016.<br><br>Pursuant to clause 3.1 of the Letter Agreement the parties can agree to extend the date.<br><br>It was proposed and agreed to extend the allocation of Sale Proceeds to 31 December 2016. Baker & McKenzie will be instructed to prepare the Extension Letter Agreement. |
|---|---|
| **Next Meeting** | No date was set for the next meeting. |

There being no further matters to discuss, the meeting was closed at 13:30.

Signed as a true and correct record of the meeting.

Signature of Chairperson

Date _11 April 2016._

Stefan Matthews

CONFIDENTIAL

DEF_01605114

31st March 2016

**PRIVATE AND CONFIDENTIAL**

The Directors
The entities as described
in the Schedule
C/- DeMorgan Limited
Suite 502, Level 5, 32 Delhi Road
North Ryde NSW 2113

Dear Directors,

**Sale of assets to NCrypt Holdings Ltd - extension of letter agreement to allocate Sale Proceeds**

We refer to:

1.      the IP Assignment Deed entered into by NCrypt Holdings Ltd (**Purchaser**), DeMorgan Limited (**DeMorgan**) and the entities as listed in Schedule 1 (**Additional Entities**) with an Effective Date of 18 December 2015; and

2.      the letter agreement entered into between DeMorgan and the Additional Entities dated 18 December 2015 (**Letter Agreement**) pursuant to which the parties agreed to negotiate in good faith to agree the allocation of the Sale Proceeds between themselves by 29 February 2016.

Pursuant to clause 3.1 of the Letter Agreement DeMorgan and the Additional Entities agree to extend the date by which they are to agree the allocation of Sale Proceeds until 31 December 2016.

All other terms of the Letter Agreement continue in full force and effect.

Unless otherwise stated all words and expressions defined in the Letter Agreement have the same meaning in this letter.

Please confirm your agreement to the terms of this letter by executing a copy of the letter in the space marked below.

**Executed** as a deed.

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____                    _____
Signature of director                                                         Signature of director


Allan Granger                                                               David Jensen
_____                    _____
Name of director                                                           Name of director

CONFIDENTIAL                                                                                         DEF_01605115

**Accepted and agreed by the Additional Entities**:

Signed sealed and delivered
by **DeMorgan Holdings Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Allan Granger
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director (please print)

Signed sealed and delivered by
**Misfit Games Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Craig Steven Wright
_____
Name of director (please print)

_____
Signature of director

Ramona Watts
_____
Name of director

Signed sealed and delivered
by **Panopticrypt Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Craig Steven Wright
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director

2704194-v1\SYDDMS

2

CONFIDENTIAL

DEF_01605116

**Signed sealed and delivered**
by **Coin-Exch Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:


_____          _____
Signature of director                     Signature of director


Allan Granger                             Ramona Watts
_____          _____
Name of director                          Name of director


**Signed sealed and delivered**
by **Integyrz Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:


_____          _____
Signature of director                     Signature of director


Allan Granger                             Ramona Watts
_____          _____


**Signed sealed and delivered**
by **Pholus Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:


_____          _____
Signature of director                     Signature of director


Allan Granger                             Ramona Watts
_____          _____
Name of director                          Name of director

CONFIDENTIAL                                                      DEF_01605117

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

---
Signature of director

Allan Granger
---
Name of director

---
Signature of director

Ramona Watts
---
Name of director

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

---
Signature of director

Allan Granger
---
Name of director

---
Signature of director

Craig Steven Wright
---
Name of director

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

---
Signature of director

Allan Granger
---
Name of director

---
Signature of /director

Ramona Watts
---
Name of director

CONFIDENTIAL

**Signed sealed and delivered**
by **Denariuz Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Interconnected Research Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

CONFIDENTIAL                                                                    DEF_01605119

**Signed sealed and delivered**
by **Zuhl Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Daso Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of secretary/director

Craig Steven Wright
_____
Name of director

Ramona Watts
_____
Name of director

CONFIDENTIAL

## Schedule 1 - the Additional Entities

DeMorgan Holdings Pty. Ltd. (ACN 600 655 427);

