P-310

Case No. 9:18-CV-89176-BB

**BAKER & McKENZIE**

---

# IP Assignment Deed

**Craig Steven Wright**

**Ncrypt Holdings Ltd**

---

Baker & McKenzie
ABN 32 266 778 912
AMP Centre
Level 27
50 Bridge Street
Sydney NSW 2000
Australia
www.bakermckenzie.com

**Table of contents**

| | | |
|---|---|---|
| 1. | Definitions and interpretation | 1 |
| 2. | Assignment | 6 |
| 3. | Moral Rights | 8 |
| 4. | Controlled Entities | 9 |
| 5. | Payment | 10 |
| 6. | GST | 10 |
| 7. | Warranties and indemnity | 11 |
| 8. | Notices | 11 |
| 9. | General provisions | 13 |

**Schedule 1** — 17
IP Schedule - Craig Wright — 17

**Schedule 2** — 20
IP Schedule - Panopticrypt Pty Ltd as trustee for the Wright Family Trust — 20

**Schedule 3** — 21
IP Schedule - Panopticrypt Pty Ltd — 21

IP Assignment Deed

CONFIDENTIAL                                                                                              DEF_01074209

**Title**       **IP Assignment Deed**

**Date**        7 January 2016

**Parties**     **Craig Steven Wright**
                (**Assignor**)

                **Ncrypt Holdings Ltd** (IBC number 16734) a company incorporated and
                registered under the laws of the State of Antigua and Barbuda with its registered
                address c/o Offshore Management & Trust Services Inc, Fitzgerald House, 44
                Church Street, St John's Antigua (**Assignee**)

## Recitals

A       The Assignor, and his Controlled Entities, own various Intellectual Property Rights.

B       In return for payment of the Contract Amount, the Assignor has agreed to assign all
        Intellectual Property Rights to the Assignee, and procure equivalent assignments from his
        Controlled Entities to the Assignee, on the terms and conditions set out in this Deed.

## Operative provisions

### 1.      Definitions and interpretation

#### Definitions

1.1     In this Deed, unless the context requires another meaning:

        **Assigned Rights** has the meaning given in clause 2.1.

        **Assignee Group** means the Assignee and its related bodies corporate (as that term is defined
        in the Corporations Act) from time to time, and also includes Tyche Consulting Ltd (a
        company incorporated and registered in England and Wales, company number 06249705).

        **Assignee and Related Entities** has the meaning given in clause 3.

        **Business** means the business undertaken by the DeMorgan Group or the Assignee Group at
        any point prior to the Effective Date.

        **Business Day** means a day that is not a Saturday, Sunday, a public holiday or bank holiday in
        Sydney.

        **Contract Amount** means AU $250,000.

        **Contract Works** means any and all Works or work output that has been authored or
        otherwise created, generated, made or discovered by the Assignor for, or in connection with,
        the Business (or any part of the subject matter of the Business) or the DeMorgan Group or the
        Assignee Group or otherwise in any way connected with the Assignor's research and
        development activities at any point prior to or on the Effective Date including all Works
        authored, created, generated, made or discovered by the Assignor:

                                                                        IP Assignment Deed
                                                                        **Execution Counterpart**

(a)   in connection with trading under the business name Craig Wright R&D (ABN 97 481 146 384);

(b)   for or at the request of any member of the DeMorgan Group or the Assignee Group; or

(c)   otherwise in the course of his employment by any member of the DeMorgan Group or the Assignee Group, regardless of whether or not specifically requested by any member of the DeMorgan Group or the Assignee Group,

and regardless of whether or not authored using any of the DeMorgan Group or Assignee Group member's resources, or whether or not authored during work hours or at any DeMorgan Group or Assignee Group member's premises; or

(d)   otherwise using the facilities, resources, time or any other opportunity provided by the DeMorgan Group or Assignee Group.

**Contract Works Information** means all information contained in or comprised by the Contract Works and any other Works in which the Assigned Rights subsist, and any other information the benefit of which is to be transferred to the Assignee.

**Control** means any situation where a person (a "Controlling Person") has, or is entitled to acquire, the right or power to secure, whether directly or indirectly, that the affairs of another person (the "Controlled Person") are conducted under the wishes of the Controlling Person.

**Controlled Entity** means:

(a)   any person (including for the avoidance of doubt all entities referred to in clause 1.2(a)(viii)) who the Assignor Controls; and

(b)   any other person (including for the avoidance of doubt all entities referred to in clause 1.2(a)(viii)):

    (i)   under or through which the Assignor beneficially owns any Intellectual Property Rights; or

    (ii)   that otherwise holds assets that include any Intellectual Property Rights on trust, where the Assignor is a beneficiary under that trust.

**Corporations Act** means the Corporations Act 2001 (Cth).

**DeMorgan Group Assigned Rights** has the meaning given in clause 2.4(a).

**DeMorgan Group** means DeMorgan Limited (ACN 601 560 525), and its related bodies corporate (as that term is defined in the Corporations Act) from time to time, and the following entities:

(a)   DeMorgan Holdings Pty. Ltd. (ACN 600 655 427);

(b)   Misfit Games Pty. Ltd. (ACN 601 677 105);

(c)   Panopticrypt Pty Ltd (ACN 151 567 118);

(d)   Coin-Exch Pty. Ltd. (ACN 163 338 467);

(e)   Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) (ACN 164 068 348);

(f)   Integyrz Pty Ltd (ACN 165 263 007);

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

DEF_01074211

(g)     Pholus Pty. Ltd. (ACN 165 472 079);

(h)     Cloudcroft Pty. Ltd. (ACN 149 732 365);

(i)     Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd. (ACN 600 516 149);

(j)     C01N Pty Ltd (ACN 152 222 421);

(k)     Denariuz Pty. Ltd. (ACN 165 471 983);

(l)     Interconnected Research Pty. Ltd. (ACN 165 472 097);

(m)     Zuhl Pty. Ltd. (ACN 165 472 066); and

(n)     Daso Pty. Ltd. (ACN 600 512 249).

**Future Developments** means:

(a)     any improvements or developments to any of the Contract Works or any other Works in which the Assigned Rights subsist; and

(b)     any new Works authored, created, generated, made or discovered by the Assignor in the course of, or otherwise in connection with, the Assignor fulfilling his obligations under clause 2.5, 2.7 and 9.2.

**Effective Date** means 18 December 2015.

**GST Act** means the A New Tax System (Goods and Services Tax) Act 1999 (Cth).

**GST Amount** means the amount calculated by multiplying the monetary consideration payable by the recipient (excluding the amount payable as GST) for the relevant taxable supply by the prevailing GST rate.

