P-469

Case No. 9:18-CV-89176-BB

**BAKER & McKENZIE**

# IP Assignment Deed

**Ncrypt Holdings Ltd**

**DeMorgan Limited**

**DeMorgan Holdings PTY. Ltd.**

**Misfit Games Pty. Ltd.**

**Panopticrypt Pty Ltd**

**Coin-Exch Pty. Ltd.**

**Integyrz Pty Ltd**

**Pholus Pty. Ltd.**

**Cloudcroft Pty. Ltd.**

**Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd.**

**C01N Pty Ltd**

**Denariuz Pty. Ltd.**

**Interconnected Research Pty. Ltd.**

**Zuhl Pty. Ltd.**

**Daso Pty. Ltd.**

Baker & McKenzie
ABN 32 266 778 912
AMP Centre
Level 27
50 Bridge Street
Sydney NSW 2000
Australia
www.bakermckenzie.com

2649672-v4A\SYDDMS

ATTORNEY'S EYES ONLY

## Table of contents

| | | |
|---|---|---|
| 1. | **Definitions and interpretation** | **2** |
| 2. | **Assignment** | **6** |
| 3. | **Moral Rights** | **8** |
| 4. | **Payment** | **8** |
| 5. | **GST** | **9** |
| 6. | **Notices** | **9** |
| 7. | **General provisions** | **12** |

**Schedule 1**     **21**
Head Vendor Co     21

**Schedule 2**     **22**
DeMorgan Holdings     22

**Schedule 3**     **23**
Misfit Games     23

**Schedule 4**     **24**
Panopticrypt     24

**Schedule 5**     **34**
Coin-Exch     34

**Schedule 6**     **50**
Integyrz     50

**Schedule 7**     **57**
Pholus     57

**Schedule 8**     **63**
Cloudcroft     63

**Schedule 9**     **72**
Chaos     72

**Schedule 10**     **73**
C01N     73

**Schedule 11**     **81**
Denariuz     81

**Schedule 12**     **105**
Interconnected Research     105

**Schedule 13**     **112**
Zuhl     112

**Schedule 14**     **117**
Daso     117

ATTORNEY'S EYES ONLY       DEF_00073808

| | |
|---|---|
| **Title** | **IP Assignment Deed** |
| **Date** | 7 January 2016 |
| **Parties** | **Ncrypt Holdings Ltd** (IBC number 16734) a company incorporated and registered under the laws of the State of Antigua and Barbuda with its registered address c/o Offshore Management & Trust Services Inc, Fitzgerald House, 44 Church Street, St John's Antigua (**Purchaser**) |

**DeMorgan Limited** (ABN 26 601 560 525) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Head Vendor Co**)

**DeMorgan Holdings Pty. Ltd.** (ACN 600 655 427) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**DeMorgan Holdings**)

**Misfit Games Pty. Ltd.** (ACN 601 677 105) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Misfit Games**)

**Panopticrypt Pty Ltd** (ACN 151 567 118) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Panopticrypt**)

**Coin-Exch Pty. Ltd.**(ACN 163 338 467) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Coin-Exch**)

**Integyrz Pty Ltd** (ACN 165 263 007) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Integyrz**)

**Pholus Pty. Ltd.** (ACN 165 472 079) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Pholus**)

**Cloudcroft Pty. Ltd.** (ACN 149 732 365)of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Cloudcroft**)

**Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd.** (ACN 600 516 149) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Chaos**)

**C01N Pty Ltd**(ACN 152 222 421) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**C01N**)

**Denariuz Pty. Ltd.** (ACN 165 471 983) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Denariuz**)

**Interconnected Research Pty. Ltd.** (ACN 165 472 097) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Interconnected Research**)

**Zuhl Pty. Ltd.** (ACN 165 472 066) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Zuhl**)

ATTORNEY'S EYES ONLY      DEF_00073809

**Daso Pty. Ltd.** (ACN 600 512 249) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Daso**)

## Recitals

A    The Vendors own various Intellectual Property Rights.

B    In return for payment of the Contract Amount to the Head Vendor Co for allocation between the Vendors, each Vendor has agreed to assign all Intellectual Property Rights that it owns to the Purchaser on the terms and conditions set out in this Deed.

## Operative provisions

### 1.    Definitions and interpretation

**Definitions**

1.1    In this Deed, unless the context requires another meaning:

**Assigned Rights** means, with respect to a Vendor, the Intellectual Property Rights assigned by that Vendor under clause 2.1.

**Business** means the business undertaken by the Vendors or the Purchaser Group at any point prior to the Effective Date.

**Business Day** means a day that is not a Saturday, Sunday, a public holiday or bank holiday in Sydney.

**Contract Amount** means AU $1,500,000.

**Contract Works** means, with respect to a Vendor, any and all Works or work output in which any of that Vendor's Assigned Rights subsist.

**Contract Works Information** means, with respect to a Vendor, all information contained in or comprised by the Contract Works and any other information the benefit of which is to be transferred to the Purchaser.

**Corporations Act** means the Corporations Act 2001 (Cth).

**Effective Date** means 18 December 2015.

**GST Act** means A New Tax System (Goods and Services Tax) Act 1999 (Cth).

**GST Amount** means the amount calculated by multiplying the monetary consideration payable by the recipient (excluding the amount payable as GST) for the relevant taxable supply by the prevailing GST rate.

**Intellectual Property Rights** means all present and future rights in or to any copyright, database, patent, design, utility model, trade mark (including any rights in get up or trade dress), brand name, service mark, trade name, domain name, business name, eligible layout right, chip topography right, plant breeder's right and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registered, registrable, patentable or not and wherever existing in the

ATTORNEY'S EYES ONLY                                                          DEF_00073810

world, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights, including all rights in or to the Patent Rights.

**IP Schedule** means:

(a)     where Head Vendor Co is the Vendor, Schedule 1;

(b)     where DeMorgan Holdings is the Vendor, Schedule 2;

(c)     where Misfit Games is the Vendor, Schedule 3;

(d)     where Panopticrypt is the Vendor, Schedule 4;

(e)     where Coin-Exch is the Vendor, Schedule 5;

(f)     where Integyrz is the Vendor, Schedule 6;

(g)     where Pholus is the Vendor, Schedule 7;

(h)     where Cloudcroft is the Vendor, Schedule 8;

(i)     where Chaos is the Vendor, Schedule 9;

(j)     where C01N is the Vendor, Schedule 10;

(k)     where Denariuz is the Vendor, Schedule 11;

(l)     where Interconnected Research is the Vendor, Schedule 12;

(m)     where Zuhl is the Vendor, Schedule 13; and

(n)     where Daso is the Vendor, Schedule 14.

**Know-How** means, with respect to a Vendor, any confidential information, know-how or trade secret described or comprised in or relating to the Contract Works or Contract Works Information, including all inventions whether or not patentable and including the Patentable Inventions, but excluding:

(a)     any such information or know-how:

  (i)     which is publicly known;

  (ii)     which is disclosed to the Vendor after the Effective Date without restriction by a third party and without any breach of confidentiality by the third party; or

  (iii)     which is developed independently by the Vendor after the Effective Date without reliance on:

    (A)     any of the Contract Works Information or Contract Works; or

    (B)     any of the other confidential information of the Purchaser Group;

  provided that such development occurs entirely independently from and outside any contractual arrangement with any member of the Purchaser Group; and

(b)     any confidential information, know-how or trade secret relating to customers of the Business or contracts with such customers.

ATTORNEY'S EYES ONLY             DEF_00073811

**Moral Rights** means without limitation any rights subsisting under Part IX of the Copyright Act 1968 (Cth) as amended, including rights contemplated by Articles 6*bis* and 14*ter* of the Berne Convention and any rights under existing or future law in the nature of moral rights, wherever existing in the world.

**Patent Rights** means any patents and patent applications in any jurisdictions, including without limitation, all patent applications and registrations (and any patents that issue from them) and all provisional applications, divisions, renewals, continuations, continuations-in-part, extensions, reissues, re-examinations, substitutions, confirmations, registrations, revalidations and additions of or to them, as well as the right to apply for any of the foregoing, as well as any patent term extension or supplementary protection certificate, or like form of protection, whether on file now or in the future with the appropriate governmental agencies in any jurisdiction.

**Patentable Inventions** has the meaning given in clause 2.3.

**Personnel** means in relation to a person, its employees, directors, officers, agents, advisers and contractors and the Personnel of any such advisers and contractors (if any).

**Purchaser Group** means the Purchaser and its related bodies corporate (as that term is defined in the Corporations Act) from time to time, and also includes Tyche Consulting Ltd (a company incorporated and registered in England and Wales, company number 06249705).

**Security Interest** means a right, interest, power or arrangement in relation to any property which provides security for, or protects against default by a person in, the payment or satisfaction of a debt, obligation or liability, including a mortgage, charge, bill of sale, pledge, deposit, lien, encumbrance or hypothecation and a security interest as defined in sections 12(1) and 12(2) of the Personal Property Securities Act 2009 (Cth).

**Third Party Claim** means, with respect to a Vendor, a claim by any person alleging that any of the Vendor's Assigned Rights, Contract Works or Contract Works Information, or any use of them, infringes any Intellectual Property Right, Moral Right or right of confidence of any person in any country.

**Third Party Interest** means any Security Interest, licence, option, covenant, notation, restriction, interest under any agreement, interest under any trust, or other right, equity, entitlement or other interest of any nature held by a third party.

**Vendors** means the following entities:

(a)     Head Vendor Co;

(b)     DeMorgan Holdings;

(c)     Misfit Games;

(d)     Panopticrypt;

(e)     Coin-Exch;

(f)     Integyrz;

(g)     Pholus;

(h)     Cloudcroft;

(i)     Chaos;

ATTORNEY'S EYES ONLY                                                                        DEF_00073812

(j)     C01N;

(k)     Denariuz;

(l)     Interconnected Research;

(m)     Zuhl; and

(n)     Daso,

and **Vendor** means each one of them.

**Vendors' Account** means BSB: 062 173, Account number: 10239751.

**Works** means the product or other result (whether tangible or intangible, and regardless of whether or not reduced to writing or other material form) of any work or other activity, including any know-how, discovery, design, improvement, formula, algorithm, process, technique, computer programs and software (whether comprising object code, source code, procedure language, job control language or any other form of computer code), documents, prototypes, methodologies, business plans, specifications, packaging, marketing materials, models, information, ideas and inventions as well as any other literary and artistic works and other items in which Intellectual Property Rights subsist or are capable of subsisting.

**Interpretation**

1.2     In this Deed:

(a)     unless the context requires, a reference to:

(i)     the singular includes the plural and vice versa;

(ii)     a gender includes all genders;

(iii)     a document (including this Deed) is a reference to that document (including any Schedules and Annexures) as amended, consolidated, supplemented, novated or replaced;

(iv)     an agreement includes any undertaking, representation, deed, agreement or legally enforceable arrangement or understanding whether written or not;

(v)     a party means a party to this Deed;

(vi)     an item, recital, clause, schedule or annexure is to an item, recital, clause, schedule or annexure of or to this Deed;

(vii)     a notice means a notice, approval, demand, request, nomination or other communication given by one party to another under or in connection with this Deed;

(viii)     a person (including a party) includes:

(A)     an individual, company, other body corporate, association, partnership, firm, joint venture, trust and government agency;

(B)     the person's successors, permitted assigns, substitutes, executors and administrators; and

(C)     a reference to the representative member of the GST group to which the person belongs to the extent that the representative member has

ATTORNEY'S EYES ONLY                                                          DEF_00073813

assumed rights, entitlements, benefits, obligations and liabilities which would remain with the person if the person were not a member of a GST group;

(ix)    a law includes any legislation, judgment, rule of common law or equity or rule of any applicable stock exchange, and is a reference to that law as amended, consolidated, supplemented or replaced and includes a reference to any regulation, by-law or other subordinate legislation;

(x)    proceedings includes litigation, arbitration and investigation;

(xi)    a judgment includes an order, injunction, decree, determination or award of any court or tribunal;

(xii)    time is to Sydney time;

(xiii)    day is to a day in Sydney;

(xiv)    an outcome being "reasonably likely" is a reference to an outcome which is more likely than merely likely and is not intended to mean something which is less than likely;

(xv)    the words "including" and "includes" mean "including, but not limited to", and "includes, without limitation" respectively; and

(xvi)    a "matter" is a reference to a fact, matter, circumstance or event;

(b)    where a word or phrase is defined, its other grammatical forms have a corresponding meaning;

(c)    headings are for convenience only and do not affect interpretation of this Deed;

(d)    if a payment or other act must (but for this clause) be made or done on a day that is not a Business Day, then it must be made or done on the next Business Day; and

(e)    if a period must be calculated from, after or before a day or the day of an act or event, it must be calculated excluding that day.

