P-565

Case No. 9:18-CV-89176-BB

# EXHIBIT 1

SENSITIVE

POSITION PAPER

| C01N PTY LTD | 11 MARCH 2016 | **SENSITIVE** |
|---|---|---|
| AUDIENCE | DATE | CLASSIFICATION |


Australian Government
Australian Taxation Office

FILE REF:  1-678K9NF

# Penalty and interest position paper

This paper explains the ATO's penalty and interest position for C01N Pty Ltd for the period 1 July 2012 to 30 June 2013

◎ SENSITIVE

❯ For more information on this position paper, phone Arna Synnot on (08) 7422 2364

SENSITIVE

CONFIDENTIAL

DEF_00029207

# TABLE OF CONTENTS

Table of contents.................................................................................................................... 2

Glossary.................................................................................................................................. 3

Introduction ........................................................................................................................... 4

Summary of our position ....................................................................................................... 5

Relevant facts ....................................................................................................................... 6

      Experience with R&D tax offset .................................................................................. 6

      Tax agent involvement ................................................................................................ 6

      Connection between purported income and Hotwire's R&D claim ..................................... 6

      Previous penalty imposition........................................................................................ 7

Our position............................................................................................................................ 8

Issue one: penalties .............................................................................................................. 8

      Penalty for false or misleading statements ............................................................... 8

      Exceptions ................................................................................................................. 8

      Base penalty amount for false or misleading statement that results in a shortfall .............. 9

      Base penalty amount for false or misleading statement that does not result in a shortfall... 9

      Penalty for taking a position that is not reasonably arguable .............................................15

      Multiple base penalty amounts .................................................................................16

      Increase in penalty ..................................................................................................16

      Reduction in Base Penalty .......................................................................................19

      Remission of penalty................................................................................................19

      Calculation of the penalty amount ............................................................................20

Issue two: interest charges..................................................................................................21

      Shortfall interest charge ...........................................................................................21

CONFIDENTIAL

DEF_00029208

# GLOSSARY

Words defined in this glossary shall have the meanings ascribed to them:

| 2012-13 income year | The year ended 30 June 2013 |
|---|---|
| ATO | Australian Taxation Office |
| Commissioner | the Commissioner of Taxation of the Commonwealth of Australia |
| C01N | C01N Pty Ltd |
| Forex | foreign exchange |
| Hotwire | Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) |
| IaaS | Infrastructure as a Service |
| MT | Miscellaneous Taxation Ruling |
| R&D | Research and Development |
| TAA | *Taxation Administration Act 1953* |
| Taxpayer | C01N Pty Ltd |
| UK | The United Kingdom |
| W&K | W&K Info Defense Research LLC |
| We | the ATO |

CONFIDENTIAL

DEF_00029209

# INTRODUCTION

1.  A position paper is a document that sets out the ATO's analysis of the facts as we understand them, application of the relevant law to those facts and details of any proposed adjustments or recommendations that might be made as a result of the finalisation of an audit.

2.  In the present case, an audit was undertaken to determine the taxable income of C01N Pty Ltd (**the taxpayer**)(**C01N**) and its eligibility for a refundable tax offset in the year ended 30 June 2013 (**2012-13 income year**). We issued the reasons for our decision to the taxpayer on 11 March 2016, which amended the taxpayer's taxable income and Research and Development (**R&D**) tax offset.

3.  Set out below is our position in relation to the penalty and interest issues relating to the amendments. Also set out below is:

    3.1.  a statement of the facts which we have relied upon in reaching our position and

    3.2.  an explanation of the reasons for our position.

4.  If you do not agree with our understanding of the facts or our interpretation of the law, then you will be given the opportunity to provide details, including any additional facts which you consider should be taken into account and any other relevant matters, before we determine our final position. The attached cover letter explains what you need to do and what happens next.

CONFIDENTIAL

# SUMMARY OF OUR POSITION

## ISSUE ONE: PENALTIES

5.   *Issue:* Is the taxpayer liable to administrative penalties under Division 284 of Schedule 1 to the *Taxation Administration Act 1953* (**TAA**)[1] for the year ended 30 June 2013?

6.   *Position:* Yes.

7.   We consider the taxpayer made false or misleading statements. We consider the statements arose from the taxpayer's intentional disregard of a taxation law. We also consider that the taxpayer did not have a reasonably arguable position.

## ISSUE TWO: INTEREST CHARGES

8.   *Issue:* Is the taxpayer liable to pay shortfall interest charge (**SIC**) pursuant to section 280-100 of Schedule 1 to the TAA for the 2012-13 income year?

9.   *Position:* No.

10.  The adjustment does not give rise to an additional amount of income tax liability. SIC is therefore not applicable.

## SUMMARY OF PENALTY AND INTEREST CHARGES

11.  The following table displays the proposed penalty and interest we propose to apply in relation to the taxpayer for the 2012-13 income year:

|         | Amount       |
|---------|--------------|
| Penalty | 1,908,206.09 |
| SIC     | 0            |
| Total   | 1,908,206.09 |

---

[1] All legislative references in this paper are to Schedule 1 to the *Taxation Administration Act 1953* (TAA) unless otherwise indicated.

CONFIDENTIAL

SENSITIVE

# RELEVANT FACTS

12.   Please refer to our Reasons for Decision for the substantive tax issues for the relevant facts.[2] Additional facts relied upon to support our penalty position are detailed below.

**Experience with R&D tax offset**

13.   Dr Wright has been a director, public officer and majority shareholder of numerous companies that have claimed the R&D Tax Concession and R&D Tax Incentive dating back to 2001-02. Dr Wright's involvement has included:

  13.1.   making declarations as the authorised officer and/or the nominated contact for various companies on their AusIndustry registration applications[3]

  13.2.   making numerous declarations as the public officer on tax returns for companies claiming the R&D Tax Concession and R&D Tax Incentive, many of which have been lodged by the companies themselves rather than a tax agent[4]

  13.3.   requesting two private binding rulings for companies relating to the R&D Tax Incentive[5]

  13.4.   representing a number of the companies in a number of audits and objections by the ATO relating to their R&D claims, including many where the ATO has disallowed R&D claims and imposed penalties.[6]

**Tax agent involvement**

14.   KPMG advised the taxpayer that KPMG did not assess the eligibility of the activities for the R&D tax offset, did not review or audit the financial statements and relied on the taxpayer's assertions in relation to technical and financial aspects of the R&D project.[7]

**Connection between purported income and Hotwire's R&D claim**

15.   Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) (**Hotwire**) claimed a notional deduction in the 2012-13 income year of $3,205,820 on expenditure incurred to the taxpayer related to the taxpayer's purported acquisition from Professor Rees.[8]

---

[2] Reasons for decision for C01N Pty Ltd for the period 1 July 2012 to 30 June 2013 dated 11 March 2013
[3] For example: Integyrs (2009); Information Defense (2009); Cloudcroft Pty Ltd and Panopticrypt (2012), Cloudcroft Pty Ltd, Coin-Exch Pty Ltd, Panopticrypt, Hotwire and the taxpayer (2013)
[4] For example: Cloudcroft Pty Ltd (2012, 2013), Hotwire (2013); Panopticrypt (2012, 2013); Cloudcroft (2012, 2013)
[5] Private ruling application for Hotwire Preemptive Intelligence Pty Ltd dated 4 October 2013 [C132]; Private ruling application for Hotwire Preemptive Intelligence Pty Ltd dated 15 November 2013 [C133]
[6] Ridges Estate Pty Ltd in 2001-02, 2002-03 and 2003-04; Information Defense Pty Ltd in 2008-09; Integyrs Pty Ltd in 2008-09 and 2009-10.
[7] Appendix B to letter from Jeremy Hirschhorn of KPMG to C01N Pty Ltd dated 18 June 2014, page 13 [C102]; Letter from Paul van Bergen of KPMG to C01N Pty Ltd dated 13 June 2014, page 13 [C134]
[8] Email from John Chesher to Rosa Solomon dated 7 November 2013 subject 'Hotwire PE Depreciation' [H9]; Hotwire Pre-emptive Intelligence Pty Ltd 2013 R&D schedule [H6]; Email from John Chesher to Rosa Solomon dated 11 November 2013 with subject 'RE: Research & Development Claim' [H13]; Email from John Chesher to Brigid Kinloch dated 18 February 2014 with subject 'Hotwire PR' [H14]

---

SENSITIVE

CONFIDENTIAL

DEF_00029212

| SENSITIVE | POSITION PAPER |
| --- | --- |

**Previous penalty imposition**

16.   On 18 August 2015, a base penalty amount imposed on the taxpayer for a false or misleading statement was worked out under item 2 of the table in subsection 284-90(1) relating to its June 2013 Business Activity Statement.[9]

---

[9] Letter from James O'Halloran to C01N Pty Ltd with subject 'Advice of the findings of our audit' dated 14 August 2015 [C135]; Notice of assessment of shortfall penalty issued to C01N Pty Ltd dated 18 August 2015 [C136]

| SENSITIVE | PAGE 7 OF 21 |
| --- | --- |

CONFIDENTIAL

# OUR POSITION

## ISSUE ONE: PENALTIES

17. **Issue:** Is the taxpayer liable to administrative penalties for the year ended 30 June 2013?

18. **Position:** Yes.

### Penalty for false or misleading statements

19. You are liable to a penalty if you make a false or misleading statement.[10]

20. The taxpayer made false or misleading statements in its 2013 income tax return that led to it claiming a refundable R&D tax offset of $2,222,252.10 to which it was not entitled, resulting in a shortfall amount of $2,079,429.[11]

    20.1. It claimed a notional deduction in respect of purported transaction with W&K Info Defense Research LLC (**W&K**).

    20.2. It claimed a notional deduction in respect of purported transaction with Dr Ignatius Pang.

21. The taxpayer also made a number of false or misleading statements that did not result in a shortfall.

    21.1. It claimed a deduction for a purported loss or outgoing in respect of a purported obligation to pay foreign currency to W&K.

    21.2. It claimed a deduction for a loss or outgoing purportedly incurred in respect of an acquisition from Professor David Rees.

    21.3. It included assessable income in respect of a purported supply to Hotwire relating to the purported acquisition from Professor Rees.

### Exceptions

#### Reasonable care

22. A taxpayer is not liable to a penalty for a false or misleading statement if the taxpayer and/or their agent exercised reasonable care in making the statement.[12]

23. As detailed below, we do not consider the taxpayer and/or their agent took reasonable care. The exception therefore does not apply.

#### Safe harbour

24. A taxpayer is not liable to an administrative penalty if it engaged a registered tax agent, gave the registered tax agent all of the relevant taxation information, the registered tax

---

[10] Section 285-75
[11] Subsection 284-90(1)
[12] Subsection 284-75(5)

CONFIDENTIAL

agent made the statement and the false or misleading nature of the statement did not result from intentional disregard or recklessness by the agent.[13]

25. The taxpayer provided its tax agent with many of the misleading or false documents it provided to us, rather than the relevant taxation information. Safe harbour therefore does not apply.

**Base penalty amount for false or misleading statement that results in a shortfall**

26. If a false or misleading statement that results in a shortfall arose from:

- a failure to take reasonable care to comply with a taxation law, a base penalty amount of 25% of the shortfall amount is imposed

- recklessness as to the operation of a taxation law, a base penalty amount of 50% of the shortfall amount is imposed

- intentional disregard of a taxation law, a base penalty amount of 75% of the shortfall amount is imposed.[14]

**Base penalty amount for false or misleading statement that does not result in a shortfall**

27. If a false or misleading statement that does not result in a shortfall arose from:

- a failure to take reasonable care to comply with a taxation law, a base penalty amount of 20 penalty units is imposed

- recklessness as to the operation of a taxation law, a base penalty amount of 40 penalty units is imposed

- intentional disregard of a taxation law, a base penalty amount of 60 penalty units is imposed.[15]

28. Penalty units for infringements occurring at the time the taxpayer lodged its income tax return are $170 per unit.[16]

*Reasonable care*

29. According to paragraph 28 of Miscellaneous Taxation Ruling MT 2008/1 *Penalty relating to statements: meaning of reasonable care, recklessness and intentional disregard*:

> The reasonable care test requires an entity to take the same care in fulfilling their tax obligations that could be expected of a reasonable ordinary person in their position. This means that even though the standard of care is measured objectively, it takes into account the circumstances of the taxpayer.

---

[13] Subsection 284-75(6)
[14] Items 1, 2 and 3 of the table in subsection 284-90(1)
[15] Items 3A, 3B and 3C of the table in subsection 284-90(1)
[16] *Crimes Act 1914* subsection 4AA(1)

CONFIDENTIAL

30. Some of the relevant factors to be taken into account include personal circumstances, level of knowledge, education and skill, understanding of tax laws, class of entity concerned, use of a tax agent, application for a private ruling, record keeping systems and procedures, reliance on third party information, the likelihood that a statement is false or misleading, the size of the shortfall amount.

### Recklessness

31. MT 2008/1 identifies the difference between recklessness and a lack of reasonable care as essentially the extent or degree to which the conduct displayed falls short of that of a reasonable person. Recklessness assumes that the behaviour in question displays a disregard or indifference to risk which would otherwise be foreseeable to a reasonable person.

### Intentional Disregard

32. MT 2008/1 states that intentional disregard means that there must be actual knowledge that the statement made is false. To establish intentional disregard, the entity must understand the effect of the relevant legislation and how it operates in respect of the entity's affairs and make a deliberate choice to ignore the law.

33. Paragraph 113 of MT 2008/1 explains that the difference between intentional disregard and behaviour that shows a want of reasonable care or recklessness is dishonesty.

34. Intentional disregard can be inferred from the facts and surrounding circumstances of the case: *Weyers & Anor v. Federal Commissioner of Taxation* (2006) [2006] FCA 818; 2006 ATC 4523; 63 ATR 268.

### Factors relevant to culpability

35. We have considered the factors relevant to the level of culpability separately for each statement below. We have also considered the following general factors in determining the level of culpability.

### General factors relevant to culpability

36. The taxpayer's director and controlling mind at the time the return was lodged, Dr Wright, claims to have over 200 qualifications, predominantly in cybersecurity, including a masters degree in law. Dr Wright has also been a director of companies that have claimed the R&D Tax Concession and R&D Tax Incentive since 2001-02. During this time, he has prepared numerous applications for registration for the programs, prepared tax returns for entities claiming the R&D Tax Incentive and requested private binding

rulings relating to the R&D Tax Incentive. He has also been involved in several audits by the ATO relating to the R&D claims of companies of which he was a director.

37.   The taxpayer engaged a registered tax agent, KPMG, to prepare its income tax return. However, we note that KPMG specifically advised the taxpayer that KPMG did not assess the eligibility of the activities, did not review or audit the financial statements and relied on the taxpayer's assertions in relation to technical and financial aspects of the project. The taxpayer provided KPMG with many of the same documents that it provided to the ATO to substantiate its claim. These documents are discussed further below.

### Application to statement relating to the purported W&K expenditure

38.   The taxpayer's claimed expenditure of $4,933,338 was purportedly based on a transaction for the acquisition of Infrastructure as a Service (IaaS) from W&K, provided by an offshore third party and paid for with Liberty Reserves. As we have detailed in our reasons for decision, the supporting documentation provided by the taxpayer contains numerous conflicting statements and anomalies:

38.1.   The purported other signatory to the W&K agreement died in 2013 so the agreement cannot be independently verified. However the purported agreement does not contain terms which we would expect to find in an agreement for IaaS. It lacks critical terms such as  price and specifications and contains appendices that could not have existed at the time the agreement  was purportedly executed. The purported end service provider is located in a tax haven and has refused our direct requests for verification.

38.2.   The taxpayer has contended that a United Kingdom (**UK**) company was involved in the payment to W&K. Independent information confirms that the UK company was still under the control of a shelf company operator at the relevant time. Dr Wright has subsequently updated documents held by UK Companies House, backdating directorships and shareholdings.

38.3.   The taxpayer's contention regarding the issue of its shares is inconsistent with two prior instances where the taxpayer advised the ATO of its shareholdings. The taxpayer's share documentation is also issued in company names that were not in existence at the relevant time, and the numbering of shares and certificates has been changed to accommodate the purported earlier issue. The taxpayer has also lodged backdated documents with the Australian Securities & Investments Commission.

CONFIDENTIAL

38.4.   The payment mechanism purportedly used cannot be independently verified and the Liberty Reserve screenshot provided by the taxpayer to evidence payment does not appear genuine.

38.5.   The material presented to show the existence and use of the purported C01N supercomputer appears to have been manipulated in an attempt to mislead the ATO into accepting that the taxpayer had access to a supercomputer with the specifications it claims to have acquired under the purported IaaS agreement. The taxpayer has not provided reliable evidence that it had access to the purported C01N supercomputer for its activities.

38.6.   Parts of the taxpayer's R&D applications and further documentation provided concerning its purported R&D activities appear to have been copied or plagiarised from publicly available sources without acknowledgement of the original author or source. Some of the material has been presented to the ATO to give the façade that it represents the taxpayer's original work, when it does not.

