| INTEGYRZ PTY LTD | 21 MARCH 2016 | **SENSITIVE** |
|---|---|---|
| AUDIENCE | DATE | CLASSIFICATION |


**Australian Government**
**Australian Taxation Office**

FILE REF: 1-6N8NM9R

# Reasons for decision

This paper explains the ATO's reasons for decision for Integyrz Pty Ltd for the period 1 July 2013 to 30 June 2014

 SENSITIVE

For more information on this decision, phone Arna Synnot on (08) 7422 2364

CONFIDENTIAL

DEF_00055977

# TABLE OF CONTENTS

Table of contents................................................................................................................... 2

Glossary................................................................................................................................. 3

Bitcoin addresses ................................................................................................................. 4

Introduction ........................................................................................................................... 5

Summary of our decision...................................................................................................... 6

Relevant facts ....................................................................................................................... 8

     Incorporation ................................................................................................................... 8
     Wright Family Trust (DeMorgan) ..................................................................................... 9
     DeMorgan Holdings ........................................................................................................ 9
     Hotwire ...........................................................................................................................10
     Wright International ........................................................................................................10
     Income tax return ...........................................................................................................10
     Purported R&D activity ..................................................................................................11
     IaaS and High Secured .................................................................................................13
     First part of the purported master agreement ................................................................14
     Second part of the purported IaaS Master Agreement ..................................................18
     Location of purported IaaS services ..............................................................................19
     Purported invoice ..........................................................................................................19
     Third party verification ...................................................................................................20
     Purported agency agreement.........................................................................................23
     GST private binding ruling and audits............................................................................24
     Purported payment to High Secured ..............................................................................25
     Bitcoin substantiation ....................................................................................................34
     Electronic evidence submitted.......................................................................................37
     Other evidence submitted ..............................................................................................40

Your contentions .................................................................................................................42

Our reasons for decision ....................................................................................................43

Issue 1: R&D tax offsets.....................................................................................................43

     No registered activities..................................................................................................43
     No expenditure incurred ................................................................................................44
     R&D activities (if any) not conducted solely in Australia or an external Territory...............55
     Prepayments..................................................................................................................56

CONFIDENTIAL

| SENSITIVE | REASONS FOR DECISION |
|---|---|

# GLOSSARY

Words defined in this glossary shall have the meanings ascribed to them:

| 2013-14 income year | The year ended 30 June 2014 |
|---|---|
| ABN | Australian Business Number |
| AEST | Australian eastern standard time |
| ASIC | Australian Securities & Investments Commission |
| ATO | Australian Taxation Office |
| A$ | Australian dollars |
| BAS | Business Activity Statement |
| BTC | Bitcoin |
| C01N | C01N Pty Ltd (formerly called Strasan Pty Ltd) |
| C01N UK | C01N Ltd (formerly called Design by Human Ltd and Moving Forward in Business Ltd) |
| CA | the Corporations Act 2001 |
| Commissioner | the Commissioner of Taxation of the Commonwealth of Australia |
| GST | Goods and Services Tax |
| High Secured | HighSecured.com |
| Hotwire | Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) |
| IaaS | Infrastructure as a Service |
| Information Defense | Information Defense Pty Ltd |
| IRDA | the Industry Research and Development Act 1986 |
| ITAA 1936 | the Income Tax Assessment Act 1936 |
| ITAA 1997 | the Income Tax Assessment Act 1997 |
| Panama | The Republic of Panama |
| Panopticrypt | Panopticrypt Pty Ltd |
| R&D | Research and Development |
| Rubik | Core In A Box Pty Ltd |
| SaaS | Software as a Service |
| Seychelles | Republic of Seychelles |
| TAA | the Taxation Administration Act 1953 |
| Taxpayer | Integyrz Pty Ltd |
| TFN | Tax File Number |
| UK | The United Kingdom |
| US | The United States of America |
| US$ | US dollars |
| VPS | Virtual Private Server |
| We | the ATO |
| Wright International | Wright International Investments Ltd |
| XBT | Bitcoin |

| SENSITIVE | |
|---|---|
| | |

CONFIDENTIAL

DEF_00055979

REASONS FOR DECISION

# BITCOIN ADDRESSES

Bitcoin address abbreviations shall have the meanings ascribed to them:

| | | | |
|---|---|---|---|
| | Bitcoin address | | XY8a |
| | Bitcoin address | | nsTD |
| | Bitcoin address | | zCea |
| | Bitcoin address | | x5nq |
| | Bitcoin address | | N1dr |
| | Bitcoin address | | g9Bj |
| | Bitcoin address | | Bqkv |
| | Bitcoin address | | j2me |
| | Bitcoin address | | hLkN |
| | Bitcoin address | | 2Hm7 |
| | Bitcoin address | | 2DTA |
| | Bitcoin address | | XdVT |
| | Bitcoin address | | XwXy |
| | Bitcoin address | | UjBD |
| | Bitcoin address | | iGJq |
| | Bitcoin address | | ofTz |
| | Bitcoin address | | qMx2 |
| | Bitcoin address | | 3Gn |
| | Bitcoin address | | 5nDB |
| | Bitcoin address | | Uccr |
| | Bitcoin address | | AyWC |
| | Bitcoin address | | b6uF |
| | Bitcoin address | | V3dM |
| | Bitcoin address | | RVZ1 |
| | Bitcoin address | | dVie |
| | Bitcoin address | | dq6 |
| | Bitcoin address | | HbQN |
| | Bitcoin address | | 4Vp1 |
| | Bitcoin address | | xDTJ |
| | Bitcoin address | | WJYm |
| | Bitcoin address | | uERD |
| | Bitcoin address | | c4x4 |
| | Bitcoin address | | ta1K |
| | Bitcoin address | | 9fE9 |
| | Bitcoin address | | ck9Y |
| | Bitcoin address | | VyrK |

CONFIDENTIAL

DEF_00055980

# INTRODUCTION

1. An audit was undertaken to determine the taxable income of Integyrz Pty Ltd (**the taxpayer**) and its eligibility for a refundable tax offset in the year ended 30 June 2014 (**2013-14 income year**).

2. Set out below is our decision in relation to the tax issues which have been identified in the course of the audit. Also set out below is:

   2.1. a statement of the facts which we have relied upon in reaching our decision

   2.2. a summary of your contentions and

   2.3. an explanation of the reasons for our decision.

3. If you do not agree with our understanding of the facts or our interpretation of the law, then you will be given the opportunity to object. The attached cover letter explains what you need to do and what happens next.

CONFIDENTIAL

DEF_00055981

# SUMMARY OF OUR DECISION

## ISSUE 1: R&D TAX OFFSETS

4.   ***Issue:*** Is the taxpayer entitled to a Research and Development (**R&D**) tax offset of $434,069.55 in the 2013-14 income year under Division 355 of the *Income Tax Assessment Act 1997* (**ITAA 1997**)[1], in respect of expenditure incurred pursuant to a contract with HighSecured.com (**High Secured**)?

5.   ***Decision:*** No.

**No R&D activities registered**

6.   No activities conducted for the taxpayer were registered under the *Industry Research and Development Act 1986* (**IRDA**). Accordingly, any expenditure incurred would not give rise to a notional deduction for the purposes of the R&D tax offset.[2]

**No expenditure incurred**

7.   Further, we do not consider the taxpayer to have incurred any expenditure pursuant to a contract with High Secured. Accordingly, the taxpayer would not have been entitled to a notional deduction for the purpose of the R&D tax offset even if registered R&D activities had been conducted.[3]

**R&D activities (if any) not conducted solely in Australia or an external Territory**

8.   Further, we do not consider that any activities undertaken were conducted solely in Australia or an external Territory. Accordingly, the taxpayer would not have been entitled to a notional deduction for the purposes of the R&D tax offset even if it had incurred expenditure on registered R&D activities.[4]

**Prepayments**

9.   Further, even if the taxpayer had been entitled to a notional deduction for the purposes of the R&D tax offset, the prepayment provisions would have applied to reduce that notional deduction to $80,163, and its offset claimable to $36,073.35 in the 2013-14 income year.[5]


## OTHER CONSIDERATIONS

### Part IVA

10.   Part IVA of the *Income Tax Assessment Act 1936* (**ITAA 1936**) contains a general anti-avoidance rule that applies to schemes undertaken for the sole or dominant purpose of obtaining a tax benefit. Where Part IVA applies to a scheme the Commissioner may make a determination cancelling any tax benefits obtained in connection with that scheme.

11.   This reasons for decision does not consider whether Part IVA would apply in the event that the taxpayer was entitled to the tax offsets or deductions summarised above; or whether, if it did, the Commissioner would make a determination which had the effect of cancelling the applicable tax benefit.

---

[1] All legislative references in this paper are to the *Income Tax Assessment Act 1997* unless otherwise indicated.
[2] Paragraph 355-100(1)(a), paragraph 355-205(1)(a) and paragraph 355-210(1)(a)
[3] Paragraph 355-100(1)(a) and subsection 355-205(1)
[4] Paragraphs 355-100(1)(a), 355-205(1)(a) and 355-210(1)(a)
[5] Section 355-110, paragraph 355-100(1)(a) and subsection 355-205(1)

CONFIDENTIAL

DEF_00055982

SENSITIVE

12. However, the Commissioner may give subsequent consideration to whether one or more of the schemes considered in this paper give rise to a tax benefit which should be cancelled under Part IVA.

**Penalties and interest**

13. This reasons for decision does not consider the application of any penalties or shortfall interest. Our position paper in respect of the application of any relevant penalties and interest will be provided separately.

**Other transactions**

14. This decision does not consider the correctness of other purported income and deductions reported by the taxpayer. However, the Commissioner may give subsequent consideration to whether the taxpayer's other income and deductions have been reported correctly.

## SUMMARY OF ADJUSTMENTS

15. The following table displays the tax adjustment we will make in relation to the taxpayer for the 2013-14 income year:

| | Pre audit | Post audit |
|---|---|---|
| Taxable income | 0 | 0 |
| Tax on taxable income | 0 | 0 |
| Refundable tax offsets | 434,069.55 | 0 |
| Amount payable (+) / refundable (-) | (434,069.55) | 0 |
| Tax shortfall | | 434,069.55 |

SENSITIVE

CONFIDENTIAL

DEF_00055983

REASONS FOR DECISION

# RELEVANT FACTS

**Incorporation**

16. The taxpayer was registered with the Australian Securities & Investments Commission (**ASIC**) on 12 August 2013.[6] ASIC records show that during the 2013-14 income year, Craig Wright and his spouse, Ramona Watts, were directors from incorporation, and Jamie Wilson was a director from incorporation to 11 November 2013.[7]

17. At registration, ASIC records indicate that Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) (**Hotwire**) held 10 fully paid $1 ordinary shares beneficially.[8] This is consistent with the taxpayer's register of members and other documentation.[9]

18. The taxpayer's register of members shows that on 9 March 2013, 964,611 $1 fully paid shares were issued to Panopticrypt Pty Ltd (**Panopticrypt**) who held them non-beneficially. The beneficial owner is not disclosed on the register. The taxpayer has provided an application for shares by Panopticrypt dated 9 March 2013. However, the application is for 694,600 shares and indicates that Panopticrypt will hold them beneficially.[10] A share certificate issued on 9 March 2013 indicates 964,611 shares were issued and that Panopticrypt held them beneficially.[11] This issue was not registered with ASIC and no amount was recorded as being received in the general ledger.[12] We note, as stated above, that the taxpayer was not registered with ASIC until 12 August 2013.

19. The taxpayer's register of members then records that on 1 September 2014, Panopticrypt's 964,611 shares were transferred to DeMorgan Holdings Pty Ltd (**DeMorgan Holdings**). The register states that the beneficial owner of these shares is Wright International Investments Ltd (**Wright International**). The taxpayer has provided an application for shares by DeMorgan Holdings dated 1 September 2014. However, the application is for 694,600 shares and indicates that DeMorgan Holdings will hold them beneficially.[13] A share certificate, referenced on the register of members as number 3, but numbered 2, issued on 1 September 2014, indicates that DeMorgan held 964,611 shares beneficially.[14] On 9 September 2014, the taxpayer advised ASIC that 964,600 $1 shares were issued on 1 September 2014 to DeMorgan Holdings and that the shares were fully paid but not beneficially held.[15]

20. Some of the taxpayer's related entities have provided an explanation for the discrepancies between their share register and ASIC in related companies. In part, the explanation states:[16]

> In the tax year ending 2014, the companies Interconnected Research Pty Ltd and Pholus Pty Ltd were set up with an arrangement for Hotwire Preemptive Intelligence Pty Ltd to

---

[6] Integyrz Pty Ltd ASIC Organisation Extract [I1]
[7] Integyrz Pty Ltd ASIC Organisation Extract [I1]
[8] Integyrz Pty Ltd Application for registration as an Australian company dated 12 August 2013 (document ID 5E3370476) [I2]
[9] Integyrz Pty Ltd register of members [I3], Integyrz Pty Ltd consent to become a member executed by Hotwire (undated) [I4], Integyrz Pty Ltd share certificate 1 dated 12 August 2013 [I5]
[10] Application for Shares in Integyrz Pty Ltd from Panopticrypt dated 9 March 2013 [I4]
[11] Integyrz Pty Ltd Share certificate 2 dated 9 March 2013 [I5]
[12] Intergyrz Pty Ltd general ledger report from 1 July 2013 to 30 June 2014 [I6]
[13] Application for Shares in Integyrz Pty Ltd from DeMorgan Holdings dated 9 March 2013 [I4]
[14] Integyrz Pty Ltd Share certificate 2 dated 1 September 2013 [I5]
[15] ASIC form 484 for Integyrz Pty Ltd dated 9 September 2014 (7E6353727) [I7]
[16] Response to ATO letter dated 05th Feb 2015 for Pholus Pty Ltd, Interconnected Research Pty Ltd and Denariuz Pty Ltd received 2 March 2015, page 26 [D4]

CONFIDENTIAL

DEF_00055984

pay a certain amount of capital into the company when called. This arrangement was constructed using Bitcoin Rights based on a loan made in these same rights to Dr Wright for Bitcoin that was held outside of Australia. At the time of issue, Bitcoin was treated as money and was not treated as a mere commodity. Hence the capitalisation was listed at the expected monetary value as cash on the ASIC company documents.

This capital was to be provided and issued to the companies when the research and development program had been started. The agreement for the issue of those amounts was done conditionally on the payment for the research activities being made. Before that payment could occur Hotwire Preemptive Intelligence was placed into administration and then deed of company arrangement was enacted. The agreement with funding by Hotwire Preemptive Intelligence for the shares was created conditionally with a clause covering any liquidation or insolvency event.

The nature of the agreement was such that Wright International Investments Ltd (Seychelles) and Tulip Trading Ltd (Seychelles) would provide capital when the required payments needed to occur following the negotiation of an extended IaaS arrangement and computer power. The transaction could not be completed in the original format. Any payment through Hotwire Preemptive Intelligence was precluded as an insolvency event had occurred. The resulting payment was restricted due to a transactional clause covering the issue of the shares. The result of which was that the beneficial owner would not gain shares in Hotwire but would directly invest in the other companies.

In order to rectify this deficiency, a new company, "DeMorgan Holdings Pty Ltd" was formed to hold these shares for the beneficial owners.

…

An analysis was conducted between the paid up and issued capital for the companies from the accounts and the ASIC records as reported. This was conducted by the companies accounting and tax advisers. The shares on issue were noted to not correctly reflect the amount of paid capital and hence the difference of paid up capital provided was corrected.

21.   The taxpayer's general ledger shows interests in 1,400 Bitcoin were received on 9 March 2014, and that these were worth $964,599.21.[17] The transaction references 'DeMorgan' and was credited by Dr Wright to an intercompany loan account with DeMorgan Pty Ltd.[18] It was subsequently credited to share capital.

**Wright Family Trust (DeMorgan)**

22.   The Wright Family Trust (also known as DeMorgan) is a discretionary trust settled on 9 August 2013.[19] The trustee of the Wright Family Trust is Panopticrypt.[20]

23.   Panopticrypt was registered with ASIC on 20 June 2011 and its directors at the relevant times were Dr Wright and Ms Watts.[21] The taxpayer advises all shares are owned by Dr Wright and Ms Watts.[22]

**DeMorgan Holdings**

24.   DeMorgan Holdings was registered with ASIC on 10 July 2014. Dr Wright was its director until 1 July 2015. At the relevant time, Dr Wright held 100% of its issued capital (non-beneficially).[23]

---

[17] Integyrz Pty Ltd Bank statement (XBT –Bitcoin Rights assignment) from 1 June 2013 to 30 June 2014 [I8]; Integyrz Pty Ltd General ledger report for from 1 July 2013 to 30 June 2014 [I6]
[18] Integyrz Pty Ltd Journal Report from 1 Jul 2013 to 30 Jun 2014, Transaction ID 9 [I9]
[19] Deed of Trust for the Wright Family Trust dated 9 August 2013 [HS3]
[20] Deed of Trust for the Wright Family Trust dated 9 August 2013 [HS3]
[21] Panopticrypt Pty Ltd ASIC Organisation Extract [P3]
[22] Panopticrypt Pty Ltd Register of Members (Beneficial Owner) [P5]

CONFIDENTIAL

DEF_00055985

### Hotwire

25. Hotwire was registered with ASIC on 2 June 2013. Dr Wright was the sole director until 1 July 2013. On 1 July 2013, Ms Watts became a director.[24]

26. The taxpayer's share register and ASIC shows that Dr Wright was the legal owner of all 100 $1 ordinary shares on issue.[25] Hotwire's register of members shows that Dr Wright has always held the majority of the shares on issue.[26]

27. Hotwire entered administration in April 2014 and is currently subject to a deed of company arrangement.[27]

### Wright International

28. The taxpayer has provided documents showing Wright International was incorporated as an international business company in the Republic of Seychelles (**Seychelles**) on 4 August 2009[28]

29. These include a copy of a certificate issued by the Seychelles registrar of international business companies, and documents stamped by the Seychelles International Business Authority or Abacus (Seychelles) Limited.

30. The register of members and share ledger for Wright International states that its 100,000 shares were held by Dr Wright until at least 23 October 2014.[29]

31. Among the documents provided is a declaration for Wright International signed by Dr Craig Wright dated 4 August 2009.[30] The declaration begins:

    'in accordance with Section 119 of the International Business Companies Act, 1994 (as amended)…'

32. Section 119 of the International Business Companies Act, 1994 was not enacted until December 2013.[31]

### Income tax return

33. On 7 November 2014, the taxpayer lodged its 2013-14 income tax return claiming notional deductions of $964,599 and a refundable R&D tax offset of $434,069.55.[32]

34. The notional deductions relate to purported expenditure incurred under an agreement with High Secured for Infrastructure as a Service (**IaaS**) services used to operate a Xeon Phi based supercomputer referred to as 'Tulip Trading'.[33]

35. The taxpayer did not specifically provide a response to our query about which registered activities the expenditure related to.

