**P-604**

Case No. 9:18-CV-89176-BB

GPO Box 9990 IN YOUR CAPITAL CITY



**Australian Government**
**Australian Taxation Office**

The Public Officer
C01N Pty Ltd
C/- BLW
PO Box H328
Australia Square  NSW  1215

Reply to:     GPO Box 9977
           Adelaide SA 5001
Our reference:   1-678K9NF
Contact officer:   Arna Synnot
Phone:     (08) 7422 2364

Attention: John Balazs and Robyn Thomas

*By email: john@blwllp.com, robyn@blwllp.com,*
*Ramona.watts@demorgan.com*

29 September 2015

**Audit Position Paper**

Dear Sir/Madam

We have enclosed a position paper setting out the findings from the audit of C01N Pty Ltd. The position paper is a statement of the facts as we understand them and our interpretation of the law as applied to those facts.

**What you need to do**
You need to review the position paper and provide a response by 28 October 2014 if any of the following apply:

- You believe our understanding of the facts is incorrect.
- You believe there are other facts we should take into consideration. If so, you must provide new evidence.
- You disagree with our interpretation of the law.  If so, you must provide an explanation why.
- You believe our figures are wrong. If so, you must explain how.
- You have any other relevant matters you wish to raise.

Send your response in writing to:

       Attention: Arna Synnot
       Australian Taxation Office
       GPO Box 9977
       ADELAIDE  SA  5001

**What happens next**
Your response to this position paper will be considered in our final position.  In addition to your response our final position will also include any information or matters that become available.

We will amend your assessment based on the current information if we don't hear from you by 28 October 2014, or the position is unchanged by any new information you provide.

**Your rights**
The ATO recognises and supports the use of Alternative Dispute Resolution (ADR) in appropriate cases as a cost effective, informal, consensual and speedy means of resolving disputes. For more information go to **www.ato.gov.au/privategroups**.

73925.319584-12.2014

CONFIDENTIAL

**For more information**
If you have any questions please phone **13 28 69** between 8.00am and 5.00pm, Monday to Friday and ask for Arna Synnot on extension 22364.

Yours faithfully


Michael Cranston
Deputy Commissioner of Taxation

DEF_00053897

SENSITIVE                                                    POSITION PAPER

| C01N PTY LTD | 29 SEPTEMBER 2015 | SENSITIVE |
|---|---|---|
| AUDIENCE | DATE | CLASSIFICATION |



**Australian Government**
**Australian Taxation Office**

FILE REF: 1-678K9NF

# Position paper

This paper explains the ATO's position for C01N Pty Ltd for the period 1 July 2012 to 30 June 2013

SENSITIVE

For more information on this position paper, phone Arna Synnot on (08) 7422 2364

SENSITIVE                                                    PAGE 1 OF 1

CONFIDENTIAL                                                    DEF_00053898

SENSITIVE

# TABLE OF CONTENTS

Table of contents..............................................................................................................2

Glossary............................................................................................................................3

Introduction ......................................................................................................................5

Summary of our position .................................................................................................6

Relevant facts ..................................................................................................................10

Your contentions .............................................................................................................35

Our position......................................................................................................................36

SENSITIVE

CONFIDENTIAL

DEF_00053899

POSITION PAPER

# GLOSSARY

Words defined in this glossary shall have the meanings ascribed to them:

| | | | |
|---|---|---|---|
| ▮ | Bitcoin address | ███████████ | TWML |
| | Bitcoin address | ███████████ | BRJq |
| | Bitcoin address | ███████████ | rf2s |
| | Bitcoin address | ███████████ | XY8a |
| | Bitcoin address | ███████████ | nGFx |
| | Bitcoin address | ███████████ | ncKE |
| | Bitcoin address | ███████████ | zm64 |
| | Bitcoin address | ███████████ | 3bad |
| | Bitcoin address | ███████████ | ta1K |
| | Bitcoin address | ███████████ | 5p2W |
| | Bitcoin address | ███████████ | u7SY |
| | Bitcoin address | ███████████ | uERD |
| 2012-13 | The year ended 30 June 2013 | | |
| 2013-14 | The year ended 30 June 2014 | | |
| ABN | Australian Business Number | | |
| ACN | Australian Company Number | | |
| ASIC | Australian Securities & Investments Commission | | |
| ATO | Australian Taxation Office | | |
| AUD | Australian dollars | | |
| BAS | Business Activity Statement | | |
| BTC | Bitcoin | | |
| Commissioner | the Commissioner of Taxation of the Commonwealth of Australia | | |
| C01N | C01N Pty Ltd | | |
| C01N UK | C01N Ltd | | |
| Forex | foreign exchange | | |
| GST | Goods and Services Tax | | |
| Hotwire | Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) | | |

CONFIDENTIAL

DEF_00053900

| IaaS | Infrastructure as a Service |
|---|---|
| IRDA | the *Industry Research and Development Act 1986* |
| ITAA | the *Income Tax Assessment Act 1997* |
| ITC | Input Tax Credit |
| MT | Miscellaneous Taxation Ruling |
| NSW | New South Wales |
| Panama | The Republic of Panama |
| Panopticrypt | Panopticrypt Pty Ltd |
| PSO | Particle swarm optimisation |
| R&D | Research and Development |
| Strasan | Strasan Pty Ltd |
| TAA | the *Taxation Administration Act 1953* |
| Taxpayer | C01N / Strasan |
| TFN | Tax File Number |
| UK | The United Kingdom |
| US | The United States of America |
| USD | US dollars |
| W&K | W&K Info Defense Research LLC |
| We | the ATO |

CONFIDENTIAL

# INTRODUCTION

1.  A position paper is a document that sets out the ATO's analysis of the facts as we understand them, application of the relevant law to those facts and details of any proposed adjustments or recommendations that might be made as a result of the finalisation of an audit.

2.  In the present case, an audit was undertaken to determine the taxable income of C01N Pty Ltd (**the taxpayer**) and its eligibility for a refundable tax offset in the 2012-13 income year.

3.  Set out below is our position in relation to the tax issues which have been identified in the course of the audit. Also set out below is:

    3.1.   a statement of the facts which we have relied upon in reaching our position

    3.2.   a summary of your contentions and

    3.3.   an explanation of the reasons for our position.

4.  If you do not agree with our understanding of the facts or our interpretation of the law, then you will be given the opportunity to provide details, including any additional facts which you consider should be taken into account and any other relevant matters, before we determine our final position. The attached cover letter explains what you need to do and what happens next.

CONFIDENTIAL

DEF_00053902

| SENSITIVE | POSITION PAPER |
|---|---|

# SUMMARY OF OUR POSITION

## ISSUE 1: R&D TAX OFFSETS (W&K)

5. ***Issue:*** Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year, under Division 355 of the *Income Tax Assessment Act 1997*[1], in respect of expenditure incurred pursuant to a contract with W&K Info Defense Research LLC (**W&K**)?

6. ***Position:*** No.

**No expenditure incurred**

7. We do not consider the taxpayer to have incurred any expenditure pursuant to a contract with W&K. Accordingly, the purported agreement did not give rise to a notional deduction for the purpose of the R&D tax offset.[2]

**No expenditure incurred (if any) on R&D activities**

8. We do not consider the taxpayer to have incurred expenditure on any R&D activities. Accordingly, if (contrary to our view) the taxpayer did incur expenditure pursuant to a contract with W&K, that expenditure would not give rise to a notional deduction for the purposes of the R&D tax offset.[3]

**R&D activities (if any) not conducted solely in Australia or an external Territory**

9. If (contrary to our view), the taxpayer did incur expenditure on R&D activities, we do not consider those activities to have been conducted solely in Australia or an external Territory. Accordingly, those activities did not give rise to a notional deduction for the purposes of the R&D tax offset.[4]

## ISSUE 2: R&D TAX OFFSETS (PANG)

10. ***Issue:*** Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year, under Division 355, in respect of expenditure incurred to Dr Ignatius Pang?

11. ***Position:*** No.

**Notional deductions less than $20,000**

12. The taxpayer's notional deductions for the 2012-13 income year are considered to be less than $20,000. Accordingly, if (contrary to our view) the taxpayer did incur

---

[1] All legislative references in this Position Paper are to the *Income Tax Assessment Act 1997* (ITAA) unless otherwise indicated.
[2] See paragraph 355-100(1)(a) and subsection 355-205(1) of the ITAA.
[3] See paragraph 355-100(1)(a) and paragraph 355-205(1)(a) of the ITAA.
[4] See paragraphs 355-100(1)(a), 355-205(1)(a) and 355-210(1)(a) of the ITAA.

| SENSITIVE | PAGE 6 OF 6 |
|---|---|

CONFIDENTIAL

expenditure to Dr Pang on registered R&D activities, that expenditure would not give rise to a tax offset as it was not incurred to a research service provider.[5]

**No expenditure incurred**

13.    We do not consider the taxpayer to have incurred any expenditure to Dr Pang. Accordingly, the purported arrangement with Dr Pang would not give rise to a tax offset even if (contrary to our view) the taxpayer's notional deductions for the 2012-13 income year were $20,000 or more. [6]

**No expenditure incurred on R&D activities**

14.    We do not consider the taxpayer to have incurred expenditure on any R&D activities. Accordingly, if (contrary to our view) the taxpayer's notional deductions for the 2012-13 income year were $20,000 or more and the taxpayer did incur expenditure to Dr Pang, that expenditure would not give rise to a tax offset for the purposes of the R&D tax offset.[7]

## ISSUE 3: FOREIGN EXCHANGE LOSS

15.    *Issue:* Is the taxpayer entitled to a deduction for a forex realisation loss of $404,204 in the 2012-13 income year, in respect of an obligation to pay foreign currency to W&K?

16.    *Position:* No.

**No obligation to pay foreign currency**

17.    We do not consider that the purported agreement with W&K gave rise to any obligation to pay foreign currency for the purposes of the forex provisions.[8] Accordingly, the purported agreement did not give rise to any forex realisation loss.

**Forex loss (if any) incorrectly calculated**

18.    If (contrary to our view) the taxpayer did have an obligation to pay foreign currency to W&K, its deductible loss was $6,053.

## ISSUE 4: PROFESSOR REES DEDUCTION

19.    *Issue:* Is the taxpayer entitled to a general deduction[9] of $2,066,392 in the 2012-13 income year in respect of a loss or outgoing incurred in respect of an acquisition from Professor Rees?

20.    *Position:* No.

---

[5] See Item 1 of Subsection 355-105(2) of the ITAA.
[6] See paragraph 355-100(1)(a) and subsection 355-205(1) of the ITAA.
[7] See paragraph 355-100(1)(a) and paragraph 355-205(1)(a) of the ITAA.
[8] Section 775-55 of the ITAA.
[9] Subsection 8-1(1) of the ITAA.

CONFIDENTIAL

**No loss or outgoing**

21.     We do not consider the taxpayer to have incurred a loss or outgoing in respect of any such acquisition. Accordingly, the taxpayer is not entitled to any general deduction.

**No connection to assessable income**

22.     If (contrary to our view) Professor Rees did provide the invoiced items and payment was made, any such payment was not incurred in gaining or producing assessable income, nor was it necessarily incurred in carrying on a business to gain or produce assessable income. Accordingly, the taxpayer is not entitled to any general deduction.

## ISSUE 5: ASSESSABLE INCOME

23.     *Issue:* Did the taxpayer derive assessable income[10] of $2,962,399 in the 2012-13 income year in respect of a supply to Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) ('**Hotwire**') related to the purported acquisition from Professor Rees?

24.     *Position:* No.

**No assessable income derived**

25.     We do not consider the subject matter of the purported sale to Hotwire, materials from Professor Rees, were acquired or existed. Accordingly, any amount received by the taxpayer did not have the character of ordinary income.

**Assessable income (if any) incorrectly calculated**

26.     If (contrary to our view), the taxpayer did provide a license or services unrelated to any purported acquisition from Professor Rees to Hotwire and (contrary to our view) Hotwire paid the taxpayer, we consider the taxpayer derived income of $3,205,820. This will be reduced by 1/11[th] if the sale is (contrary to our view), found to be a taxable supply.

## OTHER CONSIDERATIONS

**Part IVA**

27.     Part IVA of the *Income Tax Assessment Act 1936* contains a general anti-avoidance rule that applies to schemes undertaken for the sole or dominant purpose of obtaining a tax benefit. Where Part IVA applies to a scheme the Commissioner may make a determination cancelling any tax benefits obtained in connection with that scheme.

---

[10] Subsection 6-5 of the ITAA.

SENSITIVE

POSITION PAPER

28.   This position paper does not consider whether Part IVA would apply in the event that the taxpayer was entitled to the tax offsets or deductions summarised above; or whether, if it did, the Commissioner would make a determination which had the effect of cancelling the applicable tax benefit.

29.   However, the Commissioner may give subsequent consideration to whether one or more of the schemes considered in this paper give rise to a tax benefit which should be cancelled under Part IVA.

**Purported R&D expenditure carried forward**

30.   This position paper does not consider the tax implications of the $850,000 of R&D expenditure the taxpayer claims to have incurred to associates and carried forward to later years. However, the Commissioner may give subsequent consideration to whether this purported expenditure gives rise to a notional deduction for the purposes of the R&D tax offset.

**Penalties and interest**

31.   This position paper does not consider the application of any penalties or shortfall interest. The application of any relevant penalties and interest will be considered once we have received the taxpayer's response to our position paper and made a final decision on the substantive tax issues.

