1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 1

**P-637**

Case No. 9:18-CV-89176-BB

| | | | |
|---|---|---|---|
| SUBMISSION | GAAR PANEL | 29 AUGUST 2014 | **SENSITIVE: LEGAL** |
| FORMAT | AUDIENCE | DATE | CLASSIFICATION |


**Australian Government**
**Australian Taxation Office**

FILE REF:   [FILE NO.]

# PRELIMINARY GAAR PANEL SUBMISSION: CRAIG STEVEN WRIGHT AND RELATED ENTITIES

## EXECUTIVE SUMMARY

### Issue Description

The scheme consists of the generation of GST refunds in relation to the purported acquisition of rights to use software acquired from a related party where the consideration is purported to be rights to equitable interest in an offshore trust which holds bitcoin. If actual bitcoin was transferred as consideration, the input tax credits (ITCs) claimed by the relevant entities would have been offset against GST payable on bitcoin supplied.[1] This outcome is avoided by using an interest in a trust as such a supply is input taxed.[2] The scheme would also seem to be a precursor to the establishment of entitlements to large research and development claims.

Having regard to the evidence there is doubt as to whether some of the entities are carrying on an enterprise, there was a supply and/or consideration was provided.

### Questions for Panel

A. Whether the input tax credit (ITC) claims made by Craig Wright (CW) and related entities for certain purported acquisitions of software are not allowable, for the reason that the documents evidencing the relevant transactions are a sham?

B. Whether, assuming those ITC claims are not affected by sham and are otherwise allowable, Division 165 applies to negate any entitlement CW had to an ITC of $5,385,612 (or some lesser amount or combination of amounts) for making creditable acquisitions of software from MJF Consulting (MJF)[3] and W&K Information Defence LLC (W&K)[4]?

C. Whether Division 165 applies to negate any entitlement of entities controlled by CW to ITCs[5] for making a creditable acquisition of licences to use software from either CW personally or in his purported capacity as the Trustee of the Wright Family Trust trading as DeMorgan (DeMorgan)[6]?

---

[1] See *GSTR 2014/D3. the GST implications of transctions involving bitcoin.* A private ruling issued in December 2013 was issued to the taxpayer providing the same conclusion as stated in the GSTR.

[2] Item 10 in the table in subregulation 40-5.09(3) of the GST Regulations.

[3] Described by CW as a third party supplier, the principal is Mark Ferrier.

[4] A limited liability company established in the United States by CW's close friend, Dave Kleiman (who passed away on 26 April 2013).

[5] A summary of the GST refunds, which consists entirely of the ITCs claimed by each related entity, under the arrangement is provided on page 2.

[6] The trustee of the Wright Family Trust is recorded as Panopticrypt Pty Ltd (Panopticrypt). Per a memo under the DeMorgan logo a resolution dated 19 August 2013 states that Panopticrypt will act as trustee through CW

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 2 of
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 2
137

| SENSITIVE: LEGAL | GAAR PANEL SUBMISSION |
|---|---|
| | CRAIG STEVEN WRIGHT & RELATED ENTITIES |

**Short history of the issue**

1. A GST refund represents the excess of an entity's input tax credits for creditable acquisitions above the GST liability for its taxable supplies, as are attributable to a particular tax period.

2. This matter arises from claims for GST refunds in the September 2013 quarter by entities controlled by CW[7] which were retained by the Commissioner under s 8ZZALGA of the *Taxation Administration Act 1953* (TAA).[8] These claims have been under review since October 2013. There are concurrent audits of CW and the majority of entities controlled by him. Details of the audits and amounts claimed in respect of the relevant entities is summarised in the table below:

| Taxpayer | ABN | Audit Product | GST refund/liability$ |
|---|---|---|---|
| CW | 97 481 146 384 | Comprehensive Audit | 2,267,613 (Liab) |
| Cloudcroft Pty Ltd | 94 149 732 365 | Retention of Refund | 2,834,658 |
| Coin-Exch Pty Ltd | 31 163 338 467 | Audit following release of refund claim on 2 July 2014 | 3,787,429 |
| [s 38] | | | |
| Trustee for the Wright Family Trust | 72 433 066 448 | Comprehensive Audit | 114,919 (Liab) |
| Denariuz Pty Ltd | 22 165 471 983 | Retention of Refund | 4,194,857 |

3. The GST refunds claimed relate to the purported acquisition of exclusive rights to software held by DeMorgan during the quarterly period ending 30 September 2013. Additionally, there is a transaction for the purchase and sale of a Bitcoin wallet, involving Denariuz in the same period.

---

solely subject to a number of conditions including that CW remains as director of Panopticrypt for 'his term as trustee', quarterly financials are made available on request, and an external auditor is appointed and completes an audit of the trust each year.

[7] The relevant entities are Cloudcroft Pty Ltd (Cloudcroft), Coin-Exch Pty Ltd (Coin-Exch); Hotwire Pre-Emptive Intelligence Pty Ltd (Hotwire), Strasan Pty Ltd (Strasan), Pholus Pty Ltd (Pholus) and Denariuz Pty Ltd (Denariuz) – collectively these entities will be referred to as 'the related entities'.

[8] Section 8AAZLGA was introduced following the Full Federal Court decision in *Commissioner of Taxation v. Multiflex Pty Ltd* [2011] FCAFC 142 where it was held that the Commissioner had to pay refunds notified by taxpayers in business activity statements (BAS) 'forthwith'. Section 8AAZLGA confers a power to retain, in certain circumstances, a running balance account (RBA) surplus or other credit that the Commissioner would otherwise be required to refund to the taxpayer. PS LA 2012/6 provides guidance to ATO officers in administering this provision.

| SENSITIVE: LEGAL | PAGE 2 OF 31 |
|---|---|

| SENSITIVE: LEGAL | GAAR PANEL SUBMISSION CRAIG STEVEN WRIGHT & RELATED ENTITIES |
|---|---|

4. Initially, the related entities were contended to have paid for the licenced software in bitcoin.[9] A private ruling issued to CW in December 2013 concluded that supplies of bitcoin were taxable.[10] Accordingly, paying for the software in bitcoin would reduce or eliminate any GST refund to the related entities for acquiring the software as there would be an offsetting GST liability included in their net amount for the relevant tax period.

5. On various dates between 9 October 2013 to 28 October 2013, we issued the related entities with letters notifying of our decision to retain the relevant refunds under s 8AAZLGA of the TAA.

6. On 20 January 2014 we issued a letter to each of the related entities advising that we would continue to hold the refunds and that as of 20 January they had a right to object against this decision. No formal objections have been received from any of the affected taxpayers.

7. An interim report for Coin-Exch and Hotwire were issued on 14 February 2014 stating that the September 2013 BAS for both Coin-Exch and Hotwire would be amended to include the GST payable on the supply of bitcoin in exchange for the acquisition of the software.[11] No penalty would be applied given these taxpayers had taken reasonable care.

8. At a meeting with the ATO on 18 February 2014, CW advised that all consideration provided by the related entities (including DeMorgan) for the acquisition of the software was by way of the transfer of equitable interests in a Seychelles trust and that the supply of the trust interests was input taxed. On this contention, the related entities are entitled to GST refunds as input taxed supplies are not subject to GST and hence do not offset the input tax credits they claimed for the software acquisitions.

9. The property of the Seychelles Trust purportedly comprised of 650,000 bitcoin. According to CW, the only transaction which was paid with actual bitcoin was the acquisition of software from MJF.

10. Following receipt of these materially changed facts, it was agreed that the interim reports issued on 14 February 2014 to Coin-Exch and Hotwire be withdrawn. Further verification checks on the ITC claims would be made pending a decision by the ATO taking into account the new facts presented on 18 February 2014.

11. Around March 2014, given the complexity of the issue, and the time already taken in relation to the verification checks undertaken by the ATO it was agreed with CW's advisor, Andrew Sommer (Clayton Utz), that efforts would be concentrated on finalising the Coin-Exch refund claim as a priority and then the ATO would look at the other related entities.

---

[9] CW made these statements in his private binding ruling applications and in subsequent responses to questions prior to the issue of the private ruling in December 2013.

[10] GSTR 2014/D3 was released on 20 August 2014 which supports this view (provided at Attachment A).

[11] Interim reports provided in Attachment B.

| SENSITIVE: LEGAL | PAGE 3 OF 31 |
|---|---|

CONFIDENTIAL

SENSITIVE: LEGAL

12. We issued Coin-Exch a revised interim position paper on 8 April 2014.[12] The paper explained that its input tax credit claims would be disallowed because, based on the evidence provided, we concluded Coin-Exch did not acquire software or rights to software, or alternatively, if it did no consideration was provided for it.[13] An interim decision on penalties was also made, applying a 50% penalty for recklessness.[14]

13. On 9 May 2014, Clayton Utz responded, disagreeing with the interim position paper.[15] In summary, it was argued that software acquisitions were made, as evidenced by the relevant tax invoices, and further documents previously not provided to the ATO were submitted.[16] Further, it was stated that consideration need not be provided and it was enough for it to be established that Coin-Exch was liable to provide consideration for the software under s 11-5(c) of the GST Act, given that it accounts for GST on an accruals basis.[17] Submissions were also made in relation to the penalty finding.

14. On 28 April 2014, Hotwire was put under external administration. Barry Frederic Kogan and Anthony Gregory McGrath were appointed Administrators[18] and ASIC was on 29 April 2014. The Administrators advise that Hotwire can 'trade' out of insolvency on the condition of receiving its claimed GST refund. However, it is noted that Hotwire has not made any sales to third parties.[19]

15. A meeting was held at Clayton Utz on 3 June 2014 to address ATO concerns about the existence of the relevant software. Andrew Miller (ATO, auditor) and Stuart Coulson (ATO, Trusted Access) were given a demonstration of the relevant software.[20] It was apparent from that meeting that CW, and by extension the related entities, held or had access to some software but questions remain about whether the software was legally obtained and whether the valuations ascribed to the software are appropriate.

---

[12] A copy of this interim report is provided at Attachment C.

[13] Various reasons were given for this conclusion which included the fact that W&K at the time of the transaction was administratively dissolved so did not have capacity to enter into any agreements with CW, the tax invoices and contracts provided pre-dated the existence of DeMorgan so could not establish on their face that a supply had been made and/or consideration had been provided. There was no evidence of an offshore trust nor any interest that any of the entities may have had in that trust.

[14] Many of the documents provided appeared to be backdated and in an interview with CW held on 11 August 2014, CW admitted to backdating several documents, such as the relevant tax invoices because 'it seemed to make sense' to him that those documents had an earlier date, and that it didn't matter whether they predated the existence of the family trust, DeMorgan, because he always had an intention that the trust undertake the relevant transactions and all of these transactions happened in the same quarter, so no GST timing benefit was obtained.

[15] A copy of the Clayton Utz response is provided at Attachment D.

[16] In particular, a document purporting to evidence the establishment of the Seychelles trust and correspondence between CW and his lawyers purporting to evidence the intention to establish DeMorgan.

[17] Such a liability was said to be established by reference to the contracts entered into by the related entities. All entities in the arrangement are accounting on a quarterly accruals basis, so there is no issue of a timing advantage under the arrangement.

[18] The ATO had a meeting with the external administrators on 9 July 2014.

[19] It is also noted that Hotwire appears to be the only entity in the group of related entities which has employees.

[20] Details of the meeting are recorded in the minutes at Attachment E and some observations by Stuart Coulson on whether what was viewed could be valued in the millions of dollars at Attachment F.

---

SENSITIVE: LEGAL

CONFIDENTIAL
DEF_00067257

SENSITIVE: LEGAL

16. The $3.7 million GST refund for Coin-Exch was released on 2 July 2014. This decision was made based on the requirements in s 8AALZGA and the state of the evidence in our possession at that time. However we advised CW and Clayton Utz of our concerns with the transactions given the inconsistency between what was said and documented. We also advised CW that the the totality his activities and those of related entities required a full examination.[21]  This would include a consideration of Division 165 and sham issues.

17. External Counsel was engaged to interview CW on 11 and 18 August. Following these interviews, Counsel has given an indicative view that a sham applies to the arrangement, and, that issues exist in relation to whether Coin-Exch was carrying on an enterprise, whether there were supplies or acquisitions of software made, and whether  consideration was provided for the purported acquisitions. Further, according to Counsel there are arguments in favour of Division 165 applying. Counsel will provide a short outline of his views by the 4 September 2014, with further detailed analysis to follow.

18. The ATO continues to retain refunds of approximately $10.5 million pending a decision on the application of Division 165 of the GST Act.[22] It is noted that CW has a personal liability for approximately $2.26 million for the September 2013 quarter. While this is due and payable, CW has indicated he will not pay until other issues are resolved.

**Critical dates**

19. The GST refunds claimed have been retained since October 2013.  The taxpayers have not objected to the Commissioner's decision to retain the refunds.[23]  The discretion to retain the amount is assessed on an ongoing basis and in practice is reconsidered each time new information has become available or circumstances otherwise change.[24]

20. A Division 165 declaration can be made at any time,[25] however we have four years from the lodgement date of each relevant BAS in which a GST refund was claimed to amend the associated GST assessment to give effect to a declaration..[26]  Given these claims relate to the September 2013 quarter we are well within the four year amendment period.

---

[21] The ATO indicated at this discussion that we had deferred action on the recovery of CW's personal GST debt for the relevant quarter but given we were releasing Coin-Exch's refund, we would commence recovery action. Subsequent discussions with CW and his advisors have said that they will not pay a debt while the issues are still in contention. Further discussions on this aspect of the matter are continuing.

[22] Advice on whether Division 165 is a factor which the Commissioner can take into account in deciding whether to continue to hold a refund under s 8AAZGLA of the TAA is contained in Attachment G.

[23] The taxpayer's right of objection ceases where the amount is made or amended including under Division 105 in Schedule 1 of the TAA: s 8AAZLGA(5); see also *Sanctuary Australasia Pty Ltd v FC of T* [2013] AATA 371.

[24] We are still receiving new information from the taxpayer, the last interview with CW was held on 18 August 2014.

[25] Section 165-40 of the GST Act.

[26] Subsection 35-5(2) of the GST Act and subsection 105-55 of Schedule 1 to the TAA 1953. Under subsection 105-55 of Schedule 1 to the TAA 1953, there is no time limit on recovery.

SENSITIVE: LEGAL

CONFIDENTIAL

| SENSITIVE: LEGAL | GAAR PANEL SUBMISSION |
|---|---|
| | CRAIG STEVEN WRIGHT & RELATED ENTITIES |

21. We have indicated to CW's advisors that we intend to discuss this matter at a preliminary hearing of the GAAR Panel. If the Panel advice is that Division 165 may apply, we would look to have a full hearing of the matter before the Panel in early October 2014.

**Brief history of the scheme**

22. The scheme is summarised in the diagram at Attachment H.

23. CW purportedly acquired the software the subject of the later GST refund claims from two 'external' sources:

   a. **MJF**: there were two components to this acquisition by CW - Siemens automation software invoiced for $5 million and Al Baraka core banking software (including the source code) invoiced for $11.5 million. Payment for these acquisitions were made using bitcoin; and

   b. **W&K**: it is purported that CW together with Dave Kleiman developed defence and bitcoin software in this entity. CW states that he had always had possession of the software and the relevant source code but obtained legal title to it through a NSW Supreme Court action against W&K. CW commenced the NSW Supreme Court action to claim a debt of approximately $56.7 million.[27] The matter was settled with the legal title to the software being transferred to CW in exchange for extinguishment of the debt. No independent valuation of the software has been undertaken to establish whether it can be valued at $56.7 million.

24. The ATO obtained the relevant wallet addresses which contained the bitcoin purportedly used as consideration for the acquisitions from MJF. These transfers were purportedly done 'off-blockchain' which means that there is no traceable evidence of the bitcoin being transferred to anyone as the private key is provided to the recipient. It appears that the same wallets were placed into the Seychelles trust and purportedly used to finance the later transfer of the software between the related entities.

25. CW has an invoice for $35,250,000 which he claims was issued by MJF. A BAS was lodged on behalf of MJF for the relevant period. MJF's Director has advised the ATO he did not lodge, or authorise anybody else to lodge, this BAS.[28]

26. CW then contends to have sold software and intellectual property to his family trust (DeMorgan) at a price consistent with the amount he claimed to have paid MJF and the NSW Supreme Court settlement amount. CW also established the related entities and purportedly capitalised these entities with what he explained to be bitcoin, although he later amended this information to state that he transferred his rights to equitable interests the Seychelles trust which holds bitcoin.[29]

---

[27] In interviews with CW, he has admitted that he did not provide the financing as claimed in the NSW Supreme Court action, despite being listed as the financier in the documents filed with the Court, and he is unsure where those funds actually came from, stating that it was something Dave Kleiman organised.

[28] ███████████████████████████████████████████████████████████

[29] A trust which is purportedly established by a deed of loan over 650,000 bitcoin provided to CW in his personal capacity.

| SENSITIVE: LEGAL | |
|---|---|
| | PAGE 6 OF 31 |

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 7 of
137
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 7

SENSITIVE: LEGAL

27. DeMorgan then entered into exclusive licencing agreements with Coin-Exch, Hotwire and Cloudcroft.. The values ascribed to the licences reflected the price paid by DeMorgan to CW. Coin-Exch, Hotwire and Cloudcroft claim to have provided consideration for these purchases by transferring the equitable interests they each held in the Seychelles trust to DeMorgan. DeMorgan then purportedly transferred these equitable interests back to CW as consideration for its acquisition of the software.[30]

28. Coin-Exch, Hotwire, Cloudcroft, Strasan and Denariuz claimed significant input tax credits in the BAS for the period 1 July 2013 to 30 September 2013, whilst reporting minimal/nil sales, and no sales to independent third parties. This produced significant negative net amounts (i.e. GST refunds) for the majority of these entities.

29. CW has advised that for Coin-Exch there was no business plan and the company would not make a profit in the near future, but rather will be spending money. [s 38]

30. DeMorgan reported the supplies and the acquisition of the software from CW so its position is a small amount of GST payable in respect of certain other supplies. CW has claimed input tax credits for the acquisition of the software from MJF and W&K and has returned GST on the supply of the software to DeMorgan resulting in his personal GST liability of approximately $2.2 million.

**Relevant case authorities and policy**
   a. *Commissioner of Taxation v Multiflex Pty Ltd* [2011] FCAFC 142.
   b. *Simon Harland as Trustee for the PCS Global Discretionary Trust v Commissioner of Taxation* [2013] AATA 930.
   c. *Bayconnection Pty Ltd v Commissioner of Taxation* [2013] AATA 40 (denial of ITCs)
   d. *VCE v Commissioner of Taxation* [2006] AATA 821
   e. *Commisioner of Taxation v Swansea Services Pty Ltd* [2009] FCA 402
   f. *Snook v London & West Riding Investments Ltd* [1967] 2 QB
   g. *Sharrment Pty Ltd v Official Trustee in Bankruptcy* [1988] FCA 179.
   h. *Professional Admin Service Centres Pty Ltd v Commissioner of Taxation* [2013] FCA 1123
   i. *Raftland Pty Ltd v FC of T* [2008] HCA 21
   j. *Fitzroy Services Pty Limited v Commissioner of Taxation* [2013] FCA 471
   k. GSTR 2014/D3: GST implications of transactions involving bitcoin
   l.

**TCN Officers/BSL Officers**
Hoa Do (TCN) ph: 08 926 85171
Steven Koufomanolis (TCN) ph: (03) 9215 2764
George Montanez (ITX SES) ph: (02) 6216 1567
Andrew Miller (ITX) ph: (02) 9354 6379
James Webeck (ITX) ph: (02) 9374 5804
Vivek Raj (RDR) ph: (02) 9374 2987

---

[30] An analysis of the 'round robin' nature of the consideration provided is contained at Attachment I. It appears that there may not have been sufficient bitcoin in the Seychelles trust to support the consideration required for all of these supplies.

SENSITIVE: LEGAL

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 8 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 8

SENSITIVE: LEGAL

Released under FOI Act 1982
Australian Taxation Office

SENSITIVE: LEGAL

CONFIDENTIAL

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION<br>CRAIG STEVEN WRIGHT & RELATED ENTITIES

## DETAILED SUBMISSION

### Section 1 - Which GAAR?
31. Division 165 of the GST Act

### Section 2 - How the GAAR issue arose
32. See history of the scheme in the Executive Summary.

### Section 3 – Relevant Facts
33. The Executive Summary outlines the relevant facts as understood by the ATO.

34. CW has since October 2013 presented various versions of the 'facts' for this matter, with changes usually being in response to ATO request for clarification of inconsistencies or a particular position on the application of the law to the facts as presented at the time. Where inconsistencies in the facts still exist, this paper states what is considered the best view of what has occurred.  A table summarising these inconsistencies is attached at Attachment J.

## CRAIG STEVEN WRIGHT

35. CW has previously set up companies in which he has purportedly developed software relating to, amongst other things, bitcoin. Information Defense Pty Ltd and Integyers Pty Ltd, were two earlier companies for which CW was director. CW had claimed income tax deductions for research and development expenditure through these entities which were denied by the ATO. Soon after, those companies were liquidated and the liquidator made representations to ASIC at that time that CW was unfit to hold the position of director in the companies. CW then purported to transfer the software developed in these entities to Dave Kleiman for $5,000 in 2010.[31] Dave Kleiman purportedly placed that software into W&K and the same software appears to be the subject of the NSW Supreme Court settlement referred to in paragraph 23.b above. Further details on these NSW Supreme Court matters is provided at paragraphs 56 and 59 below.

36. An analysis of CW's sources of income for the last 2 years show that 94% of funds he has received have been from ATO refunds to entities he controls consisting of both research and development claims and GST refunds.

37. CW has stated at the interview of 11 August 2014 that he holds many degrees, including Masters degrees in Law (UK);  Science (SANS Institute, US); Statistics (Newcastle); and Masters in Systems Administration and Information Systems Security (both from Charles Sturt University).  Although he has claimed to be somewhat naïve about business dealings, the studies he has completed and his past experience[32] suggest that he would (or should) have a good understanding of commercial transactions and contract law.

---

[31] Evidenced by an email exchange between Dave Kleiman and CW dated 28 June 2011 and a blog post by CW dated 27 March 2011.

[32] Statements made at interview on 11 August 2014 with the ATO's external Counsel.

SENSITIVE: LEGAL

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 10 of
137
1-5WHAER2            Documents provided by the ATO to the General Anti-Avoidance Rules Panel            Page 10

38. CW was found in contempt of court, in relation to his dealings with DeMorgan Information Security Systems Pty Ltd (DISS) and sentenced to 28 days prison which was suspended on the condition of voluntary community service. In *Wright v Ryan & Anor* [2005] NSWCA 368 (27 October 2005) the Judge raised doubts on CW's credibility which was described as 'strongly under challenge'. CW was also ordered to pay DISS, which was in liquidation. The liquidator was unable to collect the debt from CW and sold collection rights to Chris McArdle (CM). CM pursued CW for amounts owing and settled on an amount which was paid.

39. CW claimed that this court-ordered payment included GST and claimed an ITC for 1/11th of the amount in Cloudcroft. CM advised the ATO that the amount did not include GST and is a payment as a result of CW's criminal conviction. Incidentally, the source of the funds paid to CM was an ATO refund paid to Cloudcroft.

CW lodged a BAS for the 30 September 2013 tax quarter which resulted in a net GST payable of $2,267,613. He has not paid this debt and has indicated that he will not pay the debt until this matter is resolved.

## THE INITIAL ACQUISITIONS

40. CW has stated that his intention in acquiring the software from MJF and W&K was to supply it to DeMorgan and then split the software into components which would then be supplied to Coin-Exch, Hotwire and Cloudcroft for their respective businesses.[33] It was never his intention to use the software acquired from MJF 'out of the box' but rather to reduce the software to its source code and build his own system by using parts of that source code acquired from 'independent' sources (ie: MJF and W&K).

### Acquisitions from MJF

41. On 3 June 2013, Mark Ferrier of MJF and CW purportedly entered into a *Contract for the Sale of Personalty* (ref OB0188)[34] for CW to acquire:

    i.   Siemens mining automation software (for $5,000,000)
    ii.   Microfinance software and accounting packages, developed by Dallah Al-Baraka (Al Baraka) (for $11,500,000); and
    iii.   Gold options from Paynes Gold Mining (for $18,750,000)
        (All amounts ex-GST)

42. CW holds two tax invoices purportedly issued by MJF. The first is marked OBO188 and refers to the items above, plus valuation services of $50,000.  This invoice is for $35,300,000 plus GST (i.e. a total of  $38,830,000).

43. The second tax invoice is marked Dallah, and is stated to be in relation to Core software per Al Baraka contract. This invoice is for $18,454,974 plus GST, ie $20,311,471.

44. The consideration provided for these acquisitions was in bitcoin.

---

[33] See Clayton Utz letter of 9 May 2014 at page 8 at Attachment D.

[34] CW has stated that he met Mark Ferrier at a conference but cannot recall where that conference was held nor what the conference was in relation to. He has confirmed that all negotiations for this contract were done over Skype and has provide a Skype record (in a form of an excel spread sheet) and email exchanges as evidence. It does not seem as though CW had undertaken any due diligence in relation to MJF before entering into the contract.

CONFIDENTIAL

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

45. CW has claimed the input tax credits for these acquisitions in his BAS for the September 2013 quarter.

46. CW has provided to the ATO the public addresses of the bitcoin wallets that were used as payment.  These bitcoin wallets were purportedly transferred 'off blockchain' meaning that the relevant transactions cannot be traced in the blockchain ledger and the relevant private key is passed directly to the recipient rather than transferring bitcoin to the recipient's own wallet.[35]  CW does not appear to have accounted for this bitcoin transaction in his September 2013 BAS. The effect of including the GST payable on the taxable supply of bitcoin would be to increase the net amount for that period by $xx. This would increase the GST payable for the September quarter to $xx. CW has mentioned that the transfer occurred outside of Australia such that he believes that the supply of bitcoin would be GST-free.

47. On 19 November 2013 the ATO received a BAS for the period ended 31 October 2013 from MJF which appears to record the receipt of consideration provided for a large transaction and appears to correspond to the contract mentioned above. During recovery action by the ATO for the outstanding GST payable on that BAS, Mark Ferrier contacted the ATO and denied any knowledge and recollection of lodging the BAS for that period.[36] He further stated that the BAS should have been nil as MJF Consulting had never commenced trading.

48. The documentation for the acquisition of the software from Al Baraka is not consistent. The Software Agreement dated 1 July 2013 states that it is between Al Baraka and Hotwire, and that CW is acting as agent for Hotwire and MJF is acting as agent for Al Baraka (a whole owned subsidiary of Al Baraka Banking Group). However, the invoice that is said to substantiate the supply and consideration provided is from MJF to CW directly. In the response to the ATO's statement in its interim position paper dated 8 April 2014 that it appears that Hotwire had acquired the Al Baraka software and not CW, Clayton Utz argue that it was always CW's intention that he acquire all the relevant software from MJF in his personal capacity. The subsequent agreements between CW, the Wright Family Trust (DeMorgan), and DeMorgan and related entities such as Coin-Exch and Cloudcroft evidence this intention.[37] It was noted that an early version of the contract contained 'BCCU Limited'[38] in the footer which was removed in a subsequent version provided.

49. ATO officers have viewed software which appears to be Siemens software and source code for a core banking package.[39] However, the following third party checks bring into question whether CW and related entities hold authorised versions of the relevant software. Specifically:
   a. Siemens Australia have advised the ATO that it has not sold or licensed software to either MJF or CW; and

---

[35] A description of off-block chain transfers is provided at Attachment K.

[36] This information is recorded against MJF's record in the ATO Siebel system. This debt was ultimately written off as non-recoverable. We have not been able to obtain any third party verification on this information from either Mark Ferrier nor his accountants at that time.

[37] See pgs 7-8 of the Clayton Utz letter dated 9 May 2014 at Attachment D.

[38] 'BCCU Limited' is believed to be Bankstown City Credit Union Limited.

[39] See paragraph 18 above.

SENSITIVE: LEGAL

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 12 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 12

> b. Al Bakara have likewise advised the ATO that it has not had any
> correspondence or agreement with either MJF, Hotwire or CW.

50.      When this information was provided to CW, he provided the ATO with copies of
letters and emails purporting to be from employees of Al Baraka regarding training and
technical support available in relation to the software. However the authenticity of these
documents is in question as they were sent from domain names which were not active
at the time the email was purportedly sent. The address of the domain is a virtual office
in Istanbul. CW's credit card records show that a payment was made to this virtual office
around the time the domain was established in January 2014. When this information
was put to CW at interview on 18 August 2014, he was unable to explain the
transaction. His advisors later asked for details of those transactions so that CW could
raise it with the bank as an unauthorised transaction.

**From W&K Information Defence (a US limited liability company)**

51. On 25 July 2013 CW lodged two Statements of Claim with Supreme Court of NSW
    (NSWSC), allegedly to obtain title to software previously owned by W&K.

52. In the first statement of claim, case 2013/225983, CW claimed a debt of $28,253,633.00
    which was said to arise from a contract dated 27 October 2008 between CW and W&K.
    This debt was said to comprise of a $20 million bond and bitcoin which reflected funding
    provided for four projects which were said to be 'associated with the Dept of Homeland
    Security USA', and the interest accrued on those project funds. In an interview with the
    ATO on 14 March 2014 CW conceded that he did not provide the bond (despite
    claiming it as a debt owed to him in the NSW Supreme Court action) and that he did not
    know who did.[40]

53. The Florida Department of State records show that W&K was established as a limited
    liability company on 14 February 2011, so it was not possible for that company to have
    entered into the agreement on 27 October 2008.[41]

54. The Dept of Homeland Security USA (DHS) has confirmed that whilst W&K had placed
    a bid for the 4 listed projects, it was not successful in obtaining any of those contracts.
    Neither did DHS provide any funding to W&K. CW was listed as the contact person for
    these bids and so would have been aware of the outcome of the bids. The IP that is
    said to have been developed for these 4 projects forms part of the software that was
    acquired by the related entities. These acquisitions form part of the GST refunds
    claimed.

55. In the second statement of claim, case 2013/245661, CW claimed $28,533,016.79 for
    funding supplied under a contract entered into with W&K on 8 January 2009 for the
    development of software and code used in the creation of a 'Bitcoin SDK and
    exchange'. The contract records CW as the financier and states that funding was
    supplied using bitcoin and a $20,000,000 gold bond. In an interview with the ATO on 14

---

[40] Although CW speculated that it may have come from a company called 'Playboy Gaming'.

[41] In response to concerns raised by the ATO on this issue, CW advised that the contract was originally with Dave
Kleiman in his personal capacity and was later ratified by W&K when it came into existence. No documents have
been provided to evidence this 'ratification'.

CONFIDENTIAL
DEF_00067265

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 13 of
137
1-5WHAER2            Documents provided by the ATO to the General Anti-Avoidance Rules Panel                Page 13

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

March 2014 CW stated that he did not provide the bond, and that he did not know who did, despite the fact that he had claimed it as a debt owing to him in the NSW Supreme Court action.

56. Information obtained from NSWSC court files for cases 2013/225983 and 2013/245661 show that both CW and Jamie Wilson acted on behalf of defendant, W&K. Jamie Wilson signed the Consent Orders for W&K on 28 August 2013 for the two cases; and CW filed the Acknowledgement of Liquidated Claim on 19 August 2013 on behalf of W&K as the legal agent and representative. In the documents he stated that he was acting in his capacity as Director/Australian Agent of W&K. CW had separately advised the ATO that W&K did not have any representatives present for the court proceedings. There are no records that show that Jamie Wilson was ever an officeholder or had authority to represent W&K in the NSWSC. There are also no records to show that CW is a director or holds any other authorised position that would enable him to legitimately represent W&K. He has advised us that he was never a Director of the company.

57. Both NSW Supreme Court matters were settled pursuant to an agreement dated 9 July 2013 (16 days before a Statement of Claim was filed for either action), between CW and Uyen Nguyen[42] (in her capacity as director of W&K). That agreement specifically listed the NSW SC case reference numbers and states "In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed considerations." This is peculiar as the statement of claim for 2013/225983 was filed on 25 July 2013 and similarly for 2013/245661 was filed on 13 August 2013. Also, the consent document provided to the ATO was not found in the case files sourced directly from the NSWSC.

58. CW has asserted that the value of the software obtained from W&K is established by reference to the amount of the debts claimed in these NSWSC matters. While this appears consistent with the NSWSC decisions, he then stated, in an interview with counsel, that the amount is based on an industry valuation method called COCOMO. These amounts form the basis for the value of the software which was supplied to DeMorgan and then supplied by DeMorgan to the relevant entities, including Coin-Exch, Hotwire and Cloudcroft.

59. It was advised to CW in March 2014 that W&K had been administratively dissolved since September 2012 (which includes the period during which legal action was taken against it). Shortly thereafter, CW advised the ATO that fees had been paid to the Florida Department of State in order to re-establish it as an active company.[43]

## WRIGHT FAMILY TRUST (DEMORGAN)

---

[42] Uyen Nguyen is a US resident. She is a key person in relation to several of the transactions which form part of the scheme. Uyen Nguyen is purportedly also a director and chief operations officer for the corporate trustee (Design by Human) for the Sychelles trust which purportedly holds bitcoin and purportedly provided a loan to CW of 650,000 bitcoin, which is held on trust for him until 'all regulatory issues in Australia' are dealt with.

[43] Under Florida Statutes, section 4481 an administratively dissolved limited liability company, whilst remaining in existence, cannot carry on business except that necessary to wind up and liquidate its business and affairs. However, under subsection 4482(3) reinstatement of an administratively dissolved limited liability company takes effect as of the effective date of the administrative dissolution and the limited liability company continues to carry on its business as if the administrative dissolution had never occurred.

SENSITIVE: LEGAL

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 14 of
1-5WHAER2                                        137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 14

SENSITIVE: LEGAL
GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

60. CW has advised that he formed the intention to set up a family trust to hold the software in the first part of 2013 and engaged a lawyer to assist with this. At interview on 11 August 2014 CW has stated that delays in setting up the trust were caused by the lawyer he had engaged. The Trust Deed for the Wright Family Trust (DeMorgan) was executed on 9 August 2013.

61. The Trust Deed states that the Trustee is Panopticrypt Pty Ltd (Panopticrypt). Prior to the Deed being requested by the ATO, we had been advised that CW was the Trustee. It has now been advised that CW was appointed by Panopticrypt as sole manager for the term of up to three years and that this meant he could act in the capacity of trustee.

62. The TFN and ABN start date for DeMorgan is 26 August 2013.

63. A memo dated 5 August 2013 by DeMorgan records that Panopticrypt accepted the position of trustee of the Wright Family Trust.  This memo includes the ABN of DeMorgan which was not issued until 11 days later.[44]

64. The supply of the software sourced from W&K and MJF to DeMorgan by CW is evidenced by a Deed of Assignment and Charge signed and dated 15 July 2013.[45]  It is not clear from this deed whether DeMorgan had actually provided any other consideration for the supply of the software. The tax invoices issued from CW to DeMorgan (referred to below) imply that consideration was provided. Unlike the other entities, there appears to be no document transferring some of CW's purported interests in the Seychelles trust to DeMorgan. CW claims that despite the deed being executed subsequent to the date of the Deed of Assignment, there was an equitable trust in place and he was acting in his capacity as trustee of that trust.

65. In respect of these supplies, CW issued a tax invoice (INV-00096) dated 1 July 2013 to DeMorgan. That invoice refers to one of the NSW Supreme Court actions where the relevant statement of claim was filed on 25 July 2013.

66. CW has recently stated in interview with Counsel on 11 August 2014 that he backdated these invoices, despite advice from Jamie Wilson (a former director of Coin-Exch) that he shouldn't.

67. It is further noted that CW issued invoices to the related companies on 22 August 2013 accompanied by Intellectual Property Licence agreements. As this was a direct agreement with the respective companies it suggests that there was no involvement of DeMorgan in the process. The agreements (dated in August) advise that CW has clear title to the IP based on the judgements of the court cases (which had not yet been handed down). CW has since provided updated deeds and invoiced which are understood to be an intended replacement for these documents.

---

[44] This discrepancy was explained by reference to a later resolution of the directors of Panopticrypt that once the ABN had been allocated to the trust, all prior records would be amended to include the trust's ABN.

[45] It is noted that the deed recorded the ABN of DeMorgan which was issued on 26 August 2013 and that the trust deed for DeMorgan was executed on 9 August 2013.

SENSITIVE: LEGAL

CONFIDENTIAL                                                                    DEF_00067267

| SENSITIVE: LEGAL | GAAR PANEL SUBMISSION<br>CRAIG STEVEN WRIGHT & RELATED ENTITIES |
|---|---|

## TRANSFERS FROM DEMORGAN TO RELATED ENTITIES

### Coin-Exch

68. Coin-Exch was incorporated and registered with ASIC on 17 April 2013. At the time of registration the sole director and secretary was CW.  CW advised in interview on 11 August 2014 that there was no business plan developed for Coin-Exch and he conceded that there was no possibility of a profit in the near future.

69. Share capitalisation was by way of 57,000 (or 217,800??) bitcoin (later revised as rights to trust which holds bitcoin) from CW, plus a further amount of 438,857 bitcoin from an unknown source (the ATO does not have details of this transaction????).

70. Coin-Exch was issued invoices by DeMorgan dated 1 July 2013 in relation to the licensing of Core Banking and Exchange Software, including some software purported originating from Al Baraka and some software originating from W&K (which was the subject of a NSWSC action).

71. Prior to 18 February 2014, CW and his related entities claimed that all transactions between related entities were made in bitcoin. Share capital contributions were also made in bitcoin.  A Private Binding Ruling was issued to CW on 23 December 2013 stating that the supply of bitcoins was a taxable supply.  When asked for evidence of transactions, CW advised the evidence was Xero accounting records (a cloud based accounting platform used for record keeping by CW for all of his related entities). On 18 February 2014, Clayton Utz advised that the bitcoin transactions were not transfers of bitcoin, but rather, the transfer of equitable interests in bitcoin that CW holds in an offshore trust, and the subject of a Deed of Loan with Design by Human Ltd (see further details regarding this loan below). Additional documents were later provided showing agreements between entities to exchange rights.

72. ATO analysis of the transactions show that there does not appear to have been sufficient bitcoin borrowed by CW to fund all of the transactions which he claims to have undertaken.  Transactions show the round-robin nature of the bitcoin; from CW to each of the related companies either via capitalisation or a loan, then on-paid to DeMorgan to pay for the license fees, who then paid CW for the software.  A diagram demonstrating this can be found at Attachment K. Additionally, most of the wallets held in the trust were transferred to MJF and therefore cannot have been available for use in the group.



| SENSITIVE: LEGAL | PAGE 15 OF 31 |
|---|---|

CONFIDENTIAL

| SENSITIVE: LEGAL | GAAR PANEL SUBMISSION |
|---|---|
| | CRAIG STEVEN WRIGHT & RELATED ENTITIES |



**[s 38]**

**Cloudcroft**

84. Cloudcroft registered for GST on 15 March 2011. The majority shareholder since a July 2012 is Panopticrypt which acquired 5,000,000 shares on that date.  On 15 November 2012 CW acquired 120,000 shares.  CW is the sole director.

85. CW has advised that there was a capital subscription of 474,332 bitcoin (or rights to bitcoin).

86. Cloudcroft lodged a BAS for the period ending 31 September 2013 showing purchases of a security software licence from CW for $31,000,000. CW has since advised that this invoice was issued in error.

---

[46] There was also a disagreement about whether the original contract specified that Rubik would be able to deliver banking software to 8 decimal places, in place of the standard 2 decimal places.

| SENSITIVE: LEGAL | PAGE 16 OF 31 |
|---|---|

CONFIDENTIAL

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

87. In that same BAS, Cloudcroft declared total sales of $3,123,500, which included export sales of $3,100,000 for the transfer of software to Denariuz SG, a Singapore based company, controlled by CW.

88. A BAS was lodged by CW with these details, and resulted in a net refund of $2,834,648. This amount has been retained under s 8AAZLGA of the TAA.

89. CW has subsequently advised the ATO that the transfer from CW was a mistake and should have been from CW to DeMorgan, and then from DeMorgan to Cloudcroft.

90. As with all other companies in the group, there are no sales to independent third parties and the only cash flow is generated through ATO refunds.

**THE SEYCHELLES TRUST**

91. On 23 October 2012, CW purportedly entered into a Deed of Loan with Design by Human Ltd UK (Design by Human) and Panopticrypt Pty Ltd acting for Denarius Seychelles International Trust (the Trust). The deed records a loan to CW in the form of bitcoin. The principal borrowed was 650,000 bitcoin, and the drawdown date was 1 July 2013. This is an interest only loan at the rate of 0.05% per annum with repayments commencing 30 July 2016 and repayment in full by 30 June 2020. The Deed records a First/Second mortgage over Permanent Success Limited UK (Permanent Success) being the whole of shares comprised in UK company reference 08260048 and all related trusts as collateral security.

92. The Deed is executed by CW on behalf of the Trust as guarantor and in his own capacity as mortgagor. Ms Uyen Nguyen executed the deed for Design by Human. The Consent to Act document attached at the end of the Deed states that Uyen Nguyen accepts the position of Chief Operating Officer of Design by Human and Permanent Success from 18 October 2012 and consents to act as Director from the later date of 30 June 2013. It was advised to CW that there is no record of Uyen Nguyen ever holding the position of Director of Design by Human and no link between him and this company until January 2014. Companies House records were then updated on 10 April 2014 to enter Uyen Nguyen retrospectively as director, as of 12 October 2012. It is unclear whether the Deed was validly executed.

93. An Appendix to the Deed lists the 26 bitcoin blockchain addresses which were the subject of the Deed and contains a note that "As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW (CW)". The Deed states that the money referred to in this deed has been received by CW.

94. Documents provided to substantiate the updated position suggest that on 1 July 2013, CW entered into two Deeds of Assignment of Equitable Interests with Coin-Exch and Hotwire. Under the Deeds, CW assigned to each of the companies all the rights under the contract. These Deeds both state that they were signed in the presence of Uyen Nguyen. CW has since advised that they were signed electronically, and witnessed as part of a Skype conversation.

95. It is noted that 22 of the 26 listed bitcoin addresses loaned to CW were purportedly transferred off blockchain to MJF on 15 August 2013 and 15 September 2013. As a result of that transfer, it appears that 4 wallets purportedly remained in the Seychelles

SENSITIVE: LEGAL

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 18 of
1-5WHAER2                                              137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 18

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

trust with a total of 275,071 bitcoin, (applying the exchange rate for bitcoin to Australian dollars at that time, the purported bitcoin holdings would have been worth $42,361,050 at this date).

96. Documents obtained from Companies House in the UK suggest that Design by Human was a dormant shelf company until January 2014, and in the control of CFS Secretaries (a company creation entity). There is no evidence of this entity undertaking any trading activities. In January 2014 the company name changed and CW was appointed as Director. The ATO holds records of transactions in which payments were made to CFS Secretaries around February 2014 by parties associated with CW. It was advised to CW in March that Uyen Nguyen was never a Director of Design by Human. Shortly thereafter, Companies House records were updated with a retrospective appointment of Directorship in the name of Uyen Nguyen.

## SECTION 4 – THE OPERATION OF RELEVANT TAX LAW, OTHER THAN THE GAAR

97. An ITC entitlement arises for a creditable acquisition.[47] A GST refund arises where ITC entitlements attributable to a tax period, exceed GST payable on taxable supplies for that tax period.[48]

98. The 4 elements required for a creditable acquisition are:[49]
    a. You acquire anything solely or partly for a creditable purpose;
    b. The supply of the thing to you is a taxable supply;
    c. You provide, or are liable to provide, consideration for the supply; and
    d. You are registered or required to be registered.

99. An acquisition is defined broadly to include an acquisition of rights.[50] An entity may be registered if it is carrying on an enterprise.[51] The concept of an enterprise is defined broadly[52] and includes activities undertaken in commencing the enterprise and activities undertaken in winding up the enterprise.

100. Although the following analysis in relation to application of the core GST provisions, are made specifically in relation to Coin-Exch, similar arguments would apply to the other entities for which refunds have been retained. At this stage, we have advice from CW only in respect of Coin-Exch which goes to whether that entity was carrying on an enterprise. The situation for other entities on the enterprise question may differ [s 38]

---

[47] Section 11-20 of the GST Act.
[48] Sections 17-5 and 35-5 of the GST Act.
[49] Section 11-5 of the GST Act
[50] Section 11-10 of the GST Act
[51] Section 23-10 of the GST Act
[52] Section 9-20 of the GST Act

SENSITIVE: LEGAL

PAGE 18 OF 31

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

101. In the interim report issued to the taxpayer on 8 April 2014, we concluded that Coin-Exch:

    a.  Has not acquired any software from the DeMorgan because:

        i.   The contracts said to be entered into between CW and W&K Info Defence LLC (W&K) pre-date the existence of W&K as a limited liability company such that the transaction could not have taken place. Further, the software said to have been acquired from W&K  was that developed for the US Department of Homeland Security (DHS) for which funding had been provided. Third party checks stated that W&K was never successful in its bids for funding and had never been engaged by DHS to develop software. On this basis we did not think that CW had acquired anything from W&K which meant that nothing was passed on to DeMorgan which could have been the subject of a supply/acquisition by Coin-Exch;

        ii.  In respect of the software acquired from MJF, we conclude that based on the evidence, it was Hotwire which acquired the Siemens and Al Baraka software and not CW nor DeMorgan. Hence, as legal title was with Hotwire and there is no agreement between Hotwire and Coin-Exch, there could not have been a supply of the software to Coin-Exch as purported;

        iii. We also raised concerns with the dates of the transactions between DeMorgan and Coin-Exch which appeared to take place before DeMorgan had been formed. Some documents provided to substantiate the supply of the software pre-dated the formation of DeMorgan, and yet contained the ABN of that entity which was not provided until months after the purported date of the contract.[53]

    b.  If Coin-Exch did acquire anything, there was no consideration provided for that acquisition.  Coin-Exch alleges that it paid consideration in the form of rights to an interest in the Seychelles trust. We questioned the validity of this statement given that the trustee for the offshore trust was a shelf company at the time of the alleged transaction and that the person executing the deed lacked the authority to do so.[54]

102. Implicitly in the interim report, it is accepted that at the time of the relevant purported acquisition, Coin-Exch had acquired the software as part of its enterprise, and that it was entitled to be registered for GST purposes. However, statements made by CW at the interview of 11 August 2014 suggests that there was never a business plan in place for Coin-Exch nor did he expect that Coin-Exch would ever make a profit.[55] These

---

[53] Deed of Assignment and Charge between CW and DeMorgan dated 15 July 2013. The trust deed is dated  9 Aug 2013 and its ABN began on 26 Aug 2013.

[54] There were no records of that person, Uyen Nguyen, being appointed as a director, although a consent to act document was appended to the deed of loan showing that she had accepted the position of chief operating officer from 18 October 2012, and was to become a director from 30 June 2013. Later inquiries established that an application to add her as a director, backdated to October 2012, was submitted with Companies House (UK) in April 2014.

[55] cf *Commisioner of Taxation v Swansea Services Pty Ltd* [2009] FCA 402

SENSITIVE: LEGAL

CONFIDENTIAL

DEF_00067272

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 20 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 20

comments bring into question whether there was in fact an enterprise being carried on by Coin-Exch.

103. In response to the interim report, the taxpayer's representatives contended that there was an acquisition and consideration was at the very least required to be paid. Specifically they stated:

a.  In relation to the W&K software, it is irrelevant whether or not DHS had provided funding for any projects – the fact remains that software was developed and that CW, at the time of the transfer of that software had possession of it.[56] Whether he had legal title to the software is irrelevant for GST purposes.[57] He had software that he supplied to DeMorgan. It is further argued that he later obtained legal title to that software through the NSW Supreme Court matters,[58] and at that time, pursuant to the contract between CW and DeMorgan,  legal title was passed onto DeMorgan and then to Coin-Exch.  It was clearly the intention of the parties that legal title to that software pass to the relevant entity.

b.  The errors on the tax invoices issued by DeMorgan[59] were due to the new accounting software and new personnel of this entity. Despite this, during the relevant tax period[60] the trust was established, it was registered for GST and it was capable of issuing tax invoices to Coin-Exch for taxable supplies it made. Further, section 29-70(1A) of the GST Act allows the taxpayer to treat a tax invoice as valid despite it missing some information so long as the correct information can be ascertained from other documents provided between the entities.

c.  It is irrelevant whether Coin-Exch has in fact provided consideration. As an accruals based taxpayer, it is entitled to claim input tax credits in a period where an invoice is issued for the taxable supply being acquired and it is liable to provide consideration for that acquisition. In order to deny the input tax credit the ATO would have to establish that Coin-Exch did not have a liability to provide consideration. The terms of the IP deed of assignment makes it clear that Coin-Exch was liable to provide consideration to DeMorgan which correlates to the invoices issued by DeMorgan.

d.  Notwithstanding this, it is contended that consideration was in fact provided. Pursuant to the deed of loan between CW and the trustee of the Seychelles trust, at CW's instructions that trustee transferred Bitcoin to the recipients nominated by him.  The conclusion that the deed of loan has no effect is contrary to the conduct of the parties.

---

[56] At the meeting of 3 June 2014 between ATO (Andrew Miller and Stuart Coulson) and the taxpayer and his representatives (in attendance were Andrew Sommer (Clayton Utz), Dr Craig Wright, Ramona Watts and Alan Penderson), some software was viewed which was purported to be that acquired from W&K. Following that meeting, there were some questions raised as to whether such software was indeed valued at $56,786,649 (pursuant to the NSW Supreme Court decisions). The issue of valuation is discussed further under Division 165.

[57] On the basis that the definition of 'supply' in GST Act 9-10 is so wide as to be able to encompass equitable rights to the software even if at that time CW did not have legal title to the software.

[58] NSWSC Cases 2013/225983 and 2013/245661.

[59] Each of the tax invoices issued by DeMorgan to Coin Exchange were dated 1 July 2013 and contained its ABN, despite the fact that DeMorgan was established on 9 August 2013 with an ABN being issued on 26 August 2013.

[60] 1 July 2013 – 30 September 2013.

CONFIDENTIAL
DEF_00067273

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 21 of
1-5WHAER2        Documents provided by the ATO to the General Anti-Avoidance Rules Panel                Page 21
137

*Whether the backdating of the documents was effective to establish that a supply was made*

104. *McDonald v Commissioner of Taxation* [2001] FCA 305 concerned the effectiveness of backdating a contract for the sale of land to 13 September 1985 in avoiding tax on a capital gain from a post-CGT subdivision and disposal. Stone J with whom the other members of the Full Court agreed observed at [20], that upon making a binding contract the "*parties may agree that one of the terms of the contract is that certain obligations under it are to be retrospective to a specified date. However, the date of the formation of the contract is a matter of law and the parties cannot, by backdating the written document, rewrite history with the effect that a binding contract existed from the specified date*".

105. It is noted that a supply for GST purposes does not require substantiation by way of contract. However, in the context of an arrangement where the thing supplied by its very nature takes it value and existence from an intangible set of rights, such as a licence to use intellectual property, it is difficult to see how a supply of such a thing can be made other than by way of a [written] agreement between the parties. We would maintain that a backdated agreement cannot have the effect of 'rewriting history', such that DeMorgan is said to have supplied rights to intellectual property it could not have owned because it did not yet exist.

*Was consideration able to be provided*

106. We continue to have serious doubts about whether consideration can be provided by Coin-Exch for the purported acquisition of the software. As demonstrated in the spread sheet at Attachment I, it appears that there was insufficient bitcoin held by the Seychelles trust to service all of the obligations to pay consideration undertaken by the various entities.

## SECTION 5 – THE OPERATION OF ANY RELEVANT NON-TAX LAW

107. Sham refers to a document which is intended to give 'the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intended to create'.[61]

108. A sham arises where there is an intention common to transacting parties that the transaction is a concealment or disguise for some other and real transaction or for no transaction at all.[62] The test as to the parties' intention is subjective. As stated by Kirby J in *Raftland Pty Ltd v FC of T*:[63]

> Neither the complexity nor the artificiality of a transaction, nor any circularity evident in it, nor the apparent lack of commercial or economic sense will of

---

[61] *Snook v London & West Riding Investments Ltd* [1967] 2 QB , as referred to by Lockhart J when explaining sham under Australian law at [16] in *Sharrment Pty Ltd v Official Trustee in Bankruptcy* [1988] FCA 179. Note also the more recent reference to *Snook* as forming the basis for sham in the specific context of its application to tax invoices by Edmonds J at [97] in *Professional Admin Service Centres Pty Ltd v Commissioner of Taxation* [2013] FCA 1123 at [97].

[62] *Richard Walter Pty Limited v Commissioner of Taxation* (1996) 67 FCR 243 at 257G–258B; see also *Raftland Pty Ltd v Federal Commissioner of Taxation* (2007) 65 ATR 336.

[63] [2008] HCA 21 at [149]

---

CONFIDENTIAL                                                                    DEF_00067274

themselves, alone or in combination, necessarily warrant a conclusion that a transaction constitutes a sham.

109. This point was confirmed in *Fitzroy Services Pty Limited v Commissioner of Taxation*[64] where Emmett J concluded that in relation to a loan where interest was not in fact payable, it is not enough to prove, by inference from circumstantial evidence that the transactions were uncommercial or not genuine.[65]  No enactment is needed to nullify a transaction to the extent it is a sham. [66]

*The MJF transaction – did it in fact occur?*

110. If CW didn't in fact acquire software from MJF, then invoices and purchase agreements purporting to evidence that this acquisitions occurred, or which purported to stipulate the terms on which the acquisitions were made, may be called shams.

111. Evidence of the absence of a common intention between the parties to these documents that they were to represent the transactions described on their face would support a finding of sham.[67] However, this conclusion requires further evidence as to the parties' subjective intention which we do not appear to have. Such an inference does not appear to be available from the evidence we do hold. Even if this were the case, the sham argument applies to the assessment to tax for CW rather than Coin-Exch, and only in respect of the acquisition of the software from MJF.

112. It is also noted that if that acquisition did not occur whether or not they are called shams, invoices purporting to record otherwise would be ineffective to substantiate ITC claims. As put recently by the AAT '*...a tax invoice does not create a taxable supply; it records one. If a taxable supply did not take place, then a "tax invoice" is meaningless. In other words, documents that are so called "tax invoices" cannot substantiate a creditable acquisition, if in fact there was no supply or acquisition.*'[68]

113. Hence, quite separately from sham, if CW didn't acquire software from MJF then invoices purporting to show otherwise would be 'meaningless' or a nullity. A tax invoice can only substantiate a taxable supply that has in fact occurred. Additionally, if these were the facts there would be limited need or scope to consider applying Division 165 to CW.

114. Ultimately, if it can be established that the purported software supply from MJF did not occur, evidence that the invoice and agreement was a sham might be most useful in addressing the matters referred to in section 165-15 of the GST Act as part of progressing the application of Division 165 of the GST Act to negate GST benefits obtained by CW and his associated entities.

---

[64] [2013] FCA 471
[65] *Fitzroy Services* [2013] FCA 471 at [27] – [34].
[66] *Jacques v Federal Commissioner of Taxation* (1924) 34 CLR 328 per Isaacs J at 358.
[67] Evidence of a lack of common intention was relied upon to conclude that there was sham in *Professional Admin Service Centres Pty Ltd v Commissioner of Taxation* [2013] FCA 1123.
[68] *Bayconnection Pty Ltd v Commissioner of Taxation* [2013] AATA 40 at [86]; See also *R.V. Investments (Aust) Pty Ltd as Trustee for the RV Unit Trust* [2014] AATA 158 at [72].

CONFIDENTIAL
DEF_00067275

1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel                Page 23

| SENSITIVE: LEGAL | GAAR PANEL SUBMISSION<br>CRAIG STEVEN WRIGHT & RELATED ENTITIES |
|---|---|

*Transactions between Coin-Exch and CW and Coin-Exch and DeMorgan*

115. In relation to transactions between CW and the entities related to him, there appears to be some evidence that certain documents were intended as a disguise for either different transactions, or no transactions.

116. In particular, on 1 July 2013 CW signed two Deeds of Assignment of Equitable Interest, both purporting that he wished to assign *all* of his interests under a loan contract (rights to borrow 650,000 BTC), to two different companies, Coin-Exch and Hotwire.  Each of the two Deeds were purportedly signed in the presence of Uyen Nguyen.  It seems clear that it was not possible to assign all of the rights to two separate companies at the same time.

117. Furthermore, despite having purportedly assigned the rights to the 650,000 BTC, CW also utilised part of this amount to fund other transactions, including the purported payment to MJF and possibly the capitalisation of other entities. On current evidence it is not clear which entities obtained the rights and to what extent as the documents appear to be contradictory.

118. Subsequently, invoices were issued to Coin-Exch and Hotwire which were purportedly paid, using as consideration the rights to BTCs which the companies had acquired pursuant to the Deeds of Assignment. A further analysis of the flows of rights to the Bitcoin through the different entities suggests that there were insufficient funds to support the consideration said to have been paid by the various entities. Further, CW, despite being recorded as a director of the corporate trustee of the Seychelles trust, has stated that he is not entitled to access any of the documents of the trust until 2015. There is also further evidence from Rubik from which an inference could be drawn that there was not a serious intention by the parties to set up a Bitcoin bank and use the acquired software in such an enterprise.

119. It may be possible to draw an inference from these facts and statements that the transactions between the related entities was a sham. The documents and evidence are inconsistent and further evidence provided by CW at the interviews conducted on 11 and 18 August may provide further support for such an argument.

## SECTION 6 - THE SCHEME

120. The scheme involved 7 steps.
Step 1: CW enters into a Deed of Loan with trustee of the Seychelles trust on 12 October 2012 to obtain 650,000 bitcoin
Step 2: CW acquires software from MJF at a purported cost of $38,461,471.
Step 3: CW initiates a court action to confirm legal title to W&K software at an inflated value, being $58,786,649
Step 4: CW assigns the right to call for the bitcoin able to be drawn down under the Deed of Loan to his related entities Coin-Exch and Hotwire
Step 5: CW sells the intellectual property and software above to his family trust (DeMorgan) and Cloudcroft at a price reflecting his purported cost bases.
Step 6: DeMorgan licenses the software and IP to entities related to CW. The licences are paid for by rights to call for bitcoin provided to those entities by CW.
Step 7: The related entities lodged BAS and claim input tax for the acquisition of the licenced software, resulting in significant refunds.


## SECTION 7- THE COUNTERFACTUALS

| SENSITIVE: LEGAL | PAGE 23 OF 31 |
|---|---|

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 24 of
1-5WHAER2                                                    137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 24

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

121. But for the scheme, it is reasonable to expect CW would have continued to develop the software he had acquired from W&K as part of the enterprise carried on by Hotwire.[69]

122. Alternatively, he could have transferred, sold or licensed the W&K software to his Family Trust at a lower value (in a similar way to his transfer of the software from Integyers to Dave Kleiman). The further development of the software could have continued in the trust and any banking business could have been set up in a separate entity, if it was commercially important to separate the use of the software from its legal ownership.

123. All counterfactuals achieve the objectives of not subjecting the Family Trust to any upfront cost or financial risk in the absence of the successful commercial development of the bitcoin software . The counterfactuals premised on CW doing something else but for the scheme, provide it with the same opportunities to develop the bitcoin venture.

## SECTION 8 – THE GST BENEFITS AND THE AVOIDER

124. The ITCs claimed by each related entity is outlined in the table below, by claiming these ITCs each of the entities has obtained a GST benefit from the scheme and are the avoiders.[70] The GST benefits were the amount by which the ITCs have reduced each entity's net amount, which in most cases has resulted in a negative net amount (ie: a GST refund).

| Taxpayer | ITCs |
|---|---|
| CW | 1,880,000 |
| Cloudcroft Pty Ltd | 2,836,794 |
| Coin-Exch Pty Ltd | 3,787,429 |
| [s 38] | |
| Trustee for the Wright Family Trust | 2,589,379 |

Note that working papers for some entities have not been provided so the figures suggested above may need to be adjusted to take account of further information received after a decision on Division 165 is taken.

## SECTION 9 – WEIGHING THE FACTORS AND APPLYING THE PURPOSE AND PRINCIPAL EFFECT TESTS

### The first factor - the manner in which the scheme was entered into or carried out

125. CW has admitted in interview of 11 August 2014 that he did not expect Coin-Exch to generate any profits in the near future. The manner in which he negotiated the acquisition of the MJF software lacks any sense of commerciality, in that all correspondence was done by Skype between CW and Mark Ferrier directly. It does not appear that he had sought any legal or commercial advice on the transaction, despite it being valued in the millions.

---

[69] Hotwire appears to be the only entity which had employees and a business premises.

[70] Within the meaning of paragraph 165-5(1)(a) of the GST Act.

SENSITIVE: LEGAL

CONFIDENTIAL

DEF_00067277

126. The proposition that CW had intended to acquire completed software in order to break it up into component parts and distribute it amongst the related entities through his family trust appears to be unnecessarily complex in order to achieve his main aim of setting up a Bitcoin bank. The price paid for software acquired, if the valuations are to be accepted, was approximately $77 million (that is, the combined price for the MJF and W&K software). He has noted that in order to do what he wants to do, he would need to spend approximately $500 million developing the relevant banking platform.[71] This appears to be an extraordinarily expensive way of developing bespoke software compared to hiring programmers to develop the software for him (which is something which he appears to have tried in relation to the Rubik contract with Hotwire).

127. The use of the Seychelles trust to provide equitable interests in bitcoin rather than using bitcoin as consideration for these acquisitions enables the entities to generate a net negative amount for the September 2013 quarter. If bitcoin were used as consideration, then the GST payable on the supply of that bitcoin by the relevant entity would have cancelled the benefit of the ITCs claimed and so result in a nil amount for the entity in that period.

128. To the extent it might have been reasonable to expect CW to have done something but for the scheme, the counterfactuals provide CW with the opportunity to have profited from the sale or licensing of the software in a more straightforward manner.

## Conclusion

129. The first factor points towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above and that they entered into the scheme with this as their dominant purpose.

### The second factor – the form and substance of the scheme

130. Much of the discussion in relation to the sham argument outlined above is relevant in this context. In form the agreements sought to create an impression that each entity was acquiring the exclusive licence to a specific part of the software purportedly held by DeMorgan in order to develop the software for use in its business. It is not clear whether once the software was divided into components whether it could in fact be used by the entities at all, at least without some substantial amount of work and further development.

131. The contracts between the entities evidences an intention to provide consideration for the acquisition of the relevant component of the software but in reality it appears that there is insufficient trust property available in the Seychelles trust to support all of the relevant transactions. Having regard to this aspect of the scheme, the entities would be unable to provide any consideration for the acquisitions despite having an obligation under the relevant contracts to do so.

132. In substance, none of the entities did anything with the software other than Hotwire, and by his own admission, CW stated that Coin-Exch did not have a business plan and was not expected to generate a profit in the near future.

---

[71] This statement appears to allude to further research and development tax offset claims which CW has already applied to Hotwire and other entities in the 2014 income year.

CONFIDENTIAL                                                                                                DEF_00067278

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 26 of
1-5WHAER2                Documents provided by the ATO to the General Anti-Avoidance Rules Panel                Page 26
                                                137

**Conclusion**

133. The second factor points towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above and that they entered into the scheme with this as their dominant purpose.

**The third factor – the purpose or object of the GST Act (whether or not expressly stated)**

134. The following passages based on the AAT decisions in *VCE v Commissioner of Taxation* and *Bayconnection* are relevant:

> An input tax credit is dependent on there having been a taxable supply on which GST is payable. Some correlation between payment of GST and an input tax credit is assumed. The consideration paid, or payable for an acquisition will generally include an amount on account of GST. The supplier will pay the GST to the Commissioner. In practical terms, the input tax credit effectively lightens the acquirer's burden in a transaction, by allowing the acquirer to claim the GST, or part of it, from the Commissioner. *An input tax credit does not represent some sort of bounty that the Commissioner bestows upon a person.* It is more appropriately regarded as an alleviation of the burden that a person has borne in paying the price for an acquisition.[72] (emphasis added)

> The GST system contains a degree of symmetry whereby what is a taxable supply for a supplier may lead to a creditable acquisition for the recipient of that supply. In such a case the GST payable by the supplier is creditable (refunded) to the recipient. Section 11-25 of the GST Act provides that the amount of the ITC available is equal to the amount of the GST payable – not paid – by the supplier on the taxable supply. *But it is surely a bold position for a taxpayer to say that*, as a purported recipient of a taxable supply, *it can comfortably claim back from the Commissioner the GST amounts that the entity on the other side of the alleged transaction* – controlled by the same family, and whose BASs were prepared by the very person who was lodging the ITC claims – *did not pay to the Commissioner in the first place.*[73] (emphasis added)

135. It has been stated by CW's advisors that the 'inter-group' transactions between the DeMorgan and the related entities would 'net out' given DeMorgan is paying GST on the supply of the software which is then claimed as an ITC by the relevant related entity (eg: Coin-Exch, Hotwire etc). However, that GST liability is offset by DeMorgan claiming ITCs on its acquisition of the software from CW. The ultimate liability for GST on the relevant acquisitions appears to rest with the third parties, principally MJF.

136. This scheme results in an unintended 'bounty' by entities controlled by CW claiming ITCs and receiving refunds of GST never paid by MJF or W&K (which is a US resident entity, who does not appear to be registered for GST). Hence the scheme distorts the symmetry contemplated by the GST Act. Neither CW nor his associated entities bore the burden of any GST ultimately remitted to the Commissioner in the consideration it purportedly paid for the rights.

**Conclusion**

137. The third factor points towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above entered into the scheme with this as their dominant purpose.

---

[72] *VCE v Commissioner of Taxation* [2006] AATA 821 at [136]. See also *Simon Harland as Trustee for the PCS Global Discretionary Trust v Commissioner of Taxation* [2013] AATA 930 at [160].

[73] *Bayconnection Property Developments Pty Ltd v Commissioner of Taxation* [2013] AATA 40 at [77] and [79].

CONFIDENTIAL                                                         DEF_00067279

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

**The fourth and fifth factors - the timing of the scheme and period over which it was entered into or carried out**

138. All of the transactions were planned to take place in the same tax period – 1 July 2013 to 30 September 2013. CW has admitted to backdating tax invoices to the beginning of that tax period because 'it made sense to him' because those were the dates on which he had wanted the transactions to occur.

139. The NSW SC settlement agreement appears to be back-dated to 9 July 2013 in order to come within this period, despite the fact that the decision in these matters was handed down in November 2013. This appears to be a deliberate attempt to ensure that the acquisition of the legal title to the W&K software was recorded at a time which enabled CW to transfer those rights to DeMorgan and for DeMorgan to supply that software before the 30 September 2013.

**Conclusion**

140. The fourth and fifth factors point towards the conclusion that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above and they entered into the scheme with this as their dominant purpose.

**The sixth factor - the effect of the GST Act in relation to the scheme, but for Division 165**

141. The following points highlight some of the difficulties we have with denying the claim for input tax credits based on the terms of section 11-5 of the GST Act.

a. The taxpayer does hold some software which, to an extent answered the description of the Siemens software, Al Baraka source code and some source code which could have been acquired from W&K.

b. The values ascribed to that software appear to be inflated. However, there is no specific provision in the GST Act which requires that parties deal on arm's length terms.[74] The only provision which takes this type of evidence into account is Division 165 (discussed below).

c. Evidence from third party checks establish that the software purported to have been acquired through MJF from Siemens and Al Baraka were in fact not acquired from those sources. The taxpayer's representative states that CW had acquired software from MJF, which was ultimately supplied to Coin-Exch. An implication which could be made from the statements made by Al Baraka and Siemens is that the software held by the entities is either stolen or an illegal copy with no copyright attached. Whether or not it was stolen or obtained through illegal means is irrelevant – the transfer of the software would still constitute a supply. In GSTR 2006/9,[75] in relation to subsection 9-10(3) we state:

> 40. Subsection 9-10(3) states:
> It does not matter whether it is lawful to do, to refrain from doing or to tolerate the act or situation constituting the supply.
> Under the GST Act something that is done illegally may constitute a supply. For example, in applying subsection 9-10(3), the Commissioner considers that a

---

[74] Division 72 of the GST Act deals with associates and provides rules where no consideration has been provided, or supplies are made for *inadequate* consideration. There is no specific rule dealing with consideration which may be considered to be more than the market value of the relevant supplies.

[75] GSTR 2006/9: Supplies

SENSITIVE: LEGAL

PAGE 27 OF 31

CONFIDENTIAL

SENSITIVE: LEGAL

GAAR PANEL SUBMISSION
CRAIG STEVEN WRIGHT & RELATED ENTITIES

second hand car dealer who sells cars, which the dealer has either stolen or has received knowing they have been stolen, is making supplies.[76]

41. The European Court of Justice (ECJ), in interpreting the Sixth Directive, has held that the principle of fiscal neutrality precluded a generalised differentiation between lawful and unlawful transactions 'except where, because of the special characteristics of certain products, all competition between a lawful economic sector and an unlawful sector is precluded'.[77] The ECJ has held that there was no liability to VAT on the illegal distribution of prohibited drugs because their supply was subject to a total prohibition in the member states (except within strictly controlled economic channels for medical and scientific purposes).[78]

42. In contrast to the European position, under the GST Act something that is done illegally may still constitute a supply even where all competition between a lawful and an unlawful sector is precluded. For example, in applying subsection 9-10(3), the Commissioner considers that the illegal distribution of prohibited drugs, or the sale of 'fake' brand name handbags or clothing in breach of intellectual property rights, would constitute supplies for our GST purposes.

d. GSTR 2003/8,[79] contemplates a mixed supply comprising of the supply of the computer program and the assignment of copyright in the program. A supply of the computer program without the supply of copyright would be a supply of goods. TR 93/12[80] also contemplates that computer software can be acquired by purchase of a copy of a software program separately to any assignment of copyright. Therefore we cannot argue that there is no supply because the copyright, which itself only consists of intangible rights which can only be dealt with through contractual means, was not provided together with the software.

e. We have viewed the software in the possession of the taxpayer. Given the position taken in GSTR 2006/9, gathering further evidence to establish whether the goods were stolen would be irrelevant for the purposes of applying section 11-5 of the GST Act.

f. The IP deed of assignment between DeMorgan and Coin-Exch clearly states that consideration is to be provided on specific dates.[81] There does not appear to be any clauses in the deed which would suggest that consideration could be deferred until a later date or indefinitely such that there is no presently existing obligation to pay the amounts specified. The taxpayer has advised that the consideration was in fact pre-paid before the due date. This had the effect of bring forward the claim for input tax credits.

---

[15] See *Customs and Excise Commissioners v. Oliver* [1980] 1 All ER 353.

[16] See *Lange v. Finanzamt Furstenfeldbruck* [1993] ECR 1-4677, at paragraph 16 of the judgment.

[17] See *Mol v. Inspecteur der Invoerrechten en Accijnzen* (1988) 4 BVC 205 and *Vereniging Happy Family Rustenburgerstraat v. Inspecteur der Omzetbelasting* [1989] 4 BVC 216.

[79] GSTR 2003/8: supply of rights for use outside Australia at paragraph 93.

[80] TR 93/12: computer software at paragraph 16.

[81] The first payment was to be made on 30 August 2013, and following instalments to be paid on 30 August each year until 30 August 2017 (Schedule 1, IP Deed of Assignment dates 15 September 2013, page 31). However, tax invoices were issued for all instalments due under the deed. Taking into account the effect of 29-70(1A) of the GST Act, these tax invoices could be taken to have been issued on 15 September 2013.

SENSITIVE: LEGAL

CONFIDENTIAL

DEF_00067281

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 29 of
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 29
137

g.  There may have been some doubt as the validity of the deed of loan between CW and the trustee of the Seychelles trust (Design by Human located in the UK). However, Companies House records show that a request was made to register Uyen Nyguyen (the person signing the deed of loan on behalf of the trustee) as a director of the trustee backdated to October 2012 which provides support for the validity of this deed.

**Conclusion**

142. The sixth factor point towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above and that they entered into the scheme with this as their dominant purpose.

**The seventh & eighth factors - any change in the financial position of the relevant entities that resulted or may reasonably be expected to result from the scheme**

143. As noted above, the use of the Seychelles trust has removed a GST liability which would have otherwise arisen in relation to the acquisition of the licence to the software by the related entities when compared with using bitcoin (as was originally contended). Those liabilities would have cancelled the benefit of the claimed ITCs. Although no GST liability would have arisen if cash or a loan were used to finance the arrangement, that does not appear to be a viable counterfactual given the amount of consideration involved (ie: some $77 million). CW and none of his related entities appear to have enough collateral to raise this type of financing through traditional means.

144. None of the counterfactuals involve any adverse change to the net assets of CW on account of dealing with the software rights. The counterfactuals that assume CW would have done something but for the scheme provide CW and the related entities with the potential to profit from the software, without incurring any significant liabilities.

**Conclusion**

145. The seventh and eighth factors point toward the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above and that they entered into the scheme with this as their dominant purpose.

**The ninth factor - any other consequences of the scheme for the avoider**

146. There are no other material consequences identifiable, separately from those explained in the analysis of the other factors. This ninth factor is neutral.

**The tenth and eleventh factors – the nature of the connection between CW and connected entities, including whether dealings were at arm's length**

147. The connection between individuals and entities involved in and advantaged by the scheme is based on CW creating the related entities in order to carry out the relevant transactions.   These were not arm's length commercial dealings.

148. The facts surrounding the W&K agreements and subsequent NSW SC action suggests that the parties were not dealing at arm's length in determining the value of the software supplied. This conclusion is further supported by reference to the fact that the relevant software was transferred for $5,000 in 2010 and it does not appear from the evidence that it was developed to the stage that it would be worth in excess of $56 million in 2013.

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 30 of
1-5WHAER2                                           137
09:18:06v                Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 30

149. The manner in which the negotiations were undertaken for the MJF transactions suggests that at the very least the arrangement was not commercial.

**The twelfth factor - the circumstances surrounding the scheme and any other relevant circumstances**

150. As was noted above, for the past 2 years, 94% of CW's income or money to which he has access through entities he controls is comprised of GST or income tax refunds. It is clear, on his own estimations of cost for his bitcoin bank project, that it will be some time before any of these entities will generate a profit, despite the vast amounts of capital required for the scheme.

151. It is noted that other taxpayers operating in the same space have managed to set up payment systems to accept bitcoin; have opened bitcoin ATM's across Australia to provide a platform for investment and cashing in of a person's bitcoin investments and have developed other forms of financial investment business in respect of bitcoin. Each of these taxpayers appear to have been able to adapt current systems to enable the use of bitcoin without the extraordinary level of capital which CW has expended.

152. The eleventh and twelfth factors point toward the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities listed in paragraph 124 above and that they had entered into the scheme with this as their dominant purpose.

**Conclusion as to purpose and principal effect after considering the 12 factors**

153. The majority of factors point towards the conclusions that CW and his related entities entered into or carried out the scheme or part thereof, with the dominant purpose getting the GST benefits, and that the getting of those benefits was each scheme's principal effect. Accordingly, the requirements for making a declaration under section 165-40 of the GST Act negating the GST benefits are met.

**SECTION 10 – THE ARGUMENTS FOR THE TAXPAYER**

154. The Panel is asked to consider the potential application of Division 165 as a preliminary matter. Although the potential application of Division 165 has been highlighted with CW and his representatives, the taxpayers are yet to provide arguments in relation to this aspect of the matter. If the Panel agree that Division 165 should apply, then a position paper will issue to the taxpayer and his representatives and opportunity will be provided for their views to be put forward at the Panel meeting scheduled for October 2014.

**SECTION 11 – RECOMMENDATION**

155. Division 165 applies to the scheme and the Commissioner should make a declaration under section 165-40 of the GST Act that the net amount of each of the related entities listed in paragraph 124 above should be increased by the amount listed in the table for the tax period ended 31 September 2013 and   .

Updated 29 August 2014

SENSITIVE: LEGAL

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 31 of
137
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 31

SENSITIVE: LEGAL

## Index of attachments

| No. | Description |
|-----|-------------|
| A | GSTR 2014/D3 |
| B | ATO interim report for Coin-Exch and Hotwire dated 14 February 2014 |
| C | ATO revised interim report for Coin-Exch dated 8 April 2014 |
| D | Clayton Utz letter in response to revised interim report dated 9 May 2014 |
| E | Minutes of meeting at Clayton Utz 3 June 2014 |
| F | Note from Stuart Coulson (Trusted Access) |
| G | TCN advice concerning Div 165 and s 8AAZGLA of TAA |
| H | Summary diagram of scheme |
| I | Diagram of round-robin movement of bitcoin |
| J | Table of inconsistencies |
| K | Description of 'off-block chain' transfers |
| L | Spreadsheet showing bitcoin balances available |
| | |

SENSITIVE: LEGAL

CONFIDENTIAL

DEF_00067284

# Cover sheet for: GSTR 2014/D3

*Generated on: 1 September 2014, 01:11:26 AM*

This cover sheet is provided for information only. It does not form part of the underlying document.

You can access a <u>guidance paper</u> that has been issued with this draft Ruling. The guidance paper provides an overview of the tax treatment for transactions associated with crypto-currencies, specifically Bitcoin. Where other crypto-currencies have the same characteristics as Bitcoin, the information in the guidance paper applies equally to the taxation treatment for other crypto-currencies.

Released under FOI Act 1982
Australian Taxation Office

CONFIDENTIAL                                                                          DEF_00067285

09-122082
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 33



**Australian Government**
**Australian Taxation Office**

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

# Draft Goods and Services Tax Ruling

## Goods and services tax:  the GST implications of transactions involving bitcoin

Contents | Para
--- | ---
**PROPOSED LEGALLY BINDING SECTION:** |
**What this Ruling is about** | **1**
**Ruling** | **5**
**Date of effect** | **16**
**PROPOSED NOT LEGALLY BINDING SECTION:** |
**Appendix 1:** |
*Explanation* | **18**
**Appendix 2:** |
*Your comments* | **87**
**Appendix 3:** |
*Detailed contents list* | **89**

ⓘ      **This publication provides you with the following level of protection:**

This publication is a draft for public comment. It represents the Commissioner's preliminary view about the way in which a relevant taxation provision applies, or would apply to entities generally or to a class of entities in relation to a particular scheme or a class of schemes.

You can rely on this publication (excluding appendixes) to provide you with protection from interest and penalties in the following way. If a statement turns out to be incorrect and you underpay your tax as a result, you will not have to pay a penalty. Nor will you have to pay interest on the underpayment provided you reasonably relied on the publication in good faith. However, even if you don't have to pay a penalty or interest, you will have to pay the correct amount of tax provided the time limits under the law allow it.

## What this Ruling is about

1.      This draft Ruling explains the Commissioner's view on the goods and services tax (GST) consequences of transactions involving the use of Bitcoin.

2.      In particular, this draft Ruling considers whether bitcoin is 'money' as defined in section 195-1 of the *A New Tax System (Goods and Services Tax) Act 1999* (GST Act) and whether it is a 'financial supply' under subsection 40-5(1) of the GST Act.

3.      In considering the GST consequences, the draft Ruling focuses on the requirement that there must be a 'supply for consideration' for there to be a taxable supply. For the purposes of this draft Ruling, it is assumed that the other requirements in section 9-5 (taxable supplies) and section 11-5 (creditable acquisitions) of the GST Act are satisfied.

4.      All references in this draft Ruling are to the GST Act unless otherwise specified.

CONFIDENTIAL                                                                          DEF_00067286

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 34 of
1-5WHAER2                    137
                  Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 34

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

Page 2 of 24                                    Status:  **draft only – for comment**

## Ruling

5.        A transfer of bitcoin is a 'supply' for GST purposes.[1] The exclusion from the definition of supply for supplies of money[2] does not apply to bitcoin because bitcoin is not 'money' for the purposes of the GST Act.[3]

6.        The supply of bitcoin is not a 'financial supply' under section 40-5. Further, it is not an input taxed supply under paragraph 9-30(2)(b).

7.        A supply of bitcoin is a taxable supply under section 9-5 if the other requirements in section 9-5 are met and the supply of bitcoin is not GST-free under Division 38 (for example, as a supply to a non-resident for use outside of Australia).[4] A supply of bitcoin in exchange for goods or services will be treated as a barter transaction.

*Example 1:  bitcoin exchange transactions*

8.        *Liam carries on a business buying and selling bitcoin (BTC) as an exchange service online in Australia charging a 1% commission on the published exchange rate. Liam is registered for GST.*

9.        *David, who is not registered for GST, uses Liam's online service to exchange 10 BTC to Australian dollars. The exchange rate at the time of the transaction is 1BTC = AUD662. The commission is $66.20. David receives AUD$6,553.80 for his 10 BTC.*

10.       *The following day Karin who is registered for GST, wishes to purchase 10 BTC from Liam's online service for use in acquiring an asset for her business. The exchange rate is 1BTC = AUD662. Karin acquires the 10 BTC for AUD$6,686.20 plus GST. The GST inclusive amount of AUD$7,354.40 is calculated as follows:  10 BTC x AUD$662, plus AUD$66.20 commission, plus AUD$668.62 GST.*

11.       *Liam records this exchange transaction with Karin and includes the amount in his business activity statement. If Karin's acquisition is wholly for a creditable purpose, Karin may claim input tax credits for the GST she paid on the acquisition of the bitcoin. When Karin later acquires an asset in exchange for bitcoin, she will record the supply of bitcoin as a taxable supply and an equivalent credit may be claimed in respect of her asset acquisition.*

*Example 2:  bitcoin provided in exchange for goods or services*

12.       *Paul owns a computer shop and is registered for GST. He sells a server for a GST-inclusive price of $7,700 to Ross Co, a building company that is registered for GST. Paul agrees to accept bitcoin from Ross Co in exchange for the server.*

---

[1] Subsection 9-10(1).
[2] Subsection 9-10(4) excludes a supply of money from the definition of supply except where money is provided as consideration for the supply of money.
[3] 'Money' is defined in section 195-1.
[4] See section 38-190.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 35 of
1-5WHAER2                  Documents provided by the ATO to the General Anti-Avoidance Rules Panel                  Page 35
137

# GSTR 2014/D3

| Status:  **draft only – for comment** | Page 3 of 24 |
|---|---|

13.     *When Paul lodges his business activity statement, he includes $7,700 for the taxable supply of the server to Ross Co and claims credits of $700 for the acquisition of the bitcoin. When Ross Co lodges its business activity statement, it includes $7,700 for the GST inclusive market value of the bitcoin, and claims credits of $700 for the acquisition of the server.*

**Example 3:  merchant using an intermediary to accept bitcoin in exchange for goods or services**

14.     *Following on from Example 2 above, Paul has an agreement with an intermediary acting as his agent to accept bitcoin in exchange for goods and services. When customers provide bitcoin to the intermediary in exchange for goods and services, Paul pays commission to the intermediary equal to 1% of the price. The intermediary agrees to deposit Australian currency (immediately or within one day) into Paul's nominated bank account. There is no agreement between the customer and the intermediary.*

15.     *Two transactions occur here. First, the customer supplies bitcoin in exchange for the supply of goods and services from Paul as a barter transaction. The GST consequences of this are explained in Example 2. Second, Paul supplies bitcoin to the intermediary (through the transfer of bitcoin from the customer) for Australian currency which is treated as a taxable supply by Paul on which GST is payable. The intermediary provides Paul with taxable services for which the commission is consideration and the intermediary may claim credits for the acquisition of the bitcoin.*

# Date of effect

16.     When the final Ruling is issued, it is proposed to apply both before and after its date of issue. However, the Ruling will not apply to taxpayers to the extent that it conflicts with the terms of settlement of a dispute agreed to before the date of issue of the Ruling (see paragraphs 75 to 76 of Taxation Ruling TR 2006/10).

17.     While the ATO view will have application for periods prior to its publication, the ATO will not generally apply compliance resources to past year cases in relation to taxpayers who have behaved in a bona fide manner and made a genuine attempt to understand and satisfy their obligations.

**Commissioner of Taxation**

20 August 2014

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

Page 4 of 24                                                    Status:  **draft only – for comment**

## Appendix 1 – Explanation

❶       *This Appendix is provided as information to help you understand how the Commissioner's preliminary view has been reached. It does not form part of the proposed binding public ruling.*

**Relevance of the concepts of 'money' and 'currency' in the GST Act**

18.      Whether bitcoin is 'money' is relevant for determining whether the transfer of bitcoin is a 'supply' for GST purposes. A supply '…does not include a supply of money unless the money is provided as consideration for a supply that is a supply of money'.[5] The value of a taxable supply is calculated by reference to the price which is made up of consideration which is expressed as an amount of money and the GST inclusive value of non-monetary consideration.[6] Further, the value of that taxable supply must be expressed in Australian currency or translated into Australian currency if the consideration is expressed in a foreign currency.[7] Having regard to these provisions, 'money' is a central concept in determining whether there is a 'supply' for GST purposes, and the calculation of the GST payable on a taxable supply.

19.      'Money' is defined to specifically include, amongst other things, 'currency (whether of Australia or of any other country)'.[8] The term 'currency' is not defined. The meaning of each of these terms in the context of the GST Act is discussed in detail in the explanation below.

20.      Determining whether bitcoin is 'money' or 'currency' for the purposes of the GST Act requires consideration of the characteristics of Bitcoin.

**What is Bitcoin?**

21.      The *Oxford Dictionary of English*[9] defines Bitcoin as:

> a type of digital currency in which encryption techniques are used to regulate the generation of units of currency and verify the transfer of funds, operating independently of a central bank:  *bitcoin has become a hot commodity among speculators* | *If you want to buy something using bitcoin you need to make sure the seller accepts the cryptocurrency*.

---

[5] Subsection 9-10(4).
[6] Subsection 9-75(1).
[7] Section 9-85.
[8] Definition of 'money' in section 195-1.
[9] *Oxford Dictionary of English* [online] 3rd ed. viewed 7 August 2014 www.oxfordreference.com.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 37 of
1-5WHAER2            Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 37
137

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

| Status:  **draft only – for comment** | Page 5 of 24 |
|---|---|

22.      It is described by commentators as 'a virtual currency that essentially operates as online cash'[10] and as a 'crypto-currency, designed to reinvent the way that money works'.[11] Bitcoin operates as a decentralized peer-to-peer payment network whose implementation relies on the use of public-key cryptography to validate transactions involving existing bitcoin and in doing so generates new bitcoin.[12] The Bitcoin system is decentralized in that it is not under the control of a central authority.[13] Transactions on the Bitcoin network are denominated in bitcoin. The value of bitcoin is 'not derived from gold or government fiat, but from the value that people assign it'.[14]

23.      The process through which bitcoins are created and enter into circulation is called bitcoin 'mining'. Mining involves a 'miner' using freely downloadable Bitcoin software to solve complex cryptographic equations that essentially verify and validate transactions involving the transfer of existing bitcoins between other parties, for example to ensure an existing bitcoin cannot be transferred more than once by the one person. The first 'miner' to successfully solve an equation receives as a reward a specified number of newly created Bitcoins to their Bitcoin address. The process of 'mining' has been explained as follows:[15]

> The actual mining of Bitcoins is by a purely mathematical process. A useful analogy is with the search for prime numbers:  it used to be fairly easy to find the small ones (Eratothenes in Ancient Greece produced the first algorithm for finding them). But as they were found it got harder to find the larger ones.
>
> ...
>
> For Bitcoins the search is not actually for prime numbers but to find a sequence of data (called a 'block') that produces a particular pattern when the Bitcoin 'hash' algorithm is applied to the data. When a match occurs the miner obtains a bounty of Bitcoins (and also a fee if that block was used to certify a transaction). The size of the bounty reduces as Bitcoins around the world are mined.
>
> The difficulty of the search is also increased so that it becomes computationally more difficult to find a match. These two effects combine to reduce over time the rate at which Bitcoins are produced and mimic the production rate of a commodity like gold. At some point new Bitcoins will not be produced and the only incentive for miners will be transaction fees.

---

[10] Brito, J and Castillo, A 'Bitcoin:  A Primer for Policymakers', *Policy*, Summer 2013-2014, vol. 29, no. 4, pp 3-12.

[11] Bradbury, D 'The problem with Bitcoin', *Computer Fraud & Security* November 2013, issue 11, pp 5-8.

[12] Refer note 10 above at p 4.

[13] See also Guthrie, N 'The End of Cash? Bitcoin, the Regulators and the Courts' *Banking & Finance Law Review* Apr 2014, vol 29, no. 2, pp 355-367; Moore, T 'The promise and perils of digital currencies' *International Journal of Critical Infrastructure Protection,* 2013, pp 147-149.

[14] Refer note 10 above at p 4 and see also note 13 above:  Guthrie, N at 357 and Moore, T at p 147.

[15] Tindell, K 'Geeks Love the Bitcoin Phenomenon Like They Loved the Internet in 1995' *Business Insider* 5 April 2013. See also note 11 above at pp 5-6.

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

24.      Bitcoins that are already in circulation can be acquired either by exchanging 'national' or 'fiat' currencies[16] for them through an online exchange (or through a Bitcoin ATM), or by accepting them as a gift or in exchange for goods and services.

25.      Bitcoins are sent and received via Bitcoin addresses. A Bitcoin address is a long alphanumeric string used by the network as an identifier. A Bitcoin address can be generated at no cost by any user of Bitcoin and a person can have any number of Bitcoin addresses.[17]

26.      Bitcoin uses public key cryptography to make and verify digital signatures used in Bitcoin transactions.[18] Each user is assigned a 'public/private' keypair which is saved to that person's Bitcoin wallet. A Bitcoin wallet has been described as something 'that stores the digital credentials for [a person's] bitcoin holdings'.[19]

27.      The public key is an alphanumeric number that mathematically corresponds to the Bitcoin address which is publically known. The private key is also an alphanumeric number, however, it is kept secret as it is what allows the bitcoins to be transferred between Bitcoin addresses.[20] The private key is also mathematically related to the Bitcoin address. It is designed so that the Bitcoin address can be calculated from that private key, but importantly, the same cannot be done in reverse.[21]

28.      To transfer bitcoins, a person creates a transaction message with the number of bitcoins to be transferred and signs the transaction with their private key.[22] Those bitcoins are associated with the person's public key. The transaction is then broadcast to the Bitcoin network for validation through the Bitcoin mining process.[23]

29.      A bitcoin is only accessible by the person in possession of the private key that relates to the Bitcoin address associated with that person's bitcoin holdings. Accordingly, a bitcoin consists not just of the numerical amount (or balance) of bitcoins and the Bitcoin address to which they are associated, but also the related private key that allows the holder to do anything with those bitcoin.

---

[16] For example, Australian dollars, US dollars etcetera. 'Fiat money' is defined as 'Money that a government has declared to be legal tender, although it has no intrinsic value and is not backed by reserves. Most of the world's paper money is now fiat money.': *A Dictionary of Finance and Banking* (Oxford) 4th revised ed.

[17] See note 11 above at p 5.

[18] See note 10 above at p 4.

[19] Villasenor, J 'Secure Bitcoin Storage:  A Q&A With Three Bitcoin Company CEOs' *Forbes* 26 April 2014.

[20] See note 10 above at p 4.

[21] Wiener, H, Zelnik, J, Tarshish, I, & Rodgers, M 'Chomping at the Bit:  U.S. Federal Income Taxation of Bitcoin Transactions' *Journal Of Taxation Of Financial Products* (2013) vol. 11, no. 3, pp. 35-47 at 35.

[22] Kondor D, Posfai M, Csabai I, Vattay G 'Do the Rich Get Richer? An Empirical Analysis of the Bitcoin Transaction Network' (2014) *PLoS ONE* vol. 9, issue 2 pp 1-10 at p 1.

[23] See note 10 above at p 4.

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

**Is Bitcoin 'money' for GST purposes?**

30.     For the purposes of the GST Act, the term 'money' is defined in section 195-1 as:

> Money includes:
>
> (a)      currency (whether of Australia or any other country); and
>
> (b)      promissory notes and bills of exchange; and
>
> (c)      any negotiable instrument used or circulated, or intended for use or circulation, as currency (whether of Australia or of any other country); and
>
> (d)      postal notes and money orders; and
>
> (e)      whatever is supplied as payment by way of:
>
> > (i)       credit card or debit card; or
> >
> > (ii)      crediting or debiting an account; or
> >
> > (iii)     creation or transfer of a debt.
>
> However, it does not include:
>
> (f)      a collector's piece; or
>
> (g)      an investment article; or
>
> (h)      an item of numismatic interest; or
>
> (i)      currency the market value of which exceeds its stated value as legal tender in the country of issue.

31.     Generally the use of the term 'includes' indicates something broader than what follows in a statutory definition. Determining whether a broader meaning is intended and the content of that meaning is informed by the statutory context in which the term 'money' appears.[24] In determining whether bitcoin is 'money' for the purposes of the GST Act, it is essential to consider each of the specified items in the definition in section 195-1. Should bitcoin be 'money' then further consideration of the meaning of 'money' is not required.

**Is Bitcoin 'money' under any item listed in the section 195-1 definition?**

***Paragraph (a):  'currency (whether of Australia or of any other country)'***

32.     Paragraph (a) of the definition operates to include:

> 'currency (whether of Australia or of any other country)'.

33.     The term 'currency' in paragraph (a) of the definition of 'money' is qualified by 'of Australia' and 'of any other country'. The term 'Australian currency' is interchangeable with the term 'currency of Australia', which is prescribed a meaning under Australian law by virtue of the *Currency Act 1965* (Cth) (Currency Act).

---

[24] *ZY Finance Co Pty Ltd v. Cummings* (1964) 109 CLR 395 at 398-399 and *Blacktown Workers' Club Ltd v. O'Shannessy* (2011) 183 LGERA 184 at 190-191.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 40 of
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel
137                                                                                        Page 40

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

Page 8 of 24                                     Status:  **draft only – for comment**

34.      In *Leask v Commonwealth*[25] (*Leask*), in finding that
subsection 31(1) of *the Financial Transaction Reports Act 1988* (Cth)
was a law with respect to 'currency' within the meaning of paragraph
51(xii) of the Constitution, Brennan CJ stated:[26]

> Currency consists of notes or coins of denominations expressed as
> units of account of a country and is issued under the laws of that
> country for use as a medium of exchange of wealth.

35.      Gummow J further explained:[27]

> Section 8(1) of the *Currency Act 1965* (Cth) ('the Currency Act')
> states that the monetary unit, or unit of currency, of Australia is the
> dollar; s 9(1), so far as is material, requires every transaction,
> dealing, matter or thing relating to money or involving the payment
> of, or a liability to pay, money to be made, executed, entered into or
> done according to the currency of Australia, unless the currency of
> some other country is used; and s 11(1) requires that every
> payment, unless made according to the currency of some other
> country, be made according to the currency of Australia.
>
> …
>
> In *Watson v Lee* (167) , Mason J, with whom Gibbs J agreed, held
> that s 51(xii) gave the Parliament power 'to control and regulate the
> receipt and use' in Australia of foreign currency. Barwick CJ and
> Stephen J (with whom Gibbs J also agreed) spoke to the same
> effect (168). By parity of reasoning, the power also supports laws to
> control and regulate the receipt and use of coin and paper money in
> Australia, being the medium of exchange in Australia.
>
> Stephen J and Mason J also emphasised that, while 'coinage' and
> 'legal tender' involved quite specific and narrow concepts, the former
> being concerned with coins as money and the latter with the
> prescription of that which at any particular time may be a lawful
> mode of payment, 'currency' was a broader expression. This is
> exemplified by the provisions of the *Currency Act* to which I have
> referred earlier in these reasons. They illustrate the proposition that
> currency is a universal means of exchange, designated by a
> particular unit of account (169). (footnotes omitted)

---

[25] [1996] HCA 29; (1996) 187 CLR 579.
[26] *Leask* (1996) 187 CLR 579 at 595.
[27] Ibid at 617-618 and 622.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 41 of
137
1-5WHAER2        Documents provided by the ATO to the General Anti-Avoidance Rules Panel        Page 41

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

| Status:  **draft only – for comment** | Page 9 of 24 |
| --- | --- |

36.       Accordingly, the meaning of the 'currency of Australia' under the Currency Act is the requisite monetary unit of exchange established by that Act as a means of discharging monetary obligations for all transactions and payments in Australia. Conversely, 'the currency of some country other than Australia' – the only other species of 'currency' according to which transactions and payment obligations can be discharged consistent with the Currency Act – must be any monetary unit recognised by another country's laws for the same purposes. It is the legislative recognition of something as a monetary unit of exchange which makes that thing 'currency'. That 'currency' can only exist within a legal framework and as an exercise of sovereignty is an aspect of the State theory of money[28] insofar as it is only by 'fiat' of the State that legitimacy is conferred.

37.       It is a general principle of statutory interpretation that, where a statute uses words that have acquired a legal meaning, 'it will be taken, prima facie, that the legislature has intended to use them with that meaning unless a contrary intention clearly appears from the context'.[29]

38.       In *Gamer's Motors Centre (Newcastle) Pty Ltd v Natwest Wholesaler Pty Ltd*[30] (*Gamer's*) Priestley JA further elaborated:[31]

> The object of the approach is not to find the legal as opposed to the 'ordinary' meaning, but to find from the range of legal and ordinary meanings, which in any event will seldom be in watertight compartments, the meanings best suited to the statutory document as a whole.

39.       As noted above, the term 'currency' is not defined in the GST Act. It has both an ordinary meaning and a legal meaning. The *Macquarie Dictionary*[32] relevantly defines 'currency' as:

> 1        that which is current as a medium of exchange; the money in actual use;
>
> ………
>
> 5        circulation, as of coin.

---

[28] C. Proctor, *Mann on the Legal Aspects of Money* (Oxford University Press, 6th ed. 2005) at [1.12] – [1.15].

[29] *Attorney-General (NSW) v. Brewery Employees Union of New South Wales* (1908) 6 CLR 469 at 531. See also the discussion in Pearce and Geddes, *Statutory Interpretation in Australia* (7th ed. 2011) at 128 [4.13] which considers case authority which has both applied the rule and distinguished it based on the context of the particular case.

[30] (1985) 3 NSWLR 475. For an application of this principle see *Johnson v Native Title Registrar* [2014] FCA 142 at ([29]-[30]).

[31] (1985) 3 NSWLR 475 at 484. See also McHugh JA in *Gamer's* (1985) 3 NSWLR 475 at 494.

[32] *The Macquarie Dictionary*, [Online], viewed 23 June 2014, www.macquariedictionary.com.au.

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 42 of
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 42
137

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

Page 10 of 24                                    Status: **draft only – for comment**

40.     The dictionary definition focuses on the function of currency as a medium of exchange. The legal meaning is that taken from the Currency Act. The Currency Act forms part of the broader statutory context in which the GST Act is to be construed. The use of the qualifiers 'of Australia' and 'of any other country' in paragraph (a) of the definition of 'money' are consistent with the concept of 'currency' in the Currency Act. Taking into account that context, the Commissioner is of the view that the concept of 'currency' in the GST Act does not extend to any broader concept of money that is current as a medium of exchange in the community.

41.     Rather, in using the term 'currency', Parliament intended that the term take its legal meaning under the Currency Act – namely, a currency recognised as a universal means of exchange, designated by a particular unit of account and form of payment by the law in Australia or in some other country. The qualifiers 'of Australia' and 'of any other country' divide currency into two types:  Australian currency and currency that is recognised as a universal means of exchange, designated by a particular unit of account and form of payment by the laws of another sovereign State (that is, foreign currency).

42.     There is nothing in the GST Act which indicates an intention to depart from this established legal meaning of 'Australian currency' or the associated concept of 'foreign currency'.

43.     Bitcoin is not a legally recognised universal means of exchange and form of payment by the laws of Australia or the laws of any other country. Therefore, it is not 'currency (whether of Australia or of any other country)' under paragraph (a) of the definition of 'money'.

### Paragraph (b):  promissory notes and bills of exchange

44.     In Australia, the *Bills of Exchange Act 1909* (Cth) (the BOE Act) establishes a framework within which the use of specified financial instruments is comprehensively governed. The BOE Act defines the terms 'bills of exchange' and 'promissory note' in sections 8 and 89 respectively. A 'bill of exchange' is defined as:

> 8(1)     A bill of exchange is an unconditional order in writing, addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand, or at a fixed or determinable future time, a sum certain in money to or to the order of a specified person, or to bearer.

> 8(2)     An instrument which does not comply with these conditions, or which orders any act to be done in addition to the payment of money, is not a bill of exchange.

45.     A 'promissory note' is defined as:

> 89(1)     A promissory note is an unconditional promise in writing made by one person to another, signed by the maker, engaging to pay, on demand or at a fixed or determinable future time, a sum certain in money, to or to the order of a specified person, or to bearer.

09/12/2014
1-5WHAER2         Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 43

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

46.      It is specifically stated in the BOE Act that common law rules shall continue to apply to bills of exchange and promissory notes unless inconsistent with that statute.[33] Therefore, the legal meaning of these terms is also informed by relevant case law.

47.      Each of the definitions quoted above evidence the character of bills of exchange and promissory notes as documentary intangibles in that the rights are transferrable by the document itself. The holder of the document, by reason of that holding alone, is able to enforce those rights against others. The same is not true for a bitcoin holding.

48.      Further, the reference to 'a sum certain in money' in the definitions of a bill of exchange and promissory note requires payment in either Australian currency or foreign currency. That is, the sum must be denominated in and the rights enforceable by reference to 'fiat' currency. This interpretation is consistent with case law which, for example, has concluded that an instrument which provided for payment in gold dust was not a promissory note.[34]

49.      It follows that a bill of exchange or promissory note which purportedly granted a right denominated in bitcoin does not meet paragraph (b) of the definition of 'money' in the GST Act.

### Paragraph (c):  negotiable instruments used or circulated as currency

50.      Paragraph (c) of the definition of 'money' includes:

> any negotiable instrument used or circulated, or intended for use or circulation, as currency (whether of Australia or of any other country).

> There are two elements to this paragraph – first, whether Bitcoin is a negotiable instrument, and second, whether its use or circulation is as currency of Australia or any other country.

51.      The term 'negotiable instrument' is not defined. As noted in paragraphs 37 and 38 above, where words have a range of meanings, the construction of those words must take into account both the legal and ordinary uses to which they have been put. The meaning best suited to those words is determined by reference to the statutory context as a whole.

---

[33] Subsection 5(2) of the BOE Act.
[34] *McDonald v. Belcher* [1904] AC 429 at 435. See also Guest, AG 2009 *Chalmers and Guest on Bills of exchange, cheques and promissory notes*, 17th ed. Sweet & Maxwell, London, pp. 29-30.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 44 of
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel        Page 44
137

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

Page 12 of 24                                        Status:  **draft only – for comment**

52.      An examination of the context in which the phrase 'negotiable instrument' appears indicates that it is intended to take on a technical or legal meaning. The *Encyclopaedic Australian Legal Dictionary*[35] defines a 'negotiable instrument' as:

> A document recording a chose in action (such as a promise to pay money by one person to another, or a direction by one person to another to pay money to a third person), with the following characteristics:  the ability to transfer the property rights recorded on the document by delivery, or by signature (indorsement) and delivery, of the document itself (unless the document, being a bill, is marked non-transferable) and without immediate notice of the transfer to the person against whom the rights are to be enforced — an instrument so transferred is said to be 'negotiated'; the ability to sue on the property rights recorded in the document in the name of the person who currently owns the rights (being the holder of the document); and the transfer not being 'subject to equities', so that a transferee in good faith, for value, prior to the maturity date of the instrument and without notice of prior defects in title (such as fraud or theft) can acquire a better title than previous holders, free of defects in title and personal equities between remote prior parties. *Miller v. Race* (1758) 1 Burr 452 ; 97 ER 398 per Lord Mansfield LCJ; *Crouch v. Credit Foncier of England Ltd* (1873) LR 8 QB 374 at 381–2 per Blackburn J; *Goodwin v Robarts* (1875) LR 10 Ex 337 at 346–54 per Lord Cockburn LCJ (affirmed (1876) 1 App Cas 476) ; *Ilich v. R* (1987) 162 CLR 110 ; 69 ALR 231 ; 61 ALJR 128 ; [1987] HCA 1.

53.      Bitcoin neither is nor involves a negotiable instrument at least because there is no instrument recording any chose in action against anyone relating to the payment of currency, nor any use or circulation actual or intended as 'currency'. It follows that bitcoin is not money under paragraph (c) of the definition.

### Paragraph (d):  postal notes and money orders

54.      Neither the term 'postal note' nor 'money order' are defined for the purposes of the GST Act. Those terms take their ordinary meaning subject to context and applicable rules of interpretation.

55.      The *Macquarie Dictionary*[36] defines each of these terms as follows:

- 'postal note' (or 'postal order') is 'an order for the payment of … money, bought from and generally cashed at a post office'; and

- 'money order' is 'an order for the payment of money, as one issued by one post office and payable at another'.

---

[35] *Encyclopaedic Australian Legal Dictionary* [online] Lexis Nexis, 2011 viewed 23 June 2014 www.lexisnexis.com.
[36] *The Macquarie Dictionary*, [Online], viewed 23 June 2014, www.macquariedictionary.com.au.

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

| Status: **draft only – for comment** | Page 13 of 24 |
| --- | --- |

56.     Bitcoin is neither a 'postal note' nor a 'money order' at least because no post office is involved and no money, in the sense of fiat currency, is involved. Therefore, Bitcoin does not meet paragraph (d) of the definition of 'money' in the GST Act.

***Paragraph (e):  payment supplied by specified means***

57.     Paragraph (e) of the definition of 'money' states:

whatever is supplied as payment by way of:

(i)      credit card or debit card; or

(ii)     crediting or debiting an account;

(iii)    creation or transfer of a debt.

58.     The term 'payment' is not defined and therefore takes its ordinary meaning subject to context and applicable rules of interpretation.[37] That context may limit a word which would otherwise have a wide connotation.[38]

59.     The *Macquarie Dictionary*[39] defines 'payment' as '2. That which is paid; compensation; recompense' or '3. requital'. These definitions are of a wide connotation. The question is whether, in the context in which the word 'payment' appears in the definition of 'money', it is intended that a narrower definition be applied.

60.     The Commissioner's view is that for the purposes of paragraph (e), there will be 'payment' by way of one of the payment mechanisms listed in paragraph (e) if whatever is supplied is denominated in (or sounds in), and the performance or enforcement of the relevant payment is in (or sounds in), fiat currency.[40] There is a distinction in the GST Act between consideration which finds expression as an amount of money and that which does not. The latter is sometimes called non-monetary consideration or 'in kind' consideration.[41] Bitcoin is not denominated in an amount of fiat currency nor is consideration provided as an amount of bitcoin something which finds expression in money.

---

[37] *Avondale Motors (Parts) Pty Ltd v. FCT* [1971] HCA 17 at [13] referring to the maxim *noscitur a sociis*.

[38] See further in Pearce and Geddes, *Statutory Interpretation in Australia* (7th ed. 2011) at [4.23] for circumstances in which the maxim *noscitur a sociis* has been applied to limit a word of wide possible connotation.

[39] *The Macquarie Dictionary*, [Online], viewed 23 June 2014, www.macquariedictionary.com.au

[40] The concept of 'payment' may encompass an amount accounted for in notional units that are directly translatable as of right to a particular amount of fiat currency (see GSTR 2003/14 *Goods and services tax: the GST implications of transactions between members of a barter scheme conducted by a trade exchange*).

[41] Section 9-75 and GSTR 2001/6 *Goods and services tax: non-monetary consideration* at [32]. See also Burrill v Commissioner of Taxation (1996) 67 FCR 519 at 525 where the Court stated that a promise to pay money was 'not consideration in kind, and although it is not actually money, it sounds in money'.

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

61.     Even if 'payment' takes a broader meaning, bitcoin would not fall within any of the payment mechanisms listed in paragraph (e) of the definition of 'money' in the GST Act. The reasons for this conclusion are as follows.

*'Whatever is supplied as payment by way of credit card or debit card'*

62.     In a credit card or debit card situation, a customer is able to effect payment for goods or services through a series of pre-existing contracts between the customer and the credit or debit card provider and the credit or debit card provider and the merchant.[42] Bitcoin holdings and transactions do not replicate the contractual relationships between the parties to a credit or debit card transaction, and so do not fall within the scope of subparagraph (e)(i) of the definition of 'money' in the GST Act.

*'Whatever is supplied as payment by way of crediting or debiting an account'*

63.     The term 'account' is not defined and therefore takes its ordinary meaning subject to context and applicable rules of interpretation.[43]

64.     The Commissioner considers that, having regard to the context in which the phrase 'crediting or debiting an account' appears, the word 'account' is intended to be used in its legal sense. That is, the account must consist of a chose in action which the account holder can enforce against the account provider. As was discussed above, a holding of bitcoin creates no right of action against anyone. Where there is a transfer of bitcoin, the person receiving it has not ability, by virtue of that holding, to compel anyone to do anything. Hence, bitcoin does not satisfy paragraph (e)(ii) in the definition of 'money' in the GST Act.

*'Whatever is supplied as payment by way of creation or transfer of a debt'*

65.     The term 'debt' is not defined and therefore takes its ordinary meaning subject to context and applicable rules of interpretation.[44]

---

[42] See *Re Charge Card Services* [1989] 1 Ch 497 for a detailed discussion of the credit card system and *Commissioner of Taxation v. American Express Wholesale Currency Services Pty Ltd* (2010) 187 FCR 398 at 421-2. See also GSTR 2014/D2 *Goods and services tax:  treatment of ATM service fees, credit card surcharges, and debit card surcharges*.
[43] *Avondale Motors (Parts) Pty Ltd v. FCT* [1971] HCA 17 at [13] referring to the maxim *noscitur a sociis*.
[44] Ibid.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 47 of
1-5WHAER2                                                   137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 47

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

| Status:  **draft only – for comment** | Page 15 of 24 |

66.    The Commissioner considers that, having regard to that statutory context 'debt' should be given its legal meaning of 'an obligation to pay a sum of *money* owed'.[45] The transfer of bitcoin does not constitute the creation or transfer of a debt in the sense that there is an obligation to pay money. Hence, Bitcoin does not satisfy the terms of paragraph (e)(iii) of the definition of 'money' in the GST Act.

### What is the intended scope of the term 'money'

67.    As was noted at paragraph 31, the definition of 'money' in the GST Act is an inclusive definition which generally indicates something broader than what follows in a statutory definition. Determining whether a broader meaning is intended and the content of that meaning is informed by the statutory context in which the term 'money' appears.[46]

68.    In the Commissioner's view, the use of the term 'money' is intended to prescribe fiat currency and those financial instruments and payment mechanisms which are denominated in, or relate directly to, fiat currency.[47]

69.    The meaning of 'money' in the context of the GST Act was considered in *Travelex Limited v. Commissioner of Taxation*[48] *(Travelex)*. There Emmett J observed:[49]

> Money is any generally accepted medium of exchange for goods and services and for the payment of debts (see *Butterworth's Australian Legal Dictionary* at 759). Currency and legal tender are examples of money. However, a thing can be money and can operate as a generally accepted medium and means of exchange, without being legal tender. Therefore, bank notes have historically been treated as money, notwithstanding that they were not legal tender. It is common consent and conduct that gives a thing the character of money (see *Miller v. Race* (1758) 1 Burrow 452 at 457). Money is that which passes freely from hand to hand throughout the community in final discharge of debts and full payment for commodities, being accepted equally without reference to the character or credit of the person who offers it and without the intention of the person who receives it to consume it or apply it to any other use than in turn to tender it to others in discharge of debts or payment for commodities (see *Moss v. Hancock* [1899] 2 QB 111 at 116).

---

[45]  *A Dictionary of Law* (7th ed.) [online], definitions 1 and 2 of 'debt', viewed 23 July 2014 www.oxfordreference.com.

[46]  *ZY Finance Co Pty Ltd v. Cummings* (1964) 109 CLR 395 at 398-399 and *Blacktown Workers' Club Ltd v. O'Shannessy* (2011) 183 LGERA 184 at 190-191.

[47]  Such as, for example, a promise to pay money under a bond which 'sounds in' money: *Burrill v. Commissioner of Taxation* (1996) 67 FCR 519 at 525.

[48]  [2008] FCA 1961; 2008 ATC 20-087.

[49]  [2008] FCA 1961 at [25].

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 48 of
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 48
137

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

Page 16 of 24                                Status: **draft only – for comment**

70.     In *Mann on the Legal Aspects of Money*,[50] Proctor says that
the formulation in *Moss*, as referred to by Emmett J in *Travelex*,
applied the functional theory to the definition of money. The functional
theory of 'money' focused on that which was a generally accepted
medium of exchange for goods and services and the payment of
debts.[51]

71.     In the modern era, however, the State theory of 'money'[52]
requires that, in addition to the functional characteristics described,
money 'must exist within some form of legal framework, because it
reflects an exercise of sovereignty by the State in question'.[53]

72.     It has been argued that bitcoin satisfies the functional theory
of money because it serves as a medium of exchange, a unit of
account and a store of value. In addition it is argued that bitcoin's
increasing acceptance in the community as a means of discharging
debts and a means of exchange for acquiring goods and services has
now reached the point that it qualifies as money. In determining
whether bitcoin is money for GST purposes, however, it is not
necessary to come to a conclusion whether bitcoin satisfies the
functional requirements referred to in *Moss*.

73.     Custom alone, whether it be local or international, cannot
make something 'money' in the absence of an 'exercise of monetary
sovereignty by the State concerned'. Consistent with statutory
context,[54] policy and the wider legislative framework governing
Australian currency established by the Currency Act, this is the sense
in which the word 'money' is used in the section 195-1 definition.[55]
Bitcoin, therefore, is not 'money' for GST purposes.

## Is a supply of Bitcoin input taxed?

### Financial supplies

74.     A financial supply is input taxed under section 40-5.[56] An
entity may make financial supplies in the course of carrying on an
enterprise if the entity provides, acquires or disposes of an interest
listed in the GST Regulations and certain other requirements for a
'financial supply' are satisfied. No GST is payable on input taxed
supplies.

---

[50] Proctor C, *Mann on the Legal Aspects of Money* (Oxford University Press, 6th
ed. 2005) at [1.11].
[51] *Moss v Hancock* [1899] 2 QB 111 (at 116), *Ilich v. R* (1987) 162 CLR 110 (at 118),
*Travelex Ltd v. Commissioner of Taxation* [2008] FCA 1961 (at [25]), *Messenger
Press Pty Ltd v. Commissioner of Taxation* [2012] FCA 756 (at [195-196]).
[52] See paragraph 36 above.
[53] Proctor, note 50 above at [1.12].
[54] Discussed at paragraph 18 above.
[55] cf *Travelex Ltd v. Commissioner of Taxation* [2008] FCA 1961 (at [26-28]).
[56] See GSTR 2002/2 *Goods and services tax: GST treatment of financial supplies
and related supplies and acquisitions* for detailed discussion of the operation of the
financial supplies provisions.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 49 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 49

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

| Status: **draft only – for comment** | Page 17 of 24 |
| --- | --- |

75.     A supply is a financial supply only if it is mentioned as a financial supply in regulation 40-5.09 or is an incidental financial supply under regulation 40-5.10.[57] Regulation 40-5.12 exclude things that otherwise would be a financial supply other than things that are an incidental financial supply.[58]

*Item 9:  Australian currency or currency of a foreign country*

76.     The provision, acquisition or disposal of an interest in Australian currency, the currency of a foreign country, or an agreement to buy or sell currency of either kind is a financial supply.[59] The term 'currency' for the purposes of item 9 has the same meaning as in paragraph (a) of the definition of 'money' in section 195-1 for GST purposes.[60] As bitcoin is not 'currency' of Australia or any other country for GST purposes, it is not a financial supply.

*Item 11:  A derivative*

77.     The term 'derivative' is defined in the GST Regulations as:

> An agreement or instrument the value of which depends on, or is derived from, the value of assets or liabilities, an index or rate.

78.     Although an entity may enter into an agreement which uses the exchange rate of a bitcoin as a measure of value, this definition does not apply to bitcoins themselves. Bitcoin is not itself an agreement or instrument nor is it evidenced or created through an agreement or instrument. Whilst the value of a bitcoin may fluctuate over time, the bitcoin itself does not derive its value from any asset or liability, or the movements in an index or rate. Bitcoin is not a derivative as defined in the GST Regulations.

*Subregulation 40-5.09(4A):  ATM services*

79.     Certain automatic teller machine (ATM) services are input taxed as financial supplies where they involve specified accounts. The term '**account**' is defined in the dictionary to the GST Regulations:

account:

(a)     means an account mentioned in item 1 in the table in regulation 40-5.09; and

(b)     includes an account in relation to which the account holder (the customer) has the right:

    (i)     to have the account maintained by the account provider (the provider); and

    (ii)     to repayment of the amount credited to the account by the provider; and

---

[57] Paragraph 40-5.08(1)(b) of the GST Regulations.
[58] Regulation 40-5.10 of the GST Regulations.
[59] Item 9 of the table in subregulation 40 5.09(3) of the GST Regulations.
[60] Refer to paragraphs 32-43 above.

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

    (iii)    to require the provider to act on directions by the customer that are in accordance with the arrangements, or any agreement, between the provider and the customer in relation to operation of the account.

80.     Use of Bitcoin ATMs do not involve transactions from, into or of an 'account' as defined.[61] Further, Bitcoin ATMs are not part of the ATM payment system.[62] Services provided through a Bitcoin ATM are not financial supplies.

## GST-free supplies[63]

81.     The supply of bitcoin from an entity in Australia to a non-resident, including a bitcoin exchange that is outside Australia, may be a GST-free supply under item 2 in the table in subsection 38-190(1).

82.     Item 2 refers to supplies made to a non-resident who is not in Australia when the thing supplied is done[64] and:

- the supply is neither a supply of work physically performed on goods situated in Australia when the work is done nor a supply directly connected with real property situated in Australia or

- the non-resident acquires the thing in carrying on the non-resident's enterprise, but is not registered or required to be registered.

83.     Item 3 in the table in subsection 38-190(1), also may apply to the transfer of bitcoins by a supplier located in Australia to a recipient outside Australia at the time of the supply and where the effective use or enjoyment takes place outside Australia.[65] Item 3 does not apply to work physically performed on goods situated in Australia at the time of the supply nor to a supply directly connected with real property situated in Australia.

---

[61] See also discussion at paragraph 64 above.
[62] See paragraph 5 of GSTR 2014/D2:  'The term "ATM" is an automatic teller machine that is used in the payment system designated by the Reserve Bank of Australia (RBA) as the ATM system.'
[63] See more generally GSTR 2000/31 *Goods and services tax: supplies connected with Australia.*
[64] See GSTR 2004/7 *Goods and services tax: in the application of items 2 and 3 and paragraph (b) of item 4 in the table in subsection 38-190(1) of the A New Tax System (Goods and Services Tax) Act 1999.*
- *when is a 'non-resident' or other 'recipient' of a supply 'not in Australia when the thing supplied is done'?*
- *when is 'an entity that is not an Australian resident' 'outside Australia when the thing supplied is done'?*
[65] See GSTR 2007/2 *Goods and services tax: in the application of paragraph (b) of item 3 in the table in subsection 38-190(1) of the A New Tax System (Goods and Services Tax) Act 1999 to a supply, when does 'effective use or enjoyment' of the supply 'take place outside Australia'?*

09/12/2007
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 51

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

84.       Subsection 38-190(2) provides that a supply covered by any of items 1 to 5 in the table in subsection 38-190(1) is not GST-free if it is the supply of a right or option to acquire something the supply of which would be connected with Australia and would not be GST-free.[66]

85.       Subsection 38-190(2A) provides that a supply covered by any of items 2 to 4 in the table in subsection 38-190(1) is not GST-free if the acquisition of the supply relates (whether directly or indirectly, or wholly or partly) to the making of a supply of real property situated in Australia that would be input taxed under Subdivisions 40-B or 40-C.

86.       Under subsection 38-190(3), a supply covered by item 2 in subsection 38-190(1) is not GST-free if:

(a)       it is a supply under an agreement entered into, whether directly or indirectly, with a **non-resident**; and

(b)       the supply is provided, or the agreement requires it to be provided, to another entity in Australia.[67]

---

[66] See paragraphs 143-150 of GSTR 2003/8 *Goods and services tax: supply of rights for use outside Australia*.

[67] See GSTR 2005/6 *Goods and services tax: the scope of subsection 38-190(3) and its application to supplies of things (other than goods or real property) made to non-residents that are GST-free under item 2 in the table in subsection 38-190(1) of the A New Tax System (Goods and Services Tax) Act 1999*.

CONFIDENTIAL                                                                        DEF_00067304

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 52 of
137
09/12/2014                Documents provided by the ATO to the General Anti-Avoidance Rules Panel
1-5WHAER2
Page 52
Page 52

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

# Appendix 2 – Your comments

87.      You are invited to comment on this draft Ruling including the proposed date of effect. Please forward your comments to the contact officer by the due date.

88.      A compendium of comments is prepared for the consideration of the relevant Rulings Panel or relevant tax officers. An edited version (names and identifying information removed) of the compendium of comments will also be prepared to:

- provide responses to persons providing comments; and

- be published on the ATO website at www.ato.gov.au.

Please advise if you do not want your comments included in the edited version of the compendium.

| | |
|---|---|
| **Due date:** | **3 October 2014** |
| **Contact officer:** | **Hoa Do** |
| **Email address:** | **hoa.do@ato.gov.au** |
| **Telephone:** | **(08) 9268 5171** |
| **Facsimile:** | **(08) 9268 8371** |
| **Address:** | **Australian Taxation Office** |
| | **GPO Box 9977** |
| | **Perth WA 6848** |

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

| Status:  **draft only – for comment** | Page 21 of 24 |
|---|---|

## Appendix 3 – Detailed contents list

89.     The following is a detailed contents list for this Ruling:

| | Paragraph |
|---|---|
| **What this Ruling is about** | **1** |
| **Ruling** | **5** |
| *Example 1:  bitcoin exchange transactions* | 8 |
| *Example 2:  bitcoin provided in exchange for goods or services* | 12 |
| *Example 3:  merchant using an intermediary to accept bitcoin in exchange for goods or services* | 14 |
| **Date of effect** | **16** |
| **Appendix 1 – Explanation** | **18** |
| Relevance of the concepts of 'money' and 'currency' in the GST Act | 18 |
| What is Bitcoin? | 21 |
| Is Bitcoin 'money' for GST purposes? | 30 |
| Is Bitcoin 'money' under any item listed in the section 195-1 definition? | 32 |
| *Paragraph (a):  'currency (whether of Australia or of any other country)'* | 32 |
| *Paragraph (b):  promissory notes and bills of exchange* | 44 |
| *Paragraph (c):  negotiable instruments used or circulated as currency* | 50 |
| *Paragraph (d):  postal notes and money orders* | 54 |
| *Paragraph (e):  payment supplied by specified means* | 57 |
| 'Whatever is supplied as payment by way of credit card or debit card' | 62 |
| 'Whatever is supplied as payment by way of crediting or debiting an account' | 63 |
| 'Whatever is supplied as payment by way of creation or transfer of a debt' | 65 |
| *What is the intended scope of the term 'money'* | 67 |
| Is a supply of Bitcoin input taxed? | 74 |
| *Financial supplies* | 74 |
| *Item 9:  Australian currency or currency of a foreign country* | 76 |
| *Item 11:  A derivative* | 77 |
| *Subregulation 40-5.09(4A):  ATM services* | 79 |
| GST-free supplies | 81 |

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 54 of
03/12/2014      Documents provided by the ATO to the General Anti-Avoidance Rules Panel      Page 54
1-5WHAER2                                              137

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

**Appendix 2 – Your comments**                          **87**

**Appendix 3 – Detailed contents list**                 **89**

CONFIDENTIAL                                          DEF_00067307

Case 9:18-cv-80176-BB  Document 885-15  Entered on FLSD Docket 02/17/2022  Page 55 of
137
1-5WHAER2    Documents provided by the ATO to the General Anti-Avoidance Rules Panel    Page 55

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

## References

*Previous draft:*

Not previously issued as a draft

*Related Rulings/Determinations:*

GSTR 2000/31; GSTR 2001/6;
GSTR 2002/2; GSTR 2003/8;
GSTR 2003/14; GSTR 2004/7;
GSTR 2005/6; TR 2006/10; GSTR
2007/2; GSTR 2014/D2

*Subject references:*

– GST financial supplies
– GST money
– GST non-monetary
  consideration

*Legislative references:*

– Bills of Exchange Act 1909 (Cth)
  5(2)
– Bills of Exchange Act 1909 (Cth)
  8
– Bills of Exchange Act 1909 (Cth)
  89
– Constitution (Cth)  51(xii)
– Currency Act 1965 (Cth)  8(1)
– Currency Act 1965 (Cth)  9(1)
– Currency Act 1965 (Cth)  11(1)
– Financial Transaction Report Act
  1988  31(1)
– ANTS(GST)A 1999  9-5
– ANTS(GST)A 1999  9-10(1)
– ANTS(GST)A 1999  9-10(4)
– ANTS(GST)A 1999  9-30(2)(b)
– ANTS(GST)A 1999  9-75
– ANTS(GST)A 1999  9-75(1)
– ANTS(GST)A 1999  9-85
– ANTS(GST)A 1999  11-5
– ANTS(GST)A 1999  Div 38
– ANTS(GST)A 1999  38-190
– ANTS(GST)A 1999  38-190(1)
– ANTS(GST)A 1999  38-190(2)
– ANTS(GST)A 1999  38-190(2A)
– ANTS(GST)A 1999  38-190(3)
– ANTS(GST)A 1999  40-5
– ANTS(GST)A 1999  40-5(1)
– ANTS(GST)A 1999  195-1
– ANTS(GST)R 1999
  40-5.08(1)(b)
– ANTS(GST)R 1999  40-5.09
– ANTS(GST)R 1999  40-5.09(3)
– ANTS(GST)R 1999  40-5.09(4A)
– ANTS(GST)R 1999  40-5.10
– ANTS(GST)R 1999  40-5.12

*Case references:*

– Attorney General (NSW) v.
  Brewery Employees Union of
  New South Wales (1908) 6
  CLR 469
– Avondale Motors (Parts)
  Pty Ltd v. FCT [1971] HCA
  17;  2 ATR 312;  71 ATC
  4101
– Blacktown Workers' Club Ltd
  v. O'Shannessy [2011]
  NSWCA 265;  183 LGERA 184
– Burrill v. Commissioner of
  Taxation (1996) 67 FCR 519;
  33 ATR 133;  (1996) 96 ATC
  4629
– Commissioner of Taxation v.
  American Express Wholesale
  Currency Services Pty Ltd
  [2010] FCAFC 122;  187 FCR
  398;  2010 ATC 20-212;  77
  ATR 12
– Gamer's Motors Centre
  (Newcastle) Pty Ltd v Natwest
  Wholesaler Pty Ltd (1985) 3
  NSWLR 475
– Ilich v R (1987) [1997] HCA 1;
  162 CLR 110
– Johnson v Native Title
  Registrar [2014] FCA 142;
  218 FCR 415
– Leask v Commonwealth [1996]
  HCA 29;  (1996) 187 CLR 579;
  35 ATR 91;  (1996) 96 ATC
  5071
– McDonald v. Belcher [1904]
  AC 429
– Messenger Press Proprietary
  Ltd v Commissioner of
  Taxation [2012] FCA 756;
  2012 ATC 20-234
– Miller v. Race (1758) 1 Burrow
  452;  97 ER 398
– Moss v. Hancock [1899] 2 QB
  111
– Re Charge Card Services
  [1989] 1 Ch 497;  [1988] 3 All
  ER 702;  [1988] 3 WLR 764
– Travelex Limited v.
  Commissioner of Taxation
  [2008] FCA 1961;  2008 ATC
  20-087;  71 ATR 216

Draft Goods and Services Tax Ruling

# GSTR 2014/D3

– ZY Finance Co Pty Ltd v. Cummings (1964) 109 CLR 395; [1964] ALR 667

*Other references:*

– *A Dictionary of Finance and Banking* [online] 4th revised edn viewed 28 July 2014 www.oxfordreference.com
– *A Dictionary of Law* [online] 7th ed. viewed 23 July 2014 www.oxfordreference.com
– Bradbury, D 'The problem with Bitcoin', *Computer Fraud & Security* November 2013, issue 11
– Brito, J and Castillo, A 'Bitcoin: A Primer for Policymakers', *Policy*, Summer 2013 2014, vol. 29, no. 4.
– *Encyclopaedic Australian Legal Dictionary* [online] Lexis Nexis, 2011 viewed 23 June 2014 www.lexisnexis.com.
– Guest, AG *Chalmers and Guest on Bills of exchange, cheques and promissory notes* (2009) 17th ed. Sweet & Maxwell, London
– Guthrie, N 'The End of Cash? Bitcoin, the Regulators and the Courts' *Banking & Finance Law Review* Apr 2014, vol 29, no. 2.
– Kondor D, Posfai M, Csabai I, Vattay G 'Do the Rich Get Richer? An Empirical Analysis of the Bitcoin Transaction

Network' (2014) PLoS ONE vol. 9, issue 2 pp 1-10
– *The Macquarie Dictionary*, [Online], viewed 23 June 2014, www.macquariedictionary.com.au
– Moore, T 'The promise and perils of digital currencies' International Journal of Critical Infrastructure Protection, 2013,
– *Oxford Dictionary of English* [online] 3rd ed. viewed 7 August 2014 www.oxfordreference.com
– Pearce and Geddes, *Statutory Interpretation in Australia* (7th ed, 2011)
– Proctor C *Mann on the Legal Aspects of Money* (Oxford University Press, 6th ed. 2005)
– Tindell, K 'Geeks Love the Bitcoin Phenomenon Like They Loved the Internet in 1995' *Business Insider* 5 April 2013
– Villasenor, J 'Secure Bitcoin Storage: A Q&A With Three Bitcoin Company CEOs' *Forbes* 26 April 2014
– Wiener, H, Zelnik, J, Tarshish, I, & Rodgers, M 'Chomping at the Bit: U.S. Federal Income Taxation of Bitcoin Transactions' *Journal Of Taxation Of Financial Products* (2013) vol. 11, no. 3

ATO references

| NO: | |
|---|---|
| ISSN: | 1443-5160 |
| ATOlaw topic: | Goods and services tax~~Financial supplies~~Other<br>Goods and services tax~~General rules and concepts<br>~~Supplies~~Taxable supplies |

**© AUSTRALIAN TAXATION OFFICE FOR THE COMMONWEALTH OF AUSTRALIA**

You are free to copy, adapt, modify, transmit and distribute this material as you wish (but not in any way that suggests the ATO or the Commonwealth endorses you or any of your services or products).

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 57 of
137
1-5WHAER2            Documents provided by the ATO to the General Anti-Avoidance Rules Panel            Page 57

GPO Box 9990 IN YOUR CAPITAL CITY



**Australian Government**

**Australian Taxation Office**

| | |
|---|---|
| Hotwire Preemptive Intelligence Pty Limited | Reply to: GPO Box 9990 |
| Suite 502, 32 Delhi Road | Parramatta NSW 2123 |
| North Ryde NSW 2113 | Our reference: 1-527QUF3 |
| | Contact officer: Des McMaster |
| | Phone: 02 9354 6086 |
| Attention: Mr John Chesher | Fax: 02 62250929 |
| | Email: Des.McMaster@ato.gov.au |
| | ABN: 48 164 068 348 |

14 February 2014

## Advice of the interim findings of our audit

Dear Mr Chesher

We are writing to provide you with an interim report of our audit of Hotwire Preemptive Intelligence
Pty Ltd.

**What you need to do**
Please review this report and provide any comments or additional information before 3 March
2014. This will give us an opportunity to consider your response and to work with you to resolve
any concerns, if possible, before we finalise our audit.

**What will happen next**
Once the audit is finalised, we will send you a letter outlining the audit result, our final position with
the proposed adjustments, and a notice of assessment for any adjustments made to your activity
statement.

If any penalties apply, we will also send you an administrative penalty notice.

**For more information**
If you have any questions, please phone **13 28 69** between 8.00am and 5.00pm, Monday to
Friday, and ask for Des McMaster on extension **46086**.

Yours faithfully

James O'Halloran
Deputy Commissioner of Taxation

70937.098132-06-2012

CONFIDENTIAL

DEF_00067310

## Interim report

**Hotwire Preemptive Intelligence Pty Limited**
**ABN: 48 164 068 348**

This report provides the findings to date.

### Issue 1 – GST on sales

Have you correctly reported the GST payable on your taxable sales in the business activity statement (BAS) for the period 1 July 2013 to 30 September 2013?

**Facts**

1. You are engaged in computer system design and related services.
2. You registered for GST on 2 June 2013 as a quarterly remitter using the accrual basis of accounting.
3. You lodged your BAS for the tax period 1 July 2013 to 30 September 2013 on 30 September 2013. In this BAS, you claimed GST credits of $3,429,150 relating to the acquisition of an exclusive licence to use BTC systems software from the Trustee for the Wright Family Trust (DeMorgan).
4. To support your claim, you submitted DeMorgan tax invoices #0001 to #0004 charging you for a total amount of $37,720,650 including GST of $3,429,150. The charges covered three (3) years prepayment plus a one-off handover fee. You advised that you paid for the software acquisition using Bitcoins on 23 September 2013. This was confirmed by your director's email to the ATO dated 6 October 2013.
5. In your email reply of 3 December 2013 to ATO queries, your director advised that you obtained the Bitcoins as shareholder capital subscriptions. Transaction report generated from your accounting system (Xero) previously submitted by your director showed that he transferred /sold Bitcoins to you amounting to $32,994,806.68 which was reported as his initial capital subscription on 1 July 2013. The report also showed that the payment was made through transfer of a Bitcoin wallet containing 284,438 Bitcoins. No further document / information has been submitted in respect of the Bitcoin transfer.
6. On 19 June 2013, your director applied for two private rulings for his sole trader business relating to the income tax and GST implications of selling and transferring 'Bitcoins'.
7. On 30 September 2013, private ruling, authorisation number 1012527956345, was issued advising your director that for GST purposes, the sale of Bitcoins to another entity is a taxable supply under section 9-5 of the *A New Tax System (Goods and Services Tax) Act 1999* (GST Act).
8. On 23 December 2013, private ruling, authorisation number 1012569478259, was issued advising your director that for GST purposes, the transfer of Bitcoins to another entity is a taxable supply under section 9-5 of the GST Act.
9. Both private rulings considered that in the context of the facts provided Bitcoins are not 'money' or 'currency' for the purposes of the GST Act.
10. You did not report the supply of Bitcoins to DeMorgan in your September 2013 quarter BAS.

**Findings**

You have understated the GST payable reported in the BAS for the period 1 July 2013 to 30 September 2013 by not reporting your transfer of Bitcoins in exchange for your acquisition of the software license and related handover fee from DeMorgan.

Your business activity statement for the relevant tax period will be revised to increase the GST payable at label 1A by $3,429,150.

We have determined that you are not liable to an administrative penalty because you took reasonable care.

**Reasons for our findings**

The transfer of Bitcoins in exchange for your acquisition of the software license is a taxable supply in accordance with section 9-5 of the GST Act.

Section 9-5 of the GST Act defines a taxable supply as follows:

> You make a *taxable supply* if:
>
> (a) you make the supply for *consideration; and
>
> (b) the supply is made in the course or furtherance of an *enterprise that you *carry on; and
>
> (c) the supply is *connected with Australia; and
>
> (d) you are *registered, or *required to be registered.
>
> However, the supply is not a *taxable supply to the extent that it is *GST-free or *input taxed.

(Items marked with an asterisk (*) are defined in the Dictionary at section 195-1 of the GST Act).

For a supply to be a taxable supply, all the requirements of section 9-5 of the GST Act must be satisfied; that is, where one element of the legislation is not met the whole section is not met.

Subsection 9-10(1) of the GST Act defines the term 'supply' as any form of supply whatsoever. Without limiting the meaning of supply in subsection 9-10(1) of the GST Act, specific things are added in the broad definition including the creation, grant, transfer, assignment or surrender of any right (paragraph 9-10(2)(e) of the GST Act) and a financial supply (paragraph 9-10(2)(f) of the GST Act).

Paragraph 76 of *Goods and Services Tax Ruling GSTR 2006/9 Goods and services tax: supplies* (GSTR 2006/9) explains that the broad definition of supply as any form of supply whatsoever is the ordinary meaning of the term and that the meaning is 'arguably extended by' the specific things listed in subsection 9-10(2) of the GST Act.

The sale or transfer of Bitcoins satisfies the broad definition of supply as any form of supply whatsoever.

Subsection 9-10(4) of the GST Act provides that a supply does not include a supply of money, unless the money is provided as consideration for a supply that is a supply of money. Subsections 9-10(3) and (3A) of the GST Act are not relevant for present purposes.

*Are bitcoins 'money' for the purposes of the GST Act?*

Money is defined in section 195-1 of the GST Act which states:

> **money** includes:
>
> (a) currency (whether of Australia or of any other country); and
>
> (b) promissory notes and bills of exchange; and
>
> (c) any negotiable instrument used or circulated, or intended for use or circulation, as currency (whether of Australia or of any other country); and
>
> (d) postal notes and money orders; and
>
> (e) whatever is supplied as payment by way of:
>
>> (i) credit card or debit card; or
>>
>> (ii) crediting or debiting an account; or
>>
>> (iii) creation or transfer of a debt.
>
> However, it does not include:

Released under FOI Act 1982 by the Australian Taxation Office

03:12:04
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 60

**(f)**   a collector's piece; or

**(g)**   an investment article; or

**(h)**   an item of numismatic interest; or

**(i)**   currency the market value of which exceeds its stated value as legal tender in the country of issue.

In *Landfall Pty Ltd v Chief Commissioner of State Revenue*  NSWADT 270 when considering the meaning of 'money' in section 55(1) of the *Duties Act 1997,* Judicial Member Block stated:

> 25.       It cannot be doubted that there is a distinction between the concept of "money" on the one hand and "other consideration" or "moneys worth "on the other. By way of example and in *John v FCT*  HCA 5; (1989) 166 CLR 417 at 450, Brennan J described sec 44 of the *Income Tax Assessment Act* as taxing "an amount" being the "par value of bonus shares" that were issued. He described the par value of bonus shares "which is money's worth but not money and the sale of the bonus shares converts the money's worth into money".

In *Travelex Limited v Commissioner of Taxation* (Corrigendum dated 4 February 2009) FCA 1961, Justice Emmett, in considering the meaning of 'money' in the GST Act  stated:

> 25. Money is any generally accepted medium of exchange for goods and services and for the payment of debts (see *Butterworth's Australian Legal Dictionary* at 759). Currency and legal tender are examples of money. However, a thing can be money and can operate as a generally accepted medium and means of exchange, without being legal tender. Thus, bank notes have historically been treated as money, notwithstanding that they were not legal tender. It is common consent and conduct that gives a thing the character of money (see *Miller v Race* (1758) 1 Burrow 452 at 457). Money is that which passes freely from hand to hand throughout the community in final discharge of debts and full payment for commodities, being accepted equally without reference to the character or credit of the person who offers it and without the intention of the person who receives it to consume it or apply it to any other use than in turn to tender it to others in discharge of debts or payment for commodities (see *Moss v Hancock*  2 QB 111 at 116).

> 26. A polity may enact legislation with a view to organising its currency. Such legislation will define the unit of account by reference to name and any applicable subdivisions of the unit. In relation to physical money, the applicable domestic law of a polity will lay down rules on legal tender, being the technical specifications for coins and notes. The monetary system of the polity will normally comprise a central bank that enjoys the exclusive privilege of issuing legal tender.

Bitcoin is accepted by some people and businesses in exchange for goods and services and there are online exchanges, that exchange Bitcoin for traditional currencies such as the US Dollar. However, Bitcoin is not generally accepted as a form of payment, nor is it accepted as a legal form of payment under Australian law or under the law of any other country.  Bitcoin is not stamped or issued by a public authority as means of exchange or measure of value.  Although, Bitcoin may have a monetary worth in that it can be exchanged for money, this does not mean that it is, in itself, money as per *Landfall Pty Ltd v Chief Commissioner of State Revenue*.

Paragraph (a) of the definition of money includes 'currency (whether of Australia or of any other country)'. Given that the terms in the phrase are not defined in the GST Act, they take their ordinary meanings within the legislative context that the terms are used. The term 'currency' and 'money' are referred to in the GST Act and in A New Tax System (Goods and Services Tax) Regulations 1999 (GST Regulations).

Other than in the definition of 'money', the term 'currency' is referred to in the GST Act as follows: section 9-85 on the value of taxable supplies provides that 'the value of a taxable supply is to be expressed in Australian currency.' and that 'any amount of the consideration for the supply that is

expressed in currency other than Australian currency is to be treated as if it were an amount of Australian currency …'

▨ subsection 13-20(2A) on GST on taxable importations and subsection 117-5(1A) on the valuation of taxable importations refer to where an amount 'is not an amount in Australian currency, the amount so taken into account is equivalent in Australian currency of that amount …'

For the purposes of subsection 40-5(2) of the GST Act, item 17 of regulation 40-5.12 of the GST Regulations refers to:

> Australian currency, or the currency of a foreign country, the market value of which exceeds its stated value as legal tender, or an agreement to buy or sell currency of either kind the market value of which exceeds its stated value as legal tender

In our view, in the definition of 'money' in the GST Act, 'currency of Australia' means the monetary unit of Australia, i.e. 'Australian dollars'. Similarly, 'currency of any other country' within the definition of 'money' is a reference to the monetary unit of that country, e.g. U.S. dollars, Euro, etc.

Bitcoins are not issued by a central issuer, such as the government of a nation. They are created by software through the activity of mining. As Bitcoins are neither the monetary unit of Australia nor any other country, they are not 'currency'.

None of the other paragraphs within the definition of 'money' in s 195-1 of the GST Act are relevant for present purposes.

*Are bitcoins financial interests for the purposes of the GST Regulations?*

Under subsection 40-5(1) of the GST Act a financial supply is input taxed. A financial supply has the meaning given by the GST Regulations.

The provision, acquisition or disposal of an interest in or under one of the items mentioned in the table in subregulation 40-5.09(3) of the GST Regulations will be a financial supply, if the other requirements subregulations 40-5.09(1) are satisfied. Item 9 in the table includes an interest in or under 'Australian currency, the currency of a foreign country, or an agreement to buy or sell currency of either kind'.

We have already concluded that Bitcoins are not 'currency (whether of Australia or any other country)' for the purpose of the definition of 'money' in section 195-1. We consider that the analysis applies equally to whether Bitcoins fall under item 9. This is subject to the proviso that the wording of item 9 is more expansive in that it extends to 'interest in or under' as well as 'an agreement to buy or sell currency of either kind'

Consistent with our view on 'currency' within the definition of 'money', Bitcoins are not a financial interest under subregulation 40-5.09(3) of the GST Regulations. Therefore, the supply of Bitcoins is not a financial supply. As such the supply of Bitcoins is not input taxed.

*Is the supply of bitcoins GST-free?*

There are no provisions in the GST Act that would deem the supply of the Bitcoins from you to DeMorgan as a GST-free supply.

*Conclusion*

As you made the supply of the Bitcoins to DeMorgan for consideration, in the course of furtherance of an enterprise that you carry on, the supply is connected with Australia and you are registered for GST, the remaining requirements of section 9-5 of the GST Act are met.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 62 of
1-5WHAER2        Documents provided by the ATO to the General Anti-Avoidance Rules Panel        Page 62
137

Therefore, your transfer of Bitcoins to DeMorgan is a taxable supply in accordance with section 9-5 of the GST Act.

As you provided non-monetary consideration, Bitcoins, for the supply of the software license to you, the GST payable on the transfer of the Bitcoins is calculated by considering the value of the consideration you received (software license) of $37,720,650 as the GST inclusive market value in accordance with Goods and Services Tax Ruling GSTR 2001/6.

## Reasons for our penalty decision

**Hotwire Preemptive Intelligence Pty Limited**
**ABN: 48 164 068 348 / 001**

Section 284-75 of Schedule 1 to the *Taxation Administration Act 1953* (TAA) imposes an administrative penalty if you make a statement to us which is false or misleading in a material particular whether because of things in it or omitted from it. A material particular is something that is likely to affect a decision regarding the calculation of an entity's tax-related liability or an entitlement to a credit or payment.

You made a statement to the Commissioner by lodging your activity statement. The statement was false or misleading as it incorrectly stated the assessed net amount. The assessed net amount includes any amount of GST that you have to pay. This is explained in the issue relating to the shortfall.

Miscellaneous Taxation Ruling MT 2008/1 *Penalty relating to statements: meaning of reasonable care, recklessness and intentional disregard* explains that you are required to take the same level of care to fulfil your tax obligations that could be expected of a reasonable person in your position, taking into account your own personal circumstances, knowledge, experience, education and skill.

You are not liable to penalty for making a false or misleading statement if you exercised reasonable care in making the statement.

We have determined that you are not liable to an administrative penalty because you took reasonable care.

We have taken the following facts into consideration when determining that you have exercised reasonable care:
- You registered for GST on 2 June 2013.
- Your director, Dr Craig Wright lodged your AS for the tax period 1 July 2013 to 30 September 2013 on 30 September 2013. The AS reported total sales of $3,409,450, GST payable on sales of $309,950, non-capital purchases of $40,010,962, GST paid amount on purchases of $3,433,216, and net refund amount of $3,123,266.
- Subsequent ATO verification of your GST credit claims disclosed that the claims relate to your acquisition of an exclusive license to use the software for the BTC systems from your director in his capacity as the Trustee for DeMorgan. The supply by DeMorgan was covered by four tax invoices (#0001 to #0004) issued on 1 July 2013 for a total amount of $37,720,650 including GST of $3,429,150. You advised that you paid the acquisitions by Bitcoin on 23 September 2013 per your director's email to the ATO dated 6 October 2013.
- Third party check conducted showed that DeMorgan reported the sale / supply of the license in its own AS for the same tax period, 1 July 2013 to 30 September 2013 which was lodged on 9 October 2013.
- Additional information provided by your director revealed that, on 19 June 2013, he applied for two private rulings for his sole trader business relating to the income tax and GST implications of selling and transferring 'Bitcoin'.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 63 of
137
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 63

- On 30 September 2013, private ruling, authorisation number 1012527956345, was issued advising your director that for GST purposes, the sale of Bitcoin to another entity is a taxable supply under section 9-5 of the GST Act. The ruling considered that Bitcoin is not 'money' or 'currency' for the purposes of the Income Tax and GST legislations.
- On 23 December 2013, private ruling, authorisation number 1012569478259, was issued advising your director that for GST purposes, the transfer of Bitcoin to another entity is a taxable supply under section 9-5 of the GST Act. The ruling considered that Bitcoin is not 'money' or 'currency' for the purposes of the Income Tax and GST legislations.
- You did not report the supply of Bitcoin to DeMorgan as taxable sales in your BAS for the tax period 1 July 2013 to 30 September 2013. Your failure to report resulted in the tax shortfall.

It is considered that in view of the circumstances, you took reasonable care and made genuine attempts to meet your GST obligations. Both rulings were issued prior to your director lodging the BAS. At the time of lodgement, he could not be expected to know the GST consequences of paying acquisitions by Bitcoin.

Released under FOI Act 1982
Australian Taxation Office

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 64 of
1-5WHAER2           Documents provided by the ATO to the General Anti-Avoidance Rules Panel           Page 64
03:12:2021                                            137

**Reasons for our penalty decision (cont.)**

**Hotwire Preemptive Intelligence Pty Limited
ABN: 48 164 068 348 / 001**

The following table is a summary of the shortfall identified in the audit and the level of penalty to be applied to each.

Issue List

| Issue # | Issue description | Tax type | Issue Shortfall $ | * Penalty Shortfall $ | Total Penalty $ |
|---|---|---|---|---|---|
| 1 | Unreported taxable sales | Goods and services tax | 3,429,150 | 3,429,150 | 0.00 |
| | | **Total (all issues)** | **3,429,150** | **3,429,150** | **0.00** |

* Credit offsets applied within the same tax period result in differences between the issue shortfall and penalty shortfall amounts. Credit offsets cannot be applied across different tax periods and may result in the total penalty shortfall being higher than the total issue shortfall. The *Summary of activity statement amendments* provides issue details for each tax period.

Summary of penalty decision – net amount *

| Period | Issue # | Penalty Shortfall $ | Behaviour | Base Penalty % | Base Penalty Amount $ | Increase $ | Reduction $ | Remission $ | Penalty Payable $ |
|---|---|---|---|---|---|---|---|---|---|
| 01 Jul 2013 – 30 Sep 2013 | 1 | 3,429,150 | Reasonable care | | | | | | 0.00 |
| **Totals (all periods)** | | **3,429,150** | | | | | | | **0.00** |

* **Net amount** includes any goods and services tax (activity statement labels 1A and 1B), wine tax (activity statement labels 1C and 1D) and luxury car tax (activity statement labels 1E and 1F) applicable to you. If you are a GST instalment payer, the total GST instalments paid by you (activity statement label 1H) are taken into account in working out your net amount.

GPO Box 9990 IN YOUR CAPITAL CITY



**Australian Government**
**Australian Taxation Office**

| | |
|---|---|
| Coin-Exch Pty Ltd | Reply to:  PO Box 9977 |
| C/- John Chesher | Parramatta NSW 2124 |
| Level 5, 32 Delhi Rd | Our reference:  1-526DVU8 |
| Macquarie Park  NSW  2113 | Contact officer:  Andrew Miller |
| | Phone:  (02) 9354 6379 |
| | Fax:  (02) 6225 0929 |
| | ABN:  31 163 338 467 |

8 April 2014

## Advice of the interim findings of our audit

Dear Mr Chesher

We are writing to provide you with an interim report on the retention of the refund for Coin-Exch Pty Ltd.

**What you need to do**
Please review this report and provide any comments or additional information before 21 April 2014. This will give us an opportunity to consider your response and to work with you to resolve any concerns, if possible, before we finalise our audit.

**What will happen next**
Once the audit is finalised, we will send you a letter outlining the audit result, our final position with the proposed adjustments a notice of assessment for any adjustment made to your activity statement.

If any penalties apply, we will also send you an administrative penalty notice.

**For more information**
If you have any questions, please phone **13 28 69** between 8.00am and 5.00pm, Monday to Friday, and ask for Andrew Miller on extension **46379**.

Yours sincerely

James O'Halloran
Deputy Commissioner of Taxation

70937 098132-06-2012

CONFIDENTIAL

DEF_00067318

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 66 of
137
1-5WHAER2                Documents provided by the ATO to the General Anti-Avoidance Rules Panel
Page 66

**Interim report**

**Coin-Exch Pty Ltd**
**ABN: 31 163 338 467**

This report provides the findings to date including penalty considerations.

**Issues**

1.  Are you entitled to input tax credits for acquisitions made in the course of your business
    between 1 July and 30 September 2013 (inclusive), for the purpose of the *A New Tax System
    (Goods and Services Tax) Act 1999* (GST Act)?

**Facts**

2.  On 17 April 2013, you were incorporated and registered with Australian Securities and
    Investments Commission (ASIC). At the time of registration, your sole director and secretary
    was Craig Steven Wright (Craig Wright). On the same day, you also applied for TFN with the
    Australian Taxation Office (ATO).

3.  From 1 June 2013, you were registered for GST. At the time of applying for your GST role, you
    provided the following information to us:
    a.  You are accounting on an accruals basis.
    b.  Your expected turnover range is $150,000.00 to $1,999,999.00.
    c.  Your main business industry is professional, scientific and technical services.
    d.  Your main business industry is currency exchange research and analysis.
    e.  You will be reporting your GST obligations on a quarterly basis.

4.  On 1 July 2013, 'The Trustee for the Wright Family Trust' (DeMorgan) issued three tax invoices
    to you. These were all for Prepaid Software Licences for 2013 - 2015. The following information
    was provided on the tax invoices:

| Inv. No. | Description | Unit Price $ | GST $ | Total Amount $ |
|----------|-------------|--------------|-------|----------------|
| INV-0010 | Software Sales- Prepaid 2014-2015 Software License | 4,950,000.00 | 495,000.00 | 5,445,000.00 |
| INV-0006 | Software Sales- Prepaid 2014-2015 Software License | 4,950,000.00 | 495,000.00 | 5,445,000.00 |
| INV-0005 | Software Sales- Prepaid 2013-2014 Software License | 9,950,000.00 | 995,000.00 | 10,945,000.00 |
| Total | | 19,850,000.00 | 1,985,000.00 | 21,835,000.00 |

The 'Payment Advice' sections of the three tax invoices suggest that all amounts payable
had already been paid in full at the time the invoices were issued, as the amount due is
$0.00.

5.  On 25 July 2013, Craig Wright lodged two Statements of Claim with the Supreme Court of New
    South Wales (NSWSC).

    The first statement of claim, case 2013/225983, provides the following statements:
    a.  Craig Wright provided contract labour services to W&K Info Defense LLC (W&K).
    b.  Craig Wright was party to a contact with W&K dated 27 October 2008.
    c.  Craig Wright was a contractor and financier.
    d.  Craig Wright conducted four projects associated with the Department of Homeland
        Security (DHS) in the United States of America (USA). The four projects are listed as
        are the fund amounts associated with each project.
    e.  The Director of W&K died in May 2013.

CONFIDENTIAL

DEF_00067319

    f.  A bond of AU$20,000,000 was provided (by implication, Craig Wright as financier is assumed to be the provider of this bond).

    g.  The IP is software and code used by the US Military, DHS and other associated parties.

    h.  Craig Wright claimed $28,253,633.00. This is comprised of the $20million bond, the funding of the four projects, and the interest accrued on the project funds.

The second statement of claim, case 2013/245661, provides the following statements:

    i.  Craig Wright provided contract labour services to W&K.

    j.  Craig Wright loaned money to W&K at a set interest rate, with the expectation that they would be repaid in full when a project was completed. This loan was issued in Bitcoin.

    k.  Craig Wright entered into a contract with W&K on 8 January 2009, under which W&K agreed to pay Craig Wright for property and consulting services.

    l.  The contract was bonded against the intellectual property of the defendant.

    m.  Craig Wright was the contractor and financier.

    n.  Funding was supplied using Bitcoin and Gold Bonds.

    o.  A bond of $20,000,000 was provided to cover funding of the research.

    p.  The IP is software and code used in the creation of a Bitcoin system.

    q.  Craig Wright claimed $28,533,016.79 which includes the $20,000,000 bond.

6.  On 22 August 2013, ASIC records show that Jamie Robert Wilson was appointed as one of your directors. This role was ceased on 23 October 2013. You have advised that Mr Wilson ceased as director when discussions to merge his company with you fell through.

7.  Also on 22 August 2013, an 'Intellectual Property Licence' was entered into between Craig Wright R&D as the licensor and you as the licensee. Relevant information from the contract has been extracted below:

    a.  The licensor owns or has the right to use the intellectual property as software.

    b.  The licensor has clear title internationally based on judgment from the NSWSC 2013/245661. (It is noted that this judgement did not occur until 6 November 2013).

    c.  Licence fee: $28,534,049.79 (excluding GST) for exclusive perpetual assignment. (This is the amount of relief claimed under Court Case 2013/245661).

    d.  Product: Bitcoin and Exchange Software in C/C++/C#/R code

    e.  Commencement date: 01 July 2013

    f.  Term: No end

    g.  Trademark: All marks associated with Coin-Exch and associated marks

    h.  Patent: Trading Systems Patent (in progress and covered under the AusIndustry Notice of Registration for the R&D Tax Incentive including IR1300136).

    i.  The contract was signed and executed by Jamie Robert Wilson on your behalf and by Craig Wright as the licensor.

8.  Also on 22 August 2013, Craig Wright R&D issued an invoice (number 105) to you for a total amount of $34,412,454.77 (including GST of $3,128,404.98). The breakdown of the supply made to you is as follows:

    a.  Item 1 is for Intellectual Property Software License as per assigned Deed for 2013/245661 for $28,534,049.79 (plus GST of $2,853,404.98)

    b.  Item 2 is for consulting services relating to the handover of software in Deed and research training and development (12 months) for $2,750,000.00 (plus GST of $275,000.00).

9.  On 27 August 2013, Craig Wright applied for a private ruling relating to GST and supply of intellectual property (Authorisation Number: 1012513887115). In this private ruling, Craig Wright advised that NSW Supreme Court action was taken to distribute property into his name. The property is intellectual property and is valued in two batches at $28,533,016.79 and $28,254,666.00. He advised he intended to exploit the value of the intellectual property (IP) by using it within companies he controls and he will have an assignment contract completed at arm's length with the value based on that determined by the court.

10. On 30 September 2013, you lodged your Business Activity Statement (BAS) for the period 1 July 2013 to 30 September 2013, with amounts set out below:

| Sales | GST Debits | Acquisitions | GST Credits | PAYG | Net BAS |
|---|---|---|---|---|---|
| 0 | 0 | 41,661,757 | 3,787,429 | 0 | -3,787,429 |

11. On 3 October 2013, we contacted your director, Craig Wright and advised that the BAS lodged for the period 1 July to 30 September 2013 has been selected for review. Craig Wright provided the following information to us during the phone conversation:
    a. You are accounting on a non-cash basis.
    b. The acquisitions made were based on a Private Ruling where Bitcoins were sold to you by Craig Wright (in his own capacity).
    We also requested for information and documents to be provided to us and sent you a letter confirming the phone conversation held.

12. On 4 October 2013, Craig Wright provided the requested information and documents via email. The information was received in six separate emails. The following information and documents were provided to us:
    a. Private Ruling 1012513887115 issued on 30 August 2013.
    b. A copy of the GST Calculation Worksheet for the tax period 1 July 2013 to 30 September 2013.
    c. A copy of the tax invoice (no. 105) issued by Craig Wright R&D on 22 August 2013 totalling $31,284,049.79 (including GST of $3,128,404.98). Breakdown of items acquired is as follows:
        i. Item 1: Intellectual Property Licence (as per Deed for Software License for 2013/245661) totalling $31,387,454.77 (including GST of $2,853,404.98).
        ii. Item 2: Consulting fees relating to handover of software in Deed and research training and development assignment (12 months) totalling $3,025,000.00 (including GST of $275,000).
    d. A copy of the Intellectual Property Licence (Ref: CE) entered into between Craig Wright R&D (Licensor) and yourself (Licensee) on 22 August 2013.
    e. A copy of the tax invoices (INV-0005, INV-0006 and INV-0010) by DeMorgan to you on 1 July 2013.
    f. A copy of Remittance Advice issued by DeMorgan to you on 23 September 2013 confirming that tax invoice (INV-005) issued on July 2013 for $10,945,000.00 has been paid in full. Payment reference: Payment – 1AUD = 0.00708357 XBT (1 XBT = 141.172 AUD).
    g. 5 screenshots showing the current market exchange conversation rates at various points in time:
        i. As at 10:00 UTC 23 September 2013, 10,945,000.00 AUD was equivalent to 77,529.63 XBT.
        ii. As at 10:06 UTC 23 September 2013, 5,445,000.00 AUD was equivalent to 38,590.05 XBT.
        iii. As at 10:32 UTC 23 September 2013, 38,880.91 XBT was equivalent to 5,477,200.12 AUD.
        iv. As 09:50 UTC 23 September 2013, the rate was 1 AUD = 0.00708529 XBT.
        v. As at 00:50 UTC 6 October 2013, 1,111,111.00 XBT was equivalent to 161,351,585.43 AUD.
    h. A letter issued to Craig Wright (in his personal capacity) on 30 August 2013 notifying Craig Wright of his private ruling (Authorisation number 1012513887115).
    i. A copy of a letter issued to you on 3 July 2013 by Innovation Australia advising that your registration of the research and development activities detailed in your application has been approved for:
        i. Income Year: 2012/13
        ii. Accounting Period: 01/07/2012 – 30/06/2013
        iii. Registration Number: IR1300136
    j. A three page PowerPoint showing the Bitcoin process.

CONFIDENTIAL                                                                          DEF_00067321

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 69 of
137
1-5WHAER2
03/12/2017
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 69

k.   Balance Sheet as at 31 October 2013.
l.   A fourteen page Project "Genoa" e-Wallet System- Project Charter.
m.   A sixteen page Detailed Specification Project "Genoa" e-Wallet System.
n.   A thirteen page User Guide.
o.   A screenshot of your Bitcoin Wallet as at 18 July 2013 showing current balance of
     438,857.00 BTC. Three recent transactions have been made from your wallet:
     i.    Incoming funds of 57,000 BTC on 20 April 2013.
     ii.   Outgoing funds of 57,000 BTC on 24 April 2013.
     iii.  Incoming funds of 438,857 BTC on 3 May 2013.
p.   A screenshot of your Bitcoin Wallet showing incoming funds received of 474,332.43
     BTC on 18 July 2011.

13. On 8 October 2013, we received an additional four emails from Craig Wright. The following
    information and documents were provided in the completed Business Questionnaire:
    i.     You are in the business of banking and finance. You are currently in the
           process of creating solutions based on Bitcoin as a currency. You have
           several research programs around the financing and distribution of Bitcoin.
           There are AusIndustry registered.
    ii.    You are currently operating from Level 9 123 Epping Road North Ryde
           NSW 2113. However, this office is too small and you have a lease starting
           at level 5 32 Delhi Road North Ryde NSW 2113. You will be operating
           from this new address on 31 October 2013. You also have offices based in
           USA and Singapore.
    iii.   Your business will not be advertised until 2014. You are in your
           development phase and expect to go 'live' to the public in June 2014 as an
           Authorised Deposit Institute (ADI).
    iv.    You are working on registering with the Australian Prudential Regulation
           Authority (APRA) to become an Australian bank.
    v.     You have a vault and wallet based on Bitcoin.
    vi.    Your main suppliers are Hotwire Preemptive Intelligence Pty Ltd (Hotwire),
           Rubik and DeMorgan.
    vii.   You employ 5 people at present. You will have 15 employees (excluding
           contract staff and US and Singaporean staff) in this financial year.
    viii.  Ann Wrightson and Jamie Wilson are responsible for preparing the figures
           reported on your activity statement. Ann Wrightson is responsible for the
           entry and Jamie Wilson reviews the figures.
    ix.    Ann Wrightson has more than 10 years of experience and Jamie Wilson is
           a qualified CPA with more than 10 years of experience.
    x.     You use the accounting software Xero.

14. On 10 October 2013, we sent you a letter to notify you of our decision to retain refund under
    section 8AAZLGA of the *Taxation Administration Act 1953*.

15. On 20 November 2013, Craig Wright sent an email to us confirming that John Chesher is
    authorised to act on your behalf.

16. On 3 December 2013, John Chesher sent an email with a response to the questions asked on
    29 November 2013. The following information was provided to us in the response:
    a.   Ann Wrightson is engaged as your bookkeeper. She was running under Jamie
         Wilson (former Controlling Financial Officer). Jamie Wilson was the authority who
         was meant to lodge the activity statement. However, due to personal reasons, he
         has left the company. Consequently, this meant that Craig Wright was left to lodge
         the statement although this should not have occurred. John Chesher has now taken
         over this role and a formal internal auditor is also to be appointed/hired.
    b.   You advised that tax invoice 105 dated 22 August 2013 from Craig Wright to you for
         a total of $34,412,454.77 does not exist in your system nor in your activity statement
         lodged.

   c. You received Bitcoin as a shareholder capital subscription event. Payment details are in Xero. The payments made to DeMorgan were paid in Bitcoin. This is reflected in the total equity for the company. The intellectual property transferred from DeMorgan is for banking software purchased from Al Baraka.

   d. The payment made to Hotwire was the fee paid to develop the banking system.

   e. Craig Wright lodged the activity statement for the tax period 1 July 2013 to 30 September 2013. Ann Wrightson is the bookkeeper and Jamie Wilson was the accountant.

   f. Although you have no employees, you have directors and use the services of contractors if and when necessary. Currently, your only activity is to request and direct research. This is handled by your directors. Future processes will be handled by group companies and on-charged to you until such time as it is necessary to retain its own staff.

17. On 20 January 2014, we sent you a letter notifying that we have decided to retain the refund for the period 1 July 2013 to 30 September 2013 and advised of your right to object to the decision.

18. On 22 January 2014, John Chesher sent an email to us in response to our notice issued on 21 January 2014 advising of our decision to retain the refund. In the email, you disputed our decision to do so and requested for the Commissioner to withdraw the purported notice and to release the refund. Alternatively, you requested that if the Commissioner does not intend to release the refund, to do so on the basis of an amended assessment.
John Chesher also advised that you are happy to receive notices or correspondence of any nature as email attachments rather than through the postal service.

19. On 3 February 2014, a meeting was held at the ATO Parramatta office at 1:15pm. John Chesher and Ann Wrightson attended on your behalf. Also present at the meeting with ATO officers, Des McMaster and Arun Sivathondan. At the meeting, John Chesher advised that the main purpose of his visit was to clarify any issues relating to your current audit and that of other related entities. The following information was provided by John Chesher at the meeting:

   a. There is currently no litigation pending in the United States of America (USA).

   b. Uyen Nguyen was also a joint director of W&K in the USA.

   c. Mr Young, the appointed Liquidator acting on behalf of two related entities audited by the ATO for R&D claims in 2012 had made representations to ASIC and declared that Craig Wright was unfit to hold the position of director in the companies.

20. On 14 February 2014, we issued you with an interim audit report, via e-mail. This was withdrawn by Marina Dolevski of the ATO on 19 February 2014, based on subsequent information you provided to us.

21. On 18 February 2014, your representatives Craig Wright, John Chesher and Andrew Sommer (of Clayton Utz) attended the ATO office at Sydney and met with Des McMaster, Marina Dolevski and Hoa Do of the ATO. At this meeting, you provided the following information:

   a. The Bitcoin transactions were not a transfer of Bitcoin but rather, the transfer of the equitable interest that Craig Wright holds in an offshore trust. You further explained that an entity receiving the interest could call for the transfer of Bitcoin (from the trust) to it absolutely or it could direct the trust to transfer the Bitcoin to a third-party at the company's direction.

   b. As such, there is a supply of rights, not the supply of Bitcoin, and you suggested that these supplies are therefore GST-free pursuant to section 38-190, item 4. The transactions occurred overseas.

   c. The invoice issued by MJF Contracting Pty Ltd (MJF), also known as MJF Mining Services WA Pty Ltd, to Craig Wright on 1 July 2013 (Ref: OBO188) includes an item 'Agreement to supply Microfinance software and Accounting packages. Integration and support. Developed in conjunction with Dallah AlBaraka group (SA). The unit price is $11,500,000 and you

advised this was an acquisition by you (Coin-Exch) through Craig Wright acting as your agent. This conflicts with a copy of the AlBaraka contract you provided at the meeting which shows the parties to the agreement are Al Baraka Banking Group and Hotwire (with Craig Wright as agent). You volunteered that Craig Wright should not have claimed the input tax credit.

    d.  For the MJF transactions, payment was made in Bitcoin, not as transfer of rights. The Bitcoin were transferred from trusts held in the UK, the trustee of which is 'Design by Human Ltd'. The remainder of Bitcoin remains in offshore trusts.

    e.  Your share capital was funded through the transfer of an interest in offshore Bitcoin trusts.

22. On 19 February 2014, the case was transferred from auditor Celso Tomas to auditor Andrew Miller, following a request by you that your case be reassigned.

23. On 25 February 2014, John Chesher provided Andrew Miller with proposed amended BAS working papers for a number of entities under audit. In the case of your BAS, the amount of refund claimed did not change. The working papers show no sales, and the significant acquisitions are from DeMorgan (for pre-paid software licences), Hotwire (for 'Research Licencing based on extensions of Core Banking and Treasury') and Craig Wright R&D (for Hardware design and implementation).

24. On 26 February 2014, John Chesher provided Andrew Miller with a briefing paper via e-mail, which provides a description of transactions. This paper provides the following information:

    a.  Much of the Bitcoin available to Dr Wright is held in a trust, formed in the Seychelles.

    b.  The Trustee of the Seychelles Trust is a company incorporated in the United Kingdom, Design by Human Ltd.

    c.  Pursuant to a 'Deed of Loan', entered in to by the Trustee and Dr Wright in October 2012, the Trust made available a facility to Dr Wright of 650,000 Bitcoin.

    d.  An annotation on the Deed of Loan (which is believed to have been written contemporaneously with the execution of the Deed) states 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW'.

    e.  Share capitalisation occurred through the transfer of these rights, and the company would be able to call for the transfer of those Bitcoin to itself or the transfer of those Bitcoin to a third party. Until such time as the company provided the Trustee with those instructions, the Bitcoin would remain held by the Trustee for the benefit of the company.

25. Also on 26 February 2014, John Chesher and Ann Wrightson met with Andrew Miller and Jenifer Trinh of the ATO. Your representatives provided explanations around the updated working papers provided the previous day.

26. On 5 March 2014, Andrew Miller sent you a request for further information and documents, via e-mail to John Chesher.

27. On 10 March 2014, John Chesher sent a response to our request on 5 March.

28. On 11 March 2014, John Chesher sent another response to our request, predominantly in relation to Hotwire and DeMorgan, two entities from which you have made acquisitions.

29. On 13 March 2014, we received information from the Commonwealth Bank of Australia in relation to bank accounts held by you and related parties.

30. On 14 March 2014, Andrew Miller and Jenifer Trinh attended the premises of Hotwire, and spoke with your representatives, John Chesher and Craig Wright. A demonstration was provided of the software owned and licenced by entities related to you and Craig Wright. Some

further documents and information were provided including correspondence between Craig Wright and Mark Ferrier of MJF, an index of AlBaraka software, and four proposals issued by W&K to the DHS in the USA. These proposals list the projects referred to in NSWSC 2013/225983 including funding amounts referred to in this case between Craig Wright and W&K.

31. On 17 March 2014, John Chesher sent a response to a request sent on 5 March 2014, in relation to Craig Wright and DeMorgan. This included responses to questions, and documents in support of those responses. The following information was provided:
    a. Craig Wright was not a Director of W&K but on occasion served as alternate Director.
    b. Craig Wright transferred IP to W&K in the 2010 Income Year, with a value set at $5,000.
    c. Craig Wright entered into an agreement with W&K on 2 April 2013 (REF: CEWK03). Under this deed, loans referred to in a previous agreement (CEWK01) are deemed paid in full and that the purchaser will accept the new terms as full satisfaction of CEWK01.
    d. Uyen Nguyen accepted the position of US Resident Director of W&K on 1 July 2013. You advised that Dave Kleiman request she hold this position.
    e. On 9 July 2013, Uyen Nguyen transferred all software and related algorithms to Craig Wright for release of W&K from existing debts. This was referenced in the NSWSC case 2013/225983.
    f. The IP referred to in the statement of claim in NSWSC 2013/225983 was designed with the DHS in mind and customised to their needs. It was stated that ownership of the IP remained with W&K.
    g. The bonds used to finance the development of the IP were obtained by W&K and not Dr Wright.

Also provided was the 'Deed of Loan' in relation to the Seychelles trust. This deed is the sole document which establishes the loan of 650,000 Bitcoin. The rights to the equity of this trust were used as consideration in your transactions with related parties. It is noted in this deed that:
    a. The trustee of the Trust is 'Design by Human Ltd' (08248988) UK.
    b. The deed is dated 23 October 2012.
    c. The deed is executed by Uyen Nguyen for Design by Human. The 'Consent to Act' document at the end of the deed states that Uyen Nguyen accepts the position of Chief Operating Officer of Design by Human from 18 October 2012 and consents to act as Director from the later date of 30 June 2013.
    d. The mortgagee agreed to lend money (in the form of Bitcoin) to the mortgagor.
    e. The loan is for 650,000 Bitcoin.
    f. The loan is to be repaid by Craig Wright by 30 June 2020.
    g. Appendix 1 lists Bitcoin blockchain addresses transferred and contains a note that 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW'.

32. On 18 March 2014, John Chesher advised Andrew Miller by email that amended BAS for the relevant period have been lodged for you and other entities related to Craig Wright. Our systems show that you lodged an amended BAS on 17 March 2014.

33. On 20 March 2014, John Chesher provided the trust deed for DeMorgan, as requested. This deed shows that DeMorgan was established on 9 August 2013 and that the trustee is Panopticrypt Pty Ltd (Panopticrypt). It is noted that the start date of DeMorgan's ABN, as per ATO systems, is 26 August 2013.

34. On 21 March 2014, Andrew Miller sent you a request for further information and documents, via e-mail to John Chesher. The questions asked were predominantly seeking clarification and further information around your responses to our previous request sent on 5 March 2014.

35. On 28 March 2014, Andrew Miller, Jenifer Trinh and Des McMaster of the ATO met with John Chesher, Craig Wright and Andrew Sommer, at the premises of Clayton Utz. At this meeting

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 73 of
137
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 73

your representatives provided documents and information to our requests, some of which had not been previously provided. The following documents/information were provided by you at this meeting:

    a.  A 'Deed of Assignment and Charge' between Craig Wright and DeMorgan, signed and dated 15 July 2013. The deed provides the ABN of DeMorgan. Under the deed, Dr Wright agrees to transfer IP to DeMorgan. The IP consists of Core Software and training materials, source code developed under agreement with W&K (listing categories related to the projects completed for DHS) and software sourced from MJF (which is said to have not been received as at the date of signing but an agreement for the supply has been completed).

    b.  An 'IP Deed of Assignment' between DeMorgan and you, dated 15 September 2013. It states that DeMorgan owns IP and the IP rights in the core technology which has been transferred from Craig Wright. The IP is the software obtained from MJF (including AlBaraka and Siemens software) and from W&K.

    c.  A 'Deed of Assignment of Equitable interests' between Craig Wright and you, dated 1 July 2013. It stated that Craig Wright holds equitable rights to a number of Bitcoin managed in the UK held in legal ownership in an overseas trust. This equitable interest entails the right to call on Bitcoin. It says that you and Craig Wright are parties to an agreement where you will purchase IP, to be held in trust from DeMorgan when created. Craig Wright wishes to assign to you, the rights under the contract.

    d.  Craig Wright is unsure of the source of the bonds referred to in the two statements of claim filed with the NSWSC. He thought they may have been bonded against an American Gaming company called 'Playboy Gaming'. He said that he did not provide the bond personally. He stated that because he is not the Director of W&K he has minimal knowledge or records in relation to the running of W&K's business and only holds the software and source code.

Also at this meeting Andrew Miller advised you of the following:

    e.  There is no evidence that DHS accepted the four proposals from W&K, which are referred to in the statement of claim in NSWSC 2013/225983. A news article was provided to you, listing the successful applicants of these projects.

    f.  W&K was registered with the Florida Department of State on 14 February 2011 and was administratively dissolved on 28 September 2012. This is a public record and a copy was provided to you.

    g.  Documents including invoices and contracts issued to and by DeMorgan, which include its ABN, are dated before it was established as a trust and before it received an ABN.

    h.  There remains a licence for software between you and Craig Wright, and it is unclear how this affects any other licences with DeMorgan for the same software.

    i.  Design by Human appears to be a dormant shelf company, created by CFS Secretaries Ltd in the UK. Public Records from 'Companies House' were provided showing that Craig Wright became Director as at 7 January 2014. There is no record of Uyen Nguyen holding any position with this company.

36. On 1 April 2014, John Chesher advised that Uyen Nguyen had paid the required fees to the Florida Department of State to reinstate W&K as a company, as at 28 March 2014.

37. On 2 April 2014, John Chesher provided Andrew Miller with a list of all Bitcoin Wallets used for the MJF transactions. He advised that these were 'off block' transactions, which is understood to mean that there is no transfer of Bitcoin between wallets but rather that an entire wallet and key are handed to a new owner.
The wallets/Bitcoins transferred in the MJF transaction make up the majority of wallets and Bitcoins referred to in the 'Deed of Loan' with the Seychelles trust. Also, some of the Bitcoin/Wallets given to MJF on or before 15 September 2013, Craig Wright claimed he had control of in an email to Michael Hardy of the ATO in an email on 10 October 2013.

38. On 3 April 2014, John Chesher provided Andrew Miller with a number of documents via email which value the software obtained from W&K, using the 'Single Line of Code' (SLOC) basis, at over $200,000,000.

Case 9:18-cv-80176-BB Document 885-15 Entered on FLSD Docket 02/17/2022 Page 74 of
03/12/2017
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 74
137

**Findings**

39. No, you are not entitled to all input tax credits for acquisitions made in the course of your
business between 1 July and 30 September 2013 (inclusive) for the purposes of the GST Act.

**Reasons for our findings**

<u>Acquisitions</u>

40. Under section 11-20 of the GST Act, you are entitled to claim input tax credits (GST Credits) for
any creditable acquisitions you make.

41. Under section 11-5 of the GST Act, you make a creditable acquisition if:
(a) you acquire anything solely or partly for a creditable purpose; and
(b) the supply of the thing to you is a taxable supply; and
(c) you provide, or are liable to provide, consideration for the supply; and
(d) you are registered or required to be registered.

42. Where you are carrying on an enterprise and claiming GST credits pertaining to creditable
acquisitions under the GST Act, you are required to show satisfactory evidence of those
acquisitions. Satisfactory evidence to meet the requirements of the Act may include, but is not
limited to, the following:
1. Valid Tax Invoices from suppliers
2. Bank Statements to show considerations paid
3. Stock lists, showing stock you have used in your business
4. Business records, business plan, accounting records

43. As notified to you on 10 October 2013, the Commissioner had retained the refund under
section 8AAZLGA of the *Taxation Administration Act 1953*. The outcome of the enquiries that
were required to prove or establish the correctness or accuracy of the information in relation to
your GST credit claim is explained in this interim report.

44. As stated in the above facts, you have revised your original BAS lodgment for the period 1 July
to 30 September 2013 and provided your working papers for amounts in the revision. The Net
amount payable in the revision is identical to the original lodgment. There is an increase in
capital purchases which you claim to be GST-free. For the purposes of this interim report, we
will refer to amounts in your revised lodgment. In doing this, where amounts do not appear in
your working papers, we have not referred to them. For example, invoice 105 issued to you by
Craig Wright for $34,412,454.77 will not be considered in this decision.

45. Your claim for GST credits relates to acquisitions of Intellectual Property you claimed to have
acquired from DeMorgan. In verifying this information, we will first consider the invoices that
this trust issued to you for the prepaid software licence. They are also presented in your
working papers and set out in the table below:

| Invoice | Date | Unit Price | GST | Total |
|---------|------|-----------|-----|-------|
| INV-0005 | 1 Jul 2013 | 9,950,000 | 995,000 | 10,945,000 |
| INV-0006 | 1 Jul 2013 | 4,950,000 | 495,000 | 5,445,000 |
| INV-0007 | 1 Jul 2013 | 4,950,000 | 495,000 | 5,445,000 |
| INV-0008 | 1 Jul 2013 | 4,950,000 | 495,000 | 5,445,000 |
| INV-0009 | 1 Jul 2013 | 4,950,000 | 495,000 | 5,445,000 |
| INV-0010 | 1 Jul 2013 | 4,950,000 | 495,000 | 5,445,000 |
| TOTAL | | 34,700,000 | 3,470,000 | 38,170,000 |

46. All of these invoices are dated 1 July 2013 and copies of invoices you have provided the ATO
include DeMorgan's ABN which has a start date of 26 August 2013. There is therefore an issue
of validity in relation to these invoices. You advised, in our meeting on 28 March 2014, that this

CONFIDENTIAL

could be an issue with the Xero Accounting software, which may insert an ABN on prior invoices once it is entered into the system. Regardless of this, DeMorgan could not have made a supply to you on 1 July as it was not established as a trust until 9 August 2013.

47. You have provided statements that the IP you acquired from DeMorgan included software sourced through MJF, including Al Baraka software and Siemens software. In support of this, the IP Deed of Assignment you entered into with DeMorgan on 15 September 2013 states that DeMorgan, as Assignor, owns IP obtained by Craig Wright through MJF, for AlBaraka and Siemens. Your representatives have provided a copy of the agreement with Al Baraka. This Agreement is between Al Baraka Banking Group and Hotwire. Hotwire is acting through Craig Wright as agent. This agreement clearly shows that the ownership of this software is with Hotwire, not Craig Wright or DeMorgan. We have requested you provide us with copies of all contracts you hold with related parties and no documents you have provided show a transfer of IP from Hotwire to you.
You have advised that there was no contract with Siemens and only an agreement with MJF for the Siemens software.

48. On this basis, we cannot accept that the IP you acquired from DeMorgan included software sourced from Al Baraka or Siemens. Some of the Bitcoin/Wallets that have been provided to MJF for this software were purported by Craig Wright to Michael Hardy, to still be in the control of Craig Wright at a time after the agreement with MJF was completed.

49. The IP Deed of Assignment with DeMorgan also states that you acquired software obtained by Craig Wright through W&K. You state that Craig Wright acquired the rights to this software under 2 NSW Supreme Court orders, that is: NSWSC Cases 2013/225983 and 2013/245661. In your email to us on 17 March 2014, you confirm that 'title to the IP remained with W&K until the judgement of the NSW Supreme Court pursuant to which it was transferred to Dr Wright. Possession of the relevant elements of IP and software remained with Dr Wright. As such between 1 July 2013 and 1 September 2013 the assignment to DeMorgan was an equitable assignment'.

50. Craig Wright filed two Statements of Claim with the NSWSC on 25 July 2013. In the Statement of Claim for 2013/225983, Craig Wright asserts that he conducted four projects associated with DHS for W&K, and lists the four projects (also detailed in the four proposal documents you provided to the ATO on 17 March 2014). The value of the relief claimed in the NSW Supreme Court actions are referrable to the project and also reflected in the proposal documents. The Statement says 'The IP is software used by the US Military, DHS and other associated parties'.

51. Third party verification conducted by the ATO shows that there is no evidence that the DHS accepted these proposals or provided funding for the projects. This information is further supported by the newspaper extract which lists successful candidates for the relevant DHS contracts. W&K was not listed as a successful applicant. You have previously advised that W&K was not known by any other names.

52. In the Statement of Claim for 2013/245661, Craig Wright asserts that by contract dated 8 January 2009, W&K agreed to pay him for property and consulting services. Records obtained from the Florida Department of State show that W&K was originally registered on 14 February 2011. W&K is a limited liability company formed in Florida. We note that a Florida Limited Liability Company can only be formed by filing its articles of organization with the Florida Department of State Division of Corporations (http://form.sunbiz.org/pdf/cr2e047.pdf). W&K could not have entered into a contract with Craig Wright on 8 January 2009 as it did not exist at the time.

53. Your representatives have also stated, in an email dated 17 March 2014, that Dr Wright transferred IP to W&K during the 2010 Income Year.  This cannot have occurred as W&K had not been formed as a limited liability company until 14 February 2011.

CONFIDENTIAL

54. Therefore, the company was dissolved and unable to make any transfers of property on 9 July 2013, as suggested by a document you have provided. Under section 4481, Florida Statutes an administratively dissolved limited liability company, whilst remaining in existence, cannot carry on business except that necessary to wind up and liquidate its business and affairs (http://www.flsenate.gov/laws/statutes/2012/608.4481).

55. The agreement entered into on 9 July 2013 related to settlement of the NSW Supreme Court action, and was not an act undertaken to wind up or liquidate the business of W&K. This conclusion is further supported by evidence provided by you stating that it was always intended that W&K continue to be a LLC and that notices about its administrative dissolution were not received by anyone. These statements are further supported by the fact that fees were paid to reinstate the company as at 28 March 2014.

56. Additionally, agreement CEWK03 between Craig Wright and W&K dated 2 April 2013 is invalid as the company was not allowed to carry on business whilst it remained administratively dissolved, and hence could not enter into new contractual agreements.

57. Having regard to the facts outlined in paragraphs 53-56 above, it is considered that the IP purportedly obtained from W&K cannot have been legally transferred to Craig Wright on the date alleged.

58. Even if IP was transferred to Craig Wright, we do not accept that the valuation of the IP can be ascertained from amounts claimed in the NSWSC cases due to the fact that W&K was not successful in its tender for the DHS contracts.

59. The IP Craig Wright claims to have received is then transferred to DeMorgan through a 'Deed of Assignment and Charge' dated 15 July 2013. This document, which includes DeMorgan's name and ABN, is dated before DeMorgan was established and before the ABN was provided by the ATO. The deed assigns to DeMorgan, software which includes source code developed under agreement with W&K and software sourced from MJF. We believe that the deed could not have been entered into on this date given one of the parties to the deed did not exist until August 2013.

60. You also provided an IP Licence between Craig Wright (Licensor) and you (Licensee), dated 22 August 2013. It is firstly noted that this deed is an agreement between you and Craig Wright in his personal capacity, with no mention of a trust. It states that 'The licensor owns or has the right to use the intellectual property as software', and 'has clear title internationally based on judgement from NSWSC 2013/245661'. This judgement did not occur until 6 November 2013, that is, after the date the deed was signed. The product is said to be Bitcoin and Exchange software. This licence clearly relates to your private ruling request on 27 August 2013, in which Craig Wright stated that he would enter into contracts with entities he controls, providing the IP obtained for a value linked to the NSW Supreme Court case. It is noted that in each case, $20,000,000 of the value was simply the return of a bond. At the meeting on 28 March 2014, Craig Wright advised that he is not certain who provided the bond, but that he did not personally provide it, even though he claimed relief for this amount in the NSWSC.

61. In summary, we have identified significant factual issues with your claim for purported acquisitions of IP from DeMorgan. Based on information obtained by the ATO, statements made as to the origin and value of the W&K software are incorrect. Contracts said to be entered into with W&K predate the existence of W&K as a limited liability company. Furthermore, W&K was administratively dissolved when Craig Wright is said to have acquired the software. Any software he did acquire was transferred to DeMorgan under a deed of charge which is dated before DeMorgan was established. The IP you allege to have acquired from DeMorgan was invoiced before the trust was established. The only software DeMorgan could have acquired was that sourced from W&K was the MJF software which appears to have been acquired by Hotwire and not you. The licence agreement with Craig Wright is based on

values claimed as relief in the NSWSC actions. We cannot accept this valuation for reasons set out above.

62. On this basis, we have formed the view that you have not acquired any IP from DeMorgan and hence are not entitled to the GST credit claimed.

Consideration

63. Alternatively, if you had acquired the IP from DeMorgan (which we consider could not have occurred), we consider that the evidence shows that you did not provide consideration for that supply. Our reasons are as follows.

64. In discussions with auditor Celso Tomas, your Director Craig Wright advised that payments were in the form of Bitcoin. We advised you that the ATO view was that the supply of Bitcoin was a taxable supply. In a meeting on 18 February 2014, you informed us of your revised understanding that consideration was not in the form of Bitcoin.

65. You have explained that consideration for all supplies made to you by related parties was by an assignment of rights to the equitable interests in an offshore trust which holds Bitcoin. We have confirmed with you that all of these assignments were for the interest in the Seychelles trust, which was created pursuant to a Deed of Loan, dated 23 October 2012. The deed is executed by Uyen Nguyen of Design by Human Ltd. Attached to the deed is a consent to act, whereby she accepts the position of Chief Operating Officer (COO) from 18 October 2012, and Director from 30 June 2013. This document is not executed by the Director of the company.

66. On the date this deed was executed, Design by Human appears to be a dormant shelf company. At that time, the Director was listed as Bryan Thornton and the Corporate Director was CFS Secretaries Ltd, an entity which conducts the secretary services for a company which creates shelf companies. Publically available information obtained from Companies House in the UK shows that Craig Wright became the director of this company (now called C01n Ltd) on 7 January 2014. There is no record of Uyen Nguyen ever holding the position of Director. Bank accounts for Hotwire show that the earliest payments to CFS occurred in 2014.

67. Your representatives have provided an email from Dave Kleiman to Craig Wright, dated 10 December 2012. The body of the email states 'Craig, we now have a company in the UK. There is a shelf company – Design by Human…that I like the name of'. It goes on to say 'leave the shelf dormant for now and leave it all off and vacant'. While this email provides some suggestions that there was an association with Design by Human prior to January 2014, this email is still after the execution of the deed of loan.

68. As there is no evidence that Uyen Nguyen was able to execute the Deed of Loan on behalf of Design by Human, we cannot consider this a valid agreement. As this is the only document you have provided in support of the establishment of this loan, we have formed the view that consideration was not provided in the manner you assert.

69. We have noted acquisitions claimed in your working papers from Craig Wright and from Hotwire. You have explained that the consideration for these supplies was also in the form of a transfer of rights in a trust pursuant to the aforementioned deed of loan. For the reasons outlined above, we do not accept that consideration has been provided for the purposes of the GST Act.

70. We have further noted significant inconsistences with the deed of loan, and with subsequent statements made to the ATO by Craig Wright. The Deed of Loan lists 26 Bitcoin block addresses, with a note that 'as agreed, all wallets to be held in UK in trust until all regulatory issues solved and group company formed with Dave Kleiman and CSW.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 78 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 78
03/12/2017

71. Of these 26 wallets which total 650,000 Bitcoin under the deed, 22 were transferred to MJF as consideration for supplies made. It is believed that some or all of these transfers were 'off Blockchain key transfers'. That is, that there was not a transfer of Bitcoin from Wallet to Wallet but rather, the entire ownership of the wallet, including the access key, was provided to MJF. This leaves only 4 wallets, to the value of 275,071.04 Bitcoin, held by the trust after the final MJF transaction on 15 September 2013.

72. Therefore, we have reduced your creditable acquisitions, disallowing GST credits claimed for all acquisitions and credits claimed for transactions with related entities. It is noted that there is one acquisition from an independent third party which has been substantiated with financial institution records. That is a bank fee of $22, which includes $2 of GST. Your amended BAS amounts are as follows.

| Sales | GST Debits | Acquisitions | GST Credits | PAYG | Net BAS |
|-------|-----------|-------------|------------|------|---------|
| 0 | 0 | 22 | 2 | 0 | -2 |

This has resulted in a GST shortfall of $3,787,427.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 79 of
137
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 79

**Administrative penalty**

Section 284-75 of Schedule 1 to the *Taxation Administration Act 1953* (TAA) imposes an administrative penalty if you make a statement to us which is false or misleading in a material particular whether because of things in it or omitted from it. A material particular is something that is likely to affect a decision regarding the calculation of an entity's tax-related liability or an entitlement to a credit or payment.

Where a shortfall arises as a result of making a false or misleading statement, the penalty is assessed in four stages:

⚬ Determine the shortfall amount
⚬ Work out the base penalty amount
⚬ The base penalty amount may be increased and/or reduced, and
⚬ The Commissioner considers remission of the calculated penalty amount.

You made a statement to the Commissioner by lodging your activity statement. The statement was false or misleading as it incorrectly stated the assessed net amount. The assessed net amount includes any amounts of GST that you have to pay. This is explained in the issue relating to the shortfall.

Your shortfall amount for penalty purposes is $3,787,427. This is the amount that is more than it would other have been if the statement were not false or misleading (item 2, section 284-80).

| Tax Period Ended | Issue | Shortfall $ |
|---|---|---|
| 30 September 2013 | Creditable Acquisitions Claimed | $3,787,427 |

Miscellaneous Taxation Ruling MT 2008/1 *Penalty relating to statements: meaning of reasonable care, recklessness and intentional disregard* explains that you are required to take the same level of care to fulfil your tax obligations that could be expected of a reasonable person in your position, taking into account your own personal circumstances, knowledge, experience, education and skill.

You are not liable to a penalty for making a false or misleading statement if you exercised reasonable care in making the statement.

Where a false or misleading statement results in a shortfall amount, the base penalty amount is worked out according to the level of care taken by you, which led to the shortfall.

Additionally, as you are responsible for the authorised actions of your employees and representatives, their behaviour may also be relevant to determining your behaviour for penalty purposes.

In *Shawinigan Ltd v Vokins & Co Ltd* [1961] 2 Lloyds Rep 153 at [162], recklessness was described as gross carelessness – 'the doing of something which in fact involves a risk, whether the doer realises it or not; and the risk being such having regard to all the circumstances, that the taking of that risk would be described as 'reckless'.  It was further said at [403]: 'If the risk is great, and the probable damage great, recklessness may readily be a fair description, however much the doer may regard the action as justified and reasonable'.

The meaning of recklessness is further discussed in MT 2008/1 at paragraphs 99 – 108. You act recklessly when your conduct clearly shows disregard of, or indifference to, consequences that are foreseeable by a reasonable person as being a likely result of your actions.

We have determined that you were reckless because the facts show that objectively you should have reasonably foreseen that your actions may have led to a shortfall amount.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 80 of
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 80
137

This is evidenced by the following:

- ∞ You lodged an activity statement in which you claimed creditable acquisitions and a refund of $3,787,429
- ∞ Documents you held substantiating your claim, including tax invoices, deeds and agreements. They include details (such the name of an entity and ABN) which could not have existed at the document date. These entities were connected to persons your director either had control of or was in a close working relationship with, such that this information could reasonably be said to be within his knowledge.
- ∞ The intellectual property you allege to have acquired cannot have been acquired in the manner you allege. This is evidenced by the fact that the original contract between your director and W&K was purported to have been entered into at a time when W&K had not been created, and the settlement agreement between W&K's director and your director was entered into at a time when the capacity of W&K to bind itself in such a way was highly questionable given it was administratively dissolved at the time. Your director was in a position to be aware of these facts;
- ∞ The consideration you provided, in the form of rights to the equity of a trust, cannot have been provided as the trust was created pursuant to a deed of loan which was not validly executed. This is because at the time deed was executed the person purporting to execute the deed on behalf of the corporate trustee was in fact not a director at that time.

This finding is consistent with paragraphs 80, 92, 99-108 and example 6 contained in MT 2008/1. Reliance on information provided by a third party, where you should have had reasonable knowledge that the information may be incorrect is relevant in considering your behaviour. Similarly, the size of the shortfall is also a relevant factor. In this case, the shortfall consists almost entirely of the refund you claimed for transactions with related entities. Based on the documents you held at the time of the transactions and the time of the false or misleading statement, a reasonable person would have had reasonable knowledge that they would not be entitled to claim this refund.

Item 2 of the table in section 284-90 of Schedule 1 to the TAA sets a base penalty amount of 50% of your shortfall amount when the shortfall results from recklessness.

The base penalty amount is increased or reduced in accordance with criteria set out in the law.

In your case we consider that there are no facts that warrant any change to the base penalty amount.

Section 298-20 of Schedule 1 to the TAA enables us to remit all or part of the penalty in appropriate circumstances. To guide us in making these decisions, the Commissioner has issued several Law Administration Practice Statements.

Law Administration Practice Statement PS LA 2012/5 *Administration of penalties for false or misleading statement that result in shortfall amounts* outlines the circumstances in which the Commissioner considers it fair and reasonable to remit penalties applying to false or misleading statements resulting in shortfall amounts.

Paragraph 156 confirms that remission decisions need to consider that a major objective of the penalty regime is to promote consistent treatment by reference to specified rates of penalty. That objective would be compromised if the penalties imposed at the rates specified in the law were remitted without just cause. Remission is only appropriate to the extent that the prescribed rates of penalty cause unintended or unjust results.

We have considered remission under PS LA 2012/5 which gives guidance on grounds for remission. Further, remission was considered under the principles of the ATO compliance model and the Taxpayers' Charter. In your case we considered that there are no facts that warrant any remission.

CONFIDENTIAL                                                                                          DEF_00067333

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 81 of
03/12/2017                                   137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 81

The following table is a summary of the shortfall identified in the audit and the level of penalty to be applied:

## Penalty table – GST

| Tax Period Ended | Shortfall Amount $ | Behaviour | Base Penalty % | Base Penalty Amount $ | Increase $ | Reduction $ (-) | Remission $ (-) | Penalty Amount $ |
|---|---|---|---|---|---|---|---|---|
| 30 September 2013 | 3,787,429 | Reckless | 50 | 1,893,714.50 | 0 | 0 | 0 | 1,893,714.50 |
| **Total (all periods)** | **$ 3,787,429** | | | | | | | **$ 1,893,714.50** |

**CLAYTON UTZ**

**Confidential**

**Email and post**                                                                                     9 May 2014

Mr Andrew Miller
Australian Taxation Office
PO Box 9977
PARRAMATTA NSW 2124
**andrew.miller@ato.gov.au**

Dear Mr Miller

**Coin-Exch Pty Ltd**

We refer to your letter dated 8 April 2014 forwarding an interim report on the refund for Coin-Exch Pty
Ltd.

We confirm that we act for Coin-Exch Pty Ltd and have been instructed by Dr Craig Wright to respond to
your interim report.

We appreciate your confirmation by email that our client has until 9 May 2014 to respond to your interim
report.

In our view, there are a number of factual and legal errors in the interim report that we consider should
be corrected in reaching a final position.  Our submissions in relation to the interim report are attached as
Appendix 1.

In Appendix 2 we have included submissions regarding the remission of the substantial penalty that is
referred to in the interim report.

If you have any questions in relation to this matter, please do not hesitate to contact the undersigned.

Yours faithfully

**Andrew Sommer, Partner**
+61 2 9353 4837
asommer@claytonutz.com

Your ref  1-526DVU8
Our ref  837/80154702

Level 15, 1 Bligh Street                    GPO Box 9806                          T +61 2 9353 4000
Sydney NSW 2000                             Sydney NSW 2001                        F +61 2 8220 6700
                                            DX 370 Sydney                         www.claytonutz.com

L\312665930.3

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 83 of
9/12/2019                                137
1-5WHAER2        Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 83



## APPENDIX 1 - DETAILED SUBMISSIONS

**Part 1 - GST Technical Submissions**

It is conceded that there are complex factual matters to be considered in relation to the affairs of Coin-Exch Pty Ltd (**Coin-Ex**) and its related entities. However, we submit that the question of whether or not Coin-Ex is entitled to input tax credits has been obscured by some of the factual complexity. Many of the factual matters that are considered in relation to the interim report issued to Coin-Ex on 8 April 2014 (**Interim Report**) are irrelevant to the availability of input tax credits for the company.

An entity is entitled to claim input tax credits for the creditable acquisitions that it makes. Pursuant to section 11-5 of the *A New Tax System (Goods and Services Tax) Act 1999* (**GST Act**), an acquisition is a "creditable acquisition" where:

- the acquisition is made solely or partly for a creditable purpose; and
- the supply of the thing is a taxable supply; and
- the recipient provides or is liable to provide the consideration for the supply; and
- the recipient is registered or required to be registered.

At paragraph 3 of the Interim Report, it is accepted that Coin-Ex was registered for GST purposes from 1 June 2013. There is no suggestion in the Interim Report that at any time during the review period that Coin-Ex was not entitled to be registered for GST purposes.

Accordingly, Coin-Ex's entitlement to input tax credits is dependent on Coin-Ex establishing:

- that Coin-Ex made an acquisition for a creditable purpose;
- that the acquisition by Coin-Ex was of a taxable supply; and
- that Coin-Ex provided or is liable to provide consideration for the supply of the thing acquired.

In relation to the tax period in which Coin-Ex was able to claim the input tax credits to which it was entitled, pursuant to section 29-10(3) of the GST Act, it was necessary for Coin-Ex to hold a "tax invoice" for the creditable acquisitions it had made at the time Coin-Ex lodged its GST return for the tax periods in which the input tax credits were claimed.

**Creditable purpose**

We understand that Coin-Ex is intending to develop and license computer software and accounting systems. Consequently, it is submitted that acquisitions relating to the licensing of computer software and accounting systems will be acquisitions made for a creditable purpose. At paragraph 72 of the Interim Report, it is accepted by the ATO that Coin-Ex is entitled to input tax credits for one of its acquisitions. As such, we submit that the ATO is satisfied that Coin-Ex is:

- carrying on an enterprise; and
- acquisitions for its business were made for a creditable purpose.

Therefore, it is submitted that the only grounds on which the ATO could determine that Coin-Ex was not entitled to the input tax credits that it has claimed are that:

- the ATO is not satisfied that Coin-Ex made an acquisition at all; or
- if Coin-Ex made an acquisition, the ATO is not satisfied that the acquisition made by Coin-Ex was of a taxable supply; or
- that Coin-Ex neither provided nor liable to provide consideration for the acquisitions made by Coin-Ex.

L\312665930.3                                                                                              2

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                        9 May 2014

**Acquisitions**

There are six principal acquisitions that Coin-Ex contends that it made during the tax period of 1 July - 30
September 2013:

- acquisition documented by INV-005 - Software - $10,945,000.00 (GST inclusive);
- acquisition documented by INV-006 - Software - $5,445,000.00 (GST inclusive);
- acquisition documented by INV-007 - Software - $5,445,000.00 (GST inclusive);
- acquisition documented by INV-008 - Software - $5,445,000.00 (GST inclusive);
- acquisition documented by INV-009 - Software - $5,445,000.00 (GST inclusive); and
- acquisition documented by INV-010 - Software - $5,445,000.00 (GST inclusive).

In each case, the supplier of the Software was the Wright Family Trust.

As between Coin-Ex and the Wright Family Trust, the issues are simply:

- was there a supply? and
- was that supply a taxable supply?

**Part 2 – Submissions on the facts**

**Supplies by the Wright Family Trust**

In the Interim Report, much is made by the ATO of their findings that:

- W&K Info Defense LLC (**W&K**) was not capable of making supplies to Dr Craig Wright at
  particular points in time (at paragraphs 54 - 57);
- documents between Dr Craig Wright and the Wright Family Trust may bear a date which is
  earlier than the date of formation of the Wright Family Trust (at paragraph 59); and
- documents between Dr Wright and Coin-Ex relating to the provision of the software do not make
  mention of the Trust.

The first of these findings is discussed in Part 3 of this Appendix 1 where we submit that W&K must be
regarded as being capable of making supplies at the relevant time.

However, for the purposes of determining the extent to which Coin-Ex is entitled to an input tax credit, we
submit that the only relevant question is whether or not the Wright Family Trust was capable of making
the relevant supplies to Coin-Ex.

In this regard, we submit that under the GST law, all that is important is that:

- irrespective of the contractual arrangements with W&K, it is understood that Dr Wright was in
  possession of the relevant software (that he considered had previously been assigned to W&K)
  at the time of the transactions with the Wright Family Trust; and
- irrespective of the date inserted on the Deed of Assignment and Charge, both Dr Wright (as
  assignee) and Panopticrypt Pty Limited (**Panopticrypt**) as Trustee of the Wright Family Trust
  have acted in accordance with that Deed and have treated themselves bound by it.

It must be borne in mind that these are transactions between related parties, often drafted without the
benefit of external legal advisers. It is simply an absurd proposition for the ATO to suggest that simply
because of the inclusion of an incorrect date on a document that the whole of the supply being made
pursuant to that document should be invalidated.

CONFIDENTIAL                                                                          DEF_00067337



**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                              9 May 2014

*Supply by Dr Wright to the Wright Family Trust*

*Obtaining rights from W&K*

As stated above, we submit that the ATO has wrongly concluded that there could be no supply from
W&K to Dr Wright. However, even if this was the case that Dr Wright did not have clear legal title to the
Software at the time he entered into the arrangements with the Wright Family Trust, this does not of itself
mean that there was no supply from Dr Wright to the Wright Family Trust.

Intellectual property is property capable of assignment at law. An agreement to assign legal property
which is subject to some defect (because the assignor lacks clear title) will be treated as an assignment
in equity where it is provided for consideration. As consideration was provided by the Wright Family
Trust to Dr Wright for that assignment, the agreement would be binding in equity and would require Dr
Wright to transfer legal title to the Wright Family Trust as soon as Dr Wright obtained such legal title.

Upon entry into the Deed of Assignment and Charge, the Wright Family Trust obtained binding rights as
against Dr Wright in relation to the assignment of the intellectual property. We submit that for the
purposes of applying the GST law, whether that Deed was executed on 15 July 2013 or some other date
is immaterial. That Deed represents an agreement in writing for consideration. Under that Deed there is
the provision of binding rights and obligations. The parties have acted in accordance with and in reliance
on the document.

Therefore, for the ATO to suggest that there is "no supply" by Dr Wright to the Wright Family Trust is
simply wrong as a matter of law. Whether the Deed of Assignment and Charge gave rise to an
immediate transfer of a legal interest or an immediate transfer of an equitable interest with the legal
interest to follow is immaterial to the question of whether or not there was a supply. We submit that in
accordance with the definition of supply in section 9-10 of the GST Act, either the provision of legal
interest or the equitable interest would be a supply. Either supply would give rise to an acquisition and
would enable the Wright Family Trust to, in turn, deal with the interest acquired.

Clearly the intention of the parties was for the transfer of the legal interest.

*Date of execution*

In relation to the Deed of Assignment and Charge either:

*   it was executed on 15 July 2013; or
*   it was executed subsequently.

If the Deed of Assignment and Charge was executed on 15 July 2013, this would have been before the
date on which the Wright Family Trust was formed. However, we understand that the formation of the
Wright Family Trust was in contemplation at the time. It is understood that although the process of
obtaining legal advice in relation to the formation of the Wright Family Trust had commenced, the final
Trust Deed had not been executed. Attached at Annexure P is an email from Dr Wright's solicitors at the
time, referring to the formation of the Wright Family Trust as at 24 July 2013. It is clear from the
execution panel of the Deed of Assignment and Charge that at the time of execution, Dr Wright
understood that he has signing in his capacity on behalf of the Wright Family Trust.

In such a circumstance, Panopticrypt was able to adopt the terms of the Deed of Assignment and Charge
by ratifying the execution of that document by Dr Wright through adopting its terms. It is understood that
the parties have acted in accordance with the terms of the Deed of Assignment and Charge and neither
party to that Deed has sought to disclaim it.

L\312665930.3                                                              4

CONFIDENTIAL                                                              DEF_00067338

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                        9 May 2014

Alternatively, if the Deed of Assignment and Charge was executed after 15 July 2013 (which would seem to be more likely), the mere fact that the date on the front page and on the signature panel was not updated to reflect the correct date as at signing should not negate the efficacy of the Deed for all other purposes - including its ability to substantiate a supply for the purposes of the GST law.

As noted above, neither Dr Wright nor the Wright Family Trust has sought to disclaim the Deed. Rather, both have acted and continue to act in accordance with its terms. In these circumstances, it seems remarkable that the ATO would use the discrepancy regarding the date to reach a view that no supply was possible under the terms of that Deed.

**Agreement between the Wright Family Trust and Coin-Ex**

*Nature of supply*

As the recipient of a supply from Dr Wright, the Wright Family Trust was capable of making a supply of the whole or part of the Software it acquired to Coin-Ex. Of course, the extent of the supply being made by the Wright Family Trust to Coin-Ex cannot exceed the scope of the rights that the Wright Family Trust had obtained from Dr Wright, but nonetheless it was capable of making such a supply. If the Wright Family Trust had only acquired an equitable interest (such as a right to the legal title to the Software once that was obtained by Dr Wright) then it was capable of assigning as much. However, much like the position of Dr Wright discussed above, the Wright Family Trust could enter into a legal assignment of the Software. Were the Wright Family Trust to do so before obtaining legal title to the Software, the agreement would be enforceable in equity where it was made for consideration. Such an agreement would operate to immediately transfer to Coin-Ex the legal interest in the Software as soon as it came into the possession of the Wright Family Trust.

It is the position of the taxpayer and Dr Wright that Dr Wright did properly possess legal title to the Software as at the date it was supplied to the Wright Family Trust and to Coin-Ex. However, as demonstrated above, even if that were not the case, the agreements between the parties would nonetheless give rise to an equitable assignment, which would immediately give rise to a legal assignment upon the legal property coming into the possession of Dr Wright.

Whether the assignment was at law or in equity, in each case there would be a supply and a corresponding acquisition for GST purposes.

*License to Coin-Ex*

At paragraph 60 of the Interim Report, reference is made to an IP Licence between Craig Wright (Licensor) and Coin-Ex dated 22 August. In that paragraph, the ATO goes on to say:

> *"It is firstly noted that this deed is an agreement between you and Craig Wright in his personal capacity, with no mention of a trust."*

However, the ATO does not go on to state the significance of this finding. Rather, the ATO simply goes on to restate (in paragraph 61) their findings discussed above that:

- nothing moved to W&K;
- nothing moved back from W&K;
- nothing moved from Dr Wright to the Wright Family Trust; and
- even if it did, the value is not supported.

As discussed above, irrespective of the nature of the arrangements with W&K, there was a supply from Dr Wright to the Wright Family Trust and the Wright Family Trust was capable of making a supply to Coin-Ex.

L\312665930.3                                                                                        5

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 87 of
9/11/2017                                                    137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 87

CLAYTON UTZ

Mr Andrew Miller, Australian Taxation Office                                    9 May 2014

There is a substantial oversight in the Interim Report in that there is no mention in that Interim Report of the IP Deed of Assignment entered into between the Wright Family Trust and Coin-Ex on 15 September 2013. That document was provided to the ATO at the meeting on 28 March 2014 in response to the ATO's questions in relation to Coin-Ex (although we understand it may also have been provided previously to the ATO).

That IP Deed of Assignment is provided again and is attached as Annexure A to this Appendix 1.

That IP Deed of Assignment clearly refers to the supplier as being the Wright Family Trust, clearly refers to the consideration as set out in the invoices from the Wright Family Trust and clearly sets out the nature of the Software and intellectual property being supplied by the Wright Family Trust to Coin-Ex. In our submission, this document clearly substantiates the binding legal relationships regarding the supply of the Software and intellectual property acquired by Coin-Ex.

In such a case, the ATO's failure to refer to this document in considering the substantiation of the acquisitions made by Coin-Ex is remarkable.

*Software acquired from MJF*

Coin-Ex's claims for input tax credits in the relevant review period is based on acquisitions it considers that it made from the Wright Family Trust. In turn, the Wright Family Trust acquired Software and intellectual property from Dr Craig Wright. We understand that Dr Craig Wright had acquired software from:

- W&K; and
- MJF Mining Services Pty Ltd (**MJF**).

The nature of the acquisitions from W&K has been discussed above.

In the Interim Report, the ATO forms the view that:

- the Al Baraka software sourced from MJF was acquired by Hotwire (at paragraph 47); and
- because there is no contract with Siemens and only and agreement with MJF there could be no supply o the Siemens software (at paragraph 47).

It is conceded that the position between Dr Wright and Hotwire in relation to the Al Baraka agreements is complicated. This is discussed further below.

However, it is absurd for the ATO to state that there must have been an agreement with Siemens in order for Dr Wright to have obtained the "Siemens Software". The agreement entered between Dr Wright and MJF required MJF to supply the Siemens software. It is assumed that MJF had arrangements with Siemens that enabled MJF in return to supply that software. However, such arrangements are outside the knowledge and control of Dr Wright and outside the knowledge and control of Coin-Ex.

As between Dr Wright and MJF there was an agreement for MJF to supply the Siemens Software to Dr Wright. As such, Dr Wright made an acquisition from MJF. Accordingly, there is no need for Dr Wright, the Wright Family Trust or Coin-Ex to have any direct contractual arrangements with Siemens.

There is no basis for the ATO to form the view that an agreement with Siemens was necessary in order for Dr Wright, the Wright Family Trust or Coin-Ex to make an acquisition of the Siemens software.

At paragraph 61 of the Interim Report, the following findings are made:

L\312665930 3                                                                      6

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                        9 May 2014

> *The IP you allege to have acquired from DeMorgan was invoiced before the trust was
> established. The only software DeMorgan could have acquired was that sourced from W&K
> was the MJF software which appears to have been acquired by Hotwire.*

As discussed above, the invoice referred to is the tax invoice which obviously bore an incorrect date.
That has no significance beyond the validity of the tax invoices, as discussed below. To extrapolate that
out to a conclusion of impossibility of supply (as the ATO does at paragraph 61) is wrong as a matter of
law. Further, as discussed above, there were rights that the Wright Family Trust could supply and did
supply to Coin-Ex.

As to the second sentence extracted from paragraph 61, this is an illogical statement. There is no
relationship between W&K and the software obtained from MJF.

Attached as Annexure B to this Appendix is a copy of the contract entered into between Dr Wright and
MJF dated 3 June 2013. This agreement relates to the supply by MJF to Dr Wright of the Siemens
control software, the Microfinance Software and certain gold options.

From this Agreement, it seems clear that the intention of Dr Wright and MJF was that Dr Wright would be
the recipient of the Siemens Software and that MJF was the supplier of that software. Again, there is no
reference to this signed and dated agreement in the ATO's interim report.

This is also consistent with the details set out in the tax invoice issued by MJF. This is attached as
Annexure C to this Appendix. This document has been provided to the ATO on numerous occasions.
Again, there is no reference to the details of this tax invoice in the Interim Report.

Accordingly, contrary to the conclusions in the Interim Report, there is strong support for the fact that:

- MJF made a taxable supply to Dr Wright comprising a number of items, but specifically including
  the Siemens Software;
- Dr Wright acquired the Siemens Software from MJF in accordance with the Agreement in
  Annexure B and documented on the tax invoice in Annexure C;
- Dr Wright supplied the Siemens Software to the Wright Family Trust in accordance with the
  agreement bearing the date of 15 July 2013 (but subsequently adopted by the Trustee on the
  formation of the Wright Family Trust); and
- the Wright Family Trust made a supply of the Siemens Software to Coin-Ex in accordance with
  the IP Deed of Assignment set out in Annexure A and in accordance with the tax invoices issued
  by the Wright Family Trust to Coin-Ex.

In these circumstances, we submit that there is ample evidence to support the conclusion that there was
an acquisition by Coin-Ex of the Siemens Software in a manner consistent with the GST return lodged on
behalf of Coin-Ex.

*Role of Dr Wright under the Al Baraka Agreement*

It would appear that there has been a lack of clarity about the role of Dr Wright under the agreement
entered into with Al Baraka. That agreement, which is attached as Annexure D, states that the parties to
the agreement are:

- Al Baraka Banking Group (B.S.C.); and
- Hotwire.

It also specifically states that:

L\312665930 3                                                                          7

CONFIDENTIAL                                                        DEF_00067341



Mr Andrew Miller, Australian Taxation Office                                                9 May 2014

- *"HOTWIREPE wishes to obtain the Software from Dallah under this Agreement"* and that
- *"HOTWIREPE is acting through its agent "Craig Wright R&D""*

Notwithstanding these explicit statements (and some of the representations previously made on behalf of Dr Wright) we understand that it was always Dr Wright's intention that he would be recipient of the software supplied under this agreement. We understand that this is because although some of the software being acquired under this agreement would be utilised in the business of Hotwire, not all of it would be so used. Rather, we understand that Dr Wright intended that:

- he would acquire the software supplied under this agreement;
- he would combine it with the software obtained from W&K and software obtained under the other agreements entered into with MJF (see Annexure B); and
- that software would be supplied to the Wright Family Trust and then split up between Coin-Ex, Hotwire and Cloudcroft for their respective businesses.

Indeed, this is what was done. Annexure A sets out the agreement for the supply of software between the Wright Family Trust and Coin-Ex. Similar agreements were entered into between the Wright Family Trust and Hotwire (Annexure E) and Cloudcroft (Annexure F).

Therefore although this intention is contrary to the terms on the face of the Al Baraka agreement in Annexure D, it is consistent with the subsequent documentation entered into by Dr Wright. Further, it is consistent with the tax invoice issued by MJF in relation to the transaction. This is set out in Annexure G. That tax invoice is made out to Dr Wright rather than Hotwire. Whilst this would also be consistent with Dr Wright being the agent of Hotwire (as permitted under Subdivision 153-A of the GST Act) it is also consistent with Dr Wright treating himself as the recipient of the supply.

As stated above, it is acknowledged that there is some inconsistency with the description of the parties and the recitals in the Al Baraka agreement. We understand that this inconsistency is regretted by our clients. However, at the time, Dr Wright was the majority shareholder of Hotwire, the director of Hotwire and the businesses were at a formative stage. The other agreement entered into with MJF around the same time (Annexure B) was clearly entered into by Dr Wright in his personal capacity. We submit that the intention of Dr Wright in relation to the Al Baraka agreement was the same and was clear from and affirmed by subsequent conduct. We are instructed that Dr Wright would be prepared to swear affidavits to this effect.

In these circumstances, the chain of supply is documented by other agreements and any misunderstanding about the impact of the terms of the Al Baraka agreement was harmless. We submit that notwithstanding the inconsistency with the terms of the Al Baraka agreement:

- Dr Wright should be treated as the recipient of the supply made by MJF in accordance with the Al Baraka agreement;
- it should be accepted that Dr Wright made a supply of the Al Baraka software to the Wright Family Trust in accordance with Assignment dated 15 July 2013 (see clause 14 which makes specific reference to the Al Baraka software); and
- it should be accepted that the Wright Family Trust made a supply of part of that software to Coin-Ex in accordance with the IP Deed of Assignment and subsequent tax invoices.

**Tax invoices issued by the Wright Family Trust**

At paragraph 46 of the Interim Report, it is noted that all of the invoices for the acquisitions made by Coin-Ex from the Wright Family Trust have a date of 1 July 2013 and as such:

> *"There is therefore an issue of validity in relation to these invoices."*

L\312665930.3                                                                                        8

CONFIDENTIAL                                                                            DEF_00067342

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 90 of
1-5WHAER2                  Documents provided by the ATO to the General Anti-Avoidance Rules Panel                Page 90
137

CLAYTON UTZ

Mr Andrew Miller, Australian Taxation Office                                                    9 May 2014

Of course, given that the Wright Family Trust was only established on 9 August 2013 and an Australian Business Number (**ABN**) was only issued to the Wright Family Trust on 26 August 2013, it is acknowledged that the date of "1 July 2013" has been erroneously included on those tax invoices.

As previously explained, these errors have arisen in the establishment of the accounting processes for the business. This was the first tax period of Coin-Ex's operations with new accounting software and new personnel. As such, systems for documentation were still being refined. We understand that staff involved at the time did not understand the significance of the requirement for a tax invoice to state the date on which it was issued pursuant to section 29-70(1)(c)(iv) of the GST Act.

Notwithstanding this, it is clear that during the relevant tax period:

- the Wright Family Trust was established;
- the Wright Family Trust was registered for GST purposes; and
- the Wright Family Trust was capable of issuing tax invoices to Coin-Ex for taxable supplies made by the Wright Family Trust.

We submit that the mere fact that those tax invoices bear an incorrect date should not be sufficient to vitiate the validity of those tax invoices. The amendments made to section 29-70 in 2010 following the recommendations of the Board of Taxation were intended to ensure that documents were capable of being valid tax invoices notwithstanding that certain pieces of information were omitted. In the present case, the failure to include the correct date in the tax invoices was a harmless omission in a transaction between related parties and does not lead to any confusion or any consequent errors in the attribution of input tax credits or taxable supplies to tax periods.

**Provision of consideration**

As noted by the ATO in the Interim Report, Coin-Ex was registered for GST purposes to account on a non-cash basis (at paragraph 3). Accordingly, under section 29-10(1), input tax credits arising from creditable acquisitions will be attributed to tax periods in which:

- Coin-Ex provides any part of the consideration for the taxable supply being acquired by Coin-Ex; or
- an invoice is issued for the taxable supply being acquired by Coin-Ex.

As such, we submit that the whole of paragraphs 63 - 71 of the Interim Report are otiose. It is simply irrelevant whether or not Coin-Ex provided consideration. In order for the ATO to deny Coin-Ex an input tax credit based on the absence of consideration, the ATO would need to demonstrate that there was no liability for Coin-Ex to provide consideration for the supply it was acquiring. Nothing in paragraphs 63 - 71 of the Interim Report reaches or substantiates such a conclusion. We submit that the terms of the IP Deed of Assignment makes it clear that Coin-Ex was liable to provide consideration to the Wright Family Trust - consideration which correlates with the invoices issued by the Wright Family Trust to Coin-Ex.

Notwithstanding this fact, we submit that consideration was in fact provided. The key to the ATO's assertion that no consideration was provided by Coin-Ex was that Coin-Ex was not in a position to assign equitable interests in Bitcoin held by Design by Human Ltd because at the time the Deed of Loan (Annexure H) was executed:

- the signatory was not a director of the company; and
- the company was a shelf company.

Importantly:

- Coin-Ex was not a party of the Deed of Loan (Annexure I);

L\312665930.3                                                                                        9

CONFIDENTIAL                                                                              DEF_00067343



CLAYTON UTZ

Mr Andrew Miller, Australian Taxation Office                                    9 May 2014

- at the time of entering into the Deed of Loan, Dr Wright had no control or position with Design By Human;
- at the time of entering into the Deed of Assignment of Equitable Interests with Coin-Ex (Annexure J), Dr Wright had no control or position with Design By Human; and
- at the time of lodging the GST Return for Coin-Ex, Dr Wright no control or position with Design By Human.

As is noted by the ATO at paragraph 66 of the Interim Report, Dr Wright became a Director of Design by Human on 7 January 2014. Thus, if there were deficiencies in the execution of the Deed of Loan, it was entirely outside Dr Wright's knowledge or control.

Subsequent to the meeting of 28 March 2014, we have received from Ms Uyen Nguyen copies of email correspondence from Mr Kleiman to Ms Nguyen dated 13 October 2012 in which Mr Kleiman requested Ms Nguyen to act as "Chief Operating Officer" of Design by Human. Further, this email correspondence indicates Mr Kleiman's intention to remain in the background of managing the company stating:

> "We will act under the shelf until 01 July 2013. At this point, you and I will both become directors officially. Before then, I do need to instruct you in the necessary duties of directorship. As soon as I amout of the VA I will start on this.
> Craig will take over the company sometime in 2014 and the trust in 2015. You will help me run these until this time.
> Right now, we are leavign [sic] the company as dormant. In UK law this does allow us to operate a trust and we can have a nominee director. That means, you and I do not need to be listed."

In relation to that trust, Mr Kleiman stated:

> "I am the primary trustee right now, but I am going to move this into the company and I also authorise you to act in my place. Please just remember to CC me on anything you do."

A copy of that email provided by Ms Nguyen is attached at Annexure K. Whether or not Mr Kleiman's understanding of UK Law was correct (we are instructed that it is and commentary on the CFS website seems to support Mr Kleiman's understanding) is irrelevant for present purposes. The intention was clear - Mr Kleiman had control of the company, was acting as a shadow director and had passed on management of the company and the trust to Ms Nguyen.

A copy of Ms Nguyen's signed acceptance of the appointment is attached as Annexure L.

Consequently, we submit that the findings of fact in paragraphs 66 - 68 of the Interim Report are simply wrong. We accept that the above evidence was not previously provided to the ATO. However, this was not the possession of our clients and has been sourced to refute the claims of the ATO in the Interim Report. We further submit that such evidence is entirely unnecessary for Dr Wright or Coin-Ex to comply with their obligations under GST Act.

It was clear to Dr Wright that he had dispositive power over the Bitcoin held by Design By Human as referred to in the Deed of Loan. As has been demonstrated to the ATO, at Dr Wright's instructions, Design by Human transferred Bitcoin to the recipients nominated by Dr Wright. As such, Dr Wright had no reason to question whether or not the Deed of Loan was validly executed - it was complied with by the counterparty in accordance with its terms.

Again, the ATO's position in the Interim Report has sought to invalidate working contractual arrangements and deny that they have any effect even though the parties to those contractual arrangements have not sought to disclaim those contractual arrangements and to the contrary, continue to act in accordance with them.

CONFIDENTIAL                                                                    DEF_00067344

Case 9:18-cv-80176-BB Document 885-15 Entered on FLSD Docket 02/17/2022 Page 92 of
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 92
137

CLAYTON UTZ

Mr Andrew Miller, Australian Taxation Office                                          9 May 2014

In this instance, there is simply no factual basis for the ATO to conclude that the Deed of Loan was not
effective and was not considered to be binding by Design by Human.  The obligations of Design by
Human have been performed by the company and this has been demonstrated to the ATO.

Therefore, we submit:

- whether or not consideration was provided is entirely irrelevant to the ability of Coin-Ex to claim
  the input tax credits included in its GST return and it is wrong for the ATO to use their conclusion
  in this regard to deny Coin-Ex an input tax credit; and
- the ATO's conclusion that the Deed of Loan has no effect is contrary to the conduct of the
  parties, contrary to documented intention of the parties and has no basis in fact.

**Conclusion of GST Technical arguments**

As we have submitted that:

- the Wright Family Trust was capable of making supplies to Coin-Ex; and
- Coin-Ex did make acquisitions from Coin-Ex; and
- Coin-Ex was liable to provide consideration for those supplies; and
- Coin-Ex did in fact provide consideration for those supplies,

we submit that the ATO's conclusion in the Interim Report to deny input tax credits to Coin-Ex is wrong
and should be reversed in any final report.

**Part 3 – Submissions in relation to W&K**

As discussed above, we submit that the position of W&K is irrelevant to the question of whether or not
Coin-Ex made acquisitions from the Wright Family Trust.  Nonetheless, for the purposes of refuting the
ATO's findings, we make the following further submissions.

Again, it is important to emphasise that the ATO has found that Dr Wright had no role in relation to W&K.
Dr Wright was not a director of W&K.

At paragraph 53 of the Interim Report, the ATO forms the view that no intellectual property was
transferred to W&K during the 2010 year.  We have not yet obtained copies of agreements pursuant to
which the intellectual property was transferred.  However, attached at Annexure M is an email from Mr
Kleiman dated 28 June 2011 confirming that, as at that date, all the software had been transferred.
Unrelated material in earlier emails in that email chain has been redacted.  That material can be made
available on a limited basis if necessary.

Again, it seems difficult to understand why the ATO has formed the view that the intellectual property
was not transferred.  Dr Wright has provided statements that he did transfer it.  The conduct and
correspondence between the parties confirms that it was transferred.  Dr Wright went to considerable
lengths during 2013 to ensure that the intellectual property was validly returned to him after the death of
Mr Kleiman.  Such steps would be illogical in the absence of the initial transfer.

As submitted, this issue has no relevance to the input tax credit entitlements of Coin-Ex.  However, the
position taken by the ATO in the interim report runs counter to considerable evidence that the intellectual
property was transferred by Dr Wright to W&K prior to 28 June 2011.

At paragraph 54 of the Interim Report, the ATO states that because W&K was the subject of an
administrative dissolution because of a failure to pay annual fees:

L\312665930.3                                                                                    11

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 93 of
137
09/12/2017
1-5WHAER2                Documents provided by the ATO to the General Anti-Avoidance Rules Panel              Page 93


**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                              9 May 2014

> "the company was dissolved and unable to make any transfers of property on 9 July 2013."

The ATO makes specific reference to Florida Law in relation to this conclusion. The ATO does not state that it has obtained advice in relation to Florida Law nor is the ATO qualified to express a view about the operation of Florida Law. As the ATO was informed on 29 March 2014, W&K was reinstated by Ms Nguyen as the director of W&K. Notwithstanding this, in the Interim Report the ATO has misleadingly referred to section 4481 without referring to the provisions dealing with reinstatement in section 4482 which states at subsection (3):

> "When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the limited liability company resumes carrying on its business as if the administrative dissolution had never occurred."

Again, we are not experts in Florida law but this provision would seem to directly contradict the ATO's assertions in paragraphs 54 – 57 of the Interim Report. In these circumstances, we would submit that the ATO's conclusions in paragraphs 54 – 57 of the Interim Report and incorrect and must be revised.

At paragraphs 58 – 62 of the Interim Report, the ATO rejects the valuation of the intellectual property obtained by Dr Wright from W&K. As the ATO is well aware, there are no provisions that would enable the ATO to impose GST by reference to a market value for a transaction between 2 parties who are not "associates".

Notwithstanding this, the ATO is aware of the Supreme Court judgements NSWSC 2013/245661 and 2013/225983 which establish that:

- an amount was owing to Dr Wright by W&K in the sum of $56,788,715.79; and
- Dr Wright released those debts in return for the assignment of the intellectual property.

In those circumstances, it must be the case that the value of the consideration provided by Dr Wright was equal to the debts released. The ATO's statements about the ability of W&K to enter into contracts are addressed by our submissions in Part 3 of this Appendix 1.

Again, we submit that the ATO's statements about whether or not W&K had successfully obtained funding from the Department of Homeland Security are irrelevant. However, documentation provided to us by Ms Nguyen indicates that Mr Kleiman had obtained significant funding. We have no further details at this time but Mr Kleiman's email attached as Annexure N states:

> "We did use Craig's source code with his permission to gain a large amount of funding, so this is a part fo [sic] where the value is from, the rest is in the use of bitcoin."

The debts owing by W&K to Dr Wright were established to the satisfaction of the NSW Supreme Court, the judgement for the debts was granted by the Court and satisfied by the provision of the software and intellectual property.

It seems remarkable that the ATO would seek to question the orders of the NSW Supreme Court in order to question a valuation which itself can have no bearing on the matters being considered by the ATO in the Interim Report - that is, the extent to which Coin-Ex can claim an input tax credit for its acquisitions from the Wright Family Trust.

L\312665930.3                                                                                          12

CONFIDENTIAL                                                                               DEF_00067346



CLAYTON UTZ

Mr Andrew Miller, Australian Taxation Office                                    9 May 2014

## APPENDIX 2 - SUBMISSIONS ON ADMINISTRATIVE PENALTY

**Introduction**

In the Interim Report, the ATO proposes to impose an administrative penalty on Coin-Ex for making a false or misleading statement to the Commissioner in Coin-Ex's Business Activity Statement (**BAS**) for the tax period 1 July 2013 to 30 September 2013 (the **September 2013 BAS**).

The amount of the penalty proposed by the ATO is 50% of the shortfall amount of $3,787,427, which the ATO alleges resulted from Coin-Ex's recklessness as to the operation of taxation law.

Legislative references in this Appendix are to provisions in Schedule 1 to the *Taxation Administration Act 1953* (Cth) (**TAA**) unless indicated otherwise.

**Relevant provisions**

A person is liable to an administrative penalty under section 284-75(1) of Schedule 1 to the TAA if:

- they make a statement to the Commissioner or to an entity exercising powers or performing functions under a taxation law (other than the Excise Acts); and

- that statement is false or misleading in a material particular, whether because of things in it or omitted from it.

Under section 284-75(5) of Schedule 1 to the TAA, a taxpayer will not be liable to an administrative penalty under section 284-75(1) (and section 284-75(4)) if the taxpayer took reasonable care in connection with the making of the statement. The exception in section 284-75(5) applies in relation to things done on or after 4 June 2010.

Section 284-85 sets out the method to calculate the amount of a penalty, which in turn is based on the "base penalty amount".

The based penalty amount is determined by reference to the table in section 284-90(1), which sets out the base penalty amount relevant to statements described in subsection 284-75(1) at Items 1 to 3 and 3A to 3C. Items 1 to 3 of this table state the base penalty amount where the taxpayer has a "shortfall amount" (as defined in section 284-80), while items 3A to 3C state the base penalty amount where there is no such shortfall amount.

Finally, the Commissioner has a discretion under section 298-20 to remit all or part of any penalty imposed under part 4-25 of Schedule 1 to the TAA, including penalty imposed under section 284-75(1).

**No false or misleading statement**

As is evident from the words of the provision, the imposition of a penalty under section 284-75(1) first requires the making of a statement that is "false or misleading in a material particular".

In Practice Statement Law Administration PS LA 2012/4 and PS LA 2012/5, the Commissioner states that a *"statement is false if it is contrary to fact or wrong, irrespective of whether or not it was made with knowledge that it was false"*.

Furthermore, the Commissioner also states in PS LA 2012/4 and PS LA 2012/5 that a *"statement is misleading if it creates a false impression, even if the statement is true"*. Further, at paragraph 36 of PS LA 2012/4, the Commissioners states that even if a statement "... *is literally true, it may be misleading because it is uninformative, unclear or deceptive"*. In both cases, the Commissioner considers that a

L\312665930.3                                                                    13

Case 9:18-cv-80176-BB Document 885-15 Entered on FLSD Docket 02/17/2022 Page 95 of
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 95
117

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                                    9 May 2014

statement may be false or misleading because of something contained in the statement or because
something is omitted from the statement.

Paragraph 39 of PS LA 2012/4 provides that a 'material particular' is something that is about a tax related
matter and it:

- is made for a purpose connected with taxation law;

- is relevant to a decision, power or function for which the statement is made;

- can be taken into account in the outcome of that decision or exercise of a power or
  performance of a function; and

- is not immaterial, inconsequential or trivial.

In paragraph 23 of PS LA 2012/5, the Commissioner also states that a material particular:

> "...is something that is likely to affect a decision regarding the calculation of an entity's tax-
> related liability or entitlement to a credit or payment. An inconsequential statement which
> does not affect an entity's tax position will not be a material particular in relation to penalties
> for false or misleading statements that result in a shortfall amount. Most of the information
> provided in a tax return or activity statement will constitute a material particular."

It is not disputed that the September 2013 BAS would be a "statement" made by Coin-Ex in which the
information provided would constitute a material particular.

As established in Appendix 1, Coin-Ex was and is entitled to claim input tax credits for its acquisitions
from the Wright Family Trust. That is, without repeating the submissions in Appendix 1:

- the Wright Family Trust was capable of making supplies to Coin-Ex and did make taxable
  supplies to Coin-Ex;

- Coin-Ex did make acquisitions of taxable supplies from the Wright Family Trust;

- Coin-Ex was liable to provide and did provide consideration for those supplies; and

- Coin-Ex acquired those supplies for a creditable purpose.

In accordance with section 29-10(1) of the GST Act, those input tax credits were attributable to Coin-Ex's
quarterly tax period from 1 July 2013 to 30 September 2013 as at the least, the Wright Family Trust
issued the relevant (tax) invoices to Coin-Ex during that period. This is the case notwithstanding that the
date of "1 July 2013" was erroneously included on the tax invoices issued by the Wright Family Trust.

Further to the above, it follows that the input tax credits claimed by Coin-Ex for its acquisitions from the
Wright Family Trust were properly claimed and reported by Coin-Ex in the September 2013 BAS. That
is, the information provided by Coin-Ex in the September 2013 BAS was true and correct, and was not
contrary to fact or wrong.

Moreover, Coin-Ex has, in its subsequent interactions with the ATO, been cooperative and open. All
documents and information available to Coin-Ex relevant to the September 2013 BAS has been provided
to the ATO, and Coin-Ex has actively engaged with the ATO in the course of its enquiries. This is not the
case where the taxpayer should be taken to be uninformative, unclear or deceptive.

L\312665930.3                                                                                            14

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                                    9 May 2014

In these circumstances, we submit that no false or misleading statement was made by Coin-Ex in the September 2013 BAS.

Accordingly, we submit that the ATO has no basis for imposing a penalty under section 284-75(1).

**Reasonable care taken**

Even if it is determined that Coin-Ex has made a false and misleading statement in the September 2013 BAS, we submit that Coin-Ex is entitled to rely on section 284-75(5) to preclude the imposition of a penalty as Coin-Ex took reasonable care in making that statement.

The meaning of 'reasonable care' is considered by the Commissioner in Miscellaneous Taxation Ruling MT 2008/1. At paragraphs 27-29 of that ruling, the Commissioner states that:

> "*The expression 'reasonable care' is not a defined term and accordingly takes its ordinary meaning. The Australian Oxford Dictionary , 1999, Oxford University Press Melbourne, defines 'care' as '... **3** serious attention; heed, caution, pains' and 'reasonable' as ' **3a** within the limits of reason; not greatly less or more than might be expected'. Taking 'reasonable care' in the context of making a statement to the Commissioner or to an entity ...means giving appropriately serious attention to complying with the obligations imposed under a taxation law.*
>
> *The reasonable care test requires an entity to take the same care in fulfilling their tax obligations that could be expected of a reasonable ordinary person in their position. This means that even though the standard of care is measured objectively, it takes into account the circumstances of the taxpayer. This aspect of the test is addressed in the Revised Explanatory Memorandum to the A New Tax System (Tax Administration) Bill (No. 2) 2000 where it states at paragraph 1.69:*
>
>> ***Reasonable care requires a taxpayer to make a reasonable attempt to comply with the provisions of the ITAA and regulations.*** *The effort required is one commensurate with all the taxpayer's circumstances, including the taxpayer's knowledge, education, experience and skill*
>>
>> ***Judging whether there has been a failure to take reasonable care turns on an evaluation of all the circumstances surrounding the making of the false or misleading statement*** *to determine whether a reasonable person of ordinary prudence in the same circumstances would have exercised greater care.*" (emphasis added)

It is submitted that Coin-Ex has continually made a reasonable and genuine attempt to comply with the GST Act, and in doing so took reasonable care in preparing and lodging the September 2013 BAS. This is evidenced by the following:

- Dr Wright sought legal advice from M+K Lawyers during 2013 regarding the establishment of Coin-Ex, the business being undertaken and arrangements to be entered into with suppliers. Email correspondence between Dr Wright and M+K Lawyers substantiating this fact is attached at Annexure O;

- Dr Wright sought legal advice from Ms Dianne Pinder of Lloyds Solicitors in Brisbane (see Annexure P) in relation to the establishment of the Wright Family Trust during July 2013;

- Dr Wright has regularly engaged with senior members of the ATO, including Senior Assistant Michael Hardy, regarding the nature of Bitcoin, the consequences of transactions in Bitcoin and the activities undertaken by Dr Wright and related companies, including Coin-Ex.

L\312665930.3                                                                                              15

CLAYTON UTZ

Mr Andrew Miller, Australian Taxation Office                                    9 May 2014

Numerous email exchanges were undertaken by Dr Wright with Mr Hardy and his team on these issues in an attempt to ensure that the transactions were documented correctly and treated correctly. For example, in an email attached at Annexure Q, Dr Wright specifically asked of Shalyce Dempster of the ATO:

> "I am also transferring the following to a company called MJF for consideration. What do I need to get to you?"

These steps are the antithesis of "recklessness". They demonstrate an early and positive engagement with the ATO in order to ensure that novel transactions of high value were correctly treated and understood within the ATO;

- Dr Wright has sought private rulings from the ATO on matters relating to the treatment of Bitcoin. These were not published at the time that the September 2013 BAS was lodged. However, following receipt of the 23 December 2013 private ruling on the treatment of Bitcoin, Dr Wright engaged further with the ATO and following the meeting of 18 February 2014, undertook to revise various BASs lodged by Dr Wright, Coin-Ex and other entities on a basis agreed with the ATO. Andrew Miller of the ATO was closely involved with John Chesher (representative of Dr Wright and Coin-Ex) in relation to those revised lodgements;

- Coin-Ex was and is entitled to claim input tax credits for its acquisitions from the Wright Family Trust, and appropriately claimed and reported those input tax credits in the September 2013 BAS (as discussed in Appendix 1 and above);

- Coin-Ex held tax invoices issued by the Wright Family Trust in respect of such acquisitions at the time it lodged the September 2013 BAS. As discussed in Appendix 1, the mere fact that these tax invoices bear an incorrect date is insufficient to vitiate the validity of the tax invoices;

- Coin-Ex had implemented appropriate accounting procedures to prepare and lodge its BASs (including the September 2013 BAS) through using the Xero Accounting software and the engagement of persons with significant experience in bookkeeping and accounting (i.e. Ann Wrightson and Jamie Wilson);

- the September 2013 BAS was prepared and lodged in accordance with information within the knowledge and control of Coin-Ex and Dr Wright. The complex nature of the relevant facts and the fact that there were matters outside the knowledge and control of Coin-Ex and Dr Wright (e.g. the arrangements between MJF and Siemens, as discussed in Appendix 1) should not impugn the correctness of the September 2013 BAS.

**Recklessness not made out**

In the alternative, if it is not accepted that Coin-Ex took reasonable care in connection with preparation and lodgement of the September 2013 BAS and, we submit that the conduct of Coin-Ex in the circumstances does not amount to "recklessness" as alleged by the ATO. Any culpability of Coin-Ex for any statement made in the September 2013 determined to be false or misleading is not sufficient to meet the accepted test for a finding of recklessness.

The meaning of the term "recklessness" is considered by the Commissioner in MT 2008/1. At paragraphs 100-101 of MT 2008/1, the Commissioner states that a finding of recklessness requires:

> "an essentially objective test... Behaviour will indicate recklessness where it falls **significantly** short of the standard of care expected of a reasonable person in the same circumstances as the entity." (emphasis added)

L\312665930.3                                                                        16

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                                    9 May 2014

As per the judicial authority discussed in MT 2008/1, the use of the word 'significantly' suggests that the behaviour must amount to gross carelessness or gross indifference in regards to the consequences.

In the Interim Report, the ATO alleges that this level of gross carelessness or gross indifference has been made out simply because Coin-Ex "should have reasonably foreseen that [its] actions may have led to a shortfall amount." In coming to this conclusion, the ATO relies upon the argument that based on the information available to Coin-Ex (including from third parties), a "reasonable person would have had reasonable knowledge that they would not be entitled to claim [a] refund". Specifically, the Commissioner has relied upon the following factors:

- documents that included details which "could not have existed at the document date";

- the fact that the intellectual property acquired "cannot have been acquired in the manner you [Coin-Ex] allege"; and

- the consideration used in the relevant transaction "cannot have been provided as the [relevant] trust was created pursuant to a deed of loan which was not validly executed".

As outlined in Appendix 1, the discrepancies / deficiencies in the tax invoices and other documents are relatively innocuous in nature. We submit that the mere inclusion of an incorrect date on a tax invoice does not amount to recklessness by the Wright Family Trust, let alone Coin-Ex. Further, we submit that certain discrepancies / deficiencies in documentation relied upon by the ATO to find recklessness were entirely outside the knowledge or control of Coin-Ex or Dr Wright (e.g. the Deed of Loan).

As to the manner in which Coin-Ex "alleged" to have made acquisitions from the Wright Family Trust, as discussed in Appendix 1, all parties to the various transactions acted in accordance with the relevant agreements / arrangements between the parties. There was and is no reason for Coin-Ex to question the validity of those agreements / arrangements. In particular, as set out in Appendix 1, W&K was capable of making supplies at the relevant time, and irrespective of the nature of the arrangements with W&K, there was a supply from Dr Wright to the Wright Family Trust and the Wright Family Trust was capable of making a supply to Coin-Ex.

Similarly, as to the matter of consideration, there was no reason for Dr Wright to question whether or not the Deed of Loan was validly executed. Further, the issues of UK law regarding the execution of the Deed of Loan are entirely irrelevant for Coin-Ex to comply with its obligations under the GST Act and in preparing and lodging the September 2013 BAS. In fact, as submitted in Appendix 1, whether or not consideration was provided is entirely irrelevant to Coin-Ex's ability to claim the input tax credits included in the September 2013 BAS.

Finally, as a general matter, it is wrong for the ATO to draw upon matters beyond the knowledge and control of Dr Wright and Coin-Ex at the time to find that Coin-Ex was reckless in lodging the September 2013 BAS.

**No shortfall amount**

Alternatively, irrespective of the preceding submissions, if is determined by the ATO that an administrative penalty under section 284-75(1) should be imposed upon Coin-Ex, we submit that Coin-Ex did not have a shortfall amount for the purposes of the penalty. That is, as discussed in Appendix 1 and above, the present circumstances do not involve a shortfall amount as Coin-Ex was entitled to claim input tax credits for its acquisitions from the Wright Family Trust.

Accordingly, it is incorrect for the ATO to purport to impose a penalty on Coin-Ex by reference to the base penalty amount set out in Item 2 of the table in section 284-90(1).

L\312665930.3                                                                                           17



Mr Andrew Miller, Australian Taxation Office                                      9 May 2014

If a penalty under section 284-75(1) must be applied (which is not conceded), it is submitted that the base penalty amount should be ascertained by reference to Items 3A to 3C of the table in section 284-90(1), which determine the base penalty amount for false or misleading statements where there is no shortfall amount.

Despite our submissions above relating to reasonable care and recklessness, we submit that, should any penalty be imposed by the ATO under section 284-75(1), the appropriate base penalty amount should at most be 20 penalty units (i.e. $3,400) in accordance with the Item 3C of the table in section 284-90(1) (i.e. for failure to take reasonable care, which is not conceded).

Accordingly, we submit a penalty in the magnitude of $1,893,714.50 in circumstances where there is no shortfall as alleged is disproportionate, and that the ATO has acted arbitrarily, capriciously and unreasonably in propose to impose such a penalty.

**Remission of penalties and charges appropriate**

In any case, we further submit that, in the circumstances described in this letter and the Appendices, it would be appropriate for the Commissioner to exercise his discretion to remit all or part of any penalty imposed.

We understand that the Commissioner's general policy on remission of penalties relevant to the present circumstances is set out in PS LA 2012/4 and PS LA 2012/5, which state the Commissioner's guidelines on the administration of penalties for false or misleading statements that do not and do (respectively) result in shortfall amounts.

Our detailed submissions as to why the Commissioner should exercise his discretion are as follows:

- As per the submissions made in Appendix 1, Coin-Ex has made creditable acquisitions from the Wright Family Trust and was entitled to claim input tax credits for those acquisitions. These input tax credits were properly attributed to and reported in the September 2013 BAS.

- As per the submissions above, Coin-Ex has acted with reasonable care and has continually made a reasonable and genuine attempt to meet its obligations under the GST Act.

- Coin-Ex has been cooperative and open in its interactions with the ATO. All documents and information available to Coin-Ex relevant to the September 2013 BAS has been provided to the ATO, and Coin-Ex has actively engaged with the ATO in the course of its enquiries.

- Further to the above, the statements made in the September 2013 BAS were not false or misleading, and did not result from:

  (a)      an intentional disregard of the law by Coin-Ex; or

  (b)      recklessness on the part of Coin-Ex in calculating its net amount; or

  (c)      lack of reasonable care on the part of Coin-Ex in calculating its net amount.

- The discrepancies in the tax invoices issued by the Wright Family Trust are innocuous and nature, and did not invalidate them. In any case, any deficiencies may be cured by the exercise of the Commissioner's discretion in section 29-70(1B) of the GST Act.

- Coin-Ex has engaged the services of experienced advisers to assist with the resolution of the matter.

L\312665930.3                                                                              16

CONFIDENTIAL                                                                      DEF_00067352

**CLAYTON UTZ**

Mr Andrew Miller, Australian Taxation Office                                              9 May 2014

- Coin-Ex has not been credited with the input tax credits claimed, and as such it has not benefited in any way. We submit that it would be an unjust result if the Commissioner did not exercise his discretion to remit all or part of any penalty.

L\312665930.3

19

CONFIDENTIAL

DEF_00067353

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 101 of
137
1-5WHAER2   03:42:20M   Documents provided by the ATO to the General Anti-Avoidance Rules Panel   Page 101

SENSITIVE

# Record of client contact

☑ **Interview**                ☐ **Telephone call**                ☐ **Other meeting**

| | | |
|---|---|---|
| **Date of contact:** | **3 June 2014** | **Start time:** 2:30 pm |
| | | **Finish time:** 4:45 pm |

| | |
|---|---|
| **Client:** | **Coin-Exch Pty Ltd** |
| **ABN:** | **31 163 338 467** |
| **Venue (if applicable):** | **L15, 1 Bligh Street Sydney NSW** |
| **Representatives for the ATO:** | **Andrew Miller (AM)** |
| | **Stuart Coulson (SC)** |
| **Representatives for the client:** | **Andrew Sommer (AS) [Clayton Utz]** |
| | **Craig Wright (CW) [Coin-Exch]** |
| | **Ramona Watts (RW) [Coin-Exch]** |
| | **Alan Penderson (AP) [Coin-Exch]** |

*Important: Interview notes are an important part in gathering evidence to support your decisions. Consider the following issues and ensure an accurate and contemporaneous record is kept.*

**Contact summary:** *Provide a summary of your client contact addressing the following*

### *Purpose of the contact*
The purpose was for Coin-Exch to demonstrate that it held the software it claimed in its BAS. This includes showing source code and functionality of the programs.

### *Risk(s)/Issue(s) discussed*
The concept of supply for the purpose of the GST Act.

### *Action items (what is required? who is responsible? when?)*
Andrew Sommer to provide Stuart Coulson with a list of all Siemens products held, with version numbers and authorisation numbers.
Andrew Miller (or his supervisors) to contact Andrew Sommer within one week to discuss the way forward.

### *Client behaviours for penalty consideration*
n/a for purpose of these minutes

### **Include reference/hyperlink to any relevant questionnaires relied upon:**

n/a

### **Record of conversation (minutes):**

The meeting commenced with each person introducing themselves. The purpose of the meeting was outlined by AS; that CW would demonstrate the software held by Coin-Exch and other related parties. He suggested beginning with the Siemens software.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 102 of
05:13:26AM                                                                                    Page 102
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel

Siemens:

CW logged onto the Siemens support web page on his lap top computer. It was
http://support.automation.siemens.com and his log on email address was
Craig.Wright@hotwirepe.com. Once logged into the support site, CW showed the various
packages for which he had support. They included various 'SIMATIC' programs, including HMI
Edition, Step 7 v5.5 and WinAC RTX F 2009, as well as RMOS3 real time operating system.

CW also said he would show that he can receive support by sending a request through the
online form. I did note that when CW clicked the empty 'name' field, the auto-fill options came up
with four different identities. While one was Craig Wright (which eh quickly clicked on, removing
other options), I believe I saw the word 'Al Baraka' somewhere in the options. I do not know why
the details of Al Baraka would be an option in pre-filling a form on CW's personal computer. SC
asked who the other people were in the options. CW said one was RW's father and one was a
colleague at Al Baraka. We were not able to view these details further and a support request was
sent.

SC thanked CW for the demonstration and asked whether he would be able to demonstrate
access to actual programs, as opposed to support for programs. CW attempted to download
numerous Siemens packages onto his computer, but the internet connection speed did not allow
this to occur in the limited time available. He did download a smaller Siemens program called
OPC Scout v10 and displayed that he could open it and use its functionalities. The details of this
program, under the 'About' tab are as follows: v07010000.3459.01 © 2001-2008.

SC asked whether they would be able to provide a comprehensive list of all Siemens packages
held and AS agreed to do so. SC asked whether they could provide, along with this the version
numbers and authorisation numbers for each package. AS asked why, and SC explained it
would enable the ATO to conduct a third-party check with Siemens to ensure that they are
legitimate versions of the software. AS said that is entirely irrelevant for the purposes of
obtaining a credit under the GST Act. He went on to say that the software was purchased in
good faith from another party and it does not matter whether the software is a legitimate copy or
not. AS concluded that they were supplied it and paid consideration for it. He used an illustration
that even if a person is purchasing something illegal like drugs, they are entitled to the input tax
credit for the acquisition, provided they hold a tax invoice and the law is like that because the
Commissioner wants his money.

SC said that it would assist the ATO to know exactly what versions of software were obtained by
Coin-Exch and AS agreed to provide a list of all Siemens software but did not agree to provide
version numbers or authorisation numbers on that basis that the Commissioner does not require
this information in order to make a decision as to whether there has been a supply.

RW and AP added that Coin-Exch thought they were buying the real thing and they would be
upset to find out that the software is not legitimate, though they believe it to be the real thing.

Al Baraka:

AS suggested that they move to a demonstration of the Al Baraka software. CW opened up what
appeared to be source code for Al Baraka 'iMAL' software. (This is not an expert opinion, and is
written only by an Auditor based on observations. AM will seek the advice of SC as to the nature
of the source code). The code appeared to be very extensive.

SC asked if the code resulted in a ready to run program and CW said yes. CW then opened what
appeared to be an online banking program, with the graphics showing a logo for 'C01N'. CW
said that this concept is 'Facebook meets online banking' in relation to Bitcoin. He provided a
demonstration of transacting Bitcoin through this system between himself and the profile of AP.

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 103 of
1-5WHAER2            Documents provided by the ATO to the General Anti-Avoidance Rules Panel            Page 103
137

He showed various other functions in the software including loans and exchanges. Comprehensive observations will be sought from SC at a later stage.

SC asked whether it would be possible for CW to have written this code himself, and is only asking so that, as an expert witness on the stand, he is able to say with some level of confidence what the source of the program is. CW asked AP how long it takes to write code. AP said, 'a long time' and explained that even an experienced team can take a day just to write a few lines. Given the great expanse of lines, there is no way one person or even a team could quickly create this. CW added that the code is so neat and beautiful that it would have taken a great team, a great deal of time to write.

W&K:

AS asked if that was it and whether we could conclude the meeting. AM said that based on previous correspondence from AS to Matt Doolan of the ATO, we were also expecting a demonstration of software obtained from W&K. AS said okay, and CW opened up some files on his computer and said that each of the folders represent software from W&K, thgouh not all of them were supplied to Coin-Exch, as some stayed with CW personally (such as Texas Hold-em and other gaming related programs). One of the programs supplied to Coin-Exch was 'SWAMP'.

AM asked whether SWAMP was the name of a specific program, or simply a category for a type of program. AS asked AM for the relevance of the question. AM said that he wants to understand what was acquired from W&K, because his understanding based on research is that SWAMP is software developed by the Department of Homeland Security in the USA and is available as a free download. AS said that AM, as someone who knows little of software should not be questioning someone like CW who is an expert in the field, and that what AM thinks he knows based on an internet search does not entitle him to question CW about how legitimate his software is. AM did not say anything further on the matter. CW said that if Homeland Security is selling his software he will be taking action against them.

(Homeland Security has advised the ATO previously that W&K submitted an application to develop software but this was not granted and no funding was provided. The client has been made aware of this previously and it was not raised again.)

AS asked AM and SC if there was anything else they wanted to see and it was advised that this would not be necessary. AS requested that AM contact him within a week to update on the audit. AM said that wither he or his senior officers would do so. AM and SC thanked each person for their time and assistance and the meeting concluded at 4:45pm. AS escorted AM and SC from the premises.

**Author's name:      Andrew Miller**
**Date of document:   4 June 2014**

_____

| From: | Coulson, Stuart |
|---|---|
| To: | Miller, Andrew |
| Cc: | Doolan, Matthew; Do, Hoa; Johnston, Geoff; Trinh, Jenifer |
| Subject: | RE: Coin-Exch Pty Ltd - Questions [DLM=Sensitive] |
| Date: | Thursday, 5 June 2014 7:39:12 AM |

Hi Andrew,

Thanks for the opportunity to assist.  Answers in blue below:

=============================================
**Stuart Coulson**
A/g Assistant Commissioner | Trusted Access | EST
Australian Taxation Office
Phone: (02) 6216 **5067** | Mobile: 0400 317 056 | Digital Fax Gateway (02) 6252 0590
**ATO** | *Working for all Australians*
_____

**From:** Miller, Andrew
**Sent:** Wednesday, 4 June 2014 12:05 PM
**To:** Coulson, Stuart
**Cc:** Doolan, Matthew; Do, Hoa; Johnston, Geoff; Trinh, Jenifer
**Subject:** Coin-Exch Pty Ltd - Questions [DLM=Sensitive]

Stuart,

Thanks again for your assistance in viewing the software demonstration yesterday. Your
insights will be valuable in assisting us in making a decision. As discussed, I am
providing you with my questions such that you can address concerns or risks in the
audit.

I will break up questions in relation to each of the three groups, and hopefully they are
progressive and cover off on all issues. Having said that, as I have limited understanding
of software code, I would ask whether there are any observations you made which you
think may be relevant to our audit decision, even where it is not covered in one of my
questions.

I ask your opinion on the following, based on the observations made yesterday;

<u>Siemens</u>:

- Are you satisfied that Craig Wright has access to Siemens online support?
Yes, however after returning to the office so do I. I have accessed the support section
of Siemens website and sought access to the same area Craig Wright had access too,
however his content showed software to download whereas mine doesn't.  This could
have something to do with accessing further paid support (or other areas that I haven't
gone to yet) where providing reference details will allow you to download additional
software functionality.

- Are you satisfied that Craig Wright holds all Siemens automation software
which was shown? (My understanding from the meeting is that Andrew Sommer will be

providing a list of all software to us). I am satisfied that Craig Wright had a variety of Siemens software, I wouldn't say it is all of Siemens software, and as with my response to your earlier question, I now hold a large variety of Siemens software as well that I have downloaded from Torrent sites. A Torrent download is a file (executable, picture, video, software, etc.) that is made available by a number of "seeder's" to download. The seeder's hold parts (or all) of the original file and the Torrent peer-to-peer network allows me to download those parts (from multiple seeder's (locations)) on to my computer. I have Siemens Step 7 v5.5, Simatic EKB, Siemens PLC Simatics WinAC, Siemens PLM NX 9.0 for MAC OSX64, Siemens Solid Edge ST5 (64bit), WinCC 2008 SP2 and the list goes on. This software may be pirated or it could be available for installation as a short term trial, however the point I'm trying to get to is suggesting the software is freely available and Craig Wright may have acquired it the same way that I have and at the same time gained pirated serial keys which he has possibly gained/payed for support to cover and this could be what we've seen.

- **Was the software obtained 'source code' or simply an 'off the shelf' program?** An off the shelf program, there were ISO files (which are image files containing multiple other files and are usually burnt to CD/DVD's prior to installation) and other compiled programs (code that has been made into a program). An off the shelf program can still be acquired from an online reseller and does not need to be handed over in person. I acquired a lot of the Siemens software without human interaction and at no cost. If I was to go to even less reputable websites I'm sure I could also get the software keys. Without a lot of additional work (on my part) it's hard to say what the business model of Siemens is, they may not follow-up on pirated software keys. What I'm saying is if I was to put a pirated software key into the Siemens site would it allow me to download updates and see me as the owner of that software? It may allow me to be seen as the owner for a short while until its licensing systems noted a discrepancy and flagged my software as pirated. This could be instantaneous or it could take a few days to a week. I have experience with this in my personal software purchasing.

- **Is it likely that the combined value of this Siemens software is $5,000,000 (including GST)** This is hard to answer, if the demand is there for software to perform a function and it is known to undertake that function really well and the price is five million, and available from nowhere else then I'm sure there's people that would pay that much. However like I said above I have downloaded some of the software and could probably get my hands on most of the software for no cost. Does having the software mean five million was paid for it? In addition valuing the code/program based on the number of lines is unreasonable unless you asked for the code to be exclusively written for you. I would argue that the code was developed for multiple sales not just one.

- **Would it be worthwhile to contact Siemens to verify the validity of the software?** If we got the software licence, key or code that Siemens recognise then I believe it would be worthwhile.

• Based on what Craig Wright explained as his intentions for the software, is it feasible that the software was obtained for a creditable purpose? Or, to ask a related question, is it possible to 'reverse engineer' this Siemens software to create the product/outcome described to you by Craig Wright? I'm guessing if you asked Craig this question he would say this was a business decision. If it was my business and I planned to spend upwards of five million on software that I was going to reverse engineer anyway I would prefer to hire 10 grads straight from university for 10 years to write what I needed and still come out of it with enough money to have the code tidied up by a professional software development company.

• Is the creation of a 'self-leaning bot' described by Craig Wright, something that could reasonably be considered to be possible, based on his experience, knowledge and current software? Yes, even I could do that with a text file and some time. He doesn't need all that software, it may help however to reengineer so much code to develop this solution doesn't seem economical.

• Is it possible that Siemens automation/mining software can be manipulated into a purpose other than for mining? If so, is it realistic to reverse engineer it, as opposed to writing code/programs from scratch? As above seems an expensive way of doing things

• Are there any other observations you wish to make in relation to this software? Paying so much for software and it sitting around being unused seems odd. The only work that's been done is what appears to be the manipulation of the Al Baraka software.

Al Baraka:

• Are you satisfied that Craig Wright holds Al Baraka 'iMAL' banking software? I am satisfied he holds lots of code that has an Al Baraka name on it, without Al Baraka confirming that it's their code we can't be sure.

• Was the software demonstrated 'source code' or simply an 'off the shelf' program? It was source code that he demonstrated (in a very basic way) that he had re-coded to run his co1n software/web page. I am not confident that the Al Baraka software was the code behind his co1n software.

• Are you confident that the code shown results in the running of the banking software which was demonstrated? Not confident. It would be no different to me reading some code and thinking that "function" (of the code) would be good in my program. I could think of better ways (at no cost) to get ideas for the co1n software demonstrated than paying lots of money for another lot of code that I could plagiarise.

• Based on the demonstration of the banking software (with C01N as the name displayed) is a fully functional banking system? The co1n software was not a fully functional banking software – it is on the way to being a software for undertaking

transaction records

•      Would it be worthwhile to contact Al Baraka (or the developer of iMAL, 'Path Solutions') to query them on the likelihood that this software was sold in Australia? It would be good to ask how they mark-up their code, to see if the header of their code matches the code we saw.  It wouldn't be hard to steal the header but without Al Baraka giving us samples of their code to compare one-to-one with Craig Wright's software we are limited to what we could do.  I believe the statement from Al Baraka that they didn't sell their product is quite compelling.

•      Are you satisfied that the support which Craig Wright claims to have for this software (the email addresses which end with @albaraka-bank.asia) are legitimate AlBaraka support, typical of source code acquisitions? The work my team has done on reviewing the details of the provided domains and email address puts into question the legitimacy of those addresses and domains.  The suggestion this software cost 11 million I would expect extensive support in and around 10% of the total cost as an ongoing cost. Having an email address that looks similar to the Al Baraka companies email address does not constitute support.

•      What level of confidence do you have that this software shown is a legally authorised/licenced copy? (I can provide contracts and licence agreements obtained directly from Al Baraka if it would speak to any concerns you may have, based on observing the software). My confidence is low based on hearsay (from you) and comments from Andrew (solicitor) that suggested he was unconcerned if it was legal or not. I would like to see the contract and licence.

•      What is your observation on the quality of the code presented? Very neat, well written and a lot of it.

•      What is your observation on the quality of the functioning system presented? Low quality, bordering on a childish (immature – as though the coder had only written a web page once or twice before, not professional) attempt to develop a webpage/interface.

•      Is it possible that such a system/code is worth $11,000,000 (including GST)? It was a lot of code and what I said earlier about supply and demand applies here too. It does appear strange to me to spend 11 million for code that you aren't going to use you're only going to rip out snippets that you can utilise in a webpage.

W&K:

•      Are you satisfied that Craig Wright holds other software which he claims to have acquired from W&K? He had folders of what appeared to be software that he said was W&K's.

•      Was the software obtained from W&K 'source code'? What I saw was compiled code and some code by itself that Craig Wright said was from W&K, it could

DEF_00067360

have just as easily been anyone's software.

• What is your observation of the quality of the code presented? It's code/software, the layout of the files in the folders and sub folders appeared to be the usual way software is layed out.

• Was Craig Wright able to demonstrate that the code was a functioning system? No

• What level of confidence to you have that the software/code shown is capable of being a functional system? The layout would suggest it could be installed and would work, I would be confident it would be functional.

• In your opinion, could the summation of all W&K software shown be valued at over $40,000,000? Again supply and demand would determine the price. I would not personally consider the software to be of that cost based solely on not having 40 million. Would it have cost even half that to write all that code? I wouldn't think so.

• Based on what Craig Wright explained as his intentions for the software, is it feasible that the software was obtained for a creditable purpose? Or similarly, is the software likely to be used in the business of Coin-Exch, as explained to you? You would have to further explain creditable purpose to me. I don't recall having it explained to me how that software would be used for coin-exch, it appeared that he wanted the code, he go the code and was holding it. To use it for banking/automation/autonomous agents would need to have the code completely reworked – just like all the other code.

• Would you see it as beneficial to obtain the SWAMP source code, for comparison with what is offered to the public by the Department of Homeland Security? Only if I could compare like for like with Craig Wright's code.

• In the list of W&K software, which Craig Wright segregated into Coin-Exch and non-Coin-Exch related, would the software relating to Coin-Exch likely be valued at $28,000,000? If you cannot answer definitively, could you provide a level of assurance or concern in relation to this value? All my other answers above about cost apply. My opinion is these values are over inflated by many times and it surprises me that a business would develop a plan to design their software around the acquisition of hundreds of millions of dollars of code that they will never use straight out of the box. I understand modifying to suit the business but this is complete reengineering and rewriting.

Other:

• Did you observe the auto-filling options which appeared in the Siemens support page? (While the options appeared for only a second, I believe that I saw the word 'AlBaraka' somewhere in the options fields). I do not want to persuade you of this though and ask only what you saw. I did not see Al Baraka, I did see the auto filling and

questioned who the other identities were. I was surprised Craig Wright did not go back to the auto-fill and show us the other names.

- Would you see value in obtaining further information/software/other from Craig Wright, to address any concerns that you have? He suggested he would send us screenshots and lists of software and licence/key/serial details. That may be of value but mainly for you to go back to the companies and ask about what those details mean to them.

Again, if there is anything else you believe I should consider, please advise. If you would like any additional information (such as findings from third parties) to assist you in coming to a decision, please let me know. Please read through my comments and ask other questions. I apologise if I have been abrupt in my responses and any misspelling or grammar issues, I have a hectic schedule and may have missed something, so please ask for clarification.

Thanks and regards,

_____

**Andrew Miller**
Auditor | Indirect Tax
Australian Taxation Office
Phone: (02) 9354 6379 | Mobile: 0401 684 338
Facsimile: (02) 6225 0929
ATO | *Working for all Australians*

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 110 of
1-5WHAER2                Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 110
93-4320M-                                                          137

| INTERNAL | OFFICE MINUTE | 22 APRIL 2013 | **Sensitive: Legal** |
|---|---|---|---|
| SEGMENT | FORMAT | ISSUE DATE | CLASSIFICATION |



**Australian Government**
**Australian Taxation Office**

# TCN ADVICE

FILE REF:   [FILE NO.]

| TO: | Jack Keshishian, A/g Senior Director, ATP Compliance Strategy & Systems, Indirect Tax |
|---|---|
| COPIES TO: | Stephen Howlin, Assistant Commissioner, Indirect Tax<br>Karen Woodward, ATP Compliance Strategy & Systems, Indirect Tax<br>Rex Daines, Aggressive Tax Planning, Indirect Tax |
| YOUR REFERENCE: | Request for advice dated 15 April 2013 |

| FROM: | Raj Srikhanta, Tax Counsel | | |
|---|---|---|---|
| BUSINESS LINE: | Law & Practice | SECTION: | TCN Superannuation & Indirect Tax |
| CONTACT OFFICER: | Jenny Lin | CONTACT PHONE: | (02) 6216 1808 |

| ISSUE DATE: | 22 April 2013 | RESPONSE DATE: | N/A |
|---|---|---|---|

| SUBJECT: | WET producer rebates – retention of refunds |
|---|---|

## Glossary

| Abbreviation | Glossary text |
|---|---|
| AAT | Administrative Appeals Tribunal |
| GST Act | *A New Tax System (Goods and Services Tax) Act 1999* |
| PS LA 2012/6 | Law Administration Practice Statement PS LA 2012/6: *Exercise of the Commissioner's discretion under section 8AAZLGA of the Taxation Administration Act 1953 to retain an amount that would otherwise have to be refunded* |
| TAA | *Taxation Administration Act 1953* |
| WET Act | *A New Tax System (Wine Equalisation Tax) Act 1999* |

*References to section 8AAZLGA are to that provision in the TAA. All other legislative references are to Schedule 1 to the TAA unless otherwise specified.*

| **Sensitive: Legal** | |
|---|---|
| | PAGE 1 OF 4 |

**Sensitive: Legal**

TCN ADVICE - WET PRODUCER REBATES - RETENTION OF<br>REFUNDS

## Purpose

1   To provide advice in relation to the retention of refunds under section 8AAZLGA.

## Issues

2   Is the application of Division 165 of the GST Act a relevant consideration in the Commissioner's decision to retain a refund?

3   If the taxpayer objects against a decision to retain a refund, can the Commissioner continue information gathering to determine the validity of the claim?

4   What are the consequences of releasing a retained refund, where at the time the decision to release the refund is made the Commissioner has insufficient information to make a decision about the application of Division 19 of the WET Act and/or Division 165 of the GST Act?

## Summary of advice

5   The application of Division 165 to the GST Act is a relevant matter that the Commissioner can and must consider in making a decision to retain a refund. It would be relevant to a number of the factors listed in the legislation, as well as being 'any other relevant matter' of its own accord.

6   The lodgment of an objection against a decision to retain a refund does not prevent the Commissioner from continuing to gather information in verifying the refund claim.

7   If the Commissioner decides to release a retained refund, he remains entitled to make or amend an assessment of the net amount at any later time providing he is within the time limits prescribed by section 105-50 (tax periods before 1 July 2012)[1] or the relevant period of review (tax periods post 1 July 2012).

## Analysis

***Issue 1: Whilst fraud and evasion are specifically mentioned, the application of the anti-avoidance provisions is not.  However, would the application of Division 165 be relevant to one or more of the other matters, for example " the likely accuracy of the notified information" or "any complexity that would be involved in verifying the notified information" or "any other relevant matter", such that it is a relevant consideration in the Commissioner's decision to retain a refund?***

8   Subsection 8AAZLGA(2) provides a list of facts that the Commissioner must consider in deciding to retain a refund under the section. Importantly, the last factor listed is 'any other relevant matter'.[2]

    a   In that sense, it does not matter whether or not the application of Division 165 of the GST Act is listed specifically (or covered by one of the listed factors), it can be a relevant matter in its own right.

9   That said, the application of Division 165 would clearly be relevant to the accuracy of the notified information,[3] the complexity involved in verifying the information.[4]

---

[1] For those taxpayers that lodge GST returns relating to tax periods prior to 1 July 2012 late.
[2] Paragraph 8AAZLGA(2)(j).

**Sensitive: Legal**

CONFIDENTIAL

10  The matter would also be relevant to whether retaining the amount is necessary for the
protection of the revenue.[5]

    a    Whilst not specifically mentioned in the body of footnote 40 to PS LA 2012/6, which
appears in the section discussing this factor, states:

> In *Xansa Barclaycard Partnership Ltd v. CCE* [2005] BVC 2085, the VAT tribunal
> accepted (at [32]) that the phrase is 'clearly designed to secure the payment by a person
> so the tax or duty for which he is accountable … **or to negate an attempt to avoid
> liability for tax'**. The tribunal also said (at [36]) that the phrase is to be given a wide
> meaning, that it involves no de minimis principle, that **it extends to straightforward
> cases of 'avoidance and abuse'**, and that it involves a 'balancing exercise' - cf
> *Prudential Assurance Co Ltd v. Revenue & Customs* [2006] UKVAT V19607 (at [6]).

(emphasis added)

***Issue 2: If the taxpayer objects against a decision to retain a refund, can the
Commissioner continue information gathering to determine the validity of the claim?***

11  We consider that an objection against a decision to retain a refund would not prevent the
Commissioner from continuing to verify the refund.

12  Firstly, the purpose of section 8AAZLGA is to enable the Commissioner to verify information
relating to a refund. Paragraph 8AAZLGA(1)(a) provides that it must be reasonable to
require verification. To stop information gathering simply because an objection has been
lodged would be inconsistent with this purpose.

13  There is an expectation that the Commissioner is actively verifying the information, which is
implied by the factor 'what the Commissioner has already done to verify the notified
information'.[6]

    a    The EM to the Tax and Superannuation Laws Amendment (2012 Measures No. 1) Bill
2012 explains this factor at paragraph 7.47:

> *Commissioner's actions to verify the information*
>
> 7.47.   This would involve a consideration of what actions the Commissioner has
> already taken in verifying the information. It would be reasonable to expect the
> Commissioner to actively seek to resolve any uncertainty there might be about the
> correctness of a claim, given the underlying purpose of the provision.

    b    PS LA 2012/6 also emphasises this point. At paragraphs 88 to 89, it states in respect of
this factor:

> 88.   […] The Commissioner will take prompt, reasonable and appropriate action
> when seeking to resolve any uncertainty there might be about the correctness of an
> amount to be refunded.
>
> 89.   Reasonable action in this regard may involve requesting information from the
> taxpayer and/or third parties and/or accessing all information already available to the
> Commissioner, as well as publicly available information.

14  Subsection 8AAZLGA(6) provides that the entity may object to a decision to retain a refund
in the manner set out in the Part IVC if the entity is dissatisfied with the decision. As with

---

[3] Paragraph 8AAZLGA(2)(a).
[4] Paragraph 8AAZLGA(2)(e).
[5] Paragraph 8AAZLGA(2)(d).
[6] Paragraph 8AAZLGA(2)(g).

CONFIDENTIAL

DEF_00067365

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 113 of
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 113
137

other objections under Part IVC, the pendency of a review by the AAT or appeal to a Court 'does not in the meantime interfere with, or affect, the decision'.[7]

   a   This means that the Commissioner may continue to exercise his powers under section 8AAZLGA to verify the retained amount even after an objection has been lodged, and even the matter is pending a review or appeal.

15  Further, subsection 8AAZLGA(5) only requires the Commissioner to release the refund in certain circumstances.[8] The provision does not require the Commissioner to release the refund on receipt of an objection, The Commissioner would be expected to continue verifying the information consistent with the purpose of the provision as discussed above.

***Issue 3: We also seek advice on the consequences of releasing a refund in circumstances where, after notifying the taxpayer we are retaining the refund we later decide to release the refund. At the time the decision to release is made, the Commissioner has insufficient information to make a decision about the application of, say Division 19 of the WET Act and/or Division 165 of the GST Act.***

16  If the Commissioner decides to release the refund, this does not stop the Commissioner from undertaking post-audit verification activities at a later time, and if required, making or amending an assessment.

   a   This is supported by provisions providing for the Commissioner's assessment making powers.[9] These provisions provide that the Commissioner 'may at any time make an assessment'.[10]

   b   Similarly, sections 105-25 and 155-35 empower the Commissioner to amend an assessment. The only material difference between the provisions is that the power to amend is subject to a period of review.

17  The power does not in any way depend on whether a refund has been retained or released – it is a power that allows the Commissioner to make (or amend) an assessment because he considers the existing net amount (where no assessment has yet been made) or the assessed amount (if an assessment has been made) to be incorrect.

18  We note that the 'associated producer test' in section 19-20 of the WET Act can only be determined at the **end** of the financial year. In deciding whether to retain a refund **before** the end of the financial year, we consider that section 19-20 would not apply at the point of time.

<br/>

Raj Srikhanta                        Jenny Lin
Tax Counsel                          Associate Technical Advisor
TCN Superannuation & Indirect Tax      TCN Superannuation & Indirect Tax

---

[7] Sections 14ZZM and 14ZZR of the TAA.
[8] The circumstances are: if 'it would no longer be reasonable to require verification of the information'; if the Commissioner fails to inform the taxpayer in the prescribed time or where an assessment has been made or amended that changes the amount refundable.
[9] For tax periods commencing before 1 July 2012: section 105-5. For tax periods commencing on or after 1 July 2012: section 155-5.
[10] Time limits exist in respect of unpaid liabilities and entitlements under sections 105-50 and 105-55. It is understood that the Commissioner is still within the four year time limit.

CONFIDENTIAL                                                          DEF_00067366

Documents provided by the ATO to the General Anti-Avoidance Rules Panel

# Wright Entity Structure & Transactions
## (as per documents)



DLM : SENSITIVE

CONFIDENTIAL

DEF_00067367

03/12/2014
1-5WHAER2
Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 115 of
137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel
Page 115

# Method used to claim refunds



This is an example only, but is representative of other entities within the group

DLM : SENSITIVE

03/12/2014 Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 116 of
1-5WHAER2                              137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 116

# Craig Wright's Bitcoin

| Date | Transaction | Bitcoin | Running Balance |
|---|---|---|---|
| | opening balance | | 0 |
| 23/10/2012 | Deed of Loan - Seychelles Trust | 600,000 | 600,000 |
| 1/07/2013 | Share Purchase - Hotwire | -284,438 | 315,562 |
| 15/08/2013 | Off Block Transfer - MJF (Gold & Valuation) | -245,103 | 70,459 |
| 22/08/2013 | Share Purchase - Coin-Exch | -217,800 | -147,341 |
| 25/08/2013 | Share Purchase - Denariuz | -63,495 | -210,836 |
| 15/09/2013 | Off Block Transfer - MJF (Core Software) | -135,100 | -345,936 |
| | | | |
| | *** See Ledgers for transactions involving other entities *** | | |
| | | | |
| 20/09/2013 | Cloudcroft - Consideration for Mining Software | 217,000 | -128,936 |
| 15/09/2013 | DeMorgan - Consideration for Contract | 40,516 | -88,420 |
| 4/10/2013 | DeMorgan - Consideration for Defence Software | 319,858 | 231,438 |
| 4/10/2013 ? | DeMorgan - Consideration for Banking Software | 323,610 | 555,048 |
| | | | |
| | Total Bitcoin Received | 900,984 | |

Issues:
1) Deed of Loan not validly executed (taxpayer has since lodged forms to appoint Director from prior date)
2) Only 600,000 Bitcoin are available (down to 219,797 after MJF Transfers) yet 900,984 are paid to Craig Wright
3) Craig Wright advised he cannot bring the Bitcoin into Australia, yet he sold most of them to MJF

03/12/2014 Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 117 of
1-5WHAER2                                          137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel                         Page 117

# Wright Entities
## Round Robin Structure



03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB    Document 885-15    Entered on FLSD Docket 02/17/2022    Page 118 of
Documents provided by the ATO to the General Anti-Avoidance Rules Panel    137

Page 118

**Craig Wright and Related Entities: Issues and Discrepancies- GROUP THE DISCREPANCIES**

| | Initial Statements Made | Contradictory Statements/ Documents Provided | Explanation of contradictory statements (if any) |
|---|---|---|---|
| **Design by Human Ltd** | | | |
| 1. | On 17 March 2014, John Chesher provided us with a copy of the *Deed of Loan*. The deed is dated 23 October 2012. The Deed is executed by Uyen Nguyen for Design by Human Ltd (Design by Human). The *Consent to Act* document at the end of the deed states that Uyen Nguyen accepts the position of Chief Operating Officer of Design by Human from 18 October 2012 and consents to act as director from the later date of 30 June 2013.<br><br>Appendix 1 lists 26 Bitcoin Blockchain addresses transferred and contains a note that 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and group company formed with Dave K and CSW'. | The *Deed of Loan* dated 23 October 2012 is not a validly executed deed. At the date the deed was entered into, Uyen Nguyen did not have authority to sign on behalf of Design by Human. There are no records that show that Uyen Nguyen was ever an officeholder of Design by Human. Design by Human also appears to be a dormant shelf company at the time the deed was executed; created by CFS Secretaries Ltd in the UK. CFS Secretaries Ltd is in the business of creating shelf companies and on-selling this to the public. These concerns were raised with the taxpayer in our meeting held on 28 March 2014.<br><br>It is also noted that 22 of the 26 listed Bitcoin wallets were purportedly transferred Off-Blockchain to MJF on 15 August 2013 and 15 September 2013. ATO records show that MJF had returned this amount in its BAS for the quarter ended 30 September 2013. However, when the ATO sought to recover the amount of GST owing, Mark Ferrier from MJF is recorded as stating that he never received such a payment; he had not authorised the lodgement of the September BAS and that the BAS should have been recorded as nil. | Soon after we advised the taxpayer of this in our meeting held on 28 March 2014, the following steps were taken by the taxpayer to rectify the issue:<br>- An *Appointment of Director* form was filed with Companies House on 10 April 2014 advising that Uyen Nguyen became a director of Design by Human as at 12 October 2012.<br>- An *Appointment of Director* form was filed with Companies House on 13 April 2014 advising that Dave Kleiman was appointed director of Design by Human as at 14 October 2012.<br>- A *Termination of a Director Appointment* was filed by Companies House advising that Dave Kleiman ceased acting as director of Design by Human as at 26 April 2014.<br><br>Furthermore, John Chesher provided Andrew Miller on 2 April 2014 with the 22 Bitcoin wallet addresses that were transferred 'Off-Blockchain' to MJF on 15 August 2013 and 15 September 2013. These 22 Bitcoin wallets are also the same wallets that are purportedly being held in the Seychelles Trust; and which Craig Wright is unable to access until 2015. Craig Wright has purportedly dealt with these wallets through a transfer of rights to the trust created over the Bitcoin.<br><br>We have not been able to contact Mark Ferrier to clarify issues in relation to the MJF transactions. |
| 2. | In our meeting dated 28 March 2014, we advised that Design by Human appears to be a dormant shelf company, created by CFS Secretaries Ltd in the UK. Public records from Companies House were provided showing that Craig Wright became director as at 7 January 2014. There was no | Soon after our meeting on 2 April 2014, Hotwire made a payment of AUD 531.09 to CFS Formations LLP.<br><br>On 10 April 2014, an *Appointment of Director* form was filed with Companies House advising that Uyen Nguyen was | In the Clayton Utz response of 9 May 2014 to the ATO's second interim report, it was stated that Craig Wright had no control or position with Design by Human at any of the following times: (i) entering into the Deed of Loan, (ii) entering into the deed of assignment; (iii) lodging the GST Return for Coin-Exchange. |

CONFIDENTIAL

DEF_00067371

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 119 of
Documents provided by the ATO to the General Anti-Avoidance Rules Panel

Page 119

| | | | |
|---|---|---|---|
| | record of Uyen Nguyen holding any position with this company. | appointed as a director of Design by Human as at 12 October 2012.<br><br>On 13 April 2014, an *Appointment of Director* form was filed with Companies House advising that Dave Kleiman was appointed as director of Design by Human, as at 14 October 2012.<br><br>On 15 April 2014, a *Termination of a Director* was filed with Companies House advising that Dave Kleiman ceased acting as a director of Design by Human, as at 26 April 2014. | Further, an email correspondence from Mr Kleiman to Ms Nguyen (provided together with the Clayton Utz response) is said to evidence an intention that the management of the company pass to Ms Nguyen.<br><br>It is further asserted in the Clayton Utz response that the deed of loan was considered to be binding by Design by Human and that it had performed the obligations binding on it by transferring Bitcoin to the recipients nominated by Dr Wright. |
| **W&K** | | | |
| 3. | Craig Wright provided us with copies of the following agreements he entered into with W&K Info Defense LLC (W&K):<br><br>  i. *Intellectual Property Licence Funding Agreement* (ref: CEWK01) dated 22 April 2011.<br>  ii. *Contract for the Sale of Shares of a Company Owning Business* (ref: CEWK03) dated 2 April 2013. | W&K was registered and incorporated with the State of Florida. The registration form was filed on 16 February 2011, effectively from 14 February 2011.<br><br>W&K was administratively dissolved on 28 September 2012 due to failure to pay annual fees. Due to the administrative dissolution, it appeared that at the time of entering into the second agreement (which superseded the first contract, CEWK01) W&K was unable to enter into any contractual arrangements. | W&K was reactivated on 28 March 2014 soon after we had informed Andrew Sommer and Craig Wright of this in our meeting earlier on the same day. John Chesher informed us that Uyen Nguyen had paid for the instatement of the company. Information received from CBA shows that it is likely that it was Ramona Watts who made the payment, and not Uyen Nguyen. CBA information show that a payment of $AU565.29 (equivalent to $US521.25) was made to Sunbiz.org from Ramona Watt's bank account (████████████9763) on 31 March 2014.<br><br>Reinstating the company on payment of late fees and lodgement of overdue annual reports had the effect of treating the limited liability company as resuming its business as if the administrative dissolution had never occurred. |
| 4. | Many of the documents provided to us in the initial stages of the audits made reference to the NSW Supreme Court (NSWSC) orders for 2013/225983 and 2013/245661.<br><br>The Statement of Claims for 2013/225983 and 2013/245661 were first filed with NSWSC on 25 July 2013.<br><br>The Judgment/Orders were only made after the September 2013 tax quarter, on 6 November 2013.<br><br>The following is an example of some of the documents provided to the ATO that makes | In early October 2013, Craig Wright provided us with copies of tax invoices between the related entities. Some of the tax invoices provided appear to be backdated as the invoice date predates the NSWSC Judgments/Orders. For example, Craig Wright provided us with tax invoice INV-00096 issued by Craig Wright to DeMorgan on 1 July 2013. The description is '2013/225983'. However, the Statement of Claim for 2013/225983 was only filed with NSWSC on 25 July 2013; and would not have existed as at 1 July 2013.<br><br>Furthermore, Craig Wright provided us three IP licencing | We raised these concerns with John Chesher on 11 March 2014. John Chesher informed us on 17 March 2014 that title of the IPs for the two cases remained with W&K until the judgments made by NSWSC. In accordance with the NSWSC judgment, title to the IP was transferred on or before 1 September 2013; and that whilst the process of obtaining judgment took some time, it was not considered that there was doubt on the outcome. Craig Wright was the sole surviving shareholder in W&K and the creditor to the company. Possession of the relevant items of IP and software remained with Craig Wright. |

CONFIDENTIAL

DEF_00067372

| | | | |
|---|---|---|---|
| | reference to the NSWSC Judgments/Orders:<br><br>i. *Intellectual Property License* entered into between Craig Wright and Coin-Exch on 22 August 2013. The agreement states that Craig Wright as licensor '*has clear title internationally based on judgement from NSWSC 2013/245661*'.<br>ii. Tax invoice (no. 105) issued by Craig Wright to Coin-Exch on 22 August 2013. Description on the invoice is '*…software licence as per assigned deed for 2013/245661*'.<br>iii. Tax invoice (INV-00096) issued by Craig Wright to DeMorgan on 1 July 2013 makes reference to 2013/225983.<br>iv. Tax invoice (INV-00098) issued by Craig Wright to DeMorgan on 1 September 2013 makes reference to '2013/Judgment 2'.<br>v. *Intellectual Property Licence* entered into between Craig Wright and Hotwire Preemptive Intelligence Pty Ltd (Hotwire) on 22 August 2013. The document states that '*The Licensor has clear titled internationally based on judgment from NSW 2013/225983*'.<br>vi. *Intellectual Property Licence* entered into between Craig Wright and Cloudcroft dated 22 August 2013. The document states that '*The Licensor has clear title internationally based on judgment from NSW 2013/225983*). | agreements he entered with Cloudcroft, Coin-Exch and Hotwire, dated and signed on 22 August 2013. All three agreements entered into states that Craig Wright has been given clear title internationally based on judgment from NSWSC 2013/245661 or 2013/255983. Judgment/Orders were not given until 8 November 2013. | Furthermore, in our meeting held on 28 March 2014, John Chesher advised us that the discrepancies between the dates was due to the timing difference of when the verbal agreement was made and when the written agreements were formalised. In relation to the two NSWSC judgments and the predated documents, John Chesher provided that the parties knew what the values were and filing the cases with NSWSC was just a formality. He stated that the purpose of commencing the court action was to ensure that Craig Wright demonstrated the validity of his claims.<br><br>In the Clayton Utz response, it was stated that the NSWSC actions were irrelevant for the purposes of determining whether there was a creditable acquisition of the W&K software by the relevant entities. This was because at the time of the agreements, Craig Wright had possession of the relevant software and at the very least an equitable interest in that software. Supply was made and it is not necessary for the person making the supply to have legal title to the software. In any event, the title to the software in the hands of the relevant entities was perfected when the NSWSC handed down judgment in favour of Craig Wright. |
| 5. | On 19 August 2013, an *Acknowledgment of Liquidated Claim* was filed with NSWSC for cases 2013/225983 and 2013/245661. The form was filed by Craig Wright on behalf of the defendant, W&K. It is stated that Craig Wright is the 'Director/Australian Agent' for W&K; and he acknowledges the whole of the amount being claimed by the plaintiff as the legal agent and representative for the defendant.  This information was obtained from the NSWSC file. | In the response provided to us on 17 March 2014, Craig Wright stated that W&K were not represented in the NSWSC for cases 2013/225983 and 2013/245661. It was further stated that Craig Wright was not a director of W&K at any time but served as an alternative director for Dave Kleiman from time to time. | The further documentation was obtained by us on 26 May 2014. We have not yet put this discrepancy to Craig Wright. |

Released under FOI Act by
Australian Taxation Office

| 6. | Information obtained from NSWSC court files for cases 2013/225983 and 2013/245661 show that both Craig Wright and Jamie Wilson acted on behalf of defendant, W&K. Jamie Wilson signed the *Consent Orders* for W&K on 28 August 2013 for the two cases; and Craig Wright filed the *Acknowledgement of Liquidated Claim* on 19 August 2013 on behalf of W&K as the legal agent and representative. In the documents he stated that he was acting in his capacity as Director/Australian Agent of W&K. | On 17 March 2014, Craig Wright advised us that W&K did not have any representatives present for the court proceedings.<br><br>John Chesher had advised ATO officer Brigid Kinloch (in relation to a research and development offset claim) on 7 February 2014 that Uyen Nguyen acted for W&K in the NSWSC proceedings for the two cases. John provided that the NSWSC had asked for evidence as to who, where and how Uyen Nguyen became a director and had capacity to consent. These issues were proven in court prior to judgment being given.<br><br>There are no records that show that Jamie Wilson was ever an officeholder or had authority to represent W&K in the NSWSC. | We have not yet put this discrepancy to Craig Wright. |
|---|---|---|---|
| 7. | In the Statement of Claims filed for cases 2013/225983 and 2013/245661 on 25 July 2013, it was stated that Craig Wright was both the contractor and financier. As financier, it is implied in the statement of claim that bonds totalling $40,000,000 provided under the contract were debts owing to Craig Wright by W&K. | Craig Wright informed us in his written response provided on 17 March 2014 and again in meeting held on 28 March 2014 that he did not provide the bonds to W&K.<br><br>In the meeting held on 28 March 2014, John Chesher advised that Dr Wright created many systems used in Lassisters and owned gaming source codes. Dave Kleiman and the Panama Trust (controlled by Dave Kleiman) acquired the software and codes in 2010 for $5,000. Source code included the Bitcoin systems, security systems, control systems and risk systems. Dave Kleiman used the code from this trust to bond the funding for the research and development to be completed. Also, other entities, including Playboy Gaming was happy to bond money as Dave Wright had provided them with source code for an online casino and because it was worth more than the amount they were bonding. | There has been no explanation provided for this discrepancy. |
| 8. | In the Statement of Claim filed for case 2013/225983, it is provided that Craig Wright conducted four projects associated with Department of Homeland Security (DHS) in the USA. The fund amounts associated with each project are listed as funds not returned to the plaintiff, Craig Wright. The IP is identified as software and code used by the US Military, DHS and other associated parties.<br><br>The court files have a document which records | On 24 March 2014, we received third party information from DHS advising that W&K was not successful in its bid for the four listed projects. They had submitted white papers; but were not selected to submit a full proposal. Further no funding was provided by DHS for these projects.<br><br>We informed Craig Wright of our finding in meeting held on 28 March 2014. To this, Craig Wright claimed that he was involved with the DHS projects and Dave Kleiman did not inform him of the outcome of the submissions.<br><br>Based on the fact that Craig Wright has provided documents | In the Clayton Utz response of 9 May 2014, it was stated that for the purposes of claiming an input tax credit for the acquisition of the W&K software by the relevant entities, it is irrelevant whether or not funding was provided by DHS. There was software developed, whether or not for DHS or someone else is irrelevant, and that software was supplied to the relevant entities for consideration. |

CONFIDENTIAL

DEF_00067374

|  | Craig Wright as the contact person for the DHS submissions. Craig Wright also provided copies of two emails from DHS to himself confirming that two of the BAA submissions (Risk Quantification and Software Assurance through Economic Measures) have been successfully received. The DHS emails were sent to three of Craig Wright's email address on 2 March 2011 and stated that the submissions were uploaded by Craig Wright.<br><br>Also in the response provided for DeMorgan on 28 March 2014, the taxpayer confirmed that they have sole rights and ownership over the following DHS software:<br><br>　i. Software Assurance Market Place (SWAMP).<br>　ii. Software Derivative Markets & Information Security Risk Systems<br>　iii. Software Assurance through Economic Measures and Anti-Fraud System<br>　iv. Risk Quantification system (for financial modelling in Bitcoin)<br>　v. Metered Payments System. | which show that he was contacted about the submissions, it is reasonable to say that as the contact person of W&K, Craig Wright would have been notified of the outcome of the submissions for the four projects and would have been aware of the refusal to provide funding.<br><br>It is not clear from the documents and responses received to date whether there was funding provided from another source. |  |
|---|---|---|---|
| 9. | On 17 March 2014, Craig Wright confirmed that the Consent Order signed by Uyen Nguyen as director of W&K in relation to NSWSC cases 2013/225983 and 2013/245661 is dated 9 July 2013. We posed this question as it was unclear whether the form of the date was month/date/ year or date/month/year. Alternatively the date could have been 1 September 2013. | The Statement of Claim for the two NSWSC cases 2013/225983 and 2013/245661 were only filed on 25 July 2013. The case numbers for those matters could not have been known before this date. The question arises as to how Uyen Nguyen was able to provide consent if the two cases has yet to be filed with NSWSC as of 9 July 2013.<br><br>It is possible to infer that the Consent Order was created after 25 July 2013 and backdated. | No explanation for this discrepancy has been provided. |
| 10. | In our meeting on 28 March 2014, we advised that W&K was registered with the Florida Department of State on 14 February 2011 and was administratively dissolved on 28 September 2012. A copy of a public record showing this was provided. | Shortly after our meeting on the same day, W&K was reinstated and made active again. The annual reports for the 2012 and 2013 years were filed and entity details were updated.<br><br>John Chesher contacted Andrew Miller on 1 April 2014 and advised him that Uyen Nguyen had paid the required fees to reinstate W&K as a company. | This point is to illustrate that whenever we have pointed to certain inconsistencies, steps are taken by the taxpayer to ensure that previous actions are validated retrospectively (where possible). |

CONFIDENTIAL

DEF_00067375

| | | However, information received from CBA shows that it is likely that it was Ramona Watts who made the payment, and not Uyen Nguyen. CBA information show that a payment of $AU565.29 (equivalent to $US521.25) was made to Sunbiz.org from Ramona Watt's bank account (_____9763) on 31 March 2014. | |
|---|---|---|---|
| **11.** | In the written response to ATO questions provided for Craig Wright on 17 March and 28 March 2014, it was stated that Craig Wright had transferred IP from Information Defense Pty Ltd and Integyrs Pty Ltd to W&K during the 2010 income year. W&K had purchased this from Craig Wright for $5,000. | We had previously conducted GST audits on Information Defense Pty Ltd and Integyrs Pty Ltd in 2010. During the two audits, one of the main issues the ATO looked at was the valuation of the IP held by the two entities at the time. This is the same IP that Craig Wright sold to W&K. Subsequently after our audits, the two entities went into liquidation.

If the IP were being held by the two entities and were handed over to the liquidators, the issue arises as to how and why Craig Wright was able to transfer this to W&K if he was not the legal title owner of the IP and should not have possession of this. | This issue has not been clarified with Craig Wright. It is not clear whether this software comprises the entirety of the software distributed to the relevant entities or only comprises a portion of the W&K software distributed. |
| | **License Agreements** | | |
| **12.** | In the initial stages of audit of Cloudcroft, Craig Wright provided us with a copy of the IP Licence entered into between Cloudcroft Pty Ltd (Cloudcroft) and Craig Wright on behalf of GICSR on 22 August 2013 for the NSWSC matter 2013/225983. The software concerned was clearly identified as BAA 3. The sale was for $31 million and the invoice states 'Transfer based on GICSR US research NASA funding P2P system. The ACSEO PDF provided indicates that the funding was from GICSR. This information was provided to us on 2 October 2013 and 4 October 2013.

Furthermore, in the March 2013 quarter, Cloudcroft lodged a refund claim for about $50,000. In the statement provided to the refund auditor, Craig Wright stated that '*Cloudcroft has been incorporated as a front-end for an international research organisation. Existing intellectual property valued through a judgment in the NSW District Court has been applied as capital. Cloudcroft is acting as the research organisation for the* | There has been conflicting information and documents provided to us in relation to the software obtained by Cloudcroft.

At the commencement of the audit, it was informed to the ATO that the software provided by Craig Wright to Cloudcroft was the BAA 3 software and that the transfer was based on GICSR US research.

However, the taxpayer subsequently changed their position and informed us that the software provided to Cloudcroft was the SCADA software. John Chesher provided us with a copy of the *Deed of Assignment* entered between DeMorgan and Cloudcroft on 15 September 2013. The agreement states that DeMorgan assigns the right to use the Core Technology to Cloudcroft. The Core Technology consists of the SCADA software.

It is noted that the software was provided by Craig Wright directly to Cloudcroft and not by DeMorgan. Craig Wright and John Chesher informed us on 26 February 2014 and 28 March 2014 that this was a mistake, that the software should have gone to DeMorgan and then to Cloudcroft. They | There are conflicting agreements and invoices in relation to this transaction which need to be clarified. |

CONFIDENTIAL

DEF_00067376

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 124 of
137

Documents provided by the ATO to the General Anti-Avoidance Rules Panel

Page 124

| | | | |
|---|---|---|---|
| | *international firm CSCSS in Australia… Research is being conducted in conjunction with Charles Sturt University and results are disseminated in the postgraduate level'.* | acknowledged that the transaction did not occur as intended.<br><br>On 28 March 2014, the purported IP Deed of Assignment entered into between DeMorgan and Cloudcroft on 15 September 2013 was provided to us.<br><br>The Deed of Assignment states on 15 September 2013, Cloudcroft was assigned the Core Technology from DeMorgan. Core Technology means SCADA software held by DeMorgan. This includes the source code, compiler code, machine language (MASM/NASM), algorithms and manuals. Any and all trademarks, pending patents and other external filings associated with these IP items are also included in the bundle.<br><br>SCADA software includes:<br><br>  i.  Siemens Process and Operations Suite.<br>  ii.  WK (1) SCADA measurements suite of Software. | |
| 13. | In October 2013, Craig Wright provided us with copies of the following agreements and the tax invoices:<br><br>  i. *Intellectual Property Licence* (Ref:CE) entered into between Craig Wright and Coin-Exch on 22 August 2013. The licence was for Bitcoin and Exchange Software in C/++/C#/R code. Tax invoice (no. 105) was subsequently issued on the same day to reflect the agreement entered into.<br><br>  ii. *Intellectual Property Licence* (Ref: HW) entered into between Craig Wright and Hotwire Preemptive Intelligence Pty Ltd (Hotwire) on 22 August 2013. The licence was for Risk Algorithms and C/C++/C#/R code. Tax invoice (no.104) was subsequently issued to Hotwire on the same day to reflect the agreement entered into.<br><br>  iii. *Intellectual Property Licence* (Ref: HWG) entered into between Craig Wright and | Despite the agreements purporting to be between Craig Wright and Cloudcroft, invoices for these transactions were issued by DeMorgan.<br><br>On 3 December 2013, it was advised to the ATO that the tax invoices issued by DeMorgan (no. 105 and no. 104) do not exist on their system or in the activity statements lodged. In relation to INV-0032, the invoice was voided and is not included in the GST report.<br><br>The taxpayer advised us that the intellectual property licence that was supplied to Coin-Exch and Hotwire was from DeMorgan and not Craig Wright, contrary to the agreements provided to us.<br><br>On 21 March 2014, we raised this concern with John Chesher. We asked him whether DeMorgan had entered into any assignment agreements in conjunction with the invoices issued. The following IP Deeds of Assignment were provided to us on 28 March 2014<br><br>  i.  IP Deed of Assignment entered into between DeMorgan and Coin-Exch on 15 September 2013.<br>  ii.  IP Deed of Assignment entered into between | In the meeting held on 28 March 2014, Craig Wright advised us that he always intended for the software to be transferred first from him to DeMorgan and then to the other entities. Craig advised that he had made many mistakes with the whole setup of the entities and the transfer of software between the related entities, that he is no longer involved with them. He advised that he has been told by many, including John Chesher and Andrew Sommer to focus purely on the software development. |

CONFIDENTIAL

DEF_00067377

03/12/2014    Case 9:18-cv-80176-BB    Document 885-15    Entered on FLSD Docket 02/17/2022    Page 125 of
1-5WHAER2    137
Documents provided by the ATO to the General Anti-Avoidance Rules Panel        Page 125

| | | | |
|---|---|---|---|
| | Cloudcroft on 22 August 2013. The licence was for ACSEO program IP and code. Tax invoice (no. INV-0032) was subsequently issued on 1 September 2013 to reflect the agreement entered into. | DeMorgan and Hotwire on 15 September 2013.<br><br>iii. IP Deed of Assignment entered into between DeMorgan and Cloudcroft on 15 September 2013. | |
| 14. | On 6 October 2013, Craig Wright provided us with a copy of the *Intellectual Property Licence* (ref: HW) entered into between Craig Wright and Hotwire on 22 August 2013.<br><br>The following was provided on the Reference Schedule:<br><br>Deed Date: 1 July 2013<br><br>    Licence Fee: $28,254,666.00 (ex GST) for exclusive perpetual<br><br>Product: Risk algorithms and C/C++/C#/R code<br><br>Commencement date: 1 July 2013<br><br>Term: No end<br><br>Trademark: All Marks Associated with Integyrz, Integyrs and associated marks<br><br>Patent: Training Systems Patent (in progress and covered under the Ausindustry Notice of Registration for the R&D Tax Incentive IR1300282).<br><br>The agreement is purportedly signed by Ramona Watts and Jamie Wilson for Hotwire; and Craig Wright on 22 August 2013. | On 13 January 2014, John Chesher sent an email to ATO officer, Brigid Kinloch with a copy of the *Intelligence Property License* (ref: HW) attached. This agreement given is different to the copy provided to us on 6 October 2013. The last page with the signatures is different from the copy provided to us on 6 October 2013.<br><br>On 10 March 2014, John Chesher provided us with yet another version of the *Intellectual Property Licence* (ref: HW) entered into on 22 August 2013. This agreement was purported entered into between **Craig Wright as Trustee for DeMorgan** and Hotwire. The deed states that payment is to be issued in capital as ordinary shares.<br><br>The following was provided on the Reference Schedule:<br><br>Deed Date: 1 July 2013<br><br>Licence fee: **$33,950,000.00 (ex GST) for exclusive assignment. The payment dates and terms are defined in the Payment Schedule.**<br><br>Product: Risk algorithms and C/C++/C#/R code; Bitcoin contract system and Escrow system.<br><br>Commencement Date: 1 July 2013<br><br>Term: No end<br><br>Trademark: All marks associated with Integyrz and associated marks<br><br>Patent: Training Systems Patent (in progress and covered under the Ausindustry Notice of Registration for the R&D Tax Incentive including IR1300282).<br><br>This agreement is also purportedly signed by Ramona Watts and Jamie Wilson for Hotwire; and Craig Wright on 22 August 2013. | John Chesher advised ATO officer, Brigid Kinloch on 7 February 2014 that the reason for the discrepancy with the different deeds was because the first deed was drafted by Jamie Wilson and he mistakenly went straight from Craig Wright to Hotwire instead of going through DeMorgan. This was corrected with the subsequent deed. John advised that he was unaware that there were different versions of the agreement and advised to use the latest deed provided as the point of reference. |

Released under Australian Taxation Office FOI 1982

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 126 of
137
Documents provided by the ATO to General Anti-Avoidance Rules Panel

Page 126

| | | It is noted that the taxpayer subsequently provided us with a copy of the *IP Deed of Assignment* between DeMorgan and Hotwire dated 15 September 2013 for the supply of the same exclusive licence.<br><br>The taxpayer has provided us with three different versions of the *Intellectual Property Agreement* (ref: HW) to the ATO. The first two deeds provided have the same content except that the signatures on the last page are different. The third deed is significantly different to the first two:<br><br>i. The deeds are conflicting in that they show that the same IP has been licensed by two separate entities, the first deed was between Craig Wright as trustee for DeMorgan and Hotwire; and the second was between Craig Wright as an individual and Hotwire.<br>ii. The deeds reference a Supreme Court Judgment (2013/225983) that had not been made as at 22 August 2013.<br>iii. The deeds have a commencement date of 1 July 2013 predating the signing of the deeds. | |
|---|---|---|---|
| 15. | On 6 January 2014, John Chesher provided the ATO with a copy of the *Software Agreement* entered into between Al Baraka Banking Group and Craig Wright on behalf of Hotwire dated 1 July 2013. | On 17 April 2014, we received third party information from Al Baraka confirming that they do not have any business relationships with the persons or companies mentioned in the agreement. They also stated that they would never provide their core banking software. The third party information received confirms that Craig Wright on behalf of Hotwire did not enter into any business agreements with Al Baraka. | Clayton Utz had advised us on numerous occasions including the meeting held on 3 June 2013 that the legitimacy of the Al Baraka is irrelevant to their eligibility to claim input tax credits. Whilst this may hold true under the core GST provisions, it does raise questions as to the appropriate valuation of the software if it were obtained illegally and dealt within outside of any licencing agreement. |
| 16. | On 6 January 2014, John Chesher provided us with a copy of an email correspondence between Craig Wright and Ashraf al Ghamrawi of Al Baraka (Ghamrawi@albaraka-bank.asia).<br><br>Craig Wright provided us with email correspondence showing the following:<br><br>i. On 31 December 2013, Craig Wright sent an email to Ashraf al Ghamrawi (Ghamrawi@albaraka-bank.asia) requesting for direct contacts in the IT and development teams. | Trusted Access (ATO) has advised of the following:<br><br>i. The website domain for '…@albaraka-bank.asia' is registered at Level 8 Tefken Tower Istanbul which is the address of the virtual offices run by Servcorp.<br>ii. It does not appear that albaraka-bank.asia is legitimate.<br>iii. The domain for albaraka-bank.asia was only created in 2014.<br>iv. http://albaraka-bank.asia/ appears to be named by a person by the name of Ashraf Ghamrawi. However, Whois registers are not enforced/ controlled so essentially anyone could put any | Information obtained is able to prove that Craig Wright was not in correspondence with the legitimate Al Baraka Banking Group. Andrew Sommer has informed us that this is irrelevant in determining the eligibility to claim input tax credits.<br><br>It is possible that Craig Wright is responsible for creating the website domain '…@albaraka-bank.asia'. The registered address is level 8 Tefken Tower Istanbul which is the address of a virtual office run by Servcorp. We have been able to identify payments made to Servcorp by Craig Wright's related entities. Furthermore, in the software demonstrated provided to the ATO on 3 June 2014, Andrew Miller observed that at the start of the demonstration when Craig Wright clicked the |

CONFIDENTIAL

DEF_00067379

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 127 of
Documents provided by the ATO to the General Anti-Avoidance Rules Panel

Page 127

| | | | |
|---|---|---|---|
| | ii. On 1 January 2014, Ashraf al Ghamrawi (from Ghamrawi@albaraka-bank.asia) responded to the email and referred Craig Wright to Nurettin Yildiz of Electronic Delivery in Al Baraka Turkey.<br><br>On the same day, John Chesher also provided with copies of email correspondence between Craig Wright and Mark Ferrier/MJF.<br><br>Of interest is an email purportedly sent by the Accounts Department of MJF (accounts@mjfminingservices.com) to Craig Wright on 30 September 2013 advising Craig to deal with Al Baraka directly in regards to the licensing; and the deployment is through e-network (http://e-network.albaraka.com/ar).<br><br>A visit to http://e-network.albaraka.com/ar shows that this is the legitimate Al Baraka site. Therefore, if Craig Wright were to follow the instructions provided by MJF, he would have obtained the legitimate email domain of Al Baraka, and not the albaraka-bank.asia domain. | details they wish in at the time of registration.<br><br>If the domain for albaraka-bank.asia was only created in 2014, there was no way Craig Wright could have sent an email to Ghamrawi@albaraka-bank.asia on 31 December 2013.<br><br>Information received from CBA show that payments have been to Servcorp by Craig Wright and/or his related entities:<br><br>i.  On 31 August 2013, $6,600.00 was made out to Servcorp Administration Sydney from Panopticrypt's bank account: ▮▮▮▮7362.<br>ii.  On 3 September 2013, first payment of $8,673.50 was made out to Servcorp Administration Sydney from Panopticrypt's bank account: ▮▮▮▮7362.<br>iii.  On 3 September 2013, second payment of $1,707.50 was made out to Servcorp Administration Sydney from Panopticrypt's bank account: ▮▮▮▮7362.<br>iv.  On 3 September 2013, third payment of $1,707.50 was made out to Servcorp Administration Sydney from Panopticrypt's bank account: ▮▮▮▮7362.<br>v.  On 7 November 2013, $1,491.70 was transferred from Hotwire's account (▮▮▮▮5413) to a Serve Corp account with ANZ Bank (▮▮▮▮9409). | empty 'name' field, the auto-fill options came up with four different entities. Andrew believed that the work 'Al Baraka' appeared somewhere in the options. When Stuart Coulson asked who the other people were, Craig Wright advised that one was Ramona Watts' father and the other was a colleague at Al Baraka. | |
| 17. | On 21 March 2014, Andrew Miller sent a further request for information and documents for all entities under audit. In the questions asked for The Trustee for Wright Family Trust (DeMorgan), we asked whether DeMorgan entered into any assignment agreements in conjunction with invoices issued. | In the response to our question asked, the following assignment agreements were provided:<br><br>i.  IP Deed of Assignment entered into between DeMorgan and Cloudcroft on 15 September 2013.<br>ii.  IP Deed of Assignment entered into between DeMorgan and Coin-Exch on 15 September 2013.<br>iii.  IP Deed of Assignment entered into between DeMorgan and Hotwire on 15 September 2013.<br><br>Prior to this date, we were not aware of the existence of the | This provides an example of the multiple conflicting documents we've received in relation to the same transaction. | |

CONFIDENTIAL

DEF_00067380

| | **Bitcoin/rights to call for Bitcoin** | abovementioned three agreements. Furthermore, Craig Wright had already provided with copies of the IP Licence Agreements he entered into with the three abovementioned entities on 22 August 2013 for the exclusive licence to software. | |
|---|---|---|---|
| 18. | Prior to 18 February 2014, Craig Wright and his related entities have claimed that all transactions between related entities, including MJF, have been made in Bitcoin. Share capital contributions made were also in Bitcoin.  Information and documents were provided to us to substantiate the claims.

A Private Binding Ruling was issued on 23 December 2013 stating that the supply of Bitcoins was a taxable supply.

On 14 February 2014, we issued our first interim decision for Coin-Exch and Hotwire. In our decision we advised that the supply of Bitcoin made is a taxable supply. | On 18 February 2014, a meeting was held with Craig Wright, John Chesher and Andrew Sommer. In the meeting, Andrew Sommer informed that the Bitcoin transactions were not a transfer of Bitcoin but rather, the transfer of equitable interest that Craig Wright holds in an offshore trust. The same applies for share capital contributions made.

From this date, new information and documents were provided to us to substantiate the new claims made. All documents provided prior to 18 February 2014 show that the transactions were made in Bitcoin. There was no mention of any rights to call for Bitcoin prior to this date. From 18 February 2014, new information and documents supporting their new position were provided to us; many that we were not aware of previously were brought to our attention. | The change in position meant that rather than incurring a GST liability for the supply of bitcoin between the entities, they were providing input taxed financial supplies in the form of an interest in a trust as consideration for the acquisition of the relevant licences for the software. |
| 19. | Craig Wright provided us with a Statutory Declaration made by Stephen D'Emillo, solicitor of Craig Wright and Hotwire on 11 October 2013. On the declaration, Stephen D'Emillo states that he was shown the screen of Craig Wright's phone on 11 October 2013 and was able to view and confirm the following Bitcoin Wallet addresses:

   i.    ▮▮▮▮▮▮▮▮▮▮zm64
   ii.   ▮▮▮▮▮▮▮▮▮▮T2s
   iii.  ▮▮▮▮▮▮▮▮▮▮b6uF
   iv.  ▮▮▮▮▮▮▮▮▮▮XY8a
   v.   ▮▮▮▮▮▮▮▮▮▮KdVT

Stephen also stated that it appeared to him that if Craig Wright wanted to, he could control all of, and make transactions, in the abovementioned Bitcoin | The Deed of Loan for the Seychelles Trust dated 23 October 2012 provided us on 17 March 2014, included an Appendix 1 which listed 26 Bitcoin Wallet Addresses that are to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.

However, three of the Bitcoin Wallets are being controlled by Craig Wright even though they are purportedly held in trust and unable to accessed until 2015:

   i.   ▮▮▮▮▮▮▮▮▮▮b6uF
   ii.  ▮▮▮▮▮▮▮▮▮▮XY8a
   iii. ▮▮▮▮▮▮▮▮▮▮KdVT | In one of the response to questions of 17 March 2014, Craig Wright notes that there are wallets that 'he can influence' which may be taken to mean that he can direct the trustee of the trust created through the deed of loan to transfer the bitcoin in the wallets to another entity. |

| | | | |
|---|---|---|---|
| | wallet addresses. | | |
| | **MJF Transactions** | | |
| 20. | On 2 April 2014, John Chesher sent an email to Andrew Miller with a list of the 22 Bitcoin Wallet addresses that were provided Off-Blockchain to MJF on 15 August 2013 and 15 September 2013. | The 22 Bitcoin wallet addresses provided are the same Bitcoin wallets that are also held in the Seychelles Trust that Craig Wright cannot access until 2015. | Clayton Utz have advised that Design by Human, the trustee for the trust which holds the wallets has dealt with them as directed by Craig Wright. |
| 21. | On 20 September 2013, MJF lodged a nil BAS for the tax period 1 July 2013 to 31 July 2013. | On 19 November 2013, a BAS for the tax quarter ended 30 September 2013 was lodged for MJF, with sales made of $74,251,632 reported. A paper lodgment purportedly signed by Mark Ferrier on 30 October 2013 was sent to the ATO.<br><br>On 16 January 2014, Mark Ferrier contacted the Debt area and denied any knowledge and recollection of lodging this BAS. He informed that the signature on the form did not belong to him.<br><br>It is noted that a check conducted revealed on the address provided on the paper lodgment, Level 26 140 St George Terrace Perth WA 6000, is a Servcorp address.<br><br>Information received from CBA shows that Craig Wright on behalf of his related entities has been making payments to Servcorp (details of the specific transactions identified are provided above).<br><br>The paper lodgment was only submitted to the ATO on 30 October 2013, approximately a month after we commenced our examinations into the tax affairs of Craig Wright's related entities. | We have not been able to contact Mark Ferrier to discuss the issues in relation to this BAS and have not yet put these issues to Craig Wright. |
| | **The Trustee for Wright Family Trust (DeMorgan)** | | |
| 22. | From 1 July 2013, DeMorgan as trustee for the Wright Family Trust (DeMorgan) has been transacting with and invoicing related entities. | A trust deed was provided which was executed on 9 August 2013. Tax invoices were issued on 1 July 2013 containing the Trust's ABN. Our system shows that DeMorgan was only registered for GST on 26 August 2013. | File notes dated 5 August 2013 to 30 September 2013 which are purported to provide evidence of the intention to set up the trust. File note of 9 August 2013 states "equitable creation of trust is noted as being 1 July 2013". File note of 19 August 2013 states "the trust documents and memos will be updated |

CONFIDENTIAL

DEF_00067382

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 130 of
137

Documents provided by the ATO to the General Anti-Avoidance Rules Panel

Page 130

| | | | |
|---|---|---|---|
| | (Source: tax invoices issued by DeMorgan dated 1 July 2013; a contract between Craig Wright and DeMorgan dated 15 July 2013. These documents include DeMorgan's ABN which was not issued until 26 August 2013) | Provided email dated 24 July 2013 between Craig Wright and Dianne Pinder of Lloyds Solicitors evidencing an intention to set up the Family Trust; This document provided to the ATO after the second interim report dated 8 March 2014 was issued to taxpayer providing an opinion that it was not possible for the trust to have entered into these agreements given it did not exist at the time. Further in the response the solicitors for the taxpayer (Clayton Utz) dated 9 May 2014 asserts that even if the trust did not exist at that time, the transactions were ratified by the trustee once the trust did come into existence.  Further a second agreement was entered into between Craig Wright and DeMorgan on 15 September 2013. | to include the ABN number (*including historical notes*) (emphasis added). Document provided to the ATO on 28 March after the ATO questioned how some of the documents could have been executed if the trust was not yet in existence.

The ABN appearing on the tax invoices dated 1 July 2013 was blamed on the accounting software and the fact that staff dealing with the invoices were not familiar with the importance of recording the correct date (information provided by Craig Wright on 28 March 2014 and in the Clayton Utz response of 9 May 2014).

In the meeting held on 28 March 2014, Craig Wright acknowledged that the mistake was on his part. He stated that there was always the idea of a trust and it was already decided in advance that a trust was going to be settled. Craig also advised that it is possible that the ABN was not originally on the invoices that were issued to/by DeMorgan. However, the Xero accounting software automatically inserts the ABN when the invoice is printed out. Therefore, the original tax invoice may not have had the ABN; but the copy provided to us included one as it was printed out after DeMorgan was registered for ABN. |
| 23. | On 17 March 2014 (and numerous occasions prior to this), it was informed to us that Craig Wright is the Trustee of the Wright Family Trust; and the trustee has not changed. | On 20 March 2014, a copy of the Trust Deed for the Wright Family Trust was provided to us. The Deed states that the Trustee is Panopticrypt Pty Ltd (Panopticrypt) and not Craig Wright. | On 21 March 2014, we raised this with DeMorgan and advised that it was stated previously and confirmed in the response dated 17 March 2014 that Craig Wright was the Trustee of the Wright Family Trust and not Panopticrypt. We also asked for an explanation to be provided for this discrepancy.

In the response provided to us on 28 March 2014, it was stated that Craig Wright was appointed by Panopticrypt as sole manager for the term of up to three years and this meant that he could act in the capacity of trustee. Copies of Panopticrypt's memos filed were provided to us to explain the discrepancy:

   -Memo filed on 5 August 2013 stating that Panopticrypt has accepted the position as trustee of the Wright Family Trust.
   -Memo filed on 9 August 2013 stating that Craig Wright |

CONFIDENTIAL

DEF_00067383

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 131 of
137

Documents provided by the ATO to General Anti-Avoidance Rules Panel

Page 131

| | | | |
|---|---|---|---|
| | | | has been appointed by the trustee as sole trust manager of the trust for a period of up to three years. |
| 24. | On 20 March 2014, John Chesher sent us a copy of the Trust Deed for Wright Family Trust (DeMorgan). The Deed was executed on 9 August 2013. | At the time the trust was executed, DeMorgan did not yet exist. Our system shows that the TFN and ABN start date of DeMorgan is 26 August 2013.<br><br>Furthermore, even prior to the Trust Deed and ABN start date, DeMorgan was already making acquisitions and invoicing related entities, as early as 1 July 2013:<br>i. On 1 July 2013, Craig Wright issued tax invoice (INV-00096) to DeMorgan for '2013/225983'.<br>ii. On 1 July 2013, DeMorgan issued 6 tax invoices to Coin-Exch for the exclusive license to software.<br>iii. On 1 July 2013, DeMorgan issued four tax invoices to Hotwire for the exclusive license to software. | We raised this issue in our questions asked on 21 March 2014 and again in our meeting held on 28 March 2014.<br><br>In the meeting held on 28 March 2014, Craig Wright acknowledged that the mistake was on his part. He stated that there was always the idea of a trust and it was already decided in advance that a trust was going to be settled. Craig also advised that it is possible that the ABN was not originally on the invoices that were issued to/by DeMorgan. However, the Xero accounting software automatically inserts the ABN when the invoice is printed out. Therefore, the original tax invoice may not have had the ABN; but the copy provided to us included one as it was printed out after DeMorgan was registered for ABN. |
| | **Jamie Wilson** | | |
| 25. | On 25 August 2013, Craig Wright filed a *Change to company details* form on behalf of Coin-Exch Pty Ltd (Coin-Exch) with ASIC to advise that Jamie Wilson became a shareholder on 22 August 2013 when he purchased 10,000,000 shares for $10,000,000 (paid in full). | On 10 March 2014, it was advised to the ATO that Mr Wilson was to become a shareholder and director of both Hotwire and Coin-Exch; but the deal fell through. The shares that were to be issued to Jamie Wilson would have been paid for by way of shares in The Digital Filing Company Pty Ltd (a company in which Jamie Wilson was the owner of director of). However, the transaction did not complete and the shares were forfeited.<br><br>The above statement suggests that Jamie Wilson was yet to receive and provide consideration for his shares. | An interview with Jamie Wilson would be useful to clarify these and other transactions in which he was involved. |
| 26. | On 28 August 2013, Craig Wright filed a *Change to company details* form on behalf of Hotwire with ASIC to advise that Jamie Wilson became a shareholder on 15 August 2013 when he purchased 1,000,000 shares for $5,000,000 (paid in full). | On 10 March 2014, it was advised to the ATO that Mr Wilson was to become a shareholder and director of both Hotwire and Coin-Exch; but the deal fell through. The shares that were to be issued to Jamie Wilson would have been paid for by way of shares in The Digital Filing Company Pty Ltd (a company in which Jamie Wilson was the owner of director of). However, the transaction did not complete and the shares | |

Page **14** of 15

CONFIDENTIAL

DEF_00067384

03/12/2014
1-5WHAER2

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 132 of
137

Documents provided by the ATO to the General Anti-Avoidance Rules Panel

Page 132

| | | were forfeited.<br><br>The above statement suggests that Jamie Wilson was yet to receive and provide consideration for his shares. | |
|---|---|---|---|

CONFIDENTIAL

DEF_00067385

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 133 of
137
93:122M-
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 133

**Note to Counsel**

**What are Crytpo-Currencies, specifically Bitcoin?**

1.  A 'crypto-currency' is a peer-to-peer, decentralised, 'digital currency' whose implementation relies on the principle of cryptography (a system of secret writing) to validate transactions (and in doing so generates new 'digital currency').  Bitcoin has been described by some as a form of 'digital currency'. More specifically, Bitcoin has been described as a 'crypto-currency' created and based on an open source cryptographic protocol, which is not under the control of a central authority. A Bitcoin has no physical existence. What actually exists is essentially a computer-based system of accounting that records transactions (without revealing who are the transactors); the unit of account in that system is a Bitcoin.

2.  The process through which Bitcoins are created and enter into circulation is called Bitcoin mining. 'Mining' involves a miner using freely downloadable Bitcoin software to solve complex cryptographic equations that verify and validate Bitcoin transactions and prevents duplicate transactions.  The first miner to successfully solve an equation receives as a reward a specified number of newly created Bitcoins to their Bitcoin address.

3.  Bitcoins that are already in circulation can be acquired either by exchanging fiat currencies  for them online (or through a Bitcoin ATM),  or accepting them as a gift or as payment for goods and services.

4.  Bitcoin is often referred to as the numerical amount (or balance) that is allocated to a Bitcoin address. A Bitcoin address is an identifier of 27-34 alphanumeric characters that represents a possible destination for a Bitcoin payment. A Bitcoin address can be generated at no cost by any user of Bitcoin. A person can have many different Bitcoin addresses and most Bitcoin software and websites will generate a brand new address each time a person receives Bitcoin to address privacy concerns. A person stores their Bitcoin addresses in a Bitcoin file called a Bitcoin wallet.

5.  Bitcoin uses public key cryptography to make and verify digital signatures used in Bitcoin transactions. Each Bitcoin address has its own associated 'public/private' keypair which is saved in the Bitcoin wallet of the person with the Bitcoin address. The public key is an alphanumeric number that mathematically corresponds to the Bitcoin address which is publically known. The private key is also an alphanumeric number, however, it is kept secret as it is what allows Bitcoin to be transferred from the Bitcoin address to someone else. The private key is also mathematically related to the Bitcoin address, and is designed so that the Bitcoin address can be calculated from the private key, but importantly, the same cannot be done in reverse.

6.  A Bitcoin is only accessible by the person in possession of the private key that relates to the Bitcoin address where the Bitcoin balance is located. Accordingly, a Bitcoin consists not just of the numerical amount (or balance) and the Bitcoin address to which they are allocated, but also the related private key that attaches to that address that allows the holder of that Bitcoin address to do anything with that Bitcoin.

DEF_00067386

7.  To 'transfer' Bitcoin, a person creates a transaction message with the number of Bitcoin to be transferred to another person's Bitcoin address, signs the transaction with their private key, and announces their public key for signature verification. The transaction is then broadcast to the Bitcoin network for validation through the Bitcoin mining process.

8.  After a Bitcoin transaction is broadcast to the Bitcoin network and included in a block that is published to the network, one 'confirmation' is said to have occurred for the transaction.  With each subsequent block that is found, the number of confirmations is increased by one.  To protect against double spending, it is recommended by the Bitcoin community that a transaction should not be considered as confirmed until a certain number of blocks confirm, or verify that transaction. [1]

9.  The classic Bitcoin client software will show a transaction as "n/unconfirmed" until 6 blocks confirm the transaction.  Merchants and exchanges who accept bitcoins as payment can set their own threshold as to how many confirmations are required until funds can be considered valid.  Where potential loss due to double spending is considered low, merchants may accept payments as soon as the transaction is seen on the network.  Most exchanges and other merchants who bear the risk from double spending require 6 or more blocks.[2]

10. Where a merchant is not willing to take on the risk of a double spend, a Bitcoin user is forced to wait until the transaction is verified through the mining process. The Bitcoin protocol is set so that each block takes roughly 10 minutes to mine.  Once the block is confirmed by the mining process, the merchant would then permit the Bitcoin user to access the product or service that they paid for with bitcoin. [3]

11. The following is a simple explanation from CoinDesk[4] of what a Bitcoin miner does when it confirms a block in the Bitcoin blockchain:

    When a block of transactions is created, miners put it through a process. They take the information in the block, and apply a mathematical formula to it, turning it into something else. That something else is a far shorter, seemingly random sequence of letters and numbers known as a hash. This hash is stored along with the block, at the end of the block chain.

    Miners just don't use transactions in a block to generate a hash. Some other pieces of data are used too. One of these pieces of data is the hash of the last block stored in the block chain.

    Because each block's hash is produced using the hash of the block before it, it becomes a digital version of a wax seal. It confirms that this block – and every block after it – is legitimate, because if you tampered with it, everyone would know.

---

[1] https://en.bitcoin.it/wiki/Confirmation
[2] Ibid.
[3] http://www.coindesk.com/information/how-do-bitcoin-transactions-work/
[4] CoinDesk is a website that claims to be "the world leader in news, prices and information on bitcoin and other digital currencies".

DEF_00067387

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 135 of
137
1-5WHAER2                    Documents provided by the ATO to the General Anti-Avoidance Rules Panel                    Page 135

So, that's how miners 'seal off' a block. They all compete with each other to do this, using software written specifically to mine blocks. Every time someone successfully creates a hash, they get a reward of 25 bitcoins, the block chain is updated, and everyone on the network hears about it. That's the incentive to keep mining, and keep the transactions working.[5]

12. The result of a double spend situation is that whichever transaction out of the two Bitcoin transactions did not form part of the block chain (whichever one was not included as a transaction in a block in the longest fork of confirmed blocks, i.e. the block chain) will disappear from the relevant Bitcoin address.  Essentially, if two transactions try to spend the same bitcoins one of them will never be confirmed by the Bitcoin network.  This 'disappearing' outcome for unconfirmed transactions also applies where very small amounts of Bitcoin are sent or an insufficient mining fee is provided. [6]  This outcome was reported to occur in February 2014 in relation to numerous 'spam-like' transactions involving 1 satoshi (0.00000001BTC) which appeared as unconfirmed transactions in numerous Bitcoin wallets.  The block chain (i.e. Bitcoin miners) was ignoring these transactions because of their size (0.00000001BTC was at the time of the report worth US$0.0000066211).  The reports of Bitcoin users receiving these 'dust' payments are that these transactions 'fail' after a few days and disappear from their Bitcoin wallet.[7]

13. In contrast to the transaction validation process explained above, an off-blockchain transaction is only recorded in private databases. There is no way of validating that transaction by reference to the blockchain. Some of the reasons why persons may wish to undertake an off-blockchain transaction include:[8]

   a. **Speed**: confirmation of on-blockchain transactions take some time to accumulate enough confirmations to ensure that they can-not be reversed. Off-chain transaction systems can record that a transaction has happened immediately, and, subject to the guarantees of the system itself, immediately guarantee it won't be reversed.

   b. **Privacy/Anonymity**: Off-blockchain transactions guarantees anonymity.

   c. **Scalability**: Bitcoin currently has a limit of 7 transactions per second, 'the blocksize limit'. This limit is related to the scalability of the system as a whole, and one option to achieve higher transaction volumes is to keep the blocksize limit as is and use off-blockchain transactions for lower-value transactions; with higher volumes fees for transactions done on-chain will rise due to supply and demand.

14. Both parties to an off-blockchain transaction require absolute trust. Even if the private key is provided to one of the parties this of itself does not guarantee that the counterparty will not 'reverse' the transaction and send the bitcoin in the relevant wallet elsewhere using their own copy of the private key.

---

[5] http://www.coindesk.com/information/how-bitcoin-mining-works/
[6] http://support.coinbase.com/customer/portal/articles/1083919-why-was-my-transaction-never-confirmed-
[7] http://www.macobserver.com/tmo/article/the-mysterious-case-of-1-satoshi-transactions-clogging-up-bitcoin-wallets
[8] https://en.bitcoin.it/wiki/Off-Chain_Transactions

CONFIDENTIAL

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 136 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 136

**Craig Wright's Bitcoins**

| Date | Transaction | Bitcoin | Running Balance |
|---|---|---|---|
| | opening balance | | 0 |
| 23/10/2012 | Deed of Loan - Seychelles Trust | 600,000 | 600,000 |
| 1/07/2013 | Share Purchase - Hotwire | -284,438 | 315,562 |
| 15/08/2013 | Off Block Transfer - MJF (Gold & Valuation) | -245,103 | 70,459 |
| 22/08/2013 | Share Purchase - Coin-Exch | -217,800 | -147,341 |
| 25/08/2013 | Share Purchase - Denariuz | -63,495 | -210,836 |
| 15/09/2013 | Off Block Transfer - MJF (Core Software) | -135,100 | -345,936 |
| | | | |
| | *** See Ledgers for transactions involving other entities *** | | |
| | | | |
| 20/09/2013 | Cloudcroft - Consideration for Mining Software | 217,000 | -128,936 |
| 15/09/2013 | DeMorgan - Consideration for Contract | 40,516 | -88,420 |
| 4/10/2013 | DeMorgan - Consideration for Defence Software | 319,858 | 231,438 |
| 4/10/2013 ? | DeMorgan - Consideration for Banking Software | 323,610 | 555,048 |

Total Bitcoin Received            900,984

DLM : SENSITIVE

Released under FOI Act 1982
Australian Taxation Office

DEF_00067389

Case 9:18-cv-80176-BB   Document 885-15   Entered on FLSD Docket 02/17/2022   Page 137 of
137
1-5WHAER2          Documents provided by the ATO to the General Anti-Avoidance Rules Panel          Page 137

**Bitcoin Transactions**

| Hotwire PE Pty Ltd | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
| 1/07/2013 | Share Capital | 284,438.00 | 284,438.00 |
| 1/08/2013 | Cloudcroft Shares | -8,460.00 | 275,978.00 |
| 26/08/2013 | Pholus Shares | -7,370.00 | 268,608.00 |
| 15/09/2013 | Income Coin-Exch | 21,831.08 | 290,439.08 |
| 23/09/2013 | Pay DeMorgan | -265,284.16 | 25,154.92 |

| Cloudcroft Pty Ltd | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
| 1/08/2013 | Share Capital | 8,460.00 | 8,460.00 |
| 20/09/2013 | Pay Craig Wright | -217,000.00 | -208,540.00 |
|  |  |  |  |
|  |  |  |  |

| C01n Pty Ltd | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
|  |  |  |  |
|  | n/a |  |  |
|  |  |  |  |
|  |  |  |  |

| DeMorgan (Wright Family Trust) | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
| 23/09/2013 | Income Hotwire | 265,284.16 | 265,284.16 |
| 23/09/2013 | Income Coin-Exch | 271,934.18 | 537,218.34 |
| 15/09/2013 | Pay Craig Wright | -40,516 | 496,702.33 |
| 4/10/2013 | Pay Craig Wright | -319,858 | 176,844.33 |
| 4/10/2013 | Pay Craig Wright | -323,610 | -146,765.67 |

| | |
|---|---|
| Received by Craig Wright for sales made | 900,984.01 |
| Maximum available after MJF Tranactions: | 219,797.00 |
| Difference: | 681,187.01 |

| Coin-Exch Pty Ltd | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
| 22/08/2013 | Share Capital | 217,800.00 | 217,800.00 |
| 15/09/2013 | Pay Hotwire | -21831.082 | 195,968.92 |
| 23/09/2013 | Pay DeMorgan | -271,934.18 | -75,965.26 |

| Denariuz Pty Ltd | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
| 25/08/2013 | Share Capital | 63,495.00 | 63,495.00 |
| *claim for purchase and sale of Bitcoin wallet from DeMorgan ignored for the sake of this analysis* | | | |

| Pholus Pty Ltd | | | |
|---|---|---|---|
| Date | Transaction | Bitcoin | Balance |
| 26/08/2013 | Share Capital | 7,370.00 | 7,370.00 |
| *no actual supplies/consideration* | | | |

DLM : SENSITIVE