## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC<br><br>    Plaintiffs,<br><br>v.<br><br>CRAIG WRIGHT<br><br>    Defendant. | **CASE NO.:  9:18-cv-80176-BB** |

## CONSOLIDATED OMNIBUS REPLY IN SUPPORT OF PLAINTIFF
## W&K'S MOTION TO STRIKE PAUL C. HUCK, JR.'S NOTICE OF APPEARANCE

## INTRODUCTION

Presented with a Motion to Strike the appearance filed by Mr. Huck, Ms. Ang (the Judgment Debtor's wife), Ms. Wright (the Judgment Debtor's ex-wife), and Mr. Huck[1] each filed their own response (for ease of reference, all three will be referred to as the Respondents herein).

---

[1] Mr. Huck's response purports to be on behalf of W&K, the same party that moved to strike his appearance on their behalf. However, Plaintiff contends that Mr. Huck does not represent W&K. Accordingly, throughout this brief, Plaintiff will refer to "arguments made by Mr. Huck" as opposed to made by W&K. No disrespect or desire to personalize counsel is intended by this convention. Also, as discussed more fully below, Ms. Ang and Ms. Wright (and by his incorporation of their arguments, Mr. Huck too) each argue that this Court is powerless to decide the propriety of Mr. Huck's claimed representation of Mr. Huck, and must instead defer to the state courts assigned to hear Ms. Ang's and Ms. Wright's lawsuits seeking to establish an ownership interest in W&K. However, it was their choice to ask Mr. Huck to appear in this case, and by his appearance to submit to the jurisdiction of this Court. Moreover, each of them initially agreed to allow this Court to resolve the issue at the last hearing (although Ms. Ang's counsel did try to walk that back later in the hearing).

Since all three Respondents are singing from the same hymnal,[2] and all three appear to have the singular goal of relieving the Judgment Debtor of his obligations to W&K pursuant to a Final Judgment from this Court, Plaintiff files this Consolidated Omnibus Reply to DE 933, 935, and 937.[3]

## FACTS AND PROCEDURAL HISTORY

This case has been pending since February 14, 2018.  W&K was added as a party on May 14, 2018.  Since its entry into the case, W&K has been represented by Boies Schiller Flexner LLP (hereinafter "BSF").  When Vel Freedman and Kyle Roche, then with BSF, left to form their own firm in August 2019, W&K began to be represented jointly by BSF and Messrs. Roche and Freedman's firm (hereinafter "FNF").[4]  BSF and FNF continue to represent W&K today.

Also, throughout these entire proceedings, Ira Kleiman has acted on behalf of W&K, flowing from his role as Personal Representative of the Estate of Dave Kleiman.  Without any objection from the Defendant, Ira Kleiman sat through a month of trial on the W&K trial table (i.e., the Plaintiff's side), and directed counsel on behalf of W&K.  Not once did Ms. Ang (as the alleged trustee of the alleged "Tulip Trust") or Ms. Wright seek to intervene in the case, seek to direct the activities of W&K, or even object to Ira's authority to speak on its behalf.

---

[2] Ms. Ang and Ms. Watt take great umbrage at the suggestion that they are acting in concert, and at the behest of their husband and ex, Judgment Debtor Wright.  Perhaps it is just a coincidence that these two women are filing multiple court actions to take control of W&K now that it has a nine-figure money judgment against Wright.  Again, we would welcome each of them to visit, and come to your courtroom in West Palm Beach, and explain under oath their motives and their "independence" from each other, and from Judgment Debtor Wright.

[3] Since this Consolidated Omnibus Reply addresses three separate responses, it will exceed the normal 10-page limit that would be applicable to each of three individual replies.

[4] That firm is now known as Freedman Normand Friedland LLP. Mr. Roche is no longer part of FNF.

But that does not mean that the issue of ownership[5] and control of W&K was not litigated, as Respondents now argue. Specifically, throughout the litigation, Defendant attacked Ira's ownership of W&K, albeit making different and wholly inconsistent arguments (some under oath, some through counsel) at different stages.

At the Motion to Dismiss stage, Defendant argued that Plaintiffs had not sufficiently alleged the Estate's sole ownership of W&K, thereby defeating diversity jurisdiction and warranting dismissal. The Court denied that part of the Motion entirety.

Defendant next moved for Judgment on the Pleadings, arguing that W&K had "foreign members" so that the Court lacked subject matter jurisdiction. This Motion included a proffer of evidence. Here is how Judge Bloom described Wright's ever-evolving position on the ownership of W&K in her Order denying his Motion:

> In his Motion, Defendant argues that both Nguyen and Coin-Exch were members of W&K, and that their membership would destroy diversity in this action. ECF No. [144], at 11-13. Then, for the first time in his Reply, the Defendant argues that his ex-wife Lynn Wright was also a member of W&K. ECF No. [171], at 6-7.

> *"Oh! What a tangled web we weave when first we practice to deceive."*
> **Sir Walter Scott, Marmion (1808).**

> This is not the first time that the Defendant has made certain representations regarding the membership of W&K. Indeed, the Court notes that the Defendant has made ***several conflicting statements*** regarding even his own ownership of W&K. ECF No. [256], at 29:24-25 ("Judge, I get that there are a number of different statements by Dr. Wright.")

