# EXHIBIT 2

**FREEDMAN NORMAND FRIEDLAND LLP**
Edward Normand (admitted *pro hac vice*)
Richard Cipolla (admitted *pro hac vice*)
Stephen Lagos (admitted *pro hac vice*)
Ivy T. Ngo (SBN 249860)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Facsimile: (646) 392-8842
Email: tnormand@fnf.law
Email: rcipolla@fnf.law
Email: slagos@fnf.law
Email: ingo@fnf.law

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL VALENTI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DFINITY USA RESEARCH LLC, DFINITY FOUNDATION, and DOMINIC WILLIAMS,<br><br>Defendants. | Case No.: 3:21-cv-06118-JD<br><br>**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY**<br><br>Date: March 2, 2023<br>Time: 10:00 a.m.<br>Courtroom: 11, 19th Floor<br>Judge: Hon. James Donato |

Lead Plaintiff Henry Rodriguez and named plaintiff Daniel Valenti, on behalf of themselves and all others similarly situated, respectfully submit this Supplemental Memorandum in Opposition to Defendants' Motion to Disqualify Roche Freedman LLP (Dkt. No. 72).

## SUPPLEMENTAL STATEMENT OF FACTS

### I. Roche Freedman LLP was formed months before being engaged by Ava Labs

Defendants have repeatedly argued that "Roche Freedman and Ava Labs launched on the *same day* in the *same* office space" (Dkt. No. 77 at 9 (emphases in original)), and that Ava provided the firm "the funding to get going" (Dkt. No. 91 at 20:18-25). Both statements are false.

In around July 2019, Kyle Roche (New York) and Vel Freedman (Miami) left Boies Schiller Flexner LLP and formed Roche Freedman LLP ("RF"). (Normand Decl. Ex. 1 at 14:19-21, 26:21-27:3.) Before launching the new firm, Mr. Freedman and Mr. Roche raised ▓▓▓ in litigation funding from an entity unaffiliated with Ava or its principals. (Ex. 2 at 2-3.) At that time, moreover, Mr. Freedman was originating millions of dollars in hourly business per year and was lead counsel in several significant matters he had originated at Boies Schiller, including *Kleiman v. Wright*, a dispute where RF ultimately obtained a $143-million judgment after a four-week jury trial.

Once the new firm was formed, Mr. Roche sought to obtain office space for himself and Joe Delich, a former Paul Weiss attorney hired by the firm following his Fifth Circuit clerkship. (Ex. 1 at 45:11-47:16.) RF ultimately found office space at the Brass Factory, a co-working space that housed between twenty and thirty different companies. (*Id.*) One of those companies was Ava, a small and unknown startup. (*Id.*) Over the ensuing months, Mr. Roche got to know two Ava executives, Emin Gun Sirer and Kevin Sekniqi. (*Id.*)

### II. Mr. Roche originated Ava Labs as a client in September 2019

On September 30, 2019, RF and Ava executed an engagement letter where RF agreed to provide ▓▓▓▓▓▓▓▓▓▓. (*Id.* at 19:25-20:7, 20:12-25.) In exchange, Ava agreed to pay the firm ▓▓▓▓▓ tokens ▓▓▓, and ▓▓▓ equity. (*Id.* at 22:24-23:22, 67:14-68:21.) One month later, at Ava's request, that agreement was modified so that Mr. Roche and Mr. Freedman—who at the time owned RF

1
PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

50/50—would each personally receive ▬▬▬▬▬▬▬▬▬. (*Id.*) The tokens, which became known as AVAX, *do not* represent an ownership interest in Ava. Instead, AVAX is akin to Ava's *product*: a publicly traded decentralized asset that Ava does not control, that anyone can purchase, and which has daily trading volumes in the hundreds of millions of dollars.

At the time the engagement agreement was executed, however, the tokens were "valueless" (*id.* at 38:9-16); indeed, they were not even *created* until October 2020, more than a year later (*id.* at 24:6-20). From RF's perspective, the engagement was a gamble: "nobody knew whether Ava Labs would become anything" and many "crypto start-ups become nothing." (*Id.* at 38:9-16.) That risk was mitigated by the fact that either party could terminate the engagement at any time and stop the vesting/payment/provision of further tokens, equity, and legal services. (*Id.* at 20:12-21:5.) The firm's lawyers thus did not receive any valuable compensation from Ava during the firm's launch, and they were never financially dependent on Ava.

