Party: Claimants/Applicants
Witness: CS Wright
Statement No.: 1st
Exhibit CSW1
Date:  15 December 2022

Claim No. IL-2022-000069

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
INTELLECTUAL PROPERTY LIST (ChD)
B E T W E E N:

(1) DR CRAIG STEVEN WRIGHT
(2) WRIGHT INTERNATIONAL INVESTMENTS LIMITED
(3) WRIGHT INTERNATIONAL INVESTMENTS UK LIMITED

Applicants/Claimants

- and –

(1)  BTC CORE (A PARTNERSHIP OF ENTITIES AND INDIVIDUALS INCLUDING THE SECOND TO TWENTY-SIXTH DEFENDANTS)
(2)  WLADIMIR JASPER VAN DER LAAN
(3)  JONAS SCHNELLI
(4)  PIETER WUILLE
(5)  MARCO PATRICK FALKE
(6)  SAMUEL DOBSON
(7)  MICHAEL ROHAN FORD
(8)  CORY FIELDS
(9)  GEORGE MICHAEL DOMBROWSKI (A.K.A. 'LUKE DASHJR')
(10)  MATTHEW GREGORY CORALLO
(11)  PETER TODD
(12)  GREGORY FULTON MAXWELL
(13)  ERIC LOMBROZO
(14)  JOHN NEWBERY
(15)  PETER JOHN BUSHNELL
(16)  BLOCK, INC.
(17)  SPIRAL BTC, INC.
(18)  SQUARE UP EUROPE LTD
(19)  BLOCKSTREAM CORPORATION INC.
(20)  CHAINCODE LABS, INC
(21)  COINBASE GLOBAL INC.
(22)  CB PAYMENTS, LTD
(23)  COINBASE EUROPE LIMITED
(24)  COINBASE INC.
(25)  CRYPTO OPEN PATENT ALLIANCE
(26)  SQUAREUP INTERNATIONAL LIMITED

Respondents/Defendants

1

_____

## FIRST WITNESS STATEMENT
## OF DR CRAIG STEVEN WRIGHT

_____

I, **CRAIG STEVEN WRIGHT**, of 21 Harebell Hill, Cobham KT11 2RS, United Kingdom, **SAY AS FOLLOWS**:

1.  I am the First Claimant in the above proceedings. I am also authorised to act on behalf of:

    (1)  the Second Claimant (which I refer to as "**WII**") as a director of Equator Consultants AG, which is a corporate director of WII; and

    (2)  the Third Claimant (which I refer to as "**WII UK**") as director.

2.  I make this witness statement on behalf of WII, WII UK and myself, in support of an application for permission to serve the draft proposed Re-Amended Claim Form, draft proposed Amended Particulars of Claim ("**APoC**") and other documents out of the jurisdiction.

3.  The facts and matters set out in this witness statement are within my own knowledge, save where I indicate otherwise, and I believe them to be true. Where I refer to information supplied by others, I state the source of that information and that information is true to the best of my knowledge and belief.

4.  This statement has been prepared following discussions with WII's and my solicitors, Harcus Parker Limited ("**HPL**"), in person, over the telephone and via videoconferencing facilities. In making this statement I do not intend to waive , and should not be deemed, to waived privilege in any respect.

5.  In order to avoid any unnecessary duplication of work and costs, I also rely upon the witness statement that I made in support of a similar application in relation to proceedings that I and WII brought against Coinbase Global Inc and related parties, with Claim No. IL-2022-000035. That statement was prepared following discussions and with the assistance of another firm of my solicitors I have instructed, Ontier LLP ("**Ontier**"). I do not waive privilege in any respect in my discussion with Ontier.

6.  I have read the APoC and I confirm that the facts stated in it are true.

7.  This witness statement is divided into five sections, as follows:

    (1)  In Section A, I describe my qualifications and background.

    (2)  In Section B, I describe the development of Bitcoin (as defined below), including the White Paper and the Bitcoin File Format.

(3)     In Section C, I describe the "Airdrops" which took place on the Bitcoin System and the characteristics of the BTC System and the Bitcoin Cash System.

(4)     In Section D, I describe the Defendants.

(5)     In Section E, I make disclosures which I am advised to make by way of full and frank disclosure.

8.     There is now produced and shown to me a paginated bundle of true copy documents marked "CSW1". References in the form [CSW1/xx] are to pages in that exhibit.

**Section A: My qualifications and background**

**My Qualifications**

9.     I have 14 Masters' degrees and two doctorates, including a PhD in computer science and economics from Charles Sturt University, Australia. I am currently studying for a further 12 degrees and 5 doctorates. I have received in excess of 60 professional commendations or certifications.[1]

10.    These various qualifications and achievements span a number of fields, from Networking Systems Administration to International Commercial Law. However, most relate to mathematics, economics or computer science – all fields in which I have been professionally involved.

**My background and experience**

11.    I am a citizen of Australia and Antigua and Barbuda but in October 2015 I immigrated to England with my wife and children, where we have lived ever since. In 2020, I became eligible to – and did – apply for permanent residency in this country, which I was granted on 12 March 2021. I submitted an application for British citizenship some months ago when I became eligible to do so and have provided my biometric information and supporting documents and completed all required steps in the process. I am awaiting confirmation of citizenship.

12.    I am a computer scientist, entrepreneur and businessman. I have founded companies that are highly active in the Bitcoin industry, and which focus on the research and development of blockchain and cryptographic systems.

13.    When I was living in Australia, I was very well-respected in my field of expertise, being computer science, security and forensics. I have more than 25 years' experience in the fields of information technology, forensics and security and was previously a lecturer and researcher in computer science

---

[1] By way of example (three out of more than 60), I refer to the following: (1) I was certified as an information systems security professional by the International Information Systems Security Certification Consortium ("ISC") [**CSW1/1**]; (2) I was certified by the ISC as an Information Systems Security Architecture Professional [**CSW1/2**]; and (3) between 2005 and 2009 I was certified by the Information Systems Audit and Control Association as an Information Systems Auditor [**CSW1/3**].

at Charles Sturt University. I have authored many articles, academic papers and books, and spoken publicly at conferences on IT, security, Bitcoin (as defined below) and other topics relating to digital currencies and blockchain technologies.

14. I personally conducted in excess of 1200 engagements relating to digital forensics / IT security for more than 120 Australian and international organisations in the private and government sectors, including 15 Commonwealth states. I have held senior executive positions with companies focused on digital currency, digital forensics, and IT security, including having been the vice president of the Centre for Strategic Cyberspace and Security Science, a strategic cyberspace think tank with a focus on collaborating with government bodies (such as the Australian Federal Police, New South Wales Police and the Australian judiciary) in securing cyber systems and giving training on cyber systems and providing expert evidence on matters relating to forensic computer in the context of criminal prosecutions (including paedophilia, drug trafficking and illegal peer-to-peer network sharing). Whilst contracted with the Australian Federal Police, I developed and gave training to judges and prosecutors to enable them to understand cybercrime, its implications and how to address these crimes. The New South Wales Police Academy is affiliated with Charles Sturt University; I lectured and gave training to the New South Wales Police in relation to cybercrime and introductory criminal law.

15. I also worked on systems that protected the Australian Stock Exchange and have trained Australian government and corporate departments in SCADA 2 security, cyber warfare, and cyber defence. In one of my early sector focuses, I helped design the architecture for the world's first legal online casino (Lasseter's Online in Australia) and advised Centrebet on security and control systems.

16. I am presently the Chief Scientist of nChain UK Limited (a UK company with registered number 09823112, whose registered address is 28-30 Market Place, London W1W 8AP), a role I have had since around October 2015. nChain UK Limited is the research and development arm of the nChain group of companies ("**nChain**"), which I helped establish in 2015 and which develops blockchain technologies with the ultimate mission of providing the world, and most especially the business world, with a truly secure database facility.

## Section B: Development of Bitcoin

### Development of Bitcoin

17. During 2007 and October 2008, I researched and then authored a paper entitled, "Bitcoin: A Peer-to-Peer Electronic Cash System" (the "**White Paper**") **[CSW1/4]**. My drafting of the White Paper and creation of the Bitcoin File Format reflected the work I had been undertaking in the digital security field for over a decade. Prior to my uploading the Original Bitcoin Code and Software in January 2009, I consulted with a number of close friends and relatives in relation to the contents of the White Paper. I studied

extensively with SANS, gaining two masters degrees and over 30 other qualifications in information security, to gain the required knowledge to design the Bitcoin File Format and datastructures.

