## EXPERT REPORT OF DAVID KALAT

Pursuant to 28 U.S.C. § 1746, I, David Kalat, hereby declare as follows:

### I.  QUALIFICATIONS

1.  I am a Director at Berkeley Research Group, LLC ("BRG"), a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation support, data analytics and other services to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. I am a member of the firm's Global Investigations + Strategic Intelligence practice group. I lead investigations involving data analytics and forensic computer examinations. I joined BRG in April 2015. Prior to joining BRG, I was a Director with Duff & Phelps, LLC ("D&P"), an independent consulting firm of over 1,000 professionals, where I was a member of the Forensic Technology & Analytics practice for four years. My Curriculum Vitae is set forth as Exhibit A, and lists my publications and prior testimony.

2.  I received my Bachelor of Arts in Film and Video Studies from the University of Michigan and graduated as a James B. Angell Scholar. I received my Masters Degree in Library and Information Science from the University of Illinois at Urbana-Champaign.

3.  I am certified by the International Society of Forensic Computer Examiners (ISFCE) as a Certified Computer Examiner (license number 1666). I am also licensed by the International Information System Security Certification Consortium ((ISC)2) as a Certified Information Systems Security Professional (license number 593527). I am a Certified Telecommunications Analyst. I am a Certified Fraud Examiner (license number 621469). I am a licensed Private Detective in the states of Illinois (license number 115.002487) and Texas (license number 52430601).

4.  I am a non-fiction author with a focus on the history of information technology. My monthly column "Nervous System" at Legal Tech News, for example, approaches issues of data privacy

and cybersecurity from a historical context.

5. I am a specialist in digital video with extensive professional experience in the field of film and video technology.

    a. Colorlab (1992-1993) My duties included color grading, the process of photochemically enhancing the color of motion picture film.

    b. Aesthetic Productions (1994-1995) As the head of the company's video production unit, my duties included all aspects of creating and finalizing television ads for local clients and other for-hire video production.

    c. Interface Media Group/DC Post (1996-1997) As Operations Manager of the mid-Atlantic region's oldest video post-production facility, I was responsible for supervising all aspects of the company's services, including film-to-tape transfer; linear and non-linear editing; video graphics; audio sweetening; and satellite distribution. Clients included the Bill Clinton and Bob Dole Presidential campaigns, Discovery Channel's Shark Week, and National Geographic.

    d. All Day Entertainment (1997-2008) I was the founder and President of an independent DVD publishing label dedicated to arthouse, independent, and classic movies. I personally conducted the digital restoration of numerous motion pictures for commercial release on All Day's DVD label.

    e. I have also served as a freelance consultant to other media companies including Turner Classic Movies, the Criterion Collection, Kino-Lorber, Class Media, Eureka's Masters of Cinema, and Arrow Video, including the creation of digital video content. Motion pictures that I helped restore on digital video have been screened on Turner Classic Movies.

6. I have served as a forensic examiner of digital video evidence in numerous matters, including

Kolodziej v. Justice Park District, *et al*., 2014 L 775 (Cook Cnty. Cir. Ct., 2014), in which I provided jury trial testimony regarding my examination of surveillance video in a wrongful death matter. I have also served as a forensic examiner of digital video evidence in other matters for which my consulting was not publicly disclosed. Such investigations included the examination of videos recorded by DVR surveillance systems, police dashcams, TASERs, hidden cameras, and other video recording devices.

7.  My present established hourly rate of $580 is based upon my experience, reputation, ability and skill to perform the services properly and the fees customarily charged in the Chicagoland Area for such services by similarly qualified forensic experts.

## II.  FACTUAL BACKGROUND

8.  The website CryptoLeaks.com has a page titled "Case #3 Ava Labs, Avalanche and Roche Freedman."[1] The page carries a publication byline of August 26, 2022, updated August 31, 2022.[2] This webpage contains content that concerns Kyle Roche and his former law firm Roche Freedman. Embedded within the text, the webpage includes links to twenty-five (25) video clips purporting to provide illustrative evidence. The CryptoLeaks website describes the videos as "spy videos," and my observation of the recordings corroborates that Mr. Roche was not aware of being recorded. Exhibit C sets forth a list of the twenty-five video clips ("Spy Videos").

9.  The Spy Videos collectively total approximately 12.7 minutes in all.

10. The Spy Videos can be classified into two distinct categories. The first set of sixteen (16) videos appear to have been recorded in an office or conference room (the "Office Videos"), and the second set of nine (9) videos appear to have been recorded in a restaurant (the "Restaurant Videos").

---

[1] See https://cryptoleaks.info/case-no-3. A PDF copy of this page is set forth as Exhibit B.
[2] I visited the archived copies of this URL that are preserved at archive.org's "Wayback Machine" and observed that the earliest copy of that page available at the Wayback Machine was captured in August 26, 2022, corroborating the publication date.

11. As detailed below, there are a variety of means by which to alter video recordings in ways that can change their content, meaning, and/or interpretation. Video manipulation can be difficult to detect.

12. The best and most reliable method for establishing the authenticity of video evidence is to verify the complete chain of custody for any questioned video, from the original recording and the device or equipment used to create it, and for each and any subsequent processing step involved. In a forensic investigation of electronic evidence, it is best practice to conduct the analysis on the original suspect data, obtained and preserved from its source whenever possible. The ideal scenario would involve access to the original unedited video recordings taken at the two meetings with Mr. Roche, the recording device or camera used to create them, and the computer(s) used to generate the clips published on CryptoLeaks. This would enable (i) the forensic comparison of the metadata in the original recordings to the published versions, (ii) identification of the distinctive characteristics of the camera and its imaging devices, and (iii) cross-referencing relevant system artifacts on the computer, in order to come to a conclusion about whether the published videos are an authentic and reliable representation of what occurred at the meetings.

13. In this instance, the original hidden camera recordings are not provided by CryptoLeaks.

14. I conducted a forensic review of the published videos, with special focus on the nine Restaurant Videos. As set forth in detail below, I conclude that these videos exhibit extensive signs of tampering and manipulation and cannot be accepted as reliable or authentic documents of what was said at those meetings.

15. In part, my conclusions are based on highly anomalous characteristics that are distinctive to the Restaurant Videos, when compared to the Office Videos and other so-called "spy videos" published by CryptoLeaks. One such video that I relied on for comparisons is published at https://cryptoleaks.info/case-no-2 and purports to be a secret recording of a person named Nick

Longo. I preserved and analyzed the Nick Longo video entitled "nl-1.mp4" according to the same procedures and methodology as the Kyle Roche Spy Videos.

### III. METHODOLOGY AND TOOLS

16. I collected and preserved the twenty-five Spy Videos, as described below. In my review of the CryptoLeaks webpage, I observed that videos can be downloaded directly from the site, as shown below:



17. I downloaded the twenty-five videos described in Exhibit B, first using this built-in download functionality provided by the site, and then again using 4KDownloader. The software application 4KDownloader is a tool I have used frequently in my capacity as a professional investigator in order to preserve suspect videos from websites. After doing so, I compared the MD5 hashes of each downloaded video to confirm that both methods result in identical

downloads.[3]

18. I used FTK Imager to forensically preserve the downloaded videos as a logical forensic image and archived that copy for safekeeping. As I conducted my analysis described herein, I relied on the MD5 hashes taken upon download to verify that my examination did not alter any video.

19. In conducting my analysis, as described below, I created additional copies and derivative excerpts from the Spy Videos that were altered in intentional, controlled ways. To create these derived copies, I used the software application AVIDemux. This is a tool I have used frequently both in my capacity as a professional investigator and in my professional experience creating digital video content for commercial use.

20. In conducting my analysis, I examined the Spy Videos and the derived copies using several tools. For examination of videos, including frame-by-frame analysis, I used the playback utility Keyframe MP2. For examination of audio waveforms, I used Audacity. Keyframe MP2 and Audacity are software tools I have used frequently both in my capacity as a professional investigator and in my professional experience creating digital video content for commercial use. For Video Error Level Analysis, I used the forensic utility VideoCleaner, a software tool I have used frequently in my capacity as a professional investigator.

## IV. TECHNICAL CONSIDERATIONS REGARDING DIGITAL VIDEO

21. The quality, clarity, and fidelity of digital videos (such as the Spy Videos) are influenced and limited by several factors, including resolution, frame rate, and compression. In this section I discuss these technical considerations, and in Section V below I discuss how these issues directly relate to the reliability of the video sources in this matter.

22. Digital video is a technology that provides for the rapid sequential display of successive still images, that are perceived by the viewer as continuous pictorial motion. Consequently, a digital

---

[3] A "hash value" is a cryptographic representation of a piece of binary data, that can be used as a digital fingerprint. If two items share the same hash value, they are electronically identical, whereas even small changes to a digital file will change its hash value.

video file is a collection of still images, each called a "frame," with a mechanism for replaying those images in sequence. The size of the digital video file, and by association the resources needed to transmit it, can be reduced through the use of data compression.

23. Some compression techniques, like Zip containers, are categorized as "lossless," because they do not remove any information from the original file. By contrast, most digital video uses "lossy compression" techniques that permanently remove certain information from the file. A digital video file consists of multiple layers:

    a. The outer layer is a container that encapsulates the data in a standard format. Typical digital video container types include .avi, .mp4, .mov, .mkv, and so on.

    b. The video frames within the container are digitally encoded during creation and decoded during playback by a "codec" (for "coder/decoder") that applies data compression both to the individual frames and between the frames. Typical codecs include .H264, H.263, XVID, and so on.

    c. In addition to video, a digital video file may also contain audio (which is itself encoded by an audio codec, such as AAC or PCM) and metadata (identifying the codecs used, and other data about the video file).

24. The Spy Videos are contained in .mp4 containers, encoded by H.264 for the video and AAC for the audio. The Spy Videos are published as high-definition videos with a resolution of 1920x1080.

## V. ANALYSIS AND OBSERVATIONS OF THE SPY VIDEOS

### A. <u>KNOWN ALTERATIONS</u>

25. Initial observation of the Spy Videos published on CryptoLeaks shows that each one has been subjected to several *self-evident* alterations that were made after the hidden camera videos were first recorded. I will refer to these collectively as "Known Alterations."

26. For one, the Spy Videos comprise less than thirteen minutes of content, excerpted from what

were evidently significantly longer meetings. The original duration of the meetings is not known, but it is reasonable to infer that the unedited hidden camera recordings span hours of content, from which only a handful of minutes have been extracted. It is therefore not possible to evaluate how the missing additional material might change the apparent meaning of the twenty-five Spy Videos from how they appear when taken out of context.

27. The Spy Videos have also been altered to re-orient the framing. The original recording is vertically oriented (the height exceeds the width), but as published on the site the videos are horizontally oriented (the width exceeds the height). To do so, the hidden camera video is framed by a fuzzy boundary on the sides, as depicted below.[4]



28. The Spy Videos appear to present a conversation with an unseen person ("The Questioner") whose voice has been concealed through use of a voice-changing filter. Because the voice-changing filter is only applied to the Questioner's voice, during a dynamic and unpredictable conversation, the filter must have been applied after the hidden camera video was recorded.

29. In many of the Office Videos, a circular shape has been superimposed over the video,

---

[4] The screenshot is taken from c3-17-i-can-sue-solana.mp4.

apparently to censor or redact some aspect of the image ("Redaction Bubble").

30. The Spy Videos have also been altered in order to overlay subtitles that purport to transcribe the snippets of conversation that are presented. Sometimes the subtitles extend beyond the width of the recorded image (as seen in the screenshot above), establishing that the subtitles were added after the re-orientation of the image.

31. The existence of these Known Alterations definitively establish that some degree of post-recording processing occurred, and that there was therefore an opportunity in which to make more meaningful, and hard to detect, alterations.

### B.  DEEP FAKES

32. The term "deep fake" refers to an array of technologies that deploy machine learning and/or artificial intelligence to generate realistic looking but inauthentic images, videos, and/or audio. The technology first came to popular attention in 2017 through research published by the University of Washington, which included the publication of a sample video of former President Barack Obama apparently giving a speech, which had in fact never occurred.[5] Anti-fraud specialists have raised concerns that deep fake technology could be used to create reputational damage, "fake news," or the basis for extortion schemes.[6] Websites, such as the Massachusetts Institute of Technology's "Detect Fakes," present opportunities for understanding how convincing deep fakes can be, and how difficult it is to detect them.[7]

33. In June 2019, a team of researchers from Stanford University, the Max Planck Institute for Informatics, Princeton University and Adobe Research presented their algorithm for creating "deep fake" videos. They presented the algorithm in a paper called "Text-Based Editing of Talking-Head Video" ("TBE")[8], along with an accompanying demonstration video. As

---

[5] See https://www.washington.edu/news/2017/07/11/lip-syncing-obama-new-tools-turn-audio-clips-into-realistic-video/
[6] See https://www.acfeinsights.com/acfe-insights/2019/3/13/could-you-spot-a-deep-fake-video.
[7] See https://detectfakes.media.mit.edu.
[8] Planck, Max. "Text-based Editing of Talking-head Video." (2019), attached as Exhibit D.

explained in the paper and demonstrated in the video, the TBE algorithm "produce[s] a realistic output video in which the dialogue of the speaker has been modified, while maintaining a seamless audio-visual flow (i.e. no jump cuts)." The video presents several demonstrations of finished "photorealistic video[s]" involving a "large variety of edits, such as the addition, removal, and alteration of words."

34. As explained in the Stanford paper, the TBE algorithm begins by processing a source video of a person speaking, along with a transcript of the person's speech. The paper reports achieving best results with at least an hour of source footage. The algorithm analyzes the source video to identify the "phonemes" and "visemes" involved. A phoneme is a constituent unit of speech, such as the \k\ sound in the word *cool*. A viseme is the corresponding configuration of the speaker's mouth that accompanies the expression of a given phoneme. By analyzing the source video for phonemes and visemes, the TBA algorithm develops an inventory of the known available speech sounds and facial positions for that speaker.

35. The user of the software can then edit the transcript to delete words, rearrange existing words, or even add new words. The algorithm finds the corresponding visemes that match those altered utterances, and splices the mouth section from those frames into the video. An AI engine then generates the necessary pixel-smoothing to seamlessly integrate the new facial motions into place.



She sells seashells ice cream by the sea shore

36. One technique for identifying when part of a video image have been altered after the original recording is to compare the differential rates of compression through Video Error Level Analysis, or "VELA."

37. I ran a VELA check on the YouTube video demonstrating the TBE algorithm. The sections of the video that openly demonstrated the completed finished product of the deep fake software ***did not*** exhibit VELA artifacts. This indicates that a successful implementation of the TBE deep fake algorithm may be expected to evade VELA detection.

38. I note that the creators of this algorithm claim it was not intended for fraudulent purposes, and expected that it would be used in legitimate post-production of film and television work where the speaker could re-record their dialogue to match the output video. The version of the algorithm described in the paper and demonstrated in the sample video does not create a new audio track. This limitation, however, is not necessarily inherent to the concept. Many tools for generating convincing audio deep fakes exist and could be used in concert with the TDE algorithm in ways its creators did not intend, including to produce end results that appear just like the Spy Videos.[9]

39. In the paper, the authors state "We acknowledge that bad actors might use such technologies to falsify personal statements and slander prominent individuals. We are concerned about such deception and misuse."

### C.  METADATA

40. I examined the metadata of the Spy Videos and observed that the twenty-five video clips all report having been encoded on various days between March 24 and March 30, 2022. I am informed that the meetings purportedly depicted in the videos occurred in January 2022. It is not surprising that the videos report encoding dates later than the original meeting, because the Known Alterations required the original recording to be re-encoded, re-compressed, and re-saved as new files.

41. It is not possible to independently verify that the dates of encoding represented in the metadata are correct. During the process of compressing, encoding, and saving a video file, the software

---

[9] Examples of deep-fake voice replica software include Resemble, Descript, ReSpeecher, and Real-Time Voice Cloning.

used to perform those functions will obtain a timestamp from the system clock of the host computer to be saved into the metadata of the digital video file, if the codec and container support that feature. As a result, if the system clock on the host computer is incorrect for any reason, either accidentally or intentionally, the error will be carried over into the digital file's metadata.

42. From the information contained in the Spy Videos themselves, it is not possible to determine if the encoding dates in the various files' metadata are accurate.

### D.  INCONSISTANT RESOLUTION

43. Several factors can influence the image quality of a video, including the capabilities of the camera, the distance between the camera and the objects it records, and the amount of compression applied to the video.

44. In my examination of the Office Videos, I observed that the overall relative level of detail seen in Mr. Roche's face and other objects of a comparable distance to the camera appears consistent.[10]



---

[10] The screengrab below was taken from c3-00-office-ava-labs-launch.mp4.

45. As a further point of comparison, I noted that the CryptoLeaks website also contains "spy videos" taken of a different individual in a different restaurant, as a part of an unrelated story. A screenshot from a video titled "nl-1.mp4" is set forth below. In the "nl-1.mp4" video, as with the Office Videos, the relative level of detail in the person's face and other objects of a comparable distance to the camera appears consistent.



46. I observed that the metadata of the "nl-1.mp4" video is comparable to the Kyle Roche Restaurant Videos in many ways: the videos share the same resolution, codecs, and container structure. The metadata for "nl-1.mp4" video identifies it as having been encoded in the same general timeframe as the Kyle Roche Spy Videos, and is reported as being encoded just hours before several of the Kyle Roche Restaurant Videos, including "c3-17-i-can-sue-solana.mp4."

47. But in contrast to the observations of the Office Videos and "nl-1.mp4" discussed above, the apparent resolution of the Restaurant Videos does not appear consistent across the frame. Instead, Mr. Roche's face appears noticeably blurrier and more pixelated than other objects at

a comparable distance from the camera in the same frame.[11]



Other details in the frame, such as his hands, hoodie, the plate of food on the table, and the mesh divider on the wall behind Mr. Roche, are all more detailed than his face, yet are aligned at a comparable proximate distance from the camera.

48. I observed that Mr. Roche's face appears less detailed and more compressed than the surrounding image in each of the nine Restaurant Videos. As discussed below, this unique feature of degraded quality around Mr. Roche's face is consistent with the use of deepfake technology.

49. When viewing the Restaurant Videos, I observed several instances when the camera appears to refocus automatically in response to objects in the foreground. This phenomenon is evident, for example, in frames 192 to 200 of the video "c3-17-i-can-sue-solana.mp4." In these frames, the unseen Questioner repositions a wine glass, and the camera's refocusing causes the edges of the frame to briefly warp. Other similar examples can be seen when Mr. Roche leans in closer to the camera, and then leans back in his chair. The refocusing does not occur, however,

---

[11] The screenshot is taken from c3-17-i-can-sue-solana.mp4.

when objects in the middle distance behind Mr. Roche move, such as wait staff. This indicates that the camera was positioned physically close to Mr. Roche. Given the close physical proximity between the camera and Mr. Roche, and the high-definition resolution, one would expect that the image quality of Mr. Roche's face would be clear and reasonably sharp.. As explained below, the fact that it is not suggests the videos may have been manipulated through deepfake technology.

50. Specifically, the fact that the image of Mr. Roche's face is of a lower quality then its surroundings indicates that someone altered the Restaurant Videos in a way that caused the image of Mr. Roche's face to undergoe a certain level of additional data compression, with an associated loss of detail, that did not occur to other areas surrounding his face. An alteration that would have this effect, would be the use of deepfake technology.

### E. AUDIO BREAKS

51. My analysis of the audio in the Retaurant Videos shows extensive signs of tampering and manipulation.

52. I analyzed the audio of the Restaurant Videos and determined that, distinctive to these videos, the audio track contains numerous "cuts" that interrupt the soundtrack. Each one is an interruption of approximately .05 of a second, during which the ambient background noise of the restaurant stops. These breaks occur every time the Questioner stops speaking, and before Mr. Roche responds. No such breaks occur in any other location, in any of the Spy Videos I reviewed, but do occur consistently and predictably in the Restaurant Videos every time Mr. Roche is about to react to something the Questioner is purported to have said. As discussed below, this edit is also suggestive of a deepfake edit.

53. I conducted this analysis using Audacity to visualize the waveforms of the audio. I have provided some screenshots from this tool, to allow a visualization of the critical discontinuities present in the audio of this clip. The screenshot below depicts a section of audio from the video "c3-17-i-can-sue-solana.mp4," from 00:00:16 to 00:00:21.



