# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

       Plaintiffs,

v.

CRAIG WRIGHT

       Defendant.

**CASE NO.:  9:18-cv-80176-BB**

## STATEMENT OF SAGAR GUPTA

**I**, **Sagar Gupta**, of Boies Schiller Flexner (UK) LLP, 5 New Street Square, London, EC4A 3BF **WILL SAY** as follows:

1. I am a solicitor of the Senior Courts of England & Wales and an associate in the law firm of Boies Schiller Flexner (UK) LLP ("**BSFUK**").

2. I make this statement in relation to Plaintiff W&K Info Defense Research LLC's Motion for Judicial Notice.

3. Unless otherwise indicated, the contents of this statement are true and are within my own knowledge. Where the contents are not within my own knowledge, I have indicated the source of such information and they are true to the best of my knowledge and belief. For the avoidance of doubt, no waiver of privilege is intended nor should be inferred from anything said in this statement.

4. Beginning on or around May 31, 2023, my colleagues at Boies Schiller Flexner LLP (the "**Firm**") sought BSFUK's assistance in obtaining specific documents related to the English Commercial Court's (the "**Court**") judgment reported at *Ramona Ang v. Reliantco Investments Ltd* [2020] EWHC 3242 (Comm). *See* Approved Judgment of Mr Justice Butcher, *Ramona Ang v. Reliantco Investments Ltd*, attached hereto as Exhibit A.

5. Specifically, BSFUK was asked to assist the Firm in obtaining copies of Dr. Craig Wright's witness statements in the above-referenced proceedings, in exercise of the Court's inherent jurisdiction in accordance with the open justice principle and Civil Procedure Rule 5.4C(2) (*Supply of documents to a non-party from court records*).

6. Accordingly, on June 9, 2023, BSFUK made an application on behalf of the Plaintiff to the Court seeking an Order permitting the Plaintiff to inspect and obtain copies of the witness

statements of Dr. Craig Wright. *See* 9 June 2023 Application Notice (without attachments), attached hereto as Exhibit B.

7. As part of the application, BSFUK provided a witness statement of David Holman Hunt, a solicitor and partner at BSFUK. This statement provided the Court with reasons and grounds for making the application. *See* First Witness Statement of David Holman Hunt (without exhibits), attached hereto as Exhibit C.

8. The application also included a Draft Order for the Court's consideration. *See* Draft Order, attached hereto as Exhibit D.

9. That same day, we received the E-Filing Submission Confirmation which confirmed our application to the Court was formally submitted. *See* E-Filing Submission Confirmation, attached hereto as Exhibit E.

10. On June 12, 2023, Mr. Justice Picken entered the Draft Order granting us permission to "inspect and take copies of the witness statement(s) of Dr Craig Wright." *See* 12 June 2023 Order, attached hereto as Exhibit F. I note that while the entered order (Ex. F) is titled "Draft Order," the stamped emblem of the Court dated 13 June 2023 signifies formal entry by the Court.

11. Upon the entry of the 12 June 2023 Order, BSFUK was granted access to Dr. Craig Wright's witness statements using the Courts Electronic Filing system (CE-File). I accessed Dr. Craig Wright's first, second, third, and fifth witness statements (together with exhibits CSW2 and CSW5) using CE-File on June 13, 2023 and shared these statements with my colleagues at the Firm that same day.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

_____

Name: Sagar Gupta
Dated: July 10, 2023

# Exhibit A

Applicants
D H Hunt
First
DHH1
9 June 2023

**IN THE HIGH COURT OF JUSTICE**　　　　　　　　　　**Claim No.:  CL-2018-000386**

**BUSINESS AND PROPERTY COURTS OF**

**ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**BETWEEN:**

**[PARTIES]**

**Claimant[s]**

**-and-**

**[PARTIES]**

**Defendant[s]**

---

**IN THE MATTER OF AN APPLICATION BY:**

**IRA KLEIMAN**

**First Applicant**

**and**

**W&K INFO DEFENSE, LLC**

**Second Applicant**

**EXHIBIT DHH1**

---



Boies Schiller Flexner (UK) LLP
5 New Street Square
London EC4A 3BF



Neutral Citation Number: [2020] EWHC 3242 (Comm)

Case No: CL-2018-000386

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 27/11/2020

**Before** :

**THE HONOURABLE MR JUSTICE BUTCHER**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **Ramona Ang** | **Claimant** |
| - and - | |
| **Reliantco Investments Ltd** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Daniel Saoul QC** (instructed by **SCA Ontier LLP** ) for the **Claimant**
**Mr Matthew Bradley** (instructed by **Cooke, Young & Keidan LLP**) for the **Defendant**

Hearing dates: 13th-15th & 19th-21st October 2020
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE BUTCHER

**1**

**The Honourable Mr Justice Butcher :**

Introduction

1. This action arises from the termination of the account of the Claimant with the Defendant in August 2017.  That has led to a bitter and acrimonious dispute, with serious allegations being made by each side against the other.

2. The Claimant, to whom I will refer as 'Ms Ang', is an individual.  She is married to Dr Craig Wright, a specialist computer scientist and researcher with cybersecurity and blockchain expertise, who claims to be the or a principal inventor of Bitcoin.

3. The Defendant, to which I will refer as 'Reliantco', is a company registered in Cyprus which offers investments in financial products and services through a web-based trading platform under the trade name 'UFX'.

4. An account was opened in the name of Ms Ang through the UFX platform on 10 January 2017.  Between January and August 2017 Ms Ang invested in Bitcoin futures though the UFX platform.  Having withdrawn US$600,600 from the account on 22 and 23 May 2017, she invested a further £300,000 at the end of July and the beginning of August 2017.  On 4 August 2017 Reliantco requested further documentation from Ms Ang, and made another request on 9 August.  Reliantco then terminated the account on 10 August 2017.

5. This triggered a dispute between the parties as to (i) the entitlement of Reliantco to terminate the account, (ii) Ms Ang's right to recover the funds in the account and the increase in the value of her positions, as well as sums from Ms Ang's proposed reinvestment of those funds, and (iii) the value of such claims.  This dispute has given rise to litigation in Germany, the Czech Republic and in this jurisdiction and has been the subject of the trial before me.

Chronology

6. It is convenient to set out a summary narrative of the parties' relationship and dealings.  This is largely apparent from the documentation. To the limited extent that there was any dispute about any of what follows in this section of the judgment it represents my findings on the evidence.

7. Until 2015 Ms Ang and Dr Wright were resident in Australia. They then moved to the UK.  After moving here, on 29 April 2016 Dr Wright opened an account with Reliantco, and deposited US$10,000 on the same day.  On 3 May 2016 he was asked to provide identification documents and did so.  On 4 May 2016 Reliantco did a LexisNexis check on Dr Wright, which indicated that he had been accused of fraud in 2015.  Reliantco blocked his account. On 31 May 2016 Reliantco returned Dr

Wright's US$10,000. Dr Wright did not access that account with Reliantco again between May 2016 and January 2017.

8.  On 16 June 2016 a sum of £437,242.80 was credited to Ms Ang and Dr Wright's joint bank account with Lloyds Bank, with reference 'F/FLOW DEMORGAN LT', and between 16 June and September 2016 a total amount of £260,000 was deposited from the Lloyds Bank account into an investment account in Ms Ang's name with the website www.IG.com.  On 10 January 2017 £8,000 was withdrawn from that account.

9.  On 10 January 2017 two accounts were opened with Reliantco, using its online form, one in Ms Ang's name and one in Dr Wright's.  I will have to return to the evidence as to the nature of the interaction between Ms Ang and Dr Wright at this point, and whether, as Reliantco contends, Ms Ang's account was being opened by and for Dr Wright, but what took place can be summarised as follows.

(1)  A UFX account with Reliantco was registered in Ms Ang's name using the email address ramona@rcjbr.org, and US$100 was deposited into that account from the Lloyds Bank account by debit card.  A first trade was made shortly afterwards, which was closed out at a small loss the next day because there were insufficient funds in the account at that point to support it.

(2)  About half an hour after the opening of Ms Ang's account, an account was opened in Dr Wright's name, using the email address craig@tuliptrading.net. US$150 was deposited in it and two trades opened, which were closed out at a small loss the next day.

(3)  On the same day, Sotiroula Constantin of Reliantco's Know Your Customer ('KYC') Department sent an email to Ms Ang requesting KYC documentation to validate her account, to include a copy of a valid passport or other official ID, a recent utility bill, and a copy of the back and front of any credit card used for making deposits.  Ms Constantin sent a similar message to Dr Wright on 11 January.

(4)  In response to Ms Constantin's request for documentation, on 11 January Ms Ang sent her a copy of pages of her passport and her credit card for the Lloyds Bank account (account ending …260).  She stated that her utility bills were online.  That was responded to on the same day by Michael Boat of Reliantco saying that it would be satisfactory to send an older bill.

(5)  On 12 January Ms Ang sent to Ms Constantin a copy of an Elmbridge Borough Council council tax bill.  Its addressees were shown as both Dr Wright and Ms Ang.

(6)  Also on 12 January Dr Wright sent to Ms Constantin copies of the KYC documentation which he had, separately, been asked for. These included a copy of

the same Elmbridge Borough Council council tax bill as Ms Ang had sent, but with her name redacted from it, so that it just showed his name as addressee, but with a space before the address; and of his credit card, which was on the same Lloyds Bank account as Ms Ang's (ending … 260), though each showed their separate names.

(7) On the same day, £400,000 was withdrawn from Ms Ang's account with www.IG.com to the Lloyds Bank account.  US$50,000 was deposited in the UFX account registered under ramona@rcjbr.org from the Lloyds Bank account on 12 January, and a further US$70,000 on 13 January.  On the latter date she signed and returned a Declaration and Approval of Payments Deposits form which provided, in part 'I hereby declare that I am the only person authorized to transact and/or execute forex trades in my account…' and stating that she had read and accepted Reliantco's Terms and Conditions.

(8) Within Reliantco there had again been an identification of the LexisNexis report indicating that Dr Wright had been accused of fraud.  This had led to Gordana Nedeljkovi 'blocking' him on 12 January.  On 16 January Alicja Kwiatkowska of Reliantco sent him an email saying that 'your application does not fulfil the Compliance Department's requirements and was found to be unsuitable therefore we cannot accept you as a client of UFX'.

(9) On 17 January Ms Ang was informed that, her compliance documents having been accepted, her account was now approved.

10. It was common ground that the process of Ms Ang's opening of her UFX account which I have referred to above resulted in a contract between her and Reliantco (which I will call 'the Customer Agreement').  While not strictly common ground, there was no serious dispute before me that it incorporated Reliantco's 'UFX Terms and Conditions' ('the Terms and Conditions').  I find that those terms were incorporated into the Customer Agreement.  In Annexe 1 to this judgment appear those of the Terms and Conditions most material to the matters debated.

11. Between January and May 2017 there was trading on Ms Ang's UFX account. This all involved trading in Bitcoin futures, and always by the establishment of long positions. By May these were showing a considerable profit. Ms Ang and Dr Wright were contemplating buying the property which they had been renting, and with a view to spending it on that purchase it was decided to realise and withdraw some of the gains.  On 2 May 2017 50 positions, each for 20 Bitcoin futures, were closed, generating a profit of US$546,725.60 in Ms Ang's UFX account.  Further positions were closed in the following days.  On 18 May 2017 US$600,000 was withdrawn from the UFX account to the Lloyds Bank account.  On 22 May 2017 a further US$600 was similarly withdrawn.

12. Between May and July 2017 the UFX account was less used.  Some positions were closed on 25 May, 12 June and 15 June.  A long position for 40 Bitcoin futures was opened on 15 June. At the end of July, as a result, as Ms Ang said, of the prospective

**4**

house purchase having fallen through, it was decided to put more money back into the UFX account.  On 31 July 2017 Dr Wright arranged for a payment of £100,000 to be deposited into Ms Ang's UFX account from the Lloyds Bank account.  He did the same as to another £100,000 on 2 August, and again on 4 August.  Two long positions for 100 Bitcoin futures were opened on 3 August 2017, and a further two long positions for 100 Bitcoin futures were opened on 4 August.

13. At this point, on 4 August, Ms Melina Theodorou, an employee of Reliantco, sent emails to Ms Ang asking her to fill in and return a Source of Wealth Form with supporting documentation within three business days.  On the same day Ms Ang completed and returned the form.  In answer to the question 'Employment Status', she ticked neither 'Self Employed' nor 'Employee', but created a box called 'Independent wealth' which she ticked.  She then ticked a box for 'Disposal of Business or other asset', and by way of further details added '40% of DeMorgan Ltd (Australia) holdings liquidated on move to U.K.  P&L and Tax return details for company attached.  Value $80,000,000 AUD.'  She also ticked the box 'Other Source', and added 'House sale (documentation attached).'  The documentation which she attached consisted of (1) a DeMorgan Ltd ('DeMorgan') 2015 tax return, balance sheet and profit and loss statement; and (2) a letter from Australian solicitors to Ms Ang and her former husband confirming the sale of the Australian property and enclosing documents confirming the payment to them of the proceeds of sale.

14. Apparently distinct from the process of requesting the Source of Wealth documentation, others within Reliantco and connected companies came to concentrate on Ms Ang's new deposit of funds and new positions.  Within 'connected companies', I include in particular an Israeli company called 'Toyga', to which Reliantco outsourced some of its functions, including some back office support.  On 4 August Jason Perry, called 'VIP Retention Manager', forwarded to Ameen Qussoom (ameen@toyga.com), another employee of Toyga, information which had been found about Dr Wright on the internet by an employee in Toyga customer services, including that Dr Wright was the founder of DeMorgan Ltd. The email included a link to a gizmodo site.

15. On 6 August Ameen Qussoom sent an email nominally to himself which stated:

'Pls see the mail below, she is the one who made around 600000$ profit by trading on Bitcoin this year.
Now she is back and made 2 transfers of 260000$ in total.
Do we have a legal right to cancel the profits she made?'

16. On 7 August 2017, a Mr Libby Weizman, who used a UFX email address, but who was an employee of Toyga, sent an email to an individual identified as 'Chris Judd' or 'Noam', which read:

'Hi Noam,

Please follow up on this user.
The accumulated risk is substantial.
Immediate action is needed to hedge this risk
Libby'

17. On the same day, Chris Judd emailed Mr Dennis De Jong, Reliantco's non-executive director and 100% shareholder, forwarding the information about Dr Wright and the gizmodo link, and stating as follows:

'Hello Dennis,
Pls check the mail below and tell me what you think we should do.
The user's deposited here around 600k and withdraw 600k, she's not speaking with us, she sends money time to time and opens bitcoin positions.
The strange story is that after she opens deals we see a big movement on the bitcoin.
We found that her husband claim that he's created the bitcoin (look at the link below also watch the videos).'

18. On the same day, Mr De Jong emailed various employees in the internal compliance team of Reliantco asking them to request proof of funds from Ms Ang and undertake extended due diligence; gave certain information in relation to Dr Wright as a 'starting point'; and stated that any withdrawals had to be approved by him.  Ms Theodorou responded to this by saying that she had already requested the Source of Funds documentation, and forwarded Ms Ang's response to Mr De Jong. As Mr De Jong said in his evidence, he did not look at that documentation at the time because he was on holiday, but he said that they may have been discussed on a conference call. What he certainly did was to ask Ms Theodorou, also on 7 August, what the standard worldcheck report said, to which Ms Theodorou replied that it was clear.  He then asked for a check also on the company name and on Dr Wright, and Ms Theodorou responded that 'This is the guy we were looking at a year ago', and attached the LexisNexis report which indicated that he had been accused of fraud.  Mr De Jong did not recall reading it, but said that he was sure it would have been discussed on a phone call.

19. On 8 August 2017,  Mr De Jong emailed Noam, as follows:

'Good morning Noam,
There would be enough information to put her account under review: suspected fraud and adverse media of husband.
So we can notify her that her account is in review and she needs to supply further information to her being married to Craig Wright and in connection with that the adverse media, fraud, etc.  By this we can limit her opening new positions until further notice and we can even advise her that all open positions will automatically close by e.g. 18:00 Thursday (3 days from now).
If this is what you want to do, we have to notify her at the time we put the account in review, we cant wait and then cancel the trades we dont like.
On the other hand if this traders hit ratio is very good, we could also send her trades to JFD and piggy bag (sic) on them with our prop money…? All subject to approval of Haim obviously.

**6**

Let me know what you think.'

20. Noam replied to this email:

'Hello Dennis,
This is what I want to do with her, tell me if we can do it.
1. the open positions will be canceled (sic)
2. to block her from open new one.
3. to freeze her account until full details about her doc' requests.
Dennis she withdrew two months ago 600k if we found that she is fraud user, can we sue her and meanwhile freeze her money in our company, she has now 400K balance.
I don't think now it's smart to cover her, I think we need to go with what we have and to block her.
Libby send me mails and I believe he will start calling me about her, he still doesn't know about what we found.
I will update him after we know in what direction we want to choose.'

21. On the same day 'Cedrick Toledano' who had the email address haim@toyga.com asked Ameen Qussoom to share what he thought should be done in the light of the above emails.

22. Also on the same date, Mr Weizman sent a further email to Noam, Ameen Qussoom and copying Haim Toledano.  This email stated:

'Ameen and Noam.
This user behavior must be checked thoroughly.
There is nothing random about her trades, timing, exposure to one asset and timing of volume.
Block the accounts and run deep and thorough KYC, research for sources of funds deposit and withdraw account names and beneficiaries, tax residency information over the net with the KYC papers submitted etc.
If you keep it running, dealing must cover her exposure.
Libby'

23. Noam replied to that email on the same day:

'Hello Libby,
I'm investigating her activity (AML doc', KYC) soon I will let you know what we have about her.
I will do my best.
Noam'.

24. Ameen Qussoom's response to Mr Toledano's request for him to share his views as to what should be done was as follows:

'If we have a legal reason to cancel all her profits and trades then let's do so (relevant for past profits too). Otherwise we need to make a decision if we want to have such a trader who we don't have any impact on her decisions nor trades.

Of course there is a risk.  Aside from the min deal size and RC we don't have other things that can be done.'

25. On 9 August, at Mr De Jong's prompting, Ms Theodorou requested, in an email to 'Ramona Watts' a copy of the DeMorgan shareholders' certificate, and also 'as we can see from your email you are using your husband's surname', a copy of her marriage certificate.  Ms Ang responded on the same day to say that she was on holiday but would provide the requested documents when she returned.

26. On 10 August Reliantco sent an email to Ms Ang as follows:

'Reliantco Investments LTD (hereinafter 'the Company') hereby informs you that your account has been terminated due to the Company's internal Anti Money Laundering policy.
As per 26.5 q), the Company has proceeded with blocking your account and terminating the Customer Agreement.
As stated in Article 26.5 b) and g) of the T&C's, the Company has proceed with the cancellation and debit of all transactions performed by the terminated account. Since the remaining balance of the account will be refunded, you will have no remaining balance in your favor for us to return to you as provided for in Article 26.7 of the T&C's.
The Company's obligations towards you are thus fulfilled in this regard and you acknowledge that there are no outstanding payments to be made in your favor.
Please consider this as written notice of the termination of the Customer Agreement between the Company and yourself, as per Article 26.3 of the T&C's.
Please note that this letter in no way limits, restricts or waives any or all rights that the Company retains under the T&C's or applicable national or international law.'

27. On 14 August Ms Ang sent an email to Reliantco responding to the request for documents which had been made on 9 August. That email read:

'Hi,
I am back from holidays and submitting the documents you require.
Please note that I have attached:

- Confirmation of Australian house sale

- Proof of married last name (Watts), although I am now divorced and use my maiden name as per my passport (Ang)

- DeMorgan share register as requested.

Re proof of funds:
The majority of funds that I have put in Reliantco are from the sale of my house in Australia.  My other source of wealth comes from the distribution of an Australian public company which we have now closed since we no longer reside in Australia.  I now live in the UK.  I had 50% shareholding in Wright Family Trust which had shares in DeMorgan Ltd as per the attached share register.
Please let me know when you can unblock my account.'

**8**

28. Ms Ang then sent a number of chasers, some of which Mr Qussoom appears to have directed should not be answered.

29. Internally, on 15 August 2017 Noam emailed Mr De Jong as follows:

'HI Dennis,
Any update about her, there is not chance we keep her balance here and sue her that she scam us and we sent 600K for her?
We must find something that will not letting her to take from us money.'

30. Again internally to Reliantco/Toyga, on 16 August Mr Weizman emailed Noam, Ameen and Haim Toledano, as follows:

'Hi Chris and Dennis
Regardless of her withdrawal, you MUST cancel all her bitcoin deals from day one.  This will put her balance in negative (not 400,000$ currently shown)
If the recent bitcoin deals are canceled, same treatment should be apply on the initial deals prior to her withdrawal.
You should not approve any withdrawal as she already withdraw approximately 600,000$ driven from illegal abusive use of the platform.'

31. On 17 August Noam responded to that:

'agreed as well, we must find some way not to give the 400K she deposited 2 weeks ago.
Dennis I know it's the third time I talking with you about her but find something.'

32. On 17 August Mr Plischke of Reliantco's Compliance Department sent an email to Mr De Jong, copied to other members of the Compliance Department, including Ms Theodorou, and Ms Nadia Ali, as follows:

'Hi Dennis
Ramona called again today.  Nadia convinced her to wait until Tuesday. She very frustrated and is threatening legal action.
She is mainly asking what is the reason behind the account being blocked and what is happening with her funds. We do not know what to tell her as we have not received instructions or information on what is happening and why we are terminating this account.
We have received all the documents we requested but we terminated the account anyway on general 'AML policy' reasons.
We have not discussed with her anything further regarding her account.
The funds are all in her account and any withdrawal must be approved by you.
Can you please advise on what we should tell her about the reason for terminating the account and what will happen to her funds? She has not raise the issue of the cancelled trades yet, but what should be our position if she does raise the issue?'

33. Mr De Jong responded to this, telling Mr Plischke that 'the account is terminated due to adverse media (potential fraud as per AML check) and employing abusive trading strategies'.  Mr Plischke prepared a draft email to Ms Ang, which stated, inter alia,

that Reliantco would refund US$8,972.02. This was on the basis that she had deposited a total of $609,572.02 and had withdrawn $600,600.  In the email which Mr Plischke sent to Mr De Jong enclosing this draft, Mr Plischke said:

> 'We will notify Vlada to refund the remaining deposits.  What shall we do with the balance (profits) left in the account? Debit to 0?
> We should also consider that this will not end here and she will want us to define 'adverse media' and 'abusive trading strategies' so she can then challenge them. She might display significant resistance/retaliation (she has the financial means to act) and our arguments are not very strong.  The burden of proof will be on us to show that we have justifiable, legitimate grounds to cancel her profits.'

34. On 24 August 2017 Reliantco sent Ms Ang an email which read:

> 'Dear Ramona Watts,
> We have received your inquiries regarding the status of your account in relation to  the email sent to you on the 10th August 2017, informing you about the termination of your account.
> Your account is currently blocked as it is under investigation due to regulatory requirements.
> We are not able to disclose any further information regarding your account at this stage as this may constitute an unlawful declaration in breach of our regulatory obligations and which may prejudice the current and/or future investigation.
> We shall not be able to communicate with you regarding this matter until further notice.'

35. In September 2017 Ms Ang applied to the court in Munich, Germany, for relief analogous to a freezing order over Reliantco's bank account with Deutsche Kontor Privatbank.  This order was then served on Reliantco in Cyprus.  In the same month, Ms Ang also applied to a court in the Czech Republic, where another Reliantco account was held, for a similar freezing type order, but that application was refused by the Czech court.

36. Reliantco did not report any concerns about Ms Ang's account, including any money laundering or insider trading issues, to MOKAS, the Cyprus anti-money laundering authority in August.  According to Mr De Jong a report was made in October.  No documentation was produced which showed this, but this, according to Mr De Jong, was because it was impermissible for such information to be disclosed.  Be that as it may, on 13 February 2018 MOKAS informed Reliantco that it would not be taking any action relating to Ms Ang's account.

<u>The English Proceedings</u>

37. On 17 April 2018 Ms Ang sent a letter before action to Reliantco.  On 5 June 2018 she issued the Claim Form in the present action.  Reliantco then challenged the jurisdiction of this court.  It relied on the Terms and Conditions and in particular on clause 27.1 thereof which provides that the courts of Cyprus are to have exclusive jurisdiction over 'all disputes and controversies arising out of or in connection with'

**10**

her Customer Agreement, and on Article 25 of the Brussels Regulation (Recast) (ie Regulation (EU) No. 1215/2012 on jurisdiction and enforcement of judgments in civil and commercial matters) ('Brussels (Recast)').

38. This jurisdiction challenge came before Andrew Baker J in February 2019.  His judgment was handed down in April 2019.  As Andrew Baker J recorded, Ms Ang answered Reliantco's case on the application of the jurisdiction clause in the Terms and Conditions in two ways: first, she contended that she was a consumer within Section 4 of Brussels (Recast); and secondly that clause 27.1 was not incorporated into her Customer Agreement in such a way as to satisfy the requirements of Article 25 of Brussels (Recast).

39. By his judgment and ensuing order, Andrew Baker J dismissed Reliantco's application.  In his judgment, Andrew Baker J:

   (1) Stated, on the basis of the evidence before him, that Ms Ang did not have any education or training in cryptocurrency investment or trading, and while she had worked in money markets for two months as a trainee had no other professional currency trading or money market experience.  Her primary occupation, Andrew Baker J said, was running the family home and bringing up the children, looking after the family wealth, and acting as an unpaid part time PA to Dr Wright.

   (2) Recorded that Dr Wright is a computer scientist who works as Chief Scientist for nChain Ltd, a blockchain technology company, and publishes prolifically.  As Andrew Baker J recorded, he is the same Craig Wright who has identified himself publicly as 'Satoshi Nakamoto', the online pseudonym associated with the inventor of Bitcoin; and who had reputedly built up a huge Bitcoin cache.

   (3) Found that Ms Ang was a consumer within Section 4 of Brussels (Recast).  In reaching this conclusion, Andrew Baker J found that speculative investment with a view to financial gain was not inherently a business to which the consumer rule could not apply; that investment by a private individual of her surplus wealth in the hope of generating good returns was not, speaking generally, a business activity; and that on the evidence her contract with Reliantco was outside any business of Ms Ang's.

   (4) Held, contrary to Ms Ang's case, that clause 27.1 of the Terms and Conditions was effectively incorporated into her agreement with Reliantco.  He rejected her claimed recollection that she had attempted to click the link to the Terms and Conditions and that it was not working. He found that this was 'demonstrably unreliable and cannot be trusted' (paragraph [78]).

40. At a consequentials hearing on 15 May 2019, Andrew Baker J indicated that he had regarded Ms Ang's story of successive, unsuccessful, attempts to access the Terms

**11**

and Conditions as being 'invention', and an 'implausible factual claim' that was 'rather effectively debunked'.

41. In August 2019, Reliantco served its Defence. In that Defence, Reliantco made the case that it was not Ms Ang who had opened the account in her name in January 2017, it had been Dr Wright; that it was Dr Wright who had thereafter operated the account 'as a means of overcoming the effects of the Defendant's termination of Dr Wright's own account with it'; that the account was thus operated 'pursuant to a deceitful misrepresentation as to the identity of the true holder and operator of the account'; that to the extent that Ms Ang invested any sums using the platform, she did so as agent for Dr Wright; and that her statements as to the sources of wealth in her emails of 4 and 14 August 2017 were incorrect.  These matters were said to give rise to rights to 'rescind' or terminate the agreement between the parties, and to establish an 'upper limit' on the amount that Ms Ang could claim from Reliantco of US$8,972.02, calculated as US$222,275 invested in January 2017, less US$213,302.98 (being her 'extraction' of US$600,600 less her reinvestment of US$387,297.02 by 4 August 2017).  Reliantco pleaded a counterclaim on the basis of an indemnity provision in the Terms and Conditions; and that the decision of Andrew Baker J and the freezing order of the Munich court had been obtained by fraud and/or deceit on the part of Ms Ang that she was the individual who had opened and was the sole user of the account.

The Issues at the Outset of the Trial

42. When the trial commenced, the issues between the parties could be summarised as follows.  Ms Ang claimed the return of the money standing to the credit of her account when it was closed on 10 August 2017, in an amount of US$708,857.63, comprising somewhat over US$400,000 invested in July/August, together with c. US$300,000 which were the trading gains as at that date on her open positions. She claimed also damages for loss of the profit which she claimed she would have made had that money not been withheld, in an amount of c. US$600,000.  These claims were based on three causes of action:

(1) Breach of contract.  Specifically Ms Ang contended that there was a breach of various express provisions of the Terms and Conditions which Reliantco itself contended were those incorporated into the contract.  She also relied on certain terms which she contended were to be implied into the contract either pursuant to the English Consumer Rights Act 2015 ('CRA 2015'), or as a matter of common law.

(2) Breach of trust.  Ms Ang's case in this respect was that she had made all transfers to Reliantco for the specific and sole purpose of those funds being invested in accordance with her instructions, and on the understanding that her funds would be segregated.  She contended that there was either an express trust or a Quistclose trust (per Barclays Bank Ltd v Quistclose Investments Ltd [1970] AC 567).  There was an issue as to whether Cyprus law recognises Quistclose trusts.

(3) Breach of the Data Protection Act 1998 or other applicable data protection law.  Ms Ang contended that Reliantco, as data controller, had breached data protection

**12**

principles, including in particular that personal data being processed should be accurate.

43. At the outset of the trial, Reliantco maintained all the points put forward in its (Amended) Defence and Counterclaim, and of which I have already given an outline. Specifically, in its Skeleton Argument, Reliantco advanced the following defences:

(1) It contended, in answer to the breach of contract claim, that it had been entitled to terminate its contract with Ms Ang for the reasons it then gave; or alternatively for other reasons which were then available to it. These other reasons included in particular an alleged right to terminate the agreement because certain representations and warranties given by Ms Ang had been or became untrue. This was said in particular to be the case in relation to a warranty Ms Ang had given as to the accuracy of information which she had given to Reliantco. Reliantco argued that this warranty was broken because the information which she had given as to her source of wealth on 4 and 14 August 2017 was untrue; and also that there was a breach of Clauses 10.2, 10.7 and 10.9 of the Terms and Conditions because either Ms Ang's account was opened and thereafter operated by Dr Wright and not by Ms Ang and insofar as Ms Ang had any involvement with the account it was simply as Dr Wright's agent, or at least that Dr Wright had some access to that account.

(2) It relied on a defence of misrepresentation, which was said, 'put at its lowest' to be based on the allegedly incorrect statements in the Source of Wealth documentation; and 'put higher' to be based on the 'deceit' involved in the account having been opened and thereafter operated by Dr Wright and not by Ms Ang. The misrepresentations, whether innocent or deceitful, were said to justify the termination 'or rescission' of the account on 10 August 2017, and to nullify any suggestion that Ms Ang should be entitled to the trading gains which there had been by 10 August 2017. It was also contended that Ms Ang should not be entitled to recover the amount which she had deposited, which stood in her account in the sum of US$407,442.40. This argument was put in a number of ways, including the adoption of the argument, already outlined, that the upper limit on any recovery was US$8,972.02 because the amount which Ms Ang had taken out by 23 May 2017 had to be taken into account, and the contention that Reliantco's counterclaim exceeded any claim which Ms Ang might have to the return of the monies which stood to her account.

(3) It denied that there was any Quistclose or other trust.

(4) It denied that Ms Ang could succeed in relation to her claims for breach of data protection principles, and specifically contended that they failed for reasons of lack of causation and remoteness.

(5) It put forward a counterclaim on the basis that a fraud had been perpetrated on the German court and on Andrew Baker J by Ms Ang's assertion that she was the user of the account.

**13**

44. The parties intended to call, in addition to factual witnesses, (1) IT experts, and (2) Cyprus law experts.  In relation to Cyprus law, the parties had agreed that this should be treated as the same as English law, save in two respects, namely (1) the principles applicable to determining whether clauses in the Terms and Conditions would be rendered ineffective as a matter of the Cypriot Unfair Terms in Consumer Contracts Act 1996, and (2) whether Cypriot law recognises Quistclose trusts.

The Narrowing of the Issues

45. The issues in the case narrowed significantly after Mr De Jong had commenced giving his evidence.  The reason for this was that he accepted that Reliantco held sums received from clients for the purposes of their trading in a fiduciary capacity, and specifically that the sums which it had received from Ms Ang had been held for her, and were 'her monies', and that Reliantco had not intended to keep her money. This led, on the fourth day of the trial, to Reliantco accepting that it would no longer contest Ms Ang's claim to the balance of the amount deposited in her account as at 10 August 2017, which it contended was an amount of US$399,298.79.  Reliantco would still be able to advance its counterclaim and an alleged right of set off, though any such right of set off was denied by Ms Ang on the basis that her claim to these monies was a proprietary one.  Given the above concession, it was agreed that the Cypriot law experts, who had principally been going to give evidence on the Quistclose trust aspect, no longer needed to be called, and that, insofar as there were any disputes as to issues of Cypriot law other than related to the recognition of Quistclose trusts or their equivalent, the evidence of Dr Marcos Dracos, who had been instructed by Ms Ang as an expert, should be accepted.

