# EXHIBIT 2

C .S. WRIGHT<br>
CLAIMANT / RESPONDENT<br>
2ND<br>
CSW2<br>
18 AUGUST 2020

<u>Claim No. CL-2018-000386</u>

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**BETWEEN:**

**MRS RAMONA ANG**

**<u>CLAIMANT</u>**

**-AND-**

**RELIANTCO INVESTMENTS LIMITED**

**<u>DEFENDANT</u>**

**-AND-**

**DR CRAIG STEVEN WRIGHT**

**<u>RESPONDENT</u>**

---

**SECOND WITNESS STATEMENT OF CRAIG STEVEN WRIGHT**

---

I, Craig Steven Wright, of 21 Harebell Hill, Cobham, Surrey KT11 2RS WILL SAY AS FOLLOWS:

1. I am a computer scientist, academic, economist, programmer and businessman resident in England. I am the husband of the Claimant to these proceedings, Ms Ramona Ang, to whom I refer throughout this statement as either "Ramona" or "my wife". I am the Respondent to this application but am not a party to my wife's claim.

2. I make this witness statement, my second in these proceedings, in response to the application by Reliantco Investments Limited ("**Reliantco**") dated 22 July 2020, seeking that I search for, disclose and give inspection of various documents pursuant to CPR r. 31.17 (the "**Application**"), and in response to the Third Witness Statement of

- 1 -

Lydia Miriam Danon, a partner in the firm of Cooke, Young and Keidan LLP ("**CYK**"), dated 22 July 2020 ("**Danon 3**"), which supported the Application.

3.     The facts and matters set out in this witness statement are true to the best of my information and belief. Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

4.     This witness statement has been prepared by me and my lawyers, SCA ONTIER LLP ("**SCA**"), who also act for Ramona in the proceedings, over telephone calls and email communications. No privilege is intended to be waived by my reference to these communications nor by my reference anywhere in this witness statement to any advice I have received in the course of preparing it.

5.     There is now produced and shown to me a paginated bundle of documents marked 'CSW2'. All references to documents in this witness statement are to Exhibit CSW2 unless otherwise stated. In order to avoid unnecessary duplication of documents, I have referred, where possible, the documents exhibited by Ms Danon to Danon 3, and I have done so using her exhibit referencing (LMD3). I have also referred to my first witness statement in these proceedings dated 3 July 2020 ("**Wright 1**") and my wife's second witness statement dated 3 July 2020 ("**Ang 2**").

6.     I understand that the documents sought by Reliantco relate to two broad issues which are said to be relevant to the matters in issue in my wife's claim: (i) the "**DeMorgan issue**"; and (ii) the "**VPN issue**". In respect of the DeMorgan issue, I consider that the searches proposed by Reliantco are broad, disproportionate, unnecessary and I do not in any event believe that I have any material documents relevant to that issue. In respect of the VPN issue, I believe that documents responsive to those searches which might be determinative of the issues in my wife's claim (as Reliantco has suggested) are unlikely to exist. I set out the reasons for this below.

7.     In this witness statement, I therefore intend to address the following:

     (A)  My responses to matters set out in Danon 3

     (B)  The DeMorgan issue

(C)   The VPN issue

## A.   MY RESPONSES TO MATTERS SET OUT IN DANON 3

8.   It is first necessary that I respond briefly to matters raised at paragraphs 7, 8 and 13 of Danon 3 to correct a number of inaccuracies.

9.   In paragraph 7 of Danon 3, Ms Danon refers to Bitcoin as a "cryptocurrency". This is a common misconception, but is not accurate. Bitcoin is not a cryptocurrency because no part of the operating code is encrypted or otherwise blinded. It is entirely open and public. Users, however, have a degree of privacy (not anonymity) because their legal identities are not inherently visible on their public keys.

10.   Ms Danon also refers at paragraph 7 to a number of legal proceedings that I am, or have been, involved in as a party. By way of further information:

10.1.   It is true that, in April and May 2019, I issued proceedings in defamation in the English High Court against a number of individuals who had published defamatory publications on social media and other online forums to the effect that I did not create Bitcoin and am a fraud for claiming that I did.

10.2.   My claims against Mr Ver and Mr Granath were both dismissed at first instance following jurisdictional challenges by the Defendants.

10.3.   Mr Ver, a Japan-domiciled Kittian citizen (who had previously renounced his US citizenship), successfully challenged the English High Court's jurisdiction to hear my claim against him on the grounds that, as he is not domiciled in the UK or any EU or Lugano Convention state, England was not "clearly the most appropriate place in which to bring" my claim pursuant to section 9(2) of the Defamation Act 2013. The Court of Appeal subsequently upheld the High Court's decision.

