# EXHIBIT 6

**C. S. WRIGHT**
**CLAIMANT**
**5th**
**CSW5**
**6 November 2020**

<u>**Claim No. CL-2018-000386**</u>

<u>**IN THE HIGH COURT OF JUSTICE**</u>
<u>**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**</u>
<u>**COMMERCIAL COURT (QBD)**</u>

**BETWEEN:**

**MRS RAMONA ANG**

<u>**CLAIMANT**</u>

**-AND-**

**RELIANTCO INVESTMENTS LIMITED**

<u>**DEFENDANT / APPLICANT**</u>

**-AND-**

**DR CRAIG STEVEN WRIGHT**

<u>**RESPONDENT**</u>

_____

**EXHIBIT CSW5**
**TO THE FIFTH WITNESS STATEMENT OF CRAIG STEVEN WRIGHT**
_____

# List of Documents

| Name/Description | Date | Pages |
|---|---|---|
| Email to Judge's Clerk with Letter to the Commercial Court | 05/11/2020 | 1 - 7 |
| Order of Mr Justice Butcher | 05/11/2020 | 8 - 9 |
| Judgment of Mr Peter Macdonald Eggers QC | 24/09/2020 | 10 - 22 |
| Draft Order | | 23 - 25 |

## Josh Watts

| | |
|---|---|
| **From:** | Nicholas Dawson |
| **Sent:** | 05 November 2020 11:55 |
| **To:** | Herald, Sarah; Nathan Masih-Hannaghan; Lydia Danon; Sam Roberts; Andrew Flynn |
| **Cc:** | Paul Ferguson; Michael Goulborn |
| **Subject:** | RE: [EXT] RE: CL-2018-000386 Application to a Judge [CYK=01743-001\13318] |
| **Attachments:** | 2020.11.05 Letter to Commercial Court.pdf |

Dear Ms Herald

We refer to the emails below and the Order of the Honourable Mr Justice Butcher (the "**Judge**") of today's date.  That Order directed the Respondent to file written submissions in answer to the Defendant's application dated 23 October 2020 for a stay of execution by 12 noon today.

Please see attached a letter for the attention of the Judge.  A copy of this letter has also been CE-filed.

The Defendant's solicitors, Cooke, Young and Keidan LLP, are copied to this email by way of service.

Kind regards


**Nicholas Dawson**
*Associate*

**SCA ONTIER LLP**
Halton House, 20-23 Holborn, London, EC1N 2JD, United Kingdom
DX248 London/Chancery Lane
Tel +44 (0) 20 7183 1701 | Fax +44 (0) 20 7183 1702 | Mobile +44 (0)77 8935 3232



BOLIVIA · BRAZIL · CHILE · COLOMBIA · DOMINICAN REPUBLIC · ITALY · MEXICO · PARAGUAY · PERU · PORTUGAL · SPAIN · UNITED KINGDOM · U.S.A. · VENEZUELA

This e-mail (including any attachments) is intended only for the recipient(s) named above and should not be read, copied or otherwise used by any other person. It may contain confidential or privileged information. If you are not a named recipient, please contact the sender and delete the e-mail from your system. SCA ONTIER LLP is a Limited Liability Partnership registered in England Registered No. OC327289. A list of the members is open to inspection at the registered office. Authorised and Regulated by the Solicitors Regulation Authority

**From:** Herald, Sarah <Sarah.Herald@justice.gov.uk>
**Sent:** 05 November 2020 09:43
**To:** Nathan Masih-Hannaghan <Nathan.Masih-Hannaghan@cyklaw.com>
**Cc:** Lydia Danon <Lydia.Danon@cyklaw.com>; Sam Roberts <Sam.Roberts@cyklaw.com>; Andrew Flynn <Andrew.Flynn@cyklaw.com>; Paul Ferguson <paul.ferguson@scaontier.com>; Michael Goulborn

<Michael.Goulborn@scaontier.com>; Nicholas Dawson <Nicholas.Dawson@scaontier.com>
**Subject:** [EXT] RE: CL-2018-000386 Application to a Judge [CYK=01743-001\13318]

Dear all,

Please find attached an order relating to the above case and circulate with all relevant parties as appropriate.

Kind Regards,
Sarah

**Miss Sarah Herald**
**Clerk to The Honourable Mr Justice Butcher**
HMCTS | Royal Courts of Justice | Pod 6 | 7 Rolls Buildings | Fetter Lane | London | EC4A 1NL
**Phone: 020 7947 6296**
**Web:** www.gov.uk/hmcts

---

**From:** Nathan Masih-Hanneghan <Nathan.Masih-Hanneghan@cyklaw.com>
**Sent:** 04 November 2020 18:06
**To:** Herald, Sarah <Sarah.Herald@justice.gov.uk>
**Cc:** Lydia Danon <Lydia.Danon@cyklaw.com>; Sam Roberts <Sam.Roberts@cyklaw.com>; Andrew Flynn <Andrew.Flynn@cyklaw.com>; Paul Ferguson <paul.ferguson@scaontier.com>; Michael Goulborn <Michael.Goulborn@scaontier.com>; Nicholas Dawson <Nicholas.Dawson@scaontier.com>
**Subject:** RE: CL-2018-000386 Application to a Judge [CYK=01743-001\13318]

Dear Ms Herald,

We confirm receipt of your email below.

Please see the attached correspondence and enclosure.

Kind regards,

Nathan

**Nathan Masih-Hanneghan**
Associate

COOKE, YOUNG & KEIDAN

---

**Cooke, Young & Keidan LLP**

| 21 Lombard Street | Tel: | +44 (0)20 7148 7800 |
|---|---|---|
| London | Fax: | +44 (0)20 7283 1499 |
| EC3V 9AH | DDI: | +44 (0)20 3409 2491 |
| | Mob: | +44 (0)77 9567 5711 |
| www.cyklaw.com | | www.cyklaw.tech |

**From:** Herald, Sarah <Sarah.Herald@justice.gov.uk>
**Sent:** 03 November 2020 15:26
**To:** Nathan Masih-Hanneghan <Nathan.Masih-Hanneghan@cyklaw.com>; Paul.Ferguson@scaontier.com;
Michael.Goulborn@scaontier.com; Nicholas.Dawson@scaontier.com
**Subject:** CL-2018-000386 Application to a Judge [CYK=01743-001\13318]
**Importance:** High

Good afternoon,

Mr Justice Butcher has responded to the application relating to the above mentioned case.

He has stated/asked for the following:

(1) I am prepared to consider the application to stay on paper;
(2) I would like the Claimant's written submissions on it by noon on Thursday 5th November, and any response by
the Defendant by noon on Friday 6th November;
(3) that there will be a stay of the obligation to pay the relevant costs until I have dealt with this application on
paper or 12.00 on 8th November, whichever is first;
(4) I would like an order drawn up embodying this.