Misfit Games Pty. Ltd. (ACN 601 677 105);

Panopticrypt Pty Ltd (ACN 151 567 118);

Coin-Exch Pty. Ltd. (ACN 163 338 467);

Integyrz Pty Ltd (ACN 165 263 007);

Pholus Pty. Ltd. (ACN 165 472 079);

Cloudcroft Pty. Ltd. (ACN 149 732 365);

Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd. (ACN 600 516 149);

C01N Pty Ltd (ACN 152 222 421);

Denariuz Pty. Ltd. (ACN 165 471 983);

Interconnected Research Pty. Ltd. (ACN 165 472 097);

Zuhl Pty. Ltd. (ACN 165 472 006); and

Daso Pty. Ltd.(ACN 600 512 249).

CONFIDENTIAL

DEF_01605121

MINUTES OF BOARD MEETING

| Venue | Meeting Room, Suite 5.02, 32 Delhi Road, North Ryde  NSW |
|---|---|
| Date and Time | Wednesday 15 April 2015 – 11:05am |
| Present | Craig Steven Wright<br>Ramona Watts<br>Allan Granger<br>David Jensen<br>Viveca Magnusson (in attendance) |
| Chairperson | Craig Steven Wright |
| TABLED AGENDA | Call meeting to order<br>Agree on minutes from previous meeting<br>Business Arising from previous minutes<br>Financial Reports<br>New Business<br>R&D<br>Commercialisation<br>Companies<br>General Business |

Agenda and action items from last meeting agreed.

**Welcome**               Craig welcomed everyone and opened the meeting.

**Minutes of**            All agreed.
**previous meeting**



**Business Arising**      ATO came earlier this month with experts from Canberra.  They are
**from previous**         continuing to hold our money despite our efforts in providing with all the
**Minutes**               information they have requested, and so We are now going to court (Federal)
                          but will take time, we will be looking to expedite the case.

                          There is now no funding, staff not being paid after April.  The current
                          situation was explained to the staff and they were told that the last pay
                          would be this week (April 15).  They will continue to work till the end of April
                          and will no longer be expected to come into work.  Some senior members of
                          staff have expressed that they will continue to do work in the interim.

**Financial Reports**     We have some serious accounting errors.  Alan Ellis on 6 month contract so
                          we don't have him here more than once a month and it seems a proper
                          handover never occurred.  Communications with Alan and Faye not
                          happening and there seem to be some crossed wires in regards to procedures

– so have found some serious accounting errors we are in the process of fixing. Eg for intercompany invoicing, ABN's were not recorded in the system, BAS's were not lodged on time. Craig discovered these errors this week and has been directing Faye to fix them.

Allan Granger happy to come in and sit to help work out some of the issues. Viveca to let him know what date Alan Ellis is coming next week and he will come to help sort out what needs to be done to correct everything.

**New Business**     Craig is having conversations with Bodog to see what we can arrange with them for some funding.

Craig is consolidating contracts between companies and accounts so everything is all up to date prior to negotiations with Bodog.

Craig proposed DeMorgan will roll over shares in each of the companies and issue shares on market value.  Book value / current tax. – All in favour, motion carried.

Craig proposed to do BAS grouping as of 1 July 2015. - Alll in favour, motion carried.

**R&D**     On hold.

**Commercialisation**     Still to ACTION – Set up a special longer board meeting to specifically cover how we set this all up with all the capitalisations etc. in the new year.

**Companies**     No update.

**General Business**     No update.

**Next Meeting**     Wednesday 13 May 2015 at 11:00am.

There being no further matters to discuss, the meeting was closed at 11.45am.

Signed as a true and correct record of the meeting.

Signature of Chairperson

Craig Steven Wright                                    Date  15 / 1 / 15

P-457
Case No. 9:18-CV-89176-BB

BAKER & M<sup>c</sup>KENZIE

# EITC Holding Ltd

## IP valuation analysis



OCTOBER 2016

**Draft for discussion only**

STRICTLY PRIVATE AND CONFIDENTIAL

© 2016 Baker & McKenzie LLP. All rights reserved.