**Intellectual Property Rights** means all present and future rights in or to any copyright, database, patent, design, utility model, trade mark (including any rights in get up or trade dress), brand name, service mark, trade name, domain name, business name, eligible layout right, chip topography right, plant breeder's right and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registered, registrable, patentable or not and wherever existing in the world, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights, including all rights in or to the Patent Rights.

**IP Schedule** means the document set out in Schedule 1 (IP Schedule - Craig Wright).

**Known Agreement** means the Employment Contract between Craig Wright and Tyche Consulting Ltd dated 26 October 2015.

**Know-How** means any confidential information, know-how or trade secret described or comprised in or relating to the Contract Works, any other Works in which the Assigned Rights subsist or the Contract Works Information, including all inventions whether or not patentable and including the Patentable Inventions, but excluding:

(a)     any such information or know-how:

        (i)     which is publicly known;

(ii)    which is disclosed to the Assignor after the Effective Date without restriction by a third party and without any breach of confidentiality by the third party; or

(iii)   which is developed independently by the Assignor after the Effective Date without reliance on:

    (A)    any of the Contract Works Information, Contract Works or any other Works in which the Assigned Rights subsist; or

    (B)    any of the other confidential information of the Assignee or any member of the Assignee Group;

provided that such development occurs entirely independently from and outside any relationship of employment (and is not undertaken in whole or in part pursuant to the terms of employment) with any member of the Assignee Group; and

(a)    any confidential information, know-how or trade secret relating to customers of the Business or contracts with such customers.

**Moral Rights** means without limitation any rights subsisting under Part IX of the Copyright Act 1968 (Cth) as amended, including rights contemplated by Articles 6*bis* and 14*ter* of the Berne Convention and any rights under existing or future law in the nature of moral rights, wherever existing in the world.

**Patent Rights** means any patents and patent applications in any jurisdictions, including without limitation, all patent applications and registrations (and any patents that issue from them) and all provisional applications, divisions, renewals, continuations, continuations-in-part, extensions, reissues, re-examinations, substitutions, confirmations, registrations, revalidations and additions of or to them, as well as the right to apply for any of the foregoing, as well as any patent term extension or supplementary protection certificate, or like form of protection, whether on file now or in the future with the appropriate governmental agencies in any jurisdiction.

**Patentable Inventions** has the meaning given in clause 2.4.

**Personnel** means in relation to a person, its employees, directors, officers, agents, advisers and contractors and the Personnel of any such advisers and contractors (if any).

**Procured IP Assignment** has the meaning given in clause 4.1.

**Security Interest** means a right, interest, power or arrangement in relation to any property which provides security for, or protects against default by a person in, the payment or satisfaction of a debt, obligation or liability, including a mortgage, charge, bill of sale, pledge, deposit, lien, encumbrance or hypothecation and a security interest as defined in sections 12(1) and 12(2) of the Personal Property Securities Act 2009 (Cth).

**Third Party Interest** means any Security Interest, licence, option, covenant, notation, restriction, interest under any agreement, interest under any trust, or other right, equity, entitlement or other interest of any nature held by a third party.

**Works** means the product or other result (whether tangible or intangible, and regardless of whether or not reduced to writing or other material form) of any work or other activity, including any know-how, discovery, design, improvement, formula, algorithm, process, technique, computer programs and software (whether comprising object code, source code, procedure language, job control language or any other form of computer code), documents, prototypes, methodologies, business plans, specifications, packaging, marketing materials,

CONFIDENTIAL               DEF_01074213

models, information, ideas and inventions as well as any other literary and artistic works and other items in which Intellectual Property Rights subsist or are capable of subsisting.

**Interpretation**

1.2     In this Deed:

(a)     unless the context requires, a reference to:

(i)     the singular includes the plural and vice versa;

(ii)     a gender includes all genders;

(iii)     a document (including this Deed) is a reference to that document (including any Schedules and Annexures) as amended, consolidated, supplemented, novated or replaced;

(iv)     an agreement includes any undertaking, representation, deed, agreement or legally enforceable arrangement or understanding whether written or not;

(v)     a party means a party to this Deed;

(vi)     an item, recital, clause, schedule or annexure is to an item, recital, clause, schedule or annexure of or to this Deed;

(vii)     a notice means a notice, approval, demand, request, nomination or other communication given by one party to another under or in connection with this Deed;

(viii)     a person (including a party) includes:

(A)     an individual, company, other body corporate, association, partnership, firm, joint venture, trust and government agency;

(B)     the person's successors, permitted assigns, substitutes, executors and administrators; and

(C)     a reference to the representative member of the GST group to which the person belongs to the extent that the representative member has assumed rights, entitlements, benefits, obligations and liabilities which would remain with the person if the person were not a member of a GST group;

(ix)     a law includes any legislation, judgment, rule of common law or equity or rule of any applicable stock exchange, and is a reference to that law as amended, consolidated, supplemented or replaced and includes a reference to any regulation, by-law or other subordinate legislation;

(x)     proceedings includes litigation, arbitration and investigation;

(xi)     a judgment includes an order, injunction, decree, determination or award of any court or tribunal;

(xii)     time is to Sydney time;

(xiii)     day is to a day in Sydney;

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

(xiv)   an outcome being "reasonably likely" is a reference to an outcome which is more likely than merely likely and is not intended to mean something which is less than likely;

(xv)    the words "including" and "includes" mean "including, but not limited to", and "includes, without limitation" respectively; and

(xvi)   a "matter" is a reference to a fact, matter, circumstance or event;

(b)   where a word or phrase is defined, its other grammatical forms have a corresponding meaning;

(c)   headings are for convenience only and do not affect interpretation of this Deed;

(d)   if a payment or other act must (but for this clause) be made or done on a day that is not a Business Day, then it must be made or done on the next Business Day; and

(e)   if a period must be calculated from, after or before a day or the day of an act or event, it must be calculated excluding that day.