1.3    This Deed may not be construed adversely to a party only because that party was responsible for preparing it.

## 2.    Assignment

2.1    In consideration for the payment by the Purchaser to the Vendors of the Contract Amount in accordance with clause 4, each Vendor hereby assigns to the Purchaser absolutely all of the Intellectual Property Rights that it owns as at the Effective Date, free from any Third Party Interest, including any and all such Intellectual Property Rights that it owns in the items and Works identified in its IP Schedule.

2.2    The assignment the subject of clause 2.1 includes the right to take action and obtain relief (including to be paid all amounts recovered in any action whether as damages, or following an account of profits or on any other basis) in relation to infringements of the Assigned Rights which occurred on or before the Effective Date.

ATTORNEY'S EYES ONLY                   DEF_00073814

**Patent Rights**

2.3    Each Vendor agrees that the Purchaser, at its cost, is entitled to apply for patent protection anywhere in the world in respect of any Contract Works that comprise inventions that are or may be patentable (**Patentable Inventions**).

2.4    Each Vendor must (and must take all reasonable steps to procure that any employee who is an inventor of any Patentable Invention will), at the Purchaser's cost and expense, cooperate with and do all things reasonably requested by the Purchaser in connection with such applications in any jurisdiction including by:

   (a)    disclosing all relevant matters to the Purchaser in connection with such applications;

   (b)    preparing any material or otherwise taking any steps reasonably requested by the Purchaser (or its patent agents) to enable such applications to be prepared and filed by the Purchaser, including by providing the Purchaser (or its patent agents) with a full description of each Patentable Invention accompanied by suitable drawings or sketches and such further explanation as they may require; and

   (c)    by signing, confirming and authenticating all forms, declarations and papers reasonably requested by the Purchaser (or its patent agents) including all such forms and documents as necessary for the making of the application and any other documentation properly required by any patent office in support of any such application.

**Know-How**

2.5    Each Vendor agrees that:

   (a)    the entire benefit and sole use of the Know-How will be enjoyed by the Purchaser;

   (b)    it must, as soon as reasonably possible following the Effective Date, disclose to the Purchaser all Know-How; and

   (c)    it must (and must take all reasonable steps to ensure that any employee who is an inventor of any Patentable Invention will), at the Purchaser's cost and expense, cooperate with and do all things reasonably requested by the Purchaser in connection with the efficient exploitation of the Know-How and the Assigned Rights under this Deed.

2.6    Each Vendor must hold all Know-How on a confidential basis and must not:

   (a)    to the extent that the Purchaser is permitted by law to prohibit the Vendor from doing so, use any Know-How other than for the purposes of performing any contract it is party to with a member of the Purchaser Group; and

   (b)    publish or disclose (or permit or assist any person to do so) any particulars of the Know-How (including any Patentable Inventions) to any person,

except as expressly permitted in writing by the Purchaser or as expressly permitted by clause 2.7.

2.7    Each Vendor may disclose Know-How:

   (a)    to its employees whose duties reasonably require such disclosure, on condition that it:

ATTORNEY'S EYES ONLY                                                                      DEF_00073815

    (i)    ensures that each such person to whom such disclosure is made is informed of the confidentiality of the information and the obligations of confidentiality under this Deed; and

    (ii)    ensures that each such person to whom such disclosure is made complies with those obligations as if they were bound by them; and

(b)    when required to do so by law or any regulatory authority provided that, if required to disclose as permitted by this clause, the Vendor must (at the Purchaser's expense):

    (i)    notify the Purchaser of the requirement as soon as is reasonably possible;

    (ii)    take all steps necessary, or reasonably requested by the Purchaser, to allow the Purchaser to challenge or limit the requirement to disclose, using any available channel or in any forum (including a court of law);

    (iii)    provide the Purchaser with all assistance and co-operation reasonably requested by the Purchaser to assist it to challenge or limit the requirement to disclose; and

    (iv)    use its best endeavours to ensure that confidential treatment will be given to the Know-How by any person to whom it is required to be disclosed.

**Other assistance**

2.8    If the Purchaser notifies a Vendor of any Third Party Claim, the Vendor must provide all reasonable assistance requested by the Purchaser to assist the Purchaser to deal with the Third Party Claim (which assistance, for the avoidance of doubt, does not include the payment of money).

## 3.    Moral Rights

3.1    Each Vendor must, and must ensure that all other persons, absolutely and irrevocably:

(a)    consent as permitted by applicable laws to any act or omission that would otherwise infringe their Moral Rights in the Contract Works whether occurring before or after the consent is given; and

(b)    waive as permitted by applicable laws all of their respective Moral Rights in the Contract Works,

for the benefit of the Purchaser and the Purchaser Group and their licensees, successors in title and anyone authorised by any of them to do acts comprised in the copyright.

3.2    If the consent or waiver above does not operate as an immediate consent in relation to or a waiver of these rights, each Vendor agrees to procure a written consent and waiver at any time at the Purchaser's request in accordance with clause 3.1 above.

## 4.    Payment

4.1    On the Effective Date, the Purchaser must pay the Contract Amount to the Vendors.

4.2    All payments required to be made under this Deed must be made by way of direct transfer of immediately available funds to the Vendors' Account or any other method as agreed in writing between the parties.

ATTORNEY'S EYES ONLY        DEF_00073816

4.3     The Vendors agree that receipt of funds in accordance with clause 4.2 will constitute a full discharge of the Purchaser's obligations in respect of the payment of the relevant amounts and the Purchaser will not be obliged to see to or be liable for the ultimate distribution of those funds out of the Vendors' Account.

4.4     The parties acknowledge and agree that:

(a)      the Contract Amount includes an amount that is intended to be paid to Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) (ACN 164 068 348) in return for Intellectual Property Rights that it will be assigning to the Purchaser; and

(b)      the Purchaser will not be obliged to see to or be liable for the ultimate distribution of that amount out of the Vendors' Account.

## 5.     GST

5.1     Terms defined in the GST Act have the same meaning when used in this clause, or in the definition of "GST Amount" unless expressly stated otherwise.

5.2     Unless expressly stated otherwise, any sum payable or amount used in the calculation of a sum payable under this Deed (including the Contract Amount) has been determined without regard to GST and must be increased, on account of any GST payable under this clause.

5.3     If any GST is payable on any taxable supply made under this Deed to the recipient by the supplier ("Supplier") the recipient must pay the GST Amount to the Supplier on the earlier of:

(a)      the time of making payment of any monetary consideration on which the GST is calculated; and

(b)      the issue of an invoice relating to the taxable supply.

5.4     The recipient must pay the GST Amount in the same manner as making payment of any monetary consideration on which the GST is calculated.  The Supplier must provide as a precondition for payment by the recipient of the GST Amount, a tax invoice or a document that the Commissioner will treat as a tax invoice.

5.5     The amount recoverable on account of GST under this clause by the Supplier will include any fines, penalties, interest and other charges incurred as a consequence of late payment or other default by the recipient under this clause.

5.6     If a party is required to pay, reimburse or indemnify the other for the whole or any part of any cost, expense, loss, liability or other amount that another party has incurred or will incur in connection with this Deed, the amount must be reduced by the amount for which the other party (or representative member if this is not the other party) can claim an input tax credit, partial input tax credit, or other like offset.

## 6.     Notices

**Requirements**

6.1     All notices must be:

(a)      in legible writing and in English;

ATTORNEY'S EYES ONLY                                                                              DEF_00073817

(b)     addressed to the recipient at the address set out below or to such other address as that party may notify in writing to the other parties:

**to the Purchaser:**

Address:                          Offshore Management & Trust Services Inc,
                                  Fitzgerald House, 44 Church Street, St John's
                                  Antigua

Attention:                        The Directors

**to Head Vendor Co:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW
                                  2113

Attention:                        The Directors

**to DeMorgan Holdings:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW
                                  2113

Attention:                        The Directors

**to Misfit Games:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW
                                  2113

Attention:                        The Directors

**to Panopticrypt:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW
                                  2113

Attention:                        The Directors

**to Coin-Exch:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW
                                  2113

Attention:                        The Directors

ATTORNEY'S EYES ONLY                                                           DEF_00073818

**to Integyrz:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors


**to Pholus:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors


**to Cloudcroft:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors


**to Chaos:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors


**to C01N:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors


**to Denariuz:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors


**to Interconnected Research:**

Address:                          502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                        The Directors

ATTORNEY'S EYES ONLY                                                    DEF_00073819

**to Zuhl:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

**to Daso:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

(c)     signed by the party, or where the sender is a company by an authorised officer of that company or under the common seal of that company;

(d)     sent to the recipient by hand, prepaid post (airmail if to or from a place outside Australia).

**Receipt**

6.2     Without limiting any other means by which a party may be able to prove that a notice has been received by another party, a notice will be deemed to be duly received:

(a)     if sent by hand, when left at the address of the recipient; or

(b)     if sent by pre-paid post, three days (if posted within Australia to an address in Australia) or seven days (if posted from one country to another) after the date of posting,

but if a notice is served by hand, or is received by the recipient's facsimile or via email on a day which is not a Business Day, or after 5:00 pm (recipient's local time) on a Business Day, the notice is deemed to be duly received by the recipient at 9:00 am (recipient's local time) on the first Business Day after that day.

## 7.    General provisions

**Joint and several liability**

7.1     A warranty, representation, covenant, or obligation given or entered into by a party that comprises more than one person binds them jointly and each of them severally.

**Entire agreement**

7.2     This Deed and any other documents referred to in this Deed or executed in connection with this Deed is the entire agreement of the parties about the subject matter of this Deed and supersedes all other representations, negotiations, arrangements, understandings or agreements and all other communications.

ATTORNEY'S EYES ONLY        DEF_00073820

**Further assurances**

7.3    Each party must, at its own expense, whenever reasonably requested by another party, promptly do or arrange for others to do, everything reasonably necessary or desirable to give full effect to this Deed and the transactions contemplated by this Deed.

**Costs**

7.4    Each party must pay its own costs in respect of this Deed and the documents and transactions contemplated by this Deed, except that Purchaser must pay all stamp duty chargeable on this Deed, and any other documents contemplated by this Deed.

**No merger**

7.5    The warranties, other representations and promises by the parties in this Deed are continuing and will not merge or be extinguished on completion of this Deed.

**Assignment**

7.6    Subject to clause 7.7, a party must not assign or otherwise transfer, create any charge, trust or other interest in, or otherwise deal in any other way with any of its rights under this Deed without the prior written consent of the other parties.

7.7    For the avoidance of doubt, the Purchaser may deal with the Assigned Rights and the Contract Works without restriction or reference to the Vendors.

**Moratorium legislation**

7.8    To the extent permitted by law, a provision of a law is excluded if it does or may, directly or indirectly:

(a)    lessen or vary in any other way a party's obligations under this Deed; or

(b)    delay, curtail or prevent or adversely affect in any other way the exercise by a party of any of its rights, remedies or powers under this Deed.

**Invalid or unenforceable provisions**

7.9    If a provision of this Deed is invalid or unenforceable in a jurisdiction:

(a)    it is to be read down or severed in that jurisdiction to the extent of the invalidity or unenforceability; and

(b)    that fact does not affect the validity or enforceability of that provision in another jurisdiction or the remaining provisions.

**Waiver and exercise of rights**

7.10    A provision of or of a right under this Deed may not be waived or varied except in writing signed by the person to be bound.

**Amendment**

7.11    This Deed may be amended only by a document signed by all parties.

**Counterparts**

7.12    This Deed may be signed in counterparts and all counterparts taken together constitute one document.

ATTORNEY'S EYES ONLY                                                                     DEF_00073821

**Rights cumulative**

7.13   The rights, remedies and powers of the parties under this Deed are cumulative and do not exclude any other rights, remedies or powers.

**Consents and approvals**

7.14   A party may give its approval or consent conditionally or unconditionally or withhold its approval or consent in its absolute discretion unless this Deed expressly provides otherwise.

**Successors and assigns**

7.15   This Deed is binding on, and has effect for the benefit of, the parties and their respective successors and permitted assigns.

**Governing law**

7.16   This Deed is governed by the laws of New South Wales.

**Jurisdiction**

7.17   Each party irrevocably and unconditionally:

(a)   submits to the non-exclusive jurisdiction of the courts of New South Wales; and

(b)   waives, without limitation, any claim or objection based on absence of jurisdiction or inconvenient forum.

**Service of process**

7.18   Each party agrees that a document required to be served in proceedings about this Deed may be served:

(a)   by being delivered to or left at its address for service of notices under clause 6; or

(b)   in any other way permitted by law.