38.7.   The taxpayer has provided numerous purported emails, Bitmessages and text messages to the ATO which it claims support its contentions. The taxpayer has also presented a number of emails to the ATO that the ATO has examined and found to be false or doctored, one of which featured a purported 'forensic analysis' prepared by the taxpayer in an attempt to show that the doctored email was legitimate. This has led us to question the veracity and genuineness of other emails and electronic communications provided by the taxpayer.

39.   Taken together, these facts indicate that the taxpayer's claim was based on a purported transaction that did not occur and services that were never provided. We infer that a significant number of documents have been deliberately and dishonestly created and submitted to the ATO in an attempt to substantiate the taxpayer's claim. As the signatory to the purported IaaS agreement, owner of the purported Liberty Reserve account and user of the purported supercomputer, Dr Wright must have known that the transactions did not occur and that the taxpayer had no entitlement to the R&D offset.

40.   On the basis of the above facts, we consider that the behaviour that resulted in the tax shortfall demonstrates an intentional disregard for Australian taxation laws. As such, the base penalty amount is 75% of the shortfall amount.

CONFIDENTIAL

***Application to statement relating to the purported Dr Pang expenditure***

41. The taxpayer claimed expenditure of $5,000 purportedly relating to services provided by Dr Pang as a notional deduction for the purposes of the R&D Tax Incentive. The taxpayer has been unable to substantiate that it incurred an expense to Dr Pang.

42. Given Dr Wright's qualifications and that he has been involved in a number of ATO audits both individually and as a director, we consider that he should have a reasonable understanding of both when a loss or outgoing has been incurred by an entity and the substantiation requirements.

43. While the taxpayer used a tax agent, KPMG relied on the taxpayer's incorrect contentions that the amount had been incurred by it.

44. The invoice purportedly issued by Dr Wright on behalf of Dr Pang does not reflect that the taxpayer incurred a liability to Dr Pang and indicates a lack of understanding by the taxpayer about the meaning of incurred and of agency relationships. The taxpayer has not indicated that it sought any advice from its tax agent or the ATO on its treatment of the expense.

45. In May 2014 Dr Wright advised KPMG that the taxpayer had incurred the expenditure to Dr Pang in the 2012-13 income year, however the amount was not paid in that year and would not be 'formally issued until June 2014'. We infer that no invoice had been issued at the relevant time.

46. Further, the financial statements do not show any expenditure to Dr Pang in the 2012-13 income year.

47. However, when asked by the ATO to provide copies of the relevant contracts and invoices related to its R&D claim in July 2014 the taxpayer produced an invoice to the ATO for the transaction with Dr Pang dated 1 June 2013.

48. The date of the invoice provided is at odds with Dr Wright's statement to KPMG that the payment would not be 'formally issued' until June 2014.

49. We have concluded from this that the invoice did not exist at the time the taxpayer lodged its return and that it was  backdated by Dr Wright, this conclusion is further supported by the nature of the invoice provided by the taxpayer, namely that it was prepared by Dr Wright rather than Dr Pang.

50. Further, Dr Pang advised he received a laptop, printer, salary and superannuation in payment for his services, yet the invoice refers to the purported provision of software.

51. Taken together, these facts indicate that the taxpayer's claim was based on a transaction that did not occur as the taxpayer contends. Given Dr Wright prepared the invoice, advised KPMG that it would not 'formally issue until 2014' and purportedly provided the

software to Dr Pang, we conclude that Dr Wright was aware that the amount had not been incurred by the taxpayer and that the taxpayer dishonestly included the amount in the R&D offset claim.

52. On the basis of the above facts, we consider that the behaviour that resulted in the tax shortfall demonstrates an intentional disregard for Australian taxation laws. As such, the base penalty amount is 75% of the shortfall amount.

### Application to statement relating to the purported foreign exchange (forex) loss

53. The taxpayer claimed a deduction of $404,204 in respect of a purported obligation to pay foreign currency to W&K.

54. As detailed above, we conclude that the purported transaction with W&K did not take place and that the taxpayer knew this. It follows that the taxpayer was aware that it did not incur a loss or outgoing with respect to an obligation to pay foreign currency.

55. On the basis of the above facts, we consider that the statement was false or misleading because of an intentional disregard for Australian taxation laws. As such, the base penalty amount is 60 penalty units.

### Application to statement relating to the purported Professor Rees expenditure

56. The taxpayer claimed a deduction of $2,258,534 in respect of a loss or outgoing purportedly incurred to Professor Rees.

57. The taxpayer has been unable to substantiate that it:

   57.1. received any material from Professor Rees

   57.2. made any payment to Professor Rees

   57.3. incurred an amount to Professor Rees or incurred it in earning assessable income.

58. The taxpayer has not provided any evidence of communication with Professor Rees, and Professor Rees' ill health indicates he was incapable of communicating during the later stages of his life.

59. The taxpayer has provided conflicting and inconsistent contentions regarding how Professor Rees was purportedly paid. Third party information indicates that there was no relationship between the taxpayer and Professor Rees.

60. Taken together, these facts indicate that the taxpayer's claim was based on a transaction that did not take place. Given Dr Wright contends to have communicated with Professor Rees about their agreement, received the material from Professor Rees and instructed that payment be made to Professor Rees, we conclude that Dr Wright knew that the amount had not been incurred by the taxpayer and that the taxpayer dishonestly included

CONFIDENTIAL

DEF_00029220

the amount as a deduction. We infer that a number of documents have been dishonestly created and submitted to the ATO in an attempt to substantiate the taxpayer's claim.

61.   On the basis of the above facts, we consider that the statement was false or misleading because of an intentional disregard for Australian taxation laws. As such, the base penalty amount is 60 penalty units.

### Application to statement relating to the purported Hotwire income

62.   As detailed above, we conclude that the purported transaction with Professor Rees did not occur and the taxpayer was aware of this. It follows that the taxpayer knew it did not derive income from Hotwire.

63.   The taxpayer included assessable income in respect of a purported supply to Hotwire relating to the purported acquisition from Professor Rees. Considered in isolation, this false or misleading statement decreased the offset owing to the taxpayer and would not usually attract a penalty. When considered in light of all the circumstances and the notional deduction claimed by Hotwire, we consider that the inclusion of the income was part of a broader deception to obtain a benefit.

64.   On the basis of the above facts, we consider that the statement was false or misleading because of an intentional disregard for Australian taxation laws. As such, the base penalty amount is 60 penalty units.

### Penalty for taking a position that is not reasonably arguable

65.   If a taxpayer makes a statement to the Commissioner which treats an income tax law as applying in a way that is not reasonably arguable, they are liable to an administrative penalty.[17]

66.   This only applies to a taxpayer if their statement results in a shortfall which is greater than $10,000 or 1% of the income tax payable on the income tax return for that year.[18] The taxpayer's shortfall amount exceeds this threshold.

67.   A matter is reasonably arguable if it would be concluded in the circumstances, having regard to the relevant authorities, that what was argued for is about as likely to be correct as incorrect, or is more likely to be correct than incorrect.[19]

68.   We do not accept the existence of the contractual relationship or the payment the taxpayer contends to have made to W&K, or that it incurred a liability to Dr Pang, and consider that the taxpayer knew that these statements were untrue. The application of the law to the true facts is straightforward. On the available evidence, we do not consider an

---

[17] Subsection 284-75(2) and 284-90(1)
[18] Paragraph 284-90(3)(a)
[19] Section 284-15

CONFIDENTIAL

DEF_00029221

alternate position to ours to be reasonably arguable. The base penalty amount for failing to have a reasonably arguable position is 25% of the shortfall amount.

**Multiple base penalty amounts**

69.   If more than one item in the table in subsection 284-90(1) of Schedule 1 to the TAA applies, the item that has the higher base penalty amount is to be applied in determining the amount of the penalty. Here items 1 and 4 of the table apply to the statements relating to the purported W&K and Dr Pang expenditure. Therefore your base penalty amount is 75% of your shortfall amount.[20]

**Increase in penalty**

70.   Relevantly, a base penalty amount for a false or misleading statement is increased by 20% if:

- the taxpayer took steps to prevent or obstruct the Commissioner from finding out about a shortfall amount or the false or misleading nature of a statement[21]  or

- the taxpayer had a base penalty amount worked out for the same type of penalty previously.[22]

***Prevention or obstruction of the Commissioner***

71.   These steps to prevent or obstruct the Commissioner from finding out about a shortfall amount can include:

71.1.   repeated failure or deferral by the entity to supply information without an acceptable reason

71.2.   repeated failure by the entity to respond adequately to reasonable requests for information including:

a)   excessive or repeated delays in responding

b)   giving information that is not relevant or does not address all the issues in the request or

c)   supplying inadequate information

71.3.   failure to respond to a request for information pursuant to formal information notices

71.4.   providing false or misleading information or documents

71.5.   destroying records or

71.6.   a combination of the factors above.

---

[20] Subsection 284-90(2)
[21] Paragraphs 284-220(1)(a)
[22] Paragraphs 284-220(1)(c)

CONFIDENTIAL

DEF_00029222

72.  We have considered the following facts to determine whether the taxpayer took steps to prevent or obstruct the Commissioner from finding out about the shortfall amount and the false or misleading nature of statements.

**General factors relevant to prevention or obstruction**

73.  During the audit, the taxpayer provided the following false or misleading documents:

73.1.  a doctored email said to have been sent by  an ATO officer in an attempt to make the Commissioner release the refund

73.2.  plagiarised material in an attempt to mislead the Commissioner that the material represented its original work

73.3.  two versions of a purported email that are identical except that they were dated years apart.

**Application to prevention or obstruction relating to the purported W&K expenditure**

74.  In relation to the W&K expenditure, the taxpayer further provided the following false or misleading documents to the ATO:

74.1.  a purported contract that included information that did not exist at the time it was purportedly entered into and executed

74.2.  documents relating to a transaction purportedly entered into by a company that was a shelf company and not under control of the taxpayer or related entities at the relevant time

74.3.  a screenshot as evidence of payment that we consider is doctored

74.4.  backdated share certificates and applications for shares

74.5.  a screen shot purportedly showing that Dr Wright controlled or had access to the 1933 bitcoin address which appears to have been doctored.

75.  As detailed in our substantive position, the taxpayer changed its contentions relating to the purported payment to W&K five times. The most recent involved a Republic of Seychelles entity. Part of the evidence provided to substantiate its existence was a backdated document.

76.  At a visit to the taxpayer's premises on 26 March 2015 Dr Wright showed ATO officers that the taxpayer had access to what he claimed was the purported C01N supercomputer. This demonstration and material appears to have been manipulated and displays numerous errors and anomalies. We conclude that the material shown to the ATO officers was created or altered in an attempt to deceive the ATO officers into accepting that the taxpayer had access to the purported C01N supercomputer for its activities.

CONFIDENTIAL

DEF_00029223

77. On two occasions the taxpayer failed or refused to provide information requested by the Commissioner during the course of the audit without adequate explanation.

   77.1. When asked to provide further evidence to establish the veracity of the Liberty Reserve screenshot, such as documents relating to the setting up of and transfer of funds into the account, no documents were provided.

   77.2. When asked to provide financial statements for a UK company involved in the purported transactions, the taxpayer did not provide them.

78. On this basis we consider that the taxpayer took steps to prevent or obstruct the Commissioner from uncovering the false or misleading statement with respect to the W&K expenditure.

### Application to prevention or obstruction relating to the purported Dr Pang expenditure

79. In relation to the Dr Pang expenditure, the taxpayer further provided an invoice, the existence of which is inconsistent with previous advice it gave to KPMG and featured a payment method that is inconsistent with the information provided by Dr Pang. We consider this to be the provision of a document that is false or misleading.

80. On this basis we consider that the taxpayer took steps to prevent or obstruct the Commissioner from finding out about the false or misleading statement with respect to the Dr Pang expenditure.

### Application to prevention or obstruction relating to the purported forex deduction

81. Given this purported deduction flowed from the purported W&K expenditure, we consider the same factors are relevant.

82. On this basis we consider that the taxpayer took steps to prevent or obstruct the Commissioner from finding out about the false or misleading statement with respect to the forex deduction.

### Application to prevention or obstruction relating to the purported Professor Rees expenditure

83. In relation to the purported expenditure to Professor Rees, the taxpayer provided an invoice and a number of written statements detailing the purported arrangement. We consider this to be the provision of documents that are false or misleading.

84. On this basis we consider that the taxpayer took steps to prevent or obstruct the Commissioner from finding out about the false or misleading statement with respect to the Professor Rees expenditure.

CONFIDENTIAL

***Application to prevention or obstruction relating to the purported Hotwire income***

85. In relation to the purported Hotwire income, the taxpayer provided documents including an invoice and contract, in addition to the same documents relating to the Professor Rees deduction. We consider this to be the provision of documents that are false or misleading.

86. On this basis we consider that the taxpayer took steps to prevent or obstruct the Commissioner from finding out about the false or misleading statement with respect to the purported Hotwire income.

***Increased penalty – prevention or obstruction***

87. All base penalty amounts are therefore increased by 20% under paragraph 284-220(1)(a) of Schedule 1 to the TAA.

***Previous base penalty amount***

88. On 18 August 2015, a base penalty amount imposed on the taxpayer for a false or misleading statement that resulted in a shortfall amount was worked out under item 2 of the table in subsection 284-90(1) relating to its June 2013 Business Activity Statement.

89. The two base penalty amounts that resulted in a shortfall are therefore increased under paragraph 284-220(1)(c).

**Reduction in Base Penalty**

90. A base penalty amount is reduced to the extent that you or your agent applied the law in a way consistent with advice given to you or your agent by or on behalf of the Commissioner, general administrative practice under that law, or a statement in a publication approved in writing by the Commissioner.[23]

91. The taxpayer did not receive advice from the Commissioner or treat the taxation law in a manner according  with general administrative practice in arriving at its conclusion. The exception therefore does not apply.

92. The base penalty amount for shortfall amounts for an accounting period may be reduced by 20% or 80% if you voluntarily tell the Commissioner about the shortfall amount and the circumstances around that disclosure.[24]

93. The taxpayer has not made a voluntary disclosure so the base penalty will not be reduced.

**Remission of penalty**

94. The Commissioner has the discretion to remit all or part of the penalty.[25]

---

[23] Section 284-224
[24] Section 284-225
[25] Section 298-20

95. Any remission decision is based on all the relevant facts and circumstances and having regard to the purpose of the penalty provision.[26] Relevant matters to consider in approaching the issue of remission include:

    95.1. that the purpose of the penalty regime is to encourage entities to take reasonable care in complying with their tax obligations

    95.2. a major objective of the penalty regime is to promote consistent treatment by reference to specified penalties. That objective would be compromised if the penalties imposed at the specified rates were remitted without just cause.

96. After giving consideration to the remission guidelines, we do not consider there are any grounds for remitting all or part of the penalty.

**Calculation of the penalty amount**

97. Section 284-85 of Schedule 1 to the TAA provides the statutory formula for calculating the amount of penalty where the base penalty amount is altered under sections 284-220 or 284-225. The formula is:

> BPA + [BPA × (Increase % - Reduction %)]
> where:
> BPA is the base penalty amount.
> Increase % is the percentage increase (if any) under section 284-220
> Reduction % is the percentage reduction (if any) under section 284-225

98. Where a shortfall is attributable to multiple matters that warrant penalties at different rates and the adjustment causes the taxpayer to move from a loss position to become taxable, the prescribed rates are applied to the tax shortfall or part thereof on a pro-rata basis.[27] This situation is analogous in that the offset disallowed exceeds the shortfall. In this instance, 99.9% of the shortfall is attributable to the purported W&K transaction and 0.1% is attributable to the Dr Pang transaction.

| Issue | Pro rata tax shortfall | Base penalty | Pro rata base penalty amount | Increase (20%) | Penalty |
|---|---|---|---|---|---|
| W&K | 2,077,325.74 | 75% | 1,557,994.30 | 311,598.86 | 1,869,593.16 |
| Dr Pang | 2,103.26 | 75% | 1,577.44 | 315.49 | 1,892.93 |
| Forex | NA | 10,200.00 | 10,200.00 | 2,040.00 | 12,240.00 |
| Prof Rees | NA | 10,200.00 | 10,200.00 | 2,040.00 | 12,240.00 |
| Hotwire | NA | 10,200.00 | 10,200.00 | 2,040.00 | 12,240.00 |
| Total | | | 1,590,171.74 | 318,034.35 | 1,908,206.09 |

99. The penalty amount is therefore $1,908,206.09.

---

[26] Law Administration Practice Statement PS LA 2012/5 *Administration of penalties for making false or misleading statements that result in shortfall amounts*
[27] Taxation Ruling TR 94/3: *Income tax: tax shortfall penalties: calculation of a tax shortfall and allocation of additional tax*

CONFIDENTIAL

## ISSUE TWO: INTEREST CHARGES

100. **Issue:** Is the taxpayer liable to pay SIC pursuant to section 280-100 of Schedule 1 to the TAA for the 2012-13 income year?