---

[23] DeMorgan Holdings Pty Ltd ASIC Organisation Extract [IC5]
[24] ASIC form 201: Hotwire Pre-emptive Intelligence Pty Ltd 1E9428931 [H1]; Hotwire Pre-emptive Intelligence Pty Ltd ASIC extract accessed 24 June 2015 [H2]. The only other individual who held a position as director was Jamie Robert Wilson from 1 August 2013 to 23 October 2013.
[25] Hotwire Preemptive Intelligence Pty Ltd Register of Members [H34]
[26] Hotwire Preemptive Intelligence Pty Ltd Register of Members [H34]
[27] Hotwire Pre-emptive Intelligence Pty Ltd ASIC extract accessed 24 June 2015 [H2]
[28] Documents relating to Wright International Investments Ltd [IC9]
[29] Wright International Investments Ltd Register of Members and Share Ledger [IC9]
[30] Documents relating to Wright International Investments Ltd [IC9]
[31] International Business Companies (Amendment) Act, 2013 (Act 15 of 2013) (Seychelles) [IC11]
[32] Integyrz Pty Ltd 2014 Income Tax Return and R&D Schedule [I12]
[33] Response to Comprehensive Audit in the 2014 income tax year for Zuhl Pty Ltd and Integyrz Pty Ltd received on 10 March 2015 [Z13]

CONFIDENTIAL

DEF_00055986

**Purported R&D activity**

36. On 4 July 2014, the taxpayer applied to register two core R&D activities and one supporting R&D activity conducted under a project entitled 'SuperMooc' under section 27A of the IRDA for 2013-14. The application was submitted with supporting attachments.[34]

37. Following a pre-registration review by AusIndustry, a revised application to register the following activities under a project entitled 'ADP Adaptive Delivery Platform' was submitted to AusIndustry on 24 September 2014:[35]

> Core activity 1: Basic platform
>
>> Supporting activity 1: Data centre and systems
>
> Core activity 2: Online learning style model
>
> Core activity 3: Product offerings research and development (high level)
>
> Core activity 4: Design research partnership program

38. On 25 September 2014, AusIndustry registered the taxpayer's activities.[36]

39. ATO officers visited the taxpayer's premises in March and April 2015 and requested written information from the taxpayer to obtain evidence that the activities as registered had been conducted in the relevant financial years and that the expenditure claimed as notional deductions had the requisite nexus to the registered activities.

40. On 1 April 2015, Dr Wright showed ATO officers what he advised was the Tulip Trading supercomputer and ran a series of commands to substantiate its existence and the taxpayer's access to it. The taxpayer recorded videos of the ATO officers' visit to its premises and screen captures of the material shown to them on the purported Tulip Trading supercomputer.

41. Dr Wright advised that the data it collected was stored on the Postgres database on the supercomputer. Dr Wright advised that data for the taxpayer's project was loaded onto the supercomputer, but no analysis was undertaken in 2013-14. However, Dr Wright refused to enter commands to allow us to view the data or its metadata to verify its existence, determine when it had been loaded onto the supercomputer and determine its size. No supercomputer system-generated log or usage files were shown on the supercomputer that demonstrated the supercomputer usage for the registered R&D activities, as described in the taxpayer's 2013-14 AusIndustry application. No source code files developed by the taxpayer for the activities described in the AusIndustry applications were shown on the supercomputer.

42. ATO Forensics is still reviewing the footage of the purported Tulip Trading supercomputer from the visit. However, a number of anomalies in similar footage of a different supercomputer (the C01N supercomputer) purported to have been used by a related entity's R&D activities led us to conclude that the C01N supercomputer did not exist and that the material presented had been deliberately manipulated.[37] ATO Forensics' preliminary advice indicates many of these anomalies are repeated in the Tulip Trading footage.

---

[34] R&D Tax Incentive Application: Registration of R&D Activities for Integyrz Pty Ltd submitted 4 July 2014 and attachments [I14]
[35] R&D Tax Incentive Application: Registration of R&D Activities for Integyrz Pty Ltd submitted 24 September 2014 [I10]
[36] Letter from AusIndustry to Integyrz Pty Ltd dated 25 September 2014 [I11]
[37] Reasons for decision for C01N Pty Ltd for the period 1 July 2012 to 30 June 2013 dated 11 March 2016

CONFIDENTIAL

DEF_00055987

43.  As a result of our investigations, the ATO requested that AusIndustry examine the taxpayer's registration for 2013-14 and that AusIndustry make a finding as to the eligibility of the activities.

44.  On 19 February 2016, AusIndustry made a finding under section 27J of the IRDA that none of the activities registered by the taxpayer in its 2013-14 AusIndustry application met the requirements of a core or supporting R&D activity.[38]  In that finding AusIndustry found that:

44.1.  In relation to activity 1.1 (Core – Basic Platform), although the taxpayer had provided evidence that work was conducted to build a prototype e-learning system based on existing software and then build another system from scratch with the same functionality, as it was recreating existing technology the taxpayer had not demonstrated any challenge or any new knowledge to be produced. The taxpayer had not demonstrated any scientific or technical unknown or challenge in developing the software. The taxpayer had also not demonstrated that any experimental activities were necessary to resolve a scientific or technical hypothesis. The taxpayer had not demonstrated that the activity was conducted for the purpose of generating new knowledge, as the activity sought to replicate existing software functionality and capability

44.2.  In relation to activity 1.2 (Core – Online Learning Style Model), although the taxpayer had provided evidence that work was conducted to analyse and understand how learning styles could be applied to online learning, it had not demonstrated any scientific or technical unknown or challenge in conducting this analysis or generating its model based on this analysis. The taxpayer had not demonstrated that any experimental activities were necessary to resolve a scientific or technical hypothesis. The taxpayer had not demonstrated that the activity was conducted for the purpose of generating new knowledge as the activity involved analysing and consolidating known information. The activity is also excluded from being a core R&D activity under section 355-25(2)(d) of the IRDA as all of the documentation provided involves research into a social science.

44.3.  In relation to activity 1.3 (Core – Product Offerings Research and Development (high level)), the taxpayer had not provided any evidence that activities were conducted to design the final massive open online course platform or include administrative functions. The taxpayer had not demonstrated that any experimental activities were necessary to resolve a scientific or technical hypothesis. It had demonstrated only a high level breakdown of different markets that will require different presentation and/or functionality. The taxpayer had not demonstrated that the activity was conducted for the purpose of generating new knowledge as the activity involved only the identification of different markets for its final product.

44.4.  In relation to activity 1.4 (Core – Design research partnership program), the only documentation provided by the taxpayer outlined six questions around how an adaptive learning massive open online course would be implemented, that were intended as future research. The taxpayer had not demonstrated that any work had been conducted, other than the generation of these six questions. Generating questions to be resolved in the future is not an experimental activity conducted to test a scientific or technical hypothesis. The taxpayer had not

---

[38] Certificate for finding under section 27J of the Industry Research and Development Act 1986 reference number RF00070 dated 19 February 2016 issued to Integyrz Pty Ltd  [I14]

CONFIDENTIAL

DEF_00055988

demonstrated that the activity was conducted for the purpose of generating new knowledge as the activity involved only coming up with questions to resolve.

44.5.    In relation to activity 1.1.1 (Supporting – Data centre and systems), as the taxpayer had not demonstrated any core R&D activities, activity 1.1.1 could not be a supporting R&D activity. The taxpayer had not provided any evidence that a quasi-opportunistic supercomputer was used in the relevant income year, or that such a supercomputer would have a direct, close and relatively immediate relationship to any experiments.

**IaaS and High Secured**

45.    The taxpayer's notional deduction claim results from two purported agreements entered into by entities related to the taxpayer, starting with an undated agreement titled the 'IaaS Master Agreement' (**the purported master agreement**).[39]

46.    IaaS is defined as:

> The capability provided to the consumer is to provision processing, storage, networks, and other fundamental computing resources where the consumer is able to deploy and run arbitrary software, which can include operating systems and applications. The consumer does not manage or control the underlying cloud infrastructure but has control over operating systems, storage, and deployed applications; and possibly limited control of select networking components (eg host firewalls).[40]

47.    The purported master agreement appears to be entered into between High Secured (referred to as 'Signia'), and 'DeMorgan (ABN 72 433 066 448)'.[41] The purported master agreement does not provide any company identifier for High Secured (or Signia) or reference to the trustee of the Wright Family Trust.

48.    High Secured is a company located in the Republic of Panama (**Panama**), specialising in offshore data hosting, including virtual private servers and cloud hosting, as well as offshore merchant accounts, offshore bank accounts and legal and offshore corporate services.[42] It is not owned or controlled by or otherwise associated with Dr Wright or the taxpayer.

49.    High Secured operates the website www.highsecured.com. This domain was established in 2004 and the registrant is currently listed as Ritzela De Gracia.[43]

50.    Each page of the purported master agreement bears the name and logo of High Secured.

51.    The purported master agreement:

51.1.    appears to be executed by Carlos Ortiz for 'Highsecure.com' and Dr Wright for the Wright Family Trust

51.2.    commences on 1 April 2014 and runs for a five year term

51.3.    states that the annual service fee (up to 20,000 cores) is 20,000 Bitcoin and that the annual fee is payable annually in advance for the first three years

51.4.    states that the Wright Family Trust 'will be able to use High Secured's Republic of Panama carrier-class data center'.

---

[39] IaaS Master Agreement between Signia (High Secured.com) and DeMorgan (ABN 72 433 066 448) (undated) [HS1]
[40] Department of Finance, Australian Government Cloud Computing Policy October 2014, http://www.finance.gov.au/sites/default/files/australian-government-cloud-computing-policy-3.pdf [C120]
[41] This is the ABN of the Wright Family Trust.
[42] https://www.highsecured.com/ [HS33]
[43] Whois record for highsecured.com [HS35]

CONFIDENTIAL

52.   The 'Background' section of the purported master agreement states that 'High Secured is a provider of infrastructure-as-a-service solutions.'

53.   The purported master agreement is made up of two distinct parts.

**First part of the purported master agreement**

54.   The first part of the purported master agreement contains 29 clauses, a section titled 'agreement details' and a section titled 'service description'.

### *Similarities to Rubik agreement*

55.   The first part of the purported master agreement bears significant similarities to a draft agreement between Hotwire, an entity controlled by Dr Wright, and Core In A Box Pty Ltd (**Rubik**), an unrelated technology company, for the provision of Rubik's 'Bank in a Box software' to be provided under a Software as a Service (**SaaS**) model. SaaS is defined as:

> The capability provided to the consumer is to use the provider's applications running on a cloud infrastructure. The applications are accessible from various client devices through either a thin client interface, such as a web browser (e.g., web-based email), or a program interface. The consumer does not manage or control the underlying cloud infrastructure including network, servers, operating systems, storage, or even individual application capabilities, with the possible exception of limited user-specific application configuration settings. [44]

56.   There are only minor differences between the purported master agreement for IaaS and the Rubik agreement for SaaS. Refer to **Appendix A** for marked up versions showing the similarities. [45]

57.   In the first part, the parties are referred to as the 'Licensee' and 'High Secured'.

58.   In relation to these similarities, a representative for entities associated with Dr Wright has stated: [46]

> To the extent that it is relevant, it is noted that the IaaS agreement was compiled using precedent clauses from earlier agreements that had been entered into by Denariuz. [47]

### *References and web addresses*

59.   The purported master agreement contains numerous references to 'clause 0' and the error message 'Error! Reference source not found'.

60.   In relation to these errors, a representative for entities associated with Dr Wright has stated that, during the process of compiling the agreement: [48]

> some of the internal referencing links were broken, giving rise to the error messages you refer to. However, these errors are relatively minor and do not change the substance of the agreement. They certainly do not render the agreement void.

61.   The purported master agreement references various websites apparently relating to High Secured. The web addresses cited in the purported master agreement, listed below, could not be accessed.

---

[44] http://www.finance.gov.au/sites/default/files/australian-government-cloud-computing-policy-3.pdf
[45] Note the IaaS Master Agreement has been optically scanned to enable highlighting.
[46] Attachment to letter dated 6 October 2015 - Misfit Games Pty Ltd – Response to Audit Findings 28 August 2015 at 3 [HS36]
[47] Denariuz Pty Ltd is an entity related to Dr Wright.
[48] Attachment to letter dated 6 October 2015 - Misfit Games Pty Ltd – Response to Audit Findings 28 August 2015 at 3 [HS36]

CONFIDENTIAL
DEF_00055990

REASONS FOR DECISION

61.1.   www.HighSecured.com.au/support[49]

61.2.   www.highsecured.com/support[50]

61.3.   www.highsecured.com/information[51]

62.   The domain highsecured.com.au has never been registered.[52]

63.   A representative for entities associated with Dr Wright has stated that these websites can be accessed provided the user is logged in, because High Secured ran a number of 'dark' services on Private IP and Private domains.[53]

64.   ATO Forensics has advised:

64.1.   the use of the domain www.highsecured.com is a public domain not private

64.2.   the use of the domain www.highsecured.com indicates a private IP address is not in use

64.3.   'dark' services do not utilise public domains

64.4.   it is against industry standards for a page requiring authorisation to return the '404 page not found error' message returned by these pages, strongly indicating the pages do not exist.

**_Definitions_**

65.   The purported master agreement relates to the provision by High Secured of 'Services' as defined in the agreement.[54] 'Services' are defined as:

65.1.   Managed Services

65.2.   Maintenance Services and

65.3.   Support Services.

66.   'Managed Services'[55] are defined to mean:

66.1.   configuring, hosting and maintaining the software

66.2.   providing the Licensee with access to and use of the software and

66.3.   storing the Licensee Data, in accordance with the Specifications.

67.   'Maintenance services'[56] are defined to mean:

67.1.   Diagnosing and correcting any errors, defects or failures of the Software and

67.2.   Implementing any patches, workarounds and updates.

68.    'Specifications'[57] is defined as:

68.1.   in respect of software or services, the requirements for that Software or Services set out or referred to in the Service Description or a Statement of Work[58],

---

[49] IaaS Master Agreement, Clause 3.5
[50] IaaS Master Agreement, clause 23.4
[51] IaaS Master Agreement, clause 23.4
[52] Who.is/domain-history/highsecured.com.au [HS34]
[53] Attachment to letter dated 6 October 2015 - Misfit Games Pty Ltd – Response to Audit Findings 28 August 2015 at 4 [HS36]
[54] IaaS Master Agreement, Clause 1.1
[55] IaaS Master Agreement, Clause 1.1
[56] IaaS Master Agreement, Clause 1.1
[57] IaaS Master Agreement, Clause 1.1

CONFIDENTIAL

> including all agreed requirements as to quality, functionality, performance, interoperability testing and other matters

68.2.   all documentation relating to the Software

68.3.   any published specifications of High Secured or a third party manufacturer or supplier relating to the Software and

68.4.   any user requirements of the Licensee as set out in a Statement of Work.

69.   'Software'[59] is defined to mean 'the software specified at item 6 of the Agreement details'.

70.   Item 6 to the 'Agreement details' provides:

> High Secured Software – The IaaS offering in this agreement is High Secured's VPS infrastructure with the functions and configuration described in the Statement of Work (to be defined).

71.   The section titled 'Service Description'[60] refers to DeMorgan establishing an online banking business based around Bitcoin, and related entities establishing a proof of concept for this using High Secured's Virtual Private Server (**VPS**) service. The pricing arrangement is based on the 'number of accounts'. The 'Service Description' states:

> The Wright Family Trust (DeMorgan) is an organisation that will establish an online banking business based around the Bitcoin crypto-currency, where the creation and transfer of Bitcoins is based on an open-source cryptographic protocol (to be managed and controlled by Hotwire) that is independent of any central authority. Whilst Bitcoins can be transferred through a computer or Smartphone without an intermediate financial institution, Hotwire will establish an intermediate company called "Denariuz Coin-Exch" (Denariuz) using the High Secured VPS Infrastructure service.
>
> High Secured's VPS Service will be configured to cater for Denariuz's products and functionality, where this is appropriate and practical. High Secured and DeMorgan will work together in good faith to establish a proof of concept. High Secured envisage that DeMorgan and Denariuz will change as many of its business processes as possible to conform to the IaaS capability.

72.   Located below the 'Service Description' is 'Table 1: VPS Infrastructure Software modules used in providing the Service'. An item in the table states:

> Annual service fee (up to 20,000 core) --- XBT 20,000[61]

73.   No brand or model number is given for the processors, nor are the cores specified in terms of their general technical specifications.

74.   A note under Table 1 states that:

> the current annual fee is the minimum annual fee applicable … and is payable annually in advance for the first 3 years. The first year's fees are due and payable on the date of the Master Services Agreement execution.

75.   The purported master agreement refers to a start date of 1 April 2014. There is no provision for the apportionment of fees applicable to periods of less than one year.

76.   The first part of the purported agreement contains an 'entire agreement' clause. It does not refer to the second part of the agreement.[62]

---

[58] Clause 6 of the IaaS Master Agreement provides a process for additional services to be provided if and when the Licensee wishes to obtain any services other than the 'Services', through a 'Statement of Work'.
[59] IaaS Master Agreement, Clause 1.1
[60] IaaS Master Agreement, 'Service description'
[61] XBT is a reference to Bitcoin.

CONFIDENTIAL

DEF_00055992

77. The first part contains clauses dealing with force majeure, notices, termination, indemnities/liability and warranties.[63]

*Licensee groups*

78. The purported master agreement provides[64] that:

78.1. any member of the Licensee Group ('the group') can make use of the software or services under the agreement; and

78.2. the Licensee enters into the agreement in its own right and as agent for each member of the group for the sole purpose of each member of the group obtaining (and being able to enforce through the Licensee) any rights granted to the member.

79. The 'Licensee Group'[65] is defined to mean the Licensee and each of its related bodies corporate (provided that they remain a related body corporate of the licensee).

80. Item 2 states that 'DeMorgan (ABN 72 433 066 448)' is the Licensee.

81. 'Related Body Corporate'[66] is defined to have the meaning given to that term in section 50 of the 'Corporations Act'. The term 'Corporations Act' is not defined. The term 'law' is defined to refer to the law in force from time to time in Panama.[67] However, section 50 of the *Corporations Act 2001* (Cth) (**CA**) states:

Where a body corporate is:

(a) a holding company of another body corporate; or

(b) a subsidiary of another body corporate; or

(c) a subsidiary of a holding company of another body corporate;

the first-mentioned body and the other body are related to each other.