## SUMMARY OF ADJUSTMENTS

32.   The following table displays the tax adjustment we propose to make in relation to the taxpayer for the year ended 30 June 2013 (**2012-13**).

|  | Pre audit | Post audit |
|---|---|---|
| Taxable income | 476,077.00 | 0 |
| Tax on taxable income | 142,823.10 | 0 |
| Refundable tax offsets | 2,222,252.10 | 0 |
| Amount payable (+) / refundable (-) | (2,079,429.00) | 0 |
| Tax shortfall | | 2,079,429.00 |

33.   In order to give effect to this adjustment, we propose to issue a notice[11] specifying that the taxpayer is not entitled to any tax offset refunds for the 2012-13 income year. The

---

[11] Subdivision 67-L of the *Income Tax (Transitional Provisions) Act 1997* ('TPA').

SENSITIVE

CONFIDENTIAL

DEF_00053906

taxpayer will be entitled to object to this notice in accordance with Part IVC of the *Taxation Administrative Act 1953*.[12]

# RELEVANT FACTS

### Incorporation

34. Strasan Pty Ltd (**Strasan**) (**the taxpayer**) was registered with the Australian Securities & Investments Commission (**ASIC**) on 21 July 2011. Dr Craig Wright and Mr Muhammad Shoaib Yousuf were appointed directors.[13] At incorporation, 2,000 shares were issued as follows:

    34.1.   500 to Panopticrypt Pty Ltd (**Panopticrypt**) beneficially

    34.2.   500 to an entity controlled by Mr Yousuf.

    34.3.   500 each to two other unrelated entities – EA Professionals Pty Ltd and Deuba Pty Ltd.

35. The taxpayer's share register and ASIC show that shares held by EA Professionals and Deuba were cancelled on 6 March 2014 (effective 3 March 2014) as the result of a buyback and forfeiture respectively.[14] The taxpayer advises that EA Professionals was deregistered on 15 May 2013 and Deuba's shares were bought back in 2012.[15]

36. At the relevant time, the shares in Panopticrypt were owned by Dr Wright and his spouse, Ms Ramona Watts, in a 29:71 ratio.[16] Dr Wright and Ms Watts were its directors.[17]

37. The taxpayer advises that on 1 July 2013 Ms Uyen Nguyen was appointed as a director of, and issued 18,000 shares in, the taxpayer.[18]

38. On 25 February 2014, the taxpayer changed its name to C01N Pty Ltd (**C01N**) with effect from 15 February 2014.[19]

### Purported R&D activity

39. On 7 October 2013, the taxpayer applied to register a project named 'Sukuriputo okane' under section 27A of the *Industry Research and Development Act 1986* (**IRDA**) for 2012-

---

[12] Section 67-135 of the TPA.
[13] ASIC form 201 for Strasan Pty Ltd lodged 21 July 2011 (1E7590526) [C1]
[14] C01n Pty Ltd register of members; ASIC form 484 for C01n lodged 6 March 2014 (7E5887792) [C2]; ASIC form 484 lodged 6 March 2014 (7E5887818) [C3]
[15] C01N Pty Ltd Register of members [C6]; Response to ATO from Ramona Watts received on 16 March 2015 page 13 (undated) [C56]; ASIC form 484 for C01N Pty Ltd (7E5887818) [C3]
[16] Panopticrypt Pty Ltd Register of members [C11]
[17] ASIC organisation extract Panopticrypt Pty Ltd accessed 10 June 2015 [C12]
[18] C01n Pty Ltd register of members [C6]; ASIC form 484 lodged 25 October 2013 (7E5601347) [C97]; ASIC form 484 lodged 25 October 2013 (7E5601224) [C98]
[19] ASIC form 205A for Strasan Pty Ltd lodged 25 February 2015 (7E5861347) [C5]

CONFIDENTIAL

DEF_00053907

13.[20] The project is described as a software library for financial cryptography including a prototype server and high-level client API able to process Bitcoin transactions and markets. The three core activities are described in the AusIndustry application as follows: [21]

39.1.    Scriptable money: exploring ways to program a distributed contract using Bitcoin to form agreements with people via the blockchain

39.2.    BTC agents: exploring currency agents

39.3.    Transaction signing: no information is provided about this activity.

40.    Much of the AusIndustry application is taken from internet sources, without acknowledgement. An annotated version of the application showing these sources is provided as **Appendix 1**.

41.    The taxpayer provided additional information to AusIndustry on 7 October 2013. Much of this information is taken from internet sources, without acknowledgement. An annotated version of the application showing these sources is provided as **Appendix 2**.

42.    On 25 November 2013, AusIndustry registered the activities for 2012-13.[22]

**Income tax return**

43.    On 20 June 2014, the taxpayer lodged its 2012-13 income tax return claiming notional deductions of $4,938,338 and a refundable R&D tax offset of $2,222,252.10.[23] The notional deductions were made up of $4,933,338 of expenditure relating to an Infrastructure as a Service (**IaaS**) contract used to operate an SGI based supercomputer referred to as 'C01N', and $5,000 of expenditure to a third-party contractor, Dr Ignatius Pang.

44.    The taxpayer also claimed a deduction of $2,066,392.17[24] for materials and assistance acquired from Professor David Rees, an academic based in the United Kingdom (**UK**).

45.    The taxpayer has returned assessable income of $2,962,399[25] pursuant to a sale to Hotwire based on a contract value of $3,205,820. The taxpayer initially contended that it provided the Professor Rees material, a statistical algorithmic library, a project plan and a

---

[20] R&D Tax Incentive Application: Registration of R&D Activities for Strasan Pty Ltd submitted 7 October 2013 [C13]
[21] Strasan AusIndustry 2012-13, Additional information provided on 7 October 2014, AusIndustry registration dated 25 November 2013 [C14]
[22] Strasan Pty Ltd AusIndustry registration for 2012-13 dated 25 November 2013 [C15]
[23] C01N Pty Ltd 2013 Income Tax Return and R&D Schedule [C65]
[24] Represented by the expense of $2,258,534 in the taxpayer's financial statements less an addition in the tax reconciliation of $192,142 for a purported error in the taxpayer's financial statements; Letter from KPMG to Craig Wright dated 16 February 2015 [C64]; C01N 2012-2013 Tax Reconciliation [C63]
[25] Represented by the income of $3,205,820 in the taxpayer's financial statements less a subtraction item in the tax reconciliation of $243,421 for a purported error in the taxpayer's financial statements; Letter from KPMG to Craig Wright dated 16 February 2015 [C64]; C01N 2012-2013 Tax Reconciliation [C63]

CONFIDENTIAL

DEF_00053908

budget to Hotwire.[26] The taxpayer's most recent contention is that it merely on-sold the Professor Rees technology to Hotwire.[27]

46. A further $850,000 of notional deductions claimed to have been incurred to associates in the current and prior years have been carried forward on the basis they had not been paid.[28]

**Retention of refund**

47. On 14 July 2014, we sent a letter notifying the taxpayer that we were retaining its refund in accordance with section 8AAZLGA of the *Taxation Administration Act 1953* (**TAA**). The letter was sent to C01N Pty Ltd c/- KPMG PO Box 558 GORDON  NSW  2072.[29]

48. On 4 February 2015, the taxpayer advised that they had not been notified that its refund had been held.[30]

49. On 4 February 2015, a copy of the letter was provided to the taxpayer.[31] Note two copies were provided, one addressed to the taxpayer's Gordon address, and one addressed to 'C/ KPMG, Level 5, 32 Delhi Rd, North Ryde NSW 2113'. Notes on ATO systems show that two letters were created, but only the one addressed to the Gordon address was sent.

50. On 19 February 2015, we confirmed to the taxpayer that the letter issued on 14 July 2014 had been sent to the Gordon address.[32]

**Substantiation of purported R&D activities**

51. On 13 August 2014, the taxpayer advised the ATO that its R&D activities included the creation of autonomous agents and prediction algorithms.[33]

52. On 20 October 2014, the taxpayer provided 'examples of the R&D activities conducted in Australia using the overseas cloud servers to run particle swarm optimisation (**PSO**) techniques on the Bitcoin Blockchain'.[34] Much of this information is taken,

---

[26] Email from John Chesher to Brigid Kinloch dated 18 February 2014 [H14]
[27] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 53 [C57]
[28] C01N Pty Ltd 2013 Income Tax Return and R&D Schedule
[29] Letter from ATO to C01N PL dated 14 July 2014 [C60]
[30] Email from Andrew Sommer to Arna Synnot dated 4 February 2015 with subject 'RE: Wright and related entities' [C61]
[31] Email from Arna Synnot to Andrew Sommer dated 4 February 2015 with subject 'RE: Wright and related entities' [C61
[32] Letter from ATO to C01N PL, Intergyrz PL and Zuhl PL dated 19 February 2015 [C62]
[33] Letter from KPMG to ATO dated 13 August 2014 at page 4 [C51]
[34] Appendix L5 to letter from KPMG to ATO dated 20 October 2014 [C16]

CONFIDENTIAL

DEF_00053909

POSITION PAPER

unacknowledged, from an internet source[35]. A version of the information highlighting the information taken from this source is provided at **Appendix 3.**

53. Also on 20 October 2014, the taxpayer provided a series of reports purportedly showing the supercomputer's CPU, disk and memory use and job data, as well as time sheets for Dr Wright. They appear to show that the supercomputer was in use in September 2012.[36] Dr Wright's timesheets also show that he was working on 'PSO tuning' from July 2012.[37] These statements are contrary to statements that the supercomputer was not built until January 2013.[38]

54. On 14 March 2015, the taxpayer provided a written explanation of its R&D activities in 2012-13. This included references to neural network systems.[39]

55. We visited the taxpayer's premises with two ATO computer scientists on several occasions to view records of the R&D activities of the taxpayer and related entities.

56. During the visit on 2 and 3 March 2015, the taxpayer advised that all the research data and artefacts (including code) were developed and stored on the supercomputer and that the supercomputer was not available for demonstration during the visit.

57. For the visit on 26 March 2015, we provided an agenda that described the following evidence we wished to see in relation to the C01N (SGI) supercomputer:

57.1. Linpack benchmark

57.2. Nvidia suite

57.3. GPUCheck.cu

57.4. Hadoop

57.5. Run the module command

57.6. Other commands

58. The agenda also specified the following that we wanted to see on the C01N (SGI) supercomputer for the taxpayer's activities for 2012-13:

58.1. Run the R module

58.2. Load the neural network, Bitcoin engine and PSO code

58.3. Demonstration of the above

58.4. View the data used in 2012-13

58.5. View the source code used in 2012-13

---

[35] James McCaffrey: Artificial Intelligence – Particle Swarm Optimisation, August 2011 accessed from https://msdn.microsoft.com/en-us/magazine/hh335067.aspx
[36] Files titles CPU.Sep12.csv; Mem.Sep12.csv; CPUperJob.Sep12.csv; Disk.Sep12.csv
[37] Timesheets for Dr Wright for 2012-13 [C17]
[38] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 25 [C57]
[39] Attachment with title 'C01N 2012-2013.pdf'to email from Andrew Sommer to Arna Synnot, Sheena Riordan and Brett Challans dated 13 March 2013 with subject 'Wright et al'

CONFIDENTIAL

DEF_00053910

58.6.    View the results generated in 2012-13.[40]

59.    On 26 February 2015, the taxpayer showed ATO officers what appeared to be a supercomputer. The taxpayer advised that the data it collected was stored on the Hadoop database on the supercomputer. However, Dr Wright refused to show the databases. No supercomputer system-generated log or usage files were shown on the supercomputer that demonstrated the supercomputer usage for the registered R&D activities, as described in the taxpayer's 2012-13 AusIndustry application.

60.    Commands for showing performance for the supercomputer such as "uptime" showed that the machine was only available, operational or used from some days before the visit. It could not be determined whether the supercomputer was available, operational or used during 2012-13 by the taxpayer.

61.    No source code files developed by the taxpayer for the registered R&D activities, as described in the AusIndustry applications, were shown on the supercomputers.

62.    During the visits, the taxpayer did not show methods or tools to monitor the performance or usage of the supercomputer for the R&D activities they claim to have undertaken in 2012-13, including tools to monitor the following to track utilisation:

62.1.    proportion of memory usage

62.2.    proportion of CPU utilisation.

63.    There were no artefacts (including data mentioned to be on Hadoop and code relating to data collection, particle swarm optimisation and artificial neural networks) shown or demonstrated evidencing the supercomputer's use in the registered R&D activities, as described in the taxpayer's AusIndustry application.

64.    On 14 March 2015, the taxpayer provided source code for two 'bots'.[41] The bot codes are predominantly taken from internet sources.[42] The bot codes do not show characteristics of an evolutionary program or self-creation or having been built for use in particle swarm optimisation.

65.    On 2 April 2015, the taxpayer provided several files to demonstrate its R&D activities. No explanation was given as to how these files related to the registered R&D activities.

---

[40] Attachment titled '20150325_Site visit_Agenda_Draft to email from Arna Synnot to Andrew Sommer dated 25 March 2015 with subject 'Draft agenda' [C66]
[41] Attachments with titles 'C01N 2012-2013 bot1.pdf' and 'C01N 2012-2013 bot2.pdf' to an email from Andrew Sommer to Arna Synnot, Sheena Riordan and Brett Challans dated 13 March 2013 with subject 'Wright et al' [C67]
[42] https://github.com/hstove/rbtc_arbitrage/tree/master/lib/rbtc_arbitrage and https://github.com/Visgean/Zeus http://common-config.googlecode.com/svn/trunk/ZeuS%202.0.8.9/

CONFIDENTIAL

DEF_00053911

**IaaS transaction – purported contract**

66. The taxpayer advised that Dr Wright, for the taxpayer, and Mr Dave Kleiman, for W&K, began negotiating for W&K to provide IaaS services in March 2012. W&K is a company incorporated and based in the State of Florida in the United States of America (**US**). The taxpayer advised that W&K had contacts in the Republic of Panama (**Panama**) that could provide better and cheaper services than other providers.[43] The taxpayer's desire to acquire the services are ostensibly supported by board meeting notes from a meeting between Dr Wright, Ms Watts and Mr Yousuf (and potentially Mr Sanjeev Bhola who is listed as both present and not present) dated 5 June 2012.[44]

67. The taxpayer purported to enter into a contract with W&K titled 'statement of work' for the provision of IaaS services over a 12 month period. The statement of work is dated 30 June 2012, but appears to have been digitally signed by Dr Wright and Mr Kleiman on 2 July 2012.[45] Refer to comments at 151 to 155 regarding electronic communications below.