> These statements include:

> On ***April 2, 2013***, the Defendant signed a contract, representing that Dave Kleiman is **100% owner** of W&K, which was filed before the Supreme Court of New South Wales. ECF No. [83-5], at 1.

> On or about ***July and August of 2013***, the Defendant filed a sworn affidavit in the Supreme Court of New South Wales declaring that he and Dave Kleiman each **owned 50%** of W&K. ECF No. [83-4], at 4.

---

[5] W&K is an LLC. Hence, the terms "owner" or "ownership," and "member" are used interchangeably herein.

On *April 16, 2018*, in a sworn affidavit the Defendant stated that he has "**never** been a member of W&K." ECF No. [12-2], at ¶ 12 (emphasis added).

On *June 28, 2019*, during his deposition the Defendant testified under oath that he has "**no idea**" who the owners of W&K were, and unequivocally stated that he was not an owner of W&K. *See* ECF No. [242-1], at (233:12-14) ("Q: Who owned W&K in reality? A. Not me.") and (233:22-23) ("Q. You have no idea who owns W&K? A. I do not know that.").

DE 265.

Notably, some of the same "evidence" Respondents rely on in the instant Response was relied on by Defendant in his Motion for Judgment on the Pleadings. *Compare* DE 935, Exhibit B to DE 265 at 9 (*e.g.*, Email from Dave Kleiman regarding listing Wright as a member manager ("Do you think I can list you as mgr or mgrm with a foreign address. or do you think they would kick it back?")). This "evidence" was specifically analyzed and considered by Judge Bloom, who ultimately held "that the Defendant has failed to provide any *credible* evidence showing a lack of diversity." DE 265. (emphasis in original).

But Defendant was not done trying to attack the ownership of W&K, returning to the issue again at the summary judgment stage. In that Motion, Wright abandoned his prior claims regarding multiple other owners of W&K (*i.e.,* despite previously seeking dismissal on the grounds that they were, he was no longer claiming that Uyen Nguyen and Coin-Exch were owners of W&K), and argued that it was just Lynn Wright, his ex-wife, who was an additional owner of W&K. Notably, his current wife (as trustee of Tulip Trust)[6] who now claims to have owned 2/3 of W&K at the

---

[6] This Court is familiar with Defendant's various claims about the Tulip Trust. What is new here is that Ms. Ang claims that the Tulip Trust was a "name change" from Craig Wright R&D. Accordingly, it is Ms. Ang's position that Craig Wright R&D was an owner of W&K, an entity that Wright and his counsel previously told the Australian government was just "Dr. Wright individually" and was "just a business name associated with [Wright] individually." DE 878-3 at 12-13. Ms. Ang's statement must therefore come as a surprise to Judgment Debtor Wright who swore under oath that he had no ownership in W&K and had no idea who did. More "tangling of the web."

time, is not alleged to be an owner of W&K in Wright's summary judgment motion.  Oversight?

Or, more likely, a continuation of Wright's pattern to make up facts as he pleases.[7]

This Motion claiming Ms. Wright's ownership of W&K was **_filed on May 8, 2020_**.

However, in her current filings with this Court and in her "Verified Complaint" in state court

(which she attached to her filing here), **_Ms. Wright herself swears that she had no ownership of_**

**_W&K between 2012 and July 2020, when she allegedly received a transfer of half of the "Tulip_**

**_Trust's" alleged interest in W&K_**.[8]  *See* Verified Petition, *In re Estate of David Kleiman*, No. 50-

2013-CP-005060-XXXX-NB (Fla. 15th Cir. Ct. July 16, 2020), attached as Exhibit A to DE 933.

Judge Bloom denied Defendant's motion for summary judgment (DE 615), finding on the

issue of the ownership of W&K, that Defendant had come forward with no evidence to cause her

to disturb her prior ruling, on Wright's Motion for Judgment on the Pleadings, that Dave Kleiman

was the sole owner of W&K.  DE 615.  In doing so Judge Bloom expressly rejected the idea that

Ira Kleiman could not control or direct W&K.

The case proceeded to trial in 2021. At trial, Defendant did not object to Ira acting on behalf

of W&K, or to the undersigned's counsel's representation of W&K.  Defendant did not call

Ramona Ang as a witness to testify that she, as the trustee of the alleged "Tulip Trust" was an

owner of W&K.[9]  Lynn Wright's deposition testimony where she claimed to be a shareholder in

---

[7] Ms. Ang's counsel here is the Rivero Mestre Firm, the same Firm that is representing her husband, the judgment debtor in this case.  In other words, the Rivero Mestre Firm is assisting Ms. Ang in her efforts to take control of W&K, so it can in turn release a $143-plus million Judgment it has against Mr. Wright, its other client.  Quite an arrangement.

[8] Judge Bloom's citation to Sir Walter Scott's famous "tangled web," is as applicable as it was when Judge Reinhart found Wright to be a serial perjurer and as it is today.

[9] Plaintiffs called Ms. Ang as a witness by deposition because she resided out of the country.  She did not show up to the trial until after her testimony was read.