### III. Roche Freedman LLP expanded and moved offices in January 2020

In January 2020, twelve lawyers from Boies Schiller, Cleary Gottlieb, and Robbins Geller joined RF. (Ex. 3.) Around this same time, the firm relocated to 99 Park Avenue in Manhattan (*id.*), where Ava does not have, and has never had, offices. As part of this expansion, and subject to various conditions, clarifications, and final agreements, Mr. Roche and Mr. Freedman executed a memorandum of understanding which contemplated the firm paying tokens to four of the firm's new attorneys: Jason Cyrulnik, Nathan Holcomb, Amos Friedland, and Edward Normand. (Ex. 1 at 26:21-29:2.) Under that MOU, Mr. Cyrulnik (who has left the firm) could receive up to 25% of tokens distributed after the first ▬▬▬▬▬▬ (*i.e.*, 25% ▬▬▬▬ tokens), while Mr. Normand, Mr. Friedland, and Mr. Holcomb (who has also left the firm) could each receive up to 5% of those tokens. (*Id.*).[1]

### IV. The firm devoted most of its time to cases unrelated to Ava or cryptoassets

Although the firm eventually grew to include nine partners, *only three* ever worked on Ava matters: Mr. Roche, Mr. Freedman, and Mr. Delich. (Ex. 1 at 17:4-18.) And those attorneys' time

---

[1] FNF and Cyrulnik are in litigation over his alleged entitlements.

2
PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

spent on Ava matters was not, by any means, all-consuming. Mr. Roche, who originated the client and was most involved, spent between 50-70 hours per month; Mr. Delich approximately 30-35; and Mr. Freedman around 20. (*Id.* at 47:17-50:15.)

Defendants wrongly claim that the firm "operates almost exclusively, if not exclusively, in the crypto space." (Dkt. No. 91 at 19:20-20:1; *see also id.* at 20:18-25 (claiming that the firm "continues to prosecute cases almost entirely in the crypto space").) The fact is that *most* of the firm's work since 2020 has had nothing to do with cryptoassets. The firm regularly handles complex commercial litigation involving everything from white-collar defense to partnership disputes.[2] Indeed, *even in the class-action space*, the firm's attorneys have devoted significant time to prosecuting and defending non-cryptoasset-related class actions, both in the securities context (eleven lead counsel appointments under the PSLRA) and non-securities context, where representative cases include *Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 1:22-cv-01245 (S.D.N.Y.) (defending RICO claims); *Adam Cain v. JPay, Inc. et al,* No. 2:21-cv-07401 (C.D. Cal) (defending various state-law claims); *Henry v. Brown Univ.*, No. 1:22-cv-00125 (N.D. Ill.) (prosecuting antitrust claims); *Davitashvili v. Grubhub Inc.*, No. 1:20-cv-03000 (S.D.N.Y.) (same); and *North Brevard County Hospital District v. C.R. Bard, Inc. et al.,* 2:22-cv-00144 (D. Utah) (same).

### V. The firm provided ordinary legal advice to Ava Labs

Through August 2022, RF attorneys—primarily Mr. Roche—provided Ava with general advice regarding employment issues, contracts, and securities. (Ex. 1 at 15:5-17:3.) In addition, RF represented Ava in a confidential arbitration and, briefly, in federal court litigation. (*Id.* at 11:2-12:14; *see* Dkt. No. 76-12 at 2 (Roche "only represented Ava Labs in a defensive capacity in a couple run-of-the-mill corporate contract disputes").) RF also represented Mr. Sirer in a partnership dispute and a defamation action. (Ex. 1 at 50:19-51:12.)

The firm has not, however, "represented Ava's interests" in any litigation "it has filed in which Ava is not a party." (*Id.* at 54:16-55:7; *see also* Dkt. No. 76-1 ¶ 3 (similar).) Nor has the firm

---

[2] *See, e.g.*, *Privatbank v. Kolomoisky*, C.A. No. 2019-0377-JRS (Del. Ch.) (RICO); *Partner Reinsurance Co. Ltd. v. RPM Mortg.*, No. 1:18-cv-05831 (S.D.N.Y.) (failed merger); *SEC v. Gallagher*, No. 1:21-cv-08739 (S.D.N.Y.) (white-collar defense).