18.   In the White Paper I set out the outlines of an electronic cash system using the concept of "a chain of digital signatures", otherwise known as a "blockchain". The White Paper is well-known among those involved with the development of electronic cash and digital assets systems and has become well-known globally to people interested in those systems.

19.   I devised the name "**Bitcoin**". I used this term in the White Paper to describe the digital asset I was creating and in the messages which I sent out in order to publicise the system.

20.   In preparation for releasing the White Paper, I registered the domain name "bitcoin.org" on 18 August 2008 on the "anonymousspeech.com" website, using an account I had created with the pseudonymous username "Sakura".

21.   I made the White Paper available to the public on 31 October 2008 under my pseudonym, "Satoshi Nakamoto". I did this by posting on the Cryptography Mailing List (which is hosted on metzdowd.com) an announcement that I had been "*working on a new electronic cash system that's fully peer-to-peer, with no trusted third party*" **[CSW1/13]**. The post I put up included a link to the White Paper at http://www.bitcoin.org, which I had previously uploaded. I kept using my pseudonym "Satoshi Nakamoto" in public messages and in relation to Bitcoin until 2011.

22.   In order to put the system into effect, I had already written a range of software during the period 2007 to 2008 (the "**Bitcoin Software**"). I set about distributing this on 9 January 2009 by uploading the Bitcoin Software and executable code onto SourceForge (an online source code repository) under the name "version 0.1.0 Alpha of the Bitcoin source code" (the "**Original Bitcoin Code**" and "**Original Bitcoin Client**" respectively). On the same day, using my Vistomail Account, satoshi@vistomail.com ("**the Vistomail Account**"), I put out the following message on the Cryptography Mailing List **[CSW1/14]**:

> *"Bitcoin v0.1 released*
>
> *Announcing the first release of Bitcoin, a new electronic cash system that uses a peer-to-peer network to prevent double-spending. It's completely decentralized with no server or central authority.*
>
> *See bitcoin.org for screenshots.*
>
> *Download link: http://downloads.sourceforge.net/bitcoin/bitcoin-0.1.0.rar"*

23.   The Original Bitcoin Code and Original Bitcoin client were subsequently developed and further versions have been released, which I refer to as the "**Bitcoin Code**" and the "**Bitcoin Client**".

24.   As outlined above, the system which I set out in the White Paper and which I implemented is a peer-to-peer electronic micropayment system ("**the Bitcoin System**"). It allows online payments to be sent directly from one party to another without going through an intermediary, such as a bank or other financial institution. The Bitcoin System distributes an electronic reward called "Bitcoin". Bitcoin can be bought, sold and transferred through digital exchanges. It can also be exchanged for fiat money (i.e., regular currencies) or other digital assets. Transactions involving Bitcoin are recorded on a public ledger or database, in the form of a "chain" of "blocks" of information, called a "blockchain". The Bitcoin blockchain records every Bitcoin transaction ever undertaken and, therefore, enables the movement of all Bitcoin to be traced.

25.   The Bitcoin System is complex, and the following is only a summary:

(1)   I designed the Bitcoin System to be a low-cost micro payment system that avoids the need for a trusted third party to control and authorise transactions. Instead, the Bitcoin System relies on peer-to-peer verification by using a register of transactions recorded in the Bitcoin blockchain which is visible to all participants. Any transaction needs to be verified before being accepted and recorded in the Bitcoin blockchain.

(2)   Devices on the network participating in processing transactions in the Bitcoin System are known as "nodes". One function of nodes is to "mine" for Bitcoin. This describes the process by which nodes (and those operating them) collect in a "mempool" (an abbreviation for "memory pool") information relating to Bitcoin transactions as they occur and are notified to the Bitcoin System, and verify that the Bitcoin involved in the transaction had not previously been disposed of. A new block is "mined" approximately every 10 minutes by the nodes competing to compute a "hash problem" which satisfies a target difficulty set by the Bitcoin Software. Once a particular node's solution to the current hash problem is accepted as valid by the other nodes, the current block, containing current transactions, is completed, and is added to the blockchain. Thus, the record of the transactions is maintained across a network of computers.

(3)   I designed the validation, verification and announcement process to be virtually instantaneous, though the Bitcoin System makes provision to establish the priority between two nodes which more or less simultaneously find a valid solution to the current hash problem. Nodes do not control the network, but merely follow the rules which are inherent in the Bitcoin System. In respect of nodes which are successful in their mining efforts a distribution is made comprising a quantity of Bitcoin together with the transaction fees relating to the transactions recorded in the new block. The quantity of Bitcoin incorporated in the distribution diminishes as time goes on. There is a limit of just under 21,000,000 Bitcoin built into the system beyond which no further Bitcoin can be distributed.

26.     In order to implement the Bitcoin System at its inception, I (under my pseudonym, "Satoshi Nakamoto") created an initial anchor for the blockchain, onto which the blocks would be added in sequence as soon as a node found a valid solution to the current hash problem. I called this the "Genesis Block", and the blockchain anchored by it I call the "**Bitcoin Blockchain**".

27.     I believe that the Bitcoin Blockchain is a database because it is a collection of data that is arranged in a systematic or methodical way and are individually accessible by electronic means. I refer to the "**Database/s**" in this statement and the APoC to mean:

(1)     The Bitcoin Blockchain;

(2)     The Bitcoin Blockchain as it stood on 1 August 2017 at 14:11 (up to and including block 478,558), and/or; and

(3)     That part of the Bitcoin Blockchain made (within the meaning of the Database Regulations) during the Material Time as defined in the APoC.

28.     I believe that having regard to the provisions of regulation 14 of the Database Regulations, I am the maker of the Database/s.

29.     The Bitcoin System included what I term the "**Bitcoin File Format**". That is an original work of my design that consists of the structure of each block of the Bitcoin Blockchain, which I have described in Schedule 2 to the APoC.

30.     The structure of the Bitcoin File Format has been encapsulated in such a way that a complex predicate can be saved and indexed across widely shuttered systems allowing for a highly distributed architecture that scales beyond current database limits. The double hash structure of a UTXO effectively randomises the transaction output creating an atomic structure. In the predicate, a single entry is provably associated with every transaction and exchange that ever exists allowing for a distributed and consistent exchange of information at massive scale. This works within the standard database ACID (atomicity, consistency, isolation and durability) properties while allowing the system to be distributed across multiple nodes and even geographically isolated.

31.     From 2009, I was responsible for the development and commercial activities of the Bitcoin System, investing substantial amounts of time, energy and funding in developing and working on it.

32.     As described in more detail below, I incorporated various companies to work on parts of the Bitcoin System but responsibility for it stayed with me. I initially employed my ex-wife to assist me and also engaged the assistance of contractors from time to time in the early days, including a contractor called John Chesher. From around 2011, there were three employees, who assisted in dealing with the commercial activities related to developing the

Bitcoin System, and this went up to approximately 50 employees by 2015 and into the 100s by the time this claim was issued. Some of the companies I incorporated were also involved in mining for Bitcoin and, together with my mining activities, generated many Bitcoin.

33. After the Bitcoin System was launched, people around the world became interested in Bitcoin and started to download the software, mine new blocks and then receive Bitcoin. The website Bitcoinmarket.com was created in 2010 as one of the first marketplaces for consumers to trade Bitcoin.

34. The success of my invention, the Bitcoin System, led to further development work being done by various developers who made decisions about the software required to operate the system and any updates to it. The protocols implemented in the software were consistent with the principles I set out in the White Paper, in the software I released in January 2009 and in the explanations and information about the Bitcoin System that I circulated (under my pseudonym, "Satoshi Nakamoto") between January 2009 and April 2011. In April 2011, I handed over effective control of the "network alert key" (as well as management of the Bitcoin code base (used in the Software), and the related access to the Bitcoin source code repository) to Gavin Andresen, who took over as the lead developer of Bitcoin.