54. The section involves the Questioner, with the voice changer applied, asking what sounds like "Is Ava Labs…" (subtitled onscreen as "It's Ava Labs…"). I observe that the waveform shown in the clip above is continuous. There is no interruption in the visualization of the background room ambience when the Questioner starts to speak, or when that speaker halts mid-sentence.

55. As a comparison, the next screenshot shows a section from approximately 00:00:26 to 00:00:31. This depicts the section where the Questioner completes the sentence by saying "…one of their competitors?" and then Mr. Roche appears to respond, "No they have me." A thin vertical green line (shown in the image below) representing the Audacity software's playhead is positioned at the moment when the Questioner completes the question, just before Mr. Roche's apparent response. Visible at this moment of transition is a discontinuous interruption of the waveform in which the background room ambience is missing.



56. The screenshot below represents a section from 00:00:33 to 00:00:38. This particular section comes right after Mr. Roche appears to say "Their name was never…" Then the Questioner interrupts to ask "Explain." This is followed by a similar discontinuity to the one noted above, where the ambient room tone disappears from the audio. The green playhead (shown in the image below) is positioned right after this discontinuity. Of special interest here is the audio spike that immediately follows this interruption, visible on the waveform to the right of the green playhead. This sound is not human speech, but an ambiguous clanging sound that has apparently been partially cut. This demonstrate that the actual audio has been manipulated beyond a simple voice distortion to, at least, the point of removing audio that had been present in the original recordings.



57. Another discontinuity appears in this section from 00:00:37 to 00:00:43. At approximately the 39 second mark is a spike of audio that is not intelligible speech but appears to be masked audio from the unseen speaker (the subtitles read this as "Correct"). The green playhead is positioned at the discontinuity, and this is followed by Mr. Roche apparently saying "a plaintiff can purchase Solana."



58. The screenshot below comes from the end of the video clip, for the section from 00:00:43.5 to 00:00:48.5. This represents the Questioner asking "Dfinity?" [sic], which is followed by another discontinuity before Mr. Roche appears to reply "Oh, Yeah." The green playhead marks the start of the discontinuity.



59. I observed that this phenomenon occurs in **every one** of the Restaurant Videos after the Questioner speaks, **but nowhere else** in any of the Spy Videos. If there were characteristics of the audio recording equipment or the voice-changer filter that caused the discontinuous audio breaks as a matter of routine course, then it would be expected to find such breaks occurring elsewhere and throughout other, non-Restaurant videos. The localized and anomalous nature of these discontinuous audio breaks instead signals that some additional processing has taken place uniquely on the Restaurant Videos to manipulate the response provided by Mr. Roche. These edits do not appear to have an "innocent" explanation.

60. This analysis, when coupled with the evidence showing the inconsistent resolution in Mr. Roche's face (see *supra* Part D), shows that it is likely that the Questioner's audio has not just been filtered with a voice-changer, but could have been replaced entirely, such that the questions and statements to which Mr. Roche was reacting during the meeting are not the ones heard on the video clips published on CryptoLeaks. Alternatively, the edits could demonstrate that technology consistent with the TBA algorithm discussed above was used to edit the actual responses provided by Mr. Roche and alter them into the statements that are now being played on the Spy Videos.

## VI. CONCLUSION

61. The original unedited hidden camera recordings related to the CryptoLeaks videos have not been provided for examination, nor has any information from the purported creator of the so-called "Spy Videos" been presented to authenticate the video clips. Any observer visiting CryptoLeaks can recognize that the videos have been tampered with to take sections out of context, reframe the image, redact portions of some videos, change the voice of the unseen Questioner, and overlay subtitles.

62. In light of the existence of deep fake techniques to materially alter or even invent audio-visual content, it is especially noteworthy that the Restaurant Videos contain unexplained breaks in audio at conspicuous moments, and an apparent loss of visual detail around the speaker's face. These artifacts are consistent with the use of deepfake techonology. Consequently, because these videos exhibit signs of repeated compression, tampering, and extensive manipulation, it is my conclusion that they cannot be accepted as reliable or authentic documents of what was said at those meetings.

63. In light of the findings discussed above, I believe, to a reasonable degree of scientific probability, that the Restaurant Videos are the subject of manipulation that may include deepfake alterations.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2023.

David Kalat

**List of Exhibits**

A        Curriculum Vitae of David Kalat

B.       Case #3 Ava Labs, Avalanche and Roche Freedman

C.       List of 25 Spy Videos

D.       Planck, Max. "Text-based Editing of Talking-head Video." (2019)

# EXHIBIT A

## Curriculum Vitae



**David Kalat**

BERKELEY RESEARCH GROUP, LLC

70 West. Madison Suite 5000 | Chicago, IL 60602

Direct: 312.429.7907

dkalat@thinkbrg.com

Mr. Kalat is an information scientist and a testifying expert in electronic evidence, digital forensics, data analytics, and information security. He is a licensed private detective, and the author of numerous publications on the history of information technologies. He leads the Chicago digital forensics lab for BRG's Global Investigations + Strategic Intelligence practice group.

## EDUCATION

- M.L.I.S       University of Illinois at Urbana-Champaign, 2011
- B.A.          University of Michigan, 1992, *James B. Angell Scholar*

## EMPLOYMENT

- Director, Global Investigations + Strategic Intelligence, Berkeley Research Group (BRG), 2015–present
- Director, Disputes and Investigations, Duff & Phelps, 2011-2015
- President, All Day Entertainment, 1997-2008
- Operations Manager, DC Post/Interface Media Group, 1996-1997

## PROFESSIONAL CERTIFICATIONS

- Licensed Private Detective (License No. 115.002487), State of Illinois (Sept. 12, 2015 – present)
- Licensed Private Detective (License No. 52430601), State of Texas (July 31, 2018 – present)
- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners (License No. 621469) (Oct. 28, 2013 – present)
- Certified Computer Examiner (CCE), International Society of Forensic Computer Examiners (ISFCE) (License No. 1666) (Sept. 14, 2014 – present)
- Certified Information Systems Security Professional (CISSP), International Information System Security Certification Consortium (ISC)2 (License No. 593527) (Feb. 2, 2017 – present)
- Certified Telecommunications Analyst (CTA), Telecommunications Certification Organization (March 26, 2019 – present)

## PROFESSIONAL AFFILIATIONS

- Board of Directors, Association of Certified Fraud Examiners, Greater Chicago Chapter (2016 - 2017; 2020 – 2022)
- Member, Association of Certified Fraud Examiners Advisory Council (2022-present)
- Member, Sedona Conference (June 2018 - present)
- Who's Who Legal: Consulting Experts - Digital Forensics/Data  (2019, 2020, 2021, 2022, 2023)
- Lexology Client Choice Award – Data Expert in USA (2022)



## TESTIMONIAL EXPERIENCE

Evox Productions v. AOL Inc., No. 2:20cv02907 (C.D. Calif., 2020)
> On behalf of defendant in alleged copyright dispute, provided expert report and deposition testimony regarding data records pertaining to identification of images that could have been viewed during subject time period.

U.S. Department of Labor v. Packers Sanitation Services Inc., No. 4:22cv3246 (D. Nebraska, 2022)
> On behalf of defendant in investigation by the U.S. Department of Labor, provided a declaration regarding forensic examination of electronic data sources to investigate allegations of evidence spoliation.

Rowan v. Brock Pierce, No. 3:20cv01648 (D. Puerto Rico, 2020)
> On behalf of defendant in putative TCPA class action, provided declaration and expert reports regarding data records pertaining to identification of putative class members.

Calhoun v FLRish, No. 3:19cv8212 (N.D. Calif., 2019)
> On behalf of defendant in putative TCPA class action, provided expert report regarding data records from third-party communications vendors pertaining to identification of putative class members.

Dumas v. Paradise Exteriors, No. 9:22cv80356 (S.D. Fla., 2022)
> On behalf of defendant in putative TCPA class action, provided declaration and rebuttal regarding the ability to reliably identify putative class members from the available records.

Young v. Certegy Payment Solutions and Complete Payment Recovery Services No. 1:21cv11037 (D. Mass., 2021)
> On behalf of defendant in putative FCRA class action, provided expert report regarding the ability to identify discrete data sets related to Plaintiff's proposed class definitions.

AEG Holdco, LLC v Vazquez et al., No. 2:21cv05290 (C.D. Calif., 2022)
> Provided expert report regarding forensic examination of various electronic data sources on behalf of plaintiff regarding alleged theft of trade secrets.

Rowan v. United Enrollment Services and Adroit Health Group, No. 9:22cv80235 (S.D. Fla., 2022)
> On behalf of defendant in putative TCPA class action, provided expert report on the database records systems used by defendants to manage and track customer communications.

Cole v. Sierra Pacific Mortgage Co., No. 3:18cv01692 (N.D. Calif., 2018)
> On behalf of defendant in putative TCPA class action, provided expert report on the technical capacity and functionality of the communication platform allegedly used by the Defendant's third-party vendor. The Court ruled in Defendant's favor on summary judgment and dismissed plaintiff's claims.

Hovanky and Jackson v. RealPage, Inc., No. 3:20cv586 (E.D. Va., 2020)
> Provided expert report on public records-based investigations into criminal records and database design analysis on behalf of a defendant in a putative class action seeking claims under the FCRA.

Petruss Media Group v. Advantage Sales & Marketing LLC, AAA Case 1-19-0002-7532 (A.A.A., 2019)
> On behalf of Respondent and Counter-Claimant in a post-acquisition dispute, provided trial testimony on the accuracy, reliability, and functionality of a database of consumer contact information intended for use in digital marketing.



Rogers v BNSF Railway Company, No. 1:19cv03083 (N.D. Ill., 2019)
> On behalf of defendants in putative class action alleging violations of Illinois' Biometric Information Privacy Act, provided written and deposition testimony on potential scope of affected class of truck drivers, and the information security protocols used to protect personal information pertaining to drivers.

PSSI Holdings LLC v. Calhoun, No. 5:21cv0080 (E.D. Tex., 2021)
> Provided written report and testimony at hearing regarding forensic examination of various electronic data sources on behalf of plaintiff in alleged Computer Fraud and Abuse Act violation.

Tichy, et al. v. Hyatt Corporation, et al., No. 1:18cv01959 (N.D. Ill., 2018)
> On behalf of defendants in putative class action alleging violations of Sherman Act's anti-trust prohibitions, provided testimony on deficiencies in plaintiffs' preservation of electronic search and browsing records.

Abante Rooter and Plumbing, Inc. v. Total Merchant Services, LLC, No. 3:19cv05711 (N.D. Calif., 2019)
> On behalf of defendant in putative TCPA class action, provided expert report on the technical capacity and functionality of the communication platform used by the Defendant.

Signode Industrial Group LLC v. Rutzky, No. 2021CH00314 (Cook Cnty. Cir. Ct., 2021)
> Provided written testimony regarding forensic examination of various electronic data sources on behalf of plaintiff in alleged theft of trade secrets dispute.

Brown v. RP On-Site, LLC, No. 1:20cv448 (E.D. Va., 2020)
> Provided expert report on public records-based investigations into criminal records and sex offender records on behalf of a defendant in a putative class action seeking claims under the FCRA.

State of Georgia v. Kathryn Schrader, No. 19-B-03161-5 (Gwinnett Cnty. Sup. Ct., GA, 2019)
> Testified at criminal jury trial on behalf of defendant Kathryn Schrader, a state court judge accused of felony computer trespass.

Moskowitz v. American Savings Bank, FSB, No. 1:17-cv-00299 (D. Hawaii, 2017)
> On behalf of defendant in putative TCPA class action, provided expert report pertaining to forensic analysis of text message communications involving the plaintiff.

Schaffer and Fabricant v. First Choice Payment Solutions, d/b/a Sekure Merchant Solutions, No. 8:18cv1981 (C.D. Calif., 2018)
> On behalf of defendant in putative TCPA class action, provided expert report on the technical capacity and functionality of the communication platform used by the Defendant and the plaintiff's proposed methodology for class member identification.

Laramar Group, LLC v. Steven Boyack, Arbitration Before JAMS, Ref. No. 1340015694 (JAMS, Chicago, Ill., 2017)
> Provided written testimony regarding forensic examination of various electronic data sources on behalf of defendant in alleged theft of trade secrets dispute.

Trustwave Holdings, Inc. v. GoSecure, Inc., et al., No. 1:19cv05455 (N.D. Ill., 2019)
> Provided written testimony regarding forensic examination of various electronic data sources on behalf of plaintiff in alleged theft of trade secrets dispute.



Bunnett & Co., Inc. and Energy Feeds Int'l., LLC v. J.D. Heiskell Holdings, LLC, *et al.*, No. 3:17cv01475 (N.D. Calif, 2017)
> Provided written reports and testimony before magistrate judge regarding forensic examination of various electronic data sources on behalf of plaintiff in dispute alleging breach of fiduciary duty.

West Loop Chiropractic & Sports Injury Center v. North American Bancard, No. 1:16cv05856 (N.D. Illinois)
> On behalf of defendant in putative TCPA class action, provided expert report and deposition testimony regarding analysis of fax logs.

Gonzalez v. TCR Sports Broadcasting Holding, LLP, No. 1:18cv20048 (S.D. Fla.)
> On behalf of defendant in putative TCPA class action, provided declaration on use of data analytics to determine class membership.

Revitch v. Citibank, No. 3:17cv06907 (N.D. Calif., 2017)
> On behalf of defendant in putative TCPA class action, provided expert report and deposition testimony regarding analysis of dialing technology used by defendant.

Flowers v. Twilio, Inc., No: RG16804363 (Sup. Ct. Cal.)
> On behalf of defendant in putative class action under California Invasion of Privacy Act, provided declaration on use of data analytics to determine class membership.

Berman v. Freedom Financial Network, LLC, No. 4:18cv01060 (N.D. Calif., 2018)
> On behalf of defendant in putative TCPA class action, provided expert report regarding analysis of lead generation data.

Marcheco v. Jo-Ann Stores, LLC, 1:18cv20564 (S.D. Fla., 2018)
> On behalf of defendant in putative TCPA class action, provided expert report and deposition testimony regarding analysis of dialing technology used by defendant.

In the Matter of Tokenlot, LLC, Lenny Kugel, and Eli L. Lewitt, Securities and Exchange Commission Administrative Proceeding File No. 3-18739 (2018)
> On behalf of defendant in SEC administrative proceeding, provided written report regarding destruction of cryptocurrency tokens.

Kolodziej v. Justice Park District, *et al*., 2014 L 775 (Cook Cnty. Cir. Ct., 2014)
> Testified at jury trial regarding analysis of surveillance video, on behalf of defendant in alleged wrongful death.

Indeck Energy Services v. DePodesta, *et al*., 14 CH 602 (Lake Cnty. Cir. Ct., 2014)
> Submitted affidavits and written report regarding forensic examination of electronic data sources, on behalf of plaintiff in case alleging theft of trade secrets.

Braver *et al.* v. NorthStar Alarm Services, LLC, 5:17cv00383 (W.D. Okla., 2017)
> On behalf of defendant in putative TCPA class action, provided written report, deposition testimony, and testimony at class certification hearing regarding use of data analytics to determine class membership.

C.J. Drilling, Inc. v. Welsh, No. 17 CH 001095 (Kane Cnty. Cir. Ct., 2017)
> Submitted written report on behalf of plaintiff regarding forensic examination of electronic data sources in case alleging theft of trade secrets.



<u>Western Union v. Kula</u>, 1:17cv00280 (N.D. Ill., 2017)
> Served as neutral in dispute alleging theft of trade secrets; forensic examination of electronic data sources.

<u>Segerdahl Corp. v. Ferruzza</u>, *et al.,* 1:17cv03015 (N.D. Ill., 2017)
> Provided written reports and deposition testimony as both expert witness and 30(b)6 witness regarding forensic examination of electronic data sources, on behalf of plaintiff in case involving alleged theft of trade secrets.

<u>L&W Supply Corp. v. Banks</u> *et al*., CV16-00816 (Washoe Cnty. Dist. Ct., 2016)
> Submitted written report on behalf of plaintiff regarding forensic examination of electronic data sources in case alleging theft of trade secrets.

<u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas, 2016); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)
> Provided written reports and testimony at bankruptcy hearing regarding forensic examination of various electronic data sources on behalf of plaintiff in dispute alleging breach of fiduciary duty.

<u>Pro Sapiens LLC v. Indeck Power Equipment Co</u>., 14L5730 (Cook Cnty. Cir. Ct., 2015)
> Provided written reports, deposition testimony, and testimony at hearing regarding forensic examination of various electronic data sources on behalf of plaintiff in dispute alleging data spoliation.

<u>Geophysical Service Inc. v. Anadarko Petroleum Corp.</u> *et al*., 1201-15228 (Ct. of Queen's Bench of Alberta, 2014)
> On behalf of multiple defendants, provided deposition testimony regarding public records investigation into plaintiff's ability to satisfy a judgment.

## PUBLICATIONS

**Note:** Since 2018, I have contributed a monthly series for LegalTech News called "Nervous System," which approaches issues of data privacy and cyber security from the context of history. Individual installments of this series are itemized below, and all are collected centrally at https://www.thinkbrg.com/insights/publications/kalat-legaltech-news-nervous-system/

> *Day One: The Origin Story of Computer Forensics,* Pratt's Privacy & Cybersecurity Law Report (LexisNexis A.S. Pratt) Vol. 1 No. 1 (August/September 2015)
> *The Trouble With Mobile Forensics*, ThinkBRGTech.com (October 15, 2015)
> *Anti-Forensics Gets An Upgrade: The Hidden Traps In Today's Latest Technology*, ThinkBRGTech.com (June 27, 2016)
> *Dyn and Dash*, SC Media (December 19, 2016)
> *Understanding the Challenges of Strong Encryption*, Law360 (April 10 & 11, 2017)
> *Outrunning the Lion: Advice for Fighting on the Front Lines of Today's Data Breach Attacks,* (Legal Tech News, December 20, 2017)
> *Fighting on Today's Front Lines*, (InfoSecurity Magazine, Jan. 3. 2018)
> *Nervous System: The Story of the First White Hat Hacker* (Legal Tech News, February 5, 2018)



*Nervous System: Evaluating TCPA Liability in the Actual Wild West* (Legal Tech News, March 1, 2018)
*Confronting BIPA Liability in the Blink of an Eye* (ThinkBRG Global I Blog, March 8, 2018)
*Nervous System: The Boy Who Could Talk to Computers* (Legal Tech News, April 5, 2018)
*Nervous System: Just the Fax, Ma'am* (Legal Tech News, May 3, 2018)
*Nervous System: The Small Start of Big Data* (Legal Tech News, June 4, 2018)
*Nervous System: The AIDS Trojan Makes You WannaCry* (Legal Tech News, July 9, 2018)
*Nervous System: The Glamour Girl's Secret Privacy Weapon* (Legal Tech News, August 6, 2018)
*Nervous System: The Tech Revolution is Earlier Than You Think* (Legal Tech News, September 4, 2018)
*How to Recognize Different Types of Dialers From Quite a Long Way Away* (The Consumer Finance Law
   Quarterly Report, Volume 72, No. 2 (2018))
*Nervous System: What Hollywood Has Taught the U.S. Government About Cybersecurity* (Legal Tech
   News, October 12, 2018)
*Nervous System: Taking Biometrics at Face Value* (Legal Tech News, November 2, 2018)
*The Digital Detective: The History of Passwords and the Case of the First Theft* (ThinkSet Issue 6,
   November 4, 2018)
*Nervous System: The Computer That Taught HAL to Sing* (Legal Tech News, December 3, 2018)
*Nervous System: The Day Grace Hopper Literally Debugged a Program* (Legal Tech News, January 7,
   2019)
*Nervous System: The Dawn of Spam* (Legal Tech News, February 4, 2019)
*Nervous System: Big Brother, the Ghost in LBJ's Computer* (Legal Tech News, March 5, 2019)
*The Digital Detective: The Evolution of Intellectual Property Rights: From Punch Cards to Pixels*
   (ThinkSet Issue 7, March 7, 2019)
*Nervous System: The First Social Network* (Legal Tech News, April 2, 2019)
*Nervous System: Think Cryptocurrency is New? You've Forgotten the '80s* (Legal Tech News, May 7, 2019)
*The Digital Detective: Why Use Encryption? Because Business Needs A Free Flow Of Ideas* (ThinkSet,
   May 16, 2019)
*You Can't Change Your Fingerprints, But Do You Need To? The Evolution of Biometric- and Password-
   Based Authentication Security,* Pratt's Privacy & Cybersecurity Law Report (LexisNexis A.S. Pratt)
   (Part I - May 28, 2019; Part II – September 4, 2019)
*Nervous System: The Great Fixer of Information Coding Errors* (LegalTech News, June 4, 2019)
*Nervous System: The Day the NSA Took Down the Military* (LegalTech News, July 3, 2019)
*Nervous System: The First Modern Presidential Campaign* (LegalTech News, Aug. 5, 2019)
*Nervous System: Clipping the Wings of the Clipper Chip* (LegalTech News, Sept. 3, 2019)
*The Digital Detective: The Case of the Tasteless T-Shirts That Created the Internet As We Know It*
   (ThinkSet, Sept. 5, 2019)
*Nervous System: How Legal Tech Helped Catch the BTK Killer* (LegalTech News, Oct. 7, 2019)
*Nervous System: Passwords Became More Secure By Adding a Pinch of Salt* (LegalTech News, Nov. 5,
   2019)
*Nervous System: Claude Shannon's Magic Mouse and the Beginnings of Artificial Intelligence*, (LegalTech
   News, Dec. 10, 2019)