46. I need only comment on these developments that I did not find Mr De Jong's concessions in the evidence to which I have referred to be in any way surprising, especially in the light of clauses 4.3, 7.1 and 7.2 of the Terms and Conditions, and of Reliantco's audited accounts. I had found more surprising the case which it had made in its pleadings and its opening that, notwithstanding that it was an agent, and had received sums on the basis that they would be held in the client's name and would not be used in the course of Reliantco's business, it was entitled to retain them itself.  In the event, as I have said, that issue was removed from the trial.

The Evidence

47. As with many cases in this Court, I considered that the most reliable basis for making findings of fact was in general the contemporary documentation, and the inferences which could be drawn from it or, in relation to certain matters, its absence.  This was, however, a case in which the oral evidence had a rather greater significance than in many commercial cases as a result, in part, of the domestic context (to use at the moment a neutral phrase) of Ms Ang's setting up and use of the account, as well as the absence of documentation on certain issues.   It is therefore necessary for me to set out my assessment of the evidence given by the four factual witnesses who testified.

**14**

48. Ms Ang herself gave evidence.  She was clearly an intelligent witness. She was aware of the nature of points which might be made against her case and was in some instances anxious to pre-empt them.  I also gained the clear impression that she had to some extent embroidered or elaborated on her memory of events.  She was thus not an entirely reliable or truthful witness, but I did not form the impression that Ms Ang was trying to deceive the court in relation to the essential elements of her narrative.  On the contrary, I considered her core evidence, that she had regarded the UFX account opened in her name as her money, using what she saw as her money, to have carried conviction.  Ms Ang came across as having independence of mind and I did not consider that Reliantco's case that, to the extent she had been involved at all with the UFX account, it had been as Dr Wright's agent, acting solely on his instructions, to have been consistent with the view I formed as to Ms Ang's character.

49. Dr Wright gave evidence.  He was an unsatisfactory witness in many respects.  He was belligerent, argumentative and deliberately provocative.  He evaded questions to which he did not wish to give a straight answer. On occasion he refused to accept what documents plainly indicated. He was prepared to make grave and unsustainable allegations, for example in relation to the supposed fabrication by or on behalf of Reliantco of an email from him of 3 September 2017.  He sought on occasion to blind with (computer) science.  I came to the conclusion that I could not rely on Dr Wright's evidence as to whether and how particular events had happened unless it was supported by documentation, other evidence I could accept or by the inherent probabilities.

50. What however did emerge from Dr Wright's evidence were certain features of his character and circumstances which I consider to be of relevance in assessing the factual issues in this case.  In the first place, as Dr Wright made clear, he is someone who has amassed a considerable fortune in Bitcoin.  He said that he has US$14 billion of Bitcoin in a trust.  The following were representative passages of his evidence:

> 'On the other hand, I don't really care about this because my car is worth more than their whole thing is [by which I understood him to mean the value of this case].  I have got a Lamborghini.  I have got other sports cars.  Their whole thing is a rounding error for me.  (Day 2/187) …
> You again seem to think I would care about $5000 deposits.  I have a watch that bloody makes this a rounding error. (Day 3/19)'

51. A further significant feature of his evidence was his recognition that, if he decided to apply himself to a matter, he would do it with pertinacity, even if it was apparently insignificant.  He gave the following evidence:

> 'I get ─ my wife tells me with these sort of things I get too upset.  I sued Amazon.  Amazon dropped a parcel over the fence and broke it.  I sued them.  I won, but I still sued them.  Over a £70 parcel I spent £700 worth of legal fees against Amazon. (Day 2/175)'

**15**

Furthermore, he made it clear that he did keep an effective watch over what was his wife's money and what was his.  He said:

> 'Basically, I keep track of everything.  I've actually – I've got qualifications in finance and accounting.  I used to work in an accounting firm.  I track all these things. (Day 3/20)'

52. It was also clear from his evidence that he valued his wife having funds of her own.  The following evidence was, in my view, broadly credible:

> 'And when I take money out of the [joint] account I do put it back, because it's my wife's money.  And I think it's important – I've got my own source of wealth.  And I don't want her beholden to me.  I think that leads to problems.
>
> If she's beholden to me, then it leads to dependency problems.   I had that in my first marriage, part of why my first marriage collapsed was my wife was completely dependent on me so I want my wife to be independent from me.  I don't want her asking, going, 'Can you put more money in for the school account, can you do this?' I want her just to have her own funds and I want her to earn from it.'

53. I also accepted that Dr Wright had a dim view of Ms Ang's technological and financial abilities.  As he said:

> 'So, yes, my wife had no ability to work out financial calculations'.
> His low estimation of her technological knowledge was clearly manifested in his evidence at Day 2/175-180.

54. Reliantco called two factual witnesses: Mr Dennis De Jong and Ms Melina Theodorou.  Ms Theodorou was an essentially trustworthy witness in relation to her, relatively limited, involvement in the matters with which I am concerned.

55. Mr De Jong's evidence was more difficult to assess.  He was straightforward in relation to the issue of whether the monies which Ms Ang had deposited were held in a fiduciary capacity.  I considered, however, that he was evasive in relation to the issue of why the decision had been taken to close Ms Ang's account and 'cancel' her trades; and, more generally, as to the relationship between Reliantco and Toyga, and the role in the relevant decisions of Messrs Toledano, Noam, Ameen Qussoom, and Weizman.

56. I consider, further, that Ms Ang made a legitimate criticism that none of the four Toyga individuals I have just referred to, nor anyone else from Toyga, was called to give evidence.

57. As I have already said, IT experts were called.  The reason for this evidence was as follows.  Reliantco produced a log of occasions on which Ms Ang's account had been accessed electronically.  Although Ms Ang did not accept the reliability of this log,

**16**

what it had shown, inter alia, was access to the account on 14 and 20 April 2017, from the UK IP server address by which her account was intermittently accessed over the period 7 to 15 February 2017 and consistently over the period 25 February to 24 May 2017. The significance of this was said to be that during the period of 12 to 20 April 2017 Ms Ang was in Singapore celebrating her father's birthday. Reliantco accordingly pointed to this as an occasion on which, as it said, it had clearly not been Ms Ang, but had been Dr Wright, who had accessed her account. Similarly, Ms Ang's account had been accessed 21 times from a Samsung Galaxy S7 mobile phone in the period between 17 February 2017 and 14 August 2017. Reliantco pointed to this as significant, because Ms Ang had had an iPhone, while Dr Wright had had a Samsung Galaxy. To these points made by Reliantco, Ms Ang and Dr Wright responded that it was use of a VPN connection which had allowed Ms Ang to access her account through her home network while she was away from home; and that the explanation of the contact through the UK IP address on 20 April 2017 was probably that it was through the VPN connection, by her using the inflight WiFi while on board a Singapore Airlines plane. The expert evidence was designed to shed light on the extent to which Ms Ang's / Dr Wright's account in relation to the VPN network was a possible or plausible explanation of the entries in the log.

58. The parties each instructed an IT expert, as follows: on behalf of Reliantco, Dr Nedko Nedev; and on behalf of Ms Ang, Mr John Douglas. This led to the proliferation of extremely technical (sub)issues, and to the experts being asked to come close to expressing views as to the reliability of the evidence of Ms Ang and Dr Wright. Ultimately, the matters which were properly the subject of expertise which separated Dr Nedev and Mr Douglas were limited, and I will return to them below. I considered each to be properly qualified and seeking to assist the court.

59. The parties served evidence as to Cyprus law: from Dr Dracos on behalf of Ms Ang; from Mr Pavlou on behalf of Reliantco. As I have said, insofar as this related to whether the equivalent of a Quistclose trust would exist or be recognised as a matter of Cyprus law, the issue fell away, and I will not say more about it. In relation to other issues of Cyprus law, as I have also said, it was agreed that I should proceed on the basis of Dr Dracos's evidence. That evidence was that Cypriot Law No. 93(1)/1996 on unfair / abusive terms in consumer contracts harmonised Cypriot law with Directive 93/13/EEC; and that that law must be interpreted consistently with the Directive and decisions of the CJEU. Dr Dracos's evidence was that a significant imbalance between the parties' rights and obligations is not enough, on its own, to render a contract term unfair; nor is it enough, on its own, that a term falls within the 'grey list', the Cypriot Supreme Court's decision in <u>Frakapor Courier Ltd v Bank of Cyprus</u> (Civ. App. 9/2011, Decision 15 June 2016) being to that effect. It must be established in all the circumstances that there was an absence of good faith. This issue would be approached consistently with the jurisprudence of the CJEU. Dr Dracos gave evidence that in his opinion this involved an objective not a subjective evaluation.

<u>The Principal Factual Issues</u>

**17**

60. I turn to consider and make findings upon the main factual issues which divided the parties.  These can be classified as falling into three main categories: (1) the issue of whether the Reliantco account opened in Ms Ang's name was in reality Dr Wright's account, with the further issues of whether and to what extent Dr Wright may have accessed and traded on that account, and whether Ms Ang and Dr Wright sought to mislead Reliantco as to the real user of the account; (2) whether the information provided by Ms Ang in the Source of Wealth Form submitted on 4 August 2017 was inaccurate; and (3) what were the reasons for Reliantco's closing Ms Ang's account and seeking to 'cancel' her trades.  I will take these in turn.

*What involvement did Dr Wright have with the account?*

61. Reliantco's primary case in relation to Ms Ang's account was an uncompromising one.  On that case, it was always Dr Wright's account.  He had set it up; he always used it; and he, with Ms Ang, took steps to try to ensure that Reliantco did not know that he had any involvement with it or indeed, as I understood it, with Ms Ang.  Reliantco's case was put in its opening skeleton argument for the trial as being that 'insofar as [Ms Ang] (as opposed to [Dr Wright]) invested any sums using [Reliantco's] platform at all, she did so in the capacity as agent for her fraudulently undisclosed principal ([Dr Wright])'.

62. I do not accept Reliantco's primary factual case about the 'true operator' and nature of the account.  I find that the account was indeed, in a real sense, Ms Ang's; that it was opened by her, albeit with help, and very probably with the encouragement, of Dr Wright; and that Ms Ang thereafter did trade on the account, though I conclude that Dr Wright probably did as well, in order to assist her.  I consider that this accords much better with the documentary evidence and the evidence from Ms Ang and Dr Wright that I am able to accept than does Reliantco's primary case.

63. More specifically in relation to the establishment of the account:

(1) I accept Ms Ang's essential account that she had played the principal role in the setting up of her account on 10 January 2017. I have no doubt that she sought, and obtained, some help from Dr Wright in doing so.  He is very expert and experienced in financial and computing matters; she, by her own (and his) account is not.

(2) It is not clear as to why Dr Wright sought to open an account on 10 January 2017 in his own name.  It may be that it was, as he said, simply a demonstration account, for the purposes of showing Ms Ang what to do; or it may be that he thought that he might use it once opened.  Whatever the precise truth in relation to that, I consider that the opening of this account does not alter the basic point that Ms Ang wanted to open an account in her own name for herself.

**18**

(3) I find that Ms Ang and Dr Wright were not seeking to conceal their relationship from Reliantco.  It would have been surprising, if they had been wanting to do that, that Ms Ang would have sent a Council Tax bill with both their names on it.  It would also have been surprising for them, on consecutive days, to have sent to the same person at Reliantco copies of bank cards for the same account at Lloyds Bank but with their different names on them.

64. As to the subsequent accessing of the account, I accept that much, probably most, was done by Ms Ang; and that many, and probably most, of the trades were done herself albeit, at least on some occasions, after some discussion of what she was doing with Dr Wright.  But I also find, on the balance of probabilities, that Dr Wright himself accessed the account.  I do this on the following basis:

(1) There was, in the end, no dispute between the IT experts as to the reliability of the access logs produced by Reliantco.  There remained a residual issue as to whether all the entries represented user authentications, but the logs were, in Mr Douglas's words, 'very accurate' in showing some sort of access, and as to its date and time, and some information as to the type of platform the account was accessed from.

(2) Given (1), I consider that the most likely explanation of the access to the account from the UK IP address on 14 and 20 April 2017 is that it was by Dr Wright.  Whilst it might perhaps be possible that it was by Ms Ang through a VPN network, I do not consider that this is the most likely explanation. This is in particular because of the access on 20 April, whilst Ms Ang was on a flight with Singapore Airlines.  While she suggested that she may have been using the on board Wifi, including for checking her emails, I did not consider this to be correct.  She had not responded to an email sent to her from a tutoring agency on 13 April until 06.39 on 20 April, at which point she wrote that she had been overseas and had just returned.  It seems to me most likely that that was sent just after she had touched down at Heathrow, and suggests to me that she had not been actively using Wifi on board.

(3) Similarly, I consider that the most likely explanation of the occasions on which the account was accessed from a Samsung Galaxy phone was that that was by Dr Wright.  The occasions of such accesses included accesses from Spain and from Italy.  I did not find convincing Ms Ang's suggestion that these were to be accounted for on the basis that she had used Dr Wright's mobile because he had had a better mobile data roaming package. As Dr Wright himself was keen to stress, he and his wife were staying in a '£20,000-a-night-type hotel', 'one of the top hotels in the world in a suite that well royalty stays in'. He was, as he put it himself, a 'bloody billionaire'.  I did not regard it as likely that Ms Ang had an inadequate data roaming package.

(4) I accepted Dr Wright's evidence that he wanted Ms Ang to have her own money, and earn from it.  But I was also sure, having seen Dr Wright give evidence, that if he came to focus on the matter, and thought he could help her make her investment profitable without taking it over, he would have done so. Furthermore,

**19**

as he said himself, he had 'real problems actually explaining things to people, but I can show them and I can write them … the only way I can express myself is to actually do something…'  This seemed to me strongly to indicate that had he wanted to help his wife with her trading in Bitcoin futures, what he would have done, at least on occasion, was to do it himself.  His low estimation of his wife's financial and technological abilities, at least by comparison with his own, would, I think, have meant that he had little compunction in helping her in this way.

(5)  It is apparent that Dr Wright did keep track on the positions in Ms Ang's UFX account.  As his Affidavit in the German proceedings said, he made certain 'parallel' investments, with positions similar to those which Ms Ang had opened with UFX.  In evidence on Day 3 of the trial Dr Wright said that he had known of the positions on Ms Ang's UFX account and had reflected them in his own positions, though he had other positions as well.  The fact that he was conducting such parallel investing suggested to me that he would have been all the more likely, on occasion, to access Ms Ang's account, at least to monitor what the position on it was.

*Was the Source of Wealth Information Inaccurate?*

65.  The second area of factual dispute was as to the source of funds utilised for Ms Ang's investments and more particularly whether the information given in the Source of Wealth Form which she submitted on 4 August 2017 was untrue.  I have already set out what that Source of Wealth Form said.  Given that that Form was filled in and returned pursuant to Ms Theodorou's email of 4 August, which had specifically mentioned Ms Ang's recent deposits and said that documentation was required to sustain her deposits, and that the form itself asked 'Please state how the source of wealth for your last deposits has been raised…', I consider that the information contained in the completed Source of Wealth Form would reasonably be considered as relating to Ms Ang's recent deposits, not to the deposits made prior to late July 2017.

66.  Reliantco's case is that the information in the completed Source of Wealth Form was inaccurate for the following reasons:

(1)  The money from the sale of the Australian property which Ms Ang had owned with her former husband was paid into a Natwest bank account in Ms Ang's name, and the majority of it was paid into another Natwest account in Ms Ang's and Dr Wright's joint names.  None was paid out into the Lloyds Bank account from which the deposits in late July / early August were made.

(2)  The amount which she had received from DeMorgan had not been a sum paid in the liquidation of DeMorgan, but had been the repayment of loans to that company.

(3)  That a considerable part of the amount received from DeMorgan in June 2016 had been paid into Ms Ang's IG account, where it was added to some money which Dr

Wright had provided, and that there were then significant trading gains on positions opened in the IG account.  It was this IG account which had then been used to fund the initial deposits made by Ms Ang after her UFX account was opened in January 2017.

67. Ms Ang said that she did not recall all the details of these matters.  She denied, however, that her statements in the Source of Wealth Form had been untrue or inaccurate.  Her evidence was that she had indeed seen the source of her deposits as being the two matters she had identified: they were important sources of her own wealth.  Specifically in relation to the amount deriving from DeMorgan, the repayment of loans had taken place as part of the liquidation of the company, and what she had said in the Form as to DeMorgan was accurate.

68. I find that the information which Ms Ang provided in the Source of Wealth Form was not untrue or inaccurate.  The question which she was asked to answer was as to the 'source of wealth', and the three suggested answers, if the source was other than annual income, were 'Inheritance from a third party', 'disposal of business or other asset' and 'other source'.  That was clearly not seeking the identification of the bank account(s) out of which the deposits were being made, but was, or could reasonably be taken to be, looking to identify the origins of the depositor's relevant wealth.  The question was not specific about how the Form should be filled in if the ultimate source of wealth was one of the two specifically suggested matters, but the money derived from those sources had been added to by investment.  In light of these points I consider that Ms Ang's answers were not inaccurate or untrue. The matters which she identified were a significant source of her own wealth, and more than equalled the amount of the deposits which she was making.

69. Specifically in relation to Reliantco's complaint that the Source of Wealth Form was untrue or inaccurate because it suggested that the sums from DeMorgan had been paid on its liquidation, whereas they had been the repayment of a shareholders' loan, I considered that this point was incorrect.  The Form said that a source of funds had been '40% of DeMorgan Ltd (Australia) holdings liquidated on move to U.K.'.  I do not consider that the Form was stating, or would reasonably be read as stating, exactly how in the process of liquidation of DeMorgan Ms Ang had been entitled to a sum of money, but was rather saying that DeMorgan had been liquidated on her move to the UK and she had been the recipient of monies as a result of that process.  That was not inaccurate.

70. Even if it can be said, contrary to my view, that the information was not an accurate answer to the questions, I reject Reliantco's case that it was deliberately untrue.  The case which was put to Ms Ang in this respect was that she deliberately avoided giving a source of funds which indicated that part of it was Dr Wright's money.  I considered Ms Ang's evidence as follows to have been credible, and I accepted it:

'Q. … I suggest that you interpreted the question exactly as you were meant to right from the off, but you gave an untrue answer in responding to it, didn't you?

A. I did not and I would have no reason to. What reason would I have had to do that?

Q. Because, firstly, the funds originally came from trading on the IG account, yes, that's a good reason not to tell them.  But you [had] a better reason not to tell them, because some of those funds derive ultimately from Craig Wright's money?

A. No, but the thing is they asked me for my source of wealth.  My source of wealth was how I came to have money.  What enabled me to put money into UFX?  What enabled me to do that was the fact that I had $1 million coming from my house sale and DeMorgan had liquidated, resulting in some-

Q. What enabled you to do it was trading profits on an IG account –

A. That's not how I saw it.'

71. Reliantco's case in this area appeared to suggest that what Ms Ang was doing, in the way in which the Source of Wealth Form had been filled in, was to conceal any connection with Dr Wright at this stage.  Mr Bradley submitted that that was 'the effect of what she was doing'.  I did not consider that this was correct.  The documentation which Ms Ang included with the Source of Wealth Form included the financial statements for DeMorgan as at 30 June 2015.  The Balance Sheet had entries for 'Related Entity Loans – Wright Family Trust' and 'Related Entity Loans – Craig Wright R&D'.  Following Ms Theodorou's request on 9 August, on 14 August Ms Ang sent a copy of the DeMorgan's shareholders' register showing the Wright Family Trust as having 131 million 'Founder' shares. Also included was the Register of Directors, which showed both Dr Wright and Ms Ang as Directors, and gave the same address in New South Wales for both of them.  None of this was consistent with an attempt to conceal a connexion with Dr Wright.

*The Reasons for the Termination of the Account and Cancellation of Trades*

72. The third area of factual dispute related to Reliantco's reasons for terminating Ms Ang's account and 'cancelling' her trades on 10 August, and the connected issue of what had actually been done by way of 'cancellation' of those trades.

73. As I have said, this was an area in which various of the Toyga individuals who seem to have been intimately involved were not called.  There was also a dearth of information, including documentation, as to what exactly had been done by way of the 'cancellation' of the trades.

74. Reliantco's case was that the reason for the termination of her account was that it had been discovered that Ms Ang was married to Dr Wright, who had been accused of fraud and who was supposed to be the inventor of Bitcoin, and that she had made significant gains earlier in the year from opening long positions which was a potential indicator of insider trading or the like.  Such at least was Mr De Jong's evidence.

**22**

75. I consider that these were the concerns which initially prompted Reliantco to consider closing Ms Ang's account.  However, I do not consider that that is the full story.  It appears to me to be apparent from the emails that there are from Messrs Noam, Qussoom, Weizman and Toledano that they were concerned to try to get back the profits on Ms Ang's earlier trades, and to deal with her open trades in such a way that she neither received back the money she had invested nor made the gains which the value of her open positions as at that date indicated.  Noam's email of 15 August 2017 said 'there is not chance we keep her balance here and sue her that she scam us and we sent 600k for her?  We must find something that will not letting her to take from us money'. I do not consider that this type of concern and desire would have arisen if Reliantco's position had been being considered in isolation.  Reliantco was, as the Terms and Conditions stated, simply a broker in relation to these trades.  Mr De Jong's evidence as to Reliantco's business was that it '[did] not take the other side of our customers' trades'.  It is hard to see how it could have occurred to a broker in that position to claim to recover for itself profits previously paid out on trades placed through it, or to appropriate to itself the sums which Ms Ang had invested with it.  I conclude that the likely explanation is that the counterparty to Ms Ang's trades was PX Exchange; and that PX Exchange was a subsidiary of ParagonEx Ltd, of which, as in the case of Toyga, the ultimate beneficial owners were Mr Toledano and a Mr Pilosof.  In the absence of any evidence from the individuals concerned, I draw the inference that the desire was at least to recoup losses made by PX Exchange on the earlier contracts it had entered into, and to avoid PX Exchange sustaining losses on Ms Ang's open positions.  It may also be that, if PX Exchange had hedged Ms Ang's positions as Mr Weizman's emails of 7 and 8 August 2017, quoted above, suggest may have been the case, PX Exchange would have made a profit as a result of the 'cancellation' of Ms Ang's positions.

76. On any view it seems clear that the decision to 'cancel' Ms Ang's trades with immediate effect on 10 August 2017, and not to return what she had deposited, was taken by, or was at least the result of the attitude of, those within Toyga.  This course went significantly beyond what Mr De Jong had advised on 8 August 2017 might be possible, and it is apparent from Mr Plischke's email of 17 August that Reliantco's Compliance Department had been given little information as to what was happening or why Reliantco was terminating Ms Ang's account.

Analysis of the Claims

*Ms Ang's claims*

77. As already set out, Ms Ang contends that she is entitled not only to recover the amount which she had deposited with Reliantco, but also the unrealised gains on the open positions which were in her account as at 10 August 2017, as well as the loss of investment returns which would have been made on those amounts.  She makes breach of trust, breach of contract and data protection claims.

*The sums deposited*

**23**

78. As further set out above, Reliantco now concedes that it has an obligation to return the amount which Ms Ang had deposited. I understood this, particularly when taken with Reliantco's acceptance of Dr Dracos's evidence as to Cyprus law, to be an acceptance that there was the equivalent of a Quistclose trust in respect of these amounts. Even if there was not, I consider it clear that Reliantco was obliged to return these monies pursuant to the Terms and Conditions and in particular to clause 26.7. In that regard, there was no suggestion that any amount needed to be withheld from those amounts in respect of future liabilities.

*Gains on open positions*

79. Reliantco did, however, contend that it was not liable in respect of the amount which represented the unrealised gains as at 10 August 2017 on Ms Ang's then open positions.

80. The starting point is that Reliantco had entered an agreement with Ms Ang. Unless it was entitled to bring it to an end, to close her positions without her consent, and not to allow her to give instructions in relation to them, would have constituted a breach of the express or implied terms of the Customer Agreement, including clauses 10.1, 11.2 and 11.5 of the Terms and Conditions. Reliantco's answer is that it was entitled to bring the relationship with Ms Ang to an end. Reliantco put this case in two ways, not including its reliance on its counterclaim, which I will consider in due course. Those two ways were: (1) it contended that Ms Ang had been guilty of misrepresentation and deceit; and (2) that it was contractually entitled to take this course. The further issue then arises as to whether, even if Reliantco was entitled to terminate Ms Ang's account, it was entitled to deal with her open positions in a way which meant that she did not receive the value of the unrealised gains as at the date of that termination.

81. In relation to its case as to misrepresentation and deceit, Reliantco was not always clear as to what misrepresentation it was relying on and when it contended it had been made. Reliantco relied primarily on what it alleged was the material misrepresentation following the submission of Ms Ang's Source of Wealth documentation (Skeleton paragraph 26). That plainly was not pre-contractual and cannot have induced the making of the Customer Agreement. No pre-contractual misrepresentation was established. Insofar as Reliantco made a case that there was a pre-contractual representation to the effect that it was Ms Ang who was opening the account, and that that was a misrepresentation because it was in fact Dr Wright who was doing so (ADC para 5(v)), I find that that fails on the facts. It was Ms Ang who opened the account. Furthermore, even if there had been a pre-contractual misrepresentation there was no right on the part of Reliantco as at 10 August 2017 to rescind the Customer Agreement. By that time rescission was not possible; many trades had been entered into between Ms Ang and third parties through Reliantco as agent, which had been fully performed.

82. As I understood it, Reliantco's case on misrepresentation, at least at trial, was directed not so much to saying that there was a pre-contractual misrepresentation, but instead

was a case that there had been misrepresentations during the course of the existence of Ms Ang's account.  This case was thus effectively the same as its case in relation to its entitlement to terminate by reason of what it contended were Ms Ang's breaches, including by reason of misrepresentations allegedly made by Ms Ang, and its case as to what the Terms and Conditions in the Customer Agreement entitled it to do in the event of such breaches, to which I will now turn.

83.  Reliantco contended that its termination of Ms Ang's account on 10 August 2017 was not wrongful because it was entitled to do so for the reasons it then gave.  Alternatively it contended that it was entitled to point to other reasons which existed at the time as justifying the termination, in accordance with the principle in Boston Deep Sea Fishing v Ansell (1888) 39 Ch D 339.   The alleged matters were: (1) that clause 26.2(n) was applicable because Ms Ang had made misrepresentations in her Source of Wealth Form and documents, and that this constituted a breach of the warranty in clause 15.1(f) and/or (g); (2) that there was a breach of clauses 10.2, 10.7 and 10.9.  The breaches alleged by Reliantco in relation to (2) were said 'at the very lowest' to be that Ms Ang was not the sole individual enjoying access to and/or the use and/or operation of the account, because Dr Wright had such access and/or made such use; and '[p]ut higher', to be that there was a breach because the account was always Dr Wright's and not Ms Ang's, and it had been opened and operated by him pursuant to a deceitful misrepresentation of the true holder and operator of the account.

84.  Taking first Reliantco's case that clause 26.2(n) was applicable because of Ms Ang's misrepresentations in her Source of Wealth Form, this argument fails because I have found that the statements made by Ms Ang in the Source of Wealth documentation were not untrue or inaccurate. That is sufficient to dispose of this point, but I should add that Reliantco's case in relation to the inaccuracy of the Source of Wealth Form was on any view a highly technical one.  This documentation appears to have played no role in the decision to terminate.  Furthermore, it was almost unprecedented for a customer to return such a form at all.  When she had received this form, Ms Theodorou forwarded it to her colleagues adding the comment (in Greek) 'first time in history' which, as she confirmed in evidence, was a remark on how infrequently such documents were returned, and was prompted by the fact that she was pleasantly surprised at the helpfulness of this client.

85.  In relation to Reliantco's case as to breach of clauses 10.2, 10.7 and/or 10.9, as will be apparent from what I have said above, I find that it is not correct that the account was Dr Wright's, or that he alone, or he predominantly, operated it, or that Ms Ang was simply his agent in anything she had to do with the account.  Accordingly, I reject Reliantco's case on breaches of these clauses insofar as it was 'put higher'.  However, I have found that Dr Wright did have some access to the account.  This must have involved a breach by Ms Ang of clause 10.9, in that Dr Wright was not 'an individual who ha[d] been expressly authorized to act on [Ms Ang's] behalf according to Section 16' of the Terms and Conditions.  Furthermore, and though it may be of limited significance given my finding in relation to clause 10.9, I consider that the fact that Ms Ang permitted Dr Wright to access the account also constituted a breach of clause

**25**

10.2, because his was not 'authorized access'; and there was also a breach of clause 10.7 because permitting Dr Wright to access the account was use 'in contravention of th[e] Customer Agreement'. I do not however find that there was a breach of that part of clause 10.7 which required Ms Ang only to use the trading system for the benefit of her account and not on behalf of any other person, because I find that the account was used only on her behalf, even when it was accessed by Dr Wright.

86. On the basis that there were breaches of clauses 10.2, 10.7 and 10.9, as I have found there to have been, what were the legal consequences? In my judgment they gave Reliantco the right to terminate Ms Ang's account under the second sentence of clause 10.2, in addition to the right which it had, irrespective of breach, to terminate by sending a notice under clause 26.3. I do not consider that clause 26.2 was engaged. I have already given my reasons as to why I reject the case that 26.2(n) applied. For completeness, I should add that I did not consider that 26.2(e) was applicable, given that there was no suggestion that Reliantco considered that the Customer Agreement could not be 'implemented'.

87. The separate question arises as to whether in such circumstances, Reliantco was entitled to deal with Ms Ang's open positions in such a way as, in effect, to arrange that they should be 'cancelled' as if they had not been entered into. This, though it did not explain with any specificity as to how it had done it, was what Reliantco contended that it had done, and been entitled to do. I do not consider that the Customer Agreement gave Reliantco such a right for breaches of clauses 10.2, 10.7 and 10.9. 'Cancellation' is, within the terms of the Customer Agreement, distinguished from 'closing' or 'closing out' open positions (clauses 26.2(r) and (s) and 26.5(g), compared with clauses 11.7, 11.9, and 26.5(b)). As is obvious, and as had happened when Ms Ang had closed open positions previously, the ordinary process of closing out trades would realise the unrealised gains on her Bitcoin futures positions at the time of closure. Any right to 'cancel' under 26.5(g), assuming it to be a valid provision, arose only if there had been the occurrence of an event within 26.2. I find that there had not been.

88. I did not in fact understand Reliantco actually to contend that, if Ms Ang's only breaches consisted of letting Dr Wright have access to her account, those breaches had entitled it to 'cancel' as opposed to closing out her open positions (Reliantco Skeleton Argument, para. 22). In any event, I am of the view that the Customer Agreement did not entitle it to do so.

89. Further, if I am wrong as to the construction of the Customer Agreement, and it is to be construed as providing by clauses 26.2 and 26.5(g) for a right in Reliantco's discretion to 'annul or cancel' open positions for any breach of clauses 10.2, 10.7 and 10.9, then I would consider that Ms Ang is correct in her case that those clauses are not binding on her by reason of s. 62 CRA 2015. I consider that the relevant provisions of that Act are applicable to the Customer Agreement. The Customer Agreement was a consumer contract within Article 6(1) of the Rome I Regulation (Regulation 593/2008); and the relevant protections afforded the consumer by the CRA 2015 are protections afforded the consumer by provisions that cannot be

derogated from by agreement by the law which would, in the absence of choice, have been applicable under Article 6(1), namely English law.  If the effect of the clauses in the Terms and Condition to which I have referred was as Reliantco contended, then they would in my judgment be unfair, in causing a significant imbalance in the parties' rights and obligations to the detriment of the consumer, contrary to the requirement of good faith.  If these clauses had such an effect they would permit Reliantco, for what might be trivial breaches, to deprive the consumer of what might be very significant gains showing on her open trading positions.  In relation to a consideration of whether a term causing such imbalance was contrary to the requirements of good faith, it is relevant to consider whether the trader could reasonably have assumed that the consumer would have agreed to such terms in individual contract negotiations.  In my judgment that could not have been reasonably assumed.

90. Further, and if I am wrong that the English CRA 2015 is applicable, and that it is Cyprus law which governs, I would conclude that, applying that law, the relevant terms were not binding on Ms Ang.  As already set out, Cypriot Law No. 93(1)/1996 harmonised Cyprus law with Directive 93/13/EEC.  For the reasons I have given in relation to s. 62 of the English CRA 2015, which derives from the same Directive, I find that considering the matter under Cyprus law leads to the same conclusion.