10.4.   Mr Granath is a Norwegian citizen and Oslovian. In May 2019, in response to my letter before action, Mr Granath issued proceedings in the Oslo District

Court seeking negative declaratory relief that his tweets concerning me were not defamatory. I issued my claim against him in June 2019 and Mr Granath challenged the High Court's jurisdiction to hear that claim on the basis that both proceedings involved the same cause of action under Article 27 of the Lugano 2 Convention and that, as the Oslo Court was first seized, the High Court was required to decline jurisdiction to hear and to dismiss my claim. The High Court granted Mr Granath's application in January 2020 and my appeal is being heard in October 2020.

10.5.   It is important to note that my claims against Messrs Ver and Granath were dismissed on jurisdictional grounds only and that the Court made no comment as to the merits of either case. If the Court of Appeal grants my appeal and reinstates my claim against Mr Granath, those proceedings will then continue.

10.6.   I discontinued my claims against Messrs Buterin and Back because (in respect of Mr Buterin) my advisors were unable to identify an appropriate address outside of the jurisdiction at which to effect service of process on him and (in respect of Mr Back) he had stopped publishing any statements about me and, as such, I decided not to pursue the matter further.

10.7.   My claim against Peter McCormack, an English-domiciled podcaster and member of the 'Twitterati', is ongoing. Disclosure Lists are due to be exchanged next month and a 2-3-week trial is listed to commence on 4 May 2021.

11.   In response to Ms Danon's reference, at paragraph 8 of Danon 3, to the findings of Magistrate Judge Reinhart in his Order on Plaintiff's Motion to Compel dated 27 August 2019 ("**Reinhart Sanctions Order**") **[LMD3, p.9-29]**, I would say three things. First, that Magistrate Reinhart also held that there was no "*direct evidence that* [I] *was responsible for alterations or falsification of documents*" **[LMD3, p.29]**. Second, I appealed the Reinhart Sanctions Order to District Judge Bloom who, in an Order dated 10 January 2020 **[CSW1, pp.1-23]**, overturned Magistrate Reinhart's decision to impose the sanctions of (i) adverse findings of fact; and (ii) the striking out of certain of my defences, but maintained the sanction of costs. Third, and in any event, the fact that I

- 4 -

have been the subject of an unfavourable judicial finding on a matter in another jurisdiction ought not lead to any conclusion being drawn in relation to separate proceedings (in which I am not a party) arising out of entirely disparate and unconnected facts in a different jurisdiction.

12. Ms Danon is incorrect to state at paragraph 13 of Danon 3 that I had on <u>two</u> occasions attempted to open a trading account with Reliantco.  I have had <u>three</u> accounts with Reliantco; one set up in 2013 (paragraph 9 of Wright 1), another set up in April 2016 (paragraphs 10-17 of Wright 1), and a third set up in January 2017 (paragraphs 18-30 of Wright 1).  I do not know why Ms Danon does not refer to the account which I set up in 2013.  I received a 'Welcome' email which referred at its foot to "Reliantco Investments Limited" and an office address on "Makarios III Avenue" in Limassol, Cyprus, the same street as I understand Reliantco's current registered office to be situated today **[CSW2, p.24-25]**.

## B.   THE DEMORGAN ISSUE

13. I understand that Reliantco is seeking orders (contained in paragraphs 1 to 3 of the Defendant's Draft Order which accompanied the Application ("**Draft Order**")) that I (i) instruct a digital forensics specialist to collect all of the emails from all of my email accounts without any limitation; (ii) search for documents using the 7 keyword search terms at paragraph 2 of the Draft Order; and (iii) disclose the results of those searches.  I understand from paragraph 3 of the Draft Order that Reliantco pursues this Application in relation to "*Issues 5 and/or 7 of the Disclosure Review Document*" prepared by the parties to this claim and which I am informed by SCA was filed on 1 November 2019 and approved by Mr Justice Bryan ("**Agreed DRD**").  I am informed that a copy of the Agreed DRD is exhibited by Ms Danon at pages 51-75 of LMD3.

14. I consider these searches to be oppressive, excessive and unnecessary, and I set out the reasons for this below.

Disclosure Issue 7

15.   I deal first with Reliantco's request that I search for and disclose documents relating to Issue 7 of the List of Issues for Disclosure in the Agreed DRD. Issue 7 is quoted by Ms Danon at paragraph 22.2 of Danon 3 and I understand relates to the source of the monies which were deposited into Ramona's UFX account from our Lloyds Bank joint account in three separate transactions between 31 July and 4 August 2017 (as set out in more detail by my wife at paragraphs 42 to 49 of Ang 2).