Kind regards,

Sarah

**Miss Sarah Herald**
**Clerk to The Honourable Mr Justice Butcher**
HMCTS | Royal Courts of Justice | Pod 6 | 7 Rolls Buildings | Fetter Lane | London | EC4A 1NL
**Phone: 020 7947 6296**
**Web:** www.gov.uk/hmcts

 HM Courts & Tribunals Service

*For guidance on the circumstances in which you are required to submit documents electronically on the Court's electronic filing*
*system, please refer to https://www.gov.uk/guidance/ce-file-system-information-and-support-advice*

*For information on how HMCTS uses personal data about you please see: https://www.gov.uk/government/organisations/hm-*
*courts-and-tribunals-service/about/personal-information-charter*

**Here is how HMCTS uses personal data about you**


This e-mail and any attachments is intended only for the attention of the addressee(s). Its unauthorised use,
disclosure, storage or copying is not permitted. If you are not the intended recipient, please destroy all
copies and inform the sender by return e-mail. Internet e-mail is not a secure medium. Any reply to this
message could be intercepted and read by someone else. Please bear that in mind when deciding whether to
send material in response to this message by e-mail. This e-mail (whether you are the sender or the
recipient) may be monitored, recorded and retained by the Ministry of Justice. Monitoring / blocking
software may be used, and e-mail content may be read at any time. You have a responsibility to ensure laws
are not broken when composing or forwarding e-mails and their contents.

Cooke, Young & Keidan LLP is a limited liability partnership registered in England and Wales, registered number OC341464, with its registered office at 21 Lombard Street,
London, EC3V 9AH. Cooke, Young & Keidan LLP is authorised and regulated by the Solicitors Regulation Authority and our professional code of conduct can be accessed
at http://www.sra.org.uk. Any reference to a partner in relation to Cooke, Young & Keidan LLP is to a member of Cooke, Young & Keidan LLP. A list of the members of

Cooke, Young & Keidan LLP is open to inspection at the registered office.

IMPORTANT: This email is confidential, intended solely for the intended recipient and may be protected by legal professional privilege. If you are not the intended recipient, please do not use, copy or disclose its content but please contact the sender immediately upon receipt. No responsibility is accepted for emails unconnected with our business. Emails are not secure and cannot be guaranteed to be free of errors or viruses. Cooke, Young & Keidan LLP does not accept service of process or other documents by email unless it agrees in writing to do so. For information about how we process data please click here to see our privacy policy.

NB: INTERNET FRAUD WARNING Please check the authenticity of any email you receive relating to the payment of monies in this matter. If you have any doubts whatsoever then please contact us by telephone as soon as possible for verification.

Consider the environment - Please think before you print

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

---

This e-mail and any attachments is intended only for the attention of the addressee(s). Its unauthorised use, disclosure, storage or copying is not permitted. If you are not the intended recipient, please destroy all copies and inform the sender by return e-mail. Internet e-mail is not a secure medium. Any reply to this message could be intercepted and read by someone else. Please bear that in mind when deciding whether to send material in response to this message by e-mail. This e-mail (whether you are the sender or the recipient) may be monitored, recorded and retained by the Ministry of Justice. Monitoring / blocking software may be used, and e-mail content may be read at any time. You have a responsibility to ensure laws are not broken when composing or forwarding e-mails and their contents.

4

SCA ONTIER LLP
Halton House
20-23 Holborn
London EC1N 2JD
T: +44(0)20 7183 1701
F: +44(0)20 7183 1702
DX248 London/Chancery Lane
www.scaontier.com

**SCA ONTIER**

Admiralty and Commercial Court Registry
Rolls Building
7 Rolls Buildings
Fetter Lane
London EC4A 1NL

<u>Attention: The Court Manager</u>

**By CE-file**

5 November 2020

Your Ref: LD/SR/01743-001

Our Ref: PF/MG/ND/WRI2.18

Dear Sirs

**Mrs Ramona Ang ("Ms Ang") -v- Reliantco Investments Limited ("Reliantco")
and Dr Craig Wright; Claim No. CL-2018-000386
Defendant's application dated 23 October 2020 to stay and/or vary the Order of
Mr Peter MacDonald Eggers QC dated 14 September 2020**

1.  We act for the Respondent, Dr Craig Wright, in respect of an application by the Defendant, Reliantco, dated 23 October 2020, for a stay of execution and to vary the costs order of Mr Peter MacDonald Eggers QC (sitting as a Deputy High Court Judge) (the "**Deputy Judge**") dated 14 September 2020 ("**Costs Order**").  We refer below to the application for a stay as "**the Stay Application**" and the remainder of Reliantco's 23 October 2020 application to vary the Costs Order as "**the Variation Application**".

2.  We refer to the direction by the Honourable Mr Justice Butcher (the "**Judge**"), communicated to the parties by an email from the Judge's clerk, Ms Sarah Herald, on 3 November 2020 at 15:26.  That direction required the Respondent to file written submissions in answer to the Stay Application by 12 noon on Thursday, 5 November 2020.

3.  We would be grateful for this letter to be placed before the Judge.  We have also provided a copy to (i) Ms Herald and (ii) Cooke, Young and Keidan LLP, for Reliantco, by email.

**Respondent's Submissions in response to the Stay Application**

4.  We would note at the outset that Dr Wright rejects the allegations in the Eighth Witness Statement of Lydia Danon dated 23 October 2020 ("**Danon 8**") as to his propriety and conduct.  Dr Wright will respond to those allegations at the appropriate time.

*(i)  Reliantco (the payor) has advanced no grounds in support of a stay*

5.  The present position is that the Costs Order stands; Dr Wright's costs were assessed by the Deputy Judge in the sum of £52,500 plus VAT on 12 October 2020; and that sum was due and payable by Reliantco on or before 26 October 2020.  The onus is on Reliantco to satisfy the Court that the Costs Order should be stayed pending the eventual resolution of the Variation Application.

SCA ONTIER LLP is a limited liability partnership registered in England
Registered No.OC327289. A list of the members is open to inspection at the registered office

Authorised and Regulated by the Solicitors Regulation Authority

6. However, nowhere in Danon 8 does Reliantco advance any grounds or adduce any evidence which justifies or supports a stay of execution of the Costs Order. Therefore the position is that Reliantco is able to pay the Costs Order (and the stay is not being sought because otherwise the Variation Application would be stifled), and Reliantco does not rely on any apparent or actual difficulty in being able to recover from Dr Wright any costs paid over to him now which might be required to be paid back to Reliantco in the event that the Variation Application is successful. The Stay Application has been advanced exclusively on the basis that Reliantco would rather not pay now until the Variation Application is finally determined.