CONFIDENTIAL

NGUYEN 000875



**Draft for discussion only**

# Contents

**1 | Executive summary**                                          **3**

    Overview                                                  4

    Key results                                               5

**2 | Valuation analysis**                                         **6**

    Breakeven analysis                                        7

    Market based approach                                     8

    Assessment framework                                      9

    Industry top-down analysis: value per patent             10

    Key observations                                         11

**Appendix 1**                                                     **12**

    Benchmarking analysis                                    13

    Market multiples analysis                                15

    Patent valuation                                         17

    Key sources of data                                      18

© 2016 Baker & McKenzie LLP | 2

NGUYEN_000876



# Executive Summary

CONFIDENTIAL

NGUYEN 000877

Draft for discussion only

# Introduction

## Overview

Baker & McKenzie LLP has been engaged by EITC Holding Ltd ("**EITC**") to help inform its management of the potential value of the blockchain technology currently being developed by the group.

We understand that EITC is seeking to market and potentially sell all, or part of, its portfolio of technology from early 2017 hence the need to understand its potential value.

This presentation summarises:

• the valuation methodologies applied and analysis performed; and

• the initial data points identified to benchmark the potential value of the blockchain IP owned (being developed) by EITC.

## Scope and Limitations

• The analysis performed has relied on information and data provided by EITC and other third parties.  We have not independently audited or otherwise verified information identified or provided to us.

• Our work will not seek to verify the validity of the technical capabilities and applications of the technology being developed by EITC.

• We do not express an opinion or offer any form of assurance regarding the accuracy of the information, financial data or its completeness.

• The analysis performed also focuses on the evaluation of the blockchain technology being developed as a standalone asset.  Specifically the work undertaken does not consider:

 • The structure of the investment and IP holding structures in place in Antigua.

 • Licensing arrangements (as we have not reviewed the group's IP holding structure).

 • Any potential retention or on-going contractual obligations of key employees.



CONFIDENTIAL

Draft for discussion only

# Key results

## Break Even Analysis

### Return on Funding



The base case scenario assumes full recovery of the funding invested by EITC.

In 2016,  total funding amounted to **c.£24.5m**, EITC's expected investment into developing blockchain technology will reach **c.£35m** by 2018.

## Industry Top-Down Analysis

### Patent Valuation

Using broad industry estimates, an implied value-per-patent was calculated. This was then multiplied by the expected number of patents to be filed by EITC.

This approach is considered the ***least robust valuation methodology*** providing estimated values ranging from **£94m to over £2bn.**

The values are based on projected patent filings for 2017.

## Market Based Approach

### Valuation multiples



The Market Based Approach sought to identify valuations for companies operating in the blockchain space or acquisition deals of start-up companies operating in high tech industries with broadly similar commercial potential (such as artificial intelligence ("**AI**"))

From the transactions identified, a number of valuation multiples (e.g. value over funding investment, value per employee) were applied to benchmark and generate a range of valuations.

**Valuation based on 2017 data**

| Comparable Set | Data points | Min (£m) | Interquartile Range* (£m) | Max (£m) |
|---|---|---|---|---|
| Blockchain only | 7 | 31.2 | **118.5 – 353.5** | 1184.7 |
| Other high tech start ups | 8 | 143.7 | **211.0 – 382.8** | 651.2 |
| Combined Set | 15 | 31.2 | **173.5 – 358.2** | 1184.7 |

* valuation based on on EITC projected funding for 2017.

© 2016 Baker & McKenzie LLP | 5

NGUYEN 000879



# Valuation analysis

CONFIDENTIAL

© 2016 Baker & McKenzie LLP | 6

NGUYEN_000880

Draft for discussion only

## Breakeven analysis

- As a first step, the breakeven analysis is determined on the valuation required for EITC to recover its financial investment into developing its portfolio of blockchain technology.

- EITC has currently invested £24m.  It is forecast to invest up to £35m by 2018.