1.3   This Deed may not be construed adversely to a party only because that party was responsible for preparing it.

## 2.   Assignment

2.1   In consideration for the payment by the Assignee to the Assignor of the Contract Amount in accordance with clause 5:

(a)   the Assignor hereby assigns to the Assignee absolutely:

(i)   all of the Intellectual Property Rights that he owns as at the Effective Date; and

(ii)   all of the present and future Intellectual Property Rights in and to any Future Developments, but excluding any Intellectual Property Rights in and to Future Developments that are authored, created, generated, made or discovered by the Assignor in the course of his employment by any member of the Assignee Group but only to the extent that ownership of those Intellectual Property Rights otherwise vests in a member of the Assignee Group operating as the Assignor's employer;

free from any Third Party Interest; and

(b)   the Assignor must procure absolute assignments of all Intellectual Property Rights owned by the Controlled Entities to the Assignee in accordance with clause 4,

(with all such Intellectual Property Rights together referred to as the **Assigned Rights**).

2.2   Without limiting the scope of the assignment in clause 2.1, the Assignor acknowledges, agrees, warrants and represents that the Assigned Rights include:

(a)   all Intellectual Property Rights in and to the Contract Works (and the Contract Works Information);

(b)   all Intellectual Property Rights identified in the IP Schedule; and

(c)   all Intellectual Property Rights in Works identified in the IP Schedule,

CONFIDENTIAL                                                      DEF_01074215

but excluding any Intellectual Property Rights in and to Works that were authored, created, generated, made or discovered by the Assignor in the course of his employment by any member of the DeMorgan Group or the Assignee Group but only to the extent that ownership of those Intellectual Property Rights has previously vested in a member of the DeMorgan Group or the Assignee Group operating as the Assignor's employer.

2.3     The assignment the subject of clause 2.1 includes the right to take action and obtain relief (including to be paid all amounts recovered in any action whether as damages, or following an account of profits or on any other basis) in relation to infringements of the Assigned Rights which occurred on or before the Effective Date.

**Patent Rights**

2.4     The Assignor:

(a)     acknowledges that the members of the DeMorgan Group are also assigning all of their Intellectual Property Rights to the Assignee (separately from this Deed) (**DeMorgan Assigned Rights**);

(b)     acknowledges that he may have been the original inventor of some of the Works in which the DeMorgan Assigned Rights subsist that comprise inventions that are or may be patentable; and

(c)     agrees that the Assignee, at its cost, is entitled to apply for patent protection anywhere in the world in respect of:

(i)     any Contract Works and any other Works in which the Assigned Rights subsist that comprise inventions that are or may be patentable; and

(ii)    any Works in which the DeMorgan Assigned Rights subsist that comprise inventions that are or may be patentable,

(together, the **Patentable Inventions**).

2.5     The Assignor must, at the Assignee's cost and expense, cooperate with and do all things reasonably requested by the Assignee in connection with such applications in any jurisdiction including by:

(a)     disclosing all relevant matters to the Assignee in connection with such applications;

(b)     preparing any material or otherwise taking any steps reasonably requested by the Assignee (or its patent agents) to enable such applications to be prepared and filed by the Assignee, including by providing the Assignee (or its patent agents) with a full description of each Patentable Invention accompanied by suitable drawings or sketches and such further explanation as they may require; and

(c)     by signing, confirming and authenticating all forms, declarations and papers reasonably requested by the Assignee (or its patent agents) including all such forms and documents as necessary for the making of the application and any other documentation properly required by any patent office in support of any such application.

2.6     The Assignor acknowledges, agrees, warrants and represents that:

(a)     he believes that he is the true and first inventor of the Patentable Inventions; and

CONFIDENTIAL                                                                                    DEF_01074216

(b)      he is not aware of any lawful ground of objection to the grant of a patent in respect of the Patentable Inventions nor has he done anything whereby the right to apply for a patent has been impugned.

**Know-How**

2.7      The Assignor agrees that:

(a)      the entire benefit and sole use of the Know-How will be enjoyed by the Assignee;

(b)      he must, as soon as reasonably possible following the Effective Date, disclose to the Assignee all Know-How; and

(c)      he must, at the Assignee's cost and expense, cooperate with and do all things reasonably requested by the Assignee in connection with the efficient exploitation of the Know-How and the Assigned Rights under this Deed.

2.8      The Assignor must hold all Know-How on a confidential basis and must not:

(a)      to the extent that the Assignee is permitted by law to prohibit the Assignor from doing so, use any Know-How other than for the purposes of his employment with the Assignee Group; and

(b)      publish or disclose (or permit or assist any person to do so) any particulars of the Know-How (including any Patentable Inventions) to any person,

except as expressly permitted in writing by the Assignee or as expressly permitted by clause 2.9.

2.9      The Assignor may disclose Know-How when required to do so by law or any regulatory authority provided that, if required to disclose as permitted by this clause, the Assignor must:

(a)      notify the Assignee of the requirement as soon as is reasonably possible;

(b)      take all steps necessary, or reasonably requested by the Assignee, to allow the Assignee to challenge or limit the requirement to disclose, using any available channel or in any forum (including a court of law);

(c)      provide the Assignee with all assistance and co-operation reasonably requested by the Assignee to assist it to challenge or limit the requirement to disclose; and

(d)      use his best endeavours to ensure that confidential treatment will be given to the Know-How by any person to whom it is required to be disclosed.

## 3.    Moral Rights

3.1      This clause 3 applies to the Assigned Rights and the DeMorgan Assigned Rights.

3.2      The Assignor unconditionally and irrevocably:

(a)      consents to the Assignee and all members of the Assignee Group and their licensees and successors in title, as well as anyone authorised by any of them to do acts comprised in the copyright (together the **Assignee and Related Entities**) acting, or omitting to act, in the manner specified in subclause (b) below in relation to the Works in which those Assigned Rights and DeMorgan Assigned Rights subsist;

(b)      consents to the Assignee and Related Entities, whether before or after this consent is given:

CONFIDENTIAL          DEF_01074217

      (i)      failing to attribute the Assignor's authorship of the Works referred to in subclause (a) or attributing another person or entity;

      (ii)     making any modification, variation or amendment of any nature whatsoever to any of the Works referred to in subclause (a) whether or not it results in a material distortion, destruction or mutilation of any of those Works or is prejudicial to the honour or reputation of the Assignor; and

(c)      to the extent permitted by law, waives all of the Assignor's Moral Rights in those Works.

3.3      The Assignor understands and acknowledges that Moral Rights include the right to be identified as the author of the work, not to have any other person identified as the author of the work and the right not to have the work subjected to any derogatory treatment.

3.4      The Assignor agrees to execute any further documents necessary to give effect to this clause 3 and, without limiting this, to the extent that the consent or waiver above does not operate as an immediate consent in relation to, or a waiver of, these rights, the Assignor agrees to give a written consent and waiver at any time at the Assignee's request in accordance with this clause.