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                    DEF_00073822

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd**
:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |
| | |
| Stefan Matthews | Robert MacGregor |
| Name of director | Name of director |

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
_Corporations Act 2001_ by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |
| | |
| Allan Granger | David Jensen |
| Name of director | Name of director |

**Signed sealed and delivered**
by **DeMorgan Holdings Pty Ltd.**
in accordance with section 127 of the
_Corporations Act 2001_ by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |
| | |
| Allan Granger | Ramona Watts |
| Name of director | Name of director (please print) |

ATTORNEY'S EYES ONLY

DEF 00073823

**Signed sealed and delivered** by
**Misfit Games Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Craig Steven Wright
_____
Name of director (please print)

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Panopticrypt Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Craig Steven Wright
_____
Name of director

Ramona Watts
_____
Name of director

ATTORNEY'S EYES ONLY

DEF_00073824

**Signed sealed and delivered**
by **Coin-Exch Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Integyrz Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____

Ramona Watts
_____

**Signed sealed and delivered**
by **Pholus Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

2649672-v4A\SYDDMS                                   17                              IP Assignment Deed
                                                                                 **Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073825

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |

| | |
|---|---|
| Allan Granger | Ramona Watts |
| Name of director | Name of director |

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |

| | |
|---|---|
| Allan Granger | Craig Steven Wright |
| Name of director | Name of director |

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of /director |

| | |
|---|---|
| Allan Granger | Ramona Watts |
| Name of director | Name of director |

ATTORNEY'S EYES ONLY

DEF_00073826

**Signed sealed and delivered**
by **Denariuz Pty Ltd.**

in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                       Signature of director

Allan Granger                               Ramona Watts
_____          _____
Name of director                            Name of director

**Signed sealed and delivered**
by **Interconnected Research Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                       Signature of director

Allan Granger                               Ramona Watts
_____          _____
Name of director                            Name of director

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073827

**Signed sealed and delivered**
by **Zuhl Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                              Signature of director

Allan Granger                                          Ramona Watts
_____          _____
Name of director                                     Name of director

**Signed sealed and delivered**
by **Daso Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                              Signature of secretary/director

Craig Steven Wright                                 Ramona Watts
_____          _____
Name of director                                     Name of director

ATTORNEY'S EYES ONLY

DEF_00073828

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd**
:

_____
Signature of director

Stefan Matthews
_____
Name of director

_____
Signature of director

Robert MacGregor
_____
Name of director

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Allan Granger
_____
Name of director

_____
Signature of director

David Jensen
_____
Name of director

**Signed sealed and delivered**
by **DeMorgan Holdings Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Allan Granger
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director (please print)

15

IP Assignment Deed
Execution Counterpart

ATTORNEY'S EYES ONLY

DEF_00073829

**Signed sealed and delivered** by
**Misfit Games Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____      _____
Signature of director                        Signature of director

Craig Steven Wright                  Ramona Watts
_____      _____
Name of director (please print)       Name of director

**Signed sealed and delivered**
by **Panopticrypt Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____      _____
Signature of director                        Signature of director

Craig Steven Wright                  Ramona Watts
_____      _____
Name of director                          Name of director

IP Assignment Deed
Execution Counterpart

ATTORNEY'S EYES ONLY        DEF_00073830

**Signed sealed and delivered**
by **Coin-Exch Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director


**Signed sealed and delivered**
by **Integyrz Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____

Ramona Watts
_____


**Signed sealed and delivered**
by **Pholus Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

2649672-v4A\SYDDMS                    17                    IP Assignment Deed
                                                           Execution Counterpart

ATTORNEY'S EYES ONLY                                      DEF_00073831

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Craig Steven Wright
_____
Name of director

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of /director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

IP Assignment Deed
Execution Counterpart

ATTORNEY'S EYES ONLY

DEF_00073832

**Signed sealed and delivered**
by **Denariuz Pty Ltd.**

in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Interconnected Research Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

ATTORNEY'S EYES ONLY                                                    DEF_00073833

**Signed sealed and delivered**
by **Zuhl Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Allan Granger
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Daso Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Craig Steven Wright
_____
Name of director

_____
Signature of secretary/director

Ramona Watts
_____
Name of director

20

IP Assignment Deed
Execution Counterpart

ATTORNEY'S EYES ONLY

DEF_00073834

## Schedule 1

### Head Vendor Co

| Number | Description |
|---|---|
| 1. | All Works owned by Head Vendor Co including its Personnel on and from 1 July 2015 except to the extent assigned under the Research, Development and Technical Services Agreement with an effective date of 29 June 2015 between Head Vendor Co and DR Technologies Ltd. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY         DEF_00073835

## Schedule 2

**DeMorgan Holdings**

No IP Schedule for DeMorgan Holdings.

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073836

**Schedule 3**

**Misfit Games**

| Number | Description |
|--------|-------------|
| 1. | All Intellectual Property Rights owned by Misfit Games in its gaming technology (both hardware and software) including the "Super Cool Gaming" project and related cooling systems research. |
| 2. | All Intellectual Property Rights owned by Misfit Games in the Core Technology as defined in and created under the IP Deed of Assignment between Denariuz and Misfit Games Pty Ltd dated 30 December 2014 (acknowledging that Denariuz may also own some Intellectual Property Rights in the Core Technology). |
| 3. | All Intellectual Property Rights owned by Misfit Games that were assigned by Pholus to Misfit Games under the Consultancy Agreement between Pholus and Misfit Games s. |
| 4. | All Intellectual Property Rights owned by Misfit Games that were assigned by Panopticrypt to Misfit Games under the Consultancy Agreement between Panopticrypt and Misfit Games. |
| 5. | All Intellectual Property Rights owned by Misfit Games that were assigned by Interconnected Research to Misfit Games under the Consultancy Agreement between Interconnected Research and Misfit Games. |
| 6. | All Intellectual Property Rights owned by Misfit Games that were assigned by Intergyrz to Misfit Games under the Consultancy Agreement between Intergyrz and Misfit Games. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073837

## Schedule 4

### Panopticrypt

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Panopticrypt in connection with its IT security services. |
| 2. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Integyrz to Panopticrypt under the R&D Services Agreement between Integyrz and Panopticrypt including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• BODOG Security Assessment and Testing;<br>• iVote System Security Review; and<br>• Panopticrypt Commercialisation (campaign). |
| 3. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Interconnected Research to Panopticrypt under the R&D Services Agreement between Interconnected Research and Panopticrypt including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• BODOG Security Assessment and Testing;<br>• iVote System Security Review; and<br>• Panopticrypt Commercialisation (campaign). |
| 4. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Pholus under the Consultancy Agreement between Pholus and Panopticrypt. |
| 5. | All Intellectual Property Rights owned by Panopticrypt in Works created by Craig Wright in the course of his employment with Panopticrypt which vest in Panopticrypt as Craig Wright's employer. |
| 6. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and C01N (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and C01N). |
| 7. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Cloudcroft (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Cloudcroft). |

**Execution Counterpart**

ATTORNEY'S EYES ONLY                    DEF_00073838

| Number | Description |
|---|---|
|  8. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Coin-Exch (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Coin-Exch). |
| 9. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Daso (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Daso). |
| 10. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Integyrz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Integyrz). |
| 11. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Interconnected Research Pty Ltd (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Interconnected Research). |
| 12. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Pholus (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Pholus). |
| 13. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Zuhl (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Zuhl). |
| 14. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Denariuz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Denariuz). |
| 15. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Misfit Games). |
| 16. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073839

| Number | Description |
|--------|-------------|
| | Consultancy Agreement between Panopticrypt and Head Vendor Co). |
| 17. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt Pty Ltd and Chaos. |
| 18. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt Pty Ltd and Head Vendor Co. |
| 19. | All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

<u>PROJECT TITLE:</u> **Risk Project (as per 2012 review): The Quantification of Information Systems Risk**

<u>Project description</u>:

*To act rationally requires that we forecast the future with inadequate information using the past as a guide. This has led information security practitioners to engage in qualitatively derived flawed risk practices due to the lack of scientifically valid quantitative risk models. The result is both a misallocation of valuable resources with alternative uses and a corresponding decrease in the levels of protection for many systems. Using a combination of modern scientific approaches and the advanced data mining techniques now available, this research effort aims to create a set of game theoretic quantitative models of risk to information systems within set confidence levels. Using empirical evidence, this research aims to investigate and quantify the root cause of security flaws that act as a source of system compromise. Research into the effects of poor system design, market based risk solutions based on derivative instruments and the impact of common system misconfigurations will be incorporated into multivariate survival models. This research incorporates the economic impact of various decisions as a means of determining the optimal distribution of costs and liability when applied to information security and in particular when assigning costs in computer system security and reliability engineering. For decades, information security practitioners have engaged in qualitatively derived risk practices due to the lack of a scientifically valid quantitative risk model. This has led to a systems failing "not ultimately for technical reasons but because incentives are wrong" Here "security failure is caused at least as often by misaligned incentives as by technical design mistakes". This misallocation of valuable resources with alternative uses and the corresponding decrease in the levels of protection for many systems not only makes systems less secure in the present, but limits future expenditure on security controls. Using a combination of modern scientific approaches and the advanced data mining techniques, this research effort is aimed at creating a game theoretic quantitative model for information systems risk that incorporates both contract theory and the methods developed within Behavioural Economics. The objective of this research is to produce an innovative modelling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are:*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073840

| Number | Description |
|--------|-------------|
| | *(1) To address the critical limitations that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions include:* |
| | *a. constant and homogenous failure rates,* |
| | *b. binary failure and univariate reliability,* |
| | *c. censoring of failure data, and* |
| | *d. independent failures.* |
| | *(2) To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering.* |
| | *(3) To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls.* |
| | *To do this, it is necessary to recognise that information security is a risk function [2]. Paying for too much security can be more damaging in economic terms than not buying enough. This leads to decisions about where the optimal expenditure on damage prevention should lie. This research will investigate who should be responsible for the security failures that are affecting the economy and society and how can this be maximized in order to minimize negative externalities.* |

20.  All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Risk tests**:

**Project description:**

*This activity is to research and test the following two hypotheses:*

*- Hypothesis 1:  Criminal groups adjust the territory size to the density of the critical resources (such as access to systems, bandwidth or data) such that the resulting territory contains sufficient benefits to offset the costs of obtaining and maintaining the component systems.*

*- Hypothesis 2:  Variation in territory size occurs because more competitors are attracted to networks that are rich in resources, and such areas are, therefore, costlier to defend per unit host. Kaspersky (Press, 2009b) and iDefense (Danchev, 2010) support this thesis.*

*Both hypotheses are fundamentally raising a very simple but complex question: Can software security be modeled and predicted?*

*The answer to this question will require a complex and comprehensive research activity associated with data gathering.*

*Sophisticated risk algorithms and honeypot systems operating on a large number of computer hosts (640) in selected locations*

**Execution Counterpart**

ATTORNEY'S EYES ONLY      DEF_00073841

| Number | Description |
|---|---|

*with objective to test and gathering of data associated with the hypotheses including:*

  *1. The length of time for an attached to break into each system;*

  *2. Optimization, continuous tuning and "training" of the algorithms allowing accurate prediction and detection of risks;*

  *3. Optimization using historical data; and*

  *4. Intelligent redirection of attackers to honeypot sites imitating real sites.*

*The undertaking for the income year 2013/14 has been to gather historical and iterative data used for the optimization and tuning of risk algorithms. This activity has been proven to be larger and much more complex than anticipated.*

*This exercise used Snort IDS, which provided the details of the attacks allowing an analysis of worm (automated) compromises against manual (attacker, script kiddies, etc.). The IDS sat between the Internet connected router and the virtualised hosts. Any outgoing traffic was investigated.*

*In a simple test of a single control, the enabling of this control had a marked effect on the survivability of the system. This demonstrates that leaving the host running with the firewall enabled provided a good level of protection (without a user on the system).*

*We next altered the experiment to investigate the attacks in classes; in particular, comparing the systems that have been compromised by an automated process (such as worms) against those which have at least some level of interaction. Tests were developed to determine that the more secure a system is (in this case, patched of known vulnerabilities), the more likely that a compromise is manually initiated.*

***Supporting – Editing and presentation****: This activity is mainly associated with management of the core activity including:*

  *1. Manage the execution of the research activities (planning, schedule, reporting);*

  *2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes.*

  *3. To capture all information, results and experiments in written format and to be able to assess the scientific or technological feasibility and developing the hypothesis stated in the core activity*