101. **Answer:** No.

### Shortfall interest charge

102. SIC is imposed on any additional amounts of income tax that become payable when assessments from the 2005 year onwards are amended.[28]

103. For the 2012-13 income year:

103.1. we have amended the taxpayer's income tax assessment to alter the components of the assessment but this amendment does not result in any additional amount of income tax payable;

103.2. the refunded component of a refundable tax offset does not form part of a taxpayer's assessment. We have given effect to our adjustment to your refundable tax offset by issuing a notice.[29]

104. As a result, SIC does not apply.

---

[28] Section 280-100
[29] *Income Tax (Transitional Provisions) Act 1997* subdivision 67-L

CONFIDENTIAL

DEF_00029227

P-598

Case No. 9:18-CV-89176-BB

**From:** Craig S Wright
**Sent:** Sunday, October 6, 2013 12:57 AM
**To:** Italia, Mark <Mark.Italia@ato.gov.au>
**CC:** Ramona Watts; Jamie Wilson; Hardy, Michael <Michael.Hardy@ato.gov.au>
**Subject:** Email 6: RE: Notification of audit ABN 48 164 068 348
**Attachments:** BITCOIN_18.07.2013.png; Hotwire Transaction INV-0001 (1).png; BITCOIN_GICSR.png; Existing value.png

**SysUserProp:** 88334F2CCA0D8E51C8530404366F9B82

Hello Mark,
I have CC'd Michael.
Please understand that the funding and other areas is something I have been discussing with the ATO and it is an area that is to remain of utmost secrecy. The funding is in cash and Bitcoin. We have already been in discussions and have filed private rulings to have XBT (Bitcoin) recognised. We are and have offered wallet details to people within the ATO such that they can track the transactions we have in XBT.
Our funding comes as we are the group that controls 5% of the global Bitcoin market.
We are dealing with listed Australian and International companies. I will send details of some of these dealings next. We intend to have a licensed Australian Bank and other aspects by the end of the year.
This information is beyond secret. We are sharing it to the ATO, but it is NOT released to market as yet.
There will be a 7th email.

Regards,
Craig

**From:** Italia, Mark [mailto:Mark.Italia@ato.gov.au]
**Sent:** Friday, 4 October 2013 1:18 PM
**To:** Craig S Wright
**Subject:** Notification of audit ABN 48 164 068 348

Hi Craig,

Further to our discussion, attached is a letter outlining the information we require as part of the audit.

<<Confirm - audit - post issue SR.pdf>>
<<Acrobat Document.pdf>>

Regards

*Mark Italia*
Indirect Tax | Refund Integrity
Australian Taxation Office
Phone 03 9275 4243

ATO Centenary | *Working for all Australians*

*********************************************************************
IMPORTANT
The information transmitted is for the use of the intended
recipient only and may contain confidential and/or legally
privileged material. Any review, re-transmission, disclosure,
dissemination or other use of, or taking of any action in
reliance upon, this information by persons or entities other
than the intended recipient is prohibited and may result in
severe penalties. If you have received this e-mail in error
please notify the Privacy Hotline of the Australian Taxation
Office, telephone 13 2869 and delete all copies of this
transmission together with any attachments.
*********************************************************************

CONFIDENTIAL                                                                                    DEF_00046093





DEF_00046095



DEF_00046096



DEF_00046097

**To:** 'nCrypt Craig'[craig@ncrypt.com]; 'nCrypt Stefan'[stefan@ncrypt.com]; ramona@ncrypt.com[ramona@ncrypt.com]; 'Stef Savanah'[stef.savanah@demorgan.com.au]
**From:** Allan Pedersen[allan@ncrypt.com]
**Sent:** Wed 1/13/2016 5:40:19 PM (UTC)
**Subject:** White Paper Program Recovery Planning
Patents Application Master Registry V10.0.pdf

P-685

Case No. 9:18-CV-89176-BB

Hi,

Perquisites for the execution of the recovery plan (see attached):

1. Standard time to produce a white paper is 10 working days max
   a. Currently not been achieved -> white paper process must be optimized
      i. Colum being injected into the process in order to produce white paper framework
      ii. Early introduction of white paper material
      iii. Access to CW (done)

2. New resources required assigned to the program (all London)
   a. Gavin assigned to program 11/01/15
   b. NEW 1 (Researcher profile) to start: 01/02/16
   c. NEW 2 (Researcher profile) to start: 15/02/16
   d. NEW 3 (Researcher profile) to start: 29/02/16

3. Allowance (minor) for familiarization has been injected into schedule for new starters.

4. Igy assigned (continued) part time to the program

5. Stef to be responsible the execution of the white paper/patent program (Sydney/London)
   a. Sydney/London stand-up meetings, Coordination between sites etc.
   b. White papers -> Guidance, reviews etc.
   c. Patents -> Engagement with FB Rice and UDL.

6. ORG Chart
   a. Stef - Director of Research
      i. Sydney: Stef    -> Igy (part time) , Ray, Ingrid (Fb Rice) and Viveca
      ii. London: Gavin  -> New 1, New 2, New 3


***Please note that we ONLY have approval for two new researchers at this stage.***


The following have been introduced to the registry (see attached):
1. Prioritization of white papers/patents being injected into the nCrypt RoadMap (5 years);  and
2. Execution of white papers (currently for the next 3 years only).


**White paper material/recordings to be produced by CW (prioritized):**

<u>Craig:</u>

| Patent # | Patent Name | Date |
|----------|-------------|------|
| 72 | Method for the processing of allocated and automated Transactions | In progress |

| ID | Multi signature trust | Progress |
|---|---|---|
| 154 | | |
| 186 | Digital rights management | 18/01/16 |
| 188 | An automated payment method and system with time-lock encryption | 20/01/16 |
| 151 | Smart contract registry | 22/01/16 |
| 155 | Bitcoin banking system | 25/01/16 |
| 71 | Distributed financial distress rating system | 27/01/16 |
| 168 | Peer to peer exchange - (d) Automated self-enforcing derivatives | 29/01/16 |
| 89 | Method for coordinating smart property--guaranteed loans utilising the blockchain | 01/02/16 |
| 152 | Non-interest property purchase | 03/02/16 |
| 129 | One-step posting for approval-based ledger transactions using multi-signature wallets | 05/02/16 |
| 118 | Colour coin exchange exception balancing system | 08/02/16 |
| 169 | Peer to peer exchange - (e) Collateralized debt obligation | 10/02/16 |
| 124 | A system and method to utilise the blockchain for an accounts receivable system | 12/02/16 |
| 7 | On block Futures Derivative and risk instrument | 15/02/16 |
| 8 | Programmable Bond system | 17/02/16 |
| 156 | Software signing on the Blockchain | 19/02/16 |
| 138 | A method and system to provide ECC/ECDH key exchange to three or more parties | 22/02/16 |
| 100 | Lease and loan sub-ledger blockchain accounting methods and system | 24/02/16 |

**Tasking White Papers:**

Stef:

| 72 | Method for the processing of allocated and automated Transactions |
|---|---|
| 187 | P2P – Lending |
| 151 | Smart contract registry |
| 168 | Peer to peer exchange - (d) Automated self-enforcing derivatives |
| 169 | Peer to peer exchange - (e) Collateralized debt obligation |

| 187 | Fast payment Network (linked to Academic paper #1) |

## Igy:

| 160 | Turing Complete BTC Scripting |
| 154 | Multi signature trust |
| 100 | Lease and loan sub-ledger blockchain accounting methods and system |

## Gavin (responsible for the patent catalogue):

| 91 | System and method for managing lending in a non-debt system |
| 155 | Bitcoin banking system |
| 89 | Method for coordinating smart property--guaranteed loans utilising the blockchain |
| 156 | Software signing on the Blockchain |

## Ingrid:

| 188 | An automated payment method and system with time-lock encryption |
| 185 | Redemption contracts |
| 186 | Digital rights management |
| 124 | A system and method to utilise the blockchain for an accounts receivable system |
| 152 | Non-interest property purchase |

## NEW 1:

| 71 | Distributed financial distress rating system |
| 129 | One-step posting for approval-based ledger transactions using multi-signature wallets |
| 138 | A method and system to provide ECC/ECDH key exchange to three or more parties |

## NEW 2:

| | |
|---|---|
| 118 | Colour coin exchange exception balancing system |
| 7 | On block Futures Derivative and risk instrument |

NEW 3:

| | |
|---|---|
| 8 | Programmable Bond system |

Cheers, Allan

**Patents Progress & Prioritization**

Latest update                                      13/01/2015

**Health check**

| | | **New Starters** | |
|---|---|---|---|
| Milestone Performance Check (execution) | | NEW 1 | 01/02/2016 |
| One or more milestones are more than 20 days behind schedule | | NEW 2 | 15/02/2016 |
| | | NEW 3 | 29/02/2016 |
| White Paper Submission Target | 32 | | |
| White Paper (32) Submission Target Date | 06/06/2016 | | |
| White Papers Submitted | 9 | | |
| NEW Patents (P1, P2, P3) Identified | 27 | | |
| NEW Academic Papers Identified | 2 | | |
| Patents Submitted by FB Rice | 0 | | |

**Projection White Paper Submission**

| | |
|---|---|
| White papers to be submitted Oct-15 to Sep-16 | 57 |
| White papers to be submitted Oct-16 to Sep-17 | 100 |
| White papers to be submitted Oct-17 to Sep-18 | 92 |
| White papers to be submitted Oct-18 to Sep-19 | 0 |

**Number of white papers/patents injected into nCrypt RoadMap**

| | |
|---|---|
| Year 1 - 2 (core system ( = =Trust)) | 19 |
| Year 3 | 19 |
| Year 4 | 19 |
| Year 5 | 22 |



White Paper Progress Indicators (DeMorgan)

Patents per Company Entity

| COIN | 23 |
|---|---|
| Cloudcroft | 12 |
| Coin-Exch | 31 |
| Denarius | 41 |
| Integyrl | 1 |
| Interconnected | 23 |
| Panoptcrypt | 24 |
| Pholus | 5 |
| Zuhl | 6 |
| CRAIG | 39 |
| **TOTAL** | **200** |

| # | Description | Entity | | | | | | | Status | YES | # | YES | | | | | | | | | | Status | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 71 | Distributed financial distress rating system | Demeruz | NEW 1 | London | 14/12/2015 | 29/02/2016 | 15.00% | | RED | YES | 2 | YES | | | | YES | | | | | | 21/03/2016 | | GREEN |
| 124 | A system and method to utilise the blockchain for an accounts receivable system | Interconnected | Ingrid | Sydney | 15/01/2016 | 25/03/2016 | 15.00% | | RED | YES | 1 | YES | | | | YES | | | | | | 15/04/2016 | | GREEN |
| 129 | One-step posting for approval-based ledger transactions using multi-signature wallets | Demeruz | NEW 1 | London | 21/12/2015 | 14/03/2016 | | | RED | YES | 1 | YES | | | | YES | | | | | | 04/04/2016 | | GREEN |
| 89 | Method for coordinating smart property-guaranteed loans utilising the blockchain | Coin-Exch | Gavin | London | 28/12/2015 | 11/03/2016 | 50.00% | | RED | YES | 1 | YES | | | | YES | | | | | | 01/04/2016 | | GREEN |
| 156 | Software signing on the Blockchain | CRAIG | Gavin | | 07/12/2015 | 25/01/2016 | 15.00% | | RED | YES | 1 | YES | | | | YES | | | | | | 15/04/2016 | | GREEN | Material OK |
| 138 | A method and system to provide ECC/ECDH key exchange to three or more parties | Panoptcrypt | NEW 1 | London | 22/12/2015 | 28/03/2016 | 10.00% | | RED | YES | 1 | YES | | | | YES | | | | | | 18/04/2016 | | GREEN |
| 59 | System, method, and computer program product for reconciling financial data from multiple sources and based "coloured coin" sources | C01N | | | 28/12/2015 | | | | GREEN | YES | 1 | YES | | | | | | YES | | | | 21/01/1900 | | GREEN |
| 118 | Colour coin exchange exception balancing system | C01N | NEW 2 | London | 11/01/2016 | 14/03/2016 | | | RED | YES | 1 | YES | | | | | | YES | | | | 15/04/2016 | | GREEN |
| 152 | Non-interest property purchase | Demeruz | Ingrid | Sydney | 11/01/2016 | 11/03/2016 | 50.00% | | RED | YES | 1 | YES | | | | YES | | | | | | 01/04/2016 | | GREEN | Material OK |
| 100 | Lease and loan sub-ledger blockchain accounting methods and system | Demeruz | Ijy | Sydney | 25/01/2016 | 01/04/2016 | 50.00% | | RED | YES | 1 | YES | | | | | | YES | | | | 22/04/2016 | | GREEN | Material OK |
| 7 | On block Futures Derivative and risk instrument | C01N | NEW 2 | London | 08/02/2016 | 28/03/2016 | | | RED | YES | 1 | YES | | | | | | YES | | | | 18/04/2016 | | GREEN |
| 8 | Programmable Bond system | C01N | NEW 3 | London | 22/02/2016 | 28/03/2016 | | | RED | YES | 1 | YES | | | | | | YES | | | | | | GREEN |
| 74 | A capital asset planning system for smart property contracts | Demeruz | | | 07/03/2016 | | | | GREEN | YES | 1 | | YES | | | | | YES | | | | | | GREEN |
| 88 | System and method for conducting an electronic financial asset deposit auction using the Blockchain | Interconnected | | | 21/03/2016 | | | | GREEN | YES | 3 | YES | | | | YES | | | | | | | | GREEN |
| 166 | Peer to peer exchange - (b) Mobile ATM model | Coin-Exch | | | 25/05/2016 | | | | GREEN | YES | 3 | YES | | | | | | YES | | | | | | GREEN |
| 167 | Peer to peer exchange - i) Insurance markets | Coin-Exch | | | 08/02/2016 | | | | GREEN | YES | 3 | YES | | | | | | YES | | | | | | GREEN |
| 123 | Method and system for managing spending through wallet allocation | Coin-Exch | | | 29/03/2016 | | | | GREEN | YES | 3 | YES | | | | | | YES | | | | | | GREEN |
| 127 | Combination cryptocurrency wallet and multi-account ledger balancing system for monitoring a user's spending habits in real-time | Demeruz | | | 01/04/2016 | | | | GREEN | YES | 3 | YES | | | | | | YES | | | | | | GREEN |
| 40 | Chargeback and escrow system based on bitcoin | Coin-Exch | | | 06/04/2016 | | | | GREEN | YES | 3 | YES | | | | | | YES | | | | | | GREEN |
| 134 | Single or multi-company business accounting system and method for same including account number maintenance | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 9 | Anti-counterfeit system | CRAIG | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 41 | System to enhance security of mobile ad hoc networks using ECCDSA and the Blockchain | Cloudcroft | | | | | | 10.00% | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 147 | A system and method to provide for automated secure cloud based file sharing | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | YES | | | | | | | | GREEN |
| 55 | System and method for capturing and storing casino information in a Blockchain | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 73 | Method and system for storing inventory holders against a tagged Blockchain token | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 81 | Automated P2P cryptocurrency loan risk assessment system and method | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 86 | Universal P2P ledger | Pholus | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 92 | Systems and methods for credit worthiness scoring and non-debt and cryptocurrency loan facilitation | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 102 | Method and electronic apparatus for performing automated bookkeeping utilising the Blockchain | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 120 | Financial management system and method with blockchain transaction and non-debt management | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 80 | System and method for margin loan securitisation using non-debt based allocation and account payment | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 2 | Service provisioning – Pseudonomous | Pholus | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 50 | System and method for utilising proforma processing of adjustments in consolidation processes based on colored coins | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 133 | Date effective quantity on hand and adjusted unit cost calculation system for cryptocurrencies | C01N | | | | | | | GREEN | YES | 4 | NO | YES | | | | | | YES | | | | | GREEN |
| 101 | Blockchain mapped budgetary ledger | C01N | | | | | | | GREEN | YES | 4 | NO | YES | | | | | YES | | | | | | GREEN |
| 14 | Secure video/audio | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 49 | Intercompany transactions elimination system | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 117 | Cryptocurrency Accounting allocation accuracy methodology | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 16 | Blockchain automata financial trading method and system | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 12 | Remote wipe system | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 47 | Blockchain-based resource tracking | Pholus | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 142 | A stock allocation and capitalisation system for a DAC | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 87 | P2P Social network payment settlement system | Zuhl | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 143 | A bond system for a DAC | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 99 | System and method for facilitating the lending of digital content using contacts lists | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 13 | IoT remote control system | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | YES | | | | | | | | GREEN |
| 145 | A system and methodology to integrate key exchange and bonding for site and system access | Cloudcroft | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 161 | Autonomous machine based oracle | CRAIG | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 93 | P2P Personal financial network | Interconnected | | | | | | | GREEN | YES | 4 | NO | YES | | | | | | | | | | | GREEN |
| 163 | Sportsbook | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 43 | A method to use wallet integrated ECC for lightweight Application authentication | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 54 | A blockchain integrated transaction accounting payment and classification system | Cloudcroft | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 55 | Intercompany loan management system that utilises the Blockchain | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | YES | | | | | | GREEN |
| 82 | Electronic P2P Margin Management System | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 86 | System, Method and computer program for operating web-based collective e-money lending/borrowing circles between members and non-members of social networking sites and DAOs | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 101 | System and method for synchronising ledger accounts by company group in blockchain allocated transactions | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 106 | Method and system of using invoice categorization in blockchain accounting to deliver an automated management application | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 121 | A system type reading, organising and manipulating accounting data held within the blockchain | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 122 | Blockchain based activity information accounting method and system | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 126 | System and method for automatically managing bad accounts of accounts receivable using the Blockchain | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 56 | System and method for implementing a revenue recognition model based on hashed information stored in Blockchain transactions | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 57 | Integrated utility accounting, materials management, work management and regulatory reporting software that derives information and stores it into the Blockchain | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 58 | Transaction accounting payment and classification system for Blockchain beased accounting | Interconnected | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 65 | Secure account aggregation using the Blockchain with one-way chains | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 75 | General ledger (GI) journal delete/accounting line reversal blockchain service | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 76 | Pay yourself first with auto bill pay system and method for blockchain accounting and budget system | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 77 | Pay yourself first with revenue generation as a system to budget against the blockchain | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | YES | | | | | GREEN |
| 83 | Electronic P2P Margin Agreement Registration and Management System | Demeruz | | | | | | | GREEN | YES | 4 | YES | | YES | | | | | | | | | | GREEN |
| 84 | Electronic P2P Margin Management System For Managing Actions Such As Margin Calls Under Margin Agreements | Demeruz | | | | | | | GREEN | YES | 4 | YES | | YES | | | | | | | | | | GREEN |
| 85 | Electronic P2P Margin Management System For Managing Actions Such As Margin Recalls Under Margin Agreements | Demeruz | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 119 | Blockchain integrated budget management system and method | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 170 | Programmable budget | C01N | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 3 | Smart media contract | Cloudcroft | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 139 | A Method and system for providing Rational Secret Sharing with Repeated Games using the blockchain | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 141 | A method to encrypt and minimise messages using the bitcoin protocol | Panoptcrypt | | | | | | | GREEN | YES | 4 | YES | | | | | | | | | | | | GREEN |
| 105 | Extensible object oriented framework for blockchain integrated general ledger | Coin-Exch | | | | | | | GREEN | YES | 4 | YES | | YES | | | | | | | | | | GREEN |
| 19 | Insurance monitoring system | Coin-Exch | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 28 | A secure blockchain based medial record system | Cloudcroft | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 48 | A method of automatic accounting that can be used for Input,Authorise and Settlement without need for reconciliation | Coin-Exch | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 51 | Online wallet user interface for processing requests for approval in comapy accounts | Coin-Exch | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 52 | A method to Integrate utility accounting, materials management, work management and regulatory reporting software based on the Blockchain | Interconnected | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 53 | A method to allow real-time consolidated accounting systems and real-time consolidated accounting processes that is mapped against allocated budgets | Interconnected | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 67 | Method and system for facilitating commerce, social interaction and charitable activities as a distributed autonomous Social organisation | Coin-Exch | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |
| 111 | Automata, system and Method for Equity-Based Cryporartner Accounting utilising the Blockchain | Demeruz | | | | | | | GREEN | YES | 5 | YES | | | | | | | | | | | | GREEN |