82. A 'subsidiary' is defined at section 46 of the CA as:

A body corporate (in this section called the first body) is a subsidiary of another body corporate if, and only if:

(a) the other body:

(i) controls the composition of the first body's board; or

(ii) is in a position to cast, or control the casting of, more than one-half of the maximum number of votes that might be cast at a general meeting of the first body; or

(iii) holds more than one-half of the issued share capital of the first body (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(b) the first body is a subsidiary of a subsidiary of the other body.

83. Section 48 of the CA states:

(1)  This section applies for the purposes of determining whether a body corporate (in this section called the first body) is a subsidiary of another body corporate.

---

[62] IaaS Master Agreement, Clause 29.11
[63] IaaS Master Agreement clauses 25, 29.3, 22, 19 and 20
[64] IaaS Master Agreement, Clause 27
[65] IaaS Master Agreement, Clause 1.1
[66] IaaS Master Agreement, Clause 1.1
[67] IaaS Master Agreement, clause 1.1. Definitions of 'licensee group', 'related body corporate' and 'law'.

CONFIDENTIAL

DEF_00055993

| SENSITIVE | REASONS FOR DECISION |
| --- | --- |

> (2) Any shares held, or power exercisable, by the other body in a fiduciary capacity are treated as not held or exercisable by it.

84. The purported master agreement requires High Secured to comply with the *Privacy Act 1988* (Cth) in the event that it accesses information about identifiable individuals held by or on behalf of the licensee.[68]

85. The purported master agreement provides that the licensee may not take certain actions except as permitted by the agreement or the *Copyright Act 1968* (Cth).[69]

86. The purported master agreement states that High Secured 'grants the Licensee and each member of the Licensee Group a non-exclusive licence or sub-licence to use the software through the hosting infrastructure, as reasonably necessary for the Licensee and each member of the Licensee Group to use the managed services, for the term.'[70]

87. The purported master agreement provides that the licensee and each member of the licensee group must not sell, lease transfer, assign, license sub-license or otherwise part with possession of the Software except as expressly permitted in the purported master agreement.[71]

88. The purported master agreement provides that the Licensee cannot assign, novate or otherwise transfer any of its rights or obligations under the agreement without the prior consent of the other party which will not be unreasonably withheld.[72]

89. The Terms and Conditions section of the purported master agreement states at Clause 4.1(c) that High Secured has the right to terminate the service to DeMorgan 'in the event of any intentional or de facto transfer or assignment of or use of services supplied by High Secured which High Secured, acting reasonably, determines to be an improper use.'

90. The ATO has not been provided with any notification of consent by High Secured to any request by DeMorgan to assign, novate or transfer any of its rights or obligations under the purported master agreement.

**Second part of the purported IaaS Master Agreement**

91. The second part contains a section containing 18 clauses titled 'Terms and conditions' and a section 'Acceptable Use Policy'. The 'Terms and conditions' and 'Acceptable Use Policy' can be found on the High Secured website. The signature block appears between the first and second parts.

92. In the second part, the parties are referred to as the 'Client' and 'High Secured.com®'.

93. Clause 14 of the 'Terms and conditions' contains an 'entire agreement clause'. The first part of the agreement is not referred to.

94. The second part contains numerous references to a 'Data Center Service Agreement'.[73] This has not been provided.

95. The 'Terms and Conditions' list the High Secured services that they apply to.[74] VPS customers are not listed.

---

[68] IaaS Master Agreement, Clause 14.3
[69] IaaS Master Agreement, Clause 16.3
[70] IaaS Master Agreement, Clause 16.2
[71] IaaS Master Agreement, Clause 16.3
[72] IaaS Master Agreement, Clause 29.9
[73] Clauses 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 of the 'Terms and Conditions' and the Acceptable Use Policy
[74] Part 1 of the 'Terms & Conditions'

| SENSITIVE | |
| --- | --- |
| | PAGE 18 OF 56 |

CONFIDENTIAL

DEF_00055994

96. Clause 6.4 and Schedule A of the Terms and Conditions states that payment may be made by credit card or wire transfer. Bitcoin is not referred to.

97. The second part also contains clauses dealing with force majeure, notices, termination, indemnities/liability and warranties.[75]

**Location of purported IaaS services**

98. High Secured's website indicates that its data centre is located in Panama.[76]

99. On 24 April 2014, Dr Wright posed the following question to AusIndustry in relation to the location of IaaS services purportedly supplied by another provider to C01N Pty Ltd (**C01N**), a company related to the taxpayer:[77]

> …is research from Australia by Australian researchers that only operate out of a location and from a computer system in Australia using a cloud based system (somewhere undefined) considered valid Australian research? Is the expense on the IaaS system needed for the activity thus a valid expense?

100. Dr Wright stated:[78]

> All research activities are conducted in Australia. This means, that people who are doing the research reside full time in Australia. The systems being in the cloud they use can be anywhere in the world. The contract for leasing the hardware used to create and run simulations is not specifically located in any place, but can be located anywhere.
>
> I do not see that this is an overseas activity as per Section 28D of the Industry Research and Development Act 1986. The people are situated in Australia and log onto computers here. They use these local machines to connect to a cloud service where we run simulations. The simulations are created using a series of neural networks that are developed and run as an evolutionary programming automata. In effect, we have a genetic algorithm that is being tuned.

101. On 29 April 2014, AusIndustry responded stating:[79]

> … it is our position that the work you have described as being done by people sitting at a computer is being conducted in Australia and is therefore an "Australian activity". You have obviously self-assessed that work as being an eligible R&D activity. However, whether the expenditure on the IaaS system is "expenditure incurred" on one or more R&D activities is really a matter for the ATO…

102. C01N contended that this email indicated that AusIndustry had confirmed that its R&D activities using the supercomputer were conducted solely within Australia.[80]

**Purported invoice**

103. On 10 March 2014, High Secured purportedly issued an invoice to DeMorgan for an amount of 60,000 Bitcoin. The invoice description and amounts are as follows:[81]

| Code | Description | Ordered | Supplied | Price | Subtotal |
|------|-------------|---------|----------|-------|----------|
| 011.180.1001 | IaaS agreement 2013-14 | 32.000 | 32.000 | 0.46875 | 15.000 |
| 011.180.1002 | IaaS agreement 2014-15 | 32.000 | 32.000 | 0.46875 | 15.000 |
| 011.180.1004 | IaaS agreement 2015-16 | 32.000 | 32.000 | 0.46875 | 15.000 |

---

[75] 'Terms and Conditions' clauses 15, 12, 4 and 11
[76] https://www.highsecured.com/facility.php [HS5]
[77] Email from Craig Wright to Lynn Bloomfield sent on 24 April 2014 [C82]
[78] Email from Craig Wright to Lynn Bloomfield sent on 24 April 2014 [C82]
[79] Email from Lynn Bloomfield to Craig Wright sent on 29 April 2014 [C82]
[80] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[81] High Secured invoice number 00649395 dated 10 March 2014 [HS7]

CONFIDENTIAL

| 011.180.1005 | IaaS agreement 2016-17 | 32.000 | 32.000 | 0.46875 | 15.000 |
| F.PRXP\MO | 32,000 Xenon Phi | | | | |

104. The purported invoice states that payment of the 60,000 Bitcoin, worth A\$42,396,541, was made via BitPay on 9 March 2014.

105. On 1 April 2015 ATO officers attended the premises of the taxpayer. A representative of the taxpayer accessed the High Secured customer portal on one of their computers and showed the officers a list of invoices on the screen. The invoices listed in the portal were denominated in US dollars and were all for small amounts. None of the invoices shown to the ATO officers were the purported invoice requesting payment for 60,000 Bitcoin issued to DeMorgan.

106. The purported invoice lists an address, email address, phone number and fax number for High Secured. The fax number listed on the invoice (507.303.09768) contains an extra digit compared to the fax number given on High Secured's website (507.303.0976).[82]

107. A representative for entities associated with Dr Wright has stated that this extra digit may be the routing number or alternatively a typographical error.[83]

108. The purported invoice also references 'Xenon Phi' processors rather than 'Xeon Phi' processors.

109. The purported invoice has a price of 15,000 Bitcoin for 32,000 cores per year. However, according to the purported contract specifications, every extra core between 20,001 and 50,000 cores would cost an extra 1.50 Bitcoin per annum, such that the price for 32,000 cores would be 38,000 Bitcoin per annum. We note the purported IaaS Master Agreement states that up to 20,000 cores will cost a minimum of 20,000 Bitcoin.

110. The purported contract specifications include that the annual fee is payable annually in advance for the first three years. The purported invoice states that DeMorgan has apparently paid in advance for the period from 1 April 2014 to potentially 30 June 2017 – over three years.

111. The Bitcoin address quoted on the invoice for payment of the ▮ Bitcoin is ▮ However, the QR code[84] on the invoice links to Bitcoin address ▮

112. The taxpayer contends that the Wright Family Trust transferred ▮ Bitcoin to ▮ which they contend is an address controlled by High Secured, on 10 March 2014.[85]

### Third party verification

113. On 15 January 2015, we emailed a letter to a publicly known High Secured email address (internationalservices@highsecured.com) requesting confirmation of the agreement, invoice and payment. High Secured did not respond.[86]

114. At a meeting on 30 January 2015, Dr Wright requested that we advise the taxpayer if we did not hear back from any third parties so he could make representations to them to respond.[87]

---

[82] http://www.highsecured.com/contact-us.php accessed 15 June 2015 [HS5]

[83] Attachment to letter dated 6 October 2015 - Misfit Games Pty Ltd – Response to Audit Findings 28 August 2015 at 6 [HS36]

[84] A QR code is a data matrix barcode which, when scanned, connects to a website for the downloading of information, such as a Bitcoin address.

[85] Response to ATO letter dated 05th Feb 2015 for Pholus Pty Ltd, Interconnected Research Pty Ltd and Denariuz Pty Ltd received 2 March 2015 [D4]

[86] Letter dated 15 January 2015 from the ATO to High Secured, forwarded by Arna Synnot to internationalservices@highsecured.com on 15 January 2015 with subject 'Request from the Australian Taxation Office' [HS9]

CONFIDENTIAL                                                        DEF_00055996

REASONS FOR DECISION

115. On 2 February 2015, we advised the taxpayer that we had attempted contact with High Secured and requested it provide authorisation for High Secured to respond.[88] At a meeting on 1 May 2015, the taxpayer's former representative, Mr Andrew Sommer, advised that he had negotiated for the ATO to have contact with High Secured and that Stuart Greatbanks, who Mr Sommer stated was the principal of High Secured, would respond to one email from the ATO via Mr Sommer. He also indicated that High Secured would permit one phone call with the ATO, where the ATO could ask three questions.[89]

116. On 3 May 2015, we received an email apparently from a publicly known High Secured email address (info@highsecured.com) saying:

> An email will be sent to Mr Sommer later today. In this email we will verify the contract. This will be through the sending of a SHA256 hash that can be used to validate the contract have (sic) not been altered.
>
> We will confirm payment and the Bitcoin received. These addresses are privileged.[90]

117. The email stated that High Secured would 'not send any further replies to your government other than through yourself [Andrew Sommer]' and 'This email is sent to yourself [Andrew Sommer] and to one of the government personal we have been informed of. No further communications will follow outside of those through you.'

118. The email contains a digital signature apparently belonging to High Secured. We have not been provided with a public key issued by a trusted authority (in the form of an X.509 certificate) to enable us to verify the signature belongs to High Secured. High Secured's website indicates it holds a key that is issued by a trusted authority.[91]

119. The 'reply to' header has been set to the email address ritzela@highsecured.net, rather than a publicly known High Secured email address.[92] The highsecured.net domain was originally registered between 14 February 2007 and 14 February 2013. It was only registered again on 27 April 2015, approximately one week before we received the email apparently from High Secured.[93]

120. The domain highsecured.net has no sender policy framework (**SPF**)[94] record to check the email against.[95]

121. A representative for entities associated with Dr Wright has stated that these domains were both owned by High Secured and no adverse implication should be drawn from the reinstated registration, after a two year hiatus, of the domain one week prior to the email being received from the domain. No evidence was provided to show that the highsecured.net domain is owned by High Secured.[96]

122. The email referenced as being sent to Mr Sommer later that day was not provided to us at that time.

---

[87] Record of conversation with Craig Wright dated 30 January 2015 [HS10]
[88] Letter from ATO to C01N Pty Ltd et al dated 2 February 2015 [HS11]
[89] Record of conversation with Craig Wright dated 30 January 2015 [HS10]
[90] Email from info@highsecured.com to Arna Synnott dated 3 May 2015 with subject 'Privilege Asserted' [H12]
[91] Highsecured.com certificate issued by GeoTrust DV SSL CA – G4 [HS37]
[92] ATO Forensics advice [HS30]
[93] http://who.is/whois/highsecured.net (Whois lookup and Domain History) [HS31]
[94] Sender Policy Framework is an email validation system that allows mail exchangers to check that incoming mail from a domain comes from a host that is authorised to process outgoing email from that domain.
[95] ATO Forensics advice [HS30]
[96] Attachment to letter dated 6 October 2015 - Misfit Games Pty Ltd – Response to Audit Findings 28 August 2015 at 3 [HS36]

CONFIDENTIAL

123. On 14 May 2015, the taxpayer's representative provided us with a fax reportedly sent from High Secured confirming in an attached letter that DeMorgan paid the invoice by transferring ▮▮▮▮ Bitcoin to address ▮▮▮ on 10 March 2014. It advised the agreement was for a bare metal IaaS contract for the Xeon Phi hosts and supporting infrastructure. It further states that 'Dr Wright has used a company, DeMorgan Ltd in Panama for the negotiations of this agreement'.[97] The letter appears to be signed by the President and Secretary of High Secured. The fax number appears to originate from Japan.[98] We are unable to confirm that it is from High Secured.

124. A representative for entities associated with Dr Wright has stated that it is their understanding that the owners of High Secured reside in Japan.[99]

125. Since the correspondence received on 14 May 2015 the ATO has not received, nor been offered, any verification to substantiate the transactions from High Secured, the taxpayer or their representatives.

126. On 20 October 2015, we again sent an email to a publicly known High Secured email address (internationalservices@highsecured.com) requesting confirmation of the agreement with DeMorgan.[100] To date, no response has been received.

127. On 27 November 2015, an entity related to the taxpayer provided PDF copies of several emails purportedly between the taxpayer's former lawyer and High Secured. These include:

  127.1. A purported email from Ms De Gracia (using a highsecured.net email address) dated 28 April 2015 where, among other things, the sender indicates all future communications will be signed by a private key that can be verified by the MIT key server[101]

  127.2. A purported email from Ms De Gracia (using a highsecured.net email address) dated 28 April 2015 where the sender acknowledges a certain Bitmessage address is associated with High Secured[102]

  127.3. A purported email from Ms De Gracia (using a highsecured.com email address) dated 3 May 2015 containing the same information as the faxed letter referred to in paragraph 123.[103]

  127.4. A purported email from Devian Rockwell (using a highsecured.com email address) dated 30 May 2015 that states that:[104]

    a) High Secured made offers to talk to the ATO and 'Apostle (sic) the documents'

---

[97] Email from Andrew Sommer to Arna Synnot dated 14 May 2015 with subject 'RE: Wright entities – FY14' and attachment FAX_2015056-1430898545_21.pdf [HS13]

[98] 81 is the country code for Japan.

[99] Attachment to letter dated 6 October 2015 – Misfit Games Pty Ltd – Response to Audit Findings 28 August 2015 at 10 [HS36]

[100] Email from Arna Synnot to internationalservices@highsecured.com dated 20 October with subject FW: Request from the Australian Taxation Office [DLM=Sensitive] [HS38]

[101] Purported email from ritzela@highsecured.com to Andrew Sommer, Heydon Miller and Ramona Watts dated 28 April 2015 with subject 'Email contact' [HS39]

[102] Purported email from ritzela@highsecured.com to Craig S Wright, Andrew Sommer, Heydon Miller and Ramona Watts dated 28 April 2015 with subject 'Bitmessage' [HS39]

[103] Email from info@highsecured.com to Andrew Sommer dated 3 May 2015 with subject 'Privilege Asserted' [HS39]

[104] Email from d.rockwell@highsecured.com to Andrew Sommer dated 30 May 2015 with subject 'Digital Evidence (Final).' [HS39]

CONFIDENTIAL                                                                           DEF_00055998

    b)    The ATO had conducted checks into High Secured's overseas partners, including a United Kingdom (UK) entity names as Unitrust Capital, an unnamed United States of America (US) partner and an unnamed Japanese partner

    c)    High Secured held many of the Bitcoin addresses we requested the taxpayer sign in our letter of 25 May 2015 and despite having the ability to sign messages to verify ownership, declined to do so

    d)    Dr Wright had used their systems and services since 2013 and supplied consideration totalling over US$50 million.

128.  We note we have never approached Unitrust Capital, and have no knowledge of any US or Japanese 'partners' of High Secured.

**Purported agency agreement**

129.  On or around 30 August 2014[105], Panopticrypt as trustee for the Wright Family Trust (DeMorgan), the taxpayer and ten other entities related to the taxpayer (the other entities) purported to enter into an agreement titled the 'Agency Deed' (**purported agency agreement**).[106]

130.  The purported agency agreement is undated, although it appears that it was executed on 30 August 2014.[107]

131.  The background to the purported agency agreement indicates that at the time the Wright Family Trust[108] entered into the IaaS Master Agreement with Signia, it was the intention of the parties that the Wright Family Trust entered into the arrangement on its own behalf and on behalf of the other entities and the purpose of the purported agency agreement is to 'formalise the intention of the parties'.

132.  One of the entities referred to is DASO Pty Ltd (**DASO**). DASO was incorporated on 3 July 2014, three months after the commencement of the purported master agreement.[109]

133.  Under the purported agency agreement:

    133.1.  the taxpayer and the other entities have appointed the Wright Family Trust as their agent to procure computer related services from Signia

    133.2.  from the date of the deed, the taxpayer and the other entities agree to pay the Wright Family Trust (or Signia if directed by the Wright Family Trust) any amounts payable under the IaaS Master Agreement

    133.3.  to the extent that the Wright Family Trust has paid Signia any amounts under the IaaS Master Agreement, the other entities agree to reimburse the Wright Family Trust

    133.4.  the Wright Family Trust will pro-rata the amounts between the other entities based on the extent to which they have used the IaaS services.