68. The statement of work appears to have been adapted from a US government IaaS tender document obtained from the internet.[46] A highlighted version of the statement of work showing where the text matches the tender document is provided at **Appendix 4**.

69. The taxpayer advised that the purported contract was signed electronically and has provided the electronic signature. However, the purported appendices and 'HPC Work Schedule' do not appear to be included in the electronically signed document.[47] Further, the purported appendices do not have the same writing style,[48] lettering system,[49] font or footer as the statement of work.

70. The statement of work states that W&K, via 'W&K Panama', will provide Strasan with cloud storage services, virtual machines and cloud web hosting as needed for 12 months.

---

[43] Letter from KPMG to ATO dated 20 October 2014 Response to question 11, page 21 [C52]
[44] Board meeting notes for Strasan Pty Ltd dated 5 June 2012 (unsigned) [C23]
[45] Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC dated 30 June 2012, including certificate [C24]
[46] US Government Infrastructure as a Service solicitation
http://webcache.googleusercontent.com/search?q=cache:_c038yREBo4J:https://www.gsaadvantage.gov/images/products/elib/pdf_files/iaasrfq.pdf+&cd=8&hl=en&ct=clnk&gl=au [C28]
[47] Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC dated 30 June 2012, including certificate [C24]
[48] Unlike the Statement of Work, the purported Appendices contain numerous typographical, spelling and grammatical errors.
[49] The Statement of Work contains a 'List of Attachments' which includes 'Appendix A', 'Appendix B', 'Appendix C' etc; refer Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC dated 30 June 2012 at 23 [C24]

CONFIDENTIAL   DEF_00053912

No identifiers or addresses for W&K Panama are provided and the taxpayer advises they have no knowledge of this entity.[50]

71.  The statement of work includes detailed descriptions of the technical specifications and different 'bundles' available, but no terms relating to pricing or quantity (in terms of the amount of storage, RAM or disk space of virtual machines or data bandwidth allowed).

72.  The statement of work provides that the service is for 'fixed fee for the provision of systems over a 12 month period'.[51] However, an appendix titled 'C01N Pricing', states that 'Cost base will be calculated as… RPeak 4.50 USD /GFlop'.[52] At the time the contract was purportedly executed, the taxpayer's name was Strasan Pty Ltd.

73.  A separate document titled 'Server HPC Schedule' is not referenced in the statement of work.[53] The document provides a breakdown of the cost of the provision of 1024 virtual computers, 100,000 GB of SSD storage, 100,000,000 GB of storage and 50,000,000 GB of snapshot storage and a monthly cost of $431,250. The taxpayer contends that this document was used to determine the invoiced amount of $5,175,000 USD[54] and that it represents Appendix C to the statement of work.[55] However, Appendix C appears to be the document titled 'C01N Pricing'.

74.  With respect to payment, the statement of work provides that funds for the service 'are to be held at and paid' through Liberty Reserve SA of San Jose, Costa Rica.[56]

75.  The statement of work does not contain any provisions for, or reference to, security for payment. However, a purported appendix titled 'Contractor Team Arrangements (URL)' provides that 'all details will be conducted using a suitable timestamp system to be decided by the parties on or before the final payment and movement of funds form escrow'.[57] Further, a purported appendix titled 'Commercial Terms and Conditions' provides that '[f]ailure to pay by the due date will invoke the irrevocable retention of the Bitcoin wallet', and that 'transfer of this wallet will not count as full satisfaction of the contract unless the sale value of such exceeds the amount owed'.[58] There is no reference to any 'escrow', 'due date' or 'Bitcoin wallet' elsewhere in the documentation. The

---

[50] Letter from KPMG to ATO dated 20 October 2014, question 5 response (page 14) [C52]
[51] 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, clause 6 [C24]
[52] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC [C26]
[53] Server HPC Schedule [C27]
[54] Letter from KPMG to ATO dated 13 August 2014 at page 22, paragraph (g). [C52]
[55] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 23 [C57]
[56] Statement of Work', clause 6 [C24]
[57] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, 'Contractor Team Arrangements (URL)', [C26].
[58] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, 'Commercial Terms and Conditions', [C26].

CONFIDENTIAL

DEF_00053913

POSITION PAPER

taxpayer has subsequently advised that Bitcoin address 1933 was to be held in escrow until payment.[59]

76. On 18 December 2014 the taxpayer advised that the escrow arrangement for the Bitcoin held for the security of the payment obligation was 'built into the blockchain', hence no escrow provider was used.[60]

77. On 26 May 2015, the taxpayer provided screenshots of purported Bitmessages indicating that Bitcoin address 1933 was transferred via Fedex, indicating that a paper wallet may have been used in the escrow arrangement and physically transferred between the parties.[61] Refer to comments at 151 to 155 regarding electronic communications below. The taxpayer contends this paper wallet was held by W&K as security until payment was made.

78. The taxpayer advises that W&K obtained the services from a Panamanian company, Signia, trading as 'High Secured' and has provided screenshots of purported Bitmessages between Dr Wright and Mr Kleiman and Dr Wright and High Secured to support this.[62] Refer to comments at 151 to 155 regarding electronic communications below.

79. We have received an email apparently from High Secured stating that they used the Bitmessage address included in the screenshots of purported Bitmessages provided by Dr Wright, but not confirming any agreement between them and W&K.[63]

80. We have also been provided with a screenshot of a High Secured customer account purportedly registered to W&K Info Defense Research acting for DeMorgan Panama.[64] This shows no indication of any invoices over US$39 being issued to the customer.

81. A purported appendix titled 'Security Requirements' references a director of 'Signia Corp. Panama (783956)' as a potential manager of systems access.[65] However, there was no such Panamanian company in existence at the time the contract was purportedly

---

[59] Letter from KPMG to ATO dated 20 October 2014, question 15 response (page 22) [C52]
[60] Annexure 1 to letter from Clayton Utz to ATO dated 18 December 2014, response to question 5 (page 2) [C53]
[61] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[62] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[63] Email from info@highsecured.com to Andrew Sommer, cc to Craig Wright, Ramona Watts and Arna Synnot dated 3 May 2015 with subject heading 'Privilege Asserted' [HS12]
[64] Screenshot of Client Area – High Secured for account 'W&K info Defense Research acting for DeMorgan Panama' dated 15 October 2014 [C69]
[65] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, 'Security Requirements', [C26]

CONFIDENTIAL

DEF_00053914

executed. A company named 'Signia Enterprises Corp' was registered with that company number four months later, on 17 October 2012.[66]

82. On 26 May 2015, the taxpayer advised that the contract was 'a mixture of written terms (the statement of work) and oral terms'.

83. 'C Wright' is listed as W&K's representative under the contract, which further states that he 'shall act as a central point of contact with Strassan [sic] … (and) have full authority to act for W&K in all contractual matters'.[67]

**IaaS transaction – purported invoice and payment**

84. The taxpayer has provided a purported invoice issued by W&K dated 30 June 2012 for 12 months of IaaS services for a total of US$5,175,000 and states payment was to be made by assigning rights to Bitcoin on 15 January 2013.[68] The taxpayer advises that negotiating a fixed price per month provided better value and payment would be made in January as the taxpayer needed W&K to acquire the systems to conduct its R&D before it could make full use of the services.[69]

85. The taxpayer advises that due to volatility in the price of Bitcoin, the parties renegotiated the payment terms such that payment would be made in US dollars.[70]

86. The taxpayer contends that it paid the amount of the purported invoice in the 2012-13 income year.

*Purported Liberty Reserve transfer*

87. To evidence the purported payment to W&K, the taxpayer has provided a purported screenshot of a Liberty Reserve account called 'Craig Wright R&D Trust' showing a payment equal to US$5,175,000 was made to W&K on 6 January 2013.[71] Liberty Reserve was an unlicensed financial transaction company based in Costa Rica that did not observe 'know your client' procedures and was shut down by the US Government in May 2013.

88. In contrast, the taxpayer's accounting records record the payment as having been made on 14 January 2013. They also show a foreign exchange loss of $404,280.93 was

---

[66] Registro Publico De Panama search results for Signia Enterprises Corp. (company number 783956) undertaken on 19 January 2015 [C30]
[67] Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC including certificate page 20 [C24]
[68] Invoice issued by W&K Info Defence Research LLC to Strasan Pty Ltd dated 30 July 2012 [C25]
[69] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 23 [C57]
[70] Letter from KPMG to ATO dated 20 October 2014, question 15 response (page 25) [C52]
[71] Liberty Reserve screenshot: 'Craig Wright R&D Trust' [C34]

CONFIDENTIAL

DEF_00053915

generated from the difference between the AUD/USD exchange rate at the time of the invoice and the time of payment.[72]

89. The taxpayer contends the AUD/USD rates at 30 July 2012 and the date of payment were $1.04869 and $0.969281 respectively.[73]

90. The actual AUD/USD rates at 30 July 2012 and 6 January 2013 were $0.953301991 and $0.9544717.[74]

91. The taxpayer has provided purported screenshots of Bitmessages, blogs, emails and text messages that ostensibly confirm the payment was received by W&K in Liberty Reserves.[75] Refer to the comments at 151 to 155 regarding electronic communications below.

### Purported arrangement with C01N UK

92. The taxpayer contends that it paid the amount of the purported IaaS invoice in accordance with an arrangement with UK company, C01N Ltd (**C01N UK**) (previously called Design by Human Ltd). The taxpayer has provided several versions of events regarding this purported payment.

92.1. On 13 August 2014, the taxpayer advised that C01N UK, acting in its capacity as trustee of the Craig Wright R&D Trust, funded the taxpayer with equity. C01N UK paid share subscription proceeds direct to W&K in settlement of the invoice. C01N UK transferred funds to W&K using a Liberty Reserve account in the name of Craig Wright R&D Trust.[76]

92.2. On 20 October 2014, the taxpayer changed its contentions and indicated that shares in the taxpayer were issued to C01N UK in its personal capacity, rather than in its capacity as trustee, that C01N UK made the payment by transferring value from its share capitalisation and held that value as trustee of the Craig Wright R&D Trust as a payment mechanism.[77] On 21 November 2014, we requested further details of the 'Craig Wright R&D Trust' Liberty Reserve account, including when the account was established, the legal owner of the account, documentation evidencing the establishment of the account, the name of the currency exchange service the account holder used to transfer amounts to

---

[72] C01N Pty Ltd Xero 'Realised Gains and Losses' – Accounts Payable (United States Dollar) report from 1 July 2012 to 30 June 2013 [C70]
[73] C01N Pty Ltd Xero 'Realised Gains and Losses' – Accounts Payable (United States Dollar) report from 1 July 2012 to 30 June 2013 [C70]
[74] www.xe.com.au
[75] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[76] Letter from KPMG to ATO dated 13 August 2014, appendix C (page 3) [C51]
[77] Letter from KPMG to ATO dated 20 October 2014, question 7(c) response (page 16) [C52]

CONFIDENTIAL

DEF_00053916

and from the Liberty Reserve account and documentary evidence of the transfer of funds to the Liberty Reserve account via the currency exchange service. In its response on 16 December 2014, the taxpayer did not provide the details requested.[78]

92.3. On 16 December 2014, the taxpayer again changed its contentions, advising that C01N UK agreed to make an equity contribution to the taxpayer and C01N UK provided property (known as Liberty Dollars) to the value of US$5,175,000 to Dr Wright on behalf of the taxpayer and that the taxpayer directed Dr Wright to convert the property to US dollars and pay the US dollar amount to W&K. The taxpayer declined to provide C01N UK's financial statements, despite Dr Wright being the controlling mind of both entities.[79]

92.4. In correspondence received on 20 February 2015, the taxpayer again changed its contentions, advising that a further, unnamed 'trust' transferred $5,270,895.98 in Liberty Dollars to Dr Wright's trust account under loan. The taxpayer stated that Dr Wright used $5,175,000 of this amount to pay W&K. This was described as a 'capital injection', 75% from 'Uyen' (believed to be Ms Uyen Nguyen) and 25% from Ms Watts, 'as owners of the capital injected'.[80]

92.5. On 26 May 2015, the taxpayer again changed its contentions, advising that C01N UK acquired the shares as trustee for the Tulip Trust and that it owned the Liberty Reserve account titled 'Craig Wright R&D Trust' as trustee for that trust.[81]

93. The taxpayer has provided a company memorandum for a UK company referred to as '08248988 UK', the company number of Design by Human Ltd, dated 7 January 2013 that states:[82]

93.1. The taxpayer will issue 50,000 shares to the UK company in return for that company funding the data centre.

93.2. Craig Wright R&D's Liberty Reserve account 'will be used in trust for this transaction. The UK company will be the trustee of this account'.