W&K was read to the jury in Plaintiff's case in chief, although we now know, based on her current filings, that this sworn testimony from her was false.[10]

The jury returned a $100 million verdict in favor of W&K against Dr. Wright, which resulted in a $143 million Final Judgment once prejudgment interest was included.  Wright did not appeal that Judgment.  But now Ms. Ang and Ms. Wright have sprung into action.  Apparently, they have decided that they cannot sit idly by and let Ira Kleiman cause such terrible harm to W&K.  After all, it would appear that according to them, it is in W&K's interest to let their husband and ex-husband off scot-free, and to release his $100-plus million judgment debt to W&K.  This is absurd and, as this Court recently observed, how can resuscitating W&K in furtherance of obtaining a $100 million-plus dollar judgment be a bad thing for the company (obviously, it was not a great development for Judgment Debtor Wright)?  DE 939.

## ARGUMENT

Below, we will address the arguments made by each of the Respondents.[11]

---

[10]  Ms. Wright was deposed on January 13, 2020, seven months before she purportedly received her now-claimed membership interest in W&K (July 10, 2020).

[11] For the most part but not entirely, Ms. Ang and Ms. Wright make the same arguments.  For his part, Mr. Huck adopts and incorporates them all.  Only Mr. Huck makes the argument regarding the effects of "disassociation" of a member of an LLC.

**A. No, Ira did not "admit" in his January 26th filing that his brother owned only 50% of W&K.**

Each of the Respondents argues that Ira "admitted" in his January 26th filing that his brother owned only 50% of W&K.  Each of the Respondents is misrepresenting what Ira said in his statement.[12]

*To be clear and to be blunt, Ira's January 26th Notice to the Court (DE 918) makes no mention whatsoever of his brother's ownership stake in W&K*.[13]  To the extent it mentions ownership interests in any entity, it talks about how Dave Kleiman was a 50% owner in Coin-Exch.  Indeed, Ms. Ang's response is especially pernicious since she quotes <u>part</u> of what Ira said, and then chops off the rest of the sentence choosing instead to write her own conclusion to Ira's statement to fit her narrative.  Ira did not write that his brother owned only 50% of W&K; instead, he wrote that his "brother's estate received a 50% ownership **in a company called *Coin-Exch***." *Id*. (emphasis added).  Inexplicably, the "in a company called Coin-Exch." part of his statement was intentionally omitted from Ms. Ang's response.

To go through the tortured history of "Coin-Exch" is beyond the scope of this filing and is unnecessary to resolve the pending Motion to Strike.  In summary, Coin-Exch is a company that Judgment Debtor Wright told Ira his brother had a 50% interest in.  Indeed, at trial Ira testified that

---

[12]  When one litigant makes a blatant misrepresentation to a Court on a key issue in dispute, it can sometimes just be a mistake.  After all, to err is human.  When two of them do it, further inquiry by the Court is likely warranted as coincidence (*i.e.,* two people making the exact same "mistake") becomes a less credible explanation.  When three of them do it, repeatedly and in unison, it cannot be explained away as a mistake, carelessness or even zealous advocacy.  It is a coordinated, purposeful act to mislead the Court.  Moreover, when all three make this misrepresentation as part of an illicit scheme to hijack a duly enforceable judgment, the Court should specifically inquire as to this basis of this claim, why the words of a document are being misrepresented, and whatever else is necessary to protect the integrity of the Court.

[13] A good sign that a statement in a pleading is likely not supported by the citation included is the failure to actually quote the cited material.  Here, if Ira's letter to the Court had said his brother only owned 50% of W&K at the time of his death, then logic tells you that Ms. Ang, Ms. Wright or Mr. Huck would have quoted it.  They did not because the letter makes no such "admission."

all he knew about Coin-Exch is what Judgment Debtor Wright told him.  DE 839 at 100:10-12.

Accordingly, Ira could not "admit" anything about Coin-Exch, including whether it "was to be the

successor to W&K" as Ang alleges without citation, or that his brother's alleged 50% ownership

in Coin-Exch meant he owned that same amount of W&K.

    A summary of the trial evidence regarding Coin-Exch is that it was used as a carrot by

Judgment Debtor Wright to entice Ira to help him with the investigation that the Australian Tax

Office ("ATO") was conducting of Wright.  *See* P731 at DE 829-137.  He was promising Ira shares

of Coin-Exch, worth "millions," and encouraging Ira to coordinate with Wright's lawyer on how

to answer the ATO's questions (or, alternatively, to convince Ira to not answer the ATO's

questions at all).[14]  *Id.*   In sum, Coin-Exch was just another part of Judgment Debtor Wright's

fraud against Ira and others.

    **B.  No, Ira did not "admit" at trial that his brother owned only 50% of W&K.**

    Ms. Ang (and Mr. Huck through his wholesale adoption by reference of <u>all</u> arguments and

factual recitations made by her) claims that Ira "admitted" in his trial testimony that Dave owned

only 50% of W&K.  This too, unfortunately, is a blatant misrepresentation of Ira's testimony.

    Specifically, the part of Ira's trial testimony Respondents cite to, when read in context, is

his reference to having seen a document written by Judgment Debtor Wright in which Wright

states that he and Dave were 50% owners of W&K.[15] First, we know Craig was lying in this

document since he testified under oath in this case that he was never an owner of W&K, and that

he had no idea who owned W&K.  Second, Ira was correct about what he had seen -- there is a

document that was written by Wright for submission to the Courts in Australia as part of his fraud

---

[14] Like this Court, other governing authorities also found that Wright lied to it and showed a disregard for the law.   DE 878-12 at 6.