3
PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

discussed with Ava any cases that it was considering bringing on behalf of other clients, with the exception of one case (not this one) where Mr. Roche sought to confirm the absence of a "positional conflict." (Ex. 1 at 55:8-59:7; *see also* Dkt. No. 76-1 ¶ 6 (similar testimony).) Indeed, as Ava has explained, neither it nor its principals "ever directed Roche in his selection of cases" and "Roche has filed all their cases independently of us." (Dkt. No. 76-12 at 2.)

In fact, in July 2022, more than a month before CryptoLeaks released videos, Ava's General Counsel *criticized* a class action RF filed against Solana as "a scurrilous attack by plaintiffs' lawyers claiming that yet another blockchain token is an investment contract." (Dkt. No. 76-13 at 1.) Ava later stated that it was "livid" that Mr. Roche "was suing another project" (Dkt. No. 76-12 at 2.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ (Ex. 1 at 59:8-23.) And Mr. Freedman believes Mr. Roche did so while "investigating" potential claims against Defendants. (*Id.* at 60:2-64:2.) No one other than Mr. Roche participated in any similar conversations, the firm does not know ▮▮▮▮▮▮▮▮▮▮ to Mr. Roche if and when asked about these Defendants (if they responded at all), and Mr. Roche was not prompted by Ava to investigate Defendants. (*Id.* at 60:2-64:2, 108:2-9.) Instead, the firm's involvement was prompted by an attorney with no relationship with Ava, ▮▮▮▮▮▮▮▮ ▮▮▮, who saw a *New York Times* article about Defendants and a state-court lawsuit against them and suggested Mr. Roche investigate. (*Id.* at 113:21-116:22.) As part of that investigation, the firm believes Mr. Roche discussed Defendants with "folks that he knew who were in the cryptocurrency space," including ▮▮▮▮▮▮▮, and many others. (*Id.* at 113:21-116:22.)

### VI. Mr. Roche was the only firm attorney whose relationship with Ava Labs extended beyond an attorney-client capacity

Although Mr. Roche became friends with Messrs. Sekniqi and Sirer (Ex. 1 at 58:21-59:4), no one else from the firm had a social relationship with anyone from Ava (*id.* at 65:17-66:7, 103:22-104:7). Mr. Roche was likewise the only firm attorney who had a business relationship with Ava outside of an attorney-client relationship. (*Id.* at 67:14-68:8, 91:7-10, 94:11-15, 95:9-12, 96:21-25.)

1  Even then, that relationship was limited to a litigation funding platform that never took off. (*Id.* at
2  69:9-73:11.) Contrary to Defendants' counsel's assertion at the telephonic hearing on February 15,
3  2023 (Dkt. No. 95), Ava and its principals have *not* provided litigation funding to the firm's cases,
4  let alone $6 million for a single case (Ex. 1 at 69:9-73:11.) Nor did the *firm* (as opposed to Mr.
5  Roche) and Ava ever jointly own that platform or any other business. (*Id.* at 67:11-13.) Defendants'
6  further assertion that Mr. Roche "now lives with Mr. Sekniqi" (Dkt. No. 72 at 9) is misleading. Mr.
7  Roche and his spouse stayed with Mr. Sekniqi in Miami "for a short period of time while they were
8  looking for a place" to live in South Florida. (Ex. 1 at 103:5-13.)

### VII. After the Token price increased, Ava Labs modified the engagement agreement

In October 2020, Ava made its first distribution of AVAX tokens, ▮▮▮▮, to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 1 at 24:6-26:2, 42:1-21.) In June 2021, ▮▮▮▮▮▮▮▮▮▮ tokens from Ava. (*Id.* 26:3-15.) ▮▮▮▮▮▮▮▮▮▮▮▮ each received 5% of that later distribution. (*Id.* at 29:3-9.)