35. I made it clear that the core design for Bitcoin was fixed. For example, on 17 June 2010, I posted the following message (again using my pseudonym, "Satoshi Nakamoto") on the bitcointalk.org forum **[CSW1/16]**:

> *"The nature of Bitcoin is such that once version 0.1 was released, the core design was set in stone for the rest of its lifetime. Because of that, I wanted to design it to support every possible transaction type I could think of. The problem was, each thing required special support code and data fields whether it was used or not, and only covered one special case at a time. It would have been an explosion of special cases. The solution was script, which generalizes the problem so transacting parties can describe their transaction as a predicate that the node network evaluates. The nodes only need to understand the transaction to the extent of evaluating whether the sender's conditions are met.*
>
> *The script is actually a predicate. It's just an equation that evaluates to true or false. Predicate is a long and unfamiliar word so I called it script.*
>
> *The receiver of a payment does a template match on the script. Currently, receivers only accept two templates: direct payment and bitcoin address. Future versions can add templates for more transaction types and nodes running that version or higher will be able to receive them. All versions of nodes in the network can verify and process any new transactions into blocks, even though they may not know how to read them.*

*The design supports a tremendous variety of possible transaction types that I designed years ago. Escrow transactions, bonded contracts, third party arbitration, multi-party signature, etc. If Bitcoin catches on in a big way, these are things we'll want to explore in the future, but they all had to be designed at the beginning to make sure they would be possible later.*

*I don't believe a second, compatible implementation of Bitcoin will ever be a good idea. So much of the design depends on all nodes getting exactly identical results in lockstep that a second implementation would be a menace to the network. The MIT license is compatible with all other licenses and commercial uses, so there is no need to rewrite it from a licensing standpoint."*

36.   I kept progressing the commercial exploitation of the Bitcoin System, promoting it using the name "Bitcoin". My clients included:

(1)   Hoyts – (2010 – 2016) a chain of digital cinema and film centres using my blockchain technology and token authentication via the Bitcoin Blockchain in order to enhance security on their network. I later made the security devices which were used by Hoyts as part of this process;

(2)   Bodog – (2012 – 2015) a chain of casinos using the Bitcoin System with a view to ensuring that forensic information was timestamped and captured (thereby ensuring the precise times and dates of transactions were recorded and provable);

(3)   CentreBet – (2009 – 2013) a betting chain using the Bitcoin System also with a view to ensuring that forensic information was timestamped and captured (thereby ensuring the precise times and dates of transactions were recorded and provable);

(4)   Sportingbet – (2009 – 2010) a UK online gambling operator also using the Bitcoin System to ensure that forensic information was timestamped and captured (thereby ensuring the precise times and dates of transactions were recorded and provable);

(5)   RIAA (Recording Industry Association of America/Recording Industry of Australia) – (2011 – 2013) who (via a third party intermediary, William Bush) were provided with forensic services via the Bitcoin System; and

(6)   Qantas Staff Credit Union – (2009 – 2013) a credit union with whom I negotiated use of the Bitcoin System for the purpose of token authentication for security purposes (in addition to use of core banking software).

37.   I discussed the Bitcoin System with third parties and potential customers, and made decisions about its technical and commercial development. I was supported in this by external investors such as Robert McGregor, a national

and resident of the UK, who invested in 2015 into nCrypt Limited (now called nChain UK Limited) to develop the software and code for my blockchain network.

38.  The Bitcoin System became increasingly popular from 2009 onwards. As greater numbers of people came to buy, sell and trade in Bitcoin, it moved from being a digital asset known only to those with an interest in fields such as networks, information systems and computer science to being known by the public in general around the world, including in the UK. This led to companies and businesses accepting Bitcoin as a form of payment by consumers. The more it was used, the more secure the Bitcoin Blockchain became, and as trust in it increased, so did the value of Bitcoin. By 2017, it had become a household name and was a functional electronic cash system capable of being used in making micropayments.

39.  In the period 2009 to 2016, I set up, owned and controlled various trading entities, including WII, to develop my ideas for blockchain technology. WII was involved with the technical development of the Bitcoin System. Nevertheless, I am the person responsible for the development and exploitation of Bitcoin System including by activities I undertook using my "Satoshi Nakamoto" pseudonym. I consider that the goodwill generated in Bitcoin under the Bitcoin System is owned by me. Nevertheless, I acknowledge that various intellectual property rights relating to the Bitcoin System ("IPR") have been transferred to WII and/or WII UK and, as such, that IPR (potentially including goodwill, the database rights and copyright I rely on) is owned, at least in part, by WII and/or WII UK. I have included WII and WII UK as claimants in this case on that basis.

40.  I was involved in setting up nCrypt/nChain in 2015, as I mentioned above. I assigned the software, code and financial modelling systems for the Bitcoin System to this company and those discrete aspects have been further developed by nChain under my direction.

41.  Since its launch in 2009, I have never stopped working on the development of the Bitcoin System. Although Gavin Andresen took over as lead developer in 2011 (as described at paragraph 34), I continued to be the driving force behind the improvement and promotion of the Bitcoin System and sought to publicise its utility in various ways. The actions I took included:

(1)  working on the development of the Bitcoin System, including continuous research into ways of improving the utility of the Bitcoin System. My work in this regard has focused on how to "scale" the system and to keep transaction costs low so that it is capable of being used as a global payments system by an increasingly high number of users throughout the world (as I always intended Bitcoin to be used);

(2)  attending conferences, writing papers and giving interviews and presentations on the Bitcoin System in order to promote the system and its utility around the world. One example of this is a discussion

I took part in at Sydney's Informa Conference in 2014 during which I spoke about what Bitcoin is and how it relates to the idea of traditional money; this can be found at the following link: https://www.youtube.com/watch?v=1PtAqNpEm7w.         Another example is an interview I gave to Dale Dickens on 10 July 2014 at Melbourne's first bitcoin conference, in which I talked about the benefits of the Bitcoin System and its multiple potential applications in the future. This interview can be found here: part 1 https://www.youtube.com/watch?v=gYskRI0ynAM     ;     part     2 https://www.youtube.com/watch?v=HwopmmsNeCs     ;     part     3 https://www.youtube.com/watch?v=N1yNQSW8jGA.  These are just two examples out of many. I took any opportunity available to me to explain and promote the Bitcoin System and raise awareness regarding its potential utility in the future; and

(3)     continuing to commercially exploit the Bitcoin System by liaising with clients and potential clients and seeking to promote the benefits and utility of the Bitcoin System to them.

42.     By 2017, the Bitcoin System that I created, developed and promoted had become a household name.

**Section C: Airdrops and the creation of BTC System and the Bitcoin Cash System**

**Airdrops**

43.     An important technical process which I need to now describe is something I have termed an "Airdrop".

44.     Airdrop describes the process by which certain nodes adopt different software from that used previously and form a new network using that different software. This means that new blocks are added by the new network to the blockchain which are incompatible with and use a different protocol from the blocks added by the existing software, leading to the development of two different versions of the blockchain. The historic transactions of the new network, up to when it is created, will be the same as for the pre-existing network.

45.     In relation to my invention, the Bitcoin System, there are two Airdrops which I need to describe. They happened because certain developers – whom I was opposed to – associated with the maintenance of the Bitcoin System circulated to the nodes new software that made use of the existing Bitcoin Blockchain and part of the Bitcoin System. This new software used different protocols and implemented a different system. These developers encouraged the nodes to activate the airdrop by messaging them about the various updates.

**The 2017 Airdrop**

46.    The first Airdrop on the Bitcoin System took place on 1 August 2017 ("**the 2017 Airdrop**") and introduced a facility called "Segregated Witness" ("**SegWit**"). This facility – which partly made use of certain amendments to the Bitcoin software during the previous year – was introduced by developers who had opposing visions to my own regarding the development of the Bitcoin System. What they wanted was to separate transactions from their digital signature (a method of verifying the identity of the person undertaking the transaction) and to have the digital signature information stored on side networks or "off chains", while the transaction remains recorded on the main blockchain. This is a fundamental difference with the Bitcoin System and was done in order to set up a network which was not transparent and would not allow transactions to be traced from one user to another, for example, by law enforcement agencies (in contrast with the Bitcoin System). I refer to this new system as "the BTC System" and the digital asset which it made available as, "**BTC**".

47.    In forcing through the 2017 Airdrop, the developers put out the following message on 12 March 2017 [**CSW1/18**]:

    *"It is hoped that miners will respond to this BIP by activating segwit early, before this BIP takes effect. Otherwise this BIP will cause the mandatory activation of the existing segwit deployment before the end of midnight November 15th 2017."*

48.    There were many nodes which adopted the 2017 Airdrop, but not all of them did so. The nodes that didn't adopt it continued to use the Bitcoin System. The exchanges did, however, adopt the name Bitcoin Cash (using the ticker BCH) when referring to the original Bitcoin under the Bitcoin System.

49.    The BTC System did not, and does not, have all the same characteristics as Bitcoin. In particular, it:

    (1)    Enabled "off" or "side" blockchains through the introduction of SegWit. As I mentioned above, this changed the structure of blocks and segregated the digital signature from the transaction record and allowed side chains to be placed on top of the blockchain, requiring the recording of transaction details "off chain" and reducing the ability to verify all transactions.