*The Digital Detective: They Came to Rob Star Wars* (ThinkSet, Jan. 9, 2020)

*Nervous System: The Countess of Lovelace, the First Computer Programmer* (LegalTech News, Jan. 10, 2020)

*Nervous System: Alan Turning's Gin Memory* (LegalTech News, Feb. 10, 2020)

*Nervous System: UNIVAC Predicts the Next President* (LegalTech News, March 3, 2020)

*Nervous System: How Punch Cards Brought Us to Our Census* (LegalTech News, April 1, 2020)

*The Seven Layer Cake of Information Security: A Technical Guide for the Non-Technical Reader* Pratt's Privacy & Cybersecurity Law Report (LexisNexis A.S. Pratt) (Vol. 6, No. 3, April 2020)

*Nervous System: The Triumphs of a Lazy Programmer* (LegalTech News, May 5, 2020)

*Nervous System: Teaching Machines to See Faces* (LegalTech News, June 5, 2020)

*Nervous System: The Unexpected History of VoIP* (Legaltech News, July 7, 2020)

*Nervous System: The Police Beat Algorithm and Automated Criminal Justice Information Systems* (LegalTech News, Aug. 4, 2020)

*Demystifying Blockchain and Cryptocurrencies* (The Journal of Robotics, Artificial Intelligence & Law, Vol. 3, No. 6, Nov.-Dec. 2020)

*Nervous System: The Inventor, the Barbershop Quartet, and the Origin of the Email Attachment* (LegalTech News, Sept. 1, 2020)

*Nervous System: The Sleepy History of the Buffer Overflow Attack* (LegalTech News, Oct. 7, 2020)

*Nervous System: Before the Battle Over 5G There Was the Battle Over 3G* (LegalTech News, Nov. 9, 2020)

*Nervous System: The First Major Data Breach, 1984* (LegalTech News, Dec. 8, 2020)

*Nervous System: Dialing for Dollars* (LegalTech News, Jan. 8, 2021)

*Nervous System: How 'The 414s' Hacking for Video Game High Scores Led to Federal Cyber Law* (LegalTech News, Feb. 8, 2021)

*Dispossessed, Beyond Custody, and Out of Control: Where the Stored Communications Act and the Federal Rules of Civil Procedure Meet Modern Communications Technology* Pratt's Privacy & Cybersecurity Law Report (LexisNexis A.S. Pratt) (Vol. 7, No. 2, February 2021)

*Nervous System: Computer Crime and Punishment* (LegalTech News, March 2, 2021)

*Nervous System: Oliver North and the Origin Story of Legal Technology* (LegalTech News, April 6, 2021)

*The Digital Detective: Why Computers Aren't Patented* (ThinkSet, April 26, 2021)

*Nervous System: Audrey, the Dragon, and the History of Voice Recognition Technology* (LegalTech News, May 5, 2021)

*Nervous System: The CPU ARM Race Had Its Start in the '80s* (LegalTech News, June 7, 2021)

*Nervous System: SafeBack in the Day* (LegalTech News, July 6, 2021)

*Nervous System: Florida Man, Joe Biden, and the Federal Computer Crimes Act* (LegalTech News, August 4, 2021)

*Nervous System: Dumpster Diving for Fraud and Profit* (LegalTech News, September 1, 2021)

*Nervous System: Engineering the Next Generation of Computer Users with the Alto* (LegalTech News, Oct. 4, 2021)

*Nervous System: Rethinking Voice Recognition at the Canada Border* (LegalTech News, Nov. 2, 2021)

*Nervous System: The Computer Virus That Wasn't* (LegalTech News, Nov. 30, 2021)



*Nervous System: The Computer Crime of the Century* (LegalTech News, Jan. 6, 2022)

*Nervous System: Knowing Your Place in the World* (LegalTech News, Feb. 1, 2022)

*Nervous System: Presenting Our Next Witness, the iPhone* (LegalTech News, March 2, 2022)

*Nervous System: The Entropy of Wordle* (LegalTech News, April 4, 2022)

*Nervous System: From a Cry in the Dark to the Forensic Voiceprint* (LegalTech News, May 4, 2022)

*Nervous System: Cybernetics and the Birth of Computer Ethics* (LegalTech News, June 8, 2022)

*Nervous System: How Lossless Compression Makes Information Skinnier* (LegalTech News, July 7, 2022)

*Nervous System: How to Have a Secure Conversation With a Stranger* (LegalTech News, August 2, 2022)

*Nervous System: How Trolls Built Big Tech* (LegalTech News, Sept. 19, 2022)

*Nervous System: The Bakery Computer* (LegalTech News, Oct. 4, 2022)

*Nervous System: The Strange Case of the Forged Email, the Carphone, and the Woman Who Lost Her Job* (LegalTech News, Nov. 3, 2022)

*Nervous System: From Gibberish to Unicode* (LegalTech News, Dec. 6, 2022)

*Nervous System: The Great Emoji War* (LegalTech News, Jan. 4, 2023)

*Nervous System: Formulae for Success* (LegalTech News, Feb. 2, 2023)

# EXHIBIT B

Crypto Leaks

# Ava Labs (Avalanche) attacks Solana & cons SEC in evil conspiracy with bought law firm, Roche Freedman

In his rush to hurt competitors, and distract regulators from his actions, Emin Gün Sirer is harming everyone in blockchain

**Our spy videos:** This report shares extensive spy video. All video has been collected in accordance with applicable laws.

**Whistleblower appeal:** With these disclosures, we aim to show people who are not crypto insiders what goes on behind the scenes. Do you want to be part of this movement? If you have any further information on this case and the different parties involved, become a whistleblower

for Crypto Leaks and join our movement bringing honesty and integrity back to the crypto community.

CASE #3 August 26, 2022 [UPDATED August 31]

# Ava Labs, Avalanche and Roche Freedman

Ava Labs is an American for-profit company that develops and promotes the Avalanche blockchain, which recently raised substantial funding in collaboration with Three Arrows Capital, the failed hedge fund that has been accused of acting like a Ponzi scheme. It is led by CEO and founder, Emin Gün Sirer, and claims to employ more than 150 people. The Avalanche network currently has a fully diluted market capitalization of more than $16.5 billion USD.




Roche Freedman is a law firm that widely sues people in crypto, currently running at least 25 class actions, including against Binance, the crypto exchange, and Ava Labs (Avalanche) competitors Solana Labs (Solana) and the

Dfinity Foundation (an Internet Computer contributor). It is led by founding partner, Kyle Roche, and employs more than 30 lawyers.



We can reveal that for several years they have been operating according to an extraordinary secret pact that harms the crypto industry, and has a nature so perverse that it undermines the integrity of the American legal system.

Some years ago, blockchain company Ava Labs and Amercian law firm Roche Freedman, made a deal. A pact was formed that involved Ava Labs granting Roche Freedman a massive quantity of Ava Labs stock and Avalanche cryptocurrency (AVAX), *now worth hundreds of millions of dollars, in exchange for Roche Freedman agreeing to pursue a hidden purpose*.

In a shocking series of video recordings, shared by this case investigation, Kyle Roche himself now reveals the exact nature of their ongoing operations. The case is highly disturbing in nature.

**We can reveal that the pact directs Roche Freedman and their leader Kyle Roche, to: 1) use the American legal system - gangster style - to attack and harm crypto organizations and projects that might compete with Ava Labs or Avalanche in some way, 2) sue crypto industry actors generally with the aim of creating magnets for regulators such as the SEC and CFTC that distract them**

from the highly commercial nature of Ava Labs and the Avalanche blockchain, and 3) secretly pursue Emin Gün Sirer's personal vendettas against individuals.

As usual, Crypto Leaks brings you the hard evidence that nobody else can obtain. We explain with the help of words spoken by Emin Gün Sirer's own lawyer, Kyle Roche.

## Ava Labs & Roche Freedman co-locate

August 2019, the newly formed law firm Roche Freedman moved into a co-working space *with Ava Labs*, the for-profit company that develops and promotes the Avalanche blockchain.



## Big money establishes a secret pact

In exchange for Roche Freedman providing what Kyle calls "legal services", Ava Labs granted them massive amounts of:

- AVAX ⬤ the Avalanche blockchain's tokens.

- Ava Labs corp's stock (Ava Labs holds AVAX for founders and investors).

Kyle Roche says he was the *very first person* to receive Ava Labs stock after Andreessen Horowitz, a venture capitalist that provided their initial funding.



**So if Ava Labs was flush with cash having just received investment from Andreessen Horowitz, why did they need to pay for "legal services" in this way?**

The answer is that they were not paying for normal legal services. The massive payments of AVAX and Ava Labs stock established a secret pact. This was so unusual, that it required the grant of assets that are worth hundreds of millions of dollars today.

Kyle boasts he has a full point on AVAX, and Ava Lab stock...



Kyle says he has about a third of what Kevin Sekniqi has, who is the co-founder and current COO (Chief Operating Officer) of Ava Labs.

**Kyle says that he helps control the AVAX token supply, and helps Ava Labs with "regulation issues," and "competitors..."**



Kyle refers to Emin Gün Sirer by his nickname, "Goon."

He says he trusts "Goon" and Kevin "like brothers," and that they have the "same interests..."



As the conversation progresses, the truth about the pact begins to emerge: Kyle confirms that they litigate against (sue) other parties in crypto as a "strategic instrument" to "support Ava Labs" to a level where they made him an "equity partner." Kyle says litigation "is an underused tool."

Kyle describes participating in the pact as a:

 **completely different way than being a lawyer**



**Kyle Roche moved to Miami for "tax purposes."**

He moved in with Kevin Sekniqi, Ava Labs' COO, reflecting just how tightly the organizations work together.

In the years since he moved, Kyle Roche has failed to update his LinkedIn profile, which still lists his location as the "New York City Metropolitan Area," which is a more prestigious place to locate a law firm.

**Naturally, Kyle's profile makes no mention of Avalanche or Ava Labs.**

*Behind this elaborate smokescreen, Kyle is working from Miami with two key objectives: 1) to increase the price at which he can sell his AVAX tokens and Ava Labs stock, and 2) to reduce the amount of tax he pays when he sells.*



I'm living... I just moved to Miami for tax purposes.

# Harvesting confidential information

As the conversation continues, the first signs of the perverse nature of the secret Ava Labs/Roche Freedman pact begin to emerge.

Kyle reveals that he started out as a "crypto expert" for Ava Labs. But how, you might ask, could a lawyer be a "crypto expert" for a company that develops and promotes a blockchain.

Kyle reveals that answer. He can contribute a special kind of expertise and knowledge — which he explains he has been able to obtain because:

 **I sue half the companies in this space**

In the USA, when you sue an individual or company, you can demand access to their confidential accounts, commercial data, email and social media communications, and more, using a special legal process known as "discovery". This has resulted in him:

 **seeing the insides of every single crypto company**

Kyle boasts that being able collect information in this way has resulted in him becoming one of the:

 **top 10 people [experts] in the world [in crypto]**

If a blockchain company could unfairly gain access to the confidential information of others, they could use it as a powerful competitive tool. It seems that Kyle sharing this special expertise with Ava Labs was one of the key factors that convinced Emin Gün Sirer to make the pact.

Until proven otherwise, we must assume that Ava Labs may even have directed Roche Freedman as to what confidential information they should harvest from the industry. It is unclear how much confidential information Ava Labs has obtained, but the potential for extreme wrongdoing is very concerning.

Naturally, you can be sure that during discovery against a target, Roche Freedman automatically demands the identities of investors, contractual agreements with partners, customer lists, payroll details, and information about every other kind of financial transacton, related to the organizations they are litigating against, and their founders and executives. They will also ask for complete email, Slack and other communication histories, which provide them with a treasure trove of information valuable to a competitor, including even technical insights.

**The many crypto industry participants who have been litigated against by Kyle Roche must now question exactly how much of their confidential data is now in the possession of Ava Labs executives.**



0:00 / 0:21

-I've seen the insides of every single crypto company.

# Harming competitors and fooling regulators

Roche Freedman runs litigation against numerous people and organizations in the blockchain industry (i.e. it sues them). A favored method is to initiate class actions. Several months ago, Kyle Roche claimed to be running more than 25 class actions.

> **Roche Freedman class actions:** In their American class actions, they propose a class of people whom they claim have been harmed, for example because they lost money trading a cryptocurrency. They then create a lawsuit in their name, for example claiming that the cryptocurrency is an illegal security, and that therefore that those developing or promoting the blockchain involved, or those running crypto exchanges that enabled them to trade the cryptocurrency, are liable for the losses of everyone in the class. In the United States, they only have to find one person willing to be a representative plaintiff for the class to initiate action.

When they create class actions and other litigation against Ava Labs competitors and crypto industry participants, Kyle Roche has revealed that Roche Freedman often has two hidden purposes:

1. **Surreptitiously causing harm to a competitor.**
   If there are two horses competing in a race, and you can hack at the leg of one, the other will win. Their horse is AVAX and Ava Labs stock. Initiating a class action against their competitors can harm them in multiple ways, and so they have secretly weaponized the legal system to do this. Even when they can make only a weak case, such that with high probability they will lose the litigation, this can still harm their targets, greatly profiting them. Moving the price of AVAX by only a small amount, by harming competitors, can produce big gains for them when they make sales from their huge hoard of AVAX tokens and Ava Labs stock. Ava Labs is not ever named as the litigant — the class of plaintiffs is — disguising what is really going on.

2. **Luring regulators, including the SEC and CFTC, away from Ava Labs.**
   They often litigate against competitors in ways that make *them look guilty of regulatory transgressions*. Directing the attention of regulators towards competitors can cause further great harm to them, but also serves to *lure regulators away from Ava Labs and their ravenously commercial behavior, which regulators would otherwise be very interested in*. Kyle tells us he litigates to create "other magnets" for regulators to go after. They also do this to crypto actors who are not obvious competitors.

Here's a quick crib sheet for what is going on:

- Roche Freedman typically attacks competitors using American "class actions," in which they claim to be representing a group of people who they claim have been "harmed" (the plaintiffs). For example, they can claim another blockchain's tokens are illegal securities, and consequently some people who traded them suffered unfair losses when the price fell.

- In the United States, class action legal filings are "protected speech." This allows Roche Freedman to make damaging claims about other projects that are in reality completely false, without risk of being sued for defamation (or "libel"). For example, they filed a lawsuit against the Dfinity Foundation that

essentially parroted the false claims of Arkham Intelligence. The purpose is to damage the reputation of their targets, and/or surround their brands in FUD.

- Once Roche Freedman has initiated litigation against a target in crypto, they can collect/harvest confidential information from them using the legal discovery process, creating "expertise" that they can share with Ava Labs.

- The nature of the American class action system forces targets to spend far more on defense than Roche Freedman spends litigating against them. This is because if they lose — and juries are unpredictable — the judge can award astronomical damages against them. This drains the resources of competitors, as well as distracting them from their core work.

- Roche Freedman's financial risk is limited to the money it spends on litigating against a target. This is because another quirk of the American legal system prevents the targets of their class actions from claiming their legal costs back from Roche Freedman if they win.

- Roche Freedman can spend a few million dollars litigating against an Ava Labs competitor, and lose the case, and still come out on top, if their actions harm or suppress a blockchain that competes with Avalanche (since if their actions may drive the price of AVAX even slightly higher, such is the size of their holdings, they can make a substantial profit).

- By naming the founders and executives of blockchain ecosystems and companies in their class actions, they can threaten them with total bankruptcy if they lose. This destablizes their key leaders and innovators, also placing tremendous pressure on their families, especially when there are children involved. Naturally, if they can cause family issues for the leaders of competitors, this will further degrade their capabilities.

- Ava Labs and Roche Freedman seek to surreptitiously increase the price of AVAX in a ruthless and highly commercial manner. Their desire to promote AVAX and increase its price at any cost greatly increases the risk that the SEC would class the AVAX token as an illegal security. To divert the attention of regulators like the SEC and CFTC elsewhere, they widely litigate against other actors in the blockchain industry accusing them of regulatory transgressions. This protects them by diverting attention elsewhere, while increasing the

regulatory risk of the target, which is doubly useful to them if they are some kind of competitor.

Kyle Roche says he is the reason Ava Labs haven't been sued. He says that to protect them, he makes sure that:

 **the SEC and CFTC have other magnets to go after**





Kyle even claims that thanks to his efforts, he has ensured that for Ava Labs, there's

> **no such thing as regulation for what they want to do**



# Emin Gün Sirer's two-faced nature

Emin Gün Sirer regularly professes his support for other blockchain projects, and indicates he wishes their ecosystems the best. Here he offers support for Solana users when they were having their wallets emptied by the Slope wallet exploit, claiming kinship by saying everyone in the space was affected, and then offering apparently well-intentioned technical theories on what might be happening (all of which proved wrong).



Nobody should be fooled. This tweet thread was created only weeks after Roche Freedman filed a class action targeting the core of the Solana ecosystem claiming that its SOL token is an illegal security.

*The false narrative Emin is establishing by these attacks hurts everyone in the industry. He should consider that one day he may find himself facing exactly the same arguments that he is establishing in his rush to hurt competitors.*

# Do their actions make AVAX a security?

What is most frustrating, is that Ava Labs and Roche Freedman are probably the most ruthlessly commercial operation in blockchain, which is amply revealed by their secret weaponization of the legal system against competitors. Indeed, their relentless subtle (and not so subtle) promotion of AVAX as an investment opportunity, combined with their nefarious tactics, are in fact very likely to make AVAX a security.

**Kyle Roche has implored Emin Gün Sirer not to mention the price of AVAX so as not to catch the eye of the regulators. However, Emin can't contain himself when there is a major AVAX price rally.**

During one such rally December 7 2021, Emin Gün Sirer even encouraged his followers by leading them in an adapted Paul Simon song:



CASE UPDATE — Thanks to community

In the tweet below, Emin announced an Ava Labs marketing campaign on the New York subway, with the strapline "It's never too late to be early." The not-so-subtle sales pitch to investors is that it is still possible to be an early investor in the AVAX token and make substantial profits. Emin's tweet announced the campaign, which ran in parallel with other Ava Labs campaigns, on December 14, 2021. That day the AVAX price was $87.30. By December 15, the price was $101.18. By December 21, the price was $123.33. At the time of writing (end August 2022) the price is around $19.



**Emin Gün Sirer** 🔺 ✔
@el33th4xor · **Follow**

It's never too late to be early.

9:04 AM · Dec 14, 2021

❤ 4K        💬 Reply        ⬆ Share

Read 179 replies

Roche Freedman is continually suing other blockchain projects on the basis that they have made regulatory infractions, and are therefore liable to token traders that lost money. Yet, they have never sued Ava Labs, a blockchain project that directly markets its tokens to retail investors as investment products, who have consequently lost substantial funds.