91. On this basis, I consider that Reliantco's obligation to pay the 'Balance' on Ms Ang's account under clause 26.7 of the Terms and Conditions included an obligation to pay the amount which represented a closure of Ms Ang's open positions in a way which captured the unrealised gains which were shown on those trades on 10 August 2017. The failure on the part of Reliantco to close the open positions and realise that gain (if that is what happened) and to pay the balance which should have resulted from such closure 'as soon as reasonably practicable' constituted a breach of the Customer Agreement and in particular of clause 26.7.

92. Furthermore, and in case I am wrong in relation to the existence of a contractual claim, I consider that Ms Ang's claim to equitable compensation is made out.  As I have said, it was ultimately not contested that the monies which Ms Ang had invested with Reliantco were the subject of the equivalent of a Quistclose trust.  In my judgment Reliantco acted in breach of trust and of its fiduciary duties of loyalty in dealing with the positions opened on Ms Ang's account with those funds in such a way that meant that she did not accrue the benefit of the market gains on those positions at the time of termination of the account.  As I have said, I find that this was done, at least in large part, in order to benefit Reliantco or parties which it or its controllers were related to, in the ways to which I have referred above.

*Ms Ang's claim for loss of investment returns*

93. Ms Ang claims what she says would have been earned by her had the monies to which she was entitled been paid to her upon the termination of the account.  Although this claim had been formulated in a number of ways, by the time of trial the claim was put as follows.  She contended that she and Dr Wright had decided in about May 2017,

when it became public knowledge that Bitcoin was going to 'fork' into Bitcoin Cash, that at the end of August or September 2017 she would close any positions she then had on UFX and he would close positions on an exchange called Kraken. They had decided that because they wished to purchase Bitcoin Cash on the Kraken exchange. Had she been able to do so, and if Reliantco had not blocked her account, she would have closed her positions with Reliantco on about 3 or 4 September 2017 and would have bought 3530 Bitcoin Cash. As at 3 July 2020, 3530 Bitcoin Cash would have been worth US$1,334,163.30.

94.  It was put to Ms Ang that her account in relation to her planned investment through Kraken was entirely invented.  I concluded that that was not the case.  There appeared to me no very good reason why Ms Ang should have invented that account.  It would have produced a considerably larger claim had she said that she would have stayed invested, or would have reinvested, in the same type of Bitcoin futures as she had purchased through Reliantco.

95.  Accordingly I consider that Ms Ang is entitled to succeed on this aspect of her claim.  I have already found breach of contract on the part of Reliantco.  Remoteness of damage is not an issue, as it was plainly within the reasonable contemplation of the parties when they contracted that if Reliantco failed to pay to Ms Ang sums which she had invested in and/or made from investing in Bitcoin futures, she might lose the amount which she might gain from investing in similar products.

*Data Protection*

96.  Ms Ang also made her claims on the basis of data protection law.  Given that Cyprus and English law were, on the point, assumed to be the same, the matter was put on behalf of Ms Ang, for convenience, by reference to the Data Protection Act 1998.  It was common ground that Ms Ang was a data subject, and Reliantco a data controller.  Ms Ang's case was, in particular, that Reliantco had contravened Data Protection Principles 1 and 4.  Specifically it was said that she had supplied considerable amounts of personal data, including in response to Reliantco's 4 August 2017 request.  Her account had then been closed, apparently as a result of an alleged money laundering risk which her data was perceived to indicate.  This, it was said, could only be because the personal data Reliantco processed was inaccurate, contrary to DPP 4; or that the processing of the data had not been fair and lawful.

97.  It did not appear that, given my conclusions in relation to Ms Ang's other causes of action, anything turned on her data protection claims.  Because of that and because I was concerned that they had not been fully explored, I do not consider that it is necessary or would be helpful to deal with this case in detail.  I will say only that it did not appear to me that Ms Ang's real complaint is most naturally put as a claim in respect of improper or unlawful data processing, as opposed to breach of contractual or equitable obligations.

*Reliantco's Counterclaim*

98. I have already indicated the broad nature of Reliantco's counterclaim. It contended that it was entitled to recover (i) repayment of the costs paid to Ms Ang of £115,000 pursuant to the order of Andrew Baker J of 15 May 2019; (ii) its own costs of these proceedings; and (iii) its own costs of the proceedings which had been taken against it in Germany and the Czech Republic. This was put on two bases.

99. The first basis was that it was entitled to recover these amounts pursuant to the indemnity provision in Clause 6.8 of the Terms and Conditions. This provides:

> 'You agree to indemnify us against any loss, liability, cost, claim, action, demand or expense incurred or made against us in connection with the proper performance of your obligations under this Customer Agreement except where that loss, liability, cost, claim, action, demand or expense arises from our negligence, fraud or wilful default or that of our employees.'

100. Mr Saoul QC for Ms Ang put forward an argument that clause 6.8 was intended to apply only to actions brought by third parties, and not to actions brought by Ms Ang herself. While neither side referred me to it, there is authority that similar indemnity clauses can apply to actions brought by the person providing the indemnity: John v Price Waterhouse [2002] 1 WLR 953; Renewable Power & Light Ltd v McCarthy Tetrault [2014] EWHC 3848 (Ch). Clause 6.8, however, is in distinctive terms. It provides for an indemnity for claims made against Reliantco in connection with 'the proper performance of **your** obligations under this Customer Agreement' (emphasis added). 'Your' there means Ms Ang, as is confirmed by the definitions in Part VI of the Terms and Conditions. I do not consider that it can sensibly be said that the claim made by Ms Ang in the present proceedings are claims made in connection with the proper performance of Ms Ang's obligations under the Customer Agreement, as opposed to claims for the allegedly (and as I have found, established) improper performance by Reliantco of its obligations.

101. In any event, I consider that the present claims would fall within the exception for liability arising from Reliantco's 'negligence, fraud or wilful default or that of our employees'. I consider that this proviso must be taken as at least embracing a case such as the present where Reliantco has itself been in breach of its fiduciary and contractual obligations to Ms Ang such that she can successfully claim sums from it. In this regard, and if there is any ambiguity in the width of the proviso it should, as pleaded by Ms Ang in her Reply, be accorded that meaning that is most favourable to the consumer, pursuant to s. 69 CRA 2015.

102. The second basis on which Reliantco's counterclaim is advanced is a claim that the judgments of Baker J and of the German Court were procured by fraud. The nature of the fraud or deceit alleged to have procured these judgments was, as it was put in Reliantco's skeleton argument 'her assertion that … she was the individual who opened and was the sole user and operator of the account held with [Reliantco] in her name (and so was the relevant 'consumer' for the purposes of the Brussels regime on jurisdiction) whereas in fact [Dr Wright] was that individual and/or operator of that account.'

**29**

103.     Reliantco submitted that the legal principles to be applied in relation to the setting aside of judgments procured by fraud were set out in <u>Royal Bank of Scotland plc v Highland Financial Partners LLP</u> [2013] EWCA Civ 328, at para. [106] per Aikens LJ.  These principles were in summary and insofar as relevant for present purposes, that: (i) there had to have been 'conscious and deliberate dishonesty' in relation to the relevant evidence given or statement made which is relevant to the judgment sought to be impugned; (ii) the relevant evidence or statement had to be 'material', which means that the fresh evidence [i.e. that disclosing the true position] 'would have entirely changed the way in which the first court approached and came to its decision', and this meant that the dishonesty had to be 'causative of the impugned judgment being obtained in the terms it was'; and (iii) the question of materiality was to be judged by reference to its impact on the evidence supporting the original decision, not on what decision might be made if the case were retried on honest evidence.

104.     Reliantco argued that it was able to rely on the alleged fraud in a separate action and not solely by way of appeal of the original decision.  It was said that this flowed naturally from the fact that a cause of action accrues from the procurement of a judgment on the basis of fraud, which is distinct from that in the underlying action, and for that proposition Reliantco referred to <u>Takhar v Gracefield Developments Ltd</u> [2019] UKSC 13, and to the summary of the principles in <u>Henry Longe v Bank of Scotland plc</u> [2019] EWHC 3540 (Ch) at paragraphs [52]-[53].

105.     In my judgment this basis for the counterclaim clearly fails, as a result of my findings of fact.  Whilst it is true to say that I have made findings that Ms Ang has given inaccurate, and indeed I find untruthful, evidence as to Dr Wright's having never accessed her account, I have found that she opened it and was its principal user.  I have rejected the case that the account was simply Dr Wright's, and that everything Ms Ang did in relation to the account was done as his agent.  While not condoning any untruthful evidence, I do not consider that the respects in which Ms Ang's evidence was false were material in the sense used in <u>Royal Bank of Scotland v Highland Financial Partners</u>, either in relation to the proceedings in Germany or to the decision of Andrew Baker J.  I do not consider that truthful evidence in relation to those matters would have entirely changed the way in which either court would have come to its decisions.  In particular, they were not material to Andrew Baker J's conclusion that Ms Ang was the relevant 'consumer' for the purposes of the Brussels jurisdiction regime.

106.     Furthermore, Reliantco has not made out its case on causation.  That it was sued in Germany and in these courts was caused by its failure to pay to Ms Ang the sums which it should have paid her after terminating her account.

<u>Conclusion</u>

107.     For these reasons, Ms Ang's claim succeeds and Reliantco's counterclaim fails.  I will hear submissions as to the terms of the order which should be made, if it cannot be agreed.

**THE HONOURABLE MR JUSTICE BUTCHER**
Approved Judgment

Ang -v- Reliantco Investments Ltd

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80176-BLOOM/Reinhart**

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

**AMENDED FINAL JUDGMENT**

**THIS CAUSE** is before the Court following entry of the Final Judgment, ECF No. [814], and Order on Motion to Amend Final Judgment, ECF No. [888] ("Order"). Pursuant to Rule 58, and for the reasons set forth in the Court's Order, it is **ORDERED AND ADJUDGED** as follows:

1. Judgment is entered in favor of Plaintiff W&K Info Defense Research, LLC, as to its claim against Defendant Craig Wright for Conversion in the amount of $100,000,000.00, for which sum let execution issue.

2. Consistent with the Court's Order, ECF No. [888], prejudgment interest shall be awarded in the amount of **$43,132,492.48** pursuant to Florida Statute § 55.03.

3. The Court reserves jurisdiction to award attorneys' fees and costs.

4. Post-judgment interest shall accrue on this Judgment pursuant to 28 U.S.C. § 1961.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 9, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record

**32**



Neutral Citation Number: [2020] EWHC 1873 (QB)

Case No: HQ13X02470, HQ12X01829 & Ors.

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL
Date: 16 July 2020

Before:

**THE HON. MR. JUSTICE PICKEN**
- - - - - - - - - - - - - - - - - - - - -
**Between:**

**GRAHAM DRING (for and on behalf of THE
ASBESTOS VICTIMS SUPPORT GROUPS
FORUM UK)**

**Applicant**

**- and -**

**CAPE INTERMEDIATE HOLDINGS LIMITED**

**Interested
Party**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Robert Weir QC** and **Jonathan Butters** (instructed by **Leigh Day**) for the Applicant.
**Geraint Webb QC** and **James Williams** (instructed by **Freshfields Bruckhaus Deringer
LLP**) for the Interested Party.

Hearing dates: 15 and 16 June 2020.
Draft judgment supplied to the parties: 10 July 2020

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.
.............................

**33**

**THE HON. MR. JUSTICE PICKEN:**

**Introduction**

1. This case has had an interesting life. It has entailed a six-week trial before me in 2017 which resulted in a settlement prior to judgment being finalised. There were then certain hearings before the Master concerning the applicant's attempts to obtain the documentation which is the subject of the application now before me. This led, in turn, to a hearing before the Court of Appeal and, after that, a hearing before the Supreme Court. That latter hearing resulted in an order that the application be listed before me (or, if not possible, then, another High Court judge), as Lady Hale put it in the Supreme Court's judgment ([2019] UKSC 38) at [50]:

   *"to determine whether the court should require [the interested party] to provide a copy of any other document placed before the judge and referred to in the course of the trial to [the applicant]… in accordance with the principles laid down by this court".*

2. The background is described in Lady Hale's judgment at [3] to [13]. There is nothing to be gained from my seeking to reformulate what is stated there. It is, however, probably useful to quote at least parts of Lady Hale's description in what follows.

3. At [3] Lady Hale said this:

   *"The circumstances in which this important issue comes before the court are unusual, to say the least. Cape Intermediate Holdings Ltd ('Cape') is a company that was involved in the manufacture and supply of asbestos. In January and February 2017, it was the defendant in a six-week trial in the Queen's Bench Division before Picken J. The trial involved two sets of proceedings, known as the 'PL claims' and the 'CDL claim', but only the PL claims are relevant to this appeal. In essence, these were claims brought against Cape by insurers who had written employers' liability policies for employers. The employers had paid damages to former employees who had contracted mesothelioma in the course of their employment. The employers, through their insurers, then claimed a contribution from Cape on the basis that the employees had been exposed at work to asbestos from products manufactured by Cape. It was alleged that Cape had been negligent in the production of asbestos insulation boards; that it knew of the risks of asbestos and had failed to take steps to make those risks clear; indeed, that it obscured, understated and unfairly qualified the information that it had, thus providing false and misleading reassurance to employers and others. Cape denied all this and alleged that the employers were solely responsible to their employees, that it did publish relevant warnings and advice, and that any knowledge which it had of the risks should also have been known to the employers."*

4. She, then, went on at [4] to describe the documents position at trial:

   *"Voluminous documentation was produced for the trial. Each set of proceedings had its own hard copy 'core bundle', known as Bundle C, which contained the core documents obtained on disclosure and some documents obtained from public sources. The PL core bundle amounted to over 5,000 pages in around 17 lever arch files. In addition, there was a joint Bundle D, only available on an electronic platform, which contained all the disclosed documents in each set of proceedings. If it was needed to*

*refer to a document in Bundle D which was not in Bundle C, it could immediately be viewed on screen, and would then be included in hard copy in Bundle C. The intention was that Bundle C would contain all the documents referred to for the purpose of the trial, whether in the parties' written and oral opening and closing submissions, or in submissions or evidence during the trial."*

I can confirm, indeed, that it is my practice in trials involving electronic files to ensure that by the end of trial there is a hard copy set of documents which have been referred to during the course of trial.

5.    Lady Hale next described, at [5], how, after the trial had ended but before judgment was delivered, the PL claims were settled in March 2017 and how the CDL claim was also settled a month later, again before judgment.

6.    She continued at [6]:

*"The Asbestos Victims Support Groups Forum UK ('the Forum') is an unincorporated association providing help and support to people who suffer from asbestos-related diseases and their families. It is also involved in lobbying and promoting asbestos knowledge and safety. It was not a party to either set of proceedings. On 6 April 2017, after the settlement of the PL claims, it applied without notice, under the Civil Procedure Rules, CPR rule 5.4C, which deals with third party access to the 'records of the court', with a view to preserving and obtaining copies of all the documents used at or disclosed for the trial, including the trial bundles, as well as the trial transcripts. This was because the Forum believed that the documents would contain valuable information about such things as the knowledge of the asbestos industry of the dangers of asbestos, the research which the industry and industry-related bodies had carried out, and the influence which they had had on the Factory Inspectorate and the Health and Safety Executive in setting standards. In the Forum's view, the documents might assist both claimants and defendants and also the court in understanding the issues in asbestos-related disease claims. No particular case was identified but it was said that they would assist in current cases."*

7.    Lady Hale, then, stated as follows at [7]:

*"That same day, the Master made an ex parte order designed to ensure that all the documents which were still at court stayed at court and that any which had been removed were returned to the court. She later ordered that a hard drive containing an electronic copy of Bundle D be produced and lodged at court. After a three day hearing of the application in October, she gave judgment in December, holding that she had jurisdiction, either under CPR rule 5.4C(2) or at common law, to order that a non-party be given access to all the material sought. She ordered that Mr Dring (now acting for and on behalf of the Forum) should be provided with the hard copy trial bundle, including the disclosure documents in Bundle C, all witness statements, expert reports, transcripts and written submissions. She did not order that Bundle D be provided but ordered that it be retained at court."*

8.    Lady Hale went on, at [8], to explain that Cape appealed, *inter alia*, on the grounds that: (1) the Master did not have jurisdiction, either under CPR 5.4C or at common law, to make an order of such a broad scope; (2) to the extent that the Court did have jurisdiction to grant access, she had applied the wrong test to the exercise of her

**35**

discretion; and (3) in any event, she should have held that the Forum failed to meet the requisite test.

9.    As for that appeal, Lady Hale summarised the position in this way:

*"9. The appeal was transferred to the Court of Appeal because of the importance of the issues raised. In July 2018, that court allowed Cape's appeal and set aside the Master's order: [2018] EWCA Civ 1795; [2019] 1 WLR 479. It held that the 'records of the court' for the purpose of the discretion to allow access under CPR rule 5.4C(2) were much more limited than she had held. They would not normally include trial bundles, trial witness statements, trial expert reports, trial skeleton arguments or written submissions; or trial transcripts. Nevertheless, the court had an inherent jurisdiction to permit a non-party to obtain (i) witness statements of witnesses, including experts, whose statements or reports stood as evidence-in-chief at trial and which would have been available for inspection during the trial, under CPR rule 32.13; (ii) documents in relation to which confidentiality had been lost under CPR rule 31.22 and which were read out in open court, or the judge was invited to read in court or outside court, or which it was clear or stated that the judge had read; (iii) skeleton arguments or written submissions read by the court, provided that there is an effective public hearing at which these were deployed; and (iv) any specific documents which it was necessary for a non-party to inspect in order to meet the principle of open justice. But there was no inherent jurisdiction to permit non-parties to obtain trial bundles or documents referred to in skeleton arguments or written submissions, or in witness statements or experts' reports, or in open court, simply on the basis that they had been referred to in the hearing.*

*10.    When exercising its discretion under CPR rule 5.4C(2) or the inherent jurisdiction, the court had to balance the non-party's reasons for seeking disclosure against the party's reasons for wanting to preserve confidentiality. The court would be likely to lean in favour of granting access if the principle of open justice is engaged and the applicant has a legitimate interest in inspecting the documents. If the principle of open justice is not engaged, then the court would be unlikely to grant access unless there were strong grounds for thinking it necessary in the interests of justice to do so (paras 127 and 129).*

*11.    Accordingly, the court ordered, in summary: (i) that the court should provide the Forum with copies of all statements of case, including requests for further information and answers, apart from those listed in Appendix 1 to the order, so far as they were on the court file and for a fee, pursuant to the right of access granted by CPR rule 5.4C(1); (ii) that Cape should provide the Forum with copies of the witness statements, expert reports and written submissions listed in Appendix 2 to the order; and (iii) that the application be listed before Picken J (or failing him some other High Court Judge) to decide whether any other document sought by the Forum fell within (ii) or (iv) in para 9 above and if so whether Cape should be ordered to provide copies. Copying would be at the Forum's expense. Cape was permitted to retrieve from the court all the documents and bundles which were not on the court file and the hard drive containing a copy of Bundle D. In making this order, the Court of Appeal*

**36**

*proceeded on the basis that clean copies of the documents in question were available."*

10.     Lady Hale, then, at [12] and [13], outlined the nature of the issues which arose before the Supreme Court in this way:

> *"12. Cape now appeals to this court. It argues, first, that the Court of Appeal should have limited itself to order (i) in para 11 above; second, that the Court of Appeal was wrong to equate the court's inherent jurisdiction to allow access to documents with the principle of open justice; the treatment of court documents is largely governed by the Civil Procedure Rules and the scope of any inherent jurisdiction is very limited; insofar as it goes any further than expressly permitted by the Rules, it extends only to ordering provision to a non-party of copies of (a) skeleton arguments relied on in court and (b) written submissions made by the parties in the course of a trial (as held by the Court of Appeal in **GIO Personal Investment Services Ltd v Liverpool and London Steamship Protection and Indemnity Association Ltd (FAI General Insurance Co Ltd intervening)** [1999] 1 WLR 984 ('FAI')); and third, that the Court of Appeal was wrong to conclude that the Forum did have a relevant legitimate interest in obtaining access to the documents; the public interest in open justice was different from the public interest in the content of the documents involved.*

> *13. The Forum cross-appeals on the ground that the Court of Appeal was wrong to limit the scope of CPR rule 5.4C in the way that it did. Any document filed at court should be treated as part of the court's records for that purpose. The default position should be to grant access to documents placed before a judge and referred to by a party at trial unless there was a good reason not to do so. It should not be limited by what the judge has chosen to read."*

**The decision of the Supreme Court**

11.     Lady Hale, in giving the judgment of the Court, reviewed a number of authorities, including **FAI** and **R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)** [2012] EWCA Civ 420, [2013] QB 618, explaining at [34] that:

> *"The Court of Appeal had the unenviable task of trying to reconcile the very different approaches taken by that court in **FAI** and **Guardian News and Media**. This court has the great advantage of being able to consider the issues from the vantage point of principle rather than the detailed decisions which have been reached by the courts below. There can be no doubt at all that the court rules are not exhaustive of the circumstances in which non-parties may be given access to court documents. They are a minimum and of course it is for a person seeking to persuade the court to allow access outside the rules to show a good case for doing so. However, case after case has recognised that the guiding principle is the need for justice to be done in the open and that courts at all levels have an inherent jurisdiction to allow access in accordance with that principle. Furthermore, the open justice principle is applicable throughout the United Kingdom, even though the court rules may be different."*

12. Having identified open justice as the guiding principle and specifically by reference to *"the principles established"* in **Guardian News and Media**, Lady Hale went on at [37] to say this:

*"So what were those principles? The purpose of open justice "is not simply to deter impropriety or sloppiness by the judge hearing the case. It is wider. It is to enable the public to understand and scrutinise the justice system of which the courts are the administrators" (para 79). The practice of the courts was not frozen (para 80). In FAI, for example, issues of informing the public about matters of general public interest did not arise (para 81). In earlier cases, it had been recognised, principally by Lord Scarman and Lord Simon of Glaisdale (dissenting) in Home Office v Harman [1983] 1 AC 280, 316, and by Lord Bingham in SmithKline Beecham Biologicals SA v Connaught Laboratories Inc [1999] 4 All ER 498, p 512, that the practice of receiving evidence without its being read in open court 'has the side effect of making the proceedings less intelligible to the press and the public'. Lord Bingham had contemplated that public access to documents referred to in open court might be necessary 'to avoid too wide a gap between what has in theory, and what has in practice, passed into the public domain'. The time had come to acknowledge that public access to documents referred to in open court was necessary (para 83). Requiring them to be read out would be to defeat the purpose of making hearings more efficient. Stating that they should be treated as if read out was merely a formal device for allowing access. It was unnecessary. Toulson LJ was unimpressed by the suggestion that there would be practical problems, given that the Criminal Procedure Rules 2011, in rule 5.8, provided, not only that there was certain (limited) information about a criminal case which the court officer was bound to supply, but also that, if the court so directs, the officer could supply 'other information' about the case orally and allow the applicant to inspect or copy a document containing information about the case (para 84). But it was the common law, not the rule, which created the court's power; the rule simply provided a practical procedure for implementing it."*

13. She continued at [38]:

*"Hence '[i]n a case where documents have been placed before a judge and referred to in the course of proceedings ... the default position should be that access should be permitted on the open justice principle; and where access is sought for a proper journalistic purpose the case for allowing it will be particularly strong'. In evaluating the grounds for opposing access, the court would have to carry out a fact-specific proportionality exercise. 'Central to the court's evaluation will be the purpose of the open justice principle, the potential value of the material in advancing that purpose and, conversely, any risk of harm which access to the documents may cause to the legitimate interests of others' (para 85)."*

14. Lady Hale, then, at [39], referred to **Kennedy v Charity Commission (Secretary of State for Justice intervening)** [2014] UKSC 20, [2015] AC 455, describing that as a decision in which the principles laid down in **Guardian News and Media** were clearly endorsed by Lord Mance, Lord Toulson, Lord Neuberger and Lord Clarke (in the majority) and not doubted by Lord Wilson and Lord Carnwath (in the minority). She, then, noted that the principles were also endorsed by a unanimous Supreme Court in **A v British Broadcasting Corpn (Secretary of State for the Home Department intervening)** [2014] UKSC 25, [2015] AC 588, in which Lord Reed expressly adopted

**38**

the test laid down in **Kennedy**, at [41], described by Lady Hale as *"a direct citation"* from **Guardian News and Media** at [85], namely:

*"Whether a departure from the principle of open justice was justified in any particular case would depend on the facts of that case. As Lord Toulson JSC observed in **Kennedy v Information Comr (Secretary of State for Justice intervening)** [2015] AC 455, para 113, the court has to carry out a balancing exercise which will be fact-specific. Central to the court's evaluation will be the purpose of the open justice principle, the potential value of the information in question in advancing that purpose and, conversely, any risk of harm which its disclosure may cause to the maintenance of an effective judicial process or to the legitimate interests of others."*

15.     In passages which are very important for present purposes and which were the subject of extensive submissions by both Mr Robert Weir QC, on behalf of the Forum, and by Mr Geraint Webb QC, on behalf of Cape, Lady Hale, then, went on to say this at [41]-[47]:

*"41.   The constitutional principle of open justice applies to all courts and tribunals exercising the judicial power of the state. It follows that, unless inconsistent with statute or the rules of court, all courts and tribunals have an inherent jurisdiction to determine what that principle requires in terms of access to documents or other information placed before the court or tribunal in question. The extent of any access permitted by the court's rules is not determinative (save to the extent that they may contain a valid prohibition). It is not correct to talk in terms of limits to the court's jurisdiction when what is in fact in question is how that jurisdiction should be exercised in the particular case.*

*42.    The principal purposes of the open justice principle are two-fold and there may well be others. The first is to enable public scrutiny of the way in which courts decide cases - to hold the judges to account for the decisions they make and to enable the public to have confidence that they are doing their job properly. In **A v British Broadcasting Corpn**, Lord Reed reminded us of the comment of Lord Shaw of Dunfermline, in **Scott v Scott** [1913] AC 417, 475, that the two Acts of the Scottish Parliament passed in 1693 requiring that both civil and criminal cases be heard 'with open doors', 'bore testimony to a determination to secure civil liberties against the judges as well as against the Crown' (para 24).*

*43.    But the second goes beyond the policing of individual courts and judges. It is to enable the public to understand how the justice system works and why decisions are taken. For this they have to be in a position to understand the issues and the evidence adduced in support of the parties' cases. In the olden days, as has often been said, the general practice was that all the argument and the evidence was placed before the court orally. Documents would be read out. The modern practice is quite different. Much more of the argument and evidence is reduced into writing before the hearing takes place. Often, documents are not read out. It is difficult, if not impossible, in many cases, especially complicated civil cases, to know what is going on unless you have access to the written material.*

*44.    It was held in **Guardian News and Media** that the default position is that the public should be allowed access, not only to the parties' written submissions and arguments, but also to the documents which have been placed before the*

**39**

*court and referred to during the hearing. It follows that it should not be limited to those which the judge has been asked to read or has said that he has read. One object of the exercise is to enable the observer to relate what the judge has done or decided to the material which was before him. It is not impossible, though it must be rare, that the judge has forgotten or ignored some important piece of information which was before him. If access is limited to what the judge has actually read, then the less conscientious the judge, the less transparent is his or her decision.*

45.  *However, although the court has the power to allow access, the applicant has no right to be granted it (save to the extent that the rules grant such a right). It is for the person seeking access to explain why he seeks it and how granting him access will advance the open justice principle. In this respect it may well be that the media are better placed than others to demonstrate a good reason for seeking access. But there are others who may be able to show a legitimate interest in doing so. As was said in both **Kennedy**, at para 113, and **A v British Broadcasting Corpn**, at para 41, the court has to carry out a fact-specific balancing exercise. On the one hand will be 'the purpose of the open justice principle and the potential value of the information in question in advancing that purpose'.*

46.  *On the other hand will be 'any risk of harm which its disclosure may cause to the maintenance of an effective judicial process or to the legitimate interests of others'. There may be very good reasons for denying access. The most obvious ones are national security, the protection of the interests of children or mentally disabled adults, the protection of privacy interests more generally, and the protection of trade secrets and commercial confidentiality. In civil cases, a party may be compelled to disclose documents to the other side which remain confidential unless and until they are deployed for the purpose of the proceedings. But even then there may be good reasons for preserving their confidentiality, for example, in a patent case.*

47.  *Also relevant must be the practicalities and the proportionality of granting the request. It is highly desirable that the application is made during the trial when the material is still readily available, the parties are before the court and the trial judge is in day to day control of the court process. The non-party who seeks access will be expected to pay the reasonable costs of granting that access. People who seek access after the proceedings are over may find that it is not practicable to provide the material because the court will probably not have retained it and the parties may not have done so. Even if they have, the burdens placed on the parties in identifying and retrieving the material may be out of all proportion to benefits to the open justice principle, and the burden placed upon the trial judge in deciding what disclosure should be made may have become much harder, or more time-consuming, to discharge. On the other hand, increasing digitisation of court materials may eventually make this easier. In short, non-parties should not seek access unless they can show a good reason why this will advance the open justice principle, that there are no countervailing principles of the sort outlined earlier, which may be stronger after the proceedings have come to an end, and that granting the request will not be impracticable or disproportionate."*

16.   Lady Hale, then, turned to the present case, explaining at [49] as follows:

*"Cape argues that the Court of Appeal did not have jurisdiction to make the order that it did, not that if it did have jurisdiction the order was wrong in principle. The Forum argues that the court should have made a wider order under CPR rule 5.4C(2). Both are, in our view, incorrect. The Court of Appeal not only had jurisdiction to make the order that it did, but also had jurisdiction to make a wider order if it were right so to do. On the other hand, the basis of making any wider order is the inherent jurisdiction in support of the open justice principle, not the Civil Procedure Rules, CPR rule 5.4C(2). The principles governing the exercise of that jurisdiction are those laid down in **Guardian News and Media**, as explained by this court in **Kennedy, A v British Broadcasting Corpn** and this case."*

17.   Lady Hale, accordingly, went on at [50] to say this:

*"In those circumstances, as the Court of Appeal took a narrower view, both of the jurisdiction and the applicable principles, it would be tempting to send the whole matter back to a High Court judge, preferably Picken J, so that he can decide it on the basis of the principles enunciated by this court. However, Cape has chosen to attack the order made by the Court of Appeal, not on its merits, but on a narrow view of the court's jurisdiction. Nor has it set up any counter-vailing rights of its own. In those circumstances, there seems no realistic possibility of the judge making a more limited order than did the Court of Appeal. We therefore order that paras 4 and 7 of the Court of Appeal order (corresponding to points (i) and (ii) in para 11 above) stand. But we would replace paragraph 8 (corresponding with point (iii)) with an order that the application be listed before Picken J (or, if that is not possible, another High Court Judge) to determine whether the court should require the appellant to provide a copy of any other document placed before the judge and referred to in the course of the trial to the respondent (at the respondent's expense) in accordance with the principles laid down by this court."*

**The application**

18.   The Forum's application is supported by the same evidence which was before the Master, namely three witness statements by Ms Harminder Bains, a partner in Leigh Day, and a witness statement from Mr Graham Dring, who is the chair of the Forum. Also before the Master were two witness statements made by Cape's solicitor, Mr Jonathan Isted, a partner in Freshfields. In addition, although not before the Master but produced for the purposes of the hearing before the Court of Appeal, before me on the remitted application was a further witness statement from Ms Bains together with a statement from Mr Ian Jones, a senior associate at Freshfields.

19.   As previously mentioned, the application before the Master (and so the application before me) was an application which sought the supply of documents to a non-party under CPR 5.4C(2). There was no mention in the application itself of the Court's inherent jurisdiction, although, in the event, this was invoked at the substantive hearing which took place before the Master. No point was taken by Cape, either before me or on any prior occasion, as to the fact that the application itself did not refer to the inherent jurisdiction of the court and only referred to CPR 5.4C(2). I proceed accordingly.

20.     In her first witness statement Ms Bains outlined the background to the application and
        described the documentation which the Forum sought. Specifically, in paragraph 22
        Ms Bains referred to witness statements and experts' reports, as well as transcripts of
        evidence and, then, identified this further category:

        *"All documents disclosed by Cape and other parties, including... a. Minutes from
        Board meetings ... b. Minutes from meetings that Cape attended with other
        stakeholders ... c. Minutes of all meetings with the Asbestos Research Council ... d.
        Minutes of all meetings with Her Majesty's Factory Inspectorate ... e. Minutes of all
        meetings with Government Officials ... f. Press releases ... g. Memorandums and dust
        sampling results ... h. Research documents and correspondence between Cape and
        other parties ... i. Advertising campaigns ... j. Draft submissions to Government
        committees."*

21.     It will be apparent that the application, therefore, was widely couched, embracing the
        entirety of Bundle D (the documents disclosed in the proceedings), and so not
        confined to documents contained in Bundle C (the documents to which reference was
        made during the course of the trial). Mr Weir QC made clear before me, however,
        that, following the provision of some of the documents sought by the Forum, the
        application is now limited to Bundle C documents. Mr Webb QC told me (although
        Mr Weir QC did not agree every detail) that this bundle consists of approximately
        5,000 pages, the Forum having already now received somewhere in the region of
        1,716 pages of other documents, amounting to some four lever arch files. Those
        documents were, indeed, before me on the hearing of the application and include all
        pleadings (some 231 pages), including Part 18 Requests and Replies, written opening
        submissions (some 442 pages), witness statements (10 pages), experts' reports (623
        pages) and written closing submissions (409 pages).