16.   My wife has given extensive disclosure of documents, including our Lloyds Bank joint account statements for the months of May, June, July and August 2017 which go to this issue. Copies of these bank statements are exhibited at **pages 26 to 99 of CSW2**. I am informed by SCA that these show:

16.1.   that as a result of Ramona having withdrawn USD $600,600 from her UFX account, the total sum of £461,187.00 was credited to the Lloyds Bank joint account (in 15 separate transactions) between 19 and 24 May 2017 **[CSW2, pp.37-40]**;

16.2.   that as at 24 May 2017, after the final payment (£453.42) was received from Reliantco, the balance of the Lloyds Bank joint account was £556,494.72 **[CSW2, p.40]**;

16.3.   that between 24 May and 1 August 2017 (when the first payment to UFX referred to at paragraph 43 of Ang 2 appears as a deposit on the Lloyds Bank joint account statement for August 2017 **[CSW2, p.81]**) the balance of funds in the Lloyds Bank joint account fluctuated but never fell below £476,443.71 (see the balance on 24 July 2017 **[CSW2, p.76]**). In other words, the balance of this account was significantly in excess of the amount Ramona withdrew from UFX at all times between that withdrawal in May 2017 and the re-investment in July/August 2017.

17.   I do not therefore understand how Reliantco can say that disclosure is required from me, a third party, in order to fairly dispose of Ramona's claim or its defence as I understand it relates to this issue.

Disclosure Issue 5

18.   I understand that Reliantco is also seeking that I search for and disclose documents in
relation to Issue 5 in the Agreed DRD.   Issue 5 is set out by Ms Danon at paragraph 22.1
of Danon 3.   My opposition to Reliantco's Application on this issue falls under two main
headings.   First, that Reliantco has not adequately identified or particularised the
document or documents which it says I am likely to possess which are required to fairly
resolve the claim.   Second, that to the extent that documents are required, I believe I am
unlikely to possess such documents.

*(i)      The documents sought by Reliantco*

19.   I am advised by SCA that while Ms Danon has described the prior correspondence
between SCA and CYK in relation to disclosure of documents on this issue (matters in
respect of which I was of course not involved), she has not identified, or sought to
identify, precisely the document or types of documents which Reliantco alleges exist and
are necessary to fairly dispose of its claim, as I am informed by SCA that it is required
to do in order to succeed on this Application against me.   Reliantco has instead proposed
that I search the *entirety* of every single email account in my possession / control.   This
request is extraordinarily broad and intrusive.

20.   Instead of identifying a document or narrow class of documents, Reliantco is instead
seeking that search terms be run over all of my email accounts.   This is, on any view,
onerous.   To the best of my recollection, the email accounts I used in the early part of
2016 when the DeMorgan monies were repaid to Ramona were: (i) my personal Google
G Suite email account registered under the email address *craig@rcjbr.org*; (ii)
*c.wright@ncrypt.com*,   which   was   my   professional   email   address   (now
*c.wright@nchain.com*) and which I only used for matters related to my employment with
nChain; and (iii) other university email accounts associated with, amongst other courses
of study, my PhD study at Charles Sturt University and which I only used for matters
related to those studies.

21.   The 7 search terms proposed by Reliantco are set out at paragraph 2 of the Draft Order.
These search terms are entirely new.   They bear no resemblance to the 6 search terms set

out in the Agreed DRD (see pages 67-68 of LMD3), which I am informed by SCA were applied to the documents collected from my wife, and which I am aware were applied to the emails in my *craig@rcjbr.org* account, for the purpose of extended disclosure in my wife's claim. I am informed by SCA that Reliantco has never queried the 6 search terms in the Agreed DRD nor complained that those 6 agreed search terms were inadequate. I am also informed by SCA that the 7 search terms at paragraph 2 of the Draft Order were never proposed by Reliantco at any prior stage in my wife's proceedings, whether at the time the DRD was discussed and finalised in October 2019, or subsequent to that. These 7 entirely new search terms are imprecise and Ms Danon has not explained how any of them would result in documents necessary to fairly resolve Issue 7 being identified.

22. Taking each of these in turn:

22.1. *"DeMorgan" AND "Loan"*: I understand that this search term would 'hit' on every document in which these two words appear anywhere throughout the document. It would not (to me) identify with any specificity any documents which may exist in relation to loans by Ramona to DeMorgan or the repayment of those loans and would therefore result in a wide range of documents being required to be manually reviewed which are likely to have no relevance whatsoever to my wife's claim or Reliantco's defence. In addition, DeMorgan was a very large company that I recall had many other inter-company loans (there were something like 19 companies within the group) that had nothing to do with loans that I or Ramona made to it. It follows that this search would be likely to result in a very large volume of irrelevant material having to be reviewed.

22.2. *"DeMorgan" AND "Wright Family Trust"*: The Wright Family Trust was a DeMorgan shareholder. This search is therefore likely to 'hit' on every document which lists the DeMorgan shareholders. I do not understand the identity of DeMorgan's shareholders to be an issue in my wife's claim.