7. Dr Wright's overarching submission is that the Court should not grant a stay of execution (i) in the absence of any good reason to do so; and (ii) particularly when that stay is sought by the paying party in respect of an interlocutory costs order without any prejudice to the paying party having been identified.

### (ii)  Dr Wright (the payee) would be prejudiced by the stay

8. On the other hand, Dr Wright would be prejudiced by a stay of the Costs Order:

   a. First, Reliantco has requested that the Application be heard at the consequentials hearing following judgment being handed down on Ms Ang's claim. No such hearing is listed, Reliantco have shown no display of urgency to have the Variation Application determined earlier, and the stay requested by Reliantco is therefore effectively 'open ended' for now. It cannot be right that a paying party can avoid complying with an order for summary assessment of costs in respect of an unsuccessful application, discrete and separate from the trial, for an indefinite period of time by merely issuing an application to vary that order.

   b. Second, Reliantco's Stay Application continues a pattern of conduct in the underlying proceedings to (i) seek to delay payment of adverse costs which arise out of taking losing positions on discrete applications; and (ii) engage in satellite disputes and use up court time in respect of costs matters. By way of example, in the face of Reliantco's refusal to give further disclosure of certain documents in the possession of key participants - including Mr Polyviou, Mr Weizman, 'Chris Judd' / 'Noam' and other individuals employed by Toyga - Ms Ang was required to issue an application for specific disclosure on 24 July 2020. Reliantco then immediately resiled from its previously held position and agreed to provide the disclosure sought. Notwithstanding this volte-face, Reliantco refused to agree to bear the Claimant's costs of that application. Reliantco's position, inter alia, was that the Court should delay making a costs order on the Claimant's successful interlocutory application _until after the trial_ when (so it said) the relevance of the disclosure it had consented to provide could be assessed. This disputed costs matter was therefore required to be heard by the Deputy Judge at the PTR (who ordered that Reliantco pay Ms Ang's costs of that application and summarily assessed those costs).

   c. Third, Reliantco issued its application on 23 October 2020, only one business day prior to the expiry of the 14 day period following assessment of Dr Wright's costs. As a matter of practical reality, and at the last possible moment, Reliantco has engineered its own stay. No evidence or explanation has been given as to Reliantco's conduct. It must be inferred therefore that Reliantco always anticipated that it would obtain a stay of execution by default at Dr Wright's expense. The Court should not condone or encourage this conduct.

   d. Fourth, at this stage, there is nothing to think that Reliantco will succeed in its Variation Application. Indeed, Reliantco's alternative position seeks a _reduction_ in the quantum of the assessed costs it is required to pay to Dr Wright. It therefore anticipates that

6

some costs might be required to be paid over to Dr Wright even if the Variation Application is successful.  A stay of the entirety of the Costs Order cannot be justified in those circumstances.

e. Fifth, if a stay is granted, and Reliantco does not ultimately succeed in its Variation Application, then Reliantco will have obtained a "free run" or a "one-way bet" on its Variation Application – it should be required to comply with the Costs Order.

*(iii) Conclusion*

9. In summary, Dr Wright should not be prejudiced by the grant of a stay of execution on the mere possibility that Reliantco's Variation Application is eventually successful.  Reliantco could and should have complied with the Costs Order in advance of making that application.  Had it taken that far more reasonable course (i) existing Court orders would have been complied with; (ii) the Variation Application would have proceeded at more proportionate cost, as the costs of these further written submissions on the Stay Application would have been avoided; and (iii) the additional judicial time taken up on the unnecessary Stay Application would have been avoided.

10. Taken together, Dr Wright respectfully requests the Court dismiss the Stay Application.

11. Alternatively, Dr Wright requests that Reliantco be ordered to pay the amount of £52,500 plus VAT (£63,000) to this firm ("**SCA**"), to be held in SCA's client account (subject to appropriate undertakings being provided to Reliantco).  It is respectfully submitted that this strikes a more appropriate balance between requiring Reliantco's compliance with existing Court orders while it takes the benefit of the Court's procedures on the Variation Application and reducing the obvious prejudice to Dr Wright in the event that the Variation Application is eventually unsuccessful.

**Further Information**

12. Should the Court require any further information please contact Nicholas Dawson (*Nicholas.Dawson@scaontier.com*) or Paul Ferguson (*Paul.Ferguson@scaontier.com*) of this firm.

Yours faithfully

SCA ONTIER LLP

**SCA ONTIER LLP**

*Cc:*

*1.  Ms Sarah Herald, Clerk to the Honourable Mr Justice Butcher (by email: Sarah.Herald@justice.gov.uk)*

*2.  Cooke, Young & Keidan LLP, solicitors for the Defendant (by email)*

7

**IN THE HIGH COURT OF JUSTICE**          **CLAIM   NO.   CL-2018-000386**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**




05 Nov 2020

CL-2018-000386

**Before: The Honourable Mr Justice Butcher**

**Dated: 5th November 2020**

**B E T W E E N : -**

MRS RAMONA ANG

<u>**Claimant**</u>

-and-

RELIANTCO INVESTMENTS LTD

<u>**Defendant/Applicant**</u>

-and-

CRAIG WRIGHT

<u>**Respondent**</u>

---

**Order**

---

**UPON** the Defendant's Application Notice dated 23 October 2020 for (i) an order for a stay upon the Defendant's obligation to pay the Respondent's costs pursuant to paragraph 6 of the order of Mr Peter MacDonald Eggers QC dated 14 September 2020, as assessed on 12 October 2020 (the "**Stay Application**") and (ii) an order varying the order of Mr Peter MacDonald Eggers QC, such that the costs ordered to be paid to the Respondent be reduced to nil or to such other reduced sum as the Court deems fit (the "**Variation Application**")

1

8

**AND UPON** reading correspondence from the Defendant's solicitors dated 23 October 2020

**IT IS ORDERED THAT:-**

1.  The Stay Application shall be determined on paper.

2.  The Respondent shall provide submissions in writing as to the Stay Application by noon on 5 November 2020.

3.  The Defendant shall provide submissions in writing as to the Stay Application by noon on 6 November 2020.

4.  Pending determination of the Stay Application or noon on 9 November 2020 (whichever is first), the Defendant's obligation to pay the Respondent's costs under paragraph 6 of the order of Mr Peter MacDonald Eggers QC dated 14 September 2020 shall be stayed.