- It follows that EITC would need to achieve a valuation of between **£24m to £35m** to recover its investment.



© 2016 Baker & McKenzie LLP | 7

NGUYEN-000881

Draft for discussion only

# Market based approach

**Valuation of companies in the blockchain space**

- In applying the market valuation approach, work was first undertaken to identify third party valuations of existing blockchain focused technology companies on which a valuation for EITC could be derived from.

- The research undertaken identified 7 third party valuation of blockchain companies.

**Acquisition of other new technology start-up companies**

- To supplement the initial search, further research was undertaken to identify recent acquisitions of other high tech start-up companies. The research focused on areas such as AI, which like blockchain, is considered to be a relatively new area of technology with significant future commercial potential and application.

- The additional research performed identified 8 acquisitions of new technology start-up companies.

**Valuation Multiples**

- Using available information around the transaction identified, various valuation multiples were then computed. In particular, based on the information available, 2 key valuation multiples were considered.

  - Value on total investment

  - Value per employee
  (Data was obtained from Linkedin where no specific number of value of employees was given to provide a range of multiples)

**Results**

- The valuation multiples calculated were then applied to EITC data (e.g. funding invested to date, number of employees) to derive a valuation for EITC.

- The results (**based on 2017 financials**) are summarised below and fully detailed in Appendix 1 to this study.

| Comparable Set | Data points | Minimum | Lower Quartile | Median | Upper Quartile | Maximum |
|---|---|---|---|---|---|---|
| Blockchain only (£m) | 7 | 31.2 | 118.5 | 198.4 | 353.5 | 1184.7 |
| Other high tech start-ups (£m) | 8 | 143.7 | 211.0 | 298.1 | 382.8 | 651.2 |
| Combined set (£m) | 15 | 31.2 | 173.5 | 256.9 | 358.2 | 1184.7 |

- The range above has been calculated based on the set of valuations derived from funding multiples and best case value per employee valuations.



© 2016 Baker & McKenzie LLP | 8

NGUYEN 000882

Draft for discussion only

# Assessment framework

| Key observations | Description | Application to EITC |
|---|---|---|
| Blockchain VS Other tech acquisitions | Higher funding multiples observed in other tech acquisitions compared to blockchain comparables.<br>• 3x – 4x for blockchain companies.<br>• 8x to 13x for other tech start-ups. | • Other tech start-ups operate in more established areas of AI – which has already attracted investors such as Google and Facebook.<br>• Some tech companies are actually revenue generating e.g. Occulus.<br>• In comparison, blockchain technology is in its relatively infancy.<br>• The blockchain company valuations observed relate to companies working to solve very specific applications in the fintech world.<br>• Whilst investors may consider EITC to be comparable to the set of blockchain comparables – EITC operates under a more agnostic model.<br>• Technology being developed by EITC, whilst not focused on specific applications, may form the basis for greater wider reaching solutions. |
| Occulus provides an indication of potential maximum<br>Max funding multiple of 20x. | Occulus develops virtual reality technology:<br>• The company was revenue generating when acquired.<br>• The group operates in a clearly defined market e.g. technology to support the growth in smart phones and other gaming and visual audio applications. | • In contrast to Occulus,  EITC is:<br>• pre-revenue;<br>• nTrust is expected to be a loss maker in the near to medium term;<br>• not  focused on producing fully formed solutions; and<br>• the full potential and application of blockchain tech is still developing. |
| Occulus vs DeepMind | Comparing the acquisition of Occulus and DeepMind:<br>• DeepMind achieved a greater valuation per employee than Occulus.<br>• Occulus is a much  larger business – it is unlikely that all employees are key value drivers. | • DeepMind arguably is the better comparable to EITC, in so far as:<br>• it is pre revenue;<br>• it is developing technology which yet to have specific application but has wide ranging potential; and<br>• Google acquired the business in part for the strength of its research team.<br>• EITC has also assembled a team of highly skilled researchers and engineers and high profile individuals. |
| Economic history | • Underlying investment into IP acquired from the De Morgan group. | • Significant investment was made (not only financial but also man-hours) into the initial development of IP by the De Morgan group.<br>• EITC managed to acquire the IP as a distressed asset.  As such, the initial investment by De Morgan into developing the IP is not fully captured in the overall acquisition price paid and subsequent funding provided by EITC. |

© 2016 Baker & McKenzie LLP | 9

NGUYEN 000883

Draft for discussion only

# Industry top-down analysis: value per patent

From various industry reports, estimates for total market value and the number of blockchain patents developed were taken to derive an implied value per patent.