## 4.    Controlled Entities

4.1      The Assignor must, on the Effective Date, procure from each of the following Controlled Entities:

(a)      Panopticrypt Pty Ltd as trustee for the Wright Family Trust (ABN 72 433 066 448); and

(b)      Panopticrypt Pty Ltd (ACN 151 567 118);

each of the following:

(a)      an assignment to the Assignee of all Intellectual Property Rights owned by that Controlled Entity on the Effective Date (which the Assignor acknowledges will in each case include a non-exhaustive named list of Intellectual Property Rights included in the relevant assignment based on the lists set out in Schedule 2 and Schedule 3 of this Deed) free from any Third Party Interest;

(b)      obligations to provide or procure the cooperation of relevant inventors of Works the subject of the Assigned Rights on a similar basis to clauses 2.4 to 2.6;

(c)      an agreement that the entire benefit and sole use of all know-how, confidential information and trade secrets vests with the Assignee (and related confidentiality protections) on substantially similar terms to clauses 2.7 to 2.9; and

(d)      an agreement to waive, or obtain all necessary consents to, all acts or omissions that would constitute an infringement of Moral Rights in favour of the Assignee and Related Entities,

using the form of assignment (consistent with this Deed) provided for this purpose by the Assignee which the parties acknowledge may, where the relevant Intellectual Property Rights are held on trust by a Controlled Entity, include provisions dealing with the ability and capacity of the Controlled Entity to assign those rights,

(in each case, together referred to as a **Procured IP Assignment**).

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

DEF_01074218

4.2     The Assignor acknowledges that procuring such Procured IP Assignments is an obligation on the Assignor and that the Assignee is not obliged to make any additional payments to the Controlled Entities with respect to such Procured IP Assignments, unless separately agreed to between the Assignee and the Controlled Entities.

4.3     The Assignor warrants and represents that, between 29 June 2015 and the Effective Date, neither he, nor any Controlled Entity, has assigned any Intellectual Property Rights to any person other than pursuant to a Known Agreement.

4.4     The parties agree that if, at any time following the Effective Date, the Assignee requests in writing that the Assignor procure an equivalent Procured IP Assignment from any other Controlled Entity that has been identified, the Assignor will procure that Procured IP Assignment on the same basis set out in clauses 4.1 to 4.3 provided that in each case:

    (a)     only Intellectual Property Rights that subsisted and were owned by the relevant Controlled Entity as at the Effective Date will be covered by the relevant Procured IP Assignment; and

    (b)     the Assignor warrants and represents that the relevant Controlled Entity has not assigned any Intellectual Property Rights to any person between the Effective Date of this Deed and the date that the relevant Procured IP Assignment is executed.

4.5     Without limiting the obligation in clause 4.4, the Assignor acknowledges and agrees that if and when Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangements) (ACN 164 068 348) becomes a Controlled Entity of the Assignor, the Assignor will comply with clause 4.4 with respect to that company.

## 5.     Payment

5.1     On the Effective Date, the Assignee must pay to the Assignor the Contract Amount.

5.2     The parties acknowledge and agree that:

    (a)     the Contract Amount includes an amount that is intended to be paid to Panopticrypt Pty Ltd as trustee for the Wright Family Trust in return for entry into its Procured IP Assignment; and

    (b)     the Assignee will not be obliged to see to or be liable for the ultimate distribution of that amount by the Assignor.

## 6.     GST

6.1     Terms defined in the GST Act have the same meaning when used in this clause, or in the definition of "GST Amount" unless expressly stated otherwise.

6.2     Unless expressly stated otherwise, any sum payable or amount used in the calculation of a sum payable under this Deed (including the Contract Amount) has been determined without regard to GST and must be increased, on account of any GST payable under this clause.

6.3     If any GST is payable on any taxable supply made under this Deed to the recipient by the supplier ("Supplier"), the recipient must pay the GST Amount to the Supplier on the earlier of:

    (a)     the time of making payment of any monetary consideration on which the GST is calculated; and

    (b)     the issue of an invoice relating to the taxable supply.

CONFIDENTIAL                                                          DEF_01074219

6.4     The recipient must pay the GST Amount in the same manner as making payment of any monetary consideration on which the GST is calculated.  The Supplier must provide as a precondition for payment by the recipient of the GST Amount, a tax invoice or a document that the Commissioner will treat as a tax invoice.

6.5     The amount recoverable on account of GST under this clause by the Supplier will include any fines, penalties, interest and other charges incurred as a consequence of late payment or other default by the recipient under this clause.

6.6     If either party is required to pay, reimburse or indemnify the other for the whole or any part of any cost, expense, loss, liability or other amount that the other party has incurred or will incur in connection with this Deed, the amount must be reduced by the amount for which the other party (or representative member if this is not the other party) can claim an input tax credit, partial input tax credit, or other like offset.

## 7.     Warranties and indemnity

7.1     The Assignor warrants and represents that:

(a)     he is entitled to assign the rights he is required to assign under clause 2 and the Controlled Entities are entitled to assign the rights the Assignor is required to procure that they assign under clause 4;

(b)     the rights he is required to assign or procure the assignment of under clause 2 and 4 are assigned to the Assignee free from any Third Party Interest;

(c)     the Works in which the Assigned Rights subsist and the use of those Works does not, and will not at any time infringe any Intellectual Property Right, Moral Right or any right of confidence of any person; and

(d)     the Know-How, the Contract Works Information and the Works in which the rights he is required to assign under clause 2 and the rights that he is required to procure that the Controlled Entities assign under clause 4 subsist, have not previously been disclosed to, and are not known to any person other than the DeMorgan Group or the Assignee Group and the DeMorgan Group's Personnel and Assignee Group's Personnel.

7.2     If any person makes any claim alleging that any of the Assigned Rights, Know-How, Contract Works Information or Works in which the Assigned Rights subsist, or any use of them, infringes any Intellectual Property Right, Moral Right or any right of confidence of any person in any country, the Assignor must indemnify the Assignee and other Assignee Group members and their Personnel (**Indemnified Persons**) against all costs, claims, losses, damages, demands and expenses (including all reasonable legal costs, fees and expenses) arising directly or indirectly out of the claim.

7.3     To the extent that the indemnity under clause 7.2 is in favour of Indemnified Persons other than the Assignee, the Assignee contracts as trustee of the rights under clause 7.2.