*This includes project management and collection of report data for analysis.*

21. All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

    **PROJECT TITLE: Core - Registry design and test**:

    **Project description:**

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073842

| Number | Description |
|---|---|
| | This activity is seeking to emulate and model decentralized behaviour using agile system testing methodologies (scenarios, injection etc). |
| | A test net system was designed using a cloud based computer. |
| | A series of agents where configured using evolutionary coding techniques. The aim is to have a system that is more effective than existing human based ones. |
| | From this we seek to create a series of automated bots that can manage an escrow system without (or with only limited) human interaction. |
| | This will stop the loss of distributed (such as is used in Bitcoin) private keys (even on the death of the owner) and without centralised authority, and allow for distributed secure transactions. |
| | We are using a set of evolutionary coded autonomous "bots" based on a set of Multi-layer Perceptrons that "learn and improve". |
| | To create and train Multi-Layer Perceptron neural network we did the following set of steps for each test or experiment subset: |
| | 1. Create start case Perceptron neural network project; |
| | 2. Create Multi-Layer perceptron network; |
| | 3. Create training set; |
| | 4. Train network; and |
| | 5. Test trained network. |
| | Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptron can solve problems which are not linearly separable. |
| | Initial tests have been centred on the neighbourhood effects in diffusion and play when separate but interrelated reputational systems interact. |
| | We are testing the hypothesis that: |
| | Given q e(0,1), where we suppose there is a cofinite set such that none of its subsets is (1-q)-cohesive that diffusion is possible. |
| | In order to do this, we have constructed a set of cofinite nodes that are represented by a series of MLPs. We have started with the assumption that no bot can remain in a choice of action (define a valid registry contract) when t exceeds a set value and a threshold is achieved by a level of  of consensus between bots with competing agenda. |
| | This differs from the heretical work of Morris (2000) as the network we postulate is countably infinite and adds a level of more delicate technical issues that need to be solved. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073843

| Number | Description |
|---|---|
| | *In testing this postulation, we have created a series of components in a network that is not fully connected. We see that diffusion is only possible where the original seed is not set to be fully connected.* |
| | ***Supporting - Editing and presentation****: This activity is mainly associated with management of the core activity including:* |
| | *1. Manage the execution of the research activities (planning, schedule, reporting);* |
| | *2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes.* |
| | *3. To capture all information, results and experiments in written format and to be able to assess the scientific or technological feasibility and developing the hypothesis stated in the core activity.* |
| | *This includes project management and collection of report data for analysis.* |
| 22. | The Works comprised in the body of work described as: Smart contract registry. |
| 23. | The Works comprised in the body of work described as: A method and system to provide ECC/ECDH key exchange to three or more parties. |
| 24. | The Works comprised in the body of work described as: Secure video/audio. |
| 25. | The Works comprised in the body of work described as: Remote wipe system. |
| 26. | The Works comprised in the body of work described as: IoT remote control system. |
| 27. | The Works comprised in the body of work described as: A method to use wallet integrated ECC for lightweight Application authentication. |
| 28. | The Works comprised in the body of work described as: Integrated utility accounting, materials management, work management and regulatory reporting software that derives information and stores it into the blockchain. |
| 29. | The Works comprised in the body of work described as: A Method and system for providing Rational Secret Sharing with Repeated Games using the blockchain. |
| 30. | The Works comprised in the body of work described as: A method to encrypt and notorise messages using the bitcoin protocol. |
| 31. | The Works comprised in the body of work described as: Wallet based authentication system. |
| 32. | The Works comprised in the body of work described as: Blockchain based Incremental automata verification. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073844

| Number | Description |
|--------|-------------|
| 33. | The Works comprised in the body of work described as: Unified, configurable services stack for integration of enterprise applications using a loop stack against the blockchain. |
| 34. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping into bitcoin addresses. |
| 35. | The Works comprised in the body of work described as: Method and apparatus for data encryption/decryption using cellular automata transform. |
| 36. | The Works comprised in the body of work described as: CGA++ cryptographic key. |
| 37. | The Works comprised in the body of work described as: Anti-theft system. |
| 38. | The Works comprised in the body of work described as: A method to create Efficient Wireless Security Protocols using the blockchain. |
| 39. | The Works comprised in the body of work described as: A blockchain wallet system to enable Object Signing and Encryption. |
| 40. | The Works comprised in the body of work described as: A system and methods to ensure High-priority communications sessions within a wireless communications system using ECCDSA based access with a blockchain integrated ledger. |
| 41. | The Works comprised in the body of work described as: Network and system modelling. |
| 42. | The Works comprised in the body of work described as: System and method for credential management and administration using the blockchain. |
| 43. | The Works comprised in the body of work described as: Analog and Perceptron nureal network logic automata (on the blockchain). |
| 44. | The Works comprised in the body of work described as: Asynchronous logic automata. |
| 45. | The Works comprised in the body of work described as: Deterministic encoding of fuzzy finite state automata in continuous recurrent neural networks related to blockchains. |
| 46. | The Works comprised in the body of work described as: A method to securely distribute keys and pins for online wallets (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073845

| Number | Description |
|--------|-------------|
| 47. | The Works comprised in the body of work described as: Software signing on the Blockchain (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 48. | The Works comprised in the body of work described as: Anti-counterfeit system(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 49. | The Works comprised in the body of work described as: Autonomous machine based oracle (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 50. | The Works comprised in the body of work described as: A secure blockchain based medial record system (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 51. | The Works comprised in the body of work described as: Secure off-block transfers (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 52. | The Works comprised in the body of work described as: BOTMAN (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 53. | The Works comprised in the body of work described as: Blockchain computing as a basis for equipment health monitoring service (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 54. | The Works comprised in the body of work described as: Blockchain based medical insurance verification and processing system (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 55. | The Works comprised in the body of work described as: Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 56. | The Works comprised in the body of work described as: System verification using one or more blockchain automata (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 57. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata (DFA) graph compression (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073846

| Number | Description |
|--------|-------------|
| | Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 58. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 59. | The Works comprised in the body of work described as: Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 60. | The Works comprised in the body of work described as: A point recording system and network graph analysis platform based on the Blockchain (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 61. | The Works comprised in the body of work described as: Plausible deniability wallet (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 62. | The Works comprised in the body of work described as: Intelligent blockchain graph walking (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 63. | The Works comprised in the body of work described as: Method and apparatus for traversing a deterministic finite automata (dfa) graph compression to find optimised blockchain exchange paths (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 64. | The Works comprised in the body of work described as: Blockchain automata Toilet and Facilities management systems, methods, and techniques (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073847

## Schedule 5

### Coin-Exch

| Number | Description |
| --- | --- |
| 1. | All Intellectual Property Rights owned by Coin-Exch in and to the Works known as "Exchange". |
| 2. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research to Coin-Exch under the R&D Services Agreement between Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research and Coin-Exch including all such Intellectual Property Rights created in the course of or in connection with these projects, including in all Works created in the course of or in connection with the project known as "Cornerstone Firewall". |
| 3. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Interconnected Research to Coin-Exch under the R&D Services Agreement between Interconnected Research and Coin-Exch including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- Exchange Server baseline and proof of concept;
- Bitcoin Exchange Escrowed Marketplace; and
- Bitcoin Exchange Escrowed Marketplace (Regulated).

| | |
| --- | --- |
| 4. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Intergyrz to Coin-Exch under the R&D Services Agreement between Intergyrz and Coin-Exch including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- Exchange Server baseline and proof of concept;
- Bitcoin Exchange Escrowed Marketplace; and
- Bitcoin Exchange Escrowed Marketplace (Regulated).

| | |
| --- | --- |
| 5. | All Intellectual Property Rights owned by Coin-Exch that were assigned to Coin-Exch under the IP Deed of Assignment between The Wright Family Trust DeMorgan and Coin-Exch dated 15 September 2013, being: |

- Core Banking and Exchange Software, being: MJF iMal (Source Code); MJF T24 updates and guides;
- Metered Payments system;
- Software Derivative Markets & Information Security Risk Systems; and
- Software Assurance Marketplace (SWAMP),

(acknowledging that Craig Wright, The Wright Family Trust, MJF Mining Services WA Pty Ltd, Siemens, Al Baraka and W&K Info

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073848

| Number | Description |
|--------|-------------|
| | Defense Research LLC may also own some Intellectual Property Rights in connection with the above items). |
| 6. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Pholus to Coin-Exch under the Consultancy Agreement between Pholus and Coin-Exch. |
| 7. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Panopticrypt to Coin-Exch under the Consultancy Agreement between Panopticrypt and Coin-Exch. |
| 8. | All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: AF00053: Virtual Currency Economy**

**Project description:**

> We endeavour to build a risk contained alternate currency trading platform that conforms to AML (Anti-Money Laundering) and APRA provisions that allows people to trade Bitcoins in a rate hedged risk controlled environment. We propose that computer simulations based on mathematical models are an indispensable research tool for studying the phenomenological behaviour of physical systems including currency exchange. In order to use a mathematical model, it is often necessary to adjust some of its parameters such that the simulation output best matches some given experimental data obtained from physical experiments a task often called parameter estimation. In addition, optimal experimental design methodology, taking into account certain sensitivities of the model, can be used to maximize the information gained from the physical experiments. This project will take a number of trading systems and test for resilience and risk control in a manner that can lead to a hedged derivative measure attacked to a alternate currency transaction.

> The goal is to create a means to trade in normal "bricks and mortar" stores within Australia using alternate currency (Bitcoin) from a cloud based wallet in a manner that is both secure as well as protected from the existing issues with Bitcoin (such as a loss of wallet leading to a loss of currency – as with cash).

> ANZSRC code: Economics; Applied Economics.

| 9. | All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: Core - Bayesian Design**

**Project description**:

> Investigations on Bitcoin volatility and resilience against speculative attack. It is known that investors 'attack' currencies. The low distribution and perceived volatility of Bitcoin leads it open to such speculation-derived currency fluctuations. The environment is such that trading strategies are well known by 'competing' investors (or, 'players' in the context of game theory). This makes the

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073849

| Number | Description |
|---|---|
| | situation suitable for analysis and experimentation using game theory concepts such as Nash Equilibrium. The experiment is designed to create systems that can hedge risk as well as leading to Nash optimal non-attack game outcomes. Hypotheses:<br><br>(1a) The success of a currency attack on Bitcoin depends on the number of attackers and the time intervals involved in this process.<br><br>(1b) There are two pure Nash equilibria in this macro coordination game: (i) everyone attacks or (ii) nobody attacks.<br><br>Research: Creation of a simulation model using surface derivative analysis to enable resilience in Currency Attack experiments. Two versions of the game are run simultaneously. Speculators, if seen to act in the same way as with 'real world' currency, would be expected to coordinate on the 'attack' equilibrium in one, but not the other version (see hypothesis 1b above). Simulations will be tested in live exchange environments. Feedback is designed to control and optimise exchange feedback and limit the risk position of the currency exchange.<br><br>**Supporting – Development of a virtualised multicore platform**: Supercomputing is rapidly becoming an essential element of innovation and competitiveness. Computer-based methods now play a central role in all areas of economic development, education, and research. Economically, computational analysis, modelling, and simulation have become a distinguishing factor in business competitiveness. Educationally, developing computing skills in students is an essential part in preparing for a future in a wide range of careers. Establishing the virtualised core supercomputer will greatly accelerate these trends to the benefit of Denariuz and allow it to complete the creation of a DASO in a timely manner. These system will have very high-speed fibre connectivity, small computing clusters, high-speed, high definition video conferencing, a large 3-D visualization screen, and desktop computing platforms with 3-D visualization. In order to support the proposed research activities with access to world-class computing assets, we will first will acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live. Opportunistic Supercomputing is a form of networked grid computing whereby a "super virtual computer" of many loosely coupled volunteer computing machines performs very large computing tasks. Grid computing has been applied to a number of large-scale embarrassingly parallel problems that require supercomputing performance scales. The problem with many approaches is that basic grid and cloud computing approaches that rely on volunteer computing cannot handle traditional supercomputing tasks such as fluid dynamic simulations and will not be adequate for the use in the creation of a set of multi-level perceptron based DASO's that compete in evolutionary formats. http://www.top500.org/system/178468. |

10.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-1: CO1N – eWallet including NFC application**

**Project description**:

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073850

| Number | Description |
|---|---|

**Main activities:**

- *Develop Bitcoin wallet management features to enable create/modify/delete/import/export of wallet details including use of mobile and web access.*
- *Develop protocols and rule-based algorithms to reduce transaction times.*
- *Design novel security protocols and encryption algorithms.*
- *Performance tests for speed and scalability.*

*All experiments are in the set-up or early stages with no reportable results to date.*

*Hypothesis 1: a generic, scalable and efficient scaffold for peer-to-peer applications based on Bitcoin protocols can be integrated into existing eWallet applications.*

*Research into decentralized, self-organizing fault-tolerant set of Blockchain nodes (specialised servers) to provide efficient request routing, deterministic object location, and load balancing. We require mechanisms that support and facilitate application-specific object replication (for data resilience), caching (for processing efficiency/speed), and fault recovery (for data integrity):*

- *Replication. Mapping of application-specific objects to multiple 'eligible' nodes to optimally balance efficiency versus resilience. Objects are inserted by routing a Bitcoin message which, when reaching an eligible node, replicates the object among all the other eligible nodes.*
- *Distributed Caching. Efficient protocol to guarantee access to copies of application-specific objects by routing a Bitcoin message and caching objects on nodes encountered along the path to the primary nodes.*
- *Fault Recovery. Uniform random assignment of node-ids for load balancing and quorum-based protocols for data robustness. Nodes with adjacent node-ids are diverse in geographic location, ownership, jurisdiction, network attachment, etc. Quorum-based protocols securely update the state of replicated objects, even given a limited number of malicious nodes in the system.*