| # | Description | Entity | | | | | | | Status | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 128 | Method and system to allow for the adjustments to relational chart of accounts against the blockchain | CS3N | | | | | GREEN | YES | a | YES | | | | GREEN |
| 131 | Selective Processing of Reverse Invoices in Computer Systems for Financial Transactions and implementing a chargeback system for merchant using a blockchain based payment system | CS3N | | | | | GREEN | YES | a | | YES | | | GREEN |
| 61 | System and method for utilizing proforma processing of adjustments in blockchain based consolidation processes | CS3N | | | | | GREEN | YES | | YES | | | | GREEN |
| 62 | System, method, and computer program product for automatically posting transactions associated with a transaction in the blockchain that is mapped to an account into a general ledger | CS3N | | | | | GREEN | YES | | YES | | | | GREEN |
| 108 | Apparatus and method for dynamically auditing blockchain accounts to produce metadata | Coin-Exch | | | | | GREEN | YES | a | YES | | | | GREEN |
| 130 | Cryptocurrency-implemented method and system for reading transactions posted into the blockchain and posting journal entries to general ledger | Coin-Exch | | | | | GREEN | YES | | YES | | | | GREEN |
| 135 | Automatic taxonomy merge system for blockchain based accounting | Interconnected | | | | | GREEN | YES | a | YES | | | | GREEN |
| 5 | Wallet based authentication system | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 176 | Online distributed ledger | Pholus | | | | | GREEN | YES | | YES | | | | GREEN |
| 4 | Smart event ticketing | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 26 | Blockchain based Incremental automata verification | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 136 | Unified, configurable services stack for integration of enterprise applications using a logic stack against the blockchain | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 36 | Blockchain based Deterministic finite automata graph traversal with nodal bit mapping into bitcoin addresses | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 114 | Blockchain system to ensure the prioritization of group communications at a wireless communication device | Cloudcroft | | | | | GREEN | YES | a | YES | | | | GREEN |
| 97 | Methods and systems for improving timely loan repayment by controlling online accounts, notifying social contacts, using loan repayment DAISO's employing social graphs | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 157 | Verify layered software on the Blockchain | Denariuz | | | | 15.00% | GREEN | YES | | YES | | | | GREEN |
| 90 | System and method of tracking and recognizing the exchange of favors in a DAISO | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 17 | Method and apparatus for data encryption/decryption using cellular automata transform | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 175 | CGA++ cryptographic key | Panoptycrypt | | | | | GREEN | YES | YES | | | YES | | GREEN |
| 145 | DAISO - (e) Sports bet (85%) | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 11 | Anti-theft system | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 44 | A method to create Efficient Wireless Security Protocols using the blockchain | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 14 | A blockchain wallet system to enable Object Signing and Encryption | Panoptycrypt | | | | | GREEN | YES | | YES | | | | GREEN |
| 146 | An authentication system based on the use of cryptocurrency wallets | Coin-Exch | | | | | GREEN | YES | | YES | | | | GREEN |
| 159 | Secure off-block transfers | CRAIG | | | | 15.00% | GREEN | YES | | YES | | | | GREEN |
| 113 | A system and methods to ensure High-priority communications sessions within a wireless communications system using ECCDSA based access with a blockchain integrated ledger | Panoptycrypt | | | | | GREEN | YES | YES | | | | | GREEN |
| 150 | A system and method to store and implement network and system level controls into the Blockchain | Cloudcroft | | | | | GREEN | YES | | YES | | | | GREEN |
| 158 | K. Intelligent bitcoin agents | CS3N | | | | 15.00% | GREEN | YES | | YES | | | | GREEN |
| 160 | BOTMAN | CRAIG | Tech-1 | | | 50.00% | GREEN | YES | | YES | | | | GREEN |
| 139 | A method to provide Ad-hoc updates to source transactions against the blockchain | Pholus | | | | | GREEN | YES | | YES | | | | GREEN |
| 44 | User-controlled blockchain verified sweepstakes entries | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 27 | Automated 3d fabrication system | Pholus | | | | | GREEN | YES | | YES | | | | GREEN |
| 45 | System and method for cryptocurrency business logic and validation | CS3N | | | | | GREEN | YES | | YES | | | | GREEN |
| 63 | Blockchain computing as a basis for equipment health monitoring service | CRAIG | | | | | GREEN | YES | | YES | | | | GREEN |
| 104 | Blockchain enabled Enterprise information management system and methods | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 29 | Extensible vote based property ownership system | Interconnected | | | | | GREEN | YES | | YES | | | | GREEN |
| 79 | System and method for international merchandise return service against the blockchain | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 112 | Blockchain integrated revenue management systems and methods with re-rating and rebilling | Coin-Exch | | | | | GREEN | YES | | NO | | YES | | GREEN |
| 177 | DAISO - (x) Employment smart contract | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 179 | DAISO - (C) Anti-fraud loyalty | Denariuz | | | | | GREEN | YES | | YES | | | | GREEN |
| 183 | Reactive and preemptive security system based on choice theory | Cloudcroft | Ben | Sydney | 04/08/2015 | 05/11/2015 | 100.00% | ACHIEVED | YES | YES | Awaiting review - awaiting feedback from nChief | 11/01/2016 | 18/01/2016 | 75.00% | YELLOW | Questions have been forwarded to Craig |
| 6 | Network and system modelling | Panoptycrypt | | | | | | YES | | YES | | | | |
| 68 | Blockchain verified Player reward program with loyalty-based reallocation | Denariuz | | | | | | YES | | YES | | | | |
| 70 | Automatically verified Player reward program with loyalty-based reallocation | Denariuz | | | | | | YES | | YES | | | | |
| 110 | Blockchain based medical insurance verification and processing system | CRAIG | | | | | | YES | | YES | | | | |
| 125 | A blockchain and cryptocurrency Gift card assembly and method | Coin-Exch | | | | | | YES | | YES | | | | |
| 160 | DAISO - (d) Smart switch | Denariuz | | | | | | YES | | YES | | | | |
| 103 | Vote based blockchain requisition and authorization process | Interconnected | | | | | | YES | | YES | | | | |
| 109 | Automated automata and system and method for managing and monitoring financial performance associated with benefits | CS3N | | | | | | YES | | YES | | | | |
| 164 | Secure bitcoin messaging platform | Cloudcroft | | | | | | YES | | YES | | | | |
| 46 | System and method for credential management and administration using the blockchain | Panoptycrypt | | | | | | YES | | YES | | | | |
| 46 | General ledger chart of accounts combination editing request response | Coin-Exch | | | | | | YES | | YES | | | | |
| 107 | Method and system to manage blockchain enabled services for multiple managed computer systems | Interconnected | | | | | | YES | | YES | | | | |
| 10 | Distributed Reputation system | Zuhl | | | | | | YES | | YES | | | | |
| 18 | Analog and Perceptron numal network logic automata (on the blockchain) | Panoptycrypt | | | | | | YES | | YES | | | | |
| 172 | Reputation based authentication system | Zuhl | | | | | | YES | | YES | | | | |
| 21 | Asynchronous logic automata | Panoptycrypt | | | | | | YES | | YES | | | | |
| 140 | A method to efficiently allocate connections in a Gossip protocol network | Pholus | | | | | | YES | | YES | | | | |
| 171 | XML mapping system block chain integration | Interconnected | | | | | | YES | | YES | | | | |
| 178 | DAISO - (b) Time clock | Denariuz | | | | | | YES | | YES | | | | |
| 20 | Vehicle history log | Denariuz | | | | | | YES | | YES | | | | |
| 35 | Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process | CRAIG | | | | | | YES | | YES | | | | |
| 39 | System verification using one or more blockchain automata | CRAIG | | | | | | YES | | YES | | | | |
| 96 | System and method for creating a secure trusted social network with reputation recorded into the blockchain | Zuhl | | | | | | YES | | YES | | | | |
| 149 | An integrated secure blockchain based voting system | Interconnected | | | | | | YES | | YES | | | | |
| 182 | 20, eLearning | Integerz | | | | | | YES | | YES | | | | |
| 30 | Blockchain based Deterministic finite automata (DFA) graph compression | CRAIG | | | | | | YES | | YES | | | | |
| 33 | Blockchain based Deterministic finite automata graph traversal with nodal bit mapping | CRAIG | | | | | | YES | | YES | | | | |
| 34 | Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process | CRAIG | | | | | | YES | | YES | | | | |
| 148 | A point recording system and network graph analysis platform based on the Blockchain | CRAIG | | | | | | YES | | YES | | | | |
| 162 | Autonomous consensus platform | Denariuz | | | | | | YES | | YES | | | | |
| 170 | Auditable secret voting system | Interconnected | | | | | | YES | | YES | | | | |
| 174 | Plausible deniability wallet | CRAIG | | | | | | YES | | YES | | | | |
| 25 | Deterministic encoding of fuzzy finite state automata in continuous recurrent neural networks related to blockchains | Zuhl | | | | | | YES | | YES | | | | |
| 37 | Intelligent blockchain graph walking | CRAIG | | | | | | YES | | YES | | | | |
| 69 | Method and system for generating occupant schedules that are maintained in the blockchain | Panoptycrypt | | | | | | YES | | YES | | | | |
| 94 | DAISO and method for collaborative shopping, business and entertainment | Zuhl | | | | | | YES | | YES | | | | |
| 111 | Automated blockchain system for customizing and managing benefits | Interconnected | | | | | | YES | | YES | | | | |
| 22 | Deterministic Finite Automata Graph Traversal with Nodal Bit Mapping based on a distributed block system | Denariuz | | | | | | YES | | YES | | | | |
| 23 | Automata-Theoretic Approach Compiler for Adaptive Software | Cloudcroft | | | | | | YES | | YES | | | | |
| 31 | Blockchain enabled automata driven self evolution in multi-agent environments | Cloudcroft | | | | | | YES | | YES | | | | |
| 32 | Blockchain based Deterministic finite automata (DFA) processing | Cloudcroft | | | | | | YES | | YES | | | | |
| 38 | Method and apparatus for traversing a deterministic finite automata (dfa) graph compression | CRAIG | | | | | | YES | | YES | | | | |
| 79 | Blockchain automata Toilet and Facilities management systems, methods, and techniques | CRAIG | | | | | | YES | | YES | | | | |
| 80 | Method of Sharing Possessions among "Friends" Connected through a Social Network using blockchain based tracking | Zuhl | | | | | | YES | | YES | | | | |
| 137 | A method and system to allow for the exchange of personal information whilst maintaining privacy in social and dating networks | Zuhl | | | | | | YES | | YES | | | | |
| 199 | Secure Gaming Player Wallet System | Craig | | NEW | | | N/A | TBD | TBD | YES | | YES | | |

**P-742**

Case No. 9:18-CV-89176-BB

**Reasons for decision**

**Craig Wright R&D – 97 481 146 384**
**Trustee for the Wright Family Trust – 72 433 066 448**
**Cloudcroft Pty Ltd – 94 149 732 365**

**Issues**

1. Are you, Craig Wright, entitled to the input tax credits claimed in your Business Activity Statement (BAS) as lodged for the tax period ended 30 September 2013 (the relevant tax period), for the purpose of the *A New Tax System (Goods and Services Tax) Act 1999* (GST Act)?

2. Are any of your related entities, Trustee for the Wright Family Trust (DeMorgan); Cloudcroft Pty Ltd (Cloudcroft) and Coin-Exch Pty Ltd (Coin-Ex) (collectively, the related entities) entitled to the input tax credits claimed in their BAS' as lodged for the relevant tax period, for the purposes of the GST Act?

**Audit Findings**

3. No, you are not entitled to the input tax credits claimed in your BAS for the relevant tax period so far as those input tax credits relate to the purported acquisition of software from W&K Information Defence Research LLC (W&K) and MJF Mining Services WA Pty Ltd (MJF)[1].

4. No, the related entities are not entitled to the input tax credits claimed in their BAS' for the relevant tax period so far as those input tax credits relate to the purported acquisition of software or intellectual property (IP) in software from you or DeMorgan.

**Background information**

5. On 14 February 2014, we emailed Hotwire[2] and Coin-Exch an interim audit report. The interim audit report explained that Hotwire and Coin-Exch initially contended to have paid bitcoin to DeMorgan for software licences, and asserted that an input tax credit entitlement arose for these acquisitions. The interim audit report advised that Coin-Exch did not properly account for its supply of bitcoin in consideration for the contended software licence acquisition as a taxable supply. If it did, Coin-Exch would not have a negative net amount for the relevant tax period.   Marina Dolevski of the ATO withdrew this report on 19 February 2014, based on subsequent information you provided to us, as set out below.