134.  On 2 March 2015, the taxpayer provided two versions of an untitled document that gives a breakdown of the allocation of the cost of the system across the entities and the years

---

[105] Email from Uyen Nguyen to Craig Wright dated 30 August 2014 subject 'RE: Agency Deed' [HS16]
[106] IaaS Master Agreement between Signia and DeMorgan (undated) [HS1]
[107] Email from Uyen Nguyen to Craig Wright dated 30 August 2014 subject 'RE: Agency Deed' [HS16]
[108] The agreement specifically uses the term Wright Family Trust (or WFT) throughout the agreement so we have adopted that usage in this section.
[109] MASCOT organisation extract for DASO Pty Ltd accessed 2 July 2015 [HS27]

CONFIDENTIAL

DEF_00055999

REASONS FOR DECISION

2013-14, 2014-15, 2015-16 and 2016-17.[110] One version of the table for the taxpayer shows $150,000, $450,000, $135,000 and $450,000 allocated to the four years respectively, and gives an incorrect total of $1.5 million, the other shows $353,304.51 per year for the first two years and $141,321.80 per year for the second two years totalling $989,252.62. The total amounts allocated to each financial year do not accord with the number of days the entities purportedly had access to those services in that period.

135. The taxpayer's general ledger shows its allocation by year as follows:[111]

| Year | Amount |
|---|---|
| 2013-14 | $344,499.71 |
| 2014-15 | $344,499.72 |
| 2015-16 | $137,799.89 |
| 2016-17 | $137,799.89 |
| **Total ($)** | **$964,599.21** |
| **Total (Bitcoin)** | **1,400** |

136. At a meeting on 30 January 2015, Dr Wright advised that the apportionment was based on his experience and knowledge of the activities.[112] However, in a response received on 2 March 2015, percentages are given for each entity and it is stated that the other entities have been assigned system times based on those percentages and 'if the computer system was to quadruple in power, the percentages would not change'.[113] The percentages do not match the amounts in the table above in any year.

**GST private binding ruling and audits**

137. In December 2013, the ATO was undertaking Goods and Services Tax (**GST**) audits on a number of entities related to the taxpayer. The audits focused on certain transactions involving the purported transfer of Bitcoin. Dr Wright had also made an application for a private binding ruling regarding the GST treatment of a transfer of Bitcoin. On 23 December 2013, we issued the private binding ruling to Dr Wright advising that a transfer of Bitcoin was a taxable supply so would attract GST.[114] On 14 February 2014, we issued interim reports for two of the entities under GST audit advising that the supply of Bitcoins was a taxable supply and therefore subject to GST. This resulted in the Commissioner increasing the GST payable by several entities.[115]

138. In February 2014, following the receipt of the private binding ruling and interim GST audit reports the entities advised us that, contrary to their earlier contentions, the transactions involved the transfer of equitable interests in Bitcoin, which had been lent to Dr Wright from a trust in the Seychelles.[116]

---

[110] Untitled one page document featuring one excel table and six notes [HS18]; Untitled two page document featuring three excel tables, the first repeating the table and notes from the first document, with the last totalling $42,396,540.85 [HS19]
[111] Intergyrz Pty Ltd general ledger report from 1 July 2013 to 30 June 2014 [I6]
[112] Record of conversation with Craig Wright 30 January 2015 [HS10]
[113] Response to the ATO for Denariuz, Pholus and Interconnected Research received on 2 March 2015, page 24 [HS21]
[114] Letter from Steve Vesperman to Craig Wright containing private ruling (authorisation number 1012569478259) dated 23 December 2013 [H39]
[115] Letters to Coin-Exch Pty Ltd and Hotwire Preemptive Intelligence Pty Ltd dated 14 February 2014 with subject 'Advice of the interim findings of our audit' [T36]
[116] Transcript of conversation with Andrew Sommer, Craig Wright and John Chesher on 18 February 2014 [T18]; Document titled 'Description of transactions – transfer of equitable interests in offshore trusts' attached to email from John Chesher to Andrew Miller dated 26 February 2014 with subject 'Briefing paper for this afternoon' [T19]

CONFIDENTIAL

**Purported payment to High Secured**

### Mining

139.   Dr Wright contends he began mining Bitcoin in his personal capacity in 2009 and mined approximately 1.1 million Bitcoins at a cost of $1.1 million.[117] However, Dr Wright has also advised mining was conducted within two companies he formerly controlled - Information Defense Pty Ltd (**Information Defense**) and Integyrs Pty Ltd (**Integyrs**).[118]

### Transfer to Mr Kleiman

140.   The taxpayer contends that following adverse ATO audit outcomes where the ATO disallowed Dr Wright's deductions for Bitcoin mining, and disallowed the sale of rights to Bitcoin he had mined to Information Defense and Integyrs, Dr Wright transferred his 1.1m Bitcoin to Mr David Kleiman, a US based friend and business associate of Dr Wright who died in April 2013, (or Mr Kleiman for a related entity) for $5,000 in 2010 or 2011.[119]

141.   The taxpayer has provided a blog post as evidence of this intention.[120] ATO Forensics advises it is possible to backdate blogspot posts.

142.   We note that the audit records of these entities do not refer to any transactions involving Bitcoin.[121]

### Tulip Trust

143.   Entities related to the taxpayer contend that Mr Kleiman then arranged for these Bitcoin to be held by the 'Tulip Trust'. In relation to the Tulip Trust, entities related to the taxpayer contend:

143.1.   the trust was set up to promote Bitcoin and was investing in research that Dr Wright was undertaking[122]

143.2.   the Trust was settled in 2010 and has 17 'members', including a Seychelles company related to Dr Wright. Dr Wright knows the identities of only five of the members.[123]

143.3.   under the terms of the trust Dr Wright was to have control and access to the trust deed after 2015[124]

143.4.   Dr Wright was unable to identify the beneficiaries of the trust.[125]

---

[117] Transcript of conversation with Andrew Sommer, Craig Wright and John Chesher on 18 February 2014 [T18]; Record of conversation with John Chesher and Ann Wrightson on 26 February 2014 [T20]; Record of conversation with Craig Wright on 2 February 2015 [T28]
[118] A response to the ATO questions (Part 2) for Craig Wright R&D (ABN 72 433 066 448) received on 28 March 2014 [T23]
[119] Records of conversation with Craig Wright on 30 January 2015 [T27]; Record of conversation with Craig Wright on 2 February 2015 [T28]; Transcript of conversation with Craig Wright and Andrew Sommer on 28 March 2014 [T24]
[120] Cracked, inSecure and Generally Broken blog post on 27 March 2011 [T1]
[121] Letter from James O'Halloran to Information Defense Pty Ltd dated 13 April 2011 with subject 'Completion of Audit' [T31]; Letter from James O'Halloran to Integyrs Pty Ltd dated 6 May 2011 with subject 'Completion of Audit' [T32]; Letter from James O'Hallaran to Craig Wright on 7 June 2011 with subject 'Completion of audit' [T33]
[122] Transcript of interview with Craig Wright on 18 August 2014 (see pages 5-11) [T26] As an example of the research, Dr Wright stated that he was 'Building a supercomputer at the moment'.
[123] A response to the ATO questions (Part 2) for Craig Wright R&D (ABN 72 433 066 448) received on 28 March 2014 [T23]
[124] A response to the ATO questions (Part 2) for Craig Wright R&D (ABN 72 433 066 448) received on 28 March 2014 [T23]
[125] Transcript of interview with Craig Wright on 18 August 2014 (see pages 5-11) [T26]

CONFIDENTIAL

DEF_00056001

144. A series of documents relating to the Tulip Trust have been provided including what appears to be a digitally signed document by Mr Kleiman indicating he held Bitcoin from Dr Wright and was going to establish a trust (the 'Tulip Trust document').[126] However, the taxpayer has provided two versions of the email from Mr Kleiman to which the Tulip Trust document was purportedly attached. The emails are identical except one is dated 24 June 2011 and the other 17 October 2014.[127] Mr Kleiman died in April 2013.

145. The Tulip Trust document states:

145.1. As of 9 June 2011, Mr Kleiman held 1,100,111 Bitcoin he received from Dr Wright

145.2. Mr Kleiman will form a trust designated 'Tulips' to be 'managed and held' in the Seychelles and be 'managed' by between three and seven people

145.3. All Bitcoin will be returned to Dr Wright on 1 January 2020 in the form of a return of control of an unnamed Seychelles company to Dr Wright

145.4. The trust must hold a balance of at least 100,000 Bitcoin in 2020

145.5. Dr Wright may request a loan of Bitcoin for certain purposes. All transactions in loaned funds must take place outside of Australia and the US unless Bitcoin is recognised as a currency.

146. The Tulip Trust document lists four PGP fingerprints relating to the following PGP keys[128]: E545EB7B, C941FE6D, 1F556274 and 5EC948A1. These are listed on the MIT key server as being associated with Dave Kleiman, Satoshi Nakamoto[129], Dr Wright and Satoshi Nakamoto respectively.

147. ATO Forensics advises that:

147.1. the public keys linked to these PGP keys can be created with backdated creation dates

147.2. anyone can upload a key to the MIT key server and there is no 'know your customer' or 'proof of identity' verification

147.3. two of the keys, Dr Wright's and one tied to Satoshi Nakamoto, are showing as having been created using encryption software that was unavailable at the dates they were purportedly created.[130]

148. Dr Wright has also stated that the trust's Bitcoin came from both him and Mr Kleiman.[131] Uyen Nguyen, a US based business associate of Dr Wright's who is purportedly now involved in the Tulip Trust, advised that 650,000 of the trust's Bitcoin came from Dr Wright, 350,000 from Mr Kleiman and the other 100,000 Bitcoin from the trust's other 'members'.[132]

149. On 26 February 2014, an entity related to the taxpayer advised that C01N Ltd (**C01N UK**) (formally called Design by Human Ltd (**Design By Human**)) is the trustee of the Tulip

---

[126] Attachment titled 'Tulip Trust.pdf' to email from Dave Kleiman to Craig Wright sent on 24 June 2011 at 12:04:57 PM with subject 'Requested attached.' [C80]

[127] Email from Dave Kleiman to Craig Wright sent on 17 October 2014 at 12:04:57 PM with subject 'Requested attached.' [C81]

[128] PGP (Pretty Good Privacy) is a data encryption and decryption program that provides cryptographic privacy and authentication for data communication. Each user has a public/private key pair. The private key is known only to the user. The public key is usually bound to a user name and/or an email address.

[129] Satoshi Nakamoto is the pseudonym used by the person or group who invented Bitcoin.

[130] Both were created using the preferred has algorithm 8,2,19, 11, which was non-existent in the PGP code base until 9 July 2009 [C123]

[131] Transcript of interview with Craig Wright on 18 August 2014 (see pages 5-11) [T26]

[132] Record of conversation between ATO officers and Uyen Nguyen on 23 June 2015 [T29]

CONFIDENTIAL

SENSITIVE

Trust.[133] On 23 June 2015, Ms Nguyen advised that a number of individuals acted as trustees.[134] On 27 November 2015, the taxpayer advised that 'at no stage was the ATO advised that C01N UK was the only trustee'.[135]

***Deed of loan***

150. Dr Wright contends he entered into a loan agreement with the Tulip Trust on 23 October 2012 to borrow 650,000 'BTC'[136] on the later date of 1 July 2013. Key features of the agreement provided are as follows:[137]

150.1. The cover states the agreement is between Design By Human Ltd as mortgagee, Craig Wright R&D as mortgagor and Denariuz Seychelles Trust as guarantor. The first page states that Panopticrypt Pty Ltd as trustee for Denariuz Seychelles International Trust is guarantor and that the mortgagee is 'Uyen Nguyen of Design by Human'. The deed contains no references to Design by Human Ltd acting in a trustee capacity.

150.2. The deed is apparently executed by Ms Nguyen of Design by Human. Attached to the deed is a 'consent to act', whereby she accepts the position of Chief Operating Officer of Design by Human and Permanent Success Ltd (**Permanent Success**) from 18 October 2012, and Director of both from 30 June 2013.

150.3. The deed records a purported loan from Design By Human for the principal amount of 650,000 Bitcoin, with a drawdown date of 1 July 2013. Interest may be payable at 5%.

150.4. The Loan Deed records a First/Second mortgage over all the shares in 'Permanent Success Limited UK' (Permanent Success UK company reference 08260048) and all related trusts as collateral security.

150.5. In Recital B to the deed the trustee for the Denariuz Seychelles International Trust (the guarantor) and Dr Wright (the mortgagor) 'acknowledge that the money referred to in this deed has been received by the mortgagor'.

150.6. Recital C reads '*It is noted that [Uyen Nguyen of Design by Human Ltd as mortgagee] holds a sum of Bitcoin (in wallets noted in appendix A) for a trust that wishes to extend the uptake and value of Bitcoin globally*'.

150.7. An Appendix to the agreement lists 26 Bitcoin addresses and contains the handwritten annotation 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW'. The balance of each address is listed and they total 655,275.08 Bitcoin.

151. Ms Nguyen contends Mr Kleiman prepared the deed before he died and she signed it sometime around June 2013.[138]

152. Blockchain records show the balances in these addresses was only 585,386.17 Bitcoin as at 23 October 2012[139] (six addresses had no Bitcoin in them at that date)[140] and 615,328.51 Bitcoin as at 1 July 2013 (four addresses had no Bitcoin in them).[141]

---

[133] Description of Transactions – transfers of equitable interests in offshore trusts provided on 26 February 2014 [T19]
[134] Record of conversation between ATO officers and Uyen Nguyen on 23 June 2015 [T29]
[135] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015 [C57]
[136] BTC is a reference to Bitcoin.
[137] Deed of loan between Design By Human Ltd, Craig Wright and Denariuz Seychelles Trust dated 23 October 2012 [T30]
[138] Record of conversation with Uyen Nguyen on 23 June 2015 [T29]
[139] www.blockchain.com [T39]

SENSITIVE

CONFIDENTIAL

DEF_00056003

153. The taxpayer contends that:

> Pursuant to a "Deed of Loan" entered into by the Trustee and Dr Wright in October 2012, the [Tulip] Trust made available a facility to Dr Wright of 650,00 Bitcoin. It appears that there was an intention to immediately loan the whole amount to Dr Wright with the undrawn balance of Bitcoin remaining with the Trustee as a separate Trust for Dr Wright pursuant to the Deed of Loan. Therefore, it is considered that the 650,000 Bitcoin held by the Trustee were held not on the terms of the original trust but on terms of a "bare trust" in favour of Dr Wright from the date of the Deed of Loan. Dr Wright could call for the transfer to him of any or all of that number of Bitcoin or could require the Trustee to transfer the Bitcoin to a third party in satisfaction of Dr Wright's interest in that separate trust established under the Deed of Loan. [142]

### *Accessing the Bitcoin under the deed of loan*

154. On 2 March 2015, entities related to the taxpayer have also provided a document titled 'Trust function', which seeks to explain the workings of the trust. [143] It states in part:

> One standard method for storing a secret key (or any secret information) is by using a secret-sharing scheme, such as proposed by Shamir.

> With a secret-sharing scheme, the secret is broken into two or more pieces, each piece tendered to an agent (a trustee) for safekeeping. Some critical number of agents, usually fewer than the total number, can reconstruct the secret by combining their shares, while no group of agents fewer in number than the critical number, can reconstruct the secret.

> To further ensure trust, the trust beneficiary can maintain a section of the key themselves. This key section can be configured to be a critical component of the Shamir scheme to have a series of agents that need to act in concert with the trust and who cannot act against the beneficiary.

> The prototype implementation, the "Tulip Trust" is an M-of-N implementation that can work off block to distribute keys securely.

> A "Brainwallet" style heuristic key generator is used to create a multisig address/

> In the "Tulip Trust", a scheme of 3 of 5 keys has been created.

> A "Time Release" of 2020 has been deployed. This will ned [sic] the trust and release the remainder in Dec 2020.

155. We note that the 'Trust function' document referenced above was provided as substantiation for a related entity's R&D activities for the 2013-14 income year and has been taken primarily from the internet sources, with the addition of references to the Tulip Trust, Bitcoin and beneficiaries. [144]

156. We have been provided with a number of differing accounts of the number of segments the private keys were purportedly split into, the minimum number required to recreate the keys, who held them and the number held by each person.

157. A purported Bitmessage from Mr Kleiman to Dr Wright dated 6 November 2012 states the trust will offer the loan to Dr Wright, and details the method of splitting the Bitcoin address private keys. It states the keys have been split into 15 segments with a threshold of 12,

---

140
141

[142] Document titled 'Description of transactions – transfer of equitable interests in offshore trusts' attached to email from John Chesher to Andrew Miller dated 26 February 2014 with subject 'Briefing paper for this afternoon' [T19]
[143] Document titled 'Trust function' submitted in support of Panopticrypt Pty Ltd's R&D activities [T37]
[144] http://www.google.com/patents/US5675649, https://en.bitcoin.it/wiki/Contract,
https://github.com/orisi/wiki/wiki/Orisi-White-Paper [T38]

meaning that 12 of 15 segments are required to recreate the private key and spend the Bitcoin, and that:

157.1.   Mr Kleiman holds 3 segments

157.2.   Ms Nguyen holds 2 segments

157.3.   Dr Wright holds 9 segments, 5 of which are replicated in other trust members

157.4.   Dr Wright cannot control the trust but does have veto. In order to spend Bitcoin, Dr Wright would need to do one of the following: get Mr Kleiman and Ms Nguyen to sign; get Ms Nguyen and two others to transfer control or get Mr Kleiman and one other to sign

157.5.   Mr Kleiman and Ms Nguyen will not let Dr Wright know who the others are.[145]

158.   We note that Mr Kleiman, Ms Nguyen and Dr Wright's keys total 14 segments, not 15.

159.   In contrast, on 23 June 2015, Ms Nguyen advised that:

159.1.   Mr Kleiman had sole access to three segments (which have been lost since his death)

159.2.   Ms Nguyen holds three segments

159.3.   Dr Wright holds three segments

159.4.   The remaining segments are held by other members of the trust.[146]

160.   In correspondence on 27 November 2015, the taxpayer advised that, at least in relation to one address that was subject to the Tulip Trust deed of loan, 'we have invented a split wallet whereby you take a threshold amount of keys (at least 7 of 15) to gain access to the private key'.

### United Kingdom companies

161.   The taxpayer contends that Mr Kleiman acquired Design By Human (later C01N UK) and Permanent Success (later Denariuz Ltd (**Denariuz UK**)) from CFS, a UK shelf company provider. A related entity has provided a series of screenshots of purported Bitmessages, emails (some purportedly electronically signed) and text messages between Mr Kleiman and Dr Wright relating to the companies.