93.3. W&K will manage the Panama data centre for not more than 10% over costs.

---

[78] Annexure 1 to letter from Clayton Utz dated 18 December 2014, question 10 and response to question 10 (page 3) [C53]
[79] Annexure 1 to letter from Clayton Utz to ATO dated 18 December 2014, response to question 10 (page 3) and response to questions 11 and 12 (pages 3 and 4) [C53]
[80] Response from Ramona Watts to ATO received on 20 February 2015, page 27 (dated 16 February 2015) [C55]
[81] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph [31d] [C57]
[82] Company memorandum – 08248988 UK dated 7 January 2013 [C33]

CONFIDENTIAL

DEF_00053917

POSITION PAPER

94. The memorandum describes the company as '08248988 (To be C01N)'. Design by Human Ltd changed its name to Moving Forward in Business Ltd on 15 October 2013.[83] Moving Forward in Business Ltd changed its name to C01N Ltd on 7 January 2014.[84]

95. The memorandum states that it was issued by Panopticrypt as director. The references to the company number are in a different colour and font type to the rest of the memorandum.

96. A carbon copy of the memorandum was sent to Ms Nguyen. The taxpayer has provided an undated 'consent to act' whereby Ms Nguyen agrees to act as a director of C01N UK from the later date of 30 June 2013.[85]

97. The taxpayer advises that the shares in it were issued at $100 each as that was the value of the taxpayer at the time. No valuations were performed to determine this value. The taxpayer has advised the shares were finally issued at $106 due to exchange rate differences.[86]

98. Records from Companies House show that until 3 January 2014:[87]

    98.1. C01N UK was owned and controlled by a UK shelf company operator, the CFS group of companies;

    98.2. its directors were CFS Nominees Ltd and Bryan Thornton (connected with the CFS group);

    98.3. it had one ordinary £1 share on issue.

99. CFS Secretaries Ltd confirmed these facts on 11 May 2015.[88] When asked about the formation and sale of C01N UK, CFS Secretaries Ltd stated C01N UK:

    … Was a Shelf Company which was purchased from CFS on 3rd January 2014

    … Sold as a Shelf Company

    … Dormant when the company was incorporated and owned by CFS

100. We have obtained a 'Combined Register' for C01N UK, from computer records obtained from an entity related to the taxpayer, where the details match the original contemporaneous CFS documents.[89]

---

[83] File Copy - Certificate of Incorporation on Change of name Company Number 8248988 dated 15 October 2013 [C72]
[84] File Copy – Certificate of Incorporation on Change of name Company Number 8248988 dated 7 January 2014 [C73]
[85] Consent to Act, Uyen Nguyen, Design by Human Ltd (undated) [C71]
[86] Letter from KPMG to ATO dated 20 October 2014, question 17(b) response (page 26) [C52]
[87] Companies house extract: C01N Ltd [C35]; Annual return AR01 for Design By Human Ltd dated 11 October 2013 submitted 14 October 2013 [C74]
[88] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 2015 ATO ref 7790 [C38]
[89] Combined Register for C01N Ltd (obtained from NUIX) [C36]

CONFIDENTIAL

DEF_00053918

101. These records do not show Panopticrypt Pty Ltd as a director of C01N UK. However, on 22 January 2014 (ie after CFS sold the company), documents were lodged with Companies House indicating:[90]

    101.1.   Panopticrypt had been a director since 1 January 2013

    101.2.   At 30 June 2013:

        (a)   the directors were Panopticrypt and Bryan Thornton (associated with the CFS group) and the secretary was Craig Wright

        (b)   200 ordinary shares were on issue and 38,707,000 preference shares were on issue

        (c)   The company had assets of £38,508,838 and no liabilities. It had a revaluation reserve of negative £127,017 and a loss account balance of £71,345.

    101.3.   At 1 February 2014:[91]

        (a)   the directors were Panopticrypt and Craig Wright and the secretary was Craig Wright

        (b)   200 ordinary shares were on issue held equally between Craig Wright and Ramona Watts

        (c)   18,707,000 redeemable preference shares were held by Denariuz Lte (believed to be Denariuz Ltd, a Singaporean company related to Dr Wright)

        (d)   20,000,000 redeemable preference shares were held by Panopticrypt non-beneficially.

102. On 28 March 2014, the ATO advised the taxpayer that there was no record of Uyen Nguyen ever holding the position of Director of Design by Human.

103. On 10 April 2014, documents were lodged with Companies House indicating Mr Kleiman and Ms Nguyen were appointed directors on 12 October 2012.[92]

104. A response to a request for information from CFS Secretaries bears a handwritten annotation which indicates that both appointments had been 'backdated by the client'.[93]

105. CFS Secretaries stated 'not applicable' when we requested company minutes. However, several purported minutes (unsigned or signed by Dr Wright) were found on computer

---

[90] Companies house extract: C01N Ltd [C35]; C01N Ltd Abbreviated (Unaudited) Accounts (11 October 2012 to 30 June 2013) submitted 22 February 2014 [C75]; Annual return AR01 for Design By Human Ltd dated 11 October 2013 submitted 14 October 2013 (Companies House document ID X2IY8NUH) [C74]
[91] Annual return AR01 for C01N Ltd dated 1 February 2014 22 February 2014 (Companies House document ID X32AHLAB) [C76]
[92] Appointment of director for C01N Ltd (Mr David Kleiman) submitted 13 April 2014 (Companies House document ID X35OYHCI) [C78]; Appointment of director for C01N Ltd (Ms Uyen Nguyen) submitted 13 April 2014 (Companies House document ID X35JPOGG) [C79]
[93] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 205 ATO ref 7790 [C38].

CONFIDENTIAL

DEF_00053919

records obtained from an entity related to the taxpayer that ostensibly corroborate the taxpayer's contention that Panopticrypt was a director of C01N UK. One minute (dated 3 January 2014) appears to have been executed by the same person that executed several share certificates included in the 'Combined Register', yet makes no reference to Panopticrypt having any role in the company at 3 January 2014.[94]

### Purported issue of shares to C01N UK

106. On 16 March 2015, the taxpayer provided a copy of a document entitled 'C01N Pty Ltd – A.C.N. 152 222 421 – Application for shares', dated 8 January 2013.[95] The document appears to represent an application by 'C01N Ltd' for 50,000 shares in 'C01N Pty Ltd' at $1 each. However, on 8 January 2013 the taxpayer's name was Strasan Pty Ltd and C01N UK's name was 'Design By Human Ltd'.

107. Both the application and share register show the shares as being beneficially held by C01N UK. However, the taxpayer's most recent contention is that the shares are held by C01N UK for the Tulip Trust; refer subparagraph 92.5 above.

108. The issue of 50,000 shares is recorded on the share register as having occurred on 8 January 2013 at $106 each.[96] The accompanying share certificate is numbered five and has also been issued in the name of C01N Pty Ltd.[97]

109. A share certificate originally numbered five issued in the name of Strasan Pty Ltd and dated 1 July 2013 has been annotated to change the number to six and the sequence of shares to accommodate the 50,000 shares apparently issued to C01N UK in January 2013.[98]

110. ASIC records show 50,000 shares were issued to C01N UK on 1 April 2013 and that these were held beneficially. However, the share register shows the shares were issued on 8 January 2013. The ASIC record was lodged on 22 April 2014, over a year after the purported issue took place.[99]

---

[94] Minutes of Design By Human Ltd dated 11 October 2012, 1 January 2013, 14 October 2013 and 15 October 2013; Minutes of Members' meeting of Moving Forward in Business Ltd dated 3 January 2014; Minutes of meeting of Moving Forward in Business Ltd dated 3 January 2014 (signed); Minutes of meeting of C01n Ltd dated 3 January 2014 (obtained from NUIX) [C37]
[95] Application by C01N Ltd for shares in C01N Pty Ltd dated 8 January 2013 [C7]
[96] C01N Pty Ltd Register of Members [C6]
[97] C01N Pty Ltd share certificate number 5 dated 8 January 2013 [C8]
[98] C01N Pty Ltd share certificate number 6 dated 1 July 2013 [C9]
[99] ASIC form 484 for C01N Pty Ltd dated 22 April 2014 (7E5996081) [C4]

CONFIDENTIAL

DEF_00053920

111. On 11 November 2013, as part of an application for a private binding ruling, Hotwire advised the ATO that, as at 2 June 2013, the taxpayer's membership had not changed since incorporation; refer paragraph 34 above. Hotwire advised: [100]

> The only company CS Wright controlled is Panopticrypt as one of two directors.
> At the time, his ownership of Panopticrypt was 5%.

112. In queries about the taxpayer's BASs, the taxpayer was asked when its share capital was paid and who the beneficial owners were. In its response, on 10 March 2014, the taxpayer made no reference to 50,000 shares having been issued to C01N UK or the Tulip Trust. [101]

### Tulip Trust

113. A series of documents relating to the Tulip Trust have been provided by the taxpayer and related entities, including what appears to be a digitally signed document by Dave Kleiman indicating he held Bitcoin from Dr Wright and was going to establish a trust. [102] However, the taxpayer has provided two versions of the email from Mr Kleiman to which the document was purportedly attached. The emails are identical except one is dated 24 June 2011 and the other 17 October 2014. [103] Mr Kleiman died in April 2013. Refer also to comments at 151 to 155 regarding electronic communications below.

114. The taxpayer has provided a series of screenshots of purported Bitmessages, emails (some electronically signed) and text messages from Dave Kleiman that ostensibly indicate Mr Kleiman advised Dr Wright that he 'had obtained' Design By Human Pty Ltd, on 11 October 2012, then on 14 October 2012 that Dave Kleiman would 'put in the order for the UK company shortly', then on 25 October 2012 advises 'I have used CFS in the UK. I have 2 companies in the UK. Design by Human'. They further ostensibly indicate that Dave Kleiman established a trust known as the Tulip Trust. [104] Refer to the comments at 151 to 155 regarding electronic communications below.

115. The taxpayer has advised that C01N UK was the trustee for the Tulip Trust[105], however the document by Mr Kleiman and advice from Ms Nguyen appear to state that a number of individuals act as trustees. [106]

---

[100] Email from John Chesher to Rosa Solomon and Craig Wright dated 11 November 2013 with subject 'RE: Research & Development Claim' [H13]
[101] Response to GST queries regarding C01N Pty Ltd received on 10 March 2014 [C84]
[102] Attachment titled 'Tulip Trust.pdf' to email from Dave Kleiman to Craig Wright sent on 24 June 2011 at 12:04:57 PM with subject 'Requested attached.' [C80]
[103] Email from Dave Kleiman to Craig Wright sent on 17 October 2014 at 12:04:57 PM with subject 'Requested attached.' [C81]
[104] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[105] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 27 [C57]

CONFIDENTIAL

DEF_00053921

| SENSITIVE | POSITION PAPER |

### W&K

116. W&K was registered with Florida's corporate registry on 14 February 2011 with Dave Kleiman, listed as agent and 'manager/member'.[107]

117. The taxpayer has advised that Dr Wright had no role with the company other than as a shareholder.[108] However, Dr Wright has signed an acknowledgement of liquidated claim for W&K acknowledging 'I am the legal agent and representative for the defendant' in his capacity as its 'director / Australian agent'.[109]

118. W&K's shareholder register shows that at incorporation, Dr Wright and Mr Kleiman initially held 500 shares each. At the time of the transaction with the taxpayer it shows that Mr Kleiman held 500 shares, Dr Wright 250 shares, Ms Lynn Wright (Dr Wright's ex-wife) 250 shares and Ms Nguyen 500 shares.[110] However, an agreement between Dr Wright and Mr Kleiman dated 2 April 2013 that styles itself as a share sale agreement states 'the vendor [Dave Kleiman] is the owner of all issued shares in the company [W&K Info Defense LLC]. Ownership is 50% in the Vendor's name and 50% in trust held for the purchaser [Craig Wright].[111]

119. The taxpayer has advised that the contract figures are wrong and this was an oversight that was repeated in an affidavit to the New South Wales (**NSW**) Supreme Court.[112]

### Location of IaaS services

120. On 24 April 2014, the taxpayer emailed AusIndustry, describing the use of the IaaS systems located 'anywhere in the world' by researchers in Australia and asks:[113]

> …is research from Australia by Australian researchers that only operate out of a location and from a computer system in Australia using a cloud based system (somewhere undefined) considered valid Australian research? Is the expense on the IaaS system needed for the activity thus a valid expense?'