[15] Respondents cut off their citation of DE 839, Nov. 3, 2021 Trial Tn., at 155:12. The context for that testimony is understood by reading through 156:15.

to steal W&K's intellectual property that claimed that he and Dave each owned 50% of W&K (he also submitted documents that said Dave was the 100% owner of W&K).  P710, DE 829-131, at 26 or DE 83-4, at 4; DE 265 citing DE 83-5, at 1.  Again, the full story of the fraud committed in the Australian Courts to steal W&K's assets is beyond the scope of this Reply.  But here is a summary of the trial evidence on that issue.

After Dave died, Judgment Debtor Wright brought a lawsuit in Australia against W&K claiming that he had provided certain services to the company but was not paid.  P709, P710, at DE 829-131, 132.  In that lawsuit, he "acknowledged" that W&K owed him money (i.e., he appointed himself as the representative of W&K in the lawsuit he initiated against W&K).  P709, DE 829-131 at 34.  Then, on behalf of W&K, he "consented" to a judgment against W&K and in his favor in which, in exchange for the debt he claimed he was owed, he would graciously accept ownership of all of W&K's intellectual property. P709, DE 829-131 at 26.  Yes, Wright agreed that W&K should give him its intellectual property.  This was the Australian Court fraud story that was proved at trial, and undoubtedly contributed to the jury's verdict against Wright that he had stolen the intellectual property of W&K.

The dishonesty of suggesting that documents Wright fraudulently created and submitted to the Australian Courts, and to which Ira merely testified at trial he had seen, is an "admission" by Ira that his brother owned only 50% of W&K is truly astounding, even for Wright and his enablers.[16]

---

[16] The irony should not be lost on the Court.  In Australia, Wright devised a plan whereby he would sue W&K, and then consent to judgment against W&K, and obtain all of its intellectual property.  Here, his plan is to again wrongfully seize effective control of W&K and release its judgment against him for stealing W&K's intellectual property.  This is a fraud hiding in plain sight.

**C.  No, there is no "new" evidence since Judge Bloom ruled on the W&K ownership issue.**

Respondents are making these preposterous claims about Ira's alleged "admissions" in an attempt to do an end-round from Judge Bloom's prior rulings regarding the ownership of W&K, rulings that were not appealed by Wright.  They argue specifically that these "admissions" are "new" evidence, and therefore everything Judge Bloom found regarding the ownership of W&K should be ignored.  Again, the Estate's position has been and remains that Dave Kleiman was the sole owner of W&K.  Nothing Ira said at trial, or since trial, has wavered from that at all.  *See* Discussion, Argument Sections A and B, *supra*.

Also, the evidence supporting Judge Bloom's ruling is no different now than it was when Judge Bloom held as follows:

- The Court has thus conducted a careful review of the evidence presented by the Defendant and the record in this case, and finds, however, that the Defendant has failed to present any *credible* evidence showing that any of the parties he suggests are *members* of W&K; DE 265.

- Based on the foregoing, the Court agrees with Plaintiffs that Defendant has presented "the same type of evidence it considered when it denied Defendant's motion for judgment on the pleadings." ECF No. [533] at 30. The Court, accordingly, concludes that subject matter jurisdiction is not lacking.[17]  DE 615.

In sum, having disposed of the phantom "admissions" Respondents claim occurred, the fact is that Judge Bloom reviewed and analyzed the same evidence Respondents rely on here, and concluded that there is no basis to question that Dave Kleiman was the sole owner of W&K.  There is no "new" evidence which would cause this Court to now second-guess that ruling.

---

[17] Defendant's argument was that Lynn Wright was an owner of W&K and, as such, defeated diversity jurisdiction.

**D.  No, the Court should not ignore Judge Bloom's rulings regarding W&K.**

It is "a fundamental precept of common-law adjudication" that "an issue once determined by a competent court is conclusive." *Arizona v. California*, 460 U.S. 605, 619 (1983); *see also* Wright & Miller, Federal Practice & Procedure § 4478 (3d ed. 2022) ("The core principle that a final judgment should stand is the very core of res judicata, more fundamental than the elaboration in claim preclusion and issue preclusion."). Accordingly, although "res judicata and collateral estoppel do not apply if a party moves the rendering court in the same proceeding to correct or modify its judgment," *id.*, a related doctrine—direct estoppel—does apply to protect a judgment from an attack in the rendering court. "'Direct estoppel' is a form of issue preclusion that arises 'within the confines of a single claim or cause of action.'" *DuChateau v. Camp, Dresser & McKee, Inc.*, 713 F.3d 1298, 1301 (11th Cir. 2013) (quoting Wright & Miller, Federal Practice & Procedure § 4418 (2d ed. 2002)); *see also Ermini v. Scott*, 937 F.3d 1329, 1339 (11th Cir. 2019) ("Direct estoppel, as opposed to collateral estoppel, governs the preclusive effect of a litigated issue in a separate proceeding within a single suit."). "[T]he rule for applying either direct or collateral estoppel is well-established." *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1180 (11th Cir. 2013); *see also DuChateau*, 713 F.3d at 1303 ("[O]ur analysis 'remains the same, whether we refer to the application of estoppel principles as 'direct' or 'collateral.'") (quoting *United States v. Shenberg*, 89 F.3d 1461, 1478 (11th Cir. 1996)). "A party asking the court to apply estoppel must establish that (1) the issue at stake is identical to the one involved in the earlier proceeding; (2) the issue was actually litigated in the earlier proceeding; (3) the determination of the issue must have been a critical and necessary part of the earlier judgment; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue." *Tampa Bay*

*Water*, 731 F.3d at 1180 (cleaned up). "If established, then 'estoppel operates to bar the introduction or argumentation of certain facts necessarily established in a prior proceeding.'" *Id*. (quoting *United States v. Lee*, 622 F.2d 787, 790 (5th Cir. 1980)).