In the summer 2021, AVAX prices increased. As a result of that increase and the firm's dispute with Cyrulnik, Ava renegotiated the deal to require ▮▮▮▮▮▮▮▮ and other material concessions. (*Id.* at 20:8-21:18.) In September 2021, the parties agreed RF would provide ▮▮▮▮▮▮▮▮▮▮▮▮ without receiving any additional tokens. (*Id.* at 29:21-32:25.) Although the remaining tokens ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) ▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* at 87:6-10.) ▮▮▮▮ received 5% ▮▮▮▮▮▮▮▮. (*Id.* at 29:3-9.)

### VIII. Mr. Roche leaves the firm and Ava Labs terminates its engagement with the firm

Mr. Roche left the firm shortly after the CryptoLeaks videos were released. (Ex. 1 at 109:20-21.) He has no ongoing financial interest in FNF or this case. (*Id.* at 79:14-82:6.) Nor does he have any real business relationship with FNF or any FNF attorney. (*Id.* at 78:23-79:13.) In fact, Mr. Freedman is the *only* firm attorney that regularly communicates with Mr. Roche, and he does so primarily because they are co-defendants in litigation, co-counsel in a litigation, and their wives are friends. (*Id.* at 104:8-105:18.) Mr. Roche is co-counsel with the firm on three matters (none are class cases and two are unrelated to cryptoassets) because Mr. Roche brought those clients in while at the firm and they insisted on keeping him on as counsel. (*Id.* at 75:3-17.)[3]

At around the same time Mr. Roche left, his client, Ava, terminated its agreements with Messrs. Roche and Freedman and the firm (except the ███████████████████ ███████████) (*Id.* at 10:7-11:1). That termination was written and contains no provisions relating to this litigation; indeed, over the course of negotiating it, this litigation was not discussed. (*Id.* at 107:2-9.) FNF does not represent Ava or any of its principals in any matters, and it has no "business relationship of any form" with Ava. (*Id.* at 66:9-67:13.)[4] And contrary to Defendants' claim that FNF holds "an enormous equity stake in Ava Labs worth ***tens of millions of dollars*** or more" (Dkt. No. 77 at 9 (emphasis in original)), FNF has *no equity stake* in Ava (Ex. 1 at 67:14-68:21). Instead, ████████████████████████████████████████████████████████████████████████ ██████████.

Aside from that ███████████, *none* of the firm's attorneys have a relationship with anyone from Ava—business, personal, or otherwise. (*Id.* at 67:14-68:8, 89:25-90:10, 91:4-10, 94:6-15, 95:9-12, 96:18-25, 98:3-8, 103:22-104:7, 112:24-113:2.) Accordingly, the *only* remaining (tenuous) connection between the firm and Ava is that ████████████████████████ holds a personal interest in ██████████████████████████ tokens (*i.e.*, the *product* created by

---

[3] There may be a fourth matter filed (also an individual action unrelated to cryptoassets) that a third law firm originated and asked the firm and Mr. Roche to assist with. (*Id.* at 77:18-78:18.)
[4] The only litigation to survive Mr. Roche's departure was a defamation action where the firm acted as local counsel, but that relationship has also now ended. (*Id.* at 51:4-53:10.)

| | |
|---|---|
| 1 | Ava), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ have contractual rights to |
| 2 | ▮▮▮▮ tokens. (*Id.* at 44:25-45:6.) Most of these tokens |
| 3 | ▮▮▮ (*id.*), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ claim that they are |
| 4 | collectively entitled ▮▮ of them (*id.* at 36:14-37:14). |

## LEGAL STANDARD

The Court has explained that it intends to analyze Defendants' motion under Federal Rule of Civil Procedure 23 and the PSLRA. (Dkt. No. 91 at 2:15-20.) The PSLRA "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel and counsel retention." *In re Cavanaugh*, 306 F.3d 726, 734 n.14 (9th Cir. 2002) (citations omitted). That decision should be disturbed "only when necessary 'to protect the interests of the class.'" *Habelt v. iRythmn Techs., Inc.*, 2021 WL 2207365, at *2 (N.D. Cal. June 1, 2021) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(ii)(II)(aa)). Such intervention is not warranted where counsel's "purported conflicts are speculative." *In re Outlaw Lab., LP Litig.*, 2019 WL 2358692, at *11 (S.D. Cal. June 4, 2019); *see also Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1047 (N.D. Cal. 2014) (rejecting "speculative concerns about conflicts of interest"); *O'Shea v. Epson Am., Inc.*, 2011 WL 4352458, at *4-6 (C.D. Cal. Sept. 19, 2011) (same); *cf. Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative conflicts.").