    (2)    Enabled separate networks such as the Lightning Network to exist. The Lightning Network was designed to allow the exchange of transactions outside the blockchain and without leaving a record on the blockchain, and is further encouraged by the capped blocksizes imposed by the BTC System.

    (3)    Has higher transaction fees than the Bitcoin System. This means that it cannot function as well as a medium of exchange in small transactions (which is what I wanted the Bitcoin System to be).

(4)    Permanently changed certain Op-Codes and added further altered OpCodes. This had a negative affect on the flexibility of the system and basically meant it was less flexible.

(5)    Permanently disabled the NlockTime function by omitting the NlockTime Op Code and by re-assigning the purpose of the NlockTime and nSequence parameters, using them as parameters in inferior functions known as CLTV and CSV. This meant that Bitcoin subjected to transactions using CLTV or CSV function would become unspendable by those continuing to use the authentic Bitcoin System. At the same time, those who used Nlocktime in the manner provided for in the authentic Bitcoin System would create transactions which were regarded as invalid in the BTC System.

(6)    Implemented Taproot which obscures money making the implementation of financial crime easier. This is designed to anonymised transactions and change bitcoin which is not a cryptocurrency into a cryptocurrency. In combination with the Lightning Network, Taproot is designed to create a system that allows for untraceable monetary exchanges with no ability for law enforcement to interact.

(7)    Does not operate on the Bitcoin Blockchain. The BTC System operates on a new blockchain which was built by the nodes that adopted the 2017 Airdrop.

50.    I would not have included these characteristics in the Bitcoin System because they meant that the BTC System was a less functional electronic payment system that would not work as low-cost micro payment system. These characteristics meant there was less incentive to transact using Bitcoin. They also removed the transparency of the transaction record, mostly through the SegWit facility and the use of "side" or "off" chains. This meant that, for example, law enforcement agencies could not trace transactions in the same way they could with the Bitcoin System.

**The 2018 Airdrop**

51.    On 15 November 2018, a further airdrop took place in relation to the Bitcoin System, using the name Bitcoin Cash and the ticker, BCH ("**the 2018 Airdrop**"). I refer to this new system as, "**the Bitcoin Cash System**" and the digital asset which it made available as, "**BCH**".

52.    As with the 2017 Airdrop, many nodes took the 2018 Airdrop but the nodes that did not take that airdrop continued to use my system – the Bitcoin System. The exchanges adopted the name, "Bitcoin Satoshi Vision", using the ticker "BSV" when referring to my original Bitcoin System in order to avoid confusion with the new system created (which continued to use the names "Bitcoin" and "Bitcoin Cash", and the "BCH" ticker).

53.    As a result of the 2018 Airdrop, the Bitcoin Cash System did not, and does not, have the same characteristics as Bitcoin. The Bitcoin Cash System:

(1)    Uses "side-chains" through the launch of a project called SmartBCH. The SmartBCH website says that the introduction of this side-chain enabled an interaction between other systems like Ethereum and BCH. This undermines the ability of the Bitcoin System to operate at low cost and with transparency.

(2)    The Bitcoin Cash System has introduced additional "Op-codes", such as OP_CHECKDATASIG, allowing flexible signing conditions for BCH transactions and even allowing for messages to be validated from outside the Bitcoin Cash System blockchain. I did not intend this to be available on the Bitcoin System as it means that transactions are less transparent. Although these "Op-codes" were portrayed as allowing for different types of smart contract to be performed on the network (and as allowing for the creation of new types of metadata implementation such as coloured coins and representative tokens) they actually make the network less traceable. Other new Op-codes include OP-SPLIT and OP_DATASIGNVERIFY.

(3)    The implementation of the "Canonical Transaction Ordering Proposal ("CTOR")", was added to the BCH network in November 2018. CTOR changes the order of transactions stored in blocks so that they are ordered by their transaction IDs – as opposed to their sequence position (i.e. if a transaction B depends on a transaction A to be valid, then the transaction B must appear after the transaction A within the block), which the Bitcoin protocol which I had designed intended. The addition of CTOR is a very significant difference which the Bitcoin Cash System has with the Bitcoin System.

(4)    Does not operate on the Bitcoin Blockchain. The Bitcoin Cash System operates on a new blockchain which was built by the nodes that adopted the 2018 Airdrop.

54.    I would not have included these characteristics in the Bitcoin System. The combination of these characteristics, and the absence of certain of Bitcoin's essential characteristics, means that the functionality of the electronic payment system is restricted. It also removes transaction traceability (of which I have emphasised the importance above) and confidence in the Bitcoin System.

55.    "Bitcoin Satoshi Vision" remains the only digital asset which is in accordance with the White Paper and the principles and protocols of the Bitcoin System.

**Section D: Infringement of the Database Rights and Copyright**

56.     The BSV network operates with the licence and consent of the Claimants, through an alternative open source license known as the Open BSV License[2].

57.     The Claimants have never authorised or approved of or consented to or licensed the operation of the BTC Network or System that has operated since 1 August 2017 or any use of all or any part of the Database/s.

58.     On the contrary, I made it clear that the core design for Bitcoin was fixed by stating:

    (1)     In the 17 June 2010 message that I describe in paragraph 35 above;

    (2)     on 18 June 2010, when I started using the Satoshi Nakamoto pseudonym on the bitcoin.org/forum website that: "*This is a design where the majority version wins if there's any disagreement, and that can be pretty ugly for the minority version and I'd rather not go into it, and I don't have to as long as there's only one version. I know, most developers don't like their software forked,but I have real technical reasons in this case.*"

59.     Despite this, I believe that the owners, operators and/or funders of the BTC System and Network made fundamental changes to the Bitcoin System to use on that Network without my authorisation or approval. Those changes include:

    (1)     Changing the structure of blocks to enable "*off*" or "*side*" blockchains through the introduction of SegWit.  This reduced the ability to verify all transactions.

    (2)     Enabling separate networks such as the Lightning Network to exist, which allows the exchange of transactions outside the blockchain and without leaving a record on the blockchain.

    (3)     Increasing transactions fees, reducing the ability of the Bitcoin System to function as a medium of exchange in small transactions.

    (4)     Permanently changing certain Op-Codes and added further altered Op-Codes, adversely affecting the flexibility of the Bitcoin System.

    (5)     Permanently disabling the NlockTime function by omitting the NlockTime Op Code and by re-assigning the purpose of the NlockTime and nSequence parameters, using them as parameters in inferior functions known as CLTV and CSV. The effect of this was that those who used NlockTime as specified in the authentic Bitcoin System would create transactions that were not valid on the BTC System.

---

[2] Open BSV License - Bitcoin Association

60.    I have strongly expressed my opposition to BTC, the BTC System and Network, including all the changes I described above.

**Subsistence of the Database Right**

61.    From October 2015 until the present (which I refer to in this statement as the "**Material Time**"), I have been habitually resident in the UK. WII UK has been habitually resident in the UK since they were incorporated in this jurisdiction.

62.    I believe that the Database/s are each a database within the meaning of section 3A(1) of the Copyright Designs and Patents Act, 1988 (the "**CDPA**").

63.    Since the time when I worked on the Original Bitcoin Code in 2007-2008 until the present, I have made substantial investment and took the initiative in obtaining, verifying and presenting the contents of the Database/s. The investment that I made included the following:

(1)    I drafted the White Paper and carried out all of the related research.

(2)    I created the Original Bitcoin Code and Client. This was a significant undertaking: I started working on the concept of a micro payment solution that would work securely over the Internet in 1998 and expended several million dollars in corporate funds looking at security solutions that would deliver micro payments under a cent globally. This research continued for over a decade with the required knowledge being based upon the completion of several postgraduate or masters degrees in mathematical statistics, information security, information engineering, law, banking and finance and accounting. The coding of bitcoin required extensive development and testing over hundreds of days.

(3)    hosting the Bitcoin Blockchain for distribution to new nodes and so presented the contents of the Database.

(4)    I continued to invest significantly in developing the Bitcoin Code and Client and the Bitcoin Network. This supports and supported the integrity of the Database/s and promoted them.

(5)    I have continued at all relevant times to be personally responsible for the Bitcoin System by developing it.