**Kyle Roche's own words, shared by our Case #3 videos, make it amply clear why Roche Freedman have not, and will not, sue Ava Labs.**

# Emin Gün Sirer's personal vendettas

It is a great surprise that Ava Labs' legal proxy performs work prosecuting Emin Gün Sirer's *personal vendettas*. This looks like a misuse of company resources

for personal purposes, which is a serious no-no in the corporate world.

His regular use of "dark power" is also most unexpected for a man who likes to brandish the title of "professor at Cornell University".

### First blood: a social media pundit

Emin's first vendetta was against a Turkish social media crypto pundit who said that he "heard he was a member of FETO."





Kyle Roche found out that the social media pundit was landing in Miami for a business trip. He used the event to serve him papers, and ensnare him in the American legal system. The moment was videoed for Emin's pleasure.

**Kyle shares that Emin now watches the video once a month — presumably to relive the shock and pain caused by the ambush — revealing troubling tendencies.**

Kyle seems very pleased, and says:

 **that's why Gün loves me...**



**CASE UPDATE — Thanks to community**

We have *not investigated* the rights-and-wrongs of the Crypto Emre case. However, the community has produced interesting additional information. They say that early in 2021, there was a lot of excitement about CBDCs (Central Bank Digital Currencies), and that Ava Labs ran marketing campaigns in Turkey claiming that they were in talks about running them on Avalanche with the Turkish Central Bank, the Bank of England, and the Bank Of Canada. They say that Emre then debunked the claims, by contacting the central banks involved, and then tweeting their responses (see here, here and here) and that this kind of thing was a key driver of Ava Labs' animosity towards him.

We also note that Kyle Roche/Roche Freedman threatened Emre in February 2021 *on behalf of Ava Labs and Emin Gün Sirer*. This contrasts with Emin Gün Sirer's recent denials of close links to Roche Freedman.



## Surreptitiously attacking Craig Wright

### CORRECTION — Thanks to community

Emin Gün Sirer has marketed himself as a Cornell University professor for years. However, in fact, he appears to have ben removed from his post at the end of 2021. Regarding his actual role: Emin completed his PhD, then spent 7 years as an *assistant professor*, then transitioned to *associate professor*, where he remained for 14 years, never making it to *university professor*. We believe frustrations with his academic career led him to a grandiose sense of his own academic achievements within blockchain.

There are numerous indications that Emin Gün Sirer wishes to promote himself as the "Father of Blockchain." Recently, he had his PR people update his wikipedia page with the dramatic claim that his:

 **Karma system, published in 2003, is the first cryptocurrency that uses a distributed mint based on proof-of-work**

Experts in the field examining this paper say this claim is unjustifiable. Meanwhile, while developing Avalanche, he anonymously published a paper describing the consensus protocol he planned to use under the pseudonym "Team Rocket," which he then drew attention to on social media with faux rapture, as though it heralded the return of Satoshi Nakamoto:



It was only after sustained ridicule on social media, that Emin was eventually forced to concede that it was his own team that produced the paper, thus ending his quest to emulate Satoshi through anonymous publication.

Recently, Twitter bots (i.e. fake Twitter user accounts that are directed by automated systems for the purpose of marketing), which appear controlled by Ava Labs, either directly or indirectly, have hailed Emin as the "Father of Blockchain."

Emin's grandiose sense of his own contributions to blockchain, and an envy of the Satoshi Nakamoto crown, perhaps combined with a disposition towards dark power, then led to him wanting Kyle Roche to pursue Craig Wright, who claims to be part of a small team that invented Bitcoin.

**Many people fiercely disagree with Craig Wright's claim, but most people would not secretly attack him through the legal system:**



Through his attacks on Craig Wright, Kyle Roche boasts how he helped massively devalue the Bitcoin Satoshi Vision (BSV) blockchain by billions of dollars. This will be of interest to Craig Wright, and every member of the BSV cryptocurrency community who sustained losses:



**CASE UPDATE — Thanks to community**

It is important to note that Emin Gün Sirer appears to have a long history of attacking from the shadows. The /r/BSV reddit (a kind of online public forum) was squatted by anti-BSV moderators who managed to acquire complete control. They then trolled BSV enthusiasts wishing to use the forum as a place to discuss the BSV network, disrupting their community. These moderators made great efforts to remain anonymous, but now this official link to old reddit content appears to reveal that Emin Gün Sirer himself was one of those moderators.

Link: https://old.reddit.com/user/el33th4xor/



**CASE UPDATE — Thanks to community**

It appears that Emin Gün Sirer gave Kyle Roche a painting of Craig Wright as a gift after the first phase of the Roche Freedman case against him was complete. This speaks to the importance of his working relationship with Emin Gün Sirer and Ava Labs.



**Christen Ager-Hanssen** ✔
@agerhanssen · **Follow**

14th February 2022 in Kyle Roche @KyleWRoche office.
Kyle proudly shows me the attached picture/painting of
Craig Wright @Dr_CSWright  that  he said was a very
special gift from Emin Gün Sirer @el33th4xor for
"defeating" Craig Wright in the case Kleinman vs Wright

3:07 AM · Aug 30, 2022

♥ 167     💬 Reply     ⬆ Share

Read 34 replies

## Class actions against competitors

At another venue with Kyle Roche, it quickly became clear that his favorite class actions were against obvious Ava Labs competitors. When asked, he appeared hardly able to conceal his glee when confirming that Dfinity — the not-for-profit developer of the Internet Computer blockchain, and the subject of a major Roche Freedman class action — was a competitor to Ava Labs and Avalanche.



## Kyle's personal nature emerges?

Kevin Dutton, a psychologist and writer specializing in the study of psychopathy at the University of Oxford, says that among professionals, lawyers count the second highest proportion of psychopaths, because of the opportunities the career affords them to pursue their predilections.

Psychopaths crave feelings of power and control over other people. Many display traits of grandiosity, narcissiscm, sociopathy and Machiavellianism.

We are not saying Kyle is a psychopath, as only a psychologist can classify people. However, we see these traits in his behavior, and in the following, Kyle appears to express a disturbing determination to exert power and control over others:



# Filing class actions on behalf of Ava Labs

Kyle Roche has been enabled to freely pursue his predilections, because of the vast amount of wealth provided by Ava Labs. He says he can sue people:

 **just for the sport of it**

Kyle boasts how he can file class actions that attack those competing with Ava Labs (Avalanche), such as *Solana Labs*, and the Dfinity Foundation, *on behalf of Ava Labs*.

**At the time we collected these recordings, Roche Freedman had already been working on *two* class actions against Dfinity, and had filed one, but had not yet filed its first class action against Solana. However, he has now filed a major class action against Solana. Everything he said proved true.**

 **So, I can sue Solana!**

Both the class actions filed so far against Solana and Dfinity make accusations that their tokens are illegal securities.



## How Kyle Roche sees the legal system...

Kyle leverages the fact that judges and juries don't understand blockchain.



He has a colorful strategy for bamboozling juries and gaining their trust.



He calls American juries "10 idiots." He feels confident that he can work these "idiots" to control American class actions.



Earlier, when boasting about the large settlement he believed he could obtain from one of his class actions, he seems to say that a key deciding factor would be the interests of his law firm (i.e. *his* interests). Shouldn't the decision to settle be based soley on the interests of the class of plaintiffs he is representing?



Perhaps it's not surprising that he considers his own interests when deciding how to conduct a case, because he describes one of his plaintiff classes — people who lost money in crypto — as "100,000 idiots."



# Emin and Kyle's "iLO" horror

Class action lawsuits can be very destructive. They impose vicious legal costs on those being attacked that they cannot reclaim, drain attention better used for productive purposes, and can impose terrible stress for years, including on the famililies of those targeted. Class action frameworks are not intended for use "just for the sport of it," or as a "strategic tool to competition," as Kyle Roche suggests.

They are also not intended as a means for ruthless people to squeeze money out of good people, in the mode of patent trolling, say. That kind of thing should have no place in Western democracies like America.

**But to Emin Gün Sirer and Kyle Roche, *litigation is just a for-profit opportunity*.**

They plan to create a new business on Avalanche, which will support the creation of something called an Initial Litigation Offering, or iLO. The idea is that lawyers like Kyle will be enabled to propose new class actions and other litigations en masse, and then blockchain investors will fund the proposed litigation by buying tokens to share in proceeds obtained through out-of-court settlements and damages awards.

In this sociopathic business vision, litigation is just another financial asset, and they want to provide a framework that makes it easy to mint as much as possible. Kyle appears to spare no thought for the social impact of his plans.

For Kyle Roche:

 **litigation is the most uncorrelated asset that exists, period**



**CASE UPDATE — Evidence share**
Newly obtained correspondence from Sam Wang, Ava Labs' Director of Business Development, shows that as recently as last December, Ava Labs was introducing Kyle Roche as:

 **spearheading our litigation financing initiatives**

This reflects how this effort is a joint venture between Ava Labs and Roche Freedman, and how they work as an integrated team. This evidence also strongly contrasts with Emin Gün Sirer's recent denials of close links to Roche Freedman:

**Sam Wang** <sam.wang@avalabs.org>                    Tue, Dec 28, 2021, 8:00 AM    ☆    ↩    ⋮

to me, Mauricio, John, Kyle ▾

Christen & Mauricio,

Allow me to introduce you to Kyle Roche who is spearheading our litigation financing initiatives. He is aware of your interest in developing something similar for the European market and will take the conversation from here. Cheers.

**Kyle Roche**

Roche Freedman LLP

(t) (646) 970-7509

(@) kyle@rochefreedman.com

Sam



**Sam Wang**

Director of Business Development – Enterprise & Institutional

sam.wang@avalabs.org | 832-863-3955

Website | Twitter | Telegram | Discord | LinkedIn

# Roche Freedman at war over its AVAX

Roche Freedman actually began as "Roche Cyrulnik Freedman". But according to ex-partner Jason Cyrulnik, once it became apparent just how valuable their haul of AVAX tokens and Ava Labs stock was, Kyle Roche and Devin Freedman conspired to expel the older man from the partnership in February 2021 by out-voting him, then keeping his almost 25% share for themselves.



Now former partner Paul Fattaruso says he was hired on promise of 2% of the firm's equity, but was not told of a secret agreement between five of the partners (Kyle Roche, Devin Freedman, Amos Friedland, Nathan Holcomb and Edward Normand) to share the AVAX tokens and Ava Labs stock exclusively between themselves. These claims are now subject to numerous ongoing lawsuits.

The moral of the story is: be careful in your choice of colleagues.

## CASE UPDATE — Evidence share

It was internal warfare within Roche Freedman that provided us with early hard evidence regarding the nefarious goings-on. In particular, we share a lawsuit filed by Jason Cyrulnik against his old partners, https://cryptoleaks.info/cyrulnik-vs-rochefreedman.pdf. This contained an early internal Roche Freedman MOU, which detailed how the AVAX tokens they received would be divided.

A payment of between 4-5M AVAX tokens was made monthly over three years, terminating September 2022.

> **B.    Ava Labs Tokens**
>
> The Founding Partners understand that Roche Freedman LLP represents Ava Labs.  Ava Labs is a startup company that plans to distribute a certain amount of Digital Assets (the "Tokens") as part of its plans of building a new platform for decentralized assets and applications.  In exchange for legal services, Ava Labs has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019.  A copy of the Roche Freedman LLP / Ava Labs retention agreement is attached to this MOU as Exhibit B. Notwithstanding, the Founding Partners understand that Roche Freedman LLP has agreed to distribute its Ava Labs Tokens according to the following breakdown:
>
> | | |
> |---|---|
> | Jason Cyrulnik | 25% |
> | Velvel Freedman | 32% |
> | Amos Friedland | 5% |
> | Nathan Holcomb | 5% |
> | Edward Normand | 5% |
> | Kyle Roche | 28% |
>
> The Founding Partners understand that Kyle Roche will be the Originating Attorney for Ava Labs (i.e., he will have 100% of the Origination Credit) and any further consideration paid by Ava Labs for the Firm's services will be subject to the Firm's Partnership Compensation Model.

# Brad Garlinghouse lit the fuse

Before Kyle Roche founded Roche Freedman and made a pact with Ava Labs, he was a relatively lowly associate at the law firm Boies Schiller Flexner. They were representing Ripple, who were defending a lawsuit claiming their XRP token was an illegal security. According to Kyle, he proposed to their CEO, Brad Garlinghouse, that he create a new law firm that would specialize in suing others in crypto, using exactly the same kinds of tactics that were being used against Ripple. Kyle asked that Brad become his angel investor, and curiously Brad agreed — one might have expected he would want to see less of this kind of litigation across the industry.

**For whatever reasons Brad Garlinghouse invested in Kyle Roche, and supported him on his current path, it certainly didn't save him from the SEC. Ripple's current travails might be a bad omen for Emin Gün Sirer.**

# Remedies and conclusion

For anyone who cares about crypto and the blockchain industry, Crypto Leaks Case #3 should be a watershed moment. The movement was created by visionaries, theoreticians, engineers and true believers. People with integrity. But the value creation brought in cowboys and ruthless opportunists, who are just out to make money, whatever it takes. These people don't care about crypto and blockchain, and what it stands for. They only care about themselves.

We have enough bad people in crypto already. Three Arrows Capital had highly vocal and popular leaders, who played Pied Piper to the masses, but behind the scenes they ran their hedge fund like a Ponzi scheme. Those same masses have now lost billions that they thought were safe in cryto banks. People in crypto deserve an industry where not everything is smoke and mirrors, and where they can trust other people's integrity.

We must demand change.

### Cornell University

Emin Gün Sirer has traded relentlessly on his "professor at Cornell" status, using Cornell's brand to convince the masses that he primarily cares about the advancement of blockchain science and has special technical skills. In fact, his real modus operandi is more Professor Moriarty, who tries to get Ava Labs and

Avalanche ahead through clandestine attacks on competitors that involve secretly weaponizing the legal system, as well as the pursuit of personal vendettas. Cornell must decide whether it wants its reputation wielded for profit by someone who seemingly operates without a moral compass. He uses their brand to cloak himself, which directly supports his deceptive self-promotion, and masks his Machiavellian schemes, which damages individuals and their families and the wider crypto and blockchain community and industry. Cornell will not want to be part of this charade.

Here is Emin's pinned tweet, which reflects how he has branded himself since launching Ava Labs and Avalanche:



**Emin Gün Sirer** 🔺 ✔
@el33th4xor · **Follow**

So many academics forget that our goal, as a profession, is *not* to publish papers. It's to change the world.

5:09 AM · May 23, 2018

❤️ **10K**    💬 **Reply**    ⬆️ **Share**

**Read 1.6K replies**

## Andreessen Horowitz and Polychain

In the realm of traditonal startup companies, venture capitalists used to only invest in one project in each segment, so that they were never exposed to the conflict of interest involved in backing competing companies. Crypto changed all of that, with some venture capitalists investing widely into native blockchain tokens, seeing that a rising tide was "floating all boats," and to make sure they had holdings in the few that would make it big. Now the check has come due, and with the release of this report, some will now find that they have unknowingly funded a project making unacceptable, clandestine, industry-damaging and clearly immoral attacks on competitive projects that they also backed (for example, both Andreessen Horowitz and Polychain recently threw massive resources behind Solana Labs, a key target of Roche Freedman and Ava Labs). They must now do the honorable thing, and help protect the industry and projects that have made them so much money, by vocally disowning Ava Labs.

**Lawyers working for Roche Freedman**

The legal system is a fundamental pillar of any democratic society, and its integrity is something we must cherish and protect. But Roche Freedman has perverted the role of a law firm, subverting and weaponizing the legal system thereby promoting the value of blockchain tokens and stock owned by a few of its partners. It undermines everything that makes the legal profession honorable. Lawyers working at Roche Freedman who were previously unaware of this behavior will not wish to condone it, accept a leader that lacks a moral compass, or work for a law firm with a hidden purpose. Most lawyers do not go through law school to end up living "Better Call Saul."

**The American Bar Association**

The mission statement of The American Bar Association is: "to serve equally our members, our profession and the public by defending liberty and delivering justice as the national representative of the legal profession." They advocate for the profession as a whole, and the thousands of lawyers who work with integrity within society's understanding of what being a lawyer entails. The ABA works to "increase public understanding of and respect for the rule of law, the legal process, and the role of the legal profession." This is entirely incompatible with defending those people who have decided to follow "a completely different way then being a lawyer," by weaponizing and perverting the legal system for personal gain, which is also an assault on liberty and justice.

**American Regulators (SEC, CFTC...)**

Roche Freedman and Ava Labs are attemping to make fools out of regulators. Through their nefarious weaponization of the legal system, they wish to manipulate regulators by drawing them to competitors, and away from their own activities. This behavior will undermine everyone's faith in the fairness of the regulatory system. Good actors will fear that unscrupulous competitors have bought unscrupulous lawyers using hundreds of millions of dollars worth of crypto assets, and that they are misusing the regulatory system to paint them as targets for regulators, both to harm them, and distract regulators from their own wrongdoings.

**Ava Labs shareholders and executives**

According to the evidence shared in this case study, Emin Gün Sirer has used company resources to pursue his *personal vendettas*, which may now result in

reprisals that directly undermine shareholder value. This is a clear breach of fiduciary duty. When any leader runs out of control in this way, it is time for them to go. For example, John Wu, the President, could be made CEO, and Emin Gün Sirer could be removed from his post to restore confidence. This will enable the organization to reset its reputation and proceed in a more business-like manner.

## Developers building on Avalanche

Once upon a time, those driving the blockchain project were pursuing dreams. They met and discussed designs, they cooperated and collaborated, and they were passionate about what was possible. But it wasn't long before the opportunists came hunting, and they learned how to dress themselves in the clothes of those they joined. There are many projects in the blockchain space today, which often have dramatically different visions and approaches to R&D and marketing. Some also have different moral compasses. Tech has always been highly competitive, but the winners do not generally compromise their integrity. When the smoke eventually clears, it will be seen that authenticity and passion really count. Developers will prefer to work on a platform where they can be proud of the team, ecosystem and ethos. Those that wish to stay with Avalanche will demand change.

## The crypto press

Most participants in the blockchain industry do not realize quite how focused the crypto press is on promoting vested interests. It may come as a surprise to many that not only did the crypto press fail to report on our previous cases (see Case #1 and Case #2) but some parts actively suppressed information about them. For example, to address the lack of reporting, we recently attempted to purchase a paid press release on Cointelegraph, as others do, but were mysteriously blocked, presumably to protect those our cases reference. Meanwhile, Roche Freedman were able to purchase a paid press release on Cointelegraph freely, which they then used to distribute misleading statements to millions of users through Google news feeds.

Our revealing exposé of Arkham Intelligence (Case #2) was not reported on at all by the crypto press. The exposé has led to a defamation lawsuit being filed against Arkham and the New York Times, but this has only been reported on in the mainstream press by Politico . Today, DeFi and CeFi organizations once lauded unquestioningly by the crypto press have caused multi-billion dollar

losses to retail investors, and it is time to move on towards fairer plains. This is the only way our industry will ever reach maturity. We ask the crypto press to report objectively on this case investigation. The videos speak for themselves and tell a clear story that everyone in crypto needs to be aware of.

**Those being sued by Roche Freedman**
With the release of Crypto Leaks Case #3, those being sued by Roche Freedman know the true measure of their adversary. They should respond accordingly, and take the fight to the enemy. They should not settle. They must fight their corner and make their case. Together they can weaken their adversary, and can help make blockchain a better place.

Read other case investigations...