22.     In her first witness statement, at paragraph 23, Ms Bains went on to give as *"reasons"*
        why *"the documents will be valuable"* the following:

        *"i. It would assist the Court to understand the knowledge within the industry about
        the number of asbestos related disease cases in the UK and overseas (for example in
        the vicinity of the mines operated by asbestos manufacturing companies);*

        *ii. It helps for background to detail the research that the asbestos industry were
        carrying out and the relationship between the large asbestos manufacturing
        companies, both in the UK and overseas. It also helps to understand the relationship
        they had with other stakeholders, such as the Factory Inspectorate, the British
        Occupational Hygiene Society, Asbestosis Research Council, Asbestos Information
        Committee and any organisations undertaking research on behalf of the asbestos
        industry in relation to asbestos;*

        *iii. It helps to know the dates that various asbestos materials were manufactured,
        there relative costs and when alternative materials were developed, their costs and
        any reasons why those asbestos-free materials were not developed and/or marketed
        earlier;*

        *iv. It helps to know the quantities of asbestos materials which were manufactured and,
        where asbestos-free alternatives were made, where and how they were made ...;*

42

*v. It helps to understand what steps the manufacturers were taking to carry out research, who did that research, and the arrangements for the publication of the research – i.e. was it checked by the manufacturers and amended before it was published (and what organisation did the research);*

*vi. It helps to understand what discussions were taking place behind the scenes with other stakeholders, including the Factory Inspectorate and HSE - what research did the Asbestos Research Council ('ARC') make available to them to determine the numerical standards and other guidance which published dust concentrations TDN13 and TDN42 for example, were the figures supplied by ARC and, if so, were they the only figures.*

*vii. Were any discussions taking place in Whitehall with government about the loss of jobs within the industry, who were they taking place with and what was the outcome of those discussions;*

*viii. How did information in relation to crocidolite being the main cause of mesothelioma become published? What did they know about amosite for example. How did the ARC justify publishing information that the risk of mesothelioma was limited to crocidolite?*

*ix. What influence went on with Her Majesty's Factory Inspectorate ('HMFI') and HSE in relation to setting numerical limits and standards. How did HMFI come to adopt the British Occupational Hygiene Society ('BOHS') standard, how did the BOHS get published? What risks did that consider?*

*x. What did Cape know about 'safe' levels of asbestos in the 1960s? Were Cape carrying out research before that time in the UK or overseas and what were the findings of that research?*

*xi. What did Directors of Cape know about the dangers of asbestos?*

*xii. What did the expert witnesses say in their reports? This could narrow issues and save costs in future cases (i.e. prevent need for engineering evidence on similar cases)*

*xiii. Were the limits and standards based on safe levels of exposure levels which the industry thought were achievable with very little cost in terms of engineering controls? Could the industry put profit before safety and did HMFI let them?*

*xiv. The documents may help to resolve the issue of limits and standards and availability of sampling in the 1960s. This is an area of significant disagreement between the experts."*

23.    Ms Bains, then, concluded in paragraph 24 by saying this:

*"As stated above, I specialise in asbestos-related disease cases. Accordingly, the documents may not only assist the Defendants and Claimants, but also the Court in understanding the issues and may, in fact, narrow the legal issues."*

24.    In his witness statement, Mr Dring gave certain details concerning the role played by the Forum. As he put it in paragraph 4:

**43**

*"The main role of the Forum is to speak with one voice on behalf all the Groups on important issues affecting asbestos victims. To that end, the Forum attends meetings of the All Party Parliamentary Occupational Safety and Health Group and is invited to inform Ministers on policy developments and to respond to Government consultations. The Forum is recognised as an authentic and legitimate representative of asbestos victims and their families ... ."*

25. Mr Dring went on, under the heading *"Why I am bringing this claim"*, to state as follows in paragraph 7:

*"On behalf of the Forum I am bringing this claim because we consider that the documents which were preserved by Order dated 6 April 2017, and are now in the Royal Courts of Justice for safekeeping, will greatly benefit victims of asbestos related diseases to prove their claims in negligence against Defendants ...".*

26. He, then, said this in paragraph 8:

*"I see many asbestos disease sufferers. In my experience, they are a particularly risk adverse group, especially when it comes to litigation. The vast majority will never have dealt with a legal professional; with the possible exception of the solicitor who dealt with their house sale. Their prime concern is ensuring their family is financially stable and as secure as possible as a result of their illness, or subsequent death. This is their main interest in pursuing a personal injury case against a negligent employer. Therefore, from my understanding, the documents will greatly assist in establishing negligence in current ongoing claims which are being pursued, and in future claims."*

27. In paragraph 12, under the heading *"Why it is in the public interest for the court to determine this matter"*, he stated as follows:

*"There are estimated to be approximately 2,600 new mesothelioma sufferers per annum in the UK with a similar number of asbestos related lung cancer cases. In addition to this, there are hundreds of others each year newly diagnosed with other asbestos diseases, such as asbestosis and pleural thickening. In view of this and because the right to health and safety at work and just compensation for breach of that right is of fundamental importance to society the Forum believes it is in the public interest that this matter is considered. The public have an interest in the prevention of harm occasioned by negligence and civil compensation plays an important role in deterring work-related negligence. Quite apart from civil compensation there is a clear public interest in developing the fullest knowledge and understanding as to how the epidemic in asbestos-related disease arose so that institutional or individual wrongdoers can be held to account and the necessary lessons learned. There is also profound public sympathy for sufferers of mesothelioma and genuine concern that they should be treated justly and fairly."*

**The Forum's position before me (in outline)**

28. It was Mr Weir QC's position that this is a case in which the Forum has a *"legitimate interest"* in the Bundle C documents sought and that *"the default position"* identified by Lady Hale in the Supreme Court at [44] applies. As such, he submitted, again by reference to what Lady Hale had to say at [44], *"the public should be allowed access, not only to the parties' written submissions and arguments, but also to the documents*

**44**

*which have been placed before the court and referred to during the hearing"*, namely here the documents comprising Bundle C. Granting the Forum access to such documentation would, Mr Weir QC submitted, advance the open justice principle in the manner described by Lady Hale at [43] since it would *"enable the public to understand how the justice system works and why decisions are taken"*, specifically they would be *"in a position to understand the issues and the evidence adduced in support of the parties' cases"*.

29.     Mr Weir QC submitted, in this context, rightly, that it makes no difference that the underlying proceedings settled before a judgment was produced. He pointed not only to what Hamblen LJ had to say in the Court of Appeal at [124] and [126] but also to **In the matter of Z** [2019] EWCOP 55, in which, referring to the decision of the Supreme Court in the present case, Morgan J had this to say at [21]:

> *"It is clear that where there is a hearing in open court, the open justice principle is engaged and the principles laid down by the Supreme Court in Dring as to the disclosure of documents apply. This is the position even if there is no judicial decision following the hearing in open court because, for example, the case is settled before judgment. That was the position in Dring itself. In the Court of Appeal in that case, there is a detailed discussion as to why the open justice principle is relevant to disclosure of documents to a non-party where there has been a hearing in open court even where there is no judicial decision: see at [123]-[126]."*

Morgan J added this at [23], which is also relied upon by Mr Weir QC:

> *"The Court of Appeal in Dring, at [126] and [128], approved the approach adopted in Dian. Thus, the open justice principle applies where there has been a hearing in open court (whether or not a judicial decision was given) and to an application which leads to a judicial decision on the papers (that is, where there has not been a hearing in open court). Further, something akin to the open justice principle applies where there has been an application which is not pursued but where 'there are strong grounds for thinking that it is necessary in the interests of justice' to allow a non-party to have access to the relevant documents."*

30.     Nor, Mr Weir QC also observed, again relying on what Hamblen LJ stated in the Court of Appeal, this time at [135], and also on what Morgan J had to say in **In the matter of Z** at [26], does it matter that the Forum's interest is other litigation. As Morgan J put it:

> *"Finally, as to the legal principles as to open justice, it is clear that an entirely private or commercial interest in a document can qualify as a legitimate interest: see the Court of Appeal in **Dring** at [135]. That does not, however, mean that all things which qualify as legitimate interests are to be given identical weight when carrying out the balancing exercise described above. Some legitimate interests will be more weighty than others."*

31.     Mr Weir QC submitted as to the balancing exercise required to be undertaken that it is a balancing exercise which has, in the present case, already been undertaken by the Master (and upheld by the Court of Appeal). Mr Weir QC pointed out, as to this, that there was no appeal to the Supreme Court in relation to the Master's exercise of discretion and the Court of Appeal's upholding of the exercise of that discretion. As a

result, it was his submission that the Court is now bound, on this application, to grant the Forum access to the documents in Bundle C which are sought; there is no residual discretion which can, he suggested, legitimately be exercised.

32.    Mr Weir QC's alternative position was that, if the discretion still falls to be exercised at this juncture, then, it should be exercised in favour of the Forum so as to mean that access is provided to the documents contained within Bundle C.

33.    It was his submission, in this connection, that the discretion is broad and, in particular, that there is no requirement that a non-party applying to access court documents must establish that the purpose marries up with the rationale for the principle of open justice.

34.    As to how the Court should exercise its discretion, Mr Weir QC submitted that, if access to the documents with which the Forum has already been provided satisfies the *"principal purposes of the open justice principle"*, as the Supreme Court must have thought is the case, then, it must follow, *a fortiori*, that access to the underlying documents (the Bundle C documents) does so also.

35.    In any event, he went on to submit, if a purely commercial interest in documents can satisfy the relevant requirement, then, the Forum's public interest (whether for use in other litigation or for informing the public about a matter of obvious public interest and concern) must clearly do so also.

36.    Mr Weir QC also highlighted how Cape has not raised any countervailing interests in response to the application at any stage. On that basis, he suggested, there is no reason not to apply the default position, and so to order provision of the documentation.

37.    Furthermore, Mr Weir QC submitted, there are no issues of practicality or proportionality which arise in this case given the retention by Cape of clean, electronic, copies of the bundles.

**Cape's position before me (in outline)**

38.    Mr Webb QC submitted that Mr Weir QC's primary position that the Court has no fresh discretion to exercise is not tenable since, if Mr Weir QC were right and there is now no discretion to be exercised, then, the Supreme Court would not have remitted the matter in the way which it did.

39.    Mr Webb QC, further, submitted that this is not a case in which the principle described by Lady Hale in the Supreme Court judgment at [43] is applicable. He submitted, specifically, that the Forum is unable to establish (the burden being upon it, as Mr Weir QC acknowledged) that the Bundle C documents are required in order for it to be understood *"how the justice system works"* in the sense described in the third sentence of [43], namely in order *"to understand the issues and the evidence adduced in support of the parties' cases"*.

40.    Mr Webb QC observed, in this context, that the Supreme Court decision ought to be regarded as a restatement of the open justice principle, in particular that the *"legitimate interest"* approach is no longer the appropriate approach. Mr Webb QC submitted that, in place of such an approach, the Supreme Court in the present case

had simplified matters by, in essence, stipulating that a third party has no right to documents but has to make out a case both as to why it should obtain such documents by reference to the open justice principle and as to how the open justice principle will be advanced by provision of the documents sought. The Court will, then, consider, Mr Webb QC submitted, whether the applicant has shown that there are no countervailing factors or, if there are, consider whether such factors ought to mean that the documents are not provided, as part of a balancing exercise which will also take into account whether production would be impracticable or disproportionate. On this basis, Mr Webb QC submitted, the Court should conclude that the reason given by Mr Dring (and amplified by Ms Bains), namely that the Forum should be able to use the documents for other purposes, including in relation to other litigation, has nothing to do with the open justice principle and will do nothing to advance that principle.

41.    Mr Webb QC additionally submitted that, in weighing the various factors in deciding whether an order ought to be made, regard should be had to the fact that, if the documents are obtained, then, Cape is in no position to make representations concerning its own documents in such other proceedings as they might come to be deployed in. This, Mr Webb QC suggested, is a factor which should mean that no order is made.

42.    Mr Webb QC lastly submitted that it would, in any event, be impracticable or disproportionate to require that the Bundle C documents are provided, and so that the order sought ought not to be made.

**Discussion**

*A residual discretion?*

43.    It is convenient to start by addressing Mr Weir QC's primary submission that the Court has no discretion but is, on the contrary, obliged to order production of the documents in Bundle C because the Master has already decided, in the exercise of her discretion (upheld by the Court of Appeal), that such documents should be provided.

44.    Mr Weir QC had in mind, in this context, the following passages in the judgment of Hamblen LJ in the Court of Appeal at [133]-[138]:

"133. [Cape] submitted that this shows that [the Forum's] stated intention is simply to publish all the documents it obtained in the hope that someone else might make use of them. Mr Dring himself (or his organisation) do not propose to undertake any substantive research on the documents themselves or indeed do anything with them at all. They rely on unidentified others to do this at some unknown time in the future. It was submitted that the Master wrongly assumed that because [the Forum] was pursuing 'legitimate' (i.e. lawful) activities it could therefore show a 'legitimate interest' in obtaining the documents on the application; that this is an erroneous reading of the 'legitimate interest' test, and that, even if it is read as not setting a particularly high bar, it cannot be correct that anyone pursuing any lawful activity then meets the relevant test to obtain documents under CPR 5.4C if the 'open justice' principle is engaged.

134.    In my judgment the Master was clearly entitled to find that [the Forum] had a legitimate interest and this finding is not open to challenge on appeal.

**47**

135.  *As the authorities make clear, an entirely private or commercial interest in a document can qualify as a legitimate interest. Often, as in [**FAI**] and **Law Debenture Trust** and **Dian**, it will be an interest in related litigation.*

136.  *In the present case, [the Forum's] interest is of a public nature. The Forum provides help and support to asbestos victims, it is in some respects a pressure group and it is involved in lobbying and promoting asbestos knowledge and safety. All these qualify as providing a legitimate interest, as the Master found at [124]. The Master recognised at [152] that the material which [the Forum] sought was of 'legal, social and scientific interest'. As set out by the Master at [5] of her judgment of 6 April 2017 there was a 'public interest in a general sense in asbestos liability and injury litigation, given the death toll and injury toll that has arisen down the years'.*

137.  *There is more to be said for [Cape's] argument that it has not been shown that there are strong grounds in the interests of justice for access to the documents, but it is not necessary to decide this issue since, on my analysis of the applicable principles, it does not arise.*

138.  *In relation to documents which fell within her jurisdiction, I would accordingly reject the challenges made to the exercise of the Master's discretion."*

45.  This was a submission which Mr Weir QC described as one which he could *"not quite let go"* since his position was that the *"legitimate interest"* approach discussed below remains appropriate. It is not, however, a submission which I can accept. As Mr Webb QC pointed out, if Mr Weir QC were right and there is now no discretion to be exercised, then, the Supreme Court would not have remitted the matter in the way which it did. The Supreme Court having remitted the application to me, in order that I should decide it in accordance with the principles set out by Lady Hale, it cannot be right that it is now incumbent upon me simply to make the same order as the Master did. The more so, in circumstances where in the Court of Appeal, at [54], Hamblen LJ described the Master's order as being *"unprecedented"* in scope.

*"Legitimate interest" no more?*

46.  The point, in fact, goes further, however, since the fact that the Supreme Court made the order which it did itself serves to demonstrate not only that the approach adopted by the Master should be revisited by me but also that the approach adopted by the Court of Appeal, on appeal from the Master, should also be revisited. Were the position otherwise, then, again, the Supreme Court would not have remitted the matter to me but would, instead, itself have made whatever order it considered to be appropriate.

47.  I am clear that Mr Webb QC was right when he characterised the Supreme Court as having essentially restated the applicable principles. This is apparent from Lady Hale's reference at [34] to the Court of Appeal having *"had the unenviable task of trying to reconcile the very different approaches taken by that court in **FAI** and **Guardian News and Media**"*. It is apparent also from the fact that Lady Hale went on, in the next sentence, to refer to the Supreme Court as having *"the great advantage of being able to consider the issues from the vantage point of principle rather than the detailed decisions which had been reached by the courts below"*. Lady Hale was here

**48**

recognising that there were difficulties in reconciling previously decided cases and taking the opportunity to restate the core principles in recognition of this.

48. That this is the position is underlined by Lady Hale's later reference, at [49], to the principles governing the exercise of the inherent jurisdiction as being *"laid down in Guardian News and Media, as explained by this Court in Kennedy, A v British Broadcasting Corporation and this case"*. Lady Hale was making it clear that, as between *Guardian News and Media* and *FAI*, the approach adopted in the former (albeit as *"explained"*) is to be preferred over the approach adopted in the latter.

49. As I see it, it was precisely because, as Lady Hale observed at [31], the Court of Appeal in the present case *"largely adopted the approach in FAI, while recognising that in certain respects the law had been developed"* that the Supreme Court decided that the case should be remitted to me.

50. That the Court of Appeal did, indeed, largely adopt the approach in *FAI* is clear from a number of passages in the judgment of Hamblen LJ. Thus, having considered *FAI* and a number of other cases which adopted the *FAI* approach, Hamblen LJ went on, at [85], to refer to *Guardian News and Media*, specifically the following passages in the judgment of Toulson LJ (as he then was):

*"69. The open justice principle is a constitutional principle to be found not in a written text but in the common law. It is for the courts to determine its requirements, subject to any statutory provision. It follows that the courts have an inherent jurisdiction to determine how the principle should be applied.*

*70. Broadly speaking, the requirements of open justice apply to all tribunals exercising the judicial power of the state.*

*...*

*75. ... I do not consider that the provisions of the Criminal Procedure Rules are relevant to the central issue. The fact that the rules now lay down a procedure by which a person wanting access to documents of the kind sought by the Guardian should make his application is entirely consistent with the court having an underlying power to allow such an application. The power exists at common law; the rules set out a process.*

*...*

*83. The courts have recognised that the practice of receiving evidence without it being read in open court potentially has the side effect of making the proceedings less intelligible to the press and the public. This calls for counter measures. In SmithKline Beecham Biologicals SA v Connaught Laboratories Inc [1999] 4 All ER 498 Lord Bingham referred to the need to give appropriate weight both to efficiency and to openness of justice as the court's practice develops. He observed that public access to documents referred to in open court might be necessary. In my view the time has come for the courts to acknowledge that in some cases it is indeed necessary ...*

*...*

**49**

> *85. In a case where documents have been placed before a judge and referred to in the course of proceedings, in my judgment the default position should be that access should be permitted on the open justice principle; and where access is sought for a proper journalistic purpose, the case for allowing it will be particularly strong. However, there may be countervailing reasons. In company with the US Court of Appeals, 2nd Circuit, and the Constitutional Court of South Africa, I do not think that it is sensible or practical to look for a standard formula for determining how strong the grounds of opposition need to be in order to outweigh the merits of the application. The court has to carry out a proportionality exercise which will be fact-specific. Central to the court's evaluation will be the purpose of the open justice principle, the potential value of the material in advancing that purpose and, conversely, any risk of harm which access to the documents may cause to the legitimate interests of others."*

51. Hamblen LJ, then, at [86], recorded the Forum as having *"submitted that the default position described by Toulson LJ now represents the law in both criminal and civil proceedings"* and that to the extent that **FAI** *"is authority for a more restrictive approach, it no longer represents good law"*.

52. He went on, at [87], to record Cape's submission that **Guardian News and Media** is a case which was concerned only with criminal proceedings and, in any event, was wrongly decided, before observing at [88] that, in his judgment, **FAI** *"still stands as Court of Appeal authority that there is no inherent jurisdiction to allow a non-party access to trial documents simply on the basis that they had been referred to in a skeleton argument, witness statement, expert's report or in court"*.

53. Hamblen LJ, then, had this to say at [89]:

   *"There is, however, one aspect of [**FAI**] in relation to which I consider that law and practice has moved on, as Potter LJ recognised may well occur. That is in respect of documents read or treated as being read in open court. It is clear from **SmithKline Beecham**, **Barings** and **Lilly Icos** that the category of documents treated as having been read in open court has expanded, at least for the purposes of CPR 31.22. Moreover, the rationale in [**FAI**] for allowing a non-party access to skeleton arguments may be said also to apply to any document which would have been read out in open court had it not been pre-read."*

54. Later, when considering the exercise of the Court's discretion at [115] to [130], Hamblen LJ referred to **Dian AO v Davis Frankel & Mead** [2005] 1 WLR 2951 and **Pfizer Health AB v Schwarz Pharma AG** [2010] EWHC 3236 (Pat), specifically in the case of the latter, at [120], the summary of the applicable principles provided by Floyd J (as he then was) at [20], as follows:

   *"i) There is no unfettered right to documents on the court file except where the rules so specify ...;*

   *ii) The requirement for permission is a safety valve to allow access to documents which should in all the circumstances be provided ...;*

**50**

*iii)   The principle of open justice is a powerful reason for allowing access to documents where the purpose is to monitor that justice was done, particularly as it takes place …;*

*iv)   Where the purpose is not to monitor that justice was done, but the documents have nevertheless been read by the court as part of the decision making process, the court should lean in favour of disclosure if a legitimate interest can still be shown for obtaining the documents …;*

*v)   Where the principle of open justice is not engaged at all, such as where documents have been filed but not read, the court should only give access where there are strong grounds for thinking that it is necessary in the interests of justice to do so."*

55.   Hamblen LJ, then, at [123], described Cape as having submitted *"that documents that relate only to a trial in a matter which settled are not covered by the principle of open justice, for the simple reason that if no judgment is delivered there is no need, nor is it possible, to supervise the judicial process"*.

56.   Hamblen LJ rejected that submission, at [124], as follows:

*"I do not agree that the open justice principle is to be viewed as narrowly as this. In relation to trials I accept that there has to be an effective hearing for the principle to be engaged. Once there is a hearing, however, the right of scrutiny arises, the principle of open justice is engaged and it will continue to be so up and until any settlement or judgment. The same will apply to the hearing of interlocutory applications."*

57.   Hamblen LJ made essentially the same point at [126]:

*"The principle of open justice is accordingly engaged as soon as there is an effective hearing. It may be more fully engaged if the hearing proceeds to a judgment, but it is still engaged. The only circumstance in which a judicial decision is likely to be necessary to engage the principle is where the application is determined on the papers and so there is no hearing, as was the case with one of the applications in Dian."*

58.   He, then, at [127] identified the principles applicable to the exercise of the discretion in relation to an application under CPR 5.4C(2) by a non-party as entailing the Court having *"to balance the non-party's reasons for seeking copies of the documents against the party to the proceedings' private interest in preserving their confidentiality"*. In this respect, he identified relevant factors as being likely to include:

*"…*

*(1)   The extent to which the open justice principle is engaged;*

*(2)   Whether the documents are sought in the interests of open justice;*

*(3)   Whether there is a legitimate interest in seeking copies of the documents and, if so, whether that is a public or private interest.*

**51**

> (4)   *The reasons for seeking to preserve confidentiality.*
>
> (5)   *The harm, if any, which may be caused by access to the documents to the legitimate interests of other parties."*

59.   Hamblen LJ clarified at [129], by reference to *FAI* (amongst other cases), that these various factors, in his view, applied also to the Court's inherent jurisdiction:

> *"In relation to the court's inherent jurisdiction the factors relevant to the exercise of discretion are likely to be such as those set out in paragraph 127 above. In the light of the guidance provided in [FAI], **Barings** and **Lilly Icos**, and the importance of the principle of open justice, the court is likely to lean in favour of granting access to documents falling within the categories set out in paragraph 112(2) above where the applicant has a legitimate interest in inspecting the identified documents or class of documents."*

60.   It is clear, therefore, that, as far as the Court of Appeal was concerned, the *"legitimate interest"* approach adopted in *FAI* applied. Indeed, Hamblen LJ went on, at [131] to [138] to address the issue of *"legitimate interest"* by reference to the Master's decision that the Forum had such an interest in the documents sought.

61.   It seems to me, in the circumstances, that Mr Webb QC must be right when he submitted that the Supreme Court's decision to remit the matter to me, taken together with Lady Hale's approval of the *General News and Media* approach (*"as explained"*) in contradistinction to the *FAI* approach, must mean that the Supreme Court should, indeed, be regarded as having restated the open justice principle in a way which no longer makes it appropriate to apply the *"legitimate interest"* approach.

*The proper approach*

62.   It is necessary, in the circumstances, to consider what, in line with the Supreme Court's judgment, is the appropriate approach now to adopt in place of the *"legitimate interest"* approach applied in *FAI*.

63.   The answer is that, consistent with the statement of principle by Lord Toulson in *Guardian News and Media* (as quoted by Lady Hale at [2]), the Supreme Court took a broad view of the Court's inherent jurisdiction. This is reflected, indeed, in what Lady Hale had to say concerning limits, at [41] (in the last sentence), namely:

> *"It is not correct to talk in terms of limits to the court's jurisdiction when what is in fact in question is how that jurisdiction should be exercised in the particular case."*

64.   The Supreme Court's broad approach to the open justice principle is further confirmed by what Lady Hale went on to say in the paragraphs which follow. Thus, she recognised at [42] (in the first sentence) that the *"principal purposes of the open justice principle are two-fold and there may well be others"*, before going on to identify the first as being *"to enable public scrutiny of the way in which courts decide cases"* and the second being, as stated at [43], *"to enable the public to understand how the justice system works and why decisions are taken"*.

65.    In any event, whether or not the *"legitimate interest"* approach remains valid in the light of the Supreme Court's decision, it was Mr Weir QC's position that this is a case in which *"the default position"* identified by Lady Hale at [44] applies, namely where *"the public should be allowed access, not only to the parties' written submissions and arguments, but also to the documents which have been placed before the court and referred to during the hearing"* (here, the Bundle C documents).

66.    It was Mr Weir QC's submission that there is no prior hurdle to the exercise of the Court's discretion through the balancing of relevant considerations of the type suggested by Mr Webb QC, namely that the third party applicant should have to establish that production of the documents would advance the open justice principle in the sense that it is not sufficient for an applicant to come to the Court and say that it wants the Court to order that it be provided with documents read by a judge on the basis of the open justice principle but for a reason (however otherwise legitimate) which is not itself rooted in the open justice principle.

67.    Mr Weir QC submitted that, instead, the Court should, in effect, proceed straight to the balancing exercise. As he put it, an application such as this *"proceeds on a sliding scale"*. It is, accordingly, appropriate for the Court to decide, in the exercise of its discretion and weighing up the factors for and against the making of an order, that in a given case the open justice principle does not warrant the making of the order sought. What the Court should not do, Mr Weir QC suggested, is require that a good reason be shown by the applicant as to why the documents sought would advance the open justice principle and, only if such a good reason is shown, then proceed to the balancing exercise referable to the Court's discretion. In short, it was Mr Weir QC's submission that the discretion is broad and, in particular, there is no threshold requirement that a non-party applying to access Court documents must establish that the purpose marries up with the rationale for the principle of open justice before the discretion comes to be exercised. In this respect, Mr Weir QC made the point that, if access to the documents with which the Forum has already been provided satisfies the *"principal purposes of the open justice principle"*, as the Supreme Court must have thought is the case given that at [50] Lady Hale made it clear that the Supreme Court was upholding the decision of the Court of Appeal insofar as certain documents were concerned, then, it must follow, *a fortiori*, that access to underlying documents (the Bundle C documents) does so also.

68.    In support of his core submission that it is incumbent upon a third party making an application for production of documents to show a good reason why those documents will advance the open justice principle, Mr Webb QC quibbled with Mr Weir QC's reliance on what Lady Hale had to say at [44] concerning *"the default position"* being *"that the public should be allowed access, not only to the parties' written submissions and arguments, but also to the documents which had been placed before the court and referred to during the hearing"*. He submitted that this does not detract from the obligation on the part of the third party to identify how the open justice principle justifies the application in the particular case. This, he submitted, is clear from the way in which Lady Hale described matters at [43], specifically the references to the public needing *"to understand how the justice system works and why decisions are taken"* and to their having *"to be in a position to understand the issues and the evidence adduced in support of the parties' cases"*.

69.    It was Mr Webb QC's submission that nothing which Lady Hale went on to say in this paragraph or at [44] detracts from such a requirement. Indeed, he suggested, it is clear from what Lady Hale went on to say at [45] that, whilst the Court has the *"power to allow access"*, an applicant has *"no right to be granted it"*. Mr Webb QC submitted, in effect, that the first sentence of [45], beginning with the word *"However"*, should be treated as though it carried directly on from the third sentence in [43], ending with the words *"evidence adduced in support of the parties' cases"*. In those circumstances, Mr Webb QC suggested, Lady Hale's reference to *"the default position"* being as stated in [44] does not greatly assist the Forum. On the contrary, Mr Webb QC submitted, the position is as clearly stated by Lady Hale in the second sentence in [45], namely that:

*"It is for the person seeking access to explain why he seeks it and how granting him access will advance the open justice principle."*

70.    The position is underlined, Mr Webb QC submitted, by Lady Hale's reference in the last sentence of [47] to non-parties not seeking access *"unless they can show a good reason why this will advance the open justice principle"* - as well as *"that there are no countervailing principles of the sort outlined earlier, which may be stronger after the proceedings have come to an end, and that granting the request will not be impracticable or disproportionate"*.

71.    It seems to me that Mr Webb QC must be right about this, and so that a third party making an application for access to documents should show that the documents will advance the open justice principle. This appears, indeed, to be what Lady Hale was saying in the passages to which I have referred. It is also consistent, on a proper analysis, with what was decided in ***Guardian News and Media*** since it is important to appreciate that in that case, as Toulson LJ made clear at [82], the applicant, The Guardian, had *"put forward credible evidence that it was hampered in its ability to report as full as it would have wished by not having access to the documents which it was seeking"*.

72.    This followed an earlier passage, at [76], where Toulson LJ said this:

*"I turn to the critical question of the merits of the Guardian's application. The application is for access to documents which were placed before the District Judge and referred to in the course of the extradition hearings. The practice of introducing documents for the judge's consideration in that way, without reading them fully in open court, has become commonplace in civil and, to a lesser extent, in criminal proceedings. The Guardian has a serious journalistic purpose in seeking access to the documents. It wants to be able to refer to them for the purpose of stimulating informed debate about the way in which the justice system deals with suspected international corruption and the system for extradition of British subjects to the USA."*

73.    It was with this journalistic purpose in mind that Toulson LJ went on to say at [82] as follows, after referring to The Guardian as having *"put forward credible evidence"*:

*"That being so, the court should be cautious about making what would really be an editorial judgment about the adequacy of the material already available to the paper for its journalistic purpose."*

**54**

74.     It was also with this journalistic purpose in mind that Toulson LJ had a little earlier made this observation at [79]:

> "The first objection is based on too narrow a view of the purpose of the open justice principle. The purpose is not simply to deter impropriety or sloppiness by the judge hearing the case. It is wider. It is to enable the public to understand and scrutinise the justice system of which the courts are the administrators."

75.     This, then, is the context for what Toulson LJ went on to say at [85], as expressly adopted by Lord Reed in *A v BBC* at [41] and quoted with apparent approval by Lady Hale at [39]. In other words, in stating what he did at [85], Toulson LJ would have had in mind the evidence which was before him on the part of The Guardian which was specifically directed towards the open justice principle. It is in this respect that Toulson LJ described *"the default position"* being *"that access should be permitted on the open justice principle"*, going on immediately afterwards to observe that *"where access is sought for a proper journalistic purpose, the case for allowing it will be particularly strong"*. He, then, went on to state, in terms, that:

> "Central to the court's valuation will be the purpose of the open justice principle, the potential value of the material in advancing that purpose and, conversely, any risk of harm which access to the documents may cause to the legitimate interests of others".

76.     The reference to the material's potential value *"in advancing that purpose"* is entirely consistent with the proposition put forward by Mr Webb QC that a third party making an application such as this should have to show that the documents sought will advance the open justice principle and that it is not sufficient merely that the applicant is heard to say that documents should be made available in accordance with the open justice principle irrespective of whether those documents will, once made available, advance *that* principle (as opposed to serve some other purpose).