22.3. *"DeMorgan" AND "Ramona"*: Ramona was a director of DeMorgan between 1 September 2014 and 1 September 2016. Her company email address during this time was "*ramona@demorgan.com.au*". Her email signature at the time

included the words "Ramona" and "DeMorgan". This search would therefore hit on every single document in my possession within my emails which includes an email sent by or to Ramona from her DeMorgan email address to which I was also copied or forwarded.

22.4. *"Wright Family Trust" AND "deed"*: The Wright Family Trust was the Australian arm of a family trust structure that I founded in the 1990s before I met and subsequently married Ramona. This was a private trust structure I started which has been a holding entity for companies that I founded in the past. Ramona became part of this when she started working with me in 2011 on the creation of new companies and new products. It was (and remains) private and has no relationship to this case.

22.5. *"Wright Family Trust" AND "declaration"*: Please see above at 22.4.

22.6. *"Wright Family Trust" AND "benefici!"*: Please see above at 22.4.

22.7. *"Wright Family Trust" AND "Ramona"*: Please see above at 22.4.

23. None of these search terms are limited by date. I would be required to search across all of the emails I have ever possessed and still possess.

24. The most Ms Danon says about these search terms is in point 2 in the table at paragraph 56 of Danon 3, where she says these are keyword searches which she believes "*are likely to locate documents relevant to Ms Ang's ostensible interest in DeMorgan and the Wright Family Trust*". I am advised by SCA that the question of my wife's "interest in DeMorgan and the Wright Family Trust" is not a live issue in these proceedings. In addition, while I understand that this is a matter for legal submissions at the trial of Ramona's claim, I do not see how information said to be derived from the content of an email which I sent to my wife on 13 August 2017 (described at paragraph 34.2 of Danon 3), which I understand was then provided by Ramona to Reliantco on 14 August 2017 (see paragraph 60 of Ang 2 and **[CSW2, pp.100-101]**), could be said to be necessary to fairly resolve the paragraphs of Reliantco's Defence referred to at paragraph 43 of Danon 3 when Reliantco blocked and terminated my wife's UFX account *four days earlier*, on 10 August 2017 (a point which Ms Danon fails to mention anywhere in her statement).

25.   I also understand that Reliantco seeks an order that I instruct (at my own cost) a digital forensics specialist to collect all of the documents from my email accounts.  In support of this proposition, Reliantco relies on (i) the fact that the searches of my *craig@rcjbr.org* email account for the purpose of extended disclosure in my wife's claim were undertaken by a different methodology to that adopted for the searches of my wife's email account; and (ii) the findings of the Floridian Court in the proceedings in which I am a party referred to in paragraph 8 of Danon 3 and to which I have responded at paragraph 11 above (see the first column of the table at paragraph 56 of Danon 3).  As to those propositions, I would say the following.  First, I note that although I am informed by SCA that Reliantco has reserved its rights regarding the different methodology adopted in respect of the collection and searches of my emails by the digital forensics consultant instructed by my wife (that methodology is set out in the Disclosure Certificate filed on behalf of my wife at LMD3, p.115), it is not seeking by this Application that the searches of the terms in the Agreed DRD be run again.  Further, I am advised that it is not incumbent on a *party* to instruct a forensic disclosure consultant to collect their documents for the purposes of disclosure so I do not see how I (as a non-party) can be criticised for not permitting the entirety of my emails to be collected for the purposes of the searches required to be conducted by Ramona for her extended disclosure).  I also note in this regard that "*Reliantco did not intend to instruct a digital forensics specialist*" for the purpose of disclosure in Ramona's claim initially (see paragraph 14 of CYK's letter to SCA dated 15 May 2020 **[LMD3, p.160]**).  Second, I wholeheartedly reject the proposition that the findings of a foreign court on an interlocutory matter could in any way be said to justify that I should be required to instruct a digital forensics consultant to collect my documents as a third party to this claim.

26.   However, as a result of me being a party to the proceedings referred to at paragraph 10.7 above, documents in my possession and control (including emails) have already been forensically collected and are hosted by AlixPartners, the same digital forensics consultant instructed by my wife in her claim.  To illustrate the lack of particularity with which Reliantco has approached the search terms, SCA instructed AlixPartners (on my behalf) to indicate how many documents 'hit' upon the 7 search terms proposed in the Draft Order.  I am informed that this resulted in 5,548 'hits' and 18,985 documents in total when so-called family members were included.  I do not believe that it could

reasonably be said that I should be required to instruct SCA to undertake the review of nearly 19,000 documents before the trial in October.  I am informed by SCA that this is about 1.5 times the total number of documents collected from my wife upon which the search terms in the Agreed DRD were run for the purposes of her extended disclosure, and that the total number of documents disclosed by both sides in this claim is just over 1000 documents.