**Service of the Order**

The Court has provided a sealed copy of this order to the serving party:

**Cooke, Young & Keidan LLP at 21 Lombard Street, London EC3V 9AH**

Ref: LD/SR/01743-001

***Solicitors for the Defendant***



Neutral Citation Number: [2020] EWHC 2529 (Comm)

Case No: CL-2018-000386

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 24/09/2020

**Before** :

**Mr Peter MacDonald Eggers QC**
**(sitting as a Deputy Judge of the High Court )**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**MRS RAMONA ANG**                                   **Claimant**

**- and –**

**RELIANTCO INVESTMENTS LIMITED**        **Defendant/**
**Applicant**

**- and –**

**DR CRAIG WRIGHT**                                  **Respondent**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Matthew Bradley** (instructed by **Cooke, Young & Keidan LLP**) for the
**Defendant/Applicant**
**Nikki Singla QC** (instructed by **SCA Ontier LLP**) for the **Respondent**

Hearing date: 14 September 2020

- - - - - - - - - - - - - - - - - - - - -

**Judgment Approved by the court for handing down**
**(subject to editorial corrections)**

**If this Judgment has been emailed to you it is to be treated as 'read-only'.**
**You should send any suggested amendments as a separate Word document.**

**"Covid-19 Protocol: This judgment will be handed down by the judge remotely by**
**circulation to the parties' representatives by email and release to Bailii. The date**
**and time for hand-down will be deemed to be 10:15AM on 24 September 2020."**

## Peter MacDonald Eggers QC:

### Introduction

1. On 10th January 2017, the Claimant had opened an investment/trading account with the Defendant. The Defendant terminated that account on 10th August 2017.

2. This action is concerned with a dispute between the Claimant and the Defendant as to whether the Defendant validly terminated the account.

3. The Claimant's case is that the account was purportedly terminated by the Defendant without warning, her open investment positions (being Bitcoin futures contracts) were closed, and her invested funds, accrued trading gains and the value of her open investment positions were unlawfully retained by the Defendant. The Claimant claims damages for breach of contract and other relief from the Defendant.

4. The Defendant's case is that the Claimant's account was operated pursuant to a deceitful misrepresentation as to the identity of the true holder and operator of the account and pursuant to various breaches of contract. The Defendant alleges that the Claimant's account was opened and operated by the Claimant's husband, Dr Craig Wright (as a means of subverting the Defendant's prior blocking of Dr Wright's own account), and that the information the Claimant provided as to the source of the funds invested by her on 4th and 14th August 2017 was untrue.

5. The Defendant has applied for an order for third party disclosure against Dr Wright pursuant to CPR rule 31.17. CPR rule 31.17(3) provides that:

   "*The court may make an order under this rule only where–*

   (a) *the documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and*

   (b) *disclosure is necessary in order to dispose fairly of the claim or to save costs.*"

6. It is evident therefore that the Court has a discretion whether to make such an order, but that discretion becomes available only if the jurisdictional requirements are satisfied. Those jurisdictional requirements are that:

   (1) The documents sought are "*likely*" to support the applicant's case or adversely affect any of the other parties' case. The word "*likely*" has been interpreted to mean that the documents sought "*may well*" support or adversely affect a party's case; the applicant does not have to establish that the documents have a better than 50% chance of supporting or adversely affecting a party's case; in order to satisfy this requirement, the documents must be relevant (*Three Rivers District Council v Governor and Company of the Bank of England (No. 4)* [2002] EWCA Civ 1182; [2003] 1 WLR 210, para. 30-32, 39).

   (2) Disclosure is necessary to dispose fairly of the claim or to save costs. This is not an inherently a high hurdle to be met in that it has been said that all relevant

11

documents should be before the Court so that the trial is a fair one (*Hollander on Documentary Evidence*, (13th ed.), para. 3-14). However, it is the disclosure which must be necessary, because if the disclosure is available from another party to the action, such disclosure may not be considered necessary (*Frankson v Home Office* [2003] EWCA Civ 655; [2003] 1 WLR 1952, para. 12).

7.    Once these jurisdictional requirements are satisfied, the Court has a discretion whether or not to order disclosure. In *Frankson v Home Office* [2003] EWCA Civ 655; [2003] 1 WLR 1952, para. 10, the Court of Appeal said that "*The word "only" in rule 31.17(3) emphasises that disclosure from third parties is the exception rather than the rule. Disclosure will not be routinely ordered but only where the conditions there specified are met*". Nevertheless, the Court of Appeal recognised that "*wider considerations*" come into play in the exercise of the Court's discretion (para. 13).

8.    The documentation which is the subject of the application relates to particular allegations advanced by the Claimant in these proceedings and supported by the evidence of Dr Wright.

9.    The trial of this action is fixed to commence on 12th October 2020. Both the Claimant and Dr Wright are intending to give evidence at the trial.

10.   The Defendant's application for an order for disclosure against Dr Wright was issued on 22nd July 2020 and originally sought the following orders for compliance by Dr Wright as the Respondent:

"*1.    The Respondent shall instruct a suitably qualified digital forensics specialist (the "Disclosure Consultant"), under the supervision of his solicitors, to collect the emails stored in all email accounts of which he has possession, custody or control.*

*2.    The Respondent shall instruct the Disclosure Consultant, under the supervision of his solicitors, to run the following keyword searches (with Boolean operators) on an industry standard disclosure platform over those emails which have been collected under paragraph 1 of this Order:*

*2.1.    "DeMorgan" AND "Loan"*

*2.2.    "DeMorgan" AND "Wright Family Trust"*

*2.3.    "DeMorgan" AND "Ramona"*

*2.4.    "Wright Family Trust" AND "deed"*

*2.5.    "Wright Family Trust" AND "declaration"*

*2.6.    "Wright Family Trust" AND "benefici!"*

*2.7.    "Wright Family Trust" AND "Ramona"*

*3.    The Respondent shall disclose to the parties those documents responsive to the searches under paragraph 2 of this Order which fall within Issues*

> *5 and/or 7 of the Disclosure Review Document approved by Mr Justice Bryan on 25 October 2020, by no later than [XXXX] 2020.*
>
> 4. *The Respondent shall, in consultation with and under the oversight of his solicitors, conduct a reasonable search for the following categories of documents within his control, and, by [XXXX] 2020, disclose such documents which are located unless they are privileged:*
>
> > 4.1. *Documents relating to the configuration of the Respondent's home virtual private network system between 1 January and 31 August 2017.*
> >
> > 4.2. *Documents relating to the IP addresses which the Respondent held or rented from other IP address providers and access logs documenting user log-ins.*"

11. Mr Matthew Bradley, on behalf of the Defendant, submitted that the application sought disclosure of two broad categories of documents:

   (1) Documents relating to monies said to have been received by the Claimant from DeMorgan Ltd, an Australian company, pursuant to the Claimant's alleged interest in that company as the beneficiary of the Wright Family Trust, which owned 60% of the shares in the company.