### World Economic Forum

- According to the World Economic Forum, the development of fintech blockchain technology attracted US $1.4bn (£1.14bn) of investment funding over the past 3 years, with over 2500 patents filed to date.

- This implies an investment per patent of £0.46m.

- Multiplying this £0.46m per patent funding value, by the investment multiples identified in the market based approach provides for an implied value per patent of between **£0.5m to £9.5m**

### Santander Market Report

- Another study by Santander estimates the potential savings in the fintech sector in the range between US$15-20bn (£12.2-16.2bn).

- Dividing this market value by the 2,500 patents noted from the World Economic Forum provides for an implied per patent valuation of between **£4.9m to £6.5m.**

### Implied Valuation

- The valuation per patent derived, were then multiplied by the number of patents to be filed by EITC.

- The number of patents EITC is expected to file are set out in the table in the below:

| 2016 | 2017 | 2018 |
|------|------|------|
| 86 | 206 | 266 |

- This approach is considered the least robust valuation methodology providing estimated values ranging from **£94m to £2bn** (based on 2017 estimated number of patents filed)

### Results

The table below shows the range of estimated values based on EITC filing **206 patents by 2017**.

**Results based on World Economic Forum and Market Multiples**

| Range £m | Blockchain only | Other tech start up | Combined set |
|----------|-----------------|---------------------|--------------|
| Minimum | 93.9 | 557.8 | 93.9 |
| Lower Quartile | 293.1 | 798.2 | 331.0 |
| Average | 364.9 | 1106.6 | 735.7 |
| **Median** | **330.6** | **1,013.2** | **654.5** |
| **Upper Quartile** | **371.6** | **1,282.1** | **976.1** |
| Max | 768.3 | 1,957.3 | 1,957.3 |

**Results based on Santander Market Report**

| Santander Valuation | Implied value of patent portfolio |
|---------------------|-----------------------------------|
| Lower estimate £m | **1,006.1** |
| Upper estimate £m | **1,341.5** |



NGUYEN 000884

**Draft for discussion only**

## Key observations

**Industry Top-Down Analysis**

- This analysis provides only a broad indication of value.

- The results are based on a range of estimates from industry reports on markets that have not yet been commercialised and therefore are still highly uncertain.

- The potential of the market as noted in the industry reports only reflects a best estimate of what they believe a complete hypothetical blockchain solution could provide e.g. the associated cost savings should blockchain reduce transaction processes in the financial services industry.

- EITC is arguably one step away from producing complete solutions.

- As discussed, EITC needs a partner (e.g. Google, Alibaba, Microsoft etc) to take its work to the next level.