## 8.     Notices

**Requirements**

8.1     All notices must be:

CONFIDENTIAL                                                                  DEF_01074220

(a)     in legible writing and in English;

(b)     addressed to the recipient at the address or email address set out below or to such
        other address or email address as that party may notify in writing to the other parties
        (provided that, when a copy is sent in hard copy to an address a soft copy must also be
        sent via email):

**to the Assignor:**

Address:

Email:                          craig.wright@demorgan.com.au

**to the Assignee:**

Address:                        c/o Offshore Management & Trust Services Inc,
                                Fitzgerald House, 44 Church Street, St John's
                                Antigua

Attention:                      Robert MacGregor

Email:                          Robert.MacGregor@tyche.co.uk

(c)     signed by the party, or where the sender is a company by an authorised officer of that
        company or under the common seal of that company; and

(d)     sent to the recipient by hand, prepaid post (airmail if to or from a place outside
        Australia) or email; and

(e)     if sent by email, in a form which:

        (i)     identifies the sender;

        (ii)    is electronically signed by the sender or an authorised officer of the sender;
                and

        (iii)   clearly indicates the subject matter of the notice in the subject heading of the
                email,

        provided that the recipient has not provided written notice to the other parties confirming that
        it does not wish to receive notices by email.

8.2     The parties consent to the method of signature contained in clause 8.1(e) and agree that it
        satisfies the requirements of applicable law for signature on service of notice by email.

### Receipt

8.3     Without limiting any other means by which a party may be able to prove that a notice has
        been received by another party, a notice will be deemed to be duly received:

        (a)     if sent by hand, when left at the address of the recipient;

        (b)     if sent by pre-paid post, three days (if posted within Australia to an address in
                Australia) or seven days (if posted from one country to another) after the date of
                posting; and

(c)     if sent by email, when the sender receives an automated message confirming delivery or four hours after the email is sent (as recorded on the device from which the sender sent the email), unless the sender receives an automated message that the email has not been delivered, whichever occurs first,

but if a notice is served by hand, or is received by the recipient's facsimile or via email on a day which is not a Business Day, or after 5:00 pm (recipient's local time) on a Business Day, the notice is deemed to be duly received by the recipient at 9:00 am (recipient's local time) on the first Business Day after that day.

## 9.    General provisions

### Entire agreement

9.1    This Deed and any other documents referred to in this Deed or executed in connection with this Deed is the entire agreement of the parties about the subject matter of this Deed and supersedes all other representations, negotiations, arrangements, understandings or agreements and all other communications.

### Further assurances

9.2    Each party must, at its own expense, whenever reasonably requested by the other party, promptly do or arrange for others to do, everything reasonably necessary or desirable to give full effect to this Deed and the transactions contemplated by this Deed.

### Costs

9.3    Each party must pay its own costs in respect of this Deed and the documents and transactions contemplated by this Deed, except that the Assignee must pay all stamp duty chargeable on this Deed, and any other documents contemplated by this Deed.

### No merger

9.4    The warranties, other representations and promises by the parties in this Deed are continuing and will not merge or be extinguished on completion of this Deed.

### Assignment

9.5    Subject to clause 9.6, a party must not assign or otherwise transfer, create any charge, trust or other interest in, or otherwise deal in any other way with any of its rights under this Deed without the prior written consent of the other party.

9.6    For the avoidance of doubt, the Assignee may deal with the Assigned Rights and the Works in which the Assigned Rights subsist without restriction or reference to the Assignor.

### Indemnities

9.7    The indemnities in this Deed are:

(a)     continuing obligations of the parties, separate and independent from their other obligations and survive the termination of this Deed; and

(b)     absolute and unconditional and unaffected by anything that might have the effect of prejudicing, releasing, discharging or affecting in any other way the liability of the party giving the indemnity.

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

9.8     It is not necessary for a party to incur expense or make payment before enforcing a right of indemnity under this Deed.

**Moratorium legislation**

9.9     To the extent permitted by law, a provision of a law is excluded if it does or may, directly or indirectly:

(a)     lessen or vary in any other way a party's obligations under this Deed; or

(b)     delay, curtail or prevent or adversely affect in any other way the exercise by a party of any of its rights, remedies or powers under this Deed.

**Invalid or unenforceable provisions**

9.10    If a provision of this Deed is invalid or unenforceable in a jurisdiction:

(a)     it is to be read down or severed in that jurisdiction to the extent of the invalidity or unenforceability; and

(b)     that fact does not affect the validity or enforceability of that provision in another jurisdiction or the remaining provisions.

**Waiver and exercise of rights**

9.11    A provision of or of a right under this Deed may not be waived or varied except in writing signed by the person to be bound.

**Amendment**

9.12    This Deed may be amended only by a document signed by all parties.

**Counterparts**

9.13    This Deed may be signed in counterparts and all counterparts taken together constitute one document.

**Rights cumulative**

9.14    The rights, remedies and powers of the parties under this Deed are cumulative and do not exclude any other rights, remedies or powers.

**Consents and approvals**

9.15    A party may give its approval or consent conditionally or unconditionally or withhold its approval or consent in its absolute discretion unless this Deed expressly provides otherwise.

**Successors and assigns**

9.16    This Deed is binding on, and has effect for the benefit of, the parties and their respective successors and permitted assigns.

**Governing law**

9.17    This Deed is governed by the laws of New South Wales.

**Jurisdiction**

9.18    Each party irrevocably and unconditionally:

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

    (a)      submits to the non-exclusive jurisdiction of the courts of New South Wales; and

    (b)      waives, without limitation, any claim or objection based on absence of jurisdiction or inconvenient forum.

**Service of process**

9.19    Each party agrees that a document required to be served in proceedings about this Deed may be served:

    (a)      by being delivered to or left at its address for service of notices under clause 8; or

    (b)      in any other way permitted by law.