*Hypothesis 2: Specialised Bitcoin clients can be created to realise savings in data storage and processing overheads.*

*Research:*

*Signing-only clients: request data about certain transactions from the server and only send out their own transactions. Restrict file system usage to our own keys and transactions of concern.*

*Headers-only clients: download full blocks only when expect incoming transactions and when searching Blockchain for keys in the wallet. Development using Bitcoin software library employing certain precautions to preserve security.*

*Hypothesis 3a: Can use NFC (efficiently) to connect the eWallet to the Point-Of-Sale.*

*Hypothesis 3b: A multi-factor authentication procedure will improve security.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073851

| Number | Description |
|--------|-------------|

*Research:*

*Transaction confirmation on a mobile phone.*

*Multi-signature transactions (multiple recipient addresses). Drawbacks to be overcome:*

- *more Blockchain space used; and*
- *need to save copies of public keys involved in these transactions after they happen.*

*Three-party escrow: the Buyer chooses an Arbiter, trusted by both Buyer and the Seller to resolve disputes. Requires three public keys rather than two.*

11.      All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-2: Bitcoin market and exchange**

**Project description:**

*Creating a fast, decentralised and secure universal trading platform using Bitcoin as currency and utilising the protocols developed for the Blockchain. The system allows value backed exchange of any items at all levels of transaction from micro-finance to high finance.*

*A contracted dispute process is built into the mechanism using a time-stamped permanent record that acts as a notarised proof process for a complete and managed contract exchange system. The platform extends beyond financial transactions to include secure storage and authorised exchange of any type of information. Users can exchange goods, services, contracts, id eas; proof of work tokens or even public utility records (see Core 6: P2P exchange). This phase is the design and implementation of a basic exchange platform to enable customers to buy and sell Bitcoins. All experiments are in the set-up or early stages with no reportable results to date.*

*Hypothesis 1: The basic platform can be enhanced to enable any kind of exchange including new Bitcoin-based financial products similar to bonds and derivatives.*

*Research is ongoing for:*

*- Valuations and risk models for new Bitcoin-based financial instruments.*

*- Provision of 3 strong security guarantees: (1) tamper-proof credentials, (2) no party can control the addition of credentials to the exchange, and (3) all parties will share a consistent view of the exchange.*

*Hypothesis 2: anonymous credentials can be constructed by enhancing the public/private key method; attaching vector commitments and non-interactive proofs to the private key.*

*Research is ongoing to:*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073852

| Number | Description |
|--------|-------------|

*(i) Design an efficient publicly verifiable accumulator to gather the set of all previous commitments together. An efficient membership algorithm is employed to avoid the difficulty level of credential verification scaling with the increasing number of commitments.*

*(ii) Prove that our construction provides for: consistency of credentials (ensuring multiple users cannot pool their credentials); the establishment of pseudonyms; and a long set of extensions built upon anonymous credentials.*

*(iii) Formally define and prove the security of this distributed anonymous credential scheme and provide a model for the distributed ledger.*

*Hypothesis 3: Impersonation ('Sybil') attacks in ad hoc networks can be effectively counteracted by setting a threshold for re-use of anonymous credentials within a given time period. Research is ongoing on adapting the anonymous subscription service concept for distributed application and determining the optimum k-value (re-use threshold).*

*Hypothesis 4: An anonymous credential system allows peers to identify their contributions to routing traffic in exchange for a credential that they can then use to originate traffic. Research is ongoing on configurations to ensure that peers contribute resources back to the network while preserving their anonymity. This allows fair resource utilization where peers both contribute and consume resources.*

12. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-3: Bitcoin Payment and Merchant Gateway**

**Project description:**

*Development of a Merchant Gateway with fast, secure and scalable Bitcoin transaction processes to enable merchants to accept and widely use Bitcoin.*

*Main activities:*

*- Creation of the world's first low fraud system that enables secure transactions of any party anywhere in the world instantaneously with another individual or merchant.*

*- Development of a method to transact within seconds and at a rate of over 10,000tps (and eventually 1,000,000tps).*

*- Development of a Simplified Payment Verification (SPV) system which allows proof of inclusion without needing the full contents of the block.*

*- A merchant gateway that has a permanent and verifiable record that cannot be altered.*

*- Researching varying local and international government regulations and international trading terms to allow new types of transactions that are contract based to be accepted in the international Bitcoin community.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                      DEF_00073853

| Number | Description |
|---|---|
| | *All experiments are in the set-up or early stages with no reportable results to date.* |
| | *Hypothesis 1: The existing Bitcoin network can scale to much higher transaction rates.* |
| | *Research: sync lightweight clients to more powerful backbone nodes capable of scaling to millions of users and tens of thousands of transactions/second. Aim to handle 10 million plus connections/second.* |
| | *Hypothesis 2: It is possible to build a reliable Bitcoin implementation that does not verify everything, but instead relies on either connecting to a trusted node, or puts its faith in high difficulty as a proxy for proof of validity.* |
| | *Research: new protocols that provide variable degrees of trusts and human-free third party mediations at low transaction costs. E.g., clients connect to an arbitrary full node and download only the block headers. The level of difficulty required to obtain confidence that the remote node is not feeding fictional transactions depends on the threat model.* |
| | *Hypotheses: (3a) Block headers buried sufficiently deep can be discarded after some time; (3b) it is possible to create a system that can connect to a random node whilst making the cost for an attacker to mine a block sequence containing a counterfeit transaction higher than the value to be obtained by defrauding the target.* |
| | *Research: determining how deeply buried the block must be to manage the trade-off between confirmation time vs. cost of an attack.* |
| | *Hypothesis 4: anonymous credentials can exist without a centralised certification authority (CA) acting as trusted issuer. Using this decentralised ledger and standard cryptographic primitives, it is possible to provide a proof of security for a basic anonymous credential system that allows users to make flexible identity assertions with strong privacy guarantees. Current certificates (SSL/TLS) are centralised and thus flawed since any loss of trust is fatal.* |
| | *Research: Using Bitcoin's distributed, public, append-only ledger model at individual nodes to make assertions about identity in a fully anonymous fashion.* |

13.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-4: Bitcoin Banking (Super-Node Depository)**

**Project description:**

*Aim is to build a world-first Bitcoin based retail bank in Australia adapting current standard traditional banking software, methodologies and systems, but with the introduction of Bitcoins. Includes primary bank functions such as balance request; cash flow; funding; withdrawal; and tax reporting.*

*Hypothesis 1: A super-node depository can replace existing fractional reserve banking systems on a global basis with a lower level of fraud, corruption and loss as well as having the potential for far greater levels of efficiency in international trade.*

*Research: Ability for the Bank to provide traditional banking products such as loans and deposits, and services such as ATM,*

ATTORNEY'S EYES ONLY                                                                                DEF_00073854

| Number | Description |
|---|---|
| | credit and debit cards. New Bitcoin versions need to satisfy various local and international regulations as well as Bitcoin-specific technical requirements (e.g., Bitcoin requires 8 decimal places with the potential to extend to 16 decimal places). We had partnered with external companies who could not provide a solution. We are researching solutions to these issues. |

*Hypothesis 2: a system can be created that is capable of securely storing Bitcoin keys without a centralised key store and only the owner can recover (except in cases of a legal order or an estate issue such as a death).*

*Research: Ability to eliminate or sufficiently minimise theft and duress. Example is a "fake" code that can make it look as if the transaction has occurred, but which can be tainted later (and still noted on the Blockchain). Must have a means to reverse transactions (this can be an escrow and block message that can only be reversed on pre-confirmed situations).*

*Hypothesis 3: A system can be created to achieve the fundamental requirements of any financial organization of any country, but currently unknown to Bitcoin. For example, automatically reporting tax and generating receipts (in a manner that cannot be lost). That is, the key holder can recreate all transactions without needing to go back to the merchant.*

*Associated research questions include:*

*- How to log and register a sufficient number of Bitcoin transactions and the IP addresses to report to financial authorities in a manner that allows for user anonymity and crime reporting.*

*- Can an economically feasible, trustless peer-to-peer system be created that will allow for secure deposits where fraud by the bank/exchange operator is prevented?*

*- Is a Bitcoin Dealer Network Association book balancing between national dealers feasible for an international "bank"?*

*- Can existing Core Banking Technology be extended and Integrated into a distributed Blockchain? If so, which components can be reused and which will need to be created from scratch?*

14. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-5: Secure Wallet**

**Project description:**

*This activity involves building a large-scale data warehouse that will support secured high-speed data transmissions and transformation activities. The study of various multi-layered crypto-graphical schemes is undertaken to provide a highly secure eWallet. The activity studies how to combine two or more encryption schemes under the project's proposed "multi-layered security schemes" (cascade encryption or multiple encryption) to provide highly secure eWallets. Testing is undertaken to find the right balance between computational performance and the level of security that the system requires as a feasible system to use in the commercial world. This involves the study of various multi-layered crypto-graphical schemes to identify the optimum trade-off in terms of speed and security where the strength of security will be measured by effective key size and resistance to*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073855

| Number | Description |
|---|---|
| | crypto-analytic attacks. To find the optimal point of the design, heuristic algorithms are employed. |

All experiments are in the set-up or early stages with no reportable results to date.

Hypothesis 1: It is not required for most fully validating nodes to store the entire chain, only the size of the current unspent output size plus some additional data that is needed to handle re-orgs.

Research: currently at very high transaction rates each block can be over a gigabyte in size.

Prove the ability to delete unnecessary data about transactions that are fully spent. We seek to develop a block system where the size of the unspent output set is less than 50,000MB, which is small enough to easily fit in RAM in a distributed system.

Hypothesis 2: Only a small number of archival nodes need to store the full chain going back to the genesis block. These nodes can be used to bootstrap new fully validating nodes from scratch but are otherwise unnecessary.

Research: creation of a format and block structure such that the set will always fit in memory on dedicated server class machines.

Hypothesis 3: The creation of a custom verifier tuned for secp256k1 that can go beyond 20,000 signature verifications per second can be developed along the lines of the OpenSSL solution.

Research: This proposal requires careful review by professional cryptographers as confidence in the scheme will be a part of the project being successful.

Hypothesis 4: It is possible to create a distributed wallet with escrow and considerations for Estate planning.

Associated research questions:

How to ensure the wallet is able to:

- Block undesirable transactions.

- Recompute blocks without selected transactions (reversals) and how can this be defended.

- Link a user to a set of addresses and keys in a secure manner.

- Allow a wallet be created where names are not linkable (no intermediaries between a payee and payer).

- Securely hold multiple keys for separate parties who can all access without interacting with the other.

15.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-6: P2P Exchange**

**Project description:**

Bitcoin-based P2P exchange capable of handling large concurrent users providing secure transactions and traceability. A

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073856

| Number | Description |
|--------|-------------|

*simplified contracting system allows any entity to exchange anything with any other using a set of embedded contractual conditions and incorporating a resolution/penalty process. Involves experimentation with novel Bitcoin-based commodities and non-financial instruments.*

*Hypothesis 1: new Blockchain techniques allow the continued huge growth of the Blockchain without compromising speed or security.*

*Research:*

*- Isolated blockchains (smaller size) for each virtual exchange and protocols to regularly synchronise them with the global block.*

*- Filtering techniques to send only relevant transactions to nodes that have registered for the service.*

*- Validation over mini-blockchain or trimmed Merkle tree to speed up the transaction time.*

*- Analysis and testing of algorithms and cryptographic functionalities for throughput, bandwidth efficiency, scalability and security.*

*Hypothesis 2: P2P Exchange eliminates the need for intermediaries in complex financial transactions. Includes trades in traditional securities and derivatives; new Bitcoin-denominated instruments; and other instruments such as title deeds and letters of credit.*

*Research involves:*

*- Development of derivatives (such as futures, forwards, options and swaps) and securities denominated purely in Bitcoins using 'smart contracts' saved into the Blockchain.*

*- New protocols that operate securely despite lack of regulation and without external intervention. (Currently, Bitcoin derivatives are unlikely to be subject to full regulation under the Commodities and Exchange Act).*

*Associated research issues:*

*1. How to integrate Bitcoin derivatives into the protocol as smart contracts.*

*2. Effective protocols for algorithmic trading and hedging strategies.*

*3. What is the effect on volatility (e.g. for Bitcoin Margin Trading)?*

*4. Can Bitcoin-denominated instruments be used in Commodities and Futures trading without call to Fiat money? Can they be linked into the Blockchain without losing privacy?*

*5. How to implement automated functions such as dividend payments; shareholder votes; tax and other reporting; etc.*

*Hypothesis 3: Bitcoins could be used to represent something besides money. It is possible to assign a single Satoshi to any type of token to represent a house, a car, a share of stock, a futures contract, etc. Thus the Blockchain becomes a completely decentralized and perfectly reconciled property registry and verification mechanism.*