6. On 18 February 2014,  you and other representatives of yourself and the related entities, namely John Chesher and Andrew Sommer (of Clayton Utz), met Des McMaster, Marina Dolevski and Hoa Do of the ATO at our Sydney office.[3] During the meeting, you provided the following information:

---

[1] The contract provided to us between you and MJF refers to 'MJF Mining Services WA Pty Ltd' whereas the invoice purportedly issued to you was from 'MJF Contracting'. These entities are purportedly one and the same.
[2] Hotwire Pre-emptive Intelligence Pty Ltd, an entity formerly under your control but under administration as at the date of this correspondence.
[3] We note that the presentation slides used by Clayton Utz at this meeting and later provided to Marina Dolevski differ in material respects from the transactions described in the Clayton

CONFIDENTIAL                                                                 DEF_01099811

a. Hotwire and Coin-Exch did not supply bitcoin to pay DeMorgan for the software. Instead, they transferred an equitable interest that you held in an offshore trust. You further explained that the recipient of the interest could call for the transfer of bitcoin from the trust to it absolutely, or, could direct the trustee to transfer the bitcoin to a third-party;

b. As such, there was a supply of rights, not the supply of bitcoin, and later your advisor suggested that these supplies were interests in or under a trust over bitcoin, which are input taxed under item 10 of the table following subregulation 40-5.09(3) of the GST Regulations;[4]

c. The invoice MJF issued you dated 1 July 2013 (Ref: OB0188) included an item 'Agreement to supply Microfinance software and Accounting packages. Integration and support. Developed in conjunction with Dallah AlBaraka group (SA).'(Al Baraka). The 'unit price' was $11,500,000 and you advised you made this acquisition as an agent for Coin-Exch. (At the meeting you provided us a copy of a contract regarding the AlBaraka software that showed  Al Baraka Banking Group and Hotwire (with Craig Wright as agent) as the parties);

d. For the MJF transactions, payment was made in bitcoin, and not by way of a transfer of rights. The bitcoin were transferred from trusts held in the UK, the trustee of which is 'Design by Human Ltd'. The remainder of bitcoin remains in offshore trusts; and

e. Share capital in the relevant related entities Coin-Exch, Hotwire and Cloudcroft was funded through the transfer of an interest in an offshore trust which holds bitcoin.

7. On 19 February 2014, the case was transferred from auditor Celso Tomas to auditor Andrew Miller, following your request that your case be reassigned.

8. On 25 February 2014, John Chesher provided Andrew Miller with proposed amended BAS working papers for a number of entities under audit.

9. On 26 February 2014, John Chesher emailed Andrew Miller a paper that described certain relevant transactions. This paper provides the following information:

a. Much of the bitcoin available to you is held in a trust, formed in the Seychelles (the Seychelles trust).

b. The Trustee of the Seychelles Trust is a company incorporated in the United Kingdom, Design by Human Ltd.

c. Pursuant to a 'Deed of Loan', entered in to by that Trustee and you in October 2012, the Seychelles trust made a facility of 650,000 bitcoin available to you.

d. An annotation on the Deed of Loan (which is believed to have been written contemporaneously with the execution of the Deed) states 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K [understood to be a reference to a certain Dave Kleiman] and CSW'.

e. Share capitalisation of the related entities occurred through the transfer of the rights to draw down on the facility, and the relevant related entity (i.e.: either Coin-Exch or Cloudcroft) receiving the rights would be able to call for the transfer of bitcoin to itself or the transfer of the bitcoin to a third party. Until such time as the relevant related entity provided the Trustee

---

Utz letter dated 9 May 2014. The description of the information disclosed at the 18 February 2014 meeting, as outlined in paragraph 8, is taken from the transcripts of that meeting.
[4] Per email from Clayton Utz on 24 March 2014 to Andrew Miller.

CONFIDENTIAL

DEF_01099812

with its instructions, the bitcoin would remain held by the Trustee for the benefit of that entity.

10. Also on 26 February 2014, John Chesher and Ann Wrightson met with Andrew Miller and Jenifer Trinh of the ATO. Your representatives gave explanations concerning the updated working papers provided the previous day.

11. On 17 March 2014, John Chesher sent a response to an ATO information request sent on 5 March 2014, in relation to you and DeMorgan. This included responses to questions, and documents in support of those responses. The following information was provided:
    a. You were not a director of W&K but on occasion served as alternate director.
    b. You transferred IP to W&K during the 2010 income year, with a value set at $5,000.
    c. You entered into an agreement with W&K on 2 April 2013 (REF: CEWK03). Under this deed, loans from you to W&K referred to in a previous agreement (CEWK01) were deemed to have been paid in full and the purchaser is stated to have accepted the new terms as full satisfaction of CEWK01.
    d. Uyen Nguyen accepted the position of US resident director of W&K on 1 July 2013. You advised that Dave Kleiman request she hold this position.
    e. On 9 July 2013, Uyen Nguyen transferred all software and related algorithms to you in exchange for the release of W&K from existing debts. The document that is contended to give effect to this transfer referenced NSW Supreme Court (NSWSC) cases 2013/225983 and 2013/245661. The relevant statements of claim were filed at the NSWSC on 25 July 2013.

12. Also provided was a 'Deed of Loan' in relation to the Seychelles trust (Loan Deed). This deed is contended to establish the loan to you of 650,000 bitcoin from Design by Human Ltd, explained at paragraph 11 above. It is contended that rights to the equity of this 'trust' were used as consideration for the acquisition of software in transactions involving you and the related entities. It is noted in this deed that:
    a. The trustee of the Trust is 'Design by Human Ltd' (08248988) UK;
    b. The deed is dated 23 October 2012;
    c. The deed is executed by Uyen Nguyen for Design by Human. The 'Consent to Act' document at the end of the deed states that Uyen Nguyen accepts the position of Chief Operating Officer of Design by Human from 18 October 2012 and consents to act as Director from the later date of 30 June 2013;
    d. The mortgagee (identified in the deed as Design by Human) agreed to lend money in the form of bitcoin to the mortgagor (identified in the deed as you).
    e. The loan is for 650,000 bitcoin;
    f. You are to repay the loan by 30 June 2020; and
    g. Appendix 1 lists bitcoin blockchain addresses stated to have been transferred and contains a note that 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW'.

13. On 18 March 2014, John Chesher advised Andrew Miller by email that amended BAS' for the relevant period had been lodged for you and other entities related to you. Our systems show that you lodged an amended BAS on 17 March 2014.

CONFIDENTIAL

DEF_01099813

14. On 28 March 2014, Andrew Miller, Jenifer Trinh and Des McMaster of the ATO met with John Chesher, Craig Wright and Andrew Sommer, at the premises of Clayton Utz in Sydney. At this meeting your representatives provided documents and information in further response to our information requests, some of which had not been previously provided.[5] In particular, you provided us the following documents and information for the first time during these audits:

    a. A 'Deed of Assignment and Charge' between you and DeMorgan, signed and dated 15 July 2013. This deed among other things, refers to the ABN of DeMorgan. Under the deed, you agreed to transfer IP to DeMorgan. The IP was stated to consist of core software and training materials, source code developed under agreement with W&K (the deed listed categories of source code purportedly related to projects completed for the United States Department of Homeland Security (US DHS)) and software sourced from MJF (which although stated by the deed not to have been received as at the date of signing, was stated to be purportedly subject to an agreement for supply).

    b. Three documents, all described as an 'IP Deed of Assignment' respectively between DeMorgan and each of the related entities, dated 15 September 2013.

    c. Three documents, each described as a 'Deed of Assignment of Equitable interests' between you and each of the related entities, dated 1 July 2013. According to these documents you held equitable rights to a number of bitcoin managed in the UK, the bitcoin being legally owned under the terms of an overseas trust. The 'equitable interest' so described is contended to confer the right to call on bitcoin.

    d. You also confirmed that you personally did not provide the bonds referred to in the NSWSC statements of claim, despite claiming relief for those amounts.  You were uncertain of the source of those bonds and thought the bonds may have been from an American gaming company called 'Playboy Gaming'. The settlement of the NSWSC proceedings is said to have resulted in you obtaining legal title to software purportedly held previously by W&K in exchange for the satisfaction of the debt you claimed in those proceedings (which included the $20,000,000 bonds).

15. W&K was administratively dissolved on 28 September 2012 due to failure to pay annual fees. On 29 March 2014, John Chesher advised us that Uyen Nguyen had paid the required fees to the Florida Department of State (FDS) to reinstate W&K as a company, as at 28 March 2014. This had the effect of treating W&K has having never been administratively dissolved.

16. On 2 April 2014, John Chesher provided Andrew Miller with a list of all bitcoin wallets used for the MJF transactions. He advised that these were 'off blockchain' transactions, which is understood to mean that there was no transfer of bitcoin between the wallets of the purchaser and the vendor of the software recorded on the blockchain (a publicly available ledger of bitcoin transactions), but rather an entire bitcoin wallet and key were provided by the purchaser to the vendor. It is noted that the wallets and bitcoins purportedly transferred in the transaction under which the MJF software was acquired, comprise the majority of wallets and

---

[5] We note that these documents are inconsistent with the structure of the arrangement as advised to us at the meeting of 18 March 2014. In describing the arrangement below, we have taken into account relevant source documents, including those provided to us on 28 March 2014 and statements made by you at interview on 11 and 18 August 2014.

CONFIDENTIAL

DEF_01099814

bitcoins referred to in the deed of loan entered between you and the trustee of the Seychelles trust.

17. On 8 April 2014, we issued a second interim report to Coin-Exch, explaining our view that there was no supply or acquisition of software or IP given the conflicting contractual documents and that even if there was, there was no consideration provided for any associated acquisition, as a result of the deed of loan not being signed by an authorised person and hence having no effect.

18. We received a response to the 8 April 2014 interim report on 9 May 2014. Broadly your advisor asserted Coin-Exch's entitlement to input tax credits arose because it made an acquisition for a creditable purpose, the acquisition by Coin-Exch was of a taxable supply, and that Coin-Exch provided or was liable to provide consideration for the supply of the thing acquired. You provided us with an opportunity to view the software held in your group in order to verify that there was a supply and that you do hold software.

19. On 3 June 2014, Stuart Coulson and Andrew Miller of the ATO, attended the Sydney offices of Clayton Utz. You provided a demonstration of various software, showing you had access to Siemens support and could download different software suites. You showed us source code which appeared to relate to Al Baraka and demonstrated what you purport to be a functioning online bitcoin banking system. You also showed us other software packages which you said were obtained from W&K, including online gaming software such as 'Texas hold 'em'.

20. On 30 June 2014, George Montanez of the ATO spoke with your representatives and advised that the refund claimed by Coin-Exch  would be released because, on our understanding of the  evidence held at that time, it was considered appropriate to do so. However, we made it clear that there would be further compliance action encompassing a review of the transactions concerning the contended acquisition of software IP underlying you and your related entities input tax credit claims for the relevant tax period.

21. On 11 and 18 August 2013, you attended an interview with Counsel representing the ATO. Some relevant statements made at these interviews are set out below:

    a. You advised the funding for Coin-Exch was obtained via a Panamanian trust, in conflict with all previous statements that it was a trust in the Seychelles.[6]
    b. You admitted to back-dating invoices, despite advice that you shouldn't.[7]
    c. When asked what changed [with the transactions] following input from the Commissioner [of Taxation], you said 'How we did GST'.[8]
    d. You advised that there was no business plan for Coin-Exch and that it won't be making money in the foreseeable future, and that it will be spending money.[9]
    e. You described the inter-company transactions as 'zero transactions', the effect of which is to net-off to a nil amount.[10]

---

[6] Auscript transcript of 11 August 2014 at pages 10-13.
[7] Auscript transcript of 11 August 2014 at pages 23-24 and 18 August 2014 at pages 25-26.
[8] Auscript transcript of 11 August 2014 at page 24 and 18 August 2014 at pages 25-26.
[9] Auscript transcript of 11 August 2014 at pages 9-10.
[10] Auscript transcript of 18 August 2014 at pages 25-26.

Page 5 of 23

CONFIDENTIAL

DEF_01099815

22. On 15 September 2014 we sent you our final audit report (in draft form). On 23 September 2014 you provided us with further information in relation to whether DeMorgan, Coin-Exch and Cloudcroft were carrying on an enterprise for the purposes of subsection 25-5(1) of the GST Act.

**Description of the arrangement[11]**

23. You, Craig Wright, incorporated numerous companies which you have indicated each relate to the bitcoin industry. The company details (based on ASIC records) are set out below:

| Company Name | ABN | Established | Director(s) |
|---|---|---|---|
| Coin-Exch Pty Ltd (Coin-Exch) | 31 163 338 467 | 17/04/2013 | Craig Wright Jamie Wilson  (ceased) |
| Hotwire Preemptive Intelligence Pty Ltd (Hotwire)[12] | 48 164 068 348 | 02/06/2013 | Craig Wright Ramona Watts |
| Cloudcroft Pty Ltd (Cloudcroft) | 94 149 732 365 | 08/03/2011 | Craig Wright Lynn Wright (ceased) |

24. You and each of these companies report GST quarterly on an accrual basis.

25. You also contend to have established a trust 'the Wright Family Trust', which through its trustee purportedly trades as 'DeMorgan'. You assert that you formed the intention to set up a family trust to hold software in the first part of 2013 and engaged a lawyer to assist with this. The trust deed for DeMorgan was stated to have been executed on 9 August 2013 and it was issued with an ABN on 26 August 2013. The trustee is said to be Panopticrypt Pty Ltd.

26. You have stated that you acquired software, including source code, from two primary sources; W&K and MJF. Your stated intention in acquiring the software from W&K and MJF was to supply it to DeMorgan and then split the software into components which would then be supplied to Coin-Exch, Hotwire and Cloudcroft.[13]

The W&K transaction:

27. W&K is a limited liability company that was registered in Florida on 14 February 2011. W&K was administratively dissolved on 28 September 2012 due to owing outstanding company fees to its  corporate regulator, the FDS. After advising you of this on 28 March 2014 the outstanding fees were paid to FDS on the same day, the effect of which was to reinstate the company as if it were never administratively dissolved.

28. You have stated that some of the software the subject of the W&K agreements was originally developed by you and later transferred to Dave Kleiman 'at cost' for $5,000.[14] Your representatives have also stated that irrespective of the

---

[11] All amounts in this position paper are in Australian dollars unless otherwise indicated.
[12] According to ASIC records, Hotwire was placed into administration on 28 April 2014.
[13] Submissions received in relation to the draft interim report for Coin-Exch dated 9 May 2014 (the Clayton Utz letter) at page 8.
[14] Email from David Kleiman dated 28 June 2011 confirming that 'all software' had been transferred for $5,000. This appears to be the subject of NSWSC case 2013/245661.

CONFIDENTIAL

DEF_01099816

contractual arrangements with W&K, you were in possession of the relevant software at the time you purportedly transferred it to DeMorgan.[15]

29. On 25 July 2013 you lodged a Statement of Claim with the NSWSC, which you claim was done to obtain title to software previously owned by W&K. In this case, 2013/225983, you made the following statements to the court:
   a. You provided contract labour services to W&K.
   b. You were party to a contract with W&K dated 27 October 2008.
   c. You were a contractor and financier.
   d. You conducted four projects associated with the US DHS (the statements you provided to the NSWSC listed the projects and the associated funding)
   e. The Director of W&K died in May 2013.
   f. A bond of $20,000,000 was provided (the inference to be drawn, given your claim as particularised at g below, is that you purportedly loaned or otherwise provided W&K a bond of $20,000,000). W&K held IP in the form of software and code used by the US Military, US DHS and other associated parties.
   g. You claimed $28,253,633.00. This was comprised of the $20,000,000 bond, the funding provided for the four projects, and the interest accrued on the project funds.

30. The reference to the contract of 27 October 2008 was explained as being a reference to a purported contract between you and David Kleiman in his personal capacity which was then ratified by W&K once it was incorporated.[16]

31. The US DHS has confirmed that whilst W&K had placed a bid to complete the four projects listed in the documents you provided the NSWSC, it was not successful in obtaining any of those contracts. You were listed as the contact person for the project submissions. Documents obtained from the NSWSC in relation to these cases contained 2 emails sent to you from the US DHS BAA Program Support Office confirming that two proposals for W&K had been received electronically at that office and that those proposals were uploaded by you.

32. The US DHS also confirmed that it did not provide any funding to W&K. You have stated that you were not involved in the applications for funding from the US DHS and that David Kleiman did not inform you of the outcome. An email between David Kleiman and Uyen Nguyen refers to using your source code to 'gain a large amount of funding' but it is not clear what funding is referred to and where that funding was obtained.[17]

33. The IP that is said to have been developed for these 4 projects purportedly forms part of the software that was later acquired by your related entities Coin-Exch and Cloudcroft.

34. On 13 August 2013, you filed a second statement of claim with the NSWSC. In this case, 2013/245661, you made the following statements to the court:
   a. You provided contract labour services to W&K.

---

[15] Clayton Utz letter at page 3.
[16] In this respect, your provided us with a document titled 'statement of work'.
[17] Email between David Kleiman and Uyen Nguyen dated 20 December 2012 referring to her acceptance of the director position at W&K.

CONFIDENTIAL                                                          DEF_01099817

    b. You loaned money to W&K at a set interest rate, with the expectation that W&K would repay that amount in full when a project was completed. This loan was issued in bitcoin.

    c. You entered into a contract with W&K on 8 January 2009, under which W&K agreed to pay you for property and consulting services.

    d. The contract was secured against the intellectual property of W&K.

    e. You were the contractor and financier.

    f. Funding was supplied using Bitcoin and gold bonds.

    g. A bond of $20,000,000 was provided to cover funding of the research.

    h. The IP is software and code used in the creation of a Bitcoin system.

    i. You claimed $28,533,016.79 which includes the $20,000,000 bond.