161.1.   On 11 October 2012, Mr Kleiman purportedly advised Dr Wright that he 'had obtained' Design by Human.[147]

161.2.   Also on 11 October 2012, Mr Kleiman purportedly advised Dr Wright 'I will transfer the trust holdings from the Seychelles into a shell I have obtained for you. It is UK company 08248988' (Design By Human's company number).[148]

161.3.   On 14 October 2012, Mr Kleiman purportedly advised Dr Wright 'I will put the order in for the UK company shortly. As agreed. I am just agent in this.'[149] This is inconsistent with Mr Kleiman's earlier statements that he had already 'obtained' Design By Human.

---

[145] Bitmessage from Dave Kleiman to Craig Wright received 6 November 2012 at 12:19 AM with subject 'The trust process' [T12]
[146] Record of conversation with Uyen Nguyen on 23 June 2015 [T29]
[147] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[148] Various Bitmessages, emails & texts between Dr Wright and Dave Kleiman, Uyen Nguyen & High Secured [C31]
[149] Various Bitmessages, emails & texts between Dr Wright and Dave Kleiman, Uyen Nguyen & High Secured [C31]

CONFIDENTIAL

DEF_00056005

161.4.   On 25 October 2012, Mr Kleiman purportedly advised Dr Wright 'I have used CFS in the UK. I have 2 companies in the UK. Design by Human Permanent Success. I will handle the details for you'.[150]

161.5.   On 10 December 2012 at 1:20 AM, Mr Kleiman purportedly advised Dr Wright 'We now have a company in the UK. There is a shelf company – Design by Human (08248988) that I like the name of'.[151] This purported email was almost two months after Mr Kleiman had purportedly already acquired the company and advised Dr Wright of this.

161.6.   On 15 December 2012, Dr Wright purportedly emailed Mr Kleiman saying 'We have 08248988 held and reserved at CFS. Should we grab another as a backup, at least hold or reserve one?', and attached a purported screenshot of CFS's webpage showing the company Permanent Success Ltd as available for sale. Mr Kleiman's response on the same day states 'no need. There are several others from October if we come into any issues, but we only need one.'[152] This purported email exchange is after Mr Kleiman purportedly advised Dr Wright he had already acquired Permanent Success, and Mr Kleiman had already purportedly advised Dr Wright of the holding of Design By Human several times.

162.   In relation to Design By Human, records from Companies House show that:

162.1.   it was registered under the *Companies Act 2006* (UK) on 11 October 2012[153]

162.2.   until 3 January 2014, it was owned and controlled by a UK shelf company operator, CFS

162.3.   until 3 January 2014, its directors were CFS Nominees Ltd and Bryan Thornton (connected with CFS)[154]

162.4.   its name was changed from Design By Human Ltd to Moving Forward in Business Ltd on 15 October 2013[155]

162.5.   its name was changed from Moving Forward in Business Ltd to C01N Ltd on 7 January 2014.[156]

163.   We have obtained a 'Combined Register' for C01N UK, from computer records obtained from an entity related to the taxpayer, where the details match the original contemporaneous CFS documents.[157]

164.   CFS Secretaries Ltd confirmed these facts on 11 May 2015. When asked about the formation and sale of C01N UK, CFS stated C01N UK:

… Was a Shelf Company which was purchased from CFS on 3rd January 2014

… Sold as a Shelf Company…

… The name was changed from Design By Human to Moving Forward in Business by CFS to sell as a Shelf Company. The Client then changed the name to C01N LTD…

---

[150] Various Bitmessages, emails & texts between Dr Wright and Dave Kleiman, Uyen Nguyen & High Secured [C31]
[151] Various Bitmessages, emails & texts between Dr Wright and Dave Kleiman, Uyen Nguyen & High Secured [C31]
[152] Purported email from Craig Wright to Dave Kleiman dated 15 December 2012 with subject 'Re: Brits' [C137]
[153] Certificate of incorporation of a private limited company (company number 8248988) [C138]
[154] Companies house extract: C01N Ltd [C35]; Annual return AR01 for Design By Human Ltd dated 11 October 2013 submitted 14 October 2013 [C74]
[155] Certificate of incorporation on change of name (company number 8248988) dated 15 October 2013 [C72]
[156] Certificate of incorporation on change of name (company number 8248988) dated 7 January 2014 [C73]
[157] Combined Register for C01N Ltd (obtained from NUIX) [C36]

CONFIDENTIAL

| REASONS FOR DECISION

... Dormant when the company was incorporated and owned by CFS...[158]

165.  However, on 22 February 2014 (ie after CFS sold the company), documents were lodged with Companies House indicating:[159]

165.1.  Panopticrypt had been a director since 1 January 2013

165.2.  At 30 June 2013:

a)  the directors were Panopticrypt and Mr Thornton and the secretary was Dr Wright

b)  200 ordinary shares were on issue and 38,707,000 preference shares were on issue

c)  the company had assets of £38,508,838 and no liabilities. It had a revaluation reserve of negative £127,017 and a loss account balance of £71,345.

165.3.  At 1 February 2014:[160]

a)  the directors were Panopticrypt and Dr Wright and the secretary was Dr Wright

b)  200 ordinary shares were on issue held equally between Dr Wright and Ms Watts

c)  18,707,000 redeemable preference shares were held by Denariuz Lte (believed to be Denariuz Pte Ltd, a Singaporean company related to Dr Wright)

d)  20,000,000 redeemable preference shares were held by Panopticrypt non-beneficially.

166.  On 28 March 2014, the ATO advised the taxpayer that there was no Companies House record of Ms Nguyen ever holding the position of Director of C01N UK.

167.  On 10 April 2014, documents were lodged with Companies House indicating Mr Kleiman and Ms Nguyen were appointed directors on 12 October 2012.[161]

168.  A response to a request for information from CFS bears a handwritten annotation which indicates that both appointments had been 'backdated by the client'.[162]

169.  CFS stated 'not applicable' when we requested company minutes. However, several purported minutes (unsigned or signed by Dr Wright) were found on computer records obtained from an entity related to the taxpayer that ostensibly corroborate the taxpayer's contention that Panopticrypt was a director of C01N UK. One minute (dated 3 January 2014) appears to have been executed by the same person that executed several share

---

[158] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 2015 ATO ref 7790 [C38]
[159] Companies house extract: C01N Ltd [C35]; C01N Ltd Abbreviated (Unaudited) Accounts (11 October 2012 to 30 June 2013) submitted 22 February 2014 [C75]; Annual return AR01 for Design By Human Ltd dated 11 October 2013 submitted 14 October 2013 (Companies House document ID X2IY8NUH) [C74]
[160] Annual return AR01 for C01N Ltd dated 1 February 2014 22 February 2014 (Companies House document ID X32AHLAB) [C76]
[161] Appointment of director for C01N Ltd (Mr David Kleiman) submitted 13 April 2014 (Companies House document ID X35OYHCI) [C78]; Appointment of director for C01N Ltd (Ms Uyen Nguyen) submitted 13 April 2014 (Companies House document ID X35JPOGG) [C79]
[162] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 205 ATO ref 7790 [C38]

CONFIDENTIAL | DEF_00056007

certificates included in the 'Combined Register', yet makes no reference to Panopticrypt having any role in the company at 3 January 2014.[163]

170. Ms Nguyen advised that she and Dr Wright changed C01N UK's name from Design By Human Ltd to Moving Forward in Business Ltd as they felt they were in need of a change and it had to do with the principles of Feng Shui.[164]

171. The taxpayer contends that Design By Human was set up by Mr Kleiman and that Dr Wright was not involved in the administrative aspects of the company. The taxpayer further contends that either Mr Kleiman or CFS failed to keep the records up to date.[165]

172. In relation to Permanent Success, records from Companies House show that:

172.1.   it was registered under the *Companies Act 2006* (UK) on 18 October 2012[166]

172.2.   until 3 January 2014, it was owned and controlled by CFS

172.3.   until 3 January 2014, its directors were CFS Secretaries Ltd and Bryan Thornton (connected with CFS)[167]

172.4.   its name was changed from Permanent Success Ltd to Denariuz Ltd on 7 January 2014[168]

173. CFS Secretaries Ltd confirmed these facts on 11 May 2015. When asked about the formation and sale of Denariuz UK, CFS stated Denariuz UK:

… Was a Shelf Company which was purchased from CFS on the 7th January 2014

… Sold as a Shelf Company…

… Dormant when the company was incorporated and owned by CFS…[169]

174. However, on 22 January 2014 (ie after CFS sold the company), documents were lodged with Companies House indicating that Panopticrypt had been a director since 1 January 2013.[170]

*Issue of shares*

175. The taxpayer contends that it received equitable interests in 1,400 Bitcoin from the Wright Family Trust worth $964,600 on 9 March 2014 as consideration for 964,600 $1 shares issued to Panopticrypt in a trustee capacity.[171]

176. In relation to the purported share issue we note:

---

[163] Minutes of Design By Human Ltd dated 11 October 2012, 1 January 2013, 14 October 2013 and 15 October 2013; Minutes of Members' meeting of Moving Forward in Business Ltd dated 3 January 2014; Minutes of meeting of Moving Forward in Business Ltd dated 3 January 2014 (signed); Minutes of meeting of C01n Ltd dated 3 January 2014 (obtained from NUIX) [C37]
[164] Record of conversation with Uyen Nguyen on 23 June 2015 [T29]
[165] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[166] Certificate of incorporation of a private limited company (company number 8260048) [C139]
[167] Companies house extract: Denariuz Ltd [C140]; Annual return AR01 for Permanent Success Ltd dated 18 October 2013 submitted 18 October 2013 [C141]
[168] Certificate of incorporation on change of name (company number 8260048) dated 7 January 2014 [C142]
[169] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 2015 ATO ref 7790 [C38]
[170] Companies house extract: Denariuz Ltd [C140]; Appointment of corporate director for Denariuz Ltd (Panopticrypt Pty Ltd) submitted 22 February 2014 (Companies House document ID X32AHKVU) [C143]
[171] Intergyrz Pty Ltd general ledger report from 1 July 2013 to 30 June 2014 [I6]; Integyrz Pty Ltd Bank statement (XBT –Bitcoin Rights assignment) from 1 June 2013 to 30 June 2014 [I8]; Integyrz Pty Ltd register of members [I3]

CONFIDENTIAL

DEF_00056008

176.1. no source documentation has been provided to evidence the Wright Family Trust transferred its equitable interest in 1,400 Bitcoin to the taxpayer

176.2. a share application, certificate and the register of members provided by the taxpayer record shares being issued to Panopticrypt on 9 March 2013, four months prior to the taxpayer being registered with ASIC

176.3. the share issue to Panopticrypt was not registered with ASIC. Rather ASIC records show that until 1 September 2014 the taxpayer had only \$10 of paid up share capital and on that date the taxpayer issued 964,600 \$1 fully paid shares to Demorgan Holdings.

176.4. the share certificates provided by the taxpayer for the shares purportedly issued to Panopticrypt and those issued to Demorgan Holdings, with serial numbers 11 to 964611, are both numbered certificate 2

176.5. the taxpayer's general ledger shows interests in 1,400 Bitcoin were received on 9 March 2014, and that these were worth \$964,599.21, however this transaction was not entered into the taxpayers accounts until 1 September 2014.[172] The transaction references 'DeMorgan' and was credited by Dr Wright to an intercompany loan account with DeMorgan Pty Ltd.[173] It was subsequently credited to share capital on 30 June 2014 with the reference 'Conversion of loan into share capital'.

### Payment by C01N UK to High Secured

177. On 14 August 2015, a related entity of the taxpayer provided an 'Instruction for Transfer of Legal Interest in BTC' (the 'instruction').[174] The instruction is dated 5 March 2014 and states that pursuant to an agreement, Dr Wright transferred his equitable interest in an unspecified number of Bitcoin to the Wright Family Trust 'for value'. It does not state the date of this purported agreement and a copy has not been provided. It goes on to state that:

177.1. The Wright Family Trust instructs C01N UK to transfer ▮▮▮▮ Bitcoin to 'Signia c/o High Secured (Panama)'

177.2. C01N UK will be deemed to have complied with the notice by transferring the Bitcoin from Bitcoin address ▮▮▮ to Bitcoin address ▮▮▮

178. A related entity contends that address ▮▮▮ is owned by the Wright Family Trust.[175]

179. The Blockchain shows that: [176]

179.1. ▮▮▮▮▮▮▮ Bitcoin were transferred from ▮▮▮ to ▮▮▮ at approximately ▮▮▮▮▮▮ This was the first time Bitcoin in ▮▮▮ had been sent to a new address.

179.2. several minutes later, ▮▮▮ Bitcoin were transferred from ▮▮▮ to ▮▮▮ purportedly representing the payment of the High Secured invoice, and ▮▮▮ Bitcoin were transferred from ▮▮▮ to ▮▮▮

[172] Integyrz Pty Ltd Bank statement (XBT –Bitcoin Rights assignment) from 1 June 2013 to 30 June 2014 [I8]; Integyrz Pty Ltd General ledger report for from 1 July 2013 to 30 June 2014 [I6]

[173] Integyrz Pty Ltd Journal Report from 1 Jul 2013 to 30 Jun 2014, Transaction ID 9 [I9]

[174] Instruction for transfer of legal interest in BTC from DeMorgan (Panopticrypt Pty Ltd) to C01N Ltd [Z18]

[175] Response to ATO letter dated 05th Feb 2015 for Pholus Pty Ltd, Interconnected Research Pty Ltd and Denariuz Pty Ltd received 2 March 2015 [D4]

[176] Blockchain.com [HS8]. Note the Blockchain records transactions in Universal Coordinated Time.

CONFIDENTIAL

DEF_00056009

179.3.   shortly after, the Bitcoin in those addresses was further divided until it was split into approximately ▮ Bitcoin per address.

180.   The first part of these transactions is represented diagrammatically below.




**Bitcoin substantiation**

181.   On 10 October 2013 Dr Wright provided a list of addresses he contended that the group owned. This included a screenshot of Bitcoin wallet software showing a number of Bitcoin addresses, including ▮ However, the ▮ address is in a different font and size to the other addresses.[177]

182.   The taxpayer has provided a statutory declaration made by Stephen D'Emilio, a solicitor, dated 11 October 2013, that states that Mr D'Emilio viewed five Bitcoin addresses, including ▮ and two other addresses purportedly loaned to Dr Wright under the Deed of Loan[178], on Dr Wright's mobile phone and it appeared that 'Mr Wright' could control all of, and make transactions in, the Bitcoin wallet addresses.[179]

183.   ATO Forensics advises that if the addresses were able to be controlled by Dr Wright from his mobile phone or computer's wallet software, the private keys would have been required to input the addresses into the wallet software.

184.   Entities related to the taxpayer have contended that evidence of Dr Wright's Tax File Number (**TFN**) has been embedded into the ▮ address and that this verifies his control of the address.[180] Two amounts of Bitcoin that are representations of Dr Wright's TFN were sent to this address on 9 October 2013 with a value at that time of approximately $517.[181] We note that Bitcoin can be sent to any other address without the sender controlling the recipient address.

185.   On 25 May 2015, we requested the taxpayer provide evidence of the control of several tranches of Bitcoin addresses relating to relevant transactions, by using the message signing feature of Bitcoin wallet software.[182] The addresses included:

185.1.   ▮ – the address purportedly loaned to Dr Wright by the Tulip Trust and used to fund the High Secured transaction

185.2.   ▮ – the address purportedly held by the Wright Family Trust and used to transfer Bitcoin to High Secured. Note this address is not subject to the purported Deed of Loan.

---

[177] Email from Dr Wright to Michael Hardy dated 10 October 2013 [C44]
[178] ▮
[179] Statutory declaration by Stephen D'Emilio dated 11 October 2013 [C68]
[180] Response to an information request for Denariuz Pty Ltd, Pholus Pty Ltd and Integyrz Pty Ltd received on 2 March 2015, page 41 [HS21]
[181] At an exchange rate of $148.86012403/Bitcoin http://www.xe.com/currencytables/?from=XBT&date=2013-10-09#
[182] Letter from the ATO to the taxpayer and related entities dated 25 May 2015 [C84]

CONFIDENTIAL                                                        DEF_00056010

185.3. ▇▇ – the address into which the remaining ▇▇ Bitcoin from the High Secured transaction was paid, which we understood to be under the control of the taxpayer and/or related entities

185.4. several addresses into which Bitcoin from ▇▇ was subsequently paid[183], which we understood to be under the control of the taxpayer and/or related entities

185.5. a number of addresses containing Bitcoin purportedly loaned to Dr Wright by the Tulip Trust where the private keys were purportedly transferred to third parties[184]

185.6. a number of addresses containing Bitcoin purportedly loaned to Dr Wright by the Tulip Trust where we understood that Dr Wright still held the equitable interest in the Bitcoin[185].

186. The taxpayer did not sign any messages, and advised: [186]

186.1. ▇▇ was a 'paper wallet – noted to be transferred in 2014'. No explanation was provided as to why Dr Wright did not control the private key and could not sign a message in the address.

186.2. ▇▇ was 'address used in HS transaction – balance transferred in from the paper wallet'. No explanation was provided as to why Dr Wright did not control the private key and could not sign a message in this address.

186.3. ▇▇ was an 'Escrow wallet previously held with High Secured outside Dr Wright's control – now transferred to High Secured'. No further explanation was provided as to why the group purportedly paid an additional ▇▇ Bitcoin, worth over A\$36 million, to High Secured to be held in escrow and subsequently transferred.

186.4. where addresses had purportedly been used to pay third parties, 'control of address passed outside Dr Wright's control as part of the [third party] Transactions by transfer of the private keys', 'balance transferred to [third party's] wallet and documented on the blockchain' and '[third party's] address'

186.5. where addresses had been loaned to Dr Wright but remained unspent, '30/6/2014 - Address transferred out of Dr Wright's control as part of a repayment of the amounts loaned by the Trust'.

187. Ms Nguyen has asserted that until June 2013 Dr Wright could not access the private key for the ▇▇ address as she held a 'BIP 64' key required to unencrypt the private key. [187] ATO Forensics advises that Bitcoin Improvement Proposal (BIP) 64 is unrelated to the encryption of private keys.

188. Ms Nguyen asserts that Dr Wright and Mr Kleiman set up the ▇▇ address in 2011, and that Dr Wright then created the paper wallet using software he had developed. Ms Nguyen asserts that Mr Kleiman held the password to unencrypt the private key until late 2012, when he sent it to Ms Nguyen via Cryptocat[188] and that she then provided the password, via Cryptocat, to Dr Wright in June 2013. [189]

---



[183] Appendix 3 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015 [C45]
[187] Email from Ut Ng to Arna Synnot dated 14 August 2015 with subject 'RE: ATO request [DLM=Sensitive]' [T34]
[188] Cryptocat is an online instant messaging application that uses end-to-end encryption.
[189] Email from Ut Ng to Arna Synnot dated 14 August 2015 with subject 'RE: ATO request [DLM=Sensitive]' [T34]

CONFIDENTIAL                                                                 DEF_00056011

189. On 27 November 2015, an entity related to the taxpayer contended that Dr Wright had the passphrase to access the private key to the ▮▮▮ address from its creation, and also that at least 7 of 15 keys were needed to access the 'key'.[190] It is unclear if this latter reference to 'key' refers to the private key or the passphrase.