---

[106] Bitmessage from Dave Kleiman to Craig Wright with subject 'the trust process' dated 6 November 2012 at 12:19AM [C31]; Record of conversation with Uyen Nguyen on 23 June 2015 [H30]; Attachment titled 'Tulip Trust.pdf' to email from Dave Kleiman to Craig Wright sent on 24 June 2011 at 12:04:57 PM with subject 'Requested attached.' [C80]
[107] Electronic articles of organisation for Florida Limited Liability Company: W&K Info Defense Research LLC [C18]; 2013 Limited liability company reinstatement: W&K Info Defense Research LLC [C19]
[108] Letter from KPMG to ATO dated 20 October 2014, Question 3(c) response, page 12 and question 17(a) response, page 26 [C52]
[109] Acknowledgement of liquidated claim case number 2013/225983 filed on 19 August 2013 (NSWSC) [C21]
[110] W&K US share register [C20]
[111] Contract for the sale of shares of a company owning business between Dave Kleiman for W&K Info Defence LLC (vendor) and Craig Wright R&D (purchaser) dated 2 April 2013 [C22]
[112] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 19 [C57]
[113] Email from Craig Wright to Lynn Bloomfield sent on 24 April 2014 [C82]

| SENSITIVE | PAGE 25 OF 25 |

CONFIDENTIAL

121. On 29 April 2014, AusIndustry responded stating:[114]

> … it is our position that the work you have described as being done by people sitting at a computer is being conducted in Australia and is therefore an "Australian activity". You have obviously self-assessed that work as being an eligible R&D activity. However, whether the expenditure on the IaaS system is "expenditure incurred" on one or more R&D activities is really a matter for the ATO…

**Dr Pang**

122. On 14 August 2014, the taxpayer advised that it incurred $5,000 of expenditure to Dr Pang for undertaking registered R&D activities on behalf of the taxpayer. The taxpayer referred to Dr Pang as a 'contractor'. The taxpayer advised that payment was made by:

122.1. C01n Ltd as trustee for the Craig Wright R&D Trust, transferring licenses to the taxpayer in exchange for shares in the taxpayer

122.2. The taxpayer assigning the licenses to Dr Pang as consideration for services performed in respect of the R&D activities.[115]

123. As part of the same response, the taxpayer provided invoice number 1550 dated 1 June 2013, issued by Dr Wright to the taxpayer. It features both Dr Wright and the taxpayer's Australian Business Numbers (**ABN**s). It describes the supply of three items (SPSS Base, SPSS Support and SPSS Advanced Statistics) totalling $5,000 exclusive of GST. The invoice includes GST of $500. Under the 'ship to' field, it states 'C01N/Strasan, Ignatius Pang, By assignment' and the customer ID is given as 'Iggy P'. The invoice further states:

> Transfer of beneficial ownership of SPSS licence from Craig Wright R&D to Ignatius Pang in consideration for work conducted under Strasan in Statistical programming and network analysis. License code follows. This document is an irrevocable assignment of rights to the license to Mr Pang in consideration for his work for Strasan. The computer hardware is also assigned at cost.[116]

124. On 19 December 2014, the taxpayer advised that there was no formal agreement for the provision of Dr Pang's services and that the negotiations were undertaken via Skype. The taxpayer also advised that Dr Wright invoiced the taxpayer as an agent of Dr Pang, and that these arrangements were recorded in correspondence.[117] This correspondence was not provided.

---

[114] Email from Lynn Bloomfield to Craig Wright sent on 29 April 2014 [C82]
[115] Letter from KPMG to ATO dated 13 August 2014, appendix C (page 6) [C51]
[116] Invoice 1550 dated 1 June 2013 from Dr Craig Wright to Strasan PL [C93]
[117] Annexure 1 to letter from Clayton Utz to ATO dated 18 December 2014, response to question 29 (page 8) [C53]

CONFIDENTIAL

DEF_00053923

125. The taxpayer has provided two emails from Dr Pang. One provides some details of the work he conducted for the taxpayer.[118] In the other Dr Pang advises he received a laptop, printer, salary and super payments to the value of $5,000.[119]

126. The taxpayer has never lodged any payment summaries with the ATO or reported any amounts at W1 (total salary, wages and other payments) on its Business Activity Statements (**BAS**).[120]

127. The taxpayer's financial statements do not record an expense to Dr Pang, any employee expenses, the invoice purportedly issued by Dr Wright, or the payment of any amounts (whether in software, hardware, salary or superannuation) to Dr Pang.[121] Despite this, an amount of $5,000 has been added back by KPMG in the tax reconciliation.[122]

128. ATO records indicate that Dr Pang was employed by Hotwire, a related entity of the taxpayer, from 1 September 2013 and that Hotwire paid him $5,353 in the year ended 30 June 2014 (**2013-14**).[123]

129. Dr Pang was not registered as a research service provider under the IRDA in 2012-13.[124]

**Professor Rees**

*Purported acquisition*

130. Professor David Rees was an English mathematician known for his work in commutative algebra and semigroup theory.[125] Professor Rees died aged 95 on 16 August 2013.

131. On 10 March 2014 the taxpayer advised that Professor Rees was a contractor for the taxpayer.[126]

132. On 28 March 2014 the taxpayer advised that Professor Rees had been paid for work completed in 2012-13 and for future work. However, as Professor Rees's wife had died less than a week after Professor Rees, they could not recover any of his work completed after 1 June 2013.[127]

---

[118] Email from Ignatius Pang to Viveca Magnusson dated 2 December 2014 at 2:28 PM with subject 'Re: Work you did for Craig' [C93]
[119] Email from Ignatius Pang to Craig S Wright dated 11 May 2015 at 8:55 AM with subject 'Payment confirmation' [C93]
[120] C01N Pty Ltd Business Activity Statements [C95]
[121] C01N Pty Ltd Detailed Account Transaction Report from 1 July 2012 to 30 June 2013 [C94]
[122] Letter from KPMG to Craig Wright dated 16 February 2015 [C64]; C01N 2012-2013 Tax Reconciliation [C63]
[123] Hotwire Preemptive Intelligence Pty Ltd employee wages data [C95]
[124] Innovation Australia Annual Report 2012-13, Appendix E, Table E1: List of Research Service Providers (page 137) [C92]
[125] The Telegraph obituary on Professor Rees dated 20 August 2013 http://www.telegraph.co.uk/news/obituaries/10255561/Professor-David-Rees.html accessed 4 May 2015 [C42]
[126] Response from John Cheshire to Andrew Miller received 10 March 2014, Page 2 [C49]
[127] Response to Andrew Miller received 28 March 2014, Page 5 [C50]

CONFIDENTIAL

133. On 5 February 2015 Dr Wright verbally advised that: [128]

    133.1. Professor Rees provided some source code, small algorithms and other notes and answered a number of questions particularly around algebra and the Otway-Rees protocol

    133.2. the taxpayer paid Professor Rees by Dr Wright requesting that Mr Kleiman, representing the Tulip Trust, begin holding certain Bitcoin addresses that up until that point had been held in a bare trust for the taxpayer, for Professor Rees. Dr Wright believed the Bitcoin was still held in trust for Professor Rees. He did not believe the executor of Professor Rees' estate was aware of the Bitcoin.

    133.3. there was no written agreement and there was not much of a negotiation on the amount to be paid to Professor Rees; it was more Dr Wright saying to Professor Rees, 'I will give you this'.

134. On 20 February 2015, the taxpayer advised that:[129]

    134.1. it paid Professor Rees on 28 June 2013 by giving him the private keys to ▇▇▇▇ Bitcoin addresses (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇) containing ▇▇▇▇▇▇ Bitcoin. However, the earlier response indicated the Bitcoin was held in trust for Professor Rees.

    134.2. the payment to Professor Rees was for research notes relating to cryptography

    134.3. Professor Rees stopped publishing in 1952; however continued research in his field well into the current century

    134.4. the amount to be paid to Professor Rees was agreed earlier in the same tax year.

135. On 3 March 2015 Dr Wright verbally stated that:[130]

    135.1. he acquired some bits of software and a library of unpublished papers from Professor Rees. He said some of what Professor Rees had supplied may have been from his daughters' work and that Professor Rees had been paid. He stated that Professor Rees provided help answering questions and solving things – ie 'consulting' services and that this was what the payment was for.

    135.2. he first communicated with Professor Rees in 1996. He then received assistance and advice from him between 2003 and 2011. Professor Rees didn't provide a lot of advice in 2013.

---

[128] Record of conversation between ATO and Dr Wright, Ramona Watts and Andrew Sommer, 5 February 2015 [C54]

[129] Response from Ramona Watts to ATO received on 20 February 2015 (dated 16 February 2015), Page 14 [C55]

[130] Record of conversation between the ATO and Dr Craig Wright at site visit [C87]

CONFIDENTIAL

DEF_00053925

Case 9:18-cv-80176-BB Document 885-11 Entered on FLSD Docket 02/17/2022 Page 31 of 53

SENSITIVE

POSITION PAPER

135.3. in 2010 he and Professor Rees agreed that Professor Rees would be paid for his assistance, but this agreement was not documented.

135.4. they corresponded by phone, letters and skype and through Mr Kleiman.

136. During our visit to the taxpayer's premises on 2 April 2015, Dr Wright:

136.1. showed software code source files that he said Professor Rees provided to the entities. These appear to be taken from the CoCoA software library available on the internet.[131]

136.2. claimed he was the user of Professor Rees' material, but did not demonstrate its use during our visit, and

136.3. although it was requested in advance, did not produce evidence of the unpublished research papers and when asked to produce them he advised they were at his home.

### *Source of funding*

137. The taxpayer contends that it obtained the Bitcoin to pay Professor Rees from Hotwire as payment pursuant to a 'software development agreement'.[132] The background to the agreement indicates that Dave Kleiman was the 'funder' of the project and that he would 'transfer a sufficient quantity of "Bitcoin" into trust to fund the completion of the project' on or before 10 April 2013.

138. On 29 October 2013, Hotwire advised the ATO it paid Bitcoin to the taxpayer on 18 June 2013 using Bitcoin address ▇▇▇ (per the notation on the invoice from the taxpayer to Hotwire dated 2 June 2013).[133] We note Dr Wright has also advised that this address was the property of the Tulip Trust until 1 July 2013.[134]

139. On 18 February 2014, Hotwire provided us with a 'deed of assignment' between Craig Wright 'for' Hotwire and the taxpayer dated 30 June 2013.[135] It states that Hotwire is 'the registered proprietor in NSW and has the following Bitcoin addresses associated by private keys to be transferred' to the taxpayer. The deed lists ▇ Bitcoin addresses
(▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

---

[131] http://cocoa.dima.unige.it/download/install5-unix.shtml

[132] Software Development Agreement between Craig Wright (Craig Wright R&D) ABN 97481146384 and Dave Kleiman (W&K Info Def LLC) (client) and Strasan Pty Ltd (Developer) dated 4 April 2013 (12 pages - provided to the ATO) [H15]

[133] Email from John Chesher to Rosa Solomon dated 29 October 2013 with subject 'RE: Research & Development Claim'[H13]; Invoice 1040 issued by Strasan Pty Ltd to Hotwire Pre-emptive Intelligence dated 2 June 2013 [H16]

[134] Deed of loan between Design by Human Ltd (08248988) UK (Mortgagee) and Craig Wright R&D (ABN 97481146384) (Mortgagor) and Denariuz Seychelles Trust (Guarantor) dated 23 October 2012 [C83]

[135] Deed of assignment between Craig Wright R&D for Hotwire Pre-emptive Intelligence Pty Ltd and Strasan Pty Ltd dated 30 June 2013 [H24]

SENSITIVE

PAGE 29 OF 29

CONFIDENTIAL

DEF_00053926

140. On 22 February 2014, Hotwire changed its earlier advice, that it had paid the taxpayer on 18 June 2013 and instead advised that Hotwire paid the taxpayer by assigning equitable interests in Bitcoin on 30 June 2013.[136]

141. We note the following with respect to the deed of assignment:

    141.1.   There is no register of proprietors of Bitcoin addresses

    141.2.   The address ▇▇▇ is listed three times

    141.3.   The address Hotwire previously advised was used as payment, ▇▇▇, is not listed

    141.4.   The address ▇▇▇ contained no Bitcoin at 30 June 2013

    141.5.   On 30 June 2013, the amount in these addresses totalled ▇▇▇ Bitcoin and the exchange rate was A\$106.1315 per Bitcoin, meaning the amount the taxpayer contends to have received was equal to ▇▇▇. This is \$457,049 more required than under the agreement.

    141.6.   The deed of assignment lists the taxpayer's ABN incorrectly

    141.7.   The deed specifically refers to the taxpayer acquiring the 'entire right, title and interest in and to' the Bitcoin, not an equitable interest in the Bitcoin

    141.8.   The agreement is not signed by Dr Wright (or Dr Wright 'for' Hotwire)

    141.9.   Ms Nguyen has signed for Strasan despite not becoming a director of Strasan until 1 July 2013.[137]

142. On 25 May 2015, we requested that the taxpayer and related entities show control of the private keys of certain Bitcoin addresses (including ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇) by signing messages within the addresses using the private keys.[138] This can be performed by the holder of a private key even once the Bitcoin in the address has been spent. The taxpayer and related entities did not sign any messages and on 26 May 2015, made a new claim that address ▇▇▇ had 'transferred out of Dr Wright's control as part of the MJF transactions by transfer of private keys'.[139] However, previous advice provided to the ATO indicated this address was not transferred to MJF.[140]

143. On 14 August 2015 Ms Nguyen was asked if it was possible for her to sign messages to verify control of the addresses used to pay Professor Rees. Ms Nguyen refused and advised that the homomorphic encryption scheme used to divide the private keys does

---

[136] Record of conversation between ATO (Brigid Kinloch, Mike Doran) and John Chesher, Dr Wright on 25 April 2014 [H25]

[137] C01N Pty Ltd register of members [C6]; C01N Pty Ltd register of directors [H26]

[138] Letter from ATO to C01N Pty Ltd and related entities dated 25 May 2015 [C84]

[139] Appendix 3 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015 [C45]

[140] Appendices 4 and 11 to a letter from Clayton Utz to Peter Walmsley dated 17 November 2014 (GAAR panel second submission) [C43]

CONFIDENTIAL                                                                    DEF_00053927

not involve key retention once the process is complete. As such, once the keys are transferred, the process cannot be recreated securely. Ms Nguyen also advised that Dr Wright had offered to sign messages in 2013, however as this was refused by the ATO at the time, the offer was no longer 'on the table'. [141] The ATO is not aware of such an offer being made.

144. The transaction between the taxpayer and Hotwire was the subject of a Private Binding Ruling application, on which the Commissioner refused to rule given the lack of clarity about the facts, and some High Risk Refund queries posed to Hotwire following the lodgment of its 2012-13 income tax return. After discussions with the ATO about the transaction and decline in value calculations, Hotwire made some changes to its notional decline in value deductions. Hotwire's refund was subsequently released, as notification under section 8AAZLGA of the *Taxation Administration Act 1953* had not been given within the required 30 days of lodgment, however it was recommended for post-issue review.