Applying the four-part test above, this Court should decline Respondents' pleas to decline preclusive effect to the numerous Orders Judge Bloom has already entered on the issue of the ownership of W&K.

As to the first and second factors, Defendants cannot seriously dispute that the issue of the ownership and control of W&K has not been litigated already. Indeed, as set forth in the Facts and Procedural History section above, these issues were raised by Judgement Debtor Wright three times and rejected by Judge Bloom each time.

Respondents challenge the third factor, arguing that direct estoppel does not apply when the issue was only "lightly litigated." DE 935, at 14. Incredibly, Ang states that "the specific question of how [W&K's] membership was divided was never the subject of any briefing or evidentiary hearing." ***What***? On quick count, Wright himself dedicated 36 pages, over three separate dispositive motions (plus replies) to this exact issue.[18] Plaintiffs in turn dedicated 21 pages in briefing fending off Defendant's attempt to obtain judgment in his favor based on the membership in W&K.[19] And, this "no briefing" claim by Ms. Ang would come as a great surprise to Judge Bloom who undoubtedly spent a significant amount of time considering the parties' briefing on this issue, and then issued three Orders on it, two of which were essentially entirely devoted to it.[20]

---

[18] DE 033 and DE 061, DE 144 and DE 171, DE 487 and DE 561.
[19] DE 050, DE159, DE 549.
[20] DE 068, DE 265, and DE 615.

Lastly, Respondents argue that the fourth factor is not met because Ms. Ang and Ms. Wright were not parties to the underlying case. While it is true that Ms. Ang and Ms. Watt were not parties to the underlying case, it is also true that they are ***still not parties to the case***. As such, no one is trying to use direct estoppel against them here.[21]  Admittedly, the situation here is odd because W&K, through the undersigned, is arguing that direct estoppel applies to the issue of its membership. Through Mr. Huck and his adopting of Ms. Ang's and Ms. Watts's arguments, he purports to be arguing on behalf of W&K that direct estoppel does *not* apply.[22]  In any event, direct estoppel is not being employed against Ms. Ang or Ms. Watts here – they are still not parties to this lawsuit[23] and their claimed interest is as alleged members of W&K. In other words, the parties to the underlying dispute and the parties to whom direct estoppel is being used for and against are the same now as before – W&K.

### E. No, there is still no credible evidence that Ms. Ang or the "Tulip Trust" is a member of W&K.

Ms. Ang's claimed interest here is in her capacity as the "Trustee of the Tulip Trust."  Not only is the Tulip Trust not a party to this action, it was the vehicle through which Defendant Wright tried to frustrate the discovery process. DE 277. Indeed, this Court found that Wright lied about the very existence of the Tulip Trust. *Id.*, at 221 ("The totality of the evidence in the record does not substantiate that the Tulip Trust exists.").

---

[21] Plaintiff reserves the right to argue collateral estoppel and/or other similar doctrines of preclusion in Respondents' respective state court actions.

[22] In this context, it is notable that Mr. Huck does not challenge the application of direct estoppel in his brief, electing to focus on the applicability of the law of the case doctrine.

[23] It is not worth the time to move to strike the responses and/or notices filed by Ms. Ang and Ms. Wright. However, whatever they have to say either should have been said by Mr. Huck, who they claim represents W&K, or through a motion to intervene. Short of that, they have no standing in their individual or "trustee" capacity to argue motions in this case.

Ms. Ang's current position that she, as the trustee of the Tulip Trust, is an owner of W&K, is also 100% at odds with her own prior sworn testimony in this case. Specifically, Ms. Ang was deposed in March 2020. In that deposition, Ms. Ang did not claim any ownership interest in W&K, through the Tulip Trust or any other way. In fact, she claimed to "nothing" about W&K, claimed she "wasn't' involved" in it, and only described it as "Lynn's company":

> **Q: Have you ever heard of company called W&K Info Defense?**
>
> **A: Yes, I have heard of it.**
>
> **Q: Do you know about that company?**
>
> **A: Nothing, it was before my time. I think it was Lynn's (?) company. So I wasn't involved?**

Mar. 19, 2020 Dep. Tn. of Ramona Ang, at 165:24-166:7, attached hereto as Exhibit A.

Now that W&K has obtained a $143 million judgment against her husband, Ms. Ang has decided that she now not only knows something about W&K, she now recalls that she actually owned two thirds of it (or did, but has allegedly since transferred half of that to Ms. Wright). None of this is credible, and the Court should be highly suspect of anything Ms. Ang says, especially if it is not under oath, subject to cross-examination.

In short, this is all a ruse. The Tulip Trust does not exist. Even if it did, it never held an ownership interest in W&K and it never transferred any such interest to Ms. Wright. Ms. Ang has not come forward with a shred of evidence, other than her unsworn assertions made through counsel, that she or the Tulip Trust has any ownership interest in W&K. When she did provide sworn testimony, she disavowed any substantive knowledge about W&K and her involvement with it, let alone any ownership interest in it.