## ARGUMENT

Defendants have not identified, and cannot identify, any conflict between FNF and the class, let alone a conflict that is non-speculative. Indeed, as explained below, no conflict exists.

*First*, Defendants' primary theory—that FNF attorneys' financial interest in tokens conflicts with its representation of Plaintiffs and the class—is not only, as the Court put it, "highly, highly speculative" (Dkt. No. 91 at 14:12-15:25), but also illogical. Defendants have not provided *any* evidence that this action or Defendants' financial state has any bearing whatsoever on the price of AVAX tokens. In addition, on the premise that bad news for Defendants could theoretically benefit a competitor, Defendants do not explain why that benefit would accrue to the AVAX asset, as opposed to one of the innumerable other layer-1 tokens with which Defendants' token, ICP, purports

to compete (Ex. 4), such as ETH, BNB, ADA, MATIC, SOL, DOT, and TRX, which each have larger market capitalizations than AVAX (Ex. 5).

The market capitalization for AVAX is approximately $6.2 billion, while the other seven layer-1 tokens identified have market capitalizations between $6.4 billion and $202 billion. (*Id.*) Indeed, consistent with the following analysis, AVAX prices *did not increase* during the period in which Plaintiffs allege disclosures of Defendants' misconduct caused ICP prices to collapse. (Dkt. No. 65 at 21-22; Ex. 6.) That is, if losses to ICP would directly benefit ICP's competitors, it is *far more reasonable* to assume that those benefits would accrue pro rata by market capitalization than to assume that AVAX, a relatively small player, would disproportionately benefit. Applying that more reasonable assumption, harm to ICP *could not* significantly benefit AVAX. In fact, even if the *entire market capitalization* of ICP was reallocated pro rata across this small subset of just eight layer-1 tokens by market capitalization, the price of AVAX would increase by *less than 1%*.

More fundamentally, it defies logic that FNF's attorneys would jeopardize their law licenses and sell out the class by turning down a favorable settlement based on the *speculative* possibility that doing so *might* affect AVAX prices, especially as FNF attorneys sell their AVAX and thus reduce their interest in that asset. Even if FNF supposedly could "destroy[]" Defendants in a way that was against Plaintiffs' and the class's interests (Dkt. No. 91 at 15:13-25), no reasonable person could *believe* this would affect AVAX prices (*id.* at 13:2-9); Defendants' ICP—with a market capitalization that is less than one-third of AVAX's (Ex. 5)—is simply too small a player and there are simply too many firms operating in the space sensibly to conclude otherwise. To be blunt, FNF expects to gain far more money from a favorable settlement for the class in this case than it ever could by hoping some outcome in this case could affect the price of AVAX. FNF respectfully submits the PSLRA and Local Civil Rule 3-7(d) do not require attorneys to disclose interests in potential competitive companies (or their products) for a reason: those interests are irrelevant and do not present a conflict.

*Second*, Defendants' backup argument—that FNF's attorneys will "improperly disclose confidential litigation materials to Ava Labs" (Dkt. No. 91 at 19:3-6)—is even weaker. Each of FNF's

8
PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

partners have sworn that they have never, and would never, engage in such misconduct. (Dkt. No. 80-2.) Those attorneys have every incentive to keep their word: as the Court made clear, if FNF's attorneys "inappropriately disclosed confidential information, they would be disbarred in all likelihood." (Dkt. No. 91 at 22:13-21.) It is telling that multiple courts have refused to assume that FNF's attorneys, who are not implicated by Mr. Roche's statements, would engage in such egregious misconduct. (*See, e.g.*, Dkt. Nos. 80, 82, 83.)

*Third*, to the extent that Defendants' position is that FNF's relationship with Ava *is* so close that it can reasonably be inferred that FNF is acting on Ava's behalf, that argument is utterly meritless. Ava is no longer a firm client, and aside from ███████████████████, neither the firm nor any of its attorneys maintains any relationship with Ava or any of its principals. In fact, like most FNF partners, Plaintiffs' lead counsel, Mr. Normand, never did any work for Ava; Mr. Roche—who is now gone—was the individual at RF who originated Ava as a client, had the relationship with Ava and its principals, and was primarily responsible for providing legal services to Ava. And although *three of FNF's twenty attorneys* retain some derivative interest in AVAX tokens, that interest cannot be terminated or reduced by Ava. FNF thus has no incentive—professional, financial, or otherwise—to secretly do Ava's bidding at Plaintiffs' or the class's expense.