64.    I also designed the Original Bitcoin Code and Client so that a node in the Bitcoin network would be provided with a "subsidy" of a quantity of Bitcoin when it "mined" a block, initially 50 Bitcoin and halving every 210,000 blocks or about 4 years. That subsidy was and is valuable because I created and limited the Bitcoins that could exist to 21,000,000 in the Original Bitcoin Code. I could have retained some or all of these Bitcoin, but instead decided to allocate them as a reward to a node for mining. The reward is paid whenever a node validates transactions, which is an investment in the

verification of data on the Blockchain. I personally would characterise this as making a 'unilateral offer' to the world to perform the service on acting as a node to mine blocks in exchange for a chance of payment in Bitcoin; anyone who chooses to do the mining accepts my offer. I have therefore taken the initiative and assumed the risk of investing in the obtaining and verification and presentation of the Bitcoin Blockchain. This is set out in full at Paragraph 46 of my APoC.

65.   Therefore, I have at all times since 9 January 2009, including during the Material Time, taken the initiative and assumed the risk of investing in the obtaining and verification and presentation of the Bitcoin Blockchain. I therefore believe that I am the 'maker' of the Database/s.

66.   I made the Database/s over the following periods of which the Material Time is a substantial part:

(1)   The Bitcoin Blockchain: from 12 January 2009 (being the date of the first Bitcoin transaction) to present;

(2)   The Bitcoin Blockchain as it stood on 1 August 2017 at 14:11 up to and including block 478,558: from 12 January 2009 to 1 August 2017 and/or;

(3)   The part of the Bitcoin Blockchain made during the Material Time (that is, the time when I was habitually resident in the UK), was (by definition) made during the Material Time.

67.   I believe that I satisfy the provisions of regulation 18(1)(a) and (4)(b) of the Database Regulations in respect of the Database/s. I therefore am the maker and first owner of a Database right in:

(1)   the Bitcoin Blockchain;

(2)   the Bitcoin Blockchain as it stood on 1 August 2017 at 14:11, i.e. up to and including block 478,558; and/or

(3)   that part of the Bitcoin Blockchain made during the Material Time.

**Use of and copying the Bitcoin Blockchain**

68.   I believe that the Defendants have all infringed my Database rights in the Database/s in the ways described in the APoC, which I summarise below.

69.   I believe that the BTC Participants (14th and 15th Defendants), 18th, and 22nd Defendants have all done the following within the UK (whether themselves or in concert with other Defendants).[3]

(1)   *Copying the Bitcoin Blockchain:*

---

[3] HPL advises me that they are residents in the UK (14th and 15th Defendants) and carry on business in the UK (18th and 22nd Defendants).

(a) In order to operate as a node a device must synchronise itself to the BTC Bitcoin by downloading the Bitcoin Core software and performing an initial block download from bitcoin.org, operated by the First Defendant, BTC Core. This means every new node copies the entire BTC Blockchain, which includes the Bitcoin Blockchain from the Genesis Block up to block 478,558. I set this out at Paragraph 34 of the APoC.

(b) As such, by hosting and distributing the BTC Blockchain to the BTC Network, and making Blockchain addresses, wallet addresses and/or public keys of owners of Bitcoin available to the public and/or hosting a downloaded ledger of the same for use on the BTC Network, they have infringed the Claimants' database right.

(2) *Use of the Bitcoin Blockchain:*

(a) Nodes detect when transactions occur and check their validity against the Bitcoin Blockchain and the set of rules in BTC Software. This means that information, including information regarding transactions, will be extracted from the BTC Blockchain, including that element which is a copy of the Bitcoin Blockchain.

(b) New blocks are added to the BTC Blockchain that are in or substantially in the Bitcoin File Format approximately every 10 minutes. Those new blocks are broadcast to the BTC Network to be appended to the BTC Blockchain, which will include data from the Bitcoin Blockchain up to and including block 478,558.

(c) The BTC Participants have extracted and/or re-utilised the contents of the Database/s by:

(i) hosting on and distributing the same to the BTC Network; and

(ii) making the Blockchain addresses, wallet addresses and/or public keys of owners of Bitcoin available to the public and/or hosting a downloaded ledger of them for use on the BTC Network.

(d) The BTC Participants have extracted and/or re-utilised the contents of the Database/s from the Genesis Block up to and including block 478,558 for use in the BTC Network:

(i) to verify new transactions in the BTC Network, including making the Blockchain addresses, wallet addresses and/or public keys of the parties available to the public; and

(ii)     for mining new blocks, appending new blocks to the Bitcoin Blockchain as used unlawfully within the BTC Network.

(e)     The above is set out in full at Paragraph 50 of the APoC.

70.     It is likely that the 18th and 22nd Defendants also perform these infringing actions, whether independently or in concert with the other Cash App Defendants and Coinbase Defendants respectively.

71.     The 15th Defendant has also provided a software platform on which BTC is traded, thus causing a substantial number of transactions to be made on the BTC Network utilising the contents of the Bitcoin Blockchain.

72.     Any UK-based user of the BTC System, Software and/or Network intending to become a node or acting as a node (including the BTC Participants) will download the Bitcoin Blockchain from the Genesis Block up to and including block 478,558 (as it is used in the BTC Blockchain) from other extant nodes using the BTC Software, which is created and/or maintained by the BTC Developers[4] and funded by the BTC Funders.[5] Thus, the UK-based users would infringe the Claimants' database rights and the BTC Developers and BTC Funders are liable for the same as joint tortfeasors with them.

73.     Further, the 1st Defendant, BTC Developers and BTC Funders intended to target members of the public in the UK to become nodes, and certain persons (including but not limited to the BTC Participants and/or Eighteenth and Twenty-Second Defendants) did become nodes. I therefore believe that they are primarily liable for the resulting infringement of the Claimants' database rights. That intent may be inferred from the facts that:

(1)     the BTC System and Network operate globally;

(2)     the 1st Defendant and the BTC Developers invite all viewers of the bitcoin.org website, which can be viewed in the United Kingdom, to become nodes and provide the software and instructions required to do so. The BTC Developers also make available the BTC Blockchain for the initial block download that must be performed by new nodes;

(3)     bitcoin.org, is in English as is all discussion of the BTC Software on its Github;

(4)     the Defendants promote, market and fund the BTC System and Network to expand its use worldwide, including in the United Kingdom;

---

[4] By which I refer to the 2nd to 13th Defendants.
[5] By which I refer to the 16th to 24th and 26th Defendants.

(5)     The Defendants maintain, promote and fund the BTC System, which facilitates the potential to earn BTC (thus fiat money) by operating as a node.

74.     The Cash App Defendants[6] and Coinbase Defendants[7] actively advertise the BTC System and Network to UK-based consumers, including through their UK-based companies and operations.

75.     Further, all commercial traffic associated with the BTC System is transferred and processed through servers and network equipment located within the United Kingdom.

**Subsistence and infringement of copyright in the Bitcoin File Format**

76.     I was a citizen of the Commonwealth of Australia when I created the Bitcoin File Format and was therefore a qualifying person within the meaning of section 154 CDPA. I am the author of the Bitcoin File Format and created it when I devised the Bitcoin Blockchain.

77.     The Bitcoin File Format was recorded when the Bitcoin Blockchain was first made available for use by the Bitcoin Network and when I and various companies mined the early blocks of the Bitcoin Blockchain. It was also recorded when I carried out internal tests of the Bitcoin System prior to its public release on 9 January 2009.

78.     I believe that the Bitcoin File Format is an original literary work within the meaning of section 3 CDPA. Devising the Bitcoin Format involved my exercising substantial skill, judgment, and intellectual creativity. I therefore believe that copyright subsists in the Bitcoin File Format and I was the first owner of that copyright.

79.     I believe that the BTC Participants have infringed that copyright by copying the whole or substantial parts of it by copying the entire Bitcoin Blockchain and creating new blocks in the BTC Blockchain that reproduce the Bitcoin File Format in whole or part.

**Subsistence and infringement of copyright in the White Paper**

80.     I know that:

(1)     A copy of the White Paper (in PDF form) is stored in Block 230,009 of the Bitcoin Blockchain in transaction no. 54e48e5f5c656b26c3bca14a8c95aa583d07ebe84dde3b7dd4a78f4e 4186e7 13.

(2)     That block including that transaction was added to the blockchain on or about 6 April 2012. The White Paper is therefore included in the BTC Blockchain.

---

[6] By which I refer to the 16th to 18th and 26th Defendants
[7] By which I refer to the 21st to 24th Defendants

(3)     As I explain above, by operating and causing the BTC System and Network to operate and by making copies of the BTC Blockchain in the United Kingdom without my license, the BTC Participants, and the 18th and 22nd Defendants have also infringed my copyright in the White Paper by making copies of it (whether themselves or in concert with other Defendants).