# EXHIBIT C

| Title | Duration | MD5 Hash |
|---|---|---|
| c3-00-office-ava-labs-launch | 25s 567ms | d8a25f99a9872efa521f88d4bffcd44c |
| c3-01-office-deal-for-perc-token-supply | 31s 156ms | 6ca0e6a8574be954aaf1ea9c65a68620 |
| c3-02-office-i-got-1-point-on-both | 28s 237 ms | a13c7c4006cf8dc8789b85d7e522736a |
| c3-03-office-one-third-of-what-kevin-got | 52s 886ms | b3292a3c5b88e76b2b78f1ff04756f5a |
| c3-04-office-same-interests-same-goals | 13s 972ms | 30a70c1c0fc54d223d8e58ab9f604eb4 |
| c3-05-office-litigation-is-a-strategic-instrument | 34s 576ms | 7c5eccc4a46e5779dae573d2c3d518b2 |
| c3-06-office-i-live-with-kevin-in-miami | 7s 299ms | d9a2450454a73731ade8ed82ab4de6c4 |
| c3-07-office-i-sue-crypto-companies-to-see-inside | 21s 63ms | 5cbf04c6beeab31b5a47f4a31b2482ce |
| c3-08-office-they-havent-been-sued-yet | 35s 369ms | e14ab12141216a6a11582abab93ad619 |
| c3-09-magnets-for-sec-and-competitive-attacks | 46s 129ms | 8a23574e38a9999b37ea472d5c9f8db6 |
| c3-10-office-theres-no-such-thing-as-regulation | 14s 389ms | a22632fb3d21fcf3b2f173bc512d3a1f |
| c3-11-troll-says-gun-member-feto | 32s 658ms | 303fd19d924b588212b0b1228d863973 |
| c3-12-gun-loses-his-shit | 20s 437ms | 55f417774f0f06566bc06954e4f21db8 |
| c3-13-gun-watches-video-once-a-month | 31s 490ms | 1bac5ddc08391c0d331031608a52f598 |
| c3-14-gun-goes-after-craig-wright | 23s 482ms | a46b684cdd45d6fc56eefb27826cc31c |
| c3-15-i-took-down-bsv | 1m 15s | 954dc280bbaf4c8f3c17095b4d83cca1 |
| c3-16-0-dfinity-is-a-competitor-to-avalanche | 13s 138 ms | 7d16e62c3d623ba474c20599aa66ce5b |
| c3-16-im-a-crazy-motherfucker | 49s 591ms | e97e8da64765ce73e4d41ebc4cb79382 |
| c3-17-i-can-sue-solana | 48s 924ms | 5616fa6716e43f65800be27c63fbade4 |
| c3-18-judges-and-juries-dont-understand-blockchain | 30s 697ms | b1956e0549f75b938f08acf6d0b9be78 |
| c3-19-show-me-your-cock | 31s 406ms | 5f5648ecc909a1b22030cc243b35f49f |
| c3-20-ten-idiots-control-the-flow | 29s 613ms | b72a096471a68a9e56df40fe62332254 |
| c3-21-no-reason-to-settle-less-than-500m | 17s 309ms | e68ebaa92c7bc63a4f71cf57dae4196c |
| c3-22-these-100000-idiots | 23s 565ms | 095c9db88c58866b39a52dd8c980aba0 |
| c3-23-litigation-is-the-most-uncorrelated-asset | 23s 774ms | 52469b62519bc8d04175c6f4d7166bfb |

# EXHIBIT D

# Text-based Editing of Talking-head Video

OHAD FRIED, Stanford University
AYUSH TEWARI, Max Planck Institute for Informatics
MICHAEL ZOLLHÖFER, Stanford University
ADAM FINKELSTEIN, Princeton University
ELI SHECHTMAN, Adobe
DAN B GOLDMAN
KYLE GENOVA, Princeton University
ZEYU JIN, Adobe
CHRISTIAN THEOBALT, Max Planck Institute for Informatics
MANEESH AGRAWALA, Stanford University



She sells ~~seashells~~ ice cream by the sea shore

Fig. 1. We propose a novel text-based editing approach for talking-head video. Given an edited transcript, our approach produces a realistic output video in which the dialogue of the speaker has been modified and the resulting video maintains a seamless audio-visual flow (i.e. no jump cuts).

Editing talking-head video to change the speech content or to remove filler words is challenging. We propose a novel method to edit talking-head video based on its transcript to produce a realistic output video in which the dialogue of the speaker has been modified, while maintaining a seamless audio-visual flow (i.e. no jump cuts). Our method automatically annotates an input talking-head video with phonemes, visemes, 3D face pose and geometry, reflectance, expression and scene illumination per frame. To edit a video, the user has to only edit the transcript, and an optimization strategy then chooses segments of the input corpus as base material. The annotated parameters corresponding to the selected segments are seamlessly stitched together and used to produce an intermediate video representation in which the lower half of the face is rendered with a parametric face model. Finally, a recurrent video generation network transforms this representation to a photorealistic video that matches the edited transcript. We demonstrate a large variety of edits, such as the addition, removal, and alteration of words, as well as convincing language translation and full sentence synthesis.

CCS Concepts: • **Information systems** → *Video search*; *Speech / audio search*; • **Computing methodologies** → *Computational photography*; *Reconstruction*; *Motion processing*; *Graphics systems and interfaces*.

Additional Key Words and Phrases: Text-based video editing, talking heads, visemes, dubbing, face tracking, face parameterization, neural rendering.

**ACM Reference Format:**
Ohad Fried, Ayush Tewari, Michael Zollhöfer, Adam Finkelstein, Eli Shechtman, Dan B Goldman, Kyle Genova, Zeyu Jin, Christian Theobalt, and Maneesh Agrawala. 2019. Text-based Editing of Talking-head Video. *ACM Trans. Graph.* 38, 4, Article 68 (July 2019), 14 pages. https://doi.org/10.1145/3306346.3323028

Authors' addresses: Ohad Fried, Stanford University; Ayush Tewari, Max Planck Institute for Informatics; Michael Zollhöfer, Stanford University; Adam Finkelstein, Princeton University; Eli Shechtman, Adobe; Dan B Goldman; Kyle Genova, Princeton University; Zeyu Jin, Adobe; Christian Theobalt, Max Planck Institute for Informatics; Maneesh Agrawala, Stanford University.

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. Copyrights for components of this work owned by others than the author(s) must be honored. Abstracting with credit is permitted. To copy otherwise, or republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee. Request permissions from permissions@acm.org.
© 2019 Copyright held by the owner/author(s). Publication rights licensed to ACM.
0730-0301/2019/7-ART68 $15.00
https://doi.org/10.1145/3306346.3323028

## 1 INTRODUCTION

Talking-head video – framed to focus on the face and upper body of a speaker – is ubiquitous in movies, TV shows, commercials, YouTube video logs, and online lectures. Editing such pre-recorded video is challenging, but can be needed to emphasize particular content, remove filler words, correct mistakes, or more generally match the editor's intent. Using current video editing tools, like Adobe Premiere, skilled editors typically scrub through raw video footage to find relevant segments and assemble them into the desired story. They must carefully consider where to place cuts so as to minimize disruptions to the overall audio-visual flow.

68:2 • Fried, O. et al

Berthouzoz et al. [2012] introduce a text-based approach for editing such videos. Given an input video, they obtain a time-aligned transcript and allow editors to cut and paste the text to assemble it into the desired story. Their approach can move or delete segments, while generating visually seamless transitions at cut boundaries. However, this method only produces artifact-free results when these boundaries are constrained to certain well-behaved segments of the video (e.g. where the person sits still between phrases or sentences).

Neither conventional editing tools nor the text-based approach allow synthesis of new audio-visual speech content. Thus, some modifications require either re-shooting the footage or overdubbing existing footage with new wording. Both methods are expensive as they require new performances, and overdubbing generally produces mismatches between the visible lip motion and the audio.

This paper presents a method that completes the suite of operations necessary for transcript-based editing of talking-head video. Specifically, based only on text edits, it can synthesize convincing new video of a person speaking, and produce seamless transitions even at challenging cut points such as the middle of an utterance.

Our approach builds on a thread of research for synthesizing realistic talking-head video. The seminal Video Rewrite system of Bregler et al. [1997] and the recent Synthesizing Obama project of Suwajanakorn et al. [2017] take new speech recordings as input, and superimpose the corresponding lip motion over talking-head video. While the latter state-of-the art approach can synthesize fairly accurate lip sync, it has been shown to work for exactly one talking head because it requires *huge* training data (14 hours). This method also relies on input audio from the same voice on which it was trained – from either Obama or a voice impersonator. In contrast our approach works from text and therefore supports applications that require a different voice, such as translation.

Performance-driven puppeteering and dubbing methods, such as VDub [Garrido et al. 2015], Face2Face [Thies et al. 2016] and Deep Video Portraits [Kim et al. 2018b], take a new talking-head performance (usually from a different performer) as input and transfer the lip and head motion to the original talking-head video. Because these methods have access to video as input they can often produce higher-quality synthesis results than the audio-only methods. Nevertheless, capturing new video for this purpose is obviously more onerous than typing new text.

Our method accepts text only as input for synthesis, yet builds on the Deep Video Portraits approach of Kim et al. [2018b] to craft synthetic video. Our approach drives a 3D model by seamlessly stitching different snippets of motion tracked from the original footage. The snippets are selected based on a dynamic programming optimization that searches for sequences of sounds in the transcript that should *look* like the words we want to synthesize, using a novel *viseme*-based similarity measure. These snippets can be re-timed to match the target viseme sequence, and are blended to create a seamless mouth motion. To synthesize output video, we first create a synthetic composite video in which the lower face region is masked out. In cases of inserting new text, we retime the rest of the face and background from the boundaries. The masked out region is composited with a synthetic 3D face model rendering using the mouth motion found earlier by optimization (Figure 5). The composite exhibits the desired motion, but lacks realism due to the incompleteness and

imperfections of the 3D face model. For example, facial appearance does not perfectly match, dynamic high-frequency detail is missing, and the mouth interior is absent. Nonetheless, these data are sufficient cues for a new learned recurrent video generation network to be able to convert them to realistic imagery. The new composite representation and the recurrent network formulation significantly extend the neural face translation approach of Kim et al. [2018b] to text-based editing of existing videos.

We show a variety of text-based editing results and favorable comparisons to previous techniques. In a crowd-sourced user study, our edits were rated to be real in 59.6% of cases. The main technical contributions of our approach are:

- A text-based editing tool for talking-head video that lets editors insert new text, in addition to cutting and copy-pasting in an existing transcript.
- A dynamic programming based strategy tailored to video synthesis that assembles new words based on snippets containing sequences of observed visemes in the input video.
- A parameter blending scheme that, when combined with our synthesis pipeline, produces seamless talking heads, even when combining snippets with different pose and expression.
- A recurrent video generation network that converts a composite of real background video and synthetically rendered lower face into a photorealistic video.

## 1.1 Ethical Considerations

Our text-based editing approach lays the foundation for better editing tools for movie post production. Filmed dialogue scenes often require re-timing or editing based on small script changes, which currently requires tedious manual work. Our editing technique also enables easy adaptation of audio-visual video content to specific target audiences: e.g., instruction videos can be fine-tuned to audiences of different backgrounds, or a storyteller video can be adapted to children of different age groups purely based on textual script edits. In short, our work was developed for storytelling purposes.

However, the availability of such technology — at a quality that some might find indistinguishable from source material — also raises important and valid concerns about the potential for misuse. Although methods for image and video manipulation are as old as the media themselves, the risks of abuse are heightened when applied to a mode of communication that is sometimes considered to be authoritative evidence of thoughts and intents. We acknowledge that bad actors might use such technologies to falsify personal statements and slander prominent individuals. We are concerned about such deception and misuse.

Therefore, we believe it is critical that video synthesized using our tool clearly presents itself as synthetic. The fact that the video is synthesized may be obvious by context (e.g. if the audience understands they are watching a fictional movie), directly stated in the video or signaled via watermarking. We also believe that it is essential to obtain permission from the performers for any alteration before sharing a resulting video with a broad audience. Finally, it is important that we as a community continue to develop forensics, fingerprinting and verification techniques (digital and non-digital) to identify manipulated video. Such safeguarding measures would

ACM Trans. Graph., Vol. 38, No. 4, Article 68. Publication date: July 2019.

reduce the potential for misuse while allowing creative uses of video editing technologies like ours.

We hope that publication of the technical details of such systems can spread awareness and knowledge regarding their inner workings, sparking and enabling associated research into the aforementioned forgery detection, watermarking and verification systems. Finally, we believe that a robust public conversation is necessary to create a set of appropriate regulations and laws that would balance the risks of misuse of these tools against the importance of creative, consensual use cases.

## 2   RELATED WORK

*Facial Reenactment.* Facial video reenactment has been an active area of research [Averbuch-Elor et al. 2017; Garrido et al. 2014; Kemelmacher-Shlizerman et al. 2010; Li et al. 2014; Liu et al. 2001; Suwajanakorn et al. 2017; Vlasic et al. 2005]. Thies et al. [2016] recently demonstrated real-time video reenactment. Deep video portraits [Kim et al. 2018b] enables full control of the head pose, expression, and eye gaze of a target actor based on recent advances in learning-based image-to-image translation [Isola et al. 2017]. Some recent approaches enable the synthesis of controllable facial animations from single images [Averbuch-Elor et al. 2017; Geng et al. 2018; Wiles et al. 2018]. Nagano et al. [2018] recently showed how to estimate a controllable avatar of a person from a single image. We employ a facial reenactment approach for visualizing our text-based editing results and show how facial reenactment can be tackled by neural face rendering.

*Visual Dubbing.* Facial reenactment is the basis for visual dubbing, since it allows to alter the expression of a target actor to match the motion of a dubbing actor that speaks in a different language. Some dubbing approaches are speech-driven [Bregler et al. 1997; Chang and Ezzat 2005; Ezzat et al. 2002; Liu and Ostermann 2011] others are performance-driven [Garrido et al. 2015]. Speech-driven approaches have been shown to produce accurate lip-synced video [Suwajanakorn et al. 2017]. While this approach can synthesize fairly accurate lip-synced video, it requires the new audio to sound similar to the original speaker, while we enable synthesis of new video using text-based edits. Mattheyses et al. [2010] show results with no head motion, in a controlled setup with uniform background. In contrast, our 3D based approach and neural renderer can produce subtle phenomena such as lip rolling, and works in a more general setting.

*Speech animation for rigged models.* Several related methods produce animation curves for speech [Edwards et al. 2016; Taylor et al. 2017; Zhou et al. 2018]. They are specifically designed for animated 3D models and not for photorealistic video, requiring a character rig and artist supplied rig correspondence. In contrast, our approach "animates" a real person speaking, based just on text and a monocular recording of the subject.

*Text-Based Video and Audio Editing.* Researchers have developed a variety of audio and video editing tools based on time-aligned transcripts. These tools allow editors to shorten and rearrange speech for audio podcasts [Rubin et al. 2013; Shin et al. 2016], annotate video with review feedback [Pavel et al. 2016], provide audio descriptions

of the video content for segmentation of B-roll footage [Truong et al. 2016] and generate structured summaries of lecture videos [Pavel et al. 2014]. Leake et al. [2017] use the structure imposed by time-aligned transcripts to automatically edit together multiple takes of a scripted scene based on higher-level cinematic idioms specified by the editor. Berthouzoz et al.'s [2012] tool for editing interview-style talking-head video by cutting, copying and pasting transcript text is closest to our work. While we similarly enable rearranging video by cutting, copying and pasting text, unlike all of the previous text-based editing tools, we allow synthesis of new video by simply typing the new text into the transcript.

*Audio Synthesis.* In transcript-based video editing, synthesizing new video clips would often naturally be accompanied by audio synthesis. Our approach to audio is independent of the audio, and therefore a variety of *text to speech* (TTS) methods can be used. Traditional TTS has explored two general approaches: *parametric methods* (e.g. [Zen et al. 2009]) generate acoustic features based on text, and then synthesize a waveform from these features. Due to oversimplified acoustic models, they tend to sound robotic. In contrast, *unit selection* is a data driven approach that constructs new waveforms by stitching together small pieces of audio (or *units*) found elsewhere in the transcript [Hunt and Black 1996]. Inspired by the latter, the VoCo project of Jin et al. [2017] performs a search in the existing recording to find short ranges of audio that can be stitched together such that they blend seamlessly in the context around an insertion point. Section 4 and the accompanying video present a few examples of using our method to synthesize new words in video, coupled with the use of VoCo to synthesize corresponding audio. Current state-of-the-art TTS approaches rely on deep learning [Shen et al. 2018; Van Den Oord et al. 2016]. However, these methods require a huge (tens of hours) training corpus for the target speaker.

*Deep Generative Models.* Very recently, researchers have proposed *Deep Generative Adversarial Networks (GANs)* for the synthesis of images and videos. Approaches create new images from scratch [Chen and Koltun 2017; Goodfellow et al. 2014; Karras et al. 2018; Radford et al. 2016; Wang et al. 2018b] or condition the synthesis on an input image [Isola et al. 2017; Mirza and Osindero 2014]. High-resolution conditional video synthesis [Wang et al. 2018a] has recently been demonstrated. Besides approaches that require a paired training corpus, unpaired video-to-video translation techniques [Bansal et al. 2018] only require two training videos. Video-to-video translation has been used in many applications. For example, impressive results have been shown for the reenactment of the human head [Olszewski et al. 2017], head and upper body [Kim et al. 2018b], and the whole human body [Chan et al. 2018; Liu et al. 2018].

*Monocular 3D Face Reconstruction.* There is a large body of work on reconstructing facial geometry and appearance from a single image using optimization methods [Fyffe et al. 2014; Garrido et al. 2016; Ichim et al. 2015; Kemelmacher-Shlizerman 2013; Roth et al. 2017; Shi et al. 2014; Suwajanakorn et al. 2017; Thies et al. 2016]. Many of these techniques employ a parametric face model [Blanz et al. 2004; Blanz and Vetter 1999; Booth et al. 2018] as a prior to better constrain the reconstruction problem. Recently, deep learning-based approaches have been proposed that train a convolutional network

68:4 • Fried, O. et al



Fig. 2. Method overview. Given an input talking-head video and a transcript, we perform text-based editing. We first align phonemes to the input audio and track each input frame to construct a parametric head model. Then, for a given edit operation (changing *spider* to *fox*), we find segments of the input video that have similar visemes to the new word. In the above case we use ***viper*** and ***ox*** to construct *fox*. We use blended head parameters from the corresponding video frames, together with a retimed background sequence, to generate a composite image, which is used to generate a photorealistic frame using our neural face rendering method. In the resulting video, the actress appears to be saying *fox*, even though that word was never spoken by her in the original recording.

to directly regress the model parameters [Dou et al. 2017; Genova et al. 2018; Richardson et al. 2016; Tewari et al. 2018a, 2017; Tran et al. 2017]. Besides model parameters, other approaches regress detailed depth maps [Richardson et al. 2017; Sela et al. 2017], or 3D displacements [Cao et al. 2015; Guo et al. 2018; Tewari et al. 2018b]. Face reconstruction is the basis for a large variety of applications, such as facial reenactment and visual dubbing. For more details on monocular 3D face reconstruction, we refer to Zollhöfer et al. [2018].

## 3 METHOD

Our system takes as input a video recording of a talking head with a transcript of the speech and any number of edit operations specified on the transcript. Our tool supports three types of edit operations;

- **Add new words:** the edit adds one or more consecutive words at a point in the video (e.g. because the actor skipped a word or the producer wants to insert a phrase).
- **Rearrange existing words:** the edit moves one or more consecutive words that exist in the video (e.g. for better word ordering without introducing jump cuts).
- **Delete existing words:** the edit removes one or more consecutive words from the video (e.g. for simplification of wording and removing filler such as "um" or "uh").

We represent editing operations by the sequence of words $\mathcal{W}$ in the edited region as well as the correspondence between those words and the original transcript. For example, deleting the word "wonderful" in the sequence "hello wonderful world" is specified as ('hello', 'world') and adding the word "big" is specified as ('hello', 'big', 'world').

Our system processes these inputs in five main stages (Figure 2). In the phoneme alignment stage (Section 3.1) we align the transcript to the video at the level of phonemes and then in the tracking and reconstruction stage (Section 3.2) we register a 3D parametric head model with the video. These are pre-processing steps performed once per input video. Then for each edit operation $\mathcal{W}$ we first

perform a viseme search (Section 3.3) to find the best visual match between the subsequences of phonemes in the edit and subsequences of phonemes in the input video. We also extract a region around the edit location to act as a background sequence, from which we will extract background pixels and pose data. For each subsequence we blend the parameters of the tracked 3D head model (Section 3.4) and then use the resulting parameter blended animation of the 3D head, together with the background pixels, to render a realistic full-frame video (Section 3.5) in which the subject appears to say the edited sequence of words. Our viseme search and approach for combining shorter subsequences with parameter blending is motivated by the phoneme/viseme distribution of the English language (Appendix A).