77.     The same point was made by Lord Toulson (as he had by then become) in *Kennedy* at [113], citing from his judgment in *Guardian News and Media* at [85], and, before doing so, describing the open justice principle as *"never"* being *"absolute because it may be outweighed by countervailing factors"*.

78.     I am quite clear, in the circumstances, that a third party should not merely show that access to documents would be in accordance with the open justice principle but also that such access would advance the open justice principle. If the position were otherwise, and an applicant could merely insist on production of documents on the basis that this would be in accordance with the open justice principle, there would be nothing to stop anybody making an application and doing so in overly wide terms. That clearly is not what the Supreme Court (whether in this case or in *Kennedy* or *A v BBC*) can have contemplated would justify an application under the inherent jurisdiction.

79.     It does not follow, however, that Mr Webb QC was right when he submitted that there is, in effect, a prior hurdle to the exercise of the Court's discretion on an application such as this since nothing in the authorities, including Lady Hale's judgment in the present case, leads me to conclude that there is such a freestanding prerequisite. On the contrary, it seems to me that Mr Weir QC was probably right to describe there being something of a *"sliding scale"*. Where a particular case appears on that *"sliding*

*scale"* will depend on a range of factors, including whether access to the documents will advance the open justice principle and, if so, consistent with the concept of a *"sliding scale"*, to what extent.

80.     Indeed and in fairness, Mr Weir QC made it very clear during the course of his submissions that it is not the Forum's position that, as Mr Webb QC characterised it, the open justice principle is engaged simply because the documents sought were referred to in submissions or other evidence and that this is, in effect, an *"open sesame"* to obtaining the Bundle C documents. Mr Weir QC acknowledged, in terms during the course of his reply submissions, that even the so-called *"default position"*, described by Lady Hale at [44] and upon which he relied so heavily, is still subject to the exercise of the Court's discretion (and so the *"sliding scale"*, to which he referred).

81.     I agree with Mr Weir QC, therefore, that the proper approach is not to seek to impose *"limits"* (as described by Lady Hale at [41]) or prior hurdles to the exercise of the Court's discretion. Rather, the Court should engage in the balancing exercise described by Lady Hale (as well as Lord Reed and Lord Toulson) and, in so doing, accord appropriate weight to the various different factors. The fact that a third party is seeking documents for collateral purposes which have only a limited connection with advancing the open justice principle will not, therefore, operate as a bar to the ordering of production but will be a factor which will weigh less heavily in the appropriate balancing exercise than if the position were otherwise and the documents sought would more significantly advance the open justice principle.

82.     That this must be the proper approach is, I agree with Mr Weir QC, demonstrated by the fact that, despite remitting the matter to me, the Supreme Court nonetheless upheld the Court of Appeal's decision, dismissing the appeal brought by Cape against the Master's order, to require that Cape make available various documents to the Forum. As Mr Weir QC pointed out, if Cape's submission as to the appropriate legal approach were right, then, the appeal before the Supreme Court would have been allowed in part and the Forum would not have been permitted to have access to the documents to which it has already had access. The Forum must, in short, Mr Weir QC submitted, have done sufficient to trigger the open justice principle and, indeed, to demonstrate that that principle would be advanced by its being given access to *those* documents in order for at least that level of documentary access to be permitted.

*The exercise of discretion in this case*

83.     The question, in such circumstances, is whether, in the exercise of the Court's discretion, conducting the necessary balancing exercise, it is appropriate that the Forum should be given access to the further (Bundle C) documents which it seeks.

84.     Mr Weir QC submitted that the reasons given by Mr Dring and Ms Bains justify the making of an order for production of the documents contained in Bundle C. As previously observed, he relied for these purposes on Lady Hale's observations at [43], submitting (I repeat, correctly) that the fact that the documents are sought for the purposes of other litigation (in all probability not involving Cape but between claimant employees and their employers) is no bar to the making of an order. Mr Weir QC made the point, in particular, that the Bundle C documents are documents which, whilst they were seen by the Court (as it happens, by me as the trial judge), will not be

available in other litigation (and so seen by other judges) unless the present application is successful.

85.    Mr Weir QC submitted, based on the evidence from Mr Dring and Ms Bains, that the documentation is required in order to enable the Forum to understand the evidence adduced in support of the parties' cases in the proceedings which took place before me. He suggested that having sight of the (admittedly very lengthy) experts' reports is no substitute for being able to look at the underlying documentation.

86.    Indeed, as already mentioned, it was Mr Weir QC's position that, the Forum having already obtained access to the written submissions and experts' reports, thereby obtaining what he described as *"hearsay evidence"* as to the content of the Bundle C documents, then, it must follow, *a fortiori*, that access to those underlying documents would also be appropriate. I am not impressed, however, by this contention. I cannot accept the proposition that, since the Forum already has an understanding of issues and evidence from sources which have already been made available to it, so it follows that the Forum should have access to underlying documentation (including documentation referred to in the material which the Forum has) which, necessarily, will not give it an understanding which it does not already have.

87.    Specifically, Mr Weir QC made reference to TDN13 issued by the Factory Inspectorate in 1970 and a decision of the Court of Appeal in 2011, namely ***Williams v University of Birmingham*** [2011] EWCA Civ 1242. In that case, Aikens LJ observed as follows in relation to TDN13 at [61]:

*"In my view the best guide to what, in 1974, was an acceptable and what was an unacceptable level of exposure to asbestos generally is that given in the Factory Inspectorate's 'Technical Data Note 13' of March 1970, in particular the guidance given about crocidolite. The University was entitled to rely on recognised and established guidelines such as those in Note 13. It is telling that none of the medical or occupational hygiene experts concluded that, at the level of exposure to asbestos fibres actually found by the judge, the University ought reasonably to have foreseen that Mr Williams would be exposed to an unacceptable risk of asbestos related injury."*

88.    Mr Weir QC relied on this case as demonstrating that TDN13 is especially relevant. He referred also, fairly it should be said, to ***Bussey v 00654701 Ltd (formerly Anglia Heating Ltd)*** [2018] EWCA Civ 243, [2018] ICR 1242, in which Jackson LJ had this to say concerning *Williams*, at [50] and [51]:

*"50. I hasten to say that I am not criticising the actual decision in **Williams**. The deceased in that case was exposed to very low levels of asbestos for a relatively short time. The total exposure in **Williams** was much lower than the total exposure in the present case. The Court of Appeal very properly took into account the provisions of TDN13 in addition to the expert evidence.*

*51. I am not, therefore disputing any of the legal principles stated in **Williams**. Nor am I questioning the actual decision reached. The only gloss which, respectfully, I would place on the **Williams** judgment is this. Paragraph 61 should not be read as making TDN13 a universal test of foreseeability in mesothelioma cases."*

Mr Weir QC observed that, in the circumstances, TDN13 remains relevant, if no longer determinative as regards foreseeability.

89.  Mr Weir QC went on to refer to **Baker v Quantum Clothing Group Ltd** [2011] 1 WLR 1003, [2011] UKSC 17, in which Lord Dyson said this at [101]:

*"There is no rule of law that a relevant code of practice or other official or regulatory instrument necessarily sets the standard of care for the purpose of the tort of negligence. The classic statements by Swanwick J in* **Stokes** *and Mustill J in* **Thompson v Smiths Shiprepairers (North Shields) Ltd** *[1984] QB 405 which have been quoted by Lord Mance at paras 9 and 10 of his judgment remain good law. What they say about the relevance of the reasonable and prudent employer following a 'recognised and general practice' applies equally to following a code of practice which sets out practice that is officially required or recommended. Thus to follow a relevant code of practice or regulatory instrument will often afford a defence to a claim in negligence. But there are circumstances where it does not do so. For example, it may be shown that the code of practice or regulatory instrument is compromised because the standards that it requires have been lowered as a result of heavy lobbying by interested parties; or because it covers a field in which apathy and fatalism has prevailed amongst workers, trade unions, employers and legislators (see per Mustill J in* **Thompson** *at pp 419-420); or because the instrument has failed to keep abreast of the latest technology and scientific understanding. But no such circumstances exist here. The Code was the result of careful work by an expert committee. As the judge said, at para 87, the guidance as to the maximum acceptable level was 'official and clear'. He was entitled to accept the evidence which led him to conclude that it remained the 'touchstone of reasonable standards' for the average reasonable and prudent employer at least until the publication of the consultation paper on the 1986 draft Directive (para 48)."*

90.  It was Mr Weir QC's submission, in the light of what Lord Dyson had to say here, that there is (he would say at a minimum) scope for claimants in other litigation to allege that TDN13 is appropriately to be regarded as *"compromised"*. It is on this issue, Mr Weir QC submitted, that the underlying documents contained in Bundle C (or some of them) will be (or may be) of significant value to claimants or potential claimants in other proceedings.

91.  Mr Weir QC added that it is no answer for Cape to suggest that the documents could simply be obtained by individual litigants through disclosure within individual proceedings because *inter partes* disclosure would only apply in actions against Cape, whereas most asbestos claims are brought against the employer and, furthermore, the Court would be most unlikely to order disclosure to the level obtained in the 6-week trial in this case in an ordinary asbestos claim on grounds of proportionality.

92.  Mr Weir QC observed also how Lady Hale had, at [50], noted that Cape had not *"setup any counter-vailing rights of its own"*. He submitted that there is no evidence before the Court of harm to Cape's interests in respect of any particular document, observing that Cape was in a position to provide evidence as to the nature and impact of the documents but did not do so.

93.   Furthermore, as previously mentioned, Mr Weir QC suggested that no issues of practicality or proportionality arise in this case given the retention by Cape of clean, electronic, copies of the bundles and given that the Forum will meet all copying costs.

94.   For his part, Mr Webb QC submitted that it is not a case in which the principle described by Lady Hale in the Supreme Court at [43] is applicable. He submitted, specifically, that the Forum is unable to establish (the burden being upon it, as Mr Weir QC acknowledged) that the Bundle C documents are required in order for it to be understood *"how the justice system works"* in the sense described in the third sentence of [43], namely in order *"to understand the issues and the evidence adduced in support of the parties' cases"*.

95.   On this basis, Mr Webb QC submitted, exercising the discretion afresh, the Court should refuse the application for the Bundle C documents since the second aspect of the open justice principle identified by Lady Hale, as set out at [43], is not engaged at all, the Forum's objective having no connection with the open justice principle.

96.   It will be appreciated that this is a submission which I cannot accept, at least in its purest form. As I have explained, in my view, the question of whether the documents in Bundle C will advance the open justice principle (and, if so, to what extent) *is* a matter which falls to be considered by the Court but not as a freestanding issue arising before the Court's exercise of discretion and, instead, as part of the balancing process which is entailed in the Court deciding how the discretion should be exercised.

97.   It is, then, to that balancing exercise (and the discretion) to which I now come. As I shall explain, I have reached the clear conclusion that it would not be appropriate to order production of the Bundle C documents to the Forum. I say this having regard to the authorities to which I have referred (in particular, Lady Hale's description of the open justice principle) and having regard to Mr Weir QC's *"sliding scale"*, for a number of reasons.

98.   First, I agree with Mr Webb QC that, in truth, the reason given by Mr Dring (and amplified by Ms Bains), namely that the Forum should be able to use the documents for other purposes, including in relation to other litigation, does not advance the open justice principle. Specifically, the documents in Bundle C which are sought are clearly not required by the Forum in order to understand what the issues in the underlying proceedings were and what the evidence concerning those issues constituted.

99.   Secondly, although obviously related to the first point, the evidence adduced by the Forum in support of the application does not really explain how granting access to such documents will advance the open justice principle. The focus is, rather, on seeking to establish a *"legitimate interest"* when, as previously explained, that is no longer the appropriate focus. I make it clear that I acknowledge that the use of documents in other litigation represents no bar to an application. However, the collateral purpose identified by Mr Dring and Ms Bains, in truth, has no real connection (or, in any event, an insufficient connection) with the open justice principle. Still less does it advance (or sufficiently advance) that principle.

100.   Thirdly, it should be noted that nowhere in the evidence is there a suggestion that the Forum is unable to understand the issues which arose in the underlying proceedings or the evidence which was adduced in those proceedings. On the contrary, it is clear that

there is no difficulty with this at all. However, in line with the approach explained by Lady Hale in this case, it is incumbent upon an applicant to justify its application by reference to the open justice principle. In my view, the Forum has not done this adequately in the present case. There is no evidence which approximates or even comes close, for example, to the evidence which was before the court in **_Guardian News and Media_** concerning the ability of the third party to understand the underlying proceedings.

101.   Fourthly, again following on from the previous point, and perhaps most crucially given that this is a discretionary matter, it is telling that the Forum already has documents, in the form of experts' reports in particular but also the written opening and closing submissions, which enable it to understand the issues and the evidence adduced in support of the parties' cases. The experts' reports, in particular, were very lengthy and set out substantial extracts from the underlying documents. Any reader of those experts' reports, and the various written submissions, could be in no doubt as to what the issues were and what the evidence adduced by the parties comprised. Mr Webb QC submitted, indeed, and I tend to agree, that the Forum already has *"everything short of the documents"* in Bundle C.

102.   Mr Webb QC gave as an example a passage in Cape's written closing submissions at trial, a document which runs to some 146 pages, at paragraph 118.6, which reads as follows:

   *"At a meeting on 2 May 1972 between CIH's Mr Cross and Messrs Luxon and Wilkie of HMFI, the former recorded that Mr Luxon:*

   *'... mentioned the strong feelings expressed that amosite was tending to be regarded by some people in the US in a similar category to crocidolite. I emphasised to Mr Luxon and Mr Wilkie that this represented a misunderstanding of Selikoff's point of view that there was no justification for regarding any one type of asbestos as more or less harmful than another and that all types should be subject to strict control but not prohibition, unless the controls were impossible to apply effectively.'"*

   This was a quote from a document which is to be found in Bundle C but to which the Forum does not have access. Plainly, however, the Forum knows what the document states precisely because it is quoted in this passage.

103.   The same applies to many other documents which are quoted in Cape's written closings (including in an even more lengthy 171-page appendix). It is not, however, only Cape's written submissions which provide such information since there are also the written submissions (in each case again lengthy written submissions) which were produced by the other parties to the proceedings. These, too, contain quoted extracts from the underlying documents which are to be found in Bundle C.

104.   There are also the (equally lengthy) experts' reports to consider. These, again, are documents which the Forum has already been provided with.

105.   To take an example concerned with TDN13 in particular, the report prepared by Martin Stear refers to a particular document described as *"Document 249 D4-00296"*, as follows:

*"Document 249 D4-00296 'Dust Assessment Working Group, Research Committee, Chairman of Environmental Control Committee' 20 April 1972 and provided in Cape's additional disclosure, suggests that measurement had not started by this time and was planned to take place over the subsequent two years. The minutes of the fourteenth meeting of the ARC Environmental Control Committee, 22 February 1973, stated that:*

*'Very little progress had yet been made in one important activity, the collection of information on probable dust counts. The need for this had been demonstrated recently by the Factory Inspectorate's draft Technical Data Note on 'Probable Dust Concentrations in the Construction Industry' which had included some very high dust counts taken by F.I. These had been countered to some extent by ARC's own information on insulation boards, but this had been limited and additional data would have been desirable. The Factory Inspectorate was likely to take similar action in other fields, and, if data was not available from the ARC, they would have to rely on their own counts. There was no obligation to publish ARC results if they were unhelpful, but the information should be available within ARC so that it could be used if and when desirable. Help in this matter had been requested by the F.I. some time ago, and it was in the ARC's interest to provide it" (D8-1998)."*

106.    The next paragraph of Mr Stear's report, paragraph 5.51, reads as follows:

*"'Minutes of asbestos dust assessment conference' 20 and 21 June 1974 (D2-2190). Those present were representatives of various subsidiaries of Cape Industries Limited and this document states that:*

*'At this point Mr Cross referred to the Department of Employment's earlier request to the A.R.C. to produce a list of probable dust concentrations in construction products for various operations with asbestos based materials on building sites. This was, in fact, taken up by the HMFI who published their findings in Technical Data Note No. 42. Mr Cross explained that a request was now being made to Companies in the Group to provide information on dust levels for various types of jobs within their factory environments or in respect of the conditions of use by customers of the various asbestos products to the Environmental Control Committee (ECC).'"*

107.    Another example concerns what is stated in the same report at paragraph 5.66. This reads:

*"'Joint symposium on prevention and control of fires in ships, Tuesday 20th June, 1972' (D2-1911), 'Paper No. 5 "Health Hazards (Asbestos - Its Effects and Safety Precautions)"' by Dr Smither and Mr A A Cross (stated to be of the ARC), reported 'dust levels in typical operations'. This stated, in Table 1, that:*

*a) cutting incombustible board gave levels of 100 fibres/ml where there was no exhaust ventilation and 1.1 to 4.45 fibres/ml where there was portable exhaust ventilation; and*

*b) drilling resulted in an exposure of 1.0 to 1.95 fibres, without exhaust and 0.7 to 0.95 fibres/ml with exhaust."*

108.    Paragraph 5.67, then, goes on as follows:

*"These figures were said to have been produced by the ARC (and are also reported in 'Practical methods for protection of men working with asbestos materials in shipyards, A A Cross et al', D2-232), which is undated. Table 4 of both documents (reproduced below) also reported the potential for high exposure, where the ARC membrane sampling method was used."*

109.  Table 4, then, follows. Interestingly, although no coincidence obviously, it is this table which was produced (together with other underlying documents) as part of a talk given by barristers at 12 King's Bench Walk, Mr Michael Rawlinson QC and Ms Gemma Scott, who appeared in the underlying proceedings. The PowerPoint presentation (including Table 4 and the other documents to which reference was made) appears as an exhibit to Ms Bains' second witness statement made in support of the application, where she described it as follows in paragraph 16:

*"One of the slides shows a summary table referring to average [sic] of all concentrations. These provide a range of dust levels from 19.4 f/ml to 89.3 f/ml from various tasks being carried out with AIB with background dust levels of 10.5 f/ml. These are average concentrations within a much wider range of results as shown in the table."*

110.  Mr Stear's report, then, goes on at paragraph 5.69 to state as follows:

*"This report also stated that fire-insulation boards may be used for bulkheads in board form, or with special finishes of veneer or plastic sheeting, to form the decorated wall panels of cabins and accommodation quarters generally. Further that, cutting of these with power tools gives relatively high concentrations:*

*'Manufacturers of these materials in the United Kingdom have introduced methods of surface sealing, that while these have resulted in some reduction in dust arising from handling the boards, they have not effected any improvement in the dust levels from cutting and drilling. It has been shown, however, that by the development of suitably designed tools equipped with local exhaust ventilation, the level of dust in the operator's breathing zone can be controlled to a considerable extent.*

*Ideally, panels should be cut to the sizes and shapes required ready for fitting with the minimum of adjustment on the vessel under construction. If materials cannot be obtained from the manufacturers ready cut, then a workshop should be set up on shore suitably equipped with dust extraction equipment. Such equipment, when properly designed and operated will reduce dust levels to the extent that personal protection is not necessary.*

*Even when these arrangements are made, it is not always possible to avoid some final cutting to fit. Occasional hand cutting or drilling will only produce moderate amounts of dust. Nevertheless it is recommended that respirators should be worn when this work has to be done in confined spaces. Suitably shrouded tools for cutting and drilling have been designed which can be connected to portable dust extraction equipment. Such equipment is capable of controlling the dust to levels where respiratory protection is no longer required. Tests carried out by officials assessors have confirmed that levels lower than 5 fibre/ml may be expected when performing cutting and drilling with these tools. The equipment can also be used for vacuum cleaning purposes and is relatively inexpensive (see table 4).*

*One of the larger British shipyards has established a special on-shore cutting shop equipped with saws, sanders and veneering equipment and with an exhaust ventilation installation guarantee to control the concentrations of asbestos dust at not more than 2 fibres/ml. The same yard has/also established standard working practices for joiners fitting non-combustible asbestos boards on ships under construction. These practices provide for the use of portable vacuum cleaners for cleaning working areas, for de-dusting clothing of workmen at the end of the working period, and for providing local exhaust ventilation when occasional cutting has to be done. The arrangements also include the provision of a segregated area on the ship at a point convenient for the joinery work. This is simply done by the erection of screens made up of battens and PVC sheeting. It provides in effect an on-ship workshop equipped with a power saw fitted with a dust extraction device, as well as vacuum equipment for collecting spilt sawdust and chippings.*

*It has been found that by the use of properly designed dust extraction devices, the carefully planned supply of materials involving minimum on-site fabrication, and the maintenance of good standards of industrial hygiene, incombustible boards can be worked without creating hazardous quantities of dust. It has also been found that, in carrying out these measures, the amount of labour involved in shipboard work has been considerably reduced. This saving can more than compensate for the cost of such relatively inexpensive equipment as has been described."*

111.   Paragraph 5.70, then, states as follows:

*"'Summary of dust survey taken on building sites and in customer premises", and dated (D2-242), stated that the tests were to show where customers' problems would arise under the new Asbestos Regulations. The results were said to show that there was less of a danger from inhaling asbestos dust when cutting and handling asbestos cement, successful dust suppression can be achieved by efficient dust extraction with particular emphasis on hood design, and the main problems were found in the handling and cutting of low-density high fibre content materials."*

112.   Mr Stear, then, set out in paragraph 5.71 *"the relevant tables of results ... that include work with Maronite and Asbestolux"*. Again included among these tables is a table described as *"Summary 1 - Lowest and Highest Concentrations - fibres per cc"* which appears in the presentation to which Ms Bains refers.

113.   Mr Stear, then, went on, in paragraphs 5.72 to 5.74, as follows:

*"5.72 The report does not state the exact circumstances in relationship to each measurement and whether any precautions, such as extraction, were employed. For each set of results, additional tables are provided classifying the results as under 2 fibres/ml, 2 to 4 fibres/ml, 4 to 10 fibres/ml and over 10 fibres/ml.*

*5.73 These exposure surveys may be those referred to in minutes of meetings., However I do not know the extent to which this data was shared with the HMFI/HSE and the extent to which it influenced the data in their publications. I have not seen any documentation that suggests the exposure data was shared with HMFI.*

**63**

> 5.74    *The various exposure data sources suggest higher levels than reported in HSE's documents TDN42 and EH35. Whilst this seems a reasonable conclusion to me, it is difficult to know to what extent ARC were finding higher levels than the Factory Inspectorate. There is little detail with regard to the exact circumstances of exposure and of the sampling methodology, other than it was probably by this time, sampling and analysis by the ARC's new membrane filter method. However, I have very broadly taken the Factory Inspectorate's figures and used the means, as far as possible, from document D2-242 …".*

114.    The detail apparent from these various passages, which were highlighted by Mr Webb QC purely by way of illustration, belies any suggestion on the part of the Forum that it lacks a proper understanding of the issues which arose in the underlying action or that it does not know what evidence was adduced by the parties in those proceedings. Indeed, as Mr Webb QC observed, it is instructive that in an appendix to Mr Weir QC's skeleton argument for the purposes of the hearing before me the Forum had no difficulty in setting out in considerable detail what it has been able to ascertain from the experts' reports and written submissions in the underlying litigation. I agree with Mr Webb QC that this is, indeed, as he put it, *"a striking demonstration of why further documents are not required by the Forum in order to understand the trial process or otherwise to further the open justice principle"*. He was right to say that the Forum's representatives demonstrate in this appendix *"an excellent understanding of the issues in the litigation as well as the position adopted by the parties and the arguments advanced in respect of those issues"*. He was right, therefore, also when he submitted that the appendix *"amply confirms that the Forum can show no good reason why the provision of a further 5,000 pages of documents will advance the open justice principle"*.

115.    Fifthly, although in truth this point draws the previous points together, in making the application, the Forum is seeking not to advance the open justice principle but simply trying to obtain documentation for deployment in other litigation. The Forum already knows what the issues in the underlying litigation were and what the evidence before the Court in that litigation entailed. The real motivation behind the application is a concern on the part of the Forum that it would be more useful from an evidential perspective were the underlying documents contained within Bundle C to be available for use in other litigation. In that sense, the Forum is, in effect, making a third party disclosure application in relation to other proceedings but seeking to do so without regard to the constraints to which a genuine disclosure application would be subject.

116.    As Mr Webb QC pointed out, the CPR make very clear provision for the situations in which a person can obtain documents for use in litigation, including pre-action disclosure where appropriate and justified. For example, a person can seek to obtain disclosure (as Mr Webb QC emphasised, subject always to safeguards such as CPR 31.22 in respect of the use of documents): by an application for pre-action disclosure under CPR 31.16 against a respondent *"likely to be a party to subsequent proceedings"*; by a third party disclosure application under CPR 31.17; against a defendant after commencement of a claim in accordance with the standard disclosure provisions under CPR 31.6; in limited circumstances, via a **Norwich Pharmacal** order (preserved by CPR 31.18); and pursuant to the Court's power to make a search order under section 7 of the Civil Procedure Act 1997.

**64**

117. The Forum has not sought to bring an application on the basis of any of these provisions. Instead, it now purports to rely on the inherent jurisdiction.

118. Sixthly, but related to the point just made, I consider that there was some substance in a further submission which was made by Mr Webb QC. This was that, whilst it needs obviously to be appreciated that the position is different where documents have been deployed in proceedings before the Court so as to bring into play the potential application of the open justice principle compared with the situation where documents have merely been disclosed but there has been no hearing so as to mean that the open justice principle is not applicable, nonetheless, it is relevant to consider, as part of the exercise of discretion, the fact that documents produced pursuant to an application such as the present under the Court's inherent jurisdiction are documents to which the 'implied undertaking' now to be found in CPR 31.22 has no application. Indeed, it is the Forum's avowed intention that the documents should be used in other proceedings or at least made available for such use. That necessarily will be without any restriction. However, as Mr Webb QC pointed out, Cape will have no ability (at least ordinarily) in such other proceedings to put forward any explanation as to particular documents of its own in the way that Cape was able to do in the underlying proceedings in which the documents were disclosed and, then, deployed at trial. As Mr Webb QC submitted, in weighing the various factors in deciding whether an order ought to be made, regard should be had to this. It is by no means a decisive factor. It is, however, a consideration which does seem to me to need to be taken into account. It is certainly a countervailing factor.

119. Seventhly, I consider there to be substance also in Mr Webb QC's submission that regard should be had to the fact that the Forum chose not to make an application during the course of the trial. Plainly, this does not preclude an application being made at this juncture. However, it is instructive to have regard to the position had an application been made at an earlier stage prior to the conclusion of the trial, as opposed to at a point after the proceedings had settled. I am clear that, had an application been made at trial, then, appropriate steps would have been taken in order to ensure that the Forum (and its representatives) had the awareness described by Lady Hale in her judgment in this case at [43].

120. Such measures might have included, for example, allowing a computer screen to be looked at as and when documents in what was to become Bundle C were cited. I consider it unlikely, however, that the Court would have required that the entirety of that bundle be made available to the Forum. Given this, it would seem odd that the Forum should now, through the making of the present application, be put into a better position than would have been the case had the application been made at trial. As Mr Webb QC submitted, there is a very real difference between the Court permitting non-parties inspection of documents during the course of a trial (so as to enable the trial process to be fully comprehensible), on the one hand, and the Court ordering a party, after the trial has been settled and all further proceedings dismissed, to deliver up documents to such third parties for those third parties to make whatever use of them they might wish. Put shortly, had the Forum sought production of the Bundle C documents at trial on the basis now put forward in support of the present (later) application, as set out in Mr Dring's and Ms Bains' witness statements, I am clear that the Court would have declined to order production.

**65**

121.   All in all, taking account of the submissions which were made, respectively, by Mr Weir QC and Mr Webb QC, and weighing the factors in support of the application against the countervailing factors to which I have made reference in what is, as Lady Hale put it at [45] (by reference to both *Kennedy* and *A v BBC*) *"a fact-specific balancing exercise"*, I have come to the clear conclusion that the appropriate exercise of discretion in this case results in a decision that the Bundle C documents ought not to be made available to the Forum.

122.   Indeed for reasons which have already been stated, I have the distinct impression that in the present case the open justice principle is being used by the Forum for a purpose which goes further than is legitimate (using that word in a non-technical sense) on an application such as this. It seems to me that Mr Webb QC was right when he drew an analogy with the situation which arose in a recent decision in the defamation context, *Barclay v Barclay* [2020] EWHC 1180 (QB) as follows at [21]:

> *"... the Court's machinery can sometimes be used as a mechanism for the 'laundering' into the public domain, with the protection of the privileges that attend fair and accurate reporting, of material that it suits one party to deploy in a public arena, as part of a litigation strategy. I emphasise that I am not, by saying that, indicating that that is what I consider to be going on here. However, it is a factor that has to be considered as part of the Court's decision-making in any individual case, because every individual decision may be relied on as some sort of precedent in future cases."*

123.   I should, lastly, mention two further matters.

124.   The first concerns Mr Webb QC's suggestion that it would, in any event, be impracticable or disproportionate to require that the Bundle C documents are provided, and so that the order sought ought not to be made. I do not agree with this. In practical terms, very little would be required in order to comply with the order sought. Bundle C already exists, in circumstances explained in a moment, and so to supply it would be a straightforward matter.

125.   The second concerns the status of Cape on this application and, related to this, the nature of the order which the Forum seeks. It was Mr Webb QC's submission that the Forum, in effect, seeks a mandatory injunction against Cape requiring Cape to produce the Bundle C documents. The order of the Court of Appeal, indeed, in paragraph 7 required that Cape *"shall, on payment by [the Forum] to [Cape] of [Cape's] reasonable copying costs, provide [the Forum] with one copy of each"* of the documents listed in Appendix 2 (namely witness statements, experts' reports and written submissions). The Supreme Court's order was to similar effect (see paragraph 2) and, indeed, paragraph 1 of the order was framed in these terms:

> *"The application be listed before Mr Justice Picken (or, if that is not possible, another High Court Judge) to determine whether the Court should require [Cape] to provide a copy of any other document placed before the judge and referred to in the course of the trial to [the Forum] (at [the Forum's] expense) in accordance with the principles laid down by this Court".*

In other words, again, the focus is on what Cape might be required to provide directly to the Forum.

66

126.    Furthermore, in the Court of Appeal, the mandatory nature of the relief sought was expressly recognised by Sir Brian Leveson P when, albeit in relation to Bundle D rather than Bundle C, he described the Master as having ordered *"a mandatory injunction which effectively required the parties to spend £1,800 to transfer Bundle D onto a hard drive which she then ordered to be delivered up to and retained by the Court after the case had settled"* (see paragraph 143(4)).

127.    Mr Webb QC submitted, in the circumstances, that it would be wrong to characterise Cape as being merely an interested party and, for that reason, to treat Cape's observations on the application as somehow lacking the significance which they might otherwise have. He pointed out, indeed, that, following the Court of Appeal's judgment, Cape adopted an essentially pragmatic position by suggesting that its solicitors should hold the relevant documents pending final determination of the application by me or another High Court judge after the remitted hearing contemplated by the Court of Appeal had taken place.

128.    As will be apparent from what I have had to say in this judgment, I have approached the application on the basis that, in practice, the position of Cape is a position which ought properly to be taken into account. In truth, Mr Weir QC approached matters in the same way. To be clear, however, I have not placed any weight on the fact that, again in practice, were an order for production to be made, it would be an order which would amount to a mandatory injunction against Cape. Put differently, I am unpersuaded that this is a feature which matters for discretionary purposes in this case.

**Conclusion**

129.    For the reasons which I have given and in the exercise of my discretion, in accordance with the principles laid down by the Supreme Court in this case, I have decided that no other document (specifically the documents contained in Bundle C) should be provided to the Forum.

A

Queen's Bench Division

# *Blue *v* Ashley

## [2017] EWHC 1553 (Comm)

2017   June 22; 26                                                    Leggatt J

B

*Practice — Witness statements — Inspection — Parties filing trial witness statements
with court — Statements put before court and referred to at pre-trial hearing and
then returned to parties — Non-party newspaper publisher seeking access to
statements to enable it to report parties' evidence in advance of trial — Whether
statements "put in evidence" at pre-trial hearing enabling party to supply copies
to newspaper — Whether court's power to grant non-party access to documents
applying where document sought no longer on court file — Whether power
affected by non-party's automatic right to inspect statement which had stood as
evidence-in-chief — Factors to be considered when determining whether to
exercise power — Whether publisher to be granted access to witness statements
— CPR rr 5.4C(2), 32.12(2)(c), 32.13(1)*

C

Shortly before the start of the trial of an action the defendant applied for
permission to rely at trial on certain expert evidence.  For the purposes of the hearing
of that application a bundle of documents was lodged with the court which included,
inter alia, the trial witness statements made by each of the claimant and defendant.
The court was invited to read sections of those statements, and reference was made to
them in argument during the hearing.  The publisher of a newspaper sought copies of,
inter alia, the witness statements, apparently so that it could publish some of the
parties' evidence in advance of the trial.  By CPR r 32.12(2)(c)[1] the claimant, who
had no objection to the newspaper having copies of the statements, was permitted to
supply them if, having been referred to at the pre-trial hearing, the statements had
been "put in evidence" at a hearing held in public.  Alternatively, the publisher sought
the statements pursuant to CPR r 5.4C(2), by which a non-party, with the court's
permission, could obtain from the court records a copy of any document filed by a
party.  The defendant disputed that the statements had been "put in evidence" for the
purposes of rule 32.12(2)(c), and opposed the publisher's application under
rule 5.4C(2) on the grounds that (i) the witness statements were no longer on the
court file, having been returned after the pre-trial hearing, and (ii) it was implicit in
CPR r 32.13(1) that a non-party could not be allowed to inspect a witness statement
until it had stood as evidence-in-chief.