*(ii)      Documents which may be in my possession*

27.   I understand that Ramona has already searched for, disclosed, and permitted inspection of various documents in relation to Issue 5 (such as those referred to at paragraph 34 of Danon 3).  Ms Danon has referred to other documents such as "*DeMorgan bank statements for this period* [i.e. June 2016]", which I presume indicates Reliantco considers documents such as DeMorgan bank statements to be in my possession and potentially relevant.  Taking that as an example, I do not believe that I have such documents.  DeMorgan had an internal accountant at that time.  I was also not a director of DeMorgan at that time, having resigned on 9 July 2015 (see the DeMorgan Ltd Current & Historical Company Extract held by ASIC, the Australian equivalent of Companies House **[CSW2, p.114]**).  I was aware that these monies were to be repaid by DeMorgan to Ramona but I would not have had any documents in relation to these loans or the repayment of those loans to Ramona.  I can't think of any reason why I would have documents in relation to loans made by Ramona which were being repaid to Ramona.  I do not have access to DeMorgan bank statements from that time now because DeMorgan was deregistered on 1 September 2016.  The only documents that I retained after the deregistration of DeMorgan in 2016 relate to its intellectual property.  I have no financial or accounting information in relation to DeMorgan at all.

## C.   THE VPN ISSUE

28.   I do not disagree with what Ms Danon says at paragraph 48 of Danon 3, to the effect that my wife did not disclose documents evidencing the existence or configuration of the VPN or offer up any description of the VPN in her witness statement.  If that is intended to be read as criticism of her, I do not think that is justified for the following reasons.

- 11 -

29.   I (along with persons at nChain (then nCrypt), for reasons I explain in more detail at paragraph 35 below) was responsible for configuring and administering the network (including the VPN) at 7 Oak Road, through which my wife accessed the public internet on her devices (by which I mean her devices used to access Reliantco's website) in 2017. I do not mean to do my wife a disservice when I say that she hasn't the faintest idea of how that network was set up and operated (whether in specific or even general terms) and how her devices interacted with the public internet via that network; in fact, I am certain she would agree with me (and I note that she says as much at paragraph 76 of Ang 2).

30.   I am also informed by SCA that although Ramona's use of a VPN formed part of her pleaded case in 2019, Reliantco did not seek to particularise any categories of documents which might be relevant to the VPN issue at all until those were set out in paragraph 4 of the Draft Order for this Application.

31.   I therefore accept that to the extent that documents relating to the VPN could be said to exist, they would be in my (rather than my wife's) possession or control.  However, for the reasons set out below, I do not consider that the order sought by Reliantco should be made against me as a third party.

32.   I understand that Reliantco is seeking that I search for the following categories of documents (by reference to the paragraph numbering in the Draft Order):

(i)    Draft Order para 4.1: *Documents relating to the configuration of* [my] *home virtual private network*[1] *system between 1 January and 31 August 2017.*

(ii)   Draft Order para 4.2: *Documents relating to the IP addresses which* [I] *held or rented from other IP address providers and access logs documenting user logins.*

---

[1] For the reasons set out at paragraphs 35-38, below, I do not consider that "*home ... network*" is an appropriate label for the sophisticated, commercial, network infrastructure which I had in operation at 7 Oak Road at the time.

33. My opposition to the Application insofar as it relates to the VPN issue is based on three points. First, that the categories of documents at paragraphs 4.1 and 4.2 of the Draft Order are vague, unparticularised and Reliantco has not identified or sought to identify a document or narrow category of documents (as I am advised that they are required to). Second, I do not believe that any documents which might fall within that very broad class of documents at paragraph 4.1 of the Draft Order are likely to be determinative of the matter in the way which Reliantco has suggested. Third, that I do not believe that I possess documents such as lists of IP addresses or access logs from three years ago which would fall under the categories set out at paragraph 4.2 of the Draft Order.

34. In order to provide context to those statements, it is necessary for me to describe the network infrastructure which I had in place at 7 Oak Road at the relevant time. I have already explained this in some detail in Wright 1 at paragraphs 44-54 and I do not intend to repeat that information here but would invite the Court to read those parts of Wright 1. I would however supplement that information as follows. To assist the Court, I have included at Appendix 1 to this witness statement a glossary of the underlined technical terms used in the following paragraphs.