   (2) Documents relevant to an alleged virtual private network ("VPN") system which the Claimant and Dr Wright alleged was installed in their home at 7 Oak Road.

12. At first glance, the disclosure order sought by the Defendant encompasses wide or potentially wide classes of documents. This of itself is a factor which the Court should take into account in the exercise of its discretion. I will return to this below.

13. At the hearing of this application, Mr Bradley on behalf of the Defendant indicated that the classes of documents sought by the Defendant in its application for third party disclosure were limited to:

   (1) Documents disclosed by a search of Dr Wright's email account with the search terms "*DeMorgan*", "*Loan*" and "*Ramona*" (being the Claimant's first name), plus the trust deed for the Wright Family Trust, along with any relevant deeds of variation to the same, together with preservation of the relevant metadata.

   (2) As to the VPN system which the Claimant and Dr Wright allege was installed at their home at 7 Oak Road,

   > (a) Configuration scripts and/or a network "map" or other document setting out the network architecture and/or the layout and settings by which the VPN network installed at 7 Oak Road operated over the period from January to August 2017.
   >
   > (b) Invoices from BT in relation to the leasing of the IP addresses used by the VPN, as explained by Dr Wright at para. 52 of his first witness

statement dated 3rd July 2020 and at para. 45 of his second witness statement dated 18th August 2020.

14.    In considering whether an order for disclosure by Dr Wright of these classes of documents should be made, the Defendant's overriding case should be borne in mind, namely that the Claimant misrepresented the fact that she opened and was the sole user and operator of the account with the Defendant, because it was Dr Wright who opened and operated the Claimant's account with the Defendant.

**Documents relating to DeMorgan Ltd**

15.    The documents relating to DeMorgan Ltd are said to be relevant in the current proceedings, because the Claimant has changed her case as to the source of funds invested by her in her account with the Defendant. In particular, the Defendant points to the following:

(1)    At para. 24-25 of the Amended Particulars of Claim, the Claimant pleaded that on 4th August 2017, the Claimant was requested by the Defendant to complete and provide certain documentation, including a Source of Wealth Form, which the Claimant completed and which stated that the source of the Claimant's investment funds were the sale proceeds of her former Australian home and the release of capital from DeMorgan Ltd. At para. 32, the Claimant pleads that further documents were provided to the Defendant on 14th August 2017, including the DeMorgan Ltd share register documentation. The Source of Wealth Form referred to and dated 4th August 2017 stated "*40% of DeMorgan Ltd (Australia) holdings liquidated on move to U.K.*" under the heading of "*Disposal of Business or other asset?*".

(2)    In its Defence and Counterclaim, at para. 5(viii) and (ix), the Defendant pleads that the Claimant's explanations as to the source of the monies so deposited, as provided on or about 4th August 2017 and in a later email dated 14th August 2017 (referred to at para. 24 and 32 of the Amended Particulars of Claim), were on their face problematic in that (a) by those emails, the Claimant stated that the "*majority of funds*" which she put into her account came from a house sale, but the relevant house sale related to the sale of a house which the Claimant owned with a Mr David Watts, who was apparently the Claimant's former husband so that it follows that there is no obvious reason why any of the proceeds of that sale should have been routed through an account bearing Dr Wright's name; and (b) the remainder of the Claimant's explanations as to the source of her funds relate to the realisation of her shareholding in DeMorgan Ltd, an Australian company which had been liquidated; there is no obvious reason why those funds should have been routed through an account in Dr Wright's name.

(3)    At para. 11 of her Reply, the Claimant pleads that "*On 16 June 2016 the Claimant received £437,242.80 in repayment of a loan to DeMorgan Ltd into the Lloyds Account. Those funds were initially substantially invested in the Claimant's IG account, before the Claimant withdrew £408,000 from her IG account into the Lloyds Account on 12 January 2017. The Claimant used this money as the source of her initial investment in her account with the Defendant and, as explained in paragraph 23 of the Amended Particulars, chose to re-invest most of the gains that had been withdrawn in May 2017 for the purpose*

14

*of purchasing a property (which the Claimant and Dr Wright subsequently decided not to purchase)*".

(4)  The Claimant's case has therefore changed in that the funds sourced from DeMorgan Ltd were originally said to be a "*release of capital*" and now are said to be the "*repayment of a loan*".

16.  The Defendant relies on the fact that the truth of the Claimant's explanation of the source of funds remains an issue and, if the documents disclosed in respect of DeMorgan Ltd reveal that she in fact had no interest in the Wright Family Trust or the company, then her case as to receiving funds by a release of capital cannot be sustained.

17.  According to para. 34 of the third witness statement dated 22nd July 2020 of Ms Lydia Danon of Cooke, Young & Keidan LLP, the Defendant's solicitors, the following facts emerged from the Claimant's disclosure of documents relating to DeMorgan Ltd:

(1)  The Claimant attended a Board Meeting of DeMorgan by telephone on 13th May 2016, at which sales of company assets were approved ("the IP Transaction"). The Claimant "*inquired about whether the loans in the names of Ramona Watts [Ms Ang's previous married name] and Craig Wright could be paid with funds from the IP Transaction (Personal Loans)*". However, according to Ms Danon, no further documents relating to or evidencing these purported "*Personal Loans*" have been disclosed.

(2)  When the Claimant had received a request for further documentation in response to her Source of Wealth form in August 2017, Dr Wright forwarded to her a copy of the DeMorgan Ltd share register (which she ultimately provided to the Defendant), stating "*For the UFX ppl tomorrow first thing. 50% each of us in Wright Family Trust*". According to Ms Danon, no further documents relating to or evidencing the Wright Family Trust and the Claimant's interests in the same or its interests in DeMorgan Ltd have been disclosed.

(3)  A number of bank statements in respect of the Claimant, Dr Wright and DeMorgan Ltd have been disclosed, from which it is evident that there was a deposit into the Lloyds Account for £437,242.80 on 16th June 2016, with a transaction description of "*F/FLOW DEMORGAN LT*", but a corresponding transfer out is conspicuously absent from DeMorgan Ltd's bank statements for this period, whereas by contrast, a payment out from DeMorgan Ltd of AUD 60,000 on 21st June 2016 with the description "*Withdrawal online 1209379 Intl Dr Craig S Demorgan Ltd*" appears to correspond to credit of £28,949 into the Lloyds Account with the description "*F/FLOW DEMORGAN LT*".

18.  At para. 37-39 of Ms Danon's third witness statement, it is said that:

(1)  The Claimant has refused to state whether Dr Wright has any company records relating to DeMorgan Ltd and that Dr Wright has not consented to his emails being collected, hosted by a third party and searched.