# Appendix

CONFIDENTIAL

NGUYEN 000886

# Benchmark analysis

## Market Multiples Approach

| | Company | Area of focus | Relative size of the Company | Year of incorporation | Funding ($m) | Implied valuation | Acquisition ($m) | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Needham Report >$50M Total Funding** | Circle | Payments, Wallet | 51-200 | 2013 | 136 | 480 | | 3.5 | 2.4 | 5.9 | 9.4 |
| | Coinbase | Exchange, Wallet, Payments, Platform | 51-200 | 2012 | 142.5 | 500.5 | | 3.5 | 2.5 | 6.2 | 9.8 |
| | Ripple | Payments, Clearing & Settlement, Private Blockchain, Software, FX, Platform | 51-200 | 2012 | 100 | 410 | | 4.1 | 2.1 | 5.0 | 8.0 |
| | Bitfury | Transaction Processing | 51-200 | 2012 | 90 | | | | | | |
| | Digital Assets Holdings | Clearing and settlement, Software, Private & Public Blockchains | 51-200 | 2014 | 67.2 | | | | | | |
| **Suggested by nCrpyt** | 21.co | Full-stack infrastructure for Bitcoin | 11-50 | 2013 | 121.1 | 362 | | 3.0 | 7.2 | 20.1 | 32.9 |
| | Blockstream | Crypto currencies, open assets and smart contracts | 11-50 | 2014 | 77.3 | 77.28 | | 1.0 | 1.5 | 4.3 | 7.0 |
| | R3 CEV | Crypto, exchange and venture practice | 51-200 | 2014 | | | 200* | | 1.0 | 2.5 | 3.9 |
| **MarketLine ADVANTAGE** | INVeSHARE | Voting technology | 11-50 | 2008 | 16.5 | | 135 | 8.18 | 2.7 | 7.5 | 12.3 |
| | Juzhen Financials | Clearing and settlement solutions | | 2014 | 23 | | | | | | |
| | Align Commerce | Global payments | 11-50 | 2014 | 20.25 | | | | | | |
| **Pre-revenue or early stage high tech potential comparable acquisitions** | Crosswise | Big data and machine learning | 11-50 | 2013 | 5 | | 50 | 10.0 | 1.0 | 2.8 | 4.5 |
| | DeepMind | Artificial Intelligence | 75 | 2010 | 50 | | 400 | 8.0 | 5.3 | 5.3 | 5.3 |
| | Magic Pony Technology | Machine Learning and computer vision techniques for video compression performance | 11-50 | 2014 | N/A | | 150 | | 3.0 | 8.3 | 13.6 |
| | Nervana Systems | Deep Learning | 51-200 | 2014 | 24.4 | | 350 | 14.3 | 1.8 | 4.3 | 6.9 |
| | Oculus | Virtual reality | 501-1000 | 2012 | 96.0 | | 2000 | 20.8 | 2.0 | 3.0 | 4.0 |
| | Otto | Self-driving technology | 91 | 2016 | N/A | | 680 | | 7.5 | 7.5 | 7.5 |
| | SwiftKey (Touchtype Limited) | Typing technology | 51-200 | 2008 | 21.6 | | 250 | 11.6 | 1.3 | 3.1 | 4.9 |
| | Turi | AI and machine learning | 11-50 | 2013 | 25.3 | | 100-200* | 5.9 | 3.0 | 8.3 | 13.6 |

CONFIDENTIAL

NGUYEN 000887

# Benchmark analysis

## Market Multiples Approach (cont'd)

| Blockchain Focused Only | | | | |
|---|---|---|---|---|
| Range | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
| Minimum | 1.0 | 1.0 | 2.5 | 3.9 |
| Lower Quartile | 3.1 | 1.8 | 4.7 | 7.5 |
| Average | 3.9 | 2.8 | 7.3 | 11.9 |
| Median | 3.5 | 2.4 | 5.9 | 9.4 |
| Upper Quartile | 4.0 | 2.6 | 6.8 | 11.0 |
| Max | 8.2 | 7.2 | 20.1 | 32.9 |
| Data Points | 6.0 | 7.0 | 7.0 | 7.0 |

| Other Tech Start-Ups | | | | |
|---|---|---|---|---|
| Range | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
| Minimum | 5.9 | 1.0 | 2.8 | 4.0 |
| Lower Quartile | 8.5 | 1.6 | 3.1 | 4.8 |
| Average | 11.8 | 3.1 | 5.3 | 7.5 |
| Median | 10.8 | 2.5 | 4.8 | 6.1 |
| Upper Quartile | 13.7 | 3.6 | 7.7 | 9.0 |
| Max | 20.8 | 7.5 | 8.3 | 13.6 |
| Data Points | 6.0 | 8.0 | 8.0 | 8.0 |

| Combined Set | | | | |
|---|---|---|---|---|
| Range | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
| Minimum | 1.0 | 1.0 | 2.5 | 3.9 |
| Lower Quartile | 3.5 | 1.6 | 3.7 | 5.1 |
| Average | 7.8 | 2.9 | 6.3 | 9.6 |
| Median | 7.0 | 2.4 | 5.3 | 7.5 |
| Upper Quartile | 10.4 | 3.0 | 7.5 | 11.0 |
| Max | 20.8 | 7.5 | 20.1 | 32.9 |
| Data Points | 12.0 | 15.0 | 15.0 | 15.0 |