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

DEF_01074224

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by **Craig Steven Wright**
in the presence of:

_____
Signature of witness

_____
Name of witness (please print)

_____
Signature of **Craig Steven Wright**

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd**

_____
Signature of director

_____
Signature of director

Stefan Matthews
_____
Name of director

Robert MacGregor
_____
Name of director

16

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

DEF_01074225

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by **Craig Steven Wright**
in the presence of:

_____
Signature of witness

Signature of **Craig Steven Wright**

DAVID HART
_____
Name of witness (please print)

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd**

_____
Signature of director

_____
Signature of director

Stefan Matthews
_____
Name of director

Robert MacGregor
_____
Name of director

16

IP Assignment Deed
**Execution Counterpart**

CONFIDENTIAL

DEF_01074226

## Schedule 1

### IP Schedule - Craig Wright

| Number | Description |
|---|---|
| 1. | The Intellectual Property Rights owned by Craig Wright and licensed to Hotwire Preemptive Intelligence Pty Ltd under the Intellectual Property Licence between CW R&D for DeMorgan and Jamie Wilson and Ramona Watts for Hotwire Preemptive Intelligence Pty Ltd dated 22 August 2013 in:<br>- Risk algoriths and C/C++/C#/R code;<br>- Training systems patent (in progress and covered under the AusIndustry Notice of Registration for the R&D Tax Incentive including IR1300282); and<br>- All trade marks associated with Integyrz and associated marks. |
| 2. | All Intellectual Property Rights owned by Craig Wright in and to the following Works or any Works created in connection with them, including any Works created by Craig Wright using or building on the following Works (to the extent such rights were not assigned to the Wright Family Trust under the Deed of Assignment and Charge between Craig Wright and DeMorgan Wright Family Trust dated 15 July 2013) :<br>• Automation Software, being Siemens control mining automation software; MJF iMal (Source Code); MJF T24 updates and guides;<br>• MJF Siemens Control and Operations Suite; and<br>• Microfinance Software developed by Dallah Al-Baraka,<br>(acknowledging that MJF Mining Services WA Pty Ltd and its related entities, Siemens and Al Baraka may also own some Intellectual Property Rights in connection with the above Works); and<br>• WK (1) Software Assurance through Economic Measures and Anti-Fraud System;<br>• BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures;<br>• BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure Resilient Systems and Networks;<br>• BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics;<br>• BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP);<br>• WK (2) - Metered Payments system;<br>• WF (2) - Software Derivative Markets and Information Security Risk Systems; |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

| Number | Description |
|--------|-------------|

- Risk Quantification system (for financial modelling in Bitcoin); and
- software and code used in the creation of a Bitcoin system as developed under a project for the development of a Bitcoin SDK and exchange conducted on behalf of W&K Info Defense Research LLC; and
- software and code used by the US military, Department of Homeland Security and other associated parties as developed under a project conducted on behalf of W&K Info Defense Research LLC,

(acknowledging that W&K Info Defense Research LLC may also own some Intellectual Property Rights in connection with the above Works).

| | |
|--|--|
| 3. | The Intellectual Property Rights owned by Craig Wright in and to Algorithmic Matching System and associated mathematics in relation to commutative ring theory and any other work that Craig Wright performed (including all Intellectual Property Rights in Works created by Craig Wright) in connection with the subject matter of this work. |
| 4. | The Intellectual Property Rights owned by Craig Wright in and to the specifications for chip and board designs and other associated hardware including as used for the purposes of works commissioned by C01n Pty Ltd. |
| 5. | The Works comprised in the body of work described as: A method to securely distribute keys and pins for online wallets. |
| 6. | The Works comprised in the body of work described as: Software signing on the Blockchain. |
| 7. | The Works comprised in the body of work described as: Anti-counterfeit system. |
| 8. | The Works comprised in the body of work described as: Autonomous machine based oracle. |
| 9. | The Works comprised in the body of work described as: A secure blockchain based medial record system. |
| 10. | The Works comprised in the body of work described as: Secure off-block transfers. |
| 11. | The Works comprised in the body of work described as: BOTMAN. |
| 12. | The Works comprised in the body of work described as: Blockchain computing as a basis for equipment health monitoring service. |
| 13. | The Works comprised in the body of work described as: Blockchain based medical insurance verification and processing system. |
| 14. | The Works comprised in the body of work described as: Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process. |

**Execution Counterpart**

CONFIDENTIAL                                                                              DEF_01074228

| Number | Description |
| --- | --- |
| 15. | The Works comprised in the body of work described as: System verification using one or more blockchain automata. |
| 16. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata (DFA) graph compression. |
| 17. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping. |
| 18. | The Works comprised in the body of work described as: Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process. |
| 19. | The Works comprised in the body of work described as: A point recording system and network graph analysis platform based on the Blockchain. |
| 20. | The Works comprised in the body of work described as: Plausible deniability wallet. |
| 21. | The Works comprised in the body of work described as: Intelligent blockchain graph walking. |
| 22. | The Works comprised in the body of work described as: Method and apparatus for traversing a deterministic finite automata (dfa) graph compression to find optimised blockchain exchange paths. |
| 23. | The Works comprised in the body of work described as: Blockchain automata Toilet and Facilities management systems, methods, and techniques. |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

DEF_01074229

## Schedule 2

### IP Schedule - Panopticrypt Pty Ltd as trustee for the Wright Family Trust

| Number | Description |
| --- | --- |
| 1. | All Intellectual Property Rights owned by the Wright Family Trust, that were assigned to the Wright Family Trust under the Deed of Assignment and Charge between Craig Wright and DeMorgan Wright Family Trust dated 15 July 2013, in and to: |

- Automation Software, being Siemens control mining automation software; MJF iMal (Source Code); MJF T24 updates and guides;
- Microfinance Software developed by Dallah Al-Baraka;
- Software Assurance through Economic Measures and Anti-Fraud System;
- BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures;
- BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure Resilient Systems and Networks;
- BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics;
- BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP);
- WK (2) - Metered Payments system;
- WF (2) - Software Derivative Markets and Information Security Risk Systems; and
- Risk Quantification system (for financial modelling in Bitcoin),

but excluding any Intellectual Property Rights assigned to Hotwire Preemptive Intelligence Pty Ltd under the IP Deed of Assignment between The Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd dated 15 September 2013 and excluding any Intellectual Property Rights assigned to Coin-Exch Pty Ltd under the IP Deed of Assignment between The Wright Family Trust DeMorgan and Coin-Exch Pty Ltd dated 15 September 2013.