*Research: letters of credit as a specific example of this usage. Letters of credit are mostly used in international goods*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073857

| Number | Description |
|--------|-------------|

*transactions, where trust between contracting parties is relatively low. A system is being trialled using Bitcoin as a substitute for the third party verification function of letters of credit. This will confer substantial cost savings to merchants.*

16.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: FL7 Pi Calculus: Project**

**Project description:**

*Coin-Exch Pty Ltd's experimental activities are to create knowledge in the form of solution improvements that lead to the development and creation of a new product. These experimental activities apply the scientific method to address a knowledge gap. At present, there is no known application of a Blockchain based system to implement a Core Banking System (CBS) and several commercial organisations have failed in even the basic accounting of Bitcoin let alone a complete integration of the Bitcoin system into a banking infrastructure. World leading banking software vendors and providers of core bank products, such as Temenos T24 and RUBIK, have mistakenly assumed that Bitcoin can be treated as a 'normal' currency not taking into account the fundamental requirement to support Bitcoin fields (> 8 decimal places) nor the need to account for an extended ledger that can be distributed (not simply a balance). Current banking product systems are not designed and/or prepared for Bitcoins. Coin-Exch was unfortunate to discover the evident limitation by engaging with RUBIK/Temenos T24 to setup a proof-of-concept project with the aim of supporting Bitcoin in their current suite of banking products. This project was a complete failure and was terminated soon after when the inability of the vendor to provide the base system was established. Component-based commercial banks' core system or Core Banking System (CBS) refers to the design and implementation of CBS using the computer system components. Coin-Exch is using a series of experiments in order to investigate and research two primary parts of the CBS in order to be able to integrate and create a new form of technology:*

*1. the Integrated Financial Enterprise (IFE), or rather, the CBS framework for component-based application services, and*

*2. Financial Level 7(FL7), or rather, the service framework of the application layer language.*

*The paper defines the FL7 language elements we seek to explore, descriptive methods and formal specification by means of mapping the components from the service layer onto the connectors from the semantic layer as a response to the AusIndustry request for information. Various business requirements within and between banks and requirements of business process reengineering are met by adjusting the connector glue parts on the semantic layer. Finally, Coin-Exch proposes to demonstrate that the FL7 π-calculus is a feasible foundation for exploring and researching the use of Blockchain technologies in creating a distributed Blockchain based core banking solution and to thus implement this system.*

*ANZSRC code: Information, computing and communication services; Computer software.*

17.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073858

| Number | Description |
|--------|-------------|

including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core FL7Pi Calculus**

**Project description:**

*It is our thesis that the framework which intends to meet business requirements should be divided into the requirement layer, the semantic layer and the component-based service layer [2,3,4]. The analysis and solutions from business requirements to system components are semantic mapping processes of gradual decomposition of the demands and these mappings are completed within the semantic layer. For this purpose, we define both the Integrated Financial Enterprise (IFE) services framework [4] and the application layer language FL7 (Financial Level Seven) describing the IFE. This research will address and study several some key points in the design and implementation of CBS by using system components mapping within semantic layer of IFE and will demonstrates the approach using FL7 π-calculus.*

*In simple way, Core Banking has traditionally been involved with doing all banking operations of branches and head office by connecting to a central computer kept at data centre. With technology advancement particularly in "Tele Communication" and "Wireless Communication" it has become possible to send data from one computer to another computer. Taking advantage of this it was thought fit to connect branch computers to a single computer at data centre and have all transactions of all branches recorded live at one place. This concept is "CORE BANKING". At the root level, our research seeks to fundamentally alter the manner in which banking is conducted and to distribute the core banking function in a Peer-to-Peer (P2P) manner where the public Blockchain is used as a distribution and ledger point.*

*Key Hypothesis and propositions being tested*

*Coin-Exch has purchased a set of software and statistical packages as a baseline test. In order to scientifically test a hypothesis, it is necessary to have both the null position (null hypothesis or HO) which is being investigated as well as the alternative hypothesis (Ha) that is being used to test the research proposition in an automated manner incorporating self-derived updates where the system is defined to compare and evolve against a pre-existing base (in this instance, iMal). Coin-Exch is seeking to test not only the hypothesis that Blockchain technology can be used as a ledger system in a Core Bank software solution, but that this distributed and decentralised system will be:*

*• More resilient to attacks and defend better against cyber-attacks including DDoS*

*• Less susceptible to state and criminal depredation (such as the seizure of bank accounts seen in Cypress)*

*• Faster in settlement (esp. international settlements)*

*• Able to operate at lower costs.*

***Supporting - Machine Language Coding:*** *We will develop a machine translation system using derivational morphological rules recognize and analyze words that are not found in its source lexicons, and generate default transfers for these unlisted words. Unfound words with no inflectional or derivational affixes will be initially incorporated using by default nouns. These rules are now*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073859

| Number | Description |
| --- | --- |

expanded to provide lexical coverage of a particular set of words created on the fly in an analysis of English speaking economic and banking forums (such as Quoria). What characterizes the approach is the generation of additional default parts of speech, and the use of morphological, semantic, and syntactic features from both source and target lexicons for analysis and transfer. A built-in rule-based strategy to handle language borrowing and code-mixing allows for the recognition of words with variable and unpredictable frequency of occurrence, which would remain otherwise unfound, thus affecting the accuracy of parsing and the quality of translation output. This foundation will be used in the development of a self learning machine translation system.

18. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Bitcoin Ex: Bitcoin Exchange Project**

**Project description:**

We endeavour to build a risk contained alternative currency trading platform that conforms to AML (Anti-Money Laundering) and APRA provisions and that allows people to trade Bitcoins in a rate hedged risk controlled environment. We will design and implement computer simulations based on mathematical models as a research tool for studying the behaviour of physical systems including currency exchange in a cybercrime prone environment. In order to use a mathematical model, it is often necessary to adjust some of its parameters such that the simulation output best matches some given experimental data obtained from physical experiments, a task often called parameter estimation. In addition, optimal experimental design methodology, taking into account certain sensitivities of the model, can be used to maximize the information gained from the physical experiments.

This project will simulate a number of trading systems and experiment with designs for resilience against currency attacks and risk control in a manner that can lead to a hedged derivative measure attached to an alternative currency transaction. The goal is to create a means to trade in normal "bricks and mortar" stores within Australia using alternative currency (Bitcoin) from a cloud based wallet in a manner that is both secure as well as protected from the existing issues with Bitcoin (such as a loss of wallet leading to a loss of currency and the potential threat of volatility posed by currency trading).

19. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - payment system**

**Project description:**

The aim of this core activity is to create a system that integrates seamlessly into the existing payment systems and anti-money laundering (AML) based banking infrastructure while providing audit trails and forensic mapping to the Bitcoin exchange platform. An extension to payment systems (such as Paywave/PayPass) is under development. The improved technology will support the

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073860

| Number | Description |
| --- | --- |
| | *scripted integration of the Bitcoin currency. In effect, the bank becomes a centralised depository with social networking capacities to enable peer to peer transactions. Rather than having traditional remittance markets (e.g. Filipino national working in Saudi Arabia sending money back to the Philippines – transferring between currencies) it is all done in Bitcoin – so no need for foreign exchange transactions. The facility will use a multikey wallet configurable for any combination of 'm of n' signatures. For example, a '1 of 2 (or more)' structure in which Bob puts an amount into a shared family wallet and Alice can immediately access it (as only one of the signatures is necessary). In other cases we might have 2 of 3 signatures (for greater control) – or any other combination according to the requirements of the signatories. Of course we have attributions so we have an audit trail of who did what action (i.e. deposit or withdrawal) and when. In principle this is already technically achievable within the Blockchain protocol – i.e. without requiring fundamental changes to the protocol. The challenge is to design and test the superstructure that will interface seamlessly with the Blockchain to enable the variety of transactions envisioned. Research includes investigating transaction times required across different networks to be securely recorded in the Blockchain. One important issue under investigation is that micro-transactions might take much longer than average because of the future inherent disincentive to miners to validate low value transactions. Micro-transactions are a key feature of our proposed system (both because of its democratising effect across poorer communities as well as the need to use token amounts for some types of smart contracts). Trials are continuing using the Supercomputer. Again, due to constraints on staff and budget progress has been limited but expected to ramp up later in the year as these constraints are lifted.* |

20.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Virtual Currency Economy (Virtual Payment)**

**Project description:**

*The aim is to create a virtual currency economy allowing virtual currency such as Bitcoin for mainstream financial activities.*

*Technical objective is to research and develop virtual currency components in order to facility a future and stable virtual currency economy. The components are: virtual payment, Bitcoin market and exchange; Bitcoin payment and merchant gateway; Bitcoin banking; Secure Wallet and P2P Exchange. For example, an early prototype of the virtual payment is "Pay Groove". Google Wallet, Bitcoin and PayPass have been linked to create a means to allow small payments as if they are cash [youtube link provided]. The golove has an ability to process hand gestures. We used this function as the means to authorise the transaction. Swipe your palm over the payment pad and touch your fingers together and you link to your Google Wallet and payment occurs. The end goal of virtual payment is the creation of a completely virtualised end user payment system based on the use of NFC comms.*

*ANZSRC code: Economics; Applied economics.*

21.   The Works comprised in the body of work described as: System and method for managing lending in a non-debt system.

ATTORNEY'S EYES ONLY

DEF_00073861

| Number | Description |
|---|---|
| 22. | The Works comprised in the body of work described as: Peer to peer exchange - (a) Exchange model. |
| 23. | The Works comprised in the body of work described as: Bitcoin banking system. |
| 24. | The Works comprised in the body of work described as: Peer to peer exchange - (d) Automated self-enforcing derivatives. |
| 25. | The Works comprised in the body of work described as: Peer to peer exchange - (e) Collateralized debt obligation. |
| 26. | The Works comprised in the body of work described as: Method for coordinating smart property--guaranteed loans utilising the blockchain. |
| 27. | The Works comprised in the body of work described as: Peer to peer exchange - (b) Mobile ATM model. |
| 28. | The Works comprised in the body of work described as: Peer to peer exchange - (c) Insurance markets. |
| 29. | The Works comprised in the body of work described as: Method and system for managing spending through wallet allocation. |
| 30. | The Works comprised in the body of work described as: Chargeback and escrow system based on bitcoin. |
| 31. | The Works comprised in the body of work described as: Automated P2P cryptocurrency loan risk assessment system and method. |
| 32. | The Works comprised in the body of work described as: Systems and methods for credit worthiness scoring and non-debt and cryptocurrency loan facilitation. |
| 33. | The Works comprised in the body of work described as: Cryptocurrency Accounting allocation accuracy methodology. |
| 34. | The Works comprised in the body of work described as: Intercompany loan management system that utilises the Blockchain. |
| 35. | The Works comprised in the body of work described as: Electronic P2P Margin Management System. |
| 36. | The Works comprised in the body of work described as: System, Method and computer program for operating web-based collective e-money lending/borrowing circles between members and non-members of social networking sites and DASOs. |
| 37. | The Works comprised in the body of work described as: System and method for implementing a revenue recognition model based on hashed information stored in Blockchain transactions. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073862

| Number | Description |
|--------|-------------|
| 38. | The Works comprised in the body of work described as: General ledger (gl) journal delete/accounting line reversal blockchain service. |
| 39. | The Works comprised in the body of work described as: Pay yourself first with auto bill pay system and method for blockchain accounting and budget system. |
| 40. | The Works comprised in the body of work described as: Pay yourself first with revenue generation as a system to budget against the blockchain. |
| 41. | The Works comprised in the body of work described as: Blockchain integrated Budget management system and method. |
| 42. | The Works comprised in the body of work described as: Extensible object oriented framework for blockchain integrated general ledger. |
| 43. | The Works comprised in the body of work described as: Insurance monitoring system. |
| 44. | The Works comprised in the body of work described as: Online wallet User interface for processing requests for approval in company accounts. |
| 45. | The Works comprised in the body of work described as: Apparatus and method for dynamically auditing blockchain accounts to produce metadata. |
| 46. | The Works comprised in the body of work described as: Cryptocurrency-implemented method and system for reading trenasactions posted into the blockchain and posting journal entries to general ledger. |
| 47. | The Works comprised in the body of work described as: An authentication system based on the use of cryptocurrency wallets |
| 48. | The Works comprised in the body of work described as: Blockchain integrated revenue management systems and methods with re-rating and rebilling. |
| 49. | The Works comprised in the body of work described as: A blockchain and crypotocurrency Gift card assembly and method. |
| 50. | The Works comprised in the body of work described as: General ledger chart of accounts combination editing request response. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073863

## Schedule 6

### Integyrz

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Integyrz in its eLearning Training System. |
| 2. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integyrz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

**MOOC (Massive Open Online Course) 1.1**. Including:

- MOOC 1.0
- Ease-of-use
- Seeded Content
- Product:  Indie (individual educators/learners)
- Usability feature
- Support FAQ
- Basic Rating

Exclusions:

- No Virtual Classroom
- No Interaction data capture except quiz
- No multimedia content creation tool

| 3. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

**SuperMOOC 1.0**. Including:

- Indie Presentation layer
- ADP 1:  static model
- Basic delivery odes (videos; slides and other documents; links)
- Virtual classroom 1.0
- Basic stimulation
- Quizzes

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073864

| Number | Description |
|---|---|
| 4. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

**SuperMOOC 2.0**. Including:

- Corp Presentation layer
- ADP 2:  Q-Drive
- Basic Gamified module
- Twitter module
- Second Life
- Flashcard maker
- Payment System incl. Bitcoin

| 5. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |
|---|---|

**SuperMOOC 3.0**. Including:

- Beta release (university)
- ADP 3:  Dynamic
- Biometric data v1
- Customer support live chat
- Algodoo
- Learner Authentication (Basic)

| 6. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |
|---|---|

**LMS 1 (plug in)**. Including:

- LMS1 Beta release (university)
- Moodle/Blackboard integration
- Biometric data v2
- Computable Document Format
- Augmented Reality
- Interactive Graphic Narrative

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073865

| Number | Description |
|---|---|

- Learner Authentication (Advanced)

7. All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integyrz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:

**LMS 2 (full function)**. Including:

- Supersedes Blackboard/Moodle
- Biometric data v3
- Big Data analysis
- Multiple Languages
- Universal Design
- Enhanced multimedia integration

8. All Intellectual Property Rights owned by Integyrz that were assigned by Pholus to Integyrz under the Consultancy Agreement between Pholus and Integyrz.