35. You have advised us that W&K did not have any representatives present for the court proceedings,[18] and that Uyen Nguyen acted for W&K in the two cases before the NSWSC. Both NSW Supreme Court matters were settled pursuant to an agreement dated 9 July 2013[19] (16 days before a Statement of Claim was filed for either action), between you and Uyen Nguyen in her stated capacity as director of W&K.

36. That agreement specifically listed the NSWSC case reference numbers and states "In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed considerations." The consent document provided to the ATO was not found in the case files sourced directly from the NSWSC.

37. Information obtained from NSWSC court files for cases 2013/225983 and 2013/245661 show that you filed the Acknowledgment of Liquidated Claim on 19 August 2013 on behalf of W&K as the legal agent and representative. In the documents you stated that you were acting as Director/Australian Agent of W&K. However, you have stated that you were not a director of W&K at any time but served as an alternative director for David Kleiman from time to time.[20] There are no records which establish that you held any authorised position with W&K.

38. In the same information obtained from the NSWSC court files, Jamie Wilson signed the *Consent Orders* on behalf of W&K on 28 August 2013. There are no records that establish that Jamie Wilson was ever an officeholder or had authority to represent W&K in the NSWSC.

39. You asserted that the value of the software obtained from W&K is established by reference to the amount of the debts claimed in these NSWSC matters.[21] However, you have also stated that you did not provide the $20,000,000 bond, claimed as a debt owing to you in the NSWSC actions, and that you do not know who did.[22] Further, the NSWSC was presented with a purported invoice from W&K to you, which states that W&K supplied you with 4 US DHS projects, $20,000,000 in software and loans of bitcoin.[23]

The MJF transaction:

---

[18] Response to questions received by us on 17 March 2014.

[19] We clarified with you whether the date on this document was 9 July 2013 or 7 September 2013 and you confirmed that the correct date was 9 July 2013.

[20] Response to further questions for Craig Wright received by us on 17 March 2014.

[21] Clayton Utz letter of 9 May 2014 at page 12.

[22] Statement made at interview with us on 28 March 2014.

[23] Invoice dated 22 April 2011, copy obtained from the NSWSC case file on 26 May 2014.

CONFIDENTIAL DEF_01099818

40. On 3 June 2013, Mark Ferrier of MJF and you entered into a *Contract for the Sale of Personality* (ref OB0188)[24] for you to acquire:

    i.   Siemens mining automation software for $5,000,000;
    ii.  Microfinance software and accounting packages, developed by Al Baraka for $11,500,000; and
    iii.  Gold options from Paynes Gold Mining for $18,750,000.
        (All amounts excluding GST)

41. You hold two documents described as tax invoices purportedly issued by MJF. The first is dated 1 July 2013, marked 'OB0188' and refers to the items listed above, plus valuation services of $50,000.  This invoice is for $35,300,000 plus GST; that is, for a total of $38,830,000.

42. The second purported tax invoice is dated 15 August 2013 marked 'Dallah', and is stated to be for fees in relation to 'core software per the Al Baraka contract'. This invoice is for $18,454,974 plus GST, i.e. $20,311,471.

43. You provided us a list of the public addresses of the bitcoin wallets which were purportedly used as consideration for the MJF transaction. These wallets were purportedly transferred 'off blockchain' meaning that the relevant transactions cannot be traced in the blockchain ledger and the relevant private key is passed directly to the recipient rather than transferring bitcoin to the recipient's wallet.

44. You claimed input tax credits for these contended software acquisitions from MJF in your BAS for the relevant tax period. You did not include GST on any supply of Bitcoin in your BAS for the relevant tax period.  It is noted that you advised that the Gold Options and Valuation services were never provided to you and you are taking legal action against MJF in relation to this. Regardless of the supply not occurring, you claimed an input tax credit for these acquisitions in your BAS for the relevant tax period.

45. A Software Agreement was entered into on 1 July 2013, between Al Baraka and Hotwire, listing you acting as agent for Hotwire, and MJF acting as agent for Al Baraka (a wholly owned subsidiary of Al Baraka Banking Group). However, the purported invoice that is said to substantiate the supply and consideration provided is addressed from MJF to you directly.

46. Your advisors have stated that it was always your intention to acquire all the relevant software from MJF in your personal capacity and that the subsequent agreements between you, DeMorgan and related entities such as Coin-Exch and Cloudcroft evidence this intention.[25]

47. ATO officers have viewed software which appears to be Siemens software and source code for a core banking package. However, based on the following third party checks we consider that you and your related entities did not at any material time hold authorised versions of the relevant software. Specifically:

---

[24] You have stated that you met Mark Ferrier at a conference but cannot recall where that conference was held or what the conference was in relation to. You have confirmed that all negotiations for this contract were done over Skype and have provided us with a Skype record (in a form of an excel spread sheet) and email exchanges as evidence.

[25] Clayton utz letter at page 8.

CONFIDENTIAL

DEF_01099819

a. Siemens Australia have advised us that it has not sold or licensed software to either MJF or you; and

b. Al Baraka have advised us that it has not had any relationship whatsoever with MJF, there was not any business conducted between it and Mark Ferrier (the director of MJF), and, that that the purported software supply agreement had nothing to do with them as they are not related to such business.

48. You have provided the ATO with copies of letters and emails purporting to be from employees of Al Baraka regarding training and technical support available in relation to the Al Baraka software you purportedly acquired. These emails were sent from a domain which has an address listed as a virtual office in Istanbul known as 'Servcorp'. The domain was established in January 2014. Your credit card records show that a payment was made to this virtual office around the time the domain was established. You indicated to us in interview on 18 August 2014 that you did not have any reason to make such a payment to 'Servcorp' and that you intended to make inquiries as to how that payment appeared on your statement.

49. We do not accept that the copies of the letters and emails you purportedly received from Al Baraka substantiate your input tax credit claim for software, for reasons including that they were sent from a domain name which was not active at the time the email was purportedly sent.[26]

<u>Your purported sale of the W&K and MJF software to DeMorgan:</u>

50. You state that you formed the intention of setting up a family trust in the first part of 2013. Due to delays caused by your lawyers the trust deed for the Wright Family Trust (DeMorgan) was not executed until 9 August 2013. Panopticrypt Pty Ltd was appointed as trustee, but a resolution was made on 19 August 2013 that it act as trustee through you as the sole manager of the trust for a term of up to 3 years.[27] Another memo dated 9 August 2013, stated that Lloyds Solicitors had settled the trust and that an ABN registration was to be filed with the ATO. This same document contains the ABN of DeMorgan in the footer of the page.

51. You have provided us with a 'Deed of Assignment and Charge' between you and DeMorgan dated 15 July 2013. This Deed also contains the ABN of DeMorgan, which was not issued until 26 August 2013. Your advisors have stated that it would seem likely that the deed was executed after 15 July 2013 and the date on the front page of the agreement was not updated.[28] However, even if the deed was executed on 15 July 2013, you have stated that you had signed this deed in the belief that you were acting in your capacity as trustee. However, the trust did not exist at this time. This deed purports to grant DeMorgan an exclusive licence to use and exploit certain IP which includes the software from W&K and MJF.[29]

---

[26] Email sent from 'craig.wright@hotwirepe.com' to 'Ghamrawi@albaraka-bank.asia' at 3:12pm on 31 December 2013. Domain search for 'albaraka-bank.asia' shows it was created at 8:21pm on 1 January 2014. The registered address is Level 8, Tefken Tower Buyukdere St No2094 Istanbul. This is the result of an online 'WhoIS' search on 2 June 2014.
[27] Memo dated 19 August 2013 under the DeMorgan logo.
[28] Clayton Utz letter at page 5.
[29] Clause 14 of the Deed of Assignment and Charge between you and DeMorgan dated 15 July 2013.

Page **10** of **23**

However, the deed specifically notes that the IP of W&K in 'SCADA and Firewall research will be transferred directly from Mr Wright to Cloudcroft Pty Ltd'.[30]

52. Documents described as 'invoices' dated 1 July 2013 were issued by you to DeMorgan. These 'invoices' include the ABN of DeMorgan, though no ABN was issued at this time. You advised that the invoices were issued at a later date, and that you back-dated them, despite advice from Jamie Wilson that you should not. You had previously advised that the incorrect dates appear on these invoices because of an error in your cloud based accounting software, Xero.

53. The details of these purported invoices are:

| Inv. No. | Description | Recipient | Unit Price $ | GST $ | Total Amount $ |
|---|---|---|---|---|---|
| INV-0096 | 2013/225983 and other supplies | DeMorgan | 31,388,908.50 | 3,138,890.85 | 34,527,799.35 |
| INV-0097A | Cloudcroft - NSWSC | Cloudcroft | 28,181,818.18 | 2,818,181.82 | 31,000,000.00 |
| INV-0098 | 2013 / Judgement 2 | DeMorgan | 31,000,000.00 | 3,100,000.00 | 34,100,000.00 |
| INV-0099 | Courseware for Uni Site | DeMorgan | 19,904,766.36 | 477.64 | 19,905,244.00 |
| INV-0100 | Uni Core Software | DeMorgan | 44,848,630.00 | 544,863.00 | 45,393493.00 |
| INV-0101 | Hardware Design | Coin-Exch | 174,559.83 | 17,455.98 | 192,015.81 |
| Total | | | 155,498,682.87 | 9,619,869.29 | 165,118,552.16 |

54. You have advised that INV-0097A was issued in mistake as it is intended to represent a supply of the relevant software to DeMorgan, not Cloudcroft, with DeMorgan then supplying a corresponding licence to Cloudcroft. This advice is inconsistent with the specific terms of clause 14.4 of the deed between you and DeMorgan, under which you retained the IP in the W&K SCADA to be transferred directly by you to Cloudcroft. As a consequence DeMorgan did not acquire the W&K SCADA software under this agreement.

55. You have explained that INV-099 and INV-0100 purportedly included GST-free sales for university courseware and testing.

56. On 22 August 2013, you in your personal capacity as 'Craig Wright R&D' entered into three purported 'Intellectual Property Licence' agreements with Hotwire, Coin-Exch and Cloudcroft. The terms of these contracts are similar and the key terms have been summarised below:
   a. That you as licensor own or have the right to use the IP as software.
   b. The licensor has clear title internationally based on the judgment from the NSWSC. (It is noted that this judgement was not handed down until 6 November 2013).
   c. The licence fee is the amount of relief claimed under respective court cases.
   d. Commencement date: 01 July 2013
   e. Term: No end

---

[30] Subclause 14.4 of the Deed of Assignment and Charge between you and DeMorgan dated 15 July 2013.

CONFIDENTIAL

DEF_01099821

57. You issued purported invoices on the same day to each company reflecting the amounts set out in the agreements.

58. On 27 August 2013, you applied for a private ruling relating to GST and the supply of IP (which subsequently issued as Authorisation Number: 1012513887115). In this private ruling application, you advised that the NSWSC action was taken to distribute property and transfer it into your name. The property was IP and valued in two tranches at $28,533,016.79 and $28,254,666.00. You advised you intended to exploit the value of the IP by using it within companies you control and would have an assignment contract completed at arm's length with the value based on that determined by the NSWC.

59. You then provided  us three 'agreements' styled as deeds between DeMorgan and Hotwire, Coin-Exch and Cloudcroft respectively, all dated 15 September 2013. The deeds stated that DeMorgan owned IP in the form of  software obtained through W&K and MJF. While these purported agreements conflict with the agreements of 22 August 2013, it is noted that they align with the purported invoices DeMorgan issued these companies. You advised that the invoices you issued on 22 August 2013 were in error and void and that the invoices you issued to DeMorgan correctly reflect the arrangement.

60. You lodged your BAS for the relevant tax period on 28 September 2013 (self-revised on 18 March 2014) with the following (revised) amounts:

| Sales | GST Debits | Acquisitions | GST Credits | Net BAS |
|-------|-----------|--------------|-------------|---------|
| $145,223,819 | $9,619,869 | $79,145,230 | $5,385,612 | $4,234,257 |

Transfers from DeMorgan to related entities

61. You have contended that DeMorgan supplied prepaid software licences to your related entities during the relevant tax period, and that the supply is evidenced by the deeds of assignment entered into on 15 September 2013 with each of Hotwire and Coin-Exch and the invoices dated 1 July 2013. The following information was provided on these purported tax invoices:

| Inv. No. | Description | Recipient | Unit Price $ | GST $ | Total Amount $ |
|----------|-------------|-----------|--------------|-------|----------------|
| INV-0001 | Software Sales-Prepaid Software License | Hotwire | 10,341,500 | 1,034,150 | 11,375,650 |
| INV-0002 | Software Sales-Prepaid Software License | Hotwire | 10,000,000 | 1,000,000 | 11,000,000 |
| INV-0003 | Software Sales-Prepaid Software License | Hotwire | 8,000,000 | 800,000 | 8,800,000 |
| INV-0004 | Software Sales-Prepaid Software License | Hotwire | 5,950,000 | 595,000 | 6,545,000 |
| INV-0005 | Software Sales-Prepaid Software License | Coin-Exch | 9,950,000 | 995,000 | 10,945,000 |
| INV-0006 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| INV-0007 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |

CONFIDENTIAL

DEF_01099822

| INV-0008 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
|---|---|---|---|---|---|
| INV-0009 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| INV-0010 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| **Total** | | | **68,991,500** | **6,899,150** | **75,890,650** |

*Coin-Exch*

62. Coin-Exch was incorporated and registered with ASIC on 17 April 2013. At the time of registration you were recorded as the sole director and secretary. At that time 100 shares were issued to you for $100.

63. Pursuant to a deed of assignment dated 1 July 2013 between you and Coin-Exch you purportedly assigned Coin-Exch your rights to call on 150,000 bitcoin held in a Seychelles trust (the 'rights to call on bitcoin').

64. On 22 August 2013 Coin-Exch issued 39,999,999 new shares of which 29,999,999 were allocated to you and 10,000,000 were allocated to Jamie Wilson.[31] The total value of these shares was stated to be $39,999,999 and all the shares were stated to have been paid in full. You advised us on 3 December 2013 that Coin-Exch received bitcoin in exchange for issuing these new shares. On 18 February 2014 you revised this explanation and stated that the share issue was paid for by the transfer of rights to call on bitcoin held by a trust in the Seychelles. On 11 August 2014, you advised that Coin-Exch was funded through a trust in Panama.

65. On 15 September 2013 Coin-Exch and DeMorgan entered into an 'IP deed of assignment' in relation to the licensing of Core Banking and Exchange Software, which was said to comprise of elements of both the Al Baraka and W&K software.

66. Purported invoices dated 1 July 2013 issued to Coin-Exch from DeMorgan for the supply of software licences and are said to relate to this deed of assignment and total $38,170,000. You have stated that Coin-Exch used the purported rights to call on bitcoin to pay these invoices. You advised at interview on 18 August 2014 the only funding source for each of your related entities, including Coin-Exch, were the purported rights to call on bitcoin. On 23 September 2014 your advisors noted that you have in fact redeemed that right and called on the bitcoin purportedly available to Coin-Exch and it has also used cash. Bank records for Coin-Exch show very little cash was available to Coin-Exch during the relevant period. The largest amount deposited into that account was attributable to an ATO refund which was then transferred to a related entity on the same day.

67. You advised in interview on 11 August 2014 that there was no business plan developed for Coin-Exch and you conceded that there was no possibility of a profit in the near future. During the relevant period, there is no evidence to demonstrate that Coin-Exch ever made any acquisitions or supplies to or from entities apart from you, DeMorgan and Hotwire. On 23 September 2014, your advisors provided further details in relation to the purported activities of Coin-Exch which included a paper titled 'Coin-Exch Pty Ltd Core Research' and a

---

[31] ASIC records filed on 25 August 2013.

CONFIDENTIAL

DEF_01099823

document provided to AusIndustry in relation to their request for further information (the 'AusIndustry document'). You have further advised that Coin-Exch has made acquisitions from third parties namely, Rubik, Modulus and Signia. These are understood to be acquisitions made after 30 September 2013.

*Hotwire*

68. Hotwire was incorporated and registered with ASIC on 2 June 2013. At the time of registration, you were sole director and secretary and 100 shares were issued to you for $100. On 1 July 2013 Ramona Watts (RW) was appointed as a director.

69. On 1 July 2013 you purportedly transferred an 'initial bitcoin wallet' contended to be worth $32,994,806.68 to Hotwire as a capital subscription. On 3 December 2013 you confirmed that this purported capital subscription was paid for in bitcoin. You later stated at an interview of 18 August 2014 that this capital subscription was in fact funded by rights to call on bitcoin held by a trust in the Seychelles.

70. Pursuant to a so called deed of assignment dated 1 July 2013 between you and Hotwire you purported to assign your rights to call on 284,438 bitcoin held in a Seychelles trust (the 'rights to call on bitcoin').

71. On 15 September 2013 DeMorgan and Hotwire entered into an 'IP deed of assignment' in relation to the purported licensing of automation software, including some software purportedly originating from Siemens and some software originating from W&K (which was the subject of a NSWSC action).