190. In relation to signing messages within the Bitcoin addresses to verify ownership, Ms Nguyen contended that:

   190.1. the private key to the ▮▮▮ address was provided to High Secured at the time of the transaction and that she does not believe Dr Wright still holds a copy of the private key[191]

   190.2. the homomorphic encryption scheme used to divide the private keys does not involve key retention once the process is complete. As such, once the keys are transferred to a third party, the process cannot be recreated securely.[192]

191. She further contends that Dr Wright offered to sign messages in 2013 but the ATO declined the offer and that as a result, no messages will be signed now.[193]

192. To support its assertions, a related entity of the taxpayer provided two documents. The first is an email from Dr Wright to Michael Hardy of the ATO on 28 October 2013 and states in part:[194]

> We have supplied the verification from the solicitors of the accounts to you already and a list of the accounts we control

193. It goes on to say that Dr Wright will invite Mr Hardy to visit the vault holding their cold storage wallet, to show how it is verified and let the ATO have its own technical person validate it. We note that Mr Hardy was not part of any audit on the taxpayer or any of its related entities and that the offer appears to relate to one wallet only.

194. The second is a purported email from Dr Wright to Celso Tomas of the ATO on 17 October 2013, and was provided to the ATO on 27 November 2015. In October 2013, Mr Tomas was auditing the Business Activity Statements (**BAS**) of several entities related to the taxpayer. The related entities contended they had made an acquisition from a third party and transferred the private keys associated with 22 Bitcoin addresses to the third party as consideration.

195. It states in part:[195]

> If there is a simple means to offer ongoing proof, we will do this now. As we are moving forward in business, we cannot promise that the same information will always be available. If you allow us, we will prove how we can transfer keys on and off block. Once a transfer has occurred offblock, the scheme we use wipes information.

196. This second purported email was never received by the ATO.

197. In separate correspondence, the related entities contended that 21 addresses had been transferred prior to 17 October 2013 – the date of the purported email to Mr Tomas - with the last address transferred on that day.[196]

---

[190] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

[191] Record of conversation with Uyen Nguyen on 23 June 2015 [T29]

[192] Email from Uyen Nguyen to Arna Synnot dated 14 August 2015 [C99]

[193] Email from Ut Ng to Arna Synnot dated 14 August 2015 with subject 'RE: ATO request [DLM=Sensitive]' [T34]

[194] Email from Craig Wright to Michael Hardy dated 28 October 2013 with subject 'RE: Submissions for Thursday' [C100]

[195] Purported email from Craig S Wright to Celso Tomas dated 17 October 2013 at 12:31 PM with subject 'Email' [C100]

CONFIDENTIAL                                                                    DEF_00056012

**Electronic evidence submitted**

***Purported emails with the ATO***

198. The taxpayer and related entities also controlled by Dr Wright have provided a series of emails they allege represent email correspondence between ATO officers and the taxpayer's directors/representatives in relation to related entities. These variously purport that:

    198.1. ATO officer Celeste Salem sent an email to Dr Wright regarding the holding of a related entity's income tax refund for 2012-13, failed to attach the notification letter properly and sent the physical letter to the wrong address. As a result, the related entity contends it was not notified that the ATO was holding its refund, as required under section 8AAZLGA of the TAA.[197] ATO records show this email was never sent.

    198.2. ATO officer Hao Khuu sent an email to Dr Wright advising on the GST treatment of a related entity's transaction.[198] ATO records show the time and the content of this email has been changed to support the contentions of the related entity.

    198.3. ATO officer Brigid Kinloch ATO sent an email to Dr Wright advising that a related entity could claim prepayments as notional deductions.[199] ATO records show the content of this email has been changed to support the contentions of the related entity and no such advice was given.

    198.4. Dr Wright sent an email to ATO officer Shalyce Dempster advising that related entities were transferring 17 Bitcoin addresses to a third party in advance of it occurring, and later forwarded this to ATO officer Michael Hardy as evidence that the ATO had been advised of the transaction in advance.[200] ATO records show the content of the email to Shalyce Dempster was changed when it was forwarded to Michael Hardy to support the contentions of the related entities.

    198.5. Dr Wright sent an email to ATO officer Michael Hardy advising that certain Bitcoin addresses had been transacted.[201] ATO records show this email was not received by ATO servers.

    198.6. Dr Wright forwarded to ATO officer Des McMaster an email he had sent to ATO officer Shalyce Dempster advising of an upcoming purchase. ATO records show the email sent to Shalyce Dempster was not received by ATO servers.[202]

    198.7. Dr Wright sent an email to ATO officer Celso Tomas offering to provide evidence of his holding of Bitcoin addresses (refer to paragraphs 194 to 196 above).

---

[196] Reconciliation of Bitcoin addresses (Appendix 4 of the Letter from Andrew Sommer to Peter Walmsley dated 17 November 2014 with subject 'Dr Craig S Wright and his related entities - Second submission regarding Division 165 [M15]

[197] Alleged email from Celeste Salem to Craig S Wright received in an attachment titled 'Appendix 4 – 8AAZLGA Email (00000004).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C88]

[198] Alleged email correspondence between Hao Khuu and Craig Wright received as an attachment titled 'Appendix 7 – ATO Email CF Khou 00 (000000003).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C90]

[199] Alleged email from Brigid Kinloch to Craig S Wright and John Chesher received as an attachment titled 'Appendix 0 – Kinloch Brigit 0111131 (00000002).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C90]

[200] Alleged email from Craig Wright to Michael Hardy dated 12 September 2013 with subject 'Re: Meeting on 24 September' [M16]

[201] Purported email from Craig Wright to Michael Hardy dated 12 September 2013 [M16]

[202] Email from John Chesher to Des McMaster dated 12 February 2014 with subject 'FW: Evidence.' [M18]

CONFIDENTIAL

DEF_00056013

199. On 27 November 2015, entities related to the taxpayer provided two forensic reports commissioned by Dr Wright pertaining to emails. Dr Nick Sharples was asked to examine four emails that are identified in the report as DM2, DM3, DM5 and DM6. The report suggests that DM2 and DM3 are emails from Hao Khuu, DM5 is from Brigid Kinloch and DM6 is from Celeste Salem. However, copies of the emails are not attached so we are unable to identify which emails are being referenced. Notwithstanding this, we note that Dr Sharples:

199.1. was unable to confirm that the emails had the message headers and message bodies when they were originally composed[203]

199.2. noted that the ATO email system was configured to include the email header field 'content-transfer-encoding' and none of the emails have that field present[204]

199.3. noted anomalies with the header fields in all four emails[205]

199.4. noted DM5 and DM6 did not contain a Domain Keys Identified Mail (**DKIM**) signature[206] or SPF header verification, indicating that he could not confirm whether the message was the same as when it was composed, and that these inconsistencies raised questions in his mind concerning the provenance of those emails[207]

199.5. was unable to verify that the DKIM test was passed for DM2 and DM3, indicating that he could not confirm whether the message was the same as when it was composed or that the ATO's public-private key-pair had been changed.[208]

200. We note the ATO's public-private key pair had not changed.

201. Mr Alan Batey was also asked to examine four emails that are identified in the report as DM2, DM3, DM5 and DM6.[209] The report suggests that DM2 and DM3 are emails from Hao Khuu, DM5 is from Brigid Kinloch and DM6 is from Celeste Salem. However, copies of the emails are not attached so we are unable to identify which emails are being referenced. Notwithstanding this, we note that on the basis of the email headers, Mr Batey:

201.1. States that DM2 and DM3 were sent from addresses residing within the ato.gov.au domain space

201.2. Identifies that DM5 contains no SPF record or DKIM signature

201.3. Identifies that DM6 contains no SPF record

201.4. Identifies that there is a question over the origin of DM5 given it does not have SPF and DKIM records

201.5. Conversely states that three emails have SPF and DKIM records that validate as correct.

202. Mr Batey does not appear to have attempted to verify the DKIM signatures of the four emails.

---

[203] Sharples report, paragraph 12.2
[204] Sharples report, paragraph 12.3
[205] Sharples report, paragraph 12.4
[206] Dr Sharples states 'Domain Keys Identified Mail (DKIM) is a defined standard that enables the contents and the source of email message to be verified', Sharples report, paragraph 5.1 [C94]
[207] Sharples report, paragraphs 9.7, 10,12, 10.13, 12.5.2 and 12.5.3
[208] Sharples report, paragraphs 5.7, 5.8, 7.9 and 8.9
[209] Forensic Report by Alan Batey dated 11 November 2015 case name 'Email Analysis' CR case reference 'CP15 1588' [C101]

CONFIDENTIAL

DEF_00056014

REASONS FOR DECISION

### *Purported Bitmessages with third parties*

203. The taxpayer and related entities have also provided purported Bitmessages with other parties that contain features that cast doubt on their genuineness. Screenshots of Bitmessages purportedly between Dr Wright and a third party show that messages to and from both parties appear in Dr Wright's Bitmessage inbox.[210] ATO Forensics have advised that this indicates they were sent to and from the same Bitmessage client rather than between two separate Bitmessage clients as we would expect with two third parties.

204. The taxpayer also provided purported screenshots of Bitmessages between Dr Wright, Mr Kleiman, Ms Nguyen and High Secured that ostensibly support the taxpayer's assertions that it obtained services from High Secured, the existence of the Tulip Trust and the veracity of the deed of loan.[211] The taxpayer advises that these serve as contemporaneous, unalterable evidence that the transactions took place.

205. ATO Forensics has advised that Bitmessages themselves are only encrypted ('cryptographically secure') and therefore tamper proof when they are transmitted over the internet. Once the Bitmessage is received, it can be altered.

### *Purported digital signatures*

206. The taxpayer contends that the digital signature purportedly used by Mr Kleiman provides irrefutable evidence that the signed emails and documents are genuine. We note that several emails purportedly from High Secured also appear to have been digitally signed.

207. The taxpayer contends a report by Mr Batey confirms that Mr Kleiman's digital signature has been verified. The taxpayer commissioned a report from Mr Batey 'to examine the PGP keys and establish if they were used to sign the Tulip Trust PDF document'.[212] The Tulip Trust PDF document has not been provided, however we understand it to be Tulip Trust document referred to in paragraph 145.

208. The Batey PGP report concludes that:

> … the Tulip Trust.pdf file was indeed signed by David A Kleiman or an individual who had access to his private PGP key and had made the public key available on the MIT PGP key server. If anyone else had access to the private PGP key then that person would also need to know the passphrase associated with that key.

209. ATO Forensics advise that:

209.1. the public keys used in the emails purportedly signed by Mr Kleiman and Ms De Gracia can be created with backdated creation dates

209.2. there is no 'Know Your Customer' or 'Proof Of Identity' requirements when uploading a public key to the MIT key server the taxpayer claims verifies their identities

209.3. as the digital signatures are not supported by X.509 certificates issued by trusted authorities, there is no way to verify the owner of the digital signatures, nor the date that any signing occurred.

---

[210] Screenshots of purported Bitmessages between Craig Wright and 'MJF Dealings to Baraka' [M21]
[211] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]; Various blogs written by Dr Wright [C32]
[212] Forensic Report by Alan Batey dated 20 November 2015 case name 'PGP Document Analysis' CR case reference 'CP15 1588' [C114]

CONFIDENTIAL

210. This is demonstrated by the fact that another key on the same key server is also tied to Mr Kleiman. However, its creation date is 26 February 2014, almost a year after his death.[213]

211. Another key tied to Mr Kleiman and purportedly used to sign a contract in a transaction with a related entity, was created using encryption software that was unavailable at the date it was purportedly created.[214]

### Purported blogspot posts

212. The taxpayer also suggests Blogspot posts offer contemporaneous evidence to support various contentions, particularly in relation to the Tulip Trust. ATO Forensics have advised that blogspot posts can be backdated.

213. On 27 November 2015, an entity related to the taxpayer contended that Dr Wright has a hash of the blogspot post relating to the Tulip Trust saved to Twitter, and that this hash has been forensically verified.[215] The related entity referred us to a report commissioned by Dr Wright from Mr Batey where Mr Batey is asked to 'determine if the supplied hash value is the same as the generated has value from the PDF file named Deed of Trust'. Mr Batey was provided with a hash value and the PDF file, which he hashed using HashCalc. The report does not mention a tweet, nor a blogspot post.

214. Mr Batey confirmed that the hash value of the PDF file matched the hash value provided by Dr Wright. The taxpayer has not provided the PDF file that was hashed or details of the tweet to the ATO to allow us to verify Mr Batey's work.

## Other evidence submitted

215. An entity related to the taxpayer and also connected to Dr Wright made claims regarding the acquisition of software and intellectual property from a Professor Rees in exchange for Bitcoin. Subsequent enquiries to third parties, including Professor Rees's daughters and the executor of his estate indicate that they have no knowledge of such a transaction taking place and that his estate included no Bitcoin.[216]

216. On another occasion, entities related to the taxpayer and also connected to Dr Wright provided ATO officers with copies of emails purporting to demonstrate training and technical support provided by an entity, Al Baraka, from whom the entities had 'acquired' software. The emails were sent from a domain linked to a virtual office in Istanbul known as 'Servcorp'. The credit card records of Dr Wright show that a payment was made to this virtual office around the time the domain was established.[217] Dr Wright indicated at an interview on 18 August 2014 that he did not have any reason to make such a payment to 'Servcorp' and that he intended to make inquiries as to how that payment appeared on his statement.[218] On 27 November 2015, a related entity contended that 'it is likely that [Al

---

[213] MIT PGP keyserver search results of 0x2bd4b0e7 pgp.mit.edu accessed 3 February 2016 [C144]

[214] 0x6e4a1defb6559b7f was purportedly created on 6 March 2008 using the preferred hash algorithm 8,2, 9, 10, 11, which was non-existent in the PGP code base until 9 July 2009 [C123]

[215] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

[216] Attachments to letter from HM Revenue and Customs to ATO dated 27 May 2015 ref 7790 [C46]; Attachments to letter from HM Revenue and Customs to ATO dated 20 May 2015 ref 7790 [C47]; Email from Professor Sarah Rees to ATO dated 8 May 2015 [C48]

[217] Attachments to letter from HM Revenue and Customs to ATO dated 27 May 2015 ref 7790 [C46]; Attachments to letter from HM Revenue and Customs to ATO dated 20 May 2015 ref 7790 [C47]; Email to ATO dated 8 May 2015 [C48]

[218] Email from Craig Wright to Jonathon Slater of Clayton Utz dated 21 August 2014 with subject 'RE: Servcorp' [M37]

CONFIDENTIAL

DEF_00056016

Baraka's purported agent] had a copy of Dr Wright's credit card. This credit card was cancelled in 2014 as it had been used for several fraudulent purchases'.[219]

217. The taxpayer and related entities have also provided emails purportedly with other parties that contain features that cast doubt on their genuineness. One email provided was apparently sent at '23:40 AM'.[220] Another email references a domain that was not in existence at the time it was sent.[221]

218. A related party has provided a signed memorandum featuring its Australian Business Number (**ABN**) dated 15 days prior to it receiving its ABN.[222]

219. A related party provided an invoice featuring an AusIndustry registration number dated two weeks prior to the company receiving the registration number.[223]

220. Dr Wright has admitted he backdated several invoices for a related entity.[224]

221. Dr Wright advised there was a technical error with the ATO portal and provided a purported screenshot of an error message when trying to lodge a BAS for a related entity.[225] Whether the error occurred had implications for whether the ATO could retain the entity's refund. The ATO retains detailed records relating to system performance/stability and availability that show the purported error did not occur.[226]

---

[219] Annexure A of email from Robyn Thomas to Nathan Firth dated 27 November 2015 with subject 'RE: Following up on GST objections [DLM=Sensitive:Legal] [T35]
[220] Email from accounts@mjfminingservices.com to Craig Wright dated 16 August 2013 at 23:40 AM with subject 'Reciept' [HS32]
[221] Purported email from markferrier@hotmail.com to Craig S Wright dated 12 October 2013 with subject 'Thank You…' references the subdomain cp-in-2.e-delivery.albaraka-bank.asia/cpanel. The albaraka-bank.asia domain was first registered on 31 December 2013 [M26]
[222] Minutes of Board Meeting of Panopticrypt 'Memo' To 'Trust File' from Craig S Watts cc Ramona Watts dated 9 August 2013 with subject 'Trust Management' [HS4]; ATO systems [WK35]
[223] Invoice 1040 issued by Strasan Pty Ltd to Hotwire Pre-emptive Intelligence dated 2 June 2013 [H16]; Letter from AusIndustry to Hotwire Pre-emptive Intelligence Pty Ltd dated 15 July 2013 [H4]
[224] Transcript of conversation with Craig Wright on 11 August 2014 [T25]
[225] Email from Craig S Wright to Nicholas McLenaghan and Andrew Sommer on 25 May 2015 with subject 'RE: DeMorgan Limited – Response re Audit' [T40]
[226] Internal ATO records [T41]

REASONS FOR DECISION

# YOUR CONTENTIONS

222. Detailed information relating to the taxpayer's factual contentions is set out in various parts of the 'Relevant facts' section of this Paper above.

## ISSUE 1: R&D TAX OFFSETS

223. The taxpayer contends that it incurred expenditure pursuant to a contract with High Secured on R&D activities during the 2013-14 income year.

224. The taxpayer contends that it conducted R&D activities in the 2013-14 income year solely in Australia.

225. The taxpayer contends it can deduct prepaid expenditure in the year in which it was incurred.

CONFIDENTIAL

# OUR REASONS FOR DECISION

## ISSUE 1: R&D TAX OFFSETS

226. ***Issue:*** Is the taxpayer entitled to an R&D tax offset of $434,069.55 in the 2013-14 income year under Division 355 of the *ITAA 1997*, in respect of expenditure incurred pursuant to a contract with High Secured?

227. ***Decision:*** No.

228. Under Division 355, an R&D entity may be entitled to a tax offset in respect of certain R&D activities. To be entitled to the tax offset, the R&D entity needs one or more notional deductions under the Division. The taxpayer considers that it has notional deductions for expenditure on R&D activities.

229. An R&D entity's entitlement to a notional deduction is determined under section 355-205, which provides:

    (1) An R&D entity can deduct for an income year (the present year) expenditure it incurs during that year to the extent that the expenditure:

    a) is incurred on one or more R&D activities

    (i) for which the R&D entity is registered under section 27A of the *Industry Research and Development Act 1986* for an income year and

    (ii) that the activities to which section 355-210 (conditions for R&D activities) applies and

    b) if the expenditure is incurred to the R&D entity's associate – is paid to that associate during the present year.