### *Purported payment to Professor Rees*

145. The taxpayer has recorded the Professor Rees transaction as an expense in its accounts of           on 30 June 2013 and has recorded the amount as being paid on the same day by paying           Bitcoin.[142] The Blockchain shows the amount in the addresses at 28 June 2013, was           Bitcoin. The Blockchain shows that these amounts were transferred into a new address,     , on 13 August 2013, along with an additional     Bitcoin from address,     . This totals           Bitcoin held in address     for Professor Rees.[143] However, as recently as 19 November 2014, Dr Wright advised that address     was used to pay a third party, MJF, on 15 September 2013.[144] On 10 October 2013, Dr Wright also advised that he was still in control of address     .[145] The taxpayer's former solicitor, Mr Andrew Sommer, verbally advised the ATO on 25 May 2015 that the information in this email was not current at the time it was sent.

146. On 26 May 2015, the taxpayer stated that, sometime in 2011, Dr Wright advised Professor Rees he would give him a total of 34,512.919 Bitcoin in recognition of his

---

[141] Email from Uyen Nguyen to Arna Synnot dated 14 August 2015 [C99]
[142] C01N general ledger for 1 July 2012 to 30 June 2013 [C10]
[143] Appendix 3 to a letter form Clayton Utz to Michael Cranston dated 26 May 2015, address     [C45]
[144] Appendices 4 and 11 to a letter from Clayton Utz to Peter Walmsley dated 17 November 2014 (GAAR panel second submission) [C43]
[145] Email from Dr Wright to Michael Hardy dated 10 October 2013 [C44]

CONFIDENTIAL                                                                                    DEF_00053928

contribution to Dr Wright's work, but this was not documented, and the first payment was for ███████ Bitcoin in the 2012-13 year. [146]

147. The taxpayer contends that, on instruction from Dr Wright, an invoice was prepared for Professor Rees (invoice number 4501) dated 30 June 2013 to Strasan (Australia) for £1,342,246.72 with the description:[147]

> David Rees - license of software for research and development project.
>
> Automated design and BTC chain splitting.
>
> Algebra known as semi-group theory and commutative algebra – For use in developing an automated self-matching learning system. Solutions using the Otway-Rees protocol and Northcott-Rees theory of reductions and integral closures.
>
> Library collection of selected papers. For memory of Ron Lynam.
>
> Payment CC'd to account of Joan Rees.
>
> Export (no VAT).

148. We have obtained a document that appears to be a printout from Hotwire's Xero accounting system showing an invoice from Professor Rees to Hotwire, rather than to the taxpayer, dated 1 July 2013.[148] The taxpayer contends that it was struggling to adapt to the new Xero accounting system in September 2013 and that transactions were erroneously entered into the wrong taxpayer's general ledger.[149] We note that the taxpayer contends that this transaction occurred in June 2013.

149. The taxpayer has provided screenshots of purported Bitmessages and emails between Dr Wright and Mr Kleiman that ostensibly support the provision of the notes and code and the holding of Bitcoin on trust for Professor Rees. Refer to the comments at 151 to 155 regarding electronic communications below.

### *Third party enquiries*

150. The following information has been obtained from Professor Rees's daughters (Professor Sarah Rees, Professor Mary Rees, Debbie Rees and Rebecca Rees) and the executor of his estate, Lloyds Bank:[150]

　　150.1. Professor Rees did not write any software and had not been involved in computers since the late 1940s.

　　150.2. He never did any consulting work and never issued any invoices.

---

[146] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraphs 46-47 [C57]

[147] Invoice from Professor Rees to Strasan Pty Ltd dated 30 June 2013 [C40]

[148] Invoice statement from David Rees to Hotwire (NUIX) [C41]

[149] Document titled 'Craig Wright group Items for Clarification' provided on 3 December 2013 [C85]

[150] Attachments to letter from HM Revenue and Customs to ATO dated 27 May 2015 ref 7790 [C46]; Attachments to letter from HM Revenue and Customs to ATO dated 20 May 2015 ref 7790 [C47]; Email from Professor Sarah Rees to ATO dated 8 May 2015 [C48]

CONFIDENTIAL

DEF_00053929

150.3.   He undertook no work relating to cryptography after the 1940s and never undertook any work relating to automated design, Bitcoin chain splitting or automated self-matching learning systems

150.4.   His daughter, Professor Sarah Rees, is aware of only one unpublished piece of work by her father, this work was later updated and published.

150.5.   In 2008 Professor Rees was 90, mentally confused and not developing any new mathematical ideas. His daughters do not believe it is possible he could have carried out any work relating specifically to Bitcoin. They considered it inconceivable that their father could have completed work of this nature without his family being aware.

150.6.   For the last few years of his life Professor Rees was very frail, a little confused and suffered some memory loss, his doctor regarded him as suffering from senile dementia. In early 2011 he moved into a nursing home.

150.7.   None of his daughters were aware of him having any dealings with Dr Wright or the taxpayer.

150.8.   He never spoke of Bitcoin and his estate included no Bitcoin or equitable interests in Bitcoin.

150.9.   His daughters confirmed that very few emails were sent in the last few years of his life and were sent with assistance from them, as he was unable to email on his own.

150.10.   At the time the invoice was issued Professor Rees was in the last weeks of his life, was very confused and not in a state to produce the invoice or do any mathematics. His wife, Joan Rees was also bed bound and only able to communicate intermittently.

150.11.   Professor Rees's daughter, Rebecca Rees, conducted his financial affairs from mid-2011. She has no knowledge of any dealings with Dr Wright, or his related entities, Professor Rees granting any rights, or him holding any intellectual property other than that which applied to his various academic publications, published in academic journals. She has no knowledge of Professor Rees holding any Bitcoin addresses or transacting in Bitcoin.

150.12.   His estate executors were not aware of any connection with Dr Wright's entities or Bitcoin.

CONFIDENTIAL

**Electronic evidence submitted by the taxpayer**

151. The taxpayer and related entities also controlled by Dr Wright have provided a series of emails they allege represent email correspondence between ATO officers and the taxpayer's directors/representatives. These variously purport:

   151.1. On 14 July 2014, Celeste Salem of the ATO sent Dr Wright an email relating to the holding of the taxpayer's income tax refund for 2012-13, failed to attach the notification letter properly and sent the physical letter to the wrong address. As a result, the taxpayer contends it was not notified that the ATO was holding its refund, as required under section 8AAZLGA of the *TAA 1953*.[151]

   151.2. On 5 April 2013, Dr Wright sent an email to Hao Khuu of the ATO advising the taxpayer was buying IP from Professor Rees and acquiring software from Dr Wright acquired following a dispute with a company (believed to be DISS), and that Hao Khuu advised on the GST treatment of the latter transaction.[152]

152. Two other emails, pertaining to the affairs of entities related to the taxpayer, also contain purported correspondence with ATO officers.[153]

153. ATO records show that these emails were either never sent, or that the content of the emails has been altered from what was originally sent or received, to support the contentions of the taxpayer and related entities.[154]

154. The taxpayer has also provided purported screenshots of Bitmessages, text messages, blogspot posts and digitally signed emails between Dr Wright, Mr Kleiman, Ms Nguyen and High Secured (who the taxpayer advises provided the services to W&K) that ostensibly support the taxpayer's assertions that it obtained services from W&K, paid W&K in Liberty Reserves, and obtained services and paid Professor Rees.[155] The taxpayer advises that these serve as contemporaneous, unalterable evidence that the transactions took place.

155. ATO Forensics have advised:

---

[151] Alleged email from Celeste Salem to Craig S Wright received in an attachment titled 'Appendix 4 – 8AAZLGA Email (00000004).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C88]

[152] Alleged email correspondence between Hao Khuu and Craig Wright received as an attachment titled 'Appendix 7 – ATO Email CF Khou 00 (000000003).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C89]

[153] Alleged email from Brigid Kinloch to Craig S Wright and John Chesher received as an attachment titled 'Appendix 0 – Kinloch Brigit 0111131 (00000002).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C90]; Alleged email from Craig S Wright to Shalyce Dempster sent Thursday 18 July 2013 at 9:34 PM with subject 'Evidence.' provided to the ATO by email from John Chesher to Marina Dolevski on 13 February 2014 [C91]

[154] ATO email records provided by ATO Forensics

[155] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]; Various blogs written by Dr Wright [C32]

CONFIDENTIAL

DEF_00053931

155.1. Bitmessages themselves are only encrypted ('cryptographically secure') and therefore tamper proof when they are transmitted over the internet. Once the Bitmessage is received, it can be altered.

155.2. the public keys used in the digitally signed emails can be created with backdated creation dates and there is also no 'Know Your Customer' or 'Proof Of Identity' requirements when uploading a public key to the website the taxpayer claims verifies Mr Kleiman's identity

155.3. as the digital signatures are not supported by X.509 certificates issued by trusted authorities, there is no way to verify the owner of the digital signatures, nor the date that any signing occurred

155.4. it is possible to backdate blogspot posts.

# YOUR CONTENTIONS

156. Detailed information relating to the taxpayer's factual contentions is set out in various parts of the 'Relevant facts' section of this Paper above.

## ISSUE 1: R&D TAX OFFSETS (W&K)

157. The taxpayer contends that it is entitled to an R&D tax offset in the 2012-13 income year in respect of expenditure incurred pursuant to an agreement with W&K.

158. The taxpayer contends that it incurred the expenditure pursuant to an agreement with W&K.

159. The taxpayer contends that it conducted registered R&D activities during the 2012-13 income year.

160. The taxpayer contends that it conducted the registered R&D activities in 2012-13 solely in Australia.

## ISSUE 2: R&D TAX OFFSETS (PANG)

161. The taxpayer contends that it is entitled to an R&D tax offset in the 2012-13 year in respect of expenditure incurred to Ignatius Pang.

162. The taxpayer contends that it incurred the expenditure to Dr Pang.

163. The taxpayer contends that it conducted registered R&D activities during the 2012-13 income year.

CONFIDENTIAL
DEF_00053932

## ISSUE 3: FOREIGN EXCHANGE LOSS

164. The taxpayer contends that it is entitled to a deduction for a forex realisation loss of $404,204 in the 2012-13 income year, in respect of an obligation to pay foreign currency to W&K.

## ISSUE 4: PROFESSOR REES DEDUCTION

165. The taxpayer contends that it is entitled to a general deduction of $2,066,392 in the 2012-13 income year in respect of a loss or outgoing incurred in respect of an acquisition from Professor Rees.

## ISSUE 5: ASSESSABLE INCOME

166. The taxpayer contends that it derived assessable income of $2,962,399 in the 2012-13 income year in respect of a sale to Hotwire.

# OUR POSITION

## ISSUE 1: R&D TAX OFFSETS (W&K)

167. *Issue:* Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year in respect of expenditure incurred pursuant to a contract with W&K?

168. *Position:* No.

169. Under Division 355 of the ITAA, an R&D entity may be entitled to a tax offset in respect of certain R&D activities. To be entitled to the tax offset, the R&D entity needs one or more notional deductions under the Division. One kind of notional deduction is for expenditure on R&D activities.

170. An R&D entity's entitlement to a notional deduction is determined under section 355-205, which provides:

(1) An R&D entity can deduct for an income year (the present year) expenditure it incurs during that year to the extent that the expenditure:

(a) is incurred on one or more R&D activities

(i) for which the R&D entity is registered under section 27A of the *Industry Research and Development Act 1986* for an income year and

(ii) that the activities to which section 355-210 (conditions for R&D activities) applies and

(b)        if the expenditure is incurred to the R&D entity's associate – is paid to that associate during the present year.

CONFIDENTIAL

DEF_00053933

> Note 1: if the matters in sub-paragraphs (a)(i) and (ii) are not satisfied until a later income year, the R&D entity will need to wait until then before it can deduct the expenditure for the present year
>
> Note 2: The R&D activities will need to be conducted during the income year the R&D entity is registered for those activities (see sections 27A and 27J of the *Industry Research and Development Act 1986*)

171. An R&D entity whose notional deductions are at least $20,000 is entitled to a tax offset equal to a proportion of those deductions.[156] Where the R&D entity's aggregated turnover is less than $20m and the entity is not controlled by an exempt entity or entities, the tax offset is 45% of the deductible amount and is refundable.[157]

**No expenditure incurred**

172. We do not consider the taxpayer to have incurred any expenditure pursuant to a contract with W&K. Accordingly, the purported contract did not give rise to a notional deduction for the purposes of the R&D tax offset. [158]

173. To qualify for a notional deduction under section 355-205, an R&D entity must incur expenditure.

174. The term 'incurred' is not defined in the legislation. The following guidance on the term 'incurred' is provided in *TR 97/7: Income tax: section 8-1 - meaning of 'incurred' - timing of deductions*. At paragraph 6, it states:

> The courts have been reluctant to attempt an exhaustive definition of a term such as 'incurred'. The following propositions do not purport to do this, they help to outline the scope of the definition. The following general rules, settled by case law, assist in most cases in defining whether and when a loss or outgoing has been incurred:
>
> a) a taxpayer need not actually have paid any money to have incurred an outgoing provided the taxpayer is definitively committed in the year of income. Accordingly, a loss or outgoing may be incurred within section 8-1 even though it remains unpaid, provided the taxpayer is 'completely subjected' to the loss or outgoing. That is, subject to the principles set out below, it is not sufficient if the liability is merely contingent or no more than pending, threatened or expected, no matter how certain it is in the year of income that the loss or outgoing will be incurred in the future. It must be a presently existing liability to pay a pecuniary sum;
>
> b) a taxpayer may have a presently existing liability, even though the liability may be defeasible by others;

---

[156] Subsection 355-100(1) of the ITAA.
[157] Items 1 and 2 of subsection 355-100(1) and section 67-30 of the ITAA.
[158] See paragraph 355-100(1)(a) and subsection 355-205(1) of the ITAA.