**F.   No, there is still no credible evidence that Lynn Wright is a member of W&K.**

As her Verified Petition in her West Palm Beach state court action on this issue makes clear, Ms. Wright is claiming that she obtained her ownership interest in W&K in July 2020 from the "Tulip Trust," which this Court and others have already concluded does not even exist.[24] Specifically, Ms. Wright swears  that she was initially a 1/3 owner of W&K, in 2011 she got part of her then husband's alleged 1/3 interest in W&K as part of a pre-divorce property settlement agreement, and in 2012 gave all of her interest in W&K to Craig Wright R&D in connection with her bankruptcy.  *See* Verified Petition, *In re Estate of David Kleiman*, No. 50-2013-CP-005060-XXXX-NB (Fla. 15th Cir. Ct. July 16, 2020), attached as Exhibit A to DE 933.  But then she swears that, out of the blue in 2020, Craig Wright R&D (which by that time according to Ms. Wright had changed its name to the "Tulip Trust")[25] transferred part of its interest in W&K back to her.  This transfer allegedly occurred *six days* before she filed her "Verified Petition" in West Palm Beach state court, and approximately a year before the case went to trial before Judge Bloom, yet Ms. Wright never sought to intervene in this action.  All of the above must be news to Mr. Wright himself as he testified that he had no idea who owned W&K.  *See* DE 242-1, at (233:12-14) ("Q: Who owned W&K in reality? A. Not me.") and (233:22-23) ("Q. You have no idea who owns W&K? A. I do not know that.").

Notably, as discussed above, the Tulip Trust does not exist.  Nor, throughout the barrage of motions Judgment Debtor Wright filed on the issue of the ownership of W&K, did he once allege that the Tulip Trust owned any part of W&K.  Nor has Ms. Wright come forward with a shred of evidence showing the alleged transfer of any interest from the Tulip Trust to her, why it

---

[24] DE 277 at 221 ("The totality of the evidence in the record does not substantiate that the Tulip Trust exists."); P320 at DE 885-8 at 51 ("We do not accept the existence of the 'Tulip Trust'…").
[25] Alas, it appears that all roads lead back to Judgment Debtor Wright.

was done, for what consideration, etc.    If all of this looks like one elaborate shell game set up to defraud W&K and the Court, that is because it is.

### G.  Yes, all rights Dave Kleiman had in W&K transferred to Ira upon his death.

There is no debate that Ira Kleiman is the duly appointed Personal Representative of his brother Dave's estate.  There is also no dispute that Dave Kleiman had an ownership interest in W&K at the time of his death.

Florida law is clear that *all* of a member's interest in an LLC transfers to his legal representative upon his death:

> **Power of legal representative.** If a member who is an individual dies or a court of competent jurisdiction adjudges the member to be incompetent to manage the member's person or property, **the member's legal representative may exercise all of the member's rights for the purpose of settling the member's estate** or administering the member's property, including any power the member had to give a transferee the right to become a member. If a member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that member may be exercised by its legal representative.

Fla. Stat. § 605.0504 (emphasis added in part).

Apparently, to the Respondents, "***all of the member's rights***" means everything except voting and management rights.  To reach this position, Mr. Huck cites to the part of Florida LLC's statutory scheme that discusses member's rights upon disassociation.   Even assuming the dissociation provisions apply, however,[26] the very statute Mr. Huck cites about the effect of "disassociation" makes clear that it is subject to the transfer of interest upon death set forth in § 605.0504 (quoted above).

---

[26] It is unclear how a member (Dave) of a single-member LLC (W&K) can dissociate from the LLC.  But whether the dissociation provisions or dissolution provisions (*e.g.*, §§ 605.0701(3), 605.0709) applied after Dave's death, something this Court need not decide, the result is the same—Ira Kleiman as personal representative, and Ira Kleiman alone, had the authority to prosecute claims on behalf of W&K.  Wright's challenges to that authority failed repeatedly in this case and as discussed elsewhere, he cannot now try to achieve the same result through his former and current wives.  This fraudulent charade should end here and now.

*In a footnote*, Mr. Huck cites to "the doctrine of *inclusio unis est exclusio alterius*" to argue that only part of the disassociation statute is subject to the provisions regarding transfers of interest upon the death of a member.  That doctrine plainly does not apply, which is presumably why Mr. Huck footnoted it.  *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012) (explaining that "virtually all the authorities who discuss the negative-implication cannon emphasize that it must be applied with great caution, since its application depends so much on context," and stating it applies only "when the [thing specified] can reasonably be thought to be an expression of all that shares in the grant or prohibition involved").  It would have been unnecessary to put the "subject to" clause in question earlier because the disassociated person themselves (here, someone who is dead) obviously does not continue to manage the LLC.  However, the remainder of this section, and the LLC statutory scheme itself, is clear that *all* of a deceased member's interest transfers to his or her legal representative upon their death.[27]