*Fourth*, to the extent that Defendants' position is that RF's relationship with Ava *was* so close that it can reasonably be inferred that FNF is acting on Ava's behalf, that argument is premised on a fundamental misunderstanding of the facts. The firm and Ava were not "created at the same time in a joint workspace" (Dkt. No. 91 at 7:21-8:5); the firm launched months before it was engaged by Ava and had offices in the same co-working space as Ava *and twenty to thirty other companies* for approximately four months. The firm was not "funded" by Ava (*id.* at 9:1-10); it received millions of dollars from an independent third party to pursue preexisting cases that had nothing to do with Ava; it never received litigation funding from Ava; and, when it was engaged by Ava, the tokens were valueless for over a year. Ava was not the firm's "first big client" (*id.* at 30:23-32:3); the firm launched with other clients that included a publicly traded company, and one for whom it ultimately obtained a $143-million judgment. The firm did not receive an "enormous equity stake"

9
PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANTS'
MOTION TO DISQUALIFY – No. 3:21-cv-06118

1   in Ava (Dkt. No. 77 at 9); instead, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. And the firm does not operate "almost exclusively,
3   if not exclusively, in the crypto space" (Dkt. No. 91 at 19:20-20:1); most of its cases, even its class-
4   actions, have nothing to do with cryptoassets.

5   *Fifth*, if Defendants' theory is that the only three attorneys at FNF who have ever owned
6   AVAX tokens made so much money selling those tokens that they are now beholden to Ava (and
7   thus secretly acting on its behalf), that argument is baseless. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. (Ex. 1 at
10  41:14-25, 44:1-15.) These are ▓▓▓▓▓▓, but neither ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ represented
11  Ava, and none of these individuals has an ongoing relationship with anyone from Ava. Nor did Ava
12  ask these individuals, or anyone else at FNF, to continue pursuing this action after the attorney-
13  client relationship ended. There is simply no basis to infer FNF would act unethically and against
14  its own interest and turn down a settlement in this case to collaterally benefit a former client.

15  *Sixth*, to the extent that Defendants fall back on Mr. Roche's alleged motives in filing this
16  action, not only are those motives irrelevant and not shared by FNF's attorneys (Dkt. No. 91 at 9:21-
17  25; Dkt. No. 76-1 ¶¶ 3-4), but the evidence does not support the theory (arguably suggested by Mr.
18  Roche himself in the videos) that this action was filed to benefit Ava. Mr. Roche's investigation of
19  Defendants was not prompted by Ava; it was prompted by an independent attorney's suggestion.
20  The firm has never represented Ava's interests in litigation to which Ava was not a party. And Ava
21  has made clear that it opposes the very legal theory on which this case is premised. In short, Mr.
22  Roche's statements were untrue or, at minimum, reflected an idiosyncratic view that was not held
23  by Ava or anyone at the firm. (Dkt. No. 91 at 5:3-6.)

## CONCLUSION

Plaintiffs respectfully submit, for the foregoing reasons, that the Court should deny Defendants' motion to disqualify FNF.

| | |
|---|---|
| Dated: February 24, 2023 | Respectfully Submitted, |
| | **FREEDMAN NORMAND FRIEDLAND LLP** |
| | /s/ Edward Normand |
| | Edward Normand (admitted *pro hac vice*) |
| | Richard Cipolla (admitted *pro hac vice*) |
| | Stephen Lagos (admitted *pro hac vice*) |
| | Ivy T. Ngo (SBN 249860) |
| | 99 Park Avenue, 19th Floor |
| | New York, NY 10016 |
| | Telephone: (646) 350-0527 |
| | Facsimile: (646) 392-8842 |
| | Email: tnormand@fnf.law |
| | Email: rcipolla@fnf.law |
| | Email: slagos@fnf.law |
| | Email: ingo@fnf.law |
| | |
| | *Counsel for Plaintiffs and the Class* |