## Liability of the 1st Defendant, BTC Core

81.     I believe that the 1st Defendant is a partnership consisting *inter alia* of the 2nd to 26th Defendants, or some combination of them. That is because there is a subsisting relation between them for carrying on in common the business of the use, exploitation and promotion of BTC, the BTC System and Network and the use of the BTC Software.

82.     The BTC Participants and 18th and 22nd Defendants are partners in the 1st Defendant carrying on the business of the 1st Defendant in England and Wales. The BTC Participants infringed the Claimants' Database right in the course of and for the purpose of transacting the business of the 1st Defendant. The 1st Defendant is liable for the acts of infringement I complain of.

## Assignments of Database rights and copyright

83.     I believe that WII UK is the assignee of both (a) the database right or rights and (b) the copyright that subsists in the Bitcoin File Format pursuant to section 3 CDPA. If that is not correct, then I or WII is the owner of the said Database right/s and copyright. The assignment between the First Claimant and the Second Claimant dated 21 January 2021 is at [**CSW1/22**] and the assignment between the Second Claimant and the Third Claimant dated 25 March 2022 is at [**CSW1/29**].

## Joint Liability of the BTC Developers and BTC Funders

84.     Further, or alternatively, I believe that the BTC Developers and/or BTC Funders are jointly liable with the BTC Participants for the acts of infringement of Database right and copyright complained of in the ways described and particularised in paragraphs 71 to 77 of the APoC. In summary:

(1)     The BTC System and Network is operated in the United Kingdom (and elsewhere) pursuant to a common design between the BTC Developers and/or BTC Funders and the BTC Participants, in pursuit of which the BTC Developers and/or BTC Funders and/or BTC Participants provided mutual assistance to commit the acts of infringement I allege.

(2)     The BTC Developers and/or BTC Funders have participated in, procured, controlled and/or authorised the BTC Participants (and, in the case of the Cash App and Coinbase Defendants, the Eighteenth and Twenty-Second Defendant respectively) to operate the BTC

System and Network in the United Kingdom, thus the acts of infringement.

(3)   The BTC Developers and/or Funders copied, made available to the public, extracted and/or re-utilised material in which inheres the Database right and copyright of the Claimants, and the BTC Participants, Eighteenth and Twenty-Second Defendants made the material available to the public in the United Kingdom, and/or transferred the material into the United Kingdom, and/or made copies of the material in the United Kingdom, being themselves infringing acts. The BTC Developers and/or Funders are so involved in the commission of the BTC Participants' acts of infringement (and, in the case of the Cash App and Coinbase Defendants, the Eighteenth and Twenty-Second Defendants' acts respectively) so as to be liable for them.

(4)   By providing and/or supporting the BTC Software and/or the opportunity to act as a BTC node in the United Kingdom, the BTC Developers and BTC Funders make the acts of infringement an inevitable consequence of accessing the BTC Network as a node, thus procure the acts of infringement by the BTC Participants and other UK-based nodes and potential nodes in the BTC System and Network.

85.   By their active interest in and promotion of the BTC System, BTC Software and BTC Network the Twenty Fifth Defendant and/or its members and/or by a common design between its members it is inferred must have performed the acts described above including in the UK.

## Remedies

86.   I believe that the Defendants will continue the acts of infringement of Database right and copyright unless restrained by the court. I therefore seek the declarations and injunctions set out in the APoC, as well as the monetary remedies also pleaded and an order publicising the judgment.

## Section E: My duty of Full and Frank Disclosure

87.   I am informed by HPL that the Amended Claim Form and original Particulars of Claim have been served on the 14th, 15th, 18th, 21st, 22nd, 23rd and 24th Defendants as follows:

(1)   As to the 14th, 15th and 18th Defendants, on 28 November 2022 the documents were sent by first class post, such that service is deemed to have been affected on 30 November 2022;

(2)   With respect to the 21st, 22nd, 23rd and 24th Defendant, on 29 November 2022 the documents were delivered to the (nominated for service of proceedings) business address of their solicitor, Allen & Overy LLP, such that service is deemed to have been affected on 1 December 2022.

88.   I am informed by HPL that, as this application is being made without notice to the 1st to 13th, 16, 17th , 19th, 20th, 25th and 26th Defendants, I have a duty to give to the Court full and frank disclosure of all matters that are material to the Court in deciding whether to grant the order for service out of the jurisdiction.

89.   HPL have informed me that, in this regard, I am obliged to disclose all matters which might reasonably cause the judge considering this application to have any doubt as to whether permission should be granted to serve these proceedings out of the jurisdiction or which might reasonably be thought to weigh against the making of the order sought. With that in mind, I bring the following matters to the Court's attention.

**Legal Proceedings to which I am or have been a party**

_Defamation Proceedings_

90.   I am a controversial figure in the anti-Bitcoin community, i.e. the community that seeks to pass off BTC and BCH as Bitcoin. I promote Bitcoin under the Bitcoin System created by me. The Bitcoin System was created following the extensive experience I had developed in the fields of information technology, forensics and security as set out, _inter alia_, at paragraphs 13 to 15 and 63(2) of my witness statement. The foundation of the Bitcoin System is set out in the White Paper and which some exchanges (although not the Defendants) list as Bitcoin Satoshi Vision (BSV). As set out above, BTC and BCH developers hijacked my system to their own ends. A handful of developers want to use the BTC System and the Bitcoin Cash System for illegitimate purposes and others are simply anarcho-capitalists who are seeking to avoid the rule of law and are against the role fulfilled by Government. Those within BTC and BCH seek to promote illicit activity including money-laundering and online drug sites. My background working for law enforcement (as set out above, and including my work on the Global Institute for Cybersecurity & Research Board of Directors in 2011 [**CSW1/37**]) in opposing this type of illicit activity and on anti-illegal peer-to-peer filesharing cases makes me a target for this type of anarchist group. I have a history opposing anarchist and activist groups including "anonymous". People within the illegal activist groups that use cybercrime for commercial gain seek to discredit me. Unregistered systems calling themselves exchanges such as Coinbase support them by delisting BSV and passing off BTC and BCH as Bitcoin on their platforms, misleading the public as to the nature of the digital assets they list. I am vocal in my opposition to them.

91.   I believe this is why some individuals who have a commercial interest in opposing me (being funded by corporate groups who support the BTC and Bitcoin Cash Systems) publicly label me a "liar" and a "fraud" and say that I am not "Satoshi Nakamoto" and did not create Bitcoin. They make these unfounded claims without any evidence supporting their position and continue to cause serious damage to my reputation. There are seemingly numerous articles and internet posts every day to this effect (which reference one another and build upon these false assertions). Being well

funded by those who support the BTC and Bitcoin Cash Systems, these individuals are able to keep up these relentless attacks. I have issued various defamation claims in response, as set out below.

92.   The statements made against me by these individuals are false and have never been established as true in proceedings against me. I am the person who invented the Bitcoin System and promoted it under my pseudonym, "Satoshi Nakamoto". I intend to prove this in court proceedings that are currently ongoing in this jurisdiction and overseas, as detailed further below.

93.   I have brought defamation proceedings in this jurisdiction against various individuals who have published false and, I believe, defamatory statements calling me a fraud for claiming to be "Satoshi Nakamoto". Those proceedings are:

(1)   *Craig Wright v Peter McCormack* (QB-2019-001430) ("**the McCormack Proceedings**");

(2)   *Craig Wright v Magnus Granath* (QB-2019-002311) ("**the Granath Proceedings**");

(3)   *Craig Wright v Roger Ver* (QB-2019-001598) ("**the Ver Proceedings**");

(4)   *Craig Wright v Adam Back* (QB-2019-002134) ("**the Back Proceedings**"); and

(5)   *Craig Wright v Vitalik Buterin and The Ethereum Foundation* (QB-2019001332 ("**the Buterin Proceedings**").

94.   The McCormack Proceedings concern defamatory statements by Peter McCormack (a podcaster active within the digital asset community) in 14 social media posts and in a recorded interview put out on YouTube between March and October 2019. These statements are false, vitriolic and have been very damaging to me and my reputation. As an example, one Tweet put out included, "*I would like to formally state that: I. Craig Wright is not Satoshi 2. Craig Wright is a fraud 3. I hope as many people Retweet this as possible*".

95.   Mr McCormack is financially supported by other parties in the industry in whose interests it is to damage my credibility in order to gain financially.

96.   Mr McCormack initially sought to defend my claim in part on the basis that the allegations were true. However, after disclosure had taken place, he withdrew his defence of truth (allegedly on the basis that he had run out of funds), meaning the main issues to be determined at trial were whether his statements caused serious harm to me and the remedies.