### 3.1 Phoneme Alignment

Phonemes are perceptually distinct units that distinguish one word from another in a specific language. Our method relies on phonemes to find snippets in the video that we later combine to produce new content. Thus, our first step is to compute the *identity* and *timing* of phonemes in the input video. To segment the video's speech audio into phonemes (audible realizations of phonemes), we assume we have an accurate text transcript and align it to the audio using P2FA [Rubin et al. 2013; Yuan and Liberman 2008], a phoneme-based alignment tool. This gives us an ordered sequence $V = (v_1, \ldots, v_n)$ of phonemes, each with a label denoting the phoneme name, start time, and end time $v_i = (v_i^{lbl}, v_i^{in}, v_i^{out})$. Note that if a transcript is not given as part of the input, we can use automatic speech transcription tools [IBM 2016; Ochshorn and Hawkins 2016] or crowdsourcing transcription services like rev.com to obtain it.

### 3.2 3D Face Tracking and Reconstruction

We register a 3D parametric face model with each frame of the input talking-head video. The parameters of the model (e.g. expression, head pose, etc.) will later allow us to selectively blend different aspects of the face (e.g. take the expression from one frame and pose

from another). Specifically, we apply recent work on monocular model-based face reconstruction [Garrido et al. 2016; Thies et al. 2016]. These techniques parameterize the rigid head pose $T \in SE(3)$, the facial geometry $\alpha \in \mathbb{R}^{80}$, facial reflectance $\beta \in \mathbb{R}^{80}$, facial expression $\delta \in \mathbb{R}^{64}$, and scene illumination $\gamma \in \mathbb{R}^{27}$. Model fitting is based on the minimization of a non-linear reconstruction energy. For more details on the minimization, please see the papers of Garrido et al. [2016] and Thies et al. [2016]. In total, we obtain a 257 parameter vector $p \in \mathbb{R}^{257}$ for each frame of the input video.

## 3.3 Viseme Search

Given an edit operation specified as a sequence of words $\mathcal{W}$, our goal is to find matching sequences of phonemes in the video that can be combined to produce $\mathcal{W}$. In the matching procedure we use the fact that identical phonemes are expected to be, on average, more visually similar to each other than non-identical phonemes (despite co-articulation effects). We similarly consider visemes, groups of aurally distinct phonemes that appear visually similar to one another (Section 3.3), as good potential matches. Importantly, the matching procedure *cannot* expect to find a good coherent viseme sequence in the video for long words or sequences in the edit operation. Instead, we must find several matching subsequences and a way to best combine them.

We first convert the edit operation $\mathcal{W}$ to a phoneme sequence $W = (w_1, \ldots, w_m)$ where each $w_i$ is defined as $(w_i^{lbl}, w_i^{in}, w_i^{out})$ similar to our definition of phonemes in the video $v_i$. We can convert the text $\mathcal{W}$ to phoneme labels $w_i^{lbl}$ using a word to phoneme map, but text does not contain timing information $w_i^{in}, w_i^{out}$. To obtain timings we use a text-to-speech synthesizer to convert the edit into speech. For all results in this paper we use either the built-in speech synthesizer in Mac OS X, or Voco [Jin et al. 2017]. Note however that our video synthesis pipeline does not use the audio *signal*, but only its *timing*. So, e.g., manually specified phone lengths could be used as an alternative. The video generated in the rendering stage of our pipeline (Section 3.5) is mute and we discuss how we can add audio at the end of that section. Given the audio of $\mathcal{W}$, we produce phoneme labels and timing using P2FA, in a manner similar to the one we used in Section 3.1.

Given an edit W and the video phonemes V, we are looking for the optimal partition of W into sequential subsequences $W_1, \ldots, W_k$, such that each subsequence has a good match in V, while encouraging subsequences to be long (Figure 4). We are looking for long subsequences because each transition between subsequences may cause artifacts in later stages. We first describe matching one subsequence $W_i = (w_j, \ldots, w_{j+k})$ to the recording V, and then explain how we match the full query W.

*Matching one subsequence.* We define $C_{match}(W_i, V_\star)$ between a subsequence of the query $W_i$ and some subsequence of the video V $V_\star$ as a modified Levenshtein edit distance [Levenshtein 1966] between phoneme sequences that takes phoneme length into account. The edit distance requires pre-defined costs for insertion, deletion and swap. We define our insertion cost $C_{insert} = 1$ and deletion cost $C_{delete} = 1$ and consider viseme and phoneme labels as well as

Table 1.  Grouping phonemes (listed as ARPABET codes) into visemes. We use the viseme grouping of Annosoft's lipsync tool [Annosoft 2008]. More viseme groups may lead to better visual matches (each group is more specific in its appearance), but require more data because the chance to find a viseme match decreases. We did not perform an extensive evaluation of different viseme groupings, of which there are many.

| | | | |
|---|---|---|---|
| v01 | AA0, AA1, AA2 | v09 | Y, IY0, IY1, IY2 |
| v02 | AH0, AH1, AH2, HH | v10 | R, ER0, ER1, ER2 |
| v03 | AO0, AO1, AO2 | v11 | L |
| v04 | AW0, AW1, AW2, OW0, OW1, OW2 | v12 | W |
| v05 | OY0, OY1, OY2, UH0, UH1, UH2, UW0, UW1, UW2 | v13 | M, P, B |
| v06 | EH0, EH1, EH2, AE0, AE1, AE2 | v14 | N, NG, DH, D, G, T, Z, ZH, TH, K, S |
| v07 | IH0, IH1, IH2, AY0, AY1, AY2 | v15 | CH, JH, SH |
| v08 | EY0, EY1, EY2 | v16 | F, V |
| | | v17 | sp |

phoneme lengths in our swap cost

$$C_{swap}(v_i, w_j) = C_{vis}(v_i, w_j)(|v_i| + |w_j|) + \chi ||v_i| - |w_j|| \quad (1)$$

where $|a|$ denotes the length of phoneme $a$, $C_{vis}(v_i, w_j)$ is 0 if $v_i$ and $w_j$ are the same phoneme, 0.5 if they are different phonemes but the same viseme (Section 3.3), and 1 if they are different visemes. The parameter $\chi$ controls the influence of length difference on the cost, and we set it to $10^{-4}$ in all our examples. Equation (1) penalized for different phonemes and visemes, weighted by the sum of the phoneme length. Thus longer non-matching phonemes will incur a larger penalty, as they are more likely to be noticed.

We minimize $C_{match}(W_i, V)$ over all possible $V_\star$ using dynamic programming [Levenshtein 1966] to find the best suffix of any prefix of V and its matching cost to $W_i$. We brute-force all possible prefixes of V to find the best match $V_i$ to the query $W_i$.

*Matching the full query.* We define our full matching cost $C$ between the query W and the video V as

$$C(W, V) = \min_{\substack{(W_1, \ldots, W_k) \in \text{split}(W) \\ (V_1, \ldots, V_k)}} \sum_{i=1}^{k} C_{match}(W_i, V_i) + C_{len}(W_i) \quad (2)$$

where split(W) denotes the set of all possible ways of splitting W into subsequences, and $V_i$ is the best match for $W_i$ according to $C_{match}$. The cost $C_{len}(W_i)$ penalizes short subsequences and is defined as

$$C_{len}(W_i) = \frac{\phi}{|W_i|} \quad (3)$$

where $|W_i|$ denotes the number of phonemes in subsequence $W_i$ and $\phi$ is a weight parameter empirically set to 0.001 for all our examples. To minimize Equation (2) we generate all splits $(W_1, \ldots, W_k) \in$ split(W) of the query (which is typically short), and for each $W_i$ we find the best subsequence $V_i$ of V with respect to $C_{match}$. Since the same subsequence $W_i$ can appear in multiple partitions, we memoize computations to make sure each match cost is computed only once. The viseme search procedure produces subsequences $(V_1, \ldots, V_k)$ of the input video that, when combined, should produce W.



Fig. 3. Our parameter blending strategy produces a seamless synthesized result from choppy original sequences. Above, we insert the expression "french toast" instead of "napalm" in the sentence "I like the smell of napalm in the morning." The new sequence was taken from different parts of the original video: F R EH1 taken from "fresh", N CH T taken from "drenched", and OW1 S T taken from "roast". Notice how original frames from different sub-sequences are different in head size and posture, while our synthesized result is a smooth sequence. On the right we show the pixel difference between blue and red frames; notice how blue frames are very different. *Videos in supplemental material.*



Fig. 4. Viseme search and retiming. Given a query sequence W, We split it into all possible subsequences, of which one $(W_1, W_2) \in$ split(W) is shown. Each subsequence is matched to the input video V, producing a correspondance between query phonemes $w_i$ and input video phonemes $v_i$. We retime in parameter space to match the lengths of each $v_i$ to $w_i$.

### 3.4 Parameter Retiming & Blending

The sequence $(V_1, \ldots, V_k)$ of video subsequences describes sections of the video for us to combine in order to create $\mathcal{W}$. However, we cannot directly use the video frames that correspond to $(V_1, \ldots, V_k)$ for two reasons: (1) A sequence $V_i$ corresponds to part of $\mathcal{W}$ in viseme identity, but not in viseme length, which will produce unnatural videos when combined with the speech audio, and (2) Consecutive sequences $V_i$ and $V_{i+1}$ can be from sections that are far apart in the original video. The subject might look different in these parts due to pose and posture changes, movement of hair, or camera motion. Taken as-is, the transition between consecutive sequences will look unnatural (Figure 3 top).

To solve these issues, we use our parametric face model in order to mix different properties (pose, expression, etc.) from different input frames, and blend them in parameter space. We also select a

background sequence $\mathcal{B}$ and use it for pose data and background pixels. The background sequence allows us to edit challenging videos with hair movement and slight camera motion.

*Background retiming and pose extraction.* An edit operation $\mathcal{W}$ will often change the length of the original video. We take a video sequence (from the input video) $\mathcal{B}'$ around the location of the edit operation, and retime it to account for the change in length the operation will produce, resulting in a retimed background sequence $\mathcal{B}$. We use nearest-neighbor sampling of frames, and select a large enough region around the edit operation so that retiming artifacts are negligible. All edits in this paper use the length of one sentence as background. The retimed sequence $\mathcal{B}$ does not match the original nor the new audio, but can provide realistic background pixels and pose parameters that seamlessly blend into the rest of the video. In a later step we synthesize frames based on the retimed background and expression parameters that *do* match the audio.

*Subsequence retiming.* The phonemes in each sequence $v_j \in V_i$ approximately match the length of corresponding query phonemes, but an exact match is required so that the audio and video will be properly synchronized. We set a desired frame rate $\mathcal{F}$ for our synthesized video, which often matches the input frame-rate, but does not have to (e.g. to produce slow-mo video from standard video). Given the frame rate $\mathcal{F}$, we sample model parameters $\mathbf{p} \in \mathbb{R}^{257}$ by linearly interpolating adjacent frame parameters described in Section 3.2. For each $v_j \in V_i$ we sample $\mathcal{F} \mid w_j \mid$ frame parameters in $[v_j^{in}, v_j^{out}]$ so that the length of the generated video matches the length of the query $\mid w_j \mid$. This produces a sequence that matches $\mathcal{W}$ in timing, but with visible jump cuts between sequences if rendered as-is (Figure 4 bottom).

*Parameter blending.* To avoid jump cuts, we use different strategies for different parameters, as follows. Identity geometry $\boldsymbol{\alpha} \in \mathbb{R}^{80}$ and reflectance $\boldsymbol{\beta} \in \mathbb{R}^{80}$ are kept constant throughout the sequence



(a) Ground Truth ($\mathbf{f}_i$)   (b) Face & Mouth   (c) Synth. Comp. ($\mathbf{r}_i$)

Fig. 5. Training Corpus: For each ground truth frame $\mathbf{f}_i$ (a), we obtain a 3D face reconstruction. The reconstructed geometry proxy is used to mask out the lower face region (b, left) and render a mouth mask $\mathbf{m}_i$ (b, right), which is used in our training reconstruction loss. We superimpose the lower face region from the parametric face model to obtain a synthetic composite $\mathbf{r}_i$ (c). The goal of our expression-guided neural renderer is to learn a mapping from the synthetic composite $\mathbf{r}_i$ back to the ground truth frame $\mathbf{f}_i$.

(it's always the same person), so they do not require blending. Scene illumination $\gamma \in \mathbb{R}^{27}$ typically changes slowly or is kept constant, thus we linearly interpolate illumination parameters between the last frame prior to the inserted sequence and the first frame after the sequence, disregarding the original illumination parameters of $V_i$. This produces a realistic result while avoiding light flickering for input videos with changing lights. Rigid head pose $\mathbf{T} \in SE(3)$ is taken directly from the retimed background sequence $\mathcal{B}$. This ensures that the pose of the parameterized head model matches the background pixels in each frame.

Facial expressions $\boldsymbol{\delta} \in \mathbb{R}^{64}$ are the most important parameters for our task, as they hold information about mouth and face movement — the visemes we aim to reproduce. Our goal is to preserve the retrieved expression parameters as much as possible, while smoothing out the transition between them. Our approach is to smooth out each transition from $V_i$ to $V_{i+1}$ by linearly interpolating a region of 67 milliseconds around the transition. We found this length to be short enough so that individual visemes are not lost, and long enough to produce convincing transitions between visemes.

### 3.5 Neural Face Rendering

We employ a novel neural face rendering approach for synthesizing photo-realistic talking-head video that matches the modified parameter sequence (Section 3.4). The output of the previous processing step is an edited parameter sequence that describes the new desired facial motion and a corresponding retimed background video clip. The goal of this synthesis step is to change the facial motion of the retimed background video to match the parameter sequence. To this end, we first mask out the lower face region, including parts of the neck (for the mask see Figure 5b), in the retimed background video and render a new synthetic lower face with the desired facial expression on top. This results in a video of *composites* $\mathbf{r}_i$ (Figure 5d). Finally, we bridge the domain gap between $\mathbf{r}_i$ and real video footage of the person using our neural face rendering approach, which is based on recent advances in learning-based image-to-image translation [Isola et al. 2017; Sun et al. 2018].

#### 3.5.1 Training the Neural Face Renderer. To train our neural face rendering approach to bridge the domain gap we start from a paired



Fig. 6. We assume the video has been generated by a sequential process, which we model by a recurrent network with shared generator $\mathcal{G}$. In practice, we unroll the loop three times.

Fig. 7. We employ a spatial discriminator $\mathcal{D}_s$, a temporal discriminator $\mathcal{D}_t$, and an adversarial patch-based discriminator loss to train our neural face rendering network.

training corpus $\mathcal{T} = \{(\mathbf{f}_i, \mathbf{r}_i)\}_{i=1}^{N}$ that consists of the $N$ original video frames $\mathbf{f}_i$ and corresponding synthetic composites $\mathbf{r}_i$. The $\mathbf{r}_i$ are generated as described in the last paragraph, but using the ground truth tracking information of the corresponding frame (Figure 5), instead of the edited sequence, to render the lower face region. The goal is to learn a temporally stable video-to-video mapping (from $\mathbf{r}_i$ to $\mathbf{f}_i$) using a recurrent neural network (RNN) that is trained in an adversarial manner. We train one person-specific network per input video. Inspired by the video-to-video synthesis work of Wang et al. [2018a], our approach assumes that the video frames have been generated by a sequential process, i.e., the generation of a video frame depends only on the history of previous frames (Figure 6). In practice, we use a temporal history of size $L = 2$ in all experiments, so the face rendering RNN looks at $L + 1 = 3$ frames at the same time. The best face renderer $\mathcal{G}^*$ is found by solving the following optimization problem:

$$\mathcal{G}^* = \arg\min_{\mathcal{G}} \max_{\mathcal{D}_s, \mathcal{D}_t} \mathcal{L}(\mathcal{G}, \mathcal{D}_s, \mathcal{D}_t) \ . \qquad (4)$$

Here, $\mathcal{D}_s$ is a per-frame spatial patch-based discriminator [Isola et al. 2017], and $\mathcal{D}_t$ is a temporal patch-based discriminator. We train the recurrent generator and the spatial and temporal discriminator of our GAN in an adversarial manner, see Figure 7. In the following, we describe our training objective $\mathcal{L}$ and the network components in more detail.

*Training Objective.* For training our recurrent neural face rendering network, we employ stochastic gradient decent to optimize the following training objective:

$$\mathcal{L}(\mathcal{G}, \mathcal{D}_s, \mathcal{D}_t) = \mathbb{E}_{(\mathbf{f}_i, \mathbf{r}_i)} \big[ \mathcal{L}_r(\mathcal{G}) + \lambda_s \mathcal{L}_s(\mathcal{G}, \mathcal{D}_s) + \lambda_t \mathcal{L}_t(\mathcal{G}, \mathcal{D}_t) \big] \ . \qquad (5)$$

68:8 • Fried, O. et al

Here, $\mathcal{L}_r$ is a photometric reconstruction loss, $\mathcal{L}_s$ is a per-frame spatial adversarial loss, and $\mathcal{L}_t$ is our novel adversarial temporal consistency loss that is based on difference images. Let $\mathbf{f}_{i-L}^i$ denote the tensor of video frames from frame $\mathbf{f}_{i-L}$ to the current frame $\mathbf{f}_i$. The corresponding tensor of synthetic composites $\mathbf{r}_{i-L}^i$ is defined in a similar way. For each of the $L + 1$ time steps, we employ an $\ell_1$-loss to enforce the photometric reconstruction of the ground truth:

$$\mathcal{L}_r(\mathcal{G}) = \sum_{l=0}^{L} \left\| m_{i-L+l} \otimes (\mathbf{f}_{i-L+l} - \mathcal{G}(\mathbf{c}_{i,l})) \right\|_1 ,$$

$$\text{with } \mathbf{c}_{i,l} = (\mathbf{r}_{i-L}^{i-L+l}, \mathbf{o}_{i-L}^{L+l-1}) . \qquad (6)$$

Here, the $\mathbf{c}_{i,l}$ are the generator inputs for the current frame $i$ and time step $l$, with $\mathbf{o}_{i-L}^{i-L+l-1}$ being the tensor of output frames for the previous time steps. $\otimes$ is the Hadamard product and $m_{i-L+l}$ is a mouth re-weighting mask that gives a higher weight to photometric errors in the mouth region (Figure 5). The mask is 1 away from the mouth, 10 for the mouth region, and has a smooth transition in between. Note the same generator $\mathcal{G}$ is shared across all time steps. For each time step, missing outputs of non existent previous frames (we only unroll 3 steps) and network inputs that are in the future are replaced by zeros (Figure 6). In addition to the reconstruction loss, we also enforce a separate patch-based adversarial loss for each frame:

$$\mathcal{L}_s(\mathcal{G}, \mathcal{D}_s) = \sum_{l=0}^{L} \Big[ \log(\mathcal{D}_s(\mathbf{r}_{i-L+l}, \mathbf{f}_{i-L+l}))$$

$$+ \log(1 - \mathcal{D}_s(\mathbf{r}_{i-L+l}, \mathcal{G}(\mathbf{c}_{i,l}))) \Big] . \qquad (7)$$

Note there exists only one discriminator network $\mathcal{D}_s$, which is shared across all time steps. We also employ an adversarial temporal consistency loss based on difference images [Martin-Brualla et al. 2018]:

$$\mathcal{L}_t(\mathcal{G}, \mathcal{D}_t) = \log(\mathcal{D}_t(r_{i-L}^i, \Delta_{i,l}(\mathbf{f}))) + \log(1 - \mathcal{D}_t(r_{i-L}^i, \Delta_{i,l}(\mathbf{o}))) . \qquad (8)$$

Here, $\Delta_{i,l}(\mathbf{f})$ is the ground truth tensor and $\Delta_{i,l}(\mathbf{o})$ the tensor of synthesized difference images. The operator $\Delta(\bullet)$ takes the difference of subsequent frames in the sequence:

$$\Delta_{i,l}(\mathbf{x}) = \mathbf{x}_{i-L+1}^i - \mathbf{x}_{i-L}^{i-1} . \qquad (9)$$

*Network Architecture.* For the neural face rendering network, we employ an encoder-decoder network with skip connections that is based on U-Net [Ronneberger et al. 2015]. Our spatial and temporal discriminators are inspired by Isola et al. [2017] and Wang et al. [2018a]. Our network has 75 million trainable parameters. All subnetworks ($\mathcal{G}, \mathcal{D}_s, \mathcal{D}_t$) are trained from scratch, i.e., starting from random initialization. We alternate between the minimization to train $\mathcal{G}$ and the maximization to train $\mathcal{D}_s$ as well as $\mathcal{D}_t$. In each iteration step, we perform both the minimization as well as the maximization on the same data, i.e., the gradients with respect to the generator and discriminators are computed on the same batch of images. We do not add any additional weighting between the gradients with respect to the generator and discriminators as done in Isola et al. [2017]. The rest of the training procedure follows Isola et al. [2017]. For more architecture details, see Supplemental W13.