D

E

F

On the applications—
*Held*, (1) that a witness statement was not "put in evidence" for the purposes of
CPR r 32.12(2)(c) until it had stood as evidence-in-chief; but that where a member of
the press or the public applied for access in advance of a trial to a witness statement
which had been prepared for use at the trial, in circumstances where the witness
statement had already been referred to at a pre-trial hearing, the court had the power
both under CPR r 5.4C(2) and by virtue of the common law principle of open justice
to direct that the non-party should be granted such access, regardless of whether the
court had, or had ever had, a copy of the witness statement on its file; that that power
was unaffected by the automatic right under CPR r 32.13 given to a non-party to

G

H

---

[1] CPR r 5.4C(2): see post, para 7.
CPR r 32.12: "(1) Except as provided by this rule, a witness statement may be used only for
the purpose of the proceedings in which it is served.  (2) Paragraph (1) does not apply if and to
the extent that— (a) the witness gives consent in writing to some other use of it; (b) the court
gives permission for some other use; or (c) the witness statement has been put in evidence at a
hearing held in public."
CPR r 32.13(1): see post, para 8.

© 2017 The Incorporated Council of Law Reporting for England and Wales

**68**

A  inspect a witness statement which had stood as evidence-in-chief; and that, accordingly, while the statements could not be provided on the basis that they had been "put in evidence" for the purposes of CPR r 32.12(2)(c), the court had power to permit access to them (post, paras 10–11, 18, 21, 22–23, 24, 26).

But, (2) refusing the applications, that while it was the default position that access should be permitted where a document had been placed before the judge, it was none the less necessary to consider the circumstances, including the nature of the
B  document in question, its role and relevance in the proceedings and, importantly, the purpose for which access to the document was sought; that witness statements were produced not for the public, but to assist the parties in preparing for trial and to promote the trial's efficiency; that an interest in reporting the parties' evidence before it was given did not engage the open justice principle; that the default position of granting access to statements referred to at a public hearing was displaced by the general undesirability of the court supplying a witness statement to a non-party
C  before the statement had been deployed in the proceedings; and that, accordingly, there was no legitimate basis for making the witness statements public in advance of the trial (post, paras 12–13, 15–16, 21–24, 26).

*R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2013] QB 618, CA applied.

The following cases are referred to in the judgment:

D  *NAB v Serco Ltd* [2014] EWHC 1225 (QB)
*R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2012] EWCA Civ 420; [2013] QB 618; [2012] 3 WLR 1343; [2012] 3 All ER 551, CA
*Roy v Prior* [1971] AC 470; [1970] 3 WLR 202; [1970] 2 All ER 729, HL(E)

No additional cases were cited in argument.

E  The following additional cases, although not cited, were referred to in the skeleton arguments:

*A v British Broadcasting Corpn (Secretary of State for the Home Department intervening)* [2014] UKSC 25; [2015] AC 588; [2014] 2 WLR 1243; [2014] 2 All ER 1037, SC(Sc)
*ABC Ltd v Y (Practice Note)* [2010] EWHC 3176 (Ch); [2012] 1 WLR 532; [2011]
F  4 All ER 113
*Attorney General v MGN Ltd* [2011] EWHC 2074 (Admin); [2012] 1 WLR 2408, DC
*British Arab Commercial Bank v Algosaibi Trading Services Ltd* [2011] EWHC 1817 (Comm)
*British Steel Corpn v Granada Television Ltd* [1981] AC 1096; [1980] 3 WLR 774; [1981] 1 All ER 417, HL(E)
G  *Chan U Seek v Alvis Vehicles Ltd (Guardian Newspapers Ltd intervening)* [2004] EWHC 3092 (Ch); [2005] 1 WLR 2965; [2005] 3 All ER 155
*Francome v Mirror Group Newspapers Ltd* [1984] 1 WLR 892; [1984] 2 All ER 408, CA
*GIO Personal Investment Services Ltd v Liverpool and London Steamship Protection and Indemnity Association Ltd (FAI General Insurance Co Ltd intervening)* [1999] 1 WLR 984, CA
H  *Guardian News and Media Ltd, In re* [2010] UKSC 1; [2010] 2 AC 697; [2010] 2 WLR 325; [2010] 2 All ER 799, SC(E)
*Lonrho plc, In re* [1990] 2 AC 154; [1989] 3 WLR 535; [1989] 2 All ER 1100, HL(E)
*Nestec SA v Dualit Ltd* [2013] EWHC 2737 (Pat)
*Press Association (Robert Jolleys), In re* [2013] EWCA Crim 1135; [2014] 1 Cr App R 15, CA

© 2017 The Incorporated Council of Law Reporting for England and Wales

3632
Blue v Ashley (QBD)                                                      [2017] 1 WLR
Leggatt J

*Qadir v Associated Newspapers Ltd* [2012] EWHC 2606 (QB); [2013] EMLR 15                    A
*R v Legal Aid Board, Ex p Kaim Todner* [1999] QB 966; [1998] 3 WLR 925; [1998]
    3 All ER 541, CA
*Reynolds v Times Newspapers Ltd* [2001] 2 AC 127; [1999] 3 WLR 1010; [1999]
    4 All ER 609, HL(E)
*S (A Child) (Identification: Restrictions on Publication), In re* [2004] UKHL 47;
    [2005] 1 AC 593; [2004] 3 WLR 1129; [2004] 4 All ER 683, HL(E)
*Scott v Scott* [1913] AC 417, HL(E)                                                        B
*SmithKline Beecham Biologicals SA v Connaught Laboratories Inc* [1999] 4 All ER
    498, CA
*W (Care Proceedings: Non Party Appeal), In re* [2016] EWCA Civ 1140; [2017]
    1 WLR 2415, CA

## APPLICATION

By a claim form the claimant, Jeffrey Ross Blue, claimed against the            C
defendant, Michael James Wallace Ashley, sums which he claimed were due
under an oral agreement allegedly made between them on 24 January 2013.
By his defence the defendant denied the existence of the agreement and that,
if there was such an agreement, any sums were due under it.

By application notice dated 30 May 2017 the applicant, Times
Newspapers Ltd, applied under CPR r 5.4C(2) and/or the common law for          D
the provision of a number of documents from the court's record in the
action, comprising (i) trial witness statements which had been prepared by
each of the claimant and the defendant, submitted to the court and referred
to in open court at a pre-trial hearing in the action on 7 April 2017, (ii) an
expert's report which had not been put in evidence and in respect of which
permission to do so at the trial had been refused, (iii) witness statements of
solicitors instructed by the parties which had been prepared specifically for    E
the pre-trial hearing; and (iv) the skeleton arguments prepared solely for the
purpose of that hearing. The skeleton arguments were provided as requested
but the defendant objected to the provision of the other documents.

The facts are stated in the judgment, post, paras 1–6.

*Jesse Nicholls* (instructed by *Head of Legal Department, Times*                F
*Newspapers Ltd*) for the applicant newspaper publisher.
*Adam Speker* (instructed by *Reynolds Porter Chamberlain llp*) for the
defendant.
The claimant did not appear and was not represented.

The court took time for consideration.

26 June 2017. **LEGGATT J** handed down the following judgment.                     G

1   The question of some general importance raised by this application is
whether a member of the public or the press should be given access in
advance of a trial to witness statements which have been prepared for use at
the trial in circumstances where the witness statements have already been
referred to at a pre-trial hearing. The application is made by Times            H
Newspapers Ltd ("TNL"), the publisher of *The Sunday Times*. TNL seeks
access to documents which have been filed with the court in proceedings
between two individuals, Mr Blue and Mr Ashley. These documents include
the witness statements of the two protagonists which have been prepared for

A   use at the trial. The claimant, Mr Blue, does not oppose TNL's application, but the defendant, Mr Ashley, does.

*The action*

2   The trial of the action is due to begin in a week's time on 3 July 2017. The claim brought by Mr Blue is based on an oral agreement allegedly made between himself and Mr Ashley on 24 January 2013 in relation to the share price of Sports Direct International plc ("SDI"), a company in which Mr Ashley owns and controls the majority of the shares. The agreement allegedly made was that, if Mr Blue deployed his experience, skill and contacts in corporate finance to get SDI's share price above £8 per share before 24 January 2016, Mr Ashley would pay Mr Blue £15m. Mr Blue contends that the condition was fulfilled and the money is therefore payable. Mr Ashley denies that any agreement was made. He also says that it was necessarily implicit in any oral agreement of the type alleged that the share price of SDI would need to rise to £8 by reason of Mr Blue's actions in order for the contractual sum to become payable and that Mr Blue cannot show that his actions were the effective cause of the rise in the share price.

*The April hearing*

3   The platform for this application is a hearing which took place on 7 April 2017 before Phillips J (the "April hearing") in which Mr Ashley applied for permission to rely at the trial on evidence from an expert in the field of equity markets, Mr Simon Dunn. On behalf of Mr Ashley it was argued that such evidence was reasonably required on the issue of causation in order to understand what factors influence movements in share prices and are likely to have caused the change in the share price of SDI. Phillips J dismissed the application on the grounds that it was made at a very late stage in the proceedings and that no positive case has been advanced by Mr Ashley on the issue of causation which the proposed expert evidence would go to support.

4   For the purpose of the April hearing, a bundle of documents was prepared and lodged with the court which included the witness statements which Mr Blue and Mr Ashley have each made for use at the trial. Before the hearing the judge was invited to read (amongst other material) the whole of Mr Blue's first witness statement and very short extracts from each of Mr Ashley's two witness statements. Reference was made to this material in argument by each side. In support of Mr Ashley's application, counsel for Mr Ashley argued that Mr Blue's witness statement raises matters of opinion which can only properly be addressed by an expert witness; and in opposing the application counsel for Mr Blue referred to parts of the witness statements in arguing that the issue of causation is one of fact or alternatively that, to the extent that the issue involves opinion, expert evidence is not reasonably required to resolve it.

*This application*

5   The present application was issued on 31 May 2017 by TNL following a request for access to documents made in correspondence. TNL seeks an order pursuant to CPR r 5.4C(2) or the common law powers of the court that it be permitted to obtain from court records or from a party to

© 2017 The Incorporated Council of Law Reporting for England and Wales

A

the action copies of nine specified documents.  The documents are: the skeleton arguments for the April hearing; witness statements made by Ms Cullen and Mr Fearnhead (solicitors instructed by, respectively, Mr Ashley and Mr Blue) for the purpose of that hearing; the expert report of Mr Dunn on which Mr Ashley was seeking to rely; and the trial witness statements (two made by Mr Blue and two made by Mr Ashley) already mentioned.  Of these documents, the skeleton arguments have subsequently been provided to TNL.

B

6   TNL has not served any evidence to explain why it wants access to these documents, taking the position that it does not need to do so and that it is for a party who opposes the application to show why access should not be granted.  It is obvious, however, from the nature of the material and the way the application has been argued that the primary interest of TNL is in the witness statements of Mr Blue and Mr Ashley.  What *The Sunday Times* wishes to do is to be able to publish some of the evidence that Mr Blue and Mr Ashley will give at the forthcoming trial before they give it.  This is also what Mr Ashley is chiefly concerned to prevent.

C

*The court's powers*

7   Provision is made in the Civil Procedure Rules for the supply of documents to a non-party from court records.  CPR r 5.4C(1) states a general rule that a person who is not a party to proceedings may obtain from the court records a copy of (a) a statement of case (but not any documents filed with or attached to the statement of case) and (b) a judgment or order given or made in public.  In addition, CPR r 5.4C(2) provides that: "A non-party may, if the court gives permission, obtain from the records of the court a copy of any other document filed by a party, or communication between the court and a party or another person."  TNL has applied under CPR r 5.4C(2) for permission to obtain the documents that it seeks.

D

E

8   Also relevant to the arguments made on this application are rules in CPR Pt 32 relating to witness statements.  CPR r 32.12 provides that a witness statement may be used only for the purpose of the proceedings in which it is served except where (a) the witness gives consent for some other use or (b) the court gives permission for some other use or (c) "the witness statement has been put in evidence at a hearing held in public".  CPR r 32.13(1) provides that: "A witness statement which stands as evidence-in-chief is open to inspection during the course of the trial unless the court otherwise directs."

F

9   The case law shows that, in exercising powers to permit access to documents deployed in court proceedings, courts should be guided by the principle of open justice.  This principle requires court proceedings to be conducted in public except where to do so would cause injustice.  The open justice principle is a fundamental principle of the common law.  Its importance has been reiterated in a number of recent cases including the decision of the Court of Appeal in *R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2013] QB 618.  As explained by Toulson LJ in that case, the essential purpose of the open justice principle is "to enable the public to understand and scrutinise the justice system of which the courts are the administrators": para 79.  The *Guardian News and Media* case also confirms that, subject to any statutory provision, the courts have an inherent jurisdiction to determine how the

G

H

© 2017 The Incorporated Council of Law Reporting for England and Wales

A   open justice principle should be applied.  It follows that, even in the absence of a relevant statutory power, unless they are precluded by statute, the courts have power at common law to grant access to documents if the open justice principle requires this.

*Is there power to permit access in this case?*

B   10   Given the broad powers which the court has, I reject the arguments raised on Mr Ashley's behalf that the court has no power to grant TNL access to the trial witness statements at this stage of the case.  A search made by Mr Ashley's solicitors established that Mr Blue's second statement and Mr Ashley's own trial witness statements are not on the court file, and it was argued that in these circumstances CPR r 5.4C cannot be used to obtain these documents.  However, CPR r 5.4C(2) applies where a document has

C   been "filed by a party", and "filing", in relation to a document, means delivering it to the court office: see CPR r 2.3(1).  As mentioned earlier, the trial witness statements of Mr Blue and Mr Ashley were included in a bundle of documents lodged with the court (by delivering it to the court office) for the April hearing.  The statements were therefore filed for the purpose of CPR r 5.4C(2).  The fact that the court may no longer have a copy of a

D   document on its file (for example, because the document was filed only in hard copy and was returned after the hearing) will not prevent the court from ensuring that a non-party can obtain a copy, if the open justice principle requires this.  The court could, for example, order one of the parties to file the document again or to provide a copy directly to a non-party.  Moreover, there is nothing in the CPR which precludes the court from making an order under its common law powers to enable a non-party

E   to obtain a copy of a document which has been served in the litigation, even if the document has not been filed by a party.

11   I also reject an argument made by counsel for Mr Ashley that it is implicit in CPR r 32.13 that a non-party cannot be allowed to inspect a witness statement until the statement stands as evidence-in-chief.  CPR r 32.13 gives the court, unless the court otherwise directs, an automatic

F   right to inspect a witness statement which stands as evidence-in-chief during the course of the trial, without the need to obtain the court's permission to do so.  But there is nothing in CPR r 32.13 which prevents a non-party from applying for permission—or which prevents the court from granting permission—to inspect a witness statement before the automatic right conferred by CPR r 32.13 has arisen.  Even if CPR r 32.13 could reasonably

G   be read as having that implication, which to my mind it cannot, the rules of court (which are contained in a statutory instrument) are not to be interpreted in the absence of language which makes such an intention plain beyond possible doubt as limiting or controlling the powers of the court in this context: see the *Guardian News and Media* case, para 73.

12   It is one thing to conclude, however, as I do, that the court has power to direct that a non-party should be given access to witness statements before

H   a trial, and another to decide that the power ought to be exercised in a given case.  There are, in my view, good reasons why the court should not generally make witness statements prepared for use at a trial publicly available before the witnesses give evidence.  Those reasons follow from the role that witness statements play in the litigation process.

© 2017 The Incorporated Council of Law Reporting for England and Wales

3636
Blue v Ashley (QBD)                                                    [2017] 1 WLR
Leggatt J

*The role of witness statements*                                              A

   **13**   Historically in civil cases (as it still is today in criminal proceedings)
the giving of evidence by witnesses at a trial was an entirely oral process.
First, counsel for the party calling the witness would ask questions to elicit
evidence from the witness "in chief".   Then counsel for the opposing party
would cross-examine the witness.   Traditionally, the parties to the litigation
and their counsel would have no notice of what witnesses of fact called by       B
opposing parties were going to say in evidence until they said it.   That began
to change after provision for written witness statements was first introduced
in certain parts of the High Court, including the Commercial Court, in 1986.
Under the modern Civil Procedure Rules parties are required to serve witness
statements in advance of a trial.   A witness statement is defined in the Rules
as "a written statement signed by a person which contains the evidence         C
which that person would be allowed to give orally": see CPR r 32.4.   The
purpose of requiring such statements to be served is twofold.   First, it enables
parties to prepare for trial with notice of the evidence which the other side
may adduce.   This avoids unfair surprise and enables rebuttal evidence to be
obtained where necessary and cross-examination to be better prepared.   It
also allows each party to make a fuller assessment of the strength of the
other party's case, which may facilitate settlement.   The second purpose of     D
witness statements is to make the trial process more efficient by saving the
time that would otherwise be taken up by oral evidence given in chief.
Instead of such oral evidence, the witness is simply asked to identify their
statement and confirm their belief that its contents are true.

   **14**   It is, however, important to notice that it is only when a witness is
called to give oral evidence in court that their statement becomes evidence in
the case: see CPR r 32.5.   Until then, its status is merely that of a statement of   E
the evidence which the witness may be asked to give.   Thus, it quite often
happens that a party serves a witness statement from a person who is not in
the event called to give oral evidence at the trial.   In that event the person's
statement may be admissible as hearsay evidence and may then be admitted
in written form; or the statement may not be put in evidence at all—in which
case it never becomes part of the material on which the case is decided.        F

   **15**   When a witness statement forms part of the evidence given at a trial,
the principle of open justice requires that a member of the public or press
who wishes to do so should be able to read the statement—in just the same
way as they would have been entitled to hear the evidence if it had been
given orally at a public hearing in court.   That is the rationale for the right of
a member of the public under CPR r 32.13 to inspect a witness statement
once it stands as evidence-in-chief during the trial, unless the court otherwise   G
directs.   But there is no corresponding right or reason why a member of the
public or press should be entitled to obtain copies of witness statements
before they have become evidence in the case.   Conducting cases openly and
publicly does not require this.   Nor is it necessary to enable the public to
understand and scrutinise the justice system.   The advance notice that a
witness statement provides of what evidence its maker, if called as a witness,
will give is provided for the benefit of opposing parties (for the reasons       H
I have indicated), not the public.   The trial is an event which must (save in
exceptional circumstances) be conducted in public so that justice can be seen
to be done.   But preparations by the parties for the trial for the most part are
not, and do not need to be, public.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    16   I also accept the argument made by Mr Speker on behalf of Mr Ashley that there are positive reasons why it is generally undesirable for witness statements to be made public before such statements are put in evidence at a court hearing.  A witness statement may contain assertions which are defamatory of another party and the truth of which is disputed. When such assertions are made by a witness in evidence given in court, the witness is protected by immunity from suit.  As explained by Lord

B    Wilberforce in *Roy v Prior* [1971] AC 470, 480:

> "The reasons why immunity is traditionally (and for this purpose I accept the tradition) conferred upon witnesses in respect of evidence given in court, are in order that they may give their evidence fearlessly and to avoid a multiplicity of actions in which the value or truth of their evidence would be tried over again.  Moreover, the trial process contains
C    > in itself, in the subjection to cross-examination and confrontation with other evidence, some safeguard against careless, malicious or untruthful evidence."

The safeguards referred to by Lord Wilberforce do not apply to statements made by a prospective witness which have not been given in evidence.  Yet if such statements were made public pursuant to an order of the court, a
D    person who complained that a statement contained assertions that were untrue and defamatory of him would have no recourse against the author of the statement, who would not be responsible for its publication, nor against the publisher (who would be protected by qualified privilege unless the publication was malicious) and at the same time would also lack the opportunity for rebuttal and correction provided by the trial process.  That
E    does not strike a fair balance between the relevant interests.  In addition, fair and accurate reporting of proceedings is promoted if a witness statement is put into the public domain only when it becomes evidence and its contents can also be tested and contested in a public trial.

*TNL's arguments*

F    17   On behalf of TNL, Mr Nicholls accepted that members of the public and the press have no general right to inspect witness statements before they are put in evidence at trial and would not normally be allowed to do so if the statements had not been referred to at a hearing held in public.  He argued, however, that in the present case the position is different because the witness statements of Mr Blue and Mr Ashley were referred to at the April hearing.

18   Mr Nicholls went so far as to contend that those witness statements
G    were "put in evidence" at the April hearing in the sense of CPR r 32.12(2)(c). If that contention were correct, it would mean that Mr Blue is now free to provide Mr Ashley's trial witness statements to *The Sunday Times* if he chooses without needing the permission of the court.  But in my view it is not correct.  Although the parties' witness statements were referred to at the April hearing, the reason for referring to the statements and placing them before the court was to enable the court to see the scope of the factual
H    evidence that will be given at the trial.  A similar situation arises where, for example, witness statements are placed before the court at a pre-trial review. The statements will only be put in evidence if and when the trial takes place and the witnesses are called to give oral evidence—at which point their statements will stand as their evidence-in-chief.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A

19   Nevertheless, Mr Nicholls is undoubtedly correct that the trial witness statements were placed before a judge and were referred to at the April hearing; and his central submission was that the decision of the Court of Appeal in the *Guardian News and Media* case [2013] QB 618 establishes a "strong default presumption" that, in these circumstances, access to the documents should be permitted on the open justice principle.  Mr Nicholls noted that Mr Ashley has served no evidence to attempt to rebut this presumption and submitted that Mr Ashley's representatives have not identified any plausible risk of harm to any legitimate public or private interest if access to the witness statements is permitted.  It follows, he submitted, that access to the statements should be allowed.

B

20   In the *Guardian News and Media* case the application by the *Guardian* newspaper was for access to documents which had been placed before a district judge and referred to in the course of extradition hearings.  The documents consisted of affidavits or witness statements, written arguments and correspondence.  The Court of Appeal was satisfied that the *Guardian* had a serious journalistic purpose in seeking access to these documents, namely, to stimulate informed debate about the way in which the justice system deals with suspected international corruption and the system for extradition of British subjects to the USA: see para 76.  Toulson LJ (with whose judgment Lord Neuberger of Abbotsbury MR and Hooper LJ agreed) observed that this was a purpose which the courts should assist rather than impede, unless some strong contrary argument could be made out: para 77.  He considered the various countervailing arguments which had been advanced and found them all unpersuasive.  The Court of Appeal accordingly directed that access to the documents should be allowed.  The key statement of principle on which Mr Nicholls relies is contained in para 85 of the judgment:

C

D

E

"In a case where documents have been placed before a judge and referred to in the course of proceedings, in my judgment the default position should be that access should be permitted on the open justice principle; and where access is sought for a proper journalistic purpose, the case for allowing it will be particularly strong.  However, there may be countervailing reasons . . . I do not think that it is sensible or practical to look for a standard formula for determining how strong the grounds of opposition need to be in order to outweigh the merits of the application.  The court has to carry out a proportionality exercise which will be fact-specific.  Central to the court's evaluation will be the purpose of the open justice principle, the potential value of the material in advancing that purpose and, conversely, any risk of harm which access to the documents may cause to the legitimate interests of others."

F

G

21   This decision establishes that, once documents have been placed before a judge and referred to at a public hearing, access to the documents should be permitted other things being equal.  But it does not remove the need for the court to consider the particular circumstances, including the nature of the documents in question, their role and relevance in the proceedings and, importantly, the purpose for which access to the documents is sought.  Toulson LJ made it clear that the court has to make an evaluation which involves assessing the extent to which affording access to documents will serve the public interest in open justice and weighing this

H

A   against any countervailing factors.  He also emphasised that this exercise cannot be reduced to the application of a standard formula.  It seems to me that this is the error in TNL's argument, which approaches the determination in too mechanistic a fashion and treats what is no more than a "default position" as if it were a "strong presumption".

22   A critical consideration in the present case, as I see it, is the purpose for which TNL is seeking access to the trial witness statements.  If its purpose were to facilitate a better understanding of the arguments made at the April hearing, then, in the absence of a sufficient countervailing reason, the open justice principle would indicate that access to the statements should be allowed.  However, TNL has not served any evidence to suggest—and I see no reason to assume—that this is its purpose.  *The Sunday Times* has already published a report of the April hearing two days after it took place.  That hearing happened some $2\frac{1}{2}$ months ago and Mr Ashley's application to introduce expert evidence is of little, if any, current relevance—all the more so as the application was refused so that Mr Dunn's report will not form part of the material before the court at the forthcoming trial.  There is no reason to think that TNL's purpose in seeking access to the trial witness statements at this stage is to enable *The Sunday Times* to report in more detail than it has already done on the attempt made by Mr Ashley in April to obtain permission to adduce expert evidence and the reasons why that attempt failed.  As I mentioned earlier, common sense and the thrust of TNL's arguments indicate that its purpose is to be able to report what the evidence of Mr Blue and Mr Ashley will be at the trial which is about to start.

23   For the reasons already indicated, an interest in reporting what evidence witnesses will give at a trial before they give it does not engage the open justice principle and is not a good reason to be allowed access to witness statements before the statements are put in evidence (if they are). Nor does it become a good reason just because of the adventitious fact that reference was made to the statements at a pre-trial hearing which it is not TNL's current purpose to report.  In so far as the bare fact that such reference to the statements was made makes granting access to them the "default position", that position is displaced by the general undesirability of the court supplying a witness statement to a non-party before the statement has been deployed in the proceedings to seek to prove the truth of its contents.

24   There is no doubt that, if the trial proceeds and Mr Blue and Mr Ashley give evidence, TNL (and indeed any interested member of the public) will be entitled to inspect their witness statements.  The only issue is one of timing.  I do not consider that a legitimate basis has been shown for making an order to enable the witness statements which have been prepared for use at the trial to be made public in advance.

### The other documents

25   Much less attention was directed in argument to the three other documents to which TNL has requested access.  The first of these is Mr Dunn's expert report.  In circumstances where the report has not been put in evidence and permission to do so at the trial was refused, some evidence would in my view be needed to explain why access to it is sought before the court could conclude that such access should be ordered on the open justice principle.  However, no such evidence has been provided.  The

© 2017 The Incorporated Council of Law Reporting for England and Wales

**77**

3640
**Blue v Ashley (QBD)** [2017] 1 WLR
Leggatt J

A

other two documents are the witness statements of Ms Cullen and Mr Fearnhead which were prepared specifically for the April hearing. Those documents seem to me to fall into a different category. They were put in evidence at the April hearing and, like the skeleton arguments, were prepared solely for the purpose of that hearing. In the case of these documents it seems to me that no evidence or explanation is needed to justify a request for access to them in the absence of any legitimate objection. The only reason advanced for resisting the application was that access to these documents is not needed for the purpose of reporting the proceedings. But, as the *Guardian News and Media* case [2013] QB 618 and the decision of Bean J in *NAB v Serco Ltd* [2014] EWHC 1225 (QB) make clear, that is not a sufficient reason for denying access.

*Conclusion*

26   I will make an order under CPR r 5.4C(2) that TNL be permitted to obtain from the court records on payment of the specified fee copies of the witness statements of Ms Cullen and Mr Fearnhead. The application is otherwise refused.

*Application granted in part.*

Louise Hopson, *Solicitor*

───────────

A

Supreme Court

# Dring (on behalf of the Asbestos Victims Support Groups Forum UK) *v* Cape Intermediate Holdings Ltd (Media Lawyers Association intervening)

B

## [2019] UKSC 38

2019  Feb 18, 19;                     Baroness Hale of Richmond PSC, Lord Briggs,
        July 29                       Lady Arden, Lord Kitchin, Lord Sales JJSC

*Practice — Documents — Inspection and copying — Extent of court's jurisdiction under Civil Procedure Rules to permit non-party to obtain copies of documents contained in "records of the court" — Extent of court's inherent jurisdiction in respect of documents not forming part of records of the court — Principles upon which jurisdiction to be exercised — CPR r 5.4C(2)*

C

The insurers of certain employers who had settled personal injury claims brought by employees who had been exposed to asbestos brought a claim in negligence against a company involved in the manufacture and supply of asbestos products. The company denied liability and a six-week trial took place in the High Court. After the trial had ended but before judgment had been delivered the parties settled the claim by a consent order. The applicant, who had not been a party to those proceedings, applied on behalf of a group which supported victims of asbestos-related diseases for access to all documents used or disclosed at or for the trial, including the trial bundles and trial transcripts, on the basis that they were "records of the court" within CPR r 5.4C(2)[1]. The master granted the application. The Court of Appeal allowed the company's appeal in part, holding that "records of the court" did not include trial bundles or trial transcripts but that the court had an inherent jurisdiction to permit a non-party to obtain some of the documents that a trial bundle usually contained, including witness statements and skeleton arguments. Accordingly, the court granted the applicant access to a number of documents under its inherent jurisdiction.

On appeal by the company and cross-appeal by the applicant—

*Held*, (1) dismissing the cross-appeal, that "records of the court" in CPR r 5.4C(2) did not refer to every single document generated in connection with a case and filed, lodged or kept for the time being at court, but referred to those documents and records which the court itself kept for its own purposes, although it could not depend upon how much of the material lodged at court happened still to be there when the request was made; and that, therefore, the Court of Appeal had not erred in failing to make a wider order under rule 5.4C(2) (post, paras 21–24, 49).

(2) Dismissing the appeal, that, unless inconsistent with statute or rules of court, all courts and tribunals had an inherent jurisdiction to determine what the constitutional principle of open justice required in terms of access to documents or other information placed before the court or tribunal in question; that the default position was that the public should be allowed access, not only to the parties' written submissions and arguments, but also to the documents which had been placed before the court and referred to during the hearing; that, however, a non-party did not have a right to be granted access under the inherent jurisdiction but would have to explain why he sought access and how granting him access would advance the open justice principle; that the court would then have to carry out a fact-specific balancing exercise by weighing the potential value of the information sought in advancing the purpose of the open justice principle against any risk of harm which its disclosure might cause to the maintenance of an effective judicial process or to the legitimate

D

E

F

G

H

---

[1] CPR r 5.4C: see post, para 16.

interests of others; that, therefore, the Court of Appeal had had power under the *A* inherent jurisdiction to make a wider order than it had; and that, accordingly, those parts of the Court of Appeal's order granting the applicant access to documents would stand and the matter would be listed before the High Court to decide in accordance with the principles of open justice whether the applicant should have access to any other document placed before the judge and referred to in the course of the trial (post, paras 41–50).

*R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court* *B* *(Article 19 intervening)* [2013] QB 618, CA approved.

*Kennedy v Information Comr (Secretary of State for Justice intervening)* [2015] AC 455, SC(E) and *A v British Broadcasting Corpn (Secretary of State for the Home Department intervening)* [2015] AC 588, SC(Sc) applied.

*Per curiam.* The bodies responsible for framing the court rules in each part of the United Kingdom are urged to give consideration to the questions of principle and practice raised in this case (post, para 51). *C*

Decision of the Court of Appeal [2018] EWCA Civ 1795; [2019] 1 WLR 479; [2019] 1 All ER 804 affirmed on partly different grounds.