35. The network which I built and administered at 7 Oak Road had nothing in common with a "home" network as most lay people would understand it. It is more accurate to think of there having been a state-of-the-art commercial office - including an entire floor with a board room, separate kitchen and other meeting rooms for when staff worked from there - based at my home address. The nature of my firm's (nChain – formerly nCrypt) business is in computer technology (specifically blockchain) research and development and the network at 7 Oak Road was that of a sophisticated technology company. The primary external connection was through a BT commercial fibre line. This was a commercial level, gigabit speed, connection with outsourced management and uptimes. I also had three other backup connections (to provide redundancy if the primary connection failed). These went through an aggregation link and had backup connectivity as well as failover and load balancing. The physical hardware for the network (meaning amongst other items the high-end Cisco router and the commercial grade Cisco ASA firewall and intrusion detection system I refer to at paragraph 45 of Wright 1) required a separate computer room and communications room (much like a separate server room in

a commercial office). Within 7 Oak Road, my network had both wired ethernet and a commercial grade <u>Ubiquiti Wi-Fi network</u>.

36.    The VPN had multi-levels including <u>IPsec</u> and <u>TLS</u> based VPNs. A <u>private PKI</u> based <u>CA</u> on a Windows domain server was utilised to issue <u>certificates</u> on the domain. IPsec connectivity was only utilised when <u>full VLAN</u> access to the network was required. TLS was utilised for basic web browsing, access and virus scanning.

37.    As set out in Wright 1, to all intents and purposes this was a commercial level network similar to that which might be seen in a 500 person office.

38.    At paragraph 47 of Danon 3, Ms Danon queries what I meant by "secured services" at paragraph 51 of Wright 1. In addition to the network and VPN system in place as described in Wright 1, I also used a software service called "Lookout". When, for whatever reason, the VPN was not available (I set out some examples of why this might be in paragraph 51 of Wright 1), Ramona's connection would fall back to a separate proxy server provided by the Lookout software/service. This was a <u>VPN plus proxy service</u> that allowed external access with virus scanning and other controls. In short, if a normal VPN service was not available and it was not necessary to connect via my network, Ramona's devices were automatically configured to connect using either a system including a Trend Micro virus scanner system or Lookout. Ramona's connection was therefore protected from malware and was a protected or "secured" service.

39.    I have explained at length in Wright 1 (paragraphs 44-53) the effect that the above network settings and VPN would have on the IP address visible to a third party website (such as www.ufx.com) when accessed from Ramona's devices.

40.    I now turn to the reasons why I do not think that the orders sought by Reliantco should be made against me.

<u>Paragraph 4.1 of the Draft Order</u>

- 14 -

41.   I do not presently understand how I could effectively search for documents under paragraph 4.1 of the Draft Order because Reliantco has not particularised the kind or types of documents which might exist and which I should search for (as I understand it is required to do).

42.   I also do not believe documents would exist which, as Ms Danon puts it at paragraph 48 of Danon 3, "*evidence the … configuration of the VPN*" in place at 7 Oak Road in 2017. The VPN in place on my network at 7 Oak Road was a combination of installed hardware and software settings.  The configuration of that hardware and software did not of itself generate documents or data that have been retained and to my mind I had no reason to create or retain documents which recorded the network configuration.  I freely accept that it might be possible to review a 'snapshot' of a network in-situ and confirm that various settings are selected or de-selected and that a VPN is operational, however I do not have the same system in place in my home now at 21 Harebell Hill as I had in place at 7 Oak Road three years ago.  In fact, the network infrastructure has been rebuilt entirely on a number of occasions since 2017 (at least five times)[2] and is very different now to how it was then.  The network addressing is different.  The reasons for changes to my network set-up are simple.  For one, I have moved house.  For another, nChain's business has grown and changed and this resulted in changes to how my network is set up and the way in which I work from my home office.   Finally, both hardware and software/operating systems have been updated extensively during the intervening period as a result of the pace of change of technology in this area.  Three years is an extremely long time in high-grade information/network technology terms.

43.   I do not believe documents which evidence the configuration (if by "*configuration*" Reliantco means a combination of settings) of the VPN will exist because I built the network.  I had no need to actively keep a record of the VPN settings or configuration. In my mind it would have been irresponsible, from an information and network security point of view, to choose to create and store documents which set out how my network was set-up.

Paragraph 4.2 of the Draft Order

---

[2] To the best of my recollection, twice in 2017, at the end of 2018, in 2019 and already in 2020.

44. As to the first part of paragraph 4.2 of the Draft Order, Reliantco has not sought to clarify or particularise what "[d]*ocuments relating to the IP addresses which* [I] *held or rented from other IP address providers*" are necessary to fairly resolve Ramona's claim. I do not understand what documents Reliantco is referring to. If Reliantco is referring to, for example, lists of IP addresses which were in use on the network at the time, I do not believe that documents such as those are likely to exist.

45. To the extent that I am able to recall certain details about the IP addresses in use by my VPN at the time, those are set out at paragraph 52 of Wright 1. In addition to the above, as I recall, the IP addresses in use by the network at the time were rented from BT by C01N Limited ("**C01N Ltd**"), a UK limited company under my control. C01N Ltd was dissolved by compulsory strike out on 4 July 2017. Other addressing was supplied under ISP arrangements from the ARNet provider organisation.