(2)  The Defendant has requested the Claimant to disclose documents evidencing the Wright Family Trust, including the declaration of trust and/or any other documents establishing the same, its legal ownership of the shareholding in

15

DeMorgan Ltd and documents otherwise identifying trustees and beneficiaries at the relevant time.

(3)     On 8th June 2020, the Claimant's solicitors (SCA Ontier LLP) informed the Defendant that the Claimant refused to provide any further documentation regarding the receipt of funds from DeMorgan Ltd and stated that the Defendant had not established that the documents establishing the Claimant's beneficial interest in DeMorgan Ltd were relevant and continued: "*Ms Ang exercises no control over any documents in Dr Wright's possession and cannot give disclosure of those documents*".

19.     At para. 27 of his second witness statement dated 18th August 2020, Dr Wright stated that he does not have in his possession bank statements relating to DeMorgan Ltd for June 2016, because he had resigned as a director in 2015 and because DeMorgan Ltd was de-registered on 1st September 2016. Dr Wright further stated that although he was aware of the repayment of the loan by DeMorgan Ltd to the Claimant, he would not have had any documents relating to the loan and cannot think why he should have such documents. Dr Wright concluded by stating that, after the de-registration of DeMorgan Ltd, he retained documents relating to the intellectual property of DeMorgan Ltd, but "*I have no financial or accounting information in relation to DeMorgan at all*".

20.     Mr Bradley on behalf of the Defendant submitted that there was an inconsistency in this account. Mr Bradley also referred to Dr Wright's first witness statement dated 3rd July 2020, at para. 36-37, where he stated that on 4th August 2017, the Defendant asked the Claimant to complete a Source of Wealth Form and send back some supporting documentation and the Claimant asked him about supplying some document in relation to DeMorgan Ltd; in response to this, Dr Wright provided the Claimant with the company's Tax Declaration Form, Profit and Loss statement, and Balance Sheet, "*all for 2015*". I struggle to see how these statements are inconsistent. I read them as clear statements that Dr Wright did not have documentation relating to DeMorgan Ltd's finance and accounting information for the period after his resignation as a director in 2015.

21.     Ms Danon in her sixth witness statement dated 3rd September 2020 referred to the fact that Dr Wright's statement does not accord with his evidence in his second witness statement dated 18th August 2020, at para. 22 and 26, where he said that the Claimant's solicitors had undertaken a search of Dr Wright's documents using the search terms (which are referred to in the Defendant's original application - quoted above) and produced 5,548 hits (or 18,985 documents). However, Dr Wright's statement is based on the observation that the search terms were unlimited by date and broadly drafted.

22.     Ms Danon stated at para. 16-17 of her sixth witness statement that "*The search terms were intended to capture the financial information which Reliantco seeks and, while I acknowledge some of what is said in Wright-2 about certain search terms potentially being too broad, it seems very unlikely that terms such as "DeMorgan" and "Loan" would capture "only" documents relating to DeMorgan's IP - still less, thousands of them. It therefore strikes me as very unlikely that Craig Wright has no documents in his possession going to these disclosure issues. He has moreover confirmed that they are already hosted on a review platform and there is therefore no cost involved in testing this proposition. I therefore respectfully believe there is nothing in this objection*". Although I have taken into account Ms Danon's evidence, I do not consider that Dr

Wright's statement is necessarily untrue having regard to the number of hits produced by the searches carried out.

23. As to the trust deed relating to the Wright Family Trust, Dr Wright stated, at para. 22.4 of his second witness statement, that this was a private family trust he instituted and was a holding entity for companies he had previously founded and that the trust has no relationship with the current action.

24. Mr Nikki Singla QC, on behalf of Dr Wright, objected to the Defendant's application for third party disclosure in relation to the documents relating to the Claimant's loan to DeMorgan Ltd, because:

    (1) The Defendant has not identified the documents it requires Dr Wright to search for; it has merely identified search terms with no date ranges. (The search terms are now more restricted than set out in the original application).

    (2) Without identifying such documents, it cannot satisfy the jurisdictional requirement of relevance and the propensity of the documents to support the Defendant's case or adversely affect the Claimant's case.

    (3) The Defendant has not demonstrated why disclosure from Dr Wright is necessary.

    (4) No application was made for similar disclosure against the Claimant. At para. 57.1 of Ms Danon's third witness statement, it is said that the documents requested are more likely to be in Dr Wright's possession than the Claimant's possession. The Claimant has already disclosed some bank statements. Mr Bradley on behalf of the Defendant said in reply that the Claimant had said in April 2020 that she had no further disclosure to give.

    (5) The application is made very late. Mr Bradley submitted in reply that the application was not late, as it was made three weeks after Dr Wright's first witness statement was made.

25. I accept Mr Singla QC's submissions. I do not consider that an order for third party disclosure against Dr Wright should be made in respect of the documents relating to the loan extended by the Claimant to DeMorgan Ltd including the search of Dr Wright's email account for the following reasons.

26. First, the original scope of the application for third party disclosure and even the reduced scope is too broad. The facility to order third party disclosure is most useful where a particular document or a specific class of documents can be precisely described. As Mr Singla QC observed, in exercising its jurisdiction in this respect, the Court should have regard to the impact of the order on a third party. In this case, I am aware that Dr Wright is both the husband of the Claimant and a witness in the action. Nevertheless, that is not sufficient to override the other considerations which justify the dismissal of the application.

27. Second, although I understand that the documents sought relate to the Claimant's account of the source of the funds invested by her in her account with the Defendant, I do not consider that the Defendant's application adequately identifies the specific

documents or classes of documents which justify such an order. Indeed, in the absence of such identification, the Defendant has not been able to satisfy me that the documents are relevant and might well support the Defendant's case or adversely affect the Claimant's case. It follows from this finding that the Court has no jurisdiction to grant the order sought.

28.    Third, even if the Court had a discretion to exercise, I would have exercised the discretion against making the disclosure order against Dr Wright, because (a) I am not satisfied about the relevance of the documents, (b) the order sought is disproportionately broad in its scope, and (c) Dr Wright has said that he does not have any documents relating to financial or accounting information in relation to DeMorgan Ltd.

29.    As to the application relating to the Wright Family Trust deed and deeds of variation, together with preservation of the relevant metadata, Mr Bradley on behalf of the Defendant submitted that this would demonstrate whether the Claimant in fact had an interest in DeMorgan Ltd. In response to this, Mr Singla QC submitted that whether or not the trust deed reveals the Claimant to be a beneficiary is of little if any relevance, and that it is a confidential document and should not be disclosed; that the disclosure of documents relating to the Wright Family Trust could have been pursued against the Claimant, but it has not been; and that it is now far too late for the making of the application.