CONFIDENTIAL

NGUYEN 000888

# Benchmark analysis

## Market Multiples Analysis

**Case 2** — Valuation based on blockchain companies only. Using EITC 2016 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 24 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 24.5 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 76.4 | 64.7 | 167.9 | 271.2 |
| Average | 95.2 | 100.0 | 264.4 | 428.9 |
| Median | 86.2 | 86.4 | 212.6 | 338.8 |
| Upper Quartile | 96.9 | 93.6 | 245.6 | 397.6 |
| Max | 200.4 | 260.6 | 722.7 | 1184.7 |

**Case 3** — Valuation based on other tech start-up comparables only. Using EITC 2016 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 24 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 145.5 | 36.0 | 99.8 | 143.7 |
| Lower Quartile | 208.2 | 58.5 | 110.0 | 173.3 |
| Average | 288.6 | 111.6 | 191.7 | 271.7 |
| Median | 264.3 | 90.0 | 173.5 | 219.5 |
| Upper Quartile | 334.4 | 129.0 | 276.6 | 324.5 |
| Max | 510.5 | 269.0 | 299.5 | 490.9 |

**Case 4** — Valuation based on combined set. Using EITC 2016 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 24 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 24.5 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 86.3 | 59.3 | 132.5 | 184.2 |
| Average | 191.9 | 106.2 | 225.6 | 345.1 |
| Median | 170.7 | 86.4 | 192.0 | 269.0 |
| Upper Quartile | 254.6 | 108.0 | 269.3 | 397.6 |
| Max | 510.5 | 269.0 | 722.7 | 1184.7 |

**Case 5** — Valuation based on blockchain companies only. Using EITC 2017 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 31 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 31.2 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 97.5 | 64.7 | 167.9 | 271.2 |
| Average | 121.4 | 100.0 | 264.4 | 428.9 |
| Median | 110.0 | 86.4 | 212.6 | 338.8 |
| Upper Quartile | 123.6 | 93.6 | 245.6 | 397.6 |
| Max | 255.6 | 260.6 | 722.7 | 1184.7 |

**Case 6** — Valuation based on other tech start-up comparables only. Using EITC 2017 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 31 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 185.6 | 36.0 | 99.8 | 143.7 |
| Lower Quartile | 265.6 | 58.5 | 110.0 | 173.3 |
| Average | 368.2 | 111.6 | 191.7 | 271.7 |
| Median | 337.1 | 90.0 | 173.5 | 219.5 |
| Upper Quartile | 426.5 | 129.0 | 276.6 | 324.5 |
| Max | 651.2 | 269.0 | 299.5 | 490.9 |

**Case 7** — Valuation based on combined set. Using EITC 2016 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 31 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 31.2 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 110.1 | 59.3 | 132.5 | 184.2 |
| Average | 244.8 | 106.2 | 225.6 | 345.1 |
| Median | 217.8 | 86.4 | 192.0 | 269.0 |
| Upper Quartile | 324.8 | 108.0 | 269.3 | 397.6 |
| Max | 651.2 | 269.0 | 722.7 | 1184.7 |

CONFIDENTIAL

© 2016 Baker & McKenzie LLP | 15

# Benchmark analysis

## Market Multiples Analysis (cont'd)

**Case 9** — Valuation based on blockchain companies only

Using EITC 2018 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 35 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 35.1 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 109.4 | 64.7 | 167.9 | 271.2 |
| Average | 136.2 | 100.0 | 264.4 | 428.9 |
| Median | 123.4 | 86.4 | 212.6 | 338.8 |
| Upper Quartile | 138.7 | 93.6 | 245.6 | 397.6 |
| Max | 286.8 | 260.6 | 722.7 | 1184.7 |