**Execution Counterpart**

CONFIDENTIAL          DEF_01074230

**Schedule 3**

**IP Schedule - Panopticrypt Pty Ltd**

| Number | Description |
| --- | --- |
| 1. | All Intellectual Property Rights owned by Panopticrypt in connection with its IT security services. |
| 2. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Integyrz to Panopticrypt under the R&D Services Agreement between Integyrz and Panopticrypt including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• BODOG Security Assessment and Testing;<br>• iVote System Security Review; and<br>• Panopticrypt Commercialisation (campaign). |
| 3. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Interconnected Research to Panopticrypt under the R&D Services Agreement between Interconnected Research and Panopticrypt including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• BODOG Security Assessment and Testing;<br>• iVote System Security Review; and<br>• Panopticrypt Commercialisation (campaign). |
| 4. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Pholus under the Consultancy Agreement between Pholus and Panopticrypt. |
| 5. | All Intellectual Property Rights owned by Panopticrypt in Works created by Craig Wright in the course of his employment with Panopticrypt which vest in Panopticrypt as Craig Wright's employer. |
| 6. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and C01N (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and C01N). |
| 7. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Cloudcroft (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Cloudcroft). |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

DEF_01074231

| Number | Description |
| --- | --- |
| 8. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Coin-Exch (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Coin-Exch). |
| 9. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Daso (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Daso). |
| 10. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Integyrz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Integyrz). |
| 11. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Interconnected Research Pty Ltd (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Interconnected Research). |
| 12. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Pholus (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Pholus). |
| 13. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Zuhl (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Zuhl). |
| 14. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Denariuz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Denariuz). |
| 15. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Misfit Games). |
| 16. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

DEF_01074232

| Number | Description |
|---|---|
| | Consultancy Agreement between Panopticrypt and Head Vendor Co). |
| 17. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt Pty Ltd and Chaos. |
| 18. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt Pty Ltd and Head Vendor Co. |
| 19. | All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:<br><br>**PROJECT TITLE: Risk Project (as per 2012 review): The Quantification of Information Systems Risk**<br><br>**Project description**:<br><br>*To act rationally requires that we forecast the future with inadequate information using the past as a guide. This has led information security practitioners to engage in qualitatively derived flawed risk practices due to the lack of scientifically valid quantitative risk models. The result is both a misallocation of valuable resources with alternative uses and a corresponding decrease in the levels of protection for many systems. Using a combination of modern scientific approaches and the advanced data mining techniques now available, this research effort aims to create a set of game theoretic quantitative models of risk to information systems within set confidence levels. Using empirical evidence, this research aims to investigate and quantify the root cause of security flaws that act as a source of system compromise. Research into the effects of poor system design, market based risk solutions based on derivative instruments and the impact of common system misconfigurations will be incorporated into multivariate survival models. This research incorporates the economic impact of various decisions as a means of determining the optimal distribution of costs and liability when applied to information security and in particular when assigning costs in computer system security and reliability engineering. For decades, information security practitioners have engaged in qualitatively derived risk practices due to the lack of a scientifically valid quantitative risk model. This has led to a systems failing "not ultimately for technical reasons but because incentives are wrong" Here "security failure is caused at least as often by misaligned incentives as by technical design mistakes". This misallocation of valuable resources with alternative uses and the corresponding decrease in the levels of protection for many systems not only makes systems less secure in the present, but limits future expenditure on security controls. Using a combination of modern scientific approaches and the advanced data mining techniques, this research effort is aimed at creating a game theoretic quantitative model for information systems risk that incorporates both contract theory and the methods developed within Behavioural Economics. The objective of this research is to produce an innovative modelling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are:* |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL                                                            DEF_01074233

| Number | Description |
|--------|-------------|
|  | *(1) To address the critical limitations that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions include:* |
|  | *a. constant and homogenous failure rates,* |
|  | *b. binary failure and univariate reliability,* |
|  | *c. censoring of failure data, and* |
|  | *d. independent failures.* |
|  | *(2) To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering.* |
|  | *(3) To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls.* |
|  | *To do this, it is necessary to recognise that information security is a risk function [2]. Paying for too much security can be more damaging in economic terms than not buying enough. This leads to decisions about where the optimal expenditure on damage prevention should lie. This research will investigate who should be responsible for the security failures that are affecting the economy and society and how can this be maximized in order to minimize negative externalities.* |

20.    All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Risk tests**:

**Project description:**

*This activity is to research and test the following two hypotheses:*

*- Hypothesis 1:  Criminal groups adjust the territory size to the density of the critical resources (such as access to systems, bandwidth or data) such that the resulting territory contains sufficient benefits to offset the costs of obtaining and maintaining the component systems.*

*- Hypothesis 2:  Variation in territory size occurs because more competitors are attracted to networks that are rich in resources, and such areas are, therefore, costlier to defend per unit host. Kaspersky (Press, 2009b) and iDefense (Danchev, 2010) support this thesis.*

*Both hypotheses are fundamentally raising a very simple but complex question: Can software security be modeled and predicted?*

*The answer to this question will require a complex and comprehensive research activity associated with data gathering.*

*Sophisticated risk algorithms and honeypot systems operating on a large number of computer hosts (640) in selected locations*

**Execution Counterpart**

CONFIDENTIAL                                                                                                  DEF_01074234

| Number | Description |
| --- | --- |

*with objective to test and gathering of data associated with the hypotheses including:*

1. *The length of time for an attached to break into each system;*
2. *Optimization, continuous tuning and "training" of the algorithms allowing accurate prediction and detection of risks;*
3. *Optimization using historical data; and*
4. *Intelligent redirection of attackers to honeypot sites imitating real sites.*

*The undertaking for the income year 2013/14 has been to gather historical and iterative data used for the optimization and tuning of risk algorithms. This activity has been proven to be larger and much more complex than anticipated.*

*This exercise used Snort IDS, which provided the details of the attacks allowing an analysis of worm (automated) compromises against manual (attacker, script kiddies, etc.). The IDS sat between the Internet connected router and the virtualised hosts. Any outgoing traffic was investigated.*

*In a simple test of a single control, the enabling of this control had a marked effect on the survivability of the system.  This demonstrates that leaving the host running with the firewall enabled provided a good level of protection (without a user on the system).*

*We next altered the experiment to investigate the attacks in classes; in particular, comparing the systems that have been compromised by an automated process (such as worms) against those which have at least some level of interaction.  Tests were developed to determine that the more secure a system is (in this case, patched of known vulnerabilities), the more likely that a compromise is manually initiated.*

***Supporting – Editing and presentation****: This activity is mainly associated with management of the core activity including:*

1. *Manage the execution of the research activities (planning, schedule, reporting);*
2. *Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes.*
3. *To capture all information, results and experiments in written format and to be able to assess the scientific or technological feasibility and developing the hypothesis stated in the core activity*