9. All Intellectual Property Rights owned by Integyrz that were assigned by Panopticrypt to Integyrz under the Consultancy Agreement between Panopticrypt and Integyrz.

10. All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE:** **Adaptive Delivery Platform - Basic Platform**

**Project description**:

*Current online platforms such as MOOCs (Massive Open Online Courses) use a limited range of formats, mostly video-recorded lectures and slides. Our platform will provide the ability to deliver content using a great range of formats. For example, we will include virtual 3D objects; virtual classrooms; discussion boards; simulations; gamified modules; social media based content; immersive animations; physics sandboxes, 3rd party utilities (e.g. Second Life, Microsoft Lab, SoundCloud, etc.) and many other emerging technologies. This variety provides for greater student engagement and is pedagogically more effective. The same educational content can and will be formatted into multiple delivery modes, enabling students to engage with the content using the modes most suitable to their individual needs. This is the essence of the Adaptive Delivery Platform.*

*The Integyrz platform will enable Adaptive Delivery. This innovation allows the system to automatically adjust the delivery of content to that which best suits the individual learner or cohort. This includes (i) adjusting the pace of delivery; (ii) adjusting the density of content according to the learner's level of knowledge; and especially (iii) adjusting the mode of delivery – i.e.,*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073866

| Number | Description |
|---|---|

whichever format(s) best match the learners' Online Learning Style (OLS) profile. The system is able to determine the learners' OLS via a variety of 'interaction data' such as the results of progress quizzes and biometric data (for example, keyboard stroke patters, click profiles, eye-tracking, facial expression recognition, etc). The platform represents state-of-the-art research into learning styles for online learning and is unmatched in the market. Using a continuous feedback process each learner's learning parameters (OLS, pace and knowledge level) will be kept up to date in real time. This will allow dynamic content delivery adjustment constantly matched to the individual learner's needs.

Integyrz's core platform will be designed to support several products targeting different potential markets. Presentation layers and special purpose plug-ins will enable products suitable for MOOC providers; tertiary education providers (for example, a Learning Management System as commonly used in universities); stand-alone self-paced training (as is commonly used by large corporations and government departments for staff training) and individuals or small businesses (for example, makers of 'How To' training modules). The platform will be designed for usability on any internet-enabled device (i.e. including smartphones and tablets) and will support Universal Design (for disabled learners) and multiple languages.

**Supporting - data centre and systems**

In order to support the proposed research activities with access to world-class computing assets, we will first acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live.

We are proposing to test and create a quasi-opportunistic supercomputing platform using cluster cores. In this, distributed computing solution will be developed where the "super virtual computer" of a large number of networked geographically disperse computers performs huge processing power demanding computing tasks. Using quasi-opportunistic supercomputing, we aim to deliver a higher quality of service than opportunistic grid computing by achieving more control over the assignment of tasks to distributed resources and the use of intelligence about the availability and reliability of individual systems within the supercomputing network.

The cluster shall consist of commercially available virtualised servers as nodes; with a high-speed interconnect for high-bandwidth, low-latency communication between the nodes, as well as Ethernet for administrative communication. The cluster will be designed to leverage multi-socket/multi-core node technologies to optimize system performance, switch port count and interconnect bandwidth utilization.

A scalable administration process will be provided to ensure the system can be rebooted in 30 minutes or less and that the overall uptime for at least 98% or all cores remains at 99.999999%. The project requirement is that the cluster performance, as measured in Tflops/s (10e12 floating point operations per second), be as high as achievable.

11.  All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073867

| Number | Description |
|---|---|
| | **PROJECT TITLE:** **Online Learning Style model**<br>**Project description**:<br><br>*Literature research on most valid learning styles based on empirical evidence.*<br><br>*Design of hypothesis-based online-specific learning style model (The Butterfly Model) as described further in the publication by Savanah (2014) entitled "Online Learning Styles - THE BUTTERFLY MODEL".*<br><br>*Design initial 'questionnaire' (online activities) to determine learner's initial OLS profile. Design of hypothesis-based pedagogical profile for delivery modes and creation of generic profiles for each of 17 modes of delivery (Video; podcast; Second Life; Physics Sandbox; simulation; social media; virtual 3D; CDF; documents; interactive and non-interactive graphic narrative; virtual classroom; online discussion board; digital flashcard; gamified module; immersive animation; quiz & Augmented Reality). Creation of matching algorithm to map OLS with Pedagogical profile (to optimise mode selection).* |
| 12. | All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:<br><br>**PROJECT TITLE**: **Product Offerings Research and Development**<br>**Project description**:<br><br>*(1) SuperMOOC*<br>*Design presentation layer for MOOC offering (target market: all educational institutions offering open courses). Admin functions; certification (optional); authentication options.*<br><br>*(2) Indie*<br>*Design presentation layer for Indie offering (target market: individuals and small businesses). Self-service module uploads; advertisement management.*<br><br>*(3) Corporate*<br>*Design presentation layer for Corporate offering (target market: corporations and government departments). Self-paced training modules with timing and scoring functions; authentication; certification.*<br><br>*(4) University Suite (Layered offerings)*<br>*Design presentation layer for University Suite (target market: universities and other educational institutions from primary to tertiary that offer courses to formally enrolled students).*<br><br>*(a) Hosting services. Offline hosting of content enabling one-way delivery of all content formats (i.e. presentation only, no interaction data capture). Enable soft-branding (i.e. institution's logo).*<br><br>*(b) Plug-in. Back-end API for integration of core platform with existing LMSs such as Moodle or Blackboard). Enables full* |

IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073868

| Number | Description |
|--------|-------------|

*functionality – Adaptive Delivery and hosting of all content formats with two way data transfer (i.e. enable feedback of interaction data such as scores, etc).*

*(c) Learning Management System. I.e. competition for Moodle and Blackboard. Design customisable APIs to integrate the core platform with university's core systems (i.e. student records, syllabus, etc). Full core functionality is hosted at university site.*

13.   All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

<u>PROJECT TITLE:</u> **Design research partnership program**

**Project description**:

*For collaboration with NSW Universities, primarily Macquarie and Charles Sturt.*

*High level design of research programs to test Integyrz hypotheses. Research questions include:*

- *Are there new Learning Styles specific to online learning?*
- *How do online content formats map onto Online Learning Styles? (i.e. validate the Butterfly Model).*
- *How to determine an individual's online Learning Style?*
- *How to scale up Social Learning in an online environment?*
- *How to match formats to discipline areas and learning outcomes?*
- *How to use AI to grade written work.*

14.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and C01N (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

15.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Cloudcroft (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

16.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Coin-Exch (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

17.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Daso (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

18.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Interconnected Research (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073869

| Number | Description |
|--------|-------------|
|        | Integyrz). |
| 19. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Panopticrypt (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 20. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Pholus (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 21. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Zuhl (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 22. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Denariuz (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 23. | All Intellectual Property Rights owned by Integyrz under the Consultancy Agreement between Integyrz and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Integyrz and Misfit Games). |
| 24. | All Intellectual Property Rights owned by Integyrz under the Consultancy Agreement between Integyrz and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Integyrz and Chaos). |
| 25. | All Intellectual Property Rights owned by Integyrz under the Consultancy Agreement between Integyrz and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Integyrz and Head Vendor Co). |
| 26. | The Works comprised in the body of work described as: 20. eLearning. |

ATTORNEY'S EYES ONLY                                                          DEF_00073870

**Schedule 7**

**Pholus**

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Pholus in its IT support, IPSEC and NAP systems research. |
| 2. | All Intellectual Property Rights owned by Pholus that were assigned by Interconnected Research to Pholus under the R&D Services Agreement between Interconnected Research and Pholus including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- IT infrastructure proof-of-concept platform;
- IT infrastructure;
- Top 500 System (Tulip);
- Hyper Croft Mark I (5.8 PB);
- Hyper Croft Mark II (7.2 PB);
- Hyper Croft Mark III (10.2 PB);
- hor Super Computer; and
- Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for additional Information v2.0 as provided to AusIndustry)

| | |
|---|---|
| 3. | All Intellectual Property Rights owned by Pholus that were assigned by Intergyrz to Pholus under the R&D Services Agreement between Intergyrz and Pholus including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- IT infrastructure proof-of-concept platform;
- IT infrastructure;
- Top 500 System (Tulip);
- Hyper Croft Mark I (5.8 PB);
- Hyper Croft Mark II (7.2 PB);
- Hyper Croft Mark III (10.2 PB);
- hor Super Computer; and
- Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for additional Information v2.0 as provided to AusIndustry)

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073871

| Number | Description |
|--------|-------------|
| 4. | All Intellectual Property Rights owned by Pholus that were assigned by Panopticrypt to Pholus under the Consultancy Agreement between Pholus and Panopticrypt. |
| 5. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and C01N (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and C01N). |
| 6. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Cloudcroft (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Cloudcroft). |
| 7. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Coin-Exch (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Coin-Exch). |
| 8. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Daso (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Daso). |
| 9. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Intergyrz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Intergyrz). |
| 10. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Interconnected Research (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Interconnected Research). |
| 11. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Panopticrypt (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Panopticrypt). |
| 12. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Zuhl (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Zuhl). |
| 13. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Denariuz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073872

| Number | Description |
|--------|-------------|
| | between Pholus and Denariuz). |
| 14. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Misfit Games). |
| 15. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Chaos). |
| 16. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Head Vendor Co). |
| 17. | All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: 201401: Project - Network Design and Services Research**

**Project description**:

*The work carried out within "Network Design and Services" research aims at significantly contributing to the design and delivery of the next generation converged network and service infrastructure supporting a wide variety of applications, in the context of which optical networks and network services play a key role. We aim to create secure IPv6 based systems and converged networks that are automatically scalable.*

*Main topics of focus include transparency, sustainable scaling, dependability and cost/resource efficiency, taking into consideration the increasing heterogeneity in technologies and devices.*

*One of the practical situations information technology modeling needs to achieve is in developing methods for leveraging computer-aided dispatch databases in emergency services systems to improve decision making at the tactical (e.g., station location), strategic (e.g., staffing), and operational (e.g., ambulance redeployment) levels.*

*We aim to study networks to build a network that supports specified communication patterns at the least possible cost. This will allow us to better design networks with self-interested users, trust and reputation in online interactions, fair and robust protocol design, and wireless networks and sensor nets.*

*The research involves a benchmarking program aimed at measuring the impact of applying our encryption technology to hard drives and virtual hard drives as a replacement of existing, less secure technologies. The impact was measured in terms of CPU usage required for the encryption/decryption steps during several processes: initiation (i.e. set up of encryption keys including*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073873

| Number | Description |
|---|---|

*key recovery protocols), disk reading and disk writing. The encryption technology we have researched involves a process for generating multiple shared secrets without transmission and is currently undergoing patent application.*

*The above research activities have all been undertaken on the Tulip Trading Supercomputer leased for the purpose of the Pholus research program.*

*ANZSRC code: Information, computing and communication services; distributed computing.*

*Dr. Craig Wright undertook the Benchmark Testing experiments, and conducted research based on the paper authored by Craig Wright dated 10 February 2013 entitled "Network Implementation Project".*

*R&D Engineers outsourced from Hotwire undertook the following activities:*

*1. Prototype a proof-of-concept platform for the IT infrastructure; and*

*2. Design, develop and implement a scalable and cost efficient based IPv6 IT Network Infrastructure.*