72. Hotwire was placed in external administration on 28 April 2014.

*Cloudcroft*

73. Cloudcroft registered for GST on 15 March 2011. Since 11 November 2011 you have been the sole director of Cloudcroft. The majority shareholder since 1 July 2012 is Panopticrypt which acquired 500,000 shares for $50,000 on that date. On 15 November 2012 you acquired 120,000 shares for $120,000. On 1 August 2013 Hotwire became a shareholder of Cloudcroft and according to documents lodged with ASIC acquired 1,000,000 shares for $1,000,000.

74. You have advised that there was a further capital subscription in exchange for 474,332 bitcoin. You also advised that this capital subscription was by way of transfer of rights to call on bitcoin.

75. Cloudcroft lodged a BAS for the relevant tax period disclosing purchases of a security software licence from you for $31,000,000. You have since advised that the invoice that related to this contended acquisition was issued in error.

76. In that same BAS, Cloudcroft declared total sales of $3,123,500, which included self-assessed export sales of $3,100,000 for the contended transfer of software to Denariuz SG, a Singapore based company, controlled by you.

77. You lodged the BAS on behalf of Cloudcroft which included these disclosures, and resulted in a net refund payable of $2,834,648. This amount has been retained by the Commissioner under s 8AAZLGA of the TAA.

CONFIDENTIAL

DEF_01099824

78. You have subsequently advised the ATO that the transfer of the licence from you was a mistake and should have been from you to DeMorgan, and then from DeMorgan to Cloudcroft.

79. To the extent it has undertaken any transactions, Cloudcroft has only done so with related entities.  Other than the purported transfer of rights to call on bitcoin, its only other source of funds appears to be from tax refunds.

*The Seychelles Trust*

80. In initial discussions earlier during the audit process you advised that transactions undertaken by you and the related entities were in bitcoin. After the PBR issued that explained our view that a supply of bitcoin in consideration for an acquisition would give rise to a taxable supply if the other requirements in section 9-5 of the GST Act were satisfied, you contended that consideration for all supplies of software and IP made under this arrangement was by an assignment of rights to the equitable interests in an offshore trust which holds bitcoin. In response to our information requests, you have advised that all of these assignments were for the interest in the Seychelles trust, which was purportedly created pursuant to the Loan Deed of 23 October 2012. The deed is executed by Uyen Nguyen of Design by Human Ltd. Attached to the deed is a consent to act, whereby she accepts the position of Chief Operating Officer (COO) from 18 October 2012, and Director from 30 June 2013.

81. The deed records a purported loan to you for the principal amount of 650,000 bitcoin, and the drawdown date was 1 July 2013.   The loan described in the deed is stated to be interest only loan at the rate of 0.05% per annum, with repayments commencing 30 July 2016 and repayment in full by 30 June 2020. The Loan Deed records a First/Second mortgage over all the shares in 'Permanent Success Limited UK' (Permanent Success UK company reference 08260048) and all related trusts as collateral security.

82. On 28 March 2014 we advised you that there is no record of Uyen Nguyen ever holding the position of Director of Design by Human. Companies House records were then updated on 10 April 2014 to enter Uyen Nguyen retrospectively as director, as of 12 October 2012.

83. An Appendix to the Loan Deed lists what were described as the 26 bitcoin blockchain addresses which were the subject of the Deed and contains a note that "As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW (CW)". The Loan Deed states that the money referred to in this deed, which appears to be a reference to bitcoin, has been received by you.[32]

84. It is noted that 22 of the 26 listed bitcoin addresses the subject of the Loan Deed were the same public addresses for wallets purportedly transferred off blockchain to MJF on 15 August 2013 and 15 September 2013. As a result of that transfer, it appears that 4 wallets purportedly remained available in the Seychelles trust (to

---

[32] Item 3 of the first schedule to the deed of loan notes that the draw down date was 1 July 2013, recital B states that the guarantor and the mortgagor acknowledge that the money referred to in this deed has been received by the mortgagor. The reference to 'money' is understood to be to bitcoin.

CONFIDENTIAL                                                                                            DEF_01099825

the extent such a trust actually existed) with a total of 275,071 bitcoin.[33] One of these remaining four wallets was allegedly sold by DeMorgan to Denariuz Pty Ltd (a company related to you) and purportedly exported by you as a paper wallet to a company in Singapore. You have given two separate addresses as evidencing the existence of this particular wallet.

85. On 7 January 2014 the company name for the purported corporate trustee of the Seychelles Trust changed from Design by Human to C01n Ltd and according to Companies House records you were appointed as its Director.[34]

86. However, despite holding this position, at the interview of 18 August 2014, you said that you were unable to identify any beneficiaries of the Seychelles trust. Further, despite repeated requests for a copy of the trust deed for the Seychelles trust, you have stated that you are unable to obtain that information as the terms of the trust do not allow you access to any information until 2015.

**Our findings explained**

**Issue 1 & 2 – entitlement to input tax credits**

87. You are entitled to an input tax credit if you make a creditable acquisition.[35] You make a creditable acquisition if:[36]
    a. You acquire anything solely or partly for a creditable purpose; and
    b. The supply of the thing to you is a taxable supply; and
    c. You provide, or are liable to provide, consideration for the supply; and
    d. You are registered, or required to be registered.

88. Having regard to the facts and evidence established to date and as explained above, we do not consider that you, Cloudcroft, DeMorgan or Coin-Exch made any creditable acquisitions of software or IP for which input tax credits were attributable to the relevant tax period. In particular we do not consider that:
    a. You acquired any software or IP from MJF or W&K;
    b. DeMorgan, Coin-Exch and Cloudcroft acquired software; and
    c. DeMorgan, Coin-Exch or Cloudcroft provided or were liable to provide consideration for the purported supplies of IP or software.

89. We also do not concede that, to the extent they acquired software, DeMorgan, Coin-Exch and Cloudcroft acquired it for a creditable purpose within the meaning of section 11-15 of the GST Act.. The reasons for this are explained at paragraphs 111 – 128 below.

90. We note that you provided further information to us on 23 September 2014 in relation to whether these entities were carrying on an enterprise at the relevant time. A request was also made to provide us with further information on whether the entities will likely be carrying on an enterprise in the next 12 months by 29 September 2014. We will take this information into consideration in determining any application of subsection 25-55(2) of the GST Act to the GST registration for these entities.

---

[33] Applying the exchange rate for bitcoin to Australian dollars at 15 September 2013, the purported bitcoins remaining available to be drawn down under the loan would have been worth $42,361,050.
[34] Companies House records accessed on 15 July 2014.
[35] Section 11-20 GST Act.
[36] Section 11-5 GST Act.

CONFIDENTIAL

DEF_01099826

*Purported acquisitions from MJF and W&K*

91. In this case we do not accept that you acquired software from MJF or W&K as Siemens and Al Baraka have confirmed that they did not transact with any of MJF or W&K, and it is from these entities that you purport to have acquired Siemens and Al Baraka software.

92. Additionally, according to our records MJF, has denied supplying you any software which in our view supports the conclusion that no such acquisition occurred, and or, that documents purporting otherwise did not reflect the common intention underlying any transaction between you and MJF, if indeed a transaction occurred. It follows that these documents (including any related purported invoices or tax invoices) can be considered a nullity based on sham.[37]

93. Moreover, we do not accept that the NSWSC court proceedings resulted in any acquisition by you of software and or IP from W&K, or any acquisition by you of software and or IP from W&K for the value asserted. The NSWC did not consider any evidence or make any findings of fact as to the existence or value of the software you purportedly acquired from W&K as a result of the proceedings.

94. On the evidence we have obtained, we do not consider such an acquisition in fact occurred. Part of the purported software or IP you contended to have acquired as a result of the settlement of these proceedings was purportedly developed in relation to projects undertaken for the US DHS. The US DHS has verified that neither you nor W&K were awarded any software development projects.

95. Additionally, the statements of claim underlying these proceedings were for repayment of loans or bonds you purportedly advanced according to the court documents. You have subsequently denied that you had provided the bonds referred to in the statement of claim, and could not otherwise verify the existence of these loans or bonds.

96. We also note the backdating of purported invoices said to substantiate these and related acquisitions. As put recently by the AAT '…*a tax invoice does not create a taxable supply; it records one. If a taxable supply did not take place, then a "tax invoice" is meaningless. In other words, documents that are so called "tax invoices" cannot substantiate a creditable acquisition, if in fact there was no supply or acquisition.*'[38]

97. Given this backdating and our view of the other facts surrounding this case, we do not agree that back dated invoices can substantiate supplies or acquisitions, or retrospectively impose or notify an entity of an obligation to pay, in the absence of any such supplies, acquisitions or obligations actually arising at the relevant times. In the facts of this case, we do not accept that simply accounting

---

[37] A sham arises where there is an intention common to transacting parties that the transaction is a concealment or disguise for some other and real transaction or for no transaction at all. *Snook v London & West Riding Investments Ltd* [1967] 2 QB , as referred to by Lockhart J when explaining sham under Australian law at [16] in *Sharrment Pty Ltd v Official Trustee in Bankruptcy* [1988] FCA 179. See also Edmonds J at [97] in *Professional Admin Service Centres Pty Ltd v Commissioner of Taxation* [2013] FCA 1123 at [97].

[38] *Bayconnection Pty Ltd v Commissioner of Taxation* [2013] AATA 40 at [86]; See also *R.V. Investments (Aust) Pty Ltd as Trustee for the RV Unit Trust* [2014] AATA 158 at [72].

CONFIDENTIAL

DEF_01099827

for GST on an accruals basis and receiving a document described as an invoice or tax invoices establishes that you or your related entities made creditable acquisitions in the manner contended.

98. It is noted that you have claimed input tax credits for an acquisition of Siemens Software and Al Baraka Source Code from MJF. You also claimed an input tax credit for acquisition of Gold Options and Valuation Services, yet you submitted to the NSWSC that these things were never supplied to you and have taken legal action against MJF in this regard. We understand that you withdrew that action and commenced separate action in the Federal Court. Your claims for ITCs in relation to the items not supplied will be disallowed.

99. In the alternative, if you are entitled to the input tax credit claims for your acquisition of Siemens software and Al Baraka source code from MJF, totalling $1,650,000 (which we don't concede), we note that you are contended to have provided bitcoin to MJF as consideration for this supply. The Draft GST Ruling GSTR 2014/D3 states that a transfer of bitcoin is a supply for GST purposes. The result of this ruling is that, where the supply is a taxable supply, we consider GST is levied on the supply with the value of the bitcoin you provided matching the value of the supply of software. Hence to the extent it occurred, we consider your supply of bitcoin would have been a taxable supply.

100.    As such $1,650,000 in GST is payable on the bitcoin.[39]

_Were there supplies between DeMorgan and Coin-Exch or Cloudcroft_

101.    Our concerns in relation to the fact that purported transfers of IP was made to DeMorgan at a time it did not exist were sought to be addressed by your representative in the response to our interim report for Coin-Exch. You stated that your intention at the time of the relevant deed of assignment, dated 15 July 2013, was to transfer the IP to DeMorgan and that the transfer was perfected at the time DeMorgan came into existence.

102.    Although the deeds of assignment between DeMorgan and Coin-Exch and Cloudcroft were purportedly entered into on 15 September 2013, documents described as tax invoices were issued with a date of 1 July 2013. You admitted in the interview of 18 August 2014 that documents such as these purported tax invoices were deliberately backdated and that it in your view this was not material from a tax perspective because all the transactions had occurred during the same tax period.

---

[39] We note this position provides the same outcome as the private binding ruling provided to you in December 2013 and the position taken in the first interim report issued to Coin-Exch and Hotwire in February 2014.

CONFIDENTIAL

DEF_01099828

103.     *McDonald v Commissioner of Taxation*[40] (*McDonald*) concerned the effectiveness of backdating a contract for the acquisition of land to 13 September 1985 in determining whether a gain from a post-CGT subdivision and disposal of the land was subject to CGT. Stone J with whom the other members of the Full Court agreed observed that upon making a binding contract:[41]

> parties may agree that one of the terms of the contract is that certain obligations under it are to be retrospective to a specified date. However, the date of the formation of the contract is a matter of law and the parties cannot, by backdating the written document, rewrite history with the effect that a binding contract existed from the specified date.

104.     It is noted that a supply for GST purposes need not occur only by way of contract. However, in the context of an arrangement where the thing supplied by its very nature takes it value and existence from an intangible set of rights, such as a licence to use intellectual property, it is difficult to see how a supply of such a thing can be made other than by way of a written agreement between the parties with valid legal effect.

105.     We consider that a backdated agreement cannot have the effect of 'rewriting history', such that DeMorgan is said to have supplied rights to intellectual property it could not have owned because it did not yet exist at that time.

106.     In the alternative, if each of these entities did acquire software from DeMorgan (which we don't concede), then your advisors have stated in the letter of 23 September 2014 that Coin-Exch had actually called on the bitcoin the subject of the deed of loan in order to fund its purported activities. In such a case, where bitcoin is purportedly supplied as consideration for a purported acquisition, there is GST payable on that supply.[42] In the case of Coin-Exch, the amount of GST payable on the taxable supply of the bitcoin would be equal to the amount of input tax credits claimed on the purported acquisition of the licence to the software.

*Was consideration provided or liable to be provided*

107.     We do not accept that the Seychelles Trust existed as a matter of law or fact during the relevant tax period. Further or alternatively, we do not accept that a pool of 650,000 bitcoin was in fact held according to the terms of the Seychelles Trust during the relevant tax period, or that any equitable interests in the Trust were effectively created or assigned. Notwithstanding that you asserted at interviews on 11 and 18 August 2014 that you created the trust, you could not advise us of the identity of any beneficiaries of this purported trust, or its terms. This in our view is consistent with the Trust not having any beneficiaries (and hence not existing), and or not being constituted and settled in the manner asserted. The Deed of Loan of itself does not in our view demonstrate the effective establishment of the Seychelles Trust or the holding of 650,000 bitcoin pursuant to its terms.

108.     Additionally, the Deed of Loan states that you received a loan from the trust. However you purportedly assigned your right to draw down on this loan to your related entities in exchange for shares they issued. The related entities are then

---

[40] [2001] FCA 305
[41] *McDonald* [2001] FCA 305 at [20]
[42] Consistently with the first interim report issued to Coin-Exch, the private ruling issued to you and the views expressed in draft GST ruling GSTR 2014/D3.

CONFIDENTIAL                                                                 DEF_01099829

said to have assigned this right in payment to DeMorgan for software and IP. This could not have occurred in our view because the Trust either did not exist, did not in fact have 650,000 bitcoin settled upon it, or, had already advanced you the loan funds under the Deed of Loan.

109.    It follows that we do not consider the related entities provided any consideration for their purported acquisitions by assigning 'equitable interests' for the purposes of paragraph 11-5(c) of the GST Act. Additionally, we do not consider there were any legally effective arrangements in place during the relevant tax period to have obliged them to provide consideration for their purported creditable acquisitions.

110.    Furthermore, we consider that the purported pool of 650,000 bitcoin which were the purported subject of the Deed of Loan between you and the trustee of the Seychelles trust would have been substantially depleted once and to the extent, the wallets were transferred to MJF off blockchain. At the interview conducted on 18 August 2014, you have confirmed that there are no other sources of funds available to these entities to pay the required consideration.[43] Taking into account the purported invoices issued to Coin-Exch, Hotwire and Cloudcroft, we consider that there were insufficient funds available under the Deed of Loan (assuming the trust existed) remaining for draw down under the loan agreement for the relevant entities. This, we consider supports our conclusion that paragraph 11-5(c) of the GST Act was not satisfied.

_Were DeMorgan, Coin-Exch or Cloudcroft carrying on an enterprise?_

111.    You acquire a thing for a creditable purpose to the extent that you acquire it in carrying on your enterprise.[44] 'Carrying on' an enterprise includes doing anything in the course of the commencement or termination of the enterprise.[45]

112.    Relevantly, an 'enterprise' is defined to include an activity, or a series of activities, done:
    (a)    in the form of a business; or
    (b)    in the form of an adventure or concern in the nature of trade; or
    (c)    on a regular or continuous basis, in the form of a lease, licence or other grant of an interest in property.[46]

113.    However, an enterprise does not include an activity, or series of activities, done as a private, recreational pursuit or hobby.[47]

114.    The existence of a business is a matter of fact and degree.[48] Some of the indicators that establish a business enterprise is being conducted are an intention of making a profit and a reasonable prospect of profitability,[49] existence of a business plan, keeping of detailed business records, commercial sales of product

---

[43] Your advisors have stated in the letter of 23 September 2014 that these related entities now do have access to further bitcoin and can also access funding from other related entities. However, those purported avenues of funding do not appear to have been available in the relevant period to fund the transactions the subject of these audits.
[44] Subsection 11-15(1) GST Act.
[45] Definition of 'carrying on' in section 195-1 GST Act.
[46] Subsection 9-20(1) GST Act.
[47] Paragraph 9-20(2)(b) GST Act.
[48] _Spriggs v FCT_ (2009) 239 CLR 1 at [59].
[49] _Hope v Bathurst City Council_ (1980) 144 CLR 1, at 8-9; _Case H11_ (1976) 76 ATC 59 at 61.