    Note 1: if the matters in sub-paragraphs (a)(i) and (ii) are not satisfied until a later income year, the R&D entity will need to wait until then before it can deduct the expenditure for the present year

    Note 2: The R&D activities will need to be conducted during the income year the R&D entity is registered for those activities (see sections 27A and 27J of the *Industry Research and Development Act 1986*)

230. An R&D entity whose notional deductions are at least $20,000 is entitled to a tax offset equal to a proportion of those deductions.[227] Where the R&D entity's aggregated turnover is less than $20 million and the entity is not controlled by an exempt entity or entities, the tax offset is 45% of the deductible amount and is refundable.[228]

### No registered activities

231. The taxpayer was not registered for R&D activities in the 2012-13 year. Accordingly, the purported expenditure incurred to High Secured would not give rise to a notional deduction for the purposes of the R&D tax offset.[229]

232. On 19 February 2015 AusIndustry made a finding under section 27J of the IR&D Act that none of the activities registered by the taxpayer in its 2013-14 AusIndustry application were core or supporting R&D activities.

233. Where a finding is made under section 27J of the IRDA, the R&D entity's registration is taken always to have existed in a form consistent with the finding, meaning the taxpayer is taken to have never been registered for core or supporting R&D activities.[230]

---

[227] Subsection 355-100(1)
[228] Items 1 and 2 of subsection 355-100(1) and section 67-30
[229] Paragraph 355-100(1)(a) and paragraph 355-205(1)(a)

CONFIDENTIAL

DEF_00056019

234. Findings made by AusIndustry under section 27J of the IRDA are binding on the Commissioner for the purposes of assessments of the R&D entity for the income year or years to which they apply.[231]

235. Given the taxpayer has no registered core or supporting R&D activities for 2013-14, it is not entitled to claim the expenditure purportedly incurred to High Secured as a notional deduction for the purposes of the R&D tax offset.

**No expenditure incurred**

236. Further, we do not consider the taxpayer to have incurred any expenditure pursuant to a contract with High Secured. Accordingly, the taxpayer would not have been entitled to a notional deduction for the purpose of the R&D tax offset even if registered R&D activities had been conducted for it.[232]

237. To qualify for a notional deduction under section 355-205, an R&D entity must incur expenditure.

238. The term 'incurred' is not defined in the legislation. The following guidance on the term 'incurred' is provided in *TR 97/7: Income tax: section 8-1 - meaning of 'incurred' - timing of deductions*. At paragraph 6, it states:

> The courts have been reluctant to attempt an exhaustive definition of a term such as 'incurred'. The following propositions do not purport to do this, they help to outline the scope of the definition. The following general rules, settled by case law, assist in most cases in defining whether and when a loss or outgoing has been incurred:
>
> a) a taxpayer need not actually have paid any money to have incurred an outgoing provided the taxpayer is definitively committed in the year of income. Accordingly, a loss or outgoing may be incurred within section 8-1 even though it remains unpaid, provided the taxpayer is 'completely subjected' to the loss or outgoing. That is, subject to the principles set out below, it is not sufficient if the liability is merely contingent or no more than pending, threatened or expected, no matter how certain it is in the year of income that the loss or outgoing will be incurred in the future. It must be a presently existing liability to pay a pecuniary sum;
>
> b) a taxpayer may have a presently existing liability, even though the liability may be defeasible by others;
>
> c) a taxpayer may have a presently existing liability, even though the amount of the liability cannot be precisely ascertained, provided it is capable of reasonable estimation (based on probabilities);
>
> d) whether there is a presently existing liability is a legal question in each case, having regard to the circumstances under which the liability is claimed to arise;
>
> e) in the case of a payment made in the absence of a presently existing liability (where the money ceases to be the taxpayer's funds) the expense is incurred when the money is paid.

239. The meaning of the term 'incurred' in relation to R&D expenditure is the same as its meaning in relation to section 8-1.[233]

240. In the present case there are numerous anomalies and inconsistencies in the evidence provided that lead us to conclude that:

    240.1.    the taxpayer did not have access to the purported Tulip Trading supercomputer

---

[230] IRDA subsection 27L(1)
[231] Subsection 355-705(1)
[232] Paragraph 355-100(1)(a) and subsection 355-205(1).
[233] *Desalination Technology Pty Ltd v. Federal Commissioner of Taxation* 2013 ATC 10-343 paragraph 16

CONFIDENTIAL

DEF_00056020

240.2.    no payment was made to High Secured

240.3.    no liability arose from the purported agreement between the taxpayer and High Secured.

241.    Considered cumulatively,[234] we consider that these anomalies and inconsistencies lead to the conclusion that the purported master agreement amounts to a sham. It is considered that the purported agreement was not intended to create the legal rights and obligations it gives the appearance of creating,[235] but was, rather, intended to be a disguise for some other transaction or for no transaction at all.[236]

### Existence of purported supercomputer

242.    We do not consider the taxpayer had access to the purported Tulip Trading supercomputer for the following reasons:

242.1.    We do not consider that a related entity had access to a different purported supercomputer (C01N supercomputer) and consider that the related entity presented manipulated results to us to replicate the specifications of the purported C01N supercomputer. Preliminary advice indicates that many of these anomalies also exist in relation to the purported Tulip Trading supercomputer.

242.2.    We note that for both the C01N and Tulip Trading supercomputers, the purported end provider is the same entity, High Secured.

242.3.    Dr Wright did not allow us to view the data that was purportedly held on the supercomputer, or allow us to access its metadata to ascertain its existence, when it had been loaded onto the supercomputer or its size. This evasiveness adds further weight to the conclusion that what was shown to us was not the Tulip Trading supercomputer.

243.    Considered with the other evidence and conclusions below, we consider that the taxpayer did not have access to the purported Tulip Trading supercomputer.

### The purported master agreement and invoice

244.    In this regard we note the following:

244.1.    The agreement purports to be with an unrelated company for the use of cloud computer infrastructure on which to use their *own software*, yet appears to have been created by making some minor alterations to a contract for a licence to use the *provider's software* on cloud computing infrastructure entered into between Hotwire and Rubik.

244.2.    The alterations appear to include replacing the word 'Rubik' with 'High Secured', and attempting to remove references to Australian law. This has been only partially successful. The body of the agreement refers to the laws of Panama, yet contains references to three pieces of Australian law.

244.3.    The service description is unrelated to the IaaS services the taxpayer contends were provided under the purported master agreement, and instead reflect the SaaS services that Rubik was to provide to Hotwire. In particular, the references in the agreement to DeMorgan establishing a Bitcoin bank, the parties working together to establish a 'proof of concept' and to the number of 'accounts' that will be available are wholly inconsistent with the invoice description and  High

---

[234] See *Richard Walter Pty Ltd v. Federal Commissioner of Taxation* 95 ATC 4440 at 4452
[235] *Snook v. London & West Riding Investments* [1967] All ER 518 at 528-529
[236] *Richard Walter Pty Ltd v. Commissioner of Taxation* (1996) 67 FCR 243 at 257-258

CONFIDENTIAL

DEF_00056021

REASONS FOR DECISION

Secured's description of the provision of 'bare metal cores'. Further, the purported master agreement contains no reference to the model or technical specification of processors to be provided.

244.4. The first and second parts of the purported agreement have the styles of documents that are completely independent of each other. For instance:

(a) neither part is referred to in the other part. Both parts are numbered from 1. Both parts contain 'entire agreement' clauses that do not reference the other part.

(b) key concepts in the second part are described in a 'Data Center Service Agreement', which has not been provided

(c) the terminology used to describe the parties is different in each part

(d) the second part also does not appear to apply to VPS customers, which the taxpayer contends to be

(e) the pricing, payment terms and payment means are inconsistent between the two parts, and they both purport to place contradictory rights and obligations on the parties with respect to force majeure, notices, entire agreement, termination, indemnities/liability and warranties.

244.5. The purported agreement is undated.

244.6. The purported agreement does not fully identify or define the parties. No company identifier or full legal name is provided for Signia / High Secured. The agreement is purportedly entered into by 'the Wright Family Trust' (as opposed to the trustee of the Wright Family Trust). The Wright Family Trust is not a legal entity, and has no capacity to enter into contracts.

244.7. The purported agreement contains numerous references to 'clause 0' and 'Error! Reference source not found'.

244.8. Several High Secured website addresses that appear in the first part of the agreement do not exist. We refute the explanation from representatives for entities associated with the taxpayer that these addresses are on private IP addresses and domains.[237]

245. Although the document bears the name and logo of High Secured, representatives for entities associated with the taxpayer concede that the agreement with Rubik was used a precedent and despite its anomalies, the agreement is legitimate.

246. We reject this assertion as we consider it implausible that High Secured, an independent supplier of legal, banking and IT services would consent to entering into an agreement worth over $40 million that:

246.1. was drafted by a customer

246.2. fails to accurately specify the services to be provided or the specifications of the equipment that will be used to provide that service

246.3. fails to accurately specify the legal entities party to the agreement

246.4. contains numerous errors

246.5. is inconsistent with its standard terms and conditions.

---

[237] See paragraph 64 of this paper.

CONFIDENTIAL

247. There are also a number of anomalies with the invoice that cast doubt on its legitimacy:

    247.1. High Secured's fax number on the purported invoice contains an extra digit. In light of the other evidence, we do not accept the taxpayer's contention that this is a routing number or a typographical error by High Secured.

    247.2. The invoice refers to 'Xenon Phi' processors, when the product name is 'Xeon Phi'.

    247.3. The invoice requests payment to the 1HR4 address, yet the QR code links to a blockchain.info website for address 15wJ.

    247.4. The invoice contains inconsistent references to the number of cores to be provided – the description refers to 32,000 Xenon (sic) Phi [cores], yet the note states '30,000 system core availability at 99.9999'.

    247.5. The agreement states that the fee for 32,000 cores will be 38,000 Bitcoin per year.[238] The invoice charges 15,000 Bitcoin per year for 32,000 cores.

    247.6. The agreement states that the fee is payable annually in advance for the first three years. The invoice requires payment for four periods in advance.

    247.7. The invoice charges the same fee for periods of unequal length.

248. We have not been provided with any conclusive confirmation from High Secured that it was a party to the purported master agreement, issued the invoice, or received payment. The unusual and unreasonable limitations imposed upon offers of communication with High Secured lead us to conclude that such offers were not made in good faith and, moreover, cast extreme doubt upon whether they in fact involved High Secured.[239]

249. Furthermore, the information presented as confirmation of the agreement from High Secured is not considered reliable for the following reasons:

    249.1. The header of the email apparently sent to the ATO directly from High Secured reverts to a different domain that had only been reactivated several days prior to us receiving the email. We have not been provided with evidence that High Secured controls the different domain and see no reason why High Secured would send us an email from the correct domain, yet direct any replies to a different domain.

    249.2. In any event, the email does not advise what payment was made or what it was for.[240] The email was digitally signed by a key on the MIT key server attributed to Ms De Gracia. We do not accept that it was from Ms De Gracia as the MIT key server requires no proof of identity and does not issue X.509 certificates that would verify the keyholder's identity. We find it improbable that High Secured would sign with this key when their website indicates they hold a X.509 certificate and so could sign with a key that has been verified as belonging to them.

    249.3. The fax provided, which contains confirmation of the payment and services provided, was not received directly and is not from a known High Secured fax number. In fact, it comes from a Japanese fax number. No evidence has been provided to support the taxpayer's contention that the owners of High Secured live in Japan.

---

[238] 20,000 Bitcoin for 20,000 cores and 1.50 Bitcoin for each additional core (20,000 + 1.5 x (32,000 − 20,000).
[239] See paragraphs 113 to 128 of this paper.
[240] See paragraph 116 of this paper.

CONFIDENTIAL

249.4.   The other emails purportedly between High Secured and the taxpayer's representatives have not been provided in their native format, but in PDF format. This does not allow us to check their provenance.

249.5.   Contrary to the purported statement in an email from High Secured, we have not conducted checks into any of High Secured's business partners.

249.6.   Doubt is cast on all evidence provided by the taxpayer in light of the other electronic communications and other evidence received from the taxpayer and related entities that has been demonstrated to be fabricated (see paragraphs 198 to 221 of this paper).

249.7.   ATO officers did view a representative of the taxpayer log into what appeared to be the High Secured customer portal. However the officers refute the taxpayer's contention that the portal showed the invoice in question, or that it had been paid.

250.   The burden of showing that the agreement with High Secured is not a sham is on the taxpayer.[241] For the reasons outlined above, we do not consider that the taxpayer is able to discharge the burden of showing that the purported master agreement reflects the true nature of the relationship between the parties.

***The agency agreement***

251.   Further, if the purported master agreement had legal effect, we do not accept that the taxpayer is a party to it. Such a conclusion would be contrary to the terms of the purported master agreement, which identifies the parties who are intended to have the benefit of the software and services to be provided by High Secured.

252.   Clause 27 of the purported master agreement implies that software and services are only to be supplied to the licensee and members of the 'Licensee group'. The 'licensee group is defined to mean each of the licensee's related bodies corporate as defined in section 50 of the CA. This is consistent with other clauses in the purported master agreement which seek to restrict the entities who receive the benefit of software and services provided by High Secured.[242]

253.   The taxpayer was not a member of the licensee group as the as defined. The taxpayer would not therefore be entitled to enforce the purported master agreement, since this would be contrary to the terms of that agreement.[243] Although the taxpayer is identified as a party to the purported agency agreement, it is established law that a person cannot claim to be a principal to a contract if this would be inconsistent with the terms of the contract itself.[244] The purported master agreement defines the entities for whom DeMorgan acts as agent, indicating that DeMorgan is not also entitled to act as agent for other, unidentified entities, including the taxpayer.

254.   We also note that one of the entities for whom the purported master agreement was purportedly entered into, DASO, was not in existence at the time the purported master

---

[241] *Richard Walter Pty Ltd v. Commissioner of Taxation* (1996) 67 FCR 243; *Millar & Anor v. FC of T* 2015 ATC 20-531 at [48]
[242] IaaS Master Agreement between Signia and DeMorgan (undated) clauses 16.3, 28/3, 28.4, 29.9 and 'Terms and Conditions' clause 4.1(c) [HS1]
[243] CA sections 46, 47, 48 and 50
[244] *White v. Baycorp Advantage Business Information Services Ltd* [2006] NSWSC 441 at [80]-[83]; *Humble v. Humble* (1848) 12 QB 310; *Formby Bros v. Formby* (102 LT 116); *Fred Drughorn Ltd v. Rederiaktiebolaget Transatlantic* [1919] AC 203; *Dunlop Pneumatic Tyre Co Ltd v. Selfridge & Co Ltd* [1915] AC 847 at 864; *Siu Yin Kwan (Administratrix of the Estate of Chan Ying Lung, Decd) & Anor v. Eastern Insurance Co Ltd* [1994] 2 AC 1999 at 207

agreement was entered into. This casts further doubt on the legitimacy of the purported agreements.

### Purported Payment

255.  Expenditure can be incurred when paid, in the absence of a presently existing liability. However, evidence casting doubt on the existence of an obligation to pay[245] also casts doubt on the existence of the payment.

256.  In the present case we do not accept that the taxpayer and related entities ever held the Bitcoin purportedly used to pay High Secured. Further, we do not accept that the taxpayer paid Bitcoin to High Secured in the manner contended for a number of reasons.

### Bitcoin substantiation

257.  We do not accept that the taxpayer has substantiated that it or any related entity controlled the Bitcoin in address ▮▮▮ for the following reasons:

257.1.  The 'embedding' of Dr Wright's TFN in the ▮▮▮ address, at best, indicates that Dr Wright either made a payment into or instructed payment to be made into the address; it offers no evidence that Dr Wright or related entities had control or ownership of the private key to the recipient address.

257.2.  The screenshot of the wallet software submitted to the ATO (while inconclusive at best) also has the ▮▮▮ address in a different font to the other addresses, indicating the image has been doctored. Further, given images can be easily created or altered, a screenshot is not conclusive evidence that the wallet existed or that it existed on the taxpayer's or a related entity's computer. This is particularly relevant in the context of the other doctored pieces of electronic evidence provided by the taxpayer and/or related parties.

257.3.  In response to the ATO's request for a message to be signed using the private key associated with the ▮▮▮ address, the taxpayer merely stated that it was a paper wallet and 'transferred' in 2014. The related entities did not advise why a message could not be signed. No evidence has been provided to support Ms Nguyen's contention that Dr Wright provided the private key to High Secured and did not keep a copy. Further, it is illogical that the private key to the ▮▮▮ address would be of any value to High Secured if Dr Wright and/or his related entities also knew the key.

257.4.  Mr D'Emilio's statutory declaration states that it 'appeared' that Dr Wright could control and make transactions in the address. However, it does not state that Mr D'Emilio witnessed Dr Wright doing so. Indeed, Blockchain records show that no transactions were made from the ▮▮▮ address until March 2014, months after the statutory declaration was made.

257.5.  Finally, we note that for an address to be loaded into wallet software on a mobile phone or computer such that it can be spent, the private key must be imported into the software ie Dr Wright must have held the private key to import it into the wallet. If Dr Wright held the private key, even after providing a copy to High Secured, he would retain a copy such that he could sign a message with it unless he positively took steps to dispose of the private key. Further, if Dr Wright held the private key, there was no need for DeMorgan to issue an instruction to C01N UK as trustee for the Tulip Trust to transfer the Bitcoin from ▮▮▮ to ▮▮▮ as Dr Wright had full ownership of the ▮▮▮ address.

---

[245] See paragraphs 242 to 253 of this paper.

CONFIDENTIAL                                                                    DEF_00056025

257.6.    Further, doubt is cast on all evidence provided by the taxpayer in light of the other
electronic communications and other evidence received from the taxpayer and
related entities that have been demonstrated to be fabricated (see paragraphs
198 to 221 of this paper).

258.    We therefore do not accept that the taxpayer has demonstrated that the address ▮
was ever held by it or a related entity.

259.    We consider it relevant that not only has the taxpayer not verified its holding of the Bitcoin
in the ▮ address, it has not substantiated its holding of any of the Bitcoin purportedly
subject to the deed of loan.

260.    We dispute Dr Wright's contention that the ATO audited and disallowed deductions
relating to Bitcoin mining on the basis that Bitcoin mining was a hobby and that he tried to
transfer equitable interest in Bitcoin to related companies. The audit reports contain no
references to Bitcoin.