CONFIDENTIAL

DEF_00053934

   c)   a taxpayer may have a presently existing liability, even though the amount of the liability cannot be precisely ascertained, provided it is capable of reasonable estimation (based on probabilities);

   d)   whether there is a presently existing liability is a legal question in each case, having regard to the circumstances under which the liability is claimed to arise;

   e)   in the case of a payment made in the absence of a presently existing liability (where the money ceases to be the taxpayer's funds) the expense is incurred when the money is paid.

175. The meaning of the term 'incurred' in relation to R&D expenditure is the same as its meaning in relation to section 8-1.[159]

176. In the present case there are numerous anomalies and inconsistencies in the purported agreement between the taxpayer and W&K that lead us to conclude that no liability arose from it.

   176.1.   The statement of work appears to have been created by making some minor alterations to a US government IaaS tender document obtained from the internet.

   176.2.   The statement of work does not fully identify or define the parties. The taxpayer is simply referred to as 'Strasan' or 'Strassan' and no company identifier, corporate seal, contact details or other identifying information is provided.

   176.3.   The taxpayer's director, Dr Wright is listed as the contact for W&K.

   176.4.   The statement of work does not contain any detailed specifications of quantity of services to be provided, the price of those services, the time at which those services are to be performed or that price is to be paid.

   176.5.   Purported appendices to the statement of work:

     (a)   do not state a price for the alleged services or a date for payment;

     (b)   contradict pricing arrangements in the statement of work, which refer to a fixed fee over a 12 month period;

     (c)   appear to be excluded from the contract file which the taxpayer contends has been electronically signed;

     (d)   refer to the taxpayer as 'C01N', even though the taxpayer did not change its name to C01N until 25 June 2014;

     (e)   purport to provide for the management of systems access by a company which did not exist at the time of the agreement;

---

[159] *Desalination Technology Pty Ltd v. Federal Commissioner of Taxation* 2013 ATC 10-343 paragraph 16

CONFIDENTIAL       DEF_00053935

      (f)   make references to escrow arrangements which are not otherwise found in the documentation;

      (g)   otherwise have the style of a document created separately from the statement of work

176.6.    The taxpayer has made contradictory statements regarding the escrow arrangements for the transaction.

177.  Having regard to these inconsistencies and anomalies, both in the contract document and between the contract and the invoice, and the reliance on electronic evidence, we do not accept that the documents provided substantiate that the taxpayer owed a presently existing liability to W&K.

178.  Expenditure can be incurred when paid, in the absence of a presently existing liability. However, in the present case we do not accept that the taxpayer made any payment to W&K for the following reasons.

178.1.    Evidence casting doubt on the existence of an obligation to pay (see paragraph 176 above) also casts doubt on the existence of the payment.

178.2.    Primary evidence for the payment consists of a purported screenshot from a defunct website, and, as such, cannot be verified.

178.3.    Anomalies in C01N UK's purported resolution to acquire shares, application to acquire shares and share certificates cast doubt on their authenticity.

178.4.    There are numerous inconsistencies in other evidence provided by the taxpayer which cast doubt on the contention that a payment was made:

      (a)   The purported invoice, which requires payment by way of an assignment of Bitcoin, is contrary to the statement of work, which requires payment through Liberty Reserve.

      (b)   The taxpayer has changed its explanation as to how the purported invoice was paid on five separate occasions.

      (c)   Evidence from independent sources supports the conclusion that C01N UK was an inactive shelf company which had no connection with the taxpayer at the time the alleged payment was made.

      (d)   The taxpayer's most recent explanation conflicts with share certificates and the share register which it claims are source documents.

179.  Further, in light of the ability to alter the source documents that the taxpayer seeks to rely upon, and the false emails the taxpayer's director has presented as representing correspondence with the ATO, we cannot accept the veracity of any of the electronic

CONFIDENTIAL                                                                         DEF_00053936

POSITION PAPER

communications the taxpayer claims support its contentions in relation to the transactions under audit.

**No expenditure incurred (if any) on R&D activities**

180. We do not consider the taxpayer to have incurred any expenditure on R&D activities. Accordingly, if (contrary to our view) the taxpayer did incur expenditure to W&K, that expenditure would not give rise to a notional deduction for the purposes of the R&D tax offset.[160]

*R&D activities*

181. Registration of activities does not render the activities described in the registration as R&D activities, nor is it an indication of compliance with the requirements of the R&D tax incentive. The Commissioner may disallow an R&D claim on the basis that the activities undertaken by the taxpayer do not meet the definition of 'R&D activities' as defined in the ITAA.[161]

182. As detailed at **Appendix 1,** the vast majority of the content in the taxpayer's AusIndustry registration application is taken from unacknowledged internet sources.

183. The taxpayer's description of the project's objectives is predominantly taken from a wiki on Open Transactions, an already developed free software toolkit and financial cryptography library, API, CLI and prototype server.

184. The taxpayer's description of the new knowledge to be developed further draws upon a wiki about Bitcoin contracts. This leaves a vague description of 'programmed money'. The taxpayer's description of its core activity 'scriptable money' draws heavily from internet sources. When this is removed, the activity is described only in terms of what the taxpayer is seeking to achieve.

185. The details of the core activity 'BTC Agents' is again mostly taken from internet sources and at best, describes how agents work. When the internet sources are removed, the taxpayer's activity description merely states that it 'seek[s] to explore currency agents'.

186. The taxpayer has provided no explanation of its core activity 'transaction signing'.

187. While we note that the additional information provided to AusIndustry does not form part of the taxpayer's registered activities, the additional information provided is again predominantly taken from unacknowledged internet sources. We note that the taxpayer's description of the 'scriptable money' activity is merely a reproduction of part of a paper by

---

[160] See paragraph 355-100(1)(a) and paragraph 355-205(1)(a) of the ITAA.
[161] For example, see *GHP v. FC of T* [2014] AATA 515 at [34].

CONFIDENTIAL

Timo Hanke, with one sentence added at the end. It does not describe the experiments undertaken, or the steps to undertake them. The description of the taxpayer's 'BTC Agent' activity is again predominantly a reproduction of internet wikis.

188. The taxpayer has included an original paragraph about its aims, but again no details of the actual experiments undertaken. The taxpayer's description of the core activity 'transaction signing' is taken entirely from a paper by Timo Hanke. Again, the taxpayer has not described in any detail the experiments carried out. Of further concern is that the taxpayer has changed Timo Hanke's last paragraph from 'we have introduced a payment protocol for customer-merchant relations' to 'the aim [of the taxpayer's activity] is to introduce a payment protocol for customer/merchant relations'. The Hanke paper suggests that this has already been achieved.

189. The taxpayer claims to have undertaken PSO techniques and evolutionary success paradigms, yet this is not included in any information provided to AusIndustry. The information provided by the taxpayer merely outlines a PSO methodology taken from the internet. The bot code provided by the taxpayer appears to be taken from websites and, apart from a few minor changes, does not appear to have been modified from its original functionality and purpose. The codes do not show linkages to Blockchain data and shows no characteristics of evolutionary programming or having been built for PSO.

190. Core R&D activities are experimental activities whose outcome can only be determined by applying a systematic progression of work based on scientific principles.[162] In the present case, the evidence indicates that the taxpayer's activities did not have a sufficient degree of novelty and that, at best, their objective was merely to validate existing knowledge or apply it in a different context.[163]

191. For these reasons, we consider that the taxpayer has failed to demonstrate that it undertook R&D activities. Therefore any expenditure, if incurred, was not incurred on R&D activities.

***Substantiation of R&D activity***

192. A taxpayer must also substantiate that they have undertaken the registered R&D activities.

---

[162] Subsection 355-25(1) of the ITAA.
[163] See Explanatory Memorandum, Tax Laws Amendment (Research and Development) Act 2011, Chapter 2, paragraph 2.18; *RACV Sales & Marketing Pty Ltd v. Innovation Australia* 2012 ATC 10-254; *Re DBTL and Innovation Australia* [2013] AATA 573.

CONFIDENTIAL

193. Guidance published by AusIndustry clearly states that companies must keep adequate records to demonstrate both to them and the ATO that they carried out eligible research and development activities in the relevant period.[164]

194. This requirement is affirmed by the Administrative Appeals Tribunal in *Ozone Manufacturing Pty Ltd v Federal Commissioner of Taxation*[165]. At paragraph 135 Senior Member Dunne states:

> It is clear that eligible companies intending to claim the R&D tax offset must maintain adequate contemporaneous records which substantiate the carrying on of claimed R&D activities.

195. From the information provided by the taxpayer, there were no experimental artefacts shown, demonstrated or provided to support that any work on the registered R&D activities, as described AusIndustry application, was undertaken by the taxpayer in 2012-13.

196. Accordingly, if (contrary to our view) the taxpayer's registered activities are R&D activities, we consider that it has not substantiated that it undertook the R&D activities in 2012-13.

**Connection between expenditure and R&D activity**

197. For expenditure to be incurred 'on' the R&D activities, there must also be a sufficient connection and close association between the expenditure and the actual R&D activities. It is not limited to expenditure incurred directly on the actual R&D activities, but does not extend to expenditure more remote in purpose.[166]

198. While the taxpayer demonstrated that it had access to what appeared to be a supercomputer at our visit, it did not demonstrate that the supercomputer was available to the taxpayer or was used in any way in 2012-13. The taxpayer has provided some usage reports but also conflicting information about when the supercomputer was in use. Despite being requested, the taxpayer refused to show the Hadoop database. Despite issuing an agenda calling for the evidence needed to substantiate the use of the supercomputer, no source code files developed by the taxpayer were shown on the supercomputer. There were no artefacts shown or demonstrated that evidenced use of the supercomputers by the taxpayer in the registered R&D activities in 2012-13.

---

[164] http://www.business.gov.au/grants-and-assistance/innovation-rd/RD-TaxIncentive/Program-Information/Pages/RD-Record-Keeping.aspx
[165] [2013] AATA 420.
[166] *Robe River Mining Co Pty Ltd v. Commissioner of Taxation* (1989) 21 FCR 1; 89 ATC 4606; (1989) 20 ATR 768; *Pine Creek Goldfields Ltd v. FC of T* 99 ATC 4382; (1999) 41 ATR 471; *QCT Resources Limited v. FC of T* 97 ATC 4432; (1997) 36 ATR 184.

CONFIDENTIAL

DEF_00053939

199. Accordingly, if (contrary to our view) the taxpayer has carried on eligible R&D activities, we consider that it has not demonstrated any connection or nexus between those activities and any expenditure on the supercomputer.

**R&D activities (if any) not conducted solely in Australia or an external Territory**

200. If (contrary to our view), the taxpayer conducted eligible R&D activities in 2012-13 and did incur expenditure with sufficient nexus to those R&D activities pursuant to an agreement with W&K, we do not consider that all (or any) of those activities were conducted solely in Australia. Accordingly, expenditure on such activities could not give rise to a notional deduction for the purposes of the R&D tax offset.[167]

201. In order for expenditure on such activities to qualify for a notional deduction, the activities would have to be conducted for the taxpayer solely within Australia or an external Territory.[168] This requirement is not satisfied in the present case, as W&K did not conduct any activities in these places.

202. Where all or part of an R&D activity is conducted outside of Australia and its external Territories, it must be covered by an overseas finding.[169] In the present case, the taxpayer did not have an overseas finding in relation to activities purportedly conducted for it by W&K.

203. The statutory test to be applied concerns whether the relevant activity is 'conducted for' an entity within Australia or an external Territory. The word 'conducted' ordinarily means 'controlled', 'managed' or 'operated'.[170] However, it is clear that an entity can 'conduct' R&D activity for the purposes of the R&D provisions, despite having no actual or effective ownership of the results of the activity and no ultimate control over the R&D activity as a whole.[171] Such an entity conducts R&D activity 'for' an R&D entity by carrying out its actions for the benefit of the R&D entity, whether as agent or otherwise.[172]

204. In the present case, the purported services which provided the occasion for the purported expenditure comprise the provision of access to computing infrastructure for cloud storage, virtual machines and cloud web hosting.[173] If (contrary to our view) such services constituted R&D activity, that activity would be conducted in the place or places

---

[167] See paragraphs 355-100(1)(a), 355-205(1)(a) and 355-210(1)(a) of the ITAA.
[168] Paragraph 355-210(1)(a) of the ITAA.
[169] See paragraphs 355-210(1)(d) and (e) of the ITAA and paragraph 28C(1)(a) of the IRDA.
[170] *Pharmaceutical Society of Great Britain (Council of) v. Fuller* (1932) 96 JP 422 at 424; *Pride of Derby v. British Calanese Ltd* [1953] 1 All ER 179 at 189.
[171] On the concept of ownership of results and control over conduct, see Taxation Ruling IT 2451.
[172] See IT 2451, paragraph 21.
[173] Statement of Work, sections 2, 4.3.1, 4.3.2, 4.3.3. [C24]

CONFIDENTIAL
DEF_00053940

where the computing infrastructure is located. Those places were not in Australia or an external Territory.