Some of the more appropriate doctrines of constructions are the ordinary meaning canon and the specific versus general canon.  The first is simple – give the words the meaning they have.  Scalia & Garner, Reading Law: The Interpretation of Legal Texts at 69 (pursuant to the ordinary-meaning canon—the "most fundamental semantic rule of interpretation"—words are presumed to bear "their ordinary, everyday meanings"); *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1332 (11th Cir. 2005) (in construing a statute, "the preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there.") (cleaned up).  Here, "*all* of the member's rights" simply would mean all of

---

[27] Under Respondent's tortured reading of the statute, if an LLC was owned 99% by one person, and 1% by another, all of the management rights to the LLC would go to the 1% owner upon the death of the 99% of owner, instead of to the decedent's legal representative.

the member's right.  Under the second canon, a specific statutory provision trumps a general one. *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009) (stating same).  Under that canon, the specific statute pertaining to death of a member (Fla. Stat. § 605.0504) would trump the general statute regarding dissociation (Fla. Stat. § 605.0602).  *See also*, *e.g.*, Scalia & Garner, *supra*, at 156 (the scope-of-subparts canon, explaining that a subpart does not relate to other subparts), 126 (the subordinating/superordinating canon: "A dependent phrase that begins with *subject to* indicates that the main clause it introduces or follows does not derogate from the provision to which it refers," and explaining "*subject to* often introduces a provision that contradicts some applications of what it modifies"), 116 (conjunctive/disjunctive canon: "Under the conjunctive/disjunctive canon, *and* combines items . . . ."), 167 (the whole-text canon).

In the end, this discussion is academic here as Dave was the only member of W&K, and upon his death all of his rights including the ability to manage and direct the LLC went to Ira Kleiman, his legal representative.  *See, e.g.,* Fla. Stat. § 605.0201 (permitting single-member LLCs).

### H.  No, this Court does not have to wait for a State Court to tell it who represents the parties practicing before it.

The crux of the issue at hand is whether Ms. Wright and Ms. Ang had the right to retain Mr. Wright on behalf of W&K.  The question turns on whether Ms. Wright and Ms. Ang have any ownership interest in W&K.  As demonstrated above, they do not.

Implicitly recognizing the weakness of their position, including this Court's repeated rulings on the issue of W&K's ownership, Respondents suggest that this Court cannot decide the issue, and must instead wait for the state court(s) to do so.  This makes no sense.  Are Respondents really suggesting that the Court must allow W&K to have two sets of attorneys, who are simultaneously advocating entirely different positions for W&K?  How would that even work?

Notably, it was *Respondents* that brought this issue to the Court when they asked Mr. Huck to file an appearance in this case.  They cannot then turn around and assert that this Court cannot adjudicate whether Mr. Huck can properly appear in front of it.  Respondents distract from common sense by arguing that it is "unclear that this Court has ancillary jurisdiction" to determine the ownership of W&K (in order to determine the propriety of Mr. Huck's appearance). DE 935, at n.8; *see also* DE 933, at 1.  This legal concept is inapposite.  Ancillary jurisdiction typically involves defending parties haled into court against their will or by another person whose rights might be lost if they could not assert them in an ongoing action in federal court.  *Peacock v. Thomas*, 516 U.S. 349, 355, 116 S. Ct. 862 (1996). This court does not need "ancillary jurisdiction" to decide issues in a case already before it, related to parties that are already before it.  Simply stated, at the request of Respondents, Mr. Huck noticed an appearance *in this Court* purporting to represent a party *in this action.*  Whether or not this was proper is, of course, a question *this Court* may answer.

Respondents cite to *Peacock v. Thomas*, 516 U.S. 349, 116 S. Ct. 862 (1996) and *National Maritime Services, Inc. v. Straub*, 776 F.3d 783 (11 Cir. 2015) in support of their position.[28]

---

[28]   In a footnote, Respondents bizarrely argue that "the state courts are properly situated to resolve the dispute over W&K's ownership" pursuant to the "internal affairs doctrine."  DE 935 at 13 n.8 (citing *Commonwealth of Pennsylvania v. Williams*, 294 U.S. 176, 185 (1935)).  The internal affairs doctrine is about choice of law on issues of corporate law; it has nothing to do with abstention or even deference to state courts.  *See, e.g., Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1133 (11th Cir. 2020) ("The internal affairs doctrine instructs that the extent and nature of the relationship between corporation and stockholder, corporate officer or director and stockholder, and stockholders inter sese should be governed by the laws of the state of incorporation.") (cleaned up); *The Internal Affairs Doctrine: Theoretical Justifications and Tentative Explanations for Its Continued Primacy*, 115 Harv. L. Rev. 1480 (2002) (the "internal affairs doctrine is a judge-made choice of law canon").  Even if this Court had not resolved the issue of ownership of W&K already (which it has, repeatedly, *see supra* §§ C, D), it plainly has the authority and competence to resolve corporate ownership issues.  Respondents do not identify any doctrine or caselaw to the contrary.

*National Maritime* does not even discuss competing jurisdictions between courts. Instead, it holds that a federal court has jurisdiction over a non-party over claims that it was the recipient of a fraudulent transfer in an underlying federal case. In short, it has nothing to do with the principle Respondent cites it for and, to the extent it has any relevance, it supports Plaintiff's position here.