97.   The trial in these proceedings took place on 23 to 25 May 2022 before Mr Justice Chamberlain and judgment was handed down on 1 August 2022 [**CSW1/38**]. The Court found that all fifteen publications had caused me

serious harm, citing the influence which Mr McCormack's trenchantly expressed views must have had on some of those reading them on the question of whether I am "Satoshi Nakamoto". As a result, the Court found that Mr McCormack had defamed me.

98.   I should point out that Mr Justice Chamberlain also held that I had deliberately advanced a false case in relation to the serious harm to my reputation that I had actually suffered and as a result he awarded me only £1 nominal damages (notwithstanding that I had withdrawn that part of my pleaded case). I am, of course, very unhappy about this and will be seeking permission to appeal.

99.   With due respect to the Court, I believe that this (and other adverse findings) stemmed from the fact that I suffer from Autism Spectrum Disorder which can affect my communication skills and often results in people viewing my responses to questioning as deceptive and grandiose and failing to understand what I am saying. I appreciate that the Judge commented that my condition was not material to his findings, but I do not agree and wish to stress the impact and seriousness of this condition and the need for those assessing evidence of autistic individuals to understand fully the impact and effects of the condition.

100.   I would also point out that the Court's findings regarding my evidence in these proceedings were in the context of evidence I gave on whether I was disinvited to various academic conferences in 2019 (and related points) but they do not go the issue of whether I am "Satoshi Nakamoto" or to what will be the central issues in these proceedings. When seeking to prove that I am the person behind the pseudonym "Satoshi Nakamoto", I intend to rely not only on my own testimony but also on considerable evidence from third parties who were aware at the relevant time that I was indeed "Satoshi Nakamoto".

101.   The Granath Proceedings concern a Norwegian national, Magnus Granath, who is a well-known supporter of the BTC System and BTC and the owner of the @Hodlonaut Twitter account handle. As a supporter of BTC, Mr Granath has a financial interest in ruining my reputation. Mr Granath published a series of defamatory tweets including "*As a tribute to Craig Wright being a fraud, I'm going to make next week 'Craig Wright is a fraud week', and tag all my tweets with #CraigWrightIsAFraud Feel free to join the celebration*" **[CSW1/71]**. Acting through Ontier LLP ("**Ontier**"), I sent a letter before action to Mr Granath over Twitter, not knowing how else to reach him. Mr Granath shortly thereafter commenced proceedings in the Oslo City court seeking negative declaratory relief regarding his various defamatory statements. I subsequently commenced proceedings in the English court regarding his false and damaging statements (see **[CSW1/78]** for the Claim form and **[CSW1/80]** for the Amended Particulars of Claim). Mr Granath filed an application challenging the jurisdiction of the English court which was initially allowed by the High Court ([2020] EWHC 51 (QB)) but was later overturned on appeal to the Court of Appeal ([2021] EWCA Civ 28) **[CSW1/89]**. The Costs and Case Management Conference in the English proceedings was expected to take place on Thursday 9

December 2022 but the parties agreed to adjourn the hearing to a date in 2023. The trial in the Norwegian proceedings includes allegations that I have forged relevant documents (which I deny because I did not create those documents as I intend to prove) and was heard from 12 to 21 September 2022. The judgment was handed down on 20 October 2022 (see a translated copy of the judgment at [**CSW1/144**]) and held that Magnus Granath's statements were not unlawful. An appeal is in process and may be heard in the first half of next year.

102. The Ver Proceedings concern a defamatory statement by Roger Ver (a computer scientist, businessman and the main promoter of the Bitcoin Cash System) in which he said, in a YouTube video published on 15 April 2019, "*Craig Wright is a liar and a fraud. So sue me. Again*.". Again, Mr Ver has a direct financial interest in destroying my reputation, being the central figure behind the Bitcoin Cash System. My proceedings against him were dismissed by the High Court following a jurisdictional challenge by Mr Ver under the Defamation Act 2013 ([2019] EWHC 2094 (QB)) [**CSW1/170**]. The Court of Appeal dismissed my appeal against that decision ([2020] EWCA Civ 672) [**CSW1/192**] However, I have since issued proceedings in defamation (in respect of the same publications) against Mr Ver in the courts of Antigua and Barbuda. Mr Ver also brought a jurisdictional challenge in those proceedings and judgment is awaited.

103. I ultimately chose to discontinue the Buterin Proceedings due to difficulties with locating the defendants and identifying suitable addresses at which to effect service of process on them. I also chose to discontinue the Back Proceedings, preferring instead to focus on my more vitriolic detractors, Messrs Mc Cormack, Granath and Ver.

*Crypto Open Patent Alliance v Dr Craig Steven Wright – IL-2021-000019 ("the COPA Proceedings")*

104. I am currently defending proceedings in this jurisdiction concerning the issue of whether I am the author of the White Paper and the owner of the copyright in it or the person who used the "Satoshi Nakamoto" pseudonym. These proceedings have been commenced in the Chancery Division of the High Court of Justice in London by the Crypto Open Patent Alliance. I exhibit a copy of the re-amended particulars of claim dated 17 March 2022 [**CSW1/211**], the re-amended defence dated 4 April 2022 [**CSW1/232**] and the re-amended reply dated 21 April 2022 at [**CSW1/260**]. As can be seen from the particulars of claim, the claimant, "COPA" (the 25th Defendant in this claim), is acting as a representative party for four of its members, including the 24th Defendant to this claim. The basis of COPA's claim is that it and the represented parties wish to be free to publish the White Paper. COPA is seeking declarations that: (i) I am not the author of the White Paper; (ii) I am not the owner of the copyright in the White Paper; and (iii) any use of the White Paper by the claimant will not infringe any copyright owned by me. At the trial – which is set down to commence in January 2024 – I intend to produce evidence (including evidence from a number of witnesses of fact) which, I believe, will prove to the Court that I am exactly who I say I am. The Costs and Case Management Conference in these

proceedings took place on 1 and 2 September 2022 and i provided directions leading up to trial.

*Dr Craig Steven Wright & anor v Coinbase Global, Inc & ors – IL-2022-000035; Dr Craig Steven Wright & anor v Payward, Inc & ors – IL-2022-000036 ("the Passing Off Proceedings")*

105. The Passing Off Proceedings concern passing off by the defendants' use of the name Bitcoin in relation to digital currency and software relating thereto which do not confirm to the principles and protocols as described in the White Paper (which was drafted by me under the pseudonym "Satoshi Nakamoto") and software published anonymously by me (also under the pseudonym "Satoshi Nakamoto").

106. I commenced proceedings in the English court in April 2022. See [**CSW1/269**] and [**CSW1/274**] for the amended claim form and particulars of claim in claim no. IL-2022-00035 and [**CSW1/332**] and [**CSW1/337**] for the amended claim form and particulars of claim in claim no. IL-2022-00036. The defendants in both sets of proceedings have subsequently served their defences. I have exhibited the defence in claim number IL-2022-000035 at [**CSW1/298**] and the defence in claim number IL-2022-000036 at [**CSW1/361**].

**Ira Kleiman, as personal representative of the Estate of David Kleiman and W&K Info Defense Research, LLC v Craig Wright – Case No. 18-cv-80176BLOOM/Reinhart ("Kleiman proceedings").**

107. I was also a defendant to legal proceedings in Florida, USA, brought by the estate of a long-term friend Dave Kleiman (now deceased) and a Florida limited liability company, W&K Info Defense LLC ("W&K"). In these proceedings, the plaintiffs alleged that they were entitled to half of any digital assets amassed by me during Mr Kleiman's lifetime as well as unspecified intellectual property. The entire basis of their claim was that I was the person behind the pseudonym "Satoshi Nakamoto". The case proceeded on this basis.

108. The trial took place from 1 to 29 November 2021. On 6 December 2021, the jury issued a verdict rejecting all of the allegations by both plaintiffs with the exception of W&K's claim for conversion of intellectual property, awarding it $100 million [**CSW1/397**]. There is an appeal on foot in which my wife and my ex-wife, Lynn Wright, are currently asserting their rights to ownership of two thirds of W&K and claiming that the Kleiman Estate owns no more than a third of the shareholdings in this company.