Table 2. Input sequences. We recorded three sequences, each about 1 hour long. The sequences contain ground truth sentences and test sentences we edit, and also the first 500 sentences from the TIMIT dataset. We also downloaded a 1.5 hour long interview from YouTube that contains camera and hand motion, and an erroneous transcript. Seq2 and Seq3 are both 60fps. Seq1 was recorded at 240fps, but since our method produces reasonable results with lower frame rates, we discarded frames and effectively used 60fps. Seq4 is 25fps, and still produces good results.

| | Source | Transcript | Length |
|---|---|---|---|
| Seq1 | Our recording | Manually verified | ~1 hour |
| Seq2 | Our recording | Manually verified | ~1 hour |
| Seq3 | Our recording | Manually verified | ~1 hour |
| Seq4 | YouTube | Automatic (has errors) | ~1.5 hours |

The rendering procedure produces photo-realistic video frames of the subject, appearing to speak the new phrase $W$. These localized edits seamlessly blend into the original video, producing an edited result, all derived from text.

*Adding Audio.* The video produced by our pipeline is mute. To add audio we use audio synthesized either by the built in speech synthesizer in Mac OS X, or by VoCo [Jin et al. 2017]. An alternative is to obtain an actual recording of the performer's voice. In this scenario, we retime the resulting video to match the recording at the level of phones. Unless noted otherwise, all of our synthesis results presented in the performer's own voice are generated using this latter method. Note that for move and delete edits we use the performer's voice from the original video.

## 4   RESULTS

We show results for our full approach on a variety of videos, both recorded by ourselves and downloaded from YouTube (Section 4). We encourage the reader to view video results (with audio) in the supplemental video and website, since our results are hard to evaluate from static frames.

*Runtime Performance.* 3D face reconstruction takes 110ms per frame. Phoneme alignment takes 20 minutes for a 1 hour speech video. Network training takes 42 hours. We train for 600K iteration steps with a batch size of 1. Viseme search depends on the size of the input video and the new edit. For a 1 hour recording with continuous speech, viseme search takes between 10 minutes and 2 hours for all word insertion operations in this paper. Neural face rendering takes 132ms per frame. All other steps of our pipeline incur a negligible time penalty.

### 4.1   Video Editing

Our main application is text-based editing of talking-head video. We support moving and deleting phrases, and the more challenging task of adding new unspoken words. A few examples of replacing one or more words by unspoken word(s) are shown in Figure 1 and Figure 9. Our approach produces photo-realistic results with good audio to video alignment and a photo-realistic mouth interior including highly detailed teeth (Figure 10). For more examples of adding new words, and results for moves and deletes we refer to the supplemental video and Supplemental W1–W4.



Fig. 8. Comparison of different neural face rendering backends: We compare the output of our approach with a baseline that is trained based on input data as proposed in Deep Video Portraits (DVP) [Kim et al. 2018b]. DVP does not condition on the background and thus cannot handle dynamic background. In addition, this alternative approach fails if parts of the foreground move independently of the head, e.g., the hands. Our approach explicitly conditions on the background and can thus handle these challenging cases with ease. In addition, our approach only has to spend capacity in the mouth region (we also re-weight the reconstruction loss based on a mouth mask), thus our approach gives much sharper higher quality results. *Video credit (middle): The Mind of The Universe.*



Fig. 9. Our approach enables a large variety of text-based edits, such as deleting, rearranging, and adding new words. Here, we show examples of the most challenging of the three scenarios, adding one or more unspoken words. As can be seen, our approach obtains high quality reenactments of the new words based on our neural face rendering approach that converts synthetic composites into photo-real imagery. For video results we refer to the supplemental.

Our approach enables us to seamlessly re-compose the modified video segments into the original full frame video footage, and to seamlessly blend new segments into the original (longer) video. Thus our approach can handle arbitrarily framed footage, and is agnostic to the resolution and aspect ratio of the input video. It also enables localized edits (i.e. using less computation) that do not alter most of the original video and can be incorporated in a standard editing pipeline. Seamless composition is made possible by our neural face rendering strategy that conditions video generation on the original background video. This approach allows us to accurately reproduce the body motion and scene background (Figure 11). Other neural rendering approaches, such as Deep Video Portraits [Kim et al. 2018b] do not condition on the background, and thus cannot guarantee that the body is synthesized at the right location in the frame.

### 4.2 Translation

Besides text-based edits, such as adding, rearranging, and deleting words, our approach can also be used for video translation, as long as the source material contains similar visemes to the target language. Our viseme search pipeline is language agnostic. In order to support a new language, we only require a way to convert words into individual phonemes, which is already available for many languages. We show results in which an English speaker appears to speak German (Supplemental W5).

### 4.3 Full Sentence Synthesis Using Synthetic Voice

With the rise of voice assistants like Alexa, Siri and the Google Assistant, consumers have been getting comfortable with voice-based interactions. We can use our approach to deliver corresponding video. Given a video recording of an actor who wishes to serve as the face of the assistant, our tool could be used to produce the video for any utterance such an assistant might make. We show results of full sentence synthesis using the native Mac OS voice synthesizer



Fig. 10. Our approach synthesizes the non-rigid motion of the lips at high quality (even lip rolling is captured) given only a coarse computer graphics rendering as input. In addition, our approach synthesizes a photorealistic mouth interior including highly detailed teeth. The synthesis results are temporally coherent, as can be seen in the supplemental video.



Fig. 11. Our approach enables us to seamlessly compose the modified segments back into the original full frame input video sequence, both spatially as well as temporally. We do this by explicitly conditioning video generation on the re-timed background video.

(Supplemental W7). Our system could also be used to easily create instruction videos with more fine-grained content adaptation for different target audiences, or to create variants of storytelling videos that are tailored to specific age groups.

## 5  EVALUATION, ANALYSIS & COMPARISONS

To evaluate our approach we have analyzed the content and size of the input video data needed to produce good results and we have compared our approach to alternative talking-head video synthesis techniques.

### 5.1  Size of Input Video

We performed a qualitative study on the amount of data required for phoneme retrieval. To this end, we iteratively reduced the size of the used training video. We tested our retrieval approach with 5%, 10%, 50%, and 100% of the training data (Supplemental W8). More data leads in general to better performance and visually more pleasing results, but the quality of the results degrade gracefully with the amount of used data. Best results are obtained with the full dataset.

We also evaluate the amount of training data required for our neural face renderer. Using seq4 (our most challenging sequence),



Fig. 12. Evaluation of Parameter Blending: Without our parameter blending strategy, the editing results are temporally unstable. In this example, the mouth unnaturally closes instantly between two frames without blending, while it closes smoothly with our blending approach.

we test a self-reenactment scenario in which we compare the input frames to our result with varying training data size. We obtain errors (mean RMSE per-image) of 0.018 using 100%, 0.019 using 50% and 0.021 using only 5% of the data (R,G,B ∈ [0, 1]). This result suggests that our neural renderer requires less data than our viseme retrieval pipeline, allowing us to perform certain edits (e.g., deletion) on shorter videos.

### 5.2  Size of Edit

We tested our system with various synthesized phrases. We randomly select from a list of "things that smell" and synthesize the phrases into the sentence "I love the smell of X in the morning" (Supplemental W11). We found that phrase length does not directly correlate with result quality. Other factors, such as the visemes that comprise the phrase and phoneme alignment quality influence the final result.

### 5.3  Evaluation of Parameter Space Blending

We evaluate the necessity of our parameter blending strategy by comparing our approach to a version without the parameter blending (Figure 12 and Supplemental W12). Without our parameter space blending strategy the results are temporally unstable.

### 5.4  Comparison to MorphCut

*MorphCut* is a tool in Adobe Premiere Pro that is designed to remove jump cuts in talking-head videos, such as those introduced by moving or deleting words. It is based on the approach of Berthouzoz et al. [2012], requires the performer to be relatively still in the video and cannot synthesize new words. In Figure 13, we compare our approach to MorphCut in the word deletion scenario and find that our approach is able to successfully remove the jump cut, while MorphCut fails due to the motion of the head.

We also tried to apply MorphCut to the problem of word addition. To this end, we first applied our phoneme/viseme retrieval pipeline to select suitable frames to compose a new word. Afterwards, we tried to remove the jump cuts between the different phoneme subsequences with MorphCut (Figure 14). While our approach with



Fig. 13. We compare our approach in the word deletion scenario to *MorphCut*. MorphCut fails on the second, third, and forth frames shown here while our approach is able to successfully remove the jump cut. *Video credit: The Mind of The Universe.*



Fig. 14. We tried to stitch retrieved viseme sequences with MorphCut to generate a new word. While our approach with the parameter space blending strategy is able to generate a seamless transition, MorphCut produces a big jump of the head between the two frames.

parameter space blending is able to generate seamless transitions, MorphCut produces big jumps and can not smooth them out.

### 5.5  Comparison to Facial Reenactment Techniques

We compare our facial reenactment backend with a baseline approach that is trained based on the input data as proposed in Deep Video Portraits [Kim et al. 2018b] (Figure 8). For a fair comparison, we trained our recurrent generator network (including the temporal GAN loss, but without our mouth re-weighting mask) with Deep Video Portraits style input data (diffuse rendering, uv-map, and eye conditioning) and try to regress a realistic output video. Compared to Deep Video Portraits [Kim et al. 2018b], our approach synthesizes a more detailed mouth region, handles dynamic foregrounds well, such as for example moving hands and arms, and can better handle dynamic background. We attribute this to our mouth re-weighting mask and explicitly conditioning on the original background and body, which simplifies the learning task, and frees up capacity in the network. Deep Video Portraits struggles with any form of motion that is not directly correlated to the head, since the head motion is the only input in their technique. We refer to the supplemental video for more results.

We also compare our approach to Face2Face [Thies et al. 2016], see Figure 15. Our neural face rendering approach can better handle the



Fig. 15. Comparison to the Face2Face [Thies et al. 2016] facial reenactment approach. Our approach produces high quality results, while the retrieval-based Face2Face approach exhibits ghosting artifacts and is temporally unstable. We refer to the supplemental video for more results.

complex articulated motion of lips, e.g., lip rolling, and synthesizes a more realistic mouth interior. The Face2Face results show ghosting artifacts and are temporally unstable, while our approach produces temporally coherent output. We refer to the supplemental video for more results.

### 5.6  Ablation Study

We also performed an ablation study to evaluate the new components of our approach (see Figure 16). We perform the study in a self-reenactment scenario in which we compare our result to the input frames. To this end we compare our complete approach (Full) with two simplified approaches. The first simplification removes both the mouth mask and background conditioning (w\o bg & mask) from our complete approach, while the second simplification only removes the mouth mask (w\o mask). As shown in Figure 16, all components positively contribute to the quality of the results. This is especially noticeable in the mouth region, where the quality and level of detail of the teeth is drastically improved. In addition, we also show the result obtained with the Deep Video Portraits (DVP) of Kim et al. [2018a]. We do not investigate alternatives to the RNN in our ablation study, as Wang et al. [2018a] have already demonstrated that RNNs outperform independent per-frame synthesis networks.

### 5.7  User Study

To quantitatively evaluate the quality of videos generated by our text-based editing system, we performed a web-based user study with $N = 138$ participants and collected 2993 individual responses, see Table 3. The study includes videos of two different talking heads, *Set 1* and *Set 2*, where each set contains 6 different base sentences. For each of the base sentences, we recorded a corresponding target sentence in which one or more words are different. We use both the base and target sentences as ground truth in our user study. Next, we employed our pipeline to artificially change the base into the target sentences. In total, we obtain $2 \times 3 \times 6 = 36$ video clips.

ACM Trans. Graph., Vol. 38, No. 4, Article 68. Publication date: July 2019.

Table 3. We performed a user study with $N = 138$ participants and collected in total 2993 responses to evaluate the quality of our approach. Participants were asked to respond to the statement "This video clip looks real to me" on a 5-point Likert scale from 1 (*strongly disagree*) to 5 (*strongly agree*). We give the percentage for each score, the average score, and the percentage of cases the video was rated as 'real' (a score of 4 or higher). The difference between conditions is statistically significant (Kruskal-Wallis test, $p < 10^{-30}$). Our results are different from both GT-base and from GT-target (Tukey's honest significant difference procedure, $p < 10^{-9}$ for both tests). This suggests that while our results are often rated as real, they are still not on par with real video.

| | GT Base Videos | | | | | | | GT Target Videos | | | | | | | Our Modified Videos | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Scores | | | | | | | Scores | | | | | | | Scores | | | | | | |
| | 5 | 4 | 3 | 2 | 1 | Σ | 'real' | 5 | 4 | 3 | 2 | 1 | Σ | 'real' | 5 | 4 | 3 | 2 | 1 | Σ | 'real' |
| **Set 1** | 45.3 | 36.3 | 7.9 | 10.0 | 0.5 | 4.1 | 81.6% | 47.0 | 31.9 | 9.7 | 10.1 | 1.4 | 4.1 | 78.9% | 31.9 | 25.2 | 10.9 | 23.9 | 8.2 | 3.5 | 57.1% |
| **Set 2** | 41.6 | 38.1 | 9.9 | 9.2 | 1.2 | 4.1 | 79.7% | 45.7 | 39.8 | 8.7 | 5.4 | 0.4 | 4.3 | 85.6% | 29.3 | 32.8 | 9.4 | 22.9 | 5.7 | 3.9 | 62.1% |
| **Mean** | 43.5 | 37.2 | 8.9 | 9.6 | 0.9 | 4.1 | 80.6% | 46.4 | 35.9 | 9.2 | 7.7 | 0.9 | 4.2 | 82.2% | 30.6 | 29.0 | 10.1 | 23.4 | 7.0 | 3.7 | 59.6% |



Fig. 16. Ablation study comparing ground truth with several versions of our approach: a simplified version without providing the mouth mask and the background conditioning (w/o bg & mask); a version that provides the background but not the mouth mask (w/o mask); and our complete approach with all new components (Full). In addition, we show a result from the Deep Video Portraits (DVP) of Kim et al. [2018a]. All components of our approach positively contribute to the quality of the results, and our full method outperforms DVP. This is especially noticeable in the hair and mouth regions.

In the study, the video clips were shown one video at a time to participants $N = 138$ in randomized order and they were asked to respond to the statement "This video clip looks real to me" on a 5-point Likert scale (5-*strongly agree*, 4-*agree*, 3-*neither agree nor disagree*, 2-*disagree*, 1-*strongly disagree*). As shown in Table 3, the real ground truth base videos were only rated to be 'real' 80.6% of the cases and the real ground truth target videos were only rated to be 'real' 82.2% of the cases (score of 4 or 5). This shows that the participants are already highly alert, given they were told it was a study on the topic of 'Video Editing'. Our pipeline generated edits were rated to be 'real' 59.6% of the cases, which means that more than half of the participants found those clips convincingly real. Table 3 also reports the percentage of times each score was given and the average score per video set. Given the fact that synthesizing convincing audio/video content is very challenging, since humans are highly tuned to the slightest audio-visual misalignments (especially for faces), this evaluation shows that our approach already achieves compelling results in many cases.

ACM Trans. Graph., Vol. 38, No. 4, Article 68. Publication date: July 2019.

## 6 LIMITATIONS & FUTURE WORK

While we have demonstrated compelling results in many challenging scenarios, there is room for further improvement and follow-up work: (1) Our synthesis approach requires a re-timed background video as input. Re-timing changes the speed of motion, thus eye blinks and gestures might not perfectly align with the speech anymore. To reduce this effect, we employ a re-timing region that is longer than the actual edit, thus modifying more of the original video footage, with a smaller re-timing factor. For the insertion of words, this could be tackled by a generative model that is able to synthesize realistic complete frames that also include new body motion and a potentially dynamic background. (2) Currently our phoneme retrieval is agnostic to the mood in which the phoneme was spoken. This might for example lead to the combination of happy and sad segments in the blending. Blending such segments to create a new word can lead to an uncanny result. (3) Our current viseme search aims for quality but not speed. We would like to explore approximate solutions to the viseme search problem, which we believe can allow interactive edit operations. (4) We require about 1 hour of video to produce the best quality results. To make our method even more widely applicable, we are investigating ways to produce better results with less data. Specifically, we are investigating ways to transfer expression parameters across individuals, which will allow us to use one pre-processed dataset for all editing operations. (5) Occlusions of the lower face region, for example by a moving hand, interfere with our neural face renderer and lead to synthesis artifacts, since the hand can not be reliably re-rendered. Tackling this would require to also track and synthesize hand motions. Nevertheless, we believe that we demonstrated a large variety of compelling text-based editing and synthesis results. In the future, end-to-end learning could be used to learn a direct mapping from text to audio-visual content.

## 7 CONCLUSION

We presented the first approach that enables text-based editing of talking-head video by modifying the corresponding transcript. As demonstrated, our approach enables a large variety of edits, such as addition, removal, and alteration of words, as well as convincing language translation and full sentence synthesis. We believe our approach is a first important step towards the goal of fully text-based editing and synthesis of general audio-visual content.

## ACKNOWLEDGMENTS

This work was supported by the Brown Institute for Media Innovation, the Max Planck Center for Visual Computing and Communications, ERC Consolidator Grant 4DRepLy (770784), Adobe Systems, and the Office of the Dean for Research at Princeton University.

## REFERENCES

Annosoft. 2008. Lipsync Tool. (2008). http://www.annosoft.com/docs/Visemes17.html

Hadar Averbuch-Elor, Daniel Cohen-Or, Johannes Kopf, and Michael F. Cohen. 2017. Bringing Portraits to Life. *ACM Transactions on Graphics (SIGGRAPH Asia)* 36, 6 (November 2017), 196:1–13. https://doi.org/10.1145/3130800.3130818

Aayush Bansal, Shugao Ma, Deva Ramanan, and Yaser Sheikh. 2018. Recycle-GAN: Unsupervised Video Retargeting. In *ECCV*.

Floraine Berthouzoz, Wilmot Li, and Maneesh Agrawala. 2012. Tools for Placing Cuts and Transitions in Interview Video. *ACM Trans. Graph.* 31, 4, Article 67 (July 2012), 8 pages. https://doi.org/10.1145/2185520.2185563

Volker Blanz, Kristina Scherbaum, Thomas Vetter, and Hans-Peter Seidel. 2004. Exchanging Faces in Images. *Computer Graphics Forum (Eurographics)* 23, 3 (September 2004), 669–676. https://doi.org/10.1111/j.1467-8659.2004.00799.x

Volker Blanz and Thomas Vetter. 1999. A Morphable Model for the Synthesis of 3D Faces. In *Annual Conference on Computer Graphics and Interactive Techniques (SIGGRAPH)*. 187–194. https://doi.org/10.1145/311535.311556

James Booth, Anastasios Roussos, Allan Ponniah, David Dunaway, and Stefanos Zafeiriou. 2018. Large Scale 3D Morphable Models. *International Journal of Computer Vision* 126, 2 (April 2018), 233–254. https://doi.org/10.1007/s11263-017-1009-7

Christoph Bregler, Michele Covell, and Malcolm Slaney. 1997. Video Rewrite: Driving Visual Speech with Audio. In *Proceedings of the 24th Annual Conference on Computer Graphics and Interactive Techniques (SIGGRAPH '97)*. ACM Press/Addison-Wesley Publishing Co., New York, NY, USA, 353–360. https://doi.org/10.1145/258734.258880

Chen Cao, Derek Bradley, Kun Zhou, and Thabo Beeler. 2015. Real-time High-fidelity Facial Performance Capture. *ACM Transactions on Graphics (SIGGRAPH)* 34, 4 (July 2015), 46:1–9. https://doi.org/10.1145/2766943

Caroline Chan, Shiry Ginosar, Tinghui Zhou, and Alexei A. Efros. 2018. Everybody Dance Now. *arXiv e-prints* (August 2018). arXiv:1808.07371

Yao-Jen Chang and Tony Ezzat. 2005. Transferable Videorealistic Speech Animation. In *Symposium on Computer Animation (SCA)*. 143–151. https://doi.org/10.1145/1073368.1073388

Qifeng Chen and Vladlen Koltun. 2017. Photographic Image Synthesis with Cascaded Refinement Networks. In *International Conference on Computer Vision (ICCV)*. 1520–1529. https://doi.org/10.1109/ICCV.2017.168

Pengfei Dou, Shishir K. Shah, and Ioannis A. Kakadiaris. 2017. End-To-End 3D Face Reconstruction With Deep Neural Networks. In *The IEEE Conference on Computer Vision and Pattern Recognition (CVPR)*.