The following cases are referred to in the judgment of the court:

*A v British Broadcasting Corpn (Secretary of State for the Home Department intervening)* [2014] UKSC 25; [2015] AC 588; [2014] 2 WLR 1243; [2014] 2 All *D* ER 1037, SC(Sc)
*Barings plc v Coopers & Lybrand* [2000] 1 WLR 2353; [2000] 3 All ER 910, CA
*GIO Personal Investment Services Ltd v Liverpool and London Steamship Protection and Indemnity Association Ltd (FAI General Insurance Co Ltd intervening)* [1999] 1 WLR 984, CA
*Home Office v Harman* [1983] 1 AC 280; [1982] 2 WLR 338; [1982] 1 All ER 532, HL(E) *E*
*Kennedy v Information Comr (Secretary of State for Justice intervening)* [2014] UKSC 20; [2015] AC 455; [2014] 2 WLR 808; [2014] 2 All ER 847, SC(E)
*Law Debenture Trust Corpn (Channel Islands) Ltd v Lexington Insurance Co* [2003] EWHC 2297 (Comm); 153 NLJ 1551
*Practice Direction (Audio Recordings of Proceedings: Access)* [2014] 1 WLR 632; [2014] 2 All ER 330, Sen Cts
*R v Howell* [2003] EWCA Crim 486, CA *F*
*R v Sussex Justices, Ex p McCarthy* [1924] 1 KB 256, DC
*R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2012] EWCA Civ 420; [2013] QB 618; [2012] 3 WLR 1343; [2012] 3 All ER 551, CA
*Scott v Scott* [1913] AC 417, HL(E)
*SmithKline Beecham Biologicals SA v Connaught Laboratories Inc* [1999] 4 All ER 498, CA *G*

The following additional cases were cited in argument:

*Al Rawi v Security Service (JUSTICE intervening)* [2011] UKSC 34; [2012] 1 AC 531; [2011] 3 WLR 388; [2012] 1 All ER 1, SC(E)
*Attorney General of Nova Scotia v MacIntyre* [1982] 1 SCR 175
*Blue v Ashley* [2017] EWHC 1553 (Comm); [2017] 1 WLR 3630; [2018] 2 All ER 284 *H*
*Cadam v Beaverbrook Newspapers Ltd* [1959] 1 QB 413; [1959] 2 WLR 324; [1959] 1 All ER 453, CA
*Chan U Seek v Alvis Vehicles Ltd (Guardian Newspapers Ltd intervening)* [2004] EWHC 3092 (Ch); [2005] 1 WLR 2965; [2005] 3 All ER 155

631

[2020] AC                    Dring v Cape Intermediate Holdings Ltd (SC(E))

A  *Khuja v Times Newspapers Ltd* [2017] UKSC 49; [2019] AC 161; [2017] 3 WLR 351; [2018] 1 Cr App R 1, SC(E)

*Mafart v Television New Zealand* [2006] NZSC 33; [2006] 3 NZLR 18

*Plant v Plant* [1998] 1 BCLC 38

*R (C) v Secretary of State for Justice (Media Lawyers Association intervening)* [2016] UKSC 2; [2016] 1 WLR 444; [2017] 1 All ER 513, SC(E)

B  *R (UNISON) v Lord Chancellor (Equality and Human Rights Commission intervening) (Nos 1 and 2)* [2017] UKSC 51; [2017] 3 WLR 409; [2017] ICR 1037; [2017] 4 All ER 903, SC(E)

*Secretary for Justice v FTCW* [2014] HKCA 9; [2014] 2 HKC 132

*Taylor v Lawrence* [2002] EWCA Civ 90; [2003] QB 528; [2002] 3 WLR 640; [2002] 2 All ER 353, CA

**APPEAL** from the Court of Appeal

C    The insurers of certain employers who had paid out damages to employees in settlement of personal injury claims for mesothelioma caused by exposure to asbestos, brought two actions against a company, Cape Intermediate Holdings Ltd, the manufacturers of asbestos products, seeking a contribution towards the damages paid.  The company denied liability. A six-week trial, involving a large volume of documents, took place before D  Picken J.  After the trial had ended but before judgment had been delivered, the parties settled the claims by a consent order dated 14 March 2017.

On 6 April 2017, the applicant, Graham Dring, acting on behalf of the Asbestos Victims Support Groups Forum UK, applied without notice pursuant to CPR r 5.4C seeking to obtain as "records of the court" all documents used or disclosed at the trial in respect of one of the actions E  brought by the insurers against the company.  The same day Master McCloud made an order requiring all documents and electronic bundles in the litigation to be stored and held by the court.  On 5 December 2017 Master McCloud [2017] EWHC 3154 (QB) granted the applicant's application.

By an appellant's notice and with permission of Martin Spencer J granted on 5 March 2018 the company appealed.  On 31 July 2018 the Court of F  Appeal (Sir Brian Leveson P, Hamblen and Newey LJJ) [2018] EWCA Civ 1795; [2019] 1 WLR 479 allowed the company's appeal in part, holding that "records of the court" did not extend to witness statements, expert reports, trial bundles, transcripts or written submissions but that the court had an inherent jurisdiction to allow non-parties to inspect witness statements, expert reports and documents which were read out in open court G  and any specific documents which were necessary for a non-party to inspect in order to comply with the principle of open justice.

Pursuant to permission granted by the Supreme Court (Baroness Hale of Richmond PSC, Lord Carnwath and Lady Arden JJSC) on 31 October 2018 the company appealed and the applicant cross-appealed.  The issue on the appeal was: "What are the powers of the court pursuant to the Civil H  Procedure Rules or its inherent jurisdiction to permit access to documents used in litigation to which the applicant for access was not a party?"

The Media Lawyers Association was given permission to intervene on the appeal.

The facts are stated in the judgment of the court, post, paras 3–14.

© 2020 The Incorporated Council of Law Reporting for England and Wales

**81**

*Michael Fordham QC, Geraint Webb QC* and *James Williams* (instructed by *Freshfields Bruckhaus Deringer llp*) for the company.

Access to documents from the court file is governed by CPR r 5.4C and is limited to documents held and retained as "records of the court". That denotes formal documents. The design of the rule should be adhered to. There is no "inherent jurisdiction" to disapply its restrictions and no constitutional necessity for one. The correct approach to rule 5.4C is that adopted by the Court of Appeal. The inherent jurisdiction could not support the orders made below. Inherent jurisdiction does not operate unless there is a gap in the Rules or there is a necessity. There is neither.

The Civil Procedure Rule Committee make the rules under a statutory obligation. Where there are rules regulating certain subject matter, that is where to look for the scope of the court's powers in that area. Any reform requires careful consideration. The rules give effect to the open justice principle. The Rule Committee has frequently reviewed the requirements of open justice and made appropriate changes to the Civil Procedure Rules. Whilst the provisions have changed over time, there has never been a general right to inspect or obtain documents in trial bundles. [Reference was made to *GIO Personal Investment Services Ltd v Liverpool and London Steamship Protection and Indemnity Association Ltd (FAI General Insurance Co Ltd intervening)* [1999] 1 WLR 984, RSC Ord 63, r 4 and to historic provisions of court rules.]

The application of the open justice principle, most commonly encountered where the hearings are in private or the reporting of what happened in open court is restricted, frequently involves the balancing of competing imperatives. Frequently the court is balancing human rights, often the right to privacy against the right to freedom of expression. The present case was in open court and is not about whether anything said in open court should be restrained from being communicated.

At the heart of the open justice principle are the dual values of a public hearing which public and press alike can attend and unrestricted communication rights so that public and press can speak freely about what they have seen and heard at the public hearing. The central rationale of the open justice principle is the scrutiny of the judicial process and public confidence which comes from such scrutiny, promoting the values of the rule of law. The open justice principle is most relevant at the time of the hearing and the emphasis in the rules giving effect to it is on contemporaneous reporting. There is an inherent jurisdiction in relation to skeleton arguments because there was a gap there; there is no such gap for witness statements or trial documents. [Reference was made to *Mafart v Television New Zealand* [2006] 3 NZLR 18.]

The open justice principle is premised on an essential interest in the determination of the court. The scrutiny arises in what the judges decide. It is in delivering judgment that the court comes to explain to the public what the key evidence and law were, and how they featured in the judicial process. The fact that some cases settle without any public hearing, or settle after a public hearing but without a judgment, is no reason to create a public register of court documents.

© 2020 The Incorporated Council of Law Reporting for England and Wales

82

A    There is something invidious about a satellite application after a trial has taken place and proceedings have finally been disposed of, that rests upon open justice arguments by a person who had no interest in attending the trial or in inspecting the evidence-in-chief under the CPR rules, or in analysing the transcripts to see what unfolded at the trial, but simply wants to acquire documents through mandatory injunctions.

B    [Reference was made to *Taylor v Lawrence* [2003] QB 528, *R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2013] QB 618, *R (UNISON) v Lord Chancellor (Equality and Human Rights Commission intervening) (Nos 1 and 2)* [2017] 3 WLR 409 and *Chan U Seek v Alvis Vehicles Ltd (Guardian Newspapers Ltd intervening)* [2005] 1 WLR 2965.]

C    The relevant case management powers and open justice principle responsibilities were those of the trial judge, while seized of the case, to whom requests based on the open justice principles should have been made at the time. This was a case where the judge was functus. Relevant rule-making powers are those of the Civil Procedure Rule Committee which can and should be trusted to make any appropriate amendments to the Rules following consultation.

D    There was no abrogation of the open justice principle in this trial nor was the principle abrogated by the applicant being unable to acquire the trial documents.

   *Robert Weir QC, Jonathan Butters* and *Harry Sheehan* (instructed by *Leigh Day*) for the applicant.

E    Open justice is a common law principle which is fundamental to the rule of law and the dispensation of justice. Public scrutiny extends beyond judging the judges. Justice has to be seen to be done. It should be open to full view that the justice system provides for equality before the law. The evidence and argument at trial should be publicly known, that being something of great value in its own right. The legitimacy of the judicial process, operated by an organ of the state, depends on such transparency.

F    The judiciary is one of the branches of the state and the need for it to be open and accountable is as much a central feature of a democratic society as it is with the executive or the legislature. Judges are not accountable to the public through election or to Parliament. Transparency is the means by which the judicial system can be held to account in a democratic society. Scrutiny is only through open justice and public access to documents, whether or not they are read out in open court. Access must be provided to

G    all documents which were referred to in court and also documents which the judge did not read but had access to.

H    [Reference was made to *Al Rawi v Security Service (JUSTICE intervening)* [2012] 1 AC 531, *Khuja v Times Newspapers Ltd* [2019] AC 161, *R (C) v Secretary of State for Justice (Media Lawyers Association intervening* [2016] 1 WLR 444, *Kennedy v Information Comr (Secretary of State for Justice intervening)* [2015] AC 455, *Home Office v Harman* [1983] 1 AC 280, *SmithKline Beecham Biologicals SA v Connaught Laboratories Inc* [1999] 4 All ER 498 and *R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2013] QB 618.]

© 2020 The Incorporated Council of Law Reporting for England and Wales

A

The furthering of the open justice principle so far as concerns a non-party seeking access to court documents is achieved either under the jurisdiction provided by CPR r 5.4C(2) or under the inherent jurisdiction of the court. The Civil Procedure Rules provide the necessary jurisdiction. If, however, CPR r 5.4C(2) does not cover trial documents, then access should be granted under the inherent jurisdiction.

B

That rule must be read purposively so as to further the open justice principle. On a plain reading the "records of the court" will include any document filed by a party with the court and still retained by the court. Thus the act of filing a document puts it on the court record. But where a filed document is no longer retained by the court, it will cease to be a record of the court.

C

Rule 5.4C is the principal rule by which the CPR further the open justice principle in respect of documents accessible to a non-party. Public scrutiny of a trial is not achievable unless non-parties have the right to apply to the court for copies of documents deployed at trial. *GIO Personal Investment Services Ltd v Liverpool and London Steamship Protection and Indemnity Association Ltd (FAI General Insurance Co Ltd intervening)* [1999] 1 WLR 984 was wrongly decided, but being a decision of the Court of Appeal, that case is not binding on the Supreme Court.

D

The exercise of the inherent jurisdiction of the court does not contravene the CPR. There is room for the engagement of the open justice principle through the inherent jurisdiction of the court to provide copies of skeleton arguments which are generally not covered by the CPR. The Court of Appeal was wrong to limit the scope of the inherent jurisdiction. The court has an inherent power to control proceedings in order to be able to carry out its functions properly. The court has a constitutional duty to secure open justice by applying its inherent jurisdiction.

E

Once documents have been deployed at a trial the court has a jurisdiction to provide a non-party with access to them, whether the case subsequently settles or a judgment is given, and whether the application is made during the course of the hearing or later. The broad rationale for allowing non-party access to court documents pursuant to the open justice principle applies as much after trial as it does during the trial.

F

[Reference was made to *Blue v Ashley* [2017] 1 WLR 3630 and *Cadam v Beaverbrook Newspapers Ltd* [1959] QB 413.]

The applicant has a legitimate interest in bringing the application as a non-party with a public interest in the subject matter of the trial. The court had jurisdiction to provide the documents sought.

G

*Jude Bunting* (instructed by *Reynolds Porter Chamberlain llp*) for the intervener.

There can be no public accountability of a justice system if there is no open justice. The public obtain information through the media. A proper democracy requires that the media be free and have access to information. The company's approach would lead to practical problems and a narrowing of open justice. The media would need to be present in court and that would not be practical due to the number of court sittings. Trial judges would be required to take editorial decisions. The media would be less able to inform

H

A  the public accurately.  Different approaches would arise in the different jurisdictions of the United Kingdom.  The solution to these problems is the inherent jurisdiction identified in *R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2013] QB 618, which permits a request for access to court material to be assessed on the basis of a proportionality exercise.  This approach reflects an international consensus: see *Attorney General of Nova Scotia v MacIntyre* [1982] 1 SCR
B  175 and *Secretary for Justice v FTCW* [2014] 2 HKC 132.

   *Fordham QC* in reply.
      There is a need to know what the inherent jurisdiction is and what is actually to be made available: practical considerations are important.  Court bundles are returnable to the parties after the trial.  Are parties then allowed
C  to destroy documents or should they be retained?  These are questions not dealt with by the applicant.  The documents are contextualised in the judgment.  Notes made by the judge in a trial are not disclosed, nor are the judge's marked up documents.  They are excluded by the CPR.  It is not implicit in the CPR that there is a free-standing power.  The Insolvency Rules (rule 12.39) make explicit provision for access to documents; there could be
D  such a provision in the CPR but there is not.  Even if a document falls within the scope of CPR r 31.22 that does not give a right of public access. [Reference was made to *Barings plc v Coopers & Lybrand* [2000] 1 WLR 2353 and *Plant v Plant* [1998] 1 BCLC 38.]
      There must be a proportionality assessment.  The test must be whether the ordinary observer needs the documents to understand the case.  There was
E  no such claim in the present application.

   The court took time for consideration.

   29 July 2019.  **BARONESS HALE OF RICHMOND PSC** handed down the following judgment of the court.

F     1   As Lord Hewart CJ famously declared, in *R v Sussex Justices, Ex p McCarthy* [1924] 1 KB 256, 259, "it is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done".  That was in the context of an appearance of bias, but the principle is of broader application. With only a few exceptions, our courts sit in public, not only that justice be done but that justice may be seen to be done.  But whereas in the olden days
G  civil proceedings were dominated by the spoken word—oral evidence and oral argument, followed by an oral judgment, which anyone in the court room could hear, these days civil proceedings generate a great deal of written material—statements of case, witness statements, and the documents exhibited to them, documents disclosed by each party, skeleton arguments and written submissions, leading eventually to a written judgment.  It is
H  standard practice to collect all the written material which is likely to be relevant in a hearing into a "bundle"—which may range from a single ring binder to many, many volumes of lever arch files.  Increasingly, these bundles may be digitised and presented electronically, either instead of or as well as in hard copy.

© 2020 The Incorporated Council of Law Reporting for England and Wales

2   This case is about how much of the written material placed before the court in a civil action should be accessible to people who are not parties to the proceedings and how it should be made accessible to them.  It is, in short, about the extent and operation of the principle of open justice.   As Toulson LJ said, in *R (Guardian News and Media Ltd) v City of Westminster Magistrates' Court (Article 19 intervening)* [2013] QB 618 ("*Guardian News and Media*"), at para 1:

> "Open justice.  The words express a principle at the heart of our system of justice and vital to the rule of law.  The rule of law is a fine concept but fine words butter no parsnips.  How is the rule of law itself to be policed?  It is an age old question.  Quis custodiet ipsos custodes—who will guard the guards themselves?  In a democracy, where power depends on the consent of the people governed, the answer must lie in the transparency of the legal process.  Open justice lets in the light and allows the public to scrutinise the workings of the law, for better or for worse."

### The history of the case

3   The circumstances in which this important issue comes before the court are unusual, to say the least.  Cape Intermediate Holdings Ltd ("Cape") is a company that was involved in the manufacture and supply of asbestos.  In January and February 2017, it was the defendant in a six-week trial in the Queen's Bench Division before Picken J.  The trial involved two sets of proceedings, known as the "PL claims" and the "CDL claim", but only the PL claims are relevant to this appeal.  In essence, these were claims brought against Cape by insurers who had written employers' liability policies for employers.  The employers had paid damages to former employees who had contracted mesothelioma in the course of their employment.   The employers, through their insurers, then claimed a contribution from Cape on the basis that the employees had been exposed at work to asbestos from products manufactured by Cape.  It was alleged that Cape had been negligent in the production of asbestos insulation boards; that it knew of the risks of asbestos and had failed to take steps to make those risks clear; indeed, that it obscured, understated and unfairly qualified the information that it had, thus providing false and misleading reassurance to employers and others.  Cape denied all this and alleged that the employers were solely responsible to their employees, that it did publish relevant warnings and advice, and that any knowledge which it had of the risks should also have been known to the employers.

4   Voluminous documentation was produced for the trial.  Each set of proceedings had its own hard copy "core bundle", known as Bundle C, which contained the core documents obtained on disclosure and some documents obtained from public sources.  The PL core bundle amounted to over 5,000 pages in around 17 lever arch files.  In addition, there was a joint Bundle D, only available on an electronic platform, which contained all the disclosed documents in each set of proceedings.  If it was needed to refer to a document in Bundle D which was not in Bundle C, it could immediately be viewed on screen, and would then be included in hard copy in Bundle C. The intention was that Bundle C would contain all the documents referred to for the purpose of the trial, whether in the parties' written and oral

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] AC                         Dring v Cape Intermediate Holdings Ltd (SC(E))

A  opening and closing submissions, or in submissions or evidence during the trial.

5  After the trial had ended, but before judgment was delivered, the PL claims were settled by a consent order dated 14 March 2017 and sealed on 17 March 2017. The CDL claim was also settled a month later, before judgment.

B  6  The Asbestos Victims Support Groups Forum UK ("the Forum") is an unincorporated association providing help and support to people who suffer from asbestos-related diseases and their families. It is also involved in lobbying and promoting asbestos knowledge and safety. It was not a party to either set of proceedings. On 6 April 2017, after the settlement of the PL claims, it applied without notice, under the Civil Procedure Rules, CPR r 5.4C, which deals with third party access to the "records of

C  the court", with a view to preserving and obtaining copies of all the documents used at or disclosed for the trial, including the trial bundles, as well as the trial transcripts. This was because the Forum believed that the documents would contain valuable information about such things as the knowledge of the asbestos industry of the dangers of asbestos, the research which the industry and industry-related bodies had carried out, and the

D  influence which they had had on the Factory Inspectorate and the Health and Safety Executive in setting standards. In the Forum's view, the documents might assist both claimants and defendants and also the court in understanding the issues in asbestos-related disease claims. No particular case was identified but it was said that they would assist in current cases.

E  7  That same day, the master made an ex parte order designed to ensure that all the documents which were still at court stayed at court and that any which had been removed were returned to the court. She later ordered that a hard drive containing an electronic copy of Bundle D be produced and lodged at court. After a three-day hearing of the application in October, she gave judgment in December, holding that she had jurisdiction, either under CPR r 5.4C(2) or at common law, to order that a non-party be given

F  access to all the material sought. She ordered that Mr Dring (now acting for and on behalf of the Forum) should be provided with the hard copy trial bundle, including the disclosure documents in Bundle C, all witness statements, expert reports, transcripts and written submissions. She did not order that Bundle D be provided but ordered that it be retained at court.

G  8  Cape appealed, inter alia, on the grounds that: (1) the master did not have jurisdiction, either under CPR r 5.4C or at common law, to make an order of such a broad scope; (2) to the extent that the court did have jurisdiction to grant access, she had applied the wrong test to the exercise of her discretion; and (3) in any event, she should have held that the Forum failed to meet the requisite test.

H  9  The appeal was transferred to the Court of Appeal because of the importance of the issues raised. In July 2018, that court allowed Cape's appeal and set aside the master's order [2019] 1 WLR 479. It held that the "records of the court" for the purpose of the discretion to allow access under CPR rule 5.4C(2) were much more limited than she had held. They would not normally include trial bundles, trial witness statements, trial expert

reports, trial skeleton arguments or written submissions; or trial transcripts. Nevertheless, the court had an inherent jurisdiction to permit a non-party to obtain (i) witness statements of witnesses, including experts, whose statements or reports stood as evidence-in-chief at trial and which would have been available for inspection during the trial, under CPR r 32.13; (ii) documents in relation to which confidentiality had been lost under CPR r 31.22 and which were read out in open court, or the judge was invited to read in court or outside court, or which it was clear or stated that the judge had read; (iii) skeleton arguments or written submissions read by the court, provided that there is an effective public hearing at which these were deployed; and (iv) any specific documents which it was necessary for a non-party to inspect in order to meet the principle of open justice.  But there was no inherent jurisdiction to permit non-parties to obtain trial bundles or documents referred to in skeleton arguments or written submissions, or in witness statements or experts' reports, or in open court, simply on the basis that they had been referred to in the hearing.

10   When exercising its discretion under CPR r 5.4C(2) or the inherent jurisdiction, the court had to balance the non-party's reasons for seeking disclosure against the party's reasons for wanting to preserve confidentiality. The court would be likely to lean in favour of granting access if the principle of open justice is engaged and the applicant has a legitimate interest in inspecting the documents.  If the principle of open justice is not engaged, then the court would be unlikely to grant access unless there were strong grounds for thinking it necessary in the interests of justice to do so (paras 127 and 129).

11   Accordingly, the court ordered, in summary: (i) that the court should provide the Forum with copies of all statements of case, including requests for further information and answers, apart from those listed in Appendix 1 to the order, so far as they were on the court file at a fee, pursuant to the right of access granted by CPR r 5.4C(1); (ii) that Cape should provide the Forum with copies of the witness statements, expert reports and written submissions listed in Appendix 2 to the order; and (iii) that the application be listed before Picken J (or failing him some other High Court judge) to decide whether any other document sought by the Forum fell within (ii) or (iv) in para 9 above and if so whether Cape should be ordered to provide copies.  Copying would be at the Forum's expense.  Cape was permitted to retrieve from the court all the documents and bundles which were not on the court file and the hard drive containing a copy of Bundle D.  In making this order, the Court of Appeal proceeded on the basis that clean copies of the documents in question were available.

12   Cape now appeals to this court.  It argues, first, that the Court of Appeal should have limited itself to order (i) in para 11 above; second, that the Court of Appeal was wrong to equate the court's inherent jurisdiction to allow access to documents with the principle of open justice; the treatment of court documents is largely governed by the Civil Procedure Rules and the scope of any inherent jurisdiction is very limited; in so far as it goes any further than expressly permitted by the Rules, it extends only to ordering provision to a non-party of copies of (a) skeleton arguments relied on in court and (b) written submissions made by the parties in the course of a trial

A  (as held by the Court of Appeal in *GIO Personal Investment Services Ltd v Liverpool and London Steamship Protection and Indemnity Association Ltd (FAI General Insurance Co Ltd intervening)* [1999] 1 WLR 984 ("*FAI*")); and third, that the Court of Appeal was wrong to conclude that the Forum did have a relevant legitimate interest in obtaining access to the documents; the public interest in open justice was different from the public interest in the content of the documents involved.

B  13  The Forum cross-appeals on the ground that the Court of Appeal was wrong to limit the scope of CPR r 5.4C in the way that it did. Any document filed at court should be treated as part of the court's records for that purpose. The default position should be to grant access to documents placed before a judge and referred to by a party at trial unless there was a good reason not to do so. It should not be limited by what the judge has chosen to read.

C  14  The Media Lawyers Association has intervened in the appeal to this court. It stresses that the way in which most members of the public are able to scrutinise court proceedings is through media reporting. The media are the eyes and ears of the public. For this, media access to court documents is essential. The need often arises after the proceedings have ended and judgment has been given because that is when it is known that scrutiny is required. The media cannot be present at every hearing. It cites, among many other apposite quotations, the famous words of Jeremy Bentham, cited by Lord Shaw of Dunfermline in the House of Lords in *Scott v Scott* [1913] AC 417, the leading case on open justice, at p 477: "Publicity is the very soul of justice. It is the keenest spur to exertion and the surest of all guards against improbity. It keeps the judge himself while trying under trial."

D

E  *The issues*

15  There are three issues in this important case:

F  (1) What is the scope of CPR r 5.4C(2)? Does it give the court power to order access to all documents which have been filed, lodged or held at court, as the master ruled? Or is it more limited, as the Court of Appeal ruled?

(2) Is access to court documents governed solely by the Civil Procedure Rules, save in exceptional circumstances, as Cape argues? Or does the court have an inherent power to order access outside the Rules?

(3) If there is such a power, how far does it extend and how should it be exercised?

G  *CPR r 5.4C*

16  Rule 5.4C is headed "Supply of documents to a non-party from court records". For our purposes, the following provisions are relevant:

H  "(1) The general rule is that a person who is not a party to proceedings may obtain from the court records a copy of— (a) a statement of case, but not any documents filed with or attached to the statement of case, or intended by the party whose statement it is to be served with it; (b) a judgment or order given or made in public (whether made at a hearing or without a hearing) . . .

© 2020 The Incorporated Council of Law Reporting for England and Wales

**89**

A

"(2) A non-party may, if the court gives permission, obtain from the records of the court a copy of any other document filed by a party, or communication between the court and a party or another person."

17   By rule 2.3(1), "statement of case":

B

"(a) means a claim form, particulars of claim where these are not included in a claim form, defence, Part 20 claim, or reply to defence; and (b) includes any further information in relation to them voluntarily or by court order . . ."

18   There are thus certain documents to which a non-party has a right of access (subject to the various caveats set out in the rule which need not concern us) and what looks at first sight like a very broad power to allow a non-party to obtain copies of "any other document filed by a party, or communication between the court and a party or other person". Hence the Forum argues that the test is filing. CPR r 2.3 provides that " 'filing', in relation to a document, means delivering it, by post or otherwise, to the court office". So, it is argued, any document which has been delivered to the court office has been filed and the court may give permission for a non-party to obtain a copy.

C

D

19   There are two problems with this argument. First, the fact that filing is to be achieved in a particular way does not mean that every document which reaches court in that same way has been filed: the famous fallacy of the undistributed middle. The second is that the copy is to be obtained "from the records of the court". The Civil Procedure Rules do not define "the records of the court". They do not even provide what the records of the court are to contain. Nor, so far as we are aware, does any other legislation.

E

20   The Public Records Act 1958 is not much help. It only tells us which records are public records and what is to be done with them. The person responsible for public records must make arrangements to select those which ought to be permanently preserved and for their transfer to the Public Record Office no later than 20 years after their creation (section 3). The Lord Chancellor is the person responsible for many court records, including those of the High Court and Court of Appeal (section 8). Section 10 and Schedule 1 define what is meant by a public record. Paragraph 4 of Schedule 1 includes the records of or held in the Senior Courts (ie the High Court and Court of Appeal) in the list of records of courts and tribunals which are public records. We have been shown a document prepared by Her Majesty's Courts and Tribunals Service and the Ministry of Justice, headed *Record Retention and Disposition Schedule*. This lists how long various categories of files and other records are to be kept. Queen's Bench Division files, for example, are to be destroyed after seven years. Trial bundles are to be destroyed if not collected by the parties at the end of the hearing or on a date agreed with the court. This is of no help in telling us what the court files should contain.

F

G

H

21   We have been shown various historical sources which indicate what the records of certain courts may from time to time have contained, but it is clear that practice has varied. Some indication of what the court

A  records may currently contain is given by CPR Practice Direction 5A, paragraph 4.2A of which lists the documents which a *party* may obtain from the records of the court unless the court orders otherwise. These include "a claim form or other statement of case together with any documents filed with or attached to or intended by the claimant to be served with such claim form"; "an acknowledgement of service together

B  with any documents filed with or attached to or intended by the party acknowledging service to be served with such acknowledgement of service"; "an application notice", with two exceptions, and "any written evidence filed in relation to an application", with the same two exceptions; "a judgment or order made in public (whether made at a hearing or without a hearing)"; and "a list of documents". It does not include witness statements for trial, experts' reports for trial, transcripts of hearings, or trial

C  bundles.

22  The essence of a record is that it is something which is kept. It is a permanent or long-term record of what has happened. The institution or person whose record it is will decide which materials need to be kept for the purposes of that institution or person. Practice may vary over time depending on the needs of the institution. What the court system may have

D  found it necessary or desirable to keep in the olden days may be different from what it now finds it necessary or desirable to keep. Thus one would expect that the court record of any civil case would include, at the very least, the claim form and the judgments or orders which resulted from that claim. One would not expect that it would contain all the evidence which had been put before the court. The court itself would have no need for that, although

E  the parties might. Such expectations are confirmed by the list in Practice Direction 5A.

23  The "records of the court" must therefore refer to those documents and records which the court itself keeps for its own purposes. It cannot refer to every single document generated in connection with a case and filed, lodged or kept for the time being at court. It cannot depend upon how much of the material lodged at court happens still to be there when the request is

F  made.

24  However, current practice in relation to what is kept in the records of the court cannot determine the scope of the court's power to order access to case materials in particular cases. The purposes for which court records are kept are completely different from the purposes for which non-parties may properly be given access to court documents. The principle of open

G  justice is completely distinct from the practical requirements of running a justice system. What is required for each may change over time, but the reasons why records are kept and the reasons why access may be granted are completely different from one another.

*Other court rules*

H  25  There are other court rules which are relevant to the access to documents which may be granted to non-parties. CPR r 39.2 lays down the general rule that court hearings are to be in public. Rule 39.9 provides that in any hearing the proceedings will be recorded. Any party or other person may require a transcript (for which there will be a fee). If the hearing was in

A

private, a non-party can get a transcript but only if the court so orders. *Practice Direction (Audio Recordings of Proceedings: Access)* [2014] 1 WLR 632 states that there is generally no right for either a party or a non-party to listen to the recording. If they have obtained a copy of the transcript, they can apply for permission to listen, but this will only be granted in exceptional circumstances, save to official law reporters. Nevertheless, the effect of rule 39.9 (which is wider than its predecessor) is that a non-party can (at a fee) obtain a transcript of everything that was said in court.

**26** Rule 39.5 requires the claimant to file a trial bundle and Practice Direction 32, paragraph 27.5, deals in detail with how these are to be prepared. Nothing is said about non-parties being granted access to them.

**27** CPR Pt 32 deals with evidence. If a witness who has made a witness statement is called to give evidence, the witness statement shall stand as his evidence-in-chief (rule 32.5(2)). A "witness statement which stands as evidence-in-chief is open to inspection during the course of the trial unless the court otherwise directs" (rule 32.13(1)). The considerations which might lead the court otherwise to direct are listed as the interests of justice, the public interest, the nature of expert medical evidence, the nature of confidential information, and the need to protect a child or protected person (rule 32.13(3)). Rule 32.13 recognises that the modern practice of treating a witness statement as evidence-in-chief (which dates back to the *Report of the Review Body on Civil Justice* (1988) (Cm 394)) means that those observing the proceedings in court will not know the content of that evidence unless they can inspect the statement. The rule puts them back into the position they would have been in before that practice was adopted.

**28** In *FAI* [1999] 1 WLR 984, FAI applied to inspect and obtain: copies of documents referred to in witness statements which they had obtained under the predecessor to rule 32.13 (RSC Ord 38, r 2A); any written opening, skeleton argument or submissions, to which reference was made by the judge, together with any documents referred to in them; and any document which the judge was specifically requested to read, which was included in any reading list, or which was read or referred to during trial. The Court of Appeal held that RSC Ord 38, r 2A, the predecessor to CPR r 5.4C(2), did not cover documents referred to in witness statements. The purpose of using witness statements was to encourage a "cards on the table" approach, to accelerate the disclosure of the parties' evidence as between themselves; it was not to enable non-parties to obtain access to documentation which would otherwise have been unavailable to them whether or not they had attended court. As to the inherent jurisdiction of the court, based on the principle of open justice, the same reasoning applied to documents referred to in court or read by the judge, unless they had been read out in court and thus entered the public domain.

**29** Written submissions or skeleton arguments were a different matter. The confidence of the public in the integrity of the judicial process must depend upon having an opportunity to understand the issues. Until recently this had been done in an opening speech, but if the public were deprived of that opportunity by a written opening or submissions which were not read out, it was within the inherent jurisdiction of the court to require that a copy be made available. Nevertheless, the court did observe (at p 997), having

© 2020 The Incorporated Council of Law Reporting for England and Wales

643

[2020] AC             Dring v Cape Intermediate Holdings Ltd (SC(E))

A referred to Lord Woolf's report, *Access to Justice: Final Report to the Lord Chancellor on the Civil Justice System in England and Wales* (July 1996) that "It is of great importance that the beneficial saving in time and money which it is hoped to bring about by such new procedures should not erode the principle of open justice".