46. As to the second part of paragraph 4.2 of the Draft Order, I have not retained server and/or access logs documenting user log-ins. On the network at 7 Oak Road, logs were retained on a syslog server for a rolling period of 60 days only. That physical server was decommissioned some time ago but I do not recall precisely when. I did not back-up those server logs as I had no reason to retain, back-up or archive that data after the 60 day period. The 60 day period was, in effect, short term memory on that hardware server. That data was not stored or archived after 60 days because it was not necessary to store or archive that data for a longer period. Further, there would have been a cost associated with the storage of that data and it would in any event have been a full time job to manage the server logs on a network of the size and sophistication of my network at 7 Oak Road. I do not keep old servers and I do not have lists of the servers or computers that I had connected to those servers. I had racks of over 30 computers running in the communications/server room at 7 Oak Road. None of those servers or computers exist anymore (as a result of me moving house and upgrades to the network as set out at paragraph 42 above). There is no drive, archive or hardware that I could search which would contain access logs.

47. To the extent Reliantco would seek to criticise this or say that this data was intentionally not retained, I would say two things. First, that I am not and have never been a party to

this claim.  Second, I understand the allegation that it was me (and not Ramona) who accessed her UFX account was only raised for the first time when Reliantco served its Defence and Counterclaim in August 2019.  This was some two years after the relevant events took place.  In fact, due to the rolling 60-day retention policy in place on my syslog server, the logs for 14 and 20 April 2017 (which I understand from Reliantco's Application to be the key dates on which it says there is evidence to suggest it was me and not Ramona who accessed her UFX account) would have not been retained after June 2017, so before this dispute even arose.

The searches I have in any event conducted

48.   I have, in any event, conducted some, limited, searches of documents in my possession which could be said to evidence the *existence* of the VPN (or at least the existence in the 7 Oak Road network of the hardware which, when installed in the way I have described in Wright 1 would have the effect I have described in Wright 1).

49.   I have exhibited the documents obtained as a result of these searches at **CSW2, pp.117-147**.  These include:

49.1.   a number of digital photographs taken while I was building the network at 7 Oak Road.  These images show:

49.1.1.   a communications rack and VLAN switch points (enabling groups of devices to be combined into a single network) **[CSW2, p.117]**;

49.1.2.   a 3-phase (3 x 100 Amp or 300 Amp) industrial power supply.  Most residential homes would commonly have a 30 Amp or 60 Amp power supply **[CSW2, p.118]**;

49.1.3.   a number of high performance computing ("**HPC**") units in the process of being installed **[CSW2, p.119]**;

49.1.4.   a number of secondary distribution / VLAN switches **[CSW2, p.120]**;

49.1.5.   another HPC system, in this case a cluster computer used for data storage and mathematical modelling **[CSW2, p.121]**;

49.1.6.   a computer workstation including a dual Intel Xeon Phi Coprocessor. The Intel Xeon Phi Coprocessor was a high performance processor made for the non-consumer market **[CSW2, p.122]**; and

49.1.7.   a back-up rack for communications and redundant connectivity **[CSW2, p.123]**.

49.2.   an "Order Confirmation" email from Amazon.co.uk dated 31 August 2016 **[CSW2, p.124-128]** evidencing the purchase of hardware for the network and VPN at 7 Oak Road including:

49.2.1.   a "*NETGEAR FVS336G-300EUS ProSAFE VPN Firewall Router with 4 LAN + 2 WAN Ports, 25 IPSec + 10 SSL VPN Tunnels*"; [emphasis added]

49.2.2.   a "*TP-LINK TL-SG1008 8-Port Rackmountable Gigabit Switch*";

49.2.3.   a "*Cisco 1921 Integrated Services Router ADSL2+ Bundle HWIC-1ADSL 256 MB Flash 512MB DRAM IP Base License* [sic.]";

49.2.4.   a "*Cisco EHWIC-VA-DSL-A= MULTI MODE VDSL2/ADSL/2/2+ -EHWIC ANNEX A IN*"; and

49.2.5.   various other ancillary equipment, such as cables.

49.3.   a "Dispatch Confirmation" email from Amazon.co.uk dated 6 September 2016 in respect of the Cisco Router referred to at paragraph 49.2.3 above **[CSW2, p.129-130]**;

49.4.   an email which I sent to Mr Stefan Matthews of nChain (then known as nCrypt) on 30 September 2016 forwarding an email from Mr Ryan Snell, an account

- 18 -

manager with BT Local Business Southern Counties, regarding the installation of a private fibre internet circuit at 7 Oak Road which was to be paid for by nChain **[CSW2, p.131-139]**;

49.5.   a chain of emails culminating in an email from me to "IanSnells Shop" on 16 October 2016 regarding the purchase of a "*Cisco ASA 5525-X Firewall Edition Adaptive Security Appliance with 8 GE Copper Ports*" **[CSW2, p.140]**;

49.6.   an "Order Confirmation" email from Amazon.co.uk dated the next day, 17 October 2016, regarding the Cisco ASA referred to at paragraph 49.5 above **[CSW2, p.141-142]**; and

49.7.   a chain of emails between me and Mr Snell of BT regarding the installation of the private fibre internet circuit referred to at paragraph 49.4 above, culminating in an email from me to Mr Snell on 19 October 2016 where I refer to having a "Cisco 4431" router **[CSW2. p.143-147]**.