30.    As to this, I consider that the Defendant is not entitled to a third party disclosure order against Dr Wright in respect of the Wright Family Trust deed and any deed of variation (or any metadata) for the following reasons:

(1)    There is an inconsistency in the Claimant's pleaded case in that she initially pleaded that the funds invested in her account with the Defendant were originally a release of capital from DeMorgan Ltd (in which the Trust has a 60% share), but in her Reply it is said that the funds were a repayment of a loan. If the latter, the Trust deed is of less or little relevance. Nevertheless, given this inconsistency, I consider that the jurisdictional requirements of CPR rule 31.17 are satisfied.

(2)    Nevertheless, the Court's discretion should be exercised against providing such disclosure, because:

(a)    The inconsistency on the statements of case has been known for some time, since October 2019, when the Reply was served. The Claimant's interest in the Wright Family Trust was revealed by the Claimant's disclosure in April 2020. The application is made relatively late.

(b)    An application could and should have been made against the Claimant.

(c)    I have taken into account countervailing considerations, including that (i) as the founder of the Trust, Dr Wright is likely to have a copy of the Trust deed and any deed of variation in his possession, and (ii) the documents are precisely identified and can be readily disclosed. However, these considerations do not indicate to me that the making of

18

the disclosure order against Dr Wright is likely to advance the parties' positions at trial.

(d)     Although a lesser consideration, I take into account that the documents are potentially confidential.

**Documents relating to the VPN at 7 Oak Road**

31.     The Defendant contends that the documents relating to the VPN maintained by Dr Wright at 7 Oak Road are relevant because at para. 5(x) of the Defence and Counterclaim, the Defendant pleads that

> "*Further, at Appendix 1 to Ang-1, the Claimant gave evidence that over 12 to 20 April 2017 she was in Singapore for her Father's 80th birthday celebrations. However, whilst she was in Singapore celebrating her Father's birthday, the Claimant's account with the Defendant was accessed on both 14 and 20 April 2017 from the same UK BT Openworld J.P. server address by which her account was (i) intermittently accessed over the period 7 to 15 February 2017 and (ii) consistently accessed over the period 25 February 2017 to 24 May 2017.*"

32.     At para. 22 of her Reply, the Claimant pleads that "*Paragraph 5(x) is admitted . Use of a VPN connection enabled the Claimant to access her account through her home network when she was away from home*".

33.     The use of the VPN is relevant to the issues to be tried because the Claimant's account with the Defendant was accessed from an IP address in the United Kingdom while the Claimant was in Singapore or on a flight from Singapore. The Defendant's case is that it was Dr Wright who accessed the account in the United Kingdom while the Claimant was in Singapore or on a flight from Singapore. The Claimant's explanation for this is that the Claimant used the VPN established by Dr Wright and this is consistent with her accessing the account whilst abroad.

34.     Dr Wright has explained the VPN which was installed at the Claimant's and his home at para. 44-54 of his first witness statement. In that statement, Dr Wright said, amongst other things, that:

(1)     He had extensive knowledge and experience of cyber security and took the security of the IT system deployed at his home very seriously. The network was connected to the nChain network and had access to very valuable intellectual property and research. In the simplest of terms, Dr Wright and the Claimant had high level commercial grade security systems and protection at home.

(2)     A VPN is a way to connect securely with an existing network, potentially anywhere in the world. Each device directly connected to the internet has a unique address, known as an IP (Internet Protocol) address. This is used to route information between systems that has both a recipient and sender address. When accessing a website, it needs to know the sender IP address to return information. When using the VPN in full tunnel mode, the device (sender) IP address is replaced with the external address of his network. In this situation, the accessed website would see the connection as originating from the VPN network.

19

(3)    All of Dr Wright's and the Claimant's devices were configured to connect to the Internet through the VPN for the purpose of security and anonymity. The configuration forces all network traffic through the VPN in effect making it appear that an authenticated user, such as the Claimant, is present on the home network when accessing external services, regardless of the user's actual geographical location giving the impression he or she was physically there.

(4)    The Claimant's computers and iPhone were configured to be on the domain and the security policy was set and pushed to the Claimant's machine using group policy. The Claimant's devices were all set to access all Internet sites through the VPN, being an automatic process. This was subject to a number of exceptions.

(5)    The net effect of the way the VPN worked was that the Claimant could log on to a website from anywhere in the world and the IP address would be shown as being inside the VPN in the United Kingdom. When using her standard equipment (her iPhone or laptop) the Claimant would enter one of the public IP addresses used by the home network at the time (which in 2017, included four addresses in the USA as exit points, 2,048 addresses in the United Kingdom on the BT commercial network via a gigabit fibre, one IP address in Singapore, one IP address in Tokyo, and eight other randomised IP addresses in the United Kingdom).

35.    Dr Wright developed this evidence at para. 34-39 of his second witness statement. Mr Bradley on behalf of the Defendant submitted that there is no documentary evidence referred to or relied on by Dr Wright in support of his statements.

36.    Mr Bradley submitted that the existence and operation of the VPN at 7 Oak Road is plainly an issue and is relevant to the question whether the Claimant accessed the account whilst outside the United Kingdom; the documents sought are likely to be within Dr Wright's possession; and Dr Wright is knowledgeable about the VPN, which is apparent from his witness statements. In the absence of documentary evidence, Mr Bradley submitted, the Defendant is entitled to disclosure of relevant documents relating to (a) the configuration of the VPN and (b) the IP addresses used in connection with the VPN.

37.    The disclosure sought by the Defendant was originally for (a) documents relating to the configuration of Dr Wright's home virtual private network system between 1st January and 31st August 2017; and (b) documents relating to the IP addresses which Dr Wright held or rented from other IP address providers and access logs documenting user log-ins.

38.    The Defendant has confined this application to (a) a document setting out the network architecture and/or the layout and settings by which the VPN network installed at 7 Oak Road operated over the period from January to August 2017; and (b) invoices from BT in relation to the leasing of the IP addresses used by the VPN.

39.    Mr Singla QC on behalf of Dr Wright objected to this application, because:

(1)    The documents relating to the VPN configuration and the invoices are not relevant and so the Court has no jurisdiction to make the order. However, I

20

understand that Mr Singla QC accepted that the documents relating to access logs would be sufficiently relevant and necessary for the fair disposal of the case. That said, and as I understand Mr Bradley clarified, the access logs were not within the Defendant's narrowed application.

(2)     The Court should not exercise its jurisdiction to order disclosure, because the purpose of this request was tied to the Defendant's application to adduce expert evidence on the VPN. (During the Pre-Trial Review, at which the current application was heard, I ordered that the Defendant was permitted to adduce such expert evidence.)