**Case 10** — Valuation based on other tech start-up comparables only

Using EITC 2018 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 35 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 208.2 | 36.0 | 99.8 | 143.7 |
| Lower Quartile | 298.0 | 58.5 | 110.0 | 173.3 |
| Average | 413.1 | 111.6 | 191.7 | 271.7 |
| Median | 378.2 | 90.0 | 173.5 | 219.5 |
| Upper Quartile | 478.6 | 129.0 | 276.6 | 324.5 |
| Max | 730.7 | 269.0 | 299.5 | 490.9 |

**Case 11** — Valuation based on combined set

Using EITC 2018 Metrics

| EITC Metrics | Funding | Employees |
|---|---|---|
| | 35 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 35.1 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 123.6 | 59.3 | 132.5 | 184.2 |
| Average | 274.6 | 106.2 | 225.6 | 345.1 |
| Median | 244.3 | 86.4 | 192.0 | 269.0 |
| Upper Quartile | 364.4 | 108.0 | 269.3 | 397.6 |
| Max | 730.7 | 269.0 | 722.7 | 1184.7 |

CONFIDENTIAL

NGUYEN_000890

# Patent value analysis

## V a l u a t i o n   b a s e d   o n   p a t e n t   p o r t f o l i o

| Value per patent (pre acquisition) £m | | | 0.46 |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| Patents filed by EITC | 84 | 206 | 266 |

Implied valuation based on patent portfolio (as of 2016)

| Range £m | Blockchain only | Other tech start up | Combined set |
|---|---|---|---|
| Minimum | 38.3 | 227.4 | 38.3 |
| Lower Quartile | 119.5 | 325.5 | 135.0 |
| Average | 148.8 | 451.2 | 300.0 |
| Median | 134.8 | 413.1 | 266.9 |
| Upper Quartile | 151.5 | 522.8 | 398.0 |
| Max | 313.3 | 798.1 | 798.1 |

Implied valuation based on patent portfolio (as of 2017)

| | Blockchain only | Other tech start up | Combined set |
|---|---|---|---|
| | 93.9 | 557.8 | 93.9 |
| | 293.1 | 798.2 | 331.0 |
| | 364.9 | 1106.6 | 735.7 |
| | 330.6 | 1013.2 | 654.5 |
| | 371.6 | 1282.1 | 976.1 |
| | 768.3 | 1957.3 | 1957.3 |

Implied valuation based on patent portfolio (as of 2018)

| | Blockchain only | Other tech start up | Combined set |
|---|---|---|---|
| | 121.3 | 720.2 | 121.3 |
| | 378.4 | 1030.7 | 427.4 |
| | 471.2 | 1428.9 | 950.0 |
| | 426.9 | 1308.3 | 845.1 |
| | 479.8 | 1655.5 | 1260.4 |
| | 992.1 | 2527.4 | 2527.4 |

## Santander and World Economic Forum data*

**Valuation based on patent portfolio**

| | Lower estimate | Upper estimate |
|---|---|---|
| Potential efficiency gains to financial services from blockchain £m* | 18,428 | 24,570 |

*values were converted to £ using 20-10-2016 fx rate

| Patents filed in the financial sector per World Economic Forum report | 2500 |
|---|---|

| | Lower estimate | Upper estimate |
|---|---|---|
| Implied value per patent in £m | 7.4 | 9.8 |
| | 2016 | 2017 | 2018 |
| Patents filed by EITC | 84 | 206 | 266 |

| Range £m | Implied value of patent portfolio | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| Lower estimate | 619.2 | 1518.4 | 1960.7 |
| Upper estimate | 825.6 | 2024.6 | 2614.2 |

CONFIDENTIAL

NGUYEN_000891

© 2016 Baker & McKenzie LLP | 17