*This includes project management and collection of report data for analysis.*

21.  All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Registry design and test**:

**Project description:**

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

DEF_01074235

| Number | Description |
|---|---|
| | *This activity is seeking to emulate and model decentralized behaviour using agile system testing methodologies (scenarios, injection etc).* |
| | *A test net system was designed using a cloud based computer.* |
| | *A series of agents where configured using evolutionary coding techniques. The aim is to have a system that is more effective than existing human based ones.* |
| | *From this we seek to create a series of automated bots that can manage an escrow system without (or with only limited) human interaction.* |
| | *This will stop the loss of distributed (such as is used in Bitcoin) private keys (even on the death of the owner) and without centralised authority, and allow for distributed secure transactions.* |
| | *We are using a set of evolutionary coded autonomous "bots" based on a set of Multi-layer Perceptrons that "learn and improve".* |
| | *To create and train Multi-Layer Perceptron neural network we did the following set of steps for each test or experiment subset:* |
| | *1. Create start case Perceptron neural network project;* |
| | *2. Create Multi-Layer perceptron network;* |
| | *3. Create training set;* |
| | *4. Train network; and* |
| | *5. Test trained network.* |
| | *Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptron can solve problems which are not linearly separable.* |
| | *Initial tests have been centred on the neighbourhood effects in diffusion and play when separate but interrelated reputational systems interact.* |
| | *We are testing the hypothesis that:* |
| | *Given q e(0,1), where we suppose there is a cofinite set such that none of its subsets is (1-q)-cohesive that diffusion is possible.* |
| | *In order to do this, we have constructed a set of cofinite nodes that are represented by a series of MLPs. We have started with the assumption that no bot can remain in a choice of action (define a valid registry contract) when t exceeds a set value and a threshold is achieved by a level of of consensus between bots with competing agenda.* |
| | *This differs from the heretical work of Morris (2000) as the network we postulate is countably infinite and adds a level of more delicate technical issues that need to be solved.* |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL                                                                                          DEF_01074236

| Number | Description |
|---|---|
| | *In testing this postulation, we have created a series of components in a network that is not fully connected. We see that diffusion is only possible where the original seed is not set to be fully connected.*<br><br>**Supporting - Editing and presentation**: *This activity is mainly associated with management of the core activity including:*<br><br>*1. Manage the execution of the research activities (planning, schedule, reporting);*<br><br>*2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes.*<br><br>*3. To capture all information, results and experiments in written format and to be able to assess the scientific or technological feasibility and developing the hypothesis stated in the core activity.*<br><br>*This includes project management and collection of report data for analysis.* |
| 22. | The Works comprised in the body of work described as: Smart contract registry. |
| 23. | The Works comprised in the body of work described as: A method and system to provide ECC/ECDH key exchange to three or more parties. |
| 24. | The Works comprised in the body of work described as: Secure video/audio. |
| 25. | The Works comprised in the body of work described as: Remote wipe system. |
| 26. | The Works comprised in the body of work described as: IoT remote control system. |
| 27. | The Works comprised in the body of work described as: A method to use wallet integrated ECC for lightweight Application authentication. |
| 28. | The Works comprised in the body of work described as: Integrated utility accounting, materials management, work management and regulatory reporting software that derives information and stores it into the blockchain. |
| 29. | The Works comprised in the body of work described as: A Method and system for providing Rational Secret Sharing with Repeated Games using the blockchain. |
| 30. | The Works comprised in the body of work described as: A method to encrypt and notorise messages using the bitcoin protocol. |
| 31. | The Works comprised in the body of work described as: Wallet based authentication system. |
| 32. | The Works comprised in the body of work described as: Blockchain based Incremental automata verification. |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

DEF_01074237

| Number | Description |
|---|---|
| 33. | The Works comprised in the body of work described as: Unified, configurable services stack for integration of enterprise applications using a loop stack against the blockchain. |
| 34. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping into bitcoin addresses. |
| 35. | The Works comprised in the body of work described as: Method and apparatus for data encryption/decryption using cellular automata transform. |
| 36. | The Works comprised in the body of work described as: CGA++ cryptographic key. |
| 37. | The Works comprised in the body of work described as: Anti-theft system. |
| 38. | The Works comprised in the body of work described as: A method to create Efficient Wireless Security Protocols using the blockchain. |
| 39. | The Works comprised in the body of work described as: A blockchain wallet system to enable Object Signing and Encryption. |
| 40. | The Works comprised in the body of work described as: A system and methods to ensure High-priority communications sessions within a wireless communications system using ECCDSA based access with a blockchain integrated ledger. |
| 41. | The Works comprised in the body of work described as: Network and system modelling. |
| 42. | The Works comprised in the body of work described as: System and method for credential management and administration using the blockchain. |
| 43. | The Works comprised in the body of work described as: Analog and Perceptron nureal network logic automata (on the blockchain). |
| 44. | The Works comprised in the body of work described as: Asynchronous logic automata. |
| 45. | The Works comprised in the body of work described as: Deterministic encoding of fuzzy finite state automata in continuous recurrent neural networks related to blockchains. |
| 46. | The Works comprised in the body of work described as: A method to securely distribute keys and pins for online wallets (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL                                                                                      DEF_01074238

| Number | Description |
|--------|-------------|
| 47. | The Works comprised in the body of work described as: Software signing on the Blockchain (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 48. | The Works comprised in the body of work described as: Anti-counterfeit system(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 49. | The Works comprised in the body of work described as: Autonomous machine based oracle (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 50. | The Works comprised in the body of work described as: A secure blockchain based medial record system (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 51. | The Works comprised in the body of work described as: Secure off-block transfers (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 52. | The Works comprised in the body of work described as: BOTMAN (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 53. | The Works comprised in the body of work described as: Blockchain computing as a basis for equipment health monitoring service (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 54. | The Works comprised in the body of work described as: Blockchain based medical insurance verification and processing system (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 55. | The Works comprised in the body of work described as: Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 56. | The Works comprised in the body of work described as: System verification using one or more blockchain automata (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 57. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata (DFA) graph compression (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with |

**Execution Counterpart**

CONFIDENTIAL                                                                                        DEF_01074239

| Number | Description |
|--------|-------------|
| | Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 58. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 59. | The Works comprised in the body of work described as: Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 60. | The Works comprised in the body of work described as: A point recording system and network graph analysis platform based on the Blockchain (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 61. | The Works comprised in the body of work described as: Plausible deniability wallet (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 62. | The Works comprised in the body of work described as: Intelligent blockchain graph walking (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 63. | The Works comprised in the body of work described as: Method and apparatus for traversing a deterministic finite automata (dfa) graph compression to find optimised blockchain exchange paths (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 64. | The Works comprised in the body of work described as: Blockchain automata Toilet and Facilities management systems, methods, and techniques (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |

IP Assignment Deed

**Execution Counterpart**

CONFIDENTIAL

DEF_01074240