18. All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Self Scaling Hyper V Domain system**

**Project description**:

*The system will use self tuning algorithms to predict and deploy systems as needed in a efficient manner.*

19. All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Interdependencies among Critical Infrastructures**

**Project description**:

*We seek to model Interdependencies among Critical Infrastructures, both inside the ICT domain and between ICT0 and other sectors(e.g. Oil & Gas and Finance), are complex to be understood. Critical Infrastructures risk always changing due to new threats, interdependencies and possible usage scenarios. The aim of this project is to define and develop a Methodology and Tools for a simulation based Risk Assessment of Critical Infrastructures interdependencies and contingency plans. Two kinds of tools are of direct concern:*

*a the Framework modelling and*

*b. the Simulation & Risk Assessment environment.*

*The Framework provides instruments to model interdependencies among Critical Infrastructures, services and contingency plans using a common taxonomy. The Simulation & Risk Assessment environment allows the user to simulate disasters and threats, to*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073874

| Number | Description |
|---|---|

*evaluate the risk using objective metrics and to analyze the impact of an ICT contingency plan to other interdependent Critical Infrastructures. Moreover the Methodology and the tools will support the user to evaluate the efficiency of the ICT emergency process, such as restoration and reconfiguration procedures, band to optimize interdependent contingency plans in order to enhance the availability and robustness of ICT networks.*

*A set of contingency plans will be analysed and evaluated in two complex scenarios: The first scenario will consider ICT intra-domain interdependencies. The second scenario will take into account cross-sector interdependencies (e.g. between ICT and Oil & Gas sector, or between ICT and Finance sector).*

20.   All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Supporting - Virtualised Modelling system**

**Project description**:

*A platform for the development and testing of the models will be deployed using a NAP based distributed database.*

21.   All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - NAP Domain tests**

**Project description**:

*We seek to tests the deployment of a distributed automatically scaling HyperV based network that goes through several stages enrolment. These are:*

*1. Policy Validation: System health validator (SHV) servers first check the "health" of client systems that are requesting access to the secure domain. Basically, this stage checks that the client is compliant with the policy used and enforced within the organisation.*

*A NAP health policy server software counterpart to a system health agent (SHA). An SHV verifies the statement of health (SoH) made by its corresponding SHA.*

*2. NAP enforcement and network restriction: These systems limit network access. They act as go-between's to the secure network for non-compliant servers and hosts and allow some limited but controlled access to the secure zone.*

*3. Remediation: Non-compliant hosts can be placed into quarantine and forced to have patches, signature updates and more applied.*

*4. Ongoing monitoring and auditing: A health certificate does not last forever and can also be revoked. If a system is seen to become non-compliant, it can be isolated from the secure network.*

ATTORNEY'S EYES ONLY                                                                                          DEF_00073875

| Number | Description |
|--------|-------------|
| | *This network will scale to the use and deploy and report automatically.* |
| 22. | The Works comprised in the body of work described as: Universal P2P ledger. |
| 23. | The Works comprised in the body of work described as: Service provisioning – Pseduonomous. |
| 24. | The Works comprised in the body of work described as: Blockchain-based resource tracking. |
| 25. | The Works comprised in the body of work described as: Online distributed ledger. |
| 26. | The Works comprised in the body of work described as: A method to provide Ad-hoc updates to source transactions against the blockchain. |
| 27. | The Works comprised in the body of work described as: Automated 3d fabrication system. |
| 28. | The Works comprised in the body of work described as: A method to efficently allocate connections in a Gossip protocol network. |
| 29. | The Works comprised in the body of work described as: A method to securely distribute keys and pins for online wallets. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073876

**Schedule 8**

**Cloudcroft**

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Cloudcroft in its reactive and preemptive security systems. |
| 2. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Interconnected Research to Cloudcroft under the R&D Services Agreement between Interconnected Research and Cloudcroft including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- Cloudcroft Commercialisation (WEB Company Profile, marketing campaigns);
- Hyper Croft Mark (5.8 PB) Commercialisation;
- Exascale Monitoring Tool;
- Hyper Croft Mark II (7.2 PB) Commercialisation; and
- Hyper Croft Mark III (10.2 PB) Commercialisation.

| | |
|---|---|
| 3. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Intergyrz to Cloudcroft under the R&D Services Agreement between Intergyrz and Cloudcroft including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- Cloudcroft Commercialisation (WEB Company Profile, marketing campaigns);
- Hyper Croft Mark (5.8 PB) Commercialisation;
- Exascale Monitoring Tool;
- Hyper Croft Mark II (7.2 PB) Commercialisation; and
- Hyper Croft Mark III (10.2 PB) Commercialisation.

| | |
|---|---|
| 4. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Pholus to Cloudcroft under the Consultancy Agreement between Pholus and Cloudcroft. |
| 5. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Panopticrypt to Cloudcroft under the Consultancy Agreement between Panopticrypt and Cloudcroft. |
| 6. | All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073877

| Number | Description |
|--------|-------------|
| | **PROJECT TITLE: Reactive and Pre-emptive Security System based on choice theory**: |

**Project description**:

*The objective is to research and develop an alternative to existing attacker preventive systems by re-directing traffic instead of blocking it. We will seek to create a Virtual Universe tailored specifically for the attacker's profile without disrupting the attack currently in progress. For example, an attacker may be in the process of an illegal credit card transaction and the preventive system will switch the attacker to a Virtual Universe. The attacker will then be able to continue the illegal transaction but in a controlled environment with no harm to the credit card holder or financial institution.*

*The Virtual Universe will not only provide a "fake" environment for the attacker, but we aim to also analyse the attackers 'behaviour, profile, systems, algorithms and methodologies to prevent future attacks. The objective is for the attacker to continue his attack as long as possible allowing profiling and scoring of the attacker's strengths and weaknesses.*

*Current preventative systems  block the attacker (in some cases disrupting systems being attacked) but does not stop future attacks. Current solutions are insufficient (no information gathering about attackers and with limited or no data sharing). The cost to scan and attack systems is insignificant and will not be prevent future attacks.*

*We are seeking to develop a reactive and pre-emptive security system to prevent attacks by cyber criminals by redirecting traffic instead of blocking it, thus switching the attacker to a Virtual Universe, and by gathering and sharing information about attackers. Most importantly by making it a very time-consuming and a costly affair for attackers.*

*The Reactive and Pre-emptive Security System will 'welcome' the attacker, but in a controlled environment, without disrupting the system being attacked.*

*We are now working on creating a system, method, server processing system, and computer program product for operating a cybercriminal attack pattern database and using this to update systems to intercept and modify attacks.*

*It is hypothesised that the present invention relates to a pre-emptive security system that protects network connected systems. We hypothesise that we can create a system which redirects network traffic instead of blocking it, and that the Virtual Universe server system will make cybercriminal attacks economically unprofitable.*

*The solution including the cybercriminal attack pattern database will be attractive to most large corporations and institutions worldwide from an economical perspective. Cloudcroft will maintain and distribute the cybercriminal attack pattern database in conjunction with clients.*

7.  All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Development of a Core hardware Platform (Part 1)**:

**Project description**:

64 IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY   DEF_00073878

| Number | Description |
|--------|-------------|
|        | *The goal of our core experiment was to create a set of applications-relevant codes enabling rapid exploration of algorithmic options and their mapping to computer platforms. In order to do this, we utilised algorithms that are designed to solve a scalar equation and used that to test a set number of performance domains as below:* |

*• Node memory bandwidth;*

*• Cache hit to miss ratio; and*

*• Weak scaling*

*These have been broken down into separate cores (1, 2, 3).*

*We then examined the performance on 2 types of chip architecture (Xeon phi and AMD).*

*Hypothesis: We believe we can create PSOMADs (Particle Swarm Optimisation Mesh Adaptive Direct) that will capture key performance issues on system architecture performance that will enable rapid exploration of these performance issues in a meaningful context and will be modified accordingly that impact a broader set of scientific programs. We further postulate that these sets of captured performance metrics will enable us to create a robust simulation model that correctly mimics the chip architecture environment. Our goal is to begin to answer the question: under what conditions does a PSOMAD represent a key performance characteristic in a full application?*

*Test 1 - Node memory bandwidth*

*Node memory bandwidth has a significant impact on the performance of an application. In order to test node memory bandwidth, we utilised a circuit simulation code. Circuit simulation adheres to a general flow. We used mini applications which are circuit analysers which simulate electronic circuits (including microchips) and simulated different chip designs in software. What we are running on this simulation are differential equation solvers, finite problem solvers, physics engines and general linear equation solvers.*

*Here we are trying to discover the quickest manner to find the fastest bitshift architecture. In doing this we:*

*1. Passed original input feed (data) in to non-linear DAE solver;*

*2. Which was passed through a non-linear solver;*

*3. Which was finally passed through a linear solver; and*

*4. We then tested to see if the information in our seed file (our original input feed) has been converged, meaning that if it has correctly solved the posited problem and returned the correct values from system cache.*

*There were many iterations of this particular experiment. If there is non-convergence, the data is resent into the nonlinear solver. If it has converged, we can then test if the simulation is complete or still running. We can conclude that if the simulation is not complete, it has failed, meaning that or code is not functioning as a suitable model and so the experiment begins again from the start (passing through non-linear DAE again). If it is completed, we can end the simulation and take the data.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073879

| Number | Description |
|--------|-------------|
| | *This allows us to model the processing power of the various architectures in real time and to test a variety of platform architectures before deciding on a large scale deployment.* |
| | ***Supporting****: This activity is mainly associated with management of the core activity including:* |
| | *1. Manage the execution of the research activities (planning, schedule, reporting);* |
| | *2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes;* |
| | *3. Documentation issued in-line with Croudcraft project lifecycle processes and practices;* |
| | *4. System Design;* |
| | *5. System Setup and Configuration;* |
| | *6. System Deployment and Testing; and* |
| | *7. System Acceptance Testing.* |
| | *The experiments undertaken are further detailed in the document entitled "Cloudcroft - Development of a Core hardware Platform (Part 1, Part 2 & Part 3)" by Craig Wright.* |
| 8. | All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: Development of a Core hardware Platform (Part 2)**

**Project description:**

*The goal of our core experiment was to create a set of applications-relevant codes enabling rapid exploration of algorithmic options and their mapping to computer platforms.  In order to do this, we utilised algorithms that are designed to solve a scalar equation and used that to test a set number of performance domains as below:*

*• Node memory bandwidth;*

*• Cache hit to miss ratio; and*

*• Weak scaling.*

*These have been broken down into separate cores (1, 2, 3).*

*We then examined the performance on 2 types of chip architecture (Xeon phi and AMD).*

*Hypothesis*

*We believe we can create PSOMADs (Particle Swarm Optimisation Mesh Adaptive Direct) that will capture key performance issues on system architecture performance that will enable rapid exploration of these performance issues in a meaningful*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073880

| Number | Description |
|--------|-------------|
| | *context and will be modified accordingly that impact a broader set of scientific programs. We further postulate that these sets of captured performance metrics will enable us to create a robust simulation model that correctly mimics the chip architecture environment.* |

*Our goal is to begin to answer the question: under what conditions does a PSOMAD represent a key performance characteristic in a full application?*

*Test 2 - Cache hit to miss ration*

*We set up a series of multi-dimensional matrices that are loaded into memory. These were passed into and out of cache to measure processor metrics under load in a torus array. We then looked at the effect of non-contiguous blocks of global node identifiers.*

*This was designed to swap bit-strings in to and out of primary memory to test if the application is getting a cache hit (CPU cache) or whether it is just a system memory. The reason for this is to model the behaviour of the CPU when dealing with large array variables.*

*When bit-shifting 256 bit values, the system has to load the string into 64 bit registers, process the calculation and reassemble the original byte string. In this process, data loss and error can occur, but more critically for our tests, the time to swap from fast cache into slower system memory can critically impart the operation of the sorting and decision algorithms.*

*As such, we are seeking to model the processors in a manner that allows us to determine the most effective architecture for a given problem set.*

*The experiments undertaken are further detailed in the document entitled "Cloudcroft - Development of a Core hardware Platform (Part 1, Part 2 & Part 3)" by Craig Wright.*

9.  All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

    **PROJECT TITLE: Development of a Core hardware Platform (Part 3):**

    **Project description**:

    *These have been broken down into separate cores (1, 2, 3). We then examined the performance on 2 types of chip architecture (Xeon phi and AMD).*

    *Hypothesis*

    *We believe we can create PSOMADs (Particle Swarm Optimisation Mesh Adaptive Direct) that will capture key performance issues on system architecture performance that will enable rapid exploration of these performance issues in a meaningful context and will be modified accordingly that impact a broader set of scientific programs. We further postulate that these sets of captured performance metrics will enable us to create a robust simulation model that correctly mimics the chip architecture*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073881