CONFIDENTIAL                                                                            DEF_01099830

&/or skills, exercise of knowledge of skill.[50] No single indicator is decisive and the indicators often overlap.[51] Further, not all of them will be relevant all of the time.[52]

115.    More specifically, an 'enterprise' includes an activity, or series of activities, done in the form of a business. The phrase 'in the form of a business' is broad and has as its foundation the longstanding concept of a business. The meaning of this phrase has not been considered in significant detail by Australian courts.[53]

116.    In *FCT v. Swansea Services Pty Ltd*[54] McKerracher J. observed in relation to the words 'in the form of' in paragraph 9-20(1)(a):[55] '

> Rather than these words supporting a suggestion that form alone may prevail over substance, they have the effect of extending the reach of "enterprise" to those activities which are in the form of a business but would not, in the ordinary meaning of "business" be considered such. But the activity must still be reasonably intended to be profit making in the case of an individual and cannot for any entity simply be a private recreational pursuit or hobby. That this is so is clear from the exclusions to s 9-20 of the GST Act which, relevantly, rules out private recreational pursuits or hobbies or, in the case of individuals, (other than a charitable trustee) an activity or activities done without a reasonable expectation of profit or gain.

117.    TR 97/11 discusses the main indicators of carrying on a business. Based on that discussion some indicators are:
   - a significant commercial activity;
   - a purpose and intention of the taxpayer to engage in commercial activity;
   - an intention to make a profit from the activity;
   - the activity is or will be profitable;
   - the recurrent or regular nature of the activity;
   - the activity is carried on in a similar manner to that of other businesses in the same or similar trade;
   - activity is systematic, organised and carried on in a businesslike manner and records are kept;
   - the activities are of a reasonable size and scale;
   - a business plan exists;
   - commercial sales of product; and
   - the entity has relevant knowledge or skill.

118.    We have taken into account the information provided by your advisors on 23 September 2014 in our discussion below. We note that a decision on whether to cancel the GST registration for DeMorgan, Cloudcroft and Coin-Exch under subsection 25-55(2) of the GST Act will be made after we receive further information from you to be provided, as requested, on 29 September 2014.

119.    In examining the activities conducted by you, DeMorgan, and the related companies, it is noted that none of these entities have traded with any third parties during the relevant period.

---

[50] *Miscellaneous Tax Ruling MT 2006/1: The New Tax System: the meaning of entity carrying on an enterprise for the purposes of entitlement to an Australian Business Number.*
[51] *Evans v FC of T* (1989) 89 ATC 4540 at 4555.
[52] *Dotrac Pty Ltd v Commissioner of Taxation* [2014] AATA 336 at [52].
[53] Paragraph 170 of MT 2006/1.
[54] [2009] FCA 402.
[55] *Swansea* [2009] FCA 402 at [97]-[99].

CONFIDENTIAL                                                                  DEF_01099831

120.    In relation to Coin-Exch and Cloudcroft, during the relevant period, neither of these companies retained the services of any employees or third parties contractors.

121.    You stated that there was no business plan for Coin-Exch and there appears in our view to be a lack of commercial purpose. On 23 September 2014 you provided us with documents titled 'Coin-Exch Pty Ltd Core Research' and 'Cloudcroft Pty Ltd Research'. Neither of these documents are dated. You also provided us with a copy of a response to AusIndustry's for further information from Coin-Exch. Whilst there is much detail in these documents outlining the intention of the research that Coin-Exch and Cloudcroft are to undertake, in this respect the statements of Brennan J in *Inglis v FCT* are relevant:[56]

> The carrying on of a business is not a matter merely of intention. It is a matter of activity, … At the end of the day, the extent of the activity determines whether the business is being carried on. That is a question of fact and degree.

122.    The documents do not show how such intended activities could be practically undertaken or turned to a profit. In examining these companies, even if each entity was engaged in an activity in the relevant period, that activity consisted entirely of transactions with related parties.

123.    More broadly, the significant amounts of shares issued in the companies purportedly paid for by bitcoin or by the assignment of rights thereto, do not on the facts appear to have made any real or lasting contribution to the capital of the companies. The inference to be drawn is that the bitcoin related capital contributions have not established or advanced any enterprise by your related entities.

124.    Additionally, an indicator of carrying on a business is commercial sales of product. As stated above, none of the entities related to you have made any commercial sales, other than sales to related entities, with payment amounting to contended interests in the Seychelles trust (the same trust stated to have been used to capitalise the entities).

125.    Although you have stated in relation to Coin-Exch that it could use its bitcoin holdings as payment or convert such bitcoin to cash to meet its expenditure, on the evidence we currently have, we do not think that any of these entities, had a reasonable view to a profit. Any business plans that did exist relied solely, if not heavily, upon generating ATO refunds to meet running costs. You explained during two interviews in August 2014, that all the inter-company transactions net off to zero from a GST perspective. The position in our first interim reports for Hotwire and Coin-Exch supported this approach, as the GST payable on the transfer of bitcoin as consideration for the purported transfer of the software would equate to any applicable input tax credit entitlement for each transaction. You later advised of an updated footing for the inter-company transactions involving the purported transfer of trust interest as consideration. We consider this was done to enable the companies to receive refunds for what you described as a 'zero transaction'.

126.    Although you have explained that there is an intention that the entities will promote bitcoin and establish a platform for, among other things, trading and

---

[56] *Inglis v FCT* (1979) 10 ATR 493 at 496-7.

CONFIDENTIAL                                                                    DEF_01099832

loaning bitcoin, you have not demonstrated that the related entities are conducting an enterprise. It is our position that in the absence of ATO refunds, the companies would likely be insolvent – this relevantly indicates that the companies are not operated in a business-like manner, nor is there an intention to make a profit. You have previously indicated that there was no business plan and the documents you provided on 23 September 2014 provide no details as to how the proposed research could be turned to profit or commercially exploited. Your activities and those of your related entities during the relevant period consisted entirely of related party transactions and there no records of commercial sales of product that have or are reasonably likely to occur in future.

127.    In relation to DeMorgan's purported activities in granting a licence or other grant of an interest in property, as noted above at paragraph 106 above, DeMorgan was not able to supply rights to intellectual property it could not have owned because it did not yet exist at the relevant time.

128.    We consider that during the relevant period neither DeMorgan, Coin-Exch and Cloudcroft were carrying on an enterprise. On this basis, paragraph 11-5(a) is not satisfied.

CONFIDENTIAL                                                    DEF_01099833

**From:** nCrypt Craig
**Sent:** Thursday, February 4, 2016 9:07 AM
**To:** Stefan Matthews
**CC:** Ramona Watts
**Subject:** Re: IP Transaction and Patent Filing

**P-871**

Case No. 9:18-CV-89176-BB

Good.

On Thu, Feb 4, 2016 at 8:54 AM, Stefan Matthews <stefan.matthews@demorgan.com.au> wrote:
All clear .... onward with the patent program and filing now 😊

Begin forwarded message:

**From:** "Lawrence, Adrian" <Adrian.Lawrence@bakermckenzie.com>
**Date:** 4 February 2016 at 7:15:33 AM GMT
**To:** "stefan.matthews@demorgan.com.au" <stefan.matthews@demorgan.com.au>
**Cc:** "Harindra, Dharshi" <Dharshi.Harindra@bakermckenzie.com>, "Manvell, Allison" <Allison.Manvell@bakermckenzie.com>, "Angelopulo, Byron" <Byron.Angelopulo@bakermckenzie.com>
**Subject:** FW: IP Transaction and Patent Filing

Stefan,

Thanks for your email.

As per our email on 7 January (attached), with the transfer of funds, the **fully executed** IP transaction documents were **dated 7 January 2016 and released**.

Therefore, in respect of all IP owned by DeMorgan group entities (with the exception of Hotwire), the IP has been transferred to and is now owned by Ncrypt.  Ncrypt is therefore free to proceed with patent filings in respect of that IP as it requires.

Outside the DeMorgan Group documentation,  we are still awaiting signature of:

- the DR Technologies IP Assignment Deed;

- the DR Technologies Novation and Assignment Deed; and

- (following our email yesterday) the W&K IP Assignment Deed (to be signed by Uyen).

With respect to the **DR Technologies** Assignment Deeds, the effect of this is that anything created by DeMorgan from 1 July 2015 to date still belongs to DR Technologies rather than Ncrypt. To the extent that any of the pending patent filings incorporate IP developed in that time frame, these should proceed only once DR Technologies has executed the relevant documentation.

With respect to the **W&K IP Assignment Deed**, as noted in the IP Ownership Analysis Report, there is some uncertainty as to the scope of the IP required to be transferred pursuant to the NSW Supreme Court judgments, and as to whether the short document executed by Uyen Nguyen as director of W&K Info Defense stating that W&K Info Defense *"accept[s] the consent orders in 2013/225983 and 2013/245661.  In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed consideration"* does in fact constitute an effective assignment of those IP rights to Craig Wright (and which have therefore been effectively assigned to Ncrypt pursuant to the IP Assignment Deed between Ncrypt and Craig Wright). There is therefore some risk in respect of patent filings using the W&K IP the subject of the NSW Supreme Court Statements of Claim.

In our view, whilst the proposed IP Assignment Deed would provide certainty that all the IP pursuant to the Consent Orders has been transferred to Ncrypt, there is some possibility that these IP rights were assigned to Craig Wright, and, even if that is not correct, there is a strong argument that even if W&K Info Defense ever sought to argue differently, the existence of the Consent Orders would mean that W&K Info Defense would be likely to be in contempt of court if it raised any counterargument to that proposition. Nevertheless, to the extent that it is possible to obtain Uyen's signature of the W&K IP Assignment Deed this is of course preferable.

Please let us know if you would like to discuss.

CONFIDENTIAL                                                                                                 DEF_01895822

regards

Adrian

**Adrian Lawrence**
Partner

Baker & McKenzie
Level 27, AMP Centre, 50 Bridge Street | Sydney NSW 2000 | Australia
T +61 2 8922 8204 | M +61 411 792 204 | F +61 2 9225 1595
adrian.lawrence@bakermckenzie.com | www.bakermckenzie.com/australia

**From:** Matthews, Stefan [mailto:stefan.matthews@demorgan.com.au]
**Sent:** Tuesday, 2 February 2016 3:15 AM
**To:** Lawrence, Adrian
**Subject:** IP Transaction and Patent Filing

Hi Adrian,

We are progressing rapidly against our patent program and have a number of patents queued up and can file, however, before I give the "go ahead" on this I want to obtain final advice that we are clear to do this against the background of the IP transaction.

The patent filing will be done here in UK by UDL in the name of nCrypt Holding Ltd. The name of the inventor will be suppressed at the time of filing.

Last week we received 4 signatures from Uyen (I am assuming that these marry up to the documents we had forwarded to her for execution.

That being confirmed, my understanding is that Bakers are in a position to date and release all the documents related to the transaction, except for those that relate to Hotwire. Hotwire is taking time as the Administrator is finalising a complex claim related to Macquarie Telecom. This doesn't impact anything except the distribution of the already paid funds (fixed amount of available funds) to the creditors.

Note, none of the patents are related to Hotwire.

Please advise asap so that I can get this pipeline moving. Thks.

This email is sent by Baker & McKenzie (ABN 32 266 778 912), an Australian partnership and member of Baker & McKenzie International, a Swiss Verein. The contents are confidential and may contain copyright and/or legally privileged information. Personal information contained in communications with Baker & McKenzie is subject to our Privacy Policy and the obligations of the Privacy Act. Emails sent to Baker & McKenzie are subject to automated email filtering. Should you receive this email in error, please telephone us on +61 2 8205 0200 or email our Helpdesk.

Should this email contain a marketing message that you would prefer not to receive from us in the future, please select UNSUBSCRIBE ALL to unsubscribe.

Thank you.

CONFIDENTIAL

DEF_01895823

---------- Forwarded message ----------
From: "Lawrence, Adrian" <Adrian.Lawrence@bakermckenzie.com>
To: "'Stefan Matthews (stefan.matthews@demorgan.com.au)'" <stefan.matthews@demorgan.com.au>, "'Allan Granger (allan.granger@demorgan.com.au)'" <allan.granger@demorgan.com.au>, "'robert.macgregor@tyche.co.uk'" <robert.macgregor@tyche.co.uk>
Cc: "Harindra, Dharshi" <Dharshi.Harindra@bakermckenzie.com>, "Angelopulo, Byron" <Byron.Angelopulo@bakermckenzie.com>, "Hutton, Julie" <Julie.Hutton@bakermckenzie.com>, "Byrne, Mary-Cate" <Mary-Cate.Byrne@bakermckenzie.com>
Date: Thu, 7 Jan 2016 12:19:45 +0000
Subject: RE: DeMorgan / Ncrypt receipt of monies

Stefan, Allan, Rob,


Further to receiving confirmation of receipt of $1,500,000 consideration, we are pleased to confirm that the IP transaction has been completed today, 7 January 2016.

We will date the fully executed IP transaction documents accordingly and circulate digital and hard copies in due course.


Notwithstanding completion as of today's date, we note that we await confirmation of execution of the following documentation which is expected to be received in due course, and will be dated upon execution:


**Transaction documents**

| Company name | Execution status |
| --- | --- |
| DR Technologies IP Assignment Deed | Awaiting execution by DR Technologies Ltd |
| DR Technologies Novation and Assignment Deed | Awaiting execution by DR Technologies Ltd |
| Uyen Nguyen IP Assignment Deed | Awaiting execution by Uyen Nguyen |
| W&K Info Defense Research LLC IP Assignment Deed | Awaiting execution by Uyen Nguyen on behalf of W&K Info Defense Research LLC |


**Corporate documents**

| Deeds of Access, Indemnity and Insurance for the following companies: | Execution status |
| --- | --- |
| CO1N Pty Ltd | Awaiting execution by Uyen Nguyen |
| Pholus Pty. Ltd. | Awaiting execution by Uyen Nguyen |


Congratulations to all.


regards

Adrian


**Adrian Lawrence**
Partner

Baker & McKenzie
Level 27, AMP Centre, 50 Bridge Street | Sydney NSW 2000 | Australia
T +61 2 8922 5204 | M +61 411 752 204 | F +61 2 9225 1595
adrian.lawrence@bakermckenzie.com | www.bakermckenzie.com/australia

  #1 Law Firm Brand   Acritas 2015 Asia Pacific & Global

---

**From:** Lawrence, Adrian
**Sent:** Thursday, 7 January 2016 5:19 PM

CONFIDENTIAL

DEF_01895824

**To:** Stefan Matthews (stefan.matthews@demorgan.com.au); Allan Granger (allan.granger@demorgan.com.au); robert.macgregor@tyche.co.uk
**Cc:** Harindra, Dharshi; Angelopulo, Byron; Hutton, Julie; Byrne, Mary-Cate
**Subject:** DeMorgan / Ncrypt receipt of monies

Stefan, Allan, Rob

Stefan has now confirmed that the monies have been transferred.

We note that the following documentation is currently outstanding:

**Transaction documents**

| Company name | Execution status |
|---|---|
| DR Technologies IP Assignment Deed | Awaiting execution by DR Technologies Ltd |
| DR Technologies Novation and Assignment Deed | Awaiting execution by DR Technologies Ltd |
| Uyen Nguyen IP Assignment Deed | Awaiting execution by Uyen Nguyen |
| W&K Info Defense Research LLC IP Assignment Deed | Awaiting execution by Uyen Nguyen on behalf of W&K Info Defense Research LLC |

**Corporate documents**

The following Deeds of Access, Indemnity and Insurance are currently outstanding:

| Company name | Execution status |
|---|---|
| CO1N Pty Ltd | Awaiting execution by Uyen Nguyen |
| Pholus Pty. Ltd. | Awaiting execution by Uyen Nguyen |

If Rob has already managed to confirm signatories for DR Technologies and get the IP Assignment Deed and Novation and Assignment Deed signed on behalf of DR Technologies, please do forward copies to us.

In any event, and noting that there will be some further delay in obtaining Uyen's signature where required, provided that everyone is comfortable with the position, and the fact that these will be executed in due course, in our view the outstanding documents should not impede completion of the IP transaction being confirmed today, now that the $1.5m has now been transferred.

If you're happy to proceed on that basis, we will separately confirm completion as having occurred today and proceed to date the fully executed transaction documentation accordingly.

Once we receive the outstanding signed documents, we will date those documents at the date on which they have been fully executed.

Please let me know if you have any questions which you would like to discuss.

Regards

Adrian

CONFIDENTIAL

**Adrian Lawrence**
Partner

Baker & McKenzie
Level 27, AMP Centre, 50 Bridge Street | Sydney NSW 2000 | Australia
T +61 2 8922 5204 | M +61 411 782 204 | F +61 2 9225 1595
adrian.lawrence@bakermckenzie.com | www.bakermckenzie.com/australia

 

| | Law Firm Brand | Acritas 2015 Asia Pacific & Global |