261.    We accept that if related entities did transfer private keys to third parties via Bitmessage
using the purported methodology, they could no longer sign messages in those
addresses. However, there are a number of anomalies and omissions in the reasons put
forward to explain why messages could not be signed.

261.1.    Address ▮ was purportedly held by DeMorgan and never subject to the
purported deed of loan. It follows that its private key was not split into segments.
It has not been explained why the taxpayer did not sign a message in this
address.

261.2.    The taxpayer contends that the Bitcoin in three addresses[246] purportedly lent to
Dr Wright under the deed of loan had not been spent and had been 'returned' to
the Tulip Trust. It has not been explained why the taxpayer or related entities did
not sign messages in these addressees.

261.3.    When asked to sign messages in address ▮ (which held the remainder of the
Bitcoin from the ▮ address following the purported payment to High Secured),
and several addresses that Bitcoin subsequently flowed through, the taxpayer
contended that those addresses were transferred to High Secured and held as
escrow, then subsequently transferred to High Secured. The taxpayer has not
offered an explanation of why it would transfer ▮ Bitcoin, equivalent to over
▮ to High Secured or how the escrow arrangement worked and no
supporting documents have been provided.

262.    In relation to the taxpayer's contentions regarding its offers to sign messages:

262.1.    We do not accept that the email from Dr Wright offering to show one cold storage
wallet to an ATO officer who was not involved in any compliance activities on the
entities constitutes an offer to sign messages in all addresses controlled by the
group.

262.2.    ATO records show the ATO did not receive the purported email from Dr Wright
offering to validate the addresses and warning that such validation would not
always be possible. We do not accept that this email was ever sent for two
reasons. Firstly, at the time the email was purportedly sent, the only transactions
under review were those involving purported transfer of Bitcoin to a third party by
related entities. Of the 22 private keys purportedly transferred under that
transaction, 21 had already been transferred before the date of the email, with

---

<sup>246</sup> ▮

CONFIDENTIAL                                                        DEF_00056026

the final key purportedly transferred on the date of the email. If, as the taxpayer contends, the private keys could not be recreated, it would not be possible for them to verify ownership of the private keys relating to the principal transaction the ATO would have wanted verified at that time. Secondly, the taxpayer's ability to verify the addresses at that time is inconsistent with the failure to sign messages in the addresses apparently returned to the Tulip Trust in May 2015.

263. Further, the taxpayer has not provided evidence that High Secured controls the address ▆▆▆ and we have not been able to conclusively verify this with High Secured. Doubt is cast on all evidence provided by the taxpayer in light of the other electronic communications and other evidence received from the taxpayer and related entities that have been demonstrated to be fabricated (see paragraphs 198 to 221 of this paper).

264. We therefore do not accept that High Secured was paid 60,000 Bitcoin.

### Tulip Trust

265. We do not accept the existence of the 'Tulip Trust', and therefore do not accept that the taxpayer paid the amount in the manner contended due to the anomalies, inconsistencies and gaps in the taxpayer's contentions.

266. Independent evidence states that C01N UK was not in any way related to Dr Wright, Mr Kleiman or related entities until 3 January 2014, when Dr Wright acquired it. We do not accept it was in any way associated with the purported 'Tulip Trust'.

267. The taxpayer contends that Mr Kleiman digitally signed the Tulip Trust document, evidencing the trust's existence. Two of the PGP fingerprints listed in the document relate to public keys where the creation date of the public keys appears to have been deliberately backdated. The document was also provided with two covering emails that are identical except for the dates. One bears the date 24 June 2011 and the other 17 October 2014. The existence of two versions of this email, one dated after the death of Mr Kleiman, and the presence of fingerprints with fabricated creation dates casts extreme doubt on the veracity of this document and indicates this evidence has likely been fabricated.

268. We reject Mr Batey's evidence that the digital signature belonged to Mr Kleiman. Any person can upload a public key to the MIT key server and link it to any email address. This is evidenced by the fact that the MIT key server contains a public key tied to Mr Kleiman that was purportedly created after his death.

269. We also reject the contention that Mr Batey's evidence proves that the Tulip Trust document was contemporaneous. No evidence has been provided that the hash value of the document was posted to Twitter by Dr Wright as contended by the taxpayer. We note Mr Batey's report does not mention a tweet, merely that the hash value was provided by Dr Wright. Mr Batey merely confirmed that the hash value of the document matched the hash value created by Dr Wright.

270. While we do not accept the Tulip Trust document, we further note that it contains contradictory information about whether the trust has been created or whether it will be created in the future.

271. Dr Wright's blog post, at best, shows an intention to transfer Bitcoin to a trust overseas. In any event, it cannot be verified as contemporaneous as blogspots can be backdated.

272. The inconsistent information we have been given about the source of the Bitcoin purportedly held by the Tulip Trust creates further doubt on its existence. Dr Wright and Mr Kleiman's Tulip Trust document claim Dr Wright contributed 1.1m Bitcoin to the Tulip

REASONS FOR DECISION

Trust, but Dr Wright has also stated that the trust's Bitcoin came from both him and Mr Kleiman. Ms Nguyen has stated that 650,000 of the trust's Bitcoin came from Dr Wright, 350,000 from Mr Kleiman and the remainder from the trust's other 'members'. If the trust existed and Ms Nguyen, Mr Kleiman and Dr Wright were involved as contended, we would expect them all to be aware of the trust's assets and who contributed them.

273.  We also note the inconsistencies between the Bitmessages provided by Dr Wright and information from Ms Nguyen regarding how many segments of the private key exist and who held them.

273.1.  In a purported Bitmessage from Mr Kleiman, Dr Wright advises that there were 15 segments and a threshold of 12 was needed to recreate the private key. Mr Kleiman advised he held three segments, Ms Nguyen two and Dr Wright nine, of which five were replicated in other trust 'members'. This totals 14, not 15 segments.

273.2.  Ms Nguyen advised that she, Mr Kleiman and Dr Wright each held three segments. This totals nine segments.

273.3.  Dr Wright advised that there were 15 segments and the threshold was seven.

274.  Again, if all three individuals were, as contended, intimately involved in the establishment and/or operation of the trust, we would expect them all to be well aware of its basic workings.

275.  Dr Wright has stated that he mined the 1.1m Bitcoin and tried to sell the rights to it to Information Defense and Integyrs, and that the ATO disallowed his personal deductions relating to mining and did not accept the transfer to the two companies. He has conversely stated that it was mined by Information Defense and Integyrs. The ATO audit reports for these entities contain no reference to Bitcoin.

276.  We do not have any reliable evidence that Dr Wright or any of his associated entities held 1.1 million or 650,000 Bitcoin. Nor do we have any reliable evidence that the ownership of any amount of Bitcoin was transferred from Dr Wright to Mr Kleiman or from Mr Kleiman or anyone else to the purported trustee, C01N UK.

277.  Dr Wright and related entities also claim that C01N UK was the, or one of the, trustee(s) of the Tulip Trust. We have been provided with various documents that purportedly support the existence of the Tulip Trust in 2012 and the acquisition of C01N UK to act as trustee. However, the documentation is inconsistent. Mr Kleiman purportedly advises of the acquisition of Design By Human on 11 October 2012, then three days later advises he will put in the order for it, implying it has not been acquired. On 25 October, he again advises he has acquired it. Then on 10 December 2012, he advises that they 'now' have it. These inconsistencies have not been explained. Records from Companies House and CFS also show that C01N UK was an inactive shelf company which had no connection with Dr Wright or associated entities until January 2014. CFS's advice that it changed the company's name to Moving Forward in Business Ltd also directly contradicts the assertion that Dr Wright and Ms Nguyen changed the name based on the principles of Feng Shui. This indicates that the documentation may be fabricated.

278.  Dr Wright also claims that he cannot provide further documentation regarding the trust as its terms do not allow him access to any information until after 2015. This is despite Dr Wright purporting that Panopticrypt held a position as a director of C01N UK from 1 January 2013, and Dr Wright himself holding a position as director of C01N UK from 1 February 2014.

CONFIDENTIAL

DEF_00056028

279. Further, doubt is cast on all evidence provided by the taxpayer in light of the other electronic communications and other evidence received from the taxpayer and related entities that have been demonstrated to be fabricated (see paragraphs 198 to 221 of this paper).

280. We therefore do not accept that the Tulip Trust existed. It follows that the taxpayer could not have paid High Secured in the manner contended.

### Deed of loan

281. It follows that we do not accept the deed of loan purportedly executed by Dr Wright and Ms Nguyen for C01N UK on 23 October 2012. In this respect, we further note:

281.1. Evidence from Companies House and CFS shows that C01N UK and Denariuz UK were dormant shelf companies held by CFS at the relevant times.

281.2. Evidence from Companies House and CFS shows that Ms Nguyen's directorship of C01N UK and Denariuz UK was backdated.

281.3. The deed of loan contradictorily states both that the Bitcoin has been received by Dr Wright at the date of execution and that he will draw it down on 1 July 2013.

281.4. There is no reference to C01N UK or Ms Nguyen acting in a trustee capacity. The only references to a trust are two conflicting references to the guarantor – firstly as the 'Denariuz Seychelles Trust' and then as Panopticrypt for the 'Denariuz Seychelles International Trust'.[247]

281.5. While we do not accept the email containing the information as legitimate or that Permanent Success was held by anyone other than CFS at the relevant date (refer paragraph 165), we note that Dr Wright and Mr Kleiman indicate on 15 December 2013 that they do not own Permanent Success at that date.[248] It was therefore not possible to offer a mortgage over its shares as security at the date of the deed of loan.

281.6. At neither the date of apparent execution nor the purported drawdown date did the Bitcoin addresses listed total 650,000 Bitcoin.[249] In fact, four addresses contained no Bitcoin at both dates. This indicates that the document was not prepared contemporaneously.

281.7. Ms Nguyen advised that the deed of loan was prepared by Mr Kleiman before he passed away (in April 2013) and that she signed the deed of loan around June 2013. This is after the date of the deed.

282. Further, doubt is cast on all evidence provided by the taxpayer in light of the other electronic communications and other evidence received from the taxpayer and related entities that have been demonstrated to be fabricated (see paragraphs 198 to 221 of this paper).

283. We therefore do not accept that parties intended the deed of loan to have legal effect. It follows that the taxpayer could not have paid High Secured in the manner contended.

### Subsequent purported assignments

---

[247] Deed of loan between Design By Human Ltd, Craig Wright and Denariuz Seychelles Trust dated 23 October 2012 [T30] cover page and page 1
[248] Email from dave@davekleiman.com to Craig Wright dated 15 December 2012 at 15:28 PM with subject 'Re: Brits' [T14]
[249] At 23 October 2012, the balance in the addresses was 585,386.17 Bitcoin. At 1 July 2013, the balance in the addresses was 615,328.51 Bitcoin.

CONFIDENTIAL

DEF_00056029

284. The taxpayer contends that the Dr Wright transferred his equitable interests in 111,114 Bitcoin to the Wright Family Trust pursuant to 'an agreement'. The agreement has not been provided to evidence this, nor has any information been provided about how this transfer was effected.

285. Given we do not accept that Dr Wright held any Bitcoin pursuant to the deed of loan, we do not accept that Dr Wright transferred any equitable interest in Bitcoin to the Wright Family Trust. Further, we do not accept that the taxpayer has substantiated the transfer.

**Share issue**

286. Further, if the Wright Family Trust held equitable interests in Bitcoin acquired in the manner contended, we do not accept that Panopticrypt acting as trustee for an unknown entity assigned its interest in 1,400 Bitcoin to the taxpayer in exchange for shares.

    286.1. No deed of assignment has been provided to evidence the purported assignment of Panopticrypt's interest in 1,400 Bitcoin to the taxpayer

    286.2. The taxpayer's share records cannot be relied upon as accurate. This conclusion is supported by the purported share issue not being reported to ASIC or entered into the taxpayers financials until September 2014 and the repeated and significant inconsistencies outlined above at 176.

287. We therefore consider that there are no reliable contemporaneous source documents to indicate that shares were issued on 9 March 2014. The systemic and repeated inconsistencies between the taxpayer's internal share records, financial records and ASIC indicate these records cannot be relied upon.

288. Further, in light of the taxpayer's statements relating to C01N UK which independent evidence suggests are false, and the false emails the taxpayer's director has presented as representing correspondence with the ATO, we cannot accept the veracity of any of the documentation the taxpayer claims support its contentions in relation to the transactions under audit.

**Sham**

289. Further evidence indicates that the arrangement for the purported payment of consideration (the loan of Bitcoin to Dr Wright and the assignment of rights to call on that Bitcoin) is a sham.

290. Entities related to the taxpayer changed their contentions regarding transactions under GST audit following a private binding ruling issued on 23 December 2013 and interim GST reports issued on 14 February 2014 that concluded that Bitcoin was a taxable supply. While initially contending the payments under GST audit were made in Bitcoin, the taxpayer then contended that the transactions under audit actually involved the transfer of equitable interests in Bitcoin (which the taxpayer contends are input taxed) purportedly held by the Tulip Trust on bare trust for Dr Wright pursuant to the deed of loan. This indicates that the purported deed of loan and contentions subsequent to it appear to be a response to the unfavourable GST interim report and private binding ruling the taxpayer's related entities received. The related entities had not mentioned the existence of C01N UK, the Tulip Trust or the deed of loan prior to 26 February 2014.

291. For these reasons, we do not consider that the taxpayer incurred any expenditure to High Secured. Accordingly, the purported contract would not have given rise to a notional deduction for the purposes of the R&D tax offset, even if registered R&D activities were conducted for the taxpayer.

CONFIDENTIAL

DEF_00056030

**R&D activities (if any) not conducted solely in Australia or an external Territory**

292. Further, we do not consider that all (or any) of the taxpayer's purported activities were conducted solely in Australia or an external Territory. Accordingly, the taxpayer would not be entitled to a notional deduction for the purposes of the R&D tax offset, even if it incurred expenditure on registered R&D activities.[250]

293. In order for expenditure on such activities to qualify for a notional deduction, the activities would have to be conducted for the taxpayer solely within Australia or an external Territory.[251] This requirement is not satisfied in the present case, as High Secured did not conduct any activities in these places. Rather, its activities (if any) were conducted in Panama.

294. Where all or part of an R&D activity is conducted outside of Australia and its external Territories, it must be covered by an overseas finding.[252] In the present case, the taxpayer did not have an overseas finding in relation to activities purportedly conducted for it by High Secured.

295. The statutory test to be applied concerns whether the relevant activity is 'conducted for' an entity within Australia or an external Territory. The word 'conducted' ordinarily means 'controlled', 'managed' or 'operated'.[253] However, it is clear that an entity can 'conduct' R&D activity for the purposes of the R&D provisions, despite having no actual or effective ownership of the results of the activity and no ultimate control over the R&D activity as a whole.[254] Such an entity conducts R&D activity 'for' an R&D entity by carrying out its actions for the benefit of the R&D entity, whether as agent or otherwise.[255]

296. To the extent that core R&D activities were conducted in the present case they would have consisted of:

296.1. 'experiment[s]' being undertaken on computing infrastructure controlled by High Secured and

296.2. 'observation and evaluation'[256] being undertaken by researchers on behalf of the taxpayer.

297. High Secured's computer infrastructure would have been used to perform the core R&D activity to the extent that it was used to perform simulations,[257] since this process would bring into existence the very thing which forms the basis of experimentation.[258]

298. To the extent that the IaaS services were directly related to the performance of experiments, despite not being part of the experiments themselves, they would have been supporting R&D activities.[259]

---

[250] Paragraphs 355-100(1)(a), 355-205(1)(a) and 355-210(1)(a)
[251] Paragraph 355-210(1)(a)
[252] Paragraphs 355-210(1)(d) and (e); IRDA paragraph 28C(1)(a)
[253] *Pharmaceutical Society of Great Britain (Council of) v. Fuller* (1932) 96 JP 422 at 424; *Pride of Derby v. British Calanese Ltd* [1953] 1 All ER 179 at 189
[254] On the concept of ownership of results and control over conduct, see Taxation Ruling IT 2451 *Income tax: Investor funding of research and development activities* (withdrawn).
[255] IT 2451 (withdrawn), paragraph 21
[256] Subparagraph 355-25(1)(a)(ii)
[257] Refer paragraph 100 of this paper.
[258] Subsection 355-25(1) and *Explanatory memorandum to Tax Laws Amendment (Research and Development) Act 2011* paragraph 2.19
[259] Subsection 355-30(1) and *Explanatory memorandum to Tax Laws Amendment (Research and Development) Act 2011*, paragraph 2.21

CONFIDENTIAL

299. While the purported master agreement provides inconsistent descriptions of the services apparently to be provided by High Secured, we understand the taxpayer's contention is that the services which provided the occasion for the purported expenditure comprise the provision of access to cloud based virtual private servers.[260] If (contrary to our view) such services constituted R&D activity, that activity would be conducted in the place or places where the computing infrastructure is located. Those places were not in Australia or an external Territory.

300. We note that the requirements above are only relevant to expenditure which the taxpayer contends that it incurred on R&D activities. The question does not arise in relation to expenditure on other activities which may have been conducted by people located in Australia.[261]

**Prepayments**

301. Further, even if the taxpayer had been entitled to a notional deduction for the purposes of the R&D tax offset, the prepayment provisions would have applied to reduce that notional deduction to $80,163, and the offset claimable to $36,073.35 in the 2013-14 income year.[262]

302. The prepayment provisions in Subdivision H of Divison 3 of Part III of the ITAA 1936 prevent the immediate notional deductibility of certain advance prepaid expenses. This Subdivision has effect as if conducting R&D activities was the carrying on of a business.[263] For entities with an aggregated turnover of less than $2 million, a notional deduction for prepaid expenditure on registered R&D activity is calculated in accordance with the following formula:[264]

$$\frac{Period\ in\ year}{Eligible\ service\ period}$$

303. The taxpayer contends that it incurred expenditure of $964,599.21. The taxpayer's documentation provides contradictory information about the eligible service period; however we understand it contends it to be between from 1 April 2014 to 30 March 2017, or 1095 days. The taxpayer contends the number of days in the eligible service period was 91 days.

304. In the present case the taxpayer has not incurred any expenditure on registered R&D activities conducted solely in Australia or and external Territory. However, if it had incurred such expenditure, its notional deduction allowable in the 2013-14 income year would be limited to $80,163. Its refundable tax offset would therefore be limited to $36,073.35.

---

[260] Statement of Work, sections 2, 4.3.1, 4.3.2, 4.3.3. [C24]
[261] See paragraph 100 of this paper.
[262] Section 355-110, paragraph 355-100(1)(a) and subsection 355-205(1)
[263] ITAA 1936 subsection 82KZL(3)
[264] Section 355-110 and ITAA 1936 subsection 82KZM(1)

DEF_00056032