205.   We note that the requirements above only apply to expenditure which the taxpayer contends that it incurred on R&D activities. The question does not arise in relation to expenditure on other activities, such as those which the taxpayer alleges were conducted by people located in Australia.[174]

## ISSUE 2: R&D TAX OFFSETS (PANG)

206.   *Issue:* Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year, under Division 355 of the ITAA, in respect of expenditure incurred to Ignatius Pang?

207.   *Position:* No.

**Notional deductions less than $20,000**

208.   As stated, we do not consider that the taxpayer is entitled to a notional deduction in respect of the purported W&K expenditure. Accordingly, the taxpayer's notional deductions for the 2012-13 income year are less than $20,000.

209.   Where notional deductions are less than $20,000, a tax offset is only available in relation to expenditure which has been incurred to a research service provider (within the definition of the IRDA).[175]

210.   The taxpayer claims to have incurred $5,000 to Dr Pang, who was not a research service provider in 2012-13. Accordingly, the taxpayer would not be entitled to a tax offset even if (contrary to our view) it incurred expenditure to Dr Pang on registered R&D activities.

**No expenditure incurred**

211.   As noted, we do not consider the taxpayer to have incurred any expenditure to Dr Pang. Accordingly, the purported arrangement with Dr Pang would not give rise to an entitlement to a tax offset even if (contrary to our view) the taxpayer's notional deductions for the 2012-13 income year were $20,000 or more.[176]

212.   See paragraphs 174 to 175 above for discussion of the meaning of the term incurred.

213.   The evidence provided by the taxpayer does not establish that the taxpayer owed any obligation to Dr Pang, or paid him any amount.

---

[174] See paragraph 120 of this Position Paper.
[175] See Item 1 of Subsection 355-105(2) of the ITAA.
[176] See paragraph 355-100(1)(a) and subsection 355-205(1) of the ITAA.

CONFIDENTIAL

DEF_00053941

214. The taxpayer has not provided any written agreement with Dr Pang, or an invoice issued by Dr Pang, that would evidence a presently existing liability existed. Further, the invoice apparently issued by Dr Wright 'as agent' for Dr Pang is for the provision of software by Dr Wright to the taxpayer – not for services provided by Dr Pang as we would expect if it reflected the agency arrangement the taxpayer contends. The taxpayer has provided no evidence of the purported agency arrangement.

215. The taxpayer has provided contradictory accounts about whether Dr Pang was a contractor or employee and how Dr Pang was paid, including from Dr Pang himself. Dr Pang's email does not indicate what he was paid for, who he was paid by or when he was paid. This confusion is amplified by the fact that Dr Pang received remuneration from Hotwire in 2013-14. Further, the purported expenditure was not entered into the taxpayer's financial statements.

216. Having regard to the lack of documentation evidencing that the taxpayer had a presently existing liability to, or paid Dr Pang in 2012-13, we do not accept that the taxpayer incurred a liability to Dr Pang.

**No expenditure incurred on R&D activities**

217. As explained at paragraphs 180 to 195 above, we consider that the taxpayer has failed to demonstrate that it undertook R&D activities. Therefore the purported arrangement with Dr Pang would not give rise to any entitlement to a tax offset even if (contrary to our view) the taxpayer's notional deductions in 2012-13 were $20,000 or more and it incurred expenditure to Dr Pang.

## ISSUE 3: FOREIGN EXCHANGE LOSS

218. *Issue:* Is the taxpayer entitled to a deduction under section 775-55 of the ITAA for a forex realisation loss of $404,204 in the 2012-13 income year, in respect of an obligation to pay foreign currency to W&K?

219. *Position:* No.

**No obligation to pay foreign currency**

220. We do not consider that the purported contract with W&K gave rise to any obligation to pay foreign currency for the purposes of the forex provisions.[177] Accordingly, the purported contract did not give rise to any forex realisation loss.

---

[177] Section 775-55 of the ITAA.

CONFIDENTIAL

DEF_00053942

221. Forex realisation event 4 happens if an entity ceases to have all or part of an obligation to pay foreign currency.[178] An entity makes a forex realisation loss from forex realisation event 4 where the amount paid in respect of the event happening exceeds the proceeds of assuming the obligation to pay, and some or all of that excess is attributable to a currency exchange rate effect.[179]

222. In the present case we do not accept that the taxpayer had an obligation to pay foreign currency to W&K. Accordingly, the taxpayer did not make a deductible forex loss.

**Forex loss (if any) incorrectly calculated**

223. If (contrary to our view) the taxpayer did have an obligation to pay foreign currency to W&K, we consider that its deductible forex realisation loss was incorrectly calculated.

224. If (contrary to our view) the taxpayer did have an obligation to pay foreign currency to W&K, its deductible forex loss would be calculated as follows:

| Date | Item | $USD value | $AUD value of 1 USD | $AUD value (rounded) |
|------|------|-----------|---------------------|----------------------|
| 30 July 2012[180] | Proceeds of assuming obligation | 5,175,000 | 0.9533019907 | 4,933,338 |
| 6 January 2013[181] | Proceeds of discharging obligation | 5,175,000 | 0.9544716999 | (4,939,391) |
| Forex realisation loss (AUD) | | | | (6,053) |

## ISSUE 4: PROFESSOR REES DEDUCTION

225. *Issue:* Is the taxpayer entitled to a deduction of $2,258,534 in the 2012-13 income year under section 8-1 of the ITAA in respect of a loss or outgoing incurred in respect of an acquisition from Professor Rees?

226. *Position:* No.

**No loss or outgoing**

227. We do not consider the taxpayer to have incurred a loss or outgoing in respect of any acquisition from Professor Rees. Accordingly, the purported arrangement with Professor Rees did not give rise to any general deduction.[182]

---

[178] Paragraph 775-55(1)(a) of the ITAA.
[179] Subsection 775-55(5) of the ITAA.
[180] Invoice issued by W&K Info Defence Research LLC to Strasan Pty Ltd dated 30 July 2012 [C25]
[181] Liberty Reserve screenshot: 'Craig Wright R&D Trust' [C34]

DEF_00053943

228. See paragraphs 174 to 175 above for discussion of the meaning of the term incurred.

229. The evidence provided by the taxpayer does not establish that the taxpayer acquired any material or services from or owed any obligation to Professor Rees.

230. The agenda for the visit to the taxpayer's premises on 1 and 2 April 2015 (issued in draft form on 25 March 2015 and final form on 30 March 2015) indicated under the heading 'Professor Rees material' that we requested to see the 'library'. Despite being advised in the taxpayer's response dated 20 February 2015 that selected papers would be available to view, no papers were shown.

231. Professor Sarah Rees indicated that she was only aware of one unpublished paper written by her father and that the content of that paper was later published in an updated form. We also asked to see evidence of the software provided under licence. The taxpayer showed us one piece of software and refused our request to run it. Professor Sarah Rees has advised us that her father did not write software. We further note that the software showed to us resembles that available from the CoCoA library. The taxpayer provided no evidence of the 'algebra' provided, all four of Professor Rees' daughters advise they have never heard of the taxpayer or Dr Wright. Professor Sarah Rees also advised that Professor Rees did not undertake consulting work. Accordingly, we do not accept that the taxpayer acquired anything from Professor Rees.

232. Regardless of whether the taxpayer acquired anything from Professor Rees, it has not demonstrated that it incurred any loss or outgoing. The taxpayer has stated that no written agreement existed with Professor Rees and the taxpayer has not provided any correspondence from Professor Rees himself regarding the arrangement.

233. The taxpayer has not substantiated that it paid Professor Rees, and has provided anomalous accounts of this. The taxpayer first advised that it had instructed an amount be held in trust for Professor Rees. The taxpayer then advised that it provided private keys to Professor Rees on 28 June 2013. We note the following anomalies:

    233.1. At 28 June 2013, Professor Rees was in a nursing home, declining in health and had ceased using a computer

    233.2. The taxpayer claims that Professor Rees was provided with private keys to ▓▓▓ addresses. At 28 June 2013, the contents of these addresses was ▓▓▓ Bitcoin, greater than the ▓▓▓ Bitcoin the taxpayer claims to have been in them.

---

[182] Subsection 8-1(1) of the ITAA.

CONFIDENTIAL                                                                                      DEF_00053944

233.3.  The taxpayer claims that the contents of the addresses were forwarded to a new address, ▮▮▮. The taxpayer claims that that this was held for Professor Rees, a position that is inconsistent with Professor Rees having the private keys to the seven addresses.

233.4.  The taxpayer claims that a related entity used the ▮▮▮ address to pay a third party, Mark Ferrier on 15 September 2013. If the Bitcoin was held by or for Professor Rees, it could not have been provided to Mr Ferrier. The taxpayer has further advised that the ▮▮▮ address was still controlled by Dr Wright at 10 October 2013. Clearly, the address cannot have been held simultaneously by or for Professor Rees, Mr Ferrier and Dr Wright.

233.5.  None of Professor Rees's daughters has any knowledge of the payment and no Bitcoin was known to the executors of Professor Rees's estate.

234.  Further, we have not been provided with any evidence that the taxpayer received any Bitcoin from Hotwire to fund the purported payment to Professor Rees. Hotwire first claimed it paid the taxpayer on 18 June 2013 with Bitcoin in address ▮▮▮; then presented a deed indicating it paid using different Bitcoin addresses on 30 June 2013; then indicated that the deed, despite clearly indicating that legal title was to transfer, merely represented the transfer of equitable interests in the Bitcoin held within those addresses.

235.  The taxpayer has not provided any evidence to substantiate the statement in the background to the Software Development Agreement that Mr Kleiman funded the agreement. The taxpayer declined to sign messages within the relevant addresses to evidence that it controlled them. On this basis, the taxpayer has not substantiated that it ever held the Bitcoin or interests in Bitcoin it purports to have paid Professor Rees. This casts further doubt on the taxpayer's assertion that it paid Professor Rees.

236.  Based on these discrepancies and inconsistencies, and the taxpayer's reliance on electronic evidence, we do not accept that the taxpayer incurred or paid an amount to Professor Rees.

### No connection with assessable income

237.  If (contrary to our view) Professor Rees did provide the invoiced items and payment was made, the following evidence indicates any such payment was not incurred in gaining or producing assessable income; nor was it necessarily incurred in carrying on a business to gain or produce assessable income:

CONFIDENTIAL                                                      DEF_00053945

237.1.   Professor Rees provided assistance to Dr Wright for many years without remuneration

237.2.   Professor Rees did not request payment or enter into negotiations with Dr Wright over the payment – Dr Wright told him what the taxpayer would give him

237.3.   Dr Wright had to instruct Mr Kleiman to make Professor Rees take the payment.

## ISSUE 5: ASSESSABLE INCOME

238.   Did the taxpayer derive assessable income [183] of $2,962,399 in the 2012-13 income year in respect of a supply to Hotwire related to the purported acquisition from Professor Rees?

239.   *Position:* No.

### No assessable income derived

240.   A taxpayer's assessable income includes the ordinary income derived by the taxpayer during the income year. Ordinary income has generally been held to include three categories, namely, income from personal service, income from property and income from carrying on a business.

241.   Ordinary income is derived when a gain has 'come home' to the taxpayer in a realised or immediately realisable form.[184]

242.   The taxpayer's most recent contention is that it merely on-sold the Professor Rees 'technology' to Hotwire for a profit. Given that the taxpayer has failed to substantiate that it acquired anything from Professor Rees, we do not accept that the taxpayer provided anything to Hotwire. On the basis of the evidence currently available to us, we do not accept that the taxpayer received anything from Hotwire which could have the character of assessable income.

### Assessable income (if any) calculated incorrectly

243.   If (contrary to our view), in accordance with Hotwire's earlier contention that the taxpayer provided Hotwire with the Professor Rees materials (or incorporated them into other products provided), a mathematic and cryptographic library, and prepared a project plan and budget, and Hotwire paid the taxpayer for these items, we consider the taxpayer derived income of $3,205,820.

---

[183] Section 6-5 of the ITAA.
[184] *CT v. Executor & Trustee Agency Co of South Australia* (1938) 63 CLR 108 (*Carden's case*)

CONFIDENTIAL

244. *TR 98/1 Income tax: determination of income; receipts versus earnings* (TR 98/1) discusses the two methods of determining when income is derived: the receipts method and the earnings method. At paragraph 8, TR 98/1 states that under the receipts method, income is derived when it is received. At paragraph 9, it states that under the earnings method, income is derived when it is earned. At paragraph 17, TR 98/1 states that a taxpayer must adopt the method that, in the circumstances of the case, is the most appropriate ie gives a substantially correct reflex of income (*Carden's case*).

245. Given the taxpayer's limited activities, we consider the receipts method gives a substantially correct reflection of the taxpayer's income.

246. If (contrary to our view) the taxpayer did provide goods and/or services to Hotwire, we consider this would have the character of assessable income and if (contrary to our view) it was paid, the amount would have 'come home' to the taxpayer. The taxpayer's tax agent calculated the amount of assessable income by translating the number of Bitcoin that the taxpayer purportedly received from Hotwire into Australian dollars. However, given the currency referred to in both the software development agreement and invoice is Australian dollars, we consider the amount and form of settlement to be irrelevant to the determination of the taxpayer's assessable income from the purported sale. The correct assessable income is therefore $3,205,820. This will be reduced by 1/11th if the sale is (contrary to our view), found to be a taxable supply, being the GST-exclusive amount of the sale.

CONFIDENTIAL

SENSITIVE

**Appendix 1: C01N AusIndustry registration application for 2012-13**

**Appendix 2: Additional information provided to AusIndustry**

**Appendix 3: Additional information provided to the ATO**

**Appendix 4: Statement of Works**

CONFIDENTIAL

DEF_00053948