Respondent's citation to *Peacock* fares no better. In that case, a claim was brought against a company and an employee for ERISA violations. The plaintiff prevailed against the company only. When the company failed to pay the judgement, the plaintiff tried to bring an entirely new cause of action against the individual it had sued, arguing that he had conspired with the judgment debtor to siphon assets away to prevent collection of the judgment. While reaffirming the concept of ancillary jurisdiction generally, the Court there held that a federal court does not have ERISA federal question jurisdiction under a piercing the corporate veil theory against the individual because that is not an ERISA recognized cause of action. Accordingly, the Court concluded that the trial court lacked subject matter jurisdiction over the new claim against the individual.

To the extent *Peacock* has any relevance here, it is in its reaffirmation of the notion that a court retains jurisdiction through the enforcement of a judgment. *Peacock* 516 U.S. 349 at 355 ("Without jurisdiction to enforce a judgment entered by a federal court, the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution).

## CONCLUSION

To quote the great Scottish-American singer and songwriter David Byrne ("Talking Heads") – "***same as it ever was***." Defendant Wright has gone from perjuring himself and otherwise acting in ways "antithetical to the administration of justice," DE 277 at 28, to having others do it for him. This, unfortunately, is not progress, and it must stop. Plaintiff W&K respectfully requests

that Mr. Huck, who Ira Kleiman has never met and has certainly not retained have his unauthorized

appearance on its behalf be stricken.

Dated: March 3, 2023.

                                    Respectfully submitted,

                                    By: */s/ Andrew S. Brenner, Esq.*
                                    ANDREW S. BRENNER, ESQ.
                                    Florida Bar No. 978663
                                    **BOIES SCHILLER FLEXNER LLP**
                                    100 SE 2nd Street, Suite 2800
                                    Miami, Florida 33131
                                    Telephone: (305) 539-8400
                                    Facsimile:  (305) 539-1307
                                    abrenner@bsfllp.com

                                    MAXWELL V. PRITT, ESQ.
                                    **BOIES SCHILLER FLEXNER LLP**
                                    44 Montgomery Street, 41st Floor
                                    San Francisco, CA  94104
                                    Telephone: (415) 293-6869
                                    Facsimile:  (415) 293-6869
                                    mpritt@bsfllp.com

                                    Vel (Devin) Freedman
                                    **Freedman Normand Friedland LLP**
                                    1 SE 3rd Ave., Suite 1240
                                    Miami, FL 33131
                                    (t) 305.753.3675
                                    (f) 646.392.8842
                                    (@) vel@fnf.law

                                    ***Counsel to Plaintiffs Ira Kleiman as
                                    Personal Representative of the Estate of
                                    David Kleiman and W&K Info Defense
                                    Research, LLC.***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 3, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Andrew S. Brenner, Esq.*
Andrew S. Brenner, Esq.

# Exhibit A

Page 1

RAMONA WATTS - CONFIDENTIAL
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:9:18-cv-80176-BB/BR

---------------------------------------
IRA KLEIMAN, as the personal          )
representative of the Estate of David  )
Kleiman, and W&K Info Defense          )
Research, LLC                          )
                    Plaintiffs,.       )
                                       )
        v.                             )
                                       )
CRAIG WRIGHT                           )
                    Defendant.         )
---------------------------------------

DEPOSITION OF RAMONA WATTS

On

Thursday March 19, 2020

At the offices of:

SCA Ontier
Halton House,
20-23 Holborn,
London EC1N 2JD,
United Kingdom

Taken by:
AMY COLEY, Court Reporter



Page 165

1                    RAMONA WATTS - CONFIDENTIAL

2          A.      I don't recall.

3          Q.      Okay, fair.  What was Strasan?

4          A.      I really don't remember.  I know

5    that Craig worked with four other guys on it.

6    I don't know what they were doing.  I think they

7    were trying to do some perhaps hardware stuff, but

8    I think one of the men they wanted to work on

9    consulting work, so it did not last for very long.

10         Q.      Was one of the guys that working on

11   Strasan with Craig Dave Kleiman?

12         A.      No, Shaoib Usev(?), I was thinking

13   of a different person.  I believe his name was

14   Shaoib -- S-H-A-O-I-B, I think.

15         Q.      If you could go to tab 24?

16         A.      Yes.  It is a different Strasan

17   that we are talking about.

18         Q.      What is this Strasan?

19         A.      I don't know.  I have not seen this

20   one at all.

21         Q.      Okay.  You have never seen this

22   document?

23         A.      I don't recall, no.

24         Q.      Have you ever heard of company

25   called W&K Info Defense?



Page 166

1              RAMONA WATTS - CONFIDENTIAL

2          A.      Yes, I have heard of it.

3          Q.      What do you know about that

4     company?

5          A.      Nothing, it was before my time.

6     I think it was Lynn's(?) company.  So I wasn't

7     involved?

8          Q.      You used that expression a couple

9     of times, you said, "It was before my time".  What

10    are you defining as before your time?

11              MR. SAOUL:  Can I just ask, are we

12    marking tab 24 as an exhibit or ----

13       (Exhibit 7 was marked for identification)

14              MR. BRENNER:  Sure, we didn't do

15    anything with it, but we can mark it.  That is

16    better.  Thank you.

17         A.      It was before I met Craig, I think.

18         Q.      When you say "before my time", it

19    is before 2010?

20         A.      Yes, or I wasn't involved in it.

21    But mostly, I really mean it is before I met him,

22    yes.

23         Q.      Is it your testimony, as you sit

24    here today, that you don't know anything about W&K

25    Info Defence?