**Other Proceedings in which I am or have been involved**

*Tulip Trading Ltd v Bitcoin Association for BSV and others – BL-2021-000313 ("the Bitcoin Recovery Proceedings")*

109.    On 24 February 2021, a company of which I am the beneficial owner (Tulip Trading Limited ("**TTL**")) issued a claim in the High Court against sixteen defendants – who develop and/or control the development of their respective blockchain networks – in relation to the theft of the private keys that permit access to/control over TTL's digital assets. This theft was part of a hacking of my computer systems by person(s) unknown to me which took place in February 2020. TTL's digital assets comprise approximately 111,000 tokens on four blockchain networks, worth over USD $4 billion (as at the date of TTL's Particulars of Claim). TTL is seeking, amongst other relief, a declaration that the defendants owe fiduciary and tortious duties to TTL to assist it to regain access to and control of its digital assets. On 4, 7 and 8 March 2022 the hearing in respect of a Part 11 application brought by thirteen of the sixteen defendants (i.e., the developers) challenging jurisdiction took place. On 25 March 2022, Mrs Justice Falk ruled in those developers' favour on the basis that there was no serious issue to be tried regarding whether any fiduciary and/or tortious duties are owed by those developers to TTL: see [2022] EWHC 667 (Ch) **[CSW1/407]**. TTL's factual case was not rejected and TTL sought permission to appeal the High Court's judgment. On 11 August 2022, the Court of Appeal granted TTL permission to appeal **[CSW1/447]**. The appeal was heard in front of the Court of Appeal on 6 and 7 December 2022.  The judges reserved judgment and indicated that it was unlikely that a judgment would be handed down before the end of the year.

*Ang v Reliantco Investments Limited [2020] EWHC 3242 (Comm)*

110.    In this case I gave evidence at the trial of a claim by my wife, Ramona Ang, to recover certain funds held by the defendant and other claims. In his judgment **[CSW1/449]**, Mr Justice Butcher said I was an "unsatisfactory witness" but nevertheless accepted aspects of my evidence.

*Australian Tax Office Audit*

111.    A group of companies I was involved with in Australia was the subject of an ATO audit several years ago.[8] I had limited involvement in the audit. I moved to the UK in 2015 and was no longer a director or officer of any group company when the audit completed. My personal tax audit was cleared with no negative findings.

---

[8] As set out at paragraphs 88-96 of my first witness statement in the Bitcoin Recovery Proceedings. Association for BSV and others – BL-2021-000313 **[CSW1/504]**

**Whether there is a serious issue to be tried**

*I am "Satoshi Nakamoto"*

112.    As described above, the issue as to whether I am the author of the White Paper and the person behind the pseudonym "Satoshi Nakomoto" is the subject of a number of proceedings. I intend to prove these facts during the trial of this action. It might be thought to be a prior issue in the Passing Off Proceedings also.

*The contribution of other developers*

113.    The Defendants or some of them might argue that I could not have been responsible for the overarching development of the Bitcoin System from April 2011 onwards because I handed the role of lead developer to Gavin Andersen at that time. Whilst it is true that various developers worked on the Bitcoin System and that they contributed to the maintenance of the software over the years, any material decisions they made were in line with my instructions in the White Paper and the emails and posts I put out under my pseudonym, "Satoshi Nakamoto", until the 2017 Airdrop that I have described above. As I set out above, I also incentivised future miners to participate in the Bitcoin System by allocating some Bitcoin as a reward for mining, instead of retaining some or all of them. Furthermore, my efforts to develop and publicise the utility of the Bitcoin System did not simply cease in 2011 when I handed over to Gavin Andersen. Post 2011, I continued to work on improving and developing the Bitcoin System I created as described in Section B above.

*Airdrops*

114.    The Coinbase Defendants might dispute my version of the events surrounding the two Airdrops referred to above, and provide alternative accounts of events. This seems likely from the content of the Coinbase website and the ways in which they describe the creation of the BTC System and Bitcoin Cash System. The other Defendants might adopt a similar position.

115.    In relation to the Airdrop of 1 August 2017, it is possible they will say that no such event took place. They may contend that what happened is that SegWit was a proposed way of dealing with a "transaction malleability" problem (bad actors manipulating the Bitcoin System) and a "scalability" problem. They might seek to argue that it was the BTC System which continued legitimately to operate on the Bitcoin Blockchain, and it was the newly named "Bitcoin Cash System" which split off from the original system. Such a claim seems to follow from what they say on the BTC price page on the Coinbase website, namely that, "Bitcoin [i.e. BTC] was created by Satoshi Nakamoto, a pseudonymous person or team who outlined the technology in a 2008 white paper", and that it was released in 2009.[9] In their view, it seems, the BTC System is the original system. This line of argument

---

[9] These statements can be found at this webpage – https://www.coinbase.com/price/bitcoin.

seems bizarre to me in circumstances where, using my Satoshi Nakomoto pseudonym, I specifically stated that the nature of Bitcoin was such that once version 0.1 was released the core design was set in stone for the rest of its lifetime **[CSW1/14]**. It was never intended to "fork" or to be changed.

116.    In relation to the 2018 Airdrop, it is possible they may also say that no such event took place. Instead, they may try to argue that what happened was merely the result of a disagreement between the developers resulting in a further split in the Bitcoin Blockchain. They may argue that the Bitcoin Cash System continued to operate on the Bitcoin Blockchain and that it was the newly named "Bitcoin Satoshi Vision" (or "BSV") that split off. I am very clear that my explanation contained in section C above is correct regarding the Airdrops. Without waiving privilege, I understand from Ontier that this will be a matter for factual and expert evidence in due course in any event.

### The Database rights claim

117.    I am advised that the Court should assume that the Defendants will deny liability in relation to my claim for breach of the Database rights, including on any of the following grounds:

(1)     The Claimants are not the owner of any Database right in the Bitcoin Blockchain because:

(a)     I am not "*Satoshi*" and therefore did not create the Bitcoin Blockchain.

(b)     It is not possible for a Database right to subsist in the Bitcoin Blockchain because it is not a database within the meaning of the Database Regulations.

(c)     The Claimants were not resident in the United Kingdom at the relevant time to gain a Database right in the Bitcoin Blockchain.

(d)     The Claimants have not made a substantial investment in obtaining, verifying, or presenting the contents of the Database/s, or did not do so at the correct time. They may dispute that the investments I identify in this statement and the APoC qualify or are sufficient.

(e)     The Claimants are not the maker of the Database/s; it is the miners and/or users of the Bitcoin Blockchain or BTC Blockchain who make the Database/s.

(2)     If the Claimants are the owners of a Database right in the Bitcoin blockchain, an express or implied license was granted to make use of it because the Bitcoin Code was released under the MIT License.

(3)     The Defendants do not require a license to use the Bitcoin Blockchain because the mining, use and promotion of the BTC

Blockchain does not amount to the extraction or re-utilisation of the Bitcoin Blockchain, or they do not prejudice my rights.

(4)    The Claimants are not in any case entitled to the relief that we claim, because the court should not exercise its discretion to grant them or they would be ineffective.

118.   I believe there is at the very least a serious issue to be tried in relation to all of these matters.

**The Bitcoin File Format copyright claim**

119.   I am advised that the Court should assume that the Defendants will also deny liability in relation to my claim for breach of copyright in the Bitcoin File Format. The Defendants might deny that the Claimants own any copyright in the Bitcoin File Format or that it was infringed because:

(1)    I am not "Satoshi Nakamoto" and therefore did not create the Bitcoin File Format.

(2)    The Bitcoin Code was released under the MIT License, including the Bitcoin File Format.

(3)    The Bitcoin File Format is not an original literary work.

**The White Paper copyright claim**

120.   I am advised that the Court should assume that the Defendants will also deny liability in relation to my claim for breach of copyright in the Bitcoin File Format. The Defendants might deny that the Claimant owns any copyright in the Bitcoin File Format or that it was infringed because:

(1)    I am not "Satoshi Nakamoto" and therefore did not create the White Paper.

(2)    Making copies of the Bitcoin Blockchain does not constitute making a copy of the White Paper.

**Summary**

121.   As I have described: a) I am the creator of Bitcoin, the Bitcoin System and White Paper; b) the Claimants have intellectual property rights in the Bitcoin Blockchain, Bitcoin File Format and White Paper; c) the Defendants (or some combination of them) have since 2017 infringed these rights by utilising the contents of the Bitcoin Blockchain (which contains a copy of the White Paper) and the Bitcoin File Format in their BTC System, without the Claimants' permission, when neither BTC nor BCH is the true Bitcoin as created by me as described above.

**Statement of Truth**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

....................................................
**DR CRAIG STEVEN WRIGHT**

15 December 2022
....................................................
**DATE**