Pif Edwards, Chris Landreth, Eugene Fiume, and Karan Singh. 2016. JALI: An Animator-centric Viseme Model for Expressive Lip Synchronization. *ACM Trans. Graph.* 35, 4, Article 127 (July 2016), 11 pages. https://doi.org/10.1145/2897824.2925984

Tony Ezzat, Gadi Geiger, and Tomaso Poggio. 2002. Trainable Videorealistic Speech Animation. *ACM Transactions on Graphics (SIGGRAPH)* 21, 3 (July 2002), 388–398. https://doi.org/10.1145/566654.566594

Graham Fyffe, Andrew Jones, Oleg Alexander, Ryosuke Ichikari, and Paul Debevec. 2014. Driving High-Resolution Facial Scans with Video Performance Capture. *ACM Transactions on Graphics* 34, 1 (December 2014), 8:1–14.

J. S. Garofolo, L. F. Lamel, W. M. Fisher, J. G. Fiscus, D. S. Pallett, and N. L. Dahlgren. 1993. DARPA TIMIT Acoustic Phonetic Continuous Speech Corpus CDROM. (1993). http://www.ldc.upenn.edu/Catalog/LDC93S1.html

Pablo Garrido, Levi Valgaerts, Ole Rehmsen, Thorsten Thormaehlen, Patrick Pérez, and Christian Theobalt. 2014. Automatic Face Reenactment. In *CVPR*. 4217–4224. https://doi.org/10.1109/CVPR.2014.537

Pablo Garrido, Levi Valgaerts, Hamid Sarmadi, Ingmar Steiner, Kiran Varanasi, Patrick Pérez, and Christian Theobalt. 2015. VDub: Modifying Face Video of Actors for Plausible Visual Alignment to a Dubbed Audio Track. *Computer Graphics Forum (Eurographics)* 34, 2 (May 2015), 193–204. https://doi.org/10.1111/cgf.12552

Pablo Garrido, Michael Zollhöfer, Dan Casas, Levi Valgaerts, Kiran Varanasi, Patrick Pérez, and Christian Theobalt. 2016. Reconstruction of Personalized 3D Face Rigs from Monocular Video. *ACM Transactions on Graphics* 35, 3 (June 2016), 28:1–15. https://doi.org/10.1145/2890493

Jiahao Geng, Tianjia Shao, Youyi Zheng, Yanlin Weng, and Kun Zhou. 2018. Warp-guided GANs for Single-photo Facial Animation. In *SIGGRAPH Asia 2018 Technical Papers (SIGGRAPH Asia '18)*. ACM, New York, NY, USA, Article 231, 231:1–231:12 pages. http://doi.org/10.1145/3272127.3275043

Kyle Genova, Forrester Cole, Aaron Maschinot, Aaron Sarna, Daniel Vlasic, and William T. Freeman. 2018. Unsupervised Training for 3D Morphable Model Regression. In *The IEEE Conference on Computer Vision and Pattern Recognition (CVPR)*.

Ian J. Goodfellow, Jean Pouget-Abadie, Mehdi Mirza, Bing Xu, David Warde-Farley, Sherjil Ozair, Aaron Courville, and Yoshua Bengio. 2014. Generative Adversarial Nets. In *Advances in Neural Information Processing Systems*.

Y. Guo, J. Zhang, J. Cai, B. Jiang, and J. Zheng. 2018. CNN-based Real-time Dense Face Reconstruction with Inverse-rendered Photo-realistic Face Images. *IEEE Transactions on Pattern Analysis and Machine Intelligence* (2018), 1–1. https://doi.org/10.1109/TPAMI.2018.2837742

Andrew J Hunt and Alan W Black. 1996. Unit selection in a concatenative speech synthesis system using a large speech database. In *Acoustics, Speech, and Signal Processing, 1996. ICASSP-96. Conference Proceedings., 1996 IEEE International Conference on*, Vol. 1. IEEE, 373–376.

IBM. 2016. IBM Speech to Text Service. https://www.ibm.com/smarterplanet/us/en/ibmwatson/developercloud/doc/speech-to-text/. (2016). Accessed 2016-12-17.

Alexandru Eugen Ichim, Sofien Bouaziz, and Mark Pauly. 2015. Dynamic 3D Avatar Creation from Hand-held Video Input. *ACM Transactions on Graphics (SIGGRAPH)* 34, 4 (July 2015), 45:1–14. https://doi.org/10.1145/2766974

Phillip Isola, Jun-Yan Zhu, Tinghui Zhou, and Alexei A. Efros. 2017. Image-to-Image Translation with Conditional Adversarial Networks. In *Conference on Computer Vision and Pattern Recognition (CVPR)*. 5967–5976. https://doi.org/10.1109/CVPR.2017.632

Zeyu Jin, Gautham J Mysore, Stephen Diverdi, Jingwan Lu, and Adam Finkelstein. 2017. VoCo: Text-based insertion and replacement in audio narration. *ACM Transactions on Graphics (TOG)* 36, 4 (2017), 96.

Tero Karras, Timo Aila, Samuli Laine, and Jaakko Lehtinen. 2018. Progressive Growing of GANs for Improved Quality, Stability, and Variation. In *International Conference on Learning Representations (ICLR)*.

Ira Kemelmacher-Shlizerman. 2013. Internet-Based Morphable Model. In *International Conference on Computer Vision (ICCV)*. 3256–3263.

Ira Kemelmacher-Shlizerman, Aditya Sankar, Eli Shechtman, and Steven M. Seitz. 2010. Being John Malkovich. In *European Conference on Computer Vision (ECCV)*. 341–353. https://doi.org/10.1007/978-3-642-15549-9_25

Hyeongwoo Kim, Pablo Garrido, Ayush Tewari, Weipeng Xu, Justus Thies, Matthias Nießner, Patrick Pérez, Christian Richardt, Michael Zollhöfer, and Christian Theobalt. 2018a. Deep Video Portraits. *ACM Transactions on Graphics (TOG)* 37, 4 (2018), 163.

H. Kim, P. Garrido, A. Tewari, W. Xu, J. Thies, N. Nießner, P. Pérez, C. Richardt, M. Zollhöfer, and C. Theobalt. 2018b. Deep Video Portraits. *ACM Transactions on Graphics 2018 (TOG)* (2018).

Mackenzie Leake, Abe Davis, Anh Truong, and Maneesh Agrawala. 2017. Computational Video Editing for Dialogue-driven Scenes. *ACM Trans. Graph.* 36, 4, Article 130 (July 2017), 14 pages. https://doi.org/10.1145/3072959.3073653

Vladimir I Levenshtein. 1966. Binary codes capable of correcting deletions, insertions, and reversals. In *Soviet physics doklady*, Vol. 10. 707–710.

Kai Li, Qionghai Dai, Ruiping Wang, Yebin Liu, Feng Xu, and Jue Wang. 2014. A Data-Driven Approach for Facial Expression Retargeting in Video. *IEEE Transactions on Multimedia* 16, 2 (February 2014), 299–310.

Kang Liu and Joern Ostermann. 2011. Realistic facial expression synthesis for an image-based talking head. In *International Conference on Multimedia and Expo (ICME)*. https://doi.org/10.1109/ICME.2011.6011835

L. Liu, W. Xu, M. Zollhoefer, H. Kim, F. Bernard, M. Habermann, W. Wang, and C. Theobalt. 2018. Neural Animation and Reenactment of Human Actor Videos. *ArXiv e-prints* (September 2018). arXiv:1809.03658

Zicheng Liu, Ying Shan, and Zhengyou Zhang. 2001. Expressive Expression Mapping with Ratio Images. In *Annual Conference on Computer Graphics and Interactive Techniques (SIGGRAPH)*. 271–276. https://doi.org/10.1145/383259.383289

Ricardo Martin-Brualla, Rohit Pandey, Shuoran Yang, Pavel Pidlypenskyi, Jonathan Taylor, Julien Valentin, Sameh Khamis, Philip Davidson, Anastasia Tkach, Peter Lincoln, Adarsh Kowdle, Christoph Rhemann, Dan B Goldman, Cem Keskin, Steve Seitz, Shahram Izadi, and Sean Fanello. 2018. LookinGood: Enhancing Performance Capture with Real-time Neural Re-rendering. *ACM Trans. Graph.* 37, 6, Article 255 (December 2018), 14 pages.

Wesley Mattheyses, Lukas Latacz, and Werner Verhelst. 2010. Optimized photorealistic audiovisual speech synthesis using active appearance modeling. In *Auditory-Visual Speech Processing*. 8–1.

Mehdi Mirza and Simon Osindero. 2014. Conditional Generative Adversarial Nets. (2014). https://arxiv.org/abs/1411.1784 arXiv:1411.1784.

Koki Nagano, Jaewoo Seo, Jun Xing, Lingyu Wei, Zimo Li, Shunsuke Saito, Aviral Agarwal, Jens Fursund, and Hao Li. 2018. paGAN: Real-time Avatars Using Dynamic Textures. In *SIGGRAPH Asia 2018 Technical Papers (SIGGRAPH Asia '18)*. ACM, New York, NY, USA, Article 258, 12 pages. https://doi.org/10.1145/3272127.3275075

Robert Ochshorn and Max Hawkins. 2016. Gentle: A Forced Aligner. https://lowerquality.com/gentle/. (2016). Accessed 2018-09-25.

Kyle Olszewski, Zimo Li, Chao Yang, Yi Zhou, Ronald Yu, Zeng Huang, Sitao Xiang, Shunsuke Saito, Pushmeet Kohli, and Hao Li. 2017. Realistic Dynamic Facial Textures from a Single Image using GANs. In *International Conference on Computer Vision (ICCV)*. 5439–5448. https://doi.org/10.1109/ICCV.2017.580

Amy Pavel, Dan B Goldman, Björn Hartmann, and Maneesh Agrawala. 2016. VidCrit: Video-based Asynchronous Video Review. In *Proc. of UIST*. ACM, 517–528.

Amy Pavel, Colorado Reed, Björn Hartmann, and Maneesh Agrawala. 2014. Video Digests: A Browsable, Skimmable Format for Informational Lecture Videos. In *Proc. of UIST*. 573–582.

Alec Radford, Luke Metz, and Soumith Chintala. 2016. Unsupervised Representation Learning with Deep Convolutional Generative Adversarial Networks. In *International Conference on Learning Representations (ICLR)*.

Elad Richardson, Matan Sela, and Ron Kimmel. 2016. 3D Face Reconstruction by Learning from Synthetic Data. In *International Conference on 3D Vision (3DV)*. 460–469. https://doi.org/10.1109/3DV.2016.56

Elad Richardson, Matan Sela, Roy Or-El, and Ron Kimmel. 2017. Learning Detailed Face Reconstruction from a Single Image. In *Conference on Computer Vision and Pattern Recognition (CVPR)*. 5553–5562. https://doi.org/10.1109/CVPR.2017.589

Olaf Ronneberger, Philipp Fischer, and Thomas Brox. 2015. U-Net: Convolutional Networks for Biomedical Image Segmentation. In *International Conference on Medical Image Computing and Computer-Assisted Intervention (MICCAI)*. 234–241.

Joseph Roth, Yiying Tong Tong, and Xiaoming Liu. 2017. Adaptive 3D Face Reconstruction from Unconstrained Photo Collections. *IEEE Transactions on Pattern Analysis and Machine Intelligence* 39, 11 (November 2017), 2127–2141. https://doi.org/10.1109/TPAMI.2016.2636829

Steve Rubin, Floraine Berthouzoz, Gautham J Mysore, Wilmot Li, and Maneesh Agrawala. 2013. Content-based tools for editing audio stories. In *Proceedings of the 26th annual ACM symposium on User interface software and technology*. 113–122.

Matan Sela, Elad Richardson, and Ron Kimmel. 2017. Unrestricted Facial Geometry Reconstruction Using Image-to-Image Translation. In *International Conference on Computer Vision (ICCV)*. 1585–1594. https://doi.org/10.1109/ICCV.2017.175

Jonathan Shen, Ruoming Pang, Ron J Weiss, Mike Schuster, Navdeep Jaitly, Zongheng Yang, Zhifeng Chen, Yu Zhang, Yuxuan Wang, Rj Skerrv-Ryan, et al. 2018. Natural tts synthesis by conditioning wavenet on mel spectrogram predictions. In *ICASSP*. IEEE, 4779–4783.

Fuhao Shi, Hsiang-Tao Wu, Xin Tong, and Jinxiang Chai. 2014. Automatic Acquisition of High-fidelity Facial Performances Using Monocular Videos. *ACM Transactions on Graphics (SIGGRAPH Asia)* 33, 6 (November 2014), 222:1–13. https://doi.org/10.1145/2661229.2661290

Hijung Valentina Shin, Wilmot Li, and Frédo Durand. 2016. Dynamic Authoring of Audio with Linked Scripts. In *Proc. of UIST*. 509–516.

Qianru Sun, Ayush Tewari, Weipeng Xu, Mario Fritz, Christian Theobalt, and Bernt Schiele. 2018. A Hybrid Model for Identity Obfuscation by Face Replacement. In *European Conference on Computer Vision (ECCV)*.

Supasorn Suwajanakorn, Steven M. Seitz, and Ira Kemelmacher-Shlizerman. 2017. Synthesizing Obama: Learning Lip Sync from Audio. *ACM Trans. Graph.* 36, 4, Article 95 (July 2017), 13 pages. https://doi.org/10.1145/3072959.3073640

Sarah Taylor, Taehwan Kim, Yisong Yue, Moshe Mahler, James Krahe, Anastasio Garcia Rodriguez, Jessica Hodgins, and Iain Matthews. 2017. A Deep Learning Approach for Generalized Speech Animation. *ACM Trans. Graph.* 36, 4, Article 93 (July 2017), 11 pages. https://doi.org/10.1145/3072959.3073699

Ayush Tewari, Michael Zollhöfer, Florian Bernard, Pablo Garrido, Hyeongwoo Kim, Patrick Perez, and Christian Theobalt. 2018a. High-Fidelity Monocular Face Reconstruction based on an Unsupervised Model-based Face Autoencoder. *IEEE Transactions on Pattern Analysis and Machine Intelligence* (2018), 1–1. https://doi.org/10.1109/TPAMI.2018.2876842

Ayush Tewari, Michael Zollhöfer, Pablo Garrido, Florian Bernard, Hyeongwoo Kim, Patrick Pérez, and Christian Theobalt. 2018b. Self-supervised Multi-level Face Model Learning for Monocular Reconstruction at over 250 Hz. In *The IEEE Conference on Computer Vision and Pattern Recognition (CVPR)*.

Ayush Tewari, Michael Zollhöfer, Hyeongwoo Kim, Pablo Garrido, Florian Bernard, Patrick Pérez, and Christian Theobalt. 2017. MoFA: Model-based Deep Convolutional Face Autoencoder for Unsupervised Monocular Reconstruction. In *ICCV*. 3735–3744. https://doi.org/10.1109/ICCV.2017.401

Justus Thies, Michael Zollhöfer, Marc Stamminger, Christian Theobalt, and Matthias Nießner. 2016. Face2Face: Real-Time Face Capture and Reenactment of RGB Videos. In *Conference on Computer Vision and Pattern Recognition (CVPR)*. 2387–2395. https://doi.org/10.1109/CVPR.2016.262

Anh Tuan Tran, Tal Hassner, Iacopo Masi, and Gerard Medioni. 2017. Regressing Robust and Discriminative 3D Morphable Models with a Very Deep Neural Network. In *Conference on Computer Vision and Pattern Recognition (CVPR)*. 1493–1502. https://doi.org/10.1109/CVPR.2017.163

Anh Truong, Floraine Berthouzoz, Wilmot Li, and Maneesh Agrawala. 2016. Quickcut: An interactive tool for editing narrated video. In *Proc. of UIST*. 497–507.

Aäron Van Den Oord, Sander Dieleman, Heiga Zen, Karen Simonyan, Oriol Vinyals, Alex Graves, Nal Kalchbrenner, Andrew W Senior, and Koray Kavukcuoglu. 2016. WaveNet: A generative model for raw audio. In *SSW*. 125.

Daniel Vlasic, Matthew Brand, Hanspeter Pfister, and Jovan Popović. 2005. Face Transfer with Multilinear Models. *ACM Transactions on Graphics (SIGGRAPH)* 24, 3 (July 2005), 426–433. https://doi.org/10.1145/1073204.1073209

Ting-Chun Wang, Ming-Yu Liu, Jun-Yan Zhu, Guilin Liu, Andrew Tao, Jan Kautz, and Bryan Catanzaro. 2018a. Video-to-Video Synthesis. In *Advances in Neural Information Processing Systems (NeurIPS)*.

Ting-Chun Wang, Ming-Yu Liu, Jun-Yan Zhu, Andrew Tao, Jan Kautz, and Bryan Catanzaro. 2018b. High-Resolution Image Synthesis and Semantic Manipulation with Conditional GANs. In *CVPR*.

O. Wiles, A.S. Koepke, and A. Zisserman. 2018. X2Face: A network for controlling face generation by using images, audio, and pose codes. In *European Conference on Computer Vision*.

Jiahong Yuan and Mark Liberman. 2008. Speaker identification on the SCOTUS corpus. *The Journal of the Acoustical Society of America* 123, 5 (2008), 3878–3878. https://doi.org/10.1121/1.2935783 arXiv:https://doi.org/10.1121/1.2935783

Heiga Zen, Keiichi Tokuda, and Alan W Black. 2009. Statistical parametric speech synthesis. *speech communication* 51, 11 (2009), 1039–1064.

Yang Zhou, Zhan Xu, Chris Landreth, Evangelos Kalogerakis, Subhransu Maji, and Karan Singh. 2018. Visememet: Audio-driven Animator-centric Speech Animation. *ACM Trans. Graph.* 37, 4, Article 161 (July 2018), 161:1–161:10 pages.

M. Zollhöfer, J. Thies, P. Garrido, D. Bradley, T. Beeler, P. Pérez, M. Stamminger, M. Nießner, and C. Theobalt. 2018. State of the Art on Monocular 3D Face Reconstruction, Tracking, and Applications. *Computer Graphics Forum (Eurographics State of the Art Reports 2018)* 37, 2 (2018).

## A PHONEME & VISEME CONTENT

Our matching algorithm (Section 3.3) is designed to find the longest match between sequences of phonemes/visemes in the edit and the input video. Suppose our input video consists of all the sentences in the TIMIT corpus [Garofolo et al. 1993], a set that has been designed to be phonetically rich by acoustic-phonetic researchers. Figure 17 plots the probability of finding an exact match anywhere in TIMIT to a phoneme/viseme subsequence of length $K \in [1, 10]$. Exact matches of more than 4-6 visemes or 3-5 phonemes are rare. This result suggests that even with phonetically rich input video we cannot expect to find edits consisting of long sequences of phonemes/visemes (e.g. multiword insertions) in the input video and that our approach of combining shorter subsequences with parameter blending is necessary.

Figure 17 also examines the variation in individual viseme instances across the set of 2388 sentences in the TIMIT corpus. We see that there is variation both between different visemes and within a class of visemes. These observations led us to incorporate viseme distance and length in our search procedure (Section 3.3) and informed our blending strategy (Section 3.4).




Fig. 17. Left: probability of matching phoneme/viseme subsequences of length $K \in [1, 10]$ in the TIMIT corpus. To ensure that the query subsequences reflect the distribution of such sequences in English we employ a leave-one-out strategy: we choose a random TIMIT sequence of length K, and look for an exact match anywhere in the rest of the dataset. Exact matches of more than 4-6 visemes and 2-3 phonemes are uncommon. Right: variation in viseme duration in TIMIT. Different instances of a single viseme vary by up to an order of magnitude. Between different visemes, the median instance length varies by a factor of five.