    30   Indeed, Lord Woolf MR himself took the same view. In *Barings plc v* B *Coopers & Lybrand* [2000] 1 WLR 2353, para 43, he said:

> "As a matter of basic principle the starting point should be that practices adopted by the courts and parties to ensure the efficient resolution of litigation should not be allowed to adversely affect the ability of the public to know what is happening in the course of the proceedings."

C     31   In this case the Court of Appeal [2019] 1 WLR 479 largely adopted the approach in *FAI*, while recognising that in certain respects the law had been developed. First, it was now apparent that the court had inherent jurisdiction to allow access to all parties' skeleton arguments, not just the opening submissions, provided there was an effective public hearing at which they were deployed (see *Law Debenture Trust Corpn (Channel* D *Islands) Ltd v Lexington Insurance Co* [2003] EWHC 2297 (Comm); 153 NLJ 1551), and the same would apply to other advocates' documents provided to the court to assist its understanding of the case, such as chronologies, dramatis personae, reading lists and written closing submissions (para 92). Second, although CPR r 32.13 is limited to access during the trial, there was no reason why access to witness statements E taken as evidence-in-chief should not be allowed under the inherent jurisdiction after the trial (para 95). Third, what applies to witness statements should also apply to experts' reports which are treated as their evidence-in-chief (para 96). This did not extend to documents exhibited to witness statements or experts' reports unless it was not possible to understand the statement or report without sight of a particular document F (para 100).

    32   Finally, developments since *FAI* also meant that it was within the inherent jurisdiction to allow access to "documents read or treated as read in open court" (para 107). This should be limited to documents which are read out in open court; documents which the judge is invited to read in open court; documents which the judge is specifically invited to read outside court; and documents which it is clear or stated that the judge has G read (para 108). These were all documents which were likely to have been read out in open court had the trial been conducted orally. Furthermore, the rule that parties may only use documents obtained on disclosure for the purpose of the proceedings in which they are disclosed does not apply to documents which have been "read to or by the court, or referred to, at a hearing which has been held in public" unless the court prohibits or limits H their use (CPR r 31.22). However, the mere fact that a document had been referred to in court did not mean that it would have been read out had the trial been conducted wholly orally or that sight of it is necessary in order to understand or scrutinise the proceedings (para 109). So, as in *FAI*, the court did not consider that the inherent jurisdiction extended to granting

© 2020 The Incorporated Council of Law Reporting for England and Wales

644
**Dring v Cape Intermediate Holdings Ltd (SC(E))**                    [2020] AC

A

access "simply on the basis that it has been referred to in open court" (para 109).

33   The decisions of the Court of Appeal in *FAI* and in this case are not the only cases in which the courts have accepted that they have an inherent jurisdiction to allow access to materials used in the course of court proceedings and that the rationale for doing so is the constitutional principle of open justice. That this is so is made even plainer by some recent cases of high authority.

B

*The principle of open justice*

34   The Court of Appeal had the unenviable task of trying to reconcile the very different approaches taken by that court in *FAI* and *Guardian News and Media*. This court has the great advantage of being able to consider the issues from the vantage point of principle rather than the detailed decisions which have been reached by the courts below. There can be no doubt at all that the court rules are not exhaustive of the circumstances in which non-parties may be given access to court documents. They are a minimum and of course it is for a person seeking to persuade the court to allow access outside the rules to show a good case for doing so. However, case after case has recognised that the guiding principle is the need for justice to be done in the open and that courts at all levels have an inherent jurisdiction to allow access in accordance with that principle. Furthermore, the open justice principle is applicable throughout the United Kingdom, even though the court rules may be different.

C

D

35   This was plainly recognised in *Guardian News and Media* [2013] QB 618. A district judge had ordered two British citizens to be extradited to the USA. The Guardian newspaper applied to the district judge to inspect and take copies of affidavits, witness statements, written arguments and correspondence, supplied to the judge for the purpose of the extradition hearings, referred to during the course of the hearings but not read out in open court. The judge held that she had no power to allow this and the Divisional Court agreed. In a comprehensive judgment, Toulson LJ, with whom both Hooper LJ and Lord Neuberger of Abbotsbury MR agreed, held that she did.

E

F

36   The requirements of open justice applied to all tribunals exercising the judicial power of the state. The fact that magistrates' courts were created by statute was neither here nor there (para 70). The decisions of the House of Lords in *Scott v Scott* [1913] AC 417, and of the Court of Appeal in *FAI* [1999] 1 WLR 984, and *R v Howell* [2003] EWCA Crim 486—respectively a family, civil and criminal case—were illustrations of the jurisdiction of the court to decide what open justice required (para 71). Hence the principles established in *Guardian News and Media* cannot be confined to criminal cases. They were clearly meant to apply across the board. Nor has anyone suggested why the jurisdiction in criminal cases should be wider than that in civil. More to the point, they have since been approved by this court.

G

H

37   So what were those principles? The purpose of open justice "is not simply to deter impropriety or sloppiness by the judge hearing the case. It is wider. It is to enable the public to understand and scrutinise the justice

© 2020 The Incorporated Council of Law Reporting for England and Wales

A  system of which the courts are the administrators" (para 79).  The practice of the courts was not frozen (para 80).  In *FAI*, for example, issues of informing the public about matters of general public interest did not arise (para 81).  In earlier cases, it had been recognised, principally by Lord Scarman and Lord Simon of Glaisdale (dissenting) in *Home Office v Harman* [1983] 1 AC 280, 316, and by Lord Bingham of Cornhill CJ in *SmithKline Beecham Biologicals SA v Connaught Laboratories Inc* [1999]

B  4 All ER 498, 512, that the practice of receiving evidence without its being read in open court "has the side effect of making the proceedings less intelligible to the press and the public".  Lord Bingham had contemplated that public access to documents referred to in open court might be necessary "to avoid too wide a gap between what has in theory, and what has in practice, passed into the public domain".  The time had come to

C  acknowledge that public access to documents referred to in open court was necessary (para 83).  Requiring them to be read out would be to defeat the purpose of making hearings more efficient.  Stating that they should be treated as if read out was merely a formal device for allowing access.  It was unnecessary.  Toulson LJ was unimpressed by the suggestion that there would be practical problems, given that the Criminal Procedure Rules

D  2011, in rule 5.8, provided, not only that there was certain (limited) information about a criminal case which the court officer was bound to supply, but also that, if the court so directs, the officer could supply "other information" about the case orally and allow the applicant to inspect or copy a document containing information about the case (para 84).  But it was the common law, not the rule, which created the court's power; the rule simply provided a practical procedure for implementing it.

E  38   Hence "In a case where documents have been placed before a judge and referred to in the course of proceedings . . . the default position should be that access should be permitted on the open justice principle; and where access is sought for a proper journalistic purpose, the case for allowing it will be particularly strong".  In evaluating the grounds for opposing access, the court would have to carry out a fact-specific proportionality exercise.

F  "Central to the court's evaluation will be the purpose of the open justice principle, the potential value of the material in advancing that purpose and, conversely, any risk of harm which access to the documents may cause to the legitimate interests of others" (para 85).

39   The principles laid down in *Guardian News and Media* were clearly endorsed by the majority of the Supreme Court in *Kennedy v Information Comr (Secretary of State for Justice intervening)* [2015] AC

G  455: see Lord Mance JSC, at para 47, Lord Toulson JSC, with whom Lord Neuberger of Abbotsbury PSC and Lord Clarke of Stone-cum-Ebony JSC agreed, at paras 110–118, Lord Sumption JSC, who agreed with both Lord Mance and Lord Toulson JJSC, at para 152.  Nor did the minority cast doubt upon the decision: see Lord Wilson JSC, at para 192; Lord Carnwath JSC, at para 236.  The principles were also endorsed by a

H  unanimous Supreme Court in *A v British Broadcasting Corpn (Secretary of State for the Home Department intervening)* [2015] AC 588, a case emanating from Scotland: see Lord Reed JSC, with whom Baroness Hale of Richmond DPSC, Lord Wilson, Lord Hughes and Lord Hodge JJSC agreed, at paras 23–27.  That case was concerned with the exceptions to the open

© 2020 The Incorporated Council of Law Reporting for England and Wales

**Dring v Cape Intermediate Holdings Ltd (SC(E))**                    **[2020] AC**

justice principle, in particular to the naming of a party to the proceedings, and at para 41 Lord Reed JSC expressly adopted the test laid down in *Kennedy*, which was a direct citation from *Guardian News and Media*, at para 85:

> "Whether a departure from the principle of open justice was justified in any particular case would depend on the facts of that case.  As Lord Toulson JSC observed in *Kennedy v Information Comr (Secretary of State for Justice intervening)* [2015] AC 455, 525, para 113, the court has to carry out a balancing exercise which will be fact-specific.  Central to the court's evaluation will be the purpose of the open justice principle, the potential value of the information in question in advancing that purpose and, conversely, any risk of harm which its disclosure may cause to the maintenance of an effective judicial process or to the legitimate interests of others."

40   It follows that there should be no doubt about the principles.  The question in any particular case should be about how they are to be applied.

*Discussion*

41   The constitutional principle of open justice applies to all courts and tribunals exercising the judicial power of the state.  It follows that, unless inconsistent with statute or the rules of court, all courts and tribunals have an inherent jurisdiction to determine what that principle requires in terms of access to documents or other information placed before the court or tribunal in question.  The extent of any access permitted by the court's rules is not determinative (save to the extent that they may contain a valid prohibition).  It is not correct to talk in terms of limits to the court's jurisdiction when what is in fact in question is how that jurisdiction should be exercised in the particular case.

42   The principal purposes of the open justice principle are two-fold and there may well be others.  The first is to enable public scrutiny of the way in which courts decide cases—to hold the judges to account for the decisions they make and to enable the public to have confidence that they are doing their job properly.  In *A v British Broadcasting Corpn* [2015] AC 588, Lord Reed JSC reminded us of the comment of Lord Shaw of Dunfermline, in *Scott v Scott* [1913] AC 417, 475, that the two Acts of the Scottish Parliament passed in 1693 requiring that both civil and criminal cases be heard "with open doors", "bore testimony to a determination to secure civil liberties against the judges as well as against the Crown" (para 24).

43   But the second goes beyond the policing of individual courts and judges.  It is to enable the public to understand how the justice system works and why decisions are taken.  For this they have to be in a position to understand the issues and the evidence adduced in support of the parties' cases.  In the olden days, as has often been said, the general practice was that all the argument and the evidence was placed before the court orally.  Documents would be read out.  The modern practice is quite different.  Much more of the argument and evidence is reduced into writing before the hearing takes place.  Often, documents are not read out.  It is difficult, if not

© 2020 The Incorporated Council of Law Reporting for England and Wales

647
[2020] AC                           Dring v Cape Intermediate Holdings Ltd (SC(E))

A   impossible, in many cases, especially complicated civil cases, to know what is going on unless you have access to the written material.

**44**   It was held in *Guardian News and Media* [2013] QB 618 that the default position is that the public should be allowed access, not only to the parties' written submissions and arguments, but also to the documents which have been placed before the court and referred to during the hearing.

B   It follows that it should not be limited to those which the judge has been asked to read or has said that he has read.  One object of the exercise is to enable the observer to relate what the judge has done or decided to the material which was before him.  It is not impossible, though it must be rare, that the judge has forgotten or ignored some important piece of information which was before him.  If access is limited to what the judge has actually read, then the less conscientious the judge, the less transparent is his or her

C   decision.

**45**   However, although the court has the power to allow access, the applicant has no right to be granted it (save to the extent that the rules grant such a right).  It is for the person seeking access to explain why he seeks it and how granting him access will advance the open justice principle.  In this respect it may well be that the media are better placed than others to

D   demonstrate a good reason for seeking access.  But there are others who may be able to show a legitimate interest in doing so.  As was said in both *Kennedy* [2015] AC 455, at para 113, and *A v British Broadcasting Corpn* [2015] AC 588, at para 41, the court has to carry out a fact-specific balancing exercise.  On the one hand will be "the purpose of the open justice principle" and "the potential value of the information in question in advancing that purpose".

E   **46**   On the other hand will be "any risk of harm which its disclosure may cause to the maintenance of an effective judicial process or to the legitimate interests of others".  There may be very good reasons for denying access.  The most obvious ones are national security, the protection of the interests of children or mentally disabled adults, the protection of privacy interests more generally, and the protection of trade secrets and commercial

F   confidentiality.  In civil cases, a party may be compelled to disclose documents to the other side which remain confidential unless and until they are deployed for the purpose of the proceedings.  But even then there may be good reasons for preserving their confidentiality, for example, in a patent case.

**47**   Also relevant must be the practicalities and the proportionality of

G   granting the request.  It is highly desirable that the application is made during the trial when the material is still readily available, the parties are before the court and the trial judge is in day-to-day control of the court process.  The non-party who seeks access will be expected to pay the reasonable costs of granting that access.  People who seek access after the proceedings are over may find that it is not practicable to provide the material because the court will probably not have retained it and the parties

H   may not have done so. Even if they have, the burdens placed on the parties in identifying and retrieving the material may be out of all proportion to benefits to the open justice principle, and the burden placed upon the trial judge in deciding what disclosure should be made may have become much harder, or more time-consuming, to discharge.  On the other hand,

**97**

A

increasing digitisation of court materials may eventually make this easier.  In short, non-parties should not seek access unless they can show a good reason why this will advance the open justice principle, that there are no countervailing principles of the sort outlined earlier, which may be stronger after the proceedings have come to an end, and that granting the request will not be impracticable or disproportionate.

B

48   It is, however, appropriate to add a comment about trial bundles. Trial bundles are now generally required.  They are compilations of copies of what are likely to be the relevant materials—the pleadings, the parties' submissions, the witness statements and exhibits, and some of the documents disclosed.  They are provided for the convenience of the parties and the court.  To that end, the court, the advocates and others involved in the case may flag, mark or annotate their copies of the bundle as an aide memoire.  But the bundle is not the evidence or the documents in the case. There can be no question of ordering disclosure of a marked up bundle without the consent of the person holding it.  A clean copy of the bundle, if still available, may in fact be the most practicable way of affording a non-party access to the material in question, but that is for the court hearing the application to decide.

C

D

*Application to this case*

49   Cape argues that the Court of Appeal did not have jurisdiction to make the order that it did, not that if it did have jurisdiction the order was wrong in principle.  The Forum argues that the court should have made a wider order under CPR r 5.4C(2).  Both are, in our view, incorrect.  The Court of Appeal not only had jurisdiction to make the order that it did, but also had jurisdiction to make a wider order if it were right so to do.  On the other hand, the basis of making any wider order is the inherent jurisdiction in support of the open justice principle, not the Civil Procedure Rules, CPR r 5.4C(2).  The principles governing the exercise of that jurisdiction are those laid down in *Guardian News and Media* [2013] QB 618, as explained by this court in *Kennedy* [2015] AC 455, *A v British Broadcasting Corpn* [2015] AC 588 and this case.

E

F

50   In those circumstances, as the Court of Appeal took a narrower view, both of the jurisdiction and the applicable principles, it would be tempting to send the whole matter back to a High Court judge, preferably Picken J, so that he can decide it on the basis of the principles enunciated by this court.  However, Cape has chosen to attack the order made by the Court of Appeal, not on its merits, but on a narrow view of the court's jurisdiction. Nor has it set up any countervailing rights of its own.   In those circumstances, there seems no realistic possibility of the judge making a more limited order than did the Court of Appeal.  We therefore order that paragraphs 4 and 7 of the Court of Appeal order (corresponding to points (i) and (ii) in para 11 above) stand.  But we would replace paragraph 8 (corresponding with point (iii)) with an order that the application be listed before Picken J (or, if that is not possible, another High Court judge) to determine whether the court should require Cape to provide a copy of any other document placed before the judge and referred to in the course of the

G

H

649
**[2020] AC**  **Dring v Cape Intermediate Holdings Ltd (SC(E))**

*A*   trial to the Forum (at the Forum's expense) in accordance with the principles laid down by this court.

*Postscript*

*B*   51   We would urge the bodies responsible for framing the court rules in each part of the United Kingdom to give consideration to the questions of principle and practice raised by this case.  About the importance and universality of the principles of open justice there can be no argument.  But we are conscious that these issues were raised in unusual circumstances, after the end of the trial, but where clean copies of the documents were still available.  We have heard no argument on the extent of any continuing obligation of the parties to co-operate with the court in furthering the open justice principle once the proceedings are over.  This and the other practical questions touched on above are more suitable for resolution through a consultative process in which all interests are represented than through the prism of an individual case.

*C*

*Appeal and cross-appeal dismissed.*
*Case remitted to High Court for*
*D*   *further consideration.*

S<small>HIRANIKHA</small> H<small>ERBERT</small>, Barrister

*E*

*F*

*G*

*H*

© 2020 The Incorporated Council of Law Reporting for England and Wales

**99**

# Exhibit B

# Application Notice

- You must complete Parts A **and** B, **and** Part C if applicable
- Send any relevant fee and the completed application notice to the court with any draft order, witness statement or other evidence
- It is for you (and not the court) to serve this application notice

| In the | **High Court of Justice** **Business and Property Courts of** **England and Wales** **King's Bench Division** **Commercial Court** |
|---|---|
| **Claim No.** | CL-2018-000386 |
| **Warrant no.** (if applicable) | |
| **Claimant(s)** (including ref.) | Ramona Ang |
| **Defendant(s)** (including ref.) | Reliantco Investments Ltd |
| **Date** | 9 June 2023 |

**You should provide this information for listing the application**

Time estimate    0 (hours)    0 (mins)

Is this agreed by all parties?    ☐ Yes  ☑ No

Please always refer to the Commercial Court Guide for details of how applications should be prepared and will be heard, or in a small number of exceptional cases can be dealt with on paper.

## Part A

1. Where there is more than one claimant or defendant, specify which claimant or defendant

(The Claimant)(The Defendant)[1]

Ira Kleiman - First Applicant
W&K Info Defense, LLC - Second Applicant (together with the First Applicant, the "Applicants")

2. State clearly what order you are seeking (if there is room) or otherwise refer to a draft order (which must be attached)

intend(s) to apply for an order (a draft of which is attached) that[2]

grants the Applicants permission to inspect and take copies of the witness statement(s) of Dr Craig Wright pursuant to the inherent jurisdiction of the Court and CPR 5.4C(2)

3. Briefly set out why you are seeking the order. Identify any rule or statutory provision

because[3]

the relevant witness statement(s) are "records of the court" under CPR 5.4C(2) and formed part of the decision making process of the Court (see Ramona Ang v Reliantco Investments Ltd [2020] EWHC 3242 (Comm) at [49]-[53]). Therefore, the Applicants should be allowed access to the witness statement(s) in accordance with the open justice principle.

The Court office at the Admiralty and Commercial Registry, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, EC4A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the Court, please address forms or letters to the Listing Office and quote the claim number.

**N244(CC)** Application Notice (09.22)                                                                                                  © Crown copyright 2022

**Part B**

The Applicants

*(~~The Claimant~~)(~~The Defendant~~)[1] wishes to rely on: *tick one*

the attached (witness statement)(~~affidavit~~) ✓   (~~The Claimant~~)(~~The Defendant~~)'s[1] statement of case ☐

evidence in Part C overleaf in support of this application ☐

| Signed | | Position or office held | Partner, Boies Schiller Flexner (UK) LLP |
|---|---|---|---|
| | *(Applicant) ('s legal representative)* | (if signing on behalf of firm, company or corporation) | |

---

4. If you are not already a party to the proceedings, you must provide an address for service of documents

**Address to which documents about this claim should be sent (including reference if appropriate)[4]**

| Boies Schiller Flexner (UK) LLP 11th Floor 5 New Street Square London Ref: DH/9987.0001 | If applicable | |
|---|---|---|
| | Tel. no. | +44 (0) 203 908 0800 |
| | Fax no. | |
| | DX no. | |
| Postcode  EC4A 3BF | e-mail | DHunt@bsfllp.com |

**Part C**

| Claim No. | CL-2018-000386 |
|---|---|

**(Note: Part C should only be used where it is convenient to enter here the evidence in support of the application, rather than to use witness statements or affidavits)**

*(The claimant)(The defendant)[1] wishes to rely on the following evidence in support of this application:

## Statement of truth

I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☐ **I believe** that the facts stated in this application notice and any attached sheets are true.

☑ **The applicant** believes that the facts stated in this application notice and any attached sheets are true. **I am authorised** by the applicant to sign this statement.

**Signature**

☐ Applicant

☐ Litigation friend (where claimant is a child or protected party)

☑ Applicant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 0 9 | 0 6 | 2 0 2 3 |

Full name

David Holman Hunt

Name of applicant's legal representative's firm

Boies Schiller Flexner (UK) LLP

If signing on behalf of firm or company give position or office held

Partner

# Exhibit C

Applicants
D H Hunt
First
DHH1
9 June 2023

IN THE HIGH COURT OF JUSTICE                    Claim No.:  CL-2018-000386

BUSINESS AND PROPERTY COURTS OF

ENGLAND AND WALES

COMMERCIAL COURT (KBD)

BETWEEN:

RAMONA ANG

**Claimant**

-and-

RELIANTCO INVESTMENTS LTD

**Defendant**

IN THE MATTER OF AN APPLICATION BY:

IRA KLEIMAN

**First Applicant**

and

W&K INFO DEFENSE, LLC

**Second Applicant**

---

**FIRST WITNESS STATEMENT OF DAVID HOLMAN HUNT**

---

**I, DAVID HOLMAN HUNT,** of Boies Schiller Flexner (UK) LLP, 5 New Street Square, London, EC4A 3BF **WILL SAY** as follows:

**1.      INTRODUCTION**

1.1      I am a solicitor of the Senior Courts of England & Wales and a partner in the law firm Boies Schiller Flexner (UK) LLP.

1.2      I make this statement in support of the application by the Applicants for permission to inspect and take copies of the witness statement(s) of Dr Craig Wright made in support of the Claimant (the "**Application**"). I explain in this statement the reasons for and grounds of this Application.

1.3      Unless otherwise indicated, the contents of this statement are true and are within my own knowledge. Where the contents are not within my own knowledge, I have indicated the source of such information and they are true to

the best of my knowledge and belief. For the avoidance of doubt, no waiver of privilege is intended nor should it be inferred from anything said in this statement.

1.4   Copies of documents are referenced herein in the form [page [⬤]] and, unless specified otherwise, contained in a paginated bundle of documents marked as Exhibit DHH1.

**2.       THE APPLICATION**

2.1   At the outset, I note that, after a public hearing, Mr Justice Butcher handed down the Court's judgment in the underlying proceedings on 27 November 2020, reported at *Ramona Ang v Reliantco Investments Ltd* [2020] EWHC 3242 (Comm) (the "**Judgment**") [**DHH1, pages 1-31**].

2.2   As set out above, by this Application, the Applicants are seeking relief from this Court to obtain copies of Dr Wright's witness statement(s) in the proceedings, in exercise of the Court's inherent jurisdiction in accordance with the open justice principle and CPR 5.4C(2).

**(A)      BACKGROUND**

2.3   The Applicants have obtained a final judgment from the United States District Court for the Southern District of Florida ("**S.D. Fla.**"), which found Dr Wright liable for conversion of certain of the Applicants' bitcoins and intellectual property (the "**US Proceedings**") [**DHH1, page 32**].  My firm has conduct of the US Proceedings.  I am not involved in the conduct of those proceedings and the information I provide below in relation to the US Proceedings is therefore based on information provided to me by my colleagues who have conduct of the US Proceedings.

2.4   In the US Proceedings, the Applicants allege that Dr Wright's witness testimony in the US Proceedings demonstrates a lack of credibility as a result of inconsistencies with other statements made Dr Wright. In particular, I understand that the Applicants rely upon inconsistencies between the extracts of Dr Wright's witness evidence as set out in the Judgment [**DHH1, pages 15-16**] and his evidence in the US Proceedings. The Applicants will seek to rely on Dr Wright's witness statement(s) provided in the underlying proceedings in the enforcement stage of the US Proceedings to further highlight these inconsistencies.

**(B)      THE REASONS FOR MAKING THE APPLICATION**

2.5   In the Judgment, the Court makes several important observations on the credibility of Dr Wright's witness evidence:

> *"Dr Wright gave evidence. **He was an unsatisfactory witness in many respects. He was belligerent, argumentative and deliberately provocative. He evaded questions to which he did not wish to give a straight answer. On occasion he refused to accept***

> ***what documents plainly indicated.*** *He was prepared to make grave and unsustainable allegations, for example in relation to the supposed fabrication by or on behalf of Reliantco of an email from him of 3 September 2017. He sought on occasion to blind with (computer) science.* ***I came to the conclusion that I could not rely on Dr Wright's evidence as to whether and how particular events had happened unless it was supported by documentation, other evidence I could accept or by the inherent probabilities.***" (emphasis added) [**DHH1, page 15**]

2.6   Notwithstanding the above, the Court relied on some aspects of Dr Wright's witness evidence when arriving at its conclusions, as is apparent from the following:

> "*What however did emerge from Dr Wright's evidence were certain features of his character and circumstances which I consider to be of relevance in assessing the factual issues in this case. […]*
>
> *A further significant feature of his evidence was his recognition that, if he decided to apply himself to a matter, he would do it with pertinacity, even if it was apparently insignificant. […]*
>
> *Furthermore, he made it clear that he did keep an effective watch over what was his wife's money and what was his. […]*
>
> *It was also clear from his evidence that he valued his wife having funds of her own. The following evidence was, in my view, broadly credible: […]*
>
> *I also accepted that Dr Wright had a dim view of Ms Ang's technological and financial abilities. […]*" [**DHH1, pages 15-16**]

2.7   The Applicants are seeking Dr Wright's witness statement(s) to understand his witness evidence concerning the issues in the underlying proceedings.

2.8   Further, as Dr Wright's witness statement(s) were put before the Court and were referenced in the Judgment, it follows that they formed part of the decision-making process in the underlying proceedings. Therefore, the Applicants seek access to these witness statement(s) in accordance with the open justice principle.

**(C)**     **THE GROUNDS OF THE APPLICATION**

(a)     <u>Open justice principle</u>

2.9     The Applicants should be granted access to Dr Wright's witness statement(s) in accordance with the open justice principle as laid down in *Dring (on behalf of the Asbestos Victims Support Groups Forum UK) v Cape Intermediate Holdings Ltd (Media Lawyers Association intervening)* [2020] A.C. 629 ("***Dring***") [**DHH1, pages 79-99**]:

> "[...] unless inconsistent with statute or the rules of court, all courts and tribunals have an inherent jurisdiction to determine what that principle requires in terms of access to documents or other information placed before the court or tribunal in question." [**DHH1, page 96**]

2.10    The Supreme Court in *Dring* elucidated two purposes of the open justice principle, both of which will be satisfied by making the order requested by the Applicants:

(a)     "*to enable public scrutiny of the way in which courts decide cases—to hold the judges to account for the decisions they make and to enable the public to have confidence that they are doing their job properly*" [**DHH1, page 96**]; and

(b)     "*to enable the public to understand how the justice system works and why decisions are taken. For this they have to be in a position to understand the issues and the evidence adduced in support of the parties' cases*" [**DHH1, page 96**].

2.11    Further, granting the Applicants access to Dr Wright's witness statement(s) will advance the open justice principle. As stated above, the issues of Dr Wright's credibility as a witness in the underlying proceedings as well as the contents of his evidence are material to understanding the process of and the reasons behind the decision making of the Court. To be able to understand this, the Applicants will need access to the evidence adduced in the underlying proceeding.

2.12    In any event, the provision of access to Dr Wright's witness statement(s) is proportional. Such access presents no risk of harm to the maintenance of an effective judicial process or the legitimate interests of others. In *Dring*, the Supreme Court identified certain exceptional circumstances that would qualify as legitimate interests including "*national security, the protection of the interests of children or mentally disabled adults, the protection of privacy interests more generally, and the protection of trade secrets and commercial confidentiality*" [**DHH1, page 97**].

2.13    However, in this Application, none of these interests are engaged. As Dr Wright's witness statements have been deployed for the purpose of the underlying proceedings and have been relied on to determine factual issues in the Judgment, there can be no privacy or commercial confidentiality interests that may be claimed (see the Supreme Court's reasoning in *Dring* at [46] [**DHH1, page 97**]).

2.14    Lastly, it is practical to grant the Applicants access to Dr Wright's witness statement(s). The Applicants undertake to pay the reasonable costs of granting

such access. In the unlikely event that Dr Wright's witness statement(s) have not been retained by the Court, the Court may order the Claimant to provide a copy directly to the Applicants (see _Blue v Ashley_ [2017] 1 WLR 3630 [**DHH1, pages 68-78**]).

(b)   CPR 5.4C(2)

2.15    Alternatively, CPR 5.4C(2) provides that "_a non-party may, if the court gives permission, obtain from the records of the court a copy of any other document [i.e. a document other than a statement of case, judgment or order] filed by a party..._".

2.16    A witness statement is a "record of the court" under this provision and the Applicants seek the Court's permission to obtain Dr Wright's witness statement(s) in the underlying proceeding on this basis.

**3.      PROCEDURE**

3.1     In accordance with CPR 5.4D, the Applicants are making this Application by an application notice under CPR Part 23 without formal notice to the Claimant.

3.2     As the Application is being made without notice, I am aware that I am therefore under a duty of full and frank disclosure. In _Dring v Cape Intermediate Holdings Ltd_ [2020] EWHC 1873 (QB), the judge denied the defendant's application to obtain certain documents on the basis that the defendant was not seeking to advance the open justice principle but simply trying to obtain documentation for deployment in other litigation [**DHH pages 33-67**]. Importantly, the Court noted that the defendant already knew the issues involved and the evidence adduced in the underlying case. I do not consider this authority to be relevant to this Application. As stated above, the primary purpose of this Application is to understand Dr Wright's credibility as a witness in the underlying proceedings as well as the contents of his evidence, thereby advancing the open justice principle.

3.3     While the provisions of CPR 5.4D are not strictly applicable if this Application has to be made under the inherent jurisdiction rather than CPR 5.4C, I would submit that the procedure set out in CPR 5.4D is equally appropriate for the Court's exercise of its inherent jurisdiction.

3.4     I consider that the Application can be determined on the papers, unless the Court considers an oral hearing to be necessary.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

_____

Name: David Holman Hunt
Dated: 9 June 2023

# Exhibit D

**IN THE HIGH COURT OF JUSTICE**                          Claim No.: CL-2018-000386
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

**Before:**


**BETWEEN:**

**RAMONA ANG**

<u>**Claimant**</u>

**-and-**

**RELIANTCO INVESTMENTS LTD**

<u>**Defendant**</u>


**IN THE MATTER OF AN APPLICATION BY:**


**IRA KLEIMAN**

<u>**First Applicant**</u>

**and**

**W&K INFO DEFENSE, LLC**

<u>**Second Applicant**</u>

---

*Draft* ORDER

---

**UPON** the application of the Applicants dated 9 June 2023

**AND UPON** reading the written evidence filed by the Applicants

**IT IS ORDERED** that:

1.     In exercise of the Court's powers under its inherent jurisdiction and CPR 5.4C(2), the Applicants be granted permission to inspect and take copies of the witness statement(s) of Dr Craig Wright made in support of the Claimant in these proceedings in accordance with the open justice principle.

Dated this _____ day of June 2023

# Exhibit E

# E-Filing Submission Confirmation

The following electronic filing(s) were successfully submitted.  Please keep a copy of this confirmation for your records.

**Submitted Number**     523771686322758700
**Submitted Date**         09-06-2023 03:59 PM

**Filings Submitted:**

| Court | Case Number | Matter/Ref. Number | Filing Type(s) | Documents | Fees |
|---|---|---|---|---|---|
| Commercial Court (KBD) | CL-2018-000386 | | Application to a Judge - Application to Judiciary on Paper (Without Notice) | 4 | £ 108.00 |
| Total | | | | | £ 108.00 |

# Exhibit F

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

Claim No.: CL-2018-000386

CL-2018-000386

**Before: Mr Justice Picken**

13 Jun 2023

**BETWEEN:**

**RAMONA ANG**

<u>Claimant</u>

-and-

**RELIANTCO INVESTMENTS LTD**

<u>Defendant</u>

**IN THE MATTER OF AN APPLICATION BY:**

**IRA KLEIMAN**

<u>First Applicant</u>

and

**W&K INFO DEFENSE, LLC**

<u>Second Applicant</u>

*Draft* ORDER

**UPON** the application of the Applicants dated 9 June 2023

**AND UPON** reading the written evidence filed by the Applicants

**IT IS ORDERED** that:

1.    In exercise of the Court's powers under its inherent jurisdiction and CPR 5.4C(2), the Applicants be granted permission to inspect and take copies of the witness statement(s) of Dr Craig Wright made in support of the Claimant in these proceedings in accordance with the open justice principle.

Dated this 12 day of June 2023