50.   As these documents show, the network infrastructure at 7 Oak Road bore no resemblance whatsoever, in terms of hardware or software, to a standard "home" network.

Conclusion in relation to the VPN issue

51.   For the reasons set out above, I consider that the searches sought by Reliantco under paragraphs 4.1 and 4.2 of the Draft Order are oppressive and unnecessary in circumstances where I am not a party to this claim and the documents which I do possess are unlikely to be determinative of the VPN issue (or at least what I understand the VPN issue to be) as Ms Danon suggests.

52.   I should also add that I would strongly resist any attempt by Reliantco to require me to search for documents relating to my *current* network setup for (at least) two reasons. First, as set out at paragraph 42, above, there is no equivalence between the network at 7 Oak Road and my network now.   Second, I am a well-known public figure in the blockchain sphere and it is no exaggeration to state that my network is under frequent attack from hackers and cyber criminals.  Describing or disclosing information relating

to my current network in a public forum (such as these court proceedings) would be an open invitation to hackers and cyber criminals to use that information to attack and seek out vulnerabilities in my current network and to that of nChain Ltd. From an information/cyber security perspective (a subject which, as set out at paragraphs 5-6 of Wright 1 I have extensive experience), publication or dissemination of information about my current network set-up would be akin to giving away the combination to a safe. To do so would expose me, my family and my business interests to unacceptable and entirely unnecessary risk. I could never conscionably make that information public and, with the greatest of respect to this Court, would strongly oppose any attempt by Reliantco to force me to do so.

## D.  CONCLUSION

53.  For the reasons set out above, I would respectfully request the Court dismiss Reliantco's application.

### Statement of Truth

I believe that the facts stated in this Witness Statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed: ...................................

**Dr Craig S. Wright**
**Respondent**

**18 Aug 2020**
Dated: .............................

## APPENDIX 1

## GLOSSARY OF TECHNICAL TERMS

| | |
|---|---|
| **Aggregation link** | A way of grouping a number of individual ethernet links together so they act like a single local link |
| **CA** | A certificate authority (CA) is a company or organisation that acts to validate the identities of entities and bind them to cryptographic keys through the issuance of electronic documents known as digital certificates |
| **Certificates** | In cryptography, a public key certificate, also known as a digital certificate or identity certificate, is an electronic document used to prove the ownership of a public key |
| **Failover** | A procedure by which a system automatically transfers control to a duplicate system when it detects a fault or failure |
| **Firewall** | A network security device that monitors incoming and outgoing network traffic and permits or blocks data packets based on a set of security rules |
| **Full VLAN** | Stands for "Virtual Local Area Network," or "Virtual LAN." A VLAN is a custom network created from one or more existing LANs. It enables groups of devices from multiple networks (both wired and wireless) to be combined into a single logical network. The result is a virtual LAN that can be administered like a physical local area network. |
| **Gigabit** | A multiple of the unit *bit* for digital information or computer storage. Gigabit is one billion bits |
| **IPsec** | (Internet Protocol Security) IPsec is a group of protocols that are used together to set up encrypted connections between devices. It helps keep data sent over public networks secure. IPsec is often used to set up VPNs, and it works by encrypting IP packets, along with authenticating the source where the packets come from |

| | |
|---|---|
| **Load balancing** | The efficiently distribution of incoming network traffic across a group of backend servers, also known as a *server farm* or *server pool* |
| **Private PKI** | Public Key Infrastructure (PKI) is a technology for authenticating users and devices in the digital world. The basic idea is to have one or more trusted parties digitally sign documents certifying that a particular cryptographic key belongs to a particular user or device |
| **Router** | A networking device that forwards data packets between computer networks |
| **TLS** | Transport Layer Security, or TLS, is the use cryptographic protocols designed to provide communications security over a computer network. |
| **Ubiquiti Wi-Fi network** | Ubiquiti Networks Inc is a New York, USA, based technology company which markets professional networking products, primarily to commercial users. |
| **Uptimes** | Time during which a piece of equipment (such as computer) is functioning or able to function |
| **VPN plus proxy service** | A proxy server is essentially another computer which serves as a hub through which internet requests are processed |