(3)     At para. 42-43 and 46 of his second witness statement, Dr Wright said that the configuration of the VPN hardware and software at 7 Oak Road did not of itself generate documents and Dr Wright had no reason to create and retain such documentation; that, although it is possible to review a "*snapshot*" of a VPN configuration and network at a particular point of time, the VPN network installed by Dr Wright at 7 Oak Road is no longer in place, because the Claimant and Dr Wright have moved to a new address, and because the network infrastructure has been rebuilt entirely on several occasions since 2017; and that he did not believe that documents relating to the VPN configuration exist and he did not keep a record of the VPN settings and configuration; that Dr Wright did not retain server or access logs documenting user log-ins. Mr Bradley replied that the Defendant's VPN expert, Dr Nedko Nedev, said that it would be "*highly unusual for an enterprise-grade VPN to not have documentation of the network configuration*" (para. 33 of Ms Danon's sixth witness statement).

(4)     Mr Bradley indicated during his oral submissions that the invoices might disclose the IP addresses which Dr Wright leased from BT. Mr Singla QC said that it is unclear to what extent invoices issued by BT, from whom Dr Wright rented the IP addresses, would include the IP address information. The matter of invoices was first raised in Ms Danon's sixth witness statement dated 3rd September 2020 (at para. 38, 41-42), but as Mr Singla QC observed, it was not explained in the statement why the invoices would disclose relevant information. Mr Singla QC informed the Court, on instructions, that Dr Wright has searched for such invoices, but they have not materialised.

40.     In my judgment, the application for third party disclosure in relation to the VPN documents (apart from the BT invoices) should be dismissed. Although I consider that certain documentation in relation to the VPN would be sufficiently relevant to engage the Court's jurisdiction under CPR rule 31.17, the Court's discretion should be exercised against such disclosure by Dr Wright because Dr Wright has given evidence that no documents falling within the refined class of documents sought by the Defendant exist and so it would follow they would not be in his control (his evidence is that they are not currently in his possession, but if they do not exist, I do not see how they could be in his control). As the VPN installed at 7 Oak Road is no longer in place, no further action can be taken in this respect. If an order for third party disclosure were made, it seems likely that Dr Wright would produce the same evidence as he has already provided.

41.     As far as the BT invoices are concerned, there is no evidence as to what information relating to IP addresses those invoices would disclose, although I think it is fair to

21

conclude that they might well reveal the IP addresses which are being leased. I also consider that there is at least a reasonable possibility that such documents exist and can be accessed by Dr Wright. In any event, the invoices sought by the Defendant are those which list the IP addresses in respect of which payment is sought (para. 38 of Ms Danon's sixth witness statement dated 3rd September 2020). Furthermore, Dr Wright has not yet given evidence as to the existence of these documents or the likelihood that they are within his control (although his position has been stated on instructions). Accordingly, a third party disclosure order should be made in respect of the BT invoices. I appreciate that there are said to be as many as 2,048 addresses and so there might well be a relatively large number of invoices to search for and produce, if they exist and are within his control, but Dr Wright can be compensated by an order for costs in his favour in respect of costs incurred in complying with this order. If, however, compliance with this order proves to be unexpectedly disproportionate or would be too time-consuming or would be excessively delayed, Dr Wright has the liberty to apply to the Court to explain the position and seek a variation of the order.

42.     I understand that this order is made relatively late in the action, and shortly before trial, but as Dr Wright gave evidence about the leasing of the IP addresses from BT in his witness statements dated 3rd July 2020 and 18th August 2020, in my judgment, the application which was issued on 22nd July 2020, and subsequently narrowed by Ms Danon's sixth witness statement on 3rd September 2020, is not critically late to prevent the order being made.

## Conclusion

43.     For the reasons explained above, I dismiss the Defendant's application for third party disclosure against Dr Wright, with the exception of the disclosure sought in respect of the BT Openworld invoices for the lease of the relevant IP addresses, which are ordered to be disclosed. I would like to hear from counsel as to the terms of the order, including the limits to be imposed in identifying the invoices which should be disclosed.

44.     Subject to considering any further submissions from the parties, I think it should follow that an order for costs should be made in favour of Dr Wright both in respect of the dismissed application and in respect of the order for providing disclosure of BT invoices (pursuant to CPR rule 46.1(2)).

45.     Dr Wright will have liberty to apply.

22

Claim No.  CL-2018-000386

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**BEFORE:**

**DATE:**

**B E T W E E N :**

### MS RAMONA ANG

<u>**Claimant**</u>

**-and-**

### RELIANTCO INVESTMENTS LIMITED

<u>**Applicant/Defendant**</u>

**-and-**

### MR CRAIG WRIGHT

<u>**Respondent**</u>

---

*Draft* **ORDER**

---

**UPON** reading the Third Witness Statement of Lydia Miriam Danon dated 22 July 2020 and [*Claimant's/Respondent's evidence in response*]

**AND UPON** hearing [XX], Counsel for the Claimant, Mr Matthew Bradley, Counsel for the Defendant and [XX], Counsel for the Respondent

**IT IS ORDERED THAT:**

1.      The Respondent shall instruct a suitably qualified digital forensics specialist (the "**Disclosure Consultant**"), under the supervision of his solicitors, to collect the emails stored in all email accounts of which he has possession, custody or control.

2.      The Respondent shall instruct the Disclosure Consultant, under the supervision of his solicitors, to run the following keyword searches (with Boolean operators) on an industry standard disclosure platform over those emails which have been collected under paragraph 1 of this Order:

2.1.    "DeMorgan" AND "Loan"

2.2.    "DeMorgan" AND "Wright Family Trust"

2.3.    "DeMorgan" AND "Ramona"

2.4.    "Wright Family Trust" AND "deed"

2.5.    "Wright Family Trust" AND "declaration"

2.6.    "Wright Family Trust" AND "benefici!"

2.7.    "Wright Family Trust" AND "Ramona"

3.      The Respondent shall disclose to the parties those documents responsive to the searches under paragraph 2 of this Order which fall within Issues 5 and/or 7 of the Disclosure Review Document approved by Mr Justice Bryan on 25 October 2020, by no later than [XXXX] 2020.

4.      The Respondent shall, in consultation with and under the oversight of his solicitors, conduct a reasonable search for the following categories of documents within his control, and, by [XXXX] 2020, disclose such documents which are located unless they are privileged:

4.1.    Documents relating to the configuration of the Respondent's home virtual private network system between 1 January and 31 August 2017.

4.2.    Documents relating to the IP addresses which the Respondent held or rented from other IP address providers and access logs documenting user log-ins.

5.      When giving disclosure in accordance with this Order, the Respondent shall serve on the parties a disclosure statement which complies with CPR r. 31.10, specifying any of

24

those documents which are no longer in his control and what has happened to them, or in respect of which he claims a right or duty to withhold inspection.

6.    No order as to costs.